1  George M. Lee (SBN 172982)
2  **SEILER EPSTEIN LLP**
   275 Battery Street, Suite 1600
3  San Francisco, California 94111
4  Phone: (415) 979-0500
   Fax: (415) 979-0511
5  Email: gml@seilerepstein.com

6
7  John W. Dillon (SBN 296788)
   **GATZKE DILLON & BALLANCE LLP**
8  2762 Gateway Road
9  Carlsbad, California 92009
   Phone: (760) 431-9501
10 Fax: (760) 541-9512
   Email: jdillon@gdandb.com
11
12 *Attorneys for Plaintiffs*

13

14

15              **UNITED STATES DISTRICT COURT**

16        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

17

18 | JAMES MILLER, et al., | Case No. 3:19-cv-01537-BEN-JLB |

19             Plaintiffs,      Hon. Roger T. Benitez
20                              Magistrate Hon. Jill L. Burkhardt
        vs.
21                              **DECLARATION OF EMANUEL**
22 XAVIER BECERRA, in his official    **KAPELSOHN IN SUPPORT OF**
   capacity as Attorney General of    **PLAINTIFFS' MOTION FOR**
23 California, et al.,                 **PRELIMINARY INJUNCTION**

24             Defendants.     Complaint filed: August 15, 2019
25                             Amended Complaint filed:
                               September 27, 2019
26
27                             Hearing Date: January 16, 2020
                               Time: 10:00 a.m.
28                             Courtroom: 5A, 5th Floor

---

*DECLARATION OF EMANUEL KAPELSOHN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*
(CASE NO.: 3:19-CV-01537-BEN-JLB)

# DECLARATION OF EMANUEL KAPELSOHN

I, Emanuel Kapelsohn, declare as follows:

1.  I am an expert, consultant, and expert witness in matters including firearms, ballistics, firearms safety, firearms training, police training and tactics, self-defense, and the use of force. I have been retained by the plaintiffs in this matter to provide expert opinion testimony regarding the design, usage, utility, safety features, and lethality of modern semiautomatic rifles, primarily the AR-15 type rifle in its common configurations discussed below. I have personal knowledge of the facts stated herein, and if called as a witness, I could competently testify to these facts.

2.  This declaration is executed in support of plaintiffs' motion for a preliminary injunction in this matter, in which they seek to enjoin the continuing prohibition on these semi-automatic firearms.

## QUALIFICATIONS

3.  I have been a professional instructor and instructor-trainer in firearms, tactics, self-defense, and use of force, primarily for law enforcement officers, police instructors and law enforcement agencies throughout the United States, and occasionally in other countries, for the past 39 years. I have also trained hundreds of private individuals (i.e., non-law enforcement officers) in firearms skills.

4.  I have been certified as a firearms instructor by the FBI, NRA, New Jersey Police Training Commission, Pennsylvania Municipal Police Officers Education & Training Commission, Glock, H&K, and others. My instructor certifications cover rifles of all sorts, handguns, and shotguns, and cover both the training of police and civilians in recreational and defensive use of firearms. I am also certified as a Chief Range Safety Officer, that being someone who is trained to supervise other instructors on a multi-range facility, and to oversee the operations of the facility from a safety

- 1 -

standpoint. I was an instructor at the Burlington County (New Jersey) Police Academy from approximately 1986 to 1995, and was an instructor at the Allentown (Pennsylvania) Police Academy from 1999-2007.  I taught a course I developed entitled "Police Use of Force" in the Criminal Justice Department of Indiana University in Bloomington, Indiana for two years while I lived in Indiana.  I instructed in a 3-year series of Senior Firearms Instructor Classes for the federal Bureau of Alcohol, Tobacco & Firearms, taught at various locations on the East and West Coasts.  I have regularly been a presenter on firearms-related topics at annual and regional training conferences of the International Association of Law Enforcement Firearms Instructors (IALEFI), the International Law Enforcement Educators & Trainers Association (ILEETA), and formerly the American Society of Law Enforcement Trainers (ASLET).

5.  Law enforcement agencies for which I have conducted instructor-level training in firearms include the New York State Police (multiple courses), Oregon State Police, Louisiana State Police, Missouri Highway Patrol, Washington D.C. Metropolitan Police (two courses), Massachusetts Metropolitan Police, Tennessee Bureau of Investigation, Toronto Metropolitan Police Service (Emergency Task Force and Dignitary Protection Unit), Calgary Police Service Tactical Unit, Salt Lake County Sheriff's Office, Nevada State Fire Marshal's Office, and the Police Departments of Philadelphia, Baltimore, Jersey City, Trenton, Atlantic City (multiple courses), Dallas (two courses), Phoenix (multiple courses), Miami, Jacksonville (two courses), St. Petersburg, Seattle, Tacoma, and many others.

6.  I have consulted extensively for years for the Pennsylvania Municipal Police Officers Education & Training Commission ("MPOETC").  Among other things, I served on the curriculum development committee that wrote the firearms and use of force curriculum that has been used at police academies throughout the Commonwealth

- 2 -

of Pennsylvania for the past 18 years.  I conducted instructor-training courses for the MPOETC at the Pennsylvania State Police Academy at Hersey, at Fort Indiantown Gap, and at other locations; have served as a subject matter expert that established Patrol Rifle Guidelines ("patrol rifles" being AR-15 type rifles) for Pennsylvania's law enforcement agencies, and most recently served on the MPOETC committee that created a mandatory in-service Use of Force training program (including teaching the pilot course and an instructor-training course) that has been presented to some 25,000 police officers throughout the Commonwealth of Pennsylvania.

7.  I have served for some 35 years on the IALEFI Board of Directors, and for the past several years have been First Vice President of that association.  IALEFI publishes authoritative materials and guidelines for law enforcement training, and conducts police firearms and use of force training programs, including a week-long Annual Training Conference attended by hundreds of law enforcement firearms instructors from all parts of the United States and various foreign countries.  IALEFI also conducts some 15-20 additional police training programs per year at locations throughout the country.

8.  I have served as a sworn, armed reserve deputy sheriff or special deputy sheriff for two sheriff's departments over the past 23 years, have served as a firearms and use of force instructor at both of those departments, and have had first-hand experience in a wide range of law enforcement activities, up to and including the arrest of criminals at gunpoint, and dealing with barricaded gunman situations.

9.  In California, I have taught firearms classes for the San Francisco Sheriff's Office, for nuclear security personnel of the Sacramento Municipal Utilities District, taught a police firearms instructor course hosted by the El Cajon Police Department attended, among others, by instructors from the California Department of Justice, taught in an IALEFI Annual Training Conference hosted by the San Diego District Attorney's

- 3 -

Office, and taught in BATF Senior Firearms Instructor Courses held in San Diego, Los Angeles, and San Francisco.

10. Concerning my experience, knowledge, and expertise with semiautomatic rifles in general and AR-15 type rifles in particular, I have owned and used semiautomatic rifles since I was sixteen, that is, for the past 51 years. I have, since the 1970's, owned and used Ruger Mini-14 rifles. The Mini-14 is a semiautomatic, .223 (5.56mm) caliber rifle that is functionally virtually identical to the AR-15 rifle in terms of its ballistics, rate of fire, and other capabilities, although most of the Mini-14's variants have not had some of the AR-15's military-looking features that the California legislation finds objectionable, such as the pistol grip and flash suppressor. I currently own several Ruger Mini-14 rifles, and I have personally carried Mini-14 rifles for defensive purposes on three continents. I have owned and used AR-15 rifles since the 1980's. I served as the Line Judge for Colt Firearms at the first Colt Cup rifle competition ever held, which was fired with AR-15 rifles in Connecticut. I have been certified as an AR-15 Armorer by Colt, and as an FN-15 Armorer by FN (Fabrique Nationale). An armorer is an individual trained and certified to inspect, maintain, and repair a certain model or category of firearms by the manufacturer of the firearms. Certification as an armorer means I am fully conversant with the internals parts and workings of the AR-15, its design and function. The FN-15 is an AR-15 clone, manufactured by FN and functionally identical to the Colt AR-15. It is used as a patrol rifle by my sheriff's department. I have written several published articles about the AR-15 and other semiautomatic rifles, and have on at least two occasions worked as a consultant to manufacturers of such rifles. I currently own several AR-15 rifles, as well as M1A rifles, M1 Garand rifles, US M1 Carbines, Mini-14s, semi-automatic variants of the AK-47 rifle, an SKS rifle, a Ruger 10/22, an AR-7 survival rifle, and other

- 4 -

semiautomatic rifles that the California legislation in question might categorize as "assault weapons."  I have also owned and used other semiautomatic rifles, including the Steyr AUG, the FN-FAL, several semiautomatic .22 rimfire rifles, an H&K 91, and several IWI Tavor rifles.  I assisted IWI in the development of its Armorer Course for the Tavor rifle, and in preparation of its Armorer Manual.

11.  I have taught police user-level and instructor level courses in what police call "patrol rifle" (i.e., AR-15 type rifle) in 1999, 2003, 2004, 2009, 2010, 2012, 2017 and 2018, have taught a "Shoulder Weapon Selection" course at the State of Connecticut Police Academy in 1994, Countersniper Rifle Courses at Ft. Dix (NJ) and at the Glastonbury Police Department in Connecticut, Special Weapons and SWAT Team courses addressing the AR-15 rifle at the Atlantic County (NJ) and Cape May County (NJ) Police Academies, assisted in conducting AR-15 rifle training and qualification sessions for my sheriff's departments in Indiana and Pennsylvania, and for the Berks-Lehigh Regional Police, and was a presenter on the Patrol Rifle Panel at the ILEETA Annual Conference in St. Louis in 2017.

12.  I achieved competitive rankings as a Junior Smallbore (Rifle) Expert and Light Rifle Expert in my teenage years, and have thereafter been certified as a Highpower Rifle Expert, Patrol Rifle Expert, Patrol Rifle Instructor, and Police Precision Rifle Instructor.  I successfully graduated from the NRA's Police Rifle Instructor Development Course taught at USMC Base Quantico, Virginia, from the NRA's Precision Rifle Instructor School held at The Crucible in Fredericksburg, Virginia, from the IACP's Countersniper Rifle Course at Fort Dix, New Jersey, from Gunsite's General Rifle Course (using an M1A semiautomatic rifle) with an Expert rating, from the Thunder Ranch "Urban Rifle" course (using two models of semiautomatic rifles), and from the U.S. Army Marksmanship Training Unit's

- 5 -

Countersniper Rifle Course at Fort Benning, Georgia. With handgun, I have held the rating of Distinguished Expert, which is a higher rating than expert, and I was an "A" Class IPSC Combat Pistol Shooter. I have competed on a regional and national level with shotgun, and have placed on a winning team with shotgun in a national event.

13. In addition to the AR-15s and other semiautomatic rifles mentioned above, I have owned and used bolt-action rifles, lever-action rifles, break-open single shot ("hinge action") rifles and combination guns, pump-action rifles, and black powder muzzle-loading rifles. In addition, I have owned and used select-fire M16 rifles (which are true "machine guns" capable of fully automatic fire), as well as select-fire submachine guns of various brands and types, also capable of fully automatic fire. I have also fired other fully-automatic firearms, including military belt-fed machine guns and automatic weapons fed from large box magazines. I have also received armorer training, and have worked as an expert witness, in two cases involving the GAU-17 and other motor-driven, fully automatic "mini-guns," typically mounted on helicopter gunships, military patrol boats, and other military vehicles, capable of cyclic rates of fire ranging from 2,000 to 4,000 rounds per minute. I am thus conversant with all types of rifles, their designs and functioning characteristics, their capabilities, ballistics, and features, and have actual, first-hand knowledge of the differences between true military weapons and the semi-automatic rifles, shotguns and handguns addressed by the California legislation. I have also written over 30 published articles about handguns, handgun ammunition, and handgun technique, and at least seven published articles on shotguns (including semiautomatic shotguns), shotgun ammunition, and shotgun technique. I have served as a consultant on design features to major manufacturers of rifles, shotguns and handguns. I was for several years Technical Editor of POLICE MARKSMAN magazine, during which time I performed technical

- 6 -

reviews and evaluations of firearms, ammunition and firearms accessories of all sorts.

14.  In total, I have trained over 15,000 students in my firearms classes.  I have watched them fire literally millions of rounds of ammunition from rifles (mainly AR-15s and other semiautomatic rifles), handguns of all sorts, shotguns, submachine guns, and machine guns.  I have watched others fire many millions more rounds from such firearms in training classes, qualification exercises, competitions, and firearms demonstrations. I myself have fired hundreds of thousands of rounds of ammunition from such weapons.  I have owned and/or used firearms, including select-fire and fully automatic firearms, with suppressors ("silencers"), flash suppressors, detachable box magazines, drum magazines, pistol-grip stocks, folding stocks, telescoping stocks, barrel shrouds, and other features addressed by the legislation in question. I last participated in an AR-15 training class about two weeks ago, and I will next be involved in police AR-15 training and qualification within the next two weeks.  Unlike many of the individuals who, on information and belief, have drafted, proposed, and/or support the legislation in question, I have actual – not theoretical or second-hand – experience with all of the types of firearms and firearms design features addressed by the legislation.

**PRIOR EXPERT TESTIMONY**

15.  I have served as an expert witness in numerous courts since 1984.  In total, I have served as an expert in well over 350 cases, and have testified roughly 85 times in criminal and civil trials in state and federal trial courts throughout the United States, in addition to testimony before grand juries, Police Boards, administrative courts and tribunals (including the U.S. Government Accountability Office or "GAO"), state and city legislative committees, and before committees of both Houses of the United States Congress.   In total, I have been qualified and have testified as an expert in some

- 7 -

14 federal courts in 12 states, and in some 45 state courts in 18 states.  I have also served as an expert in cases that have been dismissed, settled, plea bargained, or for some other reason have not gone to trial, and therefore have not required my testimony, in at least 23 other states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Canada.   In California, I have testified as an expert in the U.S. District Court for the Southern District of California (Estate of Angel Lopez v. City of San Diego, Case No. 3cv2240 GPC (MDD), 2017), and in the California Superior Court for Fresno County (Loera v. Glock, Inc., No. 498182-5).  I have worked as an expert in several other California cases that have not gone to trial.

16.  I have served as an expert in several cases involving AR-15s and other semiautomatic rifles, most often (but not always) used by police officers.

## OPINIONS AND ANALYSIS

17.  A semiautomatic firearm uses the power of the firing cartridge, typically either through diverting some of the pressurized gas from the cartridge's burning propellant gunpowder, or through the recoil produced when the projectile moves forward out of the cartridge case, to operate the gun's mechanism and bring a fresh cartridge into position for firing. In a semiautomatic firearm, the trigger must be pulled separately for each shot. A semiautomatic firearm differs from a manually operated repeating firearm, such as a bolt-action, lever-action, or pump-action firearm, in which the user manually operates the mechanism to bring a fresh cartridge into position for firing.  The semiautomatic also differs from a fully automatic ("automatic") firearm – commonly called a "machine gun" -- in which holding the trigger depressed will result in a continuous series of shots until the trigger is released or the ammunition supply is exhausted.  Semiautomatic firearms are not a new invention.  Semiautomatic rifles, shotguns, and handguns were all developed before 1900, and were in common use in

- 8 -

the early 1900's.

18.   Armalite, an American small arms engineering firm located in California, developed the AR-15 in the 1950's.  It was designed in large part by Eugene ("Gene") Stoner, a famous American firearms designer whom I met and spoke with several times. In 1959, due to financial and production problems, Armalite sold its rights to its AR-10 and AR-15 designs to Colt's Manufacturing.  A version of the rifle, in select-fire form (meaning it could, by operation of a selector switch, be fired either semiautomatically, i.e., one shot for each pull of the trigger, or fully-automatically, i.e., continuous firing as long as the trigger was held depressed), was first used by our military in the Vietnam War as the M-16.  AR-15 type rifles, also called "MSRs" or "Modern Sporting Rifles," are today among the most popular rifles sold and used in the United States.  They have been manufactured by literally hundreds of companies, including Colt, FN, Ruger, Remington, Bushmaster, Rock River Arms, Wilson Combat, Barrett, DPMS Panther Arms, H&K, Lewis Machine, Olympic Arms, Palmetto State Armory, and Mossberg. The National Shooting Sports Foundation (NSSF), a firearms industry trade group, estimates that there are currently between 5 and 10 million AR-15 rifles in civilian hands in the United States today.  The AR-15 uses a detachable box magazine for the .223 Remington or 5.56mm NATO cartridge (the two rounds are very similar, and can be used interchangeably in many AR-15s).  The most common magazine size is 30 rounds, although magazines of 5, 10, 20 and 40 rounds are also available, as well as other sizes.  With an estimated 5-10 million AR-15 rifles in civilian hands, there are certainly many times that number of 20-round and 30-round magazines in private ownership as well.  AR-15 rifles are commonly used for both formal and informal target shooting (including each year at the National Matches at Camp Perry, Ohio), for hunting, by farmers and ranchers for control of predators and pest animals, and for

- 9 -

self-defense.  They are also widely used by law enforcement agencies as "patrol rifles," in many parts of the country all but completely replacing the 12-gauge shotgun as the shoulder weapon carried in most police cars.  Anyone visiting any retail gun store in most states will see many AR-15 rifles for sale, as well as displays of magazines, accessories, and ammunition for these rifles.  Similarly, someone taking a trip to most outdoor shooting ranges, and indoor ranges with rifle capability as well, will find many people target shooting with AR-15 rifles.  The AR-15 is especially popular because of its light weight, mild recoil, and good ergonomics, all of which make it well suited to younger shooters, female shooters, and other shooters of smaller stature, as well as an easy rifle for larger, stronger individuals to use.  All of these design features of the AR-15 – its light weight, mild recoil, and good ergonomics – as well as the adjustable length of its buttstock when fitted with a telescoping buttstock, the effectiveness of its cartridge for self-defense use, and its better continuity of fire when used with its most commonly available 20-round and 30-round magazines, make the AR-15, in many cases, a better choice of  shoulder weapon for a female user or other smaller-statured user than the 12-gauge or other shotguns that have often been recommended for that purpose.  The shotgun, in fact, is much harder for most women (as well as most other shooters) to use, too heavy, ill-fitting in its commonly available stock configurations, and has recoil which is far too punishing, discouraging practice and resulting in poor competence and many safety problems.  For the same reasons that the AR-15 has largely replaced the shotgun in police use, it is a better choice as a self-defense weapon for many private individuals as well.  Other semiautomatic rifles which would be prohibited by the California legislation, including the bullpup design IWI Tavor and Steyr AUG, are similarly good choices as self-defense shoulder weapons for women and others.  The bullpup designs are particularly popular among women because the

- 10 -

design places more of the rifle's weight closer to the user's body, where less muscle is needed to support it when firing.

19.  My opinion that AR-15 rifles are suitable for self-defense use by private individuals is supported by many examples of such use.  For example, a pregnant mother used an AR-15 to save the life of her husband, killing one of the two intruders who were terrorizing her family. Attached hereto as **Exhibit 1** is a true and correct copy of the digital article "Pregnant Florida Mom Uses AR-15 to Kill Home Intruder."

20.  Another example was in Glen St. Mary, Florida in 2018, where seven home invaders were fought off by their would-be victim using an AR-15.  One of the seven invaders was killed, and five others were arrested.   The defender fired over thirty (30) shots in the process, underscoring the need for magazines that hold more than a few rounds of ammunition.  Attached hereto as **Exhibit 2** is a true and correct copy of the digital article, "Deputies: 30 Rounds Fired From AR-15 in Deadly Florida Home Invasion."

21.  In another case, in Oswego, Illinois, a man named Dave Thomas, who was in legal possession of an AR-15, used it without the need to fire a single shot to stop a man who was repeatedly stabbing one of his neighbors. Attached hereto as **Exhibit 3** is a true and correct copy of the digital article "Man Armed With AR-15 Stops Attack By Neighbor in Oswego."

22.  In the highly-publicized 2017 active shooter event at the First Baptist Church in Sutherland Springs, Texas, in which the gunman killed 27 people and wounded 20 others, a 55-year-old plumber living across the street from the church, alerted by his daughter that a man was shooting people at the church, got his AR-15 out of his gun safe, loaded it, and exchanged shots with the gunman, hitting him twice, and then flagged down a passing motorist to pursue the gunman together when the gunman

- 11 -

attempted to flee from the scene.  Attached hereto as **Exhibit 4** is a true and correct copy of the digital article, "Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter."

