John W. Dillon (SBN 296788)
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, California 92009
Phone: (760) 431-9501
Fax: (760) 431-9512
Email:  jdillon@gdandb.com

George M. Lee (SBN 172982)
Seiler Epstein LLP
275 Battery Street, Suite 1600
San Francisco, California 94111
Telephone: (415) 979-0500
Fax: (415) 979-0511
Email: gml@seilerepstein.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>Hon. Roger T. Benitez<br>Magistrate Hon. Jill L. Burkhardt<br><br>**DECLARATION OF GEORGE A. MOCSARY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Part 1 of 2)**<br><br>Complaint filed: August 15, 2019<br>Amended Complaint filed: September 27, 2019<br><br>Hearing Date: January 16, 2020<br>Time: 10:00 a.m.<br>Courtroom: 5A, 5th Floor |

# DECLARATION OF GEORGE A. MOCSARY

I, George A. Mocsary, declare as follows:

1.    I am not a party to the above-captioned action, I am over the age of 18, I have personal knowledge of the facts stated herein, and I am competent to testify as to the matters stated and the opinions rendered below.

2.    I graduated from the Cooper Union School of Engineering with a bachelor's degree in engineering in 1995. I earned a master's degree in business administration from the University of Rochester in 1997. And I received my Juris Doctor degree in 2009 from Fordham Law School, where I graduated first in my class and summa cum laude. I served as Notes and Articles Editor of the Fordham Law Review and was the recipient of the Fordham Law Alumni Association Medal in Constitutional Law.

3.    I am currently a Professor of Law at the University of Wyoming College of Law. I previously taught at the Southern Illinois University School of Law as an Associate Professor and at the University of Connecticut School of Law as a Visiting Assistant Professor.

4.    Prior to entering academia, I practiced corporate and bankruptcy law at Cravath, Swaine and Moore in New York. And before that, I clerked for the Honorable Harris L Hartz of the U.S. Court of Appeals for the Tenth Circuit.

5.    I co-authored the first law school textbook on the Second Amendment, entitled *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (2nd ed. 2017) (with Nicholas J. Johnson, David B. Kopel, and Michael P. O'Shea).

6.    I have also published several scholarly research articles on the right to keep and bear arms, which have been published in the Connecticut Law Review, Duke Law Journal Online, Fordham Law Review, George Mason Law Review, and other journals.

7.    My scholarship has been cited by the Supreme Court of the United States

- 1 -

in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court of Illinois, and in several opinions by the U.S. Courts of Appeals.

8.      I taught a course on the Second Amendment at Southern Illinois University School of Law, and will likely teach it again at the University of Wyoming College of Law.

9.      Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum Vitae. It describes my education, employment background, career experience, and publications.

10.      My opinions expressed here are formed in light of my scholarship and study of the current legal landscape of the Second Amendment.

11.      Based on my education, work experience, research, publications, and review of the research of others, in my opinion, the arms that California prohibits as "assault weapons" are protected by the Second Amendment. The Supreme Court held that the Second Amendment protects arms in "common use." The Court's clearest indication of the criteria that determine "common use" appears in Justice Samuel A. Alito, Jr.'s concurrence, which Justice Clarence Thomas joined, in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), *viz.*, the number in existence of the type of arm in question, and the number of jurisdictions in which the type of arm is lawful.

12.      In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. 570, 625 (2008). Put differently, "the sorts of weapons protected [a]re those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

13.      This was consistent with the founding-era practice that, "when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 624 (quoting *Miller*, 307 U.S. at 179) (brackets omitted). The *Miller* Court remanded because it was not

1  presented with data on whether the weapon at issue there was in common enough use

2  to be usable in militia service. *See* 307 U.S. at 178-79, 183.

3      14.   Attached hereto as **Exhibit 2** is a true and correct copy of *United States v.*

4  *Miller*, 307 U.S. 174 (1939).

5      15.   In adjudicating a firearms prohibition, therefore, "the pertinent Second

6  Amendment inquiry is whether [the arms] are commonly possessed by law-abiding

7  citizens for lawful purposes today." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032

8  (2016) (Alito, J., concurring) (emphasis omitted).

9      16.   But the Supreme Court has not expressly defined "common."

10     17.   The Court addressed handgun bans in *Heller* and *McDonald v. City of*

11 *Chicago*, 561 U.S. 742 (2010). And because handguns, as a class, were "the most

12 popular weapon chosen by Americans for self-defense in the home," *Heller*, 554 U.S.

13 at 629, it went without saying that they were "in common use," so the Court did not

14 perform a commonality analysis.

15     18.   *Heller* made clear that a protected arm must be among "the sorts of

16 weapons" or "of the kind" that are in common use. *Heller*, 554 U.S. at 624, 627. The

17 specific features, make, or model, of the arm in question need not be common.

18     19.   *Caetano* summarily reversed and remanded an opinion of the

19 Massachusetts Supreme Judicial Court upholding a stun gun prohibition. While the

20 Court's per curiam opinion focused on the lower court's violations of Supreme Court

21 precedent, Justices Alito and Thomas's concurrence explained, inter alia, that stun guns

22 are, indeed, common.

23     20.   In reaching this determination, the concurrence elucidated that "[t]he more

24 relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold

25 to private citizens, who it appears may lawfully possess them in 45 States." *Id.*

26 (quotation omitted).

27     21.   The raw number of arms and the number of jurisdictions in which those

28

arms are available are, therefore, the only specific commonality factors that any Justices have provided to date.

22.    In referring to both stun guns and Tasers, the *Caetano* concurrence applied its commonality analysis to bearable—carryable, *Heller*, 554 U.S. at 584—handheld electroshock weapons as a "class of arms," *Caetano*, 136 S. Ct. at 1031, rather than to a subset of those weapons defined by certain features.

23.    Attached hereto as **Exhibit 3** is a true and correct copy of *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016).

24.    Applying those factors here, California bans arms that are common, and thus protected by the Second Amendment.

<u>JURISDICTIONAL ANALYSIS</u>

25.    Following the approach taken in *Caetano*, I conducted research on and reviewed the various state "assault weapon" bans throughout the U.S. in order to determine the number of jurisdictions that prohibit and/or restrict semiautomatic centerfire firearms with various features, like those listed in California Penal Code § 30515.

26.    Only five other states have bans that arguably approach California's in their severity.

27.    **Connecticut** bans the possession of "assault weapons," which it defines as "[a]ny selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user," a list of specified makes and models of semiautomatic rifles and pistols, and semiautomatic firearms that contain certain external features like a "folding or telescopic stock" or a "forward pistol grip." Conn. Gen. Stat. Ann. § 53-202a; Conn. Gen. Stat. Ann. § 53-202c.

28.    Attached hereto as **Exhibit 4** is a true and correct copy of Conn. Gen. Stat. Ann. § 53-202a; Conn. Gen. Stat. Ann. § 53-202c.

29.    **Maryland** makes it illegal to "possess, sell, offer to sell, transfer,

purchase, or receive an assault weapon" in the state. Md. Code Ann., Crim. Law § 4-303. Maryland defines "assault weapon" as "(1) an assault long gun; (2) an assault pistol; or (3) a copycat weapon." Md. Code Ann., Crim. Law § 4-301(d). Maryland defines "assault long gun" and "assault pistol" by reference to two lists of specified firearms, "or their copies" (for long guns) and "or a copy" (for pistols).

30.     Attached hereto as **Exhibit 5** is a true and correct copy of Md. Code Ann., Crim. Law §§ 4-301(b)-(d), 4-303; and Md. Pub. Safety § 5-101(r)(2).

31.     **Massachusetts** based its "assault weapon" ban on the federal ban from 1994—the Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, §§ 110101-06, 108 Stat. 1796, 1996-2010 (1994). Massachusetts law provides that, "No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994." Mass. Gen. Laws Ann. ch. 140, § 131M.

32.     Attached hereto as **Exhibit 6** is a true and correct copy of Mass. Gen. Laws Ann. ch. 140, § 131M.

33.     **New Jersey** prohibits several dozen "assault firearms" by name, in addition to any firearm "substantially identical" to those listed by name. New Jersey also prohibits arms capable of accepting, a "semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock"; a " semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds"; a "part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person."; and a "firearm with a bump stock attached." N.J. Stat. Ann. § 2C:39-1w.

34.     Attached hereto as **Exhibit 7** is a true and correct copy of N.J. Stat. Ann. § 2C:39-1w.

35.     **New York** prohibits "assault weapons," which it defines as "(a) a

- 5 -

semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of" a number of external features, like a "folding or telescoping stock" or "a pistol grip that protrudes conspicuously beneath the action of the weapon"; "(b) a semiautomatic shotgun that has at least one of" a separate list of external features, or "(c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of" a third list of external features; or "(d) a revolving cylinder shotgun." N.Y. Penal Law § 265.00, 22.

