George M. Lee (SBN 172982)
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511
Email: gml@seilerepstein.com

John W. Dillon (SBN 296788)
**GATZKE DILLON & BALLANCE LLP**
2762 Gateway Road
Carlsbad, California 92009
Phone: (760) 431-9501
Fax: (760) 541-9512
Email: jdillon@gdandb.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, et al., | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | Hon.  Roger T. Benitez<br>Magistrate Hon. Jill L. Burkhardt |
| vs. | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | |
| Defendants. | Complaint filed: August 15, 2019<br>Amended Complaint filed: September 27, 2019 |
| | Date: Thursday, January 16, 2020<br>Time: 10:00 a.m.<br>Department: Courtroom 5A (5th floor) |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................... 1

II.   FACTUAL BACKGROUND ....................................................... 2

   A. California's Assault Weapon Control Act ............................. 2

   B. Plaintiff's Injuries .............................................................. 6

III.  Legal Standard ...................................................................... 10

IV.  Argument ............................................................................... 10

    A. Plaintiffs Are Likely to Succeed on the Merits. ..................... 10

        1. The AWCA's Complete Ban on Commonly Owned Firearms
           Violates the Second Amendment Under *Heller*'s
           Categorical Analysis. ..................................................... 11

        2. The AWCA Bans Arms in "Common Use." ............................... 13

        3. Firearms Covered by California's Ban Are
           Well-Suited for Self-Defense. ......................................... 15

        4. Firearms Covered by California's Ban Are
           Well-Suited for Militia Service. ....................................... 15

        5. California's "Assault Weapons" Ban Does Not Fall
           Within Any Historically Permissible Limit on the Right
           to Keep and Use Arms ................................................... 16

        6. The AWCA Fails the Ninth Circuit's Two-Part Test ................ 18

           a)   Burden on the Second Amendment ..................................... 19

           b)  Heightened Scrutiny Imposes a High Bar for the State
              when Defending Infringements of Second Amendment
              Rights ...................................................................... 20

           c)  There is No Reasonable Fit Between the Government's
              Interests and the AWCA ................................................ 22

    B. All Other Preliminary Injunction Factors Favor Enjoining
    The AWCA ................................................................................ 27

        1. Likelihood of irreparable harm absent preliminary relief .......... 28

        2. The Balance of Equities Tips in Plaintiffs' Favor ...................... 29

        3. An Injunction Is in The Public Interest ................................. 29

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

V.   CONCLUSION ..................................................................................................30

iii

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127, 1134-35 (9th Cir. 2011) .......................................................... 10, 28

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
  559 F.3d 1046 (9th Cir. 2009) ...................................................................... 10

*Ashcroft v. Free Speech Coal.*
  535 U.S. 234 (2002) ...................................................................................... 24

*Bauer v. Becerra*
  858 F.3d 1216, 1221 (9th Cir. 2017) ................................................................ 19

*Buckley v. Valeo*
  424 U.S. 1 (1976) .......................................................................................... 22

*Caetano v. Massachusetts*
  136 S. Ct. 1027 (2016) .................................................................................... 12

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n*
  447 U.S. 557 (1980) ....................................................................................... 21

*cf. Wrenn v. D.C.*
  864 F.3d 650, 666 (D.C. Cir. 2017) ................................................................... 12

*City of Los Angeles v. Alameda Books, Inc.*
  535 U.S. 425 (2002) .................................................................................. 23, 24

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................... *passim*

*Duncan v. Becerra*
  265 F. Supp.3d 1106 (S.D. Cal. 2017) ............................................................... 16

*Duncan v. Becerra,*
  366 F. Supp.3d 1131 (S.D. Cal. 2019) ........................................ 1, 11, 22, 23, 26

*Edenfield v. Fane*
  507 U.S. 761 (1993) ................................................................................. 21, 22

*Elrod v. Burns*
  427 U.S. 347 (1976) ....................................................................................... 27

*Ezell v. City of Chicago*
  651 F.3d 684, 703 (7th Cir. 2011) ............................................................... 18, 28

iv

# TABLE OF AUTHORITIES

**Cases**

*Friedman v. City of Highland Park*
    784 F.3d 406 (7th Cir. 2015) ..................................................... 26

*Heller v. District of Columbia*
    670 F.3d 1244 (2011) ..................................................... 12, 13, 14, 17

*Jackson v. City of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ..................................................... 19, 20

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ..................................................... 29

*Mance v. Sessions*
    896 F.3d 699 (5th Cir. 2018) ..................................................... 20

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ..................................................... 10, 11, 13, 18

*McCutcheon v. FEC*
    134 S. Ct. 1434 (2014) ..................................................... 22

*Monterey Mech. Co. v. Wilson*
    125 F.3d 702 (9th Cir. 1997) ..................................................... 28

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ..................................................... 27

*Ohralik v. Ohio State Bar Ass'n*
    436 U.S. 447 (1978) ..................................................... 22

*Parker v. District of Columbia*
    478 F.3d 370 (D.C. Cir. 2007) ..................................................... 19

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018) .....................................................

*R.A.V. v. City of St. Paul*
    505 U.S. 377 (1992) ..................................................... 20

*Robb v. Hungerbeeler*
    370 F.3d 735 (8th Cir. 2004) ..................................................... 24

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013) ..................................................... 28

*Rupp v. Becerra*
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ..................................................... 22, 23, 25

v

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Se. Promotions Ltd. v. Conrad*
   420 U.S. 546 (1975) ................................................. 24

*Silveira v. Lockyer*
   312 F.3d 1052 (9th Cir. 2002) .......................... 5, 11

*Silvester v. Becerra*
   138 S. Ct. 945 (2018) ............................................. 19

*Silvester v. Harris*
   834 F.3d 816 (9th Cir. 2016) ............................... 20

*Stanley v. Georgia*
   394 U.S. 557 (1969) .............................................. 24

*Staples v. United States*
   511 U.S. 600 (1994) .............................................. 17

*Turner Broadcasting System, Inc. v. FCC*
   512 U.S. 622 (1994) .............................................. 26

*Tyler v. Hillsdale County Sheriff's Dept.*
   837 F. 3d 678 (6th Cir. 2016) .............................. 20

*United States v. Chester*
   628 F.3d 673 (4th Cir. 2010) ............................... 20

*United States v. Miller*
   307 U.S. 174 (1939) ........................................ 15, 16

*United States v. Chovan*
   735 F.3d 1127 (9th Cir. 2013) .................. 18, 19, 21

*Valle del Sollnc. v. Whiting*
   732 F.3d 1006 (9th Cir. 2013) ........................ 28, 29

*Vincenty v. Bloomberg*
   476 F.3d 74 (2d Cir. 2007) .................................. 24

*Winter v. Natural Res. Defense Council, Inc.*
   555 U.S. 7 (2008) ............................................. 4, 10

