1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   PETER H. CHANG
    Deputy Attorney General
5   State Bar No. 241467
    JOHN D. ECHEVERRIA
6   Deputy Attorney General
    State Bar No. 268843
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
8    Telephone:  (213) 269-6249
     Fax:  (916) 731-2124
9    E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendants Xavier Becerra, in*
10  *his official capacity as Attorney General of*
    *the State of California, and Brent E. Orick,*
11  *in his official capacity as Interim Director of*
    *the Department of Justice Bureau of*
12  *Firearms*

13           IN THE UNITED STATES DISTRICT COURT

14         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15

16

17

18   **JAMES MILLER, et al.,**           19-cv-1537 BEN-JLB

19                  Plaintiffs,

20        **v.**                 **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

21   **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,**

22                       Date:        February 6, 2020
                           Time:        2:00 p.m.

23                   Defendants.   Courtroom:  5A
                           Judge:       Hon. Roger T. Benitez

24                            Trial Date:   None Set
                           Action Filed: August 15, 2019

25

26

27

28

---

1

## TABLE OF CONTENTS

2

**Page**

3   INTRODUCTION ......................................................................................... 1

4   BACKGROUND ........................................................................................... 3

    I.     The Assault Weapons Control Act ....................................................... 3

5       II.    The Present Action .............................................................................. 4

6   LEGAL STANDARD ................................................................................... 5

7   ARGUMENT................................................................................................. 5

    I.     Plaintiffs Seek an Overbroad Preliminary Injunction........................... 5

8
    II.    Plaintiffs Fail to Satisfy the Heightened Standard for a
9             Mandatory Injunction that Would Alter the Status Quo....................... 7

    III.   Plaintiffs Fail to Satisfy the Equitable Factors for Preliminary
10             Injunctions ........................................................................................ 10

11          A.    Plaintiffs Are Not Likely to Succeed on the Merits ................. 10

              1.    The Two-Step Framework for Second Amendment
12                      Claims.................................................................... 10

13                 2.    Step One:  The AWCA Does Not Burden Conduct
                   Protected by the Second Amendment ..................... 11

14                      a.   Assault Weapons Are Not in Common Use
                         for Lawful Purposes, Such as Self-Defense........ 11

15                      b.   Assault Weapons Are Most Useful in
16                           Military Service.................................................... 13

17                      c.   The AWCA Is Analogous to Longstanding
                        Firing-Capacity Regulations ............................... 16

18                 3.    Step Two:  The AWCA Is Subject to and Satisfies
                   Intermediate Scrutiny ............................................. 17

19                      a.   The AWCA Is Subject to Intermediate
                        Scrutiny ............................................................... 17

20                        b.   The AWCA Satisfies Intermediate Scrutiny
                        Because It Is Reasonably Fitted to Important
21                           Government Interests ........................................... 20

22          B.    Plaintiffs Have Failed to Demonstrate that They Will
              Suffer Irreparable Harm in the Absence of a Preliminary
23                 Injunction .................................................................... 29

24          C.    The Balance of the Equities and the Public Interest Both
              Weigh Against Preliminary Injunctive Relief .......................... 31

25       IV.   The Court Should Stay Enforcement of any Preliminary
          Injunction Pending an Interlocutory Appeal........................................ 32

26   CONCLUSION............................................................................................ 32

27

28

i

# TABLE OF AUTHORITIES

**Page**

*All. for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) .......................................................... 4, 5

*Ariz. Dream Act Coal. v. Brewer*
  757 F.3d 1053 (9th Cir. 2014) ............................................................. 7

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.*
  910 F.3d 106 (3d Cir. 2018) ......................................................... 17, 24

*Bauer v. Becerra*
  858 F.3d 1216 (9th Cir. 2017) ........................................................... 18

*Duncan v. Becerra*
  366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..........................................*passim*

*Duncan v. Becerra*
  2019 WL 1510340 (S.D. Cal. Apr. 4, 2019) ................................... 9, 32

*Fantasyland Video, Inc. v. Cnty. of San Diego*
  505 F.3d 996 (9th Cir. 2007) ............................................................. 28

*Friedman v. City of Highland Park*
  68 F. Supp. 3d 895 (N.D. Ill. 2014) ................................................... 15

*Fyock v. Sunnyvale*
  779 F.3d 991 (9th Cir. 2015) ........................................... 16, 20, 21, 26

*Gallinger v. Becerra*
  898 F.3d 1012 (9th Cir. 2018) .............................................. 13, 14, 27

*Garcia v. Google*
  786 F.3d 733 (9th Cir. 2015) (en banc) ............................................... 8

*Heller v. District of Columbia*
  670 F.3d 1244 (D.C. Cir. 2011) ...................................................*passim*

*Hohe v. Casey*
  868 F.2d 69 (3d Cir. 1989) ................................................................. 29

ii

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Indep. Towers of Wash. v. Wash.*

4

   350 F.3d 925 (9th Cir. 2003) ...................................................................... 7

5

*Jackson v. City & Cnty. of San Francisco*

6

   746 F.3d 953 (9th Cir. 2014) ........................................................... 18, 19, 20

7

*Kachalsky v. Cnty. of Westchester*

8

   701 F.3d 81 (2d Cir. 2012) ......................................................................... 21

9

*Kolbe v. Hogan*

   849 F.3d 114 (4th Cir. 2017) (en banc) ............................................... *passim*

10

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*

11

   941 F.2d 970 (9th Cir. 1991) ...................................................................... 5

12

*Maryland v. King*

13

   133 S. Ct. 1 (2012) ................................................................................... 31

14

*McDonald v. City of Chicago*

15

   561 U.S. 742 (2010) (plurality opinion) ........................................... 11, 30

16

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*

17

   804 F.3d 242 (2d Cir. 2015) ........................................................ 9, 18, 19, 22

18

*Nken v. Holder*

19

   556 U.S. 418 (2009) ................................................................................. 31

20

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*

   762 F.2d 1374 (9th Cir. 1985) .................................................................. 30

21

*Pena v. Lindley*

22

   898 F.3d 969 (9th Cir. 2018) ............................................................. 20, 21

23

*Rupp v. Becerra*

24

   401 F. Supp. 3d 978 (C.D. Cal. 2019) ................................................ *passim*

25

*Rupp v. Becerra*

26

   2018 WL 2138452 (C.D. Cal. May 9, 2018) ........................................... 31

27

*S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*

28

   18 F. Supp. 3d 997 (N.D. Cal. 2014) ...................................................... 28

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3

*Saddiq v. Trinity Servs. Grp.*

4

2015 WL 13684701 (D. Ariz. Nov. 3, 2015) ........................................................ 8

5

*Silveira v. Lockyer*

6

312 F.3d 1052 (9th Cir. 2002) ............................................................................... 3

7

*Silvester v. Harris*

8

843 F.3d 816 (9th Cir. 2016) ........................................................... 11, 16, 17, 20

9

*Stanley v. Univ. of So. Cal.*

13 F.3d 1313 (9th Cir. 1994) ................................................................................. 7

10

*Staples v. United States*

11

511 U.S. 600 (1994) ............................................................................... 12, 14, 15

12

*Tanner Motor Livery, Ltd. v. Avis, Inc.*

13

316 F.2d 804 (9th Cir. 1963) ................................................................................. 7

14

*Tracy Rifle & Pistol LLC v. Harris*

15

118 F. Supp. 3d 1182 (E.D. Cal. 2015) ................................................................. 8

16

*United States v. Cox*

17

906 F.3d 1170 (10th Cir. 2018) .......................................................................... 26

18

*United States v. Masciandaro*

19

638 F.3d 458 (4th Cir. 2011) .............................................................................. 31

20

*United States v. Skoien*

614 F.3d 638 (7th Cir. 2010) (en banc) .............................................................. 17

21

22

*Wiese v. Becerra*

2017 WL 2619110 (E.D. Cal. June 16, 2017) .................................................... 30

23

*Wilson v. Cook Cnty.*

24

937 F.3d 1028 (7th Cir. 2019) ....................................................................... 8, 18

25

*Winter v. Natural Res. Def. Council, Inc.*

26

555 U.S. 7 (2008) ..................................................................................... 5, 10, 31

27

*Worman v. Healey*

28

922 F.3d 26 (1st Cir. 2019) ....................................................................... 9, 18, 29

iv

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3

STATUTES

4

Assault Weapons Control Act .......................................................................*passim*

5

California Penal Code

6

   § 30505(a) ................................................................................................. 3

7

   § 30510 ......................................................................................... 3, 6, 21

   § 30515(a) .......................................................................................*passim*

8

   § 30515(a)(1) ................................................................................... 4, 22

9

   § 30515(a)(1)(A) ................................................................................... 24

   § 30515(a)(1)(B) ................................................................................... 24

10

   § 30515(a)(1)(C) ................................................................................... 25

11

   § 30515(a)(1)(D) ................................................................................... 26

   § 30515(a)(1)(E) ................................................................................... 25

12

   § 30515(a)(1)(F) ................................................................................... 24

13

   § 30515(a)(2) ................................................................. 4, 9, 23, 24

   § 30515(a)(3) ............................................................................... 4, 25

14

   § 30515(a)(4) ............................................................................... 4, 22

15

   § 30515(a)(4)(A) ................................................................................... 25

16

   § 30515(a)(4)(B) ................................................................................... 24

   § 30515(a)(4)(C) ................................................................................... 24

17

   § 30515(a)(4)(D) ................................................................................... 22

   § 30515(a)(5) ................................................................. 4, 9, 23, 24

18

   § 30515(a)(6) ............................................................................... 4, 15

19

   § 30515(a)(6)(A) ................................................................................... 25

   § 30515(a)(6)(B) ................................................................................... 24

20

   § 30515(a)(7) ......................................................................................... 4

21

   § 30515(a)(8) ......................................................................................... 4

   § 30515(b) .............................................................................................. 3

22

   § 30515(c) .............................................................................................. 4

23

   § 30600 ............................................................................................... 4, 6

   § 30600(a) .............................................................................................. 4

24

   § 30605 .................................................................................................... 4

25

   § 30605(a) .............................................................................................. 4

   § 30800 ............................................................................................... 4, 6

26

   § 30800(d) .............................................................................................. 6

27

   § 30910 ............................................................................................... 4, 5

   § 30915 ............................................................................................... 4, 5

28

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

California Penal Code (Cont.)

