XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (916) 731-2124
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in
his official capacity as Attorney General of
the State of California, and Brent E. Orick,
in his official capacity as Interim Director of
the Department of Justice Bureau of
Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **JAMES MILLER, et al.,** | 19-cv-1537 BEN-JLB |
| Plaintiffs, | |
| v. | **DECLARATION OF PROFESSOR JOHN J. DONOHUE IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,** | |
| Defendants. | |

## DECLARATION OF PROFESSOR JOHN J. DONOHUE

I, John J. Donohue, declare:

1.    I am a professor and researcher, who has written extensively on crime, guns, and the impact of gun policies.  I make this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction.  This declaration is based on my own personal knowledge and experience, and if called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

2.    I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School.  (A copy of my complete cv is attached as Exhibit A.)  After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986.  I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School.  I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), and Renmin University (Beijing).

3.    At Stanford, I regularly teach a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland, and will teach such a course at the Universidad del Rosario in Bogota, Colombia in June 2020.

4.    Since gun crime is such an important aspect of overall American crime, my courses evaluate both the nature of gun regulation in the United States

1    and the impact of gun regulation on crime.  This topic is an important part of my

2    research, about which I have published extensively (as reflected in my c.v.).  I have

3    also consistently taught courses on law and statistics for two decades.

4         5.    I am a Research Associate of the National Bureau of Economic

5    Research, and a member of the American Academy of Arts and Sciences.  I was a

6    Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and

7    served as the co-editor (handling empirical articles) of the American Law and

8    Economics Review for six years.  I have also served as the President of the

9    American Law and Economics Association and as Co-President of the Society of

10   Empirical Legal Studies.

11        6.    From 2011-2018, I served on the Committee on Law and Justice of the

12   National Research Council ("NRC"), which "reviews, synthesizes, and proposes

13   research related to crime, law enforcement, and the administration of justice, and

14   provides an intellectual resource for federal agencies and private groups."  (See

15   http://www7.national-academies.org/claj/ online for more information about the

16   NRC.)

17        7.    I filed an expert declaration in each of two cases challenging city

18   restrictions on the possession of large-capacity magazines:  *Fyock v. City of*

19   *Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San*

20   *Francisc*o, United States District Court (N.D. Cal.), January 2014.

21        8.    I also filed an expert declaration in a case involving a challenge to

22   Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v.*

23   *O'Malley*, United States District Court (District of Maryland), February 2014. I

24   filed an expert declaration, and provided expert testimony, in response to a motion

25   for a preliminary injunction in a case involving a challenge to New Jersey's

26   restrictions on large-capacity magazines in *Association of New Jersey Rifle & Pistol*

27   *Clubs, Inc. v. Grewal*, No. 3:18–cv–10507–PGS–LHG (D.N.J.)

28

9.     In all these cases, the relevant gun regulations were sustained in the district courts and upheld on appeal.

10.     I also submitted, on June 1, 2017, an expert declaration in a case involving a challenge to California's restrictions on carrying of weapons in public in *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS; expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, United States District Court (S.D. Cal.), Case No. 17-cv-1017-BEN-JLB, and *Weise v. Becerra*, United States District Court (E.D. Cal.), Case No. 2:17-cv-00903-WBS-KJN; and expert declarations on October 25, 2018 and November 21, 2018 in *Rupp v. Becerra*, Case No. 8:17-cv-00746-JLS-JDE, a case challenging California's restrictions on rifles classified as assault weapons.

11.     Finally, I filed an expert declaration in October 2018 in a case involving a challenge to Vermont's restrictions on large-capacity magazines in *Vermont Federation of Sportsmen's Clubs v. Birmingham*, No. 224-4-18 Wncv (Vermont Superior Court, Washington Unit).

## SUMMARY OF CONCLUSIONS

12.     The problem of public mass shootings in the United States is a serious and worsening national problem that imposes substantial burdens on the American public far beyond the growing numbers of dead and injured victims that are besieged every year. Since so many of these shootings are committed (or made possible) by previously law-abiding citizens with no basis under current law to prevent them from possessing firearms and since such a large proportion of the mass shooters die in the course of their deadly massacres, improved background checks and increased criminal penalties alone cannot fully address this growing problem.  Moreover, the empirical evidence indicates that another possible policy response – allowing increased gun carrying by the untrained public – rarely

1   generates any benefit by stopping public mass shootings and is indeed self-

2   defeating since it generates substantial increases in violent crime.[1]

3       13.    It is a sound, evidenced-based, and longstanding harm-reducing

4   strategy virtually uniformly embraced throughout the developed world for

5   governments to place constraints on weaponry that exceeds a certain level of

6   deadliness that is inappropriate for civilian use because of its substantial social cost.

7   Restrictions on weaponry most suitable for battlefield use (and unsuitable for

8   civilian self-defense) – such as those prohibited under California's assault weapons

9   ban – sit comfortably in this appropriate regulatory approach and can be expected to

10  reduce deaths and injury from gun violence.  Indeed, gun massacres fell

11  substantially during the ten years of the federal assault weapons ban, and then rose

12  sharply when the ban was lifted in 2004.  FBI data show that the problem of active

13  shooters inflicting mayhem on the public has been rising substantially since the end

14  of the federal assault weapons ban.

15      14.    One of the factors that led to the selection of assault rifles for use by

16  the U.S. military was that they could generate such devastating and lethal wounds

17  on the battlefield. This very fact underscores why any serious effort to reduce the

18  death toll and the proliferation of the damaging wounds from mass shootings would

19  seek to remove these weapons from the arsenal available to those who would turn

20  them on the public.

21      15.    Bans on assault weapons have little or no effect on the ability of

22  individuals to possess weapons for self-defense in the home but should have a

23  restraining impact on the effectiveness of those who have the criminal intent to kill

24  as many individuals as possible.  The assault weapons ban is thus well-tailored to

25  limit the behavior of criminals engaging in the most dangerous forms of violent

---

[1] See Donohue, John, Abhay Aneja, and Kyle Weber, 2019, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

criminal behavior, without impairing the defensive capabilities of law-abiding citizens.    Indeed, these weapons can injure or kill third parties hundreds of yards away, when the necessary range for self-defense in the home is usually measured in feet.  Moreover, to the extent these weapons impose greater risks to law enforcement, one would expect that their presence would encumber and endanger police, while diminishing police effectiveness in ways that would put upward pressure on crime generally.

16.    The empirical evidence supports the conclusion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States.  California's ban on assault weapons is one tool in the important governmental effort to reduce the likelihood that Californians will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip themselves with weapons that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

17.    Most Americans do not own guns, and most Americans who do own guns do not own assault weapons.  Both statements are particularly true for Californians.

18.    The fact that most Americans favor bans on assault weapons underscores the fact that only a relatively small minority of Americans owns or values these weapons.

19.    The current level of assault weapons in circulation in the nation has no bearing on the ability of the state of California to address the socially damaging and worsening problem of public mass shooting. A federal ban on assault weapons did, and could in the future, significantly curtail mass shooting deaths by limiting the number of assault weapons in circulation.

**OPINIONS**

20.     While the precise number of Americans who own assault weapons nationally is uncertain,[2] it is clear that most gun-owners do not possess these types of weapons.  First of all, most Americans do not own guns – 70-75 per cent of adults do not own any firearm according to recent survey data.[3]

21.     Second, since assault weapons are only a small fraction of the overall gun supply in the United States, it is clear that most Americans who do own guns do not own assault weapons.  Both statements are particularly true for Californians, where only 1 in 7 adults (roughly 14 percent) owns a gun, and of course far fewer have grandfathered assault weapons.[4]

22.     The fact that a substantial majority of Americans favor bans on assault weapons underscores the fact that only a relatively small minority of Americans owns these weapons, and that most Americans recognize that assault weapons are not important to their self-defense.

23.     The support for bans on assault weapons has remained consistently strong over the last five years.  A poll conducted for the New York Times from June 17-20, 2016 among a national sample of 1975 registered voters found that 67 percent of Americans favored such a ban. Importantly, the New York Times also

---

[2] Kate Irby, "Nobody knows exactly how many assault rifles exist in the U.S. – by design," *McClatchy*, February 23, 2018, https://www.mcclatchydc.com/news/nation-world/national/article201882739.html. References to the number of guns manufactured in or imported into the U.S. are misleading since they fail to distinguish between guns provided to the military or guns subsequently transported, legally or illegally, to other countries.  We know that the U.S. is a major supplier of assault weapons to drug gangs in Mexico, Brazil, and throughout Latin America.

3 Lydia Saad, What Percentage of Americans Own Guns? https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx; https://www.washingtonpost.com/news/monkey-cage/wp/2018/05/07/americans-vastly-overestimate-the-number-of-gun-owners-thats-a-problem/.

[4] Andrew Sheeler, "Gun control isn't stopping Californians from owning firearms, new study says," The Sacramento Bee, December 6, 2019, (https://www.sacbee.com/news/california/article238113499.html).

6

polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy" to ask them what measures would be most effective in dealing with America's mass shooting problem, and an assault weapons ban was deemed overall by this panel to be the single most effective measure.[5]

24.     Less than a year later, a Pew Research Center survey among 3,930 adults (conducted from March 13-27 and April 4-18, 2017) again showed broad opposition to assault weapons.[6]

25.     The Pew survey results released on October 18, 2018 again showed that 67 percent of Americans favored bans on assault weapons and on high-capacity magazines.[7]  The same Pew survey based on interviews from September 3 – 15, 2019 showed that 69 percent of Americans supported a ban on assault weapons.[8]

**Weapons Restrictions Have Historically Followed Growing Criminal Abuse**

26.     Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. This makes sense because it is not always clear at the outset which inventions will

---

[5] The list of 32 academics included not only me, but also many strong gun-rights supporters, including John Lott, who is Plaintiffs' proffered expert in this case, Gary Kleck, David Kopel, Carlisle E. Moody, and Eugene Volokh. See, Margot Sanger-Katz And Quoctrung Bui, "How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws," *New York Times*, October 5, 2017, https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html.

[6] Ruth Igielnik and Anna Brown, "Key takeaways on Americans' views of guns and gun ownership," Pew Research Center, June 22, 2017, http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/.  The authors noted that this poll was conducted *prior* to two of the five deadliest mass shootings in modern US history, which occurred in October and November of 2017: "a staggering [59] people were killed and more than 500 were hurt when [Steven Paddock] opened fire on a Las Vegas concert and at least 26 people were killed in a Texas church" only five weeks later.

[7] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

[8] Katherine Schaeffer, "Share of Americans who favor stricter gun laws has increased since 2017," https://www.pewresearch.org/fact-tank/2019/10/16/share-of-americans-who-favor-stricter-gun-laws-has-increased-since-2017/ (October 16, 2019).

7

lead to adverse impacts on public safety.  Frequently, the dangers of products and practices fly below the radar until their proliferation generates sufficient social damage to enable the public and the scientific community to become aware of the full extent of their social harm.

27.     The first group of state restrictions on weapons deemed inappropriate for civilian use were adopted in the 1920s and 1930s after weapons like the Tommy gun became a preferred weapon for gangsters.[9]  More recently, the sharp increases in crime in the 1980s as more powerful weaponry started to proliferate led to a second round of restrictions limiting magazine capacity and banning assault weapons, including the now expired ten-year federal assault weapons ban of 1994-2004.[10]  State restrictions continued to be adopted following the expiration of the federal ban, often in direct response to public mass shootings.

**The Problem of Public Mass Shootings in the United States Is Serious**

28.     Any discussion of assault weapons must address the tragic problem of public mass shootings. While some diminish the importance of governmental action to address this problem by arguing that the deaths from mass shootings are only a relatively small portion of the total homicides in the United States, this point is misguided for three reasons:   the deaths and injuries caused by mass shootings are increasing at an alarming pace, the social harm from these traumatic events is far larger than the mere numerical casualty counts, and the incessant efforts to enhance the deadliness of firearms to increase gun sales means that, if this deadly arms race is not restrained, mass shootings with deaths of many hundreds of individuals may well be our fate.  This growing menace cannot be effectively addressed without concerted and effective governmental action, including bans on assault weapons and high-capacity magazines.  I discuss these issues further below.

---

[9] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68 (2017).
[10] *See* 1990 N.J. Sess. Law Serv. 32 (West); Haw. Rev. Stat. Ann § 34–(8);  Pub. L. 103–322, § 110103 (Sep. 13, 1994).

**The Growing Problem of Public Mass Shootings**

29.     Although the long-term secular trend in overall crime has been benign over the last 25 years, the opposite is true for the trend in public mass shootings. As the Third Circuit stated in upholding New Jersey's restrictions on high-capacity magazines, "plaintiffs attempt to discount the need for [governmental weaponry restrictions] by describing mass shootings as rare incidents" gives insufficient weight "to the significant increase in the frequency and lethality of these incidents." Association Of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey (3d Cir., December 5, 2018).

