XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (916) 731-2124
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in
his official capacity as Attorney General of
the State of California, and Brent E. Orick,
in his official capacity as Interim Director of
the Department of Justice Bureau of
Firearms*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER, et al.,** | 19-cv-1537 BEN-JLB |
| Plaintiffs, | |
| v. | **DECLARATION OF BLAKE GRAHAM IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,** | |
| Defendants. | |

## DECLARATION OF BLAKE GRAHAM

I, Blake Graham, declare:

1.      I am a Special Agent in Charge for the California Department of Justice, Bureau of Firearms.  I make this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction.  This declaration is based on my own personal knowledge and experience, and if called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

2.      I received a Bachelor of Science degree in May 1992 in Criminal Justice from the California State University Sacramento.  My coursework included forensics, corrections, and a number of classes in criminal justice-related topics.

3.      Since 1994, I have worked as either an investigator for the California Department of Alcoholic and Beverage Control (ABC) or as a Special Agent for the California Department of Justice (DOJ).  My job responsibilities in all of these positions have involved the recovery, investigation, and identification of firearms, the ammunition used for those firearms, and the magazines used for feeding ammunition for those firearms.

4.      My work as an Investigator for ABC between 1994 and 1999 included the recovery of firearms, magazines, and ammunition.

5.      Between 1999 and 2002, I worked as a Special Agent for DOJ, and was assigned to the Violence Suppression Program in the Bureau of Narcotic Enforcement.  In this job, I investigated violent crimes and various violations occurring at California gun shows.  As a gun-show enforcement agent, I attended gun shows in the San Francisco Bay Area to monitor, and if necessary, seize, firearms, ammunition, and magazines sold illegally to felons, parolees, and probationers.

1

6.      From October 2002 to March 2019, I was a Special Agent and Special Agent Supervisor, for the DOJ's Bureau of Firearms (BOF).  In that capacity, I was assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons and machine guns, and illegal possession of various magazines and ammunition. From April, 2019 to the present, I have been a Special Agent in Charge, for the BOF.  In this capacity, I supervise teams of Special Agents who are assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons and machine guns, and illegal possession of various magazines and ammunition.

7.      Since 2008, I have been responsible for reviewing handguns that are submitted by manufacturers for inclusion in California's roster of handguns certified for sale.  A copy of the roster can be found on the DOJ website: http://certguns.doj.ca.gov/.

8.      During my career, I have attended at least 40 gun shows and have become knowledgeable about current laws pertaining to the sales of firearms, assault weapons identification, assault weapons registration, the Automated Firearms System (AFS), ammunition, and ammunition containers—including large-capacity magazines (LCMs)—in the State of California.

9.      I have been trained and qualified to carry several different types of firearms, including the Glock Model 17 (9 mm semiautomatic pistol), multiple Glock .40 caliber semiautomatic pistols, the Heckler & Koch MP5 (9 mm submachine gun), the Smith & Wesson, Model 60 (.38 Special revolver), multiple .45 caliber semiautomatic pistols, and the Colt, Model M4 (5.56 mm machine gun). I have access to other Department-owned handguns, shotguns, submachine guns, machine guns, rifles, shotguns and 40 mm "less lethal" launchers.

Declaration of Blake Graham (19-cv-1537 BEN-JLB)

10.     Throughout my career, I have conducted training programs in the identification and handling of firearms.  I have also trained other Special Agents of BOF on assault weapons and firearms identification.  I also have given firearms identification classes to members of the multiple District Attorney's offices in the State of California.

11.     I have also completed at least 15 firearms training courses since 1994. These courses covered the assembly and use of specific firearms, cartridge composition (bullet, propellant, and casing), common calibers used by law enforcement, and training on rifle and handgun ammunition.  I have been certified as a California Peace Officer Standards and Training (POST)-approved Firearms Instructor/Rangemaster since 2002.

12.     During my career, I have become proficient in the use and disassembly of various revolvers, pistols, submachine guns, shotguns, and rifles.  I have effected or assisted in the arrest of at least thirty persons for illegal weapons possession.  In the course of my employment, I have participated in more than 30 search warrants involving the illegal possession of firearms.

13.     I have been qualified as an expert witness regarding the use of firearms in 16 cases in both federal and state court since 2007.

**OPINIONS**

14.     I am aware of the current state and former federal laws restricting the manufacture and sale of assault weapons and large-capacity magazines (LCMs) in California.

15.     California's Roberti-Roos Assault Weapons Control Act (AWCA) prohibits the sale of assault weapons and ownership of unregistered assault weapons.  The AWCA prohibits the manufacture, sale, and possession of specified rifles, pistols, and shotguns, which are defined as assault weapons by their make and model.  The lists of prohibited assault weapons are provided in Penal Code section 30510 and section 5499 of title 11 of the California Code of Regulations;

1   these lists are commonly referred to as Category 1 and Category 2 weapons,

2   respectively.  Some of the firearms listed in Penal Code section 30510 are weapons

3   that were prohibited under the federal assault weapons ban, which was in effect

4   from 1994 to 2004.  In general, the firearms listed in Penal Code section 30510 and

5   the additional ones listed in the regulations could be considered semiautomatic

6   versions of military weapons.  It is my understanding that the Plaintiffs in this

7   litigation are not challenging the assault weapons listed in section 30510 of the

8   Penal Code or section 5499 of title 11 of the California Code of Regulations.

9       16.    In response to attempts by firearm manufacturers to circumvent the

10  AWCA, in 2000, the California Legislature amended the AWCA to include an

11  alternative definition of assault weapons based on certain features or characteristics

12  of the firearm instead of their make or model.  The features-based definitions are

13  provided in Penal Code section 30515; firearms subject to the AWCA under these

14  alternative definitions are generally referred to as Category 3 weapons.  While it is

15  not necessary for a Category 1 or Category 2 assault weapon to have certain

16  features, those listed weapons usually share one or more of the features listed in

17  Penal Code Section 30515.  For semiautomatic rifles that qualify as assault

18  weapons, the most common feature of prohibited assault weapons is likely the

19  pistol grip.  The next most common features are probably telescoping stocks and

20  flash suppressors.  In my experience, assault pistols and assault shotguns are much

21  less common in California than assault rifles.  .

22      17.    I understand that Plaintiffs in this case are challenging California's

23  restrictions on assault weapons that apply to rifles, pistols, and shotgun deemed to

24  be assault weapons under Penal Code section 30515(a), i.e., Category 3 assault

25  weapons.

26      18.    The California Attorney General's Office has released an Assault

27  Weapons Identification Guide (last updated in November 2001).  The guide

28  provides photographs of Category 1 and Category 2 assault weapons, as well as a

4

discussion of the features-based definitions for Category 3 assault weapons. A true and correct copy of the Assault Weapons Identification Guide is attached as Exhibit A to this declaration. As noted, many of the Category 3 assault weapons have the same features as Category 1 and Category 2 weapons, so the photographs of those categories are illustrative of the features for Category 3 weapons. While the terms "assault rifle," "assault pistol," and "assault shotgun" are not used in the Penal Code, I use those terms in this declaration to refer to rifles, pistols, and shotguns, respectively, that qualify as assault weapons under the statute.

## I. ASSAULT-WEAPON DEFINITIONS BASED ON PROHIBITED FEATURES OR CHARACTERISTICS

### A. Assault Rifles (Section 30515(a)(1)-(3))

19. Penal Code section 30515(a)(1) defines an assault weapon to include "a semiautomatic, centerfire rifle that does not have a fixed magazine but has any one" of the following features:[1]

a. A pistol grip that protrudes conspicuously beneath the action of the weapon.

b. A thumbhole stock.

c. A folding or telescoping stock.

d. A grenade launcher or flare launcher.

e. A flash suppressor.

f. A forward pistol grip.

#### 1. Semiautomatic

20. As a threshold matter, this features-based definition applies to only semiautomatic, centerfire rifles that lack a fixed magazine. A semiautomatic rifle is "a firearm functionally able to fire a single cartridge, eject the empty case, and reload the chamber each time the trigger is pulled and released." California Code

---

[1] These features have been defined for purposes of assault-weapon registration in section 5471 of title 11 of the California Code of Regulations (hereafter, Section 5471). A true and correct copy of Section 5471 is attached as Exhibit B.

of Regulations, Title 11, § 5471(hh).  An automatic firearm, otherwise known as a "machine gun or sub-machinegun," by contrast, fires multiple rounds with a single pull of the trigger.  The California Penal Code defines "machinegun" to mean "any weapon that shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  Penal Code, § 16880(a).  Some machineguns and submachine-guns can be set to fire in "burst" mode with a fixed number of rounds being fired with each pull of the trigger.  More commonly, a functional and fully loaded machine gun or sub-machine gun can fire or continuously until the trigger is released.  Select-fire rifles can alternate between semiautomatic fire and automatic and/or burst fire depending on the setting selected by the shooter.  Law enforcement officers are generally issued semiautomatic rifles.

## 2.   Centerfire

21.   The next threshold requirement for the features-based definition is that the rifle be a "centerfire" rifle.  "Centerfire" refers to the type of ammunition the firearms were built to fire, namely a "cartridge with its primer located in the center of the base of the case."  California Code of Regulations, Title 11, § 5471(j).  This excludes all semiautomatic rimfire (usually .22 caliber) rifles that might have one or more listed features.

22.   Centerfire rifles generally use rounds that are associated with increased lethality.  The United States military uses various centerfire rifle rounds (5.56 mm and 7.62 x 51, for example) in multiple weapons systems.  Some California assault rifles are capable of firing the same centerfire rounds as these military weapons and could have the same high capacity for firepower as the military weapons.  In my experience being around the California gun industry and gun culture for nearly 20 years, rounds most commonly used with assault rifles are rifle-caliber rounds such as .223 caliber, 5.56 mm, or 7.62 x 39 mm.  These rounds will typically defeat normal bullet resistant body armor used by law enforcement.  While rifle resistant

1   plates can be added to most law enforcement body armor, the rifle plates are not

2   going to block or resist rifle-caliber rounds fired at all angles.  Some rifle rounds

3   are strong enough to defeat even the rifle-resistant plates available to law

4   enforcement.

5        23.     Some assault rifles are chambered in traditional pistol-caliber rounds,

6   such as 9 mm, .40, and .45 calibers.  Pistol-caliber rounds fired from assault rifles

7   chambered in these calibers may or may not be stopped by traditional law

8   enforcement body armor.  Generally, the longer the barrel the faster the bullet will

9   travel.  A rifle and handgun both shooting the same ammunition may have different

10  results in terms of penetrating body armor of equal protection levels.  The shorter

11  barrel lengths usually associated with a normal semiautomatic handgun might be 3-

12  5 inches long. By state and federal law, a rifle generally must have at least a 16-

13  inch long barrel.  The rifle barrel being at least three times longer than most

14  semiautomatic handgun barrels leads to the bullet leaving the barrel at a higher rate

15  of speed (or higher muzzle velocity).  In general, the faster the bullet is traveling,

16  the more likely it is to defeat body armor.  For example, the higher muzzle velocity

17  of .223 rounds shot out of a rifle can penetrate the soft body armor worn by most

18  law enforcement personnel, and can have greater range depending on the weapon.

### 3.   Lacking a Fixed Magazine Capable of Holding No More than 10 Rounds

24.     In addition to applying to only semiautomatic, centerfire rifles, the

features-based definition applies to rifles that lack a "fixed magazine," which the

Penal Code defines as "an ammunition feeding device contained in, or permanently

attached to, a firearm in such a manner that the device cannot be removed without

disassembly of the firearm action."  Penal Code § 30515(b).  Generally,

ammunition is supplied to semiautomatic rifles by magazines, which hold a certain

number of rounds and can be either detachable or fixed to the firearm.  A rifle that

lacks a fixed magazine allows the shooter to rapidly exchange a depleted magazine

with a fully loaded one, enabling a shooter to fire a large number of rounds near-continuously.  In the event of a public shooting, this may deprive an opportunity for law enforcement or the public to intervene to save lives.

25.    As with the former federal assault weapons ban, California defines large-capacity magazines (LCMs) as any ammunition feeding device with the capacity to accept more than 10 rounds.  Some LCMs can hold 20, 30, 50, 75 or 100 rounds of ammunition at a time.  Because semiautomatic, centerfire rifles that have fixed LCMs qualify as assault weapons under section 30515(a)(2), the features-based definition will not apply to a rifle that has a fixed magazine capable of holding no more than 10 rounds.

