1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   PETER H. CHANG
    Deputy Attorney General
5   State Bar No. 241467
    JOHN D. ECHEVERRIA
6   Deputy Attorney General
    State Bar No. 268843
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
8    Telephone:  (213) 269-6249
     Fax:  (916) 731-2124
9    E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendants Xavier Becerra, in*
10  *his official capacity as Attorney General of*
    *the State of California, and Brent E. Orick,*
11  *in his official capacity as Interim Director of*
    *the Department of Justice Bureau of*
12  *Firearms*

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15

16

17

18  **JAMES MILLER, et al.,**                19-cv-1537 BEN-JLB

19                          Plaintiffs,

20                               v.          **DECLARATION OF PROFESSOR**
                                             **LOUIS KLAREVAS IN SUPPORT**
21  **CALIFORNIA ATTORNEY**                  **OF DEFENDANTS' OPPOSITION**
    **GENERAL XAVIER BECERRA, et**           **TO MOTION FOR PRELIMINARY**
22  **al.,**                                 **INJUNCTION**

23                          Defendants.

24

25

26

27

28

## DECLARATION OF PROFESSOR LOUIS KLAREVAS

I, Louis Klarevas, declare:

1.     I make this Declaration in support of defendants' opposition to plaintiffs' motion for a preliminary injunction.  This Declaration is based on my own personal knowledge and experience, and if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## I.     QUALIFICATIONS AND BACKGROUND

2.     I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3.     I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  My current research examines the nexus between American public safety and gun violence.

4.     During the course of my 20-year career as an academic, I have served on the faculties of the George Washington University, the City University of New York, New York University, and the University of Massachusetts.  I have also served as a Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

5.     In addition to having made well over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and

_____

[1] Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016).

over 70 commentary pieces.  My most recent project—a peer-reviewed article published in the *American Journal of Public Health*—assessed the effectiveness of restrictions on large-capacity magazines (ammunition-feeding devices holding more than 10 rounds of ammunition) in reducing gun massacres.[2]

6.     Besides the present case, I have been previously retained by the California Attorney General's Office in *Duncan v. Becerra*, Case No. 17-cv-1017-BEN-JLB, Southern District of California, and *Wiese v. Becerra*, Case No. 2:17-cv-00903-WBS-KJN, Eastern District of California.  *Duncan* and *Wiese* both involve challenges to California's regulation of large-capacity magazines.  In 2017, I served as an expert for the State of Colorado, as it defended a legal challenge to its restrictions on large-capacity magazines in *Rocky Mountain Gun Owners, et al. v. Hickenlooper*, Case Number 2013CV33879, District Court, City and County of Denver, Colorado.  While I was never deposed in *Wiese*, I was deposed in *Duncan* and *Rocky Mountain Gun Owners*.  I also testified in court in *Rocky Mountain Gun Owners*.  These are the only times that I have testified or been deposed in legal proceedings in the past five years.

7.     A more detailed list of my credentials and professional experiences can be found in my curriculum vitae (*see* Exhibit 1).

---

[2] Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 Am. J. of Pub. Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed January 6, 2020).

## II.   OPINIONS

8.     It is my professional opinion, based upon my extensive review and analysis of data from the past four decades, that (1) gun massacres involving six or more fatalities presently pose the deadliest criminal threat, in terms of individual acts of intentional violence, to the safety and security of American society in the post-9/11 era, and the problem is growing nationwide; (2) gun massacres involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons; and (3) jurisdictions that restrict the possession of assault weapons experience fewer gun massacres, per capita, than jurisdictions that do not restrict assault weapons.  Based on these findings, it is my opinion that restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of gun massacres (*see* Exhibit 2 for a tabular overview of how gun massacres are definitionally a subset of mass shootings).[3]

### A.   Gun Massacres Are a Growing Threat to Public Safety

9.     In 1984, a gunman armed with, among other firearms, an Uzi assault weapon walked into a restaurant in San Ysidro, California, and murdered 21 people and injured 19 others, making it the deadliest mass shooting in American history at

---

[3] In my book *Rampage Nation*, I defined a mass shooting as "any violent attack that results in four or more individuals incurring gunshot wounds."  I then differentiated between three different categories of mass shooting: (1) Nonfatal are those mass shootings in which no one dies; (2) Fatal are those mass shootings in which at least one victim dies; and (3) High-Fatality are those mass shootings in which six or more victims die.  Throughout my book and in this Declaration, I use the terms "high-fatality mass shooting" and "gun massacre" interchangeably.  Of the three categories of mass shooting, gun massacres are the deadliest, resulting in the highest fatality tolls per individual incidents.  Klarevas, *supra* note 1, at 47-48.

the time.  In the years since, the United States has experienced several deadlier shootings: 27 people killed, including 20 first-graders, in Newtown, Connecticut, in 2012; 49 people killed in Orlando, Florida, in 2016; and 58 people killed in Las Vegas, Nevada, in 2017.  All of these gun massacres were perpetrated with assault weapons (*see* Exhibit 3 for details on how gun massacres involving assault weapons have been coded for purposes of this Declaration).

10.    Since the coordinated attack by terrorists on September 11, 2001, gun massacres—like the Newtown, Orlando, and Las Vegas shootings—have been the deadliest individual acts of violence in the United States.  In fact, the ten deadliest acts of intentional violence since 9/11 have all been gun massacres (*see* Table 1). In terms of the number of victims-per-incident, mass shootings are presently the most lethal criminal threat to the security and safety of American society.[4]

Table 1.  The 10 Deadliest Acts of Intentional Violence in the U.S. since 9/11

| Deaths | Date | Location | Involved Assault Weapon(s) |
|--------|------|----------|----------------------------|
| 58 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 22 | August 3, 2019 | El Paso, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | |
| 13 | November 5, 2009 | Fort Hood, TX | |

11.    Since 1980, there have been a total of 103 gun massacres (high-fatality mass shootings resulting in six or more victims being shot to death), claiming a combined 1,007 lives (*see* Exhibit 3).  The data show that the past decade

---

[4] Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in this Declaration are drawn from the list of all gun massacres since 1980 in Exhibit 3.

(2010-2019) has been the worst on record, accounting for over one-third of all gun-massacre incidents from the past four decades (37 out of 103) and over 45% of all deaths lost in such high-fatality mass shootings (457 out of 1,007).  In other words, mass shootings pose a grave threat to the United States, and the threat is growing (*see* Figures 1 and 2).

