# EXHIBIT 19
# TO THE DECLARATION OF JOHN D. ECHEVERRIA

MATTHEW E. SLOAN (SBN 165165)
matthew.sloan@probonolaw.com
MATTHEW J. TAKO (SBN 307013)
matthew.tako@probonolaw.com
EVAN G. SLOVAK (SBN 319409)
evan.slovak@probonolaw.com
AGNES N. ANIOL (SBN 324467)
agnes.aniol@probonolaw.com
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600

Attorneys for *Amicus Curiae*
Everytown for Gun Safety

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STEVEN RUPP, *et al.*, | CASE NO.: 8:17-cv-00746-JLS-JDE |
| Plaintiffs, | BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | Hearing Date:   May 31, 2019<br>Hearing Time:   10:30 a.m.<br>Courtroom:   10A<br>Judge:   Hon. Josephine L. Staton |

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety has no parent corporations.  It has no stock and hence no publicly held company owns 10% or more of its stock.

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ 1

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICUS CURIAE* .............................................................. 1

INTRODUCTION ................................................................................... 1

ARGUMENT ......................................................................................... 3

I.   California's Prohibition of Assault Weapons Is Part of a Longstanding History of Analogous Prohibitions. ........................... 3

   A.   The AWCA Is Consistent with Centuries of Laws Prohibiting Weapons Deemed To Be Especially Dangerous Dating from the Colonial Period to the Present Day. ............... 5

   B.   States Have Prohibited Semi-Automatic Firearms Capable of Quickly Firing Multiple Rounds Since the Early Twentieth Century. .................................................. 7

II.   The "Common Use" Test Proposed by Plaintiffs Is Illogical and Should Not Be Followed. ..................................................... 9

   A.   Plaintiffs' "Common Use" Test Is Logically Circular and an Unreasonable Constraint on Federalism Principles. ............ 10

   B.   The "Common Use" Test Should Instead Be Used To Evaluate Whether the Weapon Is Necessary for the Core Second Amendment Right of Home Defense. ......................... 14

III.   The Use of Assault Weapons Makes Mass Shootings and Other Gun-Violence Incidents Deadlier and It Is in California's Interest To Regulate These Weapons To Protect the Public. ..................... 15

CONCLUSION ....................................................................................... 21

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

# <u>TABLE OF AUTHORITIES</u>

## **Cases**

*Aymette v. State*,
  21 Tenn. 154 (1840) ........................................................................ 6

*Cockrum v. State*,
  24 Tex. 394 (1859) .......................................................................... 6

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................................. 2, 4, 5, 10, 15

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) .......................................................... 9

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...................................... 2, 4, 10, 14, 17

*Fyock v. City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) ........................................... 4, 15, 16

*Gallinger v. Becerra*,
  898 F.3d 1012 (9th Cir. 2018) ................................. 2, 5, 15, 16, 18

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ................................................ 2, 15

*Jackson v. City & County of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ..................................................... 3, 14

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) ..................................... 2, 10, 11, 12, 15,18, 20

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ..................................................................... 14

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ...................................................... 2, 18, 20

*National Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  700 F.3d 185 (5th Cir. 2012) .......................................................... 4

*People v. Gleason*,
  No. H042771, 2017 WL 6276235 (Cal. Ct. App. Dec. 11, 2017) ............... 2

*People v. James*,
  174 Cal. App. 4th 662 (2009) .................................................... 2, 5

*People v. Zondorak*,
  220 Cal. App. 4th 829 (2013) ........................................................ 2

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ......................................................... 5

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) .............................................................. 4

*Worman v.* Healey,
   293 F. Supp. 3d 251 (D. Mass. 2018) ................................................ 10

## Statutes

Act of July 8, 1932, ch. 465, §§ 1, 14, 47 Stat. 650 ................................ 7

1763-1775 N.J. Laws 346 ........................................................................ 5

1837 Ala. Sess. Laws 7 ............................................................................ 6

1837 Ga. Laws 90 .................................................................................... 6

1837-1838 Tenn. Pub. Acts 200 .............................................................. 6

1879 Tenn. Pub. Acts 136, ch. 96, § 1 .................................................... 6

1881 Ark. Acts 192 .................................................................................. 6

1903 S.C. Acts 127-28 ............................................................................. 6

1907 Ala. Sess. Laws 80 .......................................................................... 6

1909 Me. Laws 141 .................................................................................. 6

1911 N.Y. Laws 442 ................................................................................. 6

1912 Vt. Acts & Resolves 310 ................................................................. 6

1913 Iowa Acts 307, ch. 297, § 2 ........................................................... 6

1913 Minn. Laws 55 ................................................................................ 6

1916 N.Y. Laws 338-39 ........................................................................... 6

1917 Cal. Stat. 221 .................................................................................. 6

1917 Minn. Laws 354 .............................................................................. 6

1926 Mass. Acts 256 ................................................................................ 6

1927 Cal. Stat. 938 .................................................................................. 8

1927 Mich. Pub. Acts 887-89 .................................................................. 6

1927 Mich. Pub. Acts 888 ....................................................................... 7

1927 R.I. Pub. Laws 256-59 .................................................................... 7

1927 R.I. Pub. Laws 259 .......................................................................... 6

S. Rep. No. 72-575 (1932) ....................................................................... 8

iii

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000361

| 1 | 1933 Cal. Stat. 1169 ............................................................................ 8 |
| 2 | 1933 Minn. Laws 232 ........................................................................... 8 |
| 3 | 1933 Ohio Laws 189 ............................................................................ 8 |
| 4 | 1934 Va. Acts 137 ............................................................................... 8 |
| 5 | The Laws of Plymouth Colony (1671) ................................................. 5 |
| 6 | Records of the Colony of New Plymouth in New England 230 (Boston 1861) .......... 5 |

**Other Authorities**

Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security*, ABC News (Aug. 21, 2013), http://abcn.ws/1KwN9Ls .................. 18

Alex Yablon, *Most Californians Who Own 'Assault Rifles' Have 10+ Guns*, The Trace  (Nov. 12, 2018), https://bit.ly/2FFyQJO ......................................... 11

Bonnie Berkowitz et al., *The terrible numbers that grow with each mass shooting*, (Oct. 1, 2017) Wash. Post, https://wapo.st/2CMznZz ...................... 17

Charles DiMaggio et al., *Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. of Trauma and Acute Care Surgery 11 (2018) ................. 19

