# EXHIBIT 21
# TO THE DECLARATION OF JOHN D. ECHEVERRIA





# DEPARTMENT OF THE TREASURY STUDY ON THE SPORTING SUITABILITY OF MODIFIED SEMIAUTOMATIC ASSAULT RIFLES

## APRIL 1998

Def. Exhibit 21
Page 000990

TABLE OF CONTENTS

Page

1.   Executive Summary………………………………………………………   1

2.   Background…………………………………………………………….   4

3.   Defining the Type of Weapon Under Review……………………………   16

4.   Scope of "Sporting Purposes"……………………………………………   16

5.   Method of Study………………………………………………………..   19

6.   Suitability for Sporting Purposes………………………………………   21

7.   Determination…………………………………………………………..   36

8.   Exhibits:

White House Memorandum:  Importation of Modified Semiautomatic Assault-type Rifles

Study Rifle Models

Study Rifles

ATF Form 4590, Factoring Criteria for Weapons

Military Configuration

Memorandum to File From First Meeting of Firearms Advisory Panel

State Fish and Game Commission Review

9.   Appendix:  Summary of Externally Gathered Information

Def. Exhibit 21
Page 000991

1

## EXECUTIVE SUMMARY

On November 14, 1997, the President and the Secretary of the Treasury ordered a review of the importation of certain modified versions of semiautomatic assault rifles into the United States.[1]  The decision to conduct this review stemmed in part from concerns expressed by members of Congress and others that the rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable in a 1989 decision by the Bureau of Alcohol, Tobacco and Firearms (ATF).  The decision also stemmed from the fact that nearly 10 years had passed since the last comprehensive review of the importation of rifles, and many new rifles had been developed during this time.

Under 18 U.S.C. section 925(d)(3), the Secretary shall approve applications for importation only when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test").  In 1989, ATF denied applications to import a series of semiautomatic versions of automatic-fire military assault rifles.  When ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles.  This distinctively military configuration served as the basis for ATF's finding that the rifles were not considered sporting rifles under the statute.

The military configuration identified by ATF incorporated eight physical features: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. In 1989, ATF took the position that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic rifle not importable.

Subsequent to the 1989 decision, certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features other than the ability to accept a detachable magazine.  Significantly, most of these modified rifles not only still had the ability to accept a detachable magazine but, more specifically, still had the ability to accept a detachable large capacity magazine that

---

[1]   The President and the Secretary directed that all pending and future applications for importation of these rifles not be acted upon until completion of the review.  They also ordered that outstanding permits for importation of the rifles be suspended for the duration of the review period.  The existence of applications to import 1 million new rifles and outstanding permits for nearly 600,000 other rifles threatened to defeat the purpose of the expedited review unless the Department of the Treasury deferred action on additional applications and temporarily suspended the outstanding permits.  (See exhibit 1 for a copy of the November 14, 1997, memorandum directing this review.)

The rifles that are the subject of this review are referred to in this report as "study rifles."

Def. Exhibit 21
Page 000992

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000399

2

was originally designed and produced for the military assault rifles from which they were derived. These magazines are referred to in this report as "large capacity military magazines." Study rifles with the ability to accept such magazines are referred to in this report as "large capacity military magazine rifles," or "LCMM rifles." It appears that only one study rifle, the VEPR caliber .308 (an AK47 variant), is not an LCMM rifle. Based on the standard developed in 1989, these modified rifles were found to meet the sporting purposes test. Accordingly, the study rifles were approved for import into the United States.

These modified rifles are the subject of the present review. Like the rifles banned in 1989, the study rifles are semiautomatic rifles based on AK47, FN-FAL, HK91 and 93, Uzi, and SIG SG550 military assault rifles. While there are at least 59 specific model designations of the study rifles, they all fall within the basic designs listed above. There are at least 39 models based on the AK47 design, 8 on the FN-FAL design, 7 on the HK91 and 93 designs, 3 on the Uzi design, and 2 on the SIG SG550 design (see exhibit 2 for a list of the models). Illustrations of some of the study rifles are included in exhibit 3 of this report.

This review takes another look at the entire matter to determine whether the modified rifles approved for importation since 1989 are generally recognized as particularly suitable for or readily adaptable to sporting purposes.[2] We have explored the statutory history of the sporting purposes test and prior administrative and judicial interpretations; reexamined the basic tenets of the 1989 decision; analyzed the physical features of the study rifles, as well as information from a wide variety of sources relating to the rifles' use and suitability for sporting purposes; and assessed changes in law that might have bearing on the treatment of the rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard. Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military configuration features identified in 1989, other than the ability to accept a detachable magazine. Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test. Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding

---

[2]   The study was carried out by a working group composed of ATF and Treasury representatives. The working group's activities and findings were overseen by a steering committee composed of ATF and Treasury officials.

Def. Exhibit 21
Page 000993

3

devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem.  Specifically, Congress found that these magazines served "combat-functional ends" and were attractive to criminals because they "make it possible to fire a large number of rounds without reloading, then to reload quickly when those rounds are spent."[3]  Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose.  Accordingly, we found that the ability to accept such a magazine is a critical factor in the sporting purposes test, which must be given the same weight as the other military configuration features identified in 1989.

In addition, the information we collected on the use and suitability of LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes.  Although our review of this information indicated that, with certain exceptions, the LCMM rifles sometimes are used for hunting, their actual use in hunting is limited.  There are even some general restrictions and prohibitions on the use of semiautomatic rifles for hunting game.  Similarly, although the LCMM rifles usually may be used, with certain exceptions, and sometimes are used for organized competitive target shooting, their suitability for this activity is limited.  In fact, there are some restrictions and prohibitions on their use.

Furthermore, the information we gathered demonstrated that the LCMM rifles are attractive to certain criminals.  We identified specific examples of the LCMM rifles' being used in violent crime and gun trafficking.  In addition, we found some disturbing trends involving the LCMM rifles, including a rapid and continuing increase in crime gun trace requests after 1991 and a rapid "time to crime."  Their ability to accept large capacity military magazines likely plays a role in their appeal to these criminals.

After weighing all the information collected, we found that the LCMM rifles are not generally recognized as particularly suitable for or readily adaptable to sporting purposes and are therefore not importable.  However, this decision will in no way preclude the importation of true sporting firearms.

---

[3]   H. Rep. No. 103-489, at 18-19.

Def. Exhibit 21
Page 000994

4

<u>BACKGROUND</u>

<u>Importation of Firearms Under the Gun Control Act</u>

The Gun Control Act of 1968 (GCA)[4] generally prohibits the importation of firearms into the United States.[5]  However, the GCA creates four narrow categories of firearms that the Secretary of the Treasury shall authorize for importation.  The category that is relevant to this study is found at 18 U.S.C. section 925(d)(3).

> The Secretary shall authorize a firearm . . . to be imported or brought into the United States . . . if the firearm . . .
>
>> (3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and **is generally recognized as particularly suitable for or readily adaptable to sporting purposes**, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.  (Emphasis added)

This provision originally was enacted, in a slightly different form, by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968[6] and also was contained in Title I of the GCA, which amended Title IV later that year.

The GCA was enacted in large part "to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States."  However, the Senate Report to the act also made clear that Congress did not intend the GCA to place any undue or unnecessary restrictions or burdens on responsible, law-abiding citizens with respect to acquiring, possessing, transporting, or using firearms for lawful activities.[7]

---

[4]   Pub. L. No. 90-618.

[5]   18 U.S.C. section 922(l).

[6]   Pub. L. No. 90-351.

[7]   S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

Def. Exhibit 21
Page 000995

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000402

5

Consistent with this general approach, legislative history indicates that Congress intended the importation standard provided in section 925(d)(3) to exclude military-type weapons from importation to prevent such weapons from being used in crime, while allowing the importation of high-quality sporting rifles. According to the Senate Report, section 925(d)(3) was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting."[8] The report goes on to explain that "[t]he importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which this title is designed to alleviate [crime]. Thus, the import provisions of this title seem entirely justified."[9] Indeed, during debate on the bill, Senator Dodd, the sponsor of the legislation, stated that "Title IV prohibits importation of arms which the Secretary determines are not suitable for . . . sport . . . . The entire intent of the importation section is to get those kinds of weapons that are used by criminals and have no sporting purpose."[10]

The Senate Report, however, also makes it clear that the importation standards "are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms."[11] (The rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.) Similarly, the report states that the importation prohibition "would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes."[12] The reference to recreational purposes is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting, because firearms particularly suitable for these purposes also can be used for other purposes such as recreational shooting.

During debate on the bill, there was discussion about the meaning of the term "sporting purposes." Senator Dodd stated:

> [h]ere again I would have to say that if a military weapon is used in a

---

[8]   S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

[9]   S. Rep. No. 1501, 90th Cong. 2d Sess. 24 (1968).

[10]   114 Cong. Rec. S 5556, 5582, 5585 (1968).

[11]   S. Rep. No. 1501, 90th Cong. 2d. Sess. 38 (1968).

[12]   S. Rep. No. 1501, 90th Cong. 2d. Sess. 22 (1968).

Def. Exhibit 21
Page 000996

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000403

6

> special sporting event, it does not become a sporting weapon.  It is a military weapon used in a special sporting event . . . .  As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.[13]

Legislative history also shows that the determination of a weapon's suitability for sporting purposes is the direct responsibility of the Secretary of the Treasury.  The Secretary was given this discretion largely because Congress recognized that section 925(d)(3) was a difficult provision to implement.  Immediately after discussing the large role cheap imported .22 caliber revolvers were playing in crime, the Senate Report stated:

> [t]he difficulty of defining weapons characteristics to meet this target without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.[14]

Indeed, Congress granted this discretion to the Secretary even though some expressed concern with its breadth:

> [t]he proposed import restrictions of Title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes.  If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed through consumer preference in the marketplace . . . . [15]

Section 925(d)(3) provides that the Secretary shall authorize the importation of a firearm if it is of a "type" that is generally recognized as particularly suitable for or readily adaptable to sporting purposes.  The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d).  Specifically, the Senate Report to the GCA states that section 925(d) "gives the

Secretary authority to permit the importation of ammunition and certain types of firearms."[16]

---

[13]   114 Cong. Rec. 27461-462 (1968).

[14]   S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[15]   S. Rep. No. 1097, 90th Cong. 2d. Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and Burdick).  In Gun South, Inc. v. Brady, F.2d 858, 863 (11th Cir. 1989), the court, based on legislative history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

[16]   S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Def. Exhibit 21
Page 000997

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000404

7

The Senate Report to the GCA also recommended that the Secretary establish a council that would provide him with guidance and assistance in determining which firearms meet the criteria for importation into the United States.[17]  Accordingly, following the enactment of the GCA, the Secretary established the Firearms Evaluation Panel (FEP) (also known as the Firearms Advisory Panel) to provide guidelines for implementation of the "sporting purposes" test.  This panel was composed of representatives from the military, the law enforcement community, and the firearms industry.  At the initial meeting of the FEP, it was understood that the panel's role would be advisory only.[18]  The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction.  ATF thereafter developed an evaluation sheet (ATF Form 4590) that was put into use for evaluating handguns pursuant to section 925(d)(3).  (See exhibit 4.)

