MATTHEW E. SLOAN (SBN 165165)
matthew.sloan@probonolaw.com
MATTHEW J. TAKO (SBN 307013)
matthew.tako@probonolaw.com
RAZA RASHEED (SBN 306722)
raza.rasheed@probonolaw.com
AGNES N. ANIOL (SBN 324467)
agnes.aniol@probonolaw.com
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

Attorneys for *Amicus Curiae*
Everytown for Gun Safety Support
Fund

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, *et al.*,<br><br>     Defendants. | CASE NO.: 3:19-cv-01537-BEN-JLB<br><br>BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Hearing Date: February 6, 2020<br>Hearing Time: 2:00 p.m.<br>Courtroom: 5A, 5th floor<br>Judge: Hon. Roger T. Benitez |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Everytown for Gun Safety Support Fund has no parent corporations.  It has no stock and hence no publicly held company owns 10% or more of its stock.

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

INTRODUCTION ...................................................................................... 2

ARGUMENT .............................................................................................. 4

    I.    California's Prohibition of Assault Weapons Is Part of a
          Longstanding History of Analogous Prohibitions. ............... 4

        A.    The AWCA Is Consistent with Centuries of Laws
             Prohibiting Weapons Deemed to Be Especially Dangerous
             Dating from the Colonial Period to the Present Day. ............... 6

        B.    States Have Prohibited Semi-Automatic Firearms Capable
             of Quickly Firing Multiple Rounds Since the Early
             Twentieth Century. ...................................................... 7

    II.    The "Common Use" Test Proposed by Plaintiffs Is Illogical and
          Should Not Be Followed. ................................................ 10

        A.    Plaintiffs' "Common Use" Test Is Logically Circular and
             Inconsistent with Federalism Principles. ........................ 11

        B.    The "Common Use" Test Should Instead Be Used to
             Evaluate Whether the Weapon Is Necessary for the Core
             Second Amendment Right of Home Defense ..................... 15

    III.    The Use of Assault Weapons Makes Mass Shootings and Other
          Gun-Violence Incidents Deadlier and It Is in California's Interest
          to Regulate These Weapons to Protect the Public. ............... 16

    IV.    The Use of Assault Weapons for Self-Defense or Militia Service
          Does Not Render the AWCA Unconstitutional. ................. 24

CONCLUSION ................................................................................ 25

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*,
   910 F.3d 106 (3d Cir. 2018) .............................................................. 1

*Aymette v. State*,
   21 Tenn. 154 (1840) .......................................................................... 6

*Cockrum v. State*,
   24 Tex. 394 (1859) ............................................................................ 6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..................................................................*passim*

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013) ............................................................ 10

*Earth Island Institute v. Nash*,
   No. 1:19-CV-01420 (DAD) (SAB),
   2019 WL 6790682 (E.D. Cal. Dec. 12, 2019).................................... 2

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015), *cert. denied*,
   136 S. Ct. 447 (2015) ................................................................*passim*

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015)....................................................... 4, 17

*Fyock v. City of Sunnyvale*,
   25 F. Supp. 3d 1267 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir.
   2015)................................................................................................ 17

*Funbus Systems, Inc. v. State of California Public Utilities Commission*,
   801 F.2d 1120, 1125 (9th Cir. 1986).................................................. 2

*Gallinger v. Becerra*,
   898 F.3d 1012 (9th Cir. 2018)..............................2, 6, 16, 17, 18, 20

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ...........................................2, 16, 24

*Jackson v. City & County of San Francisco*,
   746 F.3d 953 (9th Cir. 2014).......................................................4, 15

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017 ) (en banc), *cert. denied*,
   138 S. Ct. 469 (2017) ................................................................*passim*

ii

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................. 15

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo ("NYSRPA")*,
    804 F.3d 242 (2d Cir. 2015), *cert. denied*,
    136 S. Ct. 2486 (2016) ......................................... 2, 20, 23, 25

*National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms
    & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ..................................................... 4

*People v. Gleason*,
    No. H042771, 2017 WL 6276235 (Cal. Ct. App. Dec. 11, 2017)
    (unpublished) (6th Dist.), *cert. denied*, 139 S. Ct. 116 (2018).......... 2

*People v. James*,
    174 Cal. App. 4th 662 (2009).............................................. 2, 6

*People v. Zondorak*,
    220 Cal. App. 4th 829 (2013) .................................................. 2

*Rehaif v. United States.*,
    139 S. Ct. 2191 (2019) ............................................................ 1

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) , *appeal docketed*,
    No. 19-56004 (9th Cir. Aug. 28, 2019).............................*passim*

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc), *cert. denied*,
    138 S. Ct. 1988 (2018) .............................................................. 5

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ................................................ 10

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) ..................................................... 4

*United States v. Torres*,
    911 F.3d 1253 (9th Cir. 2019).................................................. 15

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019), *petition for cert. docketed*,
    No. 19-704 (U.S. Dec. 3, 2019)......................................... 2, 16, 17

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019), *petition for cert. docketed*,
    No. 19-404 (U.S. Sept. 25, 2019)..................................... 2, 24, 25

*Worman v. Healey*,
    293 F. Supp. 3d 251 (D. Mass. 2018), *aff'd*,
    922 F.3d 26 (1st Cir. 2019) ...................................................... 11

iii

**STATUTES**

72 Cong. ch. 465, §§ 1, 14, 47 Stat. 650-654 ................................................ 8

1763-1775 N.J. Laws 346 .............................................................................. 6

1837 Ala. Laws 7 ........................................................................................... 6

1837 Ga. Laws 90 .......................................................................................... 6

1837-1838 Tenn. Pub. Acts 200 .................................................................... 6

1879 Tenn. Pub. Acts 136 .............................................................................. 6

1881 Ark. Acts 192 ........................................................................................ 6

1903 S.C. Acts 127-28 ................................................................................... 7

1907 Ala. Laws 80 ......................................................................................... 7

1909 Me. Laws 141 ........................................................................................ 7

1911 N.Y. Laws 442 ...................................................................................... 7

1912 Vt. Acts & Resolves 310 ...................................................................... 7

1913 Iowa Acts 307 ....................................................................................... 7

1913 Minn. Laws 55 ...................................................................................... 7

1916 N.Y. Laws 338-39 ................................................................................. 7

1917 Cal. Stat. 221 ........................................................................................ 7

1917 Minn. Laws 354 .................................................................................... 7

1926 Mass. Acts 256...................................................................................... 7

1927 Cal. Stat. 938 ........................................................................................ 8

1927 Mich. Pub. Acts 887-89 .................................................................... 7, 8

1927 R.I. Pub. Laws 256-59 ...................................................................... 7, 8

1933 Cal. Stat. 1170 ...................................................................................... 9

1933 Minn. Laws 232 .................................................................................... 9

1933 Ohio Laws 189 ..................................................................................... 9

1934 Va. Acts 137 ......................................................................................... 9

The Laws of Plymouth Colony (1671) ......................................................... 6

iv

Records of the Colony of New Plymouth in New England 230 (Boston 1861) .......... 6

**OTHER AUTHORITIES**

Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security,* ABC News (Aug. 20, 2013 7:10 AM), http://abcn.ws/1KwN9Ls ................................................................... 20

Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More Deadly?*, Criminology & Pub. Policy 1 (2019), https://bit.ly/2GaGiNF ................................................................... 21

Alex Yablon, *Most Californians Who Own 'Assault Rifles' Have 10+ Guns,* The Trace (Nov. 12, 2018), https://bit.ly/2FFyQJO ......................................... 12

Bonnie Berkowitz et al., *The Terrible Numbers That Grow With Each Mass Shooting,* (Oct. 1, 2017) Wash. Post, https://wapo.st/2CMznZz .............. 18, 23

Charles DiMaggio et al., *Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data,* 86 J. of Trauma and Acute Care Surgery 11 (2018), https://bit.ly/2K44ZzQ ................................................................... 21, 22

Christopher Ingraham, *It's Time To Bring Back The Assault Weapons Ban, Gun Violence Experts Say,* Wash. Post (Feb. 15, 2018), https://wapo.st/2JjFlSk ................................................................... 22

Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources,* 95 J. Urban Health 313 (Oct. 2018), https://goo.gl/cwgrcq ................................................................... 22

