GIFFORDS LAW CENTER TO PREVENT
   GUN VIOLENCE
HANNAH SHEARER, SBN 292710
   hshearer@giffords.org
HANNAH FRIEDMAN, SBN 324771
   hfriedman@giffords.org
268 Bush St. No. 555
San Francisco, CA 94104
Telephone: 415.433.2062, Facsimile: 415.433.3357

Attorneys for *Amicus Curiae* Giffords Law
Center to Prevent Gun Violence

GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
   sedelman@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 310.557.8061, Facsimile: 310.552.7041

VIVEK R. GOPALAN, SBN 296156
   vgopalan@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200, Facsimile: 415.393.8306

KATHRYN M. CHERRY
   kcherry@gibsondunn.com
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
Telephone: 214.698.3313, Facsimile: 214.571.2966

Of Counsel for *Amicus Curiae* Giffords Law
Center to Prevent Gun Violence

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, et al.<br><br>       Plaintiffs,<br><br>   v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,<br><br>      Defendants. | CASE NO. 3:19-cv-1537-BEN-JLB<br><br>***AMICUS CURIAE* BRIEF OF GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE**<br><br>**Hearing:**<br>Date: February 6, 2020<br>Time: 2:00 pm |

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* hereby certifies that it has no parent corporation. It has no stock, and therefore no publicly held corporation owns 10% or more of its stock.

Gibson, Dunn &
Crutcher LLP

1

2

# TABLE OF CONTENTS

3

I. STATEMENT OF INTEREST ........................................................................ 1

II. ARGUMENT ............................................................................................... 1

    A.    The AWCA Bans a Subset of Semiautomatic Rifles and
             Other Weapons Whose Military Features Facilitate Criminal
             Mass Killings .................................................................................. 3

        1.    The Regulated Assault Rifles Are Uniquely Dangerous ................ 4

        2.    The Regulated Assault Rifles Are Disproportionately Used
             by Criminals and in Mass Shootings ........................................... 8

        3.    The Regulated Assault Rifles Are Not Suited for Sporting or
             Self-Defense ................................................................................. 9

        4.    The Regulated Assault Pistols and Shotguns Also Have
             Uniquely Destructive Features, and Are Not Suited for
             Lawful Use ................................................................................ 10

    B.    The AWCA Is a Reasonable and Tailored Response to a
             Compelling State Interest in Public Safety .................................... 12

        1.    The AWCA Furthers the Substantial Governmental Interest
             in Reducing Gun Violence .......................................................... 14

        2.    The AWCA Is Also Narrowly Tailored to Achieve a
             Compelling Government Interest ................................................. 17

        3.    This Court Should Defer to the Reasoned Decisions of the
             Legislature ................................................................................. 19

    C.    Plaintiffs Rely on Dubious Evidence from a Widely
             Discredited Declarant ................................................................ 21

         1.    Mr. Lott's Research Methodologies Have Been Widely
             Criticized .................................................................................. 21

        2.    Mr. Lott Avoids Peer Review and Has Failed to Publish
             Source Data ............................................................................... 23

        3.    Mr. Lott Has Committed Ethical Violations to Defend His
             Work. ........................................................................................ 24

III. CONCLUSION ....................................................................................... 25

26

27

28

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB

# TABLE OF AUTHORITIES

## Cases

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*,
    901 F.3d 1166 (9th Cir. 2018) .................................................................... 3

*Abrams v. Johnson*,
    521 U.S. 74 (1997) ................................................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................................. 23

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..................................................................... 12, 13, 19

*Duncan v. Becerra*,
    366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...................................................... 5

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ................................................................... 20

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) ........................................... 12, 13, 14, 15, 16

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ............................................................... 14

*Jackson v. City & Cty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) .............................................................. 15, 19

*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ...................................................................... 20

*Kansas v. Hendricks*,
    521 U.S. 346 (1997) ................................................................................. 24

*Kasler v. Lockyer*,
    23 Cal. 4th 472 (2000) ........................................... 3, 7, 15, 17, 18, 19, 20

*Kolbe v. Hogan*,
    849 F. 3d 114 (4th Cir. 2017) .......................................... 4, 12, 14, 16, 17

Gibson, Dunn &
Crutcher LLP

*Mahoney v. Sessions*,
   871 F.3d 873 (9th Cir. 2017)................................................................ 15, 25

*Mance v. Sessions*,
   896 F.3d 699 (5th Cir. 2018).......................................................................... 20

*Marshall v. United States*,
   414 U.S. 417 (1974)....................................................................................... 24

*McDonald v. Chicago*,
   561 U.S. 742 (2010)....................................................................................... 19

*Nat'l Paint & Coatings Ass'n v. City of Chicago*,
   45 F.3d 1124 (7th Cir. 1995)......................................................................... 21

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015)................................................................ 14, 16, 20

*Paris Adult Theatre I v. Slaton*,
   413 U.S. 49 (1973)......................................................................................... 24

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018)................................................................... 13, 20

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016)......................................................................... 14

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010)............................................................................ 13

*United States v. Salerno*,
   481 U.S. 739 (1987)....................................................................................... 17

*United States v. Torres*,
   911 F.3d 1253 (9th Cir. 2019)....................................................................... 17

**Statutes**

Cal. Penal Code § 30505 ............................................................................. 15, 19

Cal. Penal Code § 30510 ................................................................................... 19

Cal. Penal Code § 30515(a) ................................................................................. 3

**Other Authorities**

2015 California Senate Bill No. 880, California 2015-2016 Regular
Session....................................................................................................17, 18

Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC
Report*, 13 Am. Law & Econ. Rev. 565 (2011) ......................................22

Alex Daugherty, *Mangled Tissue and Softball-Sized Exit Wounds: Why
AR-15 Injuries Are So Devastating*, Miami Herald (Feb. 24, 2018),
*available at*
https://www.miamiherald.com/news/local/community/broward/article2
01949054.html ........................................................................................7

Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault
Weapons*, 40 Campbell L. Rev. 301, 327 (2018) ......................................8

Amy Novotney, *What Happens to the Survivors*, 49 Monitor on Psychol.
36 (Sep. 2018), *available at*
https://www.apa.org/monitor/2018/09/survivors ......................................9

B. Gil Horman, *AR-15 Pistols for Home Defense?*, American Rifleman,
Nov. 28, 2016, *available at*
https://www.americanrifleman.org/articles/2016/11/28/ar-15-pistols-
for-home-defense/ ..................................................................................11

Bill Chappell, *The Pistol That Looks Like A Rifle: The Dayton Shooter's
Gun*, NPR, Aug. 8, 2019, *available at*
https://www.npr.org/2019/08/08/748665339/the-pistol-that-looks-like-
a-rifle-the-dayton-shooters-gun..............................................................11

Christopher S. Koper, *An Updated Assessment of the Federal Assault
Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-
2003*, Jerry Lee Ctr. Of Criminology (June 2004) ................................8, 9

Claudia Deane, *A Fabricated Fan and Many Doubts*, Wash. Post, Feb. 11,
2003, *available at*
https://www.washingtonpost.com/archive/politics/2003/02/11/a-
fabricated-fan-and-many-doubts/b086b96f-0c86-417e-afe9-
c4623d5e936f/.........................................................................................23

Gibson, Dunn &

Crutcher LLP

Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States*, 320 J. of Am. Med. Ass'n 1034 (Sept. 11, 2018) ............................................................... 8

