John W. Dillon (SBN 296788)
  jdillon@gandb.com
**GATZKE DILLON & BALLANCE LLP**
2762 Gateway Road
Carlsbad, California 92009
Phone: (760) 431-9501
Fax: (760) 431-9512

George M. Lee (SBN 172982)
  gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>         Plaintiffs,<br><br>   vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>         Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    February 6, 2020<br>Time:    2:00 p.m.<br>Courtroom 5A<br>Judge:   Hon. Roger T. Benitez |

# TOPICAL INDEX

**Page**

I. PLAINTIFFS SATISFY THE SECOND AMENDMENT'S REQUIRED TEST ...................................................................... 1

    A. The AWCA Bans Firearms In Common Use For Lawful Purposes ........................................................... 1

    B. The Firearms In Question Are Not Dangerous And Unusual ................................................................... 3

    C. The AWCA Has No Historical Pedigree ................................................... 5

    D. Under the Supreme Court's Heller Test, the AWCA Fails Constitutional Muster .................................................. 6

II. PLAINTIFFS ALSO SATISFY THE NINTH CIRCUIT'S TWO-PART TEST ...................................................................... 6

III. DEFENDANTS' ATTEMPTS TO RELITIGATE DUNCAN FAIL ................................................................................... 8

IV. PLAINTIFFS SEEK AN APPROPRIATE INJUNCTION ........................................................................................... 8

V. PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM ................................................................................... 9

VI. PLAINTIFFS SEEK A PROHIBITORY INJUNCTION; NEVERTHELESS, PLAINTIFFS MEET THE HEIGHTENED STANDARD OF A MANDATORY INJUNCTION ..................................... 10

VII. CONCLUSION ..................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Freedom Def. Initiative v. King Cty.*
796 F.3d 1165 (9th Cir. 2015) ................................................................................. 10

*Anderson v. United States*
612 F.2d 1112 (9th Cir. 1979) ................................................................................. 10

*Andrews v. State*
50 Tenn. 165 (1871) ................................................................................................... 8

*Arizona Dream Act Coalition v. Brewer*
757 F.3d 1053 (9th Cir. 2014) ................................................................................. 10

*Associated Press v. Otter*
682 F.3d 821 (9th Cir. 2012) ..................................................................................... 9

*Caetano v. Massachusetts*
136 S.Ct. 1027 (2016) ............................................................................................ 3, 6

*Clune v Publisher's Ass'n of N.Y.C.*
214 F. Supp. 520 (S.D.N.Y. 1963) .......................................................................... 10

*District of Columbia v. Heller*
554 U.S. 570 (2008) ............................................................................................... 6, 7

*Duncan v. Becerra*
265 F. Supp. 3d 1106 (2017) ................................................................................ 9, 11

*Duncan v. Becerra*
366 F. Supp. 3d 1131 (S.D. Cal. 2019) ....................................................... 3, 4, 5, 6, 8

*Elrod v. Burns*
427 U.S. 347 (1976) ..................................................................................................... 9

*Grace v. D.C.*
187 F. Supp. 3d 124 (D.D.C. 2016) ........................................................................... 9

*Legal Aid Soc. of Hawaii v. Legal Services Corp.*
961 F. Supp. 1402, 1408 (D. Haw. 1997) ................................................................. 10

*McDonald v. City of Chicago*
561 U.S. 742 (2010) .................................................................................................... 7

*Moore v. Madigan*
702 F.3d 933, 939 (7th Cir. 2012) .............................................................................. 3

*New York State Rifle & Pistol Ass'n v. Cuomo*
804 F.3d 242 (2015).................................................................................................1

*United States v. Miller*
307 U.S. 174 (1939).................................................................................................6

**Statutes**

**Pen. Code**

§ 30515(a) ................................................................................................................5

**Other Authorities**

2 Collected Works of James Wilson 1142
n. x (K. Hall & M. Hall eds.2007) ...........................................................................9

