John W. Dillon (SBN 296788)
   jdillon@gandb.com
**GATZKE DILLON & BALLANCE LLP**
2762 Gateway Road
Carlsbad, California 92009
Phone: (760) 431-9501
Fax: (760) 431-9512

George M. Lee (SBN 172982)
   gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>   Plaintiffs,<br><br>   vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>   Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**DECLARATION OF ROBERT A. MARGULIES, M.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   February 6, 2020<br>Time:   2:00 p.m.<br>Courtroom 5A<br>Judge:  Hon. Roger T. Benitez |

//
//
//

# DECLARATION OF ROBERT A. MARGULIES, M.D.

I, Robert A. Margulies, declare as follows:

1. I am an adult resident of the State of Washington. I have personal knowledge of the facts stated herein, and if called as a witness could competently testify thereto.

2. This declaration is executed in support of the Plaintiffs' motion for preliminary injunction. Specifically, the opinions offered in this declaration are to respond to the Declaration of Christopher B. Colwell, M.D. offered in support of the defendants' opposition to the motion.

3. I have been a practicing emergency medicine physician for over 50 years, including 24 years of active duty in the military which included both front line combat and command experience. I retired from the U.S. Navy at the rank of Captain. During my time in the military, I received training and in all aspects of emergency and combat medicine, combat treatment of casualties in austere environments, and worked with all branches of the military. I also served as a civilian police officer during medical school, and subsequently served as a police and fire surgeon in several states.

4. Throughout my fifty-year medical career, I have treated gunshot wounds from various firearms, including rifles, starting as a medical student, and continuing next through the treatment of combat casualties in the field during the Vietnam War. During that conflict, I treated in excess of 40 gunshot wounds, mostly rifle wounds from Soviet/Chinese AK variants shooting the 7.62 x 39 mm cartridge. These rounds were larger and generally more powerful than the 5.56 x 45 mm cartridge that our forces were (and still) are using. During this time, I was also able to treat Vietnamese casualties who had been shot by U.S. forces, using the 5.56 cartridge. Most of these casualties were reported to have occurred at intermediate ranges (less than 150 yards). Deaths were generally torso hits, but I

did not see extremities "blown off" by either round.

5. After Vietnam, I was Chairman of Operational and Emergency Medicine at the Uniformed Services University of the Health Sciences (USUHS) teaching medical students the treatment of gunshot wounds using controlled animal experiments, mostly using the 5.56 x 45 mm round to hind quarters. During this training, students were required to intubate and treat the animal's wound for 24 continuous hours prior to chemical euthanasia. We rarely had an animal fail to make 24 hours and deaths were generally due to errors.

6. Throughout my military and post-military career, as an emergency room physician, I have treated a variety of gunshot wounds from all types of firearms, mostly handguns and rifles, including wounds suffered from hunting-rifle related accidents.

7. I am also trained in firearms, and am a certified NRA instructor in many firearms disciplines. In the state of Washington, I am a commissioned and sworn reserve peace officer and am a certified Police Firearms Instructor (certified by the Criminal Justice Training Commission, for the State of Washington).

8. I semi-retired from full-time emergency medicine in 2010, but maintain an active license, and have continued to practice part time in emergency medicine and urgent care. I also continue to teach firearms and field trauma and medical management to police officers and civilians. I have continued to consult in firearms, explosives and medical-legally in personal injury cases.

9. A true and correct copy of my current curriculum vitae is attached as **Exhibit 1** to this declaration.

10. The declaration of Christopher B. Colwell, M.D., offered in support of the defense, is almost all anecdotal in nature, and does not provide any empirical evidence regarding the supposed "lethality" of assault weapons as opposed to other firearms that use the same caliber. For every anecdote that Dr. Colwell offers

– 3 –
DECL. OF ROBT. MARGULIES, MD IN SUPPORT OF MOTION FOR PRELIM. INJUNCTION | CASE NO. 3:19-cv-01537-BEN-JLB

regarding the supposed power of rounds that "assault weapons" use, I could be able to tell you about wounds I treated from more powerful "traditional" rifle rounds such as the .308 Winchester round, a common hunting round with more weight than the .223/5.56 round commonly used in AR-platform rifles, or even the 7.62 x. 39 mm round commonly used in AK-platform rifles.

