1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable ROGER T. BENITEZ, District Court Judge

4
    JAMES MILLER, et al.,          )
5                                  )
                       Plaintiff,  )    CASE NO.
6     VS.                          ) 3:19-cv-1537-BEN-JLB
                                   )
7   XAVIER BECERRA, et al.,        )
                                   )
8                      Defendants. )
    ───────────────────────────────)
9                                   San Diego, California
                                    Monday, October 19, 2020
10
                 EVIDENTIARY HEARING – DAY 1
11

12  APPEARANCES:

13  For Plaintiffs:      DILLON LAW GROUP, APC
                         2647 Gateway Road, Suite 105
14                       Carlsbad, California  92009
                         BY: JOHN W. DILLON, ESQ.
15
    For Plaintiffs:      SEILER EPSTEIN LLP
16                       275 Battery Street, Suite 1600
                         San Francisco, California  94111
17                       BY: GEORGE M. LEE, ESQ.

18  For Plaintiffs:      SCHAERR JAFFE, LLP
                         1717 K Street, NW, Suite 900
19                       Washington, D.C.  20006
                         BY: ERIK S. JAFFE, ESQ.
20

21  For Defendants:      OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
                         300 South Spring Street, Suite 1702
22                       Los Angeles, California  90013
                         BY: JOHN D. ECHEVERRIA, ESQ.
23                           MARK BECKINGTON, ESQ.

24

25  Reported by:         Ellen L. Simone, RMR, CRR, CSR No. 14261
                         Official Court Reporter

1                        INDEX TO WITNESSES

2    FOR THE PLAINTIFFS:

3    EMANUEL KAPELSOHN   . . . . . . . . . . . . . . . 9

4    ASHLEY HLEBINSKY . . . . . . . . . . . . . . .50

5    JAMES CURCURUTO   . . . . . . . . . . . . . . .61

6    GEORGE MOCSARY . . . . . . . . . . . . . . . .72

7    GENERAL ALLEN YOUNGMAN . . . . . . . . . . . .77

8

9    FOR THE DEFENSE:

10   LOUIS KLAREVAS . . . . . . . . . . . . . . . 102

11   BLAKE GRAHAM . . . . . . . . . . . . . . . . 127

12   LUCY ALLEN . . . . . . . . . . . . . . . . . 150

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SAN DIEGO, CALIFORNIA; OCTOBER 19, 2020; 9:42 A.M.

 2                                -oOo-

 3         THE CLERK:  2 on calendar.  19-cv-1537.  Miller,

 4  et al. v. Becerra, et al.  Evidentiary hearing.

 5         THE COURT:  All right.  Counsel, please register your

 6  appearances for the record.

 7         MR. LEE:  Good morning, Your Honor.  George Lee

 8  appearing on behalf of plaintiffs.

 9         THE COURT:  I'm sorry.  I couldn't hear you.  Could

10  you speak into the microphone?

11         MR. LEE:  Good morning, Your Honor.  George Lee

12  appearing on behalf of the plaintiffs.

13         MR. JAFFE:  Good morning, Your Honor.  Erik Jaffe

14  appearing on behalf of plaintiffs.

15         MR. DILLON:  Good morning.  John Dillon appearing on

16  behalf of plaintiffs.

17         MR. ECHEVERRIA:  Good morning, Your Honor.  This is

18  John Echeverria, Deputy Attorney General, for the defense,

19  appearing by video.

20         THE COURT:  All right.  I scheduled this hearing this

21  morning because I have before me this case and a request to

22  issue a preliminary injunction.

23         I'm going to tell you that I'm going to reserve the

24  right to convert this to a Rule 65(a)(2) hearing if I feel that

25  I have sufficient evidence and information before me to do
```

1    that.

2           So I have an awful lot of material that has been

3    submitted to me in connection with this case.  I have reviewed

4    all of it, and I think I'm pretty familiar with the issues in

5    this case, as well as the information that has been provided to

6    me.  There's a lot of it.

7           (Audio trouble)

8           THE COURT:  Okay.  So anyway, as I was saying, I have

9    reviewed all of this information, and I'm pretty familiar with

10   all that has been filed and all the issues that have been

11   submitted.

12          So before we start, I want to say a couple things so

13   that hopefully we have some common ground to go from.

14          The first thing I want to point out, which I think is

15   pretty obvious, is that we all know that guns can be dangerous.

16   I think we all know that if guns are misused, they can kill and

17   they can severely injure people.

18          I think that there are people out there who love guns

19   and that, no matter what the gun control measure may be, that

20   it is unacceptable, in other words, that no amount of gun

21   control measures will be accepted.

22          Likewise, there are people out there for who no amount

23   of gun control -- and that includes, you know, some elected

24   officials -- that no amount of gun control laws will ever

25   suffice.

1          And we can all agree -- and I see Mr. Echeverria is on

2    video, and I hope that he will agree -- that the Bill of Rights

3    is not a list of suggestions and, in fact, it is the -- perhaps

4    the most important document that is the central fiber of our

5    orderly society.

6          I hope we can all agree that it is not my job to make

7    policy and to decide what the country or what the state should

8    do or not do.  That, in fact, it is my job to apply the law as

9    I see it to the facts and the circumstances of the case.

10          And finally, I hope we can all agree that the law, as

11    decided by the United States Supreme Court, is the supreme law

12    of the land, and that I must apply that law whether I like it

13    or not, whether you like it or not, or whether anyone else

14    likes it or not.

15          So with those premises, I hope -- if there's any

16    disagreement to anything I've just said, I would like to hear

17    it now, because I think those are some common, basic rules that

18    we should assume will control, not only how this hearing will

19    proceed forward, but how my decision will eventually be made.

20          Do I have any objections to anything that I have said?

21          MR. LEE:  No objections from plaintiffs, Your Honor.

22          THE COURT:  Mr. Echeverria?

23          MR. ECHEVERRIA:  What Your Honor has said is

24    consistent with the State's view of the importance of the Bill

25    of Rights, the dangers of firearms, and effective binding

1    Supreme Court authority on this Court, absolutely, Your Honor.

2            THE COURT:  Terrific.  Good.  Thank you.  I appreciate

3    that.

4            So now let me see -- there were a lot of reports and

5    studies that were submitted to me, and as you know, I tell my

6    juries that I do not expect my juries to have spent their life

7    or to spend their life under a rock, because life is just too

8    complicated.

9            Now, I've read a lot of the reports, and I came upon a

10   study that I don't think has been cited to me by anyone.  It

11   was a study done by, I believe, John Lott and his organization.

12   I think it was in 2020.

13           Did anybody cite that report to me?  If not, I won't

14   consider it.

15           MR. DILLON:  Your Honor, if you'll give me a minute,

16   I'll go through the exhibits and confirm whether or not it has

17   been submitted.

18           THE COURT:  All right.

19           (Pause in the proceedings)

20           MR. DILLON:  Your Honor, I believe the only analysis

21   in the study that was submitted as an exhibit as part of John

22   Lott's declaration was his book *More Guns Less Crime.*

23           THE COURT:  Great.  Then I won't consider it.

24           All right.  So is the plaintiff ready to proceed?

25           MR. LEE:  Plaintiffs are ready to proceed, Your Honor.

```
 1              To help maybe address some housekeeping issues?

 2              THE COURT:  Sure.  Go ahead.

 3              MR. LEE:  So we have submitted an ex parte application

 4    over the weekend because one of our individual plaintiffs named

 5    Neil Rutherford had a childcare issue due to the coronavirus

 6    issue, and so he has requested to appear by video at today's

 7    hearing.

 8              But to the extent that the Court feels it's necessary

 9    to hear from the individual plaintiffs who have submitted

10    declarations in this case, we would ask for leave to allow him

11    to appear by video at the hearing.

12              But at the same time, perhaps by stipulation, if the

13    Court -- if the defense will agree that the individual

14    plaintiff declarations would suffice as far as evidence, unless

15    the Court really desires to hear from the individual plaintiffs

16    as to the substance of their declarations, we can go either

17    way, of course.  We're prepared to proceed, I just thought

18    perhaps we could shorten some time.

19              THE COURT:  Well, that certainly makes sense.

20              I note, Mr. Echeverria's appearing by video.  I

21    understand all his witnesses are appearing by video.  I don't

22    know why, but they are.  I don't see any reason why not --

23              MR. LEE:  Okay.

24              THE COURT:  -- why your witness should not be able to

25    appear by video.
```

```
 1              With regards to the other part of your comment, you
 2   know, I've read all of this stuff -- "stuff", not the
 3   appropriate legal term for it, but there's a lot of stuff
 4   here -- and so I don't think that we need to necessarily rehash
 5   all of this.
 6              So I would essentially say, as far as your witnesses
 7   are concerned, you might want to touch on the really important
 8   significant issues, and if your opponent has some other area he
 9   wishes to explore, he can do so.  And likewise, when his turn
10   comes up, you can do the same thing with him.
11              MR. LEE:  Understood, Your Honor.
12              THE COURT:  So that being the case, do you have any
13   witnesses you wish to call?
14              MR. LEE:  Yes, Your Honor.  Plaintiffs will call
15   Emanuel Kapelsohn to the stand.
16              THE COURT:  Come up and be sworn.
17    EMANUEL KAPELSOHN,
18       called as a witness by the Plaintiffs,
19       having been duly sworn, testified as follows:
20              THE CLERK:  State your name and spell it for the
21   record.
22              THE WITNESS:  E-m-a-n-u-e-l, K-a-p-e-l-s-o-h-n.
23              THE COURT:  Good morning, and welcome.
24              THE WITNESS:  Good morning, Your Honor.  May I take my
25   mask off to testify?
```

```
 1              THE COURT:  You may.  You're sufficiently far away
 2   from everyone else.  Besides, the CDC says they're not very
 3   helpful anyway.
 4              So all right.  Go ahead.
 5   BY MR. LEE:
 6   Q.  Good morning, Mr. Kapelsohn.
 7   A.  Good morning.
 8   Q.  Could you state your name and -- you spelled it.
 9              COURT REPORTER:  If you could please get in front of a
10   microphone.
11   BY MR. LEE:
12   Q.  Mr. Kapelsohn, where do you reside?
13   A.  Fogelsville, Pennsylvania.  That's about an hour and a
14   quarter north of Philadelphia.
15   Q.  And how are you employed?
16   A.  Primarily, I'm employed by my own consulting firm called
17   Peregrine Corporation.  It has --
18              THE WITNESS:  I'm trying to see Your Honor --
19              THE COURT:  I know.
20              THE WITNESS:  -- past the screen here.
21              THE COURT:  Did you say Peregrine?
22              THE WITNESS:  Peregrine, like the falcon.  And the
23   corporation has existed -- I formed it in 1985.
24              Through Peregrine, I do law enforcement training and
25   consulting.  I train civilians, as well.  I consult to states
```

EMANUEL KAPELSOHN

 1   and cities and law enforcement agencies.  I do expert witness

 2   work.  I do some writing in the field.  I consult to

 3   manufacturers of firearms and holsters and ammunition.

 4          Those are the kinds of things that Peregrine does.

 5   BY MR. LEE:

 6   Q.  Do you hold any certifications in the firearms training

 7   field?

 8   A.  Yes.  I'm certified as a law enforcement firearms

 9   instructor by the FBI, by the NRA, and about seven different

10   disciplines; handgun, shotgun, patrol rifle, submachine gun,

11   precision rifle.

12          I've been certified, when I lived in New Jersey years

13   ago, by the New Jersey Training Commission as a police firearms

14   instructor.  I taught an academy there for about eight or nine

15   years.

16          I've been certified by the Pennsylvania Municipal

17   Police Officers Education and Training Commission.  That's a

18   state commission.  And I taught at an academy in Allentown,

19   Pennsylvania for nine years.

20          I hold certifications as a Chief Range Safety Officer,

21   as an instructor in taser, baton, two different kinds of police

22   batons, pepper spray, less lethal impact munitions, use of

23   force generally, cycle motor skill design, which is the design

24   of training programs for physical skills, like the use of

25   firearms.

 1              Those are some of the certifications.

 2         THE COURT:  Just a second.  Hold on just a minute.

 3              It's not right that you have to keep craning to see me

 4    and I have to keep craning to see you because of this screen.

 5         THE WITNESS:  Thank you, Your Honor.

 6         THE COURT:  I'm going to try and move it.

 7              Do me a favor.  Get rid of that, would you?  Or at

 8    least move it.

 9              There we go.  That's much better.

10              Great.  Go ahead.

11    BY MR. LEE:

12    Q.  Mr. Kapelsohn, can you give the Court some examples of

13    where you have taught and consulted on firearms, firearms

14    training, and the use of force?

15    A.   Yes.  I did a series of five firearms instructors courses

16    for the New York State Police.

17              I've done firearms instructor training and

18    certification for the Oregon State Police, the Louisiana State

19    Police, the Missouri Highway Patrol.

20              I've done training for the police departments of

21    Philadelphia, Baltimore, Dallas, Salt Lake City, Phoenix,

22    Seattle, Spokane.

23              Here in California, I've done armors training for the

24    San Francisco Sheriff's Office, I've done firearms instructor

25    programs hosted by the El Cajon Police Department, but attended

 1   by, among others, Special Agents of California Department of

 2   Justice.  An instructor program for the Sacramento Municipal

 3   Utilities District.

 4         I helped run a week-long law enforcement training

 5   conference here in San Diego hosted by the San Diego District

 6   Attorney's Office and the Sheriff's Department here.

 7         And I've taught in Los Angeles, San Diego, and San

 8   Francisco in senior firearms instructor courses for the Federal

 9   Bureau of Alcohol Tobacco & Firearms.

10         Those are some examples.  I could keep going on.  I

11   have been a professional --

12         THE COURT:  How old are you?

13         THE WITNESS:  I'll be 69 in a few months, Your Honor.

14   And I've been a professional firearms instructor for 40 years

15   now.

16         THE COURT:  All right.

17   BY MR. LEE:

18   Q.  Mr. Kapelsohn, are you a member of any professional

19   organizations in the field of firearms training?

20   A.  Yes.  The primary one is the International Association of

21   Law Enforcement Firearms Instructors, also called ILFE, that's

22   the acronym.  I've been on its Board of Directors now for 35

23   years.  I've been it's first vice president for about the last

24   eight years.  It's a 501(c)(3) non-profit organization.  It has

25   thousands of law enforcement instructors as members.

 1   Q.   Have you published anything in the field of firearms

 2   training or related to firearms in general?

 3   A.   Yes.  I've authored perhaps 130 or 140 published articles.

 4   I've been an editor or associate editor --

 5            THE COURT:  Just a second.

 6            Mr. Echeverria, I can't hear you.  Are you speaking?

 7   Have you got your mic muted?

 8            MR. ECHEVERRIA:  Yeah.  Apologies, Your Honor.

 9            My supervisor, Mark Beckington, who is also counsel on

10   this case, is unable to hear what's happening in the courtroom.

11   He's also trying to dial in.

12            THE COURT:  Okay.  All right.  Because I saw --

13            MR. ECHEVERRIA:  Is there a way --

14            THE COURT:  -- I saw your mouth moving, but I couldn't

15   tell if you were trying to talk to me or what was going on.

16            Okay.  Go ahead.

17            THE CLERK:  Your Honor, do you want me to admit him

18   into the courtroom, so to speak?  His co-counsel?

19            THE COURT:  Yes.  Mr. Echeverria, do you want us to

20   admit him into the courtroom?

21            MR. ECHEVERRIA:  Absolutely, your Honor.

22            THE COURT:  Okay.  Go ahead.  The more, the merrier.

23            There we go.  Hi.  How are you?

24            I can't hear him.  Apparently, he's on mute.

25            THE CLERK:  He has to connect to audio on his end.

 1          THE COURT:  This is so awkward.  I apologize for all

 2   this.  This is like -- all right.  Let's move on.  Maybe you

 3   can get the audio connected somehow.

 4          THE CLERK:  Or, Judge, you can let him know he needs

 5   to connect to his audio.

 6          THE COURT:  Mr. Echeverria, can you communicate with

 7   your supervisor?

 8          MR. ECHEVERRIA:  I will do that, Your Honor.

 9          THE COURT:  Okay.  Let him know that he needs to

10   connect his audio.  It's not our end.

11          What's his name, Mr. Echeverria?

12          MR. ECHEVERRIA:  Mark Beckington.  His name is on the

13   pleadings.

14          THE COURT:  Beckington.  Got it.

15          Okay.  Let's go.  Otherwise, we're going to be doing

16   this forever.

17          THE WITNESS:  One of the longer works is about a

18   350-page work.  I'm associate editor of it.  It's called

19   *Standards and Practices Guide for Law Enforcement Firearms*

20   *Instructors*.  It has been purchased in quantity by the federal

21   government to be put in federal court libraries throughout the

22   country.

23          THE COURT:  Okay.

24   BY MR. LEE:

25   Q.  Mr. Kapelsohn, have you been qualified to testify as an

1  expert witness in a court before?

2  A.   Many times.   I've testified somewhere between 88 and 90

3  times in court trials.   I've testified before federal agencies,

4  I've testified before legislative hearings, and so forth.

5  Q.   In what fields are you typically qualified to testify as an

6  expert?

7  A.   Firearms, firearms design, firearms safety, firearms

8  training, civilian training with firearms, self-defense with

9  firearms, law enforcement training and tactics, shooting scene

10 reconstruction, various force science issues that involve human

11 factors, like reaction time and things that relate to either a

12 police officer's or a civilian's self-defense in violent

13 encounters, various ballistics issues, calculation of proximity

14 of gunshots, the time of gunshots, video and other electronic

15 evidence of shooting incidents.

16         Those are some of the areas.   There are dozens more.

17 Q.   Any of these fields overlap or directly involve the issue

18 of defensive use of firearms?

19 A.   Many of them.   And I've testified many times in

20 self-defense shooting cases, either by private individuals or

21 security individuals or police officers where the issues are

22 self-defense as opposed to a police officer's use of deadly

23 force against a fleeing felon or something of that sort.

24 Q.   Have you testified both for and against police agencies in

25 your career?

1  A.  I have.  And both for and against police officers, as well.

2  Q.  Can you tell the Court what professional experience you've

3  had with regard to the AR-15 rifle in general?

4  A.  I first started shooting semi-automatic rifles when I was

5  16.  That's, I think, 51 years ago.

6          I then started shooting .223 caliber semi-automatic

7  rifles with the Mini-14 back in the 1970s.

8          By about 1980 or so, I was using AR-15 rifles.  I've

9  owned and used a number of them with all of the kinds of

10  features that are at issue in this legislation.

11          I worked as a consultant for Colt Firearms in their

12  first Colt Cup competition, which is a rifle competition with

13  AR-15 rifles.

14          I'm certified as an instructor by the NRA and by

15  others to teach patrol rifle -- police patrol rifle, which is

16  the term the police use for AR-15-type rifles.

17          The two sheriff's departments with which I've been a

18  reserve or special deputy over the last 22 years -- one

19  department in Indiana when I lived there and my department now

20  in Pennsylvania where I've been a special deputy -- it's called

21  a reserve deputy -- for 22 years -- have both used AR-15

22  rifles, and I've been trained, qualified, authorized to carry

23  and use them in law enforcement.

24          And I've worked as an instructor for those departments

25  training others to use AR-15s.

1         I have taught about a dozen AR-15 or patrol rifle

2    instructor courses for police.

3         I've taught civilians to use AR-15 rifles and security

4    personnel of corporate security and industrial security teams

5    that are armed with AR-15 rifles.

6         I've written several published articles about

7    semi-automatic .223 rifles, AR-15s, and others, including the

8    Israeli Tavor rifle, the Steyr AUG rifle.

9         I've helped --

10        THE COURT:  Let me stop you there for just a second.

11        THE WITNESS:  Yes.

12        THE COURT:  Because there's a lot of material in here,

13   and it can get a little bit confusing.  Okay?

14        THE WITNESS:  Yes, sir.

15        THE COURT:  So the weapons you've just mentioned,

16   they're not AR-15s, are they?

17        THE WITNESS:  The last two, the Tavor and the AUG?

18        THE COURT:  Yes.

19        THE WITNESS:  They're not AR-15s, but they have the

20   same kinds of features that would be addressed by this

21   legislation.

22        THE COURT:  Okay.  Because I'm trying to make sure

23   that we keep some consistent type terminology or use of

24   information.

25        So, for example, we've talked about the AR.  What

1    about the AK?  Is the AK like the AR?

2              THE WITNESS:  No.  It's a different mechanism.  It has

3    many of the sames features addressed by this legislation, but

4    it would not properly be called an AR.

5              THE COURT:  Okay.  The last two that you just

6    mentioned --

7              THE WITNESS:  Are not ARs.

8              THE COURT:  -- are they ARs?

9              See what I mean?  Okay.  So maybe we can talk about

10   semi-automatic rifles --

11             THE WITNESS:  Yes, sir.

12             THE COURT:  -- unless your expertise is limited to a

13   specific type or types, right?

14             THE WITNESS:  Not limited.

15             THE COURT:  Okay.  Well --

16             THE WITNESS:  It is not.

17             THE COURT:  -- I'm not trying to put words in your

18   mouth, I'm trying to say, so that we can --

19             Because there's a lot of information that gets, sort

20   of, confused in various respects -- I'm not going to go through

21   them all -- in all of this material.

22             So what I'm trying to find out is your testimony, what

23   you're testifying about, whether it applies to only a limited

24   type of the weaponry that is covered by the legislation or

25   whether it is broader than that.

```
 1              You see what I'm saying?
 2         THE WITNESS:  I do.  I'll try to be very specific to
 3    the question the way it's asked of me.
 4         THE COURT:  But you were being very specific, I just
 5    wanted to make sure I wasn't misunderstanding.
 6         Okay, great.  Go ahead.
 7         THE WITNESS:  Yes, sir.
 8    BY MR. LEE:
 9    Q.  Well, Mr. Kapelsohn, did you prepare and sign a declaration
10    on behalf of plaintiffs in this matter?
11    A.  I did.
12    Q.  And does that declaration describe more fully your
13    experience and qualifications as a firearms expert?
14    A.  Yes, it does.
15         MR. LEE:  So, Your Honor, this has been filed as ECF
16    22-12.  I don't know if Your Honor wishes us to refer to it
17    that way.  We have copies here, but I also saw the Court
18    brought in several binders, so perhaps it has its own copies.
19         THE COURT:  If there's something that you want me to
20    refer to in that declaration, I'll be happy to search for it
21    through all of this.  Otherwise, I'll just listen to your
22    question and listen to his answer.
23         MR. LEE:  Understood, Your Honor.
24         Your Honor, at this time, we will offer Mr. Kapelsohn
25    as an expert witness in the fields of firearms and the
```

1  defensive use of firearms.

2          THE COURT:  Is there any objection?

3          Hearing none --

4          MR. ECHEVERRIA:  There is an objection, Your Honor.

5          THE COURT:  What's the objection, Mr. Echeverria?

6          MR. ECHEVERRIA:  It was defendants' understanding,

7  based on the comments made by Your Honor at the status

8  conference several weeks ago, that this would be an evidentiary

9  hearing in connection with the preliminary injunction motion

10 because the Court had several questions for the declarants.

11         The defendants have available each of the five

12 witnesses that have signed declarations in support of

13 defendants' opposition for questions from the Court, but the

14 defendants are not prepared to engage in a trial-like

15 proceeding with direct examination, cross examination, redirect

16 examination, and the defendants are not prepared to raise

17 Daubert motion objections, qualifications of the witnesses that

18 plaintiffs have presented as declarants in support of their

19 motion.

20         It's defendants' position that if the Court is going

21 to convert this to a trial on the merits, if the Court intends

22 for this hearing to be more fulsome, then the defendants

23 request an opportunity to prepare for that type of hearing,

24 because that is just not the hearing that we were informed

25 about.

