1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable ROGER T. BENITEZ, District Court Judge

4
    JAMES MILLER, et al.,          )
5                                  )
                   Plaintiff,      )    CASE NO.
6     VS.                          ) 3:19-cv-1537-BEN-JLB
                                   )
7   XAVIER BECERRA, et al.,        )
                                   )
8                  Defendants.     )
    ───────────────────────────────)
9                                       San Diego, California
                                        Thursday, October 22, 2020
10
                    EVIDENTIARY HEARING – DAY 3
11

12   APPEARANCES:

13   For Plaintiffs:       DILLON LAW GROUP, APC
                           2647 Gateway Road, Suite 105
14                         Carlsbad, California 92009
                           BY: JOHN W. DILLON, ESQ.
15
     For Plaintiffs:       SEILER EPSTEIN LLP
16                         275 Battery Street, Suite 1600
                           San Francisco, California 94111
17                         BY: GEORGE M. LEE, ESQ.

18   For Plaintiffs:       SCHAERR JAFFE, LLP
                           1717 K Street, NW, Suite 900
19                         Washington, D.C.  20006
                           BY: ERIK S. JAFFE, ESQ.
20

21   For Defendants:       OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
                           300 South Spring Street, Suite 1702
22                         Los Angeles, California  90013
                           BY: JOHN D. ECHEVERRIA, ESQ.
23                             MARK BECKINGTON, ESQ.

24

25   Reported by:          Ellen L. Simone, RMR, CRR, CSR No. 14261
                           Official Court Reporter

1                          INDEX TO WITNESSES

2    FOR THE PLAINTIFFS:

3    RYAN PETERSON   . . . . . . . . . . . . . . . . . . 9

4    ADAM KRAUT . . . . . . . . . . . . . . . . . . .23

5    JOHN LOTT, JR. . . . . . . . . . . . . . . . . .96

6

7    FOR THE DEFENSE:

8    CHRISTOPHER COLWELL   . . . . . . . . . . . . . .28

9    JOHN DONOHUE . . . . . . . . . . . . . . . . . .48

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SAN DIEGO, CALIFORNIA; OCTOBER 22, 2020; 9:43 A.M.

 2                                -o0o-

 3              THE CLERK:  1 on calendar.  19-cv-1537.  Miller,

 4    et al. v. Becerra, et al.  Evidentiary hearing, Day 3.

 5              THE COURT:  All right.  Well, thank you, all.

 6    Appreciate your being back here today.

 7              I can't recall what the schedule was that we had

 8    agreed upon.

 9              I do want to tell you a couple things.  Apparently,

10    apparently, when I said I wanted to have an evidentiary

11    hearing, I wasn't very clear, which, it's not surprising for

12    me.

13              The plaintiff apparently understood that we were going

14    to have a full evidentiary hearing with witnesses being called,

15    with direct and cross examination.

16              The State, Mr. Echeverria, understood something

17    different, which is, you know, totally fine with me.

18              I'm a little concerned about the way this proceeding

19    is going on.  If for no other reason, that we're doing so much

20    of this by way of video, which I find to be very difficult.

21              I have questions.  I have read these declarations.

22    I've read them several times, and I have some questions, and I

23    want to have those questions answered.

24              And I would normally expect that those questions would

25    be answered through the normal process of direct and cross
```

1  examination, and as very often happens in my cases,

2  technically, if I'm the fact finder, if there are questions

3  that I still have that have not been answered, I will ask

4  questions and then allow the lawyers to ask questions that

5  would be relevant to the questions that I've opposed and the

6  answers that I've received.

7       So I guess what I'm saying is, I have a whole lot of

8  questions.  I really do.  So I'm going to try and limit my

9  questions of these witnesses to the ones that I think are the

10  most crucial for me to understand all of this information that

11  has been submitted to me, still reserving the right to, at some

12  point in time in the not-too-distant future, to have a real

13  evidentiary hearing with real witnesses in a real courtroom

14  with real questioning going on, and that will be pursuant to

15  Rule 65(a) hearing on the merits, because I see no point in

16  having a preliminary injunction hearing and then having a trial

17  on the merits, and it just seems like a very inefficient way to

18  proceed.

19       So I hope we understand each other.

20       So the point I'm trying to make is, there are some

21  questions that I really, really want to have answered now, so

22  some of the witnesses that I may have previously said that I

23  have questions of, I may not, or at least may not have very

24  many.

25       So with that preface, who did we say we were going to

1 | call first?

2 |       MR. LEE:  Good morning, Your Honor.  This is George

3 | Lee for the plaintiffs.

4 |       So as I understand, what we discussed was that we

5 | would have James Miller and Ryan Peterson, who are individual

6 | plaintiffs, available to testify this morning in person, and

7 | they are here and present.

8 |       Mr. Adam Kraut, who made the video and that Your Honor

9 | said he had some questions of, is available by video on Zoom.

10 |       THE COURT:  Okay.

11 |       MR. LEE:  Then it's my understanding that, after that,

12 | the defense witnesses will continue.

13 |       THE COURT:  Okay.

14 |       MR. LEE:  Dr. Colwell and Professor Donohue.

15 |       THE COURT:  Right.

16 |       MR. LEE:  And then John Lott we confirmed is available

17 | at 3:00 today, starting at 3:00, and if we could maybe, in

18 | light of the fact that he's been -- we've been back and forth

19 | and had him standing by on Tuesday, if we could just attempt to

20 | accommodate him and endeavor to put him on starting at

21 | 3:00 today.

22 |       THE COURT:  All right.

23 |       MR. LEE:  And then tomorrow morning --

24 |       THE COURT:  We may not need to get to tomorrow morning

25 | so --

 1              MR. LEE:  Okay.  Dr. Margulies, who is our rebuttal

 2    expert, is available tomorrow morning starting at 9:30, and

 3    that will round out the schedule, as I understand it, Your

 4    Honor.

 5              THE COURT:  All right.

 6              MR. ECHEVERRIA:  Good morning, Your Honor.  This is

 7    John Echeverria by Zoom, if I may.

 8              THE COURT:  Sure.  Of course.

 9              MR. ECHEVERRIA:  We have Dr. Colwell available right

10    now, so he is on standby for whenever Your Honor wants to ask

11    him questions.

12              And Dr. Donohue, he has a conflict this morning, but

13    I've informed him to be available at least by 2:00 this

14    afternoon.  There is a possibility that Dr. Donohue will be

15    available earlier, so if that happens, I will let you know.

16              THE COURT:  Well, thank you.  That's so nice of you.

17              So he is a doctor, right?  We talked about --

18              MR. ECHEVERRIA:  He's a Ph.D.  He has a doctorate.

19              THE COURT:  Okay.  So I don't know what the

20    appropriate way to refer to him as.  Is it professor, or

21    doctor, or do you know?

22              MR. ECHEVERRIA:  You can refer to him either way.

23              THE COURT:  Okay.

24              MR. ECHEVERRIA:  I don't think he would mind mister,

25    either.

```
 1            THE COURT:  Okay, great.  All right.

 2            So let me look at the Miller declaration and see the

 3    questions that I had, and see if I really need to ask those.

 4            MR. ECHEVERRIA:  Your Honor, this is John again.  I'm

 5    sorry for interrupting you.

 6            THE COURT:  Sure.  Go ahead.

 7            MR. ECHEVERRIA:  One additional matter I'd like to

 8    address before we begin with the witnesses today.

 9            THE COURT:  Sure.  Go ahead.

10            MR. ECHEVERRIA:  A point of clarification about

11    testimony offered by Dr. Klarevas on Monday.

12            THE COURT:  Yes.

13            MR. ECHEVERRIA:  If you recall, you discussed with

14    Dr. Klarevas about certain reports that were prepared by the

15    Las Vegas Municipal Police Department about the Las Vegas mass

16    shooting.

17            THE COURT:  Yeah.

18            MR. ECHEVERRIA:  And there was discussion about the

19    FBI reports.

20            THE COURT:  Yes.

21            MR. ECHEVERRIA:  And Dr. Klarevas had recalled that

22    they were redacted.  When we were gather -- when Dr. Klarevas

23    was gathering the documents to give to us to file, because Your

24    Honor requested those documents, he realized that he was

25    thinking about the Orlando shooting FBI reports, which are
```

1    publicly available and are redacted.  The Las Vegas FBI report

2    is not redacted, and that's the one that he has in his

3    possession.

4        So if Your Honor would like, we can file both the

5    Vegas-related reports and what Dr. Klarevas has from the FBI

6    for the Orlando shooting.  The Orlando documents are quite

7    voluminous, but we're happy to file them electronically, if

8    Your Honor would like.

9        THE COURT:  When you say "quite voluminous", are we

10   talking about 100 pages?  10,000 pages?  Do you have any idea?

11       MR. ECHEVERRIA:  Not that much.  I would say -- I've

12   only looked at a sampling of them, and they were probably a

13   couple hundred pages.

14       THE COURT:  Yeah.  Go ahead and file them

15   electronically.

16       MR. ECHEVERRIA:  Okay.

17       THE COURT:  You're so kind.  I appreciate it.

18       Okay.  All right.  So again, in keeping with what I

19   said at the beginning of the hearing today, I'm sort of trying

20   to draw a fine line between becoming an advocate and at the

21   same time getting questions asked and answered that I want to

22   hear based on the declarations that have been submitted, so I'm

23   sort of trying to use some restraint.

24       Looking at Mr. Miller's declaration, I think I can

25   skip asking him any questions.  Okay?  So I'm not going to ask

```
 1    any questions of Mr. Miller.
 2             I think that takes -- the next one was Peterson; is
 3    that correct?
 4             MR. LEE:  Yes, Your Honor.
 5             THE COURT:  All right.  Let me doublecheck Peterson
 6    and see what -- all right.  Well, I do have a question because
 7    I don't understand this, so perhaps if Mr. Peterson could come
 8    forward.
 9             By the way, my clerk has pointed out to me that
10    Mr. Peterson was in the courtroom.  Are there any other
11    witnesses in the courtroom?
12             MR. LEE:  These are all parties, Your Honor.
13             THE COURT:  Okay.  Well, okay.  That's all right.
14             Please raise your right hand.
15     RYAN PETERSON,
16        called as a witness by the Plaintiffs,
17        having been duly sworn, testified as follows:
18             THE CLERK:  State your full name for the record,
19    spelling the first and last name.
20             THE WITNESS:  My first name is -- my full name is Ryan
21    James Peterson.  My first name is spelled R-y-a-n.  Last name
22    P-e-t-e-r-s-o-n.
23             THE CLERK:  Have a seat.  Take the mask off, if you
24    want.
25             THE WITNESS:  Yes, sir.  Thank you.
```

1    THE COURT:  Mr. Peterson, I got a little bit confused
2    reading your declaration starting at paragraph 3.
3    You say, "I am not prohibited from owning firearms
4    under federal or state law.  I have a license to carry a
5    concealed weapon."
6    Paragraph 4 says, "I'm the lawful owner of a
7    semi-automatic pistol that has a fixed magazine; that is, it
8    contains an ammunition feeding device that cannot be removed
9    from the firearm without disassembling the firearm action."
10    I assume that that means that you understand that
11    firearm not to be one of the firearms that's in dispute in this
12    case, right?
13    THE WITNESS:  So it is an AR pattern pistol with a
14    fixed magazine device.
15    THE COURT:  What's an AR pattern pistol?
16    THE WITNESS:  So it's not really a functional
17    difference, it's a legal difference.  It's a difference by
18    definition.
19    Essentially, it means it's -- it's very similar to the
20    AR rifle that Your Honor handled on Monday except that it has a
21    shorter barrel.  It has a, you know, a barrel under 16 inches
22    long, and it uses something called -- either no stock at all or
23    something called a pistol brace instead of a stock.
24    The pistol brace is designed to wrap around the
25    forearm so you can hold the pistol out at arm's length, as

1   opposed to a stock, which is meant to be put on the shoulder.

2          THE COURT:  Okay.  But I was trying to figure out how

3   that fits into the picture of the case.

4          Is it your belief that this is one of the weapons that

5   is barred or prohibited?

6          THE WITNESS:  It is.  Yes, sir.  By definition -- by

7   the definition described in, I believe it's SB-880, which

8   defines a, quote/unquote, assault pistol, the pistol that I

9   own, if it were -- if it did not have a fixed magazine device,

10  would be considered a felony assault weapon under California

11  law.

12         THE COURT:  But yours does have a fixed.

13         THE WITNESS:  That's correct.  Yes, sir.

14         THE COURT:  So then yours is not prohibited.

15         THE WITNESS:  It is not a prohibited firearm because

16  it's a fixed magazine.

17         MR. DILLON:  Excuse me, Your Honor.  If I may --

18         THE COURT:  Yes.

19         MR. DILLON:  -- if I may help.

20         Mr. Peterson, you say that you have a fixed magazine

21  centerfire pistol.  Does it have the features that are also

22  listed in Penal Code Section 30515?

23         THE WITNESS:  It does.

24         MR. DILLON:  Okay.  Now, to your understanding, what

25  would make your fixed magazine AR pistol an illegal assault

 1   weapon under the law?

 2          THE WITNESS:  If I were to remove the fixed magazine,

 3   the device which fixes the magazine in place, by the definition

 4   within the law, it would be -- because it has evil features, it

 5   would be considered an assault weapon.

 6          THE COURT:  So explain to me.  Is that because it has

 7   a threaded barrel?

 8          THE WITNESS:  Well, so it's a pistol.  So if it did

 9   not have a fixed magazine device, then it could not have a

10   threaded barrel, a pistol grip, or a barrel shroud, all of

11   which I have on the gun.  Those evil features are essentially

12   allowed because the magazine device is there.

13          THE COURT:  That's what I was -- that's why I got a

14   little confused, and I apologize.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Okay.  So because yours has a fixed

17   magazine, even though it has those other features, what you

18   referred to as "evil features", your pistol is not prohibited

19   under -- at least your understanding, I realize you're not a

20   lawyer -- but your understanding is that it's not.

21          THE WITNESS:  That's correct, Your Honor.

22          THE COURT:  Okay.  So great.  So then that gets us to,

23   I think -- so then towards the bottom of your declaration, at

24   page 1, you talk about wanting to have a pistol -- I think you

25   talk about, "Pistol that has a removable magazine."

```
 1                THE WITNESS:  Mm-hmm.  Yes, sir.

 2                THE COURT:  Is that what your declaration is trying to

 3    convey to me?

 4                THE WITNESS:  That's correct, sir.

 5                THE COURT:  All right.  Now, you're also, apparently,

 6    in the business of -- you're a federal firearms dealer.

 7                THE WITNESS:  Licensee.  Yes, sir.  I own a gun shop

 8    in San Diego called Gunfire Tactical.

 9                THE COURT:  Okay.  And in your declaration, you said

10    that, because of these restrictions, you cannot sell these

11    weapons that have what you described as "evil features", right?

12                THE WITNESS:  Well, I can sell the AR pattern rifles

13    and pistols as long -- with those evil features, as long as the

14    magazine is fixed.

15                THE COURT:  Okay.  Let me ask a question.  If someone

16    purchases a weapon in California, they have to go through a

17    background check, right?

18                THE WITNESS:  That is correct.

19                THE COURT:  And they have to purchase it through a

20    federal firearms licensed dealer, right?  Generally.

21                THE WITNESS:  Yes, sir.  All firearms transactions in

22    California must go through a firearms dealer, even private

23    party sales.

