**EXHIBIT 1**



# LVMPD Criminal Investigative Report of the 1 October Mass Casualty Shooting

## LVMPD Event Number 171001-3519

**Report from the Las Vegas Metropolitan Police Department's Force Investigation Team on the shooting that occurred on October 1, 2017, at 3901 S. Las Vegas Boulevard at the Route 91 Harvest music festival.**

**Joseph Lombardo, Sheriff
Las Vegas Metropolitan Police Department**

**August 3, 2018**

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

(THIS PAGE INTENTIONALLY LEFT BLANK)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## <u>TABLE OF CONTENTS</u>

I.   EXECUTIVE SUMMARY ................................................................7

II.  PEOPLE INVOLVED ...............................................................10

    Victims........................................................................................10

    Suspect .....................................................................................19

    Witnesses.................................................................................20

III. INCIDENT OVERVIEW ...........................................................22

    The Ogden ...............................................................................22

    Mandalay Bay ..........................................................................23

    Route 91 Harvest Music Festival ............................................24

IV.  INVESTIGATION .....................................................................25

    Timeline....................................................................................25

    Detailed Overview ...................................................................38

    Interview Summaries ...............................................................48

        Civilians....................................................................................48

            Shane Calloway (Valet Attendant) .........................................48

            Jesus Campos (Security Officer) ............................................49

            Daniel Cruz (Valet Attendant) ................................................50

            Suzanne Curry (Room Service Attendant)..............................51

            Myrna Gamboa (Guest Room Attendant) ...............................51

            Antonio Hernandez (Guest Room Food Server).....................52

            John Holdridge (Guest Room Attendant).................................53

            Gerard Killeen (Bellman) ........................................................53

            Eun Kyung (Sushi Bar Employee) ..........................................53

            Paul Lacomb (Security Officer)...............................................54

            Kevin Monaghan (Wynn Casino Host).....................................54

            Jorge Morales (Bellman).........................................................55

            Michael Oelke (Assistant Security Manager) ..........................56

            Alan Rautenberg (Wynn Casino Host) ....................................56

            Miguel Sanchez (Security Officer) ..........................................57

            Stephen Schuck (Engineer).....................................................57

            Anthony Sottile (Security Operations Manager)......................59

            Phillip Torrez (Baggage Handler)............................................60

            George Umstott (Security Manager) ........................................60

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

Event: 171001-3519

Shun Zhang (Food Server) ...................................................................61

Police Personnel ..................................................................................61

Sergeant Joshua Bitsko .....................................................................61

Sergeant William Matchko .................................................................62

Detective Stephen Balonek .................................................................63

Detective Casey Clarkson ..................................................................64

Detective Matthew Donaldson .............................................................65

Detective Stephen Trzpis ...................................................................65

Detective Blake Walford ....................................................................66

Officer Bryon Bunitsky .....................................................................67

Officer Brady Cook ..........................................................................68

SWAT Officer Levi Hancock ................................................................68

Officer Marlon Magsaysay ..................................................................69

Officer David Newton........................................................................70

SWAT Officer Sean O'Donnell.............................................................71

Officer Michael Thiele ......................................................................72

Officer Michael Tolbert......................................................................73

Investigative Responsibilities ..................................................................73

FBI ..............................................................................................74

ATF .............................................................................................74

Nevada Gaming Control Board ..............................................................74

Henderson Police Department ...............................................................74

Las Vegas Metroplolitan Police Department ..............................................74

Homicide Section...........................................................................74

Downtown Area Command Patrol Investigative Section............................75

Special Investigations Section (SIS) ...................................................75

Criminal Intelligence Section (CIS) ....................................................75

Counter Terrorism Section (CTS) ......................................................75

Technical and Surveillance Squad (TASS).............................................75

Firearms and Narcotics Group (FANG) .................................................76

Counter Terrorism Analysis Group (CTAG) and Central Intelligence Unit (CIU)........................................................................................76

Las Vegas Village ............................................................................76

Mandalay Bay 32nd Floor......................................................................81

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

100 Wing Hallway .................................................................................................82

Room 32-135 .......................................................................................................83

Foyer inside Room 32-135 ...................................................................................84

West Bedroom (Master Bedroom) ........................................................................84

Sitting Area ..........................................................................................................87

Bar/Kitchenette ....................................................................................................90

Paddock's Vehicle ...............................................................................................94

Paddock's Mesquite Residence ...........................................................................95

Paddock's Reno Residence .................................................................................95

Evidence Recovery ..............................................................................................96

    Mandalay Bay Location ...................................................................................96

        32nd  Floor – 100 Wing – Stairwell Foyer Room ........................................96

        32nd Floor – 100 Wing – Hallway .............................................................96

        32nd Floor – Room 32-135 –  Main Room ..................................................96

        32nd Floor – Room 32-135 –  Bedroom Suite ...........................................103

        32nd Floor – Room 32-134 – Hotel Room .................................................103

        Mandalay Bay – East Valet – Space 317 ..................................................105

        McCarran Airport – Fuel Tanks – E. Mandalay Bay Road/Haven Street ...105

        1372 Babbling Brook Court Mesquite, Nevada (Paddock's House)...........105

        1735 Del Webb Parkway, Reno, Nevada (Paddock's House) ..................106

        Las Vegas Village .....................................................................................106

Ammunition .........................................................................................................106

Firearms Forensic Analysis ................................................................................106

Lock Interrogations .............................................................................................107

DNA.....................................................................................................................107

Digital ..................................................................................................................108

    Evidence Item HP Laptop Computer Recovered in Room 32-134 .................108

        Browser Artifacts.......................................................................................108

        Google Search Queries .............................................................................109

        Bing Search Queries .................................................................................109

    Evidence Item Dell Laptop Computer Recovered in Room 32-135 ................110

        Google Search Queries .............................................................................110

Cellular Phones ..................................................................................................110

Financial Analysis...............................................................................................111

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Suspectology................................................................................................111

    Marilou Danley ....................................................................................112

    Peggy Paddock ...................................................................................114

    Irene Hudson .....................................................................................115

    Eric Paddock .....................................................................................115

    Kerry Marie Paddock...........................................................................117

    Bruce Paddock ...................................................................................117

    Patrick Paddock .................................................................................118

    David Paddock ...................................................................................118

    Jacob Paddock ...................................................................................119

    Vivian Ayers ......................................................................................119

    Paddock's Primary Care Physician ........................................................120

Firearms ...................................................................................................120

Search Warrants and Legal Process.................................................................122

Paddock's Autopsy .......................................................................................123

V.     CONCLUSION .....................................................................................125

APPENDIX A ........................................................................................................128

    Lock Interrogation for Room 32-135 .....................................................128

APPENDIX B ........................................................................................................136

    Lock Interrogation for Room 32-134 .....................................................136

APPENDIX C ........................................................................................................141

    Stephen Paddock's Autopsy Reports.....................................................141

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## I.   EXECUTIVE SUMMARY

On October 1, 2017, at approximately 2118 hours, Mandalay Bay Hotel and Casino (Mandalay Bay) Security Officer Jesus Campos was assigned to check several Hotel Service Optimization System (HotSOS) alarms from various rooms inside the hotel.[1] Room 32-129 was the last of the rooms Security Officer Campos was assigned to check.

Security Officer Campos was on the 30th floor and responded to the 32nd floor via the stairwell in the north end of the 100 Wing. Security Officer Campos attempted to enter the hallway to the 100 Wing, but the door would not open. He took the stairs to the 33rd floor and used the guest elevator to access the 32nd floor. Once on the 32nd floor, Security Officer Campos entered the foyer leading to the stairwell. He discovered an "L" bracket screwed into the door and doorframe that prevented the door leading into the stairwell from opening. Security Officer Campos called his dispatch center with the house phone located in the foyer to report the discovery.

Security Officer Campos heard what he described as a rapid drilling sound coming from Room 32-135 after he hung up the phone. As he walked down the 100 Wing hallway, Campos heard what he described as automatic gunfire coming from the area of Room 32-135 and realized he had been shot in the left calf. He took cover in the alcove of rooms 32-122 and 32-124 and utilized both his cellular phone and radio to notify his dispatch he was shot. Security Officer Campos advised he was shot with a BB or pellet gun. While waiting for other security personnel to arrive Security Officer Campos continued to hear gunfire coming from the room.

Engineer Stephen Schuck finished fixing a water leak on the 62nd floor when he was directed to respond to the 32nd floor in reference to the bracket preventing the stairwell door from opening. Engineer Schuck used the service elevator in the 200 Wing to access the 32nd floor. When he arrived on the 32nd floor, he gathered his tools and equipment and walked from the 200 Wing to the 100 Wing.

As Engineer Schuck walked up the hallway of the 100 Wing, he observed Security Officer Campos poke his head out of an alcove. Engineer Schuck then heard rapid gunfire coming from the end of the 100 Wing hallway that lasted approximately 10 seconds. When the gunfire stopped, he heard Security Officer Campos tell him to take cover. Engineer Schuck stepped into an alcove and gunfire again erupted down the hallway coming from Room 32-135. The gunfire lasted a few seconds then stopped. The gunfire started again after a brief pause, but Engineer Schuck believed it was directed outside and not down the hallway.

Meanwhile, inside the Las Vegas Village over 50 Las Vegas Metropolitan Police Department (LVMPD) personnel were on overtime assignments for the Route 91 Harvest music festival being held at the Las Vegas Village venue. The initial gunshots were heard on an officer's body worn camera (BWC). As the suspect (Stephen Paddock) targeted the concertgoers with gunfire, officers quickly determined they were dealing with an active shooter and broadcast the information over the radio.

---

[1] A HotSOS Alarm is triggered by a guest room door that is left ajar for a predetermined amount of time.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

The crowd inside the Las Vegas Village started reacting to the gunfire, and performer Jason Aldean ran off the stage. Officers and concertgoers began treating victims who were struck by gunfire. They also tried to get concertgoers out of the venue in a safe manner. Officers determined the gunfire was coming from an elevated position, possibly from the Mandalay Bay. Medical personnel were requested for multiple people struck by gunfire.

As the active shooter incident was occurring, two LVMPD officers were in the security office of the Mandalay Bay handling a call for service in reference to two females who were in custody for trespassing. The officers heard the radio broadcast of gunfire at the Route 91 Harvest music festival. Both officers, along with security personnel, exited the security office and responded toward the Las Vegas Village. As they were making their way through the casino, security personnel advised the officers of an active shooter on the 32nd floor of the hotel.[2] The officers then directed security to escort them to that location. The officers and security personnel entered the Center Core guest elevators and were again advised the shooter was on the 32nd floor. The officers made a decision to respond to the 31st floor and take the stairwell to the 32nd floor.

LVMPD officers converged on the Las Vegas Village and Mandalay Bay. Officers formed multiple Strike Teams and entered the Mandalay Bay from various entrance points. A team of officers, including a Special Weapons and Tactics (SWAT) officer, reached the 32nd floor via the stairwell in the 100 Wing. Officers did not hear gunfire coming from Room 32-135. Officers were able to manually breach the "L" bracket on the stairwell door and gain access to the hallway. Officers immediately observed a food service cart, which had wires running under the door into Room 32-134, and prepared themselves for the possibility of an improvised explosive device (IED). The decision was made to use an explosive breach to make entry into Room 32-135.

After a successful breach of the doors to Room 32-135, officers entered and found a male (Paddock) deceased on the floor. Paddock appeared to have a self-inflicted gunshot wound to the head. Officers cleared the remainder of the room and observed numerous rifles in various locations as well as hundreds of expended casings. A second explosive breach was utilized to gain access to Room 32-134 through the connecting doors. Immediately after the breach, a SWAT officer negligently discharged his rifle. Officers cleared Room 32-134, finding several more rifles in the room.

Officers, medical personnel, and concertgoers continued the evacuation of victims in the Las Vegas Village venue. Several triage sites were established in the venue and surrounding area. Injuries ranged from being minor in nature to fatal. Hundreds of wounded were transported to area hospitals by ambulance and privately-owned citizen vehicles.

As the LVMPD's investigative response occurred, it was decided early on (post-shooting) that the LVMPD's Homicide Section would handle the documentation of the venue and 31 bodies found inside the venue and on the exterior perimeter. Homicide detectives worked closely with crime scene analysts and investigators from the Clark County Office of the Coroner Medical Examiner (CCOCME).

---

[2] Information obtained from LVMPD BWC.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

It was further decided the LVMPD's Force Investigation Team (FIT) would take responsibility for the Mandalay Bay crime scene to include the collection of evidence, documentation of the scene, and the collection of Paddock's body. This was all completed with the assistance from the Federal Bureau of Investigation's (FBI) Evidence Recovery Teams (ERT). FBI ERT handled the collection of all evidence related to the Mandalay Bay and the Las Vegas Village venue.

FIT was given primary investigative responsibility over the investigation. The mission of FIT is to provide thorough, accurate, and unbiased criminal investigations related to an LVMPD member's use of deadly force and other qualifying events resulting in death or substantial bodily harm. LVMPD policy states that FIT is responsible for the criminal investigation of deadly force and other high-risk critical incidents resulting in death or serious bodily injury. FIT is the primary investigative unit for any incident wherein the department member, during the course of his/her official duties, is the victim of a violent crime and sustains substantial injury.[3]

During the initial response to both scenes, FIT learned two LVMPD uniformed officers, Brady Cook and Casey Clarkson, were struck by gunfire. Preliminary information was received that Officer Charleston Hartfield was unaccounted for and presumed to have been struck by gunfire as well. Officer Hartfield was attending the festival in an off-duty capacity and assisted concertgoers in escaping the gunfire before he was fatally wounded. These factors are what initiated a FIT response.

In the days, weeks, and months following the 1 October shooting, LVMPD worked, alongside the FBI as well as numerous other local, state and federal agencies, to determine why the shooting occurred. Briefings looked to answer the following two questions:

1)   Was there anyone, other than Paddock who took part in or assisted in the commission of these crimes?

2)   What was Paddock's motive?

This report was derived from the LVMPD's preliminary investigative report that was released on January 18, 2018. The findings from that preliminary report remain accurate and in accordance with this final report. This report was authored to provide the reader with more information about who, what, when, and where. Regretfully, this report will not be able to address the why.

FIT believed it was important to expand upon the suspectology of Paddock. Interviews from family members are summarized in this report to include the Marilou Danley interviews. Early in the investigation, Danley was a person of interest for the LVMPD and FBI to locate and interview.

FIT expanded the sequence of events in this report to provide the reader with a greater knowledge of Paddock's actions leading up to the day of the shooting. There is a strong belief among investigators that the events leading up to 1 October began with Paddock's actions and behavior surrounding his stay at The Ogden Condominiums (The Ogden) located in downtown Las Vegas. Whether he used the Life Is Beautiful music festival as a rehearsal or not, we will

---

[3] LVMPD Department Manual 1/409.01 Internal Oversight and Constitutional Policing Bureau.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

never know. What we do know is the actions and behaviors displayed by Paddock at The Ogden were consistent with those displayed at Mandalay Bay.

Also documented in this report is a detailed account of when Paddock purchased all of his weapons. Summarized are the forensic results from each gun that was recovered from rooms 32-135 and 32-134. This report details which guns were discharged and how many rounds each gun fired. DNA analysis concluded that there were no DNA anomalies to indicate anyone other than Stephen Paddock was responsible.

Note: This is a criminal investigative report. This is not a review of every officer's actions or responses that took place that night. This report is meant to document the facts as to what happened. This report also provides the reader with background information as to the actions taken by investigative personnel. An administrative review, which is an internal process, will address issues surrounding tactics, training, decision making, policy and protocols.

## II.    PEOPLE INVOLVED

**Victims**[4]

Deceased Victims

1) Jack Reginald Beaton
    Age: 54
    Clark County Coroner's Office case number: 17-10060
    Clark County Coroner's Office seal number: 727327
    Time of death: 0545 hours on October 2, 2017

2) Christopher Louis Roybal
    Age: 28
    Clark County Coroner's Office case number: 17-10061
    Clark County Coroner's Office seal number: 727302
    Time of death: 0545 hours on October 2, 2017

3) Lisa Marie Patterson
    Age: 46
    Clark County Coroner's Office case number: 17-10062
    Clark County Coroner's Office seal number: 732484
    Time of death: 0545 hours on October 2, 2017

4) Adrian Allan Murfitt
    Age: 35
    Clark County Coroner's Office case number: 17-10063
    Clark County Coroner's Office seal number: 737364
    Time of death: 0545 hours on October 2, 2017

---

[4] Information was obtained from reports produced by the CCOCME.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

5) Hannah Lassette Ahlers
   Age: 34
   Clark County Coroner's Office case number: 17-10065
   Clark County Coroner's Office seal number: 732473
   Time of death: 0545 hours on October 2, 2017

6) Austin William Davis
   Age: 29
   Clark County Coroner's Office case number: 17-10066
   Clark County Coroner's Office seal number: 727385
   Time of death: 0545 hours on October 2, 2017

7) Stephen Richard Berger
   Age: 44
   Clark County Coroner's Office case number: 17-10067
   Clark County Coroner's Office seal number: 732488
   Time of death: 0545 hours on October 2, 2017

8) Stacee Ann Etcheber
   Age: 50
   Clark County Coroner's Office case number: 17-10068
   Clark County Coroner's Office seal number: 727388
   Time of death: 0545 hours on October 2, 2017

9) Christiana Duarte
   Age: 22
   Clark County Coroner's case number: 17-10069
   Clark County Coroner's seal number: 732404
   Time of death: 0545 hours on October 2, 2017

10) Lisa Romero-Muniz
    Age: 48
    Clark County Coroner's case number: 17-10070
    Clark County Coroner's seal number: 732458
    Time of death: 0545 hours on October 2, 2017

11) Heather Lorraine Alvarado
    Age: 35
    Clark County Coroner's Office case number: 17-10071
    Clark County Coroner's Office seal number: 732423
    Time of death: 0545 hours on October 2, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

12) Denise Cohen
   Age: 58
   Clark County Coroner's case number: 17-10072
   Clark County Coroner's Office seal number: 732474
   Time of death: 0545 hours on October 2, 2017

13) Kurt Allen Von Tillow
   Age: 55
   Clark County Coroner's Office case number: 17-10073
   Clark County Coroner's Office seal number: 732489
   Time of death: 0545 hours on October 2, 2017

14) Brennan Lee Stewart
   Age: 30
   Clark County Coroner's case number: 17-10074
   Clark County Coroner's seal number: 732414
   Time of death: 0545 hours on October 2, 2017

15) Derrick Dean Taylor
   Age: 56
   Clark County Coroner's Office case number: 17-10075
   Clark County Coroner's Office seal number: 732445
   Time of death: 0545 hours on October 2, 2017

16) Kelsey Breanne Meadows
   Age: 28
   Clark County Coroner's Office case number: 17-10076
   Clark County Coroner's Office seal number: 732486
   Time of death: 0545 hours on October 2, 2017

17) Jennifer Topaz Irvine
   Age: 42
   Clark County Coroner's Office case number: 17-10077
   Clark County Coroner's Office seal number: 727384
   Time of death: 0545 hours on October 2, 2017

18) William W. Wolfe Jr.
   Age: 42
   Clark County Coroner's Office case number: 17-10078
   Clark County Coroner's Office seal number: 732415
   Time of death: 0545 hours on October 2, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

19) Carly Anne Kreibaum
    Age: 33
    Clark County Coroner's Office case number: 17-10079
    Clark County Coroner's Office seal number: 732478
    Time of death: 0545 hours on October 2, 2017

20) Laura Anne Shipp
    Age: 50
    Clark County Coroner's Office case number: 17-10080
    Clark County Coroner's Office seal number: 732451
    Time of death: 0545 hours on October 2, 2017

21) Carrie Rae Barnette
    Age: 34
    Clark County Coroner's Office case number: 17-10085
    Clark County Coroner's Office seal number: 727391
    Time of death: 0545 hours on October 2, 2017

22) Jordyn Nicole Rivera
    Age: 21
    Clark County Coroner's Office case number: 17-10101
    Clark County Coroner's Office seal number: 732469
    Time of death: 0545 hours on October 2, 2017

23) Victor Loyd Link
    Age: 55
    Clark County Coroner's Office case number: 17-10102
    Clark County Coroner's Office seal number: 732497
    Time of death: 0545 hours on October 2, 2017

24) Candice Ryan Bowers
    Age: 40
    Clark County Coroner's Office case number: 17-10103
    Clark County Coroner's Office seal number: 732417
    Time of death: 0545 hours on October 2, 2017

25) Jordan Alan McIldoon
    Age: 23
    Clark County Coroner's Office case number: 17-10053
    Clark County Coroner's Office seal number: 732487
    Time of death: 0545 hours on October 2, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

26) Keri Lynn Galvan
Age: 31
Clark County Coroner's Office case number: 17-10054
Clark County Coroner's Office seal number: 732499
Time of death: 0545 hours on October 2, 2017

27) Dorene Anderson
Age: 49
Clark County Coroner's Office case number: 17-10057
Clark County Coroner's Office seal number: 727313
Time of death: 0545 hours on October 2, 2017

28) Neysa C. Tonks
Age: 46
Clark County Coroner's Office case number: 17-10058
Clark County Coroner's Office seal number: 727306
Time of death: 0545 hours on October 2, 2017

29) Melissa V. Ramirez
Age: 26
Clark County Coroner's Office case number: 17-10059
Clark County Coroner's Office seal number: 732407
Time of death: 0545 hours on October 2, 2017

30) Brian Scott Fraser
Age: 39
Clark County Coroner's Office case number: 17-10056
Clark County Coroner's Office seal number: 732408
Time of death: 0545 hours on October 2, 2017

31) Tara Ann Roe
Age: 34
Clark County Coroner's Office case number: 17-10055
Clark County Coroner's Office seal number: 732441
Time of death: 0545 hours on October 2, 2017

32) Bailey Schweitzer
Age: 20
Clark County Coroner's Office case number: 17-10051
Clark County Coroner's Office seal number: 732420
Time of death:  2307 hours on October 1, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

33)  Patricia Mestas
Age: 67
Clark County Coroner's Office case number: 17-10049
Clark County Coroner's Office seal number: 727390
Time of death: 2250 hours on October 1, 2017

34)  Jennifer Parks
Age: 35
Clark County Coroner's Office case number: 17-10052
Clark County Coroner's Office seal number: 727359
Time of death: 2300 hours on October 1, 2017

35)  Angela Gomez
Age: 20
Clark County Coroner's Office case number: 17-10050
Clark County Coroner's Office seal number: 732413
Time of death: 2253 hours on October 1, 2017

36)  Denise Burditus
Age: 50
Clark County Coroner's Office case number: 17-10082
Clark County Coroner's Office seal number: 731590
Time of death: 0047 hours on October 2, 2017

37)  Cameron Robinson
Age: 28
Clark County Coroner's Office case number: 17-10083
Clark County Coroner's Office seal number: 732437
Time of death: 2301 hours on October 1, 2017

38)  James Melton
Age: 29
Clark County Coroner's Office case number: 17-10084
Clark County Coroner's Office seal number: 727311
Time of death: 2320 hours on October 1, 2017

39)  Quinton Robbins
Age: 20
Clark County Coroner's Office case number: 17-10046
Clark County Coroner's Office seal number: 731535
Time of death: 2315 hours on October 1, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

40) Charleston Hartfield
    Age: 34
    Clark County Coroner's Office case number: 17-10086
    Clark County Coroner's Office seal number: 727353
    Time of death: 2230 hours on October 1, 2017

41) Erick Silva
    Age: 21
    Clark County Coroner's Office case number: 17-10087
    Clark County Coroner's Office seal number: 725563
    Time of death: 2230 hours on October 1, 2017

42) Teresa Nicol Kimura
    Age: 38
    Clark County Coroner's Office case number: 17-10088
    Clark County Coroner's Office seal number: 725567
    Time of death: 2230 hours on October 1, 2017

43) Susan Smith
    Age: 53
    Clark County Coroner's Office case number: 17-10089
    Clark County Coroner's Office seal number: 725552
    Time of death: 2230 hours on October 1, 2017

44) Dana Leann Gardner
    Age: 52
    Clark County Coroner's Office case number: 17-10090
    Clark County Coroner's Office seal number: 725569
    Time of death: 2250 hours on October 1, 2017

45) Thomas Day Jr.
    Age: 54
    Clark County Coroner's Office case number: 17-10091
    Clark County Coroner's Office seal number: 725591
    Time of death: 2341 hours on October 1, 2017

46) John Joseph Phippen
    Age: 56
    Clark County Coroner's Office case number: 17-10092
    Clark County Coroner's Office seal number: 725568
    Time of death: 0244 hours on October 2, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

47) Rachel Kathleen Parker
Age: 33
Clark County Coroner's Office case number: 17-10093
Clark County Coroner's Office seal number: 725561
Time of death: 2230 hours on October 1, 2017

48) Sandra Casey
Age: 35
Clark County Coroner's Office case number: 17-10094
Clark County Coroner's Office seal number: 725550
Time of death: 2230 hours on October 1, 2017

49) Jessica Klymchuk
Age: 34
Clark County Coroner's Office case number: 17-10095
Clark County Coroner's Office seal number: 727322
Time of death: 2230 hours on October 1, 2017

50) Andrea Lee Anna Castilla
Age: 28
Clark County Coroner's Office case number: 17-10096
Clark County Coroner's Office seal number: 727381
Time of death: 2301 hours on October 1, 2017

51) Carolyn Lee Parsons
Age: 31
Clark County Coroner's Office case number: 17-10097
Clark County Coroner's Office seal number: 727382
Time of death: 2300 hours on October 1, 2017

52) Michelle Vo
Age: 32
Clark County Coroner's Office case number: 17-10098
Clark County Coroner's Office seal number: 727355
Time of death: 2244 hours on October 1, 2017

53) Rocio Guillen
Age: 40
Clark County Coroner's Office case number: 17-10099
Clark County Coroner's Office seal number: 732409
Time of death: 2318 hours on October 1, 2017

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

54) Christopher Hazencomb
    Age: 44
    Clark County Coroner's Office case number: 17-10105
    Clark County Coroner's Office seal number: 732444
    Time of death: 1044 hours on October 2, 2017

55) Brett Schwanbeck
    Age: 61
    Clark County Coroner's Office case number: 17-10081
    Clark County Coroner's Office seal number: 732471
    Time of death: 1328 hours on October 3, 2017

56) Rhonda M. LeRocque
    Age: 42
    Clark County Coroner's Office case number: 17-10045
    Clark County Coroner's Office seal number: 542385
    Time of death: 0023 hours on October 2, 2017

57) Austin Cooper Meyer
    Age: 24
    Clark County Coroner's Office case number: 17-10047
    Clark County Coroner's Office seal number: 540045
    Time of death: 2257 hours on October 1, 2017

58) Calla-Marie Medig
    Age: 28
    Clark County Coroner's Office case number: 17-10048
    Clark County Coroner's Office seal number: 539069
    Time of death: 2246 hours on October 1, 2017

<u>Living Victims</u>

LVMPD recognizes the approximate 22,000 people who attended the Route 91 Harvest music festival are all victims. That number does not take into consideration the hundreds and possibly thousands who were walking along Las Vegas Boulevard outside the Las Vegas Village venue at the time of the shooting. The goal of FIT was to document those who actually sustained any type of physical injury, regardless of the extent or degree.

FIT used information received from local hospitals and medical facilities, crime scene analysts and detectives who responded to the primary and secondary scenes, and individual police reports to immediately begin compiling a comprehensive list of individuals who sustained physical injuries and individualized detailed accounts of the incident.

Based on the collective information that has been received to date in reference to the 1 October massacre, the following has been ascertained:

**Event: 171001-3519**

In the immediate aftermath of the shooting, victims locally sought treatment at Centennial Hills Hospital Medical Center, Desert Springs Hospital Medical Center, Henderson Hospital, Mountain View Hospital, Southern Hills Hospital & Medical Center, Southwest Medical Associates, Spring Valley Hospital Medical Center, St. Rose Dominican – Rose de Lima Campus, San Martin Campus, Siena Campus, Dignity Health neighborhood hospitals, Summerlin Hospital Medical Center, Sunrise Hospital & Medical Center, Sunrise Quick/Urgent Care, University Medical Center (UMC), UMC Urgent Care, and Valley Hospital Medical Center. Numerous out-of-state medical facilities also reported having treated victims of the 1 October incident.

Fifty-eight people were confirmed deceased; 31 victims were confirmed deceased at the venue and the remaining 27 victims were pronounced deceased at area hospitals. (4 victims were pronounced at Desert Springs Hospital Medical Center; 3 victims were pronounced at Spring Valley Hospital Medical Center; 16 victims were pronounced at Sunrise Hospital & Medical Center; 3 victims were pronounced at University Medical Center; and 1 victim was pronounced at Valley Hospital Medical Center.)

Approximately 869 people sustained documented physical injuries. Of those who sustained injuries, FIT was able to confirm approximately 413 gunshot or shrapnel injury victims. Approximately 360 victims sustained injuries other than gunshot or shrapnel injuries. Approximately 96 people were identified as having sustained an injury, but the type of injury sustained was unable to be confirmed.[5]

**Suspect**

**Stephen Paddock**

An extensive joint investigation involving the LVMPD and the FBI began immediately after the incident into the life of Paddock.

At the time of the attack, Paddock was 64 years old. He owned residences in Mesquite, Nevada (Mesquite) and Reno, Nevada (Reno) and lived with his girlfriend Marilou Danley. Paddock was the oldest of four sons born to Benjamin Paddock and Irene Hudson (Paddock). Paddock's father was arrested and was incarcerated for bank robbery. Paddock and his brothers were raised solely by their mother after Benjamin went to prison.

Paddock graduated high school and college. He worked for the United States Postal Service during his college years. According to friends and family, Paddock began working for the Internal Revenue Service (IRS) after college and later worked for several corporations, performing accounting work. Paddock invested in real estate and made a substantial amount of money.

Paddock heavily invested, monetarily and emotionally, in any activity he began. He obtained his pilot's license and at one point owned an airplane. He learned to scuba dive and bought all

---

[5] These numbers reflect data collected through August 2, 2018. Due to the mass number, types of injuries sustained, and subjects who were treated and released prior to police contact, a definitive number of people who sustained gunshot or shrapnel injuries is not known.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

required gear and equipment. With most of his hobbies, Paddock would quickly lose interest and sell any related equipment.

Paddock was described by many as a narcissist and only cared about himself. Paddock needed to feel important and only cared how relationships would benefit him. He did not have any religious or political affiliations.

Most of the people interviewed acknowledged Paddock's gambling habits. He was known to gamble tens of thousands of dollars at a time and played at numerous casinos in Las Vegas and Reno. Paddock was given complimentary rooms and meals at the casinos he frequented due to the amount of money he gambled.

During the course of the investigation, it was learned Paddock had limited contact with law enforcement. Paddock was stopped by police on occasion for traffic-related offenses, receiving only traffic citations. No arrest history was found for Paddock.

**Witnesses**

The following individuals were identified as key witnesses during the investigation.

**Hotel Employees**

1) Shane Calloway
2) Jesus Campos
3) Daniel Cruz
4) Suzanne Curry
5) Myrna Gamboa
6) Antonio Hernandez
7) John Holdridge
8) Gerard Killeen
9) Eun Kyung
10) Paul Lacomb
11) Kevin Monaghan
12) Jorge Morales
13) Michael Oelke
14) Alan Rautenberg
15) Miguel Sanchez
16) Stephen Schuck
17) Anthony Sottile
18) Phillip Torrez
19) George Umstott
20) Shun Zhang

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## Police Personnel

1) Sergeant Bitsko
2) Sergeant Matchko
3) Detective Balonek
4) Detective Clarkson
5) Detective Donaldson
6) Detective Trzpis
7) Detective Walford
8) Officer Bunitsky
9) Officer Cook
10) SWAT Officer Hancock
11) Officer Magsaysay
12) Officer Newton
13) SWAT Officer O'Donnell
14) Officer Thiele
15) Officer Tolbert

## Friends and Family

1) Marilou Danley
2) Peggy Paddock
3) Irene Hudson
4) Eric Paddock
5) Kerry Marie Paddock
6) Bruce Paddock
7) Patrick Paddock
8) David Paddock
9) Jacob Paddock
10) Vivian Ayers
11) Paddock's primary care physician

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## III.    INCIDENT OVERVIEW

**The Ogden**

On September 17, 2017, Paddock checked into The Ogden where he was booked through September 28, 2017, which overlapped his reservation at Mandalay Bay. The Ogden is a multi-story condominium complex located in downtown Las Vegas. Paddock stayed in three different units during this time.



(Life Is Beautiful venue with The Ogden in the background.)

Paddock's stay at The Ogden coincided with the Life Is Beautiful music festival. Similar to the Route 91 Harvest music festival, the Life Is Beautiful music festival is held in multiple open-air venues within the confines of several city blocks in downtown Las Vegas. The Ogden overlooks several of those city blocks and music venues. Life Is Beautiful lasted from September 22 through September 24.

While staying at The Ogden, Paddock exhibited behavior which was similar to his time spent at Mandalay Bay. Paddock left for long periods of time and moved a large amount of luggage between his vehicle and the rooms he was staying in.[6] Paddock gambled numerous times at downtown Las Vegas casinos.[7] Paddock was also observed moving numerous suitcases from his vehicle to the various units he rented.

---

[6] Information obtained by surveillance video.
[7] Information obtained by surveillance video and staff interviews.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

**Mandalay Bay**

On Monday, September 25, Paddock checked into Room 32-135 of the Mandalay Bay with a scheduled check-out date of October 2. On Friday September 29, Paddock checked into Room 32-134 which connected with Room 32-135 via connecting doors.

From September 25, through October 1, on several occasions, Paddock transported multiple suitcases to his room. Paddock also left the Mandalay Bay on a number of occasions for long periods of time, often returning to Mesquite.



1. Room 32-135
2. Room 32-134
3. Stairwell Foyer
4. Center Core

(Diagram of 100 Wing of the 32nd floor of Mandalay Bay.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**

## Criminal Investigative Report of the 1 October Mass Casualty Shooting
### CONTINUATION

**Event: 171001-3519**

**Route 91 Harvest Music Festival**



October 1 was the final day of the Route 91 Harvest music festival held at the Las Vegas Village concert venue located at 3901 S. Las Vegas Boulevard. The site is an open-air concert venue approximately 15 acres in size. It is bordered by Las Vegas Boulevard to the west, Reno Avenue to the north, Giles Street to the east, and Mandalay Bay Road to the south.

The festival was a three-day, country music concert with multiple entertainers. On October 1, 2017, the concert began at 1500 hours. Jason Aldean, the last performer, was scheduled to take the main stage at 2140 hours. Over 22,000 people were attending the final day of the festival.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## IV.   INVESTIGATION

**Timeline**

The details listed below were gathered from several different sources.[8] For the purpose of this section, the sequence of events will begin on September 17 when Paddock checked into The Ogden and will end with the LVMPD officers making entry into Paddock's Mandalay Bay room. ***All times in this section are approximates based upon different time sources and different timestamps which were all utilized to document this section of the report. All dates and times listed below occurred in the year 2017.***

Between August 27 and September 14, Paddock made several reservations through Airbnb for three different units at The Ogden. Unit 2315 was reserved from September 17 through September 22. Unit 1220 was reserved from September 21 through September 23. Unit 1703 was reserved from September 24 through September 28. All units were north facing and had a view of the Life Is Beautiful event venues which was held from September 22 through September 24.

All units at The Ogden are individually owned and rented out by the owners through a third party. Because of this, check in is not conducted like most hotels. The owner contacts the concierge when a unit is rented and adds the renter to their guest list. The renter picks up a key fob from the concierge when they arrive.

On or around September 9, Paddock made his room reservation for a Vista Suite at the Mandalay Bay, ending in 235 but not a specific floor. On September 20, Paddock's reservation was assigned by computer to Room 33-235. On September 21, Paddock's reservation was changed by computer to Room 32-235. On September 24, Paddock was assigned to Room 32-135.[9]

## September 17 through October 1 [10]

**September 17**

Overview:
Paddock checked into Unit 2315 at The Ogden with a scheduled check-out date of September 22.

- At 2005 hours, Paddock removed a large trash bag from his vehicle. Paddock was observed getting in and out of the elevator with the trash bag.
- At 2014 hours, Paddock was in the parking garage with two roller bags.

---

[8] LVMPD officer BWC's; Uber video; interviews to include officers, civilians, and Mandalay Bay employees; Mandalay Bay video surveillance; lock interrogation documents; cell phone videos and records.
[9] All changes to Paddock's rooms were done by a Mandalay Bay computer without Paddock's knowledge.
[10] Unless otherwise noted, observations or Paddock sightings were captured by video surveillance.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

- At 2250 hours, Paddock was gambling at the El Cortez Casino and had an interaction with a slot attendant and two security guards.
- At 2302 hours, Paddock was with two suitcases at The Ogden.

**September 18**

Overview:
Paddock travelled from Las Vegas to Reno.

- At 0216 hours, Paddock removed a bag from his vehicle.
- At 0428 hours, Paddock was with a suitcase.
- At 0445 hours, Paddock interacted with The Ogden concierge while in possession of a suitcase.
- At 0447 hours, Paddock exited The Ogden with a suitcase.
- From 0449 hours to 0503 hours, Paddock took a ride share to McCarran International Airport.
- From 0600 hours to 0737 hours, Paddock flew to Reno.

**September 19**

Overview:
Paddock travelled from Reno to Phoenix, Arizona (Phoenix). Paddock purchased ammunition from Douglas Haig and drove back to Las Vegas in a rental car.

- From 1240 hours to 1424 hours, Paddock flew from Reno to Phoenix.
- At 1505 hours, Paddock rented a vehicle and departed for Douglas Haig's residence.
- At 1610 hours, Paddock arrived at Haig's residence. He purchased approximately 600 rounds of .308 armor piercing incendiary ammunition from Haig.
- From 1700 hours to 2326 hours, Paddock drove to Las Vegas in the vehicle he rented.
- At 2326 hours, Paddock entered The Ogden with a laptop bag and roller suitcase.

**September 20**

Overview:
Paddock travelled between Las Vegas and Mesquite.

- At 0024 hours, Paddock was in the parking garage of The Ogden with a laptop bag and roller suitcase. Paddock moved his Chrysler Pacifica from the 5th floor of the garage to the 2nd floor and parked near the vehicle he rented.
- At 0027 hours, Paddock transferred items from the rental vehicle to the Chrysler Pacifica.
- At 0051 hours, Paddock returned the rental vehicle. He returned to The Ogden in a ride share.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

- At 0116 hours, Paddock arrived at The Ogden.
- From 0150 hours to 0315 hours, Paddock travelled from Las Vegas to Mesquite.

## September 21

Overview:
Paddock travelled between Mesquite and Las Vegas. Paddock checked into Unit 1220 at The Ogden with a scheduled checkout of September 24. Paddock checked out of Unit 2315 a day early.

- From 2000 hours to 2113 hours, Paddock drove from Mesquite to Las Vegas.
- At 2113 hours, Paddock was in the parking garage of The Ogden with a rolling suitcase and trash bag.
- At 2118 hours, Paddock entered the lobby and had an interaction with an employee at the front desk until 2123 hours.
- At 2354 hours, Paddock had a rolling suitcase.

## September 22

Overview:
Paddock travelled from Las Vegas to Mesquite. At an unknown time during the day, Paddock conducted an online search for "Life is beautiful 2017 Sunday schedule."

- At 0031 hours, Paddock entered the elevator bank from the parking garage at The Ogden with a black suitcase.
- At 0043 hours, Paddock exited the elevator on the 6th floor of the parking garage.
- At 0045 hours, Paddock entered the elevator with a suitcase.
- At 0246 hours, Paddock left The Ogden with a rolling suitcase and black plastic bag and returned to his vehicle.
- From 0250 hours to 0410 hours, Paddock travelled from Las Vegas to Mesquite.
- From 0700 to 0830 hours, Paddock conducted multiple online searches.
- At 1500 hours, the Life Is Beautiful event began in downtown Las Vegas.

## September 23

Overview:
Paddock appeared to spend most of the day in Mesquite.

## September 24

Overview:
Paddock checked into Unit 1703 at The Ogden with a scheduled checkout date of September 28, overlapping his reservation at Mandalay Bay.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

- At 1531 hours, Paddock's vehicle was in the parking garage of The Ogden.
- At 1600 hours, Paddock was at the front desk and checked into Unit 1703.
- From 2115 hours to 2216 hours, Paddock was inside the El Cortez Casino.
- At 2314 hours, Paddock returned to The Ogden.

**September 25**

Overview:
The Life Is Beautiful event ended at approximately 0100 hours. Paddock checked into Mandalay Bay Room 32-135 under his name. Paddock booked the connecting room (32-134) for September 29 through October 2. Paddock was at Mizuya Sushi (inside the Mandalay Bay). He then drove his vehicle from self-park to valet.[11]

- At 0137 hours, Paddock was in the lobby of The Ogden with a plastic bag.
- At 0137 hours and again at 0259 hours, Paddock was walking around The Ogden.
- At 0845 hours, Paddock exited the elevator on the 6th floor of the parking garage with a suitcase.
- At 0915 hours, Paddock was in the lobby of The Ogden with a suitcase.
- From 0928 hours to 1059 hours, Paddock was in the parking garage multiple times rolling suitcase. Paddock's vehicle was on various floors of The Ogden parking garage.
- At 1405 hours, Paddock exited the elevator with a rolling suitcase and took it to his vehicle. Paddock then returned to the elevator.
- At 1414 hours, Paddock exited the elevator with a rolling suitcase and took it to his vehicle. Paddock then returned to the elevator.
- At 1422 hours, Paddock exited the elevator with a rolling suitcase and a laptop bag and took them to his vehicle.
- At 1425 hours, Paddock's vehicle left The Ogden.
- At 1446 hours, Paddock's vehicle entered the Mandalay Bay self-parking area.
- At 1533 hours, Paddock checked into Room 32-135 of the Mandalay Bay.
- At 1656 hours, a bellman met Paddock and escorted him to Room 32-135. Paddock requested to go through the service elevators and not through the guest elevators. According to interviews, this request is not uncommon for guests of the hotel. Paddock rolled one bag, and a bellman used a luggage cart for the other four bags.

---

[11] Confirmed by valet ticket #275263147.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

 

- From 2137 hours to 2140 hours, Paddock had his vehicle retrieved from valet, and Paddock left the Mandalay Bay.
- At 2300 hours, Paddock arrived in Mesquite.

## September 26

Overview:
Paddock spent time at his home in Mesquite, downtown Las Vegas, and Mandalay Bay.

- From 1012 to 1455 hours, according to cell phone records, Paddock's cell phone was located in Mesquite.
- At 1535 hours, Paddock completed a wire transfer in Mesquite of $50,000 from his Wells Fargo account to an account in the Philippines.[12]
- From 2012 hours to 2100 hours, Paddock drove from Mesquite to The Ogden.
- From 2102 hours to 2216 hours, Paddock walked around and gambled at the El Cortez Hotel.
- At 2223 hours, Paddock returned to The Ogden.
- At 2234 hours, Paddock departed The Ogden and drove to Mandalay Bay.
- From 2245 hours to 2252 hours, Paddock valeted his vehicle at Mandalay Bay and took six suitcases (located on a luggage cart) and one rolling suitcase (Paddock rolled the suitcase himself) up to Room 32-135 by way of the service elevator with help of a bellman. (The bellman who escorted Paddock on September 25 was different than the bellman who escorted Paddock on September 26).
- At 2308 hours, Paddock began gambling at Mandalay Bay and continued gambling into the next morning.

---

[12] Information obtained through federal grand jury subpoena.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## September 27

Overview:
Paddock spent several hours gambling at Mandalay Bay. Paddock spoke with his VIP host reference wanting the "Vista Suite" at the end of the hall with the double doors. Paddock was insistent on the suite and connecting room. Paddock wanted to be in the 200 Wing as it had a better view, according to him. Paddock was upset about the room, but he was not angry. Paddock never mentioned the reason why he wanted a connecting room.

- At 0713 hours, Paddock stopped gambling, which he was doing continuously since the previous night.
- At 1556 hours, Paddock placed a room service order for two entrees, totaling $94.33.
- At 1632 hours, Room 32-135 was cleaned by hotel staff. Paddock remained in the room as it was cleaned.
- At 2003 hours, Paddock was seen in the valet area of Mandalay Bay with two rolling suitcases. Paddock had his vehicle retrieved from valet and left the Mandalay Bay at 2015 hours.
- At 2029 hours, Paddock arrived at The Ogden.
- From 2045 hours to 2200 hours, Paddock left The Ogden and drove to Mesquite, where he arrived at 2200 hours.
- At 2300 hours, Paddock arrived at the Walmart in Mesquite. He purchased luggage, razor blades, fake flowers, a vase and a Styrofoam ball.

## September 28

Overview:
In Mesquite Paddock purchased a .308 bolt action rifle, deposited $14,000 into a Wells Fargo account, and wire transferred $50,000 to an account in the Philippines. Paddock visited an unofficial gun range in Mesquite before traveling back to the Mandalay Bay.[13]

- From 0227 hours to 1420 hours, Paddock's cell phone was located in Mesquite according to cell phone records.
- From 1444 hours to 1501 hours, Paddock made a $14,000 deposit at Wells Fargo and transferred $50,000 to a bank in the Philippines.[14]
- At 1523 hours, Paddock purchased a .308 bolt action rifle from a gun store in Mesquite.
- From 1723 hours to 1803 hours, Paddock drove to the area of the City of Mesquite landfill located at 3200 Mesquite Heights Road (The landfill area is also an unofficial gun range in a rural area of Mesquite).
- From 2042 hours to 2146 hours, Paddock traveled from Mesquite to the Mandalay Bay and parked in valet. Paddock entered the Mandalay Bay with two rolling suitcases and a laptop bag.
- At 2218 hours, Paddock began gambling at Mandalay Bay and continued gambling into the next morning.

---

[13] The unofficial gun range was determined to be the City of Mesquite landfill.
[14] Information obtained through federal grand jury subpoena.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## September 29

Overview:
A second refrigerator was delivered to Paddock's room (32-135). Staff was asked to only change linens and take out the trash in Room 32-135. A staff member was told by Paddock not to vacuum Room 32-135 and not to remove the food service cart from the room. Staff was asked specifically to change sheets and towels and inform Paddock when they were finished. Paddock remained in Room 32-135 and used his laptop as the rooms were being cleaned.

- At 0543 hours, Paddock stopped gambling, which he was doing continuously since the previous night.
- From 1228 hours to 1314 hours, Paddock ate at Mizuya Sushi and then returned to Room 32-135.
- At 1400 hours, rooms 32-135 and 32-134 were cleaned by hotel staff.
- At 1506 hours, Paddock checked into Room 32-134 (under Danley's name) from the VIP check-in counter at the Mandalay Bay.
- At 1508 hours, Paddock took the guest elevator to the 32nd floor.
- At 1509 hours, Paddock entered Room 32-134.
- From 1509 hours to 0100 hours (September 30), Paddock remained inside rooms 32-134 and 32-135.
- At 2311 hours, a room service ticket totaling $102.99 was charged to Room 32-134.

## September 30

Overview:
Paddock traveled to Mesquite twice from Mandalay Bay. Paddock placed "Do Not Disturb" signs on both rooms 32-135 and 32-134. Paddock gambled for a couple of hours and brought more suitcases up to his room.

- At 0100 hours, Paddock drove to Mesquite.
- At 0556 hours, Paddock returned to the Mandalay Bay with four suitcases.
- From 1204 to 1215 hours, hotel staff serviced the private minibar of Room 32-134. (Paddock placed the "Do Not Disturb" signs on the room doors after 1215 hours.)
- Between 1300 to 1400 hours, Paddock was asked if he would like rooms 32-135 and 32-134 cleaned. Paddock declined.
- From 1452 hours to 1508 hours, Paddock removed his vehicle from valet and parked in the self-parking garage.
- At 1512 hours, Paddock exited the parking garage elevator with two suitcase rolling bags.
- At 1520 hours, Paddock was seen in a guest elevator with the two rolling suitcases and took them to his room.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



- At 1952 hours, Paddock drove from Mandalay Bay to Mesquite and arrived at 2057 hours.

## October 1

Overview:
From 0206 to 2040 hours, Paddock departed Mesquite and returned to Mandalay Bay. He spent several hours gambling, brought more suitcases to his room, and ordered room service.

- At 0206 hours, Paddock left Mesquite.
- At 0305 hours, Paddock arrived at the self-parking garage at the Mandalay Bay.
- From 0324 to 0734 hours, Paddock walked around the casino and gambled. Paddock used his own and Marilou Danley's player's cards.
- At 0737 hours, Paddock returned to his room.
- From 1222 to 1226 hours, Paddock moved his vehicle from the self-park garage to valet. This valet transaction was the only parking transaction during his stay at Mandalay Bay that was completed in Danley's name.[15]
- At 1229 hours, Paddock was observed waiting for an elevator with two rolling suitcases. There was also a third bag hanging from one of the rolling suitcases.
- At 1233 hours, a room service ticket was opened for Room 32-134.
- At 1317 hours, Mandalay Bay valet parked Paddock's vehicle in "Garage East", space #317.[16]
- At 1337 hours, the room service ticket in Danley's name was closed out for Room 32-134.[17] The check totaled $67.60 and included two entrees.
- From 1423 to 1940 hours, the doors for Rooms 32-134 and 32-135 were manipulated multiple times. For example, the doors were opened, closed, and the dead bolt locks were engaged and disengaged several times.

---

[15] Valet ticket #275274484.
[16] This is the same space detectives located the vehicle in after the shooting.
[17] Room service ticket #51592684.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

**From 2040 to 2205 hours, a series of events led up to the mass shooting conducted by Paddock:**

- At 2040 hours, a HotSOS alarm was generated for Room 32-129.
- At 2118 hours, the HotSOS call was assigned to Security Officer Campos via his cellphone. Security Officer Campos was assigned five HotSOS calls during the 2118 hours cellphone call. According to interviews of hotel staff, it is common practice to assign HotSOS calls to security officers and then immediately close out the HotSOS tickets prior to a security officers actually checking out the room. Security Officer Campos handled the HotSOS call for Room 32-129 last.
- At 2136 hours, the dead bolt to Room 32-135 was engaged.
- At 2140 hours, Jason Aldean started his performance at the Route 91 Harvest music festival.
- At 2146 hours, the dead bolt to Room 32-134 was engaged.

**2146 to 2204 hours**

- Security Officer Campos entered the service elevator at 2146 hours and got off on the 30th floor at 2147 hours.
- Security Officer Campos walked to the stairwell in the 100 Wing of the 30th floor and walked up to the 32nd floor.
- Security Officer Campos could not gain entry to the 32nd floor due to the door being barricaded.[18]
- Security Officer Campos walked up the stairs to the 33rd floor. Security Officer Campos walked down the 100 Wing of the 33rd floor to Center Core. He took a guest elevator to the 32nd floor.
- At 2200 hours, Security Officer Campos exited the guest elevator and walked up the 100 Wing toward Room 32-129. Security Officer Campos checked Room 32-129 and found it was secure. Security Officer Campos walked into the foyer leading to the stairwell and observed the "L" bracket screwed into the door and frame.
- At 2204 hours, Security Officer Campos picked up a house phone located inside the small foyer leading to the stairwell and called security dispatch to report the "L" bracket on the door to the stairs. Security dispatch transferred the call to maintenance dispatch. The maintenance dispatcher then transferred Security Officer Campos to the maintenance supervisor's cell phone.

---

[18] The investigation would reveal the door leading from the stairwell to the 32nd floor was barricaded by an "L" bracket screwed into the door and the door frame.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

From 2205 to 2216 hours, Paddock committed a mass casualty shooting that left 58 people dead and over 800 hundred injured:

**2205 hours**

- Engineer Schuck was contacted by the maintenance dispatcher via his radio.
- Paddock fired two single gunshots into the Las Vegas Village area.
- Paddock fired an undetermined amount of gunshots into the Las Vegas Village area.

**2206 hours**

- Security Officer Campos ended the phone call and hung up the house phone. After hanging up the phone, Security Officer Campos heard what he described as rapid drilling noises.
- Paddock fired approximately 100 rounds into the Las Vegas Village area.
- Security Officer Campos began walking down the 100 Wing toward Center Core.
- Engineer Schuck was told by his supervisor to go to the 32nd floor.
- LVMPD unit 169SE broadcast over the Convention Center Area Command (CCAC) radio channel, "169SE, we got shots fired, 415A at the Route 91. Sounded like an automatic firearm."
- Paddock fired rounds down the hallway at Security Officer Campos. Security Officer Campos was struck in the left calf with a bullet fragment. He took cover in the alcove between rooms 32-122 and 32-124.[19]
- Security Officer Campos told his dispatcher via his radio, "Hey, there's shots fired in, uh, 32-135."
- Engineer Schuck's dispatcher told him specifically where to go on the 32nd floor. Engineer Schuck left the 62nd floor and walked to the service elevators with his equipment cart. The service elevators are located in the 200 Wing of the hotel.

**2207 hours**

- Paddock fired approximately 95 rounds into the Las Vegas Village area.
- LVMPD Officers Varsin and Hendrex left the Mandalay Bay Security Office with two armed Mandalay Bay security officers.
- Paddock fired approximately 100 rounds into the Las Vegas Village area.
- Paddock fired approximately 94 rounds into the Las Vegas Village area.

**2208 hours**

- Paddock fired the first round at the fuel tank (missed tank).
- LVMPD CAD Event 171001-3519 was generated for the shooting incident.

**2209 hours**

- Paddock fired the second round at the fuel tank (missed tank).
- Paddock fired the third round at the fuel tank (missed tank).

---

[19] Information determined through the investigation and contradicts the statement by Campos.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

- Paddock fired the fourth round at the fuel tank (missed tank).
- Paddock fired the fifth round at the fuel tank, first strike into the fuel tank (top strike).
- Paddock fired the sixth round at the fuel tank, second strike into fuel tank (lower strike). The investigation was unable to determine when the seventh and eighth rounds were fired at the fuel tank.[20]
- Paddock fired a number of rounds into the Las Vegas Village area.



(McCarran International Airport fuel tank with bullet strikes.)




(Upper bullet strike.)



(Lower bullet strike.)

**2210 hours**

- Engineer Schuck arrived at Center Core of the 32nd floor and walked up the 100 Wing toward Room 32-135. As he walked, Engineer Schuck heard what he believed to be a jackhammer sound in the distance. Engineer Schuck quickly realized it was automatic

---

[20] Sequence determined through audio of Uber video. There were eight .308 casings located inside of Room 32-134.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

gunfire.[21] After the gunshots stopped, Security Officer Campos yelled at Engineer Schuck to take cover.
- Engineer Schuck turned and took cover in the alcove between rooms 32-117 and 32-119. Paddock fired rounds down the hallway at Engineer Schuck. He was not struck by gunfire. Engineer Shuck attempted to open Room 32-117 with his master key card; however, the dead bolt lock was engaged, and he was unable to gain entry into the room.
- Engineer Schuck stated over his radio, "Shannon, call the police. Someone's firing a rifle on the 32nd floor down the hallway."

### 2211 hours

- LVMPD officers Varsin and Hendrex arrived at Center Core area of the 31st floor and began walking up the 100 Wing, along with armed security officers from Mandalay Bay.
- Paddock fired approximately 80-100 rounds into the Las Vegas Village area.
- Paddock fired approximately 95 rounds into the Las Vegas Village area.

### 2212 hours

- Two armed Mandalay Bay security officers exited the guest elevator on the 32nd floor and went to Center Core.
- Paddock fired approximately 80-90 rounds into the Las Vegas Village area.
- Paddock fired an unknown number of rounds into the Las Vegas Village area. LVMPD officers Clarkson and Cook were struck by gunfire during this volley.
- Officer Hendrex and a Mandalay Bay security officer advised over their respective radios they were on the 31st floor and could hear rapid gunfire above them.

### 2213 hours

- Paddock fired an undetermined number of rounds into the Las Vegas Village area.

### 2215 hours

- Paddock fired two separate volleys of an unknown number of rounds into the Las Vegas Village area.

### 2216 hours

- LVMPD officers Varsin and Hendrex, along with Mandalay Bay security officers, made entry into the stairwell on the 31st floor.

---

[21] The investigation determined at the time Engineer Schuck heard the gunfire, Paddock fired approximately 21 rounds at the Las Vegas Village area.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

**2217 hours**

- Two LVMPD officers reach the 32nd floor via the guest elevators. Neither officer heard any gunfire after they exited the elevator.

**2218 hours**

- The heat detection indicator from inside Room 32-135 detected no further readings.

**2241 hours**

- A Strike Team, which included Sergeant Bitsko, Officer Newton, SWAT Officer Hancock, and Detective Walford ascended the stairs from the 30th floor. The Strike Team made entry and cleared the 31st floor.

**2256 hours**

- The Strike Team reentered the stairwell from the 31st floor and walked up to the 32nd floor.

**2257 hours**

- Sergeant Bitsko and SWAT Officer Hancock manually breached the door barricaded with the "L" bracket.

**2320 hours**

- The Strike Team conducted an explosive breach into Room 32-135 and made entry. The Strike Team reported Paddock was down from an apparent self-inflicted gunshot wound to the head.

**2326 hours**

- The Strike Team made a second explosive breach from inside of Room 32-135 into Room 32-134 through the connecting doors. Immediately after the explosive breach, an LVMPD SWAT officer negligently fired a three-round burst from his rifle. The rounds fired from the SWAT officer's rifle struck a chair, an entertainment center/cabinet, and a wall.

After the Strike Team finished rendering rooms 32-134 and 32-135 safe, the scene was secured until investigative personnel arrived and assumed control of the 32nd floor.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

**Detailed Overview**

During the course of the investigation, law enforcement personnel conducted numerous recorded interviews with LVMPD employees, casino employees, and citizens.

Along with the recorded interviews, written voluntary statements were obtained. These consisted of people attending the Route 91 Harvest music festival, people in the area at the time of the incident, and others with knowledge of the events. LVMPD asked employees to document their actions for those involved with the incident.

The following information was taken from witness statements and compiled into a chronological description of the events:

On October 1, 2017, LVMPD had 51 personnel assigned to work special events overtime for the Route 91 Harvest music festival. The personnel staffing consisted of a lieutenant, 5 sergeants, 44 officers, and a civilian. The event had officers staffed from 1300-0100 hours with officers arriving and securing at various times.

The specific assignments for the event were:
- West traffic (a sergeant, 10 officers)
- East traffic (a sergeant, 10 officers)
- Interior entry/gates (a sergeant, six officers)
- Interior early squad (a sergeant, eight officers)
- Interior late squad (a sergeant, eight officers)
- Event coordinator (an officer)
- Command post (an officer, a civilian)

The assignments were supervised by Lieutenant Spencer, who was designated as the incident commander for the festival.

At approximately 2118 hours, Mandalay Bay Security Officer Campos was working his normal duties when he was notified of several HotSOS calls in the 100 Wing tower where he was assigned to monitor. Once an alarm is received, the standard operating procedure for the Mandalay Bay security staff is to call the room and attempt to contact the guest. If there is no answer, a security officer will be sent to check the door. HotSOS calls are common and occur numerous times throughout the day. The security dispatcher will typically close the alarm out once a security officer is assigned. Security Dispatcher Brett Buck notified Security Officer Campos to check several HotSOS calls. Room 32-129 was last on his list to check.

Security Officer Campos was on the 30th floor and en route to Room 32-129 via the stairwell located at the north end of the 100 Wing. Security Officer Campos attempted to enter the foyer from the stairwell and discovered the door was secured and unable to be opened. The doors are to remain unlocked since the stairwell is a fire escape. The door has a handle but no locking mechanism.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Security Officer Campos stated he walked down the stairwell to the 31st floor, entered the hallway, and walked to Center Core. He used the guest elevator to go to the 32nd floor. (Video surveillance showed Security Officer Campos took the stairwell up to the 33rd floor, then took a guest elevator to access the 32nd floor.)




(Door secured by "L" bracket from stairwell and inside foyer.)

Security Officer Campos proceeded directly to the end of the 100 Wing hallway, opened the inner door of the foyer entrance to the stairwell, and observed the "L" bracket screwed into the doorframe and door that opens into the stairwell. He realized this is what kept the door secured. Security Officer Campos utilized the house phone mounted inside the foyer to notify the security dispatcher of the bracket. The information was passed to the engineering section.



(100 Wing hallway from Center Core toward Room 32-135.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



(Door leading from 100 Wing hallway into foyer and stairwell.)

Security Officer Campos hung up the phone, heard what he described as a loud rapid drilling sound coming from Room 32-135. He believed the drilling sounded like it was coming from deep inside the room.

While walking toward Center Core, Security Officer Campos heard gunfire coming from Room 32-135 and ran down the hallway. Security Officer Campos realized he was shot in his left calf as he took cover in the alcove of rooms 32-122 and 32-124. Using both his radio and cell phone, Security Officer Campos advised the security dispatcher he had been shot in the leg with a BB or pellet gun and was injured. He stayed in the alcove while on his phone with the dispatcher waiting for help. Security Officer Campos heard more gunshots coming from inside Room 32-135, but no rounds were coming down the hallway.

As country music performer Jason Aldean performed on stage, LVMPD officers working the interior of the event heard what they described as fireworks going off. Officer Hutchason and Special Events Coordinator Rodriquez, who were in the command post with security personnel, used the video monitors to look for the source of the noise. Upon recognizing the source of the noise to be gunfire, Coordinator Rodriquez directed all officers to change their radios to the Convention Center Area Command (CCAC) radio channel. Coordinator Rodriquez monitored both the Events radio channel and CCAC radio channel throughout the incident.

LVMPD officers inside the Las Vegas Village recognized the sounds were coming from the southwest. Part of the crowd started to move toward the exits. Shortly after hearing the initial

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

gunfire, LVMPD officers heard the first long burst of described automatic gunfire. Once officers recognized the sound to be gunfire, they immediately searched for the gunman.

Security personnel along with LVMPD officers Hendrex and Varsin were in the security office of Mandalay Bay with two females being detained for trespass. They became aware via the radio of an active shooter call. Security Manager Oelke headed toward the Luxor side of the property when another call came over the radio that a security officer had been shot with a pellet gun in the tower of the Mandalay Bay.[22]

Security Manager Oelke ran to Center Core guest elevators of the Mandalay Bay and met with security managers Sottile, Umstott, and LVMPD officers Hendrex and Varsin. As they arrived at the elevators, Engineering Supervisor Shannon Alsbury was holding the elevator door open. Engineering Supervisor Alsbury used a key to lock out the elevator and keep it from being stopped by guests trying to get on. There was conflicting information being broadcast on the exact location of the shooter(s), whether it was on the 29th, 31st, 32nd or the 33rd floors. While on the elevator, they decided to check all the floors.

As the door opened on the 31st floor, security managers Oelke and Umstott and LVMPD officers Hendrex and Varsin exited and walked up the 100 Wing upon hearing gunshots coming from an unknown direction. Security Manager Sottile and Engineering Supervisor Alsbury continued to the 32nd floor on the elevator.

At the Las Vegas Village, LVMPD officers observed the crowd move away from the southwest portion of the venue. They believed an active shooter was in that area. As officers moved toward the stage, they heard several more bursts of gunfire. Officers directed citizens to get on the ground as they looked for a gunman. As officers moved through the crowd, they observed several citizens wounded and deceased. Officer Polion advised LVMPD Dispatch of shots fired and multiple casualties. The radio traffic was accidently broadcast on South East Area Command (SEAC) radio channel.

Officers assigned to the venue near Reno Avenue and Las Vegas Boulevard began to move south along Las Vegas Boulevard. They believed the gunfire was coming from the south end of Las Vegas Village. As they moved southbound, officers directed civilians away from the area. The officers received direct gunfire and took cover behind a wall as bullets impacted around them. Between bursts of gunfire, officers evacuated civilians and administered first aid to the wounded.

Officers assigned to the venue near Mandalay Bay Drive and Las Vegas Boulevard heard the initial gunshots followed by a long burst of gunfire. Detective Balonek, who was on Mandalay Bay Drive east of Las Vegas Boulevard, believed the gunfire was coming from inside the Las Vegas Village or from an elevated position. He retrieved his binoculars from his vehicle and scanned the north-facing tower of Mandalay Bay. Approximately three-quarters of the way up the tower on the north end, Detective Balonek observed a silhouette of a male standing in a shooting position several feet back from a window. Detective Balonek could not see muzzle flashes; however, he did observe smoke. Detective Balonek could not broadcast on the radio,

---

[22] Security Officer Campos.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

due to heavy radio use by other officers, so he switched to the Northeast Area Command (NEAC) channel and broadcast the shooter's location.

At the same time inside Mandalay Bay, Engineer Schuck was in a room on the 62nd floor, fixing a water leak when he was directed by his radio dispatcher and supervisor to respond to the 32nd floor stairwell in the 100 Wing to remove the "L" bracket that Security Officer Campos had called and reported. Engineer Schuck utilized the 200 Wing service elevator to go down to the 32nd floor. He gathered his tools needed to remove the bracket and walked through the Center Core from the 200 Wing to the 100 Wing. Engineer Schuck walked approximately one-third of the way up the hallway when he observed Security Officer Campos poke his head into the hallway from a space between two rooms on Engineer Schuck's right-hand side.

Engineer Schuck heard the sound of rapid gunfire coming from the end of the hallway. Security Officer Campos looked out from his position and yelled for Engineer Schuck to take cover. Engineer Schuck immediately took a step to his left into the alcove between two rooms. Gunfire erupted down the hallway toward his direction. Engineer Schuck felt the concussion of the rounds pass where he was taking cover. An unknown object struck him in his back without causing injury other than a small bruise. Engineer Schuck also stated he could see blood coming from Security Officer Campos' calf area.

Below on the 31st floor, LVMPD officers Varsin and Hendrex, along with security managers Oelke and Umstott, walked up the 100 Wing when they heard gunfire coming from the 32nd floor. As they moved from Center Core toward Room 31-135, several volleys of gunfire could be heard. When they reached the area of Room 31-134, Officer Hendrex instructed everyone to move back. Officers Varsin and Hendrex, along with the security managers moved back and took cover in an alcove. They remained in the alcove for just over two minutes.

After leaving the alcove, they moved to the stairwell at the end of the hall. As they got closer to the stairwell, the gunfire continued, and they smelled gunpowder. They entered the 100 Wing stairwell and posted in that location.

Detective Clarkson, assigned to the event in uniform, was on Las Vegas Boulevard north of Mandalay Bay Drive when he heard the initial shots and radio traffic advising of multiple casualties inside the Las Vegas Village. Detective Clarkson and other officers took cover and began searching for the shooter, believing the shots were coming from the west. As patrol cars and a prisoner transport van arrived at the intersection, Detective Clarkson and other officers moved toward the vehicles for cover with the intention of moving toward Mandalay Bay.

CCAC patrol officers responded to the scene to assist. Officers Cook and Haynes arrived near Las Vegas Boulevard and Mandalay Bay Drive and parked their patrol vehicle. Officers Cook and Haynes moved towards the group Detective Clarkson was with.

As the officers moved behind the patrol vehicles, they started receiving direct gunfire which impacted the ground and patrol vehicles around them. Detective Clarkson received a gunshot wound to the neck while taking cover behind a patrol vehicle. Officer Cook was struck by a bullet in his right bicep that continued into his chest.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

While behind the vehicles, officers realized the gunfire was coming from an elevated position and was directed at the patrol vehicles. During breaks in the gunfire, officers moved in teams of two from the patrol vehicle to a block wall for better cover. Detective Clarkson and Officer Cook were both transported to hospitals by separate LVMPD vehicles.



(LVMPD vehicles struck by gunfire.)

As the gunfire continued, officers inside the event moved through the Las Vegas Village and provided direction for people trying to exit. This included the actions of Officer Hartfield who was attending the concert in an off-duty capacity and was mortally wounded while taking police action. Officers located wounded persons, began first-aid measures, and coordinated medical efforts with off-duty medical personnel who were attending the concert.

Officers also directed people towards exits and toward positions of cover and concealment. Exterior officers on the east side of the Las Vegas Village were swarmed by people as they fled the gunfire. Officers directed them to continue east and north as they recognized the gunfire was coming from Mandalay Bay. As officers began to encounter wounded civilians, casualty collection points were set up and first aid was rendered. Officers assisted in getting the wounded to hospitals via ambulances, private vehicles, and patrol cars.

Exterior officers on the west side of the Las Vegas Village along Las Vegas Boulevard encountered people as they fled the venue. Officers knew the gunfire was coming from Mandalay Bay and directed people to stay behind cover and move to the north, away from gunfire. Officers

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

encountered several wounded people and provided first aid until they could be taken to medical personnel. As officers moved south, they formed Strike Teams and moved toward the Mandalay Bay.

Sergeants Richmond, Riddle, and Van Nest each formed Strike Teams, consisting of overtime officers and patrol officers who responded the venue. The Strike Teams moved west across Las Vegas Boulevard and into the parking lot of the Luxor Hotel, then south onto the Mandalay Bay property. Upon entering Mandalay Bay, Strike Teams coordinated efforts with other LVMPD officers and security personnel already inside the casino.

As Strike Teams entered the hotel through the main valet, they met hotel security and were directed to the Center Core guest elevators. Each group was given information the shooter was possibly on the 29th, 30th, or 31st floors, and they were escorted via elevator. After each group of officers were taken to the upper floors, they instructed the hotel security guards to lock out the elevators. A Strike Team, which included two SWAT officers, was taken to the Foundation Room located on the top floor. Once inside the bar, officers evacuated occupants to a safe location and cleared the area.

On the 32nd floor, Security Officer Campos and Engineer Schuck were still pinned down in the hallway. Engineer Schuck heard another round of rapid gunfire and believed it was being fired toward the outside of the building. During a small break in the gunfire, Engineer Schuck and Security Officer Campos ran from their position back towards Center Core. Engineer Schuck was checked for injuries by Engineering Supervisor Alsbury who arrived on the 32nd floor with armed Mandalay Bay security officers. Engineer Schuck stated the gunfire continued for several long rapid volleys with short breaks between. He described the breaks in fire lasting only 5 to 6 seconds before the gunfire would continue.

As LVMPD officers arrived on the 32nd floor they proceeded down the 300 Wing. Officers made entry into rooms and searched for occupants. Engineer Schuck redirected the officers to the 100 Wing where the shooting occurred. The sound of gunfire had ceased. The officers transitioned from active shooter protocol to barricaded subject protocol and began slowly and methodically evacuating guests from their hotel rooms.

After hearing the update of the shooters location, SWAT Officer O'Donnell and two patrol officers left the Foundation Room and responded to the 32nd floor. Upon exiting the elevator, they encountered several officers already on the floor. The officers moved up the hallway toward the suspect's room.

Engineer Shuck locked out the elevators to keep guests from ascending the tower.

Police personnel on the 32nd floor included a sergeant, a SWAT officer, officers assigned to work the Las Vegas Village, and responding officers from various area commands. As occupants were evacuated from their rooms, they were moved to the elevator bank and down the tower. Officers discovered a small infant alone in one of the rooms. As evacuations continued, the nanny for the infant was located in a room across the hall and reunited with the child. The officers stopped evacuations approximately two-thirds of the way up the hall.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

At the Las Vegas Village, officers encountered people who were hiding in multiple locations and evacuated them. Additional teams of officers arrived and swept the remaining areas of the Las Vegas Village. Once evacuations were completed, the scene was secured.

SWAT Officer Hancock, along with Sergeant Bitsko and Officer Newton, went to the 31st floor and ascended the stairs to the 32nd floor. In the stairwell, they met with LVMPD Officers Hendrex and Varsin and Mandalay Bay security personnel. SWAT Officer Hancock attempted to open the first of two doors to enter the hallway but could not due to the "L" bracket.



("L" bracket after the door was manually breached.)

SWAT Officer Hancock and Sergeant Bitsko manually breached the inner door leading to the foyer of the 32nd floor. Once in the foyer, the door leading to the 100 Wing hallway was cracked open enough to see the doors to rooms 32-135 and 32-134. Both doors were closed, and a room service cart was located in front of Room 32-134. A white tablecloth was draped over the service cart with various items on top of the tablecloth. Officers observed wires leading from the service cart to Room 32-134 and believed the suspect may have set an IED.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



(Food service cart from foyer between 100 Wing hallway and stairwell.)

A decision was made to enter Room 32-135 utilizing an explosive breach and the other officers in the area were notified. No gunfire had been heard from the suspect's room for approximately 40 minutes. Officers decided entry was necessary to the room to determine if the suspect was still inside and to stop any further shooting. SWAT Lieutenant Huddler was advised by SWAT Officer Hancock that the door to Room 32-135 was going to be breached using explosives. Officer Newton stepped into the hallway and utilized a ballistic shield to provide cover for SWAT Officer Hancock as he set the breach on the door while Sergeant Bitsko covered the door to Room 32-134. Sergeant Bitsko observed a camera on the food service cart in the hallway. He covered the camera and turned it away from the doorway while SWAT Officer Hancock hung the explosive on the door to Room 32-135. Once the charge was hung on the door, the officers returned to the stairwell.



(Bullet holes in door to Room 32-135 prior to breach.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

The approval for the breach was given by SWAT Lieutenant Huddler. The officers were notified over the radio that the door to Room 32-135 was going to be breached and to take cover. Sergeant Bitsko utilized the ballistic shield to keep the door, from the foyer to the hallway, open in case the explosion damaged it. SWAT Officer Hancock observed approximately 12 officers in the stairwell behind him. He designated those who would be make entry into the suspect's room, the other officers would be a Downed Officer Rescue Team.

The entry team consisted of Sergeant Bitsko, Officer Newton, SWAT Officer Hancock, and officers Donaldson, Trzpis, and Walford. Officers Burns and Thiele were assigned to post at the door upon the team's entry to guard the hallway. The explosive breach was made into Room 32-135 and broadcast over the radio. The officers opened the stairwell door far enough to see the doorway to Room 32-135. They observed the breach was successful. Inside the room, they observed a rifle with a scope and bipod on the floor just inside the door. The officers waited for approximately 30 seconds before leaving the stairwell to see if there was any reaction from the suspect.

Moving slowly and methodically, Officer Newton entered first into the hallway with the shield followed by the officers from the stairwell. SWAT Officer O'Donnell and Officer Magsaysay joined the Strike Team as they entered the suspect's room.

From behind the shield, the Strike Team entered into Room 32-135. The team split into two teams. Team 1 went left into a bedroom and cleared it. Team 2 went right, encountered the suspect lying on the floor and relayed that information. After clearing the bedroom, Team 1 held at the doorway into the main living area.

Team 2 encountered Paddock lying on his back on the floor. A small frame revolver was observed on the ground above Paddock's head. Apparent blood was located on the revolver, and a pool of blood had formed around Paddock's head. The officers believed Paddock had a self-inflicted gunshot wound. The large window at Paddock's feet was broken out, and the curtain was blowing into the room. On the floor next to Paddock's feet was a small sledge hammer, and Paddock was laying on top of a rifle. The officers also observed numerous rifles, shell casings throughout the living area, and several loaded magazines.

Team 2 continued through the living area to the right and encountered a locked door leading to the connecting Room 32-134. Team 1 moved through the living space up to Team 2. SWAT Officer Hancock and Officer Walford attempted to kick the door open but determined it was a solid wood door inside a metal frame. It was decided a second explosive breach was needed to gain entry into the connecting room.

SWAT Officer Hancock breached the door. Immediately following the explosive breach SWAT Officer O'Donnell had an unintentional discharge of a three-round burst from his rifle. Officers in the hallway heard the shots fired and broadcast shots had been fired inside the room. Officers flooded into Room 32-134 through the breached adjoining connector door.

**Event: 171001-3519**

As Room 32-134 was cleared several rifles were found inside the room. A small hallway separated the main area of the room from the bathroom and main door. Another food service cart draped in a white tablecloth was in the hallway.
A laptop computer was on the cart and showed a live feed of the hallway. Inside the room, one of the large windows was broken out.

Both rooms were searched a second time to ensure a person was not hiding under any furniture. Several suitcases were observed throughout the rooms. Many of the suitcases contained loaded magazines. Officers observed a camera attached to the peephole on the main door of Room 32-135.

Sergeant Matchko was in the hallway and entered the rooms once they were cleared. Along with officers still in the room, Sergeant Matchko secured the crime scene. Sergeant Matchko was contacted by the command post and directed to locate any information in reference to Paddock. Sergeant Matchko told officers to look throughout the room in an attempt to locate any cell phones or identification for Paddock. These items were located, as well as several room keys and player cards in the name of Paddock and Danley. Pictures of the items were taken and sent to the command post as ordered. The officers rolled Paddock onto his side to check his pockets for identification but found none. After the search for identification was completed, the officers exited and secured the room.

Outside, officers cleared the Las Vegas Village, multiple reports of active shooters along Las Vegas Boulevard at various hotel properties were broadcasted. Various officers joined Strike Teams and left to address those reports. As the active shooter reports were cleared and determined to be unfounded, officers assigned to the Las Vegas Village returned to the command post.

Officers assigned to the Las Vegas Village remained on post until they were relieved the next morning. Officers maintained the security of the Las Vegas Village and the 32nd floor of the Mandalay Bay crime scenes as detectives and crime scene analysts responded and began the investigation.

**Interview Summaries**

The following are interview summaries of key witnesses. Although numerous interviews were conducted after the attack on October 1, not all interviews conducted are summarized in this report. The summaries are not verbatim.

Civilians

**Shane Calloway (Valet Attendant)**

On October 4, at approximately 1218 hours, detectives DeAngelis and Downing conducted an audio recorded interview with Shane Calloway inside the Mandalay Bay. Below is a summary of the interview.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

On October 1, at approximately 1226 hours, Calloway was working in valet when Paddock arrived in his Chrysler van. Calloway approached Paddock's van to welcome him. Paddock was alone in the van and Calloway asked Paddock if he was checking in. Paddock stated he already had a room and started to give Calloway the room number. Calloway stopped Paddock by telling him he only needed the name on the room. Paddock stated the room was under Marilou Danley's name.

Calloway stated nothing stood out in reference to Paddock's behavior and did not remember seeing him with any bags. The only thing Calloway thought was strange was the fact Paddock checked his vehicle in under Danley's name.

**Jesus Campos (Security Officer)**

On October 4, at approximately 1255 hours, detective Penny conducted an audio recorded interview with Jesus Campos inside the Mandalay Bay. Also present was his union Representative. Below is a summary of the interview.

Campos is an unarmed security guard for the Mandalay Bay and was working his shift. Campos stated at approximately 2200 hours, he was advised by his dispatch to check a HotSOS alarm. The alarm location was Room 32-129. Campos went to the floor using the stairwell at the end of the tower. Upon reaching the 32nd floor, he was unable to open the door from the stairwell, which was unusual.

Campos stated he walked down to the 31st floor and came back to the 32nd from the elevator. Campos walked directly to the stairwell door which is next to Room 32-135. Upon opening the hallway door to the stairwell, he saw the secondary door leading to the stairs was secured with a metal bracket. He contacted his security dispatch, inquired about it and was told to contact maintenance. Campos was told by maintenance they knew nothing about it.

While Campos was standing at the stairwell doors, he started to hear an industrial drill sound coming from inside Room 32-135. Campos walked from that location toward Center Core of the floor and stated he was near Room 32-129 when he heard gunfire behind him. As Campos started running, he was struck in the left calf. Campos hid in the alcove of rooms 32-121 and 32-123 as he broadcast over the radio and called into his dispatch reporting gunfire and that he was shot.[23] Campos stated the gunfire was coming from Room 32-135. As Campos hid, he heard more gunfire coming from up the hall.

Campos stated three armed security officers were sent to his location. While in the hallway, he started hearing more gunfire which he believed lasted about 10 minutes. He believed the gunfire was being directed outside. Campos waited until he did not hear any more gunfire from the room before he decided to run to Center Core.

As Campos arrived at Center Core, he made contact with four Metro officers. Campos gave them information about the location of the shooter. He told the officers the suspect was shooting

---

[23] Determined to be rooms 32-122 and 32-124 during the investigation.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

through the peephole. Campos then went to the lower level of the hotel and received medical attention.

Campos stated when checking the stairwell door, he did not remember seeing a room service cart in the hallway outside of Room 32-135. He also stated while pinned down, he never peeked out and looked in the direction of the room for fear of being shot. Campos did not leave the alcove until after the gunfire stopped. The only suspicious noise he heard from Room 32-135 was the drilling.

Campos did not see the suspect (Paddock) during the incident.

**Daniel Cruz (Valet Attendant)**

On October 3, at approximately 1959 hours, detectives DeAngelis and Downing conducted an audio recorded interview with Daniel Cruz inside the Mandalay Bay. Also present for the interview was MGM Attorney Ashley Eddy. Below is a summary of the interview.

On September 26, Cruz was working in valet. Paddock arrived in a van, and Cruz greeted him. Cruz stated he knows Paddock because he is a regular at the Mandalay Bay and always tells the valet attendants his name is "Stephen with a PH Paddock." Cruz was not 100% sure if Paddock was by himself. Cruz described Paddock as a friendly guy who usually tipped five dollars.

Cruz stated he was working on Friday, September 29, and saw Paddock in the valet area standing next to his vehicle with a short Asian female. Cruz believed Paddock was drunk, and the Asian female was happy and nice. Cruz asked Paddock where he was coming from and he replied, "That concert across the street." Paddock gave Cruz five dollars and Cruz left. Cruz stated he was 100% sure it was Paddock and he was 100% sure it was Friday because he took Saturday (September 30) off. Cruz could not remember what Paddock or the Asian female were wearing, and nothing "stuck out" from his interaction with Paddock.

On October 5, at approximately 1046 hours, detectives DeAngelis and Downing along with MGM Attorney Ashley Eddy interviewed Cruz a second time. Detective DeAngelis explained to Cruz that they wanted to question him again reference the interaction he had with Paddock on Friday, September 29. Detective DeAngelis told Cruz he had some time to think about it, referring to the last interview, and then asked Cruz if he was "100% positive what you told us or has anything changed." Cruz replied, "No, it's the same."

Cruz explained he wasn't sure if the female with Paddock was Danley, but Paddock was with an Asian female. The female was driving the vehicle, and Paddock was the passenger. As Cruz explained how they were in the vehicle when he observed them, an unknown female interrupted the interview with detectives and the interview and recording stopped.[24]

---

[24] The interview was stopped due to an interruption and resumed shortly after.

**Event: 171001-3519**

At approximately 1049 hours, the interview with Cruz continued with the same persons present. Cruz continued to explain how he interacted with Paddock who was possibly drunk and how the Asian female was laughing.

Detective DeAngelis asked Cruz if he knew a guy named Phil Torres. Cruz stated he knew him and that Torres was a baggage handler. Detective DeAngelis asked Cruz if he saw Torres on that night (September 29) and Cruz responded, "Um, I don't even know." Detective DeAngelis explained to Cruz that he interviewed Torres and Torres told Detective DeAngelis he saw Paddock on the night of September 29. Torres stated Paddock was alone and not drunk. Detective DeAngelis explained they were having a difficult time finding a recorded video surveillance file of the interaction Cruz was describing on video.

Detective DeAngelis asked Cruz if it could have been a mistake in identity reference seeing Paddock on September 29. Cruz stated it could have been a mistake in identity, and he was only "50/50, 50%" sure that it was Paddock. Eddy asked Cruz how much the tip was that he received from the "individual." Cruz stated it was a couple dollars. Detective DeAngelis asked Cruz if he ever referred to Paddock by his name when he spoke with him, and Cruz responded, "No-no." Detective DeAngelis asked Cruz what the Asian female looked like, and Cruz responded, "Asian." Cruz then described her as being approximately 4'11" to 5'2" with dark hair.

*Note: Throughout the investigation detectives were not able to corroborate Cruz's story. None of the surveillance video showed the interaction between Paddock and Cruz. Detectives have evidence that shows Paddock arriving alone at the Mandalay Bay valet on September 28, at approximately 2146 hours and not leaving the property until September 30, at 0100 hours.*

**Suzanne Curry (Room Service Attendant)**

On October 3, at approximately 1651 hours, detective DeAngelis conducted an audio recorded interview with Suzanne Curry inside the Mandalay Bay. Also present for the interview was Detective James Downing.  Below is a summary of the interview.

Suzanne Curry has been an employee of the Mandalay Bay since its opening. On October 1, Curry worked as a room service attendant and was given check #51592684, to take to Room 32-124. Curry knocked on the door, which was answered by a male, who was later identified as Paddock. The name on the ticket was Danley, and Curry addressed him as Mr. Danley (which he did not correct). Curry stated that Paddock did not appear to want to talk or engage in conversation. While inside the room, Curry did not notice anything out of the ordinary or suspicious. She also did not notice any other people inside the room or signs that another person was in the room with him.

**Myrna Gamboa (Guest Room Attendant)**

On October 4, at approximately 1707 hours, detectives DeAngelis and Downing conducted an audio recorded interview with Myrna Gamboa inside the Mandalay Bay. Also present for the interview was MGM Attorney Ashley Eddy and Mandalay Bay employee Catherine Kaufman to assist with language translation. Below is a summary of the interview.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Detectives asked Gamboa if she worked on Wednesday September 25. On that day, Gamboa went to Room 32-135 due to the guest (Paddock) requesting five extra towels. Upon going to the room and knocking on the door, Paddock answered the door and allowed her to enter. While in the room, he requested a new mini refrigerator and cleaning of the room due to a previous guest leaving food items in the refrigerator.

While cleaning the room, Gamboa saw luggage in the main suite area which consisted of approximately five bags, maybe more. After cleaning the main suite, Paddock asked for new linens on the bed. While changing the linens, Gamboa did not see any luggage in the bedroom. While there, room service delivered food to Paddock.

Gamboa stated Paddock would stare at her while she cleaned, and he asked her on two occasions if she was okay. She stated Paddock was the only person in the room. She observed an open laptop surrounded by papers on a table, but she never saw any guns or bullets.

On October 13, at approximately 1613 hours, Detective Hodson conducted a second audio recorded interview with Gamboa at the Mandalay Bay. Also present for the interview was an FBI agent and Mandalay Bay employees Ryan Yanagi, Perlette Jura and Andrew Harlett. Below is a summary of the interview.

Gamboa stated on September 25, she went to clean Room 32-135. The guest (Paddock) only wanted the bathroom cleaned and bed sheets changed. Gamboa did not see any trash to be taken out nor did she remove any trash from the room. While in the room, Paddock was on a laptop computer until room service arrived. As Paddock ate, he continued to watch Gamboa.

Gamboa did not see any other guests in the room. The only bags she saw were neatly stacked up. Gamboa only cleaned the room on this date.

**Antonio Hernandez (Guest Room Food Server)**

On October 3, at approximately 1737 hours, detectives DeAngelis and Downing conducted an audio recorded interview with Antonio Hernandez inside the Mandalay Bay. Below is a summary of the interview.

Hernandez worked as a food server on September 27, at approximately 1700 hours, when he received a service ticket to deliver food to Room 32-135. Hernandez stated Paddock opened to door to the room. Hernandez asked him, "How are you? How's your day going?" but Paddock did not answer him.

Hernandez walked into the room, past the bar, and asked Paddock, "Where you want me to put your order?" He replied, "No, just leave it here." Paddock tipped him ten dollars and Hernandez left.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Hernandez stated he did not see anything suspicious inside Room 32-135, including bags, computers, etc. Hernandez stated the service ticket was for two people; however, Paddock was alone inside the room.

### John Holdridge (Guest Room Attendant)

On October 4, at approximately 1208 hours, detectives DeAngelis and Downing conducted an audio recorded interview with John Holdridge inside the Mandalay Bay.  Below is a summary of the interview.

Holdridge stated on September 29, he received a call to "freshen" Room 32-134 because the occupant (Paddock) stated he smelled something. Upon going to the room, Holdridge stated there was no one inside. While inside the room, Holdridge put out air freshener. He did not see any luggage or clothing in the room, and the adjoining door, between rooms 32-134 and 32-135 was closed. Holdridge did not hear any noises from Room 32-135 and never saw or had contact with Paddock.

### Gerard Killeen (Bellman)

On October 3, at approximately 1518 hours, Detective DeAngelis conducted an audio recorded interview with Gerard Killeen inside the Mandalay Bay. Below is a summary of the interview.

On September 26, at approximately 2247 hours, Killeen received a run ticket to deliver luggage. Killeen stated he took the luggage cart by himself to a room (32-135). Upon arriving at the room, Killeen knocked and the door was answered by a male (Paddock). Killeen propped the door open with a door stop and brought the luggage cart into the room.

Killeen stated as he unloaded the luggage cart, Paddock helped him remove items, which was not unusual. Killeen stated there was luggage on the cart as well as some non-luggage items( possibly a box). While unloading, none of the items Killeen moved were particularly heavy.

While in the room, Killeen only saw Paddock, and the brief conversation with him was not unusual.

### Eun Kyung (Sushi Bar Employee)

On October 4, at approximately 1306 hours, detectives DeAngelis and Downing conducted an audio recorded interview with Eun Kyung inside the Mandalay Bay. Below is a summary of the interview.

On September 29, at approximately 1330 hours, Kyung was working at the sushi bar when Paddock arrived at the restaurant. Kyung stated Paddock sat at a table alone and ordered two rolls and a glass of water. Kyung knows Paddock by face and name due to Paddock frequenting the sushi bar in the past.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

Kyung stated Paddock charged his bill to his room and tipped her in cash. While at the restaurant, he did not talk to anyone or use his cell phone. He only sat at the table and watched TV.

**Paul Lacomb (Security Officer)**

On October 11, at approximately 1457 hours, Detective Hodson conducted an audio recorded interview with Paul Lacomb inside the Mandalay Bay. Also present for the interview was Mandalya Bay representative Howell.  Below is a summary of the interview.

Lacomb works as an armed security guard and has worked at Mandalay Bay for three years. On October 1, at approximately 2200 hours, he responded with his partner Miguel Sanchez to another security officer who was shot with a pellet gun or BB gun on the 32nd floor of the hotel. As they were on their way to the elevator, he heard over the security radio channel that there was an active shooter at the festival lot across the street.

Once they arrived on the 32nd floor, Security Officer Campos was running toward them as they entered Center Core from the elevators. Lacomb saw that Security Officer Campos had a small wound to his calf that appeared to have been caused by a BB gun or pellet gun. The wound was just dribbling a little bit of blood and appeared to have stopped bleeding. He stated that it only took them 3 to 4 minutes to respond to the 32nd floor from when they were first dispatched.

Lacomb heard numerous shots being fired from the end of the hallway. The shots were coming from a room near the end of the hallway but were not coming towards Center Core.

A few minutes after Lacomb arrived, LVMPD officers arrived on the floor. Lacomb stayed at Center Core to assist with whatever police needed. He was on the floor for over 11 hours until relieved and never went down to the suspect's room.

**Kevin Monaghan (Wynn Casino Host)**

On October 7, at approximately 1531 hours, Detective Jex conducted an audio recorded interview with Kevin Monaghan at the Wynn Corporate Security Offices. Also present for the interview was Detective Sergeant MacDonald, an FBI special agent, and Wynn Attorney Donald Jude Campbell. Below is a summary of the interview.

Monaghan is employed as a casino host for the Wynn Las Vegas. Approximately 5 to 6 years ago, Paddock was assigned to him when another host left the company. During his first encounter with Paddock, Monaghan stated Paddock seemed to be an introvert, did not have a girlfriend, and really enjoyed gambling. Paddock was described as a "high-end roller."

Over the years, Paddock never asked for anything out of the ordinary. Monaghan described him as an easy going customer, would always pay his markers on time, and never complained. For the first few years, Paddock was always alone when he came to the casino.

**Event: 171001-3519**

Approximately 3 years ago, Monaghan met Danley who Paddock introduced as his girlfriend. From that meeting forward, Paddock and Danley would come to the hotel together and gamble. Monaghan never saw anyone else with Paddock or Danley at the hotel.

During the time Monaghan knew Paddock, there was never any conversations about guns, explosives, politics, or current events. The last time Monaghan saw Paddock and Danley was August 2017 when they came to the hotel for a slot tournament.

**Jorge Morales (Bellman)**

On October 6, at approximately 1705 hours, Detective Patton conducted an audio recorded interview with Bellman Jorge Morales inside the Mandalay Bay. Also present for the interview were two FBI special agents and MGM Attorney Ashley Eddy. Below is a summary of the interview.
Morales has been a bellman at the Mandalay Bay since the day it opened. He works Friday through Tuesday from 1400 to 2200 hours.

On September 25, Morales was working his shift and received a service ticket from the registration desk to escort Paddock and his bags to Room 32-135. Morales remembered Paddock from past stays but didn't know anything specific about him. Morales introduced himself to Paddock and confirmed the room as 32-135.

Paddock requested to stay with his bags and use the back elevators or service elevators. Morales stated Paddock's request to use the service elevators was not unusual. He explained it's not uncommon for VIP guests to be escorted through the service elevators.

Paddock had regular luggage bags with him and nothing was unusual. The bags were on the service cart, and Paddock rolled one bag himself. Morales asked Paddock if he wanted to walk in front of him and he said, "No." Paddock followed Morales to the service elevators which run in the 200 Wing of the hotel. When they arrived on the 32nd floor, Paddock followed Morales to Room 32-135, which was located in the 100 Wing of the hotel.

When they arrived at the room, Morales asked Paddock if he would like him to take his bags to the back of the room. Paddock responded, "No, just leave them here" (at the front entry way of the room). Morales asked Paddock if he could get him anything for the room like ice or any directions, and Paddock said, "No." Morales stated Paddock was quiet and polite, nothing out of the ordinary, pretty low key, and normal.

When Morales removed the bags from the cart, the bags were normal weight, not lighter or heavier than usual, and Paddock did not react to Morales handling the bags. Paddock gave Morales a tip, and he left.

Morales was asked if he had any other contact with Paddock, and he replied, "No."

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

### Michael Oelke (Assistant Security Manager)

On October 11, at approximately 1556 hours, Detective Hodson conducted an audio recorded interview with Assistant Security Manager Michael Oelke. Also present for the interview was an FBI special agent and MGM Attorney Ashley Eddy.  Below is a summary of the interview.

Oelke stated he has worked for the Mandalay Bay for 12 years and is an assistant security manager on swing shift. On October 1, at approximately 2200 hours, officers had two females in custody in the security office of the building. They had requested an LVMPD patrol unit to assist with the trespass.

Officer Hendrex and his trainee (Officer Varsin) arrived and began to write the females citations. During that time, security dispatch reported a possible active shooter at the Luxor, then changed it to the Route 91 Harvest music festival.

The two LVMPD officers, security officers Oelke, Umstott, and Sottile also responded. While heading across the casino floor, they received information over their security radios that a security officer had been shot in the leg with a pellet gun on the 32nd floor.

They received information that the shooter was on the 31st floor and they exited the elevator on this floor. Oelke stated they were walking up the 100 Wing of the 31st floor from Center Core when he heard automatic gunfire. He described three breaks in the gunfire from what he believed was an automatic rifle. The tones of gunfire sounded different to him and that one of the volleys sounded like a higher powered rifle than the others.

As they arrived at the entrance to the stairwell from the 31st floor, the last volley of gunfire was occurring. The gunfire stopped, and he then heard a single gunshot, which sounded like it came from a handgun.

Oelke stated Officers Hendrex and Varsin, along with the security officers eventually entered the stairwell several minutes after the shooting stopped. They held up outside the 32nd floor entrance to ensure that the shooter could not escape down the stairwell.

Oelke stayed there with Officers Hendrex and Varsin until SWAT officers arrived and relieved them. He said he never entered the suspect's room after police officers breached the room and cleared it. From the doorway, he observed the front part of the suite and could see numerous shell casings and a rifle with a bipod on the floor.

### Alan Rautenberg (Wynn Casino Host)

On October 7, at approximately 1621 hours, Detective Jex conducted an audio recorded interview with Alan Rautenberg at the Wynn Corporate security offices. Also present for the interview was Sergeant MacDonald, an FBI special agent, and Wynn Attorney Donald Jude Campbell. Below is a summary of the interview.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Rautenberg is the vice president of player development at the Wynn Las Vegas. He stated he recognized Paddock's photo from the news to be a frequent player at the casino with high roller status.

He believed he has seen Paddock and Danley in the casino in the past but had never had any direct contact with either of them. He also said that outside of recognizing him as a frequent player, he knew nothing about either Paddock or Danley.

**Miguel Sanchez (Security Officer)**

On October 11, at approximately 1632 hours, Detective Hodson conducted an audio recorded interview with Miguel Sanchez. Also present for the interview was an FBI special agent, and MGM Attorney Ashley Eddy. Below is a summary of the interview.

Sanchez has worked for the Mandalay Bay for approximately three years and was working as an armed bike security officer on October 1. He was working the arena dock area at the end of his shift, when he heard over his security radio that there was a shooting at the Route 91 Harvest music festival. He rode toward the festival when he was dispatched to respond to the 32nd floor where a security guard had been shot with a pellet gun.

Sanchez took the elevator up to the 32nd floor with his partner, Security Officer Lacomb. When they exited the elevator, he heard automatic gunfire coming from one of the rooms at the end of the 100 Wing. Security Officer Campos was still down the hallway when Sanchez heard the automatic gunfire. He heard two to three pauses between long volleys of automatic gunfire. During one of the pauses, Campos ran quickly down the hallway toward them.

Sanchez stated LVMPD officers arrived approximately five minutes after he and his partner had arrived on the floor.

Sanchez was ordered by an LVMPD sergeant in plain clothes to start clearing the rooms on the wings of the 32nd floor. Sanchez never saw the suspect or entered the room at any point.

**Stephen Schuck (Engineer)**

On October 6, at approximately 1730 hours, Detective Patton conducted an audio recorded interview with Engineer Stephen Schuck inside the Mandalay Bay. Also present for the interview were two FBI special agents and MGM Attorney Ashley Eddy. Below is a summary of the interview.

Schuck was an apprentice engineer at the Mandalay Bay and employed there since May 2017. Schuck was on the 62nd floor fixing a water leak, when he received calls from his dispatcher and supervisor to respond to the 32nd floor. Schuck was told a security officer (Jesus Campos) found the fire door in the 100 Wing screwed shut.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Schuck left the 62nd floor and entered the service elevators which are located in the 200 Wing of the hotel. Schuck took the elevator to the 32nd floor. When Schuck exited the elevator he moved his service cart into the hallway, grabbed his tools, and walked down the hallway.
Schuck walked up the 100 Wing, and he saw someone (Campos) poke their head out into the hallway. Schuck didn't think anything of it because guests do that all the time. Schuck made it approximately 50 or 60 yards when he heard automatic gunfire. He originally thought the sound was possibly a jackhammer.

When the shooting noise stopped, Campos popped out from the right side of the hallway and told Schuck to get cover. Schuck jumped into the alcove of rooms 32-117 and 32-119. As Schuck faced the door, gunshots came down the hallway, and he felt something hit his back. Schuck believed he was shot, but he later learned a piece of the wall struck him. Schuck tried to open one of the doors with his master key, but the door was dead bolted. Schuck yelled over his radio, "Shots fired! Shots fired! Shannon get the police, do not come down the hallway, he's shooting down the hallway!"

Schuck observed Campos two or three doors ahead of him and noticed Campos was shot in the leg. He didn't know if Campos could walk or not. After the shooting stopped, he ran down the hallway. He believed more shots were going to be fired down the hallway so he jumped in front of another door. As that happened, Schuck heard another volley of gunshots. He stated the sound of gunshots were so loud he couldn't tell if they were coming down the hallway or somewhere else.

When the shooting stopped, Schuck again ran down the hallway. As he ran, Schuck observed another security guard arriving in the 100 Wing near Center Core. Schuck told the security guard to get out of the hallway. They stayed at Center Core as the gunfire continued for two to three minutes.

Schuck was attending to Security Officer Campos' leg and heard noises coming from the 300 Wing. Schuck looked down the 300 Wing and observed police officers kicking in doors. Schuck yelled at the officers and told them the shooter was in the 100 Wing.

The shooting had stopped by the time police officers ran down the 300 Wing and met Schuck at Center Core. Schuck's supervisor arrived at that time. Schuck's supervisor gave him a master key and told Schuck to take the elevator down to the beach level and turn off the guest elevators. After Schuck locked out the elevators, his supervisor called him over the radio and advised him to return to the 32nd floor because the police officers needed the master key. Schuck ran through the lobby of the hotel and took the service elevator back to the 32nd floor where he returned the master key to his supervisor.

At this time, guests exited their rooms. Schuck attempted to keep them in their rooms. Approximately 20 minutes later, an LVMPD officer asked Schuck to get the information of the person in Room 32-135. Schuck asked for the information over his radio. A security officer standing next to Schuck wrote down the information and gave it to police.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Schuck stayed on the 32nd floor until after SWAT breached the door to Room 32-135. He assisted directing guests when officers evacuated them from their rooms. He assisted SWAT officers by describing the layout of the rooms and floors.  Schuck stated he knew he could have left at any time but he wanted to help the guests and LVMPD.

At approximately midnight, Schuck's supervisor told him to put his tools away. Schuck eventually made it to his manager's office and waited there until approximately 0700 hours.

### Anthony Sottile (Security Operations Manager)

On October 12, at approximately 1156 hours, Detective Hodson conducted an audio recorded interview with Anthony Sottile. Also present for the interview was an FBI special agent and Mandalay Bay representative Dana Howell. Below is a summary of the interview.

Sottile stated he is the security operations manager at the Mandalay Bay. At approximately 2100 hours, he and his security officers located and identified two females who had been previously trespassed from the property. They took the females to the security office. They requested LVMPD officers to complete citations of the females in custody. At approximately 2140 hours, Officers Hendrex and Varsin arrived at the security office.

At approximately 2200 hours, Sottile heard reports of a shooting call over the LVMPD officer's radio. He left the security office with the two LVMPD officers and his two employees, George Umstott and Michael Oelke. They start walking through the casino floor to assist in locating the possible shooter across the street at the Route 91 Harvest music festival. While en route, he heard over his radio that a security officer was shot on the 32nd floor.

After learning about the injured security officer, he entered the elevator with the LVMPD officers and security officers to go to 32nd floor. On the way up the tower, he received information over the Mandalay Bay radio channel that the shooting was coming from the 31st floor.

Sottile stated the female LVMPD officer (Varsin), along with Umstott and Oelke, exited on the 31st floor. Sottile continued to 32nd floor and believed Officer Hendrex was with him at the time but doesn't remember exactly who was there. Sottile stated he heard consistent gunfire for approximately two minutes after he exited the elevator.

He stated other LVMPD units arrived on the floor within three to four minutes of him arriving on the 32nd floor. The officers took positions in the hallway and evacuated guests on the floor.

At approximately 2230-2240 hours, SWAT officers arrived and breached the room from the stairwell located next to Room 32-135. He heard the room was clear after a few minutes. He assisted in evacuating the rest of the rooms on the 32nd floor to include the 200 and 300 wings. Sottile went to the casino floor and worked on evacuating the rest of the property.

*Note: Sottile's account varies from the other statements where he says Officer Hendrex exited the elevator with him on the 32nd floor. It was confirmed, through body camera footage from Officer Varsin that Officer Hendrex exited the elevator on the 31st floor with her, Michael Oelke*

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

*and George Umstott. This was also consistent with the statements obtained from Varsin, Oelke and Umstott.*

### Phillip Torrez (Baggage Handler)

On October 3, at approximately 1518 hours, Detectives DeAngelis and Downing conducted an audio recorded interview with Phillip Torrez inside the Mandalay Bay. Also present for the interview was MGM Attorney Ashley Eddy. Below is a summary of the interview.

On September 26, Torrez was working and came in contact with Paddock while helping with a luggage cart. Torrez could not remember in detail what baggage was on the cart, but he thought there were duffel bags. After loading the cart, Paddock requested to be taken to his room with his luggage. The normal protocol is a guest will be given a ticket and, upon getting to their room, the guest will call and have the luggage delivered.

When Paddock requested to go with his luggage. Torrez stated he does this for guests to expedite them, and it's not unusual. While walking to the service elevator with the luggage cart, Torrez had casual conversation with Paddock. Paddock stated he had family coming to town and some of the luggage belonged to them. Torrez said the conversation was carefree, and Paddock was very pleasant. Upon reaching the service elevator, Torrez said Gerard (Killeen) took over. Torrez did not see Paddock the rest of his shift.

On September 29, Torrez was working and was called over by Valet to help a guest. Upon walking over, Torrez recognized the guest to be Paddock and possibly shook his hand. Paddock requested Torrez take him upstairs. Torrez stated he would request a bellman to help. During this encounter, Paddock was alone and had luggage items on a cart. Torrez escorted Paddock to the service elevator where he believed to have met bellman Jorge (Morales).

*Note: Throughout the investigation, detectives were not able to corroborate Torrez' story. None of the surveillance video showed the interaction between Paddock and Torrez. Evidence shows that shows Paddock arriving at the Mandalay Bay valet on September 28, at approximately 2146 hours and not leaving the property until September 30, at 0100 hours. Detectives were able to identify "Jorge" as Bellman Jorge Morales.*

### George Umstott (Security Manager)

On October 12, at approximately 1544 hours, Detective Hodson conducted an audio recorded interview with George Umstott inside the Mandalay Bay. Also present for the interview was an FBI special agent and Mandalay Bay Representative Dana Howell. Below is a summary of the interview.

Umstott stated he works at Mandalay Bay as an Assistant Security Manager and is armed while working in this capacity. On the night of October 1, he was with Security Managers Michael Oelke and Anthony Sottile with two females that were being trespassed in the security office when Officers Hendrex and Varsin arrived to issue citations to the females.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

Event: 171001-3519

He heard there was a mass shooting at the festival lot over Hendrex's police radio. They initially planned to respond to the corner of Mandalay Bay Road and Las Vegas Boulevard. As they walked through the casino, he heard a radio broadcast that Security Officer Campos was shot in the leg with a pellet gun on the 32nd floor.

Security managers along with Officers Hendrex and Varsin responded to the guest elevators. While on the elevator, they heard information, on their radios, in reference to the shooter being on the 31st floor.

As they walked up the 100 Wing of the 31st floor, they heard gunshots coming from the floor above them. As they approached the stairwell, they could still hear gunshots coming from the 32nd floor.

According to Umstott, there were also reports of other shooters on the 62nd and 29th floors. Umstott responded to the 29th floor while everyone else stayed stacked inside the stairwell.

Umstott quickly cleared the 29th floor, returned to the stairwell and rejoined the group. Several other LVMPD officers had arrived in the stairwell, and eventually the stairwell door was breached. Umstott never went any further and returned to the casino floor.

*Note: The investigation revealed there were no other shooters on the 29th or 62nd floor.*

**Shun Zhang (Food Server)**

On October 3, at approximately 2228 hours, Detective DeAngelis conducted an audio recorded interview with Shun "Jackie" Zhang inside the Mandalay Bay. Also present for the interview was detectives Downing and Wilson. Below is a summary of the interview.

Zhang has been employed by the Mandalay Bay for almost 19 years as a food server in the Noodle Shop. On September 30, Paddock went to the Noodle Shop and sat in Zhang's section. Zhang recalled that Paddock was alone at the table. He ordered two entrees and ate both of them. Paddock was quiet and did not talk to anyone.

Police Personnel

**Sergeant Joshua Bitsko**

On October 3, at approximately 1843 hours, Detective Leavitt conducted an audio recorded interview with Sergeant Bitsko at LVMPD Headquarters. Also present for the interview was PMSA Attorney Tara Roberts. Below is a summary of the interview.

On October 1, Sergeant Bitsko was conducting squad training at the Moon Valley Nursery located at Eastern and I-215 Beltway. He heard radio traffic broadcast on the CCAC radio channel and realized they had an active shooter situation. He immediately responded toward Las Vegas Boulevard. He drove to the Mandalay Bay and parked near the entrance of the Shark Reef.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Sergeant Bitsko donned his heavy tactical gear, deployed his rifle, and a ballistic shield. A detective arrived shortly after, and Sergeant Bitsko handed the ballistic shield to him. Sergeant Bitsko, Officer Newton and several plain clothes detectives formulated a Strike Team and entered the Mandalay Bay through the Shark Reef. They cleared the area as they moved from the Shark Reef to the guest elevators.

His team exited the elevator on the 28th floor and took the stairwell to the 29th floor. After they cleared the 29th floor, they used the stairwell to move up to the 32nd floor and joined with SWAT Officer Hancock and others.

They pried open the stairwell door to enter the 32nd floor hallway, which was secured from inside. He observed a room service cart in the hallway. He also observed wires and an object on the cart. They moved into the hallway with Officer Hancock to place an explosive breach on the door. He observed a camera on the cart and placed a plate on top of the camera to conceal their movements.

The door to Room 32-135 was breached. Sergeant Bitsko, SWAT Officer Hancock, and other officers moved into the room and cleared it. He observed several AR-style rifles and a male lying on the ground with a gunshot wound to the head. He also observed a small, silver revolver with blood on it near the male's head.

Sergeant Bitsko also assisted in breaching the connecting door to Room 32-134 and cleared it.

**Sergeant William Matchko**

On October 3, at approximately 1840 hours, Detective Jex conducted an audio recorded interview with Sergeant Matchko at LVMPD Headquarters. Also present for the interview was PMSA Attorney Jay Roberts. Below is a summary of the interview.

Sergeant Matchko was on his regular scheduled day off; however, he had come into work to assist detectives with the service of a search warrant. While his team prepared to serve the warrant, Sergeant Matchko heard the radio broadcast of an active shooter. He also heard gunfire in the background. Sergeant Matchko left the search warrant scene and proceeded toward the Mandalay Bay.

Sergeant Matchko arrived at the Mandalay Bay and entered the hotel, where he asked a security officer to get him up the elevators. He heard several different reports about where the shooting was coming from to include the 28th, 29th, and 32nd floors. As he reached the elevators, officers were already on it preparing to go up. Sergeant Matchko stepped onto the elevator and asked to be taken to where the security officer was shot. The information was conflicting, so he chose to go to the 28th floor, since they would come to it first and it was a possible location for the shooting.

As the group of officers exited the elevator, they did not hear gunfire. They cleared the hallways, observed no commotion, and didn't hear gunfire. Sergeant Matchko gathered more information

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

and learned other officers were headed to the 32nd floor. He led the team up the stairwell to the 32nd floor. As they exited the stairwell, they made their way down the hallway. He observed other officers near the Center Core and moved to their location. He told officers to evacuate the guest rooms, and move all citizens to safety, as the group moved up the hallway.

Sergeant Matchko observed a food service cart near the suite where he was told the shooting was coming from. He was concerned about the cart, believed it looked out of place, and thought that it may be a trap or an IED. As he was focused on the cart, SWAT Officer Hancock arrived. Sergeant Matchko directed SWAT Officer Hancock to go back down a floor and to use a stairwell that would place him near the suite door. Sergeant Matchko was in communication with Sergeant Bitsko (who was also in the stairwell) and SWAT Officer Hancock. Knowing the plan to use an explosive breach, Sergeant Matchko prepared the officers with him, on their roles, and what to do if citizens exited their rooms due to fire alarms, or the sprinkler system activating after the breach.

When the explosive breach detonated, several citizens exited their rooms and were immediately escorted by officers to Center Core. Sergeant Matchko observed the group of officers exit the stairwell and make entry into the room. He heard them broadcast the suspect was down. Sergeant Matchko believed the suspect took his own life since he did not hear rounds fired after the officers made entry. Sergeant Matchko and his group maintained their position in the hallway as the team cleared Room 32-135 and breached and cleared Room 32-134.

As the room was cleared, several other active shooter calls were broadcast over the radio. Sergeant Matchko divided the teams and told the officers to go handle more calls. He received a phone call from Captain Tomaino who ordered him to look in the room for identification of the suspect or suspects. Photographs were taken using a cell phone camera and sent to the command post. With help from Detective Trzpis, they rolled the suspect onto his side, which caused blood to flow from his mouth and down the side of his face. His pockets were checked for photo identification, and he was rolled back to his original position. Officers then exited the room and held it for investigators.

**Detective Stephen Balonek**

On October 18, at approximately 0917 hours, Detective Penny conducted an audio recorded interview with Detective Stephen Balonek at LVMPD Headquarters. Below is a summary of the interview.

On October 1, Detective Balonek was working overtime at the Route 91 Harvest music festival. He was assigned to the south side of the venue between gates six and seven, near Mandalay Bay Road and Las Vegas Boulevard.

During the shift, Detective Balonek heard shots being fired. He heard approximately three to four shots then additional shots. Detective Balonek did not see a muzzle flash and believed the shots were from within the venue or an elevated position. Detective Balonek retrieved his binoculars and scanned the Mandalay Bay tower. Approximately three-quarters of the way up the tower on the far north end, Detective Balonek observed a silhouette of a man in a shooting position,

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

standing about four to six feet back from the window. He saw smoke from the gun but did not see muzzle flashes.

Detective Balonek heard the suspect (Paddock) was shooting into the venue so he directed citizens to move east. Detective Balonek encountered several victims with gunshot wounds and provided first aid. He directed those victims toward the mobile command vehicle where he knew there was medical personnel. During the gunfire, Detective Balonek stated the sound kept changing, and he thought it could be from multiple shooters.

After the shooting stopped, Detective Balonek took up a tactical position, stopped traffic, and remained on post until being relieved.

**Detective Casey Clarkson**

On October 5, at approximately 1148 hours, Detective Penny conducted an audio recorded interview with Detective Clarkson at LVMPD Headquarters. Also present for the interview was Las Vegas Police Protective Association (LVPPA) Representative Yant. Below is a summary of the interview.

Detective Clarkson was working overtime at the Route 91 Harvest music festival. He was partnered with Detective Brosnahan. Detectives Clarkson and Brosnahan were directed to Las Vegas Boulevard to assist with an intoxicated female. Afterward, they remained in the area of Las Vegas Boulevard and Mandalay Bay Road.

Detective Clarkson heard possible gunfire. He heard reports of multiple casualties over the radio. Detectives Clarkson and Brosnahan moved behind a pony wall and looked for the gunman. They moved toward patrol cars parked near them with intent to get to the Mandalay Bay.

While they moved toward the patrol cars and prisoner transport van, two civilians attempted to join their group. While addressing the civilians, they received direct gunfire. Detective Clarkson and a civilian moved behind the prisoner transport van for cover but realized it wasn't enough. Around this time, Detective Clarkson felt something strike his neck.

Detective Clarkson stayed behind cover and shielded Detective Brosnahan as the gunfire continued. He observed bullets impacting closer to the patrol vehicles and knew the shots were coming from an elevated position. Detectives Clarkson and Brosnahan, along with several other officers, moved from the patrol vehicles to behind a block wall where several civilians were found hiding. The civilians were pushed closer to the wall as officers shielded them with their bodies.

While behind the wall, Detective Clarkson was told he was bleeding. Detective Brosnahan applied direct pressure to the wound until another officer arrived with a medical kit. After having his neck bandaged, Detectives Clarkson and Brosnahan escorted civilians away from the street and through the venue. Detectives Clarkson and Brosnahan made their way to the medical tent and found several people who were critically injured. Ambulances couldn't get to the scene, so Detective Brosnahan left to retrieve Detective Clarkson's police vehicle.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

Event: 171001-3519

Detective Clarkson moved several wounded civilians to the sidewalk to prepare for transport. When Detective Brosnahan arrived, they loaded several critically injured patients into their vehicle and drove to Valley Hospital after hearing University Medical Center was full. Upon arrival at Valley Hospital, Detective Clarkson and the wounded civilians received medical treatment. After being discharged, Detective Clarkson returned to the command post.

**Detective Matthew Donaldson**

On October 3, at approximately 1820 hours, Detective Ploense conducted an audio recorded interview with Detective Donaldson at LVMPD Headquarters. Also present for the interview was Detective Sclimenti and LVPPA Representative Yant. Below is a summary of the interview.

Detective Donaldson was at LVMPD Headquarters. His sergeant came into the office and informed the squad of an active shooter call. The squad responded to the Mandalay Bay. Detective Donaldson was with Detective Walford and they entered the Mandalay Bay near the Shark Reef.

Once inside, they met SWAT Officer Hancock. From information being broadcast, they believed the shooting was coming from the 32nd floor of the hotel. When they got to the 32nd floor, they observed officers positioned in the hallway leading to the suite where they believed the shooting was coming from.

SWAT Officer Hancock led Detective Donaldson and several other officers down to the 31st floor. They gained access to the stairwell that would lead them adjacent to the suite where the shooting was. When they reached the stairwell, they found other officers at the stairwell door to the 32nd floor.

Officer Hancock placed a breaching charge on the door to the suite and breached the door. The door did not completely come off the hinges, but they were able to see rifles on the floor inside the room. Detective Donaldson made entry with the group into the suite and cleared the room. He observed what he believed to be 25-30 scattered rifles across the room. He observed what appeared to be a deceased white male, lying on his back.

There was a closed door that led to an adjoining room which was also breached and cleared. Once the suite and connecting room was cleared, he began doing welfare checks on the floor.

**Detective Stephen Trzpis**

On October 3, at approximately 1755 hours, Detective Quinteros conducted an audio recorded interview with Detective Trzpis at LVMPD Headquarters. Also present for the interview was Detective Ubbens and LVPPA Representative Hamm. Below is a summary of the interview.

Detective Trzpis was assigned to a South Central Area Command (SCAC) Patrol Detective squad and was at the office when he heard a possible active shooter at the Route 91 Harvest music festival broadcast over the radio. Detective Trzpis and his squad left the office, put on their tactical gear, and headed to the Mandalay Bay. Based on information from the radio, they

Event: 171001-3519

believed the active shooter was inside the hotel. They arrived at the hotel from the south side, at the Shark Reef entrance, where they joined Sergeant Bitsko and Officer Newton.

Detective Trzpis was given a shield by Sergeant Bitsko, and he entered the Shark Reef. The team moved to the elevator bank and had hotel security unlock an elevator and take them up the tower. As the team prepared to take the elevator up, they were joined by another team led by Sergeant Matchko. The information being received by the team was conflicting on where the shooting was coming from. Sergeant Bitsko decided to exit on the 28th floor, clear it, and move up the stairwell. Sergeant Matchko's team would continue up to the 29th floor.

The team cleared the 28th floor and moved up, clearing the floors until they reached the 30th floor. When they reached the 30th floor, they joined another team which was also clearing the floor. The group then moved up to the 31st floor together where they were met by SWAT Officer Hancock. The group moved up the hallway that led them to the stairwell adjacent to the suite where SWAT Officer Hancock believed the shooting was coming from. They entered the stairwell and found another group of security officers and uniformed patrol officers posted on the door to the 32nd floor. The door to access the 32nd floor was bolted shut, and SWAT Officer Hancock used a tool to pry it open. A quick peek was done into the hall, and they observed bullet holes in the door.

SWAT Officer Hancock breached the door to Room 32-135, and a group of officers made entry to clear the room. As Detective Trzpis moved into the suite, he observed what he believed to be the suspect down on the ground. After the main suite was cleared, a breach was used to access the connecting room and Detective Trzpis heard two gunshots but did not know who fired. When entry was made into the second room, it was cleared and found to be unoccupied. (The shots Detective Trzpis heard was the unintential discharge by SWAT Officer O'Donnell.)

**Detective Blake Walford**

On October 3, at approximately 1857 hours, Detective Ploense conducted an audio recorded interview with Detective Walford at LVMPD Headquarters. Also present for the interview was Detective Sclimenti and LVPPA Representative Todd. Below is a summary of the interview.

Detective Walford was assigned temporary duty (TDY) to Gang Crimes and was at their office located at LVMPD Headquarters. The sergeant came into the office and informed the squad of an active shooter call. The squad responded to the Mandalay Bay. Detective Walford was with Detective Donaldson, and they made entry into the Mandalay Bay from the beach club entrance.

Once inside, they made their way to the hotel lobby where they met SWAT Officer Hancock. They were briefed the suspect was on the 32nd floor and had shot a security officer. As they reached the 32nd floor, he observed officers in the hallway that led to the suite. SWAT Officer Hancock took Detective Walford and other officers with him back to the 31st floor in order to access the stairwell that would put them next to the suite where they believed the suspect was located.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

Event: 171001-3519

When they ascended the stairwell that would put them adjacent to the suite, they removed the lights so that when they opened the door they would not be back lit. They discovered the door that leads into the hall had been secured shut. The officers used a tool SWAT Officer Hancock carried with him to pry the door open. SWAT Officer Hancock placed an explosive charge on the door to Room 32-135 and breached it.

A group of officers from the stairwell entered the suite. When Detective Walford entered, he observed rifles in the room, and a deceased male on the floor. SWAT Officer Hancock used another explosive breach to open the connecting door to Room 32-134. As the door was breached, Detective Walford heard two to three rounds fired from one of the officers in the stack. They entered the connecting room where he observed more rifles.  (The shots Detective Walford heard was the unintential discharge by SWAT Officer O'Donnell.)

**Officer Bryon Bunitsky**

On October 3, at approximately 1645 hours, detectives Sclimenti and Ploense conducted an audio recorded interview with Officer Bunitsky at LVMPD Headquarters. Also present for the interview was LVPPA Representative Ramirez. Below is a summary of the interview.

Officer Bunitsky was working as a uniformed patrol officer in the Enterprise Area Command (EAC).  Officer Bunitsky was on a domestic disturbance call with Officer Thiele. Officer Bunitsky heard from Officer Thiele there was an active shooter at the Mandalay Bay. Officer Bunitsky called a sergeant and advised he was responding to the active shooter call.

Officer Bunitsky arrived near Russell Road and Las Vegas Boulevard. Officer Bunitsky donned his tactical gear, which included his rifle and helmet. Officer Bunitsky ran down Las Vegas Boulevard to the Mandalay Bay near the convention entrance. Officer Bunitsky entered and ran through the casino toward the main part of the hotel. Officer Bunitsky met up with other officers, including SWAT Officer Hancock, by the elevators and learned the suspect was on the 32nd floor.

Officer Bunitsky and additional officers took the elevator to the 32nd floor and exited the elevator. Officer Bunitsky looked up the hallway and observed bullet holes through the suspect's (Paddock) room door, along with blood on the floor from the security officer being shot. SWAT Officer Hancock derived a plan to go back to the 31st floor and use the stairwell to make it back up to the 32nd floor near Paddock's room. After utilizing the stairwell, Officer Bunitsky posted the stairwell door that led into the 32nd floor.

Officer Bunitsky heard SWAT Officer Hancock call the SWAT lieutenant and tell him they were going to breach the door to Room 32-135. SWAT Officer Hancock breached the door, and officers entered the room. Officer Bunitsky posted near the stairwell covering the door of the adjoining Room 32-134. Officer Bunitsky heard yelling from inside the room and information about cameras and wires being in the room.

Officer Bunitsky continued covering the adjoining room and heard another breach along with a three-round burst. (The shots Officer Bunitsky heard was the unintential discharge by SWAT Officer O'Donnell.) Officer Bunitsky entered Room 32-135 and took approximately five steps

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

inside. Officer Bunitsky observed guns scattered in the room and the main window broken. Officer Bunitsky heard SWAT Officer Hancock tell everyone to get out of the room and secure the scene. Officer Bunitsky backed out of the room and left the area. Officer Bunitsky left the casino and met with fire department personnel outside the Mandalay Bay. Officer Bunitsky spent the rest of the night searching for victims in the Route 91 Harvest music festival and clearing other casinos for possible additional shooters.

**Officer Brady Cook**

On October 9, at approximately 1615 hours, detectives Quinteros and Mendoza conducted an audio recorded interview with Officer Cook at LVMPD Headquarters. Also present for the interview was LVPPA Representative Hooten. Below is a summary of the interview.

On October 1, Officer Cook and his field training officer (FTO), Officer Haynes were on duty. Officer Cook was working his second day of field training. Officers Cook and Haynes were at Flamingo Circle to conduct foot patrol when they heard of a shooting at the Route 91 Harvest music festival.

Officer's Cook and Haynes got into their patrol car and responded to the event. While en route, Dispatch broadcast an active shooter at the Route 91 Harvest music festival. Upon arrival, they parked at Las Vegas Boulevard and Mandalay Bay Road near additional patrol units and a prisoner transport van. As they exited their patrol vehicle, they encountered immediate gunfire and could see rounds impacting the ground around them.

Officer Cook took cover as the gunfire continued. He could not see where the gunfire was coming from, but he soon realized the shots were coming from above them. While taking cover, Officer Cook was struck by a bullet in his right arm, causing it to go numb. He verbalized he was shot and could see blood.

Officer Haynes grabbed Officer Cook, and they ran northbound along Las Vegas Boulevard, seeking cover behind a patrol car. Officer Haynes assessed Officer Cook's injury while they took cover. They both continued to run northbound, and gunfire continued until they reached another marked patrol unit. Officer Haynes transported Officer Cook to University Medical Center for medical attention.

**SWAT Officer Levi Hancock**

On October 3, at approximately 1607 hours, Detective Leavitt conducted an audio recorded interview with SWAT Officer Hancock at LVMPD Headquarters. Also present for the interview was Detective Ubbens and LVPPA Representative Hooton. Below is a summary of the interview.

SWAT Officer Hancock was working his normal duties as a SWAT officer when he received notification of an active shooter and responded to the Mandalay Bay. SWAT Officer Hancock donned his tactical equipment and entered the casino where he met with patrol officers. He heard radio traffic the shooter was on the 32nd floor.

Case 3:19-cv-01537-BEN-JLB   Document 61-1   Filed 11/04/20   PageID.5035   Page 70 of 188
LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

SWAT Officer Hancock and a Strike Team composed of patrol and K9 officers took the elevator to the 32nd floor where they found multiple officers posted on the floor. He received information the shooter was in the room at the end of the hallway. Due to the long length of the hallway, he decided to take the elevator down to the 31st floor and approach through the fire exit stairwell.

While in the stairwell, he encountered other officers and security who were standing by in the stairwell. He instructed the officers to disable the lights in the stairway to prevent them from being backlit when they opened the door. They pried open the fire exit door, which had been secured shut from the hallway. When the door was opened he observed a room service cart and wires which ran from the cart to a guest room. He believed the cart may be rigged with an IED.

While doing quick peeks, SWAT Officer Hancock saw multiple bullet holes in the door of Room 32-135. He decided to use an explosive breach which was authorized by SWAT Lieutenant Huddler.

When the door to Room 32-135 was breached, he conducted quick peeks and decided to make entry into the room. Once in the room, he located the suspect deceased on the floor with an apparent head wound. He encountered a second closed door to the connecting room and decided to use a charge to breach that door.

After the charge was activated, he heard SWAT Officer O'Donnell fire a burst of three shots. He spoke with SWAT Officer O'Donnell and realized he did not fire at a threat but had an unintentional discharge.

Entry was made into the connecting room, and officers found a broken window and several more weapons in the room.

After the room was deemed safe, he turned the room over to patrol and went to search for any possible additional shooters.

**Officer Marlon Magsaysay**

On October 3, at approximately 1635 hours, Detective Jex conducted an audio recorded interview with Officer Magsaysay at LVMPD Headquarters. Also present for the interview was Detective Quinteros and LVPPA Representative Todd. Below is a summary of the interview.

On October 1, Officer Magsaysay received a text message at home which advised of an active shooter at the Mandalay Bay. He responded to SCAC and put his tactical gear over his plain clothes and drove to the intersection of Russell Road and Las Vegas Boulevard. He met up with two SWAT officers who were gearing up. He ran with the SWAT officers to the Mandalay Bay. They heard a radio broadcast that the shooter was on the 32nd floor. They took the elevator up to the Foundation Room and cleared the area.

Officer Magsaysay and SWAT Officer O'Donnell went down to the 32nd floor. Other officers were already covering down on the hallway to the suspect's door located at the end of the wing. He and SWAT Officer O'Donnell moved forward and made contact with SWAT Officer Hancock at

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

the stairwell near the suspect's door. SWAT Officer Hancock placed a charge on the door and breached the door to the suite. He recalled seeing bullet holes through the door to the room and impact damage in the hallway as they approached.

Officer Magsaysay followed SWAT Officer O'Donnell through the door into the room and cleared it. They moved back into the main room and observed the suspect on the floor with an apparent gunshot wound to the head. There was a rifle and small revolver next to the suspect's body. He observed multiple spent casings, magazines and rifles throughout the main room.

They moved to the connecting room door that was locked. SWAT Officer Hancock placed another charge on the door while SWAT Officer O'Donnell and Officer Magsaysay stacked up behind him. As the charge was detonated, Officer Magsaysay heard three shots from SWAT Officer O'Donnell. He believed SWAT Officer O'Donnell was firing at a suspect. (The shots Officer Magsaysay heard was the unintential discharge by SWAT Officer O'Donnell.)

As they moved into the room, Officer Magsaysay cleared the room. He observed more rifles and a laptop with wires that ran to a camera on the room service cart in the hallway. There was no other suspect located after they cleared both suites. After the room was cleared, he assisted in evacuating guests from other rooms on the 32nd floor.

**Officer David Newton**

On October 3, at approximately 1620 hours, Detective Keith conducted an audio recorded interview with Officer Newton at LVMPD Headquarters. Also present for the interview was LVPPA Representative Yant. Below is a summary of the interview.

On October 1, Officer Newton was informed by Sergeant Bitsko of an active shooter on the CCAC channel. Officer Newton switched his radio to CCAC and heard there was a shooter at the Mandalay Bay.

He and Sergeant Bitsko made a decision to park and enter the Mandalay Bay near the Shark Reef. When they arrived, Sergeant Bitsko requested additional officers to join them and form an active shooter team.

Once the other officers arrived, they entered the casino. They told security to evacuate citizens. While working their way through the casino, they heard a radio update that the shooter was possibly on the 29th floor. They took elevator to 29th floor and began clearing hallways.

They continued to move up, floor by floor, to the 31st floor where they met with SWAT Officer Hancock at the stairwell leading to suspect's room on 32nd floor. They breached the locked interior stairwell door and devised a plan to breach the door of suspect's suite with an explosive that SWAT Officer Hancock had with him. Officer Newton stated he had the ballistic shield and entered the hallway providing cover as SWAT Officer Hancock applied the explosive charge.

Once the door was breached, he made entry to the suite where he observed a rifle with a bipod on the floor and the suspect who appeared to have shot himself. They cleared the suite and then

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

Event: 171001-3519

encountered a locked door to the connecting room. SWAT Officer Hancock used another explosive charge to breach the door to the connecting room. After the connecting room was cleared, Officer Newton exited the room.

**SWAT Officer Sean O'Donnell**

On October 3, at approximately 1545 hours, Detective Jex conducted an audio recorded interview with SWAT Officer O'Donnell at LVMPD Headquarters. Also present for the interview was Detective Quinteros. Below is a summary of the interview.

Officer O'Donnell was assigned to SWAT and was on his regular day off when he received a text from a friend in K9. The text advised of an active shooter at the Mandalay Bay, and due to the source of the information, SWAT Officer O'Donnell immediately went to his SWAT vehicle which was at his residence, turned on his radio, and began to put on his work uniform and gear. SWAT Officer O'Donnell realized quickly the information on the shooting was accurate and began to head toward the incident.

SWAT Officer O'Donnell responded to the Mandalay Bay where he joined a patrol officer and another SWAT member as they made entry into the property. The information broadcast over the radio caused him to believe the shooting was on the 32nd floor; however, there were reports of other locations as well. The decision was made to go to the top floor and work their way down to look for any threats.

The group responded to the Foundation Room, which is located on the top floor of the hotel. They found patrons who did not seem frightened or aware of any incident occurring. When SWAT Officer O'Donnell observed this and heard more information coming in about the 32nd floor, he grabbed a security officer, one patrol officer, and proceeded to the 32nd floor using a service elevator. As they exited the service elevator, he noticed uniformed officers who were focused down one of the hallways. The officers briefed SWAT Officer O'Donnell about a security officer who had been shot down the hallway and about the location they believed the threat was coming from.

SWAT Officer O'Donnell could not hear any gunfire. SWAT Officer O'Donnell believed they should treat the situation as a barricade unless circumstances changed and shooting resumed. SWAT Officer O'Donnell held his position and was informed of SWAT Officer Hancock's location. He learned of SWAT Officer Hancock's plan to breach the door to the suite and make entry. He decided when SWAT Officer Hancock moved into the room, he would quickly move up the hallway and join him.

When SWAT Officer Hancock breached the doors to Room 32-135, SWAT Officer O'Donnell quickly moved up the hallway and joined the team. As they entered the room, SWAT Officers O'Donnell and Hancock moved in different directions. He could see weapons on the floor and announced that information to the group. Once his area was cleared, he moved into the main room where he observed a male lying on the floor with what he believed to be a gunshot wound to the head. He stated there was a small handgun near the males head.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

There was a door that led to a connecting room, which the team focused their attention on. SWAT Officer Hancock set an explosive breach to make entry into the second room. The team again stacked and prepared to make entry. As the breach occurred and the team began to move, SWAT Officer O'Donnell felt he should change the rate of fire on his rifle to "select fire" which puts the gun into a three-round burst mode. As he made the switch, which takes hand manipulation, SWAT Officer O'Donnell's hand slipped which caused the weapon to fire a three-round burst into the wall. The team continued to move and went into the next room.

Once the rooms were cleared, the officers went back and located a wallet with identification that appeared to belong to the deceased person inside the room. The information of the person's identity was relayed to the command post as well as the information of the rounds that had been unintentionally fired.

**Officer Michael Thiele**

On October 3, at approximately 1639 hours, Detective Keith conducted an audio recorded interview with Officer Thiele at LVMPD Headquarters. Also present for the interview was LVPPA Representative Grammas. Below is a summary of the interview.

Officer Thiele was working in EAC with Officer Bunitsky. Both officers were on a domestic violence call when they heard an active shooter call was occurring in CCAC. Officer Thiele heard an officer had been shot and believed the officer was his brother (Officer Thiele would later learn his brother was not one of the officers who was shot). Both Officer Thiele and Bunitsky responded to the area of Russell Road and Las Vegas Boulevard. Officers Thiele and Bunitsky were teamed up with four other officers and a sergeant. The team of officers made their way through the Mandalay Bay and subsequently teamed up with SWAT Officer Levi Hancock.

The team responded to the 32nd floor but quickly turned around, went to the 31st floor, and went up a stairwell that was adjacent to the suspect's room (Room 32-135). SWAT Officer Hancock devised a plan to breach the suspect's room. SWAT Officer Hancock designated four officers to enter the room with him and three officers (one of which was Officer Thiele) to stay and watch the door.

After the breach occurred, Officer Thiele exited the stairwell and observed a cart in the hallway with cameras on it. As they stood guard outside of the suspect's room, Officer Thiele heard a second breach occur inside the suspect's room. After the breach, Officer Thiele entered the room and made it down a small hallway in the living room area. As he entered the small hallway, Officer Thiele heard the other officers inside the room state they were "Code 4"; therefore, Officer Thiele did not feel the need to go any further into the room.

After the room was cleared, officers Thiele and Bunitsky exited the room and responded to the command post where they were both assigned other duties.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

### Officer Michael Tolbert

On October 3, at approximately 1259 hours, Detective Penny conducted an audio recorded interview with Officer Tolbert at LVMPD Headquarters. Below is a summary of the interview.

Officer Tolbert was operating as a uniformed patrol officer and was in the area of Warm Springs Road and Las Vegas Boulevard when he heard the active shooter call over the radio. He responded to the Mandalay Bay, and parked his vehicle in front on the east side of the street. Officer Tolbert deployed with his shotgun when he heard automatic gunfire and believed the shooting was coming from the Mandalay Bay. He moved to the entrance of the Mandalay Bay when he was joined by other officers and entered the hotel.

The group made contact with security who stated they had possibly two shooters on the 29th and 32nd floors. They could not determine if there was still gunfire and made the decision to take the elevator to the 28th floor and then use the stairwell to access the 29th floor. While they cleared the 29th floor, they realized there was no shooting on that floor and proceeded to the 32nd floor.

When he reached the 32nd floor, there were several officers set up on a hallway. They were briefed that the shooting was coming from the end of the hallway, a security officer had been shot and the stairwell next to the suite was barricaded. Officer Tolbert joined a group of officers led by a SWAT officer down to the 31st floor, where they made their way back up a stairwell that led them next to the doors of the suite. The SWAT officer breached one of the stairwell doors that was secured by an "L" bracket and then placed an explosive breaching charge on the suite.

With the amount of officers in the stairwell, the decision was made to separate into two groups. One group would make entry into the room and the rest would maintain their position and be used for evacuation and downed officers. Officer Tolbert stayed with the second group as the first group made entry into the room. Once entry was made into the room, he heard them announce that a suspect was down. As the team that entered the room stated it was clear, the group from the hallway began to make their way toward the suite.

Officer Tolbert moved into the foyer of the suspect's room, after it had been cleared. As Officer Tolbert was in the foyer, the decision was made to finish clearing the rooms on the 32nd floor. There was information coming in of other possible active shooters at other hotels, so a group of officers including Officer Tolbert left to re-deploy to other locations. Officer Tolbert was stopped by a captain when he arrived at the valet area of the Mandalay Bay to help establish a command post.

### Investigative Responsibilities

Due to the magnitude of the investigation, federal, state, and local law enforcement agencies conducted various aspects of the investigation. Information pertaining to the investigation was gathered by the FBI, Bureau of Alcohol Tobacco and Firearms (ATF), Nevada Gaming Control Board, Henderson Police Department, and various bureaus/sections within the LVMPD.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

The ATF and FBI filed their respective legal processes in federal court. As a result, information gathered from those processes were kept with the respective federal agencies who authored the legal process. Summaries of the information generated are included in this report.

**FBI**

The FBI had 95 TDY personnel in Las Vegas within 24 hours. Within 48 hours 150 TDY personnel were assigned. This ultimately grew to 351 TDY personnel. FBI personnel took the lead in evidence documentation and collection and provided investigative support. A command post was established at the FBI's Las Vegas field office.

All tips or items that needed to be investigated or followed up on were coordinated by the FBI and the LVMPD. These leads were tracked using the Operational Response and Investigative Online Network (ORION) through the FBI.

All video surveillance collected by investigators from various sources was housed and analyzed by the FBI.

**ATF**

The ATF assisted in gathering information related to the firearms owned by Paddock. They also provided investigative support by following up on leads provided to law enforcement and conducted interviews.

### Nevada Gaming Control Board

The Nevada Gaming Control Board assisted in gathering information pertaining to Paddock's and Danley's gambling history.

### Henderson Police Department

The Henderson Police Department assisted in identifying victims and witnesses who were transported to various hospitals.

### Las Vegas Metroplolitan Police Department

Several bureaus/sections within the LVMPD assisted FIT in the investigation into 1 October.

### Homicide Section

Detectives with the Homicide Section responded to, and were responsible for, the documentation of the Las Vegas Village to include the scene and deceased victims. Detectives completed interviews of LVMPD employees who responded to the Las Vegas Village or the Mandalay Bay during the attack.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

### Downtown Area Command Patrol Investigative Section

Investigators with the Downtown Patrol Investigative Section conducted follow-up in the downtown Las Vegas area. Investigators interviewed the owners of the various units at The Ogden which Paddock rented. They located and viewed various video surveillance systems from different properties during the time period. Interviews were conducted with a number hotel/casino employees who had contact with Paddock during his stay in the downtown area.

### Special Investigations Section (SIS)

Investigators with the Special Investigation Section responded to the command post and were directed to respond to Spring Valley Hospital. Investigators interviewed victims, collected and impounded related evidence, and helped secure the hospital.

In the following days, SIS investigators obtained gaming information for Paddock through the Nevada Gaming Control Board. The information obtained included gaming history from various hotel/casino properties throughout Nevada.

### Criminal Intelligence Section (CIS)

Investigators with the Criminal Intelligence Section responded to the command post shortly after the incident began. Investigators interviewed hotel/casino employees, reviewed video surveillance, reviewed valet and self-parking logs, and analyzed cell phone data and lock interrogation logs.

### Counter Terrorism Section (CTS)

Investigators with the Counter Terrorism Section responded to the Command Post on 1 October. They immediately began developing and collecting intelligence on Paddock. Investigators drafted search warrants and court orders, coordinated efforts with other jurisdictions, conducted interviews, and produced situational and investigative updates.

### Technical and Surveillance Squad (TASS)

Investigators with the Technical and Surveillance Squad responded to the Mandalay Bay as part of the initial tactical response. Investigators provided a wireless network for access to various systems required to develop, research, and track information. They coordinated the setup of a radio repeater to provide better radio communications. Investigators served orders for the preservation of social media to aid in the investigation along with obtaining cellular phone subscriber information to gather information for the investigation.

As the incident transitioned from the tactical phase to the investigative phase, TASS investigators analyzed cellphone tower information to develop information related to Paddock. They provided technical assistance to various agencies in the analysis of information.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## Firearms and Narcotics Group (FANG)

Investigators with the Firearms and Narcotics Group worked in conjunction with the ATF. Investigators drafted and served court orders pertaining to the investigation and compiled the data learned through those orders. Investigators traced ownership history of the firearms recovered during the investigation. All firearms were traced directly to Paddock, and he was the original purchaser on 48 of the firearms. Of the firearms where Paddock was not the original purchaser, investigators were able to trace the sale of the firearms to Paddock.

## Counter Terrorism Analysis Group (CTAG) and Central Intelligence Unit (CIU)

Investigators and analysts with the Counter Terrorism Analysis Group and the Central Intelligence Unit were tasked with research and analysis of information pertaining to the incident and subsequent investigation. The information compiled was used for briefings.

## Las Vegas Village

Responsibility for documenting the venue scene was transferred from the LVMPD Homicide Section to the FBI Evidence Recovery Team on October 2, at approximately 1445 hours. The following scene description of the Las Vegas Village venue was authored by the LVMPD Homicide Section.

The Route 91 Harvest music festival was an open-air music event held at the Las Vegas Village. The festival was dimly lit with street lights, variable stage lighting and lights from temporary light stands on the perimeter. There was a chain link fence with dark netting surrounding the entire venue. On the west perimeter of the venue, there was a decorative concrete block wall between Las Vegas Boulevard South and the chain link fence. This wall ran nearly the entire length of the west side of the venue from E. Mandalay Bay Road to E. Reno Avenue.

The surface of the venue consisted of black asphalt with defined seating areas covered with artificial grass on both the northwest and south ends of the venue with vendor areas throughout. The northwest artificial grass area was used for lawn chair seating. The large artificial grass areas on the southern end was surrounded by seating, food vendors, and portable bathrooms. A large seating area with elevated bleachers and a covered VIP area was oriented near the southwest corner of the venue. Four pedestrian gates ran along the west side of the venue.

The Coca-Cola suites, additional seating areas, vendors, medical tent, and three pedestrian gates were located on the east side of the venue. The event's command post, a television broadcast tent, and one pedestrian gate were oriented on the north end of the venue.

The main stage was oriented on the south side of the venue. The main stage was covered by green roofing, and the sides were covered with black mesh. The main stage viewing area was located in the southern portion of the venue, north of the main stage, and was divided into two seating areas by metal pedestrian fencing. The fencing ran from a production tent, located in the center of the viewing area, and eventually encompassed the main stage. In addition to the fence separating the east and west side grass areas, the production tent and vendors helped to define

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

the two areas. Production vehicles, concert buses, and trailers were oriented south of the main stage.

**Location of the Deceased Victims**

A total of 31 bodies were located, documented, and eventually recovered from the inside of the venue and on the exterior perimeter. CCOCME investigators responded and assisted the LVMPD Homicide detectives and crime scene analysts to conduct the preliminary death investigations.  Each victim was given an individual Clark County coroner's case and seal number. The time of death was determined to be 0545 hours for those recovered from the venue and exterior perimeter. Davis Funeral Home responded and transported the deceased to the CCOCME for a complete examination.



1) Jack Reginald Beaton
2) Christopher Louis Roybal
3) Lisa Marie Patterson
4) Adrian Allan Murfitt
5) Hannah Lassette Ahlers
6) Austin William Davis
7) Stephen Richard Berger
8) Stacee Ann Etcheber
9) Christiana Duarte
10) Lisa Romero-Muniz

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

11)  Heather Lorraine Alvarado
12)  Denise Cohen
13)  Kurt Allen Von Tillow
14)  Brennan Lee Stewart
15)  Derrick Dean Taylor
16)  Kelsey Breanne Meadows
17)  Jennifer Topaz Irvine
18)  William W. Wolfe Jr.
19)  Carly Anne Kreibaum
20)  Laura Anne Shipp

Four bodies were located and recovered near the medical tent in the northeast portion of the venue.

21)  Carrie Rae Barnette
22)  Jordyn Nicole Rivera
23)  Victor Loyd Link
24)  Candice Ryan Bowers

Seven additional victims were located and recovered from the exterior perimeter. Their body positions and locations suggested they had been placed at these locations. The descriptions of their injuries were obtained from the CCOCME investigators and the photographs taken by an LVMPD crime scene analysts.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



25)  Jordan Alan McIldoon
26)  Keri Lynn Galvan
27)  Dorene Anderson
28)  Neysa C. Tonks
29)  Melissa V. Ramirez
30)  Brian Scott Fraser
31)  Tara Ann Roe

The remaining victims were transported to various hospitals throughout the greater Las Vegas valley and pronounced deceased at their respective locations. CCOCME investigators responded and assisted the LVMPD crime scene analysts with documentation of the decedents' injuries.  Each victim was given an individual Clark County Coroner's case and seal number. The time of death was determined by the treating physicians. Davis and Hites Funeral Home Services transported all victims from the hospital to the CCOCME for a complete examination. The descriptions of their injuries were obtained from photographs taken by LVMPD crime scene analysts.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## DESERT SPRINGS HOSPITAL

32) Bailey Schweitzer
33) Patricia Mestas
34) Jennifer Parks
35) Angela Gomez

## SPRING VALLEY HOSPITAL

36) Denise Burditus
37) Cameron Robinson
38) James Melton

## VALLEY HOSPITAL

39) Quinton Robbins

## SUNRISE HOSPITAL

40) Charleston Hartfield
41) Erick Silva
42) Teresa Nicol Kimura
43) Susan Smith
44) Dana Leann Gardner
45) Thomas Day Jr.
46) John Joseph Phippen
47) Rachel Kathleen Parker
48) Sandra Casey
49) Jessica Klymchuk
50) Andrea Lee Anna Castilla
51) Carolyn Lee Parsons
52) Michelle Vo
53) Rocio Guillen
54) Christopher Hazencomb
55) Brett Schwanbeck

## UMC HOSPITAL

56) Rhonda M. LeRocque
57) Austin Cooper Meyer
58) Calla-Marie Medig

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

### Mandalay Bay 32nd Floor



1. Master Bedroom
2. Sitting Area
3. Bar / Kitchenette
4. Living Room
5. Connecting Doors
6. Stairwell Foyer

### Scene

The scene was located in the 100 Wing of the 32nd floor of the Mandalay Bay. The 100 Wing consisted of a north-south oriented hallway with even numbered rooms on the east side and odd numbered rooms on the west side. The rooms ranged in numbers from 32-101 to 32-135. Room 32-135 was at the far north end of the 100 Wing with south-facing double entry doors. Room 32-134 was at the north end of the 100 Wing and was a connecting room to 32-135. Room 32-134 was east of the entry to Room 32-135 with a single entry door that faced west. A door leading to a foyer room, which led to the stairwell was at the north end of the hallway, west of the entry to Room 32-135, with a single entry door that faced east.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**



(100 Wing hallway from Center Core towards Room 32-135.)

## 100 Wing Hallway

The hallway consisted of alcoves containing access to four rooms: two rooms on the east side of the hallway and two rooms on the west side of the hallway, with a segment of the hallway between each alcove. Each alcove had a ceiling mounted light with two light shades: an exterior blue shade and an interior white shade as well as a light sconce on the walls between the doors.

Decorative molding was mounted to the walls the entire length of the hallway. There were numerous bullet fragments throughout the hallway floor, from the north side of the alcove of rooms 32-101 through 32-104 to the alcove of rooms 32-133 through 32-135.



(100 Wing hallway alcoves.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

A room service cart containing numerous plates, food items, and silverware was on the east side of the hallway in front of Room 32-134. A black Logitech camera with connected wires was on top of the cart, at the south end. The camera was positioned in a south direction (down the hallway) and taped to a plate. A white camera with connected wires was attached to the lower portion of the cart at the north end. The camera was positioned in a south direction (down the hallway). Wires from both of the above described cameras ran under the door and into Room 32-134.


(Food service cart in hallway with cameras.)

**Room 32-135**

Room 32-135 was a hotel suite located at the far north end of the hallway with south-facing double entry doors. The east door had two bullet holes above the door handle. The bullets traveled north to south, entering the interior side of the door and exiting the exterior (hallway). A camera was taped to the interior side of the east door inserted into the peephole. A hole was partially drilled into the bottom of the south wall, east of the entry doors. The west door was damaged (occurred during the explosive breach) and unattached from the door frame. The door was lying on the floor inside of the suite. There were bullet holes in the west door, with the bullets traveling north to south, entering the interior side and exiting the exterior (hallway).


(Camera installed in peephole of door to Room 32-135.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

The suite consisted of a south foyer room, a west bedroom (master bedroom) with attached bathroom, a north sitting area, a central bar/kitchenette, and a second bathroom east of the central bar/kitchenette. A southeast living room which contained a couch, chairs, an entertainment center cabinet, and a wall-mounted TV. A connecting door which led to Room 32-134 was located southeast of the living room on the south wall. The entire north end of the suite consisted of floor-to-ceiling windows.

### Foyer inside Room 32-135

The foyer had a table along the west wall. There was a white Babysense camera pointed in the direction of the front entry doors at the south end of the table, and a black mini-refrigerator at the north end with a white Styrofoam cooler on top. There were casings scattered on the floor of the foyer and on the table along the west wall. A black rifle with the muzzle pointed south was at the northeast portion of the foyer on the floor.

An east-west hallway extended from the east side of the foyer. A black rifle on a bipod with the muzzle pointed west, and a drill bit partially covered by a white towel were at the west end of the hallway on the floor.



(Foyer of Room 32-135 from the sitting area.)

### West Bedroom (Master Bedroom)

The bedroom was located west of the sitting area. There were east-facing double entry doors located northwest of the foyer and west of the sitting area. The room had a desk with a chair along the north wall just inside the entry doors. There were tools on the desk and the chair. A trash can was on the floor east of the desk that had numerous empty ammunition boxes inside. There was a white bag on the floor that had empty ammunition boxes inside as well as a broken Dell laptop computer. Two boxes containing empty ammunition boxes were on the floor behind the entry doors.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



(Bedroom of Room 32-135 towards the sitting area.)

A pillar was west of the desk. An empty, red gym bag and an Anran home security system box were on the floor west of the pillar. An open suitcase and a drill were on top of a chaise lounge, which was along the south wall. There were chargers plugged into the south wall, west of the chaise lounge.

 

(Desk and chaise lounge in the bedroom of Room 32-135.)

The bed was along the south wall with nightstands on either side. The following items were located on the bed: a Dell laptop computer, a passport in the name of "Stephen Paddock," four Home Depot gift cards, a checkbook, and a cash-out voucher for the Palms Casino dated 8/28/17. There were three suitcases west of the bed: two of which were empty and one had clothing inside. A television was on a dresser north of the bed. There were drill bits and tools on top of the dresser. Eight empty rifle magazines were on the floor below the west end of the dresser. An open suitcase with a tool box inside was east of the dresser. The closet was located along the wall east of the bed with a single shirt and a white bathrobe hanging inside.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



(Bedroom of Room 32-135.)

The attached southeast bathroom had a tub along the north wall with two glass vacuum suction holders on top of the tub ledge. A sink counter was along the south wall with toiletries to include a prescription for Diazepam 10 mg in the name of "Steve Paddock," and two inhalers.  The toilet room was to the east with a pair of boxers and a pair of shoes on the floor.



(Bathroom of Room 32-135.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

## Sitting Area

The sitting area was north of the foyer. Floor-to-ceiling windows covered by curtains extended along the length of the north end of the suite. There was a couch along the north side of the room, a coffee table south of the couch, and two chairs pushed together (facing one another) south of the coffee table. Pillars were located near the northeast corner of the sitting area and at the northeast corner of the living room.



(Chairs pushed together in the sitting area of Room 32-135.)

A rifle magazine was between the west and central couch cushions of the north couch. The coffee table was covered by white towels. A rifle and an empty rifle magazine were on the coffee table. There were four rifles sitting on the pushed-together chairs, and a rifle magazine was on the north arm of the east chair. One rifle was on the floor east of the chairs. There were two suitcases on the floor east of the coffee table containing numerous loaded rifle magazines. An empty rifle magazine was on the floor, east of the suitcases.




(Sitting area of Room 32-135.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

There was a stack of 14 loaded rifle magazines on the west side of the northeast pillar. A blue plastic tube with a snorkel mouthpiece attached with green tape to the east end and a black funnel with a fan inside at the west end extended from the east side of the suitcases, across the coffee table, to the west side of the room, adjacent to the doors of the west bedroom.

 

(Blue plastic tube with snorkel mouthpiece and black funnel.)

A chair facing south with a side table to the east was at the west end along the northeast bank of windows. The window located immediately east of the northwest pillar was shattered with glass on the floor below it. Numerous casings were on the floor at the base of the window and on the seat of the chair. A blue and yellow Estwing hammer was on the floor at the east side of the northeast pillar, south of the broken window. The head of the hammer had tape wrapped around it. The curtains in place over the broken window were damaged. Two rifles with bipods were on the floor south of the chair.

 

(Broken window of Room 32-135 overlooking Las Vegas Village.)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

A high top table was centrally located along the northeast bank of windows with a loaded rifle magazine on the southeast end of the table. An open suitcase was on the floor south of the table with numerous loaded rifle magazines inside. A rifle with a bipod was on the floor southeast of the table. There were casings on the floor surrounding the table. A handwritten note with distance/bullet drop calculations was recovered from this room. The note was originally observed on the small round table next to the aforementioned chair.



(Handwritten note with distance/bullet drop calculations.)

## Paddock's Body

Paddock was on the floor south of the chair and side table. He was wearing black pants, a long sleeve brown shirt, black gloves, and grey shoes. Paddock was on his back with his head to the south, feet to the north, and arms at his sides.  There was apparent blood surrounding his nose, mouth, and on the floor under his head. There was also apparent blood on the front of his shirt. A rifle was on the floor under his legs. A grey box cutter was on the floor between his feet. There were casings on the floor surrounding him. A silver and black colored Smith & Wesson revolver with apparent blood on it was on the floor south of Paddock's head.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**



(Paddock laying on the floor inside Room 32-135.)

## Bar/Kitchenette

The central bar/kitchenette was south of the sitting area east of the foyer and north of the east-west hallway. There was a north bar counter (east-west orientation) with three chairs on the north side of the counter. There were three rifles on the floor north of the west end of the counter with a backpack under them. One rifle was on the seat of the western-most chair: one rifle was on the seat of the easternmost chair; and one rifle was located on the west end of the bar counter. An empty silver colored rolling case was on the floor north of the counter, at the east end. A Luxor sticker and a "29" sticker were on the back of the case.

At the west end of the bar counter was an Anran monitor with a video feed to the previously described camera on the lower portion of the room service cart in the hallway, a laptop computer, which provided a live-feed to the camera attached to the peephole of the door, and a Samsung cell phone in a black case.

Centrally located on the bar counter were bank cards along with other cards in the name of "Stephen Paddock" and room key card packets.  At the east end of the bar counter was a black holster, a black glove, binoculars, a blue hat, brown wallet, tape roll, credit cards, a Nevada ID in the name of "Stephen Paddock," a player's card in the name of "Marilou Danley," a valet ticket, a notepad with the words "unplug phones" written on it, a white handheld monitor, a black ZTE cell phone with the front and back cameras covered with tape, and a Samsung Galaxy S6 active in a black case.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

At the southwest corner of the bar was a sink. There were two loaded rifle magazines and a Tundra fire extinguisher on the sink counter.

 

(Bar/Kitchenette from the sitting room.)

 

(Computer monitor showing live view of 100 Wing hallway. Cell phone, holster, and ID located on the countertop.)

## Living Room

The southeast living room was east of the bar/kitchenette at the east end of the east-west hallway. There was a television mounted on the south wall with an entertainment center cabinet below, couches to the north and east, and an orange chair to the west. The couch cushions were off of the east couch and piled on the north couch and on the floor.  A table and four chairs were up against the north side of the north couch.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

A side table was west of the north couch. A Meade spotting scope was on the floor north of the side table. A pink piece of paper with written measurements in feet and yards on one side was on the floor west of the east couch.[25]

An open black suitcase, containing soft rifle cases, was on the floor north of the entertainment center cabinet. There were three casings on the floor west of the side table and at the east end of the east-west hallway.[26]

There was a bullet hole through the east arm of the orange chair: two bullet holes into the entertainment center cabinet along the south wall and one bullet hole into the south wall between the entertainment center cabinet and the connecting door to Room 32-134.[27]

There were two suitcases along the west wall. A large, blue bag with numerous towels, soft rifle cases, and scope covers inside were along the west wall.


(Living room from the sitting area.)


(Connecting door to Room 32-134.)


(Living room area inside Room 32-135.)

---

[25] This note was originally located on the table near Paddock's body. The wind blew it to this location.
[26] These casings came from the SWAT officer's rifle.
[27] These bullet holes came from the SWAT officer's rifle.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

### Room 32-134

Room 32-134 was a single connecting hotel room, south of Room 32-135. The connecting door was located at the south end of Room 32-135 in the southwest corner of the southeast living room. There was damage to the south adjoining door frame, and the damaged door was on the floor inside Room 32-134.[28] The main entry door to the room was west facing, accessing the hallway. A room service cart, with an open laptop computer on the east end, was in the entry hallway, east of the entry door. Wires were plugged into the laptop and ran under the entry door. A video feed was visible on the laptop and showed the 100 Wing hallway looking south from the previously described black Logitech camera attached to the hallway room service cart.



(Room 32-134 from connecting door. Room 32-134 bedroom. Room 32-134 service cart.)

The room was furnished with two beds with a nightstand in between along the south wall, a desk, a dresser, a chair along the north wall, a television mounted on the north wall, and floor-to-ceiling windows on the east. The southern-most window was shattered with glass on the floor below it. There were nine loaded rifle magazines on top of the dresser. The dresser drawers were open and the decorative bottom molding was broken. There were three rifles with bipods on the east bed and several casings. One cartridge case was on the floor west of the east bed. There were two rifles on the west bed, one of which was a bolt action. A pair of black gloves were on the west side of the west bed. A pair of tan sandals were on the floor north of the west bed. A bullet hole was in the north wall corresponding with a hole in the south wall of the living room, and one bullet hole was in the comforter at the north end of the east bed.

---

[28] Occurred during the second explosive breach.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**




(Dresser in Room 32-134)

There were two closets along the west wall with the door to the attached southwest bathroom. The bathroom had a sink counter along the south side and tub to the north. Clothing was on the floor under the sink counter along with a trash can. There was a snorkel tube located inside the trash can.

**Paddock's Vehicle**

Paddock's vehicle was located in Mandalay Bay East Valet, 2nd floor, space 317 by investigators. The vehicle was a 2017 Chrysler Pacifica bearing Nevada plate 79D401, had been backed into space 317 and was locked. The key for the vehicle was obtained from valet.

A search warrant was obtained and at 0325 hours, detectives with the LVMPD All-Hazard Regional Multi-Agency Operations and Response Section (ARMOR) broke a window to the vehicle to allow an explosive detection dog access to the scent. A U.S. Marshall explosive detection K9 moved around the vehicle and gave an alert to the presence of explosive precursors.

Detectives secured the area on the belief there were explosive precursors within the vehicle. ARMOR detectives requested LVMPD dispatch to notify the Las Vegas Fire and Rescue Chemical, Biological, Radiological, Nuclear, and Explosive Task Force (CBRNE) to respond. Las Vegas Fire Rescue responded with their CBRNE vehicle along with FBI bomb technicians. Located inside the vehicle were five bags which were X-rayed and removed by the FBI.

Upon rendering the vehicle safe, the vehicle and all items located inside were photographed. All items removed from the vehicle were placed back inside, and the vehicle was sealed. The vehicle was subsequently towed from the Mandalay Bay Hotel to a secure FBI facility for a thorough search and evidence collection.

Evidence collected from inside Paddock's vehicle included loaded rifle magazines for both AR-15 and AR-10 style rifles. Also collected were 20 two pound containers of exploding targets, 10 one pound containers of exploding targets and 20 two pound bags of explosive precursors.

**Event: 171001-3519**






(Paddock's vehicle and evidence recovered from inside the vehicle.)

**Paddock's Mesquite Residence**

LVMPD detectives responded to Paddock's residence in Mesquite. The residence was located at 1372 Babbling Brook Court. Detectives obtained and served a search warrant at this location. Inside the residence, seven shotguns, five handguns, six rifles, exploding targets, firearm ammunition, rifle magazines and computer related items were recovered. These items were impounded and turned over to the FBI for processing.

**Paddock's Reno Residence**

FBI Special Agents responded to Paddock's residence in Reno. The residence was located at 1735 Del Webb Parkway. Agents obtained and served a search warrant at this location. Inside the residence were two shotguns, five handguns, firearm ammunition, rifle magazines, and computer-related items. The items were recovered by the FBI for processing.[29]

---

[29] Information obtained by the FBI

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

## Evidence Recovery

During the course of the investigation, hundreds of items of evidentiary value were located and impounded by LVMPD crime scene analysts and the FBI ERT. The following is a summary of key pieces of evidence located during searches of multiple locations.[30]

## Mandalay Bay Location

### 32nd Floor – 100 Wing – Stairwell Foyer Room

| |
|---|
| Metal "L" bracket with three screws securing it to the interior door/frame. |

### 32nd Floor – 100 Wing – Hallway

| |
|---|
| Two surveillance cameras from the room service cart outside Room 32-134. |
| Bullet fragments |

### 32nd Floor – Room 32-135 – Main Room

| Make | Model | Serial Number | Description |
|------|-------|---------------|-------------|
| Colt | M4 Carbine | LE451984 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. Front sight only.  |
| Noveske | N4 | B15993 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 40-round magazine. EOTech optic. |

---

[30] Items of evidentiary value were housed and analyzed by the FBI

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

| | | | |
|---|---|---|---|
| LWRC | M61C | 24-18648 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. No sights or optics.<br> |
| POF USA | P-308 | UA-1600204 | AR-10 .308/7.62 with a bipod, scope, and 25-round magazine.<br> |
| Christensen Arms | CA-15 | CA04625 | AR-15 .223 Wylde with a bump stock, vertical fore grip, and 100-round magazine. No sights or optics.<br> |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**

## Criminal Investigative Report of the 1 October Mass Casualty Shooting

**CONTINUATION**

**Event: 171001-3519**

| POF USA | P-15 | PE-1600179 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. No sights or optics. |
|---|---|---|---|
| | | |  |
| Colt | Competition | CCR014544 | AR-15 .223/5.56 with a bump stock, vertical fore grip, an 100-round magazine. No sights or optics. |
| | | |  |
| Smith & Wesson | 342 AirLite Ti | CDZ7618 | .38 caliber revolver with 4 cartridges, 1 expended cartridge case. |
| | | |  |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

| LWRC | M61C | 5P03902 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. EOTech optic. |
|---|---|---|---|
|  |  |  |  |
| FNH | FM15 | FND000905 | AR-10 .308/7.62 with a bipod, scope, and 25-round magazine. |
|  |  |  |  |
| Daniel Defense | DD5V1 | DD5007426 | AR-10 .308/7.62 with a bipod, scope, and 25-round magazine. |
|  |  |  |  |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

| | | | |
|---|---|---|---|
| FNH | FN15 | FNB024293 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. EOTech optic.  |
| POF USA | P15 | 03E-1603178 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. EOTech optic.  |
| Colt | M4 Carbine | LE564124 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine.  |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

| Daniel Defense | M4A1 | DDM4123629 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. EOTech optic. |
|---|---|---|---|



| LMT | Def. 2000 | LMT81745 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. No sights or optics. |
|---|---|---|---|



| Daniel Defense | DDM4V11 | DDM4078072 | AR-15 .223/5.56 with a bump stock and vertical fore grip. No magazine. EOTech optic. |
|---|---|---|---|

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
### CONTINUATION

**Event: 171001-3519**

| | | | |
|---|---|---|---|
| Sig Sauer | SIG716 | 23D020868 | AR-10 .308/7.62 with a bipod, red dot optic, and 25-round magazine.  |
| Daniel Defense | DD5V1 | DD5008362 | AR-10 .308/7.62 with a bipod and scope. No magazine.  |

| |
|---|
| Blue plastic hose with funnel, fan, and scuba mouthpiece attached. |
| Surveillance camera mounted to room door peephole. |
| Baby monitor camera (not mounted). |
| Surveillance camera mounted to room door peephole. |
| Small sledge hammer. |
| Laptop computer. |
| Surveillance camera monitor. |
| Spotting scope. |
| Binoculars. |
| Expended .223/5.56 cartridge casings (approximately 1,050). |
| Cellular phones. |
| Nevada Driver License – Stephen Paddock. |
| Mlife players card – Marilou Danley. |
| Polymer 40-round AR-15 magazines (loaded). |
| Steel 100-round AR-15 magazines (loaded). |
| Polymer 25-round AR-10 magazines (loaded). |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

| |
|---|
| Live ammunition (approximately 5,280). |
| Handwritten note with distance/bullet drop calculations. |
| Suitcases, duffel bags, soft rifle cases, and towels. |

### 32nd Floor – Room 32-135 –  Bedroom Suite

| |
|---|
| Laptop computer (on bed). |
| Disassembled laptop computer missing hard drive (on floor). |
| Power hand drills. |
| Empty ammunition boxes and plastic bags. |
| Scuba mask. |
| Loose ammunition. |
| Miscellaneous hand tools and drill bits. |
| Miscellaneous screws and mounting brackets. |
| Suitcases and towels. |
| Empty rifle magazines |

### 32nd Floor – Room 32-134 – Hotel Room

| Make | Model | Serial Number | Description |
|---|---|---|---|
| FNH | FN15 | FNCR000383 | AR-15 .223/5.56 with a bump stock, vertical fore grip, and 100-round magazine. No sights or optics.  |
| Ruger | American | 695-93877 | .308 caliber bolt action rifle with scope. |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

| LMT | LM308MWS | LMS18321 | AR-10 .308/7.62 with a bipod and red dot scope. No magazine. |
|---|---|---|---|



| Ruger | SR0762 | 562-13026 | AR-10 .308/7.62 with a bipod, scope, and 25-round magazine. |
|---|---|---|---|



| LMT | LM308MWS | LMS18300 | AR-10 with a bipod, scope, and 25-round magazine. |
|---|---|---|---|

| Laptop computer connected to hallway surveillance cameras. |
|---|
| Polymer 25-round AR-10 magazines (loaded). |
| Expended .308/7.62 cartridge casings (8). |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

### Mandalay Bay – East Valet – Space 317

| |
|---|
| 2017 Chrysler Pacifica, Nevada/79D401 towed to FBI garage. |
| 20x2 pound containers of exploding targets. |
| 10x1 pound containers of exploding targets. |
| 2x20 pound bags of explosive precursors. |
| Polymer 25-round AR-10 .308/7.62 magazines (loaded). |
| Polymer 40-round AR-15 .223/5.56 magazines (loaded). |
| Boxed ammunition. |
| Suitcases and towels. |

### McCarran Airport – Fuel Tanks – E. Mandalay Bay Road/Haven Street

| |
|---|
| Bullet fragments. |

### 1372 Babbling Brook Court Mesquite, Nevada (Paddock's House)

| Make | Model | Serial Number | Description |
|---|---|---|---|
| Smith & Wesson | SW99 | SAB5974 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HDU4086 | 9mm semi-automatic pistol. |
| Glock | 17 | BCGM344 | 9mm semi-automatic pistol. |
| Mossberg | 500 | V0397109 | 12 gauge pump action shotgun. |
| Sig Sauer | 516 | 20J036999 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Arma-Lite | SPRM001 | M-10-13530 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Mossberg | 590 | V0433557 | 12 gauge pump action shotgun. |
| LWRC | M61C-IC-A5 | 24-19038 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Mossberg | 590 | V0348193 | 12 gauge pump action shotgun. |
| Mossberg | 930 | AF0001141 | 12 semi-automatic gauge shotgun. |
| Arma-Lite | SPRM001 | M-10-12006 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Sig Sauer | 516 | 20K046207 | AR-15 .223/5.56 rifle, with a bipod. No sights or optics. |
| Lantac | LA-R15 Raven | LT-0297 | AR-15 .223 Wylde rifle with a bipod and scope. |
| Mossberg | 590 | P833785 | 12 gauge pump action shotgun. |
| Arsenal | Saiga 12 | H09423015L | AK-47 style semi-automatic 12 gauge shotgun. |
| Arsenal | Saiga 12 | H07420684 | AK-47 style semi-automatic 12 gauge shotgun. |
| Beretta | 92F | C856302 | 9mm semi-automatic pistol. |
| FN | 5.7 | 386215450 | 5.7mm semi-automatic pistol. |
| Handgun, shotgun, and rifle ammunition. | | | |

**Event: 171001-3519**

| Exploding targets. |
|---|
| Computer related items. |
| Soft body armor. |

**1735 Del Webb Parkway, Reno, Nevada (Paddock's House)**

| Make | Model | Serial Number | Description |
|---|---|---|---|
| Smith & Wesson | 340 | DCA2099 | .357 caliber revolver. |
| Beretta Pietro | 92A1 | A098515Z | 9mm semi-automatic pistol. |
| Remington Arms | 870 Tactical | RS90036Z | 12 gauge pump action shotgun. |
| Mossberg | 590 | V0187184 | 12 gauge pump action shotgun. |
| Glock | 17 Gen4 | BBVN828 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HHA9534 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HDL4053 | 9mm semi-automatic pistol. |
| Firearm ammunition. | | | |
| Rifle magazines. | | | |
| Computer-related items. | | | |

**Las Vegas Village**

| Bullets and bullet fragments. |
|---|

## Ammunition

Several types of ammunition were located within rooms 32-135 and 32-134 loaded into rifle magazines for AR-15 and AR-10 style rifles.  The AR-15 .223/5.56 rifle magazines were loaded with hollow point and polymer tipped hollow point ammunition. The AR-10 .308/7.62 rifle magazines and the bolt action rifle were loaded with Tracer, Frangible Incendiary Armor Piercing and Armor Piercing Incendiary ammunition.[31]

## Firearms Forensic Analysis

Recovered in rooms 32-135 and 32-134 were 1057 shell casings. Forensic analysis was completed on all of the shell casings that were recovered. Of the rifles recovered from inside rooms 32-135 and 32-134, 14 were found to have been fired. The following table indicates which guns were fired and how many times:

| Make | Serial Number | Number of Rounds Fired |
|---|---|---|
| Daniel Defense | DDM4078072 | 100 |
| POF | PE1600179 | 95 |
| FNH | FNB024293 | 153 |

---

[31] Information on the ammunition was summarized from the analysis report produced by the FBI.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

| Daniel Defense | DDM4123629 | 95 |
|---|---|---|
| Noveske Rifleworks LLC | B15993 | 33 |
| Colt | LE564124 | 96 |
| Christiansen Arms | CA04625 | 21 |
| LMT | LMT81745 | 100 |
| Colt | LE451984 | 100 |
| POF | 03E-1603178 | 100 |
| FNH | FNCR000383 | 144 |
| LWRC | 5P03902 | 12 |
| Ruger | 56213026 | 6 |
| LMT | LMS18300 | 2 |

Forensic analysis was also completed on the Smith and Wesson revolver recovered in Room 32-135. Scientists were able to determine the round recovered from Paddock's head was fired from the revolver recovered in Room 32-135. It was determined the spent shell casing recovered in the cylinder of the revolver was fired from the revolver.[32]

**Lock Interrogations**

The key cards for hotel rooms in Mandalay Bay are programmed by computer when checking into the hotel. Each card is automated to open the room door associated to that guest. As a result, each time a card is used to gain access to a guest room, the information is electronically stored. Lock interrogations were requested on both rooms 32-135 and 32-134.

On October 1, the door and lock to Room 32-135 was manipulated several times. The door was opened and closed and the dead bolt was thrown and released several times. At 2320 hours, the door to Room 32-135 showed "opened from the inside." This is the time the door was breached by officers. The only key card used to open the door from the outside was issued to Paddock.

On October 1, the door and lock to Room 32-134 was manipulated several times. The door was opened and closed, and the dead bolt was thrown and released several times. The only key card used to open the door from the outside was issued to Paddock.

Prior to October 1, key cards issued to other guests were used in an attempt to make access into rooms 32-135 and 32-134 but access was denied.[33]

**DNA**

Several items of evidentiary value were collected for DNA analysis from rooms 32-135 and 32-134 of the Mandalay Bay. These items included the 24 firearms recovered in the rooms, along with personal items, and were compared to known samples for Paddock and Danley.

---

[32] Information was summarized from the analysis report completed by the FBI.
[33] Lock interrogation reports for rooms 32-135 and 32-134. Lock interrogations are attached as Appendix A and Appendix B, respectively.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

Scientists were able to determine Paddock's DNA existed on several firearms, including the Smith and Wesson revolver. When tested against Danley's DNA, the results for the firearms were either inconclusive or negative.

DNA recovered on personal items located in the rooms were tested and found to belong to Paddock and Danley. DNA also returned to known samples of hotel employees and previous room guests. Investigators conducted interviews with those people, and it was determined they had no interaction with Paddock and were not involved in the events of 1 October.[34]

**Digital**

There were approximately 2,000 leads investigated. Approximately 22,000 hours of video and 252,000 images were obtained by investigators of the LVMPD and the FBI. Analysis found 500 sightings of Paddock.[35]

Four laptop computers and three cellphones were located in rooms 32-135 and 32-134. All laptop computers and cellphones were given to the FBI to be forensically analyzed. The forensic analysis on all electronics located in rooms 32-134 and 32-135 have been completed, and the results of the analysis is listed in the following section.

**Evidence Item HP Laptop Computer Recovered in Room 32-134**

**Browser Artifacts**

The HP laptop computer contained Internet artifacts from the following cloud storage services: Dropbox.com, Box.com, and Microsoft One Drive. Dropbox and Microsoft One Drive were installed on the laptop. Box.com was accessed through a web browser.[36]

**Google Maps**

On May 18, 2017, Google Maps searches were performed for Venice Beach and Fenway Park.

The following queries were also made with Google Maps:

- Royal Rooters' Club, Boston, MA
- Blandford Street Station, United States
- Boston University Questrom School of Business
- Boston Hotel Buckminster, Beacon Street, Boston, MA
- Boston Arts Academy
- Official Red Sox Team Store
- Official Red Sox Team Store, 19 Yawkey Way, Boston, MA

---

[34] DNA analysis was completed by the FBI. Information summarized from the FBI analysis report.
[35] Digital evidence analysis was completed by the FBI. Information summarized from the FBI analysis report.
[36] Computer analysis was completed by the FBI. Information summarized from the FBI analysis report.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

- Venice Ale House
- Fairmont Miramar Hotel, Santa Monica, CA
- The Bungalow, 101 Wilshire Boulevard, Santa Monica, CA

**Google Search Queries**

On May 18, 2017, searches were performed for "summer concerts 2017," "grant park functions," "biggest bear," "La Jolla Beach," "open air concert venues," "biggest open air concert venues in USA," and "how crowded does Santa Monica Beach get."

On September 4, 2017, searches were performed for "Las Vegas rentals," "Las Vegas condo rentals," "Las Vegas high rise condos rent," and "Las Vegas Ogden for rent."

On September 5, 2017, searches were performed for "life is beautiful expected attendance," "life is beautiful single day tickets," and "life is beautiful Vegas lineup."

On September 15, 2017, searches were performed for "swat weapons," "ballistics chart 308," "SWAT Las Vegas," "ballistic," and "do police use explosives."

**Bing Search Queries**

On September 5, 2017, searches were performed for "Mandalay Bay Las Vegas," "Route 91 harvest festival 2017 attendance," and "Route 91 harvest festival 2017."

The following websites were accessed using an Internet Explorer private browser:

- http://lineup.lifeisbeautiful.com/
- https://www.google.com/maps?hl=en&tab=wl
- https://lifeisbeautiful.com/ticket/
- http://search.topvegascondos.com/i/the-ogden-downtown-las-vegas-condos-forrent
- https://www.google.com/?
  gws_rd=ssl#q=how+crowded+does+santa+monica+beach+get&spf=1495082236761
- https://www.vividseats.com/blog/category/all-concerts/
- https://www.vividseats.com/blog/fenway-park-concerts-and-seating
- https://www.vividseats.com/blog/the-14-best-outdoor-concert-venues-in-the-us
- http://tsminteractive.com/what-are-the-most-crowded-beaches-in-america/
- https://www.yelp.com/biz/santa-monica-state-beach-santa-monica
- https://www.vividseats.com/blog/memorial-day-weekend-2017.html

The following websites were accessed using Internet Explorer:

- www.grantparkmusicfestival.com on May 18 at 0419 hours
- www.ticketmaster.com on May 18 at 0427 hours
- ticketmaster.com on May 18 at 0431 hours
- www.sandiego.org on May 18 at 0505 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

Event: 171001-3519

- sandiego.org on May 18 at 0505 hours
- www.vividseats.com on May 18 at 0540 hours
- www.lasvegascondoexperts.com on September 4 at 2212 hours
- lasvegashighrisetour.com on September 4 at 2213 hours
- www.thehighrisegroup.com on September 4 at 2214 hours

**Evidence Item Dell Laptop Computer Recovered in Room 32-135**

Computer forensic analysis of a Dell laptop Model E5570 revealed numerous Internet searches for open-air venues. Additionally, several hundred images of child pornography were located on the computer's hard drive. The investigation into the source of these images is ongoing. The following Internet searches from this laptop are indicated below:[37]

**Google Search Queries**

- How tall is Mandalay Bay/ Unknown date
- NV gun shows/ September 2, 2017 and September 30, 2017
- Life Is Beautiful 2017/ September 20, 2017
- Excalibur Hotel & Casino/ September 23, 2017
- Las Vegas Academy of the Arts Performing Arts Center/ September 23, 2017
- Fremont Hotel & Casino/ September 23, 2017
- El Cortez Hotel & Casino/ September 23, 2017
- Family Courts & Services Center/ September 23, 2017
- Gary Reese Freedom Park/ September 23, 2017
- Cashman Center/ September 23, 2017
- Cashman Field/ September 23, 2017
- Neon Museum/ September 23, 2017
- The Mob Museum/ September 23, 2017
- Discovery Children's Museum/ September 23, 2017 and September 26, 2017
- Arizona Charlie's Decatur/ September 23, 2017
- Where is hard drive located on e5570/ September 28, 2017
- NHRA schedule 2017/ September 30, 2017

**Cellular Phones**

Along with the three cellular phones located in Room 32-135, two other telephone numbers were found associated with Paddock which included the telephone number associated with Danley. Call data records for all telephone numbers were obtained through court order from October 2016 through October 2017.

Telephone records indicated the four telephone numbers primarily used by Paddock were (310) 227-7094, (310) 357-3357, (310) 357-3358, and (702) 482-6360. There were no telephone numbers which contacted all of Paddock's devices, however, there were phone numbers which

---

[37] Computer analysis completed by the FBI. Information was summarized from the FBI report.

**Event: 171001-3519**

contacted more than one of his devices. The devices which used the telephone numbers (310) 227-7094 and (310) 357-3357 were the devices most used by Paddock.

## Telephone Number (310) 227-7094

This telephone number had 1,837 contacts since the beginning of October 2016. Of those contacts, 668 were outgoing and 1,169 were incoming. The last outgoing call placed from this number was on September 27, 2017 at approximately 1522 hours. The last incoming call was on September 27, 2017 at 1058 hours.

## Telephone Number (310) 357-3357

This telephone number had 1,615 contacts since the beginning of October 2016. Of those contacts, 127 were outgoing and 1,488 were incoming. The last outgoing call was on September 27, 2017 at 1518 hours. The last incoming call was on September 28, at 0816 hours.

## Telephone Number (702) 533-5316

This telephone number was associated with a prepaid smartphone and had very little contact information. The last incoming telephone call was on September 17, 2017 at 1241 hours. The last outgoing telephone call was placed March 30, 2017 at 1154 hours.

## Financial Analysis

A financial analysis was completed on Paddock and revealed a large decrease in financial liquidity. Investigators found 14 bank accounts associated with Paddock. In September 2015, his bank accounts totaled just under $2,100,000. By contrast, in September 2017, the amount in the accounts dropped to $530,000 with most of the decline occurring in 2017.

Over $600,000 was paid to casinos, approximately $130,000 was associated with Danley, and over $170,000 was paid to credit card companies. Paddock made almost $95,000 in firearms and gun-related purchases. One of the last checks Paddock wrote was to the IRS for over $13,000.[38]

## Suspectology

Suspectology is the gathering of information to help establish the identity of a suspect and motive in a crime. Suspectology can be developed through interviews with family, friends, and associates and also through analysis of data collected about a subject.

Agents with the FBI's Behavioral Analysis Unit (BAU) responded to gather information and help with Paddock's suspectology. At the time of this report, the FBI's BAU assessment of Paddock is not complete and will be released by the FBI at a later date.

---

[38] Financial analysis completed by the FBI. Information was summarized from the FBI report.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

In order to obtain a better understanding of Paddock, the following interviews were completed with his family members and acquaintances. The following are summaries of the interviews conducted by investigators with various agencies.

**Marilou Danley**

Marilou Danley was interviewed on several occasions after the incident. Present during the interviews were various investigators with the LVMPD and FBI along with Danley's daughter and lawyer. The following is a summary of the information provided and learned during those interviews.

Danley was born in the Philippines and later moved to Australia and became a citizen. Danley moved to the United States in the late 1980s. She married and lived in Tennessee and Arkansas until separating from her husband. Danley then moved to Reno and began working as a high-limit casino host.

While in Reno, Danley met Stephen Paddock and had a professional relationship. Over the course of a couple years, their relationship developed into a romantic one. Paddock was not living in Reno at the time but would visit often and stay at the casino. According to Danley, Paddock played video poker and was known as a high roller.

As their relationship developed, Paddock bought a condominium in Reno because he was tired of staying in the hotel. In 2013, Danley moved into the condominium, and Paddock continued to travel between Mesquite, Texas, and Reno. Paddock told Danley his family owned an apartment complex in Mesquite.

In 2014, Paddock purchased a single-family residence in the Reno area and sold the condominium. Paddock and Danley moved into the house, and it became their primary residence. In January of 2015, Paddock purchased a single-family residence in Mesquite. Paddock and Danley would travel between the two residences often. All real estate transactions were completed in Paddock's name only.

After acquiring the Mesquite residence, Paddock and Danley would routinely travel to Las Vegas and stay at various casinos while gambling. Most of the trips were for a few days at a time. They had hosts at several casinos and would book rooms, show tickets, and concerts through the casino hosts. Paddock would often request a room with a nice view. Reservations were placed with both names so that both could charge incidentals to the rooms.

Paddock and Danley took multiple trips together, and Paddock asked Danley to quit working so they could travel more. Danley told him she could not because she had to work. Paddock convinced Danley to quit working in 2015 and agreed to give her a set amount of money every month. Paddock and Danley travelled, taking many cruises and international trips. Destinations included the Mediterranean, Bahamas, Dubai, and the Orient.

Danley described her relationship with Paddock as very romantic in the beginning; however, she noticed a gradual decline in affection. According to him, it was due to his declining health. Danley

**Criminal Investigative Report of the 1 October Mass Casualty Shooting**

**Event: 171001-3519**

stated over the course of their relationship, hugging and kissing stopped. Danley confronted Paddock about the lack of affection, and he told her he was unable to commit to more affection. Paddock would show concern and compassion despite the lack of affection.

Danley stated Paddock was no longer able to have an intimate relationship because he was unable to perform. Danley told investigators Paddock was physiologically able to have sex, but the physical act would exhaust him. Danley stated he would often sleep for long periods after physical exertion.

Danley described Paddock as a mild-mannered person and never violent. He rarely became visibly upset and did not yell or scream when angered. If he was upset about something, Danley stated Paddock would become quiet. He seldom drank alcohol, and she never observed him consume any type of illegal narcotic.

Paddock would often complain of being sick and told Danley that doctors couldn't cure him. He stated doctors told him he had a chemical imbalance. Paddock would get very bad headaches from chemical smells and often asked to change rooms in hotels because of the smell in the room. Paddock would not shake hands with people and often wore cotton gloves. Paddock told her in the beginning of their relationship that she would have to stop wearing lipstick and perfumes because he was allergic to them.

According to Danley, Paddock was not a religious person. He would often say things like, "Your God doesn't love me," or "Your God doesn't love us." Danley described herself as a Catholic and would often make the sign of the cross. If something negative would happen after making the sign of the cross, Paddock would blame the negative action on Danley making the sign. Although not religious, Paddock did not have a problem with Danley taking part in religious practices. According to Danley, Paddock described himself as an atheist.

Danley stated Paddock didn't talk in length about politics and did not belong to any political organizations. Paddock did express a dislike for the Obama administration and was happy when President Trump was elected. Paddock told her he believed President Trump would do something to stop illegal immigration. Paddock did not comment on the topic of gun control and did not display any racial bias.

In 2016, Paddock and Danley traveled to their residence in Reno. When they returned to Mesquite, Paddock brought back a large gun safe. The safe was placed in the garage of the Mesquite residence, and Danley observed a pistol in the safe when she placed jewelry in it. Danley observed an increase in guns and gun-related purchases after Paddock retrieved the safe.

In August 2017, Paddock and Danley drove to the residence in Reno. On their return to Mesquite, Paddock brought back a large quantity of ammunition. Danley assisted Paddock by putting loaded magazines into suitcases and duffle bags. According to Danley, each duffle bag contained 25 loaded magazines. Danley asked Paddock why he had so much ammunition and Paddock told her it was because one gun could use a lot of ammunition. Paddock also said he began buying ammunition in bulk because it was cheaper.

**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

Danley believed Paddock's new found interest in guns was merely a hobby. Packages began arriving at the residence frequently, and Paddock would open the packages in the garage. Paddock often went to gun stores and gun shows. Danley accompanied Paddock on a few trips to gun stores but did not pay attention to the transactions. Danley also accompanied Paddock to an unofficial gun range located near the waste management landfill near Mesquite. Danley helped set up targets at long distances for Paddock to shoot with the rifles. After target shooting with the various rifles, Paddock would clean them in the garage. Danley helped Paddock load magazines and move ammunition on more than one occasion.

During a stay at the Mandalay Bay in the beginning of September 2017, Danley recalled Paddock behaving strangely. They were staying in Room 60-235, and she observed Paddock constantly looking out the windows of the room which overlooked the Las Vegas Village venue. Paddock would move from window to window looking at the site from different angles.

In late August or early September 2017, Paddock told Danley she should go see her family in the Philippines. Paddock booked the travel arrangements for Danley's flights. Danley departed on September 15 and was scheduled to return on October 4. Paddock completed three separate wire transfers into Danley's account during the trip. The total of the transfers was $150,000. According to Danley, the money was to be used to purchase a home in the Philippines. Danley was concerned Paddock may be attempting to set her up with a home and break up with her.

Danley stated most of her communication with Paddock during the trip was by email or text message. They did have at least one voice call during the trip. Paddock told Danley the calls were expensive, and that's why he set up international text messaging for the trip. During text or email conversations, Paddock would become evasive or change the subject if Danley asked where he was at but did tell her he was up $70,000. Around September 27, 2017, she received an email from Paddock asking her if she wanted to stay longer, and she replied she was ready to come home.

Danley learned of the attack while she was in Manila. She was on her way to dinner when her sister received a phone call telling them to come back to the house. When Danley and her sister walked into the house, she observed her driver's license photo on the television stating she was a person of interest in the investigation. Danley contacted her daughter in California and made arrangements to return to the United States.

**Peggy Paddock**

Paddock's ex-wife Peggy was interviewed after the incident. Present during the interview were various agents with the FBI. The following is a summary of the information provided and learned during the interview.

Peggy was married to Paddock for approximately six years. After their divorce, Peggy and Paddock continued to invest in real estate together. Most of the properties were located in the Los Angeles area. Paddock would handle most of the details pertaining to the purchase and sale of properties with Peggy mainly assisting in financial support.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

Paddock spoke of growing up with a single mom and financial instability during his marriage to Peggy. Paddock emphasized a need to be self-reliant and self-sustaining because of this. During high school and college, Paddock worked for the United States Postal Service. After graduating from college, he began working for the IRS. Paddock went on to work for Lockheed, the Defense Contractor Auditing Agency and then McDonnell Douglas.

Paddock was not interested in drawing attention to himself. He did not buy flashy clothes, jewelry or cars.

**Irene Hudson**

Irene Hudson, the mother of Stephen Paddock, was interviewed on October 2, 2017, by special agents with the FBI. The following is a summary of the information provided and learned during the interview.

Hudson is the biological mother of Paddock and was his former business partner. She stated the last time she spoke with Paddock was over the phone a couple weeks before the attack. Paddock called to check on her and make sure she was prepared for Hurricane Irma.

Hudson did not believe Paddock was affiliated with any religious or political groups. Paddock did not discuss either topic with Hudson. Hudson told agents Paddock was intelligent, good with numbers, and non-violent.

Hudson did not understand why Paddock committed such a horrible act. She believed Paddock must have developed some type of "brain tumor" which caused him to act the way he did.

**Eric Paddock**

Eric Paddock, a brother of Stephen Paddock, was interviewed on several occasions after the incident. Present during the interviews were various investigators with the LVMPD and FBI. The following is a summary of the information provided and learned during those interviews:

Eric is the youngest of four siblings born to Benjamin and Irene Paddock (Hudson). Benjamin was arrested and went to prison for bank robbery when Eric and his brothers were young. Eric stated several times to investigators his dad was on the FBI's Ten Most Wanted list. Of the brothers, Eric only spoke to Paddock. Eric stated Patrick has "mental issues" and described Bruce as a "sociopath." Eric stated Paddock had limited interaction with Benjamin after Benjamin's release from prison.

Eric stated the last time he had contact with Paddock prior to the attack was approximately two weeks before and was via text message. Eric said it was not uncommon for long periods of time to pass without contact between them. He continued to say that they would only speak when something needed to be discussed.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

When asked about political and religious affiliations, Eric stated Paddock had none and was neither liberal nor conservative. Eric did not believe Paddock voted in the prior presidential election. Paddock was not a religious person, did not believe in any higher power, and found religious people to be ridiculous.

Paddock graduated from college with a degree in accounting and later worked for the IRS. Eric believed Paddock worked for the IRS in order to learn how to hide income. Paddock later worked for an aerospace engineering company before becoming involved in real estate with family members.

Eric, Paddock, and their mother Irene started a business together investing in real estate. They owned several properties together, including apartment complexes in California and Texas. The properties were sold for a substantial profit which was split between them.

After the sale of the business properties, Paddock moved to Nevada and began gambling. Most of Paddock's activities centered on gambling. Paddock had a mathematical mind and would only gamble when he believed the odds were in his favor. According to Eric, Paddock had won millions of dollars gambling and was well known in Las Vegas casinos. Paddock played mostly at the Wynn for the last few months. Because Paddock was so successful, casinos would no longer provide him free compensations.

Eric believed Paddock may have conducted the attack because he had done everything in the world he wanted to do and was bored with everything. If so, Paddock would have planned the attack to kill a large amount of people because he would want to be known as having the largest casualty count. Paddock always wanted to be the best and known to everyone.

Eric told investigators he and Paddock were smarter than the majority of other people. Eric told investigators he was in Las Vegas to help and show "how dumb you motherfuckers are," referring to law enforcement. Eric believed Paddock would have planned every part of the attack methodically. Paddock would have a need for everything found in the room. Despite appearing unkempt and in poor health, Paddock was very detail-oriented.

Paddock would not have cared about the people he killed. It would not matter their race, religion or sex. Paddock was described by Eric as a "narcissist" and only cared for people that could benefit him in some way. Eric stated Paddock needed to be seen as important and needed to be catered to. According to him, Paddock did not have anger issues and was passive aggressive toward those who angered him.

Eric was upset with Paddock until he learned Paddock had removed the hard drives of the computers found in the hotel room. Eric was upset because Paddock completed the taxes for the family and had cheated on them. Eric was afraid the hard drives would implicate him and his mother for tax evasion. Upon learning the hard drives were missing, Eric said several times maybe he (Paddock) did care for us.

**Event: 171001-3519**

Eric felt Paddock cared deeply for Danley and would do whatever possible to help take care of her. Eric expressed anger over the possibility of Danley having access to his monetary assets. Eric referred to Danley as a "gold digger."

**Kerry Marie Paddock**

Kerry Marie Paddock, the wife of Eric and sister-in-law of Paddock, was interviewed after the incident. Present during the interview were various Special Agents with the FBI. The following is a summary of the information provided and learned during those interview.

Kerry had not seen Paddock since July 2016 when she and Eric visited Paddock and Danley in Las Vegas. Kerry has known Paddock for approximately 36 years, but she only had contact with him around 20 times. Eric and Paddock would talk occasionally on the phone.

She knew Paddock worked for the IRS at one point in his life. Kerry, Paddock and Eric bought property together in Texas and California. She also believed that Paddock owned other properties, but she did not have any further information.

Kerry knew that Paddock gambled often and believed it helped him maintain his lifestyle. Paddock liked to talk about traveling and gambling. She never observed Paddock angry or upset.

Kerry knew Paddock was allergic to many things. Because of his allergies, Danley never wore lipstick or perfume. Kerry did not know if Paddock was ever diagnosed with any condition by a medical doctor.

**Bruce Paddock**

Bruce Paddock, a brother of Stephen Paddock, was interviewed on several occasions after the incident. Present during the interviews were various Special Agents with the FBI. The following is a summary of the information provided and learned during those interviews.

Bruce was staying at an inpatient medical facility awaiting back surgery. On October 1, at approximately 0230 hours, Bruce woke up in need of pain medication. Bruce watched the news on the television and learned of the shooting at the Route 91 Harvest music festival. Bruce heard that his brother, Paddock, was the suspect in the shooting. Bruce called the FBI public access line to report his location in case investigators needed to talk to him.

Bruce had no contact with Paddock or his mother for many years. Bruce had not seen Paddock since the early 1990s and had not spoken with him for over 10 years. Bruce called his mother to advise her what was going on and learned his mother was already aware.

Despite the lack of contact with Paddock, Bruce believed Paddock was suffering from mental illness and was paranoid and delusional. He did not believe Paddock was a violent person and did not abuse drugs or alcohol.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

Bruce speculated that Paddock would've had to be "very pissed off" to commit such a violent act. Bruce further stated Paddock would have planned everything well in advance. He stated Paddock knew exactly what he was doing when he selected the hotel, the room, the floor, and the concert venue below.

According to Bruce, Paddock was successful and wealthy. Paddock worked for the IRS and the United States Postal Service. He stated Paddock owned several apartment buildings.

**Patrick Paddock**

Patrick Paddock, a brother of Stephen Paddock, was interviewed on several occasions after the incident. Present during the interviews were various Special Agents with the FBI. The following is a summary of the information provided and learned during those interviews.

Patrick works at the Pima County Wastewater Reclamation Department in Tucson, Arizona. Patrick learned of the attack in Las Vegas when a co-worker asked if he was related to Stephen Paddock.

Patrick told investigators he had no current knowledge of Paddock's activities or state of mind due to having no contact with him over the last two decades. Patrick stated he had no interest in Paddock or any other family members.

Patrick was not aware of Paddock having any mental disorders or affiliations with religious or political groups. Patrick was aware Paddock had a pilot's license and worked for the IRS at one point.

According to Patrick, Paddock did not display behaviors of violence or revenge and was motivated by what benefited him personally. To his knowledge, Paddock did not abuse alcohol, illegal drugs, or prescription medications.

**David Paddock**

David Paddock, a nephew of Stephen Paddock, was interviewed after the incident. Present during the interview were various Special Agents with the FBI. The following is a summary of the information provided and learned during the interview.

David advised he has not spoken to his uncle since the beginning of June 2017. David was in Reno for a convention and met Paddock for dinner. David said Paddock seemed fine during the dinner and did not notice any abnormal behavior.

According to David, his uncle kept to himself and David described him as "wealthy" and "aloof." Paddock liked to keep to himself but enjoyed eating at restaurants and taking cruises. David knew Paddock had a girlfriend but never met her.

Event: 171001-3519

Paddock did not speak in an emotional manner. David stated his family was very direct and did not display much emotion. David never witnessed Paddock being rude or disrespectful to anyone. Paddock was not a religious person and did not belong to any political groups.

**Jacob Paddock**

Jacob Paddock was interviewed after the incident. Present during the interview were various Special Agents with the FBI. The following is a summary of the information provided and learned during the interview.

Jacob Paddock last saw his uncle in February 2017. Jacob was living in Los Angeles, California and moving back to Florida. His father, Eric Paddock, drove his RV to California to help Jacob move. Jacob and Eric stopped in Las Vegas and had dinner with Paddock at the Wynn Las Vegas. Jacob stated Paddock had two rooms at the Wynn, but he and his father did not stay the night.

Jacob believed Paddock received a degree in accounting or business and worked as an accountant at some point. Jacob also knew the majority of the family's wealth was from real estate investments.

Jacob told investigators the family was not very close and only met Paddock six or seven times in his life. Paddock would occasionally speak to Eric on the phone and the last time was during Hurricane Irma.

Jacob described Paddock as "eccentric." Paddock liked to keep to himself and did not want to be recognized. If he hit a large jackpot while gambling, Paddock would decline any photographs or recognition. Jacob said Paddock was a high roller at many casinos in Las Vegas. He said Paddock was careful with his money. Paddock would play machines on nights when his points would be doubled or tripled for complimentary rooms, shows, and meals.

Paddock did not have any political or religious affiliations that Jacob was aware of. Jacob never observed Paddock upset or angry with anyone.

**Vivian Ayers**

Vivian Ayers, Paddock's first cousin, was interviewed on several occasions after the incident. Present during the interviews were various investigators with the FBI. The following is a summary of the information provided and learned during those interviewss

Ayers has known Paddock since they were children. Ayers' mother and Paddock's mother were sisters. According to Ayers, Paddock did well in school and did not have behavioral issues.

Paddock and his brothers were told by their mother, that their father died when they were young. He was in fact in prison at the time. Ayers stated Hudson, Paddock's mother, was angry and bitter because she felt Paddock's father abandoned her and the boys. Hudson worked hard and

**Event: 171001-3519**

was a private person. Ayers felt Paddock had the same personality traits as his mother. Paddock never mentioned his personal problems to anyone.

When Paddock became interested in a subject, he would devote himself to it but then lose interest. Paddock obtained his pilot's license when he was 17 years old. He enjoyed diving, travelling and gambling. According to Ayers, Paddock began losing interest in travelling approximately one year ago.

Paddock attended college and later worked for the IRS and Lockheed. Ayers stated Paddock did not like working for other people and began investing in real estate with family members. According to Ayers, there was no criminal intent in Paddock's buying and selling real estate. Ayers was also told that Paddock had made a significant amount of money in the stock market but was no longer involved in stocks.

Besides becoming more irritable, Ayers did not notice any significant changes in Paddock's behavior; however, she was concerned for his health because he did not look well. Paddock did not take care of his teeth, and Ayers noticed his teeth were either missing or rotten. Paddock told her it was because he could not go to the dentist due to his allergies.

**Paddock's Primary Care Physician**

Paddock made numerous claims to friends and family that he consistently felt ill, in pain or fatigued. A doctor in Las Vegas was identified as Paddock's primary care physician and records were obtained through federal grand jury subpoena. An interview was conducted with him by agents with the FBI. The physician relayed, he last saw Paddock as a patient on or around October 2016 for an annual checkup.  He recalled the only major ailment Paddock had was a slip and fall accident at a casino approximately three years earlier, which caused a muscle tear.

The physician described Paddock as "odd" in behavior with "little emotion" shown. He believed Paddock may have had bipolar disorder; however, Paddock did not want to discuss that topic further with him. Paddock also refused anti-depressant medication but accepted prescriptions for anxiety. He noted Paddock seemed fearful of medications, often refusing to take them. He did not believe Paddock was abusing any medications.

**Firearms**

Paddock purchased at least 67 firearms since the early 1980s. Between 1982 and 2001 Paddock purchased 17 handguns. Beginning in October of 2016, Paddock began buying firearms at a faster rate, consisting mainly of rifles. Of the 67 firearms known to law enforcement, 24 were recovered inside the Mandalay Bay, 18 were recovered in Paddock's Mesquite residence and seven were recovered in Paddock's Reno residence. Of the firearms Paddock purchased, 18 are unaccounted for. It is unknown if these firearms were sold or traded.[39]

---

[39] Information obtained by the ATF.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

| Make | Model | Caliber | Serial Number | Date of Purchase |
|------|-------|---------|---------------|------------------|
| Charter Arms | Undercover | 0.38 | 741575 | 06/14/1982 |
| Beretta | 20 | 0.25 | BE09766V | 04/19/1983 |
| Beretta | 92F | 9mm | C85630Z | 10/03/1986 |
| Smith & Wesson | 469 | 9mm | TAZ3173 | 07/03/1987 |
| Smith & Wesson | 38 | 0.38 | AWD5144 | 07/27/1987 |
| Beretta | 21 | 0.22 | BAS23900U | 09/16/1987 |
| Colt | CAR15 | 0.223 | SP340417 | 01/06/1991 |
| Smith & Wesson | SW99 | 9mm | SAB5974 | 03/02/2000 |
| Smith & Wesson | 4103TW | 10mm | MSE3420 | 04/05/2000 |
| Smith & Wesson* | Air Light | 0.38 | C0Z7618 | 05/17/2000 |
| Kahr Arms | MK9 | 9mm | GC0840 | 06/06/2000 |
| Taurus | PT111 | 9mm | TSH98476 | 07/12/2000 |
| Smith & Wesson | SW380 | 380 | RAJ7637 | 08/14/2000 |
| Steyr | M40 | 10mm | 5708 | 11/01/2000 |
| Glock | 27 | 40 | DZC226US | 01/05/2001 |
| Sturm Ruger | P944T | 40 | 34107112 | 02/22/2001 |
| Sig Sauer | P229 | 40 | AM90219 | 04/22/2008 |
| Smith & Wesson | 340 | 357 | DCA2099 | 04/22/2008 |
| Beretta Pietro | 91A1 | 9mm | A098515Z | 12/16/2015 |
| Remington Arms | 870 | 12G | RS90036Z | 10/02/2016 |
| Colt | M4 | 5.56 | LE5044018 | 10/02/2016 |
| Mossberg | 590 | 12G | V0187184 | 10/05/2016 |
| Smith & Wesson | M&P9 | 9mm | HDU4086 | 11/17/2016 |
| Glock | 17 | 9mm | BCGM344 | 11/23/2016 |
| Daniel Defense* | DDM4 | Multi | DDM4078072 | 11/23/2016 |
| Mossberg | 500 | 12G | V0397109 | 11/30/2016 |
| DPMS | Oracle | 0.308 | 109687 | 11/30/2016 |
| Glock | 17Gen4 | 9mm | BBVN828 | 12/12/2016 |
| Smith & Wesson | M&P9 | 9mm | HHA9534 | 12/12/2016 |
| Sig Sauer | 516 | 5.56 | 20J036999 | 12/13/2016 |
| Daniel Defense* | DD5 | Multi | DD5007426 | 12/31/2016 |
| Sig Sauer* | 716 | 7.62 | 23D020868 | 01/06/2017 |
| POF* | P-15 | Multi | PE1600179 | 01/25/2017 |
| FNH* | FN15 | Multi | FNB024293 | 02/02/2017 |
| Arma-Lite | SPRM001 | 5.56 | M-10-13530 | 02/02/2017 |
| Mossberg | 590 | 12G | V0433557 | 02/13/2017 |
| Daniel Defense* | DDM4 | Multi | DDM4123629 | 02/15/2017 |
| Daniel Defense* | DD5 | Multi | DD5008362 | 02/15/2017 |
| Noveske Rifleworks LLC* | N4 | 5.56 | B15993 | 02/18/2017 |
| Smith & Wesson | M&P9 | 9mm | HDL4053 | 02/18/2017 |
| Colt* | M-4 | 5.56 | LE564124 | 03/02/2017 |
| Christiansen Arms* | CA-15 | Multi | CA04625 | 03/02/2017 |
| LWRC* | M61C | 5.56 | 24-18648 | 03/02/2017 |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

| LMT* | Defender 200 | 5.56 | LMT81745 | 03/02/2017 |
|------|--------------|------|----------|------------|
| LMT | LM8MWS | 7.62 | LMS18321 | 03/02/2017 |
| LWRC | M61C-IC-A5 | 5.56 | 24-19038 | 03/19/2017 |
| Mossberg | 590 | 12G | V0348193 | 03/19/2017 |
| Mossberg | 930 | 12G | AF0001141 | 03/22/2017 |
| Arma-Lite | SPRM001 | 5.56 | M-10-12006 | 03/22/2017 |
| LMT* | LM8MWS | 7.62 | LMS18321 | 03/22/2017 |
| Sig Sauer | 516 | 5.56 | 20K046207 | 05/02/2017 |
| POF USA* | P308 | 308 | UA-1600204 | 05/22/2017 |
| Colt* | M4 | 5.56 | LE451984 | 05/25/2017 |
| Colt* | Competition | Multi | CCR014544 | 05/25/2017 |
| Lantac | LA-R15 Raven | 0.223 Wylde | LT-0297 | 05/25/2017 |
| POF USA* | P-15 | Multi | 03E-1603178 | 06/30/2017 |
| FNH* | FN15 | Multi | FNCR000383 | 06/30/2017 |
| LWRC* | M61C | 5.56 | 5P03902 | 05/05/2017 |
| FNH* | FN15 | Multi | FND000905 | 07/05/2017 |
| Ruger* | SR762 | 7.62 | 56213026 | 09/01/2017 |
| LMT* | LM8MWS | 7.62 | LMS18300 | 09/01/2017 |
| Ruger* | American Rifle | .308win | 965-93877 | 09/28/2017 |
| Mossberg | 590 | 12G | P833785 | Unknown |
| Arsenal | Saiga 12 | 12G | H09423015L | Unknown |
| Arsenal | Saiga 12 | 12G | H07420684 | Unknown |
| FNH | 57 | 5.7 | 386215450 | Unknown |

*Denotes firearms recovered in rooms 32-135 or 32-134.

**Search Warrants and Legal Process**

The investigative process required information to be obtained from numerous sources and venues, to include but not limited to:

- Hotels and casinos
- Firearms-related businesses
- Residences of Stephen Paddock
- Vehicles of Stephen Paddock
- Internet providers
- Telephone companies
- Online retail businesses
- Email companies
- Financial Institutions

Law enforcement personnel served approximately 1,000 legal processes during the course of the investigation. These legal processes were used to obtain information or items related to the investigation. These legal documents included, but are not limited to:

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## Criminal Investigative Report of the 1 October Mass Casualty Shooting
**CONTINUATION**

**Event: 171001-3519**

- Administrative subpoenas
- Court orders
- Search warrants
- Grand jury subpoenas

**Paddock's Autopsy**

On October 6, 2017, at approximately 1625 hours, under CCOCME case 17-10064 and FBI incident number 4-LV-2215061, an autopsy was performed on the body of Paddock at the CCOCME by Doctor Lisa Gavin.

**Decedent**
Name:            Paddock, Stephen
Date of birth:   04-09-53
Gender:          Male
Ethnicity:       Caucasian
Height:          73 inches
Weight:          224 lbs
Hair:            Gray
Eyes:            Brown

Body bag seal #541486 removed at 1625 hours.

Specific Photography:
- Body bag seal
- Clothed body
- Pre-cleaned, unclothed body
- Post-cleaned, unclothed body
- Injuries
- X-rays

The following persons were in attendance:

1)  Clark County Coroner Fudenberg
2)  Forensic pathologist Doctor Gavin
3)  Detective Alsup
4)  Detective Colon
5)  SCSA Fletcher
6)  FBI ERT agents (2)
7)  Forensic Technician Rosales

The following items of evidence were retained by the FBI's Evidence Recovery Team:

1)  One brown, long-sleeved shirt
2)  One pair of black pants

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

3)   One pair of white socks
4)   One pair of black, slip-on shoes
5)   One pair of blue underwear
6)   Paper tissue from the decedent's ears
7)   Print exemplars
8)   One projectile recovered from the decedent's head

**Synopsis**

On October 6, 2017, detectives from the LVMPD, along with a LVMPD crime scene analyst, attended the autopsy of Stephen Paddock at the CCOCME. Also present were members of the FBI Evidence Recovery Team who retained all collected evidence.

The exam room was secured by Clark County Coroner John Fudenberg. Forensic Pathologist Doctor Lisa Gavin performed the autopsy with one assistant.

The decedent was X-rayed, photographed, and cleaned prior to Doctor Gavin's exam. Preliminarily, the injuries noted were on the posterior of both calves, and a gunshot wound to the upper palette inside the decedent's mouth with obvious damage to the upper teeth.
The cause of Paddock's death was an intraoral gunshot wound, and the manner of death was ruled a suicide.

- See Appendix C for all autopsy-related documents.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

## V.    CONCLUSION

On October 1, 2017, Stephen Paddock committed the largest mass casualty shooting in this country's history. Fifty-Eight people were killed, approximately 887 people sustained documented injuries. Of those 869 people, 413 sustained a gunshot wound or shrapnel-type injury.

While en route to the scene, many investigators heard multiple, chaotic emergency-only radio calls coming out in reference to active shooters at different properties along the Las Vegas Strip, fires breaking out at certain properties, actual shooters that were inside the Las Vegas Village venue at the time of the shooting. Early reporting from national news outlets reported that ISIS was claiming responsibility for the shooting. The investigation revealed none of this information was accurate.

Paddock began stockpiling weapons approximately one year prior to the shooting. His behavior began to change according to Danley. Their relationship became very business-like and she became almost subservient to him. He began purchasing semi-automatic rifles and hundreds of gun-related items almost daily.

Paddock researched various open-air venues such as Fenway Park, La Jolla Beach, and other open-air concert venues. His Internet searches also included "Biggest open air concert venues in USA", "How crowded does Santa Monica Beach get", and many others.

During a stay at the Mandalay Bay in September of 2017, Danley described Paddock's behavior strange as they were staying in Room 60-235, and she observed him looking out the windows which also overlooked the Las Vegas Village venue. She mentioned how he would move around the room looking at the venue from different angles and positions.

In late August or September of 2017, Paddock told Danley that she should go to the Philippines and visit her family. Danley traveled to the Philippines, departing on September 15,  and scheduled to return on October 4. Paddock completed three wire transfers during this time totaling $150,000. Each wire transfer was for $50,000.

On October 1, between 2205 and 2216 hours, Paddock fired approximately 1,057 rounds into the crowd at the Las Vegas Village venue down the 100 Wing hallway of the 32nd floor and at fuel tanks connected to McCarran International Airport, all from inside rooms 32-135 and 32-134 of the Mandalay Bay.

At approximately 2218 hours, heat detection indicators from inside Room 32-135 indicated there was no other movement from inside the room, leading investigators to believe Paddock was alone and at that point already dead.

At approximately 2257 hours, a Strike Team led by Sergeant Joshua Bitsko and SWAT Officer Levi Hancock, breached the interior stairwell door that Paddock had secured with an "L" bracket. At approximately 2320 hours, that same Strike Team breached their way into Room 32-135 to

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

discover Paddock, already dead on the floor with what appeared to be a self-inflicted gunshot wound to the head, and the revolver Paddock used lying a foot away on the floor.

In the days, weeks and months that followed, there was an exhaustive investigation completed by the LVMPD and FBI into Paddock's life, which resulted in the below listed findings.

**INVESTIGATIVE FINDINGS:**

1) Paddock acted alone. Despite early reports of multiple shooters in different locations, no evidence exists to substantiate any of those reports. Thousands of hours of digital media were reviewed, and after all the interviews were conducted, no evidence exists to indicate Paddock conspired with or acted in collusion with anyone else. This includes video surveillance, recovered DNA and analysis of cellular phones, and computers belonging to Paddock.

2) No suicide note or manifesto was found. Of all the evidence collected from rooms 32-135 and 32-134, there was no note or manifesto stating Paddock's intentions. The only handwritten documentation found in either room was the small note indicating measurements and distances related to the use of rifles.

3) There was no evidence of radicalization or ideology to support any theory that Paddock supported or followed any hate group or any domestic or foreign terrorist organization. Despite numerous interviews with Paddock's family, acquaintances and gambling contacts, investigators could not link Paddock to any specific ideology.

4) Paddock committed no crimes leading up to the October 1 mass shooting. All the weapons and ammunition he purchased, were purchased legally. This includes all the purchases Paddock made at gun stores as well as online purchases. Paddock did not commit a crime until he fired the first round into the crowd at the Las Vegas Village.

5) In reference to the 2,000 investigated leads, 22,000 hours of video, 252,000 images obtained and approximately 1,000 served legal processes, nothing was found to indicate motive on the part of Paddock or that he acted with anyone else.

6) Security Officer Campos was not shot with a BB gun but rather sustained a gunshot wound from one of the rounds fired by Paddock down the hallway of the 100 Wing on the 32nd floor. Security Officer Campos did in fact have a pre-planned vacation to Mexico to go visit his father, and Security Officer Campos asked law enforcement for permission to make this trip.

7) One aspect of the investigation focused on Paddock's financials. Although Paddock's liquid wealth declined prior to 1 October, the investigation proved Paddock was self-funded through his gambling and past real estate transactions. He was indebted to no one and paid all his gambling debts off prior to the shooting. Although investigators were told early on in the investigation Paddock had a bank account frozen for high dollar

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
CONTINUATION

**Event: 171001-3519**

transfers, it was determined this information was false for the two years preceding the incident.

## INDICATORS OF INTENT:

As stated earlier in this report, investigators were unable to uncover or discover what Paddock's motive may have been. While motive may have eluded investigators, there were certain indicators of intent shown by Paddock which lead up to the mass shooting.

1) Paddock had a reservation for a hotel during the Lollapalooza music festival held at Grant Park in Chicago, Illinois during the month of August. Like the Route 91 Harvest music festival, the Lollapalooza festival was held in an open-air venue. Paddock specifically requested a room overlooking the venue when he made the reservation. That reservation was cancelled two days prior to the check-in date.

2) Paddock made lodging reservations during the Life Is Beautiful music festival held in downtown Las Vegas. The festival was also an open-air music venue attended by thousands of people. Paddock requested units overlooking the venue. Paddock reserved three different units during the period and all faced the venue. Paddock was observed in video surveillance transporting several suitcases from his vehicle to the units he reserved. Paddock was alone for the trip and was never accompanied by anyone for more than a casual conversation. Investigators have been unable to determine if Paddock intended an attack during this festival or if he used it as a means to plan a future attack.

3) Paddock conducted several internet searches while planning his actions. Search terms included open-air concert venues, Las Vegas SWAT tactics, weapons, and explosives. Paddock also searched for various gun stores.

4) Paddock purchased over 55 firearms, which were mostly rifles in various calibers, from October 2016 to September 2017. He bought over 100 firearm-related items through various retailers during that period.

5) During a stay in early September 2017, Paddock requested specific rooms that overlooked the Las Vegas Village. According to Danley, Paddock spent time looking at the Las Vegas Village venue from different angles and windows while inside the room.

# APPENDIX A

# Lock Interrogation for Room 32-135

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32135 | | Online Command | 10/2/2017 7:35 AM | Ping from the server (0129) | | | | | |
| 32135 | | Online Command | 10/2/2017 7:35 AM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 10/2/2017 7:35 AM | A readout has been done (0083) | | | | | |
| 32135 | | Door Unit Internal | 10/2/2017 12:10 AM | The door is left open too long (0916) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 11:20 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 11:20 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 9:36 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 9:36 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | Guest | Guest (MC) | 10/1/2017 9:33 PM | Guest Card accepted (0067) | 764152919 | Stephen | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 10/1/2017 9:33 PM | Error, no access to this room (0320) | 764152965 | Stephen | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 10/1/2017 9:33 PM | The door is opened (0917) | | | | | |
| 32135 | Guest | Guest (MC) | 10/1/2017 9:32 PM | Error, no access to this room (0320) | 764152965 | Stephen | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 10/1/2017 9:32 PM | Error, no access to this room (0320) | 764152965 | Stephen | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 10/1/2017 9:32 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 9:29 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 10/1/2017 9:29 PM | Guest Card accepted (0067) | 764152919 | Stephen | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 10/1/2017 9:29 PM | The door is opened from the inside (0897) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:50 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:50 PM | Dead Bolt thrown (0897) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:47 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:47 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:42 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:41 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:40 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:40 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:40 PM | Dead Bolt thrown (0897) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:18 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 6:18 PM | Dead Bolt thrown (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 10/1/2017 6:18 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | CCOLTON |
| 32135 | Guest | Guest (MC) | 10/1/2017 6:18 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | CCOLTON |
| 32135 | | Door Unit Internal | 10/1/2017 1:14 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 1:14 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 1:14 PM | The door is opened (0917) | | | | | |
| 32135 | Guest | Guest (MC) | 10/1/2017 1:14 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 10/1/2017 1:14 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 10/1/2017 1:13 PM | Guest Card accepted (0067) | 764152965 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 10/1/2017 1:13 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 12:32 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 10/1/2017 12:32 PM | Dead Bolt thrown (0896) | | | | | |

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32135 | | Door Unt Internal | 10/1/2017 12:31 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unt Internal | 10/1/2017 12:31 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unt Internal | 10/1/2017 12:31 PM | The door is opened (0912) | | | | | |
| 32135 | Guest | Guest (MC) | 10/1/2017 12:31 PM | Guest Card accepted (0067) | | | | | |
| 32135 | | Door Unt Internal | 10/1/2017 12:12 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Door Unt Internal | 10/1/2017 12:12 PM | The door is opened from the inside (0917) | | 764159219 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 10/1/2017 12:12 PM | Guest Card accepted (0067) | | 764159219 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unt Internal | 10/1/2017 12:03 PM | The door is opened (0913) | | | | | |
| 32135 | Guest | Door Unt Internal | 10/1/2017 12:03 PM | The door is opened from the inside (0917) | | 764159219 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Door Unt Internal | 10/1/2017 12:03 PM | Dead Bolt released (0897) | | 764159219 | Paddock | Stephen | JWHEELER |
| 32135 | | Online Command | 10/1/2017 4:13 AM | Ping from the server (0129) | | | | | |
| 32135 | | Online Command | 9/30/2017 7:36 PM | Ping from the server (0129) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:54 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:53 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:53 PM | Guest Card accepted (0067) | | 764159219 | Paddock | Stephen | CCOLTON |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:53 PM | Guest Card accepted (0067) | | 764159219 | Paddock | Stephen | CCOLTON |
| 32135 | | Door Unt Internal | 9/30/2017 6:53 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:53 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:53 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:53 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:52 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:52 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:52 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 6:53 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 3:23 PM | Guest Card accepted (0067) | | 764159219 | Paddock | Stephen | CCOLTON |
| 32135 | | Door Unt Internal | 9/30/2017 3:23 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 3:23 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 3:23 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 3:23 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 2:42 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 2:08 PM | Error, No access to this room (0320) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 2:08 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:08 PM | Dead Bolt thrown (0896) | | 764152965 | Paddock | Stephen | COPPELLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:08 PM | Dead Bolt released (0897) | | 764152965 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:08 PM | Error, No access to this room (0320) | | 764159219 | Paddock | Stephen | CCOLTON |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:08 PM | Guest Card accepted (0067) | | 764159219 | Paddock | Stephen | CCOLTON |
| 32135 | | Door Unt Internal | 9/30/2017 2:08 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unt Internal | 9/30/2017 2:08 PM | The door is opened from the inside (0917) | | | | | |

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32135 | | | | The door opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:08 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:08 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:08 PM | Guest Card accepted (0067) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:08 PM | Error : Door unit dead bolted (0034) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:08 PM | Dead Bolt released (0897) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:07 PM | Error : No access to this room (0320) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:07 PM | Error : No access to this room (0320) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:07 PM | Error : No access to this room (0320) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:07 PM | Error : Door unit dead bolted (0034) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:07 PM | Error : Door unit dead bolted (0034) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:07 PM | Error : Door unit dead bolted (0034) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:05 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:05 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 9/30/2017 2:05 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:05 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:05 PM | The door is closed (0913) | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | Guest | Guest (MC) | 9/30/2017 2:05 PM | Error : No access to this room (0320) | 764152919 | Paddock | Stephen | CCOLTON |
| 32135 | | Door Unit Internal | 9/30/2017 2:05 PM | Error : No access to this room (0320) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:05 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 2:05 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 6:13 AM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 6:13 AM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 6:13 AM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 6:13 AM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 6:12 AM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/30/2017 6:12 AM | The door is opened (0912) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:05 AM | Guest Card accepted (0067) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:05 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:05 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:05 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 6:04 AM | Error : No access to this room (0320) | 764152965 | Paddock | Stephen | CORPILLA |

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32135 | Guest | Guest (MC) | 9/30/2017 6:03 AM | Error : No access to this room (0320) | | 764152965 | Paddock | Stephen | CORPILLA |
| 32135 | Guest | Guest (MC) | 9/30/2017 12:52 AM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Guest (MC) | 9/30/2017 12:51 AM | Dead Bolt released (0897) | | | | | |
| 32135 | | Guest (MC) | 9/30/2017 12:51 AM | Dead Bolt thrown (0896) | | | | | |
| 32135 | Guest | Guest (MC) | 9/30/2017 10:54 PM | Error : No access to this room (0320) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 9:38 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/29/2017 9:38 PM | Guest Card accepted (0067) | | 7596-49934 | Garzon | Albert | ELHOLLOWAY |
| 32135 | | Door Unit Internal | 9/29/2017 9:38 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Door Unit Internal | 9/29/2017 9:38 PM | Error : Smart Card reading (1173) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 9:38 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 9:38 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 9:38 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:15 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:15 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:15 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:15 PM | The door is opened (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:15 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:15 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | Guest | Guest (MC) | 9/29/2017 3:15 PM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 9/29/2017 3:14 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:14 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:13 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/29/2017 3:13 PM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 9/29/2017 3:00 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 3:00 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 2:33 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | HSK NB GRA - Z... | Staff (SC) | 9/29/2017 2:00 PM | Staff Card accepted (0064) | | 26-220 | 26-220 Floors 3... | HSK Status | Staff |
| 32135 | | Door Unit Internal | 9/29/2017 2:00 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 1:31 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 1:31 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 1:20 PM | The door is opened (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 1:20 PM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/29/2017 1:20 PM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 9/29/2017 12:21 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:20 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 5:54 AM | Dead Bolt released from the inside (0917) | | | | | |
| 32135 | | Online Command | 9/29/2017 5:54 AM | Ping from the server (0129) | | | | | |
| 32135 | | Online Command | 9/29/2017 5:54 AM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 9/29/2017 5:53 AM | A readout has been done (0083) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 5:47 AM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 5:47 AM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 5:47 AM | The door is opened (0912) | | | | | |
| 32135 | | | | | | | | | |

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32135 | | | | | | | | | |
| 32135 | Guest | Guest (MC) | 9/29/2017 5:47 AM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 9/29/2017 2:35 AM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 2:35 AM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 1:30 AM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 1:30 AM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:58 AM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:58 AM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:57 AM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:57 AM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:43 AM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/29/2017 12:43 AM | The door is closed (0913) | | | | | |
| 32135 | Guest | Guest (MC) | 9/29/2017 12:43 AM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Door Unit Internal | 9/29/2017 12:43 AM | The door is opened (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/28/2017 10:02 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/28/2017 10:02 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/28/2017 9:55 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/28/2017 9:55 PM | The door is opened (0912) | | | | | |
| 32135 | Guest | Guest (MC) | 9/28/2017 9:53 PM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | JWHEELER |
| 32135 | | Online Command | 9/28/2017 7:38 AM | A readout has been done (0083) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:56 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:56 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:55 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:55 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:55 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:54 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:54 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:32 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 5:21 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 4:32 PM | The door is closed (0913) | | | | | |
| 32135 | HSK NB GRA PM ... | Door Unit Internal | 9/27/2017 4:32 PM | The door is opened from the inside (0917) | | H08-09 | H08-09 PM GRA | Kevroom | Staff |
| 32135 | | Staff (SC) | 9/27/2017 4:32 PM | Staff Card accepted (004+) | | | | | |

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|------|-----------|-----------|-----------|-------|--------------|---------|-----------|-----------|-----------|
| 32135 | HSK/HB GRA Grav | Staff (MC) | 9/27/2017 | The door is closed (0912) | | HSK-09 | HSK-09 PDM FBA | Keyroom | Staff |
| 32135 | | Door Unit Internal | 9/27/2017 3:53 PM | The door is closed (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:53 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:49 PM | The door is closed (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:49 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:48 PM | The door is closed (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:48 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:28 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:28 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:28 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 3:28 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:18 AM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/27/2017 7:18 AM | The door is closed (0913) | | | | | |
| 32135 | Guest | Door Unit Internal | 9/27/2017 7:18 AM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | |
| 32135 | | Door Unit Internal | 9/27/2017 7:18 AM | The door is opened (0912) | | | | | |
| 32135 | Guest | Door Unit Internal | 9/26/2017 11:04 PM | Guest Card accepted (0067) | | 764152919 | Paddock | Stephen | |
| 32135 | | Door Unit Internal | 9/26/2017 11:04 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/26/2017 10:53 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/26/2017 10:52 PM | The door is opened (0912) | | | | | |
| 32135 | Guest (MC) | Online Command | 9/26/2017 10:52 PM | Guest Card accepted (0067) | | 764152919 | H07-03 | Keyroom | Sym |
| 32135 | HSK/HB HSM Grave | Online Command | 9/26/2017 6:57 AM | Card(s) has been cancelled (0082) | | H07-03 | H07-03 Grave HSM Keyroom | Keyroom | Sym |
| 32135 | HSK/HB HSM Grave | Online Command | 9/26/2017 6:57 AM | Cancel list full, oldest card erased (0084) | | H07-03 | H07-03 Grave HSM Keyroom | Keyroom | Sym |
| 32135 | | Online Command | 9/25/2017 10:06 PM | Setting of time completed (0094) | | | | | |
| 32135 | | Online Command | 9/25/2017 10:05 PM | Setting of time started (0093) | | | | | |
| 32135 | | Online Command | 9/25/2017 10:05 PM | Ping from the server (0129) | | | | | |
| 32135 | | Online Command | 9/25/2017 10:05 PM | Error, Guest card overridden (0017) | | | | | |
| 32135 | | Online Command | 9/25/2017 10:04 PM | A readout has been done (0083) | | 799706967 | McQuillen | Shauna | MQDER |
| 32135 | | Online Command | 9/25/2017 9:33 PM | The door is closed (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 9:33 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 9:33 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Online Command | 9/25/2017 5:51 PM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 9/25/2017 5:51 PM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 9/25/2017 5:51 PM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 9/25/2017 5:51 PM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 9/25/2017 5:51 PM | A readout has been done (0083) | | | | | |
| 32135 | | Online Command | 9/25/2017 5:50 PM | A readout has been done (0083) | | | | | |

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32135 | | Door Unit Internal | 9/25/2017 5:31 PM | Dead Bolt thrown (0896) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 5:02 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 5:02 PM | The door is opened (0912) | | | | | |
| 32135 | | Guest (MC) | 9/25/2017 5:02 PM | Guest Card accepted (0047) | | | | | |
| 32135 | Guest | Door Unit Internal | 9/25/2017 3:56 PM | The door is closed (0913) | | 764152919 | Paddock | Stephen | WHEELER |
| 32135 | | Door Unit Internal | 9/25/2017 3:56 PM | Dead Bolt released (0897) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 3:56 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Online Command | 9/25/2017 3:56 PM | One or more events may have been lost (... | | | | | |
| 32135 | | Online Command | 9/25/2017 3:56 PM | One or more events may have been lost (... | | | | | |
| 32135 | | Online Command | 9/25/2017 3:56 PM | One or more events may have been lost (... | | | | | |
| 32135 | | Online Command | 9/25/2017 3:56 PM | One or more events may have been lost (... | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 3:06 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 3:06 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 3:06 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 3:06 PM | The door is opened (0912) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 3:06 PM | The door is opened (0912) | | | | | |
| 32135 | | Staff (SC) | 9/25/2017 3:06 PM | Staff card accepted (0044) | | 26-220 | 26-220 Floors 3... | HSK Status | Staff |
| 32135 | HSK MB GRA - Z... | Door Unit Internal | 9/25/2017 2:35 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 2:18 PM | The door is opened (0912) | | | | | |
| 32135 | | Staff (SC) | 9/25/2017 2:18 PM | Staff card accepted (0044) | | 26-220 | 26-220 Floors 3... | HSK Status | Staff |
| 32135 | HSK MB Utility P... | Door Unit Internal | 9/25/2017 2:18 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 1:42 PM | The door is opened (0912) | | 27-UP1 | 27-UP1 Floors 3... | HSK Status | Staff |
| 32135 | | Door Unit Internal | 9/25/2017 1:42 PM | The door is opened from the inside (0917) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 1:41 PM | The door is closed (0913) | | | | | |
| 32135 | | Door Unit Internal | 9/25/2017 12:17 PM | The door is opened (0912) | | | | | |
| 32135 | | Staff (SC) | 9/25/2017 12:17 PM | Staff card accepted (0044) | | 26-220 | 26-220 Floors 3... | HSK Status | Staff |
| 32135 | HSK MB GRA - Z... | Staff (SC) | 9/25/2017 12:17 PM | Staff card accepted (0044) | | 26-220 | 26-220 Floors 3... | HSK Status | Staff |
| 32135 | HSK MB GRA - Z... | Door Unit Internal | 9/25/2017 11:57 AM | The door is closed (0913) | | | | | |

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

# APPENDIX B

# Lock Interrogation for Room 32-134

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32134 | | Door Unit Internal | 10/1/2017 9:47 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:47 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:47 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:47 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:46 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:46 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:46 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:46 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:44 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:44 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:44 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:43 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:43 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:43 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:40 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:40 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:39 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:34 PM | The door is opened (0912) | | | | | |
| 32134 | Guest | Guest (MK) | 10/1/2017 9:34 PM | Guest Card accepted (0067) | | 764152965 | Paddock | Stephen | WHEELER |
| 32134 | Guest | Guest (MK) | 10/1/2017 9:34 PM | Error, No access to this room (0320) | | 764152919 | Paddock | Stephen | WHEELER |
| 32134 | | Door Unit Internal | 10/1/2017 9:31 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:31 PM | The door is opened (0912) | | | | | |
| 32134 | Guest | Guest (MK) | 10/1/2017 9:31 PM | Guest Card accepted (0067) | | 764152965 | Paddock | Stephen | WHEELER |
| 32134 | Guest | Guest (MK) | 10/1/2017 9:31 PM | Error, No access to this room (0320) | | 764152919 | Paddock | Stephen | WHEELER |
| 32134 | | Door Unit Internal | 10/1/2017 9:29 PM | The door is closed (0913) | | | | | |
| 32134 | Guest | Guest (MK) | 10/1/2017 9:29 PM | Guest Card accepted (0067) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:29 PM | Error, Smart Card reading (1173) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 9:29 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 7:40 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 7:40 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 7:40 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 3:55 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 3:24 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 3:24 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 2:23 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | | Dead Bolt released (0897) | | | | | |

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32134 | | Door Unit Internal | 10/1/2017 4:21 PM | Dead bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 1:27 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 1:27 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 1:25 PM | Dead bolt thrown (0896) | | | | | |
| 32134 | Guest | Guest (MC) | 10/1/2017 1:25 PM | The door is closed (0913) | 764152919 | Paddock | Stephen | JVHEELER |
| 32134 | Guest | Guest (MC) | 10/1/2017 1:25 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | JVHEELER |
| 32134 | | Door Unit Internal | 10/1/2017 1:19 PM | Error. No access to this room (0320) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 1:19 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 12:51 PM | The door is closed (0913) | | | | | |
| 32134 | Guest | Guest (MC) | 10/1/2017 12:51 PM | The door is opened from the inside (0917) | 764152919 | Paddock | Stephen | JVHEELER |
| 32134 | | Door Unit Internal | 10/1/2017 12:30 PM | Error. No access to this room (0320) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 12:11 PM | The door is closed (0913) | | | | | |
| 32134 | Guest | Guest (MC) | 10/1/2017 12:11 PM | Guest Card accepted (0067) | 764152919 | Paddock | Stephen | JVHEELER |
| 32134 | Guest | Guest (MC) | 10/1/2017 12:11 PM | Error . No access to this room (0320) | 764152919 | Paddock | Stephen | JVHEELER |
| 32134 | | Door Unit Internal | 10/1/2017 12:03 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | Guest | Guest (MC) | 10/1/2017 12:03 PM | The door is closed (0913) | 764152965 | Paddock | Stephen | CORP1LLA |
| 32134 | | Door Unit Internal | 10/1/2017 12:03 PM | Guest Card accepted (0067) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 12:03 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 7:37 AM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 7:37 AM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 7:37 AM | The door is opened (0912) | | | | | |
| 32134 | Guest | Guest (MC) | 10/1/2017 7:37 AM | Guest Card accepted (0067) | 764152965 | Paddock | Stephen | CORP1LLA |
| 32134 | | Online Command | 10/1/2017 4:13 AM | Cancel list cleanup (0865) | | | | | |
| 32134 | | Door Unit Internal | 10/1/2017 12:00 AM | Ping from the server (0129) | | | | | |
| 32134 | | Online Command | 9/30/2017 7:35 PM | Ping from the server (0129) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 7:35 PM | Error. Guest Card overridden (0017) | | | | | |
| 32134 | Guest | Guest (MC) | 9/30/2017 7:28 PM | The door is closed (0913) | 764536415 | Sandhu | Manny | LEHAYLOR |
| 32134 | | Door Unit Internal | 9/30/2017 7:28 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 6:47 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 6:47 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 6:47 PM | The door is opened (0912) | | | | | |
| 32134 | Guest | Guest (MC) | 9/30/2017 6:47 PM | Guest Card accepted (0067) | 764152965 | Paddock | Stephen | JVHEELER |
| 32134 | | Door Unit Internal | 9/30/2017 3:25 PM | The door is closed (0913) | | | | | |
| 32134 | Guest | Guest (MC) | 9/30/2017 3:25 PM | The door is opened (0912) | | | | | |
| 32134 | Guest | Guest (MC) | 9/30/2017 3:25 PM | Guest Card accepted (0067) | 764152965 | Paddock | Stephen | CORP1LLA |
| 32134 | | Door Unit Internal | 9/30/2017 3:25 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 3:21 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 3:21 PM | The door is opened from the inside (0917) | | | | | |

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32134 | | Door Unit Internal | 9/30/2017 3:21 PM | Guest Card accepted (0067) | | 764152965 | Paddock | Stephen | CORPILLA |
| 32134 | Guest | Door Unit Internal | 9/30/2017 2:43 PM | The door is closed (0913) | | | | | |
| 32134 | Guest | Door Unit Internal | 9/30/2017 2:43 PM | Guest Card accepted (0067) | | 764152965 | Paddock | Stephen | CORPILLA |
| 32134 | Guest | Door Unit Internal | 9/30/2017 2:43 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 2:06 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 2:05 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 2:05 PM | Guest Card accepted (0912) | | | | | |
| 32134 | Guest | Door Unit Internal | 9/30/2017 2:05 PM | Guest Card accepted (0067) | | 764152965 | Paddock | Stephen | CORPILLA |
| 32134 | | Door Unit Internal | 9/30/2017 12:15 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 12:14 PM | The door is opened from the (0912) | | | | | |
| 32134 | Private Bar Attn... | Door Unit Internal | 9/30/2017 12:14 PM | Staff Card accepted (004-) | | F08-04 | Staff | | Staff |
| 32134 | | Door Unit Internal | 9/30/2017 12:13 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 12:04 PM | The door is opened (0912) | | | | | |
| 32134 | Private Bar Attn... | Door Unit Internal | 9/30/2017 12:04 PM | Staff Card accepted (004-) | | F08-04-N6 Priva... | F08-04-N6 Priva... | Keyroom | Staff |
| 32134 | Staff (SC) | Door Unit Internal | 9/30/2017 6:13 AM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 6:13 AM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 6:13 AM | Dead Bolt released (0897) | | | | | |
| 32134 | Guest (MC) | Door Unit Internal | 9/30/2017 6:04 AM | Error, Door unit dead bolted (0034) | | | | | |
| 32134 | Guest (SC) | Door Unit Internal | 9/30/2017 6:03 AM | Error, Door unit dead bolted (0034) | | | | | |
| 32134 | Guest (MC) | Door Unit Internal | 9/30/2017 3:05 AM | Error, No access to this room (0320) | | 763902324 | Thornton | Christa | ELHOLLOWAY |
| 32134 | Guest | Door Unit Internal | 9/30/2017 3:04 AM | Error, No access to this room (0320) | | 763902324 | Thornton | Christa | ELHOLLOWAY |
| 32134 | | Door Unit Internal | 9/30/2017 12:47 AM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 12:00 AM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 12:00 AM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/30/2017 12:00 AM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 11:46 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 10:53 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 10:53 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 10:52 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 9:54 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 9:54 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 9:38 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 9:38 PM | The door is closed (0913) | | | | | |
| 32134 | Guest | Door Unit Internal | 9/29/2017 9:38 PM | Guest Card accepted (0067) | | 764152965 | Paddock | Stephen | JWHEELER |
| 32134 | | Door Unit Internal | 9/29/2017 9:38 PM | Dead Bolt released (0897) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 9:38 PM | The door is opened from the inside (0917) | | | | | |

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

| Door | User group | Card name | Event time | Event | Read-out time | User ID | Last name | First name | Issued by |
|---|---|---|---|---|---|---|---|---|---|
| 32134 | | Door Unit Internal | 9/29/2017 3:42 PM | Dead Bolt thrown (0896) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:42 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:12 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:12 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:12 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:12 PM | The door is opened from the inside (0917) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:09 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 3:09 PM | The door is opened (0912) | | | | | |
| 32134 | Guest | Guest (VNC) | 9/29/2017 3:09 PM | Guest Card accepted (0082) | 764192995 | Paddock | Stephen | JV-HEELER |
| 32134 | Guest | Online Command | 9/29/2017 3:09 PM | Card(s) has been cancelled (0083) | 764192995 | Ghosh | Nilanjan Raj Mr | CGRAZDNU275 |
| 32134 | Guest | Online Command | 9/29/2017 2:27 PM | A readout has been done (0193) | 763369934 | Ghosh | Nilanjan Raj Mr | CGRAZDNU275 |
| 32134 | Guest | Online Command | 9/29/2017 2:27 PM | Card(s) has been cancelled (0082) | 763369934 | | | |
| 32134 | | Online Command | 9/29/2017 2:27 PM | A readout has been done (0083) | 763369934 | | | |
| 32134 | | Door Unit Internal | 9/29/2017 1:59 PM | The door is closed (0913) | | | | | |
| 32134 | | Staff (SC) | 9/29/2017 11:24 PM | Staff Card accepted (0064) | 27-UP1 | 27-UP1 Floors 3... | HSK Status | Staff |
| 32134 | | Door Unit Internal | 9/29/2017 11:24 PM | The door is opened (0912) | | | | | |
| 32134 | HSK H8 GRA - Z... | Staff (SC) | 9/29/2017 11:24 PM | Staff Card accepted (0064) | 26-220 | 26-220 Floors 3... | HSK Status | Staff |
| 32134 | | Door Unit Internal | 9/29/2017 12:12 PM | The door is closed (0913) | | | | | |
| 32134 | | Door Unit Internal | 9/29/2017 12:08 PM | The door is opened (0912) | | | | | |
| 32134 | HSK H8 HSM - ... | Staff (SC) | 9/29/2017 12:08 PM | Staff Card accepted (0064) | HSM-33 | HSM-33 H8 Floo... | HSK Status | Staff |

# APPENDIX C

# Stephen Paddock's Autopsy Reports

## Clark County Coroner/Medical Examiner
1704 Pinto Lane
Las Vegas, NV 89106
(702) 455-3210



## REPORT OF INVESTIGATION
### Coroner Case

**CALL INFO**

| NAME OF DECEASED (LAST, FIRST MIDDLE) | AKA | | CASE NUMBER |
|---|---|---|---|
| **Paddock, Stephen Craig** | | | **17-10064** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | REFERENCE NUMBER |
|---|---|---|---|
| Tiffany Brown | Dispatch | Las Vegas Metropolitan Police Departm | 171001-3519 |

| CALL DATE AND TIME | DISPATCH DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|---|
| 10/2/2017 11:15:00 AM | 10/2/2017 11:35:00 AM | 10/2/2017 11:55:00 AM | 10/2/2017 1:00:00 PM |

**DECEDENT**

| DATE AND TIME OF DEATH | AGE | GENDER | RACE | VET? |
|---|---|---|---|---|
| 10/2/2017 12:00:00 PM | 64 Yrs | Male | Caucasian | ☐ |

| RESIDENT COUNTY | TELEPHONE NO. | DATE OF BIRTH | |
|---|---|---|---|
| Clark | | 4/9/1953 | |

| SOCIAL SECURITY NO. | DRIVER'S LIC. NO. AND STATE | OCCUPATION | EMPLOYER |
|---|---|---|---|
| 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 | | | |

| MARITAL STATUS | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|
| Unknown | 73 | 224 | | |

| CLOTHING | SCARS/TATTOOS/MARKS |
|---|---|
| Brown shirt, black pants, underwear, socks, shoes.  Black gloves impounded by FBI at scene. | / / |

**DEATH**

| LOCATION OF DEATH | AT RESIDENCE ☐ |
|---|---|
| Mandalay Bay Hotel & Casino Room # 32-135 | |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 3950 S. Las Vegas Boulevard  Las Vegas, NV  89119 | Clark |

| ☑ PRONOUNCED BY | AGENCY |
|---|---|
| Tiffany Brown | Clark County Coroner Office |

**INCIDENT**

| LOCATION OF INCIDENT | AT WORK ☐ |
|---|---|
| Mandalay Bay Hotel and Casino Room #32-135 | |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 3950 S. Las Vegas Boulevard  Las Vegas, NV  89119 | Clark |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICERS |
|---|---|---|
| 10/1/2017 10:08:00 PM | Las Vegas Metropolitan Police Department | Detective T. Alsup |

**NOTIFICATION**

| LEGAL NEXT OF KIN | RELATIONSHIP | TELEPHONE NO. |
|---|---|---|
| | | |

| NOTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| | | |

| NAME OF PERSON NOTIFIED | RELATIONSHIP | TELEPHONE NO. |
|---|---|---|
| | | |

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| FBI Civil ID | Fingerprints | 12/11/2017 1:00:00 PM |

**DISP**

| TRANSPORTED TO MORGUE BY | TRANSPORTED TO MORTUARY BY |
|---|---|
| Davis Funeral Home | |

| FUNERAL HOME | CLOTHING RELEASED |
|---|---|
| | ☐ Yes   ☑ No |

| TYPE OF EXAM | EXAM BY |
|---|---|
| Autopsy | Lisa Ann Gavin M.D., MPH |

**VEHICULAR**

DECEDENT WAS
☐ Pedestrian  ☐ Driver  ☐ Passenger  ☐ Bicyclist  ☐ Motorcyclist  ☐ Skateboard  ☐ Motorized Wheelchair

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

| OCCURRED ON PRIVATE PROPERTY | DECEDENT WEARING SEATBELT? | SEAT POSITION | DECEDENT WEARING CRASH HELMET? |
|---|---|---|---|
| | | | |

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**REPORT OF INVESTIGATION**

**Case Number: 17-10064**

| | | | |
|---|---|---|---|
| **DECEDENT NAME:** | Stephen Craig Paddock | **DATE OF BIRTH:** | 04/09/1953 |
| **ALSO KNOWN AS:** | | **AGE:** | 64 |
| **LOCATION OF DEATH:** | Mandalay Bay Hotel & Casino Room # 32-135 | **SSN:** | 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 |
| **DATE OF DEATH:** | 10/02/2017 | **TIME OF DEATH:** | 12:00PM |

## SUMMARY OF INVESTIGATION

**Reason for Coroner Jurisdiction:**
Apparent Suicide/Intraoral Gunshot Wound (GSW)/Mass Fatality Incident/Federal Bureau of Investigations (FBI)/Las Vegas Metropolitan Police Department (LVMPD).

**Circumstances of Death:**
Per LVMPD investigation, the decedent checked into a suite on the 32nd floor at the Mandalay Bay Hotel & Casino on 09/25/17. On 09/29/17 an adjoining room, which was accessed by connecting doors, was added. On the night of 10/01/17 a Mandalay Bay Security Guard was assigned to check open door alarms from various rooms inside the hotel. The last room the security guard was assigned to check was on the 32nd floor however he was unable to access the 32nd floor from the inside stairwell, as the door would not open. After gaining entry onto the 32nd floor from the guest elevator the security guard noticed an L bracket in place on the stairwell door that was preventing the door from opening. After the security guard called the Mandalay Bay Dispatch center to report his findings he heard apparent rapid drill noise coming from room 32-135. He then started walking back down the hallway at which time he heard apparent gunfire and realized he was hit in the leg. He called for help. The decedent then continued to fire multiple shots out of his hotel windows with numerous rifles into a music festival venue, striking people at the concert. LVMPD Swat responded to the decedent's room and entered using an explosive breech. Upon entry the decedent was found beyond medical resuscitative measures on the floor with an apparent self-inflicted gunshot wound. SWAT continued to clear the room and breeched the door to room 32-134. While breeching the door an unintentional 3 round burst (3 rounds rapidly at once) shot was fired by a SWAT Officer. All three impacts were located and the decedent was not struck by the unintentional rounds. Upon my arrival I pronounced death on scene at 1200 hours on 10/02/17.

**Medical History:**
The decedent's medical history was unknown at the time of this report.

There was one prescription bottle containing pills and two inhalers located in the decedent's room. None of the prescription medications were impounded as the FBI and LVMPD were still actively processing the scene.

**Scene:**
The decedent was found lying supine on the 32nd floor of room # 32-135 of Mandalay Bay Hotel and Casino located at 3950 South Las Vegas Boulevard, Las Vegas, NV 89119. There were double entrance doors to the room. One of the doors was damaged and off of the hinges. There were multiple holes and defects noted to the door that was off the hinges. The other door had an apparent camera taped where a peep hole would normally

***Dissemination is restricted.***
***Secondary dissemination of this document is prohibited.***

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

1 of 3

Signature: _____
Tiffany Brown, Coroner Investigator

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**REPORT OF INVESTIGATION**

**Case Number:  17-10064**

be.  There were multiple rifles and expended cartridge casings located throughout the room. There was a Smith and Wesson .38 caliber revolver bearing Serial # CDZ7618-342 found near the decedent. There was a broken window in both rooms. The windows in the rooms were from the floor to the ceiling. The two broken windows were nearly completely shattered. There were multiple different drills and tools located in the room. Outside the room in the hallway was a room service cart. There were plates on the cart and under a plate was a camera. There was another camera on the cart on the bottom shelf. The cart was positioned in the hallway outside of his door so the cameras were pointing down the hallway. There were numerous apparent impacts present in the hallway. There were no apparent suicide notes located.

## Body:
The decedent, a 64-year-old Caucasian male, was observed lying supine on the carpeted flooring in his hotel room.   A limited examination was conducted.   He was clothed in a tan shirt, black gloves, black pants, underwear, white socks and gray shoes.  The gloves were impounded by the FBI.  Upon palpation of the head and skull, crepitus was noted.  There was an apparent intraoral wound noted.  There was apparent blood-like substance noted about the face and head.  The neck, chest, abdomen, back and extremities appeared to be unremarkable.  There was blanching posterior livor mortis noted which was consistent with the position the body was observed in.  The body was cool to the touch and rigor mortis was noted.  There were no signs of life present. I pronounced death at 1200 hours on 10/02/17.

## Property:
Per Clark County Office of the Coroner/Medical Examiner (CCOCME) Inventory of Personal Effects Form #12672, no property was impounded.

## Forensic Issues and Reasons for Seal:
- Coroner Seal #541486 utilized.
- Apparent intraoral GSW.
- Weapon believed used for self-inflicted wound (impounded by FBI): S&W .38 cal revolver bearing serial #CDZ7618-342,
- No ammunition information was available at this time as FBI and LVMPD were still processing the scene.
- Decedent was wearing black gloves, impounded by FBI at scene.
- Hands bagged.
- There were numerous rifles along with a revolver found in the room.
- No suicide note was found.
- Decedent's vehicle was located in the parking garage with explosive device material and impounded by FBI.

## Witnesses and Information Sources:
LVMPD Detective T. Alsup
LVMPD Detective J. Patton
LVMPD Crime Scene Analyst personnel

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

Signature: _____
Tiffany Brown, Coroner Investigator

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



# REPORT OF INVESTIGATION

### Case Number:  17-10064

**Narrative:**

On 10/02/17 at approximately 1115 hours LVMPD advised this office of a death located in room # 32-135 of the Mandalay Bay Hotel and Casino located at 3950 South Las Vegas Boulevard, Las Vegas, NV 89119.

Upon my arrival to the Mandalay Bay Hotel and Casino at approximately 1135 hours I met with LVMPD Force Investigation Team (FIT) Detective T. Alsup and J. Patton who provided me with the aforementioned circumstances. They stated that this was reference LVMPD Event # 171001-3519 and the initial 911 call came in at 2208 hours. He stated that LVMPD radio traffic regarding shots being fired initially started at 2205 hours. They requested that the decedent remain on scene as FBI was responding but they expected that to be several hours before their arrival. The decedent remained on scene until FBI and LVMPD was ready for the removal of the body.

At approximately 2100 hours on 10/02/17 LVMPD Dispatch advised this office that they were ready for the removal of the decedent from the scene. CCOCME Investigator S. Shields responded along with Davis Funeral Home. Investigator S. Shields conducted the body examination. The decedent was wrapped in a clean white sheet, placed in a body bag that was sealed with Coroner Seal # 541486 and transported to Clark County Office of the Coroner/Medical Examiner (CCOCME), arriving at approximately 2150 hours.

**Special Requests:**
None

**Tissue/Organ Donation:**
Nevada Donor Network protocol followed.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Signature: _____

Tiffany Brown, Coroner Investigator

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-10064

October 6, 2017

<u>AUTOPSY REPORT</u>

PATHOLOGICAL EXAMINATION ON THE BODY OF

STEPHEN CRAIG PADDOCK

PATHOLOGIC FINDINGS

I.   Intraoral gunshot wound of head, contact range.
   A. Entrance: roof of mouth with abundant soot.
   B. Associated injuries: perforation of the roof of the
      mouth, the base of the skull (with internal beveling),
      the brainstem, the cerebellum, the left occipital lobe,
      and partially into the occipital bone (with external
      beveling); subdural hemorrhage and subarachnoid
      hemorrhage; contusions along the wound track and of the
      base of the brain; fractures of the supraorbital portions
      of the frontal bones, base of the skull, the left petrous
      bone and the occipital bone; bilateral periorbital soft
      tissue hemorrhage.
   C. Recovered: moderately deformed copper jacketed gray metal
      missile and fragments of copper jacket and gray metal
      between occipital dura and partly into occipital skull.
   D. Exit: no corresponding exit.
   E. Trajectory: front-to-back and upward.
II.  Hypertensive cardiovascular disease.
   A. Hypertensive vasculopathy and atherosclerosis, per
      neuropathology consultation.
   B. Globally sclerosed glomeruli; glomerulomegaly, per
      histology.
   C. Slightly increased perivascular fibrosis and scattered
      hypertrophied myocytes, per histology.
III. Blunt force injuries to extremities.
   A. Abrasion of right upper calf.
   B. Faint contusion of left calf.
   C. Abrasion of right knee.
IV.  Overweight (BMI = 29.6 kg/m$^2$).
   A. Dilated cardiomegaly (550 grams).
V.   Degenerative changes of spine.

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team          *Dissemination is restricted.*
                    *Secondary dissemination of this document is prohibited.*



**Clark County Coroner**
1704 Pinto Lane
Las Vegas, NV 89106
(702) 455-3210

**AUTOPSY REPORT**

Case Number: 17-10064

VI.   Diverticula.
VII.  Mild degenerative changes of mitral valve.
VIII. Appendectomy.

### OPINION

CAUSE OF DEATH: This 64-year-old man, Stephen Craig Paddock, died of an intraoral gunshot wound of the head.

MANNER OF DEATH:   SUICIDE

Lisa Gavin, MD, MPH
Medical Examiner
Clark County Coroner
Las Vegas, NV
LG/ag

DATE: 2/5/18

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

Case Number: 17-10064

October 6, 2017

### POSTMORTEM EXAMINATION ON THE BODY OF

### Stephen Craig Paddock

### ADULT POSTMORTEM EXAMINATION

An autopsy examination is performed on the body of tentatively identified as Paddock, Stephen Craig at the Clark County Office of the Coroner/Medical Examiner (CCOCME), on 6th day of October 2017, commencing at 1622 hours. Identification is later confirmed by fingerprint comparison.

The body is received within a sealed body bag (seal #541486), which is opened on 10/6/2017 at 1625 hours by #421. The body is identified by a Clark County Office of the Coroner/Medical Examiner (CCOCME) "toe tag" around the right great toe, which includes: CCOCME Case #17-10064; Name: Paddock, Stephen (T); Date of Death: 10-2-17; Time of Death: 1200 hours; CCOCME Investigator: #342.

The autopsy is conducted in the presence of Detective T. Alsup (P#5782), Detective M. Colon (P#7585), Crime Scene Analyst S. Fletcher (P#6650) of the Las Vegas Metropolitan Police Department; also present is Special Agent R. H. Marriott and Special Agent G. Kwan of the Federal Bureau of Investigation.

### EXTERNAL EXAMINATION (EXCLUDING INJURIES)

The body is that of a well-developed, overweight, adult White male who weighs approximately 224 pounds, is 73 inches in length (body mass index, BMI = 29.6).

The body is received clad in a brown long sleeve shirt, black pants, blue boxer shorts, two white-black socks, and two charcoal shoes. Of note, during processing a brass-like casing adjacent to the head is found.



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 17-10064**

PAGE TWO

The body is cold (refrigerated). Rigor mortis is receding. Fixed pink livor mortis extends over the posterior surface of the body. Evidence of postmortem change includes: green discoloration of the right lower quadrant of the abdomen.

The scalp hair is gray-white, straight and short with male pattern baldness.

The irides appear lighter in color. The pupils are round. The corneas are clouded. Tache noire is present of the sclerae which are otherwise injected and focally hemorrhagic. The conjunctivae are a mixture of pale and congested.

The nose and ears appear normally formed. In the right ear is white tissue paper. In the left ear is bloody tissue paper.

The decedent wears an unkept beard.

The anterior teeth are in poor condition with a majority of the maxillary teeth being absent.

The neck is unremarkable.

The thorax is well developed.

The abdomen is flat.

The anus contains hemorrhoids.

The spine is normally formed and the surface of the back is remarkable for nevi.

The external genitalia are those of a normal adult male, with the testes descended bilaterally into the normally rugated scrotum.

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team                    *Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-10064

PAGE THREE

The upper and lower extremities appear well developed and without absence of digits. Some pitting edema is noted of the lower legs, particularly in a sock-like distribution.

IDENTIFYING MARKS/SCARS:

On the left mid-aspect of the back is a 1 inch brown macule. A 3/8 inch light brown-white macule on the right ventral arm near the elbow is identified.

EVIDENCE OF MEDICAL INTERVENTION:

There is no evidence of medical intervention.

## EVIDENCE OF INJURY

INTRAORAL GUNSHOT WOUND OF HEAD:

ENTRANCE: On the roof of the mouth centered approximately 6-1/2 inches below the top of the head and 1/4 inch to the left of anterior midline is an entrance gunshot wound consisting of a 1/2 x 5/8 inch defect with a marginal abrasion that appears widest at the 6 o'clock position (1/4 inch). Abundant soot is present within the roof of the mouth.

ASSOCIATED INJURIES: Perforation of the roof of the mouth, the base of the skull (with internal beveling), the brain stem, the cerebellum, the left occipital lobe and partially into occipital bone (with external beveling) is seen with contusions of the brain along the wound track. Contusions of the base of the brain are seen along with brain swelling. Fractures of the supraorbital portions of the frontal bones, the left petrous bone, the base of the skull, and the bilateral occipital bones are seen. Subdural hemorrhage and subarachnoid hemorrhage are present. Bilateral periorbital soft tissue hemorrhage is noted.

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team                    *Dissemination is restricted.*
                    *Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-10064

PAGE FOUR

RECOVERED: Recovered between the occipital dura and the occipital skull is a moderately deformed copper jacketed gray missile; additionally minute jacket and missile fragments are recovered in the same location.

EXIT: There is no corresponding exit.

TRAJECTORY: The wound track travels from the decedent's front-to-back and upward.

**BLUNT FORCE INJURIES OF EXTREMITIES:**

On the right upper calf is a 1/2 x 1/4 inch red-brown abrasion. On the left calf is a 1/4 x 3/16 inch faint pink contusion. On the right knee is a 1/4 x 1/8 inch red abrasion.

## INTERNAL EXAMINATION (EXCLUDING INJURIES)

**BODY CAVITIES:**

Focal adhesions are present between the loops of bowel. All body organs are in normal and anatomic position with apparent surgical absence of the appendix. The serosal surfaces are glistening.

**HEAD (CENTRAL NERVOUS SYSTEM):**

The brain weighs 1410 grams and is swollen. The dura mater and falx cerebri are not adherent to the brain. The cerebral hemispheres are asymmetrical due to injury. The uninjured structures at the base of the brain are free of abnormality. Sections through the uninjured cerebral hemispheres reveal no lesions within the cortex, subcortical white matter, or deep parenchyma of either hemisphere. Sections through the uninjured brain stem and cerebellum reveal no lesions. The spinal cord is not removed. Sections of the brain are submitted for further Forensic Neuropathological Evaluation (see separate report).

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team                     *Dissemination is restricted.*
                    *Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-10064

PAGE FIVE

<u>NECK:</u>

Examination of the soft tissues of the neck, including strap muscles and large vessels, reveals no abnormalities. The hyoid bone and larynx are intact. The tongue is normal.

<u>CARDIOVASCULAR SYSTEM:</u>

The heart weighs 550 grams and is dilated. The pericardial sac is free of significant fluid or adhesions. The pericardial surfaces are glistening.

The coronary arteries arise normally and follow the distribution of a right dominant pattern with no significant atherosclerosis.

The chambers and valves are proportionate. Mild degenerative changes are present of the mitral valve. The remaining valves and cusps are normally formed, thin and pliable and free of vegetations and degenerative changes. The myocardium is remarkable for increased perivascular fibrosis. Fatty infiltration of the right ventricle is noted. A focal area of pallor is noted in the lateral left ventricle near the base of the heart. The atrial and ventricular septa are intact. The tricuspid valve measures 12.5 cm; the mitral valve measures 11.5 cm; the pulmonic valve measures 7.8 cm; the aortic valve measures 8.0 cm. The right ventricle measures 0.5 cm in thickness; the left ventricle measures 1.9 cm in thickness; and the septum measures 1.9 cm in thickness.

The aorta and its major branches arise normally and follow the usual course, with no significant atherosclerosis. The orifices of the major aortic vascular branches are patent. The vena cava and its major tributaries are patent and return to the heart in the usual distribution and are unremarkable.

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team          *Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-10064

```
PAGE SIX
```

## RESPIRATORY SYSTEM:

The right and left lungs weigh 1060 and 750 grams, respectively. The upper and lower airways are unobstructed. The mucosal surfaces are smooth and yellow-tan. The pleural surfaces are glistening. The pulmonary parenchyma is a dark red-purple in the dependent portions and lighter pink in the anterior portions. The cut surface exudes moderate amounts of blood, particularly in the dependent portions. The pulmonary arteries are normally developed and without thromboemboli and atherosis. There is no saddle embolus on the in situ examination of the pulmonary trunk.

## LIVER AND BILIARY SYSTEM:

The liver weighs 1490 grams. The hepatic capsule is smooth, glistening, and intact, covering brown slightly fatty parenchyma. The gallbladder contains a moderate amount of brown-tan liquid bile without stones; some cholesterolosis is noted of the gallbladder mucosa.

## ALIMENTARY TRACT:

The esophagus is lined by gray smooth mucosa. The gastric mucosa contains the usual rugal folds. The lumen contains approximately 50 ml of brown liquid. The serosa of the small bowel is unremarkable. The serosa of the large bowel is remarkable for diverticula. The small bowel contains some partially digested food. The large bowel contains a mixture of softened and semi-firm stool. Diverticula are intact and present particularly in the sigmoid colon. The appendix is surgically absent. The pancreas contains fatty infiltration.

## GENITOURINARY TRACT:

The right and left kidneys weigh 140 and 150 grams, respectively. The renal capsules are opaque and strip with difficulty from the underlying granular, scarred, and brown

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team                    **Dissemination is restricted.**
                    *Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-10064

PAGE SEVEN

cortical surfaces. The cortices are of normal thickness and delineated from the medullary pyramids. The calyces and pelves are dilated but free of stones. The urinary bladder contains a moderate amount of yellow urine; the mucosa is gray-tan and smooth. The prostate is not enlarged. The testes are unremarkable.

## RETICULOENDOTHELIAL SYSTEM:

The spleen weighs 140 grams and has an intact capsule covering a purple diffluent parenchyma. The splenic white pulp is indiscernible. The bone marrow (rib) is red-purple. There is no prominent lymphadenopathy. The thymus is dispersed in the anterior mediastinal fat.

## ENDOCRINE SYSTEM:

The pituitary gland is of large size. The thyroid gland is of normal position, large size and normal texture. The adrenal glands have a yellow cortex and an autolyzing gray medulla.

## MUSCULOSKELETAL SYSTEM:

Degenerative changes are present of the spine. The soft tissues are not unusual. The cervical spinal column is stable on internal palpation.

### MICROSCOPIC EXAMINATION (slide #)

Conduction system - AV node (#1): network of muscle fibers in subendocardial tissues; mildly increased perivascular fibrosis.
Conduction system - SA node (#2): ganglion cells and nerve fibers identified.
Coronary arteries (#3): mild atherosclerosis.
Heart - RV (#4): increased fatty infiltration.
Heart - septum (#5): scattered hypertrophied myocytes.

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team
*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 17-10064**

PAGE EIGHT

Heart - LV (#6): scattered hypertrophied myocytes; minimally
    increased perivascular fibrosis.
Heart - apex (#7): myocyte disarray.
Lung - right (#8): autolysis.
Lung - left (#9): autolysis; patchy areas of atelectasis.
Liver (#10): mild diffuse macrosteatosis; portal tracts without
    increased fibrosis or increased inflammatory cells;
    vascular congestion; autolysis.
Spleen (#10): prominent white pulp; hyalinized vessels.
Pancreas (#11): increased fatty infiltration; autolysis; islet
    cells not identified.
Kidneys (#12): several globally sclerosed glomeruli;
    glomerulomegaly; tubular autolysis.
Adrenal (#13): intracellular cortical fat/lipid identified.
Thyroid (#13): follicles of variable diameters; early autolysis.
Bone marrow (#14): trilineage hematopoiesis; early autolysis.

### RADIOGRAPHS

Radiographs of the head and neck identify a radiopaque missile
just beneath the occipital skull at midline; additional minute
fragments are seen extending from a front-to-back trajectory.
Fractures of the occipital bones and the base of the skull are
noted. The cervical spine and hyoid bone appear intact. Dental
restorations are present within the few remaining teeth within
the mouth. Radiograph of the chest reveals a moderately enlarged
cardiac silhouette. Radiographs of the chest, abdomen, and the
pelvis reveal degenerative changes present of the spine.
Radiographs of the chest, abdomen, pelvis, lower extremities and
upper extremities reveal no clear evidence of acute skeletal
injury. Metallic portions of clothing are visible within some of
the radiographs. In addition, a radiopaque casing is visible
within some of the radiographs of the head, neck and chest (pre-
processing radiographs).

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team                    *Dissemination is restricted.*
                    *Secondary dissemination of this document is prohibited.*



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 17-10064**

PAGE NINE

### SPECIMENS OBTAINED/RESULTS

**TISSUE:** Representative sections of all of the major organs are retained.

**TOXICOLOGY:** Heart blood, peripheral blood, vitreous, urine, liver, bile, gastric contents and brain are obtained at autopsy.

**TOXICOLOGY RESULTS:** A Forensic Toxicological Analysis is performed and reported separately.

**VITREOUS SCREEN:** A vitreous screen shows slightly elevated urea nitrogen (35 mg/dL) and creatinine (1.6 mg/dL) levels; no evidence of hyperglycemia is seen.

**MICROBIOLOGY:**
Bacterial cultures of the blood grew Staphylococcus aureus, Streptococcus salivarius, Clostridium perfringens and Streptococcus parasanguinis, which is most likely due to post mortem overgrowth.
Bacterial cultures of the right lung show scant growth of Staphylococcus aureus, Streptococcus mitis/oralis and Gemella morbillorum, which is most likely due to post mortem overgrowth.
Bacterial cultures of the left lung show scant growth of Staphylococcus aureus and light growth of Streptococcus mitis, which is most likely due to post mortem overgrowth.
Stool cultures for cytomegalovirus and Enterovirus showed none isolated; no Shiga toxins were detected. No Salmonella, Shigella or Campylobacter were isolated; no ova or parasites were seen.
Bacterial cultures of the urine show no growth.
RT-PCR for Influenza and Respiratory Viral Pathogens shows no RNA detected. FilmArray for Respiratory Pathogens shows no DNA or RNA detected.

**URINALYSIS:** A reflex urinalysis identified turbid urine with trace ketones, protein, blood, bacteria and epithelial cells.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

# NMS Labs

**CONFIDENTIAL**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

## Toxicology Report

**Report Issued**  10/24/2017 12:03

| | |
|---|---|
| **Patient Name** | PADDOCK (TENT), STEPHEN C. |
| **Patient ID** | 17-10064 |
| **Chain** | 17314232 |
| **Age** 64 Y | **DOB** Not Given |
| **Gender** | Male |
| **Workorder** | 17314232 |

**To:**  **10294**
Clark County Coroner's Office
Attn: David Mills
1704 Pinto Lane
Las Vegas, NV  89106

Page 1 of 9

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Betahydroxybutyric Acid | 21 | mcg/mL | 001 - Peripheral Blood |
| Arsenic | 12 | mcg/L | 001 - Peripheral Blood |
| Bismuth | 0.92 | mcg/L | 001 - Peripheral Blood |
| Mercury | 37 | mcg/L | 001 - Peripheral Blood |
| Selenium | 290 | mcg/L | 001 - Peripheral Blood |
| Antimony | 9.6 | mcg/L | 001 - Peripheral Blood |
| Lead | 7.3 | mcg/dL | 001 - Peripheral Blood |
| Caffeine | Positive | mcg/mL | 001 - Peripheral Blood |
| Theobromine | Positive | mcg/mL | 001 - Peripheral Blood |
| Chlorpheniramine | 13 | ng/mL | 002 - Peripheral Blood |
| Nordiazepam | 42 | ng/mL | 006 - Urine |
| Oxazepam | 170 | ng/mL | 006 - Urine |
| Temazepam | 140 | ng/mL | 006 - Urine |

See Detailed Findings section for additional information

Disclaimer: Specimens for elemental testing should be collected in certified metal-free containers. Elevated results for elemental testing may be caused by environmental contamination at the time of specimen collection and should be interpreted accordingly.  It is recommended that unexpected elevated results be verified by testing another specimen.

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 9142B | Cyanide Screen, Blood |
| 2693B | Metals/Metalloids Acute Poisoning Panel, Blood |
| 0420B | Betahydroxybutyric Acid, Blood |
| 8054B | Postmortem, Expanded with NPS, Blood (Forensic) |
| 8092B | Postmortem, Expert, Blood (Forensic) |
| 8051U | Postmortem, Basic, Urine (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 10.65 mL | 10/06/2017 19:00 | Peripheral Blood | |
| 002 | Gray Top Tube | 9.65 mL | 10/06/2017 19:00 | Peripheral Blood | |
| 003 | Gray Top Tube | 9.65 mL | 10/06/2017 19:00 | Heart Blood | |
| 004 | Gray Top Tube | 5 mL | 10/06/2017 19:00 | Heart Blood | |
| 005 | Red Top Tube | 1 mL | 10/06/2017 19:00 | Vitreous Fluid | |

**NMS**
L A B S

**CONFIDENTIAL**

| | | |
|---|---|---|
| **Workorder** | 17314232 |
| **Chain** | 17314232 |
| **Patient ID** | 17-10064 |

**Page 2 of 9**

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 006 | Green Vial | 10.65 mL | 10/06/2017 19:00 | Urine | |
| 007 | Green Vial | 6.75 mL | 10/06/2017 19:00 | Bile | |
| 008 | White Plastic Container | 32.47 g | 10/06/2017 19:00 | Liver Tissue | |
| 009 | White Plastic Container | 24.92 g | 10/06/2017 19:00 | Brain Tissue | |
| 010 | White Plastic Container | 22.08 g | 10/06/2017 19:00 | Muscle Tissue | SKELETAL MUSCLE |
| 011 | White Plastic Container | 28 g | 10/06/2017 19:00 | Gastric Fluid | THIN LIGHT BROWN FLUID, pH=4 |

All sample volumes/weights are approximations.

Specimens received on 10/10/2017.

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Betahydroxybutyric Acid | 21 | mcg/mL | 20 | 001 - Peripheral Blood | GC/MS |
| Arsenic | 12 | mcg/L | 5.0 | 001 - Peripheral Blood | ICP/MS |
| Bismuth | 0.92 | mcg/L | 0.50 | 001 - Peripheral Blood | ICP/MS |
| Mercury | 37 | mcg/L | 3.0 | 001 - Peripheral Blood | ICP/MS |
| Selenium | 290 | mcg/L | 20 | 001 - Peripheral Blood | ICP/MS |
| Result verified by repeat analysis. | | | | | |
| Antimony | 9.6 | mcg/L | 1.0 | 001 - Peripheral Blood | ICP/MS |
| Lead | 7.3 | mcg/dL | 0.50 | 001 - Peripheral Blood | ICP/MS |
| Results verified by repeat analysis. | | | | | |
| Caffeine | Positive | mcg/mL | 0.10 | 001 - Peripheral Blood | GC/MS |
| Theobromine | Positive | mcg/mL | 5.0 | 001 - Peripheral Blood | GC/MS |
| Chlorpheniramine | 13 | ng/mL | 10 | 002 - Peripheral Blood | LC-MS/MS |
| Nordiazepam | 42 | ng/mL | 20 | 006 - Urine | LC-MS/MS |
| Oxazepam | 170 | ng/mL | 20 | 006 - Urine | LC-MS/MS |
| Temazepam | 140 | ng/mL | 20 | 006 - Urine | LC-MS/MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

**Reference Comments:**

1.   Antimony - Peripheral Blood:

Pentavalent antimony compounds are used in medicine as parasiticides. Additionally, antimony has been used in the production of pigments, alloys, and flame-retardants.

Typical normal antimony concentrations in blood are less than 5 mcg/L. Patients administered stibogluconate sodium for leishmaniasis developed an average peak blood antimony concentration of 8800 mcg/L at 1.3 hr post-intramuscular dosing.

NMS Labs has demonstrated that certain collection tubes can artifactually increase measured antimony concentrations rendering reported concentrations difficult to interpret.

CONFIDENTIAL

**NMS** LABS

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 3 of 9

## Reference Comments:

2.  Arsenic - Peripheral Blood:

    Arsenic is a metallic element. It is prevalent in the earth's crust and can therefore be found in numerous environmentally-related sources, e.g., well water, shellfish and soil. Individuals who are exposed to these sources may have acutely or chronically elevated body burdens of arsenic. Arsenic exists in numerous chemical compounds as well as several chemical forms. Not all arsenical compounds are equal in toxicity.

    In unexposed normal individuals, arsenic concentrations in blood are usually less than 10 mcg/L, but may be higher after seafood consumption. Other potential factors causing increased concentrations of arsenic include consumption of well-water with high arsenic content.  In reported poisoning fatalities, a range of 600 - 9300 mcg/L blood (mean, 3300 mcg/L) has been reported.

3.  Betahydroxybutyric Acid (BHB; Betahydroxybutyrate; Ketone) - Peripheral Blood:

    Ketoacidosis related to diabetes or alcoholism can be an important factor in determining cause of death. The primary ketone body produced through ketogenesis is acetoacetate. Acetoacetate may then break down to form acetone and betahydroxybutyric acid. Ketogenic diets and other means of clinically induced, mild ketogenesis have been applied to the treatment of Epilepsy, Alzheimer's disease and other disorders.

    In blood, betahydroxybutyric acid concentrations below 50 mcg/mL are considered normal while concentrations greater than 250 mcg/mL are indicative of ketoacidosis. Ketoacidosis may produce polyuria, polydipsia, weight loss, dizziness, nausea, vomiting, confusion, stupor and coma. There may be an odor of acetone on the breath. Severe ketoacidosis may result in death if left untreated.

4.  Bismuth - Peripheral Blood:

    Bismuth is used industrially to produce low-melting alloys, pigments and chemical additives.  It is also used therapeutically as astringents, antacids, skin powders, radio-opaque agents and to treat ulcers, indigestion, diarrhea, syphilis and warts.  Normal blood concentrations are usually less than 1.0 mcg/L. The primary result of bismuth overdosage is renal damage, but encephalopathy and peripheral neuropathy can also occur.  Other signs of bismuth toxicity may include discoloration of the tongue, gums or skin, salivation, nausea, vomiting, abdominal pain, tremors, ataxia, memory loss, mental confusion, and seizures. Toxic bismuth blood concentrations arising from the chronic oral use of bismuth subnitrate ranged from 50 to 1600 mcg/L. Two death cases associated with bismuth toxicity reported bismuth blood concentrations in excess of 1000 mcg/L.

5.  Caffeine (No-Doz) - Peripheral Blood:

    Caffeine is a xanthine-derived central nervous system stimulant. It also produces diuresis and cardiac and respiratory stimulation. It can be readily found in such items as coffee, tea, soft drinks and chocolate.  The reported qualitative result for this substance is indicative of a finding commonly seen following typical use and is usually not toxicologically significant. If confirmation testing is required please contact the laboratory.

6.  Chlorpheniramine (Chlor-Trimeton®) - Peripheral Blood:

    Chlorpheniramine is a potent antihistamine that has been used alone and in combination with other cold symptom relief medications, both prescribed and sold over-the-counter. It may also be provided by injection or as a nasal spray. Oral doses usually range from 4 to 12 mg with both normal and controlled release formulations available.
    Peak concentrations of 10 ng/mL  chlorpheniramine were obtained 3 hours following single oral administration of 8 mg. Toxic effects have been reported in adults at concentrations greater than 400 ng/mL (serum) and in infants at concentrations above 65 ng/mL (postmortem blood). The blood to plasma ratio of chlorpheniramine is approximately 1.2.
    Common adverse effects include sedation, dizziness, nausea and dry mouth. Signs and symptoms of acute chlorpheniramine toxicity include tremor, seizures, disorientation, loss of consciousness, fever, respiratory depression and cardiac arrhythmias.

# NMS

**CONFIDENTIAL**

| Workorder | 17314232 |
|-----------|----------|
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 4 of 9

## Reference Comments:

7. **Lead - Peripheral Blood:**

   Lead is an environmental toxicant that may deleteriously affect the nervous, hematopoietic, endocrine, renal, and reproductive systems. In the general population, the major exposure routes are inhalation of lead dusts and fumes and ingestion of lead from contaminated hands and food stuffs. Drinking water may also contribute to the total body burden. In children, paint chips from lead based paints may be a source of exposure. According to the U.S. Centers for Disease Control and Prevention (CDC), the blood lead reference level for adults is less than 5 mcg/dL. For workplace information, refer to the U.S. Occupational Safety and Health Administration (OSHA) website.

   In young children, lead exposure is a particular hazard because children absorb lead at a higher rate than do adults, and because the developing nervous system of children are more susceptible to the effect of lead. The U.S. Centers for Disease Control and Prevention (CDC) reference value based on the 97.5th percentile of the blood lead level distribution in U.S. children aged 1-5 years is 5 mcg/dL.

8. **Mercury - Peripheral Blood:**

   Mercury is a trace element, which is widely used, in industrial and agricultural products and processes, and in medicine and dentistry. Dietary intake of mercury in man ranges from approximately 1 to 30 mcg per day. Industrial exposure to mercury occurs through inhalation or by dermal absorption. Mercury exposure can be due to elemental, inorganic and organic forms of the element.

   Total blood mercury levels of up to 6 mcg/L have been measured in persons with low fish consumption and up to 200 mcg/L blood in individuals consuming large quantities of predatory marine fish. Typically, 'normal' mercury blood concentrations are less than 10 mcg/L.

   Postmortem total blood mercury concentrations ranging from 20 - 110 mcg/L with an average of 60 mcg/L have been reported in a Japanese population.

   The average oral lethal dose of inorganic mercury salts is approximately 1 gram. Toxic effects of inorganic mercury poisoning include gastroenteritis and tubular necrosis leading to renal failure. Elemental mercury is most dangerous when volatilized leading to pulmonary and CNS effects. Postmortem blood mercury concentrations can vary according to the form of mercury and the time since exposure. In two cases of inorganic mercury poisoning, blood concentrations of 1700 and 2100 mcg/L were measured. Blood concentrations of mercury after both fatal and non-fatal elemental mercury poisoning usually exceed 200 mcg/L.

9. **Nordiazepam (Chlordiazepoxide Metabolite) - Urine:**

   Nordiazepam is a pharmacologically active metabolite of several benzodiazepine anxiolytic/sedative/hypnotic agents, e.g., diazepam (Valium®). Nordiazepam is also the major active entity in clorazepate (Tranxene®), a benzodiazepine agent used for agitation, seizures and anxiety. The action of this compound is based on its CNS-depressant activity.

10. **Oxazepam (Serax®) - Urine:**

    Oxazepam is a benzodiazepine. It is frequently seen as the metabolite of diazepam and other benzodiazepines; however, it is pharmacologically active and may be given as the primary medication for the short-term relief of symptoms of anxiety and in the management of alcohol withdrawal.

    Signs associated with overdose with oxazepam are similar to those observed with other benzodiazepines, e.g., drowsiness, lethargy, respiratory depression and coma.

11. **Selenium - Peripheral Blood:**

    Selenium is an essential trace metal. It is also used in various industries, e.g., electronic semiconductors and rubber. In medicinals, selenium can be found in shampoos and dietary supplements. The compound exists in elemental, organic, and inorganic forms. Reported reference concentrations of selenium in blood of normal individuals range from 60 - 230 mcg/L. These concentrations are diet dependent.

    Adverse effects to selenium have included irritation of the skin and mucous membranes, nausea, diarrhea, fatigue, alopecia, joint pain, abdominal pain, tremor, corrosive gastritis, cyanosis, coma, and death.

# NMS
## LABS

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 17314232 |
| **Chain** | 17314232 |
| **Patient ID** | 17-10064 |

**Page 5 of 9**

**Reference Comments:**

12. Temazepam (Diazepam Metabolite; Normison®) - Urine:

Temazepam is a benzodiazepine hypnotic agent used in the short-term relief of insomnia. Its major metabolite, oxazepam, is also a pharmacologically active depressant. Temazepam is also a metabolite of diazepam (Valium®). The usual adult dosage of temazepam is 30 mg, however, 15 mg may be adequate.

In overdose, temazepam shares the same clinically observed signs and symptoms as other benzodiazepines, e.g., sedation, lethargy, loss of consciousness and respiratory depression.

Alcohol greatly enhances the activity of benzodiazepines.

13. Theobromine (Xantheose) - Peripheral Blood:

Theobromine is a methylxanthine alkaloid found in tea and cocoa products and has been reported to pass into the breast milk of nursing mothers. Theobromine has the general properties of the xanthines, including diuresis and smooth muscle stimulation. The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory.

**Sample Comments:**

001    Physician/Pathologist Name: DR. GAVIN

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded thirteen (13) months from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed. Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Workorder 17314232 was electronically signed on 10/24/2017 11:24 by:

Laura M. Labay, Ph.D., F-ABFT, DABCC-TC
Forensic Toxicologist

**Analysis Summary and Reporting Limits:**

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 0420B - Betahydroxybutyric Acid, Blood - Peripheral Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Betahydroxybutyric Acid | 20 mcg/mL | | |

Acode 2693B - Metals/Metalloids Acute Poisoning Panel, Blood - Peripheral Blood

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Arsenic | 5.0 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Bismuth | 0.50 mcg/L | | |



CONFIDENTIAL

| | |
|---|---|
| **Workorder** | 17314232 |
| **Chain** | 17314232 |
| **Patient ID** | 17-10064 |

**Page 6 of 9**

**Analysis Summary and Reporting Limits:**

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Mercury | 3.0 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Selenium | 20 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Thallium | 0.50 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Antimony | 1.0 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Lead | 0.50 mcg/dL | | |

Acode 50012B - Benzodiazepines Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/ TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 7-Amino Clonazepam | 5.0 ng/mL | Flurazepam | 2.0 ng/mL |
| Alpha-Hydroxyalprazolam | 5.0 ng/mL | Hydroxyethylflurazepam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Hydroxytriazolam | 5.0 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Lorazepam | 5.0 ng/mL |
| Clobazam | 20 ng/mL | Midazolam | 5.0 ng/mL |
| Clonazepam | 2.0 ng/mL | Nordiazepam | 20 ng/mL |
| Desalkylflurazepam | 5.0 ng/mL | Oxazepam | 20 ng/mL |
| Diazepam | 20 ng/mL | Temazepam | 20 ng/mL |
| Estazolam | 5.0 ng/mL | Triazolam | 2.0 ng/mL |

Acode 50012U - Benzodiazepines Confirmation, Urine (Forensic)

-Analysis by High Performance Liquid Chromatography/ TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 1-Hydroxymidazolam | 5.0 ng/mL | Alprazolam | 5.0 ng/mL |
| 7-Amino Clonazepam | 5.0 ng/mL | Chlordiazepoxide | 20 ng/mL |
| Alpha-Hydroxyalprazolam | 10 ng/mL | Clobazam | 20 ng/mL |



**CONFIDENTIAL**

| Workorder | 17314232 |
|-----------|----------|
| Chain | 17314232 |
| Patient ID | 17-10064 |

**Page 7 of 9**

## Analysis Summary and Reporting Limits:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| Desalkylflurazepam | 5.0 ng/mL | Lorazepam | 10 ng/mL |
| Diazepam | 20 ng/mL | Nordiazepam | 20 ng/mL |
| Estazolam | 5.0 ng/mL | Oxazepam | 20 ng/mL |
| Hydroxyethylflurazepam | 5.0 ng/mL | Temazepam | 20 ng/mL |
| Hydroxytriazolam | 5.0 ng/mL | | |

Acode 52440B - Chlorpheniramine Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/
TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| Chlorpheniramine | 10 ng/mL | | |

Acode 5970B - Synthetic Cannabinoids Confirmation Panel 2 (Qualitative), Blood - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/
TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| 5F-AB-001 | 1.0 ng/mL | FUB-AMB | 0.10 ng/mL |
| 5F-ADB | 0.20 ng/mL | FUB-JWH-018 | 0.20 ng/mL |
| 5F-AMB | 0.10 ng/mL | FUB-PB-22 | 0.10 ng/mL |
| 5F-APICA | 1.0 ng/mL | MA-CHMINACA | 0.20 ng/mL |
| 5F-APINACA (5F-AKB-48) | 2.0 ng/mL | MDMB-CHMCZCA | 0.10 ng/mL |
| 5F-MN-18 | 0.10 ng/mL | MDMB-CHMINACA | 0.10 ng/mL |
| 5F-PB-22 | 0.10 ng/mL | MDMB-FUBINACA | 0.10 ng/mL |
| AMB | 0.10 ng/mL | MMB-CHMICA | 0.10 ng/mL |
| APICA | 0.20 ng/mL | MMB-CHMINACA (MDMB-CHMICA) | 0.10 ng/mL |
| APINACA (AKB-48) | 1.0 ng/mL | MO-CHMINACA | 0.10 ng/mL |
| CUMYL-THPINACA | 0.10 ng/mL | NM-2201 | 0.10 ng/mL |
| EG-2201 | 0.20 ng/mL | THJ-018 | 0.10 ng/mL |
| FUB-144 | 0.10 ng/mL | THJ-2201 | 0.10 ng/mL |
| FUB-AKB-48 | 0.20 ng/mL | | |

Acode 8051U - Postmortem, Basic, Urine (Forensic)

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| Barbiturates | 0.30 mcg/mL | Methadone / Metabolite | 300 ng/mL |
| Benzodiazepines | 50 ng/mL | Opiates | 300 ng/mL |
| Cannabinoids | 20 ng/mL | Oxycodone / Oxymorphone | 100 ng/mL |
| Cocaine / Metabolites | 150 ng/mL | Phencyclidine | 25 ng/mL |

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| Amphetamines | 500 ng/mL | Fentanyl / Acetyl Fentanyl | 2.0 ng/mL |
| Buprenorphine / Metabolite | 5.0 ng/mL | MDMA | 300 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for:



**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 8 of 9

## Analysis Summary and Reporting Limits:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 8054B - Postmortem, Expanded with NPS, Blood (Forensic) - Peripheral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Salicylates | 120 mcg/mL |
| Cannabinoids | 10 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

-Analysis by High Performance Liquid Chromatography/TandemMass Spectrometry QTRAP (LC-MS/MS QTRAP) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 5F-AB-001 | 1.0 ng/mL | FUB-144 | 0.10 ng/mL |
| 5F-ADB | 0.20 ng/mL | FUB-AKB-48 | 0.20 ng/mL |
| 5F-ADB-PINACA | 1.0 ng/mL | FUB-AMB | 0.10 ng/mL |
| 5F-ADBICA | 1.0 ng/mL | FUB-JWH-018 | 0.20 ng/mL |
| 5F-AMB | 0.10 ng/mL | FUB-PB-22 | 0.10 ng/mL |
| 5F-APICA | 1.0 ng/mL | JWH-018 | 0.10 ng/mL |
| 5F-APINACA (5F-AKB-48) | 2.0 ng/mL | JWH-122 | 0.10 ng/mL |
| 5F-MN-18 | 0.10 ng/mL | MA-CHMINACA | 0.20 ng/mL |
| 5F-PB-22 | 0.10 ng/mL | MDMB-CHMCZCA | 0.10 ng/mL |
| AB-CHMINACA | 1.0 ng/mL | MDMB-CHMINACA | 0.10 ng/mL |
| AB-FUBINACA | 1.0 ng/mL | MDMB-FUBINACA | 0.10 ng/mL |
| AB-PINACA | 0.20 ng/mL | MMB-CHMICA | 0.10 ng/mL |
| ADB-CHMINACA | 0.10 ng/mL | MMB-CHMINACA (MDMB-CHMICA) | 0.10 ng/mL |
| ADB-FUBINACA | 1.0 ng/mL | MO-CHMINACA | 0.10 ng/mL |
| ADB-PINACA | 0.20 ng/mL | NM-2201 | 0.10 ng/mL |
| ADBICA | 1.0 ng/mL | PX1 | 0.10 ng/mL |
| AM-2201 | 0.10 ng/mL | PX2 | 0.20 ng/mL |
| AMB | 0.10 ng/mL | THJ-018 | 0.10 ng/mL |
| APICA | 0.20 ng/mL | THJ-2201 | 0.10 ng/mL |
| APINACA (AKB-48) | 1.0 ng/mL | UR-144 | 0.20 ng/mL |
| APP-CHMINACA (PX3) | 0.20 ng/mL | XLR-11 | 0.20 ng/mL |
| CUMYL-THPINACA | 0.10 ng/mL | | |
| EG-2201 | 0.20 ng/mL | | |

**NMS**
L A B S

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 17314232 |
| **Chain** | 17314232 |
| **Patient ID** | 17-10064 |

Page 9 of 9

## Analysis Summary and Reporting Limits:

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of compound classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified compound class are included. Some specific analytes outside these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs.
Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

Acode 8092B - Postmortem, Expert, Blood (Forensic) - Peripheral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Benzodiazepines | 100 ng/mL | Opiates | 20 ng/mL |
| Buprenorphine / Metabolite | 0.50 ng/mL | Oxycodone / Oxymorphone | 10 ng/mL |
| Cannabinoids | 10 ng/mL | Salicylates | 120 mcg/mL |
| Cocaine / Metabolites | 20 ng/mL | | |

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for: Anesthetics, Anticoagulant Agents, Antifungal Agents, Antihypertensive Agents, Anxiolytics (Benzodiazepine and others), Hypnosedatives (Barbiturates, Non-Benzodiazepine Hypnotics, and others) and Non-Steroidal Anti-Inflammatory Agents (excluding Salicylate).

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for: The following is a general list of compound classes included in the Gas Chromatographic screen. The detection of any particular compound is concentration-dependent. Please note that not all known compounds included in each specified class or heading are included. Some specific compounds outside these classes are also included. For a detailed list of all compounds and reporting limits included in this screen, please contact NMS Labs.
Amphetamines, Analgesics (opioid and non-opioid), Anorectics, Antiarrhythmics, Anticholinergic Agents, Anticonvulsant Agents, Antidepressants, Antiemetic Agents, Antihistamines, Antiparkinsonian Agents, Antipsychotic Agents, Antitussive Agents, Antiviral Agents, Calcium Channel Blocking Agents, Cardiovascular Agents (non-digitalis), Local Anesthetics Agents, Muscle Relaxants and Stimulants (Amphetamine-like and others).

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 9142B - Cyanide Screen, Blood - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/ TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Cyanide | 0.10 mcg/mL | | |



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**   10/30/2017 13:03

To:  **10294**
Clark County Coroner's Office
Attn: David Mills
1704 Pinto Lane
Las Vegas, NV  89106

| | |
|---|---|
| **Patient Name** | PADDOCK (TENT), STEPHEN C. |
| **Patient ID** | 17-10064 |
| **Chain** | 17322918 |
| **Age** 64 Y | **DOB** Not Given |
| **Gender** | Male |
| **Workorder** | 17322918 |

**Page 1 of 3**

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Antimony | 0.49 | mcg/g | 001 - Hair |
| Barium | 1.6 | mcg/g | 001 - Hair |
| Lead | 1.3 | mcg/g | 001 - Hair |
| Mercury | 4.7 | mcg/g | 001 - Hair |
| Barium | 5.0 | mcg/g | 002 - Pubic Hair |
| Bismuth | 0.15 | mcg/g | 002 - Pubic Hair |
| Mercury | 3.6 | mcg/g | 002 - Pubic Hair |

See Detailed Findings section for additional information

Disclaimer: Specimens for elemental testing should be collected in certified metal-free containers. Elevated results for elemental testing may be caused by environmental contamination at the time of specimen collection and should be interpreted accordingly.  It is recommended that unexpected elevated results be verified by testing another specimen.

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 2693H | Metals/Metalloids Acute Poisoning Panel, Hair |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | White Plastic Container | 0.128 g | 10/14/2017 13:10 | Hair | SCALP HAIR |
| 002 | White Plastic Container | 0.128 g | 10/14/2017 13:10 | Pubic Hair | |
| 003 | Green Plastic Container | 16.06 g | 10/14/2017 13:10 | Bone | "VERTEBRAL COLUM" |

All sample volumes/weights are approximations.

Specimens received on 10/17/2017.

# NMS
### LABS

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 17322918 |
| **Chain** | 17322918 |
| **Patient ID** | 17-10064 |

**Page 2 of 3**

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Antimony | 0.49 | mcg/g | 0.20 | 001 - Hair | ICP/MS |
| Barium | 1.6 | mcg/g | 1.0 | 001 - Hair | ICP/MS |
| Lead | 1.3 | mcg/g | 1.0 | 001 - Hair | ICP/MS |
| Mercury | 4.7 | mcg/g | 0.76 | 001 - Hair | ICP/MS |
| Barium | 5.0 | mcg/g | 0.98 | 002 - Pubic Hair | ICP/MS |
| Bismuth | 0.15 | mcg/g | 0.098 | 002 - Pubic Hair | ICP/MS |
| Mercury | 3.6 | mcg/g | 0.76 | 002 - Pubic Hair | ICP/MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

## Reference Comments:

1. Antimony - Hair:

   Normally: Less than 0.2 mcg/g.
   Not for clinical diagnostic purposes.

2. Barium - Hair, Pubic Hair:

   Normally: Less than 2 mcg/g.
   Not for clinical diagnostic purposes.

3. Bismuth - Pubic Hair:

   No reference data available.
   Not for clinical diagnostic purposes.

4. Lead - Hair:

   Normally: Less than 15 mcg/g.
   Not for clinical diagnostic purposes.

5. Mercury - Hair, Pubic Hair:

   Generally: Less than 2 mcg/g.
   Concentrations are diet and environment dependent.
   Not for clinical diagnostic purposes.

## Sample Comments:

001     Physician/Pathologist Name: DR. GAVIN

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded thirteen (13) months from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed. Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Workorder 17322918 was electronically signed on 10/30/2017 12:11 by:

Laura M. Labay, Ph.D., F-ABFT, DABCC-TC
Forensic Toxicologist



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 17322918 |
| **Chain** | 17322918 |
| **Patient ID** | 17-10064 |

Page 3 of 3

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 2693H - Metals/Metalloids Acute Poisoning Panel, Hair - Pubic Hair

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Antimony | 0.19 mcg/g | Lead | 0.98 mcg/g |
| Arsenic | 0.98 mcg/g | Selenium | 3.9 mcg/g |
| Barium | 0.98 mcg/g | Thallium | 0.098 mcg/g |
| Bismuth | 0.098 mcg/g | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Mercury | 0.76 mcg/g | | |

Acode 2693H - Metals/Metalloids Acute Poisoning Panel, Hair

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Antimony | 0.20 mcg/g | Lead | 1.0 mcg/g |
| Arsenic | 1.0 mcg/g | Selenium | 4.0 mcg/g |
| Barium | 1.0 mcg/g | Thallium | 0.10 mcg/g |
| Bismuth | 0.10 mcg/g | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Mercury | 0.76 mcg/g | | |

# NMS Labs

**CONFIDENTIAL**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

## Supplemental Report

| | |
|---|---|
| **Report Issued** 12/11/2017 11:02 | |
| **Last Report Issued** 10/24/2017 12:03 | |

**Patient Name** PADDOCK (TENT), STEPHEN C.
**Patient ID** 17-10064
**Chain** 17314232
**Age** 64 Y  **DOB** Not Given
**Gender** Male
**Workorder** 17314232

To: **10294**
Clark County Coroner's Office
Attn: David Mills
1704 Pinto Lane
Las Vegas, NV  89106

**Page 1 of 10**

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Betahydroxybutyric Acid | 21 | mcg/mL | 001 - Peripheral Blood |
| Arsenic | 12 | mcg/L | 001 - Peripheral Blood |
| Bismuth | 0.92 | mcg/L | 001 - Peripheral Blood |
| Mercury | 37 | mcg/L | 001 - Peripheral Blood |
| Selenium | 290 | mcg/L | 001 - Peripheral Blood |
| Antimony | 9.6 | mcg/L | 001 - Peripheral Blood |
| Lead | 7.3 | mcg/dL | 001 - Peripheral Blood |
| Caffeine | Positive | mcg/mL | 001 - Peripheral Blood |
| Theobromine | Positive | mcg/mL | 001 - Peripheral Blood |
| Chlorpheniramine | 13 | ng/mL | 002 - Peripheral Blood |
| Creatinine (Vitreous Fluid) | 1.6 | mg/dL | 005 - Vitreous Fluid |
| Sodium (Vitreous Fluid) | 127 | mmol/L | 005 - Vitreous Fluid |
| Potassium (Vitreous Fluid) | >20 | mmol/L | 005 - Vitreous Fluid |
| Chloride (Vitreous Fluid) | 112 | mmol/L | 005 - Vitreous Fluid |
| Urea Nitrogen (Vitreous Fluid) | 35 | mg/dL | 005 - Vitreous Fluid |
| Nordiazepam | 42 | ng/mL | 006 - Urine |
| Oxazepam | 170 | ng/mL | 006 - Urine |
| Temazepam | 140 | ng/mL | 006 - Urine |

See Detailed Findings section for additional information

Disclaimer: Specimens for elemental testing should be collected in certified metal-free containers. Elevated results for elemental testing may be caused by environmental contamination at the time of specimen collection and should be interpreted accordingly.  It is recommended that unexpected elevated results be verified by testing another specimen.

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 9142B | Cyanide Screen, Blood |
| 2693B | Metals/Metalloids Acute Poisoning Panel, Blood |
| 0420B | Betahydroxybutyric Acid, Blood |
| 8054B | Postmortem, Expanded with NPS, Blood (Forensic) |
| 1919FL | Electrolytes and Glucose Panel (Vitreous), Fluid (Forensic) |
| 8092B | Postmortem, Expert, Blood (Forensic) |
| 8051U | Postmortem, Basic, Urine (Forensic) |

### Specimens Received:

**NMS**
L A B S

CONFIDENTIAL

| Workorder | 17314232 |
|-----------|----------|
| Chain | 17314232 |
| Patient ID | 17-10064 |

**Page 2 of 10**

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|-----|----------------|--------------|---------------------|---------------|---------------------------|
| 001 | Gray Top Tube | 10.65 mL | 10/06/2017 19:00 | Peripheral Blood | |
| 002 | Gray Top Tube | 9.65 mL | 10/06/2017 19:00 | Peripheral Blood | |
| 003 | Gray Top Tube | 9.65 mL | 10/06/2017 19:00 | Heart Blood | |
| 004 | Gray Top Tube | 5 mL | 10/06/2017 19:00 | Heart Blood | |
| 005 | Red Top Tube | 1 mL | 10/06/2017 19:00 | Vitreous Fluid | |
| 006 | Green Vial | 10.65 mL | 10/06/2017 19:00 | Urine | |
| 007 | Green Vial | 6.75 mL | 10/06/2017 19:00 | Bile | |
| 008 | White Plastic Container | 32.47 g | 10/06/2017 19:00 | Liver Tissue | |
| 009 | White Plastic Container | 24.92 g | 10/06/2017 19:00 | Brain Tissue | |
| 010 | White Plastic Container | 22.08 g | 10/06/2017 19:00 | Muscle Tissue | SKELETAL MUSCLE |
| 011 | White Plastic Container | 28 g | 10/06/2017 19:00 | Gastric Fluid | THIN LIGHT BROWN FLUID, pH=4 |

All sample volumes/weights are approximations.

Specimens received on 10/10/2017.

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|-----------------------|--------|-------|------------|-----------------|-------------|
| Betahydroxybutyric Acid | 21 | mcg/mL | 20 | 001 - Peripheral Blood | GC/MS |
| Arsenic | 12 | mcg/L | 5.0 | 001 - Peripheral Blood | ICP/MS |
| Bismuth | 0.92 | mcg/L | 0.50 | 001 - Peripheral Blood | ICP/MS |
| Mercury | 37 | mcg/L | 3.0 | 001 - Peripheral Blood | ICP/MS |
| Selenium | 290 | mcg/L | 20 | 001 - Peripheral Blood | ICP/MS |
| Result verified by repeat analysis. | | | | | |
| Antimony | 9.6 | mcg/L | 1.0 | 001 - Peripheral Blood | ICP/MS |
| Lead | 7.3 | mcg/dL | 0.50 | 001 - Peripheral Blood | ICP/MS |
| Results verified by repeat analysis. | | | | | |
| Caffeine | Positive | mcg/mL | 0.10 | 001 - Peripheral Blood | GC/MS |
| Theobromine | Positive | mcg/mL | 5.0 | 001 - Peripheral Blood | GC/MS |
| Chlorpheniramine | 13 | ng/mL | 10 | 002 - Peripheral Blood | LC-MS/MS |
| Creatinine (Vitreous Fluid) | 1.6 | mg/dL | 0.050 | 005 - Vitreous Fluid | Colorimetry |
| Sodium (Vitreous Fluid) | 127 | mmol/L | 80 | 005 - Vitreous Fluid | Chemistry Analyzer |
| Potassium (Vitreous Fluid) | >20 | mmol/L | 1.0 | 005 - Vitreous Fluid | Chemistry Analyzer |
| Chloride (Vitreous Fluid) | 112 | mmol/L | 70 | 005 - Vitreous Fluid | Chemistry Analyzer |
| Glucose (Vitreous Fluid) | None Detected | mg/dL | 35 | 005 - Vitreous Fluid | Chemistry Analyzer |
| Urea Nitrogen (Vitreous Fluid) | 35 | mg/dL | 3.0 | 005 - Vitreous Fluid | Chemistry Analyzer |
| Nordiazepam | 42 | ng/mL | 20 | 006 - Urine | LC-MS/MS |
| Oxazepam | 170 | ng/mL | 20 | 006 - Urine | LC-MS/MS |
| Temazepam | 140 | ng/mL | 20 | 006 - Urine | LC-MS/MS |

# NMS LABS

**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 3 of 10

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

## Reference Comments:

1. Antimony - Peripheral Blood:

   Pentavalent antimony compounds are used in medicine as parasiticides. Additionally, antimony has been used in the production of pigments, alloys, and flame-retardants.

   Typical normal antimony concentrations in blood are less than 5 mcg/L. Patients administered stibogluconate sodium for leishmaniasis developed an average peak blood antimony concentration of 8800 mcg/L at 1.3 hr post-intramuscular dosing.

   NMS Labs has demonstrated that certain collection tubes can artifactually increase measured antimony concentrations rendering reported concentrations difficult to interpret.

2. Arsenic - Peripheral Blood:

   Arsenic is a metallic element. It is prevalent in the earth's crust and can therefore be found in numerous environmentally-related sources, e.g., well water, shellfish and soil. Individuals who are exposed to these sources may have acutely or chronically elevated body burdens of arsenic. Arsenic exists in numerous chemical compounds as well as several chemical forms. Not all arsenical compounds are equal in toxicity.

   In unexposed normal individuals, arsenic concentrations in blood are usually less than 10 mcg/L, but may be higher after seafood consumption. Other potential factors causing increased concentrations of arsenic include consumption of well-water with high arsenic content. In reported poisoning fatalities, a range of 600 - 9300 mcg/L blood (mean, 3300 mcg/L) has been reported.

3. Betahydroxybutyric Acid (BHB; Betahydroxybutyrate; Ketone) - Peripheral Blood:

   Ketoacidosis related to diabetes or alcoholism can be an important factor in determining cause of death. The primary ketone body produced through ketogenesis is acetoacetate. Acetoacetate may then break down to form acetone and betahydroxybutyric acid. Ketogenic diets and other means of clinically induced, mild ketogenesis have been applied to the treatment of Epilepsy, Alzheimer's disease and other disorders.

   In blood, betahydroxybutyric acid concentrations below 50 mcg/mL are considered normal while concentrations greater than 250 mcg/mL are indicative of ketoacidosis. Ketoacidosis may produce polyuria, polydipsia, weight loss, dizziness, nausea, vomiting, confusion, stupor and coma. There may be an odor of acetone on the breath. Severe ketoacidosis may result in death if left untreated.

4. Bismuth - Peripheral Blood:

   Bismuth is used industrially to produce low-melting alloys, pigments and chemical additives. It is also used therapeutically as astringents, antacids, skin powders, radio-opaque agents and to treat ulcers, indigestion, diarrhea, syphilis and warts. Normal blood concentrations are usually less than 1.0 mcg/L. The primary result of bismuth overdosage is renal damage, but encephalopathy and peripheral neuropathy can also occur. Other signs of bismuth toxicity may include discoloration of the tongue, gums or skin, salivation, nausea, vomiting, abdominal pain, tremors, ataxia, memory loss, mental confusion, and seizures. Toxic bismuth blood concentrations arising from the chronic oral use of bismuth subnitrate ranged from 50 to 1600 mcg/L. Two death cases associated with bismuth toxicity reported bismuth blood concentrations in excess of 1000 mcg/L.

5. Caffeine (No-Doz) - Peripheral Blood:

   Caffeine is a xanthine-derived central nervous system stimulant. It also produces diuresis and cardiac and respiratory stimulation. It can be readily found in such items as coffee, tea, soft drinks and chocolate. The reported qualitative result for this substance is indicative of a finding commonly seen following typical use and is usually not toxicologically significant. If confirmation testing is required please contact the laboratory.

6. Chloride (Vitreous Fluid) - Vitreous Fluid:

   Normal: 105 - 135 mmol/L

**NMS**
L A B S

CONFIDENTIAL

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 4 of 10

## Reference Comments:

7.   Chlorpheniramine (Chlor-Trimeton®) - Peripheral Blood:

Chlorpheniramine is a potent antihistamine that has been used alone and in combination with other cold symptom relief medications, both prescribed and sold over-the-counter.  It may also be provided by injection or as a nasal spray. Oral doses usually range from 4 to 12 mg with both normal and controlled release formulations available.

Peak concentrations of 10 ng/mL  chlorpheniramine were obtained 3 hours following single oral administration of 8 mg. Toxic effects have been reported in adults at concentrations greater than 400 ng/mL (serum) and in infants at concentrations above 65 ng/mL (postmortem blood). The blood to plasma ratio of chlorpheniramine is approximately 1.2.

Common adverse effects include sedation, dizziness, nausea and dry mouth. Signs and symptoms of acute chlorpheniramine toxicity include tremor, seizures, disorientation, loss of consciousness, fever, respiratory depression and cardiac arrhythmias.

8.   Creatinine (Vitreous Fluid) - Vitreous Fluid:

Normal: 0.6 - 1.3 mg/dL

9.   Glucose (Vitreous Fluid) - Vitreous Fluid:

Normal: <200 mg/dL

Postmortem vitreous glucose concentrations >200 mg/dL are associated with hyperglycemia.

Since postmortem vitreous glucose concentrations decline rapidly after death both in vivo and in vitro, care should be taken in the interpretation of results.  Stability of vitreous glucose for up to 30 days has been noted by NMS Labs when specimens are maintained frozen (-20°C).

10.  Lead - Peripheral Blood:

Lead is an environmental toxicant that may deleteriously affect the nervous, hematopoietic, endocrine, renal, and reproductive systems.  In the general population, the major exposure routes are inhalation of lead dusts and fumes and ingestion of lead from contaminated hands and food stuffs. Drinking water may also contribute to the total body burden. In children, paint chips from lead based paints may be a source of exposure. According to the U.S. Centers for Disease Control and Prevention (CDC), the blood lead reference level for adults is less than 5 mcg/dL.  For workplace information, refer to the U.S. Occupational Safety and Health Administration (OSHA) website.

In young children, lead exposure is a particular hazard because children absorb lead at a higher rate than do adults, and because the developing nervous system of children are more susceptible to the effect of lead.  The U.S. Centers for Disease Control and Prevention (CDC) reference value based on the 97.5th percentile of the blood lead level distribution in U.S. children aged 1-5 years is 5 mcg/dL.

11.  Mercury - Peripheral Blood:

Mercury is a trace element, which is widely used, in industrial and agricultural products and processes, and in medicine and dentistry. Dietary intake of mercury in man ranges from approximately 1 to 30 mcg per day. Industrial exposure to mercury occurs through inhalation or by dermal absorption. Mercury exposure can be due to elemental, inorganic and organic forms of the element.

Total blood mercury levels of up to 6 mcg/L have been measured in persons with low fish consumption and up to 200 mcg/L blood in individuals consuming large quantities of predatory marine fish. Typically, 'normal' mercury blood concentrations are less than 10 mcg/L.

Postmortem total blood mercury concentrations ranging from 20 - 110 mcg/L with an average of 60 mcg/L have been reported in a Japanese population.

The average oral lethal dose of inorganic mercury salts is approximately 1 gram. Toxic effects of inorganic mercury poisoning include gastroenteritis and tubular necrosis leading to renal failure. Elemental mercury is most dangerous when volatilized leading to pulmonary and CNS effects. Postmortem blood mercury concentrations can vary according to the form of mercury and the time since exposure. In two cases of inorganic mercury poisoning, blood concentrations of 1700 and 2100 mcg/L were measured. Blood concentrations of mercury after both fatal and non-fatal elemental mercury poisoning usually exceed 200 mcg/L.

**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

**Page 5 of 10**

## Reference Comments:

12. Nordiazepam (Chlordiazepoxide Metabolite) - Urine:

   Nordiazepam is a pharmacologically active metabolite of several benzodiazepine anxiolytic/sedative/hypnotic agents, e.g., diazepam (Valium®). Nordiazepam is also the major active entity in clorazepate (Tranxene®), a benzodiazepine agent used for agitation, seizures and anxiety. The action of this compound is based on its CNS-depressant activity.

13. Oxazepam (Serax®) - Urine:

   Oxazepam is a benzodiazepine. It is frequently seen as the metabolite of diazepam and other benzodiazepines; however, it is pharmacologically active and may be given as the primary medication for the short-term relief of symptoms of anxiety and in the management of alcohol withdrawal.

   Signs associated with overdose with oxazepam are similar to those observed with other benzodiazepines, e.g., drowsiness, lethargy, respiratory depression and coma.

14. Potassium (Vitreous Fluid) - Vitreous Fluid:

   Normal: <15 mmol/L
   Quantitative results for Potassium will be affected if performed on gray top tubes since these collection tubes contain potassium oxalate.

15. Selenium - Peripheral Blood:

   Selenium is an essential trace metal. It is also used in various industries, e.g., electronic semiconductors and rubber. In medicinals, selenium can be found in shampoos and dietary supplements. The compound exists in elemental, organic, and inorganic forms.  Reported reference concentrations of selenium in blood of normal individuals range from 60 - 230 mcg/L.  These concentrations are diet dependent.

   Adverse effects to selenium have included irritation of the skin and mucous membranes, nausea, diarrhea, fatigue, alopecia, joint pain, abdominal pain, tremor, corrosive gastritis, cyanosis, coma, and death.

16. Sodium (Vitreous Fluid) - Vitreous Fluid:

   Normal: 135 - 150 mmol/L
   Quantitative results for sodium will be affected if performed on gray top tubes since these collection tubes contain sodium fluoride.

17. Temazepam (Diazepam Metabolite; Normison®) - Urine:

   Temazepam is a benzodiazepine hypnotic agent used in the short-term relief of insomnia. Its major metabolite, oxazepam, is also a pharmacologically active depressant. Temazepam is also a metabolite of diazepam (Valium®). The usual adult dosage of temazepam is 30 mg, however, 15 mg may be adequate.

   In overdose, temazepam shares the same clinically observed signs and symptoms as other benzodiazepines, e.g., sedation, lethargy, loss of consciousness and respiratory depression.

   Alcohol greatly enhances the activity of benzodiazepines.

18. Theobromine (Xantheose) - Peripheral Blood:

   Theobromine is a methylxanthine alkaloid found in tea and cocoa products and has been reported to pass into the breast milk of nursing mothers. Theobromine has the general properties of the xanthines, including diuresis and smooth muscle stimulation. The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory.

19. Urea Nitrogen (Vitreous Fluid) - Vitreous Fluid:

   Normal: 8 - 20 mg/dL

## Sample Comments:

001   Physician/Pathologist Name: DR. GAVIN

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded thirteen (13) months from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed. Chain of custody documentation has been maintained for the analyses performed by NMS Labs.



**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

**Page 6 of 10**

Workorder 17314232 was electronically signed on 12/11/2017 09:12 by:

Laura M. Labay, Ph.D., F-ABFT, DABCC-TC
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 0420B - Betahydroxybutyric Acid, Blood - Peripheral Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Betahydroxybutyric Acid | 20 mcg/mL | | |

Acode 1919FL - Electrolytes and Glucose Panel (Vitreous), Fluid (Forensic) - Vitreous Fluid

-Analysis by Chemistry Analyzer for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Chloride (Vitreous Fluid) | 70 mmol/L | Sodium (Vitreous Fluid) | 80 mmol/L |
| Glucose (Vitreous Fluid) | 35 mg/dL | Urea Nitrogen (Vitreous Fluid) | 3.0 mg/dL |
| Potassium (Vitreous Fluid) | 1.0 mmol/L | | |

-Analysis by Colorimetry (C) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Creatinine (Vitreous Fluid) | 0.050 mg/dL | | |

Acode 2693B - Metals/Metalloids Acute Poisoning Panel, Blood - Peripheral Blood

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Arsenic | 5.0 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Bismuth | 0.50 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Mercury | 3.0 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:



**CONFIDENTIAL**

| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 7 of 10

**Analysis Summary and Reporting Limits:**

| Compound | Rpt. Limit | Compound | Rpt. Limit |
| --- | --- | --- | --- |
| Selenium | 20 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
| --- | --- | --- | --- |
| Thallium | 0.50 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
| --- | --- | --- | --- |
| Antimony | 1.0 mcg/L | | |

-Analysis by Inductively Coupled Plasma/Mass Spectrometry(ICP/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
| --- | --- | --- | --- |
| Lead | 0.50 mcg/dL | | |

Acode 50012B - Benzodiazepines Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/ TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
| --- | --- | --- | --- |
| 7-Amino Clonazepam | 5.0 ng/mL | Flurazepam | 2.0 ng/mL |
| Alpha-Hydroxyalprazolam | 5.0 ng/mL | Hydroxyethylflurazepam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Hydroxytriazolam | 5.0 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Lorazepam | 5.0 ng/mL |
| Clobazam | 20 ng/mL | Midazolam | 5.0 ng/mL |
| Clonazepam | 2.0 ng/mL | Nordiazepam | 20 ng/mL |
| Desalkylflurazepam | 5.0 ng/mL | Oxazepam | 20 ng/mL |
| Diazepam | 20 ng/mL | Temazepam | 20 ng/mL |
| Estazolam | 5.0 ng/mL | Triazolam | 2.0 ng/mL |

Acode 50012U - Benzodiazepines Confirmation, Urine (Forensic)

-Analysis by High Performance Liquid Chromatography/ TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
| --- | --- | --- | --- |
| 1-Hydroxymidazolam | 5.0 ng/mL | Estazolam | 5.0 ng/mL |
| 7-Amino Clonazepam | 5.0 ng/mL | Hydroxyethylflurazepam | 5.0 ng/mL |
| Alpha-Hydroxyalprazolam | 10 ng/mL | Hydroxytriazolam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Lorazepam | 10 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Nordiazepam | 20 ng/mL |
| Clobazam | 20 ng/mL | Oxazepam | 20 ng/mL |
| Desalkylflurazepam | 5.0 ng/mL | Temazepam | 20 ng/mL |
| Diazepam | 20 ng/mL | | |

Acode 52440B - Chlorpheniramine Confirmation, Blood (Forensic) - Peripheral Blood



**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 8 of 10

## Analysis Summary and Reporting Limits:

-Analysis by High Performance Liquid Chromatography/
TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Chlorpheniramine | 10 ng/mL | | |

Acode 5970B - Synthetic Cannabinoids Confirmation Panel 2 (Qualitative), Blood - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/
TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 5F-AB-001 | 1.0 ng/mL | FUB-AMB | 0.10 ng/mL |
| 5F-ADB | 0.20 ng/mL | FUB-JWH-018 | 0.20 ng/mL |
| 5F-AMB | 0.10 ng/mL | FUB-PB-22 | 0.10 ng/mL |
| 5F-APICA | 1.0 ng/mL | MA-CHMINACA | 0.20 ng/mL |
| 5F-APINACA (5F-AKB-48) | 2.0 ng/mL | MDMB-CHMCZCA | 0.10 ng/mL |
| 5F-MN-18 | 0.10 ng/mL | MDMB-CHMINACA | 0.10 ng/mL |
| 5F-PB-22 | 0.10 ng/mL | MDMB-FUBINACA | 0.10 ng/mL |
| AMB | 0.10 ng/mL | MMB-CHMICA | 0.10 ng/mL |
| APICA | 0.20 ng/mL | MMB-CHMINACA (MDMB-CHMICA) | 0.10 ng/mL |
| APINACA (AKB-48) | 1.0 ng/mL | MO-CHMINACA | 0.10 ng/mL |
| CUMYL-THPINACA | 0.10 ng/mL | NM-2201 | 0.10 ng/mL |
| EG-2201 | 0.20 ng/mL | THJ-018 | 0.10 ng/mL |
| FUB-144 | 0.10 ng/mL | THJ-2201 | 0.10 ng/mL |
| FUB-AKB-48 | 0.20 ng/mL | | |

Acode 8051U - Postmortem, Basic, Urine (Forensic)

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.30 mcg/mL | Methadone / Metabolite | 300 ng/mL |
| Benzodiazepines | 50 ng/mL | Opiates | 300 ng/mL |
| Cannabinoids | 20 ng/mL | Oxycodone / Oxymorphone | 100 ng/mL |
| Cocaine / Metabolites | 150 ng/mL | Phencyclidine | 25 ng/mL |

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 500 ng/mL | Fentanyl / Acetyl Fentanyl | 2.0 ng/mL |
| Buprenorphine / Metabolite | 5.0 ng/mL | MDMA | 300 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 8054B - Postmortem, Expanded with NPS, Blood (Forensic) - Peripheral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:



**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 17314232 |
| Chain | 17314232 |
| Patient ID | 17-10064 |

Page 9 of 10

**Analysis Summary and Reporting Limits:**

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Salicylates | 120 mcg/mL |
| Cannabinoids | 10 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

-Analysis by High Performance Liquid Chromatography/TandemMass Spectrometry QTRAP (LC-MS/MS QTRAP) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 5F-AB-001 | 1.0 ng/mL | FUB-144 | 0.10 ng/mL |
| 5F-ADB | 0.20 ng/mL | FUB-AKB-48 | 0.20 ng/mL |
| 5F-ADB-PINACA | 1.0 ng/mL | FUB-AMB | 0.10 ng/mL |
| 5F-ADBICA | 1.0 ng/mL | FUB-JWH-018 | 0.20 ng/mL |
| 5F-AMB | 0.10 ng/mL | FUB-PB-22 | 0.10 ng/mL |
| 5F-APICA | 1.0 ng/mL | JWH-018 | 0.10 ng/mL |
| 5F-APINACA (5F-AKB-48) | 2.0 ng/mL | JWH-122 | 0.10 ng/mL |
| 5F-MN-18 | 0.10 ng/mL | MA-CHMINACA | 0.20 ng/mL |
| 5F-PB-22 | 0.10 ng/mL | MDMB-CHMCZCA | 0.10 ng/mL |
| AB-CHMINACA | 1.0 ng/mL | MDMB-CHMINACA | 0.10 ng/mL |
| AB-FUBINACA | 1.0 ng/mL | MDMB-FUBINACA | 0.10 ng/mL |
| AB-PINACA | 0.20 ng/mL | MMB-CHMICA | 0.10 ng/mL |
| ADB-CHMINACA | 0.10 ng/mL | MMB-CHMINACA (MDMB-CHMICA) | 0.10 ng/mL |
| ADB-FUBINACA | 1.0 ng/mL | | |
| ADB-PINACA | 0.20 ng/mL | MO-CHMINACA | 0.10 ng/mL |
| ADBICA | 1.0 ng/mL | NM-2201 | 0.10 ng/mL |
| AM-2201 | 0.10 ng/mL | PX1 | 0.10 ng/mL |
| AMB | 0.10 ng/mL | PX2 | 0.20 ng/mL |
| APICA | 0.20 ng/mL | THJ-018 | 0.10 ng/mL |
| APINACA (AKB-48) | 1.0 ng/mL | THJ-2201 | 0.10 ng/mL |
| APP-CHMINACA (PX3) | 0.20 ng/mL | UR-144 | 0.20 ng/mL |
| CUMYL-THPINACA | 0.10 ng/mL | XLR-11 | 0.20 ng/mL |
| EG-2201 | 0.20 ng/mL | | |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of compound classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified compound class are included. Some specific analytes outside these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs.
Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

Acode 8092B - Postmortem, Expert, Blood (Forensic) - Peripheral Blood

NMS v.18.0

## NMS
LABS

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 17314232 |
| **Chain** | 17314232 |
| **Patient ID** | 17-10064 |

Page 10 of 10

**Analysis Summary and Reporting Limits:**

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Benzodiazepines | 100 ng/mL | Opiates | 20 ng/mL |
| Buprenorphine / Metabolite | 0.50 ng/mL | Oxycodone / Oxymorphone | 10 ng/mL |
| Cannabinoids | 10 ng/mL | Salicylates | 120 mcg/mL |
| Cocaine / Metabolites | 20 ng/mL | | |

-Analysis by Gas Chromatography/Mass Spectrometry
(GC/MS) for: Anesthetics, Anticoagulant Agents, Antifungal Agents, Antihypertensive Agents, Anxiolytics
(Benzodiazepine and others), Hypnosedatives (Barbiturates, Non-Benzodiazepine Hypnotics, and others) and
Non-Steroidal Anti-Inflammatory Agents (excluding Salicylate).

-Analysis by Gas Chromatography/Mass Spectrometry
(GC/MS) for: The following is a general list of compound classes included in the Gas Chromatographic screen.
The detection of any particular compound is concentration-dependent. Please note that not all known compounds
included in each specified class or heading are included. Some specific compounds outside these classes are
also included. For a detailed list of all compounds and reporting limits included in this screen, please contact
NMS Labs.
Amphetamines, Analgesics (opioid and non-opioid), Anorectics, Antiarrhythmics, Anticholinergic Agents,
Anticonvulsant Agents, Antidepressants, Antiemetic Agents, Antihistamines, Antiparkinsonian Agents,
Antipsychotic Agents, Antitussive Agents, Antiviral Agents, Calcium Channel Blocking Agents, Cardiovascular
Agents (non-digitalis), Local Anesthetics Agents, Muscle Relaxants and Stimulants (Amphetamine-like and
others).

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 9142B - Cyanide Screen, Blood - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/
TandemMass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Cyanide | 0.10 mcg/mL | | |



# STANFORD NEUROPATHOLOGY CONSULTANTS

## STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, EDWARDS BLDG R-241, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-6041      FAX #: (650) 498-5394
Hannes Vogel, MD – Director

---

Patient: **PADDOCK (TENT), STEPHEN CRAIG**

Pathology No: **SHS-17-54361**

Med. Rec. No.:
Sex: M          Age: 64
Date of Birth:  4/9/1953
Account No.:    Default

Date of Procedure:
Date Received:      11/27/2017 1:24:00 PM

Physician(s):
**LISA ANN GAVIN, M.D.**
CLARK COUNTY CORONER / MEDICAL EXAMINER
1704 PINTO LANE
LAS VEGAS, NV 89106

---

**SPECIMEN SUBMITTED:**
BRAIN AUTOPSY: CASE#17-10064

---

**DIAGNOSIS:**
1. AUTOPSY BRAIN, PREFIXATION WEIGHT 1410 GRAMS, AND PITUITARY GLAND
2. STATUS POST INTRAORAL GUNSHOT WOUND OF HEAD WITH PENETRATION OF BRAINSTEM, CEREBELLUM, LEFT OCCIPITAL LOBE
3. INTRACRANIAL HEMORRHAGE, ACUTE, SECONDARY TO #2
   a. SUBDURAL
   b. SUBARACHNOID
   c. PARENCHYMAL, MULTIFOCAL, CONTUSIVE, PETECHIAL
   d. PITUITARY GLAND
4. HYPERTENSIVE VASCULOPATHY AND ATHEROSCLEROSIS

**VOGEL**

---

**COMMENT:** The hypertensive changes are commensurate with the stated age of the deceased and evidence from the general autopsy of hypertensive cardiovascular disease.

The extent of formation of corpora amylacea as noted in the microscopic description is a known incidental finding in the brains of asymptomatic older adults. In this example of strikingly numerous corpora amylacea there is no apparent etiology, consistent with the lack of any published significance to this abundance in some individuals.

**GROSS NEUROPATHOLOGY:**   (H. Vogel, M.D.)

Christina S. Kong, M.D. – Medical Director

---

# STANFORD NEUROPATHOLOGY CONSULTANTS

## STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, EDWARDS BLDG R-241, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-6041      FAX #: (650) 498-5394
Hannes Vogel, MD – Director

Patient: **PADDOCK (TENT), STEPHEN CRAIG**

Pathology No: **SHS-17-54361**

Received through the courtesy of Dr. Gavin of the Clark County Coroner Office, Las Vegas, NV and by direct transfer from Coroner John Fudenberg on Monday November 27, 2017, and designated with the decedent name Paddock (Tent), Stephen as well as an autopsy report and identifying paperwork is formalin fixed brain tissue in a sealed plastic container.

No dura is received.  The prefixation weight of the brain is 1410 grams.  The written record of the postmortem prosection of the brain is noted in the received autopsy report. An intraoral gunshot injury is described in which the trajectory included in sequence, the roof of the mouth, the base of the skull (with internal beveling), the brain stem, the cerebellum, the left occipital lobe and partially into the occipital bones. Also described are: contusions of the base of the brain with brain swelling; and subdural and subarachnoid hemorrhage, locations unspecified. The cerebral hemispheres were asymmetrical, prefixation, due to injury. Further quoting the autopsy report: "The uninjured structures at the base of the brain are free of abnormality. Sections through the uninjured cerebral hemispheres reveal no lesions within the cortex, subcortical white matter, or deep parenchyma of either hemisphere. Sections through the uninjured brain stem and cerebellum reveal no lesions. The spinal cord was not removed." Representative portions were retained for formalin fixation.

The fixed brain tissue is received in pieces of varying sizes, as follows, with gross abnormalities if present. Neuroanatomic origins of all portions were substantiated by Dr. Gavin. Photographs were taken for documentation.
1. Frontal lobe; subarachnoid and petechial parenchymal hemorrhages
2. Cingulate gyri
3. Corpus callosum and partial basal ganglia, two pieces. Thalamus appears slightly mottled
4. Hippocampus, two pieces, sides unspecified; one with fresh contusion
5. Splenium of the corpus callosum
6. Cerebellum and injured midbrain, pons; several pieces
7. Occipital lobe, side unspecified

Representative sections are submitted as follows: A) frontal lobe, B) frontal lobe, C) corpus callosum and cingulate gyrus, D) basal ganglia with probable anterior commissure, E) thalamus, F) thalamus G) possible amygdala, H) putamen, I, J, K, L) designated hippocampus, M) thalamus and claustrum, N) designated temporal lobe with contusion, O) occipital lobe, side unspecified, P) midbrain with red nucleus, Q) injured pons, R) medulla, S) cerebellum, T)injured vermis, U) pituitary, V) optic chiasm, W) basal ganglia and internal capsule, X) basal ganglia and anterior commissure, Y) basal ganglia and possible amygdala

**MICROSCOPIC NEUROPATHOLOGY:**  (H. Vogel, M.D.)

Christina S. Kong, M.D. – Medical Director



# STANFORD NEUROPATHOLOGY CONSULTANTS

### STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, EDWARDS BLDG R-241, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-6041      FAX #: (650) 498-5394
Hannes Vogel, MD – Director

Patient: **PADDOCK (TENT), STEPHEN CRAIG**

Pathology No: **SHS-17-54361**

All sections are viewed with hematoxylin and eosin and Luxol fast blue/periodic acid Schiff (LFB/PAS). The histological sections of regions designated as injured or containing contused brain are confirmed microscopically, evidenced by perivascular microhemorrhage. Grossly identifiable subarachnoid hemorrhage is also confirmed microscopically as acute. The pituitary gland shows acute parenchymal hemorrhage.

Sections including hemispheric white matter demonstrate hyaline thickening of arterial vessels with focal perivascular hemosiderin deposition, characteristic of hypertensive vasculopathy. No microinfarcts are noted. Large subarachnoid arterial blood vessels show moderate atherosclerosis.

None of the sections show any evidence of an either acute or chronic inflammatory reaction, within brain parenchyma and leptomeninges, providing no support for a diagnosis of either an infectious or autoimmune encephalitis or meningitis. The cerebellum is histologically normal and shows no obvious neuronal loss or reactive changes.

The most striking abnormality in sections of the hippocampus, peri- third ventricular wall, optic nerve, corpus callosum, medial surfaces of frontal lobes are unusually large numbers of corpora amylacea in subpial, perivascular, and minor subependymal distributions characteristic of the usual age-related accumulation of corpora amylacea in these favored locations. Some of the subpial regions with numerous corpora amylacea display interface ("Chaslin's") gliosis. The LFB/PAS stains highlight the corpora amylacea. No abnormal accumulations of corpora amylacea are found in gray matter as seen in Lafora disease, or except in rare foci, in white matter as seen in polyglucosan body disease.

The following special stains and immunohistochemical stains were performed with results described.

1. LFB/PAS: no evidence of demyelination
2. Bielschowsky silver impregnation, block J: no neurofibrillary tangles or senile plaques of the Alzheimer type
3. Beta-amyloid, blocks B, G, J: no vascular or plaque deposition
4. AT8 (phosphor tau), blocks B, C, D, G, L, N: no neurofibrillary tangles or senile plaques of the Alzheimer type in the hippocampus; no subcortical expression of tau at depths of sulci or perivascular as seen in chronic traumatic encephalopathy, frontal lobe
5. Alpha-synuclein, blocks C, G, P: no Lewy body pathology
6. TDP-43, blocks B, G, N: no abnormal cytoplasmic staining as seen in frontotemporal lobar degeneration (FTLD)
7. Ubiquitin, blocks J, N, Y: no abnormal cytoplasmic staining as seen in FTLD

Christina S. Kong, M.D. – Medical Director



# STANFORD NEUROPATHOLOGY CONSULTANTS

### STANFORD UNIVERSITY MEDICAL CENTER

300 PASTEUR DRIVE, EDWARDS BLDG R-241, STANFORD, CALIFORNIA 94305

TEL #: (650) 723-6041        FAX #: (650) 498-5394

Hannes Vogel, MD – Director

---

Patient: **PADDOCK (TENT), STEPHEN CRAIG**          Pathology No: **SHS-17-54361**

8.  GFAP, blocks C, E, F, M: some mild increase in perivascular and subpial astrogliosis, without obvious neuronal loss
9.  Beta-amyloid precursor protein, block C: no axonal injury


## CLINICAL HISTORY:

64 year old man expired of self-administered intraoral gunshot wound. No known past medical history.

I have reviewed the specimen and agree with the interpretation above. HANNES VOGEL, M.D.
Electronically signed 12/27/2017 1:34 PM

Christina S. Kong, M.D. – Medical Director



February 5, 2018

Dr. Lisa Gavin
Clark County Coroner's Office
1704 Pinto Lane
Las Vegas, NV 89106

Re:     NMS file nos.: WO# 17314232 and 17322918

Dear Dr. Gavin:

You have requested that I provide a report discussing my opinions and conclusions regarding Mr. Stephen Paddock's toxicology results as detailed in two reports issued by NMS Labs. Specifically, you would like to know if substances found in Mr. Paddock's biological samples may be the reason for the production of violent and aggressive behavior.

In order to comply with your request, I have reviewed the following:

> Toxicology reports for Mr. Stephen Paddock issued by NMS Labs:
> o   WO# 17314232 (initial report dated 10/24/2017; supplemental report dated 12/11/2017)
> o   WO# 17322918 (dated 10/30/2017)

From my review of these two reports, Mr. Paddock's toxicology testing showed the presence several of substances. The positive findings from both reports, with the exception of the vitreous findings, are shown in the table below.

| ANALYTE | RESULT |
|---------|--------|
| Antimony | 9.6 mcg/L in Peripheral Blood<br>0.49 mcg/g in Scalp Hair |
| Arsenic | 12 mcg/L in Peripheral Blood |
| Barium | 1.6 mcg/g in Scalp Hair<br>5.0 mcg/g in Pubic Hair |
| Bismuth | 0.92 mcg/L in Peripheral Blood<br>0.15 mcg/g in Pubic Hair |
| Lead | 7.3 mcg/dL in Peripheral Blood<br>1.3 mcg/g in Scalp Hair |
| Mercury | 37 mcg/L in Peripheral Blood<br>4.7 mcg/g in Scalp Hair<br>3.6 mcg/g in Pubic Hair |
| Selenium | 290 mcg/L in Peripheral Blood |
| Caffeine | Positive in Peripheral Blood |
| Theobromine | Positive in Peripheral Blood |
| Chlorpheniramine | 13 ng/mL in Peripheral Blood |
| Nordiazepam | 42 ng/mL in Urine |
| Oxazepam | 170 ng/mL in Urine |
| Temazepam | 140 ng/mL in Urine |
| Betahydroxybutyric Acid | 21 mcg/mL in Peripheral Blood |

1

LVMPD Internal Oversight & Constitutional Policing Bureau
Force Investigation Team

My opinions about the possibility regarding the manifestation of violent and aggressive behavior are detailed as follows:

1.  Elemental analysis was performed in blood and hair. Blood is used to determine circulating concentrations at the time of its collection. In postmortem cases, it theoretically represents what was present at the time of death. Hair is used to determine if there has been any chronic exposure to a substance. Because elements are ubiquitous, the potential for environmental contamination during sample collection and from storage containers needs to be considered before attributing the results to the tested samples. The findings show concentrations that are either consistent with normal amounts for barium in scalp hair, bismuth in blood, and lead in scalp hair or are slightly above normal for antimony in blood and hair, arsenic in blood, lead in blood, mercury in blood and hair, and selenium in blood.

    Arsenic, antimony and selenium even at elevated concentrations are not known to be associated with the production of violent and aggressive behavior.

    Lead has been linked to cognitive effects, however, for lead at the reported concentration of 7.3 mcg/mL in adults there is insufficient evidence that this concentration will cause violent and aggressive behavior (1).

    Clinical manifestations of mercury toxicity are dependent upon several variables such as route of exposure, chemical form, dosage received, and duration of exposure. Some signs and symptoms associated with its toxicity may include bronchial irritation from mercury vapor exposure, gastroenteritis from inorganic mercury exposure, paresthesia, ataxia, and hearing loss from methyl and/or ethyl mercury exposure, and tubular necrosis in the kidney from inorganic mercury and ethyl mercury exposure (2).

    Important considerations for this case are that the mercury has not been analytically differentiated, and that arsenic, selenium and mercury concentrations can be elevated as a consequence of dietary (seafood) consumption and/or environmental exposures. In samples collected at autopsy from a normal Japanese population, the arsenic concentration in blood averaged 56 mcg/L with a range of 50-60 mcg/L, and the total mercury concentration in blood averaged 59 mcg/L with a range of 16-110 mcg/L (3). There is also indication that the presence of selenium may have some beneficial effects on the mitigation of mercury toxicity (4).

    My opinion is that if Mr. Paddock was experiencing toxicity to any of the identified elements he would have experienced a constellation of symptoms specifically related to that element's known toxic profile.

2.  Caffeine is a commonly used central nervous system stimulant. It is found in beverages such as coffee or soda, and some food products such as chocolate. It can promote physiological responses such as diuresis, and increased heart and respiratory rates. Theobromine is an ingredient in chocolate and a caffeine metabolite. The reported qualitative findings in blood for these two substances are not consistent with excessive use.

3.  Chlorpheniramine is an antihistamine. Common adverse effects include sedation and dizziness. The reported concentration in blood (13 ng/mL) is consistent with therapeutic use.

4.  Nordiazepam, oxazepam, and temazepam are benzodiazepines. Nordiazepam is a benzodiazepine metabolite, and oxazepam and temazepam may be present as parent drugs and/or metabolites. Benzodiazepines are prescribed to treat a wide range of conditions including, but not limited to, anxiety, insomnia, and agitation. The finding of these substances in urine and not in blood show that

Mr. Paddock had previously used or was exposed to this drug class. Substances present in the urine do not have any pharmacological activity.

5. Betahydroxybutyric Acid is a ketone body. This endogenous substance is used as a biological marker for ketoacidosis. Concentrations less than 50 mcg/mL are considered normal and, therefore, the reported concentration in blood (21 mcg/mL) is not consistent with an above normal concentration.

If you have any questions regarding this report please do not hesitate to contact me. Also, in the event information becomes available, that may affect the above opinions and conclusions, please forward such to me for evaluation.

Laura M. Labay, Ph.D., F-ABFT, DABCC-TC
Forensic Toxicologist

REFERENCES:

1. NTP monograph on health effects of low-level lead. NTP Monogr. 2012 Jun;(1):xiii, xv-148.
2. Clarkson TW, Magos L, Myers GJ. The toxicology of mercury--current exposures and clinical manifestations. N Engl J Med. 2003 Oct 30;349(18):1731-7.
3. Sumino K, Hayakawa K, Shibata T, Kitamura S. Heavy metals in normal Japanese tissues. Amounts of 15 heavy metals in 30 subjects. Arch Environ Health. 1975 Oct;30(10):487-94.
4. Spiller HA. Rethinking mercury: the role of selenium in the pathophysiology of mercury toxicity. Clin Toxicol (Phila). 2017 Nov 10:1-14.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**Criminal Investigative Report of the 1 October Mass Casualty Shooting**
**CONTINUATION**

**Event: 171001-3519**

(THIS PAGE INTENTIONALLY LEFT BLANK)

**Criminal Investigative Report of the 1 October Mass Casualty Shooting**

**Event: 171001-3519**

**FORCE INVESTIGATION TEAM**

**Lieutenant Erik Lloyd**
**Sergeant Jerry MacDonald**
**Detective Trever Alsup**
**Detective Marc Colon**
**Detective Breck Hodson**
**Detective Jason Leavitt**
**Detective Joseph Patton**
**Detective Blake Penny**
**LEST Lara Stein**

**HOMICIDE SECTION**

**Detective Jarrod Grimmett**



©1973 LVMPD

Trever Alsup, Detective
Force Investigation Team

Jerry MacDonald, Sergeant
Force Investigation Team

Erik Lloyd, Lieutenant
Force Investigation Team

Jamie Prosser, Captain
Internal Oversight & Constitutional Policing Bureau