John W. Dillon (SBN 296788)
  jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

George M. Lee (SBN 172982)
  gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al., | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **PLAINTIFFS' SUPPLEMENTAL BRIEF** |
| vs. | Date: October 19, 2020 |
| | Time: 9:30 a.m. |
| XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | Courtroom 5A |
| | Judge: Hon. Roger T. Benitez |
| Defendants. | |

## PLAINTIFFS' SUPPLEMENTAL BRIEFING

Plaintiffs James Miller, et al. ("plaintiffs") hereby submit this supplemental brief as ordered by the Court at the conclusion of the evidentiary hearing on Plaintiffs' motion for a preliminary injunction, to address evidence presented at the hearing.

**A. CALIFORNIA'S CLAIMED INTEREST IN ITS "ASSAULT WEAPONS" BAN IS ILLEGITIMATE AND UNCONSTITUTIONAL UNDER ANY APPROACH.**

Plaintiffs maintain that a categorical approach to scrutinizing Defendants' Roberti-Roos Assault Weapons Control Act of 1989 (AWCA)—looking to the text of the Second Amendment, and as it may be informed by history and tradition—is most appropriate under *District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) given that the law categorically prohibits a broad class of firearms in common use for lawful purposes, including self-defense, throughout the vast majority of the United States, and an equally broad array of constitutionally protected lawful conduct. *See*, e.g., MPI at 11-18, Reply at 1-6, *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142, 1149 (S.D. Cal. 2019). Plaintiffs likewise maintain that, if tiered scrutiny must be applied, strict scrutiny is most appropriate because the State's ban strikes at the heart of the Second Amendment. MPI 18-20; Reply 6-8. But California's broad and irrational "assault weapons" ban fails any level of heightened scrutiny. MPI 20-27, Reply 6-8.

The Ninth Circuit has repeatedly held that Second Amendment jurisprudence should be modeled on First Amendment jurisprudence. *See*, e.g., *Jackson v. City and County Of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014) (heightened scrutiny in Second Amendment cases is "guided by First Amendment principles"); *Silvester v. Harris*, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the test for intermediate scrutiny from First Amendment cases"), cert. denied, *Silvester v. Becerra*, 138 S.Ct. 945 (2018). While the Circuit Court's *application* of that legal rule sometimes appears closer to rational basis scrutiny than actual heightened scrutiny, its precedents foreclose Defendants' approach to analyzing the State's ban here. Especially given the testimony at the evidentiary hearing, any claimed governmental

interest in reducing the quality and effectiveness of firearms is on its face illegitimate and contrary to the balance already struck by the framers and ratifiers of the Second Amendment. Such a purported interest requires the same categorical or strict scrutiny analysis that content- or viewpoint-based restrictions are under the First Amendment.

In First Amendment cases, it is black-letter law that a restriction of speech based on the viewpoint of a speaker is subject to virtually insurmountably strict scrutiny. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others,' " *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (quoting *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993)). Likewise, restrictions based on the content of speech are subject to strict scrutiny that is rarely overcome outside the context of immediate and unavoidable consequences from such speech. *Matal*, 137 S. Ct. at 1765-66 (Kennedy, J., concurring in part and in the judgment) ("The First Amendment guards against laws 'targeted at specific subject matter,' a form of speech suppression known as content based discrimination.") (citation omitted). Such restrictions go to the core of the First Amendment's protection for the expression of competing views and debate on matters of public importance.

In the Second Amendment context, the right to keep and bear arms is recognized and protected precisely because *effective* arms, including those the State prohibits under its "assault weapons" ban, allow people to project lawful force beyond their own limited physical strength or skill. Protecting the citizenry's natural right and ability to use or threaten powerful force as a just response to unjust force is the very purpose of the Second Amendment, just as the freedom to create powerful (even if highly controversial) ideas and communicate them through powerful means is at the core of the First Amendment's protection of speech.

If the Second Amendment's firearm projectiles is viewed analogous to speech, then the "assault weapons" that California bans are modern computers or bullhorns. That such also could be used in inappropriate circumstances—by criminals,

1   insurgents, or the mentally ill—was as obvious in the 1700s and 1800s as it is today.

2   In the First Amendment context, the fundamental principles restricting the

3   government's ability to reduce or eliminate constitutionally protected items and

4   conduct can be seen in the prohibitions on content and viewpoint restrictions, of

5   course. But they can also be seen in the rejection of broad prophylactic rules and the

6   requirement of a clear and present danger before restricting even potentially inciting

7   speech. *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969).

8       When considering the government's interest behind a restriction, therefore, it is

9   not enough to merely claim some generalized public safety interest or similarly vague

10  macro-value. Rather, the government and the scrutinizing court must focus on the

11  particular and operative interest involved. In this case, the Defendants' claimed

12  interest is that of broadly prohibiting common firearms with various common

13  characteristics that increase the effectiveness, accuracy, and usability of firearms so

14  that they are purportedly less capable of inflicting damage. But given that the very

15  point of a firearm is to project effective, accurate, and directed force at a distance—

16  whether in a hallway against a home invasion, in a public street against a would-be

17  rapist, or, heaven forbid, against enemies of United States acting on our soil—the

18  State's ban goes to the very protected qualities of a firearm, and is thus completely

19  and categorically illegitimate. To draw an analogy, in the First Amendment context,

20  the State's "assault weapons" ban would be equivalent to a ban on computers and the

21  Internet—"high-powered" delivery mechanisms of protected speech—because they

22  can and sometimes do make it easier for bad actors to use them to incite riots, bully

23  people into suicide, and foment rebellion against a duly elected government. The

24  printing press made libel and slander easier to disseminate, more damaging in its

25  reach, and hence more harmful than merely speaking from a soap box in the town

26  square. And the Internet likewise has multiplied the number of people able to speak in

27  a rapid-fire way—see, e.g., Twitter—to a large audience and the breadth of that

