XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Xavier Becerra, in
his official capacity as Attorney General of
the State of California, and Luis Lopez, in his
official capacity as Director of the
Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,,**<br><br>Defendants. | Case No. 19-cv-1537-BEN-JLB<br><br>**DEFENDANTS' MEMORANDUM OF CONTENTION OF FACT AND LAW**<br><br>**[LOCAL RULE 16.1(f)(2)]**<br><br>Pre-Trial Conference:<br>Date:  December 16, 2020<br>Time:  10:00 a.m.<br>Dept:  5A<br>Judge:  Hon. Roger T. Benitez<br>Trial Date:  January 21, 2021<br>Action Filed:  August 15, 2019 |

1

**TABLE OF CONTENTS**

2

**Page**

INTRODUCTION ........................................................................................... 1

CONTENTIONS OF FACT AND LAW ......................................................... 2

    I.    Step One:  The AWCA Does Not Burden Conduct Protected
          Under the Second Amendment ............................................................. 2

          A.    Assault Weapons Are Not Protected Under the Second
               Amendment Because They Are Dangerous and Unusual .......... 2

               1.    Assault Weapons Are Dangerous.................................... 3

                        a.    Detachable Magazines ........................................ 3

                        b.    Fixed LCMs ....................................................... 5

                        c.    Pistol Grips, Thumbhole Stocks, and Barrel
                              Shrouds.............................................................. 5

                        d.    Folding and Telescoping Stocks and Rifles
                              Shorter than 30 Inches in Length ...................... 6

                        e.    Flash Suppressors.............................................. 6

                          f.    Threaded Pistol Barrels...................................... 7

                        g.    Grenade and Flare Launchers ............................ 7

                 2.    Assault Weapons Are Unusual....................................... 8

           B.    Assault Weapons Are "Like" the M-16 and Most Useful
               in Military Service ................................................................... 9

          C.    The AWCA Is Analogous to Longstanding Firing-
               Capacity Regulations. ............................................................ 12

    II.    Step Two:  The AWCA Is Subject to and Satisfies Intermediate
          Scrutiny ............................................................................................ 13

          A.    The AWCA Is Subject to Intermediate Scrutiny Because
               Any Burden on the Core Second Amendment Right Is
               Not Severe ............................................................................... 13

          B.    The AWCA Satisfies Intermediate Scrutiny Because It Is
                Reasonably Fitted to Important Government Interests............ 16

                 1.    Assault Weapons Are Used Disproportionately in
                        Crime, Mass Shootings, and Against Law
                        Enforcement, Resulting in More Causalities ................ 17

                 2.    The AWCA Furthers the State's Important Public
                        Safety Interests .............................................................. 20

          C.    The AWCA Alternatively Satisfies Strict Scrutiny.................. 21

    III.    Abandoned Issues (Local Rule 16.1(f)(2)(b)).................................... 22

    IV.    Other Legal Issues............................................................................ 22

CONCLUSION.............................................................................................. 23

i

1

# TABLE OF AUTHORITIES

2

**Page**

3    CASES

4    *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.*
5          910 F.3d 106 (3d Cir. 2018) ................................................................. 13

6    *Bauer v. Becerra*
7          858 F.3d 1216 (9th Cir. 2017) .............................................................. 14

8    *Binderup v. Att'y Gen. U.S.A.*
9          836 F.3d 336 (3d Cir. 2016) ................................................................... 8

10   *District of Columbia v. Heller*
11         554 U.S. 570 (2008)  ...................................................................*passim*

12   *Duncan v. Becerra*
          2020 WL 4730668 (9th Cir. Aug. 14, 2020) ........................................ 8
13
     *Duncan v. Becerra*
14         2019 WL 1510340 (S.D. Cal. Apr. 4, 2019) ...................................... 23

15   *Fantasyland Video, Inc. v. Cnty. of San Diego*
16         505 F.3d 996 (9th Cir. 2007) .............................................................. 19

17   *Friedman v. City of Highland Park*
18         68 F. Supp. 3d 895 (N.D. Ill. 2014) ..................................................... 11

19   *Fyock v. Sunnyvale*
20         779 F.3d 991 (9th Cir. 2015) ......................................................*passim*

21   *Gallinger v. Becerra*
22         898 F.3d 1012 (9th Cir. 2018) ................................................... 5, 10, 18

23   *Heller v. District of Columbia*
          670 F.3d 1244 (D.C. Cir. 2011) ............................................... 2, 10, 14
24
     *Jackson v. City & Cnty. of San Francisco*
25         746 F.3d 953 (9th Cir. 2014) ................................................... 14, 15, 16

26   *Kachalsky v. Cnty. of Westchester*
27         701 F.3d 81 (2d Cir. 2012) .................................................................. 17

28

Defendants' Memorandum of Contention of Fact and Law (3:19-cv-01537-BEN-JLB)

# TABLE OF AUTHORITIES
### (continued)

Page

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) ............................................................ *passim*

*Maloney v. Singas*
    351 F. Supp. 3d 222 (E.D.N.Y. 2018) ............................................................ 9

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ............................................................ 2

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*
    804 F.3d 242 (2d Cir. 2015) ............................................................ 14

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018) ............................................................ 16, 17

*Rupp v. Becerra*
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ............................................................ *passim*

*Rupp v. Becerra*
    No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Apr. 1, 2019) ............................................................ 13

*S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*
    18 F. Supp. 3d 997 (N.D. Cal. 2014) ............................................................ 19

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016) ............................................................ *passim*

*Staples v. United States*
    511 U.S. 600 (1994) ............................................................ 10, 11

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) ............................................................ 17

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018) ............................................................ 7

*United States v. Skoien*
    614 F.3d 638 (7th Cir. 2010) ............................................................ 13

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) ............................................................ 23

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Wilson v. Cook Cnty.*
   937 F.3d 1028 (7th Cir. 2019) .................................................................. 14

*Worman v. Healey*
   922 F.3d 26 (1st Cir. 2019) ............................................................... 8, 14

**STATUTES**

California Code of Regulations Title 11
   § 5471(nn) ............................................................................................. 6
   § 5471(oo) ............................................................................................. 6
   § 5471(r) ................................................................................................ 7

