John W. Dillon (SBN 296788)
 jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

George M. Lee (SBN 172982)
 gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>          Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>          Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**PLAINTIFFS' PRETRIAL BRIEF: MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>**[CIV. L.R. 16.1(F)(2)]**<br><br>Pretrial Conference: Dec. 16, 2020<br>Time: 10:00 a.m.<br>Courtroom 5A<br>Judge: Hon. Roger T. Benitez<br><br>Trial Date: January 21, 2021 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TOPICAL INDEX

**Page**

PRETRIAL BRIEF AND MEMORANDUM OF
CONTENTIONS OF FACT AND LAW ................................................................. 1

I.      INTRODUCTION ............................................................................................. 1

II.     CONTENTIONS OF FACT ............................................................................. 2

III.    CONTENTIONS OF LAW ............................................................................ 13

        A.      The Prohibitions under Defendants' AWCA and Regulations
                are an Impermissible Categorical Ban under *Heller* .......................... 13

        B.      The AWCA Also Fails Any Form of Heightened Scrutiny ................. 16

                1.  The AWCA Unquestionably Burdens the Right to Keep
                    and Bear Arms and Cannot Survive Strict Scrutiny ...................... 17

                2.  There is No Reasonable Fit Between the Government's
                    Interests and Its Laws, and Thus Defendants' AWCA and
                    Regulations Also Fail Intermediate Scrutiny .................................. 20

        C.      Advancements In Firearm Technology Do Not
                Alter The Analysis. ........................................................................... 25

IV.     STATEMENT OF ABANDONED ISSUES ................................................. 28

V.      CONCLUSION ............................................................................................... 28

# TABLE OF AUTHORITIES

**Page**

*Cases*

*Ashcroft v. Free Speech Coal.*
535 U.S. 234 (2002) ...........................................................22

*Bauer v. Becerra*
858 F.3d 1216, 1221 (9th Cir. 2017) ........................................17

*Brandenburg v. Ohio*
395 U.S. 444 (1969) ..........................................................20

*Buckley v. Valeo*
424 U.S. 1 (1976) ............................................................25

*Caetano v. Massachusetts*
136 S. Ct. 1027 (2016)
(Alito, J., joined by Thomas, J., concurring) .................1, 14, 15, 16, 26, 27

*United States v. Chovan*
735 F.3d 1127 (9th Cir. 2013)...........................................5, 16

*City of Los Angeles v. Alameda Books, Inc.*
535 U.S. 425 (2002) (opinion of Kennedy, J.) ...........................21

*District of Columbia v. Heller*
554 U.S. 570 (2008) .....................................................*passim*

*Duncan v. Becerra*
366 F. Supp. 3d 1131 (S.D. Cal. 2019)...............2, 8, 14, 15, 20, 21, 22, 26

*Duncan v. Becerra*
970 F.3d 1133 (9th Cir. 2020) ...................................14, 19, 25

*Edenfield v. Fane,*
507 U.S. 761 (1993)...............................................21, 24, 25

*Friedman v. City of Highland Park*
784 F.3d 406 (7th Cir. 2015) (Manion, J., dissenting) .....................23

*Heller. Cf. Heller II*
670 F.3d at 1260............................................................6

*Jackson v. City and County of San Francisco*
746 F.3d 953 (9th Cir. 2014) .......................................17, 18, 24

# TABLE OF AUTHORITIES

**Page**

*Cases (continued)*

*Kasler v. Lockyer*
23 Cal. 4th, 472 (2000) ................................................................................. 3

*Mance v. Sessions*
896 F.3d 699 (5th Cir. 2018) pet'n for cert. filed (Nov. 19, 2018) ........................ 18

*McCullen v. Coakley*
134 S. Ct. 2518 (2014) ................................................................................. 23

*McCullen v. Coakley*
573 U.S. 464 (2014) ..................................................................................... 25

*McCutcheon v. FEC*
134 S.Ct. 1434 (2014) ................................................................................... 25

*McDonald v. City of Chi.*
561 U.S. 742 (2010) ..................................................................................... 25

*Moore v. Madigan*
702 F.3d 933 (7th Cir. 2012) ......................................................................... 17

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*
804 F.3d 242 (2d Cir. 2015) .......................................................................... 14

*Ohralik v. Ohio State Bar Ass'n*
436 U.S. 447 (1978) ..................................................................................... 25

*Packingham v. North Carolina*
137 S.Ct. 1730 (2017) ................................................................................... 25

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018) ......................................................................... 18

*People v. Webb*
131 N.E. 93 (Ill. 2019) ................................................................................. 17

*Kyllo v. United States*
533 U.S. 27, 121 S.Ct. 2038 (2001) ................................................................ 26

*R.A.V. v. City of St. Paul*
505 U.S. 377 (1992) ..................................................................................... 24

*Reno v. American Civil Liberties Union*
521 U.S. 844, 117 S.Ct. 2329 (1997) .............................................................. 26

# TABLE OF AUTHORITIES

**Page**

*Cases (continued)*

*Robb v. Hungerbeeler*
370 735 (8th Cir. 2004)...................................................................22

*Rupp v. Becerra*
401 F.Supp.3d 978 (C.D. Cal. 2019) ...................................20, 21

*Silvester v. Becerra*
138 S. Ct. 945 (2018)
(Thomas, J., dissenting from denial of certiorari) ........................18, 19, 24

*Silvester v. Harris*
834 F.3d 816 (9th Cir. 2016) ...................................................19, 24

*Southeast Promotions Ltd. v. Conrad*
420 U.S. 546, 559 (1975)...............................................................22

*Stanley v. Georgia*
394 U.S. 557 (1969).......................................................................22

*Staples v. United States*
511 U.S. 600 (1994).........................................................................6

*Turner Broadcasting System, Inc. v. FCC*
512 U.S. 622 (1994)
(O'Connor, J., concurring in part and dissenting in part) ...........22

*Tyler v. Hillsdale County Sheriff's Dept.*
837 F. 3d 678 (6th Cir. 2016) .......................................................24

*United States v. Chester*
628 F.3d 673 (4th Cir. 2010) ...................................................17, 24

*United States v. Chovan*
735 F.3d 1127 (9th Cir. 2013) .................................................16, 17

*Vincenty v. Bloomberg*
476 F.3d 74 (2d Cir. 2007)............................................................22

*Ward v. Rock Against Racism,*
491 U. S. 781 (1989), 109 S. Ct. 2746, 105 L. Ed. 2d 661......................23

*Wrenn v. District of Columbia*
864 F.3d 650 (D.C. Cir. 2017) .....................................................17

# TABLE OF AUTHORITIES

Page

**California Penal Code**

§ 30515 .................................................................................................... 3, 25

§ 30515(a) ................................................................................................... 3

§ 30515(a)(1) .............................................................................................. 4

§ 30515(a)(2) .............................................................................................. 4

§ 30515(a)(3) .............................................................................................. 4

§ 30515(a)(4) .............................................................................................. 4

§ 30515(a)(5) .............................................................................................. 4

§ 30515(a)(6) .............................................................................................. 4

§ 30515(a)(7) .............................................................................................. 4

§ 30515(a)(8) .............................................................................................. 4

§ 30515(a)(9) .............................................................................................. 4

§ 30515(a)(10) ............................................................................................ 5

§ 30515(a)(11) ............................................................................................ 5

