1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   JOSE A. ZELIDON-ZEPEDA
    Deputy Attorney General
5   State Bar No. 227108
    PETER H. CHANG
6   Deputy Attorney General
    State Bar No. 241467
7   JOHN D. ECHEVERRIA
    Deputy Attorney General
8   State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
9    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
10   Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
11  *Attorneys for Defendants*

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15  **JAMES MILLER, et al.,** | Case No. 19-cv-1537-BEN-JLB |
| 16                        Plaintiffs, | **DECLARATION OF LOUIS KLAREVAS IN SUPPORT OF DEFENDANTS' *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF JOHN R. LOTT, JR.** |
| 17         **v.** | |
| 18  **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,** | |
| 19 | Date:           February 3, 2021 |
| 20                        Defendants. | Time:           10:00 a.m. |
| 21 | Dept:           5A |
| | Judge:          Hon. Roger T. Benitez |
| 22 | Trial Date:     February 3, 2021 |
| | Action Filed:   August 15, 2019 |

23

24

25

26

27

28

**DECLARATION OF LOUIS KLAREVAS**

I, Louis Klarevas, declare:

1.     I make this Declaration in support of Defendants' *Daubert* Motion to Preclude Testimony of John R. Lott, Jr.  This Declaration is based on my own personal knowledge and experience, and if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## I.  SUMMARY

2.     In John Lott's Declaration in Support of Plaintiffs Motion for Preliminary Injunction ("Lott Declaration" or "Lott Decl." hereinafter), which I understand Plaintiffs have identified as a trial exhibit (Plaintiffs' Exhibit 10), Lott primarily attempts two forms of analysis.  First, he offers his perspective on certain academic literature related to the effects of assault weapons bans (Lott Decl. paras. 13-45 and 54-62).  Second, he undertakes a 30-year time-series analysis of mass shootings before, during, and after the Federal Assault Weapons Ban (Lott Decl. paras. 46-53) in an attempt to argue that the Federal Ban did not succeed in reducing mass shootings with assault weapons during the 10-year period it was in effect (September 13, 1994 – September 12, 2004).

3.     In my Declaration in Support of Defendant's Opposition to Motion for Preliminary Injunction (paras. 28-46), which I understand Defendants' have identified as a trial exhibit (Defendants' Exhibit E), I addressed how Lott misrepresents the literature on the effects of assault weapons bans.  I will not repeat those points here.  Instead, this Declaration will be devoted to the numerous errors in Lott's analysis of mass shooting trends before, during, and after the Federal Assault Weapons Ban, which were initially raised in paragraph 45 of my prior Declaration in this case.

4.     Throughout his time-series analysis (Lott Decl. paras. 46-53), Lott presents to the Court a plethora of inaccurate data concerning mass shootings and the use of assault weapons in mass shootings.  Because his data are wrong, his

2

Declaration of Louis Klarevas in Support of Defendants' *Daubert* Motion to Preclude Testimony of John R. Lott, Jr. (3:19-cv-01537-BEN-JLB)

conclusions are wrong.  The errors in the Lott Declaration are notable not only because of their sheer quantity—as discussed below, Lott provided inaccurate data for 83% of all datapoints relied upon for analysis—but because those errors are readily apparent if one methodically consults the source materials cited by Lott.

## II.   DATA OF MASS SHOOTING INCIDENTS AND DEATHS

5.     In connection with paras. 49-52 of Lott's Declaration (on pages 18 and 19 of his Declaration), Lott provides three bar graphs that, using third-party datasets, purportedly represent trends for the 10-year period immediately preceding the Federal Assault Weapons Ban (September 1984–August 1994), the 10-year period during the Federal Assault Weapons Ban (September 1994–August 2004), and the 10-year period immediately following the Federal Assault Weapons Ban (September 2004–August 2014).[1]  The charts that appear in Lott's Declaration originally appeared in a blog post that was posted on May 5, 2018, on the website of the Crime Prevention Research Center ("CPRC"), an organization founded by Lott (see Exhibit 1).[2]  Indeed, these three charts appear in identical form (with identical datapoints) in this blog post.

### A.   Incidents and Deaths Based on Klarevas Dataset

6.     Figures 1a and 2a below are reproductions of the third-party data charts that appear in Lott's Declaration.[3]  Figures 1a and 2a each contains data that are inaccurate, rendering each chart—and the conclusions drawn from each chart—

---

[1] Lott wrongly claims: "Our numbers will differ slightly from Klarevas' simply because we … only include part of 1984 and 2014 in our time range, *whereas Klaveras [sic.] includes both years in their entirety*."  Lott Decl., lines. 16-19, p. 17 (emphasis added).  Had Lott carefully read my book, he would know that I used the following timeframes: September 13, 1984– September 12, 1994, September 13, 1994–September 12, 2004, and September 13, 2004– September 12, 2014.  My timeframes of analysis are not presented in full calendar years.  His claim to the contrary is false.

[2] The very first sentence of the blog post reads: "The Data files for the data used below is available here."  Clicking on the hyperlink in this sentence takes the reader to a Microsoft Excel Workbook that contains all of the data that Lott relied upon to draft this blog post and to construct the charts that appear in his Declaration.

[3] Figure 1a is a reproduction of the datapoints from the graph that appears at line 9, p. 18 of Lott's Declaration. Figure 2a is a reproduction of the datapoints from the graph that appears at line 16, p. 20 of Lott's Declaration.

3

1   flawed and unreliable from an analytical perspective.  The specific datapoints that

2   are inaccurate are underlined.  Figures 1b and 2b below are corrected versions of

3   the corresponding bar graphs, incorporating, to the extent possible, accurate

4   datapoints.  For ease of comparison, I present each original chart followed by the

5   respective adjusted chart.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Louis Klarevas in Support of Defendants' *Daubert* Motion to Preclude Testimony
of John R. Lott, Jr. (3:19-cv-01537-BEN-JLB)



**Figure 1a**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(Klarevas Dataset—Unadjusted as Appearing in Lott Declaration)**

**Figure 1b**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(Klarevas Dataset—Adjusted)**

Declaration of Louis Klarevas in Support of Defendants' *Daubert* Motion to Preclude Testimony
of John R. Lott, Jr. (3:19-cv-01537-BEN-JLB)



**Figure 2a**
**Deaths Before, During, and After the Federal Assault Weapons Ban**
**(Klarevas Dataset—Unadjusted as Appearing in Lott Declaration)**



**Figure 2b**
**Deaths Before, During, and After the Federal Assault Weapons Ban**
**(Klarevas Dataset—Adjusted)**



6

7.     To explain how Lott misrepresented my data, I will review the four measures in Figure 1a above that are incorrect.  First, Lott claims that there were 35 total mass shootings resulting in 6 or more victims killed from September 2004–August 2014, whereas my dataset only reflects 34 total shootings resulting in 6 or more victims killed in that same time period.  By examining Lott's Excel Workbook, it becomes clear that the additional shooting is the result of Lott including a mass shooting that occurred in Bell, Florida, on September 18, 2014, more than a decade after the Federal Assault Weapons Ban had expired and outside of his analytical timeframe of September 2004–August 2014.

