1                      UNITED STATES DISTRICT COURT

2                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    JAMES MILLER, an individual;      )
     PATRICK RUSS, an individual; RYAN )
4    PETERSON, an individual; and SAN  )
     DIEGO COUNTY GUN OWNERS POLITICAL )
5    ACTION COMMITTEE, a membership    )
     organization,                     )
6                                      )  No. 19-CV-1537-JAH-AGS
               Plaintiffs,             )
7                                      )
     v.                                )  December 16, 2020
8                                      )
     XAVIER BECERRA, in his official   )
9    capacity as Attorney General of   )
     California; and MARTIN HORAN, in  )
10   his official capacity as Chief of )
     the Department of Justice Bureau  )
11   of Firearms,                      )
                                       )  Courtroom 5A
12             Defendants.             )
     _____ )  San Diego, California

13

14                       TRANSCRIPT OF PROCEEDINGS

15                        (Pretrial Conference)

16

17     BEFORE THE HONORABLE ROGER T. BENITEZ, SENIOR DISTRICT JUDGE

18

19

20

21

22   COURT REPORTER:         AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
23                           U.S. District Court
                             333 West Broadway, Suite 420
24                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov
25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:     GEORGE LEE
                             Seiler Epstein, LLP
 3                           275 Battery Street, Suite 1600
                             San Francisco, CA  94111
 4                           (415)979-0500
                             gml@seilerepstein.com
 5

 6
                             JOHN DILLON
 7                           Gatzke, Dillon & Ballance, LLP
                             2762 Gateway Road
 8                           Carlsbad, CA  92009
                             (760)431-9501
 9                           jdillon@gandb.com

10

11
     FOR THE DEFENDANTS:     JOHN ECHEVERRIA
12                           Office of the California Attorney General
                             300 S. Spring Street, Suite 1702
13                           Los Angeles, CA  90013
                             (213)897-4902
14                           john.echeverria@doj.ca.gov

15

16                           PETER CHANG
                             JOSE ZELIDON-ZEPEDA
17                           California Attorney Generals
                             455 Golden Gate Avenue, Suite 11000
18                           San Francisco, CA  94102
                             (415)703-5939
19                           peter.chang@doj.ca.gov
                             jose.zelidonzepeda@doj.ca.gov
20
     ALSO PRESENT:           MARK BECKINGTON
21

