John W. Dillon (SBN 296788)
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151
jdillon@dillonlawgp.com

George M. Lee (SBN 172982)
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511
gml@seilerepstein.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF JOHN R. LOTT JR.**<br><br>Hearing Date: February 3, 2021<br>Time: 10:00 a.m.<br>Courtroom 5A<br>Judge: Hon. Roger T. Benitez<br><br>Trial Date: February 3, 2021 |

1

**TOPICAL INDEX**

2   INTRODUCTION ................................................................4

3   LEGAL STANDARD ..........................................................4

4   ARGUMENT ....................................................................5

5
6      1.    Defendants' Assertions that Dr. Lott is
           Not a Credible Researcher are Incorrect and Dubious..........................5

7
8          a.    Dr. Lott Has Not Advanced "Discredited Positions"
                  Regarding the Supposed Link between Firearm
                  Ownership and Suicide ......................................................7

9
10          b.    Defendants' Recycled False Claims by DeFilippis
                  and Hughes that Dr. Lott Made False Claims Regarding
11                  A Peer-Reviewed Publication ......................................8

12          c.    Defendants Mischaracterized an almost 20-Year-Old
13                  Accusation Regarding A Pseudonym Used by Dr. Lott ..............8

14          d.    Dr. Lott's Position With the Federal Department of
                  Justice Only Bolsters His Credibility............................9

15
16      2.    Dr. Lott's Expert Opinion Is Not Based On Flawed Data ...................10

17          a.    Even If the Court Accepted Klarevas' Alleged
                  Corrections of Dr. Lott's Analysis, The Results
18                  Still Support Dr. Lott's Conclusions............................12

19          b.    Klarevas' Data Set ......................................................13

20          c.    Mother Jones Data Set ................................................14

21          d.    CPRC Data Set..............................................................15

22          e.    Percentage of Attacks Using Assault Weapons..........................17

23   CONCLUSION ................................................................18

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Daubert v. Merrell Dow Pharms. Inc.*
509 U.S. 579 (1993) ............................................................................*passim*

*i4i Ltd. Partnership v. Microsoft Corp.*
598 F.3d 831 (Fed. Cir. 2010) ...................................................................4

*In re Bay Material Handling, Inc.*
1995 WL 729300, *6 (N.D. Cal. Dec. 4, 1995) ........................................5

*Kumho Tire Co. Ltd. v. Carmichael*
526 U.S. 137 (1999) ...................................................................................4

*Southland Sod Farms v. Stover Seed Co.*
108 F.3d 1134 (9th Cir. 1997) ..................................................................5

*Volk v. United States*
57 F.Supp.2d 888 (N.D. Cal. 1999) ..........................................................4


**Federal Rules of Evidence**

Federal Rule of Evidence 702 ...............................................................4, 5

**Other Authorities**

*Rampage Nation*
Louis Klaveras ..........................................................................10, 16, 18

# INTRODUCTION

Defendants' *Daubert* motion seeks to exclude the testimony of Dr. John R. Lott, Jr.  Defendants make two claims.  The first claim is that Dr. Lott's has a "pattern of dubious research methods" over several years, but this claim is nothing more than a broad-brush attempt to sully Dr. Lott's reputation; it is not grounds to exclude his declaration testimony on the effectiveness of the federal assault weapons ban in reducing the number of mass shootings or the number of fatalities in mass shootings. The second claim is that Dr. Lott's opinions are based on flawed data, which itself is based on criticisms of data from underlying sources available to the parties.  Neither claim is sufficient to exclude Dr. Lott's expert testimony in this case.  At best, Defendants' claims go the weight to be given to Dr. Lott's declaration testimony; they are insufficient to justify a blanket exclusion of his testimony, particularly in a bench trial.

# LEGAL STANDARD

Defendants' recitation of the *Daubert* legal standards omits some important qualifications. Some further context is required.

