George M. Lee (SBN 172982)
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511
Email: gml@seilerepstein.com

John W. Dillon (SBN 296788)
**GATZKE DILLON & BALLANCE LLP**
2762 Gateway Road
Carlsbad, California 92009
Phone: (760) 431-9501
Fax: (760) 541-9512
Email: jdillon@gdandb.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, et al., <br><br> Defendants. | Case No. 3:19-cv-01537-BEN-JLB <br><br> Hon. Roger T. Benitez <br><br> **DECLARATION OF JOHN LOTT IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF JOHN R. LOTT JR.** <br><br> Hearing Date: February 3, 2021 <br> Time: 10:00 a.m. <br> Courtroom 5A <br> Judge: Hon. Roger T. Benitez <br><br> Trial Date: February 3, 2021 |

# DECLARATION OF JOHN LOTT, JR.

I, John R. Lott, Jr., declare as follows:

I am not a party to the captioned action, am over the age of 18, have personal knowledge of the facts stated herein, and am competent to testify as to the matters stated and the opinions rendered below.

1.      I make this declaration in support of Plaintiffs' Memorandum In Opposition To Defendants' *Daubert* Motion To Preclude Testimony of John R. Lott, Jr.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of John R. Lott Jr., Crime Prevention Research Center, "Response to DeFilippis And Hughes Review Of The War On Guns," August 30, 2016, *available at*: https://crimeresearch.org/2016/08/response-defilippis-hughes-review-war-guns/ (last visited Jan. 20, 2021).

3.      Attached hereto as **Exhibit 2** is a true and correct copy of John R. Lott Jr., Crime Prevention Research Center, "Response To Evan DeFilippis And Devin Hughes' Newest Claims At Think Progress," August 31, 2016, *available at*: https://crimeresearch.org/2016/08/response-evan-defilippis-devin-hughes-newest-claims-thinkprogress/ (last visited Jan. 20, 2021).

4.      Attached hereto as **Exhibit 3** is a true and correct copy of John R. Lott Jr., "Response to Malkin's Op-ed," *available at*:      https://johnrlott.tripod.com/malkinsoped.html (last visited Jan. 20, 2021).

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the New York Times article, Ronald Smothers, "Florida Gunman Kills 8 and Wounds 6 in Office," The New York Times, June 19, 1990, *available at*: https://www.nytimes.com/1990/06/19/us/florida-gunman-kills-8-and-wounds-6-in-office.html (last visited Jan. 20, 2021).

6. In responding to the various allegations made in the Declaration of Louis Klarevas in Support of Defendants' Daubert Motion To Exclude Testimony of John R. Lott Jr., I have identified specific paragraphs of Klarevas' declaration and quoted his statements in bold. My response to each of these statements immediately follows.

7. First, Klarevas' book did not identify which attacks he considered involving assault weapons.[1] I reached out to him out via email before putting my original work on this to determine how he categorized the different types of weapons, but he didn't respond. Different organizations and people have different definitions of an assault weapon. While I disagree with Klarevas on how to classify some of these weapons, and sometimes a certain arbitrariness exists in classifying them, even accepting all of Klarevas' claims does not alter the results.

8. Even if one completely agrees with the changes that Klarevas wants, none of the results are consistent with what he would predict. If the Assault Weapon Ban is driving the changes in the rate of mass public shootings, assault weapons should make up a smaller share of the attacks during the assault weapon ban and then a larger share when the ban sunset. If Klarevas wants to argue that there were large changes in the total number of mass public shootings due to the assault weapon ban, the changes in the assault weapon's share of attacks should also be large. To put it differently, if the ban prevented attacks because it made it so that these murderers did not have the weapons that they wanted to use, eliminating the ban should result in more attacks primarily because these killers can now use their preferred weapon. Why would they start committing more attacks with their less preferred weapons when the preferred one becomes available?

---

[1] Table 3.2 on page 72 is available here (https://crimeresearch.org/wp-content/uploads/2018/04/A1.png and https://crimeresearch.org/wp-content/uploads/2018/04/A2.png). Louis Klarevas, "Rampage Nation: Securing America from Mass Shootings," Prometheus, 2016.

1



**Figure 6b**
**Percent of Mass Shootings with Assault Weapons**
**(Klarevas Dataset—Adjusted)**



**Figure 7b**
**Percent of Mass Shootings with Assault Weapons**
**(Mother Jones Dataset—Adjusted)**

18

4



**Figure 8b**
**Percent of Mass Shootings with Assault Weapons**
**(John Lott's CPRC Dataset—Adjusted)**

9. In each of the cases using Klarevas measure of six or more people murdered, the percentage of attacks using assault weapons is lowest during the ten years after the assault weapon ban sunset. According to Klarevas, the Mother Jones data for his preferred six or more people murdered, the percentage of attacks using assault weapons is highest when the ban is in effect and lowest after the ban sunsets. But why would the number of attacks involving non-assault weapons fall much more than the number of attacks with assault weapons during the assault weapon ban? Why would the number of attacks involving non-assault weapons rise much more than the number of attacks with assault weapons after the assault weapon ban ended?

10. As I will show later, as a result of simple division mistakes by Klarevas using his numbers, the same pattern is actually true for the measure of four or more people murdered. For example, in Figure 8b, for the period when the assault weapon ban was

in effect, the percentage of attacks using assault weapons for four or more murdered cases should be 22.7% (=5/22), not 18.2%. The percentage of attacks using assault weapons in instances where four or more people were murdered thus declined from 22.7% to 20% when the ban ended.

11.     While the ban on assault weapons might deter some from engaging in attacks, to the extent that those who would continue attacking with other types of gun do so or even some who would have substituted into other guns than assault weapons, the share of attacks with assault weapons should decline during the ban and increase when the ban ended. Klarevas' claim (p. 26 in his declaration filed 1/23/20) that "these assertions are offered without any sound logical or empirical basis" is wrong.

12.     Looking at Klarevas' preferred numbers in his figure 6b compared to the numbers that I had originally presented, his numbers are even less supportive of his theory. I had indicated a bigger drop in the percentage of attacks using assault weapons between 1984 and 1994 and the 1994 to 2004 periods. Klarevas' numbers show virtually no change (just a 1.3 percentage point drop), and then a slightly larger 1.5 percentage point further drop once the ban sunset.

13.     Not only don't these patterns move in a way that assault weapon ban advocates would predict, they are not statistically significant changes.

**Klarevas' Comments Regarding His Data Set**

14.     **Paragraph 7: "By examining Lott's Excel Workbook, it becomes clear that the additional shooting is the result of Lott including a mass shooting that occurred in Bell, Florida, on September 18, 2014, more than a decade after the Federal Assault Weapons Ban had expired and outside of his analytical timeframe of September 2004–August 2014."**

15.     The assault weapons ban actually went from mid-September 1994 to mid-September 2004, not the end of August 2004, so the ten-year interval would be from mid-September 2004 to mid-September 2014. Klarevas was off by 14 days in his statement of when the law sunset. My difference is 4-days.

16.     **Paragraph 8: "the firearm in question was a M1 carbine, which is not considered to be an assault weapon under Florida or federal law."**

17.     Yes, it was an M-1 Carbine, but it was a Universal M-1 Carbine. Despite Klarevas' claim to the contrary, there was no exemption for M-1 Carbines, as a class, during the 1994-to-2004 federal assault weapon ban. The federal assault weapon ban gave a blanket exemption specifically to the Iver Johnson M-1 Carbine (https://www.govinfo.gov/content/pkg/STATUTE-108/pdf/STATUTE-108-Pg1796.pdf#page=201). M-1 Carbines were bannable under federal law. Universal redesigned its M-1 Carbine after World War 2, but Iver Johnson did not redesign their gun. The Universal M-1 Carbine has some different design differences, including its internals such as the number of recoil springs, number of catches on the magazine release, barrel shroud, barrel bands, sights, bayonet lug, trigger guards, safeties, and other features (https://www.youtube.com/watch?v=-Hnh9n5L_-A). Very few parts of the guns are interchangeable. The Universal M-1 was not a knockoff of the Iver Johnson gun, nor was the reverse true. The Universal M-1 would still fall into the prohibited category if it contained two of the prohibited features, such as a bayonet mount (common) and a folding stock (some of the models have that https://www.gunsamerica.com/961255730/UNIVERSAL-M1-Carbine-Para-w-folding-stoc.htm) or a pistol grip (which can be added to the gun https://www.gunbroker.com/item/882463137).

18.     Florida does not ban assault weapons. But Universal M-1 Carbines can also be banned under California's Assault Weapon (https://oag.ca.gov/firearms/regs/genchar2). The state ban covers semiautomatic, centerfire rifles that can accept a detachable magazine and a list of other possible features, including a folding or

telescoping stock (https://www.gunsamerica.com/961255730/UNIVERSAL-M1-Carbine-Para-w-folding-stoc.htm).

19.     Since about 1990, New Jersey has listed the "M-1 Carbine Type." See also the New York State assault weapon ban (https://www.governor.ny.gov/sites/governor.ny.gov/files/archive/assets/documents/GunBillAWSec22.pdf).

20.     M-1 Carbines can also be banned under Maryland's assault weapon ban.

21.     **Regarding paragraph 9 starting on page 7 of the Klarevas' Daubert Motion**.

22.     After reviewing the data, those three guns in Klarevas' list of cases should be classified as assault weapons, though as noted above, Klarevas' changes here don't alter the general pattern because the percent of attacks using assault weapons still fell during the period after the ban sunset. Some of the decisions on what to classify as an assault weapon are arbitrary and if Klarevas' book had provided information on how and whether he classified different guns as assault weapons (just as Mother Jones and the CPRC have publicly provided this information), that debate could be avoided. When Mother Jones' and the CPRC data were used, I used their definitions. As I will show, Klarevas does not follow others' definition of an assault weapon even when they clearly identify the cases where they believe an assault weapon has been used.

23.     While I will shortly go through additional case, one example of the difficulty in classifying weapons as assault weapons is provided in Klarevas' discussion in lines 3 and 4 in paragraph 11 on page 10. Klarevas claims that I "omitted 4 mass shootings that involved assault weapons." It is clear that he is referring to the IHOP shooting in September 2011 in Carson City, Nevada. In testimony before the Nevada state Senate Judiciary Committee, Kenneth T. Furlong, Sheriff, Carson City, was asked: "Would

you call this an assault weapon? Would this meet the definition under federal law?" His response was: "As it was purchased under federal law, this was a sport rifle."[2]

**Klarevas' Comments Regarding the Mother Jones Data Set**

24. **Paragraph 11: "omitted 4 mass shootings that involved assault weapons".**

25. These alleged four missing cases are: one from "September 1984 to August 1994," one from "September 1994 to August 2004," and two from "September 2004 to August 2014."

26. During the period "September 1984 to August 1994" (note that the Federal Assault Weapon ban went into effect on September 13, 1994, not in August 1994, so the end periods should all be in September), Klarevas implied that I omitted a mass shooting case that involved assault weapons. Klarevas stated that there were 5 cases, but according to Mother Jones' own list, there are only 4 assault weapon cases (Air Force base shooting 6/20/94; 101 California Street shootings 7/1/93; Standard Gravure shooting 9/14/89; Stockton schoolyard shooting 1/17/89). The case he appears to refer to is the shopping center spree killings on 4/23/1987. According to Mother Jones, the weapons involved in this case are Sturm, Ruger Mini-14 semiautomatic rifle; 20-gauge Winchester pump-action shotgun; .357 Ruger Blackhawk revolver, which are not considered an assault weapons using Mother Jones definition. In Mother Jones' own list, it is marked as a non-assault weapon case, while Klarevas counted it as an assault weapon case.

27. Over the years from "September 1994 to August 2004," Klarevas claims there were four assault weapon cases involving four or more people murdered in the

---

[2] Minutes of the Senate Committee on Judiciary, Seventy-seventh Session, March 15, 2013 (https://www.leg.state.nv.us/Session/77th2013/Minutes/Senate/JUD/Final/532.pdf).

Mother Jones data set. But according to Mother Jones' list, there are only three such assault weapon cases (Caltrans maintenance yard shooting 12/18/1997; Columbine High School massacre 4/20/1999; Wakefield massacre 12/26/2000). Klarevas does not specify which case he is referring to as the fourth instance, but, in any case, it means that he disagrees with what Mother Jones classifies as an assault weapon. None of the following 12 cases are marked by Mother Jones as using an assault weapon.

| Case | Location | Date |
|---|---|---|
| Walter Rossler Company massacre | Corpus Christi, Texas | 4/3/95 |
| Fort Lauderdale revenge shooting | Fort Lauderdale, Florida | 2/9/96 |
| R.E. Phelon Company shooting | Aiken, South Carolina | 9/15/97 |
| Connecticut Lottery shooting | Newington, Connecticut | 3/6/98 |
| Westside Middle School killings | Jonesboro, Arkansas | 3/24/98 |
| Thurston High School shooting | Springfield, Oregon | 5/21/98 |
| Atlanta day trading spree killings | Atlanta, Georgia | 7/29/99 |
| Wedgwood Baptist Church shooting | Fort Worth, Texas | 9/15/99 |
| Xerox killings | Honolulu, Hawaii | 11/2/99 |
| Hotel shooting | Tampa, Florida | 12/30/99 |
| Navistar shooting | Melrose Park, Illinois | 2/5/01 |
| Lockheed Martin shooting | Meridian, Mississippi | 7/8/03 |

28.     For "September 2004 to August 2014," the two missing cases reportedly involve the IHOP shooting 9/6/2011 and the Capitol Hill attack 3/25/2006. As noted previously, as to the IHOP shooting, Kenneth T. Furlong, Sheriff, Carson City, Nevada, said that the weapon did not meet the federal definition of an assault weapon. For the Capitol Hill attack, the Bushmaster XM15 E2S semiautomatic rifle is characterized as an assault weapon by Mother Jones and the murder did have that weapon in his possession, but that gun was not used in the attack. As a news article at

the time noted: "none of Huff's weapons would have been illegal under a federal assault weapons ban that expired two years ago."[3] The guns that were used were a 40-caliber Ruger and a 12-gauge Winchester Defender pump-action shotgun. For consistency in following Mother Jones, in our revised figures below, I now include the IHOP shooting case as an assault weapon shooting.

