XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
JOSE A. ZELIDON-ZEPEDA
Deputy Attorney General
State Bar No. 227108
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER, et al.,** | Case No. 19-cv-1537-BEN-JLB |
| Plaintiffs, | **DEFENDANTS' REPLY IN SUPPORT OF *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF JOHN R. LOTT, JR.** |
| v. | |
| **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,** | Date:        February 3, 2021<br>Time:        10:00 a.m.<br>Dept:        5A |
| Defendants. | Judge:       Hon. Roger T. Benitez<br>Trial Date:  February 3, 2021<br>Action Filed:  August 15, 2019 |

**INTRODUCTION**

The opinions of Plaintiffs' expert witness, John R. Lott ("Lott"), do not reflect the "reliable principles and methods" required under Federal Rule of Evidence 702 to be admitted as expert testimony.

First, in addition to Lott's history of engaging in dubious research practices, as previously discussed in Defendants' *Daubert* motion and supporting exhibits, Defendants have obtained new evidence that Lott likely provided false testimony in this action. This is a serious charge that Defendants do not make lightly. The new evidence raises questions about the veracity of his testimony overall.[1]

Second, the declaration Lott submitted in opposition to Defendants' *Daubert* motion ("Lott's *Daubert* Declaration" or "Lott *Daubert* Decl.") does not resolve the problems with Lott's original declaration (Pls. Ex. 10).[2] Lott's *Daubert* Declaration discloses—for the first time in this case and just two weeks before trial—the specific criteria for defining and identifying "mass public shootings" applied by the Crime Prevention Research Center ("CPRC"). Without that definition, it was unclear what criteria Lott had used to exclude those mass shootings from the CPRC dataset that were included in Klarevas's dataset. Even with Lott's clarification, the fact remains that Lott's datasets for Klarevas and Mother Jones include many discrepancies that undermine any reliability of Lott's conclusions.

Third, a substantial amount of Lott's *Daubert* Declaration reasserts Lott's argument that the effectiveness of the federal assault weapons ban should be assessed by measuring the *share* of mass shootings involving assault weapons before, during, and after the federal ban. Lott's proposed test is premised on a

---

[1] While the Court's schedule for *Daubert* briefing was silent as to reply briefs, *see* Dkt. 72, Defendants obtained information about the veracity of Lott's testimony only after deposing Lott on January 22, 2021. This new evidence is relevant to the Court's ruling on the *Daubert* motion and assessment of Lott's credibility.

[2] Plaintiffs' opposition to the *Daubert* motion and Lott's *Daubert* Declaration were filed more than two weeks after the deadline for *Daubert* oppositions and should be struck from the docket. *See* Dkt. 81.

1

strawman argument that is not found in the literature, compounding the unreliability of his testimony in this case.  In addition to failing to account for spillover and substitution effects that can explain the patterns Lott observes, his proposed test seeks to judge the effectiveness of the federal ban's assault-weapon restrictions without accounting for the law's separate restrictions on large-capacity magazines—large-capacity magazines are used frequently with non-assault weapons to commit mass shootings.  It is a matter of common sense that, when a ban on assault weapons and large-capacity magazines is in effect, both the absolute number of mass shootings involving assault weapons and the absolute number of all mass shootings may decrease.  And when a ban on assault weapons and large-capacity magazines is lifted, the absolute number of mass shootings involving assault weapons may increase while the absolute number of all mass shootings may increase at a greater pace, causing the *share* of mass shootings involving assault weapons to decrease even after the expiration of the ban.

The Court should grant Defendants' *Daubert* motion and preclude Lott's testimony in this case.  At a minimum, the Court should take Lott's history of dubious practices into account, including the false testimony offered by Lott in this case, while weighing his credibility.

## ARGUMENT

### I.   LOTT IS NOT A CREDIBLE WITNESS, AND THE COURT SHOULD PRECLUDE HIS TESTIMONY

Lott's history of dubious conduct and dishonesty casts a long shadow on his testimony in this case.  The numerous examples discussed in Defendants' motion and supporting exhibits, *see* Mem. in Supp. of *Daubert* Mot. (Dkt. 73-1) at 3-4; Echeverria Decl. in Supp. of *Daubert* Mot., Exs. 1-4 (Dkt. 73-4), are not exhaustive of the charges leveled against Lott over the years.  Defendants examined Lott on some of these claims during Lott's deposition in this action, including a particular

1    claim made by Lott that he conducted a survey supporting one of his findings but

2    had lost the data in a computer crash.

