1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   PETER H. CHANG
    Deputy Attorney General
5   State Bar No. 241467
    JOSE A. ZELIDON-ZEPEDA
6   Deputy Attorney General
    State Bar No. 227108
7   JOHN D. ECHEVERRIA
    Deputy Attorney General
8   State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
9    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
10   Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
11  *Attorneys for Defendant*

12              IN THE UNITED STATES DISTRICT COURT

13           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14                        CIVIL DIVISION

15

16  **JAMES MILLER, et al.,**                3:19-cv-01537-BEN-JLB

17                          Plaintiffs,    **DEFENDANTS' PROPOSED**
                                           **FINDINGS OF FACT AND**
18          **v.**                         **CONCLUSIONS OF LAW**

19  **CALIFORNIA ATTORNEY**                 Date:        February 3, 2021
    **GENERAL XAVIER BECERRA,**             Time:        10:00 a.m.
20  **et al.,**                             Dept:        5A
                                            Judge:       Hon. Roger T. Benitez
21                          Defendants.     Trial Date:  February 3, 2021
                                            Action Filed: August 15, 2019
22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

PROPOSED FINDINGS OF FACT ................................................................................... 1

    I.     The Roberti-Roos Assault Weapons Control Act ............................... 1

    II.    Assault Weapons Are Dangerous ........................................................ 3

          A.    Detachable Magazines ................................................... 3

          B.    Large Capacity Magazines ............................................ 4

          C.    Fixed LCMs ................................................................... 4

          D.    Pistol Grips, Thumbhole Stocks, and Barrel Shrouds ............... 5

          E.    Folding and Telescoping Stocks and Rifles Shorter than 30 Inches in Length ................................................... 6

          F.    Flash Suppressors .......................................................... 7

          G.    Threaded Pistol Barrels .................................................. 7

          H.    Grenade and Flare Launchers ........................................ 8

    III.   Assault Weapons Are Unusual and Not "In Common Use" ............... 8

    IV.   Assault Weapons Are More Suited for Offensive and Military Use and Not Well Suited for Civilian Self-Defense .......................... 11

    V.    Assault Weapons Are Disproportionally Used in Crime, Mass Shootings, and Against Law Enforcement, Resulting in More Casualties. ......................................................................... 15

    VI.   The AWCA Furthers the State's Important Public Safety Interests. .......................................................................... 17

CONCLUSIONS OF LAW ............................................................................................ 19

    I.     Assault Weapons Are Not Protected Under the Second Amendment Because They Are Dangerous and Unusual.................. 19

    II.    Assault Weapons Are, Like the M-16, Most Useful in Military Service. ........................................................................... 21

    III.   The AWCA Is, Like Longstanding Firing-Capacity Regulations, a Valid State Regulation. ............................................ 21

    IV.   Intermediate Scrutiny Applies Because Any Burden Here on a Second Amendment Right Is Not Severe. ......................... 23

    V.    The AWCA Is Reasonably Fitted to Important Government Interests. .......................................................................... 24

    VI.   Alternatively, the AWCA Satisfies Strict Scrutiny. .......................... 26

i

# PROPOSED FINDINGS OF FACT[1]

## I.   THE ROBERTI-ROOS ASSAULT WEAPONS CONTROL ACT

1.   The Roberti-Roos Assault Weapons Control Act (the "AWCA") was original enacted in 1989.

2.   The AWCA initially defined as assault weapons certain semiautomatic rifles, pistols, and shotguns identified by make and model.  See Cal. Penal Code § 30510.

3.   In enacting the AWCA, the Legislature found that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  Cal. Penal Code § 30505(a).

4.   The AWCA rendered it a felony to manufacture, import, sell, or possess any of the listed firearms without a permit.  *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008).

5.   After the Legislature enacted the AWCA, gun manufacturers began to produce "copycat" weapons to evade the statute's restrictions.  *Silveira*, 312 F.3d at 1058 n.5.  In response, in 2000, the Legislature enacted Senate Bill 23 to, among other things, add a flexible, features-based definition of "assault weapons" to the AWCA, which is now codified at California Penal Code section 30515(a).

---

[1] The proposed findings of fact presented here comprise "legislative, as opposed to adjudicative, facts."  *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 455-56 (1st Cir. 2000).  Due to the compressed pre-trial discovery schedule and delays in obtaining available dates to depose Plaintiffs' witnesses, Defendants have not yet received transcripts for many of the depositions, despite requests to expedite the preparation of the transcripts.  The parties had jointly requested leave to continue the deadline for proposed findings of fact and conclusions of law.  Dkt. 78.  Defendants reserve the right to amend or supplement these proposed findings of fact and conclusions of law, or seek further leave to do so, after conclusion of the trial.

6.    Under section 30515(a), a rifle qualifies as an "assault weapon" if it is (1) a semiautomatic, centerfire rifle that does not have a fixed magazine,[2] but has any one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip; (2) a semiautomatic, centerfire rifle that has a fixed large-capacity magazine ("LCM"); or (3) a semiautomatic, centerfire rifle that has an overall length of less than 30 inches.  Cal. Penal Code § 30515(a)(1)-(3).

7.    Under section 30515(a), a pistol qualifies as an "assault weapon" if it is (1) a semiautomatic pistol that does not have a fixed magazine, but has one or more of the following features:  a threaded barrel (capable of accepting a flash suppressor, a forward handgrip, or a silencer), a second handgrip, a barrel shroud, or the capacity to accept a detachable magazine outside of the pistol grip; or (2) a semiautomatic pistol with a fixed LCM.[3]  Cal. Penal Code § 30515(a)(4)-(5).

8.    Under section 30515(a), a shotgun qualifies as an "assault weapon" under section 30515(a) if it is (1) a semiautomatic shotgun that has an adjustable stock and one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip; (2) a semiautomatic shotgun that has the ability to accept a detachable magazine; or (3) a shotgun that has a revolving cylinder.  Cal. Penal Code § 30515(a)(6)-(8).

9.    For over two decades, California has restricted the manufacture, distribution, transportation, importation, sale, lending, and possession of firearms that qualify as "assault weapons" under section 30515(a) of the AWCA.  *See* Cal. Penal Code §§ 30600(a), 30605(a).

