John W. Dillon (SBN 296788)
    jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

George M. Lee (SBN 172982)
    gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al., | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | **[Civ. L.R. 16.1(f)(9)(b)]** |
| XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | Trial: February 3, 2021<br>Time: 10:00 a.m.<br>Courtroom 5A<br>Judge: Hon. Roger T. Benitez |
| Defendants. | |

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................... 1

II. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW....................................... 1

   A.   STIPULATED FACTS ....................................................................... 1

   B.   UNCONTESTED FACTS .................................................................... 3

      The Parties........................................................................... 3

      Plaintiffs' Claims .................................................................. 9

   C.   PRIMARY CONTENTIONS OF FACT AND LAW ................................. 11

      Arms Banned By California as "Assault Weapons"
      are Common and Constitutionally Protected ................................. 11

      The Arms Banned By California as "Assault Weapons"
      Are Possessed and Used for Lawful Purposes Including Self-Defense...... 15

      The Arms Banned By California as "Assault Weapons" Are Not More
      Lethal ................................................................................ 27

      Assault Weapons Bans Have No Discernible Effect on Crime ................. 29

      The Arms Banned By California as "Assault Weapons"
      Are Not Used in Most Mass Shootings........................................... 30

      Conclusions of Law ................................................................ 31

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)....................................................... 35

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017)........................................................... 32

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016)........................................... 11, 12, 31

*District of Columbia v. Heller*, 554 U.S. 570, 582, 128 S.Ct. 2783 (2008) ......... *passim*

*Duncan v. Becerra*, 366 F.Supp.3d 1131 (S.D. Cal. 2019),
    *aff'd*, 970 F.3d 1133 (9th Cir. 2020)........................................................................ *passim*

*Edenfield v. Fane*, 507 U.S. 761 (1993) ................................................................... 34, 37

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ............................... 35

*Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (2011) ...................... 11, 14

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)........ 32, 36

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014) ................................................................. 35

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ................................................. 37

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) ............................................................... 33

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ............................................................ 36

*Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004)..................................................... 34

*Rupp v. Becerra*, 401 F.Supp.3d 978 (C.D. Cal. 2019) ................................................. 34

*Silvester v. Becerra*, 138 S.Ct. 945 (2018) .............................................................. 32, 36

*Silvester v. Harris*, 834 F.3d 816 (9th Cir. 2016) ......................................................... 36

*Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) ......................................... 34

*Stanley v. Georgia*, 394 U.S. 557 (1969)....................................................................... 35

*Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793 (1994)..................................... 14

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ................................. 35

*Tyler v. Hillsdale County Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016) .................... 37

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............................................... 36

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) .............................................. 32

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007) .................................................... 34

**Statutes**

26 U.S.C. § 2845 ............................................................................................................ 20

42 U.S.C. § 1983 .............................................................................................................. 9

42 U.S.C. § 1988 ............................................................................................................ 10

Cal. Pen. Code § 16740 ....................................................................................... 4, 6, 25

Cal. Pen. Code § 30500 ................................................................................................... 3

Cal. Pen. Code § 30510 ................................................................................................... 1

Cal. Pen. Code § 30515(a) ..................................................................................... *passim*

Cal. Pen. Code § 30515(b) ........................................................................................ 3, 24

Cal. Pen. Code § 30600 ............................................................................................. 1, 10

Cal. Pen. Code § 30605 ............................................................................................. 1, 10

Cal. Pen. Code § 30655 ................................................................................................... 1

Cal. Pen. Code § 30800 ............................................................................................. 3, 10

Cal. Pen. Code § 30900 ................................................................................................... 4

Cal. Pen. Code § 30910 ................................................................................................. 10

Cal. Pen. Code § 30915 ................................................................................................. 10

Cal. Pen. Code § 30925 ................................................................................................. 10

Cal. Pen. Code § 30945 ................................................................................................. 10

Cal. Pen. Code § 30950 ............................................................................................. 1, 10

Cal. Pen. Code § 31000 ................................................ 10

Cal. Pen. Code § 31005 ................................................ 10

Cal. Pen. Code § 32310 ................................................ 33

**Regulations**

11 Cal. Code Regs. § 5460 ......................................... 9, 10

11 Cal. Code Regs. § 5471 ....................................... *passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   INTRODUCTION

Pursuant to Civ. L.R. 16.1(f)(9)(b), plaintiffs James Miller, et al. ("plaintiffs") hereby submit their Proposed Findings of Fact and Conclusions of Law in advance of the bench trial presently scheduled for hearing on February 3, 2021, Hon. Roger T. Benitez presiding.

Plaintiffs request and reserve the right to amend and/or supplement their proposed findings of fact and conclusions of law at or after trial, as the evidence at trial is introduced, submitted, and admitted at trial.

# II.   PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## A.   STIPULATED FACTS

By and through submission of their proposed Pretrial Order, submitted to the Court on December 9, 2020, the parties stipulated to the following facts (except as otherwise indicated below):

1.    California's Robert-Roos Assault Weapons Control Act of 1989 ("AWCA") was first enacted in 1989. California's AWCA bans manufacturing, causing to be manufactured, distributing, transporting, importing into the state, keeping for sale, offering or exposing for sale, giving, lending, possessing, transferring through bequest or intestate succession any assault weapon and bars juveniles from registering or possessing any assault weapon.  Cal. Penal Code §§ 30600, 30605, 30655, 30950.

2.    The original AWCA identified particular assault weapons by make and model. *Id.* § 30510. The AWCA was amended in 2000 to add alternative definitions of assault weapons based on the features or characteristics of certain types of firearms. *Id.* § 30515(a). In relevant part, the definitions found in Penal Code § 30515(a) are as follows:

- §30515(a)(1): A semiautomatic, centerfire rifle that does not have a fixed magazine but has any one of the following: A pistol grip that protrudes

conspicuously beneath the action of the weapon; a thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; or a forward pistol grip.

- §30515(a)(2): A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

- §30515(a)(3): A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

- §30515(a)(4): A semiautomatic pistol that does not have a fixed magazine but has any one of the following: a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer; a second handgrip; a shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel; or the capacity to accept a detachable magazine at some location outside of the pistol grip.

- §30515(a)(5): A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

- §30515(a)(6): A semiautomatic shotgun that has both of the following: a folding or telescoping stock, and a pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

- §30515(a)(7): A semiautomatic shotgun that does not have a fixed magazine.

- §30515(a)(8): Any shotgun with a revolving cylinder.

- §30515(a)(9): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that does not have a fixed magazine, but that has any one of the following: a pistol grip that protrudes conspicuously beneath the action of the weapon; a thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; a forward pistol grip; a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer; a second handgrip; a shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel; or the capacity to accept a detachable magazine at some location outside of the pistol grip.[1]

---

[1]Defendants did not stipulate to this fact.

- §30515(a)(10): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that has a fixed magazine with the capacity to accept more than 10 rounds.[2]

- §30515(a)(11): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that has an overall length of less than 30 inches.[3]

3.      Penal Code § 30515(b) defines "fixed magazine" to mean "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action." *See also* 11 Cal. Code Regs. § 5471(p).

4.      Under the AWCA, the possession of any assault weapon in violation of Penal Code § 30500, et seq. is a public nuisance. Penal Code § 30800.

**B.    UNCONTESTED FACTS**

Plaintiffs have submitted the following facts, which Defendants do not appear to contest in this trial:

**The Parties**

5.      Plaintiff James Miller is a resident of San Diego, California. Plaintiff Miller is not prohibited from owning firearms. (Miller Decl., Plaintiffs' Exhibit 013, ¶¶ 1-3.) Plaintiff Miller legally owns a semiautomatic centerfire rifle which as one or more of the characteristics listed in Penal Code § 30515(a)(1), specifically, a pistol grip (§ 30515(a)(1)(A)), a telescoping stock (§ 30515(a)(1)(C), and a flash suppressor (§ 30515(a)(1)(E)). This firearm has a "fixed magazine" because it contains an ammunition feeding device that cannot be removed from the firearm without disassembly of the firearm action. (Miller Decl., Plaintiffs' Exh. 013, ¶ 4.) Plaintiff Miller rendered the firearm with a fixed magazine in order to preserve the other

---

[2]Defendants did not stipulate to this fact.
[3]Defendants did not stipulate to this fact.

1   features without having to alter, deface or destroy the other characteristics of the

2   firearm. (Id., ¶ 5.) Plaintiff Miller is also in lawful possession of a "large capacity

3   magazine," as that term is defined in Penal Code § 16740, as it has the capacity to

4   hold more than ten rounds of ammunition. (Miller Decl., Plaintiffs' Exh. 013, ¶ 6.) If

5   Plaintiff Miller were to insert the "large capacity magazine" into the firearm he

6   possesses, it would be prohibited as an assault weapon under Pen. Code §

7   30515(a)(2). Plaintiff Miller wishes to continue to use his firearm, with the magazine

8   inserted, without being subject to arrest and/or prosecution for possession or

9   manufacture of an assault weapon. (Miller Decl., Plaintiffs' Exh. 013, ¶ 8.) Plaintiff

10   Miller also desires to obtain and acquire additional AR-15 pattern firearms that do not

11   have a fixed magazine, but which have some or all of the features listed in Pen. Code

12   § 30515(a)(1). (Id., ¶ 9.)

