1  George M. Lee (SBN 172982)
   **SEILER EPSTEIN LLP**
2  275 Battery Street, Suite 1600
3  San Francisco, California 94111
   Phone: (415) 979-0500
4  Fax: (415) 979-0511
5  Email: gml@seilerepstein.com

6
   John W. Dillon (SBN 296788)
7  **GATZKE DILLON & BALLANCE LLP**
8  2762 Gateway Road
   Carlsbad, California 92009
9  Phone: (760) 431-9501
10 Fax: (760) 541-9512
   Email: jdillon@gdandb.com
11

12 *Attorneys for Plaintiffs*

13

14 **UNITED STATES DISTRICT COURT**

15 **SOUTHERN DISTRICT OF CALIFORNIA**

16

| JAMES MILLER, et al., | Case No. 3:19-cv-01537-BEN-JLB |
|---|---|
| Plaintiffs, | Hon. Roger T. Benitez |
| vs. | **DECLARATION OF PROFESSOR DAVID MUSTARD** |
| XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | Hearing Date: February 3, 2021<br>Time: 10:00 a.m.<br>Courtroom 5A<br>Judge: Hon. Roger T. Benitez |
| Defendants. | Trial Date: February 3, 2021 |

Miller v. Becerra
**Plaintiffs' Exhibit**
**033**

# DECLARATION OF PROFESSOR DAVID MUSTARD

I, David Mustard, declare as follows:

I am not a party to the captioned action, am over the age of 18, have personal knowledge of the facts stated herein, and am competent to testify as to the matters stated and the opinions rendered below.

1. I make this declaration in response to declarations filed in this matter on behalf of Professor Dan A. Black, Professor Daniel S. Nagin, and Professor Jens Ludwig pertaining my work with John R. Lott, Jr. on firearms research and issues related to the loss of Dr. Lott's hard drive in 1997.

2. I met Dr. John R. Lott, Jr. while I was a Ph.D. student at the University of Chicago. For my dissertation, I was doing research on crime. John and I co-authored "Crime, Deterrence and the Right-to-Carry Concealed Handguns", which was published in the *Journal of Legal Studies* in Jan. 1997. This paper was not part of my dissertation and John was not a member of my dissertation committee. So after we finished this paper in the fall of 1996, I went on the job market, interviewed for jobs, and worked on my dissertation. I defended my thesis in July 1997, graduated in August 1997, and started a new job at the University of Georgia in September 1997. Starting in late 1996, John extended our research from the *JLS* paper to study broader issues of gun policy. Although we were not co-authoring the research beyond the *JLS* paper, I frequently saw John and had many conversations with him about his ongoing research.

3. Dr. Lott suffered the hard drive crash, which occurred in late June or early July of 1997. I remember the timeframe because I was working intensely to finalize my dissertation and had my thesis defense in July 1997. John said that he lost large amounts of data from our *JLS* paper and data from other projects he was working on for what became *More Guns, Less Crime*.

4. At least some of the lost data were related to a survey of defensive gun uses in the United States. As we worked on the *JLS* paper, John and I wanted to learn more about self-defensive gun use. In the fall of 1996, John initially talked to me about wanting to do a survey on self-defensive gun use. I did not work on the surveys, but John and I discussed the survey periodically in 1997 before his hard drive was incapacitated.

5. After the crash, John asked me to help reconstruct and update the data sets from the *JLS* paper.

6. While I helped compile the data, I could not devote a significant amount of time to that task because I was defending my dissertation, moving, starting a new job, and had some family health issues.

7. Before his computer crashed, John Lott sent the data for our *JLS* paper to Dan Black and Daniel Nagin who wrote "Do Right-to-Carry Laws Deter Violent Crime?", which was published in the *Journal of Legal Studies* in January 1998. In the initial footnote on the first page of the Black-Nagin paper, they state, "We thank John Lott for providing the data, for many helpful conversations, and for comments on previous drafts."

8. Attached hereto as **Exhibit 1** is a true and correct copy of the title page from "Do Right-to-Carry Laws Deter Violent Crime?."

9. After John Lott's hard drive crash in 1997, I remember Lott saying that he asked Black and Nagin to return the data. I do not remember having any conversations directly with Black and Nagin about whether they returned the data to Lott.

10. In the following few years, Jens and I met and talked multiple times at conferences and were on some sessions together. In those years, Jens and I frequently talked about research on firearm ownership and policy, but I do not specifically recall whether Lott sent the *JLS* data to Ludwig.

1  I declare under penalty of perjury that the foregoing is true and correct. Executed
2  within the United States on February 2, 2021.

*[signature: David B. Mustard]*

_____
David B. Mustard
Josiah Meigs Distinguished Professor of Economics
Director of the Bonbright Center for the Study of Regulation

# EXHIBITS
# TABLE OF CONTENTS

| Exhibit | Description | Page(s) |
|---|---|---|
| 1 | "Do Right-to-Carry Laws Deter Violent Crime?" Title page. | 0001 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

# DO RIGHT-TO-CARRY LAWS DETER VIOLENT CRIME?

DAN A. BLACK and DANIEL S. NAGIN*

## ABSTRACT

John R. Lott and David B. Mustard conclude that right-to-carry laws deter violent crime. Our reanalysis of Lott and Mustard's data provides no basis for drawing confident conclusions about the impact of right-to-carry laws on violent crime. We document that their results are highly sensitive to small changes in their model and sample. Without Florida in the sample, there is no detectable impact of right-to-carry laws on the rate of murder and rape, the two crimes that by the calculations of Lott and Mustard account for 80 percent of the social benefit of right-to-carry laws. A more general model based on year-to-year differences yields no evidence of significant impact for any type of violent crime. As a result, inference based on the Lott and Mustard model is inappropriate, and their results cannot be used responsibly to formulate public policy.

## I. INTRODUCTION

**B**y 1992, 18 states had enacted laws creating a presumptive right to carry a concealed handgun.[1] Such laws require that an adult applicant be granted a concealed-weapon permit unless the individual is a felon or has a history of serious mental illness. In a highly publicized article, John R. Lott and David B. Mustard conclude that right-to-carry laws deter violent crimes, increase crimes of stealth, and have no effect on the number of accidental deaths. They argue that rational criminals substitute away from violent crimes and instead engage in property crimes, such as burglary and larceny,

---

* We thank John Lott for providing the data, for many helpful conversations, and for comments on previous drafts. Steven Levitt provided detailed, insightful comments. We also thank Ian Ayres, Susan Black, Al Blumstein, Steve Bronars, Jacqueline Cohen, Philip Cook, Laura Dugan, John Ham, Dan Hamermesh, Thomas Marvel, David McDowell, Jens Ludwig, Greg Pogarsky, Jeffrey Smith, Joel Waldfogel, and seminar participants at the Carnegie Mellon/University of Pittsburgh Applied Microeconomics Workshop, the Bureau of Justice Statistics, and Yale University for comments on earlier versions of the article. The National Consortium on Violence Research at the Heinz School of Carnegie Mellon University provided us with financial support.

[1] John R. Lott and David B. Mustard, Crime, Deterrence, and Right-to-Carry Concealed Handguns, 26 J Leg Stud 1, 12 (1997).

[Journal of Legal Studies, vol. XXVII (January 1998)]
© 1998 by The University of Chicago. All rights reserved. 0047-2530/98/2701-0008$01.50