XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
JOSE A. ZELIDON-ZEPEDA
Deputy Attorney General
State Bar No. 227108
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,**<br><br>Defendants. | 3:19-cv-01537-BEN-JLB<br><br>**DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez<br>Trial Date:  February 3, 2021<br>Action Filed:  August 15, 2019 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ........................................................................ 1

I.    The Roberti-Roos Assault Weapons Control Act ................................ 1

II.   Firearms with Assault-Weapon Configurations Are Dangerous .......... 4

    A.    Centerfire Ammunition ............................................................... 4

    B.    Detachable Magazines ................................................................ 5

    C.    Large-Capacity Magazines ......................................................... 6

    D.    Pistol Grips, Thumbhole Stocks, and Barrel Shrouds ............... 8

    E.    Folding and Telescoping Stocks and Rifles Shorter than 30 Inches in Length ................................................................ 9

    F.    Flash Suppressors ....................................................................... 9

    G.    Threaded Pistol Barrels ............................................................ 10

    H.    Grenade and Flare Launchers ................................................... 11

III.  Assault Weapons Are Unusual ........................................................... 11

    A.    Assault Weapons Are Not Commonly Owned by Law-Abiding Individuals ................................................................ 11

    B.    Assault Weapons Are More Suited for Offensive and Military Use and Are Not Well-Suited for Civilian Self-Defense .................................................................................... 14

IV.   Assault Weapons Are Disproportionally Used in Crime, Mass Shootings, and Against Law Enforcement, Resulting in More Casualties .......................................................................................... 17

V.    Assault-Weapon Restrictions Are Effective in Promoting Public Safety ................................................................................................. 21

CONCLUSIONS OF LAW ................................................................................ 22

I.    Step One:  The AWCA Does Not Burden Conduct Protected Under the Second Amendment ............................................................ 22

    A.    Assault Weapons Are Not Protected Under the Second Amendment Because They Are Dangerous and Unusual and Not in Common Use for Lawful Purposes ........................ 22

    B.    Assault Weapons Are Not Protected Under the Second Amendment Because They Are Like the M-16 and Are Most Useful in Military Service ................................................. 25

    C.    The AWCA Is Presumptively Constitutional Because It Is Similar to Longstanding Firing-Capacity Regulations ............. 25

    D.    Section 30515(a) Does Not Burden Conduct Protected by the Second Amendment Because It Merely Regulates the Use of Certain Firearm Accessories that Are Not Themselves Protected Under the Second Amendment ............ 27

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS
(continued)

**Page**

II.    Step Two: The Challenged Provisions of the AWCA Survive
Constitutional Scrutiny ................................................................... 28

    A.    Intermediate Scrutiny Applies Because Any Burden on a
Second Amendment Right Is Not Severe ................................. 28

    B.    The AWCA Survives Intermediate Scrutiny Because It Is
Reasonably Fitted to Important Government Interests............ 30

    C.    Alternatively, the AWCA Satisfies Strict Scrutiny ................. 33

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.*
    910 F.3d 106 (3d Cir. 2018) .................................................... 26

*Daggett v. Comm'n on Governmental Ethics & Election Practices*
    205 F.3d 445 (1st Cir. 2000) ..................................................... 1

*Duncan v. Becerra*
    970 F.3d 1133 (9th Cir. Aug. 14, 2020)........................................ 23, 26

*Fantasyland Video, Inc. v. Cty. of San Diego*
    505 F.3d 996 (9th Cir. 2007) .................................................... 32

*Friedman v. City of Highland Park*
    68 F. Supp. 3d 895 (N.D. Ill. 2014)............................................. 14

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) .............................................*passim*

*Gallinger v. Becerra*
    898 F.3d 1012 (9th Cir. 2018)..........................................6, 15, 19

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) .........................................*passim*

*Jackson v. City & Cty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014) .................................................... 31

*Kachalsky v. Cty. of Westchester*
    701 F.3d 81 (2d Cir. 2012) ...................................................... 31

*Kasler v. Lockyer*
    2 P.3d 581 (Cal. 2000)............................................................ 2

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017).............................................*passim*

*Korematsu v. United States*
    584 F. Supp. 1406 (N.D. Cal. 1984)............................................. 1

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Maloney v. Singas*
351 F. Supp. 3d 222 (E.D.N.Y. 2018) ................................................................. 24

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ............................................................................... 22, 23

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*
804 F.3d 242 (2d Cir. 2015) ...................................................................... 28

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018) .................................................................. 1, 31

*Rupp v. Becerra*
401 F. Supp. 3d 978 (C.D. Cal. 2019) ........................................................ *passim*

*Rupp v. Becerra*
No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Apr. 1, 2019) ...................................... 27

*S.F. Veteran Police Officers Ass'n v. City & Cty. of San Francisco*
18 F. Supp. 3d 997 (N.D. Cal. 2014) ................................................................ 32

*Silveira v. Lockyer*
312 F.3d 1052 (9th Cir. 2002) ................................................................... 1, 2

*Silvester v. Harris*
843 F.3d 816 (9th Cir. 2016) (Thomas, C.J., concurring) ........................... *passim*

*Staples v. United States*
511 U.S. 600 (1994) ............................................................................... 15, 16

*United States v. Chovan*
735 F.3d 1127 (9th Cir. 2013) ..................................................................... 31

*United States v. Cox*
906 F.3d 1170 (10th Cir. 2018) .............................................................. 27, 30

*United States v. Henry*
688 F.3d 637 (9th Cir. 2012) .................................................................. 23, 24

*United States v. Skoien*
614 F.3d 638 (7th Cir. 2010) ....................................................................... 26

1

2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3

4

*Wilson v. Cook Cty.*
 937 F.3d 1028 (7th Cir. 2019) ............................................................. 28

5

*Worman v. Healey*
 922 F.3d 26 (1st Cir. 2019) ................................................. 24, 28, 29

6

7

**STATUTES**

8

California Code of Regulations Title 11
 § 5471(r) ....................................................................................... 9, 10
 § 5499 .................................................................................................. 2

9

10

11

California Penal Code
 § 12276.5(a)(1) (2007) ..................................................................... 2
 § 12276.5(a)(2) (2007) ..................................................................... 2
 § 30500 ............................................................................................... 1
 § 30505(a) ........................................................................................... 1
 § 30510 ............................................................................................ 1, 3
 § 30515(a) .................................................................................. *passim*
 § 30515(a)(1) ............................................................................. 2, 4, 5
 § 30515(a)(1)(A) ................................................................................ 8
 § 30515(a)(1)(B) ................................................................................ 8
 § 30515(a)(1)(C) ................................................................................ 9
 § 30515(a)(1)(D) .............................................................................. 11
 § 30515(a)(1)(E) ................................................................................ 9
 § 30515(a)(1)(F) ................................................................................ 8
 § 30515(a)(2) ............................................................................. 2, 4, 7
 § 30515(a)(3) ............................................................................. 2, 4, 9
 § 30515(a)(4) ............................................................................... 2, 5
 § 30515(a)(4)(A) .............................................................................. 10
 § 30515(a)(4)(B) ................................................................................ 8
 § 30515(a)(4)(C) ................................................................................ 8
 § 30515(a)(5) ............................................................................... 2, 7
 § 30515(a)(6) ..................................................................................... 3
 § 30515(a)(6)(A) ................................................................................ 9
 § 30515(a)(6)(B) ................................................................................ 8
 § 30515(a)(7) ............................................................................... 3, 5
 § 30515(a)(8) ..................................................................................... 3
 § 30515(b) .......................................................................................... 2

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
## (continued)

**Page**

§ 30515(c)................................................................................................ 3
§ 30515(d)................................................................................................ 3
§ 30520 ................................................................................................... 2
§ 30600(a)............................................................................................ 1, 3
§ 30605(a)............................................................................................ 1, 3

**COURT RULES**

Federal Rules of Evidence
    Rule 201(a) ........................................................................................... 1

Defendants' Post-Trial Proposed Findings of Fact & Conclusions of Law
(3:19-cv-01537-BEN-JLB)

# PROPOSED FINDINGS OF FACT[1]

## I.   THE ROBERTI-ROOS ASSAULT WEAPONS CONTROL ACT

1.   The Roberti-Roos Assault Weapons Control Act (the "AWCA") was original enacted in 1989.  Cal. Penal § 30500.

2.   In enacting the AWCA, the Legislature found that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  Cal. Penal Code § 30505(a).

3.   The AWCA initially defined as assault weapons certain semiautomatic rifles, pistols, and shotguns identified by make and model.  Cal. Penal Code § 30510.

