John W. Dillon (SBN 296788)
    jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

George M. Lee (SBN 172982)
    gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>    Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**[CivLR 16.1(f)(9)(b)]**<br><br>Trial: February 3, 2021<br>Time: 10:00 a.m.<br>Courtroom 5A<br>Judge: Hon. Roger T. Benitez |

## TABLE OF CONTENTS

I.    Introduction ..................................................................................1

II.   Proposed Findings of Fact and Conclusions of Law .....................................1

   A.    STIPULATED FACTS ..........................................................1

   B.    UNCONTESTED FACTS .......................................................3

      The Parties ...................................................................3

      Plaintiffs' Claims............................................................9

   C.    PRIMARY CONTENTIONS OF FACT AND LAW ...............................11

      Categorical Analysis Under Heller Should Apply; and Even if It Does Not, Defendants' AWCA Fails All Forms of Scrutiny.....................................11

      Arms Banned By California as "Assault Weapons" are Common and Constitutionally Protected ..........................................................13

      The Arms Banned By California as "Assault Weapons" Are Possessed and Used for Lawful Purposes Including Self-Defense .....................................18

      The Burden on Plaintiffs is Not Minor .........................................33

      The Arms Banned By California as "Assault Weapons" Are Not More Lethal Than Arms That Are Not Banned.....................................37

      Assault Weapons Bans Have No Discernible Effect on Crime .................40

      California's Continuous Expansion of the Assault Weapon Control Act is Proof of its Own Failure...............................................................41

      The Arms Banned By California as "Assault Weapons" Are Not Used in Most Mass Shootings ..............................................................43

      Defendants' Evidence ..........................................................45

      Conclusions of Law..............................................................52

1

<u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)...................................................55

4

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017)...........................................53

5

6

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016) .................................*passim*

7

*District of Columbia v. Heller*, 554 U.S. 570, 582, 128 S.Ct. 2783 (2008) .........*passim*

8

*Duncan v. Becerra*, 366 F.Supp.3d 1131 (S.D. Cal. 2019),
   *aff'd*, 970 F.3d 1133 (9th Cir. 2020)................................................*passim*

9

10

*Edenfield v. Fane*, 507 U.S. 761 (1993) ........................................55, 58

11

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)...........................56

12

*Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (2011) ......................14, 17

13

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)........53, 57

14

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014) ................................................56

15

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ..............................58

16

17

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) ........................................53

18

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...................................57

19

*Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004)...................................55

20

*Rupp v. Becerra*, 401 F.Supp.3d 978 (C.D. Cal. 2019).........................54, 55

21

*Silvester v. Becerra*, 138 S.Ct. 945 (2018) ........................................53, 57

22

23

*Silvester v. Harris*, 834 F.3d 816 (9th Cir. 2016) ....................................57

24

*Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) .........................55

25

*Stanley v. Georgia*, 394 U.S. 557 (1969)..............................................55

26

*Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793 (1994)....................16, 17

27

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ..................56

28

*Tyler v. Hillsdale County Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016) ....................57

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)................................................57

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).......................................52, 53

*United States v. Miller*, 307 U.S. 174 (1939) ..............................................................29

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007)....................................................55

**Statutes**

26 U.S.C. § 2845 .............................................................................................................23

42 U.S.C. § 1983 ...............................................................................................................9

42 U.S.C. § 1988 .............................................................................................................10

Cal. Pen. Code § 16740.............................................................................................4, 6, 28

Cal. Pen. Code § 30500.....................................................................................................3

Cal. Pen. Code § 30510.....................................................................................................1

Cal. Pen. Code § 30515(a).........................................................................................*passim*

Cal. Pen. Code § 30515(b).........................................................................................3, 28

Cal. Pen. Code § 30600.................................................................................................1, 10

Cal. Pen. Code § 30605.................................................................................................1, 10

Cal. Pen. Code § 30655.....................................................................................................1

Cal. Pen. Code § 30800.................................................................................................3, 10

Cal. Pen. Code § 30900.....................................................................................................4

Cal. Pen. Code § 30910...................................................................................................10

Cal. Pen. Code § 30915...................................................................................................10

Cal. Pen. Code § 30925.............................................................................................10, 11

Cal. Pen. Code § 30945...................................................................................................10

Cal. Pen. Code § 30950........................................................................1, 10

Cal. Pen. Code § 31000............................................................................10

Cal. Pen. Code § 31005............................................................................10

Cal. Pen. Code § 32310............................................................................54

**Regulations**

11 Cal. Code Regs. § 5460.......................................................................10

11 Cal. Code Regs. § 5471.......................................................3, 10, 23, 30

## I.    INTRODUCTION

Pursuant to CivLR 16.1(f)(9)(b), plaintiffs James Miller, *et al*. ("plaintiffs") hereby submit their Proposed Findings of Fact and Conclusions of Law after the bench trial, which commenced on February 3, 2021, and submitted on February 5, 2021, the Honorable Roger T. Benitez, presiding.  Plaintiffs have amended and supplemented their proposed findings of fact and conclusions of law [ECF 88] based on the evidence introduced and admitted at trial.

## II.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    STIPULATED FACTS

By and through submission of their proposed Pretrial Order, submitted to the Court on December 9, 2020, the parties stipulated to the following facts (except as otherwise indicated below):

1.    California's Robert-Roos Assault Weapons Control Act of 1989 ("AWCA") was first enacted in 1989. California's AWCA bans manufacturing, causing to be manufactured, distributing, transporting, importing into the state, keeping for sale, offering, or exposing for sale, giving, lending, possessing, transferring through bequest or intestate succession any assault weapon and bars juveniles from registering or possessing any assault weapon.  Cal. Penal Code §§ 30600, 30605, 30655, 30950.

2.    The original AWCA identified particular assault weapons by make and model. *Id.* § 30510. The AWCA was amended in 2000 to add alternative definitions of assault weapons based on the features or characteristics of certain types of firearms. *Id.* § 30515(a). In relevant part, the definitions found in Penal Code § 30515(a) are as follows:

- §30515(a)(1): A semiautomatic, centerfire rifle that does not have a fixed magazine but has any one of the following: A pistol grip that protrudes conspicuously beneath the action of the weapon; a

thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; or a forward pistol grip.

- §30515(a)(2): A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

- §30515(a)(3): A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

- §30515(a)(4): A semiautomatic pistol that does not have a fixed magazine but has any one of the following: a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer; a second handgrip; a shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel; or the capacity to accept a detachable magazine at some location outside of the pistol grip.

- §30515(a)(5): A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

- §30515(a)(6): A semiautomatic shotgun that has both of the following: a folding or telescoping stock, and a pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

- §30515(a)(7): A semiautomatic shotgun that does not have a fixed magazine.

- §30515(a)(8): Any shotgun with a revolving cylinder.

- §30515(a)(9): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that does not have a fixed magazine, but that has any one of the following: a pistol grip that protrudes conspicuously beneath the action of the weapon; a thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; a forward pistol grip; a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer; a second handgrip; a shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel; or the capacity to accept a detachable magazine at some location outside

of the pistol grip.[1]

- §30515(a)(10): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that has a fixed magazine with the capacity to accept more than 10 rounds.[2]

- §30515(a)(11): A semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun, that has an overall length of less than 30 inches.[3]

3.      Penal Code § 30515(b) defines "fixed magazine" to mean "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action." *See also* 11 Cal. Code Regs. § 5471(p).

4.      Under the AWCA, the possession of any assault weapon in violation of Penal Code § 30500, et seq. is a public nuisance. Penal Code § 30800.

## B.   UNCONTESTED FACTS

Plaintiffs have submitted the following facts that Defendants did not appear to contest at trial:

### The Parties

5.      Plaintiff James Miller is a resident of San Diego, California. Plaintiff Miller is not prohibited from owning firearms. (Miller Decl., Plaintiffs' Exhibit 013, ¶¶ 1-3.) Plaintiff Miller legally owns a semiautomatic centerfire rifle which as one or more of the characteristics listed in Penal Code § 30515(a)(1), specifically, a pistol grip (§ 30515(a)(1)(A)), a telescoping stock (§ 30515(a)(1)(C), and a flash suppressor (§ 30515(a)(1)(E)). This firearm has a "fixed magazine" because it contains an ammunition feeding device that cannot be removed from the firearm without

---

[1] Defendants did not stipulate to this fact.
[2] Defendants did not stipulate to this fact.
[3] Defendants did not stipulate to this fact.

1   disassembly of the firearm action. Miller Decl., Plaintiffs' Exh. 013, ¶ 4. Plaintiff

2   Miller rendered the firearm with a fixed magazine in order to preserve the other

3   features without having to alter, deface or destroy the other characteristics of the

4   firearm. Id., ¶ 5. Plaintiff Miller is also in lawful possession of a "large capacity

5   magazine," as that term is defined in Penal Code § 16740, as it has the capacity to

6   hold more than ten rounds of ammunition. Miller Decl., Plaintiffs' Exh. 013, ¶ 6. If

7   Plaintiff Miller were to insert the "large capacity magazine" into the firearm he

8   possesses, it would be prohibited as an assault weapon under Pen. Code §

9   30515(a)(2.) Plaintiff Miller wishes to continue to use his firearm, with the magazine

10  inserted, without being subject to arrest and/or prosecution for possession or

11  manufacture of an assault weapon. Miller Decl., Plaintiffs' Exh. 013, ¶ 8. Plaintiff

12  Miller also desires to obtain and acquire additional AR-15 pattern firearms that do not

13  have a fixed magazine, but which have some or all of the features listed in Pen. Code

14  § 30515(a)(1). Id., ¶ 9.

15         6.     Plaintiff Wendy Hauffen is a resident of San Diego, California. Plaintiff

16  Hauffen is not prohibited from owning firearms. Hauffen Decl., Plaintiffs' Exh. 014,

17  ¶¶ 1-3. Plaintiff Hauffen is the owner of a semiautomatic centerfire rifle described as

18  an AR-15 pattern rifle. This rifle is "featureless," in that it does not have any of the

19  features listed in Pen. Code § 30515(a)(1). Hauffen Decl., Plaintiffs' Exh. 014, ¶ 4.

20  Plaintiff Hauffen rendered the firearm as "features" configuration (under 11 Cal. Code

21  Regs. § 5471(o) in order to avoid having to register the firearm as an "assault weapon"

22  pursuant to Pen. Code § 30900(b). Hauffen Decl., Plaintiffs' Exh. 014, ¶ 5. She

23  prefers to have the listed features in § 30515(a)(1) reattached to the firearm, but in

24  doing so, would have had to register the firearm as an "assault weapon." If registered

25  as an assault weapon, it would have prevented Plaintiff Hauffen from transferring the

26  firearm to anyone else or passing it along to her heirs. Hauffen Decl., Plaintiffs' Exh.

27  014, ¶ 5. She plans to and would like to pass the firearm down to her heirs or to sell

28  them should the need arise. *Id.* Plaintiff Hauffen would like to reattach some or all of

1   the § 30515(a)(1) features to her firearm but fears she would be subject to arrest
2   and/or prosecution for possessing or manufacturing an "assault weapon." *Id*., ¶ 6.

3       7.      Plaintiff Hauffen is also a firearms trainer, who specializes in training
4   other women in the proficiency of arms and self-defense. *Id*., ¶ 8. In her experience,
5   the collapsible/telescoping stock, which is common to most AR-15 rifles, makes it an
6   ideal rifle with which to instruct and train women. *Id*. Plaintiff Hauffen herself
7   specifically desires to use the ergonomic features of the firearm, such as the pistol
8   grip, in controlling the firearm and ensuring accuracy while shooting. *Id*. The ability
9   to use standard, thirty-round magazines with low recoil ammunition are among the
10  reasons why she prefers to use and train students with centerfire firearms with the
11  listed features, such as on the AR-15 rifle. *Id*. Plaintiff Hauffen also desires to obtain
12  and acquire additional AR-15 pattern firearms that do not have a fixed magazine, but
13  which have some or all of the features listed in Pen. Code § 30515(a)(1). *Id*., ¶ 9. Such
14  firearms she would like to acquire also include AR-15 pistols which have many of the
15  same features. *Id*., Pen. Code § 30515(a)(4)(A)-(D). Plaintiff Hauffen also has a
16  standard Sig Sauer P239 9mm semiautomatic pistol, which she uses both in teaching
17  firearms classes and shooting recreationally. Hauffen Decl., Plaintiffs' Exh. 014, ¶ 10.
18  She would like to replace the standard barrel with a threaded barrel, which would
19  allow her either to attach a flash suppressor or a muzzle brake to the firearm, assisting
20  her vision, accuracy, and control. *Id*.

21      8.      Plaintiff Neil Rutherford is a resident of San Diego, California. Plaintiff
22  Rutherford is not prohibited from owning firearms. Rutherford Decl., Plaintiffs' Exh.
23  017, ¶¶ 1-3. Plaintiff Rutherford desires to obtain and acquire AR-15 pattern firearms
24  that are sold in other parts of the country, and which have some or all of the features
25  listed in Pen. Code § 30515(a)(1), and which have the capacity to accept detachable
26  magazines. *Id*., ¶ 4. Plaintiff Rutherford also desires to obtain and acquire other
27  firearms classified as "assault weapons," including AR pistols, which contain some or
28  all of the features described in Pen. Code § 30515(a)(4)(A)-(D), semiautomatic

shotguns which contain some or all of the features listed in Pen. Code § 30515(a)(6) and (a)(7) but is prohibited by those provisions which define such firearms to be "assault weapons" under California law. Rutherford Decl., Plaintiffs' Exh. 017, ¶ 5.

