XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
JOSE A. ZELIDON-ZEPEDA
Deputy Attorney General
State Bar No. 227108
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, et al.,**<br><br>Defendants. | 3:19-cv-01537-BEN-JLB<br><br>**DEFENDANTS' RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Courtroom:   5A<br>Judge:        Hon. Roger T. Benitez<br>Trial Date:   February 3, 2021<br>Action Filed: August 15, 2019 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*
  910 F.3d 106 (3d Cir. 2018) ................................................... 2

*Caetano v. Massachusetts*
  136 S.Ct. 1027 (2016) ........................................................ 31

*Chafin v. Chafin*
  568 U.S. 165 (2013) ............................................................ 7

*District of Columbia v. Heller*
  554 U.S. 570 (2008) .......................................................... 31

*Duncan v. Becerra*
  970 F.3d 1133 (9th Cir. 2020) .............................................. 2

*Friedman v. City of Highland Park, Ill.*
  784 F.3d 406 (7th Cir. 2015) .................................... 1, 31, 45

*Heller v. District of Columbia*
  670 F.3d 1244 (D.C. Cir. 2011) ..................... 1, 31, 36, 70

*Jackson v. City & Cty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014) ................................... 6, 39, 51

*Kachalsky v. Cty. of Westchester*
  701 F.3d 81 (2d Cir. 2012) .................................................. 3

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) .............................................. 69

*Mai v. United States*
  952 F.3d 1106 (9th Cir. 2020) ....................................... 3, 39

*Martin v. Hunter's Lessee*
  14 U.S. 304 (1816) ............................................................. 7

*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ........................................................... 8

ii

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3
4

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*
  804 F.3d 242 (2d Cir. 2015) ................................................................. 69

5
6

*Panhandle Oil Co. v. Knox*
  277 U.S. 218 (1928) ............................................................................... 7

7
8

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018) ............................................................... 51

9

*People v. James*
  174 Cal. App. 4th 662 (2009) .............................................................. 32

10
11

*Puente Ariz. v. Arpaio*
  821 F.3d 1098 (9th Cir. 2016) ............................................................. 39

12
13

*Rupp v. Becerra*
  401 F. Supp. 3d 978 (C.D. Cal. 2019) ..........................................*passim*

14
15

*Silvester v. Harris*
  843 F.3d 816 (9th Cir. 2016) ................................................................. 3

16
17

*Staples v. United States*
  511 U.S. 600 (1994) ............................................................................. 12

18
19

*Teter v. Connors*
  460 F. Supp. 3d 989 (D. Haw. 2020) .................................................... 1

20
21

*United States v. Marzzarella*
  614 F.3d 85 (3d Cir. 2010) .................................................................... 2

22

*United States v. Solerno*
  481 U.S. 739 (1987) ............................................................................. 39

23
24

*Vermont v. Misch*
  No. 173-2-19, 2021 VT 10 (Vt. Feb. 19, 2021) ................................. 30

25
26

*Wilson v. Cook Cty.*
  937 F.3d 1028 (7th Cir. 2019) ............................................................. 69

27
28

*Worman v. Healey*
  922 F.3d 26 (1st Cir. 2019) ....................................................5, 32, 37, 69

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

STATUTES

California Penal Code
§ 30510 ...................................................................................56, 57
§ 30515 ..........................................................................................50
§ 30515(a) ...............................................................................*passim*
§ 30515(a)(1) ..............................................................................9, 24
§ 30515(a)(2) ..................................................................................24
§ 30515(a)(6) ..................................................................................27
§ 30515(a)(9) ..................................................................................50
§ 30515(a)(10) ................................................................................50
§ 30515(a)(11) ................................................................................50
§ 30660 ..........................................................................................40

OTHER AUTHORITIES

California Code of Regulations Title 11
§ 5471(r) ........................................................................................35

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1465-67 (2009) .............................................62

Frederick Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361, 368-69 (1985)..............................................................................................7

Defendants' Responses to Plaintiffs' Proposed Findings of Fact and Conclusions of Law
(3:19-cv-01537-BEN-JLB)

1    In accordance with the Court's February 5, 2021 Minute Order (Dkt. 97),

2    Defendants hereby respond to Plaintiffs' Proposed Findings of Fact and

3    Conclusions of Law ("Pls.' PFF&CL") (Dkt. 104).[1]

4    **Paragraph 28:**

5    28.    The Supreme Court has emphasized that "reasonable" tailoring
     demands a considerably closer fit than mere rational basis scrutiny; and
6    the AWCA's sweeping ban on common firearms with common
     characteristics is not a reasonable fit for achieving the State's interests.
7

8    **Defendants' Response to Paragraph 28:**

9        The Supreme Court has not specified the appropriate level of scrutiny to apply

10   in Second Amendment cases, nor has it "emphasized" the degree of tailoring

11   required in such cases.  *See Teter v. Connors*, 460 F. Supp. 3d 989, 1001 (D. Haw.

12   2020) ("*Heller* did not specify the appropriate level of scrutiny applicable to

13   Second Amendment challenges.  All that is clear from *Heller* is that (1) rational

14   basis is not appropriate, (2) some degree of heightened scrutiny applies, and (3)

15   categorical bans on possessing operable handguns at home are so severely

16   burdensome that they fail under any level of scrutiny."); *Friedman v. City of*

17   *Highland Park, Ill.*, 784 F.3d 406, 409-10 (7th Cir. 2015) ("The language from

18   *Heller* that we have quoted is precautionary: It warns against readings that go

19   beyond the scope of *Heller*'s holding that 'the Second Amendment creates

20   individuals rights, one of which is keeping operable handguns at home for self-

21   defense.'" (citation omitted)).

22

23   _____

24   [1] Defendants identify the paragraphs to which they respond by number and
     the full text of the relevant paragraph, followed by Defendants' response to the
     contentions therein, including citation to designated portions of the deposition
25   transcripts, the parties' evidence, and Defendants' prior briefing.  For the Court's
     convenience and to avoid repetition, Defendants have grouped relevant paragraphs
26   together when they address similar points.  Defendants have endeavored to address
     only the most salient contentions of fact and law.  The absence of a response to a
27   particular paragraph should not be construed as a concession by Defendants that the
     contentions in that paragraph are not contested, and the omission of an argument or
28   citation in a particular response should not be construed as a concession that
     additional evidence or authority may not be relevant.

1

**Paragraphs 29-30:**

29.     In deciding intermediate scrutiny, courts use a First Amendment analysis. Heightened scrutiny in Second Amendment cases is guided by First Amendment principles. Jackson, 746 F.3d at 961.

30.     Thus, if California's assault weapons ban does not "alleviate the claimed harms to a material degree," it fails intermediate scrutiny. *Edenfield v. Fane*, 507 U.S. 761, 770-71; See Lott Decl. Plaintiffs' Exh. 010, Exhs. 010-2 through 010-29; See also Lott Decl., Plaintiffs' Exh. 032.

**Defendants' Response to Paragraphs 29-30:**

While courts have "look[ed] to the First Amendment for guidance in fleshing out jurisprudence for the Second Amendment," *Duncan v. Becerra*, 970 F.3d 1133, 1160 n.20 (9th Cir. 2020) (citing *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014)), the Ninth Circuit has not incorporated First Amendment jurisprudence wholesale into its two-step framework for Second Amendment cases, including the requirements of intermediate scrutiny.  The First and Second Amendments, while both protecting fundamental rights, protect different individual interests and involve different risks to the public.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 122 n.28 (3d Cir. 2018) ("While our Court has consulted First Amendment jurisprudence concerning the appropriate level of scrutiny to apply to a gun regulation, we have not wholesale incorporated it into the Second Amendment.  This is for good reason: '[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights . . . .'" (citations omitted)); *United States v. Marzzarella*, 614 F.3d 85, 96 n.15 (3d Cir. 2010) ("While we recognize the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment.").  Notwithstanding the "analogies" between the First and Second Amendments, "there are salient differences between the state's ability to regulate each of these rights," and it would be "imprudent to assume that the principles and

2

doctrines developed in connection with the First Amendment apply equally to the Second." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 92 (2d Cir. 2012).

Intermediate scrutiny in the Second Amendment context requires that the State show that the challenged law is "substantially related to the important government interest of reducing firearm-related deaths and injuries." *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (quoting *Jackson*, 843 F.3d at 966). In applying intermediate scrutiny in Second Amendment cases, courts "do not impose an 'unnecessarily rigid burden of proof,'" nor do they "require 'scientific precision.'" *Mai v. United States*, 952 F.3d 1106, 1118 (9th Cir. 2020) (quoting *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018)). Accordingly, Plaintiffs' reliance on First Amendment prior-restraint cases is misplaced.

**Paragraphs 31-32:**

> 31.     Defendants have not provided any credible evidence that the AWCA is effective.
>
> 32.     Any alleged higher incidence of "assault weapons" being used in crimes, mass shootings, and/or police shootings cannot justify the State' sweeping ban on the lawful possession and use of protected arms, and the lawful use of such arms overwhelmingly outweighs any criminal use. Government "may not regulate the secondary effects of speech by suppressing the speech itself." *City of Los Angles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (opinion of Kennedy, J.).

**Defendants' Response to Paragraphs 31-32:**

Contrary to Plaintiffs' contention, Defendants have provided substantial evidence that the AWCA and similar assault-weapon restrictions are effective in mitigating the incidence and lethality of mass shootings. *See* Defs.' Post-Trial Proposed Findings of Fact & Conclusions of Law ("Defs.' PFF&CL") (Dkt. 103) at 21-22, ¶¶ 118-124. The State has more than met its burden under intermediate scrutiny. *Id.* at 30-33, ¶¶ 37-50. To the extent Plaintiffs rely on language from First Amendment case law, such reliance is misplaced. *See supra* Defs.' Resp. to ¶¶ 29-30.

**Paragraphs 33-36:**

33.     The U.S. Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 582, 128 S.Ct. 2783 (2008) rejected such an argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29.

34.     Constitutionally protected activities cannot be banned because the activity *could* lead to criminal abuses. See *Southeast Promotions Led. V. Conrad*, 420 U.S. 546, 559 (1975); *Vicenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969).

35.     Under intermediate scrutiny, "a reasonable fit requires tailoring, and a broad prophylactic ban on acquisition or possession of all" common semiautomatic firearms with common characteristics "for all ordinary, law-abiding, responsible citizens is not tailored at all." *Duncan v. Becerra*, 366 F.Supp.3d at 1180; see also *Turner Broadcasting System, Inc. v.* FCC, 512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored' — even under the more lenient [standard applicable to content neutral restrictions] — where… a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals…. Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone….") (brackets in original) (citation and quotations omitted).

36.     "To meet the narrow tailoring requirement … the government must demonstrate that alternative measures that burden substantially less [of the right] would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S. Ct. 2518, 2524 (2014); see also *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

**Defendants' Response to Paragraphs 33-36:**

To the extent Plaintiffs rely on language from First Amendment case law, such reliance is misplaced.  *See supra* Defs.' Resp. to ¶¶ 29-30.

**Paragraphs 37-41:**

37.     "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." *Friedman v. City of Highland Park*, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting).

38.     The State's justification that the self-same characteristics that make the firearms here suitable for lawful use may also make them effective tools for crime if misused, thus necessitating a ban, misses the point and would ultimately gut the Second Amendment.

39.     The very point of protecting arms, and firearms in particular, is that they allow a law-abiding person to project force against unjust force at a distance, and thereby defend themselves and others against a violent threat as soon as possible with the least amount of damage to those being protected.

40.     Inevitably, under the State's reasoning, all firearms that are suitable for any lawful purpose, including self-defense and militia service, are comparably dangerous in the hands of a violent criminal.

41.     The notion that improvements that make firearms better and safer for lawful use likewise make them comparably better for unlawful use simply leads to the absurdity that firearms may never be improved because the very fact that the firearm is more accurate or lethal outweigh the benefits and justify a ban.

**Defendants' Response to Paragraphs 37-41:**

The prohibited features that qualify certain firearms as assault weapons under California Penal Code section 30515(a) are combat-oriented features that can enhance the lethality of those firearms when fired rapidly and continuously—or even automatically if the weapon is modified—as well as the concealability of those weapons.  *See* Defs.' PFF&CL at 4-11, ¶¶ 19-67.  Those features are not needed for lawful uses.  *See id.* at 11, 16, ¶¶ 68, 92 (citing Defs.' Ex. L); *id.* at 18, ¶ 103.  Plaintiffs fail to cite any authority supporting their contention that any firearm accessory that may provide some "ergonomic" benefit is protected under the Second Amendment and may not be prohibited no matter the danger posed to society.  To the contrary, under intermediate scrutiny, the State is entitled to weigh the evidence and the respective risks.  *See Worman v. Healey*, 922 F.3d 26, 40 (1st Cir. 2019) (concluding that plaintiffs' argument that "the forbidden assault weapons and LCMs are 'ideal' for domestic self-defense for many of the same reasons that such weapons are ideal for mass shootings" "is too facile by half" and "give[s] unduly short shrift to 'the legislature's prerogative . . . to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments'" (citation omitted)); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 993 (C.D. Cal. 2019) (noting that, while "Plaintiffs may have legitimate interests in possessing semiautomatic rifles within the AWCA's scope," "California has permissibly

weighed those interests against the weapons' propensity for being used for mass violence and concluded that the weapons' lawful value is drastically outweighed by the danger they pose to California citizens").

In any event, Plaintiffs' *own evidence* indicates that a California-compliant, centerfire AR-platform rifle without any prohibited features has the same rate-of-fire and even better accuracy than an assault rifle with all of the prohibited features, undermining any claim that the prohibited features are needed for lawful uses including self-defense.  *See* Pls.' Ex. 11 (Kraut Decl.) ¶¶ 5-6.

**Paragraph 42:**

> 42.    Importantly, under intermediate scrutiny, if a law is underinclusive, that undermines the purported interest alleged by the State. *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 185-95 (1999).  And if it is necessarily underinclusive, because a more inclusive restriction would be unconstitutional, that shows the interest is not valid as framed.

**Defendants' Response to Paragraph 42:**

The Ninth Circuit has not incorporated First Amendment jurisprudence wholesale into its two-step framework for Second Amendment cases, including the requirements of intermediate scrutiny.  *See supra* Defs.' Resp. to ¶¶ 29-30.  Under intermediate scrutiny in the Second Amendment context, the fit between the challenged law and the State's important interests need not be perfect, nor does it need to be the least restrictive means of serving those interests.  *See Jackson*, 746 F.3d at 969.  The AWCA is constitutional notwithstanding any alleged over-inclusiveness or under-inclusiveness of the law.

**Paragraph 43:**

> 43.    The State admits that the AWCA does not prohibit all semiautomatic firearms precisely because such a ban would be unconstitutional.  As shown below, the AWCA's *continuous* expansion of what constitutes an assault weapon has no stopping point.  Because the AWCA has no stopping point and the current restriction is necessarily underinclusive, the State's interest as framed is improper.

**Defendants' Response to Paragraph 43:**

The AWCA has been amended over time in response to manufacturer attempts to circumvent the law. *See* Defs.' PFF&CL at 2, ¶ 8. In any event, Plaintiffs' slippery-slope concern does not undermine the constitutionality of the AWCA. *See* Frederick Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361, 368-69 (1985) ("As a start we can say that a slippery slope argument necessarily contains the *implicit concession* that the proposed resolution of the instant case is not itself troublesome. By focusing on the consequences for future cases, we implicitly concede that this instance is itself innocuous, or perhaps even desirable."). Under Article III, the Court focuses on the constitutionality of the law at issue in the case, not the possibility of its future abuse or extension. *See Martin v. Hunter's Lessee*, 14 U.S. 304, 345 (1816) ("It is always a doubtful course, to argue against the use or existence of a power, from the possibility of its abuse."); *Panhandle Oil Co. v. Knox*, 277 U.S. 218, 223 (1928) (Holmes, J., dissenting) ("The power to tax is not the power to destroy while this Court sits."); *see also Chafin v. Chafin*, 568 U.S. 165, 171 (2013) (noting that Article III restricts jurisdiction to actual "cases and controversies" and that "[f]ederal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts'" (citations omitted)).

**Paragraphs 45-47:**

45.     The Supreme Court's test for commonality is a nationwide inquiry. The Second Amendment does not mean different things in different parts of the country. The Supreme Court's analysis in *Heller* asks simply whether the arms are "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (Alito, J., joined by Thomas, J., concurring) (italics original). And if the firearms are not both, it determines if the category of arms are in common use for lawful purposes. Duncan, 366 F.Supp.3d at 1142. The text of the Second Amendment, as it is informed by history and tradition, all point in the same direction because "the pertinent Second Amendment inquiry is whether [the banned weapons] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano*, *supra*, at 1032 (italics original).

46.     The arms banned as "assault weapons" under the AWCA and regulations are not both dangerous and unusual, as the Supreme Court defined in *Heller*. To the contrary, they are common in all respects: (1) they are common functionally, as they are all semiautomatic in their operation; (2) they are common characteristically, as they are all commercially popular types of arms with various common characteristics like pistol grips and the like; and (3) they are common jurisdictionally, available in the vast majority of states. As further proof, they are common numerically, in that they are owned by citizens by the hundreds of thousands or more. All of the semiautomatic firearms California bans in Penal Code section 30515 meet the *Heller* test and are constitutionally protected.

47.     While numerical data can be helpful in determining if a particular weapon is commonly used for lawful purposes, the constitutionally-protected status of arms cannot turn on fact-bound sales numbers of particular makes, models, or even specific configurations. Rather, the question is a categorical analysis of type and function, set against a backdrop of permissibility and availability throughout the United States. "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., concurring). So too are semiautomatic firearms in various configurations of characteristics, as California bans. These firearms are commonly used by responsible, law-abiding people for various lawful purposes such as self-defense, hunting, recreation, competition, and collecting. Curcuruto Decl., Plaintiffs' Exh. 004, ¶¶ 7-14; Exhs. 004-1 to 004-8.

