John W. Dillon (SBN 296788)
  jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

George M. Lee (SBN 172982)
  gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial: February 3, 2021<br>Time: 10:00 a.m.<br>Courtroom 5A<br>Judge: Hon. Roger T. Benitez |

Pursuant to this Court's Minute Order of February 5, 2021 [ECF No. 97], plaintiffs James Miller, *et al.* ("plaintiffs") hereby submit their Response to Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law [ECF 103],

which was submitted following the bench trial which commenced before this Court on February 3, 2021, and conclding on February 5, 2021, the Honorable Roger T. Benitez, presiding.

<u>PREFACE</u>

Plaintiffs submit the attached Responses to each of the Defendants' Post-Trial Proposed Findings of Fact Nos. 1-124, with citation to appropriate evidence.

Plaintiffs contend that Defendants' separately-identified "Proposed Conclusions of Law" Nos. 1-53 are general legal arguments pertaining to the law of this matter, which have already been extensively briefed and submitted by all parties, and to which no specific response is required. Prior to these submissions, on February 19, 2021, plaintiffs attempted to meet and confer to obtain a stipulation from defendants that no responses would be submitted as to the parties' proposed conclusions of law, but defendants would not so stipulate. Any arguments raised in response to Defendants' Proposed Conclusions of Law Nos. 1-53 are supplementary to, and without waiver of arguments already raised in extensive briefing and oral argument held before this Court, including the following written submissions, which are incorporated by reference:

- Plaintiffs' Opposition to Defendants' Motion to Dismiss Certain Claims in First Amended Complaint [ECF No. 21] ("Opp. to MTD");

- Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction [ECF No. 22-1] ("MPI Memo.");

- Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Injunction [ECF No. 38] ("MPI Reply");

- Plaintiffs' Supplemental Brief following evidentiary hearing [ECF No. 63] ("Supp. Brief");

- Plaintiffs' Pretrial Brief: Memorandum of Contentions of Fact and Law [ECF No. 66] ("Pretrial Brief");

- Plaintiffs' Opposition to Defendants' Motion in Limine to Preclude or Limit Testimony at Trial [ECF No. 76] ("Opp. to MIL");

- Plaintiffs' Memorandum in Opposition to Defendants' *Daubert* Motion to Preclude Testimony of John R Lott Jr. [ECF No. 77] ("Daubert Opp.");

- Plaintiffs' Supplemental Brief on Significant Disputed Issues of Law [ECF No. 87] ("Disputed Issues Brief");

- Plaintiffs' [Pretrial] Proposed Findings of Fact and Conclusions of Law [ECF No. 88] ("Pretrial Proposed Findings of Fact/Conclusions of Law");

- Plaintiffs' [Post-trial] Proposed Findings of Fact and Conclusions of Law [ECF No. 104] ("Proposed Findings of Fact/Conclusions of Law").

Plaintiffs contend that responses to Defendant's Proposed Conclusions of Law No. 1-54 are cumulative of these arguments previously made, and that this Court is well capable of reaching its own conclusions of law without further guidance from the parties.

Dated: February 23, 2021        **SEILER EPSTEIN LLP**

/s/ George M. Lee
George M. Lee

**DILLON LAW GROUP APC**

/s/ John W. Dillon
John W. Dillon

Attorneys for Plaintiffs

1

INDEX

2

I.   RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT (NOS. 1-124)…..………1

II.  RESPONSE TO DEFENDANTS' PROPOSED CONCLUSIONS OF LAW (NOS. 1-53)…...…91

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFFS' RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT

#### Defendants' Proposed Finding of Fact No. 1.

The Roberti-Roos Assault Weapons Control Act (the "AWCA") was original enacted in 1989.  Cal. Penal § 30500.

**Plaintiffs' Response:** This fact is not in dispute, and is stipulated. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law No. 1.

#### Defendants' Proposed Finding of Fact No. 2.

In enacting the AWCA, the Legislature found that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." Cal. Penal Code § 30505(a).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is the language of Penal Code § 30505(a).

#### Defendants' Proposed Finding of Fact No. 3.

The AWCA initially defined as assault weapons certain semiautomatic rifles, pistols, and shotguns identified by make and model.  Cal. Penal Code § 30510.

**Plaintiffs' Response:** This fact is not in dispute, and is stipulated. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law No. 2.

#### Defendants' Proposed Finding of Fact No. 4.

The AWCA rendered it a felony to manufacture, import, or sell any of the listed firearms without a permit. Cal. Penal Code § 30600(a); *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008).

**Plaintiffs' Response:** This fact is not in dispute.

## Defendants' Proposed Finding of Fact No. 5.

The AWCA rendered it a misdemeanor or a felony to possess any of the listed firearms without a permit. Cal. Penal Code § 30605(a).

**Plaintiffs' Response:** Plaintiffs do not dispute that possession of an assault weapon is chargeable as a felony.

## Defendants' Proposed Finding of Fact No. 6.

The AWCA, as originally enacted, included a mechanism for the California Attorney General to seek a judicial declaration in superior court that certain weapons identical to the listed firearms are also deemed assault weapons subject to the restrictions of the AWCA. Former Cal. Penal Code § 12276.5(a)(1)-(2) (2007); Cal. Code Regs. tit. 11, § 5499; *Kasler v. Lockyer*, 2 P.3d 581, 587 (Cal. 2000), *abrogated on other grounds by Heller*, 554 U.S. 570.

**Plaintiffs' Response:** Plaintiffs do not dispute that former section 12276.5 was called an "add-on provision" which gave the Attorney General to declare firearms assault weapons, *Kasler v. Lockyer*, 23 Cal.4th 472, 478 (2000), and that those firearms are now on a list found at 11 Cal. Code Regs. § 5499. Those listed firearms are not at issue in this case.

## Defendants' Proposed Finding of Fact No. 7.

The California Attorney General's ability to add weapons to the assault weapons list ended in 2006. Cal. Penal Code § 30520.

**Plaintiffs' Response:** This fact is not in dispute.

## Defendants' Proposed Finding of Fact No. 8.

After the Legislature enacted the AWCA, gun manufacturers began to produce "copycat" weapons to evade the statute's restrictions.  In response, in 2000, the Legislature enacted Senate Bill 23 to, among other things, add a flexible, features-based definition of "assault weapons" to the AWCA, which is now codified at California Penal Code section 30515(a). *Silveira*, 312 F.3d at 1058 n.5.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. the term "copycat weapon" does not, to our knowledge, appear in the legislative history for AB 23. Plaintiffs do not dispute that dictum appears in *Silveira v. Lockyer*, 312 F.3d 1052, 1058 n.5 (9th Cir. 2002), abrogated by *District of Columbia v. Heller*, 554 U.S. 570 (2008)

### Defendants' Proposed Finding of Fact No. 9.

Under section 30515(a), a rifle qualifies as an "assault weapon" if it is (1) a semiautomatic, centerfire rifle that does not have a fixed magazine, but has any one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip; (2) a semiautomatic, centerfire rifle that has a fixed large-capacity magazine ("LCM"); or (3) a semiautomatic, centerfire rifle that has an overall length of less than 30 inches.  Cal. Penal Code § 30515(a)(1)-(3).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(1)-(3).

### Defendants' Proposed Finding of Fact No. 10.

A "fixed magazine" is "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action."  Cal. Penal Code § 30515(b).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is the current statutory definition of "fixed magazine" under Cal. Pen. Code § 30515(b). This statutory definition was added in 2016 after enactment of Assembly Bill 1135 and Senate Bill 880 (2015-2016 Reg. Session). Prior to 2016, the law attempted to define an "assault weapon" by, among other things, whether it had "the capacity to accept a detachable magazine" and one of the § 30515(a) characteristics. Prior to 2016, a "detachable magazine" was "any magazine that can be readily removed without the use of tools."

### Defendants' Proposed Finding of Fact No. 11.

Under section 30515(a), a pistol qualifies as an "assault weapon" if it is (1) a semiautomatic pistol that does not have a fixed magazine, but has one or more of

the following features:  a threaded barrel (capable of accepting a flash suppressor, a forward handgrip, or a silencer), a second handgrip, a barrel shroud, or the capacity to accept a detachable magazine outside of the pistol grip; or (2) a semiautomatic pistol with a fixed LCM. Cal. Penal Code § 30515(a)(4)-(5).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(4)-(5).

### Defendants' Proposed Finding of Fact No. 12.

Under section 30515(a), a shotgun qualifies as an "assault weapon" under section 30515(a) if it is (1) a semiautomatic shotgun that has an adjustable stock and one of the following features:  a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip; (2) a semiautomatic shotgun that has the ability to accept a detachable magazine; or (3) a shotgun that has a revolving cylinder.  Cal. Penal Code § 30515(a)(6)-(8).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(6)-(8).

### Defendants' Proposed Finding of Fact No. 13.

Firearms identified as "assault weapons" in California Penal Code section 30510 also generally qualify as "assault weapons" under California Penal Code section 30515(a). Defs.' Ex. AT (Graham *Rupp* Decl.) at 6 n.2 (DEF1629) ("There may be certain assault weapons identified in Penal Code section 30510 that are rimfire or have fixed magazines. These, however, are extremely rare and I have yet to encounter one in my career.").

**Plaintiffs' Response:** Plaintiffs do not dispute that the Legislature has called certain firearms as assault weapons by make and model under Pen. Code § 30510.

### Defendants' Proposed Finding of Fact No. 14.

The Legislature found "a significant public purpose in exempting from the definition of 'assault weapon' pistols that are designed expressly for use in Olympic target shooting events." Cal. Penal Code § 30515(c).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is part of the language of the statute, Pen. Code § 30515(c). However, these exempted pistols consist of largely rimfire or other small caliber pistols and are only those *specifically* "sanctioned by the International Olympic Committee and by USA Shooting." Penal Code § 30515(d)(2). This exemption is inapplicable to the vast amount of firearm competitions that are held throughout the United States and California that use *commonly owned* rifles, pistols, and shotguns, which fall under the definition of "assault weapons." See Defendants' Exh. R, BA, and BI; Ostini Decl., Plaintiffs' Exh. 005; Exhs. 005-1 through 005-28.

### Defendants' Proposed Finding of Fact No. 15.

The AWCA exempts from the definition of "assault weapon" "[a]ny antique firearm" and certain listed pistols that "are consistent with the significant public purpose" of exempting from the definition of "assault weapon" pistols designed expressly for use in Olympic target shooting events. Cal. Penal Code § 30515(d).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is the language of the statute, Penal Code § 30515(d). The definition of an "antique firearm" is generally a firearm made before 1899, and thus, entirely inapplicable to modern, commonly owned rifles, pistols, and shotguns. Cal. Pen. Code § 16170.

### Defendants' Proposed Finding of Fact No. 16.

For over two decades, California has restricted the manufacture, distribution, transportation, importation, sale, lending, and possession of firearms that qualify as "assault weapons" under section 30515(a) of the AWCA.  Cal. Penal Code §§ 30600(a), 30605(a).

**Plaintiffs' Response:** Plaintiffs do not dispute that California has been enforcing and expanding the AWCA since its enactment in 1989.

### Defendants' Proposed Finding of Fact No. 17.

Notwithstanding the AWCA, Californians may lawfully acquire an array of semiautomatic weapons for lawful purposes, such as a centerfire semiautomatic rifle without a fixed magazine, provided it is not a prohibited make and model and does not have any of the prohibited features, a semiautomatic, centerfire rifle with any of the militaristic features and with a fixed magazine of 10 rounds or

less, or a rimfire semiautomatic rifle with any of the listed features. *See* Cal. Penal Code § 30515(a)(1)-(3).

**Plaintiffs' Response:** Plaintiffs do not dispute that California severely limits the choices of semiautomatic rifles, pistols, and shotguns that most Californians may purchase and own, by defining most modern rifles, pistols and shotguns as "assault weapons" because they bear military-looking characteristics under Pen. Code § 30515(a)(1)-(3).

### Defendants' Proposed Finding of Fact No. 18.

Modern sporting rifles, including AR-platform rifles, without prohibited features are available for sale and possession in California for lawful purposes, including self-defense, sports shooting, and hunting. Curcuruto Dep. at 97:12-98:3, 103:10-104:8.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. The "vast majority" of modern sporting rifles includes AR/AK platform rifles, and all of those come with a pistol grip as standard; therefore, it doesn't need to be included in the definition of a modern sporting rifle because it is assumed. Curcuruto Depo., at 20:17 – 21:2. Pistol grips are the most common of the prohibited features on just about all modern semiautomatic arms. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:2-6; Graham testimony, Tx of 10/19/20 Hearing at 129:17-12; Decl of Blake Graham, Def. Exh. D, at ¶ 28 ("In my experience, this feature is the most prevalent feature of assault rifles prohibited under the AWCA."); Def. Exh. BA, p. 9 (pistol grips are common and widely adaptable to a wide range of shooters.) Further, AR platform rifles without prohibited features did not exist before State and Federal implementation of assault weapons bans. "Featureless" style AR platform rifles and "fixed magazine" firearms were specifically manufactured and modified from their original designs with various features as a direct result of California's AWCA in order to meet the demand for a compliant AR platform to those in California and other restricted states. See Kapelsohn Depo. Ex. 5. But for California's AWCA, manufacturers would not provide modified "featureless" or "fixed magazine" configurations to the public. Defendants' Exh. AU, p. 4, 7-10.

## Defendants' Proposed Finding of Fact No. 19.

Assault-weapon configurations that qualify a rifle, pistol, or shotgun as an assault weapon under the challenged provisions of the AWCA increase the dangers posed by those firearms.

**Plaintiffs' Response:** This purported fact is immaterial and the conclusion is disputed. *Any* advance in firearm technology can be argued to make it more dangerous. For example, the invention and implementation of rifling in firearms "changed the game" of firearm accuracy, making firearms incredibly more accurate. Hlebinsky Depo., 56:16-57:11, 62:15-64:19, 134:25-138:10.  Under the State's reasoning, all rifled firearms could be prohibited as rifling dramatically increases the accuracy or "dangers" imposed by firearms with rifling — limiting firearms to outdated, inaccurate smooth bore technology — such an argument is absurd. *Id. All* firearms are inherently dangerous by definition. *Kolbe v. Hogan*, 813 F.3d 160, 177 (4th Cir. 2016). And "firearms cannot be categorically prohibited just because they are dangerous. *Catetano v. Mass.*, 136 S.Ct. 1027, 1031 (Alito, J., joined by Thomas, J., concurring). The Supreme Court's *Heller* analysis asks whether the arms are "both dangerous *and* unusual," *Caetano*, 136 S.Ct. at 1031 (italics original), and if they are not both, it determines if the category of arms are in common use for lawful purposes. *Duncan v. Becerra*, 366 F.Supp.3d at 1142. And otherwise, all "[g]uns in the hands of criminals are dangerous; guns in the hands of law-abiding responsible citizens ameliorate that danger." *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1133 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

## Defendants' Proposed Finding of Fact No. 20.

Each of the prohibited features or configurations in California Penal Code section 30515(a) serves specific, combat-oriented functions, which increase the lethality of firearms and enhance their effectiveness in certain types of crime, particularly mass shootings and violence against law enforcement personnel. Defs.' Ex. Z (Bureau of Alcohol, Tobacco & Firearms, Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (1998) ("ATF Rifle Suitability Report")) at 1 (DEF0759).

**Plaintiffs' Response:** Plaintiffs dispute that the section 30515(a) characteristics are "combat-oriented." Each of the characteristics set forth in section 30515(a) have defensive utility. See Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶¶ 27-37. It can be argued that all firearm characteristics are derived from military functions, going back to the earliest firearms known. Hlebinsky Decl., Plaintiffs' Exh. 002,

¶ 7. It has long been common for weapons used in war to be sold on the civilian market both during and after wars' end, going back to the Civil War. Id., ¶ 9. Historically, firearm technological advancements would also first form in the civilian market and then be adopted by the military. Deposition of Ashley Hlebinsky, at 53:14-25, 62:15-64:19; see also Hlebinsky Decl., Plaintiffs' Exh. 002, ¶¶ 7-8 ("Often the technology advanced too quickly and would go beyond common battlefield use, finding popularity in the civilian population. Military firearms in a general sense were limited by tactics and government bureaucracy while civilian arms until recently were predominantly limited by individual budget. Additionally, civilian arms could be applied in a far greater variety of uses (e.g., hunting, self-defense, sport"). While the characteristics listed in Pen. Code 30515(a) can add some functional improvements to a firearm, the "individual level of the shooter and their ability to operate [the firearm]" has the most significant effect on the firearm's performance. Hlebinsky Depo., at 26:13-30:17. Defendants have otherwise pointed to no evidence to show that the existence of any of the § 30515(a) characteristics on a firearm made any material difference in any mass shooting. Defense expert Lucy Allen testified she did not specifically look at or analyze whether the existence of any specific firearm features would have made a difference in a mass shooting incident. Allen Depo., at 227:8 – 228:9. Defendants' reliance on a 23-year-old report is contradicted by the reality of these commonly owned firearms being used for many lawful purposes including self-defense, competition, hunting, and recreation throughout the United States.

**Defendants' Proposed Finding of Fact No. 21.**

The capability of firing centerfire ammunition is a threshold requirement for a rifle to qualify as an assault weapon.  Cal. Penal Code § 30515(a)(1).

**Plaintiffs' Response:** This purported fact is immaterial. The fact is, "[t]oday, the vast majority of ammunition produced is centerfire." https://www.nrablog.com/articles/2017/11/a-primer-about-rimfire-vs-centerfire-ammunition/. See also Plaintiffs' Exh. 004-8 at pp. 4-5 (showing U.S. pistol production by caliber). So it should not be a surprise that a vast majority of most rifles sold as "modern sporting rifles" are likewise chambered in centerfire cartridges such as .223/5.56 mm. See Plaintiffs' Exh. 004-4 at p. 23 (In a 2013 survey conducted by NSSF, 69% of respondents indicated that the caliber for their most recent modern sporting rifle purchase was .223 / 5.56 mm, followed by 7.62mm x 39mm at 10%). The most common calibers for modern semiautomatic rifles are .223 (or 5.56 x 45mm), 7.62 x 39mm, .22 caliber and

.308 caliber. Curcuruto testimony, Tx of 10/19/20 hearing at 65:7-10. These are centerfire cartridges. The most common caliber for the AR-15 rifle is the 5.56x45 NATO (or .223) cartridge, which is a centerfire cartridge as well. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:25 – 66:5.

The defense has never contended that rimfire ammunition is a suitable cartridge for self-defense. To the contrary, it is well established in law enforcement and self-defense circles that rimfire cartridges such as .22 Long Rifle lack the power to quickly stop violent acts. No police department in the county has ever issued or even allowed .22 caliber handguns to be carried by sworn officers as duty firearms. Generally, .22 LR firearms are less reliable and are more prone to ignition failures. Hlebinsky Depo., 49:13-20.

### Defendants' Proposed Finding of Fact No. 22.

Centerfire ammunition cartridges have a primer in the center of the head of the cartridge, while rimfire ammunition cartridges contain priming compound within the rim of the cartridge case.  Defs.' Ex. D (Graham Decl.) ¶ 21 (DEF0201); Kapelsohn Dep. at 28:18-29:9.

**Plaintiffs' Response:** This purported fact is immaterial. The fact is, "[t]oday, the vast majority of ammunition produced is centerfire." https://www.nrablog.com/articles/2017/11/a-primer-about-rimfire-vs-centerfire-ammunition/. See also Plaintiffs' Exh. 004-8 at pp. 4-5 (showing U.S. pistol production by caliber). So it should not be a surprise that a vast majority of most rifles sold as "modern sporting rifles" are likewise chambered in centerfire cartridges such as .223/5.56 mm. See Plaintiffs' Exh. 004-4 at p. 23 (In a 2013 survey conducted by NSSF, 69% of respondents indicated that the caliber for their most recent modern sporting rifle purchase was .223 / 5.56 mm, followed by 7.62mm x 39mm at 10%). The most common calibers for modern semiautomatic rifles are .223 (or 5.56 x 45mm), 7.62 x 39mm, .22 caliber and .308 caliber. Curcuruto testimony, Tx of 10/19/20 hearing at 65:7-10. These are centerfire cartridges. The most common caliber for the AR-15 rifle is the 5.56x45 NATO (or .223) cartridge, which is a centerfire cartridge as well. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:25 – 66:5.

### Defendants' Proposed Finding of Fact No. 23.

Centerfire ammunition is generally more powerful than rimfire ammunition. Defs.' Ex. D (Graham Decl.) ¶ 22 (DEF0201-02); Kapelsohn Dep. at 29:10-13.

**Plaintiffs' Response:** This purported fact is immaterial. The fact is, "[t]oday, the vast majority of ammunition produced is centerfire." https://www.nrablog.com/articles/2017/11/a-primer-about-rimfire-vs-centerfire-ammunition/. See also Plaintiffs' Exh. 004-8 at pp. 4-5 (showing U.S. pistol production by caliber). So it should not be a surprise that a vast majority of most rifles sold as "modern sporting rifles" are likewise chambered in centerfire cartridges such as .223/5.56 mm. See Plaintiffs' Exh. 004-4 at p. 23 (In a 2013 survey conducted by NSSF, 69% of respondents indicated that the caliber for their most recent modern sporting rifle purchase was .223 / 5.56 mm, followed by 7.62mm x 39mm at 10%). The most common calibers for modern semiautomatic rifles are .223 (or 5.56 x 45mm), 7.62 x 39mm, .22 caliber and .308 caliber. Curcuruto testimony, Tx of 10/19/20 hearing at 65:7-10. These are centerfire cartridges. The most common caliber for the AR-15 rifle is the 5.56x45 NATO (or .223) cartridge, which is a centerfire cartridge as well. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:25 – 66:5.

The defense has never contended that rimfire ammunition is a suitable cartridge for self-defense. To the contrary, it is well established in law enforcement and self-defense circles that rimfire cartridges such as .22 Long Rifle lack the power to quickly stop violent acts. No police department in the county has ever issued or even allowed .22 caliber handguns to be carried by sworn officers as duty firearms. Generally, .22 LR firearms are less reliable and are more prone to ignition failures.

### Defendants' Proposed Finding of Fact No. 24.

Centerfire ammunition may be capable of penetrating police body armor.  Defs.' Ex. D (Graham Decl.) ¶¶ 22-23 (DEF0201-02).