23.  In a case in Harris County, Texas in 2013, a 15 year old boy, at home with his little sister, used an AR-15 to drive off two burglars who had broken a window to enter the house.  They fled, leaving a trail of blood. Attached hereto as **Exhibit 5** is a true and correct copy of the digital article, "Harris County Deputy's Son Shoots One of Two Intruders." Also in 2013, a man with a .223 AR-15-type rifle in Montgomery County, Pennsylvania, successfully defended himself and his wife against an intruder, who died later in the hospital. Attached hereto as **Exhibit 6** is a true and correct copy of the digital article, "Elkins Park Man Killed After Forcing His Way Into Apartment."

24.  In 2017 in Broken Arrow, Oklahoma, three masked intruders were shot and killed by 23-year-old Zach Peters, the son of the home's owner, using an AR-15 rifle. The shooting was ruled justifiable. Attached hereto as **Exhibit 7** is a true and correct copy of the digital article, "Shooting Deemed Justifiable: Authorities Say Zach Peters Acted Lawfully When He Shot, Killed Three Intruders."

25.  Numerous other cases in which the AR-15 and other semi-automatic rifles have been used in self-defense can be found.  The fact that several of the above examples are cases in which a homeowner or other private citizen has had to fight off multiple attackers is significant in explaining the need for semiautomatic firearms and magazines that hold 20-30 rounds of ammunition.

26.  It is incorrect, and in fact a common myth, that the .223/5.56mm projectile fired by the AR-15 and other rifles under consideration is too penetrative to be used safely for self-defense inside homes and businesses, and around farms and ranches.  If that were the case, then why are police using AR-15 "patrol rifles" nationwide,

- 12 -

including as entry weapons for indoor searches and deployments?  The fact is that with properly selected ammunition, the .223/5.56mm actually presents less danger of overpenetrating walls, floors, ceilings and criminal attackers than conventional self-defense handgun bullets in calibers such as 9mm, .40 S&W, and .45 Auto.  This is because the .223/5.56mm has a much higher muzzle velocity and fires a much smaller, lighter projectile which, if properly selected as to projectile type (e.g., the self-defense type softpoint, hollow point, or ballistic tip bullets that are widely available where ammunition is sold), will fragment easily and will be unlikely to penetrate as many sheetrock partitions or other common building elements as many common handgun bullets.  I have demonstrated this to classes of police and others by firing through sheetrock and other materials, and many published studies confirm the same results. Attached hereto as **Exhibit 8** is a true and correct copy of R.K. Taubert (FBI, Ret.), "About .223 Penetration." Attached hereto as **Exhibit 9** is a true and correct copy of "Real World Testing: .223/5.56 Penetration Tests vs. .40 S&W and 12 ga. Slug;" See also attached hereto as **Exhibit 10** the digital article, "Why 'High-Powered' 5.56 NATO/.223 AR-15 is Safer for Home Defense (FBI Overpenetration Testing)," Prepared Gun Owners, July 14, 2016.

27. Penal Code section 30515(a)(1) identifies several features that distinguish "assault weapons" – as it defines that term -- from ordinary semiautomatic firearms.  In actuality, the term "assault weapon" (unlike "assault rifle," which is a compact, lightweight select-fire rifle firing a intermediate-powered cartridge) is a pejorative term created by legislative draftsmen which has no technical definition in the firearms field. See Standards & Practices Reference Guide for Law Enforcement Firearms Instructors, P. Covey and E. Kapelsohn, 1995, "assault rifle" and "assault weapon," p. 5 ff. Having extensive personal experience as a user, as a firearms instructor, and as a consultant,

- 13 -

with all of the design features identified by the legislation, and with their practical effects on the capabilities of firearms, I will address these features seriatim.

28.   Penal Code section 30515(a)(1)(A) of the legislation identifies a "pistol grip that protrudes conspicuously beneath the action of the weapon."   The current AR-15 addressed by the legislation is, as discussed above, is a semiautomatic version of the select-fire military M16 and its predecessor, the Armalite Model 15 rifle.   The M16 is designed, as its "select-fire" description indicates, to fire either semiautomatically, or automatically ("full-auto") by the positioning of its safety/selector lever.   When firing automatically ("full-auto"), the M16 has a cyclic rate of fire of 750-900 rounds per minute.   In practical effect, with the most commonly used 30-round magazines, a shooter firing an M16 full-auto may actually be able to discharge roughly 250-300 rounds per minute, although not with good accuracy.   In order to allow military users of the M16 to fire it full-auto while staying on target, rather than having significant "muzzle climb" while firing, the M16, and similar assault rifles, employ what is termed a "straight-line design," meaning that the rifle's barrel and stock are in line, so that recoil is transmitted into the user's shoulder along the axis of the bore/axis of recoil. See attached hereto as **Exhibit 11** is a true and correct diagram of a standard AR-15/M16 (depicting the straight-line design referenced). In order to make this possible, the front and rear sight assemblies of the M16 are raised considerably (about 2-1/2 inches) above the line of bore, so that they will be in line with the shooter's eye for aiming, when the rifle's buttstock is seated on the user's shoulder in firing position. This differs from the conventional design of sporting rifles and shotguns (generally wooden-stocked), in which the sights are mounted much closer to the axis of the bore/axis of recoil, and the buttstock angles downward significantly to the user's shoulder.   Because the buttstock and the point of shoulder support is thus significantly

- 14 -

below the axis of recoil, such conventionally-stocked rifles, if designed to fire full-auto and if fired that way, typically exhibit a great deal of "muzzle rise," making it hard to keep them on target when firing full-auto.  The purpose of the M16's straight-line design is to eliminate this muzzle rise.  However, because the M16 and AR-15 have a stock which comes straight back from the rifle's receiver to the user's shoulder, it became necessary to provide a "pistol grip" that protrudes downward from the rifle's receiver ("action," per the statute).  Otherwise, the user would have to raise his or her dominant arm uncomfortably high grip the rifle's buttstock, in a position where the dominant hand would interfere with aiming the rifle, and where the trigger and trigger guard of the M16 and AR-15 are not located. The design purpose of the M16/AR-15's pistol grip is to position the user's hand properly behind the trigger and trigger guard of the rifle – a position which would not be feasible for the user to assume without the pistol grip – and, in the case of the M16 when fired full-auto, to provide better control of the rifle.  When the rifle is fired semiautomatically, in the normal manner for the "civilian" AR-15, the pistol grip is not necessary for the purpose of preventing muzzle rise, as the lower rate of fire, straight-line stock design, and very minimal recoil of the AR-15's .223/5.56mm cartridge do not present a significant muzzle rise problem.  This can easily be seen when firing the Ruger Mini-14 and other semiautomatic rifles for the .223/5.56mm cartridge which use conventional sporting rifle-type stocks, not straight-line design stocks, and have no pistol grips extending downward from the rifle's receiver, but can nevertheless be controlled easily and fired very accurately in semiautomatic fire. Contrary to the claims of some anti-gun activists, a pistol grip on a rifle stock does not allow the rifle to be "spray fired" wildly in all directions.  Why would our Department of Defense want our military rifles, including our M16 and later evolved M4 rifles, to be so equipped?  The pistol grip on the AR-15 stock, and the

- 15 -

1    stocks of other semiautomatic rifles, also does not allow these rifles to be reloaded any

2    faster than semiautomatic rifles without pistol grips.

3        29.   Penal Code section 30515(a)(1)(B) of the legislation addresses "thumbhole

4    stocks."  Thumbhole stocks have been made for many years for a wide variety of rifle

5    types, including bolt-action target rifles, not just for semiautomatic rifles.  See, e.g.,

6    "Boyds     Hardwood      Gunstocks"    catalog     on     the     internet     (located    at:

7    https://www.boydsgunstocks.com/gallery#shapes).  Depending on the shooter's own

8    hand size and body configuration, thumbhole stocks can provide a comfortable grip on

9    the rifle, and can facilitate accurate shooting by advantageously positioning the

10   shooter's dominant hand relative to the rifle's trigger, while providing a comfortable

11   and solid stock comb and cheekpiece to allow a consistent "cheek weld" for accurate

12   firing.  Thumbhole stocks can also provide a lower, more comfortable grip for the

13   dominant hand on rifles which, by their original design, might otherwise have a "pistol

14   grip" type stock.  By prohibiting both pistol grip stocks and thumbhole stocks, the

15   legislation relegates rifles to be equipped and fired in a manner which is less

16   comfortable, less accurate, and less safe.

17

18

19       30.   Penal Code section 30515(a)(1)(C) addresses "folding or telescoping stocks."

20   While the AR-15 can be equipped with a solid (that is, not telescoping) buttstock, and

21   my Sheriff's Office AR-15 patrol rifle is so equipped, telescoping buttstocks are far

22   more popular.  Neither telescoping nor folding buttstocks turn semiautomatic rifles into

23   common instruments of crime, as even when so equipped, the rifles are far too large for

24   easy concealment for most criminal activities.  This is probably the major reason why

25   most crimes committed with firearms, far and away, are committed with handguns.  For

26   example, the USDOJ Bureau of Justice Statistics Special Report, NCJ251776, "Source

27   and Use of Firearms Involved in Crimes" (2019) reports that of prison inmates,

28

- 16 -

18.4% used handguns in the commission of their crimes, while only 1.5% used rifles, and 1.6% used shotguns. Attached hereto as **Exhibit 12** is a true and correct copy of the report.

31.   What telescoping buttstocks actually do is allow for the rifle stock to be adjusted to properly fit the user.  The U.S. military's current telescoping buttstock for its M4 rifle (the modern evolution of the M16) allows the stock to be set for any of four to six different lengths. This allows the rifle to be used comfortably and fired accurately by shorter-statured shooters, including female shooters among others.  It also allows the rifle to be adjusted for comfortable, accurate firing from different shooting positions, as a stock length that works well in the standing position may be too long for optimum use from a sitting or kneeling position.  The telescoping stock also allows the stock to be shortened when the shooter is wearing heavy clothing, as in wintertime, and lengthened when lighter clothing is worn in warmer weather.  Telescoping-style adjustable stocks are used for these same reasons on many other firearm models that are not semiautomatic, such as the Mossberg pump-action Model 500 Tactical and ATI Tactical shotguns. Attached hereto as **Exhibit 13**, a true and correct picture of a Mossberg 500 tactical pump shotgun with a collapsible stock.

32.   Penal Code section 30515(a)(1)(D) addresses semiautomatic firearms with a "grenade launcher or flare launcher."  Grenade launchers, such as the 40mm M203 grenade launcher designed to be mounted on the military's M16 and M4 rifles, are largely prohibited from civilian ownership, or very heavily regulated by the federal government, as "destructive devices" pursuant to the National Firearms Act of 1934. Thus, the California legislation's prohibition of grenade launchers, while sensational, is largely superfluous.  Regarding flare launchers, there is a reasonable argument that flare launchers have a legitimate safety and rescue purpose, as on ships and other watercraft.

- 17 -

33.  Penal Code section 30515(a)(1)(E) addresses "flash suppressors." A flash suppressor is a fixture on the end of a rifle's barrel that divides and diverts the muzzle flash through several slots or holes, most commonly arranged radially around the axis of the bore.  The most common type of flash suppressor on AR-15 rifles is probably the Mil Spec A2 birdcage type, which has four slots from about the nine o'clock to three o'clock positions (that is, around the top 180 degrees of the suppressor), but is solid on the bottom in order not to raise clouds of dust or dirt when firing from a prone position on dry ground. Attached hereto as **Exhibit 14**, a true and correct picture of a A2 birdcage flash hider. Flash suppressors are not expensive accessories; for example, the Aero Precision A2 birdcage-type suppressor retails for $7.99.  The major advantages of a flash suppressor on a rifle's barrel are: (1) the reduction of muzzle flash so as not to temporarily blind a shooter who is firing in a darkened environment, whether in a defensive situation or on an indoor shooting range, and (2) the reduction of muzzle flash from a military rifle, so as to minimize the illumination of the shooter, which might reveal his location to enemy troops in darkened environments.  The flash suppressor also serves to protect the muzzle of the rifle from dirt, mud, sand, etc., which could dangerously plug the muzzle if it were to touch the ground outdoors.   Purpose (2) above, which is primarily military in nature, is of questionable importance in regard to the criminal use of firearms in the civilian world.  Purpose (1) above is important in a rifle used for self-defense by civilians, and legislation that prohibits flash suppressors makes rifles less suitable for self-defense use by civilians.  Law enforcement statistics indicate that a high percentage of violent crime occurs during the hours of darkness, or in otherwise darkened environments (poorly lighted indoor areas, for example). Attached hereto as **Exhibit 15**, a true and correct copy of the digital article from Security Magazine, "Violent Crimes Most Likely to Occur At Night."  The use of a rifle

- 18 -

without a flash suppressor under those circumstances is likely to temporarily blind the user, or at least seriously impair the user's vision, placing the law-abiding user at a disadvantage to a criminal attacker.

34.  Penal Code section 30515(a)(1)(F) addresses "forward pistol grips."  Forward pistol grips on rifles, also called vertical forends, are popular among some shooters in allowing them to control the rifle better for more accurate shooting.  Depending on the design and the shooter's physiology, such vertical forends can serve as monopods to assist in stabilizing the rifle for precision firing in the prone position.  They make the rifle neither more nor less suitable for use for criminal purposes.  As stated above, the use of rifles in criminal activities is relatively rare altogether.

35.  Notable crimes committed with semiautomatic rifles, including the infamous FBI Miami Shootout (1986) in which two FBI agents were killed and five were wounded, the Winn Dixie Shopping Center shooting in Palm Bay, Florida (6 killed, 14 wounded), and numerous others since that time, have been committed with Ruger Mini-14 rifles.   The Mini-14, while semiautomatic, typically has a conventional "sporting" type wooden stock, no pistol grip, no flash suppressor, no telescoping stock, folding stock, or thumbhole stock, no grenade launcher or flare launcher – in other words, none of the "evil looking" cosmetic features addressed by the California legislation.  The  fact  is  that  even  without  these  features,  virtually  any detachable-magazine, semiautomatic rifle firing the .223/5.56mm cartridge will have the same ballistics and same capabilities as the AR-15.  Moreover, other repeating rifles that are not semiautomatic could also be used with close to the same effectiveness by a criminal, by a law enforcement officer, or by a civilian.  For example, in a Police Patrol Rifle Instructor Course I conducted, I fired the 50-round, 100-yard qualification course with a Winchester Model 94 lever-action rifle – an 1894 design – accomplishing the

- 19 -

timed reloads and achieving the second highest score in the class, among a class of police instructors all the rest of whom were using AR-15 rifles, except for one who used a semiautomatic AK-47 type rifle. Attached hereto as **Exhibit 16**, a true and correct picture of a Winchester Model 94 lever action rifle.  And the highest mortality rate of any school shooting in the United States was the Virginia Tech shooting, in which no "assault rifles" were used, just two ordinary handguns. Attached hereto as **Exhibit 17**, a true and correct copy of the digital article, "This Day in History, April 16: Virginia Tech Shooting Leaves 32 Dead."

36.. Regarding barrel shrouds on handguns, barrel shrouds on handguns are mainly a cosmetic feature, rather than an important tactical feature.  I have been shooting handguns for the past 57 years, have never owned a handgun with a barrel shroud, and cannot recall ever burning my hand on the barrel of a handgun.

37.  Regarding pistol grips on handgun (most of which already have a pistol-type grip), vertical foregrips, and flash suppressors, the comments I have already provided above are applicable.

## CONCLUSION

38.  The California legislation appears to focus primarily on cosmetic features of firearms.  In fact, the AR-15 is just another semiautomatic rifle, a type of firearm that has existed since about 1900.  The AR-15 is, in many cases, an excellent rifle for law-abiding citizens to use for self-defense, as well as for target shooting, recreational shooting, and control of predators, rodents and other pest animals where game laws permit. Features such as flash suppressors, pistol grips, forward pistol grips (vertical foregrips), telescoping stocks, and the other features discussed above are of little significance to criminals, but if prohibited will make these rifles less useful, less accurate, and less safe for law-abiding citizens to use.  It appears that this legislation is

- 20 -

1   either ill-informed, or that its intent is to prohibit one of the most widely used – because

2   it is one of the most useful – firearms in existence in the United States.

3       I declare under penalty of perjury that the foregoing is true and correct. Executed

4   on December 5 , 2019.

7               Emanuel Kapelsohn

1
2

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | "Pregnant Florida Mom Uses AR-15 to Kill Home Intruder," www.NYPost.com, November 2019 | 0001-0003 |
| 2 | "Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion," www.news4jax.com, April 2018 | 0004-0006 |
| 3 | "Man armed with AR-15 stops attack by neighbor in Oswego," February 2018 | 0007-0009 |
| 4 | "Texas Hero Reportedly Used His Own AR to Confron the Sutherland Springs Shooter," www.nationalreview.com,  November 2017 | 0010-0012 |
| 5 | "Harris County deputy's son shoots one of two intruders," www.chron.com, June 2010 | 0013-0015 |
| 6 | "Elkins Park man killed after forcing his way into apartment," The Philadelphia Inquirer, April 2013 | 0016-0017 |
| 7 | "Shooting deemed justified: Authorities say Zach Peters acted lawfully when he shot, killed three intruders," www.tulsaworld.com, April 2017 | 0018-0022 |
| 8 | "About .223 Penetration," R. K. Taubert | 0023-0032 |
| 9 | "Real World Testing: .223/5.56 Penetration Tests vs. .40 S&W and 12 ga. Slug;" | 0033-0039 |
| 10 | "Why "High Powered" 5.56 NATO/.223 AR-15 Ammo is Safer For Home Defense  (FBI overpenetration testing)," www.preparedgunowners.com, July 2016 | 0040-0043 |
| 11 | Diagram of a standard AR-15/M16 (depicting the straight-line design referenced) | 0044-0045 |
| 12 | "Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016," Special Report, U.S. Department of Justice, Bureau of Justice Statistics, January 2019 | 0046-0066 |

- 22 -

1
2
3

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 13 | Picture of a Mossberg 500 tactical pump shotgun with a collapsible stock | 0067-0068 |
| 14 | Picture of a A2 birdcage flash hider | 0069-0071 |
| 15 | "Violent Crimes Most Likely to Occur At Night," Security Magazine, June 2019 | 0072-0075 |
| 16 | Picture of a Winchester Model 94 lever action rifle | 0076-0077 |
| 17 | "This Day in History, April 16: Virginia Tech Shooting Leaves 32 Dead," www.history.com, April 2011 | 0078-0080 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 23 -

# EXHIBIT "1"

Exhibit 1
0001

NEWS

# Pregnant Florida mom uses AR-15 to kill home intruder

By Joe Tacopino

November 4, 2019 | 12:05am | Updated



Shutterstock

A pregnant woman is credited with saving the lives of her husband and daughter after she used an AR-15 to fatally gun down a home intruder, a report said.

The hero mom sprung into action when two intruders entered the family's Lithia, Fla. home last week and pistol whipped her husband while violently grabbing their daughter, according to the Hillsborough County Sheriff's Office.

"They came in heavily hooded and masked," the husband, Jeremy King, told Bay News 9.

"As soon as they had got the back door opened, they had a pistol on me and was grabbing my 11-year-old daughter."

The robbers then pistol-whipped King and kicked him while the man's wife, who is eight months pregnant, retreated into the bedroom.

"When he came toward the back door in her line of sight, she clipped him," King told the outlet. "He made it from my back door to roughly 200 feet out in the front ditch before the AR did its thing."

Exhibit 1
0002

Police said in a press conference that they found the man's dead body lying in the ditch nearby. The second suspect was on the loose.

The homeowner said he took a "severe beating," but credited his wife for saving him.

"I've got a fractured eye socket, a fractured sinus cavity, a concussion, 20 stitches and three staples in my head," said King.

"Them guys came in with two normal pistols and my AR stopped it. [My wife] evened the playing field and kept them from killing me."

The sheriff's office added that the firearm was in the home legally.