36.     Attached hereto as **Exhibit 8** is a true and correct copy of N.Y. Penal Law § 265.00, 22.

37.     A few other states have restrictions, but not prohibitions, on similar semiautomatic, centerfire firearms with various features (*e.g.*, pistol grip, folding/collapsible stock, flash suppressors, vertical forward grip, etc.).

38.     **Hawaii** bans "assault pistols," but not "assault rifles." Haw. Rev. Stat. Ann. § 134-8. "'Assault pistol' means a semiautomatic pistol that accepts a detachable magazine and 'has two or more" of a list of external features, including "[a]n ammunition magazine that attaches to the pistol outside of the pistol grip" and a "manufactured weight of fifty ounces or more when the pistol is unloaded." Haw. Rev. Stat. Ann. §§ 134-1, 134-4.

39.     Attached hereto as **Exhibit 9** is a true and correct copy of Haw. Rev. Stat. Ann. §§ 134-1, 134-4, and 134-8.

40.     **Minnesota** applies some restrictions to "semiautomatic military-style assault weapons," which are defined as any of a listed number of firearms and firearms that are similar enough to those expressly listed. Minn. Stat. Ann. § 624.712, subd. 7. In Minnesota, purchasers of "semiautomatic military-style assault weapons" can acquire a transferee permit, if they qualify. Minn. Stat. Ann. § 624.7131. If the purchaser does not have a permit, the firearms dealer must submit a report with law enforcement so law enforcement has an opportunity to conduct a background check

before the transfer occurs. Minn. Stat. Ann. § 624.7132, subd. 1. Nondealers (i.e., private transferors), however, can complete a transfer of a "semiautomatic military-style assault weapon" without submitting such a report. *Id.* at subd. 12.

41.    Attached hereto as **Exhibit 10** is a true and correct copy of Minn. Stat. Ann. §§ 624.712, subd. 7; 624.7131; and 624.7132, subd. 1 and subd. 12.

42.    **Virginia** limits the possession of "assault firearms" to citizens and permanent residents over 18. Va. Code Ann. § 18.2-308.2:01. "'Assault firearm' means any semi-automatic center-fire rifle or pistol which expels single or multiple projectiles by action of an explosion of a combustible material and is equipped . . . with a magazine which will hold more than 20 rounds of ammunition or designed by the manufacturer to accommodate a silencer or equipped with a folding stock." Va. Code Ann. § 18.2-308.2:2(G).

43.    Attached hereto as **Exhibit 11** is a true and correct copy of Va. Code Ann. §§ 18.2-308.2:01 and 18.2-308.2:2(G).

44.    Law-abiding citizens may thus possess some semiautomatic rifles in all 50 states, and any semiautomatic rifle in 44 states. Forty-one states treat all semiautomatic firearms the same as every other legal firearm, without any additional restrictions, regardless of the features attached to the firearm.

45.    All of these above-listed prohibitions and restrictions were implemented relatively recently, with California becoming the first state to implement any kind of "assault weapon" ban in 1989. California did not prohibit semiautomatic centerfire firearms according to their features until approximately a decade later.

46.    There is no federal ban or restriction on semiautomatic firearms. The 1994 Public Safety and Recreational Firearms Use Protection Act, otherwise known as the 1994 Federal Assault Weapons Ban, was in effect from 1994 to 2004. It was permitted to expire under its sunset provision because it was widely regarded as having been ineffective in reducing crime.

- 7 -

*DECLARATION OF GEORGE A. MOCSARY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*
*(CASE NO. 3:19-CV-01537-BEN-JLB)*

47.     Compared to the hundreds of thousands of hand-held electrical weapons that were lawfully possessed in 45 states, and thus in common use according to the *Caetano* concurrence, tens of millions of the rifles California bans as "assault weapons" are lawfully possessed in at least 44 states, and some are lawfully possessed in more than that number (i.e., some firearms banned in California may be owned in Connecticut, Maryland, Massachusetts, New Jersey, or New York, like "[a] semiautomatic, centerfire rifle that has an overall length of less than 30 inches." Cal. Penal Code § 30515(a)(3)).

48.     The firearms prohibited in California are therefore widely owned and accepted as a legitimate means of self-defense across the country.

**CONCLUSIONS**

49.     My research leads me to the following conclusions:

50.     The arms banned by California are owned in far greater numbers than the electroshock weapons at issue in *Caetano*.  All are lawful in nearly as many, and some are lawful in more, jurisdictions than the arms at issue in *Caetano*.

51.     Because *Heller* and the *Caetano* concurrence perform the commonality analysis at the "sort," "kind," or "class" level, it is no answer say that California is targeting merely an unprotected subcategory of firearms. *Caetano*, 136 S. Ct. at 1031; *Heller*, 554 U.S. at 624, 627. In the instant case, it would be most consistent with *Heller* and the *Caetano* concurrence for the commonality analysis to focus on whether long guns are in common use.[1]

_____

[1] Analogizing to *Heller*, long guns are at the same level of generality as handguns. The next more-general level would be firearms. The next more-specific level would be rifles (the ban of which plaintiffs here are challenging). The more-specific level after that would be semiautomatic rifles.

Analogizing to *Caetano*, long guns are at the same level of generality as handheld electroshock weapons. The next more-general level would be electroshock weapons. The next more-specific level would be stun guns (the ban of which Ms. Caetano was challenging).

52.     It is therefore no more proper to ban a subset of long guns because they are semiautomatic then it would be to ban a subset of handguns because they are semiautomatic.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed within the United States on December 6, 2019.

_George Mocsary_
George A. Mocsary

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---|---|---|
| 1 | George A. Mocsary, Curriculum Vitae | 0001-0008 |
| 2 | Conn. Gen. Stat. § 53-202(a); and<br>Conn. Gen. Stat. § 53-202(c) | 0009-0015 |
| 3 | Md. Criminal Law Code Ann. § 4-301;<br>Md. Criminal Law Code Ann. § 4-303; and<br>Md. Pub. Safety §5-101(r)(2). | 0016-0023 |
| 4 | Mass. Gen. Laws Ann. Ch. 140, § 131M | 0024-0026 |
| 5 | N.J. Stat. Ann. § 2C:39-1w | 0027-0037 |
| 6 | N.Y. Penal Law §265.00, 22 | 0038-0052 |
| 7 | Haw. Rev. Stat. Ann §§ 134-1, 134-4, 134-8 | 0053-0058 |
| 8 | Minn. Stat. Ann. §§ 624.172, subd. 7;  624.7131;<br>and 624.7132, subd.1 and subd. 12 | 0059-0068 |
| 9 | Va. Code Ann. §§ 18.2-308.2:01, 18.2-308.2:2(G) | 0069-0075 |

# EXHIBIT "1"

# George A. Mocsary

University of Wyoming College of Law
1000 E. University Avenue | Laramie, WY 82071
(307) 766-5262 | gmocsary@uwyo.edu

## ACADEMIC EXPERIENCE

**UNIVERSITY OF WYOMING COLLEGE OF LAW**                                    **Laramie, WY**
*Professor of Law*                                                       **7/18 – PRESENT**
*Director*, Business Law Practicum.

Courses:
- Corporations
- Contracts II
- Agency and Partnership
- Business Law Practicum

**SOUTHERN ILLINOIS UNIVERSITY SCHOOL OF LAW**                          **Carbondale, IL**
*Associate Professor*                                                       **7/18 – 5/19**
*Assistant Professor*                                                       **7/13 – 6/18**
*Director*, Faculty Development.
*Director*, Business Boot Camp.
*Director*, Law and Economics Program.
*Director*, Gene and Katy Simonds Lectureship in Democracy.
- Recipient of the SIU Law Outstanding Scholar Award (April 13, 2017).

Courses:
- Business Organizations
- Contracts I and II
- Judicial Externship
- Corporations
- Accounting for Lawyers
- Firearms Law and the Second Amendment
- Agency and Partnership
- Business Boot Camp

**UNIVERSITY OF CONNECTICUT SCHOOL OF LAW**                              **Hartford, CT**
*Visiting Assistant Professor*                                             **8/11 – 7/13**
Courses:  Business Organizations, Legal Accounting.

## TEACHING & RESEARCH INTERESTS

### TEACHING INTERESTS

- Business Organizations
- Securities Regulation
- International Business Transactions
- Commercial Law
- Corporations
- Contracts
- Insurance Law
- Law and Economics
- Unincorporated Business Entities
- Corporate Finance
- Accounting for Lawyers
- Firearms Law

### RESEARCH INTERESTS

- Corporate governance and corporate purpose.
- Economic analysis of law.
- Organizational theory.
- The intersection of financial regulation and financial-economic agency theory.
- Firearms law (with a focus on its intersection with business law and the economic analysis of law).