**California Penal Code**

§ 16740 ...................................................................... 2

§ 17170 ...................................................................... 4

vi

# TABLE OF AUTHORITIES

**California Penal Code**

§ 17180 ...................................................................................................... 4

§ 18005(c) ................................................................................................. 6

§ 30500 ...................................................................................................... 2

§ 30510 (former § 12276) ..................................................................... 2

§ 30515 ...................................................................................................... 2

§ 30515(a) ................................................................................................. 2

§ 30515(a)(1)(A)-(F) ............................................................................. 4

§ 30515(a)(2) ........................................................................................ 2, 3

§ 30515(a)(3) ........................................................................................... 4

§ 30515(a)(4)-(8) ................................................................................. 3, 8

§ 30515(b) ................................................................................................. 2

§ 30600(a) ................................................................................................. 6

§ 30800(a)-(d) ......................................................................................... 6

§ 30605(a) ................................................................................................. 5

**Assembly Bills**

Assembly Bill 1135 ................................................................................. 2

**Senate Bills**

Senate Bill 263 (1991-92 Reg. Sess.) ............................................... 2

Senate Bill 880 ....................................................................................... 2

**California Code of Regulations**

11 C.C.R. § 5174(gg) ............................................................................. 5

11 C.C.R. § 5174(r) ............................................................................... 3

11 C.C.R. § 5174(rr) ............................................................................. 4

11 C.C.R. 5174(t) ................................................................................... 5

11 C.C.R. § 5459-60 ............................................................................. 3

11 C.C.R. § 5469-71 ............................................................................. 3

11 C.C.R. §§ 5471(a-b), (f), (k), (m-n), and (p) ........................... 2

# TABLE OF AUTHORITIES

**California Code of Regulations**

11 C.C.R. § 5471(q) ............................................................... 3

11 C.C.R. § 5472-78 ............................................................. 3

11 C.C.R. § 5499 ................................................................... 2

**Code**

26 U.S.C. § 5801 ................................................................... 4

**Other Authorities**

11A Charles Alan Wright, et al.
*Federal Practice and Procedure*
§ 2948.1 (2d ed. 1995) ...........................................................

California's Roberti-Roos Assault Weapons Control Act of 1989 (AWCA) ........... 2

Public Safety and Recreational Firearms Use Protection Act
103rd Congress (1993-1994) ...................................................... 17

David B. Kopel & Joseph G.S. Greenlee,
*The Federal Circuits' Second Amendment Doctrines*,
61 Sᴛ. Lᴏᴜɪs U. L.J. 193, 303–04 (2017) ....................................... 12

David B. Kopel and Joseph G. S. Greenlee,
*The Second Amendment Rights of Young Adults*,
43 S. Iʟʟ. U. L.J. 495 (2019) ................................................... 16

## I.   INTRODUCTION

Semiautomatic firearms with various popular characteristics are among the most common arms in the country. And among some of the most common characteristics of such firearms are ammunition magazines that can be removed and that can hold more than ten rounds, different types of ergonomic grips, adjustable stocks, and muzzle devices that reduce flash. The State of California is one of only six states to single out and ban some of the most popular firearms in the nation because they possess such common characteristics. The State disparagingly and arbitrarily calls the entire class of such firearms "assault weapons," and imposes severe penalties for their possession, transfer, and use for otherwise lawful purposes. But forty-four States impose no prohibitions based on such common characteristics. Indeed, law-abiding citizens throughout the country own tens of millions of such firearms and use them for lawful purposes, including self-defense, proficiency training, sport, and hunting. And these firearms—neither uniquely dangerous nor unusual—are rarely used in crime.

California's ban on this common class of firearms, and Defendants' enforcement of same, violates the Second Amendment. As the Supreme Court explained in *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008), the Second Amendment protects the right to of individuals to keep and bear arms that are in common use for lawful purposes, such as self-defense, sport, hunting, and maintaining preparedness for service in the militia.

In *Duncan v. Becerra*, 366 F. Supp.3d 1131 (S.D. Cal. 2019), this Court recognized that the Second Amendment protects the right to keep and bear common arms and firearm magazines that are useful for self-defense or use in a militia, and declared unconstitutional and enjoined California's ban on so-called "large-capacity" magazines.

- 1 -

This case is a logical result of *Duncan's* analysis and seeks nothing more or less for the common arms that can use those magazines.

## II.   FACTUAL BACKGROUND

### A. California's Assault Weapon Control Act

California's Roberti-Roos Assault Weapons Control Act of 1989 (AWCA), California Penal Code section 30500, *et seq.*,[1] established an arbitrary class of firearms pejoratively categorized as "assault weapons," and threatens severe criminal penalties for the acquisition, transportation, use, and transfer of those common firearms.

The AWCA's ban initially covered firearms as identified by a list of specific makes and models.[2] It was later expanded to include arms with common characteristics, such as so-called "large-capacity" magazines (LCMs),[3] and ultimately the broad category of common firearms and common characteristics at issue in this case.[4]

Under the AWCA, a rifle is an "assault weapon" if it is: (1) a semiautomatic, centerfire rifle that does not have a "fixed magazine" [5] but does have a pistol grip that

---

[1] Further statutory citations are to the California Penal Code unless otherwise noted.

[2] Section 30510 (former § 12276); Senate Bill 263 (1991-92 Reg. Sess.); 11 California Code of Regulations (C.C.R.) § 5499.

[3] Section 30515(a); § 16740 (LCM defined as "any ammunition feeding device with the capacity to accept more than 10 rounds" unless specifically excepted).

[4] Section 30515, as amended by Senate Bill 880 and Assembly Bill 1135 (2015-16 Reg. Sess.).

[5] "Fixed magazine" means an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action. § 30515(b); *see also* 11 C.C.R. §§ 5471(a-b), (f), (k), (m-n), and (p). Semiautomatic firearms that have "fixed magazines" with the otherwise-proscribed characteristics generally are not considered "assault weapons" unless identified as such by other provisions of the law, such as § 30515(a)(2).

- 2 -

protrudes conspicuously beneath the action of the rifle, a thumbhole stock,[6] a folding or telescoping stock, a grenade or flare launcher,[7] a flash suppressor,[8] and/or a forward pistol grip (section 30515(a)(1)(A)-(F)); or (2) a semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds (section 30515(a)(2)); or, (3) a semiautomatic, centerfire rifle that has an overall length of less than 30 inches (section 30515(a)(3)). Comparable provisions, also challenged and sought to be enjoined here, define common pistols and shotguns with various common characteristics as prohibited "assault weapons." §§ 30515(a)(4)-(8); *see also* 11 C.C.R. §§ 5459-60; 5469-71; 5472-78 (regulations implementing expanded definitions).

The State's complicated AWCA ban leads to various odd consequences and

---

[6] A "thumbhole" stock simply allows the thumb of the user's trigger hand to be inserted into a hole in the stock, providing some users with a better grip, and hence better control over a firearm, than with another pistol-style grip.