§ 30925 ........................................................................................ 4, 5

§ 30945 ..................................................................................... 4, 6, 5

§ 30950 ..................................................................................... 4, 6, 5

§ 31000 ........................................................................................ 4, 6

§ 31005 ........................................................................................ 4, 6

§ 32310 ............................................................................................ 24

National Firearms Act ............................................................................ 26

**CONSTITUTIONAL PROVISIONS**

United States Constitution

First Amendment .................................................................... 28, 30, 31

Second Amendment ................................................................... *passim*

Fourteenth Amendment .................................................................... 17

**COURT RULES**

Civil Local Rule 5.1(e) ............................................................................ 3

**OTHER AUTHORITIES**

Cal. Code Regs. tit. 11

§ 5460 ........................................................................................... 4, 5

§ 5471 ............................................................................................... 4

§ 5471(nn) ........................................................................................ 25

§ 5471(*oo*) ...................................................................................... 25

§ 5471(r) .......................................................................................... 25

§ 5499 ........................................................................................... 5, 6

Senate Bill

23 ....................................................................................................... 3

880 .................................................................................................... 31

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (19-cv-1537 BEN-JLB)

**INTRODUCTION**

In response to mass shootings and escalating gun violence, the Legislature enacted the Roberti-Roos Assault Weapons Control Act (the "AWCA") in 1989 to prohibit the possession, sale, transportation, or importation of assault weapons. Since then, California has amended the AWCA to add a features-based definition that designates certain semiautomatic rifles, pistols, and shotguns as assault weapons if they possess particular features or characteristics. Plaintiffs claim that this features-based definition and a broad range of enforcement statutes and regulations that apply to assault weapons violate the Second Amendment. Plaintiffs seek a wide-ranging preliminary injunction of these provisions, even though the AWCA has been in effect for decades. Their motion should be denied.

As a threshold matter, Plaintiffs' motion is deeply flawed, seeking a vastly overbroad injunction against a laundry list of statutes. Many of the provisions that Plaintiffs seek to enjoin are not meaningfully discussed or even mentioned in their supporting papers, and some of them apply to firearm restrictions not challenged by Plaintiffs. Plaintiffs barely discuss assault pistols and assault shotguns, and, even with respect to assault rifles, Plaintiffs fail to present any evidence concerning some of the features or characteristics that may qualify a rifle as an assault weapon. Because Plaintiffs' motion lacks any tailoring, it should be denied in its entirety.

Moreover, Plaintiffs cannot satisfy the heightened standard for *mandatory* preliminary injunctions. There is nothing "preliminary" about Plaintiffs' requested relief. Plaintiffs seek to upend the status quo and obtain the ultimate relief they seek in this action—a broad injunction of the AWCA. In stark contrast to the *prohibitory* preliminary injunction issued in *Duncan v. Becerra*—which preserved the status quo during litigation by preventing enforcement of newly enacted provisions of the Penal Code that had yet to go into effect—Plaintiffs' motion seeks to alter a status quo that has existed for decades. As such, in addition to satisfying the equitable factors for a preliminary injunction, Plaintiffs must show that the facts

1

1    and the law *clearly favor* a preliminary injunction.  Plaintiffs cannot make that

2    showing because *every* federal circuit court that has reviewed the constitutionality

3    of assault-weapon restrictions like the AWCA (five thus far) has upheld them.

4         Even under the standard applicable to prohibitory preliminary injunctions,

5    Plaintiffs' motion should be denied.  Plaintiffs cannot establish that they are likely

6    to succeed on the merits under the Ninth Circuit's two-step framework for Second

7    Amendment claims.  The AWCA does not burden conduct protected by the Second

8    Amendment, and even if it does, the challenged provisions satisfy the applicable

9    level of scrutiny—intermediate scrutiny.  The Legislature's decision to restrict

10   assault weapons is supported by evidence showing that, *inter alia*, they are used

11   frequently in mass shootings, resulting in substantially more deaths and injuries.

12        The remaining factors for a preliminary injunction also weigh against

13   Plaintiffs' motion.  Plaintiffs cannot demonstrate that they will be irreparably

14   harmed in the absence of a preliminary injunction given Plaintiffs' inexplicable,

15   multi-year delay in challenging the AWCA, which reflects a lack of urgency, and

16   their access to hundreds of other firearms not subject to the AWCA.  The balance of

17   the equities and the public interest also weigh decisively against a preliminary

18   injunction.  If assault weapons that have been restricted for decades are permitted to

19   enter the State as this case is litigated—and at the same time the State is defending

20   the AWCA in a nearly identical Second Amendment case before the Ninth

21   Circuit[1]—the State would suffer irreparable injury.  A preliminary injunction would

22   cause a massive disruption to the enforcement of California's gun-safety laws and

23   cause significant public confusion and concern; and if the AWCA is ultimately

24   upheld, the status quo would be difficult to restore.  Accordingly, Plaintiffs have

25   failed to meet their burden under any standard for preliminary injunctions.

26

27        [1] *See Rupp v. Becerra*, 401 F. Supp. 3d 978 (C.D. Cal. 2019) (upholding the
     AWCA), *appeal docketed*, No. 19-56004 (9th Cir. Aug. 28, 2019).  The deadline
28   for the opening brief is January 27, 2020.

2

# BACKGROUND

## I.   THE ASSAULT WEAPONS CONTROL ACT

The AWCA initially defined as assault weapons certain semiautomatic rifles, pistols, and shotguns identified by make and model.  *See* Cal. Penal Code § 30510; *see also* Graham Decl. ¶ 15.  In enacting the AWCA, the Legislature found that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  Cal. Pen. Code § 30505(a).[2]  The AWCA rendered it a felony to manufacture, import, sell, or possess any of the listed firearms without a permit.  *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008).  After the Legislature enacted the AWCA, gun manufacturers began to produce "copycat" weapons to evade the statute's restrictions.  *Id.* at 1058 n.5.  In response, the Legislature enacted Senate Bill 23 to add a flexible, features-based definition of "assault weapons" to the AWCA, now codified at California Penal Code section 30515(a), *see* DX-1 at 4-5 (providing background on the AWCA),[3] and restrictions large-capacity magazines ("LCMs").

Under section 30515(a), a rifle qualifies as an "assault weapon" if it is (1) a semiautomatic, centerfire rifle that does not have a fixed magazine,[4] but has any one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip; (2) a semiautomatic,

---

[2] Plaintiffs do not challenge the make-and-model definition of an assault weapon.

[3] Defendants' exhibits are attached to the accompanying Declaration of John D. Echeverria, and citations to those exhibits are to "DX" followed by exhibit number; the pages of Defendants' exhibits have been numbered in consecutive numerical order.  *See* L.R. 5.1(e).

[4] A "fixed magazine" is "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action."  Cal. Penal Code § 30515(b).

3

centerfire rifle that has a fixed LCM; or (3) a semiautomatic, centerfire rifle that has an overall length of less than 30 inches.  Cal. Penal Code § 30515(a)(1)-(3).

A pistol qualifies as an "assault weapon" under section 30515(a) if it is (1) a semiautomatic pistol that does not have a fixed magazine, but has one or more of the following features:  a threaded barrel (capable of accepting a flash suppressor, a forward handgrip, or a silencer), a second handgrip, a barrel shroud, or the capacity to accept a detachable magazine outside of the pistol grip; or (2) a semiautomatic pistol with a fixed LCM.[5]  Cal. Penal Code § 30515(a)(4)-(5).

A shotgun qualifies as an "assault weapon" under section 30515(a) if it is (1) a semiautomatic shotgun that has an adjustable stock and one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip; (2) a semiautomatic shotgun that has the ability to accept a detachable magazine; or (3) a shotgun that has a revolving cylinder.  Cal. Penal Code § 30515(a)(6)-(8).

For the past two decades, California has restricted the manufacture, distribution, transportation, importation, sale, lending, and possession of firearms that qualify as "assault weapons" under the AWCA.  *See* Cal. Penal Code §§ 30600(a), 30605(a).

## II.   THE PRESENT ACTION

The initial complaint, filed on August 15, 2019, asserted a Second Amendment challenge to the AWCA's restrictions on semiautomatic, centerfire rifles and semiautomatic pistols with fixed LCMs.  On September 27, 2019, Plaintiffs filed a First Amended Complaint, expanding their challenge to *all* of the definitions in California Penal Code section 30515(a) and a range of California statutes and regulations relating to assault weapons: California Penal Code sections 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005 and

---

[5] Assault pistols "designed expressly for use in Olympic target shooting events" are exempted from the AWCA.  Cal. Penal Code § 30515(c).

sections 5460 and 5471 of title 11 of the California Code of Regulations.  Dkt. 9
at 41-42.  Plaintiffs purport to challenge these provisions on their face and as
applied to them and similarly situated individuals.  *Id.*  On December 6, 2019,
Plaintiffs filed their motion for a preliminary injunction.  Dkt. 22.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of
right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs
requesting a preliminary injunction must establish that (1) they are likely to succeed
on the merits; (2) they will likely suffer irreparable harm in the absence of
preliminary relief; (3) the balance of equities tips in their favor; and (4) an
injunction is in the public interest.  *Id.* at 20.  Alternatively, plaintiffs may
demonstrate that "serious questions going to the merits were raised and the balance
of hardships tips sharply in [plaintiffs'] favor," if they also show a likelihood of
irreparable injury and that the injunction is in the public interest.  *All. for the Wild
Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (quotation omitted).