30.     According to a report of the Congressional Research Service, there were an average of 2.7 events public mass shootings per year in the 1980s rising to an average of 4.5 events per year from 2010 to 2013.[11] Since then things have only gotten worse.

31.     Writing in May 2018, Louis Klarevas, an Associate Lecturer of Global Affairs at the University of Massachusetts–Boston, noted:

>  "Last week's school shooting in Texas marks a new milestone in American history. It's the first time we have ever experienced four gun massacres resulting in double-digit fatalities within a 12-month period. In October 2017, [59] were killed at a concert in Las Vegas. A month later, 26 were killed at a church in Sutherland Springs, Texas. Earlier this year, 17 people lost their lives at a high school in Parkland, Fl. And to this list we can now add the 10 people who lost their lives at a high school in Santa Fe, Texas."[12]

---

[11] William J. Krouse & Daniel J. Richardson, Cong. Research Serv., R44126, Mass Murder with Firearms: Incidents and Victims, 1999-2013, at 14-15 (2015), http://fas.org/sgp/crs/misc/R44126.pdf [http://perma.cc/RC4C-SP48]; Mark Follman, "Yes, Mass Shootings Are Occurring More Often," Mother Jones (Oct. 21, 2014, 5:05 am), http://www.motherjones.com/politics/2014/10/mass-shootings-rising-harvard

[12] Louis Klarevas, "After the Santa Fe massacre, bury the 'good guy with a gun' myth: Armed staffers won't deter shooters or keep kids safe," *New York Daily News*, May 22, 2018,

(continued…)

32.     In response to the growing list of gun tragedies, President Obama signed into law in 2013 the Investigative Assistance for Violent Crimes Act of 2012, which granted authority to the U.S. Attorney General to assist in the investigation of "violent acts and shootings occurring in a place of public use" and in the investigation of "mass killings and attempted mass killings."[13]

33.     To better understand the nature of these threats, the Federal Bureau of Investigation (FBI) in 2014 initiated a study of "active shooter" incidents designed to identify the prevalence of and trend in these events, how they unfolded, what brought them to an end, and other details that would be of assistance to law enforcement (Id.).[14]

34.     The latest data from the FBI underscores that the active shooter problem in the United States is growing, as illustrated in the following figure[15]:

---

http://www.nydailynews.com/opinion/santa-fe-massacre-bury-good-guy-gun-myth-article-1.4003952

[13]Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014, at 4.

[14] Note that if an active shooter bent on inflicting widespread casualties is stopped quickly enough, this incident would not appear in a count of "public mass shootings" that required, say, at least four individuals to be shot and killed, not counting the shooter (which is a standard, although not the only, definition of a mass shooting).

[15] https://www.usatoday.com/story/news/2018/06/20/fbi-most-active-shooters-dont-have-mental-illness-get-guns-legally/718283002/



**Active shooter incidents on the rise, with 2017 topping all years since 2000.**

SOURCE FBI data and the FBI's report on active shooter incidents in the United States in 2016 and 2017

35.     The ominous and steep upward trend in the FBI data charting the growth in active shooter incidents is unmistakable.  Not surprisingly, the number of mass shootings clearly is higher following the termination of the federal assault weapons ban in 2004.  Indeed, the FBI noted in its 2014 active shooter report that from 2000-2006 there were 6.4 active shooter incidents per year and that from 2007-2013 that number rose to 16.4 per year.  The mayhem accelerated in 2014 and

Declaration of Professor John J. Donohue (19-cv-1537 BEN-JLB)

2015, during which 20 incidents occurred each year,[16] and jumped further to 25 in 2016 and 30 in 2017.[17]

36.     In addition to the well-documented increase in overall public mass shootings in the United States, there has been an equally dramatic rise of these events in school settings.[18] Indeed, the authors of a recent study on mass school shootings concludes that "More people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[19] The impact of the elevated stress experienced by students and parents across the country as the reality of America's tragic mass shooting problem penetrates their consciousness is undeniable. While these horrendous gun massacres are relatively rare, each one harms tens of millions beyond those killed or wounded at the scene.

**What Public Policy Measures Can Address This Growing Menace?**

37.     Permitting "law-abiding citizens" to acquire assault weapons, as Plaintiffs urge, is not an effective public policy solution to the growing and very serious problem of mass shootings.

38.     The FBI's analysis of active shooters over age 18 found that 65 percent had no adult convictions prior to the active shooting event.[20]  In other words, most active shooters are "law-abiding citizens" in the jargon of the

---

[16]  FBI, "Active Shooter Incidents in the United States in 2014 and 2015," https://www.fbi.gov/file-repository/activeshooterincidentsus_2014-2015.pdf/view.

[17]  FBI, "Active Shooter Incidents in the United States in 2016 and 2017," https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view.

[18]Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis. Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society. *Journal of Child and Family Studies*, 2018; DOI: 10.1007/s10826-018-1096-2.

[19]Springer. "Rapid rise in mass school shootings in the United States, study shows: Researchers call for action to address worrying increase in the number of mass school shootings in past two decades." ScienceDaily. ScienceDaily, 19 April 2018. <www.sciencedaily.com/releases/2018/04/180419131025.htm>.

[20]  Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.

complaint in this case– until they launch their homicidal rampages. Moreover, the FBI report found that only a tiny fraction would have qualified as "adjudicated mental defectives" that would have been barred from possessing weapons.[21]  In other words, the lack of a basis for prohibiting gun ownership under current law for most active shooters means that tighter background checks would not have likely blocked their homicidal objectives.

39.     The Wall Street Journal analyzed data from the 32 school shootings since 1990 with at least three victims dead or injured.[22]  In 25 cases, the shooters were in their teens or younger. Of the 20 cases in which information was available, 17 of the shooters obtained their guns from their home or a relative.  In other words, teens who are not eligible to possess assault weapons may take weapons from relatives who legally possess assault weapons in the home to commit mass shootings.

40.     Nor can we hope to limit these horrific crimes by elevating the probability of apprehending mass shooters once their crime is completed since almost all mass killers are either captured, commit suicide, or are killed at the scene.[23]

41.     Indeed, it was the availability of weapons to these individuals that enabled them to initiate such deadly attacks.  Both common sense and consistent empirical evidence show that there is a strong instrumentality effect in violent

---

[21] The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. §922 (d) (4) 2016).

[22] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," (April 5, 2018), https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600

[23] According to the FBI, in 156 of the 160 episodes, the mass shooter was either captured, committed suicide (64 cases), or was killed (30 cases). Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014.  Of course, those who are captured alive are already punished as severely as the law allows, and the abundant number of mass shootings in Texas and Florida highlights the inefficacy of the death penalty in addressing this problem.

activity. Attacks with fists are less dangerous than attacks with knives which in turn are less dangerous than attacks with guns. Recent evidence has confirmed this commonsense finding one step further by showing that the enormous range of firearm lethality.

42.    A very careful study of files of 511 gunshot victims kept by the Boston Police Department revealed survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. The authors calculated that switching to less deadly firearm options could reduce the homicide rate substantially.[24]

43.    Note the contrast of a school attack in China that occurred only hours before Adam Lanza used an assault weapon armed with 30 round magazines to kill 26:  while 22 children and an adult were injured in the attack in China, no one died – a likely result, at least in part, of the attacker using a knife instead of an assault weapon.[25]

44.    In civilian life, using an assault weapon for self-defense is over-kill, as an emergency room doctor treating the pulverized victims from the Parkland shooting describes.[26]  The CBS show 60 Minutes also provided a dramatic experiment to illustrate the far more destructive impact on human tissue of being shot with an AR-15 than a handgun, as seen in the referenced video "What Makes the AR-15 so Deadly?"[27]

45.    In light of this and the limited other public policy options designed to curtail the death and injury toll from public mass shootings, an important tool in

---

[24] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber With Likelihood of Death From Gunshot Injury in Criminal Assaults," *JAMA Netw Open*. 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833.
[25] Mallory Ortberg, "Man Arrested in China After Knife Attack on Students," http://gawker.com/5968740/man-arrested-in-china-after-knife-attack-on-students.
[26] Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," The Atlantic, February 2018, https://www.theatlantic.com/amp/article/553937/
[27] https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2019-06-23/.

trying to reduce the harm these mass killers can commit is to reduce the destructive power of the weaponry that they already have or can acquire through purchase or theft, which is the central goal of California's ban on assault weapons and high capacity magazines.

46.     Public policy also disfavors civilians carrying of assault weapons for the purpose of potentially stopping public shootings, for two reasons.  First, stopping a mass shooting is a perilous endeavor and untrained individuals likely added more to the mayhem than they have been able to curtail.  Second, the best evidence suggests that increased gun carrying in the population leads to higher rates of violent crime, so the alleged remedy to the problem of mass shootings comes at a very steep price.  These points are spelled out in detail in my work estimating the impact of laws allowing citizens to carry concealed handguns on crime.[28]

47.     On the first point, an FBI study of 160 active shooter incidents found that in almost half (21 of 45) of the situations in which police engaged the shooter to end the threat, law enforcement suffered casualties, totaling nine killed and 28 wounded. One would assume the danger to an untrained permit holder trying to confront an active shooter would be greater than that of a trained professional, which may in part explain why effective intervention in such cases by permit holders to thwart crime is so rare. While the same FBI report found that in 21 of a total of 160 active shooter incidents between 2000 and 2013, "the situation ended after unarmed citizens safely and successfully restrained the shooter," there was only one case – in a bar in Winnemucca, Nevada in 2008 – in which a private citizen other than a security guard, who was armed with a handgun, stopped a shooter, and that individual was an active-duty Marine.[29]

48.     Moreover, even well-intentioned interventions by permit holders intending to stop a crime have elevated the crime count when they ended with the

---

[28] See Donohue et al, note 1, *supra*.
[29] See, id. at 8 for the details on these issues.

1  permit holder either being killed by the criminal or shooting an innocent party by

2  mistake.[30]

3       49.    On the second point, the notion of arming the populace to stop public

4  mass shootings must contend with the consequences of increasing gun carrying.

5  Here the best evidence shows that the increased gun carrying that follows from state

6  adoption of right-to-carry (RTC) laws leads to increases in violent crime of from

7  13-15 percent over the ensuing ten years.  In other words, any attempt to curtail

8  public mass shootings with more gun carrying will result in an array of unforeseen

9  and unwanted consequences ranging from more gun thefts and added burdens on

10  law enforcement to more unlawful use of weapons that on balance increases violent

11  crime substantially.[31]

12  **The Far-Reaching Costs of Public Mass Shootings**

13       50.    The large number of overall gun homicides compared with mass

14  shootings should not obscure that major public mass shootings cause profound

15  social damage.  This harm of course includes the tragic deaths and extraordinarily

16  devastating injuries, but extends far beyond these mere statistical counts of the dead

17  and injured. Public mass shootings are particularly high-visibility events that are

18  quite shocking to the public and unsettling to the sense of public safety. Horrific

19  mass shootings – such as those perpetrated by Adam Lanza at Sandy Hook School

20  (killing 26), Stephen Paddock in Las Vegas (killing 59 and shooting 422 others), or

21  by ISIS sympathizers at Inland Regional Center in San Bernardino (killing 14)[32] and

22  at Pulse in Orlando (killing 49)[33] or at various houses of worship in Charleston,

23

24      [30] See, id. at notes 15 and 16 for relevant cases of harmful interventions by permit holders.

    [31] Id.

25      [32]Christine Hauser, San Bernardino Shooting: The Investigation So Far, N.Y. Times (Dec.

26  4, 2015), http://www.nytimes.com/2015/12/05/us/san-bernardino-shooting-the-investigation-so-far.html (noting fourteen were killed in December 2015).

27      [33]Gregor Aisch et al., What Happened Inside the Orlando Nightclub, N.Y. Times (June 12,

28  2016), http://www.nytimes.com/interactive/2016/06/12/us/what-happened-at-the-orlando-nightclub-shooting.html (noting a gunman killed forty-nine in a June 2016 attack).

South Carolina (killing 9), Sutherland Springs, Texas (killing 26), and Pittsburgh, Pennsylvania (killing 11) – although small in number compared to the total number of homicides, have generated widespread apprehension and increased demand for effective responses from government.  It is abundantly clear that the horrors of a mass shooting such as the killing of 20 students and 6 teachers at Sandy Hook Elementary School in Newtown, Connecticut in December 2012 inflicted psychological distress far beyond the contours of that small community and indeed caused suffering throughout the state and indeed the entire country (and the world).