26.    LCMs are often used in conjunction with assault weapons that lack a fixed magazine.  California separately restricts the manufacture, sale, and importation of LCMs in Penal Code section 32310.  In 2016, California amended the law to generally prohibit the possession of LCMs, but as of this writing, the possession restrictions have been enjoined.  LCMs are also illegally sold to California residents or illegally imported from other states.

27.    LCMs enable a shooter to fire many more rounds without having to reload, which, as with rifles that lack a fixed magazine discussed above, may reduce the frequency of pauses during shootings and further reduces opportunities for law enforcement or the public to intervene to save lives.  A person intent on doing harm to the public or law enforcement will often pair assault weapons and multiple LCMs to maximize the lethality of their attacks.  As discussed below, assault weapons with LCMs have been used in numerous mass shootings and gun violence against peace officers.

### 4.    Prohibited Features

28.    A "pistol grip that protrudes conspicuously beneath the action of the weapon" is "a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below

1   the top of the exposed portion of the trigger while firing." California Code of

2   Regulations, title 11, § 5471. In my experience, this feature is the most prevalent

3   feature of assault rifles prohibited under the AWCA. Pistol grips are used in most

4   modern military machine guns and civilian semiautomatic rifle versions of these

5   firearms. The designers of military-style firearms are including this feature more

6   and more. A pistol grip on an assault rifle enhances the ergonomics of the weapon.

7   A shooter using an assault rifle without a pistol grip may shoot less accurately with

8   repeated—and especially rapid—shots if the shooter's trigger hand is in an

9   awkward position for a significant amount of time.

10         29.    Mr. Kapelsohn claims in his declaration that a pistol grip is not

11   necessary to prevent muzzle rise when firing a semiautomatic AR-15 platform rifle,

12   suggesting that muzzle rise is only a problem for fully automatic fire. (Kapelsohn

13   Decl. ¶ 28.) While this may be true for the firing of a single shot, it is generally not

14   true when firing multiple shots in quick succession. When a semiautomatic rifle,

15   like an AR-15, is fired rapidly, the rifle will generally exhibit muzzle rise, and a

16   pistol grip would help the shooter maintain accurate fire when shooting rapidly.

17   Furthermore, depending on the weapons system and the shooter's skill level, the

18   pistol grip may help a shooter complete magazine exchanges quicker. In addition, a

19   pistol grip may help a shooter maintain aim on a target while reloading, and perhaps

20   even fire a chambered round while reloading.

21

22

23

24

25

26

27

28

30.    A "thumbhole stock" is "a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing."  California Code of Regulations, title 1, § 5471(qq).  It allows for a grip similar to that offered by a pistol grip and can provide similar benefits to a shooter firing a rifle rapidly. Below is a photograph showing a thumbhole stock on a rifle.



31.    A "telescoping stock" is "a stock which is shortened or lengthened by allowing one section to telescope into another portion."  California Code of Regulations, title 11, § 5471(oo).  On AR-15 style firearms, the buffer tube or receiver extension acts as the fixed part of the stock on which the telescoping butt stock slides or telescopes.   A "folding stock" is "a stock which is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm."  California Code of Regulations, title 11, § 5471(nn).   A folding stock or telescoping stock that still allows the shooter to fire the rifle while the stock is folded or shortened and would likely provide a shooter with a tactical advantage because it is more versatile.

32.    The tactical advantage provided by a telescoping or folding stock include decreased overall length of the rifle by the shooter if desired for concealability.  This feature is beneficial for law enforcement purposes.  For example, when law enforcement personnel conduct room to room searches of a building, they would not want to give away their locations.  More compact weapons with folding or telescoping stocks may maintain the advantage of surprise. Semiautomatic weapons deployed by law enforcement with extremely long overall lengths may be seen by antagonists who mean to do harm to law enforcement.

Telescoping or folding stocks also allow for easier transportation and storage of the weapon and to more quickly allow the user to adjust the weapon for a better fit, but these are secondary considerations, particularly in the civilian context.

33.     Subjects intent on shooting one or more persons may have a tactical advantage by using a weapon with a shorter overall length.  This tactical advantage described above for law enforcement can also be used by a shooter wishing to remain undetected for as long as possible.  A weapon with a shorter overall length could also permit the shooter to smuggle the weapon undetected (by, for example, hiding the weapon in a backpack or bag) or to hide in the crowd without telegraphing the shooter's location.  A smaller weapon can also be concealed on the shooter's person underneath loose or bulky clothing.

34.     A "grenade launcher" is "a device capable of launching a grenade," which are classified under federal law as destructive devices.  California Code of Regulations, title 11, § 5471(v).  There is no conceivable civilian need for a grenade launcher.

35.     A "flare launcher" is "a device used to launch signal flares," California Code of Regulations, title 11, § 5471(q), which can be used in emergency situations or in military operations.  While flares may serve legitimate safety and rescue purposes in certain circumstances, for example on ships in open water, I can think of no legitimate reason for a civilian to launch flares from a rifle.

36.     A "flash suppressor" is "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. A hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be considered a flash suppressor.  A device labeled or identified by its manufacturer as a flash hider would also be considered a flash suppressor."  California Code of Regulation, title 11, § 5471(r).

37.   Most everyone has experienced a flash from a camera in our lifetimes. This camera flash can cause vision problems for people viewing the flash.   A firearm, in low light conditions may produce muzzle flash with each round fired. The muzzle flash may create vision problems for the shooter, which may cause the shooter to shoot less accurately.  Two rifles, one with a flash suppressor and one without, shooting the same ammunition with the same length barrels should perform differently in terms of reducing the amount of flash created.  The rifle with the flash suppressor should be easier to shoot in low light conditions because the shooter should have less problems aiming accurately.  Additionally, a flash suppressor can help conceal the location of a shooter in low light conditions. Mr. Kapelsohn claims that flash concealment is primarily for military purposes. (Kapelsohn Decl. ¶ 33.)  But a shooter intent on shooting people in public at night could take advantage of this effect and frustrate law enforcement efforts to stop the shooting.

38.   A "forward pistol grip" is a grip that allows for a pistol-style grasp forward of the trigger.  Many modern military machine guns, submachine guns and assault rifles worldwide have built-in forward pistol grips or locations that allow for forward pistol grips to be attached.  This feature can aid the shooter by offering an optional grip location on the rifle for the shooter's non-trigger hand to stabilize the weapon during repeated semiautomatic fire.

39.   Overall, in my experience, the challenged features described in Penal Code section 30515(a)(1), individually and especially when combined with other listed features, may assist shooters in being more effective and efficient while rapidly firing semiautomatic, centerfire rifles.  They are not merely "cosmetic" as suggested by Mr. Kapelsohn.  (Kapelsohn Decl. ¶ 38.)  (And if they were merely cosmetic, the plaintiffs would have no need for the features to engage in effective self-defense.)

40.     I have observed the videotaped demonstration of one of the Plaintiffs' declarants, Adam Kraut, which purports to show that a "featureless" rifle fires as rapidly and accurately as—or, according to the demonstration, more accurately than—a rifle with certain prohibited features.  This demonstration, however, was not performed under controlled circumstances, does not indicate how many repeated "takes" were filmed to obtain the results, and does not account for other tactical advantages that may be gained from some of the features, such as enhanced concealment from flash suppressors or adjustable stocks.  In my experience, assault rifles with one or more of the prohibited features will shoot more accurately when fired rapidly.  And as discussed below, many mass murders choose to use assault rifles to carry out their attacks.

### 5.     Additional Assault Rifles

41.     Penal Code section 30515(a)(2) also defines an "assault weapon" as a "semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds"—in other words, a semiautomatic, centerfire rifle with a fixed LCM.  As discussed previously, LCMs enable a shooter to fire more rounds in a given period of time, by reducing the frequency by which the shooter needs to reload the firearm.  LCMs are used frequently in mass shootings, such as the 2015 shooting in San Bernardino or the 2018 shooting in Thousand Oaks.  LCMs can also enable criminals to engage in sustained firefights with law enforcement personnel, causing more deaths and injuries, such as the 1997 bank robbery in North Hollywood.

42.     Detachable large-capacity magazines have been used in numerous mass shootings, such as the 1989 shooting at Cleveland Elementary School in Stockton, California, which prompted the enactment of the original AWCA.  Generally, a rifle equipped with a fixed 30-round LCM would have the capability of firing more rounds in a given period of time than an identical rifle with a fixed 10-round magazine because it would hold more rounds and would need to be

13

reloaded less frequently.  In other words, a shooter firing a semiautomatic rifle would conceivably be able to fire for a longer period of time before exhausting his or her ammunition and having to reload a LCM than for a 10-round magazine.  And even fixed magazines can be reloaded quickly—almost as quickly as a detachable magazine—when a rifle is assembled or modified in a way that allows for the rapid separation and reconnection of the lower and upper receivers.  Thus, a "fixed" LCM may not prevent the rapid reloading of a rifle, which would produce the same public-safety threats posed by detachable LCMs.

43.     Penal Code section 30515(a)(3) also defines an assault weapon as a "semiautomatic, centerfire rifle that has an overall length of less than 30 inches." According to California Code of Regulations, title 11, section 5471(x), the length of the rifle is measured in the shortest possible configuration in which the weapon will function or fire.  A shorter rifle is more concealable.  As with the adjustable stocks discussed above, the enhanced concealability of a rifle raises significant public safety concerns.

### 6.     The Suitability of Assault Rifles for Military and Law Enforcement Uses

44.     Semiautomatic rifles that qualify as assault weapons are generally modeled after successful military machine guns and submachine guns. Generally, rifles currently deemed to be assault weapons under California law have had a similar version issued to a military or police force somewhere in the world.  For example, the AR-15 is the civilian version of the military M-16.  The main difference between those military-issue firearms and firearms deemed to be assault weapons under California law is that assault weapons are semiautomatic. In some cases, military or police forces might issue semiautomatic rifles that are functionally the same as defined California assault weapons in terms of "rate of fire" or "capacity for firepower."

14

45.     The photo below depicts a Sturm Ruger, Mini-14/Ranch Rifle with no prohibited features listed in Penal Code section 30515.  It is a semiautomatic center fire rifle that is not an assault weapon.  It is effectively "featureless" in terms of Penal code section 30515.   These types of rifles are currently legal for sale in California and can be lawfully transferred and possessed by California residents who follow state and federal laws.  It has a traditional wooden stock, no pistol grip and no muzzle device:



46.     The semiautomatic centerfire rifle depicted below is a Sturm Ruger, Mini-14/Ranch Rifle with a folding stock, pistol grip and flash suppressor on the end of the barrel.  These types of rifles are currently not legal for sale in California and cannot be lawfully transferred by California residents.



47.     Rifles that qualify as assault weapons under Penal Code Section 30510, typically will have one or more features that are listed in Penal Code Section 30515 (pistol grip, etc.).  One or more of these features are also seen in many if not most of the firearms depicted in the Assault Weapon Identification Guide.

48.     As noted by Mr. Kapelsohn, assault rifles have reportedly been used by law-abiding individuals for self-defense.  (Kapelsohn Decl. ¶¶ 19-24.)  That

15

1    does not mean, however, that those rifles were particularly suitable for self-defense

2    or that a different firearm would have been less effective.  Any weapon, even a

3    fully automatic machine gun or a grenade launcher, could conceivably be used for

4    self-defense.  But machine guns and grenade launchers are not particularly suitable

5    for civilian self-defense applications.

6        49.    Nevertheless, assault rifles are suitable for law enforcement use.

7    There are many instances in which law enforcement and civilians have been hurt

8    and killed by criminals using assault weapons.  Law enforcement personnel need to

9    have equal or better weapons than those subjects they are confronting—commonly

10   referred to as a "force multiplier"—so that they are not outgunned by criminals with

11   assault weapons.

12       50.    And unlike civilians, law enforcement personnel are often required to

13   enter into dangerous situations to take a shooter into custody.  Law enforcement

14   personnel must often affirmatively put themselves in dangerous situations to subdue

15   shooters or other criminal suspects or to protect civilians.