Figure 1.  Gun-Massacre Incidents by Decade, 1980-2019



Figure 2.  Gun-Massacre Deaths by Decade, 1980-2019



**B.      The Use of Assault Weapons Is a Major Factor in the Rise of Gun-Massacre Violence**

12.      A review of the data from the past 40 years indicates that gun massacres have grown in terms of frequency and lethality.  The data also point to another striking pattern: the use of assault weapons in the commission of gun massacres has risen in vast proportions (*see* Figures 3 and 4).

Figure 3.  Assault Weapon Gun-Massacre Incidents by Decade, 1980-2019



Figure 4.  Assault Weapon Gun-Massacre Deaths by Decade, 1980-2019



Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

13.    A comparison of the 1980s with the most recent decade shows that the proportion of gun massacres involving assault weapons has increased significantly. During the 1980s, less than 20% of all gun massacres involved assault weapons (5 out of 26 incidents).  In the 2010s, 35% of all gun massacres involved assault weapons (13 out of 37 incidents).  The resort to assault weapons has been growing over the past 40 years.  It is particularly marked of late, with 67% of all gun massacres in the last three years perpetrated with an assault weapon (*see* Figure 5).

Figure 5.  Percentage of Gun-Massacre Incidents Involving Assault Weapons



14.    Even more pronounced, the proportion of deaths attributable to gun massacres involving assault weapons has more than doubled between the same two 10-year periods, from 26% to 58% (54 out of 209 deaths during the 1980s compared to 267 out of 457 deaths during the 2010s).  Indeed, deaths attributable to gun massacres involving assault weapons have risen steadily in the past four decades, with the percentage in the last three years reaching 79% (*see* Figure 6).

7

Figure 6.  Percentage of Gun-Massacre Deaths Involving Assault Weapons



15.     It is also worth noting that the 13 gun massacres involving assault weapons from the past decade account for 46% of all 28 gun massacres involving assault weapons since 1980, and the 267 deaths attributable to these 13 incidents account for 67% of all 399 deaths resulting from gun massacres involving assault weapons since 1980.  This reflects a growing preference for using assault weapons to commit high-fatality mass shootings (*see* Figure 7).

Figure 7.   Gun-Massacre Incidents and Deaths Involving Assault Weapons per
            Decade as a Percentage of All Gun-Massacre Incidents and Deaths
            Involving Assault Weapons, 1980-2019



Figure 7a.  Incidents



Figure 7b. Deaths

16.     The growing use of assault weapons to carry out gun massacres is a clear theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another obvious theme.  According to the Declaration of James Curcuruto of the National Sport Shooting Foundation (NSSF) in the present case, as of December 2019, "modern sporting rifles" made up approximately 4% of all firearms in circulation in American society (17.7 million out of 423 million firearms).[5]  If assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 4% of all gun massacres would involve assault weapons.  Yet, in 2019 (the year corresponding to NSSF's survey data), 75% of all gun massacres were committed with assault rifles (*see* Exhibit 3), far outpacing their relative prevalence in society.

17.     Of the 103 gun massacres since 1980, 28 involved assault weapons, resulting in a cumulative 399 deaths (*see* Exhibit 3).  The average death toll for these 28 gun massacres involving assault weapons is 14.3 fatalities per shooting (*see* Table 2).  By contrast, the average death toll for the 75 incidents in which assault weapons were not used is 8.1 fatalities per shooting.  In other words, the use of assault weapons in gun massacres resulted in a 77% increase in fatalities per incident.  In the past decade, the difference is even more pronounced—far more than double: 7.9 versus 20.5 deaths per incident (*see* Table 2).  This amounts to a 159% increase in the average death toll, attributed to the use of assault weapons.  Moreover, since 1980, assault weapons have been used in 80% of all gun massacres with 25 or more deaths—establishing a relationship between assault weapons and the deadliest gun massacres.  The data demonstrate that assault weapons are dangerous force multipliers when used to perpetrate high-fatality mass shootings.

---

[5] Declaration of James Curcuruto in Support of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra* (S.D. Cal. Dec. 6, 2019), No. 19-cv-1537-BEN-JLB, Doc. 22-13, para. 15.

Table 2.  The Dangerous Death Tolls Associated with the Use of Assault Weapons in Gun Massacres

|  | Average Death Toll for Gun Massacres That Did Not Involve the Use of Assault Weapons | Average Death Toll for Gun Massacres That Did Involve the Use of Assault Weapons | Percent of Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1980-2019 | 8.1 Deaths | 14.3 Deaths | 77% |
| 2010-2019 | 7.9 Deaths | 20.5 Deaths | 159% |

## C.  Restrictions on Assault Weapons Reduce the Incidence of Gun Massacres, Resulting in Lives Saved

18.     In light of the growing threat posed by mass shootings, legislatures have enacted measures aimed at reducing the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures are restrictions on assault weapons.  In 1989, California became the first state to enact an assault weapons ban.  The Roberti-Roos Assault Weapons Control Act (AWCA) was passed by the California legislature in 1989 in response to an attack on Cleveland Elementary School in Stockton earlier that year.  The gunman in this mass shooting used an AK-47 to kill five children and wound another 30 individuals, 29 of whom were children.  In the process of enacting the AWCA, the legislature codified its findings and intent (at Cal. Penal Code § 30505(a)):

> The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of the state.  The Legislature has restricted the assault weapons specified in [California's statutes] based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a

10

legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.

19.   In the years since, the state legislature has revised the law to make it more effective.  In the deliberations over SB 880 in 2016, which was ultimately enacted to close the so-called "bullet button" loophole, the author of that bill stated:

[Assault weapons] are designed only to facilitate the maximum destruction of human life.  Such weapons have been used in a number of recent gun attacks, including the recent terrorist attack in San Bernardino that left 14 Californians dead and 21 injured.  Too many Californians have died at the hands of these dangerous weapons.[6]

20.   In considering SB 880, the Assembly Committee on Public Safety noted that the assault weapon is considered "an effective tool of *mass murder*."[7] This sentiment was echoed in the Senate Committee on Public Safety, which, in its report on SB 880, reproduced the following rationale in support of the bill:

The rapid and controlled spray of bullets associated with assault weapons is a threat to police officers, families, and communities.  As was shown by the tragedy at Sandy Hook School and more recently in San Bernardino, an assault weapon escalates the lethality and number of victims in a *mass shooting incident*.[8]

---

[6] Report of the Assembly Committee on Public Safety on SB 880 (Hall), May 17, 2016, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160SB880 (last accessed January 10, 2020).

[7] *Id.* (emphasis added).

[8] Report of the Senate Committee on Public Safety on SB 880 (Hall), March 28, 2016, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160SB880 (last accessed January 10, 2020) (emphasis added).