Christopher Ingraham, *It's Time To Bring Back The Assault Weapons Ban, Gun Violence Experts Say*, Wash. Post (Feb. 15, 2018), https://wapo.st/2JjFlSk ........................................................................... 19

Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urb. Health 313 (2017) ....................................... 20

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev 231 (2015). ................................................................... 11, 12

Everytown, *Mass Shootings in the United States: 2009-2016*, Appendix (Mar. 2017), https://every.tw/2JPBIVz ............................................ 16

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://bit.ly/2u0rlr2 ........ 18

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279 (2016) .......................................... 10, 14

Joshua D. Brown et al., *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982-2018*, 108 Am. J. of Pub. Health 1385 (2018).................................................................... 19

Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 Hastings Cont. L.Q. 523 (2019)........................................ 13

iv

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000362

Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Guardian (Sept. 20, 2016), https://bit.ly/2cs0kFo........... 11

Louis Klarevas,
      *Rampage Nation: Securing America from Mass Shootings* (2016) ................ 19

Margot Sanger-Katz & Quoctrung Bui, *How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws*, N.Y. Times (Oct. 5, 2017), https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html ......... 19, 20

Marjory Stoneman Douglas High School Public Safety Commission,
      *Initial Report to the Governor, Speaker of the House of Representatives and Senate President* (Jan. 2, 2019),
      http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf........................... 17

National Shooting Sports Foundation, *The Term 'Modern Sporting Rifle'* (Sept. 19, 2011), https://perma.cc/5KTF-W6B2 ................................................ 13

Nikki Graf, *A Majority of U.S. Teens Fear a Shooting Could Happen at Their School, and Most parents Share Their Concern*, Pew Research Center (April 13, 2018), https://www.pewresearch.org/fact-tank/2018/04/18/a-majority-of-u-s-teens-fear-s-shooting-could-happen-at-their-school-and-most-parents-share-their-concern/ ........................................................................... 17

NRA Staff, *I Have This Old Gun: Colt AR-15 SP1*,
      *American Rifleman* (July, 31, 2014),
      https://www.americanrifleman.org/articles/2014/7/31/i-have-this-old-gun-colt-ar-15-sp1/ .................................................................................... 12, 13

Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute Care Surgery 853 (2016).......... 18

Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), http://read.bi/2x12PpU ............................................. 7

Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting (1928) ............................................................................................... 7

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) ...................... 4, 5, 6

Sophie Bethune, *APA Stress in America Survey: Generation Z Stressed About Issues in the News but Least Likely to Vote* (Oct. 30, 2018), https://www.apa.org/news/press/releases/2018/10/generation-z-stressed ....... 17

Steve LeVine, *School Shootings Have United Gen Z and Young Millennials*, Axios (Jan. 8, 2019), https://www.axios.con/the-issue-that-unites-the-new-generation-64c8f46d-d4d2-4256-a393-c871ebc9adc0.html ................... 17

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Tim Arango & Jennifer Medina, California Is Already Tough on Guns. After a Mass Shooting, Some Wonder if It's Enough, N.Y. Times (Nov. 10, 2018) https://www.nytimes.com/2018/11/10/us/california-shooting-guns.html ........................................................................................ 20

vi

1

### INTEREST OF *AMICUS CURIAE*

2   Everytown for Gun Safety ("Everytown") is the nation's largest gun violence

3   prevention organization, with over five million supporters across all fifty states,

4   including tens of thousands in California.  It was founded in 2014 as the combined

5   effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors

6   combating illegal guns and gun trafficking, and Moms Demand Action for Gun

7   Sense in America, an organization formed after twenty children and six adults were

8   murdered by a gunman with an AR-15 rifle—the type of weapon regulated by the

9   law challenged here—in an elementary school in Newtown, Connecticut.  The

10  mayors of more than fifty California cities are members of Mayors Against Illegal

11  Guns.  Everytown also includes a large network of gun-violence survivors who are

12  empowered to share their stories and advocate for responsible gun laws.

13  Everytown has drawn on its expertise to file briefs in numerous Second

14  Amendment cases, including challenges to assault weapon prohibitions like those at

15  issue in this case, offering historical and doctrinal analysis that might otherwise be

16  overlooked.  *See, e.g.*, *Wilson v. Cook County*, No. 18-2686 (7th Cir.); *Worman v.*

17  *Healey*, No. 18-1545 (1st Cir.); *Kolbe v. Hogan*, No. 14-1945 (4th Cir.) (en banc);

18  *Duncan v. Becerra*, No. 17-56081 (9th Cir.); *Peruta v. Cty. of San Diego*, No. 10-

19  56971 (9th Cir.) (en banc).  It seeks to do the same here.[1]

20

### INTRODUCTION

21  This case involves a Second Amendment challenge to California's Assault

22  Weapons Control Act ("AWCA"), which prohibits, among other things, the

23  manufacture, possession, transport, sale, offer for sale, and import of assault

24

25

---

26  [1] An appendix of historical gun laws accompanies this brief.  All parties consent to

27  the filing of this brief, and no counsel for any party authored in whole or part.  Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.

28

---

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000365

weapons.[2]  Four circuits have heard challenges to similar laws, and all four upheld the laws as constitutional under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *See Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015) ("*NYSRPA*"), *cert. denied*, 136 S. Ct. 2486 (2016); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015); *Heller v. District of Columbia*  ("*Heller II*"), 670 F.3d 1244, 1264 (D.C. Cir. 2011).[3]  Since *Heller*, three separate districts of the California Court of Appeal have upheld the law at issue in this case, holding that the AWCA "does not prohibit conduct protected by the Second Amendment."  *People v. James*, 174 Cal. App. 4th 662, 677 (2009) (3d Dist.); *see People v. Zondorak*, 220 Cal. App. 4th 829, 835-38 (2013) (4th Dist.); *People v. Gleason*, No. H042771, 2017 WL 6276235, at *5 (Cal. Ct. App. Dec. 11, 2017) (unpublished) (6th Dist.), *cert. denied*, 139 S. Ct. 116 (2018).