The FEP did not propose criteria for evaluating rifles and shotguns under section 925(d)(3).  Other than surplus military firearms, which Congress addressed separately, the rifles and shotguns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes.  Therefore, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns.

<u>1984 Application of the Sporting Purposes Test</u>

The first time that ATF undertook a meaningful analysis of rifles or shotguns under the sporting purposes test was in 1984.  At that time, ATF was faced with a new breed of imported shotgun, and it became clear that the historical assumption that all shotguns were sporting was no longer viable.  Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes.  This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control.  When the importer was asked to submit evidence of the weapon's sporting purposes, it provided information that the weapon was suitable for police/combat-style competitions.  ATF determined that this type of competition did not constitute a sporting purpose

under the statute, and that the shotgun was not suitable for the traditional shotgun sports of hunting, and trap and skeet shooting.

---

[17]  S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[18]  <u>Gilbert Equipment Co. v. Higgins</u>, 709 F. Supp. 1071, 1083, n. 7 (S.D. Ala. 1989), <u>aff'd without op.</u>, 894 F.2d 412 (11th Cir. 1990).

Def. Exhibit 21
Page 000998

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000405

8

### 1986 Firearms Owners Protection Act

On May 19, 1986, Congress passed the Firearms Owners Protection Act,[19] which amended section 925(d)(3) to provide that the Secretary "shall" (instead of "may") authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for or readily adaptable to sporting purposes.  The Senate Report to the law stated "it is anticipated that in the vast majority of cases, [the substitution of 'shall' for 'may' in the authorization section] will not result in any change in current practices."[20]  As the courts have found, "[r]egardless of the changes made [by the 1986 law], the firearm must meet the sporting purposes test and it remains the Secretary's obligation to determine whether specific firearms satisfy this test."[21]

### 1986 Application of the Sporting Purposes Test

In 1986, ATF again had to determine whether a shotgun met the sporting purposes test, when the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3).  Again, ATF refused to recognize police/combat-style competitions as a sporting purpose.  After examining and testing the weapon, ATF determined its weight, size, bulk, designed magazine capacity, configuration, and other factors prevented it from being classified as particularly suitable for or readily adaptable to the traditional shotgun sports of hunting, and trap and skeet shooting.  Accordingly, its importation was denied.

When this decision was challenged in Federal court, ATF argued, in part, that large magazine capacity and rapid reloading ability are military features.  The court accepted this argument, finding "the overall appearance and design of the weapon (especially the detachable box magazine . . . ) is that of a combat weapon and not a sporting weapon."[22]  In reaching this decision, the court was not persuaded by the importer's argument that box magazines can be lengthened or shortened depending on desired shell capacity.[23]  The court also agreed with ATF's conclusion that police/combat-style competitions were not considered sporting purposes.

---

[19]   Pub. L. No. 99-308.

[20]   S. Rep. No. 98-583, 98th Cong. 1st Sess. 27 (1984).

[21]   Gilbert Equipment Co., 709 F. Supp. at 1083.

[22]   Id. at 1089.

[23]   Id. at 1087, n. 20 and 1089.

Def. Exhibit 21
Page 000999

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000406

9

<u>1989 Report on the Importability of Semiautomatic Assault Rifles</u>

In 1989, after five children were killed in a California schoolyard by a gunman with a semiautomatic copy of an AK47, ATF decided to reexamine whether certain semiautomatic assault-type rifles met the sporting purposes test. This decision was reached after consultation with the Director of the Office of National Drug Control Policy. In March and April 1989, ATF announced that it was suspending the importation of certain "assault-type rifles." For the purposes of this suspension, assault-type rifles were those rifles that generally met the following criteria: (1) military appearance; (2) large magazine capacity; and (3) semiautomatic version of a machinegun. An ATF working group was established to reevaluate the importability of these assault-type rifles. On July 6, 1989, the group issued its <u>Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles</u> (hereinafter 1989 report).

In the 1989 report, the working group first discussed whether the assault-type rifles under review fell within a "type" of firearm for the purposes of section 925(d)(3). The working group concluded that most of the assault-type rifles under review represented "a distinctive type of rifle [which it called the "semiautomatic assault rifle"] distinguished by certain general characteristics which are common to the modern military assault rifle."[24] The working group explained that the modern military assault rifle is a weapon designed for killing or disabling the enemy and has characteristics designed to accomplish this purpose. Moreover, it found that these characteristics distinguish modern military assault rifles from traditional sporting rifles.

The characteristics of the modern military assault rifle that the working group identified were as follows: (1) military configuration (which included: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights) (see exhibit 5 for a thorough discussion of each of these features); (2) ability to fire automatically (i.e., as a machinegun); and (3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[25] In regards to the ability to accept a detachable magazine, the working group explained that:

> [v]irtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable

---

[24]   1989 report at 6.

[25]   1989 report at 6.

Def. Exhibit 21
Page 001000

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000407

10

magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.[26]

The working group emphasized that these characteristics had to be looked at as a whole to determine whether the overall configuration of each of the assault-type rifles under review placed the rifle fairly within the semiautomatic assault rifle type.  The semiautomatic assault rifles shared all the above military assault rifle characteristics other than being machineguns.[27]

The working group also addressed the scope of the term "sporting purposes."  It concluded that the term should be given a narrow interpretation that focuses on the traditional sports of hunting and organized competitive target shooting.  The working group made this determination by looking to the statute, its legislative history, applicable case law, the work of the FEP, and prior interpretations by ATF.  In addition, the working group found that the reference to sporting purposes was intended to stand in contrast to military and law enforcement applications.  Consequently, it determined that police/combat-type competitions should not be treated as sporting activities.[28]

The working group then evaluated whether the semiautomatic assault rifle type of firearm is generally recognized as particularly suitable for or readily adaptable to traditional sporting applications.  This examination took into account technical and marketing data, expert opinions, the recommended uses of the firearms, and information on the actual uses for which the weapons are employed in this country.  The working group, however, did not consider criminal use as a factor in its analysis of the importability of this type of firearm.

After analyzing this information, the working group concluded that semiautomatic assault rifles are not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes.  Accordingly, the working group concluded that semi-automatic assault rifles should not be authorized for importation under section 925(d)(3).  However, the working group found that some of the assault-type rifles under review (the Valmet Hunter and .22 rimfire caliber rifles), did not fall within the semiautomatic assault rifle type.  In the case of the Valmet Hunter, the working group found that although it was based on the operating mechanism of the AK47 assault rifle, it had been substantially

---

[26]   1989 report at 6 (footnote omitted).

[27]   The semiautomatic assault rifles were semiautomatic versions of machineguns.

[28]   1989 report at 9-11.

Def. Exhibit 21
Page 001001

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000408

11

changed so that it was similar to a traditional sporting rifle.[29]  Specifically, it did not have any of the military configuration features identified by the working group, except for the ability to accept a detachable magazine.

Following the 1989 study, ATF took the position that a semiautomatic rifle with any of the eight military configuration features identified in the 1989 report, other than the ability to accept a detachable magazine, failed the sporting purposes test and, therefore, was not importable.

<u>Gun South, Inc. v. Brady</u>

Concurrent with its work on the 1989 report, ATF was involved in litigation with Gun South, Inc. (GSI).  In October 1988 and February 1989, ATF had granted GSI permits to import AUG-SA rifles.  As mentioned previously, in March and April of 1989, ATF imposed a temporary suspension on the importation of rifles being reviewed in the 1989 study, which included the AUG-SA rifle.  GSI filed suit in Federal court, seeking to prohibit the Government from interfering with the delivery of firearms imported under permits issued prior to the temporary suspension.

The court of appeals found that the Government had the authority to suspend temporarily the importation of GSI's AUG-SA rifles because the GCA "impliedly authorizes" such action.[30]  In addition, the court rejected GSI's contention that the suspension was arbitrary and capricious because the AUG-SA rifle had not physically changed, explaining the argument "places too much emphasis on the rifle's structure for determining whether a firearm falls within the sporting purpose exception.  While the Bureau must consider the rifle's physical structure, the [GCA] requires the Bureau to equally consider the rifle's use."[31]  In addition, the court found that ATF adequately had considered sufficient evidence before imposing the temporary suspension, citing evidence ATF had considered

demonstrating that semiautomatic assault-type rifles were being used with increasing frequency in crime.[32]

---

[29]  This finding reflects the fact that the operating mechanism of the AK47 assault rifle is similar to the operating mechanism used in many traditional sporting rifles.

[30]  <u>Gun South, Inc. v. Brady</u>, 877 F.2d 858 (11th Cir. 1989). The court of appeals issued its ruling just days before the 1989 report was issued.  However, the report was complete before the ruling was issued.

[31]  <u>Id.</u>

[32]  <u>Id.</u>

Def. Exhibit 21
Page 001002

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000409

12

Although GSI sued ATF on the temporary suspension of its import permits, once the 1989 report was issued, no one pursued a lawsuit challenging ATF's determination that the semiautomatic assault rifles banned from importation did not meet the sporting purposes test.[33]

Violent Crime Control and Law Enforcement Act of 1994

On September 13, 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994,[34] which made it unlawful, with certain exceptions, to manufacture, transfer, or possess semiautomatic assault weapons as defined by the statute.[35]  The statute defined semiautomatic assault weapons to include 19 named models of firearms (or copies or duplicates of the firearms in any caliber);[36] semiauto-matic rifles that have the ability to accept detachable magazines and have at least two of five features specified in the law; semiautomatic pistols that have the ability to accept detachable magazines and have at least two of five features specified in the law; and semiautomatic shotguns that have at least two of four features specified in the law.[37]  However, Congress

---

[33] After the 1989 report was issued, Mitchell Arms, Inc. asserted takings claims against the Government based upon the suspension and revocation of four permits allowing for the importation of semiautomatic assault rifles and ATF's temporary moratorium on import permits for other rifles.  The court found for the Government, holding the injury complained of was not redressable as a taking because Mitchell Arms did not hold a property interest within the meaning of the Just Compensation Clause of the Fifth Amendment. Mitchell Arms v. United States, 26 Cl. Ct. 1 (1992), aff'd, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994).

[34] Pub. L. No. 103-22.  Title XI, Subtitle A of this act may be cited as the "Public Safety and Recreational Firearms Use Protection Act."

[35] 18 U.S.C. section 922(v).