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis,* 83 Tenn. L. Rev 231 (2015) ................................................................... 12, 13

Everytown, *Ten Years of Mass Shootings in the United States: An Everytown for Gun Safety Support Fund Analysis* (Nov. 2019), https://every.tw/2JPBIVz ................................................................... 17, 18, 19

Heather Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns,* The Atlantic (Feb. 22, 2018), https://bit.ly/2u0rlr2 ........ 20

Jason Silverstein, *There Were More Mass Shootings Than Days in 2019*, CBS NEWS, (Jan. 2, 2020 11:45 AM), https://cbsn.ws/2GaNI3v ........................... 21

John Donohue & Theodora Boulouta, *That Assault Weapon Ban? It Really Did Work,* N.Y. Times, (Sept. 4, 2019), https://nyti.ms/2HNgFnd ................. 22

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives,* 53 Harv. J. on Legis. 279 (2016) .......................................... 11, 15

Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States,* 1982-2018, 108 Am. J. of Pub. Health 1385 (2018), https://bit.ly/3aIWYtI.......................21

Justin Peters, *The NRA Claims the AR-15 Is Useful for Hunting and Home Defense. Not Exactly.*, Slate (June 12, 2016), https://slate.com/news-and-politics/2016/06/gun-control-ar-15-rifle-the-nra-claims-the-ar-15-rifle-is-for-hunting-and-home-defense-not-exactly.html ...............................24

Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation,* 46 Hastings Cont. L.Q. 523 (2019)..................................................14

Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each,* The Guardian (Sept. 20, 2016), https://bit.ly/2cs0kFo...........12

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016)............................................................................................................22

Margot Sanger-Katz & Quoctrung Bui, *How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws,* N.Y. Times (Oct. 5, 2017), https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reducemass-shooting-deaths-experts-say-these-gun-laws-could-help.html ....................................................................................................22

Marjory Stoneman Douglas High School Public Safety Commission, *Initial Report to the Governor, Speaker of the House of Representatives and Senate President* (Jan. 2, 2019), http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf...........................19

National Shooting Sports Foundation, *The Term 'Modern Sporting Rifle'* (Sept. 19, 2011), https://perma.cc/5KTF-W6B2 ...............................................13

Nikki Graf, *A Majority of U.S. Teens Fear a Shooting Could Happen at Their School, and Most parents Share Their Concern,* Pew Research Center (April 13, 2018), https://www.pewresearch.org/fact-tank/2018/04/18/amajority-of-u-s-teens-fear-s-shooting-could-happen-at-their-school-andmost-parents-share-their-concern/ .................................19

NRA Staff, *I Have This Old Gun: Colt AR-15 SP1, American Rifleman* (July, 31, 2014), https://www.americanrifleman.org/articles/2014/7/31/i-have-this-oldgun-colt-ar-15-sp1/.....................................................................................13

Reva Siegel & Joseph Blocher, Commentary, *Why Regulate Guns?*, Take Care (Nov. 30, 2019), https://takecareblog.com/blog/why-regulate-guns ...............19

Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths,* 80 J. Trauma & Acute Care Surgery 853 (2016)..........20

Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting (1928) .................................................................................................8

Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment,* Business Insider Australia (Dec. 18, 2012), http://read.bi/2x12PpU .......................................................... 7

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights,* 80 Law & Contemp. Probs. 55 (2017) .......................... 5, 7

S. Rep. No. 72-575 (1932) ................................................................. 8

Sophie Bethune, *APA Stress in America Survey: Generation Z Stressed About Issues in the News but Least Likely to Vote* (Oct. 30, 2018), https://www.apa.org/news/press/releases/2018/10/generation-z-stressed ....... 19

Tim Arango & Jennifer Medina, California Is Already Tough on Guns. After a Mass Shooting, Some Wonder if It's Enough, N.Y. Times (Nov. 10, 2018) https://www.nytimes.com/2018/11/10/us/california-shooting guns.html ........................................................................................... 23

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTEREST OF *AMICUS CURIAE*

Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, with nearly six million supporters across all fifty states, including tens of thousands in California.  Everytown for Gun Safety was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after 20 children and six adults were murdered by a gunman with an AR-15 rifle—a weapon regulated by the law challenged here—in an elementary school in Newtown, Connecticut.  The mayors of more than fifty California cities are members of Mayors Against Illegal Guns.  Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown has drawn on its expertise to file briefs in numerous Second Amendment cases, including challenges to assault weapon prohibitions like those at issue in this case, offering historical and doctrinal analysis that might otherwise be overlooked.  *See, e.g.*, *Wilson v. Cook Cty.*, No. 18-2686 (7th Cir.); *Worman v. Healey*, No. 18-1545 (1st Cir.); *Kolbe v. Hogan*, No. 14-1945 (4th Cir.) (en banc).  Several courts have also cited and expressly relied on Everytown's amicus briefs in deciding Second Amendment and other gun cases.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92 & n.11 (C.D. Cal. 2019), *appeal docketed*, No. 19-56004 (9th Cir. Aug. 28, 2019); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11 & nn.4, 7 (2019) (Alito, J., dissenting).[1]

---

[1] An appendix of selected, publicly available historical gun laws accompanies this brief.  All parties consent to the filing of this brief, and no counsel for any party authored it in whole or part.  Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.  Moreover, as the *(cont'd)*

1

## <u>INTRODUCTION</u>

2    This case involves a Second Amendment challenge to California's Assault

3 Weapons Control Act ("AWCA"), which prohibits, among other things, the

4 manufacture, possession, transport, sale, offer for sale, and import of assault

5 weapons.  Five circuits have heard challenges to similar laws, and all five upheld the

6 laws as constitutional under the Supreme Court's decision in *District of Columbia v.*

7 *Heller*, 554 U.S. 570 (2008).  *See Worman v. Healey*, 922 F.3d 26, 39-41 (1st Cir.

8 2019), *petition for cert. docketed*, No. 19-404 (U.S. Sept. 25, 2019); *Kolbe v. Hogan*,

9 849 F.3d 114, 137-38 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017);

10 *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("*NYSRPA*"), 804 F.3d 242, 247 (2d

11 Cir. 2015), *cert. denied*, 136 S. Ct. 2486 (2016); *Friedman v. City of Highland Park*,

12 784 F.3d 406, 412 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015); *Heller v.*

13 *District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1264 (D.C. Cir. 2011); *see also*

14 *Wilson v. Cook Cty.*, 937 F.3d 1028 (7th Cir. 2019) (affirming *Friedman*), *petition*

15 *for cert. docketed*, No. 19-704 (U.S. Dec. 3, 2019).[2]  Since *Heller*, three separate

16 districts of the California Court of Appeal have upheld the law at issue in this case,

17 holding that the AWCA "does not prohibit conduct protected by the Second

18 Amendment."  *People v. James*, 174 Cal. App. 4th 662, 677 (2009) (3d Dist.); *see*

19 *People v. Zondorak*, 220 Cal. App. 4th 829, 835-38 (2013) (4th Dist.); *People v.*

20 *Gleason*, No. H042771, 2017 WL 6276235, at \*5 (Cal. Ct. App. Dec. 11, 2017)

21 (unpublished) (6th Dist.), *cert. denied*, 139 S. Ct. 116 (2018)  Moreover, one federal

22 _____

23 Ninth Circuit has stated, there is no requirement that an amicus brief be
"disinterested."  *Funbus Sys., Inc. v. State of Cal. Pub. Utilities Comm'n*, 801 F.2d

24 1120, 1125 (9th Cir. 1986).  Rather, the focus is on whether it is "helpful."  *Earth Island Inst. v. Nash*, 2019 WL 6790682, at \*1 (E.D. Cal. Dec. 12, 2019).

25 [2] Although the Ninth Circuit has not addressed the constitutionality of assault
weapons laws under the Second Amendment since *Heller*, it recently cited the

26 consensus of its sister circuits favorably in ruling that a different state law, which
prohibits permit holders from possessing firearms on school grounds but allows

27 retired peace officers to do so, did not violate the Equal Protection Clause.
*See Gallinger v. Becerra*, 898 F.3d 1012, 1018-19 (9th Cir. 2018) (citing *Kolbe*,

28 *NYSRPA*, *Friedman*, and *Heller II*).