Evan Defilippis et al., *The GOP's Favorite Gun 'Academic' is a Fraud*, ThinkProgress, Aug. 12, 2016, *available at* https://thinkprogress.org/debunking-john-lott-5456e83cf326 ................................ 23

Giffords Law Center, *The Economic Cost of Gun Violence in California*, https://lawcenter.giffords.org/wp-content/uploads/2018/03/Economic-Cost-of-Gun-Violence-in-California.pdf.................................................................. 17

Gina Kolata & C.J. Chivers, *Wounds from Military-Style Rifles? 'A Ghastly Thing to See'*, N.Y. Times (Mar. 4, 2018), *available at* https://www.nytimes.com/2018/03/04/health/parkland-shooting-victims-ar15.html ............................................................................................ 7

H. Rep. No. 103-489 ................................................................................ 4, 10

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic Weekly (Feb. 22, 2018), *available at* https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/ ......................................................................................... 6, 7

*High-Capacity Ammunition Magazines*, Violence Policy Center (Feb. 15, 2019), *available at* http://www.vpc.org/fact_sht/VPCshootinglist.pdf .................... 8

Ian Ayres et al., *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193, 1296 (2003) ....................................... 22

James Lindgren, *Comments on Questions About John R. Lott's Claims Regarding a 1997 Survey*, Jan. 17, 2003, *available at* https://web.archive.org/web/20130304061928/http:/www.cse.unsw.edu.au/~lambert/guns/lindgren.html .......................................................... 23

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Public Health 1754 (Nov. 6, 2019) ............................................................................................ 6

Gibson, Dunn & Crutcher LLP

Maddie Crocenzi, *Pa. Was the Last State to Allow Hunting With an AR-15, and Hunters are Split*, York Daily Record (Feb. 6, 2018), *available at* https://www.ydr.com/story/news/2018/02/06/ar-15-s-legal-hunting-pa-but-some-hunters-dont-want-them/1036386001/.................................................. 10

*Marjory Stoneman Douglas High School Public Safety Commission Report*, Fl. Dep't of Law Enforcement 257 (Jan. 2, 2019) ("MSD Commission Report"), *available at* http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf...................................... 5

Max Slowik, *UTS-15 Production Starting in US*, Guns.com, May 2, 2012, *available at* https://www.guns.com/news/2012/05/02/utas-makina-producing-uts-15-shotguns-in-us-des-plaines-il....................................................... 11

Meg Kelly, *Do 98 Percent of Mass Public Shootings Happen in Gun-Free Zones?*, Wash. Post, May 10, 2018, *available at* https://www.washingtonpost.com/news/fact-checker/wp/2018/05/10/do-98-percent-of-mass-public-shootings-happen-in-gun-free-zones......................................................................... 22

Natasha Singer, *The Most Wanted Gun in America*, N.Y. Times, Feb. 2, 2013, *available at* https://www.nytimes.com/2013/02/03/business/the-ar-15-the-most-wanted-gun-in-america.html ............................................................. 1

Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma Acute Care Surg. 853 (2016) .......................... 10

Peter Moskowitz, *Inside the Mind of America's Favorite Gun Researcher*, Pacific Standard (updated Sept. 23, 2018), *available at* https://psmag.com/magazine/inside-the-mind-of-americas-favorite-gun-researcher ................................................................................................. 23

Richard Morin, *Scholar Invents Fan to Answer His Critics*, Wash. Post, Feb. 1, 2003, *available at* https://www.washingtonpost.com/archive/lifestyle/ 2003/02/01/ scholar-invents-fan-to-answer-his-critics/f3ae3f46-68d6-4eee-a65e-1775d45e2133/.................................................... 24

Rick Romell, *Jordan Fricke Fired AK-47 Pistol Through Door at Officer Matthew Rittner, Criminal Complaint Says*, Milwaukee J. Sentinel, Feb. 10, 2019, *available at* https://www.jsonline.com/story/news/2019/02/10/suspected-killer-milwaukee-police-officer-charged-1st-degree-murder/2822223002/ ...................... 11

Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017)..........................................20

U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view ........................21, 22

USA Gun Shop, *23 High Capacity Tactical Shotguns for Sale in 2019* (accessed Jan. 14, 2019), https://www.usa-gun-shop.com/7-badass-tactical-shotguns-for-home-defense-mag-capacity/ ..................................................12

Wintemute et al., *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, Ann. Emerg. Med. (July 1998) ........................................................8

Gibson, Dunn &
Crutcher LLP

## I.  STATEMENT OF INTEREST

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives.  The organization was founded in 1993 after a gun massacre at a San Francisco law firm and renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.

Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to make their communities safer from gun violence.  Its attorneys track and analyze firearm legislation, evaluate gun safety research and policy proposals, and participate in firearms-related litigation nationwide, where it has provided analysis as an amicus in numerous important cases.[1]

## II.  ARGUMENT

The assault rifles at issue in this case are semiautomatic versions of a military design first deployed on the battlefields of Vietnam.  *See, e.g.*, Natasha Singer, *The Most Wanted Gun in America*, N.Y. Times, Feb. 2, 2013, *available at* https://www.nytimes.com/2013/02/03/business/the-ar-15-the-most-wanted-gun-in-america.html.  Decades later, in an effort to create a bigger civilian market for semiautomatic rifles, gun makers ran "ads celebrating the rifle's military connections, . . . lur[ing] a new and eager audience to weapons that, not long ago, few serious gun enthusiasts would buy."  *Id*.  Those combat connections are not a relic—the semiautomatic assault rifles California regulates remain military-grade weapons.  Even today, the United States military calls semiautomatic fire the "most important firing technique during fast-moving, modern combat" and "the most accurate technique of

---

[1]  No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

placing a large volume of fire" on moving targets.  Department of the Army, Rifle Marksmanship: A Guide to M16- and M4-Series Weapons (2011), at 7–12.

The enhanced pistols and shotguns Plaintiffs claim the Constitution protects are newer designs that are just as dangerous and unfit for lawful use.  The semiautomatic shotguns at issue are not traditional hunting weapons; they were modeled after weapons originally used for riot control by foreign law enforcement.  The Armsel Striker, popular in South Africa, was marketed in the U.S. as the Street Sweeper; it featured a folding stock and measured only 16.5" long (slightly longer than a sawed-off shotgun).  This design combined concealability with the capability of firing 12 rounds in under 3 seconds.  When the Street Sweeper was designated a "destructive device" and regulated under the National Firearms Act ("NFA"), gunmakers designed workaround weapons that are as powerful as the Street Sweeper, as ill-suited to sporting purposes, and as capable of delivering catastrophic injuries by rapidly firing more than a dozen shotgun slugs.  Similarly, the pistols at issue in this case are not "common pistols" as Plaintiffs claim (Pls. Prelim. Inj. Br. at 3) but include weapons combining the enhanced lethality of assault rifles with a pistol's concealability, another workaround to evade the short-barreled rifle definition.

The Roberti-Roos Assault Weapons Control Act of 1989 and its subsequent iterations represent the considered and well-supported judgment of the California legislature to enact a weapon-by-weapon and feature-by-feature restriction. The AWCA affects only a subset of semiautomatic rifles—those weapons closest to original military rifles, making them the firearm of choice for individuals seeking to carry out mass shootings, drive-by shootings, and gang violence ("Regulated Assault Rifles")—and an even smaller subset of other weapons, namely combat-grade shotguns and AR-style pistols ("Regulated Assault Shotguns and Pistols").  The AWCA has made Californians safer for decades, and is narrowly tailored to affect only combat shotguns and the most warlike features of semiautomatic rifles and pistols.