Ammoland Shooting Sports News
*New Industry Statistics Underscore Popularity of "America's Rifle"* .......................1

David B. Kopel
*The History of Firearm Magazines and Magazine Prohibitions*
78 Alb. L. Rev. 849 (2015) .......................................................................................5

NJ.com
*N.J. gun association calls Berlin woman's death an 'absolute outrage'*
June 5, 2015 .............................................................................................................9

iii

## I. PLAINTIFFS SATISFY THE SECOND AMENDMENT'S REQUIRED TEST

### A. The AWCA Bans Firearms In Common Use For Lawful Purposes

Defendants fail to refute the clear evidence proving that the banned firearms are common. Indeed, AR-style semiautomatic rifles are so ubiquitous in the United States that they have earned the nickname "America's Rifle." *See* Ammoland Shooting Sports News, *New Industry Statistics Underscore Popularity of "America's Rifle" - 16,069,000!?*, pub. Sept. 25, 2018, http://bit.ly/3aRGG1N (citing NSSF statistics used in Curcuruto Decl., ¶15). Plaintiffs have submitted overwhelming evidence that demonstrates the immense commonality of semiautomatic rifles with common characteristics—pejoratively classified by Defendants as "assault weapons"— throughout the country. *See* Pls. Motion p. 13-14; Curcuruto Dec., ¶¶7-14, **Exs. 1-7**; Moscary Dec., ¶¶25-48, **Exs. 4-11**; Kapelsohn Dec. ¶¶17-18. While Plaintiffs' evidence focuses on rifles, the number of all semiautomatic firearms—rifles, pistols, and shotguns—is irrefutably higher. And the AWCA bans *all* semiautomatic firearms with common characteristics. Thus, Defendants' attempt to diminish the significance of the commonality of the banned rifles by focusing on the relatively less evidence regarding "assault shotguns" and "assault pistols" is misguided. *See* Mocsary Dec. ¶¶47-52 (the Supreme Court addresses arms bans at a higher level of generality).[1]

Defendants respond to Plaintiffs' evidence by merely denying it. Opp. at 12:11. Defendants provide no evidence to support their denial.[2] In fact, Defendants' evidence

---

[1] "The Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. "In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n v. Cuomo,* 804 F.3d 242, 257 n.73 (2015).

[2] *See* Defendants' evidence - Declaration of Blake Graham (claims that semiautomatic rifles, pistols, and shotguns defined as "assault weapons" are not common in his experience). Graham Dec. ¶¶ 16, 57, 62. However, his experience and anecdotes are limited to California, where a ban is in place. *See Duncan v. Becerra,* 265 F. Supp. 3d

1

demonstrates how common the banned arms are: "Military-style weapons today define the U.S. civilian gun market." Defendants' evidence - DX-9 at 244; *see also* DX-9 at 205, 211, 217, 218, 220, 222, 225, 227, 228, 229, 232 (assault pistols), 233, 236 (assault shotguns), 239, and 241; DX-20 at 388 ("semiautomatic weapons with large-capacity magazines and/or other military-style features are common among models produced in the contemporary gun market"); DX-1 at 9 ("California Complaint assault weapons" "have been permitted to flood into this state").

Defendants rely on Professor Donohue's declaration to claim that the supposed prevalence of permitted rimfire firearms (i.e., firearms chambered in .22 LR) undermine the prevalence and popularity of the firearms California bans. Donohue Dec., ¶141. To the contrary, comprehensive studies supporting Mr. Curcuruto's declaration show that rimfire weapons constitute only a small fraction of the overall numbers of modern sporting rifles involved. Curcuruto Dec., ¶9, **Ex. 4** at p. 34. Professor Donohue's suggestion that the study of "modern sporting rifles" *may* include weapons not restricted by California's AWCA is false. The term "modern sporting rifle," as used by Mr. Curcuruto and the NSSF reports, means "firearms comprised primarily of semiautomatic rifles built on the AR- and AK-platforms." Curcuruto Dec., ¶7 and **Ex. 4** at p. 15. And as the Defendants' own declarant admits, "[f]or semiautomatic rifles that qualify as assault weapons, the most common feature of prohibited assault weapons is likely the pistol grip. The next most common features are probably telescoping stocks and flash suppressors." Graham Dec., ¶16. Some semiautomatic rifles are lawful in all 50 states, and any semiautomatic rifle is lawful in 44 states. 41 states treat *all* semiautomatic firearms like other legal firearms. Mocsary Dec. ¶44.