11. As one of the experts in the field of wound ballistics, Dr. Vincent J.M. Di Maio stated in his influential book *Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques*, stated:

> One of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895).

(Di Maio, *Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques*, 2nd ed. 1999, digital ed. at p. 211; Margulies Ex. 2-005). Dr. Di Maio continues:

> In dealing with rifles, the severity of the wound is determined to a great degree by the amount of kinetic energy lost by a bullet in the body. The intermediate cartridges used in assault rifles possess significantly less kinetic energy than traditional military cartridges as well as rifle cartridges designed for hunting. Therefore, it is impossible for a intermediate-power rifle cartridge to produce severer injuries than a full-power rifle cartridge, all other factors being equal.

(Id.) True and correct excerpts from Dr. Di Maio's book are attached here as **Exhibit 2** to this declaration.

12. From my own experience in treating gunshot wounds, from Vietnam to the present, and in my training and experience with firearms, including rifles, I completely concur with these opinions expressed by Dr. Di Maio.

13. Another thing that Dr. Di Maio addresses in his book is that "[m]ost

centerfire rifle cartridges will defeat [police body] armor. Soft body armor used by police is intended to protect them from handgun bullets not rifle bullets." (Di Maio at p. 317; Margulies Ex. 2-007). His opinion was made in the context of the "mythology" surrounding "'armor-piercing' handgun ammunition in relationship to 'bullet proof' vests." I agree with this opinion. In my training and experience, and experience with the performance of rifle rounds of all variations, and contrary to the suggestions of the defense in this case (Opposition Memorandum at 23:15-16; Blake Graham Decl., ¶¶ 22-23, 41), virtually <u>any</u> rifle round will penetrate most forms of police body armor unless the armor is specifically rated to withstand it. However, most police body armor used is <u>not</u> rated to stop rifle rounds, and especially heavier rifle rounds such as the .308 Winchester (7.62 x 51 mm) round. Therefore, any suggestion that "assault weapons," which typically use the intermediate cartridges such as the .223/5.56 or the 7.62 x 39 mm rounds, have some special ability to penetrate police body armor – as opposed to any other rifle round – would be misleading.

14. The biggest flaw with Dr. Colwell's declaration is that he does not explain why the supposedly extreme wounds generated from an intermediate cartridge, such as the .223/5.56 round fired from a California-defined "assault weapon" bearing the features or characteristics set forth in California Penal Code § 30515(a) would present a greater wound profile than a wound suffered from the same round fired from a non-assault weapon, using the same barrel length. See for example, the declaration of Blake Graham, offered in support of the defense, at paragraph 45, in which he describes a Sturm Ruger Mini-14 ranch rifle that have none of the features that supposedly make it an "assault weapon." Dr. Colwell does not explain why or how the wounds generated from so-called assault weapons using the same round, and the same barrel length, are or would be qualitatively different from the wounds that would be generated from a "featureless" Mini-14

1 | firing the same .223 round.

2 |     15.    To the extent that Dr. Colwell appears to be arguing that magazine
3 | capacity makes a difference, it is my understanding that this Court has already
4 | dealt with this issue.

5 |     I declare under penalty of perjury that the foregoing is true and correct.
6 | Executed on January 28, 2020.

*[Signature: Robert A. Margulies]*
Robert A. Margulies, M.D.