```
 1          THE COURT:  That's a fair comment.  I think that's
 2   fair.
 3          So, essentially, you're asking that I limit the
 4   witnesses' questions or answers to those things that, in my
 5   review of the information, I may have had questions, right?
 6          MR. ECHEVERRIA:  That was our understanding of the
 7   type of proceeding contemplated.
 8          THE COURT:  All right.
 9          MR. ECHEVERRIA:  And we just want to make sure that we
10   are preserving any and all objections that we have to the
11   qualifications of the witnesses that signed declarations in
12   favor of the plaintiffs' motion.
13          THE COURT:  All right.  Well, I don't have any
14   questions of this witness, except for I am going to ask one
15   question.
16          Well, you know, lawyers always say that to me, and it
17   always turns out to not be true because it will always be more
18   than one.
19          But since I've got you here, let me ask you a
20   question.  You have fired an M16.
21          THE WITNESS:  Yes, sir.  I own one, in fact.
22          THE COURT:  You've fired a typical AR-15.
23          THE WITNESS:  Many, and I own many.
24          THE COURT:  And the difference between the two, as I
25   read it from all the information that I've read so far, is that
```

1    one is semi-automatic and the other one is fully automatic.

2              THE WITNESS:  Well, I would describe the M16 as select

3    fire, which it can be semi-automatic or fully automatic.

4              THE COURT:  That's correct.  That's absolutely

5    correct.

6              Is it true that the semi-automatic AR-15 fires almost

7    as fast as the M16, if the M16 is set on fully automatic mode?

8              THE WITNESS:  Well, it depends on what you mean by

9    "almost".

10             THE COURT:  Haha.  Well --

11             THE WITNESS:  The M16, depending on the rifle, how

12   well lubricated it is, and just what ammunition you're using,

13   firearms fully semi-automatically at a cyclic rate of 750 to

14   900 rounds per minute, cyclic being theoretical.  You'd run out

15   of the magazine long before a minute was up, so you'd never get

16   to 750 or 900 rounds.

17             But if you divide 750 or 900 by 60 seconds, that would

18   tell you how many rounds it would fire automatically per

19   second.

20             Most shooters would not be able to fire a

21   semi-automatic AR-15 or the M16 when set on semi-automatic

22   quite that fast, and they couldn't fire nearly that fast if

23   they were actually trying to hit anything specific.  Aim and

24   hit.  But they might be able to fire five rounds a second,

25   seven rounds a second, something like that.  That would be a

 1    cyclic rate of perhaps 300 rounds a minute.

 2            THE COURT:  Okay.

 3            THE WITNESS:  Not 900 rounds a minute.

 4            THE COURT:  So a semi-automatic requires a round to be

 5    fired with each press, as I'm understanding all of this.

 6    You've got to pull the trigger, and every time you pull the

 7    trigger, a round is expended, right?

 8            THE WITNESS:  Correct.  You have to pull it, and then

 9    release it, and then pull it again for the next round.

10            THE COURT:  Now, I know I'm old, but I'm trying to

11    figure out, can you really do that --

12            THE WITNESS:  Five times a second.

13            THE COURT:  Five times.

14            THE WITNESS:  Seven, absolutely.  If you think of

15    one-one-thousand, bang, bang, bang, bang, that's not very fast.

16    And that's four or five rounds a second, and most any of us,

17    including Your Honor or myself or most anyone I've trained, can

18    fire five to seven rounds per second from a semi-automatic

19    pistol or any semi-automatic rifle, not just an AR-15.

20            THE COURT:  And how long would you be able to keep

21    that up, do you suppose?

22            THE WITNESS:  Quite a while.

23            THE COURT:  Okay, great.  Thank you.

24            THE WITNESS:  You're welcome.

25            MR. LEE:  Your Honor, when we -- before Mr. Echeverria

 1   objected, we had offered him as an expert witness in the field

 2   of firearms and defensive use of firearms.

 3          And the plaintiffs would take the position, I think,

 4   that, to the extent the Court feels that an expert witness --

 5   qualifications as an expert would be helpful to the Court, we

 6   can certainly lay these foundations and offer them as expert

 7   witnesses in these fields.

 8          But to the extent that the Court might want to just

 9   hear all the testimony without ruling as to whether or not

10   they're qualified as an expert, and therefore subject to

11   Daubert standards, and just leave it all to weight as a matter

12   of the Court's own weight independently, since this is an

13   evidentiary hearing on preliminary injunction motion not

14   necessarily a trial, we can certainly approach it that way, as

15   well.

16          THE COURT:  Well, I think what I originally wanted to

17   do was I had questions of the various witnesses that I wanted

18   to ask, and I think that's what I indicated, and I think that's

19   what Mr. Echeverria is pointing out, which he's absolutely

20   correct.

21          I don't have any problems as far as your wanting to

22   supplement, if you wish to supplement, what's in the

23   declarations because you certainly would be able to do that by

24   way of a supplemental declaration anyway.

25          But certainly, I've reviewed his -- I reviewed his CV,

1   and it certainly sounds like he's, you know, qualified as an

2   expert, and I'm going to take whatever it is he says as an

3   expert.

4        So anyway.  So I don't really have any other questions

5   of this gentleman.  He certainly seems qualified.  But if you

6   have any other questions, things that are not covered in your

7   declaration that you think it would be wise for the Court to

8   know, I'll give you a shot at it.  Go ahead.

9        MR. LEE:  Okay.  If I could have a -- this could help

10  curtail things substantially.

11       So if I could just have the Court's indulgence for a

12  moment and see what we can cut to the chase on and see what

13  might be supplementary.

14       (Pause in the proceedings)

15  BY MR. LEE:

16  Q.  Mr. Kapelsohn, in your opinion, what is the most -- the

17  biggest advantage that an AR-15-type rifle has over other

18  semi-automatic firearms from a defensive shooting perspective?

19  A.  It's far easier for almost everyone to shoot it accurately

20  than it is for them to shoot a handgun accurately.

21       Handguns are the hardest firearms for anyone to shoot

22  with good accuracy.  They're short, they're not very well

23  supported.

24       For instance, an AR, or any rifle, is supported by

25  one's shoulder and one's cheek and both hands, whereas a

1   handgun is out there at the end of one arm or perhaps held in

2   two hands.  It doesn't have that support.

3          The AR has a long sight radius, the distance between

4   the front and rear sight, which allows it to be aligned more

5   accurately.  That's an advantage over any handgun over a

6   handgun, which has a very short sight radius, and so aiming

7   error is very common with handguns.

8          Handguns require fairly frequent practice.  We say, as

9   firearms instructors, that one's ability to shoot a handgun is

10  very much a perishable skill.  That's why police are retrained

11  and requalified several times a year, you know, at the least.

12         So if we take the average person and give them an

13  AR-15 and give them 20 or 30 minutes of training with it, not

14  that that's what I would consider sufficient, but for my answer

15  I'd say, if we give them 20 or 30 minutes of training with it,

16  they will easily be hitting something the size of a paper plate

17  at 50 yards.

18         We can train people, including police officers, for

19  the rest of their careers, and they won't develop that degree

20  of accuracy, most of them will not, with a handgun.

21         The rifle is light in weight, and it has very good

22  ergonomics.  It was designed that way by Gene Stoner, who

23  designed it.

24         And because of its light weight and good ergonomics,

25  it's an excellent firearm for use by people of all statures and

1  varying levels of strength.

2          So my wife, who is 5 foot 2 can use the same AR-15

3  that I use, and I'm close to 6 feet tall, and I weigh twice as

4  much as she does.

5          Whereas, the 12-Gauge shotgun that has 25- or 30-foot

6  pounds of free recoil is punishing because of its recoil to

7  many shooters, especially smaller statured shooters, female

8  shooters, and the like.

9          The AR-15 is pleasant to shoot, training is easily

10  accomplished, a good degree of competence and safety are easily

11  accomplished.

12          If we take even my deputy sheriffs in the Sheriff's

13  Department I'm with out to shoot shotgun, we try to have them

14  fire very few rounds in that day of shotgun training because

15  they start to complain, it hurts their shoulder, the recoil,

16  et cetera, and the result is they get relatively little shotgun

17  training.

18          The true -- same is true when you're training

19  civilians.  But you go out with an AR-15 rifle, they can easily

20  fire 100 rounds in a few hours of training, so a good level of

21  accuracy and skill and safety, because they become very

22  familiar with the mechanism, and competence are accomplished

23  by it.

24          And accuracy is very important for self-defense

25  because, unlike a criminal using a firearm, the civilian or the

1    police officer, either one is accountable for every round they

2    fire.  And any round that misses the attacker, who is attacking

3    the civilian or the police officer, if it doesn't hit what they

4    intended to hit, the attacker, then by definition it hits

5    something they didn't intend to hit.  That may be an innocent

6    bystander.

7         So the accomplishment of a good level of accuracy is

8    paramount in civilian self-defense training with firearms, and

9    the AR-15 permits that.

10        THE COURT:  All right.  So let me ask a question.

11        I think it's in one of the declarations, and I can't

12   recall whose, but there's mention of the fact that the

13   adjustable stop is beneficial because a female, a woman who is

14   not as strong, doesn't have -- their arms are not as long, that

15   that adjustable stock works to their advantage, as opposed to a

16   man like yourself, for example; is that true?

17        THE WITNESS:  Absolutely true.  And the most commonly

18   available telescoping stocks for the AR-15 rifles today have

19   between three and six different positions of adjustment.

20        They adjust by pulling out, and a spring-loaded

21   plunger going into a little hole and snaps into place.  And

22   there are anywhere from three to as many as six different

23   little hole positions.

24        So I can use the rifle with the stock fully extended.

25   My wife, who is a foot shorter than I am, almost, will use it

1    in the shortest position or the second to shortest position.

2           It's also true, at least in my part of the country,

3    Pennsylvania, in the wintertime, when we're wearing heavy coats

4    and outer clothing, you'd adjust the stock to be a little

5    shorter because you're wearing several inches of clothing on

6    yourself.

7           Tactile team, police officers, get the same advantage

8    when they wear a heavy vest with equipment or rifle plates in

9    it, or something like that.  They adjust the stocks to be

10   shorter.  So that's a big advantage of that kind of stock.

11          THE COURT:  Just out of curiosity, how does that -- I

12   mean, other than the fact that it may be more concealable if

13   you have a shortened stock as opposed to a longer stock, how

14   does that make the weapon any more lethal, if you will, than,

15   say, a Mini -- a Ruger Mini-14?

16          THE WITNESS:  Doesn't make it any more lethal.  And

17   the fact is, only somewhere between 1 and 2 percent of the

18   crimes committed with firearms are committed with rifles of all

19   types altogether.

20          So that's lever-action rifles, bolt-action rifles,

21   pump-action rifles, single-shot rifles altogether amount to

22   something like, I think, by the federal statistics -- and I

23   cited some of them in my declaration -- something like 1.4 or

24   1.6 percent of all firearms crimes.

25          These are not concealable, even when the stock is in

1    its shortest position.  They're not very concealable.  Most

2    firearms crimes are committed with handguns, which are

3    ultimately concealable.

4            THE COURT:  All right, thank you.

5            I don't have any other questions of this witness,

6    unless you do.

7            MR. LEE:  I do have a few more, Your Honor.

8    Understanding that the Court has heard a lot of the testimony

9    and is considering the declaration, I do want to supplement a

10   little bit, though.

11           THE COURT:  All right.  Would you do me a favor and

12   speak into the microphone?

13           MR. LEE:  Yes, Your Honor.

14   BY MR. LEE:

15   Q.  Mr. Kapelsohn, you mentioned the importance of accuracy

16   in -- as far as the AR-15 rifle is concerned.

17           What role does ergonomics -- and I think we are going

18   to hear a lot about ergonomics in the hearing today -- what

19   role does ergonomics play in terms of accuracy?

20   A.  A firearm with good ergonomics, whether that firearm is a

21   AR-15 or handgun or shotgun, makes it easy for a shooter to

22   achieve good accuracy with a little bit of training or a little

23   bit of proper practice.

24           A firearm with poor ergonomics may be able to be fired

25   accurately by someone, but it's an uphill struggle.  You're

1    jumping over hurdles to achieve that same level of accuracy.

2         So the fact that this rifle has good ergonomics makes

3    it easy.  As I said, in 20 or 30 minutes of training we can

4    have most any adult hitting a paper plate at 50 yards.  That's

5    good accuracy for this purpose.

6    Q.  And does ergonomics assist in the amount of training that a

7    civilian can engage in?

8    A.  Certainly.  As I said, it's an uphill struggle to achieve

9    good accuracy with a firearm that has poor ergonomics.  You're

10   having to overcome those poor ergonomics.

11   Q.  All right.  So Mr. Kapelsohn, I think we've talked about

12   the -- and in your declaration, the features that -- the

13   primary features that are contained on an AR-15 rifle.

14        And just without going into a discussion of them, can

15   you list the primary features that appear on an AR-15 rifle

16   that enhance ergonomics, accuracy, and other uses?

17   A.  Yes.

18   Q.  If you could list them.

19   A.  Oh, you want me to list them now?

20   Q.  Yes.

21   A.  It's what is called a straight-line design.  It was

22   designed by Gene Stoner that way.

23        A straight-line design -- and if you would look at the

24   picture of an AR-15 that appears both in Mr. Graham's

25   declaration and, I think, maybe in an attachment to mine, as

 1   well, it shows that the line of the boar is directly in line

 2   with the shoulder stock.

 3           And we know from Newton's Law that for every action

 4   there is an equal and opposite reaction.

 5           So the bullet goes out the end of the boar, the end of

 6   the barrel, and the axis of recoil is exactly that same line

 7   coming back rearward.  So that's the axis of recoil.

 8           In a traditional sporting rifle or sporting shotgun

 9   design where the stock drops down, it angles down to the butt

10   stock from the line of the boar, you then have muzzle rise

11   because the point of support on your shoulder is below the line

12   of the boar.  So there's an axis -- a momentum of leverage

13   there.

14           So the straight-line design of the AR allows recoil to

15   be controlled easily.  Even though the .223 cartridge has

16   relatively little recoil, it still allows the rifle to come

17   straight back into the shoulder rather than the muzzle tending

18   to rise.

19           That's the reason that AR-15s have to have the sights

20   put up high on structures that put them up to one's eye because

21   the stock and the barrel are down near one's shoulder, whereas,

22   with the sporting rifle, the barrel is up near one's eye.

23           That's also the reason that you need a pistol grip in

24   order to have good ergonomics on a straight-line design rifle.

25   Because the stock is straight behind the boar, the pistol grip

1  has to come down so that there is an ergonomically comfortable

2  and effective place to put one's firing hand.

3  Q.  Thank you.

4       Mr. Kapelsohn, I do want to address a few other things

5  that are not specifically those features that we've talked

6  about.

7       The California Assault Weapon Law prohibits firearms

8  with an overall length of less than 30 inches.

9       Do you know what the federal limit is on the length of

10  a firearm?

11  A.  Well, length of a rifle, I think you mean?

12  Q.  Length of a rifle.

13  A.  And that's 26 inches.

14  Q.  All right.  So if a rifle has less than an overall length

15  of 26 inches, it would be considered a short-barrel rifle under

16  federal law?

17  A.  Yes.

18  Q.  So let's focus on rifles that may be between 26 and

19  30 inches in length.

20       Can you tell us what the defensive advantage would be

21  to a shooter to have a firearm that's shorter than 30 inches?

22  A.  Yes.  For a homeowner or a business owner who has an AR-15

23  as a self-defense weapon in their home or place of business, it

24  makes it more maneuverable going through doorways, moving

25  around corners in hallways, and so forth, as well as making it

1 | easier to store in a smaller gun safe or locked case or

2 | whatever.

3 |        Police, for the same reason.  Entry teams and tactical

4 | teams are using shorter and shorter AR-15 rifles for

5 | maneuverability.  Things like inside buildings.

6 |        THE COURT:  Why not a sawed-off shotgun?

7 |        THE WITNESS:  When you say "sawed off", do you just

8 | mean a short shotgun?

9 |        THE COURT:  I don't know.  Just the terminology of

10 | "sawed-off shotgun" --

11 |        THE WITNESS:  Well, the federal --

12 |        THE COURT:  -- in Miller, for example.

13 |        THE WITNESS:  The sawed-off shotgun, as I understand

14 | it in Miller, is less than an 18-inch barrel, a federal legal

15 | shotgun, so it is federally highly restricted, illegal for

16 | people in most states, or many states, and --

17 |        THE COURT:  But let me ask you this.

18 |        THE WITNESS:  -- still has high recoil -- heavy recoil

19 | and --

20 |        THE COURT:  Okay.  So granted, perhaps for a female it

21 | might not be as appropriate.  But certainly, given something

22 | that you said earlier, which is that you're looking for

23 | accuracy in a self-defense weapon, right?

24 |        THE WITNESS:  Yes.

25 |        THE COURT:  Now, if you fire a shotgun at someone,

1  say, for example, who is coming through your bedroom door, you

2  don't have to be anywhere near as accurate as if you're firing

3  a 9mm pistol or a .223 rifle.

4        THE WITNESS:  Well, you actually do have to be --

5        THE COURT:  Why?

6        THE WITNESS:  -- much more accurate than the public

7  assumes.

8        THE COURT:  Why?

9        THE WITNESS:  Because the pellets from buckshot or

10  birdshot don't spread that quickly.

11        So if your bedroom is a normal-sized room, and you

12  were firing at a distance of 4 yards, 5 yards, 6 yards, we

13  still have a very small pattern of buckshot.

14        It's likely either going to miss the person entirely

15  or hit them.  In order to hit them, we've got to aim it

16  carefully.

17        THE COURT:  Okay.  Can you do that again for me?  Show

18  me the pattern size.

19        THE WITNESS:  It depends on the exact gun, but I

20  showed you something that's 3 or 4 or 5 inches across.  And

21  that's --

22        THE COURT:  And what's the diameter of a .223 bullet?

23        THE WITNESS:  A .22 caliber.  But even that 5-inch

24  pattern has to be aimed to hit.

25        THE COURT:  Right.

 1         THE WITNESS:  It can't miss over the person's shoulder

 2  or to one side or the other.

 3         THE COURT:  But I'm trying to find out, from a

 4  defensive perspective -- okay? -- because, obviously, one of

 5  the arguments that's being made here is that these weapons are

 6  necessary for -- not necessary, but are useful for

 7  self-defense, and you've said several things that have caused

 8  me to think about this.

 9         So the diameter of a .223 bullet is, what?  Maybe, I

10  don't know, say, quarter of an inch?

11         THE WITNESS:  It's 22-hundredths of an inch.

12         THE COURT:  Yeah, okay.

13         THE WITNESS:  223 of an inch.

14         THE COURT:  All right.  Well, I was close.

15         THE WITNESS:  You were close.

16         THE COURT:  We're not going to argue about the

17  details.

18         All right.  And the pattern you showed me was about 3

19  to 4 inches.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  So if we're looking to stop the intruder

22  that's coming through the bedroom door, or perhaps your front

23  door, you may be looking at a pattern with a shotgun of 3 to

24  4 inches, or if it's further away, you might actually be

25  looking at a pattern maybe a foot.

 1              THE WITNESS:  Yes.

 2              THE COURT:  But with a .223 or a 9mm weapon, you're

 3    looking at hitting something with a quarter of an inch, right?

 4              THE WITNESS:  Yes.  But there are other factors, if I

 5    can explain, Your Honor.

 6              THE COURT:  Well, I understand.  But don't confuse me,

 7    because I'm already confused enough.  Okay.

 8              THE WITNESS:  The sawed-off --

 9              THE COURT:  So -- so you certainly -- you can aim that

10    shotgun at someone, and the probability of hitting them

11    somewhere is greater than the probability of hitting them with

12    a .223.  Assuming the average homeowner -- we're not talking

13    about some performer, shooter, whatever, we're talking about

14    the average homeowner -- okay.

15              Now, you also said that maneuverability is important,

16    which makes perfectly good sense.

17              A sawed-off shotgun is way more maneuverable than the

18    AR-15 or a regular hunting shotgun, which has to have a barrel

19    of no less than 18 inches, right?  According to my

20    understanding.

21              THE WITNESS:  Yes, Your Honor, but I don't agree with

22    many of the things you're saying, if you'll allow me to

23    explain.

24              THE COURT:  Sure.  Go ahead.  That's why I asked the

25    question.

1          THE WITNESS:  The typical sawed-off shotgun, as that

2    term is used, is a sawed-off, break-open, single- or

3    double-barreled shotgun.  What person in their right mind would

4    choose to have a two-shot weapon to defend themselves with?

5          THE COURT:  Yeah.  But that's a different -- okay.  I

6    understand.

7          THE WITNESS:  So that's number one.

8          Number two, the typical sawed-off shotgun not only has

9    the barrel sawed off, it has the butt stock sawed off, too.

10          So it doesn't have the accuracy of a normal shotgun,

11    it's held in the hands, its recoil is extremely punishing, and

12    its accuracy is extremely poor.

13          The typical sawed-off shotgun is used as a threat at

14    face-to-face distance in a store robbery, or something like

15    that, where you don't have to have accuracy of hitting the

16    person coming through your bedroom door, you're pointing it in

17    the liquor store clerk's face at 2 feet.

18          THE COURT:  Well, that sort of dovetails with, one of

19    the firearms that's controlled by this legislation is a

20    shotgun -- right? -- that has a pistol grip, I believe, and has

21    a magazine, right?

22          THE WITNESS:  Yeah.  Detachable magazine, yes.

23          THE COURT:  Detachable magazine.

24          So you could have a shotgun that has the legal size

25    18 inches?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  And a pistol grip?

 3              THE WITNESS:  Yes.  And a butt stock, and a detachable

 4    magazine, and that would be an excellent firearm for a home

 5    defense by someone who is capable of handling the weight and a

 6    recoil of a shotgun.

 7              THE COURT:  How many mass shootings do you know of

 8    that have been committed with this type of weapon?

 9              THE WITNESS:  With detachable box magazine shotguns?

10    Zero.  There may be one someplace, or more than one, but I'm

11    aware of none.

12              THE COURT:  Okay.  All right.

13    BY MR. LEE:

14    Q.  Mr. Kapelsohn, back on rifles that are between 26 and

15    30 inches in length, which the California Assault Weapons Law

16    prohibits.

17              Does weight factor in as something that would

18    constitute a defensive advantage?

19    A.  Yes.  That difference of 4 inches is typically 4 inches of

20    steel barrel, which is a good bit of weight.  It's between half

21    a pound and a pound difference in weight.

22    Q.  Why would that be important in self-defense?

23    A.  Especially for the shorter statured shooter, the female

24    shooter, that weight out at the end of barrel is a lot of

25    leverage.  It's cantilevered weight out there.  It's the worst
```

1  place to put another half pound or a pound and a half of weight

2  is out at the end.  It would be better to put it close to them

3  where it can be better supported for any shooter, but

4  especially for a less-strong shooter.

5  Q.  Let's talk about pistols that are classified as assault

6  weapons in California.

7          So Penal Code Section 30515(a)(4) talks about a pistol

8  with a threaded barrel that is capable of accepting a flash

9  suppressor, forward handgrip, or silencer.

10         First of all, can you explain to the Court what a

11  threaded barrel is?

12  A.  Yes.

13         THE COURT:  I know what a threaded barrel is.

14         MR. LEE:  All right.

15  BY MR. LEE:

16  Q.  Would a threaded barrel allow you to attach other devices

17  besides silencers and flash suppressors?

18  A.  Yes.  Compensators.  And many competitive shooters use --

19         THE COURT:  What's compensators?

20         THE WITNESS:  A compensator is sometimes called a

21  muzzle break.  It has nothing to do with the flash of the

22  weapon or the sound of the weapon; it diverts gasses through

23  slots or holes in such a way that it reduces the muzzle rise or

24  recoil of a pistol.  And they've been widely used by

25  competitive shooters, among others, for over 30 years.

1   Q.   It's your understanding that compensators or muzzle breaks

2   are not prohibited under California law?

3   A.   That is my understanding, yes.

4   Q.   All right.   And it's frequent in competition circles?

5   A.   It's very frequent.

6   Q.   Are there other devices that you could attach to a pistol

7   with the threaded barrel that are not silencers or flash

8   suppressors?

9   A.   Compensators.

10  Q.   How about other things that involve sound or the

11  redirection of sound?

12  A.   Well, there are, for instance, a company called KAK, which

13  is -- manufactures its products here in California -- I think,

14  Oxnard, California -- makes what's called a flash can.   And it

15  makes -- it makes the point -- the company makes the point of

16  saying this is not a sound suppressor, nor is it a flash

17  suppressor, flash hider, it just redirects the sound out away

18  from the shooter, and that -- and it redirects something like

19  60 percent of the noise away from the shooter.

20  Q.   And would that present a defensive advantage to a shooter?

21  A.   Oh, absolutely.

22  Q.   Can you explain why?

23  A.   Inside a house or other building, firing a gun without ear

24  protection on, like we use at a shooting range, is deafening.

25               And, in fact, shooters can, and sometimes do,

1    experience some degree of permanent hearing loss from as few as
2    one single shot being fired.
3            Imagine firing a shot when you're in a hallway, or a
4    small room, or someplace where there are walls on both sides of
5    you that reverberate the sound back to one's ears.
6            For that reason, police tactical teams are widely
7    going to the use of sound suppressors, so-called silencers, on
8    their AR-15 rifles.
9            But let's take the average civilian who is defending
10   himself or herself in their home, and they have to fire several
11   shots, whether it's from a handgun or a rifle.  That is, at
12   least temporarily, quite deafening.
13           That then disables that shooter from hearing where the
14   attacker is moving in the house, hearing someone yelling, "Stop
15   shooting.  We're the police," or, "Stop shooting.  He dropped
16   his weapon," or whatever.  Whether it's voice commands or
17   whether it's movement, if someone is deafened, they are
18   seriously disadvantaged in the self-defense situation.
19   Q.   So both this sound redirection device and muzzle breaks
20   serve some defensive utility in pistol contexts.
21   A.   Absolutely.
22   Q.   Are you familiar with -- have you become familiar with
23   something called an AR pistol?
24   A.   Yes, I know about AR pistols.
25   Q.   And is it your understanding that AR pistols are generally

1    prohibited by California Assault Weapons Law --

2    A.   Yes.

3    Q.   -- with some of their features?

4         Is an AR-15 pistol a useful weapon for self-defense?

5    A.   It can be, and some people believe it has --

6         THE COURT:   What's an AR pistol?

7         THE WITNESS:   It's an AR-15 mechanism, but with a much

8    shorter barrel and without the butt stock, without the shoulder

9    stock, instead of which many of them have what's called an arm

10   break, and this is federally legal.

11        THE COURT:   And it shoots a .223 or --

12        THE WITNESS:   It shoots the .223.

13        And the utility of it -- for instance, I know people

14   who can have that gun in their home as a defensive weapon, they

15   can -- in many states, and I think in parts of California --

16   carry it in their vehicle -- have it in their vehicle under

17   their concealed carry permit because it's a handgun; whereas,

18   in many jurisdictions, one can't have a loaded rifle in their

19   vehicle just because they have a concealed handgun permit.

20        And they could then have that weapon in their home,

21   they could have it in their vehicle, they could take it to

22   their, you know, vacation home, whether it's in California or

23   some other state, and it has tremendously more accuracy than a

24   handgun does, for the average shooter.

25   Q.   And the AR-15 pistol, does its short barrel provide some

1   advantages in a really tight, close-quarters type of situation?

2   A.  Of course.

3           THE COURT:  You don't need to answer that.  I know the

4   answer to that.

5           THE WITNESS:  The Judge knows that.

6           THE COURT:  Yeah.

7   BY MR. LEE:

8   Q.  So you've mentioned, per the Judge's questioning, semi-auto

9   shotguns that may be classified as assault weapons.

10          Are all the features that we've been talking about in

11  your declaration -- pistol grips, collapsible butt stocks -- do

12  the advantages that appear for the AR-15, are those also

13  advantages that appear on a semi-automatic shotgun?

14  A.  Typically, yes.  And more and more shotguns are being

15  manufactured, including by major manufacturers like Remington

16  and Mossberg, with telescoping butt stocks.

17          My own Sheriff's Department uses them.

18          And some of those telescoping butt stocks also have

19  recoil-reducing features in that they have springs in them,

20  they function like a shock absorber on a car.

21          And so both because of the adjustability to let it fit

22  people of different sutures and because of the recoil

23  reduction, they're a great advantage on shotguns.

24  Q.  How frequent are these features used in police shotguns?

25  A.  As I said, they're becoming more and more commonly used.

1    The two major manufacturers of police shotguns, Remington and

2    Mossberg, are both offering telescoping stock, butt stock

3    shotguns, and have for several years now.

4    Q.   Thank you.

5         So I'm just going to ask you a few more questions

6    here, just to wrap this up.

7         In your declaration, you make use of the phrase

8    "cosmetic features" --

9    A.   Yes, sir.

10   Q.   -- in describing many of these 30515(a)(5).  Do you

11   remember that?

12   A.   I do.

13   Q.   Can you tell the Court what you mean when you say "cosmetic

14   features"?

15   A.   Yes.  I didn't mean that the features have no utility, I've

16   just been testifying about the utility of many of these

17   features, like the pistol grip, or the flash suppressor, or the

18   compensator, or whatever it may be, the telescoping stock.  So

19   these features have utility.  I didn't mean, by saying

20   "cosmetic", that they don't have utility.

21        But the fact is, they're not features that make these

22   weapons especially well-suited to criminal use any more than

23   any other use.  I think that they are --

24             THE COURT:  Does it make them scarier looking?

25             THE WITNESS:  Excuse me?

```
 1              THE COURT:  Does it make them --

 2              THE WITNESS:  Scarier looking.  More militaristic

 3  looking.

 4              And the legislation then prohibits these features,

 5  even though they have great civilian utility for self-defense,

 6  as they do for police self-defense use, or law enforcement use,

 7  or security use.

 8              So I say "cosmetic" because, when you're going to

 9  prohibit something like a pistol grip, you know, you could

10  commit a crime just fine without a pistol grip.

11              THE COURT:  Well, let me cut to the chase.

12              So in one of the exhibits that I saw, or it was

13  submitted, there's a video.  And there's a video of the person

14  shooting, but I think it was called a California-legal AR, and

15  then the California-prohibited AR with the features that are

16  the subject of this litigation, or part of the subject of this

17  litigation.

18              Do you know the video I'm talking about?

19              THE WITNESS:  I've heard of it, I haven't seen it

20  myself.

21              THE COURT:  You haven't seen it?  Okay.

22              THE WITNESS:  But I understand what it is.

23              THE COURT:  How about this.  You said you had a Mini

24  Ruger when you are --

25              THE WITNESS:  Mini-14.
```

 1              THE COURT:  Mini-14.  Okay.

 2              THE WITNESS:  It's a very popular rifle.  I own

 3    several of them currently.

 4              THE COURT:  Okay.  So here's my question to you.

 5              I want to be a mass shooter.  I want to kill a bunch

 6    of people.  Right?  Is there any difference between my ability

 7    to kill people between that Mini-14 and the AR-15s that we're

 8    talking about in this litigation?

 9              THE WITNESS:  No.

10              THE COURT:  All right, thank you.

11              The AR-15 -- the Mini-14 is not, as of yet, prohibited

12    or restricted in the State of California.

13              THE WITNESS:  I understand that.

14              THE COURT:  Right?

15              THE WITNESS:  Yes.

16              MR. LEE:  Your Honor, that's all the questions that I

17    have, unless the Court has additional.