24                There are a few very minor exceptions.  For instance,

25    something called an intra-familial transaction.  If a father
```

1    were gifting or selling a gun to a son or daughter, then that

2    does not have to go through a firearms dealer, but it still has

3    to get a form filled out and sent into the State.

4          But for the most part, yes, every firearms transaction

5    in California, whether it's a gift or a sale, has to go through

6    a firearms dealer, and the buyer, the transferee, has to go

7    through a background check and a 10-day wait.

8          THE COURT:  Who gets notified of that background

9    check?  Who gets notice of the fact that this weapon has been

10   purchased?

11         THE WITNESS:  So we -- there's a -- there is a -- the

12   State has a software system that we input that information into

13   and submit it to the DOJ.  The DOJ runs their own background

14   check.  They also check things like -- they check DMV

15   records --

16         THE COURT:  Is that what's known as the NICS system?

17         THE WITNESS:  Yeah.  And they also send it to the FBI,

18   which is the NICS check, yes, sir.

19         THE COURT:  And the State also runs their own check,

20   right?

21         THE WITNESS:  That's correct, sir, yes.

22         THE COURT:  Okay.  Now, is that true for all firearms?

23         THE WITNESS:  That is true for all firearms that are

24   not considered antiques.  If a firearm is over 100 years old

25   or -- not to get into -- California law is a minefield when it

1   comes to this kind of thing, so I don't mean to go into detail

2   that Your Honor doesn't need, but yeah, if a firearm is an

3   antique, or if the firearm is what's considered a black powder

4   gun, which the government does not consider to be a firearm,

5   then those -- those transactions do not need to go through a

6   gun shop or get a background check.

7          But that is the extreme rarity, of course.  You know,

8   any modern firearm, anything produced in the last 100 years,

9   does have to go through a background check.

10          THE COURT:  Now, in another case that I had, I learned

11   that, apparently, long guns did not have to be registered in

12   the State of California until like, what, 2014?  Is that --

13          THE WITNESS:  So I -- that is my understanding.  I --

14   I went into business, the business of selling firearms and

15   became an FFL in April of 2014.  So I have never owned a gun

16   shop in which long guns didn't also have to be registered.

17          It is my understanding, though, that before I owned my

18   gun shop, previously to 2014, that that was the case.

19          THE COURT:  If someone bought a pistol of the type

20   that you describe with a threaded barrel, et cetera, and a

21   detachable magazine, would that show up when the pistol was

22   going to be purchased?  Would that somehow be listed or shown

23   in the information that's provided to the FBI and to the State?

24          THE WITNESS:  So my understanding -- again, this goes

25   back to my understanding of what the law was previous to my

1  owning a gun shop -- but it is my understanding that handguns

2  have needed to be registered in the State of California since

3  the 1990s.

4          THE COURT:  But I'm asking about what specific

5  information is given to the federal and state agencies about

6  the gun that's being purchased.

7          THE WITNESS:  Make, model, serial number, barrel

8  length, whether -- the action type, semi-automatic,

9  lever-action, pump-action.  The type of firearm; pistol, rifle

10 shotgun.  The color.

11         THE COURT:  Why the color?

12         THE WITNESS:  The State wants to know what the State

13 wants to know.  I have no idea why.  I don't know why that's

14 relevant to the State, but they want to know the color.

15         THE COURT:  I don't know how many pink pistols

16 or shotguns --

17         THE WITNESS:  Apparently so.

18         THE COURT:  So you sell what I'm going to call the

19 California-legal AR-15, AK-type weapons.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  You sell a lot of those?

22         THE WITNESS:  Yes, sir.  Well, for a small -- I own a

23 very small mom-and-pop shop.  I'm sure if you compared my

24 numbers to, say, like Cabela's or Sportsman's Warehouse, my

25 numbers pale in comparison.  But for a small little mom-and-pop

1  shop, I do believe that we are San Diego's premier black rifle

2  shop.

3         THE COURT:  What's a black rifle?

4         THE WITNESS:  A black rifle is a -- black rifle is a

5  generic term used for AR and AK pattern rifles, modern sporting

6  rifles.

7         THE COURT:  Have you noticed the sale of those weapons

8  increase in the last year?

9         THE WITNESS:  Beyond anything I could have ever

10  imagined.  Yes, sir.

11         THE COURT:  A lot more people hunting?

12         THE WITNESS:  We don't get a lot of hunters.  We

13  really have a tactical shop.  I don't believe that those -- I

14  mean, I -- I can't say for certain, because I don't know what's

15  going on inside my customers' heads, but my guess is a very

16  small percentage, if any at all, that I sell are used in a

17  hunting capacity.

18         The overwhelming capacity of the guns I sell I believe

19  are used, just from talking to my customers and knowing my

20  customers, are -- I believe are almost entirely used for

21  sporting and home and self-defense purposes.

22         THE COURT:  So your complaint basically, as I see it

23  in your declaration, is that, because of these laws, you're

24  prevented from selling the weapons that are barred because of

25  the evil features as opposed to the other California-compliant

 1  weapons; is that a fair statement?

 2          THE WITNESS:  So my declaration touches on two things.

 3  One of which is, yes, absolutely, as a seller, I am barred from

 4  selling guns that are perfectly common in any state, other than

 5  California, and I would be essentially caged, bankrupted, and

 6  driven out of business if I were to sell those -- those guns.

 7          THE COURT:  Do you have --

 8          THE WITNESS:  I'm sorry, sir.

 9          THE COURT:  I'm sorry.  I interrupted you because, in

10  the interest of time.

11          Do you get customers that ask you and say to you, "How

12  come I can't buy a black rifle with an adjustable stock?"

13          THE WITNESS:  Every single day.  Yes, sir.  Especially

14  recently.  Especially in 2020.

15          As we have so many first-time gun buyers come into the

16  industry because of the macro situation with the virus and the

17  lockdowns and all this nonsense, people just don't feel safe,

18  so we have a lot of first-time buyers, and they have absolutely

19  no idea what's going on with California gun laws until they

20  walk into our shop, and they have to be educated from beginning

21  to end on what they can buy and why or why not.

22          THE COURT:  Okay.  That's all the questions I have.

23          THE WITNESS:  Your Honor, if I may just very quickly?

24          THE COURT:  Sure.  What?

25          THE WITNESS:  There are two parts of my declaration.

1    The first is as a gun seller, as I stated.  The other part of

2    my declaration is, if I take -- as a private citizen, not as a

3    gun seller -- but as a private citizen, if I take a -- my

4    legally possessed standard-capacity magazine and put it into my

5    legally possessed fixed magazine gun --

6              THE COURT:  Yeah.  I heard that.

7              THE WITNESS:  -- that automatically turns it into an

8    illegal assault weapon.

9              THE COURT:  Yeah.  I heard that before.

10             THE WITNESS:  I'm sorry.

11             THE COURT:  Thank you.  I appreciate it.

12             I don't have any other questions.

13             MR. DILLON:  No questions.

14             THE COURT:  Terrific.  Thank you, sir.

15             Wait.  Before I let you go.  Mr. Echeverria,

16   Mr. Beckington, do you have any questions?

17             MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

18   I do have some questions for the witness, if that's okay.

19             THE COURT:  So you did your homework between Tuesday

20   and today, huh?  I'm teasing you.

21             MR. ECHEVERRIA:  Thank you, Your Honor.

22   BY MR. ECHEVERRIA:

23   Q.  So Mr. Peterson, you indicated that firearms sales have

24   increased over the past year; is that correct?

25   A.  That has been my observation, yes.

1  Q.  And you testified that some of the firearms that have been

2  purchased in the past year have been what you referred to as

3  "black rifle firearms"?

4  A.  That's correct, yes.

5  Q.  Would you say that handguns have been selling more

6  frequently than the black rifle firearms that you refer to?

7  A.  No, not in my shop.  In my shop, the overwhelming majority

8  of purchases have been -- have been modern sporting guns --

9  Q.  And would that be because --

10 A.  -- have been black rifle firearms.  So Mr. Echeverria.

11 Sorry.  Go ahead.

12 Q.  That's okay.  And would that be because your shop is a

13 tactical shop?

14 A.  So there's a couple of reasons for that.  Part of it is

15 that we are a tactical shop, though we do sell handguns.

16        The big reason for that is just the supply chain is

17 very, very broken due to the lockdown, so handguns are very

18 difficult to get, but I can still pull together enough parts to

19 build AR pistols and AR rifles.

20        In addition, I -- again, we're going to my

21 observations.  It's not like I, you know, scientifically poll

22 my customers, right?  But it's been my observation, working in

23 my shop every single day, or most days, that my customers don't

24 feel a handgun is adequate.

25        They see cities being burned, on fire, and people

1    being attacked, you know, sucker-punched in groups where it's,

2    you know, 10, 12 people against a single person.

3          I've heard many customers tell me they don't feel

4    comfortable with a handgun, they want something with more fire

5    power.

6    Q.  Under California law, you are allowed to sell AR platform

7    rifles in your shop; is that correct?

8    A.  As long as the AR rifles are either featureless or have a

9    fixed magazine device, yes.

10   Q.  Okay.  Does your shop also sell California-compliant AK

11   platform rifles?

12   A.  Yes.  Again, as long as they are fixed magazine or

13   featureless.

14         It's almost impossible to make an AK use -- of any use

15   whatsoever if it has a fixed magazine.  So generally speaking,

16   AKs have to be sold featureless.

17         MR. ECHEVERRIA:  Okay.  I have no further questions

18   for the witness, Your Honor.

19         THE COURT:  Thank you.

20         Any questions?

21         MR. LEE:  No, Your Honor.

22         THE COURT:  Great.  Thank you.

23         (Witness excused)

24         THE COURT:  Boy, that was great.  This is what an

25   evidentiary hearing is supposed to be like.

1            Thank you, Mr. Echeverria.  I appreciate you're asking

2    questions.  That was very helpful.  I learned quite a bit.

3            Okay.  So who else do we have?

4            MR. LEE:  Your Honor, we have Adam Kraut, who is

5    available, and I understand in the Zoom waiting room.  He lives

6    in Pennsylvania, and he is the maker of the video that is

7    referenced in his declaration.

8            THE COURT:  Okay.  Well, let's bring him on.

9            THE CLERK:  One second, Judge.

10           Kraut, K-r-a-u-t, is that him?

11           MR. LEE:  Yes.

12           THE CLERK:  Just so I know, who is Christopher

13   Colwell?

14           THE COURT:  That's the doctor.  Mr. Echeverria and

15   Mr. Beckington's doctor.

16           THE CLERK:  Your Honor, you're going to have to swear

17   him in, of course.

18           THE COURT:  Okay.  Where is he?  There he is.

19           Good morning, Mr. Kraut.  Or is it afternoon for you?

20           THE WITNESS:  Good afternoon.  Well, it's morning for

21   you, Your Honor, and afternoon for me.

22           THE COURT:  You're in Pennsylvania?

23           THE WITNESS:  Yes, Your Honor.  Outside of

24   Philadelphia.

25           THE COURT:  I was just there last month or the month

 1   before.  Boy, what beautiful country.

 2          THE WITNESS:  It certainly is a little different than

 3   the West Coast, that's for sure.

 4          THE COURT:  Lot of green over there.

 5          THE WITNESS:  Yes.

 6          THE COURT:  All right.  Mr. Kraut, please raise your

 7   right hand.

 8    ADAM KRAUT,

 9       called as a witness by the Plaintiffs,

10       having been duly sworn, testified as follows:

11          THE COURT:  All right.  So Mr. Kraut, I watched your

12   video.  I think I understand it.  If I understood it correctly,

13   the first ten rounds that you fired were California -- was it

14   California-legal?

15          THE WITNESS:  Yes, Your Honor.  That was --

16          THE COURT:  California-legal AR.

17          THE WITNESS:  Yes, Your Honor.  That was a California

18   featureless configuration.

19          THE COURT:  Okay.  And then the second ten rounds that

20   you fired was a non -- well, a weapon with the evil features,

21   or however they call them.  I don't know.

22          THE WITNESS:  Yes, Your Honor.  It was the same base

23   firearm.  The difference between it was the collapsable stock,

24   the pistol grip, and then the barrel cap at the end or -- which

25   replaced the flash hider.

1      What I did, just to kind of keep things simple and for

2  illustrative purposes, was I used the same firearm and I

3  swapped out the California-legal features for those that were

4  not legal in California, just so that everything kind of

5  appeared as a controlled look versus using two separate rifles

6  configured one for California and one for pretty much

7  everywhere else.

8      THE COURT:  Now, as I recall your video, you shot ten

9  rounds, ten rounds, three rounds, three rounds, three rounds,

10  and three rounds, right?

11      THE WITNESS:  Correct, Your Honor.

12      THE COURT:  Okay.  And you were shooting at a

13  stationary target, right?

14      THE WITNESS:  Correct.  It was a piece -- yes.  It was

15  a piece of steel that was placed at 25 yards, and the reason

16  for using steel versus a paper target was simply so that there

17  was an auditory kind of cue that the target was hit versus

18  trying to shoot a piece of paper and then going up and showing

19  where the rounds actually impacted after each shot.

20      THE COURT:  And the point of your video was what?

21      THE WITNESS:  The purpose of the video was to

22  demonstrate that, in either configuration, it was possible to

23  shoot a man-sized target at 25 yards in rapid succession using

24  either a California featureless rifle or a standard

25  configuration AR.

```
 1            THE COURT:  I may be mistaken, but I think I noticed
 2   that your first ten rounds -- which was the featureless weapon,
 3   correct?
 4            THE WITNESS:  Yes.
 5            THE COURT:  -- you hit nine out of ten shots.  When
 6   you fired the second type of weapon, you only hit eight out of
 7   ten.
 8            How come?
 9            THE WITNESS:  Yes, Your Honor.  It's just shooter
10   error.  Haha.
11            THE COURT:  Okay.  I was going to try and tease you a
12   little bit.  Haha.  All right.
13            You're pretty familiar with these weapons, are you?
14            THE WITNESS:  Yes, Your Honor.
15            THE COURT:  You fire them quite a bit?
16            THE WITNESS:  Honestly, Your Honor, I don't get out to
17   the range nearly as much as some of my colleagues do, so no,
18   quite candidly.
19            THE COURT:  All right.  So would you consider yourself
20   to be sort of an average-type shooter?  I know that's a little
21   vague, but --
22            THE WITNESS:  I would consider myself to be proficient
23   with the firearm.  Perhaps -- I would say average to slightly
24   above average.
25            I'm certainly more familiar with it than somebody who,
```

 1   for instance, walked into the gun store and purchased the

 2   firearm that day.

 3              THE COURT:  Okay.  Were you adjusting your rate of

 4   fire for -- in other words, the number of times that you pulled

 5   the trigger for any specific reason other than perhaps trying

 6   to stay on target?

 7              THE WITNESS:  No, Your Honor.  I mean, as far as it

 8   not being a perfect cadence, it would just have to do with

 9   trying to maintain a sight picture on target to make sure that

10   rounds were hitting what was being aimed at.

11              But there was no -- there wasn't a cognizant effort to

12   go faster in one configuration versus the other.

13              THE COURT:  Okay.  So your main purpose in doing that

14   video was to show that using both configurations you were able

15   to hit the target at about the same rate and with about the

16   same accuracy; is that a fair summary of what you were doing?

17              THE WITNESS:  Absolutely.

18              THE COURT:  Okay.  That's all the questions I have.

19              MR. LEE:  No questions, Your Honor.

20              THE COURT:  Mr. Echeverria?

21              MR. ECHEVERRIA:  No questions, Your Honor.

22              THE COURT:  Okay.  It was a great video, by the way.

23   I watched it, I don't know how many times.  All right.

24              THE WITNESS:  Thank you, Your Honor.

25              THE COURT:  I've never fired one of those.  I was

```
 1        impressed, anyway.

 2                All right.  Thank you.  Appreciate it.

 3                THE WITNESS:  You're welcome.  I appreciate you having

 4        me.  Have a great day.

 5                THE COURT:  You, too.  Okay.  That's all the questions

 6        I have of that witness.

 7                (Witness excused)

 8                MR. LEE:  Your Honor, with that, the plaintiffs' next

 9        witness would be John Lott at 3:00, but other than that, we can

10        switch to defense witnesses.

11                THE COURT:  Okay.  Mr. Echeverria, do you have any

12        problems doing that?

13                MR. ECHEVERRIA:  No problems at all, Your Honor.

14                THE COURT:  Okay.  So who should we call?  Who did you

15        say was --

16                MR. ECHEVERRIA:  Dr. Colwell is up next, I believe.

17                THE COURT:  Okay.  Let's bring him in.

18                Dr. Colwell.

19                THE WITNESS:  Good morning.

20                THE COURT:  Good morning.  I'm Roger Benitez.  I'm the

21        district judge that's been assigned to try this case, or hear

22        this case anyway.

23                Where are you?

24                THE WITNESS:  I'm in my office at San Francisco

25        General.
```

```
 1            THE COURT:  Where?
 2            THE WITNESS:  At San Francisco General, the hospital.
 3  I'm in my office there.
 4            THE COURT:  How long have you worked at San Francisco
 5  General?
 6            THE WITNESS:  So a little over four years now.
 7            THE COURT:  Well, okay then.  I have some questions to
 8  ask you, if you don't mind.
 9            If you would please raise your right hand.
10   CHRISTOPHER COLWELL,
11       called as a witness by the Defendants,
12       having been duly sworn, testified as follows:
13            THE COURT:  Let me see if I can find your declaration.
14            How is the weather in San Francisco?
15            THE WITNESS:  Actually, it's quite good today.  Warm,
16  but cool.  We've had a lot of trouble with heat and air
17  quality, and they're both actually pretty good today.
18            THE COURT:  Good.
19            Well, you have to excuse me.  I have a lot of material
20  that I'm going through, and I think I must have left your
21  declaration back in my chambers.
22            Bob, would you do me a favor and see if you can find
23  it?  It should be on my conference room table.
24            THE LAW CLERK:  Yes.
25            THE WITNESS:  Where are you located?  Is that L.A.?
```