28  potential audience. In California's terms, Internet-connected modern computers would

be the "assault weapon" of speech. But it is inconceivable under our law that the State could ban the printing press, restrict the speed or capacity of the Internet, or limit personal computers by prohibiting most common applications, or limiting screen size so that they are harder to use quickly, in order to reduce the speed, reach, and effectiveness of speech simply because such qualities could be (and are) used by bad actors as well as by persons engaging in lawful and protected public debate about elections and political issues. Suppressing, even to a small degree, a means of communication precisely because one objects to the communicative impact of the content of some speech is forbidden. *Grosjean v. American Press Co., Inc.*, 297 U.S. 233 (1936) (striking down tax on newspaper advertising in papers with large circulation). Likewise, suppressing the nature and qualities of arms because one objects to the central function of arms—effective force projection—is illegitimate and forbidden. Any contrary approach would be absurd on its face, allowing the government to prohibit any improvements in firearm safety, ergonomics, accuracy, or effectiveness simply because such improvements would help criminals as well as lawful users. And, in fact, under such a theory the state need not merely ban future improvements, but could use an older baseline—such as the musket, blunderbuss, or single-shot, centerfire cartridge bolt-action rifle—as the upper limit on how advanced firearms could be. But the Supreme Court has already rejected the "argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment," *Heller*, 554 U.S. 570, 582 (2008), because "[w]e do not interpret constitutional rights that way." "Just as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (citations omitted).

Defendants' may well believe that its ban accomplishes something of value for its citizens—though the data show otherwise—and justifiable because they view

"assault weapons" to have "controversial public safety implications." But "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id*. at 636 (2008). The framers and ratifiers of the Second and Fourteenth Amendments chose to robustly protect dangerous but important rights in the Bill of Rights fully aware of, and despite, their risks. They may not be re-balanced by legislators, courts, or the Defendants.

**B.   RECENT AUTHORITY EXAMINING THE MEANING OF HEIGHTENED SCRUTINY IN SECOND AMENDMENT CASES SUPPORTS PLAINTIFFS' POSITION.**

Plaintiffs reiterate their argument, raised in their motion, that tiered scrutiny is inapplicable to laws that are categorically unconstitutional under *Heller*, including California's assault weapon ban challenged herein. However, even in the Ninth Circuit, some firearm restrictions are so severe that mere heightened scrutiny is inapplicable. *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir 2016); *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017). And even under the Ninth Circuit's two-step test, the State's ban fails any level of heightened scrutiny.

Since plaintiffs originally submitted their reply memorandum [ECF No. 38], the Ninth Circuit has only further supported plaintiffs' motion. In *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), the Circuit Court, in affirming this Court's judgment, held that, because the large-capacity magazine ban, Penal Code § 32310, "substantially burdens core Second Amendment rights," it was subject to review under strict scrutiny. 970 F.3d at 1152. In connection with the preliminary injunction motion at issue, plaintiffs here offered the testimony of Emanuel Kapelsohn, who both declared and testified that semiautomatic firearms, such as the AR-15, are well-suited for self-defense in the home because of their accuracy, enhanced by their ergonomics, light weight, maneuverability, and ease of use. (*See*, e.g., Kapelsohn testimony, 10/19/20 Tr. at 25:16 – 28:9.) These benefits also enhance and encourage civilian training. (*Id*.)

As such, the AWCA strikes at the "core" of the Second Amendment—and to be sure, the core of the Second Amendment is defined by its text, namely, the "right to

keep and bear arms" which "shall not be infringed"—because its effect is to prohibit an entire category of semiautomatic firearms—common pistols, shotguns, and rifles—that are overwhelmingly kept and used for lawful purposes throughout the United States. Indeed, the very characteristics that the State's laws prohibit do not subject firearms to the ban *in spite of* their being useful in self-defense, but apparently, *because* those features are effective in the first place. The State's apparent rationale in prohibiting firearms with these characteristics, which amounts to a declaration that 'we don't want people to be able to shoot accurately, rapidly,' fails on its face because it is not and cannot be a legitimate state interest at all, let alone a *compelling* one. A blanket prohibition on firearms in common use for lawful purposes in most all states that are "too accurate", or which do their jobs "too effectively" by allowing citizens to defend their lives "too well", severely infringes upon Second Amendment rights. It cannot survive strict scrutiny.

But even under the intermediate scrutiny standard, the Ninth Circuit's decision in *Duncan* provides further guidance and shows why the AWCA fails it too. Even though the *Duncan* Court applied strict scrutiny to affirm this Court's judgment, it also held that the analogous magazine ban would fail under intermediate scrutiny as well. *Duncan*, 970 F.3d at 1165-66. The Court began by reiterating the Supreme Court's affirmation of the "potent nature of intermediate scrutiny." *Id*. at 1165 (citing *Packingham v. North Carolina*, 137 S.Ct. 1730, 1736 (2017)). It went on to state that, "[w]hile the precise contours of intermediate scrutiny may vary, this much is certain: It has bite. It is a demanding test. While its application is neither fatal nor feeble, it still requires a reviewing court to scrutinize a challenged law with a healthy dose of skepticism. Indeed, the law must address 'harms' that 'are real' in a 'material' way." *Duncan*, 970 F.3d at 1165 (citing *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)).

*Duncan* further recognized what the organizational plaintiffs here have long asserted, that some courts have been applying intermediate scrutiny in Second Amendment cases that appears to be "a diluted form of intermediate scrutiny that

approximates rational basis, which *Heller* forbids." *Duncan*, 970 F.3d at 1166. And thus, if intermediate scrutiny must be applied, it must be that as framed by the Supreme Court, vividly illustrated in the Ninth Circuit's *Duncan* analysis. Under the actual "demanding" standard for intermediate scrutiny, the State's apparent rationale supporting its "assault weapons" ban (i.e., ban firearms that can shoot accurately, rapidly) soundly fails, as it is not an important governmental objective nor any sort of reasonable fit. In considering the State's objective under this standard, the Court is not obligated simply to accept the State's now-customary appeals to generic hand-waving about "gun violence" and "public safety." Rather, it is the State's burden to show, through actual evidence, how the end it seeks reasonably satisfies a legitimate interest through constitutionally legitimate means, establishing by proof that its regulations are reasonably tailored. "The government must do more than just simply posit the existence of the diseases sought to be cured, and demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Rhode v. Becerra*, 445 F.Supp. 3d 902, 934–35 (S.D. Cal. 2020) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664, 114 S.Ct. 2445 (1994) (internal quotations omitted); see also, *Edenfield v. Fane*, 507 U.S. 761, 770–71, 113 S.Ct. 1792, 1800 (1993).