California Penal Code
   § 30515(a) ................................................................................ 3, 15, 16
   § 30515(a)(1) ......................................................................................... 3
   § 30515(a)(1)(A) .................................................................................... 5
   § 30515(a)(1)(B) .................................................................................... 5
   § 30515(a)(1)(C) .................................................................................... 6
   § 30515(a)(1)(D) .................................................................................... 7
   § 30515(a)(1)(E) .................................................................................... 6
   § 30515(a)(1)(F) .................................................................................... 5
   § 30515(a)(2) ......................................................................................... 5
   § 30515(a)(3) ......................................................................................... 6
   § 30515(a)(4) ......................................................................................... 3
   § 30515(a)(4)(A) .................................................................................... 7
   § 30515(a)(4)(B) .................................................................................... 5
   § 30515(a)(4)(C) .................................................................................... 6
   § 30515(a)(4)(D) .................................................................................... 4
   § 30515(a)(5) ......................................................................................... 5
   § 30515(a)(6)(A) .................................................................................... 6
   § 30515(a)(6)(B) .................................................................................... 5
   § 30515(a)(7) ......................................................................................... 3
   § 30800 ................................................................................................ 22
   § 30915 ................................................................................................ 22
   § 30945 ................................................................................................ 22
   § 30950 ................................................................................................ 22
   § 31000 ................................................................................................ 22
   § 31005 ................................................................................................ 22

Defendants' Memorandum of Contention of Fact and Law (3:19-cv-01537-BEN-JLB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution
    First Amendment ............................................................................... 19
    Second Amendment.................................................................... *passim*
    Fourteenth Amendment ............................................................. 2, 12

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 25(d) .......................................................................................... 1
    Rule 65(a)(2) ...................................................................................... 1

Local Rules
    Rule 16.1(f)(2)(a) .............................................................................. 1
    Rule 16.1(f)(2)(b) ............................................................................ 22
    Rule 16.1(f)(2)(c).............................................................................. 3

Defendants' Memorandum of Contention of Fact and Law (3:19-cv-01537-BEN-JLB)

In accordance with Local Rule 16.1(f)(2)(a), Defendants Xavier Becerra, in his official capacity as Attorney General of the State of California, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms[1] (together, "Defendants"), respectfully contend that the trial of this case, set by the Court pursuant to Federal Rule of Civil Procedure 65(a)(2), involves the following material facts and issues of law.

## INTRODUCTION

The Assault Weapons Control Act (the "AWCA") is constitutional under the Second Amendment.  The AWCA is constitutional at both steps of the Ninth Circuit's two-step framework for adjudicating Second Amendment claims, which asks (1) "whether the challenged law burdens conduct protected by the Second Amendment," and if so, (2) "what level of scrutiny should be applied" and whether the challenged law satisfies that level of scrutiny, *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015).  At step one, the AWCA does not burden conduct protected by the Second Amendment.  And even if the AWCA is assumed to burden protected conduct, intermediate scrutiny must apply at step two because any burden of the AWCA on the core Second Amendment right to defense of hearth and home is not severe.  The AWCA satisfies intermediate scrutiny because it is reasonably fitted to important government interests in reducing gun violence, particularly mitigating the incidence and lethality of mass shootings and violence against law enforcement personnel.  This determination is consistent with the decisions of the five federal circuits and a sister district court in this circuit that have examined the constitutionality of substantially identical assault-weapon restrictions.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Bureau of Firearms Director Luis Lopez, in his official capacity, is substituted for former Interim Director Brent E. Orick.

## CONTENTIONS OF FACT AND LAW

### I.   STEP ONE:  THE AWCA DOES NOT BURDEN CONDUCT PROTECTED UNDER THE SECOND AMENDMENT

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms.  554 U.S. 570, 595 (2008).  This right is incorporated against the states through the Fourteenth Amendment.  *See McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010) (plurality opinion).

Under the Ninth Circuit's two-step approach adopted following *Heller* and *McDonald*, the first step considers whether the challenged law burdens conduct protected by the Second Amendment based on a "historical understanding of the scope of the right."  *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (quoting *Heller*, 554 U.S. at 625).  If it does not, then the law "may be upheld without further analysis."  *Id.* (citation omitted).  However the burden of persuasion is assigned, the AWCA is constitutional at step one of the framework.

### A.   Assault Weapons Are Not Protected Under the Second Amendment Because They Are Dangerous and Unusual

While the Court in *Heller* and *McDonald* invalidated strict laws that effectively prohibited the possession of all handguns—which the Court characterized as "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—the Court made clear that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626 (citations omitted).  The Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Heller*, 554 U.S. at 625; *see also Fyock*, 779 F.3d at 997.  This

2

articulation of what is protected by the Second Amendment finds its roots in the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627.  Dangerous and unusual weapons are not "'the sorts of weapons' that are 'in common use'" for lawful purposes.  *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring).

### 1.    Assault Weapons Are Dangerous

Assault-weapon configurations that qualify a rifle, pistol, or shotgun as an assault weapon under the AWCA increase the dangers posed by those firearms.  Each of the prohibited features or configurations in California Penal Code section 30515(a) serves specific, combat-oriented functions, which increase the lethality of firearms and enhance their effectiveness in certain types of crime, particularly mass shootings and violence against law enforcement personnel.

### a.    Detachable Magazines

The capability to accept detachable magazines is a threshold requirement for certain rifles and pistols to qualify as an assault weapon, Cal. Penal Code § 30515(a)(1), (4), and it is sufficient to designate a shotgun as an assault weapon, *id.* § 30515(a)(7).  Detachable magazines enhance the ability of a semiautomatic firearm to fire a large number of rounds quickly, by eliminating the need to manually reload each round.

The ability to accept detachable magazines "provides the soldier with a fairly large ammunition supply and the ability to rapidly reload."  Defs.' Ex. H (Bureau of Alcohol, Tobacco & Firearms, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989) ("ATF Rifle Importability Report")) at 6.[2] The ability to accept detachable magazines renders a semiautomatic weapon

---

[2] In accordance with Local Rule 16.1(f)(2)(c), Defendants organize their exhibits alphabetically.  A complete list of Defendants exhibits and witnesses is being filed concurrently with this memorandum.  Defendants' citation to evidence herein is not intended to be exhaustive, and Defendants reserve the right to cite additional evidence from their exhibit list and other evidence adduced at trial in support of their contentions of fact.