§ 30515(b) ................................................................................................... 4

§ 30600(a) ................................................................................................... 5

§ 30605(a) ................................................................................................... 5

§ 30925 ........................................................................................................ 28

§ 32310 ........................................................................................................ 19

**Other Authorities**

S.D. Cal. Local Rule 16.1(f)(2) ................................................................. 1

10 USC § 246(b) ........................................................................................ 27

Calif. Mil. & Vet. Code §§ 120 ................................................................ 27

California's Roberti-Roos Assault Weapons Control Act of 1989 ............ 1

Assembly Bill 357, 1989-1990 Reg. Sess. ............................................... 3

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Other Authorities (cont.)**

4

Assembly Bill 1135, 2015-2016 Reg. Sess. ...............................................3

5

Assembly Bill 2718, 2005-2006 Reg. Sess. ..............................................3

6

Senate Bill 23, 1999-2000 Reg. Sess. ........................................................3

7

Senate Bill 118, 2019-2020 Reg. Sess. ......................................................3

8

Senate Bill 880 ............................................................................................3

9

Public Safety and Recreational Firearms Use Protection Act
(the "Federal Assault Weapons Ban") (103rd Congress (1993-1994))......6

10

Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322)...........6

11

Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to
12

Bear Arms, 226 (2008) (citing Elliot, 3 Debates in the Several State
Conventions on the Adoption of the Federal Constitution 379 (1836))....................13

13

Carl Ingram, "Assault Gun Ban Wins Final Vote: Deukmejian's Promised
14

Approval Would Make It 1st Such U.S. Law," L.A. TIMES, May 19, 1989 ............3

15

NRA, "New Industry Statistics Underscore Popularity of "America's Rifle" –
16

16,069,000!?," ............................................................................................28

17

18

19

20

21

22

23

24

25

26

27

28

## PRETRIAL BRIEF AND MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to S.D. Cal. Local Rule 16.1(f)(2), Plaintiffs James Miller, et al. ("Plaintiffs") hereby submit this Pretrial Brief and Memorandum of Contentions of Fact and Law in advance of the Pretrial Conference presently scheduled for December 16, 2020 at 10:00 a.m. in Courtroom 5, Hon. Roger T. Benitez, presiding.

## I. INTRODUCTION

This case presents a facial and as-applied challenge to California's Roberti-Roos Assault Weapons Control Act of 1989 ("AWCA"). Hardly a "longstanding" regulation, the AWCA prohibits law-abiding individuals from acquiring, possessing, and using firearms in common use for lawful purposes throughout the vast majority of the United States. Indeed, the State of California is an outlier — much like the Commonwealth of Massachusetts as to the stun guns at issue in *Caetano* — one of only a small handful states to ban many of the most popular semiautomatic firearms in the nation because they possess one or more common characteristics, such as pistol grips and threaded barrels. The semiautomatic firearms and characteristics banned under the State's AWCA are not both dangerous *and* unusual. They are ideally suited to, and used for, lawful purposes including self-defense, competition, sport, hunting, and proficiency training. And they are among the most common small arms in the United States—categorically, jurisdictionally, and numerically—which makes them additionally suited for service in the militia.

Defendants' arguments and rationales, similar to those the Supreme Court declared to be "bordering on the frivolous" in *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), cannot overcome the fact that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," such as the arms at issue in this case. And quite unlike the State's relatively young ban on "assault weapons" that goes back just under three decades in total, the category of semiautomatic arms and characteristics

1  the AWCA bans have a longstanding history of adoption and use in America.

2  The arms and conduct proscribed by the AWCA are categorically protected

3  under the Second and Fourteenth Amendments and the Supreme Court's precedents.

4  And while the State's policy preference may be to completely deny to law-abiding

5  citizens, on pain of serious criminal and civil penalties, arms that are more accurate,

6  reliable, and controllable than others— precisely the reasons why such arms are so

7  popular and common across the United States—"the enshrinement of constitutional

8  rights necessarily takes certain policy choices off the table." *Id.* at 636. "The very

9  enumeration of the right takes out of the hands of government—even the Third

10 Branch of Government—the power to decide on a case-by-case basis whether the right

11 is *really worth* insisting upon." *Id.* at 634 (emphasis original).

12 "In *Heller*, the U.S. Supreme Court provided a simple Second Amendment test

13 in crystal clear language. It is a test that anyone can understand. The right to keep and

14 bear arms is a right enjoyed by law-abiding citizens to have arms that are not unusual

15 in common use for lawful purposes like self-defense. It is a hardware test. Is the

16 firearm hardware commonly owned? Is the hardware commonly owned by law-

17 abiding citizens? Is the hardware owned by those citizens for lawful purposes? If the

18 answers are 'yes,' the test is over. The hardware is protected." *Duncan v. Becerra*,

19 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019) (internal citations and quotations

20 omitted). As in *Duncan*, the hardware the State bans under the AWCA "is protected,"

21 period.

22 Moreover, while Plaintiffs maintain that *Heller* expressly considered and

23 rejected free flowing "interest-balancing" approaches, 554 U.S. at 634, the AWCA

24 also fails strict and intermediate scrutiny, and indeed, even the common-sense test.

25 California's ban on common semiautomatic firearms and characteristics, related

26 lawful transactions and conduct with those firearms, and Defendants' enforcement of

27 same, violates the Constitution.

28

## II.   CONTENTIONS OF FACT

California was the first state to ban common semiautomatic firearms as so-called "assault weapons" when its AWCA was first enacted in 1989. (Assembly Bill 357, 1989-1990 Reg. Sess.). [1] The AWCA was amended in Senate Bill 263 (1991-1992 Reg. Sess.) to add to the list of banned "assault weapons." In 2000, the California Supreme Court clarified the requirements for adding to the State's list of banned firearms, *Kasler v. Lockyer*, 23 Cal. 4th, 472 (2000), following which the Attorney General and his DOJ added more arms to the list. During this same period, in 1999, the Legislature passed Senate Bill 23 (1999-2000 Reg. Sess.), which, inter alia, banned the sale of so-called "large capacity magazines" and enacted the State's broad scheme to ban an entire category of (semiautomatic) arms under the AWCA based upon a number of type-and-characteristics definitions composed of, i.e., rifle, shotgun, pistol, pistol grip, detachable magazine, threaded barrel, etc. In 2006, the Legislature revoked the Attorney General and DOJ's authority to add "assault weapons" to the banned list. (Assembly Bill 2718, 2005-2006 Reg. Sess.) In 2016, the Legislature further expanded the categorical type-and-characteristics definitions of "assault weapons" banned under the AWCA. (Senate Bill 880 and Assembly Bill 1135 (2015-2016 Reg. Sess.)). And in 2020, the Legislature amended Penal Code § 30515  to extend the AWCA to prohibit other categorically common, constitutionally protected semiautomatic long guns that are, under California's definitions, "not a rifle, pistol, or shotgun"—based on the same characteristics.  (Senate Bill 118 (2019-2020 Reg. Sess.)).

Thus, today, California's AWCA bans common arms based on the following categorical type-and-characteristics definitions found in Penal Code § 30515(a):

---

[1] Carl Ingram, "Assault Gun Ban Wins Final Vote : Deukmejian's Promised Approval Would Make It 1st Such U.S. Law," L.A. TIMES, May 19, 1989, online at https://www.latimes.com/archives/la-xpm-1989-05-19-mn-112-story.html.