8.     In identifying whether or not mass shootings in my dataset involved assault weapons, Lott also misrepresents the respective data for each of the three 10-year periods under examination.  He claims there were 6 such incidents in the decade prior to the Federal Ban, whereas I identify 5 such incidents.  The discrepancy is the result of Lott treating the mass shooting that occurred in Jacksonville, Florida, on June 19, 1990, as involving an assault weapon.  However, the firearm in question was a M1 carbine, which is not considered to be an assault weapon under Florida or federal law.  Similarly, in the decade of the Federal Ban, Lott claims that there were 2 mass shootings involving assault weapons in my dataset.  Actually, there were 3 such incidents.  The shooting omitted by Lott occurred in Edinburg, Texas, on January 15, 2003.  Lott's Excel Workbook codes this shooting as not involving an assault weapon, even though it contradictorily notes that the shooting involved "semi-automatic SKS Norinco 7.62x39mm rifles," which are assault weapons (see Exhibit 2 for CPRC entries in Excel).

9.     In the decade following the Federal Ban, Lott represents that my dataset only identifies 5 mass shootings resulting in 6 or more victims killed that involved assault weapons.  Actually, there were 8 such incidents.  The first of the three omitted incidents was a mass shooting that occurred in Indianapolis, Indiana, on June 1, 2006.  Lott's Excel Workbook clearly notes that the shooting involved a

7

"long gun [that] had 7.62x39mm cartridge casings."  Moreover, when one consults the source that Lott links to this incident, that source (a ruling of the Indiana Supreme Court) indicates that the weapon was an AK-47-type assault rifle.  Again, Lott failed to count this incident as a mass shooting involving an assault weapon or report this fact in his Declaration.  The second of the three omitted incidents was a mass shooting that occurred in Geneva County, Alabama, on March 10, 2009.  Lott's Excel Workbook entry for this incident notes that one of the weapons used was a "Bushmaster XM-15 rifle," which is an AR-15-type assault rifle.  However, even though Lott was aware that the firearm in this case was an assault weapon, he failed to report it in his Declaration.  Finally, the third of the three omitted incidents was a mass shooting that occurred in Appomattox, Virginia, on January 19, 2010.  In this instance, Lott's Excel Workbook entry for this shooting does not identify any weapon.  It is blank, even though it was well reported in the local news media that the gunman used a .223-caliber AR-15-type assault rifle to kill his 8 victims.  When these shootings are accounted for, the fatality tolls reported in Figure 2a also change.  By not accurately reporting incidents from my dataset, Lott misrepresented my data.  Just an important, he gave the false impression that there were nearly 20% fewer high-fatality mass shootings involving assault weapons from September 1984 to August 2014 than there actually were (see Exhibit 2 for CPRC entries in Excel).

**B.   Incidents Based on Mother Jones Dataset**

10.   Figure 3a below is a reproduction of the third-party data chart based on Mother Jones' data (Lott Decl. p. 19, line 1).  Figure 3a contains data that are inaccurate, rendering the chart—and the conclusions drawn from the chart—flawed and unreliable from an analytical perspective.  The specific datapoints that are inaccurate are underlined.  Figure 3b below is a corrected version of the chart, incorporating, to the extent possible, accurate datapoints.  For ease of comparison, I present the original chart followed by the respective adjusted chart.

8



**Figure 3a**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(Mother Jones Dataset—Unadjusted as Appearing in Lott Declaration)**



**Figure 3b**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(Mother Jones Dataset—Adjusted)**



9

11.   As with his treatment of my dataset, Lott misrepresented the Mother Jones data.  Lott included 2 mass shootings that resulted in only 3 deaths (which are outside his definitional parameter of a minimum of four victims killed); omitted 4 mass shootings that involved assault weapons; and included the death of perpetrators in his fatality count for 10 incidents, making it seem as if there were nearly 30% more deaths in mass shootings resulting in 6 or more victims killed than there actually were.

12.   Comparing Lott's original bar charts (Figures 1a, 2a, and 3a) with the adjusted ones (Figures 1b, 2b, and 3b) shows that 15 of the 24 datapoints represented in Lott's original charts are inaccurate.  That is a 63% error rate.  Put another way, nearly two-thirds of the factual claims Lott makes in Figures 1a, 2a, and 3a are wrong.

### C.   Incidents and Deaths Based on CPRC Dataset

13.   Lott also created two bar charts using data collected by the CPRC—the organization he founded—to display trends before, during, and after the Federal Assault Weapons Ban.  Figures 4a and 5a below are reproductions of the two CPRC charts that appear in Lott's Declaration.[4]  Each of these two bar graphs contains data that are inaccurate, rendering each chart—and the conclusions drawn from each chart—flawed and unreliable.  The specific datapoints that are inaccurate are underlined.  (Explanations for how it was determined that the data are inaccurate are provided below.)  Figures 4b and 5b below are adjusted versions of the corresponding bar graphs, incorporating, to the extent possible, accurate datapoints.  For ease of comparison, I present each original chart followed by the respective adjusted chart.

---

[4] Figure 4a is a reproduction of the datapoints from the graph that appears at line 16, p. 19 of Lott's Declaration. Figure 5a is a reproduction of the datapoints from the graph that appears at line 1, p. 21 of Lott's Declaration.