22

23

24

25
```

1          (Wednesday, December 16, 2020; 10:14 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  1 on calendar, 19-CV-1537, Miller, et

6    al., versus Becerra, et al., pretrial conference.

7          THE COURT:  Okay.  Good morning.

8          THE ATTORNEYS:  Good morning.  Good morning, your

9    Honor.  Good morning, your Honor.

10         THE COURT:  All right.  If you would all do me a

11   favor, register your appearances for the record.

12         Please remember that any time that you speak you

13   should preface your comments by stating your name, since we do

14   have a court reporter.

15         So starting with the plaintiff, if you would please

16   introduce yourself for the record.

17         MR. DILLON:  This is John Dillon, counsel for

18   plaintiff.

19         MR. LEE:  And this is George Lee, appearing for the

20   plaintiffs.

21         THE COURT:  Okay.

22         MR. ECHEVERRIA:  Good morning, your Honor.  This is

23   John Echeverria for the defendants.  And I'm joined this

24   morning with three of my colleagues:  Mark Beckington, Peter

25   Chang, and José Zelidon-Zepeda.  We're also with the Department

1    of Justice, and are attorneys in this case.

2              THE COURT:  Well, let's see.  A couple of you seem

3    familiar to me.  I think I know Mr. Chang.  I think he argued

4    the -- the ammunition case before the Ninth Circuit, if I'm not

5    mistaken.  I recognize his face.

6              Mr. Beckington was here last time.  And, I'm sorry,

7    who -- who is the third?

8              MR. ZEPEDA:  Good morning, your Honor.  José

9    Zelidon-Zepeda with the Attorney General's office, for the

10   defendant.

11             THE COURT:  Okay.  Well, welcome to all of you.  So,

12   today, I think we had set this for -- what?  A pretrial sort of

13   hearing, if I'm not mistaken?  Am I right?

14             MR. LEE:  That's correct.

15             THE COURT:  Okay.  I have reviewed all of your

16   supplemental briefs.  And I think I've looked at some of the

17   exhibits that the plaintiff attached to their brief.  I think

18   there were links to some of those exhibits.  So I think

19   we're -- we're pretty much ready to go.

20             I think we had set a hearing date in January.  Is

21   that correct?

22             MR. LEE:  Yes, your Honor.

23             MR. ECHEVERRIA:  Yes, your Honor.

24             THE COURT:  All right.  So I -- I really want to move

25   this case along.  There are some important issues that I think

1   need to be resolved.

2          But as we all know, the governor's rules and

3   restrictions vary from day to day.  So I don't know if we will

4   be able to have -- be allowed to travel when the hearing date

5   comes up.  I hope we will because I think this case has been

6   pending long enough.  And unless there is a -- a restriction

7   that's issued that prohibits all travel, we will -- we will go

8   ahead and conduct a hearing on that date.

9          How long -- Mr. Dillon, Mr. Lee, how long do you

10  anticipate that you will -- you will take putting on your case?

11         MR. LEE:  Yes, your Honor.  This is George Lee

12  appearing for the plaintiffs.

13         So defendants and plaintiffs have met and conferred

14  extensively.  And we settled, I believe, on a process or

15  procedure that will really both curtail the amount of court

16  time that's necessary, as well as --

17         THE COURT:  You know, we're having -- we're having

18  the problem that we seem to always have with these Zoom

19  hearings.  I think every time you look down, I lose you.  And I

20  apologize for that.  But -- I think I just did the same thing,

21  as a matter of fact.

22         Anyway, so please -- please make sure that you speak

23  into the microphone.  Because, otherwise, at least I can't hear

24  you.

25         Okay.  Go ahead.

1          MR. LEE:  Your Honor, no need to apologize.  We're

2     all sort of adjusting to this.

3          The defense and plaintiffs have agreed on a process

4     and procedure that is going to minimize, really, the need for

5     an extensive hearing in January.

6          And the process that -- that we have agreed to

7     involves gleaning all direct testimony of all witnesses on the

8     declarations that either have been submitted or have been

9     marked as exhibits now, trial exhibits.  And all

10    cross-examination will be handled by way of deposition

11    testimony when -- whenever that is possible.

12         THE COURT:  So -- so I take it there's been

13    depositions taken?

14         MR. LEE:  We are in the process of scheduling

15    depositions currently.

16         THE COURT:  Okay.  All right.

17         MR. LEE:  Get that all completed by the time of the

18    hearing.

19         And then -- and hopefully, unless -- and so here's --

20    here's the question for your Honor.  If the parties have agreed

21    to this process and the Court agrees -- and in light of the

22    fact that there was already a hearing in October in which the

23    Court asked questions of witnesses -- will the Court decide to

24    hear direct testimony from the witnesses -- and, if so, we --

25    you know, we would have to arrange to have them appear, of

1    course, preferably by video.  But if the Court is satisfied

2    that this process of submitting everything on declarations and

3    deposition testimony is satisfactory to the Court, then I think

4    it should be a very short trial.

5           THE COURT:  So -- so the proposal is that the

6    declarations would be the direct testimony.

7           MR. LEE:  (Nods head.)

8           THE COURT:  And the cross-examination would be that

9    which has gone on by way of the depositions.  So you're --

10   you're proposing that there would not be any live witnesses?

11   Is that -- is that right?

12          MR. LEE:  Correct, your Honor.  Unless, of course,

13   the Court wishes to hear, or has some additional questions of

14   witnesses, in which we'll endeavor to produce them hopefully by

15   video, if the Court permits.

16          But -- but if -- but if the Court is satisfied that

17   this process is efficient, then I think that will really

18   minimize the amount of actual trial time.

19          THE COURT:  Why -- why would we even need a trial

20   date -- or a trial, if that's the case?  It's being handled

21   more as a motion, which could be handled, I suppose --

22   submitted on the papers, than anything else.

23          MR. LEE:  Sure.  The defense has indicated a desire

24   to file some motions in limine, some *Daubert* challenges, and

25   proposed that the bulk of the hearing would be dedicated to two

1   things.  One is resolving those motions.  And two is to produce

2   any witnesses that we may not, for whatever reason, be able to

3   depose between now and the 21st.

4         THE COURT:  Well, if there's going to be a *Daubert*

5   motion, I don't want to decide it on the date of the hearing.

6         Why -- why haven't the *Daubert* motions been filed

7   already?

8         MR. LEE:  Well, that is a question for -- for the

9   defense, I think.  Because I don't think that the plaintiffs,

10  at this point, intend to file any *Daubert* challenges as of yet.

11  But -- but then again, of course, I suppose that might depend

12  on what deposition -- what testimony is yielded at the

13  deposition.  But I'll let the defense address that specific

14  question.

15        THE COURT:  Well, you know, the -- one of the things

16  that has really troubled me about this case and the way this

17  case is being presented is that -- yeah, as a matter of fact,

18  there's a lot of testimony that I think I see and hear that --

19  that just seems to be not -- it just is not satisfactory to me

20  in the way it's being presented.

21        I'll -- I'll give you the most basic -- the most

22  basic example of this.  I believe it's in -- it's in his

23  supplemental brief.  Mr. Echeverria addresses the fact that --

24  that these -- I'm going to call them "black rifles."  I'm not

25  going to call them "assault weapons" because they're -- that's

1    a pejorative term that I don't think suits anyone.

2         So we'll use the "black rifle" or "sporting rifle"

3    terminology.  It says that it fires 300 rounds a minute.  And I

4    know that's not true.  I just happen to know that that's not

5    true.  That's a false statement.

6         And when I read that, I said, "Well, okay.  So where

7    is -- show me the evidence?  Show me the evidence that proves

8    that?  And basically all we have is -- I don't know.  Some

9    statement by someone about some statement by someone.  And --

10   and I think -- I think, if I'm not mistaken, if anything,

11   they're -- they're talking about the cycling rate, which is

12   very, very different than the firing rate.

13        So I thought, well, this is not -- this is not valid

14   evidence to be presented to me.  So -- so I think a lot of

15   *Daubert* motions, a lot of expert exclusion motions would be

16   appropriate in this case.  But it almost seems to me that we're

17   way too far down the road on that, which is why I was hoping to

18   have a live, in-person hearing, so that I could actually watch

19   and listen to the witnesses that are testifying to someone.

20        As you know, I tend to be active in those cases where

21   I am the fact-finder.  And, for example, if someone were to

22   take the witness stand and say, you know, "One of these black

23   rifles will fire 300 rounds per minute," I might be inclined to

24   say to that witness, "Well, let me get my marshal to get an

25   AR-15.  Let's go down to the range and show me that you can

1   fire 300 rounds per minute out of this."  You see?  We can't do

2   this by -- by this process that you are proposing.

3            It makes it very, very difficult for me.

4            So I -- I mean, I want to cooperate with you and do

5   what -- you know, what works for you folks.  But, by the same

6   token, you're asking me to make a factual finding on an issue

7   that I believe is pretty important.  You know, it's -- it's an

8   issue that is, at least on its margin, set out in the -- in the

9   Bill of Rights.  And I don't want to just, you know, shrug it

10  off, and -- so having expressed those concerns, I guess what

11  I'll say is this.

12           We have a hearing date set in -- in January.  If

13  there are any *Daubert* motions or motions to exclude evidence, I

14  want those to be filed no later than ten days from now.  And

15  any opposition to them may be filed no later than a week after

16  that.  So that -- that may help.

17           But, you know, so -- so a colleague of mine -- a

18  colleague of mine, Mark Bennett, from -- from Iowa, I heard him

19  say one time that -- that he didn't resolve things by

20  affidavits and declarations.  And the reason why is because you

21  can't really see the demeanor or hear the -- the real -- the

22  tone of the voice, et cetera, of the witness, when you're doing

23  things by -- by affidavits or declarations.

24           And I couldn't agree with him more.  And, in most

25  cases, I love having the witness sitting there, three feet away

1   from me, so that I can watch the witness to see how the witness

2   is reacting; the facial expressions, tone of voice, whether or