First, in cases where the trial judge is called upon to determine the validity of a party's expert testimony, courts apply Federal Rule of Evidence 702 to ensure that specialized and technical evidence is "not only relevant but reliable."  *Daubert v. Merrell Dow Pharms. Inc*., 509 U.S. 579, 589, and n.7 (*Daubert*); *accord Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999).  Here, "when the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree or relevance or accuracy … may go to the testimony's weight, but not its admissibility."  *i4i Ltd. Partnership v. Microsoft Corp*., 598 F.3d 831, 852 (Fed. Cir. 2010).

Second, though *Daubert* applies to bench trials, the concern that the fact-finder will be misled in that setting carries little weight. *Volk v. United States*, 57 F.Supp.2d

888, 896, n.5 (N.D. Cal. 1999) ("It bears noting that the *Daubert* gatekeeping obligation is less pressing in connection with a bench trial"); *In re Bay Material Handling, Inc*., 1995 WL 729300, *6 (N.D. Cal. Dec. 4, 1995) ("Given the flexible nature of FRE 702 … and given the fact that the trier of fact in this case was a judge … there thus was little risk that the expert testimony would be given undue weight") Accordingly, in this bench trial, probing the depths of an expert's opinions under *Daubert* to avoid misleading the Court is not an efficient use of judicial or party resources.  This Court can simply consider the testimony (largely in the form of declarations and deposition cross-examination) and give the testimony the weight it deserves.

Third, Defendants' motion is based on objections to the factual foundation of Dr. Lott's opinions regarding the effectiveness of the federal ban on assault-weapons, including Defendants' arguments that the data sets are flawed.  But such arguments do not justify excluding the expert evidence.  *Daubert* and its progeny focus on relevance and reliability and that "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party [here, Defendants] to examine the factual basis for each opinion in cross-examination" rather than seeking blanket exclusion orders in a bench trial.   *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1143 (9th Cir. 1997) ("Technical unreliability goes to the weight accorded …, not its admissibility") (citations omitted).

When considered in full context, Defendants' motion to exclude Dr. Lott's expert opinions should be denied.

## ARGUMENT

### 1. Defendants' Assertions that Dr. Lott is Not a Credible Researcher are Incorrect and Dubious

Defendants claim that Dr. Lott is not a credible researcher and that his work has been "roundly criticized by researchers across the pollical spectrum…," but such

criticism is not only incorrect but based on dubious attacks from largely a single individual — Evan DeFilippis — who seems to have made it his personal business to take down "the gun lobby's favorite academic" through false and unsupported accusations.

First, Defendants' assertions against Dr. Lott are unsupported as shown when examining the sources of their accusations. Defendants claim that Dr. Lott "has a long history of employing questionable and faulty practices to advance argument against firearms regulations, resulting in accusations that his gun violence research is 'junk science." Memorandum Of Points And Authorities In Support of Defendants' *Daubert* Motion To Preclude Testimony of John R. Lott, Jr. (Def. Motion), p. 3. This claim is parroted by both Professors Donohue and Klarevas. However, the claim stems from a single incident on the Piers Morgan television program in which Alan Dershowitz emotionally stated that Dr. Lott's research was "junk science…paid for by the National Rifle Association." When pressed to explain such an accusation, Mr. Dershowitz provided no evidence to support his claim. Professor Donohue, Prof. Klarevas, and Defendants are merely recycling this unfounded claim rather than providing any evidence to support it.

Second, Defendants rely on several non-peer reviewed and non-academic articles authored by Evan DeFilippis and Devin Hughes in "Vox" and "Think Progress," which twist and mischaracterize facts and data in an attempt to discredit a renowned researcher merely because they do not like his conclusions. As stated above, Evan DeFilippis and Devin Hughes appear to have the personal goal of discrediting Dr. Lott as they have levied several attacks on Dr. Lott's research throughout the years. Notably, many of their publications simply recycle the same allegations every few years. However, Defendants ignore that Dr. Lott has previously published multiple point-by-point responses to each-and-every allegation made against him and his research. Although the articles cited by Defendants make many

allegations, Plaintiffs' response fully addresses the specific allegations made in Defendants' motion and that response allows Dr. Lott to rebut such groundless claims, even those not specifically referenced by Defendants.  (See Declaration of Dr. Lott in Opposition to Defendants' *Daubert* Motion to Preclude Testimony of John R. Lott, Jr., filed concurrently herewith.)