29.     **Paragraph 11: "included the death of perpetrators in his fatality count for 10 incidents"**

30.     When I utilized Mother Jones mass shootings dataset, I analyzed the cases based on its criteria description. According to "A Guide to Mass Shootings in America"     (https://www.motherjones.com/politics/2012/07/mass-shootings-map/), Mother Jones stated that "perpetrators who died or were wounded during the attack are not included in the victim tallies." However, it turns out that it included perpetrators' death into the number of fatalities inconsistently in their list for cases before 9/16/2013 and for the 10/24/2014 Marysville-Pilchuck High School shooting.[4]

---

[3] Mother Jones includes the Capitol Hill massacre 3/25/06 as an assault weapon case, but while the attacker did have a gun that Mother Jones classifies as an assault weapon, the gun was not used in the attack. Tracy Johnson and Angela Galloway, "Police seized Huff's guns once," Seattle Post-Intelligencer, March 28, 2006. Retrieved July 24, 2006 (https://web.archive.org/web/20060329185249/seattlepi.nwsource.com/local/264597_huffarsenal28.html).

[4] For example, besides Mother Jones' statement on excluding the perpetrators deaths, before 9/16/2013, they exclude perpetrators' death for the Columbine High School massacre 4/20/1999; Atlanta day trading spree killings 7/29/1999; Living Church of God shooting 3/12/2005; Virginia Tech massacre 4/16/2007; Crandon shooting 10/7/2007; Kirkwood City Council shooting 2/7/2008; Northern Illinois University shooting 2/14/2008.



Figure 3b
Incidents Before, During, and After the Federal Assault Weapons Ban
(Mother Jones Dataset— Corrected by Lott)

31.     Figure 3b and Figure 7b below are corrected version of the charts excluding the death of the perpetrators when counting fatalities in Mother Jones dataset. The difference between these figures and Klarevas' adjusted Figures 3b and 7b is that Mother Jones differs from Klarevas in terms of what is an assault weapon. For the cases where 6 or more people have been murdered, the 1984-to-1994 period should show only two cases involving assault weapons, not three. For attacks involving four or more murdered, the three periods should show 4, 3, and 5 cases, not the 5, 4, and 6 shown by Klarevas.

32.     The correct Figure 7b shows a much more dramatic drop in the share of attacks using assault weapons after the ban sunset in 2004. The drop for cases involving six or more murdered went from 33.3% to 19.0% (rather than from 33.3% to 22.7%). Similarly, the drop for four or more murders fell from 20% to 11.8%, which is what I had previously shown but is quite a change from Klarevas' claim that there was no change in the share of attacks using assault weapons over that period.

12



Figure 7b
Percent of Mass Shootings with Assault Weapons
(Mother Jones Dataset—Corrected by Lott )

**Klarevas' Comments Regarding the CPRC Data Set**

33.     Paragraph 13: "Lott also created two bar charts using data collected by the CPRC—the organization he founded—to display trends before, during, and after the Federal Assault Weapons Ban. Figures 4a and 5a below are reproductions of the two CPRC charts that appear in Lott's Declaration.4 Each of these two bar graphs contains data that are inaccurate, rendering each chart—and the conclusions drawn from each chart—flawed and unreliable. The specific datapoints that are inaccurate are underlined. (Explanations for how it was determined that the data are inaccurate are provided below.) Figures 4b and 5b below are adjusted versions of the corresponding bar graphs, incorporating, to the extent possible, accurate datapoints. For ease of comparison, I present each original chart followed by the respective adjusted chart."

34.     Among the cases on both Klarevas' and CPRC's lists, the only case with disagreement on assault weapon involvement is Shopping centers spree killings

4/23/1987. CPRC follows Mother Jones' definition and classified the case as not using assault weapons.

35. CPRC used the traditional FBI definition of mass public shootings in all such posts. There are several parts to this definition.

- The official FBI definition of active as well as mass public shootings excludes "shootings that resulted from gang or drug violence" or that occurred in the commission of another crime such as robbery (Blair and Schweit, 2014, p. 5).[5]

- The FBI also includes only shootings in "public places" such as: commercial areas (malls, stores and other businesses); schools and colleges; open spaces; government properties (including military bases and civilian offices); houses of worship; and healthcare facilities (Blair and Schweit, 2014, p. 12). Residences were included in the FBI's total deaths only "where casualties occurred inside a private residence before a shooter moved to a public area, those incidents were categorized at the location where the public was more at risk." For example, their cases would involve a residence and then a school.

- From 1980 to 2013, the original FBI definition of "mass killings" had been "four or more victims slain, in one event, in one location," and the offender is not included in the victim count (CRS, July 30, 2015). In 2013, the definition was changed to "three or more killings." Vast majority of academics have continued to use the four or more definition. This includes researchers such as James Alan Fox. See also studies years ago such as Grant Duwe, Tom Kovandzic, and Carl Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," Homicide Studies, Nov. 1, 2012. John Lott and Carl Moody, "How the U.S. Compares To Other Countries In The Rate Of Public Mass Shooters," Econ

---

[5] Blair, J. Pete, and Katherine W. Schweit, "A Study of Active Shooter Incidents, 2000 – 2013," Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014.

Journal Watch, March 2020: 28-39. Even groups such as Bloomberg's Everytown have recently used the four or more definition. Mother Jones has used the four or more definition for most of the period and though after 2013 they did start reporting using the three or more definition.

36.     This is not to say that gang shootings over drug turf aren't important or interesting, but the causes and solution for gang fights or robberies are different than mass public shootings, where the sole goal of the attack is to kill as many people as possible.

37.     But the odd thing is that Klarevas did not evaluate the CPRC data but his own data set. To see this, compare Klarevas' first set of graphs (Figure 1b) where he presents his data relative to the graph that Klarevas says is the CPRC data (Figure 4b, the first part that looks at cases where 6 or more people are murdered).



**Figure 1b**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(Klarevas Dataset—Adjusted)**



**Figure 4b**
**Incidents Before, During, and After the Federal Assault Weapons Ban**
**(John Lott's CPRC Dataset—Adjusted)**

38.    The figures above from Klarevas' Daubert Motion Declaration for his data and for the CPRC data limited to cases where 6 or more people are murdered are identical, even though that is impossible. Using CPRC's definition of mass public shootings, 28 of the cases that Klarevas identifies in his book are not qualified for CPRC data base. Twenty-six of those cases either happened entirely on residence or do not have four or more people killed in a public venue. At least three of those cases that did not happen in public places are drug-related (Flint, MI 2/5/87; Philadelphia, PA 12/28/00; Edinburg, TX 1/15/03) and look likely to be gang activity. Five cases occurred in the commission of robbery (Palatine, IL 1/8/93; Fresno, CA 5/16/93; Philadelphia, PA 12/28/00; Edinburg, TX 1/15/03; Indianapolis, IN 6/1/06). Three of those robberies were not in public places and two of them are also drug related. Two other robberies occurred in public places. In addition, there are four cases with multiple locations involved in the shooting spree, but none of them qualifies for CPRC's criteria that four or more victims slain in one public location.

16

| | | | | **Deaths** | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | Date | City | State | | Perpetrator | Note |
| 1 | 10/18/1984 | Evansville | IN | 6 | James Day | not public |
| 2 | 12/08/1986 | Oakland | CA | 6 | Rita Lewis, David Welch | not public |
| 3 | 02/05/1987 | Flint | MI | 6 | Terry Morris | not public; drug-related |
| 4 | 07/12/1987 | Tacoma | WA | 7 | Daniel Lynam | not public |
| 5 | 09/25/1987 | Elkland | MO | 7 | James Schnick | not public |
| 6 | 12/30/1987 | Algona | IA | 6 | Robert Dreesman | not public |
| 7 | 01/26/1991 | Chimayo | NM | 7 | Ricky Abeyta | not public |
| 8 | 11/07/1992 | Morro Bay and Paso Robles | CA | 6 | Lynwood Drake | not in one location; less than four killed in one public location |
| 9 | 01/08/1993 | Palatine | IL | 7 | Juan Luna, James Degorski | occurred in the commission of robbery |
| 10 | 05/16/1993 | Fresno | CA | 7 | Allen Heflin, Johnnie Malarkey | occurred in the commission of robbery |
| 11 | 07/12/1999 | Atlanta | GA | 6 | Cyrano Marks | not public |
| 12 | 12/28/2000 | Philadelphia | PA | 7 | Shihean Black, Dowud Faruqi, Khalid Faruqi, Bruce Veney | not public; drug-related; occurred in the commission of robbery |
| 13 | 08/26/2002 | Rutlegde | AL | 6 | Westley Harris | not public |

**Explaining why Klarevas' cases don't fit the CPRC's definition of Mass Public Shootings**

17

| | Date | City | State | Deaths | Perpetrator | Note |
|---|------|------|-------|--------|-------------|------|
| | | | | | | **Explaining why Klarevas' cases don't fit the CPRC's definition of Mass Public Shootings** |

| | Date | City | State | Deaths | Perpetrator | Note |
|---|------|------|-------|--------|-------------|------|
| 14 | 01/15/2003 | Edinburg | TX | 6 | Humberto Garza, Robert Garza, Rodolfo Medrano, Juan Ramirez | not public; drug-related; occurred in the commission of robbery; gang-related |
| 15 | 03/12/2004 | Fresno | CA | 9 | Marcus Wesson, Sebrenah Wesson | not public |
| 16 | 06/01/2006 | Indianapolis | IN | 7 | James Stewart, Desmond Turner | not public; occurred in the commission of robbery |
| 17 | 12/16/2006 | Kansas City | KS | 6 | Hersel Isadore | not public |
| 18 | 12/24/2007 | Carnation | WA | 6 | Michele Anderson, Joseph McEnroe | not public |
| 19 | 09/02/2008 | Alger | WA | 6 | Isaac Zamora | not in one location; less than four killed in one public location |
| 20 | 12/24/2008 | Covina | CA | 8 | Bruce Pardo | not public |
| 21 | 01/27/2009 | Los Angeles | CA | 6 | Ervin Lupoe | not public |
| 22 | 03/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Michael McLendon | not in one location; less than four killed in one public location |

18

| | | Explaining why Klarevas' cases don't fit the CPRC's definition of Mass Public Shootings | | | | |
|---|---|---|---|---|---|---|
| | Date | City | State | Deaths | Perpetrator | Note |
| 23 | 01/19/2010 | Appomattox | VA | 8 | Christopher Speight | not public |
| 24 | 07/07/2011 | Grand Rapids | MI | 7 | Rodrick Dantzler | not public; not in one location |
| 25 | 08/07/2011 | Copley Township | OH | 7 | Michael Hance | not public; not in one location |
| 26 | 12/25/2011 | Grapevine | TX | 6 | Aziz Yazdanpanah | not public |
| 27 | 07/26/2013 | Hialeah | FL | 6 | Pedro Vargas | not in one location; less than four killed in one public location |
| 28 | 07/09/2014 | Spring | TX | 6 | Ronald Lee Haskell | not public |

Sources in order that the cases appear above.
1) https://news.google.com/newspapers?id=e-YKAAAAIBAJ&sjid=2U8DAAAAIBAJ&pg=5543,3504741&dq=
2) https://www.upi.com/Archives/1986/12/09/The-massacre-of-six-people-including-two-children-was/9233534488400/
3) https://www.mlive.com/news/flint/2016/03/man_convicted_in_deadliest_kil.html
4) http://murderpedia.org/male.L/l/lynam-daniel.htm
5) http://murderpedia.org/male.S/s/schnick-james.htm
6) https://apnews.com/article/8a3aad36d61603cdd89b3eabd5fa8b44
7) https://apnews.com/article/a0f5b384f54b6edd3d4b62e856ed7209; https://murderpedia.org/male.A/a/abeyta-ricky.htm
8) https://www.nytimes.com/1992/11/09/us/gunman-kills-6-then-himself-in-california.html
9) https://www.nytimes.com/2007/04/13/us/13chicken.html?mtrref=en.wikipedia.org; https://qctimes.com/news/local/technology-plays-key-role-in-slaying-arrests/article_90efb8e1-0b6a-5341-9da3-b6ec94567e46.html
10) https://murderpedia.org/male.M/m/malarkey-johnnie.htm;

19

| Explaining why Klarevas' cases don't fit the CPRC's definition of Mass Public Shootings | | | | | |
|---|---|---|---|---|---|
| | Date | City | State | Deaths | Perpetrator | Note |

https://apnews.com/article/4a98ddab69e0b199afe42064a3cbda60

11) https://www.washingtonpost.com/archive/politics/1999/07/14/gun-misfire-spared-boy-in-shooting-rampage-that-killed-6-family-members/cfc11989-632a-4442-8fea-1be190cc1bba/?utm_term=.68b1b5c3b275  12)

https://apnews.com/article/a0d42527b6b6437b3aa31940d89c2146;
https://www.goupstate.com/article/NC/20040306/News/605153093/SJ;
https://www.goupstate.com/article/NC/20040306/News/605153093/SJ

13) https://www.tuscaloosanews.com/article/DA/20050813/News/606116101/TL

14) https://www.tdcj.texas.gov/death_row/dr_info/medranorodolfo.html;
https://murderpedia.org/male.M/m/medrano-rodolfo-alvarez.htm

15) https://www.nydailynews.com/news/justice-story/justice-story-vampire-king-article-1.1621606; https://en.wikipedia.org/wiki/Marcus_Wesson

16) https://www.indystar.com/story/news/2016/05/31/girl-endures-after-horrendous-murders/84966722/;
https://www.in.gov/judiciary/opinions/pdf/09281101rdr.pdf

17) https://www2.ljworld.com/news/2006/dec/18/police_shooter_was_depressed/

18) https://www.seattletimes.com/seattle-news/crime/timeline-of-carnation-killings-anderson-murder-trial/  19)

https://www.seattlepi.com/local/article/Zamora-pleads-guilty-in-shooting-rampage-won-t-891406.php;
https://en.wikipedia.org/wiki/2008_Skagit_County_shooting_spree

20) https://www.nytimes.com/2008/12/27/us/27shooting.html?ref=us

21) https://www.cbsnews.com/news/mass-murder-family-in-la-part-of-trend/

22) https://www.nytimes.com/2009/03/12/us/12alabama.html;
https://en.wikipedia.org/wiki/Geneva_County_massacre

23) https://archive.vn/20110807075417/http://www2.wsls.com/sls/news/local/lynchburg/article/appomattox_murders_suspect_declared_incompetent_for_trial/108516/;
https://www.cnn.com/2010/CRIME/01/20/virginia.shootings/index.html?hpt=T2

24) https://www.nytimes.com/2011/07/08/us/08gunman.html?_r=1

25) https://www.cbsnews.com/news/ohio-rampage-suspect-bought-gun-from-pawn-shop/;
https://web.archive.org/web/20150429165955/http://www.newsnet5.com/news/local-news/akron-canton-news/police-respond-to-reports-of-multiple-gunshots

26) https://www.dallasnews.com/news/crime/2012/12/25/documents-bring-

| Explaining why Klarevas' cases don't fit the CPRC's definition of Mass Public Shootings | | | | | |
|---|---|---|---|---|---|
| | Date | City | State | Deaths | Perpetrator | Note |

glimpse-of-troubled-life-of-grapevine-mass-shooter/
27) https://www.cnn.com/2013/07/27/us/florida-shooting/index.html
28) https://www.usatoday.com/story/news/nation/2014/07/10/houston-shooting-multiple-fatalities-suspect-identified/12466251/

39.     It is absurd for Klarevas to claim that the "corrected" or "adjusted" CPRC data set has the exact set of cases as the Klarevas data set. For Klarevas' data, the total number of cases is much larger, 65, than for the CPRC data set, 37. The reason is simple: he includes mass shootings involving gang fights and robberies and attacks in residences. For the CPRC data set, the total is 37. The difference is the 28 cases listed above.