3          Lott claimed in the second edition of *More Guns, Less Crime* that 98% of

4    defensive gun uses involve the mere brandishing of the weapon.  Decl. of John D.

5    Echeveria in Supp. of Defs.' Reply in Supp. of *Daubert* Mot. to Preclude

6    Testimony of John R. Lott, Jr. ("Echeverria Reply Decl."), Ex. 1 at 2.  When

7    pressed by renowned sociologist Otis Dudley Duncan about the accuracy of the

8    98% figure—a number which Duncan had been convinced was "a figment of Lott's

9    imagination or an artifact of some careless computation or proofreading"—Lott

10   claimed that it was a finding from a nationwide telephone survey he conducted

11   during a three-month period in 1997.  *Id.*  "[M]uch later" after Lott told Duncan that

12   he had conducted the survey, Lott claimed to have lost the data in a computer crash.

13   *Id.*[3]  In his report on Lott's 98% claim, Professor James Lindgren of Northwestern

14   University concluded that he found "recent developments in this affair personally

15   troubling," noting Duncan's belief "that whether the study was done does go to

16   John Lott's credibility."  *Id.*

17         Lott's story changed again in 2013, when Ann Coulter wrote an article about

18   Lott, claiming that Lott had previously sent the survey data to three professors and

19   that each of the professors refused to return the data.  *Id.*, Ex. 2 at 1.  During Lott's

20   deposition in this case, he testified that he was the source for Coulter's claim that

21   Lott had provided the survey data to the three professors.  Lott also testified that the

22

---

23        [3] This incident was also mentioned in *Freakonomics* (2005) by Steven Levitt
     and Stephen Dubner.  In the book, Levitt describes Lott as "a champion of th[e]
24   politically charged idea [that more guns leads to less crime]" and "writes that Lott
     became a 'lightening rod for gun controversy,' a status he exacerbated by creating a
25   pseudonym, 'Mary Rosh,' which he used to defend his theory in debates over the
     Internet."  *Lott v. Levitt*, 556 F.3d 564, 566 (7th Cir. 2009) (noting that the Mary
26   Rosh point was "an embarrassing charge, but one that was apparently true as Lott
     takes no issue with it in this case").  The book also notes "the troubling allegation
27   that Lott actually invented some of the survey data that support his more-guns/less-
     crime theory," *id.*, which became the basis of a defamation claim against Levitt that
28   was dismissed.

claim was true—that he had given the allegedly missing data to the three professors and that they refused to return his data. Unlike Lott's prior statements to Ms. Coulter, however, his statements about the 98% survey during his deposition were made under oath. Contrary to Lott's deposition testimony, all three of the professors that Lott has accused of keeping his survey data testify that they never received the missing data, let alone refused to give data back to Lott. *See* Brown Decl. ¶ 3; Nagin Decl. ¶ 3; Ludwig Decl. ¶ 3. Notably, Lott's claim about the three professors was not included in Professor Lindgren's report, which was authored closer in time to the purported survey that Ms. Coulter's article. Lott could have mentioned to Professor Lindgren that he had sent the missing data to Professors Black, Nagin, and Ludwig, and that each of them refused to return the data, but any such claim is conspicuously absent from Professor Lindgren's report.

In his *Daubert* Declaration, Lott also claims, for the first time in this case, that he emailed Klarevas about the *Rampage Nation* data before CPRC's review of that data. Lott *Daubert* Decl. ¶ 7:6-8. Lott claims that Klarevas never responded. *Id.* ¶ 7:8-9. Lott testified at his deposition that he could find no record of an email being sent to Klarevas, *see* Echeverria Reply Decl. ¶ 9, and Klarevas testifies that he has no record of Lott ever having emailed him. *See* Klarevas Reply Decl. ¶¶ 3-6.[4]

Lott's pervasive credibility issues—including newly discovered evidence that Lott likely provided false testimony during his deposition in this case—warrant preclusion of his testimony at trial.

## II. LOTT'S UNDERLYING DATA AND METHODOLOGY ARE FLAWED

Lott's original declaration includes erroneous data and coding errors, particularly with respect to the Klarevas and Mother Jones datasets. *See* Corrected

---

[4] Lott's history of posting defenses of his work under the name "Mary Rosh" and his explanations for his behavior during his deposition are also suspect. *See* Echeverria Reply Decl. ¶ 11.