---

[2] A "fixed magazine" is "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action."  Cal. Penal Code § 30515(b).

[3] Assault pistols "designed expressly for use in Olympic target shooting events" are exempted from the AWCA.  Cal. Penal Code § 30515(c).

2

## II.   ASSAULT WEAPONS ARE DANGEROUS

10.   Assault-weapon configurations that qualify a rifle, pistol, or shotgun as an assault weapon under the AWCA increase the dangers posed by those firearms.

11.   Each of the prohibited features or configurations in California Penal Code section 30515(a) serves specific, combat-oriented functions, which increase the lethality of firearms and enhance their effectiveness in certain types of crime, particularly mass shootings and violence against law enforcement personnel.

### A.   Detachable Magazines

12.   The capability to accept detachable magazines is a threshold requirement for certain rifles and pistols to qualify as an assault weapon, Cal. Penal Code § 30515(a)(1), (4), and it is sufficient to designate a shotgun as an assault weapon, *id.* § 30515(a)(7).

13.   Detachable magazines enhance the ability of a semiautomatic firearm to fire a large number of rounds quickly, by eliminating the need to manually reload each round.

14.   The ability to accept detachable magazines "provides the soldier with a fairly large ammunition supply and the ability to rapidly reload."  Defs.' Ex. H (Bureau of Alcohol, Tobacco & Firearms, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989) ("ATF Rifle Importability Report")) at 6.

15.   The ability to accept detachable magazines renders a semiautomatic weapon "capable of killing or wounding more people in a shorter amount of time."  Defs.' Ex. F (S.B. 880 Report, 2015-2016 Reg. Sess., Assembly Committee on Public Safety (June 14, 2016)) at 6.

16.   A pistol capable of accepting a detachable magazine at some location other than the pistol grip, Cal. Penal Code § 30515(a)(4)(D), can help a shooter reload a pistol quicker and maintain aim during rapid fire.  Defs.' Ex. D (Graham Decl.) ¶ 29.

3

17.  A weapon lacking a fixed magazine is capable of accepting detachable LCMs, which "allow a shooter to fire more than ten rounds without having to pause to reload."  *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc).

**B.   Large Capacity Magazines**

18.  LCMs "are particularly designed and most suitable for military and law enforcement applications" and "are a feature common, but not unique, to the banned assault weapons, many of which are capable of accepting magazines of thirty, fifty, or even 100 rounds."  *Id.*

19.  Shotguns capable of firing more than five shotgun rounds without reloading, such as those with a revolving cylinder, are also "most appropriate for military or law enforcement use" and "are not particularly suitable for nor readily adaptable to generally recognized sporting purposes."  Defs.' Ex. O (Bureau of Alcohol, Tobacco, Firearms & Explosives, Study on the Importability of Certain Shotguns (2011) ("ATF Shotgun Importability Study")) at iv.

20.  The use of LCM-equipped firearms in mass shootings results in a substantially greater number of fatalities and injuries than mass shootings not involving LCMs (27 vs. 9), and especially when LCMs are used in conjunction with assault weapons (43 vs. 8).  Defs.' Ex. A (Allen Decl.) ¶¶ 33-34; *see also* Defs.' Ex. E (Klarevas Decl.) ¶ 17 (discussing higher death toll for gun massacres involving LCMs).

21.  LCMs feature prominently in gun violence against law enforcement, as LCM-equipped assault weapons can enable a shooter to engage law enforcement in prolonged standoffs, and such weapons fire ammunition that is capable of penetrating police body armor.  *See* Defs.' Ex. D (Graham Decl.) ¶¶ 22-23, 41.

**C.   Fixed LCMs**

22.  Certain rifles and pistols qualify as assault weapons if they have fixed LCMs.  Cal. Penal Code § 30515(a)(2), (5).

Defendants' Proposed Findings of Fact & Conclusions of Law (3:19-cv-01537-BEN-JLB)

23.   LCMs enable a shooter to fire more rounds in a given period of time by reducing reload frequency.

24.   An LCM enables a shooter to fire more than 10 rounds in a shorter period of time than a firearm with a fixed or detachable 10-round magazine.  *See Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (quoting *Kolbe*, 849 F.3d at 127); *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (citing "evidence that the use of [LCMs] results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries").

25.   Even if an LCM is incorporated into a rifle or pistol as a fixed magazine, the weapon would still be capable of firing more than 10 rounds repeatedly without needing to reload, enhancing that weapon's lethality.

26.   Rifles and pistols can be modified to allow a shooter to reload a fixed magazine nearly as quickly as a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 42.

### D.   Pistol Grips, Thumbhole Stocks, and Barrel Shrouds

27.   Certain rifles, pistols, and shotguns can qualify as assault weapons if they have pistol grips (either beneath the action or located in a forward position) or thumbhole stocks.  Cal. Penal Code § 30515(a)(1)(A), (1)(B), (1)(F), (4)(B), (6)(B).

28.   Pistol grips and thumbhole stocks can enable a shooter to maintain accuracy during rapid fire.  *See* Youngman Dep.; Kapelsohn Dep. at 125-26, 130.

29.   A pistol grip "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing," which can help counteract muzzle rise during repeated firing, and a forward pistol grip can similarly help a shooter stabilize a weapon during repeated semiautomatic fire. Defs.' Ex. D (Graham Decl.) ¶¶ 28-30, 38; Defs.' Ex. H (ATF Rifle Importability Report) at 6 ("[Pistol] grips were designed to assist in controlling machineguns during automatic fire.").

30.  A pistol grip can enable a shooter to maintain aim and even fire while reloading a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 29; Kaspelsohn Dep. at 126.

31.  A forward pistol grip on any firearm can also help insulate the non-trigger hand from heat during rapid fire.  *Id.* ¶ 53.

32.  A "barrel shroud" on assault pistols, Cal. Penal Code § 30515(a)(4)(C), "serve[s] a combat-functional purpose" by cooling the barrel and insulating the non-trigger hand during rapid fire.  Defs.' Ex. J (H.R. Rep. No. 103-489) at 19; Kapelsohn Dep. at 171 (agreeing that a barrel shroud could be an important tactical feature of a firearm).