13          6.     Plaintiff Wendy Hauffen is a resident of San Diego, California. Plaintiff

14   Hauffen is not prohibited from owning firearms. (Hauffen Decl., Plaintiffs' Exh. 014,

15   ¶¶ 1-3.) Plaintiff Hauffen is the owner of a semiautomatic centerfire rifle described as

16   an AR-15 pattern rifle. This rifle is "featureless," in that it does not have any of the

17   features listed in Pen. Code § 30515(a)(1). (Hauffen Decl., Plaintiffs' Exh. 014, ¶ 4.)

18   Plaintiff Hauffen rendered the firearm as "features" configuration (under 11 Cal. Code

19   Regs. § 5471(o) in order to avoid having to register the firearm as an "assault weapon"

20   pursuant to Pen. Code § 30900(b). (Hauffen Decl., Plaintiffs' Exh. 014, ¶ 5.) She

21   prefers to have the listed features in § 30515(a)(1) reattached to the firearm, but in

22   doing so, would have had to register the firearm as an "assault weapon." If registered

23   as an assault weapon, it would have prevented Plaintiff Hauffen from transferring the

24   firearm to anyone else, or passing it along to her heirs. (Hauffen Decl., Plaintiffs' Exh.

25   014, ¶ 5.) She plans to and would like to pass the firearm down to her heirs or to sell

26   them should the need arise. (Id.) Plaintiff Hauffen would like to reattach some or all of

27   the § 30515(a)(1) features to her firearm, but fears she would be subject to arrest

28   and/or prosecution for possessing or manufacturing an "assault weapon." (Id., ¶ 6.)

7.  Plaintiff Hauffen is also a firearms trainer, who specializes in training other women in the proficiency of arms and self-defense. (Id., ¶ 8.) In her experience, the collapsible/telescoping stock, which is common to most AR-15 rifles, makes it an ideal rifle with which to instruct and train women. (Id.) Plaintiff Hauffen herself specifically desires to use the ergonomic features of the firearm, such as the pistol grip, in controlling the firearm and ensuring accuracy while shooting. (Id.) The ability to use standard, thirty-round magazines with low recoil ammunition are among the reasons why she prefers to use and train students with centerfire firearms with the listed features, such as on the AR-15 rifle. (Id.) Plaintiff Hauffen also desires to obtain and acquire additional AR-15 pattern firearms that do not have a fixed magazine, but which have some or all of the features listed in Pen. Code § 30515(a)(1). (Id., ¶ 9.) Such firearms she would like to acquire also include AR-15 pistols which have many of the same features. (Id., Pen. Code § 30515(a)(4)(A)-(D).) Plaintiff Hauffen also has a standard Sig Sauer P239 9mm semiautomatic pistol, which she uses both in teaching firearms classes and shooting recreationally. (Hauffen Decl., Plaintiffs' Exh. 014, ¶ 10.) She would like to replace the standard barrel with a threaded barrel, which would allow her either to attach a flash suppressor or a muzzle brake to the firearm, assisting her vision, accuracy and control. (Id.)

8.  Plaintiff Neil Rutherford is a resident of San Diego, California. Plaintiff Rutherford is not prohibited from owning firearms. (Rutherford Decl., Plaintiffs' Exh. 017, ¶¶ 1-3.) Plaintiff Rutherford desires to obtain and acquire AR-15 pattern firearms that are sold in other parts of the country, and which have some or all of the features listed in Pen. Code § 30515(a)(1), and which have the capacity to accept detachable magazines. (Id., ¶ 4.) Plaintiff Rutherford also desires to obtain and acquire other firearms classified as "assault weapons," including AR pistols, which contain some or all of the features described in Pen. Code § 30515(a)(4)(A)-(D), semiautomatic shotguns which contain some or all of the features listed in Pen. Code § 30515(a)(6)

1  and (a)(7), but is prohibited by those provisions which define such firearms to be

2  "assault weapons" under California law. (Rutherford Decl., Plaintiffs' Exh. 017, ¶ 5.)

3       9.    Plaintiff Adrian Sevilla is a resident of San Diego, California. Plaintiff

4  Sevilla is not prohibited from owning firearms. (Sevilla Decl., Plaintiffs' Exh. 018, ¶¶

5  1-3.) Plaintiff Sevilla desires to obtain and acquire AR-15 pattern firearms that are

6  sold in other parts of the country, and which have some or all of the features listed in

7  Pen. Code § 30515(a)(1), and which have the capacity to accept detachable

8  magazines. (Id., ¶ 4.) Plaintiff Sevilla also desires to obtain and acquire other firearms

9  classified as "assault weapons," including AR pistols, which contain some or all of the

10  features described in Pen. Code § 30515(a)(4)(A)-(D), semiautomatic shotguns which

11  contain some or all of the features listed in Pen. Code § 30515(a)(6) and (a)(7), but is

12  prohibited by those provisions which define such firearms to be "assault weapons"

13  under California law. (Sevilla Decl., Plaintiffs' Exh. 018, ¶ 5.)

14       10.    Plaintiff Ryan Peterson is a resident of San Diego, California. Plaintiff

15  Peterson is not prohibited from owning firearms. (Peterson Decl., Plaintiffs' Exh. 015,

16  ¶¶ 1-3.) Plaintiff Peterson is the lawful owner of a semiautomatic pistol with a "fixed

17  magazine," as it contains an ammunition feeding device that cannot be removed from

18  the firearm without disassembly of the firearm action. (Id., ¶ 4.) If Plaintiff Peterson

19  were to remove the fixed magazine, it would be considered to be an assault weapon.

20  (Tx of 10/22/20 Hearing, at 11:20 – 12:21.) Plaintiff Peterson is also the lawful owner

21  of a large capacity magazine defined under Penal Code section 16740 that is

22  compatible with his semiautomatic fixed magazine pistol. If Plaintiff Peterson were to

23  insert his lawfully owned large capacity magazine into his semiautomatic fixed

24  magazine pistol, it would be considered an assault weapon. (Peterson Decl., Plaintiffs'

25  Exh. 015, ¶¶ 5-7.)

26       11.    Plaintiff Peterson wishes to use his lawfully owned large capacity

27  magazine in his semiautomatic fixed magazine pistol. Plaintiff Peterson also wishes to

28  obtain additional semiautomatic, centerfire firearms, including AR-15 pattern

1  firearms, that either have some or all of the features listed in Penal Code section

2  30515(a)(1) and which do not have a fixed magazine, and/or to obtain and acquire a

3  semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept

4  more than 10 rounds. (Peterson Decl., Plaintiffs' Exh. 015, ¶¶ 7-8.)

5       12.   Plaintiff Gunfighter Tactical, LLC is a federally and state-licensed

6  firearms retailer in San Diego, California, owned and managed by Plaintiff Peterson.

7  (Peterson Decl., Plaintiffs' Exh. 015, at ¶ 9; Tx of 10/22/20 Hearing at 13:9-14.)

8  Gunfighter Tactical would like to purchase, sell and transfer firearms in common use

9  for lawful purposes in other parts of the country, to ordinary, non-prohibited citizens,

10  but which firearms are prohibited because they contain some or all of the features

11  described by Pen. Code § 30515(a)(1). (Peterson Decl., Plaintiffs' Exh. 015, ¶ 9.)

12  Gunfighter Tactical is prevented from selling common AR-15 pattern rifles with

13  detachable magazines to ordinary citizens. (Tx of 10/22/20 Hearing at 13:9-14.)

14       13.   Plaintiff John Phillips is a resident of San Diego, California. Plaintiff

15  Phillips is not prohibited from owning firearms. (Phillips Decl., Plaintiffs' Exh. 016, ¶

16  1.) Plaintiff Phillips is the president of Plaintiff PWGG, L.P., doing business as

17  "Poway Weapons & Gear" and "PWG Range," a federally licensed firearms retailer

18  and shooting range in Poway, California. (Phillips Decl., Plaintiffs' Exh. 016, ¶ 3.)

19       14.   Plaintiff Phillips is also a member of organizational Plaintiffs, San Diego

20  County Gun Owners PAC, California Gun Rights Foundation, Second Amendment

21  Foundation, and Firearms Policy Coalition, Inc. (Phillips Decl., Plaintiffs' Exh. 016, ¶

22  3.)

23       15.   Plaintiff PWGG, L.P. holds a "Dangerous Weapons License/Permit"

24  issued and maintained by Defendants through the California Department of Justice,

25  Bureau of Firearms. This permit allows Plaintiff PWGG, L.P. to acquire and sell

26  "assault weapons" as defined by Penal Code section 30515(a) to select exempted

27  recipients, such as law enforcement officers. This permit does not allow Plaintiff

28  PWGG, L.P. to sell, transfer, or rent Penal Code section 30515(a) "assault weapons"

1    to non-exempt agencies or individuals, ordinary, non-prohibited citizens. (Phillips

2    Decl., Plaintiffs' Exh. 016, ¶ 5.)

3         16.    Plaintiff Phillips and Plaintiff PWGG, L.P. wish to have the business

4    purchase, sell, and transfer firearms in common use for lawful purposes which are

5    defined as "assault weapons" and contain some or all of the features described by

6    Penal Code section 30515(a) — to ordinary, non-prohibited adults through the FFL

7    dealership. Plaintiff Phillips and Plaintiff PWGG, L.P. are prevented from doing so

8    due to state law. (Phillips Decl., Plaintiffs' Exh. 016, ¶ 4.)