4.   The AWCA rendered it a felony to manufacture, import, or sell any of the listed firearms without a permit.  Cal. Penal Code § 30600(a); *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008).

5.   The AWCA rendered it a misdemeanor or a felony to possess any of the listed firearms without a permit.  Cal. Penal Code § 30605(a).

6.   The AWCA, as originally enacted, included a mechanism for the California Attorney General to seek a judicial declaration in superior court that certain weapons identical to the listed firearms are also deemed assault weapons

---

[1] The proposed findings of fact presented here largely comprise "legislative, as opposed to adjudicative, facts."  *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 455-56 (1st Cir. 2000); *see also Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) ("It is important to note that we are weighing a legislative judgment, not evidence in a criminal trial.  Because legislatures are 'not obligated, when enacting [their] statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review,' we should not conflate legislative findings with 'evidence' in the technical sense." (citation omitted)).  Legislative facts are "facts of which courts take particular notice when interpreting a statute or considering whether [the government] has acted within its constitutional authority."  *Korematsu v. United States*, 584 F. Supp. 1406, 1414 (N.D. Cal. 1984).  Legislative facts "have relevance to legal reasoning and the lawmaking process, whether in the formation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."  Fed. R. Evid. 201(a), Advisory Comm. note.

1

subject to the restrictions of the AWCA.  Former Cal. Penal Code
§ 12276.5(a)(1)-(2) (2007); Cal. Code Regs. tit. 11, § 5499; *Kasler v. Lockyer*,
2 P.3d 581, 587 (Cal. 2000), *abrogated on other grounds by Heller*, 554 U.S. 570.

7.      The California Attorney General's ability to add weapons to the
assault weapons list ended in 2006.  Cal. Penal Code § 30520.

8.      After the Legislature enacted the AWCA, gun manufacturers began to
produce "copycat" weapons to evade the statute's restrictions.  In response, in 2000,
the Legislature enacted Senate Bill 23 to, among other things, add a flexible,
features-based definition of "assault weapons" to the AWCA, which is now
codified at California Penal Code section 30515(a).  *Silveira*, 312 F.3d at 1058 n.5.

9.      Under section 30515(a), a rifle qualifies as an "assault weapon" if it
is (1) a semiautomatic, centerfire rifle that does not have a fixed magazine, but has
any one of the following features:  a pistol grip that protrudes conspicuously
beneath the action of the rifle, a thumbhole stock, a folding or telescoping stock, a
grenade or flare launcher, a flash suppressor, or a forward pistol grip; (2) a
semiautomatic, centerfire rifle that has a fixed large-capacity magazine ("LCM");
or (3) a semiautomatic, centerfire rifle that has an overall length of less than
30 inches.  Cal. Penal Code § 30515(a)(1)-(3).

10.      A "fixed magazine" is "an ammunition feeding device contained in, or
permanently attached to, a firearm in such a manner that the device cannot be
removed without disassembly of the firearm action."  Cal. Penal Code § 30515(b).

11.      Under section 30515(a), a pistol qualifies as an "assault weapon" if it
is (1) a semiautomatic pistol that does not have a fixed magazine, but has one or
more of the following features:  a threaded barrel (capable of accepting a flash
suppressor, a forward handgrip, or a silencer), a second handgrip, a barrel shroud,
or the capacity to accept a detachable magazine outside of the pistol grip; or (2) a
semiautomatic pistol with a fixed LCM.  Cal. Penal Code § 30515(a)(4)-(5).

12.     Under section 30515(a), a shotgun qualifies as an "assault weapon" under section 30515(a) if it is (1) a semiautomatic shotgun that has an adjustable stock and one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip; (2) a semiautomatic shotgun that has the ability to accept a detachable magazine; or (3) a shotgun that has a revolving cylinder.  Cal. Penal Code § 30515(a)(6)-(8).

13.     Firearms identified as "assault weapons" in California Penal Code section 30510 also generally qualify as "assault weapons" under California Penal Code section 30515(a).  Defs.' Ex. AT (Graham *Rupp* Decl.) at 6 n.2 (DEF1629) ("There may be certain assault weapons identified in Penal Code section 30510 that are rimfire or have fixed magazines.  These, however, are extremely rare and I have yet to encounter one in my career.").

14.     The Legislature found "a significant public purpose in exempting from the definition of 'assault weapon' pistols that are designed expressly for use in Olympic target shooting events."  Cal. Penal Code § 30515(c).

15.     The AWCA exempts from the definition of "assault weapon" "[a]ny antique firearm" and certain listed pistols that "are consistent with the significant public purpose" of exempting from the definition of "assault weapon" pistols designed expressly for use in Olympic target shooting events.  Cal. Penal Code § 30515(d).

16.     For over two decades, California has restricted the manufacture, distribution, transportation, importation, sale, lending, and possession of firearms that qualify as "assault weapons" under section 30515(a) of the AWCA.  Cal. Penal Code §§ 30600(a), 30605(a).

17.     Notwithstanding the AWCA, Californians may lawfully acquire an array of semiautomatic weapons for lawful purposes, such as a centerfire semiautomatic rifle without a fixed magazine, provided it is not a prohibited make and model and does not have any of the prohibited features, a semiautomatic,

centerfire rifle with any of the militaristic features and with a fixed magazine of 10 rounds or less, or a rimfire semiautomatic rifle with any of the listed features. *See* Cal. Penal Code § 30515(a)(1)-(3).

18.  Modern sporting rifles, including AR-platform rifles, without prohibited features are available for sale and possession in California for lawful purposes, including self-defense, sports shooting, and hunting. Curcuruto Dep. at 97:12-98:3, 103:10-104:8.

## II. FIREARMS WITH ASSAULT-WEAPON CONFIGURATIONS ARE DANGEROUS

19.  Assault-weapon configurations that qualify a rifle, pistol, or shotgun as an assault weapon under the challenged provisions of the AWCA increase the dangers posed by those firearms.

20.  Each of the prohibited features or configurations in California Penal Code section 30515(a) serves specific, combat-oriented functions, which increase the lethality of firearms and enhance their effectiveness in certain types of crime, particularly mass shootings and violence against law enforcement personnel. Defs.' Ex. Z (Bureau of Alcohol, Tobacco & Firearms, Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (1998) ("ATF Rifle Suitability Report")) at 1 (DEF0759).

### A. Centerfire Ammunition

21.  The capability of firing centerfire ammunition is a threshold requirement for a rifle to qualify as an assault weapon. Cal. Penal Code § 30515(a)(1).

22.  Centerfire ammunition cartridges have a primer in the center of the head of the cartridge, while rimfire ammunition cartridges contain priming compound within the rim of the cartridge case. Defs.' Ex. D (Graham Decl.) ¶ 21 (DEF0201); Kapelsohn Dep. at 28:18-29:9.

23.     Centerfire ammunition is generally more powerful than rimfire ammunition.  Defs.' Ex. D (Graham Decl.) ¶ 22 (DEF0201-02); Kapelsohn Dep. at 29:10-13.

24.     Centerfire ammunition may be capable of penetrating police body armor.  Defs.' Ex. D (Graham Decl.) ¶¶ 22-23 (DEF0201-02).

**B.    Detachable Magazines**

25.     The capability to accept detachable magazines is a threshold requirement for certain rifles and pistols to qualify as an assault weapon, and it is sufficient to designate a shotgun as an assault weapon.  Cal. Penal Code § 30515(a)(1), (4), (a)(7).

26.     Detachable magazines enhance the ability of a semiautomatic firearm to fire a large number of rounds near-continuously by allowing a shooter to rapidly exchange a depleted magazine with a fully loaded one.  Defs.' Ex. D (Graham Decl.) ¶ 24 (DEF0202).

27.     The ability to accept detachable magazines "provides the soldier with a fairly large ammunition supply and the ability to rapidly reload."  Defs.' Ex. H (Bureau of Alcohol, Tobacco & Firearms, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989) ("ATF Rifle Importability Report")) at 6 (DEF0416); Defs.' Ex. Z (ATF Rifle Suitability Report) at 21-22 (DEF0779-80).

28.     The ability to accept detachable magazines renders a semiautomatic weapon "capable of killing or wounding more people in a shorter amount of time."  Defs.' Ex. F (S.B. 880 Report, 2015-2016 Reg. Sess., Assembly Comm. on Public Safety (June 14, 2016)) at 6 (DEF0387).

29.     A weapon lacking a fixed magazine is capable of accepting detachable large- capacity magazines (LCMs), which "allow a shooter to fire more than ten rounds without having to pause to reload." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc).