9.      Plaintiff Adrian Sevilla is a resident of San Diego, California. Plaintiff Sevilla is not prohibited from owning firearms. Sevilla Decl., Plaintiffs' Exh. 018, ¶¶ 1-3. Plaintiff Sevilla desires to obtain and acquire AR-15 pattern firearms that are sold in other parts of the country, and which have some or all of the features listed in Pen. Code § 30515(a)(1), and which have the capacity to accept detachable magazines. *Id.*, ¶ 4. Plaintiff Sevilla also desires to obtain and acquire other firearms classified as "assault weapons," including AR pistols, which contain some or all of the features described in Pen. Code § 30515(a)(4)(A)-(D), semiautomatic shotguns which contain some or all of the features listed in Pen. Code § 30515(a)(6) and (a)(7) but is prohibited by those provisions which define such firearms to be "assault weapons" under California law. Sevilla Decl., Plaintiffs' Exh. 018, ¶ 5.

10.      Plaintiff Ryan Peterson is a resident of San Diego, California. Plaintiff Peterson is not prohibited from owning firearms. Peterson Decl., Plaintiffs' Exh. 015, ¶¶ 1-3. Plaintiff Peterson is the lawful owner of a semiautomatic pistol with a "fixed magazine," as it contains an ammunition feeding device that cannot be removed from the firearm without disassembly of the firearm action. *Id.*, ¶ 4.) If Plaintiff Peterson were to remove the fixed magazine, it would be considered to be an assault weapon. Tx of 10/22/20 Hearing, at 11:20 – 12:21. Plaintiff Peterson is also the lawful owner of a large capacity magazine defined under Penal Code section 16740 that is compatible with his semiautomatic fixed magazine pistol. If Plaintiff Peterson were to insert his lawfully owned large capacity magazine into his semiautomatic fixed magazine pistol, it would be considered an assault weapon. Peterson Decl., Plaintiffs' Exh. 015, ¶¶ 5-7.

11.      Plaintiff Peterson wishes to use his lawfully owned large capacity magazine in his semiautomatic fixed magazine pistol. Plaintiff Peterson also wishes to

1  obtain additional semiautomatic, centerfire firearms, including AR-15 pattern

2  firearms, that either have some or all of the features listed in Penal Code section

3  30515(a)(1) and which do not have a fixed magazine, and/or to obtain and acquire a

4  semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept

5  more than 10 rounds. Peterson Decl., Plaintiffs' Exh. 015, ¶¶ 7-8.

6      12.     Plaintiff Gunfighter Tactical, LLC is a federally and state-licensed

7  firearms retailer in San Diego, California, owned and managed by Plaintiff Peterson.

8  Peterson Decl., Plaintiffs' Exh. 015, at ¶ 9; Tx of 10/22/20 Hearing at 13:9-14.

9  Gunfighter Tactical would like to purchase, sell, and transfer firearms in common use

10  for lawful purposes in other parts of the country, to ordinary, non-prohibited citizens,

11  but which firearms are prohibited because they contain some or all of the features

12  described by Pen. Code § 30515(a)(1). Peterson Decl., Plaintiffs' Exh. 015, ¶ 9.

13  Gunfighter Tactical is prevented from selling common AR-15 pattern rifles with

14  detachable magazines to ordinary citizens. Tx of 10/22/20 Hearing at 13:9-14.

15      13.     Plaintiff John Phillips is a resident of San Diego, California. Plaintiff

16  Phillips is not prohibited from owning firearms. Phillips Decl., Plaintiffs' Exh. 016, ¶

17  1. Plaintiff Phillips is the president of Plaintiff PWGG, L.P., doing business as

18  "Poway Weapons & Gear" and "PWG Range," a federally licensed firearms retailer

19  and shooting range in Poway, California. Phillips Decl., Plaintiffs' Exh. 016, ¶ 3.

20      14.     Plaintiff Phillips is also a member of organizational Plaintiffs, San Diego

21  County Gun Owners PAC, California Gun Rights Foundation, Second Amendment

22  Foundation, and Firearms Policy Coalition, Inc. Phillips Decl., Plaintiffs' Exh. 016, ¶

23  3.

24      15.     Plaintiff PWGG, L.P. holds a "Dangerous Weapons License/Permit"

25  issued and maintained by Defendants through the California Department of Justice,

26  Bureau of Firearms. This permit allows Plaintiff PWGG, L.P. to acquire and sell

27  "assault weapons" as defined by Penal Code section 30515(a) to select exempted

28  recipients, such as law enforcement officers. This permit does not allow Plaintiff

PWGG, L.P. to sell, transfer, or rent Penal Code section 30515(a) "assault weapons" to non-exempt agencies or individuals, ordinary, non-prohibited citizens. Phillips Decl., Plaintiffs' Exh. 016, ¶ 5.

16.     Plaintiff Phillips and Plaintiff PWGG, L.P. wish to have the business purchase, sell, and transfer firearms in common use for lawful purposes which are defined as "assault weapons" and contain some or all of the features described by Penal Code section 30515(a) — to ordinary, non-prohibited adults through the FFL dealership. Plaintiff Phillips and Plaintiff PWGG, L.P. are prevented from doing so due to state law. Phillips Decl., Plaintiffs' Exh. 016, ¶ 4.

17.     Plaintiff San Diego County Gun Owners (SDCGO) is a membership organization which advocates for and advances the Second Amendment rights of residents of San Diego County, California to keep and bear arms. Individual plaintiffs Miller, Hauffen, Rutherford, Sevilla, Peterson and Phillips are members of SDCGO. FAC, ¶¶ 1-10; Schwartz Decl., Plaintiffs' Exh. 019, ¶¶ 3-4.

18.     Plaintiff SDCGO has California resident members who wish to acquire and possess common semiautomatic firearms with various characteristics which are defined as "assault weapons" under Penal Code § 30515(a). Schwartz Decl., Plaintiffs' Exh. 019, ¶¶ 5-6.

19.     Plaintiff California Gun Rights Foundation (CGF) is a non-profit foundation which advocates for and advances the Second Amendment rights of residents of California to keep and bear arms. Individual plaintiffs Miller, Hauffen, Rutherford, Sevilla, Peterson and Phillips are members of CGF. FAC, ¶¶ 1-8, 11; Hoffman Decl., Plaintiffs' Exh. 020, ¶¶ 3-4.

20.     Plaintiff CGF has California resident members who wish to acquire and possess common semiautomatic firearms with various characteristics which are defined as "assault weapons" under Penal Code § 30515(a). Hoffman Decl., Plaintiffs' Exh. 020, ¶¶ 5-6.

1    21.    Plaintiff Firearms Policy Coalition (FPC) is a non-profit organization

2    which advocates for and advances the Second Amendment rights of residents of

3    around the nation to keep and bear arms. Individual plaintiffs Miller, Hauffen,

4    Rutherford, Sevilla, Peterson, and Phillips are members of FPC. FAC, ¶¶ 1-8, 12;

5    Combs Decl., Plaintiffs' Exh. 022, ¶¶ 3-4.

6    22.    Plaintiff FPC has California resident members who wish to acquire and

7    possess common semiautomatic firearms with various characteristics which are

8    defined as "assault weapons" under Penal Code § 30515(a). Combs Decl., Plaintiffs'

9    Exh. 022, ¶¶ 3-4.

10    23.    Plaintiff Second Amendment Foundation (SAF) is a non-profit

11    educational foundation which advocates for and advances the Second Amendment

12    rights of residents of around the nation to keep and bear arms. Individual plaintiffs

13    Miller, Hauffen, Rutherford, Sevilla, Peterson, and Phillips are members of SAF.

14    FAC, ¶¶ 1-8, 13; Gottlieb Decl., Plaintiffs' Exh. 021, ¶¶ 3-5.

15    24.    Plaintiff SAF has California resident members who wish to acquire and

16    possess common semiautomatic firearms with various characteristics which are

17    defined as "assault weapons" under Penal Code § 30515(a). Gottlieb Decl., Plaintiffs'

18    Exh. 21, ¶¶ 6-7.

19

20                          **Plaintiffs' Claims**

21    25.    Plaintiffs' claims for relief arise under 42 U.S.C. § 1983, for Defendants'

22    laws, policies, customs, and enforcement practices which violate the right to keep and

23    bear arms under the Second Amendment to the U.S. Constitution. First Amended

24    Complaint [ECF Dkt. 9] ("FAC"), ¶¶ 90-104.

25    26.    Plaintiffs seek relief, as pleaded in their First Amended Complaint, as

26    follows:

27            "1. For declaratory relief adjudging that the definitions of

28            "assault weapon" pursuant to Penal Code §§ 30515(a) and (b), and

Title 11, California Code of Regulations §§ 5460 and 5471, are unconstitutional on their face and as applied, and violate the Second Amendment, to the extent that the State's laws and regulations operate to prohibit or prevent Plaintiffs and similarly situated persons from exercising their rights, including acquiring, keeping, bearing, transporting, transferring, and using "assault weapons" for lawful purposes;

2. For declaratory relief adjudging that California Penal Code §§ 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005 are unconstitutional on their face and as applied, and in violation of the Second Amendment, to the extent that the State's laws and regulations operate to prohibit or prevent Plaintiffs and similarly situated persons from exercising their rights, including acquiring, keeping, bearing, transporting, transferring, and using "assault weapons" for lawful purposes;

3. For declaratory relief supporting an injunction, and an order temporarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, who receive actual notice of the injunction, from enforcement or application of Penal Code §§ 30515(a) and (b), 30600, 30605, 30800, 30910, 30915, 30925, 30945, 30950, 31000, and 31005, as well as Title 11, California Code of Regulations §§ 5460 and 5471, against Plaintiffs on an as-applied basis, and against all similarly situated persons;

4. For costs of suit, including attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

5. For any and all further relief to which Plaintiffs may be justly entitled."

1  FAC, pp. 41-42.

2      27.    Plaintiffs have withdrawn their claim as to Pen. Code § 30925.

3

4  **C.    PRIMARY CONTENTIONS OF FACT AND LAW**

5  **Categorical Analysis Under Heller Should Apply; and Even if It Does Not,**

6  **Defendants' AWCA Fails All Forms of Scrutiny**

7      28.    The Supreme Court has emphasized that "reasonable" tailoring demands

8  a considerably closer fit than mere rational basis scrutiny; and the AWCA's sweeping

9  ban on common firearms with common characteristics is not a reasonable fit for

10 achieving the State's interests.

11     29.    In deciding intermediate scrutiny, courts use a First Amendment analysis.

12 Heightened scrutiny in Second Amendment cases is guided by First Amendment

13 principles. *Jackson,* 746 F.3d at 961.

14     30.    Thus, if California's assault weapons ban does not "alleviate the claimed

15 harms to a material degree," it fails intermediate scrutiny. *Edenfield v. Fane*, 507 U.S.

16 761, 770-71; See Lott Decl. Plaintiffs' Exh. 010, Exhs. 010-2 through 010-29; See

17 also Lott Decl., Plaintiffs' Exh. 032.

18     31.    Defendants have not provided any credible evidence that the AWCA is

19 effective.

20     32.    Any alleged higher incidence of "assault weapons" being used in crimes,

21 mass shootings, and/or police shootings cannot justify the State' sweeping ban on the

22 lawful possession and use of protected arms, and the lawful use of such arms

23 overwhelmingly outweighs any criminal use. Government "may not regulate the

24 secondary effects of speech by suppressing the speech itself." *City of Los Angles v.*

25 *Alameda Books, Inc*., 535 U.S. 425, 445 (2002) (opinion of Kennedy, J.).

26     33.    The U.S. Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570,

27 582, 128 S.Ct. 2783 (2008) rejected such an argument, finding that a ban on

28

1  possessing commonly owned firearms lacked any fit to further the government's

2  interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29.

3      34.    Constitutionally protected activities cannot be banned because the

4  activity *could* lead to criminal abuses. See *Southeast Promotions Led. V. Conrad*, 420

5  U.S. 546, 559 (1975); *Vicenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb*

6  *v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal*.,

7  535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969).

8      35.    Under intermediate scrutiny, "a reasonable fit requires tailoring, and a

9  broad prophylactic ban on acquisition or possession of all" common semiautomatic

10  firearms with common characteristics "for all ordinary, law-abiding, responsible

11  citizens is not tailored at all." *Duncan v. Becerra*, 366 F.Supp.3d at 1180; see also

12  *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 682-83 (1994) (O'Connor, J.,

13  concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored' —

14  even under the more lenient [standard applicable to content neutral restrictions] —

15  where… a substantial portion of the burden on speech does not serve to advance [the

16  State's content-neutral] goals…. Broad prophylactic rules in the area of free

17  expression are suspect. Precision of regulation must be the touchstone….") (brackets

18  in original) (citation and quotations omitted).

19      36.    "To meet the narrow tailoring requirement … the government must

20  demonstrate that alternative measures that burden substantially less [of the right]

21  would fail to achieve the government's interests, not simply that the chosen route is

22  easier." *McCullen v. Coakley*, 134 S. Ct. 2518, 2524 (2014); see also *Ward v. Rock*

23  *Against Racism*, 491 U.S. 781, 799 (1989).

24      37.    "The right to self-defense is largely meaningless if it does not include the

25  right to choose the most effective means of defending oneself." *Friedman v. City of*

26  *Highland Park*, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting).

27      38.    The State's justification that the self-same characteristics that make the

28  firearms here suitable for lawful use may also make them effective tools for crime if

1    misused, thus necessitating a ban, misses the point and would ultimately gut the

2    Second Amendment.

3        39.    The very point of protecting arms, and firearms in particular, is that they

4    allow a law-abiding person to project force against unjust force at a distance, and

5    thereby defend themselves and others against a violent threat as soon as possible with

6    the least amount of damage to those being protected.

7        40.    Inevitably, under the State's reasoning, all firearms that are suitable for

8    any lawful purpose, including self-defense and militia service, are comparably

9    dangerous in the hands of a violent criminal.