## Defendants' Response to Paragraphs 45-47:

The fact that a majority of jurisdictions permit the sale and possession of assault weapons does not entail that those weapons are necessarily in "common use" for lawful purposes.  Rather, the Supreme Court has made clear that the Second Amendment "by no means eliminates" a state's ability to "devise solutions to social problems that suit local needs and values" and that "[s]tate and local experimentation with reasonable firearms regulations will continue." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010) (plurality opinion) (quotation omitted). In any event, the AWCA does not ban weapons commonly used by responsible, law-abiding individuals for various lawful purposes.  Plaintiffs' proposed finding is based on a category of rifles commonly referenced as AR-platform rifles or "modern sporting rifles."  *See* Pls.' Ex. 4 (Curcuruto Decl.) ¶ 7.  However, the AWCA does not categorically ban such rifles.  While certain configurations of AR-platform rifles or "modern sporting rifles" are restricted by the AWCA,

8

Californians continue to enjoy the use of other configurations of these rifles for self-defense, hunting, and sport shooting.  Californians continue to own "modern sporting rifles."  Curcuruto Dep. at 71:1-18.  Californians continue to use "modern sporting rifles" in sports shooting, including competitive shooting.  *Id.* at 103:22-1014:8.  Firearms retailers in California continue to sell "modern sporting rifles."  *Id.* at 97:25-98:3.

**Paragraphs 48-51:**

48.     The fact that the AWCA may act to ban thousands of discrete configurations of common semiautomatic pistols, shotguns, and rifles held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller*. Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 47-52.

49.     Another demonstration of the commonality of semiautomatic firearms called "assault weapons" is their general legality in other jurisdictions. *Caetano*, 136 S.Ct. at 1032 ("[t]he more relevant statistic is that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," who it appears may lawfully possess them in 45 States") (Alito, J., concurring).

50.     Law-abiding citizens may possess any semiautomatic rifle in 44 states and may possess some semiautomatic rifles in all 50 states. Mocsary Decl., Plaintiffs' Exh. 003, at ¶ 44. Semiautomatic firearms may be possessed by citizens in all fifty states. Forty-one states treat all semiautomatic firearms the same as every other legal firearm, without any additional restrictions, regardless of the features attached to the firearm. *Id.*

51.     Millions of weapons that California defines as "assault weapons" by virtue of the Penal Code section 30515(a)(1) characteristics are legally owned by people in a large majority of the states. Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 25-52.

**Defendants' Response to Paragraphs 48-51:**

Plaintiffs' proposed finding is unsupported by the evidence.  Plaintiffs have not provided any evidence as to how many weapons there are that are defined as "assault weapons" under Penal Code section 30515(a)(1).  Rather Plaintiffs' estimate is based on a broad category of rifles sometimes referred to as "modern sporting rifles."  *See* Pls.' Ex. 4 (Curcuruto Decl.) ¶ 7.  However, the AWCA does not categorically ban "modern sporting rifles."  While certain configurations of "modern sporting rifles" are restricted by the AWCA, Californians continue to

9

1   enjoy the use of other "modern sporting rifles" for self-defense, hunting, and sport
2   shooting.  Curcuruto Dep. at 71:1-18, 97:25-98:3, 103:22-1014:8.

3          Furthermore, to the extent Plaintiffs' proposed finding suggests a certain
4   number of "modern sporting rifles," it is unsupported by evidence.  Plaintiffs'
5   estimate of the number of "modern sporting rifles" in lawful possession in the
6   United States is deeply flawed and cannot be relied upon.  *See infra* Defs.' Resp. to
7   ¶ 58.

8          In accordance with the Court's ruling on Defendants' motion in limine,
9   Plaintiffs cannot proffer legal conclusions through their expert witness, Professor
10  Mocsary.  *See* Feb. 3, 2021 Trial Tr. at 66:23-25 ("[T]o the extent that a legal
11  conclusion is expressed by any witness, those legal conclusions will be
12  disregarded.").

13  **Paragraph 52:**

14          52.    Assault weapons bans are not longstanding prohibitions. The only
        federal regulation on semiautomatic firearms having characteristics at
15      issue here did not occur until 1994 in the Public Safety and Recreational
        Firearms Use Protection Act (the "Federal Assault Weapons Ban")
16      (103rd Congress (1993-1994)), a subsection of the Violent Crime Control
        and Law Enforcement Act of 1994 (Pub. L. 103-322), which was allowed
17      to sunset 10 years later due to its lack of effect on crime. Lott Decl,
        Plaintiffs' Exh. 010, ¶ 8.
18

19  **Defendants' Response to Paragraph 52:**

20          The AWCA has historical analogs in firing-capacity regulations enacted in the
21  1920s and 1930s, including restrictions in the District of Columbia that have been
22  in continuous effect.  *See* Defs.' PFF&CL at 25-27, ¶¶ 16-22.  Such laws are
23  sufficiently longstanding.  *See id.*; *see also* Feb. 3, 2021 Trial Tr. at 119 (indicating
24  that the "prohibition against fully automatic weapons" dating back to the 1930s is
25  longstanding "enough for me").

26  **Paragraphs 53-54:**

27          53.    Firearms defined under California law as "assault weapons" by
        virtue of the features they contain, as set forth in Pen. Code section
28      30515(a), are in common use, for lawful purposes, including, recreational

10

and competitive target shooting, self-defense, collecting and hunting, by millions of Americans. Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7.

54.      Semiautomatic rifles bearing features prohibited by Pen. Code section 30515(a)(1) are widely available and popular. The characteristics most commonly associated with these types of firearms are that they are semiautomatic, with the ability to accept a detachable magazine. Curcuruto testimony, Tx of 10/19/20 Hearing at 62:7-11; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18. The most popular is the AR platform (or rifles modeled on the AR-15 pattern). Curcuruto testimony, Tx of 10/19/20 Hearing at 62:17-18. That is true both nationally and in the State of California. *Id.* at 62:24 – 63:19.

## Defendants' Response to Paragraphs 53-54:

Plaintiffs' proposed findings are not supported by the evidence.  *See supra* Defs.' Resp. to ¶¶ 48-51.

## Paragraph 55:

55.      An AR-15 rifle is a semiautomatic civilian rifle, which means it fires one shot with every pull of the trigger. *Staples v. United States*, 511 U.S. 600, 603, 114 S.Ct. 1793 (1994). Kapelsohn testimony, Tx of 10/19/20 hearing at 23:4-9; Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7, fn.1. This distinguishes an AR-15 from an M16, which is a "select fire" weapon, that is, it can be either semiautomatic or fully automatic. *Staples*, 511 U.S. at 603; Kapelsohn testimony, Tx of 10/19/20 Hearing at 21:22 -22:5; Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7. Semiautomatic firearms such as the AR-15 "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612; *Heller II*, 670 F.3d at 1288. In general, semiautomatic firearms are widely available and popular; the vast majority of handguns sold today are semiautomatic. *Heller II*, 670 F.3d at 1269 (Kavanaugh, J., dissenting).

## Defendants' Response to Paragraph 55:

This proposed finding is irrelevant to the asserted claims and defenses.  The AWCA does not categorically ban semiautomatic firearms or "modern sporting rifles," including the AR-15.  *See supra* Defs.' Resp. to ¶¶ 48-51.  The AWCA prohibits only certain configurations of semiautomatic firearms.  While certain configurations of AR-platform rifles or "modern sporting rifles" are restricted by the AWCA, Californians continue to enjoy the use of other "modern sporting rifles" and AR-platform rifles for self-defense, hunting, and sport shooting.  Curcuruto Dep. at 71:1-18, 97:25-98:3, 103:22-1014:8.  Under the AWCA, Californians,

unless they are otherwise prohibited, may acquire certain AR-platform semiautomatic rifles with detachable magazines and semiautomatic handguns.

Moreover, the Supreme Court's decision in *Staples v. United States*, 511 U.S. 600 (1994), is inapposite. The Court in *Staples* did not hold that AR-platform rifles can never be regulated; instead, it addressed the narrow question of whether the absence of federal prohibition on those rifles at the time would have given gun owners sufficient notice of the likelihood of regulation for purposes of establishing *mens rea*. *See Staples*, 511 U.S. at 612. The Court did not address whether assault rifles could ever be restricted or, more generally, are within the scope of the Second Amendment. In fact, the Supreme Court acknowledged in *Staples* that the "destructive potential" of assault rifles may be "even greater than" weapons such as machineguns, sawed-off shotguns, artillery pieces, and hand grenades. *Id.* And four months after *Staples* was decided, Congress enacted the federal ban on those rifles. *See* Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF0431); *see also Rupp*, 401 F. Supp. 3d at 988 n.7.

**Paragraphs 56-57:**

56.     The AR-15 type rifle is a popular, semiautomatic rifle in wide civilian use throughout the United States. *Duncan*, 366 F.Supp.3d at 1145. Curcuruto Decl., Plaintiffs' Exh. 004, ¶¶ 7-8; Curcuruto testimony, Tx of 10/19/20 Hearing at 63:10-19; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18. The AR-15 is especially popular because of its light weight, mild recoil, and good ergonomics, all of which make it well suited to younger shooters, female shooters, and other shooters of smaller stature, as well as an easy rifle for larger, stronger individuals to use. Kapelsohn Decl, Plaintiffs' Exh. 001, ¶ 18.

57.     The AR-15 rifle has been in existence since being developed by the Armalite company in the 1950s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 28; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18; Curcuruto Decl., Plaintiffs' Exh. 4, ¶ 007, fn.1. Many of the features incorporated into the AR-15 rifle already had been in existence; the only major new features incorporated into the AR-15 were lightweight alloys to synthetic materials that became a popular experimentation across all firearm platforms following World War II. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 28.

1    **Defendants' Response to Paragraphs 56-57:**

2        This proposed finding is irrelevant to the asserted claims and defenses.  The

3    AWCA does not categorically ban the AR-platform rifles or "modern sporting

4    rifles."  *See supra* Defs.' Resp. to ¶¶ 48-51.

5    **Paragraph 58:**

6        58.    United States manufacturers produced approximately 14.7 million
     AR-platform rifles for the United States commercial marketplace
7    between 1990 and 2018. Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 8; Exh.
     004-3. Currently, there are an estimated 19.8 million modern
8    semiautomatic rifles overall produced in the U.S. or imported, between
     1990-2018. Curcuruto Decl., Plaintiffs' Exhibit 004, ¶ 15-; Ex. 004-8.
9    The most common calibers for modern semiautomatic rifles are .223 (or
     5.56 x 45mm), 7.62 x 39mm, .22 caliber and .308 caliber. Curcuruto
10   testimony, Tx of 10/19/20 hearing at 65:7-10.

11   **Defendants' Response to Paragraph 58:**

12       This proposed finding is irrelevant to the asserted claims and defenses.  The

13   AWCA does not categorically ban the AR-platform rifles or "modern sporting

14   rifles."  *See supra* Defs.' Resp. to ¶¶ 48-51.  To the extent Plaintiffs' estimate of the

15   number of "modern sporting rifles" is being used to represent the number of

16   "assault weapons" under the AWCA, it is deeply flawed and unreliable.

17       First, Plaintiffs' estimate of the number of "modern sporting rifles" includes

18   rimfire rifles, which are not restricted by the AWCA.  Curcuruto Dep. at 22:14-17.

19   Plaintiffs cannot provide an estimate as to the number of rimfire "modern sporting

20   rifles" in the United States.  *Id.* at 129:14-18, 130:15-18.  Without knowing the

21   number of rimfire "modern sporting rifles" in the United States, one cannot

22   determine the number of "modern sporting rifles" that would be defined as "assault

23   weapons" under AWCA based on Plaintiffs' estimate, because it includes rimfire

24   "modern sporting rifles."

25       Second, Plaintiffs' estimate of the number of "modern sporting rifles" includes

26   rifles with fixed magazines, which are not restricted by the AWCA.  Curcuruto

27   Dep. at 21:19-22:2.  Plaintiffs cannot provide an estimate as to the number of

28   "modern sporting rifles" with a fixed magazine in the United States.  Curcuruto

Dep. at 123:7-9.  Without knowing the number of semiautomatic rifles with a fixed magazine in the United States, one cannot determine the number of "modern sporting rifles" that would be defined as "assault weapon" under AWCA based on Plaintiffs' estimate, because Plaintiffs' estimate includes semiautomatic rifles with a fixed magazine.

Third, Plaintiffs' estimate includes rifles possessed by law enforcement agencies and not available for civilian possession and use.  Curcuruto Dep. at 56:3-18.  Plaintiffs cannot provide an estimate as to the number of "modern sporting rifles" possessed by civilians.  *Id.* at 57:15-23.

Fourth, Plaintiffs' estimate of the number of "modern sporting rifles" includes *all* semiautomatic rifles imported into the United States—not only rifles that would be defined as assault weapons under the AWCA or even "modern sporting rifles" or AR-platform rifles.  Plaintiffs' estimate of the number of "modern sporting rifles" in the United States is derived in part from data from the United States International Trade Commission ("ITC").  Plaintiffs' expert searched through the ITC's database using harmonized tariff schedule codes for rifles that fit his criteria for inclusion in determining the number of "modern sporting rifles" in the United States.  Curcuruto Dep. at 51:5-22.  However, the codes that Plaintiffs' expert used to determine the number of "modern sporting rifles" exported and imported into the United States include all semiautomatic rifles and rimfire rifles.  *See* Defs.' Ex. DC; Defs.' Ex. DV (DEF3560) (9303.30.8010 [Rifles:Centerfire:Autoloading]; 9303.30.8030 [Rifles:Rimfire]) and Ex. DW (DEF3567-68) (9303.30.7010 [Centerfire:Autoloading: Centerfire:Bolt action]; 9303.30.7030 [Rimfire]).

**Paragraph 60:**

> 60.    Rimfire firearms would make up a small portion of the overall numbers of modern semiautomatic rifles, approximately 15 percent. Curcuruto testimony, Tx of 10/19/20 Hearing at 66:9-13. The "vast majority" of modern semiautomatic rifles are centerfire rather than rimfire. Curcuruto Depo., p. 129:14-21.

**Defendants' Response to Paragraph 60:**

The proposed finding is not supported by evidence.  Plaintiffs cannot provide an estimate of the number of rimfire "modern sporting rifles" or "modern semiautomatic rifles" in the United States.  Curcuruto Dep. at 58:1-3, 59:2-4, 129:14-18, 130:15-18.  Rimfire semiautomatic rifles remain popular in the United States.  In 2018, one-third of firearms retailers reported that rimfire semiautomatic rifles were among the top three calibers sold.  *Id.* at 125:5-19, 126:4-10; *see* Pls.' Ex. 4-6 at 5.

**Paragraph 61:**

61.     Defendants' own evidence acknowledges that firearms identified as "assault weapons" under Penal Code section 30515(a) are common and prolific throughout the United States. See Defendants' Exh. BH (depicting hundreds of models of firearms defined as "assault weapons"); see also Glover Decl., Def. Exh. CZ, ¶ 6 (detailing the number of registered assault weapons in California).

**Defendants' Response to Paragraph 61:**

Plaintiffs' proposed finding is not supported by the cited evidence.  Defendants' Exhibit BH does not show "hundreds" of models of firearms defined as assault weapons.  The cited exhibit does not indicate any model of firearm to be an "assault weapon."  *See* Defs.' Ex. BH.  Indeed, the cited exhibit is simply a catalog of collectable firearms.  *Id.* (DEF1849) ("2018 Standard Catalog of Firearms: The Collector's Price & Reference Guide").  Defendants' Exhibit CZ, on which Plaintiffs also rely, shows only the number of legally owned assault weapons in California and shows that assault weapons are not commonly owned by law-abiding citizens.  *See* Defs.' PFF&CL at 11-12, ¶¶ 68-72.  Indeed, the evidence that Plaintiffs rely on shows that only 0.29% of Californians aged 18 years or older legally possess an assault weapon.  *Id.* at 12, ¶ 74.  Therefore, assault weapons are not commonly possessed.

**Paragraph 62:**

62.    Semiautomatic firearms bearing the Penal Code section 30515(a) characteristics are well-suited for self-defense purposes, which is a lawful use. The AR-15 in particular is an easy firearm to shoot accurately and is generally easier to fire accurately than a handgun. Kapelsohn testimony, Tx of 10/19/20 hearing at 25:16 – 26:20. The AR-15 rifle is light in weight, and has good ergonomics, and is suitable for people of all statures and varying levels of strength. *Id.*, at 26:21 – 27:8.

**Defendants' Response to Paragraph 62:**

This proposed finding is irrelevant to the asserted claims and defenses.  The AWCA does not categorically ban semiautomatic firearms, including the AR-15 rifle.  *See supra* Defs.' Resp. to ¶¶ 48-51.  While certain configurations of centerfire semiautomatic rifles are restricted by the AWCA, Californians continue to enjoy the use of other semiautomatic rifles, including AR-platform rifles, for self-defense, hunting, and sport shooting.  Curcuruto Dep. at 71:1-18, 97:25-98:3, 103:22-1014:8; *see* Pls.' Ex. 4 (Curcuruto Decl.) ¶ 7.

**Paragraph 63:**

63.    In its standard configuration, the most popular features of semiautomatic rifles such as the AR-15 rifle, as sold in other parts of the country, are the pistol grip (prohibited by Pen. Code section 30515(a)(1)(A)), the telescoping stock (prohibited by Penal Code section 30515(a)(1)(C)), and a flash suppressor (prohibited by Penal Code section 30515(a)(1)(E)). Graham testimony, Tx of 10/19/20 Hearing at 129:21 – 130:1.