**Plaintiffs' Response:** The fact is, "[t]oday, the vast majority of ammunition produced is centerfire." https://www.nrablog.com/articles/2017/11/a-primer-about-rimfire-vs-centerfire-ammunition/. See also Plaintiffs' Exh. 004-8 at pp. 4-5 (showing U.S. pistol production by caliber). "Most centerfire rifle cartridges will defeat [police body armor] armor. Soft body armor used by police is intended to protect them from handgun bullets not rifle bullets. [...] Vests are rated as to their ability to stop bullets of various calibers. Thus, one vest may be rated as sufficient to stop bullets from .22 LR to .38 Special, while another vest may be capable of stopping bullets up to .357 Magnum. Consequently, a vest will stop a bullet only as long as it does not exceed the capability of the vest."

Plaintiffs' Exh. 012-2 at p. 2-007. "There are two kinds of body armor, soft armor and hard armor. […] Soft armor is designed to offer protection against assaults with handguns. It is intended for daily wear. It is the type of body armor that officers would typically wear while executing their daily duties." "Hard armor plates are used in tactical armor. […] Tactical armor is not typically worn for extended periods. It is donned for wear by officers entering high-risk situations." […] "Rifle caliber bullets with pointed tips tend to punch through soft armor panels. Hard armor plates are required to defeat them." And then again at p. 13, where it discusses the five levels of body armor, it says "The two remaining levels, III and IV, are typically hard armor designed to protect officers against rifle threats." Def. Exh. AY, at pp. 5, 12.

Defendants' suggestion or conclusion that rimfire cartridges are suitable for self-defense purposes is misleading and has no evidentiary basis or support.

## Defendants' Proposed Finding of Fact No. 25.

The capability to accept detachable magazines is a threshold requirement for certain rifles and pistols to qualify as an assault weapon, and it is sufficient to designate a shotgun as an assault weapon. Cal. Penal Code § 30515(a)(1), (4), (a)(7).

**Plaintiffs' Response:** Plaintiffs do not dispute that "the capability to accept a detachable magazine" is one statutory characteristic that can qualify firearms as "assault weapons" under Cal. Pen. Code § 330515(a)(1), (4), (7). "Detachable magazines" are permitted on non-semiautomatic shotguns under the AWCA.

## Defendants' Proposed Finding of Fact No. 26.

Detachable magazines enhance the ability of a semiautomatic firearm to fire a large number of rounds near-continuously by allowing a shooter to rapidly exchange a depleted magazine with a fully loaded one. Defs.' Ex. D (Graham Decl.) ¶ 24 (DEF0202).

**Plaintiffs' Response:** Plaintiffs do not dispute that detachable magazines allow a shooter to shoot a sufficient number of rounds without having to disassemble the action of the firearm. See Pen. Code § 30515(b); Cal. Code Regs. § 5471(p). Detachable magazines are common on a vast majority of semiautomatic rifles, pistols, and shotguns. Detachable magazines have been used on semiautomatic firearms since approximately the 1880s. Hlebinksy Decl., Plaintiffs' Exh. 002, ¶¶

11

11-13, 26, Exs. 002-5 through 002-18.  The AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines. Thus, the AWCA does not affect the state's purported interest of limiting the enhanced "ability of a semiautomatic firearm to fire a large number of rounds near-continuously by allowing a shooter to rapidly exchange a depleted magazine with a fully loaded one" in any material way.

## Defendants' Proposed Finding of Fact No. 27.

The ability to accept detachable magazines "provides the soldier with a fairly large ammunition supply and the ability to rapidly reload." Defs.' Ex. H (Bureau of Alcohol, Tobacco & Firearms, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989) ("ATF Rifle Importability Report")) at 6 (DEF0416); Defs.' Ex. Z (ATF Rifle Suitability Report) at 21-22 (DEF0779-80).

**Plaintiffs' Response:** This proposed finding of fact, suggesting that standard-capacity magazines (of which there are at least one hundred million in civilian hands) is somehow exclusively used by the military, would be misleading and false. The fact is, "[m]agazines holding more than 10 rounds are used for self-defense by law-abiding citizens. And they are common." *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1143-44 (S.D. Cal. 2019) (and many cases cited therein), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). Firearms with the ability to accept detachable magazines – in other words, most semi-automatic firearms – are the most common type of firearm sold.

Detachable magazines are common on a vast majority of semiautomatic rifles, pistols, and shotguns. Detachable magazines have been used on semiautomatic firearms since approximately the 1880s. Hlebinksy Decl., Plaintiffs' Exh. 002, ¶¶ 11-13, 26, exs. 002-5 through 002-18.

The AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines. Thus, the AWCA does not affect the state's purported interest of limiting a shooter's "ammunition supply" or the ability to "rapidly reload" in any material way.

## Defendants' Proposed Finding of Fact No. 28.

The ability to accept detachable magazines renders a semiautomatic weapon "capable of killing or wounding more people in a shorter amount of time."

Defs.' Ex. F (S.B. 880 Report, 2015-2016 Reg. Sess., Assembly Comm. on Public Safety (June 14, 2016)) at 6 (DEF0387).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact, which is immaterial. "Lethality is not the test." *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1145-47 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020).

Detachable magazines are common on a vast majority of semiautomatic rifles, pistols, and shotguns. Detachable magazines have been used on semiautomatic firearms since approximately the 1880s. Hlebinksy Decl., Plaintiffs' Exh. 002, ¶¶ 11-13, 26, exs. 002-5 through 002-18.

The AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines. Thus, the AWCA does not affect the state's purported interest of preventing a weapon's capability of "killing or wounding more people in a shorter amount of time" in any material way.

### Defendants' Proposed Finding of Fact No. 29.

A weapon lacking a fixed magazine is capable of accepting detachable large-capacity magazines (LCMs), which "allow a shooter to fire more than ten rounds without having to pause to reload." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc).

**Plaintiffs' Response:** Plaintiffs do not dispute that a weapon lacking a fixed magazine is otherwise called an ordinary, semiautomatic firearm with a detachable magazine, which is the most common type of firearm sold.

Detachable magazines are common on a vast majority of semiautomatic rifles, pistols, and shotguns. Detachable magazines have been used on semiautomatic firearms since approximately the 1880s. Hlebinksy Decl., Plaintiffs' Exh. 002, ¶¶ 11-13, 26, exs. 002-5 through 002-18.

The AWCA allows for centerfire semiautomatic rifles and pistols to have detachable magazines (also large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of preventing "a shooter to fire more than ten rounds without having to pause to reload" in any material way.

Further, a weapon equipped with a "fixed magazine" is still *capable* of accepting a large capacity magazine. Whether a magazine is detachable or "fixed" has no bearing on the *capacity* of the magazine inserted into the firearm. Thus, requiring a "fixed magazine" does not advance the state's interest in preventing a "shooter to fire more than ten rounds without having to pause to reload."

---

### Defendants' Proposed Finding of Fact No. 30.

LCMs "are particularly designed and most suitable for military and law enforcement applications" and "are a feature common, but not unique, to the banned assault weapons, many of which are capable of accepting magazines of thirty, fifty, or even 100 rounds." *Kolbe*, 849 F.3d at 125.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. "magazines holding more than 10 rounds are used for self-defense by law-abiding citizens. And they are common." *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1143-44 (S.D. Cal. 2019) (and many cases cited therein), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). Firearms with the ability to accept a detachable magazines – in other words, most semi-automatic firearms – are the most common type of firearm sold.

Defendants' concede that LCMs are not unusual and are common. Defendants argue that "assault weapons" are a "subset of semiautomatic firearms." If LCM are "a feature common, but not unique" to "assault weapons," by necessity, LCMs are common and not unique on semiautomatic firearms.

---

### Defendants' Proposed Finding of Fact No. 31.

LCMs enable a shooter to fire more rounds in a given period of time by reducing reload frequency. *See Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (quoting *Kolbe*, 849 F.3d at 127); *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015).

**Plaintiffs' Response:** Plaintiffs do not dispute that standard capacity magazines are in common use, and serve a lawful purpose including for self-defense by allowing the shooter to have more rounds without having to reload. See *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1143-44 (S.D. Cal. 2019) (magazines holding more than 10 rounds are used for self-defense by law-abiding citizens and are common), *aff'd* 970 F.3d 1133 (9th Cir. 2020). The AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines. Thus, the AWCA does not affect the state's

purported interest of limiting the ability of a shooter "to fire more rounds in a given period of time by reducing reload frequency" in any material way.

## Defendants' Proposed Finding of Fact No. 32.

Shotguns capable of firing more than five shotgun rounds without reloading, such as those with a revolving cylinder, are also "most appropriate for military or law enforcement use" and "are not particularly suitable for nor readily adaptable to generally recognized sporting purposes."  Defs.' Ex. O (Bureau of Alcohol, Tobacco, Firearms & Explosives, Study on the Importability of Certain Shotguns (2011) ("ATF Shotgun Importability Study")) at iv (DEF0629).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. One can go into any firearm retailer in California and legally purchase a semi-automatic shotgun with a fixed magazine that holds more than five rounds. The uses of such shotguns include but are not limited to: hunting, target shooting, and self-defense.

## Defendants' Proposed Finding of Fact No. 33.

The use of LCM-equipped firearms in public mass shootings—shooting incidents in a public place resulting in four or more fatalities excluding the shooter—results in a substantially greater number of fatalities and injuries on average than public mass shootings not involving LCMs.  Defs.' Ex. A (Allen Decl.) ¶¶ 33-34 (DEF0017-18).

**Plaintiffs' Response:** This purported fact is immaterial. *See*, *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1145-46 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. *Catetano v. Mass.*, 136 S.Ct 1027, 1031 (Alito, J. concurring) (citing *Heller*, 554 U.S. at 627). Ms. Allen also testified that she made no determination as to whether the presence of a large capacity magazine in her analysis of the 161 "public mass shootings" she looked at would have made any difference in the outcome of any particular case. Allen Depo., 218:24 – 219:7; 226:6-14; 226:20 – 227:11.

Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs'

15

Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines. Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

### Defendants' Proposed Finding of Fact No. 34.

In 161 public mass shootings from 1982-2019, LCMs were used in 60% of such shootings in which magazine capacity was known.  Defs.' Ex. A (Allen Decl.) ¶ 32.

**Plaintiffs' Response:** This purported fact is immaterial. "Large capacity magazines" are very commonly owned. For example, there are at least 100 million such magazines in circulation in civilian hands. *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1143 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). It should therefore be no surprise that if "large capacity magazines" are commonly owned and are standard on firearms sold in the United States, that many such magazines would be used in such incidents. Ms. Allen made no determination as to whether the presence of a large capacity magazine in her analysis of the 161 "public mass shootings" she looked at would have made any difference in the outcome of any particular case. Allen Depo., 218:24 – 219:7; 226:6-14; 226:20 – 227:11.

Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

### Defendants' Proposed Finding of Fact No. 35.

In 161 public mass shootings from 1982-2019, LCMs were used in 39% of such shootings even assuming that all such shootings in which magazine capacity was not known *did not* involve an LCM.  Defs.' Ex. A (Allen Decl.) ¶ 32.

**Plaintiffs' Response:** This purported fact is immaterial. "Large capacity magazines" are very commonly owned. For example, there are at least 100 million such magazines in circulation in civilian hands. *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1143 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). It should therefore be no surprise that if "large capacity magazines" are commonly owned and are standard on firearms sold in the United States, that many such magazines would be used in such incidents. Ms. Allen made no determination as to whether the presence of a large capacity magazine in her analysis of the 161 "public mass shootings" she looked at would have made any difference in the outcome of any particular case. Allen Depo., 218:24 – 219:7; 226:6-14; 226:20 – 227:11.

Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

**Defendants' Proposed Finding of Fact No. 36.**

In 161 public mass shootings from 1982-2019, the use of LCMs resulted in a greater number of fatalities on average than such shootings not involving LCMs (27 vs. 9).  Defs.' Ex. A (Allen Decl.) ¶ 33.

**Plaintiffs' Response:** This purported fact is immaterial. *See*, *Duncan v. Becerra*, 366 F.Supp.3d 1131, 1145-46 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. *Catetano v. Mass.*, 136 S.Ct 1027, 1031 (Alito, J. concurring) (citing *Heller*, 554 U.S. at 627). Ms. Allen also testified that she made no determination as to whether the presence of a large capacity magazine in her analysis of the 161 "public mass shootings" she looked at would have made any difference in the outcome of any particular case. Allen Depo., 218:24 – 219:7; 226:6-14; 226:20 – 227:11.

Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

**Defendants' Proposed Finding of Fact No. 37.**

The use of LCM-equipped firearms in gun massacres—mass shootings involving six or more fatalities excluding the shooter and regardless of the motive or location—results in a substantially greater number of fatalities and injuries on average than public mass shootings not involving LCMs.  Defs.' Ex. DB (Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High –Fatality*

*Mass Shootings, 1990-2017*, 109 Am. J. Public Health 1754 (2019) ("Klarevas 2019")) at 1754 (DEF3248).

**Plaintiffs' Response:** This purported fact is immaterial. Defendants attempt to relitigate *Duncan v. Becerra*. Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

---

### Defendants' Proposed Finding of Fact No. 38.

In 69 gun massacres from 1990-2017, LCMs were used in 64% of such shootings.  Defs.' Ex. DB (Klarevas 2019) at 1754 (DEF3248).

**Plaintiffs' Response:** This purported fact is immaterial. Defendants attempt to relitigate *Duncan v. Becerra*. Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of

fatalities in mass shootings" by restricting magazine capacity in any material way.

### Defendants' Proposed Finding of Fact No. 39.

In 69 gun massacres from 1990-2017, the use of LCMs resulted in in a greater number of fatalities on average than such shootings not involving LCMs (11.8 vs. 7.3).  Defs.' Ex. DB (Klarevas 2019) at 1754 (DEF3248); *accord* Defs.' Ex. A (Allen Decl.) ¶ 35 (DEF0019) (discussing Defs.' Ex. DB).

**Plaintiffs' Response:** This purported fact is immaterial. Defendants attempt to relitigate *Duncan v. Becerra*. Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226. Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

### Defendants' Proposed Finding of Fact No. 40.

LCMs feature prominently in gun violence against law enforcement personnel, as LCM-equipped assault weapons can enable a shooter to engage law enforcement in protracted standoffs.  *See* Defs.' Ex. D (Graham Decl.) ¶ 68 (DEF0215-18); Pls. Ex. 10-7 (Christopher S. Koper, Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003 (2004)) at 2, 18 (Pls.' pp. 285, 301).

**Plaintiffs' Response:** This purported fact is immaterial. Defendants attempt to relitigate *Duncan v. Becerra*. Defendants also fail to distinguish other relevant and determining factors that are shown to increase fatalities in mass shootings such as whether there were multiple shooters; whether multiple weapons were used; whether multiple magazines were used; the intent of the shooter: the extent of the planning period of the shooter; or the shooter's desire for fame and

infamy. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116; Defendants' Exh. AC, p. 7, 12; Defendants' Exh. AG, p. 2; Deposition of John R. Lott Jr., at 314:1-315:25; Plaintiffs Proposed Findings of Fact and Conclusions of Law ¶¶ 194-226.

Further, the AWCA allows for centerfire semiautomatic rifles and pistols to have both detachable magazines and large capacity detachable magazines). Thus, the AWCA does not affect the state's purported interest of limiting the "number of fatalities in mass shootings" by restricting magazine capacity in any material way.

Defendants do not provide any evidence of LCM-equipped assault weapons actually being used in "protracted standoffs" against law-enforcement. Even if Defendants were able to find an anecdotal incident, this would be insufficient to justify a ban.

---

### Defendants' Proposed Finding of Fact No. 41.

Certain rifles and pistols qualify as assault weapons if they have fixed LCMs. Cal. Penal Code § 30515(a)(2), (5).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 30515(a)(2), (5).

---

### Defendants' Proposed Finding of Fact No. 42.

Even if an LCM is incorporated into a rifle or pistol as a fixed magazine, the weapon would be capable of firing more than 10 rounds without needing to reload, enhancing that weapon's lethality. *See* Defs.' Ex. D (Graham Decl.) ¶ 41 (DEF0208).

**Plaintiffs' Response:** Plaintiffs do not dispute that detachable magazines allow a shooter to shoot a sufficient number of rounds without having to disassemble the action of the firearm. See Pen. Code § 30515(b); Cal. Code Regs. § 5471(p). Plaintiffs otherwise question the materiality of this purported fact. This Court has already addressed the legality of laws which prohibit the possession of "large capacity magazines," as that term is defined by Pen. Code section 16740. *Duncan v.* Becerra, 366 F.Supp.3d 1131, 1142 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020). The State cannot otherwise prohibit possession of large capacity magazines by calling firearms "assault weapons" because they are

attached to them. The State has presented no evidence of any crimes being committed with a rifle or pistol that contained a fixed magazine with the ability to accept more than ten rounds of ammunition. The State has likewise presented no evidence of any mass shootings being committed with a rifle or pistol that contained a fixed magazine with the ability to accept more than ten rounds of ammunition. Depo. of Lucy Allen, 179:4-24.

By this purported fact, Defendants concede that the restriction on fixed magazine LCMs is immaterial and ineffective in addressing the State's interest of limiting the capability of "firing more than 10 rounds without needing to reload, enhancing that weapon's lethality" in any material way. First, the AWCA allows detachable LCMs to be used in both semiautomatic rifles and pistols. Second, requiring a fixed magazine does not prevent an individual from inserting a LCM.

### Defendants' Proposed Finding of Fact No. 43.

Rifles and pistols can be modified to allow a shooter to reload a fixed magazine nearly as quickly as a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 42 (DEF0208).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Agent Graham does not explain, elaborate or demonstrate any specific device that allows the rapid reloading of a fixed magazine firearm. And Agent Graham's unfounded opinion is limited only to rifles. But even if this is purported fact is so, this undermines the State's alleged rationale for the requirement of a fixed magazine firearm in the first place. Moreover, as plaintiffs have demonstrated, a featureless version of an AR-15 rifle may be used to shoot a man-sized target at 25 yards in rapid succession. Kraut Decl., Plaintiffs' Exh. 011, ¶ 4; Kraut testimony, Tx of 10/22/20 Hearing at 23:11 – 24:7; 24:20-25. Plaintiffs also demonstrated in this video that a featureless firearm may be reloaded with no discernible difference in the rate of fire or the rate of reload. Kraut Decl, Plaintiffs' Exh. 011, at ¶¶ 12-14. Therefore, if the rapidity of a magazine reload is the stated concern, a shooter only needs to use a featureless configuration, not a firearm with a fixed magazine.

### Defendants' Proposed Finding of Fact No. 44.

Certain rifles, pistols, and shotguns can qualify as assault weapons if they have pistol grips (either beneath the action or located in a forward position) or

thumbhole stocks.  Cal. Penal Code § 30515(a)(1)(A), (1)(B), (1)(F), (4)(B), (6)(B).

**Plaintiffs' Response:** Plaintiffs do not dispute that pistol grips and thumbhole stocks are generally prohibited on semiautomatic rifles, Cal. Pen. Code § 330515(a)(1)(A) and (B). Plaintiffs do not dispute that "a forward pistol grip" is prohibited on semiautomatic rifles under § 30515(a)(1)(F). Plaintiffs do not dispute that "a second handgrip" is generally prohibited on a semiautomatic pistol, Cal. Penal Code § 30515(a)(4)(B). Plaintiffs do not dispute that a pistol grip or a thumbhole stock are generally prohibited on semiautomatic shotguns if they also have a folding or telescoping stock, under § 30515(a)(6).

### Defendants' Proposed Finding of Fact No. 45.

A pistol grip "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing," which can help counteract muzzle rise during repeated firing, and a forward pistol grip can similarly help a shooter stabilize a weapon during repeated semiautomatic fire. Defs.' Ex. D (Graham Decl.) ¶¶ 28-30, 38 (DEF0204-05, 207); Defs.' Ex. H (ATF Rifle Importability Report) at 6 (DEF0416) ("[Pistol] grips were designed to assist in controlling machineguns during automatic fire.").

**Plaintiffs' Response:** Plaintiffs dispute that pistol grips were designed to assist in controlling machine guns. Pistol grips have long been in existence since before automatic fire was invented. See Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 17; Exhs. 002-22 to 002-24 (showing pistol grips have appearing on long guns dating back to at least the 1700s).

Defendants fail to provide any evidence that "counteract[ing] muzzle rise during repeated firing" or "stabiliz[ing] a weapon during repeated semiautomatic fire" is indicative of unlawful use. Indeed both "counteract[ing] muzzle rise during repeated firing" and "stabiliz[ing] a weapon during repeated semiautomatic fire" are necessary and desired for a firearms lawful use. Both are necessary when defending from an imminent threat of lethal force and also in many sporting purposes such as competition and hunting. Defendants' Exh. BA, p. 2-13; Defendants' Exh. BI, p. 2-14. Further, pistols grips assist those who are physically weaker or disabled to stabilize the firearm while shooting. Hlebinsky Depo., at 79:10-80:13.

### Defendants' Proposed Finding of Fact No. 46.

Pistol grips and thumbhole stocks can enable a shooter to maintain accuracy during rapid fire. Defs.' Ex. D (Graham Decl.) ¶¶ 28-30, 38 (DEF0204-05, 207); Youngman Dep. at 134:17-21; Kapelsohn Dep. at 125-26, 130.

**Plaintiffs' Response:** Pistol grips and thumbhole stocks can enable a shooter to maintain accuracy and control generally. See, Decl. of Blake Graham, Def. Exh. D, ¶ 28 ("A shooter using an assault rifle without a pistol grip may shoot less accurately with repeated – and especially rapid – shots if the shooter's trigger hand is in an awkward position for a significant amount of time"); Def. Exh. BA, p. 9 (pistol grips afford greater control of the rifle during firing). Allowing law-abiding gun owners to maintain accuracy and control of the firearm under potentially stressful circumstances is a good thing.

Defendants fail to provide any evidence that "maintain[ing] accuracy during rapid fire" is indicative of unlawful use. To the contrary, "maintain[ing] accuracy during rapid fire" is necessary and desirable when defending from an imminent threat of lethal force and also in many sporting purposes such as competition and hunting. Defendants' Exh. BA, p. 2-13; Defendants' Exh. BI, p. 2-14. Further, pistols grips assist those who are physically weaker or disabled to stabilize the firearm while shooting. Hlebinsky Depo., at 79:10-80:13.

### Defendants' Proposed Finding of Fact No. 47.

A pistol grip can enable a shooter to maintain aim and even fire while reloading a detachable magazine.  Defs.' Ex. D (Graham Decl.) ¶ 29 (DEF0204); Kapelsohn Dep. at 126.