FILED UNDER   **FLORIDA, HOME INVASION**

Recommended by

# EXHIBIT "2"

Exhibit 2
0004



 57°F

**WEATHER ALERT**    Weather Alert: 8 advisories in effect for 5 counties in the area

**NEWS**

# Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion

Incident stemmed from ongoing feud between two groups, investigators say

**Garrett Pelican**, Digital executive producer
Published: **Apr. 17 2018, 7:16 pm**
Updated: **Apr. 17 2018, 7:20 pm**

Tags: **Florida, Baker County, Weird News, News, Glen St Mary**



*(Left to right: Bell, Watkins, Cayden Lauramore, Albino)*

**GLEN ST. MARY, Fla** – Three men say they were asleep inside a mobile home in Glen St. Mary about 4 a.m. Sunday when they heard a voice outside yell "Sheriff's Office!" before the front door burst open.

In stormed a masked gunman who fired off a single round before two of the men inside, one armed with an AR-15 rifle and the other with a handgun, emerged from two bedrooms and opened fire.

Gunfire ripped into the masked gunman and two other intruders, who crumpled to the floor with multiple gunshot wounds.

Those details surfaced Tuesday when the Baker County Sheriff's Office released an arrest report linked to **this weekend's home invasion turned deadly triple shooting**.

Five people are charged in the case. Investigators suspect the home invasion escalated from an ongoing feud between two groups that was stoked by social media threats.

The victims told deputies they acted in self-defense when they turned their guns on the intruders, with one of them estimating he fired over 30 rounds from an AR-15 before the threat was over.

Afterward, the victims retreated to another part of the home before they dialed 911, according to the report. None of them was hurt during the shooting.

The same cannot be said for the intruders, **several of whom were inside a vehicle deputies intercepted as it sped away** from the mobile home off County Road 125.

One of them, Corey Lauramore, died of gunshot wounds to the head. An unidentified 16-year-old remains hospitalized, and a third suspect, William Lauramore, was treated and released to police.

Investigators found a heavy amount of dried blood caked on the front steps of the home, a bloodstained mask with a bullet hole through it and a .380 caliber handgun lying nearby, the report said.

They also recovered an AR-15 rifle and a 9MM handgun inside the home.

The Sheriff's Office said the **five individuals charged in the case were among a group of seven that went to the mobile home that morning to confront and fight** the group staying there.

William Lauramore, 24; Joseph Albino, 24; Zachary Bell, 20; Christian Watkins, 19; and Cayden Lauramore, 15, are charged with home invasion. But additional charges are possible.

Albino, Bell and Watkins provided conflicting details about their involvement in the shooting, but all three said they had no idea others in their group had brought weapons along, according to the report.

*Copyright 2018 by WJXT News4Jax - All rights reserved.*

MOST LIKED ∨    NEWEST                                    FOLLOW ⊙    0 COMMENTS

Guest

Type your comment here...

# EXHIBIT "3"

Exhibit 3
0007

# Man armed with AR-15 stops attack by neighbor in Oswego

POSTED 5:37 AM, FEBRUARY 27, 2018, BY NANCY LOO AND CHARLES HAYES, *UPDATED AT 12:59PM, FEBRUARY 27, 2018*



*This is an archived article and the information in the article may be outdated. Please look at the time stamp on the story to see when it was last updated.*

**Man armed with AR-15 stops attack by neighbor in Oswego**



OSWEGO, Ill. -- A man armed with an AR-15 rifle helped stop a knife attack during an argument in Oswego.

It happened on Monday at an apartment building on Harbor Drive.

Police say it all began when someone with a knife attacked another person during an argument.

Neighbor Dave Thomas, who witnessed the attack, went into his home, got his rifle and ordered the suspect to stop.

"I ran back into the home, into my house and grabbed my AR-15. Grabbed the AR-15 over my handgun. It's just a bigger gun. I think a little bit more than an intimidation factor definitely played a part in him actually stopping."

No shots were fired.

The suspect was able to get away briefly, before police captured him.

**Exhibit 3**
**0008**

Police say Thomas has a valid firearm owner's identification card and a concealed carry permit. Thomas says he is also a firearms instructor.

"The AR-15 is my weapon of choice for home protection," Thomas said. "It's light, it's maneuverable. If you train and know how to use it properly, it's not dangerous. And this is just a perfect example of good guy with an AR-15 stopped a bad guy with a knife. And there were no lives taken, so all in all it was a good day."

NEWS

**Pregnant mom used AR-15 to kill burglar, save husband during home invasion**

NEWS

Exhibit 3
0009

# EXHIBIT "4"

Exhibit 4
0010

THE CORNER

POLITICS & POLICY

# Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter

By DAVID FRENCH | November 6, 2017 10:54 PM

During today's press conference about the Texas mass shooting, the regional director of the Texas Department of Public Safety indicated that the Texas Good Samaritan, Stephen Willeford, engaged the Sutherland Springs shooter with his own AR:

> He armed himself with an AR assault rifle and engaged the suspect. They engaged in gunfire here at the church. We know that the suspect was shot, when he dropped his assault rifle and jumped in his Ford Expedition and fled the scene.

Given what we know from other reports, this makes a great deal of sense. After all, Willeford apparently fired with a great deal of precision. Here's an account from CNN, taken from an interview of his cousin:

> And what he did, according to his cousin, is exchange fire with the gunman, hitting him in the side and twice in the neck.

> "He saw that the guy was wearing body armor, and there was a velcro strap, from the back to the front," detailed Leonard, speaking live on Monday. "He knew from that … that the vulnerable spot was going to be in the side. And so that's where he shot him."

An AR is an easy-to-use, extraordinarily accurate weapon, and one can see how it would enable a surprised civilian to engage the shooter so quickly and effectively.

We keep hearing that AR's are useless for self-defense, that they're simply "weapons of war," useful only for mass killing. This is simply not true. Earlier this year, an Oklahoma man used an AR-15 to kill three home intruders, and multiple self-defense experts have long pegged AR-style rifles as their "home defense weapon of choice." I have one in my own home, and I feel far more comfortable using it than even one of my handguns.

While Willeford obviously didn't prevent the massacre, he did stop the shooter and prevented him from harming anyone else. He did so with exactly the kind of weapon that the gun control lobby would like to deny to law-abiding Americans. That's a fact worth noting.

 RETURN TO THE CORNER

 **DAVID FRENCH** is a senior editor of *The Dispatch*. **@davidafrench**

**Exhibit 4**
**0012**

# EXHIBIT "5"

Exhibit 5
0013

★Chron  https://www.chron.com/news/houston-texas/article/Harris-County-deputy-s-son-shoots-one-of-two-1712908.php

## Harris County deputy's son shoots one of two intruders

**15-year-old and sister, 12, were alone when pair entered, so he got dad's rifle**

MIKE GLENN
, HOUSTON CHRONICLE  Published 5:30 am CDT, Wednesday, June 30, 2010

The teenage son of a Harris County deputy constable opened fire with his father's automatic rifle Tuesday after burglars forced their way into the family's home, authorities said.

The boy, 15, and his sister, 12, were alone about 2:30 p.m. when they heard glass breaking downstairs at the home in the 2600 block of Royal Place Court in northwest Harris County.

The boy went downstairs with the rifle and spotted the two burglars in the living room.

He fired several shots and struck one of the intruders, said Lt. **Jeff Stauber** with the Harris County Sheriff's Office.

"He was concerned with protecting his younger sister — that's exactly what he did," Stauber said.

Need 2 Know: Mayor Pete Surges in Iowa



The suspect who was shot -- identified as **Kinzy Evans**, 17, -- was struck several times by gunfire. Police said his accomplice was a 16-year-old who they would not identify because he is a juvenile.

Sheriff's investigators were tipped off when the suspected burglars quickly showed up at **Methodist Willowbrook Hospital**.

"Anytime you get a gunshot victim in the hospital, they're going to notify law enforcement," Stauber said.

Evans was taken by Life Flight helicopter to Memorial Hermann-The Texas Medical Center in unknown condition.

Your California Privacy Rights    Interest Based Ads    Privacy Notice    Advertising    Terms of Use    Contact Us    X

Sheriff's deputies said the burglars came into the house after breaking out a window in the living room area.

"They left the same way they came in - through the broken window," Stauber said.

### 'A little shaken up'
Family members at the scene declined to comment about the incident.

"The main thing is that the kids are OK. They're a little shaken up," said a man who identified himself as the deputy constable's brother.

Neighbors said several homes in the area also have been broken into during the daylight hours.

"There have been a lot of robberies. It's good that they caught them," said Ushantha Kawmini, whose home down the street was burglarized about a month ago.

### Break-in concerns
Another neighbor was concerned that the burglars would be brazen enough to break into a home belonging to a law enforcement officer.

"Now they're doing it to the police officers. What about regular people?" said the neighbor.

She identified herself only as Mary because she feared retaliation from other burglars.

"I'm sure they (the suspects) have got friends," the neighbor said.

The two have been charged with burglary of a habitation, officials said.

mike.glenn@chron.com

© 2019 Hearst Communications, Inc.

H E A R S T

# EXHIBIT "6"

Exhibit 6
0016

# The Philadelphia Inquirer



NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT   LIFE   FOOD   HEALTH   REAL ESTATE   OBITUARIES 🔍   ≡

# Elkins Park man killed after forcing his way into apartment

by Sam Wood, PHILLY.COM, Posted: April 22, 2013



An Elkins Park man was killed late Friday after he forced his way into a stranger's apartment in Cheltenham Township.

Jasper Brisbon, 32, wandered up to a couple late Friday at the Lynnewood Apartments as the pair spoke outside their unit. Brisbon, they told police, appeared to be on drugs. He stared at the pair for several minutes before the couple decided to go into their apartment, police said.

But as they entered their home Brisbon jumped between them, forcing his way in.

The male of the couple ran to get a semi-automatic AR-15 rifle and insisted Brisbon leave. Brisbon refused. Instead, as the man yelled "Stop! Stop Stop!" Brisbon moved menacingly toward the man, police said.

The man fired a shot striking Brisbon in the torso and immediately called 911, police said.

An ambulance rushed Brisbon to Abington Memorial Hospital where doctors pronounced him dead. According to court records, Brisbon was awaiting trial on a charge of aggravated assault stemming from an incident in December.

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

your@email.com                                                                        Sign Up

Police said the residents of the apartment were cooperating with police, did not know Brisbon and that the AR-15 was legally purchased.

*Contact Sam Wood at 215-854-2796, @samwoodiii or samwood@phillynews.com*

Posted: April 22, 2013 - 1:46 PM
Sam Wood, PHILLY.COM

## Never Miss a Story

Subscribe

# EXHIBIT "7"

Exhibit 7
0018

https://www.tulsaworld.com/communities/wagoner/news/shooting-deemed-justifiable-authorities-say-zach-peters-acted-lawfully-when/article_ad51c988-72d3-556f-be54-6c9404a5fbab.html

# Shooting deemed justifiable: Authorities say Zach Peters acted lawfully when he shot, killed three intruders

By JOSH ALLEN Staff Writer   Apr 3, 2017





First Assistant District Attorney Jack Thorp told reporters Zach Peters acted "lawfully," within "his rights as an Oklahoma citizen," when he shot and killed three masked intruders with an AR-15 inside his home after they broke in on Monday, March 27. JOSH ALLEN/AMERICAN-TRIBUNE

---

Related content

**Audio: Listen to edited version of audio of the 911 call**

**Alleged getaway driver in home invasion triple homicide reportedly knew man who shot 3 teens**

**VIDEO: 911 call released: Man who fired AR-15 on teen intruders tells dispatcher 'I shot two of them'**

**The latest: Friends in disbelief over deaths of three teens during home-invasion**

Case 3:19-cv-00253-BEN-JLB Document 22-12 Filed 12/06/19 PageID.299 Page 44 of 104

Woman arrested after Broken Arrow-area man fatally shoots three intruders

Wagoner County officials said Monday the 23-year-old who shot and killed three masked intruders inside his home on March 27 acted justifiably and would not be charged with any crime.

At a press conference on Monday, First Assistant District Attorney Jack Thorp read an official letter from the DA's office, which said Peters "acted in accordance with his rights as an Oklahoma citizen."

The DA's office sent the official letter declining to prosecute or pursue any charges against Peters to the Wagoner County Sheriff's Office on Monday, April 3.

"Upon my review of his interview, it appears that he (Peters) was in fear for his life as he perceived the intruders and discharged his weapon at the intruders," District Attorney Brian Kuester states in the letter.

Kuester concludes Peters acted in accordance with the Oklahoma statue entitled Physical or Deadly Force Against Intruder (21 O.S. 1289.25).

"My deputies have worked tirelessly on this case ever since it happened to make sure we do a good job," Wagoner County Sheriff Chris Elliott said Monday. "They've investigated this meticulously, diligently, and we've looked at every piece of evidence."

Thorp said at Monday's press conference that Elizabeth Marie Rodriguez, 21, who was arrested for her involvement in the home invasion and subsequent deaths, has officially been charged with three counts of first-degree murder by the DA's office.

The range of punishment for murder in the first degree, Thorp said, includes three possible punishments; death, life without the possibility of parole or life.

She also faces a first-degree burglary charge and a second degree burglary charge, according to court records.

"Like every other jurisdiction in the country, we too have seen burglaries ... an increased number of burglaries happening in Wagoner County," Elliott said. "We are working diligently with other law enforcement agencies and the community to try and thwart these burglaries."

11/18/2019     Shooting deemed justifiable; Authorities say Zach Peters acted lawfully when he shot three intruder | Tulsa World

Case 3:19-cv-00153-BEN-JLB  Document 22-12  Filed 07/06/19  PageID.300  Page 45 of 104

Rodriguez was arrested after she turned herself in to authorities shortly following the home invasion and shooting. She stated to investigators that she had "planned the robbery and drove the vehicle," according to authorities.

On Thursday, she told reporters in an interview from the jail that she was sorry for her part in the crime, claiming she did not plan to kill any of them but did admit to her part in the robbery attempt.

Jaykob Woodriff, 16, Jacob Redfearn, 17, and Maxwell Cook, 19, were wearing all-black and masks when they broke into Peters' home on Monday, March 27 around noon.

After hearing loud noises that woke Peters, who was at the home alone at the time, he encountered the three intruders inside his home. Armed with an AR-15 assault rifle, Peters fired, killing all three.

Authorities said one was armed with brass knuckles and another had a knife.

"At the sheriff's office, we're very troubled by this. We don't want to see this in our county," Sheriff Elliott said. "But we support the right of our citizens ... the right to bear arms and to defend their homes in this county."

"In this such, we feel strongly that that's what took place here," he continued. "We don't want to see this type of thing in our county, obviously, but we are also in the United States and in a state that affords our citizens the right to defend themselves."

Within minutes of firing the shots, Peters called 911 and requested medical personnel for the wounded intruders, telling the dispatcher "one of 'em's shot bad."

"Our condolences are extended to the families (of Woodriff, Redfearn and Cook)" Thorp said on Monday.

Originally it was reported that Rodriguez may have personally known Peters, however, she confirmed to authorities last week that "she had no connection" with him, according to Deputy Nick Mahoney, spokesman for the sheriff's office.

After waiving her right to an attorney, Rodriguez told investigators Wednesday that "she did not know Zach Peters," but said she "indirectly became aware of Peters' father."

"She said she determined Peters had money and expensive belongings, and that was why she selected his home, to 'hit a lick,'" Mahoney said.

"Hit a lick," Mahoney explained, "is a term some criminals use to describe getting a significant amount of money in a short period of time."

An arrest affidavit had previously indicated that Rodriguez "had previous knowledge of the house and the homeowner."

After Peters shot the intruders, who had broken in through a back glass door, two of them died inside, while one made it out to the driveway before collapsing.

Rodriguez told investigators that, after she heard shots fired, the injured suspect who ran outside tried to get back into her vehicle, but she said she drove away, leaving him in the driveway, Mahoney said.

Rodriguez also told investigators that she and the three deceased suspects had went to the residence prior to the shooting and burglarized a spare apartment on the property. She said they then returned later to burglarize the main house, Mahoney said.

Another witness contacted authorities last week with alleged additional information regarding the home invasion, according to Mahoney.

"Investigators have made contact with her and are currently in the process of talking with her," Mahoney said last week.

Though specific details about what she knows about the case were not revealed, he said investigators were "taking her seriously."

"She is a witness, not a suspect," Mahoney clarified.

Her name is not being released at this time. At Monday's press conference, authorities did not comment on her involvement or the information she may have provided to investigators, but Sheriff Elliott said she was a juvenile.

"We're not going to release any information on that," Elliott said referring to the witness, who may have been in the back seat of the car that Rodriguez drove to the residence prior to the home invasion. "This case is still an open investigation."

Rodriguez will go before Associate District Judge Dennis Shook on April 5 for an initial appearance hearing.

# EXHIBIT "8"

Exhibit 8
0023

Detailed Information Regarding Penetration Of .223 Ammunition
## by R.K. Taubert
*About the author: A recently retired FBI Agent with over 20 years experience in SWAT and Special Operations, he conducted extensive counter-terrorism and weapons research while in the Bureau.*

*Reprinted and edited with permission.*

## Close Quarter Battle Reputation
Several interesting but inconclusive articles examining the feasibility of the .223 caliber, or 5.56x45mm round, for CQB events, such as hostage rescue and narcotics raids, have recently been featured in a variety of firearms and police publications. However, for more than 20 years, conventional law enforcement wisdom generally held that the .223 in any configuration was a deeply penetrating round and, therefore, totally unsuited for CQB missions in the urban environment. Partly because of this erroneous, but long held perception, and other tactical factors, the pistol caliber submachine gun (SMG) eventually emerged as the primary shoulder &quot;entry&quot; weapon for the police and military SWAT teams.

Although new revelations about the .223 are beginning to slowly circulate throughout the Special Operations community, a number of law enforcement agencies are in the process of acquiring the next generation of &quot;advanced&quot; SMGs in 10mm and .40 S&W calibers. Could they and the public be better served by a .223 caliber weapons system and at less expense? Please read on and judge for yourself.

## FBI Ballistic Tests
As a result of renewed law enforcement interest in the .223 round and in the newer weapons systems developed around it, the FBI recently subjected several various .223 caliber projectiles to 13 different ballistic tests and compared their performance to that of SMG-fired hollow point pistol bullets in 9mm, 10mm, and .40 S&W calibers.

Bottom Line: In every test, with the exception of soft body armor, which none of the SMG fired rounds defeated, the .223 penetrated less on average than any of the pistol bullets.

These tests were conducted by the FBI's Firearms Training Unit (FTU), at the request of the Bureau Tactical and Special Operations personnel. Located at the FBI academy in Quantico, VA, this is the same unit with the encouragement of forensic pathologist Dr. Martin Fackler and other ballistic experts, that dramatically advanced the testing of modern handgun rounds to estimate their wounding effectiveness and potential lethality. Ultimately, this entity confirmed that permanent crush cavities, or &quot;wound-channels,&quot; and deep penetration were the primary factors for handgun-fired projectiles. The FTU further determined that under various target engagement circumstances, a depth of penetration in soft tissue of between 12 to 18 inches was required for a handgun bullet to be effective.

## Equipment Employed / Rounds Tested
For these series of tests the following firearms, ammunition and equipment were employed:

• Sealed, match grade test barrel to determine 25 yard, 10-shot group accuracy and 20-round velocity potential.
• 20&quot; barreled, M16A1 rifle to stabilize and test rounds ranging from 40 to 55 grains in weight.
• 20&quot; barreled, M16A2 rifle to stabilize and test rounds ranging from 62 to 69 grains in weight.
• Oehler Model 85 chronograph.
• Ransom type rifle rest, with laser bore sighting.
• Numerous blocks of Kind and Knox 250-A, 10% gelatin, to simulate living tissue.
• Federal's 40-grain &quot;Blitz&quot; hollow point, 55-grain soft point and 69-grain hollow point; 9mm 147-grain Hydra-Shok, 10mm and .40 S&W 180-grain, jacketed hollow points.
• Winchester's 55- and 62-grain full metal case, NTO-military spec. rounds.

As indicated, both rifles were fired from a mechanical rest. Ten-shot groups and 20-round velocity tests were fired for each round. 13 penetration tests were conducted. 95 rounds were fired for each type of round tested. A total of 760 rounds were tested and recorded for this project.

## Test Protocol
Tests 1-6:
Bare gelatin, heavy clothing, automobile sheet metal, wallboard, plywood, and vehicle windshield safety glass, were shot a distance of 10 feet from the muzzle. The vehicle safety glass was set at an angle of 45 degrees to the horizontal, with the line of bore of the rifle/SMG offset 15 degrees to the side resulting in a compound angle of impact for the bullet upon the glass, which simulates a shot directed at the driver of a car closely missing the shooter. Furthermore, the gelatin was covered with light clothing and set back 18 inches behind the glass. All gelatin blocks, with the exception of the body armor barrier, were set 18 inches behind each solid obstacle shot.