## PUBLICATIONS

### LAW JOURNAL ARTICLES

- *A Close Reading of an Excellent Distant Reading of* Heller *in the Courts*, 68 DUKE L.J. ONLINE 41 (2018).  (link)

- *Insuring the Unthinkable*, NEW APPLEMAN ON INS.: CURRENT CRITICAL ISSUES IN INS. L. 1 (Spring 2018) (lead article).

- *Freedom of Corporate Purpose*, 2016 BYU L. REV. 1319 (2017) (lead article).  (link)

- *Guns, Bird Feathers, and Overcriminalization: Why Courts Should Take the Second Amendment Seriously*, 14 GEO. J. L. & PUB. POL'Y 17 (2016) (with Robert J. Cottrol).  (link)
  o Cited in *Kolbe v. Hogan*, 849 F.3d 114, 154 (4th Cir. 2017) (Traxler, J., dissenting).

- *Insuring Against Guns?*, 46 CONN. L. REV. 1209 (2014) (lead symposium article).  (link)

- *The Embedded Firm: Corporate Governance, Labor, and Finance Capitalism—Commentary*, 3 ACCT., ECON. & L. 123 (2014) (peer reviewed essay on incentive issues in corporate governance as they relate to corporate purpose, based on participation in a symposium discussion panel on THE EMBEDDED FIRM: CORPORATE GOVERNANCE, LABOR, AND FINANCE CAPITALISM (Cynthia A. Williams & Peer Zumbansen eds., 2011)).  (link)

- *Statistically Insignificant Deaths: Disclosing Drug Harms to Investors (and Patients) Under SEC Rule 10b-5*, 82 GEO. WASH. L. REV. 111 (2013).  (link)

- *"This Right Is Not Allowed by Governments That Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823 (2010) (with Clayton E. Cramer & Nicholas J. Johnson) (link).
  o Cited in *McDonald v. Chicago*, 561 U.S. 742, 773 n.21, 776 n.25, 780 (2010).
  o Cited in *Ezell v. City of Chicago*, 651 F.3d 684, 702 n.11 (7th Cir. 2011).

- Note, *Explaining Away the Obvious: The Infeasibility of Characterizing the Second Amendment as a Nonindividual Right*, 76 FORDHAM L. REV. 2113 (2008).  (link)

### BOOKS AND SUPPLEMENTS

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2d ed. 2017) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea).
  o Cited in Illinois v. Chairez, 2018 IL 121417, at 7 n.3 (Ill. Feb. 1, 2018).

- 2015 SUPPLEMENT FOR FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2015) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea).

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY online chs. 12-15 (2014) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea).  (link)

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea) (first casebook on firearms law).
  o Cited in *Drake v. Filko*, 724 F.3d 426, 441 n.3, 441 n.5, 442 (3d Cir. 2013) (Hardiman, J., dissenting).
  o Cited in *Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

OTHER ARTICLES

- *States have a constitutional duty to recognize gun rights nationwide*, THE HILL (Dec. 27, 2017), http://thehill.com/opinion/international/366599-states-have-a-constitutional-duty-to-recognize-gun-rights-nationwide (with Rafael Mangual).

- *Defying the Supreme Court in* Kolbe v. Hogan, LIBR. L. & LIBERTY (Dec. 20, 2017), http://www.libertylawsite.org/2017/12/20/defying-the-supreme-court-in-kolbe-v-hogan/.

- *Are There Guns in Mayberry?*, LIBR. L. & LIBERTY (Oct. 17, 2016), http://www.libertylawsite.org/book-review/are-there-guns-in-mayberry/ (reviewing JENNIFER CARLSON, CITIZEN-PROTECTORS: THE EVERYDAY POLITICS OF GUNS IN AN AGE OF DECLINE (2015)).

- *Incentive Engineering*, LIBR. L. & LIBERTY (July 27, 2015), http://www.libertylawsite.org/book-review/incentive-engineering (reviewing ROBERT D. COOTER & ARIAL PORAT, GETTING INCENTIVES RIGHT: IMPROVING TORTS, CONTRACTS, AND RESTITUTION (2014)).

- *Shareholder Wealth Maximization:  A Response to Cynthia Williams*, LIBR. L. & LIBERTY (Feb. 20, 2014), http://www.libertylawsite.org/liberty-forum/shareholder-wealth-maximization-a-response-to-cynthia-williams.

- *Why the Corporation Is Not Merely a Nexus of Contracts:  A Response to Alexei Marcoux,* LIBR. L. & LIBERTY (Dec. 20, 2013), http://www.libertylawsite.org/liberty-forum/why-the-corporation-is-not-merely-a-nexus-of-contracts.

- *The Future of Shareholder Wealth Maximization*, LIBR. L. & LIBERTY (Dec. 2, 2013), http://www.libertylawsite.org/liberty-forum/the-future-of-shareholder-wealth-maximization.

- *Monopoly of Violence,* CLAREMONT REV. OF BOOKS, Summer 2010, at 46 (reviewing ROBERT H. CHURCHILL, TO SHAKE THEIR GUNS IN THE TYRANT'S FACE (2008)).  (link)

## PRESENTATIONS AND WORKSHOPS

- *Guns and Moral Panic: Sound Bite Overcriminalization and Judicial Underenforcement of the Second Amendment in New York, New Jersey, and Connecticut*, Address to the Federalist Society's New York City Young Lawyers Chapter (Nov 7, 2019).

- Debater at the University of Utah S.J. Quinney College of Law's 36th Annual Jefferson B. Fordham Debate: *Be it resolved that the Second Amendment right to keep and bear arms should be limited to the home.* (Sept. 5, 2019).

- Commenter at the Duke University School of Law, Center for Firearms Law's Firearms Law Works-in-Progress Workshop (Aug. 2, 2019).

- Discussant at the Southeastern Association of Law Schools 2019 Annual Meeting Discussion Group:  Insider Trading Stories (Aug. 1, 2019).

- Reviewer at the Southeastern Association of Law Schools 2019 Annual Meeting Prospective Law Teachers CV Review Session (Jul. 30, 2019).

- *Perceiving and Measuring Judicial Defiance of* Heller, CLE Presentation at the 22nd Annual National Firearms Law Seminar (Apr. 26, 2019).

- Discussant at the Duke University School of Law, Center for Firearms Law and Center for Law, Ethics, and National Security's, The Second Amendment and the Prevention of Tyranny Panel (Feb. 28, 2019).

- Guest Speaker at the Duke University School of Law, Second Amendment: History, Theory, and Practice Class (Feb. 28, 2019).

- Participant Revisiting Corporate Social Responsibility Colloquium presented by the Federalist Society and the Liberty Fund (Jan. 25-26, 2019).

- Presentation at the Hastings Constitutional Law Quarterly and Giffords Law Center Symposium: *Heller* at 10, A "Second-Class Right"? The Second Amendment & Other Constitutional Rights Panel (Jan. 18, 2019).

- Presentation at the AALS 2019 Annual Meeting, Open-Source Panel: Judicial Supremacy (Jan. 5, 2019).

- *Administrative Browbeating*, Presentation at the Federalist Society 2019 Faculty Conference (Jan. 4, 2019).

- Instructor, Udmurt Law Student Project (Oct. 23, 2018) (presented an overview of U.S. contract law via videoconference to Russian law students at Udmurt State University in Izhevsk, Russia).

- Discussant at the Southeastern Association of Law Schools 2018 Annual Meeting Discussion Group: The Role of Corporate Personhood in *Masterpiece Cakeshop* (Aug. 11, 2018).

- Discussant at the Southeastern Association of Law Schools 2018 Annual Meeting Discussion Group: *United States v. Martoma* and the Future of Insider Trading Law (Aug. 9, 2017).

- Commenter at the Southeastern Association of Law Schools 2018 Annual Meeting Prospective Law Teachers Mock Interview Workshop (Aug. 7, 2018).

- *Insider Trading, Demonization of the Financial Sector, and Judicial Complacency*, Presentation at the 2018 National Business Law Scholars Conference (June 21, 2018).

- Presentation at the Campbell Law Review Symposium: *Heller* After Ten Years, *Heller* and Public Carry Restrictions Panel (Feb. 2, 2018).

- *Insider Trading, Demonization of the Financial Sector, and Judicial Complacency*, Presentation at the Federalist Society 2018 Faculty Conference (Jan. 4, 2018).

- Moderator at the Federalist Society 2018 Faculty Conference, Works in Progress Panel (Jan. 5, 2018).

- *Freedom of Corporate Purpose*, Presentation at Mercer University School of Law (Nov. 9, 2017) (invited to participate in speaker series).

- *Insider Trading, Demonization of the Financial Sector, and Judicial Complacency*, Presentation at the Central States Law Schools Association 2017 Annual Meeting (Oct. 7, 2017).