[7] Grenades and grenade launchers are separately and heavily regulated by the federal government (as "destructive devices" pursuant to the National Firearms Act of 1934) and the State. Flare launchers, by contrast, are "used to launch signal flares," 11 C.C.R. § 5471(q), and can have a legitimate safety and rescue purpose. *See* Declaration of Emanuel Kapelsohn (Kapelsohn Dec.) ¶ 31, filed herewith. There is little evidence of any criminal use of flares.

[8] A "flash suppressor" is defined as "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. A hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be deemed a flash suppressor." 11 C.C.R. § 5174(r). A "muzzle brake" is "[a] muzzle attachment or feature that uses the propellant combustion gas with the desired effect of redirecting the recoil," a "compensator" is "[a] muzzle attachment or feature to redirect propellant gases with a goal of reducing muzzle lift," and a "flash hider" (also known as a "flash suppressor") is "[a] muzzle attachment designed to reduce muzzle flash." https://saami.org/saami-glossary. "Flash suppressors" and other devices, like many "muzzle brakes" and "compensators" that "functionally" have secondary "flash

- 3 -

divisions among firearms. For example, an otherwise California-compliant semiautomatic "fixed magazine" firearm may lawfully possess one or more of the characteristics in section 30515(a)—but if a lawfully owned "large-capacity magazine" is merely inserted into that same firearm, it would immediately convert into an illegal "assault weapon," subjecting the user to multiple felony violations.

Tens of millions of common semiautomatic firearms with various combinations of common characteristics banned by California are possessed throughout the United States and are widely used for lawful purposes. The characteristics California uses to define "assault weapons," individually and collectively, are *neither* unusual nor dangerous. They instead provide material benefits to millions of law-abiding firearm users, including improved ergonomics, enhanced control and accuracy while firing, and safer operation. For example, a "[p]istol grip that protrudes conspicuously beneath the action of the weapon" assists in controlling common firearms such as AR-15s and is often a necessary design characteristic. Kapelsohn Dec. ¶ 28, **Ex. 12**. Similarly, a "folding" or "telescoping" adjustable stock, as defined in 11 C.C.R. sections 5471(nn) & (oo), is just a stock that is readily adjustable "to properly fit the user" and does not significantly affect the firearm's concealability. Kapelsohn Dec., ¶ 30, **Ex. 14**.[9] Firearms with adjustable stocks can be safer and more easily controllable by law abiding users—and thus safer for others—by allowing them to fit the firearm properly to their size, stature, and other factors. *Id.* A "flash suppressor" likewise improves

---

suppressing properties," generally affix to common semiautomatic firearms used for lawful purposes by the use of a "threaded barrel." 11 C.C.R. § 5174(rr).

[9] Common semiautomatic firearms with traditional folding or telescoping stocks do not violate minimum length requirements, avoiding "short-barreled" categorization under 26 U.S.C. § 5801, *et seq.* and Penal Code §§ 17170, 17180.

- 4 -

safety by protecting the user's vision by mitigating muzzle flash directed at the firearm user, though others could still see the flash from other angles. "The use of a [firearm] without a flash suppressor under [low-light] circumstances is likely to temporarily blind the user, or at least seriously impair the user's vision, placing the law abiding user at a disadvantage to a criminal attacker." Kapelsohn Dec., ¶ 32, **Exs. 15, 16**. Such a characteristic would be important, for example, to a homeowner defending against a home invasion at night, when much violent crime occurs. See Declaration of Wendy Hauffen (Hauffen Dec.) ¶ 10, filed herewith.

Firearm control and safety are likewise improved by a "forward pistol grip"—"a grip that allows for a pistol style grasp forward of the trigger" (11 CCR section 5174(t)), and/or with regard to "assault weapon" pistols, a "second handgrip"—"a grip that allows the shooter to grip the pistol with their non-trigger hand" (11 C.C.R. section 5174(gg)). Having one's "non-trigger hand" help a user grip *any* type of firearm obviously will "assist the shooter in weapon control" before, during, and after firing it; and it is actually necessary for safe operation of many firearms, and thus improves safety for both the user and bystanders. Kapelsohn Dec. ¶ 33. Simply, the State is attempting to control where, or the angle that, a firearm owner decides to place their hands on their firearm.

Far from being the menacing hazards California implies when it categorizes firearms with such characteristics as "assault weapons," these firearms are instead a meaningfully safer and more controllable category of firearms in common use for lawful purposes. The AWCA nonetheless makes it a crime to possess such so-called "assault weapons," even by law-abiding private individuals for lawful purposes like self-defense in the home. § 30605(a); *Silveira v. Lockyer*, 312 F.3d 1052, 1059 (9th Cir. 2002). It generally imposes felony criminal penalties on the manufacture, distribution,

- 5 -

transportation, importation, keeping, offering, or exposing for sale, or giving or lending of any "assault weapon." § 30600(a). Further, violations of the AWCA subject firearms owners to other "civil" penalties of confiscation and destruction of their property, and severe fines. §§ 30800(a)-(d); 18005(c).

That some might use such safer firearms toward unlawful ends does not change the nature – or the Constitution's protection – of such firearms any more than the illegal use of any other arm changes the protected status of those tools. The common arms with common characteristics (and related conduct) California unconstitutionally bans are overwhelmingly possessed and used by law-abiding people for many lawful purposes. Plaintiffs' motion should be granted.

## B. Plaintiffs' Injuries

The individual Plaintiffs are responsible adult California residents legally eligible to possess firearms. *See* Declarations of James Miller (Miller Dec.), Neil Rutherford (Rutherford Dec.), Ryan Peterson (Peterson Dec.), Adrian Sevilla (Sevilla Dec.), John Phillips (Phillips Dec.), and Hauffen Dec. filed herewith. Additionally, each of the individually named Plaintiffs are members of the organizational Plaintiffs. *Id*.; see also Declarations of Michael Schwartz (Schwartz Dec.), Gene Hoffman (Hoffman Dec.), Alan Gottlieb (Gottlieb Dec.), and Brandon Combs (Combs Dec.) filed herewith.

Plaintiffs Miller and Peterson lawfully own and possess semiautomatic firearms with characteristics such as pistol grips, collapsible stocks, flash hiders, and/or forward pistol grips that are not currently categorized as "assault weapons" because they have "fixed" magazines. Specifically, Plaintiff Miller owns a semiautomatic rifle and Plaintiff Peterson owns a semiautomatic pistol. Miller Dec. ¶¶ 4-10, Peterson Dec. ¶¶ 4-8. Plaintiffs Miller and Peterson also lawfully own and possess "large-capacity" magazines compatible with their firearms. *Id*. Plaintiffs Miller and Peterson wish to use

- 6 -

their magazines with their firearms while maintaining the common characteristics of their firearms such as a detachable magazine, pistol grip, collapsible stock, and/or flash suppressor, but do not because of the State's laws and fear of criminal prosecution. *Id*. Additionally, Plaintiffs Miller and Peterson would acquire additional semiautomatic firearms with said characteristics but for the State's laws and Defendants' policies, practices, and customs. Miller Dec. ¶¶8-9; Peterson Dec. ¶¶ 7-8.