## ARGUMENT

### I.   PLAINTIFFS SEEK AN OVERBROAD PRELIMINARY INJUNCTION

It is well-settled that a preliminary injunction "must be tailored to remedy the
specific harm alleged" and that an "overbroad injunction is an abuse of discretion."
*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)
(citations omitted).  Here, Plaintiffs seek to enjoin numerous provisions of the
AWCA and regulations relating to assault weapons, even though many of those
provisions are not meaningfully discussed (or even mentioned) in their supporting
papers.[6]  Plaintiffs' requested injunction is overbroad in at least four respects.

---

[6] Plaintiffs' memorandum does not cite to or even mention California Penal
Code sections 30910, 30915, 30925, 30945, and 30950, and section 5460 of title 11
of the California Code of Regulations.  Plaintiffs even seek to enjoin Penal Code
section 30925, Dkt. 22 at 2, despite their representation that they will voluntarily
dismiss their challenge to that section, *see* Dkt. 21 at 12.

First, critically, Plaintiffs do not challenge the make-and-model definitions in California Penal Code section 30510 or section 5499 of title 11 of the California Code of Regulations, leaving those listed assault weapons subject to regulation under the AWCA. Yet, they seek to enjoin enforcement of the AWCA as to those listed assault weapons. This is a fundamental defect in Plaintiffs' requested relief.

Second, many of the challenged provisions also regulate .50 BMG rifles, and thus should not be enjoined in their entirety. *See* Cal. Penal Code §§ 30600, 30800, 30945, 30950, 31000, 31005.

Third, Plaintiffs do not attempt to even suggest how other activities proscribed by the challenged provisions violate the Second Amendment, yet they seek to enjoin their enforcement. *See* Cal. Penal Code §§ 30800(d) (deeming an assault weapon as a public nuisance if it was involved in a misdemeanor or felony that resulted in a conviction), 30945 (authorizing uses for registered assault weapons), 30950 (prohibiting possession of assault weapons by prohibited persons and juveniles), 31000 (authorizing additional uses for registered assault weapons with permit), 31005 (authorizing manufacture or sale of assault weapons with permit).

Fourth, to the extent Plaintiffs are challenging the features-based definition in California Penal Code section 30515(a), Plaintiffs offer scant evidence or argument concerning assault pistols and assault shotguns. Aside from the general description of the AWCA's definitions of assault pistols and assault shotguns, *see* Pls.' Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. ("Pls. Mem.") at 3, and the declarations from certain individual Plaintiffs that they want to obtain such assault weapons, *see, e.g.*, *id.* at 8, Plaintiffs' supporting papers do not identify how restrictions of those firearms violate the Second Amendment. And Plaintiffs do not cite any evidence concerning some of the prohibited features or characteristics (*e.g.*, grenade launchers, threaded barrels, or lengths of less than 30 inches). An injunction of

California Penal Code section 30515(a) without argument and evidence concerning *each* listed feature and characteristic would be overbroad.[7]

The injunction that Plaintiffs seek would be overbroad and lacking in evidentiary support.  Accordingly, the Court should deny their motion.

## II.   PLAINTIFFS FAIL TO SATISFY THE HEIGHTENED STANDARD FOR A MANDATORY INJUNCTION THAT WOULD ALTER THE STATUS QUO

Properly characterized, Plaintiffs seek a mandatory, rather than a prohibitory, preliminary injunction because it would dramatically alter the status quo.  In contrast to prohibitory injunctions designed to preserve the status quo during litigation, "mandatory" injunctions "go well beyond simply maintaining the status quo *pendent lite*."  *Stanley v. Univ. of So. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quotation omitted); *see, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (holding that requested preliminary injunction was prohibitory "like other injunctions that prohibit enforcement of a new law or policy").  Preliminary injunctions that would alter the status quo are "particularly disfavored." *Stanley*, 13 F.3d at 1320 (quotation omitted).  "It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

Here, Plaintiffs' requested injunction would completely change the status quo. Plaintiffs seek to try their claims on affidavits and obtain the ultimate relief sought in this action—a broad injunction of the AWCA.  Pls. Mem. at 30.  Plaintiffs may claim that, in seeking to "prohibit" the enforcement of the AWCA, they are

---

[7] Perhaps these features and characteristics are discussed somewhere in the more than 1,800 pages of supporting material, but Plaintiffs do not adequately tie their evidence to the particular provisions they seek to enjoin.  It is not Defendants' obligation, and especially the Court's, to find evidence that may support Plaintiffs' requested injunction.  *See Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (faulting the plaintiff's "spaghetti approach" and declining "to sort through the noodles in search of [the party's] claim").

1  requesting a "prohibitory" injunction, but the *effects* of such an injunction prove

2  otherwise.  *See Saddiq v. Trinity Servs. Grp.*, No. 13-01671-PHX-ROS (MHB),

3  2015 WL 13684701, at *2 (D. Ariz. Nov. 3, 2015) (noting that a request for a

4  preliminary "injunction 'prohibiting [defendants'] revoking of [plaintiff's] Halal

5  diet'" "appears to seek a prohibitory injunction, or one that seeks only to maintain

6  the status quo," but the "wording is misleading" as it would be "a mandatory

7  injunction that would overrule an administrative decision already in effect").

8       Plaintiffs' requested injunction would have sweeping, irreversible

9  consequences, which confirm its mandatory nature.  If granted, Plaintiffs' motion

10  would impose significant administrative burdens on law enforcement agencies at

11  multiple levels of government, generate significant public confusion and concern,

12  and amplify the existing public-safety risks posed by assault weapons by increasing

13  their availability, and likely prevalence, in the State.  *See* Graham Decl. ¶¶ 72-77.

14  Plaintiffs' requested preliminary injunction "has the character of a mandatory

15  injunction" because it "would alter the status quo by requiring California to alter its

16  regulatory scheme and practices as they pertain to firearms."  *Tracy Rifle & Pistol*

17  *LLC v. Harris*, 118 F. Supp. 3d 1182, 1194-95 (E.D. Cal. 2015).  Those burdens

18  should not be imposed on the State at this early stage of litigation, especially where

19  the challenged law has been in effect for so long.

20       Plaintiffs' requested mandatory injunction is subject to a heightened standard.

21  In addition to satisfying the equitable factors for a preliminary injunction, Plaintiffs

22  must meet a "doubly demanding" burden: they "must establish that the law and

23  facts *clearly favor* [their] position.'"  *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir.

24  2015) (en banc).  Plaintiffs cannot make this showing because *every* federal circuit

25  court to have examined assault-weapon restrictions like the AWCA—the First,

26  Second, Fourth, Seventh, and D.C. Circuits—has upheld them under intermediate

27  scrutiny.  *See Wilson v. Cook Cnty.*, 937 F.3d 1028, 1036 (7th Cir. 2019) (following

28  *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 412 (7th Cir. 2015)), *cert.*

8

1  *petition filed*, No. 19-704 (Dec. 3, 2019); *Worman v. Healey*, 922 F.3d 26, 38-41

2  (1st Cir. 2019), *cert. petition filed*, No. 19-404 (Sept. 25, 2019); *Kolbe v. Hogan*,

3  849 F.3d 114, 138-46 (4th Cir. 2017) (en banc); *N.Y. State Rifle & Pistol Ass'n v.*

4  *Cuomo* (*NYSRPA*), 804 F.3d 242, 260-63 (2d Cir. 2015); *Heller v. District of*

5  *Columbia* (*Heller II*), 670 F.3d 1244, 1261-64 (D.C. Cir. 2011).

6       And in *Rupp v. Becerra*, the district court upheld the AWCA's restrictions on

7  semiautomatic rifles.  *Rupp*, 401 F. Supp. 3d at 988, 993.  The court held that the

8  AWCA does not burden conduct protected by the Second Amendment because

9  "semiautomatic rifles within the AWCA's scope are virtually indistinguishable

10 from M-16s and thus are not protected by the Second Amendment." *Id.* at 988.

11 Alternatively, the court held that the AWCA is subject to intermediate scrutiny,

12 because it does not "severely burden the core of the Second Amendment right," and

13 that the Attorney General "more than met his burden" under intermediate scrutiny.

14 *Id.* at 989, 993.  *Rupp* and the chorus of extra-circuit authority show that an

15 injunction of the AWCA is clearly *disfavored*.

16      Plaintiffs rely heavily on this Court's decision in *Duncan v. Becerra*, which

17 held that California's LCM restrictions violated the Second Amendment and is

18 currently on appeal.  *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019),

19 *appeal docketed*, No. 19-55376 (9th Cir. Apr. 4, 2019).[8]  That decision does not

20 show that the facts and the law clearly favor granting a *preliminary injunction* in

21 this case.  Indeed, this Court stayed the effect of its grant of a *permanent injunction*

22 in that case in light of the "immeasurable societal benefit of maintaining the

23 immediate status quo while the process of judicial review takes place." *Duncan v.*

24 *Becerra*, No. 17-cv-1017-BEN-JLB, 2019 WL 1510340, at *4 (S.D. Cal. Apr. 4,

25 2019).  And even with respect to Plaintiffs' challenge to California Penal Code

26 section 30515(a)(2) and (a)(5), which concern fixed LCMs, this Court's decision in

27

28      _____

        [8] The Ninth Circuit has scheduled oral argument for April 2, 2020.