51.    A considerable scientific literature has documented the significant emotional and mental health harms that mass shootings inflict on survivors, community members, wounded victims, active responders, and children. The consistent finding of these studies is that mass shootings can lead to increased levels of post-traumatic stress disorder (PTSD), anxiety, and depression.[34] For example, on February 14, 2008, Steven Kazmierczak opened fire in a crowd of Northern Illinois University students, killing 5 people and wounding 17 more before killing himself. This shooting led to dramatic increases in the levels of post-traumatic stress (PTS) symptoms in a sample of Northern Illinois University students.[35]

---

[34] Shultz, James M., Siri Thoresen, Brian W. Flynn, et al. 2014. "Multiple Vantage Points on the Mental Health Effects of Mass Shootings." *Current Psychiatry Reports.* 16:469.  To complete this meta-analysis of the scientific literature from 2010 to early 2014, the authors searched the PUBMED, SCOPUS, PILOTS, PSYCINFO, and CINAHL databases using combinations of terms for mass shooting incidents with MeSH (Medical Subject Heading) vocabulary on mental health.

[35] Bardeen, Joseph R., Mandy J. Jumpula, and Holly K. Orcutt. 2013. "Emotional regulation difficulties as a prospective predictors of posttraumatic stress symptoms following a mass shooting." *Journal of Anxiety Disorders* 27, no.2 (March): 188-196. This longitudinal study assessed the presence of PTS symptoms in a sample of female undergraduates at Northern Illinois University at three time points: T1, the starting period (pre-shooting) (n=1,045), T2, short term post-shooting (17-100 days post-shooting, n=691), and T3, roughly 7-8 months post-shooting (n=588). In the sample of 691 students that were assessed at T1 and T2, clinically significant levels of PTS rose from 20% pre-shooting to almost 50% post-shooting.

52.      Similar findings of the broad social damage from mass shootings were also documented in three studies of the broader harm from the 2011 Norway shooting, when Anders Breivik killed 67 people and wounded at least 32. Four to five months following the shooting, survivors were six times more likely to exhibit elevated PTS symptoms compared to an age- and gender-adjusted sample derived from the overall population.[36] But the psychic trauma was not limited to the victims and survivors of mass shootings.  Two additional studies, which focused on the broader harm to the surrounding community following the Breivik shooting in Norway, found measurable increases in stress reactions in the general population, with the effects especially strong for young people with a prior history of trauma.[37]

53.      More generally, survivors of serious gunshot injuries and multiple victim incidents involving intentionally inflicted harm are at higher risk of experiencing PTS symptoms.[38]

---

[36] Dyb, Grete, Tine K. Jensen, Egil Nygaard, et al. 2014. "Post-traumatic stress reactions in survivors of the 2011 massacre on Utoya Island, Norway." *The British Journal of Psychiatry* 204, no. 5 (May): 361-367. Of the 490 survivors from the Utoya shooting invited to participate in the study, 325 agreed. Semi-structured face-to-face interviews were conducted by health personnel approximately 4-5 months after the shooting.

[37] Thoresen, Siri, Helene Flood Aakvaag, Tore Wentzel-Larsen, et al. 2012. "The day Norway cried: Proximity and distress in Norwegian citizens following, 22nd July 2011 terrorist attacks in Oslo and on Utoya Island." *European Journal of Traumatology* 3, (Nov). The study drew a representative sample from the Norwegian Population Registry. A total of 465 individuals living in Oslo and 716 individuals living in other parts of Norway were interviewed over the phone 4-5 months after the Breivik attacks.

Nordanger, Dag, Kyrre Breivik, Bente Storm Haugland, et al. 2014. "Prior adversities predict posttraumatic stress reactions in adolescents following the Oslo terror events 2011." *European Journal of Traumatology* 5, (May). The study was based on a survey of 10,220 Norwegian high school students that was conducted 7 months after the Oslo and Utoya terrorist attacks. It collected information both on adverse life experiences (e.g. exposure to sexual trauma, violence, etc.) and the exposure and reactions to the Breivik attacks.

[38] Greenspan, Arlene I., and Arthur L. Kellerman. 2002. "Physical and Psychological Outcomes 8 Months After Serious Gunshot Injury." The Journal of Trauma: Injury, Infection and Critical Care 53, no.4 (Oct): 709-716. This study interviewed 60 patients who were admitted to a Level 1 trauma center for firearm-related injuries, first, at the time of their hospitalization, and second, 8 months after they were discharged. Most respondents indicated symptoms of PTS 8-months post-discharge, with 39% reporting severe symptoms of intrusion and 42% reporting severe avoidance behaviors.

(continued…)

54.     Not surprisingly, those who have experienced previous trauma or psychological disorders are especially vulnerable to potential mental health problems after a mass shooting.[39] Moreover, children are more susceptible experiencing PTS symptoms following a mass shooting. For example, a study of 320 students who survived a mass public shooting at a Danish high school found that seven months later 35 percent of students reported PTS symptoms and 7 percent had PTSD.[40]

55.     A recent study of broad scope by Maya Rossin-Slater et al (2019) tries to estimate the impact on mental health of the over 240,000 American students who experienced and survived a school shooting in the last two decades. Using large-scale prescription data from 2006 to 2015, the authors examined the effects of 44 school shootings on youth antidepressant use in a difference-in-difference framework. Their main finding was that local exposure to fatal school shootings

Santiago, Patcho N., Robert J. Ursano, Christine L. Gray, et al. 2013. "A Systematic Review of PTSD Prevalence and Trajectories in DSM-5 Defined Trauma Exposed Populations: Intentional and Non-Intentional Traumatic Events." *PLoS One* 8, no. 4 (April). The authors identified 2,537 articles published from January 1, 1998 to December 31, 2010 and covering longitudinal studies of directly exposed trauma populations. Of these articles, they closely surveyed 58 articles that met the DSM-5 definition of having experienced a traumatic event and assessed PTSD symptoms at two or more time points within a 12-month window. The authors found that in the 5 studies with sufficient data, a median of 37.5% of individuals exposed to intentional traumatic events developed PTSD.

[39] See Shultz et al (2014), supra note 34, and Littleton, Heather, Amie E. Grills-Taquechel, Danny Axsom, et al. 2012. "Prior Sexual Trauma and Adjustment Following the Virginia Tech Campus Shooting: Examination of the Mediating Role of Schemas." *Journal of Psychological Trauma* 4, no.6 (Nov): 579-586. This study had interviewed 215 Virginia Tech college women prior to the school's mass shooting and then followed up with them two months and then one year after the shooting. The authors compared the post-shooting PTSD and depression symptoms of women with and without a history of sexual trauma.  The authors found that women who had experienced sexual trauma reported significantly higher levels of depression (p=0.006) and shooting-related PTSD symptoms (p=0.04) in the post-shooting interview.

[40] Elklit, Ask, and Sessel Kurdahl. 2013. "The psychological reactions after witnessing a killing in public in a Danish high school." *European Journal of Traumatology* 4, (Jan). Seven months after the mass public shooting, researchers administered the Harvard Trauma Questionnaire to Danish students in the second and third grade of high school (this is roughly equivalent to the final two years of high school in the US system). The questionnaire was also mailed to parents' addresses of students who had graduated in June. Of the 415 students enrolled at the time of the shooting, 320 students returned the questionnaire.

19

increased youth antidepressant use by 21.4 percent in the following two years.[41]
Given such evidence, any notion that the problem of public mass shootings in the
U.S. is relatively minor is untenable.

**Banning Assault Weapons Should Save Lives and Reduce Injuries**

56.     With only 5 percent of the world's population, the U.S. has roughly
one-third of the public mass shootings across 171 countries since the late 1960s.[42]
It is widely recognized that gun control can limit the extent of gun violence, and a
variety of measures have been adopted throughout the developed world, including
efforts to restrict who has access to weapons and where they may be carried and to
restrict the types of guns in circulation and the size of ammunition magazines. As
two political scientists explain, there are two primary rationales behind such
measures:  "One, they make it less likely that someone intent on violence will be
able to get a gun. And two, by making the weapon less deadly, gun control laws
reduce the danger that the victim of a gun attack will die."[43]

57.     California adopted the restrictions at issue in this litigation in pursuit
of this public safety rationale. California SB 880, which was signed into law on
July 1, 2016, expanded the definition of "assault weapons" under Cal. Penal Code
§ 30515.  The objective of the legislation is demonstrated by the attributes of the
banned weapons.  For example, § 30515(a)(1) identifies certain problematic
attributes of rifles with detachable magazines:

---

[41] Maya Rossin-Slater, Molly Schnell, Hannes Schwandt, Sam Trejo, Lindsey Uniat, Local Exposure to School Shootings and Youth Antidepressant Use, NBER Working Paper No. 26563 (December 2019), https://www.nber.org/papers/w26563.  See also, "My son survived Sandy Hook. It's changed me as a parent," *The Washington Post,* December 13, 2019, https://www.washingtonpost.com/lifestyle/2019/12/13/i-cry-high-school-meets-how-sandy-hook-changed-me-parent/.
[42] Lankford, Adam, "Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries," *Violence and Victims*, Vol 31, Issue 2, DOI: 10.1891/0886-6708.VV-D-15-00093, http://connect.springerpub.com/content/sgrvv/31/2/187.
[43]Jonathan Spiegler and Jacob Smith, "More mental health care alone will not stop gun violence," The Conversation, June 19, 2018. https://theconversation.com/more-mental-health-care-alone-will-not-stop-gun-violence-94201

20

(A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

(B) A thumbhole stock.

(C) A folding or telescoping stock.

(D) A grenade launcher or flare launcher.

(E) A flash suppressor.

(F) A forward pistol grip.

58.　　The goal behind the delineation of these attributes is to reduce the prevalence of weapons that will be most attractive to mass killers and most effective for committing mass murder or the type of rapid, sustained deadly fire that would be most advantageous for criminal purposes. As Senator Mark Warner noted in referring to a new proposed federal assault weapons ban, we must "recognize that the features and tactical accessories that define assault weapons under this legislation were designed for a specific purpose — to give soldiers an advantage over the enemy, not to mow down students in school hallways."[44]  The ominous and growing problem of mass public shootings since 2013 convinced the Virginia Senator to reverse his prior opposition to an assault weapons ban.

59.　　Rifles that incorporate military-style features add to their capacity to enhance the death toll in a public mass shooting event:  pistol grips and thumbhole stocks enable easier spray-firing; a collapsible or folding stock allows the weapon to be shortened and more easily concealed;[45] and a flash suppressor shields the shooter from blinding muzzle flashes during sustained rapid fire.[46] As a

---

[44] Mark Warner, "I voted against an assault weapons ban. Here's why I changed my mind," *The Washington Post*, October 1, 2018, https://www.washingtonpost.com/opinions/i-voted-against-an-assault-weapons-ban-heres-why-i-changed-my-mind/2018/10/01/3bfa76a0-c594-11e8-9b1c-a90f1daae309_story.html.

[45] Erica Goodejan, "Even Defining 'Assault Rifles' Is Complicated," *The New York Times* January 16, 2013, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

[46] *See* Rovella Aff. ¶¶ 34-38, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd*

(continued…)

1    consequence, these attributes make these weapons particularly appealing to mass

2    shooters, drug traffickers, and people who may want to exchange fire with law

3    enforcement.[47]

4         60.    Assault weapons, at least of the long gun variety, tend to have higher

5    muzzle velocities than ordinary handguns.[48] They also tend to utilize .223 rounds

6    designed to fragment and mushroom in a person's body, as illustrated in the 60

7    Minutes video referenced above at footnote 27.[49] These two factors in conjunction

8    mean that injuries from being shot by assault weapons tend to cause more complex

9    damage to the body in ways that make these wounds more dangerous and deadly in

10   both the short and long term.[50]

11   **The Federal Assault Weapons Ban Curtailed Mass Shooting Deaths**

12        61.    The first scholar to document the important beneficial effect of the

13   federal assault weapons ban in reducing mass shooting deaths was Louis Klarevas,

14   the author of Rampage Nation: Securing America from Mass Shootings (Amherst,

15   NY: Prometheus 2016).  The experience from before, during, and after the ten-year

---

16
17   *in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); H.R. Rep. No. 103-489 (1994) at 18-19.

18        [47]Footnote 56 above discusses the death after two agonizing years of the 59th victim in the Las Vegas shooting, who was rendered quadriplegic from her assault weapon injury.

19        *See* H.R. Rep. No. 103-489 (1994) at 14-16; Brady Center to Prevent Gun Violence,
20   *Assault Weapons: Mass Produced Mayhem*, October 7, 2008, *available at*
     http://www.bradycampaign.org/resources/assault-weapons-mass-produced-mayhem (last visited
     Oct. 12, 2018) at 3; Batts Decl. ¶¶ 33, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd
21   in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on
22   reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114
     (4th Cir. 2017).