16       51.    Law enforcement personnel undergo regular, specialized training to

17   safely and effectively use assault weapons.  Each round fired by law enforcement

18   personnel has the potential to cause criminal and/or civil ramifications for

19   individuals employed in this field and their agency they work for.  We are trained to

20   consider the backdrop (area behind whatever is being aimed at) to make sure

21   persons or property are not needlessly injured or damaged.  Law enforcement

22   agencies commonly require peace officers to maintain regular qualification with

23   duty firearms.  These qualifications can sometimes include varied distances from

24   the officer to the target, partially concealed targets, and scenarios in which the best

25   option available to the officer is to not shoot the target ("shoot/don't shoot"

26   scenarios).  Verbal commands and less lethal options are among the options

27   employed by law enforcement in conjunction with potentially lethal force.

28

## B.   Assault Pistols (Section 30515(a)(4)-(5))

52.     California Penal Code section 30515(a)(4) defines any semiautomatic pistol as an assault weapon if it does not have a fixed magazine and has any one (or more) of the following features:  (1) a threaded barrel capable of accepting a flash suppressor, a (second) forward hand grip, or a silencer, (2) a second handgrip, (3) a barrel shroud, and (4) the ability to accept a detachable magazine at some location other than the pistol grip beneath the action.  The Assault Weapon Identification Guide provides some examples of assault pistols on pages 40 through 48.

53.     A threaded barrel has grooves on the outside of the barrel that allow any of the listed features to be "screwed" onto the front of the pistol.  In addition to a threaded barrel, a "lugged barrel" has lugs at the end of the barrel, which can allow a silencer to be easily attached.  California regulates lugged barrels as threaded barrels.  (Section 5471(rr).)  A threaded barrel would make it relatively easy for a shooter to attach one of the listed features to the weapon quickly, making the weapon more deadly.  As I previously discussed in connection with the rifle features, a flash suppressor can help a shooter maintain accurate fire while firing the weapon rapidly in low light settings, and a second, forward pistol grip can help stabilize a firearm during repeated semiautomatic fire.  A silencer can help a shooter avoid detection while firing the weapon.  During the May 31, 2019 mass shooting in Virginia Beach, Virginia, for example, the shooter used a silencer in an incident that claimed 12 lives and injured 4 others.

54.     A semiautomatic pistol with a second handgrip—for example a forward pistol grip—can help a shooter maintain rapid fire during a shooting by counteracting muzzle rise.  And a barrel shroud can enable a shooter to hold onto the barrel while shooting rapidly without burning the non-shooting hand, which can help with accurate rapid fire in a similar way to a forward handgrip.

55.     A pistol that has the ability to accept a detachable magazine at a different location than the pistol grip, such as the Bushmaster pistol depicted on

1  page 40 of the Assault Weapons Identification Guide, is indicative of military

2  firearms and is not commonly seen on most civilian handguns.  Semiautomatic

3  pistols that accept a detachable magazine allow for reloading inside the pistol grip.

4      56.    Finally, California Penal Code section 30515(a)(5) defines a

5  semiautomatic pistol as an assault weapon if it has a fixed LCM.  As I discussed

6  earlier in connection with rifles, a pistol with a fixed LCM would enable a shooter

7  to fire more rounds in a given period than an identical pistol with a fixed 10-round

8  magazine, because the pistol would hold more ammunition and would need to be

9  reloaded less frequently.  A LCM would permit a shooter firing a semiautomatic

10  pistol to fire for a longer period of time before exhausting his or her ammunition

11  and having to reload compared to a 10-round magazine.

12      57.    In my experience, semiautomatic pistols that qualify as assault

13  weapons are not commonly owned by civilians.  They have, however, been used for

14  criminal purposes.  One of the shooters in the Columbine mass shooting, for

15  example, used an Intratec TEC-9 assault pistol, which is depicted on page 43 of the

16  Assault Weapons Identification Guide.

17      **C.    Assault Shotguns (Section 30515(a)(6)-(8))**

18      58.    The California Penal Code defines a shotgun to mean "a weapon

19  designed or redesigned, made or remade, and intended to be fired from the shoulder

20  and designed or redesigned and made or remade to use the energy of the explosive

21  in a fixed shotgun shell to fire through a smooth bore either a number of projectiles

22  (ball shot) or a single projectile for each pull of the trigger."  Penal Code § 17190.

23  Penal Code section 30515(a)(7) and (8) define shotguns as assault weapons if they

24  have certain features or characteristics.  In addition to birdshot, a shotgun can fire

25  shells containing more lethal buckshot or metal slugs that can cause significant

26  damage at short and long ranges.

27      59.    California Penal Code section 30515(a)(6) defines a semiautomatic

28  shotgun as an assault weapons if it has *both* an adjustable stock (either folding or

18

telescoping) and a pistol grip that protrudes conspicuously beneath the action of the shotgun, a thumbhole stock, or a vertical handgrip.  As with rifles, an adjustable stock can enhance the concealability of a shotgun, which can help a shooter smuggle the weapon into a sensitive place to engage in crime, such as a shooting or a robbery.  A vertical handgrip can enable a shooter to accurately fire multiple shotgun rounds rapidly.  Examples of assault shotguns are depicted on pages 50 through 53 of the Assault Weapons Identification Guide.  Each of the depicted shotguns has a pistol grip beneath the action of the firearm.

60.     California Penal Code section 30515(a)(7) defines a semiautomatic shotgun as an assault weapon if it can accept a detachable magazine.  Typically, shotguns must be reloaded manually by inserting the shells individually into the firearm.  Detachable magazines, by contrast, enable a shooter to reload a shotgun rapidly, allowing the shooter to fire more shells in a given period.

61.     Finally, California Penal Code section 30515(a)(8) defines a shotgun as an assault weapon if it has a revolving cylinder to feed ammunition into the firearm.  This includes the "Streetsweeper," depicted on page 52 of the Assault Weapons Identification Guide, and the "Striker-12," on page 53 of the guide.  Generally, a revolving cylinder can enable a shotgun to hold more shells and enables a shooter to fire those rounds without having to reload as often as a shotgun without a revolving cylinder.

62.     In my experience, shotguns that qualify as assault weapons are not commonly owned or used by civilians.

## II.   USE OF ASSAULT WEAPONS IN MASS SHOOTINGS.

63.     I am familiar with the use of assault weapons by subjects intending to do harm to civilians and law enforcement.

64.     Often assault weapons are paired with LCMs during these crimes by the suspects.  LCMs are ammunition feeding devices that can hold more than ten rounds, and sometimes up to 100 rounds, of ammunition.

65.     Semiautomatic assault weapons when loaded with LCMs enable a shooter to potentially fire more than 10 rounds without the need for the shooter to reload the weapon.

66.     Because LCMs enable a shooter to fire repeatedly without needing to reload every 10 rounds, they significantly increase a shooter's ability to kill and injure large numbers of people quickly.

67.     Assault weapons have been a popular weapon used in several mass shootings in California and elsewhere.

68.     Based on my research, all of the shootings listed below involved persons who shot and wounded and/or killed one or more persons, including peace officers, while using assault weapons.

a.     On July 18, 1984, an individual used a semiautomatic UZI and a Browning Hi-Point rifle to kill 21 people and injure 19 others at a McDonald's restaurant in San Ysidro, California.

b.     On January 17, 1989, an individual shot and killed 5 and wounded 32 others at the Cleveland Elementary School in Stockton, California. He used an AK-47 style rifle and LCMs in the shooting.  The Roberti-Roos Assault Weapon Control Act of 1989 was enacted shortly after this shooting.

c.     On April 20, 1999, 2 individuals used LCMs and an assault rifle and an assault pistol (an Intratec TEC-9) to murder 13 individuals and injure 24 others at Columbine High School in Littleton, Colorado.

d.     On January 9, 2005, an individual used a LCM and illegal assault weapon to shoot and kill Ceres Police Sgt. Howard Stevenson in Ceres, California.

e.     On June 15, 2008, an individual used an assault rifle and LCM to shoot and kill Yolo County Sheriff's Deputy Tony Diaz after a traffic stop near Dunnigan, California.

f.   On February 25, 2010, an individual used multiple weapons (including an assault weapon) and LCMs to shoot and kill Fresno County Sheriff's Detective Joel Wahlenmaier and Reedley Police Officer Javier Bejar in Minkler, California.

g.   On July 20, 2012, an individual used an assault weapon and LCMs, including a drum magazine, to kill 12 people and wound 70 others in a movie theater in Aurora, Colorado.

h.   On December 14, 2012, an individual used LCMs and multiple firearms (including an assault weapon) to kill 20 children and 6 adults at Sandy Hook Elementary School in Newtown, Connecticut.

i.   On June 7, 2013, an individual —who was previously denied purchase of a firearm by the California Department of Justice—used a home-built AR-15 rifle and LCMs to kill his father and brother at their family home, and then kill 3 and wound 4 others at the Santa Monica, California Community College.

j.   On December 2, 2015, two individuals used assault weapons and LCMs in killing 14 people and wounding 22 others at the Inland Regional Center in San Bernardino, California.

k.   On June 12, 2016, an individual used an assault rifle and LCMs to shoot and kill 49 people and wound 53 others inside a nightclub in Orlando, Florida.

l.   On July 7, 2016, an individual used an assault rifle and a LCM to shoot and kill 5 police officers and wound 9 others in Dallas, Texas.

m.   On July 17, 2016, an individual used an assault rifle and LCMs to shoot and kill 3 police officers and wound 3 other officers in Baton Rouge, Louisiana.

n.   On October 1, 2017, an individual used assault rifles and LCMs to fire over 1,000 rounds on concertgoers at an outdoor music festival

21

1  in Las Vegas, Nevada, killing 58 people and wounding more than

2  500 others.  To date, this is the deadliest mass shooting in U.S.

3  history.

4  o.  On October 3, 2018, an individual used an assault rifle in Florence,

5  South Carolina to shoot and kill 2 law enforcement officers.  Another

6  6 officers were also shot.

7  p.  On October 27, 2018, an individual used an assault rifle with LCMs

8  to kill 11 individuals and injure 6 others at the Tree of Life

9  synagogue in in Pittsburg, Pennsylvania.

10  q.  On June 19, 2019, Sacramento Police Officer Tara O'Sullivan was

11  killed by a suspect who shot her with an assault rifle while

12  responding to a domestic disturbance.

13  r.  On July 28, 2019, an individual used an AK-47 style rifle with

14  LCMs, which were purchased in Nevada weeks earlier, to kill 3

15  people and injure 12 others at the Gilroy Garlic Festival in Gilroy,

16  California.

17  s.  On August 3, 2019, an individual used an assault rifle with LCMs to

18  kill 22 people and injure 26 others at a Walmart in El Paso, Texas.

19  t.  Shortly after the El Paso shooting, on August 4, 2019, an individual

20  used an assault pistol with a 100 round drum magazine to kill 9 and

21  injure 27 others in Dayton, Ohio.

22  u.  On August 31, 2019, an individual used an assault rifle with LCMs to

23  engage in a shooting spree, including a firefight with law

24  enforcement officers, in Odessa and Midland, Texas.

25  v.  On December 10, 2019, two individuals used assault rifles and LCMs

26  to kill 4 people and injure 3 others in Jersey City, New Jersey.  One

27  of the dead was Jersey City Police Detective Joseph Seals.  The

28  shooters engaged in a lengthy firefight with law enforcement

1              personnel at a kosher grocery market and 3 law enforcement

2              personnel were injured as a result.

3        69.    Assault weapons have also been used in other countries to devastating

4   effect.  On April 28, 1996, in Port Arthur, Tasmania, an individual used an AR-15

5   rifle to murder 35 people and injure 23 others in a shooting spree that prompted the

6   government to enact restrictions on semiautomatic rifles, including a mandatory

7   buy-back program.  And on March 15, 2019, an individual used several firearms,

8   including an AR-15 platform rifle, to murder 51 people and injure 49 others at two

9   mosques in Christchurch, New Zealand.  After the Christchurch shootings, New

10   Zealand enacted a ban on semiautomatic firearms and magazines.

11        70.    Assault weapons have been used in gun violence against the public and

12   law enforcement, in California, in other states, and abroad.  While California's

13   restrictions on assault weapons cannot be expected to stop all gun violence or

14   prevent all mass shootings, it is my opinion that they have contributed positively to

15   the safety of the public and law enforcement personnel.

16        71.    It is my opinion that the AWCA enhances public safety by limiting

17   civilian access to prohibited weapons that are unreasonably dangerous for

18   unrestricted civilian use and are often used by those who intend on committing

19   crimes, such as mass shootings.