21.    The legislative intent of California is not significantly different from that of the other states that have since restricted assault weapons.  *The primary objective of every assault weapons ban is reducing the frequency and lethality of mass shootings.*  Because, on average, the use of assault weapons results in higher death tolls in mass shootings, the rationale for imposing tight restrictions on assault weapons is to reduce the loss of life attributable to the increased kill potential of such dangerous firearms.

22.    In 1994, the United States enacted the Federal Assault Weapons Ban (AWB).  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).  Modelled after California's AWCA, the federal AWB was also aimed primarily at reducing mass-shooting violence.  The law, which was in effect for only 10 years before sun-setting, regulated certain firearms and their components.  Among its provisions, the AWB prohibited the manufacture, sale, transfer, or possession of *new* assault weapons.[9]

23.    The AWB had a positive impact in reducing the number and deadliness of gun massacres (*see* Exhibit 4).  Comparing the 10-year periods before, during, and after the AWB shows that the implementation of the law coincided with a 37% drop in gun massacres and a 40% drop in gun massacres involving assault weapons (*see* Table 3).  Likewise, when compared to the 10-year period immediately prior to the AWB, the 10-year period that the AWB was in effect reflected a 43% decline in gun-massacre deaths and a 26% decline in deaths resulting from gun massacres involving assault weapons (*see* Table 3).  When the AWB expired, the 10-year period that immediately followed experienced substantially greater gun-massacre violence.  In particular, when compared to the

---

[9] Assault weapons lawfully in circulation prior to the AWB's date of effect (September 13, 1994) were exempted (i.e., grandfathered) from the ban.  Former 18 U.S.C. § 922 (v)(2) (1994).

10-year period that the AWB was in effect, the succeeding 10-year period coincided with a 183% increase in gun-massacre incidents and a 167% increase in gun-massacre incidents involving assault weapons (*see* Table 3).  Fatalities tracked a similar, albeit steeper, upward trajectory.  The 10-year period immediately following the AWB coincided with a 239% increase in gun-massacre deaths and a 223% increase in gun-massacre deaths resulting from incidents involving assault weapons (*see* Table 3).

24.    Even when comparing incidence and fatality rates—which respectively measure the onset of new cases and deaths per population under examination—the pattern holds.  The incidence and fatality rates for all gun massacres as well as only for gun massacres involving assault weapons all fell during the 10-year period of the AWB, only to skyrocket during the 10-year period that immediately followed the expiration of the ban (*see* Table 3).  The data pertaining to gun massacres immediately before, during, and immediately after the AWB point to an obvious conclusion: the AWB ushered in a period marked by stark reductions in gun-massacre violence, which increased drastically following the ban's end.

13

Table 3.  The Impact of the Federal Assault Weapons Ban on Gun Massacres

| | 10-Years Before AWB (9/13/84-9/12/94) | 10-Years During AWB (9/13/94-9/12/04) | Percentage of Change from Period Before to Period During AWB | 10-Years During AWB (9/13/94-9/12/04) | 10-Years After AWB (9/13/04-9/12/14) | Percentage of Change from Period During to Period After AWB |
|---|---|---|---|---|---|---|
| All Gun-Massacre Incidents | 19 | 12 | - 37% | 12 | 34 | +183% |
| Gun-Massacre Incidents Involving Assault Weapons | 5 | 3 | -40% | 3 | 8 | +167% |
| Deaths in All Gun-Massacre Incidents | 155 | 89 | -43% | 89 | 302 | +239% |
| Deaths in Gun-Massacre Incidents Involving Assault Weapons | 35 | 26 | -26% | 26 | 84 | +223% |
| Incidence Rate for All Gun-Massacre Incidents | 0.76 | 0.43 | -43% | 0.43 | 1.11 | +158% |
| Incidence Rate for Gun-Massacre Incidents Involving Assault Weapons | 0.20 | 0.11 | -45% | 0.11 | 0.26 | +136% |
| Fatality Rate for All Gun-Massacre Incidents | 6.22 | 3.18 | -49% | 3.18 | 9.82 | +209% |
| Fatality Rate for Gun-Massacre Incidents Involving Assault Weapons | 1.40 | 0.93 | -34% | 0.93 | 2.73 | +194% |

Note: Incidence and fatality rates are calculated as annual rates per 100 million population, using mean population for each 10-year period under examination.

14

25.     California's AWCA took effect on January 1, 1990, making California the first state to regulate assault weapons, although the District of Columbia has been regulating semiautomatic firearms with enhanced firing capacity, including assault weapons, since 1932.  Six other states and the District of Columbia have also prohibited the possession of certain assault weapons in an effort to reduce the loss of life in mass shootings.  The following is a list of those jurisdictions and the effective dates of their bans: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Connecticut (October 1, 1993); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); New York (November 1, 2000); and the District of Columbia (updating its pre-existing regulations on March 31, 2009).[10]

26.     In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect.  This measure, known as the incidence rate, allows public health experts and criminologists to identify discernable differences, while accounting for variations in the population, over a set period of time.  Relevant to the present case, calculating incidence rates across jurisdictions, in a manner that captures whether or not assault weapons bans were in effect during the period of observation, allows for the assessment of the effectiveness of such bans.  In addition, fatality rates—the number of deaths, per

---

[10] For a review of state laws that regulate assault weapons, including the effective dates of each state assault weapons ban currently in effect in the United States, *see* Giffords Law Center to Prevent Gun Violence, "Assault Weapons," *available at* https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons (last accessed January 10, 2020).

population, that result from particular events across different jurisdictions—also provide insights into the impact of assault weapons bans on gun massacres.[11]

27.     Since January 1, 1990, when the first state ban on assault weapons took effect, there have been 77 gun massacres in the United States (*see* Exhibit 3).[12] Calculating gun-massacre rates for the time-period 1990-2019, across jurisdictions with and without bans on the possession of assault weapons, reveals that states that restricted possession of certain assault weapons experienced a 46% decrease in the incidence rate and a 57% decrease in the fatality rate for all gun massacres, regardless of the weaponry used by the mass murderers (*see* Table 4).[13]  When calculations go a step further and are limited to gun massacres involving assault weapons, the difference between the two jurisdictional categories (non-ban states and ban states) is even more pronounced.  In the past 30 years, accounting for population, states with assault weapons bans in place experienced 54% fewer gun massacres involving the use of assault weapons and 67% fewer deaths resulting from such attacks perpetrated with assault weapons (*see* Table 4)  All of the above epidemiological calculations lead to the same conclusion: when bans on assault

---

[11] For purposes of this Declaration, incidence and fatality (i.e., mortality) rates are calculated in accordance with the methodological principles established by the Centers for Disease Control and Prevention.  *See* Centers for Disease Control and Prevention, Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 10, 2020).