As the State of California's brief shows, these courts got it right.  Everytown submits this *amicus curiae* brief to urge this Court to similarly uphold the AWCA here—and, in particular, to make three points:

*First*, the AWCA is part of a long tradition of regulating weapons that legislatures have determined to be unacceptably dangerous, including a century of restrictions on semi-automatic firearms capable of firing a large number of rounds

---

[2] In particular, this case challenges the AWCA's restrictions on rifles classified as assault weapons.  As Plaintiffs concede, the law's regulation of pistols and shotguns is "not relevant here."  Pls.' Mot. Summ. J. ("Pls.' MSJ"), at 3 n.6, ECF No. 77-1.

[3] Although the Ninth Circuit has not addressed the constitutionality of assault weapons laws under the Second Amendment since *Heller*, it recently cited these four circuit decisions favorably in ruling that a different state law, which prohibits permit holders from possessing firearms on school grounds but allows retired peace officers to do so, did not violate the Equal Protection Clause.  *See Gallinger v. Becerra*, 898 F.3d 1012, 1018-19 (9th Cir. 2018) (citing *Kolbe*, *NYSRPA*, *Friedman*, and *Heller II*).

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

1  without reloading.  This historical tradition alone is sufficient for this Court to find

2  the law constitutional under the Second Amendment.

3      *Second*, this Court should also reject Plaintiffs' argument that the national

4  prevalence of a type of a firearm, like the assault weapons at issue here, necessarily

5  bestows Second Amendment protection on that firearm.  Such an approach, under

6  which firearms would become effectively immune from regulation the instant they

7  are deemed in "common use" based on nationwide sales and manufacturing figures,

8  cannot be reconciled with the Supreme Court's decision in *Heller* or with common

9  sense.  Indeed, it divorces the Second Amendment from the self-defense right it

10  protects.  Further, such a test is inconsistent with core principles of federalism,

11  preventing individual states from determining how to best regulate themselves.  Put

12  simply, the "common use" test advocated by Plaintiffs would transform the

13  constitutional analysis into a consumer referendum influenced by the firearms

14  industry's aggressive modern-day marketing and sales strategies.  That is not, nor

15  should it be, the law.

16      *Finally*, even if the AWCA is found or assumed to regulate conduct protected

17  by the Second Amendment, the Court should grant the State's motion for summary

18  judgment and dismiss this action because the AWCA survives intermediate scrutiny.

19  In addition to the arguments and evidence advanced in the State's moving papers,

20  Everytown's own research and other relevant social science and statistical evidence

21  bear out California's important interest in preventing and mitigating mass shootings

22  and daily gun violence, and the AWCA's "reasonable fit," *Jackson v. City & County*

23  *of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014), with that interest.

24                                    **ARGUMENT**

25  **I.   California's Prohibition of Assault Weapons Is Part of a**
26        **Longstanding History of Analogous Prohibitions.**

27      As both the Supreme Court and the Ninth Circuit have emphasized,

28  "longstanding prohibitions" on the possession of certain types of weapons are

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

"traditionally understood to be outside the scope of the Second Amendment." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015); *see Heller*, 554 U.S. at 626-27, 635 (noting that such "longstanding prohibitions" are treated as tradition-based "exceptions" by virtue of their "historical justifications"). These prohibitions need not "mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). Instead, courts have found that even "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997 (citing *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012)).[4]

The AWCA is not a radical departure from this country's well-established history of firearm regulation. Rather, it is another instance in a long tradition of regulating or prohibiting weapons that lawmakers have concluded are unacceptably dangerous—including a century of restrictions enacted shortly after semi-automatic weapons capable of firing a large number of rounds without reloading became widely available commercially. *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68-69, 72 (2017) (explaining that "[firearm] laws were enacted not when these weapons were invented, but when they began to circulate widely in society"). Many of these laws were passed around the same time as the prohibitions on sales to felons and individuals with dangerous mental illnesses, and restrictions on commercial arms

---

[4] *See also Friedman*, 784 F.3d at 408 (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934); *Skoien*, 614 F.3d at 639-40 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by *all* felons was not enacted until 1961").

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

sales; all laws that *Heller* identified as "longstanding" and therefore presumptively valid. *See Heller*, 554 U.S. at 626-27, 635; *see also* Spitzer, *supra*, at 82 (discussing the passage of prohibitions on possession of firearms by felons and individuals with mental disabilities in the early twentieth century and the possession of semi-automatic weapons with large capacity magazines ("LCMs") in the 1920s and 1930s). Plaintiffs erroneously claim that any such restrictions "are of extremely recent vintage." Pls.' MSJ at 16. But as further described below, there is indeed a longstanding historical tradition of regulation which, in and of itself, is sufficient for the Court to find the AWCA constitutional under *Heller*. *See Heller*, 554 U.S. at 626-27; *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 673, 682-90 (9th Cir. 2017) (en banc) (applying "[a] textual and historical analysis" to conclude that "the Second Amendment . . . does not confer a freestanding right . . . to sell firearms"), *cert. denied*, 138 S. Ct. 1988 (2018).

A.  **The AWCA Is Consistent with Centuries of Laws Prohibiting Weapons Deemed To Be Especially Dangerous Dating from the Colonial Period to the Present Day.**

The AWCA is part of a long history of government weapon prohibitions aimed at enhancing public safety either because the weapons themselves are especially dangerous, or because they are particularly suitable for criminal use.[5] In this country, such prohibitions date back to the early colonial period when the American colonies and first states began adopting the English tradition of regulating especially dangerous firearms. *See generally* 1763-1775 N.J. Laws 346 (prohibiting set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the Colony of New Plymouth in New England 230 (Boston 1861) (same).

---

[5] As the California Court of Appeal stated in upholding the AWCA, "the Legislature was specifically concerned with the unusual and dangerous nature of these weapons." *James*, 174 Cal. App. 4th at 676; *see Gallinger*, 898 F.3d at 1018 (noting the "particular danger posed by assault weapons," which "motivated the Legislature to enact the AWCA").

5

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000369

The passage of the Bill of Rights did not end this practice. States continued to prohibit or regulate particularly dangerous weapons. For example, several states banned or prohibitively taxed Bowie knives,[6] which were determined to be "instrument[s] of almost certain death." *See Cockrum v. State*, 24 Tex. 394, 402 (1859) (finding Bowie knives are "differ[ent] from [guns, pistols, or swords] in [their] device and design" and are therefore more accurate and lethal than other contemporary weapons). In addition, a number of states prohibited certain types of small and easily concealable handguns, which were determined to be ideal for criminal use.[7]

Throughout the early twentieth century, many states passed laws prohibiting especially dangerous weapons or weapon features, such as silencers, as the technology of firearms and other dangerous weapons evolved.[8] And, in the 1920s and 1930s, at least twenty-eight states and the federal government passed prohibitions or severe restrictions on automatic weapons, along with the restrictions on large-capacity semi-automatic weapons discussed next. *See* Spitzer, *supra*, at 67-71; Sec. I.B., *infra*.