[36] Chapter 18 U.S.C. section 921(a)(30)(A) states that the term "semiautomatic assault weapon" means "any of the firearms, or copies or duplicates of the firearms in any caliber, known as -," followed by a list of named firearms.  Even though section 921(a)(3) defines "firearm" as used in chapter 18 to mean, in part, "the frame or receiver of any such weapon," the use of "firearm" in section 921(a)(30)(A) has not been interpreted to mean a frame or receiver of any of the named weapons, except when the frame or receiver actually is incorporated in one of the named weapons.

Any other interpretation would be contrary to Congress' intent in enacting the assault weapon ban.  In the House Report to the assault weapon ban, Congress emphasized that the ban was to be interpreted narrowly.  For example, the report explained that the present bill was more tightly focused than earlier drafts which gave ATF authority to ban any weapon which "embodies the same configuration" as the named list of guns in section 921(a)(30)(A); instead, the present bill "contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons [beyond the listed weapons]."  H. Rep. 103-489 at 21.

[37] 18 U.S.C. section 921(a)(30).

Def. Exhibit 21
Page 001003

13

exempted from the assault weapon ban any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition and any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.[38]

Although the 1994 law was not directly addressing the sporting purposes test in section 925(d)(3), section 925(d)(3) had a strong influence on the law's content.  The technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law.  The House Report to the 1994 law explained that although the legal question of whether semiautomatic assault weapons met section 925(d)(3)'s sporting purposes test "is not directly posed by [the 1994 law], the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features."[39]   As in the 1989 study, Congress focused on the external features of firearms, rather than on their semiautomatic operating mechanism.

The 1994 law also made it unlawful to possess and transfer large capacity ammunition feeding devices manufactured after September 13, 1994.[40] A large capacity ammunition feeding device was generally defined as a magazine, belt, drum, feed strip, or similar device that has the capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.[41]

Congress passed these provisions of the 1994 law in response to the use of semiautomatic assault weapons and large capacity ammunition feeding devices in crime.  Congress had been presented with much evidence demonstrating that these weapons were "the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[42]   The House Report to the 1994 law recounts numerous crimes that had occurred involving semiautomatic assault weapons and large capacity magazines that were originally designed and produced for military assault rifles.[43]

---

[38]   18 U.S.C. sections 922(v)(3)(C)&(D).

[39]   H. Rep. No. 103-489, at 17, n. 19.

[40]   18 U.S.C. section 922(w).

[41]   18 U.S.C. section 921(a)(31).

[42]   H. Rep. No. 103-489, at 13.

[43]   H. Rep. No. 103-489, at 14-15.

Def. Exhibit 21
Page 001004

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000411

14

In enacting the semiautomatic assault weapon and large capacity ammunition feeding device bans, Congress emphasized that it was not preventing the possession of sporting firearms. The House Report, for example, stated that the bill differed from earlier bills in that "it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns."[44]  In addition, Congress specifically exempted 661 long guns from the assault weapon ban which are "most commonly used in hunting and recreational sports."[45]

Both the 1994 law and its legislative history demonstrate that Congress recognized that ammunition capacity is a factor in determining whether a firearm is a sporting firearm.  For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban. Moreover, the House Report specifically states that the ability to accept a large capacity magazine was a military configuration feature which was not "merely cosmetic," but "serve[d] specific, combat-functional ends."[46]  The House Report also explains that, while "[m]ost of the weapons covered by the [ban] come equipped with magazines that hold 30 rounds [and can be replaced with magazines that hold 50 or even 100 rounds], . . . [i]n contrast, hunting rifles and shotguns typically have much smaller magazine capabilities-- from 3-5."[47]

Finally, it must be emphasized that the semiautomatic assault weapon ban of section 922(v) is distinct from the sporting purposes test governing imports of section 925(d)(3). Clearly, any weapon banned under section 922(v) cannot be imported into the United States because its possession in the United States would be illegal.  However, it is possible that a weapon not defined as a semiautomatic assault weapon under section 922(v) still would not be importable under section 925(d)(3).  In order to be importable, the firearm must be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes regardless of its categorization under section 922(v).  The

Secretary's discretion under section 925(d)(3) remains intact for all weapons not banned by the 1994 statute.

<u>The Present Review</u>

Prior to the November 14, 1997, decision to conduct this review, certain members of

---

[44]  H. Rep. No. 103-489, at 21.

[45]  H. Rep. No. 103-489, at 20.  None of these 661 guns are study rifles.

[46]     H. Rep. No. 103-489, at 18.

[47]  H. Rep. No. 103-489, at 19 (footnote omitted).

Def. Exhibit 21
Page 001005

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000412

15

Congress strongly urged that it was necessary to review the manner in which the Treasury Department is applying the sporting purposes test to the study rifles, in order to ensure that the present practice is consistent with section 925(d)(3) and current patterns of gun use.  The fact that it had been nearly 10 years since the last comprehensive review of the importation of rifles (with many new rifles being developed during this time) also contributed to the decision to conduct this review.

Def. Exhibit 21
Page 001006

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000413

16

## DEFINING THE TYPE OF WEAPON UNDER REVIEW

Section 925 (d) (3) provides that the Secretary shall authorize the importation of a firearm if it is of a "type" that meets the sporting purposes test.  Given this statutory mandate, we had to determine whether the study rifles suspended from importation fell within one type of firearm.  Our review of the study rifles demonstrated that all were derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found to be importable when certain military features were removed.

Within this group, we determined that virtually all of the study rifles shared another important feature: The ability to accept a detachable large capacity magazine (e.g., more than 10 rounds) that was originally designed and produced for one of the following military assault rifles:  AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi.  (This is the only military configuration feature cited in the 1989 study that remains with any of the study rifles).

We determined that all of the study rifles that shared both of these characteristics fell within a type of firearm which, for the purposes of this report, we call "large capacity military magazine rifles" or "LCMM rifles."  It appears that only one study rifle, the VEPR caliber .308--which is based on the AK47 design--does not fall within this type because it does not have the ability to accept a large capacity military magazine.

## SCOPE OF "SPORTING PURPOSES"

As in the 1989 study, we had to determine the scope of "sporting purposes" as used in section 925(d)(3).  Looking to the statute, its legislative history, the work of the Firearms Evaluation Panel (see exhibit 6), and prior ATF interpretations, we determined sporting purposes should be given a narrow reading, incorporating only the traditional sports of hunting and organized competitive target shooting (rather than a broader interpretation that could include virtually any lawful activity or competition.)

In terms of the statute itself, the structure of the importation provisions suggests a somewhat narrow interpretation.  Firearms are prohibited from importation (section 922(l)), with four specific exceptions (section 925(d)).  A broad interpretation permitting a firearm to be imported because someone may wish to use it in some lawful shooting activity would render the general prohibition of section 922(l) meaningless.

Similarly, as discussed in the "Background" section, the legislative history of the GCA indicates that the term sporting purposes narrowly refers to the traditional sports of hunting and organized competitive target shooting.  There is nothing in the history to indicate that it was intended to recognize every conceivable type of activity or competition that might employ a firearm.

Def. Exhibit 21
Page 001007

17

In addition, the FEP specifically addressed the informal shooting activity of "plinking" (shooting at randomly selected targets such as bottles and cans) and determined that it was not a legitimate sporting purpose under the statute.  The panel found that, "while many persons participate in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . . ."  (See exhibit 6.)

Finally, the 1989 report determined that the term sporting purposes should be given a narrow reading incorporating the traditional rifle sports of hunting and organized competitive target shooting.  In addition, the report determined that the statute's reference to sporting purposes was intended to stand in contrast with military and law enforcement applications.  This is consistent with ATF's interpretation in the context of the Striker-12 shotgun and the USAS-12 shotgun.  It is also supported by the court's decision in Gilbert Equipment Co. v. Higgins.

We received some comments urging us to find "practical shooting" is a sport for the purposes of section 925(d)(3).[48]   Further, we received information showing that practical shooting is gaining in popularity in the United States and is governed by an organization that has sponsored national events since 1989.  It also has an international organization.

While some may consider practical shooting a sport, by its very nature it is closer to police/combat-style competition and is not comparable to the more traditional types of sports, such as hunting and organized competitive target shooting.   Therefore, we are not convinced that practical shooting does, in fact, constitute a sporting purpose under section 925(d)(3).[49]   However, even if we were to assume for the sake of argument that practical shooting is a sport for the purposes of the statute, we still would have to decide whether a firearm that could be used in practical shooting meets the sporting purposes test.  In other words, it still would need to be determined whether the firearm is of a type that is generally recognized as particularly suitable for or readily adaptable to practical shooting and other sporting purposes.[50]   Moreover, the legislative history makes clear that the use of a military weapon in a practical shooting competition would not make that weapon

---

[48]   Practical shooting involves moving, identifying, and engaging multiple targets and delivering a num ber of shots rapidly.  In doing this, practical shooting participants test their defensive skills as they encounter props, including walls and barricades, with full or partial targets, "no-shoots," steel reaction targets, movers, and others to challenge them.

[49]   As noted earlier, ATF has taken the position that police/combat-style competitions do not constitute a "sporting purpose."  This position was upheld in Gilbert Equipment Co., 709 F. Supp. at 1077.

[50]   Our findings on the use and suitability of the LCMM rifles in practical shooting competitions are contained in the "Suitability for Sporting Purposes" section of this report.

Def. Exhibit 21
Page 001008

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000415

18

sporting: "if a military weapon is used in a special sporting event, it does not become a sporting weapon.  It is a military weapon used in a special sporting event."[51]  While none of the LCMM rifles are military weapons, they still retain the military feature of the ability to accept a large capacity military magazine.

---

[51]   114 Cong. Rec. 27461-462 (1968) (Sen. Dodd).

Def. Exhibit 21
Page 001009

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000416

<u>METHOD OF STUDY</u>

As explained in the "Executive Summary" section of this report, the purpose of this study is to review whether modified semiautomatic assault rifles are properly importable under 18 U.S.C. section 925(d)(3).  More specifically, we reexamined the conclusions of the 1989 report as applied today to determine whether we are correct to allow importation of the study rifles that have been modified by having certain military features removed.  To determine whether such rifles are generally recognized as particularly suitable for or readily adaptable to sporting purposes, the Secretary must consider both the physical features of the rifles and the actual uses of the rifles.[52]  Because it appears that all of the study rifles that have been imported to date have the ability to accept a large capacity military magazine,[53] all of the information collected on the study rifles' physical features and actual uses applies only to the LCMM rifles.

**Physical features**:

The discussion of the LCMM rifles' physical features are contained in the "Suitability for Sporting Purposes" section of this report.

**Use**:

We collected relevant information on the use of the LCMM rifles.  Although the 1989 study did not consider the criminal use of firearms in its importability analysis, legislative history demonstrates and the courts have found that criminal use is a factor that can be considered in determining whether a firearm meets the requirements of section 925(d)(3).[54]  Accordingly, we decided to consider the criminal use of the LCMM rifles in the present analysis.