2

district court in this state has also held that the AWCA is constitutional, finding both that it "does not burden conduct protected by the Second Amendment" and that, even if it did, "there is a reasonable fit between the AWCA and California's public safety interests." *Rupp*, 401 F. Supp. 3d at 988, 990 (C.D. Cal. 2019).

As the State of California's brief shows, these courts got it right. Everytown submits this *amicus curiae* brief to urge this Court to similarly uphold the AWCA here—and, in particular, to make three points:

*First*, the AWCA is part of a long tradition of regulating weapons that legislatures have determined to be unacceptably dangerous, including a century of restrictions on semi-automatic firearms capable of firing a large number of rounds without reloading. This historical tradition alone is sufficient for this Court to find the law constitutional under the Second Amendment.

*Second*, this Court should also reject Plaintiffs' argument that the national prevalence of a type of a firearm, like the assault weapons at issue here, necessarily bestows Second Amendment protection on that firearm. Such an approach, under which firearms would become effectively immune from regulation the instant they are deemed in "common use" based on nationwide sales and manufacturing figures, cannot be reconciled with the Supreme Court's decision in *Heller* or with common sense. Indeed, it divorces the Second Amendment from the self-defense right it protects. Further, such a test is inconsistent with core principles of federalism, preventing individual states from determining how to best regulate themselves. Put simply, the "common use" test advocated by Plaintiffs would transform the constitutional analysis into a consumer referendum influenced by the firearms industry's aggressive modern-day marketing and sales strategies. That is not, nor should it be, the law.

*Finally*, even if the AWCA is found or assumed to regulate conduct protected by the Second Amendment, the Court should grant the State's motion for summary

3

1   judgment and dismiss this action because the AWCA survives intermediate scrutiny.

2   In addition to the arguments and evidence advanced in the State's moving papers,

3   Everytown's own research and other relevant social science and statistical evidence

4   bear out California's important interest in preventing and mitigating mass shootings

5   and daily gun violence, and the AWCA's "reasonable fit," *Jackson v. City & Cnty. of*

6   *S.F.*, 746 F.3d 953, 965 (9th Cir. 2014), with that interest.

7                          <u>**ARGUMENT**</u>

8   **I.     <u>California's Prohibition of Assault Weapons Is Part of a</u>**
        **<u>Longstanding History of Analogous Prohibitions.</u>**
9

10          As both the Supreme Court and the Ninth Circuit have emphasized,

11  "longstanding prohibitions" on the possession of certain types of weapons are

12  "traditionally understood to be outside the scope of the Second Amendment."  *Fyock*

13  *v. City of Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015); *see Heller*, 554 U.S. at 626-

14  27, 635 (noting that such "longstanding prohibitions" are treated as tradition-based

15  "exceptions" by virtue of their "historical justifications").  These prohibitions need

16  not "mirror limits that were on the books in 1791."  *United States v. Skoien*, 614 F.3d

17  638, 641 (7th Cir. 2010) (en banc).  Instead, courts have found that even "early

18  twentieth century regulations might nevertheless demonstrate a history of

19  longstanding regulation if their historical prevalence and significance is properly

20  developed in the record."  *Fyock*, 779 F.3d at 997 (citing *Nat'l Rifle Ass'n of Am.,*

21  *Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th

22  Cir. 2012)).[3]

23          The AWCA is not a radical departure from this country's well-established

24  history of firearm regulation.  Plaintiffs incorrectly and inaccurately attempt to assert

25  _____

26  [3] *See also Friedman*, 784 F.3d at 408 (noting that "*Heller* deemed a ban on private
     possession of machine guns to be obviously valid" despite the fact that "states didn't
27  begin to regulate private use of machine guns until 1927," and that "regulating
     machine guns at the federal level" did not begin until 1934); *Skoien*, 614 F.3d at 639-

28                                                                     *(cont'd)*

                                         4

1  that there is "no historical support" for the AWCA.  *See* Plaintiffs' Memorandum of

2  Points and Authorities in Support of Motion for Preliminary Injunction ("Mot.") at

3  11 (ECF No. 22-1).  Rather, the AWCA is another instance in a long tradition of

4  regulating or prohibiting weapons that lawmakers have concluded are unacceptably

5  dangerous—including a century of restrictions enacted shortly after semi-automatic

6  weapons capable of firing a large number of rounds without reloading became

7  widely available commercially.  *See* Robert J. Spitzer, *Gun Law History in the*

8  *United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68-69,

9  72 (2017) (explaining that "[firearm] laws were enacted not when these weapons

10  were invented, but when they began to circulate widely in society").  Many of these

11  laws were passed around the same time as the prohibitions on sales to felons and

12  individuals with dangerous mental illnesses, and restrictions on commercial arms

13  sales; all laws that *Heller* identified as "longstanding" and therefore presumptively

14  valid.  *See Heller*, 554 U.S. at 626-27, 635; *see also* Spitzer, *supra*, at 72 (discussing

15  the passage of prohibitions on possession of firearms by felons and individuals with

16  mental disabilities in the early twentieth century and the possession of semi-

17  automatic weapons with large-capacity magazines ("LCMs") in the 1920s and

18  1930s).  As further described below, this longstanding historical tradition of

19  regulation in and of itself is sufficient for the Court to find the AWCA constitutional

20  under *Heller*.  *See Heller*, 554 U.S. at 626-27; *see also Teixeira v. Cty. of Alameda*,

21  873 F.3d 670, 673, 682-90 (9th Cir. 2017) (en banc) (applying "[a] textual and

22  historical analysis" to conclude that "the Second Amendment . . . does not confer a

23  freestanding right . . . to sell firearms"), *cert. denied*, 138 S. Ct. 1988 (2018).

24

25

26  _____
   40 (noting that "prohibitions on the possession of firearms by felons and the mentally
27  ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first
   federal statute disqualifying felons from possessing firearms was not enacted until
28  1938" and that "the ban on possession by *all* felons was not enacted until 1961")
   (emphasis in original).

1

### A.   The AWCA Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous Dating from the Colonial Period to the Present Day.

2

3      The AWCA is part of a long history of government weapon prohibitions

4 aimed at enhancing public safety either because the weapons themselves are

5 especially dangerous, or because they are particularly suitable for criminal use.[4]  In

6 this country, such prohibitions date back to the early colonial period when the

7 American colonies and first states began adopting the English tradition of regulating

8 especially dangerous firearms.  *See generally* 1763-1775 N.J. Laws 346 (prohibiting

9 set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the

10 Colony of New Plymouth in New England 230 (Boston 1861) (same).

11      The passage of the Bill of Rights did not end this practice.  States continued to

12 prohibit or regulate particularly dangerous weapons.  For example, several states

13 banned or prohibitively taxed Bowie knives,[5] which were determined to be

14 "instrument[s] of almost certain death."  *See Cockrum v. State*, 24 Tex. 394, 402

15 (1859) (finding Bowie knives are "differ[ent] from [guns, pistols, or swords] in

16 [their] device and design" and are therefore more accurate and lethal than other

17 contemporary weapons).  In addition, a number of states prohibited certain types of

18 small and easily concealable handguns, which were deemed ideal for criminal use.[6]

19 _____

20 [4] As the California Court of Appeal stated in upholding the AWCA, "the Legislature
21 was specifically concerned with the unusual and dangerous nature of these weapons." *James*, 174 Cal. App. 4th at 676; *see Gallinger*, 898 F.3d at 1018 (noting
22 the "particular danger posed by assault weapons," which "motivated the Legislature to enact the AWCA").

23 [5] *See* 1837 Ala. Laws 7 (prohibitively taxing Bowie knives); 1837 Ga. Laws 90
24 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition
25 on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the
26 assassin").

27 [6] *See* 1879 Tenn. Pub. Acts 136 (prohibiting "belt or pocket pistols, or revolvers, or
any other kind of pistols, except army or navy pistol"); 1881 Ark. Acts 192

28

*(cont'd)*

6

1    Throughout the early twentieth century, many states passed laws prohibiting

2 especially dangerous weapons or weapon features, such as silencers, as the

3 technology of firearms and other dangerous weapons evolved.[7]  And, in the 1920s

4 and 1930s, at least twenty-eight states and the federal government passed

5 prohibitions or severe restrictions on automatic weapons, along with the restrictions

6 on large-capacity semi-automatic weapons discussed next.  *See* Spitzer, *supra*, at 67-

7 71; Sec. I.B., *infra*.