1  Therefore the AWCA is constitutional, and the Court should deny Plaintiffs' request

2  for preliminary injunctive relief.

3      This *amicus* brief will focus on this core constitutional question and the reasons

4  why Plaintiffs have failed to demonstrate either a likelihood of success or a "serious

5  question" as to the merits of their claim.  *See, e.g.*, *A Woman's Friend Pregnancy Res.*

6  *Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018).  Counseling further against

7  Plaintiffs' motion, a preliminary injunction would upend a decades-old California law

8  just as the Ninth Circuit is poised to issue a ruling that will either vindicate, eliminate,

9  or dramatically clarify the scope of Plaintiffs' challenge.  The Court should apply the

10  Circuit's established Second Amendment precedent and reject Plaintiffs' efforts to

11  reintroduce in the legal market mass shooters' weapons of choice and an exotic newer

12  class of highly lethal, enhanced pistols and shotguns.[2]

13  **A.    The AWCA Bans a Subset of Semiautomatic Rifles and Other Weapons**

14      **Whose Military Features Facilitate Criminal Mass Killings**

15      The Act is not an outright ban on the semiautomatic rifles that are the focus of

16  Plaintiffs' case, or on the shotguns and pistols they include in their complaint.  Rather,

17  the AWCA regulates certain available add-on features that have been repeatedly used

18  to perpetrate mass shootings, drive-by shootings, and gang violence, among other

19  criminal activities, in California.  *See Kasler v. Lockyer*, 23 Cal. 4th 472, 482–85

20  (2000); *see also, infra,* Section II.A.2.

21      In particular, the AWCA targets semiautomatic rifles that have been enhanced—

22  through the addition of detachable magazines, folding stocks, flash suppressors, pistol

23  grips, or other features.  Cal. Penal Code § 30515(a).  In so doing, the AWCA targets a

24  subset of semiautomatic rifles whose capacity and tendency to inflict mass casualties

---

25

26  [2] As the State's brief explains, the fact that Plaintiffs have moved to enjoin a 1989 law and dramatically disrupt the status quo should subject them to the higher standard applicable to motions for mandatory preliminary injunctions.  (Defs. Opp. Br. at 8.)

27  Since Plaintiffs have failed to even meet the lower standard generally applicable to preliminary injunction motions, Plaintiffs certainly fail to demonstrate that "the law and facts *clearly favor* their position."  (*Id.* (citation omitted).)

28

outweigh their usefulness for lawful purposes. The AWCA also appropriately targets semiautomatic pistols enhanced with these same features, as well as military-grade, high-capacity shotguns—weapons Plaintiffs wholly fail to demonstrate are widely possessed or used for lawful defensive or sporting purposes.

### 1. The Regulated Assault Rifles Are Uniquely Dangerous

The AWCA regulates assault rifles by prohibiting semiautomatic versions of weapons developed for the American armed forces (such as the AR-15, which was developed by the U.S. military and "retain[s] the military features and capabilities of the fully automatic M16 and AK-47") as well as other rifles that have the same features as those combat-style models (*i.e.*, the Regulated Assault Rifles). *Kolbe v. Hogan,* 849 F. 3d 114, 124–25 (4th Cir. 2017) (en banc) (describing relationship between AR-15, M16, and AK-47 and referring to folding and telescoping stocks, pistol grips, flash suppressors, grenade launchers, and the ability to accept large-capacity magazines as "military features").

Such combat-style features distinguish military rifles and their semi-automatic counterparts from standard sporting rifles, and are not "merely cosmetic"—they "serve specific, combat-functional ends." H. Rep. No. 103-489, at 18. The Regulated Assault Rifles include features that enhance ammunition capacity, concealability, stability, and control, making it easier for shooters to fire accurately without sacrificing rate of fire. The "net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Id.* In fact, semi-automatic firing of military-style weapons like the Regulated Assault Rifles is in many ways *more* effective than automatic firing of the same weapons because they allow for more accuracy without substantially sacrificing rate of fire. Department of the Army, *supra*, at 7–12 (stating that "rapid semiautomatic fire" is "[t]he most accurate technique of placing a large volume of fire on poorly defined targets or target areas such as short exposure, multiple, or moving targets").

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB          4

Gibson, Dunn &
Crutcher LLP

Plaintiffs nevertheless argue that "so-called 'assault weapons' are merely typical semi-automatic firearms" (First Am. Compl. ¶ 30) and claim that "semi-automatic firearms" are "the category of firearms at issue in this case" (*id.* ¶ 45). That claim is false. The Regulated Assault Rifles are a *subset* of semi-automatic firearms, and they include those that are capable of firing greater-velocity rounds and enhanced with detachable magazines that enable higher round capacity, and have other features that allow more "casual" handling by inexperienced shooters. Owing to technological innovations deliberately geared toward increasing body counts at the expense of personal safety, today's military-style semiautomatic rifles are deadlier than ever.

One such innovation is the detachable magazine, which allows shooters to deplete the ammunition in one magazine and quickly swap it for another, decreasing the time a shooter must stop firing to reload and, thus, the time victims have to escape during pauses in firing. The lack of a fixed magazine also allows rifles to accommodate large-capacity magazines, which reduce the frequency with which a shooter must pause to reload, eliminating opportunities for potential victims to escape and for bystanders or law enforcement to intervene.[3] The importance of pauses in a gunman's shooting is underscored by the atrocity at Marjory Stoneman Douglas High School in Parkland, Florida. The shooter there was later confirmed to have used a weapon equipped with 30- to 40-round magazines. *See Marjory Stoneman Douglas High School Public Safety Commission Report*, Fl. Dep't of Law Enforcement, at 31, 257 (Jan. 2, 2019) ("MSD Commission Report"), *available at* http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.[4] At one point during the massacre, eight students were able to flee during a 13-second pause while the shooter retrieved and inserted a new magazine. MSD Commission Report at 31. If he had an

---

[3] These dangers also explain why California prohibits semiautomatic rifles that have a large-capacity magazine as a *fixed* magazine. *See* Defs. Opp. Br. at 23-24.

[4] *Cf. Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1177 & n.64 (S.D. Cal. 2019) (citing an erroneous National Review article that cited sources who claimed, mistakenly, that the Parkland shooter only used 10-round magazines).

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB            5

even larger magazine (say, with 100 rounds), those students may not have had that opportunity. If he had used a smaller detachable or fixed magazine, more students might have had opportunities to escape.

Indeed, a recent study (released after this Court's decision in *Duncan v. Becerra*) confirms that large capacity magazines ("LCMs") "increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons" and thus increase the likelihood that victims will be struck by multiple rounds and suffer more grievous injuries. Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Public Health 1754, 1754 (Nov. 6, 2019). This peer-reviewed analysis reached the following conclusions about LCMs' role in high-fatality mass shootings and the effectiveness of restricting them:

- More people are killed when LCMs are used in such shootings, and the difference is "substantial and statistically significant";
- States with LCM bans experience a lower rate of high-fatality mass shootings involving LCMs, and at a lower fatality count; and
- States with LCM bans experience fewer high-fatality mass shootings overall and at a lower fatality rate.

*Id.* at 1760.