Thus, compared to the "[h]undreds of thousands of Tasers and stun guns"

---

1106, 1118 ("To the extent [the firearms] may be now uncommon within California, it would only be the result of the State long criminalizing the buying, selling, importing, and manufacturing of these [firearms] . . . It cannot be used as constitutional support for further banning.").

lawfully possessed in 45 states that Justice Alito deemed common in *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1032 (2016), there are *millions* of semiautomatic firearms with the banned characteristics that are commonly owned in 44 other states. Defendants' do not refute or address this jurisdictional analysis, which this Court previously applied. *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1145 (S.D. Cal. 2019). Any ban on such firearms is unconstitutional under any standard of scrutiny.

### B. The Firearms In Question Are Not Dangerous *And* Unusual

Defendants primary argument is that the "lethality" of the banned arms justify their prohibition. But *lethality* is not the appropriate test. "[T]he Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts." Otherwise, "*Heller* would have been decided the other way." *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (citing *Heller*, 554 U.S. at 636). Indeed, the very point of protecting "arms" is precisely because they are effective at projecting lethal force should the need arise.

Defendants fail to demonstrate that these common characteristics are both dangerous *and* unusual. It "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 136 S.Ct. at 1031 (emphasis original). Thus, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id*. (citing *Heller*, 554 U.S. at 627). See *Duncan*, 366 F. Supp. 3d at 1146-47. Plaintiffs have established the ubiquity of common semiautomatic arms with common characteristics across the country, and thus the arms are not both dangerous *and* unusual.

Moreover, Defendants' subjective standard of "necessary" lethality utterly destroys the Second Amendment. The very point of a constitutional right is that it is not the right-holder's job to justify its exercise but the state's burden to justify its restriction. Nobody asks how much speech beyond a soapbox in the park is "necessary" for a politician, advocate, or ordinary person to make their argument to the public. The very inquiry is offensive to the First Amendment. Similarly, the argument

that a ban is justified because the hardware in question are "more lethal" than other firearms would ultimately justify a government prohibiting anything beyond single-shot muskets. Every advancement in firearms technology has increased some factor(s) of a firearm's utility and efficiency – capacity, accuracy, durability, control, speed of reloading, reliability, etc. – from that of a musket.[3] *See Duncan*, 366 F. Supp. 3d at 1146-1147. But technological advancements do not justify a ban. People have a right to use advancements to their lawful advantage; such advantages mean that law-abiding people can better control and accurately fire their firearms. Nor is the criminal misuse of firearms sufficient grounds for banning them. *See* Pls. Motion p. 23-24.

More, Defendants fail to offer anything but speculation that any of the characteristics are so dangerous that they can be prohibited. The bulk of Defendants' arguments center around the issue of magazine capacity, which has already been decided by this Court. See Allen Dec. ¶¶9-38; Klaveras Dec.; Donohue Dec. No ballistic difference exists between two otherwise-similar firearms—one with banned characteristics and one without—or the nature of the injury caused. Dec. of Robert A. Margulies, M.D., ¶ 14.