# EXHIBIT "1"

<u>**Margulies Exhibit 1**</u>

**Robert A. Margulies, M.D., MPH**
Captain (MC), USN (ret.)
PO Box 839
Richland, WA 99352
(509) 392-8577; ramargdr@i-e-c.org

**Honors:**

ACEP: Longest Continuous Active Career in Emergency Medicine (2014) American College of Emergency Physicians: Hero of Emergency Medicine (2008)  Life Fellow of the American College of Emergency Physicians (FACEP)

Life Fellow of the American College of Forensic Examiners (FACFE)

Fellow of the American College of Preventive Medicine (FACPM)

**Medical Experience:**

2010 – Present: Lourdes Urgent Care Center, Pasco, WA: Attending Physician
1994 – 2010: Kadlec Medical Center, Richland, WA: Director of Emergency Medicine (to 2001); Attending Emergency Physician (to 2010).
1992 -- 1994: Hartford Hospital, Hartford, CT: Senior Attending Physician in Emergency Medicine; Section Chief for Ground Ambulance.
1989 – 1992: St. Mary's Medical Center, Saginaw, MI: Emergency Medicine Attending Physician; Medical Director Flight Care.
1988 – 1989: Naval Hospital, Cherry Point, NC: Emergency & Military Medicine
1986 – 1988: Naval Hospital, Camp LeJeune, NC: Commanding Officer & Emergency Physician
1984 – 1986: Naval Hospital, Beaufort, SC: Executive Officer & Emergency Physician.
1981 – 1984: Uniformed Services University of the Health Sciences, Bethesda, MD Chairman, Operational & Emergency Medicine.
1978 – 1981: Naval Submarine Medical Research Laboratory, Groton, CT: Commanding Officer.

1976 – 1978: Naval Medical Research and Development Command, Bethesda, MD: Flight Surgeon/ Research Medical Officer.

1973 – 1975: USS Ranger (CVA 61) (Aircraft Carrier): Senior Medical Officer.
1973 – 1973: Commander Fleet Air Alameda, Alameda, CA: Flight Surgeon
1970 – 1972: USS Tecumseh (SSBN 628) (Submarine): Submarine Medical Officer.

**Education:**

1

Master of Public Health (MPH); Johns Hopkins University, Baltimore, MD (1978)
Medical Degree (MD); New Jersey College of Medicine & Dentistry, Newark, NJ (1969)
Bachelor of Arts (BA) (Honors); Rutgers University, Newark, NJ (1965)
Associate of Arts (AA) (Honors); Union College, Cranford, NJ (1963)

**Academic Positions:**

1992 – 1994: Assistant Clinical Professor, Dept. of Surgery. University of Connecticut, School of Medicine, Farmington, CT.

1992 – 1993: Assistant Clinical Professor, Dept. of Medicine, Michigan State University, College of Human Medicine, Lansing, MI.

1981 – 1989: Chairman, Department of Operational and Emergency Medicine; Assistant Professor Military Medicine; Preventive Medicine and Biometrics. Uniformed Services University of the Health Sciences, Bethesda, MD.

1985 – 1989: Clinical Associate Professor of Preventive Medicine and Community Health, University of South Carolina at Columbia.

1978 – 1985: Visiting Instructor in Preventive Medicine, Yale University, Department of Preventive Medicine.

**Editorial Boards:**

1983 – 1987: Journal of Emergency Medicine
1977 – 1992: Aviation Space and Environmental Medicine 1984 – 1985: The Journal of Pre-Hospital Care

**Publications:**

Bush, C.A. & Margulies, R.A. (1990). Traumatic diaphragmatic hernia and intestinal obstruction due to penetrating abdominal trauma. *Southern Medical Journal.* 83 (11): 1347-1350.

Wright, D., Einhorn, T. & Margulies, R.A. (1989). Ensuring the safety of air transport. In MacDonald & Miller (Eds.), *Emergency Transport of the perinatal Patient*. Boston, MA. Little, Brown and Company.

Margulies, R.A., Arthur, D.C. & Burton, M.D. (1987). Acute Hypothermia: local cold injury and acute hypothermia. In Siegel, J.H. (Eds.) Trauma: Emergency Surgery and Critical Care. New York, NY. Churchill & Livingston.