18              THE COURT:  All right.  Mr. Echeverria,

19    Mr. Beckington, do either one of you have any questions?

20              MR. ECHEVERRIA:  Your Honor, John Echeverria here.

21              As I stated earlier in this hearing, we have not

22    prepared cross examination questions for the witnesses --

23              THE COURT:  I heard that.

24              MR. ECHEVERRIA:  -- particularly cross examination on

25    new or supplemental material.

```
 1              THE COURT:  I didn't prepare any questions, either,

 2    but I asked questions because I want information, because

 3    you're asking me to make a factual determination.

 4              So all I'm saying to you is, you've heard what he has

 5    said, you've heard what I've asked him, his testimony.  Do you

 6    have any questions of what you've heard?

 7              MR. ECHEVERRIA:  I do -- I do have questions, Your

 8    Honor, and it would be our hope to either continue with the

 9    case and allow us to depose the witnesses in a more complete

10    fashion versus spontaneously at the hearing.

11              Alternatively, I think it would make sense to allow

12    for supplemental briefing to address some of the new material

13    that Mr. Kapelsohn has --

14              THE COURT:  That's fine, Mr. Echeverria.  I don't have

15    any problems with any of that.

16              And you're right.  I'm not going to convert this to a

17    Rule 65 hearing on the merits.  It wouldn't be fair to you.  I

18    fully and completely agree with that.

19              All I'm simply asking is a simple question.  You've

20    heard him testify and say several things, several of which in

21    response to my questions, and all I'm asking is, do you have

22    any questions of him?

23              If you do, go for it.  Don't?  Okay, great.  Thank you

24    very much.

25              (Witness excused)
```

```
 1              MR. ECHEVERRIA:  (Inaudible)

 2              THE COURT:  You broke up.

 3              MR. ECHEVERRIA:  We will not ask any questions.

 4              THE COURT:  Great.  Thank you.  Appreciate it.

 5              MR. LEE:  Your Honor, in light of the way the Court is

 6   proceeding with supplementing questions or asking questions

 7   based on the declarations, if we could have a moment's

 8   indulgence so we can plan our --

 9              THE COURT:  Sure.  In fact, it might not be a bad

10   thing for us to take a little break.  We've been going for,

11   what, almost an hour and a half?

12              THE CLERK:  Yes.

13              THE COURT:  So I'm sure my reporter could use a break.

14              By the way, just so that you know, we're going to

15   break about 12:30, because I have a judge's meeting I must

16   attend, and then we'll come back at 2:00, if we need to.

17              Let's be in recess for 10 minutes, say five minutes

18   after 11:00.  Thank you.

19              (Recess)

20              THE COURT:  Do you have any --

21              MR. DILLON:  Yes, Your Honor.  At this time,

22   plaintiffs would like to call Ashley Hlebinsky.

23    ASHLEY HLEBINSKY,

24       called as a witness by the Plaintiffs,

25       having been duly sworn, testified as follows:
```

```
 1              THE CLERK:  State your full name, spelling it for the
 2    record.
 3              THE WITNESS:  Ashley Hlebinsky.  A-s-h-l-e-y.
 4    H-l-e-b-i-n-s-k-y.
 5    BY MR. DILLON:
 6    Q.  Ms. Hlebinsky, can you hear me?
 7    A.  Yes.
 8    Q.  So you submitted a declaration on behalf of defendants'
 9    preliminary injunction, correct?
10    A.  Yes.
11    Q.  And in that declaration, it seems that you have quite a
12    background.  Can you just give me a brief summary of your
13    professional background?
14    A.  So I spent most of my career so far as the Robert W.
15    Woodruff curator of the Cody Firearms Museum, which is the only
16    accredited firearms museum in the United States.
17              I recently stepped back from that position, after
18    being in charge of over 7,000 different firearms, as well as
19    some prefirearms weapons and sporting arms, and I rebuilt the
20    Cody Firearms Museum on a multi-million-dollar renovation.
21              And I was responsible for all aspects of that,
22    including design, research, content.  And as the new curator
23    emerita and senior firearms scholar, I continue my research
24    with them.
25              I also serve as the adjunct scholar of firearms
```

 1   history, technology, and culture for the Firearms Policy

 2   Coalition.

 3          I work on expert witness testimony.

 4          I also spend a lot of time advising television

 5   networks, media about television shows, and I do appear on

 6   camera as an expert, as well.

 7          And I have written, I believe, over 100 articles, both

 8   combination of academic peer-reviewed articles as well as

 9   popular firearms history articles.

10   Q.   All right.  Now, in your declaration, you provide some

11   historical background on various firearms and features.

12          Can you tell us about the background -- about how that

13   background relates to this case.

14   A.   Yes.  I know it can seem a little odd when you're starting

15   to talk about an assault weapons ban and the AR-15 or the

16   modern sporting rifle platform.

17          But the reason that I start in the beginning of

18   firearms history is because a lot of the features described in

19   the Penal Code are features that have been around for

20   centuries.

21   Q.   Okay.  And have you reviewed California Penal Code Section

22   30515?

23   A.   I have.

24   Q.   And you've reviewed the various features that are listed in

25   that Penal Code section?

 1    A.   Correct.

 2    Q.   With your work with the Cody Firearms Museum, how does the

 3    Cody Firearms Museum define "assault weapon"?

 4    A.   When we defined "assault weapon" in the new museum, the way

 5    that we went about it, so to understand, is more for a layman

 6    and the general public.

 7         And so in our definition, we call it a legislative

 8    catch-all, and we specifically reference the '94 assault

 9    weapons ban, as that's the most known one to the general

10    public.  And it's basically a legislative catch-all to describe

11    what I call largely cosmetic features on semi-automatic

12    firearms.

13    Q.   And you mentioned "largely cosmetic".  Are you implying

14    that these features don't have any kind of utility?

15    A.   No, no.  I agree with Mr. Kapelsohn's statement on that, as

16    well.

17    Q.   Okay.  Based on your academic experience and research,

18    what's the driving factor for firearms technology?

19    A.   It's very interesting, because we're dealing with 800 years

20    of history.

21         And initially, when they were -- when the military was

22    trying to find a way to get down and break down fortresses, you

23    know, bow and arrows, crossbows, that wasn't going to do it.

24         And so initially in firearms history, technological

25    innovation was driven by the military.  But what happened was

1  that, basically, very, very quickly, within, you know, 100

2  years or so, the innovation on the firearms technology outpaced

3  military strategy.

4          So the higher-end arms, the rifles, the repeating

5  firearms, the magazine-fed firearms, all of those firearms that

6  have been around since the 15 and 1600s, those ended up

7  becoming something that people had in the civilian market.

8          So basically, the guns became too advanced to be

9  applied effectively with the tactics that were on hand in the

10  military, and so the civilians got the better guns.

11          And then that's kind of continued.

12          And then in the latter half of the 20th century, that

13  has done a little bit of a flip flop in the sense that the

14  civilian guns are so much more advanced in the terms of

15  precision and the sport of shooting that there are soldiers

16  taking more of the civilian competition arms and the features

17  that are a part of that to be fast and accurate and actually

18  applying them on the battlefield.

19          So now, the military looks to the civilian market for

20  the better pieces of technology that they can implement for

21  their soldiers.

22          THE COURT:  Let me ask you a question.

23          So there's an event in the winter Olympics -- I can't

24  remember the name of it.

25          THE WITNESS:  Biathlon.

```
 1                THE COURT:  What?

 2                THE WITNESS:  Biathlon.

 3                THE COURT:  Yeah, that's it.

 4                Anyway.  So, do you happen to know, the weapons that

 5    they use in the biathlon, would they be closer to weaponry used

 6    in civilian uses or military uses?  Do you know?

 7                THE WITNESS:  There's a lot of interplay between sport

 8    and war.

 9                THE COURT:  Haha.  Sad, but true.

10                THE WITNESS:  It seems like a joke, but yes, it's

11    true.

12                And so a lot of the early sport shooting, the target

13    shooting, was to make the soldier a better, you know, more

14    accurate officer.

15                And so the biathlon got its start, basically, for

16    Alpine ski patrols.  So it was competitions to improve anyone

17    that was in a, kind of, police capacity or in a military

18    capacity up in the mountains so that you could ski and

19    accurately shoot your rifle.

20                And the initial biathlon actually started center-fire

21    rifles.  And actually, I believe one of the exhibits in my

22    declaration has a Winchester Model 70 with the thumbhole stock

23    that's a centerfire rifle, as well, and that was --

24                THE COURT:  It shoots a .308?

25                THE WITNESS:  I actually don't recall which caliber it
```

 1  │  shoots.

 2  │          THE COURT:  Okay.

 3  │          THE WITNESS:  But that is a biathlon gun.

 4  │          And so it started off at center-fire, and now, because

 5  │  it is a sporting gun specifically, they've tailor-made those

 6  │  firearms to almost have a space-agey appearance, and they've

 7  │  reduced them down to .22 caliber for the accuracy of just the

 8  │  precision shooting.

 9  │          THE COURT:  I think it's a .30-06, not a .308.

10  │          Okay.  Go ahead.

11  │  BY MR. DILLON:

12  │  Q.  Ms. Hlebinsky, can you provide us with an example of

13  │  military firearms being sold to the civilian market?

14  │  A.  Yes.  It's a very common thing that what happened,

15  │  especially after the, kind of, beginning of mass manufacture

16  │  during the Industrial Revolution.

17  │          So a good sample is, after the Civil War, because they

18  │  were mass producing firearms, there was a whole host of

19  │  firearms left over, and so there were multiple options after

20  │  the Civil War.

21  │          If you were a soldier, you could purchase your own

22  │  firearm for -- the numbers vary, but some of them were for $6,

23  │  and then the larger surplus of weapons that they had from the

24  │  war, those were often sold to dealers and distributors, like

25  │  Schuyler, Hartley & Graham, and those were then sold to the

1   civilian market way, way cheaper than they were originally

2   worth.

3           And that has continued.  It's a trend that's

4   continued.

5           So it was originally rifled muskets, and then it was

6   the Springfield 1903 bolt action.  M1 Garands are still being

7   sold, I believe, through the CMP, as well as 1911

8   semi-automatic pistols.  It's a tradition that's been going on

9   pretty much as soon as we had surplus.

10          THE COURT:  The Winchester 70?

11          THE WITNESS:  Correct.

12          THE COURT:  That's a civilian rifle, right?

13          THE WITNESS:  Yes.

14          Are you speaking specifically of the one in the

15  picture, or in general?  Oh, okay.  I think they have multiple,

16  you know, functions and purposes.

17          THE COURT:  Well, it was originally a civilian rifle,

18  right?

19          THE WITNESS:  Yes.

20          THE COURT:  And then it was adopted for use as a

21  sniper rifle after World War II, right?  Or during

22  World War II?

23          THE WITNESS:  I believe so, yeah.  A lot of those

24  types of firearms have that kind of dual adaptation.

25          THE COURT:  Okay.

1    BY MR. DILLON:

2    Q.   Ms. Hlebinsky, based upon your review of Penal Code

3    Section 30515, and your experience in this field, would you say

4    that -- well, how do you classify the features listed in Penal

5    Code 30515?  Are they new or novel?

6    A.   No.

7    Q.   Let's go over a few of those features.

8          So with regard to magazines, based on your review of

9    30515, does it make any reference to magazines or ammunition

10   capacities?

11   A.   It does.

12   Q.   And when did firearm magazines first appear in history?

13   A.   So a lot of people will say that the first firearms

14   magazines, because of the way that the firearm's constructed,

15   is the Lorenzoni magazine which was developed in the mid 1600s.

16   Q.   And around that time, were there other firearms that

17   incorporated magazines?

18   A.   Yes.  The Lorenzoni was widely copied all over Europe.

19   Q.   Can you give me another example of a firearm that used

20   magazines?

21   A.   Yes.  Well, there's so many.  But in the 1700s, you have

22   the Girardoni, which is actually an air rifle, and that had a

23   20-round tubular magazine under the barrel, and the tubular

24   magazine continues up into the 1800s.

25          THE COURT:  Now, counsel, in the interest of time, as

1   you know, or have probably gathered by now, I've read an awful

2   lot of information, not just in this case, but, for example,

3   the *Duncan v. Becerra* case.  I have a pretty good handle on the

4   history of magazines and so on and so forth.

5           MR. DILLON:  Apologize, Your Honor.

6           THE COURT:  So just so that you know, I don't have any

7   questions of this witness, unless your questioning elicits

8   questions from me.  So I think I'm pretty familiar with the

9   history of firearms.

10          There's lots and lots of exhibits and things that have

11  been filed that I have read and that have, you know,

12  familiarized me with the history of firearms, and magazines,

13  and calibers, and so on and so forth.

14          MR. DILLON:  Okay.  Well, then at this time,

15  plaintiffs will just submit with what is already in the record.

16          THE WITNESS:  Thank you.

17          MR. ECHEVERRIA:  Your Honor, John Echeverria.

18          Just to clarify, are -- because I can't see the

19  courtroom, are plaintiffs' witnesses in the courtroom, or are

20  they being kept outside until they're called as witnesses?

21          THE COURT:  I don't know.  Everybody's wearing a face

22  covering, so I don't have a clue.

23          Do you want me to ask?  I could inquire.

24          MR. ECHEVERRIA:  I would appreciate that.

25          THE COURT:  Okay.  Are your witnesses in the

1    courtroom?

2              MR. LEE:  Yes, Your Honor.

3              THE COURT:  All right.  Do you want them excluded?

4              MR. ECHEVERRIA:  Well, I just don't think it's fair

5    for the plaintiffs' witnesses to be in the courtroom to observe

6    the testimony while the defendants' witnesses are kept in a

7    holding room on Zoom.

8              THE COURT:  Are you moving to exclude the witnesses?

9              MR. ECHEVERRIA:  I would -- that's generally how I

10   think it should happen.

11             THE COURT:  Okay.  The witnesses will be excluded.

12   Please ask your witnesses to step outside of the courtroom.

13             MR. LEE:  Your Honor, can we keep party witnesses?

14             THE COURT:  Of course.  Parties have a right to

15   remain.  There's no ifs ands or buts about that.

16             But if you're not a party, please step outside the

17   courtroom.

18             Thank you, Mr. Echeverria.  I appreciate your bringing

19   that to my attention.

20             All right.  Any questions of this witness?

21             MR. ECHEVERRIA:  We don't have questions for any of

22   the witnesses.

23             THE COURT:  Thank you.  You may step down.

24             THE WITNESS:  Thank you.

25             (Witness excused)

```
 1              THE COURT:  All right.  Call your next witness,
 2    please.
 3              MR. LEE:  Your Honor, Mr. James Curcuruto is waiting
 4    on Zoom, apparently.  If we could admit him into the --
 5              THE COURT:  Okay.  Well, I'm not sure exactly what
 6    that means.  All right.  I guess we'll have to bring him into
 7    the courtroom.
 8              THE CLERK:  I have someone by the name of "Jim C".
 9              MR. LEE:  That should be Mr. Curcuruto.
10              THE COURT:  Let's hear from Mr. Curcuruto.  Is he
11    there?
12              THE CLERK:  I see someone --
13              MR. LEE:  Can we do a sound check?
14              THE COURT:  Mr. Curcuruto, can you hear me?  Can you
15    hear me?
16              MR. CURCURUTO:  Yes.  I unmuted.  I can hear you, and
17    you can hear me.
18              THE COURT:  All right.  Please raise your right hand.
19     JAMES CURCURUTO,
20         called as a witness by the Plaintiffs,
21         having been duly sworn, testified as follows:
22              THE COURT:  Please state your name for the record.
23              THE WITNESS:  James Curcuruto.
24              THE COURT:  Can you spell that for us, please?
25              THE WITNESS:  J-a-m-e-s, C-u-r-c-u-r-u-t-o.
```

 1   BY MR. LEE:

 2   Q.  Mr. Curcuruto, this is George Lee, the attorney for the

 3   plaintiffs.  I don't think you can see me, but can you hear me

 4   okay?

 5   A.  I can, George.

 6   Q.  Thank you.

 7        Mr. Curcuruto, how are you employed?

 8   A.  I work as the Director of Research and Market Development

 9   for National Shooting Sports Foundation.

10   Q.  Can you tell the Court briefly what the National Shooting

11   Sports Foundation is?

12   A.  Sure.  NSSF is the trade association for the firearms and

13   ammunition industry.  We're a member of ACE organization, with

14   members being firearm retailers, shooting ranges,

15   manufacturers, primarily.

16   Q.  And what do you do with NSSF as the director of research?

17   A.  I conduct a majority of the consumer-related research here

18   and provide information to our members so they can make better

19   business decisions.

20   Q.  Are you -- as part of your job, are you familiar with

21   industry statistics and that kind of thing?

22   A.  Yes, I am.

23   Q.  Did you provide testimony in the *Duncan v. Becerra* case

24   before this Court?

25   A.  Yes.

1    Q.  And have you been asked to provide an analysis as to the

2    prevalence of what we call modern sporting rifles in the United

3    States?

4    A.  Yes.  For this Miller case?

5    Q.  Correct.

6    A.  Yes.

7    Q.  Can you tell the Court what you mean when you talk about

8    modern sporting rifle, or MSR?

9    A.  Sure.  Modern sporting rifles are semi-automatic rifles

10   with the capability to accept a detachable magazine, primarily

11   AR, AK platforms.

12   Q.  What are the primary features that make it a modern

13   sporting rifle?

14   A.  Some of the primary features for modern sporting rifles

15   are, again, they can accept a detachable magazine, they have

16   their standard barrel, grip, stock.

17   Q.  What is the most popular modern sporting rifle currently?

18   A.  The AR platform would be the most popular.

19   Q.  Is the AK type of rifle, is that also classified as a

20   modern sporting rifle, according to your definition and

21   analysis?

22   A.  Correct.

23   Q.  Okay.  So --

24           THE COURT:  Let me interrupt you for just a second.

25           Earlier, when we had a witness on the witness stand, I

1    said that there was some confusion that would arise from time

2    to time.  One of the issues that has been somewhat confusing

3    for me in this case is that sometimes we tend to talk

4    California-specific, and other times we tend to speak

5    nationally, and sometimes the two kind of run together, one

6    into the other, so it's hard to -- so it almost seems like we

7    sometimes pick and choose, you know, what's best for us,

8    whether we're going to talk about state or whether we're going

9    to talk about national.

10           So when you mention -- when you say that the AR is the

11   most popular, are you talking about nationally or are you

12   talking about specifically for the State of California?

13           THE WITNESS:  Most of the research that we conduct on

14   this topic is national in scope; however, after, kind of,

15   reviewing some of the specific to what I believe was labeled as

16   assault weapons in California, the same would apply nationally

17   to the State of California.

18           The most popular firearm can be an AR, kind of, across

19   the board has that pistol grip, has the stock barrel.

20           THE COURT:  All right.

21   BY MR. LEE:

22   Q.  Mr. Curcuruto, were you asked -- did you submit a

23   declaration in support of the plaintiffs in this case?

24   A.  Yes.

25   Q.  And what was the objective of -- what were you trying to

1  let the Court know in that declaration, generally?

2  A.  The commonality of modern sporting rifles and the various

3  legal uses of the modern sporting rifle.

4  Q.  I'm sorry.  Go ahead.

5       Mr. Curcuruto, were you finished with your answer?

6  A.  I'm not sure if you heard me, but the last question was

7  what we were trying to prove in a declaration, and just show

8  the commonality of modern sporting rifles, as well as the

9  different lawful purposes for them.

10  Q.  What was your -- and if you could give the Court some

11  highlights as to what findings you reached with regard to the

12  commonality of modern sporting rifles in the United States

13  overall.

14  A.  Sure.  So we conduct various studies, as well as use

15  informational sources from government organizations, such as

16  FBI, NICS, and Alcohol Tobacco Firearms, and we found, I

17  believe -- since the information we provide is a few years

18  old -- I believe we found in the information we provided at the

19  time there to be about 17.7 million modern sporting rifles in

20  the U.S. during that time period of 1990 to 2016, I believe.

21       Since then, we have received some updated data that

22  has increased those figures.

23       Some of the consumer studies we've referenced as

24  exhibits show that consumers own modern sporting rifles for a

25  wide variety of purposes, including personal protection, home

1    protection, hunting, target shooting, collecting.

2    Q.  Of those 17 -- the 17-million figure that you've cited to

3    the Court, how prevalent is the pistol grip on modern sporting

4    rifles of that 17-million figure?

5    A.  I believe that's pretty standard on just about all modern

6    sporting rifles, pistol grips.

7    Q.  What are the most common calibers for modern sporting

8    rifles?

9    A.  The most common are .223/.556, 7.62, .22 caliber, .308

10   caliber.

11   Q.  Have you had a chance to review the declaration of

12   Professor Donohue submitted by the defense in this matter?

13   A.  I have.

14   Q.  In particular, Professor Donohue says that your opinions

15   about the numbers are not applicable or flawed because they

16   don't account for firearms that would be considered as assault

17   weapons in California, because modern sporting rifles may be

18   rimfire rifles.  Do you recall that criticism?

19   A.  Yes, sir.

20   Q.  First of all, can you tell the Court what a rimfire rifle

21   is?

22           THE COURT:  I know what it is.  I'll save you some

23   time.

24   BY MR. LEE:

25   Q.  Okay.  What is the most common chambering of a modern

1   sporting rifle?  And if you could provide by what margins or

2   what percentages.

3   A.   The .223 centerfire is the most popular.  I believe

4   approximately 70 percent of MSRs, especially the AR-15 model,

5   about 70 percent of those are the .223.

6   Q.   And what about the remaining percents?

7   A.   I do not have that.  I know for the AR -- I'm sorry -- the

8   AK platform it is about 7.62.

9   Q.   What percentage -- what fraction -- what percentage does

10  rimfire -- firearms chambered in rimfire make up of the modern

11  sporting rifle number that you've cited?

12  A.   I, again, don't have that handy.  It's probably 15 percent,

13  ballpark.

14           THE COURT:  Just out of curiosity, would that

15  include -- when you're talking about those rimfire rifles, are

16  we talking about, say -- you're probably too young to remember

17  this -- but the .22 rifles that we used to shoot at the fairs

18  in the shooting booth to kill the lead ducks, and we'd get the

19  stuffed teddy bear if we shot enough of them.  You know, the

20  type of little .22 rifle that many people teach their kids how

21  to shoot guns, or are we talking about some other type of, you

22  know, what's been referred to by some folks as an assault

23  weapon?

24           Do you follow the difference?  Do you understand the

25  difference?

 1          THE WITNESS:  Yes, Your Honor.  So for our purposes,
 2    modern sporting rifles, whether they're rimfire or centerfire,
 3    all would have that same look and same features; a detachable
 4    magazine, the grip.
 5          So, you know, your standard or your traditional --
 6    let's say your traditional semi-automatic rifles, your Ruger
 7    10/22s that you might be referencing as a beginner rifle for
 8    use in squirrel hunting and plinking, along those lines --
 9    although I've never shot one at a carnival before -- those are
10    not included in modern sporting rifles.
11          THE COURT:  All right.  Okay, great.  Thank you.
12          MR. LEE:  Your Honor, that's all the questions I have
13    of this witness, unless the Court has additional.
14          THE COURT:  No, I don't have any other questions.
15          Mr. Echeverria, do you have any questions?
16          MR. ECHEVERRIA:  We have no questions at this time,
17    Your Honor.
18          THE COURT:  All right.  Just a second.  Actually, I
19    may have one.  I may have misspoke.
20          In your declaration you say that between 1990 and
21    2016, United States manufacturers produced approximately
22    11,432,000 AR platform rifles for sale in the United States
23    commercial marketplace, right?
24          THE WITNESS:  Correct.
25          THE COURT:  Okay.  Again, by AR platform rifles, are

 1   we -- this is where things get a little bit confusing.

 2        So in this litigation, we have, I guess, the AK-type

 3   rifles, I think Mr. Kapelsohn testified to a couple other type

 4   rifles I had never heard of.

 5        So when you talk about AR platform rifles, are you

 6   including, for example, the AK-type rifles or not?

 7        THE WITNESS:  Not in that 11 million.  I believe in

 8   that same chart you're referencing the imports.

 9        THE COURT:  Right.  I was going to get to that.  Okay.

10   So --

11        THE WITNESS:  But those are primarily -- your AKs

12   would be the import number there.  The ARs are the one's that

13   are primarily produced in the United States, although we're

14   starting to see some manufacturers, Kalashnikov USA, start to

15   produce the AK locally here in the United States, as well.

16        THE COURT:  So your declaration says that between 1990

17   and 2016, the U.S. International Trade Commission shows

18   approximately 4,660,000 AR and AK platform rifles were imported

19   into the United States.

20        So in addition to the 11,432,000 manufactured in the

21   United States, there were an additional 4,660,000 that were

22   imported into the United States?

23        THE WITNESS:  Correct.  And again, the imports are

24   primarily the AK platform, the U.S. production is primarily the

25   AR.

 1          THE COURT:  And then you further went on to say that

 2 in 2016 alone more than 2.2 million of these rifles were

 3 manufactured in the United States or imported into the U.S. for

 4 sale, right?

 5          THE WITNESS:  Correct.  Yes, sir.

 6          THE COURT:  Do you happen to know the -- obviously,

 7 the ban on these rifles, I would think, I would imagine, has

 8 curtailed the sale of these rifles in California.

 9          Do you happen to know if the sale of these rifles has

10 continued throughout the rest of the country?

11          THE WITNESS:  We do not have specific sales data, but

12 it's my understanding that sales are strong across the

13 board with a wide variety of firearms categories, including AR,

14 AK, modern sporting rifles.  And there are states that have

15 compliant models of modern sporting rifles, as well.  So, for

16 example, Connecticut, the state I'm in right now, you can

17 (inaudible).

18          COURT REPORTER:  I'm sorry, Judge.  "The state I'm in

19 right now you can" what?

20          THE COURT:  Did you hear my court reporter?

21          THE WITNESS:  I'm sorry.  No.

22          THE COURT:  I'm sorry.  This is so awkward.

23          COURT REPORTER:  I'm sorry, Judge.

24          THE COURT:  That's all right.  No problem.

25          Can you just -- do you think you can repeat your last

1   answer for me, if you remember it?

2           THE WITNESS:  Sure.  Yes.  I believe sales are strong

3   across all states right now, across all categories of firearms,

4   including modern sporting rifles, both AR and AK platforms.

5           And I also believe that there are state-compliant

6   models of modern sporting rifles, such as in the State of

7   Connecticut where I reside, you can purchase a

8   Connecticut-compliant modern sporting rifle.

9           I'm not aware of the specifics of what compliant

10  models are available in other states, such as California.

11          THE COURT:  You may not know the answer to this

12  question, but do you happen to know if the Connecticut

13  restrictions are the same as the restrictions that California

14  imposes?

15          THE WITNESS:  I'm not.  I would have to look that up.

16  I do not have that in front of me.

17          THE COURT:  Fair enough.  Fair enough.

18          Let me ask you this other question.  Do you know if,

19  when someone buys one of these rifles -- assuming they're

20  buying it legally, of course -- generally -- and I don't know

21  about private sales or anything of that sort -- but generally,

22  someone would have to go through a federal firearms licensed

23  dealer, right?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Do you know if that is somehow or another

 1 | communicated to the state?

 2 |            THE WITNESS:  Well, which state?

 3 |            THE COURT:  Any state.  So assume that I'm going to go

 4 | out and buy an AR-15-type rifle, so I have to go through a

 5 | federal firearms licensed dealer.

 6 |            Does that information get shipped over to the state?

 7 | So does the state get to review or to find out whether or not

 8 | I'm an eligible person who can buy that AR-15 rifle?

 9 |            THE WITNESS:  Sure.  In some instances, the states do

10 | participate in a background check.  But on the federal level --

11 | so if anybody wanted to go legally purchase a firearm and go

12 | through an FFL, like you mentioned, they would have to fill out

13 | a form, ATF Form 4473, and they have to fill out all that

14 | information, provide their contact information, and then that

15 | firearm dealer will either call a number and go directly to the

16 | feds or use their online system and get approval, denial, or a

17 | wait.  And I know in some instances, states are involved in

18 | that process, but others, states are not involved in that

19 | process, but it is a federal approval system.