```
 1              THE COURT:  No.  We're in God's country.  We're in
 2   San Diego.
 3              THE WITNESS:  Where I grew up.
 4              THE COURT:  Really?  What part of San Diego did you
 5   grow up in?
 6              THE WITNESS:  La Jolla.
 7              THE COURT:  Beautiful.
 8              THE WITNESS:  Yes.  It was a rough upbringing.
 9              THE COURT:  I bet.  Well, look.  While we're waiting
10   for the declaration to come back, let me ask you a question.
11              You talk in your declaration about the damage that a
12   gunshot wound from one of these AR-type weapons can do.
13              Let me ask you this:  So have you personally treated
14   wounds from these weapons that we've been referring to as
15   either assault weapons or AR-type weapons?
16              THE WITNESS:  Yes.
17              THE COURT:  Okay.  Now, you said that the wounds can
18   be pretty devastating.
19              THE WITNESS:  Yes, sir.
20              THE COURT:  Okay.  Now, have you noticed if there is
21   any difference in a wound caused by a round fired from an AR-15
22   that contained the restricted features that are at issue in my
23   case versus the wounds caused by a round fired from a weapon
24   that did not contain those features?
25              THE WITNESS:  So acknowledging that the wounds can't
```

1    be distinguished simply by looking at them in terms of

2    determining which weapon they are, and also acknowledging that

3    not every wound that I see am I aware of what the weapon was

4    that was used, my experience has been that the worst situation

5    and wounds that I have seen have tended to come from weapons

6    that have been attributed, at least by law enforcement, to be

7    AR-15s and/or AK-47s.

8              THE COURT:  Okay.  So are you able to, for example,

9    tell me if there is a difference between the wound that would

10   result from firing out of an AR-15 versus the wound that would

11   result from firing, say, a Sturm Ruger Mini-14?

12             THE WITNESS:  So if you just showed me the wound and

13   said, "What weapon did this come from?" no, I could not

14   distinguish that.

15             THE COURT:  All right.  So I assume that you would

16   agree that the severity of the wound is dependent on a lot of

17   factors, including, for example, the weight of the bullet that

18   has been fired, right?

19             THE WITNESS:  Yes.

20             THE COURT:  Say if it's a 180 grain or 140 grain,

21   right?

22             THE WITNESS:  Yes.

23             THE COURT:  And the severity of the wound would also

24   depend on the distance?

25             THE WITNESS:  Yes.

CHRISTOPHER COLWELL

1          THE COURT:  And whether or not it went through other,

2     I don't know, say, a wall, for example, right?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5          THE WITNESS:  Absolutely.

6          THE COURT:  And so take, for example, an average

7     hunting rifle.  A .308.  You realize that that's the same

8     caliber -- same caliber bullet that an AR-15 normally fires,

9     right?  Even though it's called a .223 or 5.56, right?

10          THE WITNESS:  I do understand that, yes.

11          THE COURT:  All right.  And if I had a .308 hunting

12     rifle, and I shot someone with it, you would expect to see more

13     or less the same type wound, right?

14          THE WITNESS:  So again, if it's just the individual

15     wound, it's true, it could absolutely have the same type of

16     wound from that particular one shot, yes.

17          THE COURT:  Okay.  Have you treated gunshot -- I'm

18     sorry -- shotgun wounds?

19          THE WITNESS:  Yes.

20          THE COURT:  Have you treated shotgun wounds that

21     occurred at close range?

22          THE WITNESS:  Yes.  Unfortunately, yes.

23          THE COURT:  Just out of curiosity, tell me, if you

24     can -- if you can't, that's okay, I'm just curious -- a

25     shotgun, say, for example, a shotgun that is fired in close

 1   range, let's say, oh, I don't know, 20 feet, what kind of a
 2   wound would you expect to see from that?
 3            THE WITNESS:  So from 20 feet -- and again, I usually
 4   am not in a position where I can define exactly how many feet
 5   they were away -- but I am usually able to determine, was it
 6   close range -- and by "close range", I'm usually talking within
 7   5 to 10 feet -- by 20 feet, I would expect to see the wounds be
 8   distributed more, and smaller, say, clearly identifiable pellet
 9   wounds, so to speak, as opposed to the more destruction that
10   happens as they get closer.
11            I'm thinking of a case just a few months ago where it
12   was within probably 6 feet.  The shotgun was fired, and it --
13   there were no individual wounds to see, so to speak, it was a
14   much bigger wound that was from that close of range.
15            THE COURT:  Maybe you haven't experienced this.  If
16   you haven't, just let me know.
17            Well, first of all, can you tell me, what was that
18   wound like?
19            THE WITNESS:  That particular wound was -- it was to
20   the -- what we call the flank, the lower back side, and it was
21   basically a gaping hole in that area of his body.
22            THE COURT:  You don't happen to know what gauge or
23   what size shot was fired, do you?
24            THE WITNESS:  I don't know, other than they were clear
25   shotgun.  I don't know which gauge it was.  I'm sorry.

 1          THE COURT:  You may not know the answer to this

 2   question, but say that wound that you observed from that

 3   shotgun, would you know -- if you fired a .223 or a .308 at

 4   that same distance, do you happen to know what that wound would

 5   look like?

 6          THE WITNESS:  I can't tell you specifically for that

 7   weapon.  We have seen wounds of similar -- in a similar area

 8   from a similar distance, although I can't directly connect it

 9   to a particular weapon like that.

10          THE COURT:  I'm trying to see which -- if you can tell

11   me -- which is most likely to be a damaging wound at close

12   range, a .223 or a 12-gauge shotgun?

13          THE WITNESS:  And the only thing I can tell you is,

14   from my experience, that close a range, the shotgun is probably

15   going to have at least the more significant wound that I have

16   seen.

17          THE COURT:  Yeah.  That, frankly, makes perfectly good

18   sense, so I appreciate your telling me that.

19          All right.  Give me just a second.  I may not have a

20   whole lot of questions for you for reasons that I've explained

21   to the lawyers earlier, but let me quickly look and see.

22          (Pause in the proceedings)

23          THE COURT:  That's all the questions I have.

24          Any questions?

25          MR. LEE:  I have questions, Your Honor, but I don't

1    know whether the defense wanted to ask questions first.

2                THE COURT:  Mr. Echeverria?

3                MR. ECHEVERRIA:  Mr. Lee can proceed.  I may have

4    questions after him, Your Honor.

5                THE COURT:  All right.  Why don't you go ahead.

6                But keep them related to what I've asked because, as

7    we said yesterday, I'd like to, sort of, limit the testimony.

8    Okay?

9                MR. LEE:  Yes, Your Honor.

10   BY MR. LEE:

11   Q.  Dr. Colwell, this is George Lee.  You probably can't see

12   me, but I'm one of the attorneys representing the plaintiffs in

13   this matter.

14   A.  Your picture doesn't come up, and sometimes it's a little

15   hard to hear when I can't see the lips move, but yes, I can

16   hear you just fine now.

17   Q.  Great.  Well, this will be very brief.

18                Dr. Colwell, you're not a firearms expert, are you?

19   A.  That is correct, I am not.

20   Q.  Nor are you a ballistics expert; is that right?

21   A.  That is correct, I am not.

22   Q.  So we've heard testimony in this case that, generally,

23   centerfire rounds can be classified as either pistol caliber,

24   intermediate cartridge, or higher-powered rounds.

25                Do you have any reason to dispute that classification?

1    A.   So not knowing, you know, the details, I have no reason to

2    dispute it as I sit here now, no.

3    Q.   And do you have any reason to dispute the characterization

4    of a 5.56 x 45mm round, which is the AR-15 round, do you have

5    any reason to dispute its characterization as an intermediate

6    cartridge?

7    A.   Yes.  I would say that my understanding is probably not at

8    the level of the ballistics expert for the reasons that we

9    talked about before, but yes, I have an understanding of that.

10   Q.   And likewise, the 7.62 x 39mm round, which is the AK-47

11   round, that's also classified as an intermediate cartridge.

12          Do you have any quarrel with that?

13   A.   I have no quarrel with that.

14   Q.   Okay.  And the higher-powered rounds, such as the .308,

15   which are more commonly classified as hunting rounds, do you

16   have any reason to dispute the characterization of those

17   hunting rounds as higher-powered rounds?

18   A.   No.

19   Q.   Okay.

20          MR. LEE:  That's all the questions I have, Your Honor.

21          THE COURT:  All right.  Mr. Echeverria?

22          MR. ECHEVERRIA:  Thank you, Your Honor.

23   BY MR. ECHEVERRIA:

24   Q.   Dr. Colwell, in your experience, if an individual suffers

25   multiple gunshot wounds, would you say that makes it more

1  likely or less likely that complications may result?

2  A.  Far more likely.

3  Q.  And would that make it more likely that that individual may

4  die of those injuries?

5  A.  Yes.

6          MR. ECHEVERRIA:  I have no further questions, Your

7  Honor.

8          THE COURT:  Okay.  Well, Dr. Colwell, it's been a

9  pleasure.  You take care.  Keep San Francisco General humming

10  and under control.

11          THE WITNESS:  Thank you, Your Honor.  I will do my

12  best.

13          THE COURT:  You take care.  Bye-bye.  Thank you.

14          (Witness excused)

15          THE COURT:  All right.  Moving right along.

16          MR. LEE:  Well, Your Honor, I believe the only

17  additional witnesses, Professor Donohue, is available.  I

18  believe Mr. Echeverria is going to let us know.

19          But starting at 2:00, John Lott -- John Lott is at

20  3:00.

21          THE COURT:  Okay.  So then why don't we recess until

22  2:00.  But before we do that, since we do have some time -- I

23  don't know how relevant this is going to be in the end, but I

24  am somewhat interested in knowing the answer.

25          The answer is this:  It strikes me, based on my

1   reading of *Heller*, that there are a couple things that we need
2   to look at.

3          The first thing that strikes me is this.  I don't
4   know -- there seems to be this tendency in this case to confuse
5   national, state, ARs, M16s, self-defense, militia.  There's a
6   lot of confusion that I see in some of the things that have
7   been filed.

8          I'm puzzled about something.  And Mr. Lee, this is
9   probably more in your bucket list, if you will, and that is
10  this:  I don't have any idea -- I'm pretty confident that the
11  AR-15/AKs are commonly used, commonly possessed.  I think there
12  are cases all over the country that have already talked about
13  that, and so I don't really have much of a problem with that.

14         On the other hand, I do have a problem with the idea
15  of these assault pistols, and the same thing with the shotguns,
16  I don't really have a whole lot of information about how common
17  those may be.

18         So I mention that to you because I think it would be
19  important in the end, in the final analysis, I think.

20         As in Miller, I also don't have any information that
21  either that assault pistol or the shotgun, as restricted, would
22  be useful for military purposes.  of course, it kind of
23  defines -- it depends on how we define militia, right?  And
24  there's all sorts of definitions for militia.  I suppose that
25  for militia, a baseball bat could be a commonly used weapon,

 1   perhaps, but I don't have any information in that regard.

 2         So I tell you this because, since we are going to have

 3   a hearing somewhere down the road, I would like to know,

 4   because it's certainly very possible -- I mean, I'm not trying

 5   to telegraph anything to anyone, just so that you understand --

 6   it certainly is possible that I could say, for example, these

 7   AR-15s, AKs are commonly possessed by law-abiding citizens for

 8   lawful purposes, while at the same time saying I can't say that

 9   about the assault weapons, the assault pistols or the assault

10   shotguns.

11         Do you see what I'm saying?

12         MR. LEE:  Yes, Your Honor.

13         THE COURT:  Mr. Echeverria, do you understand what I'm

14   saying?

15         MR. ECHEVERRIA:  Absolutely, Your Honor.  It's a point

16   that we tried to draw out in our opposition briefing for Your

17   Honor.

18         THE COURT:  Now, I do have a bit of a problem, though,

19   and let me tell you, since I'm now looking at you, and I do

20   have a problem, and that is this:  It strikes me that the

21   people that would have the best evidence of how common these

22   weapons are would be the State, because these weapons have to

23   be purchased through -- generally.  I mean, obviously, there's

24   illegal sales and so on -- but generally, it would seem to me

25   that these weapons have to be purchased through a federal

1   firearms licensed dealer that would provide that information to

2   the State, so I would imagine the State has a record, for

3   example, of how many of these weapons have been sold or have

4   been purchased.

5          Do you see what I'm saying?

6          MR. ECHEVERRIA:  I do, your Honor.  So in terms of the

7   information that the California Department of Justice may have

8   about purchases, that information would be with respect to

9   California-compliant pistols and shotguns.

10         So I don't know that the State would have information

11  about how common the restricted weapons would be in other

12  jurisdictions or throughout the country.

13         THE COURT:  I see.

14         MR. ECHEVERRIA:  Does that make -- yeah.

15         THE COURT:  Yeah.  That makes perfectly good sense.

16         Now, these pistols -- so they technically became

17  unlawful to possess in the State of California -- or to

18  purchase in the State of California -- what year was that?

19         MR. ECHEVERRIA:  I believe it would be the year 1989.

20  There was the make and model list that did include certain

21  pistols and shotguns on the list.

22         And then in 2000, the features-based test was

23  implemented.

24         THE COURT:  So certainly, with regards to the pistols,

25  I would think that the State would have a record of how many of

1  these pistols have been sold, wouldn't it?

2          MR. ECHEVERRIA:  Yeah.  We would have to look into

3  that, Your Honor.  And it would be entirely proper during

4  discovery to try to figure out what information the State has

5  concerning the numbers of restricted pistols and shotguns that

6  may have been registered.

7          So these would be weapons that were lawfully acquired

8  before the enactment of the AWCA that individuals registered.

9          THE COURT:  Look.  So you mentioned discovery

10  yesterday.  Here's my thinking.  Look.  I don't know how much

11  discovery is necessary in this case, to be honest with you.

12  The State has already -- I know that you've litigated this case

13  in the Central District.  For example, we certainly have had

14  the *Duncan* case, which has, at least tangentially, involved

15  some of the potential problems; ie. detachable magazines.

16          And, you know, on its face, prima facie, looking at it

17  from just a very shallow perspective, it strikes me that a

18  good case can be made for the fact that these are weapons that

19  are protected.  And if that is true, then the longer that we

20  delay this, the more that citizens who otherwise should be able

21  to own, buy, and possess these weapons, that their rights are

22  being infringed.

23          So I don't want to drag this out, you know, because

24  cases -- you know, cases -- when we get to discovery, cases

25  seem to, you know, grow sort of their own problems, and their

1   own delays, and so on and so forth.

2          So certainly, since it's really not discovery, I think

3   it's a question of whether or not the State can and will search

4   for those records for me.

5          So I'm not waiting for discovery.  I do think that the

6   State has the best evidence in connection with that

7   information.

8          I think it would be good to know what information

9   there is so that we can find out, you know, just how common are

10  these?

11         If there's only been five sold in the last 20 years,

12  well, you know, it strikes me that -- granted, we have to

13  consider the fact that they were made illegal, and so

14  therefore, as we know, just simply because you make it illegal

15  doesn't necessarily mean that it makes it less common, right?

16         But at least it speaks to the issue so that we can

17  hopefully address it in some kind of a meaningful fashion

18  rather than just simply say, hey, there's these weapons, and

19  they're in common use, and therefore, they're protected.  Well,

20  let's find out.  Let's check on that.

21         So anyway.  All right.

22         MR. LEE:  Your Honor, if I could address some of these

23  issues, I would maybe -- it might help the Court, unless --

24         THE COURT:  Okay.  Well, let's see what you have to

25  say.  That's why I brought it up.

```
1              MR. LEE:  Sure.  Well, working backwards.
2         On shotguns --
3              Well, first of all, I will concede that the data that
4     we have, that it pertains to modern sporting rifles as
5     described by Mr. Curcuruto, basically, AR, AK series rifles,
6     that data is much more prevalent and trackable nationwide than
7     it is for shotguns and for AR pistols, or what the State calls
8     assault pistols.  That's a function of its popularity, however.
9              But I do think that, first of all with regard to
10    shotguns, there is testimony from Mr. Kapelsohn, our first
11    witness, who testified that all the same features -- pistol
12    grips, collapsable stocks -- are commonly used in semi-auto
13    shotguns as well and, in fact, are used by police agencies, and
14    so there's certainly testimony to say that those are very
15    common features in other parts of the country.
16             THE COURT:  But I don't know that the fact that it's
17    used by police agencies necessarily makes it common within the
18    definition of *Heller*.  Because I think *Heller* contemplates --
19    doesn't contemplate, at least I don't think so -- law
20    enforcement agencies.  They're talking about, you know, mom and
21    pop, right?
22             MR. LEE:  Right.  But I think that the idea here is
23    that these are not unique, strange weapons.  They're
24    certainly -- you wouldn't -- no one would bat an eye if you had
25    a shotgun that had a pistol grip in any other part of the
```

1  country -- a semi-automatic shotgun that had a pistol grip in
2  any other part of the country.

3          For the same reasons, at least from a utility
4  perspective, that it would be useful on a rifle makes it maybe
5  even more useful on a shotgun in the sense that at least
6  there's a recoil-dampening feature on some of the collapsable
7  stocks for shotguns.

8          But yes, Your Honor, to address the Court's point
9  directly, the data -- the information that we have on those
10  numbers is not as hard, but obviously, we expect that we would
11  have those numbers by the time of trial.

12          As to the AR pistols and the data that might be in the
13  possession of the defense.  The problem is -- and I'm sure that
14  this has come up in many other contexts, maybe in magazines in
15  *Duncan* or elsewhere -- is that when you start asking the State
16  to produce numbers of how -- to try to determine how common it
17  is within the State when it's been banned for 20 years --

18          THE COURT:  Right.  Well, that's what I -- that's what
19  I alluded to, perhaps not too artfully.  Understanding that
20  that's -- that, obviously, that's a factor that plays into the
21  equation, that they have been banned for 20 years, you know,
22  it's not likely that you're going to see a whole lot of them
23  floating around, but at least it gives us some number, right?

24          MR. LEE:  Indeed, Your Honor.  It gives you some
25  starting point.

1    But then again, to the extent that it gives you an

2    artificially small number, it sets up the fallacy that a state

3    can claim it's not in common use because it's been banned for

4    many years, which the Court understands.

5         But there's another point with regard to pistols.

6         THE COURT:  Wasn't that an issue that was raised in

7    *Caetano* in connection with the stun guns?  Wasn't there a

8    discussion about the fact that, well, since the State prohibits

9    them or bans them, we can expect to find a few of them around,

10   right?  But again, it gives us a starting point.

11        MR. LEE:  Correct.  But there's another point that

12   needs to be addressed with regard to pistols.  That the State

13   has had an approved roster of pistols that may be -- that may

14   be sold new from a manufacturer, and it's called the State --

15   the handgun roster.

16        As far as I know, AR pistols are not on that -- new AR

17   pistols are not on that roster.

18        So all of the AR pistols that are sold, I believe have

19   to be sold through private-party transactions in California,

20   and that's the reason why we need to look outside of the State,

21   because the State also artificially limits --

22        THE COURT:  That's your -- that's your issue and your

23   problem, and I would expect that you would look for that, and

24   you would provide that information to the State, just like I

25   expect the State to provide you with the information that they

CHRISTOPHER COLWELL

 1   have.

 2          I don't want to have discovery battles.  I'm expecting

 3   that you folks are going to all publicize.

 4          I mean, I have no problems whatsoever with

 5   Mr. Echeverria.  He's been very, very professional and helpful.

 6   And so far, so have you.

 7          You find out that information nationwide, and it may

 8   become relevant because of the fact that they're absolutely

 9   banned in California, so we're not going to see too many of

10   them, if at all, but it may become relevant nationwide, right?

11          MR. LEE:  Absolutely.

12          THE COURT:  And if you find that information, you get

13   it to Mr. Echeverria, Mr. Beckington, and they will get you the

14   information that they have.  Okay?

15          MR. LEE:  Understood.

16          THE COURT:  Good.  What I'm trying to find out is,

17   look.  Again, I'm sort of puzzled at the Court of Appeals'

18   argument, there was discussion about a flamethrower.

19          My guess is that if we were to ask how many

20   flamethrowers are there out there?  Are they commonly

21   possessed?  Are they commonly used for lawful purposes?

22          The answer, as I've said sort of facetiously, is that

23   there probably aren't any, and if they're used at all in

24   civilian life, they're probably used for barbecuing parties or

25   hamburgers or hotdogs.  There's no other possible use in

1   civilian life for a flamethrower, and so the odds are pretty

2   good that they're just not commonly owned.

3           As in *Staples*, where they talked about hand grenades,

4   the odds are very good there's just not a whole lot of hand

5   grenades floating out there.

6           But that doesn't mean that it makes it irrelevant for

7   us to find out, for example, how many of these pistols are out

8   there.  We should know.  And I don't see that -- I don't see

9   that in the information that has been provided to me so far.

10          So I can see -- again, I'm not telegraphing

11  anything -- please, please, please, don't take anything I say

12  as an indication of what I'm inclined to do -- but what I'm

13  saying is I can certainly see the information with the AR-AK

14  platform rifles.

15          I'm not sure that I'm that confident about the

16  information on the shotguns or the pistols.  Okay?  All right.

17          We're going to take a recess.  We'll come back at

18  2:00.

19          I thank you very much for being here this morning.

20  Thank you.

21          (Court in recess at 10:51 a.m.)

22

23

24

25

```
 1                      AFTERNOON SESSION

 2                         2:00 p.m.