Defendants have not—and cannot—carry their burden to show that the State's ban serves any legitimate interest or that their laws are reasonably tailored.

## C.   SEMIAUTOMATIC FIREARMS ARE IN COMMON USE.

As previously contended in Plaintiffs' preliminary injunction motion, Defendants offer no historical support for their ban on common semiautomatic firearms with common characteristics because such a ban *has* "no historical pedigree." *Duncan*, 366 F. Supp.3d at 1149. Semiautomatic firearms have been in existence for over a century, and the firearms at issue in this case were able to be purchased, kept, and used in California until recently, in 1989—the polar opposite of a "longstanding" regulation. *See* Declaration of Ashley Hlebinsky (Hlebinsky Dec.), ¶¶ 10-28, **Exs. 5–**

**35**. These firearms are commonly used by responsible, law-abiding people for various lawful purposes such as self-defense, hunting, recreation, competition, and collecting. Declaration of James Curcuruto (Curcuruto Dec.) ¶¶ 7-14, **Exs. 1-7**. And indeed, the only thing rare about these firearms is severe regulation of them, with a very few states that unconstitutionally recast and prohibit them as "assault weapons." Kapelsohn Dec. ¶¶ 17-26, **Exs. 1-10**.

 *Heller*'s analysis asks simply whether the arms are "*both* dangerous *and* unusual," *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., joined by Thomas, J., concurring) (italics original), and if they are not *both*, it determines if the category of arms are in common use for lawful purposes. *Duncan v. Becerra*, 366 F. Supp.3d at 1142. The text of the Second Amendment, as it is informed by history and tradition, all point in the same direction because "the pertinent Second Amendment inquiry is whether [the banned weapons] are commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, *supra*, at 1032 (italics original). Indeed, these banned "assault weapons" are not both dangerous *and* unusual, as the Supreme Court defined in *Heller*. And they are common in all respects: 1) they are common functionally, as they are all semiautomatic in their operation; 2) they are common characteristically, as they are all commercially popular types of arms, namely, pistols, shotguns, and rifles; 3) they are common jurisdictionally, available in the vast majority of states; and as further proof, 4) they are common numerically, in that they are owned by citizens by the hundreds of thousands or more.[1] In short, all of the

---

[1] While numerical data can be helpful in determining if a particular weapon is commonly used for lawful purposes, constitutionally protected status of arms cannot turn on fact-bound sales numbers of particular makes, models, or even specific configurations. Rather, the question is a categorical question of type and function, set against a backdrop of availability throughout the United States. "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., concurring). So too are semiautomatic firearms in various configurations of more and less characteristics, as California bans. And importantly, for example, a future Glock

semiautomatic firearms California bans in Penal Code section 30515 meet the *Heller* test and are constitutionally protected.

Forty-one (41) states do not ban semiautomatic firearms with or without characteristics like pistol grips, collapsible stocks, threaded barrels, and flash suppressors, whether they are semiautomatic rifles, pistols, or shotguns. George Mocsary Declaration ¶44. These firearms have been sold for over a century throughout the United States, and continue to be sold today most places without additional restrictions. Indeed, semiautomatic firearms with such common characteristics are among the most popular firearms in the United States. Curcuruto Dec., ¶¶8-12 (discussing prevalence of relevant semiautomatic rifles and the massive numbers of common semiautomatic shotguns and pistols with such characteristics). Moreover, early semiautomatic pistols, rifles, and shotguns were developed in the first years of the 1900s and were configured with many of California's banned characteristics, such as detachable and large capacity magazines, pistol grips, and adjustable stocks. Hlebinsky Decl. ¶¶10-28.

Though categorical commonality is not based on the number of any specific firearm owned by individuals, those numbers may provide additional insight into the commonality of these firearms. For example, ownership of semiautomatic firearms, as

---

"Gen 6" model 17 semiautomatic handgun, though when first released will not be numerically common based on *sales* (because it hasn't been sold yet), it will nonetheless be constitutionally protected because it is categorically common—a semiautomatic handgun. The same goes for firearms that California bans based on one or more characteristics, or yes, their evolutionary and technological successors. Just like the argument "that only those arms in existence in the 18th century are protected by the Second Amendment [is] not merely wrong, but bordering on the frivolous," the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms…" *Id*. at 1030 (internal quotations omitted). The fact that the AWCA may act to ban thousands of discrete configurations of common semiautomatic pistols, shotguns, and rifles held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller*. *See* Mocsary Dec. ¶¶ 47-52.

rifles configured in a manner banned by California, has been conservatively estimated at perhaps greater than *5 million*. Curcuruto Dec., ¶¶ 7-13, **Exs. 1-7**. Defendants' expert witness testimony concurs with this estimate. *See* 10/22/20 Hearing Transcript ("Tr.") at 81:15-20. Semiautomatic rifles with prohibited characteristics are only one configuration of the broader category of semiautomatic firearms banned by the AWCA; and, thus, the numbers of all California prohibited semiautomatic firearms are necessarily higher.[2] *See* Pls. Motion p. 13-14; Curcuruto Dec., ¶¶ 7-14, **Exs. 1-7**; Moscary Dec., ¶¶ 25-48, **Exs. 4-11**; Kapelsohn Dec. ¶¶17-18. And the commonality of these arms is shown by the State's own evidence.[3] The State concedes that *semiautomatic firearms* (including rifles, pistols, and shotguns)—not just semiautomatic rifles—with banned characteristics are indeed common, and that "[m]ilitary-style weapons today define the U.S. civilian gun market."[4] The State's

---

[2] The number of "assault weapon" shotguns and pistols may be dwarfed by that of "assault weapon" rifles, "but it is beside the point. Otherwise, "a State would be free to ban *all* weapons *except* handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home." *Caetano*, 136 S. Ct. 1027, 1032 quoting *Heller*, 554 U.S. 570, 629 (internal quotations omitted). Again, as Plaintiffs have shown, *see*, e.g., FN1, parsing out the *Caetano* analysis to focus on sales numbers is not the proper analysis.