"capable of killing or wounding more people in a shorter amount of time."  Defs.'
Ex. F (S.B. 880 Report, 2015-2016 Reg. Sess., Assembly Committee on Public
Safety (June 14, 2016)) at 6.  Additionally, a pistol capable of accepting a
detachable magazine at some location other than the pistol grip, Cal. Penal Code
§ 30515(a)(4)(D), can help a shooter reload a pistol quicker and maintain aim
during rapid fire.  Defs.' Ex. D (Graham Decl.) ¶ 29.  A weapon lacking a fixed
magazine is also capable of accepting detachable large-capacity magazines
("LCMs"), which "allow a shooter to fire more than ten rounds without having to
pause to reload." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc).
LCMs "are particularly designed and most suitable for military and law
enforcement applications" and "are a feature common, but not unique, to the
banned assault weapons, many of which are capable of accepting magazines of
thirty, fifty, or even 100 rounds." *Id.*  Shotguns capable of firing more than five
shotgun rounds without reloading, such as those with a revolving cylinder, are also
"most appropriate for military or law enforcement use" and "are not particularly
suitable for nor readily adaptable to generally recognized sporting purposes."
Defs.' Ex. O (Bureau of Alcohol, Tobacco, Firearms & Explosives, Study on the
Importability of Certain Shotguns (2011) ("ATF Shotgun Importability Study")) at
iv.

The use of LCM-equipped firearms in mass shootings results in a substantially
greater number of fatalities and injuries than mass shootings not involving LCMs
(27 vs. 9), and especially when LCMs are used in conjunction with assault weapons
(43 vs. 8).  Defs.' Ex. A (Allen Decl.) ¶¶ 33-34; *see also* Defs.' Ex. E (Klarevas
Decl.) ¶ 17 (discussing higher death toll for gun massacres involving LCMs).
LCMs also feature prominently in gun violence against law enforcement, as LCM-
equipped assault weapons can enable a shooter to engage law enforcement in
prolonged standoffs, and such weapons fire ammunition that is capable of
penetrating police body armor.  *See* Defs.' Ex. D (Graham Decl.) ¶¶ 22-23, 41.

4

### b.   Fixed LCMs

Certain rifles and pistols qualify as assault weapons if they have fixed LCMs. Cal. Penal Code § 30515(a)(2), (5).  LCMs enable a shooter to fire more rounds in a given period of time by reducing reload frequency.

An LCM enables a shooter to fire more than 10 rounds in a shorter period of time than a firearm with a fixed or detachable 10-round magazine.  *See Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (quoting *Kolbe*, 849 F.3d at 127); *Fyock*, 779 F.3d at 1000 (citing "evidence that the use of [LCMs] results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries").  Even if an LCM is incorporated into a rifle or pistol as a fixed magazine, the weapon would still be capable of firing more than 10 rounds repeatedly without needing to reload, enhancing that weapon's lethality. And rifles and pistols can be modified to allow a shooter to reload a fixed magazine nearly as quickly as a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 42.

### c.   Pistol Grips, Thumbhole Stocks, and Barrel Shrouds

Certain rifles, pistols, and shotguns can qualify as assault weapons if they have pistol grips (either beneath the action or located in a forward position) or thumbhole stocks.  Cal. Penal Code § 30515(a)(1)(A), (1)(B), (1)(F), (4)(B), (6)(B).  Pistol grips and thumbhole stocks enable a shooter to maintain accuracy during rapid fire.

A pistol grip "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing," which can help counteract muzzle rise during repeated firing, and a forward pistol grip can similarly help a shooter stabilize a weapon during repeated semiautomatic fire.  Defs.' Ex. D (Graham Decl.) ¶¶ 28-30, 38; Defs.' Ex. H (ATF Rifle Importability Report) at 6 ("[Pistol] grips were designed to assist in controlling machineguns during automatic fire.").  A pistol grip can enable a shooter to maintain aim and even fire while reloading a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 29.  A forward

5

pistol grip on any firearm can also help insulate the non-trigger hand from heat during rapid fire. *Id.* ¶ 53. As with forward pistol grips, a "barrel shroud" on assault pistols, Cal. Penal Code § 30515(a)(4)(C), "serve a combat-functional purpose" by cooling the barrel and insulating the non-trigger hand during rapid fire. Defs.' Ex. J (H.R. Rep. No. 103-489) at 19.

### d.   Folding and Telescoping Stocks and Rifles Shorter than 30 Inches in Length

Certain rifles and shotguns may qualify as an assault weapon if it has an adjustable stock. Cal. Penal Code § 30515(a)(1)(C), (6)(A). A folding or telescoping stock enhances the portability and concealability of a rifle. *See* Cal. Code Regs. tit. 11, § 5471(nn), (oo).

The "main advantage" of a folding or telescoping stock is "portability," and "its predominant advantage is for military purposes, and it is not normally found on the traditional sporting rifle." Defs.' Ex. H (ATF Rifle Importability Report) at 6. Moreover, in military and law enforcement contexts, an adjustable stock may enable law enforcement personnel to conduct room-to-room searches and maintain a tactical element of surprise. Defs.' Ex. D (Graham Decl.) ¶ 32. As with adjustable stocks, semiautomatic centerfire rifles with lengths of less than 30 inches, Cal. Penal Code § 30515(a)(3), are more concealable and may allow a shooter to smuggle a rifle undetected in public. Defs.' Ex. D (Graham Decl.) ¶¶ 43, 59; Defs.' Ex. M (Mersereau Decl.) ¶ 10.

### e.   Flash Suppressors

A flash suppressor is a listed feature in the definition of an assault rifle. Cal. Penal Code § 30515(a)(1)(E). A flash suppressor can enable a shooter to maintain accuracy during rapid fire enhancing the concealability of a shooter in low-light settings.

A flash suppressor is a device attached to the muzzle of a rifle to reduce the flash emitted upon firing.  Cal. Code Regs. tit. 11, § 5471(r).  It is a standard feature of the M-16 that can aid a shooter to maintain accurate, rapid fire in low-light conditions, and can also counteract "muzzle climb" during rapid fire.  Defs.' Ex. H (ATF Rifle Importability Report) at 7; Defs.' Ex. D (Graham Decl.) ¶ 37.  A flash suppressor can help conceal the shooter's position, especially at night.  Defs.' Ex. H (ATF Rifle Importability Report) at 7; Defs.' Ex. D (Graham Decl.) ¶ 37.

### f.    Threaded Pistol Barrels

A semiautomatic, centerfire pistol without a fixed magazine qualifies as an assault weapon if it has a threaded barrel capable of accepting a flash suppressor, forward pistol grip, or silencer.  Cal. Penal Code § 30515(a)(4)(A).  A threaded barrel enables a shooter to quickly attach a flash suppressor, forward handgrip, or silencer, which enhance the pistol's lethality and concealability.  Defs.' Ex. D (Graham Decl.) ¶ 53.