- §30515(a)(1): A semiautomatic, centerfire rifle that does not have a fixed magazine[2] but has any one of the following: A pistol grip that protrudes conspicuously beneath the action of the weapon; a thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; or, a forward pistol grip.

- §30515(a)(2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

- §30515(a)(3): A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

- §30515(a)(4): A semiautomatic pistol that does not have a fixed magazine but has any one of the following: a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer; a second handgrip; a shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel; or, the capacity to accept a detachable magazine at some location outside of the pistol grip.

- §30515(a)(5): A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

- §30515(a)(6): A semiautomatic shotgun that has both of the following: a folding or telescoping stock, and a pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

- §30515(a)(7): A semiautomatic shotgun that does not have a fixed magazine.

- §30515(a)(8): Any shotgun with a revolving cylinder.

- §30515(a)(9): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that does not have a fixed magazine, but that has any one of the following: a pistol grip that protrudes conspicuously beneath the action of the

---

[2] Penal Code § 30515(b) defines "fixed magazine" to mean "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action." Such a requirement for disassembly, of course, renders the arms "inoperable," *Heller*, 554 U.S. at 628, which makes it impossible for citizens to use them for the "core" lawful purpose "of *immediate* self-defense." *Id*. at 635 (emphasis added).

weapon; a thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; a forward pistol grip; a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer; a second handgrip; a shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel; the capacity to accept a detachable magazine at some location outside of the pistol grip.

- §30515(a)(10): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that has a fixed magazine with the capacity to accept more than 10 rounds.

- §30515(a)(11): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that has an overall length of less than 30 inches.

Under the AWCA and Defendants' enforcement thereof, law-abiding citizens are severely punished should they manufacture or cause to be manufactured, distribute, transport, import into the state for sale, keep for sale, offer or expose for sale, give, or lend any "assault weapon." Penal Code § 30600(a). The AWCA also makes it a crime to merely *possess* any firearm considered an "assault weapon," § 30605(a), even by a law-abiding person for lawful purposes like self-defense in the home.

In contrast to the strong historical support for the constitutional protection of the arms at issue here, there is no historical support for laws prohibiting firearms with the characteristics prohibited under section 30515(a). Semiautomatic rifles, pistols, shotguns, and detachable magazines have been in existence since the late 1800s and early 1900s. As early as 1779, firearms had ammunition capacities greater than 10 rounds. Hlebinsky Dec. (**Exhibit 002**) ¶¶ 11-13, Exs. 5-18. During World War I, detachable magazines with capacities of up to 32 rounds were introduced and available in the commercial market. Kapelsohn Dec. (**Exhibit 001**), ¶ 18. Other characteristics such as the ergonomic pistol-style grip and thumbhole stock, collapsible stock, flash suppressor, and forward vertical grips have been commercially available and offered on semiautomatic firearms for up to, and in some instances, over

1 a century. Hlebinsky Dec. (**Exhibit 002**), ¶¶ 10-28, Exs. 5-35.

2   Firearms capable of holding and firing more than 10 rounds without reloading

3 arrived well before 1900, and the first semiautomatic rifle was produced by

4 Mannlicher in 1885. Hlebinsky Dec. (**Exhibit 002**), ¶¶ 11-15, Exs. 5-21. Early

5 semiautomatic pistols, rifles, and shotguns were developed in the first years of the

6 1900s and were configured with many of California's banned characteristics, such as

7 detachable and large capacity magazines, pistol grips, and adjustable stocks. *Id.*

8   The only federal regulation on semiautomatic firearms having characteristics at

9 issue here did not occur until 1994 in the Public Safety and Recreational Firearms Use

10 Protection Act (the "Federal Assault Weapons Ban") (103rd Congress (1993-1994)), a

11 subsection of the Violent Crime Control and Law Enforcement Act of 1994

12 (Pub. L. 103-322), which was allowed to sunset 10 years later due to its lack of effect

13 on crime. Lott Dec. (**Exhibit 010**), ¶¶ 8.

14   The few other state bans on "assault weapons" have an even shorter "historical"

15 pedigree. Mocsary Dec. (**Exhibit 003**), ¶¶ 23-49, Exs. 2-9. Such late-adopted

16 restrictions by a small handful of jurisdictions do not remotely qualify as the

17 historically presumptive limits mentioned in *Heller*. Cf. *Heller II*, 670 F.3d at 1260

18 ("We are not aware of evidence that prohibitions on either semi-automatic rifles or

19 large-capacity magazines are longstanding and thereby deserving of a presumption of

20 validity"); *Staples v. United States*, 511 U.S. 600, 603 n.1, 612 (1994) (discussing the

21 AR-15 and stating that weapons that fire "only one shot with each pull of the trigger"

22 "traditionally have been widely accepted as lawful possessions"). Mocsary Dec.

23 (**Exhibit 003**), ¶¶ 10-22.

24   Forty-four (44) states do not ban semi-automatic rifles that are unlawful to

25 purchase, possess, and use under the AWCA. Mocsary Dec. (**Exhibit 003**), ¶ 44

26 Forty-one (41) states do not ban semiautomatic firearms with or without

27 characteristics like pistol grips, collapsible stocks, threaded barrels, and flash

28 suppressors, whether they are semiautomatic rifles, pistols, or shotguns. Mocsary Dec.

(**Exhibit 003**), ¶ 44. These firearms have thus been sold to and owned by private citizens for over a century throughout the United States. They continue to be sold today most places without additional restrictions. Indeed, semiautomatic firearms with such common characteristics are among the most popular firearms in the United States. Curcuruto Dec. (**Exhibit 004**), ¶¶ 8-12 (discussing prevalence of relevant semiautomatic rifles and the massive numbers of common semiautomatic shotguns and pistols with such characteristics).

There is no genuine question that the semiautomatic firearms banned by California are common, not prohibited in the vast majority of States, and have been used for close to a century by *millions* of responsible, law-abiding people for various lawful purposes such as self-defense, hunting, recreation, competition, and collecting. Curcuruto Dec. (**Exhibit 004**), ¶¶ 7-14, Exs. 1-8. The only rarity regarding such firearms is the very few States that seek to restrict them by recharacterizing them as "assault weapons." Kapelsohn Dec. (**Exhibit 001**), ¶¶ 17-26, Exs. 1-10.

Today, semiautomatic firearms with one or more common characteristics are among the most popular firearms in the United States. Curcuruto Dec. (**Exhibit 004**), ¶¶ 8-12 (prevalence of relevant semiautomatic rifles and numbers of common semiautomatic shotguns and pistols with such characteristics). Ownership of semiautomatic rifles configured in a manner banned by California has previously been conservatively estimated at least 5 million strong. Curcuruto Dec. (**Exhibit 004**), ¶¶ 7-13, Exs. 1-8. Indeed, in 2016 alone, 2.2 million such rifles were either manufactured in or imported into the U.S. for sale. Id. at ¶ 8, Ex. 3. As of 2019, 96.5% of firearm retailers sell firearms that would be prohibited by the AWCA. Id. at ¶ 10, Ex. 5. However, most recently, reports show there are 17.7 million privately owned "modern sporting rifles" in the country alone—54% of the firearms manufactured and imported in the U.S. Curcuruto Dec. (**Exhibit 004**), ¶ 15, Ex. 8. One of the most common firearms meeting California's definition of "assault weapon" is the AR-15 platform firearm, which has been sold to the public since 1950 with standard characteristics like

detachable magazines that hold more than 10 rounds, pistol grips, collapsible or otherwise adjustable stocks, flash suppressors, and/or forward vertical grips. Kapelsohn Dec. (**Exhibit 001**), ¶ 18; Curcuruto Dec. (**Exhibit 004**), ¶ 8. Such firearms are lawful under federal law and in most States. As this Court previously recognized:

> Over the last three decades, one of the most popular civilian rifles in America is the AR-15 style rifle. Manufactured with various characteristics by numerous companies, it is estimated that more than five million have been bought since the 1980s. These rifles are typically sold with 30-round magazines. These commonly owned guns with commonly-sized magazines are protected by the Second Amendment and *Heller*'s straightforward test for responsible, law-abiding citizens to use for target practice, hunting, and defense.