**Figure 4a**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(John Lott's CPRC Dataset—Unadjusted as Appearing in Lott Declaration)**



**Figure 4b**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(John Lott's CPRC Dataset—Adjusted)**



Declaration of Louis Klarevas in Support of Defendants' *Daubert* Motion to Preclude Testimony
of John R. Lott, Jr. (3:19-cv-01537-BEN-JLB)





Figure 5a
Deaths Before, During, and After the Federal Assault Weapons Ban
(John Lott's CPRC Dataset—Unadjusted as Appearing in Lott Declaration)



Figure 5b
Deaths Before, During, and After the Federal Assault Weapons Ban
(John Lott's CPRC Dataset—Adjusted)

12

14.   The left half of Figure 4a attempts to document mass shooting *incidents* resulting in 6 or more victims killed, distinguishing the subset of incidents that involved assault weapons.  The left half of Figure 5a attempts to document the number of *fatalities* in mass shooting incidents resulting in 6 or more victims killed, again distinguishing the subset of fatalities that occurred in incidents involving assault weapons.  Figure 4a indicates that, in the 30-year timeframe under examination, there were a total of 39 incidents resulting in 6 or more victims killed, and that the subset of those shootings that involved assault weapons was 9 total incidents.  As was initially documented in Figure 1b and as Figure 4b makes clear, there were actually 65 incidents resulting in 6 or more victims killed during this 30-year time, 16 of which involved assault weapons.  This means that, in its references to mass shootings resulting in 6 or more victims killed, Figure 4a omitted 40% of all known incidents and 44% of all known incidents involving assault weapons.

15.   Similarly, Figure 5a indicates that, in the 30-year timeframe under examination, there were a total of 355 deaths in incidents resulting in 6 or more victims killed, and that the subset of those shootings that involved assault weapons resulted in 94 total deaths.  As was initially documented in Figure 2b and as Figure 5b makes clear, there were actually 546 deaths from incidents resulting in 6 or more victims killed during this 30-year time, and 145 of those deaths resulted from incidents that involved assault weapons.  This means that, in its references to fatalities associated with mass shootings resulting in 6 or more victims killed, Figure 5a omitted 35% of all known deaths and 35% of all known deaths from incidents involving assault weapons.  Stated another way, all 12 of the datapoints in the left halves of Figures 4a and 5a are inaccurate.

16.   The data in the right halves of Figures 4a and 5a are equally all inaccurate for a very obvious reason.  They, respectively, purport to capture the number of *incidents* resulting in 4 or more victims killed and the number of *fatalities* resulting from those incidents.  Because the fatality threshold is lowered

13

from 6 deaths to 4 deaths, *at a minimum*, the number of incidents and deaths for shootings resulting in 4 or more victims killed must be the same or larger than the number of incidents and deaths for shootings resulting in 6 or more victims killed. After all, the shootings resulting in 6 or more deaths are a subset of shootings resulting in 4 or more deaths.  Yet, a comparison of Figures 4a and 5a with Figures 4b and 5b demonstrates that Lott's data are incomplete, and therefore inaccurate. Indeed, for four of the six measures of incidents and for four of the six measures of fatalities, Lott's tallies are smaller than those for incidents resulting in 6 or more deaths.[5]  That mathematically cannot be, unless incidents (and the corresponding fatalities) are being excluded for arbitrary reasons.[6]

17.    The omissions in the CPRC dataset were adjusted for by reincorporating all known incidents and fatalities associated with mass shootings resulting in six or more deaths (as captured in Figures 1b and 2b).  Furthermore, in an effort to come up with more comprehensive numbers on shootings resulting in four or more deaths, the data on shootings resulting in six or more deaths (from Figures 1b and 2b) were combined with the CPRC data on shootings resulting in exactly four or five deaths.  When the Klarevas and CPRC datasets are combined, it becomes clear that all of the measures on the right halves of Figures 4a and 5a are undercounts.[7]

---

[5] To provide an example, Lott claims in Figure 4a that for the 10-year periods before, during, and after the Federal Assault Weapons Ban, there were, respectively, 18, 17, and 33 mass shootings that resulted in 4 or more victims killed.  But as Figures 1b and 4b indicate, there were actually 19, 12, and 34 mass shootings that resulted in 6 or more victims killed, during these corresponding 10-year periods.  Obviously, it is impossible to have 19 shootings resulting in a minimum of 6 deaths, but only 18 shootings resulting in a minimum of 4 deaths, during the exact same time period.

[6] As a case in point, in Figure 1a (which is a reproduction of unadjusted data that appear in Lott's Declaration), Lott claims that, in the 30-year period surrounding the Federal Assault Weapons Ban, there were 66 mass shootings resulting in 6 or more victims killed, 13 of which involved assault weapons.  But in Figure 4a (which is also a reproduction of unadjusted data that appear in Lott's Declaration), Lott suddenly claims that, in the 30-year period surrounding the Federal Assault Weapons Ban, there were only 39 mass shootings resulting in 6 or more victims killed, 9 of which involved assault weapons.  Basically, 27 high-fatality mass shootings, 4 of which involved assault weapons, vanished from Lott's analysis.

[7] Unfortunately, while our knowledge of mass shooting incidents resulting in 6 or more victims killed appears to be exhaustive (at least going as far back as 1966), our knowledge of mass shooting incidents resulting in 5 or fewer victims killed is not exhaustive.  As such, there is

As with the datapoints on the left halves of Figures 4a and 5a, all 12 of the datapoints on the right halves of Figures 4a and 5a are inaccurate.  This means that the combined error rate for Figures 4a and 5a is 100%.

18.   The CPRC appears to intentionally exclude certain incidents and deaths from its dataset.  Doing so violates Lott's own guideline that any dataset which is "arbitrarily selective in its data collection" should be treated as "problematic."  This admonishment is taken directly from paragraph 40 of Lott's Declaration.  As Lott's use of the CPRC dataset excludes shootings based on criteria other than the number of casualties—criteria that he did not disclose in his Declaration—he seems to be violating his own rule of analysis.[8]

19.   It should also be noted that the discrepancies cannot be dismissed as differences of opinion.  For example, as discussed above, a review of the dataset contained in Lott's CPRC Excel Workbook indicates that he clearly knew—and concurred—that 15 of the 16 cases I identified as involving assault weapons were

---

no comprehensive dataset that captures all mass shootings resulting in exactly 4 or 5 victims killed.  However, the CPRC does denote some incidents that resulted in exactly 4 or 5 victims killed during the 30-year period under examination in Lott's Declaration.  Specifically, from September 1984–August 2014, the CPRC identified a total of 30 such shootings, resulting in a total 130 deaths.  These incidents have been combined with all known mass shootings resulting in 6 or more victims killed during the corresponding 30-year time period (65 total incidents resulting in a combined 546 deaths) to generate the datapoints that appear on the right halves of Figures 4b and 5b.  The purpose of these datapoints is not to be exhaustive (which they cannot be), but to be more comprehensive, and therefore more accurate, for purposes of demonstrating that the CPRC data in Figures 4a and 5a knowingly undercount incidents and deaths.