3   not he or she is wiggling in the chair, and so on.

4         And the process that you are proposing deprives me of

5   all of that.  So -- so I'm trying to -- I'm trying to work my

6   way through what you have proposed and see how we might be able

7   to resolve some of these other issues.

8         MR. LEE:  Well, your Honor, again -- and this is

9   George Lee appearing for the plaintiffs.

10        We -- it might help if the Court had a list of

11  witnesses from whom it wished to hear specifically.  I think we

12  could all endeavor to see about producing those witnesses and

13  making them available for the Court at the hearing on the 21st,

14  if that's the Court's desire.  And I think when we started out,

15  is making this proposal about how we intend to proceed, which

16  is -- we think it's economical as well as efficient.  But, of

17  course, if the Court has a narrow list of witnesses it would

18  like to hear from, we would certainly endeavor to produce them.

19  I think both sides would.

20        THE COURT:  All right.  Well, let me say this.

21  Because, listen, I really do appreciate you folks coming up

22  with this proposed procedure.

23        I was going to suggest, as part of what I wanted to

24  talk about today, was that you folks stipulate to as many facts

25  as you possibly could, so we could take those out of

1   contention.

2          So I'm going to tell you, for example, there is a

3   contention Mr. Echeverria argues that at least as to the black

4   rifles or the sporting rifles, that they're in common use.

5          Frankly, as you know, this is my -- this is my fourth

6   Second Amendment case.  I think I'm pretty familiar with the

7   commonality of those weapons.

8          I don't know.  Maybe we could take that out of the

9   equation if -- if the state was willing to agree, at least as

10  to the sporting rifles, that they are in fact commonly

11  possessed by law-abiding citizens for lawful purposes such as

12  hunting, sporting, target practicing, and perhaps for

13  self-defense.  If that were to be stipulated to, for example,

14  then that would resolve a considerable amount of issues.

15         If there were to be a stipulation, for example -- and

16  I don't know what your discovery has shown.  You know, how many

17  of these -- how many -- how many pistols are there that -- that

18  are possessed by -- by people out there that have threaded

19  barrels?  Or that have a -- you know, a magazine in front -- in

20  front of the trigger?  Whatever the statute specifically says.

21  Those sorts of stipulations could certainly shorten the

22  amount -- the amount of time that we spend.

23         So -- so I was going to suggest you folks try to

24  stipulate to as much as you possibly can.  Because if you

25  stipulate, then, of course, then I don't have to -- to delve

1    into -- into that issue.

2         I'm -- I'm sort of thinking while I'm talking -- I'm

3    thinking about your proposed process, so let me make the

4    following suggestion.  How about this?  How about we'll give it

5    a try?  We'll -- you can do it -- you can do it as you're

6    proposing.  The problem is that I guess we don't know who --

7    how many people are going to be deposed between -- between now

8    and January.  Right?  We've got the holidays in there and --

9         MR. LEE:  Yes.  Yes, your Honor.  It's a challenge.

10   And the defense has (indiscernible) of attempting to depose --

11        THE COURT:  I'm sorry?

12        MR. LEE:  We're talking about 12 to 14 people.  And

13   we are trying to meet and confer on that -- the scope of that,

14   and agreement and stipulations where we can.  And there's

15   logistical challenges, for sure.

16        So we will endeavor to get as much of this done

17   before your Honor, as much as possible, before the hearing.

18   And we appreciate the Court's willingness at least to consider

19   this -- this approach.

20        I did want to raise one argument -- one -- one --

21   take one stab at discussing the *Daubert* issue.  And without

22   telegraphing in advance what plaintiff's position is going to

23   be, this is a bench trial.  So -- so I don't think -- so the --

24   the dangers of having expert testimony come in that may be

25   prejudicial or unreliable, I think that given that this is a

1  bench trial, your Honor's quite capable of giving any

2  testimony, expert or not, the appropriate weight that it

3  deserves.

4          And if the Court finds that certain testimony of

5  certain witnesses -- expert witnesses is less reliable than

6  others, then it's not a matter of gatekeeping to try to keep

7  that out of the jury.  There's no -- there's no danger of

8  prejudicial testimony coming in.

9          It all goes to a matter of weight, which this Court

10 is certainly well capable of -- of independently assessing.  So

11 I -- I would have no issue with having the Court decide on the

12 21st the *Daubert* challenges that each side may raise.

13         And if the Court wants to take that under submission

14 and say, well, I think it -- you know, it could be simply a

15 matter of weight rather than admissibility, given that there's

16 no gatekeeping function for the Court here, I think it's

17 appropriate to have the *Daubert* challenges for probably on the

18 day of the trial.  And, you know, the Court can hear argument

19 on that -- certainly on that day.

20         THE COURT:  Well, I guess I could -- I could decide

21 it on that day.  But I would sure like to know about it

22 beforehand.

23         You know, I don't -- I don't particularly like having

24 issues come up, particularly evidentiary issues, that come up

25 on the day of trial if they can be anticipated and resolved

1    ahead of time.

2              Maybe I should ask Mr. Echeverria, since I understand

3    you're the one who's interested in doing -- filing *Daubert*

4    motions, maybe you could tell me, what -- what are the *Daubert*

5    motions about?

6              MR. ECHEVERRIA:  Thank you, your Honor.

7              So we -- we are considering filing *Daubert* motions

8    with respect to some of the plaintiffs' expert witnesses.  That

9    is not a decision that we have made yet.  We are still hoping

10   to depose those witnesses to assess their qualifications to --

11   to offer expert testimony in this case.

12             We appreciate that, you know, there is not going to

13   be a jury.  The judge is going to be able to assess the

14   credibility of the experts' opinions and to give appropriate

15   weight to that testimony.

16             So it's not clear that *Daubert* motions will actually

17   be filed and that the Court will have to resolve several

18   *Daubert* motions.  Some of the issues may be addressed in the

19   legal briefing.

20             THE COURT:  Are there -- are there any other

21   witnesses?  Any expert witnesses that I have not looked at so

22   far?

23             MR. ECHEVERRIA:  I believe -- my colleagues on the

24   other side can correct me, but I believe the Court has seen all

25   of the expert witnesses.

1        There are several additional fact witnesses.

2   Mr. Ostini, Mr. Siegel, and Mr. Brown, who defendants are

3   hoping to depose, and the Court has not had an opportunity to

4   see yet.

5        THE COURT:  Okay.

6        MR. ECHEVERRIA:  And just to be clear, there's --

7   those three individuals submitted declarations with plaintiffs'

8   supplemental briefing.

9        THE COURT:  Okay.  All right.  All right.  Well,

10  this -- this whole COVID situation has turned our hearings, and

11  so on, into sort of difficult situations to -- to proceed with.

12  But -- and so we're -- we're going to do the best we can.

13       I want to accommodate you folks.  I want to keep in

14  mind some of the restrictions that have been imposed.  And I

15  also want to keep in mind -- as I said before, you're asking me

16  to decide some issues that I think are pretty important.

17       So, all right.  We'll play it by ear.  How's that?

18       So here's what I want you to do.  If you are going to

19  file a *Daubert* motion, as I said, I would file within the time

20  frame I already set out.  Same thing for the opposition.

21       I may or may not rule on those before the date of the

22  hearing.  It will depend.  I will see.

23       So I -- I threw out there a possible stipulation, and

24  I threw it out there for a reason.  Because in reviewing

25  Mr. Echeverria's supplemental brief, I was -- I was left -- I

1   was left somewhat puzzled by what it is that the State believes

2   is the test for a weapon that is commonly possessed by

3   law-abiding citizens for lawful purposes.

4          On the one hand, Mr. Echeverria, you argued that the

5   numbers don't matter.  And then there's a -- a -- I could

6   possibly find the particular section.  But I was left somewhat

7   wondering, well, okay.  So -- so how do we determine whether or

8   not a weapon is commonly owned?  I -- I'm one who believes in

9   certainly the numbers, you know.  The numbers are a pretty good

10  test of whether it's commonly owned.

11         But maybe I should ask Mr. Echeverria or Mr. Chang,

12  or whoever, to tell me what they believe is the test under

13  *Heller*, for deciding whether or not the weapon is commonly

14  owned for lawful purposes by law-abiding citizens.

15         MR. ECHEVERRIA:  Thank you, your Honor.  This is John

16  Echeverria.

17         It's not the defendants' position that the numbers

18  are irrelevant.  In *Heller*, the Supreme Court did look to the

19  numbers to find that handguns are commonly -- are in common use

20  for lawful purposes by law-abiding citizens.  But the numbers

21  are not the end of the story.

22         The court also looked at the core attributes of the

23  hardware that was being regulated.  And the court, in *Heller*,

24  observed that handguns have several characteristics that make

25  them ideally suited to home defense.

1    It is the defendants' position that the types of

2 configurations that are being restricted under the AWCA are

3 configurations that are not really well suited for home

4 defense.  They're more suited for military application.

5    THE COURT:  All right.  Let me stop you there.

6 Because that's right.  What you're -- what you're alluding to

7 is -- is a problem for me because there's a difference.  If you

8 look at that prong of *Heller*, it has two parts to it.

9    One is that it's -- that it's commonly owned.  And

10 that it is commonly owned for lawful purposes.  So -- so when I

11 read your supplemental brief, Mr. Echeverria, those two things

12 seem to -- seem to get merged in a way that confuses --

13 confuses me, anyway.

14    So I would like to break this apart because the first

15 thing we have to look at is whether or not they're commonly

16 owned.  Are they commonly owned?  Right?  I mean, are they

17 commonly owned?

18    And I -- and -- and the way you test that, I

19 suppose -- I think, is by the numbers.

20    And then, the second part of that test, the second --

21 the second prong of that test is are they commonly owned for

22 lawful purposes.  Right?  So, in other words, it's not -- not

23 one prong, it's -- it's -- it's a two-part prong.  How's that?

24 It's like a tripartite intermediate scrutiny test.  Okay?  I'm

25 not trying to make your life difficult.