### a.   Dr. Lott Has Not Advanced "Discredited Positions" Regarding the Supposed Link between Firearm Ownership and Suicide

Defendants claim that Dr. Lott has advanced discredited positions, such as denying the link between firearms ownership and suicide.  See Def. Motion p. 3; Declaration of Deputy Attorney General John Echeverria (Echeverria Decl.), **Exhibits 1**-**2**.  This claim stems from the DeFilippis and Hughes article in "Vox," which alleged that a National Research Council report concluded that "[o]verall, the U.S. studies have consistently found that household gun ownership is associated with a higher overall risk of suicide."  Echeverria Decl., ¶ 6, **Ex. 1**. However, as Dr. Lott's published responses explain, this statement omits the previous sentence in the NRC report: "It is not yet clear if the individuals who used a gun to commit suicide would have committed suicide by another method if a gun had not been available." Additionally, the NRC Report's executive summary states that *no conclusion* had been reached, only that: "The committee also recommends further study of the link between firearms policy and suicide."  The other studies cited in the DeFilippis and Hughes article have similarly acknowledged the possible substitutability of different methods of suicide.  See Declaration of John Lott (Lott Decl.) filed concurrently herewith, ¶ 2, **Exhibit 1**. In short, Dr. Lott — unlike DeFilippis and Hughes — has accurately referred to the conclusions made in the NRC Report; he does not make any assumptions without the proper evidentiary support.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.     Defendants' Recycle False Claims by DeFilippis and Hughes that Dr. Lott Made False Claims Regarding A Peer-Reviewed Publication**

Defendants state that Dr. Lott "claimed to have published a peer-reviewed study in Econ Journal Watch, even though the paper had been rejected by the publication. Def. Motion, p. 4; Echeverria Decl., ¶ 8, **Ex. 3**.  Again, this allegation stems from another article written by Evan DeFilippis and Devin Hughes in which DeFilippis and Hughes claim that Dr. Lott was guilty of a "clear cut case of fraud."  Echeverria Decl., ¶ 8, **Ex. 3.** Again, however, Defendants ignore the fact that this 5-year-old accusation has been publicly, satisfactorily, and repeatedly responded to by Dr. Lott.   In an August 31, 2016 article published on the Crime Prevention Research Center's website titled, "Response to Evan DeFilippis and Devin Hughes' Newest Claims At Think Progress," Dr. Lott makes clear that the Econ Journal Watch "originally accepted the paper, but at the last moment in September 2015, the month that the paper was supposed to appear in the online publication, additional work was requested requiring additional work."  Lott Decl. ¶ 3, **Ex. 2**. After disagreements arose between the editor and Dr. Lott that lasted more than 5 months, Dr. Lott accurately reports that "the paper wasn't published."  *Id.* Dr. Lott also states that he forgot to go back and remove the note that the paper was forthcoming.  Rather than accepting the truth regarding the study's publication process, DeFilippis and Hughes, and now Defendants, attempt to push forward an unsubstantiated conspiracy theory of fraud.  Again, this represents a tired and unsubstantiated claim by anti-gun advocates for which Dr. Lott has provided a perfectly reasonable explanation some time ago.