40.     The same errors also exist in Klarevas' Figure 4b for the "CPRC Data set – Adjusted" where he again includes these additional shooting cases. In addition, Klarevas makes a counting mistake, as the number of cases where four or more are murdered involving any firearm over the September 2004 to September 2014 period should be 46, not 45.

41.     Even including the 28 unqualified cases into CPRC's list and applying Klarevas' classification on assault weapons as he stated in the declaration, the figures are not the same as he presented. Even using his own numbers, the percent of Mass Shootings with Assualt Weapon during the Federal Assault Weapons Ban for four or more murdered cases should be 22.7%(=5/22), not 18.2%. The corrected versions of the charts are as follows.



Figure 4c
Incidents Before, During, and After the Federal Assault Weapons Ban
(CPRC Mass Public Shooting Dataset—added Klarevas cases and applied his classification)



Figure 8c
Percent of Mass Shootings with Assault Weapons
(CPRC Mass Public Shooting Dataset—added Klarevas cases and applied his classification )

42.    Based on CPRC dataset with its own definition, Figure 4b and 8b display trends before, during, and after the Federal Assault Weapons.



Figure 4b
Incidents Before, During, and After the Federal Assault Weapons Ban
(CPRC Mass Public Shooting Dataset—Corrected by Lott)



Figure 8b
Percent of Mass Shootings with Assault Weapons
(CPRC Dataset—Corrected by Lott )

**Klarevas' Claim that there is "no basis" for looking at the percent of attacks using assault weapons**

43.     Paragraph 22: "As noted in my prior Declaration in this case (para. 44), there is no basis for performing this type of 'share' analysis. Advancing an

**argument based on the percentage of mass shootings involving assault weapons as a share of all mass shootings is a straw-man argument that displays a lack of understanding as to how bans operate, as discussed in paragraph 44 of my prior Declaration in this case. In addition to lacking a scholarly foundation, Lott's theory about the share of mass shootings involving assault weapons also lacks an empirical foundation, given the enormous error rate that underpins his calculations of percentages."**

44.     Klarevas does not directly respond to my critique that if his theory is correct than the share of mass public shootings committed with assault weapons should have declined during the period of the assault weapon ban. Instead, Klarevas provides Figures 5 and 6 in his Declaration that was filed 01/23/2020 which look at periods that do not directly correspond to the period before, during, and after the 1994-2004 ban.

Figure 5.  Percentage of Gun-Massacre Incidents Involving Assault Weapons



45.     I tried to replicate Klarevas claims using the Mother Jones data (they have assault weapons specifically labeled up through 2012) and I used their method after that. Here is what I found.

Percent of Gun-Massacre Incidents Involving Assault Weapons

| Period | Percent |
|--------|---------|
| Last 3 Years | 70% |
| Last 5 Years | 60% |
| Last 10 Years | 44% |
| Last 20 Years | 37% |
| Last 36 Years | 34% |

■ Number of Mass Public Shootings using 6 or more killed

46.     The point of Klarevas' diagrams is to make it appear that there is a consistent upward trend in the rate that assault weapons are used in mass public shootings, but when you do it by year periods of time it becomes clear that the pattern Klarevas shows is just an artifact of the unusual way that he presents the data. The declining percentage as the time period gets longer is simply due to the fact that assault weapons were used extensively during the very end of the period, but no theory is presented for why assault weapons would suddenly become very popular twelve or more years after the end of the assault weapon ban. That particularly does not fit Klarevas' earlier analysis that compared three ten-year periods of time.

Percent of cases involved assault weapons
(6 or More Killed)

47. **From Paragraph 44 in Klarevas' 01/23/2020 Declaration: "Lott is implying that, should an assault weapons ban be repealed, establishing its effectiveness would depend on showing that the share of gun massacres involving assault weapons relative to all gun massacres increased. These assertions are offered without any sound logical or empirical basis. In particular, Lott fails to address recognized phenomena in the academic literature (e.g., spillover effects and substitution effects) that capture how regulations can lead to additional benefits, including reductions in different forms of mass-casualty firearm violence. Such a dynamic could explain why the federal AWB was effective while, at the same time, the share of gun massacres involving assault weapons, as a percentage of all gun massacres, remained constant."**

48. It is not obvious how spillover effects are relevant to this discussion, but the substitution effects work in the opposite direction of what Klarevas claims. With an assault weapon ban, while some would-be attackers might refrain from attacking if they were to use an assault weapon, others will substitute other types of guns. To the extent

that there is any substitution, that would lower the percentage of attacks using assault weapons.

49.     The argument's logic is pretty simple: if an assault weapon ban is effective, it will both discourage some people who would have used an assault weapon not to attack and cause others to switch to a different type of gun. Both effects will lower the percentage of attacks using assault weapons. Instead, the percentage of attacks using such weapons either rises or stays the same.

50.     Similarly, when the ban sunset, there should be an increase in the share of attacks using assault weapons, but clearly that share consistently falls after the ban.

51.     There is no evidence that there was a statistically significant decline in the share of attacks with assault weapons during the ban or a statistically significant increase after the ban sunset.

**Conclusion**

52.     Klarevas' reports contain numerous of errors, from simple counting mistakes to problems with division to misclassifications. Yet, in all these different breakdowns, the rate that attacks use assault weapons fell after the assault weapon ban sunset. If sunsetting the ban drove the increase in shootings, the only way that could have happened is if the share of shootings involving assault weapons increased. This result is not consistent with the hypothesis that an assault weapon ban helped reduce attacks.

53.     In addition, the Mother Jones data for six or more murders and all the CPRC data show that the percentage of attacks using assault weapons rose during the period that they were banned. All the other results show a steady decline over time in the percent of attacks using assault weapons. It is hard to square any of these results with the claim that an assault weapon ban reduced the rate of attacks. If the changes in

27

the number of attacks are not due to access to assault weapons, there must be other reasons for the changes in the rate.

54.     Most importantly, in part because of the small sample size, there is no statistically significant changes in any of these numbers over time. Possibly this lack of statistical work that either looks at statistical significance or separates out-state assault weapon bans from the federal ban is the reason that Klarevas' work isn't published in refereed journals.

55.     The lack of evidence of such support for an assault weapon ban is not surprising. As I have noted, there is an arbitrariness in how to classify these assault weapons. I have used the Mother Jones and CPRC lists of assault weapon cases in examining their data, and I would have used Klarevas' list if he had included such a list in his book. However, assault weapons are defined, you cannot get around the problem that the guns that are banned are no different from other semi-automatic guns that are still allowed in terms of their rate of fire, the types of bullets they fire, and the damage that they can do.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on January 20, 2021.

_____
John R. Lott, Jr.

**EXHIBITS**
**TABLE OF CONTENTS**

**Exhibit**  **Description**                                                    **Page(s)**

1        John R. Lott Jr., Crime Prevention Research              0001-0014
         Center, "Response to DeFilippis And Hughes
         Review Of The War On Guns"
         August 30, 2016

2        John R. Lott Jr., Crime Prevention Research              0015-0033
         Center, "Response To Evan DeFilippis And Devin
         Hughes' Newest Claims At Think Progress"
         August 31, 2016

3        John R. Lott Jr.                                         0033-0042
         "Response to Malkin's Op-ed"

4        New York Times article, Ronald Smothers,                0043-0048
         "Florida Gunman Kills 8 and Wounds 6 in Office"
         The New York Times
         June 19, 1990

# EXHIBIT "1"



# Crime Prevention Research Center

- Research
- Data
- About/Board Of Academic Advisors
- Op-Eds
- Contact/Press
- Donate

Search

Featured

# Response To DeFilippis And Hughes Review Of The War On Guns

30 Aug , 2016



DeFilippis and Hughes have another piece attacking Dr. Lott's new book The War on Guns (UPDATE: DeFilippis and Hughes discretely note by their byline that they have updated this piece, but we haven't taken the time to go through it again to see what they have changed.).  Past responses to Evan DeFilippis and Devin Hughes claims are available here and here.  You will see that many of these claims have already been address in past responses, but as is very typical for DeFilippis and Hughes, they ignore responses that already exist and just assume that their readers won't check their claims.

UPDATED: Here is Lott's response to their most recent claims:

**1) National Research Council report found that the data did not support Lott's theory**

> Evan DeFilippis and Devin Hughes: The central finding in that book [More Guns, Less Crime] — that rates of gun ownership and the existence of "right to carry" laws reduce violent crime — have been the subject of numerous subsequent studies, the most sophisticated of which conclude Lott's results are specious. (A National Research Council report found that the data did not support the theory.)

DeFilippis and Hughes incorrectly describe the National Research Council report.  In the report, the NRC simply said that it could not draw any conclusions with respect to right-to-carry laws.

Although it examined a wide variety of gun laws, the NRC panel could not identify one in particular that made a statistically significant difference. Only on right-to-carry laws was there <u>a dissent from this conclusion</u>. James Q. Wilson pointed to the panel's own regressions, all of whice found that right-to-carry reduces murder rates.

In the previous 15 years, there had been only one other dissent. Academics who don't sign on to an NRC report are not invited back to future panels. This creates strong pressure not to dissent and to agree with reports that refuse to say anything matters. In any case, the NRC report found more support for my findings than for any other study.

Here are quotes from the <u>executive summary</u> of the NRC report:

> For right-to-carry laws, the committee concluded: "If further headway is to be made, in the committee's judgment, new analytical approaches and data are needed."

> For violence and suicide: "The committee also recommends further studies of the link between firearms policy and suicide."

> For restricting access: "The committee recommends that work be started to think carefully about possible research and data designs to address these issues."

> For prevention programs and technology: "The committee recommends that firearm violence prevention programs should be based on general prevention theory, that government programs should incorporate evaluation into implementation efforts, and that a sustained body of empirical research be developed to study the effects of different safety technologies on violence and crime."

> For criminal justice interventions: "The committee recommends that a sustained, systematic research program be conducted to assess the effect of targeted policing and sentencing aimed at firearms offenders."

DeFilippis' and Hughes' claim that a study by John Donohue et. al. represents the most sophisticated study on concealed carry. In fact, there are significant errors with that research. <u>Unfortunately, they assume that the adoption of "shall-issue" or "right-to-carry" laws causes a large, immediate increase in the number of permits</u>. But many states with right-to-carry laws make it difficult to obtain permits. Compared to the rest of the country from 1999 to 2010, states that adopted right-to-carry laws actually experienced a less rapid increase in the share of the adult population with permits. Other comments are <u>available here</u>.

## 2) Lott dismisses the link between guns and suicide

Evan DeFilippis and Devin Hughes assert:

> The NRC report's larger conclusion, after reviewing the research? "Overall, the U.S. studies have consistently found that household gun ownership is associated with a higher overall risk of suicide." The exact opposite of Lott's claim.

DeFilippis and Hughes omit the previous sentence in the NRC report: "It is not yet clear if the individuals who used a gun to commit suicide would have committed suicide by another method if a gun had not been available." And the executive summary stated that no conclusion had been reached, only that: "The committee also recommends further studies of the link between firearms policy and suicide." DeFilippis and Hughes cite other studies without including passages that similarly acknowledge the possible substitutability of different methods of suicide.

DeFilippis and Hughes ignore <u>a survey</u> of economists and criminologists who have done empirical research on firearms. This survey shows a 60%-to-40% margin believing that the presence of a gun in the home does not cause an increase in the risk of suicide. Economists overwhelmingly took this position, while criminologists agreed with it by a margin of only two-percentage points.

See also here for some <u>general responses</u>.

### 3) Lott is the progenitor of the myth that mass shooters seek out "gun free" zones

Evidence on the mass public shooters picking gun-free zones is <u>available here</u>.

In the "War on Guns," I spend a paragraph discussing the James Holmes' case as it pertains to the issue of gun-free zones.

Citing Mother Jones magazine, DeFilippis and Hughes start off with the claim:

> Yet the <u>main reason</u> Holmes decided against attacking an airport, according to passages in 36 pages of <u>handwritten notes</u> gathered during the post-shooting investigation, is that he didn't want his motive to be construed as terrorism.

I have no idea what Holmes' "main reason" was for not attacking the airport. But the first reason he lists is "substantial security."



> Evan DeFilippis and Devin Hughes: This research revealed that, of the seven theaters showing "The Dark Knight" within 20 minutes of the killer's house, only one prohibited firearms. (It's worth mentioning just how arbitrary and suspiciously convenient that 20-minute cutoff is. Had he extended the study to theaters that were 21 minutes away, he'd be <u>forced to include</u> the Arapahoe Crossings 16 complex, which also posted signs forbidding guns.)