Klarevas *Daubert* Decl. ¶¶ 7-9; Pls.' *Daubert* Opp'n at 14 ("Lott agrees that the three incidents should have been included.").[5]  With respect to the Klarevas dataset, Plaintiffs incorrectly claim that Klarevas "never provided his criteria for determining what constitutes an assault weapon for his data."  Pls.' *Daubert* Opp'n at 14.  To the contrary, Klarevas explained the three criteria he used to determine whether or not gun massacres should be coded as involving assault weapons.  *See* Defs.' Ex. E (Klarevas Decl.), Ex. 3 at 4-5.

In addition, while Lott's original declaration failed to disclose the specific definition of a "mass public shooting" used in compiling CPRC's dataset, the definition now provided by Lott in opposing the *Daubert* motion is flawed.  Lott states that CPRC used "the traditional FBI definition of mass public shootings," claiming that "[t]he official FBI definition of active *as well as mass public shootings* excludes 'shootings that resulted from gang or drug violence' or that occurred in the commission of another crime such as robbery."  *See* Lott *Daubert* Decl. ¶ 35 (emphasis added).  Lott cited a 2014 FBI report on active shooter incidents as the source for his definition.  *Id.*  Contrary to Lott's suggestion, however, that report does not provide an "official definition" of "mass public shootings."  *Id.*  Active shooter incidents are different from mass shootings or mass public shootings.  The 2014 report explicitly states:  "This is not a study of mass killings or mass shootings . . . ."  Pete J. Blair & Katherine W. Schweit, A Study of Active Shooter Incidents in the United States Between 2000 and 2013 (2014), at 5.  Lott claimed that this report provided CPRC's definition of active "as well as mass

---

[5] In reviewing Lott's *Daubert* Declaration, Professor Klarevas identified two typographical errors in his declaration submitted in support of Defendants' *Daubert* motion (Dkt. 73-2).  One error was an incorrect entry of 18.2% instead of 22.7%, *see* Corrected Klarevas *Daubert* Decl. at 2 n.1, which Lott notes in his declaration.  Lott *Daubert* Decl. ¶¶ 10, 41.  Even with the corrected datapoint, Lott's entry of 23.5% in Figure 8 was incorrect.  *See id.* ¶ 20 figs. 8a, 8b.  Klarevas's declaration also included an incorrect chart concerning Lott's datapoints for Mother Jones.  Corrected Klarevas *Daubert* Decl. at 2 n.1.  The corrected chart reflects that all of the Mother Jones datapoints were incorrect.  *Id.*; *id.* ¶ 21.

1   public shootings," even though the report expressly disclaims providing a definition

2   of anything other than active shootings.  Indeed, the author of the 2014 report has

3   accused Lott of using a "straw-man argument" that conflates active shootings with

4   mass shootings, noting that the report "does not discuss mass shootings or mass

5   killings other than to distinguish them from active shooter incidents."  Pete Blair &

6   M. Hunter Martaindale, *Misrepresenting the FBI Active Shooter Report: A*

7   *Response to Lott*, XL ACJS Today 32, 32-33 (May 2015).

8        In addition, Lott added the criterion that a shooting must not have resulted

9   from the commission of another crime to qualify as a "mass public shooting,"

10  which appears to be an exclusionary criterion used by Mother Jones in its

11  compilation of public mass shootings, and not the 2014 active shooter report.  The

12  CPRC dataset excludes several incidents in the FBI dataset involving four or more

13  fatalities, confirming that to the extent Lott claims to be applying the FBI's criteria,

14  he was not applying those criteria consistently.

15       In sum, the errors and inaccuracies in Lott's underlying data and methodology

16  undermine any reliability of his opinions.