**E.    Folding and Telescoping Stocks and Rifles Shorter than 30 Inches in Length**

33.  Certain rifles and shotguns may qualify as an assault weapon if they have an adjustable stock.  Cal. Penal Code § 30515(a)(1)(C), (6)(A).

34.  A folding or telescoping stock enhances the portability and concealability of a rifle.  *See* Cal. Code Regs. tit. 11, § 5471(nn), (oo).

35.  The "main advantage" of a folding or telescoping stock is "portability," and "its predominant advantage is for military purposes, and it is not normally found on the traditional sporting rifle."  Defs.' Ex. H (ATF Rifle Importability Report) at 6.

36.  In military and law enforcement contexts, an adjustable stock may enable law enforcement personnel to conduct room-to-room searches and maintain a tactical element of surprise.  Defs.' Ex. D (Graham Decl.) ¶ 32.

37.  Semiautomatic centerfire rifles with lengths of less than 30 inches, Cal. Penal Code § 30515(a)(3), are more concealable and may allow a shooter to smuggle a rifle undetected in public.  Defs.' Ex. D (Graham Decl.) ¶¶ 43, 59; Defs.' Ex. M (Mersereau Decl.) ¶ 10.

### F. Flash Suppressors

38. A flash suppressor is a listed feature in the definition of an assault rifle. Cal. Penal Code § 30515(a)(1)(E).

39. A flash suppressor is a device attached to the muzzle of a rifle to reduce the flash emitted upon firing. Cal. Code Regs. tit. 11, § 5471(r).

40. A flash suppressor can enable a shooter to maintain accuracy during rapid fire in low-light settings. *See* Youngman Dep.

41. It is a standard feature of the M-16 that can aid a shooter to maintain accurate, rapid fire in low-light conditions, and can also counteract "muzzle climb" during rapid fire. Defs.' Ex. H (ATF Rifle Importability Report) at 7; Defs.' Ex. D (Graham Decl.) ¶ 37; Kapelsohn Dep. at 147-48 (acknowledging that a flash suppressor may have a "very minimal" effect on counteracting muzzle climb).

42. A flash suppressor can help conceal the shooter's position, especially at night. Defs.' Ex. H (ATF Rifle Importability Report) at 7; Defs.' Ex. D (Graham Decl.) ¶ 37; *see also* Youngman Dep.

### G. Threaded Pistol Barrels

43. A semiautomatic, centerfire pistol without a fixed magazine qualifies as an assault weapon if it has a threaded barrel capable of accepting a flash suppressor, forward pistol grip, or silencer. Cal. Penal Code § 30515(a)(4)(A).

44. A threaded barrel enables a shooter to quickly attach a flash suppressor, forward handgrip, or silencer, which enhance the pistol's lethality and concealability. Defs.' Ex. D (Graham Decl.) ¶ 53.

45. A flash suppressor and forward pistol grip enhance the lethality or concealability of a firearm. Defs.' Ex. H (ATF Rifle Importability Report) at 6-7.

46. A silencer can be affixed to a pistol to reduce the sound it emits upon firing, which can help a shooter maintain a tactical advantage by concealing the shooter's position or the fact that a shot was even fired. Defs.' Ex. D (Graham

Decl.) ¶ 53 (noting Virginia Beach workplace shooting that involved a silencer-equipped handgun).[4]

### H.   Grenade and Flare Launchers

47.   A semiautomatic, centerfire rifle without a fixed magazine qualifies as an assault rifle if it is equipped with a grenade launcher or a flare launcher.  Cal. Penal Code § 30515(a)(1)(D).

48.   Neither a grenade launcher nor a flare launcher serve any legitimate civilian need on a rifle.  Defs.' Ex. D (Graham Decl.) ¶¶ 34-35.

## III.  Assault Weapons Are Unusual and Not "In Common Use"

49.   Assault weapons regulated under the AWCA are not "in common use" for lawful purposes like self-defense.

50.     Plaintiffs have failed to demonstrate that assault weapons are widely possessed by law-abiding civilians for lawful purposes.

51.   Assault weapons restricted under the AWCA are not well-suited for lawful uses, particularly self-defense.

52.   The prohibited features enhance a firearm's ability to fire more rounds in a given period of time, to maintain accuracy during rapid-fire, or to be more readily concealable.  These attributes are not necessary for lawful self-defense.

53.   Individuals fire 2.1 shots on average when firearms were used in self-defense in the home, firing no shots in 16.1% of incidents.  Defs.' Ex. A (Allen Decl.) ¶ 15; *see also id.* ¶ 23 (finding of Ms. Allen that an average number of 2.34 shots are fired in self-defense in the home, with a median of 2.03, based on review of news stories nationwide).

---

[4] Silencers are not protected by the Second Amendment, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("[B]ecause silencers are not 'bearable arms,' they fall outside the Second Amendment's guarantee."), *cert denied*, 139 S. Ct. 2690 (June 10, 2019), so prohibiting threaded barrels capable of accepting a silencer would not offend the Second Amendment.

54.  Plaintiffs have failed to demonstrate that pistols and shotguns that qualify as assault weapons under the AWCA are widely possessed by law-abiding civilians for lawful purposes.

55.  While Plaintiffs proffered disputed testimony regarding sales figures for certain firearms that may or may not qualify as assault weapons under California law, Plaintiffs offer no evidence about whether these firearms "are in fact commonly possessed by law-abiding citizens for lawful purposes."

56.  Based on the California Department of Justice's assault weapon registration data, excluding assault weapons registered to peace officers, there are approximately 185,569 assault weapons currently registered with the Department of Justice, of which approximately 165,804 are rifles, 16,306 are pistols, and 3,459 are shotguns.  Defs.' Ex. CZ (Glover Decl.) ¶ 7.  Of the assault weapons registered to non-peace officers in California, only 8.7% are pistols and 1.7% are shotguns.  *See id.*

57.  Individuals currently registered to possess assault weapons have registered approximately 2.04 assault weapons on average.  *See id.* ¶¶ 7-8.

58.  Plaintiffs has failed to provide an estimate as to the number of assault weapons in the United States.

59.  Plaintiffs have provided an estimate of the number of "modern sporting rifles" in the United States, but not all "modern sporting rifles" are assault rifles under the AWCA.