9         17.    Plaintiff San Diego County Gun Owners (SDCGO) is a membership

10   organization which advocates for and advances the Second Amendment rights of

11   residents of San Diego County, California to keep and bear arms. Individual plaintiffs

12   Miller, Hauffen, Rutherford, Sevilla, Peterson and Phillips are members of SDCGO.

13   (FAC, ¶¶ 1-10; Schwartz Decl., Plaintiffs' Exh. 019, ¶¶ 3-4.)

14        18.    Plaintiff SDCGO has California resident members who wish to acquire

15   and possess common semiautomatic firearms with various characteristics which are

16   defined as "assault weapons" under Penal Code § 30515(a). (Schwartz Decl.,

17   Plaintiffs' Exh. 019, ¶¶ 5-6.)

18        19.    Plaintiff California Gun Rights Foundation (CGF) is a non-profit

19   foundation which advocates for and advances the Second Amendment rights of

20   residents of California to keep and bear arms. Individual plaintiffs Miller, Hauffen,

21   Rutherford, Sevilla, Peterson and Phillips are members of CGF. (FAC, ¶¶ 1-8, 11;

22   Hoffman Decl., Plaintiffs' Exh. 020, ¶ 3-4.)

23        20.    Plaintiff CGF has California resident members who wish to acquire and

24   possess common semiautomatic firearms with various characteristics which are

25   defined as "assault weapons" under Penal Code § 30515(a). (Hoffman Decl.,

26   Plaintiffs' Exh. 020, ¶ 5-6.)

27        21.    Plaintiff Firearms Policy Coalition (FPC) is a non-profit organization

28   which advocates for and advances the Second Amendment rights of residents of

around the nation to keep and bear arms. Individual plaintiffs Miller, Hauffen, Rutherford, Sevilla, Peterson and Phillips are members of FPC. (FAC, ¶¶ 1-8, 12; Combs Decl., Plaintiffs' Exh. 022, ¶¶ 3-4.)

22.    Plaintiff FPC has California resident members who wish to acquire and possess common semiautomatic firearms with various characteristics which are defined as "assault weapons" under Penal Code § 30515(a). (Combs Decl., Plaintiffs' Exh. 022, ¶¶ 3-4.)

23.    Plaintiff Second Amendment Foundation (SAF) is a non-profit educational foundation which advocates for and advances the Second Amendment rights of residents of around the nation to keep and bear arms. Individual plaintiffs Miller, Hauffen, Rutherford, Sevilla, Peterson and Phillips are members of SAF. (FAC, ¶¶ 1-8, 13; Gottlieb Decl., Plaintiffs' Exh. 021, ¶¶ 3-5.)

24.    Plaintiff SAF has California resident members who wish to acquire and possess common semiautomatic firearms with various characteristics which are defined as "assault weapons" under Penal Code § 30515(a). (Gottlieb Decl., Plaintiffs' Exh. 21, ¶¶ 6-7.)

**Plaintiffs' Claims**

25.    Plaintiffs' claims for relief arise under 42 U.S.C. § 1983, for Defendants' laws, policies, customs, and enforcement practices which violate the right to keep and bear arms under the Second Amendment to the U.S. Constitution. First Amended Complaint [ECF Dkt. 9] ("FAC"), ¶¶ 90-104.

26.    Plaintiffs seek relief, as pleaded in their First Amended Complaint, as follows:

"1. For declaratory relief adjudging that the definitions of "assault weapon" pursuant to Penal Code §§ 30515(a) and (b), and Title 11, California Code of Regulations §§ 5460 and 5471, are unconstitutional on their face and as applied, and violate the Second Amendment, to the extent that the State's laws

and regulations operate to prohibit or prevent Plaintiffs and similarly situated persons from exercising their rights, including acquiring, keeping, bearing, transporting, transferring, and using "assault weapons" for lawful purposes;

2. For declaratory relief adjudging that California Penal Code §§ 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005 are unconstitutional on their face and as applied, and in violation of the Second Amendment, to the extent that the State's laws and regulations operate to prohibit or prevent Plaintiffs and similarly situated persons from exercising their rights, including acquiring, keeping, bearing, transporting, transferring, and using "assault weapons" for lawful purposes;

3. For declaratory relief supporting an injunction, and an order temporarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, who receive actual notice of the injunction, from enforcement or application of Penal Code §§ 30515(a) and (b), 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005, as well as Title 11, California Code of Regulations §§ 5460 and 5471, against Plaintiffs on an as-applied basis, and against all similarly situated persons;

4. For costs of suit, including attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

5. For any and all further relief to which Plaintiffs may be justly entitled."

[FAC, pp. 41-42].

27.     Plaintiffs have withdrawn their claim as to Pen. Code § 30925.

## C.   PRIMARY CONTENTIONS OF FACT AND LAW

### Arms Banned By California as "Assault Weapons" are Common and Constitutionally Protected

28.     The Supreme Court has held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582, 128 S.Ct. 2783 (2008). The right to keep and bear arms is a right enjoyed by law-abiding citizens to have arms that are not unusual "in common use" "for lawful purposes like self-defense." *Heller*, 554 U.S. at 624; *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1271 (2011) (Kavanaugh, J., dissenting); *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020).

29.     The Supreme Court's test for commonality is a nationwide inquiry. The Second Amendment does not mean different things in different parts of the country. The Supreme Court's *Heller*'s analysis asks simply whether the arms are "*both dangerous and* unusual," *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (Alito, J., joined by Thomas, J., concurring) (italics original), and if they are not *both*, it determines if the category of arms are in common use for lawful purposes. *Duncan*, 366 F.Supp.3d at 1142. The text of the Second Amendment, as it is informed by history and tradition, all point in the same direction because "the pertinent Second Amendment inquiry is whether [the banned weapons] are commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, *supra*, at 1032 (italics original).

30.     The arms banned as "assault weapons" under Defendants' AWCA and regulations are <u>not</u> *both* dangerous *and* unusual, as the Supreme Court defined in *Heller*. To the contrary, they are common in all respects: 1) They are common functionally, as they are all semiautomatic in their operation; 2) they are common characteristically, as they are all commercially popular types of arms with various

common characteristics like pistol grips and the like; and 3) they are common jurisdictionally, available in the vast majority of states. As further proof, they are common numerically, in that they are owned by citizens by the hundreds of thousands or more. All of the semiautomatic firearms California bans in Penal Code section 30515 meet the *Heller* test and are constitutionally protected.

31.     While numerical data can be helpful in determining if a particular weapon is commonly used for lawful purposes, constitutionally protected status of arms cannot turn on fact-bound sales numbers of particular makes, models, or even specific configurations. Rather, the question is a categorical analysis of type and function, set against a backdrop of permissibility and availability throughout the United States. "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., concurring). So too are semiautomatic firearms in various configurations of more and less characteristics, as California bans. These firearms are commonly used by responsible, law-abiding people for various lawful purposes such as self-defense, hunting, recreation, competition, and collecting. (Curcuruto Decl., Plaintiffs' Exh. 004, ¶¶ 7-14; Exs. 004-1 to 004-8.)

32.     The fact that the AWCA may act to ban thousands of discrete configurations of common semiautomatic pistols, shotguns, and rifles held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller*. (Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 47-52.)

33.     Another measure of the commonality of semiautomatic firearms called "assault weapons" is their general legality in other jurisdictions. *Caetano*, 136 S.Ct. at 1032 ("[t]he more relevant statistic is that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," who it appears may lawfully possess them in 45 States") (Alito, J., concurring).

34.     Law-abiding citizens may possess any semiautomatic rifle in 44 states,

and may possess some semiautomatic rifles in all 50 states. (Mocsary Decl., Plaintiffs' Exh. 003, at ¶ 44.) Semiautomatic firearms may be possessed by citizens in all fifty states. Forty-one states treat all semiautomatic firearms the same as every other legal firearm, without any additional restrictions, regardless of the features attached to the firearm. (Id.)

35.     From a jurisdictional perspective, assault weapon bans are not common, and it would appear that millions of weapons that California defines as "assault weapons" by virtue of the § 30515(a)(1) characteristics are legally owned by people in a large majority of the states. (Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 25-52.)

36.     Assault weapons bans are not longstanding prohibitions. The only federal regulation on semiautomatic firearms having characteristics at issue here did not occur until 1994 in the Public Safety and Recreational Firearms Use Protection Act (the "Federal Assault Weapons Ban") (103rd Congress (1993-1994)), a subsection of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322), which was allowed to sunset 10 years later due to its lack of effect on crime. (Lott Decl, Plaintiffs' Exhibit 010, ¶ 8.)

37.     Firearms defined under California law as "assault weapons" by virtue of the features they contain, set forth in Pen. Code § 30515(a), are in common use, for lawful purposes, including, recreational and competitive target shooting, self-defense, collecting and hunting, by millions of Americans. (Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7.)