5

### C.   Large-Capacity Magazines

30.     LCMs "are particularly designed and most suitable for military and law enforcement applications" and "are a feature common, but not unique, to the banned assault weapons, many of which are capable of accepting magazines of thirty, fifty, or even 100 rounds."  *Kolbe*, 849 F.3d at 125.

31.     LCMs enable a shooter to fire more rounds in a given period of time by reducing reload frequency.  *See Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (quoting *Kolbe*, 849 F.3d at 127); *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015).

32.     Shotguns capable of firing more than five shotgun rounds without reloading, such as those with a revolving cylinder, are also "most appropriate for military or law enforcement use" and "are not particularly suitable for nor readily adaptable to generally recognized sporting purposes."  Defs.' Ex. O (Bureau of Alcohol, Tobacco, Firearms & Explosives, Study on the Importability of Certain Shotguns (2011) ("ATF Shotgun Importability Study")) at iv (DEF0629).

33.     The use of LCM-equipped firearms in public mass shootings— shooting incidents in a public place resulting in four or more fatalities excluding the shooter—results in a substantially greater number of fatalities and injuries on average than public mass shootings not involving LCMs.  Defs.' Ex. A (Allen Decl.) ¶¶ 33-34 (DEF0017-18).

34.     In 161 public mass shootings from 1982-2019, LCMs were used in 60% of such shootings in which magazine capacity was known.  Defs.' Ex. A (Allen Decl.) ¶ 32.

35.     In 161 public mass shootings from 1982-2019, LCMs were used in 39% of such shootings even assuming that all such shootings in which magazine capacity was not known *did not* involve an LCM.  Defs.' Ex. A (Allen Decl.) ¶ 32.

36.     In 161 public mass shootings from 1982-2019, the use of LCMs resulted in a greater number of fatalities on average than such shootings not involving LCMs (27 vs. 9).  Defs.' Ex. A (Allen Decl.) ¶ 33.

37.     The use of LCM-equipped firearms in gun massacres—mass shootings involving six or more fatalities excluding the shooter and regardless of the motive or location—results in a substantially greater number of fatalities and injuries on average than public mass shootings not involving LCMs.  Defs.' Ex. DB (Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High –Fatality Mass Shootings, 1990-2017*, 109 Am. J. Public Health 1754 (2019) ("Klarevas 2019")) at 1754 (DEF3248).

38.     In 69 gun massacres from 1990-2017, LCMs were used in 64% of such shootings.  Defs.' Ex. DB (Klarevas 2019) at 1754 (DEF3248).

39.     In 69 gun massacres from 1990-2017, the use of LCMs resulted in in a greater number of fatalities on average than such shootings not involving LCMs (11.8 vs. 7.3).  Defs.' Ex. DB (Klarevas 2019) at 1754 (DEF3248); *accord* Defs.' Ex. A (Allen Decl.) ¶ 35 (DEF0019) (discussing Defs.' Ex. DB).

40.     LCMs feature prominently in gun violence against law enforcement personnel, as LCM-equipped assault weapons can enable a shooter to engage law enforcement in protracted standoffs.  *See* Defs.' Ex. D (Graham Decl.) ¶ 68 (DEF0215-18); Pls. Ex. 10-7 (Christopher S. Koper, Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003 (2004)) at 2, 18 (Pls.' pp. 285, 301).

41.     Certain rifles and pistols qualify as assault weapons if they have fixed LCMs.  Cal. Penal Code § 30515(a)(2), (5).

42.     Even if an LCM is incorporated into a rifle or pistol as a fixed magazine, the weapon would be capable of firing more than 10 rounds without needing to reload, enhancing that weapon's lethality.  *See* Defs.' Ex. D (Graham Decl.) ¶ 41 (DEF0208).

7

43.     Rifles and pistols can be modified to allow a shooter to reload a fixed magazine nearly as quickly as a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 42 (DEF0208).

**D.    Pistol Grips, Thumbhole Stocks, and Barrel Shrouds**

44.     Certain rifles, pistols, and shotguns can qualify as assault weapons if they have pistol grips (either beneath the action or located in a forward position) or thumbhole stocks.  Cal. Penal Code § 30515(a)(1)(A), (1)(B), (1)(F), (4)(B), (6)(B).

45.     A pistol grip "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing," which can help counteract muzzle rise during repeated firing, and a forward pistol grip can similarly help a shooter stabilize a weapon during repeated semiautomatic fire. Defs.' Ex. D (Graham Decl.) ¶¶ 28-30, 38 (DEF0204-05, 207); Defs.' Ex. H (ATF Rifle Importability Report) at 6 (DEF0416) ("[Pistol] grips were designed to assist in controlling machineguns during automatic fire.").

46.     Pistol grips and thumbhole stocks can enable a shooter to maintain accuracy during rapid fire.  Defs.' Ex. D (Graham Decl.) ¶¶ 28-30, 38 (DEF0204-05, 207); Youngman Dep. at 134:17-21; Kapelsohn Dep. at 125-26, 130.

47.     A pistol grip can enable a shooter to maintain aim and even fire while reloading a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 29 (DEF0204); Kapelsohn Dep. at 126.

48.     A forward pistol grip on any firearm can also help insulate the non-trigger hand from heat generated during rapid fire.  Defs.' Ex. D (Graham Decl.) ¶ 54 (DEF0212).

49.     A semiautomatic pistol qualifies as an "assault weapon' if it has a "barrel shroud" affixed to, or encircles partially or completely, the barrel of the weapon.  Cal. Penal Code § 30515(a)(4)(C).

8

50.     A barrel shroud "serve[s] a combat-functional purpose" by cooling the barrel and insulating the non-trigger hand during rapid fire.  Defs.' Ex. J (H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act ("H.R. Rep. No. 103-489")) at 19 (DEF0449); Kapelsohn Dep. at 171:12-17 (agreeing that a barrel shroud could be an important tactical feature of a firearm).

**E.     Folding and Telescoping Stocks and Rifles Shorter than 30 Inches in Length**

51.     Certain rifles and shotguns may qualify as an assault weapon if they have an adjustable stock.  Cal. Penal Code § 30515(a)(1)(C), (6)(A).

52.     A folding or telescoping stock enhances the portability and concealability of a rifle.  Defs.' Ex. D (Graham Decl.) ¶¶ 31-33 (DEF0205-06).

53.     The "main advantage" of a folding or telescoping stock is "portability," and "its predominant advantage is for military purposes, and it is not normally found on the traditional sporting rifle."  Defs.' Ex. H (ATF Rifle Importability Report) at 6 (DEF0416).

54.     In military and law enforcement contexts, an adjustable stock may enable law enforcement personnel to conduct room-to-room searches and maintain a tactical element of surprise.  Defs.' Ex. D (Graham Decl.) ¶ 32 DEF0205-06); Youngman Dep. at 141:21-143:7.

55.     Semiautomatic centerfire rifles with lengths of less than 30 inches, Cal. Penal Code § 30515(a)(3), are more concealable and may allow a shooter to smuggle a rifle undetected in public.  Defs.' Ex. D (Graham Decl.) ¶¶ 43, 59 (DEF0209, 213-14); Defs.' Ex. M (Mersereau Decl.) ¶ 10 (DEF0566).

**F.     Flash Suppressors**

56.     A semiautomatic, centerfire rifle qualifies as an assault weapon if it is equipped with a flash suppressor.  Cal. Penal Code § 30515(a)(1)(E).

57.     A flash suppressor is a device attached to the muzzle of a rifle to reduce the flash emitted upon firing.  Cal. Code Regs. tit. 11, § 5471(r).

58.     The definition of a flash suppressor includes any "device labeled or identified by its manufacturer as a flash hider."  Cal. Code Regs. tit. 11, § 5471(r).

59.     A flash suppressor can enable a shooter to maintain accuracy during rapid fire in low-light settings.  Youngman Dep. at 139:5-9.

60.     A flash suppressor is a standard feature of the M-16 that can aid a shooter to maintain accurate, rapid fire in low-light conditions, and can also counteract "muzzle climb" during rapid fire.  Defs.' Ex. H (ATF Rifle Importability Report) at 7 (DEF0417); Defs.' Ex. D (Graham Decl.) ¶ 37 (DEF0207); Kapelsohn Dep. at 147-48 (acknowledging that a flash suppressor may have a "very minimal" effect on counteracting muzzle climb).

61.     A flash suppressor can help conceal the shooter's position, especially at night.  Defs.' Ex. H (ATF Rifle Importability Report) at 7 (DEF0417); Defs.' Ex. D (Graham Decl.) ¶ 37 (DEF02070); *see also* Kapelsohn Dep. at 145:24-146:4 (testifying that flash suppressors can make it more difficult to locate the precise location of a shooter and that is "one reason the military uses them").