10       41.    The notion that improvements that make firearms better and safer for

11   lawful use likewise make them comparably better for unlawful use simply leads to the

12   absurdity that firearms may never be improved because the very fact that the firearm

13   is more accurate or lethal outweigh the benefits and justify a ban.

14       42.    Importantly, under intermediate scrutiny, if a law is underinclusive, that

15   undermines the purported interest alleged by the State.  *Greater New Orleans*

16   *Broadcasting Ass'n v. United States*, 527 U.S. 173, 185-95 (1999).  And if it is

17   necessarily underinclusive, because a more inclusive restriction would be

18   unconstitutional, that shows the interest is not valid as framed.

19       43.    The State admits that the AWCA does not prohibit all semiautomatic

20   firearms precisely because such a ban would be unconstitutional. As shown below, the

21   AWCA's continuous expansion of what constitutes an assault weapon has no stopping

22   point. Because the AWCA has no stopping point and the current restriction is

23   necessarily underinclusive, the State's interest as framed is improper.

24

25        **Arms Banned By California as "Assault Weapons" are Common and**
26                    **Constitutionally Protected**

27       44.    The Supreme Court has held that "the Second Amendment extends,

28   prima facie, to all instruments that constitute bearable arms, even those that were not

1  in existence at the time of the founding." *Heller*, 554 U.S. at 582 (2008). The right to

2  keep and bear arms is a right enjoyed by law-abiding citizens to have arms that are "in

3  common use" "for lawful purposes like self-defense." *Heller*, 554 U.S. at 624; *Heller*

4  *v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1271 (2011) (Kavanaugh, J.,

5  dissenting); *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*, 970

6  F.3d 1133 (9th Cir. 2020).

7    45.    The Supreme Court's test for commonality is a nationwide inquiry. The

8  Second Amendment does not mean different things in different parts of the country.

9  The Supreme Court's analysis in *Heller* asks simply whether the arms are "*both*

10  dangerous *and* unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016)

11  (Alito, J., joined by Thomas, J., concurring) (italics original).  And if the firearms are

12  not *both*, it determines if the category of arms are in common use for lawful purposes.

13  *Duncan*, 366 F.Supp.3d at 1142. The text of the Second Amendment, as it is informed

14  by history and tradition, all point in the same direction because "the pertinent Second

15  Amendment inquiry is whether [the banned weapons] are commonly possessed by

16  law-abiding citizens for lawful purposes *today*." *Caetano*, *supra*, at 1032 (italics

17  original).

18    46.    The arms banned as "assault weapons" under the AWCA and regulations

19  are not *both* dangerous *and* unusual, as the Supreme Court defined in *Heller*. To the

20  contrary, they are common in all respects: (1) they are common functionally, as they

21  are all semiautomatic in their operation; (2) they are common characteristically, as

22  they are all commercially popular types of arms with various common characteristics

23  like pistol grips and the like; and (3) they are common jurisdictionally, available in the

24  vast majority of states. As further proof, they are common numerically, in that they

25  are owned by citizens by the hundreds of thousands or more. All of the semiautomatic

26  firearms California bans in Penal Code section 30515 meet the *Heller* test and are

27  constitutionally protected.

28    47.    While numerical data can be helpful in determining if a particular

1   weapon is commonly used for lawful purposes, the constitutionally-protected status of

2   arms cannot turn on fact-bound sales numbers of particular makes, models, or even

3   specific configurations. Rather, the question is a categorical analysis of type and

4   function, set against a backdrop of permissibility and availability throughout the

5   United States. "While less popular than handguns, stun guns are widely owned and

6   accepted as a legitimate means of self-defense across the country." *Caetano*, 136 S.

7   Ct. 1027, 1033 (2016) (Alito, J., concurring). So too are semiautomatic firearms in

8   various configurations of characteristics, as California bans. These firearms are

9   commonly used by responsible, law-abiding people for various lawful purposes such

10  as self-defense, hunting, recreation, competition, and collecting. Curcuruto Decl.,

11  Plaintiffs' Exh. 004, ¶¶ 7-14; Exhs. 004-1 to 004-8.

12      48.   The fact that the AWCA may act to ban thousands of discrete

13  configurations of common semiautomatic pistols, shotguns, and rifles held in

14  respectively smaller numbers than the over-arching category of "assault weapons" as a

15  whole is irrelevant to the constitutional inquiry under *Heller*. Mocsary Decl.,

16  Plaintiffs' Exh. 003, ¶¶ 47-52.

17      49.   Another demonstration of the commonality of semiautomatic firearms

18  called "assault weapons" is their general legality in other jurisdictions. *Caetano*, 136

19  S.Ct. at 1032 ("[t]he more relevant statistic is that "[h]undreds of thousands of Tasers

20  and stun guns have been sold to private citizens," who it appears may lawfully possess

21  them in 45 States") (Alito, J., concurring).

22      50.   Law-abiding citizens may possess any semiautomatic rifle in 44 states

23  and may possess some semiautomatic rifles in all 50 states. Mocsary Decl., Plaintiffs'

24  Exh. 003, at ¶ 44. Semiautomatic firearms may be possessed by citizens in all fifty

25  states. Forty-one states treat all semiautomatic firearms the same as every other legal

26  firearm, without any additional restrictions, regardless of the features attached to the

27  firearm. *Id*.

28      51.   Millions of weapons that California defines as "assault weapons" by

1   virtue of the Penal Code section 30515(a)(1) characteristics are legally owned by
2   people in a large majority of the states. Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 25-52.

3       52.     Assault weapons bans are not longstanding prohibitions. The only federal
4   regulation on semiautomatic firearms having characteristics at issue here did not occur
5   until 1994 in the Public Safety and Recreational Firearms Use Protection Act (the
6   "Federal Assault Weapons Ban") (103rd Congress (1993-1994)), a subsection of the
7   Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322), which
8   was allowed to sunset 10 years later due to its lack of effect on crime. Lott Decl,
9   Plaintiffs' Exh. 010, ¶ 8.

10      53.     Firearms defined under California law as "assault weapons" by virtue of
11  the features they contain, as set forth in Pen. Code section 30515(a), are in common
12  use, for lawful purposes, including, recreational and competitive target shooting, self-
13  defense, collecting and hunting, by millions of Americans. Curcuruto Decl., Plaintiffs'
14  Exh. 004, ¶ 7.

15      54.     Semiautomatic rifles bearing features prohibited by Pen. Code section
16  30515(a)(1) are widely available and popular. The characteristics most commonly
17  associated with these types of firearms are that they are semiautomatic, with the
18  ability to accept a detachable magazine. Curcuruto testimony, Tx of 10/19/20 Hearing
19  at 62:7-11; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18. The most popular is the AR
20  platform (or rifles modeled on the AR-15 pattern). Curcuruto testimony, Tx of
21  10/19/20 Hearing at 62:17-18. That is true both nationally and in the State of
22  California. *Id*. at 62:24 – 63:19.

23      55.     An AR-15 rifle is a semiautomatic civilian rifle, which means it fires one
24  shot with every pull of the trigger. *Staples v. United States*, 511 U.S. 600, 603, 114
25  S.Ct. 1793 (1994). Kapelsohn testimony, Tx of 10/19/20 hearing at 23:4-9; Curcuruto
26  Decl., Plaintiffs' Exh. 004, ¶ 7, fn.1. This distinguishes an AR-15 from an M16, which
27  is a "select fire" weapon, that is, it can be either semiautomatic or fully automatic.
28  *Staples*, 511 U.S. at 603; Kapelsohn testimony, Tx of 10/19/20 Hearing at 21:22 -

22:5; Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7. Semiautomatic firearms such as the AR-15 "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612; *Heller II*, 670 F.3d at 1288. In general, semiautomatic firearms are widely available and popular; the vast majority of handguns sold today are semiautomatic. *Heller II*, 670 F.3d at 1269 (Kavanaugh, J., dissenting).

56.     The AR-15 type rifle is a popular, semiautomatic rifle in wide civilian use throughout the United States. *Duncan*, 366 F.Supp.3d at 1145. Curcuruto Decl., Plaintiffs' Exh. 004, ¶¶ 7-8; Curcuruto testimony, Tx of 10/19/20 Hearing at 63:10-19; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18. The AR-15 is especially popular because of its light weight, mild recoil, and good ergonomics, all of which make it well suited to younger shooters, female shooters, and other shooters of smaller stature, as well as an easy rifle for larger, stronger individuals to use. Kapelsohn Decl, Plaintiffs' Exh. 001, ¶ 18.

57.     The AR-15 rifle has been in existence since being developed by the Armalite company in the 1950s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 28; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18; Curcuruto Decl., Plaintiffs' Exh. 4, ¶ 007, fn.1. Many of the features incorporated into the AR-15 rifle already had been in existence; the only major new features incorporated into the AR-15 were lightweight alloys to synthetic materials that became a popular experimentation across all firearm platforms following World War II. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 28.

58.     United States manufacturers produced approximately 14.7 million AR-platform rifles for the United States commercial marketplace between 1990 and 2018. Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 8; Exh. 004-3. Currently, there are an estimated 19.8 million modern semiautomatic rifles overall produced in the U.S. or imported, between 1990-2018. Curcuruto Decl., Plaintiffs' Exhibit 004, ¶ 15-; Ex. 004-8. The most common calibers for modern semiautomatic rifles are .223 (or 5.56 x 45mm), 7.62 x 39mm, .22 caliber and .308 caliber. Curcuruto testimony, Tx of 10/19/20 hearing at 65:7-10.

59.     The most common caliber for the AR-15 rifle is the 5.56x45 NATO (or .223) cartridge, which is a centerfire cartridge. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:25 – 66:5. The .223 cartridge is essentially the same as the 5.56 x 45mm round, with minor differences in the brass, but having the identical bullet. Depo. of Dr. Robert Margulies, at 52:15 – 53:15.

60.     Rimfire firearms would make up a small portion of the overall numbers of modern semiautomatic rifles, approximately 15 percent. Curcuruto testimony, Tx of 10/19/20 Hearing at 66:9-13. The "vast majority" of modern semiautomatic rifles are centerfire rather than rimfire. Curcuruto Depo., p. 129:14-21.

61.     Defendants' own evidence acknowledges that firearms identified as "assault weapons" under Penal Code section 30515(a) are common and prolific throughout the United States. See Defendants' Exh. BH (depicting hundreds of models of firearms defined as "assault weapons"); see also Glover Decl., Def. Exh. CZ, ¶ 6 (detailing the number of registered assault weapons in California).

## The Arms Banned By California as "Assault Weapons" Are Possessed and Used for Lawful Purposes Including Self-Defense

62.     Semiautomatic firearms bearing the Penal Code section 30515(a) characteristics are well-suited for self-defense purposes, which is a lawful use. The AR-15 in particular is an easy firearm to shoot accurately and is generally easier to fire accurately than a handgun. Kapelsohn testimony, Tx of 10/19/20 hearing at 25:16 – 26:20. The AR-15 rifle is light in weight, and has good ergonomics, and is suitable for people of all statures and varying levels of strength. *Id*., at 26:21 – 27:8.

63.     In its standard configuration, the most popular features of semiautomatic rifles such as the AR-15 rifle, as sold in other parts of the country, are the pistol grip (prohibited by Pen. Code section 30515(a)(1)(A)), the telescoping stock (prohibited by Penal Code section 30515(a)(1)(C)), and a flash suppressor (prohibited by Penal Code section 30515(a)(1)(E)). Graham testimony, Tx of 10/19/20 Hearing at 129:21 –

130:1.

64.    Accuracy is very important for self-defense, because unlike the criminal using a firearm, a civilian or a police officer is accountable for every round they fire. And thus, if they miss the attacker, they will hit something they did not intend to hit, which may be an innocent bystander. Kapelsohn testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6. The defense does not dispute the importance of accuracy in self-defense shootings. Graham testimony, Tx of 10/19/20 Hearing at 134:15-18 ("if you're firing a weapon for self-defense, accuracy would be ideal").

65.    Ergonomics is important to accuracy. Kapelsohn testimony, Tx of 10/19/20 Hearing at 30:17 – 31:5. In addition, good ergonomics assists the ability of a civilian to train more effectively. *Id*., at 31:6-10.

66.    Pistol grips are a prohibited feature under Pen. Code section 30515(a)(1)(A). A pistol grip is a grip "that protrudes conspicuously beneath the action of the weapon." *Id*. Pistol grips are the most common of the prohibited features on just about all modern semiautomatic arms. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:2-6; Graham testimony, Tx of 10/19/20 Hearing at 129:17-12; Decl of Blake Graham, Def. Exh. D, at ¶ 28 ("In my experience, this feature is the most prevalent feature of assault rifles prohibited under the AWCA."). Pistol grips enhance the ergonomics of the weapon. Decl. of Blake Graham, Def. Exh. D, ¶ 28. Pistol grips are therefore important to good ergonomics, particularly on a straight line design rifle such as the AR-15. Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 28; Kapelsohn testimony, Tx of 10/19/20 hearing at 32:23 – 33:2. This enhances the firearm's accuracy. *Id*.; Decl. of Blake Graham, Def. Exh. D, ¶ 28 ("A shooter using an assault rifle without a pistol grip may shoot less accurately with repeated – and especially rapid – shots if the shooter's trigger hand is in an awkward position for a significant amount of time"); Def. Exh. BA, p. 9 (pistol grips afford greater control of the rifle during firing).

67.    Pistol grips have appeared on long guns dating back to at least the 1700s.

1    Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 17; Exhs. 002-22 to 002-24.

2    68.    Thumbhole stocks are a prohibited feature under Penal Code sections

3    30515(a)(1)(B) (on rifles) and 30515(a)(6)(B) (on shotguns). Like pistol grips,

4    thumbhole stocks allow the shooter to gain a comfortable grip on the firearm and can

5    facilitate accurate shooting. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29. By

6    prohibiting both pistol grip stocks and thumbhole stocks, section 30515(a)(1)(B)

7    relegates such firearms to be equipped in a manner that is less comfortable, less

8    accurate, and less safe. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29. Thumbhole stocks

9    are functionally similar to pistol grips. Def. Exh. BA, p. 9.