**Defendants' Response to Paragraph 63:**

Plaintiffs' proposed finding is not supported by the cited evidence.  The cited evidence provides only that the most common feature prohibited for rifles, under the AWCA, "is the pistol grip, followed by the telescoping stock and the flash suppressor."  Oct. 19, 2020 Hearing Tr. at 129:21-130:1 (Graham testimony).  The cited testimony does not address what comprises "standard configuration" or "more popular features" of rifles sold in other parts of the United States.

**Paragraphs 64-65:**

64.     Accuracy is very important for self-defense, because unlike the criminal using a firearm, a civilian or a police officer is accountable for every round they fire. And thus, if they miss the attacker, they will hit something they did not intend to hit, which may be an innocent bystander. Kapelsohn testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6. The defense does not dispute the importance of accuracy in self-defense shootings. Graham testimony, Tx of 10/19/20 Hearing at 134:15-18 ("if you're firing a weapon for self-defense, accuracy would be ideal").

65.     Ergonomics is important to accuracy. Kapelsohn testimony, Tx of 10/19/20 Hearing at 30:17 – 31:5. In addition, good ergonomics assists the ability of a civilian to train more effectively. *Id.*, at 31:6-10.

**Defendants' Response to Paragraphs 64-65:**

The prohibited features are combat-oriented features that are not well-suited to lawful civilian use, and the prohibition of certain configurations involving those features do not diminish accuracy in lawful applications.  *See supra* Defs.' Resp. to ¶¶ 37-41.

**Paragraph 66:**

66.     Pistol grips are a prohibited feature under Pen. Code section 30515(a)(1)(A). A pistol grip is a grip "that protrudes conspicuously beneath the action of the weapon." *Id.* Pistol grips are the most common of the prohibited features on just about all modern semiautomatic arms. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:2-6; Graham testimony, Tx of 10/19/20 Hearing at 129:17-12; Decl of Blake Graham, Def. Exh. D, at ¶ 28 ("In my experience, this feature is the most prevalent feature of assault rifles prohibited under the AWCA."). Pistol grips enhance the ergonomics of the weapon. Decl. of Blake Graham, Def. Exh. D, ¶ 28. Pistol grips are therefore important to good ergonomics, particularly on a straight line design rifle such as the AR-15. Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 28; Kapelsohn testimony, Tx of 10/19/20 hearing at 32:23 – 33:2. This enhances the firearm's accuracy. *Id.*; Decl. of Blake Graham, Def. Exh. D, ¶ 28 ("A shooter using an assault rifle without a pistol grip may shoot less accurately with repeated – and especially rapid – shots if the shooter's trigger hand is in an awkward position for a significant amount of time"); Def. Exh. BA, p. 9 (pistol grips afford greater control of the rifle during firing).

**Defendants' Response to Paragraph 66:**

The prohibited features are combat-oriented features that are not well-suited to lawful civilian use, and the prohibited configurations do not diminish accuracy in lawful applications.  *See supra* Defs.' Resp. to ¶¶ 37-41.

**Paragraph 67:**

> 67.    Pistol grips have appeared on long guns dating back to at least the 1700s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 17; Exhs. 002-22 to 002-24.

**Defendants' Response to Paragraph 67:**

Contrary to Plaintiffs' proposed finding, the "pistol grips" referenced by Plaintiffs to have dated to the 1700s are grips *on pistols*, not pistols grips on rifles or shotguns.  Pls.' Ex. 2 (Hlebinsky Decl.) ¶ 17; Pls.' Exs. 2-22 – 2-24.

**Paragraph 68:**

> 68.    Thumbhole stocks are a prohibited feature under Penal Code sections 30515(a)(1)(B) (on rifles) and 30515(a)(6)(B) (on shotguns). Like pistol grips, thumbhole stocks allow the shooter to gain a comfortable grip on the firearm and can facilitate accurate shooting. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29. By prohibiting both pistol grip stocks and thumbhole stocks, section 30515(a)(1)(B) relegates such firearms to be equipped in a manner that is less comfortable, less accurate, and less safe. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29. Thumbhole stocks are functionally similar to pistol grips. Def. Exh. BA, p. 9.

**Defendants' Response to Paragraph 68:**

The prohibited features are combat-oriented features that are not well-suited to lawful civilian use, and the prohibited configurations do not diminish accuracy in lawful applications.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Pistol grips and thumbhole stocks enhance the lethality of semiautomatic weapons when fired rapidly and continuously.  *See* Defs.' PFF&CL at 8, ¶¶ 4 5-47.  There is no evidence that a pistol grip is necessary for a law-abiding civilian to fire accurately, and Plaintiffs' own evidence indicates otherwise.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Notwithstanding the AWCA, the ergonomic benefit of the straight-line design of the AR-15 is available to Californians, who can acquire and possess California-compliant AR-platform rifles with the straight-line design.  *See* Feb. 5, 2021 Trial Tr. at 53:3-54:1.

**Paragraph 69:**

69.     Thumbhole stocks have been on rifles for many years. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 29. Rifles featuring thumbhole stocks have been featured on certain Olympic rifles, including several models dating to the 1950s, and are a prominent shooting sports feature. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 19, Exh. 2-27; Hlebinsky testimony, Tx of 10/19/20 Hearing at 54:20-23.

**Defendants' Response to Paragraph 69:**

Plaintiffs' expert testified that rifles with thumbhole stocks are a modern invention as "a reaction against a regulation on pistol grips."  Hlebinsky Dep. at 83:10-20.

**Paragraphs 70-72:**

70.     Folding or telescoping stocks are features prohibited under Pen. Code section 30515(a)(1)(C). On an AR-15 rifle, a telescoping stock, prohibited by Penal Code section 30515(a)(1)(C), is typically an adjustable buttstock capable of between three and six different adjustment positions, thereby changing the length. Kapelsohn Decl., Plaintiffs' Exhibit 001, at ¶ 31; Kapelsohn testimony, Tx of 10/19/20 Hearing at 28:10-23. This enables the rifle stock to be properly adjusted to fit the user. Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 31. This is particularly beneficial to persons of smaller stature, or women. Kapelsohn testimony, Tx of 10/19/20 Hearing at 28:24 – 29:1; Youngman testimony, Tx of 10/19/20 Hearing at 88:13-20. In addition, the ability to change the firearm length is useful for people who need to wear heavier clothing. Kapelsohn testimony, Tx of 10/19/20 Hearing at 29:2-10. Plaintiff Hauffen, a firearms trainer, has indicated that the telescoping stock is preferred, among other ergonomic features, and that she prefers to train women or younger shooters with this feature. Hauffen Decl., Plaintiffs' Exh. 014, ¶ 8.

71.     A folding stock, though it makes the firearm more portable, does not turn a semiautomatic rifle into a common instrument of crime, since it does not make a rifle easily concealable for most criminal activities. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 30. As such, most crimes are committed by handguns. (*Id.*) Even without a folding stock, an AR-15 firearm is easily separated into two halves, an upper and a lower receiver, which can be separated by pulling out two pins, and which does not take any specialized training. Graham testimony, Tx of 10/19/20 Hearing at 143:9 – 144:13; 146:11-18. Without specialized skill or training, therefore, a person can take apart an AR-15, and make it concealable, in a matter of seconds. *Id.*

72.     A folding or telescoping stock that meets the minimum overall length requirements for rifles and/or shotguns while collapsed or folded is no more "concealable" than a rifle or shotgun with a fixed stock that meets the minimum overall length requirements.

**Defendants' Response to Paragraphs 70-72:**

Fixed-length stocks are available for AR-platform rifles in a variety of lengths to accommodate different body-types. Kapelsohn Dep. at 133:9-17, 134:18-20; Youngman Dep. at 124:18-125:15. A folding or telescoping stock is a combat-oriented feature and prohibiting such adjustable stocks on certain weapons does not diminish accuracy in lawful applications. *See supra* Defs.' Resp. to ¶¶ 37-41.

**Paragraph 73:**

73.     Folding or telescoping stocks have been on firearms dating back to the 1700s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 20. The flexibility of stock size became important in the civilian market where comfort and having firearms suited for the individual became feasible. *Id.*; Exhs. 002-28 to 002-31.

**Defendants' Response to Paragraph 73:**

Contrary to Plaintiffs' proposed finding, the first rifle with a folding stock was not developed until after World War II, in the 1950s. Hlebinsky Dep. at 100:12-22. And Plaintiffs' expert does not know which was the first rifle to have a telescoping stock. *Id.* at 102:7-10. As Plaintiffs' expert explained, folding or telescoping stocks were not seen in early firearms history because early firearms were customarily made by artisans. Pls.' Ex. 2 (Hlebinsky Decl.) ¶ 20. In her declaration, Plaintiffs' expert provided the blunderbuss, the Lugar Model 1902, and Try Guns as examples of firearms with adjustable stocks. *Id.* However, Plaintiffs' expert later confirmed that the blunderbuss is neither a rifle nor a pistol, and neither the Lugar Model 1902 nor the Try Gun have folding or telescoping stocks. Hlebinsky Dep. at 95:19-96:6, 96:16-21, 97:17-23, 98:8-10, 99:12-14.

**Paragraphs 74-75:**

74.     A "grenade launcher" is a feature prohibited on rifles under Pen. Code section 30515(1)(D). Grenade launchers on rifles are not numerically common, but that is largely a function of grenades being separately prohibited as "destructive devices" and regulated by federal law. Because the law prohibiting grenades is already addressed in the law, California's law prohibiting grenade launchers is largely superfluous. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32. Grenade

20

launchers, also known as hand mortars, date to the 1600s and 1700s. The State has not presented any evidence that grenade launchers, attached to a rifle, have ever been used in the commission of a crime. Regardless, if this Court were to eliminate the AWCA in its entirety, the ability for an individual to acquire, let alone attach a grenade launcher to a firearm, would not be enhanced in any way as both grenades and grenade launchers are separately regulated under California and Federal law.

75.     A "flare launcher" is another feature prohibited on rifles under Pen. Code section 30515(1)(D). Yet, Defendants have not provided a single instance in which a flare launcher was ever used in a crime. Flare guns were in use by the 1800s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 21. Most importantly, flare launchers are signaling devices — nothing more. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32. They are inherently passive. The State's interest in "public safety" or decreasing mass shootings are in no way connected to a ban on flare launchers. Moreover, flare launchers are designed to a different diameter than grenade launchers, grenades, or other destructive devices. Thus, no grenade or destructive device could be fired from a flare launcher. Defendants have also not alleged nor provided any evidence that any kind of destructive device could be fired from a flare launcher.

## Defendants' Response to Paragraphs 74-75:

The state is not required to present evidence that any of the particular features has been used in the commission of a crime, including in any mass shooting. It is common sense that a grenade launcher poses serious public-safety risks, *see* Feb. 3, 2021 Trial Tr. at 112:21-24 (the Court observed that it merely requires "common sense" to know that "[t]he more shots you can fire, the more likely you are . . . to injure or kill people"), and while flare launchers may have lawful uses as signaling devices, they have no legitimate civilian need to be affixed to a rifle, *see* Defs.' PFF&CL at 11, ¶¶ 66-67.  And contrary to Plaintiffs' proposed finding, Plaintiffs' expert does not know when rifles with a flare launcher were first developed. Hlebinsky Dep. at 106:3-10.

## Paragraphs 76-78:

76.     A flash suppressor is a device that is prohibited on rifles under Penal Code section 30515(a)(1)(E). A flash suppressor is a device fitted on the end of a muzzle which diverts the muzzle flash through several slots or holes, most commonly arranged around the axis of the bore. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33. The most common type of flash suppressor on AR-15 rifles is the "birdcage" type of device. *Id.*, Exh. 001-14. The primary advantage of a flash suppressor is to reduce muzzle flash so as not to temporarily blind a shooter who is shooting in a dark environment. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33. The use of

21

a rifle without a flash suppressor under low light circumstances is likely to temporarily blind the user, or impair the user's vision, placing a law-abiding user at a disadvantage to a criminal attacker. *Id.*; Kapelsohn Depo. at 124:25 – 125:8 ("I have fired ARs that don't have a flash suppressor and [they] throw out a God awful flame and muzzle blast as a result.").

77.     Another advantage of flash suppressors is that they protect the muzzle of a rifle from dirt, sand, or mud that could dangerously plug the muzzle were it to touch the ground outdoors. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 33.

78.     The State specifically defines a "flash suppressor" as "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." 11 Cal. Code Regs. § 5471(r). A flash suppressor is not, by this definition, a device intended to conceal a shooter's position.

### Defendants' Response to Paragraphs 76-78:

Flash suppressors are a standard feature of the M-16 and can facilitate more accurate (and lethal) rapid fire and can conceal the location of the shooter in low-light conditions. *See* Defs.' PFF&CL at 10, ¶¶ 58-61. A flash suppressor is not necessary to protect the muzzle of a rifle from dirt or other debris. *See* Kapelsohn Dep. at 158:8-12 (testifying that he is "sure there must be" other devices that can be affixed to the barrel of a rifle to minimize the possibility of debris entering the barrel); *id.* at 158:16-159:5 (discussing caps or tape that can be used to protect a muzzle from debris prior to firing the first round).

### Paragraph 79:

79.     Flash suppressors have appeared on firearms since the early 20th Century and have appeared on AR platform firearms since they were invented in the 1950s. Hlebinsky Decl., Plaintiffs' Exhibit 002, ¶ 23; Ex. 2-32; Plaintiffs' Exh. 001-14.

### Defendants' Response to Paragraph 79:

The cited evidence does not support Plaintiffs' proposed finding. The cited evidence states that early 20th-century guns with a "flash suppressor" are actually guns with a silencer, not "flash suppressors" under the AWCA. Pls.' Ex. 2 (Hlebinsky Decl.) ¶ 23; Pls.' Ex. 2-32.

**Paragraphs 80-81:**

80.    A forward pistol grip is prohibited on rifles under Penal Code section 30515(a)(1)(F). The State further defines "forward pistol grip" as "a grip that allows for a pistol style grasp forward of the trigger." 11 Cal. Code Regs. § 5471(t). By its very definition, therefore, a forward pistol grip is designed to enhance control of the firearm. Forward pistol grips on rifles, also called vertical forends, are popular among some shooters in allowing them to control the rifle better for more accurate shooting. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 34. Forward pistol grips may also serve as a "monopod" to assist in stabilizing the rifle for more precision shooting in the prone position. *Id.*

81.    Forward pistol grips are found on firearms dating back at least to the 1860s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 18; Exh. 002-25.

**Defendants' Response to Paragraphs 80-81:**

Forward pistols grips, particularly on rifles or pistols, are not well suited to lawful civilian use, and the prohibition of certain configurations involving forward pistol grips does not diminish accuracy in lawful applications.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Plaintiffs' expert does not know which firearm was the first semiautomatic rifle with a forward pistol grip.  *See* Hlebinsky Dep. at 93:4-7.

**Paragraphs 83-85:**

83.    Rifles that have shorter overall lengths are more advantageous to the user, particularly in close quarters situation, such as the defense of a home, because it enables the user to be more maneuverable moving through doorways and around corners. Kapelsohn testimony, Tx of 10/19/20 Hearing at 33:18 – 34:5; Graham testimony, Tx of 10/19/20 Hearing at 132:13 – 134:6.

84.    The idea of a "carbine," which is a shorter rifle, has long been in existence, and typically refers to a rifle with a barrel less than 20 inches. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 22. Rifles with shorter barrel lengths also have the added advantage of having less weight, which would be important from a defensive perspective. Kapelsohn testimony, Tx of 10/19/20 Hearing at 39:14 – 40:4.

85.    Defendants have not provided any evidence that the Federal minimum overall length for rifles and/or shotguns is insufficient to further the State's interests. Defendants also have not provided any evidence that a rifle 30 inches long is significantly less concealable than a firearm that is 26 inches long.

**Defendants' Response to Paragraphs 83-85:**

The evidence shows that rifles with lengths less than 30 inches are more concealable.  *See* Defs.' PFF&CL ¶ 55.  Moreover, the existence of a shorter

23

26-inch restriction under federal law does not render California's 30-inch restriction unconstitutional; California Penal Code section 30515(a)(2) applies to rifles not covered by the federal length restriction (i.e., rifles with an overall length of 26 to 29 inches) if they are *also* semiautomatic, centerfire rifles without a fixed magazine.

**Paragraph 86:**

86.     Firearms characterized as assault weapons based upon the Penal Code section 30515(a)(1) characteristics are numerically common, and the features are commonly used for lawful purposes, including self-defense.

**Defendants' Response to Paragraph 86:**

Plaintiffs provided no evidence to support this proposed finding.  Specifically, there is no evidence that any of the "features" listed in Penal Code section 30515(a)(1) are commonly used for lawful purposes.  As to the numerical commonality of firearms defined as assault weapons under Penal Code section 30515(a)(1), Plaintiffs' estimate is deeply flawed and unreliable.  *See supra* Defs.' Resp. to ¶ 58.

**Paragraph 91:**

91.     The same rationale that applies to the utility of pistol grips, vertical foregrips, and flash suppressors as they are found on rifles, apply equally to those features that appear on pistols. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 37.

**Defendants' Response to Paragraph 91:**

The features qualifying pistols as "assault weapons" under the AWCA are not suitable for lawful use and the prohibition of certain configurations involving those features does not diminish the accuracy of those weapons for lawful use.  *See supra* Defs.' Resp. to ¶¶ 37-41.