**Plaintiffs' Response:** Plaintiffs dispute that this is the intended purpose or function of a pistol grip on a long gun. The fact is, *any* shooter can maintain aim and fire while reloading a detachable magazine, at least for the one round in the chamber, on a featureless firearm or otherwise. A law abiding gun owner's ability to maintain their aim without becoming distracted by a reloading function is a good thing. See, Def. Exh. BA, p. 9 (pistol grips afford greater control of the rifle during firing). On a pistol, moreover, California law requires models of new semiautomatic pistols sold at retail to have "magazine disconnect mechanisms," which means that these firearms are literally incapable of being fired without a magazine inserted. See, Pen. Code §§ 31910(b)(4)-(6), 32000, and 16900 (defining "magazine disconnect mechanism" as "a mechanism that prevents a

semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol.") Therefore, a California-compliant modern semiautomatic handgun sold at retail generally cannot "be fired while reloading a detachable magazine."

Defendants have also not provided any evidence that a shooter cannot maintain aim and fire while reloading a detachable magazine on a firearm that does not have a pistol grip. See video linked in Kraut Decl., Plaintiffs' Exh. 011, at ¶ 4 (demonstrating a reload of a featureless firearm lacking a pistol grip).

### Defendants' Proposed Finding of Fact No. 48.

A forward pistol grip on any firearm can also help insulate the non-trigger hand from heat generated during rapid fire. Defs.' Ex. D (Graham Decl.) ¶ 54 (DEF0212).

**Plaintiffs' Response:** Plaintiffs dispute that a forward pistol grip "insulate[s] the non-trigger hand from heat generated during rapid fire." Plaintiffs do not dispute that the purpose of a barrel shroud (Pen. Code § 30515(a)(4)(C)) is to protect the user's hand from touching the barrel and becoming burned. Kapelsohn Depo. at 169:5-21.

Defendants fail to provide any evidence that "maintain[ing] rapid fire" or "accurate rapid fire" is indicative of unlawful use. To the contrary, "maintain[ing] rapid fire" and/or "accurate rapid fire" is necessary and desirable when defending from an imminent threat of lethal force and also in many sporting purposes such as competition and hunting. Defendants' Exh. BA, p. 2-13; Defendants' Exh. BI, p. 2-14.

### Defendants' Proposed Finding of Fact No. 49.

A semiautomatic pistol qualifies as an "assault weapon' if it has a "barrel shroud" affixed to, or encircles partially or completely, the barrel of the weapon. Cal. Penal Code § 30515(a)(4)(C).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(4)(C).

**Defendants' Proposed Finding of Fact No. 50.**

A barrel shroud "serve[s] a combat-functional purpose" by cooling the barrel and insulating the non-trigger hand during rapid fire.  Defs.' Ex. J (H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act ("H.R. Rep. No. 103-489")) at 19 (DEF0449); Kapelsohn Dep. at 171:12-17 (agreeing that a barrel shroud could be an important tactical feature of a firearm).

**Plaintiffs' Response:** Plaintiffs do not dispute that the purpose of a barrel shroud (Pen. Code § 30515(a)(4)(C)) is to protect the user's hand from touching the barrel and becoming burned. Kapelsohn Depo. at 169:5-21. Plaintiffs dispute that this is a "tactical" feature any more than any other enhancement to a firearm which is advantageous to the user may be considered a "tactical feature." To clarify, Mr. Kapelsohn testified that a barrel shroud "could" be a tactical feature because it could serve a defensive purpose. Id. at 171:12-17. Defendants have not provided any evidence that extended and/or excessive firing is necessary in order for a firearm's barrel to reach high temperatures that can burn the user's hand. A barrel shroud, by definition, is a safety device. Defendants' justifications for prohibiting a barrel shroud would also serve as justification for prohibiting shooters from wearing gloves while shooting or characterizing a glove as a "tactical feature."

**Defendants' Proposed Finding of Fact No. 51.**

Certain rifles and shotguns may qualify as an assault weapon if they have an adjustable stock. Cal. Penal Code § 30515(a)(1)(C), (6)(A).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(1)(C), (6)(A).

**Defendants' Proposed Finding of Fact No. 52.**

A folding or telescoping stock enhances the portability and concealability of a rifle. Defs.' Ex. D (Graham Decl.) ¶¶ 31-33 (DEF0205-06).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. A folding stock does not turn a rifle into a common instrument of crime, as even when so equipped, the rifle is far too large for easy concealment for most criminal activities. Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 30. The purpose of a telescoping buttstock is to allow the rifle stock to be adjusted to properly fit the user. Id., at ¶

31. It does not make the firearm more concealable. Kapelsohn testimony, Tx of 10/19/20 Hearing at 28:10 – 30:3.

If a rifle or shotgun that has either a folding or telescoping stock meets the minimum overall length requirements when folded or collapsed to its shortest possible length, then by definition, the ability to adjust the stock's length or fold the stock does not enhance the concealability of the firearm.

Further, Defendants have provided no evidence that a mass shooter has ever relied on a folding or telescoping stock to transport or conceal a firearm or that a shooter was able to transport or conceal a firearm specifically because it had a folding or telescoping stock.

Even if Defendants were able to find a single anecdotal incident, this would not be a sufficient cause to prohibit such firearm characteristics.

## Defendants' Proposed Finding of Fact No. 53.

The "main advantage" of a folding or telescoping stock is "portability," and "its predominant advantage is for military purposes, and it is not normally found on the traditional sporting rifle." Defs.' Ex. H (ATF Rifle Importability Report) at 6 (DEF0416).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. The purpose of a telescoping buttstock is to allow the rifle stock to be adjusted to properly fit the user. Id., at ¶ 31. It does not make the firearm more concealable. Kapelsohn testimony, Tx of 10/19/20 Hearing at 28:10 – 30:3. According to the defense, telescoping stocks are commonly found on firearms that qualify as "assault weapons." Graham Decl., Def. Exh. D, at ¶ 16 ("The next most common features are probably telescoping stocks and flash suppressors.")

Further, the fact that a firearm is "portable" is not a "predominant advantage" for military purposes. Common sense dictates that gun owners routinely have to travel with firearms — whether going to a competition, going hunting, traveling to the gun range, or traveling to a gun shop for gunsmithing — there are countless lawful reasons for having a firearm be more "portable."

### Defendants' Proposed Finding of Fact No. 54.

In military and law enforcement contexts, an adjustable stock may enable law enforcement personnel to conduct room-to-room searches and maintain a tactical element of surprise.  Defs.' Ex. D (Graham Decl.) ¶ 32 DEF0205-06); Youngman Dep. at 141:21-143:7.

**Plaintiffs' Response:** Plaintiffs do not dispute that rifles with have shorter overall lengths are more advantageous to any user, particularly in close quarters situation, such as the defense of a home, because it enables the user to be more maneuverable moving through doorways and around corners. Kapelsohn testimony, Tx of 10/19/20 Hearing at 33:18 – 34:5; Graham testimony, Tx of 10/19/20 Hearing at 132:13 – 134:6. Generally, a shorter rifle has the same advantages as defendants' purported fact for purposes of civilian self-defense. Kapelsohn Depo. at 93:12 – 94:1.

Further adjustable stocks allow individuals of different statures to adjust the same firearm to the specific individual using it. Deposition of Ashley Hlebinsky, at 24:19-25:1, 139:6-140:14. Adjustable stocks also allow individuals with physical inferiorities or disabilities to properly fit the firearm to themselves. *Id*.

### Defendants' Proposed Finding of Fact No. 55.

Semiautomatic centerfire rifles with lengths of less than 30 inches, Cal. Penal Code § 30515(a)(3), are more concealable and may allow a shooter to smuggle a rifle undetected in public.  Defs.' Ex. D (Graham Decl.) ¶¶ 43, 59 (DEF0209, 213-14); Defs.' Ex. M (Mersereau Decl.) ¶ 10 (DEF0566).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. A rifle with an overall length of 26 inches, the minimum length under federal law (see 26 U.S.C. § 2845(a)(4) (defining "firearm" for purposes of compliance with the National Firearms Act to include a weapon made from a rifle that has an overall length of less than 26 inches, or a barrel of less than 16 inches in length)) is not concealable. Moreover, an AR-15 firearm is easily separated into two halves, an upper and a lower receiver, which can be separated by pulling out two pins, and which does not take any specialized training. Graham testimony, Tx of 10/19/20 Hearing at 143:9 – 144:13; 146:11-18. Without specialized skill or training, therefore, a person can take apart an AR-15, and make it concealable, in a matter of seconds. (Id.) Whether that firearm overall length is 30 inches or 26 inches is immaterial.

## Defendants' Proposed Finding of Fact No. 56.

A semiautomatic, centerfire rifle qualifies as an assault weapon if it is equipped with a flash suppressor.  Cal. Penal Code § 30515(a)(1)(E).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(1)(E).

## Defendants' Proposed Finding of Fact No. 57.

A flash suppressor is a device attached to the muzzle of a rifle to reduce the flash emitted upon firing.  Cal. Code Regs. tit. 11, § 5471(r).

**Plaintiffs' Response:** The regulatory definition of "flash suppressor" is "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." 11 Cal. Code Regs. § 5471(r).

## Defendants' Proposed Finding of Fact No. 58.

The definition of a flash suppressor includes any "device labeled or identified by its manufacturer as a flash hider."  Cal. Code Regs. tit. 11, § 5471(r).

**Plaintiffs' Response:** The regulatory definition of "flash suppressor" further includes "[a] hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be deemed a flash suppressor. A device labeled or identified by its manufacturer as a flash hider would be deemed a flash suppressor."

## Defendants' Proposed Finding of Fact No. 59.

A flash suppressor can enable a shooter to maintain accuracy during rapid fire in low-light settings. Youngman Dep. at 139:5-9.

**Plaintiffs' Response:** Plaintiffs do not dispute that a major advantage of a flash suppressor is the reduction of muzzle flash so as not to temporarily blind a shooter who is firing in a darkened environment. Kapelsohn Decl., Plaintiffs' Exh. 001, at ¶ 33. This device enhances its use for self-defense by civilians. Id.

Plaintiffs dispute that a flash suppressor maintains accuracy *only* "during rapid fire" in low-light settings. A flash suppressor by definition "perceptibly reduce[s] or redirect[s] muzzle flash from the shooter's field of vision," whether it is a single shot or multiple shots, and regardless of the rate of fire.

Defendants have not provided any evidence that a flash hider has ever had a determining effect on a mass shooter's ability to "maintain accurate rapid fire in low light conditions."

Even if Defendants were able to find a single anecdotal incident, this would not be a sufficient cause to prohibit such firearm characteristics.

### Defendants' Proposed Finding of Fact No. 60.

A flash suppressor is a standard feature of the M-16 that can aid a shooter to maintain accurate, rapid fire in low-light conditions, and can also counteract "muzzle climb" during rapid fire.  Defs.' Ex. H (ATF Rifle Importability Report) at 7 (DEF0417); Defs.' Ex. D (Graham Decl.) ¶ 37 (DEF0207); Kapelsohn Dep. at 147-48 (acknowledging that a flash suppressor may have a "very minimal" effect on counteracting muzzle climb).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact and Defendants' conclusion. As Mr. Kapelshohn testified, the amount of muzzle climb that is affected by a flash suppressor is "very minimal." If a person actually wishes to counteract muzzle climb, he or she would simply use a compensator, which is legal on any firearm, and is common. Testimony of Emanuel Kapelsohn, Tx of 10/19/20 Hearing at 40:16 – 41:3. Additionally, flash suppressors are a common characteristic on semiautomatic firearms. Deposition of Ashley Hlebinsky, at 111:10-114:20; Ostini Decl., Plaintiffs' Exh. 005; Exh. 005-1 through 005-28.

Defendants have not provided any evidence that a flash hider has ever had a determining effect on a mass shooter's ability to "maintain accurate rapid fire in low light conditions." Even if Defendants were able to find a single anecdotal incident, this would not be a sufficient cause to prohibit such firearm characteristics.

### Defendants' Proposed Finding of Fact No. 61.

A flash suppressor can help conceal the shooter's position, especially at night. Defs.' Ex. H (ATF Rifle Importability Report) at 7 (DEF0417); Defs.' Ex. D

(Graham Decl.) ¶ 37 (DEF02070); *see also* Kapelsohn Dep. at 145:24-146:4 (testifying that flash suppressors can make it more difficult to locate the precise location of a shooter and that is "one reason the military uses them").

**Plaintiffs' Response:** This purported fact is immaterial. The State's regulations specifically define a "flash suppressor" as "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." 11 Cal. Code Regs. § 5471(r). The regulations say nothing about concealing a shooter's position because there is no evidence that this ever occurred. A flash suppressor is not, by this regulatory definition, a device that is intended to conceal a shooter's position. Defendants' own after-the-fact justifications about the purported abilities of a flash hider are not relevant.

Defendants have not provided any evidence that a flash hider has ever had a determining effect on a mass shooter's ability to conceal their position either during the day or at night.

Even if Defendants were able to find a single anecdotal incident, this would not be a sufficient cause to prohibit such firearm characteristics.

### Defendants' Proposed Finding of Fact No. 62.

A semiautomatic pistol without a fixed magazine qualifies as an assault weapon if it has a threaded barrel capable of accepting a flash suppressor, forward pistol grip, or silencer.  Cal. Penal Code § 30515(a)(4)(A).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Pen. Code § 30515(a)(4) states "(A) A threaded barrel, capable of accepting a flash suppressor, forward *handgrip*, or silencer." Plaintiffs contend that a threaded barrel capable of accepting a forward handgrip is non-sensical and does not exist in reality.

### Defendants' Proposed Finding of Fact No. 63.

A threaded barrel enables a shooter to quickly attach a flash suppressor, forward handgrip, or silencer, which enhance the pistol's lethality and concealability. Defs.' Ex. D (Graham Decl.) ¶ 53 (DEF0212).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. First, Plaintiffs contend that a threaded barrel capable of accepting a forward handgrip is non-sensical and does not exist in reality.

Second, the attachment of a flash suppressor or silencer does not enhance a pistols' "lethality" or its concealability. Both the addition of a flash suppressor or a silencer would significantly lengthen the pistol's overall length. Thus, the pistol would be "less concealable."

Third, the AWCA allows for a flash suppressor, compensator, or muzzle brake to be *permanently affixed* to a pistol barrel. The State's purported interest cannot be to inhibit the "pistol's lethality and concealability" by prohibiting flash suppressors on pistols, because the AWCA allows flash suppressors on pistols. Thus, the AWCA seemingly seeks to prevent a person from "quickly" attaching a flash suppressor. However, no evidence or argument has been provided by Defendants as to why having the ability to "quickly attach" and/or remove a muzzle device is something that furthers the State's interest.

Fourth, silencers are separately prohibited under California law and also heavily regulated federally both in manufacture and sale. See, e.g., Cal. Pen. Code § 33410; 18 U.S.C. § 921(a)(24). Thus, it is immaterial whether a pistol in California has a threaded barrel.

Fifth, threaded barrels are common and lawful on centerfire semiautomatic rifles under the AWCA. CA Penal Code § 30515(a). Thus, the State's interest of preventing a shooter from "quickly attaching" a flash suppressor seems only to apply to pistols. The AWCA's own inconsistencies undermine the State's interests.

Finally, Defendants have not provided any evidence that a threaded barrel on a pistol has ever had a determining effect on a mass shooter's ability to "quickly attach a flash suppressor or silencer" or that a flash suppressor installed on a pistol has ever had a determining effect on a mass shooting.

Even if Defendants were able to find a single anecdotal incident, this would not be a sufficient cause to prohibit such firearm characteristics.

## Defendants' Proposed Finding of Fact No. 64.

A flash suppressor and forward pistol grip enhance the lethality or concealability of a firearm.  Defs.' Ex. H (ATF Rifle Importability Report) at 6-7 (DEF0416-17).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. First, a bullet travelling from a firearm equipped with a flash suppressor is no more lethal than a bullet from a pistol without a flash suppressor.

Second, the attachment of a flash suppressor or silencer does not enhance a firearm's "lethality or concealability." Both the addition of a flash suppressor or a silencer would significantly lengthen the firearms' overall length. Thus, the firearm would be "less concealable."

Third, the AWCA allows for a flash suppressor, compensator, or muzzle brake to be *permanently affixed* to a pistol barrel. The AWCA also allows flash suppressors and forward pistol grips on centerfire semiautomatic rifles with fixed magazines. The AWCA's own inconsistencies undermine the State's interests.

Finally, Defendants have not provided any evidence that a flash suppressor or forward pistol grip has ever had a determining effect on the lethality or concealability of a firearm used in any mass shooting.

Even if Defendants were able to find a single anecdotal incident, this would not be a sufficient cause to prohibit such firearm characteristics.

## Defendants' Proposed Finding of Fact No. 65.

A silencer can be affixed to a pistol to reduce the sound it emits upon firing, which can help a shooter maintain a tactical advantage by concealing the shooter's position or the fact that a shot was even fired. Defs.' Ex. D (Graham Decl.) ¶ 53 (DEF0212) (noting Virginia Beach workplace shooting that involved a silencer-equipped handgun).

**Plaintiffs' Response:** This purported fact is immaterial. Plaintiffs are not challenging the silencer law, Cal. Pen. Code § 33410, in this action. The fact is, a silencer also has defensive utility, particularly in an indoor/home defense situation. Kapelsohn testimony, Tx of 10/19/20 Hearing at 41:10 – 42:21 (describing both silencers and sound redirection devices).

**Defendants' Proposed Finding of Fact No. 66.**

A semiautomatic, centerfire rifle without a fixed magazine qualifies as an assault rifle if it is equipped with a grenade launcher or a flare launcher.  Cal. Penal Code § 30515(a)(1)(D).

**Plaintiffs' Response:** Plaintiffs do not dispute that this is one statutory definition of an assault weapon under Cal. Pen. Code § 330515(a)(1)(D).


**Defendants' Proposed Finding of Fact No. 67.**

Neither a grenade launcher nor a flare launcher serve any legitimate civilian need on a rifle.  Defs.' Ex. H (ATF Rifle Importability Report) at 7 (DEF0417); Defs.' Ex. D (Graham Decl.) ¶¶ 34-35 (DEF0206-07).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. A "grenade launcher" is a feature prohibited on rifles under Pen. Code section 30515(1)(D). Grenade launchers on rifles are not numerically common, but that is largely a function of grenades being separately prohibited as "destructive devices" and regulated by federal law. Because the law prohibiting grenades is already addressed in the law, California's law prohibiting grenade launchers is largely superfluous. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32. Grenade launchers, also known as hand mortars, date to the 1600s and 1700s. The State has not presented any evidence that grenade launchers, attached to a rifle, have ever been used in the commission of a crime. Regardless, if this Court were to eliminate the AWCA in its entirety, the ability for an individual to acquire, let alone attach a grenade launcher to a firearm, would *not* be enhanced in any way as both grenades and grenade launchers are heavily regulated by federal and state law.

A "flare launcher" is another feature prohibited on rifles under Pen. Code section 30515(1)(D). Yet, Defendants have not provided a single instance in which a flare launcher was ever used in a crime. Flare guns were in use by the 1800s. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶ 21. Most importantly, flare launchers are signaling devices — nothing more. Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 32. They are inherently passive. The State's interest in "public safety" or decreasing mass shootings are in no way connected to a ban on flare launchers. Moreover, flare launchers are designed to a different diameter than grenade launchers, grenades, or other destructive devices. Thus, no grenade or destructive device could be fired from a flare launcher. Defendants have also not alleged nor provided any evidence that any kind of destructive device could be fired from a

flare launcher. Defendants have also not provided any evidence that a flare launcher attached to a rifle has ever been involved in a mass shooting or act of violence.

## Defendants' Proposed Finding of Fact No. 68.

Rapid semiautomatic fire is a "combat fire technique" that is not consistent with lawful uses of a firearm.  Defs.' Ex. L (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons (2008)) at 7-8 (DEF0541).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. While Defendants contend that "accurate rapid fire" of firearms is "not consistent" with lawful use, Defendants have provided no evidence to support such a contention. To the contrary, common sense demands that "accurate rapid fire" may be needed to defend one's life from an imminent lethal threat. "Accurate rapid fire" is both desired and necessary in sporting use such as competitions. "Accurate rapid fire" is both desired and necessary in the lawful activity of firearms training. Defendants' conclusion, which is to say that all firearms (which can be fired rapidly) should be less accurate, is absurd. That penalizes the law-abiding citizen from denying him or her the ability to use accurate firearms, where accountability for each shot is of the utmost concern. Kapelsohn testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6. The State does not claim that prohibiting the specified features of section 30515(a)(1) prevents rapid fire, only that it prevents accurate rapid fire. However, regardless of the characteristics installed on the firearm, with training, a shooter can pull the trigger of any semiautomatic pistol or rifle of five to seven rounds per second. Kapelsohn testimony, Tx of 10/19/20 Hearing at 23:4-22.

## Defendants' Proposed Finding of Fact No. 69.

Based on the California Department of Justice's assault weapon registration data, excluding assault weapons registered to peace officers, as of December 3, 2020, there are approximately 185,569 assault weapons currently registered with the Department of Justice, of which approximately 165,804 are rifles, 16,306 are pistols, and 3,459 are shotguns.  Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222).

**Plaintiffs' Response:** This purported fact, if true, supports plaintiffs' claims that assault weapons are in common use. Further, the registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that

were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

## Defendants' Proposed Finding of Fact No. 70.

Of the assault weapons registered to non-peace officers in California, only 8.7% are pistols and 1.7% are shotguns. *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222).

**Plaintiffs' Response:** The AWCA regulates "assault weapons" pursuant to their definitions in California Penal Code 30515(a). According to Defendants, there are 185,569 assault weapons currently registered with the Department of Justice. Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222). Thus, "assault weapons" are in common use in California.

Defendants' attempt to parse out rifles, pistols, and shotguns as distinct subcategories of "assault weapons" is immaterial and misleading to the commonality of "assault weapons."

"Assault weapons" are lawful to purchase, own, possess and use, in 43 states in the United States. Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 25-52, Exs. 003-2 through 003-9. There are millions of "assault weapons" in common use throughout the United States. Curcuruto Decl., Plaintiffs' Exh. 004. Hundreds of models and configurations of "assault weapons" are offered by the biggest manufacturers in the United States. See generally, Cururuto Decl., Plaintiffs' Exh. 004, ¶¶ 9-15, Exs. 004-4 to 004-8; Curcuruto Depo., 41:11 – 44:11, Depo. Ex. 1; Ostini Decl., Plaintiffs' Exh. 005, ¶¶ 4-13, Exs. 005-1 through 005-13.