Tests 7-13:
All involved shots through heavy clothing, safety glass and bare gelatin at 50 to 100 yards, concluding with internal walls, external walls and body armor at 10 feet. Test eight however, involved safety glass at 20 yards, shot dead-on, without the 15 degree offset, to simulate a shot at a car's driver bearing down on the shooter.

For the connivance of the reader, test results are summarized in the following chart. Please note that the data displayed represents the average penetration of these rounds as measured in 10% ballistic gelatin (see tables 1 and 2).

Considering that the average person's torso is 9 inches thick, front to back, all the .223 rounds ranging in weight from 55 to 69 grains appear to be adequate performers on soft targets where frontal shots are involved. Although the majority of target engagements are frontal, profile shots can and do occur. A .223 round that is required to pass through an arm before entering the rib cage mat, upon striking bone, fragment, and while possibly shattering the appendage, would most likely not be successful in producing a sufficiently deep body cavity wound to be decisive. In this, as with any CQB encounter, &quot;controlled pairs,&quot; or rapid-repeat hits may be

Case 3:19-cv-01537-BEN-JLB   Document 22-12   Filed 12/06/19   PageID.305   Page 50 of 104
About .223 Penetration

required to ensure target neutralization.

**Defeating Ballistic Garments**
Soft body armor appears to have little effect on the calibers ability to penetrate and actually seemed to enhance the 40-grain Blitz's depth of penetration in soft tissue.

From a law enforcement standpoint, the ability of the .223 caliber round to defeat soft body armor, military ballistic helmets and many ballistic shields is a &quot;double-edged sword.&quot; The criminal use of body armor is rare, but increasing. Possessing the ability to penetrate and adversary's protective vest is obviously desirable. However, this round will also defeat law enforcement vests, so great care must be exercised in laying out and observing fields of fire in training and during operations. With this concern over potential fratricide in mind, voices have been raised in some quarters regarding this bilateral tactical attribute. A number of veteran officers strongly embrace The traditional concept that a department's duty rounds should not exceed the capabilities of their vests. Arguably, this is a sound approach for any law enforcement agency to take for its non-tactical response personnel. However, SWAT, because of its specialized missions, may be a different matter and this later concern, while important, should not dominate the rationale supporting weapons selection by highly competent tactical units.

Although it has been reported that less that 1% of all serious crimes involve long guns and less than 8% of long gun related crimes involve rifles, law enforcement is being confronted more frequently by criminals with weapons and munitions that are capable of defeating all but the heaviest ballistic protection. The FBI's Uniform Crime Reporting Section indicates, for example, that rifles were involved in 13% of the assaults on police officers during 1992. The incident a Waco, Texas, is a recent example of this problem. For forced entry teams, the need for higher levels of ballistic protection is essential.

For safe training of specialized law enforcement teams, the development of a lead-free, low penetration, short-range 5.56mm/.223 caliber training round that will (1) not penetrate ballistic vests and helmets, (2) destroy &quot;shooting house&quot; walls, (3) crater, or perforate steel-reactive targets, is extremely important. Fortunately, it appears that private industry is responding to these demands and such munitions are currently being developed.

**Vehicle Interaction**
With the exception of the full metal case and the 69-grain JHP rounds, it appears inadvisable to select lighter weight, soft or hollow point versions of this caliber when automobiles are likely to be engaged during planned raids and arrests. Penetration against automobile windshield safety glass is generally very poor and is only slightly better on sheet steel. Although terrorists from the insurgent New Peoples' Army were able to blast their way through an armored limousine in the Philippines and murder a highly regarded U.S. military official with concentrated M-16 rifle fire, the SMG-fired pistol round demonstrates at least a theoretical, if not practical, edge against such hardened targets.

Interestingly, while penetration on auto glass and sheet steel is marginal, .223 projectiles will readily perforate and breach mild steel such as standard pepper poppers, that pistol rounds will

3 / 9

**Exhibit 8**
**0026**

only slightly dimple. However, very little of the .223's mass is retained, so after defeating mild steel, significant wound potential is severely diminished upon exit.

**Barriers and Structures**
The Bureau's research also suggests that common household barriers such as wallboard, plywood, internal and external walls are also better attacked with pistol rounds, or larger caliber battle rifles, if the objective is to &quot;dig out&quot; or neutralize people employing such object as cover or concealment. Although it is usually not advisable to fire at targets you can't see in urban settings, it is done and some subjects have been stopped in this manner. Conversely, the ability of some pistol rounds to penetrate barriers tested puts innocent bystanders and fellow team members at greater risk in CQB scenarios. If an operator misses the intended target, the .223 will generally have less wounding potential than some pistol rounds after passing through a wall or similar structure. The close range penetration tests conducted indicated that high velocity .223 rounds were initially unstable and may, depending on their construction, disintegrate when they strike an object that offers some resistance. When concrete, brick or macadam are struck at an angle at close range, .223 rounds tent to fragment or break up, and ricochets are generally less hazardous. The .223 could consequently be considered safer for urban street engagements, because of its inherent frangibility within the cross-compartments created by street environments. In other words, in most shootings, the round would probably strike something, hopefully a hard object, break up and quickly end its potentially lethal odyssey.

As a point of interest, the rifled shotgun slug, while not possessing the .223's flat trajectory, is still capable of attaining a maximum range of 900 yards. This fact illustrates that any errant law enforcement round regardless of caliber, or maximum range, is potentially dangerous to the community.

**.223 Wounding Characteristics**
Ballisticians and Forensic professionals familiar with gunshot injuries generally agree that high velocity projectiles of the .223 genre produce wounds in soft tissue out of proportion to their calibers, i.e. bullet diameter. This phenomenon is primarily attributed to the synergistic effects of temporary stretch cavity (as opposed to the relatively lower velocity stretching which typifies most pistol rounds) and bullet fragmentation on living tissue.

Distinguished forensic pathologist Dr. Martin L. Fackler, observed when he was conducting wound research for the U.S. Army several years ago (&quot;Wounding Patterns of Military Rifles,&quot; International Defense Review, Volume 22, January, 1989), that in tissue simulants such as ballistic gelatin, , the 55-grain, M-193 military bullet lost stability, yawed (turned sideways) 90 degrees, flattened and broke at the cannelure (groove around the bullet into which the cartridge case is crimped) after penetrating about four to five inches. The forward portion of the bullet generally remained in one piece, accounting for 60% of its originally weight. The rear, or base portion of the bullet, broke into numerous fragments that may also penetrate tissue up to a depth of three inches. Dr. Fackler also noted that a relatively large stretch cavity also occurred, violently stretching and weakening tissue surrounding the primary wound channel and its effect was augmented by tissue perforation and further weakening by numerous fragments. An enlarged permanent cavity significantly larger than the bullet diameter resulted by severing

Exhibit 8
0027

and detaching tissue pieces. However, as the range increases, the degree of bullet fragmentation and temporary cavitation decreases because terminal velocity diminishes. At 100 meters, Fackler observed that the bullet, upon penetrating tissue, breaks at the cannelure, forming two large fragments. However, beyond 200 meters, it no longer looses its integrity, although flattening continues to somewhat occur out to 400 meters.

In his study, Fackler remarked that in abdominal shots, "There will be increased tissue disruption (beyond the bullet diameter wound channel) from the synergistic effect of the temporary cavitation acting on tissue that has been weakened by bullet fragmentation. Instead of observing a hole consistent with the size of the bullet in hollow organs such as the intestines, we typically find a void left by missing tissue up to three inches in diameter." However, "unless a extremity (peripheral hit) is sufficiently thick like a thigh, or the bullet does not strike bone, the round may pass through an arm for instance, causing little damage from a puncture type wound."

Regarding NATO's 62-grain FMC M-855 (SS109) .223 caliber round Dr. Fackler observed that the bullet produces a wound profile similar to the M-193's, particularly where abdominal or thigh wounds were involved. Other sources indicate this bullet, with a [steel] core penetrator, exhibits 10% greater fragmentation and retains its ability to fragment at slightly longer ranges than the 55-grain military bullet. *[Keep in mind that the M-855 round, because of its steel core, has a length comparable to a 73-grain lead core bullet, and should be shot out of longer barrels (18+ inches) with tighter twists in order to retain good practical accuracy]*   ,

Hollow and soft point bullets in this caliber can be expected to upset and fragment much sooner and more consistently that full metal case (FMC) bullets. In light of this more consistent performance, Fackler recommends hollow points over "ball" ammunition for police use, providing the HP bullet penetrates deep enough to disrupt something vital. However, in his candid opinion the most effective round currently available for law enforcement operations is the 64-grain, Winchester-Western, pointed soft point, currently referred to as "Power Point". This bullet has a heavier jacket than those tested by the FBI, resists hyper-fragmentation, penetrates well and "expands like a .30 caliber rifle round." Subsequent FBI tests of this round fired from Colt's 14.5-inch barreled Mk-IV carbine bore this out and bullet expansion was "impressive."

Dr. Fackler also advised that the synergistic effects of fragmentation and high velocity temporary cavitation cannot be scientifically measured in gelatin because that medium is too elastic. More Accurate results can be obtained by examination of fresh animal tissue soon after it is shot.

**Range Limitations**
Federal's Blitz round, because of its very high velocity, low weight and frangible construction, demonstrated extremely poor overall penetration in the FBI tests. If it is considered for CQB use, it should be fired from ultra-short barreled weapons, such as Heckler & Koch's, 8.85-inch barreled HK-53. Shorter barrels would bleed off excessive velocity to reliably fragment and produce good temporary stretch cavities at close range. Because of this velocity loss, the maximum effective range on personnel would most likely be 100 yards or less. To ensure that

Exhibit 8
0028

.223 caliber bullets perform as previously described by Dr. Fackler, it appears that a minimum target striking velocity of 2,500 feet per second (fps) is required. Bullets over 50 grains in weight may not accelerate to this critical velocity in barrels less than 10 to 11 inches in length. Tactical teams should therefore carefully select the appropriate barrel length for their CQB weapon, to ensure that the round they employ will deliver minimum terminal ballistic velocities at the ranges desired and balance it against maneuverability requirements *[Also remember that dr. Fackler's data is based on the FMJ ball ammo results and that hollow point ammunition will be as effective with lower velocities]*

&quot;Bull pup&quot; configured carbines, such as the Steyr AUG, enjoy a distinct advantage here, because they retain long barrel lengths with relatively compact overall dimensions and are as flexible as an SMG in confined areas. In fact, a Steyr AUG compares favorably to H&K's MP5-SD SMG in overall length and with a 16-inch barrel, is only an inch longer overall than a 14-inch barreled Remington 870 raid shotgun.

*[At this point, Mr. Taubert's article goes into extreme range shooting and barrel length. His suggestion is to have a barrel at least 14-18 inches long for CQB use as this allows for useful terminal ballistics at around 150-200 yards with 60+ grain bullets. I disagree with Mr. Taubert's point of view for the simple fact that we are discussing Close Quarters firearms, and not long range sniping firearms. In these instances, a barrel length of 6-10 inches is practical for entry team use as it allows for greater maneuverability and acceptable ballistic performance with 55-grain hollow point ammunition. Also, a lot of Mr. Taubert's information is based off of Dr. Fackler's research using FMJ ammunition. Most of my information is based upon real-world shootings and actual testing of commercial ammunition in short barreled firearms designed for this application.]*

A recent review of major U.S. ammunition manufacturers' pricing indicates that commercially loaded .223 ammunition is slightly less expensive than similarly configured premium hollow point pistol ammunition. With millions of rounds of surplus military .223 ammunition possibly available to law enforcement, because of numerous base closures and through low cost channels, training with this caliber could be highly cost effective.

The .223 carbine is able to satisfy both close and intermediate range requirements and presents a good argument for eliminating the necessity for the law enforcement SMG. This one-gun concept will not only stretch departmental funds in this respect and reduce training requirements, but in some cases the difference in price between a single-fire carbine and a select-fire SMG often amounts to several hundreds of dollars. The need for full automatic fire with the M-16 carbine is debatable and two single-fire versions can often be purchased by police agencies for the cost of one top-of-the-line SMG. *[This is a fact that I have been preaching for a long time. Another fact that Mr. Taubert does not touch on is that the M-16/AR-15 family of rifles use a split receiver system that allows the rapid exchange of differently configured uppers. This allows one officer to carry a 16&quot; CAR-15 in is patrol vehicle as his secondary firearm, and a 6&quot; upper receiver unit in his trunk for tactical entry use]*

As a result of contemporary research, such as that conducted by the first FBI's Wound Ballistic Workshop, some law enforcement agencies have expressed the opinion that concerns about

pistol bullet over penetration were exaggerated. They cite the toughness and flexibility of the human skin in resisting bullet exit and the fact that police officers historically missed their intended targets most of the time in actual shootings. While poor hit ratios and over penetration may not be critical to some for individual gun battles that occur in the street, these marksmanship realities can become real planning and safety concerns when establishing fields of fire during raids, hostage rescues and other tactical operations.

Typically, these operations involve confined areas, where officers occupy positions in close proximity to each other. In close combat operations, every round expended must be accounted for. It is imperative that that rounds fired hit their intended targets and not pass through them to endanger other officers and innocent bystanders. If misses occur, it is desirable that once the stray round strikes a solid object, it expends its energy and disintegrates into relatively harmless pieces. If deep, barrier penetration is necessary, special ammunition or projectiles *[or weapons]* possessing this attribute can be selected.

### Shootout Results

It was late in the morning on a hot July day in 1993, when members of a major Western cities' police tactical unit executed a search and arrest warrants in connection with a narcotics raid on a &quot;biker residence.&quot; The tactical officers were armed with Sig-Sauer 9mm P-226 pistols and 16-inch barreled Steyr AUG .223 caliber carbines with optical sights. The Steyr, loaded per SOP, with 28 Federal 55-grain HP rounds was the primary entry weapon for several officers on the team. Steyr carbines were selected for this raid, because the team leaders anticipated shots &quot;out to 25 yards.&quot;

The team was required to knock and announce, effectively negating the element of surprise. Approximately 92 seconds into the raid, the officer involved in the following shooting incident was in the process of cuffing a subject when two Rottweiler dogs attacked. While the other officers were dealing with the dogs by employing OC aerosol, a 6-foot-tall, 201-pound subject, high on &quot;speed&quot;, suddenly burst into the room occupied by the police through a locked door and leveled a 9mm pistol at one of the tactical officers. The distance between the adversaries was approximately 20 feet. With his back essentially to the subject, the involved officer acquired the threat in his peripheral vision, whirled around and commanded, &quot;Police, put your hands up,&quot; while clearing the Steyr's safety and mounting the weapon. The subject then shifted his pistol, held by one hand in a bladed stance, towards the reacting officer. In &quot;less than a second&quot; the subject's hostile action was countered by the officer by firing two fast, sighted, tightly controlled pairs, for a total of four rounds at the subject. Rounds one and two missed, but were contained by the structure. Round three connected, penetrated and remained in the subject. Round four grazed his upper chest and exited as he spun and fell. Round three was quickly effective. The collapsing subject ceased all motor movement and expired within 60 seconds. The involved officer was aware of each round fired and simultaneously moved to cover. Tactical members were then confronted by a female accomplice armed with a double-barreled shotgun. However, the involved officer also successfully negotiated her surrender. All .223 rounds that missed the subject struck parts of the building's internal structure, fragmented and remained inside.

When the autopsy was performed, the forensic pathologist was amazed at the degree of

Exhibit 8
0030

internal devastation caused b the .223 round. There was a two-inch void of tissue in the chest, with a literal &quot;snowstorm&quot; of bullet fragments and secondary bone fragments throughout the upper left chest area. The round struck the subject 11 inches below the top of his head and inflicted the following wounds:

- Penetrated the top of the left lung, left carotid and subclavian arteries.
- The collar bone and first rib were broken. Cavity measured 5x6 centimeters.

What is significant about this &quot;instant one-shot stop&quot; was that the round did not strike the subject at the most effective or optimum angle and did not involve any direct contact with the heart or central nervous system. It is doubtful that this type o terminal ballistic performance could have been achieved by any of the police service pistol/SMG rounds currently in use.

Although this is only one incident and could be an aberration, police tactical teams require this type of terminal ballistic performance to enhance their safety and survival particularly during CQB engagements, when criminals most often enjoy a positional and action-versus-reaction time advantage.

The FBI study clearly demonstrates the following: (1) that .223 rounds on average, penetrate less than the hollow point pistol rounds evaluated, (2) concern for over penetration of the .223 round, at close range, has been greatly exaggerated, (3) with the exception of soft ballistic garment penetration, the .223 round appears to be relatively safer for employment in CQB events than the hollow point bullets tested.

Observations and experience indicate that high velocity rifle bullets generally produce more serious wounds in tissue than pistol bullets, regardless of range.

Violent temporary cavitation, in conjunction with bullet yaw and fragmentation, are essential wounding components for high velocity rifle projectiles.

As range and bullet stability increases and velocity decreases, rifle caliber wound severity decreases and penetration increases.

Where soft target penetration requirements exist and over penetration concerns are prevalent, police should employ hollow point bullets in this caliber.

Full metal case or heavier soft point bullets may be more appropriate for hard target penetration in this caliber.

The .223 and the current carbine systems available for it are highly versatile and well suited for urban as well as rural operations. However, because of enhanced terminal ballistic performance, rifles are recommended if targets are expected to be engaged beyond 200 meters. *[The .223 round itself should not be used in law enforcement applications at any ranges outside of 300 yards/meters. Long distance shots should be left to highly trained sniper units using medium caliber center fire rifle ammunition. e.g. .308/7.62 NATO. Also, the majority of*

Exhibit 8
0031

*police sniper shots occur within 100 yards/meters.]*

The ability to train with one shoulder weapon and caliber for both CQB and open air options simplifies logistics and training, makes training more effective and is cost effective. *[Again, one upper for general, secondary weapon usage, and one upper for CQB]*

Under current pricing, police agencies can realize significant savings by purchasing single-fire carbines instead of select-fire machine guns.

Because of the &quot;political&quot; considerations and perhaps the concern over the possibility of more serious injuries caused by errant &quot;friendly fire,&quot; the highly versatile and powerful .223 carbine may not be a suitable CQB firearm for some departments. However, if the above factors are not involved, the .223 carbine is an extremely flexible and effective anti-personnel weapon with, in many cases, handling characteristics actually superior to many contemporary SMGs. It offers the advantages of reduced logistics, lower costs and reduced training time when compared to agencies employing multiple specialty weapons. The caliber in its current offering is far from perfect, but in spite of some shortcomings, I anticipate that in the future it will eventually replace pistol caliber SMGs in many police departments and law enforcement agencies.

*It has been a recently growing trend to see law enforcement departments exchanging their issue shotguns for the police carbine in 9mm, .40 S&W, and .45 ACP. And many departments have found that these carbines do not serve their needs as they expected. However, they are fearful to switch, or in many cases purchase, .223 carbines because &quot;they will go through 10 people and 3 city blocks before they stop!&quot; As you can see, this is not the case, and is in fact, completely the opposite. I hope that this article helps to clear all false truths and misnomers about this very versatile and serviceable cartridge.*

ALL OF THE INFORMATION IN THIS ARTICLE IS BASED UPON THE PERSONAL EXPERIENCE OF INDIVIDUALS WHO MAY BE USING SPECIAL TOOLS, PRODUCTS, EQUIPMENT AND COMPONENTS UNDER PARTICULAR CONDITIONS AND CIRCUMSTANCES, SOME OR ALL OF WHICH MAY NOT BE REPORTED, NOR OTHERWISE VERIFIED IN THIS ARTICLE. NOTHING HEREIN IS INTENDED TO CONSTITUTE A MANUAL FOR THE USE OF ANY PRODUCT OR THE CARRYING OUT OF ANY PROCEDURE OR PROCESS. THE WRITERS, EDITORS, AND PUBLISHERS OF THIS ARTICLE ACCEPT NO RESPONSIBILITY FOR ANY LIABILITY, INJURIES OR DAMAGES ARISING OUT OF ANY PERSON'S ATTEMPT TO RELY UPON ANY INFORMATION CONTAINED HEREIN.