- *Guns, Bird Feathers, and Overcriminalization: Why Courts Should Take the Second Amendment Seriously*, Constitution Day Address at John A. Logan College (Sept. 18, 2017).

- Reviewer at the Southeastern Association of Law Schools 2017 Annual Meeting Prospective Law Teachers CV Review Session (Aug. 2, 2017).

- Discussant at the Southeastern Association of Law Schools 2017 Annual Meeting Discussion Group: Three Felonies a Day?: Is There a Problem of White-Collar Overcriminalization? (Aug. 1, 2017).

- *Guns, Bird Feathers, and Overcriminalization: Why Courts Should take the Second Amendment Seriously*, Keynote Address at the Federalist Society's Lawyer Division's Chicago Chapter's Fourth Annual Otis McDonald Memorial Second Amendment Lecture (May 6, 2017).

- Moderator at the Federalist Society 2017 Faculty Conference, Works in Progress Panel (Jan. 5, 2017).

- Commentator at the George Mason University School of Law, Law and Economics Center's Research Roundtable on Solving the Public Pension Crisis (Sept. 29-30, 2016) (invited to review and comment on nine scholarly papers accepted for publication).

- *Freedom of Corporate Purpose*, Presentation at the Southeastern Association of Law Schools 2016 Annual Meeting (Aug. 6, 2016).

- Commenter at the Southeastern Association of Law Schools 2016 Annual Meeting Prospective Law Teachers Mock Job Talk Workshop (Aug. 5, 2016).

- Commenter at the Southeastern Association of Law Schools 2016 Annual Meeting Prospective Law Teachers Mock Interview Workshop (Aug. 4, 2016).

- *Freedom of Corporate Purpose*, Presentation at the University of Iowa College of Law Faculty Workshop (Feb. 4, 2016).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop on the Contractual Theory of the Corporation (Jan. 20-22, 2016).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on the Economics of the Rule of Law (Dec. 11-14, 2015).

- *Freedom of Corporate Purpose*, Presentation at the University of Chicago Law School Legal Scholarship Workshop (Nov. 23, 2015).

- Author Participant and Organizer at the Theory of the Firm Colloquium presented by the Federalist Society and the John Templeton Foundation (Nov. 6-7, 2015) (featured readings included George A. Mocsary, *Freedom of Corporate Purpose*, 2016 BYU L. REV. 1319 (2017) and George A. Mocsary, *Why the Corporation Is Not Merely a Nexus of Contracts: A Response to Alexei Marcoux*, LIBR. L. & LIBERTY (Dec. 20, 2013), http://www.libertylawsite.org/liberty-forum/why-the-corporation-is-not-merely-a-nexus-of-contracts).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on the Economics of Public Pension Reform (Sept 17-20, 2015).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on Austrian Law and Economics (Oct. 2-3, 2014).

- Guest Presenter and Workshop Participant at the George Mason University School of Law, Law and Economics Center's Economics Institute for Law Professors (June 15-26, 2014) (taught a segment on game theory in corporate law).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on Risk, Injury, Liability, and Insurance (Jan. 30 - Feb. 1, 2014).

- Presentation at the AALS 2014 Annual Meeting, Criminal Justice Panel:  The Problematics of Possessory Offenses (Jan. 5, 2014) (discussing the potential for liability insurance mandates to lead to status criminality).

- *Insuring Against Guns?*, Presentation at the University of Chicago Law School Legal Scholarship Workshop (Nov. 25, 2015).

- *Insuring Against Guns?*, Presentation at the Connecticut Law Review Symposium:  Up in Arms:  The Second Amendment in the Modern Republic, Tragedy and Gun Control: The Legislative Response Panel (Nov. 15, 2013).

- Moderator at the Connecticut Law Review Symposium:  Up in Arms:  The Second Amendment in the Modern Republic, Litigating the Affirmed Right to Arms Panel (Nov. 15, 2013).

- *The Second Amendment as Tyranny Control*, Presentation at the Indiana Tech Law School Symposium:  On the Question of Regulating Guns (Nov. 8, 2013).

- *Insuring Against Guns?*, Presentation at the Indiana Tech Law School Faculty Workshop (Nov. 7, 2013).

- Discussant at the Society for the Advancement of Socio-Economics 2012 Annual Meeting, Authors meet Critics Panel (June 29, 2012) (discussing THE EMBEDDED FIRM:  CORPORATE GOVERNANCE, LABOR, AND FINANCE CAPITALISM (Cynthia A. Williams & Peer Zumbansen eds., 2011)).

## EDUCATION

**FORDHAM UNIVERSITY SCHOOL OF LAW**                                    **New York, NY**
Juris Doctor, *Summa Cum Laude*.                                        **MAY 2009**
G.P.A.:  3.9 (First in a class of 468).
- Notes & Articles Editor, Fordham Law Review.

**UNIVERSITY OF ROCHESTER, SIMON GRADUATE SCHOOL OF BUSINESS**          **Rochester, NY**
Master of Business Administration, Competitive and Organizational Strategy.   **MARCH 1997**
- Specialized in the application of financial-economic agency theory to business situations.
- Dean's list; 70% merit scholarship; selected to mentor first-year students.

**THE COOPER UNION SCHOOL OF ENGINEERING**                             **New York, NY**
Bachelor of Engineering, Civil Engineering.                            **MAY 1995**
- Dean's list; Full scholarship.

## LEGAL EXPERIENCE

**CRAVATH, SWAINE & MOORE**                                             **New York, NY**
*Associate*, Bankruptcy & Restructuring                                **12/10 – 8/11**
*Summer Associate*, Bankruptcy & Restructuring and Litigation          **SUMMER 2008**
- Represented a major derivatives creditor in Lehman Brothers' bankruptcy and handled other bankruptcy matters.
- Worked on restructuring transactions involving major American corporations.
- Assisted other Corporate Department groups with bankruptcy and restructuring matters.

**HON. HARRIS L. HARTZ, U.S. COURT OF APPEALS FOR THE TENTH CIRCUIT**   **Albuquerque, NM**
*Law Clerk*                                                            **8/09 – 7/10**

**HON. JOSE L. LINARES, U.S. DISTRICT COURT, DISTRICT OF NEW JERSEY**   **Newark, NJ**
*Judicial Intern*                                                      **SUMMER 2007**

HON. NOVALYN L. WINFIELD, U.S. BANKRUPTCY COURT, DISTRICT OF NEW JERSEY               Newark, NJ
*Judicial Intern*                                                                  SUMMER 2007

## BUSINESS EXPERIENCE

GRENFELL CONSULTING                                                            New York, NY
*Owner/Management Consultant*                                                    9/01 – 2/07
Clients included:

**Pictet & Cie.,** e-Business Group                                        **Geneva, Switzerland**
Pictet & Cie. is one of the oldest private banks in Switzerland.
- Created a strategy for the wireless delivery of financial information that adhered to Swiss banking-secrecy laws.

**Blister, LLC**                                                              **New York, NY**
- Advised creative advertising business in its startup phase, helping to grow its revenues from $36,000 in its first year to over $800,000 in its second.

**Office of the Mayor, City of New York**                                     **New York, NY**
- Oversaw projects for a $9 billion capital program.
- Taught training classes to City employees and vendors on the City's financial systems and business processes.

**JPMorgan Chase & Co.**                                                      **New York, NY**
- Analyzed the businesses of banks acquired via merger to identify synergies and areas for system integration.

CLICKTHINGS                                                                   New York, NY
*Manager, Professional Services*                                                5/00 – 1/01
ClickThings developed information-distribution technology for the business-services market.
- Created plans for entering new markets via reseller partnerships by analyzing clients' and competitors' strategies.

AMERICAN MANAGEMENT SYSTEMS                                                   New York, NY
*Senior Business Analyst*                                                       6/97 – 5/00
- Led a team of consultants in creating a business model that integrated budgeting, procurement, and accounting activities, enabling the City of New York to match forecasts with expenditures for the first time in its history.

CREDIT SUISSE FIRST BOSTON                                                    New York, NY
*Change Management Coordinator*, Fixed Income Division                           9/94 – 1/97
(Worked half-time while classes were in session, full-time during winter, spring, and summer recesses.)

## OTHER

**BAR ADMISSIONS:**  New York, U.S. Court of Appeals for the Tenth Circuit.

**COMMUNITY SERVICE:** Provided **Carbondale New School** with *pro bono* advisory work on contract-related matters; presented two *pro bono* **seminars on end-of-life matters** open to and attended by members of the public.

**LANGUAGES:** Fluent in conversational **Hungarian**, basic understanding of **French**.

# EXHIBIT "2"

Exhibit 2
0009

## *Conn. Gen. Stat. § 53-202a*

Current through the 2019 First Regular Session, and the 2019 First Special Session.