Plaintiff Hauffen lawfully owns and possesses a semiautomatic, centerfire "featureless" rifle that does not have any of the other listed characteristics under section 30515(a) except a detachable magazine. Although functionally identical to many banned "assault weapons," it is not considered an "assault weapon." Hauffen Dec. ¶ 4. Plaintiff Hauffen purchased parts to convert her firearm into this configuration so it did not meet the definition of an "assault weapon" and thus allow her to possess, use, and eventually pass down her firearm to her heirs. *Id*. at ¶ 5. But for the AWCA and Defendants' enforcement of it, Plaintiff Hauffen would not have made this conversion. As a female firearms instructor, Plaintiff Hauffen prefers AR-15 style firearms for self-defense purposes and has selected this type of firearm specifically because of its characteristics. *Id*. at ¶¶ 8-9, **Ex. 1**. Plaintiff Hauffen would configure and use her firearm in a standard configuration with characteristics common throughout the country, but for California's laws, Defendants' policies, practices, and customs, and her fear of prosecution. *Id*. at ¶¶ 6-7.

Plaintiff Hauffen also owns a Sig Sauer P239 9mm semiautomatic pistol and wishes to be able to replace the firearm's standard barrel with a threaded barrel allowing her to readily attach either a flash suppressor or a muzzle brake. Hauffen Dec. ¶ 10. Plaintiff Hauffen would attach the muzzle brake to her pistol when using the gun for firearms instruction and recreational shooting. *Id*. She wants to readily change these

attachments and attach a flash suppressor to her pistol when carrying her pistol at night as she is a concealed weapons permit holder. *Id*. However, Plaintiff Hauffen is prevented from doing so because installing a threaded barrel on her semiautomatic pistol would render it an illegal assault weapon under the AWCA. § 30515(a)(4).

Plaintiffs Hauffen, Miller, Rutherford, Sevilla, and Peterson would acquire, possess, use, and transfer various models of pistols, rifles, and shotguns now covered by the AWCA due to their characteristics, but for the State's laws, Defendants' policies, practices, and customs, and their fear of prosecution. Hauffen Dec.¶ 10; Miller Dec. ¶¶7-9 ; Rutherford Dec. ¶¶ 4-5; Sevilla Dec. ¶¶ 4-5, and Peterson Dec. ¶ 6.

Plaintiff Gunfighter Tactical is owned and operated by Plaintiff Peterson. Plaintiff Gunfighter Tactical would acquire, sell, and otherwise lawfully transfer common firearms covered by the AWCA to ordinary lawful adults, but is prohibited by California's laws and Defendants' policies, practices, and customs, and a fear of loss of his licenses and prosecution. Peterson Dec. ¶¶ 9-11.

Plaintiff Poway Weapons and Gear (PWG) is owned and operated by Plaintiff Phillips. In addition to other state, federal, and local licenses and permits allowing operation as a legal firearms dealer and shooting range, Plaintiffs PWG and Phillips maintain a Dangerous Weapons Permit issued by the California Department of Justice and are permitted to sell "assault weapons" to exempt entities and individuals. Phillips Dec. ¶¶ 3-5. Plaintiffs PWG and Phillips would sell, or rent for use at the PWG range, common firearms covered by the AWCA to individual adults who are not prohibited from possessing or acquiring firearms but are prohibited by California's AWCA and Defendants' policies, practices, and customs, but for a fear of losing their licenses and prosecution. *Id*.

But for California's laws and Defendants' policies, practices, and customs

- 8 -

criminalizing the acquisition, possession, and use of common firearms covered by the AWCA due to their characteristics, Plaintiffs and other similarly situated adults in California would import, acquire, assemble/manufacture, transfer, use, transport, and pass down those common semiautomatic firearms. Hauffen Dec. ¶ 10; Miller Dec. ¶¶ 7-9; Rutherford Dec. ¶¶ 4-5; Peterson Dec. ¶ 6; and Sevilla Dec. ¶¶ 4-5. Thus, California's ban and Defendants' policies, practices, and customs criminalizing the acquisition, possession, and use of such firearms violates Plaintiffs' Second Amendment rights.

Organizational Plaintiffs San Diego County Gun Owners PAC (SDCGO), California Gun Rights Foundation (CGF), Second Amendment Foundation (SAF), and Firearms Policy Coalition (FPC) represent thousands of members and supporters with all of the indicia of membership, who are not prohibited from purchasing or possessing firearms, but who are similarly situated to the individually named Plaintiffs. *See* Schwartz Dec., Hoffman Dec., Gottlieb Dec., and Combs Dec. These members include but are not limited to adult individuals who currently have (i) firearms identified as assault weapons which cannot be transferred or passed down to their heirs or others by bequest; (ii) "fixed-magazine" semiautomatic, centerfire and rimfire firearms; (iii) "featureless" semiautomatic, centerfire firearms; (iv) lawfully owned and possessed "large-capacity" magazines; and (v) semiautomatic shotguns with non-detachable magazines (who wish to use standard, detachable magazines). Members of these organizations also include individuals who wish to acquire and use common semiautomatic firearms with common characteristics, train their children (minors under 18) on the safe handling and use of such firearms, and pass down their property to their heirs. Schwartz Dec. ¶¶ 3-8; Hoffman Dec. ¶¶ 3-8; Gottlieb Dec. ¶¶3-9; and Combs Dec. ¶¶ 4-6. The organizational Plaintiffs have expended and diverted time and

- 9 -

resources that could have been used on other programs due to the State's ban and Defendants' policies, practices, and customs. *Id.* The organizational Plaintiffs seek relief on behalf of themselves, their members and supporters, and similarly situated members of the public, because the Second Amendment rights of those individuals are violated, and continue to be violated, by California's AWCA ban and Defendants' polices, practices, and customs that enforce the ban.

## III.   LEGAL STANDARD

To obtain preliminary relief, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7, 20 (2008)). Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## IV.   ARGUMENT

### A.   Plaintiffs Are Likely to Succeed on the Merits.

The United States Constitution protects a fundamental, individual right to keep and bear arms. "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. That right "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582, and "is fully applicable to the States," *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). The "central" holding in *Heller* was "that

- 10 -

the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780.

While banning common semiautomatic firearms with common characteristics and magazines may be popular in California and a few other jurisdictions, such a prohibition "is no less unconstitutional by virtue of its popularity." *Silveira*, 312 at 1091. Whatever policy arguments the State may have for these kinds of proscriptive laws, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.

### 1. The AWCA's Complete Ban on Commonly Owned Firearms Violates the Second Amendment Under *Heller*'s Categorical Analysis.