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (19-cv-1537 BEN-JLB)

*Duncan* is not dispositive; this case concerns the sufficiency of different evidence concerning assault weapons under intermediate scrutiny.  Whatever the outcome of *Duncan*, the State has compelling reasons to restrict fixed LCMs *in certain firearms*, such as semiautomatic firearms with militaristic features.

In sum, Plaintiffs seek a mandatory preliminary injunction, but they cannot show that the law and the facts *clearly* support their motion.  For this reason alone, the Court should deny Plaintiffs' motion.

### III.  PLAINTIFFS FAIL TO SATISFY THE EQUITABLE FACTORS FOR PRELIMINARY INJUNCTIONS

In addition to failing to meet the heightened standard controlling mandatory injunctions, Plaintiffs' motion fails to establish any of the equitable factors courts traditionally apply in weighing the issuance of a preliminary injunction.  Whether Plaintiffs' motion is viewed as seeking mandatory or prohibitory relief, each of the *Winter* factors weighs against a preliminary injunction of the AWCA.

### A.  Plaintiffs Are Not Likely to Succeed on the Merits

Plaintiffs have failed to meet their burden of establishing a likelihood of success on the merits.  As previously discussed, each of the five federal circuit courts to have considered the constitutionality of assault-weapon restrictions like the AWCA has upheld them under the same two-step framework adopted by the Ninth Circuit.  As in those cases, the AWCA is constitutional.

### 1.  The Two-Step Framework for Second Amendment Claims

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms.  554 U.S. at 595.  While the Court in *Heller* invalidated a prohibition of all handguns—which the Court characterized as "the quintessential self-defense weapon," *id.* at 629—the Court made clear that "the right secured by

10

1   the Second Amendment is not unlimited" and does not extend to "a right to keep

2   and carry any weapon whatsoever in any manner whatsoever and for whatever

3   purpose," *id.* at 626 (citations omitted).  The Court cautioned that the Second

4   Amendment "by no means eliminates" a state's "ability to devise solutions to social

5   problems that suit local needs and values," emphasizing that "[s]tate and local

6   experimentation with reasonable firearms regulations will continue under the

7   Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010)

8   (plurality opinion) (quotation omitted).

9        The Ninth Circuit has adopted a two-step approach to evaluating the

10   constitutionality of gun-safety laws under the Second Amendment.  *See Silvester v.*

11   *Harris*, 843 F.3d 816, 820-21 (9th Cir. 2016).  The first step considers whether the

12   challenged law burdens conduct protected by the Second Amendment, based on a

13   "historical understanding of the scope of the right." *Id.* at 821 (quotation omitted).

14   If it does not, the law "may be upheld without further analysis." *Id.* (citation

15   omitted).  If the Court determines that the law burdens conduct protected by the

16   Second Amendment, it proceeds to the second step of the inquiry to determine the

17   appropriate level of scrutiny to apply, and then to apply that level of scrutiny.  *Id.*

18   (citation omitted).  The AWCA passes constitutional muster at each step.

19

20   **2.    Step One:  The AWCA Does Not Burden Conduct Protected by the Second Amendment**

21        Plaintiffs have failed to demonstrate that the AWCA burdens conduct

22   protected by the Second Amendment at the first step.  Assault weapons are not

23   protected by the Second Amendment because they are not in common use for self-

24   defense, are military weapons, and have been subject to longstanding regulation.

25

26   **a.    Assault Weapons Are Not in Common Use for Lawful Purposes, Such as Self-Defense**

27        The Supreme Court has explained that the Second Amendment does not

28   protect firearms unless they are "in common use" for lawful purposes like self-

11

defense.[9]  Plaintiffs flatly contend that "the semiautomatic firearms banned by California are common," Pls. Mem. at 13, but the record fails to support this assertion.  To begin with, Plaintiffs fail to present *any* evidence that assault pistols or assault shotguns are in common use for lawful purposes.  *See id.* at 13-14.  Plaintiffs do not even attempt to offer an estimate of how many assault pistols or assault shotguns there may be in the United States; the limited data offered by Plaintiffs concerning the production of pistols and shotguns do not necessarily reflect the production or ownership of *assault* pistols and shotguns.  *See* Curcuruto Decl. ¶ 15.  Contrary to Plaintiffs' conclusory assertions, assault pistols and assault shotguns are not common.  *See* Graham Decl. ¶¶ 57, 62.

Plaintiffs have also failed to show that assault rifles are in common use.[10]  Estimates of the number of "modern sporting rifles" manufactured, imported, or owned, Pls. Mem. at 14, do not necessarily concern assault rifles, as not all modern sporting rifles are restricted under the AWCA—*e.g.*, semiautomatic, rimfire or "featureless" rifles.  *See* Donohue Decl. ¶ 140.  And Plaintiffs do not account for the increasing concentration of gun ownership in the United States.  *See id.* ¶ 142.

Even assuming assault weapons are commonly owned, they are not commonly *used* for self-defense and are not well-suited for that purpose.  Once again, as to

---

[9] Plaintiffs also argue that assault weapons are well-suited for militia service, "as contemplated by the Second Amendment's prefatory clause and history."  Pls. Mem. at 15.  The Supreme Court, however, has explained that the prefatory clause is irrelevant to determining whether the Second Amendment applies to certain arms.  *Heller*, 554 U.S. at 627 ("[T]he fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.").  If anything, the suitability of assault weapons for militia or other military service supports a finding that assault weapons are not protected by the Second Amendment.  *See infra* Section III.A.2.b at pp. 13-16.

[10] Plaintiffs claim that that the AR-15 and other semiautomatic weapons "traditionally have been widely accepted as lawful possessions," citing *Staples v. United States*, 511 U.S. 600, 612 (1994).  Pls. Mem. at 17.  The Court in that case addressed the narrow question of whether the lack of federal prohibition on those weapons at the time gave gun owners sufficient notice of the likelihood of regulation for purposes of establishing *mens rea*.  *Staples*, 511 U.S. at 618-19.  The *Staples* Court did not hold a government may not ban assault rifles; indeed, Congress did so four months later.  *Rupp*, 401 F. Supp. 3d at 988 n.7.

1   assault pistols or assault shotguns, Plaintiffs have provided no evidence that these

2   firearms have been used in self-defense or are particularly useful for self-defense.

3   Furthermore, rifles of any type (assault or non-assault) are rarely used in self-

4   defense.  *See* DX-2 at 30 (rifles are used in 4.6 percent of justifiable homicides in

5   self-defense).  And even if rifles have been used in self-defense in some

6   circumstances (assuming they qualify as assault weapons) that does not

7   demonstrate that they are particularly useful for that purpose.  Any weapon could

8   conceivably be useful for self-defense, such as a machine gun or grenade launcher,

9   but that does not make them well-suited for that purpose.  *See* Graham Decl. ¶ 48.

10       The rarity with which assault rifles have been used in self-defense is to be

11   expected.  Handguns are by far the preferred weapon for self-defense and have

12   several advantages over rifles for home-defense.  *See Heller*, 554 U.S. at 629; *see*

13   *also Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (noting the lack of

14   evidence that assault weapons are well-suited for self-defense, in contrast to

15   handguns, and the "inherent risks that accompany carrying assault weapons for self-

16   defense" (citation omitted)).  For that reason, police and other law enforcement

17   officers recommend handguns and not rifles (let alone assault rifles) for home-

18   defense.  *See* Donohue Decl. ¶ 111.  Plaintiffs have failed to show that assault

19   weapons are commonly owned or commonly used for self-defense.

20           **b.    Assault Weapons Are Most Useful in Military Service**

21       Assault weapons fall outside the scope of the Second Amendment also

22   because they are, like the M-16, most useful in military service.  In *Heller*, the

23   Supreme Court made clear that the Second Amendment does not protect weapons

24   that are "most useful in military service," such as the "M-16 and the like."  *Heller,*

25   554 U.S. at 627; *Kolbe*, 849 F.3d at 136.  Assault weapons are "most useful in

26   military service" due to their ability to accept ammunition from fixed or detachable

27   LCMs and their combat-oriented features.  *See Kolbe*, 849 F.3d at 137 ("Whatever

28   their other potential uses—including self-defense—the AR-15, other assault

1  weapons, and large-capacity magazines . . . are unquestionably most useful in
2  military service."); *Gallinger*, 898 F.3d at 1018 (referencing "mass shootings
3  perpetrated by individuals with *military-style rifles*" (emphasis added)); *see also*
4  *infra* Section III.A.3.b.1 at pp. 21-26 (discussing combat-functionality of each
5  assault-weapon feature); *supra* note 9 (discussing militia suitability).

6        The Supreme Court has highlighted the M-16 as exemplifying a "dangerous
7  and unusual" weapon that falls outside the protection of the Second Amendment.
8  *Heller*, 554 U.S. at 627.  Assault weapons have a military pedigree and are nearly
9  identical to the M-16.  *Staples*, 511 U.S. at 603 ("The AR-15 is the civilian version
10 of the military's M-16 rifle . . . ."); *Kolbe*, 849 F.3d at 136 ("Because the banned
11 assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons
12 that are most useful in military service'—they are among those arms that the
13 Second Amendment does not shield" (citing *Heller*, 554 U.S. at 627)); *Rupp*, 401 F.
14 Supp. 3d at 988 ("[T]he Court concludes that semiautomatic rifles within the
15 AWCA's scope are virtually indistinguishable from M-16s . . . ."); DX-3 at 38
16 (describing "military features and characteristics . . . carried over to semiautomatic
17 versions of the original military rifle"); Graham Decl. ¶ 44; Youngman Decl. ¶ 14
18 ("The AR-15 pattern of rifle . . . is a firearm not just well-suited, but *ideal* for
19 militia service." (emphasis added)).