23        [48]*See* Defs' Stmt. Docket Entry 63 ¶¶ 44–45, 58–59, 61, 64–65, *Worman v. Healey*,1-17-
     CV-10107, 293 F. Supp. 3d 251 (D. Mass. 2018).

24        [49]*See* Batts Decl. ¶¶ 44-45, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in
     part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g
25   en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir.
     2017); Rovella Aff. ¶¶ 39, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part,
26   rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir.
     2015); Duncan Long, *The Complete AR-15/M16 Sourcebook* (2d ed.), 2001 at 50; Colwell Decl.
27   at 2-4, *Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018).

28        [50] *See* Colwell Decl. in Supp. of Defs.' Opp. to Mot. for Prelim. Inj. ¶ 8.

22

1   period from 1994-2004 when the federal assault weapons ban was in effect

2   provides important evidence that this federal law saved lives and reduced the

3   mayhem from the deadliest mass shootings.

4         62.    Klarevas illustrated in the graphic reproduced below how the pattern

5   of the deadliest mass shootings changed over the period from 1984-2014.

6   Examining gun massacres in which at least six were killed, Klarevas found that

7   these incidents and the number of resulting deaths fell during the decade in which

8   the federal assault weapons ban was in place and then rebounded when the ban was

9   lifted in 2004.

10        63.    As the following figure shows, when one compares the ten years prior

11  to the federal assault weapons ban to the ten years under that ban, we see a 37

12  percent drop in the number of gun massacres (from 19 down to 12) and 43 percent

13  drop in the number of fatalities (falling from 155 to 89) during the years the federal

14  assault weapons ban was in effect.  When the ban ended, gun massacres

15  skyrocketed by more than 183 percent in the following decade (from 12 to 34) and

16  the number of fatalities rose by more than 239 percent (from 89 to 302).

17

18

19

20

21

22

23

24

25

26

27

28



**Gun massacres fell during the assault weapons ban**

Gun massacre (6+ deaths) incidents and fatalities in the decades before, during and after the federal assault weapons ban of 1994

Source: Louis Klarevas
THE WASHINGTON POST

64.     The Klarevas data ended in 2014, so I conducted my own study both to verify the accuracy of the Klarevas findings and then to extend the analysis forward to the present.  In implementing his definition of a gun massacre as a mass shooting incident in which 6 or more people died, Klarevas notes in his book that "It doesn't matter if there is one gunman or several gunmen. It doesn't need to occur in public. It can be for any reason whatsoever."  In my study, I chose to use the Mother Jones database, which does limit the gun crimes to killings occurring in a public place and omits killings related to armed robbery, gang activity, or domestic violence in accord with recent FBI practice.

65.     Figure 1 below shows the number of incidents of such gun massacres and the deaths resulting therefrom based on these criteria.[51] The figure illustrates clearly that the number and deadliness of these mass shootings dropped during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted.[52] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is substantial and noteworthy.

66.     After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill ever more quickly with predictable results.  The decade after the ban elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward (reflected in the dotted line in Figure 1).  In other words, my independent assessment confirms the pattern first revealed by Louis Klarevas: gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.

67.     What has happened since 2014 is even more alarming. In five years, the number of fatalities in these gun massacres has already topped the previous high that occurred during the first decade after the federal assault weapon ban was removed. This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in Figure 1 confirms.[53] If we

---

[51] Figures 1 and 2 are replicated from John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV and discussed further in John Donohue, "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," *Law and Contemporary Problems*, (forthcoming, February 2020).  See also the earlier piece: John Donohue and Theodora Boulouta, "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.

[52] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that enabled the law to lapse.

[53] This downward trend in violent crime even as mass shootings rise after 2004 is

(continued…)

continue at the post-2014 pace until 2024, the last column of Figure 1 shows that we will have an astonishing order of magnitude increase in gun massacre deaths over a 20-year period.[54]

68.     The evident effectiveness of the assault weapons ban in reducing mass shooting deaths is exactly what we would expect, since during the decade of the federal assault weapons ban mass killers could not simply enter a gun store and buy an assault weapon with a large capacity magazine, as they can do in most of the U.S. today.[55]

**Figure 1**



69.     Figure 2 illustrates the average number of fatalities in each mass shooting for the same four periods shown in Figure 1.  The pattern is the same:

important evidence of the harmful impact of ending the federal assault weapons ban.  Without that evidence one might mistakenly think that the overall violent crime drop of roughly 14 percent during the decade of the federal assault weapons ban was simply part of downward crime which itself explains the drop in mass shooting deaths. The experience after 2004 undermines that view.

[54] Note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*.  Using that more capacious definition, there have been 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8.

[55] Only 7 states and the District of Columbia ban assault weapons and all of those states plus Colorado and Vermont restrict the permissible size of the ammunition magazines.

fatalities per incident fell during the federal assault weapon ban and have risen sharply thereafter.  With the weaponry available to citizens getting increasingly more potent and plentiful, the average number of people who die in every incident has increased by 90 percent since the decade after elimination of the assault weapons ban.

70.    Assault weapons and/or high capacity magazines were used in all 15 gun massacres since 2014 in which at least six were killed (other than the shooter) shown in Figure 1; all 272 people who died in these 15 gun massacres were killed by weaponry prohibited under the federal assault weapons ban.[56]

**Figure 2**



Gun Massacres: Deaths per Incident
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019.

---

[56] After Figure 1 was created another victim of the Las Vegas shooting died from her horrendous and agonizing injuries, which elevates to 272 the number of deaths form public gun massacres in the last five years.  The following article highlights some of the devastating injuries that result from being shot by an assault rifle, such as that used by the Las Vegas shooter. https://www.kptv.com/news/vancouver-woman-says-sister-injured-in-las-vegas-shooting-has/article_af9198c6-099c-11ea-87c1-37de7096726f.html

71.     The dramatic increases in gun massacre incidents and fatalities closely tracks the growth in U.S. sales of previously federally banned weaponry that was ignited by the expiration of the federal assault-weapons ban in 2004, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, ranging from high-capacity magazines to flash suppressors, that stimulated the demand for this highly dangerous consumer product. Josh Sugarmann, executive director of the Violence Policy Center, notes that "The end of the assault-weapons ban allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."[57]

**Industry Advertising of Assault Weapons Appeals to Potential Mass Shooters**

72.     A year after the lapsing of the federal assault weapons ban, the Protection of Lawful Commerce in Arms Act (PLCAA) was passed, which provided gun manufacturers with near-blanket immunity from suits based on the criminal misuse of their products.  This emboldened a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons, and sales soared in response.  The dramatic rises in gun massacres followed.

73.     These advertising campaigns reveal exactly how the gun industry sought to market assault weapons:  they are hawked with explicit depictions of combat and phrases like "The closest you can get without having to enlist."[58]

74.      Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts. Moreover, an industry survey of civilian assault-rifle ownership "reveals that the average civilian assault-rifle owner keeps a small arsenal, owning three or more of the guns; 27 percent of owners have

[57] Quoted in Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[58] *Id.*

bought four or more. [Unfortunately,] many civilian assault-rifle owners fail to secure their arms; nearly one owner in five does not lock up his rifle, and more than 30 percent take no care to secure their ammunition."[59] In other words, a very substantial fraction of owners of assault rifles act irresponsibly, thereby exposing their weapons to loss or theft and resulting criminal misuse. For example, the weapons used by Adam Lanza to kill his mother, Nancy Lanza, and in the Newtown shooting were owned by his mother – a pattern that has repeated itself all too often as the Wall Street Journal noted (see footnote 22, above).

75.     Indeed, the makers of the Bushmaster assault rifle Nancy Lanza owned and that her son Adam Lanza used to gun down first-graders and teachers in Newtown was sold under the slogan "Forces of opposition, bow down." While such weapons are designed for and appropriately used by trained military personnel and law enforcement, they are exceedingly dangerous when wielded by mentally unstable civilians.

76.     While the United States does not have a higher rate of mental illness than other advanced industrialized nations, it certainly has a higher rate of public mass shootings.

77.     The gun industry frequently claims that the term "assault weapon" did not exist in the lexicon of firearms, but is a political term, developed by anti-gun publicists to expand the category of "assault rifles" so as to allow an attack on as many additional firearms as possible on the basis of undefined "evil appearance."[60]

---

[59] The NSSF periodically conducts research on civilian assault rifles intended for gun sellers, and these figures are from their latest survey. Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[60] The complaint in Rupp v. Becerra, challenging California's ban on assault weapons. Mr. Curcuruto's declaration in this case includes a gun industry publication as Exhibit 1 that mimics this same inaccurate claim in stating:  "Mislabeling these rifles as "assault rifles" was, and is, a strategy of gun-banners, and anyone who uses that terminology aids efforts to strip away the right to own these versatile, fun-to-shoot firearms."

1    This is incorrect. In fact, throughout the 1980s the gun industry marketed AR-type
2    rifles as "assault" weapons because that promoted sales. The image below of a
3    Guns & Ammo magazine cover highlighting assault rifles in July 1981 is just one
4    of the numerous such advertisements and gun industry publications concerning
5    assault weapons that one can find on the web throughout the 1980s.[61]  Only when
6    the increase in civilian ownership of these weapons was followed by outrage over
7    (and fears of potential tort liability for) prominent mass shootings did the industry
8    shift away from that direct terminology in its advertisements (while continuing to
9    market guns with appeals to their military character).

10       The July 1981 issue of Guns & Ammo. (Reproduced from the New York
11       Times, https://www.nytimes.com/2013/01/17/us/even-defining-assault-
12       weapons-is-complicated.html



---

[61] See, https://www.democraticunderground.com/126210025.

Declaration of Professor John J. Donohue (19-cv-1537 BEN-JLB)

1

2

3      78.    Consider the following Bushmaster advertisement for the gun that

4  Adam Lanza used, and imagine the impact it could have on someone struggling

5  with substantial mental health problems:



79.    Notably, while Lanza used a Savage Mark II bolt-action .22-caliber

rifle to kill his sleeping mother, he chose the much more dangerous Bushmaster

assault weapon with 30-round magazines that enabled him to fire 154 bullets over

the 264 seconds in his lethal rampage at Sandy Hook School.[62] We can surmise that

if he had only a bolt action hunting rifle, he could not have fired as many bullets

and many lives would have been spared.

--------

[62] Coalition to Stop Gun Violence, "What Adam Lanza Took, and Didn't Take, to Sandy
Hook Elementary," https://www.csgv.org/adam-lanza-took-didnt-take-sandy-hook-elementary/
(last visited on October 22, 2018).

80.   The impact of the gun industry's efforts to exploit messages about assault weapons directed at those with deep insecurities and even mental health issues showed up in another recent mass shooting.



81.   The nineteen-year old killer of 17 at Parkland High School (on February 14, 2018) was moved to post the above NRA image on his Instagram account.  He stated in a recording that he had had enough of being told what to do and was tired of being called "an idiot." "I am nothing. I am no one, my life is nothing and meaningless. With the power of the A.R., you will know who I am."

82.   Of course, banning assault weapons does not eliminate the threat from troubled individuals, but since these weapons are particularly attractive to troubled potential mass killers and specifically designed to facilitate the most rapid and effective annihilation of all intended targets, bans on assault weapons is not only prudent but indeed indispensable in any governmental effort designed to effectively address the mass shooting problem in America.  A brief discussion of how and why the AR-15 came to be chosen as the primary military combat weapon used by the U.S. in Vietnam explains why.

**The Army Adopts the AR-15 for Battlefield Use**

83.     In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle, that could operate in both semi- and full-automatic modes with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." Stoner devised the AR-15 to meet these specifications. The Advanced Research Projects Agency (ARPA) –today known as DARPA – was so impressed with the AR-15's value as a combat weapon that it pushed to have 1,000 rifles shipped for use by South Vietnamese troops and their American special-forces trainers in 1961.

84.     The performance of this new assault weapon was assessed in a confidential ARPA report in July 1962, stating "The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam."[63] The report noted that "The lethality of the AR-15 and its reliability record were particularly impressive."[64] The wounds generated by this weapon were prodigious: "At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC [(Viet Cong)] with 3 rounds [of Caliber .223] with the first burst. One round in the head-took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that *any one of the three would have caused death*."[65]

85.     The report enumerated the wounds in a Ranger ambush of a Viet Cong position, including: a back wound that "caused the thoracic cavity to explode"; a buttock wound that "destroyed all tissue of both buttocks"; and finally "a heel wound," where "the projectile entered the bottom of the right foot causing the leg to

---

[63] Advanced Research Projects Agency, Office of the Secretary of Defense, *Field Test Report, AR-15 Armalite Rifle*, at 4 (July 31,1962,). Retrieved October 12, 2018 from http://www.dtic.mil/dtic/tr/fulltext/u2/343778.pdf
[64] Id. at 15.
[65] Id. at 22 (emphasis added).

split from the foot to the hip." All the deaths were "instantaneous," "except the buttock wound. He lived approximately five minutes."[66]

86.     The "phenomenal lethality" of the AR-15 described by ARPA led the Army in December 1963 to adopt the AR-15 – rebranding it the M16.