20   **III.  AN INJUNCTION WOULD DISRUPT ENFORCEMENT OF CALIFORNIA'**
21   **FIREARMS LAWS BEYOND THE CHALLENGED LAWS AND WOULD**
       **REQUIRE TIME TO IMPLEMENT**

22        72.    If enforcement of the challenged provisions of the AWCA is enjoined,

23   it would likely disrupt the State's ability to enforce the existing scheme of firearms

24   laws, beyond the challenged provisions themselves, and could potentially cause

25   irreversible harm.

26        73.    As I stated above, there have been numerous mass shootings in

27   California where the shooter had used assault weapons.  The AWCA seeks to

28   reduce the number of these firearms in circulation in the state.  If the challenged

1   provisions of the AWCA are enjoined, even if the injunction is later reversed, the

2   state would be left with many more of these firearms than before the injunction.

3       74.     An injunction would also disrupt enforcement of other laws.

4   California law requires all lawfully possessed assault weapons acquired before

5   December 31, 2016 to be registered with the California Department of Justice.

6   Penal Code § 30900.  The most recent registration period ended on July 1, 2018.

7   Penal Code § 30900(b)(1).  Therefore, if a law enforcement officer encounters an

8   assault weapon in the field, and, upon checking the Automated Firearms System,

9   determines that the firearm is not registered, the officer would deem that firearm to

10  be illegally possessed and take appropriate action.

11      75.     However, if the challenged provisions of the AWCA are enjoined,

12  residents of California would be permitted to acquire and possess new assault

13  weapons.  If a law enforcement officer encounters an unregistered assault weapon

14  in the field, the officer may have difficulty determining whether the firearm is new

15  and outside the existing registration requirement, and therefore potentially legally

16  possessed, or whether it was a firearm that should have been registered previously

17  (for example, a self-manufactured assault weapon built during the registration

18  window or an assault rifle acquired prior to 2014 that is not in the AFS) and the

19  owner had violated the registration laws.

20      76.     If the challenged provisions of the AWCA is enjoined, it would also

21  impose administrative burdens on law enforcement agencies at multiple levels and

22  the injunction that would require time to be implemented.  Law enforcement

23  agencies statewide have been enforcing the AWCA for decades.  If an injunction is

24  issued, all law enforcement agencies in the state would have to be informed of the

25  injunction, the scope of the injunction, and how an injunction might affect their

26  duties despite the AWCA still being on the books.

27      77.     If law enforcement agencies are not properly informed of the

28  injunction and the scope of the injunction, officers in the field may inadvertently

1 | violate the injunction by enforcing the law as they have been aware of it for the past
2 | 20 years.

3 |     I declare under penalty of perjury that the foregoing is true and correct.

4 |     Executed on January 22, 2020 at Sacramento, California.

Blake Graham

# EXHIBIT A

# California Attorney General



# Assault Weapons
# Identification Guide

as listed or described in Penal Code Sections 12276, 12276.1, and 12276.5

(Includes selected recent legislation)
3rd EDITION - November 2001

**State of California**
**Office of the Attorney General**
**Sacramento, California**

The purpose of this guide is to assist peace officers, firearms dealers, and the general public in the identification of assault weapons and to promote the better understanding of some of the more significant recently enacted legislation.

**This booklet may be reproduced without permission for noncommercial purposes, downloaded from the Firearms Division website at www.ag.ca.gov/firearms/awguide/, or purchased from the Firearms Division for $2 per copy at the address below.**

**Department of Justice**
**Firearms Division - AW Guide**
**P.O. Box 820200**
**Sacramento, California 94203-0200**

**Questions or requests for assistance may be directed to:**

| | |
|---|---|
| Telephone: | (916) 227-3703 |
| Fax: | (916) 227-3744 |

**Training for law enforcement agencies and firearms dealers on the subject of assault weapons or any matter concerning firearms or firearm law enforcement may be scheduled by calling (916) 263-0815.**

## INTRODUCTION

For the purposes of this guide, assault weapons are divided into three categories.  These are:  Category 1 - Penal Code section 12276 subdivisions (a), (b), (c) (Roberti Roos Assault Weapons Control Act of 1989); Category 2 - Penal Code section 12276 subdivisions (e) and (f) (*Kasler v. Lockyer*, AK and AR-15 series assault weapons); and Category 3 - Penal Code section 12276.1 (SB 23 - generic characteristic assault weapons).  **A combined listing of Category 1 and Category 2 assault weapons can be found on page 82.**

**Category 1**.  The Roberti-Roos Assault Weapons Control Act of 1989
This was California's first assault weapons act.  Under this act, any firearm on a list specified in Penal Code section 12276 is considered an assault weapon.  Such assault weapons are controlled (i.e., may not be legally purchased, kept for sale, offered for sale, exposed for sale, given, lent, manufactured, distributed, or imported) after December 31, 1991, and were required to be registered as assault weapons with the Department of Justice on or before March 31, 1992.  In addition, the Roberti-Roos Assault Weapons Control Act controlled AK and AR-15 series assault weapons (Penal Code section 12276, subd (e) and (f) - see Category 2).  These assault weapons are controlled regardless of whether they have Category 3 (Penal Code section 12276.1 - SB 23) characteristics.  The only legal option for Category 1 assault weapons that were not registered on or before March 31, 1992, is to surrender them to law enforcement pursuant to Penal Code section 12288.

**Category 2**.  AK and AR-15 Series Weapons
The California Supreme Court upheld the constitutionality of the Roberti-Roos Assault Weapons Control Act of 1989 in *Kasler v. Lockyer.*  This decision took effect August 16, 2000.  Effective August 16, 2000, firearm models that are variations of the AK or AR-15, with only minor differences from those two models, are assault

weapons under the original Roberti-Roos Assault Weapons Control Act of 1989.  AK and AR-15 series weapons were controlled as of August 16, 2000, and must have been registered as assault weapons with the Department of Justice on or before January 23, 2001.  The only legal option for Category 2 assault weapons that were not registered on or before January 23, 2001, is to surrender them to law enforcement pursuant to Penal Code section 12288.  These assault weapons are controlled regardless of whether they have Category 3 (Penal Code section 12276.1 - SB 23) characteristics.

**Category 3**.  Generic Characteristics
As of January 1, 2000, Senate Bill 23 (Chapter 129, Statutes of 1999) provided that firearms that have characteristics falling under any of the categories listed in Penal Code section 12276.1 are assault weapons.  These assault weapons were controlled as of January 1, 2000, and must have been registered as assault weapons with the Department of Justice on or before December 31, 2000.  However, a person arrested for possession of an unregistered Category 3 assault weapon on or before December 31, 2001 could have registered it under conditions specified in Penal Code section 12280(c) pursuant to reducing the charge to an infraction.  On and after January 1, 2002, the only legal option for Category 3 assault weapons that are not registered is to surrender them to law enforcement pursuant to Penal Code section 12288.  An exception for peace officers is addressed on the next page.

*__Punishment__*
  • Possession – Felony or misdemeanor -- **(Penal Code § 12280(b))**
                    Infraction under limited time and conditions -- **(Penal Code § 12280(c))**
  • Manufacture, distribution, transportation, importation, sale, and transfer of assault weapons -- Felony.
    **(Penal Code § 12280(a))**

**PEACE OFFICER EXEMPTION EFFECTIVE JANUARY 1, 2002**

Effective January 1, 2002, a peace officer member of a police department, sheriffs' office, or other law enforcement agency specified in Penal Code section 12280(f) who possesses or receives an assault weapon prior to January 1, 2002, may, with the authorization of his or her agency head, retain and personally possess that firearm provided he or she registers it as an assault weapon with the Department of Justice on or before April 1, 2002.  Any such-identified peace officer may also, with the authorization of his or her agency head, purchase or receive an assault weapon on or after January 1, 2002, provided he or she registers it as an assault weapon with the Department of Justice within 90 days of receipt.  Agency authorization must be in the form of verifiable written certification from the head of the agency identifying the recipient or possessor of the assault weapon as a peace officer and authorizing him or her to receive or possess the specific assault weapon.  The peace officer must include a copy of this authorization with the assault weapon registration.  Assault weapon registration forms may be obtained from the Department of Justice by calling (916) 227-3694.

**CONFIRMATION OF REGISTRATION (Law Enforcement Agencies Only)**

A law enforcement agency may verify an assault weapon registration by consulting the Automated Firearms System (AFS), which is accessible through the California Law Enforcement Telecommunications System (CLETS).  Each AFS assault weapon record includes the date of registration, information identifying the registrant, and information identifying the weapon.  Please note that the assault weapon registrant is not required to be in possession of his or her registration documentation.

# Contents

**CATEGORY 1.  Roberti-Roos Assault Weapons Control Act of 1989 ...................... 1**

   **LISTING** ..................................................................................................................... 3

   **RIFLES** ..................................................................................................................... 5

      AK Series (See Category 2, p. 57-61 for additional makes and models) ................................ 6

      Norinco 86S ................................................................................................................................ 7

      Colt AR-15 Series (See Category 2, p. 62-67 for additional makes and models) .................... 8

      Armalite AR-180 ........................................................................................................................ 9

      Beretta AR-70 .......................................................................................................................... 10

      Bushmaster Assault Rifle ........................................................................................................ 11

      Calico M-900 ........................................................................................................................... 12

      CETME Sporter ........................................................................................................................ 13

      Daewoo K-1, Max 1, AR 110C ................................................................................................ 14

      Daewoo K-2, Max 2,  AR 100 .................................................................................................. 15

      Fabrique Nationale FAL, LAR, and 308 Match ....................................................................... 16

      Fabrique Nationale FNC and Sporter ...................................................................................... 17

      Galil ......................................................................................................................................... 18

      HK-91 and HK-93 .................................................................................................................... 19

      HK-94 ...................................................................................................................................... 20

      HK-PSG-1 ............................................................................................................................... 21

      J&R ENG M-68 ........................................................................................................................ 22

      MAC Types .............................................................................................................................. 23

      MAS 223 .................................................................................................................................. 24

SAR 48 .................................................................................................................. 25
SIG AMT ............................................................................................................. 26
SIG PE-57 ........................................................................................................... 27
SG 550 and SG 551 ............................................................................................ 28
SKS with detachable magazine ........................................................................... 29
Springfield Armory BM 59 ................................................................................... 30
Sterling MK-6 ...................................................................................................... 31
Steyr* AUG ......................................................................................................... 32
Uzi ....................................................................................................................... 33
Valmet M62S ....................................................................................................... 34
Valmet M71S ....................................................................................................... 35
Valmet M78S ....................................................................................................... 36
Weaver Arms Nighthawk ..................................................................................... 37
**PISTOLS** .............................................................................................................. **39**
Bushmaster Pistol .............................................................................................. 40
Calico M-950 ....................................................................................................... 41
Encom MP-9 and MP-45 ...................................................................................... 42
Intratec TEC-9 .................................................................................................... 43
MAC Types .......................................................................................................... 44
Sites Spectre ...................................................................................................... 45
Sterling MK-7 ...................................................................................................... 46
Uzi ....................................................................................................................... 47

\* Statute spelling of "Steyer" is incorrect.

**SHOTGUNS** ...................................................................................................... 49
    Franchi Law 12 ......................................................................................... 50
    Franchi SPAS 12 ...................................................................................... 51
    The Streetsweeper Type S/S Inc. .......................................................... 52
    Striker 12 .................................................................................................. 53

# CATEGORY 2.  AK and AR-15 Series Weapons (Kasler v. Lockyer) ..................... 55
   **AK and AR-15 Series Weapons** .............................................................. 56
      AK Series Weapons .............................................................................. 57
      AR-15 Series Weapons ......................................................................... 62

# CATEGORY 3.  Assault Weapons Defined and Identified based on Generic Characteristics (Penal Code section 12276.1) ........................................................ 70

**LARGE CAPACITY MAGAZINES** ............................................................................ 73
   **Restrictions and Exemptions (Penal Code section 12020)** .................... 74
**Recent Firearms-Related Legislation** .................................................................... 77
    Handgun Safety Testing (Penal Code section 12125, et seq.) ............... 78
    Firearm Safety Device Requirement (Penal Code section 12087, et seq.) .......... 78
**Glossary** ................................................................................................................... 79

# Combined Listing of Category 1 and Category 2 Assault Weapons .... 82

# Category 1.

## Penal Code Section 12276, subdivisions (a)-(c)
# Roberti-Roos Assault Weapons Control Act of 1989

1

2

## CATEGORY 1

The Roberti-Roos Assault Weapons Control Act of 1989

The Roberti-Roos Assault Weapons Control Act of 1989 was California's first assault weapons act.  The Act is still in effect and specifically identifies assault weapons by make and model.  Assault weapons under this act include those firearms that are marked as specified in Penal Code section 12276, as well as those makes and models specified by the Attorney General pursuant to Penal Code section 12276.5.  As of October 2001, the Attorney General has not utilized the add-on provisions of Penal Code section 12276.5 subdivisions (a)-(f).