[12] There were no state bans on assault weapons in effect prior to 1990.  Therefore, 1990 is the logical starting point for an analysis of the impact of state assault weapons bans.

[13] For purposes of coding, between September 13, 1994, and September 12, 2004, the federal AWB was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that banned the possession of certain prohibited assault weapons.  As such, the entire country is coded as being under an assault weapons ban during the timeframe that the AWB was in effect.

weapons are in effect, per capita, fewer gun massacres occur and fewer people die in such high-fatality mass shootings.

Table 4.  Incidence and Fatality Rates for Gun Massacres, by Whether or Not Assault Weapons Bans Were in Effect, 1990-2019

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| **All Gun Massacres** | | | | | |
| Non-AW Ban States | 150.6 | 51 | 1.13 | 566 | 12.53 |
| AW Ban States | 142.1 | 26 | 0.61 | 232 | 5.44 |
| Percentage Decrease in Rate for AW Ban States | | | 46% | | 57% |
| **Gun Massacres Involving Assault Weapons** | | | | | |
| Non-AW Ban States | 150.6 | 16 | 0.35 | 263 | 5.82 |
| AW Ban States | 142.1 | 7 | 0.16 | 82 | 1.92 |
| Percentage Decrease in Rate for AW Ban States | | | 54% | | 67% |

Note: Population data are from U.S. Census Bureau's State Intercensal Datasets, *available at* https://www.census.gov/data/datasets.All.html (last accessed January 7, 2020).

**D.     Response to Declaration of John Lott in Support of Plaintiffs' Motion for Preliminary Injunction**

28.     In support of their Motion for Preliminary Injunction, the Plaintiffs include a Declaration from John Lott.  The overall conclusion of Lott's Declaration is that "there is no credible evidence that so-called 'assault weapons' bans have any meaningful effect on reducing gun homicides and no discernable crime-reduction impact."[14]  Lott has a long history of employing questionable and faulty practices to advance arguments against firearms regulations, resulting in accusations that his

---

[14] Declaration of John Lott in Support of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra* (S.D. Cal. Dec. 6, 2019), No. 19-cv-1537-BEN-JLB, Doc. 22-18, para. 63.

gun violence research is "junk science."[15]  Lott's Declaration in the present case suffers from similar problems.

29.    The major arguments that Lott attempts to advance in his Declaration can be summed up as follows:

A.    Studies show that criminals do not acquire their firearms through legal channels, meaning that bans on weapons generally will not influence criminals' use of those prohibited weapons; and

B.    "All credible studies" have found that bans on assault weapons have not had any meaningful effect on crime, implying that bans on assault weapons do not work.

30.    As discussed above, the legislative intent of bans on assault weapons is primarily to reduce the frequency and lethality of massacres perpetrated with firearms, especially military-style firearms.  With that in mind, it is noteworthy to identify what is conspicuously absent from Lott's Declaration.  In particular, Lott fails to mention how (1) legislatures enacting assault weapons bans are primarily targeting the use of military-style firearms to commit mass murder, as opposed to all gun violence in general; (2) the number of victims losing their lives in gun massacres nationwide, especially those involving assault weapons, has been on the rise since the expiration of the federal AWB in 2004; (3) the use of assault weapons in gun massacres has been disproportionately higher than the percentage of assault weapons in circulation; and (4) the use of assault weapons in gun massacres has

---

[15] Evan DeFilippis & Devin Hughes, *Shooting Down the Gun Lobby's Favorite 'Academic': A Lott of Lies*, Armed with Reason, December 1, 2014, *available at* http://www.armedwithreason.com/shooting-down-the-gun-lobbys-favorite-academic-a-lott-of-lies (last accessed on January 13, 2020); and Piers Morgan, *Lawyer Alan Dershowitz on the Research of Author John Lott Jr.: 'Junk Science … Paid for by the National Rifle Association'*, CNN.com, July 24, 2012, *available at* http://piersmorgan.blogs.cnn.com/2012/07/24/lawyer-alan-dershowitz-on-the-research-of-author-john-lott-jr-junk-sciencepaid-for-by-the-national-rifle-association (last accessed January 13, 2020).

resulted in substantially higher average death tolls, when compared to incidents that do not involve assault weapons. As discussed above, there is an evidentiary basis for these four relevant factual patterns that Lott overlooks.

31.    Nevertheless, the two major conclusions advanced by Lott in his Declaration (summarized above in para. 29) deserve a response. First, Lott asserts that "criminals do not buy their firearms legally."[16] He goes on to claim that "criminals have guns and they get them illegally, primarily from drug dealers…. Arbitrary bans of firearm features will do little to stop this."[17] Leaving aside the unsubstantiated and unsourced claim that criminals obtain their illegal firearms "primarily from drug dealers," Lott fails to mention that multiple investigations have determined that the vast majority of gunmen who used a firearm to commit mass murder obtained their weapons legally.[18] Knowing that mass murderers tend to acquire their assault weapons legally suggests that assault weapons bans can assist in reducing the occurrence of gun massacres. In fact, a recent study in the *British Medical Journal* (which Lott did not reference) found that "States with more permissive gun laws and greater gun ownership have higher rates of mass shootings, and a growing divergence is noted in recent years as rates of mass

---

[16] Declaration of John Lott, *supra* note 14, para. 10.

[17] *Id.*, para 13.

[18] Larry Buchanan et al., *How They Got Their Guns*, N.Y. Times, February 16, 2018, *available at* https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html (last accessed January 13, 2020); Luis Melgar & Lisa Dunn, *Since 1982, 74 Percent of Mass Shooters Obtained Their Guns Legally*, Guns and America (WAMU Public Radio), November 2, 2018, *available at* https://gunsandamerica.org/story/18/11/02/since-1982-74-percent-of-mass-shooters-obtained-their-guns-legally (last accessed January 13, 2020); Jillian K. Peterson and James A. Densley, *The Violence Project Database of Mass Shootings in the United States, 1966-2019*, November 2019, *available at* https://www.researchgate.net/publication/337261684_The_Violence_Project_Database_of_Mass_Shootings_in_the_United_States_1966-2019 (last accessed January 13, 2020).

shootings in restrictive states have decreased and those in permissive states have increased."[19]

32.    Second, Lott asserts that "all *credible* evidence shows that assault weapon bans have little to no effect in reducing *mass shootings*, homicides, or violent crime."[20]  There is a solid evidentiary foundation for rejecting this assertion. Focusing on mass shootings, which is the primary focus of assault weapons bans, scholarly research shows that bans on assault weapons have indeed been effective. As the bulk of Lott's Declaration deals with the impact of assault weapons bans and given that he devoted one-third of his Declaration to my research, a discussion of the flaws in his analysis is warranted.