---

[6] *See* 1837 Ala. Sess. Laws 7 § 1 (prohibitively taxing Bowie knives); 1837 Ga. Laws 90 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin").

[7] *See* 1879 Tenn. Pub. Acts 136 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1881 Ark. Acts 192 (pocket pistols and "any kind of cartridge, for any pistol"); 1903 S.C. Acts 127-28 (similar); *See* 1907 Ala. Sess. Laws 80 (similar).

[8] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Acts & Resolves 310 (same); 1913 Minn. Laws 55 (same); 1916 N.Y. Laws 338-39 (same); 1926 Mass. Acts 256 (same); 1927 Mich. Pub. Acts 887-89 (same); 1927 R. I. Pub. Laws 259 (same). States also banned a wide variety of unusually dangerous weapons, including blackjacks and billy clubs, slung-shots (a metal or stone weight tied to a string), brass knuckles, various kinds of knives, and explosives. *See, e.g.*, 1917 Cal. Stat. 221 (blackjacks and billy clubs); 1911 N.Y. Laws 442 (slung-shots); 1913 Iowa Acts 307 (daggers and similar-length knives); 1917 Minn. Laws 354 (brass knuckles); 1927 Mich. Pub. Acts 887-89 (explosives).

6

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000370

**B.** **States Have Prohibited Semi-Automatic Firearms Capable of Quickly Firing Multiple Rounds Since the Early Twentieth Century.**

States have regulated semi-automatic firearms capable of quickly firing a large number of rounds—the precursor to modern-day assault weapons—since shortly after these firearms first became widely commercially available at the turn of the twentieth century. *See* Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), http://read.bi/2x12PpU (explaining that semi-automatic weapons became commercially available in the early 1900s). Such laws often categorized large-capacity, semi-automatic firearms, along with fully automatic weapons, as "machine guns," and imposed restrictions that effectively prohibited them entirely. *See, e.g.*, 1927 R.I. Pub. Laws 256-59 (prohibiting the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 888 (prohibiting possession of "any machine gun or firearm which can be fired more than sixteen times without reloading").

In 1928, the National Conference of Commissioners on Uniform State Laws (now the Uniform Law Commission) adopted a model law prohibiting possession of "any firearm which shoots more than twelve shots semi-automatically without reloading," setting the national standard for laws prohibiting possession of semi-automatic firearms with LCMs. *See* Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting 422-23 (1928).[9] Shortly thereafter, the federal government enacted a similar prohibition for the District of Columbia. *See* Act of July 8, 1932, ch. 465,§§ 1, 14, 47 Stat. 650 (making it a crime to "possess any machine gun,"

---

[9] This standard originated with a model law promulgated by the National Crime Commission in 1927. Report of Firearms Committee, at 422-23.

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

1  which it defined as "any firearm which shoots . . . semiautomatically more than

2  twelve shots without loading").  Even the National Rifle Association endorsed

3  passage of the D.C. law, saying, "it is our desire [that] this legislation be enacted for

4  the District of Columbia, in which case it can then be used as a guide throughout the

5  states of the Union."  S. Rep. No. 72-575, at 5-6 (1932).

6       California first prohibited automatic weapons in 1927[10] and expanded this

7  prohibition with a 1933 statute that prohibited the sale or possession of not only "all

8  firearms . . . capable of discharging automatically," but also "all firearms which are

9  automatically fed after each discharge from or by means of clips, discs, drums, belts

10  or other separable mechanical devices having a capacity of greater than ten

11  cartridges."  1933 Cal. Stat. 1170.  These statutes were at least as restrictive as the

12  AWCA, and indeed appear *more* restrictive than the AWCA, as the 1933 law

13  prohibited *all* firearms equipped with LCMs, rather than only the assault weapons at

14  issue here (or even the magazines themselves, which are separately regulated under

15  California law).  *See id.*  Several other states, including Minnesota, Ohio, and

16  Virginia, also prohibited or strictly regulated semi-automatic firearms with LCMs.[11]

17       These regulations have evolved as the firearm marketplace continually

18  introduces new products and the market embraces certain models or technologies.  In

19  their moving papers, Plaintiffs claim that the AWCA and similar laws "are of an

20  _____

21  [10] *See* 1927 Cal. Stat. 938 (prohibiting "all firearms known as machine rifles,
22  machine guns or submachine guns capable of discharging automatically and
   continuously loaded ammunition of any caliber in which the ammunition is fed to
23  such gun from or by means of clips, disks, drums, belts or other separable
   mechanical device").

24  [11] *See* 1933 Minn. Laws 232 (prohibiting "[a]ny firearm capable of automatically
25  reloading after each shot is fired, whether firing singly by separate trigger pressure or
   firing continuously" if the weapon was modified to allow for a larger magazine
26  capacity); 1933 Ohio Laws 189 (creating prohibitive licensing for "any firearm
   which shoots more than eighteen shots semi-automatically without reloading"); 1934
27  Va. Acts 137 (effectively prohibiting possession or use of weapons "from which
   more than sixteen shots or bullets may be rapidly, automatically, semi-automatically
28  or otherwise discharged without reloading").

8
BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000372

1    extremely recent vintage" and therefore should not be upheld.  Pls.' MSJ at 16.  But

2    there are two significant flaws with this argument.  First, it ignores the dynamic

3    history of firearm regulation outlined above, of which the AWCA is a natural

4    extension.  Second, AR-15s and similar rifles were not commercially available until

5    the second half of the twentieth century and were not popular in the American

6    marketplace until the 1980s.  *See* Sec. II.A., *infra*.  There can be no centuries-old

7    regulation for a firearm that did not exist.  Rather, the "recent vintage" of the 1980s

8    and 1990s laws, when the AWCA and other modern laws prohibiting assault

9    weapons emerged, perfectly aligns with the ascendance of these firearms in

10   American life.  *See id.*

11        As this historical record shows, the AWCA is the natural continuation of the

12   longstanding tradition of government prohibition or regulation of especially

13   dangerous weapons.  This includes nearly a century of restrictions on semi-automatic

14   firearms with the ability to shoot large numbers of rounds in a short time without

15   reloading.  These regulations have logically and necessarily progressed along with

16   improvements in firearm technology, growth in firearm popularity, and changes in

17   the national regulatory landscape.  Given that broader historical context, any

18   relatively small lapse in the regulation of a certain firearm does not summarily render

19   any and all future regulations unconstitutional, nor does it nullify the entire

20   regulatory history.  As such, the AWCA qualifies as a longstanding prohibition,

21   which, accordingly, falls outside the scope of the Second Amendment.  *See, e.g.*,

22   *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (finding that a concealed-carry

23   licensing standard that had been in effect "in some form for nearly 90 years"

24   "qualifies as a longstanding, presumptively lawful regulation").