The term "generally recognized" in section 925(d)(3) indicates that the Secretary should base his evaluation of whether a firearm is of a type that is particularly suitable for or readily adaptable to sporting purposes, in part, on a "community standard" of the firearm's use.[55]  The community standard "may change over time even though the firearm remains the same.  Thus, a changing pattern of use may significantly affect whether a firearm is generally recognized as particularly suitable for or readily adaptable to a sporting purpose."[56]  Therefore, to assist the Secretary in determining whether the LCMM rifles presently are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes, we gathered information from the relevant "community."  The relevant community was defined as persons and groups who are

---

[52]   <u>Gun South, Inc.</u>, 877 F.2d at 866.

[53]   The VEPR caliber .308 discussed on page 16 has not yet been imported.

[54]   114 Cong. Rec. S 5556, 5582, 5585 (1968)("[t]he entire intent of the importation section [of the sporting purposes test] is to get those kinds of weapons that are used by criminals and have no sporting purposes") (Sen. Dodd); <u>Gun South, Inc.</u>, 877 F.2d at 866.

[55]   <u>Gun South, Inc.</u>, 877 F.2d at 866.

[56]   <u>Id</u>.

Def. Exhibit 21
Page 001010

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000417

knowledgeable about the uses of these firearms or have relevant information about whether these firearms are particularly suitable for sporting purposes.  We identified more than 2,000 persons or groups we believed would be able to provide relevant, factual information on these issues.  The individuals and groups were selected to obtain a broad range of perspectives on the issues.  We conducted surveys to obtain specific information from hunting guides, editors of hunting and shooting magazines, organized competitive shooting groups, State game commissions, and law enforcement agencies and organizations.  Additionally, we asked industry members, trade associations, and various interest and information groups to provide relevant information.[57]  A detailed presentation of the surveys and responses is included as an appendix to this report.

We also reviewed numerous advertisements and publications, both those submitted by the editors of hunting and shooting magazines and those collected internally, in our search for material discussing the uses of the LCMM rifles.  Further, we collected importation data, tracing data, and case studies.[58]

Our findings on use are contained in the "Suitability for Sporting Purposes" section of this report.

---

[57]   **Hunting guides**: Guides were asked about specific types of firearms used by their clients.  The guides were an easily definable group, versus the entire universe of hunters.  We obtained the names of the hunting guides surveyed from the States.

**Editors of hunting and shooting magazines**: Editors were surveyed to determine whether they recommended the LCMM rifles for hunting or organized competitive target shooting and whether they had written any articles on the subject.  The list of editors we surveyed was obtained from a directory of firearms-related organizations.

**Organized competitive shooting groups**: Organized groups were asked whether they sponsored competitive events with high-power semiautomatic rifles and whether the LCMM rifles were allowed in those competitions.  We felt it was significant to query those who are involved with organized events rather than unofficial activities with no specific rules or guidelines.  As with the editors above, the list of groups was obtained from a directory of firearms-related organizations.

**State game commissions**: State officials were surveyed to determine whether the use of the LCMM rifles was prohibited or restricted for hunting in each State.

**Law enforcement agencies and organizations**: Specific national organizations and a sampling of 26 police departments across the country were contacted about their knowledge of the LCMM rifles' use in crime.  The national organizations were surveyed with the intent that they would gather input from the wide range of law enforcement agencies that they represent or that they would have access to national studies on the subject.

**Industry members and trade associations**: These groups were included because of their knowledge on the issue.

**Interest and information groups**: These organizations were included because of their wide range of perspectives on the issue.

[58]   To assist us with our review of the crime-related information we collected, we obtained the services of Garen J. Wintemute, MD, M.P.H. Director of the Violence Prevention Research Program, University of California, Davis, and Anthony A. Braga, Ph.D., J.F.K. School of Government, Harvard University.

Def. Exhibit 21
Page 001011

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000418

21

## SUITABILITY FOR SPORTING PURPOSES

The next step in our review was to evaluate whether the LCMM rifles, as a type, are generally recognized as particularly suitable for or readily adaptable to hunting and organized competitive target shooting.[59]   The standard applied in making this determination is high.  It requires more than a showing that the LCMM rifles may be used or even are sometimes used for hunting and organized competitive target shooting; if this were the standard, the statute would be meaningless.  Rather, the standard requires a showing that the LCMM rifles are especially suitable for use in hunting and organized competitive target shooting.

As discussed in the "Method of Study" section, we considered both the physical features of the LCMM rifles and the actual uses of the LCMM rifles in making this determination.

Physical Features

**The ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi.**

Although the LCMM rifles have been stripped of many of their military features, they all still have the ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 and 93, SIG SG550, or Uzi; in other words, they still have a feature that was designed for killing or disabling an enemy.  As the 1989 report explains:

> Virtually all modern military firearms are designed to accept large, detachable magazines.  This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload.  Thus, large capacity magazines are indicative of military firearms.  While detachable magazines are not limited to military firearms, most traditional

---

[59]   One commenter suggests that the Secretary has been improperly applying the "readily adaptable to sporting purposes" provision of the statute.  Historically, the Secretary has considered the "particularly suitable for or readily adaptable to" provisions as one standard.  The broader interpretation urged by the commenter would make the standard virtually unenforceable.  If the Secretary allowed the importation of a firearm which is readily adaptable to sporting purposes, without requiring it actually to be adapted prior to importation, the Secretary would have no control over whether the adaptation actually would occur following the importation.

Def. Exhibit 21
Page 001012

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000419

22

semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.[60]

Thus, the 1989 report found the ability to accept a detachable large capacity magazine originally designed and produced for a military assault rifle was a military, not a sporting, feature.  Nevertheless, in 1989 it was decided that the ability to accept such a large capacity magazine, in the absence of other military configuration features, would not be viewed as disqualifying for the purposes of the sporting purposes test.  However, several important developments, which are discussed below, have led us to reevaluate the weight that should be given to the ability to accept a detachable large capacity military magazine in the sporting purposes test.

Most significantly, we must reevaluate the significance of this military feature because of a major amendment that was made to the GCA since the 1989 report was issued.  In 1994, as discussed in the "Background" section of this report, Congress passed a ban on large capacity ammunition feeding devices and semiautomatic assault weapons.[61]  In enacting these bans, Congress made it clear that it was not preventing the possession of sporting firearms.[62]  Although the 1994 law was not directly addressing the sporting purposes test, section 925(d)(3) had a strong influence on the law's content.  As discussed previously, the technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law.

Both the 1994 law and its legislative history demonstrate that Congress found that ammunition capacity is a factor in whether a firearm is a sporting firearm.  For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban.  In other words, Congress found magazine capacity to be such an important factor that a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition will not be banned, even if it contains all five of the assault

---

[60]  1989 report at 6 (footnote omitted).  This was not the first time that ATF considered magazine capacity to be a relevant factor in deciding whether a firearm met the sporting purposes test.  See Gilbert Equipment Co., 709 F. Supp. at 1089 ("the overall appearance and design of the weapon (especially the detachable box magazine . . .) is that of a combat weapon and not a sporting weapon."

[61]   The ban on large capacity ammunition feeding devices does not include any such device manufactured on or before September 13, 1994.  Accordingly, there are vast numbers of large capacity magazines originally designed and produced for military assault weapons that are legal to transfer and possess ("grandfathered" large capacity military magazines).  Presently these grandfathered large capacity military magazines fit the LCMM rifles.

[62]   See, for example, H. Rep. No. 103-489, at 21.

Def. Exhibit 21
Page 001013

23

weapon features listed in the law.  Moreover, unlike the assault weapon ban in which a detachable magazine and at least two physical features are required to ban a rifle, a large capacity magazine in and of itself is banned.

In addition, the House Report specifically states that the ability to accept a large capacity magazine is a military configuration characteristic that is not "merely cosmetic," but "serve[s] specific, combat-functional ends."[63]  The House Report also explains that large capacity magazines

> make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent.  Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds.  Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds.  Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. . . .  In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities--from 3-5.[64]

Congress specifically exempted 661 long guns from the assault weapon ban that are "most commonly used in hunting and recreational sports."[65]  The vast majority of these long guns do not use large capacity magazines.  Although a small number of the exempted long guns have the ability to accept large capacity magazines, only four of these exempted long guns were designed to accept large capacity military magazines.[66]

The 1994 law also demonstrates Congress' concern about the role large capacity magazines and firearms with the ability to accept these large capacity magazines play in

---

[63]  H. Rep. No. 103-489, at 18.

[64]  H. Rep. No. 103-489, at 19 (footnote omitted).  The fact that 12 States place a limit on the magazine capacity allowed for hunting, usually 5 or 6 rounds, is consistent with this analysis.  (See exhibit 7).

[65]  H. Rep. 103-489, at 20.

[66]  These four firearms are the Iver Johnson M-1 carbine, the Iver Johnson 50th Anniversary M-1 carbine, the Ruger Mini-14 autoloading rifle (without folding stock), and the Ruger Mini Thirty rifle.  All of these weapons are manufactured in the United States and are not the subject of this study.  In this regard, it should also be noted that Congress can distinguish between domestic firearms and foreign firearms and impose different requirements on the importation of firearms.  For example, Congress may ban the importation of certain firearms although similar firearms may be produced domestically.  See, for example, B-West Imports v. United States, 75 F.3d 633 (Fed. Cir. 1996).

Def. Exhibit 21
Page 001014

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000421

24

crime.  The House Report for the bill makes reference to numerous crimes involving these magazines and weapons, including the following:[67]

> The 1989 Stockton, California, schoolyard shooting in which a gunman with a semiautomatic copy of an AK47 and 75-round magazines fired 106 rounds in less than 2 minutes.  Five children were killed and twenty-nine adults and children were injured.

> The 1993 shooting in a San Francisco, California, office building in which a gunman using 2 TEC DC9 assault pistols with 50-round magazines killed 8 people and wounded 6 others.

> A 1993 shooting on the Long Island Railroad that killed 6 people and wounded  19 others.  The gunman had a Ruger semiautomatic pistol, which he reloaded several times with 15-round magazines, firing between 30 to 50 rounds before he was overpowered.

The House Report also includes testimony from a representative of a national police officers' organization, which reflects the congressional concern with criminals' access to firearms that can quickly expel large amounts of ammunition:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before [re]loading.  Now it is not at all unusual for a cop to look down the barrel of a TEC-9 with a 32 round clip.  The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and preservation.  The six-shot .38 caliber service revolver, standard law enforcement issue for years, is just no match against a criminal armed with a semiautomatic assault weapon.[68]

Accordingly, by passing the 1994 law, Congress signaled that firearms with the ability to accept detachable large capacity magazines are not particularly suitable for sporting purposes.  Although in 1989 we found the ability to accept a detachable large capacity military magazine was a military configuration feature, we must give it more weight, given this clear signal from Congress.