8    **B.    States Have Prohibited Semi-Automatic Firearms Capable of**

9    **Quickly Firing Multiple Rounds Since the Early Twentieth**
        **Century.**

10

11    States have regulated semi-automatic firearms capable of quickly firing a large

12 number of rounds—the precursor to modern-day assault weapons—since shortly

13 after these firearms first became widely commercially available at the turn of the

14 twentieth century.  *See* Robert Johnson & Geoffrey Ingersoll, *It's Incredible How*

15 *Much Guns Have Advanced Since the Second Amendment*, Business Insider Australia

16 (Dec. 18, 2012), https://bit.ly/30KvgrH (explaining that semi-automatic weapons

17 became commercially available in the early 1900s).[8]  Such laws often categorized

18 large-capacity, semi-automatic firearms, along with fully automatic weapons, as

19 (prohibiting pocket pistols and "any kind of cartridge, for any pistol"); 1903 S.C.
Acts 127-28 (similar); *see* 1907 Ala. Sess. Laws 80 (similar).

20 [7] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Acts & Resolves

21 310 (same); 1913 Minn. Laws 55 (same); 1916 N.Y. Laws 338-39 (same); 1926
Mass. Acts 256 (same); 1927 Mich. Pub. Acts 888-89 (same); 1927 R.I. Pub. Laws

22 259 (same). States also banned a wide variety of unusually dangerous weapons,
including blackjacks and billy clubs, slung-shots (a metal or stone weight tied to a

23 string), brass knuckles, various kinds of knives, and explosives.  *See, e.g.*, 1917 Cal.
Stat. 221 (blackjacks and billy clubs); 1911 N.Y. Laws 442 (slung-shots); 1913 Iowa

24 Acts 307 (daggers and similar-length knives); 1917 Minn. Laws 354 (brass
knuckles); 1927 Mich. Pub. Acts 888-89 (explosives).

25 [8] *See also* Declaration of Ashley Hlebinsky in Support of Plaintiffs' Motion for

26 Preliminary Injunction ¶ 28 (ECF No. 22-14) ("By the 20th century, semi-automatic
firearms with various combinations of features such as pistol grips, flash hiders,

27 folding/telescoping stocks, and detachable magazines had been modified and
perfected to the point of replication in hundreds, possibly thousands, of models by

28 countless manufacturers for both civilian and military markets.").

7

1  "machine guns," and imposed restrictions that effectively prohibited them entirely.

2  *See, e.g.*, 1927 R.I. Pub. Laws 256-59 (prohibiting the "manufacture, s[ale], purchase

3  or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots

4  more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub.

5  Acts 888 (prohibiting possession of "any machine gun or firearm which can be fired

6  more than sixteen times without reloading").

7  In 1928, the National Conference of Commissioners on Uniform State Laws

8  (now the Uniform Law Commission) adopted a model law prohibiting possession of

9  "any firearm which shoots more than twelve shots semi-automatically without

10  reloading," setting the national standard for laws prohibiting possession of semi-

11  automatic firearms with LCMs.  *See* Report of Firearms Committee, Handbook of

12  the National Conference on Uniform State Laws and Proceedings of the Thirty-

13  Eighth Annual Meeting 422-23 (1928).[9]  Shortly thereafter, the federal government

14  enacted a similar prohibition for the District of Columbia.  *See* 72 Cong., ch. 465, §§

15  1, 14, 47 Stat. 650-54 (making it a crime to "possess any machine gun," which it

16  defined as "any firearm which shoots . . . semiautomatically more than twelve shots

17  without reloading").  Even the National Rifle Association endorsed passage of the

18  D.C. law, saying, "it is our desire [that] this legislation be enacted for the District of

19  Columbia, in which case it can then be used as a guide throughout the states of the

20  Union."  S. Rep. No. 72-575, at 5-6 (1932).

21  California first prohibited automatic weapons in 1927[10] and expanded this

22  prohibition with a 1933 statute that prohibited the sale or possession of not only "all

23  _____

24  [9] This standard originated with a model law promulgated by the National Crime
25  Commission in 1927.  Report of Firearms Committee, at 422-23.

26  [10] *See* 1927 Cal. Stat. 938 (prohibiting "all firearms known as machine rifles,
   machine guns or submachine guns capable of discharging automatically and
27  continuously loaded ammunition of any caliber in which the ammunition is fed to
   such gun from or by means of clips, disks, drums, belts or other separable
28  mechanical device").

1   firearms . . . capable of discharging automatically," but also "all firearms which are

2   automatically fed after each discharge from or by means of clips, discs, drums, belts

3   or other separable mechanical device having a capacity of greater than ten

4   cartridges."  1933 Cal. Stat. 1170.  These statutes were at least as restrictive as the

5   AWCA, and indeed appear *more* restrictive than the AWCA, as the 1933 law

6   prohibited *all* firearms equipped with LCMs, rather than only the assault weapons at

7   issue here (or even the magazines themselves, which are separately regulated under

8   California law).  *See id.*  Several other states, including Minnesota, Ohio, and

9   Virginia, also prohibited or strictly regulated semi-automatic firearms with LCMs.[11]

10   These regulations have evolved as the firearm marketplace continually

11   introduces new products and the market embraces certain models or technologies.  In

12   their moving papers, Plaintiffs claim that the AWCA and similar laws lack

13   "historical support" and therefore should not be upheld.  Mot. at 16.  But there are

14   two significant flaws with this argument.  First, it ignores the dynamic history of

15   firearm regulation outlined above, of which the AWCA is a natural extension.

16   Second, AR-15s and similar rifles were not commercially available until the second

17   half of the twentieth century and were not popular in the American marketplace until

18   the 1980s.  *See* Sec. II.A., *infra.*  There can be no centuries-old regulation for a

19   firearm that did not exist.  Rather, the passage of the AWCA and other laws

20   prohibiting assault weapons, beginning in the 1980s and 1990s, perfectly aligns with

21   the ascendance of these firearms in American life.  *See id.*

22

23

---

24   [11] *See* 1933 Minn. Laws 232 (prohibiting "[a]ny firearm capable of automatically
25   reloading after each shot is fired, whether firing singly by separate trigger pressure or
     firing continuously" if the weapon was modified to allow for a larger magazine
26   capacity); 1933 Ohio Laws 189 (creating prohibitive licensing for "any firearm
     which shoots more than eighteen shots semi-automatically without reloading"); 1934
27   Va. Acts 137 (enacting a variety of regulations on the possession or use of weapons
     "from which more than sixteen shots or bullets may be rapidly, automatically, semi-
28   automatically or otherwise discharged without reloading").

9

1   As this historical record shows, the AWCA is the natural continuation of the

2   longstanding tradition of government prohibition or regulation of especially

3   dangerous weapons.  This includes nearly a century of restrictions on semi-automatic

4   firearms with the ability to shoot large numbers of rounds in a short time without

5   reloading.  These regulations have logically and necessarily progressed along with

6   improvements in firearm technology, growth in firearm popularity, and changes in

7   the national regulatory landscape.  Given that broader historical context, any

8   relatively small lapse in the regulation of a certain firearm does not summarily render

9   any and all future regulations unconstitutional, nor does it nullify the entire

10  regulatory history.  As such, the AWCA qualifies as a longstanding prohibition,

11  which, accordingly, falls outside the scope of the Second Amendment.  *See, e.g.*,

12  *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (finding that a concealed-carry

13  licensing standard that had been in effect "in some form for nearly 90 years" indeed

14  "qualifies as a longstanding, presumptively lawful regulation"); *see also United*

15  *States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) ("The relevant inquiry is whether

16  a particular *type* of regulation [is] longstanding." (citation omitted)).