In addition, another danger posed by weapons like the Regulated Assault Rifles is that the velocity of bullets fired by weapons like the Regulated Assault Rifles is three times those fired by a 9-millimeter handgun—making the force with which they hit three times greater. *See* Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic Weekly (Feb. 22, 2018), *available at* https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/. Dr. Garen Wintemute of the University of California, Davis Medical School testified before California's Committee of the Whole that "[w]hen a high velocity bullet enters the

body, . . . it starts to 'tumble' as it moves through the tissue[,] . . . greatly increasing the amount of tissue which is damaged by direct contact with the bullet." *Kasler*, 23 Cal. 4th at 484. "Moreover, as this high-velocity missile travels through the tissue, it sends out pressure waves." *Id.* Dr. Wintemute explained: "We've all seen pictures of airplanes breaking the sound barrier, and waves moving away from the plane. The same thing happens as these bullets travel through tissue; these pressure waves . . . create what is called a 'temporary cavity' behind the path of the bullet, which may be 10 to 15 times—or even greater—the diameter of the bullet itself." *Id.* "As a result . . . these high-velocity missiles can damage or destroy organs, break bones—including the femur, possibly the strongest bone in the body—without ever touching them." *Id.* Exit wounds can be as much as a foot wide. Sher, *supra*; Gina Kolata & C.J. Chivers, *Wounds from Military-Style Rifles? 'A Ghastly Thing to See'*, N.Y. Times (Mar. 4, 2018), *available at* https://www.nytimes.com/2018/03/04/health/parkland-shooting-victims-ar15.html.

Ultimately, a "low velocity bullet is like clipping the corner of your car" while a high velocity bullet is like "getting slammed by an 18-wheeler . . . . The high velocity bullet totals you." Alex Daugherty, *Mangled Tissue and Softball-Sized Exit Wounds: Why AR-15 Injuries Are So Devastating*, Miami Herald (Feb. 24, 2018), *available at* https://www.miamiherald.com/news/local/community/broward/article201949054.html. While injuries from low-velocity bullets are generally survivable, injuries from the high-velocity bullets fired by the Regulated Assault Rifles—"the same sort of horrific injuries seen on battlefields"—are often not. Kolata and Chivers, *supra*. Were that not enough, the destructive power of semiautomatic rifle fire—capable of breaking the femur without touching it—increases the likelihood that bullets will speed through walls and obstacles, which can increase casualties in a mass shooting and the risk of striking bystanders to a criminal confrontation.

Finally, the additional features targeted by the AWCA in the Regulated Assault Rifles (such as folding stocks, pistol grips, and flash suppressors) enhance

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB          7

concealability, stability, and control, making the weapons easier for mass shooters to operate without sacrificing the speed of fire.  *See* Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 Campbell L. Rev. 301, 327 (2018). The best evidence that mass shooters value these features is that, as described *infra,* section II.A.2, they select them, over and over again.[5]

### 2.    The Regulated Assault Rifles Are Disproportionately Used by Criminals and in Mass Shootings

As might be expected, these dangerous copies of military firearms are most popular with criminals, especially mass shooters.  Rostron, *supra*, at 322–23; Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States*, 320 J. of Am. Med. Ass'n 1034, 1034 (Sept. 11, 2018).  As of 1993, only one percent of total firearms in the United States were assault weapons, yet they comprised over eight percent of guns traced by law enforcement.  Rostron, *supra*, at 322.  Researchers have also found that firearm purchasers with criminal histories were more likely to buy assault weapons, and that probability was even higher if purchasers had more serious criminal histories. Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Jerry Lee Ctr. Of Criminology (June 2004) at 17–18 (citing Wintemute et al., *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, Ann. Emerg. Med. (July 1998)).

Most notably, these weapons have been used in many of the deadliest shootings in United States history: in El Paso, Parkland, Sutherland Springs, Las Vegas, Orlando,

---

[5] Perpetrators of four of the five deadliest shootings in modern American history used assault-style weapons incorporating or modified with one or more of these features. The Las Vegas shooter used AR-15 style rifles with a forward grip; the Orlando shooter used a Sig Sauer "concealable" assault weapon with a pistol grip and collapsible stock; the Sandy Hook shooter used a Bushmaster Model XM15-E2S semiautomatic rifle with a pistol grip; and the Sutherland Springs shooter used a Ruger AR-556 rifle, which has a pistol grip and flash suppressor. *See High-Capacity Ammunition Magazines*, Violence Policy Center (Feb. 15, 2019), *available at* http://www.vpc.org/fact_sht/VPCshootinglist.pdf.

Gibson, Dunn & Crutcher LLP

San Bernardino, Sandy Hook, and Aurora.  *Id.* at 330; de Jager et al., *supra*, at 1034. A recent study published in the Journal of the American Medical Association found that 24.6% of active shooter incidents involved a semi-automatic rifle.  About 80% of all rifles used by active shooters were semi-automatic, which is a far greater share than the percentage of total rifles in circulation that are semi-automatic.  De Jager et al., *supra*, at 1034 (providing data).  Shootings involving a semi-automatic rifle resulted in 82% more people wounded and 71% more killed.  *Id.*  The deadlier the shooting, the higher the likelihood that the shooter used a semiautomatic rifle.  *Id.*

Criminals (including mass shooters) choose these weapons because they are effective (in terms of the number and likelihood of casualties) and because the weapons' military style makes them particularly intimidating to intended victims. Rostron*, supra*, at 329–30.  That advantage is not merely "cosmetic." It has a real and damaging effect.  Intimidation not only allows shooters to carry out their attacks with less chance of resistance, it means victims die in fear and survivors are left traumatized.  Fear has physical and psychological consequences: post-traumatic stress disorders linked to mass shootings last longer and are more debilitating for those survivors who were in closer proximity to the shooter and feared for their lives.  *See* Amy Novotney, *What Happens to the Survivors*, 49 Monitor on Psychol. 36 (Sep. 2018), *available at* https://www.apa.org/monitor/2018/09/survivors.

Experts also suggest that the military style fuels a potential shooter's violent fantasies and may "embolden [him] to undertake a mass shooting spree he otherwise might not have attempted."  Rostron, *supra*, at 329.  Weapons like the Regulated Assault Rifles appeal to perpetrators of mass shootings because they are uniquely deadly—and they are uniquely deadly, in part, because they appeal to perpetrators of mass shootings.

**3.    The Regulated Assault Rifles Are Not Suited for Sporting or Self-Defense**

As discussed, weapons like the Regulated Assault Rifles are more effective at inflicting "more wounds, more serious, in more victims."  H. Rep. No. 103-489, at 18. For hunting and self-defense, however, they are no more effective and are in some ways less useful.  For example, the last state to legalize semiautomatic rifles like the AR-15 for big game hunting did so despite feedback that hunters did not need or want them.  Maddie Crocenzi, *Pa. Was the Last State to Allow Hunting With an AR-15, and Hunters are Split*, York Daily Record (Feb. 6, 2018), *available at* https://www.ydr.com/story/news/2018/02/06/ar-15-s-legal-hunting-pa-but-some-hunters-dont-want-them/1036386001/.  And a high-velocity bullet that explodes bones and organs is no better for stopping a home intruder than a traditional firearm well-suited for this purpose.  *See* Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma Acute Care Surg. 853, 865 (2016) (observing that law enforcement use shotguns for short-range combat and self-defense because it is "easier to aim and hit a target," and the traditional shotgun, not an assault weapon, is arguably "the optimal weapon for home defense" for less experienced shooters too).