Defendants' claims of the effectiveness of "assault weapon" bans are overstated. And claims that it would have had an effect if permitted to continue are speculative. Also, Professor Klaveras' claim that mass shootings pose a grave threat to the United States is exaggerated (citing 103 "gun massacres" in the last 40 years claiming 1,007 lives). Although tragic, this amounts to roughly 25 deaths per year on average, assuming his data. His and others' claim that mass shooters obtain their guns legally is based on Mother Jones "data", which provides no description of its sources or how data was collected. Further, the data is fatally flawed as it counts firearms that were

---

[3] For example, the Colt Single Action Army revolver exponentially improved accuracy, reliability, capacity, and the speed of reloading of its predecessors. Similarly, the Glock 17 handgun revolutionized pistols when compared to standard revolvers pistols. *See* Hlebinsky Dec. for other firearm advancements.

1  stolen from the original legal purchaser as "legally acquired." The irony, of course, is
2  that this argument flies in the face of the supposedly longstanding pedigree of
3  California's own evolving ban on various disfavored firearms, which apparently has
4  had no effect. Furthermore, even the current expanded ban does not reduce the
5  *availability* of the features deemed offensive – it only forbids certain combinations of
6  such features in a single firearm. A criminal seeking to do harm will not be prevented
7  from such illegal reconfiguration in the slightest and this particular law will do nothing
8  to stem such unlawful acts – it will only pose a trap for the unwary law-abiding citizen.
9  At bottom, Defendants cannot use the qualities that make arms worth constitutional
10 protection as the reasons for denying that same protection.

### C. The AWCA Has No Historical Pedigree

In a failed attempt to justify the AWCA and other *recent bans* on common semiautomatic firearms with common characteristics, Defendants refer to early 1920s and 1930s machine gun restrictions (which were repealed) and relabel them "firing capacity restrictions." Opp. at 16:19 – 17:3. These very same restrictions were offered and rejected as "longstanding" regulations in *Duncan*. This Court provided a detailed analysis of the scope and application of such restrictions. *See Duncan*, 366 F. Supp. 3d at 1150-1153. They provide no historical support for the AWCA. The simple fact is, 41 states treat all semiautomatic firearms the same as every other legal firearm (Mocsary Dec., ¶44), and have *never* placed prohibitions or additional restrictions based on characteristics, *from the Founding Era to the present date*.

Plaintiffs set forth a comprehensive case that the specific firearm characteristics prohibited by Pen. Code § 30515(a) have been in existence throughout history. Ashley Hlebinsky Dec., ¶¶10-28, **Exs. 11-35**.[4] Thus, Plaintiffs have demonstrated that none of these characteristics that the AWCA purports to prohibit are particularly new or

---

[4] See also David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015).

"cutting edge technology." Indeed, as to the specific types of firearms that are most directly at issue, e.g., AR- or AK-pattern firearms, Ms. Hlebinsky proves the now-prohibited characteristics used on these types of firearms were designed and in use prior to the 1950s. Hlebinsky Decl., ¶28. And, as Defendants concede, the AWCA's characteristic-based prohibitions have been in existence, in some form, for only twenty years. Opp. at 30:15-16. In relative terms, that time frame hardly qualifies as a long-standing or historical prohibition on specific firearms. Indeed, in *Heller*, the Court struck down a ban on the possession and use of handguns that had been in effect in the District of Columbia for over thirty years. 554 U.S. 570.

### D. Under the Supreme Court's *Heller* Test, the AWCA Fails Constitutional Muster

Under *Heller*, laws that prohibit law-abiding people from keeping and bearing arms "in common use" "for lawful purposes like self-defense" are categorically invalid. 554 U.S. at 624-625 ("the sorts of weapons protected were those 'in common use at the time'" (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Under the Supreme Court's precedents, such laws do not receive heightened scrutiny analysis; they are declared unconstitutional and enjoined, full stop. Put simply, "the pertinent Second Amendment inquiry is whether [the arms in question] are commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano,* 136 S.Ct. at 1032 (Alito, J., concurring) (emphasis omitted). Indeed, "[i]t is a test that anyone can understand. . . . It is a hardware test. Is the firearm hardware commonly owned? Is the hardware commonly owned by law-abiding citizens? Is the hardware owned by those citizens for lawful purposes? If the answers are 'yes,' the test is over. The hardware is protected." *Duncan,* 366 F. Supp. 3d at 1142.