Arthur, D.C. & Margulies, R.A. (1987). A short course in diving medicine. *Annals of Emergency Medicine*. 16: 687-701.

2

La Piana, M.D., Turcksa, R.A., Margulies, R.A., et al.; (1987). Ocular trauma modeling. *The Journal of Trauma.* 27(1): 75-78.

Margulies, R.A. & Cowan, M.L. (1984). A personal medical emergency kit. *Aviation Space and Environmental Medicine.* 55(4): 319-320.

Margulies, R.A. & Cowan, M.L. (1984). Emergency health care providers. *The Journal of Emergency Medicine.* 1(4): 353-354.

Arthur, D.C. & Margulies, R.A. (1982). The pathophysiology, presentation and triage of altitude-related decompression sickness associated with hypobaric chamber operation. *Aviation, Space and Environmental Medicine.* 53(5): 489-494.

Shea, DeBell, Bonke and Margulies. (1981). Drugs exposed to extreme cold: The military perspective. *Naval Submarine Medical Research Laboratory.* Report #963.

Arthur, Eckenhoff, Knight, & Margulies. (1982). Altitude related decompression sickness. *Naval Submarine Medical Research Laboratory.* Report #984.

Margulies, R.A. & Arthur, D.C. (1980). Aviation related decompression. *Sickness, Aviation, Space and Environmental Medicine.* 51(11):1271.

Margulies, R.A., Arthur, D.C. & Burton, M.D. (1987). Chapter: Acute Hypothermia: local cold injury and acute hypothermia. In Siegel, J.H. (Eds.) Trauma: Emergency Surgery and Critical Care. New York, NY. Churchill & Livingston.

**Abstracts/ Presentations**

Intermountain Alpine Club, Richland, Washington (April 2015).  *High Altitude Medicine and Survival.*

Intermountain Alpine Club, Richland, Washington (April 2014).  *High Altitude Medicine and Survival*

Rocky Mountain Elk Foundation, Oregon State Rendezvous (August 2013). *Wilderness Survival and First Aid*

Rattlesnake Mountain Shooting Facility ({several repeats} from 2011 – 2013).  *Trauma First Aid Course*

Rocky Mountain Elk Foundation, Washington State Rendezvous (August 2010). *Wilderness Survival and First Aid*

International Conference on Disaster Medicine: Orlando, FL, (Feb. 1994). *Environmental Injuries*

Emergency Medicine Life Threat Series: Hartford Hospital, Hartford, CT, (Sept.1993). *Acute Hypothermic and Local Cold Injuries Acute Inhalational Toxicology*

Internal Medicine Survival Series: Hartford Hospital, Hartford, CT, (Aug. 1993). *Pre-Hospital Emergency Dept. and Definitive Diagnosis and Treatment*

Hartford Hospital EMT Lecture Series: Hartford, CT (May, 1993). *Heat Injuries, Cold Injuries, Anaphylactic Shock*

Connecticut State EMS Meeting. Cromwell, CT. (March, 1993). *Self Care for the Emergency Medical Services and Other Public Safety Providers*

9th Annual EMS/ Trauma Symposium. Hartford, CT. (Oct. 1992). *Washington D.C., the 14th Street Bridge Disaster: What if you had been there?*

Michigan State EMS Expo. Kalamazoo, MI (May, 1992). *Flicker Vertigo and Seizure Self Care for the Pre-hospital and Public Safety Provider*

Emergency Medicine Grand Rounds, St. Mary's Medical Center. Saginaw, MI. (March 1991). *Hypothermia – Recognition and Treatment.*

Emergency Medicine Grand Rounds, St. Mary's Medical Center. Saginaw, MI. (April 1990). *Hypothermia – Recognition and Treatment.*

2nd Marine Division Medical Dept. CME Series. (July, 1987). *Heat Stress – Pathophysiology and Therapy*