20 |            THE COURT:  If I'm going to buy an AR-15-type rifle in

21 | the State of California, I'm going to have to go through a

22 | background check, and the state will run a NICS check as well

23 | to see if I am a prohibited person that's otherwise prohibited

24 | from buying that gun; is that true?

25 |            THE WITNESS:  I'm not aware of the specifics in the

1   State of California.

2          THE COURT:  All right.  That's fine.  Great.  Thank

3   you.

4          All right.  Thank you.

5          MR. LEE:  Thank you, Your Honor.

6          THE COURT:  Mr. Echeverria, any questions?

7          MR. ECHEVERRIA:  No questions at this time, Your

8   Honor.

9          THE COURT:  All right.  Thank you.  Thank you, sir.

10  You may be excused.

11         (Witness excused)

12         THE COURT:  Please call your next witness.

13         MR. DILLON:  Plaintiffs call George Mocsary to the

14  stand.

15   GEORGE MOCSARY,

16      called as a witness by the Plaintiffs,

17      having been duly sworn, testified as follows:

18         THE CLERK:  State your full name for the record,

19  spelling both.

20         THE WITNESS:  George Mocsary.  G-e-o-r-g-e,

21  M-o-c-s-a-r-y.

22  BY MR. DILLON:

23  Q.  Professor Mocsary, did you submit a declaration in support

24  of plaintiffs' motion for preliminary injunction?

25  A.  I did.

1    Q.  Okay.  And in that declaration, does it provide the

2    understanding of your background and experience?

3    A.  It does.

4    Q.  And as a part of that declaration that you submitted, did

5    you review each state's laws and regulations regarding firearms

6    defined as assault weapons?

7    A.  I did.

8    Q.  And how many states in the United States have assault

9    weapon laws similar to California?

10   A.  Five states; New York, New Jersey, Maryland -- excuse me --

11   New York, New Jersey --

12   Q.  Massachusetts?

13   A.  Massachusetts -- yes.  New York, New Jersey, Massachusetts

14   Maryland, and Connecticut.  Excuse me.

15   Q.  All right.  And do any other states place restrictions on

16   assault weapons?

17   A.  Yes, three other states; Hawaii, Wisconsin, and Virginia

18   have much lower restrictions than those five states.

19   Q.  Does Minnesota?

20            THE COURT:  Are they all the same restrictions?  Every

21   one of these states have the same restrictions?

22            THE WITNESS:  No.  They all vary around the edges.

23   The five that I mentioned previously are the most restrictive.

24   Generally speaking, they focus on the features of the firearm.

25   One of the states -- and I don't recall which now -- has a list

 1  of firearms that it bans and says, "Anything similar to these

 2  firearms are also covered by the restriction."

 3  BY MR. DILLON:

 4  Q.  I believe, when I asked you other states that have placed

 5  restrictions on assault weapons, can you name those states

 6  again?

 7  A.  Yes.  Hawaii, Wisconsin, and Virginia.

 8  Q.  Does Minnesota place any restrictions on assault weapons?

 9  A.  Minnesota, yes.

10  Q.  So does Wisconsin place restrictions?

11  A.  No, it does not.  I apologize.  Minnesota and Virginia --

12        THE COURT:  Have you testified before in court?

13        THE WITNESS:  I have not.

14        THE COURT:  I didn't think so.  Haha.  All right.

15  Now, look.  I'll tell you this.

16        THE WITNESS:  I did clerk, Your Honor, so --

17        THE COURT:  I tell witnesses all the time.  It's

18  pretty obvious to me when people come testify who have never

19  testified before, and they're nervous.  You know.  So I tell

20  them, look, you're among friends.  Nobody's going to hurt you.

21  Nobody's going to bite you.  I promise you.

22        So just relax.  Okay?

23        All right.  Go ahead.

24  BY MR. DILLON:

25  Q.  All right.  Professor Mocsary, so to summarize, how many

1    states treat all semi-automatic firearms the same as any other

2    firearm, regardless of their features?

3    A.   41 states.

4         MR. ECHEVERRIA:  Your Honor, pardon me.  This is John

5    Echeverria.

6         I'm going to make an objection to the extent that

7    plaintiffs' counsel is asking the witness to characterize the

8    laws of other states or provide legal testimony here.

9         An expert witness should testify about the facts and

10   their opinions about the facts.

11        THE COURT:  All right.  Well -- but you raised it in

12   your opposition.  You've raised -- as I recall, you raised the

13   fact that there are some other states that have restricted the

14   weaponry.  And if that's relevant, certainly the converse is

15   also relevant.

16        And so, you know, if you disagree, Mr. Echeverria,

17   that's why I've given you an opportunity to ask questions.  If

18   you want to ask questions, you can ask questions.

19        So anyway, your objection is overruled.

20        MR. ECHEVERRIA:  Okay.

21        THE COURT:  Go ahead.

22   BY MR. DILLON:

23   Q.   Professor Mocsary, how many states allow for any citizens

24   to possess any semi-automatic rifles?

25   A.   44 states allow the possession of any semi-automatic rifle.

1    The three states that I mentioned earlier put some

2    restrictions and make it more difficult to acquire them, but

3    they do ultimately allow them to be possessed.

4    Q.  And how many states allow citizens to possess at least some

5    type of semi-automatic rifle?

6    A.  All 50.

7    Q.  And based on your review of the various state laws

8    prohibiting or restricting assault weapons, have these laws

9    been in place a long time?

10   A.  They have not.  The first was passed here in California in

11   1989.

12        THE COURT:  That was the first restriction on

13   semi-automatic rifles?

14        THE WITNESS:  Yes, sir.  On so-called assault weapons.

15   BY MR. DILLON:

16   Q.  Okay.  And in that initial ban, did California restrict

17   assault weapons based off of features?

18   A.  It did not.  It was a named list of firearms.

19   Q.  So when did California begin restricting assault weapons

20   based off of features?

21   A.  About 10 years later.

22   Q.  Why did you choose to analyze the various jurisdictions

23   that apply assault weapon bans?

24   A.  Because I was asked to do a commonality analysis to see

25   whether the weapons covered by California's law were in common

 1 │ use.

 2 │          MR. DILLON:  At this time, we have no further

 3 │ questions.

 4 │          THE COURT:  All right.  Mr. Echeverria?

 5 │          MR. ECHEVERRIA:  We don't have any questions at this

 6 │ point, but we'll maintain that objection as to any legal

 7 │ conclusions offered by the expert, Your Honor.

 8 │          THE COURT:  All right.  Well, okay.  Thank you.  You

 9 │ may step down.

10 │          (Witness excused)

11 │          THE COURT:  Please call your next witness.

12 │          MR. LEE:  Your Honor, we'll call General Youngman.

13 │  GENERAL ALLEN YOUNGMAN,

14 │      called as a witness by the Plaintiffs,

15 │      having been duly sworn, testified as follows:

16 │          THE CLERK:  State your full name, spelling your first

17 │ and last name.

18 │          THE WITNESS:  Allen, A-l-l-e-n.  Youngman,

19 │ Y-o-u-n-g-m-a-n.

20 │ BY MR. LEE:

21 │ Q.  General Youngman, thank you.

22 │          How are you employed, sir?

23 │ A.  I'm retired from the United States Army.  My primary

24 │ occupation now is Executive Director of the Defense Small Arms

25 │ Advisory Council.

1    Q.   General, how long were you in the United States Army?

2    A.   34 years and 9 months.

3    Q.   Can you tell the Court some of your more significant duty

4    assignments while you were active duty?

5    A.   I was commissioned in 1970.  I served in the Special Forces

6    Group.  I served in Vietnam as an advisor.  I served 101st

7    Airborne Division.

8              THE COURT:  I'm sorry.  101st?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Airborne Division?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Thank you for your service.

13             THE WITNESS:  Thank you, sir.

14             Other Special Forces assignments.  Some armory

15   assignments in the Kentucky National Guard.

16             Also served the Pentagon for about six years.

17             And my last assignment was as the Adjutant General of

18   Kentucky.

19   Q.   What is the Adjutant General of Kentucky?

20   A.   Every state has an adjutant general who is the person in

21   charge of the National Guard, both Army and Air, in every

22   state.

23   Q.   And when did you retire from active duty?

24   A.   December of 2003.

25   Q.   And when you retired, what rank did you retire at?

 1  A.   Major General.

 2  Q.   You did discuss briefly about some of your experience with

 3  the National Guard.

 4        Can you tell the Court what some of your more

 5  significant assignments were with regard specifically to

 6  National Guard duty?

 7  A.   National Guard, I commanded an armored calvary, tank

 8  battalion, and an armored brigade.

 9        I also served the National Guard Bureau at the

10  Pentagon.

11  Q.   When you say "National Guard", can you tell the Court

12  whether that's a U.S. Army position or is that a state

13  position?

14  A.   The National Guard is a reserve component of the United

15  States Army.  Every state has one.

16        THE COURT:  Do you know if that's called -- classified

17  as a militia under the Militia Act?

18        THE WITNESS:  The National Guard represents a portion

19  of the militia, sir.

20        THE COURT:  Right.

21        THE WITNESS:  I don't know how much history you'd like

22  to go into.

23        THE COURT:  You don't have to.  I just wanted to make

24  sure.

25        So that is a militia.

 1              THE WITNESS:  It is a part of the militia.

 2              THE COURT:  Right.  There's organized and then there's

 3   unorganized.

 4              THE WITNESS:  Very much so.

 5              THE COURT:  Got it.  All right.  So the National Guard

 6   is part of the organized militia.

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  Okay, good.

 9              Go ahead.

10   BY MR. DILLON:

11   Q.  General, I know military men don't like to talk about this,

12   but I want to ask you.  Can you tell the Court some of the

13   military awards that you've received in the course of your

14   career, maybe the more significant ones?

15   A.  I was awarded the Army Distinguished Service Medal, the

16   Silver Star, the Defense Superior Service Medal, Legion of

17   Merit, Bronze Star, Purple Heart, Combat Infantry Badge, Master

18   Parachutist Wings, Special Forces Tag.

19   Q.  The Silver Star and the Bronze Star and the Purple Heart,

20   are those earned in your service in Southeast Asia?

21   A.  Correct.

22   Q.  So have you, in your duties as both in the Army and the

23   National Guard, overseen or been directly responsible for the

24   training and readiness of our military forces?

25   A.  I have.

1   Q.  And from these experiences, have you developed an

2   understanding of what it takes to achieve a certain level of

3   readiness?

4   A.  Yes, I have.

5   Q.  And you mentioned to the Court the civilian post that you

6   hold.  Can you tell the Court, does that post that you hold --

7   or that position you hold in your civilian life give you

8   insight as to small arms needs in the United States military?

9   A.  Yes, it does.

10  Q.  Have you also held civilian law enforcement positions?

11  A.  I have.

12  Q.  Can you tell the Court what those are?

13  A.  I've been a Reserve Deputy with the Davis County Sheriff's

14  Office since 2004.  Senior Firearms Instructor there.  And also

15  been in a similar function with the Warren County Kentucky

16  Sheriff's Department.

17  Q.  So from all the experience that you've described for the

18  Court today, and the declaration that you submitted to the

19  Court, have you become familiar with the small arms that have

20  been used in both the civilian and the military side?

21  A.  I have.

22  Q.  And when we saw "small arms", can you tell the Court what

23  you mean by that?

24  A.  Generally speaking, that's anything smaller than 40mm,

25  usually an individually-employed weapon rather than a

1  crew-served weapon.

2  Q.  From your training, education, and experience, your combat

3  experience, sir, working with equipping our civilian and

4  military law enforcement, have you become familiar with the

5  rifle that's known generally as the AR-15 rifle?

6  A.  Yes, I have.

7  Q.  And now, we've heard testimony in this hearing today, and

8  the Court had some questions about, you know, what constitutes

9  an AR platform rifle, that kind of thing.  And maybe you're the

10 best person to tell us this.  What's the difference between an

11 AR-15 rifle and an M16?

12 A.  The principal difference is that an M16 is capable of

13 select fire or full-automatic fire, and the AR platform is

14 semi-automatic only.

15       THE COURT:  Let me ask you a question.  When you were

16 in Vietnam, did you -- were you equipped with an AR-15 rifle?

17       THE WITNESS:  No, sir, I was equipped with an M16A1

18 rifle.

19       THE COURT:  Is the M16A1 a selective fire weapon?

20       THE WITNESS:  Yes, sir, it is.

21       THE COURT:  As a member of the National Guard, are you

22 equipped with an M16 or an AR-15 rifle?

23       THE WITNESS:  Persons equipped with a rifle are

24 equipped with the M16.

25       THE COURT:  So as a member of the National Guard, the

1    official militia, you are armed with an M16.

2              THE WITNESS:  Yes, Your Honor.  There are variations,

3    depending on the duty positions, but those aren't rifles, it's

4    either the M16 or the M4, which is a carbine version of the

5    M16.

6              THE COURT:  Not an AR-15.

7              THE WITNESS:  No, sir.

8              THE COURT:  You've been in combat.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  All right.  Again, I thank you for that.

11             Now, if you were in combat, what weapon would you

12   prefer to have in combat; the bolt-action rifle or a

13   semi-automatic rifle?

14             THE WITNESS:  As between the two, a semi-automatic,

15   Your Honor.

16             THE COURT:  If you were in combat, which weapon would

17   you prefer to have; a selective fire weapon or a semi-automatic

18   weapon?

19             THE WITNESS:  Selective fire, Your Honor.

20             THE COURT:  Okay.  Thank you.

21   BY MR. LEE:

22   Q.  General Youngman, you mentioned the M4 rifle.  What does

23   "M4" mean?

24   A.  M4 is derived somewhat from the XM1772 family, it's called

25   a CAR-15.  It's been resurrected as the M4.  It's derived

 1   primarily from the M16 family.

 2   Q.   Does the M4 have the select fire feature?

 3   A.   A military M4, yes, sir, it does.

 4   Q.   So the term M4, or M16 as we've been using it, that's --

 5   there's no off-the-shelf rifle that is sold as that, is there?

 6   A.   That's a harder question to answer than you might suspect.

 7        Colt continues to market semi-auto versions of the M4

 8   that are marked M4, but they have the characteristics of the

 9   M16, rather than the M16 family.

10   Q.   So M16, is that basically a U.S. Government designation?

11   A.   That is correct.

12   Q.   And for a rifle to qualify as an M16, it has to be

13   purchased by the United States Government.

14   A.   Correct.

15   Q.   And in order for it to be purchased from the United States

16   Government as an M16 rifle, it has to meet certain government

17   specifications.

18   A.   That is correct.

19   Q.   And that includes select fire.

20   A.   Yes, sir.

21   Q.   And the same theory applies to what we call M4 rifles, as

22   well.

23   A.   That is correct.

24   Q.   All right.  So as the Adjutant General of Kentucky, you

25   were responsible for the training of our forces for potential

 1   combat?

 2   A.   That is correct.

 3   Q.   And that wasn't just theoretical, was it?  I mean, some of

 4   your forces did actually go to combat?

 5   A.   I would put it this way.  September 11th, 2001, was my

 6   30-day on the job as the Adjutant General, and our focus at

 7   that point in time was solely on preparing forces to deploy.

 8   Q.   And as the Judge pointed out, that's the organized --

 9   the -- your units were the organized militia.

10   A.   Yes.

11   Q.   And did they go and serve in foreign duty abroad?

12   A.   That is correct.

13   Q.   And when they did that, was there anyone left at home?

14   A.   Yes.  Parts of the National Guard -- there was not a time

15   when all of the National Guard deployed at once.

16   Q.   All right.  So General Youngman, based on your training,

17   your experience, your combat experience, and as a someone who

18   is really primarily responsible for the training of our forces,

19   do you have an opinion as to the suitability of the AR-15 rifle

20   for militia service in the United States today?

21   A.   Yes, I do.

22   Q.   What's that opinion?

23   A.   It would be the ideal weapon for the militia.

24   Q.   Just to be clear, when we talk about "the militia" -- and

25   you may have touched on this already -- what do you mean when

1  you saw "the militia" in terms of your opinion?

2  A.   The Army, both as envisioned by George Washington and

3  currently reflected in the law, there's really three components

4  or three levels; there's the regular Army, then there's the

5  reserve components, which include the National Guard -- they're

6  organized, trained for deployment overseas as part of war

7  plans -- and then you have the state-controlled militia below

8  that, and that varies from state to state how many steps have

9  been taken.

10        Some states have a -- like California has a State

11  Guard, I understand.  It's about 1,000 people.

12        My state has extra provision for it, but does not

13  organize.  It's a state defense force type militia, but it's a

14  much broader concept than the specifically war-planned National

15  Guard forces.

16  Q.   Okay.  When you talk about the suitability of the AR-15

17  rifle for militia service, what are you talking about when you

18  say "militia service"?

19  A.   Those forces organized by and for the state, they serve the

20  pleasure of the state.

21  Q.   We're not talking about -- when we say "militia", we're not

22  talking about private organizations that aren't called up by a

23  government?

24  A.   Ones that decide to go kidnap the Governor of Michigan, no,

25  that's not what we're talking about.

1  Q.  So in terms of the assumptions that we're raising when we

2  talk about militia service, it's not just theoretical, though,

3  is it?  It's possible that every state in the country may call

4  upon its unorganized militia to muster able-bodied persons to

5  defend their state, if necessary.

6  A.  Absolutely.  That's exactly what happened during

7  World War II.  The entire National Guard was mobilized and

8  deployed.  There was basically nothing left at home.  That's

9  where a lot of states went to, kind of, an ad hoc organization.

10  And I think that name was recognized in the 1950s, and that's

11  why Title 32 United States Code, Section 11(i)(c), I think,

12  provides for state defense forces.

13  Q.  So when we talk about the suitability of the AR-15 for

14  militia service, why do you feel, in your opinion, that it's an

15  ideal weapon for militia service?

16  A.  First of all, it's a ubiquitous weapon.  You can almost say

17  it's in the American DNA at this point.  People know how to use

18  it.  It's very easy to train on.  Anybody coming off of

19  active-duty military service is already proficient at it.

20  There's a short training curve.  It's semi-automatic so an

21  individual can own it, in most states at least.  And it has all

22  the characteristics you would probably need for the militia.

23  Q.  Is there a commonality of -- does the commonality of

24  certain parts of the AR-15 play into your analysis?

25  A.  Yeah.  There's a robust supply chain.  Very mature

1    technical knowledge.  It's not hard -- if you had some other

2    weapons, you probably would have to develop a supply chain for

3    replacement parts or repair parts.  Those things already exist

4    for the AR-15.

5    Q.  What are some of the features that are common to the AR-15

6    that make it suitable for militia service?

7    A.  First of all, it's lightweight.  It -- particularly the

8    adjustable stock, which is mostly common with the AR-15 family

9    today.

10            THE COURT:  Let me ask you this, since you've actually

11   been in combat.

12            THE WITNESS:  Yes, sir.

13            THE COURT:  Let me ask you this.  What difference does

14   it make if you have an adjustable stock?

15            THE WITNESS:  Your Honor, during Vietnam, most of us

16   did not wear body armor, for example, and we were all male, and

17   so one size could, arguably, fit all.

18            Today, we wear body armor.  Today, we have a lot of

19   female soldiers.  Being able to adjust the length of the stock

20   to get a proper alignment is key to accuracy.

21            THE COURT:  Okay.  Thank you.

22   BY MR. DILLON:

23   Q.  And the commonality of magazines that fit into an AR-15,

24   how does that play into your opinion about the usefulness for

25   militia service?

1  A.   That's an extremely useful feature, the fact that

2  magazines, known standard, lots of producers, and magazines, as

3  we know, facilitate the manual arms being able to use a common

4  magazine, as well as supplying different units.

5  Q.   Does the AR-15 use a standard type of magazine that fits in

6  most of the same or similar type of firearm?

7  A.   Just about everything that's on the market today would meet

8  the NATO standard that was adopted years ago, particular

9  dimensions for both aluminum steel and polymer magazines, and

10 they are ubiquitous in this country.

11 Q.   Is that what's referred to as a STANAG magazine?

12 A.   That's correct.

13 Q.   So when we talk about -- when you talk about militia

14 service and the AR-15 as being something suitable for militia

15 service, are you envisioning something that is privately owned

16 or something that is kept in a government warehouse?

17 A.   Theoretically, both are possible.  As a practical matter,

18 privately owned would be much more available.  I don't know of

19 any state that's actually stockpiling weapons for that purpose.

20 It would tie up budgetary resources.  Probably most states are

21 not going to do that.

22       THE COURT:  Let me interrupt you for just a second

23 because, like I said, I do have questions.

24       In your declaration, you talk about, for example, the

25 difference between a 44 -- I'm sorry -- .45 ACP, and 5.56 NATO

 1    round, and a 7.62 AK round.

 2          Do you know anything at all about the ballistics of

 3    those rounds?

 4          THE WITNESS:  I'm sorry, Your Honor?

 5          THE COURT:  Do you know anything about the ballistics

 6    of the rounds, other than one's a .45 ACP, one is a 5.56 NATO

 7    round, and the other one is a 7.62?

 8          THE WITNESS:  Usually, we divide it in pistol caliber,

 9    which is somewhat like 9mm or .45.  You can also find it in a

10    carbine.

11          Then you have the intermediate, which is the AK-47,

12    which is 7.62 x 39, fairly short.  The 5.56 or .223 fall in

13    that category.

14          NATO, the .308 or the 7.62 x 51 NATO round, those are

15    called high-powered cartridges designed for longer distances.

16          THE COURT:  Do you know anything at all about the

17    penetration capability of the various different rounds, of your

18    own personal -- I'm sorry.  That's not what I meant to say.

19          Do you know of the difference in the penetration

20    capabilities of all of the rounds that are mentioned in your

21    declaration?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Tell me about those.

24          THE WITNESS:  The pistol caliber rounds have a very

25    limited penetration capability, very low power and short

 1 | distance.

 2 |         You start getting into the higher calibers, .308 and

 3 | 7.62, et cetera, they will penetrate a great deal more.

 4 |         Intermediate, it depends upon the type of round.  For

 5 | example, the original M16 round, Vietnam Era, was called M193.

 6 | It was a 55 grain full metal jacket.  It had very limited

 7 | penetration capabilities against any kind of hard target, like

 8 | a vehicle door or a helmet.

 9 |         In the early 1980s, there was an attempt to upgrade

10 | that to what's called an M855 round.  It included a steel

11 | penetrator, which gave you a little bit better penetration.

12 |         What happened in the last couple years is the Army has

13 | been on a quest for a better penetrating round.  Now the M855A1

14 | has significantly greater penetration capabilities.  It will go

15 | through a helmet, or -- the real reason it was designed was to

16 | go through any body armor, and that's fundamental.  It has a

17 | dramatically increased ability to penetrate.

18 |         Most of these are classified, but the general idea is

19 | it will get the job done.  I think 3/8th inch steel or

20 | 300 meters is standard.

21 |         THE COURT:  So the fact is that these weapons, even,

22 | say, a 9mm or a .40 caliber, you can buy different ammunition,

23 | for example, hollow points, right?

24 |         THE WITNESS:  Yes, sir.

25 |         THE COURT:  Or full metal jacket.  They will have a

1    different penetrating capability --

2              THE WITNESS:  That is correct.

3              THE COURT:  -- right?

4         The same thing for the .223, and the same thing for

5    the 5.56 and the 7.62, right?

6              THE WITNESS:  That is correct, sir.

7              THE COURT:  Okay.  And the same thing for the distance

8    that they will be able to travel at some form of accuracy,

9    right?

10              THE WITNESS:  That is correct.

11              THE COURT:  Okay.  So perhaps if you were -- so if you

12    were a citizen, just an average Joe or Jill, you're not in the

13    military, you know.  It might not be a good idea for you to own

14    the NATO round.  Not the intermediate round, but the other --

15    which one did you say was the higher powered round?

16              THE WITNESS:  You're talking about the new 5.56, the

17    improved round?

18              THE COURT:  Well, no.  I thought you classified -- I'm

19    sorry.  I got confused.  But I thought you were talking about

20    low-powered, intermediate, and --

21              THE WITNESS:  High-powered.

22              THE COURT:  -- high-powered.

23         So I thought the 7.62 was a high-powered.  Maybe I'm

24    mistaken.

25              THE WITNESS:  The 7.62 x 51 NATO round is

 1    high-powered, Your Honor.

 2              THE COURT:  Okay.  That's what I was getting at.  All

 3    right.

 4              So, for example, for a civilian, one could argue that

 5    you have absolutely really no use for that round, generally.

 6              THE WITNESS:  Your Honor, there's -- there is some

 7    confusion on that point.  Here again, it depends on the

 8    loading.

 9              7.62 x 51 is virtually identical -- nearly identical

10    to the .308 Winchester, which is probably the most popular deer

11    hunting round in this country.  So it's kind of difficult to

12    draw those lines.

13              But, yeah, as between the two, the more lethal round

14    is going to be the larger round.

15              THE COURT:  So if you had a .308 hunting rifle with a

16    five-round magazine, you would do the same amount of damage as

17    if you did a 7.62 x 51 with a five-round magazine.

18              THE WITNESS:  That is correct, Your Honor.

19              THE COURT:  Okay.  All right.  I'm sorry.  I

20    apologize.

21              All right.  Go ahead.  Anymore questions?

22              MR. LEE:  I do want to follow up on that line of

23    thinking, because there's been some testimony on the defense

24    side about piercing -- about how intermediate rounds can pierce

25    body armor of law enforcement.

1  BY MR. LEE:

2  Q.  Are you familiar with that topic, generally?

3  A.  I am.

4  Q.  So your standard AR-15 has a NATO 5.56 round, right?

5  That's an intermediate cartridge?

6  A.  (Non-verbal response.)

7  Q.  Is that capable of penetrating body armor?

8  A.  Depends on the body armor.

9  Q.  Is body armor rated by a certain measure?

10  A.  That is correct.  Probably what most of the Protective

11  Service or U.S. Marshals in this building wear is probably soft

12  body armor, Level 3A, which is rated for handgun rounds.  It

13  would be penetrated by virtually any rifle round, including my

14  grandfather's ancient Model 94 Winchester .30-30.  It can go

15  right through.  Any rifle round can go through soft body armor.

16       When you start talking about steel or composite or

17  ceramic rifle plates that are specifically designed to protect

18  from rifles, most rifle rounds will not penetrate that.

19  Q.  So most body armor is not really rated to withstand any

20  rifle round, unless it specifically has a rifle plate or

21  something like that.

22  A.  That is correct.

23  Q.  And your standard -- as you mentioned, your standard

24  hunting round, like a .308, is that going to have more kinetic

25  energy, in general, than an intermediate cartilage, like as

 1   used in the AR-15?

 2   A.   That is correct.

 3   Q.   Okay.  Have you been involved, in the Pentagon and in your

 4   posts with the National Guard, in planning for a situation when

 5   all the forces of the National Guard have been deployed abroad?

 6   A.   Yes, that's correct.

 7   Q.   And in those discussions -- I know it's hard to think

 8   about, but sometimes in the military you have to think about

 9   the unthinkable.

10        Has the situation ever been thought of or planned for

11   at the Pentagon level where our forces are totally 100 percent

12   either engaged abroad and possibly even defeated?

13   A.   Short answer to that would be no when you talk about being

14   defeated.  Virtually every war plan involves mobilizing and

15   deploying various force packages.

16        There are some that would take particularly two

17   simultaneous or near simultaneous contingencies somewhere in

18   the world would take virtually all of our forces.  That would

19   be 100 percent of the National Guard.

20        In fact, one of the real struggles after the end of

21   the Cold War was how much of a force to maintain.

22        At this point, it's very difficult to justify any

23   force that's not assigned against one or more war plans.

24        So conceivably, if those war plans were implemented,

25   the cupboard would be bare back here in the United States.

1  Q.  What do you mean when you say "the cupboard would be bare"?

2  A.  No deployment of military forces.  Those assigned to the

3  training base producing replacement soldiers and things like

4  that would still be here as far as units that could actually

5  take up arms and perform any kind of military defensive role in

6  this country.  There would be none other than those the states

7  are prepared to organize.