 3            THE COURT:  Good afternoon.  Welcome back.

 4            I believe we were going to talk with Professor

 5   Donohue; is that right?

 6            MR. ECHEVERRIA:  That's correct, Your Honor.

 7            THE COURT:  All right.  Why don't you find him and

 8   let's get going.

 9            There he is.  Good afternoon.  How are you?  Are you

10   Professor Donohue?

11            THE WITNESS:  I am, indeed.

12            THE COURT:  Good.  I'm Roger Benitez.  I'm the judge

13   assigned to this case.

14            THE WITNESS:  Hello.

15            THE COURT:  Where are you?

16            THE WITNESS:  I'm in my office at Stanford Law School.

17            THE COURT:  Oh.  You're not too far away.  How is the

18   weather up there?

19            THE WITNESS:  Beautiful today.  Beautiful.

20            How about your part of the world?

21            THE COURT:  We're in God's country.  The weather is

22   always beautiful.

23            THE WITNESS:  You're a lucky man.

24            THE COURT:  I couldn't agree more with you.  Listen,

25   if you would do me a favor and raise your right hand.
```

1    JOHN DONOHUE,

2         called as a witness by the Defendants,

3         having been duly sworn, testified as follows:

4         THE COURT:  If you would do me a favor, please state

5    your full name and spell it for us for the record.

6         THE WITNESS:  Yes.  John Jay Donohue, and Donohue is

7    spelled D-o-n-o-h-u-e.

8         THE COURT:  All right.  So, listen.  The reason why I

9    asked you to be here is because I've read your declaration, you

10   obviously have done a lot of work in this area, and you're

11   pretty familiar with a lot of the issues involved, you

12   obviously have a considerable amount of expertise, but there

13   are some things about your declaration that caused me some

14   confusion, and I wanted to try to see if I could work my way

15   through some of that confusion.  Okay?

16        First thing I want to do --

17        THE WITNESS:  Yes.

18        THE COURT:  -- is I want to ask you the following:

19   Can you define for me an assault weapon?  Because in your

20   declaration, I think there's several places where the

21   definition seems to shift, so I wanted to know from you what

22   you consider to be an assault weapon.

23        THE WITNESS:  Yeah.  That's a great question.

24        And the definitions do vary.  Of course, when the gun

25   industry first started to promote assault weapons, they were,

1   you know, usually referring to the AR-15-style weapons.

2          But over time, of course, at both the Federal Assault

3   Weapon Ban, the California Assault Weapon Ban, all of them have

4   slightly different configurations of what is an assault weapon.

5          So there is no single definition, but a, sort of, core

6   element would usually be a semi-automatic weapon that has a

7   detachable magazine that facilitates a master firing.

8          And depending on which state or federal regulation or

9   law you're looking at, they would usually have some additional

10  military-style feature to qualify as an assault weapon.

11         THE COURT:  You're kind of breaking up on me, and my

12  court reporter, which is reporting these proceedings, I think

13  is having a bit of a time, as well.  So I don't know if maybe

14  you can speak into the microphone or what's going on.

15         THE WITNESS:  Yeah.

16         THE COURT:  So tell me about the military-style

17  features that you're talking about.  What is that referring to?

18         THE WITNESS:  Well, again, the different statutes

19  might spell things out a little bit differently, but, for

20  example, one aspect that is often highlighted would be a pistol

21  grip, could be things like flash suppressers or bayonet mounts.

22  So an array of features that are more designed for military use

23  rather than civilian use.

24         THE COURT:  Okay.  Would it be fair to say -- for

25  purposes of my reviewing your declaration, would it be fair to

1   say that, whenever you talk about an assault weapon, you are

2   referring to a semi-automatic rifle that has a detachable

3   magazine, and that that is the commonality with all of the

4   other features that you've talked about, right?

5          So if you took all of the assault weapons, you boil

6   them down to their essence -- besides obviously having a

7   trigger and a barrel -- the common feature that you use to

8   define an assault weapon is a semi-automatic with a detachable

9   magazine; would that be fair?

10          THE WITNESS:  Well, I guess I'd clarify a little bit.

11          So, you know, some of these weapons are not

12   characterized as rifles.  They might be an assault pistol, but

13   it would still have the same, sort of, semi-automatic firing

14   capability with detachable magazine.

15          And then, if you're focused on a particular

16   legislative enactment, then you would have to look to the

17   statute whether a particular weapon is covered by that

18   particular statute.

19          So California law is more restrictive than just

20   semi-automatic weapon with detachable magazine.

21          THE COURT:  All right.  You're kind of breaking up

22   again.  Sorry.  I think this video conferencing is really

23   awkward, and it's very -- it's not unusual for us to stray from

24   the mic, or to look down, or whatever, such that the voice

25   doesn't come across quite well.

1        So, for example, right now, I'm getting feedback for
2   some reason.
3        THE WITNESS:  I just wonder if some other people might
4   have their microphone on instead of muted, and maybe that's
5   giving some additional feedback.
6        THE COURT:  We can hear you now.  I think -- I don't
7   know where your microphone is located, but maybe if you speak
8   to the microphone instead of looking down, it might help a
9   little bit.  I don't know.
10       THE WITNESS:  Okay.
11       THE COURT:  I know Mr. Echeverria and Mr. Beckington,
12  I don't think they have their microphones on, right?  And they
13  would be the only ones that would have their microphones on
14  so --
15       All right.  Good enough.
16       THE WITNESS:  Okay.
17       THE COURT:  All right.  Now, my recollection is you're
18  a lawyer besides being a professor, right?
19       THE WITNESS:  Yeah.  I have a law degree, and also a
20  Ph.D. in economics, so I do a lot of empirical evaluation on
21  law and policy.
22       THE COURT:  Okay.  So I wanted to ask you a question.
23  In your declaration, you indicated that a substantial majority
24  of Americans favor bans of assault weapons.
25       Given that you're a lawyer, that's not really --

1    that's not really relevant to whether or not these weapons are

2    protected, right?  Because, I mean, I think you agree with me

3    that the Bill of Rights was originally intended to protect us

4    from the tyranny of the majority, right?

5          THE WITNESS:  Sure.  The Bill of Rights is not, sort

6    of, subject to majority consideration.

7          THE COURT:  All right.  So the fact that there may be

8    a substantial majority of people who might be opposed to these

9    weapons, that's not really terribly germane to my determination

10   as to whether or not these weapons are protected by the Second

11   Amendment.

12         I think you would agree with that, right?

13         THE WITNESS:  Well, if you think about, for example,

14   you know, Jay Harvey Wilkinson's opinions in the Maryland

15   Assault Weapon Ban case, of course, he's a very conservative

16   Reagan appointee, he said -- I'm quoting here -- "To say in the

17   wake of so many mass shootings in so many localities across

18   this country, people themselves are now to be rendered duly

19   powerless when all they can do is stand by and watch as federal

20   courts design their destiny.  This would deliver a body blow to

21   Democracy as we have known since the very founding of this

22   nation."

23         So I think that that's a relevant factor that, if the

24   people have a very strong preference to address the problem of

25   mass shootings, it is a very bold step for an elected judge to

 1    try to supplant a legislative determination, and so that's why
 2    I think it is relevant.
 3             THE COURT:  Did you say an elected judge?
 4             THE WITNESS:  No, an unelected judge.
 5             THE COURT:  Oh, an unelected Judge.  Okay.  I was
 6    wondering maybe I had been demoted or something.  I don't know.
 7             All right.  Good enough.
 8             Now, there's only six states that have banned -- I
 9    think, if I understand your declaration, there are only six
10    states and D.C. that have some kind of ban on these assault
11    weapons?
12             THE WITNESS:  I think it's seven states and D.C.
13             THE COURT:  And that means that -- let's see if I can
14    do my math -- 50 states, minus seven, that means in 43
15    states don't, right?
16             THE WITNESS:  Yeah, that's right.
17             THE COURT:  Good.  See, I can do basic math.
18             You talk about mass shootings.  That was something
19    that confused me a little bit about your declaration.  And that
20    is that sometimes you talk about mass shootings -- and, of
21    course, as I mentioned -- I think I mentioned this to
22    Ms. Allen, and I may have mentioned it to Mr. Klaveras -- and
23    that is, the definition of a mass shooting is kind of all over
24    the place.  There are people who define it as three, others
25    define it as four, some define it as six, which makes it very

 1    difficult, very difficult when you're trying to find any

 2    consistency in the numbers.

 3              You define it as six; is that right?

 4              THE WITNESS:  Well, I think you spoke to Louis

 5    Klarevas yesterday, and he had been the first one to identify

 6    the very dramatic decline in mass shootings defined as six-plus

 7    during the decade of the assault weapon ban and the very

 8    dramatic increase when the ban was allowed to lapse.

 9              And so I'm always very cautious about accepting other

10    people's conclusions, and since that was a very important one,

11    I did my own independent evaluation and used a different

12    dataset, but just wanted to see if, on a different dataset, the

13    six-plus conclusion that Louis Klarevas had come up with would

14    be replicated in the data, and indeed, it was, very strongly,

15    and I was able to, you know, use my rendition of his data in

16    (inaudible).

17              THE COURT:  You're breaking up again.  I'm sorry.

18              THE WITNESS:  Yeah.  Sorry about that.

19              And basically, Klarevas' data ended in 2014, my data

20    went through 2019, which made the conclusions even more

21    dramatic.  So the increase in the 15 years after the lapse of

22    the Federal Assault Weapon Ban was even more dramatic than the

23    ten years post lapse that Louis Klarevas and John Lott had

24    looked at.

25              THE COURT:  So, I'm sorry.  I got lost.  Do you use

1     six as your definition?

2              THE WITNESS:  Well, what I did was, my first effort

3     was to replicate, on a different dataset, using six-plus as the

4     definition of these very -- what Klarevas called gun massacres,

5     but I'm also careful to look to see whether that definition is

6     something that's unique.

7              And indeed, when I published the information using the

8     six-plus characterization of a gun massacre, the immediate

9     response of number of people was, oh, we don't believe this

10    because he should have used four-plus, rather than six-plus.

11             But, of course, I had already done it using four-plus

12    and gets almost the identical result as it does if you use

13    five-plus.

14             So the good news is, for those who are interested in

15    the impact of the Federal Assault Weapon Ban, it doesn't matter

16    whether you use four-plus, five-plus, six-plus, or even a

17    larger number, the basic conclusion comes through, as you would

18    expect it would if the assault weapon ban is really driving the

19    outcome.

20             Indeed, I think it's very hard to argue, based on the

21    existing data that we have, that the Federal Assault Weapon Ban

22    did not limit the gun massacres defined as either six-plus,

23    five-plus, four-plus, or ten-plus, for that matter.

24             THE COURT:  Well, it's not in your declaration, but I

25    wonder if you can do this for me.  So there was a recent study

 1    by the Bloomberg School at Johns Hopkins that concluded that
 2    there really is no association between assault weapons and mass
 3    shootings.
 4          Have you looked at that study?
 5          THE WITNESS:  Yeah, I did look at that study.  And,
 6    essentially, they argue that all of the benefit came from the
 7    large-capacity magazine restriction.
 8          It's a little hard to differentiate, though, what part
 9    of the Federal Assault Weapon Ban drove the dramatic decline in
10    deaths during the ten years and then is responsible for
11    the (inaudible).
12          THE COURT:  You're breaking up again.
13          You know, I think what's happening -- and I'm sorry.
14    I hate to do this.  And, in fact, I really hate having this
15    hearing by video.  And I'm really trying to accommodate
16    everyone by doing this.
17          But I think what you're going to have to do is you're
18    going to have to stop looking down, because I'm noticing that
19    every time you look down, rather than speak into the
20    microphone, your voice fades, and when your voice fades, my
21    reporter can't hear you, and neither can I.
22          Well, I'm not going to ask you about that study too
23    much.  Just simply something that you said triggered my -- got
24    me thinking about it, and I thought, well, I wonder if he's
25    actually looked at it.

1          Let me ask you this:  At paragraph 39 of your
2   declaration you said that, "Out of 32 school shootings, 25 of
3   the shooters were teenagers;" is that correct?
4          THE WITNESS:  Yeah.  Let me take a quick look at --
5   this was paragraph 39?
6          THE COURT:  That's what my notes say.
7          THE WITNESS:  Okay.  Let me just take a quick look.
8   So this is a Wall Street Journal study of school shootings.
9          THE COURT:  Right.  But this is in your declaration.
10  You cited that in your declaration, so I'm trying to find out,
11  is it true that 25 out of 32 of the school shootings were by
12  teenagers?
13         THE WITNESS:  Yeah.  The Wall Street Journal report
14  says teenagers or younger, so --
15         THE COURT:  Okay.  Teenagers or younger.  So I think I
16  did the math on that, and that's like 75 percent.
17         THE WITNESS:  Yeah.  It's roughly a little over
18  75 percent.  That's right.
19         THE COURT:  Do you know if, using your definition of
20  assault weapon, if assault weapons were used in all of those 32
21  school shootings?
22         THE WITNESS:  Yeah.  No.  It is not the case that, in
23  all of those school shootings, assault weapons were used.
24         THE COURT:  Do you know how many of those 32 school
25  shootings assault weapons were actually used?

```
 1                THE WITNESS:  You know, basically, it's unfortunate
 2     that we don't have better data on each of these shootings.  We
 3     have some incomplete data.  But a not bad way to think about it
 4     is, if a lot of people are dead, it probably is using a weapon
 5     that would have been banned under the Federal Assault Weapon
 6     Ban.  And if a small number of people are dead, then it
 7     probably wasn't one of the weapons that would have been banned
 8     under the Federal Assault Weapon Ban.
 9                So Adam Lanza, of course, used an AR-15 (inaudible).
10                THE COURT:  You're breaking up again.  Sorry.  Say
11     that again.  I heard you say something about Adam Lanza.
12                But I'm troubled by your comment that, if a lot of
13     people were killed, then there was an assault weapon used.
14                Lucy Allen yesterday, or the day before, mentioned
15     that pre-ban there had been six, what she called, massacres,
16     gun massacres.  There were two out of those that were -- that
17     used assault weapons.
18                That means, if I'm not mistaken -- again, doing my
19     rudimentary math -- that means that four out of the six did not
20     use assault weapons.
21                Do you have any reason to disagree with Ms. Allen's
22     statement?
23                THE WITNESS:  Well, again, I was referring to the
24     weaponry banned by the Federal Assault Weapon Ban.  So that
25     would include both what we're calling assault weapons as well
```

1    as any weapon using a high-capacity magazine.

2            And so if both of those, or either of those, are

3    present, you tend to see a higher number of deaths.

4            And so I was highlighting that Adam Lanza killed 26,

5    the Heartland shooter in Florida killed 17.  But in a number of

6    other school shootings, you'll see one or two people killed,

7    and those tend to be pistols, perhaps without a large-capacity

8    magazine.

9            THE COURT:  Let me ask you this.  If six people showed

10   up at a place, each one armed with a single-shot 410 shotgun,

11   and they killed six people, under your definition, would that

12   be a mass shooting?

13           THE WITNESS:  Well, I got my data from the Mother

14   Jones dataset, and their particular definition was limited to

15   single individuals engaging in the shooting.  So they would not

16   have included your example in their Mother Jones mass shooting

17   dataset.

18           THE COURT:  In your declaration you refer to the AR-15

19   being used in Vietnam.

20           Now, were you in Vietnam?

21           THE WITNESS:  No.  I was a little too young, I guess.

22           THE COURT:  Okay.  Do you know that the AR-15 was used

23   in Vietnam?

24           THE WITNESS:  Well, of course, it was the Defense

25   Department that had asked the Armalite gun designers to come up

1    with the AR-15.  So that was actually a Defense Department

2    request to come up with a weapon that the Army could use, and a

3    specific request was that they produce --

4              THE COURT:  Okay.  I hate to interrupt you, but I only

5    have so much time, and so I hate to do this, but do you know

6    that the AR-15 was used in Vietnam?

7              THE WITNESS:  Well, I think they called it a different

8    name, but it was --

9              THE COURT:  What did they call it?

10             THE WITNESS:  The M16.

11             THE COURT:  Is there a difference between the M16 and

12   the AR-15?

13             THE WITNESS:  Well, not originally.  So the weapon

14   that was originally designed for the Defense Department was

15   called the AR-15.  When the Defense Department adopted it for

16   the military use in Vietnam, they called it an M16.  And then

17   Armalite sold a civilian version that did not have the fully

18   automatic capacity that the M16 has.

19             THE COURT:  So then -- just to be clear, when we're

20   talking about the AR-15 now, regardless of what it might have

21   been called way back in the Vietnam days, when we talk about

22   the MR15 -- I mean the AR-15, we're not talking about an M16,

23   right?

24             THE WITNESS:  That's right.  The weapons that we're

25   talking about are semi-automatic, while the M16 is something

1 │ with a fully automatic capacity.  It doesn't have to fire in

2 │ that mode, but it has that capacity.

3 │         THE COURT:  Okay.  And you know, of course, that fully

4 │ automatic weapons have been banned -- or I should say

5 │ restricted -- not banned, but actually restricted for a long

6 │ period of time, right?  I think since the 1930s or thereabouts?

7 │         THE WITNESS:  Yes, the restrictions on those came

8 │ earlier.

9 │         THE COURT:  Yeah.  So when you say that the AR-15 was

10 │ used in Vietnam, that's not quite correct, is it?  What was

11 │ used in Vietnam was an M16, which is a weapon that has -- that

12 │ is fully automatic capable; am I right?

13 │         THE WITNESS:  With the qualification that if you read

14 │ the DARPA report of July 1962, it does state, "The AR-15

15 │ Armalite rifle has been subjected to a comprehensive field

16 │ evaluation under combat conditions in Vietnam."

17 │         So the original AR-15 did have the fully automatic

18 │ capacity, but once the Army adopted it, they called it an M16,

19 │ and the Armalite company kept the AR-15 name, but in the

20 │ civilian marketplace just limited it to semi-automatic firing.

21 │         THE COURT:  All right.  Well, that's part of the

22 │ confusion I was trying to clear up.

23 │         So apparently, at least according to you -- and I'm

24 │ not doubting it, I'm just simply -- I know that there are folks

25 │ who have indicated that it's not so, but fine.