[3] *See* Defendants' evidence, specifically the Declaration of Blake Graham (claims that semiautomatic rifles, pistols, and shotguns defined as "assault weapons" are not common in his experience). Graham Dec. ¶¶ 16, 57, 62. However, his anecdotal experience is limited to California, *which banned these firearms*. Mr. Graham has no basis for his opinion on the commonality of such firearms throughout the United States; and therefore, his opinion should be flatly rejected.

[4] Again, s*ee* Defendants' evidence DX-9 at 244; *see also* DX-9 at 205, 211, 217, 218, 220, 222, 225, 227, 228, 229, 232 (assault pistols), 233, 236 (assault shotguns), 239, and 241 (.50 BMG rifles); DX-20 at 388 ("semiautomatic weapons with large-capacity magazines and/or other military-style features are common among models produced in the contemporary gun market"); DX-1 at 9 (previously "'California Complaint assault weapons'" "have been permitted to flood into this state").

1   evidence is not limited to semiautomatic rifles, but semiautomatic *weapons*—which

2   includes rifles, pistols, and shotguns. The State also misapplies the analysis in

3   *Caetano* by independently analyzing the State's ban on common semiautomatic

4   firearms as "assault weapons" in three separate categories—rifles, pistols, and

5   shotguns—rather than the proper mode of analysis, that is, semiautomatic firearms

6   (period) with characteristics prohibited by Defendants' laws and regulations. The

7   State asserts that these semiautomatic firearms are not in common use because it has

8   banned these firearms. However, a State's ban cannot be its own evidence that the

9   weapons are not in common use. And, more, "[t]he more relevant statistic" is that

10   millions of "assault weapon" rifles, shotguns, and rifles "have been sold to private

11   citizens," who "may lawfully possess them in [41] States." *Caetano*, 136 S. Ct. 1027,

12   1032 (2016). Thus, Plaintiffs have established that all semiautomatic firearms with (or

13   without) California-prohibited characteristics—colloquially called "evil features"—

14   are common by any standard, including *Heller*'s. *See* Mocsary Decl. ⁋51. Defendants'

15   response is simply to deny the uncontroverted evidence. Opp. at 12:11.

16         Moreover, the State may attempt to rely on the number of semiautomatic

17   firearms with characteristics that are registered as assault weapons in California. But

18   that evaluation only proves Plaintiffs' contention—these firearms are unquestionably

19   in common use. In 2009, Steve Buford of the California Department of Justice (DOJ)

20   provided assault weapon registration information to Attorney Jason Davis in response

21   to a Public Records Act (PRA) request. As shown in the data provided by the DOJ,

22   under the original Roberti-Roos Assault Weapon Act, 56,626 "assault weapons" were

23   registered in California. Subsequently, with the enactment of Senate Bill 23, which

24   expanded the definition of assault weapons under the AWCA, another 91,211 assault

25   weapons were registered in California. *See* Declaration of Jason Davis ⁋⁋6-7, **Exhibits**

26   **A** and **B**. Moreover, there was another 5,281 registered weapons by peace officers that

27   were allowed or required to register their personal firearms as "assault weapons."

28   Thus, even in 2009—nearly a decade before the enactment of SB 880 and AB 1135

(which required additional firearms to be registered as "assault weapons")—there were already about 153,118 *registered* assault weapons in California.[5]

After SB 880 and AB 1135 went into effect in 2017, another broad swath of firearms needed to be registered as "assault weapons" in California. In response to a 2018 PRA request from Brandon Combs, president of Plaintiff Firearms Policy Coalition, California Deputy Attorney General Robert D. Wilson (for Defendant Becerra) stated that from July 31, 2017 to June 30, 2018 (the end of the registration period), 68,848 applications to "assault weapons" were submitted for registration in the DOJ's California Firearms Application Reporting System (CFARS).  See Declaration of Brandon Combs (Combs Decl.), ¶15. Of those 68,848 assault weapons, 6,365 are pistols, 1,365 are shotguns, and 61,118 are rifles, respectively. Combs Decl., ¶17. Accordingly, it is reasonable to infer that approximately 219,083 *registered* semiautomatic assault weapons—pistols, shotguns, and rifles—exist in California. Thus, Defendants' registration data support that these arms are commonly possessed for lawful purposes in California, let alone outside of it. And as high as these numbers are, they are still far from the total universe of such firearms in the United States, and even in California and because of the State's own mandate that such firearms be registered, taken out of California, made compliant by removing semiautomatic function or characteristics, or turned into the police.

Again, 41 states treat *all semiautomatic firearms with characteristics banned in California* like all other semiautomatic firearms—without any additional restrictions, regardless of characteristics—*and have since the founding era.* Plaintiffs have also shown that the various characteristics prohibited in California have been used on semiautomatic firearms for over a century. *See Hlebinsky Decl.* These facts alone independently establish that semiautomatic firearms with or without various

---

[5] There is no way to know what the voluntary compliance rate for these registration periods was, but we know with certainly it was not 100% since the state not only discouraged, but prevented people from doing so. *See* Combs Dec., ¶18.

combinations of characteristics are indeed in common use for lawful purposes, and fully protected by the Second Amendment. Compared to the "[h]undreds of thousands of Tasers and stun guns" lawfully possessed in 45 states, as Justice Alito observed in *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1032 (2016), there are *millions* of semiautomatic firearms—pistols, shotguns, and rifles—with common characteristics that are commonly sold and owned in a large majority of the United States. Defendants have never refuted or addressed these facts. Such commonality is also demonstrated by the *additional* evidence offered herein.