A flash suppressor and forward pistol grip enhance the lethality or concealability of a firearm.  Defs.' Ex. H (ATF Rifle Importability Report) at 6-7.  And a silencer can be affixed to a pistol to reduce the sound it emits upon firing, which can help a shooter maintain a tactical advantage by concealing the shooter's position or the fact that a shot was even fired.  Defs.' Ex. D (Graham Decl.) ¶ 53 (noting Virginia Beach workplace shooting that involved a silencer-equipped handgun).  Silencers are not protected by the Second Amendment, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("[B]ecause silencers are not 'bearable arms,' they fall outside the Second Amendment's guarantee."), *cert denied*, 139 S. Ct. 2690 (June 10, 2019), so prohibiting threaded barrels capable of accepting a silencer would not offend the Second Amendment.

### g.    Grenade and Flare Launchers

A semiautomatic, centerfire rifle without a fixed magazine qualifies as an assault rifle if it is equipped with a grenade launcher or a flare launcher.  Cal. Penal

1   Code § 30515(a)(1)(D).  Neither serve any legitimate civilian need on a rifle.

2   Defs.' Ex. D (Graham Decl.) ¶¶ 34-35.

3              **2.    Assault Weapons Are Unusual**

4        In addition to being dangerous, assault weapons regulated under the AWCA

5   are not "in common use" for lawful purposes like self-defense.  The Ninth Circuit

6   has observed that "[c]ommonality is determined largely by statistics," with

7   "common use" being established primarily by evidence that a weapon is

8   "overwhelmingly owned and used for lawful purposes," *Duncan v. Becerra*, __

9   F.3d __, 2020 WL 4730668, at *7 (9th Cir. Aug. 14, 2020), *petition for reh'g en*

10  *banc filed*.  It is Plaintiffs' burden to show that assault weapons are in "common

11  use" by law-abiding citizens for lawful purposes.  *See Binderup v. Att'y Gen.*

12  *U.S.A.*, 836 F.3d 336, 347 (3d Cir. 2016) ("[I]f the challenger succeeds at step one,

13  the burden shifts to the Government to demonstrate that the regulation satisfies

14  some form of heightened scrutiny . . . at step two . . . .").  Plaintiffs have failed to

15  demonstrate that assault weapons are widely possessed by law-abiding civilians for

16  lawful purposes.

17       Even if Plaintiffs are able to present evidence of marketing materials or sales

18  figures for assault rifles, assault pistols, and assault shotguns, such evidence would

19  not show that the weapons are in common use by law-abiding citizens for lawful

20  purposes.  For one, "marketing materials and sales statistics" do "not necessarily

21  show that [particular weapons] are in fact commonly possessed by law-abiding

22  citizens for lawful purposes."  *Fyock*, 779 F.3d at 998.  Moreover, evidence of a

23  firearm's prevalence alone is insufficient to show that the weapon is in "common

24  use" for lawful purposes.  *See Kolbe*, 849 F.3d at 141-42 (noting that "the *Heller*

25  majority said nothing to confirm that it was sponsoring the popularity test");

26  *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring

27  'common use' by the sheer number of weapons lawfully owned is somewhat

28  illogical" (citing *Friedman*, 784 F.3d at 409)), *cert. denied*, __ S.C. __, 2020 WL

8

3146687 (June 15, 2020).  The evidence here shows that assault weapons restricted under the AWCA are not well-suited for lawful uses, particularly self-defense.  The prohibited features enhance a firearm's ability to fire more rounds in a given period of time, to maintain accuracy during rapid-fire, or to be more readily concealable.  These attributes are not necessary for lawful self-defense, as the evidence shows that individuals fire 2.1 shots on average when firearms were used in self-defense in the home, firing no shots in 16.1% of incidents.  Defs.' Ex. A (Allen Decl.) ¶ 15; *see also id.* ¶ 23 (finding of Ms. Allen that an average number of 2.34 shots are fired in self-defense in the home, with a median of 2.03, based on review of news stories nationwide).

While assault weapons might be used in self-defense, they are more useful for offensive purposes or combat.  The fact that law enforcement agencies may use weapons that would otherwise qualify as assault weapons under the AWCA plays no role in the analysis; law-enforcement use is not considered when determining whether an arm is in common use by law-abiding citizens for lawful purposes.  *See Maloney v. Singas*, 351 F. Supp. 3d 222, 229 n.10 (E.D.N.Y. 2018) (excluding sales of arms to law enforcement agencies because "the Second Amendment is only concerned with weapons 'typically possessed by law-abiding citizens for lawful purposes.'" (quoting *Heller*, 554 U.S. at 625)).

## B.   Assault Weapons Are "Like" the M-16 and Most Useful in Military Service

Assault weapons fall outside the scope of the Second Amendment because they are like the M-16 and most useful in military service.  In *Heller*, the Supreme Court made clear that the Second Amendment does not protect weapons that are "most useful in military service," such as the "M-16 and the like."  *Heller,* 554 U.S. at 627; *Kolbe*, 849 F.3d at 136.  Assault weapons are "most useful in military service" due to their ability to accept ammunition from fixed or detachable LCMs and their combat-oriented features.  *See Kolbe*, 849 F.3d at 137 ("Whatever their

9

other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines . . . are unquestionably most useful in military service."); *see also Gallinger*, 898 F.3d at 1018 (referencing "mass shootings perpetrated by individuals with *military-style rifles*" (emphasis added)).

The Supreme Court has highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the protection of the Second Amendment. *Heller*, 554 U.S. at 627.  Assault weapons have a military pedigree and are nearly identical to the M-16.  *Staples v. United States*, 511 U.S. 600, 612 (1994) at 603 ("The AR-15 is the civilian version of the military's M-16 rifle . . . ."); *Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (citing *Heller*, 554 U.S. at 627)); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 (C.D. Cal. 2019) (Staton, J.) ("[T]he Court concludes that semiautomatic rifles within the AWCA's scope are virtually indistinguishable from M-16s . . . ."); Defs.' Ex. H (ATF Rifle Importability Report) at 6 (describing "military features and characteristics . . . carried over to semiautomatic versions of the original military rifle"); Defs.' Ex. D (Graham Decl.) ¶ 44; Defs.' Ex. C (Donohue Decl.) ¶¶ 83-89.