*Duncan*, 366 F.Supp.3d at 1145.

Defendants' own registration data support Plaintiffs' claim: Under the 1989 AWCA, 56,626 "assault weapons" were registered in California. Subsequent additions led to the addition of another 91,211 assault weapons registered in California. Davis Dec. (**Exhibit 008**), ¶¶ 6-7, Exs. 1 and 2. Moreover, there was another 5,281 registered weapons by peace officers that were allowed or required to register their personal firearms as "assault weapons." Thus, even in 2009—nearly a decade before the enactment of SB 880 and AB 1135—there were already about 153,118 *registered* assault weapons in California. After SB 880 and AB 1135 went into effect in 2017, another broad swath of firearms needed to be registered as "assault weapons" in California. There is no way to know what the voluntary compliance rates for these registration periods were, but we know with certainly it was not 100% since the state not only discouraged, but prevented people from doing so. *See* Combs Dec. (**Exhibit 023**), ¶ 18. In response to a 2018 PRA request from Brandon Combs, president of Plaintiff Firearms Policy Coalition, California Deputy Attorney General Robert D. Wilson (for Defendant Becerra) stated that from July 31, 2017 to June 30, 2018 (the end of the registration period), 68,848 applications to "assault

weapons" were submitted for registration in the DOJ's California Firearms Application Reporting System (CFARS). See Combs Dec. (**Exhibit 023**), ¶ 15. Of those 68,848 assault weapons, 6,365 are pistols, 1,365 are shotguns, and 61,118 are rifles, respectively. Combs Dec. (**Exhibit 023**), ¶ 17. Accordingly, it is reasonable to infer that approximately 219,083 *registered* semiautomatic assault weapons—pistols, shotguns, and rifles—exist in California. And these are merely the voluntary registration figures. The fact is, the State expected that many more assault weapons were legally possessed in California prior to 2018. In connection with a 2017 budget proposal to the Legislature to accommodate online registrations, the Bureau of Firearms had estimated that "1-1.5 million assault weapons will be registered by approximately 250,000 different owners" within the state. (**Exhibit. 024**.) That alone is clear evidence of the commonality of these firearms in the State, let alone nation-wide.

To be sure, Defendants' AWCA and regulations prohibit common configurations of the AR-15 rifle, a widely and very commonly held-firearm, with standardized and interchangeable component parts. And the AR-15 is, well-suited for militia service. (Youngman Decl. (**Exhibit 009**), ¶ 14; Youngman testimony, 10/19/20 Tr. at 85:16-23 ("It would be the ideal weapon for the militia."). Indeed, the rifle's use of standardized ("STANAG") magazines, and common ammunition, its reliability, low cost, and light weight, serve the same purposes sought to be achieved by the drafters of our Founding Era militia acts. Furthermore, the modularity and standardization of the AR-15, along with its ubiquity, commonality, and widespread ownership in common chamberings as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it an ideal weapon for militia service. (Youngman Decl. (**Exhibit 009**), ¶¶ 15-19.)

At the first evidentiary hearing on Plaintiffs' motion for preliminary injunction, this Court queried Plaintiffs as to information pertaining to pistols and shotguns classified as assault weapons under California law. (10/22/20 Tr. at 37:14 – 38:10).

Attorney and researcher Joseph Ostini surveyed 73 different firearm manufacturers in the United States and found that of the 61 pistol manufacturers, there are at least 356 different models of firearms offered for sale defined as an "assault weapon" pistol under section 30515. Ostini Dec. (**Exhibit 005**), ¶¶ 4-12.[3] Some manufacturers, such as CMMG, offer 38 different models of California banned "assault pistols." Some of these manufacturers, such as Ruger, Sig Sauer, Springfield Armory, and Beretta, — each of which offer several models of pistols considered by California to be "assault weapons" — are widely held as some of the largest firearm manufacturers in the United States. Ostini Dec. (**Exhibit 005**), Ex. 1.

Moreover, Ruger, and many other manufacturers, sell threaded pistol barrels for their handguns. Ostini Dec. (**Exhibit 005**), ¶13, Ex. 3. Merely installing one of these threaded barrels on a common handgun like a Glock 17, would change this typical, common pistol into an illegal "assault weapon" under the AWCA. In fact, there is an entire industry of pistol-barrel manufacturers that produce and sell threaded handgun barrels for the largest manufacturers. Ostini Dec. (**Exhibit 005**), ¶13, Exs. 4-15. Threaded firearm barrels are not only commonly used for lawful purposes, including self-defense and sport, they have been available and used on semiautomatic firearms for many decades. Hlebinsky Dec. (**Exhibit 002**), ¶ 24. For example, a popular retailer's offerings show that they offer threaded barrels for 14 different models of Glock pistols of the 29 base models offered by Glock, approximately 48% of the total models offered by Glock. Ostini Dec. (**Exhibit 005**) ¶13, Ex. 12. Most of the remaining models of Glock handguns are capable of accepting threaded barrels offered by other barrel manufacturers. Ostini Dec. (**Exhibit 005**) ¶13, Ex. 13. Threaded barrels are regularly made for the 1911 platform handgun, which is over a

---

[3]This search was limited in scope to commercially available new firearms and did not include the millions of firearms that exist in, for example, used or collector markets.

century old. Ostini Dec. (**Exhibit 005**) ⁋13, Exs. 14-15. California's AWCA ban encompasses common, every-day semiautomatic handguns, many of which identify as good firearms for first time shooters, such as a .22 rimfire pistol. Ostini Dec. (**Exhibit 005**) ⁋13, Ex. 16.

Firearm manufacturer sales data also supports Plaintiffs' conclusion regarding the commonality of prohibited pistols. According to Nathan Lewis Siegal, Ruger's Associate General Counsel for ATF Compliance, "Ruger's records reveal that the Company has manufactured and domestically distributed semiautomatic pistol models that accept detachable magazines and have at least one feature listed" under Penal Code section 30515(a)(4) "since at least 2011." Siegal Dec. (**Exhibit 006**), ¶ 4. Additionally, after reviewing Ruger's records regarding the domestic manufacture, sale, and distribution of semiautomatic pistol models, between January 1, 2017 and October 26, 2020, *Ruger domestically distributed for the civilian market at least 283,579 semiautomatic pistols that accept a detachable magazine and have at least one characteristic generally banned by section 30515. Id.*, ¶ 6.