[8] Lowering the fatality threshold from 6 victims killed to 4 victims killed, for purposes of a broader analysis, is a worthy research objective.  However, the assertion that the FBI defines "mass shootings" as shootings resulting in 4 or more deaths—an assertion that Lott makes in paras. 48-49 of his Declaration in an effort seemingly to imply that there is an official federal government definition of "mass shootings"—is patently false and misleading.  Indeed, the blog post that serves as the origin of Lott's time-series analysis refers to "the official FBI definition of mass public shootings." *The FBI has never defined the terms "mass shootings" or "mass public shootings."*  By contrast, in a 2014 report, the FBI defined the term "active shooter."  But it also made it clear in that same report that an active shooter incident is not the same thing as a mass shooting.  In a subsequent publication, the lead author of the FBI's report on active shooter events publicly scolded Lott for his efforts to "confound" key definitional terms as well as for "misrepresenting" the FBI's work to advance "a straw-man argument" that is "simply not true."  See, Pete Blair and M. Hunter Martindale, "Misrepresenting the FBI Active Shooter Report: A Response to Lott," *ACJS Today*, 40(3), May 2015, 32-35, available at: https://cdn.ymaws.com/www.acjs.org/resource/resmgr/ACJSToday/ACJSTodayMay2015.pdf.

indeed perpetrated with assault weapons.[9]  Yet, despite having this information in his dataset, he instead provided the Court with charts that indicated that there were fewer than 15-16 incidents involving assault weapons, giving the false impression that the difference between the 10-year periods before, during, and after the Federal Assault Weapons Ban was less pronounced than it actually was.[10]

## III.  SHARE OF MASS SHOOTINGS INVOLVING ASSAULT WEAPONS

20.   Turning to the last set of bar charts in Lott's Declaration, Figures 6a, 7a, and 8a below are also reproductions of the final three bar charts that appear in Lott's Declaration.[11]  Each of these three bar graphs contains data that are inaccurate, rendering each chart—and the conclusions drawn from each chart— flawed and unreliable.  The specific datapoints that are inaccurate are underlined. Figures 6b, 7b, and 8b are adjusted versions of the corresponding bar graphs, incorporating, to the extent possible, accurate datapoints.  For ease of comparison, I present each original chart followed by the respective adjusted chart.

---

[9] As mentioned above in paragraph 9, of the known mass shooting incidents resulting in 6 or more victims killed that involved assault weapons, the only one that Lott and I seem to disagree on is the January 19, 2010, massacre in Appomattox, Virginia, which involved AR-15-type assault rifles.  The CPRC dataset does not list any weapons for this shooting.  Despite not knowing the types of firearms used, Lott classified this shooting as not involving assault weapons, rather than classifying it as "unknown."  (See Exhibit 2 for the CPRC's data entries on the Appomattox massacre from Lott's Excel Workbook).

[10] In paragraph 42 of his Declaration, Lott writes: "Using Klarevas' definition, we identified only two cases involving assault weapons in the ten years during which the Federal Assault Weapons Ban was in effect—September 1994 to September 2004.  The two attacks were the Columbine shooting in 1999 and a case in Wakefield, Massachusetts in 2000 that involved an AK-47."  When one examines the CPRC dataset that Lott helped maintain, it is clear that the CPRC dataset also documented the use of AK-47-type assault rifles in the January 15, 2003, mass murder in Edinburg, Texas.  (See Exhibit 2 for the CPRC's data entries on the Edinburg massacre from Lott's Excel Workbook).  However, Lott fails to report this in his Declaration.

[11] Figure 6a is a reproduction of the datapoints from the graph that appears at line 1, p. 22 of Lott's Declaration. Figure 7a is a reproduction of the datapoints from the graph that appears at line 1, p. 23 of Lott's Declaration. Figure 8a is a reproduction of the datapoints from the graph that appears at line 15, p. 23 of Lott's Declaration.

16



**Figure 6a**
**Percent of Mass Shootings with Assault Weapons**
**(Klarevas Dataset—Unadjusted as Appearing in Lott Declaration)**

**Figure 6b**
**Percent of Mass Shootings with Assault Weapons**
**(Klarevas Dataset—Adjusted)**

17



Figure 7a
Percent of Mass Shootings with Assault Weapons
(Mother Jones Dataset—Unadjusted as Appearing in Lott Declaration)

Figure 7b
Percent of Mass Shootings with Assault Weapons
(Mother Jones Dataset—Adjusted)

18



**Figure 8a**
**Percent of Mass Shootings with Assault Weapons**
**(John Lott's CPRC Dataset—Unadjusted as Appearing in Lott Declaration)**

**Figure 8b**
**Percent of Mass Shootings with Assault Weapons**
**(John Lott's CPRC Dataset—Adjusted)**

19

21.   Figures 6a, 7a, and 8a purport to capture the percentage of mass shootings that involved assault weapons as a share of all mass shootings.  Because most of the underlying datapoints in Figures 1a, 3a, and 4a that were used to calculate these percentages were inaccurate, nearly all of the corresponding percentages in Figures 6a, 7a, and 8a are inaccurate as well.  When re-performing the calculations using adjusted incident data (drawn from Figures 1b, 3b, and 4b), we see that all 3 of the datapoints in Figure 6a, 4 of the 6 datapoints in Figure 7a, and all 6 of the datapoints in Figure 8a are inaccurate.  In other words, 13 of the 15 datapoints in Figures 6a, 7a, and 8a are inaccurate.  That is an error rate of 87%.

22.   As noted in my prior Declaration in this case (para. 44), there is no basis for performing this type of "share" analysis.  Advancing an argument based on the percentage of mass shootings involving assault weapons as a share of all mass shootings is a straw-man argument that displays a lack of understanding as to how bans operate, as discussed in paragraph 44 of my prior Declaration in this case.  In addition to lacking a scholarly foundation, Lott's theory about the share of mass shootings involving assault weapons also lacks an empirical foundation, given the enormous error rate that underpins his calculations of percentages.