```
 1              But do you understand what I'm saying?

 2              So, for example, if we could agree -- okay.  Could we

 3    agree, by way of stipulation, that, yeah, there's a whole lot

 4    of these black rifles out there in the population, and thereby

 5    agree that they're commonly owned?  Leaving us to then decide

 6    whether or not they're commonly owned for a lawful purpose and

 7    whether or not they're commonly owned by law-abiding citizens.

 8              You follow what I'm saying?  Does that make any sense

 9    to you?

10              MR. ECHEVERRIA:  This is John Echeverria.  This does

11    make sense, your Honor.

12              The -- you know, the Supreme Court in *Heller* and

13    *McDonald* did not break it up into a two-part test or a two-part

14    test embedded in another test.  You know, it was -- the

15    threshold question is, are these weapons in common use for

16    lawful purposes, like self-defense?

17              And the numbers are part of the equation but it's the

18    defendants' position that the numbers of MSRs or black rifles,

19    those aren't the appropriate numbers to look at.  That's an

20    over-inclusive universe because the state is not prohibiting

21    those -- those MSRs like the AR-15.  The AR-15 is an MSR that

22    is available for purchase and lawful possession in the state of

23    California.  The state is just prohibiting certain

24    configurations of those weapons --

25              THE COURT:  Yeah, I understand that.
```

 1          MR. ECHEVERRIA:  -- that in the State's view are more

 2    dangerous.

 3          THE COURT:  See, I understand what you're saying.

 4    But the problem with that statement, Mr. Echeverria, is this.

 5    Nowhere in *Heller* -- nowhere in *Heller* did the Supreme Court

 6    say that they are commonly possessed by law-abiding citizens

 7    for self-defense.  They didn't say that.  I've read *Heller* I

 8    don't know how many times now.  What they said was they were

 9    commonly possessed by law-abiding citizens for lawful purposes

10    like self-defense.

11          So -- so I can -- I can -- I can see, for example,

12    how we could reserve for argument and evidence whether or not

13    these weapons are used for lawful purposes, while at the same

14    time agreeing that they are commonly owned.  Do you see what

15    I'm saying?

16          If you make this all a one-prong test -- I -- I -- I

17    don't know that I saw that in *Heller* anywhere.  And it makes --

18    it makes our trying this case that much more difficult.  But

19    I -- but I do understand your position as far as the

20    configurations, which kind of leads me to -- to another concern

21    that I had, and that was this.

22          So -- so I assume that the state has decided that

23    these weapons should be banned.  For example, the weapon that

24    has a -- a pistol grip.  Because they're a sufficient danger to

25    the public that they should be outlawed.  Right?

1          MR. ECHEVERRIA:  That's correct, your Honor.

2          THE COURT:  All right.  Which leads me to believe

3    that there must be enough of these weapons out in the community

4    for the state to be concerned and by -- to enact a law

5    forbidding the ownership of those weapons.

6          And as I was reading the transcript from the last

7    hearings, it struck me that the state has to have a -- a

8    foundation for -- for making it unlawful to possess these

9    weapons.

10          So, to -- so I -- so I had written several notes to

11    myself.  And the first note -- the first note, by the way, was,

12    okay, so what's the test for commonly owned?  Well, we've

13    talked about that.  I -- I don't know that you're ever going to

14    agree with my position that commonly owned is a separate -- a

15    separate part of commonly owned for lawful purposes.  I take it

16    you're not.

17          Am I correct in that -- in that assumption?

18          MR. ECHEVERRIA:  Well, I need to give it some more

19    thought, your Honor.  I'm not aware of any cases that have

20    articulated the common use test in the way that you are.

21          I think it is -- it is eminently helpful to think

22    about the common use test based on the different factors that

23    the Supreme Court has touched upon in *Heller*, including the

24    popularity of a weapon.  Which would -- which would, in some

25    ways, relate to the number of that firearm that is in

```
 1   circulation.  Another fact to consider is the core attributes
 2   of the weapon.  And the core attributes in Heller made the
 3   handgun the quintessential self-defense weapon.
 4             THE COURT:  Sure.
 5             MR. ECHEVERRIA:  You know.  And we'll get the
 6   attributes of the assault weapons that are being regulated.
 7   And we believe the Court could determine the state had a
 8   sufficient basis for determining -- you know, based on
 9   legislative facts -- that these regulated weapons are more
10   dangerous; particularly in mass-shooting scenarios because of
11   their ability to stabilize a weapon in rapid fire.  Which is
12   not the type of fire that you would need to use commonly in a
13   self-defense scenario.  So --
14             THE COURT:  Doesn't -- doesn't that go to -- doesn't
15   that go, however, Mr. Echeverria, to a different part of the --
16   what I am going to be having to decide, which is whether or not
17   there is a basis?
18             Whether we use the strict scrutiny or intermediate
19   scrutiny basis for -- for -- for restricting these weapons?  As
20   opposed to -- so -- so the way I look at the test -- and maybe
21   I'm wrong.  But the way I look at the test is that Heller says,
22   "Look, is the weapon commonly owned?"  Well, first of all, we
23   start out with, Is it dangerous and unusual?  Well, every gun
24   is dangerous.  Some guns may be unusual.  I don't know.
25             I suspect that the M16 is probably an unusual weapon
```

1   for -- for people to own in -- in a nonmilitary setting.   Okay.

2   So is it dangerous and unusual?

3            The next part of the test is, is it commonly owned by

4   ordinary citizens for lawful purposes?   If the answer is yes,

5   now then what we have to look at -- which I think is where --

6   what you're talking about.   We then have to look at, okay, so

7   if we assume that it fits that *Heller* test, then the next thing

8   we have to look at and say, okay, but this -- this weapon is --

9   is -- is such that the state can restrict or limit or ban its

10  use or possession.   And then, of course, we then have to decide

11  whether or not in doing so we apply strict scrutiny or the

12  intermediate scrutiny test.

13            Do you understand?   Does that make any sense to you?

14            MR. ECHEVERRIA:   It does make sense, your Honor.

15            THE COURT:   Okay.   And -- and I'll tell you why --

16  why did -- why the numbers.   Okay?   If we can get rid of the

17  numbers issue, why that -- why that's important -- because if

18  it's not, it seems to me that the state has the best evidence.

19  The state has been requiring background checks and

20  registrations on these weapons for a long time.

21            I know that long rifles, since at least 2014 have --

22  have -- have required that they go through the NICS background,

23  and so on and so forth.

24            So it leads me to conclude that the state probably

25  has the best, most accurate information as to how many of these

1    weapons are actually out there in the state of California,