**c.     Defendants Mischaracterize an almost 20-Year-Old Accusation Regarding A Pseudonym Used By Dr. Lott**

Defendants claim that Dr. Lott assumed a pseudonym of "Mary Rosh" to "defend his work online over a period of three years."  However, this claim is a feeble attempt to resurface mischaracterized accusations regarding Dr. Lott's character

dating back to 2003.  Def. Motion, p. 4.  Again, Dr. Lott publicly and sufficiently responded to these accusations many years ago.  Dr. Lott has never denied, and openly admitted, that he used a pseudonym in *internet chat rooms* that discussed gun policy. Dr. Lott stated, "I had originally used my own name in chat rooms but switched after receiving threatening and obnoxious telephone calls from other internet posters." Lott Decl. ¶ 4, **Ex. 3**.

Considering that Dr. Lott was getting threatening messages for discussing his research, it is unsurprising that he did not want to use his own name.  From the beginning, Dr. Lott has been forthright with the use of the name Mary Rosh.  The individual who first "discovered" this fact, Julian Sanchez, "had put up a post on his blog site asking for help in identifying someone who was cutting and pasting many of [Lott's] responses from other places in chat room discussions.  Because a dynamic IP address was being used, Sanchez could only identify the posting as coming from someone in southeastern Pennsylvania.  When [Lott] found that he was asking for help in identifying the poster, [Lott] admitted that is was using the pseudonym." Lott Decl. ¶ 4, **Ex. 3**.  This is hardly the actions of someone who is trying to nefariously hide his identity.  Several family members of Dr. Lott also used a family email account maryrosh@aol.com and wrote some reviews on Amazon of Dr. Lott's book.  Having a family member write an Amazon review of another family member's book is hardly nefarious, nor uncommon.

### d.   Dr. Lott's Position With the Federal Department of Justice Only Bolsters His Credibility

Dr. Lott accepted a position with the Federal Department of Justice on October 20, 2020.  His original position was Senior Advisor for Research and Statistics in the Office of Justice Programs.  It was later switched to Senior Advisor for Research and Statistics in the Office of Legal Policy on December 18, 2020. Dr. Lott was accepted for this position because of his wealth of experience and credibility as a researcher.  Defendants' have scheduled Dr. Lott's deposition for

January 22, 2021 and are free to inquire into his position.[1]   Defendants' characterization that Dr. Lott's appointment was "highly controversial" because United States Senators expressed concerns about the hiring of Dr. Lott because he is a "pro-gun advocate" only highlight the politics surrounding the Second Amendment in the United States.  These senators have well-known anti-gun political stances and their criticism of Dr. Lott merely parrot the same unfounded allegations that Dr. Lott has repeatedly responded to over the years.

Defendants' characterization of Dr. Lott's "history of engaging in dubious practices and disseminating false information" are both wrong and unsupported by any reliable evidence. They are intended to tarnish Dr. Lott's reputation and should be rejected.

## 2.  Dr. Lott's Expert Opinion Is Not Based On Flawed Data

Defendants claim that Dr. Lott advances flawed analysis on the effectiveness of federal assault weapon ban because of inaccurate data.  Not so.  As stated by Defendants, "the key relevant, substantive opinion advanced in Lott's declaration is that the federal assault weapons ban was not effective in reducing the number of mass shootings or the number of fatalities in mass shootings." Def. Motion, p. 5.  On this point, Defendants are correct; and even if the Court were to accept Defendants' own expert's flawed analysis, the evidence *still* supports this conclusion.

Defendants and Klarevas attempt to mischaracterize differences in classifications of data as mistakes or fraudulent omissions of data.  In Dr. Lott's declaration submitted to this Court in December, 2019, he provided numerous graphs based on three different data sources: Louis Klarevas' *Rampage Nation*, Mother Jones, and the Crime Prevention Research Center.

---

[1] Plaintiffs provided Defendants with an updated copy of Dr. Lott's CV on Wednesday, December 30, 2020.

First, any issue Klarevas may have regarding the underlying data/classifications from the three data sets analyzed by Lott are critiques of the source data, and not critiques of Dr. Lott's expert qualifications or opinions.  While Klarevas may consider his own interpretations and classifications to be "correct," the fact is that differences or discrepancies between the three data sources highlight the inherent, arbitrary nature of classifying certain weapons as "assault weapons" and the differences in how various organizations or individuals classify public mass shootings. Lott Decl. ¶¶ 7, 22, and 55.