In fact, the only reason that they know about the signs at the Arapahoe Crossings 16 complex is because I **already <u>provided that information</u>**. Most of the other theaters that were farther than 20 minutes away also allowed permitted concealed handguns. The 20 minute distance was arbitrary, but the point is that of all the movie theaters that were somewhat close only one posted signs banning concealed handguns and that is the one that he went to. He clearly went to the closest movie theater that banned concealed handguns. In any case, I have publicly provided information on other theaters (it is readily available on my website). Arapahoe Crossings 16 complex was 23 minutes from Holmes apartment.

> DeFilippis and Hughes: In classifying theaters as gun-free zones, Lott makes the suspect assumption that any theater without a visible "No Weapons Allowed" sign must necessarily allow firearms. This

ignores the fact that businesses might ban guns as a matter of internal policy but nevertheless be reticent to advertise that policy. Indeed, we know that Lott's assumption is wrong, because we made follow-up calls to the theaters in Lott's data set. Esquire Theater, for instance, which is within the 20-minute circle of Holmes's apartment, disallows weapons as a matter of policy, yet it has no posted signs.

There are several problems with this claim. 1) The Esquire movie theater can have any "internal" policy that it wants. But if the customers aren't notified of the theater's preferences, moviegoers will be bringing their permitted concealed handguns into the theater. 2) Esquire Theater was not showing the Batman movie when Holmes attacked, so this unstated policy was hardly relevant.

DeFilippis and Hughes: Lott also cites statements in the rambling "manifesto" of Elliot Rodger, who killed six people and wounded 14 others in Isla Vista, California, near the University of California at Santa Barbara campus. But Rodger makes it crystal clear that it was police officers he was worried about encountering, not armed civilians.

I agree that Elliot Rodger wanted to avoid police, just as I had noted that Holmes had wanted to avoid airport security. It is true that these individuals did not make specific statements about armed civilians. But the point of these two references was to show that these two particular killers avoided places where people with guns might be able to stop them. It answers DeFilippis' and Hughes' question: "Are we really to believe that sociopaths like James Holmes" pay attention to such details?"

Evan DeFilippis and Devin Hughes: He misclassified shootings in Umpqua Community College in Oregon; Hiahleah, Florida; and elsewhere as occurring in gun-free zones. But as Politifact has reported, Umpqua permitted people with concealed-carry licenses to carry arms on campus.

For those questioning whether the community college is a gun-free zone, here is a statement from the recent past president of the college in the New York Daily News.

But Joe Olson, the former president of Umpqua, said he decided to keep the campus gun-free last year after a campus-wide debate. . . .

The Register-Guard newspaper in Eugene, Oregon had this from the Interim community college President Rita Calvin (this link is now broken):

Interim community college President Rita Calvin said security officers are on campus around the clock, but are not armed. The campus is a gun-free zone. . . .

Schools can clearly prevent faculty members from carrying a gun on campus. Here, the pertinent case is: Court of Appeals of Oregon. Jane DOE, Plaintiff-Appellant, v. MEDFORD SCHOOL DISTRICT 549C, Defendant-Respondent.073765E2; A137804. Decided: November 18, 2009.

In our view, the school district's internal employment policy does not represent the sort of exercise of the "authority to regulate" firearms that the statute preempts. Because, as we have noted, the trial court erred in dismissing the declaratory judgment action rather than issuing a judgment containing a declaration as to the matter in dispute, we must vacate the judgment and remand for entry of a judgment declaring that the school district's policy is not preempted by ORS 166.170. . . .

Employment policy thus seems clear. What has not been decided is whether schools can, as a condition of enrollment, prohibit students from carrying guns. But it seems likely that Oregon courts would make a decision similar to their decision in regard to school employees. *Wouldn't this include non-faculty school employees, if it were stated in their employee handbooks?*

In another, more recent case, the Oregon state Appeals Court ruled about a challenge to Western Oregon University's administrative rule banning guns. In that case, the court decided that the school did not have the

authority to make such a rule.  Administrative rules, however, are a different matter from stated employment or enrollment policies in student or faculty handbooks.  OREGON FIREARMS EDUCATIONAL FOUNDATION, an Oregon nonprofit corporation, Petitioner, v. BOARD OF HIGHER EDUCATION and BOARD OF HIGHER EDUCATION and Oregon University System, Respondents.A142974.    Decided: September 28, 2011.

> In this administrative rule challenge, ORS 183.400(1), petitioner Oregon Firearms Educational Foundation seeks the invalidation of an administrative rule of the Oregon State Board of Higher Education and the Oregon University System (respondents) that imposes sanctions on persons who possess or use firearms on university property.    Petitioner contends that the rule exceeds respondents' statutory authority, that it is preempted by ORS 166.170, and that it violates the Second Amendment to the United States Constitution.    We conclude that the rule is preempted and therefore do not address whether it also violates the Second Amendment.    Accordingly, we conclude that the rule is invalid. . . .

If guns are banned through statements in student and faculty handbooks, then only non-student and non-faculty members would be clearly able to carry on school/college campuses. But then there is the question of whether schools/colleges can ban guns in buildings. It appears that the Oregon state Appeals Court has answered that question in the affirmative.

> That exception, petitioner contends, demonstrates the legislature's intention to expressly authorize persons with concealed handgun permits to carry firearms in public buildings, including buildings on state college and university campuses.    We reject the contention that a statutory exception to criminal sanctions for the possession of a handgun in public buildings indicates an intention to require public educational institutions to permit concealed handguns. . . .

As to the Yoyito-Café in Hialeah, Florida, DeFilippis and Hughes rely on a report by Michael Bloomberg's Everytown. Although Everytown mentions that guns are banned in restaurants which earn 50 percent or more of their revenue from alcohol, the group doesn't seem to have bothered to check whether that was the case for this restaurant. Apparently, the restaurant was at the time a very popular venue for parties serving alcohol.  If Bloomberg's group had checked, they would have found that it was a gun-free zone.

The organization of the bar in the center of the restaurant is also important for this determination. After it reopened, I called up the Café to check on these facts.

**4) There's little to no evidence that wielding a gun makes you safer**

Academic studies showing this point is available here.  A survey of academics on this point see here.

My book cites separate studies by Lawrence Southwick and Gary Kleck. DeFilippis and Hughes cite one study on the other side that has a lot of problems with it. In addition, DeFilippis and Hughes ignore that the National Crime Victimization Survey (NCVS) has a significant bias against finding defensive gun uses. This survey has a screening question that asks people whether they have been victims of violent crime. Because people who have used guns defensively are likely to avoid becoming victims, the question biases the survey by making it less able to pick up on defensive gun uses.

Gun ownership improves safety both by deterring criminals from attacking and by giving defendants the means to protect themselves. The NCVS survey does not study deterrence, but only deals with the latter point. Among peer-reviewed, nationwide studies by criminologists, economists and law professors, approximately two-thirds find that right-to-carry laws reduce violent crime.

**5) Evidence-free assertions about guns and children**

Who knows how they define "evidence-free assertions," but here is one of the peer-reviewed studies that I have published on guns and children.  Another peer-reviewed study is available here.

DeFilippis and Hughes repeat other criticisms that I have already dealt with elsewhere (see here and here).



attacks by gun control advocates, Response to critics

  Share on Facebook
0
0

  **By johnrlott**

Related posts

 UPDATED: What people are saying about Senate Democrats demanding that John Lott, CPRC's former president, be fired from the US Department of Justice

 Nine Democrat US Senators Attack the Trump Administration's Hiring of the CPRC's former President John Lott



 In the Missoulian: Proof of expertise

## Leave a Reply

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

☐ Save my name, email, and website in this browser for the next time I comment.

**Submit Comment**

☐ Confirm you are NOT a spammer

Comments RSS Feed

## Books

Gun Control Myths: How politicians, the media, and botched "studies" have twisted the facts on gun control



The War On Guns: Arming Yourself Against Gun Control Lies

More Guns, Less Crime (University of Chicago Press, 3rd ed, 2010)



The Bias Against Guns



Straight Shooting: Firearms, Economics and Public Policy



Stalked and Defenseless: How Gun Control Helped My Stalker Murder My Husband in Front of Me



Freedomnomics, see Chapter 4 for a general overview of the economics of crime



Dumbing Down the Courts: How Politics Keeps the Smartest Judges Off the Bench

## Archives

- January 2021
- December 2020
- November 2020
- October 2020
- September 2020
- August 2020
- July 2020

- June 2020
- May 2020
- April 2020
- March 2020
- February 2020
- January 2020
- December 2019
- November 2019
- October 2019
- September 2019
- August 2019
- July 2019
- June 2019
- May 2019
- April 2019
- March 2019
- February 2019
- January 2019
- December 2018
- November 2018
- October 2018
- September 2018
- August 2018
- July 2018
- June 2018
- May 2018
- April 2018
- March 2018
- February 2018
- January 2018
- December 2017
- November 2017
- October 2017
- September 2017
- August 2017
- July 2017
- June 2017
- May 2017
- April 2017
- March 2017
- February 2017
- January 2017
- December 2016
- November 2016
- October 2016
- September 2016
- August 2016
- July 2016
- June 2016
- May 2016
- April 2016
- March 2016
- February 2016
- January 2016

- December 2015
- November 2015
- October 2015
- September 2015
- August 2015
- July 2015
- June 2015
- May 2015
- April 2015
- March 2015
- February 2015
- January 2015
- December 2014
- November 2014
- October 2014
- September 2014
- August 2014
- July 2014
- June 2014
- May 2014
- April 2014
- March 2014
- February 2014
- January 2014
- December 2013
- November 2013
- October 2013
- September 2013
- August 2013
- July 2013
- May 2013
- February 2013
- January 2013

# **Click here to subscribe to our research updates**

Search for: [            ] [Search]

- Popular
- Latest



UPDATED: Comparing Death Rates From Mass Public Shootings And Mass Public Violence In The US And Europe

23 Jun , 2015

## Updated: Murder And Homicide Rates Before And After Gun Bans

16 Apr , 2016

## Comparing Murder Rates And Gun Ownership Across Countries

31 Mar , 2014



## Murders In US Very Concentrated: 54% Of US Counties In 2014 Had Zero Murders, 2% Of Counties Have 51% Of The Murders

25 Apr , 2017



## At Newsweek: Don't Let Anti-Gun Activists Weaponize The Capitol Hill Riot

20 Jan , 2021



## Fox News: Behind Nikki Goeser's Ongoing Harassment From Her Husband's Jailed Killer

20 Jan , 2021



[CPRC On The Tron Simpson Show: Andrew Pollack Discusses The Failures Of Liberal Policies](#)

<u>19 Jan , 2021</u>



[Defensive Gun Uses Where People Legally Carrying Concealed Guns Have Stopped Crime, Cases From Early January To Late January 2020](#)

<u>18 Jan , 2021</u>

Search By Topic

- **ANNUAL REPORT ON NUMBER OF CONCEALED HANDGUN PERMITS**
- **ASSAULT WEAPONS BAN**
- **CPRC RESEARCH**
- **PRE CPRC RESEARCH**
- **ABOUT THE CPRC**
- **BACKGROUND CHECKS**
- **BLOOMBERG'S GROUPS**
- **CONCEALED CARRY STATISTICS — ANNUAL REPORT**
- **CONCEALED CARRY — HOW LAW-ABIDING ARE PERMIT HOLDERS?**
- **CONCEALED HANDGUNS ALLOWED IN SCHOOLS, LIST OF STATES**
- **CONCEALED HANGUNS ALLOWED IN STATE CAPITOLS**
- **CONCEALED HANDGUNS ALLOWED IN SCHOOLS, HOW ITS HAS WORKED OUT**
- **CONCEALED HANDGUNS USED TO STOP MASS PUBLIC SHOOTINGS**
- **CONCEALED CARRY — OTHER**
- **CONSTITUTIONAL CARRY**
- **DATA FROM VARIOUS STUDIES**
- **DEATH PENALTY**
- **DEBATES**
- **DEFENSIVE GUN USES WITH CONCEALED HANDGUNS**
- **DEMOGRAPHICS OF MASS PUBLIC SHOOTERS**
- **FACT CHECKING THE MEDIA**
- **GUN BANS: MURDER AND HOMICIDE RATES BEFORE AND AFTER GUN BANS**
- **GUN CONTROL ADVOCATES REFUSE TO DEBATE**
- **GUN CONTROL LIES**

- **GUN-FREE ZONES**
- **GUN SHOW REGULATIONS**
- **ILLEGAL ALIEN CRIME**
- **IMPACT OF GUN CONTROL ON THE POOR**
- **INTERNATIONAL COMPARISONS**
- **MASS PUBLIC KILLINGS NON-SHOOTINGS**
- **MASS PUBLIC SHOOTINGS**
- **MASS PUBLIC SHOOTINGS IN GUN-FREE ZONES**
- **MEDIA APPEARANCES**
- **MEDIA BIAS ON GUNS**
- **MEDIA DISCUSSION ON THE CPRC**
- **MENTAL ILLNESS**
- **MORE GUNS, LESS CRIME**
- **NEWS COVERAGE OF CPRC**
- **OP-EDS**
- **POLICE OFFICER SAVED BY CONCEALED HANDGUN PERMIT HOLDER**
- **PUBLIC HEALTH RESEARCH**
- **RED FLAG LAWS**
- **REGISTRATION OF GUNS**
- **RESPONSES TO CRITICS**
- **SAFE STORAGE LAWS**
- **SCHOOL SECURITY**
- **SMART GUNS**
- **STAND YOUR GROUND**
- **SURVEYS ON GUN OWNERSHIP**
- **TALKS**
- **TELEVISION SHOW BIAS ON GUNS**
- **TESTIMONY**
- **WOMEN AND GUNS**

© Copyright 2021　　Crime Prevention Research Center **TOP**

Privacy Policy　　Terms of Service

# EXHIBIT "2"



# Crime Prevention Research Center

- Research
- Data
- About/Board Of Academic Advisors
- Op-Eds
- Contact/Press
- Donate

Search

Featured

# Response To Evan DeFilippis And Devin Hughes' Newest Claims At Think Progress

31 Aug , 2016

**ThinkProgress**
Moving news forward.

I have responded previously to some of these claims by Evan DeFilippis and Devin Hughes. Their latest attack is over at **ThinkProgress**, which bills itself as providing a progressive perspective. No doubt, the attack was prompted by the media coverage that I have been getting for my new book, The War on Guns.  If they feel the need to attack, it shows that we are making some progress in educating people and they mention my book near the beginning of their attack piece.