17  **III.  LOTT'S PROPOSED TEST MEASURING THE SHARE OF MASS SHOOTINGS**
    **INVOLVING ASSAULT WEAPONS IS NOT SUPPORTED BY THE**
18  **LITERATURE AND IS NOT A RELIABLE METHODOLOGY**

19       Lott's principal opinion in this case is that the federal assault weapons ban was

20  ineffective because the *share* of mass shootings involving assault weapons

21  continued to decline after the federal ban expired.  Lott Decl. (Pls.' Trial Ex. 10)

22  ¶¶ 34 (discussing DiMaggio et al. 2018), 38 (discussing Gius 2015), 46 (discussing

23  *Rampage Nation*).  Lott reasserts this argument in his *Daubert* Declaration.  *See,*

24  *e.g.*, Lott *Daubert* Decl. ¶ 8.  Lott's proposed test, however, is premised on a

25  strawman argument and is belied by common sense.[6]  Tellingly, Lott fails to

26  _____
    [6] Lott's proposed test regarding the share of mass shootings is not the only
27  logical fallacy advanced by Lott in this case.  Lott's original declaration in this case
    claims that criminals obtain their firearms illegally, suggesting that a prohibition on
28  assault weapons will not stop criminals from acquiring firearms.  Pls.' Ex. 10 ¶¶ 10-

6

1  provide any citation to the literature to show that his proposed test is an accepted

2  methodology for assessing gun-safety laws, like the federal assault weapons ban or

3  the AWCA.  Lott's novel test has also not been discussed in the caselaw examining

4  the constitutionality of assault-weapon restrictions.

5       Lott's methodology is not reliable for purposes of assessing the effectiveness

6  of the federal assault weapons ban.  According to Lott's test, the share of mass

7  shootings involving assault weapons declined during and after the federal assault

8  weapons ban relative to mass shootings involving other firearms,[7] which is

9  somehow evidence that the federal ban was not effective in reducing the incidence

10  and lethality of mass shootings.  *See, e.g.*, Lott *Daubert* Decl. ¶ 38.  Klarevas has

11  explained how spillover and substitution effects can explain changes in the share of

12  mass shootings involving assault weapons—as would-be shooters forgo their

13  attacks or use less lethal weapons due to the unavailability of assault weapons.  Lott

14  acknowledges both of these dynamics: "if an assault weapon ban is effective, it will

15  both discourage some people who would have used an assault weapon not to attack

16  and cause others to switch to a different type of gun."   Lott *Daubert* Decl. ¶ 49.

17  While Lott claims that the substitution of different weapons "would lower the

18  percentage of attacks using assault weapons," *id.* ¶ 48, Lott fails to account for the

19  substitution of *less-lethal* firearms, which may make it more difficult for a shooter

20  to kill the requisite number of victims to qualify as a mass shooting.  Thus, contrary

21  to Lott's logic, the number of mass shootings not involving assault weapons can

22  also decrease, consistent with the ban being effective.

23

24  12.  That claim is a red herring.  Lott testified at his deposition that the vast

25  majority of *mass shooters* and *active shooters* do in fact acquire their firearms
legally.  Echeverria Reply Decl. ¶ 12.  Lott's testimony is consistent with the

26  testimony of Defendants' expert witnesses.  *See, e.g.*, Defs Ex. A (Allen Decl.) ¶
38.

27  [7] Klarevas's corrected data reflects that the share remained relatively constant

28  throughout the period in question.  *See* Corrected Klarevas *Daubert* Decl. ¶ 20, fig.
6b.

In addition, Lott's proposed test completely ignores the federal ban's separate restrictions on large-capacity magazines, which can be used with non-assault weapons to devastating effect and can explain the changes in the share of mass shootings that Lott discusses.  Regarding the period after the expiration of the federal assault weapons ban, Lott asks: "Why would [mass shooters] start committing more attacks with their less preferred [non-assault] weapons when the preferred [assault weapon] becomes available?"  *See* Lott *Daubert* Decl. ¶ 8.  The answer is simple:  large-capacity magazines also became legal and made non-assault weapons more effective for mass murder.  Thus, the number of mass shootings with assault weapons jumped after the federal ban expired—as Lott's own charts demonstrate—even if the *share* stayed the same or even decreased.  *See* Pls.' Ex. 10 ¶ 52.  Lott's promotion of this baseless methodology further shows that his testimony is not reliable in this case.

## CONCLUSION

For these reasons, and those discussed in Defendants' memorandum in support of their *Daubert* motion, the Court should preclude Lott's testimony at trial.

Dated:  January 27, 2021                         Respectfully submitted,

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOSE A. ZELIDON-ZEPEDA
PETER H. CHANG
Deputy Attorneys General


s/ John D. Echeverria

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendants*

S2019104420
42531121.docx