60.  Plaintiffs' definition of "modern sporting rifles" include semiautomatic rifles with a fixed magazine.  Curcuruto Tr. at 21:19-22:2.

61.  Plaintiffs' estimate of the number of "modern sporting rifles" includes semiautomatic rifles with fixed magazines, Curcuruto Tr. at 21:19-22:2, which are not assault weapons under California law.

62.  Plaintiffs could not provide an estimate as to the number of "modern sporting rifles" with a fixed magazine in the United States.  Curcuruto Tr. at 123:7-

9

9.  Without knowing the number of semiautomatic rifles with a fixed magazine in the United States, one cannot determine the number of assault rifles under AWCA based on Plaintiffs' estimate of the number of "modern sporting rifles" in the United States, because Plaintiffs' estimate includes semiautomatic rifles with a fixed magazine.

63.  Plaintiffs' estimate of the number of "modern sporting rifles" includes rimfire semiautomatic rifles, Curcuruto Tr. at 22:14-17, which are not assault weapons under California law.

64.  Plaintiffs have provided no evidence as to the number of semiautomatic rimfire rifles in the United States.  Curcuruto Tr. at 129:14-18, 130:15-18.

65.  There is likely a sizeable number of rimfire rifles in the United States because, according to a 2018 survey, one-third of firearms retailers responded that the rimfire rifle was third most popular caliber rifles that they sold.  Curcuruto Tr. at 126:4-10.

66.  Without knowing the number of semiautomatic rimfire rifles in the United States, one cannot determine the number of assault rifles under AWCA based on Plaintiffs' estimate of the number of "modern sporting rifles" in the United States, because Plaintiffs' estimate includes semiautomatic rimfire rifles.

67.  Plaintiffs could not provide an estimate as to the number of "modern sporting rifles" with an overall length of less than 30 inches.  Curcuruto Tr. at 124:16-20.

68.  Plaintiffs' estimate of the number of "modern sporting rifles" in the United States is deeply flawed and is unreliable in other respects as specified below.

69.  Plaintiffs' estimate of the number of "modern sporting rifles" in the United States is not limited to semiautomatic centerfire rifles possessed by

civilians.  Rather, it includes semiautomatic centerfire rifles possessed by law enforcement agencies.  Curcuruto Tr. at 56:14-18.

70.  Plaintiffs could not provide an estimate as to the number of "modern sporting rifles" possessed by law enforcement agencies.  Curcuruto Tr. at 56:3-8.

71.  Plaintiffs could not provide an estimate as to the number of "modern sporting rifles" possessed by civilians.  Curcuruto Tr. at 57:15-23.

72.  Plaintiffs' estimate of the number of "modern sporting rifles" in the United States is partly based on data from the United States International Trade Commission ("ITC").  Plaintiffs' expert searched through the ITC's database using harmonized tariff schedule ("HTS") codes for rifles that fit his criteria for inclusion in determining the number of "modern sporting rifles" in the United States. Curcuruto Tr. at 51:5-22.

73.  The codes that Plaintiffs' expert used to determine the number of "modern sporting rifles" exported and imported into the United States include semiautomatic rifles, rimfire rifles, and bolt action rifles.  Defs. Ex. DC; *see* Defs. Exs DV and DW (Codes 9303.30.7010 [Autoloading/Bolt action], 9303,30,7030 [Rimfire], 9303.30.8010 [Autoloading/Bolt action], 9303.30.8030 [Rimfire]).

74.  Rimfire rifles and bolt action rifles are not assault weapons under the AWCA.

75.  Plaintiffs have provided no estimate as to the number of shotguns and pistols that are defined as assault weapons under the challenged provisions of the AWCA.

## IV. ASSAULT WEAPONS ARE MORE SUITED FOR OFFENSIVE AND MILITARY USE AND NOT WELL SUITED FOR CIVILIAN SELF-DEFENSE

76.  While assault weapons might be used in self-defense, they are more useful for offensive purposes or combat.

77.  Assault rifles, assault pistols and assault shotguns are most useful in military service and are not well-suited for civilian self-defense.  *See Kolbe*, 849

F.3d at 136 (holding that "the banned assault weapons" are most useful in military service); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908 (N.D. Ill. 2014) (noting that submachine guns are "the analog for a civilian assault pistol" and "facilitate the assault and capture of a military objective" (citation omitted)); Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 28 (noting that assault pistols are "for the most part simply semiautomatic versions of submachine guns"); Defs.' Ex. O (ATF Shotgun Importability Study) at iv (discussing shotgun features that "are most appropriate for military or law enforcement use," including adjustable stocks and forward pistol grips).

78. Beginning in the 1980s, the gun industry began to market heavily military-style rifles to the civilian gun market, Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 1, using the term "assault rifles" to describe these military-style weapons, Defs.' Ex. R (Guns & Ammo (July 1981)) at 48, 54 (July 1981 Guns & Ammo Magazine) (variously describing a "new breed of assault rifles" as "[s]pawned in the crucible of war," "military-type," "military-style," and "military autoloaders").

79. Manufacturers of assault weapons specifically advertise them to civilians as military-grade firearms. *See Kolbe*, 849 F.3d at 125 ("Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess."); Defs.' Ex. C (Donohue Decl.) ¶¶ 72-82; Defs.' Ex. P (Colt.com, AR15A4 Advertisement) at 1; Defs.' Ex. Q (Colt.com, About Colt Rifles) at 1.

80. Assault weapons are "most useful in military service" due to their ability to accept ammunition from fixed or detachable LCMs and their combat-oriented features. *See Kolbe*, 849 F.3d at 137 ("Whatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines . . . are unquestionably most useful in military service."); *see*

Defendants' Proposed Findings of Fact & Conclusions of Law (3:19-cv-01537-BEN-JLB)

*also Gallinger*, 898 F.3d at 1018 (referencing "mass shootings perpetrated by individuals with *military-style rifles*" (emphasis added)).