38.     Semiautomatic rifles bearing features prohibited by Pen. Code § 30515(a)(1) are widely available and popular. The characteristics most commonly associated with these types of firearms are that they are semiautomatic, with the ability to accept a detachable magazine. (Curcuruto testimony, Tx of 10/19/20 Hearing at 62:7-11; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18.) The most popular is the AR platform (or rifles modeled on the AR-15 pattern). (Curcuruto testimony, Tx

1    of 10/19/20 Hearing at 62:17-18.) That is true both nationally and to the State of

2    California. (Id. at 62:24 – 63:19.)

3        39.    An AR-15 rifle is a semiautomatic civilian rifle, which means it fires one

4    shot with every pull of the trigger. *Staples v. United States*, 511 U.S. 600, 603, 114

5    S.Ct. 1793 (1994). Kapelsohn testimony, Tx of 10/19/20 hearing at 23:4-9; Curcuruto

6    Decl., Plaintiffs' Exh. 004, ¶ 7, fn.1.) This distinguishes an AR-15 from an M16,

7    which is a "select fire" weapon, that is, it can be either semiautomatic or fully

8    automatic. *Staples*, 511 U.S. at 603; Kapelsohn testimony, Tx of 10/19/20 Hearing at

9    21:22 -22:5; Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7.) Semiautomatic firearms such

10   as the AR-15 "traditionally have been widely accepted as lawful possessions."

11   *Staples*, 511 U.S. at 612; *Heller II*, 670 F.3d at 1288. In general, semiautomatic

12   firearms are widely available and popular; the vast majority of handguns sold today

13   are semiautomatic. *Heller II*, 670 F.3d at 1269 (Kavanaugh, J., dissenting).

14       40.    The AR-15 type rifle is a popular, semiautomatic rifle in wide civilian

15   use throughout the United States. *Duncan*, 366 F.Supp.3d at 1145. (Curcuruto Decl.,

16   Plaintiffs' Exh. 004, ¶¶ 7-8; Curcuruto testimony, Tx of 10/19/20 Hearing at 63:10-19;

17   Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18.) The AR-15 is especially popular because

18   of its light weight, mild recoil, and good ergonomics, all of which make it well suited

19   to younger shooters, female shooters, and other shooters of smaller stature, as well as

20   an easy rifle for larger, stronger individuals to use. (Kapelsohn Decl, Plaintiffs' Exh.

21   001, ¶ 18.)

22       41.    The AR-15 rifle has been in existence since being developed by the

23   Armalite company in the 1950s. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 28;

24   Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18; Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7,

25   fn.1.) Many of the features incorporated into the AR-15 rifle had already been in

26   existence; the only major new features incorporated into the AR-15 were lightweight

27   alloys to synthetic materials that became a popular experimentation across all firearm

28   platforms following World War II. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 28.)

42.     According to Plaintiffs' offered industry estimates, derived from government reports, United States manufacturers produced approximately 14.7 million AR-platform rifles for the United States commercial marketplace between 1990 and 2018. (Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 8; Exh. 004-3.) Currently, there are an estimated 19.8 million modern semiautomatic rifles overall produced in the U.S. or imported, between 1990-2018. (Curcuruto Decl., Plaintiffs' Exhibit 004, ¶ 15-; Ex. 004-8.) The most common calibers for modern semiautomatic rifles are .223 (or 5.56 x 45mm), 7.62 x 39mm, .22 caliber and .308 caliber. (Curcuruto testimony, Tx of 10/19/20 hearing at 65:7-10.)

43.     The most common caliber for the AR-15 rifle is the 5.56x45 NATO (or .223) cartridge, which is a centerfire cartridge. (Curcuruto testimony, Tx of 10/19/20 Hearing at 65:25 – 66:5.) The .223 cartridge is essentially the same as the 5.56 x 45mm round, with minor differences in the brass, but having the identical bullet. (Depo. of Dr. Robert Margulies, at 52:15 – 53:15.)

44.     Rimfire firearms would make up a small portion of the overall numbers of modern semiautomatic rifles, approximately 15 percent. (Curcuruto testimony, Tx of 10/19/20 Hearing at 66:9-13.) The "vast majority" of modern semiautomatic rifles are centerfire rather than rimfire. (Curcuruto Depo., p. 129:14-21.)

**The Arms Banned By California as "Assault Weapons" Are Possessed and Used for Lawful Purposes Including Self-Defense**

45.     Semiautomatic firearms bearing the 30515(a) characteristics are well suited for self-defense purposes, which is a lawful use. The AR-15 in particular is an easy firearm to shoot accurately, and is generally easier to fire accurately than a handgun. (Kapelsohn testimony, Tx of 10/19/20 hearing at 25:16 – 26:20.) The AR-15 rifle is light in weight, and has good ergonomics, and is suitable for people of all statures and varying levels of strength. (Id., at 26:21 – 27:8.)

46.     In its standard configuration, the most popular features of semiautomatic

1  rifles such as the AR-15 rifle, as sold in other parts of the country, are: the pistol grip
2  (prohibited by Pen. Code § 30515(a)(1)(A)), the telescoping stock (§ 30515(a)(1)(C)),
3  and a flash suppressor (§ 30515(a)(1)(E)). (Graham testimony, Tx of 10/19/20
4  Hearing at 129:21 – 130:1.)

5   47.   Accuracy is very important for self-defense, because unlike the criminal
6  using a firearm, a civilian or a police officer is accountable for every round they fire.
7  And thus, if they miss the attacker, they will hit something they did not intend to hit,
8  which may be an innocent bystander. (Kapelsohn testimony, Tx of 10/19/20 Hearing
9  at 27:24 – 28:6.) The defense does not dispute the importance of accuracy in self-
10  defense shootings. (Graham testimony, Tx of 10/19/20 Hearing at 134:15-18: "if
11  you're firing a weapon for self-defense, accuracy would be ideal.")

12   48.   Ergonomics is important to accuracy. (Kapelsohn testimony, Tx of
13  10/19/20 Hearing at 30:17 – 31:5.) In addition, good ergonomics assists the ability of
14  a civilian to train more effectively. (Id., at 31:6-10.)

15   49.   Pistol grips are a prohibited feature under Pen. Code § 30515(a)(1)(A). A
16  pistol grip is a grip "that protrudes conspicuously beneath the action of the weapon."
17  (Id.) Pistol grips are the most common of the prohibited features on just about all
18  modern semiautomatic arms. (Curcuruto testimony, Tx of 10/19/20 Hearing at 65:2-6;
19  Graham testimony, Tx of 10/19/20 Hearing at 129:17-12; Decl of Blake Graham, Def.
20  Exhibit D, at ¶ 28 ("In my experience, this feature is the most prevalent feature of
21  assault rifles prohibited under the AWCA."). Pistol grips enhance the ergonomics of
22  the weapon. (Decl. of Blake Graham, Def. Exhibit D, ¶ 28.) Pistol grips are therefore
23  important to good ergonomics, particularly on a straight line design rifle such as the
24  AR-15. (Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 28; Kapelsohn testimony, Tx of
25  10/19/20 hearing at 32:23 – 33:2.) This enhances the firearm's accuracy. (Id; Decl. of
26  Blake Graham, Def. Exhibit D, ¶ 28 ("A shooter using an assault rifle without a pistol
27  grip may shoot less accurately with repeated – and especially rapid – shots if the
28  shooter's trigger hand is in an awkward position for a significant amount of time.")

1   50.   Pistol grips have appeared on long guns dating back to at least the 1700s.

2   (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 17; Exhs. 002-22 to 002-24.)

3   51.   Thumbhole stocks are a prohibited feature under Pen. Code §§

4   30515(a)(1)(B) (on rifles) and 30515(a)(6)(B) (on shotguns). Like pistol grips,

5   thumbhole stocks allow the shooter to gain a comfortable grip on the firearm, and can

6   facilitate accurate shooting. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29.) By

7   prohibiting both pistol grip stocks and thumbhole stocks, section 30515(a)(1)(B)

8   relegates such firearms to be equipped in a manner that is less comfortable, less

9   accurate, and less safe. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29.)

10   52.   Thumbhole stocks have been on rifles for many years. (Kapelsohn Decl.,

11   Plaintiffs' Exh. 001, ¶ 29.) Rifles featuring thumbhole stocks have been featured on

12   certain Olympic rifles, including several models dating to the 1950s, and which is a

13   prominent shooting sports feature. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 19, Exh.

14   002-27; Hlebinsky testimony, Tx of 10/19/20 Hearing at 54:20-23.)

15   53.   Folding or telescoping stocks are features prohibited under Pen. Code §

16   30515(a)(1)(C). On an AR-15 rifle, a telescoping stock, prohibited by Pen. Code §

17   30515(a)(1)(C), is typically an adjustable buttstock capable of between three and six

18   different positions of adjustment, thereby changing the length. (Kapelsohn Decl.,

19   Plaintiffs' Exhibit 001, at ¶ 31; Kapelsohn testimony, Tx of 10/19/20 Hearing at

20   28:10-23.) This enables the rifle stock to be properly adjusted to fit the user.

21   (Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 31.) This is particularly beneficial to

22   persons of smaller stature, or women. (Kapelsohn testimony, Tx of 10/19/20 Hearing

23   at 28:24 – 29:1; Youngman testimony, Tx of 10/19/20 Hearing at 88:13-20.) In

24   addition, the ability to change the firearm length is useful for people who need to wear

25   heavier clothing, or body armor. (Kapelsohn testimony, Tx of 10/19/20 Hearing at

26   29:2-10.) Plaintiff Hauffen, a firearms trainer, has indicated that the telescoping stock

27   is preferred, among other ergonomic features, and that she prefers to train women or

28   younger shooters with this feature. (Hauffen Decl., Plaintiffs' Exh. 014, ¶ 8.)