**G.     Threaded Pistol Barrels**

62.     A semiautomatic pistol without a fixed magazine qualifies as an assault weapon if it has a threaded barrel capable of accepting a flash suppressor, forward pistol grip, or silencer.  Cal. Penal Code § 30515(a)(4)(A).

63.     A threaded barrel enables a shooter to quickly attach a flash suppressor, forward handgrip, or silencer, which enhance the pistol's lethality and concealability.  Defs.' Ex. D (Graham Decl.) ¶ 53 (DEF0212).

64.     A flash suppressor and forward pistol grip enhance the lethality or concealability of a firearm.  Defs.' Ex. H (ATF Rifle Importability Report) at 6-7 (DEF0416-17).

65.     A silencer can be affixed to a pistol to reduce the sound it emits upon firing, which can help a shooter maintain a tactical advantage by concealing the shooter's position or the fact that a shot was even fired.  Defs.' Ex. D (Graham

10

Decl.) ¶ 53 (DEF0212) (noting Virginia Beach workplace shooting that involved a silencer-equipped handgun).

**H.   Grenade and Flare Launchers**

66.     A semiautomatic, centerfire rifle without a fixed magazine qualifies as an assault rifle if it is equipped with a grenade launcher or a flare launcher.  Cal. Penal Code § 30515(a)(1)(D).

67.     Neither a grenade launcher nor a flare launcher serve any legitimate civilian need on a rifle.  Defs.' Ex. H (ATF Rifle Importability Report) at 7 (DEF0417); Defs.' Ex. D (Graham Decl.) ¶¶ 34-35 (DEF0206-07).

**III.   ASSAULT WEAPONS ARE UNUSUAL**

**A.   Assault Weapons Are Not Commonly Owned by Law-Abiding Individuals**

68.     Rapid semiautomatic fire is a "combat fire technique" that is not consistent with lawful uses of a firearm.  Defs.' Ex. L (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons (2008)) at 7-8 (DEF0541).

69.     Based on the California Department of Justice's assault weapon registration data, excluding assault weapons registered to peace officers, as of December 3, 2020, there are approximately 185,569 assault weapons currently registered with the Department of Justice, of which approximately 165,804 are rifles, 16,306 are pistols, and 3,459 are shotguns.  Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222).

70.     Of the assault weapons registered to non-peace officers in California, only 8.7% are pistols and 1.7% are shotguns.  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222).

71.     As of December 3, 2020, there are approximately 90,886 individuals currently registered to possess an assault weapon in California.  Defs.' Ex. CZ (Glover Decl.) ¶ 8 (DEF3222).

72.     Individuals currently registered to possess assault weapons have registered approximately 2.04 assault weapons on average.  Defs.' Ex. CZ (Glover Decl.) ¶¶ 7-8 (DEF3222).

73.     According to the U.S. Census, there are approximately 30.6 million persons aged 18 years or older in California.  *See* U.S. Census Bureau, Quick Facts, California (2019), *available at* https://www.census.gov/quickfacts/fact/table/CA/PST045219 (last visited Feb. 15, 2021).

74.     0.29% of Californians aged 18 years or older are registered to possess an assault weapon.  Defs.' Ex. CZ (Glover Decl.) ¶ 8 (DEF3222) (stating that 90,886 Californians are registered to possess an assault weapon); United States Census Bureau, Quick Facts, California (2019) (indicating that there are approximately 30.6 million persons aged 18 years or older in California), *available at* https://www.census.gov/quickfacts/fact/table/CA/PST045219 (last visited Feb. 15, 2021).

75.     According to a 2018 California Safety and Well-Being Survey, 4.2 million adult Californians personally own a firearm.  Defs.' Ex. DY at 1 (DEF3578); Defs.' EA (Nicole Kravitz-Wirtz et al., *Firearm Ownership and Acquisition in California: Findings from the 2018 California Safety and Well-Being Survey*, 26 Injury Prevention 516 (2020) ("Safety and Well-Being Survey")) at 516 (DEF3581).

76.     According to the 2018 California Safety and Well-Being Survey, approximately 14% of the California adult population personally owns a firearm.  Defs.' EA (Safety and Well-Being Survey) at 516 (DEF3581).

77.     According to the 2018 California Safety and Well-Being Survey, Californians own an estimated 19.9 million firearms.  Defs.' EA (Safety and Well-Being Survey) at 516 (DEF3581).

78.     According to the 2018 California Safety and Well-Being Survey, approximately 10% of California's gun owners own 10 or more firearms, comprising approximately half of all firearms owned in the state.  Defs.' EA (Safety and Well-Being Survey) at 516 (DEF3581).

79.     Approximately 2.2% of California's gun owners possesses a registered assault weapon (90,886/4,200,000).  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 8 (DEF3222) (stating that 90,886 Californians are registered to possess an assault weapon); Defs.' Ex. EA at 516 (DEF3581) (indicating that 4.2 million adult Californians personally own a firearm).

80.     Of the approximately 19.9 million firearms possessed in California, approximately 0.83% of those weapons are rifles registered as assault weapons (165,804/19,900,000).  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222) (stating that 165,804 rifles are registered as assault weapons); Defs.' Ex. EA at 516 (DEF3581) (indicating that there are 19.9 million firearms owned by individuals in California).

81.     Of the approximately 19.9 million firearms possessed in California, approximately 0.08% of those weapons are pistols registered as assault weapons (16,306/19,900,000).  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222) (stating that 16,306 pistols are registered as assault weapons); Defs.' Ex. EA at 516 (DEF3581) (indicating that there are 19.9 million firearms owned by individuals in California).

82.     Of the approximately 19.9 million firearms possessed in California, approximately 0.02% of those weapons are shotguns registered as assault weapons (3,469/19,900,000).  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222) (stating that 3,459 shotguns are registered as assault weapons); Defs.' Ex. EA at 516 (DEF3581) (reporting that there are approximately 19.9 million firearms owned by individuals in California).

13

83.     Plaintiffs provided no reliable estimate of the number of firearms that qualify as assault weapons under the challenged provisions of the AWCA that are in lawful possession in the United States.

**B.     Assault Weapons Are More Suited for Offensive and Military Use and Are Not Well-Suited for Civilian Self-Defense**

84.     While assault weapons might be used in self-defense, they are more useful for offensive purposes or combat.  Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 28 (DEF0604) (noting that assault pistols are "for the most part simply semiautomatic versions of submachine guns"); Defs.' Ex. O (ATF Shotgun Importability Study) at iv (DEF0629) (discussing shotgun features that "are most appropriate for military or law enforcement use," including adjustable stocks and forward pistol grips); *Kolbe*, 849 F.3d at 136 (holding that "the banned assault weapons" are most useful in military service); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908 (N.D. Ill. 2014) (noting that submachine guns are "the analog for a civilian assault pistol" and "facilitate the assault and capture of a military objective" (citation omitted)).

85.     Beginning in the 1980s, the gun industry began to market heavily military-style rifles to the civilian gun market, emphasizing the military pedigree and combat applications of the weapons.  Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 1 (DEF0577) (using the term "assault rifles" to describe these military-style weapons); Defs.' Ex. R (July 1981 Guns & Ammo Magazine) at 48, 54 (DEF0662, 664, 670) (variously describing a "new breed of assault rifles" as "[s]pawned in the crucible of war," "military-type," "military-style," and "military autoloaders").

86.     Manufacturers of assault weapons specifically advertise them to civilians as military-grade firearms.  Defs.' Ex. C (Donohue Decl.) ¶¶ 72-82 (DEF0132-36); Defs.' Ex. P (Colt.com, AR15A4 Advertisement) at 1 (DEF0659);

14

Defs.' Ex. Q (Colt.com, About Colt Rifles) at 1 (DEF0660); *Kolbe*, 849 F.3d at 125 ("Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess.").

87.     Assault weapons are "most useful in military service" due to their ability to accept ammunition from fixed or detachable LCMs and their combat-oriented features. *See Kolbe*, 849 F.3d at 137 ("Whatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines . . . are unquestionably most useful in military service."); *see also Gallinger*, 898 F.3d at 1018 (referencing "mass shootings perpetrated by individuals with *military-style rifles*" (emphasis added)).