10    69.    Thumbhole stocks have been on rifles for many years. Kapelsohn Decl.,

11    Plaintiffs' Exh. 001, ¶ 29. Rifles featuring thumbhole stocks have been featured on

12    certain Olympic rifles, including several models dating to the 1950s, and are a

13    prominent shooting sports feature. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 19, Exh. 2-

14    27; Hlebinsky testimony, Tx of 10/19/20 Hearing at 54:20-23.

15    70.    Folding or telescoping stocks are features prohibited under Pen. Code

16    section 30515(a)(1)(C). On an AR-15 rifle, a telescoping stock, prohibited by Penal

17    Code section 30515(a)(1)(C), is typically an adjustable buttstock capable of between

18    three and six different adjustment positions, thereby changing the length. Kapelsohn

19    Decl., Plaintiffs' Exhibit 001, at ¶ 31; Kapelsohn testimony, Tx of 10/19/20 Hearing at

20    28:10-23. This enables the rifle stock to be properly adjusted to fit the user. Kapelsohn

21    Decl., Plaintiffs' Exh. 001, at ¶ 31. This is particularly beneficial to persons of smaller

22    stature, or women. Kapelsohn testimony, Tx of 10/19/20 Hearing at 28:24 – 29:1;

23    Youngman testimony, Tx of 10/19/20 Hearing at 88:13-20. In addition, the ability to

24    change the firearm length is useful for people who need to wear heavier clothing.

25    Kapelsohn testimony, Tx of 10/19/20 Hearing at 29:2-10. Plaintiff Hauffen, a firearms

26    trainer, has indicated that the telescoping stock is preferred, among other ergonomic

27    features, and that she prefers to train women or younger shooters with this feature.

28    Hauffen Decl., Plaintiffs' Exh. 014, ¶ 8.

71.    A folding stock, though it makes the firearm more portable, does not turn a semiautomatic rifle into a common instrument of crime, since it does not make a rifle easily concealable for most criminal activities. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 30. As such, most crimes are committed by handguns. (*Id.*) Even without a folding stock, an AR-15 firearm is easily separated into two halves, an upper and a lower receiver, which can be separated by pulling out two pins, and which does not take any specialized training. Graham testimony, Tx of 10/19/20 Hearing at 143:9 – 144:13; 146:11-18. Without specialized skill or training, therefore, a person can take apart an AR-15, and make it concealable, in a matter of seconds. *Id.*

72.    A folding or telescoping stock that meets the minimum overall length requirements for rifles and/or shotguns while collapsed or folded is no more "concealable" than a rifle or shotgun with a fixed stock that meets the minimum overall length requirements.

73.    Folding or telescoping stocks have been on firearms dating back to the 1700s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 20. The flexibility of stock size became important in the civilian market where comfort and having firearms suited for the individual became feasible. *Id.*; Exhs. 002-28 to 002-31.

74.    A "grenade launcher" is a feature prohibited on rifles under Pen. Code section 30515(1)(D). Grenade launchers on rifles are not numerically common, but that is largely a function of grenades being separately prohibited as "destructive devices" and regulated by federal law. Because the law prohibiting grenades is already addressed in the law, California's law prohibiting grenade launchers is largely superfluous. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32. Grenade launchers, also known as hand mortars, date to the 1600s and 1700s. The State has not presented any evidence that grenade launchers, attached to a rifle, have ever been used in the commission of a crime. Regardless, if this Court were to eliminate the AWCA in its entirety, the ability for an individual to acquire, let alone attach a grenade launcher to a firearm, would *not* be enhanced in any way as both grenades and grenade launchers

1    are separately regulated under California and Federal law.

2        75.    A "flare launcher" is another feature prohibited on rifles under Pen. Code

3    section 30515(1)(D). Yet, Defendants have not provided a single instance in which a

4    flare launcher was ever used in a crime. Flare guns were in use by the 1800s.

5    Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 21. Most importantly, flare launchers are

6    signaling devices — nothing more. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32. They

7    are inherently passive. The State's interest in "public safety" or decreasing mass

8    shootings are in no way connected to a ban on flare launchers. Moreover, flare

9    launchers are designed to a different diameter than grenade launchers, grenades, or

10   other destructive devices. Thus, no grenade or destructive device could be fired from a

11   flare launcher. Defendants have also not alleged nor provided any evidence that any

12   kind of destructive device could be fired from a flare launcher.

13       76.    A flash suppressor is a device that is prohibited on rifles under Penal

14   Code section 30515(a)(1)(E). A flash suppressor is a device fitted on the end of a

15   muzzle which diverts the muzzle flash through several slots or holes, most commonly

16   arranged around the axis of the bore. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33. The

17   most common type of flash suppressor on AR-15 rifles is the "birdcage" type of

18   device. *Id*., Exh. 001-14. The primary advantage of a flash suppressor is to reduce

19   muzzle flash so as not to temporarily blind a shooter who is shooting in a dark

20   environment. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33. The use of a rifle without a

21   flash suppressor under low light circumstances is likely to temporarily blind the user,

22   or impair the user's vision, placing a law-abiding user at a disadvantage to a criminal

23   attacker. *Id*.; Kapelsohn Depo. at 124:25 – 125:8 ("I have fired ARs that don't have a

24   flash suppressor and [they] throw out a God awful flame and muzzle blast as a

25   result.").

26       77.    Another advantage of flash suppressors is that they protect the muzzle of

27   a rifle from dirt, sand, or mud that could dangerously plug the muzzle were it to touch

28   the ground outdoors. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33.

78.     The State specifically defines a "flash suppressor" as "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." 11 Cal. Code Regs. § 5471(r). A flash suppressor is not, by this definition, a device intended to conceal a shooter's position.

79.     Flash suppressors have appeared on firearms since the early 20th Century and have appeared on AR platform firearms since they were invented in the 1950s. Hlebinsky Decl., Plaintiffs' Exhibit 002, ¶ 23; Ex. 2-32; Plaintiffs' Exh. 001-14.

80.     A forward pistol grip is prohibited on rifles under Penal Code section 30515(a)(1)(F). The State further defines "forward pistol grip" as "a grip that allows for a pistol style grasp forward of the trigger." 11 Cal. Code Regs. § 5471(t). By its very definition, therefore, a forward pistol grip is designed to enhance control of the firearm. Forward pistol grips on rifles, also called vertical forends, are popular among some shooters in allowing them to control the rifle better for more accurate shooting. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 34. Forward pistol grips may also serve as a "monopod" to assist in stabilizing the rifle for more precision shooting in the prone position. *Id*.

81.     Forward pistol grips are found on firearms dating back at least to the 1860s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 18; Exh. 002-25.

82.     Penal Code § 30515(a)(3) provides that "[a] semiautomatic, centerfire rifle that has an overall length of less than 30 inches" is prohibited as an assault weapon. The federal limit on the length of a rifle is 26 inches. Kapelsohn testimony, Tx of 10/19/20 Hearing at 33:9-17; 26 U.S.C. § 2845(a)(4) (defining "firearm" for purposes of compliance with the National Firearms Act to include a weapon made from a rifle that has an overall length of less than 26 inches, or a barrel of less than 16 inches in length).

83.     Rifles that have shorter overall lengths are more advantageous to the user, particularly in close quarters situation, such as the defense of a home, because it

1   enables the user to be more maneuverable moving through doorways and around

2   corners. Kapelsohn testimony, Tx of 10/19/20 Hearing at 33:18 – 34:5; Graham

3   testimony, Tx of 10/19/20 Hearing at 132:13 – 134:6.

4       84.    The idea of a "carbine," which is a shorter rifle, has long been in

5   existence, and typically refers to a rifle with a barrel less than 20 inches. Hlebinsky

6   Decl., Plaintiffs' Exh. 002, ¶ 22. Rifles with shorter barrel lengths also have the added

7   advantage of having less weight, which would be important from a defensive

8   perspective. Kapelsohn testimony, Tx of 10/19/20 Hearing at 39:14 – 40:4.

9       85.    Defendants have not provided any evidence that the Federal minimum

10  overall length for rifles and/or shotguns is insufficient to further the State's interests.

11  Defendants also have not provided any evidence that a rifle 30 inches long is

12  significantly less concealable than a firearm that is 26 inches long.

13      86.    Firearms characterized as assault weapons based upon the Penal Code

14  section 30515(a)(1) characteristics are numerically common, and the features are

15  commonly used for lawful purposes, including self-defense.

16      87.    The State's own evidence pertaining to assault weapon registration bears

17  out the commonality of these types of firearms, even in a restricted jurisdiction such

18  as California. Under the 1989 AWCA, 56,626 "assault weapons" were registered in

19  California. Subsequent additions led to another 91,211 assault weapons registered in

20  California during prior registration periods. Davis Decl., Plaintiffs' Exh. 008, ¶¶ 6-7.

21  In 2009, a decade before enactment of SB 880 and AB 1135 in 2016, there were

22  already approximately 153,118 registered assault weapons in California. *Id*.

23      88.    Prior to the assault weapon registration requirement in 2018, in

24  connection with a 2017 budget proposal to the Legislature to accommodate online

25  registrations, the California Department of Justice, Bureau of Firearms, estimated that

26  "1-1.5 million assault weapons will be registered by approximately 250,000 different

27  owners" within the State. Plaintiffs' Exh. 024.

28      89.     According to the State, currently, there are 200,039 assault weapons

1    registered with the California Department of Justice, of which approximately 180,142
2    are rifles, 16,419 are pistols, and 3,478 are shotguns. Glover Decl., Def. Exh. CZ, ¶ 6.
3    Excluding assault weapons registered to peace officers, there are 185,569 assault
4    weapons currently registered, of which 165,804 are rifles, 16,306 are pistols and 3,459
5    are shotguns. *Id*., ¶ 7.

6        90.    Penal Code section 30515(a)(4) includes in its definition of an "assault
7    weapon" a "semiautomatic pistol that does not have a fixed magazine but has any one
8    of the following: [¶] (A) A threaded barrel, capable of accepting a flash suppressor,
9    forward handgrip, or silencer [¶] (B) A second handgrip [¶] (C) A shroud that is
10   attached to, or partially or completely encircles, the barrel that allows the bearer to fire
11   the weapon without burning the bearer's hand, except a slide that encloses the barrel
12   [¶] (D) The capacity to accept a detachable magazine at some location outside of the
13   pistol grip."

14       91.    The same rationale that applies to the utility of pistol grips, vertical
15   foregrips, and flash suppressors as they are found on rifles, apply equally to those
16   features that appear on pistols. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 37.

17       92.    The purpose of a barrel shroud (Pen. Code § 30515(a)(4)(C)) is to protect
18   the user's hand from touching the barrel and becoming burned. Kapelsohn Depo. at
19   169:5-21. Defendants have not provided any evidence that extended and/or excessive
20   firing is necessary in order for a firearm's barrel to reach high temperatures that can
21   burn the user's hand. A barrel shroud, by definition, is a safety device. Defendants'
22   justifications for prohibiting a barrel shroud would also serve as justification for
23   prohibiting shooters from wearing gloves while shooting.

24       93.    Threaded barrels on pistols are common. Ostini Decl., Plaintiffs' Exh.
25   005, ¶ 10; Exh. 005-1. In addition to being able to accept flash suppressors, threaded
26   barrels can allow a user to attach compensators or muzzle brakes, which are devices
27   that are not prohibited on pistols (if such devices are *permanently attached* to the
28   barrel), and which are in wide use by competition shooters. Kapelsohn testimony, Tx

of 10/19/20 Hearing at 40:16 – 41:5. Thus, the State's prohibition on threaded barrels prevents a shooter from being able to switch muzzle devices depending on the user's intended need or purpose. While threaded barrels are prohibited on pistols, the AWCA *permits* threaded barrels on rifles. CA Penal Code section 30515(a). No explanation or evidence has been provided by Defendants which can account for prohibiting threaded barrels on pistols, but allowing threaded barrels on rifles, even though silencers, flash suppressors, and compensators or muzzle brakes are equally available for both platforms.

94.   Plaintiff Hauffen, a firearms trainer in San Diego, would like to replace the standard barrel on her Sig P239 pistol with a threaded barrel, which would allow her either to attach a flash suppressor or a muzzle brake to the firearm, assisting her vision, accuracy, and control. Hauffen Decl., Plaintiffs' Exh. 014, ¶ 10.

95.   AR-15 pistols, which also generally fire the .223 round, are also suitable for self-defense, because of their accuracy, light weight, and maneuverability in close quarters. Kapelsohn testimony, Tx of 10/19/20 hearing at 42:22 – 44:6. AR-15 pistols would be prohibited under Penal Code section 30515(a)(4)(D) because they generally accept detachable magazines outside of the pistol grip.

96.   The Court asked the parties to supply information pertaining to the commonality of assault weapon pistols and assault weapon shotguns. Tx of 10/22/20 Hearing at 37:14 – 38:10.

97.   According to the State's evidence pertaining solely to registered assault weapons, there are currently 16,419 pistols registered as assault weapons, and 3,478 shotguns registered as assault weapons. Glover Decl., Def. Exh. CZ, ¶ 6.

98.   Plaintiffs' witness Joseph Ostini surveyed the websites and catalog information from 73 different firearm manufacturers in the United States and found that of the 61 pistol manufacturers, there are at least 356 different models of firearms offered for sale defined as an "assault weapon" pistol under Penal Code section 30515. Ostini Decl., Plaintiffs' Exh. 005), ¶¶ 4-12. Some manufacturers, such as

1    CMMG, offer 38 different models of California-prohibited "assault pistols." Some of

2    these manufacturers, such as Ruger, Sig Sauer, Springfield Armory, and Beretta,—

3    each of which offer several models of pistols considered by California to be "assault

4    weapons" — are widely held as some of the largest firearm manufacturers in the

5    United States. *Id.*, Exh. 005-1.

6        99.    Ruger, and other manufacturers, sell threaded pistol barrels for their

7    handguns. Ostini Decl., Plaintiffs' Exh. 005, ¶ 13; Exh 005-3.