**Paragraph 92:**

92.     The purpose of a barrel shroud (Pen. Code § 30515(a)(4)(C)) is to protect the user's hand from touching the barrel and becoming burned. Kapelsohn Depo. at 169:5-21. Defendants have not provided any

24

evidence that extended and/or excessive firing is necessary in order for a firearm's barrel to reach high temperatures that can burn the user's hand. A barrel shroud, by definition, is a safety device. Defendants' justifications for prohibiting a barrel shroud would also serve as justification for prohibiting shooters from wearing gloves while shooting.

**Defendants' Response to Paragraph 92:**

The features qualifying pistols as "assault weapons" under the AWCA are not suitable for lawful use and the prohibition of certain configurations involving those features does not diminish the accuracy of those weapons for lawful use. *See supra* Defs.' Resp. to ¶¶ 37-41.  Moreover, Plaintiffs have not submitted evidence that normal use of a firearm can result in barrel temperatures necessitating the use of a barrel shroud to prevent accidental burning.  To the contrary, the evidence shows that barrel shrouds serve specific combat functions. *See* Defs.' PPF&CL at 9, ¶ 50; Kapelsohn Dep. at 170:23-171:7 (discussing firing techniques involving the holding of the barrel).

**Paragraph 93:**

93.     Threaded barrels on pistols are common. Ostini Decl., Plaintiffs' Exh. 005, ¶ 10; Exh. 005-1. In addition to being able to accept flash suppressors, threaded barrels can allow a user to attach compensators or muzzle brakes, which are devices that are not prohibited on pistols (if such devices are permanently attached to the barrel), and which are in wide use by competition shooters. Kapelsohn testimony, Tx of 10/19/20 Hearing at 40:16 – 41:5. Thus, the State's prohibition on threaded barrels prevents a shooter from being able to switch muzzle devices depending on the user's intended need or purpose. While threaded barrels are prohibited on pistols, the AWCA permits threaded barrels on rifles. CA Penal Code section 30515(a). No explanation or evidence has been provided by Defendants which can account for prohibiting threaded barrels on pistols, but allowing threaded barrels on rifles, even though silencers, flash suppressors, and compensators or muzzle brakes are equally available for both platforms.

**Defendants' Response to Paragraph 93:**

Plaintiffs proposed finding is not supported by the evidence; there is no evidence that threaded pistol barrels are numerically common or that they are well suited to lawful uses.  The features that can be affixed to a pistol with a threaded barrel are themselves not suitable for lawful use. *See supra* Defs.' Resp. to ¶¶ 37-41.  The fact that the AWCA does not prohibit threaded barrels for rifles is

25

1    irrelevant to the evaluation of the law under intermediate scrutiny.  *See supra* Defs.'

2    Resp. to ¶ 42.

3    **Paragraph 95:**

4       95.    AR-15 pistols, which also generally fire the .223 round, are also
         suitable for self-defense, because of their accuracy, light weight, and
5       maneuverability in close quarters. Kapelsohn testimony, Tx of 10/19/20
         hearing at 42:22 – 44:6. AR-15 pistols would be prohibited under Penal
6       Code section 30515(a)(4)(D) because they generally accept detachable
         magazines outside of the pistol grip.
7

8    **Defendants' Response to Paragraph 95:**

9       The features qualifying AR-15 pistols as "assault weapons" under the AWCA

10   are not suitable for lawful use.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Moreover,

11   Plaintiffs have not submitted evidence that AR-15 pistols are in "common use" for

12   lawful purposes.

13   **Paragraph 97:**

14      97.    According to the State's evidence pertaining solely to registered
         assault weapons, there are currently 16,419 pistols registered as assault
15      weapons, and 3,478 shotguns registered as assault weapons. Glover
         Decl., Def. Exh. CZ, ¶ 6.
16

17   **Defendants' Response to Paragraph 97:**

18       According to the State's evidence, there are currently 16,306 pistols and 3,459

19   shotguns registered by non-peace officers as assault weapons in California.  Defs.'

20   Ex. CZ (Glover Decl.) ¶ 7.  Possession of such weapons by law enforcement or

21   military personnel is irrelevant to whether the weapons are in "common use" by

22   law-abiding citizens for lawful purposes.  *See* Defs.' PFF&CL at 24, ¶ 11.

23   **Paragraphs 98-99:**

24      98.    Plaintiffs' witness Joseph Ostini surveyed the websites and
         catalog information from 73 different firearm manufacturers in the
25      United States and found that of the 61 pistol manufacturers, there are at
         least 356 different models of firearms offered for sale defined as an
26      "assault weapon" pistol under Penal Code section 30515. Ostini Decl.,
         Plaintiffs' Exh. 005), ¶¶ 4-12. Some manufacturers, such as CMMG,
27      offer 38 different models of California-prohibited "assault pistols." Some
         of these manufacturers, such as Ruger, Sig Sauer, Springfield Armory,
28      and Beretta,— each of which offer several models of pistols considered

                                              26

by California to be "assault weapons" — are widely held as some of the largest firearm manufacturers in the United States. *Id.*, Exh. 005-1.

99.    Ruger, and other manufacturers, sell threaded pistol barrels for their handguns. Ostini Decl., Plaintiffs' Exh. 005, ¶ 13; Exh 005-3.

### Defendants' Response to Paragraphs 98-99:

Plaintiffs have failed to present evidence of the number of pistols that qualify as "assault weapons" under the challenged provisions of the AWCA that are lawfully possessed in the United States.  To the extent Plaintiffs purport to submit information from websites as substantive evidence, such evidence is improper hearsay.  Moreover, Plaintiffs' Exhibit 5 (Ostini Decl.) does not provide any evidence regarding whether the pistols listed on the websites and catalogues were actually sold, and thus does not establish that these weapons were in "common use" for lawful purposes by law-abiding citizens.

### Paragraph 101:

101.    The same rationale that applies to the utility of pistol grips, and telescoping stocks as they are found on rifles, apply equally to those features that appear on shotguns. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 31. Furthermore, a shotgun with pistol grips, collapsible stocks and detachable magazines would make excellent firearms for home defense. Kapelsohn testimony, Tx of 10/19/20 38:24 – 39:6. In fact, some shotguns use telescoping buttstocks that absorb recoil, like a shock absorber, which is particularly useful to dampen the heavy recoil of a shotgun. *Id.* at 44:8-23; Kapelsohn Depo. at 195:8 – 198:7; 199:8 – 200:3.

### Defendants' Response to Paragraph 101:

The features qualifying shotguns as "assault weapons" under the AWCA are not suitable for lawful use and the prohibition of certain configurations involving those features does not diminish the accuracy of those weapons for lawful use.  *See supra* Defs.' Resp. to ¶¶ 37-41.  The AWCA does not define a shotgun with a telescoping stock *without a pistol grip* as an "assault weapon."  *See* Cal. Penal Code § 30515(a)(6).

1

**Paragraphs 102-103:**

2

3

    102.    Following the evidentiary hearing, Plaintiffs offered evidence regarding the commonality of shotgun features that would make them "assault weapons" under Penal Code section 30515(a)(6). First, as to his survey, Plaintiffs' witness Ostini found that popular shotgun choices include the AK47/Kalashnikov action shotguns like the Lynx 12 or Kalashnikov USA KS-12 Shotgun." Ostini Decl., Plaintiffs' Exh. 005, ¶ 13, Ex. 005-17. Of the 96 different "tactical shotgun" models offered on Atlantic Firearms' website, for example, 56 of those models would be classified as "assault weapon" shotguns under Penal Code section 30515.

4

5

6

7

    103.    Plaintiffs also offered industry data pertaining to semiautomatic shotguns, using distribution information pertaining to the Benelli M1014, a popular semiautomatic shotgun popular in the United States. In California, it is prohibited for sale to citizens as it is considered an assault weapon because of the existence of both a pistol grip and a telescoping stock. Plaintiffs' Exh. 007-1. According to Plaintiffs' witness Kenneth Brown, looking the distribution data for various models of this shotgun, from 2016 to 2020, there were several thousand of this particular model of shotgun (containing the California-prohibited features) distributed/sold in his western region alone. Brown Decl., Plaintiffs' Exh. 007, ¶¶ 16-19.

8

9

10

11

12

13

**Defendants' Response to Paragraphs 102-103:**

14

    Plaintiffs have failed to present evidence of the number of pistols that qualify

15

as "assault weapons" under the challenged provisions of the AWCA that are

16

lawfully possessed in the United States.  Plaintiffs' own evidence confirms that

17

shotgun models without prohibited features are available for sale and possession in

18

California.  Pls.' Ex. 7 (Brown Decl.) ¶ 23 (testifying that Benelli sells a California-

19

compliant version of the M1014 shotgun).  To the extent Plaintiffs purport to

20

submit Plaintiffs' Exhibit 7 (Brown Decl.) as substantive evidence, such evidence is

21

improper hearsay.  Moreover, Plaintiffs' Exhibit 7 does not provide any evidence

22

regarding whether the subject shotguns were actually sold, and thus does not

23

establish that these weapons are in "common use" for lawful purposes by law-

24

abiding citizens.

25

**Paragraph 104:**

26

    104.    Plaintiffs have shown that pistols and shotguns that would be classified as "assault weapons" under Pen. Code section 30515(a)(4), (6), (7) and (8) are common in the United States.

27

28

**Defendants' Response to Paragraph 104:**

Plaintiffs have failed to present evidence of the number of pistols and shotguns that qualify as "assault weapons" under the challenged provisions of the AWCA that are lawfully possessed in the United States. Plaintiffs' own evidence confirms that pistol and shotgun models without prohibited features are available for sale and possession in California. Pistols and shotguns that qualify as "assault weapons" under the challenged provisions of the AWCA are not well suited to lawful purposes like self-defense. *See supra* Defs.' Resp. to ¶¶ 37-41.

**Paragraphs 107-109**

107.    This Court has already addressed the legality of laws, which prohibit the possession of "large capacity magazines," as that term is defined by Pen. Code section 16740. *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). The State cannot otherwise prohibit possession of large capacity magazines by calling firearms "assault weapons" because they are attached to them.

108.    The State has presented no evidence of any crimes being committed with a rifle or pistol that contained a fixed magazine with the ability to accept more than ten rounds of ammunition.

109.    The State has presented no evidence of any mass shootings being committed with a rifle or pistol that contained a fixed magazine with the ability to accept more than ten rounds of ammunition. Depo. of Lucy Allen, 179:4-24.

**Defendants' Response to Paragraphs 107-109:**

Under intermediate scrutiny, the State may "rely on any evidence 'reasonably believed to be relevant,'" including mass shootings involving detachable LCMs, in determining that fixed LCMs pose a significant public danger. *See* Defs.' PPF&CL at 31, ¶ 41. It is a matter of "common sense" that fixed LCMs can enable a shooter to fire more rounds, inflict injuries on more people, and kill more people. *See* Feb. 3, 2021 Trial Tr. at 112:21-24 (discussing fixed LCMs).

**Paragraphs 110-114:**

110.    "*Heller* recognized that militia members traditionally reported for duty carrying "the sorts of lawful weapons that they possessed at home," and that the Second Amendment therefore protects such weapons as a

class, regardless of any particular weapon's suitability for military use." *Caetano*, 136 S.Ct. at 1032 (Alito, J., concurring) (citing *Heller*, 554 U.S. at 627).

111.     Plaintiffs have also shown that firearms characterized as assault weapons under the AWCA are particularly useful for service in a militia.

112.     It was clearly understood, from the early founding of the Republic, that the unorganized militia consisted of the people themselves. *Heller*, 554 U.S. at 595-596, 128 S.Ct. at 1799 (that "the Militia comprised of all males physically capable of acting in concert for the common defense[]" comports with founding-era sources) (citing *Miller*, 307 U.S. at 179). In *Heller*, the majority rejected a narrower view of the militia as having been limited to state and congressionally-regulated military forces. 554 U.S. at 596, 128 S.Ct. at 2799-2800. From the outset, "[t]he republican militia was the armed populace at large, not a select militia or standing army." Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms, 226 (2008) (citing Elliot, 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 379 (1836)).

113.     Plaintiffs have shown that the AR-15 firearm in its standard configuration – prohibited by California law as an "assault weapon" – is useful for service in the militia.

114.     In particular, Plaintiffs have shown that the AR-15 rifle, with standardized and interchangeable component parts, is well-suited for militia service. (Youngman Decl., Plaintiffs' Exh. 009, ¶ 14; Youngman testimony, Tx of 10/19/20 Hearing at 85:16-23 ("It would be the ideal weapon for the militia.")).  The AR-15's use of standardized ("STANAG") magazines and common ammunition, and its reliability, low cost, and light weight, serve the same purposes sought to be achieved by the drafters of our Founding Era militia acts. Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common chamberings as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it an ideal firearm for militia service. (Youngman Decl., Plaintiffs' Exh. 009, ¶¶ 15-19).

**Defendants' Response to Paragraphs 110-114:**

Whether a firearm is suitable for militia service—or is otherwise suitable for law enforcement or military service—is irrelevant to whether the firearm is protected under the Second Amendment.  *See* Defs.' PFF&CL at 25, ¶¶ 14-15; *id.* at 14-17, ¶¶ 84-97; *see also Vermont v. Misch*, No. 173-2-19, 2021 VT 10 (Vt. Feb. 19, 2021) (upholding Vermont LCM restrictions under the Vermont Constitution and noting that "the militia world contemplated by the Second Amendment no longer exists, and no plausible analogy to that nexus can be reconstructed" (quoting

30

1    H. Uviller & W. Merkel, *The Second Amendment in Context: The Case of the*

2    *Vanishing Predicate*, 76 Chi.-Kent L. Rev. 403, 547 (2000))); Feb. 5, 2021 Trial Tr.

3    at 77:20-79:1 (discussing *Heller* and *Miller*).

4        At the time of the founding, members of the militia would bring "the sorts of

5    lawful weapons that they possessed at home to militia duty," but today the types of

6    arms commonly possessed for lawful purposes like self-defense are not necessarily

7    the same types of weapons used in the military, giving rise to an increasing gap

8    between the prefatory clause's statement of purpose and the right secured by the

9    Second Amendment.  *Heller*, 554 U.S. at 627 (acknowledging "the fact that modern

10   developments have limited the degree of fit between the prefatory clause and the

11   protected right" because "no amount of small arms could be useful against modern-

12   day bombers and tanks"); *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016)

13   ("*Heller* acknowledged that advances in military technology might render many

14   commonly owned weapons ineffective in warfare."); *Friedman*, 784 F.3d at 408

15   ("[The *Heller* Court] observed that state militias, when called to service, often had

16   asked members to come armed with the sort of weapons that were 'in common use

17   at the time' and it thought these kinds of weapons (which have changed over the

18   years) are protected by the Second Amendment in private hands, while military-

19   grade weapons (the sort that would be in a militia's armory), such as machine guns,

20   and weapons especially attractive to criminals, such as short-barreled shotguns, are

21   not.").

22       The development of firearms technology for military or law enforcement

23   applications does not mean that the scope of the operative Second Amendment right

24   has expanded to keep pace with those changes.  *See Heller*, 554 U.S. at 578 (noting

25   that a prefatory clause's statement of purpose "does not limit or expand the scope of

26   the operative clause").  Thus, despite its original militia-based purpose, the Second

27   Amendment permits the banning of "weapons that are most useful in military

28   service."  *Id.* at 627.  If anything, Plaintiffs argument and supporting evidence that

31

assault weapons are suitable for militia service support the constitutionality of the AWCA.  *See* Defs.' PFF&CL at 25, ¶¶ 14-15; *id.* at 14-17, ¶¶ 84-97; *People v. James*, 174 Cal. App. 4th 662, 676 (2009) ("As the [Supreme Court's] discussion makes clear, the Second Amendment right does not protect possession of a military M-16 rifle.  Likewise, it does not protect the right to possess assault weapons or .50 caliber BMG rifles.").

**Paragraph 117:**

117.    The very qualities that make the Penal Code section 30515(a)(1) characteristics advantageous for purposes of self-defense would tend to make rifles that lack those characteristics less advantageous, such as reduced ergonomics and accuracy.

**Defendants' Response to Paragraph 117:**

The prohibited features that qualify certain firearms as assault weapons under California Penal Code section 30515(a) are combat-oriented features that can enhance the lethality of those firearms when fired rapidly and continuously—or even automatically if the weapon is modified— as well as the concealability of those weapons.  *See supra* Defs.' Resp. to ¶¶ 37-41; *Worman*, 922 F.3d at 40; *Rupp*, 401 F. Supp. 3d at 993.

**Paragraph 119:**

119.    AR-type firearms may also be made "featureless," in that some of the key components of a standard AR-15, such as the pistol grip, telescoping stock, or flash suppressor, may be removed and replaced by other devices. Kraut Del., Plaintiffs' Exh. 011, ¶¶ 5-6. On video, Plaintiff's witness Adam Kraut demonstrated the use of a "featureless" AR-15 rifle by shooting the same rifle in two different strings of fire, one in the standard configuration, and one in the "featureless" condition. *Id.*; Kraut testimony, Tx of 10/22/20 Hearing at 23:11 – 24:7. The purpose of the video was to demonstrate that in either configuration it was possible to shoot a man-sized target at 25 yards in rapid succession using either a California featureless rifle or a standard configuration AR-15. *Id.* at 24:20-25.

**Defendants' Response to Paragraph 119:**

Plaintiffs' *own evidence* indicates that a California-compliant, centerfire AR-platform rifle without any prohibited features has the same rate-of-fire and even

better accuracy than an assault rifle with all of the prohibited features, undermining any claim that the prohibited features are needed for lawful uses including self-defense. *See* Pls.' Ex. 11 (Kraut Decl.) ¶¶ 5-6.