Plaintiffs have challenged California's Assault Weapon Control Act. Much like "handheld electro-shock weapons" in *Caetano*, Plaintiffs have shown that "assault weapons" are not dangerous and unusual and are in common use. Plaintiffs' Exh. 003, ¶ 13, ex. 003-3.

## Defendants' Proposed Finding of Fact No. 71.

As of December 3, 2020, there are approximately 90,886 individuals currently registered to possess an assault weapon in California.  Defs.' Ex. CZ (Glover Decl.) ¶ 8 (DEF3222).

**Plaintiffs' Response:** This purported fact, if true, supports plaintiffs' claims that assault weapons are in common use.

Further, the registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

Additionally, the mere fact that there are 90,886 individuals who own assault weapons *in a single state*, necessarily proves that "assault weapons" are common throughout the United States, even if this Court were to assume every other state in the Country had fewer assault weapons by a factor of ten.

### Defendants' Proposed Finding of Fact No. 72.

Individuals currently registered to possess assault weapons have registered approximately 2.04 assault weapons on average.  Defs.' Ex. CZ (Glover Decl.) ¶¶ 7-8 (DEF3222).

**Plaintiffs' Response:** This purported fact is immaterial.

Further, the registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

Additionally, the mere fact that there are 90,886 individuals who own assault weapons *in a single state that has attempted to prohibit a class of firearm for over thirty years*, necessarily proves that "assault weapons" are common throughout the United States, even if this Court were to assume every other state in the Country had fewer assault weapons by a factor of ten.

The purported fact that each "assault weapon" owner has 2.04 assault weapons on average only bolsters Plaintiffs' claims that "assault weapons" are commonly owned.

**Defendants' Proposed Finding of Fact No. 73.**

According to the U.S. Census, there are approximately 30.6 million persons aged 18 years or older in California. *See* U.S. Census Bureau, Quick Facts, California (2019), *available at* https://www.census.gov/quickfacts/fact/table/CA/PST045219 (last visited Feb. 15, 2021).

**Plaintiffs' Response:** This purported fact is immaterial. Constitutional rights are not determined by the percentage of citizens who choose to exercise them, or the reasons that people choose to exercise them.

**Defendants' Proposed Finding of Fact No. 74.**

0.29% of Californians aged 18 years or older are registered to possess an assault weapon. Defs.' Ex. CZ (Glover Decl.) ¶ 8 (DEF3222) (stating that 90,886 Californians are registered to possess an assault weapon); United States Census Bureau, Quick Facts, California (2019) (indicating that there are approximately 30.6 million persons aged 18 years or older in California), *available at* https://www.census.gov/quickfacts/fact/table/CA/PST045219 (last visited Feb. 15, 2021).

**Plaintiffs' Response:** This purported fact is immaterial. Constitutional rights are not determined by the percentage of citizens who choose to exercise them, or the reasons that people choose to exercise them. Furthermore, defendants' purported fact is underinclusive. California law prohibits persons under the age of 21 from purchasing firearms. See Pen. Code §§ 27505, 27510. Even if individuals 18 to 21 were to meet the State's few illusory exemptions to Penal Code sections 27505 and 27510, they are still prohibited from purchasing, transferring, or gaining control or possession of all semi-automatic centerfire rifles (regardless of their features). Pen. Code §§ 27505, 27510.

**Defendants' Proposed Finding of Fact No. 75.**

According to a 2018 California Safety and Well-Being Survey, 4.2 million adult Californians personally own a firearm. Defs.' Ex. DY at 1 (DEF3578); Defs.' EA (Nicole Kravitz-Wirtz et al., *Firearm Ownership and Acquisition in California: Findings from the 2018 California Safety and Well-Being Survey*, 26 Injury Prevention 516 (2020) ("Safety and Well-Being Survey")) at 516 (DEF3581).

**Plaintiffs' Response:** This purported fact is immaterial. Constitutional rights are not determined by the percentage of citizens who choose to exercise them, or the reasons that people choose to exercise them.

Most people are not forced to defend their life from an imminent threat of lethal force. Nor have Americans had to take up arms to defend against a tyrannical government since the Revolutionary War. However, these facts do not negate the right to self-defense or the Second Amendment.

### Defendants' Proposed Finding of Fact No. 76.

According to the 2018 California Safety and Well-Being Survey, approximately 14% of the California adult population personally owns a firearm. Defs.' EA (Safety and Well-Being Survey) at 516 (DEF3581).

**Plaintiffs' Response:** This purported fact is immaterial. Constitutional rights are not determined by the percentage of citizens who choose to exercise them, or the reasons that people choose to exercise them.

Most people are not forced to defend their life from an imminent threat of lethal force. Nor have Americans had to take up arms to defend against a tyrannical government since the Revolutionary War. However, these facts do not negate the right to self-defense or the Second Amendment.

### Defendants' Proposed Finding of Fact No. 77.

According to the 2018 California Safety and Well-Being Survey, Californians own an estimated 19.9 million firearms. Defs.' EA (Safety and Well-Being Survey) at 516 (DEF3581).

**Plaintiffs' Response:** This purported fact is immaterial. Constitutional rights are not determined by the percentage of citizens who choose to exercise them, or the reasons that people choose to exercise them.

The most commonly owned firearm is a handgun. This fact does not reduce the right for individuals to own other types of firearms.

**Defendants' Proposed Finding of Fact No. 78.**

According to the 2018 California Safety and Well-Being Survey, approximately 10% of California's gun owners own 10 or more firearms, comprising approximately half of all firearms owned in the state.  Defs.' EA (Safety and Well-Being Survey) at 516 (DEF3581).

**Plaintiffs' Response:** This purported fact is immaterial. Constitutional rights are not determined by the percentage of citizens who choose to exercise them, or the reasons that people choose to exercise them.

Most people are not forced to defend their life from an imminent threat of lethal force. Nor have Americans had to take up arms to defend against a tyrannical government since the Revolutionary War. However, these facts do not negate the right to self-defense or the Second Amendment.

**Defendants' Proposed Finding of Fact No. 79.**

Approximately 2.2% of California's gun owners possesses a registered assault weapon (90,886/4,200,000).  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 8 (DEF3222) (stating that 90,886 Californians are registered to possess an assault weapon); Defs.' Ex. EA at 516 (DEF3581) (indicating that 4.2 million adult Californians personally own a firearm).

**Plaintiffs' Response:** This purported fact is immaterial. The most commonly owned firearm is a handgun. This fact does not reduce the right for individuals to own other types of firearms. Most people are not forced to defend their life from an imminent threat of lethal force. Nor have Americans had to take up arms to defend against a tyrannical government since the Revolutionary Wwar. However, these facts do not negate the right to self-defense or the Second Amendment.

Further, the registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

**Defendants' Proposed Finding of Fact No. 80.**

Of the approximately 19.9 million firearms possessed in California, approximately 0.83% of those weapons are rifles registered as assault weapons (165,804/19,900,000). *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222) (stating that 165,804 rifles are registered as assault weapons); Defs.' Ex. EA at 516 (DEF3581) (indicating that there are 19.9 million firearms owned by individuals in California).

**Plaintiffs' Response:** This purported fact is immaterial. The registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

Assault weapons are in common use in California and throughout the United States. Glover Decl., Def. Exh. CZ, ¶ 6 (detailing the number of registered assault weapons in California); Ostini Decl., Plaintiffs' Exh. 005, ¶¶ 4-13, exs. 005-1 through 005-13.

**Defendants' Proposed Finding of Fact No. 81.**

Of the approximately 19.9 million firearms possessed in California, approximately 0.08% of those weapons are pistols registered as assault weapons (16,306/19,900,000). *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222) (stating that 16,306 pistols are registered as assault weapons); Defs.' Ex. EA at 516 (DEF3581) (indicating that there are 19.9 million firearms owned by individuals in California).

**Plaintiffs' Response:** This purported fact is immaterial. The most commonly owned firearm is a handgun. This fact does not reduce the right for individuals to own other types of firearms. Most people are not forced to defend their life from an imminent threat of lethal force. Nor have Americans had to take up arms to defend against a tyrannical government since the Revolutionary War. However, these facts do not negate the right to self-defense or the Second Amendment.

Further, the registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

41

Assault weapons are in common use in California and throughout the United States. Glover Decl., Def. Exh. CZ, ¶ 6 (detailing the number of registered assault weapons in California); Ostini Decl., Plaintiffs' Exh. 005, ¶¶ 4-13, exs. 005-1 through 005-13.

### Defendants' Proposed Finding of Fact No. 82.

Of the approximately 19.9 million firearms possessed in California, approximately 0.02% of those weapons are shotguns registered as assault weapons (3,469/19,900,000).  *See* Defs.' Ex. CZ (Glover Decl.) ¶ 7 (DEF3222) (stating that 3,459 shotguns are registered as assault weapons); Defs.' Ex. EA at 516 (DEF3581) (reporting that there are approximately 19.9 million firearms owned by individuals in California).

**Plaintiffs' Response:** This purported fact is immaterial. The most commonly owned firearm is a handgun. This fact does not reduce the right for individuals to own other types of firearms. Most people are not forced to defend their life from an imminent threat of lethal force. Nor have Americans had to take up arms to defend against a tyrannical government since the Revolutionary War. However, these facts do not negate the right to self-defense or the Second Amendment.

Further, the registration data does not account for the firearms that were converted to "featureless" configurations to avoid "assault weapon" registration. Nor does it account for the firearms that were sold or taken out of state because of the firearm's reclassification as an assault weapon due to SB 880 and AB 1135.

Assault weapons are in common use in California and throughout the United States. Glover Decl., Def. Exh. CZ, ¶ 6 (detailing the number of registered assault weapons in California); Ostini Decl., Plaintiffs' Exh. 005, ¶¶ 4-13, exs. 005-1 through 005-13.

### Defendants' Proposed Finding of Fact No. 83.

Plaintiffs provided no reliable estimate of the number of firearms that qualify as assault weapons under the challenged provisions of the AWCA that are in lawful possession in the United States.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Firearms defined under California law as "assault weapons" by virtue of the features they contain, as set forth in Pen. Code section 30515(a), are in common use, for lawful purposes, including, recreational and competitive target shooting, self-defense, collecting and hunting, by millions of Americans. Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7. Semiautomatic rifles bearing features prohibited by Pen. Code section 30515(a)(1) are widely available and popular. The characteristics most commonly associated with these types of firearms are that they are semiautomatic, with the ability to accept a detachable magazine. Curcuruto testimony, Tx of 10/19/20 Hearing at 62:7-11; Kapelsohn Decl., Plaintiffs' Exh. 001, ¶ 18. The most popular is the AR platform (or rifles modeled on the AR-15 pattern). Curcuruto testimony, Tx of 10/19/20 Hearing at 62:17-18. That is true both nationally and in the State of California. *Id*. at 62:24 – 63:19. United States manufacturers produced approximately 14.7 million AR-platform rifles for the United States commercial marketplace between 1990 and 2018. Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 8; Exh. 004-3. Currently, there are an estimated 19.8 million modern semiautomatic rifles overall produced in the U.S. or imported, between 1990-2018. Curcuruto Decl., Plaintiffs' Exhibit 004, ¶ 15-; Ex. 004-8. The most common calibers for modern semiautomatic rifles are .223 (or 5.56 x 45mm), 7.62 x 39mm, .22 caliber and .308 caliber. Curcuruto testimony, Tx of 10/19/20 hearing at 65:7-10. The most common caliber for the AR-15 rifle is the 5.56x45 NATO (or .223) cartridge, which is a centerfire cartridge. Curcuruto testimony, Tx of 10/19/20 Hearing at 65:25 – 66:5. The .223 cartridge is essentially the same as the 5.56 x 45mm round, with minor differences in the brass, but having the identical bullet. Depo. of Dr. Robert Margulies, at 52:15 – 53:15. Rimfire firearms would make up a small portion of the overall numbers of modern semiautomatic rifles, approximately 15 percent. Curcuruto testimony, Tx of 10/19/20 Hearing at 66:9-13. The "vast majority" of modern semiautomatic rifles are centerfire rather than rimfire. Curcuruto Depo., p. 129:14-21.

Additionally, there are at minimum, 73 manufacturers that sell shotguns and pistols that would be identified as "assault weapons" under Pen. Code § 30515(a). These manufacturers offer at least 410 different models of semiautomatic shotguns and pistols that would be identified as "assault weapons" under Pen. Code § 30515(a). Ostini Decl., Plaintiffs' Exh. 005, ¶¶ 4-13, exs. 005-1 through 005-17. The number of manufacturers and models of rifles that would be classified as "assault weapons" under Pen. Code § 30515(a) is even larger.

Importantly, firearms defined as "assault weapons" under Pen. Code 30515(a) are treated like any other firearm in a vast majority of jurisdictions in the United States. "Only five other states have bans that arguable approach California's in their severity." Mocsary Decl., Plaintiffs' Exh. 003, ₱₱ 26-48, exs. 003-4 through 003-11. California was the first state to implement such a ban for the first time in this Nation's history in 1989. States with similar prohibitions have all been enacted relatively recently. *Id.*, at ₱ 45. Notably, even California's did not prohibit semiautomatic centerfire firearms according to their features until approximately 2000. *Id.*

Citizens may possess *any semiautomatic rifle* (regardless of its characteristics/features) in 44 states. *Id.*, at ₱44. In 44 states, all semiautomatic firearms are treated exactly the same as any other legal firearm — e.g., their characteristics/features are immaterial. *Id.*

Defendants' own evidence acknowledges that firearms identified as "assault weapons" under Penal Code section 30515(a) are common and prolific throughout the United States. See Defendants' Exh. BH (depicting hundreds of models of firearms defined as "assault weapons"); see also Glover Decl., Def. Exh. CZ, ¶ 6 (detailing the number of registered assault weapons in California).

Is it beyond dispute that firearms (rifles, pistols, and shotguns) which are classified as "assault weapons" under Pen. Code § 30515(a) are in common use. Any claim otherwise lacks common sense as a visit to any gun shop, gun range, or gun show, will prove how common these so-called "assault weapons" are.

Finally, Defendants have not provided evidence that "assault weapons" are not in common use throughout the United States. Nevertheless, even if this Court were to take the lowest estimated numbers of assault weapons in use throughout the United States, they would still be considered "common" by any application of the term.

### Defendants' Proposed Finding of Fact No. 84.

While assault weapons might be used in self-defense, they are more useful for offensive purposes or combat. Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 28 (DEF0604) (noting that assault pistols are "for the most part simply semiautomatic versions of submachine guns"); Defs.' Ex. O (ATF Shotgun Importability Study) at iv

(DEF0629) (discussing shotgun features that "are most appropriate for military or law enforcement use," including adjustable stocks and forward pistol grips); *Kolbe*, 849 F.3d at 136 (holding that "the banned assault weapons" are most useful in military service); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908 (N.D. Ill. 2014) (noting that submachine guns are "the analog for a civilian assault pistol" and "facilitate the assault and capture of a military objective" (citation omitted)).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Nothing in Defendants' exhibits supports Defendants' conclusion. Defendants' exhibits which describe such firearms as being useful for "offensive purposes or combat" is hyperbolic opinion without foundation. Plaintiffs have otherwise established that firearms bearing the characteristics set forth in Pen. Code § 30515(a) are in common use, and for lawful purposes, including self-defense. See Kapelsohn Decl., Plaintiffs' Exh. 001, ¶¶ 18-38; Curcuruto Decl., Plaintiffs' Exh. 004, ¶¶ 7-13, Exs. 004-4, 004-5, 004-6; Ostini Decl., Plaintiffs' Exh. 005, ¶¶ 4-13, Exs. 005-1 through 005-13; Defense Exh. BI.

### Defendants' Proposed Finding of Fact No. 85.

Beginning in the 1980s, the gun industry began to market heavily military-style rifles to the civilian gun market, emphasizing the military pedigree and combat applications of the weapons. Defs.' Ex. N (Violence Policy Ctr., *The Militarization of the U.S. Civilian Firearms Market* (2011)) at 1 (DEF0577) (using the term "assault rifles" to describe these military-style weapons); Defs.' Ex. R (July 1981 Guns & Ammo Magazine) at 48, 54 (DEF0662, 664, 670) (variously describing a "new breed of assault rifles" as "[s]pawned in the crucible of war," "military-type," "military-style," and "military autoloaders").

**Plaintiffs' Response:** Defendants' evidence adopted the legislative terms of the time. Defs.' Ex. R (July 1981 Guns & Ammo Magazine) at 48, 54. When actually reading Defendants' evidence, it shows the many practical and lawful uses of so-called "assault weapons"— supporting Plaintiffs' contentions. *Id*., See also Defendants' Exh. BA, p. 2-13; Defendants' Exh. BI, p. 2-14.

### Defendants' Proposed Finding of Fact No. 86.

Manufacturers of assault weapons specifically advertise them to civilians as military-grade firearms.  Defs.' Ex. C (Donohue Decl.) ¶¶ 72-82 (DEF0132-36); Defs.' Ex. P (Colt.com, AR15A4 Advertisement) at 1 (DEF0659); Defs.' Ex. Q

(Colt.com, About Colt Rifles) at 1 (DEF0660); *Kolbe*, 849 F.3d at 125 ("Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess.").

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defendants' Ex. Q describes the "Colt M16 automatic rifle" as a "military-grade rifle." "[T]oday's Colt commercial and sporting rifles" are commercial semiautomatic versions of the Stoner AR-15 design. Defs.' Ex. Q (Colt.com, About Colt Rifles) at 1 (DEF0660). The "military standards and specifications" describe in the Colt Ad describe the tolerances and accuracy of the design specifications (*e.g.*, measurements) of the firearm, not their use in the military. Defs.' Ex. Q (Colt.com, About Colt Rifles) at 1 (DEF0660)

Plaintiffs also dispute Defendants' Ex. P as it merely identifies the fact that Colt manufactures and sells firearms to military and law enforcement. Further, "reliability, performance, and accuracy" are not solely military traits, but necessary and desired traits of all firearms. Defs.' Ex. P (Colt.com, AR15A4 Advertisement) at 1 (DEF0659);

Plaintiffs dispute that Defendants' Ex. C (Donohue Decl.) paragraphs 72 through 82 provide any evidence that "[m]anufacturers of assault weapons specifically advertise them to civilians as military-grade firearms."

## Defendants' Proposed Finding of Fact No. 87.

Assault weapons are "most useful in military service" due to their ability to accept ammunition from fixed or detachable LCMs and their combat-oriented features. *See Kolbe*, 849 F.3d at 137 ("Whatever their other potential uses— including self-defense—the AR-15, other assault weapons, and large-capacity magazines . . . are unquestionably most useful in military service."); *see also Gallinger*, 898 F.3d at 1018 (referencing "mass shootings perpetrated by individuals with *military-style rifles*" (emphasis added)).

**Plaintiffs' Response:** Plaintiffs' dispute this purported fact. This misapplies the standard set by *Heller* which protects arms in common use *for any lawful purpose*. Further, no evidence has been presented that "assault weapons" with fixed magazine LCMs are used in the military whatsoever.

## Defendants' Proposed Finding of Fact No. 88.

Assault weapons have a military pedigree and are nearly identical to the M-16. Defs.' Ex. C (Donohue Decl.) ¶¶ 83-89 (DEF0137-39); Youngman Dep. at 54:4-6; *Staples v. United States*, 511 U.S. 600, 612 (1994) at 603 ("The AR-15 is the civilian version of the military's M-16 rifle . . . ."); *Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (citing *Heller*, 554 U.S. at 627)); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 (C.D. Cal. 2019) ("[T]he Court concludes that semiautomatic rifles within the AWCA's scope are virtually indistinguishable from M-16s . . . .").

**Plaintiffs' Response:** Plaintiffs dispute that all assault weapons are nearly identical to the M-16. Plaintiffs do not dispute that the semiautomatic AR-15 is a civilian firearm. Plaintiffs do not dispute that all firearms are derived from military use. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶¶ 7-9. Plaintiffs also do not dispute that a primary difference between AR-15 rifles and M16 rifles, a U.S. Government designation that meets certain government specifications, is that the M16 must be capable of select (fully automatic) fire. See Youngman testimony, Tx of 10/19/20 Hearing at 82:7-14; 84:10-20.

## Defendants' Proposed Finding of Fact No. 89.

The AR-15 rifle is the civilian version of the military M-16.  Defs.' Ex. D (Graham Decl.) ¶ 44 (DEF0209); Defs.' Ex. H (ATF Rifle Importability Report) at 6 (DEF0416) (noting that the "military features and characteristics (other than select fire)" of "modern military assault rifles" are "carried over to semiautomatic versions of the original military rifle"); Youngman Dep. at 54:4-6; Kapelsohn Dep. at 82:24-83:13.

**Plaintiffs' Response:** Plaintiffs do not dispute that the AR-15 rifle is a civilian firearm. Plaintiffs do not dispute that a primary difference between AR-15 rifles and M16 rifles, a U.S. Government designation that meets certain government specifications, is that the M16 must be capable of select (fully automatic) fire. See Youngman testimony, Tx of 10/19/20 Hearing at 82:7-14; 84:10-20. Plaintiffs dispute that the characteristics identified in Penal Code section 30515(a) are military features and characteristics. Hlebinsky Decl., Plaintiffs' Exh. 002, ¶¶10-28, exs. 002-5 through 002-34.

| Defendants' Proposed Finding of Fact No. 90. |
|---|

The primary difference between the M-16 and an assault weapon is that the M-16 is a select-fire weapon that allows the shooter to fire in either automatic or semiautomatic mode, while an assault weapon fires only in semiautomatic mode. Semiautomatic weapons, however, can "fire almost as rapidly as automatics." *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1263 (D.C. Cir. 2011); Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF04480); Defs.' Ex. K (Brady Ctr. to Prevent Gun Violence, *Assault Weapons "Mass Produced Mayhem"* (2008)) at 1 (DEF0484) (a 30-round magazine empties in less than two seconds on automatic, while the same magazine empties in just five seconds on semiautomatic); Defs.' Ex. I (Violence Policy Center, *Key Points About Assault Weapons*) at 1 (DEF0430).

**Plaintiffs' Response:** Plaintiffs do not dispute that a primary difference between AR-15 rifles and M16 rifles, a U.S. Government designation that meets certain government specifications, is that the M16 must be capable of select (fully automatic) fire. See Youngman testimony, Tx of 10/19/20 Hearing at 82:7-14; 84:10-20. Plaintiffs object to and dispute the conclusions set forth in Def. Exhibits K and I. Further, Defendants' evidence fails to distinguish between all semiautomatic weapons and "assault weapons" in their rate of fire. The AWCA specifically allows "featureless" semiautomatic rifles to use LCMs. Thus, the AWCA's inconsistencies undermine the State's purported interests.

| Defendants' Proposed Finding of Fact No. 91. |
|---|

A semiautomatic weapon has an effective rate-of-fire between 300 to 500 rounds per minute. Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF04480) ("[S]emiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns."); Kapelsohn Dep. at 81:21-82:4; Oct. 19, 2020 Hearing Tr. at 23 (Kapelsohn testimony).