Exhibit 8
0032

# EXHIBIT "9"

Exhibit 9
0033

## .223 / 5.56 Penetration Tests vs.

## .40 S&W and 12 ga. Slug

### Overview
The research on the penetration of .223 ammunition has been completed. In an effort to make research more meaningful, testing consisted of handgun and shotgun ammunition in the same testing medium. The final results were that the .223 demonstrated less penetration capability than the 12 gauge slug and the .40S&W [handgun round].

### Testing Medium
Type 250A Ordnance Gelatin was cast into blocks, 6"x6"x16". The process used is that which is recommended by Col. M. Fackler, Director of the US Army Wound Ballistics Laboratory. This is a 10% mixture, 1Kg of gelatin to 9000ml of H2O. This type of gelatin accurately simulates human body tissue in terms of bullet penetration.

A small piece of wall was constructed to duplicate the standard exterior walls found in [the Pacific Northwest] area. This piece of wall was sheeted with ½" wafer board, covered with a 2nd piece of ½" wafer board to simulate siding. This wall was built using a 2x4 frame and finished on the inside with ½" sheet rock. The interior [of the wall] was lined with fiberglass insulation.

### Weapons Used
CAR-15, cal .223 Rem./5.56x45mm with a 16" barrel.
Glock M22, cal .40S&W.
Remington 870, 12 ga.

### Ammunition Used
Federal .223 Remington, 55 grain HP.
Winchester .40S&W, 180 grain HP.
Federal 12 ga., 2 ¾", rifled slug.

Exhibit 9
0034

## Procedure

All rounds were fired from a distance of 12 feet. After each round was fired, its penetration was recorded and bullet performance noted. After a bullet was fired into the [bare] gelatin, another bullet of the same type was fired through the section of wall and into the gelatin. This was done in order to determine its penetration potential in the event a stray round were to hit the wall of a building.

## Results

| Caliber | Testing medium | Penetration | Condition of bullet |
|---------|----------------|-------------|---------------------|
| .223 Rem. | gelatin only | 9.5&quot; | two pieces |
| .223 Rem. | wall & gelatin | 5.5&quot; * | fragmented |
| .40S&W | gelatin only | 13.5&quot; | mushroomed |
| .40S&W | wall & gelatin | 22&quot; * | no deformation |
| .40S&W | wall & gelatin | 22&quot; * | no deformation |
| .40S&W | wall & gelatin | 19.5&quot; * | slight deformation |
| 12 ga. | wall & gelatin | 27.5&quot; | mushroomed |

* these measurements do not include penetration of the 6&quot; wall.
CCI Gold Dot.

## Summary

The 55 grain HP .223 has less penetration than any of the other ammunition tested. Based on the results of this testing, there appears to be no basis for concern regarding the over penetration of the .223 [HP] round. In fact, it seems even safer in this regard than .40 S&W handgun ammunition.

The hollow point cavity in the .40S&W round filled with material when shot through the wall. This caused [these bullets] to fail to expand when they entered the gelatin. As a result, they penetrated 8.5&quot; farther than when shot directly into the gelatin.

When the .223 [HP] was shot through he wall it began to fragment and as a result penetrated the gelatin only 5.5&quot;.

Because the .223 [HP] begins to break up on impact, it has less potential for damage or injury than the 12 ga. in the event of a ricochet. The .223 [HP] is obviously safer in an urban environment than the 12 ga. with slugs or buckshot.

**Real World .223 Testing**

Additional testing conducted proved that the .223 would penetrate a car door or glass. The .223 rounds fired into windshields began to break up after entering the glass and did not retain much energy. In most cases these rounds split in two.

---

## The Call-Out Bag

# by Gunsite Training Center Staff

### A Comparison of .223 Penetration vs. Handgun Calibers

The .223 shoulder-fired weapon systems (e.g., AUG, CAR) have received some recent interest as indoor tactical weapons for special operations teams. increased power, longer effective distances, and greater tactical flexibility have been cited as positive factors of the .223 systems over 9me SMG-type weapon systems. Other authors (Fackler, et all) have postulated greater capability for tissue damage and incapacitation of the .223 rifle cartridge over the 9mm projectile fired from handguns or SMGs. Negative considerations for the indoor use of the .223 weapon systems focus on over-penetration of projectiles and possible subsequent liability.

Our effort was made to compare the penetration characteristics of various .223 bullets to various handgun bullets fired into test barriers representing indoor and outdoor building walls. We felt that the following test might mimic shots fired from inside a building, through the internal rooms, out the exterior wall, and into another similar building nearby. A comparison of wall penetration effects by a variety of handgun calibers versus the effects of .223 FMJ ball, .223 SP, and .223 HP, under these same conditions, was expected to substantiate other findings reported or provide new information to those interested in this area of ballistics.

Two interior test walls were constructed using a wood 2x4 frame with standard drywall board attached to both sides. Two exterior test walls were made using wooden frames with drywall board attached to one side and exterior grade T1-11 wooden siding attached on the other (exterior) side. R-19 fiberglass insulation batting (Dow Coming) was stapled inside the two exterior test walls. To maintain test medium consistency, no wooden cross beams, electrical

**Exhibit 9**
**0036**

**Real World .223 Testing**

fixtures, conduits, or electrical wiring were placed in any of the test walls.

The test walls were placed in the following sequence to mimic shots fired from. inside a building, through two internal rooms, out the building, and into another similarly constructed building:

**A.** Interior wall #1 was placed 8 feet from the shooting position.

**B.** Interior wall #2 was placed 8 feet beyond interior wall #1.

**C.** Exterior wall #1 was placed 8 feet beyond interior wall #2. (Exterior side facing away from the shooter.)

**D.** Exterior wall #2 was placed 15 feet beyond exterior wall #1. (Exterior side facing toward the shooter.)

All calibers tested were fired from a position 8 feet in front of interior wall #I, so the bullet trajectory would travel in sequence through each of the succeeding test walls. Each caliber tested was chronographed and all firing results were videotaped for archive files.

The following results were obtained:

    1.  All handgun calibers exited exterior wall #1. This means they exited the &quot;house&quot; after passing through two interior &quot;rooms,&quot; then entered another &quot;house&quot; to impact into the berm. The handgun caliber which demonstrated the least penetration was .22 LR Lightning.
    2.  The only calibers which did NOT exit the &quot;house&quot; were .223 (5.56) soft point and hollow point loaded bullets.
    3.  All projectiles demonstrated directional changes in their trajectory after passing through the first interior wall. The greatest directional changes (10 inches+ yaw) were shown by 9mm and .40 S&W projectiles.
    4.  Directional changes in bullet trajectory appeared to increase in magnitude with each test

**Exhibit 9**
**0037**

**Real World .223 Testing**

wall the projectile passed through.

The penetration characteristics of projectiles have long been believed to be primarily determined by a relationship of bullet mass, bullet shape, bullet velocity, and bullet construction. The penetration differences of .223 soft point and hollow point projectiles versus the effects from .223 full metal jacket may be due to differences in bullet construction. The differential effects on penetration due to bullet construction shown with the .223 are different and appear greater in magnitude than those encountered when handgun bullet construction is modified. Since .223 projectile velocities are threefold greater than those of handgun projectiles, the increased magnitude of bullet velocity might account for the differences in bullet trajectory and penetration distance. The deviated trajectory of hollow point handgun projectiles was also greater than the deviation found with full metal jacketed handgun bullets; again, possibly due to contact point deformation. The preceding study more than ever identifies the need for a personal emphasis of marksmanship and tactical fundamentals. The shooter is responsible for the bullets that go downrange. Practice, be aware, manage your trigger, and watch your front sight!

*Many thanks to Jack Furr, Ron Benson, Pete Wright, and Seth Nadel, U.S. Customs, for conducting and reporting this test.*

| | | |
|---|---|---|
| .22 LR 40 gr Lightning | 899 fps | Captured in exterior wall #2 |
| 9mm 147gr Win JHP | 948 fps | Captured in exterior wall #2 |
| 9mm 147 gr Win JHP | 1004 fps | Exited exterior wall #2 |
| .40 S&W 180 gr FMJ | 941 fps | Exited exterior wall #2 |
| .40 S&W 180 gr Black Talon JHP | 861 fps | Exited exterior wall #2 |
| .45 ACP 230 gr Win FMJ ball | 862 fps | Captured in exterior wall #2 |
| .45 ACP 230 gr HydraShok JHP | 851 fps | Exited exterior wall #2 |
| .223 (5.56) 55 gr Fed FMJ ball | 2952 fps | Exited exterior wall #2 |
| .223 (5.56) 55 gr Rem SP | 3019 fps | Captured in exterior wall #2 |
| .223 (5.56) 55 gr Fed JHP | 3012 fps | Captured in exterior wall #2 |

ALL OF THE INFORMATION IN THIS ARTICLE IS BASED UPON THE PERSONAL EXPERIENCE OF INDIVIDUALS WHO MAY BE USING SPECIAL TOOLS, PRODUCTS, EQUIPMENT AND COMPONENTS UNDER PARTICULAR CONDITIONS AND CIRCUMSTANCES, SOME OR ALL OF WHICH MAY NOT BE REPORTED, NOR OTHERWISE VERIFIED IN THIS ARTICLE. NOTHING HEREIN IS INTENDED TO CONSTITUTE A MANUAL FOR THE USE OF ANY PRODUCT OR THE CARRYING OUT OF ANY PROCEDURE OR PROCESS.

Exhibit 9
0038

THE WRITERS, EDITORS, AND PUBLISHERS OF THIS ARTICLE ACCEPT NO
RESPONSIBILITY FOR ANY LIABILITY, INJURIES OR DAMAGES ARISING
OUT OF ANY PERSON'S ATTEMPT TO RELY UPON ANY INFORMATION
CONTAINED HEREIN.

Exhibit 9
0039

# EXHIBIT "10"

Exhibit 10
0040

# Why "High Powered" 5.56 NATO/.223 AR-15 Ammo is Safer For Home Defense (FBI overpenetration testing)

By Caleb - Jul 14, 2016



6
Shares



If you listen to the mainstream media, then the standard 5.56 NATO/.223 Remington cartridges the AR-15 shoots are "high powered assault weapon" rounds that have no place in civilian hands.

(I hope you are catching the sarcasm as I'm pouring it on)

Yet, as we've discussed previously, the AR-15 is a GREAT choice for Home Defense.

And what's even more amazing, is that it may be one of the "safest" bullets you can shoot from a gun in a home when it comes to overpenetration concerns.

## Home Defense and The Risks of Over-Penetration

The truth is that almost everyone, once they start thinking about home defense, starts to think about overpenetration.

In other words: what if I miss the bad guy? Where will the bullet go? Is it going to go through a wall and hit other members of my family?

That's what they call "over penetration".

The truth is: almost any round that will penetrate deeply enough to hit vital organs in the human body (and stop an attacker) will penetrate typical interior home walls.

That's because most walls are made up of little more than a couple 2×4 wood studs and drywall on each side. And maybe some insulation depending on the part of the country.

Although this fact remains, that ANY adequate self-defense round will penetrate a wall because you need it to penetrate human flesh, we still want to limit our penetration as much as possible.

## Shotgun VS Pistol VS Rifle Home Defense Penetration

Your typical choices for home defense weapons are a pistol, the shotgun, or a rifle.

Now, when most people think of overpenetration risks they assume that pistol bullets would penetrate less than the rifle or shotgun.

That's actually dead wrong.

**Exhibit 10**
**0041**

Pistol bullets consistently penetrate the most.

Shotgun is next.

And rifles, at least the so-called "high powered assault weapon" AR-15 in 5.56 NATO/.223 Rem penetrates the LEAST.

## FBI and Independent Testing Has Consistently Shown .223/5.56 NATO Fired From AR-15's Do Not Over Penetrate More Than Pistol/Shotgun

First up is this older article by R.K. Taubert, a retired FBI agent with over 20 years experience who conducted extensive counter-terrorism and weapons research while with the Bureau.

To quote Mr Taubert, (emphasis mine) " ... As a result of renewed law enforcement interest in the .223 round and in the newer weapons systems developed around it, the FBI recently subjected several various .223 caliber projectiles to 13 different ballistic tests and compared their performance to that of SMG-fired hollow point pistol bullets in 9mm, 10mm, and .40 S&W calibers.

"Bottom Line: **In every test, with the exception of soft body armor, which none of the SMG fired rounds defeated, the .223 penetrated less on average than any of the pistol bullets."**

—--

And again on this page, there is testing by Gunsite Training Center Staff which found in a comparison of handgun calibers (9mm, .40 S&W, .22 LR, .45 ACP), and rifle caliber .223 (5.56) that:

"The only calibers which did NOT exit the "house" were .223 (5.56) soft point and hollow point loaded bullets."

—--

Then there are the "Box O' Truth" tests with great pictures where they found, "... Common pistol rounds easily penetrated all 4 walls spaced out at room distances ... The 12 gauge shotgun went through 4 walls like they were not there ... The 5.56 rounds deviated greatly from the original flight path once they started tumbling. This occurred after the second wall."

—--

And this drywall testing concluded, "Moving away from rifle rounds takes us from fascinating discoveries into the realm of mythbusting. Handgun rounds, for instance, may penetrate less than rifle rounds–but only if the rifle rounds in question are full-power ball ammo. **The relatively slow speed and heavy weight of handgun bullets make them a poor choice for limiting interior wall penetration, which is why professional door-kicker types have abandoned pistol-caliber submachineguns in favor of .223 carbines."**

—--

And this interesting test at outdoorub found "The pistol rounds were seemingly unaffected by the drywall and/or wood barriers. There was no observable deviation or fragmentation of the 9mm projectiles. You'd be safe counting on a pistol round to keep going, and going, and going ... Even though the .223 rounds start with a lot more energy, they tend to lose it quickly when encountering the barriers in this test ... **Moral of the story? Don't trust the mainstream media. Those high-powered, so called "assault weapons" may be safer than your average pistol for inside-the-home defense."**

(NOTE: many of the rounds tested at outdoorhub are found on the "approved list" of AR-15 self-defense ammo here.)

## When It Comes To Home Defense, The AR-15 Rifle Ammo Is Less Likely To Over-Penetrate

The truth is that AR-15 ammo is less likely to overpenetrate. Yet it is highly effective at stopping threats. Sounds like a good choice for Home Defense to me.

Please Note: that all this "rifle vs shotgun vs pistol" testing is comparing the AR-15 in standard 5.56/.223 to the pistols and shotguns ...

That means that "other rifles" such as AK-47's in 7.62×39, .308 hunting rifles or AR-10 style semi-autos, etc are not included in these tests. THOSE rifle bullets would most likely penetrate much, much further because they are bigger, heavier bullets (though I'm not aware of much actual testing).

**Exhibit 10**
**0042**

**The bottom line to remember in all of this though is to still be aware of your target and what is around/beyond it because ALL bullets that will penetrate deep enough to stop an attacker will still penetrate at least one interior wall. And even a bullet, like the .223 that tends to lose steam and deviate after a wall or two can still be deadly to your family/innocents.**

Check out these other articles for more on excellent performing 5.56 NATO/.223 ammo:

– The "Approved List" Of 5.56 NATO/.223 Rem Self-Defense/Duty Ammo

– The Best Home Defense Ammo For Your AR-15?

Anyways, I hope this clears up some misconceptions when it comes to choosing home defense ammo (or a gun) that will be least likely to penetrate.

### Caleb

Caleb Lee is the #1 best-selling author of "Concealed Carry 101" and founder of PreparedGunOwners.com. He is a civilian (no law enforcement or military experience) who shares information about self-defense and becoming more self-reliant. He's a 1st degree black belt in Taekwondo, NRA Certified Basic Pistol & Personal Protection Inside The Home Instructor, Concealed Carry Academy Instructor certified & also a graduate of the Rangemaster firearms instructor course. He's also the author of numerous online courses including the UndergroundAssaultRifle.com course.

**Exhibit 10**
0043

preparedgunowners.com/2016/07/14/why-high-powered-5-56-nato-223-ar-15-ammo-is-safer-for-home-defense-fbi-overpenetration-testing/    3/3

# EXHIBIT "11"

Exhibit 11
0044



Exhibit 11
0045

# EXHIBIT "12"

Exhibit 12
0046



**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

JANUARY 2019

**SPECIAL REPORT**

NCJ 251776

# Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016

Mariel Alper, Ph.D., and Lauren Glaze, *BJS Statisticians*

Based on the 2016 Survey of Prison Inmates (SPI), about 1 in 5 (21%) of all state and federal prisoners reported that they had possessed or carried a firearm when they committed the offense for which they were serving time in prison (**figure 1**). More than 1 in 8 (13%) of all prisoners had used a firearm by showing, pointing, or discharging it during the offense for which they were imprisoned. Fewer than 1 in 50 (less than 2%) of all prisoners had obtained a firearm from a retail source and possessed, carried, or used it during the offense for which they were imprisoned.

An estimated 287,400 prisoners had possessed a firearm during their offense. Among these, more than half (56%) had either stolen it (6%), found it at the scene of the crime (7%), or obtained it off the street or from the underground market (43%). Most of the remainder (25%) had obtained it from a family member or friend, or as a gift. Seven percent had purchased it under their own name from a licensed firearm dealer.



**FIGURE 1**
**Percent of all state and federal prisoners who had possessed or used a firearm during their offense, 2016**

Note: See appendix table 1 for standard errors.
[a]Includes prisoners who carried or possessed a firearm during the offense.
[b]Includes prisoners who showed, pointed, or discharged a firearm during the offense.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## HIGHLIGHTS

- About 21% of state and 20% of federal prisoners said they possessed a gun during their offense, while 79% of state and 80% of federal prisoners did not.

- About 29% of state and 36% of federal prisoners serving time for a violent offense possessed a gun during the offense.

- About 1.3% of prisoners obtained a gun from a retail source and used it during their offense.

- Handguns were the most common type of firearm possessed by state and federal prisoners (18% each); 11% of all prisoners used a handgun.

- Among prisoners who possessed a gun during their offense, 90% did not obtain it from a retail source.

- Among prisoners who possessed a firearm during their offense, 0.8% obtained it at a gun show.

- About 1 in 5 state and federal prisoners who possessed a firearm during their offense obtained it with the intent to use it during the crime.

- Among state prisoners who possessed a gun during their offense, 27% killed someone with it, another 12% injured someone, 7% fired the gun but did not injure anyone, and 54% did not fire it.

- State prisoners with no military service were more likely to possess a gun during their offense (21%) than prisoners who had served in the military (16%).

**Exhibit 12**
**0047**



Statistics in this report are based on self-reported data collected through face-to-face interviews with a national sample of state and federal prisoners in the 2016 SPI. (See *Methodology*.)

The 2016 SPI data collection was conducted from January through October 2016. The SPI was formerly known as the Survey of Inmates in State and Federal Correctional Facilities (SISFCF). The Bureau of Justice Statistics (BJS) has periodically conducted the survey since the 1970s, with the most recent iteration fielded in 2004. The survey collects information from prisoners on a variety of topics, including firearm possession during the crime for which a prisoner was serving time and how the firearm was used during the crime. It also collects information on the method, source, and process that prisoners used to obtain the firearm. (See appendix 1, *Questions related to firearms in the Survey of Prison Inmates, 2016*.)

## Terms and definitions

- **Firearm** – a weapon that uses gunpowder to shoot a bullet. Primary types are handguns, rifles, and shotguns:[1]

  o *Handgun* – a firearm which has a short stock and is designed to be held and fired by the use of a single hand.

  o *Rifle* – a firearm intended to be fired from the shoulder and designed to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

  o *Shotgun* – a firearm intended to be fired from the shoulder and designed to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each pull of the trigger.

- **Firearm possession** – carrying or possessing at least one firearm when the offense for which prisoners were serving a sentence was committed.

- **Firearm use** – showing a firearm to or pointing a firearm at anyone or discharging a firearm during the offense for which a prisoner was serving time.

- **Source of the firearm** – from where and how prisoners reported obtaining the firearm they possessed during the crime for which they were imprisoned—

  o *Purchased or traded from a retail source* – includes a gun shop or store, pawn shop, flea market, or gun show.

  - **Gun shop or store** – a business establishment that sells firearms in an open shopping format.

  - **Pawn shop** – a business that offers secured loans to customers, with personal property used as collateral. This personal property is sold to the public if the loan is not repaid.

  - **Flea market** – a market that rents space to individuals to sell or barter merchandise.