*LexisNexis® Connecticut Annotated Statutes  >  Title 53 Crimes (Chs. 938 — 949g) >  Chapter 943 Offenses Against Public Peace and Safety (§§ 53-169 — 53-215a)*

## Sec. 53-202a. Assault weapons: Definitions.

As used in this section and *sections 53-202b* to *53-202k*, inclusive:

(1)"Assault weapon" means:

(A)

(i)Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR-180; Australian Automatic Arms SAP Pistol; Auto-Ordnance Thompson type; Avtomat Kalashnikov AK-47 type; Barrett Light-Fifty model 82A1; Beretta AR-70; Bushmaster Auto Rifle and Auto Pistol; Calico models M-900, M-950 and 100-P; Chartered Industries of Singapore SR-88; Colt AR-15 and Sporter; Daewoo K-1, K-2, Max-1 and Max-2; Encom MK-IV, MP-9 and MP-45; Fabrique Nationale FN/FAL, FN/LAR, or FN/FNC; FAMAS MAS 223; Feather AT-9 and Mini-AT; Federal XC-900 and XC-450; Franchi SPAS-12 and LAW-12; Galil AR and ARM; Goncz High-Tech Carbine and High-Tech Long Pistol; Heckler & Koch HK-91, HK-93, HK-94 and SP-89; Holmes MP-83; MAC-10, MAC-11 and MAC-11 Carbine type; Intratec TEC-9 and Scorpion; Iver Johnson Enforcer model 3000; Ruger Mini-14/5F folding stock model only; Scarab Skorpion; SIG 57 AMT and 500 series; Spectre Auto Carbine and Auto Pistol; Springfield Armory BM59, SAR-48 and G-3; Sterling MK-6 and MK-7; Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns; USAS-12; UZI Carbine, Mini-Carbine and Pistol; Weaver Arms Nighthawk; Wilkinson "Linda" Pistol;

(ii)A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subparagraph (A)(i) of this subdivision, or any combination of parts from which an assault weapon, as defined in subparagraph (A)(i) of this subdivision,may be rapidly assembled if those parts are in the possession or under the control of the same person;

(B)Any of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on April 4, 2013: (i) AK-47; (ii) AK-74; (iii) AKM; (iv) AKS-74U; (v) ARM; (vi) MAADI AK47; (vii) MAK90; (viii) MISR; (ix) NHM90 and NHM91; (x) Norinco 56, 56S, 84S and 86S; (xi) Poly Technologies AKS and AK47; (xii) SA 85; (xiii) SA 93; (xiv) VEPR; (xv) WASR-10; (xvi) WUM; (xvii) Rock River Arms LAR-47; (xviii) Vector Arms AK-47; (xix) AR-10; (xx) AR-15; (xxi) Bushmaster Carbon 15, Bushmaster XM15, Bushmaster ACR Rifles, Bushmaster MOE Rifles; (xxii) Colt Match Target Rifles; (xxiii) Armalite M15; (xxiv) Olympic Arms AR-15, A1, CAR, PCR, K3B, K30R, K16, K48, K8 and K9 Rifles; (xxv) DPMS Tactical Rifles; (xxvi) Smith and Wesson M&P15 Rifles; (xxvii) Rock River Arms LAR-15; (xxviii) Doublestar AR Rifles; (xxix) Barrett REC7; (xxx) Beretta Storm; (xxxi) Calico Liberty 50, 50 Tactical, 100, 100 Tactical, I, I Tactical, II and II Tactical Rifles; (xxxii) Hi-Point Carbine Rifles; (xxxiii) HK-PSG-1; (xxxiv) Kel-Tec Sub-2000, SU Rifles, and RFB; (xxxv) Remington Tactical Rifle Model 7615; (xxxvi) SAR-8, SAR-4800 and SR9; (xxxvii) SLG 95; (xxxviii) SLR 95 or 96; (xxxix) TNW M230 and M2HB; (xl) Vector Arms UZI; (xli) Galil and Galil Sporter; (xlii) Daewoo AR 100 and AR 110C; (xliii) Fabrique Nationale/FN 308 Match and L1A1 Sporter; (xliv) HK USC; (xlv) IZHMASH

Conn. Gen. Stat. § 53-202a

Saiga AK; (xlvi) SIG Sauer 551-A1, 556, 516, 716 and M400 Rifles; (xlvii) Valmet M62S, M71S and M78S; (xlviii) Wilkinson Arms Linda Carbine; and (xlix) Barrett M107A1;

**(C)**Any of the following specified semiautomatic pistols, or copies or duplicates thereof with the capability of any such pistols, that were in production prior to or on April 4, 2013: (i) Centurion 39 AK; (ii) Draco AK-47; (iii) HCR AK-47; (iv) IO Inc. Hellpup AK-47; (v) Mini-Draco AK-47; (vi) Yugo Krebs Krink; (vii) American Spirit AR-15; (viii) Bushmaster Carbon 15; (ix) Doublestar Corporation AR; (x) DPMS AR-15; (xi) Olympic Arms AR-15; (xii) Rock River Arms LAR 15; (xiii) Calico Liberty III and III Tactical Pistols; (xiv) Masterpiece Arms MPA Pistols and Velocity Arms VMA Pistols; (xv) Intratec TEC-DC9 and AB-10; (xvi) Colefire Magnum; (xvii) German Sport 522 PK and Chiappa Firearms Mfour-22; (xviii) DSA SA58 PKP FAL; (xix) I.O. Inc. PPS-43C; (xx) Kel-Tec PLR-16 Pistol; (xxi) Sig Sauer P516 and P556 Pistols; and (xxii) Thompson TA5 Pistols;

**(D)**Any of the following semiautomatic shotguns, or copies or duplicates thereof with the capability of any such shotguns, that were in production prior to or on April 4, 2013: All IZHMASH Saiga 12 Shotguns;

**(E)**Any semiautomatic firearm regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that meets the following criteria:

**(i)**A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least one of the following:

**(I)**A folding or telescoping stock;

**(II)**Any grip of the weapon, including a pistol grip,a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

**(III)**A forward pistol grip;

**(IV)**A flash suppressor; or

**(V)**A grenade launcher or flare launcher; or

**(ii)**A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds; or

**(iii)**A semiautomatic, centerfire rifle that has an overall length of less than thirty inches; or

**(iv)**A semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following:

**(I)**An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

**(II)**A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer;

**(III)**A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or

**(IV)**A second hand grip; or

**(v)**A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds; or

**(vi)**A semiautomatic shotgun that has both of the following:

**(I)**A folding or telescoping stock; and

Conn. Gen. Stat. § 53-202c

53a-46a" throughout (b) and (c); inserted "described in subparagraph (A) of subdivision (1) of section 53-202a" in (c); inserted (d) and redesignated former (d) as (e); substituted "subsection (f)" for "subsection (d)" in (e); and made gender neutral and related changes.

## Case Notes

Constitutional Law: Bill of Rights: Fundamental Rights: Right to Bear Arms

Criminal Law & Procedure: Criminal Offenses: Weapons: Possession: General Overview

Governments: Legislation: Interpretation

Governments: Legislation: Overbreadth

### Constitutional Law: Bill of Rights: Fundamental Rights: Right to Bear Arms

Core provisions of the New York and Connecticut laws prohibiting possession of semiautomatic assault weapons, *N.Y Penal Law §§ 265.00(22)*, 265.00(23)(a), 265.02(7), 265.10, and *Conn. Gen. Stat. §§ 53-202a(1)(E)*, *53-202b(a)(1)*, and *53-202c(a)*, did not violate the Second Amendment where, assuming that the prohibited conduct fell under the Second Amendment and applying intermediate scrutiny, the provisions were substantially related to public safety and crime reduction. *New York State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 2015 U.S. App. LEXIS 18121 (2d Cir. N.Y. 2015)*, cert. denied, *136 S. Ct. 2486, 195 L. Ed. 2d 822, 2016 U.S. LEXIS 3959 (U.S. 2016)*.

### Criminal Law & Procedure: Criminal Offenses: Weapons: Possession: General Overview

Under the plain and unambiguous meaning of both *Conn. Gen. Stat. §§ 53-202a* and *53-202c*, defendant's possession of a Maadi MISR firearm, in violation of *Conn. Gen. Stat. § 53-202c*, was upheld, as firearm was a selective-fire firearm banned thereunder and comparable to an AK-47, which was also banned; moreover, as defendant failed to show that the statute did not provide fair warning that it applied to the conduct at issue, and he even considered the weapon he possessed to be an AK-47, his argument that he could not know that the Maadi MISR was a prohibited "Avtomat Kalashnikov AK-47 type" assault weapon was rejected. *State v. Kalman, 93 Conn. App. 129, 887 A.2d 950, 2006 Conn. App. LEXIS 18 (Conn. App. Ct. 2006)*.