Precisely like the common magazines at issue in *Duncan*, Defendants can offer no historical support for their ban of the common firearms with common characteristics—including the same magazines—at issue here because such a ban *has* "no historical pedigree." *Duncan*, 366 F. Supp.3d at 1149. Such common firearms with common characteristics, like semiautomatic firearms in general, have been in existence for over a century and were unregulated in the State until 1989 or later—the polar opposite of a "longstanding" regulation. *See* Declaration of Ashley Hlebinsky (Hlebinsky Dec.), ¶¶ 10-28, **Exs. 5–35** filed herewith. Indeed, such common semiautomatic firearms with common characteristics were for decades "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. They remain among the most popular firearms throughout most of the country to this day.

Given such straight-forward alignment with the baseline constitutional standard set forth in *Heller*, there is no need to analyze this case using varying "tiers of scrutiny."

- 11 -

Rather, a clear-cut categorical rejection of the challenged prohibitions is consistent with *Heller* itself and is a common approach in our nation's constitutional law. *See* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U. L.J. 193, 303–04 (2017) (examples under the First, Fifth, Sixth, Eighth, Tenth, and Fourteenth Amendments); *cf. Wrenn v. D.C.*, 864 F.3d 650, 666 (D.C. Cir. 2017) ("*Heller I*'s categorical approach is appropriate here even though our previous cases have always applied tiers of scrutiny to gun laws."); *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (2011) ("*Heller II*") (Kavanaugh, J., dissenting) (courts should "assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."

As this Court has recognized, *Heller*'s categorical analysis asks simply whether the arms being regulated or banned are in common use for lawful purposes. *Duncan v. Becerra*, 366 F. Supp.3d at 1142. The text, history, and tradition of the Second Amendment all point in the same direction: the firearms and conduct banned through operation and application of section 30515(a) have long been and continue to be commonly owned by law-abiding citizens for lawful purposes and are not uniquely dangerous *and* unusual in any manner that provides a historical basis for their prohibition. "A weapon may not be banned unless it is *both* dangerous *and* unusual,;" it "is a conjunctive test." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring). Because the arms California bans in the AWCA are not unusual, the Court need not consider if they are "dangerous" in a manner different from the inherent "danger" of firearms in general—such "danger" to those who pose a threat, of course, being the very reason arms are protected and useful in the first place. As Justice Alito explained, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.*

- 12 -

Accordingly, just like the District of Columbia's ban on handguns in *Heller*, the City of Chicago's ban on handguns in *McDonald*, and California's ban on "large-capacity" magazines in *Duncan*, California's sweeping ban on this ever-expanding category of firearms is categorically unconstitutional—full stop.

### 2. The AWCA Bans Arms in "Common Use."

As for the primary predicate of such categorical analysis, there is no genuine question that the semiautomatic firearms banned by California are common, not prohibited in the vast majority of States, and have been used for close to a century by millions of responsible, law-abiding people for various lawful purposes such as self-defense, hunting, recreation, competition, and collecting. Declaration of James Curcuruto (Curcuruto Dec.) ¶¶ 7-14, **Exs. 1-7**, filed herewith. The only rarity regarding such firearms is the very few States that seek to restrict them by recharacterizing them as "assault weapons." Kapelsohn Dec. ¶¶ 17-26, **Exs. 1-10**.

Firearms capable of holding and firing more than 10 rounds without reloading arrived well before 1900, and the first semiautomatic rifle was produced by Mannlicher in 1885. Hlebinsky Dec. ¶¶ 11-15, **Exs. 5-21**. Early semiautomatic pistols, rifles, and shotguns were developed in the first years of the 1900s and were configured with many of California's banned characteristics, such as detachable and large capacity magazines, pistol grips, and adjustable stocks. *Id.*

Today, semiautomatic firearms with such common characteristics are among the most popular firearms in the United States. Curcuruto Dec., ¶¶8-12 (discussing prevalence of relevant semiautomatic rifles and massive numbers of common semiautomatic shotguns and pistols with such characteristics). "We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend." *Heller II*, 670 F.3d

- 13 -

at 1261.

Although categorical commonality is not exclusively based on number of any particular type of arm owned by individuals, the numbers are telling. Ownership of semiautomatic rifles configured in a manner banned by California has previously been conservatively estimated at least 5 million strong. Curcuruto Dec., ¶¶ 7-13, **Exs. 1-7**. Indeed, in 2016 alone, 2.2 million such rifles were either manufactured in or imported into the U.S. for sale. *Id.* at ¶ 8, **Ex. 3**. As of 2019, 96.5% of firearm retailers sell firearms that would be prohibited by the AWCA. *Id.* at ¶ 10, **Ex. 5.** However, most recently, reports show there are 17.7 million privately owned "modern sporting rifles" in the country alone—54% of the firearms manufactured and imported in the U.S. Curcuruto Dec. ¶15, **Ex. 8**.

One of the most common firearms meeting California's definition of "assault weapon" is the AR-15 platform firearm, which has been sold to the public since 1950 with standard characteristics like detachable magazines that hold more than 10 rounds, pistol grips, collapsible or otherwise adjustable stocks, flash suppressors, and/or forward vertical grips. Kapelsohn Dec. ¶ 18; Curcuruto Dec. ¶ 8. Such firearms are lawful under federal law and in most States. As this Court previously recognized:

> Over the last three decades, one of the most popular civilian rifles in America is the much maligned AR-15 style rifle. Manufactured with various characteristics by numerous companies, it is estimated that more than five million have been bought since the 1980s. These rifles are typically sold with 30-round magazines. *These commonly owned guns with commonly-sized magazines* are protected by the Second Amendment and *Heller's* simple test for responsible, law-abiding citizens to use for target practice, hunting, and defense.

*Duncan*, 366 F. Supp.3d at 1145 (emphasis added).

- 14 -

### 3.  Firearms Covered by California's Ban Are Well-Suited for Self-Defense.

The common firearms banned under the AWCA are not only in common use, but ideal for self-defense. Kapelsohn Dec. at ¶¶18-26, **Exs. 1-10**. They are highly beneficial to lawful gun owners; especially, but not exclusively, in life or death self-defense situations. Hauffen Dec. ¶ 8, **Ex. 1**. As described previously, the regulated characteristics improve the control, accuracy, function, and safety of firearms. Kapelsohn Dec. ¶¶ 27-37. These characteristics also make them ideal for lawful purposes such as sport and hunting. Common sense dictates that standard characteristics that enhance accuracy, control, and safety should be encouraged, not banned. But rather than promoting safer firearm handling, the State's regulatory scheme actually prevents firearm users from maximizing their safe and controlled use of common semiautomatic firearms.

### 4.  Firearms Covered by California's Ban Are Well-Suited for Militia Service.

In addition to meeting *Heller*'s common-use predicate, the firearms banned by the AWCA are especially fit for militia service should the need arise, as contemplated by the Second Amendment's prefatory clause and history. The common AR-15 platform firearm, for example, has standardized and interchangeable parts, magazines, and ammunition; is durable, reliable, relatively inexpensive, and lightweight; and readily fulfils the same purposes sought (and mandated) by the founding-era Militia Acts. *See* Declaration of Allen Youngman (Youngman Dec.), ¶ 14-19, filed herewith.