20       The primary difference between the M-16 and an assault weapon is that the
21 M-16 is a select-fire weapon that allows the shooter to fire in either automatic or
22 semiautomatic mode, while an assault weapon fires only in semiautomatic mode.
23 DX-4 at 53.  This is not a material difference.  Semiautomatic weapons can "still
24 fire almost as rapidly as automatics."  *See Heller II*, 670 F.3d at 1263; DX-5 at 72;
25 DX-6 at 109 (a 30-round magazine empties in less than two seconds on automatic,
26 while the same magazine empties in just five seconds on semiautomatic).  In fact,
27 soldiers issued M-16 rifles are instructed to generally use "rapid semiautomatic
28 fire," because fully automatic fire is "inherently less accurate."  DX-7 at 171.  And

assault rifles, such as the AR-15, are easily converted to fire automatically. *Staples*, 511 U.S. at 603 (noting that "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon"); DX-5 at 72 ("[I]t is a relatively simple task to convert a semiautomatic weapon to automatic fire . . . ."); DX-8 at 195-96, ¶ 20.

As with assault rifles, assault pistols and assault shotguns are most useful in military service and are not well-suited for civilian self-defense. *See Kolbe*, 849 F.3d at 136 (holding that "the banned assault weapons" are most useful in military service);[11] *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908 (N.D. Ill. 2014) (noting that submachine guns are "the analog for a civilian assault pistol" and "facilitate the assault and capture of a military objective" (citation omitted)); DX-9 at 232 (noting that assault pistols are "for the most part simply semiautomatic versions of submachine guns"); DX-10 at 258 (discussing shotgun features that "are most appropriate for military or law enforcement use," including adjustable stocks and forward pistol grips).[12]

The military utility of assault weapons is confirmed by the manufacturers of such weapons, which advertise them to civilians as military-grade firearms. *See Kolbe*, 849 F.3d at 125 ("Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess."); Donohue Decl. ¶¶ 72-82; DX-11 at 289, DX-12 at 291 (Colt advertisements). Beginning in the 1980s, the gun industry began to market heavily military-style rifles to the civilian gun market, DX-9 at 205, using the term "assault rifles" to

---

[11] *Kolbe* upheld restrictions on assault rifles and assault shotguns. *Kolbe*, 849 F.3d at 122 n.2. The court's analysis would apply logically to assault pistols. *Rupp* upheld the AWCA's restrictions on assault rifles because they are "like" M-16 rifles and, thus, are "dangerous and unusual" weapons. *Rupp*, 401 F. Supp. 3d at 986. Assault pistols and assault shotguns are similarly dangerous and unusual.

[12] Though the ATF Working Group examining shotgun features determined that pistol grips for the trigger hand are prevalent on shotguns, DX-10 at 270, the AWCA does not apply to a shotgun with such a pistol grip unless it also has an adjustable stock, Cal. Penal Code § 30515(a)(6).

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (19-cv-1537 BEN-JLB)

1  describe these military-style weapons, DX-13 at 294, 296, 302 (July 1981 Guns &

2  Ammo Magazine) (variously describing a "new breed of assault rifles" as

3  "[s]pawned in the crucible of war," "military-type," "military-style," and "military

4  autoloaders").

5       As in *Kolbe* and *Rupp*, this Court should hold that assault weapons restricted

6  under the AWCA are "like" the M-16, most useful in military service, and beyond

7  the scope of Second Amendment protection.

8

9            **c.    The AWCA Is Analogous to Longstanding Firing-Capacity Regulations**

10       Plaintiffs are also unlikely to succeed on the merits at the first step of the

11  Second Amendment analysis because the AWCA is a "'presumptively lawful

12  measure[]' falling outside the scope of Second Amendment protection." *Silvester*,

13  843 F.3d at 830 (Thomas, C.J., concurring) (quoting *Heller*, 554 U.S. at 626,

14  627 n.26).  In restricting firearms capable of firing numerous rounds without

15  reloading—either because they can accept detachable LCMs or have fixed LCMs—

16  the AWCA is analogous to "regulations from the early twentieth century that

17  restricted the possession of firearms based on the number of rounds that the firearm

18  could discharge automatically or semi-automatically without reloading." *Fyock v.*

19  *Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).[13]  In the 1920s and 1930s, Michigan,

20  Rhode Island, and Ohio enacted restrictions on semiautomatic weapons capable of

21  firing sixteen, twelve, and eighteen shots, respectively, without reloading.  DX-14

22  at 309 (Michigan); DX-15 at 316 (Rhode Island); DX-16 at 319 (Ohio).  And in

23  1932, Congress enacted a twelve-shot restriction on semiautomatic weapons in the

24  District of Columbia—one of the few jurisdictions subject to the Second

25

26       [13] The Ninth Circuit has observed that, "[a]lthough not from the founding era,

27  these early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997.

28

1   Amendment at that time, before it was incorporated into the Fourteenth

2   Amendment in 2010—and this restriction has remained in effect ever since.  DX-17

3   at 321.[14]

4         In regulating firearms based on their capacity for enhanced firepower, these

5   laws provide a historical analog to the AWCA.  *See United States v. Skoien*, 614

6   F.3d 638, 641 (7th Cir. 2010) (en banc) (noting that the challenged regulation need

7   not "mirror" the historical regulation); *see, e.g.*, *Silvester*, 843 F.3d at 823-24, 831

8   (Thomas, C.J., concurring) (citing original iteration of California's waiting-period

9   law, which provided a *single-day* waiting period, in determining that California's

10  longer, ten-day waiting period was presumptively lawful).  And these laws are

11  sufficient analogs despite their adoption by "several states."  *See id.* at 831

12  (Thomas, C.J., concurring) (citing just three states that enacted waiting-period

13  statutes in the 1920s).  In sum, the political debate concerning the regulation of

14  assault weapons "was presaged by the successful, and at the time obviously

15  uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s."

16  DX-18 at 341; *see also* DX-19 at 371-73.  For this additional reason, the AWCA

17  does not burden the Second Amendment.

18

19        **3.    Step Two:  The AWCA Is Subject to and Satisfies
               Intermediate Scrutiny**

20              **a.    The AWCA Is Subject to Intermediate Scrutiny.**

21        Even if the AWCA burdens the Second Amendment, that is not the end of the

22  Court's inquiry.  Contrary to Plaintiffs' suggestion, *Heller* did not endorse a

23  "categorical analysis" that asks "simply whether the arms being regulated or banned

24  are in common use for lawful purposes."  Pls.' Mem. at 12.  "Common use" is not

25  _____

26        [14] Many other states imposed firing-capacity restrictions on fully automatic
    weapons, DX-18 at 342-43, which, as discussed, can have similar firing rates as
    semiautomatic weapons, *Heller II*, 670 F.3d at 1263.  While most of the firing-

27  capacity laws were repealed by the 1970s, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v.
    Attorney General N.J.* (*ANJRPC*), 910 F.3d 106, 117 n.18 (3d Cir. 2018), the

28  District of Columbia has maintained its restrictions.

dispositive in determining whether a regulation of firearms violates the Second Amendment. *See Kolbe*, 849 F.3d at 141-42 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman*, 922 F.3d at 35 n.5 (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citing *Friedman*, 784 F.3d at 409)). If a regulation burdens the Second Amendment right, the Court proceeds to select an appropriate level of scrutiny, depending on "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014) (quotation omitted). Intermediate scrutiny applies unless the challenged law severely burdens that core Second Amendment right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (quoting *Heller*, 554 U.S. at 635).

Every federal circuit court that has selected a level of scrutiny to apply to assault-weapon restrictions, like the AWCA, has determined that intermediate scrutiny applies because they do not rise to the level of a "substantial burden" on the core right protected by the Second Amendment. *See Wilson*, 937 F.3d at 1036; *Worman*, 922 F.3d at 38; *Kolbe*, 849 F.3d at 138-39; *NYSRPA*, 804 F.3d at 257-61; *Heller II*, 670 F.3d at 1261-62. Similarly, the district court in *Rupp* determined that intermediate scrutiny is appropriate because the AWCA does not severely burden the core Second Amendment right, given the range of other firearms available to Californians that are not restricted by the AWCA, including a variety of handguns. *Rupp*, 401 F. Supp. 3d at 989. Indeed, the court determined that assault rifles—the focus of Plaintiffs' claims in this action—are "ill-suited for self-defense" and that self-defense is not the reason why most "modern sporting rifles" are acquired. *Id.* Consistent with *Rupp* and the myriad circuit cases upholding assault-weapon restrictions, intermediate scrutiny applies to the AWCA.

18

1    The AWCA regulates, at most, the *manner* in which persons may exercise

2   their Second Amendment rights.  Californians are free to possess a range of rifles,

3   pistols, and shotguns to engage in lawful self-defense, except for a small subset of

4   firearms that qualify as assault weapons.  *See Jackson*, 746 F.3d at 961 ("[F]irearm

5   regulations which leave open alternative channels for self-defense are less likely to

6   place a severe burden on the Second Amendment right than those which do not.").