87.     Of course, the civilian AR-15 lacks the fully automatic (and burst) mode of the M16, but it still retains all the other aspects that made it such a valuable lethal weapon for deadly combat. In fact, the Army's own Field Manual states that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," noting, "It is surprising how devastatingly accurate rapid semi-automatic fire can be."[67] In other words, saying that this semi-automatic assault weapon is not a weapon of war because it doesn't have fully automatic capacity is like saying that a conventional bomber is not a war plane because it isn't carrying a nuclear payload.  Indeed, the ability to convert a civilian AR-15 into a fully automatic weapon – or the near fully-automatic capacity that Stephen Paddock used in the Las Vegas shooting of a year ago – is yet an additional factor that renders it unusually dangerous.

88.     According to one of its designers, the AR-15 assault rifle was originally engineered to generate "maximum wound effect." "It's a perfect killing machine," says Dr. Peter Rhee, a trauma surgeon and retired Navy captain.[68]

89.     Rhee was the doctor who saved the life of Arizona Rep. Gabby Giffords after she was shot in the head with a handgun fired during a mass shooting in 2011. According to Rhee: "A handgun [wound] is simply a stabbing with a

---

[66] Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/
[67] Id.
[68] Id.

1   bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with

2   a Coke can."

3   **The Allure of and Value to Mass Shooters of Assault Weapons**

4   90.   It is not surprising that mass shooters employing these particularly

5   lethal weapons are able to kill so many so quickly:  Adam Lanza was able to

6   slaughter 26 in less than five minutes with his Bushmaster AR-15. James Holmes

7   used a Smith & Wesson "Military & Police" (M&P) AR-15 fitted with a 100-round

8   magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired

9   San Bernardino, California, shooters used a pair of AR-15s to kill 14. Orlando

10  shooter Omar Mateen unleashed Sig Sauer's concealable "next-generation AR" to

11  leave 49 dead and dozens more injured at the Pulse nightclub.

12  91.   Moreover, there is not the slightest evidence that the federal

13  restrictions on assault weapons that was enacted in 1994 (and lapsed ten years later)

14  compromised the safety of law-abiding citizens.  Since these weapons are useful for

15  those bent on mass killing, further limiting their availability should have a

16  beneficial effect on the active shooter and mass shooting problems that are serious

17  and worsening in the United States.

18  92.   It should be noted that even if an assault weapons ban failed to reduce

19  the overall criminal use of guns, it can be expected to reduce the overall death toll

20  from the criminal use of guns.

21  93.   As noted above, Adam Lanza was able to kill more because he was

22  using a lawfully purchased assault weapon equipped with a 30-round large-capacity

23  magazine.  Telling us that Nancy Lanza was a law-abiding citizen so there would be

24  no reason to deprive her of the right to buy an assault weapon entirely misses the

25  point of the benefit of an assault weapons ban:  it was the weaponry of a totally

26  law-abiding citizen that directly led to horrific slaughter of 20 first-grade students

27  and six adults.  Law-abiding citizens can and do themselves cross over the line into

28  criminal misconduct, but they also facilitate and enable others to engage in deadly

misconduct when they make their guns available to others through loss or theft.  In other words, the assault weapons ban is designed precisely to save lives and by raising the costs for killers, it would be expected to advance that goal, as indeed the empirical evidence confirms.

94.    The references to "law-abiding citizens" in Plaintiffs' complaint reflects an inaccurate assessment of the potential impact on "law-abiding citizens" of California's assault weapons ban.  Hundreds of law-abiding citizens have been killed in mass shootings and the problem of mass shootings is getting worse.  Since the value of assault weapons over non-assault weapons for legitimate self-defense is virtually non-existent, the primary impact of removing such weapons from circulation will be to decrease the prospect that a law-abiding citizen will be confronted by a criminal with such weaponry.

95.    "[L]aw-abiding citizens" whose guns are lost or stolen each year are one of the most important sources of weapons for criminals in the United States. The best current estimates are that roughly 400,000 guns move into the hands of criminals this way each year in the United States.[69]  In other words, it is orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire an assault weapon in lawful self-defense.  More assault weapons in the hands of law-abiding citizens like Nancy Lanza means more assault weapons in the hands of criminals such as Adam Lanza.

---

[69]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers), "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts. See, Freskos, Brian. 2017c. "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen." The Trace. 4/11/2017. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/ and Freskos, Brian. 2017b. "Missing Pieces." The Trace. 11/20/2017. https://www.thetrace.org/features/stolen-guns-violent-crime-america/.

Declaration of Professor John J. Donohue (19-cv-1537 BEN-JLB)

96.     Further, many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens.  The list, which is too long to recite, includes Stephen Paddock, who killed 59 in Las Vegas; Omar Mateen, who killed 49 in the Pulse nightclub in Orlando; Adam Lanza, who killed 26 in Newtown, Connecticut; and the Batman killer in Aurora, Colorado, who killed 12.

97.     On November 5, 2009, Nidal Hasan killed 13 and injured more than 30 others at Fort Hood, near Killeen, Texas.  When Hasan purchased his killing arsenal, he asked for "the most technologically advanced weapon on the market and the one with the highest standard magazine capacity."[70]  Searching for the deadliest assault weapon is exactly what one would do if one wanted to simply kill as many people as possible in the shortest amount of time. If one is serious about stopping mass killings, a good first step is to deprive such killers of their preferred killing approaches.

**Assault Weapons Bans are Critical to Reducing the Cost of Mass Shootings**

98.     The response that bans on assault weapons will have a limited effect on overall gun crime, which is most commonly committed with a handgun, is misplaced because California's assault weapons ban was not enacted to address gun crime generally, but rather was adopted in response to the growing mass shooting problem in the United States.  The AWCA was enacted in the immediate aftermath of the 1989 mass shooting in the schoolyard of Cleveland Elementary School in Stockton, California by an individual armed with an AK-47 semiautomatic rifle. The legislature in Vermont recently adopted a series of gun control measures including barring sales of assault weapons to those under 21 after the arrest of Jack Sawyer based on evidence that he intended to commit a mass school shooting in

---

[70]Scott Huddleston, "Hasan Sought Gun with 'High Magazine Capacity,'" October 21, 2010, http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-with-high-magazine-capacity/.

Fair Haven, Vermont.[71]  Among other things, police recovered a diary titled "Journal of an Active Shooter" and were told by Mr. Sawyer that he had recently purchased a shotgun and was hoping to buy an AR-15 rifle.[72]

99.    Empirical studies of public mass shootings by Christopher Koper and others lead them to support restrictions on assault weapons and the large-capacity magazines that can enhance their lethality. Koper concludes from his research that a revived federal assault weapons ban can "reduce the number and severity of mass shooting incidents."[73]

100.    The troubling gun massacres of the last year have underscored the efforts of the California legislature and voters "to aid in the shaping and application of those wise restraints that make men free" by banning the assault weapons that have been a key element enabling the escalating threat and lethality of horrific mass shootings.[74]

101.    It is my opinion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban,

---

[71] The Vermont State police arrested Jack Sawyer the day after the Parkland, Florida mass school shooting.  *See State v. Sawyer*, 2018 VT 43, ¶¶ 5-10.  Several public officials shortly thereafter announced their support for new gun safety legislation.  *See* John Walters, *Scott Shifts Gun Stance Following Fair Haven Threat*, Seven Days (Feb. 16, 2018), *available at* https://www.sevendaysvt.com/OffMessage/archives/2018/02/16/walters-scott-shifts-gun-stance-following-fair-haven-threat; Alan J. Keays, *Scott says 'everything's on the table' as pressure builds for gun measures*, VTDigger (Feb. 22, 2018), https://vtdigger.org/2018/02/22/updated-scott-says-everythings-on-the-table-as-pressure-builds-for-gun-measures/.

[72] Alan J. Keays, *Court Shown Video of Alleged School Shooting Plotter's Interrogation,* VTDigger (Feb. 27, 2018), https://vtdigger.org/2018/02/27/ex-student-accused-fair-haven-shooting-plot-details-plans/.

[73] Linda Qiu and Justin Bank, "Major Shootings Led to Tougher Gun Laws, but to What End*?" The New York Times,* Feb. 23, 2018, https://www.nytimes.com/2018/02/23/us/politics/fact-check-mass-shootings-gun-laws.html; see also, Carolyn Lochhead, "Feinstein renews effort to ban assault weapons," *San Francisco Chronicle*, March 3, 2018, https://www.sfchronicle.com/nation/article/Feinstein-renews-effort-to-ban-assault-weapons-12725959.php.

[74]The quote is from John MacArthur Maguire and is enshrined at the Harvard Law School library.  See https://asklib.law.harvard.edu/friendly.php?slug=faq/115309 (last visited Nov. 1, 2017).

1   many of the gun tragedies of recent years would have been far less deadly and

2   damaging to countless individuals who have been maimed and injured throughout

3   the United States.  It is also my opinion that California's ban on assault weapons is

4   one tool in the important governmental effort to reduce the likelihood that

5   Californians will be killed in mass shootings by making it incrementally harder for

6   prospective mass shooters to equip themselves with weapons that are both uniquely

7   appealing to their criminal aspirations as well as uniquely designed to aid in their

8   homicidal rampages.

9   **Uses of Assault Weapons for Self-Defense are Extremely Rare**

10      102.   In the face of the clear evidence from around the United States and the

11   world, Plaintiffs' complaint and motion for preliminary injunction posit that assault

12   weapons might protect against crime rather than simply increase the death toll.

13   First, it is worth noting that the vast majority of the time that an individual in the

14   United States is confronted by violent crime, they do not use any gun for self-

15   defense.  Specifically, over the period from 2007-2011 when roughly 6 million

16   violent crimes occurred each year, data from the National Crime Victimization

17   Survey shows that the victim did not defend with a gun in 99.2 percent of these

18   incidents – this in a country with 300 million guns in civilian hands.

19      103.   Second, even if a gun were available for self-defense use, the need for

20   an assault weapon is virtually non-existent according to decades of statements by

21   NRA-affiliated and pro-gun experts. For example, one of Plaintiffs' proffered

22   experts in this case, John Lott, has repeatedly made the following claims:

23   - based on "about 15 national survey[s] … about 98 percent of [defensive
        gun uses] involve people brandishing a gun and not using them."[75]

24

25

26   _____

27   [75]Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert
     on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of
     Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript

28   prepared by the Clerk of the Legislature, Transcriber's Office.

- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[76]
- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[77]

104.   Gun Owners of America cite published survey results on gun brandishing: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[78]

105.   In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States.  In the "overwhelming majority" of the less than 1 percent of cases in which a gun is used, brandishing is all that is needed for defense.  The U.S. Supreme Court in Heller considered a handgun the quintessential self-defense weapon.  It cannot be seriously maintained that an assault weapon plays any important role in furtherance of this Second Amendment goal. Indeed, if they were, the industry would have marketed them as protection weapons instead of assault weapons – or in the more recent gun-marketing jargon "sporting" or "tactical" rifles.

106.   Consequently, California's assault weapons ban, which is designed to limit the mayhem caused by criminals engaging in the most dangerous forms of violent criminal behavior, is likely to have little or no impact on the defensive capabilities of law-abiding citizens in their homes.

107.   Assault weapons are the mass killers' armaments of choice.  A study of 62 public mass shooting incidents occurring between August 1982 and

---

[76]John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April 30, 1997, Pg. 52.

[77]John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.

[78]Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995). https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf .

40

1  December 2012 found that more than half the time, the attackers used assault rifles,

2  high-capacity magazines, or both.[79]  Indeed, as I noted above, at least 272 people

3  who died in gun massacres since 2014 were killed by weaponry prohibited under

4  the federal assault weapons ban.

5  **Law Enforcement and Military Support for Assault Weapon and LCM Bans**

6      108.   The testimony of United States Attorney (District of Colorado) John

7  Walsh before the Senate Judiciary Committee on February 27, 2013,[80] is worth

8  quoting:

> From the point of view of most law enforcement professionals, a perspective
> I share as a long-time federal prosecutor and sitting United States Attorney,
> shutting off the flow of military-style assault weapons and high-capacity
> magazines is a top public safety priority. […]
> Like military-style assault weapons, high-capacity magazines should be
> reserved for war, and for law enforcement officers protecting the public.[81]

13      109.   Dean L. Winslow, a retired Air Force colonel, flight surgeon, and

14  professor of medicine at Stanford University has particularly valuable insight into

15  the wisdom of having assault weapons in civilian hands.