2  Except as otherwise noted, firearms described in this publication have been physically identified as assault weapons by their markings.  Those markings generally, but not always, include both the name or trademark of the manufacturer and the model name or number of the firearm.  Each description includes identification markings and an indication of where those markings, if any, are found on the firearm.

Caution must be used in identifying Roberti-Roos assault weapons because of the ease in which their appearance may be altered with attachments or different types of stocks; however, removing a characteristic does not change a firearm's status as a a Category 1 assault weapon.  A firearm specified in Penal Code section 12276 by make and model is a controlled assault weapon even if it is not identical to its picture in this publication.  If in doubt about the identity of a particular firearm, or if identifying marks have been removed or altered, please consult the Department of Justice Firearms Division at (916) 263-4887.

## CHAPTER 2.3. ROBERTI-ROOS ASSAULT WEAP-
## ONS CONTROL ACT OF 1989
## LISTING

The ACT  provides in part:

**12276.**  As used in this chapter, "assault weapon" shall mean the following designated semiautomatic firearms:

**(a) All of the following specified rifles:**
(1)   All AK series including, but not limited to, the models identified as follows:
  (A) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S.
  (B) Norinco 56, 56S, 84S, and 86S.
  (C) Poly Technologies AKS and AK47.
  (D) MAADI AK47 and ARM.
(2)   UZI and Galil.
(3)   Beretta AR-70.
(4)   CETME Sporter.
(5)   Colt AR-15 series.
(6)   Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR 110C.
(7)   Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter.
(8)   MAS 223.
(9)   HK-91, HK-93, HK-94, HK-PSG-1.
(10) The following MAC types:
  (A) RPB Industries Inc. sM10 and sM11.
  (B) SWD Incorporated M11.
(11) SKS with detachable magazine.
(12) SIG AMT, PE-57, SG 550, and SG 551.
(13) Springfield Armory BM59 and SAR-48.
(14) Sterling MK-6.
(15) Steyer AUG.
(16) Valmet M62S, M71S, and M78S.
(17) Armalite AR-180.
(18) Bushmaster Assault Rifle.
(19) Calico M-900.
(20) J&R ENG M-68.
(21) Weaver Arms Nighthawk.

**(b)  All of the following specified pistols:**
(1) UZI.
(2) Encom MP-9 and MP-45.
(3) The following MAC types:
  (A) RPB Industries Inc. sM10 and sM11.
  (B) SWD Incorporated M-11.

3

4

(C) Advance Armament Inc. M-11.
(D) Military Armament Corp. Ingram M-11.
(4) Intratec TEC-9.
(5) Sites Spectre.
(6) Sterling MK-7.
(7) Calico M-950.
(8) Bushmaster Pistol.

**(c) All of the following specified shotguns:**
(1) Franchi SPAS 12 and LAW 12.
(2) Striker 12.
(3) The Streetsweeper type S/S Inc. SS/12.

**(d) Any firearm declared by the court pursuant to Section 12276.5 to be an assault weapon that is specified as an assault weapon in a list promulgated pursuant to Section 12276.5.**

**(e) The term "series" includes all other models that are only variations with minor differences, of those models listed in subdivision (a), regardless of the manufacturer.**

**(f) This section is declaratory of existing law, as amended, and a clarification of the law and the Legislature's intent, which bans the weapons enumerated in this section, the weapons included in the list promulgated by the Attorney General pursuant to Section 12276.5, and any other models which are only variations of those weapons with minor differences, regardless of the manufacturer. The Legislature has defined assault weapons as the types, series, and models listed in this section because it was the most effective way to identify and restrict a specific class of semiautomatic weapons.**

4



5

# AK Series
6
12276(a)(1)

**AK Series**

6



*MANUFACTURER:*  various

*MARKINGS:*  **AK, AKM, AKS, AK47, AK47S, 56, 56S, 86S.  Also See Category 2.**

*Comments:*  The firearm pictured represents the general appearance of the AK series; however, these firearms may be found in various configurations.



*MANUFACTURER:* Chinese Government

*MARKINGS:* **86S located on left side of receiver near the rear. Also See Category 2.**

*Comments:* The firearm pictured here is included in the AK series and was originally identified by the Department of Justice as an assault weapon because the internal operation is similar to other AK type firearms.

**Norinco 86S**

**Norinco 86S**                           7                           12276(a)(2)

# Colt AR-15 Series  12276(a)(5)



*MANUFACTURER*:  Colt

*MARKINGS*:  **AR-15.  Also See Category 2.**

*Comments:*   The firearm pictured represents one general appearance of the Colt AR-15.  These firearms may be found in various configurations.

Colt AR-15 Series



*MANUFACTURER:*   various manufacturers
*MARKINGS:*   **Armalite AR-180** located on the right side of the receiver.

*Comments:*   Various other markings, including the name of manufacturer, are found on the firearm, but they are not material to identifying it as an assault weapon.

**Armalite AR-180**                    9                    12276(a)(17)

**Armalite AR-180**

# Beretta AR-70  12276(a)(3)



MANUFACTURER:   Pietro Beretta SPA

MARKINGS:   **AR 70** on the left side of the receiver near the top.

Comments:   May be marked Mod 70S or Mod 70 Sport.  However, only the mark **AR 70** is essential to identify the firearm as an assault weapon.



*MANUFACTURER:*   Bushmaster Firearms

*MARKINGS:*   **Bushmaster Assault Rifle** located on the left side of the receiver above the magazine.

*Comments:*   none

## Bushmaster Assault Rifle   11

12276(a)(18)

# Calico M-900  12276(a)(19)

**Calico M-900**



*MANUFACTURER:*   Calico Light Weapons Systems

*MARKINGS:*   **M-900** usually on the left side of the receiver.

*Comments:*   An unconventional spiral magazine may be located on the top of the receiver as pictured here.



13

*MANUFACTURER:*   Made in Spain
*MARKINGS:*   **CETME "Sport"** usually found on the left side of the magazine well.

*Comments:*   none

**CETME Sporter**

## CETME Sporter

13

12276(a)(4)

## Daewoo K-1, Max 1, AR 110C  🔢14

12276(a)(6)



MANUFACTURER:   Daewoo Precision Industries Ltd.

MARKINGS:   **K1**, **Max1**, or **AR110C** usually located on the left side of the receiver on the magazine well.

Comments:   Markings may include **A1** and other designations, but these additional markings are not material to identifying the firearm as an assault weapon.



15

MANUFACTURER:   Daewoo Precision Industries Ltd.

MARKINGS:   **K2**, **Max II** or **AR100** usually located on the left side of the receiver on the magazine well.

Comments:   none

**Daewoo K-2, Max 2,  AR 100**   15   12276(a)(2)

**Daewoo K-2, Max 2, AR 100**

**Fabrique Nationale FAL, LAR, and 308 Match** 🄻🄶 16  12276(a)(7)



16

*MANUFACTURER:*   FN Herstal SA (Fabrique Nationale Herstal)
*MARKINGS:*  **FAL**, **LAR**, or **.308 Match** usually located on the left side of the receiver.
*Comments:*   none

Fabrique Nationale FAL, LAR, and 308 Match



**47**

**Fabrique Nationale FNC and Sporter**

*MANUFACTURER:*   FN Herstal SA (Fabrique Nationale Herstal)

*MARKINGS:*   **FNC** or **Sporter** usually located near the top on the left side of the receiver.

*Comments:*   none

**Fabrique Nationale FNC and Sporter**    **17**                    12276(a)(7)

# Galil

18

12276(a)(2)

Galil



*MANUFACTURER:*   IMI (Israel Military Industries)

*MARKINGS:*   **GALIL** usually found on the left side of the receiver above the pistol grip.

*Comments:*   Various other model markings located on the firearm are not material to identifying it as an assault weapon.

18



*MANUFACTURER:*   HK (Heckler and Koch GmbH)
*MARKINGS:*   **HK91** or **HK93** usually found on the left side of the receiver on the magazine well.

*Comments:*   The **HK91** and **HK93** appear substantially the same but are in different calibers.

**HK-91 and HK-93**                    19                    12276(a)(9)

HK-91 and HK-93

## HK-94     20                    12276(a)(9)

HK-94



20

MANUFACTURER:   HK (Heckler and Koch GmbH)
MARKINGS:   **HK94** usually found on the top of the receiver.
Comments:  none



*MANUFACTURER:*   HK (Heckler and Koch GmbH)

*MARKINGS:*  The designation **PSG-1** is located on the left side of the receiver on the magazine well.

*Comments:*  none

**HK-PSG-1**

21

12276(a)(9)

**HK-PSG-1**

## J&R ENG M-68

22

12276(a)(20)



MANUFACTURER:   various  manufacturers

MARKINGS:   **J&R ENG. M68** located on the back end of the receiver above the stock.

Comments:   none

22

J&R ENG M-68



23

*MANUFACTURER:*   RPB Industries Inc. or SWD Inc.

*MARKINGS:*   **RPB Industries Inc. sM10** or **sM11** are usually marked on the right side of the lower receiver. **SWD Inc. M-11** is usually marked on the right side of the lower receiver.

*Comments:*   The appearance of this type of assault weapon may vary because of the type of stock or barrel attached, but those differences are not material to identifying the firearms as an assault weapon.

**MAC Types**

23

12276(a)(10)

**MAC Types**

## MAS 223

24

12276(a)(8)

MAS 223



*MANUFACTURER:*   MAS (Manufacture Nationale d'Armes de St Etienne)
*MARKINGS:*   The designation **MAS .223** appears on the right side of the receiver on the magazine well.

*Comments:*   none



25

*MANUFACTURER:*   Springfield Armory

*MARKINGS:*   **S.A.R.- 48** is found on the left side of the receiver above the pistol grip.

*Comments:*   The bipod, which folds up under the barrel, is shown here extended.

**SAR 48**

**SAR 48**

25

12276(a)(13)

# SIG AMT

 12276(a)(12)

SIG AMT



26

*MANUFACTURER:*   SIG (Swiss Industrial Company)

*MARKINGS:*  **AMT** usually found on top of the receiver near the barrel.

*Comments:*  none



*MANUFACTURER:*   SIG (Swiss Industrial Company)
*MARKINGS:*  **PE-57**

*Comments:*  none

**SIG PE-57**

27

12276(a)(12)

**SIG PE-57**

## SG 550 and SG 551



12276(a)(12)



*MANUFACTURER:*   SIG (Swiss Industrial Company)

*MARKINGS:*   **SG550** or **SG551** usually found on the left side of the receiver above the magazine well.

*Comments:*   These firearms have a similar appearance; however, the **550** is longer than the **551** model which is pictured here.

**SG 550 and SG 551**





*MANUFACTURER:*   Various

*MARKINGS:*   **SKS** usually found on the left side of the receiver.

*Comments:*   The SKS rifle was originally manufactured with a fixed 10 round magazine. However, modified versions accept detachable magazines and are assault weapons.

**SKS with detachable magazine**      12276(a)(11)

## Springfield Armory BM 59 

12276(a)(13)



MANUFACTURER:   Springfield Armory

MARKINGS:   **BM59** found in various locations on the firearm.

Comments:   Shown here without the detachable magazine. The marking "Beretta" may also be found but is not material to identifying it as an assault weapon.



MANUFACTURER:   Sterling Armament Co Ltd. (England)
MARKINGS:   **MK6** located on top of the magazine well.

Comments:   The magazine extends horizontally from the left side of the receiver.

**Sterling MK-6**

## Sterling MK-6

31

12276(a)(14)

# Steyr* AUG  12276(a)(15)



MANUFACTURER:   Steyr*-Manlicher AG (member of the Steyr*-Daimler-Puch AG group)

MARKINGS:  **AUG** usually molded in the right side of the polymer stock and followed by **/SA**.

Comments:  This firearm is in a bullpup configuration and is shown here with a muzzle cap and without the detachable magazine.

*Spelling of "Steyer" in the statute is a typographical error.



*MANUFACTURER:*   IMI (Israel Military Industries)

*MARKINGS:*   **UZI** usually located on the left side of the receiver near the rear.