33.    In support of his claim, Lott cites four studies that, according to him, offer evidence that assault weapons bans are ineffective.[21]  The four particular studies referenced by Lott are a 2004 preliminary report on the 1994 federal AWB led by Christopher Koper that ultimately concluded "it is premature to make definitive assessments of the ban's impact on gun crime";[22] an article by Gary Kleck on the use of large-capacity magazines in mass shootings that did not assess the effectiveness of any firearms bans whatsoever;[23] a short research note by Mark

---

[19] Paul M. Reeping et al., *State Gun Laws, Gun Ownership, and Mass Shootings in the U.S.: Cross Sectional Time Series*, British Medical Journal, 364, no. 8190, (2019), *available at* https://www.bmj.com/content/364/bmj.l542 (last accessed January 13, 2020).

[20] Declaration of John Lott, *supra* note 14, para. 64 (emphasis added).

[21] *Id.*, paras. 19-30.

[22] Christopher S. Koper et al., An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003, Report to the National Institute of Justice, Jerry Lee Center for Criminology, University of Pennsylvania 2 (2004), *available at* Declaration of John Lott, *supra* note 14, Exhibit 7.

[23] Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 Justice Research & Policy 28 (2016), *available at* Declaration of John Lott, *supra* note 14, Exhibit 8.

Gius that did not address mass shootings;[24] and Lott's own three-page "simple before-and-after" assessment of assault weapons bans from his controversial and much challenged book *More Guns, Less Crime*.[25]  As none of these studies offer an evidentiary basis that is directly related to the legislative intent of assault weapons bans, they are largely irrelevant.

34.     Lott also cites four other studies that found evidence that assault weapons bans have been effective at reducing mass shooting violence in the United States.  However, Lott concludes that all four of these studies can be dismissed because, according to him, they are not "credible."

35.     The first study that Lott dismisses is a 2018 study led by Christopher Koper, the lead author of the 2004 preliminary report on the 1994 federal AWB.  According to Lott, the 2018 Koper et al. study "provides no evidence that murders or mass public shootings were reduced by the [federal] assault weapon ban."[26]  However, Koper and his colleagues actually state, "available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of [mass murder] incidents.  Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts."[27]  This led the authors to conclude that their study "provides further evidence that the federal ban curbed

---

[24] Mark Gius, *An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates*, 21 Applied Economics Letters 265, *available at* Declaration of John Lott, *supra* note 14, Exhibit 9.

[25] John R. Lott, Jr., More Guns, Less Crime: Understanding Crime and Gun Control Laws 327 (3d ed. 2010), *available at* Declaration of John Lott, *supra* note 14, Exhibit 10.

[26] Declaration of John Lott, *supra* note 14, paras. 31-33.

[27] Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 Journal of Urban Health 313, 319 (2018), *available at* Declaration of John Lott, *supra* note 14, Exhibit 11.

the spread of high-capacity semiautomatic weapons when it was in place and, in doing so, may have had preventive effects on gunshot victimizations."[28]

36.    The second study that Lott dismisses is a 2019 article by Charles DiMaggio and his colleagues.[29]  After comparing trends from 1981-2017, the authors concluded that "the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States."[30]  Lott is critical of this study for applying a time-series analysis (which is a form of trend analysis that observes data points across time intervals), even though this is an acceptable methodology in the social sciences (as will be shown below).[31]  In fact, Lott himself has performed such "simple before-and-after" assessments, including in his Declaration.[32]  Lott is also critical of the DiMaggio et al. study for not "attempt[ing] to differentiate states with and without their own assault weapons bans," even though the main purpose of the study was to evaluate the impact of the federal AWB.[33]

37.    The third study that Lott dismisses is a 2015 article by Mark Gius on the impact of both the federal AWB as well as state assault weapons bans on public mass shootings.[34]  After surveying public mass shootings from 1982-2011, Gius found that "fatalities due to mass shootings were lower during both the federal and

---

[28] *Id.*, at 320.

[29] Declaration of John Lott, *supra* note 14, paras. 34-37.

[30] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. of Trauma & Acute Care Surgery 11, 15 (2019), *available at* Declaration of John Lott, *supra* note 14, Exhibit 12.

[31] Declaration of John Lott, *supra* note 14, para. 34.

[32] *Id.*, paras. 50-53.

[33] *Id.*, para. 34.

[34] *Id.*, paras. 38-42.

state assault weapons ban periods."[35] This led him to conclude that "the present study's focus on mass shootings shows the effectiveness of these gun control measures in reducing murders due to mass shootings."[36] Lott takes issue with this study because its data is drawn from the *Mother Jones* database of mass shootings, which he finds to be "arbitrarily selective in its data collection" and, therefore, "problematic."[37] (The "problematic" nature of the *Mother Jones* dataset did not prevent Lott from using it as one of the data sources for his own analysis that he undertakes later in his Declaration at paras. 50-53.) Lott also criticizes the 2015 Gius study for not observing the rate at which assault weapons were employed (as a percentage of all firearms used) in a mass shooting. But as will be shown below, this is a flawed criticism that displays a limited understanding of how regulations can impact outcomes.[38]

38.     The last study on the effectiveness of the federal AWB that Lott dismisses is that from my book *Rampage Nation*.[39] To repeat the findings reported above (para. 23), I found that, when compared to the 10-year period immediately before the 1994 AWB, the 10-year period that the federal ban was in effect corresponded with a 37% reduction in gun massacre incidents and a 43% reduction in gun massacre deaths. After the AWB expired, the 10-year period that immediately followed corresponded with a 183% increase in gun massacre incidents and a 239% increase in gun massacre deaths. Even after accounting for population growth, these trajectories in gun massacre violence remain consistent.

---

[35] Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 Applied Economics Letters 281, 283 (2015), *available at* Declaration of John Lott, *supra* note 14, Exhibit 13.

[36] *Id.*

[37] Declaration of John Lott, *supra* note 14, para. 40.

[38] *Id.*, para. 38. Lott also leveled a similar criticism against the 2019 DiMaggio study. *Id.*, para. 35.

[39] *Id.*, paras. 43-53.

23

As Lott notes, the evidence from my research has been used by members of Congress to propose a new federal assault weapons ban.[40]

39.     Lott levels three criticisms against my work: (1) I only analyzed high-fatality mass shootings, resulting in six or more fatalities (not including the gunmen), as opposed to a lower threshold of fatalities; (2) I analyzed all categories of mass shooting, regardless of motive or location, as opposed to only those that were public rampages that targeted random victims; and (3) I employed a time-series analysis.