25   II.   **The "Common Use" Test Proposed by Plaintiffs Is Illogical and Should
         Not Be Followed.**

26

27        Plaintiffs assert that assault weapons must be afforded constitutional

28   protection because they are "owned and in common use by millions of Americans for

9

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000373

1   self-defense" and remain lawful "in all but a few states." *See* Third Am. Compl.

2   ("TAC") ¶¶ 1-2 (ECF No. 60); *accord* Pls.' MSJ at 13-14. There is neither firm

3   legal footing nor sound logic in the "common use" test that Plaintiffs advance.

4        The argument that assault weapons must be afforded Second Amendment

5   protection simply because they are widely available in other states dangerously

6   misconstrues the Supreme Court's decision in *Heller*. While the Second

7   Amendment "does not protect those weapons not typically possessed by law-abiding

8   citizens for lawful purposes, such as short-barreled shotguns," *Heller*, 554 U.S. at

9   625, it does not logically follow—and neither the Supreme Court nor other courts

10  have held—that the Second Amendment somehow protects *all* weapons that have

11  achieved some preordained degree of commercial success. *See Worman v. Healey*,

12  293 F. Supp. 3d 251, 266 (D. Mass. 2018) ("[P]resent day popularity is not

13  constitutionally material."), *appeal docketed*, No. 18-1545 (1st Cir.).

14  **A.   Plaintiffs' "Common Use" Test Is Logically Circular and an Unreasonable Constraint on Federalism Principles.**

15

16       In addition to lacking a firm jurisprudential foundation, Plaintiffs' "common

17  use" test is hopelessly circular. Plaintiffs' proposed approach would allow the

18  constitutionality of weapons prohibitions to be decided not by how dangerous a

19  weapon is, but rather by "how widely it is circulated to law-abiding citizens by the

20  time a bar on its private possession has been enacted and challenged." *Kolbe*, 849

21  F.3d at 141. Just as "it would be absurd to say that the reason why a particular

22  weapon can be banned is that there is a statute banning it, so that it isn't commonly

23  owned," *Friedman,* 784 F.3d at 409, it would be similarly absurd to claim that a law

24  is constitutionally barred because it addresses dangerous, but ongoing, activity. *See*

25  Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate*

26  *Alternatives*, 53 Harv. J. on Legis. 279, 288 (2016) (discussing the "central

27  circularity" that plagues the "common use" test: "what is common depends largely

28  on what is, and has been, subject to regulation"). Yet, this is exactly what the

10

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000374

1   application of the "common use" test advocated by Plaintiffs would dictate, both

2   here and elsewhere.

3       This approach also fails to provide either workable standards or any

4   overarching guidance on whether the "common use" of assault weapons is

5   determined by considering the number produced, the number sold, or the number of

6   law-abiding owners. *See Kolbe*, 849 F.3d at 135-36. This distinction is critical.

7   Firearm ownership is extremely concentrated, with only 3% of American adults

8   possessing 50% of the country's guns. *See* Lois Beckett, *Meet America's Gun*

9   *Super-Owners—With An Average of 17 Firearms Each*, The Guardian (Sept. 20,

10   2016), https://bit.ly/2cs0kFo; *see also* Alex Yablon, *Most Californians Who Own*

11   *'Assault Rifles' Have 10+ Guns*, The Trace (Nov. 12, 2018), https://bit.ly/2FFyQJO

12   (reporting research finding that "four out of five assault rifles in [California] are

13   owned by people who own 10 or more guns"). If production or sales numbers form

14   the basis of the common use analysis, then this small group of gun owners would

15   essentially govern the meaning and reach of the Second Amendment. This

16   disproportionate influence of a tiny minority of the population cannot be what either

17   the Framers or the *Heller* Court intended.

18       A constitutional analysis driven by the prevalence of the prohibited firearm in

19   the market also would create perverse incentives for the firearms industry. Such an

20   analysis grants firearms manufacturers a unilateral ability to insulate highly

21   dangerous firearms with Second Amendment protection "simply by manufacturing

22   and heavily marketing them" before a government could assess their danger,

23   determine whether to regulate them, and build the political momentum to actually do

24   so. Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment*

25   *"Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015); *see Kolbe*, 849 F.3d

26   at 141-42. Plaintiffs' proposed framework would unreasonably "hinder efforts to

27   require consumer safety features on guns." Jacobs, *supra*, at 267, 269. This is

28   because if there is any delay before states are able to mandate a new safety feature,

11

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000375

1  the firearm may reach some undefined level of "common use" sufficient to command

2  Second Amendment protection.  Given the emergence of new firearm technology

3  (including, for example, 3D-printed gun components that are undetectable using

4  traditional screening methods), and given the inevitability of future technological

5  developments, Plaintiffs' common use theory, if endorsed by this Court, would pose

6  a serious threat to public safety.  *See* Jacobs, *supra*, at 269.