The passage of the 1994 ban on large capacity magazines has had another effect.  Under the 1994 ban, it generally is unlawful to transfer or possess a large capacity magazine

---

[67]  H. Rep. No. 103-489, at 15 (two of these examples involve handguns).

[68]  H. Rep. 103-489, at 13-14 (footnote omitted).

Def. Exhibit 21
Page 001015

25

manufactured after September 13, 1994.  Therefore, if we require the LCMM rifles to be modified so that they do not accept a large capacity military magazine in order to be importable, a person will not be able to acquire a newly manufactured large capacity magazine to fit the modified rifle.  Thus, the modified rifle neither will be able to accept a grandfathered large capacity military magazine, nor can a new large capacity magazine be manufactured to fit it.  Accordingly, today, making the ability to accept a large capacity military magazine disqualifying for importation will prevent the importation of firearms which have the ability to expel large amounts of ammunition quickly without reloading.

This was not the case in 1989 or prior to the 1994 ban.

It is important to note that even though Congress reduced the supply of large capacity military magazines by passing the 1994 ban, there are still vast numbers of grandfathered large capacity military magazines available that can be legally possessed and transferred.  These magazines currently fit in the LCMM rifles.  Therefore, the 1994 law did not eliminate the need to take further measures to prevent firearms imported into the United States from having the ability to accept large capacity military magazines, a nonsporting factor.

Another impetus for reevaluating the existing standard is the development of modified weapons.  The 1989 report caused 43 different models of semiautomatic assault rifles to be banned from being imported into the United States.  The effect of that determination was that nearly all semiautomatic rifles with the ability to accept detachable large capacity military magazines were denied importation.  Accordingly, at the time, there was no need for the ability to accept such a magazine to be a determining factor in the sporting purposes test.  This is no longer the case.  As discussed earlier, manufacturers have modified the semiautomatic assault rifles disallowed from importation in 1989 by removing all of their military configuration features, except for the ability to accept a detachable magazine.  As a result, semiautomatic rifles with the ability to accept detachable large capacity military magazines (and therefore quickly expel large amounts of ammunition) legally have been entering the United States in significant numbers.  Accordingly, the development of these modified weapons necessitates reevaluating our existing standards.

Thus, in order to address Congress' concern with firearms that have the ability to expel large amounts of ammunition quickly, particularly in light of the resumption of these weapons coming into the United States, the ability to accept a detachable large capacity military magazine must be given greater weight in the sporting purposes analysis of the LCMM rifles than it presently receives.[69]

---

[69]   A firearm that can be easily modified to accept a detachable large capacity military magazine with only minor adjustments to the firearm or the magazine is considered to be a firearm with the ability to accept these magazines.  The ROMAK4 is an example of such a firearm: With minor modifications to either the

Def. Exhibit 21
Page 001016

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000423

26

**Derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found importable when certain military features were removed.**

All rifles that failed to meet the sporting purposes test in 1989 were found to represent a distinctive type of rifle distinguished by certain general characteristics that are common to the modern military assault rifle. Although the LCMM rifles are based on rifle designs excluded from importation under the 1989 standard, they all were approved for import when certain military features were removed. However, the LCMM rifles all still maintain some characteristics common to the modern military assault rifle. Because the outward appearance of most of the LCMM rifles continues to resemble the military assault rifles from which they are derived, we have examined the issue of outward appearance carefully. Some might prefer the rugged, utilitarian look of these rifles to more traditional sporting guns. Others might recoil from using these rifles for sport because of their nontraditional appearance. In the end, we concluded that appearance alone does not affect the LCMM rifles' suitability for sporting purposes. Available information leads us to believe that the determining factor for their use in crime is the ability to accept a detachable large capacity military magazine.

Use

In the 1989 study, ATF found that all rifles fairly typed as semiautomatic assault rifles should be treated the same. Accordingly, the report stated "[t]he fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type."[70] We adopt the same approach for the present study.

**Use for hunting:**

The information we collected on the actual use of the LCMM rifles for hunting medium or larger game suggests that, with certain exceptions, the LCMM rifles sometimes are used for hunting; however, their actual use in hunting is limited.[71] In fact, there are some

---

firearm or a large capacity magazine that was originally designed and produced for a semiautomatic assault rifle based on the AK47 design, the ROMAK4 has the ability to accept the magazine.

[70]   1989 report at 11.

[71]   We targeted the surveys toward the hunting of medium and larger game (e.g., turkey and deer) because the LCMM rifles chamber centerfire cartridges and therefore likely would be most suitable for hunting this type of game. We also learned that the LCMM rifles were used to shoot certain varmints (e.g., coyotes and groundhogs), which are generally considered to be pests, not game. Many commented that the LCMM

Def. Exhibit 21
Page 001017

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000424

27

general restrictions and prohibitions on the use of any semiautomatic rifle for hunting game. Almost half of the States place restrictions on the use of semiautomatic rifles in hunting, mostly involving magazine capacity (5-6 rounds) and what can be hunted with the rifles (see exhibit 7).

Of the 198 hunting guides who responded to our survey, only 26 stated that they had clients who used the LCMM rifles on hunting trips during the past 2 hunting seasons and only 10 indicated that they recommend the LCMM rifles for hunting. In contrast, the vast majority of the guides (152) indicated that none of their clients used the LCMM rifles on hunting trips during the past 2 hunting seasons. In addition, the hunting guides indicated that the most common semiautomatic rifles used by their clients were those made by Browning and Remington.[72] We found significant the comments of the hunting guides indicating that the LCMM rifles were not widely used for hunting.

Of the 13 editors of hunting and shooting magazines who responded to our survey, only 2 stated that their publications recommend specific types of centerfire semiautomatic rifles for use in hunting medium or larger game. These two respondents stated that they recommend all rifles that are safe and of appropriate caliber for hunting, including the LCMM rifles. However, they did not recommend the LCMM rifles based on the Uzi design for hunting big game; these rifles use a 9mm cartridge, which is not an appropriate caliber for this type of game, according to the editors. It is important to note that the LCMM rifles use different cartridges. The LCMM rifles based on the FN-FAL, SIG SG550, and HK91 and 93 designs are chambered for either the .308 Winchester cartridge or the .223 Remington cartridge, depending on the specific model; the LCMM rifles based on the Uzi design are chambered for the 9mm Parabellum cartridge; and the majority of the LCMM rifles based on the AK47 design are chambered for the 7.62 x 39mm cartridge (some are chambered for the .223 Remington cartridge).

Of the five interest and information groups that responded to our survey, three supported the use of the LCMM rifles for hunting. However, one of these groups stated that the

---

rifles were particularly useful on farms and ranches because of their ruggedness, utilitarian design, and reliability.

[72] According to a 1996 study conducted for the Fish and Wildlife Service, only 2 percent of big game hunters surveyed used licensed hunting guides. Therefore, it should be noted that the information provided by the guides we surveyed may not be representative of all hunters. However, we believe that the hunting guides' information is reliable and instructive because of their high degree of experience with and knowledge of hunting.

Def. Exhibit 21
Page 001018

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000425

28

ammunition used by the LCMM rifle models based on the Uzi design were inadequate for shooting at long distances (i.e., more than 100 yards).

Out of the 70 published articles reviewed from various shooting magazines, only 5 contained relevant information.  One of these five articles stated that, in the appropriate calibers, the LCMM rifles could make "excellent" hunting rifles.  Two of the articles stated that the 7.62 x 39mm cartridge (used in LCMM rifles based on the AK47 design) could be an effective hunting cartridge.  One of the articles that recommended the rifles also recommended modifications needed to improve their performance in hunting.  None of the articles suggested that LCMM rifles based on the Uzi design were good hunting rifles.  Thus, although the LCMM rifles could be used in hunting, the articles provided limited recommendations for their use as hunting weapons.

In their usage guides, ammunition manufacturers recommend the .308 and the 7.62 x 39mm cartridges (used in LCMM rifles based on the FN-FAL and HK 91 designs, and the AK47 design respectively) for medium game hunting.  However, the usage guides do not identify the 9mm cartridge (used in the Uzi design rifles) as being suitable for hunting.

A majority of the importers who provided information said that the LCMM rifles they import are used for hunting deer and similar animals.  However, they provided little evidence that the rifles were especially suitable for hunting these animals.  Two of the importers who responded also provided input from citizens in the form of letters supporting this position. The letters show a wide variety of uses for the LCMM rifles, including deer hunting, plinking, target shooting, home defense, and competitive shooting.

Our review of all of this information indicates that while these rifles are used for hunting medium and larger game, as well as for shooting varmints, the evidence was not persuasive that there was widespread use for hunting.  We did not find any evidence that the ability to accept a large capacity military magazine serves any hunting purpose.  Traditional hunting rifles have much smaller magazine capabilities.  Furthermore, the mere fact that the LCMM rifles are used for hunting does not mean that they are particularly suitable for hunting or meet the test for importation.

**Use for organized competitive target shooting**:

Of the 31 competitive shooting groups we surveyed that stated they have events using high-power semiautomatic rifles, 18 groups stated that they permit the use of the LCMM rifles for all competitions.  However, 13 respondents stated that they restrict or prohibit the LCMM rifles for some competitions, and one group stated that it prohibits the LCMM

Def. Exhibit 21
Page 001019

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000426

29

rifles for all competitions.  These restrictions and prohibitions generally were enacted for the following reasons:

1.     High-power rifle competitions generally require accuracy at ranges beyond the capabilities of the 9mm cartridge, which is used by the LCMM rifles based on the Uzi design.

2.   The models based on the AK47 design are limited to competitions of 200 yards or less because the 7.62 x 39mm cartridge, which is used by these models, generally has an effective range only between 300 and 500 yards.

3.   Certain matches require U.S. military service rifles, and none of the LCMM rifles fall into this category.

The LCMM rifles are permitted in all United States Practical Shooting Association (USPSA) rifle competitions.  The USPSA Practical Shooting Handbook, Glossary of Terms, states that "[y]ou can use any safe firearm meeting the minimum caliber (9mm/.38) and power factor (125PF) requirements."  The USPSA has stated that "rifles with designs based on the AR15, AK47, FN-FAL, HK91, HK93, and others are allowed and must be used to be competitive."  Moreover, we received some information indicating that the LCMM rifles actually are used in practical shooting competitions.[73]  However, we did not receive any information demonstrating that an LCMM rifle's ability to accept large capacity military magazines was necessary for its use in practical shooting competitions.

A couple of the interest groups recommended the LCMM rifles for organized competitive target shooting.

None of the 70 published articles read mentioned the use of the LCMM rifles in organized competitive target shooting.

All of the major ammunition manufacturers produce .308 Winchester ammunition  (which is used in the LCMM rifle models based on the HK 91 and FN-FAL designs) and .223 Remington ammunition (which is used in the HK 93, the SIG SG550, and some of the study rifle models based on the AK47 design) specifically for competitive shooting for rifles.  The major manufacturers and advertisers of 9mm ammunition (which is used in the LCMM rifles based on the Uzi design) identify it as being suitable for pistol target shooting and self-defense.