17  **II.    The "Common Use" Test Proposed by Plaintiffs Is Illogical and Should**
18  **Not Be Followed.**

19  Plaintiffs assert that assault weapons must be afforded constitutional

20  protection because they are "common, not prohibited in the vast majority of States,

21  and have been used for close to a century . . . for various lawful purposes such as

22  self-defense, hunting, recreation, competition, and collecting."  *See* Mot. at 13.  Even

23  assuming, arguendo, such descriptions are taken to be true, there is neither firm legal

24  footing nor sound logic in the "common use" test that Plaintiffs advance.

25  The argument that assault weapons must be afforded Second Amendment

26  protection simply because they are widely available in other states dangerously

27  misconstrues the Supreme Court's decision in *Heller*.  While the Second

28

1  Amendment "does not protect those weapons not typically possessed by law-abiding
2  citizens for lawful purposes, such as short-barreled shotguns," *Heller*, 554 U.S. at
3  625, it does not logically follow—and neither the Supreme Court nor other courts
4  have held—that the Second Amendment somehow protects *all* weapons that have
5  achieved some preordained degree of commercial success.  *See Worman v. Healey*,
6  293 F. Supp. 3d 251, 266 (D. Mass. 2018) ("[P]resent day popularity is not
7  constitutionally material."), *aff'd*, 922 F.3d 26 (1st Cir. 2019).

8     A.  **Plaintiffs' "Common Use" Test Is Logically Circular and**
9         **Inconsistent with Federalism Principles.**

10        In addition to lacking a firm jurisprudential foundation, Plaintiffs' "common
11  use" test is hopelessly circular.  *See Rupp*, 401 F. Supp. 3d at 986 n.5.  Plaintiffs'
12  proposed approach would allow the constitutionality of weapons prohibitions to be
13  decided not by how dangerous a weapon is, but rather by "how widely it is circulated
14  to law-abiding citizens by the time a bar on its private possession has been enacted
15  and challenged."  *Kolbe*, 849 F.3d at 141.  Just as "it would be absurd to say that the
16  reason why a particular weapon can be banned is that there is a statute banning it, so
17  that it isn't commonly owned," *Friedman*, 784 F.3d at 409, it would be similarly
18  absurd to claim that a law is constitutionally barred because it addresses dangerous,
19  but ongoing, activity.  *See* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public*
20  *Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288 (2016) (discussing
21  the "central circularity" that plagues the "common use" test: "what is common
22  depends largely on what is, and has been, subject to regulation").  Yet, this is exactly
23  what the application of the "common use" test advocated by Plaintiffs would dictate,
24  both here and elsewhere.

25        This approach also fails to provide either workable standards or any
26  overarching guidance on whether the "common use" of assault weapons is
27  determined by considering the number produced, the number sold, or the number of
28

11

1  law-abiding owners.  *See Kolbe*, 849 F.3d at 135-36.  This distinction is critical.

2  Firearm ownership is extremely concentrated, with only 3% of American adults

3  possessing 50% of the country's guns.  *See* Lois Beckett, *Meet America's Gun*

4  *Super-Owners—With An Average of 17 Firearms Each*, The Guardian (Sept. 20,

5  2016), https://bit.ly/2cs0kFo; *see also* Alex Yablon, *Most Californians Who Own*

6  *'Assault Rifles' Have 10+ Guns*, The Trace (Nov. 12, 2018), https://bit.ly/2FFyQJO

7  (reporting research finding that "four out of five assault rifles in [California] are

8  owned by people who own 10 or more guns").  If production or sales numbers form

9  the basis of the common use analysis, then this small group of gun owners would

10 essentially govern the meaning and reach of the Second Amendment.  This tyranny

11 of a tiny minority of the population cannot be what either the founding generation

12 understood or the *Heller* Court intended.

13       A constitutional analysis driven by the prevalence of the prohibited firearm in

14 the market also would create perverse incentives for the firearms industry.  Such an

15 analysis grants firearms manufacturers a unilateral ability to insulate highly

16 dangerous firearms with Second Amendment protection "simply by manufacturing

17 and heavily marketing them" before a government could assess their danger,

18 determine whether to regulate them, and build the political momentum to actually do

19 so.  Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment*

20 *"Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015); *see Kolbe*, 849 F.3d

21 at 141-42.  Plaintiffs' proposed framework would unreasonably "hinder efforts to

22 require consumer safety features on guns."  Jacobs, *supra*, at 267, 269.  This is

23 because if there is any delay before states are able to mandate a new safety feature,

24 the firearm may reach some undefined level of "common use" sufficient to command

25 Second Amendment protection.  Given the emergence of new firearm technology

26 (including, for example, 3D-printed gun components that are undetectable using

27 traditional screening methods), and given the inevitability of future technological

28

1    developments, Plaintiffs' common use theory, if endorsed by this Court, would pose

2    a serious threat to public safety.  *See* Jacobs, *supra*, at 269.

3          These concerns about aggressive marketing and sales campaigns by

4    manufacturers are not merely remote or hypothetical; they can be observed by

5    looking at the exact weapons at issue here.  For example, the AR-15 rifle—"the most

6    popular of the prohibited assault weapons," *Kolbe*, 849 F.3d at 124—"did not catch

7    on in the American market in a significant way until the late 1980s."  Affidavit of

8    Robert Spitzer, Ph.D. at ¶ 8, *Worman v. Healey*, No. 17-cv-10107-WGY (D. Mass.

9    Dec. 15, 2017), ECF No. 61-5; *see also* NRA Staff, *I Have This Old Gun: Colt AR-*

10   *15 SP1*, *American Rifleman* (July 31, 2014), https://bit.ly/2GexBC4 (statement of

11   Martin K.A. Morgan, at 4:15-5:00).  Indeed, it was only *after* the federal prohibition

12   on assault weapons expired in 2004 that the gun industry focused its marketing

13   resources on assault weapons, like the AR-15.  The industry first promoted these

14   weapons as "tactical rifles" or "black rifles," and later—after a concerted post-*Heller*

15   campaign launched in 2009 by the firearms industry's chief trade association, the

16   National Shooting Sports Foundation—as "modern sporting rifles."[12]  As a result of

17   these coordinated industry efforts, the civilian sales of assault weapons skyrocketed.

18   *See* NRA Staff, *supra*, at 4:15-5:00 (noting that the AR-15's popularity underwent a

19   "fundamental evolution" after 2004, causing civilian sales to "explode[]").  But

20   contemporary and aggressive marketing strategies should have no bearing on the

21   meaning of the United States Constitution.  *See Rupp*, 401 F. Supp. 3d at 987 ("Gun

22   manufacturers cannot determine the scope of Second Amendment protection . . . .").

23

_____

24   [12] *Compare, e.g.*, Smith & Wesson 2006 10-K at 3-4, 2007 Smith & Wesson 10-K at
     4, 2008 Smith & Wesson 10-K at 4, 2009 Smith & Wesson 10-K at 4, and 2010
25   Smith & Wesson 10-K at 5, *with*, *e.g.*, 2011 Smith & Wesson 10-K at 5-6, and 2012
     Smith & Wesson 10-K at 4, *available at* http://ir.smith-
26   wesson.com/phoenix.zhtml?c=90977&p=irol-
     sec&control_selectgroup=Annual%20Filings; *see also* National Shooting Sports
27   Foundation, *The Term 'Modern Sporting Rifle'* (Sept. 19, 2011),
     https://perma.cc/5KTF-W6B2.
28

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    The history of the American firearms industry also makes clear why a market-

2    based "common use" test does not make sense.  As recent scholarship has found,

3    "[f]or the nation's first one hundred years, . . . the guns that were in 'common use'

4    were determined" not by manufacturers or consumers, but "by federal subsidization

5    and regulation."  Lindsay Schakenbach Regele, *A Different Constitutionality for Gun*

6    *Regulation*, 46 Hastings Const. L.Q. 523, 528-30 (2019) ("The sum total of this

7    government regulation and subsidization determined what was in the market, and

8    thus what firearms were in 'common use.'").  Thus, contrary to what Plaintiffs'

9    approach here would mandate, "[i]t is not historically sound . . . to allow gun

10   manufacturers and marketers to determine what arms are in common use."  *Id.* at

11   530.  As discussed above, *see* Sec. I., *supra*, history instead provides strong support

12   for sensible gun safety measures like the AWCA "that are consistent with the Second

13   Amendment."  Regele, *supra*, at 523.

14       Beyond these logical and historical problems with Plaintiffs' proposed

15   "common use" test, a test that turns on nationwide manufacturing or sales totals

16   would also create significant federalism consequences.  Under such a test, whenever

17   a new, potentially dangerous firearm feature became available, states would either

18   have to act immediately, and in unison, to prevent such features from becoming

19   widely available, or else forfeit their ability indefinitely to regulate such weapons

20   going forward.  States that might choose to gather more information before

21   regulating would instead be incentivized to regulate reflexively, not reflectively.