Furthermore, though these weapons are not more useful in these contexts, they certainly are more dangerous.  Users are likely to fire more rounds (even when not needed), bystanders are more likely to be hit, and bystanders who are hit are more likely to be killed.  *See supra* Section II.A.1.

### 4. The Regulated Assault Pistols and Shotguns Also Have Uniquely Destructive Features, and Are Not Suited for Lawful Use

The AWCA covers semiautomatic pistols enhanced with the same features that make the Regulated Assault Rifles the weapon of choice in gun massacres and criminal shootings—only packaged in a fully concealable pistol.  Because these pistols are designed not to be fired from the shoulder, they evade the NFA's definition of short-barreled rifles.  But their short length paired with the number of rounds they fire mean they present a similar, if not identical, threat to public safety, as evidenced during the

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB          10

2019 mass shooting in Dayton, Ohio, in which the perpetrator used an AR-style pistol to kill nine people and wound over a dozen in just 30 seconds.  Bill Chappell, *The Pistol That Looks Like A Rifle: The Dayton Shooter's Gun*, NPR, Aug. 8, 2019, *available at* https://www.npr.org/2019/08/08/748665339/the-pistol-that-looks-like-a-rifle-the-dayton-shooters-gun.[6]  Conversely, such pistols have no demonstrated value for responsible self-defense; weapons reviewers have noted that instructors generally do not even offer self-defense courses with AR-style pistols.  *See* B. Gil Horman, *AR-15 Pistols for Home Defense?*, American Rifleman, Nov. 28, 2016, *available at* https://www.americanrifleman.org/articles/2016/11/28/ar-15-pistols-for-home-defense/.

The AWCA's prohibition on high-capacity shotguns similarly targets weapons that are unreasonably dangerous and not suited for lawful purposes.  The Regulated Shotguns include those modeled after the Street Sweeper, discussed *supra*: a combat-grade weapon used by militaries and international law enforcement for riot control.  The gun industry claims that the weapons' design modifications means they are not "destructive devices" under the NFA, but the Bureau of Alcohol, Tobacco & Firearms still bars their import on grounds that they serve no sporting purpose.  *See, e.g.*, Max Slowik, *UTS-15 Production Starting in US*, Guns.com, May 2, 2012, *available at* https://www.guns.com/news/2012/05/02/utas-makina-producing-uts-15-shotguns-in-us-des-plaines-il.  These high-capacity shotguns share the Street Sweeper's firepower and ability to hold a dozen rounds or more.  The weapons' history and design, and the

---

[6] Unsurprisingly, these pistols have been used to carry out other devastating attacks as well.  Last year, a Milwaukee man suspected of illegal gun and drug dealing used an AK-47 semiautomatic pistol to murder a police officer, puncturing the officer's aorta and both lungs with a single shot.  Rick Romell, *Jordan Fricke Fired AK-47 Pistol Through Door at Officer Matthew Rittner, Criminal Complaint Says*, Milwaukee J. Sentinel, Feb. 10, 2019, *available at* https://www.jsonline.com/story/news/2019/02/10/suspected-killer-milwaukee-police-officer-charged-1st-degree-murder/2822223002/.

way they are marketed, underscores that they are designed for killing enemies on the battlefield or violently suppressing mobs, not self-defense.[7]

**B.    The AWCA Is a Reasonable and Tailored Response to a Compelling State Interest in Public Safety**

The AWCA's constitutionality turns on "whether the challenged law burdens conduct protected by the Second Amendment," *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015) (internal quotation marks and citation omitted), and if so, "what level of scrutiny should be applied" and whether it survives such scrutiny.  *Id.*

The AWCA does not burden conduct protected by the Second Amendment. "The Second Amendment right is 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 996 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  "Thus, longstanding prohibitions on the possession of 'dangerous and unusual weapons' have uniformly been recognized as falling outside the scope of the Second Amendment." *Id.* at 997 (quoting *Heller*, 554 U.S. at 625).  The semiautomatic military-style rifles, pistols, and high-capacity shotguns regulated by the AWCA have little (if any) connection to the arms protected by the Second Amendment.  They are far more similar to those weapons "specifically designed for military use and . . . employed in a military capacity"—the arms that the Supreme Court held in *Heller* are not the "arms" protected by the Second Amendment's "right to bear arms."  554 U.S. at 581; *see also Kolbe*, 849 F.3d at 135–37.

Even if the Court finds that the AWCA governs weapons within the scope of the Second Amendment, it should evaluate the law under intermediate scrutiny.  The appropriate level of scrutiny is determined by "how closely the law comes to the core

---

[7] *See, e.g.*, USA Gun Shop, *23 High Capacity Tactical Shotguns for Sale in 2019* (accessed Jan. 14, 2019), https://www.usa-gun-shop.com/7-badass-tactical-shotguns-for-home-defense-mag-capacity/ (touting weapons described as "total combat shotgun[s]," a shotgun that "could be a 50-round weapon of mass destruction," and a "civilian combat shotgun" with a "short barrel [that] turns serious buckshot into pure evil at close quarters").

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB           12

Gibson, Dunn & Crutcher LLP

1    of the Second Amendment right" and "how severely, if at all, the law burdens that

2    right." *Fyock*, 779 F.3d at 998–99. The AWCA does not reach the core Second

3    Amendment right — "the right of law-abiding, responsible citizens to use arms in

4    defense of hearth and home," *Heller*, 554 U.S. at 634–35 — because it in no way

5    prevents "law-abiding, responsible citizens" from generally keeping firearms in their

6    home for self-defense. The AWCA also has no substantial effect on "the ability of

7    law-abiding citizens to possess the 'quintessential self-defense weapon'—the

8    handgun." *Fyock*, 779 F.3d at 999. Although the AWCA restricts a limited class of

9    pistols, "the plaintiffs admit that they are able to buy an operable handgun suitable for

10   self-defense—just not the exact gun they want." *Pena v. Lindley*, 898 F.3d 969, 978

11   (9th Cir. 2018) (noting that "[p]urchasers have adduced little evidence that the

12   handguns unavailable for purchase in California are materially more effective for self-

13   defense than handguns currently for sale in the state").

14        To be sure, the Regulated Assault Rifles and the Regulated Assault Shotguns

15   and Pistols *could* be used for home or self-defense. But the mere possibility that a

16   weapon could be used for this purpose does not immunize it from all state regulation.

17   Under that rationale, "any type of firearm possessed in the home would be protected

18   merely because it could be used for self-defense." *United States v. Marzzarella*, 614

19   F.3d 85, 94 (3d Cir. 2010). Nor does a weapon's potential usefulness in a militia or

20   military insulate it from regulation (*cf.* First Am. Compl. ¶ 42); otherwise, the Second

21   Amendment would permit unrestricted civilian possession of weapons like machine

22   guns and missiles. *Heller* confirmed that governments may bar citizens from

23   possessing machine guns and other "sophisticated arms" for use "against modern-day

24   bombers and tanks," even if a modern-day militia might require them. 554 U.S. at

25   627.