### III. PLAINTIFFS ALSO SATISFY THE NINTH CIRCUIT'S TWO-PART TEST

For many of the same reasons the ban violates the Supreme Court's common use test, the ban also fails the Ninth Circuit's two-part test under *any* standard of

heightened scrutiny.[5] *See* Pls. Motion, p. 18-27.

But Defendants offer additional justifications that must be refuted. Defendants argue that even if the banned arms are commonly owned for self-defense, they "are not commonly *used* for self-defense." Opp. at 12. The right cannot depend on how regularly arms are *used* in self-defense. The perverse result would be that the safer the country became, the fewer rights the people would have, because fewer arms would be used in self-defense. Thus, *Heller* did not attempt to quantify defensive handgun incidents; what mattered instead was that handguns were often the *chosen* arms kept for self-defense. Unfired firearms are protected by the Second Amendment just as unread books are protected by the First Amendment. What matters is that millions of Americans keep the banned firearms for the purpose of self-defense.

Defendants also argue that the banned arms "are not well-suited for" self-defense. Opp. at 12. The relevant inquiry is whether the arms are commonly *selected* for that purpose. As Justice Stevens explained, "[t]he Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald v. City of Chicago*, 561 U.S. 742, 890, n.33 (Stevens J., dissenting) (emphasis in original). The *McDonald* plurality provided the same reason for striking the ban in *Heller*: "this right applies to handguns because they are the most preferred firearm in the nation to 'keep' and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767–68 (quotations, citations, and brackets omitted). Because handguns are "preferred," they "must be permitted." The same is true for the banned firearms here.

Defendants contend the ban is "not substantial" because "self-defense is not the reason why most 'modern sporting rifles' are acquired." Opp. at 18. While untrue –

---

[5] Plaintiffs maintain their position that tiered scrutiny is inapplicable to laws held categorically unconstitutional in *Heller*. *See* Pls. Motion, p. 18, fn. 11.

7

and certainly arms can be acquired for multiple purposes – the Second Amendment protects all lawful purposes. *See Heller*, 554 U.S. at 625 (the right protects weapons "typically possessed by law-abiding citizens for lawful purposes."); *Id.* at 624 (militiamen brought arms "in common use at the time for lawful purposes *like* self-defense." (emphasis added); *Id.* at 614 (approvingly quoting that "the right to keep arms involves, necessarily, the right to use such arms for *all the ordinary purposes*.") (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871) (emphasis added)); *Id.* at 599 ("most [Americans in the founding era] undoubtedly thought [the right] even more important for self-defense and hunting" than militia service).

## IV. DEFENDANTS' ATTEMPTS TO RELITIGATE *DUNCAN* FAIL

The bulk of Defendants' opposition and declarations are dedicated to relitigating the magazine capacity issue addressed by this Court in *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019). Attempting to justify their nomenclature of "assault weapons," Defendants describe the AWCA ban as "firing capacity" restrictions. Opp. at 16, 17 n.14; Allen Dec. ¶¶9-24. Elsewhere, Defendants conflates the "assault weapon" issue with the "large-capacity" magazine issue, such that they are inseparable. See Opp. at 27; Allen Dec., ¶¶25-37; Colwell Dec. ¶11; Donohue Dec. ¶115. Defendants' arguments fail here as they did before, when they were considered and appropriately rejected by this Court. See Pls. Motion, p. 23-24.