2nd Annual Jackson Foundation Conference on Military Medicine. (Oct. 1986). *Current Concepts and Controversies in the Treatment of Hypothermia and Frostbite.*

International Society of Aquatic Medicine. St. Thomas, U.S. VI. (May 1984). *Hypothermia – Theory and Practice Submarine Medicine*

Maryland Institute of Emergency Medical Services. University of Maryland (Feb. 1984). *Management of Hypothermic Patients*

Johns Hopkins University Center for Occupational & Environmental Health (Oct. 1983). *Cold Weather Medicine: Occupational and Clinical Correlations*

District of Columbia Medical Society. (April 1983). *Hyperthermia: Clinical, Occupational and Recreational Aspects*

Medicine of Sport SCUBA Diving. Bonaire, N.A. (Feb. 1983). *Diving and Other Injuries in Remote Locations,* District of Columbia Medical Society. (Sept. 1982)

*Cold Weather Medicine: Epidemiology and Clinical Concepts.*

Walter Reed Army Institute of Research, Course in Tropical Medicine. (August 1982). *Hyperthermic Injuries, Clinical Perspectives*

CME Seminar, St. Joseph's Hospital, Lancaster, PA. (Feb. 1982). *Hypothermic Injuries*

Scientific Program of the Aerospace Medical Association. 1979. *Emergency Medicine and the Airline Passenger* (co-presented by Mohler, Nicogossian and Margulies)

Scientific Program of the Aerospace Medical Association. 1978. *Experimental Cardiopulmonary Resuscitation workshop: Inflight Technical Coordination.* (co-presented by Mohler, Nicogossian and Margulies)

Scientific Program of the Aerospace Medical Association. 1978. *Dysrhythmia and Antiarrhythmic Therapy.* (co-presented by Nicogossian, MacIntyre, Triebwasser and Margulies)

Scientific Program of the Aerospace Medical Association. 1978. *Airway Management and Ventilatory Adjuncts.* (co-presented by MacIntyre, Nicogossian and Margulies)

Scientific Program of the Aerospace Medical Association. 1978. *Basic Life Support – General Principles.* (co-presented by MacIntyre, Nicogossian and Margulies)

# EXHIBIT "2"

# Gunshot Wounds

## Practical Aspects of Firearms, Ballistics, and Forensic Techniques

### Second Edition

by
**Vincent J. M. Di Maio, M.D.**



**CRC Press**
Boca Raton    New York

©1999 CRC Press LLC

Margulies Ex. 2-001

**Library of Congress Cataloging-in-Publication Data**

Catalog record is available from the Library of Congress.

This book contains information obtained from authentic and highly regarded sources. Reprinted material is quoted with permission, and sources are indicated. A wide variety of references are listed. Reasonable efforts have been made to publish reliable data and information, but the author and the publisher cannot assume responsibility for the validity of all materials or for the consequences of their use.

Neither this book nor any part may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, microfilming, and recording, or by any information storage or retrieval system, without prior permission in writing from the publisher.

The consent of CRC Press LLC does not extend to copying for general distribution, for promotion, for creating new works, or for resale. Specific permission must be obtained in writing from CRC Press LLC for such copying.

Direct all inquiries to CRC Press LLC, 2000 Corporate Blvd., N.W., Boca Raton, Florida 33431.

**Trademark Notice:** Product or corporate names may be trademarks or registered trademarks, and are only used for identification and explanation, without intent to infringe.

© 1999 by CRC Press LLC

No claim to original U.S. Government works
International Standard Book Number 0-8493-8163-0
Printed in the United States of America  1  2  3  4  5  6  7  8  9  0
Printed on acid-free paper

**Margulies Ex. 2-002**

When full metal-jacketed 55 gr. 5.56-mm bullets break up in the body, the tip of the bullet tends to break off at the cannelure with the tip remaining relatively intact, while the lead core and the rest of the jacket shred (Figure 7.6 A–B). The triangular shape of the tip of the bullet often can be seen on x-ray.