8  Q.  So in that situation then, it would be up to the individual

9  states to potentially call up individuals available for militia

10  service in the defense of those states.

11  A.  Yes.  And that's precisely what happened during

12  World War II.

13            THE COURT:  Anything else?

14            MR. LEE:  Yes, Your Honor.

15  BY MR. LEE:

16  Q.  Are you familiar with the term "manual of arms"?

17  A.  I am.

18  Q.  What does that mean?

19  A.  That's the movement by which you implement various controls

20  on the firearm; load, unload, move the selective switch from

21  "safe" to "fire", conduct emergency action drills, and things

22  of that nature.

23  Q.  Is manual of arms a measure -- or is it a part of training?

24  A.  It is.

25  Q.  And how does the manual of arms of the AR-15, how does that

1    play into your opinion regarding the suitability of the AR-15

2    for militia service?

3    A.   First of all, it's a fairly easy weapon to master the

4    manual of arms, particularly with practice.  There's plenty of

5    training material available.  And there's great commonality

6    from one system to the other, so you and I could each have an

7    AR-15, exchange them, I'll be as fully familiar with yours as I

8    will be with mine.

9              MR. LEE:  Your Honor, that's all the questions I have.

10             THE COURT:  Mr. Echeverria, any questions?

11             MR. ECHEVERRIA:  We don't have any questions, Your

12    Honor.

13             THE COURT:  All right.  Thank you, sir.  You may step

14    down.

15             (Witness excused)

16             MR. ECHEVERRIA:  Your Honor, can you hear me?

17             THE COURT:  Yes.

18             MR. ECHEVERRIA:  So we have several witnesses who are

19    standing by.  Some of them are on the East Coast.  And I

20    understand that Your Honor said that we were going to adjourn

21    at 12:30 and reconvene at 2:00 --

22             THE COURT:  That's correct.

23             MR. ECHEVERRIA:  -- if needed.

24        I'm wondering if it would be possible for me to

25    inform -- I'm wondering if it would be okay if we informed our

 1 | witnesses that they can leave for now, but then to come back at
 2 | 2:00?
 3 |          THE COURT:  Oh, sure.  Of course.  Yes.  Yes.
 4 | Absolutely.  All right.
 5 |          MR. ECHEVERRIA:  I'll let them know.  Thank you, Your
 6 | Honor.
 7 |          THE COURT:  Do you have anymore witnesses?
 8 |          MR. LEE:  Yes, Your Honor.
 9 |          THE COURT:  How long do you anticipate?  I have to be
10 | out of here at 12:30 so --
11 |          MR. DILLON:  Yeah.  We can't -- I would not start the
12 | next testimony.
13 |          THE COURT:  Who is the witness you've got to call
14 | next?
15 |          MR. DILLON:  Dr. John Lott.
16 |          THE COURT:  Well, okay.  That's probably going to take
17 | a while.
18 |          Let's take our lunch break.  Please plan to be back
19 | here at 2:00.  Thank you.
20 |          MR. LEE:  Thank you, Your Honor.
21 |
22 |
23 |
24 |
25 |

1        AFTERNOON SESSION

2            2:00 p.m.

3        THE COURT:  All right.  We're back.  Please call your

4    next witness.

5        MR. DILLON:  Your Honor, as a preliminary matter, we

6    have a number of plaintiff witnesses that are still remaining.

7    Unless Your Honor has any questions that you'd like to ask any

8    of the plaintiff witnesses, may we let them know that they can

9    be excused?

10        THE COURT:  Let's see.  Well, that means I've got to

11    go through all of my stuff --

12        MR. DILLON:  We're more than happy to keep them here,

13    too, by the way, if you want to question them.

14        THE COURT:  How many of them are local, if any?

15        MR. DILLON:  Other than Mr. Neil Rutherford and Adrian

16    Savia, I believe all are present.

17        THE COURT:  I'm sorry?

18        MR. DILLON:  All are present -- local San Diego?

19        THE COURT:  Yes.

20        MR. DILLON:  All of the plaintiffs that are in

21    attendance today, yes.

22        THE COURT:  So the plaintiffs are in attendance.

23        MR. DILLON:  Yeah.  They're all here, and they're all

24    local.

25        THE COURT:  I honestly don't know that I have any

1    questions for them, to be honest with you.

2          What other witnesses do you have?

3          MR. DILLON:  The next witness that we'll be calling

4    will be Dr. John Lott.

5          THE COURT:  Right.  So I was wondering -- again, I

6    don't want to tell you how to do your case, but I'll be more

7    than happy to do that, as well.

8          Since Mr. Echeverria has witnesses that are from the

9    East, the East Coast, and there's about a three-hour

10   difference, I was wondering if we might not take those out of

11   order, and then we can return to yours.

12         So Mr. Echeverria, do you have any objection to doing

13   that?

14         MR. ECHEVERRIA:  No objection to that at all, Your

15   Honor, but one procedural point.  It appears that my colleague,

16   Mark Beckington, has not yet been admitted to the Zoom call, so

17   I'm hoping that the courtroom can allow him to join.

18         THE COURT:  Yes.  We'll try and get that done.

19         THE CLERK:  He hung up, that's why.

20         THE COURT:  He hung up?

21         THE CLERK:  Yes.

22         THE COURT:  It's not very often that lawyers hang up

23   on judges.  There he is.  There's Mr. Beckington.

24         MR. ECHEVERRIA:  Yes.

25         THE COURT:  Good afternoon, and welcome back.

 1                 So why don't we do that.  Let's call some of the

 2        defense witnesses out of order.

 3                 So I'd like to hear from Mr. Klarevas.

 4                 MR. ECHEVERRIA:  Dr. Klarevas?

 5                 THE COURT:  Klarevas.  Unless you want to do it some

 6        other way, but I'm just going to go through the witnesses that

 7        I think I have questions for.  But if you want to call them in

 8        some other order, that's fine with me.

 9                 MR. ECHEVERRIA:  That's how we envisioned it, Your

10        Honor.  We brought all the witnesses here, and you can ask

11        questions for them.

12                 THE COURT:  Well, let's do it then.

13                 THE CLERK:  Who is it, Judge?

14                 THE COURT:  Professor Klarevas.

15                 THE CLERK:  I don't have that --

16                 THE COURT:  Louis Klarevas.

17                 Professor Klarevas?

18                 THE WITNESS:  Klarevas, yes.

19                 THE COURT:  Klarevas.  I'm sorry.

20                 THE WITNESS:  That's okay.  No problem.

21                 THE COURT:  Klarevas.  There it is.

22                 THE WITNESS:  Yes.  Okay.

23          LOUIS KLAREVAS,

24             called as a witness by the Defendants,

25             having been duly sworn, testified as follows:

 1          THE COURT:  Great.  Could you tell us your name real

 2   quickly and spell it for us?

 3          THE WITNESS:  Sure.  It's Louis Klarevas.  L-o-u-i-s.

 4   K-l-a-r-e-v-a-s.

 5          THE COURT:  All right.  So my name is Roger Benitez.

 6   I'm the district judge assigned to this case.

 7          I have some questions for you.  I don't know if

 8   plaintiffs' counsel might have some questions, but here are my

 9   questions:

10          First of all, let me ask you this.  I looked through

11   your curriculum vitae, and as best as I can tell, you always

12   testify for the state when called upon to testify on these

13   matters; is that correct?

14          THE WITNESS:  I have been involved in -- I can't

15   remember how many cases, but all of them were, I believe, for,

16   yeah, either the State of Colorado or the State of California,

17   that's correct.

18          THE COURT:  All right.  And as best as I can tell, you

19   analyzed Chicago, Detroit, Baltimore, and New York?

20          THE WITNESS:  No, that's not me.

21          THE COURT:  Maybe I've got the wrong one.  Somewhere

22   in your declaration I believe you talked about a spray or spray

23   fire.  I think it's -- you said, "The rapid and controlled

24   spray of bullets associated with assault weapons is a threat to

25   police officers."  Was that your statement?

 1        THE WITNESS:  No, I don't believe so, no.

 2        THE COURT:  Oh.

 3        THE WITNESS:  I would have to look.  Is there a way I

 4  can look at my declaration to see what you're --

 5        THE COURT:  Oh, absolutely.  Do you have it with you?

 6  I think it's paragraph 20.

 7        THE WITNESS:  Yes.  I see what you're referring to,

 8  Your Honor.  That's not me, that's the language out of the

 9  Legislative Intent Report for SB-880.

10        THE COURT:  All right.  Can you explain that to me?

11        THE WITNESS:  Right.  So one of the things I wanted to

12  look at was what was the legislative intent behind California's

13  assault weapons laws.

14        And so one of the laws that was -- one of the bills

15  that was the precursor to the law was SB-880, and this is dated

16  March 28th, 2016.  This is the report of the Senate Committee

17  on Public Safety on that bill, so it spoke to the legislative

18  intent.

19        THE COURT:  Okay.  But you don't have any

20  independent -- you don't have any independent knowledge or

21  experience with regards to these weapons being able to spray

22  bullets, as stated; is that a fair statement?

23        THE WITNESS:  Well, I wrote a book that discussed

24  assault rifles, and in that chapter, I do address this, yes.

25        THE COURT:  All right.  So you address it.  But my

```
 1    question is, have you -- do you have any personal experience --

 2    not research experience, I'm talking about personal

 3    experience --

 4              THE WITNESS:  Yeah.  In terms of marksmanship.  No,

 5    Your Honor.

 6              THE COURT:  Okay.  In your declaration, you analyzed

 7    the ten deadliest acts of intentional violence in the U.S.

 8              Now, apparently, the one in Las Vegas, Nevada was the

 9    highest number of deaths; is that correct?

10              THE WITNESS:  That is correct.

11              THE COURT:  All right.  Now, have you seen any of the

12    police reports or FBI reports that describe what happened

13    during --

14              THE WITNESS:  Yes.

15              THE COURT:  -- the Las Vegas, Nevada shooting?

16              THE WITNESS:  Yes.

17              THE COURT:  You have those -- you were made --

18              THE WITNESS:  Yes.

19              THE COURT:  -- you were made privy to those.

20              THE WITNESS:  Well, they're public records, Your

21    Honor.  The Las Vegas Metropolitan Police Department issued a

22    report which is -- also has a lot of information that was

23    provided to us by the FBI in that report.

24              THE COURT:  Have you seen the FBI reports?

25              THE WITNESS:  I don't remember if I saw separate files
```

1   from the FBI or if they were incorporated into that report.

2          THE COURT:  Are you saying you don't know whether --

3   what you reviewed was the Las Vegas Metropolitan Police

4   Department report which referred to or somewhat incorporated

5   FBI information?

6          THE WITNESS:  Correct.  So I did look at some FBI

7   files, now that I'm recalling.  In particular, the

8   ballistics -- ballistic reports, which the FBI, I believe, put

9   out.

10         THE COURT:  Was that made part of the public record?

11         THE WITNESS:  That's correct.  These things are

12   available at what's called the FBI Vault, which is a website

13   maintained by the FBI.

14         THE COURT:  What was it about that report, if

15   anything, that you found to be unusual, as opposed to other

16   mass shooting cases?

17         THE WITNESS:  Well, in the Las Vegas incident, the

18   shooter used what are referred to as bump stocks, and that sets

19   that particular shooting apart from other shootings.

20         Bump stocks are a device that you would --

21         Is the Court familiar with a bump stock, or do you

22   want me to explain?

23         THE COURT:  No.  Go ahead and explain it to me.

24         THE WITNESS:  A bump stock is a device that you would

25   put -- it's a stock, basically, that goes on the back part of

1  your rifle which would allow you, with one finger pull of the

2  trigger, to fire the equivalent of automatic fire.  Basically,

3  you pull the trigger, and because of the way it pumps on your

4  body, the fire would come out at a very rapid rate akin to what

5  you would see with an automatic weapon.

6          THE COURT:  Was there anything else unusual that you

7  noted about that particular shooting?

8          THE WITNESS:  Yes.  In that particular shooting, the

9  gunman was situated in a sniper position on the 32nd floor of

10 the -- I believe it was the Mandalay Bay, shooting into a crowd

11 of concert goers.  So there were quite a lot of subjects below

12 him that he was shooting at from that, kind of, perched

13 position of 32 stories high.

14          In addition to that, he used, I believe, according

15 to -- again, this is where the FBI, I believe, did this part of

16 the report -- he used 13 assault rifles to perpetrate that

17 attack.

18          THE COURT:  To your knowledge, did he use what perhaps

19 might be described as an assault shotgun?

20          THE WITNESS:  No, not that I'm aware of, no.

21          THE COURT:  Did he use an assault pistol?

22          THE WITNESS:  No, not that I'm aware of.

23          THE COURT:  The rifles -- or the assault rifles -- and

24 again, I'm using alternate terminology between assault rifles

25 and AR-type weapons, or what some people refer to as sporting

 1  rifles.  I guess it depends on which side you're on and how you

 2  want to craft the debate.

 3          But all right.  So the weapons that were used in that

 4  incident, did any of them have a folding stock or an adjustable

 5  stock?

 6          THE WITNESS:  I would have to go back and look, Your

 7  Honor.  I mean, I know some certainly had bump stocks.

 8          THE COURT:  Bump stocks.

 9          THE WITNESS:  That was in the report, yes.

10          THE COURT:  All right.  And you said there were 13

11  different weapons that were used.

12          THE WITNESS:  No --

13          THE COURT:  I'm sorry?

14          THE WITNESS:  Yes.  If I can add.  So it was 13 that

15  were used to fire on the crowd, and there was an additional two

16  other weapons that -- I think one was used to fire tracer

17  rounds toward -- I'm not sure what these were, if these were

18  gas -- natural gas containers or something that was in the

19  distance beyond, I believe, the concert venue, and then the

20  gunman also used, I believe -- I'm not sure -- it was a

21  handgun, I think it might have been a revolver, to commit

22  suicide at the end of his attack.

23          THE COURT:  Do you happen to know how he got all of

24  these weapons into the Las Vegas -- the MGM Hotel?

25          THE WITNESS:  Yes.  I believe, based on a reporting

1    related to the incident, that he was bringing them in piecemeal

2    in suitcases, or in luggage.

3         THE COURT:  So he wasn't like bringing them in in a

4    backpack, for example, right?

5         THE WITNESS:  I don't remember, Your Honor.  He might

6    have used a backpack.  Like, he might have used a duffle bag.

7         THE COURT:  He might have used a duffle bag to bring

8    all --

9         THE WITNESS:  Yes.  I don't remember --

10         THE COURT:  I'm sorry?

11         THE WITNESS:  I'm sorry.  I don't remember -- I don't

12    remember precisely what the luggage was or the baggage was.

13         THE COURT:  But you have the reports, right?

14         THE WITNESS:  Yeah.  They're in -- I do have the

15    reports, yes.

16         THE COURT:  Would you mind providing me with a copy of

17    those reports?

18         THE WITNESS:  Absolutely.

19         THE COURT:  You do mind or you don't mind?

20         THE WITNESS:  No.  I would gladly provide --

21         THE COURT:  That was an inartfully posed question.

22    I'm sorry.

23         THE WITNESS:  I would gladly provide the Court with

24    the reports, absolutely.

25         THE COURT:  All right.  Mr. Echeverria, can you make

1  sure that he can provide that report to me within, say, the

2  next week or so?

3        MR. ECHEVERRIA:  We will file the reports within the

4  next week.

5        THE COURT:  All right.

6        MR. ECHEVERRIA:  Yes, Your Honor.

7        THE COURT:  You may need to file those under seal.  I

8  don't know what's in them.  I don't know.  If they're public

9  reports, I guess not.

10        MR. ECHEVERRIA:  We will confirm when we file them.

11        THE WITNESS:  I believe, Your Honor, if memory serves

12  me correct, anything that was put out to the public by the FBI

13  has -- if it wasn't meant for public consumption, it has

14  redactions already in it.

15        THE COURT:  You know, I'm wondering about that.  Why,

16  if you know, why would there be anything redacted from a report

17  having to do with a public mass shooting?  Was this like the

18  Russians or the Chinese were involved?  Was it a matter of

19  national security or what?

20        THE WITNESS:  No.  I don't believe --

21        MR. ECHEVERRIA:  I'm sorry.  This is John Echeverria

22  by video, Your Honor.  I just wanted to make an objection that

23  this calls for speculation.  I'm not sure that Dr. Klarevas

24  knows that information.

25        THE COURT:  You notice, from my smile, that I was

1    being somewhat facetious.  But I'm just wondering why --

2              MR. ECHEVERRIA:  I can't see your smile.  I'm sorry.

3              THE COURT:  I was just wondering why, on an issue of

4    this importance, with so many people being interested in it, I

5    was just wondering, you know, if the Russians and the Chinese

6    and the Iranians were not involved in this, why would there be

7    anything redacted from the report about a mass shooting of this

8    significance?  But I was being somewhat facetious.  I tend to

9    do that, and sometimes I shouldn't.

10             You would agree, would you not, Professor, that that

11   Las Vegas shooting was kind of an outlier, right?  Both in the

12   number of weapons that were used, the number of rounds that

13   were fired, the number of people that were shot, as compared to

14   all the other mass shootings that we normal -- that you

15   probably have reviewed, right?

16             THE WITNESS:  Well, if you think of at outlier as the

17   most extreme case, then yes, that would be the outlier.

18             THE COURT:  Well, it's way more extreme, isn't it?

19             THE WITNESS:  Well, not necessarily.  You also have 49

20   people shot in Orlando.  You had 32 shot in Virginia Tech.  27,

21   I believe, in New Town.  Another -- you know, another high

22   number like 25 or 26 -- 25 shot in Sutherland Springs.

23             THE COURT:  How many rounds were expended in the

24   Las Vegas shooting?

25             THE WITNESS:  I believe it was --

1           THE COURT:  Thousand --

2           THE WITNESS:  It was definitely over 1,000.

3           THE COURT:  1,043?

4           THE WITNESS:  Yeah, it was something like a

5    thousand -- no.  It might have been more.  I honestly don't

6    remember, but I know it was over a thousand.

7           THE COURT:  Okay.  How many were expended in, say, the

8    other shootings that you mentioned?

9           THE WITNESS:  I'm unaware of how many in Orlando --

10          THE COURT:  How many?

11          THE WITNESS:  I'm unaware of Orlando, but that, I

12   believe, also is in FBI reports that are publicly available.

13          And I'm not sure about Blacksburg.

14          In New Town, there were 154 rounds there were fired, I

15   believe, at Sandy Hook.

16          And I'm not sure about the other ones on my list of

17   the ten deadliest.  I would have to go back and look at

18   reports.

19          THE COURT:  I was looking -- and I apologize if I

20   don't have this correctly -- but I was looking particularly at

21   page 10 of your declaration, and I noticed -- or it seemed to

22   me that you were saying that in 1989, the Roberti-Roos Assault

23   Weapons Control Act was passed.  And if I'm reading your

24   declaration correctly, it seems that -- and again, it assumes

25   that my math is correct, which it may not be -- but it seems to

1    me that the number of deaths have doubled since the passing of

2    the Roberti-Roos Assault Weapons Control Act; is that true?

3              THE WITNESS:  The number of deaths where, Your Honor;

4    in California, or in general in the United States?

5              THE COURT:  I'm assuming you're talking about

6    California.

7              See, that's part of the confusion that I've had is

8    that -- both sides are doing this, and it's terrible for me --

9    it seems like sometimes you talk about national numbers, and

10   sometimes you talk about state numbers, and then sometimes you

11   confuse one with the other, which confuses me.

12             So I'm not sure what you're referring to with regards

13   to paragraph 18 of your declaration at page 10.

14             THE WITNESS:  So two quick comments on that.

15             One, I don't believe I used any California aggregate

16   numbers, all my numbers are nationwide.

17             And in that particular paragraph, I'm again just

18   raising the issue of legislative intent and nothing more.

19             THE COURT:  Let me ask you a question that's also kind

20   of troubling.  It's sort of along the same line of the

21   discussion causing confusion, and that is this:

22             Sometimes some folks define a mass shooting as six

23   people or more, including the shooter; sometimes they define

24   them as five; sometimes they define them as four; I'm not sure

25   if I saw as low as three.

1    Which is the number that you think -- which is the

2    number that you think is the most accurate number for

3    describing what a mass shooting is?

4    THE WITNESS:  Your Honor, in my declaration, Exhibit 2

5    lists my -- the way I conceptualize mass shootings.

6    THE COURT:  All right.  Let me look at Exhibit 2.

7    Just a second.

8    THE WITNESS:  Sure.

9    THE COURT:  All right.  So your view is a high

10   fatality gun massacre is six or more victims die, correct?

11   THE WITNESS:  Correct.

12   THE COURT:  Does that include the shooter?

13   THE WITNESS:  No, it does not.

14   THE COURT:  Let me turn your attention to page 16,

15   line 27.  Tell me if my understanding of what you say is

16   incorrect.

17   The pre-assault weapon ban statistics were that there

18   were three gun massacres in California.  Two involved assault

19   weapons; one was in San Ysidro, the other one was in Oakland.

20   Is that right?

21   THE WITNESS:  I'm sorry.  This is on page 16?

22   THE COURT:  Page 16, paragraph 27, I believe.

23   THE WITNESS:  Okay.  Can you repeat the question?

24   THE COURT:  Yeah.  If I understand this correctly --

25   okay.  Here we go.  If you go to Exhibit 3 of your declaration.

```
 1              If I understand --
 2              THE WITNESS:  Okay.
 3              THE COURT:  -- this chart, there were three gun mass
 4    shootings.  Two of those involved assault weapons; one in
 5    San Ysidro, the other one in Oakland.  Is that right?
 6              THE WITNESS:  Three gun massacres, yes, that's
 7    correct.  Two involved assault weapons.
 8              THE COURT:  I'm a little confused.  What's the
 9    difference between a massacre and a mass shooting?
10              THE WITNESS:  Well, as I pointed out in Exhibit 2, a
11    mass shooting is four or more people shot, and a gun massacre
12    is a more extreme form of mass shooting where six or more
13    victims are killed.
14              THE COURT:  Just a second.  I thought you said --
15    where was that exhibit where you described the -- your
16    definition of mass shootings?  What was that exhibit number?
17              THE WITNESS:  Exhibit 2, Your Honor.
18              THE COURT:  Exhibit 2?
19              THE WITNESS:  Correct.
20              THE COURT:  Okay.  Oh, I see.  Okay.  All right.  So
21    what you called a high-fatality gun massacre.  Okay.  Got it.
22    I understand now.
23              All right.  So am I correct in saying that your
24    Exhibit 3 says that there were three gun massacres.  Two with
25    assault weapons; one is in San Ysidro, and one in Oakland.
```

 1          THE WITNESS:  That's correct.  That was in the decade
 2  of the 1980s, Your Honor.
 3          THE COURT:  Right.  So that was before the gun ban --
 4  the assault weapon ban, right?
 5          THE WITNESS:  California, yes.
 6          THE COURT:  All right.  Now, I got a little confused,
 7  because then, if I see this right, after the assault weapon ban
 8  there have been ten gun massacres.  Three with assault weapons;
 9  one in Fresno, one in San Francisco, and one in San Bernadino.
10  Is that correct?
11          THE WITNESS:  Sorry.  I'm just reviewing -- I just
12  need one second.
13          (Pause in the proceedings)
14          THE WITNESS:  If my math is correct, there have
15  been -- in the 30 years since that, there have been -- one,
16  two, three, four, five -- there have been 11 gun massacres in
17  the State of California, three of which involved assault
18  weapons.
19          THE COURT:  And how long a period was that?
20          THE WITNESS:  30 years, Your Honor.
21          THE COURT:  And what were the three gun massacres that
22  you referred to in pre-assault weapon ban?  Those happened in
23  the '80s?  The decade of the '80s?
24          THE WITNESS:  That's correct, Your Honor.  The other
25  three that we were mentioning in San Ysidro, Oakland, and I

 1  believe it was Sunnyvale, they occurred in the 1980s, and two

 2  of them involved assault weapons.

 3       THE COURT:  Right.  Now, turning your attention to

 4  your page 17 -- because I know Mr. Lott or Dr. Lott is going to

 5  be called to testify, and I'd like to know from you -- so in

 6  your declaration, you criticize his work, and you say that

 7  his -- that he has a long history of employing questionable and

 8  faulty practices and advance arguments against firearms

 9  regulations, and that it's been referred to as junk science --

10  or his work has been referred to as junk science.

11       Let me ask you, because I think it's only fair, do you

12  know if your work has ever been criticized?

13       THE WITNESS:  Oh, I'm sure someone has criticized my

14  work.  I'm sure someone out there.

15       THE COURT:  I wanted to see how honest you were.  If I

16  asked the question, and you told me "no", I wasn't go to pay

17  attention to a word you said.

18       All right.  That means you're being honest.  Okay,

19  great.  Terrific.  I appreciate that.

20       THE WITNESS:  Haha.

21       THE COURT:  At page 28, paragraph 48, you make the

22  following statement:  "The main purpose of the assault weapons

23  ban is to restrict the availability of assault weapons.  The

24  rationale is that if there are fewer assault weapons in

25  circulation, then potential mass shooters will either be

 1  dissuaded from attacking or they will be forced to use less

 2  lethal firearms, resulting in fewer lives lost."

 3        So I read that, and I thought, okay, so then you must

 4  agree that if there were no firearms, there would be no firearm

 5  injuries, right?

 6        THE WITNESS:  Yes, I would agree with that statement.

 7  If there were no firearms in this world, there would be no

 8  firearm injuries.

 9        THE COURT:  And if there were no firearms, there would

10  be no firearm deaths, right?

11        THE WITNESS:  If there were no firearms, there would

12  be no firearm deaths, yes.

13        THE COURT:  All right.  Now, can you see a scenario

14  where -- because you weren't here when I started this hearing,

15  but I said that there are a couple things that are true, and

16  that is that there are people who want absolutely no

17  restrictions on guns and weapons, that no restriction

18  whatsoever is acceptable to them, but there are also people who

19  believe that there is no amount of gun control that will ever

20  be acceptable.

21        My guess is, as we know from the real world, is that

22  the truth lies somewhere in between.  We already have some gun

23  regulations.

24        I suppose -- and I pose this question -- I'm not sure

25  if I posed this question to Mr. Echeverria once before.  I know

 1    I posed it in *the Duncan v. Becerra* case.

 2            And here's my question to you:

 3            If we did away with the assault weapons, as are

 4    currently banned, it would still allow what I think are known

 5    as California-legal AR-type weapons, correct?

 6            THE WITNESS:  Yes.

 7            THE COURT:  All right.  And if those --

 8            THE WITNESS:  That is my understanding of the law.

 9            THE COURT:  Okay.  And if those were the only weapons

10    that were available, a reasonable person using their reasoning

11    powers would conclude that the next mass shooting, if you will,

12    that would occur would occur with one of those weapons, that

13    is, one of the AR-type weapons that is not currently banned

14    under the assault weapons ban.

15            Would you agree with that?

16            THE WITNESS:  Not necessarily.

17            THE COURT:  Why not?

18            THE WITNESS:  And if you'd like, I'll elaborate, yes.

19            So the logic behind a ban would be -- as I noted here,

20    is that you might either be dissuaded from attacking, or you'll

21    be forced to use less lethal weaponry.

22            So the assumption there is that the person will use --

23    how did you refer to them?  AR-type?

24            THE COURT:  Call them whatever you want.  Assault

25    weapons.

 1          THE WITNESS:  Well, no.  I mean, they wouldn't be

 2    assault weapons under the law, so, I guess, AR-type, legally

 3    compliant firearms?

 4          THE COURT:  Yes.  There you go.

 5          THE WITNESS:  Okay.  So the assumption is that the

 6    person using that AR-type legally compliant firearm would be

 7    able to kill enough victims to rise to the level of, say, a gun

 8    massacre.  And --

 9          THE COURT:  And that would be seven.  That would be

10    seven, according to your numbers.