```
 1              So apparently, at one time, the M16 was originally
 2    called the AR-15.  When the military adopted it, it became
 3    known as the M16.  And then Armalite began to market a civilian
 4    weapon called an AR-15, and the difference between the M16 and
 5    the AR-15 is that the M16 has fully automatic capability and
 6    the AR-15 does not; is that a fair statement?
 7              THE WITNESS:  Yes, in the current description of those
 8    weapons, yes.
 9              THE COURT:  Okay.  All right.
10              Well, thank you.  I wanted to ask you that question
11    because I was a little bit confused between -- in the
12    interchangeability of the terminology.
13              THE WITNESS:  I could also give you the Defense
14    Department report where they do refer to it as an AR-15.
15              THE COURT:  Yeah.
16              THE WITNESS:  But that was back in 1962.
17              THE COURT:  Yeah.  But that would really be irrelevant
18    to me, because -- the point -- and you know the point -- the
19    point is -- the point here is whether or not this is a military
20    weapon versus a civilian version of a military weapon, and I
21    think we've agreed that, although it might have at first been
22    called an AR-15, it was a different weapon, it became the M16,
23    which is fully automatic, and the AR-15 is not.
24              And if anything I've said is incorrect, please, please
25    stop me because I don't want to be confused.
```

```
 1                THE WITNESS:  Yeah.  I would just add to what you said
 2       that the Army's field manual states that semi-automatic fire
 3       is --
 4                THE COURT:  But that wasn't my question, Mr. Donohue.
 5       That was not my question.
 6                My question was, we agree that they're two different
 7       weapons, right?  The M16 and the AR-15 are two different
 8       weapons.  The M16 has a fully automatic capability, the AR-15
 9       does not.  Agreed?
10                THE WITNESS:  That is true.
11                THE COURT:  Okay.  Now, one of the reasons why the M16
12       was modified to allow for burst and/or semi-automatic firing
13       was to, A, preserve ammunition, and B, to make it more accurate
14       because, obviously, you don't have the barrel rise with a
15       semi-automatic single-fire as opposed to a fully automatic
16       weapon, right?
17                THE WITNESS:  That's correct.
18                THE COURT:  Okay.  So let me ask you a question.  You
19       looked at this issue an awful lot, spent a lot of time, you've
20       written a lot of declarations and so on.
21                You're familiar with the Sturm Ruger Mini-14?
22                THE WITNESS:  Yes.
23                THE COURT:  You realize that that's a semi-automatic
24       weapon?
25                THE WITNESS:  Yes.
```

 1          THE COURT:  It has a detachable clip?

 2          THE WITNESS:  That's correct.

 3          THE COURT:  It's not a clip, it's a magazine.  I'm

 4    falling into an error.

 5          The reality is that, as between an AR-15 and a Sturm

 6    Ruger Mini-14, there really is no difference between those two

 7    weapons, with the exception of the fact that one has perhaps a

 8    wooden or fiber stock, a conventional stock, and the other one

 9    has a different kind of stock.

10          And look, right?  But the firing -- the lethality of

11    the two weapons is the same, isn't it?

12          THE WITNESS:  Well, I would -- I would draw some

13    distinctions there.  First of all, the Mini Ruger would not

14    have the pistol grip --

15          THE COURT:  Agreed.

16          THE WITNESS:  -- and therefore, would not be as

17    well-suited to, you know, what a mass shooter would be hoping

18    to use.

19          THE COURT:  Why do you -- what evidence do you have to

20    support that?  Because, I mean, as you probably know, I was

21    also the judge that decided the *Duncan v. Becerra* case.  I'm

22    sure you have been already alerted to that.

23          I did an awful lot of research into mass shootings,

24    and it appears to me that there were an awful lot of weapons

25    used in other mass shootings that had a plain old conventional

1   hunting-style stock, just like the Ruger Mini-14.

2         So what leads you to say what you just said?

3         THE WITNESS:  Since the Federal Assault Weapon Ban

4   went into effect in 1994, there has never been a mass shooting

5   using a Mini Ruger.  And so, essentially, we have pretty strong

6   evidence that people who really want to kill a lot of people

7   don't use a Mini Ruger, they would rather use the AR-15.

8         And there are really two possible reasons for that.

9   They probably both are factors.

10         One is, they believe, correctly or incorrectly, that

11   they can kill more people faster with the -- you know, the

12   assault weapon version as opposed to the Mini Ruger version.

13         And two, the combination of the advertising of the gun

14   industry and the nature of the people who are potentially on

15   the line to commit, sort of, mass murder that we see in these

16   horrific episodes are motivated by the ostensible power and

17   lethality of the AR-15 or Bushmaster weapon would have.

18         And by comparison, the Mini Ruger almost seems the

19   feminine in comparison.

20         So if you're being motivated by, sort of, macho

21   advertising of the gun industry for a reckless and troubled

22   young man, usually, the AR-15 seems so much more potent to

23   leave the final message of your life, because you're probably

24   going to die during the mass shooting episode, and you don't

25   want to be seen to be holding what looks like a more feminine

 1    gun if you can find one that is very potent and lethal in

 2    its -- not to mention it's appearance.

 3              THE COURT:  Well, I was asking you from a lethality

 4    point of view, there really is no difference between the two.

 5              But you make a -- raise an interesting point.

 6              I watched a video, which I suspect you've also

 7    watched, by Mr. Kraut.

 8              And in that video he fires two weapons; one was called

 9    a California-compliant weapon or featureless AR-15, and the

10    other one is a non-California-compliant weapon.

11              Now, did you see that video, by any chance?  Did you

12    watch it?

13              THE WITNESS:  No, I haven't seen that particular one.

14              THE COURT:  Okay.  Well, I find it interesting that

15    you say that the Sturm Ruger Mini-14, you said it was more

16    feminine.

17              But I saw the two weapons in that video.  I mean, I

18    don't know how you define "feminine" and "masculine" when it

19    comes to weaponry, unless one is pink with, I don't know,

20    sequins or something, but I didn't see a bit of difference

21    between the two weapons that Mr. Kraut was firing.

22              I mean, if you were looking for an ugly weapon,

23    something that was scary, I didn't see a difference between

24    those two weapons.

25              And so consequently, that takes me to the question of,

1   okay -- so -- and by the way, don't take anything that I've

2   said as meaning that I've concluded how I'm going to decide

3   this case, but certainly, it strikes me that if you were to

4   ban -- or continue the ban on the -- what have been referred to

5   as the evil-featured AR-15, the natural progression for the

6   person that you describe as wanting to kill people is going to

7   be the California-compliant AR-15, right?

8           THE WITNESS:  Well, the reason that the gun industry

9   merchants, you know, merchandise these AR-15s by saying things

10   like, "Consider your man card re-issued," or, "Forces of

11   opposition will bow down for the AR-15," but not for the

12   Mini-14, is that they impact the, sort of, potential mass

13   shooter in a different way.

14           And so I don't think it's -- I don't think it's a

15   coincidence that the Mini-14 has never been used since the

16   assault weapon ban went into effect.

17           THE COURT:  Okay.  Well, that may be so.  That may be

18   so.  But I got past that.  I got past the AR -- the Ruger

19   Mini-14.

20           And you made the comment that the reason why shooters

21   had used the AR-15 assault weapon -- by the way, I'm including

22   AKs, because I'm not going to keep talking about the two as if

23   they're a different weapon.  For our intents and purposes, I

24   consider them to be in the same category.

25           So you said that the reason why shooters use the

1  AR-15, and not the Mini Ruger 14, is because the Mini Ruger 14

2  is more feminine, the AR-15 is more masculine.

3        And so then I asked you the question, if you look at

4  the difference between the California-compliant AR-15 and a

5  California non-compliant AR-15, there really is not much

6  difference in the way that they look, is there?

7        THE WITNESS:  You know, you'd have to look at each one

8  and evaluate them.  But again, the idea behind the California

9  regulations is to ban the semi-automatic weapons that are more

10  appealing to mass shooters or make them more lethal.

11        And you're right, if you're just talking about pulling

12  a trigger at a given target, the Mini-14 is very --

13        THE COURT:  Okay.  Okay.  Maybe I'm not making myself

14  clear.  In the interest of time, forget the Mini-14.  We're not

15  going to talk about the Mini-14 anymore.  The Mini-14 doesn't

16  exist.

17        THE WITNESS:  Okay.

18        THE COURT:  Okay?  All right.

19        Now, my question to you is, so if the point is that a

20  weapon that is more masculine is the weapon of choice for a

21  mass shooter, I'm trying to find out from you, if you can tell

22  me, what is it about the California-compliant AR-15 that makes

23  it less masculine than the California non-compliant AR-15?

24        THE WITNESS:  Well, in that dimension, I was focused

25  more on the elements that would make the gun more valuable to

1    kill as many people as quickly as you can.  And if you had the

2    capacity to have a pistol grip and, you know, some of these

3    other accouterments that both facilitate mass shootings, that

4    would be something that would be more attractive, and those are

5    the features that the California regulations are most designed

6    to suppress by banning certain weapons.

7           THE COURT:  Do you have any evidence or are you aware

8    of any reports that indicate that, in fact, there have been

9    more people killed with weapons having these features than with

10   weapons that don't have the features?

11          THE WITNESS:  Well, I mean, we do have the indirect

12   evidence of the Federal Assault Weapon Ban which was effective

13   in suppressing mass killings.  And so general -- if one's goal

14   is to, sort of, limit mass killings, you want to get as close

15   to a Federal Assault Weapon Ban as you can.

16          So that's the reason that governments are interested

17   in -- who are interested in reducing the number of mass

18   killings are interested in having limitations on assault

19   weapons and --

20          COURT REPORTER:  I'm sorry.  "Assault weapons and" --

21          THE COURT:  Did you hear my court reporter?

22          THE WITNESS:  I'm sorry.  Could she repeat it?

23          THE COURT:  Yeah.  She couldn't hear you.

24          THE WITNESS:  So I'm not sure when she lost my trail.

25          THE COURT:  Well, where did you lose him?

 1          COURT REPORTER:  Judge, "Interested in having
 2   limitations on assault weapons and" --
 3          THE WITNESS:  And large capacity magazines.
 4          COURT REPORTER:  Thank you.
 5          (Pause in the proceedings)
 6          THE COURT:  In paragraph 87 of your declaration you
 7   said, "Of course, the civilian AR-15 lacks the fully automatic
 8   and burst mode of the M16 but still retains all the other
 9   aspects that made it such a valuable lethal weapon for deadly
10   combat."
11          The other aspects, what are the other aspects that you
12   were referring to?
13          THE WITNESS:  Well, I was alluding to the DARPA
14   report, what they called the phenomenal lethality of a round
15   fired from the AR-15, and that's true whether it's the civilian
16   version or the M16 version.  Those are identically dangerous.
17   And if you read the report, it is chilling how lethal a shot
18   from one of those weapons is.
19          THE COURT:  Is the lethality of the weapon, the AR-15
20   with the features that are banned by California, is the
21   lethality different than the lethality of a featureless AR-15?
22          THE WITNESS:  Yeah.  So in certain respects, the
23   California ban does not extend to rimfire weapons, which are
24   less powerful than centerfire weapons.
25          But again, of course, the attributes that the State

1    has tried to identify as being most likely to lead to the

2    greatest body count are things that are independent of what the

3    actual round hitting the body is, but allow for, you know, head

4    fire and spray fire, or --

5              THE COURT:  So spray fire is a technical term used by

6    the military which refers to either -- if you're firing fully

7    automatic or burst firing capabilities that the AR does not

8    have.  Are you aware of that?

9              THE WITNESS:  Well, the way I was using it is, you

10   know, pulling the trigger as fast as you can without, you know,

11   narrow targeting of a victim to spray across a group of

12   individuals perhaps, and that can be done more effectively with

13   a pistol grip.  It would be much harder to do that with, like,

14   the Mini Ruger or something like that.

15             THE COURT:  I see.

16             THE WITNESS:  And you have a sling on the gun that

17   will allow you to, you know, swing around as you're firing.

18             And in the very first mass shooting that drew a lot of

19   attention in California, there was quite a bit of evidence that

20   the weapon that was used there, which was the TEC-9 assault

21   pistol, was not a very accurate gun but could do this, sort of,

22   effort to, sort of, wound individuals by shooting a spray-like

23   fashion, you know, a semi-automatic, and then the shooter in

24   that case went and finished people off when they were brought

25   to their knees by being hit by this first round of spray-like

1    fire, and then he finished them off with a handgun.  But they

2    were initially incapacitated as he sprayed across the law firm

3    of (inaudible).

4              COURT REPORTER:  "The law firm of" --

5              THE COURT:  Yeah.  I'm sorry.  We didn't hear the last

6    part of your answer.

7              THE WITNESS:  In the law firm of Pettit & Martin.

8              THE COURT:  Do you know of any military branch that

9    uses the AR-15 as configured with the features that California

10   has banned?

11             THE WITNESS:  No.  I think that it would be more

12   likely that they would use the M16 and then just use it in

13   semi-automatic mode if they wanted to have the more accurate

14   firing.

15             THE COURT:  So the answer is that you don't know of

16   any.

17             THE WITNESS:  I do not.

18             THE COURT:  Okay.  At paragraph number 111 of your

19   declaration you talk about the fact that, "Experts consider

20   handguns clearly more suitable than assault weapons for

21   self-defense."

22             Can I ask a question?  Is that really -- is that

23   really relevant, what an expert considers, as opposed to what a

24   citizen considers?

25             THE WITNESS:  Well, of course, remember that the

1   *Heller* decision said that you have a right to weaponry for

2   self-defense in the home, but, of course, that was very clearly

3   specified not to be an unlimited right (inaudible).

4           THE COURT:  I'm sorry.  Again, you're breaking up on

5   us.  Please speak up.

6           THE WITNESS:  The *Heller* decision said that you had a

7   right to certain weaponry for self-defense in the home, but

8   that would not be an unlimited right, and you would not be

9   entitled to military weaponry.

10          THE COURT:  Agreed.

11          THE WITNESS:  So the question is, is the AR-15 closer

12  to a handgun or is it closer to an M16?  And, for example, the

13  Maryland Assault Weapon Ban case, they said there's no

14  question (inaudible).

15          THE COURT:  I'm sorry.  I'm sorry.  Say that again,

16  please.

17          THE WITNESS:  So in the Maryland Assault Weapon Ban

18  case, the Fourth Circuit said there was no question that the

19  AR-15 is closer to an M16 than it is to a handgun, and

20  therefore, for the same reason that the M16 should not be

21  considered lawful, the AR-15 should not have some Second

22  Amendment protection, and they said there would be no Second

23  Amendment protection for such a weapon.

24          THE COURT:  But my question was -- I'm not sure, maybe

25  I didn't state it clearly -- my question was, the fact that

1   experts may consider a handgun more suitable than, say, an

2   assault weapon for self-defense -- and again, I think this is

3   where this whole case gets so botched up.

4          So realistically, if a homeowner, for example, owned a

5   California-compliant AR-15, it wouldn't be any closer to a

6   handgun than a non-compliant AR-15, right?

7          THE WITNESS:  Well, I mean, as we said earlier, some

8   of the compliant weapons are less potent than the banned

9   weapons.  And so, again, I think California is trying to craft

10  the wise restraints that make that free, and some of your

11  comments suggest that maybe they should have gone further in

12  banning, but I think it's useful to take incremental steps, and

13  if you're not getting the full benefits of reduction in mass

14  killings, you could go further.

15         MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

16  Can I make a point?

17         THE COURT:  Sure.

18         MR. ECHEVERRIA:  It may be easier to hear Dr. Donohue

19  if he calls in separately.  I believe there should be a dial-in

20  line.  I don't know if that's something the Court would be

21  interested in, in having him phone in for voice while

22  maintaining video feed for visual.

23         THE COURT:  Let me ask my courtroom deputy, and I'll

24  be right back.  Okay?

25         (Court and court clerk confer)