## 1. Firearm Manufacturer Sales Data

Sturm, Ruger & Co., Inc. (Ruger) is one of the nation's leading manufacturers of firearms for the commercial sporting market. For 70 years, Ruger has manufactured firearms in the United States. As a licensed firearms manufacturer, Ruger maintains records related to firearms it has manufactured and sold. According to Nathan Lewis Siegal, Ruger's Associate General Counsel for ATF Compliance, "Ruger's records reveal that the Company has manufactured and domestically distributed semiautomatic pistol models that accept detachable magazines and have at least one feature listed" under Penal Code section 30515(a)(4) "since at least 2011." Declaration of Nathan Lewis Siegal Dec. (Siegal Decl.), ¶ 4. Additionally, after reviewing Ruger's records regarding the domestic manufacture, sale, and distribution of semiautomatic pistol models, between January 1, 2017 and October 26, 2020, *Ruger domestically distributed for the civilian market at least 283,579 semiautomatic pistols that accept a detachable magazine and have at least one feature generally banned by section 30515*. Siegal Decl., ¶ 6. This data encompasses only the last three years with just one U.S. firearms manufacturer. And semiautomatic shotguns are also in common use. Reviewing just a fraction of the distribution of Benelli tactical shotguns especially suitable for self-defense, though banned under the AWCA, it is clear that there are thousands of semiautomatic shotguns with features like pistol grips and adjustable stocks. *See* Declaration of Kenneth Brown, ¶¶ 1-24.

## 2. The Broader U.S. Market of Semiautomatic Pistols and Shotguns

Additionally, attorney and researcher Joseph Ostini conducted a survey of commercially-available firearm makes and models for sale to citizen consumers within the United States.[6] *See* Declaration of Joseph Ostini, ¶¶ 4-12. In his survey, Mr. Ostini reviewed 73 different firearm manufacturers in the United States to identify how many different commonly available firearms presently sold throughout the United States would fall under the definition of "assault weapon" pistols or shotguns under Penal Code section 30515. Though not exhaustive, the list he developed in his survey provides additional insight into whether these firearms are in common use. Mr. Ostini found that of the 61 pistol manufacturers, there are at least 356 different models of firearms offered for sale defined as an "assault weapon" pistol under Penal Code section 30515. Some manufacturers, such as CMMG, offer 38 different models of California banned "assault pistols". Some of these manufacturers, such as Ruger, Sig Sauer, Springfield Armory, and Beretta,— each of which offer several models of pistols considered by California to be "assault weapons"—are widely held as some of the largest firearm manufacturers in the United States. *See* Declaration of John W. Dillon (Dillon Decl.), **Exhibit A**.

Moreover, Ruger, and many other manufacturers, sell threaded pistol barrels for their handguns. Dillon Decl., **Ex. B**. Merely installing one of these threaded barrels on a common handgun like a Glock 17, would change this typical pistol into an illegal "assault weapon" pistol under the AWCA.[7] In fact, there is an entire industry of pistol-barrel manufacturers that produce and sell threaded handgun barrels for  the largest

---

[6] Note this search was limited in scope to new firearms and did not include the millions of firearms that exist on the used market.

[7] And even mere possession of such a threaded barrel, or any other characteristic, might subject an individual to criminal constructive possession. See, e.g., People v. Nguyen, 212 Cal.App.4th 1311 (Cal. Ct. App. 2013).

1   manufacturers.. Dillon Decl., **Exs**. **C**, **D**, **E**, **F**, **G**, **H**, **I**, **J**, **K**, **L**, **M**, and **N**. Threaded

2   firearm barrels are not only commonly used for lawful purposes, including self-

3   defense and sport, they have been available and used on semiautomatic firearms for

4   many decades. Hlebinsky Dec., ¶ 24. For example, Glock pistols are widely

5   considered one of the most popular handguns today. Glockstore.com is "the world's

6   largest distributor of Glock parts and accessories, magazines, holsters, logo gear,

7   apparel, concealment items, custom parts and Glock custom guns." Dillon Decl., **Ex.**

8   **K**. Reviewing Glockstore's website, they offer threaded barrels for 14 different

9   models of Glock pistols of the 29 base models offered by Glock,[8] approximately 48%

10  of the total models offered by Glock. Moreover, most of the remaining models of

11  Glock handguns are capable of accepting threaded barrels offered by other barrel

12  manufacturers. Dillon Decl., **Ex. L**. Threaded barrels are regularly made for the over a

13  century old semiautomatic 1911 platform handgun. Dillon Decl., **Exs. M** and **N**.

14      Despite the State's attempt to portray "assault weapon" pistols as dangerous

15  *and* unusual, and thus uncommon, California's ban encompasses common, every day

16  semiautomatic handguns, many of which identify as good firearms for first time

17  shooters and even kids, such as a .22 rimfire pistol. Dillon Decl., **Ex. O**. Defendants'

18  attempt to single-out specific configurations of semiautomatic pistols to hide the fact

19  that the AWCA bans all commonly owned semiautomatic pistols with prohibited

20  characteristics is misleading and incorrect.

21      Similarly, semiautomatic shotguns are categorically in common use for lawful

22  purposes with or without characteristics such as pistol grips and collapsible/folding

23  stocks. Often these types of firearms are referred to as "tactical shotguns."  For

24  example, under the "tactical shotgun" section of the website of Atlantic Firearms (a

25  licensed firearms dealer), it states that it "offers a wide selection Tactical Shotguns for

26  _____

27  [8] Glock advertises over 50 different pistol models. However, many are variations of
    the same handgun model. Thus, in quantifying the models offered by Glock, Plaintiffs

28  analyzed the base model numbers (e.g., Glock 17, 19, 26, 27, etc.).

Sporting, Home Defense and Hunting applications. We offer these in semi auto, pump action magazine fed and Bull pup configurations. Popular Shotguns choices are the AK47/Kalashnikov action shotguns like the Lynx 12 or Kalashnikov USA KS-12 Shotgun." Dillon Decl., **Ex. P**. Of the 96 different "tactical shotgun" models offered on Atlantic Firearms' website, 56 of those models are classified as "assault weapon" shotguns under Penal Code section 30515. Thus, 58 percent of the models offered for sale by Atlantic Firearms—legal in the majority of the United States—are illegal "assault weapon" shotguns in California. *Id*. Kalashnikov USA, a highly popular manufacturer, sells 4 different shotgun models—and all four would be "assault" shotguns in California. See also Brown Decl. ¶¶ 1-24. In short, semiautomatic firearms with any one or more of the characteristics banned under Penal Code section 30515 are unquestionably in common use for lawful purposes, and are additionally historically common types of firearms.