The primary difference between the M-16 and an assault weapon is that the M-16 is a select-fire weapon that allows the shooter to fire in either automatic or semiautomatic mode, while an assault weapon fires only in semiautomatic mode. Defs.' Ex. I (Violence Policy Center, *Key Points About Assault Weapons*) at 1. This is not a material difference.  Semiautomatic weapons can "still fire almost as rapidly as automatics."  *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1263 (D.C. Cir. 2011); Defs.' Ex. J (H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act ("H.R. Rep. No. 103-489")) ("[S]emiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns.");

10

1   Defs.' Ex. K (Brady Ctr. to Prevent Gun Violence, *Assault Weapons "Mass*

2   *Produced Mayhem"* (2008)) at 1 (a 30-round magazine empties in less than two

3   seconds on automatic, while the same magazine empties in just five seconds on

4   semiautomatic).  In fact, soldiers issued M-16 rifles are instructed to generally use

5   "rapid semiautomatic fire," because fully automatic fire is "inherently less

6   accurate."  Defs.' Ex. L (Excerpt of United States Army, *Rifle Marksmanship*

7   *M16/M4 - Series Weapons* (2008)) at 7-12.  And assault rifles, such as the AR-15,

8   are easily converted to fire automatically.  *Staples*, 511 U.S. at 603 (noting that

9   "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to

10   convert the AR-15 into an automatic weapon"); Defs.' Ex. J (H.R. Rep. No. 103-

11   489) at 18 ("[I]t is a relatively simple task to convert a semiautomatic weapon to

12   automatic fire . . . ."); Defs.' Ex. M (Mersereau Decl.) ¶ 20.

13       As with assault rifles, assault pistols and assault shotguns are most useful in

14   military service and are not well-suited for civilian self-defense.  *See Kolbe*, 849

15   F.3d at 136 (holding that "the banned assault weapons" are most useful in military

16   service); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908 (N.D. Ill.

17   2014) (noting that submachine guns are "the analog for a civilian assault pistol" and

18   "facilitate the assault and capture of a military objective" (citation omitted)); Defs.'

19   Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms*

20   *Market* (2011)) at 28 (noting that assault pistols are "for the most part simply

21   semiautomatic versions of submachine guns"); Defs.' Ex. O (ATF Shotgun

22   Importability Study) at iv (discussing shotgun features that "are most appropriate

23   for military or law enforcement use," including adjustable stocks and forward pistol

24   grips).  Indeed, manufacturers of assault weapons advertise them to civilians as

25   military-grade firearms.  *See Kolbe*, 849 F.3d at 125 ("Several manufacturers of the

26   banned assault weapons, in advertising them to the civilian market, tout their

27   products' battlefield prowess."); Defs.' Ex. C (Donohue Decl.) ¶¶ 72-82; Defs.'

28   Ex. P (Colt.com, AR15A4 Advertisement) at 1; Defs.' Ex. Q (Colt.com, About Colt

Rifles) at 1.  Beginning in the 1980s, the gun industry began to market heavily military-style rifles to the civilian gun market, Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 1, using the term "assault rifles" to describe these military-style weapons, Defs.' Ex. R (Guns & Ammo (July 1981)) at 48, 54 (July 1981 Guns & Ammo Magazine) (variously describing a "new breed of assault rifles" as "[s]pawned in the crucible of war," "military-type," "military-style," and "military autoloaders").

### C.   The AWCA Is Analogous to Longstanding Firing-Capacity Regulations.

Plaintiffs are also unlikely to succeed on the merits at the first step of the Second Amendment analysis because the AWCA is a "'presumptively lawful measure[]' falling outside the scope of Second Amendment protection." *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring) (quoting *Heller*, 554 U.S. at 626, 627 n.26).  In restricting firearms capable of firing numerous rounds without reloading—either because they can accept detachable LCMs or have fixed LCMs—the AWCA is analogous to "regulations from the early twentieth century that restricted the possession of firearms based on the number of rounds that the firearm could discharge automatically or semi-automatically without reloading." *Fyock*, 779 F.3d at 997.  In the 1920s and 1930s, Michigan, Rhode Island, and Ohio enacted restrictions on semiautomatic weapons capable of firing sixteen, twelve, and eighteen shots, respectively, without reloading.  Defs.' Ex. S (Mich. Public Acts, 1927 – No. 372); Defs.' Ex. T (R.I. Public Acts, 1927 – Ch. 1052); Defs.' Ex. U (Ohio General Code, 1933 – § 12819-3).  And in 1932, Congress enacted a twelve-shot restriction on semiautomatic weapons in the District of Columbia—one of the few jurisdictions subject to the Second Amendment at that time, before it was incorporated into the Fourteenth Amendment in 2010—and this restriction has remained in effect ever since.  Defs.' Ex. V (Pub. L. No. 275, 1932 – 72d Cong.,

Sess. I, chs. 465, 466).  While most of the firing-capacity laws were repealed by the 1970s, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.* (*ANJRPC*), 910 F.3d 106, 117 n.18 (3d Cir. 2018), the District of Columbia has maintained its restrictions.

In regulating firearms based on their capacity for enhanced firepower, these laws provide a historical analog to the AWCA.  *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (noting that the challenged regulation need not "mirror" the historical regulation); *see, e.g.*, *Silvester*, 843 F.3d at 823-24, 831 (Thomas, C.J., concurring) (citing original iteration of California's waiting-period law, which provided a *single-day* waiting period, in determining that California's longer, ten-day waiting period was presumptively lawful).  And these laws are sufficient analogs despite their adoption by "several states."  *See id.* at 831 (Thomas, C.J., concurring) (citing just three states that enacted waiting-period statutes in the 1920s.  In sum, the political debate concerning the regulation of assault weapons "was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s." Defs.' Ex. W (Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69; *see also* Defs.' Ex. X (Br. of *Amicus Curiae* Everytown for Gun Safety in Supp. of Def.'s Mot. for Summ. J., *Rupp v. Becerra*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Apr. 1, 2019) (Dkt. 82-1)) at 7-9.  For this additional reason, the AWCA does not burden the Second Amendment.

## II.   STEP TWO:  THE AWCA IS SUBJECT TO AND SATISFIES INTERMEDIATE SCRUTINY

### A.   The AWCA Is Subject to Intermediate Scrutiny Because Any Burden on the Core Second Amendment Right Is Not Severe

Even if the AWCA is assumed to burden conduct protected under the Second Amendment at step one, the Court proceeds to select an appropriate level of

13

scrutiny at step two, depending on "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014) (quotation omitted).  Intermediate scrutiny applies unless the challenged law severely burdens that core Second Amendment right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (quoting *Heller*, 554 U.S. at 635).