As to semiautomatic shotguns, they are likewise in common use for lawful purposes with or without characteristics such as pistol grips and collapsible/folding stocks. Often these types of firearms are referred to as "tactical shotguns." For example, under the "tactical shotgun" section of the website of Atlantic Firearms (a licensed firearms dealer), it states that it "offers a wide selection Tactical Shotguns for Sporting, Home Defense and Hunting applications. We offer these in semi auto, pump action magazine fed and Bull pup configurations. Popular Shotguns choices are the AK47/Kalashnikov action shotguns like the Lynx 12 or Kalashnikov USA KS-12 Shotgun." Ostini Dec. (**Exhibit 005**) ⁋13, Ex. 17. Of the 96 different "tactical shotgun" models offered on Atlantic Firearms' website, 56 of those models are classified as "assault weapon" shotguns under Penal Code section 30515. Thus, 58 percent of the models offered for sale by Atlantic Firearms—legal in the majority of the United States—are illegal "assault weapon" shotguns in California. *Id*.

Kalashnikov USA, a highly popular manufacturer, sells 4 different shotgun models—and all four would be "assault" shotguns in California. See also Brown Dec. (**Exhibit 007**), ¶¶ 1-24.

Unquestionably, the characteristics that trigger prohibition in fact improve the safe and controlled use of firearms so equipped. Kapelsohn Dec. (**Exhibit 001**), ¶ 27-37, Exs. 11-18. Thus, they improve public safety relating to the lawful use of such firearms. As for unlawful use, there is no indication that criminals are particularly concerned about avoiding collateral or unintended damage through greater accuracy or control and, in any event, there is no evidence criminals would be any less destructive using California-compliant firearms without banned characteristics. *Id*. The prohibited characteristics in the AWCA do not change the fundamental semiautomatic function of the firearms, nor do they affect the ballistics of their projectiles.

The pistol grip assists in the safe control of a firearm. It does not significantly increase the speed or ability of reloading compared to firearms without one. See video comparing a common AR-15 platform semiautomatic firearm in a common configuration lawful in the majority of states with one in a California-compliant configuration without banned characteristics, online at http://bit.ly/miller-kraut-video; see also Kraut Dec. (**Exhibit 011**), ¶¶ 4-14; Kapelsohn Dec. (**Exhibit 001**), ¶ 28, Ex. 12. More to the point, semiautomatic firearms with the regulated characteristics are not more deadly in the hands of a criminal than a firearm without those characteristics. *Id*., Exs. 17, 18. Indeed, many notable crimes have been committed by criminals with semiautomatic firearms that did not have the regulated characteristics. Kapelsohn Dec. (**Exhibit 001**), ¶ 34. In fact, some of the worst mass shootings involved only handguns.

All credible research on the effectiveness of "assault weapon" bans in reducing gun violence and/or mass shootings shows no demonstrable correlation between the two. Lott Dec., (**Exhibit 010**), ¶¶ 6-65, Exs. 2-19. The experiment of these bans has

1  been tried, and they have failed to demonstrate that they directly or materially advance

2  any government interest relating to gun violence. At the federal level, the 1994

3  Federal Assault Weapons Ban was allowed to expire due to its lack of effect. *Id*.

4  California has had an ever-expanding ban on "assault weapons" since 1989, with no

5  indication it has done anything to alleviate the problems cited by the State. Lott Dec.

6  (**Exhibit 010**) ¶ 6-17, Exs. 2-5.

7      It was clearly understood, from the early founding of the Republic, that the

8  unorganized militia consisted of the people themselves. *See, Heller*, 554 U.S. at 595-

9  596, 128 S. Ct. at 1799 (that "the Militia comprised of all males physically capable of

10  acting in concert for the common defense[]" comports with founding-era sources)

11  (citing *Miller*, 307 U.S. at 179). In *Heller*, the majority rejected a narrower view of the

12  militia as having been limited to state and congressionally-regulated military forces.

13  554 U.S. at 596, 128 S. Ct. at 2799-2800. From the outset, "[t]he republican militia

14  was the armed populace at large, not a select militia or standing army." Stephen P.

15  Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*,

16  226 (2008) (citing Elliot, 3 *Debates in the Several State Conventions on the Adoption*

17  *of the Federal Constitution* 379 (1836)).

18  **III.  CONTENTS OF LAW**

19      **A.  THE PROHIBITIONS UNDER DEFENDANTS' AWCA AND REGULATIONS**

20          **ARE AN IMPERMISSIBLE CATEGORICAL BAN UNDER *HELLER*.**

21      "The Second Amendment extends, prima facie, to *all* instruments that constitute

22  bearable arms." *Heller*, 554 U.S. at 582 (emphasis added). As the Supreme Court

23  explained in *Heller*, the right to keep and bear arms is a right enjoyed by all law-

24  abiding citizens to keep and bear arms that are "in common use" "for lawful purposes

25  like self-defense." *Heller*, 554 U.S. at 624. And as this Court has stated, "It is a

26  hardware test. Is the firearm hardware commonly owned? Is the hardware commonly

27  owned by law-abiding citizens? Is the hardware owned by those citizens for lawful

28  purposes? If the answers are "yes," the test is over. The hardware is protected."

1  *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133
2  (9th Cir. 2020).

3      "In other words, it identifies a presumption in favor of Second Amendment
4  protection, which the State bears the initial burden of rebutting." *New York State Rifle*
5  *& Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) ("*NYSRPA I*").
6  Thus, in *NYSRPA I*, the Second Circuit struck a ban on a pump-action rifle because
7  the state focused exclusively on semiautomatic weapons and "the presumption that the
8  Amendment applies remain[ed] unrebutted." *Id.*

9      Furthermore, once it is determined that the Second Amendment applies to a
10 particular type of arm, it is unconstitutional for the government to ban it. This again
11 flows directly from *Heller*, which categorically struck down the District of
12 Columbia's handgun ban. Indeed, this is precisely how the Supreme Court described
13 *Heller*'s holding in *McDonald*: because "we found that [the Second Amendment] right
14 applies to handguns," the Court explained, "we concluded, citizens must be permitted
15 to use handguns for the core lawful purposes of self-defense." *McDonald v. City of*
16 *Chi.,* 561 U.S. 742, 767 (2010) (cleaned up).

17     Here, the arms that California bans are presumptively protected under *Heller*'s
18 analysis, and the State cannot rebut that presumption. Citizens therefore must be
19 permitted to possess and use those arms for the core lawful purpose of self-defense,
20 and California's ban of those arms is unconstitutional.

21     In *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1032–33 (2016), Justice Alito's
22 concurring opinion stated that "[t]he more relevant statistic is that "[h]undreds of
23 thousands of Tasers and stun guns have been sold to private citizens," who it appears
24 may lawfully possess them in 45 States. […] While less popular than handguns, stun
25 guns are widely owned and accepted as a legitimate means of self-defense across the
26 country. Massachusetts' categorical ban of such weapons therefore violates the
27 Second Amendment." 136 S.Ct. at 1032–33.

28     In the present case, Plaintiffs will show that firearms banned under the

1  challenged statutes and regulations are in common use, for lawful purposes, and are
2  thus protected under *Heller*.