## IV.  CONCLUSION

23.   When we take all eight bar charts that Lott presented in his Declaration and evaluate the accuracy of each datapoint in these charts, we can conclude that 52 of the 63 datapoints are inaccurate.  Overall, the combined error rate for all of these eight bar charts is 83%—only 17% of the data provided by Lott, and relied on to form his opinions about the effectiveness of assault weapons bans, are accurate.[12]

---

[12] Setting aside the CPRC data that Lott reported in his Declaration (Figures 4a, 5a, and 8a), Lott's error rate in reporting the Klarevas data (Figures 1a and 2a) was 67% and his error rate in reporting the Mother Jones data (Figure 3a) was 58%.  When Lott subsequently attempted to calculate the percentage of mass shootings involving assault weapons as a share of all mass shootings, his error rate regarding the Klarevas data (Figure 6a) was 100% and his error rate regarding the Mother Jones (Figure 7a) was 67%.  The combined error rate for Figures 1a, 2a, 3a, 6a, and 7a—which represents all of the non-CPRC data reported by Lott in his Declaration—is 67%.

When such gross errors permeate charts, any conclusions that are drawn from those charts are of no analytical value.

24.   In discussing trends in the incidence and lethality of mass shootings before, during, and after the Federal Assault Weapons Ban, Lott asserts, "Klarevas' own data shows a decline over time that continued after the [federal] assault weapons ban expired.  The Mother Jones and CPRC data show even steeper post-ban declines."[13]  When adjusted for accuracy, all the data show that, contrary to Lott's assertion, mass shootings decreased during the 10-year period of the Federal Assault Weapons Ban, when compared to the 10-year period immediately preceding the Federal Ban, only to increase in the 10-year period immediately following the expiration of the Federal Ban.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on December 27, 2020.

_____
Louis Klarevas

---

[13] Lott Decl. para. 52.

21

**EXHIBIT 1**

12/26/2020 Klaveras false claims about the federal assault weapons ban and mass public shootings - Crime Prevention Research Center | Crime Pre…

Case 3:19-cv-01537-BEN-JLB  Document 73-2  Filed 12/28/20  PageID.8795  Page 23 of 54



# Crime Prevention Research Center

- Research
- Data
- About/Board Of Academic Advisors
- Op-Eds
- Contact/Press
- Donate

Search



Case 3:19-cv-01537-BEN-JLB   Document 73-2   Filed 12/28/20   PageID.8796   Page 24 of 54

Featured

# Klarevas' False Claims About The Federal Assault Weapons Ban And Mass Public Shootings

5 May , 2018

The Data files for the data used below is **available here**.

A large amount of research has been done on the federal assault weapons ban that was in effect from 1994 to 2004.  It has consistently found no statistically significant impact on mass public shootings or any other type of crime.

This holds true even for research funded by the Clinton administration. Criminology professors Chris Koper and Jeff Roth <u>concluded</u> in a 1997 report for the National Institute of Justice, "The evidence is not strong enough for us to conclude that there was any meaningful effect (i.e., that the effect was different from zero)."  Messrs. Koper and Roth suggested that it might be possible to find a benefit after the ban had been in effect for more years. In 2004, they published a follow-up NIJ study with fellow criminologist Dan Woods. They found: "We cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence."

Dr. John Lott and others have done similar research on both state and federal assault weapons bans.  They've found no evidence that any such ban reduced the frequency or deadliness of mass public shootings or had a beneficial impact on any other crime rate.  The third edition of "More Guns, Less Crime" (University of Chicago Press, 2010) examined the impact of federal and state assault weapon bans both before, during, and after the federal ban was in effect.

Even a 2014 survey by the left-leaning <u>ProPublica concluded</u> that despite some claims by Democratic politicians, there was no compelling evidence that the federal assault weapons ban had any impact on any type of crime.

In looking at mass public shootings, most researchers have used the traditional FBI definition.  And we have also done so in all of our posts on mass public shootings (e.g., <u>here</u>, <u>here</u>, <u>here</u>, and <u>here</u>).  There are several parts to this definition.

1. The official FBI definition of mass public shootings excludes "<u>shootings that resulted from gang or drug violence</u>" or that occurred in the commission of another crime such as robbery.  It isn't that gang deaths aren't important, but just that the causes and solutions are dramatically different from the type of mass public shootings at schools, movie theaters and malls where the point of the attack is simply to kill as many people as possible.  Indeed, the amount of coverage given to these different events shows that the media also treats these two types of cases quite differently.

2. The FBI only includes shootings in "<u>public places</u>" such as commercial areas (malls, stores, and other businesses), schools and colleges, open spaces, government properties (including military bases and civilian offices), houses of worship, common areas at apartment buildings, and healthcare facilities. [Residences were included in the total deaths only when "where casualties occurred inside a private residence before a shooter moved to a public area, those incidents were categorized at the location where the public was more at risk." For example, their cases would involve a residence and then a school.]

3. From the 1980s to 2013, the original FBI definition of "mass killings" had been "*four or more* victims slain, in one event, in one location," not including the offender in the victim count (<u>CRS, July 30, 2015</u>).  In 2013, the definition was changed to "three or more killings."  The vast majority of academics have continued to use the four-or-more definition.  This includes researchers such as <u>James Alan Fox</u>.  See also studies from years ago such as, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," (Grant, Kovandzic, Moody, Homicide Studies, Nov. 1, 2002).  Even groups such as <u>Bloomberg's</u>

<u>Everytown for Gun Safety</u>, which Snopes cites approvingly, has recently used the four-or-more definition.

Some recent work by Louis Klarevas has gotten a lot of attention for claiming that the 1994-2004 Assault Weapon ban supposedly reduced the number of mass shootings. While his research isn't peer-reviewed research, we will still spend some time discussing it. Klarevas starts by making an unusual decision in terms of how he limits his research to shootings with 6 or more fatalities.  We don't know of any other study that does this, and Klarevas doesn't provide an explanation.  Nor does he explain why he mixes together public shootings with gang shootings.  Klarevas merely uses the alternative phraseology of "high-fatality" mass shootings.

Here are two graphs, the first by the Washington Post and the second by <u>former Labor Secretary Robert Reich</u>, that make use of Klarevas' numbers.



**Gun massacres fell during the assault weapons ban**

Gun massacre (6+ deaths) incidents and fatalities in the decades before, during and after the federal assault weapons ban of 1994

Source: Louis Klarevas
WAPO.ST/WONKBLOG



Academics wouldn't make the types of comparisons that Klarevas makes. They would see how death rates changed in states where the federal ban actually affected the ability of citizens to own assault weapons. Then they would compare these states with other states where the law effectively remained unchanged because state-level bans were already in place. That is the way Koper and Roth did it in their studies, as did Lott, and it resulted in not finding any impact from assault weapon bans.