2    as -- not including those that may have been brought, for

3    example, into the state, that have never been registered, and

4    so on; or those that may be owned illegally, and so on.  But at

5    least the state would have a number -- a hard number that they

6    would be able to give us and tell us, "This is how many, for

7    example, AK-47s have been purchased or registered in the state

8    of California."  And, you see, that would give us a number.

9           And so what I was trying to avoid -- I was trying to

10   avoid putting you, Mr. Echeverria, to the task of having to

11   provide me with that information.  You see?

12          So if you just simply agree, yeah, okay, all right.

13   There's a whole lot of these things floating out there.  So we

14   can get rid of that -- that issue.

15          Now let's talk about whether they're owned for lawful

16   purposes, what a lawful purpose is, and whether the state has

17   met its burden of restricting their possession and use under

18   either strict scrutiny or intermediate scrutiny.

19          So, I guess what I'm saying is this.  If the state

20   will not agree that these weapons are in fact commonly owned,

21   then I'm going to ask the state, since I believe you have the

22   best evidence, to provide the Court with the numbers of how

23   many of these weapons have been sold, registered; sold or

24   registered in the state of California.  And, of course, I would

25   want that information before -- before the date of the hearing,

1    and I would also want it to be provided to the defense.

2            Hopefully that won't be necessary.  Hopefully you'll

3    agree to what I think -- you know, and I think -- I think

4    several other courts have -- have -- have talked about these

5    weapons being commonly owned.  So, you know, it seems to me

6    that issue is really a nonissue that we can get over pretty

7    quickly and save us some time.

8            Now, I can't say, to be honest with you, that I have

9    seen a case or -- or read anything about how often -- or how

10   common these pistols with -- with -- with threaded barrels or

11   magazines in front of the -- in front of the trigger are.

12           I think the articles that Mr. Lee and Mr. Dillon

13   submitted as a supplemental -- part of their supplemental --

14   supplemental brief seems to address the threaded barrels.  As I

15   recall, there was a lot of literature about sales on -- on

16   threaded barrels.  And I don't know if the state would have any

17   information that would help us.  I guess -- I guess they would,

18   wouldn't they?

19           Because these are pistols that also have to be

20   purchased through an FFL and have to go through a background

21   check, and so on.  Right?

22           So -- so the state would have to know how many -- how

23   many of these pistols have been -- have been purchased and/or

24   registered in the state of California.  Right?

25           MR. ECHEVERRIA:  Your Honor, this is John Echeverria,

1    if I may.

2                THE COURT:   Go ahead.

3                MR. ECHEVERRIA:   The defendants have obtained the

4    registration numbers that your Honor is referring to.   And we

5    presented today a declaration of Yvette Glover (phonetic), who

6    is with the Bureau of Firearms at the Department of Justice.

7    We provided that declaration to the plaintiffs yesterday.

8                THE COURT:   Okay.

9                MR. ECHEVERRIA:   And I have seen -- through the trial

10   process, you know, that we've agreed to -- that the Court will

11   see that evidence.

12               The way -- the way that the registration numbers are

13   breaking down is -- we've isolated the assault rifles, assault

14   pistols and assault shotgun numbers so the Court can see the

15   relative numbers of the registrations.

16               But we don't have it drilled down further, to how

17   many pistols are registered as an assault weapon because a

18   pistol had a threaded barrel, for instance.

19               THE COURT:   That's fine.   Mr. Echeverria, that seems

20   to me to be absolutely fine, I think.   I mean, as long as we

21   know, I suppose, how many have been sold or registered.

22   Whether they were sold or registered as an assault weapon or

23   not, you know, if they have the restricted feature.   That would

24   be what we need to know.   So I think that's wonderful.   You

25   beat me to it.   (Laughing.)

1          All right.  By the way, getting to the issue of the
2    assault rifle -- now, look.  I don't mean to nit-pick.  But --
3    but that's an important definition because quite often, in the
4    material that I have seen so far, there seems to be this --
5    mmmm -- ambiguity, if you will, that is created by referring
6    to -- for example, Professor Donahue refers to assault weapons
7    rather loosely.  By -- I think he considers AR-15s, AK-47s to
8    be assault weapons because they're semiautomatics.  Right?  And
9    in some cases those are called assault weapons by folks.  But
10   they're not the same as the assault weapon -- the definition is
11   not the same as the definition that is created by AWCA.  Right?
12   Because simply because it is a semiautomatic weapon -- right?
13   Simply because it's an AR, simply because it's an AK-47, it is
14   not an assault weapon.  Right?  Can we agree on that?
15          MR. ECHEVERRIA:  This is John Echeverria.  Yes.  Yes.
16          THE COURT:  Okay.  So that ambiguity has been
17   troubling me a lot throughout this case.  And every time I
18   read, for example, a transcript from the witnesses that we
19   heard from the other day, I keep asking myself, okay, so are we
20   talking about an assault weapon as defined by AWCA?  Or are we
21   talking about an assault weapon that may be defined as
22   something different?  And that has been a bit of a problem for
23   me.  So I wanted to alert you to that.
24          Let's see.  Is there -- is there any discovery that
25   has been provided regarding the number of shootings that have

1    occurred where assault weapons prohibited by AWCA have -- have

2    occurred?  Do we have that information?

3              MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

4              So we have a list of public mass shootings that Lucy

5    Allen compiled based on four sources.  And then she went

6    through each shooting to determine what -- you know, what type

7    of weapon was used and whether that weapon would be the type of

8    weapon -- or the type of configuration that is subject to the

9    AWCA.

10             We also have the list of gun massacres that was

11   compiled by Professor Klarevas, and he also did a similar

12   procedure by downloading information of shootings to determine

13   whether the weapon used was the type of weapon with a

14   configuration that would qualify it as an assault weapon under

15   the AWCA.

16             THE COURT:  So -- so, in other words, the weapons

17   that Ms. Allen and Mr. Klarevas -- I butchered his name last

18   time, and I apologize.  I did it again.  That -- that the

19   shootings that they are talking about are shootings where the

20   weapon was configured with the prohibited features?  Right?

21             So not, for example -- I know that there was talk

22   about the Mini-Ruger-14 ranch rifle.  So it would not include,

23   for example, a Mini-Ruger ranch -- Mini-Ruger-14 ranch rifle.

24   Right?

25             MR. ECHEVERRIA:  I don't believe so, your Honor.