As Dr. Lott states, in analyzing the effectiveness of assault weapons bans, there is always going to be a certain level of arbitrariness in classifying the shootings and the firearms involved.   Lott Decl. ¶¶7, 22, and 55. This is because different organizations and people have different definitions of what constitutes a mass shooting or what constitutes an assault weapon. Thus, you will not find identical conclusions between different sources." *Id.*

Second, as outlined in Dr. Lott's declaration, even if this Court were to accept all of the changes that Klarevas asserts in his declaration in support of Defendants' *Daubert* motion, none of the results are consistent with what Klarevas would predict. Lott Decl. ¶ 8-13; Figures 6b and 7b.  If the assault weapons ban is driving the changes in the rate of mass public shootings, assault weapons should make up a smaller share of the attacks during the assault weapon ban and then a larger share upon the sunset of the assault weapons ban.  The substitution effects described by Klarevas of the assault weapons ban actually work to contradict Klarevas' claims.  *Id.* With an assault weapons ban in effect, while some would-be attackers might refrain from attacking if they were to use an assault weapon, others will substitute other types of guns.  "To the extent that there is any substitution, that would *lower the percentage of attacks using assault weapons.*" Lott Decl. ¶¶ 48-51 (emphasis added).  Defendants even admit that Klarevas' alleged "corrected chart shows that the share [of mass

shootings with assault weapons] has been relatively flat over 30 years.  See Def. Motion, p. 7.  Klarevas' Figures 6b, 7b, and 8b show no statistically significant difference in the percentage of assault weapon attacks during and after the federal assault weapons ban.  Declaration of Louis Klarevas in Support of Defendants' *Daubert* Motion To Preclude Testimony Of John R. Lott, Jr. (Klarevas Decl.) pgs.17-19. This fact alone contradicts Defendants' claim on the effectiveness of the federal assault weapons ban.

Third, any mistakes in computing the number of mass shootings, the number of mass shootings using assault weapons, or the number of deaths from such incidents are minor and do not alter Dr. Lott's conclusions.  To the contrary, Klarevas' own "corrected" figures only serve to contradict his conclusions.  Assault weapons bans have little to no effect on mass public shootings.

As shown below, Dr. Lott's analysis survives the *Daubert* standard.

### a. Even If the Court Accepted Klarevas' Alleged Corrections of Dr. Lott's Analysis, The Results Still Support Dr. Lott's Conclusions

Even if the Court were to accept Klarevas' alleged corrections of Dr. Lott's analysis, the result still contradicts Klarevas' claim that the federal assault weapons ban was effective.

In Klarevas' declaration supporting Defendants' *Daubert* motion, he provided a number of allegations regarding Dr. Lott's original analysis and offers all kinds of percentages to portray a few minor computational mistakes into major flaws or intentional omissions.  However, even if this Court accepted all of Klarevas' alleged "corrections" (and it should not), none of the results are consistent with Klarevas' claims regarding the effectiveness of the federal assault weapon ban.

If the federal assault weapons ban is driving the changes in the rate of mass public shootings, assault weapons should make up a smaller share of attacks during he

1    assault weapon ban and then a large share upon the sunset of the ban. Lott Decl.

2    ¶¶ 8-13, 48-51. This is not the case. Defendants even admit that Klarevas' alleged

3    "corrected chart shows that the share [of mass shootings with assault weapons] has

4    been relatively flat over 30 years. Def. Motion, p. 7. Looking at Klarevas' Figures

5    6b, 7b, and 8b, there is no statistically significant difference in the percentage of

6    assault weapon attacks during and after the federal assault weapons ban. Lott Decl.