Regarding the bottom of line of whether concealed carry reduces murder rates, here is a list of papers published in peer-reviewed journals by economists and criminologists.

Let me go through DeFilippis' and Hughes' points in order.

1)**"Lott's assertion that more guns leads to more safety formally repudiated by a** National Research Council panel**"**

DeFilippis and Hughes incorrectly describe the National Research Council report.  The NRC report simply said that they could not draw any conclusions with respect to right-to-carry laws.

**0016**

The report examined seemingly every possible gun law that has been studied by academics, but the NRC panel could not identify one particular law that made a statistically significant difference. Only on right-to-carry laws was there a dissent from this conclusion. James Q. Wilson pointed out that all of the panel's own regressions found that right-to-carry reduces murder rates. In the previous 15 years, there had only been one other dissent.

Academics who don't sign on to an NRC report are not invited back to be on future panels. This creates strong pressure not to dissent and to agree with reports which refuse to say that anything matters. In any case, the NRC report actually found more support for my findings than for any other study.

For all the various gun control laws, the NRC panel simply said that no conclusions could be drawn and they called for more research. Nothing was different for right-to-carry laws, though DeFilippis and Hughes would never note this for any of the gun control laws that they support. Here are quotes from the executive summary of the NRC report:

> For right-to-carry laws, the committed concluded: "If further headway is to be made, in the committee's judgment, new analytical approaches and data are needed."

> For violence and suicide: "the committee also recommends further studies of the link between firearms policy and suicide."

> For restricting access: "the committee recommends that work be started to think carefully about possible research and data designs to address these issues."

> For prevention programs and technology: "the committee recommends that firearm violence prevention programs should be based on general prevention theory, that government programs should incorporate evaluation into implementation efforts, and that a sustained body of empirical research be developed to study the effects of different safety technologies on violence and crime."

> For criminal justice interventions: "The committee recommends that a sustained, systematic research program be conducted to assess the effect of targeted policing and sentencing aimed at firearms offenders."

2) **DeFilippis and Hughes claim: Lott "**had also been <u>caught pushing studies</u> with severe statistical errors on numerous occasions.**"**

They point to a paper by Ayres and Donohue in the Stanford Law Review. However, the Stanford Law Review issued an unusual, strongly-worded correction. The paper that Ayres and Donohue were commenting on was not my paper. It was a paper by Florenz Plassmann and John Whitley. The Stanford Law Review stated that, "Ayres and Donohue's Reply piece is incorrect, unfortunate, and unwarranted" because of this misimpression and why I had stopped by involvement with the paper.

For a discussion by Florenz Plassmann and his response to Ayres and Donohue, please see here.

DeFilippis and Hughes ignore that Donohue was actually forced to acknowledge serious errors in a paper that he wrote on concealed handgun laws (see this paper and also this one for more detailed discussions).

For other notes on Ayres and Donohue see here.

3) **DeFilippis and Hughes claim, "**An investigation uncovered that [Lott] had almost certainly fabricated an entire survey on defensive gun use.**"**

On July 3rd, 1997, I suffered a computer hard disk crash that lost data for many different papers, many papers that I was working on with co-authors at the time. Co-authors and I spent much of the next two years putting the lost data together again. All the data that went into my regressions on right-to-carry laws was replace. One set of data

**0017**

involved a survey on defensive gun use, something that involved one paragraph in my book, More Guns, Less Crime.

As Ann Coulter wrote: "In 1997, a computer crash led to the loss of Lott's underlying data. Fortunately, he had previously sent this data to his critics — professors Dan Black, Dan Nagin and Jens Ludwig. When Lott asked if they would mind returning it to him to restore his files, they refused."

There are two other problems with the claim about the lost survey data.

— This lost data that They ignore evidence supporting the existence of the survey, which was lost in a hard drive crash.

> A) Science requires replication. The survey, with the same questions and format, was redone in 2002. The redone, smaller survey produced similar results. That survey data are available at https://crimeresearch.org/data/.
>
> B) The survey was used in a single paragraph in my book, More Guns, Less Crime. I argued that the simple defensive brandishing or warning shots are not news worthy. The higher the rate of defensive brandishing or warning shots, the easier it is to explain why the media is not biased when it doesn't cover most defensive gun uses. If I wanted to show that the media was more biased, I should have used the surveys with lower defensive brandishing rates. I have also explained why the length of the time people are asked to recall events over can explain the difference in the four surveys on brandishing that have been done over the last twenty years (two designed by me and two by Gary Kleck).
>
> C) Two people have come forward to say that they took the original survey (John Hamilton and David Gross). Professor Jeff Parker of George Mason University interviewed John Hamilton, a retired private detective in Tennessee. Parker also interviewed Hamilton's sister, who reported being told contemporaneously by Hamilton that he had taken the survey.
>
> David Gross, a former prosecutor in Minnesota, also took the survey. Gross's statements confirmed many aspects of my 1997 survey (e.g., the number of questions, students conducting it, and the questions asked). .
>
> Other people were able to confirm various other aspects of the survey, such as when it was conducted and that I talked to people at the time of the survey. I have also supplied my tax records from 1997, which show large payments for research assistants. Some have speculated that Hamilton and Gross took a 1999 survey by David Hemenway, but when Hemenway finally released his data, a decade later, it was possible to look at where those survey lived as well as their age, race, and gender and that information made it clear that neither Hamilton nor Gross could have taken their survey.
>
> D) Many people knew of this hard disk crash because they were working with me on other projects, for which I also lost data.

— The source for DeFilippis' and Hughes' claims has been repeatedly caught altering documents. He has also not been particularly objective in the debate over gun laws (see here, here, and here).

### 4) DeFilippis and Hughes claim: "[Lott] was all but excommunicated from academia."

Lott currently ranks 28th worldwide among the hundreds of thousands of economists, business professors, law professors, and other academics in terms of the rate that his papers are downloaded on the Social Science Research Network. Over the last year, Lott ranked 41st in the world. The Crime Prevention Research Center not only has a prestigious Board of Academic Advisors, but my brand new book has received strong endorsements from many extremely prominent academics (some are also on our Board of Academic Advisors). Yet, if you want to know what it is like being a conservative in academia, you might want to read this about how Chicago Mayor Richard

**0018**

Daley <u>put pressure</u> on the University of Chicago to get me removed from the University.  Something similar happened when I was at the Yale Law School.  As to academic positions, I was at the University of Maryland up until June 2009.

"To paraphrase a once-famous commercial slogan, 'When John R. Lott speaks, everyone listens.' Or, at least they should when this leading expert on all matters gun control speaks out so provocatively and persuasively. In his new book, Lott delves into the myriad ways in which anti-gun 'statistics' and 'research' have been used to perpetrate utter falsehoods and misleading propaganda. If there is to be any intelligent, honest, and objective discussion of gun policy in the United States, then The War on Guns ought to be required reading."

—**PROFESSOR CHARLES J. GOETZ**, Joseph M. Hartfield Professor of Law Emeritus, University of Virginia School of Law

"John R. Lott is a role model for those who do scientific research on important problems. He is objective and logical. He uses the best evidence available—data from natural experiments on the effects of gun regulations—to compare the effects of alternative policies. He fully discloses his analysis, and responds to critics by conducting further research. As a result, his findings have persuaded many people. Lott's scientific approach is the opposite of the advocacy research that fills many academic journals, and which the media delight in reporting. Lott's The War on Guns exposes and explains the deceptions used by gun-control advocates. Those who want to live in a safer world will benefit from Lott's findings. Of the many gun regulations to date, there are no scientific comparisons that have found a reduction in crime or death rates."

—**PROFESSOR J. SCOTT ARMSTRONG**, The Wharton School, University of Pennsylvania

"We should all thank and admire John Lott for single-handedly changing the debate on guns from ill-informed rhetoric attacking gun ownership to hard-headed empirical analysis that shows the benefits of allowing law abiding citizens to carry concealed weapons. The War on Guns continues this debate by showing that the anti-gun lobby has spent millions of dollars making false and misleading claims about guns. Once again, John Lott provides careful and rigorous empirical analysis that undermines these claims. Kudos to John Lott for having the guts to take on the anti-gun lobby."

—**PROFESSOR WILLIAM M. LANDES**, senior lecturer and Clifton R. Musser Professor Emeritus of Law & Economics, University of Chicago Law School

"John Lott is more responsible than anyone else for arguments that gun ownership in the U.S. increases safety and reduces crime. Arrayed against him are the entire public health establishment and much of the media. In this book, John carefully analyzes many of the arguments made against gun ownership—for example, there are more gun homicides and mass shootings in the U.S. than elsewhere, background checks reduce gun harms, "Stand Your Ground" laws harm African Americans and increase crime—and shows using both statistical and anecdotal evidence that they are incorrect. He also shows that wealthy opponents of gun ownership (such as Michael Bloomberg) finance much fallacious "public health" research on the effects of guns. Anyone interested in the gun debate should read this book, and opponents of gun ownership have an intellectual obligation to confront the arguments."

—**PROFESSOR PAUL H. RUBIN**, Samuel Candler Dobbs Professor of Economics, Emory University

"John Lott's new book, The War on Guns: Arming Yourself Against Gun Control Lies, does just that. Lott deals with a wide variety of claims that question the value of firearms for self-defense, providing the analysis and facts the public needs to see through the distortions of gun control advocates. This is a valuable guide to a more balanced understanding of the issue."

**0019**

—**PROFESSOR JOYCE LEE MALCOLM**, Patrick Henry Professor of Constitutional Law and the Second Amendment, Antonin Scalia Law School, George Mason University

"John Lott's new book, The War on Guns: Arming Yourself Against Gun Control Lies, is an indispensable source of facts, insights, and cogent argument. Anyone who wants to be informed on the gun control issue has to read this book."

— **PROFESSOR CARLISLE E. MOODY**, Professor of Economics, William and Mary

5) **DeFilippis and Hughes assert: "**A blogger <u>revealed</u> that Mary Rosh, an online commentator claiming to be a former student of Lott's who would frequently post about how amazing he was, was in fact John Lott himself.**"** It was a family email account and I wasn't the only one who posted comments.

As I posted well over a decade ago, the blogger Julian Sanchez <u>misrepresented the events here</u>.

6) **DeFilippis and Hughes note**:

"In February, he [Lott] made the claim before the <u>Tennessee Senate</u>. 'Most people may not realize this, but the rate of mass public shootings in Europe is actually fairly similar to the rate in the United States,' he said. 'There is no statistically significant difference there, either in terms of the rate or fatalities.'

A couple of months earlier, he said something similar to the <u>Washington Post</u>, which quickly highlighted that his analysis was quite different from that of other experts in the field. As the Post noted, while Lott said the per capita rates of mass shootings in Europe and the United States were approximately the same, another researcher found the U.S. rate to be five times higher. The Post explained that the gulf between the results was due to Lott and the other researcher using different definitions."

The average incident rate per capita for the 28 EU countries is 0.0602 with a 95% confidence Interval of .0257 to .09477. The US rate of 0.078 is higher than the EU rate, but the difference is not statistically different. The average fatality rate for the 28 EU countries is 0.114, with a 95% confidence Interval of -.0244 to .253. The US rate of 0.089 is lower than the EU rate, but again the difference is not statistically significantly.

In Chapter 7 in The War on Guns, I show that from 2009 through 2015 (the first seven years of Obama's presidency), the fatality rate per million people was 0.58 in the EU and 0.62 in the US. The injury rate was 1.316 in the EU and 0.609 in the US.

Not that it matters, but the quote at the end of the first paragraph is incorrect. It should read "the rate of fatalities," not "the rate or fatalities."

7) **DeFilippis and Hughes note: "**Further, Lott's carefully crafted criteria to include an incident as a mass shooting is highly suspect. Lott goes to great lengths to exclude mass shootings that are the result of burglaries and gang violence, but he includes terrorist attacks.**"**

As I explain in my book, The War on Guns, and elsewhere, I rely on the FBI definition of mass public shootings (p.67). Since my original research with Bill Landes in the <u>late 1990s</u>, I have excluded shootings involving other crimes. Whether the shootings were classified as terrorist attacks was irrelevant.

The FBI definition of mass public shootings excludes "shootings that resulted from gang or drug violence" or that were part of some other crime.33 The FBI also defines "public" places as "includ[ing] commercial areas (divided into malls, businesses open to pedestrian traffic, and businesses closed to pedestrian traffic), educational environments (divided into schools [pre-kindergarten through twelfth grade] and IHEs), open spaces, government properties (divided into military and other govern- ment properties), houses of worship, and healthcare facilities."34

**0020**

Mass public shootings rivet our attention on the news. In most cases, they are carried out for the purpose of attracting media attention. They occur in areas where it is relatively easy to kill a lot of people—places like schools, malls, and movie theaters.

For the original source, see the fourth paragraph on <u>page 5</u> in this 2014 report by the FBI:

Specifically, shootings that resulted from gang or drug violence—pervasive, long-tracked, criminal acts that could also affect the public— were not included in this study. . . .

Also page 12 in the section marked "locations."

The FBI identified 11 separate incident location categories31 when seeking to identify the primary locations where the public was most at risk during an incident. These location categories include commercial areas (divided into malls, businesses open to pedestrian traffic, and businesses closed to pedestrian traf c), educational environments (divided into schools [pre-kindergarten through 12th grade] and IHEs), open spaces, government proper- ties (divided into military and other government properties), residences, houses of worship, and health care facilities. . . .

DeFilippis and Hughes write: "This year alone, there have already been <u>233 mass shootings</u>, where four or more victims were shot, leaving 310 dead and 930 injured." These cases, while tragic, were largely gang shootings or attacks that were part of some other crime.

Curbing gang violence is important, and it could be done pretty simply: legalize drugs or stop enforcing the existing laws.  Absent legalization or demand disappearing, drug gangs will keep fighting to control turf.  Just as gangs can get a hold of illegal drugs, they can get a hold of the weapons that they use to protect that valuable property. But whether drugs should be legalized is another topic.  The point here is simply that gun laws are not to blame for drug gang violence.  Drug gang violence and mass public shootings tend to have very different causes. The latter attacks are typically designed to kill or wound as many people as possible.  It doesn't make much sense to lump together the two types of gun violence.