81.  Assault weapons have a military pedigree and are nearly identical to the M-16.  *Staples v. United States*, 511 U.S. 600, 612 (1994) at 603 ("The AR-15 is the civilian version of the military's M-16 rifle . . . ."); *see Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (citing *Heller*, 554 U.S. at 627)); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 (C.D. Cal. 2019) ("[T]he Court concludes that semiautomatic rifles within the AWCA's scope are virtually indistinguishable from M-16s . . . ."); Defs.' Ex. C (Donohue Decl.) ¶¶ 83-89; *see also* Youngman Dep.

82.  For example, the AR-15 is the civilian version of the military M-16. Defs.' Ex. D (Graham Decl.) ¶ 44.

83.  The "military features and characteristics (other than select fire)" of "modern military assault rifles" are "carried over to semiautomatic versions of the original military rifle."  Defs.' Ex. H (ATF Rifle Importability Report) at 6.

84.  The primary difference between the M-16 and an assault weapon is that the M-16 is a select-fire weapon that allows the shooter to fire in either automatic or semiautomatic mode, while an assault weapon fires only in semiautomatic mode.  Defs.' Ex. I (Violence Policy Center, *Key Points About Assault Weapons*) at 1.

85.  The difference between a select-fire rifle and a semiautomatic rifle is not a material one.  Plaintiffs' expert witness, Kapelsohn, testified that an average shooter can fire between 5-7 rounds per second with a semiautomatic firearm and could maintain that rate-of-fire for "quite a while."  Oct. 19, 2020 Hearing Tr. at 23; *accord* Kapelsohn Dep. at 81-82.

86.  Semiautomatic weapons can "fire almost as rapidly as automatics." *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1263 (D.C. Cir. 2011); Defs.' Ex. J (H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act ("H.R. Rep. No. 103-489")) ("[S]emiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns."); Defs.' Ex. K (Brady Ctr. to Prevent Gun Violence, *Assault Weapons "Mass Produced Mayhem"* (2008)) at 1 (a 30-round magazine empties in less than two seconds on automatic, while the same magazine empties in just five seconds on semiautomatic).  In fact, soldiers issued M-16 rifles are instructed to generally use "rapid semiautomatic fire," because fully automatic fire is "inherently less accurate."  Defs.' Ex. L (Excerpt of United States Army, *Rifle Marksmanship M16/M4 - Series Weapons* (2008)) at 7-12.

87.  Assault rifles, such as the AR-15, are easily converted to fire automatically.  Staples, 511 U.S. at 603 (noting that "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon"); Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 ("[I]t is a relatively simple task to convert a semiautomatic weapon to automatic fire . . . ."); Defs.' Ex. M (Mersereau Decl.) ¶ 20

88.  Except for the small subset of firearms that qualify as assault weapons under the AWCA when configured with certain particularly dangerous features, Californians are free to possess a range of rifles, pistols, and shotguns to engage in lawful self-defense.  *See Jackson*, 746 F.3d at 961 ("[F]irearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not.").

89.  The AWCA does not ban all rifles, pistols, or shotguns, or even all semiautomatic versions of those firearms.

90.   Californians may lawfully acquire an array of semiautomatic rifles for lawful purposes, such as a centerfire semiautomatic rifle without a fixed magazine, provided it is not a prohibited make and model and does not have any of the prohibited features, a centerfire semiautomatic rifle with any of the militaristic features and with a fixed magazine of 10 rounds or less, or a rimfire semiautomatic rifle with any of the listed features.

91.   Californians may also possess a range of handguns and shotguns, including semiautomatic versions that lack any of the prohibited features or configurations.

92.   Plaintiffs fail to show that assault weapons with any of the prohibited features or configurations are necessary for effective self-defense.

93.   On average, approximately *two rounds* are fired when firearms are used in self-defense, Defs.' Ex. A (Allen Decl.) ¶¶ 15, 22, confirming that assault weapons—particularly those with LCMs—are not necessary to engage in lawful self-defense.

94.   The AWCA restricts a "subset" of particularly lethal rifles, pistols, and shotguns that are not necessary for effective self-defense

95.   None of the features enumerated in California Penal Code section 30515(a) are necessary to operate a firearm.

V.   **ASSAULT WEAPONS ARE DISPROPORTIONALLY USED IN CRIME, MASS SHOOTINGS, AND AGAINST LAW ENFORCEMENT, RESULTING IN MORE CASUALTIES.**

96.   "[S]emiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."  Defs.' Ex. J (H.R. Rep. No. 103-489) at 13.

97.   "The carnage inflicted on the American people [by] criminals and mentally deranged people armed with . . . semi-automatic assault weapons has been overwhelming and continuing," and the use of those weapons by "criminal gangs,

drug-traffickers, and mentally deranged persons continues to grow." *Id.* at [1089-90].

98.  Assault weapons are used disproportionately in crime.  Defs.' Ex. J (H.R. Rep. No. 103-489) at 18; Defs.' Ex. E (Klarevas Decl.) ¶ 16; Defs.' Ex. C (Donohue Decl.) ¶ 115.

99.  Generally, assault weapons and semiautomatic weapons with LCMs account for 22 to 36 percent of crime guns, and "appear to be used in a higher share of firearm mass murders (up to 57% in total)," Defs.' Ex. Y (Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health 313 (2017) ("Koper 2017")) at 1, far greater than their prevalence in the market, *see* Defs.' Ex. E (Klarevas Decl.) ¶ 16.  S

100. Assault weapons and semiautomatic weapons with LCMs are used disproportionally against law enforcement personnel.  Defs.' Ex. Y (Koper 2017) at 1, 7 (finding that 13 to 16 percent of guns used in the murder of police are assault weapons); *see also* Defs.' Ex. AA (Violence Policy Ctr., *"Officer Down": Assault Weapons and the War on Law Enforcement* (2003)) at 5; Defs.' Ex. C (Donohue Decl.) ¶ 117.

101. Victims of assault weapons generally suffer more extensive and more numerous gunshot wounds, resulting in higher morbidity and mortality than victims of shootings from other weapons.  *See* Defs.' Ex. B (Colwell Decl.) ¶¶ 9, 12; Defs.' Ex. BB (Panagiotis K. Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, J. of Acute Disease, 178 (2014)) at 181-82 (discussing cavitation of small-caliber bullets from M-16 and AK-47 rifles).