54.     A folding stock, though it makes the firearm more portable, does not turn a semiautomatic rifle into a common instrument of crime, since it does not make a rifle easily concealable for most criminal activities. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 30.) As such, most crimes are committed by handguns. (Id.) Even without a folding stock, an AR-15 firearm is easily separated into two halves, an upper and a lower receiver, which can be separated by pulling out two pins, and which does not take any specialized training. (Graham testimony, Tx of 10/19/20 Hearing at 143:9 – 144:13; 146:11-18.) Without specialized skill or training, therefore, a person can take apart an AR-15, and make it concealable, in a matter of seconds. (Id.)

55.     Folding or telescoping stocks have been on firearms dating back to the 1700s. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 20.) The flexibility of stock size became important in the civilian market where comfort and having firearms suited for the individual became feasible. (Id.; Exs. 002-28 to 002-31.)

56.     A "grenade launcher or [a] flare launcher" are features prohibited on rifles under Pen. Code § 30515(1)(D). Grenade launchers on rifles are not numerically common, but that is largely a function of grenades being separately prohibited as "destructive devices" and regulated by federal law. Because the law prohibiting grenades is already addressed in the law, California's law prohibiting grenade launchers is largely superfluous. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32.) Grenade launchers or flare launchers, also known as hand mortars, date to the 1600s and 1700s. Flare guns were in use by the 1800s. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 21.) Flare launchers, however, may have some use in that there is a legitimate safety use for them for signaling. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32.) The State has presented no evidence that grenade launchers or flare launchers, attached to a rifle, have ever been used in the commission of a crime.

57.     A flash suppressor is a device that is prohibited on rifles under Penal Code § 30515(a)(1)(E). A flash suppressor is a device fitted on the end of a muzzle which diverts the muzzle flash through several slots or holes, most commonly

1   arranged around the axis of the bore. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33.)

2   The most common type of flash suppressor on AR-15 rifles is the "birdcage" type of

3   device. (Id., Exh. 001-14.) The primary advantage of a flash suppressor is to reduce

4   muzzle flash so as not to temporarily blind a shooter who is shooting in a dark

5   environment. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33.) The use of a rifle without

6   a flash suppressor under low light circumstances is likely to temporarily blind the

7   user, or impair the user's vision, placing a law-abiding user at a disadvantage to a

8   criminal attacker. (Id.; Kapelsohn Depo. at 124:25 – 125:8 ("I have fired ARs that

9   don't have a flash suppressor, and throw out a God awful flame and muzzle blast as a

10  result.")).

11      58.   Another advantage of flash suppressors is that they protect the muzzle of

12  a rifle from dirt, sand or mud which could dangerously plug the muzzle were it to

13  touch the ground outdoors. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33.)

14      59.   The State specifically defines a "flash suppressor" as "any device

15  attached to the end of the barrel, that is designed, intended, or functions to perceptibly

16  reduce or redirect muzzle flash from the shooter's field of vision." 11 Cal. Code Regs.

17  § 5471(r). A flash suppressor is not, by this definition, a device that is intended to

18  conceal a shooter's position.

19      60.   Flash suppressors have appeared on firearms since the early 20th

20  Century, and have appeared on AR platform firearms since they were invented in the

21  1950s. (Hlebinsky Decl., Plaintiffs' Exhibit 002, ¶ 23; Ex. 002-32; Plaintiffs' Exh.

22  001-14.)

23      61.   A forward pistol grip is prohibited on rifles under Penal Code §

24  30515(a)(1)(F). The State further defines "forward pistol grip" as "a grip that allows

25  for a pistol style grasp forward of the trigger." 11 Cal. Code Regs. § 5471(t). By its

26  very definition, therefore, a forward pistol grip is designed to enhance control of the

27  firearm. Forward pistol grips on rifles, also called vertical forends, are popular among

28  some shooters in allowing them to control the rifle better for more accurate shooting.

(Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 34.) Forward pistol grips may also serve as a "monopod" to assist in stabilizing the rifle for more precision shooting in the prone position. (Id.)

62.   Forward pistol grips are found on firearms dating back at least to the 1860s. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 18; Exh. 002-25.)

63.   Penal Code § 30515(a)(3) provides that "[a] semiautomatic, centerfire rifle that has an overall length of less than 30 inches" is prohibited as an assault weapon. The federal limit on the length of a rifle is 26 inches. (Kapelsohn testimony, Tx of 10/19/20 Hearing at 33:9-17.) 26 U.S.C. § 2845(a)(4) (defining "firearm" for purposes of compliance with the National Firearms Act to include a weapon made from a rifle that has an overall length of less than 26 inches, or a barrel of less than 16 inches in length).

64.   Rifles that have shorter overall lengths are more advantageous to the user, particularly in close quarters situation, such as the defense of a home, because it enables the user to be more maneuverable moving through doorways and around corners. (Kapelsohn testimony, Tx of 10/19/20 Hearing at 33:18 – 34:5; Graham testimony, Tx of 10/19/20 Hearing at 132:13 – 134:6.)

65.   The idea of a "carbine," which is a shorter rifle, has long been in existence, and typically refers to a rifle with a barrel less than 20 inches. (Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 22.) Rifles with shorter barrel lengths also have the added advantage of having less weight, which would be important from a defensive perspective. (Kapelsohn testimony, Tx of 10/19/20 Hearing at 39:14 – 40:4.)

66.   Firearms characterized as assault weapons based upon the § 30515(a)(1) characteristics are numerically common, and the features are commonly used for lawful purposes, including self-defense.

67.   The State's own evidence pertaining to assault weapon registration bears out the commonality of these types of firearms, even in a restricted jurisdiction such as California. Under the 1989 AWCA, 56,626 "assault weapons" were registered in

California. Subsequent additions led to another 91,211 assault weapons registered in California during prior registration periods. (Davis Decl., Plaintiffs' Exh. 008, ¶¶ 6-7.) In 2009, a decade before enactment of SB 880 and AB 1135 in 2016, there were already approximately 153,118 registered assault weapons in California. (Id.)

68.     Prior to the assault weapon registration requirement in 2018, in connection with a 2017 budget proposal to the Legislature to accommodate online registrations, the California Department of Justice, Bureau of Firearms, estimated that "1-1.5 million assault weapons will be registered by approximately 250,000 different owners" within the State. (Plaintiffs' Exh. 024.)

69.     According to the State, currently, there are 200,039 assault weapons currently registered with the California Department of Justice, of which approximately 180,142 are rifles, 16,419 are pistols, and 3,478 are shotguns. (Glover Decl., Def. Exh. CZ, ¶ 6.) Excluding assault weapons registered to peace officers, there are 185,569 assault weapons currently registered, of which 165,804 are rifles, 16,306 are pistols and 3,459 are shotguns. (Id., ¶ 7.)

70.     Penal Code § 30515(a)(4) includes in its definition of an "assault weapon" as "A semiautomatic pistol that does not have a fixed magazine but has any one of the following: [¶] (A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer [¶] (B) A second handgrip [¶] (C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel [¶] (D) The capacity to accept a detachable magazine at some location outside of the pistol grip."

71.     The same rationale that applies to the utility of pistol grips, vertical foregrips and flash suppressors as they are found on rifles, apply equally to those features that appear on pistols. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 37.)

72.     The purpose of a barrel shroud (§ 30515(a)(4)(C)) is to protect the user's hand from touching the barrel and becoming burned. (Kapelsohn Depo. at 169:5-21.)

73.     Threaded barrels on pistols are common. (Ostini Decl., Plaintiffs' Exh. 005, ¶ 10; Exh. 005-1.) In addition to being able to accept flash suppressors, threaded barrels can allow a user to attach compensators or muzzle brakes, which are devices that are not prohibited on pistols, and which are in wide use by competition shooters. (Kapelsohn testimony, Tx of 10/19/20 Hearing at 40:16 – 41:5.)

74.     Plaintiff Hauffen, a firearms trainer in San Diego, would like to replace the standard barrel on her Sig P239 pistol with a threaded barrel, which would allow her either to attach a flash suppressor or a muzzle brake to the firearm, assisting her vision, accuracy and control. (Hauffen Decl., Plaintiffs' Exh. 014, ¶ 10.)

75.     AR-15 pistols, which also generally fire the .223 round, are also suitable for self defense, because of their accuracy, light weight and maneuverability in close quarters. (Kapelsohn testimony, Tx of 10/19/20 hearing at 42:22 – 44:6.) AR-15 pistols would be prohibited under § 30515(a)(4)(D) because they generally accept detachable magazines outside of the pistol grip.

76.     The Court asked the parties to supply information pertaining to the commonality of assault weapon pistols and assault weapon shotguns. (Tx of 10/22/20 Hearing at 37:14 – 38:10.)

77.     According to the State's evidence pertaining solely to registered assault weapons, there are currently 16,419 pistols registered as assault weapons, and 3,478 shotguns registered as assault weapons. (Glover Decl., Def. Exh. CZ, ¶ 6.)