88.     Assault weapons have a military pedigree and are nearly identical to the M-16.  Defs.' Ex. C (Donohue Decl.) ¶¶ 83-89 (DEF0137-39); Youngman Dep. at 54:4-6; *Staples v. United States*, 511 U.S. 600, 612 (1994) at 603 ("The AR-15 is the civilian version of the military's M-16 rifle . . . ."); *Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (citing *Heller*, 554 U.S. at 627)); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 (C.D. Cal. 2019) ("[T]he Court concludes that semiautomatic rifles within the AWCA's scope are virtually indistinguishable from M-16s . . . .").

89.     The AR-15 rifle is the civilian version of the military M-16.  Defs.' Ex. D (Graham Decl.) ¶ 44 (DEF0209); Defs.' Ex. H (ATF Rifle Importability Report) at 6 (DEF0416) (noting that the "military features and characteristics (other than select fire)" of "modern military assault rifles" are "carried over to semiautomatic versions of the original military rifle"); Youngman Dep. at 54:4-6; Kapelsohn Dep. at 82:24-83:13.

90.     The primary difference between the M-16 and an assault weapon is that the M-16 is a select-fire weapon that allows the shooter to fire in either

automatic or semiautomatic mode, while an assault weapon fires only in semiautomatic mode.  Semiautomatic weapons, however, can "fire almost as rapidly as automatics."  *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1263 (D.C. Cir. 2011); Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF04480); Defs.' Ex. K (Brady Ctr. to Prevent Gun Violence, *Assault Weapons "Mass Produced Mayhem"* (2008)) at 1 (DEF0484) (a 30-round magazine empties in less than two seconds on automatic, while the same magazine empties in just five seconds on semiautomatic); Defs.' Ex. I (Violence Policy Center, *Key Points About Assault Weapons*) at 1 (DEF0430).

91.      A semiautomatic weapon has an effective rate-of-fire between 300 to 500 rounds per minute.  Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF04480) ("[S]emiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns."); Kapelsohn Dep. at 81:21-82:4; Oct. 19, 2020 Hearing Tr. at 23 (Kapelsohn testimony).

92.      Soldiers issued M-16 rifles are instructed to generally use "rapid semiautomatic fire," because fully automatic fire is "inherently less accurate." Defs.' Ex. L (Excerpt of United States Army, *Rifle Marksmanship M16/M4 - Series Weapons* (2008)) at 7-12 (DEF0545); *accord* Youngman Dep. at 51:6-13 (agreeing that fully automatic weapons are less accurate generally than semiautomatic weapons when fired rapidly).

93.      Assault rifles, such as the AR-15, are easily converted to fire automatically.  *Staples*, 511 U.S. at 603 (noting that "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon"); Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF0448) ("[I]t is a relatively simple task to convert a semiautomatic weapon to automatic fire . . . ."); Defs.' Ex. M (Mersereau Decl.) ¶ 20 (DEF0568).

94.     According to stories of defensive gun uses aggregated by the National Rifle Association, individuals fired an average of 2.1 rounds when firearms were used in self-defense in the home.  Defs.' Ex. A (Allen Decl.) ¶ 15 (DEF0006-07).

95.     According to stories of defensive gun uses aggregated by the National Rifle Association, individuals fired no rounds in 16.1% of incidents in the home. Defs.' Ex. A (Allen Decl.) ¶ 15 (DEF0007).

96.     According to a systematic review of 4,841 news stories nationwide involving a defensive gun use in the home, individuals fired an average of 2.34 rounds when firearms were used in self-defense in the home.  Defs.' Ex. A (Allen Decl.) ¶ 23 (DEF0012-13).

97.     According to a systematic review of 4,841 news stories nationwide involving a defensive gun use in the home, individuals fired no rounds in 11.6% when firearms were used in self-defense in the home.  Defs.' Ex. A (Allen Decl.) ¶ 23 (DEF0012-13).

## IV.   ASSAULT WEAPONS ARE DISPROPORTIONALLY USED IN CRIME, MASS SHOOTINGS, AND AGAINST LAW ENFORCEMENT, RESULTING IN MORE CASUALTIES

98.     Congress found, in enacting the federal assault weapons ban, that "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder," that "[t]he carnage inflicted on the American people [by] criminals and mentally deranged people armed with . . . semi-automatic assault weapons has been overwhelming and continuing," and that the use of those weapons by "criminal gangs, drug-traffickers, and mentally deranged persons continues to grow."  Defs.' Ex. J (H.R. Rep. No. 103-489) at 12-13 (DEF0442-43).

99.     Congress found, in enacting the federal assault weapons ban, assault weapons are used disproportionately in crime.  Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF0448); Defs.' Ex. E (Klarevas Decl.) ¶ 16 (DEF0331); Defs.' Ex. C (Donohue Decl.) ¶ 115 (DEF0147-48).

17

100.     Generally, assault weapons and semiautomatic weapons with LCMs account for 22 to 36 percent of crime guns, and "appear to be used in a higher share of firearm mass murders (up to 57% in total)," far greater than their prevalence in the market.  *See* Defs.' Ex. Y (Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health 313 (2017) ("Koper 2017")) at 1 (DEF0748); Defs.' Ex. E (Klarevas Decl.) ¶ 16 (DEF0331).

101.     Assault weapons and semiautomatic weapons with LCMs are used disproportionally against law enforcement personnel.  Defs.' Ex. Y (Koper 2017) at 1, 7 (DEF0748, 754) (finding that 13 to 16 percent of guns used in the murder of police are assault weapons); *see also* Defs.' Ex. AA (Violence Policy Ctr., *"Officer Down": Assault Weapons and the War on Law Enforcement* (2003)) at 5 (DEF0816); Defs.' Ex. C (Donohue Decl.) ¶ 117 (DEF0149).

102.     Victims of assault weapons generally suffer more extensive and more numerous gunshot wounds, resulting in higher morbidity and mortality than victims of shootings from other weapons.  *See* Defs.' Ex. B (Colwell Decl.) ¶¶ 9, 12 (DEF0054-55); Defs.' Ex. AB (Panagiotis K. Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, J. of Acute Disease, 178 (2014)) at 181-82 (DEF0842-43) (discussing cavitation of small-caliber bullets from M-16 and AK-47 rifles).

103.     Assault weapons enable a shooter to fire more rounds rapidly in a given period with greater accuracy, increasing the likelihood that more individuals will be shot and suffer multiple injuries, making it "far more likely" that the individual will suffer complications and die of those injuries.  Defs.' Ex. B (Colwell Decl.) ¶ 8 (DEF0053-54).

104.     Assault weapons were used in seven of the 10 deadliest mass shootings in the United States since 1980.  *See* Defs.' Ex. E (Klarevas Decl.) ¶ 10 tbl. 1 (DEF0326).

18

105.    Assault weapons are often used in public mass shootings—shooting incidents in a public place resulting in four or more fatalities excluding the shooter. Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017).

106.    In 161 public mass shootings from 1982-2019, assault weapons were used in 22% of such shootings in which it could be determined whether an assault weapon was used.  Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017).

107.    In 161 public mass shootings from 1982-2019, assault weapons were used in 20% of such shootings, even if it is assumed that the public mass shootings where it could not be determined whether an assault weapon was used all did not involve an assault weapon.  Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017).

108.    Assault weapons are often used in gun massacres in the United States—mass shootings involving six or more fatalities excluding the shooter and regardless of the motive or location of the shooting—and the proportion gun massacres involving assault weapons has been increasing.  Defs.' Ex. E (Klarevas Decl.) ¶ 13 & fig. 5.

109.    During the 1980s, assault weapons were used in approximately 19% of all gun massacres in the United States.  Defs.' Ex. E (Klarevas Decl.) ¶ 13.

110.    During the 2010s, assault weapons were used in approximately 35% of all gun massacres in the United States.  Defs.' Ex. E (Klarevas Decl.) ¶ 13 & fig. 5.

111.    In the past three years, assault weapons were used in approximately 67% of all gun massacres in the United States.  Defs.' Ex. E (Klarevas Decl.) ¶ 13 & fig. 5.

112.    When used in mass shootings, assault weapons are associated with substantially more fatalities and injuries than non-assault weapons.  Defs.' Ex. AC (Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More Deadly? Assessing How Perpetrators' Motives and Methods Have Changed Over Time*, Criminology & Pub. Pol'y 1 (2019)) at 12 (DEF0858) ("Strong empirical evidence shows that weapon choice affects lethality."); *Gallinger*, 898 F.3d at 1019

19

("[W]hen 'assault weapons and large capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines.'" (quoting *Kolbe*, 849 F.3d at 127)); *Rupp*, 401 F. Supp. 3d at 991 (citing Defs.' Ex. X); Defs.' Ex. A (Allen Decl.) ¶ 31 (DEF0017); Defs.' Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2 (DEF0331-32).