8        100.   Penal Code section 30515(a)(6)-(8) includes in its definition of an

9    "assault weapon" as: "(6) A semiautomatic shotgun that has both of the following: [¶]

10   (A) A folding or telescoping stock [¶] (B) A pistol grip that protrudes conspicuously

11   beneath the action of the weapon, thumbhole stock, or vertical handgrip. [¶] (7) A

12   semiautomatic shotgun that has the ability to accept a detachable magazine.

13   (8) Any shotgun with a revolving cylinder."

14       101.   The same rationale that applies to the utility of pistol grips, and

15   telescoping stocks as they are found on rifles, apply equally to those features that

16   appear on shotguns. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 31. Furthermore, a

17   shotgun with pistol grips, collapsible stocks and detachable magazines would make

18   excellent firearms for home defense. Kapelsohn testimony, Tx of 10/19/20 38:24 –

19   39:6. In fact, some shotguns use telescoping buttstocks that absorb recoil, like a shock

20   absorber, which is particularly useful to dampen the heavy recoil of a shotgun. *Id.* at

21   44:8-23; Kapelsohn Depo. at 195:8 – 198:7; 199:8 – 200:3.

22       102.   Following the evidentiary hearing, Plaintiffs offered evidence regarding

23   the commonality of shotgun features that would make them "assault weapons" under

24   Penal Code section 30515(a)(6). First, as to his survey, Plaintiffs' witness Ostini

25   found that popular shotgun choices include the AK47/Kalashnikov action shotguns

26   like the Lynx 12 or Kalashnikov USA KS-12 Shotgun." Ostini Decl., Plaintiffs' Exh.

27   005, ¶ 13, Ex. 005-17. Of the 96 different "tactical shotgun" models offered on

28   Atlantic Firearms' website, for example, 56 of those models would be classified as

1   "assault weapon" shotguns under Penal Code section 30515.

2      103.   Plaintiffs also offered industry data pertaining to semiautomatic

3   shotguns, using distribution information pertaining to the Benelli M1014, a popular

4   semiautomatic shotgun popular in the United States. In California, it is prohibited for

5   sale to citizens as it is considered an assault weapon because of the existence of both a

6   pistol grip and a telescoping stock. Plaintiffs' Exh. 007-1. According to Plaintiffs'

7   witness Kenneth Brown, looking the distribution data for various models of this

8   shotgun, from 2016 to 2020, there were several thousand of this particular model of

9   shotgun (containing the California-prohibited features) distributed/sold in his western

10  region alone. Brown Decl., Plaintiffs' Exh. 007, ¶¶ 16-19.

11     104.   Plaintiffs have shown that pistols and shotguns that would be classified

12  as "assault weapons" under Pen. Code section 30515(a)(4), (6), (7) and (8) are

13  common in the United States.

14     105.   Penal Code section 30515(a)(2) also defines as an assault weapon a

15  "semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept

16  more than 10 rounds." Likewise, Penal Code section 30515(a)(5) defines as an assault

17  weapon a "semiautomatic pistol with a fixed magazine that has the capacity to accept

18  more than 10 rounds."

19     106.   A fixed magazine is "an ammunition feeding device contained in, or

20  permanently attached to, a firearm in such a manner that the device cannot be

21  removed without disassembly of the firearm action." Pen. Code § 30515(b). Once a

22  firearm with a fixed magazine has expended its ammunition, it cannot be reloaded

23  without disassembly of the firearm action.

24     107.   This Court has already addressed the legality of laws, which prohibit the

25  possession of "large capacity magazines," as that term is defined by Pen. Code section

26  16740. *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*, 970

27  F.3d 1133 (9th Cir. 2020). The State cannot otherwise prohibit possession of large

28  capacity magazines by calling firearms "assault weapons" because they are attached to

them.

108.   The State has presented no evidence of any crimes being committed with a rifle or pistol that contained a fixed magazine with the ability to accept more than ten rounds of ammunition.

109.   The State has presented no evidence of any mass shootings being committed with a rifle or pistol that contained a fixed magazine with the ability to accept more than ten rounds of ammunition. Depo. of Lucy Allen, 179:4-24.

110.   "*Heller* recognized that militia members traditionally reported for duty carrying "the sorts of lawful weapons that they possessed at home," and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano*, 136 S.Ct. at 1032 (Alito, J., concurring) (citing *Heller*, 554 U.S. at 627).

111.   Plaintiffs have also shown that firearms characterized as assault weapons under the AWCA are particularly useful for service in a militia.

112.   It was clearly understood, from the early founding of the Republic, that the unorganized militia consisted of the people themselves. *Heller*, 554 U.S. at 595-596, 128 S.Ct. at 1799 (that "the Militia comprised of all males physically capable of acting in concert for the common defense[]" comports with founding-era sources) (citing *Miller*, 307 U.S. at 179). In *Heller*, the majority rejected a narrower view of the militia as having been limited to state and congressionally-regulated military forces. 554 U.S. at 596, 128 S.Ct. at 2799-2800. From the outset, "[t]he republican militia was the armed populace at large, not a select militia or standing army." Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, 226 (2008) (citing Elliot, 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 379 (1836)).

113.   Plaintiffs have shown that the AR-15 firearm in its standard configuration – prohibited by California law as an "assault weapon" – is useful for service in the militia.

114. In particular, Plaintiffs have shown that the AR-15 rifle, with standardized and interchangeable component parts, is well-suited for militia service. (Youngman Decl., Plaintiffs' Exh. 009, ¶ 14; Youngman testimony, Tx of 10/19/20 Hearing at 85:16-23 ("It would be the ideal weapon for the militia.")). The AR-15's use of standardized ("STANAG") magazines and common ammunition, and its reliability, low cost, and light weight, serve the same purposes sought to be achieved by the drafters of our Founding Era militia acts. Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common chamberings as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it an ideal firearm for militia service. (Youngman Decl., Plaintiffs' Exh. 009, ¶¶ 15-19).

115. "[…] *Heller* recognized that militia members traditionally reported for duty carrying "the sorts of lawful weapons that they possessed at home," and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano*, 136 S.Ct. at 1032 (Alito, J., concurring) (citing *Heller*, 554 U.S. at 627).

116. A "featureless firearm" is a semiautomatic firearm (rifle, pistol, or shotgun) lacking the characteristics associated with that weapon, as listed in Penal Code section 30515. 11 Cal. Code Regs. § 5471(*o*).

117. The very qualities that make the Penal Code section 30515(a)(1) characteristics advantageous for purposes of self-defense would tend to make rifles that lack those characteristics less advantageous, such as reduced ergonomics and accuracy.

118. A Ruger Mini-14 ranch rifle, such as the first kind depicted in Defense Exhibit D, ¶ 45, is legal to purchase and own in California because it is featureless. Graham Decl., Def. Exh. D, ¶ 45; Graham testimony, Tx of 10/19/20 Hearing at 137:18 – 140:9 ("those are available in many gun stores up and down California.")

119. AR-type firearms may also be made "featureless," in that some of the key

1  components of a standard AR-15, such as the pistol grip, telescoping stock, or flash

2  suppressor, may be removed and replaced by other devices. Kraut Del., Plaintiffs'

3  Exh. 011, ¶¶ 5-6. On video, Plaintiff's witness Adam Kraut demonstrated the use of a

4  "featureless" AR-15 rifle by shooting the same rifle in two different strings of fire,

5  one in the standard configuration, and one in the "featureless" condition. *Id.*; Kraut

6  testimony, Tx of 10/22/20 Hearing at 23:11 – 24:7. The purpose of the video was to

7  demonstrate that in either configuration it was possible to shoot a man-sized target at

8  25 yards in rapid succession using either a California featureless rifle or a standard

9  configuration AR-15. *Id.* at 24:20-25.

10       120.   To a criminal, therefore, or to someone who is intent upon committing

11  crimes, the existence of the prohibited features may not make any difference. A

12  person can commit a crime with a weapon just as easily without a pistol grip.

13  Kapelsohn testimony, Tx of 10/19/20 Hearing at 46:8-10. Moreover, a criminal or

14  mass shooter is not concerned with the consequences of being inaccurate, while a

15  lawful citizen is.  A mass shooter may intend to kill as many people as possible. The

16  legal consequences for a negligent shot or hitting an unintended target are entirely

17  inconsequential to a mass murder. On the other hand, lawful citizens are responsible

18  for every shot fired and features that enhance a firearm's accuracy or comfort (even to

19  a minimal degree) are vitally important, for the effectiveness of the weapon, the

20  ability of the citizen to train with it, and to ensure that only the thing that is fired upon

21  is the intended target.

22       121.   Because California assault weapon ban is largely based on the

23  characteristics that are attached to the firearm, nothing prevents a determined

24  individual from purchasing a featureless rifle, purchasing one or more of these

25  otherwise-legal features that can be used on a fixed-magazine or rimfire firearm (*e.g.*,

26  pistol grip, collapsible stock, non-fixed magazine release, *etc.*), and then unlawfully

27  converting the featureless firearm into an illegal configuration to commit a crime. This

28  is similar to what was done in the San Bernardino terrorist attack in 2015, when the

1  shooters converted compliant rifles into non-compliant rifles. Lott Decl., Plaintiffs'
2  Exh. 010, ¶ 12.

3      122.   Without a pistol grip, a featureless firearm is less ergonomic and less
4  accurate. A featureless AR-15 rifle that lacks a standard pistol grip is not as
5  ergonomic and is a poor design. Kapelsohn Depo., at 124:3-18. A pistol grip allows a
6  shooter to manage recoil better than a rifle with a traditional stock design, particularly
7  on an AR-type rifle. Kapelsohn Depo., at 179:24 – 183:4.

8      123.   Plaintiff Wendy Hauffen owns a featureless firearm, which she
9  accomplished by removing the features prohibited by § 30515(a)(1). Hauffen Decl.,
10 Plaintiffs' Exh. 014, ¶ 5. Plaintiff Hauffen would prefer to have standard AR-15 with
11 ergonomic features, such as a pistol grip or a forward vertical grip, to assist in
12 controlling the firearm. *Id.*, ¶ 8. In addition, she would prefer to use and train other
13 women shooters with a telescoping stock, which can accommodate smaller shooters.
14 *Id.*

15     124.   Another drawback to the featureless AR-15 rifle is that the lack of a
16 pistol grip makes it less safe when it comes to clearing malfunctions. On an AR-15
17 rifle, the process for clearing a malfunction or ammunition jam is hindered by one's
18 inability to wrap their hand around a pistol grip because one does not maintain the
19 same degree of control when performing the malfunction clearance procedures.
20 Kapelsohn Depo. at 188:11 – 194:19.

21     125.   For the same reasons that show that the prohibited characteristics of
22 Penal Code section 30515(a)(1) are common, preferred, and useful for lawful
23 purposes such as self-defense, the State has not shown that ordinary citizens must
24 resort to "featureless" versions of AR-15 rifles that lack those characteristics.

25     126.   While Defendants continue to deny the decades of lawful use of firearms
26 defined as "assault weapons" pursuant to California law, Defendants' evidence
27 explicitly contradicts Defendants' contentions.

28     127.   For example, Defendants' evidence shows that rifles characterized as

1   "assault"-type rifles are also called "sporting rifles." Defendants' Exh. BA, p. 3.

2   128.   Defendants' evidence also shows that so-called "military-type rifles" are

3   typically chambered in .223 Remington, a caliber common for varmint or coyote

4   hunting. Defendants' Exh. BA, p. 6.128.

5   129.    Defendants' evidence also shows that flash hiders are common and

6   commercially available to sportsmen for sporting purposes. Defendants' Exh. BA, p.

7   7.

8   130.   Defendants' evidence also shows that pistol grips are common and

9   widely adaptable to a wide range of shooters. Defendants' Exh. BA, p. 9.

10   131.   Defendants' evidence shows that AR-platform rifles have supplanted 30

11   caliber rifles in target competitions. Defendants' Exh. BI, p. 3. The AR-platform rifle

12   is now accepted as a law enforcement tool, and is embraced by many as an entirely

13   suitable defensive firearm. Id.

14   132.   "[T]here is perhaps no rifle on the face of the planet for which you can

15   buy more gear, accessories, add-ons, improvements and just plain 'stuff'…. Indeed,

16   target shooters add plain old lead weights to bring their ARs up past 15 pounds, to

17   make them more stable for long shots." Defendants' Exh. BI, p. 4.

18   133.   Defendants' evidence acknowledges the use of "assault weapons" in

19   competition: "If you wanted to be competitive you had to leave your tuned M-14 in

20   the rack, with its heavy recoil, and get an AR-15 race-gun or Service Rifle for

21   competition." Defendants' Exh. BI, p. 6. This same article describes four different

22   shooting competitions in which "assault weapons" are used: Benchrest, Short-Range

23   Run and Gun, USPSA, and Long-Range shooting competitions. Defendants' Exh. BI,

24   pp. 8-11.

25

26   **The Burden on Plaintiffs is Not Minor**

27   134.   Defendants contend that the AWCA is a "minor burden" because it

28   merely limits a subset of semiautomatic rifles that California citizens are able to

choose from. Not only does this misstate the severe burden placed by the AWCA, but such a rationale has already been rejected by *Heller* which expressly rejected the notion that the ability to acquire other sorts of firearms justifies a ban on protected arms.