**Paragraph 120:**

> 120.    To a criminal, therefore, or to someone who is intent upon committing crimes, the existence of the prohibited features may not make any difference. A person can commit a crime with a weapon just as easily without a pistol grip. Kapelsohn testimony, Tx of 10/19/20 Hearing at 46:8-10. Moreover, a criminal or mass shooter is not concerned with the consequences of being inaccurate, while a lawful citizen is.  A mass shooter may intend to kill as many people as possible. The legal consequences for a negligent shot or hitting an unintended target are entirely inconsequential to a mass murder. On the other hand, lawful citizens are responsible for every shot fired and features that enhance a firearm's accuracy or comfort (even to a minimal degree) are vitally important, for the effectiveness of the weapon, the ability of the citizen to train with it, and to ensure that only the thing that is fired upon is the intended target.

**Defendants' Response to Paragraph 120:**

Plaintiffs provide no evidence that a criminal or mass shooter has no interest in accurate, continuous rapid fire.  To the contrary, firearms with assault-weapon configurations are "incredibly effective killing machines" because the prohibited features "increase the capabilities of semiautomatic rifles and thereby enhance their capacity for mass violence." *Rupp*, 401 F. Supp. 3d at 992, 993.  Moreover, the evidence shows that a vast majority of individuals who commit mass shootings were "lawful citizens" when they acquired the murder weapons.  *See* Defs.' PFF&CL at 21, ¶ 117; *see also* Defs.' Ex. A (Allen Decl.) ¶ 38 (DEF0020) (finding that "shooters in 77% of mass shootings obtained their guns legally").

**Paragraph 121:**

> 121.    Because California assault weapon ban is largely based on the characteristics that are attached to the firearm, nothing prevents a determined individual from purchasing a featureless rifle, purchasing one or more of these otherwise-legal features that can be used on a fixed-magazine or rimfire firearm (*e.g.*, pistol grip, collapsible stock, non-fixed magazine release, *etc.*), and then unlawfully converting the featureless firearm into an illegal configuration to commit a crime. This is similar to what was done in the San Bernardino terrorist attack in 2015, when the

shooters converted compliant rifles into non-compliant rifles. Lott Decl.,
Plaintiffs' Exh. 010, ¶ 12.

**Defendants' Response to Paragraph 121:**

While it is possible that the AWCA's restrictions may be circumvented by

determined criminals, assault-weapon restrictions can make it more difficult to

obtain or configure illegal assault weapons.  *See* Lott Dep. at 226:10-12, 258:16-25

(testifying that assault-weapon restrictions can increase prices for prohibited

weapons on the black market).  Moreover, the evidence shows that assault-weapon

restrictions like the AWCA are effective in reducing the use of assault weapons in

mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶ 27 (DEF0338-39).

**Paragraph 122:**

122.    Without a pistol grip, a featureless firearm is less ergonomic and
less accurate. A featureless AR-15 rifle that lacks a standard pistol grip is
not as ergonomic and is a poor design. Kapelsohn Depo., at 124:3-18. A
pistol grip allows a shooter to manage recoil better than a rifle with a
traditional stock design, particularly on an AR-type rifle. Kapelsohn
Depo., at 179:24 – 183:4.

**Defendants' Response to Paragraph 122:**

The prohibited features are combat-oriented features that are not well-suited to

lawful civilian use, and the prohibition of certain configurations involving those

features do not diminish accuracy in lawful applications.  *See supra* Defs.' Resp. to

¶¶ 37-41.

**Paragraph 124:**

124.    Another drawback to the featureless AR-15 rifle is that the lack of
a pistol grip makes it less safe when it comes to clearing malfunctions.
On an AR-15 rifle, the process for clearing a malfunction or ammunition
jam is hindered by one's inability to wrap their hand around a pistol grip
because one does not maintain the same degree of control when
performing the malfunction clearance procedures. Kapelsohn Depo. at
188:11 – 194:19.

34

**Defendants' Response to Paragraph 124:**

Plaintiffs have not provided evidence that California-compliant AR-platform rifles are less safe when clearing malfunctions. *See* Kapelsohn Dep. at 204:9-15 (agreeing that California-compliant pistol grips can enable a shooter to clear a malfunction); *id.* at 211:1-5.

**Paragraphs 125-130:**

125. For the same reasons that show that the prohibited characteristics of Penal Code section 30515(a)(1) are common, preferred, and useful for lawful purposes such as self-defense, the State has not shown that ordinary citizens must resort to "featureless" versions of AR-15 rifles that lack those characteristics.

126. While Defendants continue to deny the decades of lawful use of firearms defined as "assault weapons" pursuant to California law, Defendants' evidence explicitly contradicts Defendants' contentions.

127. For example, Defendants' evidence shows that rifles characterized as "assault"-type rifles are also called "sporting rifles." Defendants' Exh. BA, p. 3.

128. Defendants' evidence also shows that so-called "military-type rifles" are typically chambered in .223 Remington, a caliber common for varmint or coyote hunting. Defendants' Exh. BA, p. 6.1.

129. Defendants' evidence also shows that flash hiders are common and commercially available to sportsmen for sporting purposes. Defendants' Exh. BA, p. 7.

130. Defendants' evidence also shows that pistol grips are common and widely adaptable to a wide range of shooters. Defendants' Exh. BA, p. 9.

**Defendants' Response to Paragraphs 125-130:**

The evidence shows that assault-weapon configurations of centerfire, semiautomatic rifles and semiautomatic pistols without a fixed magazine enhance the lethality of those weapons, regardless of the uses of each feature in different contexts. *See supra* Defs.' Resp. to ¶¶ 37-41. Moreover, the cited evidence does not support Plaintiffs' proposed finding. The cited evidence references "built-in muzzle breaks," which are not necessarily "flash suppressors" or "flash hiders" under California law. *See* Cal. Code Reg., tit. 11, § 5471(r). And the cited evidence does not address the commonality of pistol grips.

35

## Paragraph 131:

131.   Defendants' evidence shows that AR-platform rifles have supplanted 30 caliber rifles in target competitions. Defendants' Exh. BI, p. 3. The AR-platform rifle is now accepted as a law enforcement tool, and is embraced by many as an entirely suitable defensive firearm. Id.

## Defendants' Response to Paragraph 131:

AR-platform rifles are available for sale and possession in California.  *See supra* Defs.' Resp. to ¶¶ 56-57.  Law enforcement use of certain firearms is irrelevant to whether those firearms are in "common use" by law-abiding civilians. *See supra* Defs.' Resp. to ¶ 97.

## Paragraph 134:

134.   Defendants contend that the AWCA is a "minor burden" because it merely limits a subset of semiautomatic rifles that California citizens are able to choose from. Not only does this misstate the severe burden placed by the AWCA, but such a rationale has already been rejected by *Heller* which expressly rejected the notion that the ability to acquire other sorts of firearms justifies a ban on protected arms.

## Defendants' Response to Paragraph 134:

*Heller* did not assess the burden of the AWCA or assault-weapon restrictions generally.  Consistent with the unanimous opinion of five federal circuit courts, assault-weapon restrictions like the AWCA do not impose a severe burden on the core Second Amendment right.  *See* Defs.' PPF&CL at 28-30, ¶¶ 28-36.

## Paragraph 135:

135.   The AWCA denies Californians the ability to use the safest, most controllable, and accurate firearms owned by millions of law-abiding citizens for lawful purposes across the Country. The AWCA prohibits gun owners from the choice of selecting the best characteristics for their firearm to fill that individual's specific needs and intended uses. Just like the government may not regulate the choice of words to express an idea protected by the First Amendment, the government cannot regulate the choice of configuration of characteristics on firearms used for lawful purposes.

**Defendants' Response to Paragraph 135:**

The evidence does not support Plaintiffs' proposed finding of fact.  There is no evidence that firearms defined as "assault weapons" under the challenged provisions of the AWCA are "the safest, most controllable, and accurate firearms." Moreover, California does not categorically prohibit AR-platform rifles.  *See supra* Defs.' Resp. to ¶¶ 45-47.  Finally, First Amendment principles, while potentially instructive, are not binding the Second Amendment context.  *See supra* Defs.' Resp. to ¶¶ 29-30.

**Paragraphs 136-137:**

136.    For the same reasons the State deems "assault weapons" as "too lethal" in the hands of a criminal, those very same characteristics allow lawful citizens to configure their firearms in a manner that best suits their specific use — whether that be self-defense or numerous other lawful uses. Kapelsohn Decl., Plaintiffs' Exh. 001 ¶¶ 17-38.

137.    Lawful gun owners have more reason both in defending from criminal action and engaging in lawful uses like sporting and hunting activities to ensure accurate, rapid fire of their firearms (see paragraphs 160-165 below).

**Defendants' Response to Paragraphs 136-137:**

The prohibited features that qualify certain firearms as assault weapons under California Penal Code section 30515(a) are combat-oriented features that can enhance the lethality of those firearms when fired rapidly and continuously—or even automatically if the weapon is modified—as well as the concealability of those weapons.  *See supra* Defs.' Resp. to ¶¶ 37-41; *Worman*, 922 F.3d at 40; *Rupp*, 401 F. Supp. 3d at 993.  In any event, Plaintiffs' *own evidence* indicates that a California-compliant, centerfire AR-platform rifle without any prohibited features has the same rate-of-fire and even better accuracy than an assault rifle with all of the prohibited features, undermining any claim that the prohibited features are needed for lawful uses including self-defense.  *See* Pls.' Ex. 11 (Kraut Decl.) ¶¶ 5-6.

**Paragraphs 138-145:**

138.   Moreover, the AWCA demands severe criminal penalties for any violation of the many technical and minute definitions — regardless of the intent of the gun owner. Penal Code §§ 30515, 30600, 30605(a).

139.   If a California gun owner purchases the wrong muzzle device (even one labeled as a legal muzzle brake) that is later determined to reduce the muzzle flash when the firearm is fired, they are subject to one or more felony charges because their muzzle device could be considered a "flash hider." There is no need for any kind of violent criminal action or criminal intent.  Penal Code §§ 30515, 30600, 30605(a); see also Title 11, California Code of Regulations § 5471(r).

140.   If a California gun owner's stock is not fixed into place properly, so that it allows even minor play back and forth, the stock could be considered an unlawful "telescoping" or adjustable stock. Brown Decl., Plaintiffs' Exh. 007, Exh. 007-1 (California Department of Justice letter to Benelli dated June 23, 2003). Again, felony charges await gun owners for such an oversight. Penal Code §§ 30515, 30600, 30605(a); see also Title 11, California Code of Regulations § 5471(mm), (nn) and (oo).

141.   If even intending to comply with the law, if a gun owner installs a grip on their rifle that is not angled enough to completely prevent the webbing of the shooter's trigger hand from falling below the topmost exposed portion of the trigger when firing, they could be convicted of both creating and possessing an assault weapon —two separate felony charges. Penal Code §§ 30515, 30600, 30605(a); see also Title 11, California Code of Regulations § 5471(z).

142.   Taking a lawfully owned "large capacity magazine" out of a lawful "featureless" rifle and then inserting that same magazine into a lawfully owned "fixed-magazine" rifle or pistol will likewise result in felony charges. Penal Code § 30515, 30600, 30605(a); see also Title 11, California Code of Regulations § 5471(a), (m), (n), (o), (p), and (w).

143.   A parent who wishes to teach their children (under 18 years old) firearm safety could face severe criminal penalties for permitting their children to merely possess an "assault weapon" even under the parents' direct supervision.  Penal Code §§ 30515, 30600, 30605(a).

144.   These same felony charges apply without exception to those who merely attach a "barrel shroud" to their pistol to keep their hands from being burned. They apply to those who wish to have a collapsible stock and pistol grip on their semiautomatic shotgun for better control.  Penal Code §§ 30515, 30600, 30605(a).

145.   Felony charges and convictions for merely possessing a firearm that may have the "wrong" grip or "muzzle device" are not "minor" burdens. Felony convictions are life changing and result not only in prison sentences, but they strip fundamental constitutional rights from individuals for life. They also have significant effect on the ability to acquire employment after such a conviction.

**Defendants' Response to Paragraphs 138-145:**

Plaintiffs present several hypothetical applications of the AWCA, but it is not clear how a court would apply those provisions in a criminal case.  In any event, alleged hypothetical applications of the AWCA that raise constitutional concerns will not render the AWCA *facially* invalid.  *See Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) ("[T]o succeed on a facial challenge the plaintiff must show that 'no set of circumstances exists under which the [challenged law] would be valid.'" (quoting *United States v. Solerno*, 481 U.S. 739, 746 (1987))).  The *Solerno* rule concerning facial validity "remains binding law in the Ninth Circuit," *id.* at 1104 n.6, but even under the more relaxed standard that courts sometimes use when upholding laws against facial challenges, unconstitutional applications of a statute will not render it facially invalid if the statute has a "plainly legitimate sweep." *Jackson*, 746 F.3d at 961-62 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008))).  Moreover, under Ninth Circuit precedent, courts must assess the burden of a challenged law on its aggregate effects, not how the challenged law may burden a particular individual.  *See Mai*, 952 F.3d at 1115 (agreeing with the Sixth Circuit that the severity of the burden of a challenged law is to be assessed according to its burden on "the public at large" and not the "narrow class of individuals" who may suffer a "substantial" burden individually (quoting *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 691 (6th Cir. 2016))), *cert. petition filed*, No. 20-819 (Dec. 9, 2020).

**Paragraphs 146-147:**

146.    The AWCA provides no exception for those that may have physical or medical reasons for seeking certain characteristics on their firearms. Those of small statute or strength may need an adjustable stock, pistol grip, or vertical foregrip to maintain proper control of their firearm. For those that have trouble handling the recoil of a pistol, the choices are to: (1) continue to use a firearm that cannot be properly controlled; (2) choose a different and potentially inferior firearm; or (3) face felony charges for adding a threaded barrel to their pistol to accommodate a muzzle brake. Penal Code §§ 30515, 30600, 30605(a).

147.    Those with medical disabilities are left to operate firearms that intentionally do not have characteristics that would make the firearm more comfortable or easier to operate. There is no exception for them. Penal Code §§ 30515, 30600, 30605.

**Defendants' Response to Paragraphs 146-147:**

The AWCA does not categorically prohibit AR-platform rifles and permits law-abiding individuals to acquire a range of firearms for lawful purposes, including semiautomatic AR-platform rifles with adjustable stocks, pistol grips, and vertical foregrips.  *See supra* Defs.' Resp. to ¶¶ 45-47; *see also* Defs.' PFF&CL at 28, ¶ 29.

**Paragraphs 148-149:**

148.    Additionally, Defendants contend that the AWCA is only a minor burden because it allows for "assault weapons" to be used in competition. However, Defendants omit the fact that the exempted firearms are "pistols that are designed expressly for use in Olympic target shooting events," which consist of largely rimfire or other small caliber pistols and are only those *specifically* "sanctioned by the International Olympic Committee and by USA Shooting." Penal Code § 30515(d)(2). Most lawful gun owners are not Olympic athletes, nor do they ever contemplate competing in the Olympics. This exemption is inapplicable to everyday lawful gun owners and ignores the vast amount of firearm competitions that are held throughout the United States and California that use commonly-owned rifles, pistols, and shotguns, which fall under the definition of "assault weapons." See Defendants' Exh. BI.

149.    While the AWCA allows of out-of-state gun owners to come into California and compete with firearms defined as "assault weapons," there is no such exemption for California residents. Penal Code § 30665. Defendants provide no explanation or evidence for allowing "assault weapons" in competitions by non-residents, while at the same time prohibiting California residents in those very same competitions.

**Defendants' Response to Paragraphs 148-149:**

California Penal Code section 30660 authorizes an individual who possesses a lawfully registered assault weapon to lend that weapon to another person if, *inter alia*, the weapon is possessed "on a target range that holds a regulatory or business license for the purpose of practicing shooting at that target range," "on the premises of a target range of a public or private club or organization organized for the

40

purpose of practicing shooting at targets," or "while attending any exhibition, display, or educational project about firearms."

**Paragraph 150:**

150.    The State has not demonstrated that assault weapons bans are justified because the features prohibited by Pen. Code section 30515(a) make the firearm more lethal.

**Defendants' Response to Paragraph 150:**

The features listed in California Penal Code section 30515(a) make certain firearms more lethal, particularly when fired rapidly and continuously.  *See supra* Defs.' Resp. to ¶¶ 37-41.  The enhanced lethality of such assault-weapon configurations demonstrates a reasonable fit between the challenged provisions of the AWCA and the State's important public-safety interests.  *See* Defs.' PFF&CL at 32, ¶ 44.

**Paragraph 153:**

153.    As one of the experts in the field of wound ballistics, Dr. Vincent J.M. DiMaio stated in his influential book Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques, stated:

One of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895).

Margulies Decl., Plaintiffs' Exh. 012, ¶ 11; Exh. 012-2.

**Defendants' Response to Paragraph 153:**

Defendants do not claim that assault rifles produce wounds "more severe" than those due to regular military rifles and hunting rifles.  Indeed, assault rifles *are* military rifles.  Assault rifles under the AWCA are the same as the military M-16 in terms of the severity of wounds they inflict on a shot-by-shot basis.  As to hunting rifles, AR-platform rifles can fire both intermediate cartridges as well as traditional hunting cartridges such as the .308 Winchester.  Margulies Dep. at 55:16-25.  One could change out the upper portion of a semiautomatic centerfire rifle to fire

41

different caliber ammunition. *Id.* at 100:14-101:25. Additionally, some AR-platform rifles, such as the AR-10, are designed to fire the .308 traditional hunting cartridge. *Id.* at 103:9-104:3.