**Plaintiffs' Response:** Self-serving fantastical testimony adduced at Congressional hearings is not evidence before this Court and is entitled to little if any weight. Moreover, the rate of fire is merely theoretical. Kapelson testimony, Tx of 10/19/20 Hearing at 21:19 - 23:1.

**Defendants' Proposed Finding of Fact No. 92.**

Soldiers issued M-16 rifles are instructed to generally use "rapid semiautomatic fire," because fully automatic fire is "inherently less accurate."  Defs.' Ex. L (Excerpt of United States Army, *Rifle Marksmanship M16/M4 - Series Weapons* (2008)) at 7-12 (DEF0545); *accord* Youngman Dep. at 51:6-13 (agreeing that fully automatic weapons are less accurate generally than semiautomatic weapons when fired rapidly).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact, which is immaterial in any event. That fully automatic firearms are generally more *difficult to control* than semiautomatic firearms is a feature that distinguishes them from semiautomatic firearms, not their inherent inaccuracy. Defendants do not dispute that accuracy is important in self-defense shootings. (Graham testimony, Tx of 10/19/20 Hearing at 134:15-18: "if you're firing a weapon for self-defense, accuracy would be ideal.") Defendants' conclusion that certain firearms can be banned because they can be fired accurately is an absurd proposition that would essentially justify the prohibition of *all* semiautomatic firearms, which defendants concede would be unconstitutional.

**Defendants' Proposed Finding of Fact No. 93.**

Assault rifles, such as the AR-15, are easily converted to fire automatically. *Staples*, 511 U.S. at 603 (noting that "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon"); Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF0448) ("[I]t is a relatively simple task to convert a semiautomatic weapon to automatic fire . . . ."); Defs.' Ex. M (Mersereau Decl.) ¶ 20 (DEF0568).

**Plaintiffs' Response:** This fact is disputed. Nowhere in *Staples* did the Court even come close to holding that an AR-15 firearm is easily converted to fully-automatic, nor has any court ever found so. Self-serving fantastical testimony adduced at Congressional hearings is not evidence before this Court and is entitled to little if any weight. The fact is, "Conversion of these weapons to full-automatic fire capability is difficult and rarely encountered in spite of stories appearing in the press." (Def. Exhibit DA, at p. 170). Plaintiffs' witness General Youngman, who is the executive officer of a small arms advisory group and who has been around AR-15 and M16 rifles his entire adult life, stated, when asked the question, "is it fairly difficult process to convert the AR-15 to fully-automatic fire by changing those parts, testified: "I don't know. I've never seen it done. I

don't know of anybody who has done it." Youngman Depo. at 58:23 – 59:1. See also Defense Exhibit BI, addressing certain myths surrounding the AR-15, in stating, "You can be pretty sure that when you're talking to someone, when they say 'the AR-15 is easy to convert' that they've never done it. And probably have no idea how to do it, nor even seen one that had been so converted." If rifles are so easily converted to fully automatic fire, notably absent in the record is any evidence that even *one* mass shooting involved a converted firearm.

---

### Defendants' Proposed Finding of Fact No. 94.

According to stories of defensive gun uses aggregated by the National Rifle Association, individuals fired an average of 2.1 rounds when firearms were used in self-defense in the home. Defs.' Ex. A (Allen Decl.) ¶ 15 (DEF0006-07).

**Plaintiffs' Response:** Plaintiffs dispute the materiality of this purported fact. Ms. Allen's conclusion is scientifically unsound. Ms. Allen's conclusion was derived from looking at a collection of stories selected for publication in an NRA publication called "The Armed Citizen," but Ms. Allen could claim no editorial insight into the how the stories were selected. Allen Depo. at 106:7 – 114:7. Ms. Allen did not seem to realize that the Armed Citizen feature was published in the NRA magazines for many years, admitting that "she did not focus on the magazines at all." Id. at 107:16-18. Ms. Allen admits that the Armed Citizen "database" (as she calls it) was not compiled scientifically, nor was it comprehensive. Id. at 105:8-18; *see also*, *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1129 (S.D. Cal. 2017), aff'd 742 F.Appx. 218 (9th Cir. 2018); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) (Allen conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense.) Ms. Allen's method was further flawed in that if the story did not indicate the number of rounds that were fired, she would use an "imputed number" that would use an average. Id. at 129:8 – 131:22. Although she claimed she might be able to figure out an imputed number from an actual story, she seemed unwilling or unable to do so when confronted with an actual story. Id. at 131:13 – 137:5. Ms. Allen's average number of shots fired included all instances where a firearm was used, even when no shots were fired. Id. at 116:4 – 118:17. When no shots were fired, that counted as zero, id. at 118:18 – 119:15, which would affect the average. However, Ms. Allen never did an analysis of the

purported number of shots that were fired when shots were fired. Id. at 119:16 – 120:19.

## Defendants' Proposed Finding of Fact No. 95.

According to stories of defensive gun uses aggregated by the National Rifle Association, individuals fired no rounds in 16.1% of incidents in the home. Defs.' Ex. A (Allen Decl.) ¶ 15 (DEF0007).

**Plaintiffs' Response:** Plaintiffs dispute the materiality of this purported fact. Ms. Allen's conclusion is scientifically unsound. Ms. Allen's conclusion was derived from looking at a collection of stories selected for publication in an NRA publication called "The Armed Citizen," but Ms. Allen could claim no editorial insight into the how the stories were selected. Allen Depo. at 106:7 – 114:7. Ms. Allen did not seem to realize that the Armed Citizen feature was published in the NRA magazines for many years, admitting that "she did not focus on the magazines at all." Id. at 107:16-18. Ms. Allen admits that the Armed Citizen "database" (as she calls it) was not compiled scientifically, nor was it comprehensive. Id. at 105:8-18; *see also*, *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1129 (S.D. Cal. 2017), aff'd 742 F.Appx. 218 (9th Cir. 2018); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) (Allen conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense.)

## Defendants' Proposed Finding of Fact No. 96.

According to a systematic review of 4,841 news stories nationwide involving a defensive gun use in the home, individuals fired an average of 2.34 rounds when firearms were used in self-defense in the home.  Defs.' Ex. A (Allen Decl.) ¶ 23 (DEF0012-13).

**Plaintiffs' Response:** Plaintiffs dispute the materiality of this purported fact. Ms. Allen's conclusion was limited to news stories of defensive gun uses in the home, and the search terms were so limited. Allen Depo. at 75:10 – 77:25. The purpose of limiting those instances of defensive gun use in the home was to try to replicate the stories that were being advanced by the NRA "which has been a party to some of these lawsuits or helped fund some of these lawsuits," even

though the NRA has no involvement in this lawsuit. For some reason, Ms. Allen was trying to replicate the types of stories being advanced by a non-party to this lawsuit, or "to replicate the stories that plaintiffs claim are defensive gun use," id. at 78:6, even though plaintiffs in the present case never claimed to limit lawful purposes to defensive gun use in the home. See *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) (Allen conceded that her analysis of Factiva data could have excluded defensive gun use incidents among residents of the same home and that her search criteria omitted some important terms.) Moreover, as with her analysis of the NRA Armed Citizen stories, Ms. Allen's method was further flawed in that if the story did not indicate the number of rounds that were fired, she would use an "imputed number" that would use an average. Id. at 129:8 – 131:22. Although she claimed she might be able to figure out an imputed number from an actual story, she seemed unwilling or unable to do so when confronted with an actual story. Id. at 131:13 – 137:5. Ms. Allen's average number of shots fired included all instances where a firearm was used, even when no shots were fired. Id. at 116:4 – 118:17. When no shots were fired, that counted as zero, id. at 118:18 – 119:15, which would affect the average. However, Ms. Allen never did an analysis of the purported number of shots that were fired when shots were fired. Id. at 119:16 – 120:19. Overall, the purpose of Ms. Allen's analysis as offered here is unclear, since this case challenges the law defining certain firearms as assault weapons when they have *fixed magazines* with the capacity to accept more than 10 rounds. Pen. Code § 30515(a)(2), (5), unless the defense is claiming that once a homeowner uses ten rounds of ammunition in self-defense they should not be able to reload the firearm at all.

### Defendants' Proposed Finding of Fact No. 97.

According to a systematic review of 4,841 news stories nationwide involving a defensive gun use in the home, individuals fired no rounds in 11.6% when firearms were used in self-defense in the home.  Defs.' Ex. A (Allen Decl.) ¶ 23 (DEF0012-13).

**Plaintiffs' Response:** Plaintiffs dispute the materiality of this purported fact. Ms. Allen's conclusion was limited to news stories of defensive gun uses in the home, and the search terms were so limited. Allen Depo. at 75:10 – 77:25. The purpose of limiting those instances of defensive gun use in the home was to try to replicate the stories that were being advanced by the NRA "which has been a

party to some of these lawsuits or helped fund some of these lawsuits," even though the NRA has no involvement in this lawsuit. For some reason, Ms. Allen was trying to replicate the types of stories being advanced by a non-party to this lawsuit, or "to replicate the stories that plaintiffs claim are defensive gun use," id. at 78:6, even though plaintiffs in the present case never claimed to limit lawful purposes to defensive gun use in the home. See *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) (Allen conceded that her analysis of Factiva data could have excluded defensive gun use incidents among residents of the same home and that her search criteria omitted some important terms.) Moreover, as with her analysis of the NRA Armed Citizen stories, Ms. Allen's method was further flawed in that if the story did not indicate the number of rounds that were fired, she would use an "imputed number" that would use an average. Id. at 129:8 – 131:22. Although she claimed she might be able to figure out an imputed number from an actual story, she seemed unwilling or unable to do so when confronted with an actual story. Id. at 131:13 – 137:5. Ms. Allen's average number of shots fired included all instances where a firearm was used, even when no shots were fired. Id. at 116:4 – 118:17. When no shots were fired, that counted as zero, id. at 118:18 – 119:15, which would affect the average. However, Ms. Allen never did an analysis of the purported number of shots that were fired when shots were fired. Id. at 119:16 – 120:19. Overall, the purpose of Ms. Allen's analysis as offered here is unclear, since this case challenges the law defining certain firearms as assault weapons when they have *fixed magazines* with the capacity to accept more than 10 rounds. Pen. Code § 30515(a)(2), (5), unless the defense is claiming that once a homeowner uses ten rounds of ammunition in self-defense they should not be able to reload the firearm at all.

## Defendants' Proposed Finding of Fact No. 98.

Congress found, in enacting the federal assault weapons ban, that "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder," that "[t]he carnage inflicted on the American people [by] criminals and mentally deranged people armed with . . . semi-automatic assault weapons has been overwhelming and continuing," and that the use of those weapons by "criminal gangs, drug-traffickers, and mentally deranged persons continues to grow." Defs.' Ex. J (H.R. Rep. No. 103-489) at 12-13 (DEF0442-43).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Congress allowed the Federal Assault Weapons Ban to sunset. While Congress may have made certain findings before enacting the Federal Assault Weapons Ban, those findings are immaterial, irrelevant, and inapplicable, as Congress chose to allow the federal ban to sunset despite its original findings.

Moreover, the federal assault weapons ban was enacted before the decision in *Heller*. In *Heller*, it was accurately observed that handguns are involved in the vast majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29. Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969).

Likewise, even if this Court were to accept Congressional findings supporting a law that is no longer in effect, the findings are entirely immaterial and insufficient to justify the State's ban on "assault weapons."

### Defendants' Proposed Finding of Fact No. 99.

Congress found, in enacting the federal assault weapons ban, assault weapons are used disproportionately in crime. Defs.' Ex. J (H.R. Rep. No. 103-489) at 18 (DEF0448); Defs.' Ex. E (Klarevas Decl.) ¶ 16 (DEF0331); Defs.' Ex. C (Donohue Decl.) ¶ 115 (DEF0147-48).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Congress allowed the Federal Assault Weapons Ban to sunset. While Congress may have made certain findings before enacting the Federal Assault Weapons Ban, those findings are immaterial, irrelevant, and inapplicable, as Congress chose to allow the federal ban to sunset despite its original findings.

Moreover, the federal assault weapons ban was enacted before the decision in *Heller*. In *Heller*, it was accurately observed that handguns are involved in the vast majority of all firearm-related deaths and the government argued that such

fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29. Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969).

Likewise, even if this Court were to accept Congressional findings supporting a law that is no longer in effect, the findings are entirely immaterial and insufficient to justify the State's ban on "assault weapons."

### Defendants' Proposed Finding of Fact No. 100.

Generally, assault weapons and semiautomatic weapons with LCMs account for 22 to 36 percent of crime guns, and "appear to be used in a higher share of firearm mass murders (up to 57% in total)," far greater than their prevalence in the market. *See* Defs.' Ex. Y (Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health 313 (2017) ("Koper 2017")) at 1 (DEF0748); Defs.' Ex. E (Klarevas Decl.) ¶ 16 (DEF0331).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact and Defendants' conclusions. First, in *Heller*, it was accurately observed that handguns are involved in the vast majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29. Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969). Likewise, even if this Court were to accept Defendants' purported facts, they are

entirely immaterial and insufficient to justify the State's ban on "assault weapons."

Second, Defendants' evidence cannot distinguish between "assault weapons" and "semiautomatic weapons with LCMs" in determining their use in crime or mass murder. Def. Exhibit BK, p. 2 ("mass shootings and other crimes committed with high-capacity semiautomatics (including assault weapons and other models) [...]" Def. Exh. BL, p. 1 ("[t]his article examines the use, impacts, and regulation of assault weapons and other high-capacity semiautomatic firearms as they pertain to the problem of mass shootings in the United States.").

Defendants' Exhibit Y suffers from the same lack of distinction between so-called "assault weapons" and semiautomatic firearms. See Defendants' Exhibit Y, pg. 1-9 ("This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA….").

Without providing evidence that distinguishes between "assault weapons" and "semiautomatic weapons with LCMs," Defendants percentages of firearms used in crime is immaterial and empirically meaningless.

The California AWCA permits pistols and featureless semiautomatic rifles with LCMS. Thus, the AWCA's ban on "assault weapons" does not advance the state's interest in any material way.

### Defendants' Proposed Finding of Fact No. 101.

Assault weapons and semiautomatic weapons with LCMs are used disproportionally against law enforcement personnel. Defs.' Ex. Y (Koper 2017) at 1, 7 (DEF0748, 754) (finding that 13 to 16 percent of guns used in the murder of police are assault weapons); *see also* Defs.' Ex. AA (Violence Policy Ctr., *"Officer Down": Assault Weapons and the War on Law Enforcement* (2003)) at 5 (DEF0816); Defs.' Ex. C (Donohue Decl.) ¶ 117 (DEF0149).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact and Defendants' conclusions. First, in *Heller*, it was accurately observed that handguns are involved in the vast majority of all firearm-related deaths and the government argued that such fact established the government's interest in banning handguns to prevent or mitigate firearm-related homicides. *Heller*, 554 U.S. at 695-696 (Breyer, J., dissenting). The Court rejected that argument, finding that a ban on possessing commonly owned firearms lacked any fit to further the government's

interest under any level of scrutiny. *Heller*, 554 U.S. at 628-29. Constitutionally protected activities cannot be banned because the activity could lead to criminal abuses. See *Southeast Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); accord *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969). Likewise, even if this Court were to accept Defendants' purported facts, they are entirely immaterial and insufficient to justify the State's ban on "assault weapons."

Second, Defendants' evidence cannot distinguish between "assault weapons" and "semiautomatic weapons with LCMs" in determining their use in crime or mass murder.

Defendants' evidence cannot distinguish between "assault weapons" and other semiautomatic firearms used in mass shootings. Def. Exhibit BK, p. 2 ("mass shootings and other crimes committed with high-capacity semiautomatics (including assault weapons and other models) […]" Def. Exh. BL, p. 1 ("[t]his article examines the use, impacts, and regulation of assault weapons and other high-capacity semiautomatic firearms as they pertain to the problem of mass shootings in the United States.").

Defendants' Exhibit Y suffers from the same lack of distinction between so-called "assault weapons" and semiautomatic firearms. See Defendants' Exhibit Y, pg. 1-9 ("This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA….").

Without providing evidence that distinguishes between "assault weapons" and "semiautomatic weapons with LCMs," Defendants percentages of firearms used in crime is immaterial and empirically meaningless.

The California AWCA permits pistols and featureless semiautomatic rifles with LCMS. Thus, the AWCA's ban on "assault weapons" does not advance the state's interest in any material way.

## Defendants' Proposed Finding of Fact No. 102.

Victims of assault weapons generally suffer more extensive and more numerous gunshot wounds, resulting in higher morbidity and mortality than victims of shootings from other weapons. *See* Defs.' Ex. B (Colwell Decl.) ¶¶ 9, 12

(DEF0054-55); Defs.' Ex. AB (Panagiotis K. Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, J. of Acute Disease, 178 (2014)) at 181-82 (DEF0842-43) (discussing cavitation of small-caliber bullets from M-16 and AK-47 rifles).

**Plaintiffs' Response:** This fact is disputed. As one of the experts in the field of wound ballistics, Dr. Vincent J.M. DiMaio stated in his influential book Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques, stated: "One of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." Margulies Decl., Plaintiffs' Exh. 012, ¶ 11; Exh. 012-2. Defendants have conceded that wounds cannot be distinguished simply by the type of weapon that fired them. Colwell testimony, Tx of 10/22/20 Hearing at 29:20 – 30:14. A wound from a .223/5.56 round fired from a California-defined "assault weapon" bearing the features or characteristics found in section 30515(a) would not present a greater profile from a non-assault weapon, using the same round, and using the same barrel length. Margulies Decl., Plaintiffs' Exh. 014, ¶ 14. Defendants also concede that shotgun wounds at close range are, generally speaking, more devastating than rifle rounds. Id. at 31:20 – 33:16. The severity of the wound is determined, to a great degree, by the amount of kinetic energy. The intermediate cartridges commonly used in "assault weapons" (such as the .223/5.56 caliber, or the 7.62 x 39mm cartridges) contain far less kinetic energy than traditional hunting cartridges such as the .308 Winchester. Margulies Decl., ¶¶ 10-11; Exh. 011-2.

**Defendants' Proposed Finding of Fact No. 103.**

Assault weapons enable a shooter to fire more rounds rapidly in a given period with greater accuracy, increasing the likelihood that more individuals will be shot and suffer multiple injuries, making it "far more likely" that the individual will suffer complications and die of those injuries.  Defs.' Ex. B (Colwell Decl.) ¶ 8 (DEF0053-54).

**Plaintiffs' Response:** The fact that firearms are more accurate is not disputed. Defendants' conclusion that more accuracy makes it "far more likely" that the individual will suffer complications and die of those injuries is. Dr. Colwell's opinion is without basis.

Defendants have not provided any evidence that any criminal or mass shooter has been enabled to "fire more rounds rapidly in a given period with greater accuracy" due to the specific § 30515(a) characteristics attached to the firearm used to commit a mass shooting or criminal act.

## Defendants' Proposed Finding of Fact No. 104.

Assault weapons were used in seven of the 10 deadliest mass shootings in the United States since 1980.  *See* Defs.' Ex. E (Klarevas Decl.) ¶ 10 tbl. 1 (DEF0326).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact and Defendants' conclusions. Defendants' evidence does not account for many other factors that have a determining effect on the number of fatalities in these 10 shootings.

Specifically, in the Las Vegas shooting, multiple firearms and magazines were used in the shooting. The shooter also planned the attack for an extended period of time. Evidence shows that the shooter also desired fame/infamy due to killing a large number of people. Defendants' Exhibit AG, p.2; Defendants' Exh. AC. In the Blacksburg, VA shootings (Virginia Tech Shooting) two pistols and 19 magazines were used — one being a rimfire pistol — which resulted in the third highest fatality count. The San Bernardino shooting involved multiple shooters and multiple firearms and magazines. These firearms were illegally modified California "compliant" rifles. Both the Bingham, NY shooting and the Fort Hood, TX shootings involved multiple pistols. In fact, the Sutherland Springs shooting was stopped by a civilian armed with an AR-15. Plaintiffs' Exh. 027. All of these facts are ignored by Defendants. Thus, at least 5 of the 10 deadliest shooting in the United States since 1980 involved handguns. At least 6 involved multiple firearms being used.

Defendants' own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC, p. 2. Defendants' evidence showing a correlation between "assault weapons" and higher fatalities rates in mass shootings does not account for other significant factors that are correlated with higher fatalities rates.

The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants entirely ignore. However, Defendants' evidence shows that

"previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings.

Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal

Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP)" Defendants' Exhibit AG, p.2.

Defendants have also provided no evidence or explanation why fatalities have increased in the past ten years even though "assault weapons" have been widely available for decades.

## Defendants' Proposed Finding of Fact No. 105.

Assault weapons are often used in public mass shootings—shooting incidents in a public place resulting in four or more fatalities excluding the shooter.  Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017).

**Plaintiffs' Response:** Plaintiffs do not dispute that Ms. Allen found that assault weapons are not used in a majority of public mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30. Thus, it is fair to conclude that most mass shootings that the defense analyzed did not involve the use of assault weapons. Indeed, it would appear that the most prevalent firearm that is found at the scene of a mass shooting is a handgun. Allen Decl., Def. Exh. A, Appendix C; see also Def. Exh. CW (pictorial look at the weapons used in 19 mass shootings); Def. Exh. CG (Mother Jones 2012 article, at p. 23: "In the 62 mass shootings we analyzed, 54 of the killers had handguns – including in all 15 of the mass shootings since the surge of pro-gun laws began in 2009); Def. Exh. BM, p. 1: "Contrary to popular belief, however, assault rifles were not the predominant type of weapon used in these types of crimes. In fact, according to a recent study, handguns were the most commonly used type of firearm in mass shootings." Ms. Allen testified she did not specifically look at or analyze whether the existence of any specific firearm features would have made a difference in a mass shooting incident. Allen Depo., at 227:8 – 228:9. And the defense has offered no evidence that the existence of any of the § 30515(a) features would have made a difference in the outcome of any of the 161 public mass shootings identified by Ms. Allen.

## Defendants' Proposed Finding of Fact No. 106.

In 161 public mass shootings from 1982-2019, assault weapons were used in 22% of such shootings in which it could be determined whether an assault weapon was used.  Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017).