  - **Gun show** – a temporary market where licensed dealers and unlicensed sellers can rent tables or booths to sell firearms.

  o *Obtained from an individual* – includes purchasing, trading, renting, or borrowing from a family or friend. Also includes when the firearm was gifted to or purchased for the person.

  o *Off the street or underground market* – illegal sources of firearms that include markets for stolen goods, middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs.

  o *Theft* – includes stealing the firearm during a burglary or from a retail source, family member, friend, or another source.

  o *Other sources* – includes a firearm that a prisoner obtained or found at the location of the crime, including one that belonged to a victim or that someone else brought to the location of the crime. This category also includes sources for which there were few responses, such as for guns bought online, and other sources that did not fit into one of the existing categories. This also includes instances where there was not enough information to categorize the source, such as when a firearm was purchased from an unknown source or obtained from another person by an unknown method.

---

[1] The definitions of types of firearms in this section were taken from 18 U.S.C. § 921 (2009). They have been edited for length.

**Exhibit 12**
**0048**

### Controlling-offense characteristics

About 29% of state and 36% of federal prisoners serving a sentence for a violent offense in 2016 possessed a firearm during the crime (table 1). About a quarter of state (23%) and federal (25%) prisoners serving time for a violent offense used a firearm during the crime. "Firearm use" is defined in this report as showing, pointing, or discharging a firearm during the offense for which a prisoner was serving a sentence.

Among prisoners serving time for homicide, more than 2 in 5 (44%) state prisoners and more than 1 in 3 (36%) federal prisoners had possessed a firearm during the crime. About 37% of state and 28% of federal prisoners serving time for homicide used a firearm during the homicide.

Among those serving time for robbery, more than 2 in 5 state prisoners (43%) and federal prisoners (46%) possessed a firearm during the offense, and nearly a third of state (31%) and federal (32%) prisoners used a firearm during the robbery. Firearm possession was less common among state prisoners serving a sentence for rape or sexual assault (2%). Less than 1% of state prisoners serving time for rape or sexual assault used a firearm in the commission of their crime.

### TABLE 1
**Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of controlling offense, 2016**

| Controlling offense[a] | Estimated number of state prisoners[b] | Percent of state prisoners who— | | Estimated number of federal prisoners[b] | Percent of federal prisoners who— | |
|---|---|---|---|---|---|---|
| | | Possessed a firearm[b] | Used a firearm[c] | | Possessed a firearm[b] | Used a firearm[c] |
| Total | 1,211,200 | 20.9% | 13.9% | 170,400 | 20.0% | 5.0% |
| Violent* | 667,300 | 29.1% | 23.0% | 20,900 | 36.2% | 25.3% |
| Homicide[d] | 191,400 | 43.6 | 37.2 | 3,800 | 35.9 | 28.4 |
| Rape/sexual assault | 144,800 | 2.0 | 0.8 | 2,400 | : | : |
| Robbery | 149,600 | 43.3 | 31.5 | 10,700 | 46.3 | 32.1 |
| Assault | 149,400 | 25.0 | 20.6 | 2,900 | 29.0 | 18.1 |
| Other violent[e] | 32,200 | 17.0 | 12.6 | 1,200 | 34.1 | : |
| Property | 186,100 | 4.9% † | 2.0% † | 12,000 | 2.6% † | : |
| Burglary | 88,100 | 6.7 | 3.2 | 300 | : | : |
| Other property[f] | 98,000 | 3.3 | 1.0 | 11,800 | 2.4 | : |
| Drug | 180,800 | 8.4% † | 0.8% † | 80,500 | 12.3% † | 0.6% † |
| Trafficking[g] | 130,500 | 9.4 | 0.9 | 72,300 | 12.9 | 0.7 |
| Possession | 45,900 | 6.1 | : | 3,500 | : | : |
| Other/unspecified drug | 4,300 | : | : | 4,700 | : | : |
| Public order | 158,300 | 21.5% † | 5.6% † | 52,900 | 30.2% | 5.3% † |
| Weapons[h] | 43,800 | 67.2 | 15.7 | 22,200 | 66.9 | 11.3 |
| Other public order[i] | 114,400 | 4.0 | 1.7 | 30,700 | 3.6 | : |
| Other | 3,900 | : | : | 1,800 | : | : |
| Unknown | 14,900 | 4.3% † | : | 2,200 | : | : |

Note: See appendix table 2 for standard errors.

*Comparison group.

†Difference with comparison group is significant at the 95% confidence level across main categories, and no testing was done on subcategories (e.g., homicide).

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.

[a]See *Methodology* for information on how controlling offense was measured.

[b]Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession. Includes prisoners who were missing responses on firearm use.

[c]Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession, and an additional 0.6% of state prisoners and 0.7% of federal prisoners who were missing responses on firearm use.

[d]Includes murder and both negligent and non-negligent manslaughter.

[e]Includes kidnapping, blackmail, extortion, hit-and-run driving with bodily injury, child abuse, and criminal endangerment.

[f]Includes larceny, theft, motor vehicle theft, arson, fraud, stolen property, destruction of property, vandalism, hit-and-run driving with no bodily injury, criminal tampering, trespassing, entering without breaking, and possession of burglary tools.

[g]Includes possession with intent to distribute.

[h]Includes being armed while commiting a crime; possession of ammunition, concealed weapons, firearms and explosive devices; selling or trafficking weapons; and other weapons offenses. Among federal prisoners, weapons offense include violations of federal firearms and explosives.

[i]Includes commercialized vice, immigration crimes, DUI, violations of probation/parole, and other public-order offenses.

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0049

State and federal prisoners serving time for a violent offense were much more likely to have possessed a firearm during the offense (29% state, 36% federal) than prisoners serving time for a property (5% state, 3% federal) or drug (8% state, 12% federal) offense. Among prisoners serving time for a public-order offense, about 1 in 5 (21%) state prisoners and nearly 1 in 3 (30%) federal prisoners reported that they possessed a firearm during the crime, and about 1 in 20 reported they had used it. About two-thirds of state and federal prisoners sentenced for a weapons offense said they possessed a firearm during the crime.[2]

---

[2]In addition to prisoners serving a sentence in state or federal prison in 2016 who possessed a firearm during the offense, weapons offenses include prisoners who were convicted of trafficking firearms but did not possess them at the time of the offense and prisoners who were convicted of a weapons offense that did not involve a firearm.

## Extent of firearm use among prisoners during the crime

State and federal prisoners in 2016 who had possessed a firearm during their offense were about equally likely to report that they had obtained the firearm with the intent to use it during the offense (19% state, 20% federal) (table 2). However, state prisoners (68%) who possessed a firearm were more than 2.5 times as likely as federal prisoners (26%) who possessed a firearm to have used it during the crime.

Nearly half of state prisoners (46%) serving a sentence for a crime during which they possessed a firearm discharged the firearm when they committed the crime, compared to 12% of federal prisoners. Among state prisoners who possessed a firearm during their offense, 27% killed a victim with the firearm and another 12% injured or shot a victim but did not kill him or her. Federal prisoners who possessed a firearm when they committed their offense were much less likely to have killed (4%) or injured (2%) a victim with the firearm than state prisoners.

## TABLE 2
Among state and federal prisoners who possessed a firearm during the offense for which they were serving time, extent of firearm use, 2016

| Firearm use | State prisoners* | Federal prisoners | State prisoners | | Federal prisoners | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Violent offense* | Non-violent offense[a] | Violent offense* | Non-violent offense[a] |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Obtained firearm because planned to use in controlling offense[b] | | | | | | |
| Yes | 19.3% | 19.7% | 17.7% | 24.6% † | 26.4% | 18.0% |
| No | 80.7 | 80.3 | 82.3 | 75.4 † | 73.6 | 82.1 |
| Used firearm[c] | 68.0% | 25.9% † | 81.0% | 24.8% † | 72.5% | 12.9% † |
| Discharged | 46.5% | 11.9% † | 55.9% | 15.4% † | 27.3% | 7.5% † |
| Killed victim | 27.1 | 4.1 † | 35.0 | : | 16.5 | : |
| Injured/shot victim but did not kill victim | 12.4 | 2.2 † | 14.5 | 5.3 † | : | : |
| Discharged firearm but did not shoot anyone | 7.0 | 5.6 | 6.4 | 9.0 | 5.7 | 5.4 |
| Did not discharge[d] | 21.5% | 14.0% † | 25.2% | 9.4% † | 45.3% | 5.4% † |
| Did not use firearm | 32.0% | 74.1% † | 19.0% | 75.2% † | 27.5% | 87.1% † |
| Estimated number of prisoners who possessed a firearm (with valid data)[e] | 245,400 | 32,900 | 187,800 | 57,000 | 7,200 | 25,600 |

Note: Percentages are based on data reported on firearm possession, use, and controlling offense. Excludes 3.1% of state prisoners and 3.5% of federal prisoners who possessed a firearm during the offense and were missing responses on firearm use and 0.3% of state prisoners and 0.7% of federal prisoners who possessed a firearm and were missing a controlling offense. The sum of violent offense and non-violent offense does not equal the total number of state and federal prisoners who possessed a firearm in this table due to an estimated 600 state and 100 federal prisoners whose offense type was unknown. See appendix table 3 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Includes property, drug, public order, and other non-violent offenses.
[b]Percentages are based on the 246,200 state and 32,600 federal prisoners who reported they carried or possessed a firearm and whether they obtained a firearm to use during the offense.
[c]Includes prisoners who showed a firearm to anyone, pointed a firearm at anyone, or discharged the firearm during the offense.
[d]Includes prisoners who showed or pointed a firearm at anyone during the offense but did not discharge it.
[e]Includes prisoners who reported they carried or possessed a firearm. Excludes prisoners who were missing responses on firearm possession or use. For violent offense and non-violent offense, also excludes prisoners who were missing a controlling offense.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0050

Among prisoners who possessed a firearm during a violent offense, a large majority of both state (81%) and federal (73%) prisoners used the firearm during the offense, far more than the percentages for non-violent offenders (25% state, 13% federal). More than half (56%) of state prisoners serving time for a violent offense who possessed a firearm during the crime discharged it, compared to fewer than a sixth (15%) of non-violent offenders in state prison who possessed a firearm. Violent offenders (27%) in federal prison who possessed a firearm during the crime were about 3.5 times as likely to discharge it as non-violent offenders (8%). Among state prisoners who had possessed a firearm during their offense, however, non-violent offenders (25%) were more likely than violent offenders (18%) to have planned to use the firearm during the offense.

## Type of firearm possessed by prisoners during offense

Handguns were by far the most common type of firearm possessed or used by prisoners during the crime for which they were sentenced. About 18% of all state and federal prisoners in 2016 reported that they had possessed a handgun during the crime for which they were serving a sentence (table 3). Two percent or fewer possessed a rifle or a shotgun. Twelve percent of state and 5% of federal prisoners used a handgun during their offense. Most state (79%) and federal (80%) prisoners did not possess any type of firearm during the crime for which they were imprisoned.

## TABLE 3

**Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of firearm, 2016**

| Type of firearm | Percent of prisoners who possessed a firearm | | | Percent of prisoners who used a firearm[a] | | |
|---|---|---|---|---|---|---|
| | All prisoners | State* | Federal | All prisoners | State* | Federal |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Firearm[b] | 20.8% | 20.9% | 20.0% | 12.8% | 13.9% | 5.0% † |
| Handgun | 18.4 | 18.4 | 18.3 | 11.2 | 12.2 | 4.6 |
| Rifle | 1.5 | 1.4 | 2.0 † | 0.8 | 0.8 | 0.4 † |
| Shotgun | 1.6 | 1.6 | 1.7 | 1.1 | 1.2 | 0.4 † |
| No firearm | 79.2% | 79.1% | 80.0% | 87.2% | 86.1% | 95.0% |
| Estimated number of prisoners (with valid data)[c] | 1,378,200 | 1,208,100 | 170,100 | 1,378,200 | 1,208,100 | 170,100 |

Note: Details on type of firearm may not sum to totals because prisoners could report more than one type of firearm. Percentages exclude missing data. Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession during the offense and an additional 0.3% of state prisoners and 0.2% of federal prisoners who were missing responses on type of firearm. See appendix table 4 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
[a]Percentages exclude 0.6% of state prisoners and 0.7% of federal prisoners who were missing responses on firearm use.
[b]Includes prisoners who reported a type of firearm that did not fit into one of the existing categories and those who did not provide enough information to categorize the type of firearm. About 0.1% of state prisoners and 0.2% of federal prisoners reported another type of firearm or did not report enough information to specify the type of firearm.
[c]Excludes prisoners who were missing responses on firearm possession or type of firearm. Counts are weighted to totals from the 2015 National Prisoner Statistics Program; see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0051

### Demographic characteristics

Male prisoners were more likely than female prisoners to have possessed a firearm during their crime. About a fifth of male state and federal prisoners serving a sentence in 2016 possessed a firearm during the crime (table 4). Males in state prisons in 2016 were about 2.5 times as likely (22%) as females in state prisons (9%) to have possessed a firearm during the crime for which they were imprisoned. In federal prisons, males (21%) were about three times as likely as females (7%) to have possessed a firearm during their crime. Almost

3 in 10 (29%) black prisoners serving a sentence in state prison in 2016 possessed a firearm during their crime. White (12%) and Hispanic (21%) state prisoners were less likely to have possessed a firearm during their crime. Similarly, white (17%) and Hispanic (13%) federal prisoners serving a sentence in 2016 were less likely to have possessed a firearm during the crime than black (29%) federal prisoners. State prisoners who served in the military were less likely to have possessed a firearm during their crime (16%) than state prisoners who had not served in the military (21%).

## TABLE 4
**Firearm possession among state and federal prisoners during the offense for which they were serving time, by demographic characteristics, 2016**

| | State | | Federal | |
|---|---|---|---|---|
| Demographic characteristic | Number of prisoners | Percent of prisoners who possessed a firearm during the offense | Number of prisoners | Percent of prisoners who possessed a firearm during the offense |
| **Sex** | | | | |
| Male* | 1,124,200 | 21.8% | 159,800 | 20.9% |
| Female | 87,000 | 9.5 † | 10,600 | 6.6 † |
| **Race/Hispanic origin[a]** | | | | |
| White | 383,300 | 12.4% † | 35,400 | 16.6% † |
| Black* | 401,500 | 29.4 | 53,800 | 29.2 |
| Hispanic | 247,200 | 21.5 † | 62,600 | 12.6 † |
| American Indian/Alaska Native | 17,200 | 14.8 † | 2,800 | 23.8 |
| Asian/Native Hawaiian/Other Pacific Islander | 10,700 | 22.8 | 2,600 | : |
| Two or more races | 133,100 | 19.1 † | 10,900 | 29.3 |
| **Age at time of survey** | | | | |
| 18–24* | 123,800 | 31.7% | 8,200 | 30.1% |
| 25–34 | 389,100 | 24.4 † | 47,700 | 27.4 |
| 35–44 | 318,800 | 19.3 † | 58,800 | 19.0 † |
| 45–54 | 224,800 | 14.6 † | 36,700 | 14.1 † |
| 55 or older | 154,800 | 16.0 † | 19,000 | 12.2 † |
| **Marital status** | | | | |
| Married* | 168,500 | 16.7% | 36,800 | 14.4% |
| Widowed/widowered | 34,300 | 18.3 | 3,100 | 21.7 |
| Separated | 58,300 | 12.7 † | 9,600 | 12.8 |
| Divorced | 233,300 | 14.5 | 30,900 | 15.2 |
| Never married | 715,900 | 24.8 † | 90,000 | 24.6 † |
| **Education[b]** | | | | |
| Less than high school* | 750,500 | 23.1% | 94,900 | 22.7% |
| High school graduate | 273,700 | 19.6 † | 36,500 | 19.4 |
| Some college | 133,900 | 14.7 † | 23,100 | 18.8 |
| College degree or more | 43,600 | 11.0 † | 12,700 | 6.3 † |
| **Citizenship** | | | | |
| U.S. citizen* | 1,156,800 | 21.0% | 127,500 | 24.2% |
| Non-U.S. citizen | 53,100 | 18.5 | 42,400 | 7.2 † |
| **Military service** | | | | |
| Yes* | 95,200 | 15.6% | 9,200 | 15.9% |
| No | 1,115,900 | 21.4 † | 161,200 | 20.3 |

Note: Percentages and counts exclude missing data. Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession during the offense. Details for counts may not sum to totals due to missing data. See appendix table 5 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic/Latino origin, unless specified.
[b]Based on highest year of education completed.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**Exhibit 12**
**0052**

In general, the likelihood of state and federal prisoners having possessed a firearm during their crime decreased with age. Firearm possession among state prisoners ages 18 to 24 (32%) in 2016 was more common than among older prisoners. Federal prisoners ages 18 to 24 (30%) were more likely to possess a firearm than those age 35 or older (16%, not shown in table).

The difference in firearm possession between U.S. citizens (21%) and non-citizens (18%) in state prisons in 2016 was not statistically significant. Among federal prisoners serving a sentence in 2016, firearm possession was more than three times as high among U.S. citizens (24%) as non-citizens (7%).

## Method, source, and process used to obtain the firearm

Among prisoners who possessed a firearm when they committed the offense for which they were imprisoned and who reported the source from which they obtained it, the most common source (43%) was off-the-street or the underground market (table 5). Another 7% of state and 5% of federal prisoners stole the firearm, and 7% of state and 8% of federal prisoners reported that they obtained the firearm at the location of the crime.

## TABLE 5

**Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, sources and methods used to obtain a firearm, 2016**

| Source and method to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Purchased/traded at retail source | 10.1% | 9.7% | 13.7% |
| Gun shop/store | 7.5 | 7.2 | 9.6 |
| Pawn shop | 1.6 | 1.5 | 2.2 |
| Flea market | 0.4 | : | : |
| Gun show | 0.8 | 0.8 | 1.4 |
| Obtained from individual | 25.3% | 26.0% | 20.5% |
| Purchased/traded from family/friend | 8.0 | 7.9 | 9.1 |
| Rented/borrowed from family/friend | 6.5 | 7.0 | 3.0 |
| Gift/purchased for prisoner | 10.8 | 11.2 | 8.4 |
| Off the street/underground market[a] | 43.2% | 43.2% | 42.9% |
| Theft[b] | 6.4% | 6.6% | 4.7% |
| From burglary | 1.5 | 1.5 | : |
| From retail source | 0.2 | : | : |
| From family/friend | 1.6 | 1.8 | : |
| Unspecified theft[c] | 3.1 | 3.3 | 1.8 |
| Other source | 17.4% | 17.1% | 20.1% |
| Found at location of crime/victim | 6.9 | 6.7 | 7.9 |
| Brought by someone else | 4.6 | 4.7 | 3.6 |
| Other[d] | 5.9 | 5.6 | 8.5 |
| Multiple sources[e] | 2.5% | 2.6% | 2.0% |
| Estimated number of prisoners who possessed a firearm, excluding prisoners who did not report source[f] | 256,400 | 227,100 | 29,300 |

Note: Prisoners were asked to report all sources and methods of obtaining any firearm they possessed during the offense, so details may not sum to totals. Each source is included in this table when multiple sources were reported. See *Methodology*. Percentages exclude missing data. Excludes 10.3% of state prisoners and 14.1% of federal prisoners who possessed a firearm during the offense and were missing responses on either source or method of obtaining the firearm. These prisoners were excluded either because they did not provide a valid response or they did not receive the questions due to providing an open-ended response to the previous question about type of weapon. See appendix table 6 for standard errors.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Illegal sources of firearms that include markets for stolen goods, middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs.
[b]Excludes theft from victim.
[c]Includes theft where the source could not be identified and theft other than from a burglary, retail location, family, or friend.
[d]Included if no source specified in the table was reported. Includes sources that did not fit into one of the existing categories, sources for which there were few responses such as bought online, or if there was not enough information to categorize the source. Examples of other sources include bought from an unknown source or obtained from a friend by an unknown method.
[e]Includes prisoners who reported multiple sources or methods that fit into more than one of the categories. Each reported source is included in the categories above.
[f]Includes prisoners who reported they carried or possessed a firearm and prisoners who reported a source or method.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**Exhibit 12**
**0053**

Among prisoners who possessed a firearm during the offense for which they were imprisoned, 7% of state and 10% of federal prisoners serving a sentence in 2016 bought or traded for the firearm from a gun shop or gun store. About 1% bought or traded for the firearm at a gun show. About a quarter (26%) of state prisoners and about a fifth (21%) of federal prisoners obtained a firearm that they possessed during their offense from an individual in a non-retail setting, such as a friend or family member.