### Governments: Legislation: Interpretation

Under the plain and unambiguous meaning of both *Conn. Gen. Stat. §§ 53-202a* and *53-202c*, defendant's possession of a Maadi MISR firearm, in violation of *Conn. Gen. Stat. § 53-202c*, was upheld, as firearm was a selective-fire firearm banned thereunder and comparable to an AK-47, which was also banned; moreover, as defendant failed to show that the statute did not provide fair warning that it applied to the conduct at issue, and he even considered the weapon he possessed to be an AK-47, his argument that he could not know that the Maadi MISR was a prohibited "Avtomat Kalashnikov AK-47 type" assault weapon was rejected. *State v. Kalman, 93 Conn. App. 129, 887 A.2d 950, 2006 Conn. App. LEXIS 18 (Conn. App. Ct. 2006)*.

### Governments: Legislation: Overbreadth

Under the plain and unambiguous meaning of both *Conn. Gen. Stat. §§ 53-202a* and *53-202c*, defendant's possession of a Maadi MISR firearm, in violation of *Conn. Gen. Stat. § 53-202c*, was upheld,

## Conn. Gen. Stat. § 53-202c

Current through the 2019 First Regular Session, and the 2019 First Special Session.

**LexisNexis® Connecticut Annotated Statutes  >  Title 53 Crimes (Chs. 938 — 949g)  >  Chapter 943 Offenses Against Public Peace and Safety (§§ 53-169 — 53-215a)**

## Sec. 53-202c. Possession of assault weapon prohibited. Exemptions. Class D felony.

(a)Except as provided in *section 53-202e*, any person who, within this state, possesses an assault weapon, except as provided in *sections 53-202a* to *53-202k*, inclusive, and *53-202o*, shall be guilty of a class D felony and shall be sentenced to a term of imprisonment of which one year may not be suspended or reduced by the court, except that a first-time violation of this subsection shall be a class A misdemeanor if (1) the person presents proof that such person lawfully possessed the assault weapon (A) prior to October 1, 1993, with respect to an assault weapon described in subparagraph (A) of subdivision (1) of *section 53-202a*, or (B) on April 4, 2013, under the provisions of *sections 53-202a* to *53-202k*, inclusive, in effect on January 1, 2013, with respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of *section 53-202a*, and (2) the person has otherwise possessed the assault weapon in compliance with subsection (f) of *section 53-202d*,

(b)The provisions of subsection (a) of this section shall not apply to the possession of assault weapons by: (1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States, (2) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to *section 26-5*, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty, (3) a member of the military or naval forces of this state or of the United States, or (4) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility.

(c)The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in subparagraph (A) of subdivision (1) of *section 53-202a* by any person prior to July 1, 1994, if all of the following are applicable:

   (1)The person is eligible under *sections 53-202a* to *53-202k*, inclusive, to apply for a certificate of possession for the assault weapon by July 1, 1994;

   (2)The person lawfully possessed the assault weapon prior to October 1, 1993; and

   (3)The person is otherwise in compliance with *sections 53-202a* to *53-202k*, inclusive.

(d)The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of *section 53-202a* by any person prior to April 5, 2013, if all of the following are applicable:

Conn. Gen. Stat. § 53-202a

**(II)**Any grip of the weapon, including a pistol grip,a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or

**(vii)**A semiautomatic shotgun that has the ability to accept a detachable magazine; or

**(viii)**A shotgun with a revolving cylinder; or

**(ix)**Any semiautomatic firearm that meets the criteria set forth in subdivision (3) or (4) of subsection (a) of *section 53-202a of the general statutes*, revision of 1958, revised to January 1, 2013; or

**(F)**A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, may be assembled if those parts are in the possession or under the control of the same person;

**(2)**"Assault weapon" does not include (A) any firearm modified to render it permanently inoperable, or (B) a part or any combination of parts of an assault weapon, that are not assembled as an assault weapon, when in the possession of a licensed gun dealer, as defined in subsection (f) of *section 53-202f*, or a gunsmith who is in the licensed gun dealer's employ, for the purposes of servicing or repairing lawfully possessed assault weapons under *sections 53-202a* to *53-202k*, inclusive;

**(3)**"Action of the weapon" means the part of the firearm that loads, fires and ejects a cartridge, which part includes, but is not limited to, the upper and lower receiver, charging handle, forward assist, magazine release and shell deflector;

**(4)**"Detachable magazine" means an ammunition feeding device that can be removed without disassembling the firearm action;

**(5)**"Firearm" means a firearm, as defined in *section 53a-3*;

**(6)**"Forward pistol grip" means any feature capable of functioning as a grip that can be held by the nontrigger hand;

**(7)**"Lawfully possesses" means, with respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of this subdivision, (A) actual possession that is lawful under *sections 53-202b* to *53-202k*, (B) constructive possession pursuant to a lawful purchase transacted prior to or on April 4, 2013, regardless of whether the assault weapon was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the assault weapon, or (ii) full or partial payment for the assault weapon was made by the purchaser to the seller of the assault weapon prior to or on April 4, 2013, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes;

**(8)**"Pistol grip" means a grip or similar feature that can function as a grip for the trigger hand; and

**(9)**"Second hand grip" means a grip or similar feature that can function as a grip that is additional to the trigger hand grip.

## History

*P.A. 93-306, S. 1*; *P.A. 01-130, S. 1*; *P.A. 13-3, S. 25*, eff. April 4, 2013; *P.A. 13-220, S. 4*, 3, 21, eff. June 18, 2013.

Conn. Gen. Stat. § 53-202c

**(1)**The person is eligible under *sections 53-202a* to *53-202k*, inclusive, to apply for a certificate of possession for the assault weapon by January 1, 2014;

**(2)**The person lawfully possessed the assault weapon on April 4, 2013, under the provisions of *sections 53-202a* to *53-202k*, inclusive, in effect on January 1, 2013; and

**(3)**The person is otherwise in compliance with *sections 53-202a* to *53-202k*, inclusive.

**(e)**The provisions of subsection (a) of this section shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon, or the trustee of a trust that includes an assault weapon, for which a certificate of possession has been issued under *section 53-202d* if the assault weapon is possessed at a place set forth in subdivision (1) of subsection (f) of *section 53-202d* or as authorized by the Probate Court.

**(f)**The provisions of subsection (a) of this section shall not apply to the possession of a semiautomatic pistol that is defined as an assault weapon in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of *section 53-202a* that the Commissioner of Emergency Services and Public Protection designates as being designed expressly for use in target shooting events at the Olympic games sponsored by the International Olympic Committee pursuant to regulations adopted under subdivision (4) of subsection (b) of *section 53-202b* that is (1) possessed and transported in accordance with subsection (f) of *section 53-202d*, or (2) possessed at or transported to or from a collegiate, Olympic or target pistol shooting competition in this state which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms, provided such pistol is transported in the manner prescribed in subsection (a) of *section 53-202f*.

## History

*P.A. 93-306, S. 3*; *P.A. 02-120, S. 5*; *P.A. 11-51, S. 134*; *P.A. 13-3, S. 27*, eff. April 4, 2013; *P.A. 13-220, S. 6*, eff. June 18, 2013.

Annotations

## LexisNexis® Notes

## Notes

### Amendment Notes

2013 amendment, by P.A. 13-3, in (a), substituted "an assault weapon" for "any assault weapon" following "possesses", substituted "sections 53-202a to 53-202k, inclusive, and 53-202o" for "sections 29-37j, 53-202a to 53-202k, inclusive, and 53-202o and subsection (h) of section 53a-46a", deleted the semicolon following "reduced", inserted "by the court", in clause (1), inserted the (A) designator, added "with respect to an assault weapon described in subparagraph (A) of subdivision (1) of section 53-202a, or", and added (B), and in clause (2), substituted "assault weapon" for "firearm" and "subsection (f)" for "subsection (d)"; in (b), inserted "any employee of a Nuclear Regulatory Commission licensee operating a nuclear power generating facility in this state for the purpose of providing security services at such facility, or any person, firm, corporation, contractor or subcontractor providing services at such facility" and substituted "any provision" for "anything" and "when the possession or use is within the scope of such member's duties" for "the use is within the scope of their duties"; substituted "sections 53-202a to 53-202k, inclusive" for "sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section

# EXHIBIT "3"

Exhibit 3
0016

## *Md. CRIMINAL LAW Code Ann. Section 4-301*

Including all Acts of the 2019 Regular Session of the General Assembly

*MD - Annotated Code of Maryland  >  CRIMINAL LAW  >  TITLE 4. WEAPON CRIMES  >  SUBTITLE 3. ASSAULT WEAPONS AND DETACHABLE MAGAZINES.*

## Section 4-301. Definitions.

**(a) In general.** --In this subtitle the following words have the meanings indicated.

**(b) Assault long gun.** --"Assault long gun" means any assault weapon listed under *Section 5-101(r)(2) of the Public Safety Article.*

**(c) Assault pistol.** --"Assault pistol" means any of the following firearms or a copy regardless of the producer or manufacturer:

> **(1)**AA Arms AP-9 semiautomatic pistol;
>
> **(2)**Bushmaster semiautomatic pistol;
>
> **(3)**Claridge HI-TEC semiautomatic pistol;
>
> **(4)**D Max Industries semiautomatic pistol;
>
> **(5)**Encom MK-IV, MP-9, or MP-45 semiautomatic pistol;
>
> **(6)**Heckler and Koch semiautomatic SP-89 pistol;
>
> **(7)**Holmes MP-83 semiautomatic pistol;
>
> **(8)**Ingram MAC 10/11 semiautomatic pistol and variations including the Partisan Avenger and the SWD Cobray;
>
> **(9)**Intratec TEC-9/DC-9 semiautomatic pistol in any centerfire variation;
>
> **(10)**P.A.W.S. type semiautomatic pistol;
>
> **(11)**Skorpion semiautomatic pistol;
>
> **(12)**Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);
>
> **(13)**UZI semiautomatic pistol;
>
> **(14)**Weaver Arms semiautomatic Nighthawk pistol; or
>
> **(15)**Wilkinson semiautomatic "Linda" pistol.