Such utility for militia service helps to understand the breadth of arms protected under the Second Amendment. In the pre-*Heller* decision in *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court looked to "ordinary military equipment" that could "contribute to the common defense" in identifying weapons covered by the

- 15 -

Second Amendment. It further explained that the debates, history, legislation, and commentary preceding and surrounding the Bill of Rights "plainly" showed that:

> the Militia comprised all males physically capable of acting in concert for the common defense. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

307 U.S. at 179.

When the Court in *Heller* later resolved the individual nature of Second Amendment rights, it clarified that *Miller* was establishing "that the sort of weapons protected were those 'in common use at the time.'" 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179). This Court itself has agreed that "*Miller* implie[d] that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment.". *Duncan*, 265 F. Supp.3d at 1116.

Firearms in common use and suitable for militia service were *expected*—indeed, often *required*—to be kept by ordinary citizens.[10] Today, such arms are semiautomatic firearms, such as the AR-15 rifle, with the common characteristics discussed above. Youngman Dec. ¶ 19.

### 5. California's "Assault Weapons" Ban Does Not Fall Within Any Historically Permissible Limit on the Right to Keep and Use Arms.

In contrast to the strong historical support for protecting the firearms at issue here, there is no historical support at all for prohibiting such firearms. As noted earlier, at page 13-14 semiautomatic rifles, pistols, and shotguns and detachable magazines have been in existence since the late 1800s and early 1900s. As early as 1779, firearms

---

[10] David B. Kopel and Joseph G. S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019).

had capacities of up to 30 rounds. *Hlebinsky Dec.* ¶¶11-13, **Exs. 5-18**. During World War I, detachable magazines with capacities of 25-to-32 rounds were introduced and available in the commercial market. Kapelsohn Dec., ¶ 18. Other characteristics such as the ergonomic pistol-style grip and thumbhole stock, collapsible stock, flash suppressor, and forward vertical grips have been commercially available and offered on semiautomatic firearms for decades. Hlebinsky Dec. ¶¶ 10-28, **Exs. 5-35**.

Despite the long history of such firearms, and even longer prior history of militia-suitable firearms being available to the population in general, it was not until 1989 that California became the first State to implement any "assault weapon" ban with the first and narrower iteration of the AWCA based on specific makes and models. The only federal regulation on semiautomatic firearms having characteristics at issue here did not occur until 1994 in the Public Safety and Recreational Firearms Use Protection Act (the "Federal Assault Weapons Ban")(103rd Congress (1993-1994)), a subsection of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322), which was allowed to sunset 10 years later due to its lack of effect on crime. *See* Declaration of John Lott (Lott Dec.) ¶¶ 8, filed herewith. The few subsequent state "assault weapon" bans have an even shorter "historical" pedigree. *See* Declaration of George A. Mocsary (Mocsary Dec.) ¶¶ 23-49, **Exs. 2-9**. Such late-adopted restrictions by a mere handful of jurisdictions do not remotely qualify as the historically permissible limits mentioned in *Heller*. *Cf. Heller II*, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity"); *Staples v. United States*, 511 U.S. 600, 603 n.1, 612 (1994) (discussing the AR-15 and stating that weapons that fire "only one shot with each pull of the trigger" "traditionally have been widely accepted as lawful possessions"). Mocsary Dec. ¶¶10-22.

- 17 -

Under each aspect of *Heller*'s straightforward analysis, California's AWCA violates the Second Amendment. It criminalizes the lawful use and possession of common firearms with common characteristics, suitable for militia service and used for lawful purposes such as self-defense, proficiency training, hunting, recreation, and competition. Such prohibition has no longstanding historical predicate and broadly restricts the protected activities of virtually all law-abiding adults in California for effectively all purposes. And like the ban struck down in *Heller*, it threatens citizens with substantial criminal penalties. *Heller*, 554 U.S. at 634. Because the challenged law fails *Heller*'s categorical analysis, this Court need go no further to find that Plaintiffs have a high likelihood of success on the merits.

### 6. The AWCA Fails the Ninth Circuit's Two-Part Test.

The State's AWCA scheme also fails the Ninth Circuit's two-part test applying tiered scrutiny.[11] Assuming *arguendo* that an interest-balancing test is required, the challenged provisions still fail any level of "heightened scrutiny."

The Ninth Circuit applies a two-part test to some Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). This "inquiry '(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'"

---

[11] Plaintiffs preserve and maintain their position that such a test, and tiered scrutiny, are inappropriate for categorical bans, including the AWCA's at issue here. *Heller*, 554 U.S. at 634, 635 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach"; "[t]he Second Amendment . . . is the very *product* of an interest balancing by the people"); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional.").

- 18 -

*Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Jackson v. City of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014)). The level of scrutiny to be applied depends on the closeness to the core and "the severity of the law's burden," on the Second Amendment. *Chovan*, 735 F.3d at 1138.

### a.    Burden on the Second Amendment

As shown above, at page 12-14, semiautomatic firearms with common characteristics proscribed by the AWCA are in common use for lawful purposes and thus protected arms under the Second Amendment. The State's ban thus "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for lawful purposes, including for possession in the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628.[12] The AWCA and Defendants' policies, practices, and customs impose a *substantial* burden on Second Amendment rights, and thus deserves strict scrutiny "to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari); *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second Amendment right and severely burdens that right'") (citation omitted); *Mance v. Sessions*, 896 F.3d 699, 705-06 (5th Cir. 2018), *pet'n for*

---

[12] Any suggestion by Defendants that the AWCA bans only a small subset of firearms or that there are other classes of firearms available and thus the AWCA is not a categorical ban is foreclosed by *Heller*. "It is no answer to say […] that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller* 554 U.S. at 629; *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament.

- 19 -

*cert. filed* (Nov. 19, 2018) (applying strict scrutiny in Second Amendment cases).

Even if the AWCA's broad ban somehow were deemed less severe, and only intermediate scrutiny applied, the prohibitions challenged here would still fail "constitutional muster." *Heller*, 554 U.S. at 628–29. Plaintiffs thus will discuss only intermediate scrutiny on the understanding that such discussion applies all the more acutely and fatally under strict scrutiny. They preserve their claims to *Heller*'s categorical analysis and, alternatively, for strict scrutiny should the need arise here or on appeal.

### b. Heightened Scrutiny Imposes a High Bar for the State when Defending Infringements of Second Amendment Rights

Under any form of heightened scrutiny, the government bears the burden of justifying its restrictions. *See, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (unless conduct "not protected by the Second Amendment at all, the [g]overnment bears the burden of justifying the constitutional validity of the law."); *Tyler v. Hillsdale County Sheriff's Dept.,* 837 F. 3d 678, 694 (6th Cir. 2016) ("the burden of justification is demanding and it rests entirely on the State.") (citation omitted).