7   Contrary to Plaintiffs' claim, Pls. Mem. at 19, the AWCA does not restrict an

8   "entire class" of arms that could warrant strict scrutiny.  *See NYSRPA*, 804 F.3d at

9   260.  It does not ban all rifles, pistols, or shotguns, or even all semiautomatic

10   versions of those firearms.  To the contrary, Californians may lawfully acquire an

11   array of semiautomatic rifles for lawful purposes, such as a centerfire

12   semiautomatic rifle without a fixed magazine, provided it is not a prohibited make

13   and model and does not have any of the prohibited features, a centerfire

14   semiautomatic rifle with any of the militaristic features and with a fixed magazine

15   of 10 rounds or less, or a rimfire semiautomatic rifle with any of the listed

16   features.[15]  They may also possess a range of handguns and shotguns, including

17   semiautomatic versions that lack any of the prohibited features or characteristics.[16]

18    Plaintiffs fail to show that assault weapons with any of the prohibited features

19   are necessary for effective self-defense.  On average, approximately *two rounds* are

20   fired when firearms are used in self-defense, Allen Decl. ¶¶ 15, 22, confirming that

21   assault weapons—particularly those with LCMs—are not necessary to engage in

22   lawful self-defense.  Because the AWCA restricts a "subset" of particularly lethal

23   rifles, pistols, and shotguns that are not necessary for effective self-defense,

24

25   ———————————

[15] A rimfire rifle fires rimfire cartridges, such as .22 caliber rounds.  Graham
Decl. ¶ 21.

26   [16] In fact, many of the individual plaintiffs own California-compliant

27   firearms, *see* Miller Decl. ¶ 4; Hauffen Decl. ¶ 4; Peterson Decl. ¶ 4, and the
AWCA does not prevent the other individual plaintiffs from acquiring California-
compliant firearms for lawful purposes.

28

1   intermediate scrutiny applies.  *Fyock*, 779 F.3d at 999-1000 (applying intermediate

2   scrutiny to LCM restrictions); *see also Rupp*, 401 F. Supp. 3d at 988-89.[17]

3   **b.   The AWCA Satisfies Intermediate Scrutiny Because It Is Reasonably Fitted to Important Government Interests**

4

5   A regulation satisfies intermediate scrutiny if (1) the government's stated

6   objective is "significant, substantial, or important"; and (2) there is a "'reasonable

7   fit' between the challenged regulation and the asserted objective." *Silvester*, 843

8   F.3d at 821-22 (citation omitted).  Intermediate scrutiny does not require the fit

9   between the challenged regulation and the stated objective to be perfect, nor does it

10  require that the regulation be the least restrictive means of serving the interest.

11  *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable

12  opportunity to experiment with solutions to admittedly serious problems." *Id.* at

13  969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

14  In determining applying intermediate scrutiny, courts "afford substantial

15  deference to the predictive judgments of the legislature." *Pena v. Lindley*, 898 F.3d

16  969, 979 (9th Cir. 2018) (quotation omitted).  Even when the record contains

17  "conflicting legislative evidence," intermediate scrutiny "allow[s] the government

18  to select among reasonable alternatives in its policy decisions." *Id.* (quotation

19  omitted).  Deferential review is appropriate here because "the legislature is 'far

20  better equipped than the judiciary' to make sensitive public policy judgments

21  (within constitutional limits) concerning the dangers in carrying firearms and the

22

23  [17] Intermediate scrutiny is the proper standard to apply under Ninth Circuit precedent; in fact, the Ninth Circuit has never applied strict scrutiny to a gun-safety law.  But the AWCA is constitutional even under strict scrutiny.  The State's public-safety interests are compelling.  *See, e.g.*, Donohue Decl. ¶ 28-36 (discussing growing threat of mass shootings); Klarevas Decl. ¶ 9-11 (discussing rise in gun massacres); DX-20 at 387, 393 (finding disproportionate use of assault weapons in murders of law enforcement personnel).  The law is narrowly tailored to those interests by restricting weapons frequently used in mass shootings—and which cause substantially more fatalities and injuries on average—and by defining assault weapons based on particular features that, individually or combined, enhance the lethality of those weapons in mass shootings and violence against law enforcement personnel.

24

25

26

27

28

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (19-cv-1537 BEN-JLB)

1    manner to combat those risks." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97

2    (2d Cir. 2012) (quotation omitted).  Under intermediate scrutiny, the government

3    may "rely on any evidence 'reasonably believed to be relevant' to substantiate its

4    important interests," and the Court "may consider 'the legislative history of the

5    enactment as well as studies in the record or cited in pertinent case law.'" *Fyock*,

6    779 F.3d at 1000 (quotations omitted).  Such "evidence need only 'fairly support[]'

7    [the government's] conclusions." *Pena*, 898 F.3d at 982 (quotation omitted).

8        "It is beyond question that the government's interest in promoting public

9    safety and reducing gun violence is important or substantial." *Rupp*, 401 F. Supp.

10   3d at 990 (quotation omitted); *see, e.g.*, *Fyock*, 779 F.3d at 1000; *Chovan*, 735 F.3d

11   at 1135.  The AWCA satisfies intermediate scrutiny because it furthers the State's

12   important interests by restricting a particularly dangerous subset of firearms that

13   pose an acute danger to the public and law enforcement.

### (1) The Prohibited Features Enhance the Lethality and Criminal Utility of Already Dangerous Firearms

16        The features listed in California Penal Code section 30515(a) are not merely

17   "cosmetic," as suggested by one of Plaintiffs' declarants.  *See* Kapelsohn Decl.

18   ¶ 38.  Indeed, if they were, Plaintiffs would have no claim that the AWCA violates

19   the Second Amendment.  To the contrary, each of the prohibited features enhances

20   the ability of rifles, pistols, and shotguns to serve specific, combat-oriented

21   functions, which increase the lethality of those weapons and make them more

22   effective in certain types of crime, such mass shootings and standoffs with law

23   enforcement personnel.  *See* Graham Decl. ¶¶ 28-62; DX-21 at 421; DX-5 at 72

24   ("[T]he features that characterize a semiautomatic weapon as an assault weapon are

25   not merely cosmetic, but do serve specific, combat-functional ends.").  Those

26   features are found on many of the assault weapons listed in California Penal Code

27   section 30510.  Graham Decl. ¶ 18.

28

1    Contrary to Plaintiffs' suggestion that the prohibited features make assault

2    weapons "better and safer for lawful use," Pls.' Mem. at 27, the State has already

3    weighed the competing interests, and its decision to restrict firearms based on the

4    prohibited features is supported by the evidence. *Rupp*, 401 F. Supp. 3d at 993

5    (noting that "[p]laintiffs miss the point" in arguing that the AWCA is depriving the

6    public of more accurate rifles because "[s]emiautomatic rifles with non-fixed

7    magazines, along with the other enumerated features, are incredibly effective

8    killing machines," and "California has permissibly weighed [the self-defense]

9    interests against the weapons' propensity for being used for mass violence");

10   *NYSRPA*, 804 F.3d at 262 (noting that the contention that "these features improve a

11   firearm's 'accuracy,' 'comfort,' and 'utility'" is "a milder way of saying that these

12   features make the weapons more deadly").  As discussed below, each of the

13   prohibited features renders already dangerous firearms more lethal and more

14   concealable, and thus more useful in crime.

15                        (a)   **Detachable Magazines**

16   The capability to accept detachable magazines is a threshold requirement for

17   certain rifles and pistols to qualify as an assault weapon, Cal. Penal Code

18   § 30515(a)(1), (4), and it is sufficient to designate a shotgun as an assault weapon,

19   *id.* § 30515(a)(7).  That feature renders a semiautomatic weapons "capable of

20   killing or wounding more people in a shorter amount of time."  DX-1 at 7.

21   Additionally, a pistol capable of accepting a detachable magazine at some location

22   other than the pistol grip, Cal. Penal Code § 30515(a)(4)(D), can help a shooter

23   reload a pistol quicker and maintain aim during rapid fire.  Graham Decl. ¶ 29.

24   A weapon lacking a fixed magazine is also capable of accepting detachable

25   *LCMs*, which "allow a shooter to fire more than ten rounds without having to pause

26   to reload."  *Kolbe*, 849 F.3d at 125.  LCMs "are particularly designed and most

27   suitable for military and law enforcement applications" and "are a feature common,

28   but not unique, to the banned assault weapons, many of which are capable of

accepting magazines of thirty, fifty, or even 100 rounds." *Id.*  LCMs "are indicative of military firearms."  DX-3 at 38.  Shotguns capable of firing more than five shotgun rounds without reloading, such as those with a revolving cylinder, are also indicative of military arms.  *See* DX-10 at 268-69 (discussing drum magazines).

Detachable magazines, and especially detachable LCMs, are not necessary to engage in effective self-defense.  On average, approximately two rounds—far fewer than the number of rounds that can be fired with LCMs—are fired when a firearm is used in self-defense.  *See* Allen Decl. ¶¶ 15, 22.  On the other hand, the use of LCM-equipped firearms in mass shootings results in a substantially greater number of fatalities and injuries than mass shootings not involving LCMs (27 vs. 9), and especially when LCMs are used in conjunction with assault weapons (43 vs. 8).  *See id.* ¶¶ 33-34; *see also* Klarevas Decl. ¶ 17 (discussing higher death toll for gun massacres involving LCMs).  LCMs also feature prominently in gun violence against law enforcement, as LCM-equipped assault weapons can enable a shooter to engage law enforcement in prolonged standoffs, and such weapons fire ammunition that is capable of penetrating police body armor.  *See* Graham Decl. ¶¶ 22-23, 41.

(b)  **Fixed LCMs**

Certain rifles and pistols qualify as assault weapons if they have fixed LCMs.  Cal. Penal Code § 30515(a)(2), (5).  As discussed, LCMs are uniquely dangerous firearm accessories that are not necessary for self-defense, pose a threat to public safety even when used in self-defense, cause more death and injury when used in mass shootings, and are used frequently in gun violence against law enforcement personnel.  Even if an LCM is incorporated into a rifle or pistol as a fixed magazine, the weapon would still be capable of firing repeatedly without needing to reload.  And rifles and pistols can be modified to allow a shooter to reload a fixed magazine nearly as quickly as a detachable magazine.  Graham Decl. ¶ 42.