16      110.   Dr. Winslow noted that "as commander of an Air Force hospital in

17  Baghdad during the surge, I have seen what these weapons do to human beings.

18

19  [79] Follman M, Aronsen G, and Lee J, More than half of mass shooters used assault
weapons and high-capacity magazines. http://www.motherjones.com/politics/2013/02/assault-
20  weapons-high-capacity-magazines-mass-shootings-feinstein. This study defines a mass shooting
as an incident where 4 or more victims are killed with a firearm, in a public place, and excludes
21  familicide mass shootings and mass shootings related to other crimes such as gang violence or
armed robbery. Out of the 62 incidents, the authors identified 31 mass shooting incidents
22  involving high capacity magazines, 14 mass shooting cases involving assault weapons, and
overall 33 cases involving assault weapons or high capacity magazines or both.  The authors
23  identify guns using high capacity magazines or assault weapons based on the definitions in the
Feinstein Assault Weapons Ban Senate bill of 2013.
24     https://www.motherjones.com/politics/2012/07/mass-shootings-map/U.
25  [80]Statement of John F. Walsh before the United States Senate Committee on the Judiciary,
https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited
26  Nov. 1, 2017).
27  [81]See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*,
Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-
28  dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

41

The injuries are devastating."[82]  Moreover, unlike a shotgun filled with birdshot, which is far more likely to hit a target than a bullet from an assault weapon, assault weapons are simply not well suited for defensive use in the home.  Based on his extensive military and medical experience, Dr. Winslow noted that it is "insane … that in the United States of America a civilian can go out and buy a semiautomatic weapon like an AR-15."

111.   According to Maryland Police Superintendent Marcus Brown, "in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas."[83] Experts consider handguns clearly more suitable than assault weapons for self-defense. Massachusetts Chief of Police Mark K. Leahy said that when "asked to recommend a weapon for home defense or concealed carry, I always recommend a handgun."[84]

112.   Since AR-15's were selected by the Defense Department as a weapon of choice for the battlefield in Vietnam because the destructive force of the gun made it especially lethal to even outer extremity wounds, the point could not be clearer:  keeping these weapons out of civilian hands will reduce the death toll and seriousness of woundings in cases of mass shootings or other criminal or accidental uses of these weapons.

**Gun Control Dramatically Reduced Mass Shootings in Australia**

113.   In this regard, consider what happened in Australia after a gunman shot and killed 35 people in Port Arthur, Tasmania in 1996.  The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it

---

[82] See also, Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic Monthly*, February 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/

[83] Brown Decl. ¶ 20, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).

[84] Leahy Decl. ¶ 22, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 7 public mass shootings in Australia during the seventeen-year period 1979–96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 23 years since (in contrast to the bleak trend in public mass shootings in the United States[85]).  Adjusting for the relative populations of the two countries, it would be as though there were 103 separate mass shooting events in the 18 years prior to the massive Australian gun buyback and none in the 23 years since.[86]

114.   The important point of the Australian experience for present purposes is that by depriving disturbed individuals of the vehicle by which they imagined they would unleash their murderous impulses, Australia showed that strong gun control measures such as bans on semiautomatic rifles could dramatically reduce the number of mass shootings – even if guns are still widely available, as they remain in Australia.

**Some Responses to Points in Submissions by the Plaintiffs**

115.   While defensive gun ownership is designed to prevent violence, the intent of the public mass shooter is to kill as many people as possible. Accordingly, the lethal capacity of the weapon will influence that toll of these homicidal events (as opposed to the defensive setting when brandishing typically achieves its goal). As Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings.[87]  When such weapons

---

[85] Dan Diamond, "Mass Shootings Are Rising. Here's How To Stop Them," *Forbes*, June 18, 2015 (depicting the accelerating trend in the U.S. versus the benign trend in Australia), https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-deaths-are-an-american-tragedy-mass-shootings-are-rising/#12bd32ef787b.

[86] The population of Australia in 1996 was 18.3 million and the population of the US in the same year was 269.4 million, according to data from the World Bank.

[87] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Washington Post, February 15, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/02/15/its-time-to-bring-back-the-assault-weapons-ban-gun-violence-experts-say/;  Koper 2004 Assessment at 14, 18.

43

are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'"[88]  Among the mass shootings identified in a 2016 study by Everytown for Gun Safety, use of a large capacity magazine, or assault weapon that likely included a large capacity magazine, was associated with more than twice as many people being shot and nearly 50 percent more people being killed.[89]

116.   Many mass shooters seem to prefer using assault weapons, and mass shootings in which assault weapons are used tend to result in worse outcomes. Some estimates suggest that around 11-13 percent of mass shootings are with assault weapons but these numbers tend to be biased downward.[90]  For example, Christopher S. Koper et al. examine a sample of 145 mass shooting incidents (with incomplete weapons data) from 2009-2015 and estimated that assault weapons were used in at least 10.3 percent of all incidents.[91]  This figure, however, rose to 35.7 percent when limiting the sample to the 42 cases where there is sufficiently detailed information to definitively determine whether an assault weapon was used.[92] Research by Luke Dillon shows that mass shooting incidents using assault weapons result in more people injured and more total victims.[93]

---

[88]*N.Y.S. Rifle*, 804 F.3d at 264 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011)).

[89]Mass Shootings in the United States: 2009 – 2016,  Appendix of Shootings Profiled, https://everytownresearch.org/documents/2017/03/appendix-mass-shootings-united-states-2009-2016.pdf

[90]Everytown for Gun Safety, *Analysis of Recent Mass Shootings*, July 2014, *available at* https://everytownresearch.org/documents/2015/04/analysis-of-recent-mass-shootings.pdf (last visited Oct. 12, 2018) at 4; Mark Follman, Gavin Aronsen, and Deanna Pan, "A Guide to Mass Shootings in America," *Mother Jones* (Sept. 20 2018).

[91]Christopher S. Koper et al., "Criminal Use of Assault Weapons and High Capacity Semi-Automatic Firearms: An Updated Examination of Local and National Sources," 95(3) *Journal of Urban Health* 313-321 (2017) at 317.

[92]Christopher S. Koper et al. 2017, Finding at 317.

[93]Luke Dillon, *Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012*, Fall 2013, *available at http://mars.gmu.edu/xmlui/handle/1920/8694*.

117.  Assault weapons also pose particular dangers and problems to law enforcement. Because of the types of rounds typically fired by assault weapons as well as the muzzle velocities they tend to have, assault weapons are "capable of penetrating the soft body armor customarily worn by law enforcement."[94] The ability to fire rapidly also allows criminals to more effectively engage with responding police officers, even from a significant distance.[95]  Empirical research by the Violence Policy Center shows that "one in five law enforcement officers slain in the line of duty was killed with an assault weapon," despite the relative rarity of assault weapon use in crime in general.[96]  Christopher S. Koper et al. find that assault weapons, virtually all of which were assault rifles, "accounted for 13.2% of the firearms used in [police murders]" from 2009-2013 (note that this excludes cases involving the officer's own firearm).[97]  Many law enforcement officers and agencies report that the possibility of encountering criminals with assault weapons necessitates that they spend a great deal of time and resources preparing for such encounters.[98]

118.  Assault weapons, acquired in the United States, are particularly popular weapons for drug traffickers and gang members, both in the United States and in Mexico.[99]

119.  Beyond the unmistakable evidence that the federal assault weapons ban reduced deaths from public mass shootings, there is also evidence that the federal assault weapons ban was effective in limiting all criminal use of assault

---

[94]Brown Decl. ¶ 23, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).

[95]Kyes Decl. ¶ 15-17, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

[96]Violence Policy Center, *Officer Down: Assault Weapons and the War on Law Enforcement,* May 2003, *available at* http://www.vpc.org/studies/officer%20down.pdf (last visited Oct. 12, 2018) at 5.

[97]Christopher S. Koper et al. 2017, Finding at 317.

[98]Brady Center to Prevent Gun Violence 2008 at 4-6.

[99]Id. at 3-6; Violence Policy Center, *Assault Pistols: The Next Wave*, January 2013, *available at* http://www.ncdsv.org/images/VPC_AssaultPistolsTheNextWave_1-2013.pdf (last visited Oct. 12, 2018) at 1-2; Spitzer Aff. ¶ 4, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

weapons. Brady Center to Prevent Gun Violence analysis suggests that the share of gun crimes committed with assault weapons declined following the institution of bans.[100]  This study used the share of Bureau of Alcohol, Tobacco, and Firearms (ATF) firearm traces that are of assault weapons as a dependent variable, even though it is likely that this measure is marred by changes in the nature and frequency of gun tracing behavior by ATF.[101]  The Police Executive Research Forum found that the relative usage of assault weapons in crime increased after the ban's end, with 38 percent of police agencies reporting that criminals' use of assault weapons had increased.[102]

120.   No one has a greater desire or use for an assault weapon than a determined mass killer. A ban on such assault weapons is an important tool and prudent step in the effort to stop and/or diminish the harm from the most egregious homicidal rampages.

121.   An argument that assault weapons are in "common use" and cannot be banned in California because a large number of individuals throughout the United States have assault weapons today is flawed. The current level of ownership cannot be taken as an expression of American approval of assault weapons.  The existing stock of guns is a function of legislation and marketing and it provides a very slippery basis for determining what guns are presumptively legal or subject to appropriate prohibition, which should be determined from a more fact-based assessment of the nature of the threats and the relevant safety considerations.

---

[100]Brady Center to Prevent Gun Violence, *On Target: The Impact of the 1994 Federal Assault Weapons Ban,* March 2004, *available at* https://www.bradycampaign.org/sites/default/files/on_target.pdf (last visited Oct. 12, 2018).
[101]Violence Policy Center, *A Further Examination of Data Contained in the Study On Target Regarding Effects of the 1994 Federal Assault Weapons Ban,* April 2004, *available at* http://vpc.org/graphics/AWAnalysisFinal.pdf (last visited Oct. 12, 2018) at 7-8.
[102]Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact,* May 2010, *available at* https://www.policeforum.org/assets/docs/Critical_Issues_Series/guns%20and%20crime%20-%20breaking%20new%20ground%20by%20focusing%20on%20the%20local%20impact%202010.pdf (last visited Oct. 12 2018) at 2.

122.   As the Fourth Circuit held in upholding Maryland's assault weapons ban in 2017: "the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence … is that they do.[103] The ability and right of citizens to enact safety promoting measures designed to deal with the serious and growing problem of public mass shootings should not be affected by how quickly gun manufacturers can sell their products before regulations can be put into place.

123.   In 2016, fourteen-year old Jesse Osborne of South Carolina wanted to top the death toll of Adam Lanza, and he made numerous attempts to get his father's assault weapon from a gun safe as he planned a school shooting at a nearby elementary school.  When that failed, he took his father's loaded handgun from his bed dresser and killed his father before heading to the school where he opened fire on the playground, killing a 6-year-old boy before his gun jammed.  As the Wall Street Journal study referenced above found, a sizeable proportion of students aged 12-18 had access to firearms without adult permission.  For students and others who harbor homicidal fantasies similar to Jesse Osborne, the most powerful and deadly weapons will be most helpful for their criminal designs.[104]

**<u>Responding to the Lott Declaration</u>**

124.   John Lott has submitted a declaration on behalf of the plaintiffs.  As an initial matter, Lott has been roundly criticized by many experts in the field, including experts who regularly consult for the plaintiffs in Second Amendment cases.  For example, during his deposition in *Rupp v. Becerra*, Gary Kleck, who

---

[103] *Kolbe v. Hogan*, (4th Circuit Court of Appeals, February 21, 2017), https://cases.justia.com/federal/appellate-courts/ca4/14-1945/14-1945-2017-02-21.pdf?ts=1487707284.

[104] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," *The Wall Street Journal*, https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600, April 5, 2018.

was one of the plaintiffs' expert witnesses in that case, testified that he did not believe that John Lott is a credible criminologist.[105]

125.   Lott's analysis in this case is deeply flawed in numerous aspects.  For example, on pages 6 and 7 of his declaration, Lott states the following:

> In fact, based on my research, every place that has banned guns (either all guns or all handguns) has seen murder rates go up. Examples include Chicago, Illinois, Washington D.C., and island nations such as England, Jamaica, Ireland, Venezuela, and obscure places like the Solomon Islands. The original research is available in Lott, More Guns, Less Crime, University of Chicago Press, 2010, Third edition. Support for my opinion is found at https://crimeresearch.org/2016/04/murder-and-homicide-rates-before-and-after-gun-bans/

The statement is both irrelevant and incorrect.