*Comments:*   Various other model markings located on the firearm are not material to identifying it as an assault weapon.  The UZI is shown here with stock collapsed.

**Uzi**

**33**

12276(a)(2)

# Valmet M62S



12276(a)(16)

Valmet M62S

34



*MANUFACTURER:*   Valmet (Finland)

*MARKINGS:*   **M62/S** usually located on right side of the receiver to the rear.

*Comments:*   none



MANUFACTURER:   Valmet (Finland)

MARKINGS:   **M71/S** usually located on the right side of the receiver.

Comments:   Shown here without the detachable magazine.

**Valmet M71S**

35

12276(a)(16)

Valmet M71S

## Valmet M78S  12276(a)(16)



MANUFACTURER:   Valmet (Finland)

MARKINGS:  **M78S**

Comments:   Shown here without the detachable magazine.



MANUFACTURER:   Weaver Arms Ltd.
MARKINGS:  **Nighthawk** located  on the left side of the receiver.
Comments:  none

**Weaver Arms Nighthawk**

**Weaver Arms Nighthawk**          37

37

12276(a)(21)

38



39

39

# Bushmaster Pistol  12276(b)(8)



MANUFACTURER:   Bushmaster Firearms

MARKINGS:   **Bushmaster Pistol** usually appears on the left side of the receiver.

Comments:   This firearm is in bullpup configuration.

Bushmaster Pistol



*MANUFACTURER:*   Calico Light Weapons Systems

*MARKINGS:*   **M-950** is usually located on the left side of the receiver, below the magazine.

*Comments:*   An unconventional spiral magazine may be located on the top of the receiver as pictured here.

**Calico M-950**

41

12276(b)(7)

**Calico M-950**

# Encom MP-9 and MP-45  12276(b)(2)



MANUFACTURER:   Encom America

MARKINGS:   **MP9** (or **MP45**) usually found on the left rear of the receiver.

Comments:   The MP9 and MP45 appear substantially the same but are in different calibers.

Encom MP-9 and MP-45



*MANUFACTURER:*   Intratec

*MARKINGS:*   **TEC-9** is usually molded in the plastic on the left side of the magazine well.

*Comments:*   Shown here without the detachable magazine.

**Intratec Tec-9**

**Intratec TEC-9**                    43                    12276(b)(4)

## MAC Types

44

12276(b)(3)

MAC Types

44



*MANUFACTURER:*   various manufacturers

*MARKINGS:*   **RPB sM10** or **sM11**, **SWD Inc. M11**, **Advanced Armament Corp. M11,** and **Military Armament Corp. M-11**.  These weapons are usually found with the appropriate marks on the right side of the receiver above the pistol grip.

*Comments:*   none



45

**Sites Spectre**

*MANUFACTURER:*   Sites SpA (Italy)

*MARKINGS:*   **Spectre** is usually located on the right side of the receiver.

*Comments:*   Shown here without the detachable magazine.

# Sites Spectre    45    12276(b)(5)

# Sterling MK-7



12276(b)(6)



*MANUFACTURER:*   Sterling Armament Co. Ltd. (England)

*MARKINGS:*   **MK7** usually appears on the top of the magazine well.

*Comments:*   The magazine well extends horizontally from the left side of the receiver.

Sterling MK-7



*MANUFACTURER:*   IMI (Israel Military Industries)

*MARKINGS:*   **UZI** usually located on the left side of the receiver below the rear sight.

*Comments:*   none

**Uzi**                                           47                                           12276(b)(1)



48



49

# Franchi Law 12  12276(c)(1)



*MANUFACTURER:*   Luigi Franchi SPA

*MARKINGS:*   **LAW 12** usually appears on the right side of the receiver above the trigger.

*Comments:*   none



**51**

**Franchi SPAS 12**

*MANUFACTURER:*   Luigi Franchi SPA

*MARKINGS:*   **SPAS 12** usually appears on the right side of the receiver above the trigger.

*Comments:*   This shotgun fires in semiautomatic or pump-action modes.

**Franchi SPAS 12**                    **51**                    12276(c)(1)

## The Streetsweeper Type S/S Inc.  12276(c)(3)





*MANUFACTURER:*   S/S Inc. (may have the Cobray insignia).

*MARKINGS:*  **SS /12** is usually located on the front of the receiver above the winding key.

*Comments:*  none



53

*MANUFACTURER:*   various manufacturers

*MARKINGS:*   **Striker-12** usually appears on the left side of the receiver where the barrel affixes to the receiver.

*Comments:*   Shown here with a short barrel and without a stock attached.

**Striker 12**

53

**12276(c)(2)**

**Striker 12**



54

55

# Category 2.

## Penal Code Section 12276, subdivision (e)
# AK and AR-15
# Series Weapons
# (Kasler v. Lockyer)

55

# AK and AR-15 Series Weapons [56]

## CATEGORY 2

### AK and AR-15 Series Weapons (Kasler v. Lockyer)

This California Supreme Court decision took effect on August 16, 2000.  Under this decision, any firearm of minor variation of the AK or AR-15 type (i.e., series weapon), regardless of the manufacturer, is a Category 2 (*Kasler v. Lockyer*) assault weapon under the original Roberti-Roos Assault Weapons Control Act of 1989. **All AK and AR-15 series weapons had to be possessed before August 16, 2000 and must have been registered on or before January 23, 2001**.  The Department of Justice is required to identify these series weapons and includes in this publication a listing of identified AK and AR-15 series weapons.

**It is important to note that removal of a firearm's characteristics does not affect its status as a Category 2 assault weapon.  A Category 2 assault weapon is still an assault weapon even if it has no Category 3 (SB 23 - generic characteristics) features.**

**Category 2 assault weapons may be of any caliber, including .22 caliber rimfire.**

AK and AR-15 Series Weapons

## AK Series Weapons

The following pages show markings and illustrations of AK series weapons subsequently identified as Roberti-Roos assault weapons as a result of the California Supreme Court's ruling in *Kasler v. Lockyer* on August 16, 2000. Listed weapons were required to be purchased on or before August 16, 2000 and registered as assault weapons on or before January 23, 2001, with the exception of original Category 1 (Roberti-Roos) assault weapons, which were required to be registered on or before March 31, 1992. Category 1 weapon models on the list are noted with asterisks.

The markings on each of these firearms can usually be found on the receiver. In some cases, the markings appear on the trundle (between the barrel and the receiver).

Caliber has no bearing on a weapon's status as a series weapon and should be disregarded when making an identification. For example, a ROMAK AK-47 is a series weapon whether it is in .223 cal, .308 cal, or 7.62 X 39 mm.

The makes and models provided in this guide include those which the Department of Justice was able to locate prior to printing this booklet. It is probable that some series weapons unknown to the Department of Justice are in circulation. If you encounter a suspected series weapon that is not specifically identified in this booklet, please contact the Firearms Division at (916) 263-4887 for identification of that weapon. Additional assault weapon models as they are identified will be included in future versions of this guide and will be posted on our website at www.ag.ca.gov/firearms/awguide/.

# AK Series Weapons

**Penal Code § 12276(e)**

**AK Series Weapons**

**58**

Penal Code § 12276(e)

*AK Series markings include, but are not limited to, the following:*

**American Arms**
AK-Y 39
AK-F 39
AK-C 47
AK-F 47

**Arsenal**
SLR (all)
SLG (all)

**B-West**
AK-47 (all)

**Hesse Arms**
Model 47 (all)
Wieger STG 940 Rifle

**Inter Ordnance - Monroe, NC**
AK-47 (all)
RPK
M-97

**Kalashnikov USA**
Hunter Rifle /Saiga

**MAADI CO**
*AK47
*ARM
MISR (all)
MISTR (all)

**Made in China**
*AK
*AKM
*AKS
*AK47
*56
*56S
*84S
*86S

**MARS**
Pistol

**Mitchell Arms, Inc.**
AK-47 (all)
AK-47 Cal. 308 (all)
M-76
RPK
M-90

**Norinco**
AK-47 (all)
Hunter Rifle
NHM 90, 90-2, 91 Sport
RPK Rifle
*56
*56 S
81 S (all)
*84 S
86 (all)
*86 S
MAK 90

**Ohio Ordnance Works (o.o.w.)**
AK-74
ROMAK 991

**Poly Technologies**
*AKS
*AK47

**Valmet**
Hunter Rifle
76 S

**WUM**
WUM (all)

**\*** These weapons were required to be registered on or before March 31, 1992.

**58**

**AK Series Weapons**



**59**

*Comments:*   The firearms pictured represent the general appearance of the AK series; however, these firearms may be found in various configurations as pictured in this section.

**AK Series Weapons (Continued)**   **59**   Penal Code § 12276(e)

AK Series Weapons (Continued)

**AK Series Weapons (Continued)** 60 Penal Code § 12276(e)



*Comments:*   The firearms pictured represent the general appearance of the AK series; however, these firearms may be found in various configurations as pictured in this section.

AK Series Weapons (Continued)



*Comments:*   The firearms pictured represent the general appearance of the AK series; however, these firearms may be found in various configurations as pictured in this section.

**AK Series Weapons (Continued)**   61   Penal Code § 12276(e)

**AK Series Weapons (Continued)**

61

# AR-15 Series Weapons 

**AR-15 Series Weapons**

The following pages show markings and illustrations of AR-15 series weapons. The Colt AR-15 was the only AR-15 series weapon to be originally identified as an assault weapon under the Roberti-Roos Assault Weapons Control Act of 1989, and was required to be registered on or before March 31, 1992. With the exception of the Colt AR-15, all of the listed AR-15 series weapons were subsequently identified by the Department of Justice as Category 2 assault weapons as a result of the *Kasler v. Lockyer* California Supreme Court ruling effective August 16, 2000. Category 2 (*Kasler v. Lockyer*) weapons were required to be purchased on or before August 16, 2000 and registered as assault weapons on or before January 23, 2001. The markings on these firearms usually appear on the left side of the lower receiver.

Caliber has no bearing on a weapon's status as a series weapon and should be disregarded when making an identification. For example, upper receiver conversion kits are available to convert almost any AR series weapon into .45 ACP, .40 S&W, 7.62 X 39 mm, 9 mm, 10 mm, or .223 caliber.

The makes and models provided in this guide include those which the Department of Justice was able to locate prior to printing this booklet. It is probable that some series weapons in circulation are unknown to the Department of Justice. If you encounter a suspected series weapon that is not specifically named in this booklet, please contact the Firearms Division at (916) 263-4887 for identification of that weapon. Additional assault weapon models as they are identified will be included in future versions of this guide and will be posted on the Firearms Division website at www.ag.ca.gov/firearms/awguide/.

### _AR-15 Series markings include, but are not limited to, the following:_

**_American Spirit_**
ASA Model

**_Armalite_**
AR 10 (all)
M15 (all)
Golden Eagle

**_Bushmaster_**
XM15 (all)

**_Colt_**
*AR-15 (all)
Sporter (all)
Match Target (all)
Law Enforcement (6920)

**_Dalphon_**
B.F.D.

**_DPMS_**
Panther (all)

**_Eagle Arms_**
M15 (all)
EA-15 A2 H-BAR
EA-15 E1

**_Frankford Arsenal_**
AR-15 (all)

**_Hesse Arms_**
HAR 15A2 (all)

**_Knights_**
SR-15 (all)
SR-25 (all)
RAS (all)

**_Les Baer_**
Ultimate AR (all)

**_Olympic Arms_**
AR-15
Car-97
PCR (all)

**_Ordnance, Inc._**
AR-15

**_Palmetto_**
SGA (all)

**_Professional Ordnance, Inc._**
Carbon 15 Rifle
Carbon 15 Pistol

**_PWA_**
All Models

**_Rock River Arms, Inc._**
Standard A-2
Car A2
Standard A-4 Flattop
Car A4 Flattop
NM A2 - DCM Legal
LE Tactical Carbine

**_Wilson Combat_**
AR-15

**\*** These weapons were required to be registered on or before March 31, 1992.

# AR-15 Series Weapons    63

**AR-15 Series Weapons**

**AR-15 Series Weapons (Continued)** 64 Penal Code § 12276(e)



*Comments:*   The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.



**AR-15 Series Weapons (Continued)**

*Comments:*  The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.

**AR-15 Series Weapons (Continued)**     65     Penal Code § 12276(e)

**AR-15 Series Weapons (Continued)**  Penal Code § 12276(e)



*Comments:*  The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.



*Comments:*   The firearm pictured represents one general appearance of the AR-15 series. However, these firearms may be found in various configurations.