40.     The first two criticisms speak to my outcome variable, so I will address them together.  Lott contends:

> In forming his analysis and conclusions, Klarevas limits his research to shootings with 6 or more fatalities.  *I don't know of any other study that does this, and Klarevas doesn't provide an explanation.  Nor does he explain why he lumps in public shootings with gang shootings, failing to draw any distinction.*  These factors single out Klarevas' analysis as no other studies use these limitations or fail to make such distinctions.[41]

41.     Just in this short, three-sentence statement, Lott makes several inaccurate statements.  First, Lott claims that the he is unaware of "any other study" that uses six fatalities as a threshold for studying mass-scale gun violence.  Yet, in the sentence immediately preceding this statement, Lott discusses an analysis by John Donohue and Theodora Boulouta which employed the six-fatality threshold as one of its measures.[42]  And there have been other studies that have used six fatalities as a measure as well.[43]  Second, Lott claims that I do not "provide an

---

[40] *Id.*, para. 44.

[41] *Id.*, para. 43 (emphasis added).

[42] *Id.*

[43] Klarevas et al., *supra* note 2; Gary Kleck, Targeting Guns: Firearms and Their Control (1997); Sherry Towers et al., *Temporal Trends in Public Mass Shootings: High-Capacity Magazines Significantly Increase Fatality Counts, and Are Becoming More Prevalent*, medRxiv (2019), available at

explanation" for why I employed a six-fatality threshold.  I do, however, make the case in my book that gun massacres are a unique subset of mass shootings.[44]  In short, gun massacres are the deadliest category of mass shootings.  As such, they deserve particular attention.  Third, Lott claims that I lump together all gun massacres (despite differences in their motives) without drawing any distinctions.  This, too, is something that I discussed at length in Chapter Two of my book, where I argued that high-fatality mass shootings are troubling, regardless of motive or target.[45]  Indeed, legislatures that enact laws seek to prevent all such large-scale acts of firearm violence, not just the ones in public that target random victims.  Fourth, Lott claims that "no other studies use these limitations or fail to make such distinctions."  Again, there are several studies that treat mass shootings as incidents broader than merely what Lott refers to as "public mass shootings."[46]

42.    The third criticism that Lott levels against my work is that it employs a time-series approach.  According to Lott, "Few academics would make the types of comparisons that Klarevas makes."[47]  Contrary to this assertion, Lott in his own Declaration cites several time-series analyses undertaken by the following scholars: Christopher Koper, Daniel Woods, Jeffrey Roth, William Johnson, Jordan Nichols, Ambrozine Ayers, Natalie Mullins, Charles DiMaggio, Jacob Avraham, Cherisse Berry, Marko Bukur, Justin Feldman, Michael Klein, Noor Shah, Manish Tandon, Spiros Frangos, John Donohue, Theodora Boulouta, and James Alan Fox.  The

---

https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 (last accessed January 13, 2020).

[44] Klarevas, *supra* note 1; *see also* Klarevas et al., *supra* note 2.

[45] Klarevas, *supra* note 1, at 31-48.

[46] Klarevas et al., *supra* note 2; Reeping et al., *supra* note 20; Marisa Booty et al., *Describing a 'Mass Shooting': The Role of Databases in Understanding Burden*, 6 Injury Epidemiology (2019), *available at* https://injepijournal.biomedcentral.com/articles/10.1186/s40621-019-0226-7 (last accessed January 13, 2020).

[47] Declaration of John Lott, *supra* note 14, para. 45.

bottom line is that employing a time-series analysis is a legitimate methodological practice.  In fact, Lott even cites the 2004 Koper report, which relies in part on time-series analyses to assess trends affected by the 1994 federal AWB, as a credible study in support of his argument.[48]  Perhaps the legitimacy of this methodology explains why Lott, himself, employs it for purposes of the analysis he performs in his Declaration.[49]

43.     In addition, Lott makes inaccurate statements in his Declaration concerning mass-casualty violence and how weapons restrictions can function to reduce such violence.  For starters, Lott suggests that small differences in the number of incidents before, during, and after the federal AWB are not "large enough to prove that the ban had any impact on the frequency of attacks."[50] Extreme events are incidents that do not happen frequently, but, when they do occur, they have tremendous consequences.  To put it in simple terms, the Oklahoma City and the September 11 terrorist attacks were both extreme events. No credible scholar would judge post-9/11 counter-terrorism policies as ineffective because the decrease in such extreme terrorist attacks amounted to only two fewer incidents—from two to zero—in the years since 2001.  Given the nature of extreme events, like gun massacres, a small decrease in the number of such incidents do matter, especially to the numerous lives saved that such decreases might represent.

44.     Lott also argues that "if assault weapons bans reduced these attacks [i.e., gun massacres], the share of attacks committed with 'assault weapons' should have decreased."[51]  Lott is suggesting that the number of gun massacres involving assault weapons as a percentage or share of all gun massacres must go down

---

[48] *Id.*, paras. 19-23.

[49] *Id.*, paras. 50-53.

[50] *Id.*, para. 49.

[51] *Id.*, para. 46.

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

substantially in order to establish that an assault weapons ban was effective. Furthermore, Lott is implying that, should an assault weapons ban be repealed, establishing its effectiveness would depend on showing that the share of gun massacres involving assault weapons relative to all gun massacres increased. These assertions are offered without any sound logical or empirical basis. In particular, Lott fails to address recognized phenomena in the academic literature (e.g., spillover effects and substitution effects) that capture how regulations can lead to additional benefits, including reductions in different forms of mass-casualty firearm violence. Such a dynamic could explain why the federal AWB was effective while, at the same time, the share of gun massacres involving assault weapons, as a percentage of all gun massacres, remained constant.

45.    There are also empirical grounds for rejecting Lott's claims regarding patterns and trends related to the federal AWB. Specifically, he uses faulty data in his analysis of gun massacres before, during, and after the AWB. To provide one example, in the 10-year period following the AWB (September 13, 2004, to September 12, 2014), Lott states that there were 35 gun massacres, 5 of which involved assault weapons. He then calculates the share of incidents involving assault weapons to be 14% (5 divided by 35 equals 0.14). Actually, there were 34 gun massacres during that timeframe, 8 of which involved assault weapons. In other words, the share was 24% (8 divided by 34 equals 0.24). Lott's errors result in a significant undercount of the share of incidents involving assault weapons relative to all incidents. Moreover, his mistakes are not limited to the post-AWB timeframe. Lott's analysis of gun massacres occurring in the 10-year periods before and during the AWB also contains incorrect data points. Despite these errors, Lott's data (as presented in his Declaration) still show that gun massacres involving assault weapons went down after the AWB went into effect, only to go up after the AWB expired.