7       These concerns about aggressive marketing and sales campaigns by

8  manufacturers are not merely remote or hypothetical; they can be observed by

9  looking at the weapons at issue in this very case.  The AR-15 rifle—"the most

10 popular of the prohibited assault weapons," *Kolbe*, 849 F.3d at 124, which Plaintiffs

11 reference throughout their complaint (*See* TAC ¶¶ 23-24, 26, 41-42, 48, 50, 107) and

12 assert "has been available to the American public for over 60 years" (Pls.' MSJ at

13 16)—"did not catch on in the American market in a significant way until the late

14 1980s."  Affidavit of Robert Spitzer, Ph.D. at ¶ 8 in *Worman v. Healey*, No. 17-cv-

15 10107-WGY (D. Mass. Dec. 15, 2017), ECF No. 61-5; *see also* NRA Staff, *I Have*

16 *This Old Gun: Colt AR-15 SP1*, *American Rifleman* (July 31, 2014),

17 https://www.americanrifleman.org/articles/2014/7/31/i-have-this-old-gun-colt-ar-15-

18 sp1/ (statement of Martin K.A. Morgan, at 4:15-5:00).  Indeed, it was only *after* the

19 federal prohibition on assault weapons expired in 2004 that the gun industry focused

20 its marketing resources on assault weapons, like the AR-15.  The industry first

21 promoted these weapons as "tactical rifles" or "black rifles," and later—after a

22 concerted post-*Heller* campaign launched in 2009 by the firearms industry's chief

23 trade association, the National Shooting Sports Foundation— as "modern sporting

24 rifles."[12]  As a result of these coordinated industry efforts, the civilian sales of assault

25 ————————————

26 [12] *Compare, e.g.,* Smith & Wesson 2006 10-K at 3-4, 2007 Smith & Wesson 10-K at 4, 2008 Smith & Wesson 10-K at 4, 2009 Smith & Wesson 10-K at 4, and 2010

27 Smith & Wesson 10-K at 5 *with, e.g.,* 2011 Smith & Wesson 10-K at 1, 3-6, and 2012 Smith & Wesson 10-K, at 4, *available at* http://ir.smith-

28 wesson.com/phoenix.zhtml?c=90977&p=irol-

*(cont'd)*

12

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000376

1    weapons skyrocketed.  *See* NRA Staff, *supra*, at 4:15-5:00 (noting that the AR-15's

2    popularity underwent a "fundamental evolution" after 2004, causing civilian sales to

3    "explode[]").  But contemporary and aggressive marketing strategies should have no

4    bearing on the meaning of the United States Constitution.

5         The history of the American firearms industry also makes clear why a market-

6    based "common use" test does not make sense.  As recent scholarship has found,

7    "[f]or the nation's first one hundred years, . . . the guns that were in 'common use'

8    were determined" not by manufacturers or consumers, but "by federal subsidization

9    and regulation."  Lindsay Schakenbach Regele, *A Different Constitutionality for Gun*

10   *Regulation*, 46 Hastings Const. L.Q. 523, 528-30 (2019) ("The sum total of this

11   government regulation and subsidization determined what was in the market, and

12   thus what firearms were in 'common use'.").  Thus, contrary to what Plaintiffs'

13   approach here would mandate, "[i]t is not historically sound . . . to allow gun

14   manufacturers and marketers to determine what arms are in common use."  *Id.* at

15   530.  As discussed above, *see* Sec. I., *supra*, history instead provides strong support

16   for sensible gun safety measures like the AWCA "that are consistent with the Second

17   Amendment."  Regele, *supra*, at 523.

18        Beyond these logical and historical problems with Plaintiffs' proposed

19   "common use" test, a test that turns on nationwide manufacturing or sales totals

20   would also create significant federalism consequences.  Under such a test, whenever

21   a new, potentially dangerous firearm feature became available, states would either

22   have to act immediately, and in unison, to prevent such features from becoming

23   widely available, or else forfeit their ability indefinitely to regulate such weapons

24   going forward.  States that might choose to gather more information before

25   regulating would instead be incentivized to regulate reflexively, not reflectively.

26   _____

27   (cont'd from previous page)
     sec&control_selectgroup=Annual%20Filings; *see also* National Shooting Sports
     Foundation, *The Term 'Modern Sporting Rifle'* (Sept. 19, 2011),

28   https://perma.cc/5KTF-W6B2.

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

1   And if a state's citizens simply had a different position on gun policy, those

2   legislative policy judgments would potentially extend far beyond that state's borders

3   with outsized constitutional effects.

4        Legislators' decisions in one part of the country should not make laws in other

5   parts any "more or less open to challenge under the Second Amendment."

6   *Friedman*, 784 F.3d at 408.  If they did, that "would imply that no jurisdiction other

7   than the United States as a whole can regulate firearms.  But that's not what *Heller*

8   concluded."  *Id.* at 412.  Because our Constitution "establishes a federal republic

9   where local differences are cherished as elements of liberty," federalism is "no less

10  part of the Constitution than is the Second Amendment."  *Id.*  The Supreme Court's

11  decision in *Heller* (as applied to the states in *McDonald v. City of Chicago*, 561 U.S.

12  742 (2010)) "does not foreclose *all* possibility of experimentation" by state and local

13  governments, *Friedman*, 784 F.3d at 412, but rather permits them to do what they

14  have long done in the realm of firearm legislation:  "experiment with solutions to

15  admittedly serious problems."  *Jackson*, 746 F.3d at 970 (citation omitted); *see also*

16  *McDonald*, 561 U.S. at 785 (noting that "[s]tate and local experimentation with

17  reasonable firearms regulations will continue under the Second Amendment"

18  (citation omitted)).  The Plaintiffs' test would eviscerate their ability to do so.[13]

19  **B.   The "Common Use" Test Should Instead Be Used To Evaluate**
20  **Whether the Weapon Is Necessary for the Core Second Amendment**
     **Right of Home Defense.**

21       To the extent that "common use" should play any role in the constitutional

22  analysis, it should be tied to "the purpose of the right to keep and bear arms."

23  Blocher & Miller, *supra*, at 291.  The test should focus, in other words, on whether

24  the regulated weapons are commonly used or are reasonably necessary *for self-*

25  ───────────────

26  [13] A counterfactual further demonstrates why Plaintiffs' "common use" test is
     inappropriate:  If Congress had renewed the federal prohibition on assault weapons

27  rather than permitting it to lapse in 2004, the weapons prohibited by the AWCA
     would not be in widespread use today and would therefore not be subject to Second

28  Amendment protection under this "common use" theory.

14

*defense* or, in particular, *self-defense in the home*, which *Heller* holds is the core of the right.  *See* 554 U.S. at 635.  The D.C. Circuit, in upholding a similar law, has adopted that approach—and implicitly rejected the plaintiffs' market-share "common use" test—by asking whether assault weapons "are commonly used or are useful specifically for self-defense."  *See Heller II*, 670 F.3d at 1261.