---

[73]   Merely because a rifle is used in a sporting competition, the rifle does not become a sporting rifle.  114 Cong. Rec. 27461-462 (1968).

Def. Exhibit 21
Page 001020

30

A majority of the importers who provided information stated that the LCMM rifles they import are permitted in and suitable for organized competitive target shooting. Two of the importers who responded also provided input from citizens in the form of letters and petitions supporting this position. However, the importers provided little evidence that the rifles were especially suitable for organized competitive target shooting.

The information collected on the actual use of the LCMM rifles for organized competitive target shooting suggests that, with certain exceptions, the LCMM rifles usually may be used and sometimes are used for organized competitive target shooting; however, their suitability for this activity is limited. In fact, there are some restrictions and prohibitions on their use. The use of the rifles in competitive target shooting appears more widespread than for hunting and their use for practical shooting was the most significant. Although we are not convinced that practical shooting does in fact constitute a sporting purpose under section 925(d), we note that there was no information demonstrating that rifles with the ability to accept detachable large capacity military magazines were necessary for use in practical shooting. Once again, the presence of this military feature on LCMM rifles suggests that they are not generally recognized as particularly suitable for or readily adaptable to sporting purposes.

**Use in crime:**

To fully understand how the LCMM rifles are used, we also examined information available to us on their use in crime. Some disturbing trends can be identified, and it is clear the LCMM rifles are attractive to criminals.

The use of LCMM rifles in violent crime and firearms trafficking is reflected in the cases cited below. It should be noted that the vast majority of LCMM rifles imported during the period 1991-1997 were AK47 variants, which explains their prevalence in the cited cases.

North Philadelphia, Pennsylvania

From April 1995 to November 1996, a convicted felon used a straw purchaser to acquire at least 55 rifles, including a number of MAK90s. The rifles were then trafficked by the prohibited subject to individuals in areas known for their high crime rates. In one case, the rifles were sold from the parking lot of a local elementary school.
Oakland, California

On July 8, 1995, a 32-year-old Oakland police officer assisted a fellow officer with a vehicle stop in a residential area. As the first officer searched the rear compartment of the stopped vehicle, a subject from a nearby residence used a Norinco model NMH 90 to shoot the 32-year old officer in the back. The officer later died from the wound.

Def. Exhibit 21
Page 001021

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000428

31

El Paso, Texas

On April 15, 1996, after receiving information from the National Tracing Center, ATF initiated an undercover investigation of a suspected firearms trafficker who had purchased 326 MAK90 semiautomatic rifles during a 6-month period.  The individual was found to be responsible for illegally diverting more than 1,000 firearms over the past several years.  One of the MAK90 rifles that the subject had purchased was recovered from the scene of a 1996 shootout in Guadalajara, Mexico, between suspected drug traffickers and Mexican authorities.  Another MAK90 was recovered in 1997 from the residence of a former Mexican drug kingpin following his arrest for drug-related activities.

Charlotte, North Carolina

On May 24, 1996, four armed subjects—one with a MAK90 rifle—carried out a home invasion robbery during which they killed the resident with a 9mm pistol.  All four suspects were arrested.

Dallas, Texas

In September 1997, an investigation was initiated on individuals distributing crack cocaine from a federally subsidized housing community.  During repeated undercover purchases of the narcotics, law enforcement officials noticed that the suspects had firearms in their possession.  A search warrant resulted in the seizure of crack cocaine, a shotgun, and a North China Industries model 320 rifle.

Chesterfield, Virginia

In November 1997, a MAK90 rifle was used to kill two individuals and wound three others at a party in Chesterfield, Virginia.

Orange, California

In December 1997, a man armed with an AKS 762 rifle and two other guns drove to where he was previously employed and opened fire on former coworkers, killing four and injuring three, including a police officer.

Baltimore, Maryland

In December 1997, a search warrant was served on a homicide suspect who was armed at the time with three pistols and a MAK90 rifle.

Def. Exhibit 21
Page 001022

32

We also studied import and trace information to learn whether the LCMM rifles are used in crime.

Between 1991 and 1997, there were 425,114 LCMM rifles imported into the United States. This represents 7.6 percent of the approximately 5 million rifles imported during this period.  The breakdown of the specific variants of LCMM rifles imported follows:

    AK-47 variants:     377,934
    FN-FAL variants:     37,534
    HK variants:          6,495
    Uzi variants:         3,141
    SIG SG550 variants:      10

During this same time period, ATF traced 632,802 firearms.[74]  This included 81,842 rifles of which approximately 3,176 were LCMM rifles.[75]  While this number is relatively low compared to the number of total traces, it must be viewed in light of the small number of LCMM rifles imported during this time period and the total number of rifles, both imported domestic, that were available in the United States.  A more significant trend is reflected in figure 1.

---

[74]   ATF traces crime guns recovered and submitted by law enforcement officials.  A crime gun is defined, for purposes of firearms tracing, as any firearm that is illegally possessed, used in a crime, or suspected by law enforcement of being used in a crime.  Trace information is used to establish links between criminals and firearms, to investigate illegal firearm trafficking, and to identify patterns of crime gun traces by jurisdiction.  A substantial number of firearms used in crime are not recovered by law enforcement agencies and therefore not traced.  In addition, not all recovered crime guns are traced.  Therefore, trace requests substantially underestimate the number of firearms involved in crimes, and trace numbers contain unknown statistical biases.  These problems are being reduced as more law enforcement agencies institute policies of comprehensive crime gun tracing.

[75]   The vast majority of LCMM rifles traced during this time period were AK47 variants.  Specifically, AK47 variants comprised 95.6 percent of the LCMM rifles traced.  This must be viewed within the context that 88 percent of the LCMM rifles imported during this period were AK47 variants.

Def. Exhibit 21
Page 001023

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000430

33

Firearms Traces 1991-1997

| Year | Total Firearms Traced | Total Rifles Traced | Total Assault[76] Rifles  Traced | Total LCMM Rifles Traced |
|---|---|---|---|---|
| 1991 | 42,442 | 6,196 | 656 | 7 |
| 1992 | 45,134 | 6,659 | 663 | 39 |
| 1993 | 54,945 | 7,690 | 852 | 182 |
| 1994 | 83,137 | 9,201 | 735 | 596 |
| 1995 | 76,847 | 9,988 | 717 | 528 |
| 1996 | 136,062 | 17,475 | 1,075 | 800 |
| 1997 | 194,235 | 24,633 | 1,518 | 1,024 |
| Cumulative Total | 632,802 | 81,842 | 6,216 | 3,176 |

Figure 1

The figures in this table show that between 1991 and 1994, trace requests involving LCMM rifles increased rapidly, from 7 to 596.  During the same period, trace requests for assault rifles increased at a slower rate, from 656 to 735.  The years 1991 to 1994 are significant because they cover a period between when the ban on the importation of semiautomatic assault rifles was imposed and before the September 13, 1994, ban on semiautomatic assault weapons was enacted.  Thus, during the years leading up to the 1994 ban, traces of LCMM rifles were increasing much more rapidly than the traces of the rifles that had been the focus of the 1989 ban, as well as the rifles that were the focus of the 1994 congressional action.

We also compared patterns of importation with trace requests to assess the association of LCMM rifles with criminal involvement.  The comparison shows that importation of LCMM rifles in the early 1990s was followed immediately by a rapid rise in the number of trace requests involving LCMM rifles.  This is shown in figures 2 and 3.

---

[76]   For purposes of this table, assault rifles include (1) semiautomatic assault rifles banned from importation in 1989 but still available domestically because they had been imported into the      United States prior to the ban, (2) domestically produced rifles that would not have qualified for importation after 1989, and (3) semiautomatic assault rifles that were banned in 1994.

Def. Exhibit 21
Page 001024

34



**LCMM Rifles Imported, 1991-1997**

Figure 2

**LCMM Rifles Traced, 1991-1997**

Figure 3

Two aspects of the relationship between importation and trace request patterns are significant.  First, the rapid rise in traces following importation indicates that, at least in some cases, very little time elapsed between a particular LCMM rifle's importation and its recovery by law enforcement.  This time lapse is known as "time to crime."  A short time to crime can be an indicator of illegal trafficking.  Therefore, trace patterns suggest what the case examples show:  LCMM rifles have been associated with illegal trafficking.  Second, while LCMM rifles have not been imported in large numbers since 1994,[77] the number of trace requests for LCMM rifles continues to rise.  This reflects a sustained and

---

[77]     One reason is that there has been an embargo on the importation of firearms from China since May 1994.

Def. Exhibit 21
Page 001025

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000432

35

continuing pattern of criminal association for LCMM rifles despite the fact that there were fewer new LCMM rifles available.[78]  Moreover, it is reasonable to conclude that if the importation of LCMM rifles resumes, the new rifles would contribute to the continuing rise in trace requests for them.[79]

All of the LCMM rifles have the ability to accept a detachable large capacity military magazine.  Thus, they all have the ability to expend large amounts of ammunition quickly.  In passing the 1994 ban on semiautomatic assault rifles and large capacity ammunition feeding devices, Congress found that weapons with this ability are attractive to criminals.[80]  Thus, we can infer that the LCMM rifles may be attractive to criminals because in some ways they remain akin to military assault rifles, particularly in their ability to accept a detachable large capacity military magazine.

---

[78]    The increase in trace requests also reflects the fact that law enforcement officials were making trace requests for all types of firearms much more frequently beginning in 1996.  There were 76,847 trace requests in 1995, 136,062 trace requests in 1996, and 194,235 trace requests in 1997.  Traces for assault rifles were increasing by approximately the same percentage as traces for LCMM rifles during these years.

[79]    In addition to looking at case studies and tracing and import information, we attempted to get information on the use of the LCMM rifles in crime by surveying national law enforcement agencies and organizations, as well as metropolitan police departments.  Twenty-three national law enforcement agencies and organizations were surveyed and five responded.  Three of the respondents stated they had no information.  The other two provided information that was either outdated or not specific enough to identify the LCMM rifles.

The 26 metropolitan police departments surveyed provided the following information:

17 departments had no information to provide.
5 departments stated that the LCMM rifles were viewed as crime guns.
1 department stated that the LCMM rifles were nonsporting.
2 departments stated that the LCMM rifles were used to hunt coyotes in their areas.
1 department stated that the LCMM rifles were used for silhouette target shooting.

[80]    H. Rep. No. 103-489, at 13, 18, 19.