22   And if a state's citizens simply had a different position on gun policy, those

23   legislative policy judgments would potentially extend far beyond that state's borders

24   with outsized constitutional effects.

25       Legislators' decisions in one part of the country should not make laws in other

26   parts any "more or less open to challenge under the Second Amendment."

27   *Friedman*, 784 F.3d at 408.  If they did, that "would imply that no jurisdiction other

28

14

1  than the United States as a whole can regulate firearms.  But that's not what *Heller*

2  concluded." *Id.* at 412.  Because our Constitution "establishes a federal republic

3  where local differences are cherished as elements of liberty," federalism is "no less

4  part of the Constitution than is the Second Amendment." *Id.*  The Supreme Court's

5  decision in *Heller* (as applied to the states in *McDonald v. City of Chicago*, 561 U.S.

6  742 (2010)), "does not foreclose *all* possibility of experimentation" by state and local

7  governments, *Friedman*, 784 F.3d at 412, but rather permits them to do what they

8  have long done in the realm of firearm legislation:  "experiment with solutions to

9  admittedly serious problems."  *Jackson*, 746 F.3d at 970 (citation omitted); *see also*

10  *McDonald*, 561 U.S. at 785 (noting that "[s]tate and local experimentation with

11  reasonable firearms regulations will continue under the Second Amendment"

12  (alteration in original) (citation omitted)).  The Plaintiffs' test would eviscerate their

13  ability to do so.[13]

**B.   The "Common Use" Test Should Instead Be Used to Evaluate Whether the Weapon Is Necessary for the Core Second Amendment Right of Home Defense.**

16  To the extent that "common use" should play any role in the constitutional

17  analysis, it should be tied to "the purpose of the right to keep and bear arms."

18  Blocher & Miller, *supra*, at 291.  The test should focus, in other words, on whether

19  the regulated weapons are commonly used or are reasonably necessary *for self-*

20  *defense* or, in particular, *self-defense in the home*, which *Heller* holds is the core of

21  the right.  *See* 554 U.S. at 635; *see also United States v. Torres*, 911 F.3d 1253, 1262

22  (9th Cir. 2019) ("*Heller* tells us that the core of the Second Amendment is 'the right

23  of law-abiding, responsible citizens to use arms in defense of hearth and home.'"

24  (emphasis omitted) (citations omitted)).  The D.C. Circuit, in upholding a similar

[13] A counterfactual further demonstrates why Plaintiffs' "common use" test is inappropriate:  If Congress had renewed the federal prohibition on assault weapons rather than permitting it to lapse in 2004, the weapons prohibited by the AWCA would not be in widespread use today and would therefore not be subject to Second Amendment protection under this "common use" theory.

1    law, has adopted that approach—and implicitly rejected the plaintiffs' market-share

2    "common use" test—by asking whether assault weapons "are commonly used or are

3    useful specifically for self-defense."  *See Heller II*, 670 F.3d at 1261.  The court then

4    went on to note that prohibitions on certain semi-automatic weapons do not prohibit

5    "the quintessential self-defense weapon"—the handgun—and do not "prevent a

6    person from keeping a suitable and commonly used weapon for protection in the

7    home or hunting, whether a handgun or a non-automatic long gun."  *Id.* at 1261-62

8    (citation omitted).  Meanwhile, the Seventh Circuit noted that it uses a "parallel"

9    consideration, namely "whether law-abiding citizens retain adequate means of self-

10   defense" when upholding a similar assault weapons prohibition.  *Wilson*, 937 F.3d at

11   1036 (citation omitted); *see also Friedman*, 784 F.3d at 410.

12       As the State demonstrates in its filings, these weapons are "not necessary to

13   engage in lawful self-defense."  Defendants' Opposition to Plaintiffs' Motion for

14   Preliminary Injunction (ECF No. 33) ("Defs.' Opp.") at 19; *see generally*

15   Declaration of Lucy P. Allen (ECF No. 33-1) (noting, for example, that the average

16   citizen fires 2.2 shots in self-defense and only fired more than 10 bullets in 0.3% of

17   all incidents, with no shots fired in 18.2% of incidents).  Indeed, as courts have

18   noted, such weapons are "unquestionably most useful in military service" rather than

19   self-defense.  *Kolbe*, 849 F.3d at 137; *see Gallinger*, 898 F.3d at 1018-20 (endorsing

20   *Kolbe*'s reasoning regarding the dangers posed by assault weapons and their minimal

21   usefulness for self-defense).  Put simply, and as the evidence before the Court shows,

22   Plaintiffs' assertion that the firearms prohibited by the AWCA fall within the

23   purview of self-defense enunciated in *Heller* is patently wrong.

24   **III.   The Use of Assault Weapons Makes Mass Shootings and Other Gun-**
     **Violence Incidents Deadlier and It Is in California's Interest to Regulate**
25   **These Weapons to Protect the Public.**

26       As the Ninth Circuit has recognized, "when 'assault weapons and large-

27   capacity magazines are used, more shots are fired and more fatalities and injuries

28

1  result than when shooters use other firearms and magazines.'" *Gallinger*, 898 F.3d
2  at 1019 (quoting *Kolbe*, 849 F.3d at 127); *accord Rupp*, 401 F. Supp. 3d at 991; *see*
3  *also* Everytown, *Ten Years of Mass Shootings in the United States: An Everytown for*
4  *Gun Safety Support Fund Analysis* (Nov. 2019) ("Everytown, *Ten Years of Mass*
5  *Shootings*"), https://every.tw/2JPBIVz (finding that "mass shootings that involved an
6  assault weapon accounted for 32 percent of all mass shooting deaths and 82 percent
7  of injuries" and also "left six times as many people shot than when there was no
8  assault weapon").  But when Plaintiffs state that there is no "demonstrable
9  correlation" between statutes such as the AWCA and reductions in mass shootings
10 (Mot. at 22), this ignores both *Gallinger* and a wealth of peer-reviewed research.
11 Everytown's analysis, as well as other relevant research, demonstrates that the use of
12 assault weapons, particularly when coupled with LCMs, results in more people being
13 shot, more injuries per victim, and more deaths.[14]  *See infra*.

14 Because the AWCA does not implicate nor substantially burden a core Second
15 Amendment right, intermediate scrutiny, at most, is the appropriate standard for this
16 Court to apply.  *See Fyock*, 779 F.3d at 998-99.  A statute survives intermediate
17 scrutiny under the Second Amendment if:  (1) the government's stated objective is
18 "significant, substantial, or important"; and (2) there exists "a reasonable fit between
19 the challenged regulation and the asserted objective."  *Id.* at 1000.

20 According to Plaintiffs, "it is far from clear" that the State would have any
21 significant or important interest in preventing or mitigating "so-called 'mass
22 shootings'" because such events are "rare."  Mot. at 22.  But this could not be further
23 from the truth.  As courts have explicitly stated, in the context of firearms
24 regulations, "[p]ublic safety and crime prevention are compelling government
25 interests."  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1279 (N.D. Cal. 2014),

---

[14] The Seventh Circuit has noted that courts should consider the "dangerousness of
the prohibited weapons by discussing general evidence" of their features.  *Wilson*,
937 F.3d at 1034.

1    *aff'd*, 779 F.3d 991 (9th Cir. 2015); *see also Friedman*, 784 F.3d at 412 (holding that

2    "reduc[ing] the overall dangerousness of crime" is a "substantial" government

3    interest).  As demonstrated by the research outlined below, mass shootings and

4    assault weapons pose a serious threat to the safety of all Californians.  California

5    therefore has a significant, substantial, and important public interest in reducing the

6    risk of harm to its residents from such assault weapons, and the AWCA is a

7    reasonably tailored attempt to address this serious public safety concern.