26        Even if the AWCA implicated the core Second Amendment right, however, the

27   burden it imposes is minimal. The law "bans only certain military-style weapons and

28   detachable magazines, leaving citizens free to protect themselves with a plethora of

other firearms and ammunition." *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc).  Nor does the AWCA categorically "ban 'an entire class of arms.'" *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015).  This limited scope "makes the restrictions substantially less burdensome," since "numerous alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Id*. Rather, California has "ban[ned] only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features." *Id*.  Californians remain free to protect themselves with a wide range of other firearms and ammunition, including traditional shotguns, semiautomatic weapons with fixed magazines, and semiautomatic weapons with detachable magazines that lack parts deemed more dangerous by the California legislature.

Other courts have overwhelmingly agreed that targeted legislation regulating semiautomatic assault weapons is subject to, at most, intermediate scrutiny.  *See, e.g.*, *Kolbe*, 849 F.3d at 138–39; *New York State Rifle*, 804 F.3d at 258–61; *Heller v. District of Columbia*, 670 F.3d 1244, 1256–58 (D.C. Cir. 2011).  Because the AWCA does not closely affect "the core of the Second Amendment right," and does not "severely . . . burden[] that right," *Fyock*, 779 F.3d at 998, the strictest standard that should be applied to the AWCA is intermediate scrutiny.

### 1.    The AWCA Furthers the Substantial Governmental Interest in Reducing Gun Violence

California had ample reason to conclude that the AWCA's prohibition of private possession of military-style weapons serves the State's compelling interest in reducing the frequency and lethality of gun violence.  Overwhelming evidence supports this conclusion.  Therefore the AWCA readily withstands intermediate scrutiny.

The intermediate scrutiny test is "not a strict one," *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016), and requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Fyock*, 779 F.3d at 1000.  Intermediate scrutiny

"does not require the least restrictive means of furthering a given end"; only that the challenged law "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Id.* The State may use "any evidence reasonably believed to be relevant to substantiate its important interests," *id.*, and "reasonable inference[s]" from such evidence should be credited, *Mahoney v. Sessions*, 871 F.3d 873, 883 (9th Cir. 2017).

California's stated objective is significant, substantial, *and* important. The California legislature sought to address "[t]he shooting incident in Stockton, the drive-by shootings that have been going on in Southern California at an alarming rate, the number of police officers who have been the victims of semi-automatic weapons, [] the 'stats' that now show the alarming group of arrests that are taking place, and [the fact that] when the items are confiscated, on many, many occasions those items have turned out to be semi-automatic weapons." *Kasler*, 23 Cal. 4th at 482 (quoting Speaker of the Assembly Willie L. Brown, Jr. on the purpose of the "extraordinary" session of the California State Assembly . . . as a Committee of the Whole").

To address assault weapons' enormous public safety threat, the California legislature enacted the AWCA. *See* Cal. Penal Code § 30505 ("The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state . . . ."). California's purpose in banning possession of these weapons—promoting public safety and reducing gun violence—is a substantial interest. *See, e.g.*, *Fyock*, 779 F.3d at 1000 (explaining that the State's interest in "promoting public safety," "reducing violence crime," and "reducing the harm and lethality of gun injuries" are "substantial and important government interests"); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 969 (9th Cir. 2014) ("It is self-evident that [the State's] interest in reducing the fatality of shootings is substantial.").

And there is a reasonable fit between the AWCA and these important State interests. The AWCA bans semiautomatic rifles and pistols with military features and

an uncommon class of shotguns with military-grade firepower.  As demonstrated *supra* in Section A, these are all particularly dangerous military-style devices designed to inflict mass casualties.  They pose real and immediate threats to public safety.  Absent the AWCA, California's interests in public safety and reducing gun violence plainly "would be achieved less effectively." *Fyock*, 779 F.3d at 1000.

Case law and empirical evidence confirm the reasonable fit between the AWCA and California's substantial interests.  Courts have upheld similar assault weapons statutes under intermediate scrutiny, recognizing that the Second Amendment allows reasonable restrictions on semiautomatic weapons with military-style features.  As these courts have concluded, there is a reasonable fit between assault weapons bans and the government interest in reducing gun violence: assault weapons make mass shootings and criminal violence more lethal.

For example, in *New York State Rifle*, the Second Circuit upheld New York's and Connecticut's assault weapons bans because they prohibited semiautomatic rifles with "enumerated military-style features" and had "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general." 804 F.3d at 262.  The Second Circuit accordingly upheld the challenged weapons bans under intermediate scrutiny because they were "substantially" related to the States' interests in mitigating the risk and lethality of mass shootings.  *Id.* at 262–63. Similarly, in *Kolbe*, the Fourth Circuit upheld Maryland's assault weapons ban, which prohibited semiautomatic weapons that included "features designed to achieve their principal purpose—'killing or disabling the enemy' on the battlefield." 849 F.3d at 124–25, 139–40.  In light of the unique lethality of the banned assault weapons, the Fourth Circuit concluded that there was "a reasonable, if not perfect, fit between the [ban] and Maryland's interest in protecting public safety." *Id.* at 140–41.

In sum, California's Legislature made the reasonable choice to prohibit access to an extremely dangerous subset of weapons that facilitate mass killings.  The record available to the legislature and the evidence catalogued in this brief demonstrates that

California's stated interest of addressing gun violence would be achieved less effectively—far less effectively—absent the AWCA, which is sufficient to uphold the law under intermediate scrutiny.

### 2.   The AWCA Is Also Narrowly Tailored to Achieve a Compelling Government Interest

The AWCA need only satisfy strict scrutiny if the law *severely* burdens the core Second Amendment right to self-defense in the home.  As discussed, the AWCA does not.  *See, e.g.*, *United States v. Torres*, 911 F.3d 1253, 1253 (9th Cir. 2019); *Kolbe*, 849 F.3d at 138.  Yet the AWCA would survive even strict scrutiny.

Strict scrutiny in the Second Amendment context requires that a statute be "narrowly tailored to achieve a compelling governmental interest." *Kolbe*, 849 F.3d at 133 (quoting *Abrams v. Johnson*, 521 U.S. 74, 82 (1997)).  The AWCA meets even this higher bar because its restrictions are narrowly tailored in furtherance of California's compelling interests in reducing gun violence, including the frequency and severity of mass shootings.  *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (noting that "the Government's general interest in preventing crime" is compelling); *see also* 2015 California Senate Bill No. 880, California 2015-2016 Regular Session.

California's compelling interest in regulating assault weapons is clear.  Gun violence exacts an enormous toll on Californians.  "In recent years, California has experienced an average of 1,327 gun-related homicides, 1,553 gun-related suicides, 4,284 nonfatal interpersonal shootings, and 1860 accidental shootings per year." Giffords Law Center, *The Economic Cost of Gun Violence in California*, https://lawcenter.giffords.org/wp-content/uploads/2018/03/Economic-Cost-of-Gun-Violence-in-California.pdf.  Assault weapons have had a particularly devastating role in California.  A month before the California legislature considered the AWCA, a man used a semiautomatic AK-47 to rake an elementary schoolyard in Stockton, California where 300 kindergartners to third graders were enjoying recess.  Five children, ages 6 to 9, died; one teacher and 29 children were wounded.  *Kasler*, 23 Cal. 4th at 483.

This was not the only recent incident.  After telling his wife he was "going to hunt humans," a man opened fire in a McDonalds with a 9-millimeter UZI submachine gun, among other weapons.  *Id.*  With his Uzi "[h]e fired nearly hundreds of rounds.  The gunfire was so heavy that police at first assumed that more than one gunman was inside."  *Id.*  Twenty-one people died and 15 people were injured.