## V. PLAINTIFFS SEEK AN APPROPRIATE INJUNCTION

In complaining about the supposed overbreadth of the requested injunction against the wildly overbroad restrictions imposed by AWCA, Defendants flip the appropriate constitutional review on its head. The AWCA's many interrelated provisions all turn on a broad and constitutionally defective definition of so-called assault weapons based on features implicating no legitimate state interest. Plaintiffs seek to enjoin the application of the various provisions of the AWCA to the extent they rely upon such a defective definition – a remedy precisely as broad as the problem posed by the statutes in question. Indeed, plaintiffs could have sought more given that

a statute that is substantially overbroad in many applications should be struck down even if it has some permissible applications. It is for the legislature, not the courts, to undertake appropriate narrow tailoring in the first instance. Plaintiffs' motion is proper.

### VI. PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM

The Ninth Circuit has held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is all the more true for the loss of Second Amendment freedoms, which protect "the natural right of defense of one's person or house," or as Justice Wilson called it, the law of "self preservation." *Heller*, 554 U.S. at 585 (quoting 2 Collected Works of James Wilson 1142, and n. x (K. Hall & M. Hall eds.2007)). When dealing in matters of life and death, the potential injury epitomizes "irreparable." And waiting for government action has tragically proven fatal in the past. *See, e.g.*, Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.COM, June 5, 2015 (http://bit.ly/2RIrCfm) (victim fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting over a month for a handgun application).

Moreover, "[t]he right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1135 (S.D. Cal. 2017), *aff'd,* 742 F. App'x 218 (9th Cir. 2018) (quoting *Grace v. D.C.*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). "Loss of that peace of mind . . . and the enjoyment of Second Amendment rights constitutes irreparable injury." *Id.*

Defendants complain that Plaintiffs waited too long to file the case. Even if true, Plaintiffs face irreparable harm today. Plaintiffs have the right to select their preferred constitutionally protected arms for the defense of their lives, and the deprivation of that right—for even minimal periods of time—constitutes irreparable injury.

### VII. PLAINTIFFS SEEK A PROHIBITORY INJUNCTION; NEVERTHELESS, PLAINTIFFS MEET THE HEIGHTENED STANDARD OF A MANDATORY INJUNCTION

Finally, Defendants attempt to make a distinction between the prohibitory preliminary injunction issued in *Duncan* and the preliminary injunction sought here. Plaintiffs here seek a prohibitory injunction. "A mandatory injunction commands performance of certain acts whereas a prohibitory injunction prohibits the performance of certain acts." *Legal Aid Soc. of Hawaii v. Legal Services Corp.*, 961 F. Supp. 1402, 1408 (D. Haw. 1997) (citing *Anderson v. United States*, 612 F.2d 1112, 1114–15 (9th Cir. 1979)). See also *Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165, 1173 (9th Cir. 2015) (holding "an order requiring Metro to publish an ad previously unpublished" is a "mandatory injunction"). Plaintiffs do not ask this Court to mandate and compel Defendants to take any action. To the contrary, Plaintiffs seek an injunction to *stop* Defendants from enforcing the State's overbroad, unconstitutional statutes and regulations. *See*, *e.g.*, *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), in which the Ninth Circuit held that the requested injunction was prohibitory, and not mandatory, because it would not have ordered defendants to issue drivers' licenses to DACA plaintiffs, even if enjoining the state's newly enacted policies would have achieved the same result. 757 F.3d at 1061. However, even if Plaintiffs had requested equitable relief in the form of a mandatory injunction, it would be appropriate in this case, where the constitutional injuries alleged are not "capable of compensation in damages." *Anderson*, 612 F.2d at 1115 (quoting *Clune v Publisher's Ass'n of N.Y.C.*, 214 F. Supp. 520, 531 (S.D.N.Y. 1963)).

### VII. CONCLUSION

Plaintiffs respectfully request that this Court grant their motion.

January 30, 2020                              **GATZKE DILLON & BALLANCE LLP**

                                                       */s/ John W. Dillon*
                                                      John W. Dillon
                                                      Attorneys for Plaintiffs