The M-193 (55 gr.) version of the 5.56 × 45 mm cartridge has been replaced in U.S. military service with the M-885 cartridge. This is loaded with a 62-gr. bullet. The bullet has a compound steel/lead core with a small mild steel core in front of a larger lead core. Just like the 55-gr. bullet, the 62-gr. bullet begins to yaw widely shortly after entering the body. The bullet tends to break at the cannelure resulting in loss of lead core (a "lead snowstorm"); a relatively intact triangular tip and the residual copper jacketing (Figure 7.6 C–D).

## Centerfire Rifle Wounds

Wounds from centerfire rifles may be classified as contact, intermediate, or distant. Contact wounds of the head are the most devastating, producing a bursting rupture of the head (Figure 7.7). Large irregular tears in the scalp radiate from the entrance site. Powder soot and searing are typically present at the entrance. Rarely, virtually no soot will be present.

In some contact wounds of the head, the entrance may be difficult to locate because of the massive destruction. Large pieces of the skull and brain are typically blown away, with pulpification of the residual brain in the cranial cavity. Pieces of scalp may be sheared off. The skull shows extensive comminuted fractures. Such wounding effects are due partly to the large quantities of gas produced by combustion of the propellant, emerging from the muzzle under high pressure. This gas begins to expand as soon as it emerges from the muzzle of the weapon. If the gun is held in contact with the head, this gas follows the bullet into the cranial cavity, producing an effect that can only be described as explosive. That the massive wounds produced are due partly to the gas can be deduced from cases of suicides in which the weapon used was equipped with a flash suppressor. This device, attached to the muzzle of military rifles, breaks up the "ball of fire" produced on firing a rifle at night, making the soldiers firing these weapons less susceptible to enemy counterfire. The flash suppressor disperses the gas emerging from the barrel through a number of slits in the sides of the suppressor. If an individual shoots himself with a weapon equipped with a flash suppressor, such that the end of it is in contact with the head, the flash suppressor will divert much of the gas emerging from the barrel before it has an opportunity to enter the cranial cavity. Thus, the wound produced by a weapon with a flash suppressor will be less severe than a wound produced by the same weapon without a flash suppressor. In contact wounds, the gas diverted by the flash suppressor may produce a characteristic pattern of searing and soot deposition (see Figure 4.13).

**Margulies Ex. 2-003**

©1999 CRC Press LLC

around the hole in the shade, but on its exit side, i.e., the side facing the glass. Thus, the bullet perforated the shade and then the glass, at which time melted lead particles were sprayed backward from the bullet onto the shade. This phenomena was reproduced experimentally for lead bullets and bullets with an exposed lead tip but not for Silvertip® or copper jacketed bullets.

## Assault Rifles

The term "Assault Rifle" refers to an auto-loading rifle having a large capacity (20 rounds or more) detachable magazine, capable of full automatic fire and firing an intermediate rifle cartridge. This term has been corrupted by the media, politicians and the bureaucracy to include virtually all self-loading weapons that look "ugly" and/or "mean". Weapons that fire pistol ammunition, e.g., Intratec Tec-9's, Cobray M-11's, are not assault rifles by virtue of their firing pistol ammunition and that they were not designed for full-automatic fire. Nor are weapons that while firing an intermediate rifle cartridge have fixed magazines and were never intended for full automatic fire, e.g., the SKS-45. In the United States, civilian versions of true assault weapons, such as the AKS-47, MAK-90 and AR-15, that can only deliver semiautomatic fire, are widely available. Strictly speaking, these are also not assault rifles as they are designed for semi-automatic fire only. Conversion of these weapons to full-automatic fire capability is rare. Use of assault rifles in crimes is uncommon as they are not concealable.