11          THE WITNESS:  Yes.  Or six.  Six.

12          THE COURT:  Six.

13          THE WITNESS:  Yes, six.  Yeah.  That they would be

14    able to do that.

15          And so far, in the State of California, that hasn't

16    borne true, that I'm aware of -- and we do have evidence to the

17    contrary, which is the Poway Synagogue shooter, who did use

18    such an AR-type legally compliant weapon under California law

19    and was not able to kill enough victims.

20          And what ended up happening in that case was, he had a

21    problem reloading his magazine -- again, because this is a type

22    of weapon that doesn't have some of the features that are

23    identified in the assault weapons statute -- he had trouble

24    reloading, and after expending the same rounds in his magazine,

25    he was attacked by someone and chased out of the Synagogue.

1    So he killed one person, and he injured, I believe,

2    another two or three that day -- this was last year in the

3    Spring of 2019 -- but that shooting did not rise to the level

4    of a gun massacre.

5        THE COURT:  Can you explain for me, if you would, the

6    gun massacre in the 1980s that did not involve an assault

7    weapon?

8        THE WITNESS:  Sure.  There are -- if I can go back to

9    my list real quickly.

10       And you wanted an example that did not involve an

11   assault weapon; is that correct?

12       THE COURT:  Well, the point I was trying to get to is

13   that, if you ban the assault weapons, you're not eliminating

14   the gun massacres, are you?

15       THE WITNESS:  No.

16       THE COURT:  In fact, we know as a matter -- we know as

17   a matter of fact that, in the 30 years that you mentioned post

18   assault weapon ban, there have been eight gun massacres that

19   have occurred without an assault weapon, right?

20       THE WITNESS:  You mean in the State of California?

21       THE COURT:  Yes.  I'm trying not to confuse things,

22   right?  So you agree.

23       THE WITNESS:  Yes.  Yes.

24       THE COURT:  Okay.  Now, if you did away with the

25   assault weapons that are currently -- that the plaintiff is

1    complaining about, you still have these weapons, for example,

2    the Mini-14, which is -- one of the other witnesses today

3    testified has the same firing capacity as these assault

4    weapons.  So you can still have the same firing capacity that

5    would allow you to commit these gun massacres, right?

6            THE WITNESS:  I'm sorry.  Just a point of

7    clarification.  Because "capacity" usually refers to the

8    ammunition that's in the magazine.  So that would just depend

9    on the magazine in that case.

10           Do you mean fire power or --

11           THE COURT:  It's a semi --

12           THE WITNESS:  -- velocity?

13           THE COURT:  It's the same essential semi-automatic

14   weapon with a different stock, fires the same ammunition.  It's

15   a semi-automatic weapon.

16           THE WITNESS:  I would definitely consider it a

17   semi-automatic rifle capable of receiving a detachable

18   magazine, yeah.

19           THE COURT:  Yeah.  So the fact is that -- and, in

20   fact, there have been many gun massacres -- I'm not talking

21   about just California now, but throughout the country -- where

22   gun massacres have occurred where the shooter has used weapons

23   other than assault weapons, right?

24           THE WITNESS:  That's correct, Your Honor.

25           THE COURT:  Okay.  So, in essence, if you do away with

 1 | the assault weapons, all you're really doing is you're
 2 | motivating the shooter to find a different way to commit their
 3 | massacre, right?
 4 |       THE WITNESS:  Well, one of two things.  One, that's
 5 | called a substitution effect, what you're referring to, which
 6 | would be that you're basically forcing them to use an
 7 | alternative type of weapon.  And the other thing that you would
 8 | be doing is what we call the spillover effect where they might
 9 | be affecting their calculus, how they think about doing this.
10 |       If I can give an example.  Joshua Cook, who is also
11 | known in the media as the Matrix Murderer.  In 2003, Joshua
12 | Cook killed his mother and his father.  He shot them with a
13 | shotgun.
14 |       Now, in 2003 -- this happened in the State of
15 | Virginia.
16 |       In 2003, that was when we had the Federal Assault
17 | Weapons Ban.  He went two days prior to his shooting to buy his
18 | weapon.  He obviously couldn't buy, you know, an AR-15 assault
19 | rifle because they weren't for sale then -- new ones weren't
20 | for sale then, so he bought a shotgun.  He killed his parents.
21 |       Later on, 10 years later, he gave an interview from
22 | prison.  He was sentenced to 40 years in prison for his crime.
23 |       THE COURT:  Wait, how many?
24 |       THE WITNESS:  40 years.  40.
25 |       THE COURT:  40 years for killing two people.  Okay,

 1 | got it.

 2 | THE WITNESS:  Yes.  Right.  And I believe it was 32

 3 | years -- the sentences ran concurrent -- plus 8 years for the

 4 | firearms -- for using firearms in the commission of a felony.

 5 | I'm not -- I think it was something like that, and it added up

 6 | to 40 years.

 7 | And in an interview 10 years afterwards, he said that

 8 | he wasn't able to get an AR-15, but had he gotten one, he

 9 | thought about that night possibly going to a mall and

10 | shooting -- and I believe his quote was, "As many people as I

11 | could."  But he couldn't get an AR-15, and therefore he

12 | didn't -- he decided not to do that.

13 | So it also can affect your calculus and how you think

14 | about, you know, what you want to do.  Your intention.

15 | THE COURT:  So I prefaced a question earlier by

16 | pointing out that there are some people who believe that no

17 | amount or -- no amount of gun control is enough.

18 | So what happened was that Mr. Cook couldn't get his

19 | hands on an AR, so instead, he used a shotgun.

20 | Now, suppose he would have been able to get his hands

21 | on, what I think I told you earlier, a Mini-14, which is a

22 | semi-automatic weapon, it's not banned by the assault weapons

23 | ban, has the same amount of firing power.

24 | And if I understand your testimony, Mr. Cook would

25 | have then, if he had been able to get his hands on that

1    Ruger 14, he would have gotten his hands on that Ruger 14 and

2    killed as many people as he could; is that a fair statement?

3        THE WITNESS:  Your Honor, I can't speak to what he

4    would have done with a Mini-14 because he's never addressed

5    that.  I can only tell you what he said.

6        THE COURT:  Okay.  Well, Mr. Klarevas, I have to tell

7    you, I've enjoyed chatting with you.  You have helped clarify

8    some of my questions from reviewing your declaration and your

9    exhibits.  And I thank you for being here in -- well, you

10    weren't here in my courtroom, but appearing before me.  It's

11    certainly been a pleasure.

12        Does the plaintiff have any questions of Dr. Klarevas?

13        MR. DILLON:  Yes, Your Honor.  Two quick questions.

14        MR. ECHEVERRIA:  Your Honor, if I may.  This is John

15    Echeverria on video.

16        We're going to object to the plaintiffs cross

17    examining Dr. Klarevas or our other witnesses.  This hearing

18    was an opportunity for the Court to ask clarifying questions of

19    our witnesses.  We have not called them.  So it would appear to

20    violate a fundamental rule of fairness to allow the plaintiffs

21    to cross examine a witness that we have not, in fact, called.

22        And if cross examination is permitted, we think that,

23    in the interest of fairness, that any line of examination be

24    limited to the points of clarification that Your Honor has

25    brought up with Dr. Klarevas.

1     THE COURT:  I think that's a fair point.  The last

2  point is a fair point.

3     If I am the trier of fact, in cases where I have bench

4  trials or injunctions or whatever -- actually, sometimes even

5  in jury trials -- if I think that I need to ask a question to

6  get information, I will ask the question, I won't hesitate

7  about that.  But if the questions that I ask cause counsel to

8  have questions in that regard, I allow them to ask that.

9     So, Mr. Echeverria, again your point is well taken.

10    So if you have questions that relate to questions that

11  I have asked or answers that have been given in response to my

12  questions, you're certainly welcome to ask them.  Otherwise,

13  not.

14    MR. DILLON:  All right.  I'll limit it then, Your

15  Honor.

16  BY MR. DILLON:

17  Q.  Mr. Klarevas, are you aware that bump stocks are separately

18  prohibited under California law as they're considered

19  multi-burst trigger activators?

20  A.  I'm not familiar with how they're treated under California

21  law, no.

22    MR. DILLON:  That's it, Your Honor.

23    THE COURT:  That's it?  Okay.

24    Well, thank you.  Again, it's been a pleasure.  You

25  take care.

 1          THE WITNESS:  Thank you, Your Honor.  I appreciate the
 2   opportunity to appear via Zoom, although San Diego is my
 3   favorite city in the United States.
 4          THE COURT:  If you want, I can trail this until
 5   tomorrow and order that you be here physically.
 6          THE WITNESS:  Haha.
 7          THE COURT:  You take care.  Have a great day.
 8          THE WITNESS:  I might take you up on that.  Thank you
 9   very much.
10          THE COURT:  You take care.
11          (Witness excused)
12          THE COURT:  How about Blake Graham?  Special Agent
13   Blake Graham?
14          THE CLERK:  Can I bring him in, Your Honor?
15          THE COURT:  Yes.
16          THE CLERK:  Okay, Judge.
17          THE COURT:  Hi.  Are you Special Agent Blake Graham?
18   I can't hear you.  You're muted.
19          THE CLERK:  Not from our end.
20          THE WITNESS:  Hello.
21          THE COURT:  There you go.
22          THE WITNESS:  Okay.
23          THE COURT:  Are you Special Agent Blake Graham?
24          THE WITNESS:  Yes, sir.  My new title is Assistant
25   Director, but I'm the person that has provided a declaration

 1   for this lawsuit.

 2            THE COURT:  Okay.  Would you do me a favor, raise your

 3   right hand?

 4    BLAKE GRAHAM,

 5        called as a witness by the Defendants,

 6        having been duly sworn, testified as follows:

 7            THE COURT:  Please tell us your name and spell it for

 8   the record.

 9            THE WITNESS:  Blake Graham.  B-l-a-k-e, G-r-a-h-a-m.

10   My title is -- thank you.

11            THE COURT:  All right.  What's your official title

12   now?

13            THE WITNESS:  Effective July 31st, it's Assistant

14   Director, sir.

15            THE COURT:  All right.  That's a long title.  Can I

16   just call you Director Blake Graham, and perhaps maybe you'll

17   get a promotion one of these days?

18            THE WITNESS:  You can call me whatever you like.

19            THE COURT:  Haha.  I've been called a lot of things,

20   as well.

21            Just to shorten it up, Director Graham, in your

22   declaration, you said that, in your experience, assault pistols

23   and assault shotguns are much less common in California than

24   assault weapons.

25            Can you tell me what your experience is in that

BLAKE GRAHAM                                                                    128

1   regard?

2                THE WITNESS:  Yes, sir.  My experience, as far as

3   recovering them in crimes that the Bureau has investigated and

4   regarding questions that I have been asked about by various

5   agencies, the firearms that are defined by Penal Code 30515,

6   those types of weapons, the rifles are vastly outnumbered,

7   assault shotguns and assault pistols that we here at the Bureau

8   have encountered, or -- I've received questions from other

9   agencies about those three different classes.

10               THE COURT:  So, I'm sorry.  Tell me about your

11   investigations.

12               THE WITNESS:  Sure.  So since 2002 or so I've been

13   here at the Bureau in the law enforcement capacity, and since

14   that time we've recovered what I would call assault weapons,

15   based on 30515 of the Penal Code, vastly larger numbers than

16   assault shotguns or assault pistols, as defined by the same

17   code.

18               THE COURT:  Can you give me a ratio?  For example,

19   would you say it's 20 to 1?  100 to 1?

20               THE WITNESS:  Again, this is just a guess, but

21   probably --

22               THE COURT:  Don't give me a guess, give me an

23   estimate.

24               THE WITNESS:  Yeah.  My estimate would be, out of

25   every ten, probably eight are assault rifles, and perhaps one

1  would be an assault shotgun and one would be an assault pistol,

2  something in that range, sir.

3          THE COURT:  Okay.  Somewhere in your declaration

4  you -- well, let me find it.  Give me just a minute.  I want to

5  find what it is you said.  It might take me a minute here.

6          (Pause in the proceedings)

7          THE COURT:  So I think in your declaration, at

8  paragraph 16, you talk about semi-automatic rifles that qualify

9  as assault weapons.  And you said, "The most common feature of

10 prohibited assault weapons is likely the pistol grip."  Is that

11 your experience?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  All right.  So a lot of the weapons that

14 you have encountered in your investigation over the years have

15 involved pistol grips, right?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  And then it says, "Most -- the next most

18 common feature is the telescoping stock and flash suppressors,"

19 right?

20         THE WITNESS:  Correct.  Yes, sir.

21         THE COURT:  So out of those eight out of ten weapons

22 that you've been involved in since 2002, eight of them are

23 rifles, the most common feature prohibited for those weapons is

24 the pistol grip, followed by the telescoping stock and the

25 flash suppressors, correct?

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  All right.  At page 9 you said,

 3     "Furthermore, depending on the weapon's system and the

 4     shooter's skill level, the pistol grip may help a shooter

 5     complete magazine exchanges quicker."

 6              I have never attempted to do this, so I have no idea

 7     what that means, but can you explain to me how a pistol grip

 8     helps exchange a magazine quicker?

 9              THE WITNESS:  Yes, sir.  What I was trying to imply is

10     that, if you're a right-handed shooter, you're going to raise

11     your hand -- you see my hand here?

12              THE COURT:  Yes.

13              THE WITNESS:  -- my right hand on the -- I'm going to

14     mimic that I have a rifle in my hand.

15              THE COURT:  Yes.

16              THE WITNESS:  If I'm able to keep a sight picture, I'm

17     going to be able to keep it in a static location.  If I

18     brought my magazine, I'm going to bring my second magazine up,

19     I'm able to keep sight picture on my target and have more of a

20     consistent movement, so that's what I was trying to get across

21     by writing that statement there.

22              THE COURT:  Okay.  So you don't really change it

23     quicker, it's just that you don't lose sight of your target.

24              THE WITNESS:  I think the -- if you have enough

25     repetition, it could increase the speed if the shooter has

1    enough time to practice.  That's what we do is we try to have

2    repetitive muscle memory built into our training, and that's

3    what I was trying to convey in the words.

4         THE COURT:  Okay.  At paragraph 33, you talk about the

5    length of the weapon.  You talk about it being able to be

6    hidden in a backpack.

7         Have you ever tried hiding a 26-inch AR-15 with a

8    telescoping stock in a backpack?

9         THE WITNESS:  So there are some products out there

10   that are designed for assault-rifle-sized weapons of various

11   lengths.

12        As I said, whether I've done it in a designated

13   backpack, I don't think I have when the weapon was assembled,

14   meaning the upper and lower were attached and the rifle was in

15   a functional capacity.  I have broken an AR-15 down in two

16   pieces and transported it that way.

17        THE COURT:  Okay.

18        THE WITNESS:  But I do know products that -- for a

19   fully assembled AR-15 to be contained in such a backpack.

20        THE COURT:  All right.

21        THE WITNESS:  I don't remember the -- sorry -- I don't

22   remember the company.  It might be 511 that makes the product.

23        THE COURT:  And what are the specifications of that,

24   if you know?  So it's not a regular backpack, it's a special

25   backpack designed for storing these, right?

 1              THE WITNESS:  Correct.  It's a -- I think it's

 2    marketed as some kind of a discrete carry backpack, something

 3    along those lines.

 4              THE COURT:  Right.

 5              THE WITNESS:  And I believe it's 511, but I'm not

 6    100 percent as I sit here today.

 7              THE COURT:  Now, you say, "A smaller weapon can also

 8    be concealed on a shooter's person underneath loose or bulky

 9    clothing," but you can see a Glock 17 or a Glock 19 under

10    somebody's clothing, correct?

11              THE WITNESS:  Yes.  You can easily conceal various

12    handguns under loose or bulky clothing, for sure.

13              THE COURT:  Let me ask you a question.  In your

14    experience -- if you have any.  If you don't have any, just

15    tell me -- someone who is looking for a weapon for

16    self-defense, do you think they would want a weapon that's more

17    maneuverable or less maneuverable?

18              THE WITNESS:  I think it would depend upon the

19    situation they were in.  I'm trying to put myself in those

20    shoes.

21              THE COURT:  Okay.  Go ahead and do that.

22              THE WITNESS:  Yes.  Generally, depending on the

23    situation you're in, maneuverability is good as far as being

24    able to maneuver through small areas, if you're sitting in a

25    car, something like that.

```
 1                THE COURT:  So if you have a shotgun with a 31-inch
 2     barrel, you're in bed with your wife and you hear somebody
 3     walking through the front door, and you take that 31-inch
 4     barrel on that shotgun, and you try to swing it towards the
 5     door, there's a good probability you're going to hit your wife
 6     on the head with that barrel, right?
 7                THE WITNESS:  I guess, hypothetically, maybe there's a
 8     greater chance if -- depending on the location of the bed.
 9     There's a lot of variables in that question.
10                THE COURT:  Yeah.  I was kind of teasing you.
11                But you agree that -- look.  You could have a
12     howitzer -- right? -- in your home, and somebody breaks into
13     your home.  It's going to be very difficult for you to defend
14     yourself with that howitzer, right?
15                THE WITNESS:  Well, with respect, sir, the howitzer
16     would be a destructive device.  I think I pick up the humor in
17     your question.  But a larger weapon, like you discussed, the
18     shotgun --
19                THE COURT:  Yes.
20                THE WITNESS:  -- it's going to be available to someone
21     that wanted to have one of those, whereas an 18-inch barreled
22     shotgun, which is quite a bit smaller, would be available, too.
23     That would be something that's much more compact than the
24     31-inch barreled version we spoke of.
25                THE COURT:  Right.  So it would be more maneuverable,
```

 1 | right?

 2 |         THE WITNESS:  Correct.

 3 |         THE COURT:  And much easier to perhaps acquire a

 4 | target with?

 5 |         THE WITNESS:  Possibly, depending on the house and the

 6 | layout.

 7 |         THE COURT:  Less likely, as I said somewhat jokingly,

 8 | that you're going to hit your spouse on the head with the

 9 | barrel of the gun, right?

10 |         THE WITNESS:  I would assume so, with less chance of

11 | bumping into things you didn't want it to bump into.

12 |         THE COURT:  Right.  Okay.  Now, let me ask another

13 | question.  I think I saw this in your declaration, if I'm not

14 | mistaken.

15 |         A self-defense weapon; do you want it to be more

16 | accurate or less accurate?

17 |         THE WITNESS:  Accuracy -- if you're firing a weapon

18 | for self-defense, accuracy would be ideal.

19 |         THE COURT:  At page 14 of your declaration you said

20 | the following -- and I'm really puzzled by this -- "In some

21 | cases, military or police forces might issue semi-automatic

22 | rifles that are functionally the same as defined California

23 | assault weapons in terms of rate of fire or capacity for fire

24 | power."

25 |         What did you mean by that?

```
 1              THE WITNESS:  Yes.  So some agencies, or perhaps
 2    members of the military, may be issued a semi-automatic version
 3    of an M16, for example.
 4              THE COURT:  Do you know that for a fact?
 5              THE WITNESS:  I do know that law enforcement agencies
 6    are not all issued machine guns, for example.  There -- a lot
 7    of California agencies specifically are getting AR-15s and
 8    they're semi-auto only.
 9              So that's what I was trying to infer is that some
10    agencies have, basically, Penal Code 30515 defined assault
11    rifles in their patrol cars.
12              CHP, California Highway Patrol, they have
13    semi-automatic AR-15s in their vehicles, the last time I had a
14    conversation with those folks.
15              THE COURT:  Yeah.  I don't take issue with that.
16              The only question that -- the only thing that bothered
17    me about your question was that you said in some cases,
18    military forces might, and I was trying to find out in what
19    cases military forces -- first of all, the word "might" kind of
20    confused me a little bit, so let me ask you this question:
21              Do you know of any military forces that issue AR-15s
22    to their members?
23              THE WITNESS:  As far as an AR-15 versus an M16?  Are
24    you going down the path of full-auto versus semi-only, sir, if
25    I understand the question?
```

 1          THE COURT:  Yes.

 2          THE WITNESS:  Okay.  I'm not -- I'm not personally a

 3   military member, but -- and I don't know what every single

 4   agency is issuing these days.  But I have heard that

 5   agencies -- or not agencies, sorry -- I have heard that, in

 6   some cases, the semi-autos were what were being issued, and

 7   this has been over a course of time.  I don't recall which

 8   agency or which branch it was, but it was something I heard

 9   discussed in the last, probably, 10 years or so.

10          THE COURT:  But you can't tell me which --

11          THE WITNESS:  More about -- I can't, sir.  I don't

12   recall.  But it was more about the -- it was a concern that

13   there was too much ammunition being used, and they wanted to

14   restrict that, I guess, by limiting the -- the volume of rounds

15   down range, or something to that effect.  I don't recall

16   which --

17          THE COURT:  You know, I appreciate you're saying that,

18   because, look.  I want to keep you from digging yourself into a

19   hole.

20          So do you understand that the M16 is a selective fire

21   firearm?

22          THE WITNESS:  I do, sir.

23          THE COURT:  And you understand that a selective fire

24   firearm shoots both semi-auto, and the modern M16 shoots bursts

25   and also shoots single rounds.

1      Is that what you're talking about is that the Armed

2  Forces is now issuing -- as opposed to, say, during the Vietnam

3  War -- they're now issuing weapons that have selective firing

4  capabilities that essentially can operate as a semi-automatic

5  weapon?  Is that what you're referring to?

6      THE WITNESS:  Sir, I'm aware of other branches having

7  full-auto, and also the possibility of the burst option.

8      And, again, I don't recall where I've heard this, but

9  they were looking at semi-auto only variance potentially being

10 issued to the military.

11     I don't have personal knowledge of which branch or if

12 they did assign those out.  My experience would be towards the

13 law enforcement side.

14     THE COURT:  Okay.

15     THE WITNESS:  I know that the majority of law

16 enforcement is semi-auto in California, sir.

17     THE COURT:  I can't argue with that.

18     So you triggered my curiosity, because at page 15 of

19 your declaration you have what I believe is a photograph of

20 the -- no, in fact, I know it because it says it in your

21 declaration -- you have the Sturm Ruger Mini-14 Ranch Rifle.

22     You're familiar with that rifle, right?

23     THE WITNESS:  Yes, sir.

24     THE COURT:  And that's a rifle that has a detachable

25 magazine?

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  And it's a semi-automatic rifle?

 3              THE WITNESS:  Yes.

 4              THE COURT:  It does not have a collapsable stock,

 5  meaning that it's adjustable.  So if you have one in the

 6  family, whether it's the husband or the wife that's using it,

 7  they have to use the same stock, right?

 8              THE WITNESS:  Correct.  The photo I think you're

 9  referencing is the top photo of the two photos on that page?

10              THE COURT:  Yes, that's correct.

11              THE WITNESS:  Yes.  And traditionally, whoever wanted

12  to shoot the weapon would have to deal with whatever stock was

13  attached.

14              THE COURT:  Okay.  Now, the second weapon that is at

15  page 15 appears to be, if I'm not mistaken, a very similar

16  weapon, the difference being that, instead of having a -- what

17  I'll call a traditional stock, it seems to have a completely

18  collapsable stock, a pistol grip, and I think it has a flash

19  suppressor on it, right?  Maybe a larger --

20              THE WITNESS:  Yes, sir.

21              THE COURT:  -- a larger magazine.

22              But otherwise, otherwise, it is a Sturm Ruger Mini-14

23  Ranch Rifle, right?

24              THE WITNESS:  Yes.  I believe that's probably the

25  government model derivative.  That's the ones I've seen here in

 1   California.  That's what it was marked as.

 2          THE COURT:  Under the assault weapons law that I'm

 3   being asked to decide, the weapon on the bottom would be

 4   unlawful to possess, the weapon at the top would not; is that a

 5   fair statement?

 6          THE WITNESS:  The weapon on the bottom could be

 7   lawfully possessed if the person had registered it during the

 8   appropriate registration window in the early 2000s, basically

 9   between 1/1/2000 and 12/31/2000.  If they registered it then,

10   and they received our approval letter, they could still possess

11   that weapon today, unless it became prohibited.

12          THE COURT:  So if it is prohibited now -- if you can't

13   buy it because it's an assault weapon under the current

14   statutes because it's got a detachable magazine, holds more

15   than ten rounds, has a pistol grip, has a collapsable stock,

16   and has a flash suppressor, you would not be able to buy that

17   weapon, right?

18          THE WITNESS:  Correct.  Not legally at this time.

19          THE COURT:  Haha.  Okay.  So you could buy it

20   illegally.  You could buy anything illegally -- right? --

21   including an M16, I suppose.

22          THE WITNESS:  There's a good chance --

23          THE COURT:  Yeah.  Go ahead.

24          THE WITNESS:  I'm sorry.  I cut you off, sir.

25          THE COURT:  No.  Go ahead.

1          THE WITNESS:  I was going to say, there's a

2    good chance that many weapons are sold illegally up and down

3    the state, various -- whether it be a revolver or, in this

4    case, an assault rifle.

5          THE COURT:  Yeah, I agree with that.

6          But the top weapon, that would be perfectly legal to

7    purchase under current law, right?

8          THE WITNESS:  Correct.  Yeah, those are available in

9    many gun stores up and down California.

10          THE COURT:  Just out of curiosity, has little to do

11    with this case, although it does have tangential effect.

12          Do you happen to know how many people on the

13    prohibited persons list in the State of California still remain

14    outstanding without having been charged or prosecuted?

15          THE WITNESS:  I mean, there are probably over 20,000

16    people that we are monitoring, attempting to locate, attempting

17    to investigate.  And in some cases, we have already

18    investigated them, and we're still tracking the weapon itself,

19    even after we've contacted the person face-to-face.

20          But your question is pretty broad, so I don't want to

21    minimize my answer, sir.

22          THE COURT:  Okay.  Sometimes I have a hard time

23    reading my own writing, so forgive me.

24          (Pause in the proceedings)

25          THE COURT:  Your declaration, at page 21, line G, you

1  talk about, on July 20th, 2012, an individual used an assault

2  weapon, including a drum magazine.

3         Do you run into those very often?

4         THE WITNESS:  Yeah.  We actually probably used to see

5  them more often back in the early 2000s, and then there was,

6  we'll call it a drought, for lack of a better term, up until

7  the point in which the Federal Assault Weapons Ban sunsetted,

8  and then we began to see more of them come into California

9  after that point.

10        THE COURT:  Are they commonly possessed by people in

11 the State of California?

12        THE WITNESS:  You're still speaking about a drum

13 magazine, right, sir?

14        THE COURT:  Yes.

15        THE WITNESS:  Okay.  I would say most of my contacts

16 are with prohibited people.  I don't end up talking to the

17 average citizen, per se, during our investigations.  So the --

18 of those prohibited people having -- them having the drum

19 magazine is a somewhat rare event.

20        What we are seeing, and I would call these new

21 manufactured drum magazines, they're ones that would fit, let's

22 say, a Glock handgun, that style, whereas the old, let's say,

23 metal AK-47-style drum magazine, we see less and less of those

24 over time.

25        THE COURT:  At page 22, line 19, it says, "Shortly

 1   after the El Paso shooting, an individual used an assault

 2   pistol with a 100-round drum magazine and killed 9 and injured

 3   27 others in Dayton, Ohio."

 4           That 100-round drum magazine was illegal as it was at

 5   the time it was used, right?

 6           THE WITNESS:  So that weapon in that state may or may

 7   not have been legal.  As I said, it was in Ohio.  I didn't do

 8   any research as far as the legality of it in that state.

 9           If it was in this state, depending on the age of the

10   magazine and if the person lawfully possessed it prior to the

11   year 2000, it might have been legal here.

12           THE COURT:  Okay.  I think I'm almost done.  Give me

13   just a second.