```
 1              THE COURT:  Mr. Echeverria, that's a great suggestion.
 2    Why don't we try it and see if that works.
 3              You've got contact information, right?  Professor
 4    Donohue?
 5              THE WITNESS:  Yes.  Let me see if I can pull up that
 6    email quickly.  Okay.  So the email -- I'm trying to see where
 7    in the email it gives a phone number.  So is it the 669 number?
 8              THE CLERK:  It's the San Jose U.S. line.
 9              THE COURT:  I don't know.  It's a San Jose.
10              THE CLERK:  669.
11              THE COURT:  San Jose 669 number.
12              THE WITNESS:  Okay.  I will call that number right now
13    on my office telephone.
14              THE COURT:  All right.  I'm sorry to do that to you,
15    but --
16              Professor Donohue, I need you to mute your Zoom
17    monitor.  Just your microphone on your computer.
18              THE CLERK:  He has to mute his computer microphone.
19              THE COURT:  Stop.  Just a minute.  I'm sorry.
20              THE CLERK:  He has to mute his computer microphone.
21              THE COURT:  Yes.  I need you to mute your computer
22    microphone.
23              THE WITNESS:  So how do I sound now?
24              THE COURT:  You sound much better.  Thank you.
25              Great suggestion, Mr. Echeverria.
```

 1                THE WITNESS:  Yeah.

 2                THE COURT:  I always appreciate his comments.

 3           Okay.  I kind of lost track of where I was, so let me

 4      see if I can -- if I can find my way.

 5                I really had a whole lot of questions for you, but for

 6      reasons that I explained earlier today, I'm trying to get

 7      through the one's that are most troubling for me.

 8                THE WITNESS:  Okay.

 9                THE COURT:  At paragraph 137 of your declaration --

10                THE WITNESS:  Okay.

11                THE COURT:  -- you made the following point:  You

12      said, "The bigger point here is that you can't just average

13      shots per minute since the advantage of a semi-automatic weapon

14      is that it permits the shooter to shoot rapidly when he needs

15      or wants to, and large capacity magazines allow this continued

16      stream of fire to be extended without the need to reload as

17      frequently."

18                So I don't disagree with a thing that you stated.  My

19      question for you, though, is -- since you're obviously a very

20      bright man -- is this:  If we do away with -- just if you'll

21      bear with me -- if we were to do away with all weapons that

22      have, say, 30-round magazines -- okay? -- you still have

23      semi-automatic AR-15s that may have -- I don't know.  They come

24      in 20- or 10-round magazines -- but you would agree with me,

25      using your powers of logic, that what would happen then is that

1   those who wanted to use these types of weapons would use the

2   next highest available magazine, right?

3           THE WITNESS:  Presumably, yes.

4           THE COURT:  Yeah.  And, of course, if you reduced the

5   number from, say, 10 down to 7, they probably would use a

6   7-round magazine, right?

7           THE WITNESS:  Yes.

8           THE COURT:  Okay.  And then, I suppose you could

9   follow that progression until you got down to a single shot,

10  which, you know, it would be very difficult to have a mass

11  shooting with a single shot.

12          So I guess what I'm wondering, I mean, is your main

13  concern with these weapons that they are semi-automatic, or

14  that they are easily concealable, or that they're too accurate,

15  or that they can fire multiple shots, or that they have

16  interchangeable magazines, or all of the above?

17          THE WITNESS:  Yeah.  Sort of all of the above in a

18  sense, although, you know, the different weapons obviously have

19  different configurations.

20          But, you know, if you're thinking in broad terms, what

21  is -- what is our goal in trying to stop mass shootings, you

22  want to find ways to either reduce the lethality of the

23  weapons, reduce the speed of firing the weapons, reduce the

24  attractiveness to, you know, potential mass killers, and there

25  has been quite a bit of evidence for the last 50 years of a

1   so-called instrumentality effect.  So the more lethal the
2   weapon is, the more people die.

3           And, in fact, a really impressive study just came out
4   about a year ago by Phil Cook at Duke Department of Economics
5   where he showed that, if you just look at people who show up in
6   Emergency Rooms, you can tell who has a higher probability of
7   surviving a gunshot wound depending on attributes of the
8   bullets or the gun that it's fired from.  So if you can move
9   people to less lethal choices, Cook concluded you could lower
10  the homicide rate by 30 or 40 percent.

11          THE COURT:  Did -- is it Professor Cook?  Dr. Cook?
12  Mr. Cook?

13          THE WITNESS:  Yeah.  Doctor or Professor.

14          THE COURT:  All right.  Did he, for example, analyze
15  the data between, say, for example, shotgun wounds at close
16  range, handgun wounds from hollow point ammunition, hunting
17  rifles, for example, 30-06, or .308, or .223s, 5.56, 7.62?
18  Does he make that kind of an analysis?

19          THE WITNESS:  No.  He was more limited in his focus.
20  Again, he was only dealing with cases of people who showed up
21  in the emergency room for injuries in Boston.  So, of course,
22  it is a narrower category of guns that were used in that study.

23          But the conclusion, again, goes to this finding that
24  has, sort of, been replicated for 50 years that, you know, if
25  you can get people to use knives instead of guns, you're going

 1   to get fewer deaths.  If you can get people to use less potent

 2   weapons or lower caliber bullets, there will be fewer deaths.

 3            Because 100,000 people get shot every year, but the

 4   number who actually die is only a relatively small fraction of

 5   that, so there is a potential big benefit from reducing the

 6   lethality of the weaponry

 7            THE COURT:  Okay.  You indicated in your declaration

 8   that the popularity of hunting is dropping, which I --

 9            THE WITNESS:  Yes.

10            THE COURT:  -- which I probably agree with.  I --

11   being a former hunter, I can explain -- I can tell you why that

12   might be, but that would be besides the point.

13            You also indicated, though -- and I was a little

14   troubled, because I couldn't quite understand the idea that you

15   were -- you were talking about -- I think you were trying to

16   get to the commonality of these AR-type weapons, and you

17   were -- I don't know -- you were saying that there were some

18   gun owners who owned, apparently, multiples of these weapons,

19   and because of that, it didn't really show -- or it showed that

20   these guns weren't as common in -- among the population as we

21   think they are.

22            Did I understand that correctly?

23            THE WITNESS:  Yeah.  Well, the point is simply that

24   some people are trying to make claims about the number of guns

25   manufactured as suggestive of a similar number of guns are held

1    by that many individuals.

2         And, of course, it turns out that a lot of gun owners

3    have lots and lots of guns, and so a very substantial number of

4    AR-15 or assault weapons are held by people who have multiple

5    such weapons.

6         And so, you know, if you're -- and let's say there

7    were 10 million in circulation.  If, you know, 5 million people

8    hold 10 million guns, the breadth of ownership is only half as

9    large as one might first think on hearing that there are

10   10 million guns in circulation.

11        THE COURT:  Okay.  That clears that up for me.

12        Now, you also said -- you said at paragraph 144 that

13   "while the precise number of American households that own

14   assault weapons nationally is uncertain, it is clear that most

15   gun-owning households do not possess these type of weapons."

16        I was trying to find the authority for that statement,

17   and I was -- I couldn't find it, so maybe you can help me with

18   that.

19        THE WITNESS:  Yeah.  So more generally, you might

20   think, you know, maybe 25 percent of the adult population, 20

21   to 25 percent has a weapon of some sort, a firearm of some

22   sort.

23        And since that number would be vastly higher than even

24   the highest estimates of how many assault weapons there are, it

25   shows that most Americans don't have any gun, and most gun

1  owners don't have an assault weapon.

2          THE COURT:  I'm sorry.  I didn't quite catch it.

3  Maybe you can explain that to me one more time.

4          I understand about -- I understood that, obviously,

5  not everyone owns a gun, and that, in fact, it may be that, I

6  think you posed 25 percent of the population may own guns.

7          But how do you arrive at the fact that out of that

8  25 -- because your statement is, "Most gun-owning households do

9  not possess these types of weapons," so how do you arrive at

10  that sentence?

11          THE WITNESS:  Well, just to use simple numbers, let's

12  say there were 250 million adults.  And if the number of gun

13  owners was 25 percent -- it's somewhere between 20 and

14  25 percent -- that would mean 50 million adults have guns.

15          And if you look at the estimates for assault

16  weapons -- and we know that individuals own multiple assault

17  weapons -- you know, maybe there are, you know, 5 or 6 million

18  different individuals who own assault weapons, which is a small

19  fraction of the number of people that we just said owned guns,

20  which we were estimating at like 50 million.

21          So most Americans don't have guns.  That's 75 to

22  80 percent.  And probably 80 to 90 percent of gun owners don't

23  have assault weapons.

24          THE COURT:  Now, see, now we're talking about assault

25  weapons being the types of weapons that are banned in

1  California, or are we talking about all AR-15/AK-type weapons?

2        THE WITNESS:  Yeah.  So I was -- I was going off

3  Mr. Cucuruto's numbers in drawing those conclusions, and I

4  wasn't quite sure if he was using the broader definition or a

5  more limited definition.

6        But certainly, in either event, even in the highest

7  estimates of the number of AR-15 weapons, it doesn't come

8  anywhere near the number of households or individuals that do

9  possess firearms.

10        THE COURT:  So getting back to my point earlier about

11  the fact that hunters are on the decline.

12        So this morning we heard from one of the plaintiffs

13  who testified that there has been a significant increase in the

14  number of people who are buying, I think he called them black

15  rifles, which are -- which is another term for the AR-type

16  weapon.

17        Since hunting is declining, according to your

18  calculations -- which I believe are probably accurate -- to

19  what would you attribute the fact that there's this increase in

20  people buying these black rifles?

21        THE WITNESS:  You know, if you look at Exhibit 1 of

22  the Cucuruto expert report, it does say that these are

23  fun-to-shoot weapons.  And essentially, this is what the

24  assault weapon story is really all about.  That, you know,

25  advertising campaigns and other things that persuade a certain

1  number of Americans that it's fun to shoot these weapons --

2              THE COURT:  Have you ever fired one?  Have you ever

3  fired one?

4              THE WITNESS:  I've never fired a -- I've never fired

5  an AR-15, but one of the experts that I do cite is a friend,

6  and he -- he said, "Yeah, they are a lot of fun to shoot."

7              So it's -- but I would, sort of, think that that's

8  really irrelevant to the Second Amendment because there are

9  lots of fun things in the world that don't get constitutional

10  protection --

11             THE COURT:  Doesn't --

12             THE WITNESS:  -- because the danger is --

13             THE COURT:  Well, wait a minute.  You're a lawyer.

14  Doesn't the *Heller* decision say that, for lawful purposes, and

15  shooting a gun for -- say, for example, plinking or target

16  practice, wouldn't that be a lawful purpose?

17             THE WITNESS:  Well --

18             MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

19  Sorry for interjecting.

20             I'm going to make an objection to the extent that the

21  question calls for a legal interpretation of *Heller*.

22             THE COURT:  Yeah, I understand.  That's fine.  Your

23  objection is sustained.

24             MR. ECHEVERRIA:  Thank you very much, Your Honor.

25             THE COURT:  You bet.  All right.

1        Are you aware of any instances where one of these

2  weapons that we've been talking about, the black rifles,

3  AR-15s, or assault weapons has been used for self-defense?

4        THE WITNESS:  You know, there are enough of them out

5  there that you would imagine someone has used one for

6  self-defense at one point.  But --

7        THE COURT:  You've not researched that?

8        THE WITNESS:  Well, you know, it's hard to get fully

9  accurate information on every self-defense gun used.  But,

10  sure, I've certainly looked at this as much as the data allows.

11        But, of course, the relevant question is not did

12  someone use an AR-15 in self-defense, the question is did it

13  enhance their safety more than some legitimate civilian weapon

14  that would be an alternative to the assault weapon.

15        THE COURT:  You know, I think in your declaration I

16  saw a reference -- and forgive me if I'm wrong, because I'm not

17  looking at my notes, I'm doing this straight from memory -- but

18  I think in your declaration somewhere you alluded to the fact

19  that, very often in home defense situations, all that the

20  homeowner has to do is to brandish the weapon, doesn't have to

21  fire a weapon.

22        Did you address that in your declaration?

23        THE WITNESS:  Yeah.  I cited John Lott repeatedly

24  saying that, you know, 98 or 99 percent of the time defensive

25  gun use would just involve brandishing a weapon.

```
 1              THE COURT:  Why do you suppose that would be?

 2              THE WITNESS:  Well, people -- you know, again, if it's

 3   true -- are reluctant to get shot, so that would play a role.

 4              THE COURT:  Haha.  Yeah.  I agree.

 5              So you've seen one of these AR-15-type weapons, right?

 6              THE WITNESS:  I have.

 7              THE COURT:  Kind of ugly looking, aren't they?

 8              THE WITNESS:  They are.

 9              THE COURT:  And if you saw somebody standing in a

10   doorway with one of those weapons, you might want to think

11   twice about going inside the door, wouldn't you?

12              THE WITNESS:  Well, I don't know.  If somebody had a

13   Glock pistol, I'd be pretty reluctant, as well.

14              THE COURT:  Well, okay.  So you're telling me that in

15   your --

16              THE WITNESS:  Or a shotgun.

17              THE COURT:  Or a shotgun.

18              -- in your opinion, if somebody saw someone standing

19   there in the doorway with an AR-15, that that would not deter

20   them from coming in the door?

21              THE WITNESS:  No.  I'm just saying that the sort of

22   relevant question is if we ban AR-15s, do we diminish the

23   protective benefit of gun ownership, and I'm not -- I'm not

24   persuaded that, you know, the alternative weaponry is

25   inadequate to deter criminality.
```

```
 1              And, of course, it's extremely rare that someone would
 2    come into your home to kill you, and I think, you know, about
 3    86 people die that way each year.  Probably a number of them
 4    are involved in some sort of criminality themselves.
 5              And a lot more people get, you know, injured by virtue
 6    of gun accidents and other mishaps with guns than are actually
 7    killed by an intruder coming into a home.
 8              THE COURT:  So how many people are deterred from
 9    coming into a home because they know someone owns a gun or a
10    gun has been brandished in front of them?
11              THE WITNESS:  You know, it's a hard number to
12    estimate, although --
13              THE COURT:  Well, give me the best -- give me the best
14    number you can give me.
15              THE WITNESS:  Yeah.  It's a good question.
16              We certainly don't see, in the United States, lower
17    rates of burglary than in Europe, for example, where gun
18    ownership would be much less and much more restrained.
19              So the relevant question is, you know, if we got rid
20    of guns, we'd be reducing the people who are coming at the
21    homes with guns, as well as reducing the people who have the
22    guns within the home itself.
23              Again, we do know that, you know, about eight-tenths
24    of one percent of the time that someone is confronted in a
25    violent episode they try to use a gun to alter the outcome.
```

1    So it's -- it's overwhelmingly the case that, if there

2    is a violent activity happening, a gun will not be used in a

3    defensive effort.

4        THE COURT:  I can't find it in my notes for some

5    reason, but I know you have a graph showing the rise of mass

6    shootings.  I'm going to try and find it.  I don't remember

7    where that is.

8        THE WITNESS:  Maybe page 26?

9        THE COURT:  26.  Thank you.  Or --

10       THE WITNESS:  Or there's another one by the FBI that I

11   also showed.  Let me see if I can find that for you.

12       THE COURT:  Yeah.  It's one of those linear graphs.

13   It's not --

14       THE WITNESS:  Yeah.

15       MR. DILLON:  Your Honor, it may be page 11 of his

16   declaration.

17       THE COURT:  Page what?

18       MR. DILLON:  Page 11.

19       THE COURT:  Yes, that's it.  That's the one I'm

20   looking for.

21       THE WITNESS:  Okay.

22       THE COURT:  So I'm looking at your number 26 on that

23   page.

24       THE WITNESS:  Yup.

25       THE COURT:  What is that?  What does that represent?