## D.   DEFENDANTS RELY ON FAULTY DATA AND SKEWED METHODOLOGY

Defendants' opposition to both the Plaintiffs' preliminary injunction motion and the supporting witnesses' declarations improperly attempts to re-litigate *Duncan v. Becerra*. However, this Court has already issued its judgment on those issues, and the Ninth Circuit has robustly affirmed that judgment in its own decision. Defendants' witnesses also make unsubstantiated assertions, and rely on flawed data in forming their opinions—reasons enough to discard or discount such evidence.

### 1.   Professor Donohue's Declaration and Testimony

Defendants' rely on the declaration and testimony of Professor John Donohue. In both, Professor Donohue makes a number of claims regarding mass shootings, school shootings, societal views on gun control, United States gun ownership, psychological trauma of mass shooting victims, and both the lethality and ballistics of so-called "assault weapons." However, many of these claims are not supported by any evidence or expertise. Instead, they are merely Professor Donohue's personal and unsupported opinions.

First, Professor Donohue has no training or experience with "assault weapons." In spite of those facts, Professor Donahue asserts that "[i]n civilian life, using an assault weapon for self-defense is over-kill…." Donohue Decl. ¶ 44. Professor Donahue's statement is both irrelevant and misleading, and his personal opinion of what type of firearms should be used for self-defense is irrelevant to the thousands, if not millions, of gun owners who exercise their right to choose otherwise. Moreover, the AWCA expansively prohibits common firearms such as a Glock 19 (9mm) or a Ruger Mark IV .22LR handgun merely because they have a threaded barrel. Indeed, the AWCA prohibits even "the quintessential self-defense weapon," semiautomatic handguns. As such, Professor Donohue's opinions lack credibility.

Second, Professor Donohue cites to his own study, "Right-to-carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," and claims "the best evidence suggests that increased gun carrying in the population leads to higher rates of violent crime." Donohue Decl. ¶12, fn. 1. This study has been subject to heavy criticism for its faulty methods and data. Dillon Decl., **Ex. Q**. And notably, *public carrying* of firearms is *not* at issue in this case; and thus, any opinions on this subject should be rejected as irrelevant.

Third, Professor Donohue makes a pair of claims regarding gun ownership in the United States. Relying on a General Social Survey (GSS) to measure gun ownership, Professor Donohue states that "most Americans do not own guns, and most Americans who do own guns do not own assault weapons." Donohue Decl., ¶ 20-21. Dillon Decl., **Ex. R**. For example, the GSS shows that the number of people owning guns in Illinois has been flat over time from 2008 to 2017, with about 1.2 million gun owners in the State. However, in Illinois, people must have a FOID card to legally own a gun. The number of FOID cards went from 1.31 million in 2010 to 2.10 million in 2017. *Id*. However, the more common way of evaluating gun ownership numbers is to assess the percentage of homes that own guns. With one exception, those surveys show gun ownership in between approximately 40% to 49%

1   of homes. *Id*. Additionally, Professor Donohue testified that when looking at the

2   estimates for assault weapons, there are approximately "5 or 6 million different

3   individuals who own assault weapons." 10/22/20 Tr. at 81:15-20. Even accepting

4   Professor Donohue's claims of this "small fraction" of assault weapon ownership, 5 or

5   6 million different individuals owning assault weapons far outstrips the numbers of

6   "bearable handheld electroshock weapons" shown to be in common use for lawful

7   purposes in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016).

8       Fourth, in his declaration, Professor Donohue makes multiple references to

9   school shootings. Professor Donohue states that "[t]he Wall Street Journal analyzed

10  data from the 32 school shootings since 1990 with a least three victims dead or

11  injured.  In 25 cases, the shooters were in their teens or younger…" and at least 17

12  obtained their guns from their home or a relative. Donohue Decl., ℙ 39. He then claims

13  that "[i]n other words, teens who are not eligible to possess assault weapons may take

14  weapons from relatives who legally possess assault weapons in the home to commit

15  mass shootings." *Id*. However, the Wall Street Journal analysis did not analyze

16  whether *assault weapons* were used in these shootings. Further, the simple fact that a

17  prohibited person can break the law and steal a firearm from a lawful gun owner is not

18  sufficient to justify a broad ban on an entire category of lawfully owned firearms.

19      Professor Donohue's most troubling claim came during his testimony when the

20  Court asked how many of these school shootings involved assault weapons. After

21  confirming that he did not have accurate data, Professor Donohue stated, "if a lot of

22  people are dead, it probably is using a weapon that would have been banned under the

23  Federal Assault Weapon Ban.  And if a small number of people are dead, then it

24  probably wasn't one of the weapons that would have been banned under the Federal

25  Assault Weapons Ban." 10/22/20 Tr. at 58: 1-8. No evidence or data was used to

26  support such a flawed and biased claim.  It should be summarily rejected.

27      Finally, Professor Donohue asserts that there is an increased trend of mass

28  shootings over the last 25 years. He claims that "the long-term secular trend in overall

1    crime has been benign over the last 25 years, [but] the opposite is true for the trend in

2    public mass shootings." Donohue Decl. ¶¶ 29, 34-35. In support of this assertion,

3    Professor Donohue references the 2014 FBI study of "active shooter" incidents, and

4    presents a graph on page 11 of his declaration that appears to indicate a "steep upward

5    trend in the FBI data charting the growth in active shooter incidents is unmistakable."

6    But Professor Donohue's claims are incorrect and based on faulty data, as shown

7    below.

8        First, the 2014 FBI study references "active shooter incidents," and not public

9    mass shootings. The term "active shooter" is very broad—"an individual actively

10   engaged in killing or attempting to kill people in a confined and populated area."

11   Dillon Decl., **Ex. S**. Notably, this definition does not require that anyone be killed.

12   This is significantly different than any study analyzing "mass shootings," which

13   generally require at least 3 or 4 victims killed. Further, the 2014 FBI study states,

14   "[t]he study does not encompass all mass killings or shootings in public places and

15   therefore is limited in its scope." Although the report discusses mass shootings, it

16   never makes clear that these types of fatalities and attacks are not increasing over

17   time. Professor Donohue also fails to make these key distinctions.