Every federal circuit court that has selected a level of scrutiny to apply to assault-weapon restrictions, like the AWCA, has determined that intermediate scrutiny applies because they do not rise to the level of a "substantial burden" on the core right protected by the Second Amendment.  *See Wilson v. Cook Cnty.*, 937 F.3d 1028, 1036 (7th Cir. 2019) (following *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 412 (7th Cir. 2015)), *cert. denied*, __ S.C. __, 2020 WL 3146694 (June 15, 2020); *Worman*, 922 F.3d at 38; *Kolbe*, 849 F.3d at 138-39; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257-61 (2d Cir. 2015); *Heller II*, 670 F.3d at 1261-62.   Similarly, the district court in *Rupp* determined that intermediate scrutiny is appropriate because the AWCA does not severely burden the core Second Amendment right, given the range of other firearms available to Californians that are not restricted by the AWCA, including a variety of handguns. *Rupp*, 401 F. Supp. 3d at 989.  Indeed, the court determined that assault rifles—the focus of Plaintiffs' claims in this action—are "ill-suited for self-defense" and that self-defense is not the reason why most "modern sporting rifles" are acquired.  *Id.* Consistent with *Rupp* and the federal circuit cases upholding similar assault-weapon restrictions, intermediate scrutiny applies to the AWCA.

The AWCA does not impose a severe burden on the core Second Amendment right because, except for the small subset of firearms that qualify as assault weapons under the AWCA when configured with certain particularly dangerous features, Californians are free to possess a range of rifles, pistols, and shotguns to

14

1    engage in lawful self-defense.  *See Jackson*, 746 F.3d at 961 ("[F]irearm regulations

2    which leave open alternative channels for self-defense are less likely to place a

3    severe burden on the Second Amendment right than those which do not.").  The

4    AWCA does not ban all rifles, pistols, or shotguns, or even all semiautomatic

5    versions of those firearms.  To the contrary, Californians may lawfully acquire an

6    array of semiautomatic rifles for lawful purposes, such as a centerfire

7    semiautomatic rifle without a fixed magazine, provided it is not a prohibited make

8    and model and does not have any of the prohibited features, a centerfire

9    semiautomatic rifle with any of the militaristic features and with a fixed magazine

10   of 10 rounds or less, or a rimfire semiautomatic rifle with any of the listed features.

11   They may also possess a range of handguns and shotguns, including semiautomatic

12   versions that lack any of the prohibited features or configurations.

13        The burden on the core right is further minimized by the fact that the AWCA,

14   in effect, operates as a restriction on the manner in which certain semiautomatic

15   firearms are sold and possessed, rather than a prohibition on the possession of any

16   particular class of firearm.  *See Silvester*, 843 F.3d at 827 ("This court has

17   explained that laws which merely regulate only the '*manner* in which persons may

18   exercise their Second Amendment rights' are less burdensome than those which bar

19   firearm possession completely." (quoting *United States v. Chovan*, 735 F.3d 1127,

20   1138 (9th Cir. 2013))).  Under the AWCA, Californians may acquire and possess

21   semiautomatic, centerfire rifles and semiautomatic pistols and shotguns, provided

22   the weapons do not have any of the proscribed accessories or features listed in

23   California Penal Code section 30515(a).  The Ninth Circuit has indicated that the

24   Second Amendment may protect the right to possess certain firearm accessories or

25   hardware that may be necessary to operate the firearm.  *See Fyock*, 779 F.3d at 997

26   ("[O]ur case law supports the conclusion that there must also be some corollary,

27   albeit not unfettered, right to possess the magazines *necessary to render those*

28   *firearms operable*." (emphasis added) (quoting *Jackson*, 746 F.3d at 967).  But

1    none of the features enumerated in California Penal Code section 30515(a) are

2    necessary to operate a firearm.  Because the challenged provisions of the AWCA

3    regulate the *manner* in which certain rifles, pistols, and shotguns may be

4    configured—without rendering those firearms inoperable—the burden on the core

5    Second Amendment right, if any, is minimal.

6        Plaintiffs fail to show that assault weapons with any of the prohibited features

7    or configurations are necessary for effective self-defense.  On average,

8    approximately *two rounds* are fired when firearms are used in self-defense, Defs.'

9    Ex. A (Allen Decl.) ¶¶ 15, 22, confirming that assault weapons—particularly those

10   with LCMs—are not necessary to engage in lawful self-defense.  Because the

11   AWCA restricts a "subset" of particularly lethal rifles, pistols, and shotguns that are

12   not necessary for effective self-defense, intermediate scrutiny applies.  *Fyock*, 779

13   F.3d at 999-1000 (applying intermediate scrutiny to LCM restrictions); *see also*

14   *Rupp*, 401 F. Supp. 3d at 988-89.

### B.   The AWCA Satisfies Intermediate Scrutiny Because It Is Reasonably Fitted to Important Government Interests

17       A regulation satisfies intermediate scrutiny if (1) the government's stated

18   objective is "significant, substantial, or important"; and (2) there is a "'reasonable

19   fit' between the challenged regulation and the asserted objective."  *Silvester*, 843

20   F.3d at 821-22 (citation omitted).  Intermediate scrutiny does not require the fit

21   between the challenged regulation and the stated objective to be perfect, nor does it

22   require that the regulation be the least restrictive means of serving the interest.

23   *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable

24   opportunity to experiment with solutions to admittedly serious problems."  *Id.* at

25   969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

26       In determining whether a law survives intermediate scrutiny, courts "afford

27   substantial deference to the predictive judgments of the legislature."  *Pena v.*

28   *Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) (quotation omitted).  Even when the

record contains "conflicting legislative evidence," intermediate scrutiny "allow[s] the government to select among reasonable alternatives in its policy decisions." *Id.* (quotation omitted).  Deferential review is particularly appropriate here because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quotation omitted).  Under intermediate scrutiny, the government may "rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests," and the Court "may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'" *Fyock*, 779 F.3d at 1000 (quotations omitted).  Such "evidence need only 'fairly support[]' [the government's] conclusions." *Pena*, 898 F.3d at 982 (quotation omitted).