3      The Supreme Court's test for commonality is a nationwide inquiry. Indeed, the
4  Second Amendment does not mean different things in different parts of the country.
5  The Supreme Court's *Heller*'s analysis asks simply whether the arms are "*both*
6  dangerous *and* unusual," *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016)
7  (Alito, J., joined by Thomas, J., concurring) (italics original), and if they are not *both*,
8  it determines if the category of arms are in common use for lawful purposes.
9  *Duncan v. Becerra*, 366 F. Supp.3d at 1142. The text of the Second Amendment, as it
10  is informed by history and tradition, all point in the same direction because "the
11  pertinent Second Amendment inquiry is whether [the banned weapons] are commonly
12  possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, *supra*, at 1032
13  (italics original).

14      The arms banned as "assault weapons" under Defendants' AWCA and
15  regulations are <u>not</u> *both* dangerous *and* unusual, as the Supreme Court defined in
16  *Heller*. To the contrary, they are common in all respects: 1) They are common
17  functionally, as they are all semiautomatic in their operation; 2) they are common
18  characteristically, as they are all commercially popular types of arms with various
19  common characteristics like pistol grips and the like; and 3) they are common
20  jurisdictionally, available in the vast majority of states. As further proof, they are
21  common numerically, in that they are owned by citizens by the hundreds of thousands
22  or more. All of the semiautomatic firearms California bans in Penal Code section
23  30515 meet the *Heller* test and are constitutionally protected.

24      While numerical data can be helpful in determining if a particular weapon is
25  commonly used for lawful purposes, constitutionally protected status of arms cannot
26  turn on fact-bound sales numbers of particular makes, models, or even specific
27  configurations. Rather, the question is a categorical analysis of type and function, set
28  against a backdrop of permissibility and availability throughout the United States.

"While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., concurring). So too are semiautomatic firearms in various configurations of more and less characteristics, as California bans. These firearms are commonly used by responsible, law-abiding people for various lawful purposes such as self-defense, hunting, recreation, competition, and collecting. Curcuruto Dec. (**Exhibit 004**) ¶¶ 7-14, Exs. 1-8.

A future Glock "Gen 6" model 17 semiautomatic handgun, though when first released will not be numerically common based on *sales* (because it hasn't been sold yet), it will nonetheless be constitutionally protected because it is categorically common—that is to say, it will be a semiautomatic handgun, which is a categorically common, and protected, bearable arm. The same goes for firearms that California bans based on one or more characteristics, and their evolutionary and technological successors. Just like the argument "that only those arms in existence in the 18th century are protected by the Second Amendment [is] not merely wrong, but bordering on the frivolous," the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms…" *Id.* at 1030 (internal quotations omitted). The fact that the AWCA may act to ban thousands of discrete configurations of common semiautomatic pistols, shotguns, and rifles held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller*. *See* Mocsary Dec. (**Exhibit 003**), ¶ 47-52.

## B.   THE AWCA ALSO FAILS ANY FORM OF HEIGHTENED SCRUTINY.

Beyond the categorical, common-use analysis as proffered, the State's AWCA scheme also fails the Ninth Circuit's two-part test applying tiered scrutiny as well. If an interest-balancing test is required, the challenged provisions still fail any level of heightened scrutiny.

The Ninth Circuit applies a two-part test to Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). This "inquiry '(1) asks

whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'" *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014).The level of scrutiny to be applied depends on the closeness to the core and "the severity of the law's burden," on the Second Amendment. *Chovan*, 735 F.3d at 1138.

We note that the fact that the Ninth Circuit has applied the two-part test in Second Amendment challenges does not mean that the Court must apply it here. Several courts that otherwise apply a two-step analysis similar to the Ninth Circuit have nevertheless categorically struck down laws that broadly prohibit conduct protected by the Second Amendment. *See, e.g.*, *Wrenn v. District of Columbia*, 864 F.3d 650, 666–67 (D.C. Cir. 2017) (striking down D.C.'s "may-issue" carry law categorically); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (same with Illinois's public carry ban); *People v. Webb*, 131 N.E. 93, 98 (Ill. 2019) (same with Illinois's stun gun ban). To the extent this Court disagrees, Plaintiffs' reserve their right to contend on appeal that the Ninth Circuit's adoption of a two-part, interest-balancing test should be overturned.

### 1. The AWCA Unquestionably Burdens the Right to Keep and Bear Arms and Cannot Survive Strict Scrutiny.

Semiautomatic firearms with common characteristics proscribed by the AWCA are in common use for lawful purposes and thus protected under the fundamental, individual right to keep and bear arms. The State's ban thus "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for lawful purposes, including for possession in the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Furthermore, the state bans such firearms for reasons that conflict with the very essence of the Second Amendment, essentially claiming that more accurate, effective, and safe firearms can be banned because they are too good at the central purpose of firearms—projecting

force when needed—and thus benefit those who would misuse such firearms just as well as those who use them lawfully.

In attempting to rebalance the Second Amendment's inherent conclusion regarding the benefits and risks of firearm possession, the AWCA and Defendants' policies, practices, and customs impose a substantial burden on Second Amendment rights, and thus deserves strict scrutiny "to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari); *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second Amendment right and severely burdens that right'") (citation omitted); *Mance v. Sessions*, 896 F.3d 699, 705-06 (5th Cir. 2018), pet'n for cert. denied (applying strict scrutiny in Second Amendment cases).

The Defendants' AWCA and regulations strike at the "core" of the Second Amendment—and to be sure, the core of the Second Amendment is defined by its text, namely, the "right to keep and bear arms" which "shall not be infringed"— because its effect is to prohibit an entire category of semiautomatic firearms— common pistols, shotguns, and rifles—that are overwhelmingly kept and used for lawful purposes throughout the United States. Indeed, the State prohibits these categories of firearms not merely *in spite of* their being useful in self-defense, but apparently, *because* firearms with those characteristics are effective in the first place. The State's apparent rationale that "we don't want people to be able to shoot accurately, rapidly," is not and cannot be a legitimate state interest at all, let alone a *compelling* one. A blanket prohibition on common firearms that are "too accurate," or do their jobs "too effectively" by allowing citizens to defend their lives "too well," severely infringes upon Second Amendment rights and cannot survive strict scrutiny.

Taking a cue from *Heller*, the Ninth Circuit has repeatedly held that Second Amendment jurisprudence should be modeled on First Amendment jurisprudence. *See*, e.g., *Jackson*, 746 F.3d at 961 (9th Cir. 2014) (heightened scrutiny in Second

Amendment cases is "guided by First Amendment principles"); *Silvester v. Harris*, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the test for intermediate scrutiny from First Amendment cases"), cert. denied, *Silvester v. Becerra*, 138 S.Ct. 945 (2018). While the Circuit Court's *application* of that legal rule sometimes appears closer to rational basis scrutiny than actual heightened scrutiny, its precedents foreclose Defendants' approach to analyzing the State's ban here. Especially given the testimony at the evidentiary hearing, any claimed governmental interest in reducing the quality and effectiveness of firearms is on its face illegitimate and contrary to the balance already struck by the framers and ratifiers of the Second Amendment. Such a purported interest requires the same categorical or strict scrutiny analysis that content- or viewpoint-based restrictions are given under the First Amendment. In *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), the Ninth Circuit, in affirming this Court's judgment, held that, because the large-capacity magazine ban, Penal Code § 32310, "substantially burdens core Second Amendment rights," it was subject to review under strict scrutiny. 970 F.3d at 1152.