The rate of mass shootings or mass public shootings may go up and down for many reasons over time. But if the assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have

decreased.  If the gun control advocates are right, banning assault weapons ought to reduce attacks or murders committed with assault weapons.

But just for the sake of argument, let's initially follow Klarevas in looking at the total number of attacks before, during, and after the assault weapons ban.  We will use the cases that Klarevas identifies in his book as mass shootings (here and here) as well as mass public shootings collected by Mother Jones and the CPRC.  Klarevas doesn't provide any breakdown for only shootings committed with assault weapons, even though the assault weapons ban is the subject of his research.

In an email to writer Jon Stokes, Klarevas identified seven mass shootings with assault weapons over the ten years from January 1984 though 1993 (the earliest being the San Ysidro, California attack on a McDonald's in July 1983).  Using Klarevas' definition, we identified two cases with assault weapons in the ten years when the federal Assault Weapons Ban was in effect from September 1994 to September 2004 (the Columbine shooting in 1999 and an attack in Wakefield, Massachusetts in 2000 with an AK-47).  Even using Klarevas' cases, our numbers differ slightly from his because we look at the 10-year periods from September 1984 to August 1994, September 1994 to August 2004, and September 2004 to September 2014.  We only include part of 1984 and 2014 in our time range, whereas Klaveras includes both years in their entirety.

The Mother Jones dataset also includes cases that don't meet the FBI's definition of Mass Public Shootings, but since it is a widely cited source of cases we have used it for our comparisons.

No matter which dataset we use, the number of mass shootings committed with assault weapons is very small compared to the total number of mass shootings.  Looking at the number of attacks with assault weapons, the Mother Jones list shows a difference of only one or two between each of the three, ten-year periods.  This holds true whether we use the traditional FBI definition of 4-or-more killed or Klarevas' definition of 6-or-more killed.  The CPRC data is similar, showing differences of either zero, two, or three

attacks.  None of these changes are large enough to prove the ban had any impact on attacks.

Looking at attacks committed with any type of firearm, the differences that Klarevas finds between the pre-ban and ban periods either completely disappears or becomes just one or two attacks.





| Number of Mass Public Shootings using Klaveras of 6 or more killed | Number of Mass Public Shootings using Traditional FBI Definition of 4 or more killed |
|---|---|



When we instead look at the number of fatalities, we see again that the results are very sensitive to how Klarevas sets it up. When looking at mass public shootings, there is very little evidence of a significant drop in deaths from the assault weapons ban. Using the Mother Jones list of cases, we find that compared to the preceding ten years, there is drop of only four deaths in the decade of the assault weapons ban. That comes to 0.4 fewer deaths per year. The CPRC data actually shows a slight increase in deaths from the ban when it was in effect.

There is a similar pattern in deaths from mass shootings with 6 or more fatalities. However, the difference between pre-ban and ban fatalities is reduced when examining cases with 4 or more fatalities.







12/26/2020 Klarevas' false claims about the federal assault weapons ban and mass public shootings | Crime Prevention Research Center of Crime Pre…

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8306 Page 34 of 54



As we mentioned before, while it still doesn't account for the fact that the federal law didn't change the law in all states, looking at the share of attacks or deaths specifically from assault weapons seems a much more useful way of testing Klarevas' and other gun control advocates' claims. But whether we use Klarevas' list of cases and definition of mass shootings or the Mother Jones or CPRC lists and definitions, **none of the results are consistent with what Klarevas would predict**. The share of attacks using assault weapons should be lowest during the federal assault weapons ban. For both Klarevas and Mother Jones, there was a continual drop over time in the share of attacks committed with assault weapons. In both cases, the ten years after the end of the assault weapons ban (September 2004 to August 2014) saw the lowest share of shootings using assault weapons.



**Percent of Mass Shootings with Assault Weapons**
**(Using Klarevas' Mass Shooting data )**

12/26/2020 Klaveras' false claims about the federal assault weapons ban and mass public shootings | Crime Prevention Research Center Pre…

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8908 Page 36 of 54







The same analysis can be done of the share of mass shooting and mass public shooting deaths from assault weapons.  Again, Klarevas' data shows a continual decline over time.  The Mother Jones and CPRC data show even steeper declines.  Instead of the decade with the assault weapons ban showing the lowest share of deaths from assault weapons, **the pattern is clearly the exact opposite of what gun control advocates would predict.**  This is true whether one uses the traditional FBI definition of 4-or-more killed or Klarevas' definition of 6-or-more killed.







**"Arbitrariness"**

Klarevas has claimed that Lott's definition of mass public shootings was "arbitrary." But Lott was using the traditional FBI definition, and the point of doing so is to focus only on the sorts of attacks that get the attention of the news media. These attacks are intended to kill people in public places to generate fear and media attention. But Klarevas doesn't explain what he thinks is wrong with the FBI definition.

In any case, as we have just shown, even Klarevas own numbers don't show that both the share of attacks and deaths from mass shootings is not at its

12/26/2020    Klaveras false claims about the federal assault weapons ban and mass public shootings – Crime Prevention Research Center Crime Pre…

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8912 Page 40 of 54

lowest during the federal assault weapon ban. Instead, his own numbers show a continual decline over time.  This is not consistent with his theory.

**Pages 66 and 67**

So too do the conclusions of John Lott, who employs arbitrary criteria in a manner akin to *Mother Jones* in order to exclude certain mass shootings from his analyses.