```
1              THE COURT:  Okay.  All right.  That's good.  All
2   right.  Great.
3              Ms. Allen -- I don't recall if she's a professor or
4   whether I should refer to her as professor or Ms. Allen.  But
5   Ms. Allen said that she had asked for information from the
6   state about the number of shots that had been fired in -- in
7   any given situation-defensive shooting.  And she said that it
8   was her understanding that the state did not have that
9   information.
10             Mr. Echeverria, you objected to her statement.  But I
11  think it's an important issue.  And the issue is -- or the
12  question is, does the state have, in fact -- since I keep
13  hearing about this 2.2 shot limit, does the state in fact have
14  records of how many shots are fired in each shooting that has
15  been reported to the state?
16             MR. ECHEVERRIA:  Your Honor, this is John Echeverria.
17  If I can quickly address the comment made by Lucy Allen during
18  the hearing.
19             And just -- just to be clear, Lucy Allen is not a
20  professor.  She's an economist with NERA.
21             So Ms. Allen, she's been an expert witness in several
22  of these cases, not just the large -- the large-capacity
23  magazine challenges and assault weapons challenges throughout
24  the country.  I believe Ms. Allen is referring to a
25  communication she may have had with one of those other
```

```
 1   jurisdictions that (indiscernible) preceded California.  And my
 2   objection at the hearing was, just to be clear, that Ms. Allen
 3   does not have personal knowledge of what records the Department
 4   of Justice may or may not have.
 5          I will say that I don't believe that information is
 6   something the Department of Justice has, at least with respect
 7   to incidents that the Department of Justice's peace officers
 8   respond to.  You know, local police departments and sheriff's
 9   offices, they may respond to a self-defense gun use, and they
10   may have police reports compiling that information.  But they
11   may -- that information may not necessarily be within the
12   department's custody or knowledge.
13          And I would also note that, you know, this is just
14   not information that the defendants have been asked by
15   plaintiffs through discovery to obtain for them.  So I can't
16   sit here today and represent what the department has or does
17   not have about self-defense gun uses.
18          THE COURT:  Well, I -- I think it's important,
19   though.  Because if -- if you are -- if you are asking me to --
20   which I assume this is why it's -- it's being given to me.  You
21   know, this -- Ms. Allen's study about the 2.2 shots for
22   defensive use.  If -- if that information is placed before me,
23   I assume that it is being placed before me because it has some
24   importance.  Because I know you, Mr. Echeverria, you -- you
25   wouldn't want to waste my time.  You -- you -- you have been a
```

1  very professional advocate.  So I assume, you think, that

2  there's some relevance to that -- to that.

3          But if that's the case, then I certainly should have

4  the best evidence that's available in deciding the issue,

5  rather than just simply -- I mean, she's talking about -- she's

6  talking about using the NRA statistics and Factiva and news

7  sources, and so on.  Well, news sources are a dime a dozen.

8  They're -- their trustworthiness is almost none.

9          So -- but it certainly would seem to me that a police

10 report, for example, where someone showed up at a shooting

11 and -- and the officer doing the investigation noted that there

12 had been no shots fired or 40 shots fired, to me that would

13 certainly seem to carry a lot more evidentiary weight.

14         And so I'm wondering if you couldn't -- if you would

15 be able to see -- I think you said that you don't know if the

16 Department of Justice keeps those records.  But I wonder if you

17 would be able to look that up for me.

18         MR. ECHEVERRIA:  I can certainly look into that.  I

19 think that information may be helpful.

20         But I do think it would be difficult to extrapolate

21 solely from the Department of Justice's records about the

22 number of rounds fired in self-defense throughout the country

23 on average.

24         Lucy Allen's analysis cap -- we believe Lucy's

25 analysis is the best evidence available for capturing the

1   degree of burden that the AWCA poses on the core right to

2   self-defense in the home.

3           Her -- her testimony concerning the number of rounds

4   fired in self-defense is very important in this case.   It's

5   extraordinarily relevant because it shows that the burden on

6   the core right is minimal.   Because, on average, individuals

7   don't fire anywhere close to ten rounds of ammunition in

8   self-defense.   And that's based on aggregated data throughout

9   the country, based on the National Rifle Associate's own

10  reporting of self-defense gun uses and a survey of news

11  reports.

12          And while news reports, while not always accurate,

13  sometimes they are the best available evidence.   And defendants

14  are more than happy to address any -- you know, any

15  inaccuracies in her testimony.   But, you know, in this case no

16  inaccuracies have been identified.   And no inaccuracies were

17  identified in the *Rupp versus Becerra* action, where she

18  provided very similar testimony concerning the number of rounds

19  fired in self-defense.

20          THE COURT:   But not to -- I've always hated when

21  judges -- when judges cite their own opinions or their own

22  orders as authority for anything.   I've always thought it's

23  sort of a bit of an ego trip.

24          But -- but not to -- not to delve into that issue too

25  deeply, I think I looked at Ms. Allen's study in the *Duncan*.

 1   And with all due respect to Judge Stanton in the *Rupp* case, I

 2   fully and completely disagree with her on that.

 3           And I disagree with the accuracy and the validity,

 4   and so on, of Ms. Allen's study, which is why I'm asking --

 5   although I agree with you, Mr. Echeverria, that the -- the

 6   state of California may not have information nationwide.  But

 7   it certainly would be helpful to the Court if at least we had

 8   the State of California.  Right?  And we could see -- you know,

 9   maybe -- maybe it supports Ms. Allen's -- maybe as a

10   proportion.  Okay?  So maybe we could say, well, look, you

11   know?  She says this is nationwide.  Well, look, our state

12   statistics seem to corroborate that.  And here are the reports,

13   the police reports that show, for example.  Right?

14           So I don't know.  It certainly seems to me that if

15   you -- if you do have that information -- which at this point

16   in time I guess you're telling me you don't know whether you

17   have that information or not.  I think I should have it, and I

18   think that plaintiffs' counsel should have it as well.  I think

19   it would be important, anyway.

20           Okay.  And now I want to talk about -- because

21   there's an issue that has been totally and completely

22   overlooked by everyone but that I think is really central to

23   this case.  And it is this:  The Second Amendment in *Heller* --

24   in fact, *Heller* -- *Heller* discusses this issue extensively.

25           *Heller* talks about the fact that the reason why we

1   have the Second Amendment is because we want people to be

2   prepared in the event -- well, that's not quite completely

3   right.

4           First of all, what *Heller* says is, look, the right to

5   self-defense precedes, predates.  Has nothing to do with --

6   with -- with the -- the Constitution or the Bill of Rights.  It

7   was -- self-defense has been understood to be a right -- what

8   is it?  A -- a natural right of people to defend themselves and

9   to defend their property and to defend their loved ones.

10  Which, by the way, is a proposition that makes perfectly good

11  sense to me.

12          But then what happened is that when they drafted the

13  Second Amendment, the people knowing -- people who drafted the

14  Second Amendment knew that -- that -- that people possessed

15  weapons for lawful uses, whether it be hunting or protecting

16  themselves or their family or their property.

17          And so they drafted this -- this -- this simple --

18  relatively simple Second Amendment that says that in order to

19  have the well-organized militia, the right of the people to

20  keep and bear arms shall not be infringed.

21          The reason why I mention this, Mr. Echeverria -- and

22  I will alert you to my thinking on the subject -- is this.  My

23  recollection is that *Miller*, the *Miller* case said, "Look, I

24  don't have any evidence before me that the sawed-off shotguns

25  have any military value whatsoever.  And so, therefore, it's

1    not protected by the Second Amendment.

2              I have not seen a single case -- and, by golly, I

3    have had my law clerks look thoroughly to find a case that has

4    overturned *Miller*.   Not a one.

5              And the reason why that's important, Mr. Echeverria,

6    to my decision making in this case, is this.   Let us assume,

7    hypothetically if you will, that some -- as some of the folks

8    who talk about -- you know, these -- these weapons are weapons

9    of war.   Okay?   Weapons of war.

10             Well, what kinds of weapons would you expect the

11   militia to want to bring to bear if they were called, for

12   example, to defend if the dreaded Russians or Chinese were to

13   be marching down Broadway in San Diego and had defeated our

14   armies?   What kind of weapons would we want our militia to

15   bring to bear to that battle?

16             I know I was a little facetious in my *Duncan* case,

17   when I said that the Second Amendment was not intended to

18   protect foam baseball bats and down pillows.   But it seems to

19   me, based on my reading of *Heller*, is that it's also intended

20   to protect those with weapons that are not solely useful for

21   military purposes but which are commonly possessed by people;

22   but which could be used by militia in the event that they were

23   required to defend ourselves from enemies, both foreign and

24   domestic.

25             So I mention that issue because nobody has touched

1    upon it.   And obviously it's important.   Because if we're

2    talking about, for example, say, a magazine -- a ten-round

3    magazine, it may not be useful -- very useful for purposes of

4    self-defense, perhaps, assuming that the numbers really do bear

5    it out.   But, by golly, you can't argue with the fact that it

6    might not be useful if the Russians or the Chinese come

7    marching down Broadway.

8              So since nobody has -- has raised it, I think I would

9    like for you folks to address the *Miller* case, because it's

10   important.   I think it's important.

11             MR. LEE:   Your Honor?

12             THE COURT:   Yes.

13             MR. LEE:   This is George Lee, if I may, on that

14   point.

15             THE COURT:   Yes.

16             MR. LEE:   Plaintiff -- the plaintiffs certainly have

17   addressed this issue and in fact made it a central component of

18   our claims.

19             THE COURT:   Well, then I apologize.   Then I apologize

20   because I have forgotten about it.   I've read so much -- as I

21   said, this is my fourth Second Amendment case.   So sometimes I

22   tend to kind of confuse things a little bit.   And so if in fact

23   you have raised it, then I apologize.

24             MR. LEE:   No worries, your Honor.   There's a lot of

25   moving parts in this case.   But I just wanted to be sure that a

1    substantial component of our claim -- the plaintiffs' claim in

2    this matter is to adhere to a faithful, literal reading of

3    *United States versus Miller*.   Which is -- as the Court has

4    pointed out, has not been overruled.   It is still good law.

5    And -- and if the premise of *Miller* is that a sawed-off shotgun

6    could be prohibited because it was not useful inherently to the

7    military service or service in a militia, well, that's the

8    entire rationale and reason why we have taken that principle

9    and turned it on its head in this case and said, "Well, let's

10   take a look at the AR-15 rifle."   Because General Youngman has

11   testified in this case, both in the declarations and in person.

12   That is a firearm that is ideally suited for militia service

13   for many reasons, including the common -- the use of common

14   30-round -- what they call -- STANAG magazines, which are

15   common interchangeable magazines.

16         Those are -- that is part of the -- the supply chain

17   and the system of -- weapons operating system which makes it

18   ideally -- ideal for militaries and, in particular, militia

19   service.   In fact, General Youngman testified that the AR-15 is

20   so commonly used that it's part of the American DNA at this

21   point.   That's why -- that is why -- that is a major reason why

22   we think that the -- that the prohibition cannot stand because

23   *Miller* stands for this proposition.

24         And as -- as your Honor pointed out, no case since

25   *Miller* has directly addressed this.   Although Judge Kozinski

 1   did elaborate on -- on these very points on his dissent in the

 2   *Soheera (phonetic) versus Lokyer* case.  And he refers to *Miller*

 3   in saying we are bound not by the outcome of *Miller* but also by

 4   its rationale.  And if the rationale is that the firearm cannot

 5   be prohibited if it is useful for military service, well, then,

 6   by gosh, I think we've just presented this Court with very good

 7   reasons why the state cannot prohibit firearms such as the

 8   AR-15, which is ideally suited for --

 9           THE COURT:  Well, you know, Mr. Lee, let me say this

10   about that.

11           I understand where you're coming from.  I have some

12   serious questions about the threaded barrel issue.  Maybe you

13   might want to address that because I -- I don't know.

14           I suppose that one could make the general statement

15   that any weapon that is not solely useful for military

16   purposes, including whether it has a threaded barrel and a

17   silencer, might be sufficient for militia purposes.  I suppose,

18   if one wants to be true and honest to that principle, then you

19   may be right.

20           But -- but as -- but as a matter of practicality, I'm

21   really wondering, sort of like the sawed-off shotgun, is there

22   really any -- any history to threaded barrels being used for

23   military purposes?

24           MR. LEE:  Well, I appreciate the Court's thinking on

25   this.  But it's not that *Miller* is the -- is the exclusive