7    ¶ 9. This fact alone contradicts Defendants claims on the effectiveness of the federal

8    assault weapons ban. In fact, Klarevas' own "corrected" data suffers from simple

9    division mistakes. Lott Decl. ¶ 10; See also Lott Decl. p. 21, Figure 4c; See also

10   Klarevas Decl., p. 19, Figure 8b. Accepting Defendants' argument, this would render

11   Klarevas' data and conclusions unreliable. Regardless, according to Klarevas, using

12   Mother Jones Data for 6 or more people murdered, the percentage of attacks with

13   assault weapons is highest during the federal assault weapons ban. Lott Decl. ¶ 10.

14         Moreover, accepting Klarevas' preferred numbers in Klarevas' Decl., Figure 6b

15   compared to Lott's original numbers shown in Klarevas' Decl., Figure 6a, Klarevas'

16   numbers are less supportive of his theory. Lott's original analysis indicated a larger

17   drop in the percentage of assault weapon attacks between the period 1984-1994 and

18   1994-2004. Klarevas' numbers show virtually no change (1.3%) and then a

19   1.5% drop after the sunset of the ban. Neither support Klarevas' conclusions, nor are

20   statistically significant changes. Lott Decl. ¶¶ 12-13.

21         **b.    Klarevas' Data Set**

22

23         In paragraph 8 of Klarevas' declaration in support of Defendants' *Daubert*

24   motion, he claims that Dr. Lott incorrectly included the Jacksonville, Florida shooting

25   as involving an assault weapon in the decade prior to the Federal assault weapons ban.

26   The incident in question involved an M1 Carbine. However, there was no blanket

27   exemption for M1 Carbines in the Federal assault weapons ban. News reports of the

28   incident describe the firearm used as a ".30 caliber assault style semi-automatic rifle"

and a firearm that "would be banned under a bill now pending in Congress that does cover domestically manufactured assault rifles."  See Lott Decl. ¶¶ 16-20; See also Lott Decl., ¶ 5, **Ex. 4**. Moreover, depending on the configuration, M1 carbines could be considered under the federal assault weapons ban or the California assault weapons ban.   *Id*. Finally, Klarevas' never provided his criteria for determining what constitutes an assault weapon in his data.

In paragraph 9 of Klarevas' declaration in support of Defendants' *Daubert* motion, he claims Dr. Lott omitted three incidents that should have been categorized as attacks using assault weapons.  In reviewing the data, Dr. Lott agrees that the three incidents should have been included.  Lott Decl. ¶¶ 21-23. However, as stated above, this correction does not alter the general pattern with the percentage of attacks using assault weapons, because the percentage still fell during the period after the sunset of the ban. *Id*. Again, the methods of how assault weapons were determined in his book were not identified. These discrepancies were avoided using the Mother Jones data and the CPRC data because those sources provided their definitions/criteria.  Lott Decl. ¶¶ 21-23.

### c.    Mother Jones Data Set

In paragraph 11 of Klarevas' declaration, he claims that Dr. Lott omitted four mass shootings involving assault weapons from the Mother Jones data set.  This is incorrect.

During the 1984-to-1994 period, Klarevas implies that Dr. Lott omitted one mass shooting, claiming there were 5 cases, not 4.  However, according to Mother Jones' own list for their data set, this is incorrect.  See Lott Decl. ¶¶ 24-26. The incident in question involved a Ruger Mini-14. The Mother Jones definition of assault weapon does not consider this an assault weapon, while Klarevas does. *Id*. These are not mistakes, but merely differences in how various people/organizations classify assault weapons. *Id*. Moreover, Klarevas' criticism is more properly directed at

Mother Jones and not Dr. Lott.