DeFilippis and Hughes note: "This choice means that while the <u>Texas biker gang gunfight</u> last summer is excluded in his statistics, the November Paris attacks, which accounted for more than one-third of Europe's mass shooting fatalities, are included."

Yet, DeFilippis and Hughes reference to what they themselves note as a "Texas biker gan gunfight" clearly doesn't fit the FBI definition.  To exclude all four of the Paris attacks last year would mean that one would have to exclude the Orlando, San Bernardino, Fort Hood, Chattanooga, and other attacks in the US.  Yet, the key comparison for these terrorist attacks and those at Newtown is that the killers want to kill as many people as possible and to obtain news media attention.

### 8) **Econ Journal Watch paper**

Econ Journal Watch originally accepted the paper, but at the last moment in September 2015, the month that the paper was supposed to appear in the online publication, additional work was requested requiring additional work. After that disagreements arose between the editor and myself that spread out over 5 months, and the paper wasn't published. I forgot to go back and remove the note that the paper was forthcoming.  For those interested in seeing whether I needed one more line on my Vita, <u>here is a copy of it</u>.

### 9) **Did Moody, Marvell, Zimmerman, and Alemante (MMZA) misinterpret their own results (paper <u>available here</u>)? No.**

DeFilippis and Hughes claim:

In their <u>paper</u> "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," Carlisle Moody, a CPRC board member, and three co-authors examine the impact of right-to-carry (RTC) laws

**0021**

on violent crime and critique an earlier study by John Donohue and his colleagues.

Donohue and his colleagues had concluded that the most significant effect of concealed carry laws is an increase in aggravated assault, but Moody et al. reported that: "the most robust result, confirmed using both county and state data, is that RTC laws significantly reduce murder. There is no robust, consistent evidence that RTC laws have any significant effect on other violent crimes, including assault." This result fits well with Lott's long established hypothesis that concealed carry significantly decreases crime, and the authors interpret it as a direct repudiation of Donohue's results.

But there's just one problem. Moody and his co-authors misread their own analysis."

DeFilippis and Hughes seem to accuse a lot of people of deliberately deceiving others. But DeFilippis and Hughes don't seem to understand what is meant by "robust results, confirmed using both county and state data." MMZA weren't claiming that there wasn't a single result showing a significant effect for aggravated assaults. What they were saying is that the results weren't consistent across different estimates.

## 10) DeFilippis and Hughes claim other mistakes by Lott "allies":

As Ian Ayres and Donohue described in a brutal takedown of Lott and his allies' research, there were at least two previous cases where Lott used this tactic. The first time, Lott presented a series of graphs to the National Academy of Sciences, which David Mustard, one of Lott's allies, then decided to include in a comment for a 2003 Brookings Institute book. When Donohue demonstrated the results were the product of fatal coding errors, Lott's ally was forced to withdraw those graphs from the book. Also in 2003, Lott supported (and initially co-authored) a paper appearing in the Stanford Law Review by Plassman and Whitley that also appeared to support the more guns, less crime hypothesis. Again, Donohue proved that their results were based on coding errors, undermining the authors' central claim.

The discussion here regarding the Stanford Law Review paper by Plassmann and Whitley simply repeats what DeFilippis and Hughes already mentioned (see point 2 above). Repeating this point a second time doesn't make it any more accurate.

As to the claim about David Mustard, there was a minor mistake, but it did not alter his results. The editors of the Brookings Institute book were gun control supporters and would not allow Mustard to make the simple corrections that he asked to make.

## 11) DeFilippis and Hughes' claims about gun-free zones are very confusing. They point to two cases in which I was supposedly wrong about permitted concealed handguns being banned. Those two cases were the Umpqua Community College and Yoyito Cafe-Restaurant shootings. They write:

After the mass shooting at a gay nightclub in Orlando, Florida in June, Lott published a piece in which he wrote, "Since at least as far back as 1950, all but three U.S. mass public shootings (with more than three fatalities) have occurred in places where citizens are not allowed to carry their own firearms."

This claim has been a staple for Lott, who has repeated it in various forms in numerous articles, usually phrasing it as areas "where citizens were banned from carrying guns." To support his contention, Lott cites his own report analyzing different aspects of mass shootings.

However, what Lott repeats in public is quite different from what his report actually shows. While Lott's public statements equate gun-free zones with areas that prohibit concealed carry, his mass shooting report expands the gun-free zone definition to include areas where Lott feels it might be difficult to obtain a permit or where there might not be many permit holders despite being able to legally carry. Indeed, Lott admits in the report that more than six mass public shootings in the past six years have occurred in areas that legally allow citizens to carry their firearms, a direct contradiction of his public statements.

**0022**

And not only does Lott mischaracterize his own research, but the research itself is also filled with significant errors.

Umpqua Community College shooting:

For those questioning whether the community college is a gun-free zone, here is a statement from the recent, past President of the college. From the New York Daily News (October 3, 2015):

> But Joe Olson, the former president of Umpqua, said he decided to keep the campus gun-free last year after a campus-wide debate. . . .

The Register-Guard newspaper in Eugene, Oregon has this from the Interim community college President Rita Calvin (link broken):

> Interim community college President Rita Calvin said security officers are on campus around the clock, but are not armed. The campus is a gun-free zone. . . .

Yoyito Cafe-Restaurant shooting:

Bloomberg's Everytown group mentions that people with permitted concealed handguns aren't allowed to carry permitted concealed handguns in restaurants that get 50 percent of their revenue from alcohol. However, Everytown didn't actually check whether that was the case for this restaurant, which at the time was apparently a very popular venue for parties serving alcohol. If Bloomberg's group had checked, they would have found that it was a gun-free zone. The organization of the bar in the center of the restaurant is also important for this determination.

12) The Taylor Woolrich story.

DeFilippis and Hughes' claim:

> "Dear Dartmouth, I am one of your students, I am being stalked, please let me carry a gun to protect myself" read the headline of a piece on Fox News in August 2014.
>
> The first person account was a harrowing story about teenager Taylor Woolrich's desperate attempts to escape and protect herself from a persistent stalker who was ruining her life. The article blasted Dartmouth for not allowing her to carry a gun, and noted that carrying a gun was the only way she could remain truly safe.
>
> The story quickly went viral, and is one that's still brought up by right-wing gun activists. But Woolrich didn't actually write the article. . . .

Taylor Woolrich wrote up a several thousand word description of what had occurred in her stalking case. She didn't want the op-ed to be simply her personal story. As an economics major, she also wanted references to empirical studies. So, she and I worked together on a piece that was published in the Daily Caller. I included references to empirical work and helped cut down the piece to the length of an op-ed.

Here is what was posted on the Crime Prevention Research Center website after the above Buzzfeed story was published in August 2015:

> Last August, Taylor Woolrich was the first speaker at our conference for Students for Concealed Carry. Her tragic story about a woman who was being stalked and her desire to be able to defend herself received a lot of media coverage. In a piece at Buzzfeed last night and today, there is a story up about how John Lott supposedly put pressure on Taylor Woolrich to have an op-ed at Fox News. From Buzzfeed:

**0023**

*[beginning of quote] <u>Lott and Rebekah Riley, who was CPRC's director of communications at the time but no longer works there, had encouraged Woolrich to tell her story to journalists</u> — but, they say, warned her of the implications of telling it. On the day of the conference, Woolrich also booked an <u>interview</u> on her own with a reporter from the BBC. Later, when she told Lott about the BBC, he became "extremely, inappropriately pushy," she says, "controlling and kind of snappy." Woolrich chalked it up to Lott disagreeing with the BBC's political leaning. (Lott denies this and says he would have been "extremely happy" for Woolrich to get such a "big hit" as the BBC.) Taylor decided that when she returned to California, she would cut off contact with him.*

*Then Fox News decided to publish the op-ed after all, but only, according to Lott, if it came directly from Woolrich. They needed it immediately. When she said she didn't have time to write a new piece from her first-person perspective, Lott offered to do it instead and Woolrich agreed. "I don't know if I should just say yes and not piss him off," she remembers worrying.*

*The piece incorporated elements of her talk at the conference, but otherwise it was the essentially the same article written by Lott, which is still <u>online</u> at the Daily Caller. "It's his op-ed," she says. "Word for word, except the chunks that match what's said in my speech." The references to Lott's disputed research? Not hers. The link to the Amazon sales page for his book? Not hers. The headline? "Dear Dartmouth, I am one of your students, I am being stalked, please let me carry a gun to protect myself."*

*"I think his first priority was his cause," she says. "He saw me as a really great asset." . . .*

*"It's not like John Lott held a gun to my head and told me to talk to the media," Woolrich says. "I wanted to talk to the media, if it could mean something positive. But I wanted to talk to the media about stalking." In response to the flurry of interview requests, she changed her number and did not return Lott's or Riley's messages. . . . [end quote]*

But Buzzfeed's writer, Madison Pauly, and editor Anita Badejo, simply ignored text exchanges Lott sent them that he had with Taylor — and those exchanges tell a different story from what their piece presents. The texts show that Taylor appeared enthusiastic to have Lott's help in getting her story out, and that she approved the story to run on Fox News. Just a few of Buzzfeed's omissions and errors:

Buzzfeed didn't mention Taylor's text to Lott on August 6th, in which she wrote "I am totally okay with you submitting it [the Fox News article]."

Buzzfeed ignored that Taylor wrote Lott texts such as "I would love to get my story out there and be able to turn this whole mess into some sort of positive" and "I am happy that NYC [media appearance] is working out!"

Buzzfeed ignored emails in which Taylor wrote Lott things like, "thanks again for all your work on this" — in reference to the additions he had made to her draft op-ed.

Even worse, Buzzfeed's Pauly and Badejo committed journalistic malpractice by failing to inform readers that what Taylor told them changed over time. When reporter Madison Pauley first emailed Lott, she wrote him indignantly, "Richard Bennett victimized Taylor by taking control away from her [Taylor]. If, as Taylor says, she neither wrote nor approved the final version of the op-ed that bears her byline, more control was taken from her —control over the way she tells her story. This would mean that a victim's story was spun, without her consent, for political/personal gain and falsely attributed to her."

After Lott sent Pauly the text Taylor had sent him ("I am totally okay with you submitting it"), Pauly wrote, "I'll get back to you after I think about this for a few days."

Lott then didn't hear anything for months, until this week, when Buzzfeed editor Anita Badejo reached out. After Lott told her about the text in which Taylor said "I am totally okay with you submitting it,"

Badejo responded to Lott that Taylor "completely refutes that she sent the text in which she gave you permission to submit the article, and questions its authenticity."

After Lott offered to show the text to Badejo in person, or have a tech expert of their choosing come to Lott's office and verify that it is real, Badejo then insisted that it was not relevant.  Yet, in the version of the article that finally appeared, Taylor's story changed dramatically: she now claimed that she had given permission for the op-ed, but that she had done it because she did "not [want to] piss [Lott] off."

Not relevant? Couldn't Buzzfeed leave that to their readers to decide?

Lott worked with Taylor in good faith to help get her story out. It is a shame, but no surprise, that Buzzfeed sees the need to paint an organization that did its best to help her get her speak out as the villain. It's worth considering: If, a year from now, Taylor were to change her mind again and be dissatisfied with the way Buzzfeed handled things; would it be fair to say that Buzzfeed used her as a tool to try to discredit people they don't like? No, it would not — yet that is what Buzzfeed is doing to Lott here.

Buzzfeed certainly has an axe to grind. In their article, they underplay Lott's previous interactions with Jonah Perretti, the founder and CEO of Buzzfeed. Perretti had impersonated Lott during 2003, setting up a website "AskJohnLott" and sending out a lot of emails under Lott's name that pretended Lott had changed his mind on gun issues. After being sued for the impersonation, Perretti issued an apology, took down the website, and also took down a similar site where he was impersonating another person, Jeff Goldblatt.

There are many other errors in the piece, but we hope this incident will at least give the public a better idea of how Buzzfeed and its founder like to operate.



attacks by gun control advocates, Response to critics

  Share on Facebook

0

0



**By johnrlott**

Related posts


 UPDATED: What people are saying about Senate Democrats demanding that John Lott, CPRC's former president, be fired from the US Department of Justice

 Nine Democrat US Senators Attack the Trump Administration's Hiring of the CPRC's former President John Lott



 In the Missoulian: Proof of expertise

## Leave a Reply

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

☐ Save my name, email, and website in this browser for the next time I comment.