102. When used in mass shootings, assault weapons cause substantially more fatalities and injuries than non-assault weapons.  *See Gallinger*, 898 F.3d at 1019 ("[W]hen 'assault weapons and large capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other

firearms and magazines.'" (quoting *Kolbe*, 849 F.3d at 127)); *Rupp*, 401 F. Supp. 3d at 991 (citing Defs.' Ex. X); Defs.' Ex. CC (Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More Deadly? Assessing How Perpetrators' Motives and Methods Have Changed Over Time*, Criminology & Pub. Pol'y 1 (2019)) at 12 ("Strong empirical evidence shows that weapon choice affects lethality.").

103. The use of assault weapons in public mass shootings involving four or more fatalities has resulted in an average of 38 fatalities or injuries compared to 10 without assault weapons, *see* Defs.' Ex. A (Allen Decl.) ¶ 31—a 280 percent increase in average casualties. The disparity is more pronounced when comparing public mass shootings with assault weapons *and LCMs* (an average of 43 fatalities or injuries) with mass shootings not involving assault weapons or LCMs (an average of 8 fatalities or injuries), *id.* ¶ 34—an approximately 440 percent increase.

104. This correlation holds when examining mass shootings involving six or more fatalities (regardless of the location of the shooting). *See* Defs.' Ex. E (Klarevas Decl.) ¶ 17 (finding a 159 percent increase in casualties in the past ten years).

105. The vast majority of firearms used in mass shootings are acquired legally. Defs.' Ex. A (Allen Decl.) ¶ 38; Lott Dep. (agreeing that the majority of mass shooters and active shooters acquire their weapons legally).

## VI. THE AWCA FURTHERS THE STATE'S IMPORTANT PUBLIC SAFETY INTERESTS.

106. Restricting the possession of assault rifles has had and will continue to have a significant impact on public safety.

107. Assault weapons restrictions are effective in reducing gun violence, particularly violence associated with mass shootings.

108. The federal assault weapons ban was effective in reducing the prevalence of the banned assault weapons in gun crime.  Defs.' Ex. Y (Koper 2017) at 7; Defs.' Ex. C (Donohue Decl.) ¶ 119.

109. The federal ban was also effective in reducing the incidence and lethality of mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶¶ 23-24 & tbl. 3 (finding a 37 percent decline in gun massacres during the federal ban, and a 49 percent decline in gun-massacre fatalities, followed by a 183 percent increase in gun massacres after its expiration, and a 209 percent increase in gun-massacre fatalities).

110. The correlation between a ban on assault weapons and large-capacity magazines and a reduction in the incidence and lethality of mass shootings has been replicated in states that have enacted assault-weapon restrictions, like California. *Id.* ¶ 27; Defs.' Ex. EE (Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013)) at 4.

111. The features prohibited under the AWCA increase the lethality of semiautomatic weapons by enhancing accuracy when firing rapidly and, in the case of collapsible stocks and semiautomatic rifles that are less than 30 inches in length, enhance the concealability of the firearm.

112. Assault weapons enable a shooter to fire more rounds rapidly in a given period with greater accuracy, increasing the likelihood that more individuals will be shot and suffer multiple injuries, making it "far more likely" that the individual will suffer complications and die of those injuries.  Defs.' Ex. B (Colwell Decl.) ¶ 8.

113. More people are injured and killed in mass shootings involving assault weapons.  *See* Defs.' Ex. A (Allen Decl.) ¶¶ 26, 33-34 (finding correlation in public mass shootings involving four or more fatalities excluding the shooter); Defs.' Ex. E (Klarevas Decl.) ¶ 17 (finding correlation in gun massacres involving six or more fatalities excluding the shooter); Defs.' Ex. B (Colwell Decl.) ¶¶ 9 (describing

18

1    personal experiences treating victims of the Columbine and Aurora mass

2    shootings).

3         114. California's assault-weapon restrictions are effective in mitigating the

4    lethality of mass shootings and can even reduce the incidence of mass shootings.

5    *See* Defs.' Ex. E (Klarevas Decl.) ¶¶ 22-23.

6         115. While the AWCA is broader than the federal assault weapons ban in

7    defining a firearm as an assault weapon if it has only one qualifying feature, the

8    AWCA is narrower than the federal ban in being limited to centerfire rifles. *See*

9    Defs.' Ex. J (H.R. Rep. No. 103-489) at 2 (defining any semiautomatic rifle as an

10   assault weapon if it has the ability to accept a detachable magazine and at least two

11   qualifying features).

12                        **CONCLUSIONS OF LAW**

13   **I.    ASSAULT WEAPONS ARE NOT PROTECTED UNDER THE SECOND
           AMENDMENT BECAUSE THEY ARE DANGEROUS AND UNUSUAL.**
14

15        1.    While the Supreme Court in *Heller* and *McDonald* invalidated strict

16   laws that effectively prohibited the possession of all handguns—which it

17   characterized as "the quintessential self-defense weapon," *Heller*, 554 U.S. at

18   629—the Court made clear that "the right secured by the Second Amendment is not

19   unlimited" and does not extend to "a right to keep and carry any weapon

20   whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626

21   (citations omitted).

22        2.    The Second Amendment "does not protect those weapons not typically

23   possessed by law-abiding citizens for lawful purposes, such as short-barreled

24   shotguns." *Heller*, 554 U.S. at 625; *see also Fyock*, 779 F.3d at 997.  This

25   articulation of what is protected by the Second Amendment finds its roots in the

26   "historical tradition of prohibiting the carrying of 'dangerous and unusual

27   weapons.'" *Heller*, 554 U.S. at 627.

28

3.    Dangerous and unusual weapons are not "'the sorts of weapons' that are 'in common use'" for lawful purposes.  *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring).

4.    The Ninth Circuit has observed that "[c]ommonality is determined largely by statistics," with "common use" being established primarily by evidence that a weapon is "overwhelmingly owned and used for lawful purposes," *Duncan v. Becerra*, __ F.3d __, 2020 WL 4730668, at *7 (9th Cir. Aug. 14, 2020), *petition for reh'g en banc filed*.

5.    Marketing materials or sales figures for assault rifles, assault pistols, and assault shotguns would not show that the weapons are in common use by law-abiding citizens for lawful purposes.  For one, "marketing materials and sales statistics" do "not necessarily show that [particular weapons] are in fact commonly possessed by law-abiding citizens for lawful purposes."  *Fyock*, 779 F.3d at 998.