78.     Plaintiffs' witness Joseph Ostini surveyed the websites and catalog information from 73 different firearm manufacturers in the United States and found that of the 61 pistol manufacturers, there are at least 356 different models of firearms offered for sale defined as an "assault weapon" pistol under § 30515. (Ostini Decl., Plaintiffs' Exh. 005), ¶¶ 4-12.) Some manufacturers, such as CMMG, offer 38 different models of California-prohibited "assault pistols." Some of these manufacturers, such as Ruger, Sig Sauer, Springfield Armory, and Beretta,— each of which offer several models of pistols considered by California to be "assault

1  weapons"—are widely held as some of the largest firearm manufacturers in the United

2  States. (Id., Exh. 005-1.)

3      79.    Ruger, and other manufacturers, sell threaded pistol barrels for their

4  handguns. (Ostini Decl., Plaintiffs' Exh. 005, ¶ 13; Exh 005-3.)

5      80.    Plaintiffs also offered firearm data from manufacturers. According to

6  Nathan Lewis Siegal, Ruger's Associate General Counsel for ATF Compliance,

7  "Ruger's records reveal that the Company has manufactured and domestically

8  distributed semiautomatic pistol models that accept detachable magazines and have at

9  least one feature listed" under Penal Code section 30515(a)(4) "since at least 2011."

10  (Siegal Decl., Plaintiffs' Exh. 006, ¶ 4.) Ruger domestically distributed for the civilian

11  market at least 283,579 semiautomatic pistols that accept a detachable magazine and

12  have at least one characteristic generally banned by section 30515 for the period

13  between January 1, 2017 and October 26, 2020. (Id., ¶ 6.)

14      81.    Penal Code § 30515(a)(6)-(8) includes in its definition of an "assault

15  weapon" as: "(6) A semiautomatic shotgun that has both of the following: [¶] (A) A

16  folding or telescoping stock [¶] (B) A pistol grip that protrudes conspicuously beneath

17  the action of the weapon, thumbhole stock, or vertical handgrip. [¶] (7) A

18  semiautomatic shotgun that has the ability to accept a detachable magazine.

19  (8) Any shotgun with a revolving cylinder."

20      82.    The same rationale that applies to the utility of pistol grips, and

21  telescoping stocks as they are found on rifles, apply equally to those features that

22  appear on shotguns. (Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 31.) Furthermore, a

23  shotguns with pistol grips, collapsible stocks and detachable magazines would make

24  excellent firearms for home defense. (Kapelsohn testimony, Tx of 10/19/20 38:24 –

25  39:6.) In fact, some shotguns use telescoping buttstocks that absorb recoil, like a

26  shock absorber, which is particularly useful to dampen the heavy recoil of a shotgun.

27  (Id. at 44:8-23; Kapelsohn Depo. at 195:8 – 198:7; 199:8 – 200:3.)

28      83.    Following the evidentiary hearing, Plaintiffs offered evidence regarding

1   the commonality of shotgun features which would make them "assault weapons"

2   under Penal Code § 30515(a)(6). First, as to his survey, Plaintiffs' witness Ostini

3   found that popular shotgun choices include the AK47/Kalashnikov action shotguns

4   like the Lynx 12 or Kalashnikov USA KS-12 Shotgun." (Ostini Decl., Plaintiffs' Exh.

5   005, ¶ 13, Ex. 005-17.) Of the 96 different "tactical shotgun" models offered on

6   Atlantic Firearms' website, for example, 56 of those models would be classified as

7   "assault weapon" shotguns under Penal Code section 30515.

8       84.    Plaintiffs also offered industry data pertaining to semiautomatic

9   shotguns, using distribution information pertaining to the Benelli M1014, a popular

10  semiautomatic shotgun which is popular in the United States. In California, it is

11  prohibited for sale to citizens as it is considered to be an assault weapon because of

12  the existence of both a pistol grip and a telescoping stock. (Plaintiffs' Exhibit 007-1.)

13  According to Plaintiffs' witness Kenneth Brown, looking the distribution data for

14  various models of this shotgun, from 2016 to 2020 there were several thousands of

15  this particular model of shotgun (containing the California-prohibited features)

16  distributed/sold in his western region alone. (Brown Decl., Plaintiffs' Exh. 007, ¶¶ 16-

17  19.)

18      85.    Plaintiffs have shown that pistols and shotguns that would be classified

19  as "assault weapons" under Pen. Code § 30515(a)(4), (6), (7) and (8) are common in

20  the United States.

21      86.    Penal Code § 30515(a)(2) also defines as an assault weapon "A

22  semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept

23  more than 10 rounds." Likewise, section 30515(a)(5) defines as an assault weapon "A

24  semiautomatic pistol with a fixed magazine that has the capacity to accept more than

25  10 rounds."

26      87.    A fixed magazine is "an ammunition feeding device contained in, or

27  permanently attached to, a firearm in such a manner that the device cannot be

28  removed without disassembly of the firearm action." Pen. Code § 30515(b). Once a

1  firearm with a fixed magazine has expended its ammunition, it cannot be reloaded

2  without disassembly of the firearm action.

3      88.    This Court has already addressed the legality of laws which prohibit the

4  possession of "large capacity magazines," as that term is defined by Pen. Code §

5  16740. See, *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*,

6  970 F.3d 1133 (9th Cir. 2020). The State cannot otherwise prohibit the possession of

7  large capacity magazines by calling firearms "assault weapons" because they are

8  attached to them.

9      89.    The State has presented no evidence of any crimes being committed with

10  a rifle or pistol which contained a fixed magazine with the ability to accept more than

11  ten rounds of ammunition.

12      90.    The State has presented no evidence of any mass shootings being

13  committed with a rifle or pistol which contained a fixed magazine with the ability to

14  accept more than ten rounds of ammunition. (Depo. of Lucy Allen, p. 179:4-24.)

15      91.    "[…] *Miller* and *Heller* recognized that militia members traditionally

16  reported for duty carrying "the sorts of lawful weapons that they possessed at home,"

17  and that the Second Amendment therefore protects such weapons as a class, regardless

18  of any particular weapon's suitability for military use." *Caetano*, 136 S.Ct. at 1032

19  (Alito, J., concurring) (citing *Heller*, 554 U.S. at 627). "Indeed, *Heller* acknowledged

20  that advancements in military technology might render many commonly owned

21  weapons ineffective in warfare. […] But such 'modern developments ... cannot

22  change our interpretation of the right.'" *Caetano*, 136 S.Ct. at 1032.

23      92.    A "featureless firearm" is a semiautomatic firearm (rifle, pistol, or

24  shotgun) lacking the characteristics associated with that weapon, as listed in Penal

25  Code section 30515. 11 Cal. Code Regs. § 5471(*o*).

26      93.    The very qualities that make the § 30515(a)(1) characteristics

27  advantageous for purposes of self-defense would tend to make rifles that lack those

28  characteristics less advantageous, such as reduced ergonomics and accuracy.

94.    A Ruger Mini-14 ranch rifle, such as the first kind depicted in Defense Exhibit D, ¶ 45, is legal to purchase and own in California because it is featureless. (Graham Decl., Def. Exh. D, ¶ 45; Graham testimony, Tx of 10/19/20 Hearing at 137:18 – 140:9 ("those are available in many gun stores up and down California."))

95.    AR-type firearms may also be made "featureless," in that some of the key components of a standard AR-15, such as the pistol grip, telescoping stock, or flash suppressor, may be removed and replaced by other devices. (Kraut Del., Plaintiffs' Exh. 011, ¶¶ 5-6.) On video, Plaintiff's witness Adam Kraut demonstrated the use of a "featureless" AR-15 rifle by shooting the same rifle in two different strings of fire, one in the standard configuration, and one in the "featureless" condition. (Id.; Kraut testimony, Tx of 10/22/20 Hearing at 23:11 – 24:7.) The purpose of the video was to demonstrate that in either configuration it was possible to shoot a man-sized target at 25 yards in rapid succession using either a California featureless rifle or a standard configuration AR-15. (Id. at 24:20-25.)

96.    To a criminal, therefore, or to someone who is intent upon committing crimes, the existence of the prohibited features may not make any difference. A person can commit a crime with a weapon just as easily without a pistol grip. (Kapelsohn testimony, Tx of 10/19/20 Hearing at 46:8-10.) To a law-abiding and responsible citizen, however, features that enhance a firearm's accuracy or comfort are vitally important, both for the effectiveness of the weapon, and the ability of the citizen to train with it.

97.    Because California assault weapon ban is largely based on the characteristics that are attached to the firearm, nothing prevents a determined individual from purchasing a featureless rifle, purchasing one or more of these banned characteristics (e.g., pistol grip, collapsible stock, non-fixed magazine release, etc.), and then unlawfully converting the firearm into an illegal configuration to commit a crime. This is similar to what was done in the San Bernardino terrorist attack in 2015, when the shooters converted compliant rifles into non-compliant rifles. (Lott Decl.,

Plaintiffs' Exhibit 010, ¶ 12).

98.   Without a pistol grip, a featureless firearm is less ergonomic and less accurate. A featureless AR-15 rifle which lacks a standard pistol grip is not as ergonomic, and is a poor design. (Kapelsohn Depo., at 124:3-18.)

99.   Plaintiff Wendy Hauffen owns a featureless firearm, which she accomplished by removing the features prohibited by § 30515(a)(1). (Hauffen Decl., Plaintiffs' Exh. 014, ¶ 5.) Plaintiff Hauffen would prefer to have standard AR-15 with ergonomic features such as a pistol grip or a forward vertical grip to assist in controlling the firearm. (Id., ¶ 8.) In addition, she would prefer to use and train other women shooters with a telescoping stock, which can accommodate smaller shooters. (Id.)