113.   The use of assault weapons in public mass shootings involving four or more fatalities excluding the shooter has resulted in an average of 38 fatalities or injuries compared to 10 without assault weapons—an approximately 280 percent increase in the average number of casualties.  Defs.' Ex. A (Allen Decl.) ¶ 31 (DEF0017).

114.   The use of assault weapons and LCMs in public mass shootings involving four or more fatalities has resulted in an average of 43 fatalities or injuries compared to an average of 8 fatalities or injuries in such shootings when neither an assault weapon or an LCM was used—an approximately 440 percent increase in the average number of casualties.  Defs.' Ex. A (Allen Decl.) ¶ 34 (DEF0018).

115.   Since 1980, the use of assault weapons in gun massacres—mass shootings involving six or more fatalities excluding the shooting and regardless of the motive or location of the shooting—has resulted in an average of 14.3 fatalities compared to 8.1 fatalities in such shootings in which no assault weapons was used—an approximately 77 percent increase in the average number of fatalities.  Defs.' Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2 (DEF0331-32).

116.   In the past ten years, the use of assault weapons in gun massacres has resulted in an average of 20.5 fatalities compared to 7.9 fatalities in such shootings in which no assault weapons was used—an approximately 159 percent increase in the average number of fatalities.  Defs.' Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2 (DEF0331-32).

117.     The vast majority of firearms used in mass shootings are acquired legally.  Defs.' Ex. A (Allen Decl.) ¶ 38 (DEF0020); Lott Dep. at 222:14-16 (agreeing that the majority of mass shooters acquire their weapons legally).

## V.     ASSAULT-WEAPON RESTRICTIONS ARE EFFECTIVE IN PROMOTING PUBLIC SAFETY

118.     The federal assault weapons ban was effective in reducing the use of assault weapons in gun crime.  Defs.' Ex. Y (Koper 2017) at 7 (DEF0754); Defs.' Ex. C (Donohue Decl.) ¶ 119 (DEF0149-50).

119.     The federal ban was effective in reducing the incidence and lethality of mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶¶ 23-24 & tbl. 3 (DEF0334-36) (finding a 37 percent decline in gun massacres during the federal ban, and a 49 percent decline in gun-massacre fatalities, followed by a 183 percent increase in gun massacres after its expiration, and a 209 percent increase in gun-massacre fatalities).

120.     California's assault-weapon restrictions are effective in mitigating the lethality of mass shootings and can even reduce the incidence of mass shootings. Defs.' Ex. E (Klarevas Decl.) ¶¶ 22-23, 27 (DEF0334-35, 338); Defs.' Ex. AE (Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013)) at 4 (DEF0884).

121.     Since 1990, states that enacted assault-weapon restrictions experienced a 46% decrease in the incidence rate per capita for all gun massacres—mass shootings involving six or more fatalities excluding the shooter and regardless of the motive or location of the shooting—and a 57% decrease in the fatality rate per capita for all gun massacres.  Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

122.     Since 1990, states that enacted assault-weapon restrictions experienced 54% fewer gun massacres involving assault weapons and 67% fewer fatalities in

1   such incidents, on a per capita basis.  Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4

2   (DEF0338-39).

3        123.    While the AWCA is narrower than the federal ban in being limited to

4   centerfire rifles, the AWCA is broader than the federal assault weapons ban in

5   defining a firearm as an assault weapon if it has only one qualifying feature, and

6   thus the AWCA can be expected to be more effective in reducing the use of assault

7   weapons in gun crime, particularly mass shootings and gun violence against law

8   enforcement personnel.  *See* Defs.' Ex. J (H.R. Rep. No. 103-489) at 2 (DEF0432)

9   (defining any semiautomatic rifle as an assault weapon if it has the ability to accept

10  a detachable magazine and at least two qualifying features).

11       124.    Assault-weapon restrictions like the AWCA are effective in reducing

12  gun violence, particularly violence associated with mass shootings.  *See* Defs.' Ex.

13  E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

**CONCLUSIONS OF LAW**

14  

15  **I.    STEP ONE:  THE AWCA DOES NOT BURDEN CONDUCT PROTECTED UNDER THE SECOND AMENDMENT**

16  

17      **A.    Assault Weapons Are Not Protected Under the Second Amendment Because They Are Dangerous and Unusual and Not in Common Use for Lawful Purposes**

18  

19      1.    While the Supreme Court in *Heller* and *McDonald* invalidated strict

20  laws that effectively prohibited the possession of all handguns—which it

21  characterized as "the quintessential self-defense weapon" *Heller*, 554 U.S. at 629—

22  the Court made clear that "the right secured by the Second Amendment is not

23  unlimited" and does not extend to "a right to keep and carry any weapon

24  whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626

25  (citations omitted).

26      2.    The Second Amendment "does not protect those weapons not typically

27  possessed by law-abiding citizens for lawful purposes, such as short-barreled

28  shotguns."  *Heller*, 554 U.S. at 625; *see also Fyock*, 779 F.3d at 997.

22

3.      This articulation of what is protected by the Second Amendment finds its roots in the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627.

4.      The Second Amendment "by no means eliminates" a state's ability "to devise solutions to social problems that suit local needs and values," emphasizing that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010) (plurality opinion) (quotation omitted).

5.      Dangerous and unusual weapons are not "'the sorts of weapons' that are 'in common use'" for lawful purposes. *Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J., concurring).

6.      A weapon is "dangerous" "when it is 'likely to cause serious bodily harm.'" *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (quoting *Black's Law Dictionary* 451 (9th ed. 2009)).

7.      The Ninth Circuit has observed that "[c]ommonality is determined largely by statistics," with "common use" being established primarily by evidence that a weapon is "overwhelmingly owned and used for lawful purposes." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. Aug. 14, 2020), *petition for reh'g en banc filed*.

8.      While the AWCA is narrower than the federal ban in being limited to centerfire rifles, the AWCA is broader than the federal assault weapons ban in defining a firearm as an assault weapon if it has only one qualifying feature, and thus the AWCA can be expected to be more effective in reducing the use of assault weapons in gun crime, particularly mass shootings and gun violence against law enforcement personnel. *See* Defs.' Ex. J (H.R. Rep. No. 103-489) at 2 (DEF0432) (defining any semiautomatic rifle as an assault weapon if it has the ability to accept a detachable magazine and at least two qualifying features).

9.     Marketing materials or sales figures for assault rifles, assault pistols, and assault shotguns would not establish that the weapons are in common use by law-abiding citizens for lawful purposes.  *Fyock*, 779 F.3d at 998 (noting that "marketing materials and sales statistics" do "not necessarily show that [particular weapons] are in fact commonly possessed by law-abiding citizens for lawful purposes").

10.     Evidence of a firearm's prevalence alone is insufficient to show that the weapon is in "common use" for lawful purposes.  *See Kolbe*, 849 F.3d at 141-42 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citing *Friedman*, 784 F.3d at 409)), *cert. denied*, __ S.C. __, 2020 WL 3146687 (June 15, 2020); *see also* Dkt. 88 (Pls.' Pre-Trial Proposed Findings of Fact & Conclusions of Law) ¶ 30 ("[C]onstitutionally protected status of arms cannot turn of fact-based sales numbers of particular makes, models, or even specific configurations.").

11.     Whether law enforcement agencies use weapons that would otherwise qualify as assault weapons under the challenged provisions of the AWCA is irrelevant to the "common use" analysis.  Law-enforcement use is not considered when determining whether an arm is in common use by law-abiding citizens for lawful purposes.  *See Maloney v. Singas*, 351 F. Supp. 3d 222, 229 n.10 (E.D.N.Y. 2018) (excluding sales of arms to law enforcement agencies because "the Second Amendment is only concerned with weapons 'typically possessed by law-abiding citizens for lawful purposes.'" (quoting *Heller*, 554 U.S. at 625)).

12.     Assault weapons regulated under the challenged provisions of the AWCA are not protected by the Second Amendment because they are "dangerous and unusual" weapons.  *See supra* Proposed Findings of Fact Sections II & III; *see also Henry*, 688 F.3d at 640 (citing *Heller*, 554 U.S. at 627) (observing that the

24

1   Second Amendment does not protect "the types of weapons that qualify as

2   'dangerous and unusual weapons'").

3       13.     Assault weapons regulated under the challenged provisions of the

4   AWCA are not protected by the Second Amendment because they are not "in

5   common use" for lawful purposes like self-defense. *See supra* Proposed Findings

6   of Fact, Sections II & III; *see also Silvester*, 843 F.3d at 830 (Thomas, C.J.,

7   concurring).