135.  The AWCA denies Californians the ability to use the safest, most controllable, and accurate firearms owned by millions of law-abiding citizens for lawful purposes across the Country. The AWCA prohibits gun owners from the choice of selecting the best characteristics for their firearm to fill that individual's specific needs and intended uses. Just like the government may not regulate the choice of words to express an idea protected by the First Amendment, the government cannot regulate the choice of configuration of characteristics on firearms used for lawful purposes.

136.  For the same reasons the State deems "assault weapons" as "too lethal" in the hands of a criminal, those very same characteristics allow lawful citizens to configure their firearms in a manner that best suits their specific use — whether that be self-defense or numerous other lawful uses. Kapelsohn Decl., Plaintiffs' Exh. 001 ¶¶ 17-38.

137.  Lawful gun owners have more reason both in defending from criminal action and engaging in lawful uses like sporting and hunting activities to ensure accurate, rapid fire of their firearms (see paragraphs 160-165 below).

138.  Moreover, the AWCA demands severe criminal penalties for any violation of the many technical and minute definitions — regardless of the intent of the gun owner. Penal Code §§ 30515, 30600, 30605(a).

139.  If a California gun owner purchases the wrong muzzle device (even one labeled as a legal muzzle brake) that is later determined to reduce the muzzle flash when the firearm is fired, they are subject to one or more felony charges because their muzzle device could be considered a "flash hider." There is no need for any kind of violent criminal action or criminal intent.  Penal Code §§ 30515, 30600, 30605(a); see

1   also Title 11, California Code of Regulations § 5471(r).

2   140.   If a California gun owner's stock is not fixed into place properly, so that
3   it allows even minor play back and forth, the stock could be considered an unlawful
4   "telescoping" or adjustable stock. Brown Decl., Plaintiffs' Exh. 007, Exh. 007-1
5   (California Department of Justice letter to Benelli dated June 23, 2003). Again, felony
6   charges await gun owners for such an oversight.  Penal Code §§ 30515, 30600,
7   30605(a); see also Title 11, California Code of Regulations § 5471(mm), (nn) and
8   (oo).

9   141.   If even intending to comply with the law, if a gun owner installs a grip on
10  their rifle that is not angled enough to completely prevent the webbing of the shooter's
11  trigger hand from falling below the topmost exposed portion of the trigger when
12  firing, they could be convicted of both *creating and possessing* an assault weapon —
13  two separate felony charges. Penal Code §§ 30515, 30600, 30605(a); see also Title 11,
14  California Code of Regulations § 5471(z).

15  142.   Taking a lawfully owned "large capacity magazine" out of a lawful
16  "featureless" rifle and then inserting that same magazine into a lawfully owned "fixed-
17  magazine" rifle or pistol will likewise result in felony charges. Penal Code § 30515,
18  30600, 30605(a); see also Title 11, California Code of Regulations § 5471(a), (m), (n),
19  (o), (p), and (w).

20  143.   A parent who wishes to teach their children (under 18 years old) firearm
21  safety could face severe criminal penalties for permitting their children to merely
22  possess an "assault weapon" even under the parents' direct supervision.  Penal Code
23  §§ 30515, 30600, 30605(a).

24  144.   These same felony charges apply without exception to those who merely
25  attach a "barrel shroud" to their pistol to keep their hands from being burned. They
26  apply to those who wish to have a collapsible stock and pistol grip on their
27  semiautomatic shotgun for better control.  Penal Code §§ 30515, 30600, 30605(a).

28  145.   Felony charges and convictions for merely possessing a firearm that may

1   have the "wrong" grip or "muzzle device" are not "minor" burdens. Felony

2   convictions are life changing and result not only in prison sentences, but they strip

3   fundamental constitutional rights from individuals for life. They also have significant

4   effect on the ability to acquire employment after such a conviction.

5   146.   The AWCA provides no exception for those that may have physical or

6   medical reasons for seeking certain characteristics on their firearms. Those of small

7   statute or strength may need an adjustable stock, pistol grip, or vertical foregrip to

8   maintain proper control of their firearm. For those that have trouble handling the

9   recoil of a pistol, the choices are to: (1) continue to use a firearm that cannot be

10   properly controlled; (2) choose a different and potentially inferior firearm; or (3) face

11   felony charges for adding a threaded barrel to their pistol to accommodate a muzzle

12   brake. Penal Code §§ 30515, 30600, 30605(a).

13   147.   Those with medical disabilities are left to operate firearms that

14   intentionally do not have characteristics that would make the firearm more

15   comfortable or easier to operate. There is no exception for them. Penal Code §§

16   30515, 30600, 30605.

17   148.   Additionally, Defendants contend that the AWCA is only a minor burden

18   because it allows for "assault weapons" to be used in competition.  However,

19   Defendants omit the fact that the exempted firearms are "pistols that are designed

20   expressly for use in Olympic target shooting events," which consist of largely rimfire

21   or other small caliber pistols and are only those *specifically* "sanctioned by the

22   International Olympic Committee and by USA Shooting." Penal Code § 30515(d)(2).

23   Most lawful gun owners are not Olympic athletes, nor do they ever contemplate

24   competing in the Olympics. This exemption is inapplicable to everyday lawful gun

25   owners and ignores the vast amount of firearm competitions that are held throughout

26   the United States and California that use commonly-owned rifles, pistols, and

27   shotguns, which fall under the definition of "assault weapons." See Defendants' Exh.

28   BI.

149.  While the AWCA allows of out-of-state gun owners to come into California and compete with firearms defined as "assault weapons," there is no such exemption for California residents. Penal Code § 30665. Defendants provide no explanation or evidence for allowing "assault weapons" in competitions by non-residents, while at the same time prohibiting California residents in those very same competitions.

## The Arms Banned By California as "Assault Weapons" Are Not More Lethal Than Arms That Are Not Banned

150.   The State has not demonstrated that assault weapons bans are justified because the features prohibited by Pen. Code section 30515(a) make the firearm more lethal.

151.   Contrary to what the State argues and implies (see Decl. of Blake Graham, Def. Exhibit D, at ¶ 22), the ammunition that is fired from "assault weapons" bearing the prohibited section 30515(a) characteristics is not inherently more "lethal" than those fired from non-assault weapons.

152.   According to Defendants' own evidence, "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Defendants' Exh. BL, p. 3.

153.   As one of the experts in the field of wound ballistics, Dr. Vincent J.M. DiMaio stated in his influential book *Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques*, stated:

> One of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895).

Margulies Decl., Plaintiffs' Exh. 012, ¶ 11; Exh. 012-2.

154.   Defendants concede that wounds cannot be distinguished simply by the

type of weapon that fired them. Colwell testimony, Tx of 10/22/20 Hearing at 29:20 – 30:14. A wound from a .223/5.56 round fired from a California-defined "assault weapon" bearing the features or characteristics found in section 30515(a) would not present a greater profile from a non-assault weapon, using the same round, and using the same barrel length. Margulies Decl., Plaintiffs' Exh. 014, ¶ 14. Defendants also concede that shotgun wounds at close range are, generally speaking, more devastating than rifle rounds. *Id*. at 31:20 – 33:16.

155.   The severity of the wound is determined, to a great degree, by the amount of kinetic energy. The intermediate cartridges commonly used in "assault weapons" (such as the .223/5.56 caliber, or the 7.62 x 39mm cartridges) contain far less kinetic energy than traditional hunting cartridges such as the .308 Winchester. Margulies Decl., ¶¶ 10-11; Exh. 011-2.

156.   Body armor worn by law enforcement is generally intended to protect from handgun bullets, and not rifle bullets. Margulies Decl., Plaintiffs' Exh. 012, ¶ 13; Exh. 012-2, p. 007; Youngman testimony, Tx of 10/19/20 Hearing at 94:4-15; Def. Exh. AY, p. 5 ("Soft armor is designed to offer protection against assaults with handguns. It is intended for daily wear. It is the type of body armor that officers would typically wear while executing their daily duties."). Any rifle rounds, including the intermediate cartridges of .223/5.56 or 7.62x39mm, will penetrate body armor typically worn by law enforcement unless the body armor is specifically rated to withstand it. Youngman testimony, Tx of 10/19/20 Hearing at 94:4-15; Margulies Decl., Plaintiffs' Exh. 012, ¶ 13; Defense Exhibit AY, pp. 12-13. This is true regardless of whether the rifle has characteristics that would qualify it as an "assault weapon" under California law.

157.   The State's stated concern is not merely with rapid fire, but the ability of a shooter to fire rapidly and maintain accuracy. Tx of 10/19/20 Hearing at 187:18 – 188:2. But the answer is not to say that firearms should be less accurate. That penalizes the law-abiding citizen from denying him or her the ability to use accurate

firearms, where accountability for each shot is of the utmost concern. Kapelsohn testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6. The State does not claim that prohibiting the specified features of section 30515(a)(1) prevents rapid fire, only that it prevents accurate rapid fire. However, regardless of the characteristics installed on the firearm, with training, a shooter can pull the trigger of any semiautomatic pistol or rifle of five to seven rounds per second. Kapelsohn testimony, Tx of 10/19/20 Hearing at 23:4-22.

158.   A featureless version of an AR-15 rifle may be used to shoot a man-sized target at 25 yards in rapid succession. Kraut Decl., Plaintiffs' Exh. 011; Kraut testimony, Tx of 10/22/20 Hearing at 23:11 – 24:7; 24:20-25.

159.   Semiautomatic firearms with the regulated characteristics are not more deadly in the hands of a criminal than a firearm without those characteristics. Many notable crimes and mass shootings have been committed by criminals with semiautomatic firearms that did not have the regulated characteristics. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 34. For example, the 2007 shooting at Virginia Tech, in which 32 victims were killed, and 17 others injured, the shooter used handguns which are legal to own and purchase in California. Depo. of Lucy Allen, p. 219:8 – 220:13; Def. Exh. A, Appendix C, line 80.

160.   Moreover, while Defendants contend that "accurate rapid fire" of firearms is "not consistent" with lawful use, Defendants have provided no evidence to support such a contention.

161.   To the contrary, common sense demands that "accurate rapid fire" may be needed to defend one's life from an imminent lethal threat.

162.   "Accurate rapid fire" is both desired and necessary in sporting use such as competitions.

163.   "Accurate rapid fire" is both desired and necessary in the lawful activity of firearms training.

164.   Defendants have offered no evidence that any criminal or mass shooter in California has ever been prevented from delivering lethal "rapid fire" as a result of the prohibitions in AWCA since its inception in 1989. Defendants have likewise presented no evidence mass shooters place a premium on accuracy as opposed to indiscriminate mayhem. Even if Defendants could find one or two anecdotal examples, they would not justify such a ban under any kind of heightened scrutiny analysis.

165.   At any rate, certainly "accurate rapid fire" is preferable to inaccurate rapid fire. And it is the latter that is promoted by California's ban, as the banned characteristics promote accuracy and do nothing to enhance the rapidity with which a firearm may be fired.

## Assault Weapons Bans Have No Discernible Effect on Crime

166.   Generally, firearm bans have little effect on preventing criminals from obtaining guns. Lott Decl., Plaintiffs' Exh. 010, ¶ 13.

167.   In fact, research shows that all places that have banned guns (either all firearms or all handguns) has seen murder rates go up. Lott Decl., Plaintiffs' Exh. 010, ¶ 13.

168.   There is no evidence that "assault weapons" bans had any meaningful effect on reducing gun homicides and no discernable crime reduction impact. Several studies have shown no discernable crime-reduction impact. Lott Decl., Plaintiffs' Exh. 010, ¶ 63.

169.   According to Defendants' evidence "[M]any experts doubt the ban had any significant impact before it expired in 2004." Defendants' Exh. CE, p. 2.

170.   Defendants' evidence acknowledges that the federal "feature-based ban" had no real-world effect and assault weapons bans in general are a "distraction."

Though assault weapons have become a potent symbol of mass shootings, bans of that style of gun are a "distraction," said Adam Winkler, a UCLA law professor, and the author of Gunfight.  For starters,

1
2
3
4

he says, it didn't actually stop manufacturers from selling assault rifles. Because the 1994 ban defined weapons based on "cosmetic" features like pistol grips or collapsible stocks, gun makers evaded these restrictions by removing just enough design features so as to not trigger the ban. Meanwhile, the weapons remained semiautomatic and could still accept magazines of any size.

5
6

Defendants' Exh. CE, p.2.

7
8
9
10
11
12
13
14
15

171.   "Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs." Defendants' Exh. BJ, p. 96.

16
17
18

172.   A state assault weapon ban is even less likely to be effective than a federal ban because the banned firearms *will remain legally available* in the vast majority of the states in the country. Defendants' Exh. BJ, fn 95.

19
20

**California's Continuous Expansion of the Assault Weapon Control Act is Proof of its Own Failure**

21
22
23
24
25

173.   In 1989, the State of California imposed its first "assault" weapons ban in the Roberti-Roos Assault Weapons Control Act of 1989. This legislation established a list of firearms that are specifically named by type, series, and model and that are now found at Penal Code section 30510(a) [rifles], (b) [pistols] and (c) [shotguns]. These are referred as "Category I" assault weapons.

26
27
28

174.   By 1999, AWCA Category I and II assault weapons lists based on the specific makes and models of firearms were necessarily deemed to be insufficient. In 1999, the Legislature enacted Senate Bill 23, which expressly stated that "this bill

would further define 'assault weapon" by providing descriptive definitions concerning the capacity and function of the weapon." This bill expanded the definition of an "assault weapon" for the third time, attempting to proscribe a specified list of "generic features," which are now found at Penal Code section 30515(a).

175.   Thus, from 2000 to 2016, the AWCA restricted firearms classified as assault weapons pursuant to Category I and II assault weapons, and through the "generic feature" definition in Category III assault weapons.

176.   Firearm technology continued to progress during this time, and products were offered that would allow firearms normally considered "assault weapons" to be lawfully purchased, possessed, and used largely through items called the "bullet button." A firearm using a "bullet button" or similar product, was considered to have a "fixed magazine" under the current California definition of "fixed magazine." Thus, it could have any number of the characteristics listed in Penal Code section 30515.