**Paragraph 154:**

> 154.    Defendants concede that wounds cannot be distinguished simply by the type of weapon that fired them. Colwell testimony, Tx of 10/22/20 Hearing at 29:20 – 30:14. A wound from a .223/5.56 round fired from a California-defined "assault weapon" bearing the features or characteristics found in section 30515(a) would not present a greater profile from a non-assault weapon, using the same round, and using the same barrel length. Margulies Decl., Plaintiffs' Exh. 014, ¶ 14. Defendants also concede that shotgun wounds at close range are, generally speaking, more devastating than rifle rounds. *Id.* at 31:20 – 33:16.

**Defendants' Response to Paragraph 154:**

The cited evidence does not support Plaintiffs' proposed finding. Specifically, the cited testimony does not state that wounds cannot be distinguished simply by the "type" of weapon that fired them. Oct. 22, 2020 Hearing Tr. at 29:20-30:14. The context of the question relates specifically to different types of rifles, not rifles compared to other types of weapons. To the contrary, Plaintiffs' expert, Dr. Margulies, testified that a treating physician can determine whether a wound was caused by a centerfire rifle or a handgun during surgery, and can even sometimes make the determination by visual inspection of the wound. Margulies Dep. at 121:16-122:7, 124:18-25.

Plaintiffs' proposed finding that shotgun wounds at close range are more devastating than rifle rounds is irrelevant to the asserted claims and defenses. It is undisputed that shotguns cannot be fired at nearly the same rate as semiautomatic rifles.

The features listed in California Penal Code section 30515(a) make certain firearms more lethal, particularly when fired rapidly and continuously, even if they are chambered with the same type of ammunition. *See supra* Defs.' Resp. to ¶¶ 37-41. Assault weapons tend to produce more numerous gunshot wounds, which

42

1   increase the complexity and potential morbidity of such injuries.  *See* Defs.

2   PPF&CL at 18, ¶¶ 102-103.

3   **Paragraph 155:**

4       155.    The severity of the wound is determined, to a great degree, by the
        amount of kinetic energy. The intermediate cartridges commonly used in
5       "assault weapons" (such as the .223/5.56 caliber, or the 7.62 x 39mm
        cartridges) contain far less kinetic energy than traditional hunting
6       cartridges such as the .308 Winchester. Margulies Decl., ¶¶ 10-11; Exh.
        011-2.
7

8   **Defendants' Response to Paragraph 155:**

9       Plaintiffs' proposed finding is incomplete and is irrelevant as stated.

10  Plaintiffs' expert, Dr. Margulies, testified that semiautomatic AR-platform rifles

11  can fire both intermediate cartridges as well as traditional hunting cartridges such as

12  the .308 Winchester.  Margulies Dep. at 55:16-25.  One could change out the upper

13  portion of a semiautomatic centerfire rifle to fire different caliber ammunition.  *Id.*

14  at 100:14-101:25.  Additionally, some AR-platform rifles, such as the AR-10, are

15  designed to fire the .308 traditional hunting cartridge.  *Id.* at 103:9-104:3.

16  **Paragraph 156:**

17      156.    Body armor worn by law enforcement is generally intended to
        protect from handgun bullets, and not rifle bullets. Margulies Decl.,
18      Plaintiffs' Exh. 012, ¶ 13; Exh. 012-2, p. 007; Youngman testimony, Tx
        of 10/19/20 Hearing at 94:4-15; Def. Exh. AY, p. 5 ("Soft armor is
19      designed to offer protection against assaults with handguns. It is intended
        for daily wear. It is the type of body armor that officers would typically
20      wear while executing their daily duties."). Any rifle rounds, including the
        intermediate cartridges of .223/5.56 or 7.62x39mm, will penetrate body
21      armor typically worn by law enforcement unless the body armor is
        specifically rated to withstand it. Youngman testimony, Tx of 10/19/20
22      Hearing at 94:4-15; Margulies Decl., Plaintiffs' Exh. 012, ¶ 13; Defense
        Exhibit AY, pp. 12-13. This is true regardless of whether the rifle has
23      characteristics that would qualify it as an "assault weapon" under
        California law.
24

25  **Defendants' Response to Paragraph 156:**

26      The features listed in California Penal Code section 30515(a) make certain

27  firearms more lethal, particularly when fired rapidly and continuously, even if they

28  are chambered with the same type of ammunition.  *See supra* Defs.' Resp. to

¶¶ 37-41.  Assault weapons tend to produce more numerous gunshot wounds, which increase the complexity and potential morbidity of such injuries.  *See* Defs. PPF&CL at 18, ¶¶ 102-103.

**Paragraph 157:**

> 157.    The State's stated concern is not merely with rapid fire, but the ability of a shooter to fire rapidly and maintain accuracy. Tx of 10/19/20 Hearing at 187:18 – 188:2. But the answer is not to say that firearms should be less accurate. That penalizes the law-abiding citizen from denying him or her the ability to use accurate firearms, where accountability for each shot is of the utmost concern. Kapelsohn testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6. The State does not claim that prohibiting the specified features of section 30515(a)(1) prevents rapid fire, only that it prevents accurate rapid fire. However, regardless of the characteristics installed on the firearm, with training, a shooter can pull the trigger of any semiautomatic pistol or rifle of five to seven rounds per second. Kapelsohn testimony, Tx of 10/19/20 Hearing at 23:4-22.

**Defendants' Response to Paragraph 157:**

The features listed in California Penal Code section 30515(a) make certain firearms more lethal, particularly when fired rapidly and continuously, even if they are chambered with the same type of ammunition.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Assault weapons tend to produce more numerous gunshot wounds, which increase the complexity and potential morbidity of such injuries.  *See* Defs. PPF&CL at 18, ¶¶ 102-103.  In any event, Plaintiffs' *own evidence* indicates that a California-compliant, centerfire AR-platform rifle without any prohibited features has the same rate-of-fire and even better accuracy than an assault rifle with all of the prohibited features, undermining any claim that the prohibited features are needed for lawful uses including self-defense.  *See* Pls.' Ex. 11 (Kraut Decl.) ¶¶ 5-6.

**Paragraph 159:**

> 159.    Semiautomatic firearms with the regulated characteristics are not more deadly in the hands of a criminal than a firearm without those characteristics. Many notable crimes and mass shootings have been committed by criminals with semiautomatic firearms that did not have the regulated characteristics. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 34. For example, the 2007 shooting at Virginia Tech, in which 32 victims

44

were killed, and 17 others injured, the shooter used handguns which are legal to own and purchase in California. Depo. of Lucy Allen, p. 219:8 – 220:13; Def. Exh. A, Appendix C, line 80.

**Defendants' Response to Paragraph 159:**

The fact that individuals who commit mass shootings and other forms of gun violence may substitute non-assault weapons does not undermine the constitutionality of the AWCA. *See Friedman*, 784 F.3d at 411 ("Plaintiffs argue that the ordinance substantially restricts their options for armed self-defense. But that contention is undermined by their argument, in the same breath, that the ordinance serves no purpose, because (they say) criminals will just substitute permitted firearms functionally identical to the banned guns. If criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners. Unlike the District of Columbia's ban on handguns, Highland Park's ordinance leaves residents with many self-defense options.").

**Paragraphs 160-163:**

160.    Moreover, while Defendants contend that "accurate rapid fire" of firearms is "not consistent" with lawful use, Defendants have provided no evidence to support such a contention.

161.    To the contrary, common sense demands that "accurate rapid fire" may be needed to defend one's life from an imminent lethal threat.

162.    "Accurate rapid fire" is both desired and necessary in sporting use such as competitions.

163.    "Accurate rapid fire" is both desired and necessary in the lawful activity of firearms training.

**Defendants' Response to Paragraphs 160-163:**

Rapid semiautomatic fire is a "combat fire technique." *See* Defs.' PFF&CL at 11, ¶ 68. Rapid semiautomatic fire is not consistent with lawful self-defense because, on average, approximately two rounds are fired when a firearm is used for home defense. *See id.* at 17, ¶¶ 94-95. Plaintiffs concede that certain of the prohibited features listed in California Penal Code section 30515(a) do in fact aid in more accurate—and thus deadly—semiautomatic rapid fire. In any event,

45

Plaintiffs' *own evidence* indicates that a California-compliant, centerfire AR-platform rifle without any prohibited features has the same rate-of-fire and even better accuracy than an assault rifle with all of the prohibited features, undermining any claim that the prohibited features are needed for lawful uses including self-defense.  *See* Pls.' Ex. 11 (Kraut Decl.) ¶¶ 5-6.

**Paragraph 164:**

> 164.    Defendants have offered no evidence that any criminal or mass shooter in California has ever been prevented from delivering lethal "rapid fire" as a result of the prohibitions in AWCA since its inception in 1989. Defendants have likewise presented no evidence mass shooters place a premium on accuracy as opposed to indiscriminate mayhem. Even if Defendants could find one or two anecdotal examples, they would not justify such a ban under any kind of heightened scrutiny analysis.

**Defendants' Response to Paragraph 164:**

The evidence shows that the use of assault weapons in mass shootings is associated with substantially more fatalities and injuries than when other firearms are used.  *See* Defs.' PFF&CL at 18-20, ¶¶ 104-116.

**Paragraph 165:**

> 165.    At any rate, certainly "accurate rapid fire" is preferable to inaccurate rapid fire. And it is the latter that is promoted by California's ban, as the banned characteristics promote accuracy and do nothing to enhance the rapidity with which a firearm may be fired.

**Defendants' Response to Paragraph 165:**

The prohibited features that qualify a firearm as an assault weapon under California Penal Code section 30515(a) can enhance the effective rate of fire by enhancing aiming during rapid fire and facilitating quicker reloading of expended magazines.  *See* Defs.' PFF&CL at 8, ¶ 46.  In any event, Plaintiffs' *own evidence* indicates that a California-compliant, centerfire AR-platform rifle without any prohibited features has the same rate-of-fire and even better accuracy than an assault rifle with all of the prohibited features, undermining any claim that the

prohibited features are needed for lawful uses including self-defense. *See* Pls.'
Ex. 11 (Kraut Decl.) ¶¶ 5-6.

**Paragraph 166:**

166.    Generally, firearm bans have little effect on preventing criminals from obtaining guns. Lott Decl., Plaintiffs' Exh. 010, ¶ 13.

**Defendants' Response to Paragraph 166:**

This proposed finding is irrelevant to the asserted claims and defenses. Plaintiffs' expert has conceded that the vast majority of individuals who commit mass shootings acquire their murder weapons legally. *See* Defs.' PFF&CL at 21, ¶ 117.  Moreover, the evidence shows that assault-weapon restrictions like the AWCA reduce the use of assault weapons in mass shootings. *See* Defs.' Ex. E (Klarevas Decl.) ¶ 27 (DEF0338-39).

**Paragraph 167:**

167.    In fact, research shows that all places that have banned guns (either all firearms or all handguns) has seen murder rates go up. Lott Decl., Plaintiffs' Exh. 010, ¶ 13.

**Defendants' Response to Paragraph 167:**

This proposed finding is irrelevant to the asserted claims and defenses.  The AWCA is not a "gun ban," let alone a ban on "all firearms or all handguns," because it proscribes only certain configurations of certain weapons. *See supra* Defs.' Resp. to ¶¶ 45-47.  In any event, Japan is a country that did not experience an increase in murder rates after prohibiting firearms and has "had effective gun bans . . . for centuries."  Lott Dep. at 227:3-13.

**Paragraphs 168-171:**

168.    There is no evidence that "assault weapons" bans had any meaningful effect on reducing gun homicides and no discernable crime reduction impact. Several studies have shown no discernable crime-reduction impact. Lott Decl., Plaintiffs' Exh. 010, ¶ 63.

169.    According to Defendants' evidence "[M]any experts doubt the ban had any significant impact before it expired in 2004." Defendants' Exh. CE, p. 2.

47

170.    Defendants' evidence acknowledges that the federal "feature-based ban" had no real-world effect and assault weapons bans in general are a "distraction."

> Though assault weapons have become a potent symbol of mass shootings, bans of that style of gun are a "distraction," said Adam Winkler, a UCLA law professor, and the author of Gunfight.  For starters, he says, it didn't actually stop manufacturers from selling assault rifles. Because the 1994 ban defined weapons based on "cosmetic" features like pistol grips or collapsible stocks, gun makers evaded these restrictions by removing just enough design features so as to not trigger the ban. Meanwhile, the weapons remained semiautomatic and could still accept magazines of any size.

Defendants' Exh. CE, p.2.

171.    "Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs." Defendants' Exh. BJ, p. 96.

### Defendants' Response to Paragraphs 168-171:

The State has presented evidence that assault-weapon prohibitions like the AWCA are effective in reducing the incidence and lethality of *particular types of gun crime*, including mass shootings and gun violence against law enforcement personnel.  *See* Defs.' PFF&CL at 21-22 ¶¶ 118-124.  In any event, conflicting evidence of the efficacy of assault-weapon restrictions will not undermine the constitutionality of the AWCA under intermediate scrutiny, as it is the province of the legislature and not the judiciary to weigh such evidence.  *See id.* at 31, ¶¶ 39-41.

### Paragraph 172:

172.    A state assault weapon ban is even less likely to be effective than a federal ban because the banned firearms *will remain legally available* in the vast majority of the states in the country. Defendants' Exh. BJ, fn 95.

**Defendants' Response to Paragraph 172:**

Even if assault weapons may remain available for purchase and possession in other states, California's restrictions make it more difficult to acquire those weapons, and assault-weapon restrictions are effective in reducing their use in mass shootings. *See supra* Defs.' Resp. to ¶ 122.

**Paragraphs 176-178:**

176.    Firearm technology continued to progress during this time, and products were offered that would allow firearms normally considered "assault weapons" to be lawfully purchased, possessed, and used largely through items called the "bullet button." A firearm using a "bullet button" or similar product, was considered to have a "fixed magazine" under the current California definition of "fixed magazine." Thus, it could have any number of the characteristics listed in Penal Code section 30515.

177.    Lawful sales of bullet button firearms (including rifles, shotguns, and pistols) continued throughout California for at least 9 years.

178.    In 2016, the California Legislature again determined that the current AWCA was insufficient and needed to be expanded. Senate Bill 880, and Assembly Bill 1135 were passed on July 1, 2016. These bills expanded the definition of "assault weapon" to include the new category of "bullet button assault weapons" by redefining the term "fixed magazine" among other definitions. According to the June 25, 2016, Assembly Floor analysis, "[a]bsent this bill, the assault weapon ban is severely weakened, and these types of military-style firearms will continue to proliferate on our streets and in our neighborhoods."

**Defendants' Response to Paragraphs 176-178:**

The AWCA has been amended over time in response to manufacturer attempts to circumvent the law. *See* Defs.' PFF&CL at 2, ¶ 8. Bullet buttons were designed specifically to circumvent the prior definition of an assault weapon applicable to a "semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine." *See* Cal. Penal Code § 30515(a) (2012). They did not represent any "progress" of "[f]irearm technology."

**Paragraphs 180-182:**

180.    This lawsuit was initiated in 2019. Since that time, the AWCA has undergone yet another amendment to expand the definition of "assault weapon." The expanded definition now includes "assault firearms," which are not legally defined as rifles, pistols, or shotguns.

181.     In the 39 years since it was originally enacted, the AWCA has been expanded at least four times. Each time, the current definition of "assault weapon" has been deemed insufficient by the Legislature. With each amendment, vast numbers of ordinary, commonly owned, and lawfully purchased firearms are redefined as illegal "assault weapons." With each amendment, the State necessarily admits that the AWCA is incomplete and insufficient.

182.     While a state may be permitted to experiment, California has been permitted to experiment with the AWCA for nearly 40 years. Over and over again, the AWCA has been expanded because the then current definition of "assault weapon" has been deemed insufficient by the California Legislature. The experiment has failed.

**Defendants' Response to Paragraphs 180-182:**

The definition of assault weapons was amended in 2019 to address new types of firearms designed to circumvent the assault-weapon definitions applicable to rifles, pistols, and shotguns.  The new provisions of the AWCA are not challenged in this action.  *See* Feb. 3, 2021 Trial Tr. at 40:16-19 (reiterating that the Court did not grant Plaintiffs leave to amend to challenge California Penal Code sections 30515(a)(9)-(11)).  The amendments to California Penal Code section 30515 were enacted in response to manufacturer attempts to avoid the AWCA, not because existing restrictions were ineffective.  *See* Defs.' PFF&CL at 2, ¶ 8.

**Paragraph 183:**

183.     All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two. Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

**Defendants' Response to Paragraph 183:**

Plaintiffs' proposed finding is not supported by the cited evidence.  Plaintiffs' expert witness, John R. Lott, Jr., discusses research showing that assault-weapon restrictions like the AWCA are effective.  *See* Pls.' Ex. 10 (Lott Decl.) ¶¶ 34-37 (discussing DiMaggio et al. 2018); *id.* ¶¶ 38-42 (discussing Gius 2015); *id.* ¶¶ 43-53 (discussing *Rampage Nation*).  To the extent Lott claims that these studies are not sufficiently "credible" in his view because the share of mass shootings involving assault weapons continued to decline after the expiration of the federal

50

assault weapons ban, *see id.* ¶¶ 38, 52-53, Lott's criticism based on the share of mass shootings involving assault weapons is unreliable and logically flawed, *see infra* Defs.' Resp. to ¶ 193.  To the extent Lott claims that these studies are not sufficiently "credible" in his view because they are based on time-series data, Lott admits that time-series analysis has been conducted, including in peer reviewed academic literature.  *See* Lott Dep. at 270:4-24.