**Plaintiffs' Response:** Plaintiffs do not dispute that Ms. Allen found that assault weapons are not used in a majority of public mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30. Thus, it is fair to conclude that most mass shootings that the defense analyzed did not involve the use of assault weapons. Indeed, it would appear that the most prevalent firearm that is found at the scene of a mass shooting is a handgun. Allen Decl., Def. Exh. A, Appendix C; see also Def. Exh. CW (pictorial look at the weapons used in 19 mass shootings); Def. Exh. CG (Mother Jones 2012 article, at p. 23: "In the 62 mass shootings we analyzed, 54 of the killers had handguns – including in all 15 of the mass shootings since the surge of pro-gun laws began in 2009); Def. Exh. BM, p. 1: "Contrary to popular belief, however, assault rifles were not the predominant type of weapon used in these types of crimes. In fact, according to a recent study, handguns were the most commonly used type of firearm in mass shootings." Ms. Allen testified she did not specifically look at or analyze whether the existence of any specific firearm features would have made a difference in a mass shooting incident. Allen Depo., at 227:8 – 228:9. And the defense has offered no evidence that the existence of any of the § 30515(a) features would have made a difference in the outcome of any of the 161 public mass shootings identified by Ms. Allen.

## Defendants' Proposed Finding of Fact No. 107.

In 161 public mass shootings from 1982-2019, assault weapons were used in 20% of such shootings, even if it is assumed that the public mass shootings where it could not be determined whether an assault weapon was used all did not involve an assault weapon.  Defs.' Ex. A (Allen Decl.) ¶ 30 (DEF0017).

**Plaintiffs' Response:** Plaintiffs do not dispute that Ms. Allen found that assault weapons are not used in a majority of public mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30. Thus, it is fair to conclude that most mass shootings that the defense analyzed did not involve the use of assault weapons. Indeed, it would appear that the most prevalent firearm that is found at the scene of a mass shooting is a handgun. Allen Decl., Def. Exh. A, Appendix C; see also Def. Exh. CW (pictorial look at the weapons used in 19 mass shootings); Def. Exh. CG

(Mother Jones 2012 article, at p. 23: "In the 62 mass shootings we analyzed, 54 of the killers had handguns – including in all 15 of the mass shootings since the surge of pro-gun laws began in 2009); Def. Exh. BM, p. 1: "Contrary to popular belief, however, assault rifles were not the predominant type of weapon used in these types of crimes. In fact, according to a recent study, handguns were the most commonly used type of firearm in mass shootings." Ms. Allen testified she did not specifically look at or analyze whether the existence of any specific firearm features would have made a difference in a mass shooting incident. Allen Depo., at 227:8 – 228:9. And the defense has offered no evidence that the existence of any of the § 30515(a) features would have made a difference in the outcome of any of the 161 public mass shootings identified by Ms. Allen.

### Defendants' Proposed Finding of Fact No. 108.

Assault weapons are often used in gun massacres in the United States—mass shootings involving six or more fatalities excluding the shooter and regardless of the motive or location of the shooting—and the proportion gun massacres involving assault weapons has been increasing.  Defs.' Ex. E (Klarevas Decl.) ¶ 13 & fig. 5.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defs. Ex. E, ¶ 13 & fig. 5 is intentionally misleading. The purpose of figure 5 in Defendants' Ex. E is to "make it appear that there is a consistent upward trend in the rate that assault weapons are used in mass public shootings, but when you do it by year periods of time it becomes clear that the pattern Klarevas shows is just an artifact of the unusual way that he presents the data. The declining percentage as the time period gets longer is simple due to the fact that assault weapons were used extensively during the very end of the period, but no theory is presented for why assault weapons would suddenly become very popular twelve or more years after the end of the assault weapons ban." Plaintiffs' Exh. 032, ¶¶ 44-46

While 67% of mass shootings involved assault weapons from 2016 to 2019, 0% of cases involved mass shootings from 2008-2011. These are fluctuations that Defendants' evidence has not explained. Plaintiffs' Exh. 032, ¶¶ 44-46.

From 1984 to 1987 mass shootings involving assault weapons accounted for 25% of all cases.

From 1988 to 1991, they accounted for 25%.

From 1992 to 1995, they accounted for 50%

From 1996 to 1999, they accounted for 25%.

From 2000 to 2003, they accounted for 50%

From 2004 to 2007, they accounted for 29%

From 2008 to 2011, they accounted for 0%.

From 2012 to 2015, they accounted for 30%.

From 2016 to 2019, they accounted for 67%.

See Plaintiffs' Exh. 032, ¶ 46, "Percentage of Cases Involved Assault Weapons" table, p. 26.

If Defendants' theory that the Federal Assault Weapons Ban was effective is correct, then the share of mass public shootings committed with assault weapons should have declined during the period of the assault weapon ban. There was no statistically significant decline. Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

### Defendants' Proposed Finding of Fact No. 109.

During the 1980s, assault weapons were used in approximately 19% of all gun massacres in the United States.  Defs.' Ex. E (Klarevas Decl.) ¶ 13.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defs. Ex. E, ¶ 13 & fig. 5 is intentionally misleading. The purpose of figure 5 in Defendants' Ex. E is to "make it appear that there is a consistent upward trend in the rate that assault weapons are used in mass public shootings, but when you do it by year periods of time it becomes clear that the pattern Klarevas shows is just an artifact of the unusual way that he presents the data. The declining percentage as the time period gets longer is simple due to the fact that assault weapons were used extensively during the very end of the period, but no theory is presented for why assault weapons would suddenly become very popular twelve or more years after the end of the assault weapons ban." Plaintiffs' Exh. 032, ¶¶ 44-46

While 67% of mass shootings involved assault weapons from 2016 to 2019, 0% of cases involved mass shootings from 2008-2011. These are fluctuations that Defendants' evidence has not explained. Plaintiffs' Exh. 032, ¶¶ 44-46.

From 1984 to 1987 mass shootings involving assault weapons accounted for 25% of all cases.

From 1988 to 1991, they accounted for 25%.

From 1992 to 1995, they accounted for 50%

From 1996 to 1999, they accounted for 25%.

From 2000 to 2003, they accounted for 50%

From 2004 to 2007, they accounted for 29%

From 2008 to 2011, they accounted for 0%.

From 2012 to 2015, they accounted for 30%.

From 2016 to 2019, they accounted for 67%.

See Plaintiffs' Exh. 032, ¶ 46, "Percentage of Cases Involved Assault Weapons" table, p. 26.

If Defendants' theory that the Federal Assault Weapons Ban was effective is correct, then the share of mass public shootings committed with assault weapons should have declined during the period of the assault weapon ban. There was no

statistically significant decline. Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

## Defendants' Proposed Finding of Fact No. 110.

During the 2010s, assault weapons were used in approximately 35% of all gun massacres in the United States.  Defs.' Ex. E (Klarevas Decl.) ¶ 13 & fig. 5.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defs. Ex. E, ¶ 13 & fig. 5 is intentionally misleading. The purpose of figure 5 in Defendants' Ex. E is to "make it appear that there is a consistent upward trend in the rate that assault weapons are used in mass public shootings, but when you do it by year periods of time it becomes clear that the pattern Klarevas shows is just an artifact of the unusual way that he presents the data. The declining percentage as the time period gets longer is simple due to the fact that assault weapons were used extensively during the very end of the period, but no theory is presented for why assault weapons would suddenly become very popular twelve or more years after the end of the assault weapons ban." Plaintiffs' Exh. 032, ¶¶ 44-46

While 67% of mass shootings involved assault weapons from 2016 to 2019, 0% of cases involved mass shootings from 2008-2011. These are fluctuations that Defendants' evidence has not explained. Plaintiffs' Exh. 032, ¶¶ 44-46.

From 1984 to 1987 mass shootings involving assault weapons accounted for 25% of all cases.

From 1988 to 1991, they accounted for 25%.

From 1992 to 1995, they accounted for 50%

From 1996 to 1999, they accounted for 25%.

From 2000 to 2003, they accounted for 50%

From 2004 to 2007, they accounted for 29%

From 2008 to 2011, they accounted for 0%.

From 2012 to 2015, they accounted for 30%.

From 2016 to 2019, they accounted for 67%.

See Plaintiffs' Exh. 032, ¶ 46, "Percentage of Cases Involved Assault Weapons" table, p. 26.

If Defendants' theory that the Federal Assault Weapons Ban was effective is correct, then the share of mass public shootings committed with assault weapons should have declined during the period of the assault weapon ban. There was no statistically significant decline. Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

### Defendants' Proposed Finding of Fact No. 111.

In the past three years, assault weapons were used in approximately 67% of all gun massacres in the United States.  Defs.' Ex. E (Klarevas Decl.) ¶ 13 & fig. 5.

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defs. Ex. E, ¶ 13 & fig. 5 is intentionally misleading. The purpose of figure 5 in Defendants' Ex. E is

to "make it appear that there is a consistent upward trend in the rate that assault weapons are used in mass public shootings, but when you do it by year periods of time it becomes clear that the pattern Klarevas shows is just an artifact of the unusual way that he presents the data. The declining percentage as the time period gets longer is simple due to the fact that assault weapons were used extensively during the very end of the period, but no theory is presented for why assault weapons would suddenly become very popular twelve or more years after the end of the assault weapons ban." Plaintiffs' Exh. 032, ¶¶ 44-46

While 67% of mass shootings involved assault weapons from 2016 to 2019, 0% of cases involved mass shootings from 2008-2011. These are fluctuations that Defendants' evidence has not explained. Plaintiffs' Exh. 032, ¶¶ 44-46.

From 1984 to 1987 mass shootings involving assault weapons accounted for 25% of all cases.

From 1988 to 1991, they accounted for 25%.

From 1992 to 1995, they accounted for 50%

From 1996 to 1999, they accounted for 25%.

From 2000 to 2003, they accounted for 50%

From 2004 to 2007, they accounted for 29%

From 2008 to 2011, they accounted for 0%.

From 2012 to 2015, they accounted for 30%.

From 2016 to 2019, they accounted for 67%.

See Plaintiffs' Exh. 032, ¶ 46, "Percentage of Cases Involved Assault Weapons" table, p. 26.

If Defendants' theory that the Federal Assault Weapons Ban was effective is correct, then the share of mass public shootings committed with assault weapons should have declined during the period of the assault weapon ban. There was no statistically significant decline. Nor did this percentage increase after the Federal

Assault Weapons Ban ended.  Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

### Defendants' Proposed Finding of Fact No. 112.

When used in mass shootings, assault weapons are associated with substantially more fatalities and injuries than non-assault weapons.  Defs.' Ex. AC (Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More Deadly? Assessing How Perpetrators' Motives and Methods Have Changed Over Time*, Criminology & Pub. Pol'y 1 (2019) at 12 (DEF0858) ("Strong empirical evidence shows that weapon choice affects lethality."); *Gallinger*, 898 F.3d at 1019 ("[W]hen 'assault weapons and large capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines.'" (quoting *Kolbe*, 849 F.3d at 127)); *Rupp*, 401 F. Supp. 3d at 991 (citing Defs.' Ex. X); Defs.' Ex. A (Allen Decl.) ¶ 31 (DEF0017); Defs.' Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2 (DEF0331-32).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defendants intentionally misstate the evidence in Defendants' Exh. AC. "Strong empirical evidence shows that weapon choice affects lethality. Multiple data sources indicate that active and public mass shootings committed with semiautomatic rifles *and* assault weapons result in more victims killed, on average, than attacks with less powerful weapons." Defs.' Ex. AC, p. 12 (bold added).

Defs.' Exh. AC provides no distinction between all semiautomatic rifles and "assault weapons" In other words, at best, the evidence shows that more fatalities occur when semiautomatic rifles *of any kind* are used in a mass shooting compared to "less powerful weapons." Defendants' evidence fails to show that "assault weapons" are more lethal and/or dangerous the any other kind of semiautomatic rifle, pistol or shotgun not prohibited by the AWCA.

69

Defendants' evidence cannot distinguish between "assault weapons" and other semiautomatic firearms used in mass shootings. Def. Exhibit BK, p. 2 ("mass shootings and other crimes committed with high-capacity semiautomatics (including assault weapons and other models) […]" Def. Exh. BL, p. 1 ("[t]his article examines the use, impacts, and regulation of assault weapons and other high-capacity semiautomatic firearms as they pertain to the problem of mass shootings in the United States.").

Defendants' Exhibit Y suffers from the same lack of distinction between so-called "assault weapons" and semiautomatic firearms. See Defendants' Exhibit Y, pg. 1-9 ("This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA….").

Without providing evidence regarding what features were specifically used in any mass shooting or distinguishing between "assault weapons" and "other high-capacity semiautomatic" firearms, Defendants high fatality correlation is empirically meaningless.

Defendants' own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC, p. 2. Defendants' evidence showing a correlation between "assault weapons" and higher fatalities rates in mass shootings does not account for other significant factors that are correlated with higher fatalities rates.

The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings.

Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP)" Defendants' Exhibit AG, p.2.

Defendants have also provided no evidence or explanation why fatalities have increased in the past ten years even though "assault weapons" have been widely available for decades.

See also Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶¶ 194 through 226.

**Defendants' Proposed Finding of Fact No. 113.**

The use of assault weapons in public mass shootings involving four or more fatalities excluding the shooter has resulted in an average of 38 fatalities or injuries compared to 10 without assault weapons—an approximately 280 percent increase in the average number of casualties.  Defs.' Ex. A (Allen Decl.) ¶ 31 (DEF0017).

**Plaintiffs' Response:** Plaintiff dispute this fact. Defendants' own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC, p. 2. Defendants' evidence showing a mere correlation between "assault weapons" and higher fatalities rates in mass shootings does not account for other significant factors that are correlated with higher fatalities rates.

The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants' simple averages entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings; it does not account for whether or not there were multiple shooters; and it does not account for the intent or motive behind the shooting — whether it be terrorism, gang-related, a desire for fame/infamy, or a revenge style shooting. All of these factors must be examined to form any kind of substantive conclusion.

Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all

of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP)" Defendants' Exhibit AG, p.2.

Defendants' Exhibit A provides generalized comparisons and averages that lack any kind of empirical analysis. See also Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶¶ 194 through 226.

### Defendants' Proposed Finding of Fact No. 114.

The use of assault weapons and LCMs in public mass shootings involving four or more fatalities has resulted in an average of 43 fatalities or injuries compared to an average of 8 fatalities or injuries in such shootings when neither an assault weapon or an LCM was used—an approximately 440 percent increase in the average number of casualties. Defs.' Ex. A (Allen Decl.) ¶ 34 (DEF0018).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defendants' own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC, p. 2. Defendants' evidence showing a mere correlation

between "assault weapons" and higher fatalities rates in mass shootings does not account for other significant factors that are correlated with higher fatalities rates.

The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants' simple averages entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings; it does not account for whether or not there were multiple shooters; and it does not account for the intent or motive behind the shooting — whether it be terrorism, gang-related, a desire for fame/infamy, or a revenge style shooting. All of these factors must be examined to form any kind of substantive conclusion.

Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP)" Defendants' Exhibit AG, p.2.

Defendants' Exhibit A provides generalized comparisons and averages that lack any kind of empirical analysis. See also Plaintiffs' Proposed Findings of Fact and Conclusions of Law, paragraphs 194 through 226.

### Defendants' Proposed Finding of Fact No. 115.

Since 1980, the use of assault weapons in gun massacres—mass shootings involving six or more fatalities excluding the shooting and regardless of the motive or location of the shooting—has resulted in an average of 14.3 fatalities compared to 8.1 fatalities in such shootings in which no assault weapons was used—an approximately 77 percent increase in the average number of fatalities. Defs.' Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2 (DEF0331-32).

**Plaintiffs' Response:** Defendants' own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC, p. 2. Defendants' evidence showing a correlation between "assault weapons" and higher fatalities rates in mass shootings does not account for other significant factors that are correlated with higher fatalities rates.

The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims

killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings.

Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP)" Defendants' Exhibit AG, p.2.

Defendants have also provided no evidence or explanation why fatalities have increased in the past ten years even though "assault weapons" have been widely available for decades.

See also Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶¶ 194 through 226.

### Defendants' Proposed Finding of Fact No. 116.

In the past ten years, the use of assault weapons in gun massacres has resulted in an average of 20.5 fatalities compared to 7.9 fatalities in such shootings in which no assault weapons was used—an approximately 159 percent increase in the average number of fatalities.  Defs.' Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2 (DEF0331-32).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact and Defendants' conclusions. Defendants have provided no evidence or explanation why fatalities have increased in the past ten years even though "assault weapons" have been widely available for decades.

Defendants' own evidence admits, "[t]o date, no one has provided a clear and compelling explanation for why public mass shootings have become deadlier over time." Defendants' Exhibit AC, p. 2. Defendants' evidence showing a correlation between "assault weapons" and higher fatalities rates in mass shootings does not account for other significant factors that are correlated with higher fatalities rates.

The fatality correlation asserted by Defendants does not account for whether multiple guns were used in the shootings. This is a significant factor that Defendants entirely ignore. However, Defendants' evidence shows that "previous research findings have revealed that active and public mass shootings committed by perpetrators with multiple firearms also result in more victims killed, on average, compared with attacks with a single firearm (Klarevas, 2016; Lankford, 2015, 2016a). Defendants' Exhibit AC, p. 12.

This fact is consistent with Plaintiffs' expert witness John R. Lott, Jr., who also stated that a more relevant factor in higher fatalities in mass shootings is whether multiple firearms were used. Deposition of John R. Lott, Jr., at 314:1-315:25.

The fatality correlation asserted by Defendants also does not account for whether multiple magazines were used in the shootings.

Defendants contentions that assault weapons are responsible for higher fatalities in mass shootings ignores their own evidence, which shows that society's "increased desires for fame and attention" and a "blurring of the distinction between fame and infamy" have resulted in mass shooters seeking fame by increasing the number of people killed, conducting more extensive attack strategies, extending planning periods, and acquiring and using more guns — all of which result in an increase in the fatality numbers of mass shootings. Defendants' Exhibit AC.

In the article, "Why Have Public Mass Shootings Become More Deadly?" Table 2 provides a comparison of high-fatality public mass shootings before and after 2010. Notably, from 2010-2019, 56% of "high fatality incidents" (resulting in 8 or more victims killed) involved a "semiautomatic rifle or assault weapon." (Defendants' Exh. AC, p. 7). No distinction is offered between semiautomatic rifles and "assault weapons."

Further, this same study offered by Defendants shows that 78% of those same incidents involved multiple firearms.  Further, 67% involved a "perpetrator below 30 years old," 56% of the incidents showed "explicit evidence of fame-seeking or attention seeking," 50% of the incidents involved "direct evidence that perpetrator was influenced by another specific attacker or attackers," 50% of the shooters "planned mass shooting for more than 1 year," and in 61% of the incidents, an "attack strategy was developed to increase fatalities. Defendants Exh. AC.)

The desire to seek infamy through committing high fatality mass shootings is also seen in Defendants' Exhibit AG, U.S. Department of Justice, Federal Bureau of Investigation, "Key Findings of the Behavioral Analysis Unit's Las Vegas Review Panel (LVRP)" Defendants' Exhibit AG, p.2.

See also Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶¶ 194 through 226.

## Defendants' Proposed Finding of Fact No. 117.

The vast majority of firearms used in mass shootings are acquired legally.  Defs.' Ex. A (Allen Decl.) ¶ 38 (DEF0020); Lott Dep. at 222:14-16 (agreeing that the majority of mass shooters acquire their weapons legally).

**Plaintiffs' Response:** This fact is immaterial. Moreover, this fact, if true, supports Plaintiffs contentions that the AWCA cannot stop or even mitigate a pre-planned attack; especially one in which the shooter has no criminal or mental health record. Defendants' evidence shows that 50% of the shooters "planned mass shooting for more than 1 year." Defendants' Exh. AC, pg. 7, tbl. 2.

## Defendants' Proposed Finding of Fact No. 118.

The federal assault weapons ban was effective in reducing the use of assault weapons in gun crime.  Defs.' Ex. Y (Koper 2017) at 7 (DEF0754); Defs.' Ex. C (Donohue Decl.) ¶ 119 (DEF0149-50).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. The full statement quoted by Defendants states:

"Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs."

Defendants' Exh. BJ, p. 96.

Defendants' evidence goes on to state that a state assault weapon ban is even less likely to be effective than a federal ban because the banned firearms *will remain legally available* in the vast majority of the states in the country. Defendants' Exh. BJ, fn 95.

Defendants ignore the fact that "[a]ttributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that crimes with LCMs appear to have been steady or rising since the ban. For this reason,

we do not undertake a rigorous investigation of the ban's effects on gun violence." Defendants Exh. BJ, p. 92.

Further, Defendants' evidence states "a more casual assessment shows that gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect if crimes with AWs and LCMs had both declined." Defendants Exh. BJ, p. 92.

Importantly, this same study states that "neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die. If anything, this percentage has been higher since the ban…" Defendants Exh. BJ, p. 92.

The study states, "It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since. We did not update the gun murder analysis because interpreting the results would be unavoidably ambiguous. Such an investigation will be more productive after demonstrating that the ban has reduced crimes with both Aws and LCMs. Defendants Exh. BJ, p. 92, fn. 109.

Further, the study concludes, "Having said this, the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement." Defendants' Exh. BJ, p. 97.

Defendants' Exh. BJ is consistent with Plaintiffs Exhibits 010 and 032 (Declarations of Dr. John R. Lott Jr.) who concludes that "All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two." Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

## Defendants' Proposed Finding of Fact No. 119.

The federal ban was effective in reducing the incidence and lethality of mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶¶ 23-24 & tbl. 3 (DEF0334-36) (finding a 37 percent decline in gun massacres during the federal ban, and a 49 percent decline in gun-massacre fatalities, followed by a 183 percent increase in gun massacres after its expiration, and a 209 percent increase in gun-massacre fatalities).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass

shootings, shows no demonstrable correlation between the two. Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

Assault Weapons are not used in a majority of mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30.

Over time, the rate of mass shootings or mass public shootings may rise or fall for many reasons. But regardless of any other factors, if the federal assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have decreased as a direct result of the ban. Lott Decl., Plaintiffs' Exh. 010, ¶¶ 6-65; Exhs. 010-2 to 010-19 and Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

In fact, the percentage of mass shootings committed with "assault weapons" did not decrease during the Federal Assault Weapons Ban.  Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010 and 032.