Prisoners who reported that they had purchased or traded a firearm at a retail source were asked if they had obtained the firearm from a licensed dealer or private seller. Among prisoners who had possessed a firearm during the offense for which they were serving time, 8% of state and 11% of federal prisoners had purchased it from or traded with a licensed firearm dealer at a retail source **(table 6)**.

Prisoners who reported that they had purchased a firearm from a licensed firearm dealer at a retail source were further asked whether they bought the firearm under their own name and whether they knew a background check was conducted. Among those who had possessed a firearm during the offense for which they were imprisoned, 7% of state and 8% of federal prisoners had purchased it under their own name from a licensed firearm dealer at a retail source, while approximately 1% of state and 2% of federal prisoners had purchased a firearm from a licensed dealer at a retail source but did not purchase it under their own name (not shown in table).

Among all prisoners who purchased or traded a firearm from a licensed firearm dealer at a retail source (8.2%), the majority reported that a background check was conducted (6.7%).

## TABLE 6

**Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, processes used to obtain a firearm, 2016**

| Process to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Not purchased or traded at retail source | 89.9% | 90.3% | 86.3% |
| Purchased or traded at retail source[a] | 10.1% | 9.7% | 13.7% |
| Licensed firearm dealer at retail source | 8.2 | 7.9 | 10.9 |
| Purchased under own name[b] | 6.9 | 6.8 | 8.4 |
| Background check was reportedly conducted[c] | 6.7 | 6.3 | 9.4 |
| Private seller at retail source[d] | 1.2 | 1.1 | 2.3 |
| Unknown[e] | 0.7 | 0.8 | : |
| Estimated number of prisoners who possessed a firearm (with valid data)[f] | 256,400 | 227,100 | 29,300 |

Note: Percentages exclude missing data. Excludes 10.3% of state prisoners and 14.1% of federal prisoners who possessed a firearm during the offense and were missing responses on source or method of obtaining the firearm. See appendix table 7 for standard errors.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Includes prisoners who purchased or traded from a retail source, including a retail store, pawn shop, flea market, or gun show.
[b]Includes prisoners who purchased from a retail source, including a retail store, pawn shop, flea market, or gun show. Excludes prisoners who traded for a firearm from a retail source.
[c]Includes prisoners who purchased from a retail source, including a retail store, pawn shop, flea market, or gun show. Excludes prisoners who traded for a firearm from a retail source and prisoners who reported that a background check was not conducted or who were unaware as to whether one was conducted.
[d]Excludes private sellers other than at a retail source.
[e]Includes prisoners who purchased or traded a firearm from a retail source and were missing responses on whether a firearm was purchased or traded from a licensed firearm dealer or a private seller at a retail source.
[f]Includes prisoners who reported they carried or possessed a firearm and prisoners who reported a source or method.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0054

## Use and source of firearms among all state and federal prisoners

About 1% of all state and federal prisoners used a firearm during the offense that they obtained from a retail source (table 7). About 2% of prisoners possessed a firearm that they obtained from a retail source, including a retail store, pawn shop, flea market, or gun show.

Thirteen percent of all state and federal prisoners used a firearm during the offense for which they were serving time in 2016.

## TABLE 7
**Firearm possession and use among all state and federal prisoners during the offense for which they were serving time, by type of controlling offense and source, 2016**

| Controlling offense[a] | Percent of state and federal prisoners who— | | Percent of state and federal prisoners who— | |
|---|---|---|---|---|
| | Possessed a firearm[b] | Possessed a firearm that they obtained from a retail source[c] | Used a firearm[d] | Used a firearm that they obtained from a retail source[e] |
| Total | 20.8% | 1.9% | 12.8% | 1.3% |
| Violent* | 29.3% | 2.8% | 23.1% | 2.3% |
| Homicide[f] | 43.5 | 5.9 | 37.0 | 5.2 |
| Robbery | 43.5 | 1.8 | 31.5 | 1.3 |
| Property | 4.8% † | 0.5% † | 1.9% † | : |
| Drug | 9.6% † | 1.0% † | 0.8% † | 0.1% † |
| Public order | 23.6% † | 1.7% † | 5.5% † | 0.6% † |

Note: Percentages exclude missing data. Excludes 2.8% of prisoners who were missing responses on firearm possession during the offense and 1.2% of prisoners who had a valid response to firearm possession but were missing a controlling offense. Retail source includes purchasing or trading the firearm from a retail store, pawn shop, flea market, or gun show. Use includes prisoners who showed a firearm to anyone, pointed a firearm at anyone, or discharged a firearm during the controlling offense. See appendix table 8 for standard errors.
*Comparison group.
† Difference with comparison group is significant at the 95% confidence level across main categories, and no testing was done on subcategories (e.g., homicide).
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]See *Methodology* for more information on how controlling offense was measured.
[b]Includes state and federal prisoners who reported a valid response to firearm possession.
[c]Includes state and federal prisoners who reported a valid response to firearm possession and source.
[d]Includes state and federal prisoners who reported a valid response to firearm possession and use.
[e]Includes state and federal prisoners who reported a valid response to firearm possession, source, and use.
[f]Includes murder and both non-negligent and negligent manslaughter.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0055

## Methodology

### Survey of Prison Inmates

The findings in this report are primarily based on data collected through the 2016 Survey of Prison Inmates (SPI). The SPI is a periodic, cross-sectional survey of the state and sentenced federal prison populations. Its primary objective is to produce national statistics of the state and sentenced federal prison populations across a variety of domains, including—but not limited to—demographic characteristics, current offense and sentence, incident characteristics, firearm possession and sources, criminal history, socioeconomic characteristics, family background, drug and alcohol use and treatment, mental and physical health and treatment, and facility programs and rule violations. RTI International served as BJS's data collection agent for the 2016 SPI under a cooperative agreement (award no. 2011-MU-MU-K070). From January through October 2016, data were collected through face-to-face interviews with prisoners using computer-assisted personal interviewing (CAPI).

Prior iterations of the SPI were known as the Survey of Inmates in State and Federal Correctional Facilities (SISFCF), which was renamed with the 2016 implementation. The first survey of state prisoners was fielded in 1974 and thereafter in 1979, 1986, 1991, 1997, and 2004. The first survey of federal prisoners was fielded in 1991, along with the survey of state prisoners, and since then both surveys have been conducted at the same time using the same questionnaire and administration.

The target population for the 2016 SPI was prisoners ages 18 and older who were held in a state prison or had a sentence to federal prison in the United States during 2016. Similar to prior iterations, the 2016 survey was a stratified two-stage sample design in which prisons were selected in the first stage and prisoners within sampled facilities were selected in the second stage. The SPI sample was selected from a universe of 2,001 unique prisons (1,808 state and 193 federal) that were either enumerated in the 2012 Census of State and Federal Adult Correctional Facilities or had opened between the completion of the census and July 2014 when the SPI sample of prisons was selected. A total of 364 prisons (306 state and 58 federal) participated in the 2016 survey out of the 385 selected (324 state and 61 federal) for interviewing. The first-stage response rate (i.e., the response rate among selected prisons) was 98.4% (98.1% among

state prisons and 100% among federal prisons).[3] A total of 24,848 prisoners participated (20,064 state and 4,784 federal) in the 2016 SPI based on a sample of 37,058 prisoners (30,348 state and 6,710 federal). The second-stage response rate (i.e., the response rate among selected prisoners) was 70.0% (69.3% among state prisoners and 72.8% among federal prisoners).[4]

Responses from interviewed prisoners in the 2016 SPI were weighted to provide national estimates. Each interviewed prisoner was assigned an initial weight corresponding to the inverse of the probability of selection within each sampled prison. A series of adjustment factors were applied to the initial weight to minimize potential bias due to non-response and to provide national estimates.

For more information on the 2016 SPI methodology, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).

### Standard errors and tests of significance

When national estimates are derived from a sample, as with the SPI, caution must be used when comparing one estimate to another or when comparing estimates between years. Although one estimate may be larger than another, estimates based on a sample rather than a complete enumeration of the population have some degree of sampling error. The sampling error of an estimate depends on several factors, including the size of the estimate, the number of completed interviews, and the intracluster correlation of the outcome within prisons. When the sampling error around an estimate is taken into account, estimates that appear different may not be statistically different. One measure of the sampling error associated with an estimate is the standard error. The standard error may vary from one estimate to the next. Standard errors in this report were estimated using Taylor Series Linearization to account for the complex design of the SPI in producing the variance estimates.

---

[3]A total of 15 prisons (12 state and 3 federal) that were sampled were deemed ineligible for the 2016 SPI. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).
[4]There were 10,661 sampled prisoners who were eligible for the survey but did not participate. Another 1,549 sampled prisoners were deemed ineligible for the survey. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).

Exhibit 12
0056

Readers may use the estimates and standard errors of the estimates provided in this report to generate a 95% confidence interval around the estimates as a measure of the margin of error. Typically, multiplying the standard error by 1.96 and then adding or subtracting the result from the estimate produces the confidence interval. This interval expresses the range of values with which the true population parameter is expected to fall 95% of the time if the same method is used to select different samples.

For small samples and estimates close to 0%, the use of the standard error to construct the 95% confidence interval may not be reliable. Therefore, caution should be used when interpreting the estimates. Caution should also be used if constructing a 95% confidence interval, which would include zero in these cases, because the estimate may not be distinguishable from zero.

The standard errors have been used to compare estimates of firearm possession during the offense, firearm use during the crime, and type of firearm possessed. They have also been used to compare firearm possession among selected groups of prisoners that have been defined by demographic characteristics and controlling offense. To facilitate the analysis, rather than provide the detailed estimates for every standard error, differences in the estimates for subgroups in the relevant tables in this report have been tested and notated for significance at the 95% level of confidence. Readers should reference the tables for testing on specific findings. Unless otherwise noted, findings described in this report as higher, lower, or different passed a test at the 0.05 level of statistical significance (95% confidence level).

## Measurement of firearm possession and source

The 2016 SPI was restricted to prisoners age 18 or older at the time of the survey. Firearms analyses in this report were restricted to state and federal prisoners who were sentenced or state prisoners who were convicted but were awaiting sentencing. This report excludes prisoners who were awaiting trial (i.e., unconvicted) or a revocation hearing or who were held for other reasons. Unconvicted prisoners, such as those awaiting trial or being held for other reasons like safekeeping or a civil commitment, were excluded from this report because they were not asked questions about firearm possession to protect against self-incrimination. (See appendix 1, *Questions related to firearms in the Survey of Prison Inmates, 2016*.) Of

the estimated 1,421,700 state and federal prisoners in 2016, an estimated 287,400 were armed with a firearm, 1,094,200 were not armed with a firearm, 23,800 did not know or refused to answer the question, and 16,300 were not asked the question because they were not convicted or they stopped the interview before responding to the question.[5]

To determine whether prisoners possessed a firearm at the time of the offense for which they were serving time in prison, respondents were first asked whether they had carried, possessed, or used a weapon when the controlling offense occurred. Respondents could report that they carried, possessed, or used a firearm or another weapon such as a toy or BB gun, knife, other sharp object, or blunt object. Weapons other than firearms, including toy and BB guns, were excluded from this report. Multiple weapons and firearms could be reported by respondents.

Of the respondents who were asked about possessing a firearm during the offense for which they were imprisoned, about 3.0% of state and 1.7% of federal prisoners in 2016 were missing responses on firearm possession. These prisoners were excluded from the analyses in this report. All prisoners who reported they carried, possessed, or used a firearm during the offense were asked whether they had obtained the firearm because they were planning to carry, possess, or use it during the offense. They were also asked whether they showed, pointed, or fired the firearm during the offense. Respondents who reported that they fired the firearm were also asked whether they shot anyone and, if so, whether anyone they shot had died. Of the respondents who possessed a firearm during the offense, about 3.1% of state and 3.5% of federal prisoners in 2016 were missing responses on how they used the firearm. These prisoners were excluded from the analyses in figure 1, tables 1 through 3, and table 7.

To measure the type of firearm possessed by prisoners, respondents were asked whether they had carried, possessed, or used a handgun, rifle, shotgun, or some other type of firearm during the offense for which they were imprisoned. About 0.3% of state prisoners and 0.2% of federal prisoners in 2016 were missing responses on the type of firearm that they possessed. These prisoners, along with prisoners who were missing a response on firearm possession, were excluded from the analyses in table 3.

---

[5]The SPI sample was weighted to the state and federal prison populations that were eligible to be sampled in the survey. See *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).

Exhibit 12
0057

To measure the source and method of obtaining the firearm possessed by prisoners during their crime, two separate questions were asked in the survey. The first question asked how the prisoners obtained the firearm, and multiple responses could be reported in the 2016 SPI. Possible responses included stole it, rented it, borrowed it from or were holding it for somebody, traded something for it, bought it, someone bought it for them, someone gave it as a gift, found it or it was at the location where the offense occurred, it was brought by someone else, or other. If respondents specified an "other" method of obtaining the firearm, then the field interviewers entered the respondents' answers into a text field. These responses originally reported as "other" were coded to one of the existing response categories if possible.

The second question asked where prisoners obtained the firearm, and multiple responses could be reported in the 2016 SPI. Respondents received this question if they reported that they stole, rented, borrowed from or were holding for somebody, traded something for, or bought the firearm. Possible responses included gun shop or gun store; pawn shop; flea market; gun show; from a victim, family member, or friend; from a fence (a middleman for stolen goods) or underground market; off the street or from a drug dealer; in a burglary; online or the internet; or other. Fewer than 1% of state and federal prisoners reported obtaining a firearm online. These responses were included in table 5 in the "other" category due to the small number of sample cases. If respondents specified an "other" source of obtaining a firearm, then the field interviewers entered the respondents' answers into a text field. Responses originally reported as "other" were coded to one of the existing response categories if possible.

The responses from these two questions were used to create the source and method categories in figure 1 and tables 5 through 7. Approximately 10.3% of state and 14.1% of federal prisoners in 2016 who possessed a firearm during the offense for which they were serving a sentence were missing responses on source or method of obtaining the firearm. These prisoners were excluded from figure 1 and tables 5 through 7.

Prisoners who reported purchasing or trading a firearm from a retail source (gun shop or gun store, pawn shop, flea market, or gun show) were asked if they purchased or traded it from a licensed firearm dealer or a private seller. Prisoners who reported they purchased a firearm from a retail source were further asked whether they bought the firearm under their own name and whether the seller did a firearm purchase background check before selling them the firearm. About 1% of the respondents who possessed a firearm during the offense purchased or traded it from a retail source and were missing responses on whether they bought the firearm from a licensed dealer or private seller. About 1% of respondents who possessed a firearm during the offense purchased it from a retail source and were missing responses on whether the firearm was purchased under their own name or whether a background check was conducted.

## Measurement of controlling offense

The way controlling offense was measured through the 2016 SPI, and reflected in this report, varies by sentence status and the number of offenses of prisoners:

- For sentenced prisoners and those awaiting sentencing with one offense, that offense is the controlling offense.

- For sentenced prisoners with multiple offenses and sentences, the controlling offense is the one with the longest sentence.

- For sentenced prisoners with multiple offenses and one sentence and those awaiting sentencing with multiple offenses, the controlling offense is the most serious offense. For this report, violent offenses are considered most serious, followed by property, drug, public-order, and all other offenses.

For prisoners who were convicted but awaiting sentencing, the controlling offense is the most serious offense.

**Exhibit 12**
**0058**

## Appendix 1. Questions related to firearms in the Survey of Prison Inmates, 2016

This appendix includes the questions from the 2016 SPI that were used to measure the firearms' constructs in this report. Text that appears in capital letters in the questions was not read out loud to respondents. That text reflects programming instructions for the CAPI instrument, instructions to field interviewers who conducted the interviews, or response options that were not read out loud to respondents but were coded by the field interviewers during the interviews.

**Questions**

**CJ39.** (ASK IF RESPONDENT REPORTED BEING SENTENCED IN CJ1 OR CJ3 OR IF RESPONDENT REPORTED HE/SHE WAS AWAITING SENTENCING IN CJH2A.) Did you carry, possess, or use a weapon when the (INSERT CONTROLLING OFFENSE) occurred?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH1.** How many weapons did you carry, possess, or use when the (INSERT CONTROLLING OFFENSE) occurred?

- ONE
- TWO OR MORE

**CJH2.** What (INSERT "kind of weapon was it?" OR "kinds of weapons were they?") CHECK ALL THAT APPLY.

- FIREARM
- TOY OR BB GUN (INCLUDE FAKE OR REPLICA GUNS)
- KNIFE
- OTHER SHARP OBJECT (SCISSORS, ICE PICK, AX, ETC.)
- BLUNT OBJECT (ROCK, CLUB, BLACKJACK, ETC.)
- ANOTHER WEAPON
  - What kinds of weapons were they?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH3.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) How many firearms did you carry, possess, or use when the (INSERT CONTROLLING OFFENSE) occurred?

- ENTER NUMBER OF FIREARMS

**CJH4.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) What (INSERT "type of firearm was it?" OR "types of firearms were they?") CHECK ALL THAT APPLY.

- A HANDGUN
- A RIFLE
- A SHOTGUN
- SOME OTHER TYPE OF FIREARM
  - What type of firearm?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH5.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) How did you obtain the (INSERT "firearm" OR "firearms") that you carried, possessed, or used during the (INSERT CONTROLLING OFFENSE)? Any others? CHECK ALL THAT APPLY.

- STOLE IT (GO TO CJH6)
- RENTED IT (GO TO CJH6)
- BORROWED FROM OR WAS HOLDING FOR SOMEBODY (GO TO CJH6)
- TRADED SOMETHING FOR IT (GO TO CJH6)
- BOUGHT IT (GO TO CJH6)
- SOMEONE BOUGHT IT FOR ME (GO TO CJH7)
- SOMEONE GAVE IT TO ME AS A GIFT (GO TO CJH9)
- FOUND IT/WAS AT LOCATION WHERE OFFENSE OCCURRED (GO TO CJH9)
- WAS BROUGHT BY SOMEONE ELSE (GO TO CJH9)
- OTHER
  - How did you obtain the firearm that you carried, possessed, or used during the offense?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH6.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2 AND REPORTED IN CJH5 HE/SHE "STOLE IT", "RENTED IT", "BORROWED FROM OR WAS HOLDING FOR SOMEBODY", "TRADED SOMETHING FOR IT", OR "BOUGHT IT".) Where did you obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)? CHECK ALL THAT APPLY.

- GUN SHOP OR GUN STORE (GO TO CJH6A)
- PAWN SHOP (GO TO CJH6A)
- FLEA MARKET (GO TO CJH6A)
- GUN SHOW (GO TO CJH6A)
- FROM THE VICTIM(S) (GO TO CJH9)
- FROM A FAMILY MEMBER (GO TO CJH9)
- FROM A FRIEND (GO TO CJH9)
- FROM A FENCE/BLACK MARKET SOURCE (GO TO CJH9)
- OFF THE STREET/FROM A DRUG DEALER (GO TO CJH9)
- IN A BURGLARY (GO TO CJH9)
- ONLINE/THE INTERNET (GO TO CJH9)
- OTHER
  - Where did you obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

*Continued on next page*

**Exhibit 12**
**0059**

## Appendix 1. Questions related to firearms in the Survey of Prison Inmates, 2016 (continued)

**CJH6a.** (ASK IF RESPONDENT REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) When you obtained the (INSERT TYPE OF FIREARM REPORTED IN CJH4) was it from a licensed firearm dealer or a private seller?

- LICENSED FIREARM DEALER
- PRIVATE SELLER

**CJH6b.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND IN CJH6 REPORTED THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did you buy the (INSERT TYPE OF FIREARM REPORTED IN CJH4) under your own name?

- YES
- NO
- NO PAPERWORK WAS REQUIRED

**CJH6c.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did the seller do a firearm purchase background check before selling you the gun?

- YES
- NO

**CJH6d.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did you buy the (INSERT TYPE OF FIREARM REPORTED IN CJH4) directly or did someone else buy it for you?

- INMATE BOUGHT
- SOMEONE ELSE BOUGHT

**CJH7.** (ASK IF RESPONDENT REPORTED "SOMEONE ELSE BOUGHT IT FOR ME" IN CJH5.) Where did that person obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?