**(d) Assault weapon.** --"Assault weapon" means:

> **(1)**an assault long gun;
>
> **(2)**an assault pistol; or
>
> **(3)**a copycat weapon.

**(e) Binary trigger system.** --"Binary trigger system" means a device that, when installed in or attached to a firearm, fires both when the trigger is pulled and on release of the trigger.

**(f) Bump stock.** --"Bump stock" means a device that, when installed in or attached to a firearm, increases the rate of fire of the firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger.

Alexandria Gibson
**Exhibit 3**
**0017**

Md. CRIMINAL LAW Code Ann. Section 4-301

**(g) Burst trigger system.** --"Burst trigger system" means a device that, when installed in or attached to a firearm, allows the firearm to discharge two or more shots with a single pull of the trigger by altering the trigger reset.

**(h) Copycat weapon.** --

    **(1)**"Copycat weapon" means:

        **(i)**a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:

            **1.**a folding stock;

            **2.**a grenade launcher or flare launcher; or

            **3.**a flash suppressor;

        **(ii)**a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

        **(iii)**a semiautomatic centerfire rifle that has an overall length of less than 29 inches;

        **(iv)**a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

        **(v)**a semiautomatic shotgun that has a folding stock; or

        **(vi)**a shotgun with a revolving cylinder.

    **(2)**"Copycat weapon" does not include an assault long gun or an assault pistol.

**(i) Detachable magazine.** --"Detachable magazine" means an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

**(j) Flash suppressor.** --"Flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

**(k) Hellfire trigger.** --"Hellfire trigger" means a device that, when installed in or attached to a firearm, disengages the trigger return spring when the trigger is pulled.

**(l) Licensed firearms dealer.** --"Licensed firearms dealer" means a person who holds a dealer's license under Title 5, Subtitle 1 of the Public Safety Article.

**(m) Rapid fire trigger activator.** --

    **(1)**"Rapid fire trigger activator" means any device, including a removable manual or power-driven activating device, constructed so that, when installed in or attached to a firearm:

        **(i)**the rate at which the trigger is activated increases; or

        **(ii)**the rate of fire increases.

    **(2)**"Rapid fire trigger activator" includes a bump stock, trigger crank, hellfire trigger, binary trigger system, burst trigger system, or a copy or a similar device, regardless of the producer or manufacturer.

    **(3)**"Rapid fire trigger activator" does not include a semiautomatic replacement trigger that improves the performance and functionality over the stock trigger.

**(n) Trigger crank.** --"Trigger crank" means a device that, when installed in or attached to a firearm, repeatedly activates the trigger of the firearm through the use of a crank, a lever, or any other part that is turned in a circular motion.

## History

## *Md. CRIMINAL LAW Code Ann. Section 4-303*

Including all Acts of the 2019 Regular Session of the General Assembly

*MD - Annotated Code of Maryland > CRIMINAL LAW > TITLE 4. WEAPON CRIMES > SUBTITLE 3. ASSAULT WEAPONS AND DETACHABLE MAGAZINES.*

## Section 4-303. Assault weapons -- Prohibited

(a) **In general.** --Except as provided in subsection (b) of this section, a person may not:

(1)transport an assault weapon into the State; or

(2)possess, sell, offer to sell, transfer, purchase, or receive an assault weapon.

(b) **Exception.** --

(1)A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police before August 1, 1994, may:

(i)continue to possess and transport the assault pistol; or

(ii)while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to a law enforcement unit, barracks, or station, a State or local law enforcement agency, or a federally licensed firearms dealer, as applicable, if the person has notified a law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

(2)A licensed firearms dealer may continue to possess, sell, offer for sale, or transfer an assault long gun or a copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013.

(3)A person who lawfully possessed, has a purchase order for, or completed an application to purchase an assault long gun or a copycat weapon before October 1, 2013, may:

(i)possess and transport the assault long gun or copycat weapon; or

(ii)while carrying a court order requiring the surrender of the assault long gun or copycat weapon, transport the assault long gun or copycat weapon directly to a law enforcement unit, barracks, or station, a State or local law enforcement agency, or a federally licensed firearms dealer, as applicable, if the person has notified a law enforcement unit, barracks, or station that the person is transporting the assault long gun or copycat weapon in accordance with a court order and the assault long gun or copycat weapon is unloaded.

(4)A person may transport an assault weapon to or from:

(i)an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

(ii)a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

(5)A federally licensed firearms dealer may receive and possess an assault weapon received from a person in accordance with a court order to transfer firearms under *Section 6-234 of the Criminal Procedure Article.*

## History

## *Md. PUBLIC SAFETY Code Ann. Section 5-101*

Including all Acts of the 2019 Regular Session of the General Assembly

*MD - Annotated Code of Maryland  >  PUBLIC SAFETY  >  TITLE 5. FIREARMS  >  SUBTITLE 1. REGULATED FIREARMS*

## Section 5-101. Definitions

(a) **In general. --**In this subtitle the following words have the meanings indicated.

(b) **Antique firearm. --**"Antique firearm" has the meaning stated in *Section 4-201 of the Criminal Law Article.*

(b-1) **Convicted of a disqualifying crime. --**

(1)"Convicted of a disqualifying crime" includes:

(i)a case in which a person received probation before judgment for a crime of violence; and

(ii)a case in which a person received probation before judgment in a domestically related crime as defined in *Section 6-233 of the Criminal Procedure Article.*

(2)"Convicted of a disqualifying crime" does not include a case in which a person received a probation before judgment:

(i)for assault in the second degree, unless the crime was a domestically related crime as defined in *Section 6-233 of the Criminal Procedure Article*; or

(ii)that was expunged under Title 10, Subtitle 1 of the Criminal Procedure Article.

(c) **Crime of violence. --**"Crime of violence" means:

(1)abduction;

(2)arson in the first degree;

(3)assault in the first or second degree;

(4)burglary in the first, second, or third degree;

(5)carjacking and armed carjacking;

(6)escape in the first degree;

(7)kidnapping;

(8)voluntary manslaughter;

(9)maiming as previously proscribed under former Article 27, Section 386 of the Code;

(10)mayhem as previously proscribed under former Article 27, Section 384 of the Code;

(11)murder in the first or second degree;

(12)rape in the first or second degree;

(13)robbery;

(14)robbery with a dangerous weapon;

(15)sexual offense in the first, second, or third degree;

(16)home invasion under *Section 6-202(b) of the Criminal Law Article*;

Md. PUBLIC SAFETY Code Ann. Section 5-101

(17)a felony offense under Title 3, Subtitle 11 of the Criminal Law Article;

(18)an attempt to commit any of the crimes listed in items (1) through (17) of this subsection; or

(19)assault with intent to commit any of the crimes listed in items (1) through (17) of this subsection or a crime punishable by imprisonment for more than 1 year.

**(d) Dealer.** --"Dealer" means a person who is engaged in the business of:

(1)selling, renting, or transferring firearms at wholesale or retail; or

(2)repairing firearms.

**(e) Dealer's license.** --"Dealer's license" means a State regulated firearms dealer's license.

**(f) Designated law enforcement agency.** --"Designated law enforcement agency" means a law enforcement agency that the Secretary designates to process applications to purchase regulated firearms for secondary sales.

**(g) Disqualifying crime.** --"Disqualifying crime" means:

(1)a crime of violence;

(2)a violation classified as a felony in the State; or

(3)a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

**(h) Firearm. --**

(1)"Firearm" means:

(i)a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or

(ii)the frame or receiver of such a weapon.

(2)"Firearm" includes a starter gun.