The intermediate scrutiny to be applied is the same as, and is drawn from, such scrutiny in the First Amendment context. *Jackson*, 746 F.3d at 961 (heightened scrutiny in Second Amendment cases is "guided by First Amendment principles"); *Silvester v. Harris*, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the test for intermediate scrutiny from First Amendment cases"), *cert. denied*, *Silvester v.*

---

We think that argument frivolous. It could be similarly contended that all firearms may

- 20 -

*Becerra*, 138 S. Ct. 945 (2018). Various cases in the Ninth Circuit have described that test as whether "(1) the government's stated objective [is] significant, substantial, or important; and (2) there [is] a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139). The Supreme Court has emphasized that "reasonable" tailoring demands a considerably closer fit than mere rational basis scrutiny, and requires evidence that the restriction directly and materially advances a *bona fide* state interest. The test under intermediate scrutiny is "whether the challenged regulation advances these interests in a direct and material way, and whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). "'[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *Id*. at 770 (quoting *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564 (1980)).

Further, the government's burden of justifying its restriction on constitutional rights "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a *material degree*." *Edenfield*, 507 U.S. at 770-71 (emphasis added). Restrictions on constitutional rights must be analyzed in their specific context, and "will depend upon the identity of the parties and the precise circumstances of the" protected activity. *Edenfield*, 507 U.S. at 774. Generalized risk does not warrant restrictions as to all persons, and "a preventative rule" aimed at such generic hazards is "justified only in situations 'inherently conducive to'" the specific dangers identified. *Id*. (quoting *Ohralik v. Ohio State Bar Ass'n*, 436

_____

be banned so long as sabers were permitted."), *aff'd sub nom. Heller*, 554 U.S. 570.

U.S. 447, 449 (1978)). Finally, even where the challenged restrictions materially address a genuine harm, the State must prove that its chosen means are "'closely drawn'" to achieve that end without "'unnecessary abridgment'" of constitutionally protected conduct. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)).

Assuming *arguendo* the importance of the State's highly generalized claimed interests in public safety and reducing "gun violence," those interests must "rely on . . . hard facts and reasonable inferences drawn from convincing analysis amounting to substantial evidence based on relevant and accurate data sets." *Duncan*, 366 F. Supp.3d at 1161. Further, if the State's claimed interest is instead a more specific desire to prevent or mitigate so-called "mass shootings," *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991 (C.D. Cal. 2019), then it is far from clear that an interest directed at such rare events is significant and/or important. Nevertheless, even assuming the importance of the interest at either level of generality, the AWCA's sweeping ban on common firearms with common characteristics is not a reasonable fit for achieving these interests.

### c.  There is No Reasonable Fit Between the Government's Interests and the AWCA

The AWCA's broad ban on common semiautomatic firearms is not a reasonable fit for a plethora of reasons. First, the ban does not "alleviate [the claimed harms] to a material degree." *Edenfield*, 507 U.S. at 770-71. All credible research on the effectiveness of "assault weapon" bans in reducing gun violence and/or mass shootings shows no demonstrable correlation between the two. Lott Dec. ¶¶ 6-65, **Exs. 2-19**. The experiment of these bans has been tried, and they have failed to demonstrate that they directly or materially advance any government interest relating to gun violence. At the

- 22 -

federal level, the 1994 Federal Assault Weapons Ban was allowed to expire due to its lack of effect. *Id.* California has had an ever-expanding ban on "assault weapons" since 1989, with no indication it has done anything to alleviate the problems cited by the State. Lott Dec. ¶ 6-17, **Exs. 2-5**. As this Court previously observed:

> No case has held that intermediate scrutiny would permit a state to impinge even slightly on the Second Amendment right by employing a known failed experiment. Congress tried for a decade the nationwide experiment of prohibiting large capacity magazines. It failed. California has continued the failed experiment for another decade and now suggests that it may continue to do so ad infinitum without demonstrating success. That makes no sense.

*Duncan*, 366 F. Supp.3d at 1169.

Second, any correlation between different crimes and the weapons used therein does not establish a reasonable fit for a ban on all such weapons. Thus, notwithstanding the District Court's findings in *Rupp*, that "such weapons are disproportionately used in mass shootings," *Rupp v. Becerra*, 401 F. Supp. 3d 978, 993 (C.D. Cal. 2019), such findings do not even suggest that a ban would do anything other than divert such criminals to alternative legal or illegal weapons, or would in any way mitigate the problems. Further, any alleged higher incidence of "assault weapons" being used in crimes, mass shootings, and/or police shootings cannot justify a sweeping ban on lawful ownership of protected arms. Lawful use of such arms overwhelmingly outweighs any criminal use. Government "may not regulate the secondary effects of speech by suppressing the speech itself." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (opinion of Kennedy, J.). Indeed, in *Heller* itself, it was accurately observed that handguns are involved in the majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller,* 554 U.S. at 695-696

- 23 -

(Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29.

Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. *See Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); *accord Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969). Indeed, computing devices connected to the Internet are now the most common tool for engaging in lawful, protected First Amendment activities, but undoubtedly also the most common tool for engaging in many unprotected and sometimes illegal forms of speech (*e.g.*, defamation, true threats) and other illegal conduct (*e.g.*, child pornography, hacking, and identity theft) as well. The latter hardly can justify restricting *lawful* use of computers connected to the Internet by law-abiding people who wish to publish their protected content and viewpoints.

Third, the line drawn by California between permitted and proscribed weapons is arbitrary and based on speculation and conjecture. The characteristics that trigger prohibition in fact improve the safe and controlled use of firearms so equipped. Kapelsohn Dec. ¶ 27-37, **Exs. 11-18**. Thus, they improve public safety relating to the lawful use of such firearms. As for unlawful use, there is no indication that criminals are particularly concerned about avoiding collateral or unintended damage through greater accuracy or control and, in any event, there is no evidence criminals would be

- 24 -

any less destructive using California-compliant "featureless" firearms. *Id*.[13] The prohibited characteristics in the AWCA do not change the fundamental semiautomatic function of the firearms, nor do they affect the ballistics of their projectiles. The District court in *Rupp* accepted the State's claims that the various targeted characteristics enhance the accuracy, capacity, and hence danger of the prohibited firearms—"[a]s discussed throughout, that the rifles are more accurate and easier to control is precisely why California has chosen to ban them"—and thus, upheld the AWCA. *Rupp* 401 F. Supp.3d at 993 (C.D. Cal. 2019). The District Court's analysis was deeply flawed. Such a standard would justify a ban on nearly all modern firearms, as they are all more accurate and controllable than early firearms (*e.g.,* muskets). It would also curb most future innovation in firearms, as any improvements would justify a ban.