Every federal circuit court to have considered 10-round magazine limits (six thus far) has upheld them under the Second Amendment.  *See supra* Section II at

pp. 8-9 (citing cases); *see also ANJRPC*, 910 F.3d at 122-23.  *But see Duncan*, 366 F. Supp. 3d at 1182-83 (holding that California Penal Code section 32310 violates the Second Amendment).  *Duncan* did not address the constitutionality of restrictions on fixed LCMs in certain assault weapons.  Even if it is ultimately held that California cannot limit magazines to ten rounds, constitutional applications of California Penal Code section 30515(a)(2) and (a)(5) would remain—*e.g.*, semiautomatic, centerfire rifles *with a fixed LCM* and one or more of the features listed in the AWCA.

(c) <b>Pistol Grips, Thumbhole Stocks, or Barrel Shrouds</b>

Certain rifles, pistols, and shotguns can qualify as assault weapons if they have pistol grips (either beneath the action or located in a forward position) or thumbhole stocks.  Cal. Penal Code § 30515(a)(1)(A), (1)(B), (1)(F), (4)(B), (6)(B).  Both features enable a shooter to maintain accuracy during repeated firing.  A pistol grip "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing," and a thumbhole stock allows for a similar grip.  *See* Graham Decl. ¶¶ 28-30.  Pistol grips can help counteract muzzle rise during repeated firing, and a forward pistol grip can similarly help a shooter stabilize a weapon during repeated semiautomatic fire.  *Id.*; DX-3 at 38 ("[Pistol] grips were designed to assist in controlling machineguns during automatic fire.").  A pistol grip can enable a shooter to maintain aim and even fire while reloading a detachable magazine.  Graham Decl. ¶ 29.  A forward pistol grip on any firearm can also help insulate the non-trigger hand from heat during rapid fire.  *Id.* ¶ 53.  As with forward pistol grips, a "barrel shroud" on assault pistols, Cal. Penal Code § 30515(a)(4)(C), "serve a combat-functional purpose" by cooling the barrel and insulating the non-trigger hand during rapid fire.  DX-5 at 73.

1

2

(d)   **Folding or Telescoping Stocks and Rifles Shorter than 30 Inches**

Certain rifles and shotguns may qualify as an assault weapon if they have an adjustable stock.  Cal. Penal Code § 30515(a)(1)(C), (6)(A).  A folding or telescoping stock enhances the portability and concealability of a rifle.  *See* Cal. Code Regs. tit. 11, § 5471(nn), (*oo*).  As described by ATF, the "predominant advantage" of a folding or telescoping stock "is for military purposes, and it is not normally found on the traditional sporting rifle."  DX-3 at 38.  Moreover, in military and law enforcement contexts, an adjustable stock may enable law enforcement personnel to conduct room-to-room searches and maintain the element of surprise.  Graham Decl. ¶ 32.  As with adjustable stocks, semiautomatic centerfire rifles with lengths of less than 30 inches, Cal. Penal Code § 30515(a)(3), are more concealable and may allow a shooter to smuggle a rifle undetected in public.  Graham Decl. ¶¶ 43, 59; DX-8 at 193, ¶ 10.

(e)   **Flash Suppressors**

A flash suppressor is a listed feature in the definition of an assault rifle.  Cal. Penal Code § 30515(a)(1)(E).  A flash suppressor is a device attached to the muzzle of a rifle to reduce the flash emitted upon firing.  Cal. Code Regs. tit. 11, § 5471(r).  It is a standard feature of the M-16 that can aid a shooter to maintain accurate, rapid fire in low-light conditions, and can also counteract "muzzle climb" during rapid fire.  DX-3 at 39; Graham Decl. ¶ 37.  A flash suppressor can help conceal the shooter's position, especially at night.  DX-3 at 39; Graham Decl. ¶ 37.

(f)   **Threaded Pistol Barrels**

A semiautomatic, centerfire pistol without a fixed magazine qualifies as an assault weapon if it has a threaded barrel capable of accepting a flash suppressor, forward pistol grip, or silencer.  Cal. Penal Code § 30515(a)(4)(A).  A threaded barrel enables a shooter to quickly affix militaristic features (*i.e.*, a flash suppressor, a forward pistol grip, or a silencer) to a pistol.  Graham Decl. ¶ 53.  As discussed

25

above, a flash suppressor and forward pistol grip enhance the lethality or concealability of a firearm.  And a silencer can be affixed to a pistol to reduce the sound it emits upon firing, which can help a shooter maintain a tactical advantage by concealing the shooter's position or the fact that a shot was even fired.  *Id.* (noting Virginia Beach workplace shooting that involved a silencer-equipped handgun).  Silencers are not protected by the Second Amendment, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("[B]ecause silencers are not 'bearable arms,' they fall outside the Second Amendment's guarantee."), *cert denied*, 139 S. Ct. 2690 (June 10, 2019), so prohibiting threaded barrels capable of accepting a silencer would not burden conduct protected by the Second Amendment.

Notably, Plaintiffs offer no evidence that a threaded barrel is needed for self-defense, nor do they provide evidence that a flash suppressor, forward pistol grip, or silencer *on a pistol* serves any legitimate self-defense function.  Applying the AWCA to pistols with threaded barrels ensures that non-assault pistols cannot be quickly converted into more dangerous assault weapons and returned to non-assault status, which would render the AWCA's assault-pistol restrictions less effective. *See Fyock*, 779 F.3d at 1000 (noting that intermediate scrutiny requires a showing only "that [the regulation] promotes a 'substantial government interest that would be achieved less effectively absent the regulation'" (quotation omitted)).

(g)   **Grenade or Flare Launchers**

A semiautomatic, centerfire rifle without a fixed magazine qualifies as an assault rifle if it is equipped with a grenade launcher or a flare launcher.  Cal. Penal Code § 30515(a)(1)(D).  Neither serve any legitimate civilian need on a rifle.  Graham Decl. ¶¶ 34-35.  A grenade launcher is a destructive device under the National Firearms Act, Kapelsohn Decl. ¶ 32, and while a flare launcher may serve legitimate safety and rescue purposes "on ships and other watercraft," *id.*, there is no legitimate civilian need to launch flares from a rifle.  Graham Decl. ¶ 35.

**(2)** **Assault Weapons Are Used Disproportionately in Crime, Mass Shootings, and Against Law Enforcement, Resulting in More Causalities**

In passing the federal assault weapons ban, Congress found that "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder." DX-5 at 67. It further found that "[t]he carnage inflicted on the American people [by] criminals and mentally deranged people armed with . . . semi-automatic assault weapons has been overwhelming," and the use of those weapons by "criminal gangs, drug-traffickers, and mentally deranged persons continues to grow." *Id.* at 67. Assault weapons are used disproportionately in crime. *Id.*; Klarevas Decl. ¶ 16; Donohue Decl. ¶ 115. Generally, assault weapons and semiautomatic weapons with LCMs account for 22 to 36 percent of crime guns, and "appear to be used in a higher share of firearm mass murders (up to 57% in total)," DX-20 at 387, far greater than their prevalence in the market, *see* Klarevas Decl. ¶ 16. Such weapons are also used disproportionally against law enforcement personnel. DX-20 at 387, 393 (finding that 13 to 16 percent of guns used in the murder of police are assault weapons); *see also* DX-22 at 457; Donohue Decl. ¶ 117. Victims of assault-weapons generally suffer more extensive and more numerous gunshot wounds, resulting in higher morbidity and mortality than victims of other weapons. *See* Colwell Decl. ¶¶ 9, 12; DX-23 at 484 (discussing cavitation of small-caliber bullets from M-16 and AK-47 rifles).

When used in mass shootings, assault weapons cause substantially more fatalities and injuries than non-assault weapons. *Gallinger*, 898 F.3d at 1019 ("[W]hen 'assault weapons and large capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines.'" (quoting *Kolbe*, 849 F.3d at 127)); *Rupp*, 401 F. Supp. 3d at 991 (citing DX-19 at 380); DX-24 at 501 ("Strong empirical evidence shows that weapon choice affects lethality."). The use of assault weapons in public mass

27

shootings involving four or more fatalities has resulted in an average of 38 fatalities or injuries compared to 10 without assault weapons, *see* Allen Decl. ¶ 31—a 280 percent increase in average casualties.[18]  The disparity is more pronounced when comparing public mass shootings with assault weapons *and LCMs* (an average of 43 fatalities or injuries) with mass shootings not involving assault weapons or LCMs (an average of 8 fatalities or injuries), *id.* ¶ 34—an approximately 440 percent increase.  This correlation holds when examining mass shootings involving six or more fatalities (regardless of the location of the shooting).  *See* Klarevas Decl. ¶ 17 (finding a 159 percent increase in casualties in the past ten years).