126.   First, the statement is irrelevant because Lott's opinion is based on bans on "all guns or all handguns," and does not address assault weapons under the AWCA.  A far more relevant comparison would be the previously-discussed assault weapons ban in Australia that dramatically reduced the country's mass shooting problem.

127.   Although the ban was highly controversial when enacted in 1996, the results have been so unambiguously positive for the country that there is now overwhelming support for it throughout Australia, as repeatedly shown in public opinion polls.  The last, by Essential Research in 2016, confirmed that 44 percent thought Australians gun restrictions were "about right" and 45 percent thought the laws were "not strong enough."[106]  Against this 89 percent in support of gun restrictions, only 6 percent thought the laws were "too strong."  Significantly, the

---

[105] Deposition of Gary Kleck, *Rupp v. Becerra*, dated Dec. 12, 2018, at 59.
[106] Essential Research, "Gun laws", 1 November 2016.

Declaration of Professor John J. Donohue (19-cv-1537 BEN-JLB)

poll specifically noted that these views were now consistent regardless of political party voting tendency for Labor, Coalition, or Greens voters.

128.   Second, Lott's irrelevant claim is also incorrect.  Even if there have been some instances where murder rates have risen following gun bans, this is typically because gun bans are enacted when there is a growing crime menace.  We don't dismiss the value of flu shots taken in September because episodes of flu are greater in December.  It only means that the suppressive effect of the vaccinations is exceeded by the factors causing the disease.  It certainly would not mean that flu shots did not reduce the problem, and any claim to that effect would be both conceptually flawed and unsupported by evidence.

129.   Lott's claim is based on flawed data.  The link at the end of the quoted statement by Lott above attempts to explain away the momentous drop in the murder rate in Japan after its post-war gun ban was implemented by incorrectly stating that "Japan has had a very low murder rate for as long as data is available…." But this is not true.

130.   In fact, we can turn to Mark Ramsayer, a coauthor of John Lott, who documents the dramatic drop in the murder rate after guns were banned in Japan, as seen in Figure 3 below.  Note that the murder rate in Japan before the Japanese handgun ban was more than three and a half times that of Australia or Western Europe today, where stringent gun control is the norm.  Indeed, Figure 3 makes the point that the murder rate for Japan was well above that of white Americans in 1950, and Japan's murder rate consistently fell by more than 75 percent over the next six decades (while the US rate steadily climbed throughout the 1960s and 1970s).

**Figure 3**

Declaration of Professor John J. Donohue (19-cv-1537 BEN-JLB)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure from J. Mark Ramseyer & Minoru Nakazato, *Japanese Law: An Economic Approach* (1999).

131.   In addition to making this initial error, Lott tells us that gun bans do not work because "criminals do not buy their firearms legally."  We have already discussed this issue above, and once again, Lott is misguided in multiple dimensions.

132.   Lott's first mis-step in this claim is that he cites a study of prisoners in custody.  But the prison population would not provide accurate data on where public mass shooters get their weapons because most of mass shooters die at the

50

scene.  As noted above in footnote 23, the FBI study of 160 active shooter incidents found that in 59 percent of these incidents (94 of 160) the shooter is either killed or commits suicide.  Thus, the single most deadly mass killer, Stephen Paddock, did indeed buy all his assault weapons legally before he rained down terror on a Las Vegas music festival, but he could never appear in a prisoner interview (since he killed himself as the police closed in).

133.  Moreover, as we stated above, an enormous source of guns used by teens in school shootings come from the home and the ability to kill is greatly enhanced if the gun at home is an assault weapon with a high-capacity magazine (see footnote 22, above).  Adam Lanza could not have made this point any more powerfully when he used his mother's assault rifle to kill 26 (also killing himself as the police closed in).  Of course, this is part of the larger problem of the enormous rates of gun thefts in the United States each year – in the neighborhood of 400,000 stolen.  The more assault weapons lying around in the home of law-abiding citizens, the more will be made available to criminals via these enormous rates of theft.

134.  In his report, Lott attempts to discredit studies that find that the federal assault weapons ban was effective and to express support for those that find no effect.  His attempts are flawed.

135.  For example, Lott cites very early work by Christopher Koper (conducted well before a final empirical assessment was possible) that didn't find a strong effect of the federal assault weapons ban but ignores the fact that Koper's continued research in this area made the important point that one would see a bigger impact on mass shootings and killings of police than on overall homicides. As Koper told the *New York Times* in language that well applies to Lott's claims, "My work is often cited in misleading ways that don't give the full picture…. These

laws can modestly reduce shootings overall" and reduce the number and severity of mass shootings.[107]

136. Then Lott favorably cites the deeply flawed study of Gary Kleck, who presented this study on behalf of the NRA in trying to oppose New Jersey's restrictions on high-capacity magazines. The trial court rejected Kleck's study (and the NRA claims), finding Kleck's "methodologies and conclusions were flawed."[108] An example of the misconceived nature of Kleck's study can be seen in his effort to show that mass shooters shoot so slowly that high-capacity magazines don't help them kill more. To show this, he looked at the Virginia Tech killing and counted the number of shots fired and the duration of the assault in minutes, reaching the wholly implausible conclusion that there was only about 1 shot fired per minute as the shooter killed 32 and wounded 17. But Kleck grossly overstates the number of minutes of the assault by starting the clock hours before the main campus assault when the shooter killed two at an off-campus residence. In fact, the shooting episode on campus lasted nine minutes, while Kleck's miscalculation led him to conclude that the 172 shots fired came at the leisurely pace of one every 54 seconds.

137. The bigger point here is that you can't just average shots/minute since the advantage of an semiautomatic weapon is that it permits the shooter to shoot rapidly when he needs or wants to (such as when someone tries to flee or tries to attack the shooter), and large-capacity magazines allow this continuous stream of fire to be extended without the need to reload as frequently.

138. Lott then engages in an extended effort to contradict Klarevas's finding that the federal assault weapons ban reduced mass shooting deaths during the decade it was in place and these deaths jumped sharply thereafter. Lott's

---

[107] Linda Qiu and Justin Bank, "Major Shootings Led to Tougher Gun Laws, but to What End*?" The New York Times,* Feb. 23, 2018, https://www.nytimes.com/2018/02/23/us/politics/fact-check-mass-shootings-gun-laws.html.
[108] Association Of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey (3d Cir., December 5, 2018).

critique fails for two reasons.  First, he completely miscalculates mass shootings conducted with weaponry banned by the federal law.  Second, he only works with data through 2014 (as Klarevas had done), but my work has greatly strengthened Klarevas' conclusion by having data through 2019.

139.   In trying to minimize the impact of the federal assault weapons ban, Lott only counts a fraction of the crimes committed with federally banned weaponry.  He ignores the critical importance that the assault weapons ban included a limit on the size of large-capacity magazines.  Thus, all guns that could accept magazines, whether handguns or assault weapons, are less deadly when high-capacity magazines were restricted.  My empirical evaluation of data through 2019 has emphasized that restrictions on high-capacity magazines are essential if one wants to reduce the risk of Las Vegas style killings that enable hundreds of individuals to be shot.[109]  The evidence that the federal assault weapons bans reduced deaths from public mass shootings is powerful and unrefuted.

**Responding to the Curcuruto Declaration**

140.   Mr. Curcuruto opines that "modern sporting rifles" are commonly used by Americans for variety of lawful purposes.  His opinion, however, is incorrect because it relies on incorrect assumptions and flawed data.  As an initial matter, his opinion relies on a series of surveys by the National Shooting Sports Foundation (NSSF).  The NSSF surveys appear to have surveyed only hunters and target shooters, owners of "modern sporting rifles," or firearms retailers. These surveys naturally reflect selection-bias and are unreliable as an indicator of the prevalence of AR-15 style rifles or the uses for the AR- 15 style rifles by the general public,

---

[109] Arguments such as Lott's that focus solely on one component of the assault weapons ban – the gun itself – without considering the importance of the other component of the assault weapons ban – the restriction to only ten bullets in the magazine – cannot hope to provide a useful evaluation of the beneficial effect of the ban in reducing mass shooting deaths.  This issue is discussed more fully in John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV.

much less for assault weapons as defined by the AWCA.[110]  Curcuruto also cites a report that shows approximately 11 million AR-platform rifles were manufactured for sale in the United States between 1990 and 2016.  (Curcuruto ¶ 8.)[111]

141.   The fundamental flaw in Curcuruto's calculation is that he assumes, incorrectly, that all AR-platform rifles or "modern sporting rifles" are considered assault weapons under the AWCA.  That is simply not true.  The AWCA prohibits only semiautomatic rifles that are centerfire, lack a fixed magazine, and has one or more of the prohibited features.  Curcuruto, however, counts AR-15 platform rifles as assault weapons whether they are rimfire rifles (and thus not prohibited under California law) or centerfire rifles (which may, or may not, be prohibited, depending on the presence or absence of other features or a fixed magazine).  Thus, Curcuruto's focus on AR-15 platform rifles or "modern sporting rifles" includes many weapons that are not restricted under the AWCA and irrelevant to this case. Similarly, Curcuruto includes in his counts AR-15 platform rifles that could be either featureless or equipped with fixed magazines. In neither case would these weapons be considered assault weapons under California law.  In short, Curcuruto has no evidence how many firearms in the United States are considered assault weapons under the AWCA.

142.   Regardless of the number of assault weapons, what we do know is AR-15 platform rifles, of which assault weapons are a subset, are not commonly owned or used because ownership of those firearms is highly concentrated and growing more so. The evidence that gun ownership is concentrated is strong and uncontradicted. Researchers analyzing the results of a 2015 national survey found that 8% of individual gun owners reported owning ten or more firearms—

---

[110] Indeed, the NSSF reports that Curcuruto relies on show that its respondents owned 2.6 "modern sporting rifles" in 2010, which increased to 3.1 such rifles in 2013.  (Curcuruto Exhibit 4 at 13.)

[111] Elsewhere, Curcuruto cites a NSSF report that estimated 17.7 million modern sporting rifles produced in or imported into the United States between 1990-2017.  (Curcuruto ¶ 15.)

collectively accounting for 39% of the American gun stock—and that 20% of gun owners, who owned the most guns collectively, possessed about 60% of the nation's guns.[112] A decade earlier, researchers found a similar pattern: a 2004 survey indicated that 48% of gun owners possessed four or more guns and that the top 20% of firearms owners possessed 65% of all firearms.[113]

143.    Curcuruto's own evidence supports this.  The NSSF Report shows that the survey respondents owned an average of 2.6 "modern sporting rifles" in 2010, which increased to 3.1 such rifles in 2013.  (Curcuruto Exhibit 4 at 17.) It also shows that 66 percent of owners of AR- or AK-platform rifles own two or more such rifles; over 30 percent of them report owning three or more such rifles; and over 25 percent of them own four or more such rifles. (Curcuruto Exhibit 4 at 18, 24.)

144.    Because reliable social science data shows that the number of households that own guns has likely dropped in recent decades, and certainly has not grown, it seems most likely that robust gun sales can be attributed not to increasingly broad gun ownership but instead largely to purchases of guns by members of households that previously owned guns. While the precise number of American households that own assault weapons nationally is uncertain,[114] it is clear that most gun-owning households do not possess these types of weapons.

145.    Accordingly, the share of households containing an assault weapon will only be a subset of gun owners. This minority status of assault weapon

---

[112] See Azrael et al., supra.

[113] Hepburn et al., "The US Gun Stock: Results from the 2004 National Firearms Survey," Injury Prevention 2007;13:15–19.

[114] Kate Irby, "Nobody knows exactly how many assault rifles exist in the U.S. – by design," *McClatchy*, February 23, 2018, https://www.mcclatchydc.com/news/nation-world/national/article201882739.html. References to the number of guns manufactured in or imported into the U.S. can be misleading since they may fail to distinguish between guns provided to the military or guns subsequently transported, legally or illegally, to other countries.

ownership by <u>household</u> reflects the judgment of most Americans that assault weapons are not important to their self-defense.

146.   Plaintiffs and Mr. Curcuruto also state that "modern sporting rifles" are used for hunting.  (Curcuruto Decl. ¶ 7.)  However, while these firearms may be used for hunting, they are not often used for that purpose.  The 2019 NSSF report relied on by Curcuruto show that, of all weapons, "modern sporting rifles" were the least used for hunting, tied with handguns.  (Curcuruto Exhibit 6 at 151.)  The most popular weapons for hunting are shotgun, the traditional rifle, and archery equipment.  Even black powder firearms or muzzleloaders are more frequently used for hunting than "modern sporting rifles."  (*Id.*)

147.   We also know that the population of hunters in the United States has declined dramatically.  The General Social Survey has documented a dramatic, long-term decline in the number of Americans around the country who engage in hunting, and this decline is perfectly reflected in a similarly declining number of hunting licensees per capita. In the figure below, I plot the evolution of the GSS-reported hunting rate alongside hunting licensees per capita, and both indicate that Americans' tastes for hunting have abated steadily and substantially since the late 1970s.  In 1977, 31.6% of adults reported being a hunter or married to one, in 2016 the corresponding rate was only 17.1%.