**AR-15 Series Weapons (Continued)**

**AR-15 Series Weapons (Continued)**                    67                    Penal Code § 12276(e)



68

# Category 3.

## Penal Code Section 12276.1

# Assault Weapons Defined and Identified based on Generic Characteristics

69

70

# CATEGORY 3

## Assault Weapon Generic Characteristics (Penal Code Section 12276.1)

The Roberti-Roos Assault Weapons Control Act of 1989 (Penal Code section 12276) regulates specific assault weapons by makes and models.  Since its passage in 1989, many manufacturers created new firearm models that have very similar characteristics to controlled assault weapons.  In response, the Legislature passed and the governor signed SB 23 (Chapter 129, Statutes of 1999), which created Penal Code section 12276.1 to define assault weapons by generic characteristics.  It is important to understand that the Roberti-Roos Assault Weapons Control Act of 1989 (Penal Code section 12276), which lists assault weapons by make and model, is still the law and those weapons were required to be registered on or before March 31, 1992 (with the exception of certain AK series and AR-15 series weapons, which were required to be registered on or before January 23, 2001).  (Penal Code §§ 12276.1)

Penal Code section 12276.1 complements rather than supersedes the Roberti-Roos Assault Weapons Control Act of 1989.  A firearm that is of a type specified in Penal Code Section 12276.1 that has any of the specified characteristics listed for that type of firearm is considered a Category 3 (generic characteristics) assault weapon.  Under Penal Code section 12276.1, a firearm's make, model, or markings have no bearing on whether it is an assault weapon.  A firearm's status as an assault weapon under this category is determined solely by its characteristics.  There are three general types of firearms that are controlled by the generic characteristics assault weapons laws.  These types include semiautomatic centerfire rifles, semiautomatic pistols, and semiautomatic or revolving cylinder shotguns.

## <u>Generic Characteristics Defining Assault Weapons:</u>

**12276.1  (a) Notwithstanding Penal Code section 12276, "assault weapon" shall also mean the following:**
<u>Rifles</u>

    (1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following:

        (A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

        (B) A thumbhole stock.

        (C) A folding or telescoping stock.

        (D) A grenade launcher or flare launcher.

        (E) A flash suppressor.

        (F) A forward pistol grip.

    (2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

    (3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

**Note:  Bayonets and bayonet lugs are not assault weapon characteristics under California law.**

71

72

**Pistols**

(4)  A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the fol-
lowing:

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.

(B) A second handgrip.

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to
fire the weapon without burning his or her hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5)  A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

**Shotguns**



(6)  A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or
vertical handgrip.

(7)  A semiautomatic shotgun that has the ability to accept a detachable magazine.

(8)  Any shotgun with a revolving cylinder.

73

# LARGE CAPACITY MAGAZINES

73

74

**Large Capacity Magazine Restrictions and Exemptions (Penal Code Section 12020)**

A large capacity magazine is defined as "any ammunition feeding device with a capacity to accept more than 10 rounds but shall not be construed to include a feeding device that is permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device (or, effective January 1, 2002, a tubular magazine contained in a lever-action firearm)."  It is important to understand that a large capacity feeding device may be detachable or fixed, and includes any tube ammunition feeding device (other than .22 caliber or, effective January 1, 2002, a tubular magazine contained in a lever-action firearm) that can accommodate more than 10 rounds.  A large capacity magazine also includes linked ammunition with more than 10 rounds linked together or an ammunition belt with the capacity to accept more than 10 rounds.

**Possession** of large capacity magazines, whether by peace officers or private citizens, **is not** controlled.

**The manufacturing, importation into the state, offering for sale, keeping for sale, exposing for sale, giving, and lending of a large capacity magazine is** controlled.  No person may participate in these activities without a permit issued by the Department of Justice.  For exceptions, see Penal Code §§12020(b)(19)-(32).

Specified law enforcement agencies and their employees are exempt from these restrictions.  These agencies and employees include any federal, state, county, city and county, or city, law enforcement agencies and employees of those agencies while discharging their official duties, whether on-duty or off-duty, where the use is authorized by the agency within the scope of their duties.  This exemption includes the sale of, giving of, lending of, importation into the state, or purchase of any large capacity magazine.

Peace officers (distinct from law enforcement agencies) who are authorized to carry firearms in the course and scope or their duties are exempted.  This exemption includes the sale to, lending to, purchase of, purchase by, receipt of, or importation into the state of large capacity magazines.  For record keeping purposes, a peace officer who purchases large capacity magazines from a firearms dealer is required to provide that firearms dealer with a copy of his or her peace officer photo identification.  In the event the magazine is stamped "RESTRICTED LAW ENFORCEMENT/GOVERNMENT USE ONLY," federal regulations require the law enforcement officer to provide the firearms dealer with:  1) A written statement from the officer, under penalty of perjury, that the magazine is being purchased for use in performing official duties and the it is not being acquired for personal use or for purposes of transfer or resale; and 2) a written statement from a supervisor of the purchasing officer, stating under penalty of perjury that the officer is acquiring the magazine for use in official duties, that the magazine is suitable for use in performing official duties, and that the magazine is not being acquired for personal use or for purposes of transfer or resale.

Other allowances are made for firearms dealers; the loaning of large capacity magazines under specified conditions; the importation into the state of previously owned magazines by residents who lawfully possessed those magazines prior to January 1, 2000 and who lawfully took them out of the state; the repair of magazines; importation of large capacity magazine by permitted individuals; the armored car industry; manufacturing large capacity magazines for specified purposes; and prop masters (Penal Code §§ 12020(b)(21)-(32)).

*Punishment* – Felony or Misdemeanor. **(Penal Code § 12020(a)(2))**
*Law Enforcement Exemption* – Agencies and sworn peace officers. **(Penal Code §§ 12020(b)(19), (20))**

76

# Selected Recent Firearms-Related Legislation

77

78

### Peace Officer Registration and Acquisition of Assault Weapons (Penal Code Section 12280(g))

Effective January 1, 2002, a peace officer member of the Department of Justice, police departments, sheriffs' offices, marshals' offices, the Youth and Adult Corrections Agency, the Department of the California Highway Patrol, district attorneys' offices, Department of Fish and Game, Department of Parks and Recreation, or the military or naval forces of this state or of the United States, or any federal law enforcement agency, who possesses or receives an assault weapon prior to January 1, 2002, may, with the authorization of his or her agency, retain and personally possess that firearm provided he or she registers it as an assault weapon with the Department of Justice on or before April 1, 2002. Such a peace officer may also, with the authorization of his or her agency, personally purchase or receive an assault weapon on or after January 1, 2002, provided he or she registers it as an assault weapon with the Department of Justice within 90 days after possession or receipt. Assault weapon registration forms are available from the Department of Justice and may be obtained by calling (916) 227-3694.

Acceptable agency authorization is defined as verifiable written certification from the head of the agency identifying the recipient or possessor of the assault weapon as a peace officer and authorizing him or her to receive or possess the specific assault weapon. The peace officer must include a copy of this authorization with the assault weapon registration.

### Large-Capacity Magazines (Penal Code Section 12020)

Effective January 1, 2002, tubular magazines contained in lever-action firearms are excluded from the definition of "large capacity magazine." This change removes statutory prohibitions against manufacturing, selling, giving, lending, etc., many "old west" style lever-action rifles.

Effective January 1, 2002, technical amendments to Penal Code section 12020 expressly allow properly licensed persons to manufacture large-capacity magazines. Prop masters may also purchase and loan large-capacity magazines.

### Criminal Storage of a Firearm (Penal Code Sections 12035 & 12036)

Effective January 1, 2002, the age under which persons are considered "children" for purposes of criminal storage of a firearm is increased from 16 years to 18 years. Any person guilty of criminal storage of a firearm is guilty of an additional misdemeanor and a fine of up to $5,000 if the child took the firearm to a school or school-sponsored activity.

# Glossary

79



**80**

**Automatic firearm** -  An automatic firearm continues to self-load and fire as long as the trigger is held back and a supply of ammunition is present.  In an automatic firearm, one pull on the trigger may result in multiple shots being fired.

**Caliber** -  The caliber of a firearm is the approximate diameter of the bore measured before rifling (or the diameter of a circle formed by the tops of the rifling lands).

**Flash suppressor -** Any device designed, intended, or that functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

**Forearm** -  The forward portion of a two-part stock which is usually under the barrel.

**Magazine** -  Any ammunition feeding device.

**Magazine, fixed** -  A magazine which remains affixed to the firearm during loading.  Frequently a fixed magazine is charged (loaded) from a clip (en bloc or stripper) of cartridges inserted through the open breech into the magazine.

**Magazine, detachable** -  An ammunition feeding device that can be removed readily from the firearm with neither disassembly of the firearm action nor use of a tool being required.  A bullet or ammunition cartridge is considered a tool.  Ammunition feeding device includes any belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.

**Pistol Grip, conspicuously protruding** -  A grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.

**Pistol Grip, forward** -  A grip that allows for a pistol style grasp forward of the trigger.

**Receiver** - The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. The receiver may consist of two sections. In some autoloading pistols and other firearms, the terms receiver and frame are used interchangeably.

**Receiver, lower** -  In a receiver composed of two parts, the lower receiver usually contains the trigger and firing mechanism.

**Receiver, upper** -  In a receiver composed of two parts, the upper receiver usually contains the barrel and breech mechanism.

**Semiautomatic firearm** -  This refers to a firearm which is self-loading but not self firing.  A single pull on the trigger results in a single shot being fired.

**Stock** -  The part of a rifle, carbine or shotgun to which the barrel assembly is attached and which provides a means for holding the weapon to the shoulder.

**Stock, collapsing** -  A stock which is shortened by allowing one section to telescope into another.

**Stock, folding** -  A stock which is hinged to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm.

**Stock, thumbhole -** A stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.

81

**82**

## Combined Listing of Category 1 and Category 2 Assault Weapons

Italicized models are Category 1 and were required to be registered on or before March 31, 1992.  Non-italicized models are Category 2 and were required to be registered with the Department of Justice on or before January 23, 2001.  Category 3 assault weapons are not included in this listing.

### *Rifles*

**American Arms**
AK-C 47
AK-F 39
AK-F 47
AK-Y 39

**American Spirit**
ASA Model

**Armalite**
AR 10 (all)
*AR-180*
Golden Eagle
M15 (all)

**Arsenal**
SLG (all)
SLR (all)

**B-West**
AK-47 (all)

**Beretta**
*AR-70*

**Bushmaster**
*Assault Rifle*
XM15 (all)

**Calico**
*M-900*

**Colt**
*AR-15 (all)*
Law Enforcement (6920)
Match Target (all)
Sporter (all)

**Daewoo**
*AR100, AR110C*
*K-1, K-2*
*Max 1, Max 2*

**Dalphon**
B.F.D.

**DPMS**
Panther (all)

**Eagle Arms**
EA-15 A2 H-BAR
EA-15 E1
M15 (all)

**Fabrique Nationale**
*308 Match, Sporter*
*FAL, LAR, FNC*

**Frankford Arsenal**
AR-15 (all)

**Hesse Arms**
HAR 15A2 (all)
Model 47 (all)
Wieger STG 940 Rifle

**HK**
*91, 94, PSG-1*
*93*

**IMI**
*Galil*
*Uzi*

**Inter Ordnance - Monroe, NC**
AK-47 (all)
M-97
RPK

**J&R ENG**
*M-68*

**Kalashnikov USA**
Hunter Rifle / Saiga

**Knights**
RAS (all)
SR-15 (all)
SR-25 (all)

**Les Baer**
Ultimate AR (all)

**This listing does not include firearms whose characteristics alone make them assault weapons (Category 3)**

**MAADI CO**
*AK 47*
*ARM*
MISR (all)
MISTR (all)

**Made in China**
*56*
*56S*
*84S*
*86S*
*AK*
*AK47*
*AKM*
*AKS*

**Made in Spain**
*CETME Sporter*

**MAS**
*223*

**Mitchell Arms, Inc.**
AK-47 (all)
AK-47 Cal .308 (all)
M-76
M-90
RPK

**Norinco**
*56*
*56 S*
81 S (all)
*84 S*
86 (all)
*86 S*
AK-47 (all)
Hunter Rifle
MAK 90
NHM 90, 90-2, 91 Sport
RPK Rifle
*SKS w/ detachable magazine*