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

46.     When the studies and underlying data are analyzed in a comprehensive and accurate manner, the outcome is clear: there is ample evidence to reasonably conclude that assault weapons bans reduce gun massacres and save lives.

## III.   SUMMARY

47.     It is my professional opinion, based upon my extensive review and analysis of data from the past four decades, that (1) gun massacres involving six or more fatalities presently pose the deadliest criminal threat, in terms of individual acts of intentional violence, to the safety and security of American society in the post-9/11 era, and the problem is growing nationwide; (2) gun massacres involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons; and (3) jurisdictions that restrict the possession of assault weapons experience fewer gun massacres, per capita, than jurisdictions that do not restrict assault weapons.  Based on these findings, it is my opinion that restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of gun massacres.

48.     The main purpose of an assault weapons ban is to restrict the availability of assault weapons.  The rationale is that, if there are fewer assault weapons in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearms, resulting in fewer lives lost.  The epidemiological data buttress this line of reasoning, supporting the California legislature's determination that restricting civilian access to assault weapons will enhance public safety.

49.     While imposing constraints on assault weapons will not prevent all future mass shootings, the data suggest that legislative efforts to deny gunmen access to assault weapons should result in a significant number of lives being saved.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed in New York, New York, on January 22, 2020.

3

4

5

6

7

8

9    _____
     Louis Klarevas

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Professor Louis Klarevas (19-cv-1537-BEN-JLB)

# EXHIBIT 1

**Louis J. Klarevas**
**ljk2149@tc.columbia.edu**

**Education**

Ph.D.   International Relations, 1999
          School of International Service
          American University

B.A.     Political Science, *Cum Laude*, 1989
          School of Arts and Sciences
          University of Pennsylvania

**Current Position**

Research Professor, Teachers College, Columbia University, New York, NY

**Representation**

*Book/Print*
Don Fehr
Trident Media Group
41 Madison Avenue
New York, NY 10010

*Film/TV*
Kim Yau
Paradigm Talent Agency
360 North Crescent Drive
Beverly Hills, CA 90210

**Experience**

*Academic Experience (Presented in Academic Years)*
Research Professor, Teachers College, Columbia University, New York, NY, 2018-

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*
Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-

Opinion Contributor, *New York Daily News*, New York, NY, 2017-

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, Academy for International Conflict Management and Peacebuilding, United States Institute of Peace, Washington, DC, 2008-2009

Consultant, United States Institute of Peace, Washington, DC, 2005

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Books**

*Rampage Nation: Securing America from Mass Shootings* (2016)

**Scholarship**

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, forthcoming (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis)

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

**Commentaries and Correspondence**

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Columns Written (in Greek) for *To Vima* Newspaper (Athens)**

"Time to Pay," August 2003

"Does Turkey Have an Ulterior Motive?" July 2003

"Will They Make Up?" June 2003

"Don't Take the Bait," May 2003

"If the Cheers Turn to Jeers," April 2003

"The Power of a Niche Identity," April 2003

"If You Can't Beat Them, Join Them," April 2003

"Show Me the Euros," March 2003


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

13

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge


**Service to University, Profession, and Community**

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Expert for Victims of Sutherland Springs, TX, Mass Shooting, 2019-

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Expert for State of California, 2017-

Expert for State of Colorado, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Associations and Organizations (Past and Present)**

Academy of Political Science

American Political Science Association

Anderson Society of American University

Carnegie Council Global Ethics Network

International Political Science Association

International Studies Association

Museum of Modern Art

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Sigma Nu Fraternity

Social Science Research Network

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Honors and Awards**

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT 2

**Excerpt from *Rampage Nation***

**Table 2.1**

# Table 2.1. The Concept of a Mass Shooting.

## Definition of a Mass Shooting:

Any violent attack that results in four or more individuals incurring gunshot wounds.

## Categories of Mass Shooting:

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.

✯ ✯ ✯

Source: Louis Klarevas, Rampage Nation: Securing America from Mass Shootings 48 (2016).

**EXHIBIT 3**

**Gun Massacres in the United States, 1980-2019**

|  | Date | City | State | Deaths | Involved Assault Weapon(s) |
|---|---|---|---|---|---|
| 1 | 1/3/1981 | Delmar | IA | 6 | N |
| 2 | 1/7/1981 | Richmond | VA | 6 | N |
| 3 | 5/2/1981 | Clinton | MD | 6 | N |
| 4 | 8/21/1981 | Indianapolis | IN | 6 | N |
| 5 | 2/17/1982 | Farwell | MI | 7 | N |
| 6 | 8/9/1982 | Grand Prairie | TX | 6 | N |
| 7 | 8/20/1982 | Miami | FL | 8 | N |
| 8 | 9/7/1982 | Craig | AK | 8 | N |
| 9 | 9/25/1982 | Wilkes-Barre | PA | 13 | Y |
| 10 | 2/18/1983 | Seattle | WA | 13 | N |
| 11 | 3/3/1983 | McCarthy | AK | 6 | N |
| 12 | 10/11/1983 | College Station and Hempstead | TX | 6 | N |
| 13 | 4/15/1984 | Brooklyn | NY | 10 | N |
| 14 | 5/19/1984 | Manley Hot Springs | AK | 8 | N |
| 15 | 6/29/1984 | Dallas | TX | 6 | N |
| 16 | 7/18/1984 | San Ysidro | CA | 21 | Y |
| 17 | 10/18/1984 | Evansville | IN | 6 | N |
| 18 | 8/20/1986 | Edmond | OK | 14 | N |
| 19 | 12/8/1986 | Oakland | CA | 6 | Y |
| 20 | 2/5/1987 | Flint | MI | 6 | N |
| 21 | 4/23/1987 | Palm Bay | FL | 6 | Y |
| 22 | 7/12/1987 | Tacoma | WA | 7 | N |
| 23 | 9/25/1987 | Elkland | MO | 7 | N |
| 24 | 12/30/1987 | Algona | IA | 6 | N |
| 25 | 2/16/1988 | Sunnyvale | CA | 7 | N |
| 26 | 9/14/1989 | Louisville | KY | 8 | Y |