As the State demonstrates in its motion and accompanying expert reports, the assault weapons at issue in this case do not, and cannot, meet that standard.  *See* Def.'s Mot. Summ. J. at 15-16, 19-23, ECF No. 73; Def.'s Ex. 1, ECF No. 76-1 (Donahue Report); Def.'s Ex. 3, ECF No. 76-3 (Mersereau Report).  Indeed, as courts have noted, such weapons are "unquestionably most useful in military service" rather than self-defense.  *Kolbe*, 849 F.3d at 137; *see Gallinger*, 898 F.3d at 1018-20 (endorsing *Kolbe*'s reasoning regarding the dangers posed by assault weapons and their minimal usefulness for self-defense).  Put simply, and as the evidence before the Court shows, Plaintiffs' assertion that the firearms banned by the AWCA fall within the purview of self-defense enunciated in *Heller* is patently wrong.

**III.** **The Use of Assault Weapons Makes Mass Shootings and Other Gun-Violence Incidents Deadlier and It Is in California's Interest To Regulate These Weapons To Protect the Public.**

As the Ninth Circuit has recognized, "when 'assault weapons and large-capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines.'"  *Gallinger*, 898 F.3d at 1019 (quoting *Kolbe*, 849 F.3d at 127).  The data backs this up:  Everytown's analysis, as well as other relevant research, demonstrates that the use of assault weapons, particularly when coupled with LCMs, results in more people being shot, more injuries per victim, and more deaths.  Because the AWCA does not implicate nor substantially burden a core Second Amendment right, intermediate scrutiny, at most, is the appropriate standard for this Court to apply in determining its constitutionality.  *See Fyock*, 779 F.3d at 998-99.  A statute survives intermediate

15

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000379

1   scrutiny under the Second Amendment if:  (1) the government's stated objective is

2   "significant, substantial, or important"; and (2) there exists "a reasonable fit between

3   the challenged regulation and the asserted objective."  *Id.* at 1000.  The research

4   below reflects the California legislature's findings, and the data marshaled by the

5   State in its moving papers:  California has a significant, substantial, and important

6   public interest in reducing the risk of harm to its residents from such assault

7   weapons, and the AWCA is a reasonably tailored attempt to address this serious

8   public safety concern.

9        ***Everytown's research.***  Relying largely on press coverage and FBI data,

10  Everytown has tracked and documented mass shootings since 2013 and has released

11  several reports summarizing this data. While Everytown's research cannot present a

12  comprehensive dataset of the firearms used in every mass shooting (the reality of gun

13  violence in the United States is that mass shootings are so frequent that this kind of

14  information is either not reported or not readily available in every instance), the

15  available information indicates that assault weapons make shootings significantly

16  more deadly.

17        For example, data from Everytown's continued tracking of mass shootings

18  shows that when assault weapons are used, more than twice as many people are

19  killed on average (10.1 per shooting versus 4.9) and more than ten times as many are

20  shot and injured (11.4 per shooting versus 1.1).  *See* Everytown, *Mass Shootings in*

21  *the United States: 2009-2016*, Appendix (Mar. 2017), https://every.tw/2JPBIVz.

22  Everytown's tracking of mass shootings also shows that assault weapons are

23  invariably used in the most deadly and injurious events.  The Ninth Circuit has

24  recognized the same. *See Gallinger*, 898 F.3d at 1018-19.  Indeed, over the past

25  decade, the six deadliest mass shooting incidents in America, one of which took

26  place in California, all involved the use of assault weapons.[14]

27  _____
   [14] These shootings are:  Las Vegas, Nevada (59 fatalities); Orlando, Florida (50
28  fatalities); Newtown, Connecticut (28 fatalities); Sutherland Springs, Texas (27

*(cont'd)*

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

1    Mass shootings involving assault weapons are also "highly salient" events that
2  have a unique impact that policymakers may consider when weighing policy choices.
3  *Friedman*, 784 F.3d at 412.  Such shootings like those that occurred at San
4  Bernardino, Newtown, Las Vegas, Parkland, Sutherland Springs, and Aurora sear
5  themselves into the national consciousness and affect the way people live their
6  everyday lives.  *See, e.g.*, Nikki Graf, *A Majority of U.S. Teens Fear a Shooting*
7  *Could Happen at Their School, and Most Parents Share Their Concern*, Pew
8  Research Ctr., Apr. 18, 2018, https://www.pewresearch.org/fact-tank/2018/04/18/a-
9  majority-of-u-s-teens-fear-a-shooting-could-happen-at-their-school-and-most-
10  parents-share-their-concern/ (results of a survey conducted in the two months
11  following the Parkland shooting showed that a majority of U.S. teens (57%) fear a
12  shooting could happen at their school, and most parents (63%) share their concern);
13  Steve LeVine, *School Shootings Have United Gen Z and Young Millennials*, Axios,
14  Jan. 8, 2019, https://www.axios.com/the-issue-that-unites-the-new-generation-
15  64c8f46d-d4d2-4256-a393-c871ebc9adc0.html (recent poll showing that school
16  shootings are the number one issue for American youth, with 68% of people ages 14-
17  29 say that school shootings are the most important issue facing the nation); Sophie
18  Bethune, *APA Stress in America Survey: Generation Z Stressed About Issues in the*
19  *News but Least Likely to Vote* (Oct. 30, 2018),
20  https://www.apa.org/news/press/releases/2018/10/generation-z-stressed (according to
21  the American Psychological Association, 75% of young people ages 15-21 say that

22  _____
(cont'd from previous page)
23  fatalities ); Parkland, Florida (17 fatalities); and San Bernardino, California (14
fatalities). *See* Bonnie Berkowitz, Denise Lu, & Chris Alcantara, *The terrible*
24  *numbers that grow with each mass shooting*, Wash. Post, (Oct. 1, 2017) (continually
updated), https://wapo.st/2CMznZz.  Notably, the Parkland shooter specifically
25  chose an AR-15 to use in the shooting rather than a different type of a firearm,
stating in videos recorded in the days prior to the shooting that "[w]ith the power of
26  my AR you will all know who I am." Marjory Stoneman Douglas High School
Public Safety Commission, *Initial Report to the Governor, Speaker of the House of*
27  *Representatives and Senate President*, at 256(Jan. 2, 2019),
http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.
28

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

1   mass shootings are a significant source of stress); Alana Abramson, *After Newtown,*
2   *Schools Across the Country Crack Down on Security*, ABC News (Aug. 21, 2013),
3   http://abcn.ws/1KwN9Ls (comparing the impact of the Sandy Hook shooting on
4   school security to that of 9/11 on airport security and noting that school districts have
5   spent tens of millions of dollars on security improvements).  While shootings on the
6   scale of these tragedies remain statistically rare compared to the plague of day-to-day
7   gun violence, their enormous impact reinforces the compelling justifications for the
8   AWCA.