Def. Exhibit 21
Page 001026

36

<u>DETERMINATION</u>

In 1989, ATF determined that the type of rifle defined as a semiautomatic assault rifle was not generally recognized as particularly suitable for or readily adaptable to sporting purposes. Accordingly, ATF found that semiautomatic assault rifles were not importable into the United States. This finding was based, in large part, on ATF's determination that semiautomatic assault rifles contain certain general characteristics that are common to the modern military assault rifle. These characteristics were designed for killing and disabling the enemy and distinguish the rifles from traditional sporting rifles. One of these characteristics is a military configuration, which incorporates eight physical features: Ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. In 1989, ATF decided that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic assault rifle not importable.

Certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features, except for the ability to accept a detachable magazine. Significantly, most of these modified rifles not only still have the ability to accept a detachable magazine but, more specifically, still have the ability to accept a large capacity military magazine. It appears that only one of the current study rifles, the VEPR caliber .308 (an AK47 variant), does not have the ability to accept a large capacity military magazine and, therefore, is not an LCMM rifle. Based on the standard developed in 1989, these modified rifles were found not to fall within the semiautomatic assault rifle type and were found to meet the sporting purposes test. Accordingly, these rifles were approved for import into the United States.

Members of Congress and others have expressed concerns that these modified semiautomatic assault rifles are essentially the same as the semiautomatic assault rifles determined to be not importable in 1989. In response to such concerns, the present study reviewed the current application of the sporting purposes test to the study rifles to determine whether the statute is being applied correctly and to ensure that the current use of the study rifles is consistent with the statute's criteria for importability.

Our review took another look at the entire matter. We reexamined the basic tenets of the 1989 study, conducted a new analysis of the physical features of the rifles, surveyed a wide variety of sources to acquire updated information relating to use and suitability, and assessed changes in law that might have bearing on the treatment of the study rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard. Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military

Def. Exhibit 21
Page 001027

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000434

37

configuration features identified in 1989, other than the ability to accept a detachable magazine.  Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test.  Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem.  The House Report to the 1994 law emphasizes that the ability to accept a large capacity magazine "serve[s] specific, combat-functional ends."[81]  Moreover, this ability plays a role in increasing a firearm's "capability for lethality," creating "more wounds, more serious, in more victims."[82]  Furthermore, the House Report noted semiautomatic assault weapons with this ability are the "weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[83]

Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose.  The House Report to the 1994 law notes that, while most of the weapons covered by the assault weapon ban come equipped with detachable large capacity magazines, hunting rifles and shotguns typically have much smaller magazine capabilities, from 3 to 5 rounds.[84]  Similarly, we found that a number of States limit magazine capacity for hunting to 5 to 6 rounds.  We simply found no information showing that the ability to accept a detachable large capacity military magazine has any purpose in hunting or organized competitive target shooting.

Accordingly, we find that the ability to accept a detachable large capacity military magazine is a critical factor in the sporting purposes test that must be given the same weight as the other military configuration features identified in 1989.

The information we collected on the use and suitability of the LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes.  Although our study found that the LCMM rifles, as a type, may sometimes be used for hunting, we found no evidence that they are commonly used for hunting.  In fact, some of the rifles are unsuitable for certain types of hunting.

---

[81]   H. Rep. No. 103-489, at 18.

[82]   H. Rep. No. 103-489, at 19.

[83]   H. Rep. No. 103-489, at 13.

[84]   H. Rep. No. 103-489, at 19 (footnote omitted).

Def. Exhibit 21
Page 001028

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000435

38

The information we collected also demonstrated that although the LCMM rifles, as a type, may be used for organized competitive target shooting, their suitability for these competitions is limited. There are even some restrictions or prohibitions on their use for certain types of competitions. In addition, we believe that all rifles which are fairly typed as LCMM rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of LCMM rifles as a whole should govern each rifle within this type. The findings as a whole simply did not satisfy the standard set forth in section 925(d)(3).

Finally, the information we gathered demonstrates that the LCMM rifles are attractive to certain criminals. We find that the LCMM rifles' ability to accept a detachable large capacity military magazine likely plays a role in their appeal to these criminals. In enacting the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress recognized the appeal large magazine capacity has to the criminal element.

Weighing all this information, the LCMM rifles, as a type, are not generally recognized as particularly suitable for or readily adaptable to sporting purposes. As ATF found in conducting its 1989 study, although some of the issues we confronted were difficult to resolve, in the end we believe the ultimate conclusion is clear and compelling. The ability of all of the LCMM rifles to accept a detachable large capacity military magazine gives them the capability to expel large amounts of ammunition quickly; this serves a function in combat and crime, but serves no sporting purpose. Given the high standard set forth in section 925(d)(3) and the Secretary's discretion in applying the sporting purposes test, this conclusion was clear.

This decision will in no way preclude the importation of true sporting firearms. It will prevent only the importation of firearms that cannot fairly be characterized as sporting rifles.

Individual importers with existing permits for, and applications to import involving, the LCMM rifles will be notified of this determination in writing. Each of these importers will be given an opportunity to respond and present additional information and arguments. Final action will be taken on permits and applications only after an affected importer has an opportunity to makes its case.

Def. Exhibit 21
Page 001029

Exhibit .

## THE WHITE HOUSE

### WASHINGTON

November 14, 1997

MEMORANDUM FOR THE SECRETARY OF THE TREASURY

SUBJECT:          Importation of Modified Semiautomatic
                  Assault-Type Rifles

The Gun Control Act of 1968 restricts the importation of
firearms unless they are determined to be particularly suitable
for or readily adaptable to sporting purposes.  In 1989, the
Department of the Treasury (the Department) conducted a review
of existing criteria for applying the statutory test based on
changing patterns of gun use.  As a result of that review,
43 assault-type rifles were specifically banned from impor-
tation.  However, manufacturers have modified many of those
weapons banned in 1989 to remove certain military features
without changing their essential operational mechanism.
Examples of such weapons are the Galil and the Uzi.

In recent weeks Members of Congress have strongly urged that it
is again necessary to review the manner in which the Department
is applying the sporting purposes test, in order to ensure that
the agency's practice is consistent with the statute and current
patterns of gun use.  A letter signed by 30 Senators strongly
urged that modified assault-type weapons are not properly
importable under the statute and that I should use my authority
to suspend temporarily their importation while the Department
conducts an intensive, expedited review.  A recent letter from
Senator Dianne Feinstein emphasized again that weapons of this
type are designed not for sporting purposes but for the com-
mission of crime.  In addition, 34 Members of the House of
Representatives signed a letter to Israeli Prime Minister
Binyamin Netanyahu requesting that he intervene to stop all
sales of Galils and Uzis into the United States.  These
concerns have caused the Government of Israel to announce
a temporary moratorium on the exportation of Galils and Uzis
so that the United States can review the importability of
these weapons under the Gun Control Act.

Def. Exhibit 21
Page 001030

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000437

Exhibit 1

2

The number of weapons at issue underscores the potential threat to the public health and safety that necessitates immediate action.  Firearms importers have obtained permits to import nearly 600,000 modified assault-type rifles.  In addition, there are pending before the Department applications to import more than 1 million additional such weapons.  The number of rifles covered by outstanding permits is comparable to that which existed in 1989 when the Bush Administration temporarily suspended import permits for assault-type rifles.  The number of weapons for which permits for importation are being sought through pending applications is approximately 10 times greater than in 1989.  The number of such firearms for which import applications have been filed has skyrocketed from 10,000 on October 9, 1997, to more than 1 million today.

My Administration is committed to enforcing the statutory restrictions on importation of firearms that do not meet the sporting purposes test.  It is necessary that we ensure that the statute is being correctly applied and that the current use of these modified weapons is consistent with the statute's criteria for importability.  This review should be conducted at once on an expedited basis.  The review is directed to weapons such as the Uzi and Galil later that failed to meet the sporting purposes test in 1989, but were later found importable when certain military features were removed.  The results of this review should be applied to all pending and future applications.

The existence of outstanding permits for nearly 600,000 modified assault-type rifles threatens to defeat the purpose of the expedited review unless, as in 1989, the Department temporarily suspends such permits.  Importers typically obtain authorization to import firearms in far greater numbers than are actually imported into the United States.  However, gun importers could effectively negate the impact of any Department determination by simply importing weapons to the maximum amount allowed by their permits.  The public health and safety require that the only firearms allowed into the United States are those that meet the criteria of the statute.

Accordingly, as we discussed, you will:

    1)  Conduct an immediate expedited review not to exceed 120 days in length to determine whether modified semiautomatic assault-type rifles are properly importable under the statutory sporting purposes test.  The results of this review will govern action on pending and future applications for import permits, which shall not be acted upon until the completion of this review.

Def. Exhibit 21
Page 001031

Exhibit 1

3

    2)  Suspend outstanding permits for importation of modified semiautomatic assault-type rifles for the duration of the 120-day review period.  The temporary suspension does not constitute a permanent revocation of any license.  Permits will be revoked only if and to the extent that you determine that a particular weapon does not satisfy the statutory test for importation, and only after an affected importer has an opportunity to make its case to the Department.



Def. Exhibit 21
Page 001032

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000439

Exhibit 2

## STUDY RIFLE MODELS

AK47 Variants:                                           FN-FAL Variants:

| MAK90* | SA2000 | Saiga rifle | L1A1 Sporter |
| 314* | ARM | Galil Sporter | FAL Sporter |
| 56V* | MISR | Haddar | FZSA |
| 89* | MISTR | Haddar II | SAR4800 |
| EXP56A* | SA85M | WUM 1 | X FAL |
| SLG74 | Mini PSL | WUM 2 | C3 |
| NHM90* | ROMAK 1 | SLR95 | C3A |
| NHM90-2* | ROMAK 2 | SLR96 | LAR Sporter |
| NHM91* | ROMAK 4 | SLR97 | |
| SA85M | Hunter rifle | SLG94 | |
| SA93 | 386S | SLG95 | |
| A93 | PS/K | SLG96 | |
| AKS 762 | VEPR caliber | | |
| VEPR | 7.62 x 39mm | | |
| caliber .308 | | | |

HK Variants:                      Uzi Variants:                    SIG SG550 Variants:

| BT96 | Officers 9* | SG550-1 |
| Centurian 2000 | 320 carbine* | SG550-2 |
| SR9 | Uzi Sporter | |
| PSG1 | | |
| MSG90 | | |
| G3SA | | |
| SAR8 | | |

- These models were manufactured in China and have not been imported since the 1994 embargo on the importation of firearms from China.

Def. Exhibit 21
Page 001033

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000440

Exhibit 3

### STUDY RIFLES

The study rifles are semiautomatic firearms based on the AK47, FN-FAL, HK 91 and 93, Uzi, and SIG SG550 designs.  Each of the study rifles is derived from a semiautomatic assault rifle.  The following are some examples of specific study rifle models grouped by design type.  In each instance, a semiautomatic assault rifle is shown above the study rifles for comparison.