8        ***Everytown's research.***  Relying largely on press coverage, police reports, and

9    FBI data, Everytown has tracked and documented mass shootings since 2009 and has

10   released several reports of its findings.  While Everytown's research cannot present a

11   comprehensive dataset of the firearms used in every mass shooting (the reality of

12   American gun violence is that the frequency of mass shootings makes this kind of

13   information not reported or readily available in every instance), the findings indicate

14   that assault weapons make shootings significantly more deadly.

15       For example, data from Everytown's continued tracking of mass shootings

16   shows that when assault weapons are used, more than twice as many people are

17   killed on average (11.6 per shooting versus 5.0) and more than twenty-one times as

18   many are shot and injured (25.1 per shooting versus 1.2).  *See* Everytown, *Ten Years*

19   *of Mass Shootings*.  Everytown's tracking of mass shootings also shows that assault

20   weapons are invariably used in the most deadly and injurious events.  The Ninth

21   Circuit has recognized the same.  *See Gallinger*, 898 F.3d at 1018-19.  Indeed, from

22   2009 to the present, the seven deadliest mass shooting incidents in America, one of

23   which took place in California, all involved the use of assault weapons.[15]

24   ─────────────────
     [15] These shootings are:  Las Vegas, Nevada (58 fatalities); Orlando, Florida (49
25   fatalities); Newtown, Connecticut (27 fatalities); Sutherland Springs, Texas (25
     fatalities); El Paso, Texas (22 fatalities); Parkland, Florida (17 fatalities); and San
26   Bernardino, California (14 fatalities).  *See* Everytown, *Ten Years of Mass Shootings*;
     *see also* Bonnie Berkowitz, Chris Alcantara, & Denise Lu, *The Terrible Numbers*
27   *That Grow With Each Mass Shooting*, WASH. POST (Oct. 1, 2017) (continually
     updated), https://wapo.st/2CMznZz.  Notably, the Parkland shooter specifically

28                                                                                    *(cont'd)*
─────────────────────────────────────────────
                                    18

1  Meanwhile, in the ten years from 2009 to 2018, there were at least 26 mass

2  shootings[16] (17 percent of those with known weapon data) that involved the use of an

3  assault weapon, resulting in 302 deaths and 653 injuries.  *See* Everytown, *Ten Years*

4  *of Mass Shootings*.  In other words, mass shootings that involved an assault weapon

5  accounted for 32 percent of all mass shootings deaths and 82 percent of injuries.  *See*

6  *id.*  And when an assault weapon was used in a mass shooting, it left six times as

7  many people shot than when there was no assault weapon.  *See id.*

8         Mass shootings involving assault weapons are also "highly salient" events that

9  have a unique impact that policymakers may consider when weighing policy choices.

10  *Friedman*, 784 F.3d at 412; *see* Reva Siegel & Joseph Blocher, Commentary, *Why*

11  *Regulate Guns?*, Take Care (Nov. 30, 2019), https://takecareblog.com/blog/why-

12  regulate-guns (explaining that "the constitutionality of a gun law need not pivot

13  exclusively on how many shootings it can be shown to prevent").  Such shootings

14  like those that occurred at San Bernardino, Newtown, Las Vegas, Parkland,

15  Sutherland Springs, and Aurora sear themselves into the national consciousness and

16  affect the way people live their everyday lives.  *See, e.g.*, Nikki Graf, *A Majority of*

17  *U.S. Teens Fear a Shooting Could Happen at Their School, and Most Parents Share*

18  *Their Concern*, Pew Research Ctr. (Apr. 18, 2018), https://pewrsr.ch/38tNWi1

19  (results of a survey conducted in the two months following the Parkland shooting

20  showed that a majority of U.S. teens (57%) fear a shooting could happen at their

21  school, and most parents (63%) share their concern); Sophie Bethune, *APA Stress in*

22  *America Survey: Generation Z Stressed About Issues in the News but Least Likely to*

23  *Vote* (Oct. 30, 2018), https://bit.ly/37kodsb (finding that 75% of young people ages

24  _____

chose an AR-15 to use in the shooting rather than a different type of a firearm,

25  stating in videos recorded in the days prior to the shooting that "[w]ith the power of

my AR you will all know who I am."  Marjory Stoneman Douglas High School

26  Public Safety Commission, *Initial Report to the Governor, Speaker of the House of*

*Representatives and Senate President*, at 256 (Jan. 2, 2019),

27  http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.

28  [16] Defined as a shooting which killed four or more individuals.

1   15-21 say that mass shootings are a significant source of stress); Alana Abramson,

2   *After Newtown, Schools Across the Country Crack Down on Security*, ABC News

3   (Aug. 20, 2013 7:10 A.M.), http://abcn.ws/1KwN9Ls (comparing the impact of the

4   Sandy Hook shooting on school security to that of 9/11 on airport security and noting

5   that school districts have spent tens of millions of dollars on security improvements).

6   While shootings on the scale of these tragedies remain statistically rare compared to

7   the plague of day-to-day gun violence, their enormous impact reinforces the

8   compelling justifications for the AWCA.

9       ***Other social science research.***  Additional research—some of which the Ninth

10  Circuit appears to reference in *Gallinger*, 898 F.3d at 1018-19—supports the State's

11  conclusion that assault weapons pose significant dangers to public safety.

12      The evidence here is substantial.  Assault weapons "tend to result in more

13  numerous wounds, more serious wounds, and more victims."  *NYSRPA*, 804 F.3d at

14  262; *accord Kolbe*, 849 F.3d at 140; s*ee also Gallinger*, 898 F.3d at 1019

15  (acknowledging the "exceptional lethality of [assault weapons]").  They are designed

16  to fire far more bullets, at a far faster rate than other firearms, with each round from

17  an assault weapon having up to four times the muzzle velocity of a handgun round—

18  and thus able to inflict much greater damage.  *See* Peter M. Rhee et al., *Gunshot*

19  *Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute

20  Care Surgery 853 (2016); *see also, e.g.*, Heather Sher, *What I Saw Treating the*

21  *Victims From Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22,

22  2018), https://bit.ly/2u0rlr2 ("The injury along the path of the bullet from an AR-15

23  is vastly different from a low-velocity handgun injury. . . .  The high-velocity bullet

24  causes a swath of tissue damage that extends several inches from its path.  It does not

25  have to actually hit an artery to damage it and cause catastrophic bleeding.  Exit

26  wounds can be the size of an orange.").  And, as researchers examining mass

27  shootings between 1982 and 2018 found, the sort of assault weapon rifles challenged

28

1   in this case are particularly dangerous, resulting in far more injuries per shooting

2   than handguns (an average of 29.9 injuries for assault rifle long guns and 7.7 injuries

3   for handguns).  *See* Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting*

4   *Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982-2018*,

5   108 Am. J. of Pub. Health 1385, 1386 (Oct. 2018), https://bit.ly/3aIWYtI.

6         Research regarding mass shootings is most telling here.  A study of mass

7   shootings between 1981 and 2017 found that assault weapons accounted for 86% of

8   the 501 fatalities reported in 44 mass-shooting incidents.  *See* Charles DiMaggio et

9   al., *Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal*

10  *Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. of Trauma and Acute

11  Care Surgery 11, 13 (2018), https://bit.ly/2K44ZzQ; *see also* Adam Lankford &

12  James Silver, *Why Have Public Mass Shootings Become More Deadly?*,

13  Criminology & Pub. Policy 1, 13 (2019), https://bit.ly/2GaGiNF ("Overall, the

14  increased use of semi-automatic rifles and assault weapons is an important reason

15  why public mass shootings have become more deadly over time.").  Meanwhile, in

16  2019 alone, there were over 400 instances of shootings where at least four people

17  were shot, excluding the shooter, resulting in "more mass shootings across the U.S.