Then-California Attorney General John Van de Kamp testified before the Committee of the Whole that semi-automatic military assault rifles were "the weapons of choice" for gang members, and "it had 'become fashionable among hard-core members of the Crips gang to spray a stream of bullets in hopes of taking down one rival gang member.'"  *Id.* at 484.  He said, "the young killers even have a phrase for [the collateral damage that may result].  They say, 'I spray the babies to the eighties.'"  *Id.*  Lieutenant Bruce Hagerty, a Los Angeles police officer, described a Good Friday gang shooting that killed children, teens, and the elderly as a "war scene."  *Id.* at 485.

In addition to the sheer carnage, gun violence has devastating financial costs.  "The 9,980 shootings that occur each year in California are a serious drain on the state's economy."  *Id.*  Gun violence costs California over $6.5 billion per year, due to losses from healthcare, law enforcement, criminal justice, and lost income.  *Id.*

The AWCA is the least restrictive means of furthering California's interest in mitigating the humanitarian and economic costs of mass shootings.  For example, the California legislature banned only those weapons that it found did not have a legitimate sporting use.  *See, e.g.*, 2015 California Senate Bill No. 880, California 2015-2016 Regular Session ("[B]ullet button-equipped semi-automatic weapons have no legitimate use for sport hunters or competitive shooters.").  The law prohibits a fraction of available firearms: high-capacity shotguns and those semiautomatic rifles and pistols with military-style features, including detachable magazines. These weapons facilitate rapid devastation of human life, which the California legislature found uniquely dangerous.

In drafting the AWCA, "[t]he Legislature was . . . confronted with two conflicting societal interests, both of which it recognized as legitimate—the interest of all citizens in being protected against the use of semiautomatic weapons by criminals, and the interest of some citizens in using semiautomatic weapons for hunting, target practice, or other legitimate sports or recreational activities." *Kasler*, 23 Cal. 4th at 488. "[T]o accommodate those conflicting interests," the legislature found that it was "the most effective way to identify and restrict a *specific class* of semiautomatic weapons." *Id.* (emphasis added). Rather a categorical ban, the legislature made feature-by-feature decisions and then determined that *each* other firearm listed in the AWCA "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." *Id.*; *see also* Cal. Penal Code § 30505, referencing *id.* § 30510 (current version of statute cited in *Kasler*). The AWCA is therefore a quintessential example of narrow tailoring.

### 3.   This Court Should Defer to the Reasoned Decisions of the Legislature

State legislatures must have the leeway to make informed, predictive judgments about curbing gun violence, and legislative deference is particularly appropriate in this realm. Gun violence is a complex problem, and experts disagree on the most effective policy solution. States must be able to experiment with multiple, localized approaches. The Supreme Court has accordingly emphasized that the Second Amendment "limits (but by no means eliminates) [the States'] ability to devise solutions to social problems that suit local needs and values." *McDonald v. Chicago*, 561 U.S. 742, 785 (2010); *see also Heller*, 554 U.S. at 636 (reserving to state legislatures "a variety of tools for combating" gun violence); *Jackson*, 746 F.3d at 961 (localities "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems").

Even if California's law is not a perfect solution to the gun violence problems the Legislature identified, "the Legislature was not constitutionally compelled to throw up its hands just because a perfectly comprehensive regulatory scheme was not

politically achievable," *Kasler*, 23 Cal. 4th at 487.  Targeted steps to achieve incremental results are precisely the type of reasonable laws that are constitutionally permissible.  *See, e.g.*, *Mance v. Sessions*, 896 F.3d 699, 708 (5th Cir. 2018) (upholding interstate handgun sales restrictions under strict scrutiny because "a State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns" (internal quotation marks omitted)); *New York State Rifle*, 804 F.3d at 263.  Indeed, an incremental approach is necessary to keep up with innovations by gun manufacturers and sellers, some of which are only identified as dangerous or attractive to mass shooters after months or even years of sales and use. For example, states only banned machine guns after they were circulated widely and increasingly used in crimes.  *See* Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 67–68 (2017).

This Court should not second-guess California's policy judgment.  Legislatures are "far better equipped than the judiciary to make sensitive public policy judgments" about the risks of gun violence and the dangers of specific firearm features.  *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012); *see also Pena v. Lindley*, 898 F.3d 969, 979–80 (9th Cir. 2018) (courts "must allow the government to select among reasonable alternatives in its policy decisions" and "lack the means" to resolve "a policy disagreement that the California legislature already settled").  Those judgments should be reserved to elected state representatives who are directly accountable to the public.  *See, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (the "best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate").  California found a narrowly tailored solution that balanced citizens' Second Amendment rights with a compelling and urgent public safety interest.  The AWCA's narrow restrictions on certain especially dangerous semiautomatic weapons—precisely those that criminals repeatedly select for their value in boosting casualty counts and intimidating victims—should be upheld.

**C.      Plaintiffs Rely on Dubious Evidence from a Widely Discredited Declarant**

In arguing that the AWCA does not survive heightened scrutiny, Plaintiffs rely on a 64-paragraph declaration by economist John R. Lott.  (*See* Dkt. 22-18 (Lott Decl.).)  Plaintiffs cite Mr. Lott extensively, including for the (incorrect) propositions that there is "no demonstrable correlation" between assault weapon bans and "reducing gun violence and/or mass shootings" (Pls. Prelim. Inj. Br. at 3) and that no prospective mass shooter would "pause for a second at the prospect of also violating the AWCA" (Pls. Prelim. Inj. Br. at 24–25 n.13).  In fact, as explained above and in the State's brief, social science research establishes that assault weapons play a disproportionate role in fueling violent crimes, homicide, and gun massacres and that restricting them will likely reduce these incidents' frequency and lethality.  Furthermore, contrary to Lott's assumption that criminal shooters will invariably evade the law, FBI data on active shootings from 2000 to 2013 demonstrated that "only very small percentages [of shooters] obtain[ed] a firearm illegally."  U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.[8]

Yet it is unsurprising that Mr. Lott's view opposes this wide body of research.  Mr. Lott makes his living offering intellectually dubious and scientifically flawed opinions on firearm policy.  His declaration in this case should be given no weight.

**1.      Mr. Lott's Research Methodologies Have Been Widely Criticized**

Mr. Lott's research methodology on firearm restrictions' impact on crime rates has been criticized as fundamentally flawed.  Academics including Stanford University's Abhay Aneja and John Donohue reviewed Mr. Lott's research on "right-

---

[8] Lawmakers therefore can assume that restricting access to assault weapons will deter their criminal use—precisely the type of reasonable assumption that underlies virtually all criminal laws and regulations aimed at regulating dangerous products.  *Accord, e.g.,* *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1128–29 (7th Cir. 1995) ("Legislatures often enact laws that reduce but cannot eliminate the effects of movements across municipal and state borders.").

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB        21

to-carry" laws and the National Research Council's subsequent critical evaluation of that research, concluding that Mr. Lott's data set had "several coding errors" that skewed his conclusions.  They highlighted incorrect coding for the year in which several states adopted right-to-carry laws and other key variables.  Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report*, 13 Am. Law & Econ. Rev. 565, 585, 613–14 (2011).  Moreover, as Drs. Aneja and Donohue observed, Mr. Lott neglected "major factors influencing the pattern of U.S. crime in recent decades," such as increases in the prison and police populations.  *Id.* at 614–15.  Professor Donohue published a separate critique with Yale Law Professor Ian Ayres, concluding that Mr. Lott's research had "not withstood the test of time," since his results "collapsed" when "more complete" data sets were used in plausible models.  Ian Ayres et al., *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193, 1296 (2003).  They also noted significant coding errors in Mr. Lott's past work, including one that, when fixed, undermined his claim that "right to carry" laws reduce crime.  *Id.* at 1261.