The first true "Assault" ("Storm") rifle was the Sturmgewehr 44 (StG 44).[10,11] This rifle was developed as a result of the experience of the German Army in World War I. They wanted a short reliable rifle chambered for a mid-range (intermediate) cartridge. In 1938, the firm of Polte was given a contract to develop this cartridge while the firm of C.G. Haenel was awarded a contract for development of a weapon to fire it. The cartridge, the 7.9-mm Kurz Patrone (7.92 × 33 mm), completed development by late 1940–early 1941. The weapon, called a Maschinenkarabiner (machine carbine), completed initial development by 1940. The first prototype apparently appeared in late 1941. By July 1942, the first 50 test weapons were produced. In January 1941, Walther was also commissioned to develop a weapon. By July 1942, only two prototypes were developed. Mass production was to begin by Haenel in November 1942 and Walther in October. The Haenel weapon was designated the Maschinenkarabiner 42(H) and the Walther the Maschinenkarabiner 42(W). By February 1943, less than 2000 weapons of both types had been delivered. Also by this time, the Haenel design was selected over the Walther. Full-scale production of the Haenel weapon, now the MP 43, was begun in July 1943. The MP 43 was a simplified version of the MKb 42(H)

**Margulies Ex. 2-004**

©1999 CRC Press LLC

with a modified gas system and the internal hammer firing system used on the Walther design. These weapons were first used by German troops on the Russian front in the winter of 1943. By January 1944, the Army had received more than 19,000 MP 43's. The name MP 43 was changed to Sturmgewehr 44 in late 1944. Total production of all weapons is estimated at approximately 425,000.

As can best be determined, in 1939, Russia began development of an intermediate-power rifle cartridge, probably independent of the work in Germany. The new cartridge the 7.62 × 39 mm was developed by 1943. The first weapon to utilize this cartridge was the SKS-45, a traditional semi-automatic rifle and not an assault rifle. The rifle synonymous with this cartridge, and which was to symbolize assault rifles throughout the last half of the 20th century, the Avtomat Kalashnikova Obrazets (AK-47) was adopted in 1949. It was not until 1957, that the first AR-15 chambered for the 5.56 × 45 mm cartridge was to appear and it was not until 1963 that the first "one-time" order was placed for this weapon by the United States Army. In the early 1970s, the AK-47 was replaced in the Russian Army with the AK 74 chambered for the 5.45 × 39-mm cartridge. Table 7.2 compares the assault rifle cartridges.

One of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifles and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895).

In dealing with rifles, the severity of the wound is determined to a great degree by the amount of kinetic energy lost by a bullet in the body. The intermediate cartridges used in assault rifles possess significantly less kinetic energy than traditional military cartridges as well as rifle cartridges designed for hunting. Therefore, it is impossible for a intermediate-power rifle cartridge to produce severer injuries than a full-power rifle cartridge, all other factors being equal.

In the past few years, the author has had extensive experience with deaths due to the 7.62 × 39-mm cartridge loaded with full metal-jacketed bullets having either a mild steel core (standard Russian and Chinese military design) or a lead core. In a review of 50 cases involving this cartridge, the following observations were made:

1. All primary head wounds were perforating.
2. While entrance wounds of the head, and usually the exits, can easily be mistaken for wounds inflicted by handguns, internally, there are very severe injuries with multiple fractures of the skull and extensive lacerations of the brain. The severe nature of the internal injuries

**Margulies Ex. 2-005**

©1999 CRC Press LLC

## NYCLAD® Revolver Cartridges

This ammunition was originally manufactured by Smith & Wesson. When they stopped manufacturing ammunition, Federal purchased the exclusive manufacturing rights. These cartridges are loaded with nylon-coated lead bullets of roundnose, hollow-point and semi-wadcutter hollow-point. This black coating significantly reduces the amount of lead particles in the air of firing ranges. Rifling is impressed on the coating and not on the lead. If these bullets go through thick bone, the nylon jacketing may be shredded or stripped from the core, making bullet comparison difficult if not impossible.