14           THE WITNESS:  Sure.

15           THE COURT:  All right.  That's all the questions I

16   have.

17           Does the plaintiff have any questions that they wish

18   to ask in response to questions that I've asked?

19           MR. LEE:  Yes, Your Honor.  And this will be limited,

20   for our discussion, to the scope of what Your Honor has asked.

21           THE COURT:  Okay.

22   BY MR. LEE:

23   Q.  Agent Graham, this is George Lee.  You probably can't see

24   me, but hopefully you can hear me.

25           I represent the plaintiffs in this matter.

```
 1              THE COURT:  Can you hear him?
 2              THE WITNESS:  Yes, sir, I can hear Mr. Lee.
 3              THE COURT:  All right, great.  Thank you.
 4    BY MR. LEE:
 5    Q.  The Judge was asking you about putting assault weapons in
 6    backpacks, as far as their potential concealability.
 7              Do you recall your testimony on that?
 8    A.  Yes, sir, I do.
 9    Q.  So an AR-15 is really separated into two halves, is it not?
10    A.  Did you say rarely?
11    Q.  It is really separated into two halves, is it not?
12    A.  I think -- are you asking about the receiver being a
13    two-part receiver?
14    Q.  I'm asking whether an AR-15 is separated into an upper
15    receiver and a lower receiver.
16    A.  Yes, sir.  In that -- with that question, yeah, it's an
17    upper and lower receiver, sort of a dual or two-part receiver
18    system for that weapon system.
19    Q.  Correct.  And that two-part receiver system is, in a
20    typical AR-15, separated by two pins; is that right?
21    A.  Correct.
22    Q.  Two pins that you pull out to the right, if you're facing
23    down the muzzle, right?
24    A.  Yes.
25    Q.  And you've testified in another case that, if a shooter --
```

1    or if somebody knows what they're doing, they could separate

2    the upper and lower in a matter of seconds.

3          Is that consistent with your understanding still?

4    A.   Yes.

5    Q.   So if I knew what I was doing, and I knew how to separate

6    the upper and the lower, I could simply separate the upper and

7    the lower, put it in a backpack, and then, if I had to

8    reassemble it, I could reassemble it in a couple seconds,

9    again, if I knew what I was doing, right?

10   A.   Yes.   That practice that you described is very common for

11   cleaning the weapon.   So, yeah, if you know how to clean the

12   weapon, you're probably capable of disassembling the upper and

13   the lower and storing it in a backpack.

14         THE COURT:   Let me interrupt you for just a second.

15         I don't really understand that what you're talking

16   about, lower and the upper.

17         MR. LEE:   I'll --

18         THE COURT:   I have a good feeling that we may be here

19   tomorrow.   I don't know.   I could be wrong.   But I was

20   wondering if someone could bring one of these -- hopefully a

21   California-legal one -- if you could bring it tomorrow, make

22   sure that the marshals downstairs know that I've asked you to

23   bring it, or, I don't know, I see we have one of our CSOs out

24   back there, maybe we can get one from the marshals.   I have no

25   idea.

 1          But anyway, I'd like to see one in here and see

 2   exactly what we're talking about.  Because when you're talking

 3   about someone knowing what they're doing, that's a little

 4   confusing for me.

 5          So, for example, in the *Staples* case -- I'm sure you

 6   remember the *Staples* case -- the question was whether or not

 7   someone could grind part of the AR-15 and essentially make it

 8   an automatic weapon as opposed to a semi-automatic weapon.  My

 9   guess is that probably requires a certain amount of skill and

10   equipment and so on to do.

11          As to what you're talking about, just a matter of

12   pushing pins and putting it back together again, I'd like to

13   see how easy that is to be done, because it makes a difference,

14   I think, based on what you're trying to get at, and sort of

15   what I was trying to ask.

16          MR. LEE:  Indeed, Your Honor.  As to the Court's

17   request to see one of these, we have thought about that, and we

18   will certainly accommodate the Court if it's its desire.

19          We'll clear it with the marshal, of course, but I'm

20   going to suggest that we will bring a firearm that has the bolt

21   that's -- firing bolt that's removed so it's not an operable

22   firearm, and we'll clear that with the marshal.

23          THE COURT:  Yeah.  I've had plenty of firearms in my

24   courtroom over the years.  Yeah, just make sure -- I think the

25   way they do it downstairs is they have like a plastic tie or

 1   something that they put around that secures it so that it can't

 2   be fired.  You take the firing bolt out, make sure it's

 3   unloaded, make sure you take the magazine out and so on.

 4          MR. LEE:  Understood, Your Honor.  We'll make that

 5   arrangement.

 6          But as to the Court's other inquiry, I'll ask a few

 7   more foundational questions on that, and then we can follow up

 8   on that tomorrow with this witness.

 9          THE COURT:  Okay.

10   BY MR. LEE:

11   Q.  Agent Graham, so pulling the two pins on the AR-15 lower to

12   separate the upper and the lower, that doesn't take any

13   specialized skill or training, does it?

14   A.  No.

15   Q.  It's not something that a gunsmith needs to do, it's

16   something that, if you know how to pull pins, you can basically

17   do it; would you agree?

18   A.  Yes.

19   Q.  Okay.  The Court was also asking you about firearms with

20   longer lengths as opposed to shorter lengths.

21          Do you recall your testimony on that issue?

22   A.  Yes.  We discussed shotgun barrels of various lengths.

23   Q.  Right.  You are personally issued an M4 rifle, were you

24   not?

25   A.  Yes.

Q.   For your duty use?

A.   Yes.

Q.   And that M4 rifle, in fact, is a select fire weapon, is it
not?

A.   Yes.

Q.   And so what is the barrel length on your M4 issued?

A.   The barrel itself is 14 and a half inches, and then there's
a flash suppressor that's about another inch and a half,
two inches that's firmly affixed.

Q.   And what is the standard length for a civilian AR-15 rifle,
for a civilian length for California?

A.   So nationally, the barrel length traditionally has to be
16 inches or longer.

Q.   And if you had to -- your choice, would you rather have a
shorter barrel or a longer barrel for your defensive use, for
your duty use?

A.   I'm going to probably say that I would prefer the length of
the barrel that I've used, I've had the same rifle/M4 since
2003 or so.  So I prefer exactly what I have.

Q.   Which is a 14-and-a-half-inch barrel with a flash
suppressor.

A.   Correct.  That's what's assigned to me.  That's what the
department issues to all of our staff that's -- they've been
through the training.

Q.   You would not prefer to have anything longer, if given the

1  choice, would you?

2  A.  I guess it depends on the mission.  But the mission that I

3  have, this is what meets my duties.

4       We have had longer barreled versions of different

5  weapons assigned over time, and I think we still have some in

6  the armory.  They're not Colts, I think they were Heckler &

7  Koch.

8  Q.  Okay.

9       MR. LEE:  Your Honor, the Court's indulgence for a

10  moment?

11       That's all the questions I have of this witness, Your

12  Honor.

13       THE COURT:  All right.  Well, Mr. Echeverria, I

14  certainly don't want to deprive you of the opportunity to ask

15  any questions, but my guess is you're going to say you don't

16  have any questions.

17       MR. ECHEVERRIA:  That is correct, Your Honor.  You

18  read my mind.

19       THE COURT:  Haha.  Okay.  Look.  I think you answered

20  my question.  What I was trying to find out was how difficult

21  is it when you asked about removing those two pins.

22       Again, I've never done it.  I have no idea where they

23  are.  But I think he said it doesn't require any special skill

24  or that anyone can do it, so I appreciate that.

25       Well, listen.  I thank you very much for answering my

1    questions.  I've read your declaration pretty thoroughly, and

2    these questions were sort of bothering me.  I appreciate your

3    honest and candid answers.

4            And so unless anybody has anything else, I'm going to

5    excuse this witness.

6            MR. LEE:  Yes, Your Honor.

7            THE COURT:  Thank you, sir.  Thank you for being with

8    us.  Take care.

9            (Witness excused)

10           MR. LEE:  So, Your Honor, do I understand, from the

11   Court's colloquy, that the Court does not need to see a firearm

12   tomorrow?  I just --

13           THE COURT:  I think you're about to be preempted.

14           THE CLERK:  I acquired one.  It's on its way.

15           THE COURT:  I think we've acquired one.

16           MR. LEE:  Oh, okay.

17           THE COURT:  Have you ever seen MASH?  Do you remember

18   Radar in MASH?

19           MR. LEE:  Yes, Your Honor.

20           THE COURT:  Well, I have my own version.  He has made

21   arrangements to get one for me so that I can take a look at it.

22           Anyway, I'm trying to figure out who's next.

23           MR. ECHEVERRIA:  Your Honor, this is John again on

24   video.

25           THE COURT:  Yes.

 1              MR. ECHEVERRIA:  I'd like to note that we still have
 2    one witness who is on the East Coast.  That would be Lucy
 3    Allen.  She's in New York.
 4              So if I may suggest, if the Court is interested in
 5    speaking with her, maybe she can be asked to testify next.
 6    It's just a suggestion.
 7              THE COURT:  It's an excellent suggestion, and I would
 8    take you up on that.
 9              So why don't we go ahead and call Lucy Allen.
10              THE CLERK:  All right.  Bringing her in, Judge.
11              THE COURT:  There she is.
12              How are you?  Can't hear you?  You're muted.  You're
13    still muted.
14              THE WITNESS:  Now can you hear me?
15              THE COURT:  I can hear you.  How are you?  I'm Roger
16    Benitez.  I'm sure you've heard lots about me.  I'm the judge
17    assigned to this case.  And it's a pleasure to have you with
18    us.
19              Would you do me a favor?  Please raise your right
20    hand.
21     LUCY ALLEN,
22        called as a witness by the Defendants,
23        having been duly sworn, testified as follows:
24              THE COURT:  Terrific.  Would you do me a favor and
25    please state your name and spell it for the record?

1          THE WITNESS:  Lucy Kate Allen.  L-u-c-y, K-a-t-e.

2    A-l-l-e-n.

3          THE COURT:  Terrific.  So I have some questions for

4    you.  I've reviewed your declaration.  Now I'm very familiar

5    with your testimony and with your work.

6          My first question is, you said that, "The self-defense

7    average is 2.0 shots fired.  1.9 shots in the home."

8          I just have to ask you, how does a weapon fire a .9

9    shot?

10         THE WITNESS:  Haha.  So the average is taking the

11   number of incidents and dividing.

12         So averages may not round to even numbers once you

13   take a number of incidents and divide by the number of shots,

14   the same way you might have heard that, you know, the average

15   household has, I don't know, 1.7 children or something.

16         THE COURT:  I thought that was the answer you were

17   going to give me, but I had to ask anyway.

18         THE WITNESS:  Haha.

19         THE COURT:  So tell me how you arrived at your

20   averages.

21         THE WITNESS:  Sure.  So I think it's -- so I've used a

22   number of different data sources to look at the number of the

23   average number of shots that were fired.

24         And one of the data sources that I looked at were NRA

25   incidences of people defending themselves in the home -- or

1 | people defending themselves, and some of those incidences were

2 | in the home and some were not in the home.

3 | So I took the total number of incidences and divided

4 | by the number of shots fired, and coded the stories into

5 | whether they occurred in the home or whether they occurred

6 | elsewhere.  That's one set of sources of information.

7 | Another analysis that I did was not based on the NRA

8 | stories but was based on all new stories that are covered

9 | within FACTIVA, which is an aggregator of news.

10 | THE COURT:  It's a what?

11 | THE WITNESS:  An aggregator of news stories.

12 | THE COURT:  Okay.

13 | THE WITNESS:  So something that we frequently use, and

14 | other researchers and academics frequently use it.  It's often

15 | used in litigation.

16 | And within that, within FACTIVA, I searched for news

17 | stories that met certain criteria, and then within the stories

18 | that met the criteria, I had a team review the stories to see

19 | whether they were about incidents of people defending

20 | themselves in the home with guns, and then -- within the set,

21 | and then did a random sample and coded those up.

22 | So I have a number of different sources that I used,

23 | but for each of them it was -- you know, the average were based

24 | on whatever the news stories said about how many shots were

25 | fired.

1       THE COURT:  Let me ask you a question.  Did you ever
2   ask, for example, Mr. Echeverria if he would get you the law
3   enforcement reports of home defense shootings that may have
4   occurred where the homeowner or the person at home fired shots
5   at someone that was intruding?

6       THE WITNESS:  Yes.  So I did ask both from the State
7   of California as well as from a number of other states that I
8   have worked for, I have asked for data on incidents of exactly
9   that, or whether there was a broader set of data that they had
10  that I could then review.

11      THE COURT:  And did you get that from the State of
12  California?

13      THE WITNESS:  I did not.  It was my understanding that
14  the State of California did not have that data or did not have
15  that in a way that it could be reviewed.  That that is not --
16  that is not a type of data that is collected.

17      THE COURT:  I see.  So the State of California does
18  not collect that information.

19      MR. ECHEVERRIA:  Objection, Your Honor.

20      THE WITNESS:  That is my --

21      THE COURT:  I'm sorry?

22      MR. ECHEVERRIA:  That calls for Ms. Allen to speculate
23  about the State of California's data repository or the
24  information the State has.  I'm not sure that Ms. Allen would
25  be able to testify about that.

```
 1            THE CLERK:  Machine gun is here, Judge.

 2            THE COURT:  Oh.  Tell you what.  Let's take a break

 3    for just a second.  We're going to keep you on hold for just a

 4    minute.

 5            Mr. Echeverria, somebody has brought me, I think, an

 6    AR-type weapon.

 7            Right?

 8            MARSHALL:  Yes, Your Honor.

 9            THE COURT:  Bring it up here.  Let me take a look at

10    it.  It is unloaded?

11            THE MARSHAL:  Yes, Your Honor.  Of course.  Where

12    would you like it, Your Honor?

13            THE COURT:  Just hand it to me.

14            (Pause in the proceedings)

15            THE COURT:  This has a collapsable stock.

16            THE CLERK:  Are we on the record, by the way?

17            THE COURT:  No, we don't have to be on the record.

18            (Discussion off the record)

19            THE COURT:  Sorry for the interruption.  Thank you.

20            Okay.  So there was an objection, I think, and I'm

21    sorry I interrupted you, but you were objecting,

22    Mr. Echeverria, about something?

23            MR. ECHEVERRIA:  If I recall correctly, Your Honor, I

24    was objecting to the extent that Your Honor's question is

25    calling for Ms. Allen to speculate about the type of
```

1    information that the Department of Justice has, where she is

2    not an employee of the Department of Justice, and I have that

3    objection.

4         THE COURT:  Okay.  Well, that's not a bad objection,

5    except for I don't think it's completely accurate because I

6    think she was the one who said she had asked for the

7    information, and I asked whether she had looked at that

8    information, whether she had information from the State of

9    California because --

10        And why would I ask that, Mr. Echeverria?  Well,

11   because the news doesn't always report everything, and if they

12   do report it, it's not always accurate, and so I would

13   expect -- I don't know, correct me if I'm wrong -- but I would

14   expect that if there was a shooting, somebody broke into my

15   home, and I fired shots, I would expect that law enforcement

16   would be there, that law enforcement would take a report, and

17   that law enforcement would accurately report how many shots

18   were fired.  Maybe I'm wrong, maybe law enforcement wouldn't

19   care how many shots were fired, but I would think they would

20   want to know.

21        And if that's the case, I was asking whether or not

22   Ms. Allen had asked the State of California for that

23   information and whether she had conducted a study doing that

24   using State official records, rather than news stories.

25        We'll move on.

 1          So tell me about the numbers that you used in order to
 2   arrive at the 2.0 shots.
 3          By the way, I thought I heard before it was 2.2 shots.
 4   Did the numbers go down somewhere?  I seem to recall, I think
 5   it was in the *Duncan v. Becerra* case that I think I was told it
 6   was 2.2 shots.
 7          THE WITNESS:  So if you look at my declaration in this
 8   case.
 9          THE COURT:  Yes.
10          THE WITNESS:  So again, I've done it a couple
11   different ways.
12          The average using the NRA armed citizen incidents
13   overall is 2.2 shots.  The average in the home is 2.1 shots.
14   And I had done this a few times and --
15          THE COURT:  I thought it was 1.9 shots.  Your
16   declaration says -- I thought it said 1.9 shots.  Did I miss
17   something?
18          THE WITNESS:  So that's -- oh.  That's for the State
19   of California.
20          THE COURT:  Ah.
21          THE WITNESS:  That's the subset only in the State of
22   California.
23          THE COURT:  Okay.  Got it.  So what was the highest
24   number of shots that were fired?
25          THE WITNESS:  So in the -- so again, I have done this

1  a few times, and each time that I -- so I have been working on

2  this since 2013, I believe -- so whatever that is, eight, nine

3  years -- and I have updated my data periodically with

4  additional data.

5          In the NRA stories, there were -- of the ones that I

6  have looked at, which are starting in January 2011, there were

7  two incidents that had more than ten shots fired, and those

8  incidents were added after I had coded up this data and used it

9  a couple of times, and after it had been reviewed by courts in

10 other states.  So I don't remember --

11         There were two incidents that were added later to this

12 NRA database, and I believe one of them maybe had 14 shots and

13 one of them had 16, is my recollection.  So of the almost 1,000

14 incidents that I have looked at overall, those were the two

15 highest.

16         THE COURT:  But you didn't look at all, you selected

17 some, and this is what you came up with, right?  So somehow you

18 selected --

19         THE WITNESS:  Um.

20         THE COURT:  -- you selected some --

21         THE WITNESS:  No.

22         THE COURT:  No.

23         THE WITNESS:  So I didn't -- so one of the analysis I

24 did was not -- was selecting every single incident that was in

25 the NRA database of citizens defending themselves -- armed

1  citizens defending themselves, and it's something like over

2  700 incidents from January 2011, and I did this numerous times,

3  but in this particular declaration for the Miller case, that

4  went through May of 2017, and I quoted up every single incident

5  within the NRA database.  There's no selection going on there,

6  it's every single one.

7        THE COURT:  But is this nationwide or California only?

8        THE WITNESS:  Oh, that was nationwide.

9        And then within that, I looked at only the one's that

10  were in California.  And again, no selections, just every

11  single one that was within California.  And I guess that was --

12  I don't recall the exact number but I should have that here,

13  how many incidents, but it's of the same set.

14        So of the 700 and so incidents, a certain number were

15  within California.  47, it looks like.

16        THE COURT:  So 47 out of the 700 were in California.

17        THE WITNESS:  Yeah.  And I think it's 736, it looks

18  like.

19        THE COURT:  Okay.  Now, that's the NRA number.

20        What about the news sites, the aggregator or whatever

21  it was that you were talking about?

22        THE WITNESS:  Okay.  So FACTIVA is the name of the

23  aggregator.  And I searched over the entire, face-to-face, a

24  database for stories that met certain criteria, and the

25  criteria themselves would mirror the stories that were in the

 1   NRA database.  So it would give you back the stories that are

 2   in the NRA database.

 3           THE COURT:  Would it give you more or less?

 4           THE WITNESS:  Oh, it would certainly give you many

 5   more incidents than are in the NRA database.

 6           THE COURT:  So it would give you more incidents than

 7   were in the NRA?  Is that what you said?

 8           THE WITNESS:  Sure, yes.

 9           THE COURT:  Okay.

10           THE WITNESS:  So the search criteria yields something

11   like 35,000 stories.  So 35,000 stories were not -- search

12   criteria yielded stories that were not people defending

13   themselves in the home with guns, they just happened to have

14   those same words.

15           So I took a random sample of the 35,000 stories, and

16   then coded up the random samples to see whether they really

17   were incidents about people defending themselves in the home.

18           And so a subset of those were of people defending

19   themselves in the home, and the numbers work out so that it

20   would be something like, of the 35,000 stories that the search

21   criteria selected, something like 4,800 would actually be news

22   stories about people defending themselves in the home, and of

23   those, I'm selecting a random sample.

24           THE COURT:  And what were the dates, starting and

25   beginning?

 1                THE WITNESS:  The same dates -- the same dates as the

 2    news stories were, from January 2011 through May 2017.  So the

 3    same as what I had looked at for the NRA stories.

 4                THE COURT:  And what was the criteria that you used?

 5    Let me ask you this.  Is there a --

 6                THE WITNESS:  Sure.

 7                THE COURT:  -- based on your analysis, could incidents

 8    that would otherwise qualify, say, for example, as home

 9    shootings or shootings outside of the home, have escaped your

10    analysis as a result of your criteria?

11                THE WITNESS:  Yes.  It's possible the criteria doesn't

12    capture every news story, but I'm not looking at the criteria

13    to figure out the number of incidents that there are, I'm

14    looking at it to figure out the number of rounds of bullets

15    that are used in self-defense in the home.

16                So whether -- it doesn't matter if I don't include

17    every story.

18                THE COURT:  That's where I thought you were going.

19    Let me just ask you --

20                THE WITNESS:  Yeah.  I'm not (inaudible) that number

21    of stories.  So I don't want to end up with stories that are

22    biased and have -- that you would expect to have a different

23    number of bullets being used.

24                So one of the things that I find --

25                THE COURT:  I'm sorry.  Repeat that again.  I'm sorry.

1    Can you repeat that?

2            THE WITNESS:  So I don't want -- the way the research

3    works, I'm not trying to count the number of incidents of home

4    defense.  That's not what the -- that's not the purpose of

5    this.  The purpose of this is to see how many bullets are used

6    in self-defense.

7            So I'm not trying to say how many incidents are there,

8    I'm trying to say -- I'm trying to take a random sample of

9    incidents that there are stories about and see how many bullets

10   are used.

11           So it doesn't matter if I'm omitting stories, what I

12   want to know is whether the stories I'm omitting are different

13   in terms of the number of bullets -- are systematically

14   different in terms of the number of bullets that are being used

15   in the stories I get from the search in the random sample.

16           And I don't see any evidence that they are different,

17   with the exception that, in general, there are more stories

18   written when there are more bullets used.  So the more bullets

19   on average, the more stories.

20           So incidents where fewer bullets are used, there

21   were -- there are likely fewer stories.  And incidents where

22   there are no stories, I would also expect there are less

23   bullets being used.

24           So there's a clear correlation that more stories are

25   written about incidents where more bullets are used, and that

1    pattern is something that I can take account of specifically.

2         So I can make an adjustment for that, I can look at

3    the relationship and see, for each story that I found, how many

4    bullets were there, and how many other stories were there that

5    this particular incident -- that covers this particular

6    incident.

7         So how likely was I to find that incident.  And if an

8    incident had 10 stories, then I'm 10 times more likely, with a

9    random sample, to find that incident than I am with an accident

10   where only one story covers it.  So that's an adjustment that

11   I'm able to make with the data.

12        THE COURT:  I'm still a little troubled by something

13   you said, and I'm trying to --

14        THE WITNESS:  Sure.

15        THE COURT:  -- make sure I understand.

16        So you came up with some criteria, whatever the

17   criteria were, and then you did the search, and then you came

18   up with a random number from that search, and then you averaged

19   those out, and you came up with your 2.0 and 1.9 number, or 2.2

20   nationally and whatever the other number was.

21        But my question, what I was trying to find out is the

22   criteria that you used, whether or not there would be shootings

23   that occurred that would not be captured by your criteria.

24        THE WITNESS:  So the criteria does mirror the stories

25   that are in the NRA.  90 percent of the stories that are in the

 1  NRA database have those same criteria so that my criteria would
 2  find those same stories.
 3          What the criteria don't particularly find are things
 4  that happened outside the home, which are -- but I don't see
 5  evidence that the criteria are missing stories that are
 6  systematically either more bullets or fewer bullets.
 7          THE COURT:  Let me ask you a question.
 8          THE WITNESS:  So that's --
 9          THE COURT:  The Sutherland Florida Church shooting,
10  did your criteria capture that?
11          THE WITNESS:  These are -- these are self-defense in
12  the home, so it doesn't --
13          THE COURT:  Just in the home.  But I thought --
14          THE WITNESS:  Yes, yes.  The FACTIVA search is focused
15  on defense in the home.
16          THE COURT:  I have two numbers; self-defense number of
17  2 shots fired and 1.9 shots fired in the home.  That's
18  paragraph 16 of your declaration in California.
19          THE WITNESS:  Those numbers are similar.  They're
20  different incidents.  So whether they're statistically
21  different or not, I don't know.  But those are the -- those are
22  just based on NRA stories that happened in California.
23          Another analysis that I did was based on a systematic
24  scientific analysis of news stories.  So one analysis that I
25  did is based on NRA's who have been maintaining the database of

1  people defending themselves in the home.  That's where the 2.0

2  and the 1.9, which are the California stories that are in the

3  NRA database.

4       Then I did another analysis, which is a systematic

5  scientific analysis, of news stories that's separate from the

6  NRA analysis, that's not part of the NRA database, and it's not

7  specific to California.  That analysis was nationwide, and it

8  focused on self-defense in the home.

9       THE COURT:  All right.

10       THE WITNESS:  And so that those -- those stories all

11  dealt with in the home.  I (inaudible) up stories that are

12  self-defense in the home.  That's on page 10 of paragraph 21

13  about their -- in my declaration.

14       THE COURT:  Let me turn your attention to paragraph 36

15  of your declaration.  In your declaration, you say --

16       THE WITNESS:  Sure.

17       THE COURT:  -- that the average shots fired was 152.

18       THE WITNESS:  Paragraph 36?

19       THE COURT:  I believe that's correct.

20       THE WITNESS:  Okay.  So now, this is in mass

21  shootings.  Is that your --

22       THE COURT:  Yes.

23       THE WITNESS:  Okay.  We're switching to mass

24  shootings.  Okay.

25       THE COURT:  So you took all of those shootings, you

 1   added up the number of shots fired, you divided by the number
 2   of shootings, and you arrived at 152; is that right?
 3            THE WITNESS:  So this is mass shootings that involves
 4   an assault weapon.
 5            THE COURT:  Right.  But what I just said is accurate?
 6   You took all of these shootings, you took all the shots fired,
 7   you divided it by the number of shots fired -- I mean, the
 8   number of mass shootings with assault weapons and arrived at a
 9   number of 152 shots fired.
10            THE WITNESS:  Yes, I believe that's correct.
11            THE COURT:  Okay.  How many shots were fired in
12   Las Vegas?
13            THE WITNESS:  Well, if you look at my table, you'll
14   see the numbers in there.
15            THE COURT:  It's 1,043, isn't it?
16            THE WITNESS:  I have Las Vegas.  It looks like it's
17   1,100.
18            THE COURT:  Okay.  Close enough.
19            How many mass shootings did you average?  How many
20   mass shootings did you average?
21            THE WITNESS:  How many mass --
22            THE COURT:  Yes.
23            THE WITNESS:  Well, the total number of mass shootings
24   that I've analyzed is 161.  And of those -- of those, 32
25   involved an assault weapon, or I could tell that they involved

 1  an assault weapon.  There's some that are unknown.

 2              THE COURT:  Okay.

 3              THE WITNESS:  And there are 22 in which the numbers of

 4  shots fired is known, so I don't know the number of shots fired

 5  in all of the -- all of the incidents.

 6              THE COURT:  So again, I'm trying to understand your

 7  analysis.

 8              So you used 32 mass shootings that occurred with

 9  assault weapons, you took all the shots fired, and you

10  divided --

11              THE WITNESS:  Well, I took 22 in which -- sorry.

12  Sorry to interrupt you.

13              THE COURT:  No.  Did you say 22?

14              THE WITNESS:  Well, I think it's 22 in which the

15  number of shots fired is known.

16              THE COURT:  Okay.  So you took 22, you added up all

17  the shots that were fired and that you know of, right?  You

18  divided all the shots fired by 22, and that's how you arrived

19  at the 152 average shots, correct?