```
 1              THE WITNESS:  So this was the FBI active shooter
 2   report, and they said that there were 26 incidents where
 3   someone was moving into the public space trying to randomly
 4   kill as many people or a lot of people.  So there were 26
 5   incidents that year.
 6              THE COURT:  And that was in 2010?
 7              THE WITNESS:  Yes.
 8              THE COURT:  And then I note that it appears to be a
 9   precipitous drop down to 2011.  To what would you attribute
10   that drop?
11              THE WITNESS:  Yeah.  Well, essentially, there's signal
12   and there's noise in all of this data.  And I think the signal
13   is, sort of -- the upward linear trend that you see starts
14   right after 2004.  But any given year there's a certain amount
15   of variation, and you see that with the numbers jumping up and
16   down.
17              So I don't think anyone has come up with a good
18   explanation of a particular year's active shooters, but the
19   trend is the thing that's most relevant to determinations about
20   what the best legal or policy regime should be.
21              THE COURT:  So, in essence, we really can't determine
22   what it is that caused the rise, for example, from 2000 -- I
23   note in 2000 it's gone up.  2001.  Then in 2001 it drops.  Then
24   it makes this huge increase.  Goes to 2004, then it drops.  And
25   I assume you would probably attribute that to -- well, I don't
```

 1 | know.

 2 |         Then it rises again, then it kind of plateaus, then it

 3 | rises, then it drops, then it rises precipitously, then it

 4 | drops precipitously, then it rises again, and then it drops.

 5 |         So you're telling me that it's hard to decide what's

 6 | causing those oscillations, but for you, your concern is the

 7 | trend; is that correct?

 8 |         THE WITNESS:  Yes.  The trend and when the trend

 9 | really starts to manifest itself.

10 |         So, you know, if you take the average over the period

11 | of the assault weapon ban, it's quite a bit lower, and then it

12 | starts moving up quite sharply thereafter.

13 |         THE COURT:  All right.  So let me see -- this is a

14 | $64,000 question I'm going to telegraph to you.

15 |         You're going to tell me that, in fact, if we were to

16 | look at, starting at 2008 to 2017, we would attribute this

17 | sharp rise in the trend to weapons that are being controlled --

18 | that is, the evil-featured California-compliant -- I'm sorry --

19 | non-evil -- no, no.  Strike that.  Never mind.  That was a

20 | horrible question.

21 |         So you're going to tell me that the reason for the

22 | rise between this 2008 and currently is because there are more

23 | of these assault weapons that have these features that

24 | California is trying to ban; is that a fair statement?

25 |         THE WITNESS:  Well, again, I think, essentially, what

1    you can say is that (inaudible).

2             THE COURT:  We couldn't hear you.

3             THE WITNESS:  Oh, I'm sorry.

4             The way I would frame it is the evidence seems to

5    point in the direction that the elements of the Federal Assault

6    Weapons Ban restrained mass shootings, and when those elements

7    were eliminated, then you started to see this very sharp upward

8    trend.  So that would involve both the allowance of assault

9    weapons as well as high-capacity magazines to be introduced

10   into the public more profusely.

11            THE COURT:  Okay.  Give me just a second.  I think I'm

12   about finished.

13            I mean, I could go on.  Your declaration is very, very

14   interesting.  Full of lots of -- lots of information that an

15   inquisitive mind would want to explore, but I really don't

16   think it's necessary for me to do that.  I'll allow the lawyers

17   to do that at some other time.

18            I just wanted to make sure I wasn't misunderstanding

19   some things in your declaration.

20            All right.  Give me just a minute.

21            (Pause in the proceedings)

22            THE COURT:  All right.  Well, Mr. Echeverria, do you

23   have any questions you wish to ask Professor Donohue?

24            MR. ECHEVERRIA:  I do not, Your Honor.

25            THE COURT:  All right.  Mr. Lee?

1          MR. LEE:  Yes.

2          THE COURT:  Again, reserve your questions to things

3    that I may have asked.

4          MR. LEE:  I will.  I will certainly do that.

5    BY MR. LEE:

6    Q.  Professor Donohue, good afternoon.  This is George Lee.  I

7    am one of the attorneys representing the plaintiffs in this

8    matter.

9          I know you can't see me, but can you hear me okay?

10   A.  Yes.

11   Q.  Great.  I want to follow up on one very discrete issue --

12         MR. LEE:  -- that I know will be brief because

13   Professor Lott is waiting, Your Honor.

14   BY MR. LEE:

15   Q.  You stated -- you told the Court that you were not aware of

16   any mass shootings involving Mini-14s, rifles, since the

17   expiration of the assault weapons ban, right?

18   A.  Yes.

19   Q.  Now, in 1989, in Montreal, Canada, there was a shooting in

20   an engineering school in which an individual walked into an

21   engineering school, separated the men from the women, killed 14

22   women and wounded 14 others.

23         Do you remember that incident?

24   A.  So this was a Canadian mass shooting?

25   Q.  Do you remember that incident?

1    A.   You know, vaguely.  I was sort of focused more on American

2    mass shootings, but I vaguely remember the shooting that you're

3    referring to.

4    Q.   Right.  My question is, did you exclude that in your

5    consideration because it was Canadian or because it was before

6    the expiration of the assault weapons ban?

7    A.   Yeah.  Just because it was -- I mean, the statement I made

8    would apply in both ways, but the analysis that I did was

9    limited to the shootings in the United States.

10   Q.   Right.  And is it your understanding that the individual

11   used a Ruger Mini-14 in that incident?

12   A.   I would -- I would not know off the top of my head what

13   weapon was used in that case.

14   Q.   All right.  Let's talk about one more thing that occurred

15   in more recent years.  It's the shooting in Norway that took

16   place on July 22, 2011.

17        Do you remember that incident?

18   A.   Yes.

19   Q.   And that incident took place in Norway.  The individual

20   killed a bunch of people with a bomb at first, but then ferried

21   to an island and killed a bunch of kids on an island in Norway.

22        Do you remember that incident?

23   A.   I do.

24   Q.   And he wound up shooting -- killing 67 individuals by

25   gunfire.

1    Do you remember that?

2    A.   I remember it was a very large number, but I think he

3    killed like 77 in total, something like that.  But it was a

4    large number, yeah.

5    Q.   Right.  77 total, but I think 67 were killed by gunshots.

6    And he used a combination of a Ruger Mini-14 rifle and a Glock

7    semi-automatic handgun, is that your understanding?

8    A.   You know, the only thing I remember about that shooting --

9    again not a U.S. shooting -- was that he couldn't get the

10   high-capacity magazines in Europe because of the gun laws, so

11   he came to the U.S. to get them -- or purchased them from the

12   U.S., and so people have highlighted that as an example of why

13   restrictions on large-capacity magazines are important in

14   reducing the deaths from mass shootings.

15   Q.   So to answer the question that I asked you, do you remember

16   that he used Ruger Mini-14 and a Glock semi-automatic handgun?

17   A.   You know, again, my piece on the impact of the Federal

18   Assault Weapon Ban was limited to shootings in the United

19   States, so I didn't evaluate that one, and I wasn't aware of

20   the particular weapons that he used, other than the fact that

21   they had a large-capacity magazine.

22   Q.   So you were or were not aware of that fact that he had used

23   a Ruger Mini-14?

24   A.   Yeah.  I didn't look into it, and if you're representing

25   it, then that's your representation.

1   Q.  And I think you answered this question, but is the reason

2   why you excluded that because it was -- didn't take place in

3   the United States?

4   A.  Well, I was trying to estimate the impact of the Federal

5   Assault Weapon Ban, and so I looked at United States data and,

6   you know, that's what my paper was about.  And so any shootings

7   that occurred outside the United States would not have been in

8   the dataset that I had available to me.

9          MR. LEE:  Thank you.  That's all of the questions I

10  have, Your Honor.

11         THE COURT:  Well, Professor Donohue, it is obvious to

12  me that you have done a lot of work in this area.  That you are

13  well-informed, and that you're very interested in the area.

14         I thank you very much for being here this afternoon.

15  It's been a pleasure talking to you.

16         I'm sorry that we had the problems that we did with

17  the video and the audio, and so on, but hopefully it was better

18  than inconveniencing you and putting you into one of those

19  aluminum tubes that flies through the air to come down to see

20  me in God's country.

21         But in any event, it's been a pleasure.  I'm sure we

22  will be seeing you again, because this is not going to be the

23  end of this case, and so I appreciate your taking your time.

24         And unless there's anything else, may this witness be

25  excused?

 1                   MR. DILLON:  Yes, Your Honor.

 2                   THE COURT:  Thank you.  Have a wonderful rest of your

 3    afternoon.

 4                   THE WITNESS:  Thanks so much, Your Honor.

 5                   THE COURT:  You bet.

 6                   (Witness excused)

 7                   THE COURT:  Let's take a little break.  My staff's

 8    been going nonstop for a while.  If you don't mind.

 9                   So let's come back at 10 minutes 'til 4:00.  That

10    gives us about 10 minutes.  Thank you.

11                   (Recess)

12                   MR. ECHEVERRIA:  I was wondering if Mr. Beckington can

13    be re-allowed to enter the hearing?

14                   THE COURT:  Of course.

15                   MR. ECHEVERRIA:  Thank you.

16                   THE COURT:  Mr. Lott is --

17                   MR. DILLON:  He's available in the waiting room.

18                   THE COURT:  Okay.  Mr. Lott, can you see me?  Maybe if

19    I turn my microphone on it might help.

20                   THE WITNESS:  I can hear you, sir.

21                   THE COURT:  All right.  And you prefer to be called

22    Doctor?  Professor?

23                   THE WITNESS:  Whatever you want to call me is fine.

24                   THE COURT:  That's -- one should never say that.

25    Trust me, coming from a guy who's been called all sorts of

 1 | things.

 2 |           THE WITNESS:  I assume, within certain bounds.  So

 3 | anyway.

 4 |           THE COURT:  I'll try to keep it at Professor.  How is

 5 | that?

 6 |           THE WITNESS:  That would be fine.

 7 |           THE COURT:  I have lost you on my screen, but I'm

 8 | looking over my CRD's shoulder.

 9 |           And you can see me, right?

10 |           THE WITNESS:  Yes, I can.

11 |           THE COURT:  Good.  Not that it's terribly important

12 | that you see me, but in any event.

13 |           Well, welcome this afternoon.  My name is Roger

14 | Benitez.  I'm the judge that's been assigned this case.

15 |           Appreciate your being here this afternoon.  I'm going

16 | to try, particularly since it's getting kind of late in the

17 | day, I'm going to try and limit the number of questions that I

18 | ask.

19 |           Before we go any further, if you would do me a favor,

20 | please raise your right hand.

21 |  JOHN LOTT, JR.,

22 |      called as a witness by the Plaintiffs,

23 |      having been duly sworn, testified as follows:

24 |           THE COURT:  Please state your full name and spell your

25 | last name for the record.

1           THE WITNESS:  My name is John Richard Lott, Jr., and

2      my last name is spelled L-o-t-t.

3           THE COURT:  All right.  Professor Lott, I'm going to

4      ask you some questions about your declaration.  I thank you for

5      all of the exhibits attached to your declaration, given the

6      COVID confinement.  It was very helpful to my physical -- my

7      physical fitness program, if you will, having to carry and

8      deadlift all of that weight.

9           I'm going to ask you a question about paragraph 11 of

10     your declaration.  In paragraph 11 of your declaration, it

11     says, basically, that 56 percent of the firearms used in an

12     offense by prisoners were either stolen, 6 percent were found

13     at the scene, 7 percent were obtained off the street or on the

14     underground market, the remainder, 1.6 percent, was obtained in

15     theft from a family member or friend, 1.5 percent obtained from

16     burglaries, 2 percent in theft from retail sources, and

17     3 percent in other unspecified thefts.

18          I assume that number is talking about all firearms,

19     not just the firearms that are at issue in this case, which I'm

20     going to refer to now -- I think it's easier for me to refer to

21     them as California-compliant weapons.

22          THE WITNESS:  Right.  That is correct.  It's a survey

23     that the Bureau of Justice statistics does somewhat regularly,

24     and it refers to all guns that -- that the criminals obtain

25     that are in the prisons.

1              THE COURT:  Do you think it makes any difference -- I

2     mean, as far as my decision-making -- as to whether or not

3     these weapons -- the ban should be sustained or not, does it

4     really make any difference whether the guns were stolen or

5     found or purchased from some other source?

6              THE WITNESS:  No, I really don't think so.  And I

7     think it's a bit much even to limit yourself to what we've seen

8     in the past in the United States.

9              Because even if somehow you could limit criminals

10    getting guns in some particular way, they'll frequently find

11    other ways of going and obtaining the guns.

12             If you look at a country like Mexico, for example,

13    which has had only one gun store in the country since 1972.

14    The most powerful rifle -- most powerful gun that they can

15    legally buy is a .22 caliber short round since that time.

16             You know.  They have very strict licensing.  You know,

17    just -- maybe less than a tenth of one percent of Mexican

18    adults legally own a gun.  You have to pay a fee of over $2,000

19    just to apply for a permit to be able to own a gun.

20             But yet Mexico has a murder rate about six times

21    higher than the murder rate we have in the United States.  And

22    what's happened is is that they've simply gotten guns from

23    around the world.

24             The drug gangs, since they bring in the drugs from the

25    rest of the world, they bring in the weapons that they need to

1    be able to have them.

2           And you have a similar type of thing happen here in

3    the United States.  Even if I can click my fingers and cause

4    all drug -- illegal drugs to disappear and all guns, you'd

5    probably very quickly see, you know, in San Diego or El Paso,

6    illegal weapon and drugs coming back to the country from the

7    drug gangs who bring in the weapons that they need to protect

8    that valuable property.

9           It's not like the drug dealer can go to the police and

10   say, "This other dealer stole my drugs.  Can you help me get

11   them back."  They have to go and set up their own little

12   militaries (inaudible).

13          In Mexico and in the United States, a major source of

14   illegal guns are drug dealers because they have guns themselves

15   in order to go and protect the valuable property that they

16   have.

17          And it's just as hard to stop criminals from getting

18   illegal guns as it is to stop them from buying illegal drugs.

19          THE COURT:  Let me ask you about paragraph 32.

20          Paragraph 32 you say, "However, if you look at

21   murders, the FBI Uniform Crime Reports show that only

22   2.9 percent of firearm murders and 2.1 percent of all murders

23   are committed with any type of rifle.  Not only is this small,

24   but the share fell after the Federal Assault Weapons Ban fell

25   ended.  The percentage of firearm murders with rifles was

1    4.8 percent prior to the ban starting in September 1994,

2    4.9 percent from 1995 to 2004 when the ban was in effect, and

3    just 3.6 percent after that, 3.9 percent if you look at just

4    the first 10 years after the ban ended."

5              How did you arrive at those numbers?

6              THE WITNESS:  Well, you can go to the FBI Uniform

7    Crime Reports, and under their murder category, what they do is

8    they have weapons that are used in different types of murders.

9    And you can go and see --

10             They break it down by handguns, rifles, shotguns,

11   other types of guns, and you can just add them up by year

12   there.

13             And they also give you the total number of firearm

14   murders and the total number of murders.

15             So it's just a question of taking the number of

16   murders committed with rifles, dividing it into the number of

17   firearm murders or the number of total murders that are there.

18             THE COURT:  Does that report break down the type of

19   rifles that were used?  So, for example, from it, can you

20   ascertain if there were what are described as assault weapons

21   or whether they are the AR-type weapons?

22             THE WITNESS:  No, you can't.  There's so few murders

23   in the rifle category there that they don't break it down.

24             I mean, for example, in the latest year you're talking

25   about something like about 200 -- I think it's like 270 murders

1    in the entire country.

2              THE COURT:  Have you conducted any studies to

3    determine whether or not the guns -- the weapons that are

4    banned under the California bans are anymore deadly, in other

5    words, have there been anymore fatalities or injuries using the

6    weapons that are banned in California as opposed to other types

7    of weapons, like the California-compliant AR-15s?

8              THE WITNESS:  Well, I mean, you can go -- I mean, you

9    can't break it down for murders generally for the whole

10   country, because, as I say, they don't break that down.

11             But you can look at things like mass public shootings,

12   for example.  And when you break it down, what you find is that

13   the big things that seem to matter are the number of guns as

14   opposed to the types of guns that are used.

15             And if you -- in any case, if you do a statistical

16   test, if you say, well, how about mass public shootings that

17   are only committed with assault weapons or only involve people

18   that use large-capacity magazines, or only involve multiple

19   weapons, or some combination of those, you don't find any real

20   statistically significant difference in terms of the average

21   number of people that are killed in those attacks.

22             And so like if you look at the murders --

23             THE COURT:  I'm sorry.  You know what?  Okay.  I was

24   having this problem with Professor Donohue earlier.  I don't

25   know if it's your microphone, I don't know if it's that you

 1   looked down or that you're too far away, but every once in a
 2   while we, kind of, lose what you're saying.

 3           So if you would repeat it for us.

 4           THE WITNESS:  Sure.  I'd be happy to.  And I'll try to
 5   speak up more loudly.

 6           So what we can look at is mass public shootings.  We
 7   don't have data on this for murders generally (inaudible).

 8           But one thing you see with mass public shootings --
 9   you can break it down in many different ways.  You can break it
10   down by whether an assault weapon was used, you can break it
11   down by whether only a large-capacity magazine was involved,
12   the number of guns that were involved and -- or some
13   combination of those.

14           And what you find is that if you look at all the mass
15   public shootings from 1998 through now, what you find is that
16   there's no statistically significantly difference in the
17   average way that people are killed by the different combination
18   of weapons or types of weapons that are used in the mass public
19   shootings.

20           And the (inaudible) tell me that if you were to change
21   the type of weapon that they were using, it seems unlikely to
22   me that it's going to make a big difference in terms of the
23   number of people who would be killed in these attacks.

24           If you look at mass public shootings generally, you
25   have 56 percent of the mass public shootings only involve

1    handguns.  You have 13 percent only involve rifles of any type.

2         And then if you go and -- you know, you can go and

3    say, well, how about rifles and other types of weapons?  You

4    can get rifles up to over 20 percent of the attacks, and over

5    80 percent of the attacks involve handguns.  (Inaudible)

6         So I would go and argue, you know, if you want to go

7    and ban all semi-automatic guns, maybe there would be something

8    to talk about there, at least in terms of logical (inaudible),

9    but I think nobody's hopefully talking about banning all

10   semi-automatic guns because semi-automatic guns also make it

11   easier for people to defend themselves (inaudible).

12        COURT REPORTER:  I'm sorry.  "To defend themselves" --

13        THE COURT:  Yes.  I'm sorry.  To defend what?

14        THE WITNESS:  It makes -- semi-automatic weapons make

15   it easier for people to defend themselves.

16        If the alternative is having a manually loaded gun

17   where you have to physically put another shell in the chamber

18   after each shot is fired, people may not have the luxury of

19   time to be able to go and reload the gun if they have multiple

20   attackers that are facing them.

21        You know, I just put together -- or we put together a

22   post on the crime prevention research on our website which just

23   shows in the last few years the number of cases -- there's a

24   number of cases where more than ten shots were fired by people

25   in order to defend themselves, and that usually involves cases

1    where you have multiple attackers.

2          So if you have multiple attackers, or if you fire and

3    miss, or if you fire but don't incapacitate the attacker.

4    Maybe people have to go and manually reload the gun as opposed

5    to having a semi-automatic gun may make it very difficult for

6    them to go and defend themselves.

7          THE COURT:  If you don't mind, out of curiosity, can

8    you tell me how many cases or instances you found where more

9    than ten rounds were fired?

10         THE WITNESS:  Well, I didn't try very hard to look,

11   but the fact (inaudible) 10 cases over the last few years, and

12   they were as many as 40 shots were fired in one of the cases.

13   Others, you know, you may have like 20 shots fired or 15 shots

14   fired.  But basically, they involved cases where somebody has

15   faced multiple attackers.

16         THE COURT:  Yeah.  I'm sorry.  Maybe my question

17   wasn't articulate or maybe I missed what you said.

18         But what I asked was, do you know how many instances,

19   in your study that you just talked about, how many instances

20   where more than ten rounds were fired.  Was it three times --

21   three cases?  Five cases?

22         THE WITNESS:  It was about ten.  I had done this

23   earlier back in 2012.  In December 2012 I found ten cases in

24   that month where ten or more shots were fired by people in

25   self-defense.