18       Second, the 2014 FBI study provided no analysis on whether or not "assault

19   weapons" were used in any of the "active shooter" incidents reviewed. Thus, no

20   reasonable conclusion can be made as to whether the end of the Federal Assault

21   Weapons Ban had any effect on the active shooter incidents analyzed in this study as

22   the firearm(s) that were used in each incident were not considered.

23       Third, the 2014 FBI study suffers from numerous subtle and misleading

24   decisions as well as outright errors in its data collection and analysis. For example, the

25   study missed a large number of mass public shootings that should have been included.

26   Additionally, the graphs are based on many cases that had nothing to do with mass

27   killings or even killings of any kind. Both of these issues work to make it look as if

28   there was a much larger increase in active shooter incidents than actually occurred.

Over the last four decades, *there has been no statistically significant increase in these kinds of attacks*. Dillon Decl., **Ex. T**.

Specifically, of the 160 cases the 2014 FBI study counts from 2000 to 2013, 32 involved a gun being fired with no deaths. *Id*., Appendix 2. And 11 of those have either zero, or just one person wounded. Another 35 involved the death of one single person. These cases, which should not have been included in any analysis on "mass killings," make up 42% of the 160 cases. And these cases do not fit the FBI's older definition of mass killings, which requires four or more murders; they also do not fit the FBI's new definition of three or more murders. By including this cases where no one is killed, the study invites the production of systematic bias as it is relatively easier to identify more recent public shootings where zero or one person was killed and thus that would tend to produce an upwards, if unintentional, bias in the number of cases over time.[9] "In fact, these non-mass shootings, with zero or one person killed, drive much of the purported increase in the number of attacks.  Out of the cases where no one or only one person was killed, 50 occurred during the last seven years of the period the FBI examines, and only 17 cases took place during the first seven years.  In other words, the later years are padded much more heavily with these extra cases"— which inaccurately shows an increasing trend. Dillon Decl., **Ex. T**.

Additionally, in attempting to analyze "active shooter" incidents, the FBI's data missed 20 mass shootings where at least two people were killed. Dillon Decl., **Ex. T**, Appendix 1. Thus, the FBI's conclusions cannot be considered accurate. These missing cases also have a common trend, in that they "were three times more likely to

---

[9] This study derived its data from Google news searches to compile these active shooter cases.  Google may be good for finding articles on recent stories, but articles become scarcer as one looks further back in time.  For example, there may only be one or two stories written about a shooting that took place where no one was killed. By comparison, hundreds of articles are written about mass shootings where many are killed.  Over time, the few stories that were posted on the shooting where no one was killed will disappear, while the articles on the mass shootings will still be numerous.

occur in the first half than the second half (15 to 5) of the time period studied. *Id*. Thus, again, the missing observations bias the results toward finding a larger increase over time.  Erroneously including non-mass shootings as well as omitting mass shootings biases the results to make it look as if attacks were increasing." *Id*.

Finally, the 2014 FBI study limited its study from 2000 to 2013. However, when including analysis covering data on mass public shootings from 1977 to 1999, there is only a slight increase in deaths over 38 years, but even that small upward trend largely depends on the one highly unusual year—2012, when 91 deaths occurred. *Id*.

Dr. John R. Lott Jr. analyzed and corrected the 2014 FBI data to only look at cases where at least two people were killed. In so doing, the annual increase in deaths from mass public shootings is cut in half relative to the uncorrected data. However, "the real change in results occurs when the longer period of data is used.  Doing that reduces the annual increase to just 0.98%; or just 6% of the increase implied by the 2014 FBI data.  This change is not statistically significant." *Id*.

## 2. Professor Klarevas' Declaration and Testimony

Defendants' reliance on Professor Louis Klarevas' declaration and testimony is similarly misplaced and based upon  skewed data. First, in his declaration, one of Professor Klarevas' main assertions is that "gun massacres are a growing threat to public safety."[10] Klarevas Decl.  ¶ 9-11. In support of this claim, Professor Klarevas refers to Figures 1 and 2 in his declaration ("Gun-Massacre Incidents by Decade, 1980-2019" and "Gun Massacre Deaths by Decade, 1980-2019."). *Id*., ¶ 11, at p. 5. However, this data provides no information regarding *assault weapons* used in mass shootings.

---

[10] Note that this portion of Professor Klarevas' analysis defines "gun massacres" as "high-fatality mass shootings resulting in six or more victims being shot to death." Klarevas Decl. ¶ 11.

1    Second, in claiming that "the proportion of gun massacres involving assault

2    weapons has increased significantly," Professor Klarevas refers to Decl. Figures 5 and

3    6, detailing the "percentage of gun massacre incidents involving assault weapons" and

4    the percentage of gun massacres deaths involving Assault Weapons." Klarevas Decl.

5    ¶ 13-14, pgs. 7-8. The most significant problem with Professor Klarevas' Decl.

6    Figures 5 and 6 is that they look at periods that do not directly correspond to the

7    period before, during, and after the 1994-2004 Federal Assault Weapons Ban. By

8    Professor Klarevas arranging the data in that manner, which analyzes the "Last 3

9    years," then the "Last 5 years," then the "Last 10 years" etc., he makes it appear that

10   there is a consistent upward trend in the rate that assault weapons are used in mass

11   public shootings. But that is a flawed analysis. If the data is analyzed by year periods

12   of time, it becomes clear that the pattern Professor Klarevas shows is an artifact of the

13   unusual way that he presents the data. Said differently, the declining percentage as the

14   time period gets longer is simply because assault weapons were used extensively

15   during the very end of the period (the last 3 years), but Professor Klarevas does not

16   provide any data or substantiated opinion on *why* assault weapons would suddenly

17   become very popular twelve or more years after the end of the Federal Assault

18   Weapons Ban.

19   Third, Professor Klarevas criticizes Dr. Lott's review of the 2018 Koper *et al*.

20   paper, "Criminal Use of Assault Weapons and High-Capacity Semiautomatic

21   Firearms: An Updated Examination of Local and National Sources." Dr. Lott's

22   declaration stated that the 2018 Koper study "provides no evidence that murders or

23   mass public shootings were reduced by the [federal] assault weapon ban." Professor

24   Klarevas claims that Dr. Lott is incorrect as the authors of the study state "available

25   information suggests that AWs and other high-capacity semiautomatics are involved