"It is beyond question that the government's interest in promoting public safety and reducing gun violence is important or substantial." *Rupp*, 401 F. Supp. 3d at 990 (quotation omitted); *see, e.g.*, *Fyock*, 779 F.3d at 1000; *Chovan*, 735 F.3d at 1135.  The AWCA satisfies intermediate scrutiny because it furthers the State's important interests by restricting a particularly dangerous subset of firearms that pose an acute danger to the public and law enforcement.

### 1. Assault Weapons Are Used Disproportionately in Crime, Mass Shootings, and Against Law Enforcement, Resulting in More Causalities

In passing the federal assault weapons ban, Congress found that "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder." Defs.' Ex. J (H.R. Rep. No. 103-489) at 13.  It further found that "[t]he carnage inflicted on the American people [by] criminals and mentally deranged people

17

1    armed with . . . semi-automatic assault weapons has been overwhelming and

2    continuing," and the use of those weapons by "criminal gangs, drug-traffickers, and

3    mentally deranged persons continues to grow." *Id.* at [1089-90].

4        Assault weapons are used disproportionately in crime.  Defs.' Ex. J (H.R. Rep.

5    No. 103-489) at 18; Defs.' Ex. E (Klaravas Decl.) ¶ 16; Defs.' Ex. C (Donohue

6    Decl.) ¶ 115.  Generally, assault weapons and semiautomatic weapons with LCMs

7    account for 22 to 36 percent of crime guns, and "appear to be used in a higher share

8    of firearm mass murders (up to 57% in total)," Defs.' Ex. Y (Christopher S. Koper

9    et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic*

10   *Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban

11   Health 313 (2017) ("Koper 2017")) at 1, far greater than their prevalence in the

12   market, *see* Defs.' Ex. E (Klaravas Decl.) ¶ 16.  Such weapons are also used

13   disproportionally against law enforcement personnel.  Defs.' Ex. Y (Koper 2017) at

14   1, 7 (finding that 13 to 16 percent of guns used in the murder of police are assault

15   weapons); *see also* Defs.' Ex. AA (Violence Policy Ctr., *"Officer Down": Assault*

16   *Weapons and the War on Law Enforcement* (2003)) at 5; Defs.' Ex. C (Donohue

17   Decl.) ¶ 117.  Victims of assault-weapons generally suffer more extensive and more

18   numerous gunshot wounds, resulting in higher morbidity and mortality that victims

19   of shootings from other weapons.  *See* Defs.' Ex. B (Colwell Decl.) ¶¶ 9, 12; Defs.'

20   Ex. AB (Panagiotis K. Stefanopoulos et al., *Gunshot Wounds: A Review of*

21   *Ballistics Related to Penetrating Trauma*, J. of Acute Disease, 178 (2014)) at 181-

22   82 (discussing cavitation of small-caliber bullets from M-16 and AK-47 rifles).

23       When used in mass shootings, assault weapons cause substantially more

24   fatalities and injuries than non-assault weapons.  *See Gallinger*, 898 F.3d at 1019

25   ("[W]hen 'assault weapons and large capacity magazines are used, more shots are

26   fired and more fatalities and injuries result than when shooters use other firearms

27   and magazines.'" (quoting *Kolbe*, 849 F.3d at 127)); *Rupp*, 401 F. Supp. 3d at 991

28   (citing Defs.' Ex. X); Defs.' Ex. AC (Adam Lankford & James Silver, *Why Have*

*Public Mass Shootings Become More Deadly? Assessing How Perpetrators' Motives and Methods Have Changed Over Time*, Criminology & Pub. Pol'y 1 (2019) at 12 ("Strong empirical evidence shows that weapon choice affects lethality.").  The use of assault weapons in public mass shootings involving four or more fatalities has resulted in an average of 38 fatalities or injuries compared to 10 without assault weapons, *see* Defs.' Ex. A (Allen Decl.) ¶ 31—a 280 percent increase in average casualties.  The disparity is more pronounced when comparing public mass shootings with assault weapons *and LCMs* (an average of 43 fatalities or injuries) with mass shootings not involving assault weapons or LCMs (an average of 8 fatalities or injuries), *id.* ¶ 34—an approximately 440 percent increase. This correlation holds when examining mass shootings involving six or more fatalities (regardless of the location of the shooting).  *See* Defs.' Ex. E (Klarevas Decl.) ¶ 17 (finding a 159 percent increase in casualties in the past ten years).

Such correlative evidence is sufficient to show a reasonable fit under intermediate scrutiny.  *See Rupp*, 401 F. Supp. 3d at 993 ("Even assuming there is not direct *causal* evidence between mass shootings and higher casualty rates and rifles within the scope of the AWCA, California is entitled to make 'reasonable inferences' from the available data that shows a correlation." (quoting *Worman*, 922 F.3d at 40)); *S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (holding that LCM restrictions satisfied intermediate scrutiny where "[t]he record demonstrates that there is a very high correlation between mass shootings and the use of [LCMs]"); *see also Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1002 (9th Cir. 2007) (upholding law under First Amendment based on "studies and reports, reported court decisions, and anecdotal testimony" supporting a "correlation between adult establishments and negative secondary effects" under intermediate scrutiny).

## 2. The AWCA Furthers the State's Important Public Safety Interests

Restricting the possession of assault rifles has had and will continue to have a significant impact on public safety.  Evidence shows that assault weapons restrictions are effective in reducing gun violence, particularly violence associated with mass shootings.  For example, the federal assault weapons ban was effective in reducing the prevalence of the banned assault weapons in gun crime.  Defs.' Ex. Y (Koper 2017) at 7; Defs.' Ex. C (Donohue Decl.) ¶ 119.  The federal ban was also effective in reducing the incidence and lethality of mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶¶ 23-24 & tbl. 3 (finding a 37 percent decline in gun massacres during the federal ban, and a 49 percent decline in gun-massacre fatalities, followed by a 183 percent increase in gun massacres after its expiration, and a 209 percent increase in gun-massacre fatalities).  This trend has been replicated in states that have enacted assault-weapon restrictions, like California. *Id.* ¶ 27; Defs.' Ex. AE (Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013)) at 4.

The AWCA exhibits a reasonable fit to the State's important interests in protecting the public and law enforcement from gun violence.  The evidence shows that the features prohibited under the AWCA increase the lethality of semiautomatic weapons by enhancing accuracy when firing rapidly and, in the case of collapsible stocks and semiautomatic rifles that are less than 30 inches in length, enhance the concealability of the firearm.  Assault weapons enable a shooter to fire more rounds rapidly in a given period with greater accuracy, increasing the likelihood that more individuals will be shot and suffer multiple injuries, making it "far more likely" that the individual will suffer complications and die of those injuries.  Defs.' Ex. B (Colwell Decl.) ¶ 8.