In the Second Amendment context, the right to keep and bear arms is recognized and protected precisely because *effective* arms, including those the State prohibits under its "assault weapons" ban, allow people to project lawful force beyond their own limited physical strength or skill. Protecting the citizenry's natural right and ability to use or threaten powerful force as a just response to unjust force is the very purpose of the Second Amendment, just as the freedom to create powerful (even if highly controversial) ideas and communicate them through powerful means is at the core of the First Amendment's protection of speech. If the Second Amendment's protected firearms are viewed as analogous to speech, then the "assault weapons" that California bans are equivalent to modern computers. That such arms also could be used in inappropriate circumstances—by criminals, insurgents, or the mentally ill— was as obvious in the 1700s and 1800s as it is today. In the First Amendment context, the fundamental principles restricting the government's ability to reduce or eliminate

constitutionally protected speech can be seen in the prohibitions on content and viewpoint restrictions, of course. But they can also be seen in the rejection of broad prophylactic rules and the requirement of a clear and present danger before restricting even potentially inciting speech. *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969).

When considering the government's interest behind a restriction, therefore, it is not enough to merely claim some generalized public safety interest or similarly vague macro-value. Rather, the government and the scrutinizing court must focus on the particular and operative interest involved. In this case, the Defendants' claimed interest is that of broadly prohibiting common firearms with various common characteristics that increase the effectiveness, accuracy, and usability of firearms so that they are purportedly less capable of inflicting damage. But given that the very point of a firearm is to project effective, accurate, and directed force at a distance— whether in a hallway against a home invasion, in a public street against a would-be rapist, or, heaven forbid, against enemies of United States acting on our soil—the State's ban goes to the very protected qualities of a firearm, and is thus completely and categorically illegitimate.

### 2. There is No Reasonable Fit Between the Government's Interests and Its Laws, and Thus Defendants' AWCA and Regulations Also Fail Intermediate Scrutiny.

The Supreme Court has further emphasized that "reasonable" tailoring demands a considerably closer fit than mere rational basis scrutiny. Assuming arguendo the importance of the State's highly generalized claimed interests in public safety and reducing "gun violence," those interests must "rely on . . . hard facts and reasonable inferences drawn from convincing analysis amounting to substantial evidence based on relevant and accurate data sets." *Duncan*, 366 F. Supp.3d at 1161. Further, if the State's claimed interest is instead a more specific desire to prevent or mitigate so-called "mass shootings," *Rupp v. Becerra*, 401 F.Supp.3d 978, 991 (C.D. Cal. 2019), then it is far from clear that an interest directed at such rare events is significant and/or

important. Nevertheless, even assuming the importance of the interest at either level of generality, the AWCA's sweeping ban on common firearms with common characteristics is not a reasonable fit for achieving these interests.

The AWCA's broad ban on common semiautomatic firearms and lawful conduct with them is not a reasonable fit to any legitimate government interest. First, the ban does not "alleviate [the claimed harms] to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71. *See* Lott Dec., (**Exhibit 010**), ¶¶ 6-65, Exs. 2-19. As this Court previously observed:

> No case has held that intermediate scrutiny would permit a state to impinge even slightly on the Second Amendment right by employing a known failed experiment. Congress tried for a decade the nationwide experiment of prohibiting large capacity magazines. It failed. California has continued the failed experiment for another decade and now suggests that it may continue to do so ad infinitum without demonstrating success. That makes no sense.

*Duncan v. Becerra*, 366 F.Supp.3d at 1169.

Second, any correlation between different crimes and the weapons used does not establish a reasonable fit for a ban on all such weapons. Thus, notwithstanding the District Court's findings in *Rupp*, that "such weapons are disproportionately used in mass shootings," *Rupp*, 401 F.Supp.3d at 993, such findings do not even suggest that a ban would do anything other than divert such criminals to alternative legal or illegal weapons, or would in any way mitigate the problems. Further, any alleged higher incidence of "assault weapons" being used in crimes, mass shootings, and/or police shootings cannot justify the State's sweeping ban on the lawful possession and use of protected arms. Indeed, lawful use of such arms overwhelmingly outweighs any criminal use. Government "may not regulate the secondary effects of speech by suppressing the speech itself." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (opinion of Kennedy, J.). In *Heller* itself, it was accurately observed that handguns are involved in the majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning

1   handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-

2   696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on

3   possessing commonly owned firearms lacked any fit to further the government's

4   interest under *any* level of scrutiny. *Heller*, 554 U.S. at 628-29.

5       Constitutionally protected activities cannot be banned because the activity *could*

6   lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559

7   (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); Robb v.

8   Hungerbeeler, 370 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*,

9   535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969). Indeed,

10  computing devices connected to the Internet are now the most common tool for

11  engaging in lawful, protected First Amendment activities, but undoubtedly also the

12  most common tool for engaging in many unprotected and sometimes illegal forms of

13  speech (e.g., defamation, true threats) and other illegal conduct (e.g., child

14  pornography, hacking, and identity theft) as well. The latter hardly can justify

15  restricting lawful use of computers connected to the Internet by law-abiding people

16  who wish to publish their protected content and viewpoints.

17      The AWCA burdens far more protected activity than necessary by imposing a

18  complete ban on an ordinary, law abiding individual's acquisition, purchase, transfer,

19  and use of a common class of arms. Even under intermediate scrutiny, "a reasonable

20  fit requires tailoring, and a broad prophylactic ban on acquisition or possession of all"

21  common semiautomatics with common characteristics "for all ordinary, law-biding,

22  responsible citizens is not tailored at all." *Duncan*, 366 F.Supp.3d at 1180; see also

23  *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 682-83 (1994) (O'Connor, J.,

24  concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored'—

25  even under the more lenient [standard applicable to content neutral restrictions]—

26  where ... a substantial portion of the burden on speech does not serve to advance [the

27  State's content-neutral] goals.... Broad prophylactic rules in the area of free expression

28  are suspect. Precision of regulation must be the touchstone....") (brackets in original)

(citations and quotations omitted). "To meet the narrow tailoring requirement, … the government must demonstrate that alternative measures that burden substantially less [of the right] would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S. Ct. 2518, 2524 (2014). *See also Ward v. Rock Against Racism*, 491 U. S. 781,  799 (1989). And even still, the State may not regulate the right to keep and bear arms in such a manner that a substantial portion of the burden on the right "does not serve to advance its goals." *Id.*, at 799. By prohibiting even fully background-checked and law-abiding citizens from possessing a common and effective class of firearms, the law imposes considerably more burden than is warranted by the rare instances of criminal violence using such firearms. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." *Friedman v. City of Highland Park*, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting).

California's regulatory scheme for common semiautomatic firearms and common characteristics undermines public safety and does not materially advance any legitimate public interest. The State's justification that the self-same characteristics that make the firearms here suitable for lawful self-defense may also make them effective tools for crime if misused, thus necessitating a ban, misses the point and would gut the Second Amendment. After all, the very point of protecting arms, and firearms in particular, is that they allow law-abiding people to project force against unjust force at a distance, and thereby defend themselves and others against a violent threat as soon as possible with the least amount of damage to those being protected. Inevitably, all firearms that are at all suitable for self-defense or militia service are comparably dangerous in the hands of a violent criminal. The notion that improvements that make firearms better and safer for lawful use likewise make them comparably better for unlawful use simply leads to the absurdity that firearms may never be improved because the harms ipso facto outweigh the benefits and justify a ban. However, the Second Amendment itself has already balanced the need for and

dangers from arms that can effectively project force against another. As "the very product of an interest balancing by the people," the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 634-35. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures . . . think that scope too broad." *Id*.