As I discuss in great detail in chapter 5, Lott is a favorite "scholar" of many pro-gun conservatives.[65] Now a Fox News commentator and president of the Crime Prevention Research Center (CPRC)—a euphemistically named gun-rights advocacy organization—he has devoted decades to promoting increased ownership of firearms as a way to lower crime.[66] In 2014, the CPRC issued its first report, an analysis of mass shootings authored by Lott that was largely a point-by-point attack of Everytown's report. The primary gripe: Everytown "greatly exaggerated their number [of incidents] by including gang killings and shootings as part of some other crime (robberies etc.) as well as residential killings involving families."[67] When Lott applied his more restrictive definition, he found that during the same time period, there were only twenty-five mass shootings, resulting in 180 cumulative fatalities.[68] By changing parameters, Lott recalculated the overall number of multiple-victim shootings between January 2009 and July 2014 to be 77 percent less and the number of total deaths to be 68 percent less than Everytown's tallies. Lott drew on this drastic difference to conclude, "shootings, where the shooter intends to commit mass murder in a public place, has [*sic*] not 'exploded' over the last few years, as frequently claimed in the media."[69]

Of course, redefining the problem is a bit disingenuous on Lott's part. As I argued in chapter 2, mass shootings are best viewed in broad terms. The fewer arbitrary exclusions we apply, the more accurate our understanding will be. If there's a criticism to be leveled at the Everytown report, it's that its time frame is too short to allow for long-term trend analysis. It's hard to say that mass shootings are on the rise or decline based on just a few years of data. Yet, instead of raising this issue, Lott fell into the same trap by applying the identical time frame.[70]

## Conclusion

To do a proper analysis, one has to consider that some states had assault weapons bans both before and after the federal ban. We want to compare these states with those where the federal law actually imposed a new ban. How did changes in the number of attacks in one type of state compare to the changes in the other type of state?

Even if one doesn't follow this approach, it still makes more sense to look at the number of attacks or deaths from assault weapons, and compare those changes with the changes for all firearms. When we do so, even Klarevas' own definition of mass shootings doesn't support his prediction that the federal ban caused a decrease in attacks and deaths. And using Mother Jones or CPRC data, we find evidence for the opposite of what Klarevas would predict about deaths from mass shootings.

Looking at just the number of attacks or deaths, as Klarevas wants people to do, shows why he looked at all attacks with firearms and not specifically at attacks using assault weapons. It explains why he looks at mass shootings with six or more deaths, and not at mass public shootings using the traditional FBI definition of 4-or-more deaths. While Klarevas describes cases that meet the FBI's definition of mass public shootings, he doesn't account for why he applies the FBI definition to mass shootings but not to mass public shootings. He provides no explanation for why he only picks cases where 6 or more people have died.



Assault Weapons Ban, Gun Control Lies

  Share on Facebook
0
0



**By johnrlott**

Related posts

 Why Biden's proposal to classify semi-automatic rifles and magazines holding more than 10 rounds as Class III weapons depends on whether Democrats take control of the Senate

 Joe Biden explains that he would have voted against the DC v Heller decision, the implication is that would allow the government to ban all guns

 Kamala Harris on her ability as president to use an Executive Order to ban guns

---

# 2 Responses

1. *Ron Ames* says:
   May 9, 2018 at 9:56 AM

People neglect to note that the ban only restricted the appearance of AR15 style rifles. They were still available during the ban.

Reply

2.   *Mike* says:
     March 4, 2019 at 2:56 PM

     Looking at this data reminds me of clinical trials: if the placebo (non-assault weapons) performs like the drug being controlled and tested (assault weapons), would the trial be considered successful?

     Hmm… I wonder if we would see a similar 'decrease and increase' with other weapons, like knives.

     Reply

## Leave a Reply

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

☐ Save my name, email, and website in this browser for the next time I comment.

12/26/2024 Klaveras false claims about the federal assault weapons ban and mass public shootings – Crime Prevention Research Center

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8916 Page 44 of 54

Submit Comment

☐ Confirm you are NOT a spammer

Comments RSS Feed

# Books



Gun Control Myths: How politicians, the media, and botched "studies" have twisted the facts on gun control



The War On Guns: Arming Yourself Against Gun Control Lies



More Guns, Less Crime (University of Chicago Press, 3rd ed, 2010)



The Bias Against Guns



Straight Shooting: Firearms, Economics and Public Policy



Stalked and Defenseless: How Gun Control Helped My Stalker Murder My Husband in Front of Me



Freedomnomics, see Chapter 4 for a general overview of the economics of crime



Dumbing Down the Courts: How Politics Keeps the Smartest Judges Off the Bench

## Archives

- December 2020
- November 2020
- October 2020
- September 2020

12/26/2020 Klaveras false claims about the federal assault weapons ban and mass public shootings – Crime Prevention Research Center Pre…

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8818 Page 46 of 54

- August 2020
- July 2020
- June 2020
- May 2020
- April 2020
- March 2020
- February 2020
- January 2020
- December 2019
- November 2019
- October 2019
- September 2019
- August 2019
- July 2019
- June 2019
- May 2019
- April 2019
- March 2019
- February 2019
- January 2019
- December 2018
- November 2018
- October 2018
- September 2018
- August 2018
- July 2018
- June 2018
- May 2018
- April 2018
- March 2018
- February 2018
- January 2018
- December 2017
- November 2017
- October 2017
- September 2017

12/26/2020 Klaveras false claims about the federal assault weapons ban and mass public shootings – Crime Prevention Research Center Cr…

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8818 Page 47 of 54

- August 2017
- July 2017
- June 2017
- May 2017
- April 2017
- March 2017
- February 2017
- January 2017
- December 2016
- November 2016
- October 2016
- September 2016
- August 2016
- July 2016
- June 2016
- May 2016
- April 2016
- March 2016
- February 2016
- January 2016
- December 2015
- November 2015
- October 2015
- September 2015
- August 2015
- July 2015
- June 2015
- May 2015
- April 2015
- March 2015
- February 2015
- January 2015
- December 2014
- November 2014
- October 2014
- September 2014

12/26/2020 Klaveras false claims about the federal assault weapons ban and mass public shootings – Crime Prevention Research Center of Crime Pre…

Case 3:19-cv-01537-BEN-JLB Document 73-2 Filed 12/28/20 PageID.8320 Page 48 of 54

- August 2014
- July 2014
- June 2014
- May 2014
- April 2014
- March 2014
- February 2014
- January 2014
- December 2013
- November 2013
- October 2013
- September 2013
- August 2013
- July 2013
- May 2013
- February 2013
- January 2013

# Click here to subscribe to our research updates

Search for: [            ] [ Search ]

- Popular
- Latest



## UPDATED: Comparing Death Rates From Mass Public Shootings And Mass Public Violence In The US And Europe

23 Jun , 2015

## Updated: Murder And Homicide Rates Before And After Gun Bans

16 Apr , 2016

## Comparing Murder Rates And Gun Ownership Across Countries

31 Mar , 2014



## Murders In US Very Concentrated: 54% Of US Counties In 2014 Had Zero Murders, 2% Of Counties Have 51% Of The Murders

25 Apr , 2017



## As Shootings And Crime Climbing Dramatically, Gun Permit Requests By New Yorkers Soared By 216%, But The Rate That Permits Were Approved Feel By 81%

25 Dec , 2020

12/26/2020    Klaveras' False Claims About the Federal Assault Weapons Ban and Mass Public Shootings – Crime Prevention Research Center of ...