```
1    test -- the Second Amendment test that's involved and
2    particularly, you know, in light of Heller, used for lawful
3    purposes.  As we've elaborated on, there is a particular --
4    those include self-defense.  We're also advancing a -- a theory
5    that commonly-owned firearms elsewhere, including firearms with
6    pistols with threaded barrels are commonly owned and used in
7    enhanced training purposes.
8            A -- a threaded barrel that allows a pistol to accept
9    a variety of devices, including muzzle breaks, including
10   potentially flash fires, and including potentially silencers,
11   those are training -- those are devices that enhance training.
12           And I would suspect that a threaded barrel -- if the
13   military is indeed moving toward the use of silencers as part
14   of the training, then I think that that would be relevant.  So
15   I think we can certainly explore all of that.
16           But, all of that being said, I think that -- just to
17   elaborate on what the Court's concern is there, we're not
18   saying that Miller -- United States versus Miller is the only
19   test that applies.  We're saying it's a very relevant and still
20   active test that at least allows us to take a look -- a hard
21   look at the AR-15 rifle, which -- which the AWCA attempted to
22   ban in its most common form and say, well, you know, we can't
23   do that because that's -- if we're being faithful to Miller,
24   then I think that's -- that's the result.  That AR-15 rifles,
25   in their common form, can't be -- cannot be prohibited in the
```

1    manner that the state says.

2          MR. DILLON:  Your Honor, this is John Dillon for the

3    plaintiff.  The one thing I would just want to add with my

4    co-counsel, here, is that your question with regard to the

5    military use was -- is answered by Ms. Hlebinsky's declaration

6    and testimony regarding the history and use of firearms and

7    also various firearm --

8          THE COURT:  Yeah, I -- I understand all of that.

9          But my -- my concern was more -- more on the line

10   of -- originally, before I went off on the threaded barrel

11   rabbit trail was more on the question of whether or not the

12   *Miller* case is still good law.  Has it been overturned or

13   overruled by the Supreme Court?  And if not, then is it not

14   binding law that -- whether I like it or not, whether I like it

15   or not, that I have to -- that I have to -- to live with?

16         Maybe it has been addressed, and maybe I need to go

17   back.  I'm sitting here looking at (indicating) about two

18   inches of material, not counting the exhibits, to -- I believe

19   it was Mr. Dillon's supplemental brief.  That I've looked at in

20   the last -- oh, I don't know.  Last couple of weeks.  So it's

21   possible that I have forgotten that this issue was addressed

22   by -- by the defense.  That the *Miller* case and the *Miller*

23   issue was addressed by the defense.

24         But if it has not, then I would like to give,

25   certainly -- since apparently the plaintiff has addressed it, I

1   would certainly like to give the defense an opportunity to

2   address the issue before me.  So, anyway.

3                MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

4                This is an issue that the defense -- or the Attorney

5   General's office has addressed with your Honor in this case and

6   also in the *Duncan* case.

7                You may recall a discussion that we had in *Duncan*

8   about the connection between the preparatory clause and the

9   operative clause in the Second Amendment.

10                And that's where the Supreme Court in *Heller*

11   clarified how *Miller* applies in the post-*Heller* era.  *Miller*

12   does not create a independent freestanding test to protect

13   weapons that are useful for militia service.  The test is

14   whether the weapons are in common use for self-defense.

15                And the court, in *Heller*, explained how the common

16   use test is consistent with the reasoning and holding in the

17   *Miller* case.

18                THE COURT:  Explain that to me.  Do me a favor, tell

19   me about that again.

20                MR. ECHEVERRIA:  Sure.

21                So, in *Heller*, the majority described the *Miller*

22   holding in terms of the right to self-defense.  So *Miller*, the

23   court found that the sawed-off shotgun -- I -- I believe it was

24   like it doesn't have a connection to the militia service.  I

25   believe that was the language used in -- in *Miller*.

1          And in *Heller*, the court said that --

2          THE COURT:  Yeah, go ahead.

3          MR. ECHEVERRIA:  In *Heller* -- thank you, your Honor.

4   And in *Heller*, the court explained that at the time of its

5   founding the weapons that were used in the militia were the

6   weapons that individuals commonly owned for lawful purposes

7   like self-defense.

8          And since the founding, there's been a decoupling,

9   essentially, of the preparatory clause and the operative clause

10  because -- I mean, frankly, no small arms are going to be a

11  match for America's enemies.  You know, as -- as your Honor

12  pointed.  If there's an actual military confrontation on

13  domestic soil, small arms are really not going to cut it.  And

14  the Second Amendment does not protect the right to bazookas,

15  flamethrowers, howitzers, and the like.

16         So the -- if your Honor, you know, reads *Heller* yet

17  another time -- and I'm sure, you know, this won't be the last

18  time that your Honor looks at the language in *Heller* --

19         THE COURT:  (Laughing.)

20         MR. ECHEVERRIA:  -- but the Supreme Court really did

21  explain how *Miller* still applies today.  And how *Miller* does

22  not create a right to possess weapons most useful in military

23  service.

24         And the defendants --

25         THE COURT:  Yeah, that's the -- that's the -- that's

1    the language -- that's the language where -- where Justice

2    Scalia talks about the M16.  But you see the difference?  The

3    difference --

4             MR. ECHEVERRIA:  Correct.

5             THE COURT:  This is where I'm -- this is where --

6    and, frankly, I think *Heller* does a pretty good job, in my

7    opinion, of reconciling the differences between those weapons

8    that are most -- that are most useful solely for military

9    purposes -- for example, the flamethrowers, the hand grenades,

10   the fully automatic weapons like the M16s, and the weapons that

11   are commonly possessed by law-abiding citizens for lawful

12   purposes like self-defense.  Which might include, for example,

13   an AR-15 with a 30-round -- 30-round magazine.

14             Now, you know, you mentioned the idea that people

15   with, perhaps, an AR-15 would not be able to take on the

16   Chinese military if they came waltzing down Broadway.

17             I've heard that.  I've heard that -- that comment

18   before.  I've read it.  And, frankly, with all due respect to

19   all of those people who say that, it's just not supported by

20   historical fact.  Why do I say that?

21             Well, I say that because if you -- if you read

22   history, you will note that in World War II, there was a

23   considerable amount of resistance, for example, by the French,

24   who were fighting, perhaps, the most powerful Army, Navy, and

25   Air Force known to mankind at the time.  And yet they were

1    mounting a considerable amount of resistance.  Some of them

2    with -- I think what was called -- a grease gun that the United

3    States was dropping behind enemy lines.  They were basically,

4    you know, like throw-away machine guns.  And they mounted a

5    considerable amount of resistance to that.

6            Another historical fact that I personally have

7    some -- quite a bit of experience with is, as you probably

8    know, I was born in Cuba.  And there's this fellow by the name

9    of Fidel Castro.  And Fidel Castro eventually wound up

10   overthrowing the Bautista government.  The Bautista government

11   had every weapon you could possibly imagine at the time, with

12   the possible exception of nuclear weapons, because they were

13   provided largely by the United States.  They had tanks.  They

14   had planes.  They had ships.  They had the most modern rifles,

15   machine guns, and so on.  And yet this -- this small group

16   of -- of fellows who were armed with M1 carbines -- and it was

17   a small group of people.  They were actually able to overthrow

18   that -- that well-armed -- that well-armed -- armed forces of

19   Cuba.  So, historically, that statement just doesn't hold

20   water.

21           It's not a point of whether or not the militia would

22   be able to overthrow China or Russia and defeat them.  The

23   question is would it be useful.  For example, as you know -- as

24   I pointed out in the *Duncan* case, you'll recall that at the

25   battle for Concord, these -- there were these -- these

1   disorganized folks.  You know, doctors, teachers, blacksmiths

2   who showed up with weapons.  And -- and they gave the British

3   hell.  Right?  They might not have necessarily been able to

4   overthrow the British army at that point in time.  But they did

5   enough damage to essentially eventually wind up, you know,

6   resulting in -- in -- in this great country that we have today.

7          So -- so the point -- the point -- getting back to my

8   basic point.  My basic point is not whether or not we would be

9   able to defeat the Chinese or the Russians by having AR-15s.

10  The question is -- the question is if *Miller* -- if *Miller* says

11  that weapons that are useful for military purposes are

12  protected by the Second Amendment and if *Miller* has not been

13  overruled, what do I do with that?  What do I do with that?

14         I think I have some idea, based on my multiple

15  reading of *Heller*.  But if you already addressed it,

16  Mr. Echeverria, then you don't need to do it again.  I will go

17  back, and I will review what you have already prepared.  But if

18  you have not addressed it, I would love to hear from you.

19         Because I think it's -- I think it's a really -- I

20  think it's a really interesting question.  I do.  I really do.

21  I think that clearly -- as I -- as I said -- and as I've said

22  in *Duncan,* for example, you know, a 30-round magazine might be

23  something that is commonly used by law-abiding citizens for --

24  for -- for -- for common purposes.  Perhaps a hundred-round

25  magazine would not be except for if you make the argument that

1    a hundred-round magazine might not be useful for self-defense

2    but it might be useful for militia purposes.  You see?

3            And I think it's an interesting issue that at some

4    point in time somebody's going to have to define.  And either

5    say, look, *Miller* has been overruled or *Miller* is still good

6    law and here are the limitations to *Miller*.  Anyway.

7            Well, I probably have said a lot more than I probably

8    should say.  But what -- what is the plan, as far as submitting

9    these declarations and -- and -- I guess I already have the

10   affidavits or declarations.  But what is the plan for me being

11   able to -- to read these -- these deposition testimony?  Is it

12   your plan that I will get those before the date of the hearing?

13           Is there a plan -- as we all know, there are

14   objections that can be raised at -- at the deposition.  Is

15   there going to be a fight about what testimony is going to be

16   admitted and what's not going to be admitted?  What objections

17   are going to be made, sustained, overruled as part of the

18   depositions that are being taken?  What -- what is your -- what

19   is your -- do you have a take on how that's going to occur?

20           MR. ECHEVERRIA:  Your Honor, this is John Echeverria,

21   if I may.

22           We were meeting and conferring with the plaintiffs

23   about how to address the deposition testimony and how to best

24   present that testimony to the Court.  And we were unable to

25   arrive at -- at an agreement on that.

1          The defendants' proposal would be to have a date in

2    advance of the hearing date, where all of the parties would

3    designate portions of the transcript and -- and file them with

4    your Honor.  And then have another date, maybe a week after, to

5    allow the parties to cross-designate additional portions of the

6    transcripts.  So this way we're not overburdening the Court

7    with, you know, entire deposition transcripts.  We're just

8    providing the Court with the relevant excerpts, while giving

9    the parties an opportunity to maybe provide some additional

10   context to those excerpts, if necessary.

11          So we think that two deadlines would make the most

12   sense in advance of the hearing.

13          THE COURT:  Okay.  But you were not able to agree

14   upon that?  Is that -- is that right?

15          MR. LEE:  Well, your Honor, this is George Lee for

16   the plaintiff.

17          So the problem -- and I -- I agree with what

18   Mr. Echeverria has proposed in theory.  But the problem is that

19   we have this trial date on January 21.  And, you know, and --

20   and there's a real -- and with the holidays and after the New

21   Year's, we have a lot of depositions that will be stacked up

22   in, really, the week leading up to the trial.

23          So I didn't want necessarily to limit us to some

24   deadline, and to give us more flexibility in terms of

25   deposition scheduling and being able to do these things up

1    to -- up to the last moment.

2            I -- would propose that all parties simply submit the

3    number of deposition testimony that they wish as of the 20th.

4    And that, of course, you know, all objections that are raised

5    at a deposition are preserved.  And the Court -- again, this is

6    a bench trial.  There's no danger of, you know, testimony

7    coming in before a jury.  And the Court is certainly well

8    capable of being able to rule on and consider any objections as

9    it considers the deposition testimony that comes in.  Which is

10   something we could certainly address on the day of the trial.

11           That was -- that was the -- that was our thinking on

12   that.

13           THE COURT:  By the way, are these going to be video

14   depositions?

15           MR. LEE:  No, your Honor.  Not as far as I'm aware.

16           THE COURT:  You know, I tell you, I -- as I said

17   before, my -- my colleague Mark Bennett hits it right on the

18   head when he says that it's really important to see a

19   witnesses's demeanor when they're testifying.  But -- but, you

20   know, I'll leave it up to you folks.  I know that increases the

21   expense, and it makes things a little more difficult but --

22           Okay.  Well, how about this.  I think

23   Mr. Echeverria's proposition is actually a pretty good one.  I

24   like his suggestion.

25           So how about this.  How about -- how about if -- what