Additionally, in Klarevas' review of the 1994-to-2004 period with 4 or more people murdered, he claims there were 4 incidents, not 3.  See Klarevas Decl. ¶ 11, Figures 3a, 3b.  Again, this only shows Klarevas' disagreement with the Mother Jones definitions.  Mother Jones only classifies 3 assault weapon incidents.  According to Mother Jones, the remaining 12 incidents do not involve assault weapons. Lott Decl. ¶ 27. For the 2004-to-2014 period, Klarevas claims there are 2 omitted cases. Klarevas Decl. ¶ 11, Figures 3a and 3b.  The two cases omitted are an IHOP attack in September 2011 and the Capitol Hill attack in March 2006. However, the IHOP incident did not involve an assault weapon as determined by Mother Jones.  See Lott Decl. ¶28.  Although the murderer in the Capitol Hill attack had a Bushmaster XM15 E2S rifle — which would be classified as an assault weapon — the shooter never used the gun in the attack. *Id*.

Klarevas also asserts that Dr. Lott improperly included the death of perpetrators in his fatality counts for 10 incidents.  Klarevas Decl. ¶ 11.  Again, Klarevas' criticisms are more properly aimed at Mother Jones, and not Dr. Lott. Dr. Lott took the data collected by Mother Jones, which explicitly states, "perpetrators who died or were wounded during the attack are not included in the victim tallies."  Nonetheless, Mother Jones included these in the victim tallies. Lott Decl. ¶¶ 29-32. Dr. Lott went back through and corrected the Mother Jones data and provided revised figures in Figures 3b and 7b in his declaration.  Lott Decl. ¶¶ 29-32 (Figures 3b and 7b). The only difference between the Mother Jones figures corrected by Dr. Lott (Lott Decl. pgs. 11-12) and Klarevas' figures in Klarevas' Figures 3b and 7b (Klarevas Decl. pgs. 9 and 18) is that Mother Jones defines assault weapons differently than Klarevas.

### d.    CPRC Data Set

Klarevas asserts multiple inaccuracies in the CPRC data set.  Klarevas Decl. ¶¶ 13-19.  Klarevas' criticism is incorrect and flawed.  First, in comparing CRPC's

data and Klarevas' data, there is only one case where there is disagreement on whether an assault weapon was used (*i.e.*, the Shopping Center Spree Killing on June 23, 1987). Lott Decl. ¶34. CRPC follows Mother Jones' definition, which does not classify the case as using an assault weapon. *Id*. Thus, Klarevas merely classifies assault weapons differently than CPRC and Mother Jones.

In classifying mass shootings, CPRC used the traditional FBI definition of mass shooting used in all the FBI posts on this subject.  Lott Decl. ¶35.  Interestingly, when Klarevas attempts to analyze and correct the CPRC mass shooting classifications, *he substitutes in his own data set*, and not CPRC's.  See Lott Decl. ¶¶ 37-40. The "corrected figure 4b" — which is supposed to be based on the CPRC data — offered by Klarevas is *exactly the same* as Figure 1b from Klarevas' declaration, which is supposed to be a graph based on Klarevas' data set from the *Rampage Nation*. *Id*. This is impossible as Klarevas and CPRC used different criteria in classifying mass shootings. *Id.*

Specifically, using CPRC's definition of mass public shootings, 28 of the cases that Klarevas identified in *Rampage Nation* are not qualified for CPRC database.  Lott Decl. ¶ 38. Twenty-six of those cases either happened entirely in a residence or do not have four or more people killed in a public venue.  *Id*. At least three of the cases that did not happen in a public place are drug-related (Flint, MI 2/5/87; Philadelphia, PA 12/28/00; and Edinburg, TX 1/15/03) and are likely gang related. *Id*. Five cases occurred during the commission of a robbery (Palatine, IL 1/8/93; Fresno, CA 5/16/93; Philadelphia, PA 12/28/00; Edinburg, TX 1/15/03; Indianapolis, IN 6/1/06). *Id*.  Three of those robberies were not in public places and two of them are also drug related. *Id*.  Two other robberies occurred in public places. *Id*.  In addition, there are four cases with multiple locations involved, but none of them meet CPRC's criteria of four or more victims slain in one public location.  *Id*.