Submit Comment

☐ Confirm you are NOT a spammer

Comments RSS Feed

## Books



Gun Control Myths: How politicians, the media, and botched "studies" have twisted the facts on gun control



The War On Guns: Arming Yourself Against Gun Control Lies



More Guns, Less Crime (University of Chicago Press, 3rd ed, 2010)



The Bias Against Guns



Straight Shooting: Firearms, Economics and Public Policy



Stalked and Defenseless: How Gun Control Helped My Stalker Murder My Husband in Front of Me

**0027**



[Freedomnomics, see Chapter 4 for a general overview of the economics of crime](#)



[Dumbing Down the Courts: How Politics Keeps the Smartest Judges Off the Bench](#)

## Archives

- [January 2021](#)
- [December 2020](#)
- [November 2020](#)
- [October 2020](#)
- [September 2020](#)
- [August 2020](#)
- [July 2020](#)
- [June 2020](#)
- [May 2020](#)
- [April 2020](#)
- [March 2020](#)
- [February 2020](#)
- [January 2020](#)
- [December 2019](#)
- [November 2019](#)
- [October 2019](#)
- [September 2019](#)
- [August 2019](#)
- [July 2019](#)
- [June 2019](#)
- [May 2019](#)
- [April 2019](#)
- [March 2019](#)
- [February 2019](#)
- [January 2019](#)
- [December 2018](#)
- [November 2018](#)
- [October 2018](#)
- [September 2018](#)
- [August 2018](#)
- [July 2018](#)
- [June 2018](#)

- May 2018
- April 2018
- March 2018
- February 2018
- January 2018
- December 2017
- November 2017
- October 2017
- September 2017
- August 2017
- July 2017
- June 2017
- May 2017
- April 2017
- March 2017
- February 2017
- January 2017
- December 2016
- November 2016
- October 2016
- September 2016
- August 2016
- July 2016
- June 2016
- May 2016
- April 2016
- March 2016
- February 2016
- January 2016
- December 2015
- November 2015
- October 2015
- September 2015
- August 2015
- July 2015
- June 2015
- May 2015
- April 2015
- March 2015
- February 2015
- January 2015
- December 2014
- November 2014
- October 2014
- September 2014
- August 2014
- July 2014
- June 2014
- May 2014
- April 2014
- March 2014
- February 2014
- January 2014
- December 2013

**0029**

- [November 2013](#)
- [October 2013](#)
- [September 2013](#)
- [August 2013](#)
- [July 2013](#)
- [May 2013](#)
- [February 2013](#)
- [January 2013](#)

# <span style="color:red">Click here to subscribe to our research updates</span>

Search for: [                    ]  [ Search ]

- [Popular](#)
- [Latest](#)



[UPDATED: Comparing Death Rates From Mass Public Shootings And Mass Public Violence In The US And Europe](#)

23 Jun , 2015

[Updated: Murder And Homicide Rates Before And After Gun Bans](#)

16 Apr , 2016

[Comparing Murder Rates And Gun Ownership Across Countries](#)

31 Mar , 2014



[Murders In US Very Concentrated: 54% Of US Counties In 2014 Had Zero Murders, 2% Of Counties Have 51% Of The Murders](#)

25 Apr , 2017



At Newsweek: Don't Let Anti-Gun Activists Weaponize The Capitol Hill Riot

20 Jan , 2021



Fox News: Behind Nikki Goeser's Ongoing Harassment From Her Husband's Jailed Killer

20 Jan , 2021



CPRC On The Tron Simpson Show: Andrew Pollack Discusses The Failures Of Liberal Policies

19 Jan , 2021



Defensive Gun Uses Where People Legally Carrying Concealed Guns Have Stopped Crime, Cases From Early January To Late January 2020

18 Jan , 2021

## Search By Topic

- **ANNUAL REPORT ON NUMBER OF CONCEALED HANDGUN PERMITS**
- **ASSAULT WEAPONS BAN**
- **CPRC RESEARCH**
- **PRE CPRC RESEARCH**
- **ABOUT THE CPRC**
- **BACKGROUND CHECKS**
- **BLOOMBERG'S GROUPS**
- **CONCEALED CARRY STATISTICS — ANNUAL REPORT**
- **CONCEALED CARRY — HOW LAW-ABIDING ARE PERMIT HOLDERS?**
- **CONCEALED HANDGUNS ALLOWED IN SCHOOLS, LIST OF STATES**
- **CONCEALED HANGUNS ALLOWED IN STATE CAPITOLS**
- **CONCEALED HANDGUNS ALLOWED IN SCHOOLS, HOW ITS HAS WORKED OUT**
- **CONCEALED HANDGUNS USED TO STOP MASS PUBLIC SHOOTINGS**
- **CONCEALED CARRY — OTHER**
- **CONSTITUTIONAL CARRY**
- **DATA FROM VARIOUS STUDIES**
- **DEATH PENALTY**
- **DEBATES**
- **DEFENSIVE GUN USES WITH CONCEALED HANDGUNS**
- **DEMOGRAPHICS OF MASS PUBLIC SHOOTERS**
- **FACT CHECKING THE MEDIA**
- **GUN BANS: MURDER AND HOMICIDE RATES BEFORE AND AFTER GUN BANS**
- **GUN CONTROL ADVOCATES REFUSE TO DEBATE**
- **GUN CONTROL LIES**
- **GUN-FREE ZONES**
- **GUN SHOW REGULATIONS**
- **ILLEGAL ALIEN CRIME**
- **IMPACT OF GUN CONTROL ON THE POOR**
- **INTERNATIONAL COMPARISONS**
- **MASS PUBLIC KILLINGS NON-SHOOTINGS**
- **MASS PUBLIC SHOOTINGS**
- **MASS PUBLIC SHOOTINGS IN GUN-FREE ZONES**
- **MEDIA APPEARANCES**
- **MEDIA BIAS ON GUNS**
- **MEDIA DISCUSSION ON THE CPRC**
- **MENTAL ILLNESS**
- **MORE GUNS, LESS CRIME**
- **NEWS COVERAGE OF CPRC**
- **OP-EDS**
- **POLICE OFFICER SAVED BY CONCEALED HANDGUN PERMIT HOLDER**
- **PUBLIC HEALTH RESEARCH**
- **RED FLAG LAWS**
- **REGISTRATION OF GUNS**
- **RESPONSES TO CRITICS**
- **SAFE STORAGE LAWS**
- **SCHOOL SECURITY**
- **SMART GUNS**
- **STAND YOUR GROUND**
- **SURVEYS ON GUN OWNERSHIP**
- **TALKS**
- **TELEVISION SHOW BIAS ON GUNS**
- **TESTIMONY**

**0032**

- **WOMEN AND GUNS**

© Copyright 2021    Crime Prevention Research Center **TOP**

Privacy Policy   Terms of Service

# EXHIBIT "3"

Below is Malkin's op-ed with commentary by me (my comments are indented and in italics and start at the bottom of the page with the numbered responses corresponding to the numbers in the supporting document). (Note that two other discussions on this issue have been posted since February 2003 and involve a general discussion of the two other polls that ask about brandishing that have been done over the previous two decades as well a response to other attacks are available at the bottom of the page found here.) Despite being sent this information several times, she has not responded to any of these points. Steve Malzberg and Karen Hunter, co-hosts of a morning drive time show on WWRL (1600 AM) in New York, offered to let Malkin discuss these claims with me on the air, but she was unwilling to participate. It is disappointing that she will make allegations in print and on radio shows, but that she is unwilling to defend these assertions when I am present.

The general evidence for the survey is available here. The beginning of that document provides a brief abstract of the primary points.

An overview of the evidence is this: A) The survey was redone and the redone somewhat smaller survey produced similar results. In fact that survey data was already available at www.johnlott.org when Malkin wrote her piece.
B) The survey results in the single paragraphs in the two books where I have referenced this survey data was biased against the claim that I was making. I argued that the simple defensive brandishing or warning shots are not news worthy. The higher the rate of defensive brandishing or warning shots, the easier it is to explain why the media is not biased when it doesn't cover most defensive gun uses. If I wanted to show that the media was more biased, I should have used the surveys with lower defensive brandishing rates. I have also explained why the length of the time people are asked to recall events over can explain the difference in the four surveys on brandishing that have been done over the last twenty years (two designed by me and two by Gary Kleck).
C) Two people who took the survey have said that they took it. One person, James Hamilton, was interviewed by Professor Jeff Parker at GMU. As to the second person who took the survey, James Lindgren claims that David Gross took a different 1996 survey, but Gross's statements as well as the survey data from the 1996 survey indicate that Gross took my 1997 survey. The data from the 1996 survey is available from me or from the ICPSR under Hemenway's name. Other people were able to confirm various other aspects, such as the timing of when the survey was done and that I talked to people at the time of the survey. I have also supplied my tax records from 1997 to Joe Olson a tax law professor and other professors that show large payments for research assistants. Many others have confirmed many other aspects of what happened.
Bottom line: Science involves replication and I have always made my data available to others. In this case, I redid the survey and made that data available to anyone who wants access to it.

**The other Lott controversy**
Michelle Malkin
February 5, 2003

## Home

## Johnlott.org (description of book, downloadable data sets, and discussions of previous controversies)

## Academic papers:

### Social Science Research Network

## Book Reviews:

For a list of book reviews on *The Bias Against Guns*, click **here**.

--------------------------------
## List of my Op-eds
--------------------------------

# Posts by topic

### Appalachian law school attack

### Baghdad murder rate

### Arming Pilots

### Fraudulent website pretending to be run by me

### Ayres and Donohue

### Stanford Law Review

### Mother Jones article

### Vin Suprynowicz quote

# Links

### Craig Newmark

### Eric Rasmusen

### William Sjostrom

### Dr. T's EconLinks.com

For those few of us in the mainstream media who openly support Second Amendment rights, research scholar John Lott has been -- or rather, had been -- an absolute godsend.

Armed with top-notch credentials (including stints at Stanford, Rice, UCLA, Wharton, Cornell, the University of Chicago and Yale), Lott took on the entrenched anti-gun bias of the ivory tower with seemingly meticulous scholarship. His best-selling 1998 book, "More Guns, Less Crime," provided analysis of FBI crime data that showed a groundbreaking correlation between concealed-weapons laws and reduced violent crime rates.

I met Lott briefly after a seminar at the University of Washington in Seattle several years ago and was deeply impressed by his intellectual rigor. Lott responded directly and extensively to critics' arguments. He made his data accessible to many other researchers.

But as he prepares to release a new book, "Bias Against Guns," next month, Lott must grapple with an emerging controversy -- brought to the public eye by the blogosphere -- that goes to the heart of his academic integrity.

The most disturbing charge, first raised by retired University of California, Santa Barbara professor Otis Dudley Duncan and pursued by Australian computer programmer Tim Lambert, is that Lott fabricated a study claiming that 98 percent of defensive gun uses involved mere brandishing, as opposed to shooting.

When Lott cited the statistic peripherally on page three of his book, he attributed it to "national surveys." In the second edition, he changed the citation to "a national survey that I conducted." He has also incorrectly attributed the figure to newspaper polls and Florida State University criminologist Gary Kleck.

> *1) The reference to the survey involves one number in one sentence in my book. Compared to the 98 percent number there was an earlier survey by Kleck that found 92 percent of defensive gun uses involved brandishing and warning shots and because the survey was asking people about events that occurred over a long period of time it is likely that it over emphasized more dramatic responses. (My number that is directly comparable to the 92 percent estimate is about 99 percent.) My point in the book was that defensive gun use rarely involves more "newsworthy" events where the attacker is killed and either survey would have made the general point. A general discussion of the different methodologies is provided here.*

> *I never attributed my survey results to Kleck. What happened was that Dave Kopel from the Independence Institute took an op-ed that I had in the Rocky Mountain News and edited it for his web site. In the editing he added the incorrect reference to Kleck. (Statements from Kopel and others are provided in the supporting documents ). The two pieces are identical except for the reference to Kleck. As to the claim that I attributed the number to newspaper polls, that claim involves a misreading of two different sentences in an op-ed (see the material addressed in the second half of the link to point*

Interview with National
Review Online

Lyonette Louis-Jacques's
page on Firearms
Regulation Worldwide

The End of Myth: An
Interview with Dr. John
Lott

Cold Comfort, Economist
John Lott discusses the
benefits of guns--and the
hazards of pointing them
out.

An interview with John R.
Lott, Jr. author of More
Guns, Less Crime:
Understanding Crime and
Gun Control Laws

# Some data not found at www.johnlott.org:

Updated Media Analysis of Appalachian Law School Attack

Since the first news search was done additional news stories have been added to Nexis:

There are thus now 218 unique stories, and a total of 294 stories counting duplicates (the stories in yellow were duplicates): **Excel file** for general overview and **specific stories**. **Explicit mentions** of defensive gun use increase from 2 to 3 now.

Journal of Legal Studies
paper on spoiled ballots
during the 2000
Presidential Election

Data set from USA Today,
STATA 7.0 data set

"Do" File for some of the
basic regressions from the

paper

*(1)). As to using the plural, that was an error. Given the years that have passed since I wrote the sentence, I cannot remember exactly what I had in my mind but the most plausible explanation is that I was describing what findings had been generated by the polls, in other words I was thinking of them as a collective body of research. I had been planning on including more of a discussion on the survey in the book, just as I have in my book that came out early this year, but I had a hard disk crash (see response (2)) and I lost part of the book along with the data.*

*More importantly, the survey results that I used were biased against the claim that I was making. The relevant discussions in both of my books focus on media bias and the point was that the lack of coverage of defense gun uses is understandable if most uses simply involve brandishing where no one is harmed, no shots fired, no dead bodies on the ground, no crime actually committed. If others believe that the actual rate of brandishing is lower and I had used the results of Kleck, it becomes MORE difficult to explain the lack of news coverage of defensive gun uses. The two short discussions that I have on this issue in my two books thus choose results that are BIASED AGAINST the overall point that I am making, that the media is biased against guns.*

*Some issues involving the source for Malkin's claims can be found [here](#), [here](#), and [here](#).*

Last fall, Northwestern University law professor James Lindgren volunteered to investigate the claimed existence of Lott's 1997 telephone survey of 2,424 people. "I thought it would be exceedingly simple to establish" that the research had been done, Lindgren wrote in his report.

*Unfortunately, Malkin fails to mention that Lindgren is not an unbiased observer since I had written a journal article in Journal of Law & Politics critiquing some of his work months before he "volunteered to investigate" these claims.*

It was not simple. Lott claims to have lost all of his data due to a computer crash.

*2) As to the "claim" that I lost my data in a computer crash on July 3, 1997, I have offered Malkin the statements from nine academics ([statements attached](#)), four of whom I was co-authoring papers with at the time and who remember quite vividly also losing the data that we had on various projects. David Mustard at the University of Georgia spent considerable time during 1997 helping me replace gun crime data. Other academics worked with me to replace data on our other projects. Just so it is clear, this computer crash basically cost me all my data on all my projects up to that point in time, including all the data and word files for my book, More Guns, Less Crime, and numerous papers that were under review at journals. The next couple of years were hell trying to replace things and the data for this survey which ended up being one sentence in the book, was not of particular importance. However, all the data was replaced, including not only the large*

*county level data, the state level data, as well as the survey data, when the survey was redone.*

He financed the survey himself and kept no financial records.

*\* Unlike many academics, I have never asked for government support for my research. Nothing different or unusual was done in this case. While we still have the tax forms that we filed that show we made large expenditures on research assistants that year, my wife keeps our financial documents for the three years required by the IRS. I have provided my tax records from that year to several professors. Among them is a tax expert, Professor Joe Olson, at Hamline University in Minnesota, and he can verify this information. I have checked with the bank that we had an account with, but they only keep records five years back. Since wild claims have been made about the costs of the survey, some notion of its scope would be useful. The survey was structured so that over 90 percent of those questioned would only have to answer three short questions and those were usually completed in under 30 seconds. Less than one percent of those surveyed would actually answer as many as seven questions and even in that case the survey only took about two minutes. The appendix in The Bias Against Guns provides a description of the survey when it was replicated.*

He has forgotten the names of the students who allegedly helped with the survey and who supposedly dialed thousands of survey respondents long-distance from their own dorm rooms using survey software Lott can't identify or produce.