6.    Evidence of a firearm's prevalence alone is insufficient to show that the weapon is in "common use" for lawful purposes.  *See Kolbe*, 849 F.3d at 141-42 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citing *Friedman*, 784 F.3d at 409)), *cert. denied*, __ S.C. __, 2020 WL 3146687 (June 15, 2020).

7.    Whether law enforcement agencies use weapons that would otherwise qualify as assault weapons under the AWCA is irrelevant to the "common use" analysis.  Law-enforcement use is not considered when determining whether an arm is in common use by law-abiding citizens for lawful purposes.  *See Maloney v. Singas*, 351 F. Supp. 3d 222, 229 n.10 (E.D.N.Y. 2018) (excluding sales of arms to law enforcement agencies because "the Second Amendment is only concerned with weapons 'typically possessed by law-abiding citizens for lawful purposes.'" (quoting *Heller*, 554 U.S. at 625)).

**II.   ASSAULT WEAPONS ARE, LIKE THE M-16, MOST USEFUL IN MILITARY SERVICE.**

8.     Assault weapons fall outside the scope of the Second Amendment because they are like the M-16 and most useful in military service.

9.     In *Heller*, the Supreme Court made clear that the Second Amendment does not protect weapons that are "most useful in military service," such as the "M-16 and the like."  *Heller,* 554 U.S. at 627; *Kolbe*, 849 F.3d at 136. The Supreme Court has highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the protection of the Second Amendment. *Heller*, 554 U.S. at 627.

**III.   THE AWCA IS, LIKE LONGSTANDING FIRING-CAPACITY REGULATIONS, A VALID STATE REGULATION.**

10.   The AWCA is a "'presumptively lawful measure[]' falling outside the scope of Second Amendment protection."  *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring) (quoting *Heller*, 554 U.S. at 626, 627 n.26).

11.   In restricting firearms capable of firing numerous rounds without reloading—either because they can accept detachable LCMs or have fixed LCMs—the AWCA is analogous to "regulations from the early twentieth century that restricted the possession of firearms based on the number of rounds that the firearm could discharge automatically or semi-automatically without reloading." *Fyock*, 779 F.3d at 997.

12.   In the 1920s and 1930s, Michigan, Rhode Island, and Ohio enacted restrictions on semiautomatic weapons capable of firing sixteen, twelve, and eighteen shots, respectively, without reloading.  Defs.' Ex. S (Mich. Public Acts, 1927 – No. 372); Defs.' Ex. T (R.I. Public Acts, 1927 – Ch. 1052); Defs.' Ex. U (Ohio General Code, 1933 – § 12819-3).

13.   In 1932, Congress enacted a twelve-shot restriction on semiautomatic weapons in the District of Columbia—one of the few jurisdictions subject to the

Second Amendment at that time, before it was incorporated into the Fourteenth Amendment in 2010—and this restriction has remained in effect ever since.  Defs.' Ex. V (Pub. L. No. 275, 1932 – 72d Cong., Sess. I, chs. 465, 466).  While most of the firing-capacity laws were repealed by the 1970s, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.* (*ANJRPC*), 910 F.3d 106, 117 n.18 (3d Cir. 2018), the District of Columbia has maintained its restrictions.

14.  In regulating firearms based on their capacity for enhanced firepower, these laws provide a historical analog to the AWCA.  *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (noting that the challenged regulation need not "mirror" the historical regulation); *see, e.g.*, *Silvester*, 843 F.3d at 823-24, 831 (Thomas, C.J., concurring) (citing original iteration of California's waiting-period law, which provided a *single-day* waiting period, in determining that California's longer, ten-day waiting period was presumptively lawful).

15.  These laws restricting dangerous semiautomatic firearms  are sufficient analogs even though they were not adopted by all fifty states.  *See id.* at 831 (Thomas, C.J., concurring) (citing just three states that enacted waiting-period statutes in the 1920s).

16.  The political debate concerning the regulation of assault weapons "was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s."  Defs.' Ex. W (Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017)) at 69; *see also* Defs.' Ex. X (Br. of *Amicus Curiae* Everytown for Gun Safety in Supp. of Def.'s Mot. for Summ. J., *Rupp v. Becerra*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Apr. 1, 2019) (Dkt. 82-1)) at 7-9.

17.  The AWCA does not burden the Second Amendment because it has historical analogs.

1
2

**IV.   INTERMEDIATE SCRUTINY APPLIES BECAUSE ANY BURDEN HERE ON A SECOND AMENDMENT RIGHT IS NOT SEVERE.**

3   18.  Every federal circuit court that has selected a level of scrutiny to apply

4   to assault-weapon restrictions, like the AWCA, has determined that intermediate

5   scrutiny applies because they do not rise to the level of a "substantial burden" on

6   the core right protected by the Second Amendment.  *See Wilson v. Cook Cty.*, 937

7   F.3d 1028, 1036 (7th Cir. 2019) (following *Friedman v. City of Highland Park, Ill.*,

8   784 F.3d 406, 412 (7th Cir. 2015)), *cert. denied*, __ S.C. __, 2020 WL 3146694

9   (June 15, 2020); *Worman*, 922 F.3d at 38; *Kolbe*, 849 F.3d at 138-39; *N.Y. State*

10   *Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257-61 (2d Cir. 2015); *Heller II*, 670

11   F.3d at 1261-62.

12   19.  The district court in *Rupp* determined that intermediate scrutiny is

13   appropriate because the AWCA does not severely burden the core Second

14   Amendment right, given the range of other firearms available to Californians that

15   are not restricted by the AWCA, including a variety of handguns.  *Rupp*, 401 F.

16   Supp. 3d at 989.  Indeed, the court determined that assault rifles—the focus of

17   Plaintiffs' claims in this action—are "ill-suited for self-defense" and that self-

18   defense is not the reason why most "modern sporting rifles" are acquired.  *Id.*

19   Consistent with *Rupp* and the federal circuit cases upholding similar assault-

20   weapon restrictions, intermediate scrutiny applies to the AWCA.