100.   Another drawback to the featureless AR-15 rifle is that the lack of a pistol grip makes it less safe when it comes to clearing malfunctions. On an AR-15 rifle, the process for clearing a malfunction or ammunition jam is hindered by one's inability to wrap their hand around a pistol grip because one does not maintain the same degree of control when performing the malfunction clearance procedures. (Kapelsohn Depo. at 188:11 – 194:19; Youngman Depo. [excerpts forthcoming].)

101.   For the same reasons that show that the prohibited characteristics of § 30515(a)(1) are common, preferred, and are useful for lawful purposes such as self-defense, the State has not shown that ordinary citizens must resort to "featureless" versions of AR-15 rifles that lack those characteristics.

**The Arms Banned By California as "Assault Weapons" Are Not More Lethal**

102.   The State has not demonstrated that assault weapons bans are justified because the features prohibited by Pen. Code § 30515(a) make the firearm more lethal.

103.   Contrary to what the State argues and implies (see Decl. of Blake Graham, Def. Exhibit D, at ¶ 22), the ammunition that is fired from "assault weapons"

bearing the prohibited § 30515(a) characteristics is not inherently more "lethal" than those fired from non-assault weapons.

104.    As one of the experts in the field of wound ballistics, Dr. Vincent J.M. DiMaio stated in his influential book *Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques*, stated:

> One of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895).

(Margulies Decl., Plaintiffs' Exh. 012, ¶ 11; Exhibit 012-2.)

105.    Defendants concede that wounds cannot be distinguished simply by the type of weapon that fired them. (Colwell testimony, Tx of 10/22/20 Hearing at 29:20 – 30:14.) A wound from a .223/5.56 round fired from a California-defined "assault weapon" bearing the features or characteristics found at § 30515(a) would not present a greater profile from a non-assault weapon, using the same round, and using the same barrel length. (Margulies Decl., Plaintiffs' Exh. 014, ¶ 14.) Defendants also concede that shotgun wounds at close range are, generally speaking, more devastating than rifle rounds. (Id. at 31:20 – 33:16.)

106.    The severity of the wound is determined, to a great degree, by the amount of kinetic energy. The intermediate cartridges commonly used in "assault weapons" (such as the .223/5.56 caliber, or the 7.62 x 39mm cartridges) contain far less kinetic energy than traditional hunting cartridges such as the .308 Winchester. (Margulies Decl., ¶¶ 10-11; Ex. 11-2.)

107.    Body armor worn by law enforcement is generally intended to protect from handgun bullets, and not rifle bullets. (Margulies Decl., Plaintiffs' Exh. 012, ¶ 13; Exh. 012-2, p. 007; Youngman testimony, Tx of 10/19/20 Hearing at 94:4-15.) Any rifle rounds, including the intermediate cartridges of .223/5.56 or 7.62x39mm, will penetrate body armor typically worn by law enforcement unless the body armor is

1   specifically rated to withstand it. (Id.; Margulies Decl., Plaintiffs' Exh. 012, ¶ 13.)

2       108.   The State's stated concern is not merely with rapid fire, but the ability of

3   a shooter to fire rapidly and maintain accuracy. (Tx of 10/19/20 Hearing at 187:18 –

4   188:2.) But the answer is not to say that firearms should be less accurate. That

5   penalizes the law-abiding citizen from denying him or her the ability to use accurate

6   firearms, where accountability for each shot is of the utmost concern. (Kapelsohn

7   testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6.) The State does not claim that

8   prohibiting the specified features of section 30515(a)(1) prevents rapid fire, only that

9   it prevents accurate rapid fire. With training, a shooter can pull the trigger of any

10  semiautomatic pistol or rifle of five to seven rounds per second. (Kapelsohn

11  testimony, Tx of 10/19/20 Hearing at 23:4-22.)

12      109.   Plaintiffs were able to demonstrate that even with a featureless version of

13  an AR-15 rifle, it was easy to shoot a man-sized target at 25 yards in rapid succession.

14  (Kraut Decl., Plaintiffs' Exh. 11; Kraut testimony, Tx of 10/22/20 Hearing at 23:11 –

15  24:7; 24:20-25.)

16      110.   Semiautomatic firearms with the regulated characteristics are not more

17  deadly in the hands of a criminal than a firearm without those characteristics. Many

18  notable crimes and mass shootings have been committed by criminals with

19  semiautomatic firearms that did not have the regulated characteristics. (Kapelsohn

20  Decl., Plaintiffs' Exh. 001, ¶ 34.) For example, the 2007 shooting at Virginia Tech, in

21  which 32 victims were killed, and 17 others injured, the shooter used handguns which

22  are legal to own and purchase in California. (Depo. of Lucy Allen, p. 219:8 – 220:13;

23  Def. Exh. A, Appendix C, line 80.)

24

25      **Assault Weapons Bans Have No Discernible Effect on Crime**

26      111.   Generally, firearm bans have little effect on preventing criminals from

27  obtaining guns. (Lott Decl., Plaintiffs' Exhibit 010, ¶ 13.)

28      112.   In fact, research shows that all places that have banned guns (either all

firearms or all handguns) has seen murder rates go up. (Lott Decl., Plaintiffs' Exhibit 010, ¶ 13.)

113.   There is no evidence that "assault weapons" bans had any meaningful effect on reducing gun homicides and no discernable crime reduction impact. Several studies have shown no discernable crime-reduction impact. (Lott Decl., Plaintiffs' Exh. 010, ¶ 63.)

### The Arms Banned By California as "Assault Weapons" Are Not Used in Most Mass Shootings

114.   All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two. (Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 010-2 to 010-19.)

115.   Assault Weapons are not used in a majority of mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. (Allen Decl., Def. Exh. A, ¶ 30.) Thus, it is fair to conclude that most mass shootings that the defense analyzed did not involve the use of assault weapons.

116.   Looking at Ms. Allen's analysis, it appears that the most prevalent firearm that is found at the scene of a mass shooting is a handgun. (Allen Decl., Def. Exh. A, Appendix C.)

117.   Regarding the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, there is no demonstrable correlation between the two. (Lott Decl., Plaintiffs' Exh. 010, ¶¶ 6-65;, Exhs. 010-2 to 010-19.)

118.   Over time, the rate of mass shootings or mass public shootings may rise or fall for many reasons. But regardless of any other factors, if the federal assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have decreased as a direct result of the ban. (Lott Decl., Plaintiffs'

1   Exh. 010, ¶ 46.)

2       119.   Using data from the Book Rampage Nation, and data collected by Mother

3   Jones, the share of attacks committed with assault weapons continued to drop even

4   after the federal assault weapons ban expired. The ten years after the end of the assault

5   weapons ban (September 2004 to August 2014) saw the lowest share of shootings

6   involving assault weapons. (Lott Decl., Plaintiffs' Exh. 010, ¶ 53.)

7

8   **Conclusions of Law**

9       120.   Firearms with the prohibited § 30515(a) characteristics are in common

10  use, for lawful purposes, and are protected under *Heller*.

11      121.   The Supreme Court's test for commonality is a nationwide inquiry. The

12  Second Amendment does not mean different things in different parts of the country.

13  The Supreme Court's *Heller*'s analysis asks simply whether the arms are "both

14  dangerous *and* unusual," *Caetano*, 136 S.Ct. at 1031 (2016) (Alito, J., joined by

15  Thomas, J., concurring) (italics original), and if they are not both, it determines if the

16  category of arms are in common use for lawful purposes. *Duncan v. Becerra*, 366

17  F.Supp.3d at 1142. The text of the Second Amendment, as it is informed by history

18  and tradition, all point in the same direction because "the pertinent Second

19  Amendment inquiry is whether [the banned weapons] are commonly possessed by

20  law-abiding citizens for lawful purposes *today*." *Caetano*, at 1032 (italics original).

21      122.   The arms banned as "assault weapons" under the AWCA are not both

22  dangerous and unusual, as the Supreme Court defined in *Heller*. To the contrary, they

23  are common in all respects: 1) They are common functionally, as they are all

24  semiautomatic in their operation; 2) they are common characteristically, as they are all

25  commercially popular types of arms with various common firearm characteristics; and

26  3) they are common jurisdictionally, available in the majority of the states. They are

27  common numerically, in that they are owned by citizens by the millions. All of the

28  semiautomatic firearms prohibited by the characteristics found in Pen. Code §

30515(a) meet the *Heller* test and are constitutionally protected.

123.   Beyond the categorical, common-use analysis, the AWCA also and separately fails the Ninth Circuit's two-part test applying tiered scrutiny as well. If an interest-balancing test is required, the challenged provisions still fail any level of "heightened scrutiny" as required in Second Amendment cases by *Heller*.

124.   Under this approach, the Ninth Circuit applies a two-part test to Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). This "inquiry '(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'" *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014).The level of scrutiny to be applied depends on the closeness to the core and "the severity of the law's burden," on the Second Amendment. *Chovan*, 735 F.3d at 1138.