8   **B.   Assault Weapons Are Not Protected Under the Second
        Amendment Because They Are Like the M-16 and Are Most**

9   **Useful in Military Service**

10      14.     The Supreme Court has highlighted the M-16 as exemplifying a

11  "dangerous and unusual" weapon that falls outside the protection of the Second

12  Amendment. *Heller*, 554 U.S. at 627; *Kolbe*, 849 F.3d at 136.

13      15.     Assault weapons regulated by the challenged provisions of the AWCA

14  fall outside the scope of the Second Amendment because they are like the M-16 and

15  are most useful in military service. *See supra* Proposed Findings of Fact, Section

16  III.B; *see also Kolbe*, 849 F.3d at 137; *Rupp*, 401 F. Supp. 3d at 986-88.

17  **C.   The AWCA Is Presumptively Constitutional Because It Is
        Similar to Longstanding Firing-Capacity Regulations**

18

19      16.     The AWCA is a "'presumptively lawful measure[]' falling outside the

20  scope of Second Amendment protection." *Silvester*, 843 F.3d at 830 (Thomas, C.J.,

21  concurring) (quoting *Heller*, 554 U.S. at 626, 627 n.26).

22      17.     In restricting firearms capable of firing numerous rounds without

23  reloading—either because they can accept detachable LCMs or have fixed LCMs—

24  the AWCA is analogous to "regulations from the early twentieth century that

25  restricted the possession of firearms based on the number of rounds that the firearm

26  could discharge automatically or semi-automatically without reloading." *Fyock*,

27  779 F.3d at 997.

28

25

18.     In the 1920s and 1930s, Michigan, Rhode Island, and Ohio enacted restrictions on semiautomatic weapons capable of firing sixteen, twelve, and eighteen shots, respectively, without reloading.  Defs.' Ex. S (Mich. Public Acts, 1927 – No. 372) (DEF0676); Defs.' Ex. T (R.I. Public Acts, 1927 – Ch. 1052) (DEF0682); Defs.' Ex. U (Ohio General Code, 1933 – § 12819-3) (DEF0684).

19.     In 1932, Congress enacted a twelve-shot restriction on semiautomatic weapons in the District of Columbia—one of the few jurisdictions subject to the Second Amendment at that time, before it was incorporated into the Fourteenth Amendment in 2010—and this restriction has remained in effect ever since.  Defs.' Ex. V (Pub. L. No. 275, 1932 – 72d Cong., Sess. I, chs. 465, 466) (DEF0685).

20.     While most of the firing-capacity laws were repealed by the 1970s, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.* (*ANJRPC*), 910 F.3d 106, 117 n.18 (3d Cir. 2018), the District of Columbia has maintained its restrictions, *see Duncan*, 970 F.3d at 1150 (noting that the District of Columbia has continuously regulated magazine capacity since 1932).

21.     In regulating firearms based on their capacity for enhanced firepower, these laws provide a historical analog to the AWCA.  *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (noting that the challenged regulation need not "mirror" the historical regulation); *see, e.g.*, *Silvester*, 843 F.3d at 823-24, 831 (Thomas, C.J., concurring) (citing original iteration of California's waiting-period law, which provided a *single-day* waiting period, in determining that California's longer, ten-day waiting period was presumptively lawful).  These laws restricting dangerous semiautomatic firearms are sufficient analogs even though they were not adopted by all fifty states.  *See id.* at 831 (Thomas, C.J., concurring) (citing just three states that enacted waiting-period statutes in the 1920s).

22.     The political debate concerning the regulation of assault weapons "was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s."  Defs.' Ex. W (Robert J. Spitzer,

26

1     *Gun Law History in the United States and Second Amendment Rights*, 80 Law &

2     Contemporary Problems 55 (2017)) at 69 (DEF0704); *see also* Defs.' Ex. X (Br. of

3     *Amicus Curiae* Everytown for Gun Safety in Supp. of Def.'s Mot. for Summ. J.,

4     *Rupp v. Becerra*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Apr. 1, 2019) (Dkt. 82-1))

5     at 7-9 (DEF0733-35).

6
7
8

    **D.**   **Section 30515(a) Does Not Burden Conduct Protected by the Second Amendment Because It Merely Regulates the Use of Certain Firearm Accessories that Are Not Themselves Protected Under the Second Amendment**

9        23.     The Second Amendment extends to only those "instruments that

10     constitute *bearable* arms." *Heller*, 554 U.S. at 582 (emphasis added).

11        24.     California Penal Code section 30515(a) defines certain firearms as

12     assault weapons based on the presence of certain enumerated accessories or

13     features, such as a pistol grip, an adjustable stock, and a flash suppressor. As such,

14     those provisions effectively regulate the use of the listed accessories or features in

15     conjunction with certain types of firearms.

16        25.     None of the accessories or features listed in California Penal Code

17     section 30515(a) constitutes, by itself, a "bearable arm" subject to Second

18     Amendment protection. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir.

19     2018) (holding that silencers are not protected by the Second Amendment because

20     "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of

21     defense')" and thus "can't be a 'bearable arm' protected by the Second

22     Amendment").

23        26.     In addition, to qualify for Second Amendment protection, a firearm

24     accessory or feature must be necessary to render a firearm operable. *See Fyock*,

25     779 F.3d at 997 ("[O]ur case law supports the conclusion that there must also be

26     some corollary, albeit not unfettered, right to possess the magazines *necessary to*

27     *render those firearms operable*." (emphasis added) (quoting *Jackson v. City & Cty.*

28     *of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014))); *see also Cox*, 906 F.3d at

27

1196 (Hartz, J., concurring) (suggesting that, while silencers are accessories not protected by the Second Amendment, "[w]e had no occasion to consider whether items that are not themselves bearable arms *but are necessary to the operation of a firearm* (think ammunition) are also protected" (emphasis added)).

27.     Section 30515(a) does not burden conduct protected by the Second Amendment because none of the accessories or features listed in California Penal Code section 30515(a) is necessary to operate a firearm.  *See supra* Proposed Findings of Fact, Section I, ¶ 18 (AR-platform rifles without any enumerated features are available for sale and possession in California).

## II.     Step Two: The Challenged Provisions of the AWCA Survive Constitutional Scrutiny

### A.     Intermediate Scrutiny Applies Because Any Burden on a Second Amendment Right Is Not Severe

28.     Every federal circuit court that has selected a level of scrutiny to apply to assault-weapon restrictions, like the AWCA, has determined that intermediate scrutiny applies because they do not rise to the level of a "substantial burden" on the core right protected by the Second Amendment.  *See Wilson v. Cook Cty.*, 937 F.3d 1028, 1033 (7th Cir. 2019) (following *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410-12 (7th Cir. 2015)), *cert. denied*, __ S.C. __, 2020 WL 3146694 (June 15, 2020); *Worman*, 922 F.3d at 38; *Kolbe*, 849 F.3d at 138-39; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257-61 (2d Cir. 2015); *Heller II*, 670 F.3d at 1261-62.

29.     The district court in *Rupp* determined that intermediate scrutiny is appropriate because the AWCA does not severely burden the core Second Amendment right, given the range of other firearms available to Californians that are not restricted by the AWCA, including a variety of handguns.  Indeed, the court determined that assault rifles—the focus of Plaintiffs' claims in this action—are "ill-suited for self-defense" and that self-defense is not the reason why most "modern sporting rifles" are acquired.  *Rupp*, 401 F. Supp. 3d at 989.

28

30.     Consistent with the reasoning and evidence considered in *Rupp* and the federal circuit cases upholding similar assault-weapon restrictions, intermediate scrutiny applies to the AWCA.  *See Rupp*, 401 F. Supp. 3d at 989 (noting that "the chorus of circuits applying intermediate scrutiny to assault weapon bans has only grown, as the First Circuit applied intermediate scrutiny to an assault weapon ban in April of [2019]" (citing *Worman*, 922 F.3d at 38)).

31.     The AWCA does not impose a severe burden on the core Second Amendment right because "individuals remain free to choose any weapon that is *not* restricted by the AWCA or another state law."  *Rupp*, 401 F. Supp. 3d at 989 (citation and quotation marks omitted); *see also Worman*, 922 F.3d at 37 (holding that assault-weapon law "does not heavily burden the core right of self-defense in the home" because it "does not ban all semiautomatic weapons and magazines" and instead "proscribes only . . . semiautomatic assault weapons that have certain combat-style features").

32.     Notwithstanding the AWCA, Californians may acquire and possess semiautomatic, centerfire rifles and semiautomatic pistols and shotguns, provided the weapons do not have any of the proscribed accessories or features listed in California Penal Code section 30515(a).  *See Rupp*, 401 F. Supp. 3d at 989.