177.   Lawful sales of bullet button firearms (including rifles, shotguns, and pistols) continued throughout California for at least 9 years.

178.   In 2016, the California Legislature again determined that the current AWCA was insufficient and needed to be expanded. Senate Bill 880, and Assembly Bill 1135 were passed on July 1, 2016. These bills expanded the definition of "assault weapon" to include the new category of "bullet button assault weapons" by redefining the term "fixed magazine" among other definitions. According to the June 25, 2016, Assembly Floor analysis, "[a]bsent this bill, the assault weapon ban is severely weakened, and these types of military-style firearms will continue to proliferate on our streets and in our neighborhoods."[4]

---

[4] In a single sentence, the California Legislature admits to both the AWCA's ineffectiveness in stopping the sale of so-called "assault weapons" and to the commonality of firearms deemed "assault weapons" —  by conceding that these "firearms will continue to proliferate."

179.   Thus, the AWCA, which already had two significant amendments to expand the definition of "assault weapon," was amended again after at least 9 years of operating in a "severely weakened" state. This new definition of "assault weapon" resulted in tens of thousands of newly registered "assault weapons." Decl. of Yvette Glover, Defendants' Exh. CZ.

180.   This lawsuit was initiated in 2019.  Since that time, the AWCA has undergone yet another amendment to expand the definition of "assault weapon." The expanded definition now includes "assault firearms," which are not legally defined as rifles, pistols, or shotguns.

181.   In the 39 years since it was originally enacted, the AWCA has been expanded at least four times. Each time, the current definition of "assault weapon" has been deemed insufficient by the Legislature. With each amendment, vast numbers of ordinary, commonly owned, and lawfully purchased firearms are redefined as illegal "assault weapons." With each amendment, the State necessarily admits that the AWCA is incomplete and insufficient.

182.   While a state may be permitted to experiment, California has been permitted to experiment with the AWCA for nearly 40 years. Over and over again, the AWCA has been expanded because the then current definition of "assault weapon" has been deemed insufficient by the California Legislature. The experiment has failed.

**The Arms Banned By California as "Assault Weapons" Are Not Used in Most Mass Shootings**

183.   All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two. Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

184.   Assault Weapons are not used in a majority of mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them

1   (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30.

2   Thus, it is fair to conclude that most mass shootings that the defense analyzed did not

3   involve the use of assault weapons.

4   185.   Looking at Ms. Allen's analysis, it appears that the most prevalent

5   firearm that is found at the scene of a mass shooting is a handgun. Allen Decl., Def.

6   Exh. A, Appendix C; see also Def. Exh. CW (pictorial look at the weapons used in 19

7   mass shootings); Def. Exh. CG (Mother Jones 2012 article, at p. 23: "In the 62 mass

8   shootings we analyzed, 54 of the killers had handguns – including in all 15 of the

9   mass shootings since the surge of pro-gun laws began in 2009); Def. Exh. BM, p. 1:

10  "Contrary to popular belief, however, assault rifles were not the predominant type of

11  weapon used in these types of crimes. In fact, according to a recent study, handguns

12  were the most commonly used type of firearm in mass shootings."

13  186.   Over time, the rate of mass shootings or mass public shootings may rise

14  or fall for many reasons. But regardless of any other factors, if the federal assault

15  weapons ban reduced these attacks, the share of attacks committed with "assault

16  weapons" should have decreased as a direct result of the ban. Lott Decl., Plaintiffs'

17  Exh. 010, ¶¶ 6-65; Exhs. 010-2 to 010-19 and Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

18  187.   In fact, the percentage of mass shootings committed with "assault

19  weapons" did not decrease during the Federal Assault Weapons Ban.  Nor did this

20  percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs.

21  010 and 032.

22  188.   This fact is true regardless of the data set that is analyzed — whether it

23  be from Rampage Nation, Mother Jones, or Crime Prevention Research Center.

24  Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

25  189.   Defendants attempt to dismiss this fact stating that spillover effects and

26  substitution effects have not been accounted for in Dr. Lott's percentage analysis.

27  Incorrect. Defendants' Exh. K, ¶ 44; Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

28  190.   Plaintiffs are the only parties that have provided an explanation of any

1  kind of substitution effects of the Federal Assault Weapons Ban. These substitution

2  effects support Plaintiffs' contention that the Federal Assault Weapon Ban was

3  ineffective. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

4          191.   Considering substitution effects of the Federal Assault Weapons Ban, *if*

5  *the ban were effective*, some killers would refrain from committing a mass shooting

6  with an assault weapon, while others would substitute other kinds of firearms. In both

7  instances, the percentage of attacks committed with assault weapons would decrease.

8  Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

9          192.   Defendants have not provided any evidence there was a statistically

10  significant decline in the percentage of attacks with assault weapons during the ban or

11  a statistically significant increase after the ban. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-

12  13, 44-55.

13          193.   Using data from the Book Rampage Nation, and data collected by Mother

14  Jones, the share of attacks committed with assault weapons continued to drop even

15  after the federal assault weapons ban expired. The ten years after the end of the assault

16  weapons ban (September 2004 to August 2014) saw the lowest share of shootings

17  involving assault weapons. Lott Decl., Plaintiffs' Exh. 010, ¶ 53.

18

19                                  **Defendants' Evidence**

20          194.   Defendants have not provided any evidence that any mass shooter has

21  ever selected any firearm that could be classified as an "assault weapon" under

22  California Penal Code section 30515 *because* the firearm in question had any of the

23  characteristics listed in Penal Code 30515(a).

24          195.   Defendants have not provided any evidence that a mass shooter in

25  California has ever refrained from committing a mass shooting (or any criminal act)

26  because the shooter could not obtain a firearm that had any of the characteristics listed

27  in California Penal Code section 30515(a).

28

1     196.   Defendants have not provided any evidence that a use of a pistol grip on
2  a firearm defined as an "assault weapon" pursuant to California Penal Code section
3  30515(a) had any determining effect on any mass shooting committed in or outside of
4  California.

5     197.   Defendants have not provided any evidence that a use of a forward
6  vertical grip on a firearm defined as an "assault weapon" pursuant to California Penal
7  Code section 30515(a) had any determining effect on any mass shooting committed in
8  or outside of California.

9     198.   Defendants have not provided any evidence that a use of a flash hider on
10  a firearm defined as an "assault weapon" pursuant to California Penal Code section
11  30515(a) had any determining effect on any mass shooting committed *in or outside of*
12  *California*.

13     199.   Defendants have not provided any evidence that a use of a collapsible
14  stock on a firearm defined as an "assault weapon" pursuant to California Penal Code
15  section 30515(a) had any determining effect on any mass shooting committed *in or*
16  *outside of California*.

17     200.   Defendants have not provided any evidence that a use of a folding stock
18  on a firearm defined as an "assault weapon" pursuant to California Penal Code section
19  30515(a) had any determining effect on any mass shooting committed *in or outside of*
20  *California.*

21     201.   Defendants have not provided any evidence that a use of a flare launcher
22  on a firearm defined as an "assault weapon" pursuant to California Penal Code section
23  30515(a) had any determining effect on any mass shooting committed *in or outside*
24  *California*.

25     202.   Defendants have not provided any evidence that a flare launcher attached
26  to a firearm has *ever* been used in the commission of any crime.

27     203.   Defendants have not provided any evidence that a use of a grenade
28  launcher on a firearm defined as an "assault weapon" pursuant to California Penal

1  Code section 30515(a) had any determining effect on any mass shooting committed *in*
2  *or outside of California.*

3      204.   Defendants have not provided any evidence that a use of a barrel shroud
4  on a firearm defined as an "assault weapon" pursuant to California Penal Code section
5  30515(a) had any determining effect on any mass shooting committed *in or outside of*
6  *California*.

7      205.   Defendants have not provided any evidence that a use of a magazine well
8  outside of the pistol grip of a pistol defined as an "assault weapon" pursuant to
9  California Penal Code section 30515(a) had any determining effect on any mass
10  shooting committed *in or outside of California*.

11      206.   Defendants have not provided any evidence that a use of a threaded
12  barrel on a pistol defined as an "assault weapon" pursuant to California Penal Code
13  section 30515(a) had any determining effect on any mass shooting committed *in or*
14  *outside of California*.

15      207.   Defendants have not provided any evidence that a use of a both a pistol
16  grip and collapsible stock on a semiautomatic shotgun defined as an "assault weapon"
17  pursuant to California Penal Code section 30515(a) had any determining effect on any
18  mass shooting committed *in or outside of California*.

19      208.   Defendants have not provided any evidence that a use of a rifle with an
20  overall length of less than 30 inches defined as an "assault weapon" pursuant to
21  California Penal Code section 30515(a) had any determining effect on any mass
22  shooting committed *in or outside of California*.

23      209.   Defendants have not provided any evidence that a use of a rifle with a
24  California defined "fixed magazine" and a "large capacity magazine" in any mass
25  shooting had any determining effect on any mass shooting committed in or outside of
26  California.

27      210.   Defendants' evidence showing a mere correlation between assault
28  weapons and a higher fatality rate in mass shootings cannot distinguish which

1  unidentified various combinations of the characteristics listed in Penal Code section

2  30515 on a semiautomatic firearm caused any such correlation. Nor does Defendants'

3  evidence identify which specific characteristics were used in mass shootings with

4  higher fatalities.

5      211.   Defendants' evidence cannot distinguish between "assault weapons" and

6  other semiautomatic firearms used in mass shootings. See Defendants' Exhibit AC

7  ("Multiple data sources indicate that active and public mass shootings committed with

8  semiautomatic rifles and assault weapons result in more victims killed, on average,

9  than attacks with less powerful weapons. de Jager et al., 2018; Follman, Aronsen, &

10 Pan, 2018; Klarevas, 2016)."; Def. Exhibit BK, p. 2 ("mass shootings and other

11 crimes committed with high-capacity semiautomatics (including assault weapons and

12 other models) […]" Def. Exh. BL, p. 1 ("[t]his article examines the use, impacts, and

13 regulation of assault weapons and other high-capacity semiautomatic firearms as they

14 pertain to the problem of mass shootings in the United States.").

15     212.   Defendants' Exhibit Y suffers from the same lack of distinction between

16 so-called "assault weapons" and semiautomatic firearms. See Defendants' Exhibit Y,

17 pg. 1-9 ("This study investigates current levels of criminal activity with assault

18 weapons and other high-capacity semiautomatics in the USA….").

19     213.    Without providing evidence regarding what features were specifically

20 used in any mass shooting or distinguishing between "assault weapons" and "other

21 high-capacity semiautomatic" firearms, Defendants high fatality correlation is

22 empirically meaningless.

23     214.   Defendants' evidence showing a correlation between "assault weapons"

24 and higher fatalities rates in mass shootings also does not account for other significant

25 factors that are correlated with higher fatalities rates. Defendants own evidence

26 admits, "[t]o date, no one has provided a clear and compelling explanation for why

27 public mass shootings have become deadlier over time." Defendants' Exhibit AC.

28

215.   The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

216.   This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

217.   The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings.

218.   Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

219.   In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

220.   Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking

1  or attention seeking," 50% of the incidents involved "direct evidence that perpetrator

2  was influenced by another specific attacker or attackers," 50% of the shooters

3  "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack

4  strategy was developed to increase fatalities. Defendants Exh. AC.)

5      221.  Thus, there is a correlation between many different factors and high

6  fatality rates in mass shootings. Defendants ignore these other factors to justify their

7  desired result — a ban on commonly owned firearms.

8      222.  The desire to seek infamy through committing high fatality mass

9  shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal

10  Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas

11  Review Panel (LVRP):

> The LVRP concludes that Paddock's intention to die by suicide was compounded by his **desire to attain a certain degree of infamy via a mass casualty attack….**

> Paddock's exploration of other potential sites suggests that his final selection was based on the identification of a tactically-advantageous location from which to attack. His selected position in a hotel room on the 32nd floor enabled Paddock to shoot at a densely-packed crowd of unsuspecting and vulnerable people. Further, it provided sufficient privacy for Paddock to prepare for and execute the attack, all within driving distance of his residence in Mesquite….

> Once Paddock decided to attack, **he characteristically devoted time, attention, and energy to the shooting.** Paddock engaged in detailed preparations for the attack, including a year-long burst of firearms and ammunition acquisition. The planning and preparation–in and of itself– was likely satisfying to Paddock as it provided a sense of direction and control despite his mental and physical decline. He engaged insignificant, methodical, Internet-based research regarding site selection, police tactics and response, and ballistics. Paddock conducted in-person site surveillance and engaged in end-of-life planning….

Defendants' Exhibit AG, p.2.

223.   As stated above, a dedicated mass murderer who commits to long-term planning (as many mass shooters do) would not be prevented by the AWCA in purchasing California "complaint" firearms and then converting them to "assault weapons" (e.g., taking a featureless rifle and adding prohibited characteristics). The high correlation between planning and mass murder also shows that the AWCA has no realistic prospect of success in preventing the use of "assault weapons" in mass shootings.

224.   Although during the bench trial on February 5, 2021, Defendants' counsel denied the ability to consider a shooter's intent when analyzing factors that lead to an increase in fatalities from mass shootings, Defendants' evidence says otherwise. Any simple correlation between assault weapons and higher fatalities in mass shootings (which Defendants have not established since their data does not isolate assault weapons) does not account for or distinguish between these other factors. Thus, without defining the *extent* of the correlation or considering the many other factors that also have an effect on fatalities, Defendants cannot justify the AWCA's ban under any form of heightened scrutiny as their evidence, at best, amounts to speculation.