Moreover, contrary to his testimony in this case, Lott has not personally conducted a statistical study of the use of assault weapons in mass shootings. *Compare* Oct. 22, 2021 Hearing Tr. at 102:6-19; Lott Dep. at 314:1-22 (testifying that he presented a statistical test of assault weapons in *The War on Guns*), *with* Defs.' Ex. DX (excerpt of *The War on Guns*); Feb. 5, 2021 Trial Tr. at 198:1-202:22 (explaining that Lott conducted a statistical study of the use of LCMs and multiple guns in mass shootings, not assault weapons).  Contrary to Lott's claims, evidence shows that assault weapons feature prominently in mass shootings throughout the country and correlate with substantially higher numbers of casualties on average.  Defs.' PFF&CL ¶¶ 104-116.  Moreover, even assuming there were no statistically significant relationship between the use of assault weapons and more casualties, the absence of statistical significance would not mean, as asserted in Plaintiffs' proposed finding, that there is "no discernable correlation between the two."  *See* Pls.' Ex. 10 at 772 ("The fact of the matter is that statistical significance lies on a continuum, a continuum of confidence.").

Even if there is disagreement in the literature about whether assault-weapon restrictions are effective, the State has "select[ed] among reasonable alternatives in its policy decisions," notwithstanding differences of opinion and "conflicting legislative evidence."  *Pena*, 898 F.3d at 980 (quoting *Peruta v. Cty. of San Diego*, 824 F.3d 919, 944 (9th Cir. 2016) (en banc) (Graber, J., concurring)).  The State's evidence supporting the constitutionality of the AWCA should be credited by the Court because the evidence is not "facially implausible."  *Jackson*, 746 F.3d at 969.

51

**Paragraph 186:**

186.    Over time, the rate of mass shootings or mass public shootings may rise or fall for many reasons. But regardless of any other factors, if the federal assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have decreased as a direct result of the ban. Lott Decl., Plaintiffs' Exh. 010, ¶¶ 6-65; Exhs. 010-2 to 010-19 and Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

**Defendants' Response to Paragraph 186:**

Plaintiffs' expert's argument that the federal assault weapons ban was ineffective based on the share of mass shootings involving assault weapons is unreliable and not supported by the literature.  *See* Defs.' Reply in Supp. of *Daubert* Mot. to Preclude Testimony of John R. Lott, Jr. (Dkt. 84) at 6-8.  There are many reasons why the share may continue to decrease or remain the same, as shooters may substitute less-lethal weapons than assault weapons or decide to forego a shooting due to the unavailability of assault weapons.  *See id.* at 7-8. Moreover, the federal assault weapons ban also prohibited LCMs, and their legality in most jurisdictions after the federal ban expired can explain why the share of mass shootings involving assault weapons may have continued to decline after the expiration of the federal ban.

**Paragraphs 187-188:**

187.    In fact, the percentage of mass shootings committed with "assault weapons" did not decrease during the Federal Assault Weapons Ban. Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010 and 032.

188.    This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs., 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

**Defendants' Response to Paragraphs 187-188:**

The proposed findings are not supported by the evidence.  Plaintiffs' expert determined that the percentage of mass shootings committed with assault weapons *did* decrease during the federal assault weapons ban.  *See* Pls.' Ex. 10 at 22-23.  In any event, Plaintiffs' expert's argument that the federal assault weapons ban was

ineffective based on the share of mass shootings involving assault weapons is
unreliable and not supported by the literature.  *See* Defs.' Reply in Supp. of
*Daubert* Mot. to Preclude Testimony of John R. Lott, Jr. (Dkt. 84) at 6-8.
Moreover, the expert's data sets for Rampage Nation, Mother Jones, and the Crime
Prevention Research Center are riddled with errors that undermine any reliability of
the expert's analysis.  *See* Defs.' Ex. DL (Corrected Klarevas Decl.) ¶¶ 5-19
(DEF3338-50).

**Paragraphs 189-191:**

> 189.   Defendants attempt to dismiss this fact stating that spillover
> effects and substitution effects have not been accounted for in Dr. Lott's
> percentage analysis. Incorrect. Defendants' Exh. K, ¶ 44; Lott Decl.,
> Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

> 190.   Plaintiffs are the only parties that have provided an explanation of
> any kind of substitution effects of the Federal Assault Weapons Ban.
> These substitution effects support Plaintiffs' contention that the Federal
> Assault Weapon Ban was ineffective. Lott Decl., Plaintiffs' Exh. 032, ¶¶
> 8-13, 44-55.

> 191.   Considering substitution effects of the Federal Assault Weapons
> Ban, if the ban were effective, some killers would refrain from
> committing a mass shooting with an assault weapon, while others would
> substitute other kinds of firearms. In both instances, the percentage of
> attacks committed with assault weapons would decrease. Lott Decl.,
> Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

**Defendants' Response to Paragraphs 189-191:**

Plaintiffs' expert's argument that the federal assault weapons ban was
ineffective based on the share of mass shootings involving assault weapons is
unreliable and not supported by the literature.  *See* Defs.' Reply in Supp. of
*Daubert* Mot. to Preclude Testimony of John R. Lott, Jr. (Dkt. 84) at 6-8.  There are
many reasons why the share may continue to decrease or remain the same, such as
the substitution of less-lethal weapons than assault weapons and the decision to
forego a shooting due to the unavailability of assault weapons.  *See id.* at 7-8.  The
substitution of less-lethal firearms can explain why the share of mass shootings
involving assault weapons may have declined or stayed constant during the federal
assault weapons ban, as it would be more difficult for a shooter to kill the requisite

number of victims to qualify as a mass shooting.  *See* Lott Dep. at 297:8-13.

Moreover, the federal assault weapons ban also prohibited LCMs, and their legality

in most jurisdictions after the federal ban expired can explain why the share of mass

shootings involving assault weapons may have continued to decline after the

expiration of the federal ban.

**Paragraph 193:**

> 193.    Using data from the Book Rampage Nation, and data collected by Mother Jones, the share of attacks committed with assault weapons continued to drop even after the federal assault weapons ban expired. The ten years after the end of the assault weapons ban (September 2004 to August 2014) saw the lowest share of shootings involving assault weapons. Lott Decl., Plaintiffs' Exh. 010, ¶ 53.

**Defendants' Response to Paragraph 193:**

Plaintiffs' expert's argument that the federal assault weapons ban was

ineffective based on the share of mass shootings involving assault weapons is

unreliable and not supported by the literature.  *See* Defs.' Reply in Supp. of

*Daubert* Mot. to Preclude Testimony of John R. Lott, Jr. (Dkt. 84) at 6-8.  There are

many reasons why the share may continue to decrease or remain the same, such as

the substitution of less-lethal weapons than assault weapons and the decision to

forego a shooting due to the unavailability of assault weapons.  *See id.* at 7-8.

Moreover, the federal assault weapons ban also prohibited LCMs, and their legality

in most jurisdictions after the federal ban expired can explain why the share of mass

shootings involving assault weapons may have continued to decline after the

expiration of the federal ban.

**Paragraphs 194-210:**

> 194.    Defendants have not provided any evidence that any mass shooter has ever selected any firearm that could be classified as an "assault weapon" under California Penal Code section 30515 because the firearm in question had any of the characteristics listed in Penal Code 30515(a).

> 195.    Defendants have not provided any evidence that a mass shooter in California has ever refrained from committing a mass shooting (or any criminal act) because the shooter could not obtain a firearm that had any of the characteristics listed in California Penal Code section 30515(a).

196.     Defendants have not provided any evidence that a use of a pistol grip on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed in or outside of California.

197.     Defendants have not provided any evidence that a use of a forward vertical grip on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed in or outside of California.

198.     Defendants have not provided any evidence that a use of a flash hider on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed *in or outside of California*.

199.     Defendants have not provided any evidence that a use of a collapsible stock on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed *in or outside of California*.

200.     Defendants have not provided any evidence that a use of a folding stock on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed *in or outside of California*.

201.     Defendants have not provided any evidence that a use of a flare launcher on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed *in or outside California*.

202.     Defendants have not provided any evidence that a flare launcher attached to a firearm has ever been used in the commission of any crime.

203.     Defendants have not provided any evidence that a use of a grenade launcher on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed *in or outside of California*.

204.     Defendants have not provided any evidence that a use of a barrel shroud on a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed *in or outside of California*.

205.     Defendants have not provided any evidence that a use of a magazine well outside of the pistol grip of a firearm defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed in or outside of California.

206.     Defendants have not provided any evidence that a use of a threaded barrel on a pistol defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed in or outside of California.

55

207.    Defendants have not provided any evidence that a use of a both a pistol grip and collapsible stock on a semiautomatic shotgun defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed in or outside of California.

208.    Defendants have not provided any evidence that a use of a rifle with an overall length of less than 30 inches defined as an "assault weapon" pursuant to California Penal Code section 30515(a) had any determining effect on any mass shooting committed in or outside of California.

209.    Defendants have not provided any evidence that a use of a rifle with a California defined "fixed magazine" and a "large capacity magazine" in any mass shooting had any determining effect on any mass shooting committed in or outside of California.

210.    Defendants' evidence showing a mere correlation between assault weapons and a higher fatality rate in mass shootings cannot distinguish which unidentified various combinations of the characteristics listed in Penal Code section 30515 on a semiautomatic firearm caused any such correlation. Nor does Defendants' evidence identify which specific characteristics were used in mass shootings with higher fatalities.

**Defendants' Response to Paragraphs 194-210:**

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41.  Courts do not require evidence of each particular feature being used in the commission of a mass shooting, including different combinations of those features (e.g., a pistol grip alone vs. a pistol grip and a flash suppressor) to determine that prohibiting those features is reasonably fitted to important government interests.  *See, e.g.*, *Rupp*, 401 F. Supp. 3d at 993.  The State has presented evidence that each feature enhances the lethality of a firearm and serves specific combat functions.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Moreover, Plaintiffs contend that many of the features listed in California Penal Code section 30515(a) are "standard" features of the respective weapons; thus, if an AR-platform rifle is used in the commission of a mass shooting in a jurisdiction lacking assault-weapon restrictions like the AWCA, according to Plaintiffs' own claims, the weapon likely had features that would qualify the firearm as an assault weapon under the AWCA.  In addition, the features listed in California Penal Code section 30515(a) are present on most if not all of the firearms listed in California Penal

56

Code section 30510.  *See* Defs.' Ex. AT (Graham *Rupp* Decl.) at 6 n.2 (DEF1629). Thus, if a firearm listed in California Penal Code section 30510 is used in the commission of a mass shooting, the weapon likely had features that would qualify the firearm as an assault weapon under the AWCA.

**Paragraph 211:**

211.    Defendants' evidence cannot distinguish between "assault weapons" and other semiautomatic firearms used in mass shootings. See Defendants' Exhibit AC ("Multiple data sources indicate that active and public mass shootings committed with semiautomatic rifles and assault weapons result in more victims killed, on average, than attacks with less powerful weapons. de Jager et al., 2018; Follman, Aronsen, & Pan, 2018; Klarevas, 2016)."; Def. Exhibit BK, p. 2 ("mass shootings and other crimes committed with high-capacity semiautomatics (including assault weapons and other models) […]" Def. Exh. BL, p. 1 ("[t]his article examines the use, impacts, and regulation of assault weapons and other high-capacity semiautomatic firearms as they pertain to the problem of mass shootings in the United States.").

**Defendants' Response to Paragraph 211:**

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210.  Under intermediate scrutiny, the State may "rely on any evidence 'reasonably believed to be relevant." *See id.*  Defendants' evidence does distinguish between mass shootings involving assault weapons and mass shootings involving non-assault weapons, where such distinctions are possible.  *See* Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017) (explaining methodology for determining whether an assault weapon was used in a mass shooting); Defs.' Ex. E (Klarevas Decl.), Ex. 3 at 4-5 (DEF0378-79) (explaining methodology for determining whether an assault weapon was used in a gun massacre).  Plaintiffs have not identified any mass shooting evaluated by Defendants' experts that were improperly determined to involve an assault weapon.

**Paragraph 213:**

213.    Without providing evidence regarding what features were specifically used in any mass shooting or distinguishing between "assault weapons" and "other high-capacity semiautomatic" firearms, Defendants high fatality correlation is empirically meaningless.

**Defendants' Response to Paragraph 213:**

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210, ¶ 211.  The State has presented evidence that each feature enhances the lethality of a firearm and serves specific combat functions.  *See supra* Defs.' Resp. to ¶¶ 37-41.  The State's evidence of assault weapons being used in mass shootings is sufficient under intermediate scrutiny to justify the AWCA's restrictions.  *See Rupp*, 401 F. Supp. 3d at 993.

**Paragraph 214:**

214.   Defendants' evidence showing a correlation between "assault weapons" and higher fatalities rates in mass shootings also does not account for other significant factors that are correlated with higher fatalities rates. Defendants own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC.

**Defendants' Response to Paragraph 214:**

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210, ¶ 211.  The State has presented evidence that each feature enhances the lethality of a firearm and serves specific combat functions.  *See supra* Defs.' Resp. to ¶¶ 37-41.  The State's correlative evidence of the use of assault weapons in mass shootings is sufficient under intermediate scrutiny to justify the AWCA's restrictions.  *See Rupp*, 401 F. Supp. 3d at 993.

**Paragraphs 215-216:**

215.   The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

216.   This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass

shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

### Defendants' Response to Paragraphs 215-216:

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210, ¶ 211.  The State has presented evidence that each feature enhances the lethality of a firearm and serves specific combat functions.  *See supra* Defs.' Resp. to ¶¶ 37-41.  The State's correlative evidence of the use of assault weapons in mass shootings is sufficient under intermediate scrutiny to justify the AWCA's restrictions.  *See Rupp*, 401 F. Supp. 3d at 993.  The use of multiple firearms does not explain the decrease in mass shooting deaths during the federal assault weapons ban and the increase in mass shooting deaths after its expiration, as the federal assault weapons ban did not affect the ability of a shooter to use multiple weapons in a mass shooting.  *See* Feb. 5, 2021 Trial Tr. at 202:23-203:9.

### Paragraphs 218-221:

218.    Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

219.    In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

220.    Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

59

221.    Thus, there is a correlation between many different factors and high fatality rates in mass shootings. Defendants ignore these other factors to justify their desired result — a ban on commonly owned firearms.

**Defendants' Response to Paragraphs 218-221:**

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210, ¶ 211.  Assault weapons are marketed as military-grade firearms in a way that appeals to potential perpetrators of mass shootings and other forms of gun violence.  *See* Defs.' Ex. C (Donohue Decl.) ¶¶ 72-82 (DEF0132-36); Defs.' PFF&CL at 14, ¶ 86.  The State has presented evidence that each feature enhances the lethality of a firearm and serves specific combat functions.  *See supra* Defs.' Resp. to ¶¶ 37-41.  The fact that other factors may contribute to the enhanced lethality of mass shooting, such as the use of LCMs, does not undermine the correlation between assault weapons and higher numbers of casualties in mass shootings.

**Paragraph 222:**

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP):

The LVRP concludes that Paddock's intention to die by suicide was compounded by his desire to attain a certain degree of infamy via a mass casualty attack….

Paddock's exploration of other potential sites suggests that his final selection was based on the identification of a tactically-advantageous location from which to attack. His selected position in a hotel room on the 32nd floor enabled Paddock to shoot at a densely-packed crowd of unsuspecting and vulnerable people. Further, it provided sufficient privacy for Paddock to prepare for and execute the attack, all within driving distance of his residence in Mesquite….

Once Paddock decided to attack, he characteristically devoted time, attention, and energy to the shooting. Paddock engaged in detailed preparations for the attack, including a year-long burst of firearms and ammunition acquisition. The planning and preparation–in and of itself–was likely satisfying to Paddock as it

60

provided a sense of direction and control despite his mental and physical decline. He engaged insignificant, methodical, Internet-based research regarding site selection, police tactics and response, and ballistics. Paddock conducted in-person site surveillance and engaged in end-of-life planning….

Defendants' Exhibit AG, p.2.

**Defendants' Response to Paragraph 222:**

The shooter in the Las Vegas mass shooting used multiple assault weapons. *See, e.g.*, Defs.' Ex. E (Klarevas Decl.), Ex. 3 at 4 (DEF0378). The fact that the shooter spent a significant amount of time preparing for his attack does not diminish the role of assault weapons in killing 58 individuals.

**Paragraph 223:**

223. As stated above, a dedicated mass murderer who commits to long-term planning (as many mass shooters do) would not be prevented by the AWCA in purchasing California "complaint" firearms and then converting them to "assault weapons" (e.g., taking a featureless rifle and adding prohibited characteristics). The high correlation between planning and mass murder also shows that the AWCA has no realistic prospect of success in preventing the use of "assault weapons" in mass shootings.

**Defendants' Response to Paragraph 223:**

The State's evidence satisfies intermediate scrutiny. *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210, ¶ 211. While it is possible for determined criminals to violate the AWCA, assault-weapon restrictions make it more difficult to configure illegal assault weapons, and evidence shows that assault-weapon restrictions like the AWCA reduce the use of assault weapons in mass shootings. *See supra* Defs.' Resp. to ¶ 121.

**Paragraph 224:**

224. Although during the bench trial on February 5, 2021, Defendants' counsel denied the ability to consider a shooter's intent when analyzing factors that lead to an increase in fatalities from mass shootings, Defendants' evidence says otherwise. Any simple correlation between assault weapons and higher fatalities in mass shootings (which Defendants have not established since their data does not isolate assault weapons) does not account for or distinguish between these other factors. Thus, without defining the *extent* of the correlation or considering the many other factors that also have an effect on fatalities, Defendants cannot justify the AWCA's ban under any form of heightened scrutiny as their evidence, at best, amounts to speculation.