This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Plaintiffs are the only parties that have provided an explanation of any kind of substitution effects of the Federal Assault Weapons Ban. These substitution effects support Plaintiffs' contention that the Federal Assault Weapon Ban was ineffective. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Defendants have not provided any evidence there was a statistically significant decline in the percentage of attacks with assault weapons during the ban or a statistically significant increase after the ban. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Using data from the Book Rampage Nation, and data collected by Mother Jones, the share of attacks committed with assault weapons continued to drop even after the federal assault weapons ban expired. The ten years after the end of the assault weapons ban (September 2004 to August 2014) saw the lowest share of shootings involving assault weapons. Lott Decl., Plaintiffs' Exh. 010, ¶ 53.

Defendants' evidence also contradicts their own contentions. "Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs." Defendants' Exh. BJ, p. 96.

Defendants' evidence goes on to state that a state assault weapon ban is even less likely to be effective than a federal ban because the banned firearms *will remain legally available* in the vast majority of the states in the country. Defendants' Exh. BJ, fn 95.

Defendants ignore the fact that "[a]ttributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that crimes with LCMs appear to have been steady or rising since the ban. For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence." Defendants Exh. BJ, p. 92.

Further, Defendants' evidence states "a more casual assessment shows that gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect if crimes with AWs and LCMs had both declined." Defendants Exh. BJ, p. 92.

Importantly, this same study states that "neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die. If anything, this percentage has been higher since the ban…" Defendants Exh. BJ, p. 92.

Moreover, Defendants' evidence also states, "[i]t is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since. We did not update the gun murder analysis because interpreting the results would be unavoidably ambiguous. Such an investigation will be more productive after demonstrating that the ban has reduced crimes with both Aws and LCMs. Defendants Exh. BJ, p. 92, fn. 109.

Defendants' Exh. BJ makes clear, "the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement." Defendants' Exh. BJ, p. 97.

Defendants' Exh. CE also acknowledges that the federal "feature-based ban" had no real-world effect and assault weapons bans in general are a "distraction."

> Though assault weapons have become a potent symbol of mass shootings, bans of that style of gun are a "distraction," said Adam Winkler, a UCLA law professor, and the author of Gunfight. For starters, he says, it didn't actually stop manufacturers from selling assault rifles. Because the1994 ban defined weapons based on "cosmetic" features like pistol grips or collapsible stocks, gun makers evaded these restrictions by removing just enough design features so as to not trigger the ban. Meanwhile, the weapons remained semiautomatic and could still accept magazines of any size.

Defendants' Exh. CE, p.2.

Defendants' Exh. CE also states that "[M]any experts doubt the ban had any significant impact before it expired in 2004." Defendants' Exh. CE, p. 2.

Generally, firearm bans have little effect on preventing criminals from obtaining guns. Lott Decl., Plaintiffs' Exh. 010, ¶ 13. In fact, research shows that all places that have banned guns (either all firearms or all handguns) has seen murder rates go up. Lott Decl., Plaintiffs' Exh. 010, ¶ 13.

Moreover, Defendants' evidence showing a mere correlation between assault weapons and a higher fatality rate in mass shootings cannot distinguish which unidentified various combinations of the characteristics listed in Penal Code section 30515 on a semiautomatic firearm caused any such correlation. Nor does Defendants' evidence identify which specific characteristics were used in mass

shootings with higher fatalities. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶¶ 194 through 226.

## Defendants' Proposed Finding of Fact No. 120.

California's assault-weapon restrictions are effective in mitigating the lethality of mass shootings and can even reduce the incidence of mass shootings. Defs.' Ex. E (Klarevas Decl.) ¶¶ 22-23, 27 (DEF0334-35, 338); Defs.' Ex. AE (Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013)) at 4 (DEF0884).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defendants' Ex. E, ¶¶ 22-23 provides no evidence that California's assault-weapon restrictions are effective in mitigating the lethality of mass shootings as it discusses a flawed analysis of the federal assault weapons ban. All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two. Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

Assault Weapons are not used in a majority of mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30.

Over time, the rate of mass shootings or mass public shootings may rise or fall for many reasons. But regardless of any other factors, if the federal assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have decreased as a direct result of the ban. Lott Decl., Plaintiffs' Exh. 010, ¶¶ 6-65; Exhs. 010-2 to 010-19 and Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

In fact, the percentage of mass shootings committed with "assault weapons" did not decrease during the Federal Assault Weapons Ban. Nor did this percentage increase after the Federal Assault Weapons Ban ended. Plaintiffs' Exhs. 010 and 032. This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Plaintiffs are the only parties that have provided an explanation of any kind of substitution effects of the Federal Assault Weapons Ban. These substitution effects support Plaintiffs' contention that the Federal Assault Weapon Ban was ineffective. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Defendants have not provided any evidence there was a statistically significant decline in the percentage of attacks with assault weapons during the ban or a statistically significant increase after the ban. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Using data from the Book Rampage Nation, and data collected by Mother Jones, the share of attacks committed with assault weapons continued to drop even after the federal assault weapons ban expired. The ten years after the end of the assault weapons ban (September 2004 to August 2014) saw the lowest share of shootings involving assault weapons. Lott Decl., Plaintiffs' Exh. 010, ¶ 53.

Defendants' Ex. E, ¶ 27 & tlb. 4 (DEF0338-39) is a simple comparison of 7 states that have assault weapon bans versus 43 states that do not. It is not surprising that the 7 states have fewer incidents of "gun massacres" since the number of states this group is compared against is significantly larger.

The small minority of states that do have assault weapon bans accounted for 33.8% of all "gun massacre" incidents. Moreover, these 7 states with assault weapon bans accounted for 30.4% of "gun massacres" involving assault weapons. Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

Finally, Defendants' simple comparison is far from any kind of empirical analysis as it does not account for the numerous other factors that have an determining effect on fatalities. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116.

**Defendants' Proposed Finding of Fact No. 121.**

Since 1990, states that enacted assault-weapon restrictions experienced a 46% decrease in the incidence rate per capita for all gun massacres—mass shootings involving six or more fatalities excluding the shooter and regardless of the motive or location of the shooting—and a 57% decrease in the fatality rate per capita for all gun massacres.  Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

**Plaintiffs' Response:** Plaintiffs' dispute this fact. Defendants' Ex. E, tlb. 4 (DEF0338-39) is a simple comparison of 7 states that have assault weapon bans versus 43 states that do not. It is not surprising that the 7 states have fewer incidents of "gun massacres" since the number of states this group is compared against is significantly larger.

The small minority of states that do have assault weapon bans accounted for 33.8% of all "gun massacre" incidents. Moreover, these 7 states with assault weapon bans accounted for 30.4% of "gun massacres" involving assault weapons. Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two. Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

Assault Weapons are not used in a majority of mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30.

Over time, the rate of mass shootings or mass public shootings may rise or fall for many reasons. But regardless of any other factors, if the federal assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have decreased as a direct result of the ban. Lott Decl., Plaintiffs' Exh. 010, ¶¶ 6-65; Exhs. 010-2 to 010-19 and Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

In fact, the percentage of mass shootings committed with "assault weapons" did not decrease during the Federal Assault Weapons Ban.  Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010 and 032. This fact is true regardless of the data set that is analyzed — whether it be

from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶¶49-53 and 032, ¶¶ 8-13, 44-55.

Plaintiffs are the only parties that have provided an explanation of any kind of substitution effects of the Federal Assault Weapons Ban. These substitution effects support Plaintiffs' contention that the Federal Assault Weapon Ban was ineffective. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Defendants have not provided any evidence there was a statistically significant decline in the percentage of attacks with assault weapons during the ban or a statistically significant increase after the ban. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Using data from the Book Rampage Nation, and data collected by Mother Jones, the share of attacks committed with assault weapons continued to drop even after the federal assault weapons ban expired. The ten years after the end of the assault weapons ban (September 2004 to August 2014) saw the lowest share of shootings involving assault weapons. Lott Decl., Plaintiffs' Exh. 010, ¶ 53.

Finally, Defendants' simple comparison is far from any kind of empirical analysis as it does not account for the numerous other factors that have an determining effect on fatalities. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116.

### Defendants' Proposed Finding of Fact No. 122.

Since 1990, states that enacted assault-weapon restrictions experienced 54% fewer gun massacres involving assault weapons and 67% fewer fatalities in such incidents, on a per capita basis.  Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

Plaintiffs' Response: Plaintiffs dispute this purported fact. Defendants; Ex. E, tlb. 4 (DEF0338-39) is a simple comparison of 7 states that have assault weapon bans versus 43 states that do not. It is not surprising that the 7 states have fewer

incidents of "gun massacres" since this number of states this group is compared against is significantly larger.

The small minority of states that do have assault weapon bans accounted for 33.8% of all "gun massacre" incidents. Moreover, just these 7 states with assault weapon bans accounted for 30.4% of "gun massacres" involving assault weapons.

All credible research on the effectiveness of "assault weapon" bans in reducing gun violence, or mass shootings, shows no demonstrable correlation between the two. Decl. of John R. Lott, Plaintiffs' Exh. 010, ¶¶ 6-65, Exhs. 10-2 to 10-19.

Assault Weapons are not used in a majority of mass shootings. According to defense witness Lucy Allen, in her analysis of 161 incidents constituting "public mass shootings" (as she defined that term), "assault weapons" were used in 32 of them (22%) where the type of weapon could be determined. Allen Decl., Def. Exh. A, ¶ 30.

Over time, the rate of mass shootings or mass public shootings may rise or fall for many reasons. But regardless of any other factors, if the federal assault weapons ban reduced these attacks, the share of attacks committed with "assault weapons" should have decreased as a direct result of the ban. Lott Decl., Plaintiffs' Exh. 010, ¶¶ 6-65; Exhs. 010-2 to 010-19 and Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

In fact, the percentage of mass shootings committed with "assault weapons" did not decrease during the Federal Assault Weapons Ban.  Nor did this percentage increase after the Federal Assault Weapons Ban ended.  Plaintiffs' Exhs. 010 and 032.

This fact is true regardless of the data set that is analyzed — whether it be from Rampage Nation, Mother Jones, or Crime Prevention Research Center. Plaintiffs' Exhs. 010, ¶49-53 and 032, ¶¶ 8-13, 44-55.

Plaintiffs are the only parties that have provided an explanation of any kind of substitution effects of the Federal Assault Weapons Ban. These substitution effects support Plaintiffs' contention that the Federal Assault Weapon Ban was ineffective. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Considering substitution effects of the Federal Assault Weapons Ban, *if the ban were effective*, some killers would refrain from committing a mass shooting with an assault weapon, while others would substitute other kinds of firearms. In both instances, the percentage of attacks committed with assault weapons would decrease. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Defendants have not provided any evidence there was a statistically significant decline in the percentage of attacks with assault weapons during the ban or a statistically significant increase after the ban. Lott Decl., Plaintiffs' Exh. 032, ¶¶ 8-13, 44-55.

Using data from the Book Rampage Nation, and data collected by Mother Jones, the share of attacks committed with assault weapons continued to drop even after the federal assault weapons ban expired. The ten years after the end of the assault weapons ban (September 2004 to August 2014) saw the lowest share of shootings involving assault weapons. Lott Decl., Plaintiffs' Exh. 010, ¶ 53.

Finally, Defendants' simple comparison is far from any kind of empirical analysis as it does not account for the numerous other factors that have an determining effect on fatalities. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116.

## Defendants' Proposed Finding of Fact No. 123.

While the AWCA is narrower than the federal ban in being limited to centerfire rifles, the AWCA is broader than the federal assault weapons ban in defining a firearm as an assault weapon if it has only one qualifying feature, and thus the AWCA can be expected to be more effective in reducing the use of assault weapons in gun crime, particularly mass shootings and gun violence against law enforcement personnel. *See* Defs.' Ex. J (H.R. Rep. No. 103-489) at 2 (DEF0432) (defining any semiautomatic rifle as an assault weapon if it has the ability to accept a detachable magazine and at least two qualifying features).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defendants' claim that the "AWCA can be expected to be more effective" is not evidence that the AWCA has been effective. Defendants provide no evidence that the AWCA is actually more effective than the federal assault weapons ban. The California AWCA has been in place for approximately 39 years. The State cannot rely on mere "expectation" of its effectiveness.

<u>**Defendants' Proposed Finding of Fact No. 124.**</u>

Assault-weapon restrictions like the AWCA are effective in reducing gun violence, particularly violence associated with mass shootings.  *See* Defs.' Ex. E (Klarevas Decl.) ¶ 27 & tbl. 4 (DEF0338-39).

**Plaintiffs' Response:** Plaintiffs dispute this purported fact. Defendants have provided no evidence that the California AWCA has been effective in reducing gun violence, particularly violence associated with mass shootings.

Defendants' evidence cannot distinguish between "assault weapons" and "semiautomatic weapons with LCMs" in determining their use in crime or mass murder. Def. Exhibit BK, p. 2 ("mass shootings and other crimes committed with high-capacity semiautomatics (including assault weapons and other models) [...]" Def. Exh. BL, p. 1 ("[t]his article examines the use, impacts, and regulation of assault weapons and other high-capacity semiautomatic firearms as they pertain to the problem of mass shootings in the United States.").

Defendants' Exhibit Y suffers from the same lack of distinction between so-called "assault weapons" and semiautomatic firearms. See Defendants' Exhibit Y, pg. 1-9 ("This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA….").

Without providing evidence that distinguishes between "assault weapons" and "semiautomatic weapons with LCMs," Defendants conclusions regarding the effectiveness of California's AWCA lack evidentiary support and are meaningless.

Nor does Defendants' evidence account for the numerous factors that must be analyzed in determining what causes higher fatalities in some mass shootings and lower fatalities in others. See Plaintiffs' Responses to Defendants' Proposed Finding of Fact No. 112 through 116

Again, Defendants' Ex. E, tlb. 4 (DEF0338-39) is a simple comparison of 7 states that have assault weapon bans versus 43 states that do not. It is not surprising that the 7 states have fewer incidents of "gun massacres" since this number of states this group is compared against is significantly larger.

The small minority of states that do have assault weapon bans accounted for 33.8% of all "gun massacre" incidents. Moreover these 7 states with assault

weapon bans accounted for 30.4% of "gun massacres" involving assault weapons.

## II. RESPONSE TO DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

### Defendants' Proposed Conclusion of Law No. 1

While the Supreme Court in *Heller* and *McDonald* invalidated strict laws that effectively prohibited the possession of all handguns—which it characterized as "the quintessential self-defense weapon" *Heller*, 554 U.S. at 629—the Court made clear that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626 (citations omitted).

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

### Defendants' Proposed Conclusion of Law No. 2

The Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625; *see also Fyock*, 779 F.3d at 997.

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

**Defendants' Proposed Conclusion of Law No. 3**

This articulation of what is protected by the Second Amendment finds its roots in the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627.

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). This case represents a challenge to California's "assault weapon" laws that operate based on the definitions of "assault weapons" under section 30515 and Defendants' policies, practices, and customs that individually and collectively operate as a ban on constitutionally protected arms and conduct. As the Supreme Court held in *Heller*, 554 U.S. at 628-629, a ban that "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" cannot withstand constitutional scrutiny under any standard.  And thus, no interest-balancing tests or means-end inquiries are to be invoked or applied at all when a textual and historical analysis shows that the challenged scheme amounts to a ban on a category of protected arms. In other words, Heller limits governments to completely restricting only such classes of arms banned in our "historical tradition," such as guns that are both "dangerous and unusual," and thus are not the sort of lawful weapons that citizens have commonly possessed and used for lawful purposes. *Heller*, 554 U.S. at 627-628. If a law amounts to an impermissible ban on a protected category of arms, it must be declared unconstitutional and enjoined without resort to or need for any level of scrutiny. See also, *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ("[U]nder [Heller], 'complete prohibition[s]' of Second Amendment rights are always invalid. […] It's appropriate to strike down such 'total ban[s]' without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right); *Heller v. D.C.*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.") (Kavanaugh, J., dissenting).

See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

**Defendants' Proposed Conclusion of Law No. 4**

The Second Amendment "by no means eliminates" a state's ability "to devise solutions to social problems that suit local needs and values," emphasizing that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010) (plurality opinion) (quotation omitted).

**Plaintiffs' Response:** See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

**Defendants' Proposed Conclusion of Law No. 5**

Dangerous and unusual weapons are not "'the sorts of weapons' that are 'in common use'" for lawful purposes. *Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J., concurring).

**Plaintiffs' Response:** "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (emphasis original) (Alito, J., concurring). "As to 'dangerous,' the court below held that a weapon is 'dangerous per se' if it is ''designed and constructed to produce death or great bodily harm' and 'for the purpose of bodily assault or defense.'' […] That test may be appropriate for applying statutes criminalizing assault with a dangerous weapon. […] But it cannot be used to identify arms that fall outside the Second Amendment. First, the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. See *Heller*, *supra*, at 627, 128 S.Ct. 2783 (contrasting " 'dangerous and unusual weapons' " that may be banned with protected "weapons ... 'in common use at the time' "). Second, even in cases where dangerousness might be relevant, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the "Arms" covered by the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " 554 U.S., at 581, 128 S.Ct. 2783. Under the decision below, however, virtually every covered arm would qualify as "dangerous." [¶]  Were there any doubt on this point, one need only look at the court's first example of "dangerous per se" weapons: "firearms." […] If *Heller* tells us anything, it is that firearms cannot be categorically

93

prohibited just because they are dangerous." *Caetano*, 136 S.Ct. at 1031 (citing Heller, 554 U.S. at 636). Ultimately, *all* firearms are inherently dangerous by definition. *Kolbe v. Hogan*, 813 F.3d 160, 177 (4th Cir. 2016); *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1133 (S.D. Cal. 2017) ("[g]uns in the hands of criminals are dangerous; guns in the hands of law-abiding responsible citizens ameliorate that danger"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

## Defendants' Proposed Conclusion of Law No. 6

A weapon is "dangerous" "when it is 'likely to cause serious bodily harm.'" *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (quoting *Black's Law Dictionary* 451 (9th ed. 2009)).

**Plaintiffs' Response:** Ultimately, *all* firearms are inherently dangerous by definition. *Kolbe v. Hogan*, 813 F.3d 160, 177 (4th Cir. 2016). And "firearms cannot be categorically prohibited just because they are dangerous. *Catetano v. Mass.*, 136 S.Ct. 1027, 1031 (Alito, J., joined by Thomas, J., concurring). The Supreme Court's *Heller* analysis asks whether the arms are "both dangerous *and* unusual," *Caetano*, 136 S.Ct. at 1031 (italics original), and if they are not both, it determines if the category of arms are in common use for lawful purposes. *Duncan v. Becerra*, 366 F.Supp.3d at 1142. And otherwise, all "[g]uns in the hands of criminals are dangerous; guns in the hands of law-abiding responsible citizens ameliorate that danger." *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1133 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

## Defendants' Proposed Conclusion of Law No. 7

The Ninth Circuit has observed that "[c]ommonality is determined largely by statistics," with "common use" being established primarily by evidence that a weapon is "overwhelmingly owned and used for lawful purposes." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. Aug. 14, 2020), *petition for reh'g en banc filed*.

**Plaintiffs' Response:** See Plaintiffs' discussions regarding the common use test under *Heller*. MPI Memo. at pp. 13-16; MPI Reply at pp. 1-3; Supp. Brief at pp.

7-16; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 44-61, 227-230.

## Defendants' Proposed Conclusion of Law No. 8

While the AWCA is narrower than the federal ban in being limited to centerfire rifles, the AWCA is broader than the federal assault weapons ban in defining a firearm as an assault weapon if it has only one qualifying feature, and thus the AWCA can be expected to be more effective in reducing the use of assault weapons in gun crime, particularly mass shootings and gun violence against law enforcement personnel. *See* Defs.' Ex. J (H.R. Rep. No. 103-489) at 2 (DEF0432) (defining any semiautomatic rifle as an assault weapon if it has the ability to accept a detachable magazine and at least two qualifying features).

**Plaintiffs' Response:** This is not a conclusion of law, but speculation on Defendants' part.

## Defendants' Proposed Conclusion of Law No. 9

Marketing materials or sales figures for assault rifles, assault pistols, and assault shotguns would not establish that the weapons are in common use by law-abiding citizens for lawful purposes. *Fyock*, 779 F.3d at 998 (noting that "marketing materials and sales statistics" do "not necessarily show that [particular weapons] are in fact commonly possessed by law-abiding citizens for lawful purposes").

**Plaintiffs' Response:** Marketing materials and sales figures for "assault weapons" are not the sole consideration of the commonality of a firearm. However, they provide significant and persuasive evidence. Commonality is also determined by a review of the jurisdictions that place no restrictions on so-called "assault weapons" as well as the lack of any such prohibitions on firearms throughout this Nation's history. See Plaintiffs' discussions regarding the common use test under *Heller*. MPI Memo. at pp. 13-16; MPI Reply at pp. 1-3; Supp. Brief at pp. 7-16; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 44-61, 227-230.

## Defendants' Proposed Conclusion of Law No. 10

Evidence of a firearm's prevalence alone is insufficient to show that the weapon is in "common use" for lawful purposes. *See Kolbe*, 849 F.3d at 141-42 (noting

that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citing *Friedman*, 784 F.3d at 409)), *cert. denied*, __ S.C. __, 2020 WL 3146687 (June 15, 2020); *see also* Dkt. 88 (Pls.' Pre-Trial Proposed Findings of Fact & Conclusions of Law) ¶ 30 ("[C]onstitutionally protected status of arms cannot turn of fact-based sales numbers of particular makes, models, or even specific configurations.").

**Plaintiffs' Response:** Plaintiffs have provided significantly more evidence than a so-called "popularity contest." See Plaintiffs' discussions regarding the common use test under *Heller.* MPI Memo. at pp. 13-16; MPI Reply at pp. 1-3; Supp. Brief at pp. 7-16; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 44-61, 227-230.

### Defendants' Proposed Conclusion of Law No. 11

Whether law enforcement agencies use weapons that would otherwise qualify as assault weapons under the challenged provisions of the AWCA is irrelevant to the "common use" analysis. Law-enforcement use is not considered when determining whether an arm is in common use by law-abiding citizens for lawful purposes. *See Maloney v. Singas*, 351 F. Supp. 3d 222, 229 n.10 (E.D.N.Y. 2018) (excluding sales of arms to law enforcement agencies because "the Second Amendment is only concerned with weapons 'typically possessed by law-abiding citizens for lawful purposes.'" (quoting *Heller*, 554 U.S. at 625)).

**Plaintiffs' Response:** See Plaintiffs' discussions regarding the common use test under *Heller.* MPI Memo. at pp. 13-16; MPI Reply at pp. 1-3; Supp. Brief at pp. 7-16; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 44-61, 227-230.