- GUN SHOP OR GUN STORE
- PAWN SHOP
- FLEA MARKET
- GUN SHOW
- FROM THE VICTIM(S)
- FROM A FAMILY MEMBER
- FROM A FRIEND
- FROM A FENCE/BLACK MARKET SOURCE

- OFF THE STREET/FROM A DRUG DEALER
- IN A BURGLARY
- ONLINE/THE INTERNET
- OTHER
  - Where did that person obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH8.** (ASK IF RESPONDENT REPORTED "SOMEONE ELSE BOUGHT IT FOR ME" IN CJH5.) Why did someone else obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4) for you? CHECK ALL THAT APPLY.

- COULD NOT TRAVEL TO WHERE THE SELLER WAS
- NOT ALLOWED BECAUSE TOO YOUNG
- NOT ALLOWED BECAUSE OF CRIMINAL RECORD
- THEY COULD GET IT MORE QUICKLY OR EASILY
- DID NOT WANT TO BE LINKED TO FIREARM PURCHASE
- OTHER
  - Why did someone else obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4) for you?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH9.** Did you get the (INSERT TYPE OF FIREARM REPORTED IN CJH4) because you were **planning** to carry, possess, or use it during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO

**CJH10.** Did you show or point (INSERT "the firearm" OR "any of the firearms") at anyone during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO

**CJH11.** Did you fire (INSERT "the firearm" OR "any of the firearms") during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH12.** Did you shoot anyone?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH13.** Did anyone you shot die?

- YES
- NO

**Exhibit 12**
**0060**

## APPENDIX TABLE 1
**Standard errors for figure 1: Percent of all state and federal inmates who had possessed or used a firearm during their offense, 2016**

| Characteristic | Possessed | Used |
|---|---|---|
| Any gun | 0.64% | 0.51% |
| Handgun | 0.59 | 0.46 |
| Gun they obtained from retail source | 0.13 | 0.12 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 2
**Standard errors for table 1: Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of controlling offense, 2016**

| Controlling offense | Estimated number of state prisoners | Percent of state prisoners who— | | Estimated number of federal prisoners | Percent of federal prisoners who— | |
|---|---|---|---|---|---|---|
| | | Possessed a firearm | Used a firearm | | Possessed a firearm | Used a firearm |
| Total | 31,100 | 0.69% | 0.57% | 8,300 | 1.76% | 0.71% |
| Violent | 22,400 | 0.90% | 0.73% | 2,700 | 2.87% | 2.83% |
| Homicide | 10,900 | 1.16 | 1.12 | 700 | 6.53 | 4.75 |
| Rape/sexual assault | 9,900 | 0.36 | 0.22 | 600 | : | : |
| Robbery | 6,700 | 1.32 | 1.28 | 1,600 | 3.73 | 3.80 |
| Assault | 5,900 | 1.34 | 1.24 | 700 | 5.15 | 4.52 |
| Other violent | 2,100 | 2.03 | 1.73 | 300 | 8.42 | : |
| Property | 7,800 | 0.53% | 0.32% | 2,000 | 0.83% | : |
| Burglary | 3,900 | 0.80 | 0.54 | 100 | : | : |
| Other property | 5,800 | 0.58 | 0.33 | 2,000 | 0.81 | : |
| Drug | 11,400 | 0.68% | 0.20% | 5,400 | 0.87% | 0.21% |
| Trafficking | 9,700 | 0.83 | 0.24 | 5,000 | 0.88 | 0.21 |
| Possession | 3,400 | 1.06 | : | 600 | : | : |
| Other/unspecified drug | 700 | : | : | 600 | : | : |
| Public order | 8,400 | 1.35% | 0.58% | 3,600 | 3.55% | 0.88% |
| Weapons | 3,000 | 2.02 | 1.70 | 2,700 | 2.02 | 1.60 |
| Other public order | 7,200 | 0.70 | 0.42 | 3,800 | 0.89 | : |
| Other | 600 | : | : | 300 | : | : |
| Unknown | 1,400 | 1.61% | : | 400 | : | : |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0061

## APPENDIX TABLE 3

**Standard errors for table 2: Among state and federal prisoners who possessed a firearm during the offense for which they were serving time, extent of firearm use, 2016**

| Firearm use | State prisoners | Federal prisoners | State prisoners | | Federal prisoners | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Violent offense | Non-violent offense | Violent offense | Non-violent offense |
| Obtained firearm because planned to use in controlling offense | | | | | | |
| Yes | 0.81% | 1.57% | 0.81% | 2.00% | 4.01% | 1.88% |
| No | 0.81 | 1.57 | 0.81 | 2.00 | 4.01 | 1.88 |
| Used firearm | 1.11% | 1.92% | 0.85% | 1.83% | 3.86% | 1.57% |
| Discharged | 1.34% | 1.17% | 1.36% | 1.47% | 3.58% | 1.14% |
| Killed victim | 1.28 | 0.75 | 1.40 | : | 2.49 | : |
| Injured/shot victim but did not kill victim | 0.73 | 0.55 | 0.86 | 0.89 | : | : |
| Discharged firearm but did not shoot anyone | 0.47 | 0.98 | 0.51 | 1.17 | 2.16 | 1.02 |
| Did not discharge | 0.97% | 1.60% | 1.21% | 1.24% | 4.99% | 0.87% |
| Did not use firearm | 1.11% | 1.92% | 0.85% | 1.83% | 3.86% | 1.57% |
| Estimated number of prisoners who possessed a firearm (with valid data) | 10,100 | 3,100 | 9,200 | 3,400 | 1,200 | 2,200 |

: Not calculated. Too few cases to provide a reliable estimate or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 4

**Standard errors for table 3: Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of firearm, 2016**

| Type of firearm | Percent of prisoners who possessed a firearm | | | Percent of prisoners who used a firearm | | |
| --- | --- | --- | --- | --- | --- | --- |
| | All prisoners | State | Federal | All prisoners | State | Federal |
| Firearm | 0.64 | 0.69% | 1.76% | 0.51 | 0.57% | 0.71% |
| Handgun | 0.59 | 0.64 | 1.63 | 0.46 | 0.51 | 0.67 |
| Rifle | 0.10 | 0.10 | 0.28 | 0.07 | 0.08 | 0.13 |
| Shotgun | 0.11 | 0.12 | 0.22 | 0.09 | 0.10 | 0.09 |
| No firearm | 0.64 | 0.69 | 1.76 | 0.51 | 0.57 | 0.71 |
| Estimated number of prisoners (with valid data) | 32,100 | 31,000 | 8,300 | 32,100 | 31,000 | 8,300 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**Exhibit 12**
**0062**

## APPENDIX TABLE 5

**Standard errors for table 4: Firearm possession among state and federal prisoners during the offense for which they were serving time, by demographic characteristics, 2016**

| Demographic characteristic | State | | Federal | |
|---|---|---|---|---|
| | Number of prisoners | Percent of prisoners who possessed a firearm during the offense | Number of prisoners | Percent of prisoners who possessed a firearm during the offense |
| **Sex** | | | | |
| Male | 30,700 | 0.74% | 8,200 | 1.88% |
| Female | 5,200 | 0.96 | 1,300 | 1.00 |
| **Race/Hispanic origin** | | | | |
| White | 16,500 | 0.64% | 3,900 | 2.28% |
| Black | 16,200 | 0.91 | 5,600 | 2.02 |
| Hispanic | 12,400 | 1.26 | 8,000 | 1.70 |
| American Indian/Alaska Native | 2,500 | 2.94 | 800 | 5.18 |
| Asian/Native Hawaiian/Other Pacific Islander | 1,600 | 4.69 | 600 | : |
| Two or more races | 5,000 | 1.19 | 1,200 | 3.50 |
| **Age at time of survey** | | | | |
| 18–24 | 8,200 | 1.71% | 1,000 | 5.69% |
| 25–34 | 13,700 | 1.00 | 3,200 | 2.57 |
| 35–44 | 9,500 | 0.94 | 3,400 | 1.68 |
| 45–54 | 9,100 | 0.76 | 2,400 | 1.68 |
| 55 or older | 7,700 | 1.02 | 2,200 | 2.02 |
| **Marital status** | | | | |
| Married | 6,300 | 1.06% | 3,100 | 1.77% |
| Widowed/widowered | 2,000 | 2.10 | 400 | 5.93 |
| Separated | 2,700 | 1.34 | 1,200 | 3.11 |
| Divorced | 10,600 | 0.97 | 2,200 | 1.58 |
| Never married | 20,100 | 0.81 | 5,800 | 2.10 |
| **Education** | | | | |
| Less than high school | 21,500 | 0.83% | 6,000 | 2.18% |
| High school graduate | 8,500 | 0.88 | 2,100 | 1.69 |
| Some college | 5,000 | 0.96 | 2,000 | 2.08 |
| College degree or more | 2,500 | 1.43 | 2,000 | 1.83 |
| **Citizenship** | | | | |
| U.S. citizen | 30,000 | 0.69% | 10,700 | 1.87% |
| Non-U.S. citizen | 3,700 | 2.04 | 9,500 | 1.09 |
| **Military service** | | | | |
| Yes | 4,800 | 1.07% | 1,200 | 2.98% |
| No | 28,700 | 0.72 | 8,200 | 1.80 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**Exhibit 12**
**0063**

## APPENDIX TABLE 6

**Standard errors for table 5: Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, sources and methods used to obtain a firearm, 2016**

| Source and method to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Purchased/traded at retail source | 0.66% | 0.70% | 2.07% |
| Gun shop/store | 0.54 | 0.56 | 1.87 |
| Pawn shop | 0.27 | 0.29 | 0.62 |
| Flea market | 0.13 | : | : |
| Gun show | 0.16 | 0.17 | 0.44 |
| Obtained from individual | 0.87% | 0.94% | 2.02% |
| Purchased/traded from family/friend | 0.59 | 0.65 | 1.27 |
| Rented/borrowed from family/friend | 0.47 | 0.52 | 0.54 |
| Gift/purchased for prisoner | 0.69 | 0.75 | 1.40 |
| Off the street/underground market | 1.07% | 1.13% | 3.26% |
| Theft | 0.48% | 0.53% | 0.79% |
| From burglary | 0.22 | 0.24 | : |
| From retail source | 0.07 | : | : |
| From family/friend | 0.26 | 0.29 | : |
| Unspecified theft | 0.31 | 0.34 | 0.53 |
| Other source | 0.78% | 0.85% | 1.80% |
| Found at location of crime/victim | 0.50 | 0.53 | 1.31 |
| Brought by someone else | 0.45 | 0.49 | 0.87 |
| Other | 0.51 | 0.55 | 1.40 |
| Multiple sources | 0.27% | 0.29% | 0.50% |
| Estimated number of prisoners who possessed a firearm, excluding prisoners who did not report source | 9,900 | 9,500 | 2,800 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 7

**Standard errors for table 6: Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, processes used to obtain a firearm, 2016**

| Process to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Not purchased or traded at retail source | 0.66% | 0.70% | 2.07% |
| Purchased or traded at retail source | 0.66% | 0.70% | 2.07% |
| Licensed firearm dealer at retail source | 0.60 | 0.63 | 2.08 |
| Purchased under own name | 0.54 | 0.57 | 1.89 |
| Backgroundcheck was reportedly conducted | 0.54 | 0.56 | 1.93 |
| Private seller at retail source | 0.19 | 0.20 | 0.63 |
| Unknown | 0.21 | 0.24 | : |
| Estimated number of prisoners who possessed a firearm (with valid data) | 9,900 | 9,500 | 2,800 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Exhibit 12
0064

## APPENDIX TABLE 8

**Standard errors for table 7: Firearm possession and use among all state and federal prisoners during the offense for which they were serving time, by type of controlling offense and source, 2016**

| Controlling offense | Percent of state and federal prisoners who— | | Percent of state and federal prisoners who— | |
|---|---|---|---|---|
| | Possessed a firearm | Possessed a firearm that they obtained from a retail source | Used a firearm | Used a firearm that they obtained from a retail source |
| Total | 0.64% | 0.13% | 0.51% | 0.12% |
| Violent | 0.88% | 0.23% | 0.72% | 0.21% |
| Homicide | 1.14 | 0.63 | 1.10 | 0.62 |
| Robbery | 1.25 | 0.29 | 1.22 | 0.25 |
| Property | 0.50% | 0.15% | 0.30% | : |
| Drug | 0.52% | 0.17% | 0.15% | 0.04% |
| Public order | 1.35% | 0.27% | 0.48% | 0.17% |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**Exhibit 12**
**0065**



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeffrey H. Anderson is the director.

This report was written by Mariel Alper and Lauren Glaze of BJS. Mariel Alper conducted statistical analyses. Marcus Berzofsky and John Bunker of RTI International provided statistical review. Danielle Kaeble, Laura Maruschak, Todd Minton, and Stephanie Mueller verified the report. Lauren Glaze was the BJS project manager for the 2016 Survey of Prison Inmates.

Eric Hendrixson and Jill Thomas edited the report. Tina Dorsey and Morgan Young produced the report.

January 2019, NCJ 251776





NCJ251776

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.gov**

Exhibit 12
0066

# EXHIBIT "13"

Exhibit 13
0067

**FREE SHIPPING** On Orders Over $40 | See Details »



HOME > SHOOTING GEAR & GUN SUPPLIES > SHOTGUNS > MOSSBERG 500 TACTICAL - SPX PUMP SHOTGUN



# Mossberg 500 Tactical - SPX Pump Shotgun

by Mossberg

ID 1477325 | MPN 51523

★★★★★    1 Review | 1 Question, 1 Answer | 2 Buyer Comments

# $609.99

⊘ **RESTRICTIONS APPLY**      +

♡     |

## CUSTOMER GALLERY





| ITEM # | MODEL | GAUGE | CHAMBER | CAPACITY | BARREL LENGTH | LOP | FINISH | STOCK | CHOKE | WEIGHT | ACTION | PRICE |
|--------|-------|-------|---------|----------|---------------|-----|--------|-------|-------|--------|--------|-------|

# EXHIBIT "14"

Exhibit 14
0069



MidwayUSA.com
1-800-243-3220
5875 West Van Horn Tavern Rd.
Columbia, MO 65203

# AR-STONER Flash Hider A2 1/2"-28 Thread AR-15

★★★★☆ 29 Reviews | Write a Review

**Product #:** 691158 | Manufacturer #: A2-FLASH-556





Our Price: $7.99
**Available**
Ships tomorrow from MidwayUSA
Made in USA
Quantity: 1

✉ Email to Friend  f  t  p

## SUGGESTED PRODUCTS



**AR-STONER Crush Washer AR-15...**
★★★★★ | 2 Reviews
$2.49

[ Add to Cart ]

**AR-STONER Flash Hider A2 5/8"-24...**
★★★★★ 17 Reviews
$9.99

[ Add to Cart ]

**Wilson Combat A2 Birdcage Flash...**
★★★★★ 18 Reviews
$8.95

[ Add to Cart ]

>

## Product Overview

The AR-STONER™ A2 Flash Hider with 1/2" - 28 threads is an effective option for reducing muzzle flash from AR-15 rifle barrels. This high quality, matte steel, flash hider is ready for installation on your AR-15 rifle.

**Note:** The use of a crush washer is recommended



Exhibit 14
0070



**Exhibit 14**
**0071**

# EXHIBIT "15"

Exhibit 15
0072

This website requires certain cookies to work and uses other cookies to help you have the best experience. By visiting this website, certain cookies have already been set, which you may delete and block. By closing this message or continuing to use our site, you agree to the use of cookies. Visit our updated <u>privacy and cookie policy to learn more.</u>

✖



# Violent Crimes Most Likely to Occur At Night



*June 14, 2019*

When are criminals active during the day? The <u>Crimes at Night: Analyzing Police Incident Reports in Major Cities</u> reveals that violent crimes occur most often at night.

**Exhibit 15**
**0073**

In 2017, an estimated 1,247,321 violent crimes occured nationwide, a decrease of 0.2 percent from the 2016 estimate, according to FBI data.

**More than half of police incidents took place during the day:**

- Larceny/theft, drug violations, simple assaults, and property crimes were slightly more likely to happen while the sun was out, but more violent crimes such as driving while impaired, murder, rape/sexual assault, and robbery were more frequently reported at night.

### Percentage of Police Incident Reports, by Offense Type

| Offense | At Night Percentage | During the Day Percentage |
|---|---|---|
| DWI/DUI | 87% | 13% |
| Murder & Negligent Manslaughter | 65% | 35% |
| Rape/Sexual Assault | 59% | 41% |
| Robbery | 56% | 44% |
| Aggravated Assault | 54% | 46% |
| Motor Vehicle Theft | 51% | 49% |
| Burglary | 50% | 50% |
| Property Crime | 48% | 52% |
| Simple Assault | 47% | 53% |
| Drug Violation | 43% | 57% |
| Larceny/Theft | 40% | 60% |

**Police incidents tend to happen between Monday and Friday.**

- Friday experienced the highest peak in known crime reports during the day, with an average of 755 police incidents per 10,000 residents. Alternatively, Sunday had the fewest incidents during the day – an average of 595 per every 10,000 individuals.
- When are violent crimes most likely to happen? Unfortunately, midnight was the peak hour for violent crimes like rape and sexual assault, while 2 a.m. was the ideal time to stay off the roads – DWI/DUI police incidents happened the most then.
- Murder peaked at 9 p.m. and aggravated assault peaked just an hour after.

**Exhibit 15**
**0074**

Copyright ©2019. All Rights Reserved BNP Media.

Design, CMS, Hosting & Web Development :: ePublishing

**Exhibit 15**
**0075**

# EXHIBIT "16"

Exhibit 16
0076



Exhibit 16
0077

# EXHIBIT "17"

Exhibit 17
0078



## THIS DAY IN HISTORY | APRIL 16 ⌄



UPDATED: JUL 27, 2019 · ORIGINAL: APR 13, 2011

### 2007

April 16

## Virginia Tech shooting leaves 32 dead

*Win McNamee/Getty Images*

On this day in 2007, 32 people died after being gunned down on the campus of Virginia Tech by Seung Hui Cho, a student at the college who later committed suicide.

The Virginia Tech shooting began around 7:15 a.m., when Cho, a 23-year-old senior and English major at Blacksburg-based Virginia Polytechnic Institute and State University, shot a female freshman and a male resident assistant in a campus dormitory before fleeing the building.

Police were soon on the scene; unaware of the gunman's identity, they initially pursued the female victim's boyfriend as a suspect in what they believed to be an isolated domestic-violence incident.

However, at around 9:40 a.m., Cho, armed with a 9-millimeter handgun, a 22-caliber handgun and hundreds of rounds of ammunition, entered a classroom building, chained and locked several main doors and went from room to room shooting people. Approximately 10 minutes after the rampage began, he died from a self-inflicted gunshot wound.

The attack left 32 people dead and more than a dozen wounded. In all, 27 students and five faculty members died in the massacre.

11/18/2019                              Virginia Tech shooting leaves 32 dead - HISTORY
Case 3:19-cv-01537-BEN-JLB   Document 22-12   Filed 12/06/19   PageID.359   Page 104 of
                                         104

Two days later, on April 18, NBC News received a package of materials from Cho with a timestamp indicating he had mailed it from a Virginia post office between the first and second shooting attacks. Contained in the package were photos of a gun-wielding Cho, along with a rambling video diatribe in which he ranted about wealthy "brats," among other topics.

In the aftermath of the Virginia Tech shooting, authorities found no evidence that Cho, who was born in South Korea and moved to America with his family in 1992, had specifically targeted any of his victims. The public soon learned that Cho, described by students as a loner who rarely spoke to anyone, had a history of mental-health problems.

It was also revealed that angry, violent writings Cho made for certain class assignments had raised concern among some of his professors and fellow students well before the events of April 16.

In 2011, Virginia Tech was fined by the U.S. Department of Education for failing to issue a prompt campus-wide warning after Cho shot his first two victims.

School officials sent an email notification about the dorm shooting to students and faculty at 9:26 that morning. According to the Department of Education, the message was vague and did not indicate there had been a murder or that the gunman was still at large.

## Citation Information

### Article Title

Virginia Tech shooting leaves 32 dead

### Author

History.com Editors

### Website Name

HISTORY

### URL

https://www.history.com/this-day-in-history/massacre-at-virginia-tech-leaves-32-dead

### Access Date

November 18, 2019

### Publisher

A&E Television Networks

### Last Updated

July 27, 2019

### Original Published Date

April 13, 2011

**FACT CHECK:** *We strive for accuracy and fairness. But if you see something that doesn't look right, click here to contact us!*

ALSO ON THIS DAY