**(i) Firearm applicant.** --"Firearm applicant" means a person who makes a firearm application.

**(j) Firearm application.** --"Firearm application" means an application to purchase, rent, or transfer a regulated firearm.

**(k) Fugitive from justice.** --"Fugitive from justice" means a person who has fled to avoid prosecution or giving testimony in a criminal proceeding.

**(l) Habitual drunkard.** --"Habitual drunkard" means a person who has been found guilty of any three crimes under Section 21-902(a), (b), or (c) of the Transportation Article, one of which occurred in the past year.

**(m) Habitual user.** --"Habitual user" means a person who has been found guilty of two controlled dangerous substance crimes, one of which occurred in the past 5 years.

**(n) Handgun. --**

(1)"Handgun" means a firearm with a barrel less than 16 inches in length.

(2)"Handgun" includes signal, starter, and blank pistols.

**(o) Handgun qualification license.** --"Handgun qualification license" means a license issued by the Secretary that authorizes a person to purchase, rent, or receive a handgun.

**(p) Licensee.** --"Licensee" means a person who holds a dealer's license.

**(q) Qualified handgun instructor.** --"Qualified handgun instructor" means a certified firearms instructor who:

(1)is recognized by the Maryland Police and Correctional Training commissions;

Md. PUBLIC SAFETY Code Ann. Section 5-101

**(2)**has a qualified handgun instructor license issued by the Secretary; or

**(3)**has a certification issued by a nationally recognized firearms organization.

**(r)  Regulated firearm.** --"Regulated firearm" means:

**(1)**a handgun; or

**(2)**a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

**(i)**American Arms Spectre da Semiautomatic carbine;

**(ii)**AK-47 in all forms;

**(iii)**Algimec AGM-1 type semi-auto;

**(iv)**AR 100 type semi-auto;

**(v)**AR 180 type semi-auto;

**(vi)**Argentine L.S.R. semi-auto;

**(vii)**Australian Automatic Arms SAR type semi-auto;

**(viii)**Auto-Ordnance Thompson M1 and 1927 semi-automatics;

**(ix)**Barrett light .50 cal. semi-auto;

**(x)**Beretta AR70 type semi-auto;

**(xi)**Bushmaster semi-auto rifle;

**(xii)**Calico models M-100 and M-900;

**(xiii)**CIS SR 88 type semi-auto;

**(xiv)**Claridge HI TEC C-9 carbines;

**(xv)**Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;

**(xvi)**Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2;

**(xvii)**Dragunov Chinese made semi-auto;

**(xviii)**Famas semi-auto (.223 caliber);

**(xix)**Feather AT-9 semi-auto;

**(xx)**FN LAR and FN FAL assault rifle;

**(xxi)**FNC semi-auto type carbine;

**(xxii)**F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

**(xxiii)**Steyr-AUG-SA semi-auto;

**(xxiv)**Galil models AR and ARM semi-auto;

**(xxv)**Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;

**(xxvi)**Holmes model 88 shotgun;

**(xxvii)**Avtomat Kalashnikov semiautomatic rifle in any format;

**(xxviii)**Manchester Arms "Commando" MK-45, MK-9;

**(xxix)**Mandell TAC-1 semi-auto carbine;

**(xxx)**Mossberg model 500 Bullpup assault shotgun;

**(xxxi)**Sterling Mark 6;

Md. PUBLIC SAFETY Code Ann. Section 5-101

**(xxxii)**P.A.W.S. carbine;

**(xxxiii)**Ruger mini-14 folding stock model (.223 caliber);

**(xxxiv)**SIG 550/551 assault rifle (.223 caliber);

**(xxxv)**SKS with detachable magazine;

**(xxxvi)**AP-74 Commando type semi-auto;

**(xxxvii)**Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand;

**(xxxviii)**Street sweeper assault type shotgun;

**(xxxix)**Striker 12 assault shotgun in all formats;

**(xl)**Unique F11 semi-auto type;

**(xli)**Daewoo USAS 12 semi-auto shotgun;

**(xlii)**UZI 9mm carbine or rifle;

**(xliii)**Valmet M-76 and M-78 semi-auto;

**(xliv)**Weaver Arms "Nighthawk" semi-auto carbine; or

**(xlv)**Wilkinson Arms 9mm semi-auto "Terry".

**(s)  Rent. --**"Rent" means the temporary transfer for consideration of a regulated firearm that is taken from the property of the owner of the regulated firearm.

**(t)  Secondary sale. --**"Secondary sale" means a sale of a regulated firearm in which neither party to the sale:

**(1)**is a licensee;

**(2)**is licensed by the federal government as a firearms dealer;

**(3)**devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of earning a profit through the repeated purchase and resale of firearms; or

**(4)**repairs firearms as a regular course of trade or business.

**(u)  Secretary. --**"Secretary" means the Secretary of State Police or the Secretary's designee.

**(v)  Straw purchase. --**"Straw purchase" means a sale of a regulated firearm in which a person uses another, known as the straw purchaser, to:

**(1)**complete the application to purchase a regulated firearm;

**(2)**take initial possession of the regulated firearm; and

**(3)**subsequently transfer the regulated firearm to the person.

## History

An. Code 1957, art. 27, Sections 441(a)-(j), (l)-(n), (r)-(w), 442(f)(1), (h)(2)(i)1-3, 443(e)(4)(iii)1-3, (i)(2)(i)-(iii), 445(b)(1)(i)-(iii), (3), (d)(1)(i)-(ii), (3); _2003, ch. 5,_ Section 2; _2013, ch. 427_ ; _2014, chs. 115_ , _116_ ; _2015, ch. 321_ ; _2017, chs. 804_ , _805_ ; _2019, ch. 21,_ Section 2 _ch. 22,_ Section 2.

Annotations

## Notes

# EXHIBIT "4"

Exhibit 4
0024

## *ALM GL ch. 140, § 131M*

Current through Chapter 108 of the 2019 Legislative Session.

*Annotated Laws of Massachusetts > PART I ADMINISTRATION OF THE GOVERNMENT (Chs. 1 - 182) > TITLE XX PUBLIC SAFETY AND GOOD ORDER (Chs. 133 - 148A) > TITLE XX PUBLIC SAFETY AND GOOD ORDER (Chs. 133 — 148A) > Chapter 140 Licenses (§§ 1 — 206)*

## § 131M. Firearms — Assault Weapons.

No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

The provisions of this section shall not apply to: (i) the possession by a law enforcement officer for purposes of law enforcement; or (ii) the possession by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving such a weapon or feeding device from such agency upon retirement.

## History

*1998, 180, § 47*; *2014, 284, § 65*.

Annotations

## Notes

**Editorial Note—**

**Codification—**

*Acts 1998, 180, § 47*, effective July 23, 1998, enacted this section.

**The 2014 amendment,** effective Aug 13, 2014, deleted "for purposes of law enforcement" following "enforcement officer" in (i) of the second paragraph.

## Notes to Decisions

**1. Constitutional issues**

ALM GL ch. 140, § 131M

Although Massachusetts law which proscribed the sale, transfer, and possession of certain semiautomatic assault weapons and large-capacity magazines, implicated the right of self-defense in the home, it did not violate the Second Amendment because its burden was minimal as it did not ban all semiautomatic weapons and magazines, and it met intermediate scrutiny since it protected the safety and well-being of citizens due to the inordinate dangers of the proscribed weapons. *Worman v. Healey (1st Cir. Mass. Apr. 26, 2019), 2019 U.S. App. LEXIS 12588*.

Proscription against the transfer or possession of assault weapons and large capacity magazines does not violate the Second Amendment because AR-15 and its analogs, along with large capacity magazines, are not weapons within the original meaning of the right to bear arms. *Worman v. Healey (D. Mass. Apr. 5, 2018), 293 F. Supp. 3d 251, 2018 U.S. Dist. LEXIS 59357*, aff'd, *(1st Cir. Mass. Apr. 26, 2019), 2019 U.S. App. LEXIS 12588*.

Term "copies and duplicates" refers to exact replicas of the enumerated firearms as well as firearms that may not be identical but are nevertheless imitations. While citizens may need to apply their own interpretation of this language at the margins, this obligation does not render the language impermissibly vague. *Worman v. Healey (D. Mass. Apr. 5, 2018), 293 F. Supp. 3d 251, 2018 U.S. Dist. LEXIS 59357*, aff'd, *(1st Cir. Mass. Apr. 26, 2019), 2019 U.S. App. LEXIS 12588*.

## Research References & Practice Aids

Research References and Practice Aids

Law Reviews

Johnson, A Second Amendment Moment: The Constitutional Politics of Gun Control. *71 Brook. L. Rev. 715 (Winter, 2005)*.

Annotated Laws of Massachusetts
Copyright © 2019 Matthew Bender & Company, Inc.,
a member of the LexisNexis Group All rights reserved.

**End of Document**