While the pistol grip assists in the safe control of a firearm, it *does not* significantly increase the speed or ability of reloading compared to "featureless" non-"assault weapons." *See* Video (comparing a common AR-15 platform semiautomatic firearm in a California-compliant "featureless" configuration with a standard configuration commonly available in the majority of other states), online at http://bit.ly/miller-kraut-video; *see also* Declaration of Adam Kraut (Kraut Dec.) ¶¶ 4-14; Kapelsohn Dec. ¶ 28, **Ex. 12.** Further, semiautomatic firearms with the regulated characteristics are not more deadly in the hands of a criminal than a firearm without those characteristics. *Id*., **Exs**. **17, 18**. Indeed, many notable crimes have been committed by criminals with semiautomatic firearms that did not have the regulated

---

[13] Or that criminals would be deterred from illegally obtaining or creating prohibited firearms. It is absurd to suggest that a person intent on the grotesque crime of mass murder would pause for a second at the prospect of also violating the AWCA while he was at it. In for a pound, in for a penny. Lott Dec. ¶¶ 6-27, **Exs. 2-5**.

- 25 -

characteristics. Kapelsohn Dec., ¶ 34. In fact, some of the worst mass shootings used only handguns or bolt action rifles.

Fourth, the AWCA burdens far more protected activity than necessary by imposing a *complete ban* on an ordinary, law-abiding individual's acquisition, purchase, transfer, and use of a common class of arms. Even under intermediate scrutiny, "a reasonable fit requires tailoring, and a broad prophylactic ban on acquisition or possession of all" common semiautomatics with common characteristics "for all ordinary, law-biding, responsible citizens is not tailored at all." *Duncan*, 366 F. Supp.3d at 1180; *see also Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored'—even under the more lenient [standard applicable to content-neutral restrictions]—where ... a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals.... Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone....") (brackets in original) (citations and quotations omitted). By prohibiting even fully background-checked and law-abiding citizens from possessing a common and effective class of firearms, the law imposes considerably more burden than is warranted by the rare instances of criminal violence using such firearms. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." *Friedman v. City of Highland Park*, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting).

California's regulatory scheme for common semiautomatic firearms and common characteristics undermines public safety and does not materially advance any legitimate public interest. The State's justification that the self-same characteristics that make the firearms here suitable for lawful self-defense may also make them effective

- 26 -

tools for crime if misused, thus necessitating a ban, misses the point and would gut the Second Amendment. After all, the very point of protecting arms, and firearms in particular, is that they allow law-abiding people to project force against unjust force at a distance, and thereby defend themselves and others against a violent threat as soon as possible with the least amount of damage to those being protected. Inevitably, all firearms that are at all suitable for self-defense or militia service are comparably dangerous in the hands of a violent criminal. The notion that improvements that make firearms better and safer for lawful use likewise make them comparably better for unlawful use simply leads to the absurdity that firearms may never be improved because the harms *ipso facto* outweigh the benefits and justify a ban. However, the Second Amendment itself has already balanced the need for and dangers from arms that can effectively project force against another. As "the very *product* of an interest balancing by the people," the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 634-35. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures . . . think that scope too broad." *Id.*

The AWCA's ban on an entire class of common semiautomatic firearms having common characteristics imposed against law-abiding individuals has no constitutional fit, let alone a reasonable one. The challenged law fails the categorical analysis; it fails even intermediate scrutiny.

**B. All Other Preliminary Injunction Factors Favor Enjoining The AWCA**

For the reasons above, Plaintiffs are likely to succeed on the merits. And Plaintiffs also satisfy the other preliminary injunction factors.

- 27 -

### 1.  Likelihood of irreparable harm absent preliminary relief

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Plaintiffs have been and continue to be deprived of their fundamental Second Amendment rights. See Miller Dec., Hauffen Dec., Rutherford Dec., Sevilla Dec., Phillips Dec., Peterson Dec., Gottlieb Dec., Hoffman Dec., and Combs Dec.

Further, the Ninth Circuit has applied the First Amendment's "irreparable-if-only-for-a-minute" rule to cases involving other rights and, in doing so, has held a deprivation of these rights represents irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). S*ee also Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law"). Moreover, the AWCA's restrictions on otherwise lawful and innocuous conduct are enforced by severe criminal and "civil" penalties, which can result in incarceration and a lifetime prohibition on an individual's Second Amendment rights. Thus, the AWCA and Defendants' policies, practices, and customs have and will continue to cause irreparable harm absent injunctive relief.

### 2.  The Balance of Equities Tips in Plaintiffs' Favor

The next factor considers the balance of equities, or "the balance of hardships between the parties." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). The state "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns."

- 28 -

*Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Valle del Sollnc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable ... to allow the state ... to violate the requirements of federal law.") (citations omitted). The likelihood of success on the merits thus largely drives the equitable balance as well. Additionally, because no credible evidence supports the effectiveness of California's "assault weapon" ban, *supra* at p. 21-22, there is no genuine harm from enjoining such a scheme. Conversely, Plaintiffs and other similarly situated law-abiding individuals would indeed benefit from the safety and control characteristics of the otherwise restricted firearms and thus are injured by the restrictions beyond the direct injury to their Second Amendment rights. The balance of equities tips sharply in Plaintiffs' favor.

### 3.  An Injunction Is in The Public Interest

When challenging government action that affects the exercise of constitutional rights, "[t]he public interest … tip[s] *sharply* in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). Again, the likelihood of success on the merits and the lack of effectiveness in advancing the State's claimed interests largely drive a comparable conclusion regarding the public interest. Furthermore, mass shootings are extremely rare. Since 1982, there were still 19 public mass shootings in California. These incidents involved: multiple firearms, banned firearms, illegally modified firearms, firearms with and without common characteristics, and firearms with and without "large-capacity" magazines—all while the AWCA was in effect. Any suggestion that the AWCA has any salutary effect on the harms of mass shootings thus is speculative at best, and demonstrably false at worst. Additionally, it is not only *Plaintiffs'* rights at stake, but the rights of all law-abiding

- 29 -

adults in California—and future adults—as well. Thus, the public interest tips even more sharply in Plaintiffs' favor. *Id.* at 1208.

Further, even with the AWCA and Defendants' policies, practices, customs, and regulations properly enjoined, all firearm purchases still must go through federal and state background checks. Purchasers and transferees also must still: (a) take and pass a firearms safety test; (b) present a valid firearm safety certificate for any transfer; (c) provide proofs of identity and residency; (d) complete a ten-day waiting period; (e) complete a safe handling demonstration of the firearm being purchased; (f) sign a gun safe affidavit, or purchase a firearm cable lock; and (g) complete a background check for ammunition purchases. This list is not exhaustive, but provides a summary of the vast array of firearms regulations already in place that, according to the State, ensure public safety.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their motion and preliminarily enjoin the AWCA and Defendants' policies, practices, customs, and regulations that enforce it.

Respectfully submitted,

December 6, 2019                      **GATZKE DILLON & BALLANCE LLP**

Attorney for Plaintiffs

*/s/ John W. Dillon*_____
John W. Dillon

- 30 -