Notably, in *Rupp v. Becerra*, one of the plaintiffs' proffered expert witnesses, Gary Kleck, acknowledged that assault weapons correlate with greater casualties. DX-25 at 522:21-523:7 (agreeing with Professor Donohue), 524:20-24 (agreeing with Lucy Allen).  Mr. Kleck acknowledged that "'a correlation between the use of assault weapons and the number of victims injured or killed' makes it '[m]ore likely' that there is a causal relationship." *Rupp*, 401 F. Supp. 3d at 993 (quoting DX-25 at 521:15-16).  Such correlative evidence is sufficient to show a reasonable fit under intermediate scrutiny.  *See id.* ("Even assuming there is not direct *causal* evidence between mass shootings and higher casualty rates and rifles within the scope of the AWCA, California is entitled to make 'reasonable inferences' from the available data that shows a correlation." (quoting *Worman*, 922 F.3d at 40)); *S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (upholding LCM restrictions based on "a very high correlation between mass shootings and the use of [LCMs]"); *see also Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1002 (9th Cir. 2007) (upholding law under First Amendment based on "studies and reports, reported court decisions,

---

[18] This analysis was based on 161 public mass shootings since 1982, involving four or more fatalities (excluding the shooter), that were identified by the following four sources:  Mother Jones, the Citizens Crime Commission of New York City, the Washington Post, and the Violence Project.  *See* Allen Decl. ¶¶ 25, 26 n.27 & app. B.

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (19-cv-1537 BEN-JLB)

and anecdotal testimony" supporting a "correlation between adult establishments and negative secondary effects" under intermediate scrutiny).

### (3)   The AWCA Furthers the State's Important Public Safety Interests

Restricting the possession of assault weapons has had and will continue to have a significant impact on public safety.  Evidence shows that assault weapons restrictions are effective in reducing gun violence, particularly violence associated with mass shootings.  DX-26 at 529.  For example, the federal assault weapons ban was effective in reducing the prevalence of the banned assault weapons in gun crime.  DX-20 at 393; Donohue Decl. ¶ 119.  The federal ban was also effective in reducing the incidence and lethality of mass shootings.  *See* Klarevas Decl. ¶¶ 23-24 & tbl. 3 (finding a 37 percent decline in gun massacres during the federal ban, and a 49 percent decline in gun-massacre fatalities, followed by a 183 percent increase in gun massacres after its expiration, and a 209 percent increase in gun-massacre fatalities).  This trend has been replicated in states that have enacted assault-weapon restrictions, like California.  *Id.* ¶ 27; DX-26 at 531.

In prohibiting law-abiding citizens from acquiring assault weapons, the AWCA is reasonably fitted to the State's important public-safety interests.  Contrary to the view of John Lott, who claims that prohibitions do not stop criminals from acquiring assault weapons, Lott Decl. ¶¶ 10-12, mass shooters purchased their firearms legally or stole them from individuals who did so, *see* Allen Decl. ¶ 38; Donohue Decl. ¶¶ 123, 131-33; *see also Worman*, 922 F.3d at 40.

### B.   Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

Plaintiffs have not, and cannot, establish that they will suffer any irreparable harm in the absence of preliminary injunctive relief.  Plaintiffs' mere assertion of constitutional claims is not dispositive on this factor, even if they could establish a likelihood of success on the merits (which they have not).  *See Hohe v. Casey*, 868

1    F.2d 69, 73 (3d Cir. 1989) (noting that "[c]onstitutional harm is not necessarily

2    synonymous with the irreparable harm necessary for issuance of a preliminary

3    injunction" even in the First Amendment context (citing *City of Los Angeles v.*

4    *Lyons*, 461 U.S. 95, 112-13 (1983))).  And, Plaintiffs cannot show that *each*

5    challenged provision of the AWCA will harm them (let alone irreparably) in the

6    absence of an injunction.

7          As has been the case since the enactment of the AWCA decades ago, the

8    individual Plaintiffs are free to arm themselves with other weapons, including non-

9    assault rifles, pistols, or shotguns, to engage in lawful self-defense.  They may arm

10   themselves with semiautomatic, rimfire rifles, or semiautomatic, centerfire rifles

11   that do not have any of the militaristic features of an assault rifle.  In restricting

12   access to a uniquely dangerous subset of military-grade firearms, the AWCA will

13   not irreparably harm Plaintiffs during this litigation.

14         Plaintiffs also cannot show irreparable harm because they waited an inordinate

15   amount of time before seeking a preliminary injunction.  The challenged provisions

16   of the AWCA have been in effect since 2000.  If Plaintiffs' purported injuries were

17   truly irreparable, they should have sought injunctive relief long ago.  Instead,

18   Plaintiffs waited until August of 2019 to commence this action, nearly twenty years

19   after the enactment of the challenged provisions in the AWCA and nearly ten years

20   after the Supreme Court incorporated the Second Amendment right against the

21   states.  *See McDonald*, 561 U.S. at 790.  And they waited an additional four months

22   after commencing this action to file their motion for a preliminary injunction.  *See*

23   *Wiese v. Becerra*, No. 2:17-cv-903-WBS-KJN, 2017 WL 2619110, at *2 (E.D. Cal.

24   June 16, 2017) (denying preliminary injunction motion because plaintiffs failed to

25   "immediately move[] for a preliminary injunction upon filing suit"); *see also*

26   *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)

27   ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of

28   urgency and irreparable harm.").  In fact, Plaintiffs' original complaint did not even

1  challenge many of the provisions they now claim are causing irreparable harm.[19]

2  Plaintiffs' ability to retain firearms for lawful purposes and their inexplicable delay

3  in seeking a preliminary injunction demonstrate that Plaintiffs will not be

4  irreparably harmed if this case proceeds without a preliminary injunction.

5

6  **C.   The Balance of the Equities and the Public Interest Both Weigh Against Preliminary Injunctive Relief**

7  A district court "must balance the competing claims of injury and consider the

8  effect" of the requested relief, paying "particular regard for the public consequences

9  in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24

10  (quotation omitted).  The balance of the equities and the public interest "merge

11  when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435

12  (2009).  Indeed, "[t]he Ninth Circuit instructs that when balancing the hardships 'of

13  the public interest against a private interest, the public interest should receive

14  greater weight.'" *Rupp v. Becerra*, No. 17-cv-00746-JLS-JDE, 2018 WL 2138452,

15  at *13 (C.D. Cal. May 9, 2018) (quotation omitted).

16  Plaintiffs cannot demonstrate that it is in the public interest to enjoin a duly-

17  enacted law designed to protect the public from gun violence that has been in effect

18  for two decades; with human lives on the line, the stakes for public safety are just

19  too high, especially where five federal circuit courts have found that assault

20  weapons pose an acute public-safety risk.  *See United States v. Masciandaro*, 638

21  F.3d 458, 475-76 (4th Cir. 2011) (cautioning that "miscalculat[ion] as to Second

22  Amendment rights" could lead to an "unspeakably tragic act of mayhem");

23  *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers) ("[A]ny time

24

25  _____

[19] Since filing their motion, Plaintiffs have claimed that "[t]his case became
necessary" after the Legislature enacted Senate Bill 880 in 2016 to close the "bullet
button" loophole. Dkt. 30 at 2.  That amendment did not create the features-based
definition or the various enforcement statutes challenged in this case, and Plaintiffs
barely mentioned it in the First Amendment Complaint or in the materials
supporting their motion.  In any event, Plaintiffs waited more than *three years* after
the enactment of Senate Bill 880 to seek a preliminary injunction.

1   a State is enjoined by a court from effectuating statutes enacted by representatives
2   of its people, it suffers a form of irreparable injury." (quotation omitted)).  Here, the
3   State's injury would be compounded by the fact that the AWCA has been in place
4   for two decades; enjoining it now on a preliminary record would wreak havoc on
5   California's gun-safety laws and cause potentially irreversible harm if the AWCA is
6   eventually upheld.  *See* Graham Decl. ¶¶ 72-77.  Accordingly, the law, the balance
7   of harms, and the public interest all weigh decisively a preliminary injunction here.

8
9   **IV.  THE COURT SHOULD STAY ENFORCEMENT OF ANY PRELIMINARY INJUNCTION PENDING AN INTERLOCUTORY APPEAL**

10      Although Plaintiffs' motion should be denied for the reasons stated above, if
11  the Court is inclined to grant the motion for any reason, either in whole or in part,
12  Defendants request that the Court also issue an immediate stay of enforcement of
13  any preliminary injunction to preserve the status quo during any subsequent
14  interlocutory appeal.  In *Duncan*, this Court entered a stay of the judgment to
15  preserve the status quo pending the Attorney General's appeal, recognizing that
16  "[t]here is immeasurable societal benefit of maintaining the immediate status quo
17  while the process of judicial review takes place."  *Duncan*, 2019 WL 1510340, at
18  *2-3.  As in *Duncan*, the four factors that the courts consider in determining
19  whether to stay an order or judgment pending appeal would weigh in favor of a
20  stay.  *See id.* at *2.  To effectively preserve the status quo pending appeal, an
21  *immediate* stay would be necessary, without further motion practice, to prevent the
22  influx of new assault weapons in the interim between the issuance of any
23  preliminary injunction and the entry of a stay.  A stay is especially appropriate here
24  because the Ninth Circuit will be considering the issues presented in this case
25  shortly in *Rupp*.  *See supra* note 1.

26                              **CONCLUSION**
27      For the foregoing reasons, and particularly to preserve the status quo, the
28  Court should deny Plaintiffs' motion for a preliminary injunction of the AWCA.

1   Dated:  January 23, 2020                       Respectfully Submitted,

2                                           XAVIER BECERRA

3                                           Attorney General of California
MARK R. BECKINGTON

4                                           Supervising Deputy Attorney General
PETER H. CHANG

5                                           Deputy Attorney General

6

7                                           s/ John D. Echeverria

8                                           JOHN D. ECHEVERRIA
Deputy Attorney General

9                                           *Attorneys for Defendants Xavier*

10                                           *Becerra, in his official capacity as*
*Attorney General of the State of*
*California, and Brent E. Orick, in his*

11                                           *official capacity as Interim Director*
*of the Department of Justice Bureau*

12                                           *of Firearms*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (19-cv-1537 BEN-JLB)