148.   Indeed, it was the dramatic decline in hunting, along with the concomitant decline in sales of long guns that led the gun industry to start actively promoting "assault rifles" in the 1980s as a way to boost flagging sales (see the industry advertisement of "assault rifles pictured above in paragraphs 76-81).

149.   The 2019 NSSF report relied on by Curcuruto also documents that in the overall population of Americans who considers themselves to be hunters or sports shooters (or both), the proportion of hunters is declining sharply.  (Curcuruto Exhibit 6 at 141.). The report shows that within a mere six-year period between 2012-2018, the proportion who consider themselves to be hunters fell by a

1   whopping 14.5 per cent percentage points, and, as of 2018, the majority of the

2   hunting-shooting population were non-hunter.[115]

3       150.   Moreover, while some of the declining population of hunters are

4   inclined to use assault weapons, many hunters actively disdain this practice and

5   view it as inconsistent with the true sport of hunting.  As one self-described Second

6   Amendment supporter has written: "Hunters themselves find the rifle controversial,

7   with some arguing AR-15-style rifles empower sloppy, 'spray and pray' hunters to

8   waste ammunition."[116]

9       151.   The article goes on to capture a common refrain in the hunting

10  community, citing the following comment to an article in the NRA publication

11  americanhunter.org: "I served in the military and the M16A2/M4 was the weapon I

12  used for 20 years. It is first and foremost designed as an assault weapon platform,

13  no matter what the spin. A hunter does not need a semi-automatic rifle to hunt, if he

14  does he sucks, and should go play video games. I see more men running around the

15  bush all cammo'd up with assault vests and face paint with tricked out AR's. These

16  are not hunters but wannabe weekend warriors."

17

18

19

20

21

22

23

24

25

26   [115] According to the 2019 NSSF report, "There has been a steady trend among the entire hunting-shooting population moving to non-hunting, with 38.7% of this population being non-hunters in 2012, 44.2% in 2014, 51.4% in 2016, and now 53.2% being non-hunters in 2018."  Curcuruto Exhibit 6, at 141.

27

28   [116] https://slate.com/news-and-politics/2016/06/gun-control-ar-15-rifle-the-nra-claims-the-ar-15-rifle-is-for-hunting-and-home-defense-not-exactly.html).

1    I declare under penalty of perjury that the foregoing is true and correct.

2        Executed on January 23, 2020 at
     Stanford, California.

3

4

5

6    _____

7        John J. Donohue

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Professor John J. Donohue (19-cv-1537 BEN-JLB)

**EXHIBIT A**

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail: donohue@law.stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

## EMPLOYMENT

**Full-time Positions**

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

**Temporary Appointments**

- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.
- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.

1

- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

## EDUCATION
**Yale University, 1981-1986**
- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.
  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.
- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

**Harvard Law School, 1974-1977 (J.D.)**

- Graduated Cum Laude.
- Activities:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year):  (a)

2

First Semester:  Massachusetts Advocacy Center; (b) Second Semester:  Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against Bechtel Corporation's adherence to the Arab Boycott of Israeli companies.

**Hamilton College, 1970-1974 (B.A.)**
- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:
  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.

## PUBLICATIONS

**Books and Edited Volumes:**
- Law and Economics of Discrimination, Edward Elgar Publishing, 2013.
- Employment Discrimination:  Law and Theory, Foundation Press, 2005, 2009 (2d edition) (with George Rutherglen).
- Economics of Labor and Employment Law:  Volumes I and II, Edward Elgar Publishing, 2007.  http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070
- Foundations of Employment Discrimination Law, Foundation Press, 2003 (2d edition).
- Foundations of Employment Discrimination Law, Oxford University Press, 1997 (Initial edition).

**Book Chapters:**
- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty," Chapter in Encyclopedia of Law and Economics, Spring (2013).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, Controlling Crime: Strategies and Tradeoffs (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin," in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer?  The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare?" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).

- "The Evolution of Employment Discrimination Law in the 1990s:  A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).

- "The Impact of Concealed Carry Laws," in Jens Ludwig and Philip Cook, Evaluating Gun Policy:  Effects on Crime and Violence (Washington D.C.:  Brookings, 2003).

**Articles:**

- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," Law and Contemporary Problems, (forthcoming, January 2020).

- "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," NBER Working Paper No. 25863, May 2019 (with Steven Levitt).
    - Featured on Freakonomics Radio, "Abortion and Crime, Revisited."
      https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

- "A Panel-based Proxy for Gun Prevalence in the US," NBER working Paper No. 25530, February 2019. https://www.nber.org/papers/w25530

- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

4

- "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

- "Saving lives by regulating guns: Evidence for policy," *Science* 08 Dec 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), **https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694**

    - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html

    - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments

- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html

- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).

5

- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3

- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html

- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp

- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/

- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/

- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html

- "The Demise of the Death Penalty in Connecticut, " Legal Aggregate - Stanford Law School (June 2016), https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/

- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.

- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides

- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227
   - Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015. https://www.newsweek.com/does-death-penalty-deter-killers-364164

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

- o Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation: Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?" San Francisco Chronicle, December 21, 2012. http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qlkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill The Death Penalty?" The California Progress Report, June 28, 2012.

7

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," Am Law Econ Rev (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang).  See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. v (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society  10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig),
  http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.
  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice:  Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).
  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology  406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).
  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).
  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws: Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

9

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply To Joyce," 39 <u>Journal of Human Resources</u> 29 (Winter 2004)(with Steven Levitt).

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," <u>Criminology & Public Policy</u> (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 <u>Stanford Law Review</u> 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 <u>Stanford Law Review</u> 1371 (2003)(with Ian Ayres).

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, <u>Can Gun Control Work?</u>), <u>The American Prospect</u> (December 16, 2002), p. 35, http://prospect.org/article/books-review-4

- "The Search for Truth:  In Appreciation of James J. Heckman," 27 <u>Law and Social Inquiry</u> 23 (2002).

- "The Schooling of Southern Blacks:  The Roles of Social Activism and Private Philanthropy, 1910-1960," <u>Quarterly Journal of Economics</u> (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.
  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).
  - Reprinted in American Bar Foundation<u>, Anaylyzing Law's Reach:  Empirical Research on Law and Society</u> (2008)

- "The Impact of Race on Policing and Arrests," <u>Journal of Law and Economics</u>, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," <u>Quarterly Journal of Economics</u> (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.
  - Reprinted in Steven Levitt and Thomas Miles, eds., <u>The Economics of Criminal Law</u>, Edward Elgar Publishing (2008).
  - Reprinted in Robert Cooter and Francesco Parisi, eds., <u>Recent Developments In Law And Economics</u>, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 <u>Stanford Law Review</u> 897 (2001).
  - Reprinted in Michael Zimmer, Charles Sullivan et al, <u>Cases and Materials on Employment Discrimination</u> (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law:  A Case Study of Statistics, Standards of Proof, and Public Policy," <u>American Law and Economics Review</u> 436 (1999)(with Ian Ayres).
  - Reprinted in Steven Levitt and Thomas Miles, eds., <u>The Economics of Criminal Law</u>, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 <u>Yale Law Journal</u> 1901 (1999).

- "Understanding  The Time Path of Crime," 88 <u>Journal of Criminal Law and Criminology</u> 1423 (1998).

- "Discrimination in Employment," <u>The New Palgrave Dictionary of Law and Economics</u> (1998).
  - Excerpted in Lynne Dallas, <u>Law and Public Policy:  A Socio-Economic Approach</u> at page 261 (2003).

10

- "The Legal Response to Discrimination:  Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs In the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).
  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum:  Essays on Criminal Justice  45 (1997).

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective:  Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).
  - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

- Review of Richard Epstein's Forbidden Grounds:  The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).
  - Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).
  - Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).

- "Continuous versus Episodic Change: The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).
  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).

- "Studying the Iceberg From Its Tip: A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).

- "Prohibiting Sex Discrimination in the Workplace: An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law: The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).
  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

- "Law and Economics: The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation: A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony: Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.: JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

12

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).
  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia: Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

**Blog Posts:**

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.," *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/

- "Stanford Law Faculty Remember Justice Stevens." *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," *Stanford Law School Legal Aggregate Blog*, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/,

- "*Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html

13

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate? Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES

- "Gun Safety Under Attack," Grand Rounds, **Stanford University Department of Psychiatry and Behavioral Sciences**, February 20, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019; Law and Economics Workshop, **University of California, Berkeley, Law School**, February 6, 2020.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

14

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

15

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School,** October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside,** October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University,** August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School,** October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association,** April 27, 2016; **The League of Women Voters of Palo Alto,** April 19, 2016; Human Rights and Health Seminar, **Stanford University,** April 12, 2016; Bechtel International Center, **Stanford University,** February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University,** February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting,** San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law,** Nov. 20, 2015.

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School,** August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York,** May 14,  2015; **NBER Summer Institute,** Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School,** November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy,** June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law,** May 14, 2007; Faculty Workshop, **University of Haifa Law School,** May 16, 2007; Law and Economics Workshop, **Georgetown Law School,** September 19, 2007; Law and Economics Workshop, **St. Gallen Law School,** Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology,** Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan,** Italy, June 8, 2015.

16

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator: "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7,  2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School**, May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns:  Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

- "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, Mountainview City Hall, Mountainview, CA, Feb. 8, 2014.

- "Gun Policy Debate," C-SPAN. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.
- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16,  2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden,

CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013; 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?" **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate:  A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

18

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.

- Plenary Session:  Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law:  The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics:  The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre**, September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona)**, June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

19

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop, **NYU Law School,** March 10, 2009.

- Intelligence-Squared Debate: "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement," Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

- "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law,** May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School,** April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law: Criminal Sentencing and the Death Penalty, **Fordham Law School,** April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology,** Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy: Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law: The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School,** "Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- "Economic Models of Crime and Punishment," Punishment:  The U.S. Record: A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty: The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law:  The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines:  Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School**, October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England,** February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

21

- "Witness to Deception: An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law,** November 10, 2005; Center for the Study of Corporate Law, **Yale Law School,** November 3, 2005; **Law Offices of Herbert Smith, London, England,** February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England,** February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club,** Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management,** September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management,** September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico,** Mexico City, October 20, 2003.

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice,** San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School,** Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall,** University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School,** April 25, 2003; Faculty Workshop, **Stanford Law School,** July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University,** October 17, 2003; Faculty Workshop, **CIDE,** Mexico City, October 20, 2003.

- "The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute,** Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School,** October 4, 2000; First-Year Orientation, **Stanford Law School,** September 5, 2001; Faculty Workshop, **Harvard Law School,** April 26, 2002; Faculty Workshop, **Columbia Law School,** April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School,** Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute,** Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School,** October 16, 2001; Faculty Workshop, **Stanford Law School,** September 18, 2002; **Yale Law School,** January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference,** San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

22

- "Corporate Governance in Developing Countries: Opportunities and Dangers," Conference on Neoliberal Policies for Development: Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School,** September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School,** October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences**, October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on Why is Crime Decreasing? **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on Rethinking Equality in the Global Society, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America: Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?" TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

- "The Power of Law: Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?" The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy: Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School,** November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law,** February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University,** Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?" Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**,

April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?" **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority: Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," Economic Analysis of Civil Procedure, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics: The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

25

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?" Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics: The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon. **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty." A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets." A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?" A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees: The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?" **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.'

- https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

## PROFESSIONAL ACTIVITIES

- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing.

27

- Legal Scholarship Network Advisory Board Member, SSRN.

- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.

- Fellow of the Society for Empirical Legal Studies, 2015 - present.

- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.

- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.

- President, American Law and Economics Association, May  2011 – May 2012.

- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.

- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011;  Testified again before the Connecticut Judiciary Committee on March 14, 2012.

- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.

- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.

- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.

- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.

- Evaluated the Connecticut death penalty system:  "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/

- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html

- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.

- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.

- Editorial Board, International Review of Law and Economics, October 1999 – present.

- Editorial Board, Law and Social Inquiry, February 2000 – present.

- Board of Editors, American Law and Economics Review, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11,1998

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, Law and Social Inquiry.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois.  May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

**PRO BONO LEGAL WORK**

- Death Penalty case:  Heath v. Alabama.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  Baker v. Georgia.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

**RESEARCH GRANTS**

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

**BAR ADMISSIONS**

29

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

**PROFESSIONAL and HONORARY ASSOCIATIONS**

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

- American Law and Economics Association

**PERSONAL**

- Born: January 30, 1953.