**Ohio Ordnance Works (o.o.w.)**
AK-74
ROMAK 991

**Olympic Arms**
AR-15
Car-97
PCR (all)

**Ordnance, Inc.**
AR-15

**Palmetto**
SGA (all)

**Poly technologies**
*AK47*
*AKS*

**Professional Ordnance, Inc.**
Carbon 15 Rifle

**PWA**
All Models

**Rock River Arms, Inc.**
Car A2
Car A4 Flattop
LE Tactical Carbine
NM A2 - DCM Legal
Standard A-2
Standard A-4 Flattop

**RPB Industries, Inc.**
*sM10, sM11*

**SIG**
*AMT, PE-57*
*SG 550, SG 551*

**Springfield Armory**
*BM59, SAR-48*

**Sterling**
*MK-6*

**Steyr**
*AUG*

**SWD Incorporated**
*M11*

**Valmet**
76 S
Hunter Rifle
*M62S, M71S, M78S*

**Weaver Arms**
*Nighthawk*

**Wilson Combat**
AR-15

**WUM**
WUM (all)

**This listing does not include firearms whose characteristics alone make them assault weapons (Category 3)**

83

84

## *Pistols*

Advance Armament Inc.
*M11*

Bushmaster
*Pistol*

Calico
*M-950*

Encom
*MP-9, MP-45*

IMI
*UZI*

Intratec
*TEC-9*

MARS
Pistol

Military Armament Corp.
*M-11*

Professional Ordnance, Inc.
Carbon 15 Pistol

RPB Industries Inc.
*sM10, sM11*

Sites
*Spectre*

Sterling
*MK-7*

SWD Incorporated
*M11*

## *Shotguns*

Cobray
*Streetsweeper, S/S Inc., SS/12
Striker 12*

Franchi
*SPAS 12, LAW 12*

**This listing does not include firearms whose characteristics alone make them assault weapons (Category 3)**

This listing includes models of Category 1 (Roberti-Roos) and Category 2 (AK & AR-15 series) assault weapons that have been brought to our attention and examined.  If you have a suspected Category 2 assault weapon that does not appear on this list, please contact the Department of Justice at (916) 263-4887 for an identification of that firearm.  This listing does not include Category 3 (Penal Code section 12276.1) assault weapons, which are defined by their characteristics, not by make/model.  Category 2 assault weapons must have been registered with the California Department of Justice on or before January 23, 2001.  Category 3 assault weapons must have been registered with the Department of Justice on or before December 31, 2000.

**EXHIBIT B**

11 CCR § 5471

§ 5471. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Explanation of Terms Related to Assault Weapon Designation.

For purposes of Penal Code section 30900 and Articles 2 and 3 of this Chapter the following definitions shall apply:

(a) "Ability to accept a detachable magazine" means with respect to a semiautomatic shotgun, it does not have a fixed magazine.

(b) "Action" means the working mechanism of a semiautomatic firearm, which is the combination of the receiver or frame and breech bolt together with the other parts of the mechanism by which a firearm is loaded, fired, and unloaded.

(c) "Barrel" means the tube, usually metal and cylindrical, through which a projectile or shot charge is fired. Barrels may have a rifled or smooth bore.

(d) "Barrel length" means the length of the barrel measured as follows: Without consideration of any extensions or protrusions rearward of the closed bolt or breech-face the approved procedure for measuring barrel length is to measure from the closed bolt (or breech-face) to the furthermost end of the barrel or permanently attached muzzle device. Permanent methods of attachment include full-fusion gas or electric steel-seam welding, high-temperature (1100$^{\circ}$ F) silver soldering, or blind pinning with the pin head welded over. Barrels are measured by inserting a dowel rod into the barrel until the rod stops against the closed bolt or breech-face. The rod is then marked at the furthermost end of the barrel or permanently attached muzzle device, withdrawn from the barrel, and measured.

(e) "Bullet" means the projectile expelled from a gun. It is not synonymous with a cartridge. Bullets can be of many materials, shapes, weights, and constructions such as solid lead, lead with a jacket of harder metal, round-nosed, flat-nosed, hollow-pointed, et cetera.

(f) "Bullet-button" means a product requiring a tool to remove an ammunition feeding device or magazine by depressing a recessed button or lever shielded by a magazine lock. A bullet-button equipped fully functional semiautomatic firearm does not meet the fixed magazine definition under Penal Code section 30515(b).

(g) "Bore" means the interior of a firearm's barrel excluding the chamber.

(h) "Caliber" means the nominal diameter of a projectile of a rifled firearm or the diameter between lands in a rifled barrel. In the United States, caliber is usually expressed in hundreds of an inch; in Great Britain in thousandths of an inch; in Europe and elsewhere in millimeters.

(i) "Cartridge" means a complete round of ammunition that consists of a primer, a case, propellant powder and one or more projectiles.

(j) "Centerfire" means a cartridge with its primer located in the center of the base of the case.

(k) "Contained in" means that the magazine cannot be released from the firearm while the action is assembled. For AR-15 style firearms this means the magazine cannot be released from the firearm while the upper receiver and lower receiver are joined together.

(*l*) "Department" means the California Department of Justice.

(m) "Detachable magazine" means any ammunition feeding device that can be removed readily from the firearm without disassembly of the firearm action or use of a tool. A bullet or ammunition cartridge is considered a tool. An ammunition feeding device includes any belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.

An AR-15 style firearm that has a bullet-button style magazine release with a magnet left on the bullet-button constitutes a detachable magazine. An AR-15 style firearm lacking a magazine catch assembly (magazine catch, magazine catch spring and magazine release button) constitutes a detachable magazine. An AK-47 style firearm lacking a magazine catch assembly (magazine catch, spring and rivet/pin) constitutes a detachable magazine.

(n) "Disassembly of the firearm action" means the fire control assembly is detached from the action in such a way that the action has been interrupted and will not function. For example, disassembling the action on a two part receiver, like that on an AR-15 style firearm, would require the rear take down pin to be removed, the upper receiver lifted upwards and away from the lower receiver using the front pivot pin as the fulcrum, before the magazine may be removed.

(o) "Featureless" means a semiautomatic firearm (rifle, pistol, or shotgun) lacking the characteristics associated with that weapon, as listed in Penal Code section 30515.

(p) "Fixed magazine" means an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action.

(q) "Flare launcher" means a device used to launch signal flares.

(r) "Flash suppressor" means any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. A hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be deemed a flash suppressor. A device labeled or identified by its manufacturer as a flash hider would be deemed a flash suppressor.

(s) "FMBUS" means a Firearm Manufactured By Unlicensed Subject.

(t) "Forward pistol grip" means a grip that allows for a pistol style grasp forward of the trigger.

(u) "Frame" means the receiver of a pistol.

(v) "Grenade launcher" means a device capable of launching a grenade.

(w) "Permanently attached to" means the magazine is welded, epoxied, or riveted into the magazine well. A firearm with a magazine housed in a sealed magazine well and then welded, epoxied, or riveted into the sealed magazine well meets the definition of "permanently attached to".

(x) "Overall length of less than 30 inches" with respect to a centerfire rifle means the rifle has been measured in the shortest possible configuration that the weapon will function/fire and the measurement is less than 30 inches. Folding and telescoping stocks shall be collapsed prior to measurement. The approved method for measuring the length of the rifle is to measure the firearm from the end of the barrel, or permanently attached muzzle device, if so equipped, to that part of the stock that is furthest from the end of the barrel, or permanently attached muzzle device. (Prior to taking a measurement the owner must also check any muzzle devices for how they are attached to the barrel.)

(y) "Pistol" means any device designed to be used as a weapon, from which a projectile is expelled by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length. This definition includes AR-15 style pistols with pistol buffer tubes attached. Pistol buffer tubes typically have smooth metal with no guide on the bottom for rifle stocks to be attached, and they sometimes have a foam pad on the end of the tube farthest from the receiver.

(z) "Pistol grip that protrudes conspicuously beneath the action of the weapon" means a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing. This definition includes pistol grips on bullpup firearm designs.

(aa) "Receiver" means the basic unit of a firearm which houses the firing and breech mechanisms and to which the barrel and stock are assembled.

(bb) "Receiver, lower" means the lower part of a two part receiver.

(cc) "Receiver, unfinished" means a precursor part to a firearm that is not yet legally a firearm. Unfinished receivers may be found in various levels of completion. As more finishing work is completed the precursor part gradually becomes a firearm. Some just have the shape of an AR-15 lower receiver for example, but are solid metal. Some have been worked on and the magazine well has been machined open. Firearms Manufactured by Unlicensed Subjects (FMBUS) began as unfinished receivers.

(dd) "Receiver, upper" means the top portion of a two part receiver.

Case 3:19-cv-01537-BEN-JLB   Document 33-4   Filed 01/23/20   PageID.3733   Page 126 of
127

(ee) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(ff) "Rimfire" means a rimmed or flanged cartridge with the priming mixture located in the rim of the case.

(gg) "Second handgrip" means a grip that allows the shooter to grip the pistol with their non-trigger hand. The second hand grip often has a grip texture to assist the shooter in weapon control.

(hh) "Semiautomatic" means a firearm functionally able to fire a single cartridge, eject the empty case, and reload the chamber each time the trigger is pulled and released. Further, certain necessary mechanical parts that will allow a firearm to function in a semiautomatic nature must be present for a weapon to be deemed semiautomatic. A weapon clearly designed to be semiautomatic but lacking a firing pin, bolt carrier, gas tube, or some other crucial part of the firearm is not semiautomatic for purposes of Penal Code sections 30515, 30600, 30605(a), and 30900.

(1) A mechanically whole semiautomatic firearm merely lacking ammunition and a proper magazine is a semiautomatic firearm.

(2) A mechanically whole semiautomatic firearm disabled by a gun lock or other firearm safety device is a semiautomatic firearm. (All necessary parts are present, once the gun lock or firearm safety device is removed, and weapon can be loaded with a magazine and proper ammunition.)

(3) With regards to an AR-15 style firearm, if a complete upper receiver and a complete lower receiver are completely detached from one another, but still in the possession or under the custody or control of the same person, the firearm is not a semiautomatic firearm.

(4) A stripped AR-15 lower receiver, when sold at a California gun store, is not a semiautomatic firearm. (The action type, among other things, is undetermined.)

(ii) "Shotgun with a revolving cylinder" means a shotgun that holds its ammunition in a cylinder that acts as a chamber much like a revolver. To meet this definition the shotgun's cylinder must mechanically revolve or rotate each time the weapon is fired. A cylinder that must be manually rotated by the shooter does not qualify as a revolving cylinder.

(jj) "Shroud" means a heat shield that is attached to, or partially or completely encircles the barrel, allowing the shooter to fire the weapon with one hand and grasp the firearm over the barrel with the other hand without burning the shooter's hand. A slide that encloses the barrel is not a shroud.

(kk) "Spigot" means a muzzle device on some firearms that are intended to fire grenades. The spigot is what the grenade is attached to prior to the launching of a grenade.

(*ll*) "Stock" means the part of a rifle, carbine, or shotgun to which the receiver is attached and which provides a means for holding the weapon to the shoulder. A stock may be fixed, folding, or telescoping.

(mm) "Stock, fixed" means a stock that does not move, fold, or telescope.

(nn) "Stock, folding" means a stock which is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm. This definition includes under folding and over folding stocks.

(oo) "Stock, telescoping" means a stock which is shortened or lengthened by allowing one section to telescope into another portion. On AR-15 style firearms, the buffer tube or receiver extension acts as the fixed part of the stock on which the telescoping butt stock slides or telescopes.

(pp) "Those weapons with an ammunition feeding device that can be readily removed from the firearm with the use of a tool" includes functional semiautomatic rifles, pistols, and shotguns with bullet-button style magazine releases. These weapons do not have a fixed magazine.

(qq) "Thumbhole stock" means a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.

(rr) "Threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer" means a threaded barrel able to accept a flash suppressor, forward handgrip, or silencer, and includes a threaded barrel with any one of those features already mounted on it. Some firearms have "lugs" in lieu of threads on the end of the barrel. These lugs are used to attach some versions of silencers. For purposes of this definition a lugged barrel is the same as a threaded barrel.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

## HISTORY

1. New section filed 7-31-2017; operative 7-31-2017. Submitted to OAL for filing and printing only pursuant to Penal Code section 30900(b)(5) (Register 2017, No. 31). For prior history, see Register 2011, No. 52.

This database is current through 1/3/20 Register 2020, No. 1

11 CCR § 5471, 11 CA ADC § 5471

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.