1

| | Date | City | State | Deaths | Involved Assault Weapon(s) |
|---|---|---|---|---|---|
| 27 | 6/18/1990 | Jacksonville | FL | 9 | N |
| 28 | 1/26/1991 | Chimayo | NM | 7 | N |
| 29 | 8/9/1991 | Waddell | AZ | 9 | N |
| 30 | 10/16/1991 | Killeen | TX | 23 | N |
| 31 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N |
| 32 | 1/8/1993 | Palatine | IL | 7 | N |
| 33 | 5/16/1993 | Fresno | CA | 7 | Y |
| 34 | 7/1/1993 | San Francisco | CA | 8 | Y |
| 35 | 12/7/1993 | Garden City | NY | 6 | N |
| 36 | 4/20/1999 | Littleton | CO | 13 | Y |
| 37 | 7/12/1999 | Atlanta | GA | 6 | N |
| 38 | 7/29/1999 | Atlanta | GA | 9 | N |
| 39 | 9/15/1999 | Fort Worth | TX | 7 | N |
| 40 | 11/2/1999 | Honolulu | HI | 7 | N |
| 41 | 12/26/2000 | Wakefield | MA | 7 | Y |
| 42 | 12/28/2000 | Philadelphia | PA | 7 | N |
| 43 | 8/26/2002 | Rutlegde | AL | 6 | N |
| 44 | 1/15/2003 | Edinburg | TX | 6 | Y |
| 45 | 7/8/2003 | Meridian | MS | 6 | N |
| 46 | 8/27/2003 | Chicago | IL | 6 | N |
| 47 | 3/12/2004 | Fresno | CA | 9 | N |
| 48 | 11/21/2004 | Birchwood | WI | 6 | Y |
| 49 | 3/12/2005 | Brookfield | WI | 7 | N |
| 50 | 3/21/2005 | Red Lake | MN | 9 | N |
| 51 | 1/30/2006 | Goleta | CA | 7 | N |
| 52 | 3/25/2006 | Seattle | WA | 6 | N |
| 53 | 6/1/2006 | Indianapolis | IN | 7 | Y |
| 54 | 12/16/2006 | Kansas City | KS | 6 | N |
| 55 | 4/16/2007 | Blacksburg | VA | 32 | N |

|    | Date | City | State | Deaths | Involved Assault Weapon(s) |
|----|------|------|-------|--------|----------------------------|
| 56 | 10/7/2007 | Crandon | WI | 6 | Y |
| 57 | 12/5/2007 | Omaha | NE | 8 | Y |
| 58 | 12/24/2007 | Carnation | WA | 6 | N |
| 59 | 2/7/2008 | Kirkwood | MO | 6 | N |
| 60 | 9/2/2008 | Alger | WA | 6 | N |
| 61 | 12/24/2008 | Covina | CA | 8 | N |
| 62 | 1/27/2009 | Los Angeles | CA | 6 | N |
| 63 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y |
| 64 | 3/29/2009 | Carthage | NC | 8 | N |
| 65 | 4/3/2009 | Binghamton | NY | 13 | N |
| 66 | 11/5/2009 | Fort Hood | TX | 13 | N |
| 67 | 1/19/2010 | Appomattox | VA | 8 | Y |
| 68 | 8/3/2010 | Manchester | CT | 8 | N |
| 69 | 1/8/2011 | Tucson | AZ | 6 | N |
| 70 | 7/7/2011 | Grand Rapids | MI | 7 | N |
| 71 | 8/7/2011 | Copley Township | OH | 7 | N |
| 72 | 10/12/2011 | Seal Beach | CA | 8 | N |
| 73 | 12/25/2011 | Grapevine | TX | 6 | N |
| 74 | 4/2/2012 | Oakland | CA | 7 | N |
| 75 | 7/20/2012 | Aurora | CO | 12 | Y |
| 76 | 8/5/2012 | Oak Creek | WI | 6 | N |
| 77 | 9/27/2012 | Minneapolis | MN | 6 | N |
| 78 | 12/14/2012 | Newtown | CT | 27 | Y |
| 79 | 7/26//2013 | Hialeah | FL | 6 | N |
| 80 | 9/16/2013 | Washington | DC | 12 | N |
| 81 | 7/9/2014 | Spring | TX | 6 | N |
| 82 | 9/18/2014 | Bell | FL | 7 | N |

|     | Date       | City                  | State | Deaths | Involved Assault Weapon(s) |
| --- | ---------- | --------------------- | ----- | ------ | -------------------------- |
| 83  | 2/26/2015  | Tyrone                | MO    | 7      | N                          |
| 84  | 5/17/2015  | Waco                  | TX    | 9      | N                          |
| 85  | 6/17/2015  | Charleston            | SC    | 9      | N                          |
| 86  | 8/8/2015   | Houston               | TX    | 8      | N                          |
| 87  | 10/1/2015  | Roseburg              | OR    | 9      | N                          |
| 88  | 12/2/2015  | San Bernardino        | CA    | 14     | Y                          |
| 89  | 2/21/2016  | Kalamazoo             | MI    | 6      | N                          |
| 90  | 4/22/2016  | Piketon               | OH    | 8      | N                          |
| 91  | 6/12/2016  | Orlando               | FL    | 49     | Y                          |
| 92  | 5/27/2017  | Brookhaven            | MS    | 8      | N                          |
| 93  | 9/10/2017  | Plano                 | TX    | 8      | Y                          |
| 94  | 10/1/2017  | Las Vegas             | NV    | 58     | Y                          |
| 95  | 11/5/2017  | Sutherland Springs    | TX    | 25     | Y                          |
| 96  | 2/14/2018  | Parkland              | FL    | 17     | Y                          |
| 97  | 5/18/2018  | Santa Fe              | TX    | 10     | N                          |
| 98  | 10/27/2018 | Pittsburgh            | PA    | 11     | Y                          |
| 99  | 11/7/2018  | Thousand Oaks         | CA    | 12     | N                          |
| 100 | 5/31/2019  | Virginia Beach        | VA    | 12     | N                          |
| 101 | 8/3/2019   | El Paso               | TX    | 22     | Y                          |
| 102 | 8/4/2019   | Dayton                | OH    | 9      | Y                          |
| 103 | 8/31/2019  | Midland and Odessa    | TX    | 7      | Y                          |

Notes: Gun massacres are defined as high-fatality mass shootings resulting in 6 or more people shot to death, not including the perpetrators.  A gun massacre was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial

declaration issued by a state official.  Incidents in gray shade are those incidents that occurred at a time when and in a state where legal restrictions on assault weapons were in effect.

Sources: Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 Am. J. of Pub. Health 1754 (2019), available at *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed January 6, 2020); and "Past Summary Ledgers," Gun Violence Archive, available at https://www.gunviolencearchive.org/past-tolls (last accessed January 21, 2020).

**EXHIBIT 4**

# Excerpt from *Rampage Nation*

## Figure 7.2



| | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| ▪ Incidents | 19 | 12 | 34 |
| ▪ Deaths | 155 | 89 | 302 |

Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

Source: Louis Klarevas, Rampage Nation: Securing America from Mass Shootings 242 (2016).