9        ***Other social-science research.***  Additional research—some of which the
10  Ninth Circuit appears to reference in *Gallinger*, 898 F.3d at 1018-19—supports the
11  conclusion reached by California that assault weapons pose significant dangers to
12  public safety.

13       The evidence here is substantial.  Assault weapons "tend to result in more
14  numerous wounds, more serious wounds, and more victims."  *NYSRPA*, 804 F.3d at
15  262; *accord Kolbe*, 849 F.3d at 140; s*ee also Gallinger*, 898 F.3d at 1019
16  (acknowledging the "exceptional lethality of [assault weapons]").  They are designed
17  to fire far more bullets, at a far faster rate than other firearms, with each round from
18  an assault weapon having up to four times the muzzle velocity of a handgun round—
19  and thus able to inflict much greater damage.  *See* Peter M. Rhee et al., *Gunshot*
20  *Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute
21  Care Surgery 853 (2016); *see also*, *e.g.*, Heather Sher, *What I Saw Treating the*
22  *Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22,
23  2018), https://bit.ly/2u0rlr2 ("The injury along the path of the bullet from an AR-15
24  is vastly different from a low-velocity handgun injury. . .The high-velocity bullet
25  causes a swath of tissue damage that extends several inches from its path. It does not
26  have to actually hit an artery to damage it and cause catastrophic bleeding. Exit
27  wounds can be the size of an orange.").  And, as researchers examining mass
28  shootings between 1982 and 2018 found, the sort of assault weapon rifles challenged

18

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000382

1  in this case are particularly dangerous, resulting in far more injuries per shooting

2  than handguns (an average of 29.9 injuries for assault rifle long guns and 7.7 injuries

3  for handguns).  *See* Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting*

4  *Venues, Types of Firearms, and Age of Perpetrators in the United States*, *1982-2018*,

5  108 Am. J. of Pub. Health 1385, 1386 (2018),

6  https://ajph.aphapublications.org/doi/10.2105/AJPH.2018.304584.

7       Research regarding mass shootings is most telling here.  A study of mass

8  shootings between 1981 and 2017 found that assault weapons accounted for 86% of

9  the 501 fatalities reported in 44 mass-shooting incidents.  *See* Charles DiMaggio et

10  al., *Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal*

11  *Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. of Trauma and Acute

12  Care Surgery 11, 13 (2018), https://bit.ly/2K44ZzQ.  Further, mass shootings were

13  also 70% less likely to occur between 1994 and 2004 when the federal prohibition on

14  assault weapons was in effect.  *See* DiMaggio, *supra*, at 13.  And researchers

15  estimate that a prohibition on assault weapons would have prevented 314 of the 448

16  mass-shooting deaths that occurred during the studied periods when the federal

17  prohibition was not in effect.  *See* DiMaggio, *supra*, at 13; *see also* Louis Klarevas,

18  *Rampage Nation: Securing America from Mass Shootings* 240-43 (2016) (finding

19  that, as compared to the ten-year period before the federal ban went into effect, the

20  number of gun massacres where six or more people were shot and killed fell by 37%

21  during the ban period; the number of people dying from gun massacres fell by 43%;

22  and gun massacres increased by 183% and massacre deaths by 239% in the decade

23  after the ban lapsed); Christopher Ingraham, *It's Time to Bring Back the Assault*

24  *Weapons Ban, Gun Violence Experts Say*, Wash. Post (Feb. 15, 2018),

25  https://wapo.st/2JjFlSk (discussing Klarevas's research).  Moreover, a 2016 survey

26  of experts in the fields of criminology, law, and public health identified assault

27  weapons prohibitions as among the most effective policy measures for preventing

28  mass shootings.  *See* Margot Sanger-Katz & Quoctrung Bui, *How to Reduce Mass*

19

*Shooting Deaths? Experts Rank Gun Laws*, N.Y. Times (Oct. 5, 2017), https://nyti.ms/2yPr0bo.

In addition to mass shootings, a recent study indicates that criminals are also using assault weapons in the day-to-day gun violence that plagues this nation, with assault weapons accounting for up to 12% of guns used in all crime and up to 16% of guns used in murders of police. Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urb. Health 313 (Oct. 2017), https://goo.gl/cwgrcq. As stated by the Second and Fourth Circuits, assault weapons "are disproportionately used in crime, and particularly in criminal mass shootings," and "are also disproportionately used to kill law enforcement officers." *NYSRPA*, 804 F.3d at 262; *Kolbe*, 849 F.3d at 140.

Thus far, California's legislative and regulatory efforts to curb gun violence have had success. For example, California has among the lowest gun-death rates per capita in the nation despite being the most populous state with the second-highest number of registered guns. *See* Tim Arango & Jennifer Medina, *California Is Already Tough on Guns. After a Mass Shooting, Some Wonder if It's Enough*, N.Y. Times (Nov. 10, 2018), https://www.nytimes.com/2018/11/10/us/california-shooting-guns.html. The AWCA has been and continues to be an important element of California's continued efforts to prevent gun violence. Additional regulations, such as the amendment to the AWCA to address the bullet-button magazine loophole that led to the staggering death toll in the San Bernardino shooting, continue to be constitutional exercises of the State's power to protect the welfare of its citizens.

Accordingly, whether this Court looks to the most recent empirical research, conducts a historical analysis of relevant laws, or looks to guidance from other federal circuits and California state courts, the outcome is the same: the AWCA should be upheld.

/ /

20

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

## CONCLUSION

For the foregoing reasons, Everytown respectfully requests that the Court grant the State of California's Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

Dated:  April 1, 2019                      Respectfully submitted,


                                           By:   /s/ Matthew E. Sloan
                                                 Matthew E. Sloan
                                                 Matthew J. Tako
                                                 Evan G. Slovak
                                                 Agnes N. Aniol

                                                 Attorneys for *Amicus Curiae*
                                                 Everytown for Gun Safety

21

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S MSJ

Miller et al. v. Becerra et al. – Defs.' Exhibit 19
Page 000385