AK47 Variants



AK47 semiautomatic assault rifle

=====================================================================



MISR                                 ARM

MAK90                               WUM 1

Def. Exhibit 21
Page 001034

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000441

Exhibit 3

__FN-FAL Variants__



FN-FAL semiautomatic assault rifle

===================================================================





L1A1 Sporter                                 SAR 4800

__HK 91 and 93 Variants__



HK91 semiautomatic assault rifle

===================================================================



SR9                          SAR 8

Def. Exhibit 21
Page 001035

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000442

Exhibit 3

Uzi Variants



Uzi semiautomatic assault rifle

=============================================================================



320 carbine

SIG SG550 Variants

The following illustration depicts the configuration of a semiautomatic assault rifle based on the SIG SG550 design.  No illustrations of modified semiautomatic versions are available.



SIG SG550 semiautomatic assault rifle

Def. Exhibit 21
Page 001036

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000443

Exhibit 4

## DEPARTMENT OF THE TREASURY
### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# FACTORING CRITERIA FOR WEAPONS

NOTE: The Bureau of Alcohol, Tobacco and Firearms reserves the right to preclude importation of any revolver or pistol which achieves an apparent qualifying score but does not adhere to the provisions of section 925(d)(3) of Amended Chapter 44, Title 18, U.S.C.

| PISTOL | REVOLVER |
|---|---|
| MODEL: | MODEL: |

**PISTOL PREREQUISITES**
1. The pistol must have a positive manually operated safety device.
2. The combined length and height must not be less than 10" with the height (right angle measurement to barrel without magazine or extension) being at least 4" and the length being at least 6"

**REVOLVER PREREQUISITES**
1. Must pass safety test.
2. Must have overall frame (with conventional grips) length (not diagonal) of 4½" minimum.
3. Must have a barrel length of at least 3".

| INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB-TOTAL | INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB-TOTAL |
|---|---|---|---|---|---|
| **OVERALL LENGTH** | | | **BARREL LENGTH** (Muzzle to Cylinder Face) | | |
| FOR EACH 1/4" OVER 6" | 1 | | LESS THAN 4" | 0 | |
| **FRAME CONSTRUCTION** | | | FOR EACH 1/4" OVER 4" | 1/2 | |
| INVESTMENT CAST OR FORGED STEEL | 15 | | **FRAME CONSTRUCTION** | | |
| INVESTMENT CAST OR FORGED HTS ALLOY | 20 | | INVESTMENT CAST OR FORGED STEEL | 15 | |
| **WEAPON WEIGHT W/MAGAZINE** (Unloaded) | | | INVESTMENT CAST OR FORGED HTS ALLOY | 20 | |
| PER OUNCE | 1 | | **WEAPON WEIGHT** (Unloaded) | | |
| **CALIBER** | | | PER OUNCE | 1 | |
| .22 SHORT AND .25 AUTO | 0 | | **CALIBER** | | |
| .22 LR AND 7.65mm TO .380 AUTO | 3 | | .22 SHORT TO .25 ACP | 0 | |
| 9mm PARABELLUM AND OVER | 10 | | .22 LR AND .30 TO .38 S&W | 3 | |
| **SAFETY FEATURES** | | | .38 SPECIAL | 4 | |
| LOCKED BREECH MECHANISM | 5 | | .357 MAG AND OVER | 5 | |
| LOADED CHAMBER INDICATOR | 5 | | **MISCELLANEOUS EQUIPMENT** | | |
| GRIP SAFETY | 3 | | ADJUSTABLE TARGET SIGHTS (Drift or Click) | 5 | |
| MAGAZINE SAFETY | 5 | | TARGET GRIPS | 5 | |
| FIRING PIN BLOCK OR LOCK | 10 | | TARGET HAMMER AND TARGET TRIGGER | 5 | |
| **MISCELLANEOUS EQUIPMENT** | | | | | |
| EXTERNAL HAMMER | 2 | | | | |
| DOUBLE ACTION | 10 | | | | |
| DRIFT ADJUSTABLE TARGET SIGHT | 5 | | | | |
| CLICK ADJUSTABLE TARGET SIGHT | 10 | | | | |
| TARGET GRIPS | 5 | | | | |
| TARGET TRIGGER | 2 | | | | |

**SAFETY TEST**

A Double Action Revolver must have a safety feature which automatically (or in a Single Action Revolver by manual operation) causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge. The safety device must withstand the impact of a weight equal to the weight of the revolver dropping from a distance of 36" in a line parallel to the barrel upon the rear of the hammer spur, a total of 5 times.

**SCORE ACHIEVED**
(Qualifying score is 75 points)

**SCORE ACHIEVED**
(Qualifying score is 45 points)

Def. Exhibit 21
Page 001037

Exhibit 5

## MILITARY CONFIGURATION

1.  <u>Ability to accept a detachable magazine</u>.  Virtually all modern military firearms are designed to accept large, detachable magazines.  This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload.  Thus, large capacity magazines are indicative of military firearms.  While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.  Additionally, some States have a limit on the magazine capacity allowed for hunting, usually five or six rounds.

2.  <u>Folding/telescoping stock</u>.  Many military firearms incorporate folding or telescoping stocks.  The main advantage of this item is portability, especially for airborne troops.  These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock.  With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking.  However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

3.  <u>Pistol grips</u>. The vast majority of military firearms employ a well-defined separate pistol grip that protrudes conspicuously beneath the action of the weapon. In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon.  Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation.  Further, such grips were designed to assist in controlling machineguns during automatic fire.  On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or organized competitive target competitions.

4.  <u>Ability to accept a bayonet</u>.  A bayonet has distinct military purposes.  First, it has a psychological effect on the enemy.  Second, it enables soldiers to fight in close quarters with a knife attached to their rifles.  No traditional sporting use could be identified for a bayonet.

5.  <u>Flash suppressor</u>.  A flash suppressor generally serves one or two functions.  First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night.  A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired as a fully automatic weapon.  From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash.  Flash suppressors that also serve to dampen muzzle climb have a limited benefit in sporting uses by allowing the shooter to reacquire

Def. Exhibit 21
Page 001038

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000445

Exhibit 5

the target for a second shot.  However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result.  There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb.  In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

6.   <u>Bipods</u>. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.  The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired as a fully automatic weapon.  Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability.  However, traditional sporting rifles generally do not come equipped with bipods, nor are they specifically designed to accommodate them.  Instead, bipods for sporting firearms are generally designed to attach to a detachable "slingswivel mount" or simply clamp onto the firearm.

7.   <u>Grenade launcher</u>. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.  Such launchers are generally of two types.  The first type is a flash suppressor designed to function as a grenade launcher.  The second type attaches to the barrel of the rifle by either screws or clamps.  No traditional sporting application could be identified for a grenade launcher.

8.   <u>Night sights</u>.  Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.  Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally not legal to hunt at night.

Def. Exhibit 21
Page 001039

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000446

Exhibit 6

**[This document has been retyped for clarity.]**

MEMORANDUM TO FILE

FIREARMS ADVISORY PANEL

The initial meeting of the Firearms Advisory Panel was held in Room 3313, Internal Revenue Building, on December 10, 1968, with all panel members present.  Internal Revenue Service personnel in attendance at the meeting were the Director, Alcohol and Tobacco Tax Division, Harold Serr; Chief, Enforcement Branch, Thomas Casey; Chief, Operations Coordination Section, Cecil M. Wolfe, and Firearms Enforcement Officer, Paul Westenberger.  Deputy Assistant Commissioner Compliance, Leon Green, visited the meeting several times during the day.

The Director convened the meeting at 10:00 a.m. by welcoming the members and outlining the need for such an advisory body.  He then introduced the Commissioner of Internal Revenue, Mr. Sheldon Cohen, to each panel member.

Mr. Cohen spoke to the panel for approximately fifteen minutes.  He thanked the members for their willingness to serve on the panel, explained the role of the panel and some of the background which led to the enactment of the Gun Control Act of 1968.  Commissioner Cohen explained to the panel members the conflict of interest provisions of regulations pertaining to persons employed by the Federal Government and requested that if any member had any personal interest in any matter that came under discussion or consideration, he should make such interest known and request to be excused during consideration of the matter.

Mr. Seer then explained to the panel the areas in which the Division would seek the advice of the panel and emphasized that the role of the panel would be advisory only, and that it was the responsibility of the Service to make final decisions.  He then turned the meeting over to the moderator, Mr. Wolfe.

Mr. Wolfe explained the responsibility of the Service under the import provisions of the Gun Control Act and under the Mutual Security Act.  The import provisions were read and discussed.

The panel was asked to assist in defining Asporting purposes≅ as used in the Act.  It was generally agreed that firearms designed and intended for hunting and all types of organized competitive target shooting would fall within the sporting purpose category.  A discussion was held on the so-called sport of Aplinking≅.  It was the consensus that, while many persons

Exhibit 6

participated in the type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation since any firearm that could expel a projectile could be used for this purpose without having any characteristics generally associated with target guns.

The point system that had been developed by the Division and another point system formula suggested and furnished by the Southern Gun Distributors through Attorney Michael Desalle, was explained and demonstrated to the panel by Paul Westenberger. Each panel member was given copies of the formulas and requested to study them and endeavor to develop a formula he believed would be equitable and could be applied to all firearms sought to be imported.

A model BM59 Beretta, 7.62 mm, NATO Caliber Sporter Version Rifle was presented to the panel and their advice sought as to their suitability for sporting purposes. It was the consensus that these rifles do have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of this rifle together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle be authorized for importation. Importation, however, should include the restriction that these weapons must not possess combination flash suppressors/grenade adaptors with outside diameters greater than 20mm (.22 mm is the universal grade adaptor size).

The subject of ammunition was next discussed. Panel members agreed that incendiary and tracer small arms ammunition have no use for sporting purposes. Accordingly, the Internal Revenue Service will not authorize these types of small arms ammunition importation. All other conventional small arms ammunition for pistols, revolvers, rifles and shotguns will be authorized.

The meeting was adjourned at 4:00 p.m.


C.M. Wolfe


Def. Exhibit 21
Page 001041

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000448

Exhibit 7

**STATE FISH AND GAME COMMISSION REVIEW**

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Alabama | Not for turkey | |
| Alaska | | |
| Arizona | | Not more than five rounds |
| Arkansas | Not for turkey | |
| California | | |
| Colorado | | Not more than six rounds |
| Connecticut* | No rifles on public land | |
| Delaware | No rifles | |
| Florida | | Not more than five rounds |
| Georgia | Not for turkey | |
| Hawaii | | |
| Idaho | Not for turkey | |
| Illinois | Not for deer or turkey | |
| Indiana* | Not for deer or turkey | |
| Iowa | Not for deer or turkey | |
| | No restrictions on coyote or fox | |
| Kansas | | |
| Kentucky | | |
| Louisiana | Not for turkey | |
| Maine* | Not for turkey | |
| Maryland* | | |

Def. Exhibit 21
Page 001042

Miller et al. v. Becerra et al. – Defs.' Exhibit 21
Page 000449