18  in 2019 than…days in the year."  Jason Silverstein, *There Were More Mass*

19  *Shootings Than Days in 2019*, CBS News (Jan. 2, 2020 11:45 AM),

20  https://cbsn.ws/2GaNI3v.  Plaintiffs put forth that "there is no credible evidence that

21  so-called 'assault weapons' bans have any meaningful effect of reducing gun

22  homicides and no discernable crime-reduction impact."  *See* Declaration of John Lott

23  in Support of Plaintiffs' Motion for Preliminary Injunction ("Lott Decl.") at ¶ 6 (ECF

24  No. 22-18).  Yet, research suggests that mass shootings were 70% less likely to occur

25  between 1994 and 2004 when the federal prohibition on assault weapons was in

26  effect.  *See* DiMaggio, *supra*, at 13.  Further, researchers estimate that a prohibition

27  on assault weapons would have prevented 314 of the 448 mass-shooting deaths that

28

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

occurred during the studied periods when the federal prohibition was not in effect.
*See* DiMaggio, *supra*, at 13; *see also* Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 240-43 (2016) (finding that, as compared to the ten-year period before the federal prohibition went into effect, the number of gun massacres where six or more people were shot and killed fell by 37% during the prohibition period; the number of people dying from gun massacres fell by 43%; and gun massacres increased by 183% and massacre deaths by 239% in the decade after the prohibition lapsed); Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Wash. Post (Feb. 15, 2018), https://wapo.st/2JjFlSk (discussing Klarevas's research).  Moreover, a 2016 survey of experts in the fields of criminology, law, and public health identified assault weapons prohibitions as among the most effective policy measures for preventing mass shootings.  *See* Margot Sanger-Katz & Quoctrung Bui, *How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws*, N.Y. Times (Oct. 5, 2017), https://nyti.ms/2yPr0bo.  Finally, weapons that would have been outlawed under the federal prohibition killed "at least 234 of the 271 people who died in gun massacres since 2014," John Donohue & Theodora Boulouta, *That Assault Weapon Ban? It Really Did Work*, Opinion, N.Y. Times (Sept. 4, 2019), https://nyti.ms/2HNgFnd, casting serious doubt on Plaintiffs' contention that "a conclusion that assault weapon bans (largely focused on rifles) have any significant effect on reducing mass shooting fatalities is problematic."  Lott Decl. ¶ 41.

In addition to mass shootings, a recent study indicates that criminals also use assault weapons in the daily gun violence plaguing this nation, with assault weapons accounting for up to 12% of guns used in all crime and up to 16% of guns used in murders of police.  Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urban Health 313 (Oct. 2018), https://goo.gl/cwgrcq.

1  Plaintiffs incorrectly assert that gun prohibitions such as the AWCA are ineffective
2  as "criminals do not buy their firearms legally."  Lott Decl. ¶ 10.  But data compiled
3  by *The Washington Post* found that at least three quarters of the guns used in mass
4  shootings since 1966 *were* purchased legally.  Berkowitz, *supra* note 15.  Plaintiffs
5  also improperly claim that "the number of mass shootings committed *with assault*
6  *weapons* is very small compared to the total number of mass shootings."  Lott Decl.
7  ¶ 49.  But as stated by the Second and Fourth Circuits, assault weapons "are
8  disproportionately used in crime, and particularly in criminal mass shootings," and
9  "are also disproportionately used to kill law enforcement officers."  *NYSRPA*, 804
10 F.3d at 262; *Kolbe*, 849 F.3d at 140.

11 Thus far, California's legislative and regulatory efforts to curb gun violence
12 have had success.  California has among the lowest gun-death rates per capita in the
13 nation despite being the most populous state with the second-highest number of
14 registered guns.  *See* Tim Arango & Jennifer Medina, *California Is Already Tough*
15 *on Guns. After a Mass Shooting, Some Wonder if It's Enough*, N.Y. Times (Nov. 10,
16 2018), https://nyti.ms/38w24r6.  The AWCA continues to be an important element of
17 California's efforts to prevent gun violence.  Additional regulations, such as the
18 AWCA amendment to address the bullet-button loophole that contributed to the
19 staggering death toll in the San Bernardino shooting, continue to be constitutional
20 exercises of the State's power to protect the welfare of its citizens.

21 The State notes the same in its filings, highlighting that weapons covered by
22 the AWCA "are used disproportionately in crime," cause "a substantially greater
23 number of fatalities and injuries" in mass shootings, are "used disproportionately
24 against law enforcement personnel," and that the federal prohibition was effective in
25 reducing mass shootings.  Defs.' Opp. at 23, 27, 29; *see generally* Declaration of
26 Professor John J. Donohue (ECF No. 33-3), Declaration of Blake Graham (ECF No.
27 33-4), Declaration of Professor Louis Klaveras (ECF No. 33-5).  Accordingly,
28

1   whether this Court looks to the most recent empirical research, conducts a historical

2   analysis of relevant laws, or looks to guidance from other federal circuits and

3   California state courts, the outcome is the same:  the AWCA should be upheld.

4   **IV.    The Use of Assault Weapons for Self-Defense or Militia Service Does Not**

5   **Render the AWCA Unconstitutional.**

6          Plaintiffs provide two additional arguments for enjoining enforcement of the

7   AWCA; that the prohibited firearms are either:  (1) "ideal for self-defense," or (2)

8   "especially fit for militia service."  Mot. at 15-16.  Neither argument is persuasive.

9          Plaintiffs' self-defense argument lacks grounding in fact or logic.  Unlike

10  handguns, which *Heller* identified as "the quintessential self-defense weapon" and

11  "the most popular weapon chosen by Americans for self-defense," assault weapons

12  are bulky and difficult to control, making them ill-suited for personal protection.  *See*

13  *Heller*, 554 U.S. at 629 (contrasting handguns with bigger weapons that are difficult

14  "to use for those without the upper-body strength to lift and aim a long gun");

15  *Worman*, 922 F.3d at 37 ("semiautomatic assault weapons do not share the features

16  that make handguns well-suited to self-defense in the home").  For example, assault

17  weapons are poorly suited for fending off intruders in the home because they are

18  difficult to maneuver in close quarters, and their greater ability to penetrate walls

19  means that every missed shot has the potential to threaten the safety of neighbors and

20  other bystanders.  *See Heller II*, 670 F.3d at 1261 (discussing evidence that "assault

21  weapons 'have no legitimate use as self-defense weapons, and would in fact increase

22  the danger to . . .  innocent bystanders if . . . used in self-defense situations'")

23  (citation omitted).[17]  In light of these limitations, it is unsurprising that assault

24  weapons are, in fact, rarely used for self-defense.  *See Worman*, 922 F.3d at 37

25  _____

26  [17] *See also* Justin Peters, *The NRA Claims the AR-15 Is Useful for Hunting and Home*

27  *Defense. Not Exactly.*, Slate (June 12, 2016), https://slate.com/news-and-politics/2016/06/gun-control-ar-15-rifle-the-nra-claims-the-ar-15-rifle-is-for-hunting-and-home-defense-not-exactly.html.

28

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  (noting the lack of examples "of the use of an assault weapon for home self-

2  defense"); *NYSRPA*, 804 F.3d at 263 (noting "the dearth of evidence" that assault

3  weapons are used "for self-defense").

4       Plaintiffs' militia service argument fares no better.  *Heller* itself expressly

5  rejected the idea that weapons cannot be regulated if they would aid a citizen in

6  rendering "effective" service in the modern military.  554 U.S. at 627.  "M-16 rifles,"

7  "bombers," and "tanks" would also be highly useful in militia service, but *Heller*

8  held that those weapons may be banned outright.  *See id.*; *Rupp*, 401 F. Supp. 3d at

9  986 (concluding "that semiautomatic assault rifles are essentially indistinguishable

10  from M-16s, which *Heller* noted could be banned pursuant to longstanding

11  prohibitions on dangerous and unusual weapons").  Indeed, states have long

12  prohibited assault weapons of this type and their precursors, *see* Sec. I.B., *supra*, and

13  *Heller* cast no doubt on these "longstanding prohibitions."  554 U.S. at 626-27.

14                              **CONCLUSION**

15       For the foregoing reasons, Everytown respectfully requests that the Court deny

16  Plaintiffs' Motion for Preliminary Injunction.

17   Dated:  January 24, 2020          Respectfully submitted,

18

19                              By:   /s/ Matthew E. Sloan
                                 Matthew E. Sloan
20                               Matthew J. Tako
                                 Raza Rasheed
21                               Agnes N. Aniol

22                               Attorneys for *Amicus Curiae*
23                               Everytown for Gun Safety
                                 Support Fund

24

25

26

27

28