Mr. Lott has also adopted conveniently crafted definitions for what constitute "mass shootings" and "gun-free zones," and there are significant discrepancies between his research—which he claimed showed that 94% of mass shootings since 1950 occurred in gun free zones—and other experts', who have found that only 10% of mass shootings occur in gun-free zones.  *See, e.g.*, Meg Kelly, *Do 98 Percent of Mass Public Shootings Happen in Gun-Free Zones?*, Wash. Post, May 10, 2018, *available at* https://www.washingtonpost.com/news/fact-checker/wp/2018/05/10/do-98-percent-of-mass-public-shootings-happen-in-gun-free-zones.  For example, Mr. Lott excludes from the definition of mass shootings those "that resulted from gang or drug violence or during the commission of a crime," as well as shootings in residences.  *Id.*  As for gun-free zones, Mr. Lott has included areas where military and police are regularly present and permitted to carry guns.  *Id.*  This bizarre definition leads him to claim shootings occurred in gun-free zones when in fact they happened in places where guns were actually present—such as Fort Hood, the Washington Navy Yard, and Pensacola

1    Naval Base.  To support his outlier claims about the efficacy of gun laws, Mr. Lott

2    relies on nonsensical assumptions that diverge from other experts.

3         **2.     Mr. Lott Avoids Peer Review and Has Failed to Publish Source Data**

4         Mr. Lott is not affiliated with a university, and "[l]ittle of his gun research has

5    been published in peer-reviewed journals."  Peter Moskowitz, *Inside the Mind of*

6    *America's Favorite Gun Researcher*, Pacific Standard (updated Sept. 23, 2018),

7    *available at* https://psmag.com/magazine/inside-the-mind-of-americas-favorite-gun-

8    researcher.  The Supreme Court recognizes that peer review—*i.e.*, "submission to the

9    scrutiny of the scientific community"—increases reliability and "the likelihood that

10   substantive flaws in methodology will be detected."  *Daubert v. Merrell Dow Pharm.,*

11   *Inc.*, 509 U.S. 579, 593–94 (1993).  Mr. Lott's failure to publish peer-reviewed work

12   calls into question the reliability of his methods and conclusions.  Mr. Lott apparently

13   shares this concern, having publicly claimed he was published in a peer-reviewed

14   journal that, in reality, rejected his work.  Evan Defilippis et al., *The GOP's Favorite*

15   *Gun 'Academic' is a Fraud*, ThinkProgress, Aug. 12, 2016, *available at*

16   https://thinkprogress.org/debunking-john-lott-5456e83cf326.

17        Moreover, in order for a scientific finding to be credible, it must be replicable.

18   But Mr. Lott is known for publishing research without source data needed to test it.

19   For instance, Mr. Lott's was unable to produce any poll data underlying a 1997 survey

20   on the protective effect of brandishing a weapon.  Claudia Deane, *A Fabricated Fan*

21   *and Many Doubts*, Wash. Post, Feb. 11, 2003, *available at*

22   https://www.washingtonpost.com/archive/politics/2003/02/11/a-fabricated-fan-and-

23   many-doubts/b086b96f-0c86-417e-afe9-c4623d5e936f/.  Mr. Lott claimed he lost the

24   data in a computer crash.  *Id.*  Experts find this explanation implausible, including

25   because "all evidence of a study with 2,400 respondents does not just disappear when a

26   computer crashes"; there should still be some records on survey funding, the survey

27   instrument, or individual responses.  *See* James Lindgren, *Comments on Questions*

28   *About John R. Lott's Claims Regarding a 1997 Survey*, Jan. 17, 2003, *available at*

1  https://web.archive.org/web/20130304061928/http:/www.cse.unsw.edu.au/~lambert/gu
2  ns/lindgren.html.

### 3. Mr. Lott Has Committed Ethical Violations to Defend His Work.

4  Mr. Lott's credibility is further undermined by a pattern of unethical behavior.
5  For example, Mr. Lott assumed a fictional identity to post online praise for himself and
6  defend himself from critics, even masquerading as a former student and posting: "he
7  was the best professor I ever had."  Richard Morin, *Scholar Invents Fan to Answer His*
8  *Critics*, Wash. Post, Feb. 1, 2003, *available at* https://www.washingtonpost.com/
9  archive/lifestyle/ 2003/02/01/ scholar-invents-fan-to-answer-his-critics/f3ae3f46-68d6-
10 4eee-a65e-1775d45e2133/.  Mr. Lott also wrote a first-person narrative claiming to be
11 Dartmouth student and stalking victim Taylor Woolrich, criticizing Dartmouth for not
12 letting her carry a gun for self-defense.  Evan Defilippis, et al., *supra*.

13 In short, Mr. Lott's work is highly suspect.  Experts have widely critiqued his
14 methodology, pointing out coding errors, biases, and bizarre definitions and
15 assumptions.  He has published his research without peer-review and has been unable
16 to produce his source data.  Finally, he is notorious for deceptive tactics such as
17 posting under false identities.  This Court should give no weight to Mr. Lott's
18 declaration.

19 Even if the Court credited some of Mr. Lott's assertions, his arguments suggest
20 at best that the effectiveness of assault weapons restrictions is subject to debate among
21 experts.  Disagreements among academics do not render California's law
22 unconstitutional: courts "do not demand of legislatures 'scientifically certain criteria of
23 legislation.'"  *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 60 (1973) (internal citation
24 omitted).  When a state regulates "in areas fraught with medical and scientific
25 uncertainties, legislative options must be especially broad."  *Marshall v. United States*,
26 414 U.S. 417, 427 (1974); *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997) (where
27 psychiatric professionals joined conflicting amicus briefs, their disagreements "do not
28 tie the State's hands" in its policy choices).  The conclusions of Plaintiffs' experts,

including Mr. Lott, do not undermine the AWCA's constitutionality in light of a record showing that California drew "reasonable inferences" from the wide body of research and expertise it considered.  *Mahoney v. Sessions*, 871 F.3d 873, 883 (9th Cir. 2017).

## III.  CONCLUSION

For all the reasons stated above, we urge this Court to deny Plaintiffs' motion for a preliminary injunction.


Dated:  January 24, 2019                    Respectfully Submitted,


                                            GIFFORDS LAW CENTER TO PREVENT
                                            GUN VIOLENCE


                                            By:  /s/ Hannah Shearer
                                                    Hannah Shearer

                                            Hannah Shearer (SBN 292710)
                                            Giffords Law Center to Prevent
                                              Gun Violence
                                            268 Bush Street No. 555
                                            San Francisco, CA 94104
                                            Telephone:  415.433.2062
                                            Facsimile:   415.433.3357
                                            hshearer@giffords.org

                                            Counsel for *Amicus Curiae* Giffords Law
                                              Center to Prevent Gun Violence

Gibson, Dunn &
Crutcher LLP

GIFFORDS LAW CENTER *AMICUS CURIAE* BRIEF
CASE NO. 3:19-cv-1537-BEN-JLB          25