## Frangible Bullets

Centerfire handgun ammunition, and to a lesser degree rifle ammunition, loaded with frangible bullets are now produced by all major ammunition manufacturers. The bullets are constructed of various materials depending on the manufacturer: copper powder compressed under high pressure; copper with a polymer binding agent; powdered tungsten, copper and a nylon matrix; twisted strands of zinc and powdered iron encased in an electroplated jacket. Kaplan et al. tested frangible ammunition composed of copper particulate material in calibers .38 Special, 9-mm Parabellum and .223 by firing them into the heads of pigs.[19] The wounds caused by the handgun bullets were comparable in severity to those caused by regular bullets. The frangible handgun bullets, when recovered, while demonstrating class characteristics, did not possess individual markings necessary for bullet-to-gun comparison. The .223 frangible bullets fragmented in the heads. The x-ray picture produced was similar to the "lead snowstorm" seen with hunting bullets but differed in that there was no evidence of any bullet jacketing and the fragments had a granular border.

## "Armor-Piercing" Handgun Ammunition: KTW and Its Legacy

In the 1960s, KTW ammunition, a form of "armor-piercing" handgun ammunition intended for police use, was introduced. It was subsequently banned in some localities because of its potential to perforate bullet-proof vests worn by police. The cartridge was loaded with a light-green Teflon-coated tungsten alloy or steel bullet with a copper half jacket on its base. This jacket, rather than the bullet proper, is gripped by the lands and grooves. Thus, rifling marks will be present only on this jacket and not on the bullet.

Margulies Ex. 2-006

If it is fired through a body, there is the potential for this jacket to separate from the rest of the bullet and be deposited in the body.[9] The author is unaware of any homicides committed with this ammunition. This ammunition has not been available for decades. Its value now is in its collectability.

Because of the KTW controversy, a whole mythology has arisen about "armor-piercing" handgun ammunition in relationship to "bullet proof" vests, i.e., soft body armor worn by police. A number of vapid public statements and proposed laws concerning ammunition allegedly of this type has emanated from government officials. The only handgun ammunition currently manufactured in the United States that will routinely defeat the soft body armor worn by police is in the possession of the military. To prevent its getting into civilian hands, the military has made an agreement with Federal law enforcement agencies not to issue this 9 mm ammunition to troops unless they are going into combat.

If one wishes to defeat the soft body armor worn by most police, there is no need to resort to the procurement of exotic handgun ammunition. Most centerfire rifle cartridges will defeat this armor. Soft body armor used by police is intended to protect them from handgun bullets not rifle bullets. These vests are composed of multiple layers of bullet-retardant material such as Kevlar®. The number of plies of this material in a vest determines the ability of the vest to stop a handgun bullet. Vests are rated as to their ability to stop bullets of various calibers. Thus, one vest may be rated as suffcient to stop bullets from .22 LR to .38 Special, while another vest may be capable of stopping bullets up to .357 Magnum. Consequently, a vest will stop a bullet only as long as it does not exceed the capability of the vest. While increasing the number of layers of material increases the ability of the vest to stop bullets of increasing lethality, it also has the effect of making the vest heavier and more bulky, thus making it uncomfortable for the individual. After a certain point, a vest may become so uncomfortable that it is no longer worn, defeating its purpose. Because of this, police agencies and individuals end up making a compromise between the degree of protection sought and what an individual will wear. Thus, to defeat soft body armor, one only has to use a caliber of weapon beyond the capability of the vest.

## Handgun Shot Cartridges

Handgun cartridges loaded with lead shot are available in various calibers, e.g., .22 Long Rifle, .38/.357. This ammunition, often called "birdshot" or "snakeshot," is used to kill small game — usually varmints — or snakes at close range. The rimfire versions of these cartridges have been discussed in Chapter 6. Blount (CCI) manufactures centerfire handgun shot cartridges in