20              THE WITNESS:  I believe that's correct.

21              THE COURT:  Well, I don't know --

22              THE WITNESS:  I might have had a number excluding the

23  Las Vegas shooting.  I don't recall if I put that in here or if

24  I've done that before.

25              THE COURT:  Well, that's a good question.  I'm glad

 1    you brought that up.  Because I was going to ask you, if you

 2    take the Las Vegas shooting out of the equation -- do you have

 3    a calculator with you?

 4              THE WITNESS:  I do not, but I might have --

 5              THE COURT:  All right.

 6              THE WITNESS:  I might have some totals without the

 7    Las Vegas shooting, but I don't recall if I did that in this --

 8    yeah.  I just don't recall.

 9              THE COURT:  Okay.  Well, don't worry about it because

10    I can do the math, I just wanted to make sure.

11              THE WITNESS:  Haha.

12              THE COURT:  Yeah.

13              THE WITNESS:  Yeah.  It should be -- I tried to make

14    it clear.  So I have the appendix in the back which lists every

15    mass shooting, and then it tells you how many shots fired, and

16    then it has a dash if I didn't have that information, and then

17    it tells me whether -- whether there's an assault weapon.

18              So you can -- it should be all detailed in here and

19    footnoted.  So that was the intent.

20              THE COURT:  So in the Las Vegas shooting, there were

21    approximately 23 weapons that were used and 1,100 shots fired.

22    That's your understanding, right?

23              THE WITNESS:  I'd have to look back on what I have

24    here, but that sounds right.

25              THE COURT:  Okay.  Have you become aware of any

 1    defensive shootings, whether in California or outside of
 2    California, since you did your analysis where more than two
 3    shots were fired?
 4              THE WITNESS:  More than two shots were fired?
 5              THE COURT:  Yes.
 6              THE WITNESS:  Oh, I don't know.  So the two is an
 7    average.
 8              THE COURT:  No, I know that.  I heard that.
 9              THE WITNESS:  Yeah.  So my focus was more on whether
10    there were more than ten.  I don't know if I have become aware,
11    since doing my declaration -- is that -- was that the question?
12              THE COURT:  Fair enough.
13              THE WITNESS:  Since doing the declaration, I don't
14    know that I really looked at any new data.  So I'm not sure if
15    I've, like, become aware of anything or done anything since
16    doing the declaration.  Not that I recall.
17              THE COURT:  Okay.  Do you, by chance, happen to know,
18    based on the information that you've looked at, of those
19    4,800 defensive shootings that you told me about, if any of
20    these, what I'll refer to in order to use a consistent
21    terminology, whether assault weapons were used in any of those
22    4,800 defensive shootings?
23              THE WITNESS:  So there are 4,800 stories.  Those are
24    not the number of incidents.  So the incidents that have a
25    large number of bullets used actually have more stories.  So

 1  that's not the number of incidents, those are the number --

 2  approximate number of stories --

 3       THE COURT:  Okay.

 4       THE WITNESS:  -- that are -- that are in -- you know,

 5  that are covered in news sources over January 2011 through May

 6  2017.  So over that six-and-a-half, seven-and-a-half-year time

 7  period.

 8       And I -- your question was, do those news stories

 9  include events where someone defended themselves with an

10  assault weapon?

11       THE COURT:  With what is commonly referred to as an

12  assault weapon, yes.

13       THE WITNESS:  I guess, one of the things that I do

14  know is the answer to that.  The incidents that I think that

15  you described in a -- was it the *Duncan* case that you had a

16  decision, Your Honor?

17       THE COURT:  Yes.

18       THE WITNESS:  I think you described -- those incidents

19  meet the criteria.  So to the extent that those incidents are

20  in my time period, they would fall into -- they would be part

21  of my 4,800 stories.

22       And I don't recall now whether those incidents

23  involved assault weapons or not, but I do recall that those --

24  the terms that were used in those stories are the terms in

25  those stories, to the extent that they were in my -- were in

1   the time period would fall into that.

2          I just don't recall whether those involved assault

3   weapons or not.  If they're in the 2011 to 2017 time period,

4   then yes, those would be in those two -- the 4,800.

5          THE COURT:  Let me try again.  Let me try it a little

6   different way.

7          So you looked at all these different news stories, and

8   from those news stories you arrived at the average shots fired.

9          Now, when you were looking at those news stories, did

10  you notice if any of those shootings where the shots were fired

11  involved AR-15-type rifles?

12         THE WITNESS:  I don't -- I wasn't particularly coding

13  that up, so I don't have an -- and I don't have a specific

14  recollection.  I couldn't give you the answer to the number,

15  and I --

16         THE COURT:  No.  I'm not asking for a number, I'm just

17  asking were there any stories that said that a defensive -- in

18  those incidents that you looked at, whether an AR-15-type rifle

19  was used.

20         THE WITNESS:  I just -- I don't recall.

21         THE COURT:  Okay.

22         THE WITNESS:  I don't know one way or the other.

23         THE COURT:  Fair enough.  Okay.

24         I don't have anymore questions at this -- wait, I do.

25  I take it back.  I'm sorry.

1          Ms. Allen, so this analysis that you did, why did you

2    do that?

3          THE WITNESS:  Which analysis are you referring to?

4          THE COURT:  Well, the one where you came up with the

5    average of shots fired.  Why did you do that?

6          THE WITNESS:  I originally did it because I was asked

7    could I determine how often large-capacity magazines or people

8    use more than ten shots in defense.  And actually, the first

9    thing I did was per their question, which was try to find out

10   whether there were police records on that.

11         I have previously used a lot of, like, you know,

12   government data to answer questions, and I agree with you that

13   I think that would be helpful, so I first did try to research

14   and ask whether there was government data or other data, police

15   records available.

16         And then what I found is that the largest selection of

17   incidents of people defending themselves in the home was

18   actually put together by the NRA, and that has been going on

19   for years, that has included hundreds of incidents.

20         So it was -- in being asked the question of, you know,

21   could I find data on this, this is -- that's how I determined

22   it.

23         THE COURT:  And who asked you to do that?

24         THE WITNESS:  It was New York State, so the -- was the

25   first time I had been asked to do that.

```
 1               THE COURT:  So State of New York asked you to do that?
 2               THE WITNESS:  The State of New York, yeah.  I don't
 3   know -- when you say "who", that's a proper -- a technically
 4   proper way of explaining who, but --
 5               THE COURT:  Okay.
 6               THE WITNESS:  -- I don't know if that's who, but, yes,
 7   it was the State of New York.
 8               THE COURT:  Okay, great.  Thank you.
 9               Any questions?
10               MR. DILLON:  Just one clarification, Your Honor.
11               THE COURT:  Okay.
12   BY MR. DILLON:
13   Q.  Ms. Allen, this is John Dillon on behalf of the plaintiffs.
14   I know you can't see me, but can you hear me?
15   A.  I can hear you.
16   Q.  Okay.  Just to clarify, in your analysis of number of shots
17   fired in self-defense in the home, if someone were to be
18   involved in a self-defense shooting, say, in their front yard
19   or their backyard, would that be included or excluded, based on
20   your criteria?
21   A.  It would be included.
22   Q.  So what is the boundary of what is "inside the home"?
23   A.  Like the home.  The story appeared to be about the home, on
24   their home property rather than not -- not their home property.
25   Q.  And with the number of incidents with no shots fired, was
```

1   that included in your percentage of incidents with less than

2   five shots fired?

3   A.   Yes, I believe so.   But I don't know where I have one with

4   less than five shots fired.

5   Q.   So in instances where someone brandishes a firearm and that

6   stops the attack, under your analysis, that would bring the

7   number of average shots fired down?

8   A.   I'm sorry.   Can you repeat that?

9   Q.   So in an incident where someone brandishes a firearm and

10   did not shoot the firearm in self-defense, that would bring

11   your percentage of incidents with less than five shots fired

12   down; is that correct?

13   A.   I don't know if it would bring it down.   That's included.

14   So if it's less than five shots, no shots fired is less than

15   five shots fired, it's included within less than five shots

16   fired.

17        MR. DILLON:   That's all, Your Honor.

18        THE COURT:   But that would be included in your

19   average, right?   So there were no shots fired versus -- so

20   let's assume two incidents.   In one incident there's no shots

21   fired, and the other incidents there's five shots fired, and

22   you divide five by two and you come up with two and a half.

23   Fair enough?

24        THE WITNESS:   Yes.

25        THE COURT:   Okay.   Terrific.   Well, listen.   It's been

1    a pleasure.  I'm sorry I've taken up your time.  I'm sorry I

2    asked you so many questions, but you are, sort of, a critical

3    witness, I might add.

4              You've shown up in, I think, two -- or maybe this

5    might be the third case I've had where your declaration has

6    shown up.

7              So I thank you very much, and you have a wonderful

8    day.  You take care.

9              THE WITNESS:  Thank you very much.  Thank you.

10             THE COURT:  All right.

11             (Witness excused)

12             THE COURT:  What time is it?

13             THE CLERK:  4:20.

14             THE COURT:  Okay.  Yeah.  It's 4:20.  So I don't know

15   that I could get to the next witness and finish in 10 minutes,

16   so let's break for the evening, come back tomorrow morning at

17   9:30 a.m.  Okay?

18             MR. LEE:  Your Honor?

19             THE COURT:  Thank you.

20             MR. LEE:  Sorry, Your Honor.

21             MR. ECHEVERRIA:  Your Honor, Mr. Echeverria by video.

22             THE COURT:  I'm sorry?

23             MR. ECHEVERRIA:  I have a conflict tomorrow, and I

24   would need to confirm that the remaining defense declarant,

25   Dr. Colwell, is able to be available tomorrow, as well.

```
 1              So I would ask if the Court could set an alternative
 2   date and give me an opportunity to confirm that Dr. Colwell
 3   will be available on that date.
 4              THE COURT:  What about John Donohue?
 5              MR. ECHEVERRIA:  Oh, I don't know how I forgot about
 6   Dr. Donohue.  Thank you, Your Honor.  Also, I would have to
 7   confirm with him as well that he's available.
 8              THE COURT:  Well, they're currently -- I believe that
 9   they're currently in the -- what is it?  Waiting room?  What's
10   that called?
11              THE CLERK:  Yeah.  I don't see a Donohue.  I see a
12   JJD.  I don't know who that is.
13              MR. ECHEVERRIA:  I believe that is Dr. Donohue.
14              THE CLERK:  Okay.
15              THE COURT:  Well, why don't we ask him.
16              You've got a conflict tomorrow?
17              MR. ECHEVERRIA:  I do have a conflict tomorrow, Your
18   Honor.
19              THE COURT:  What about your co-counsel there?  He
20   seems like he's perfectly capable of coming, based on you
21   haven't asked any questions, so I'm assuming that he would be
22   able to say, "I have no questions," tomorrow.
23              MR. BECKINGTON:  Well, Your Honor, I will say --
24   hopefully, you can hear me.
25              THE COURT:  I can.
```

1          MR. BECKINGTON:  This is Mark -- can you not hear me?

2          THE COURT:  Yes, I can hear you.

3          MR. BECKINGTON:  I'm sorry.  I am available tomorrow;

4   however, Mr. Echeverria is the lead attorney in the case, and

5   he is the one who has worked with the witnesses.  And although

6   we have not asked direct questions of them, I think that

7   Mr. Echeverria is the one who would be most appropriate to

8   primarily represent the State at the hearing.

9          My role in this case has been a supervising deputy.

10  I'm not the attorney directly responsible for the case.

11         So, you know, again, I don't personally have a

12  conflict tomorrow, but nonetheless, I think Mr. Echeverria is

13  the attorney for the State on this case, and for that reason, I

14  think he should be the one to represent the State at the

15  hearing, and I would ask that, due to his conflict, that we

16  choose a date that is mutually available for everyone on the

17  case.

18         THE COURT:  All right.  So does defense have any

19  objections to continuing this to some other date?

20         MR. LEE:  If you're asking if the plaintiffs, Your

21  Honor --

22         THE COURT:  I'm sorry.  The plaintiffs.

23         MR. LEE:  That's quite all right.  We certainly don't.

24  If we can -- we have several additional witnesses, obviously,

25  and we need to check with their availability, too.

```
 1              I know that they've blocked out today and tomorrow for
 2    testimony, so we're ready to go.  If there's a conflict,
 3    there's a conflict, obviously, but at the same time, this was
 4    scheduled as an evidentiary hearing, and it might have been
 5    anticipated that we would run more than one day, given the
 6    number of witnesses.
 7              So -- plus, the fact is, of course, you know, Your
 8    Honor, I know that the motion was submitted some while ago, but
 9    this is a preliminary injunction motion in which we're seeking
10    a remedy for irreparable injury, and so we're certainly wanting
11    to accommodate Mr. Echeverria whenever possible, but at the
12    same time, I don't think we should try to let this go too long.
13              Plus, I understand Dr. Lott is not available tomorrow
14    for testimony, so --
15              THE COURT:  Dr. Lott is not?
16              MR. LEE:  Yes.
17              THE COURT:  So then it's in your best interest to go
18    ahead and continue this to a later date.
19              MR. LEE:  From what I understand --
20              THE COURT:  Because I have a lot of questions of
21    Dr. Lott, I have to tell you.
22              MR. LEE:  Well --
23              THE COURT:  Just like I do of Dr. Donohue.
24              MR. LEE:  Your Honor, Dr. Lott's available.  He's
25    ready in the waiting room this evening.  We're ready to go.  I
```

 1  don't know if the Court wishes us just to proceed with

 2  Dr. Lott.  I mean, I know the Court has its own schedule.

 3       THE COURT:  There's no way.  We don't have enough

 4  time.  It's 4:30.  We're not going to be able to do that.

 5       MR. LEE:  Understood.

 6       THE COURT:  So -- well, I don't suppose,

 7  Mr. Echeverria, you're able to speak to your witnesses while

 8  they are in the waiting room.  I would like to set the date

 9  now.  I would like to get this resolved now.  If I can't get it

10  resolved now, we're going to do this tomorrow.  But if we can

11  find an accommodation that will work for everyone, then I'm

12  willing to go -- I don't want to go out too far.  I might go

13  out a week, maybe, something like that, because I don't want to

14  forget.  I don't want to lose track of where we've been.

15       But I'm willing to go and continue this matter, but it

16  requires that everyone be ready to go on a given date.  Okay?

17  If that can't happen, then with all due respect to

18  Mr. Echeverria, then I'm going to have to do at least some of

19  this tomorrow and then try to accommodate everybody else at

20  some other point in time.

21       But I'm trying to do the best I can to work with

22  everyone, but I don't have a magic wand, and at some point in

23  time I've got to make a decision.

24       So Mr. Echeverria, I asked you if you were able to

25  talk to your witnesses without my -- I don't want to be

 1   listening in on your conversations.  Can you do that?  Are you

 2   able to do that?

 3           MR. ECHEVERRIA:  If Your Honor can give me about five

 4   minutes then I can try to -- I have a paralegal who is

 5   interfacing with the witnesses while I'm in the hearing, so I

 6   can have the paralegal check.

 7           I'm available any day this week except for tomorrow.

 8   So I can do this Wednesday, and Thursday, or Friday.

 9           THE COURT:  Well, unfortunately, on Wednesday I've got

10   a calendar so I can't do it on Wednesday.

11           So we could do Thursday, Friday, or tomorrow.

12           MR. ECHEVERRIA:  Okay.  I will check on Thursday and

13   Friday with my witnesses.  And it might be a good idea for

14   plaintiffs to check with Dr. Lott and their remaining

15   witnesses, as well.

16           THE COURT:  Great idea.  Let's take a 10-minute

17   recess.  I'll be back.  You folks tell me where we are.  Okay?

18           MR. LEE:  Will do, Your Honor.

19           THE COURT:  Thank you.

20           (Recess)

21           THE COURT:  Mr. Echeverria, what did you find out?

22           MR. ECHEVERRIA:  Both Dr. Donohue and Dr. Colwell can

23   be available Thursday or Friday.

24           For Dr. Donohue, he has a conflict in the morning, so,

25   you know, perhaps we can schedule him for an afternoon session,

1   but he is available all day Friday, alternatively.

2           THE COURT:  I'm sorry.  I got a little confused.

3           So Dr. Donohue has a conflict Friday morning?

4           MR. ECHEVERRIA:  Thursday morning.

5           THE COURT:  Thursday morning.

6           MR. ECHEVERRIA:  But he's available to testify in the

7   afternoon on Thursday or all day Friday.

8           THE COURT:  Okay.  So we can perhaps do the other

9   doctor in the morning, if we wanted to, right?

10          MR. ECHEVERRIA:  That's correct.

11          THE COURT:  Okay.  What about you?  Where are you?

12          MR. LEE:  Well, first of all, Your Honor, perhaps we

13  can call a lot of our witnesses out, and if I make the

14  following offer:  As to each individual plaintiff and

15  organizational plaintiff that submitted a declaration, we're

16  prepared to submit on the declaration itself.  And I can go

17  through the list of names.

18          And if the State has no questions of those witnesses,

19  and the Court has intended no questions of those witnesses,

20  we'll just submit the declarations -- submit on the

21  declarations as to those witnesses.

22          THE COURT:  Okay.  Just a second.  Let me --

23          MR. LEE:  Certainly.

24          THE COURT:  I'm going to send you a bill for the

25  hernia operation.

 1          (Laughter)

 2          THE COURT:  All right.  So I have some questions for

 3   James Cucuruto.

 4          MR. LEE:  He's testified already this morning, Your

 5   Honor.

 6          THE COURT:  Oh, that's right.  Sorry.

 7          Brian Peterson, James Miller.  I'm trying to look to

 8   see if I can skip some of these.

 9          And Mr. Kapelsohn testified this morning, right?

10          MR. LEE:  Yes, Your Honor.

11          THE COURT:  So those are the one's that I think I have

12   questions for.

13          MR. LEE:  So if that's the case, Your Honor, we're

14   willing to submit on the rest of the declarations as to the

15   remaining witnesses, including Adam Kraut, who recorded the

16   video that Your Honor referenced earlier this morning.

17          THE COURT:  You know what?  How difficult would it be

18   to have him be available?  Because I would like to ask him

19   questions about that video.

20          MR. LEE:  He is available this week, I believe.

21          THE COURT:  He what?

22          MR. LEE:  This week.

23          THE COURT:  He's available this week?

24          MR. LEE:  In person or by Zoom, he could be available

25   this week, I understand.

 1                 MR. KRAUT:  It was a question.

 2                 MR. LEE:  Oh, it was a question.

 3                 THE COURT:  Your call.

 4                 MR. KRAUT:  Whatever Your Honor prefers, I can make

 5     happen.  I am from Pennsylvania, though.  If Your Honor would

 6     prefer I be here in person, I --

 7                 THE COURT:  No.  I could do it by Zoom, if you're

 8     available by Zoom.

 9                 MR. KRAUT:  Absolutely, Your Honor.

10                 MR. LEE:  With that, we'll submit the remainder on the

11     declarations, except as to Mr. Miller, Mr. Peterson, John Lott,

12     of whom I know Your Honor has questions, and Mr. Kraut, who

13     will be available by Zoom later this week.

14                 Dr. Margulies, who is a rebuttal expert witness, a

15     doctor, I assume the Court has no questions of Dr. Margulies?

16                 THE COURT:  My recollection is that he testified as to

17     the damage that -- the grounds?

18                 MR. LEE:  Yes, Your Honor.  He was -- he submitted a

19     declaration rebuttal to Dr. Colwell, who I believe will be

20     testifying for the defense.  But Dr. Margulies is available on

21     Thursday or Friday morning.

22                 THE COURT:  Well, okay.  So he's available.  So let's

23     plan on him being here by Zoom.  Okay?

24                 MR. LEE:  Okay.  And then, Your Honor, as to John

25     Lott, I think there is an issue.

```
 1              MR. DILLON:  Yes, Your Honor.  Dr. Lott is starting a
 2   new job with the Department of Justice tomorrow morning.  He is
 3   on East Coast time right now, and he doesn't have any of the
 4   home phone numbers that he can get in contact with to change
 5   his schedule for the morning.
 6              He says he can figure out his availability first thing
 7   in the morning, but at this time, he's uncertain of whether or
 8   not he can make himself available tomorrow.
 9              I am working with him with Thursday being a date that
10   was mentioned.  He is going to endeavor to see if he can make
11   Thursday, but he'd be happy to let the Court know first thing
12   in the morning.
13              THE COURT:  First thing in the morning tomorrow?
14              MR. DILLON:  Yes.  Because he's communicated to me
15   that, as soon as he gets into the office, he will inquire
16   regarding the schedule that he's going to be in this week.
17              THE COURT:  All right.  Well, then let's -- I know,
18   Mr. Echeverria, you've got a conflict tomorrow, but
19   Mr. Beckington could be here tomorrow morning.  We'll sort out
20   Mr. Lott, his schedule.  Okay?
21              We'll plan on Thursday and Friday for your witnesses,
22   Thursday and Friday for all of the other witnesses.  If we need
23   to, then maybe we can do Lott next week sometime, if we have
24   to.  I'd prefer not to, but if we have to, we'll do that.
25   Okay?
```

184

```
 1              MR. ECHEVERRIA:  Your Honor, just to be clear, did you

 2     say there is going to be a proceeding tomorrow?

 3              THE COURT:  Well, just so that we can find out

 4     whether -- very quickly, just to find out whether Mr. Lott is

 5     going to be available Thursday or Friday, and if not, what day

 6     would be available for him.

 7              And that's why I said I thought Mr. Beckington would

 8     be able to handle that, even in your absence.

 9              MR. ECHEVERRIA:  Understood.

10              MR. BECKINGTON:  Your Honor, yes.  I can certainly

11     make that appearance.  I assume we'll be provided with some

12     method of contacting the Court tomorrow morning?

13              THE COURT:  Glenn, how do we do this?

14              THE CLERK:  I'll take care of it.

15              THE COURT:  Are you going to do it now or contact

16     them?

17              THE CLERK:  I'll do it today.

18              THE COURT:  Yeah.  I know.  But what I'm asking is,

19     are you going to do it now or do we -- should I call it a day,

20     and then you'll contact them and make sure that they know what

21     the number is?

22              THE CLERK:  I will forward the email right now to

23     them, Judge.

24              THE COURT:  All right.  He's forwarding the email to

25     you right now.  Okay?
```

1        Before we part, though, I've got a question that I
2    want to ask.  It has nothing to do with the witnesses, and it's
3    a question that I want to pose to Mr. Echeverria.  Actually, a
4    couple questions.
5        So I watched the oral argument in the *Rupp* case, and a
6    couple things concern me.
7        The first thing was, Judge Hurwitz asked the question
8    about flamethrowers.  I assume, Mr. Echeverria, that you would
9    agree that flamethrowers are not commonly owned by law-abiding
10   citizens for lawful purposes.  I mean, I can't imagine what
11   that use would be, unless they didn't have a barbecue and they
12   decided that it would be a great way to cook their carne asada.
13       But would you agree that a flamethrower is not a
14   weapon that is commonly owned by law-abiding citizens for
15   lawful purposes?
16       MR. ECHEVERRIA:  Not having examined the issue or
17   being aware of any case in which a flamethrower -- or
18   flamethrower regulations have been challenged, I would -- I
19   would assume that a flamethrower is not protected under the
20   Second Amendment, and I could surmise that there are a host of
21   reasons why that's the case.
22       One event being, that I'm not aware of them being
23   commonly possessed for lawful purposes, like self-defense.
24       THE COURT:  Thank you.  I appreciate your candidness.
25       The second thing that I noticed.  So we know that in

1   the *staples* case, for example, the Supreme Court distinguished

2   between an AR-15 and a hand grenade.

3          So I think you probably would agree, likewise, that a

4   hand grenade is also not a weapon that is possessed for a

5   defensive use.  It's not commonly -- it probably is dangerous

6   and unusual.  It's not commonly possessed by law-abiding

7   citizens for lawful purposes.

8          Do you agree with that?

9          MR. ECHEVERRIA:  Again, Your Honor, I haven't studied

10  the Second Amendment law surrounding grenades.  I would just --

11  spit-balling here and brainstorming, I would query whether a

12  grenade is a bearable arm under the Second Amendment, which is

13  a threshold consideration.  It's a destructive device, in my

14  mind, but again, I haven't researched this issue.

15         THE COURT:  Okay.  There was another issue that was

16  brought up which really, really concerns me.

17         I believe that Mr. Chang said that what concerns the

18  State is a weapon that can fire in rapid succession 20 to 30

19  rounds.  And let me tell you what troubles me about that

20  statement.

21         I assume he was speaking for the State, for Attorney

22  General Becerra and for the Governor.

23         And as I said at the very beginning of the hearing

24  today, we know that there are people who don't want any kind of

25  gun regulation, there are people who want all guns regulated

 1    and perhaps banned, but, of course, there are people out there

 2    who are probably very worried -- and I think rightfully so

 3    given the progression of gun control in the State of

 4    California -- that we're just sort of in a slippery slope.

 5           So if the issue is -- if, as Mr. Chang said, that

 6    there's no reason for anyone to own a weapon that would

 7    discharge 20 to 30 rounds in rapid succession -- I've mentioned

 8    the Ruger -- Mini Ruger 14 several times.  That's a weapon that

 9    has that capability.

10           So my question to you is, is that really your concern?

11    Is that really the State's concern that a weapon -- a

12    semi-automatic weapon can fire 20 to 30 rounds in rapid

13    succession?

14           MR. ECHEVERRIA:  I haven't -- I did watch the

15    argument, Your Honor, but I don't recall what my colleague,

16    Mr. Chang's comment was in response to the question, and I

17    don't recall what the question was.

18           But I will tell you that, as the State has

19    demonstrated in this case and in our pleadings in this case,

20    that the State is concerned about particular configurations of

21    certain semi-automatic rifles -- I'm tabling assault pistols

22    and assault shotguns for the moment -- the certain is that the

23    particular configuration of certain centerfire semi-automatic

24    rifles with a detachable magazine allows someone to fire, not

25    just 30 or 40 rounds, but to fire those rounds rapidly and

1   maintain accuracy in rapid-fire scenarios.  That is the

2   concern.

3          So there are other concerns as well, but that is what

4   the State of California was concerned about.

5          And Your Honor's concern about the slippery slope

6   is -- and we discussed this in *Duncan v. Becerra* -- the

7   limiting principle -- well, there is a limiting principle in

8   this case, and then the two-step analysis where the Court will

9   examine the degree of the burden of prohibiting a certain

10  configuration on the core Second Amendment right to defense of

11  hearth and home with a firearm.

12         The State's position is that the configuration that is

13  prohibited under the Assault Weapons Control Act is not a

14  configuration -- or is not a prohibition that severely burdens

15  the core right because individuals, as Your Honor notes, can

16  use a Mini-14.  An individual can use an AR-15 so long as it's

17  rimfire and takes .22 round caliber ammunition, with all the

18  features, or a centerfire semi-automatic rifle with a

19  detachable magazine that has no pistol grip -- telescoping

20  stock, forward pistol grip, or flash suppressor.

21         So the State here is concerned about the configuration

22  of particular arms that have been proven to be the most lethal

23  in mass shooting situations, and that's what the evidence

24  shows.

25         THE COURT:  Okay.  All right.  So tomorrow morning, I

1    don't need everyone that's here today, I just need someone here

2    to tell me when Mr. Lott will be available.  Hopefully,

3    sometime Thursday or Friday.  But 9:30 tomorrow morning.

4            MR. LEE:  9:30 tomorrow morning for that purpose.

5            THE COURT:  Thank you, all.  I appreciate it.  It's

6    been certainly enlightening.

7            We will see you tomorrow morning at 9:30 a.m.

8            This hearing is concluded.  Thank you.

9                (Proceedings adjourned at 4:55 p.m.)

10                        -o0o-

1                    C E R T I F I C A T I O N

2

3              I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11   Dated:   October 29, 2020, at San Diego, California.

12

13

14

15

16                         /s/ Ellen L. Simone

17                         _____
                           Ellen L. Simone, RMR, CRR
18                         Official Court Reporter

19

20

21

22

23

24

25