```
 1              THE COURT:  And what you're saying is that the number
 2    of rounds that are fired is somewhat dependent upon the number
 3    of --
 4              THE WITNESS:  Attackers.
 5              THE COURT:  I'm sorry?
 6              THE WITNESS:  The number of attackers.
 7              THE COURT:  Yes.
 8              THE WITNESS:  So if you have like four people that
 9    break into your house, it's quite likely that the person is
10    going to end up firing a lot more shots than if only one person
11    breaks into your house.
12              THE COURT:  I was looking at the exhibit at page 18 of
13    your declaration.  And if I understand that exhibit, it seems
14    to -- I believe it shows a decrease of four mass public
15    shootings between 1994 and 2004, and then an increase of three
16    shootings between 2004 and 2014.
17              Do you know how many of those were using the types of
18    weapons that we're talking about in this case, which I assume
19    you know, right?  I mean, you have -- you know the kinds of
20    weapons that we're talking about in connection with this
21    litigation, right?
22              THE WITNESS:  Sure.  Yeah.  I mean, I don't -- haven't
23    memorized each one of those cases.  I have a spreadsheet where
24    I can look them up.
25              But my guess is that they would all be ones that would
```

1   be banned under the California Assault Weapons Ban, because the

2   California Assault Weapons Ban is actually more comprehensive

3   than the federal one, and the definition that was used in

4   deciding whether a gun was an assault weapon here pretty much

5   followed along with what was done in the Federal Assault

6   Weapons Ban.

7          THE COURT:  So wait a minute.  So let me make sure I

8   understand that.

9          So are you saying that, for example, the difference

10   between the two and the five, the two being the mass shootings?

11          THE WITNESS:  Right.  So what you have happen is you

12   have -- did have a drop during that period of time in the

13   number of assault weapons that would be meeting either the

14   Federal Assault Weapons Ban or the State of California Assault

15   Weapons Ban.  So it fell -- it was -- during the ten years

16   prior to the ban, it was six.  During the ten years of the ban,

17   it was two.  And then the ten years after the ban, it was five.

18          But what I would point out, though, is that there are

19   lots of reasons why the number of attacks go up and down over

20   time.

21          And if it was a fact that the assault weapons ban was

22   driving the lower number of attacks overall, then you could

23   have seen a drop in the percentage of mass public shootings

24   using assault weapons during the attack -- during the ban, and

25   you should have seen an increase after the ban ended, but

1    that's not what you observed.  You know, you either observed,

2    basically, no change, or you observed a continued drop over the

3    period of time.

4           The percentage of attacks after the assault weapons

5    ban ended actually involved a lower percentage of assault

6    weapons than -- than -- I mean, you can kind of look at the

7    columns right next to it, and you can see, between the 12 and

8    the 35, there's a bigger increase in the total number of mass

9    public shootings than there is between the two and the five.

10           THE COURT:  I see.  So you're saying that the

11    increase -- okay.  This is sort of beginning to make sense to

12    me.

13           So using assault weapons --

14           THE WITNESS:  If you look at assault weapons by

15    themselves, you'll see a drop that occurs there and then an

16    increase afterwards.

17           THE COURT:  Right.

18           THE WITNESS:  But the way most researchers try to do

19    these types of tests is to say, look, there are lots of factors

20    that we're not controlling for here that are going to be

21    increasing or decreasing the number of mass public shootings.

22           And if it is the law that's driving the change in the

23    number of mass public shootings, it should drive it through

24    lowering the number of mass public shootings involving assault

25    weapons.  And then when the ban's off, it should drive the

1   increase by increasing the percentage of mass public shootings
2   that are using assault weapons.
3           But that's not what you observe.  It continues
4   falling.  In the period afterwards you had an even lower
5   percentage of mass public shootings involving assault weapons.
6           So you can't say that sunsetting the law was what
7   drove the increase there.
8           Was that clear?
9           THE COURT:  Well, not completely, but in the interest
10  of time, I'm going to move on to something else.
11          Looking at page 22, you're using -- I think it's
12  Dr. Klarevas' data.  It appears to me that you're showing that
13  using his data and using the definition of six or more after
14  September --
15          THE WITNESS:  Right.
16          THE COURT:  -- 2004, the number of mass shootings with
17  assault weapons continued to drop; is that fair?
18          THE WITNESS:  Right.
19          THE COURT:  We should have seen an increase if, in
20  fact, the assault weapons ban had had any significant effect,
21  right?
22          THE WITNESS:  That's correct.
23          THE COURT:  Okay.
24          THE WITNESS:  You know, you have to ask what's driving
25  the total?  If the total is being driven by the number of

1    assault weapons then their share has to increase.  But if their

2    share is falling, then, you know, people are substituting into

3    other types weapons to go and do the attack.  It's not the

4    increase in assault weapons that's driving the increase there.

5              THE COURT:  Okay, look.  I have to tell you, I do not

6    understand the graph on page 23 at the bottom.

7              THE WITNESS:  All right.

8              THE COURT:  Can you explain that one to me?

9              THE WITNESS:  Well, these three graphs on 22 and 23

10   all are doing essentially the same thing, it's just they're

11   using different sources of data.

12             THE COURT:  Okay.  All right.

13             And you're still showing a drop in mass public

14   shootings with assault weapons using the FBI data and using the

15   Mother Jones data --

16             THE WITNESS:  That's right.

17             THE COURT:  -- is that right?

18             THE WITNESS:  That's correct.

19             THE COURT:  Just out of curiosity, what gives to the

20   rise -- I note that at the bottom -- the bottom graph, between

21   September 1994 and August of 2004, there is a rise, if you use

22   the FBI definition of four or more killed, so it seems to me

23   that that would be -- there would be a drop, but here it's

24   showing an increase.

25             Do you understand what I'm saying?

1      THE WITNESS:  So, right.  If you use the gray ones

2  there, from the before period to the middle period it increases

3  and then it falls, which is the exact opposite of what, you

4  know, a gun control advocate would go with claiming.

5      So what I would basically say, though, it's not really

6  statistically significant.  If you're going from 22.2 percent

7  to 23.5 percent, you know, that's a one percentage point change

8  in the share of the mass public shootings involving assault

9  weapons.

10     THE COURT:  All right.  So it's not much of an

11  increase.  It may not even be statistically significant.

12     THE WITNESS:  It's definitely not statistically

13  significant.  Not even remotely close.

14     THE COURT:  Okay.  How about the drop from

15  23.5 percent to 18.2 percent?  Is that statistically

16  significant?

17     THE WITNESS:  No.

18     THE COURT:  All right.  Now, I would ask you about all

19  of this other material that you attached, and frankly, I tried

20  to look at some of it, and a lot of it I did not understand.

21  But in order for me to go through that, I think we could be

22  here for days, so I'm not going to do that.

23     I just wanted to get clarification about the things --

24  that which was stated in your declaration.  And I didn't want

25  to get into the specific exhibits because, again, we could be

1   here all day or for weeks.

2            THE WITNESS:  Sure.

3            THE COURT:  I thank you for being available and

4   providing us with additional information.

5            And I'm sorry that I was -- I didn't understand some

6   of what you were referring to.  I apologize for that.

7            Mr. Echeverria, do you have any questions you want to

8   ask?

9            MR. ECHEVERRIA:  I don't have any questions for

10  Mr. Lott at this time.

11           THE COURT:  How about Mr. Lee or --

12           MR. DILLON:  Mr. Dillon.  I do have a question for

13  Mr. Lott.

14           THE COURT:  You do or do not?

15           MR. DILLON:  I do.

16           THE COURT:  Okay.

17  BY MR. DILLON:

18  Q.  Dr. Lott, this is John Dillon, plaintiffs' counsel.

19           Can you hear me all right?

20  A.  I hear you fine.

21  Q.  Okay.  Dr. Lott, did you review the declaration submitted

22  by Professor John Donohue on behalf of defendants?

23  A.  I did.

24  Q.  And are you familiar with the graph and information on

25  active shooter incidents on the rise on page 11 of Mr. Don --

1  or Professor Donohue's declaration?

2  A.  Yes, I have.

3  Q.  Now, do you agree with its conclusion that there is an

4  increasing trend in active shooter incidents?

5  A.  No, I don't.

6  Q.  And can you explain why you don't agree with that

7  conclusion?

8         MR. ECHEVERRIA:  Your Honor, this is John.  Pardon me.

9  I'd like to make an objection.  This exceeds the scope of Your

10  Honor's questioning of Professor Lott.

11         THE COURT:  Yeah, it does.  It does.  The objection is

12  sustained.

13         You can reserve that to when we have a full-blown

14  evidentiary hearing.

15         MR. DILLON:  Not a problem, Your Honor.  Thank you.

16         That's all.  No further questions.

17         THE COURT:  Okay.  I think the only other person that

18  we were going to talk to was Dr. Margulies.  It's kind of late

19  in the day.  Let me see if I can get by without --

20         THE CLERK:  Your Honor, is the witness excused?

21         THE COURT:  Yeah.  I think so.

22         THE CLERK:  Okay.

23         THE COURT:  Dr. Lott, thank you very much for being

24  with us.  Sorry to inconvenience you, and sorry about the

25  awkwardness of doing this by video, but I thank you for being

1   with us, and you're excused.  Okay?  Thank you.

2           THE WITNESS:  Thank you for your time.  Thank you.

3           (Witness excused)

4           THE COURT:  You know what?  I do have a couple

5   questions for him.  Is he available?

6           MR. LEE:  Dr. Margulies is not available today, but he

7   will be available tomorrow morning at 9:30, Your Honor.

8           THE COURT:  You know, I really only have like three

9   questions to ask him, and I think those questions could be

10  probably asked at a full evidentiary hearing in order to get

11  the same result, and I don't think it's necessary for me right

12  now to ask those, so why don't we just call it a day.

13          So unless either one of you has anything else that you

14  want to add?

15          MR. LEE:  No, Your Honor.  That's it.

16          THE COURT:  Okay.

17          MR. ECHEVERRIA:  I do -- Your Honor, this is John

18  Echeverria.

19          THE COURT:  Yes.

20          MR. ECHEVERRIA:  I do have a suggestion.  It may make

21  sense at the conclusion of this evidentiary hearing to have a

22  round of supplemental briefing, given the time between the

23  submissions of the original briefs in connection with the

24  preliminary injunction motion and to account for the testimony

25  that we heard over the past couple days.

1        THE COURT:  I don't have any problems with that, so

2    long as I don't get another one of these.  All right.

3        So how long do you think we should have,

4    Mr. Echeverria, for further briefing?

5        MR. ECHEVERRIA:  Maybe submission of simultaneous

6    briefs in a couple weeks or so?

7        THE COURT:  Excellent.  That's exactly what I was

8    thinking.  Brilliant minds think alike.

9        MR. ECHEVERRIA:  Okay.

10       THE COURT:  Do you folks have problems submitting

11   supplemental briefing within the next couple weeks?

12       MR. LEE:  No, Your Honor.  That would be fine.  And we

13   agree, if there should be supplemental, it should be an

14   exchange of simultaneous briefs.

15       THE COURT:  Great.

16       Glenn, do me a favor and give me a date in two weeks.

17       THE CLERK:  Two weeks from today?

18       THE COURT:  Yes.

19       THE CLERK:  That will be November 5th, Your Honor.

20       THE COURT:  Okay.  Now, I'm so sorry, Mr. Echeverria,

21   that you did not understand, or I'm sorry -- I shouldn't say

22   that.

23       I'm so sorry that I misspoke and misled you into not

24   understanding what I meant by an evidentiary hearing.  Perhaps

25   I said things that caused it to be more restrictive than I was

1   originally intending.

2          I don't want this case to drag on, as I said before, I

3   want this case resolved.  There's important issues, important

4   issues to both sides, to the State and, obviously, to the

5   plaintiffs.  There are constitutional rights that are at stake.

6          I don't want to grant a preliminary injunction, to be

7   honest with you, at this time because we're going to wind up

8   having, basically, the same testimony, same hearing going over

9   all the same ground at the injunction stage.  What I'd rather

10  do is expedite this case.

11         So what I'm going to do is have a hearing --

12         Glenn, give me a date -- let's see -- 90 days would

13  put us, what?  Does that put us past the first of the year?

14         THE CLERK:  About January 21, Judge, would be 91 days.

15         THE COURT:  All right.  January 21 at 10:00 a.m. in

16  this courtroom we will hold a hearing.  I intend to use it as a

17  Rule 65 decision on the merits.

18         Please make sure that you are ready to go, that you

19  have all of your witnesses ready.

20         Glenn, give me a date about 30 days before that.

21  We'll have sort of a pretrial conference, make sure that we've

22  got all our ducks in a row.

23         So obviously, not the Christmas holiday week.

24         THE CLERK:  That is the Christmas holiday week.

25         THE COURT:  Then do it the week before.

1          THE CLERK:  If we can do December 16th, Judge, that

2   would be great.

3          THE COURT:  December 16th.  Okay?

4          Folks, if there is -- I think I mentioned earlier that

5   there might be some exchange of information between the two

6   sides.  If there's going to be, I certainly hope that you can

7   all cooperate and do that without my having to get involved or

8   get our magistrate judge involved in making decisions as to

9   what should be produced and what need not be produced,

10  et cetera.  Okay?

11         So, with that --

12         MR. LEE:  Your Honor.

13         THE COURT:  Huh?

14         MR. LEE:  Your Honor, may I ask some clarifying

15  questions to help the parties greatly?

16         THE COURT:  Yes.

17         MR. LEE:  Two things.

18         With regard to the submission of the supplemental

19  briefs on the preliminary injunction in two weeks.

20         THE COURT:  Yes.

21         MR. LEE:  First, is there a page limitation, and is

22  there a scope of the supplemental briefs that Your Honor would

23  like us to confine ourselves to?

24         THE COURT:  Is there a limitation as to the pages?

25  Well, I think I held up that book and said I don't want another

1    one of those, that's for sure.

2              MR. LEE:  Right.

3              THE COURT:  How about 25 pages.  No more than 25

4    pages.

5              Does that work, Mr. Echeverria?

6              MR. ECHEVERRIA:  That's more than enough, Your Honor.

7              THE COURT:  Okay.  And do you have any suggestions as

8    to the scope that you would like to see to be able to submit

9    supplemental briefing on?

10             MR. ECHEVERRIA:  I can't think of any limitations at

11   this time.  I think any issues that the parties think the Court

12   should consider when examining the constitutionality of the law

13   based on any developments in the laws since the submission of

14   the briefs or the testimony that was presented at the hearings,

15   or if -- I mean, we will try to avoid repetition, but, you

16   know, maybe reinforcing certain themes may be appropriate.

17             THE COURT:  Fair enough.

18             Does that work for you?

19             MR. LEE:  That's fine, Your Honor.  Yes.

20             THE COURT:  Terrific.

21             Hey, listen.  I want to thank you all.

22             MR. LEE:  I'm sorry, Your Honor.  I did have one

23   additional.  I apologize.

24             THE COURT:  That's all right.

25             MR. LEE:  With regard to the hearing that we have on

1    January 21, the Rule 65 decision on the merits.

2              THE COURT:  Yes.

3              MR. LEE:  Is it my understanding that, in that regard,

4    the plaintiffs would bear the burden of persuasion and the

5    defense would bear the burden of -- well, I guess, of defense

6    on that?

7              THE COURT:  How about this.  How about if you submit

8    on your supplemental briefing.  I think it's -- let me just

9    tell you my thoughts on that subject.  Okay?

10             I have no law whatsoever to support this, so I'm just

11   sort of speaking from the top of my head.

12             Prima facie, it strikes me that this law may very well

13   infringe constitutional rights provided for in the Second

14   Amendment.

15             As a freedom-loving, liberty-loving American, I

16   believe that, whenever the government intends to curtail our

17   constitutional rights, they should be the ones that prove why

18   they're doing that and why it's necessary that we do this.

19             Now, I don't know that's the law or not, to be honest

20   with you.  I'm not so presumptuous to tell you that I can

21   remember anything and everything that I've read in my legal

22   career.  Perhaps you can brief that for me and let me know, but

23   it certainly makes sense to me.  And as I think I said earlier

24   today, certainly with regards to certain things, it strikes me

25   that the State would have the best evidence and the best

1     ability to provide evidence with regards to certain things.

2              So I guess my answer to your question is, it depends.

3              MR. LEE:  Haha.  That's what we all are accustomed to

4     saying, Your Honor.  I certainly understand that.

5              I just wanted to know, for purposes of structuring the

6     hearing so that plaintiffs would affirmatively put on their

7     case, and I don't know the extent to which the Court wishes to

8     have testimony that it might have already heard throughout this

9     hearing, but we certainly can be prepared to do --

10             THE COURT:  Well, I think this.  Look.  I'm not an

11    advocate.  I asked questions that I thought were raised by the

12    declarations that caused me to want to know more.  I'm not here

13    to present your case on either side, nor am I here to cross

14    examine witnesses on either side.

15             So my thinking is this:  First of all, at the hearing

16    that we have in December, why don't we talk about how that

17    hearing is actually going to proceed, and then that will give

18    you a better idea, both sides, of how we're going to do the

19    hearing.  Okay?

20             MR. LEE:  Yes.

21             THE COURT:  You will have briefed for me, for example,

22    who bears the burden and who does not, and then we can address

23    those issues at that hearing.

24             I would anticipate you're going to call witnesses,

25    unless you -- perhaps you and Mr. Beckington and Mr. Echeverria

1    can agree that, to the extent that something has already been

2    submitted in a declaration, we don't have to readdress it.  If

3    you can agree on that, and then perhaps simply allow you to

4    cross examine or to supplement what is in the declarations.

5    Okay?

6              MR. ECHEVERRIA:  Your Honor, this is John -- this is

7    John, if I may, Your Honor.

8              THE COURT:  Right.

9              MR. ECHEVERRIA:  I think that makes a lot of sense.

10             Perhaps in advance of the December 16th hearing the

11   parties can meet and confer about what we think the structure

12   should be in terms of how much direct examination may be

13   warranted for particular witnesses, and also agree on the

14   universe of exhibits that would be offered at trial.

15             THE COURT:  Excellent.  Wonderful.  Well, I compliment

16   both sides on your professionalism and your presentations.

17             And again, I apologize, Mr. Echeverria, for anything I

18   may have said that misled you and caused you to perhaps not

19   done certain things.

20             Anyway, all right.  Well, with that --

21             MR. BECKINGTON:  Your Honor?

22             THE COURT:  Yes.

23             MR. BECKINGTON:  I apologize, Your Honor.  Mark

24   Beckington.

25             And I apologize if I'm stealing Mr. Echeverria's

1    thunder, but one question I have is if the Court has any

2    guidance on allowing discovery at this stage.

3           I don't believe we've had the opportunity to depose

4    some of the witnesses, including Mr. Lott.  I would be happy to

5    meet and confer with the plaintiffs.  I'm sure Mr. Echeverria

6    would, also.

7           Does the Court have any thoughts or guidance on that.

8    We would like to have the opportunity to depose some of the

9    witnesses, (inaudible) Mr. Lott, some of the issues raised by

10   his declaration.  But if the Court has any guidance for the

11   parties, I wanted to raise that subject while we were all in

12   the courtroom.

13          THE COURT:  Well, I don't have any -- I'm not opposed

14   to the parties meeting and conferring and agreeing to some

15   discovery, very limited discovery, because this is the kind of

16   case that I can certainly see could turn into a discovery war,

17   and I do not want that to happen because all that does is delay

18   the process.

19          So you guys meet and confer, decide whether or not --

20   maybe the plaintiff wants to depose, I don't know, someone, and

21   maybe you do, too, and you folks can agree on the limitations,

22   and the length, and so on.

23          If you have something you want me to decide, let me

24   know.  I'll do my best to try to decide it.

25          If you want to do it by way of a conference call

1    rather than by way of a motion, save you all a lot of work, I

2    certainly would be available.  You can contact my law clerk and

3    let him or her know.  I'll see what I can do as far as

4    arranging a phone conversation so we can resolve those things.

5    Okay?

6              THE CLERK:  All the hearing dates --

7              MR. BECKINGTON:  Thank you, Your Honor.

8              THE CLERK:  All the hearing dates, everyone's in

9    person?

10             THE COURT:  Yes, please.  No more Zoom or videos or

11   whatever.  Let's have everybody here, and all the hearings are

12   at 10:00.  Okay?  Great.

13             Listen.  Thank you very much.  Have a wonderful rest

14   of your day.  You all take care.  This hearing is concluded.

15             (All say "Thank you")

16             (Proceedings conclude at 4:39 p.m.)

17                              -oOo-

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3            I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11   Dated:  October 29, 2020, at San Diego, California.

12

13

14

15

16                          /s/ Ellen L. Simone

17                          _____
                            Ellen L. Simone, RMR, CRR
18                          Official Court Reporter

19

20

21

22

23

24

25