26   in as many as 57% of [mass murder] incidents. Further, they are particularly

27   prominent in public mass shootings and those resulting in the highest casualty

28   counts." Klarevas Decl. ¶ 35. However, reviewing the share of attacks for the samples

collected in the study *does not* conclude anything about the impact of the law on *murder or crime rates*. Dr. Lott's criticisms are accurate, as the 2018 Koper study does not mention any crime outcomes in its analysis. In fact, the evidence is to the contrary. From 2004 to 2014, the City of Baltimore saw a 48.6% increase in recovered firearms with large capacity magazines (LCMs). However, the murder rate *fell* 22.2% from 43.5 to 33.8 per 100,000 during this period. Dillon Decl., **Exs. U and V**. From 2003 to 2009, in the City of Richmond, there was an 111.5% increase in recovered firearms with LCMs, yet the murder rate *fell* 60.9% from 46.5 to 18.2 per 100,000. Dillon Decl., **Exs. W and X**. From 2006 to 2014, Minneapolis saw a 49.4% increase in recovered firearms with LCMs. At the same time, the murder rate fell 49.5% from 15.18 to 7.66 per 100,000. Dillon Decl. **Exs. Y and Z**. Thus, even when LCMs and firearms with LCMs increased in numbers, murder rates still fell. Specifically looking at murders of police from 2003 to 2013, there was a 33.6% increase in firearms with LCMs being used in those deaths. However, the number of police murdered fell overall, from 52 to 48. Dillon Decl., **Ex. AA**. Again, this data shows that Dr. Lott's conclusions on the 2018 Koper study were accurate. The study "provides no evidence that murders or mass public shootings were reduced by the [federal] assault weapon ban."

Lastly, Professor Klarevas' declaration and testimony never directly respond to Dr. John Lott's critique, that if Professor Klarevas' theory regarding the federal assault weapons ban's effect is correct, then the share of mass public shootings committed with assault weapons should have declined during the period of the federal assault weapons ban by a statistically significant amount. There was no such decline.

**E.    THE FIREARMS AT ISSUE ALL USE COMMON CALIBERS.**

Finally, plaintiffs must correct a gross misrepresentation of the facts fueled by defense witness Christopher B. Colwell, M.D., that the common firearms banned under Penal Code section 30515 somehow fire rounds that "tend to be higher in complexity with higher complication rates than such injuries from non-assault

1    weapons, increasing the likelihood of morbidity in patients that present injuries from
2    assault weapons." (Colwell Decl., ¶ 8.) Dr. Colwell further stated: "In my experience,
3    assault weapons tend to cause far greater damage to the muscles, bones, soft tissue,
4    and vital organs. They are too often shredded beyond repair." (*Id*.) Dr. Colwell further
5    proffered an anecdote (a "vivid example") where he observed that a limb had to be
6    amputated because it was wounded by an AK-47 rifle round. (*Id*., ¶ 10.) But Dr.
7    Colwell had to acknowledge—as a matter of fact and common sense—that "the
8    wounds can't be distinguished simply by looking at them in terms of determining
9    which weapon they are," further conceding that he was not aware of the weapon used
10   in the case of every wound he saw. (Colwell testimony, 10/22/20 Tr. at 29:25 – 30:4.)
11   He also acknowledged that shotguns, at close distance, created a much bigger and
12   more significant wound. (*Id*. at 31:23 – 32:14; 33:1-16.) He also had no meaningful
13   experience to distinguish between the intermediate cartridges used in many AR-15
14   and AK-47 firearms (5.56x45mm NATO, and 7.62x39mm, respectively) and higher-
15   powered rounds often used in hunting firearms. (*Id*. at 34:18 – 35:18.) In other words,
16   Dr. Colwell admitted he would not be able to distinguish between a 5.56mm (i.e., .223
17   Remington, ".223") wound caused by an AR-15 firearm, and a Ruger Mini-14
18   likewise chambered in .223. (*Id*. at 30:8-14.)
19       According to NSSF's James Curcuruto, the most common calibers present in
20   modern semiautomatic rifles is .223, 7.62x.39mm, .22 caliber and .308 caliber.
21   (10/19/20 Tr. at 65:7-10). Of these, the overwhelming majority caliber is .223, in 70%
22   of modern semiautomatic rifles, "especially the AR-15 model." (*Id*. at 65:25 – 66:5.)
23   Most AK-platform rifles are chambered in 7.62x39mm. (Id. at 66:6-8.) These are what
24   are called "intermediate cartridges." (*See*, Youngman testimony, 10/19/20 Tr. at
25   90:11-13; Margulies Decl., Ex. 2-004.) These intermediate cartridges have limited
26   penetration capabilities. (*See* Youngman testimony, 10/19/20 Tr. 91:4-8; Kapelsohn
27   Decl., ¶ 26, Exhs. 8-10.) And *all* rifle rounds can penetrate body armor that is not
28   specifically rated to withstand it. (Youngman testimony, 10/19/20 Tr. at 94:4-22;

Margulies Decl., ¶ 13). "The intermediate cartridges used in assault rifles possess significantly less kinetic energy than traditional military cartridges as well as rifle cartridges designed for hunting. Therefore, it is impossible for an intermediate-power rifle cartridge to produce severer injuries than a full-power rifle cartridge, all other factors being equal." (DiMaio, *Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques* (2d ed. 1999), found at Margulies Decl., Exh. 2-005.) And these "higher powered" rounds, such as 7.62x51mm (.308), are nearly identical to the .308 Winchester, which is the most common deer hunting round in this country. (Youngman testimony, Tr. at 93:9-12.) All of these cartridges are used for all manner of lawful purposes, including self-defense, target shooting, and hunting. Defendants' fantastical effort to hide their ban behind a caliber curtain using the strawman of weapon chambering should be put to rest. A rose by any other name is still a rose, and a .223 cartridge fired from an "assault weapon" is still just a .223.

Dated: November 5, 2020

**SEILER EPSTEIN LLP**

/s/ George M. Lee
George M. Lee

**DILLON LAW GROUP APC**

/s/ John W. Dillon
John W. Dillon

Attorneys for Plaintiffs