The evidence shows that more people are injured and killed in mass shootings involving assault weapons.  *See* Defs.' Ex. A (Allen Decl.) ¶¶ 26, 33-34 (finding

20

correlation in public mass shootings involving four or more fatalities excluding the shooter); Defs.' Ex. E (Klarevas Decl.) ¶ 17 (finding correlation in gun massacres involving six or more fatalities excluding the shooter); Defs.' Ex. B (Colwell Decl.) ¶¶ 9 (describing personal experiences treating victims of the Columbine and Aurora mass shootings).  The unrebutted correlation strongly supports the reasonableness of the AWCA's fit.  *See Rupp*, 401 F. Supp. 3d at 993 (noting that "'a correlation between the use of assault weapons and the number of victims injured or killed' makes it '[m]ore likely' that there is a causal relationship" and that "California is entitled to make 'reasonable inferences' from the available data that shows a correlation" (citations omitted)).  The evidence also shows that California's assault-weapon restrictions are effective in mitigating the lethality of mass shootings and can even reduce the incidence of mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶¶ 22-23.[3]

Consistent with the unanimous view of the five federal circuit courts that have examined assault-weapon restrictions, the AWCA amply satisfies intermediate scrutiny.

## C.    The AWCA Alternatively Satisfies Strict Scrutiny

While Defendants maintain that intermediate scrutiny is the appropriate standard to apply to the AWCA, the AWCA is constitutional even under strict scrutiny.  The State's public-safety interests in reducing the incidence and lethality of gun violence are compelling.  *See* Defs.' Ex. C (Donohue Decl.) ¶¶ 28-36; Defs.' Ex. E (Klarevas Decl.) ¶¶ 9-11.  The AWCA is narrowly tailored to those interests by restricting certain military-style configurations that enhance the lethality of firearms and their effectiveness in mass shootings and violence against law enforcement personnel.  *See supra* Section II.A & B.  While the AWCA is broader

---

[3] The State is not restricted to examining mass shootings in California to demonstrate a reasonable fit and may "rely on any evidence 'reasonably believed to be relevant'"—such as mass shootings in other jurisdictions—"to substantiate its important interests" under intermediate scrutiny.  *Fyock*, 779 F.3d at 1000 (quotations omitted).

1     than the federal assault weapons ban in defining a firearm as an assault weapon if it

2     has only one qualifying feature, the AWCA is narrower than the federal ban in

3     being limited to centerfire rifles. *See* Defs.' Ex. J (H.R. Rep. No. 103-489) at 2

4     (defining any semiautomatic rifle as an assault weapon if it has the ability to accept

5     a detachable magazine and at least two qualifying features).

6     **III.  ABANDONED ISSUES (LOCAL RULE 16.1(f)(2)(b))**

7          Defendants have not abandoned any issues that were raised by the pleadings.

8     **IV.  OTHER LEGAL ISSUES**

9          Plaintiffs lack standing to challenge California Penal Code sections 30800,

10    30915, 30945, 30950, 31000, and 31005.

11         Plaintiffs James Miller, Patrick Russ, Wendy Hauffen, Neil Rutherford,

12    Adrian Sevilla, Ryan Peterson, and John Phillips (collectively, the "Individual

13    Plaintiffs") and Plaintiffs Gunfighter Tactical, LLC and PWGG, L.P. (together, the

14    "Entity Plaintiffs") do not have standing to challenge Penal Code sections 30800,

15    30915, 30945, 30950, 31000, and 31005). The operative complaint does not allege

16    that any of the Individual Plaintiffs or Entity Plaintiffs have or will suffer any

17    cognizable injury from the enforcement of these provisions.

18         Plaintiffs San Diego County Gun Owners PAC, California Gun Rights

19    Foundation, Second Amendment Foundation, and Firearms Policy Coalition, Inc.

20    (collectively, the "Organizational Plaintiffs") do not have standing to challenge

21    Penal Code sections 30800, 30915, 30945, 30950, 31000, and 31005. The

22    operative complaint does not allege that any members of the Plaintiffs San Diego

23    County Gun Owners PAC or Second Amendment Foundation have been injured by

24    any of those challenged provisions. And the generalized allegations that the other

25    two Organizational Plaintiffs' "members and supporters have been adversely and

26    directly harmed by Defendants' enforcement of the laws, regulations, policies,

27    practices, and customs challenged herein," Pls.' First Am. Compl. ¶¶ 11-12, fail to

28    demonstrate that any of their members have been injured by these particular statutes

1  and thus would have standing to challenge them in their own right.  The

2  Organizational Plaintiffs also fail to allege direct standing to challenge these

3  statutes, as the complaint fails to allege that any of these statutes has caused a

4  "drain on [their] resources from both a diversion of [their] resources and frustration

5  . . . of [their] mission."  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir.

6  2013) (quoting *Fair Hous. Council of San Fernando Valley v. Roomate.com, LLC*,

7  666 F.3d 1216, 1219 (9th Cir. 2012)).

8       If, at the conclusion of trial, the Court determines that the AWCA violates the

9  Second Amendment and that a permanent injunction of some or all of the

10  challenged provisions is warranted, Defendants respectfully request that the Court

11  stay enforcement of any such injunction pending appeal to preserve the status quo

12  that has existed for the past twenty years.  *See Duncan v. Becerra*, No. 17-cv-1017-

13  BEN-JLB, 2019 WL 1510340, at *2-3 (S.D. Cal. Apr. 4, 2019).

14  **CONCLUSION**

15       For these reasons, and those that will be further adduced at trial, the AWCA is

16  constitutional.

17  Dated:  November 18, 2020                    Respectfully submitted,

18                                                              XAVIER BECERRA
                                                                  Attorney General of California
19                                                              MARK R. BECKINGTON
                                                                  Supervising Deputy Attorney General
20                                                              PETER H. CHANG
                                                                  Deputy Attorney General
21

22                                                              *s/ John D. Echeverria*

23                                                              JOHN D. ECHEVERRIA
                                                                  Deputy Attorney General
24                                                              *Attorneys for Defendants Xavier Becerra,*
                                                                  *in his official capacity as Attorney*
25                                                              *General of the State of California, and*
                                                                  *Luis Lopez, in his official capacity as*
26                                                              *Director of the Department of Justice*
                                                                  *Bureau of Firearms*
27

28