Thus, even under intermediate scrutiny, Defendants' AWCA and regulations fail. The intermediate scrutiny to be applied is the same as, and is drawn from, the First Amendment context. *Jackson*, 746 F.3d at 961 (heightened scrutiny in Second Amendment cases is "guided by First Amendment principles"); *Silvester v. Harris*, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the test for intermediate scrutiny from First Amendment cases"), *cert. denied*, *Silvester v. Becerra*, 138 S.Ct. 945 (2018). At all times under *any* form of heightened scrutiny, the government bears the burden of justifying its restrictions. See, e.g., *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (unless conduct "not protected by the Second Amendment at all, the [g]overnment bears the burden of justifying the constitutional validity of the law."); *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F. 3d 678, 694 (6th Cir. 2016) ("the burden of justification is demanding and it rests entirely on the State.") (citation omitted).

The government's burden of justifying its restriction on constitutional rights "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71 (emphasis added). Restrictions on constitutional rights must be analyzed in their specific context, and "will depend upon the identity of the parties and the precise circumstances of the" protected activity. *Edenfield*, 507 U.S. at 774. Generalized risk does not warrant restrictions as to all persons, and "a

preventative rule" aimed at such generic hazards is "justified only in situations 'inherently conducive to'" the specific dangers identified. *Id.* (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978)).

Finally, even where the challenged restrictions materially address a genuine harm, the State must prove that its chosen means are "'closely drawn'" to achieve that end without " 'unnecessary abridgment'" of constitutionally protected conduct. *McCutcheon v. FEC*, 134 S.Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)). This means that a State cannot forego adequate less restrictive alternatives in favor of unduly broad prohibitions. *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

In *Duncan*, even though the Ninth Circuit applied strict scrutiny to affirm this Court's judgment, it also held that the analogous magazine ban would fail under intermediate scrutiny as well. *Duncan*, 970 F.3d at 1165-66. The Court began by reiterating the "potent nature of intermediate scrutiny." *Id.* at 1165 (citing *Packingham v. North Carolina*, 137 S.Ct. 1730, 1736 (2017)). It went on to state that, "[w]hile the precise contours of intermediate scrutiny may vary, this much is certain: It has bite. It is a demanding test. While its application is neither fatal nor feeble, it still requires a reviewing court to scrutinize a challenged law with a healthy dose of skepticism. Indeed, the law must address 'harms' that 'are real' in a 'material' way." *Duncan*, 970 F.3d at 1165 (citing *Edenfield*, 507 U.S. at 771).

Under the actual "demanding" standard for intermediate scrutiny, the Defendants' AWCA and regulations, and enforcement thereof, soundly fails as they do not advance an important governmental objective nor offer any sort of reasonable fit.

## C.   ADVANCEMENTS IN FIREARM TECHNOLOGY DO NOT ALTER THE ANALYSIS.

Defendants assert that firearms with characteristics prohibited under Penal Code § 30515 represent advancements in technology that make them unusually

dangerous[4] and therefore prohibitable. But this is historically untrue, as all of the characteristics have been in existence for many years. And the entire premise that the Second Amendment allows for prohibitions of modern firearms with these characteristics has no basis. In *Heller*, the Court stated:

> Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, […] and the Fourth Amendment applies to modern forms of search, […] the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

*Heller*, 554 U.S. at 582 (citing *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849, 117 S.Ct. 2329 (1997), and *Kyllo v. United States*, 533 U.S. 27, 35–36, 121 S.Ct. 2038 (2001).)

Defendants may well believe that the State's ban accomplishes something of value for its citizens—though the data show otherwise—and justifiable because they view "assault weapons" to have "controversial public safety implications." But "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. The framers and ratifiers of the Second and Fourteenth Amendments chose to robustly protect dangerous but important rights in the Bill of Rights fully aware of, and despite, their risks. They may not be re-balanced by legislators, courts, or the Defendants.

The effectiveness of the arms banned by Defendants' AWCA and regulations

---

[4] Which would not be the correct standard in any event. *Heller*'s analysis asks whether the arms are "*both* dangerous *and* unusual," *Caetano*, 136 S.Ct. at 1031 (2016) (Alito, J., joined by Thomas, J., concurring) (italics original), and if they are not both, it determines if the category of arms are in common use for lawful purposes. *Duncan*, 366 F.Supp.3d at 1142. As shown above, these firearms are protected under the *Heller* test.

shows how the operative clause of the Second Amendment, as interpreted by *Heller*, fulfills the purpose annunciated in the prefatory clause. The may not be banned under the Constitution.

Today, this continues to be reflected in both federal and state law, which considers "the militia" to be comprised of both regulars, and ordinary citizens to be available to muster for militia service when called. See, 10 USC § 246(b) ("The classes of the militia are— (1) the organized militia, which consists of the National Guard and the Naval Militia; and (2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.") As General Youngman testified, from his personal military experience, each state can control its own militia as necessary for defense of that state, and as may be called up to muster able-bodied citizens to defend their state if necessary. (Youngman testimony, 10/19/20 Tr. at 85:24 – 87:12.) *See* Calif. Mil. & Vet. Code §§ 120 ("The militia of the State shall consist of the National Guard, State Military Reserve and the Naval Militia--which constitute the active militia--and the unorganized militia.") and 121 ("The unorganized militia consists of all persons liable to service in the militia, but not members of the National Guard, the State Military Reserve, or the Naval Militia.") Every state has its own analogue of this provision.

Firearms in common use for militia service were *expected* to be held and maintained by ordinary citizens. "*Miller* and *Heller* recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class[.]" *Caetano*, 136 S.Ct. at 1032 (citing *Heller*, 554 U.S. at 627). Today, those arms would be significantly made up of those banned under Defendants' AWCA and

regulations, including but not limited to the AR-15—"America's Rifle."[5] Indeed, General Youngman testified that the AR-15 is now so familiar to two generations of Americans that "it's in the American DNA at this point." (Youngman testimony, Tr. at 87:16-17).

## IV.   STATEMENT OF ABANDONED ISSUES.

Plaintiffs consented to dismissal of their challenge to Penal Code § 30925 and the Court granted the Defendants' partial motion to dismiss with respect to that claim. Order Denying Defendants' Motion to Dismiss, ECF Doc. 46, at pp.3,11.

## V.   CONCLUSION.

Plaintiffs have shown that the Defendants' AWCA and regulations, and their enforcement thereof are unconstitutional. Plaintiffs request that the Court issue an order and permanent injunction consistent with the Plaintiffs' Prayer for Relief (First Amended Complaint, ECF Doc. no 9, at pp.41-42, as modified by the Court's order dismissing their claim as to § 30925) and as the Court deems necessary and proper to effectuate the relief requested.

November 18, 2020

SEILER EPSTEIN LLP


/s/ George M. Lee
George M. Lee

DILLON LAW GROUP APC


/s/ John W. Dillon
John W. Dillon

Attorneys for Plaintiffs

---

[5] *See* NRA, "New Industry Statistics Underscore Popularity of "America's Rifle" – 16,069,000!?," online at https://www.ammoland.com/2018/09/new-industry-statistics-underscore-popularity-of-americas-rifle.