Case 3:19-cv-01537-BEN-JLB   Document 73-2   Filed 12/28/20   PageID.8322   Page 50 of 54



## [CBS's Magnum PI Shows Criminals Using Machine Guns In Holding Hostages At A Federal Government Building](#)

[24 Dec , 2020](#)   Video



## [On The Michigan Talk Network With Steve Gruber: Andrew Pollack Discusses The Covid-19 Stimulus Bill And Trump Wanting More For Americans](#)

[23 Dec , 2020](#)



## [On The Michigan Talk Network With Steve Gruber: Andrew Pollack, Election Integrity And 75 Million Voters Concerned About Some Republicans Throwing In The Towel](#)

[22 Dec , 2020](#)

# Search By Topic

- **ANNUAL REPORT ON NUMBER OF CONCEALED HANDGUN PERMITS**
- **ASSAULT WEAPONS BAN**
- **CPRC RESEARCH**
- **PRE CPRC RESEARCH**
- **ABOUT THE CPRC**
- **BACKGROUND CHECKS**
- **BLOOMBERG'S GROUPS**
- **CONCEALED CARRY STATISTICS — ANNUAL REPORT**
- **CONCEALED CARRY — HOW LAW-ABIDING ARE PERMIT HOLDERS?**
- **CONCEALED HANDGUNS ALLOWED IN SCHOOLS, LIST OF STATES**
- **CONCEALED HANGUNS ALLOWED IN STATE CAPITOLS**
- **CONCEALED HANDGUNS ALLOWED IN SCHOOLS, HOW ITS HAS WORKED OUT**
- **CONCEALED HANDGUNS USED TO STOP MASS PUBLIC SHOOTINGS**
- **CONCEALED CARRY — OTHER**
- **CONSTITUTIONAL CARRY**
- **DATA FROM VARIOUS STUDIES**
- **DEATH PENALTY**
- **DEBATES**
- **DEFENSIVE GUN USES WITH CONCEALED HANDGUNS**
- **DEMOGRAPHICS OF MASS PUBLIC SHOOTERS**
- **FACT CHECKING THE MEDIA**
- **GUN BANS: MURDER AND HOMICIDE RATES BEFORE AND AFTER GUN BANS**
- **GUN CONTROL ADVOCATES REFUSE TO DEBATE**
- **GUN CONTROL LIES**
- **GUN-FREE ZONES**
- **GUN SHOW REGULATIONS**
- **ILLEGAL ALIEN CRIME**
- **IMPACT OF GUN CONTROL ON THE POOR**

- **INTERNATIONAL COMPARISONS**
- **MASS PUBLIC KILLINGS NON-SHOOTINGS**
- **MASS PUBLIC SHOOTINGS**
- **MASS PUBLIC SHOOTINGS IN GUN-FREE ZONES**
- **MEDIA APPEARANCES**
- **MEDIA BIAS ON GUNS**
- **MEDIA DISCUSSION ON THE CPRC**
- **MENTAL ILLNESS**
- **MORE GUNS, LESS CRIME**
- **NEWS COVERAGE OF CPRC**
- **OP-EDS**
- **POLICE OFFICER SAVED BY CONCEALED HANDGUN PERMIT HOLDER**
- **PUBLIC HEALTH RESEARCH**
- **RED FLAG LAWS**
- **REGISTRATION OF GUNS**
- **RESPONSES TO CRITICS**
- **SAFE STORAGE LAWS**
- **SCHOOL SECURITY**
- **SMART GUNS**
- **STAND YOUR GROUND**
- **SURVEYS ON GUN OWNERSHIP**
- **TALKS**
- **TELEVISION SHOW BIAS ON GUNS**
- **TESTIMONY**
- **WOMEN AND GUNS**

© Copyright 2020    Crime Prevention Research Center **TOP**

For press inquiries please contact John Lott at johnrlott@crimeresearch.org or (484) 802-5373 or Nikki Goeser at nikki@crimeresearch.org | <u>Privacy Policy</u> | <u>Terms of Service</u>

**EXHIBIT 2**

**Crime Prevention Research Center (CPRC)**
**Excel Workbook Data Entries under "Klarevas Data" Tab**
**Discrepancies with Klarevas Dataset Regarding Coding of High-Fatality Mass Shootings Involving Assault Weapons**

| Date | City | State | Killer | Murders | Assault weapon | Deaths from AW | Weapons | | Sources |
|---|---|---|---|---|---|---|---|---|---|
| 6/18/1990 | Jacksonville | Florida | James Pough | 9 | 1 | 9 | .30-caliber Universal M1 carbine rifle; .38-caliber revolver | | http://www.nytimes.com/1990/06/19/us/florida-gunman-kills-8-and-wounds-6-in-office.html; http://www.nytimes.com/1990/06/20/us/hazy-records-helped-florida-gunman-buy-arms.html; http://www.vpc.org/studies/wgun900618.htm; http://www.nytimes.com/1990/06/19/us/florida-gunman-kills-8-and-wounds-6-in-office.html?pagewanted=all&src=pm |
| 1/15/2003 | Edinburg | Texas | Humberto Garza, Robert Garza, Rodolfo Medrano, Juan Ramirez | 6 | 0 | 0 | semi-auto rifles | 2+ semi-automatic SKS Norinco 7.62x39mm rifles | https://law.justia.com/cases/texas/court-of-criminal-appeals/2008/17657.html |
| 6/1/2006 | Indianapolis | IN | James Stewart, Desmond Turner | 7 | 0 | 0 | pistol, long gun | long gun had 7.62x39mm cartridge casings | http://www.in.gov/judiciary/opinions/pdf/09281101rdr.pdf |
| 3/10/2009 | Kinston, Samson, Geneva | AL | Michael McLendon | 10 | 0 | 0 | two semi-auto rifles, one handgun, one shotgun | Bushmaster XM-15 rifle, SKS carbine rifle, handgun, shotgun | |
| 1/19/2010 | Appomattox | VA | Christopher Speight | 8 | 0 | 0 | rifle | | https://en.wikipedia.org/wiki/Appomattox_mass_murder |

**NOTE: Any cell that appears blank also appears blank in the original CPRC Excel Workbook**