```
1    I'll do, Mr. Lee, how about if we move the hearing from the

2    21st, to give you an additional week, to the following week.

3           Would that help you at all?

4           MR. LEE:  I believe so, your Honor, yes.  That could

5    certainly assist.

6           THE COURT:  All right.  Well, let me -- let me -- let

7    me say this.  I'm going to break this up, because we've been

8    going a long time.  I'm sure my court reporter has to be -- has

9    to be -- has to be tired.  But why don't I do this.

10          The following week is -- well, I guess if I did my

11   math, I could figure out that it would be January 28th, huh?

12          Does anyone have any objection to moving this hearing

13   to that date?  Okay.

14          MR. ECHEVERRIA:  No objection for defendants.

15          MR. LEE:  Your Honor, is there any possibility that

16   we could -- I don't know if Thursdays are the Court's

17   designated hearing date.

18          I know we have -- but if -- if we could start on

19   Monday the 1st, that might help, in terms of --

20          THE COURT:  That's fine.  Just a second.

21          MR. DILLON:  Sorry, your Honor.  This is John Dillon.

22   I do have a hearing for myself scheduled for the 25th.

23          So if it was on the 25th, I would not be available.

24          MR. LEE:  I think we are talking about February 1.

25          MR. DILLON:  Oh, February 1?
```

1        MR. LEE:   That is what I understand.

2        MR. ECHEVERRIA:   February 1 works for me.

3        (Pause, Court and the clerk conferring.)

4        THE COURT:   So I had on mute for a second because my

5   courtroom deputy has reminded me that we're doing a lot of

6   hearings, and so on, by videoconferencing.   And we only have so

7   much videoconferencing ability.

8        Consequently, each of us judges has been assigned a

9   day to start any videoconferencing proceedings we may have, and

10  my day falls on a Wednesday.

11       So we have two dates available for us to -- to do

12  this.   It would be either January 27th or February 3rd.

13       MR. LEE:   Your Honor, plaintiffs would prefer the

14  February 3rd, if that's okay with Mr. Dillon.

15       MR. DILLON:   This is John Dillon for the plaintiff.

16  February 3rd works for me.

17       THE COURT:   Mr. Echeverria?   Mr. Chang?

18  Mr. Beckington?   Mr. Zepeda?   How about you folks?

19       MR. ECHEVERRIA:   This is John Echeverria, your Honor.

20  February 3rd works for me.

21       MR. CHANG:   This is Peter Chang.   February 3rd works

22  as well.

23       MR. BECKINGTON:   And, your Honor, this is Mark

24  Beckington.   That date works for me as well.

25       MR. ZEPEDA:   Your Honor, José Zepeda.   That works for

1    me as well.

2            THE COURT:  Outstanding.

3            So why don't you folks work out the designation and

4    the cross-designations.  I would rather have the whole

5    deposition.  But if you will then just simply designate the

6    portion of that deposition that I should look to, that you

7    think is important or relevant; if you would do that.  And work

8    out a schedule for how you're going to submit those to me.

9            I really would like to have them ahead of time.  And

10   I'm going to tell you, right now, that I'm going to reserve the

11   right, after we've done all of this on the 3rd -- we've heard

12   from whatever live witnesses we need to hear from.  I've read

13   the deposition excerpts.  I've read the supplemental briefs.

14   I've looked at the exhibits, et cetera.  I'm going to reserve

15   the right to say, you know, I'm not really happy with this and

16   I want X witness or X witnesses to be in my courtroom, live, on

17   a given date before I render a decision.  Okay?

18           Because sometimes that's important.  All right?

19           Do we all understand each other?

20           MR. LEE:  Understood, your Honor.

21           MR. DILLON:  Understood.

22           MR. ECHEVERRIA:  Understood, your Honor.

23           THE COURT:  Listen, I want to thank you all, again.

24   I know this is a tough case for -- for both sides.  As I said,

25   I think it's an important case.  But I want to thank you all.

1          It seems to me that you've all been working
2    cooperatively, and you -- there's been -- you know, no -- no --
3    no bickering.   I understand advocacy.   I was a lawyer for 20
4    years, almost, before I became a judge.   I understand advocacy.
5    But I think you folks are handling this case very
6    professionally on both sides.   And I want to thank you for --
7    for that, and I hope that it continues.
8          And, with that, I'm going to wish you all a very,
9    very merry Christmas a happy new year.   And we'll conclude this
10   hearing.   Okay?
11         Thank you.
12         MR. ECHEVERRIA:   Merry Christmas.
13         Thank you, your Honor.   Happy holidays, your Honor.
14         THE COURT:   Same to you.   Bye-bye.
15         (Conclusion of proceedings.)
16
17
18
19
20
21
22
23
24
25

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 21st day of December, 2020.   A transcript without an original signature or conformed signature is not certified.   I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore
_____

AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290