The same mistakes also exist in Klarevas' Figure 4b for the "CPRC Data Set –

1    Adjusted" where he includes these additional shootings.  Lott Decl. ¶ 40; See also
2    Klarevas Decl., p. 11.  Klarevas also miscounts the number of cases where four or
3    more are murdered involving any firearm in the period of September 2004 and
4    September 2014.  The number should be 46, not 45.  Lott Decl. ¶40. Moreover, even
5    using Klarevas' flawed analysis of CPRC's data and including these additional
6    28 unqualified cases, the figures are still not the same as Klarevas presented.  See Lott
7    Decl. ¶¶ 41-42, Figures 4c and 8c.   Based on the CPRC dataset with its own
8    definition, Figures 4b and 8b display trends before, during, and after the Federal
9    assault weapons ban. *Id.*

10          **e.     Percentage of Attacks Using Assault Weapons**

11          Klarevas restates his claims that there is "no basis" for looking at the percentage
12    of attacks using assault weapons. Klarevas Decl. ¶ 22.  However, Klarevas' claims are
13    unsupported by evidence and rely on misleading graphs.   Instead of directly
14    responding to Dr. Lott's critique that if Klarevas' theory is correct then the share of
15    mass public shootings committed with assault weapons should have declined during
16    the period of the federal assault weapons ban, Klarevas references Figures 5 and 6 in
17    his Declaration in Support of Defendants' Opposition to Plaintiff Motion for
18    Preliminary Injunction. Klarevas Decl. ¶44; see also Declaration of Professor Louis
19    Klarevas In Support Of Defendants' Opposition To Motion For Preliminary
20    Injunction, ¶44, Figures 5 and 6.  These figures look at periods that do not directly
21    correspond to the period before, during, and after the 1994-2004 ban. See Lott Decl.
22    ¶¶44-46. This gives the illusion that there is a consistent upward trend in the rate that
23    assault weapons are used in mass public shootings.  *Id*. However, when the *same data*
24    is arranged by year periods of time, it becomes clear that the pattern Klarevas shows is
25    just an artifact of the unusual way in which he presents the data.  *Id.*

26          Further, Klarevas assumptions of spillover effects and substitution effects are
27    either not relevant or work in the opposition direction of Klarevas' claims.
28    Lott Decl. ¶ 47-51.

PLAINTIFFS'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF JOHN R.
LOTT. JR.
CASE NO. 3:19-cv-01537-BEN-JLB

1

**CONCLUSION**

2    Unquestionably, Dr. Lott is a credible researcher.   Defendants attempt to
3  recycle the repeated unfounded allegations from largely a single biased source going
4  back almost 20 years.   Defendants' actions are improper.   Dr. Lott has provided
5  multiple point-by-point responses to such allegations and those responses demonstrate
6  that such allegations are incorrect or outright wrong. See Lott Decl. ¶¶ 2-5, **Exs. 1-4**.

7    Despite Defendants' and Klarevas' claims, Dr. Lott has provided this Court
8  with accurate and detailed data to support his opinions that the rate of attacks using
9  assault weapons fell after the sunset of the assault weapon ban.   Any minor mistakes
10  made have been thoroughly explained and shown to not have any effect on Dr. Lott's
11  opinions or conclusions.   Additionally, most of the Defendants' and Klarevas'
12  assertions of intentional omissions or incorrect classifications are merely differences
13  in methodology in how the three sources (Rampage Nation, Mother Jones, and CPRC)
14  classify assault weapons and mass public shootings.   Aside from making his own
15  miscalculations, Klarevas' allegations, while largely incorrect, only highlight the
16  arbitrary nature of classifying certain firearms as "assault weapons."   For these
17  reasons, Defendants' motion should be denied.

18  January 20, 2021                    RESPECTFULLY SUBMITTED,
19
                                      DILLON LAW GROUP APC
20

21
22                                    /s/ John W. Dillon_____
23                                    John W. Dillon
                                      Attorney for Plaintiffs
24

25

26

27

28

PLAINTIFFS'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF JOHN R. LOTT, JR.
CASE NO. 3:19-cv-01537-BEN-JLB