*\* I have hired lots of student RAs over the years. Since I have been at AEI in the last couple of years I have had around 25 people work for me on various projects. The students in question worked for me during the very beginning of 1997. While I can usually reconstruct who has worked for me, it requires that I have that material written down. The information on these students was lost in the hard disk crash and given that I had lost data for other projects such as three revise-and-resubmits that I had at the Journal of Political Economy it was not a particularly high priority.*

*I don't have the original CD with telephone numbers from across the country that was used to obtain telephone numbers, but I have kept one that I obtained later in 1997 when I was considering redoing the survey and I still have that available.*

Assuming the survey data was lost in a computer crash, it is still remarkable that Lott could not produce a single, contemporaneous scrap of paper proving the survey's existence, such as the research protocol or survey instrument.

*3) I have statements from two people who took the survey and other confirmatory evidence. As to the written material, being asked for written material six years after the survey is a long time. After the survey was done, the material was kept on my computer. In addition, I have moved three times (Chicago to Yale to Pennsylvania to AEI) as well as changed offices at Chicago and*

*Yale since the summer of 1997. Yet, besides the statements from the academics who can verify the hard disk crash as well as the statement of those who participated in the survey, I do have [statements](#) David Mustard, who I had talked to numerous times about doing the survey with me during 1996 and who remembers after that us talking about the survey after it was completed. He is "fairly confident" that those conversations took place during 1997. John Whitley and Geoff Huck also have some recollections. Russell Roberts, now a professor at George Mason, was someone else that I talked to about the survey, but he simply can't remember one way of the other. I didn't talk to people other than co-authors about the survey and the research that I was doing on guns generally. This is because of the often great hostility to my gun work and also because I didn't want to give those who disliked me a heads-up on what I was doing. I did have the questions from the survey and they were reused in the replicated survey in 2002.*

After Lindgren's report was published, a Minnesota gun rights activist named David Gross came forward, claiming he was surveyed in 1997. Some have said that Gross's account proves that the survey was done. I think skepticism is warranted.

*4) David Gross is the only person who Malkin mentions and she doubts his [statements](#). Gross, a former city prosecutor, does have strong feelings on guns, but that is one reason why he remembers talking to me about the survey when I gave a talk in Minnesota a couple of years after the survey. There was no other gun survey on the questions that I asked during 1997. And another survey that was given close in time, during the beginning of 1996, was dramatically different from mine (e.g., the 1996 survey was done by a polling firm (not by students), was very long with at least 32 open ended questions (not something that could be done in a few minutes), involved Harvard (not Chicago), did not ask about brandishing, etc.). What Gross remembers indicates that it could only have been my survey.*

*Malkin also selectively quotes Lindgren. Lindgren told the Washington Times that, "I interviewed [Mr. Gross] at length and found him credible." Mr. Gross has also responded to later [statements](#) made by Lindgren.*

*I have also had a second person who participated interviewed by Jeff Parker, the former associate dean at the George Mason University Law School. Parker interviewed both James Hamilton as well as Hamilton's sister, who claims that James told her about the interview when it occurred, and he can verify this information.*

*Lindgren claimed that Gross had instead answered a quite different survey done by Hemenway at Harvard, but when Hemenway finally released the data from both his 1996 and 1999 surveys and the age and other information about Gross and Hamilton do not match any subject interviewed in either survey.*

Lott now admits he used a fake persona, "Mary Rosh," to post voluminous defenses of his work over the Internet.

*\* When Julian Sanchez asked about the similarities between my writings and those posted under this Internet chat room pseudonym during this past January I did admit it immediately. (Sanchez had put up a post on his blog site asking for help in identifying someone who was cutting and pasting many of my responses from other places in chat room discussions. Because a dynamic IP address was being used, Sanchez could only identify the posting as coming from someone in southeastern Pennsylvania. When I found that he was asking for help in identifying the poster I admitted that I was using the pseudonym.) I had originally used my own name in chat rooms but switched after receiving threatening and obnoxious telephone calls from other Internet posters. Ninety some percent of the posters in the chatroom were pretty clearly using pseudonyms. The fictitious name was from a family e-mail account we had set up for our children based on their names (see latter discussion), on a couple of occasions I used the female persona implied by the name in the chat rooms to try to get people to think about how people who are smaller and weaker physically can defend themselves. Virtually all the posting were on factual issues involving guns and the empirical debates surrounding them. All that information was completely accurate.*

"Rosh" gushed that Lott was "the best professor that I ever had."

*\*This was a family email account and I was not the only person who posted using this account.*

She/he also penned an effusive review of "More Guns, Less Crime" on Amazon.com: "It was very interesting reading and Lott writes very well." (Lott claims that one of his sons posted the review in "Rosh's" name.)

*\*The e-mail account was set up by my wife for my four sons (Maxim, Ryan, Roger, and Sherwin in birth order) and involves the first two letters of each of their names in order of their birth. Maxim wrote several reviews on Amazon.com using that e-mail account and signed in using maryrosh@aol.com, not "Mary Rosh." His posting included not only a review of my book, but also reviews of computer games such as Caesars III.*

*For whatever it is worth, a recent glich at Amazon.com revealed that it is quite common practice for authors to actually write positive anonymous reviews of their own books. The New York Times story on this revelation was actually quite sympathetic, which contrasts with the attack that the New York Times had on me when it also incorrectly claimed that I had written the review of my book.*

Just last week, "Rosh" complained on a blog comment board: "Critics such as Lambert and Lindgren ought to slink away and hide."

By itself, there is nothing wrong with using a pseudonym. But Lott's invention of Mary Rosh to praise his own research and blast other scholars is beyond creepy. And it shows his extensive willingness to deceive to protect and promote his work.

*It would have been helpful if Malkin had actually read the text of what I wrote.*

Some Second Amendment activists believe there is an anti-gun conspiracy to discredit Lott as "payback" for the fall of Michael Bellesiles, the disgraced former Emory University professor who engaged in rampant research fraud to bolster his anti-gun book, "Arming America." But it wasn't an anti-gun zealot who unmasked Rosh/Lott. It was Internet blogger Julian Sanchez, a staffer at the libertarian Cato Institute, which staunchly defends the Second Amendment. And it was the conservative Washington Times that first reported last week on the survey dispute in the mainstream press.

*The January 23rd story in the Washington Times could not accurately be described as a negative story. Professor Dan Polsby is quoted as saying that I was "vindicated." Even Lindgren, a critic whose academic work I have criticized in the past (Journal of Law and Politics, Winter 2001), is characterized by the Times as believing that " the question appears to have been at least partially resolved . . . " and he did say that David Gross was a credible witness.*

In an interview Monday, Lott stressed that his new defensive gun use survey (whose results will be published in the new book) will show similar results to the lost survey. But the existence of the new survey does not lay to rest the still lingering doubts about the old survey's existence.

*She never asked me any questions about whether the old survey was done.*

The media coverage of the 1997 survey data dispute, Lott told me, is "a bunch to do about nothing."

*This quote is totally taken out of context. Some people had accused me of violating federal regulations regarding federal approval for human experiments while I was at Chicago. Malkin's telephone call focused on that claim, and that is what my quote referred to.*

I wish I could agree.

*I spent years replacing the data lost in the hard disk crash. The county level crime data was replaced and given out to academics at dozens of universities so that they could replicate every single regression in More Guns, Less Crime. I have also made the data for my other book The Bias Against Guns available at http://www.johnlott.org/cgi-bin/login.cgi . The data for my other reserach has also been made available. The survey was also replicated and obtained similar results to the first survey and the new data has been made available since the beginning of the year. When asked I have even made my data available before the research was published. I don't think that there are any academics who have had a better record then I have in making my data available to other researchers. For an example of just on of my recent critics who has refused to share his data see here . I have*

*provided Malkin with the information noted here, but she has never replied to e-mails that I have sent her.*

# EXHIBIT "4"

**The New York Times** | https://nyti.ms/29uJMwU

# *Florida Gunman Kills 8 And Wounds 6 in Office*

**By Ronald Smothers, Special To the New York Times**

June 19, 1990



See the article in its original context from
June 19, 1990, Section A, Page 14    Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine—view over 150 years of New
York Times journalism, as it originally appeared.

SUBSCRIBE

*Does not include Crossword-only or
Cooking-only subscribers.

*About the Archive*

*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter,*

**0044**

*edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

---

A man sprayed dozens of rounds from a semiautomatic rifle through the office of a finance company here today, killing eight people and wounding six others before shooting himself to death.

Witnesses said the gunman, identified by the police as James E. Pough, 42 years old, of Jacksonsville, did not speak and immediately began shooting as he walked into the suburban offices of the General Motors Acceptance Corporation about 10:45 A.M.

Sheriff James E. McMillan said witnesses told investigators that the man walked through the office, where more than 85 peopled worked, firing rapidly, then pausing and firing some more. At times, they said, he deliberately aimed at workers who had taken cover.

One employee, Richard Langille, said: ''And then we realized the guy was pointing his gun underneath people's desks and killing them one by one. I just saw the bottom of the carpet and just prayed.''

Slaughter and Silence

Another employee, Audrey Hennessey, said: ''It wasn't random, and it wasn't continuous. It wasn't pandemonium, and at the end we didn't know it was over, because there were silences all through the shooting.''

While some workers took cover, others fled out the back door.

Charles Medlin, the building manager at nearby Reichhold Chemicals, saw a women lying on the grass outside after the shooting and ran over to help.

''She was lying there calm with a stomach wound and a chest wound and just said: 'Jesus, don't take me now. I'm not ready to go,' '' Mr. Medlin said. The gunman was armed with a .30-caliber assault-style semiautomatic rifle, a weapon that fires a round with each trigger squeeze and whose magazine typically can hold 30 rounds of ammunition. He also carried a .38-caliber revolver. Sheriff McMillan said that only one shot had been fired from the revolver, but as many as 28 rounds had been fired from the rifle.

''When it looked like he had no one else to shoot, he apparently turned the gun on himself,'' said the sheriff.

Implicated in Earlier Killings

**0045**

There were early reports that Mr. Pough had been angered over the loan office's repossession of his 1988 Pontiac. But the sheriff said later that the repossession had occurred six months ago and it was not clear that was what set off the shootings.

''But it does appear that over the last few days he was out to hurt somebody,'' said Sheriff McMillan.

---

**COOKING:** *Daily inspiration, delicious recipes and other updates from Sam Sifton and NYT Cooking.*

Sign Up

---

Sheriff McMillan said Mr. Pough had been ''positively identified'' by witnesses as the killer of a man and woman in separate shootings early Sunday. Louis Carl Bacon, 39, and Doretta Drake, 30, were walking through a northwest section of Jacksonville, near where Mr. Pough lived, and were killed with the same .30-caliber rifle he used today, the sheriff said.

Sheriff McMillan said that he had little information on Mr. Pough (pronounced PEW) and that investigators were interviewing his relatives and friends. It was not immediately known where Mr. Pough worked or whether he was married.

Soon after the shootings today, the police learned from their own records that Mr. Pough was a convicted felon. He was arrested for murder in 1971, later pleaded guilty to aggravated assault and was sentenced to five years' probation.

Registered His Handgun

Despite his record, the authorities said, Mr. Pough had purchased the .38-caliber revolver and gone through the process of registering it with the police.

Mr. Pough had apparently lied on the purchase form about whether he had been convicted of a felony. Under state law, convicted felons are not allowed to own firearms.

Mr. Pough's possession of the semiautomatic rifle, while also illegal, would not necessarily have come to the authorities' attention, since shoulder weapons, unlike handguns, do not have to be registered.

While the assault rifle used in the shooting does not come under President Bush's 1989 ban on foreign-made assault weapons, since it was manufactured by the Universal Corporation, an American concern, it would be banned under a bill now pending in Congress that does cover domestically manufactured assault rifles.

Battlefield Efficiency

**0046**

''These are military weapons that are very efficient on the battlefield, and if you use them in a G.M.A.C. office you are going to get the same effect,'' said one Democratic Congressional aide who did not want to be named. ''One of the ones sold is called a 'street sweeper,' and it isn't called that because people use it to shoot moose.''

The shooting is certain to revive the debate over ownership of guns in general and assault weapons in particular. Some gun proponents say that further restrictions on ownership would curb citizens' rights without cutting crime. Those on the other side of the issue say that assault weapons - distinguished from hunting firearms by their larger ammunition capacities, among other things - are coveted by the criminal and the unstable, not by true sportsmen.

The police said there were no records indicating where or when Mr. Pough purchased the semiautomatic rifle or a .9-millimeter pistol found later in the car he had driven to the office.

Back and Forth on Controls

Like most states in the region, Florida has few restrictions on gun purchases. For a brief period in 1987, a new law allowed virtually anyone to carry a gun openly, until corrective legislation closed the loophole. Until three years ago, firearm regulation was the province of counties, and most of those in the northern part of the state passed no controls at all.

But in 1987, the State Legislature removed gun registration from county control and established a statewide system to prevent people from purchasing guns in one county that had virtually no controls and then transporting them to another county that did have some regulations.

Inside the finance office, the police found several rifle clips, some empty and some full. ''There's numerous magazines, plus numerous rounds in his pockets,'' said Deputy Ken Bozeman.

Sheriff McMillan said Mr. Pough also had a .357-caliber magnum registered to his name, but no information was given on that weapon's location.

The .38-caliber revolver used in the shootings was registered June 4, 1979, Sheriff McMillan said.

Five office employees, a customer and the gunman were dead at the scene, said John Andrews, a company spokesman in Detroit. Two other employees died at hospitals.

In addition to Mr. Pough, the dead were identified as Drew Woods, Denise Highfill, Janice David, Sharon Louise Hall, Barbara Duckwall Holland, Julia White Burgess, Lee Simonton, and Cynthia Perry.

**0047**

Mrs. Hennessey, one of those who hid in the office today, said she now knows ''how it feels to have your life hanging from a thread.''

''Now I know how very precious life is and just how easily it can be taken away from you,'' she said.