21   20.  The AWCA does not impose a severe burden on the core Second

22   Amendment right because it leaves open alternative channels for self-defense as it

23   restricts only a small subset of firearms with particularly dangerous configurations.

24   21.  The burden on the core right is minimized by the fact that the AWCA,

25   in effect, operates as a restriction on the manner in which certain semiautomatic

26   firearms are sold and possessed, rather than a prohibition on the possession of any

27   particular class of firearm.  *See Silvester*, 843 F.3d at 827 ("This court has

28   explained that laws which merely regulate only the '*manner* in which persons may

23

exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely." (quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013))).

22.   Under the AWCA, Californians may acquire and possess semiautomatic, centerfire rifles and semiautomatic pistols and shotguns, provided the weapons do not have any of the proscribed accessories or features listed in California Penal Code section 30515(a).

23.   The Second Amendment may protect the right to possess certain firearm accessories or hardware necessary to make the firearm operable.  *See Fyock*, 779 F.3d at 997 ("[O]ur case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines *necessary to render those firearms operable*." (emphasis added) (quoting *Jackson*, 746 F.3d at 967).

24.   The challenged provisions of the AWCA regulate the *manner* in which certain rifles, pistols, and shotguns may be configured also because none of the features enumerated in California Penal Code section 30515(a) are necessary to operate a firearm.

25.   The challenged provisions of the AWCA does not render the firearms prohibited thereunder inoperable; thus, the burden on the core Second Amendment right, if any, is minimal.

26.   Intermediate scrutiny applies to the examination of the challenged provisions of the AWCA.  *See Rupp*, 401 F. Supp. 3d at 988-89.

### V.   THE AWCA IS REASONABLY FITTED TO IMPORTANT GOVERNMENT INTERESTS.

27.   A regulation satisfies intermediate scrutiny if (1) the government's stated objective is "significant, substantial, or important"; and (2) there is a "'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821-22 (citation omitted).

28.   Intermediate scrutiny does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest.  *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

29.   In determining whether a law survives intermediate scrutiny, courts "afford substantial deference to the predictive judgments of the legislature." *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) (quotation omitted).  Even when the record contains "conflicting legislative evidence," intermediate scrutiny "allow[s] the government to select among reasonable alternatives in its policy decisions." *Id.* (quotation omitted).

30.   Deferential review is particularly appropriate here because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quotation omitted).

31.   Under intermediate scrutiny, the government may "rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests," and the Court "may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'" *Fyock*, 779 F.3d at 1000 (quotations omitted).  Such "evidence need only 'fairly support[]' [the government's] conclusions." *Pena*, 898 F.3d at 982 (quotation omitted).

32.   "It is beyond question that the government's interest in promoting public safety and reducing gun violence is important or substantial." *Rupp*, 401 F. Supp. 3d at 990 (quotation omitted); *see, e.g.*, *Fyock*, 779 F.3d at 1000; *Chovan*, 735 F.3d at 1135.

33.  The AWCA satisfies intermediate scrutiny because it furthers the State's important interests by restricting a particularly dangerous subset of firearms that pose an acute danger to the public and law enforcement.

34.  Correlative evidence of the harms of assault weapons is sufficient to show a reasonable fit under intermediate scrutiny.  *See Rupp*, 401 F. Supp. 3d at 993 ("Even assuming there is not direct *causal* evidence between mass shootings and higher casualty rates and rifles within the scope of the AWCA, California is entitled to make 'reasonable inferences' from the available data that shows a correlation." (quoting *Worman*, 922 F.3d at 40)); *S.F. Veteran Police Officers Ass'n v. City & Cty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (holding that LCM restrictions satisfied intermediate scrutiny where "[t]he record demonstrates that there is a very high correlation between mass shootings and the use of [LCMs]"); *see also Fantasyland Video, Inc. v. Cty. of San Diego*, 505 F.3d 996, 1002 (9th Cir. 2007) (upholding law under First Amendment based on "studies and reports, reported court decisions, and anecdotal testimony" supporting a "correlation between adult establishments and negative secondary effects" under intermediate scrutiny).

35.  Consistent with the unanimous view of the five federal circuit courts that have examined assault-weapon restrictions, the AWCA amply satisfies intermediate scrutiny.

## VI.   ALTERNATIVELY, THE AWCA SATISFIES STRICT SCRUTINY.

36.   Intermediate scrutiny is the appropriate standard to apply to the AWCA; alternatively the AWCA is constitutional even under strict scrutiny.

37.   The State's public-safety interests in reducing the incidence and lethality of gun violence are compelling.  *See* Defs.' Ex. C (Donohue Decl.) ¶¶ 28-36; Defs.' Ex. E (Klarevas Decl.) ¶¶ 9-11.

38.  The AWCA is narrowly tailored to those interests by restricting certain military-style configurations that enhance the lethality of firearms and their

26

effectiveness in mass shootings and violence against law enforcement personnel. *See supra* Proposed Findings of Fact, Section V.

39.  The unrebutted correlation strongly supports the reasonableness of the AWCA's fit. *See Rupp*, 401 F. Supp. 3d at 993 (noting that "'a correlation between the use of assault weapons and the number of victims injured or killed' makes it '[m]ore likely' that there is a causal relationship" and that "California is entitled to make 'reasonable inferences' from the available data that shows a correlation" (citations omitted)).

40.  The State is not restricted to examining mass shootings in California to demonstrate a reasonable fit and may "rely on any evidence 'reasonably believed to be relevant'"—such as mass shootings in other jurisdictions—"to substantiate its important interests" under intermediate scrutiny. *Fyock*, 779 F.3d at 1000 (quotations omitted).

Dated:  January 27, 2021                    Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOSE A. ZELIDON-ZEPEDA
PETER H. CHANG
Deputy Attorneys General


s/ John D. Echeverria

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendants*

SA2019104420
42531575.docxs

## CERTIFICATE OF SERVICE

Case Name:   **James Miller et al. v. Xavier Becerra, et al.**
Case No.     **3:19-cv-01537-BEN-JLB**

I hereby certify that on <u>January 27, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>January 27, 2021</u>, at San Francisco, California.

| | |
|---|---|
| Robert Hallsey | /s/ Robert Hallsey |
| Declarant | Signature |

SA2019104420
42531559.docx