125.   Semiautomatic firearms with common characteristics proscribed by the AWCA are in common use for lawful purposes and thus protected under the fundamental, individual right to keep and bear arms. The State's ban thus "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for lawful purposes, including for possession in the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Furthermore, the state bans such firearms for reasons that conflict with the very essence of the Second Amendment, essentially claiming that more accurate, effective, and safe firearms can be banned because they are too good at the central purpose of firearms—projecting force when needed—and thus benefit those who would misuse such firearms just as well as those who use them lawfully.

126.   The AWCA imposes a substantial burden on Second Amendment rights, and thus deserves strict scrutiny "to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S.Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari); *Pena v. Lindley*, 898 F.3d 969, 977

1   (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second

2   Amendment right and severely burdens that right'").

3       127.   The AWCA strikes at the "core" of the Second Amendment—and to be

4   sure, the core of the Second Amendment is defined by its text, namely, the "right to

5   keep and bear arms" which "shall not be infringed"—because its effect is to prohibit

6   an entire category of semiautomatic firearms—common pistols, shotguns, and rifles—

7   that are overwhelmingly kept and used for lawful purposes throughout the United

8   States. The State prohibits these categories of firearms not merely in spite of their

9   being useful in self-defense, but apparently, because firearms with those

10  characteristics are effective in the first place. The State's apparent rationale that "we

11  don't want people to be able to shoot accurately, rapidly," is not and cannot be a

12  legitimate state interest at all, let alone a compelling one. A blanket prohibition on

13  common firearms that are "too accurate," or do their jobs "too effectively" by

14  allowing citizens to defend their lives "too well," severely infringes upon Second

15  Amendment rights and cannot survive strict scrutiny.

16      128.   Any claimed governmental interest in reducing the quality and

17  effectiveness of firearms is on its face illegitimate and contrary to the balance already

18  struck by the framers and ratifiers of the Second Amendment. Such a purported

19  interest requires the same categorical or strict scrutiny analysis that content- or

20  viewpoint-based restrictions are given under the First Amendment. In *Duncan v.*

21  *Becerra*, 970 F.3d 1133 (9th Cir. 2020), the Ninth Circuit, in affirming this Court's

22  judgment, held that, because the large-capacity magazine ban, Penal Code § 32310,

23  "substantially burdens core Second Amendment rights," it was subject to review under

24  strict scrutiny. 970 F.3d at 1152.

25      129.   Even under intermediate scrutiny, the State has not demonstrated a

26  "reasonable fit" between its interests and the law. Assuming the importance of the

27  State's generalized claimed interests in public safety and reducing "gun violence,"

28  those interests must "rely on . . . hard facts and reasonable inferences drawn from

convincing analysis amounting to substantial evidence based on relevant and accurate data sets." *Duncan*, 366 F.Supp.3d at 1161. If the State's claimed interest is instead a more specific desire to prevent or mitigate so-called "mass shootings," *Rupp v. Becerra*, 401 F.Supp.3d 978, 991 (C.D. Cal. 2019), then it is far from clear that an interest directed at such rare events is significant and/or important. Nevertheless, even assuming the importance of the interest at either level of generality, the AWCA's sweeping ban on common firearms with common characteristics is not a reasonable fit for achieving these interests.

130. The AWCA's broad ban on common semiautomatic firearms and lawful conduct with them is not a reasonable fit to any legitimate government interest. First, the ban does not "alleviate [the claimed harms] to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

131. Any correlation between different crimes and the weapons used does not establish a reasonable fit for a ban on all such weapons. Thus, notwithstanding the District Court's findings in *Rupp*, that "such weapons are disproportionately used in mass shootings," 401 F.Supp.3d at 993, such findings do not even suggest that a ban would do anything other than divert such criminals to alternative legal or illegal weapons, or would in any way mitigate the problems. In *Heller* itself, it was accurately observed that handguns are involved in the majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29.

132. Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free*

1  *Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567

2  (1969).

3      133.   The AWCA burdens far more protected activity than necessary by

4  imposing a complete ban on an ordinary, law abiding individual's acquisition,

5  purchase, transfer, and use of a common class of arms. Even under intermediate

6  scrutiny, "a reasonable fit requires tailoring, and a broad prophylactic ban on

7  acquisition or possession of all" common semiautomatics with common

8  characteristics "for all ordinary, law-biding, responsible citizens is not tailored at all."

9  *Duncan*, 366 F.Supp.3d at 1180; see also *Turner Broadcasting System, Inc. v. FCC*,

10  512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part and dissenting in part)

11  ("A regulation is not 'narrowly tailored'—even under the more lenient [standard

12  applicable to content neutral restrictions]—where ... a substantial portion of the

13  burden on speech does not serve to advance [the State's content-neutral] goals....

14  Broad prophylactic rules in the area of free expression are suspect. Precision of

15  regulation must be the touchstone....") (brackets in original) (citations and quotations

16  omitted). "To meet the narrow tailoring requirement, … the government must

17  demonstrate that alternative measures that burden substantially less [of the right]

18  would fail to achieve the government's interests, not simply that the chosen route is

19  easier." *McCullen v. Coakley*, 134 S.Ct. 2518, 2524 (2014). By prohibiting even fully

20  background-checked and law-abiding citizens from possessing a common and

21  effective class of firearms, the law imposes considerably more burden than is

22  warranted by the rare instances of criminal violence using such firearms. "The right to

23  self-defense is largely meaningless if it does not include the right to choose the most

24  effective means of defending oneself." *Friedman v. City of Highland Park*, 784 F.3d

25  406, 418 (7th Cir. 2015) (Manion, J., dissenting).

26      134.   The challenged provisions of the AWCA undermines public safety and

27  does not materially advance any legitimate public interest. The State's justification

28  that the self-same characteristics that make the firearms here suitable for lawful self-

1  defense may also make them effective tools for crime if misused, thus necessitating a

2  ban, would undermine the Second Amendment. The very point of protecting arms,

3  and firearms in particular, is that they allow law-abiding people to project force

4  against unjust force at a distance, and thereby defend themselves and others against a

5  violent threat as soon as possible with the least amount of damage to those being

6  protected. Inevitably, all firearms that are at all suitable for self-defense or militia

7  service are comparably dangerous in the hands of a violent criminal. The notion that

8  improvements that make firearms better and safer for lawful use likewise make them

9  comparably better for unlawful use simply leads to the absurdity that firearms may

10 never be improved because the harms ipso facto outweigh the benefits and justify a

11 ban. However, the Second Amendment itself has already balanced the need for and

12 dangers from arms that can effectively project force against another. As "the very

13 product of an interest balancing by the people," the Second Amendment "elevates

14 above all other interests the right of law-abiding, responsible citizens to use arms in

15 defense of hearth and home." *Heller*, 554 U.S. at 634-35. "Constitutional rights are

16 enshrined with the scope they were understood to have when the people adopted them,

17 whether or not future legislatures . . . think that scope too broad." Id.

18      135.   Thus, even under intermediate scrutiny, Defendants' AWCA and

19 regulations fail. The intermediate scrutiny to be applied is the same as, and is drawn

20 from, the First Amendment context. *Jackson*, 746 F.3d at 961 (heightened scrutiny in

21 Second Amendment cases is "guided by First Amendment principles"); *Silvester v.

22 Harris*, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the

23 test for intermediate scrutiny from First Amendment cases"), cert. denied, *Silvester v.

24 Becerra*, 138 S.Ct. 945 (2018). At all times under any form of heightened scrutiny, the

25 government bears the burden of justifying its restrictions. See, e.g., *R.A.V. v. City of

26 St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are

27 presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)

28 (unless conduct "not protected by the Second Amendment at all, the [g]overnment

1    bears the burden of justifying the constitutional validity of the law."); *Tyler v.*

2    *Hillsdale County Sheriff's Dept.*, 837 F.3d 678, 694 (6th Cir. 2016) ("the burden of

3    justification is demanding and it rests entirely on the State.") (citation omitted).

4          136.   The government's burden of justifying its restriction on constitutional

5    rights "is not satisfied by mere speculation or conjecture; rather, a governmental body

6    seeking to sustain a restriction on commercial speech must demonstrate that the harms

7    it recites are real and that its restriction will in fact alleviate them to a material

8    degree." *Edenfield*, 507 U.S. at 770-71 (emphasis added). Restrictions on

9    constitutional rights must be analyzed in their specific context, and "will depend upon

10   the identity of the parties and the precise circumstances of the" protected activity.

11   *Edenfield*, 507 U.S. at 774. Generalized risk does not warrant restrictions as to all

12   persons, and "a preventative rule" aimed at such generic hazards is "justified only in

13   situations 'inherently conducive to'" the specific dangers identified. Id. (quoting

14   *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978)).

15         137.   Under the actual "demanding" standard for intermediate scrutiny, the

16   AWCA fails, as the State does not advance an important governmental objective nor

17   offer any sort of reasonable fit.

18         138.   Plaintiffs have shown that the State's AWCA and regulations, and their

19   enforcement thereof, are unconstitutional. Plaintiffs are entitled to declaratory,

20   permanent injunctive, and other relief as prayed for in their First Amended Complaint.

21

22

23

24

25

26

27

28

1    Dated: January 27, 2020                    **SEILER EPSTEIN LLP**

2

3                                              /s/ George M. Lee
                                               George M. Lee

4
                                               **DILLON LAW GROUP APC**
5

6
                                               /s/ John W. Dillon
7                                              John W. Dillon

8                                              Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28