33.     Any burden on the core right is further minimized by the fact that the AWCA, in effect, operates as a restriction on the manner in which certain semiautomatic firearms are sold and possessed, rather than a prohibition on the possession of any particular class of firearm.  *See Silvester*, 843 F.3d at 827 ("This court has explained that laws which merely regulate only the 'manner in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely." (quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013))); *see also* Kapelsohn Dep. at 175:21-176:10 (agreeing that the AWCA could be "characterized as a prohibition on certain configurations of rifles, pistols and shotguns").

34.     The challenged provisions of the AWCA do not severely burden the core Second Amendment right because they prohibit the use of accessories that are not, themselves, "bearable arms" subject to Second Amendment protection.  *See supra* Proposed Conclusions of Law, Section I.D, ¶¶ 23-27; *see also Cox*, 906 F.3d at 1186.

35.     The challenged provisions of the AWCA do not severely burden the core Second Amendment right because none of the accessories listed in California Penal Code section 30515(a) is necessary to render a firearm operable.  *See supra* Proposed Findings of Fact, Section I, ¶ 18 (AR-platform rifles without any enumerated features are available for sale and possession in California); *see also Fyock*, 779 F.3d at 997 ("[O]ur case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines *necessary to render those firearms operable*." (emphasis added) (quoting *Jackson*, 746 F.3d at 967)); *see also Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (suggesting that, while silencers are accessories not protected by the Second Amendment, "[w]e had no occasion to consider whether items that are not themselves bearable arms *but are necessary to the operation of a firearm* (think ammunition) are also protected" (emphasis added)).

36.     Because the challenged provisions of the AWCA do not severely burden the core Second Amendment right, intermediate scrutiny applies to the examination of the constitutionality of those provisions.  *See Rupp*, 401 F. Supp. 3d at 988-89.

**B.     The AWCA Survives Intermediate Scrutiny Because It Is Reasonably Fitted to Important Government Interests**

37.     A regulation satisfies intermediate scrutiny if (1) the government's stated objective is "significant, substantial, or important"; and (2) there is a "'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821-22 (citation omitted).

30

38.     Intermediate scrutiny does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest.  *Jackson*, 746 F.3d at 969.  The government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems."  *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

39.     In determining whether a law survives intermediate scrutiny, courts "afford substantial deference to the predictive judgments of the legislature."  *Pena*, 898 F.3d at 979 (quotation omitted).  Even when the record contains "conflicting legislative evidence," intermediate scrutiny "allow[s] the government to select among reasonable alternatives in its policy decisions."  *Id.* (quotation omitted).

40.     Deferential review is particularly appropriate here because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks."  *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quotation omitted).

41.     Under intermediate scrutiny, the government may "rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests," and the Court "may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'"  *Fyock*, 779 F.3d at 1000 (quotations omitted).  Such "evidence need only 'fairly support[]' [the government's] conclusions."  *Pena*, 898 F.3d at 982 (quotation omitted).

42.     The AWCA furthers important, and indeed compelling, government interests in reducing gun violence, particularly reducing the incidence and lethality of mass shootings and gun violence against law enforcement personnel.  *Rupp*, 401 F. Supp. 3d at 990 ("It is beyond question that the government's interest in promoting public safety and reducing gun violence is important or substantial." (quotation omitted)); *see, e.g.*, *Fyock*, 779 F.3d at 1000; *Chovan*, 735 F.3d at 1135;

31

1    *see also* Defs.' Ex. C (Donohue Decl. ¶¶ 28-26 (DEF113-16); Kapelsohn Dep. at

2    68:15-22; Youngman Dep. at 40:20-41:1.

3    43.    The AWCA is reasonably fitted to the State's important public-safety

4    interests because it prohibits certain firearm configurations that make already

5    dangerous firearms more lethal, particularly when used in a manner not consistent

6    with lawful use, such as rapid semiautomatic fire.  *See supra* Proposed Findings of

7    Fact, Sections II, III.B.

8    44.    The AWCA is reasonably fitted to the State's important public-safety

9    interests because assault weapons are used disproportionately in crime, mass

10   shootings, and gun violence against law enforcement personnel.  *See supra*

11   Proposed Findings of Fact, Section IV.

12   45.    The AWCA is reasonably fitted to the State's important public-safety

13   interests because assault weapons feature prominently in mass shootings throughout

14   the country and correlate with substantially higher numbers of casualties on

15   average.  *See supra* Proposed Findings of Fact, Section IV, ¶¶ 104-116.

16   46.    Correlative evidence of the harms of assault weapons is sufficient to

17   show a reasonable fit under intermediate scrutiny.  *See Rupp*, 401 F. Supp. 3d at

18   993 ("Even assuming there is not direct *causal* evidence between mass shootings

19   and higher casualty rates and rifles within the scope of the AWCA, California is

20   entitled to make 'reasonable inferences' from the available data that shows a

21   correlation." (quoting *Worman*, 922 F.3d at 40)); *S.F. Veteran Police Officers Ass'n*

22   *v. City & Cty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014)

23   (holding that LCM restrictions satisfied intermediate scrutiny where "[t]he record

24   demonstrates that there is a very high correlation between mass shootings and the

25   use of [LCMs]"); *see also Fantasyland Video, Inc. v. Cty. of San Diego*, 505 F.3d

26   996, 1002 (9th Cir. 2007) (upholding law under First Amendment based on "studies

27   and reports, reported court decisions, and anecdotal testimony" supporting a

28

32

"correlation between adult establishments and negative secondary effects" under intermediate scrutiny).

47.     The State is not restricted to examining mass shootings in California to demonstrate a reasonable fit and may "rely on any evidence 'reasonably believed to be relevant'"—such as mass shootings in other jurisdictions—"to substantiate its important interests" under intermediate scrutiny. *Fyock*, 779 F.3d at 1000 (quotations omitted).

48.     The correlation between the use of assault weapons in mass shootings and substantially greater numbers of victims killed or injured strongly supports the reasonableness of the AWCA's fit. *See Rupp*, 401 F. Supp. 3d at 993 (noting that "'a correlation between the use of assault weapons and the number of victims injured or killed' makes it '[m]ore likely' that there is a causal relationship" and that "California is entitled to make 'reasonable inferences' from the available data that shows a correlation" (citations omitted)).

49.     The AWCA is reasonably fitted to the State's important public-safety interests because assault-weapon restrictions, like the AWCA, are effective in reducing the incidence and lethality of mass shootings and the use of assault weapons in mass shootings. *See supra* Proposed Findings of Fact, Section V.

50.     In prohibiting the sale of assault weapons to law-abiding individuals, the AWCA is reasonably fitted to the State's important public-safety interests because the vast majority of firearms used in mass shootings are acquired legally. *See supra* Proposed Findings of Fact, Section IV, ¶ 117.

**C.     Alternatively, the AWCA Satisfies Strict Scrutiny**

51.     While intermediate scrutiny is the appropriate standard of scrutiny to apply to the AWCA, the AWCA alternatively satisfies strict scrutiny.

52.     The State's public-safety interests in reducing the incidence and lethality of gun violence are compelling. *See* Defs.' Ex. C (Donohue Decl.) ¶¶ 28-36 (DEF0012-16); Defs.' Ex. E (Klarevas Decl.) ¶¶ 9-11 (DEF-325-26).

53.     The AWCA is narrowly tailored to those interests by restricting only certain military-style configurations that enhance the lethality of certain firearms and their effectiveness in mass shootings and violence against law enforcement personnel.  *See supra* Proposed Findings of Fact, Sections II, III.B, IV.

Dated:  February 16, 2021                    Respectfully Submitted,

                                            XAVIER BECERRA
                                            Attorney General of California
                                            MARK R. BECKINGTON
                                            Supervising Deputy Attorney General
                                            JOSE A. ZELIDON-ZEPEDA
                                            PETER H. CHANG
                                            Deputy Attorneys General

                                            s/ John D. Echeverria

                                            JOHN D. ECHEVERRIA
                                            Deputy Attorney General
                                            *Attorneys for Defendants*

SA2019104420
42557790.docx

34

## CERTIFICATE OF SERVICE

Case Name:   **James Miller et al. v. Xavier Becerra, et al.**
Case No.     **3:19-cv-01537-BEN-JLB**

I hereby certify that on <u>February 16, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 16, 2021</u>, at San Francisco, California.


|   Robert Hallsey   |   /s/ Robert Hallsey   |
| :----------------: | :--------------------: |
|     Declarant      |       Signature        |

SA2019104420
42557773.docx