225.   Notably, Defendants have not provided any evidence that firearms classified as "assault pistols" pursuant to California Penal Code section 30515(a) are even used in the military, let alone "most useful in military service.". However, Plaintiffs have provided evidence that "assault pistols" are widely available, numerically common, and lawful in most jurisdictions. Ostini Decl., Plaintiffs' Exh. 005; Exh. 005-1 through 005-28; Kapelsohn testimony, Tx of 10/19/20 Hearing at 40:16 – 41:5.

226.   Defendants have also not provided any evidence that firearms classified as "assault shotguns" pursuant to California Penal Code section 30515(a) are used in the military, let alone "most useful in military service." However, Plaintiffs' have provided evidence that "assault shotguns" are widely available, numerically common,

and lawful in most jurisdictions. Ostini Decl., Plaintiffs' Exh. 005; Exh. 005-1 through 005-28; Brown Decl., Plaintiffs' Exh. 007, 007-1.

**Conclusions of Law**

227.   Firearms with the prohibited section 30515(a) characteristics are in common use, for lawful purposes, and are protected under *Heller*.

228.   The Supreme Court's test for commonality is a nationwide inquiry. The Second Amendment does not mean different things in different parts of the country. The Supreme Court's *Heller*'s analysis asks simply whether the arms are "both dangerous *and* unusual," *Caetano*, 136 S.Ct. at 1031 (2016) (Alito, J., joined by Thomas, J., concurring) (italics original), and if they are not both, it determines if the category of arms are in common use for lawful purposes. *Duncan v. Becerra*, 366 F.Supp.3d at 1142. The text of the Second Amendment, as it is informed by history and tradition, all point in the same direction because "the pertinent Second Amendment inquiry is whether [the banned weapons] are commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, at 1032 (italics original).

229.   The arms banned as "assault weapons" under the AWCA are not both dangerous and unusual, as the Supreme Court defined in *Heller*. To the contrary, they are common in all respects: 1) They are common functionally, as they are all semiautomatic in their operation; 2) they are common characteristically, as they are all commercially popular types of arms with various common firearm characteristics; and 3) they are common jurisdictionally, available in the majority of the states. They are common numerically; in that they are owned by citizens by the millions. All of the semiautomatic firearms prohibited by the characteristics found in Pen. Code § 30515(a) meet the *Heller* test and are constitutionally protected.

230.   Because the semiautomatic firearms banned by California are constitutionally protected, the ban is unconstitutional under *Heller*. Indeed, *McDonald* confirmed *Heller*'s holding that firearms in common use cannot be banned: having

1  "found that [the Second Amendment] right applies to handguns," *Heller* therefore

2  "concluded, citizens must be permitted to use handguns for the core lawful purpose of

3  self-defense." *McDonald*, 561 U.S. at 767-68.

4  231.   Beyond the categorical, common-use analysis, the AWCA also and

5  separately fails the Ninth Circuit's two-part test applying tiered scrutiny as well. If an

6  interest-balancing test is required, the challenged provisions still fail any level of

7  "heightened scrutiny" as required in Second Amendment cases by *Heller*.

8  232.   Under this approach, the Ninth Circuit applies a two-part test to Second

9  Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). This

10  "inquiry '(1) asks whether the challenged law burdens conduct protected by the

11  Second Amendment and (2) if so, directs courts to apply an appropriate level of

12  scrutiny.'" *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Jackson v.*

13  *City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014).The level of

14  scrutiny to be applied depends on the closeness to the core and "the severity of the

15  law's burden," on the Second Amendment. *Chovan*, 735 F.3d at 1138.

16  233.   Semiautomatic firearms with common characteristics proscribed by the

17  AWCA are in common use for lawful purposes and thus protected under the

18  fundamental, individual right to keep and bear arms. The State's ban thus "amounts to

19  a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American

20  society for lawful purposes, including for possession in the home, where the need for

21  defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628.

22  Furthermore, the state bans such firearms for reasons that conflict with the very

23  essence of the Second Amendment, essentially claiming that more accurate, effective,

24  and safe firearms can be banned because they are too good at the central purpose of

25  firearms—projecting force when needed—and thus benefit those who would misuse

26  such firearms just as well as those who use them lawfully.

27  234.   The AWCA imposes a substantial burden on Second Amendment rights,

28  and thus deserves strict scrutiny "to afford the Second Amendment the respect due an

1  enumerated constitutional right." *Silvester v. Becerra*, 138 S.Ct. 945, 945 (2018)

2  (Thomas, J., dissenting from denial of certiorari); *Pena v. Lindley*, 898 F.3d 969, 977

3  (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second

4  Amendment right and severely burdens that right'").

5      235.  The AWCA strikes at the "core" of the Second Amendment—and to be

6  sure, the core of the Second Amendment is defined by its text, namely, the "right to

7  keep and bear arms" which "shall not be infringed"—because its effect is to prohibit

8  an entire category of semiautomatic firearms—common pistols, shotguns, and rifles—

9  that are overwhelmingly kept and used for lawful purposes throughout the United

10  States. The State prohibits these categories of firearms not merely in spite of their

11  being useful in self-defense, but apparently, because firearms with those

12  characteristics are effective in the first place. The State's apparent rationale that "we

13  don't want people to be able to shoot accurately, rapidly," is not and cannot be a

14  legitimate state interest at all, let alone a compelling one. A blanket prohibition on

15  common firearms that are "too accurate," or do their jobs "too effectively" by

16  allowing citizens to defend their lives "too well," severely infringes upon Second

17  Amendment rights and cannot survive strict scrutiny.

18      236.  Any claimed governmental interest in reducing the quality and

19  effectiveness of firearms is on its face illegitimate and contrary to the balance already

20  struck by the framers and ratifiers of the Second Amendment. Such a purported

21  interest requires the same categorical or strict scrutiny analysis that content- or

22  viewpoint-based restrictions are given under the First Amendment. In *Duncan v.*

23  *Becerra*, 970 F.3d 1133 (9th Cir. 2020), the Ninth Circuit, in affirming this Court's

24  judgment, held that, because the large-capacity magazine ban, Penal Code § 32310,

25  "substantially burdens core Second Amendment rights," it was subject to review under

26  strict scrutiny. 970 F.3d at 1152.

27      237.  Even under intermediate scrutiny, the State has not demonstrated a

28  "reasonable fit" between its interests and the law. Assuming the importance of the

1    State's generalized claimed interests in public safety and reducing "gun violence,"

2    those interests must "rely on . . . hard facts and reasonable inferences drawn from

3    convincing analysis amounting to substantial evidence based on relevant and accurate

4    data sets." *Duncan*, 366 F.Supp.3d at 1161. If the State's claimed interest is instead a

5    more specific desire to prevent or mitigate so-called "mass shootings," *Rupp v.*

6    *Becerra*, 401 F.Supp.3d 978, 991 (C.D. Cal. 2019), then it is far from clear that an

7    interest directed at such rare events is significant and/or important enough to justify a

8    sweeping prohibitions affecting many millions of firearms owned and used for lawful

9    purposes.  The occasional libel or incitement to violence would not be a sufficiently

10   important interest to justify banning the internet, for example, regardless whether such

11   means of speech inevitably were used for ill in addition to for such lawful purposes.

12   Nevertheless, even assuming the importance of the interest at either level of

13   generality, the AWCA's sweeping ban on common firearms with common

14   characteristics is not a reasonable fit for achieving these interests.

15        238.   The AWCA's broad ban on common semiautomatic firearms and lawful

16   conduct with them is not a reasonable fit to any legitimate government interest. First,

17   the ban does not "alleviate [the claimed harms] to a material degree." *Edenfield v.*

18   *Fane*, 507 U.S. 761, 770-71 (1993).

19        239.   Any correlation between different crimes and the weapons used does not

20   establish a reasonable fit for a ban on all such weapons. Thus, notwithstanding the

21   District Court's findings in *Rupp*, that "such weapons are disproportionately used in

22   mass shootings," 401 F.Supp.3d at 993, such findings do not even suggest that a ban

23   would do anything other than divert such criminals to alternative legal or illegal

24   weapons, or would in any way mitigate the problems. In *Heller* itself, it was

25   accurately observed that handguns are involved in the vast majority of all firearm-

26   related deaths and the government argued that such fact established the government's

27   interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*,

28   554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding

1   that a ban on possessing commonly owned firearms lacked any fit to further the

2   government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29.

3       240.   Constitutionally protected activities cannot be banned because the

4   activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420

5   U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir.

6   2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free*

7   *Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567

8   (1969).

9       241.   The AWCA burdens far more protected activity than necessary by

10  imposing a complete ban on an ordinary, law abiding individual's acquisition,

11  purchase, transfer, and use of a common class of arms. Even under intermediate

12  scrutiny, "a reasonable fit requires tailoring, and a broad prophylactic ban on

13  acquisition or possession of all" common semiautomatics with common

14  characteristics "for all ordinary, law-biding, responsible citizens is not tailored at all."

15  *Duncan*, 366 F.Supp.3d at 1180; see also *Turner Broadcasting System, Inc. v. FCC*,

16  512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part and dissenting in part)

17  ("A regulation is not 'narrowly tailored'—even under the more lenient [standard

18  applicable to content neutral restrictions]—where ... a substantial portion of the

19  burden on speech does not serve to advance [the State's content-neutral] goals....

20  Broad prophylactic rules in the area of free expression are suspect. Precision of

21  regulation must be the touchstone....") (brackets in original) (citations and quotations

22  omitted). "To meet the narrow tailoring requirement, … the government must

23  demonstrate that alternative measures that burden substantially less [of the right]

24  would fail to achieve the government's interests, not simply that the chosen route is

25  easier." *McCullen v. Coakley*, 134 S.Ct. 2518, 2524 (2014). By prohibiting even fully

26  background-checked and law-abiding citizens from possessing a common and

27  effective class of firearms, the law imposes considerably more burden than is

28  warranted by the rare instances of criminal violence using such firearms. "The right to

1   self-defense is largely meaningless if it does not include the right to choose the most

2   effective means of defending oneself." *Friedman v. City of Highland Park*, 784 F.3d

3   406, 418 (7th Cir. 2015) (Manion, J., dissenting).

4       242.   The challenged provisions of the AWCA undermines public safety and

5   do not materially advance any legitimate public interest. The State's justification that

6   the self-same characteristics that make the firearms here suitable for lawful self-

7   defense may also make them effective tools for crime if misused, thus necessitating a

8   ban, would undermine the Second Amendment. The very point of protecting arms,

9   and firearms in particular, is that they allow law-abiding people to project force

10  against unjust force at a distance, and thereby defend themselves and others against a

11  violent threat as soon as possible with the least amount of damage to those being

12  protected. Inevitably, all firearms that are at all suitable for self-defense or militia

13  service are comparably dangerous in the hands of a violent criminal. The notion that

14  improvements that make firearms better and safer for lawful use likewise make them

15  comparably better for unlawful use simply leads to the absurdity that firearms may

16  never be improved because the harms ipso facto outweigh the benefits and justify a

17  ban. However, the Second Amendment itself has already balanced the need for and

18  dangers from arms that can effectively project force against another. As "the very

19  product of an interest balancing by the people," the Second Amendment "elevates

20  above all other interests the right of law-abiding, responsible citizens to use arms in

21  defense of hearth and home." *Heller*, 554 U.S. at 634-35. "Constitutional rights are

22  enshrined with the scope they were understood to have when the people adopted them,

23  whether or not future legislatures . . . think that scope too broad." Id.

24      243.   Thus, even under intermediate scrutiny, Defendants' AWCA and

25  regulations fail. The intermediate scrutiny to be applied is the same as, and is drawn

26  from, the First Amendment context. *Jackson*, 746 F.3d at 961 (heightened scrutiny in

27  Second Amendment cases is "guided by First Amendment principles"); *Silvester v.*

28  *Harris*, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the

1  test for intermediate scrutiny from First Amendment cases"), cert. denied, *Silvester v.*
2  *Becerra*, 138 S.Ct. 945 (2018). At all times under any form of heightened scrutiny, the
3  government bears the burden of justifying its restrictions. See, e.g., *R.A.V. v. City of*
4  *St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are
5  presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)
6  (unless conduct "not protected by the Second Amendment at all, the [g]overnment
7  bears the burden of justifying the constitutional validity of the law."); *Tyler v.*
8  *Hillsdale County Sheriff's Dept.*, 837 F.3d 678, 694 (6th Cir. 2016) ("the burden of
9  justification is demanding and it rests entirely on the State.") (citation omitted).

10      244.   The government's burden of justifying its restriction on constitutional
11  rights "is not satisfied by mere speculation or conjecture; rather, a governmental body
12  seeking to sustain a restriction on commercial speech must demonstrate that the harms
13  it recites are real and that its restriction will in fact alleviate them to a material
14  degree." *Edenfield*, 507 U.S. at 770-71 (emphasis added). Restrictions on
15  constitutional rights must be analyzed in their specific context, and "will depend upon
16  the identity of the parties and the precise circumstances of the" protected activity.
17  *Edenfield*, 507 U.S. at 774. Generalized risk does not warrant restrictions as to all
18  persons, and "a preventative rule" aimed at such generic hazards is "justified only in
19  situations 'inherently conducive to'" the specific dangers identified. Id. (quoting
20  *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978)).

21      245.   Under the actual "demanding" standard for intermediate scrutiny, the
22  AWCA fails, as the State does not advance an important governmental objective nor
23  offer any sort of reasonable fit.

24      246.   Plaintiffs have shown that the State's AWCA and regulations, and their
25  enforcement thereof, are unconstitutional. Plaintiffs are entitled to declaratory,
26  permanent injunctive, and other relief as prayed for in their First Amended Complaint.
27
28

1   Dated: February 16, 2020                **SEILER EPSTEIN LLP**

2

3                                           /s/ George M. Lee
                                            George M. Lee

4                                           **DILLON LAW GROUP APC**

5

6                                           /s/ John W. Dillon
                                            John W. Dillon

7

8                                           Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28