61

**Defendants' Response to Paragraph 224:**

The State's evidence satisfies intermediate scrutiny.  *See* Defs.' PFF&CL at 31, ¶¶ 38-41; *see also supra* Defs.' Resp. to ¶¶ 194-210, ¶ 211.  Scientific proof of causation in this context cannot likely be adduced.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1465-67 (2009) ("There are no controlled experiments that can practically and ethically be run.").  Correlative evidence is sufficient to establish the constitutionality of the AWCA.  *See Rupp*, 401 F. Supp. 3d at 993.

**Paragraphs 225-226:**

225.    Notably, Defendants have not provided any evidence that firearms classified as "assault pistols" pursuant to California Penal Code section 30515(a) are even used in the military, let alone "most useful in military service.". However, Plaintiffs have provided evidence that "assault pistols" are widely available, numerically common, and lawful in most jurisdictions. Ostini Decl., Plaintiffs' Exh. 005; Exh. 005-1 through 005-28; Kapelsohn testimony, Tx of 10/19/20 Hearing at 40:16 – 41:5.

226.    Defendants have also not provided any evidence that firearms classified as "assault shotguns" pursuant to California Penal Code section 30515(a) are used in the military, let alone "most useful in military service." However, Plaintiffs' have provided evidence that "assault shotguns" are widely available, numerically common, and lawful in most jurisdictions. Ostini Decl., Plaintiffs' Exh. 005; Exh. 005-1 through 005-28; Brown Decl., Plaintiffs' Exh. 007, 007-1.

**Defendants' Response to Paragraphs 225-226:**

Defendants have shown that rifles qualifying as "assault weapons" under the challenged provisions of the AWCA are like the M-16 and are most useful in military service.  *See* Defs.' PFF&CL at 15-16, ¶¶ 87-93.  Pistols and shotguns that qualify as "assault weapons" under those provisions share many of the same features applicable to rifles, such as a forward pistol grip or telescoping stock, and Defendants have shown that these features are combat-oriented features.  *See supra* Defs.' Resp. to ¶¶ 37-41.  Thus, if rifles with combat-oriented features are most useful in military service, pistols and shotguns with those features are likewise most

62

useful in military service, irrespective of whether such pistols or shotguns are actually used in the military.  To the extent Plaintiffs purport to submit the information from websites as substantive evidence through Plaintiffs' Exhibit 5 (Ostini Decl.), it is improper hearsay.  Moreover, Plaintiffs' Exhibit 7 (Brown Decl.) does not establish that assault shotguns are in common use by law-abiding citizens; rather, it is inadmissible hearsay evidence.

**Paragraph 227:**

227.    Firearms with the prohibited section 30515(a) characteristics are in common use, for lawful purposes, and are protected under *Heller*.

**Defendants' Response to Paragraph 227:**

Plaintiffs' proposed finding is not supported by the evidence.  *See supra* Defs.' Resp. to ¶¶ 45-47, ¶¶ 48-51.  And even if firearms that qualify as "assault weapons" under the challenged provisions of the AWCA, the evidence shows that they are not protected by the Second Amendment.  *See* Defs.' PFF&CL at 22-28, ¶¶ 1-27.

**Paragraph 229:**

229.    The arms banned as "assault weapons" under the AWCA are not both dangerous and unusual, as the Supreme Court defined in *Heller*. To the contrary, they are common in all respects: 1) They are common functionally, as they are all semiautomatic in their operation; 2) they are common characteristically, as they are all commercially popular types of arms with various common firearm characteristics; and 3) they are common jurisdictionally, available in the majority of the states. They are common numerically; in that they are owned by citizens by the millions. All of the semiautomatic firearms prohibited by the characteristics found in Pen. Code § 30515(a) meet the *Heller* test and are constitutionally protected.

**Defendants' Response to Paragraph 229:**

Firearms that qualify as "assault weapons" under the challenged provisions of the AWCA are both dangerous and unusual.  *See* Defs.' PFF&CL at 22-25, ¶¶ 1-13.

**Paragraph 230:**

230.    Because the semiautomatic firearms banned by California are constitutionally protected, the ban is unconstitutional under *Heller*. Indeed, *McDonald* confirmed *Heller*'s holding that firearms in common use cannot be banned: having "found that [the Second Amendment] right applies to handguns," *Heller* therefore "concluded, citizens must be

permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767-68.

**Defendants' Response to Paragraph 230:**

The AWCA is not a categorical prohibition of a class of semiautomatic firearms. *See supra* Defs.' Resp. to ¶¶ 45-47. The AWCA is subject to intermediate scrutiny under the Ninth Circuit's two-step framework for Second Amendment claims, even assuming the AWCA burdens conduct protected by the Second Amendment. *See* Defs.' PPF&CL at 28-30, ¶¶ 28-36.

**Paragraph 231:**

231. Beyond the categorical, common-use analysis, the AWCA also and separately fails the Ninth Circuit's two-part test applying tiered scrutiny as well. If an interest-balancing test is required, the challenged *provisions* still fail any level of "heightened scrutiny" as required in Second Amendment cases by *Heller*.

**Defendants' Response to Paragraph 231:**

The AWCA is not a categorical prohibition of a class of semiautomatic firearms. *See supra* Defs.' Resp. to ¶¶ 45-47. The AWCA is subject to intermediate scrutiny under the Ninth Circuit's two-step framework for Second Amendment claims, even assuming the AWCA burdens conduct protected by the Second Amendment. *See* Defs.' PPF&CL at 28-30, ¶¶ 28-36. The AWCA satisfies intermediate scrutiny. *See id.* at 30-33, ¶¶ 37-50. The AWCA alternatively satisfies strict scrutiny. *See id.* at 33-34, ¶¶ 51-53.

**Paragraph 233:**

233. Semiautomatic firearms with common characteristics proscribed by the AWCA are in common use for lawful purposes and thus protected under the fundamental, individual right to keep and bear arms. The State's ban thus "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for lawful purposes, including for possession in the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Furthermore, the state bans such firearms for reasons that conflict with the very essence of the Second Amendment, essentially claiming that more accurate, effective, and safe firearms can be banned because they are too good at the central purpose of firearms—projecting force when needed—and thus benefit those who would misuse such firearms just as well as those who use them lawfully.

64

**Defendants' Response to Paragraph 233:**

The AWCA is not a categorical prohibition of a class of semiautomatic firearms. *See supra* Defs.' Resp. to ¶¶ 45-47. The AWCA is subject to intermediate scrutiny under the Ninth Circuit's two-step framework for Second Amendment claims, even assuming the AWCA burdens conduct protected by the Second Amendment. *See* Defs.' PPF&CL at 28-30, ¶¶ 28-36. The AWCA satisfies intermediate scrutiny. *See id.* at 30-33, ¶¶ 37-50. The AWCA alternatively satisfies strict scrutiny. *See id.* at 33-34, ¶¶ 51-53.

**Paragraphs 234-236:**

234.   The AWCA imposes a substantial burden on Second Amendment rights, and thus deserves strict scrutiny "to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S.Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari); Pena v. Lindley, 898 F.3d 969, 977 (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second Amendment right and severely burdens that right'").

235.   The AWCA strikes at the "core" of the Second Amendment—and to be sure, the core of the Second Amendment is defined by its text, namely, the "right to keep and bear arms" which "shall not be infringed"—because its effect is to prohibit an entire category of semiautomatic firearms—common pistols, shotguns, and rifles—that are overwhelmingly kept and used for lawful purposes throughout the United States. The State prohibits these categories of firearms not merely in spite of their being useful in self-defense, but apparently, because firearms with those characteristics are effective in the first place. The State's apparent rationale that "we don't want people to be able to shoot accurately, rapidly," is not and cannot be a legitimate state interest at all, let alone a compelling one. A blanket prohibition on common firearms that are "too accurate," or do their jobs "too effectively" by allowing citizens to defend their lives "too well," severely infringes upon Second Amendment rights and cannot survive strict scrutiny.

236.   Any claimed governmental interest in reducing the quality and effectiveness of firearms is on its face illegitimate and contrary to the balance already struck by the framers and ratifiers of the Second Amendment. Such a purported interest requires the same categorical or strict scrutiny analysis that content- or viewpoint-based restrictions are given under the First Amendment. In *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), the Ninth Circuit, in affirming this Court's judgment, held that, because the large-capacity magazine ban, Penal Code § 32310, "substantially burdens core Second Amendment rights," it was subject to review under strict scrutiny. 970 F.3d at 1152.

**Defendants' Response to Paragraphs 234-236:**

The AWCA is subject to intermediate scrutiny under the Ninth Circuit's two-step framework for Second Amendment claims.  *See* Defs.' PPF&CL at 28-30, ¶¶ 28-36.  The AWCA does not impose a severe burden on the core Second Amendment right because it is a restriction on certain configurations.  *Id.* at 29, ¶¶ 31-33.

**Paragraph 237:**

237.    Even under intermediate scrutiny, the State has not demonstrated a "reasonable fit" between its interests and the law. Assuming the importance of the State's generalized claimed interests in public safety and reducing "gun violence," those interests must "rely on . . . hard facts and reasonable inferences drawn from convincing analysis amounting to substantial evidence based on relevant and accurate data sets." *Duncan*, 366 F.Supp.3d at 1161. If the State's claimed interest is instead a more specific desire to prevent or mitigate so-called "mass shootings," *Rupp v. Becerra*, 401 F.Supp.3d 978, 991 (C.D. Cal. 2019), then it is far from clear that an interest directed at such rare events is significant and/or important enough to justify a sweeping prohibitions affecting many millions of firearms owned and used for lawful purposes.  The occasional libel or incitement to violence would not be a sufficiently important interest to justify banning the internet, for example, regardless whether such means of speech inevitably were used for ill in addition to for such lawful purposes. Nevertheless, even assuming the importance of the interest at either level of generality, the AWCA's sweeping ban on common firearms with common characteristics is not a reasonable fit for achieving these interests.

**Defendants' Response to Paragraph 237:**

The AWCA satisfies intermediate scrutiny.  *See* Defs.' PPF&CL at 30-33, ¶¶ 37-50.  To the extent Plaintiffs deny that the State has identified important government interests, their own experts agree that the State has identified important government interests in reducing the incidence and lethality of mass shootings and gun violence against law enforcement personnel.  *See id.* at 31-32, ¶ 42.

**Paragraph 238:**

238.    The AWCA's broad ban on common semiautomatic firearms and lawful conduct with them is not a reasonable fit to any legitimate government interest. First, the ban does not "alleviate [the claimed harms] to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

**Defendants' Response to Paragraph 238:**

The AWCA satisfies intermediate scrutiny.  *See* Defs.' PPF&CL at 30-33, ¶¶ 37-50.  To the extent Plaintiffs rely on language from First Amendment case law, such reliance is misplaced.  *See supra* Defs.' Resp. to ¶¶ 29-30.

**Paragraph 239:**

239.   Any correlation between different crimes and the weapons used does not establish a reasonable fit for a ban on all such weapons. Thus, notwithstanding the District Court's findings in *Rupp*, that "such weapons are disproportionately used in mass shootings," 401 F.Supp.3d at 993, such findings do not even suggest that a ban would do anything other than divert such criminals to alternative legal or illegal weapons, or would in any way mitigate the problems. In *Heller* itself, it was accurately observed that handguns are involved in the vast majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29.

**Defendants' Response to Paragraph 239:**

The AWCA satisfies intermediate scrutiny.  *See* Defs.' PPF&CL at 30-33, ¶¶ 37-50; *see also supra* Defs. Resp. to ¶ 214.

**Paragraph 240:**

240.   Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969).

**Defendants' Response to Paragraph 240:**

To the extent Plaintiffs rely on language from First Amendment case law, such reliance is misplaced.  *See supra* Defs.' Resp. to ¶¶ 29-30.

**Paragraphs 241-246:**

241.   The AWCA burdens far more protected activity than necessary by imposing a complete ban on an ordinary, law abiding individual's acquisition, purchase, transfer, and use of a common class of arms. Even under intermediate scrutiny, "a reasonable fit requires tailoring, and a broad prophylactic ban on acquisition or possession of all" common

67

semiautomatics with common characteristics "for all ordinary, law-biding, responsible citizens is not tailored at all." Duncan, 366 F.Supp.3d at 1180; see also Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored'—even under the more lenient [standard applicable to content neutral restrictions]—where ... a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals.... Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone....") (brackets in original) (citations and quotations omitted). "To meet the narrow tailoring requirement, … the government must demonstrate that alternative measures that burden substantially less [of the right] would fail to achieve the government's interests, not simply that the chosen route is easier." McCullen v. Coakley, 134 S.Ct. 2518, 2524 (2014). By prohibiting even fully background-checked and law-abiding citizens from possessing a common and effective class of firearms, the law imposes considerably more burden than is warranted by the rare instances of criminal violence using such firearms. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." Friedman v. City of Highland Park, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting).

242.   The challenged provisions of the AWCA undermines public safety and do not materially advance any legitimate public interest. The State's justification that the self-same characteristics that make the firearms here suitable for lawful self-defense may also make them effective tools for crime if misused, thus necessitating a ban, would undermine the Second Amendment. The very point of protecting arms, and firearms in particular, is that they allow law-abiding people to project force against unjust force at a distance, and thereby defend themselves and others against a violent threat as soon as possible with the least amount of damage to those being protected. Inevitably, all firearms that are at all suitable for self-defense or militia service are comparably dangerous in the hands of a violent criminal. The notion that improvements that make firearms better and safer for lawful use likewise make them comparably better for unlawful use simply leads to the absurdity that firearms may never be improved because the harms ipso facto outweigh the benefits and justify a ban. However, the Second Amendment itself has already balanced the need for and dangers from arms that can effectively project force against another. As "the very product of an interest balancing by the people," the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 634-35. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures . . . think that scope too broad." Id.

243.   Thus, even under intermediate scrutiny, Defendants' AWCA and regulations fail. The intermediate scrutiny to be applied is the same as, and is drawn from, the First Amendment context. Jackson, 746 F.3d at 961 (heightened scrutiny in Second Amendment cases is "guided by First Amendment principles"); Silvester v. Harris, 834 F.3d 816, 821 (9th Cir. 2016) (applying in Second Amendment case "the test for intermediate scrutiny from First Amendment cases"), cert. denied, Silvester v.

68

Becerra, 138 S.Ct. 945 (2018). At all times under any form of heightened scrutiny, the government bears the burden of justifying its restrictions. See, e.g., R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010) (unless conduct "not protected by the Second Amendment at all, the [g]overnment bears the burden of justifying the constitutional validity of the law."); Tyler v. Hillsdale County Sheriff's Dept., 837 F.3d 678, 694 (6th Cir. 2016) ("the burden of justification is demanding and it rests entirely on the State.") (citation omitted).

244.    The government's burden of justifying its restriction on constitutional rights "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield, 507 U.S. at 770-71 (emphasis added). Restrictions on constitutional rights must be analyzed in their specific context, and "will depend upon the identity of the parties and the precise circumstances of the" protected activity. Edenfield, 507 U.S. at 774. Generalized risk does not warrant restrictions as to all persons, and "a preventative rule" aimed at such generic hazards is "justified only in situations 'inherently conducive to'" the specific dangers identified. Id. (quoting Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 449 (1978)).

245.    Under the actual "demanding" standard for intermediate scrutiny, the AWCA fails, as the State does not advance an important governmental objective nor offer any sort of reasonable fit.

246.    Plaintiffs have shown that the State's AWCA and regulations, and their enforcement thereof, are unconstitutional. Plaintiffs are entitled to declaratory, permanent injunctive, and other relief as prayed for in their First Amended Complaint.

**Defendants' Response to Paragraphs 241-246:**

The AWCA satisfies intermediate scrutiny because it is reasonably fitted to important government interests. *See* Defs.' PPF&CL at 30-33, ¶¶ 37-50. To the extent Plaintiffs rely on language from First Amendment case law, such reliance is misplaced. *See supra* Defs.' Resp. to ¶¶ 29-30. Five federal circuit courts have upheld substantially identical assault-weapon restrictions under the same two-step framework adopted by the Ninth Circuit and on a substantially similar evidentiary record. *See Wilson v. Cook Cty.*, 937 F.3d 1028, 1033-34 (7th Cir. 2019) (following *Friedman*, 784 F.3d at 410-12), *cert. denied*, __ S.C. __, 2020 WL 3146694 (June 15, 2020); *Worman*, 922 F.3d at 38-41; *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804

69

1   F.3d 242, 261-63 (2d Cir. 2015); *Heller v. District of Columbia* (*Heller II*), 670

2   F.3d 1244, 1262-64 (D.C. Cir. 2011).  The Court should follow the reasoning in

3   those cases and uphold the challenged provisions of the AWCA.

4

5   Dated:  February 23, 2021                    Respectfully submitted,

6                                               XAVIER BECERRA
                                                Attorney General of California
7                                               MARK R. BECKINGTON
                                                Supervising Deputy Attorney General
8                                               JOSE A. ZELIDON-ZEPEDA
                                                PETER H. CHANG
9                                               Deputy Attorneys General

10                                              */s/ John D. Echeverria*

11                                              JOHN D. ECHEVERRIA
12                                              Deputy Attorney General
                                                *Attorneys for Defendant*

13

14

15   SA2019104420
     42567798.docx
16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Case Name:   **James Miller et al. v. Xavier Becerra, et al.**
Case No.       **3:19-cv-01537-BEN-JLB**

I hereby certify that on <u>February 23, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 23, 2021</u>, at San Francisco, California.

| Robert Hallsey | /s/ Robert Hallsey |
|:---:|:---:|
| Declarant | Signature |

SA2019104420
42567906.docx