### Defendants' Proposed Conclusion of Law No. 12

Assault weapons regulated under the challenged provisions of the AWCA are not protected by the Second Amendment because they are "dangerous and unusual" weapons. *See supra* Proposed Findings of Fact Sections II & III; *see also Henry*, 688 F.3d at 640 (citing *Heller*, 554 U.S. at 627) (observing that the Second Amendment does not protect "the types of weapons that qualify as 'dangerous and unusual weapons'").

**Plaintiffs' Response:** "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (emphasis original) (Alito, J., concurring). "As to 'dangerous,' the court below held that a weapon is 'dangerous per se' if it is ''designed and constructed to produce death or great bodily harm' and 'for the purpose of bodily assault or defense.'' […] That test may be appropriate for applying statutes criminalizing assault with a dangerous weapon. […] But it cannot be used to identify arms that fall outside the Second Amendment. First, the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. See *Heller*, *supra*, at 627, 128 S.Ct. 2783 (contrasting " 'dangerous and unusual weapons' " that may be banned with protected "weapons ... 'in common use at the time' "). Second, even in cases where dangerousness might be relevant, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the "Arms" covered by the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " 554 U.S., at 581, 128 S.Ct. 2783. Under the decision below, however, virtually every covered arm would qualify as "dangerous." [¶]  Were there any doubt on this point, one need only look at the court's first example of "dangerous per se" weapons: "firearms." […] If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano*, 136 S.Ct. at 1031 (citing Heller, 554 U.S. at 636). Ultimately, *all* firearms are inherently dangerous by definition. *Kolbe v. Hogan*, 813 F.3d 160, 177 (4th Cir. 2016); *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1133 (S.D. Cal. 2017) ("[g]uns in the hands of criminals are dangerous; guns in the hands of law-abiding responsible citizens ameliorate that danger"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

---

### Defendants' Proposed Conclusion of Law No. 13

Assault weapons regulated under the challenged provisions of the AWCA are not protected by the Second Amendment because they are not "in common use" for lawful purposes like self-defense. *See supra* Proposed Findings of Fact, Sections II & III; *see also Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring).

**Plaintiffs' Response:** See Plaintiffs' discussions regarding the common use test under *Heller.* MPI Memo. at pp. 13-16; MPI Reply at pp. 1-3; Supp. Brief at pp. 7-16; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 44-61, 227-230.

### Defendants' Proposed Conclusion of Law No. 14

The Supreme Court has highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the protection of the Second Amendment. *Heller*, 554 U.S. at 627; *Kolbe*, 849 F.3d at 136.

**Plaintiffs' Response:** A primary difference between AR-15 rifles and M16 rifles, a U.S. Government designation that meets certain government specifications, is that the M16 must be capable of select (fully automatic) fire. See Youngman testimony, Tx of 10/19/20 Hearing at 82:7-14; 84:10-20. In contrast, the AR-15 rifle is a civilian firearm that is in widespread, common use. The test "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (emphasis original) (Alito, J., concurring). AR-15 rifles are widely owned and possessed by millions for lawful purposes.

See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

### Defendants' Proposed Conclusion of Law No. 15

Assault weapons regulated by the challenged provisions of the AWCA fall outside the scope of the Second Amendment because they are like the M-16 and are most useful in military service. *See supra* Proposed Findings of Fact, Section III.B; *see also Kolbe*, 849 F.3d at 137; *Rupp*, 401 F. Supp. 3d at 986-88.

**Plaintiffs' Response:** A primary difference between AR-15 rifles and M16 rifles, a U.S. Government designation that meets certain government specifications, is that the M16 must be capable of select (fully automatic) fire. See Youngman testimony, Tx of 10/19/20 Hearing at 82:7-14; 84:10-20. In contrast, the AR-15 rifle is a civilian firearm that is in widespread, common use. The test "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016)

(emphasis original) (Alito, J., concurring). AR-15 rifles are widely owned and possessed by millions for lawful purposes.

See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

### Defendants' Proposed Conclusion of Law No. 16

The AWCA is a "'presumptively lawful measure[]' falling outside the scope of Second Amendment protection." *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring) (quoting *Heller*, 554 U.S. at 626, 627 n.26).

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp. Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

### Defendants' Proposed Conclusion of Law No. 17

In restricting firearms capable of firing numerous rounds without reloading— either because they can accept detachable LCMs or have fixed LCMs—the AWCA is analogous to "regulations from the early twentieth century that restricted the possession of firearms based on the number of rounds that the firearm could discharge automatically or semi-automatically without reloading." *Fyock*, 779 F.3d at 997.

**Plaintiffs' Response:** These pre-*Heller* prohibitions are not at issue in this case. California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp.

Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

### Defendants' Proposed Conclusion of Law No. 18

In the 1920s and 1930s, Michigan, Rhode Island, and Ohio enacted restrictions on semiautomatic weapons capable of firing sixteen, twelve, and eighteen shots, respectively, without reloading.  Defs.' Ex. S (Mich. Public Acts, 1927 – No. 372) (DEF0676); Defs.' Ex. T (R.I. Public Acts, 1927 – Ch. 1052) (DEF0682); Defs.' Ex. U (Ohio General Code, 1933 – § 12819-3) (DEF0684).

**Plaintiffs' Response:**  These pre-*Heller* prohibitions are not at issue in this case. California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp. Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

### Defendants' Proposed Conclusion of Law No. 19

In 1932, Congress enacted a twelve-shot restriction on semiautomatic weapons in the District of Columbia—one of the few jurisdictions subject to the Second Amendment at that time, before it was incorporated into the Fourteenth Amendment in 2010—and this restriction has remained in effect ever since. Defs.' Ex. V (Pub. L. No. 275, 1932 – 72d Cong., Sess. I, chs. 465, 466) (DEF0685).

**Plaintiffs' Response:**  These pre-*Heller* prohibitions are not at issue in this case. California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp. Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

## Defendants' Proposed Conclusion of Law No. 20

While most of the firing-capacity laws were repealed by the 1970s, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J.* (*ANJRPC*), 910 F.3d 106, 117 n.18 (3d Cir. 2018), the District of Columbia has maintained its restrictions, *see Duncan*, 970 F.3d at 1150 (noting that the District of Columbia has continuously regulated magazine capacity since 1932).

**Plaintiffs' Response:**  These pre-*Heller* prohibitions are not at issue in this case. California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp. Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

## Defendants' Proposed Conclusion of Law No. 21

In regulating firearms based on their capacity for enhanced firepower, these laws provide a historical analog to the AWCA. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (noting that the challenged regulation need not "mirror" the historical regulation); *see, e.g., Silvester*, 843 F.3d at 823-24, 831 (Thomas, C.J., concurring) (citing original iteration of California's waiting-period law, which provided a *single-day* waiting period, in determining that California's longer, ten-day waiting period was presumptively lawful).  These laws restricting dangerous semiautomatic firearms are sufficient analogs even though they were not adopted by all fifty states.  *See id.* at 831 (Thomas, C.J., concurring) (citing just three states that enacted waiting-period statutes in the 1920s).

**Plaintiffs' Response:** These pre-*Heller* prohibitions are not at issue in this case. California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp. Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

## Defendants' Proposed Conclusion of Law No. 22

The political debate concerning the regulation of assault weapons "was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s." Defs.' Ex. W (Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017)) at 69 (DEF0704); *see also* Defs.' Ex. X (Br. of *Amicus Curiae* Everytown for Gun Safety in Supp. of Def.'s Mot. for Summ. J., *Rupp v. Becerra*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Apr. 1, 2019) (Dkt. 82-1)) at 7-9 (DEF0733-35).

**Plaintiffs' Response:**  These pre-*Heller* prohibitions are not at issue in this case. California's AWCA has no historical justification, as the specific firearm characteristics which form the definitions in section 30515(a) were in existence and common use for decades before enactment of the AWCA. See Plaintiffs' discussion regarding the lack of historical prohibitions on the 30515 features. Opp. to MTD at p. 13; MPI Memo. at pp. 16-18; MPI Reply at pp. 5-6; Supp. Brief at 7-16; Pretrial Brief at 5-8; Disputed Issues Brief at 1-2 (discussing age-based restrictions).

## Defendants' Proposed Conclusion of Law No. 23

The Second Amendment extends to only those "instruments that constitute *bearable* arms." *Heller*, 554 U.S. at 582 (emphasis added).

**Plaintiffs' Response:** "Assault weapons" are bearable arms. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). See Plaintiffs' discussion regarding *Heller*'s treatment of a categorical ban on a class of protected arms. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

## Defendants' Proposed Conclusion of Law No. 24

California Penal Code section 30515(a) defines certain firearms as assault weapons based on the presence of certain enumerated accessories or features, such as a pistol grip, an adjustable stock, and a flash suppressor.  As such, those provisions effectively regulate the use of the listed accessories or features in conjunction with certain types of firearms.

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The semiautomatic firearms bearing the section 30515(a) characteristics are well-suited for self-defense purposes, which is a lawful use. See Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 62-95; Kapelsohn Decl., Plaintiffs' Exh. 001.

### Defendants' Proposed Conclusion of Law No. 25

None of the accessories or features listed in California Penal Code section 30515(a) constitutes, by itself, a "bearable arm" subject to Second Amendment protection. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that silencers are not protected by the Second Amendment because "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment").

**Plaintiffs' Response:** The accessories and features listed in California Penal Code section 30515(a) are not independently regulated and are free to purchase throughout California. Only when attached to a bearable arm, thus becoming part of a bearable arm, are such characteristics prohibited. Assault weapons with 30515(a) characteristics are bearable arms. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The semiautomatic firearms bearing the section 30515(a) characteristics are well-suited for self-defense purposes, which is a lawful use. See Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 62-95; Kapelsohn Decl., Plaintiffs' Exh. 001.

### Defendants' Proposed Conclusion of Law No. 26

In addition, to qualify for Second Amendment protection, a firearm accessory or feature must be necessary to render a firearm operable. *See Fyock*, 779 F.3d at 997 ("[O]ur case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines *necessary to render those firearms operable*." (emphasis added) (quoting *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014))); *see also Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (suggesting that, while silencers are

accessories not protected by the Second Amendment, "[w]e had no occasion to consider whether items that are not themselves bearable arms *but are necessary to the operation of a firearm* (think ammunition) are also protected" (emphasis added)).

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The semiautomatic firearms bearing the section 30515(a) characteristics are well-suited for self-defense purposes, which is a lawful use. See Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 62-95; Kapelsohn Decl., Plaintiffs' Exh. 001.

## Defendants' Proposed Conclusion of Law No. 27

Section 30515(a) does not burden conduct protected by the Second Amendment because none of the accessories or features listed in California Penal Code section 30515(a) is necessary to operate a firearm.  *See supra* Proposed Findings of Fact, Section I, ¶ 18 (AR-platform rifles without any enumerated features are available for sale and possession in California).

**Plaintiffs' Response:** "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The semiautomatic firearms bearing the section 30515(a) characteristics are well-suited for self-defense purposes, which is a lawful use. See Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 62-95; Kapelsohn Decl., Plaintiffs' Exh. 001. "Featureless" AR-15 firearms are less advantageous to a law-abiding citizen, and are less safe. See Plaintiffs' Proposed Findings of Fact/Conclusions of Law, ¶¶ 122-125.

## Defendants' Proposed Conclusions of Law No. 28

Every federal circuit court that has selected a level of scrutiny to apply to assault-weapon restrictions, like the AWCA, has determined that intermediate scrutiny applies because they do not rise to the level of a "substantial burden" on the core right protected by the Second Amendment.  *See Wilson v. Cook Cty.*, 937 F.3d 1028, 1033 (7th Cir. 2019) (following *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410-12 (7th Cir. 2015)), *cert. denied*, __ S.C. __, 2020 WL 3146694 (June 15, 2020); *Worman*, 922 F.3d at 38; *Kolbe*, 849 F.3d at 138-39;

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257-61 (2d Cir. 2015); *Heller II*, 670 F.3d at 1261-62.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 29

The district court in *Rupp* determined that intermediate scrutiny is appropriate because the AWCA does not severely burden the core Second Amendment right, given the range of other firearms available to Californians that are not restricted by the AWCA, including a variety of handguns.  Indeed, the court determined that assault rifles—the focus of Plaintiffs' claims in this action—are "ill-suited for self-defense" and that self-defense is not the reason why most "modern sporting rifles" are acquired.  *Rupp*, 401 F. Supp. 3d at 989.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 30**

Consistent with the reasoning and evidence considered in *Rupp* and the federal circuit cases upholding similar assault-weapon restrictions, intermediate scrutiny applies to the AWCA.  *See Rupp*, 401 F. Supp. 3d at 989 (noting that "the chorus of circuits applying intermediate scrutiny to assault weapon bans has only grown, as the First Circuit applied intermediate scrutiny to an assault weapon ban in April of [2019]" (citing *Worman*, 922 F.3d at 38)).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 31**

The AWCA does not impose a severe burden on the core Second Amendment right because "individuals remain free to choose any weapon that is *not* restricted by the AWCA or another state law." *Rupp*, 401 F.3d 3d at 989 (citation and quotation marks omitted); *see also Worman*, 922 F.3d at 37 (holding that assault-weapon law "does not heavily burden the core right of self-defense in the home" because it "does not ban all semiautomatic weapons and magazines" and instead "proscribes only . . . semiautomatic assault weapons that have certain combat-style features").

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 32

Notwithstanding the AWCA, Californians may acquire and possess semiautomatic, centerfire rifles and semiautomatic pistols and shotguns, provided the weapons do not have any of the proscribed accessories or features listed in California Penal Code section 30515(a). *See Rupp*, 401 F. Supp. 3d at 989.

**Plaintiffs' Response:** "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; see also, *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), which stated: "It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined – as we have done – that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them. See *Kerner*, 107 S.E. at 225 ("To exclude all pistols ... is not a regulation, but a prohibition, of ... 'arms' which the people are entitled to bear."). Indeed, the pistol is the most preferred firearm in the nation to "keep" and use for protection of one's home and family." *Parker*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008) (citing *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 225 (1921).

## Defendants' Proposed Conclusion of Law No. 33

Any burden on the core right is further minimized by the fact that the AWCA, in effect, operates as a restriction on the manner in which certain semiautomatic firearms are sold and possessed, rather than a prohibition on the possession of any particular class of firearm.   *See Silvester*, 843 F.3d at 827 ("This court has explained that laws which merely regulate only the '*manner* in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely." (quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013))); *see also* Kapelsohn Dep. at 175:21-

176:10 (agreeing that the AWCA could be "characterized as a prohibition on certain configurations of rifles, pistols and shotguns").

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

### Defendants' Proposed Conclusion of Law No. 34

The challenged provisions of the AWCA do not severely burden the core Second Amendment right because they prohibit the use of accessories that are not, themselves, "bearable arms" subject to Second Amendment protection. *See supra* Proposed Conclusions of Law, Section I.D, ¶¶ 23-27; *see also Cox*, 906 F.3d at 1186.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 35

The challenged provisions of the AWCA do not severely burden the core Second Amendment right because none of the accessories listed in California Penal Code section 30515(a) is necessary to render a firearm operable.  *See supra* Proposed Findings of Fact, Section I, ¶ 18 (AR-platform rifles without any enumerated features are available for sale and possession in California); *see also Fyock*, 779 F.3d at 997 ("[O]ur case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines *necessary to render those firearms operable*." (emphasis added) (quoting *Jackson*, 746 F.3d at 967)); *see also Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (suggesting that, while silencers are accessories not protected by the Second Amendment, "[w]e had no occasion to consider whether items that are not themselves bearable arms *but are necessary to the operation of a firearm* (think ammunition) are also protected" (emphasis added)).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 36

Because the challenged provisions of the AWCA do not severely burden the core Second Amendment right, intermediate scrutiny applies to the examination of the constitutionality of those provisions.  *See Rupp*, 401 F. Supp. 3d at 988-89.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 37

A regulation satisfies intermediate scrutiny if (1) the government's stated objective is "significant, substantial, or important"; and (2) there is a "'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821-22 (citation omitted).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 38

Intermediate scrutiny does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest. *Jackson*, 746 F.3d at 969. The government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI

Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

### Defendants' Proposed Conclusion of Law No. 39

In determining whether a law survives intermediate scrutiny, courts "afford substantial deference to the predictive judgments of the legislature." *Pena*, 898 F.3d at 979 (quotation omitted).  Even when the record contains "conflicting legislative evidence," intermediate scrutiny "allow[s] the government to select among reasonable alternatives in its policy decisions." *Id.* (quotation omitted).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

### Defendants' Proposed Conclusion of Law No. 40

Deferential review is particularly appropriate here because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quotation omitted).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

---

### Defendants' Proposed Conclusion of Law No. 41

Under intermediate scrutiny, the government may "rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests," and the Court "may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'" *Fyock*, 779 F.3d at 1000 (quotations omitted). Such "evidence need only 'fairly support[]' [the government's] conclusions." *Pena*, 898 F.3d at 982 (quotation omitted).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

---

### Defendants' Proposed Conclusion of Law No. 42

The AWCA furthers important, and indeed compelling, government interests in reducing gun violence, particularly reducing the incidence and lethality of mass shootings and gun violence against law enforcement personnel. *Rupp*, 401 F.

Supp. 3d at 990 ("It is beyond question that the government's interest in promoting public safety and reducing gun violence is important or substantial." (quotation omitted)); *see, e.g.*, *Fyock*, 779 F.3d at 1000; *Chovan*, 735 F.3d at 1135; *see also* Defs.' Ex. C (Donohue Decl. ¶¶ 28-26 (DEF113-16); Kapelsohn Dep. at 68:15-22; Youngman Dep. at 40:20-41:1.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 43

The AWCA is reasonably fitted to the State's important public-safety interests because it prohibits certain firearm configurations that make already dangerous firearms more lethal, particularly when used in a manner not consistent with lawful use, such as rapid semiautomatic fire.  *See supra* Proposed Findings of Fact, Sections II, III.B.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 44**

The AWCA is reasonably fitted to the State's important public-safety interests because assault weapons are used disproportionately in crime, mass shootings, and gun violence against law enforcement personnel.  *See supra* Proposed Findings of Fact, Section IV.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 45**

The AWCA is reasonably fitted to the State's important public-safety interests because assault weapons feature prominently in mass shootings throughout the country and correlate with substantially higher numbers of casualties on average. *See supra* Proposed Findings of Fact, Section IV, ¶¶ 104-116.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 46**

Correlative evidence of the harms of assault weapons is sufficient to show a reasonable fit under intermediate scrutiny.  *See Rupp*, 401 F. Supp. 3d at 993 ("Even assuming there is not direct *causal* evidence between mass shootings and higher casualty rates and rifles within the scope of the AWCA, California is entitled to make 'reasonable inferences' from the available data that shows a correlation." (quoting *Worman*, 922 F.3d at 40)); *S.F. Veteran Police Officers Ass'n v. City & Cty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (holding that LCM restrictions satisfied intermediate scrutiny where "[t]he record demonstrates that there is a very high correlation between mass shootings and the use of [LCMs]"); *see also Fantasyland Video, Inc. v. Cty. of San Diego*, 505 F.3d 996, 1002 (9th Cir. 2007) (upholding law under First Amendment based on "studies and reports, reported court decisions, and anecdotal testimony" supporting a "correlation between adult establishments and negative secondary effects" under intermediate scrutiny).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 47**

The State is not restricted to examining mass shootings in California to demonstrate a reasonable fit and may "rely on any evidence 'reasonably believed to be relevant'"—such as mass shootings in other jurisdictions—"to substantiate its important interests" under intermediate scrutiny.  *Fyock*, 779 F.3d at 1000 (quotations omitted).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a

categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 48**

The correlation between the use of assault weapons in mass shootings and substantially greater numbers of victims killed or injured strongly supports the reasonableness of the AWCA's fit.  *See Rupp*, 401 F. Supp. 3d at 993 (noting that "'a correlation between the use of assault weapons and the number of victims injured or killed' makes it '[m]ore likely' that there is a causal relationship" and that "California is entitled to make 'reasonable inferences' from the available data that shows a correlation" (citations omitted)).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

**Defendants' Proposed Conclusion of Law No. 49**

The AWCA is reasonably fitted to the State's important public-safety interests because assault-weapon restrictions, like the AWCA, are effective in reducing the incidence and lethality of mass shootings and the use of assault weapons in mass shootings.  *See supra* Proposed Findings of Fact, Section V.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the
inapplicability of interest-balancing tests when the challenged law amounts to a
categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI
Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at
pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-
230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the
Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp.
16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial
Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-
42; 231-245.

### Defendants' Proposed Conclusion of Law No. 50

In prohibiting the sale of assault weapons to law-abiding individuals, the AWCA
is reasonably fitted to the State's important public-safety interests because the
vast majority of firearms used in mass shootings are acquired legally.  *See supra*
Proposed Findings of Fact, Section IV, ¶ 117.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the
inapplicability of interest-balancing tests when the challenged law amounts to a
categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI
Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at
pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-
230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the
Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp.
16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial
Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-
42; 231-245.

### Defendants' Proposed Conclusion of Law No. 51

While intermediate scrutiny is the appropriate standard of scrutiny to apply to the
AWCA, the AWCA alternatively satisfies strict scrutiny.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 52

The State's public-safety interests in reducing the incidence and lethality of gun violence are compelling.  *See* Defs.' Ex. C (Donohue Decl.) ¶¶ 28-36 (DEF0012-16); Defs.' Ex. E (Klarevas Decl.) ¶¶ 9-11 (DEF-325-26).

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.

## Defendants' Proposed Conclusion of Law No. 53

The AWCA is narrowly tailored to those interests by restricting only certain military-style configurations that enhance the lethality of certain firearms and their effectiveness in mass shootings and violence against law enforcement personnel.  *See supra* Proposed Findings of Fact, Sections II, III.B, IV.

**Plaintiffs' Response:** See Plaintiffs' prior arguments regarding the inapplicability of interest-balancing tests when the challenged law amounts to a categorical ban on protected arms under *Heller*. Opp. to MTD at pp. 13-15; MPI Memo. at pp. 11-18; MPI Reply at p. 6; Supp. Brief at pp. 1-5; Pretrial Brief at pp. 13-16; Plaintiffs' Proposed Findings of Fact/Conclusions of Law ¶¶ 28, 227-230.

See Plaintiffs' prior arguments regarding the failure of the law to satisfy the Circuit's two-part test under any level of heightened scrutiny. Opp to MTD at pp. 16-17; MPI Memo. at 18-27; MPI Reply at 6-8; Supp. Brief at pp. 5-7; Pretrial Brief at pp. 16-25; Proposed Findings of Fact/Conclusions of Law ¶¶ 28-30, 35-42; 231-245.