1        UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3  JAMES MILLER, an individual;     )
   PATRICK RUSS, an individual; RYAN )
4  PETERSON, an individual; and SAN )
   DIEGO COUNTY GUN OWNERS POLITICAL )
5  ACTION COMMITTEE, a membership    )
   organization,                     )
6                                    ) No. 19-CV-1537-JAH-AGS
           Plaintiffs,               )
7                                    )
   v.                                ) February 3, 2021
8                                    )
   XAVIER BECERRA, in his official   )
9  capacity as Attorney General of   )
   California; and MARTIN HORAN, in  )
10 his official capacity as Chief of )
   the Department of Justice Bureau  )
11 of Firearms,                      )
                                     ) Courtroom 5A
12         Defendants.               )
   _____) San Diego, California

13

14              TRANSCRIPT OF PROCEEDINGS

15               (Court Trial - Day 1)

16

17  BEFORE THE HONORABLE ROGER T. BENITEZ, SENIOR DISTRICT JUDGE

18

19

20

21

22 COURT REPORTER:        AMANDA M. LeGORE
                          RDR, CRR, CRC, FCRR, CACSR
23                        U.S. District Court
                          333 West Broadway, Suite 420
24                        San Diego, CA 92101
                          amanda_legore@casd.uscourts.gov
25

```
 1              APPEARANCES PRESENT VIA VIDEO TELECONFERENCE

 2     APPEARANCES:

 3     FOR THE PLAINTIFFS:    GEORGE LEE
                              Seiler Epstein, LLP
 4                            275 Battery Street, Suite 1600
                              San Francisco, CA  94111
 5                            (415)979-0500
                              gml@seilerepstein.com
 6

 7                            JOHN DILLON
                              Gatzke, Dillon & Ballance, LLP
 8                            2762 Gateway Road
                              Carlsbad, CA  92009
 9                            (760)431-9501
                              jdillon@gandb.com
10

11                            ERIK JAFFE
                              Schaerr Jaffe LLP
12                            1717 K Street, NW, Suite 900
                              Washington, DC  20006
13                            (202)415-7412
                              ejaffe@schaerr-jaffe.com
14

15     FOR THE DEFENDANTS:    JOHN ECHEVERRIA
                              Office of the California Attorney General
16                            300 S. Spring Street, Suite 1702
                              Los Angeles, CA  90013
17                            (213)897-4902
                              john.echeverria@doj.ca.gov
18

19                            PETER CHANG
                              JOSE ZELIDON-ZEPEDA
20                            California Attorney Generals
                              455 Golden Gate Avenue, Suite 11000
21                            San Francisco, CA  94102
                              (415)703-5939
22                            peter.chang@doj.ca.gov
                              jose.zelidonzepeda@doj.ca.gov
23

24     ALSO PRESENT:          MARK BECKINGTON
                              ADAM KRAUT
25
```

| | |
|---|---|
| 1 | (Wednesday, February 3, 2021; 10:04 a.m.) |
| 2 | |
| 3 | P R O C E E D I N G S |
| 4 | |
| 5 | THE COURT:  Well, good morning. |
| 6 | THE ATTORNEYS:  Good morning, your Honor. |
| 7 | MR. CHANG:  Good morning, your Honor. |
| 8 | THE CLERK:  May I call the case, your Honor? |
| 9 | THE COURT:  Yes. |
| 10 | THE CLERK:  One on calendar, 19-CV-1537, Miller, et |
| 11 | al., versus Becerra, et al., bench trial. |
| 12 | THE COURT:  All right.  I guess, as a matter of |
| 13 | housekeeping, my understanding is that Mr. Becerra's no longer |
| 14 | the Attorney General and that Mr. Padilla is.  And I wonder if |
| 15 | it would be appropriate for us to amend the pleadings so as to |
| 16 | reflect that Mr. Padilla is now the defendant, as opposed to |
| 17 | Mr. Becerra. |
| 18 | Does that sound like -- doesn't that sound like |
| 19 | something I ought to do? |
| 20 | MR. ECHEVERRIA:  Good morning, your Honor.  This is |
| 21 | John Echeverria for the defendants. |
| 22 | THE COURT:  Yes. |
| 23 | MR. ECHEVERRIA:  I -- Mr. Padilla was appointed to be |
| 24 | a United States senator, and that's his current position. |
| 25 | Javier Becerra is still the Attorney General, even though he -- |

```
 1              THE COURT:  I'm sorry.  It has -- I'm sorry.  So who
 2    is the current Attorney General for the State of California?
 3              MR. ECHEVERRIA:  Javier Becerra is still --
 4              THE COURT:  Still is?  Okay.  All right.  Then I -- I
 5    got my players mixed up.
 6              All right.  Good enough.
 7              All right.  Counsel, please register your appearances
 8    for the record.
 9              And since I do have a court reporter here today,
10    please make sure you identify yourselves any time that you
11    speak.  Okay?  Great.
12              Starting with the plaintiff.
13              MR. LEE:  Good morning, your Honor.  This is George
14    Lee of the firm Seiler Epstein, LLP, appearing on behalf of the
15    plaintiffs.
16              MR. DILLON:  Good morning, your Honor.  This John
17    Dillon with the firm Dillon Law Group, APC, counsel for
18    plaintiffs.
19              MR. JAFFE:  Good morning, your Honor.  This is Erik
20    Jaffe of Schaerr Jaffe, LLP, Counsel for the plaintiff.
21              MR. LEE:  And, your Honor, there's -- this is George
22    Lee.  There's another attorney, but he is not attorney of
23    record for the plaintiffs:  Adam Kraut.  I think you heard him
24    testify in October.
25              He's currently in the Zoom waiting room, and would
```

1   request the ability to join by audio only, but not to

2   participate.

3             THE COURT:  Any objection?

4             MR. ECHEVERRIA:  Defendants don't object if Mr. Kraut

5   is just going to be observing.

6             THE COURT:  Okay.  Great.

7             All right.  Well, Counsel, let me -- let me just

8   first of all say this is rather an -- an unorthodox proceeding

9   that we're doing here, partly as a result of this COVID issue.

10  I have you all on video.  We don't have live witnesses.  I

11  can't see their faces.  I can't hear their tone of voice.  And

12  so, frankly, it's rather -- rather odd.

13            My recollection is that you folks had agreed that

14  declarations would be accepted as if in fact there had been

15  live testimony, and that there would be depositions taken.

16  And, again, that those would be used in lieu of live testimony.

17  I have -- I wish to thank you, and I say that with my tongue

18  firmly planted in my cheek, for the filings that I received

19  yesterday; which I believe totals 13,500 pages of information.

20  To put it into perspective, *War and Peace*, and *The Gulag*

21  *Archipelago*, put together, are approximately 3200 pages.

22            So if you -- any of you expect that I have read what

23  you submitted to me yesterday by today's hearing, you're only

24  fooling yourself.

25            Now, I had expected that I would get some kind of a

1    list of what excerpts I was going to be referred to because,

2    I -- I'll tell you, I may -- I may possibly -- if you ask me to

3    look at certain excerpts of the depositions, I will do that.

4    And if I think that in order to interpret the context or -- or

5    the story behind it, I may look to -- I may look beyond the

6    excerpts, I may do so.  But I have no plan whatsoever of

7    reading 13,500 pages in order to decide this case.

8            So, have -- have -- have I -- it's certainly possible

9    that I've missed something.  But is there a -- has there been a

10   submission from both the plaintiff and the defense as to what

11   portions of these depositions I am to be looking to for

12   purposes of determining what I have to determine?

13           MR. LEE:  Yes, your Honor.  This is George Lee.

14           So we certainly appreciate that -- the -- the task

15   the Court faces in this regard.

16           The parties had met and -- and conferred several

17   times by telephone to discuss how exactly we would be

18   submitting this.

19           We -- the parties have exchanged designations of

20   portions of the transcript.  And I believe we have endeavored

21   to -- we will get you -- those designations to the Court, if

22   they have not already been lodged.  But those are the relevant

23   portions that the parties have submitted in highlight form.

24           Now, the parties have also agreed to submit just the

25   entire transcript on the USB stick or the memory drive that the

1   Court has asked for.

2          So, certainly, the Court will have full copies of the

3   transcripts available if it needs to go outside of the

4   designation for context, et cetera.

5          THE COURT:  I think I already have those, don't I?  I

6   think that's part of the 13,000 pages, are the transcripts of

7   the depositions.  Am I not correct?

8          MR. LEE:  I -- plaintiffs have put the full

9   deposition transcripts on the -- on the USB memory device that

10  was delivered to your Honor's chambers.  What we submitted on

11  paper were the excerpts.

12         THE COURT:  Okay.

13         MR. DILLON:  Your Honor, this is John Dillon.  If I

14  can make a quick clarification.

15         What was submitted in actual hard copy materials were

16  the transcripts with the highlighted excerpts, but they did

17  actually have the full transcript as a part of that hard copy.

18         THE COURT:  Right.

19         MR. DILLON:  But the hard copies have highlighted

20  portions in them.

21         THE COURT:  So then your -- your view of what I

22  should be doing is going through these depositions -- these

23  13,000 pages of -- of material -- and then looking for the

24  highlighted sections.  And then -- and then -- and then take

25  notice of those?  Is that -- is that what you're saying?

1              MR. LEE:  Correct, your Honor.

2              THE COURT:  All right.

3              MR. ECHEVERRIA:  Your Honor?

4              THE COURT:  Yes.

5              MR. ECHEVERRIA:  This is John Echeverria for the

6    defendants.

7              THE COURT:  Yes.

8              MR. ECHEVERRIA:  We will be lodging with the Court

9    the designations and the counter-designations that we served on

10   the plaintiffs, to prepare the excerpts.  And we apologize to

11   the Court if those designations and counter-designations were

12   not included in what we -- what we lodged with the court.

13         I would also like to note that the way in which we

14   excerpted the transcripts appears to have been different from

15   the plaintiffs.

16             THE COURT:  I'm sorry.  I can barely hear you,

17   Mr. Echeverria.  Can you speak a little louder, please.

18             MR. ECHEVERRIA:  I will, your Honor.

19         The deposition excerpts that we -- that we lodged

20   with the court, in hard copy form, are only the pages that have

21   relevant testimony on them.

22         So we did not file hard copy versions of the

23   transcripts with full copies of the transcripts, with only the

24   relevant portions highlighted.  We only excerpted the relevant

25   pages.  But we will be lodging with the court the designations

1    and counter-designations so your Honor can see what we've

2    excerpted from the transcripts.

3            I would also like to note that the -- the parties had

4    previously filed a joint motion to move the proposed findings

5    of fact and conclusions of law deadline until after the trial,

6    until after the Court has admitted the evidence that the Court

7    will admit and after we have argument.

8            And we would -- the defendants would like to

9    reiterate that request, so that we can incorporate -- to the

10   fullest extent possible and in a way that would be most helpful

11   for the Court -- the relevant citations to the depositions.

12           THE COURT:  Makes perfectly good sense.

13           I -- I know I -- I remember seeing -- and forgive me.

14   But I seem to recall seeing proposed findings of fact from

15   someone.  Maybe from both.  I don't know.  But I thought that

16   it was helpful in the sense that it kind of points me in a

17   direction.  In a direction as to where I should be looking for

18   information that will help me determine this case.

19           But I think, Mr. Echeverria, your -- your suggestion

20   is an excellent one.  I think that proposed findings of fact

21   and conclusions of law would certainly be very helpful in --

22   and obviously after the designations have been made, and so on,

23   then you can -- you can specifically refer to parts of the

24   record in the proposed findings of fact and conclusions of law.

25   And that may also very well help me focus on what I think -- by

1  the way, simply because you submit it doesn't mean that I'm

2  going to adopt it.  I may adopt it in whole or in part, or I

3  may just completely disregard it if I don't believe that the

4  evidence supports what I'm being asked to find but -- or the

5  law.  So -- but, yeah, that would be very, very helpful,

6  Mr. Echeverria, and I appreciate your suggestion in that

7  regard.

8            All right.  So as for today, so tell me --

9  (laughing).  This is such an awkward proceeding.  I have to --

10  I have to tell you.

11           Tell me how -- how we should proceed today because

12  I -- this is your case, and I want to give you folks -- and

13  it's an important case.  And I want to give you as much leeway

14  as I possibly can in helping me resolve the issues that are

15  before me.

16           So what -- what is your plan of how we should proceed

17  today?

18                MR. LEE:  Your Honor --

19                THE COURT:  Let's start out with plaintiffs' counsel.

20                MR. LEE:  Thank you.

21           Your Honor, this is George Lee.

22           So I think the best way to proceed is to have the

23  parties be prepared to discuss the evidence that has been

24  submitted to your Honor, with a complete understanding that

25  your Honor has not had time to review all of the evidence that

 1   has been submitted by both parties.

 2          But I think this is our opportunity to discuss what

 3   the evidence that has been submitted shows or will show, and to

 4   discuss the law that applies to the evidence that has been

 5   submitted.

 6          Certainly there's a lot of evidence, as your Honor

 7   knows.  But I think if we can go through and highlight the

 8   major portions of the evidence, I think that that would assist

 9   the Court in being able to understand where to look and what

10   we're talking about.

11          THE COURT:  All right.  Mr. Echeverria, what's --

12   what are your thoughts?

13          MR. ECHEVERRIA:  Yes, your Honor.

14          I think that, preliminarily, there's certain

15   evidentiary motions that the Court has been presented with by

16   the defendants.  And the Court may want to entertain -- we

17   would ask for an opportunity to speak on those -- those

18   motions.

19          That would be the *Daubert* motion concerning the

20   testimony of John Lott, one of plaintiffs' experts.  And then

21   there is a -- kind of omnibus motion in limine concerning

22   certain other evidentiary issues that defendants have with

23   plaintiffs' case and plaintiffs' evidence.

24          Beyond the procedural -- or the evidentiary issues,

25   we're happy to, you know, present to the Court and highlight to

1   the Court evidence that we have submitted.

2          We would ask the Court to admit into evidence the

3   evidence that we've lodged with the court and that we've listed

4   on our exhibit list.  And -- and we're happy to entertain any

5   and all questions that the Court may have.

6          I would reiterate that the defendants --

7          THE COURT:  Well, but -- but -- but a prerequisite to

8   all of that is that I have read these depositions.  Right?

9          Wouldn't that be -- before I could possibly rule on

10  any of those issues you just raised, I -- I would have to have

11  read these depositions and would have to have them -- in fact,

12  would have to have them in front of me, so that I could see

13  whether or not whatever it is that's being objected to or

14  proposed, et cetera, is accurate.  Right?

15         MR. ECHEVERRIA:  Well, the evidentiary issues that

16  the defendants raised did not hinge on the deposition

17  testimony.  We did take depositions --

18         THE COURT:  All right.

19         MR. ECHEVERRIA:  -- for many of the witnesses -- to

20  which we object to their testimony -- out of an abundance of

21  caution.  But, for example, the *Daubert* motion regarding John

22  Lott does not depend on what he said during his deposition.

23         We did raise --

24         THE COURT:  I -- I -- I read your motion, your

25  *Daubert* motion.  I've also read your motions in limine.  So I'm

1    reasonably familiar with those.

2            Do you want to argue those now and see if we can get

3    those out of the way?

4            MR. ECHEVERRIA:  Sure.  Happy to.

5            Would your Honor like to begin with the motion in

6    limine or the *Daubert* motion?

7            THE COURT:  You -- whatever -- whatever makes you

8    happy.

9            MR. ECHEVERRIA:  Okay.  I think we can begin with the

10   *Daubert* motion, given that plaintiffs filed a declaration

11   relevant to that motion last night at 10:30.  And that was a

12   declaration from David Mustard.

13           Our *Daubert* motion was focused on decades of

14   questionable conduct raised by Dr. Lott and concerns expressed

15   by many researchers in the field about Dr. Lott's credibility

16   and his research practices and methods.

17           There was one exhibit that we attached to my

18   declaration in support of our motion that referenced a survey

19   that Dr. Lott claimed to have conducted in 1997 that people

20   have significant questions about.

21           I asked him, during his deposition, about that survey

22   data and about a suggestion that he had made that certain

23   professors received that data and refused to return the data.

24           THE COURT:  I'm sorry.  What?  I'm sorry.

25           MR. ECHEVERRIA:  So these three professors -- so

1   Dr. Lott had claimed that he sent data to three professors.

2   This would be Professors Megan, Black, and Ludwig (phonetic).

3   And that each of those professors refused to return his data.

4   That --

5           THE COURT:  I'm sorry.  Are you saying "return" his

6   data?

7           MR. ECHEVERRIA:  "Return."  Yes.  So these professors

8   allegedly received Dr. Lott's data and refused to give him back

9   his data after his computer allegedly crashed in 1997.

10          THE COURT:  Okay.

11          MR. ECHEVERRIA:  This is a claim -- this is a claim

12  that he's made off the record, and he reiterated it on the

13  record.

14          He did specify on the record during his deposition,

15  it appears that the data he gave to those three professors was

16  not the survey data that he claims to have done and lost, but

17  it related to certain regressions concerning concealed carry,

18  which was the whole point of his *More Guns, Less Crime* book.

19          And he reiterated his claim during his deposition

20  that he gave that data to Professors Megan, Black, and Ludwig,

21  and that each of them refused to return the data.

22          We have declarations that we have submitted.  We

23  submitted on January 27th, from each of those professors,

24  testifying that they did not return -- refused to return any

25  data to Dr. Lott.

1           This was a highly unusual claim to make about these

2    professors.  And I would note that the declaration of David

3    Mustard that was filed last night included as an exhibit an

4    excerpt from the study done by Megan and Black, in which in a

5    footnote, footnote 1, they thanked Dr. Lott for sharing the

6    concealed carry regression data with them.

7           So they publicly acknowledged that he gave them the

8    data.  And it would be highly unusual for them to then refuse

9    to return that data to Dr. Lott after he -- after his computer

10   had crashed.

11          But, in any event, we don't have to show that

12   Dr. Lott provided false testimony during his deposition, even

13   though there is significant question about whether he did do

14   that.

15          THE COURT:  So wait, wait, wait, wait.  Just a

16   second, Mr. Echeverria.

17          So -- so Dr. Lott or Mr. Lott or Professor Lott --

18   however you want to refer to him as -- says X.  He's -- he's

19   deposed.  He's under oath.  And then what?

20          We have declarations from people that say that what

21   he said was not true.  Right?

22          MR. ECHEVERRIA:  That's correct.

23          THE COURT:  Okay.  But -- but that doesn't go to

24   admissibility, does it?  That goes to the weight of the

25   evidence.  Right?

1          And so who's to say that Mr. Lott is wrong and the

2    people that filed declarations -- by the way, they weren't

3    deposed, were they?

4          MR. ECHEVERRIA:  They were not deposed.

5          THE COURT:  Okay.  So there's been no opportunity to

6    cross-examine those folks.  So who -- who's to say that what

7    Mr. Lott said is false?  Just because these people say it is

8    doesn't make it so, does it?

9          MR. ECHEVERRIA:  Well, I -- so for the *Daubert*

10   motion, we want to emphasize that we don't have to show that

11   Dr. Lott provided false testimony --

12         THE COURT:  I -- I agree.  I understand.  But what do

13   you have to show?

14         MR. ECHEVERRIA:  So we have to show that Dr. Lott

15   failed to reliably apply reliable methods in the field.  We

16   have other arguments on that point that I hope that I can

17   address.

18         But the fact that there's -- there are three

19   declarations, one under penalty of perjury from these

20   professors --

21         THE COURT:  Just a second.  Just a minute.  Excuse

22   me.  I -- I

23         (Telephone ringing.)

24         THE COURT:  (Laughing.)  My phone's going off, and

25   I'm trying to find it.  It's here somewhere.

1          (Pause, referring.)

2          THE COURT:  I think it stopped.

3          Okay.  Go ahead.

4          MR. ECHEVERRIA:  So -- so I was just saying that we

5  have three -- three sworn declarations from these professors

6  that they did not refuse to return data to Dr. Lott, which is

7  very strong evidence that Dr. Lott may have not provided

8  truthful testimony during his deposition.

9          THE COURT:  So you're saying that these declarations

10 are evidence, and that those declarations should control my

11 finding that somehow or another Dr. Lott -- what?  His

12 methodology is not -- is not reliable?  Is that -- is that your

13 point?

14         MR. ECHEVERRIA:  It's -- Dr. Lott's veracity and his

15 ability or willingness to tell the truth under oath during his

16 deposition and including in his declaration, they go -- they

17 don't just go to his credibility.  They go to his admissibility

18 and the admissibility of his testimony here.  And they raise

19 serious questions about whether --

20         THE COURT:  So just to make sure I understand -- I --

21 I hate to interrupt you.  But, you know, I --

22         MR. ECHEVERRIA:  That's fine.

23         THE COURT:  -- I like to address things as they come

24 up.

25         So you're saying that these declarations by these

1   people are evidence, and that that evidence can be used to

2   somehow diminish the admissibility of Dr. Lott's testimony?

3   Right?

4         MR. ECHEVERRIA:  Yes.  That is correct, your Honor.

5         THE COURT:  But -- but you do acknowledge, of course,

6   that those -- those declarations of those folks, that they have

7   not been deposed or cross-examined.  Correct?

8         MR. ECHEVERRIA:  We acknowledge that that is correct.

9         THE COURT:  Okay.  Good.  All right.

10        MR. ECHEVERRIA:  We also -- we also did request, in

11  one of our related filings -- either our ex parte application

12  to strike Dr. Lott's *Daubert* declaration or our opposition to

13  the plaintiffs' ex parte application to allow his declaration

14  to be filed out of time, we did request a *Daubert* hearing.

15        We -- if the Court feels the need to decide who is

16  telling the truth -- either Dr. Lott or each of the -- all of

17  the three professors -- we -- we're open -- open to having that

18  opportunity and to presenting that opportunity to the Court,

19  including possibly even having live testimony from Dr. Lott.

20        THE COURT:  Well, there -- therein lies the problem,

21  Mr. Echeverria.

22        Look, if we're going to start doing this with live

23  witnesses, if we're going to start -- if we're going to do

24  this, then let us just do this.  Let's just have a real trial

25  where we actually call live witnesses and bring people in.  I

1    mean, last time that we were here, you noticed -- I mean, I --

2    I -- I am the trier of fact.  I'm the one who's going to be

3    making a decision in this case.  And if I have questions, I

4    want those questions answered.

5         And one of the ways that I normally answer

6    questions -- at least in my 20-some-odd years as a judge, is I

7    put witnesses up on the stand, under oath.  I get to watch

8    their -- their facial expressions, their demeanor, listen to

9    their voice and their inflections, and so on.

10        So I don't know why -- why we would want to have a

11   live trial, if you will, as to Dr. Lott but not do that as to

12   everyone else.  You see what I'm saying?  Either we're going to

13   do this or we're not going to do this.  One or the other.

14   Right?

15        MR. ECHEVERRIA:  Frankly, your Honor, I don't know

16   that that has to be the case -- you know, the -- the defendants

17   and the plaintiffs, as well, are struggling with the fact that

18   we are in the midst of a highly unusual once-in-a-century

19   global pandemic.

20        Would it be my preference to be in the courtroom with

21   you right now with the witnesses?  Absolutely.

22        THE COURT:  Okay.  Well, I -- I agree.  I mean, I

23   wholeheartedly agree with you.  I'm doing this -- I mean, I'm

24   doing this more as an accommodation than anything else.

25        Okay.  So, fine.  Let's get back to the original

1    issue.  The original issue is -- so you say that Dr. -- or --

2    Dr. Lott's testimony should not be allowed in because he hasn't

3    told the truth in connection with this survey having to do with

4    the -- I think you said a concealed carry.  Was that --

5            MR. ECHEVERRIA:  So the -- so there are questions

6    about whether he has told the truth about conducting a

7    survey --

8            THE COURT:  Okay.

9            MR. ECHEVERRIA:  -- about the (indiscernible).

10           There's a separate issue about whether he is telling

11   the truth in this action that Professors Megan, Black, and

12   Ludwig refused to return data -- survey data to Lott.

13           THE COURT:  Okay.  I got it.  All right.  So what

14   else?  What else do you want me to know?

15           MR. ECHEVERRIA:  Yeah.  And so there are other issues

16   with John Lott's testimony.  Particularly whether he's -- he's

17   reliably applied reliable methods in the field.  And one of the

18   methods that he is proposing in this case -- it was present in

19   his preliminary injunction declaration, which has been marked

20   as Plaintiff's Exhibit 10.  It was referenced repeatedly during

21   his deposition and it was referenced again in his *Daubert*

22   opposition.  He was kind of reiterating this -- this idea he

23   has about why the federal assault weapons ban was purportedly

24   ineffective.

25           And this idea is that the share of mass public

1   shootings involving assault weapons went down during the

2   ten-year period that the federal ban was in effect, and

3   continued to go down after the ban was lifted.  And this idea

4   is something that is not seen anywhere in the literature.  It

5   hasn't been discussed in any of the cases.  This is something

6   that John Lott has just come up with in this case.

7          THE COURT:  But can't you -- can't you -- can't you

8   basically say that about every expert witness declaration or

9   testimony that has been put forth before me so far,

10  Mr. Echeverria?

11         I mean, if -- if -- say Lucy Allen, for example.

12  Lucy Allen conducts a study in a way that I can't say I've ever

13  seen or heard another study done the way she did her study.

14  Right?  Professor Donahue, some of the information that he puts

15  forward is also stuff that -- that there's really no support

16  for other than Professor Donahue's expression of his opinion,

17  based on the data as he examines it, and he arrives at a

18  certain conclusion.  But isn't that what experts always do?

19         I mean -- you know, this is why (laughing) there are

20  so many people that are so skeptical about expert witness

21  testimony.  Because, you know, you can express an opinion on

22  anything.  The question is, does it eventually carry the day in

23  the trier of fact's mind?  Right?

24         So --

25         MR. ECHEVERRIA:  We --

1          THE COURT:  So I don't know that you've so far said

2    anything that leads me to conclude that -- that Dr. Lott's

3    testimony is inadmissible.  It may not carry the day.  I'm not

4    saying that it will or it won't.  It may not carry the day, but

5    I don't -- I don't know that I see that it's -- that it's

6    inadmissible.

7          Anyway, go ahead.

8          MR. ECHEVERRIA:  So the Court, under -- under *Daubert*

9    and its progeny, serves as a gatekeeping function.  The -- the

10   Court is -- is absolutely correct that, you know, in some cases

11   experts may come up with novel ideas or novel theories or novel

12   ways of analyzing data or analyzing the facts of a case.

13         But the Court, when -- when -- when the issue is

14   properly raised by a party, the Court does have an obligation

15   to assess whether the methodology used by the expert is a

16   reliable methodology.

17         The methodologies used by defendants' experts in this

18   case, the methodology is -- is a reliable one.  It's been a

19   methodology used in other cases.  It's been published.  Many

20   cases in peer review journals.  So there really isn't a

21   question about what Lucy Allen or John Donahue has done.

22         There was some question about, frankly, what -- what

23   Dr. Klarevas had done in looking at gun massacres involving six

24   or more mortalities.

25         But as I drew out of Dr. Lott during his

1  deposition -- and it's just readily apparent on the face of his

2  declaration -- that there are other studies that have looked at

3  six or more fatalities.  So it's not like Dr. Klarevas just

4  came up with that on his own.  Even so, setting a fatality

5  threshold at six is not an unreliable method.

6          But here we have Dr. Lott coming up with this share

7  test that hasn't been anywhere in the literature, anywhere in

8  the case law.  And there are just logical fallacies that

9  underlie this approach that are readily apparent.

10          He doesn't account for substitution effects or

11  spillover effects, which he even discussed in his *Daubert*

12  declaration.  He acknowledged that there could be a

13  substitution effect during the federal assault weapons ban,

14  where people would use other weapons instead of assault weapons

15  to try to carry out mass shootings.

16          And during his deposition Dr. Lott acknowledged that

17  the substitution may be of a less effective or less lethal

18  firearm that would make it more difficult for an individual to

19  kill the requisite number of people.  So therefore --

20          THE COURT:  You kind of lost me on that.  So -- so --

21  so are you saying --

22          MR. ECHEVERRIA:  Sorry, your Honor.

23          THE COURT:  Do me a favor.  Just restate that for me

24  one more time.

25          MR. ECHEVERRIA:  Sure.

1          So Dr. Lott's share (phonetic) test has several

2   logical problems with it, and one of them is the substitution

3   effect.  He fails to account for the fact that during the

4   federal assault weapons ban, when it was more difficult for

5   would-be shooters to acquire assault weapons, they may

6   substitute different weapons.  And according to John Lott --

7          THE COURT:  But isn't that important?

8          I mean, doesn't -- doesn't -- doesn't that actually

9   work in plaintiffs' favor?

10         MR. ECHEVERRIA:  Absolutely not.

11         THE COURT:  Why -- why not?

12         MR. ECHEVERRIA:  Because by forcing prospective

13  shooters to use different weapons than assault weapons, where

14  our evidence shows that when assault weapons are used more

15  people -- significantly more people are injured, they may use

16  weapons that are less effective at murdering people.  And,

17  therefore, it may be more difficult for those shooters to

18  murder the requisite number of people to qualify as a mass

19  shooting.  So it's not --

20         THE COURT:  But they -- but -- but if I heard you

21  correctly, they did.  Right?  So during the -- the federal

22  assault weapons ban, the -- by the way, this is -- this is a

23  problematic issue for me that maybe we'll discuss later.  But

24  right now I'm going to use a very broad, generic definition of

25  assault weapon.

```
1        But if what you're saying is true, during the federal
2   assault weapon ban, we still had mass shootings, but the people
3   that are doing the mass shootings were using different weapons.
4   Right?
5        MR. ECHEVERRIA:  We're not denying -- we're not
6   disputing that mass shootings continued to happen under the
7   federal assault weapons ban, and that some of those shootings
8   involved other weapons.
9        The point is that the number of mass shootings, in
10  total, went down during the federal assault weapons ban.  So
11  the denominator --
12       THE COURT:  So let me ask you -- because this has
13  been troubling me quite a bit.  So you -- you argue that, look,
14  the -- the legislature has done a -- one -- one bang-up job of
15  considering evidence, which does not have to be like the
16  evidence that you present in court.  But evidence.  But they've
17  done all of this work, and they came up with this idea that we
18  have to ban these -- these weapons.
19       But -- but -- but the federal government, which has
20  even more resources than the state government does, did the
21  same thing.  And they -- and they -- they decided that the
22  assault weapons ban wasn't effective, and so they allowed it to
23  lapse.  And that was -- what?  2004.  So my math is not very
24  good, but I'm going to say that was at least -- what?  17 years
25  ago?  And in 17 years, the federal government has not elected
```

1    to reinstitute an assault weapons ban.  I'm not saying they may

2    not now, in light of recent elections, and so on.  But -- but

3    they didn't reinstitute the federal assault weapons ban.

4         So if you can say -- so why -- if the federal

5    government has greater resources than the state and has a much

6    broader ability to compile evidence in support of something, if

7    they concluded that in 2004 that they would allow the -- the

8    ban to lapse, why -- why doesn't -- why is that not something

9    that I should consider as evidence that supports Dr. Lott's

10   conclusion?

11        Because one would expect -- one would expect, would

12   they not, that if in fact the evidence -- the study that

13   Dr. Lott conducted was erroneous or inaccurate or that he

14   reached the wrong conclusion, that the federal government would

15   not have allowed the weapons ban to lapse.  Or that certainly

16   in the last 17 years since it lapsed -- I think I've got the

17   date right.  Right?  Wasn't it in 2004 that it lapsed?

18        MR. ECHEVERRIA:  September 2004.

19        THE COURT:  Right.  So, you know, they would have

20   reenacted it.  But they -- they haven't.  So leads me to

21   conclude that perhaps Dr. Lott's assessment may not be so

22   wrong.

23        In any event, can I say this, Mr. Echeverria, in

24   order to -- in the interest of time?

25        Look, *Daubert* motions and the Court's function as a

1   gatekeeper are much more important when -- when we have juries,

2   laypeople -- right? -- hearing evidence because they may be

3   confused or misled.

4           But when we have a bench trial, which is what we have

5   here, I'm the one who's -- I don't know how many cases I've

6   tried over the years but it's -- it's more than a handful.  And

7   I think I have a pretty good idea of being able to sort through

8   evidence and be able to, you know, separate the wheat from the

9   chaff.

10          So I wonder if we really effectively are using up our

11  time by arguing about this.

12          So far everything that you've said to me -- and by

13  the way, Mr. Echeverria, I -- I -- I love listening to you.  I

14  think you do a wonderful job on behalf of your client, and I

15  appreciate your -- your advocacy.  But I just think that

16  nothing that you've said to me so far would -- would work to --

17  to make Dr. Lott's evidence inadmissible.  Okay?

18          Now, if you want to keep arguing about it, I'll keep

19  listening to you because, you know what, I've got the time.

20  But I'm just telling you where I am right now.  Okay?

21          MR. ECHEVERRIA:  Your Honor, I do appreciate that --

22  that insight, your Honor.

23          I would note that, you know, we understand and we

24  acknowledged in our *Daubert* motion that this is a bench trial.

25  And the interests in excluding unreliable expert testimony is

1    diminished at a bench trial.

2           But a *Daubert* inquiry is still appropriate even in a

3    bench trial, so we wanted to make that motion, to give the

4    Court an opportunity to examine and probe the reliability of

5    the methods that Dr. Lott used.

6           But, in any event, the evidence that we presented and

7    the arguments that we presented about Dr. Lott's credibility

8    issues and the logical problems with his share test for

9    assessing the federal assault weapons ban relate to the merits

10   of the case, irrespective of whether the Court grants or denies

11   our motion to conclude --

12           THE COURT:  Yeah, I gather that.  I gather that to be

13   the case.

14           MR. ECHEVERRIA:  And I would also like to note that

15   even if the Court -- well, I -- I would want to push back on

16   something that the Court did say earlier, and that is the --

17   that the federal government allowed the federal assault weapons

18   ban to lapse in 2004 because it was ineffective.  This is a

19   claim made in many of the cases that I've been litigating,

20   defending California's gun safety laws.  And it is just not

21   what Koper's 2004 report says.

22           That report is clear that a final assessment of the

23   efficacy of the federal assault weapons ban was premature and

24   that more time was needed to allow, basically, the medicine to

25   work through the system.

```
 1            THE COURT:  But don't you think -- don't you think,
 2   Mr. Echeverria -- I mean, are you -- you're certainly not
 3   saying to me that our representatives in Congress are any less
 4   responsible or -- or more negligent than -- than our
 5   representatives in the state legislature.  And certainly if
 6   they thought that -- that -- that the assault weapons ban was
 7   effective -- I mean, common sense tells me that they would not
 8   have allowed it to lapse.  What they might have done, it seems
 9   to me, is they might have extended it and continued with their
10   evidence -- evidentiary search until in fact they were able to
11   come up with a finite conclusion one way or the other:  Is this
12   effective or not effective?
13            But I would think that -- that if in fact it was an
14   issue and if -- and if in fact they thought that it was an
15   important legislative accomplishment on their part, that --
16   that they would have not allowed it to lapse.  They would have
17   just conducted -- continued to conduct studies until they --
18   until they had a finite answer, or at least an answer that
19   satisfied them.  Instead, they said, "Uh, we're going to let
20   this thing lapse."
21            Now, what -- you know, whether they did that because
22   they didn't think that it was effective, I don't know.  But it
23   certainly -- it seems to me common sense tells me they wouldn't
24   have allowed it to lapse if they thought it was being
25   effective.
```

1          Anyway -- but that's arguing the merits, I think,

2     more than anything else.  And I think that gets us beyond this

3     *Daubert* motion, I think.

4          MR. ECHEVERRIA:  Well, I would just say that the fact

5     that the federal assault weapons ban was allowed to lapse, it

6     doesn't bolster the reliability of John Lott's share test that

7     he's been promoting --

8          THE COURT:  Why not?  Why not?

9          MR. ECHEVERRIA:  Well, because the fact that the

10    federal assault weapons ban lapsed is a political judgment.

11    And as your Honor acknowledges, we can't really say for certain

12    why the legislature allowed the sunset clause to go into

13    effect.

14          I mean, as your Honor --

15          THE COURT:  You can say that about any legislative --

16    in fact, you could say it about the legislative enactment that

17    we have before us right now, that it's a political act.  Right?

18          MR. ECHEVERRIA:  Well, it's a political judgment to

19    enact gun safety laws.  But, in this case, it was a political

20    judgment based on facts.  Facts --

21          THE COURT:  Are you saying that the federal

22    government -- let me make sure I understand, Mr. Echeverria.

23    Are you saying --

24          MR. ECHEVERRIA:  Sure.

25          THE COURT:  -- that when the federal government

1   allowed the assault weapons ban to lapse, they were not

2   exercising legislative judgment?  That they were just being

3   lazy, and they didn't have anything else to do, or -- or -- or

4   had other things to pay attention to and they just said, uh, we

5   don't care about this.  Let it lapse.

6           MR. ECHEVERRIA:  Well, I am definitely not saying

7   that, your Honor.

8           I'm saying that when the federal assault weapons ban

9   expired there was no statement of legislative intent.  There

10  wasn't a declaration that the ban was ineffective, or anything

11  like that.

12          But there was a substantial amount of legislative

13  evidence explaining why Congress enacted the federal assault

14  weapons ban.  About the use of assault weapons in mass

15  shootings and gun violence against police and gang violence.

16          THE COURT:  Okay.

17          MR. ECHEVERRIA:  So I don't think the Court can

18  ascribe a particular motivation to the legislature in allowing

19  the federal assault weapons ban to lapse.

20          THE COURT:  Okay.

21          MR. ECHEVERRIA:  That's all I'm saying.

22          THE COURT:  Listen, can I ask you a question?

23  Because you -- you -- you just -- you -- you kind of caused me

24  to think about something.

25          Was the definition of an assault weapon in the

1    federal assault weapons ban identical to the definition to the

2    assault weapon ban that the State of California is using?

3            MR. ECHEVERRIA:  No, they are different, and I'm

4    happy to explain the difference.

5            THE COURT:  Tell me the differences.

6            MR. ECHEVERRIA:  So the federal assault weapons ban

7    applied to -- was not limited to centerfire rifles like

8    California's Assault Weapons Control Act.  So even rimfire

9    rifles that fire .22 caliber ammunition could qualify as an

10   assault weapon under the federal statute.

11           Another -- probably the bigger difference -- the

12   centerfire distinction is kind of underappreciated in the

13   literature.  But the big distinction is that the federal ban

14   required a prohibited assault weapon to have two qualifying

15   features.  And that -- the federal ban was enacted in 1994.

16   And then, in 2000, California adopted its own features-based

17   test.

18           THE COURT:  What were the features in the -- in the

19   federal assault weapons ban?

20           MR. ECHEVERRIA:  So I don't have the statute in front

21   of me.  It is an exhibit, however, that we submitted.  But it's

22   many of the same features that we have identified in --

23           THE COURT:  Wait.  You said there were two features,

24   and so it can't be many.

25           MR. ECHEVERRIA:  So --

1              THE COURT:  What were the two features?

2              MR. ECHEVERRIA:  No, it -- a weapon would have to

3     have two or more qualifying features.  Like a pistol grip, a

4     telescoping stock, folding stock, flash suppressor.  It would

5     also have to have a detachable magazine -- capable of accepting

6     a detachable magazine.

7              So if a firearm has two or more features listed in

8     the federal assault weapons ban, it would qualify as an assault

9     weapon under federal law.

10             In California, taking --

11             THE COURT:  Was -- was -- was the hand grenade or

12    flare thrower one of the features?

13             MR. ECHEVERRIA:  I would have to double-check, your

14    Honor, but I believe it was.  I will double-check on that.

15             The flame launcher and grenade launcher feature is

16    not really hotly disputed by the parties in this case, but I

17    will double-check.

18             THE COURT:  (Laughing.)  Is that right?

19             Okay.  I'm laughing because, frankly, I'm sitting

20    here.  And I'm -- from the time this case started, I kept

21    asking myself, well, how -- how many -- how many grenade

22    launchers are there out there?  And how many people commonly

23    own guns that have grenade launchers?  And what do they use

24    them for?  I mean, do I go quail hunting and you launch a

25    grenade and you get the whole covey of quail at one time?  I

```
 1  don't know.  I don't mean to make light of it, but I just
 2  thought this is one of the really funny issues.  And now you're
 3  telling me that it's not hotly debated, and I'm trying to
 4  figure out --
 5          Is that right, Mr. Lee?  Is -- and I'm not -- I'm not
 6  trying to steer your argument one way or the other.  But is
 7  that right?  Is it -- is it really true that it's not a big
 8  issue?
 9          MR. LEE:  I wouldn't say it's not hotly debated.  It
10  certainly hasn't been the center of the parties' arguments.
11  But everything's at issue in this case.
12          THE COURT:  Okay.
13          MR. ECHEVERRIA:  If I may, your Honor, the -- the
14  plaintiffs' concede that grenade launchers are legal under
15  federal law.  They claim that the grenade launcher feature is
16  superfluous; not that individuals need a grenade launcher for
17  self-defense.
18          General Youngman testified in this case.  He has seen
19  grenade launchers affixed to rifles -- typically the M16 -- in
20  his military service.  It's a military feature of
21  military-issued weapons.  I mean, that's why California has
22  included that feature as -- as an assault weapon feature.
23          THE COURT:  Okay.
24          MR. DILLON:  Your Honor, if I may make a quick
25  clarification.
```

1          Grenade launchers, under federal law, are not in fact

2    illegal.  They are regulated under the National Firearms Act.

3    So there's nothing illegal about them.  Merely, they require

4    additional paperwork in order to, you know, own and possess it.

5          Plaintiffs have also -- Mr. Echeverria has

6    identified -- we've made the claim that the grenade launcher is

7    listed as a destructive device under California law, and so it

8    is already prohibited.

9          The fact that it is included as one of the prohibited

10   features in the California Assault Weapons Act is, you know,

11   unnecessary.  And if it were removed, it would change nothing

12   with regard to, you know, California's access to grenade

13   launchers in that respect.

14         THE COURT:  Can I ask a question?  It's the problem

15   with this case, is that every -- everything raises a question.

16         So let me ask this.  Are machine guns -- is it

17   illegal to own a machine gun in the state of California?

18         MR. DILLON:  Technically speaking, you can get a

19   Class 3 weapons permit and get lawful possession of a machine

20   gun, although there are additional requirements and standards

21   that you would have to meet before you could ever use one.

22         THE COURT:  All right.  So it's like the federal --

23   like the federal law --

24         MR. LEE:  Well --

25         THE COURT:  -- which allows you to own one, but you

1  have to go through some regulatory steps in order to be able to

2  own one.  Right?

3          MR. LEE:  And -- correct, your Honor.  And I do think

4  there is a specific penal code statute pertaining to possession

5  of machine guns.  That's a separate statute.

6          THE COURT:  Yeah, I understand that.  But I was just

7  trying to -- so -- so -- so the reason why I asked the question

8  was because -- all right.  So grenade launchers -- as I was

9  joking, I was saying, look, I don't really know how many people

10 would own a grenade launcher.  I don't know.  I honestly don't

11 know.  I have no idea.  Maybe they're very popular.  Who knows.

12         But -- but it struck me, based on what Mr. Dillon

13 said, that apparently you can own a grenade launcher in

14 California if you go through some regulatory process; just like

15 you can own a machine gun if you go through some regulatory

16 process.  Licensing or whatever.  Right?

17         I mean, you get a special permit or a special

18 license, or whatever.  Right?

19         So -- okay.  All right.  Anyway.  But what I was --

20 the reason why I asked about the federal ban and the definition

21 of an assault weapon is because, you know, this case has been

22 fraught with mixing apples and oranges, and it's been kind of

23 difficult for me in reading some of the things that I've read.

24 Because an assault weapon is not an assault weapon.  Just like

25 a mass shooting is not a mass shooting.  Right?

1          An assault weapon, for some definitions, may be --
2     may be something.  In other definitions, it may be something
3     completely different.  Or maybe not completely different but
4     something in addition to.
5          The same thing with mass shootings.  We know that
6     some people say three.  Others say four.  Others say five.
7     Others say six.  Some include the shooters.  Some do not.
8          So whenever I read all of this material that I have
9     read so far, I find it very confusing because I say to myself,
10    Wait a minute, wait a minute, wait a minute.  What kind of
11    assault weapon are they talking about?  What is it that we're
12    talking about?  What kind of a mass shooting are we talking
13    about?  Were we talking about a three, four, five, six?  Does
14    it include the shooter?
15         The same thing goes for the commonality issue.  And
16    the same thing goes for the number of mass shootings.
17    Sometimes we talk about, well, the mass shootings nationwide.
18    But then we talk about guns only in the state of California.
19         So when we look at some of these studies and some of
20    these -- these statistics that have been provided to me so far,
21    it's kind of confusing because -- well, if -- if you want to
22    talk -- if you -- if you want to compare apples to apples, so
23    then we can do this.  And we can say, okay, how many mass
24    shootings have there been in the state of California?  And then
25    we look to see how many of these weapons are owned in the state

1   of California.

2          Or if we're going to look nationally, we're going to

3   say, okay, how many mass shootings have there been nationally?

4   And then let's look at the number of weapons that are owned

5   nationally.  You see?

6          But it seems like all of these folks -- you know,

7   they seem to pick and choose what seems to support their

8   opinion.  Do you follow what I'm saying?  And so the assault

9   weapon definition for me is very confusing.

10          So, for example, one of the issues that has recently

11   come up is this new definition about -- what is this?  Is this

12   the armory rifle?  Or what -- what is the -- the -- the one

13   that -- that -- I don't have it in front of me.  But it's not a

14   rifle.  It's not a shotgun.  And it's not a pistol.  But,

15   nevertheless, it's an assault weapon.

16          Do you understand what I'm saying?

17          MR. ECHEVERRIA:  I do, your Honor.  It --I do know

18   what you're talking about.

19          This -- your Honor actually raises another important

20   preliminary issue that we should address before getting into

21   the merits of the trial.  The plaintiffs are claiming to be

22   challenging newly added provisions to the Assault Weapons

23   Control Act governing rifles, pistols, and shotguns -- or

24   weapons that don't qualify as a rifle, pistol, or shotgun but

25   have certain features.

1           This is not a claim that was raised in their first

2    amended complaint.  And they asked -- the plaintiffs' asked for

3    leave to amend their complaint to challenge these provisions

4    shortly before the October evidentiary hearing.  And the Court

5    did not allow leave to amend.

6           The Court also observed that their -- or questioned

7    how -- how these newly invented weapons would --

8           THE COURT:  What are they?  I mean, is there such a

9    thing?  What -- is there a weapon that's -- that's a

10   centerfired weapon, that's not --

11          MR. DILLON:  Your Honor -- your Honor, if I may?

12   This is John Dillon.

13          THE COURT:  Yes.

14          MR. DILLON:  Yeah, so this kind of goes to the

15   overall theme of the ever-expanding definition in California of

16   what constitutes an assault weapon.

17          But with regard to your question on this new category

18   of firearm, you know, California's definitions surrounding

19   firearms have -- are very specific.  And they identify, you

20   know, what is considered a rifle, what is considered a shotgun,

21   what is considered a handgun based on a mixture of, you know,

22   quite -- their features and how they're intended to be used.

23          For example, a rifle is defined as something that has

24   a rifle barrel and a buttstock that's meant to be fired --

25   bracing, firing against your shoulder.  While a handgun is not

1    meant to be braced against your shoulder with a buttstock.

2            In this definition surrounding assault weapons or

3    assault rifles, assault pistols, and assault shotguns, there

4    was a company who created a new -- an arguably new class of

5    firearm in sense of it was just considered a firearm.  It did

6    not meet the definition of a rifle, pistol, or shotgun under

7    California law because it had a rifle barrel over 16 inches in

8    length and it did not have a buttstock.  So it didn't really

9    meet any of the definitions under California law.

10           And because it didn't meet any of the definitions

11   under California law at the time, it was not regulated by the

12   Assault Weapons Control Act.

13           THE COURT:  Oh, I get it.  I get it.

14           So, basically, if I -- if I can interrupt you for

15   just a second.

16           By the way, I did not -- I did not grant leave to

17   amend with regards to that.  But it's only important to me in

18   regards to the question that I posed before, which is what

19   exactly is an assault weapon?

20           And, as I said, in some cases it's this, and in other

21   cases it's that, and in other cases it's that.  And so if we're

22   going to talk about expert witnesses and their opinions, and so

23   on.  And if we're going to read articles and we're going to

24   read -- we have to all have a definition that we're working

25   from.  Otherwise, it's -- it's totally unmanageable.

1          But, anyway, so I asked the question about this

2    because I was trying to figure out, what -- what -- what the

3    heck is this thing that's -- that's not a rifle, a pistol, or a

4    shotgun?

5          If I understand you correctly, Mr. Dillon, this is

6    like a pistol but it has a barrel that's 16 inches long or

7    more.  Is that correct?

8          MR. DILLON:  Yes, I believe so, your Honor.  So the

9    barrel length is a minimum of 16 inches or greater than 16

10   inches in length.

11         There's no actual buttstock on the firearm, so it's

12   not considered a rifle.  And because it has a rifling, it's not

13   considered a shotgun.

14         THE COURT:  So what do you consider a rifle barrel

15   that can fire a shotgun shell?

16         MR. DILLON:  Well, again, the -- the laws often don't

17   account for the many, many variations of firearms.

18         I think your Honor's referencing the fact that there

19   are certain shotguns that have rifle barrels for hunting

20   purposes, like turkey -- turkey hunting.  But under the laws,

21   those still count as shotguns.

22         THE COURT:  What do you -- what do you -- what do you

23   call a handgun that can fire a shotgun shell but has a rifle

24   barrel?

25         MR. DILLON:  Well, it depends on whether it's federal

1    law or California law, your Honor.

2              THE COURT:   (Laughing.)

3              MR. DILLON:   I believe under California law, there

4    are firearms that do fire shotgun shell -- handguns that fire

5    shotgun shells with a rifle barrel that are technically

6    considered short-barrel shotguns.   But, again, we're going to

7    be getting into the weeds.

8              THE COURT:   Well, that's -- that's -- that's the

9    problem.   Is that, you know, California's got so many laws

10   and -- you basically have to have a lawyer at your hip in order

11   to know whether when you are handling a firearm you're

12   violating the law and committing a felony.   Which has been part

13   of the problem, as I pointed out in the -- in -- in the *Duncan*

14   case.

15             But, anyway, all right.   So we've strayed a little

16   bit far afield from where we were going.

17             Is there anything else you wanted to address, Mr. --

18   Mr. Echeverria, in connection with your *Daubert* motion?

19             MR. ECHEVERRIA:   One final point.   And this is a

20   point that also bleeds into the merits of Dr. Lott's share

21   test.   Is that Dr. Lott fails to account for another

22   confounding variable, which was the existence of the ban on

23   large-capacity magazines that existed when the federal assault

24   weapons's ban was in effect.   So when the ban was lifted,

25   large-capacity magazines were more readily available and usable

1    in non-assault weapons, allowing those shooters to commit mass

2    shootings killing the requisite number of victims.  And,

3    therefore, it's not surprising to see that the share of mass

4    shootings not involving assault weapons may have increased or

5    may have stayed the same, as Dr. Klarevas shows.

6             THE COURT:  Where's the evidence?  Where's the

7    evidence to support that?

8             MR. ECHEVERRIA:  The evidence to support the

9    proposition that large-capacity magazines were made available

10   after the expiration of the federal assault weapons ban and --

11            THE COURT:  And used -- and used as a -- not assault

12   weapons.  Isn't that what you said?

13            MR. ECHEVERRIA:  So after the federal assault weapons

14   ban was lifted, we have evidence from Lucy Allen's study that

15   shows that large-capacity magazines are -- are used in roughly

16   a majority of public mass shootings.  So they are used more

17   frequently than assault weapons, so it's not surprising that --

18            THE COURT:  Well, wait a minute.  Wait a minute.

19   That's -- I'm sorry.  See, that's when I get a little confused.

20            But I thought, by definition, if it had the

21   large-capacity magazine, it was an assault weapon?

22            MR. ECHEVERRIA:  That is not correct, your Honor.

23   The -- so the -- the large-capacity magazine restrictions in

24   the federal assault weapons ban were a separate aspect of the

25   assault weapons ban.

1          So by ignoring that large-capacity magazines also

2    cause significant fatalities and mass shootings, Dr. Lott --

3          THE COURT:  What -- what weapons -- what weapons use

4    large-capacity magazines?

5          Look, so -- so tell me a specific instance where a

6    weapon was used in a mass shooting with a large-capacity

7    magazine, which -- for, again, purposes of making sure we're

8    talking about apples and apples and not apples and oranges, I'm

9    going to assume you're referring to a magazine that holds ten

10   rounds -- or more than ten rounds.

11         MR. ECHEVERRIA:  That's right.

12         THE COURT:  So what specific incident, for example,

13   can you point to me that tells me there was a weapon that was

14   used, that was not an assault weapon, that had a -- a magazine

15   that was ten rounds -- more than ten rounds?  I did not see

16   that in Ms. Allen's declaration.  Maybe it's in her deposition.

17   I -- I --

18         MR. ECHEVERRIA:  So, I'm sure there are many.  Many

19   examples of those kinds of shootings in Ms. Allen's appendix

20   where she lists every single one of the over 160 public mass

21   shootings that she examined.

22         One shooting that comes to mind readily -- because

23   the plaintiffs have made a major issue about it -- is the

24   Virginia Tech incident, where the shooter used, I believe it

25   was, two handguns with large-capacity magazines to murder --

1   well, an extraordinary number of victims.  At the time, I

2   believe it was one -- if not the highest fatality mass shooting

3   in the country.  So that was an example of a shooting that

4   occurred after the federal assault weapons ban, where someone

5   was able to use non-assault weapons with large-capacity

6   magazines to commit a public mass shooting, killing the

7   requisite number of victims.

8           THE COURT:  And why was that not an assault weapon?

9           MR. ECHEVERRIA:  It didn't qualify as an assault

10  weapon under federal law.  He used, I believe, a Glock with .22

11  caliber ammunition.  And I'm -- I'm unfortunately forgetting

12  what the other --

13          THE COURT:  .22 caliber.  That's rimfire.  Right?

14          MR. LEE:  Your Honor, this is George Lee.  The

15  shooter in Virginia Tech used a Glock handgun.  And a .22

16  Walther pistol.

17          MR. ECHEVERRIA:  Oh, thank you.

18          THE COURT:  Neither one of those is a rimfire?

19          MR. LEE:  One -- the .22 -- well, the Walther is a

20  rimfire.

21          THE COURT:  .22

22          MR. LEE:  Right.  The Glock was a 9 millimeter

23  handgun, I believe.  And the shooter used a combination of

24  ten-round and 15-round magazines, allegedly.

25          THE COURT:  So -- but if I understand the statutes

1   that are before me right now, you could still own a .22 rimfire

2   pistol that has a detachable magazine and holds more than ten

3   rounds.  Am I not correct?

4          Am I incorrect in that?

5          MR. LEE:  Well, your Honor, after your Honor's ruling

6   in *Duncan*, I believe that would be the case.

7          THE COURT:  Okay.

8          MR. ECHEVERRIA:  Your Honor, this is John

9   Echeverria --

10         THE COURT:  Yes.

11         MR. ECHEVERRIA:  -- if I may?

12         So in Lucy Allen's declaration, beginning on page

13  marked DEF0028, she provides an appendix, a listing of all of

14  the mass shootings that she evaluated, with columns coding

15  whether the mass shooting involved a large-capacity magazine --

16         THE COURT:  Okay.

17         MR. ECHEVERRIA:  -- and/or an assault weapon.

18         So your Honor can readily see -- I hate to add to the

19  workload that your Honor has.

20         THE COURT:  That's okay.

21         MR. ECHEVERRIA:  It appears that the Court may be

22  interested in this.

23         You can see the particular shootings that involved

24  non-assault weapons with large-capacity magazines and the

25  casualty counts from those shootings.  That is all in Lucy

1    Allen's declaration.

2              THE COURT:  Okay.  Got it.

3              MR. ECHEVERRIA:  So aside from the problems with the

4    reliability of John Lott's share test, which is readily

5    explained by substitution effects, spillover effects, and also

6    large-capacity magazine restrictions, there is the -- we -- we

7    do have a motion to preclude other testimony which we presented

8    by way of kind of an omnibus motion in limine that we would

9    also like to -- to present argument to the Court, if the Court

10   has interest in considering our arguments on the motion in

11   limine.  I think that would be another important issue to

12   address before the merits.

13             THE COURT:  I'm always interested --

14             MR. DILLON:  Your Honor?

15             THE COURT:  Yes.

16             MR. DILLON:  Sorry.  This is John Dillon.

17             Before we start going into defendants' arguments on

18   the motion in limine, I would like the opportunity to be heard

19   with regard to opposing the *Daubert* motion.

20             THE COURT:  All right.  Well, that's fair enough.

21             Go ahead.

22             MR. DILLON:  Okay.  So we -- we went over a lot of

23   different topics in the last hour but I'll try to be brief.

24             First, we agree with the Court that even if you

25   accept all of the defendants' claims, that they go to the

1  weight that is going to be given to Dr. Lott's testimony, and

2  they're not enough to exclude his testimony whatsoever.

3        We believe plaintiffs have provided sufficient

4  responses to the many allegations against Dr. Lott's

5  credibility in their motion through point-by-point responses in

6  our brief, as well as Dr. Lott's declaration and attached

7  exhibits.

8        We note that most of the credibility allegations

9  coming from defendants stem from, you know, largely a single

10 source of two individuals, Evan DeFilippis and Devin Hughes,

11 who seem to recirculate these same allegations against Dr. Lott

12 every few years or every time he publishes a new book on crimes

13 or gun violence.

14       And defendants have largely ignored the multiple

15 published point-by-point responses that Dr. Lott has drafted

16 over the years that address these allegations.  Which, frankly,

17 are unsupported by any real evidence.

18       So we'll just point the Court to -- let's see.

19 Plaintiffs' Trial Exhibit No. 032, Exhibits 1 through 3 -- or 1

20 through 4, that specifically address all of these allegations.

21       Next, with regard -- (coughing) excuse me -- to the

22 allegations surrounding the survey data that the defendants

23 added in their reply brief to the *Daubert* motion, we want to

24 make something very clear to the Court.  Is the defendants

25 have, you know, made the claim or at least implicitly implied

1  that Dr. Lott has lied under oath regarding whether or not he

2  gave certain survey data to professors who provided

3  declarations to the Court --

4          THE COURT:  Okay.  Let me -- let me -- let me stop

5  you, in the interests of time.  Look, getting back to my

6  initial issue, we have declarations from people who say that

7  Dr. Lott lied.

8          Those people are -- are -- they're not in front of

9  me.  They have not been deposed.  There's been no

10  cross-examination.  There's been no deposition taken.

11          I will take the allegations as Mr. Echeverria has

12  pointed out.  I will consider that.  I will consider whether or

13  not there's sufficient information -- I mean, so -- so -- so I

14  guess, to put a finer point on it, who's to say that those two

15  people are not lying, as opposed to Mr. Lott?  You see?

16          So I'm going to take --

17          MR. DILLON:  Your Honor?

18          THE COURT:  Go ahead.

19          MR. DILLON:  I'm sorry.  I just have to make this

20  point.  In fact, we don't even claim that the declarations by

21  the professors are -- we don't believe they're lying.  In fact

22  we believe they've just provided testimony on the wrong

23  subject.  And that's noted for your Honor's reference.

24          In Dr. Lott's deposition, pages -- (coughing) 169,

25  starting at line 19 --

1        THE COURT:  So what you're telling me -- so what

2   you're telling me is that Dr. Lott, in his deposition, says

3   that what those people said in their declarations is incorrect?

4        MR. DILLON:  Well, the declarations came after the

5   deposition.

6        Dr. Lott made very clear that there was two sets of

7   data.  The data that was given to the professors had to do with

8   the crime deterrence and right to carry concealed handgun

9   article that was published in the *Journal of Legal Studies* in

10  1997.

11       And, in fact, attached to Dr. Hughe's -- or Professor

12  Mustard's declaration is the title page that specifically

13  thanks John Lott for providing that data to those individuals.

14  And Dr. Lott made that clear that was the data he provided

15  them.  He never claimed that he provided this survey data --

16  the larger survey data to these professors with regard to a

17  claim about a 98 percent offensive gun use.

18       THE COURT:  All right.

19       MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

20  Would you mind if I address that point very briefly?

21       THE COURT:  No.  Look.  Look, I think we're spending

22  a lot of time on -- you know, I don't want to be rude, but I

23  think we're spending a lot of time on something that, in my

24  opinion, is not very fruitful.  It sounds like we may be -- if

25  you'll pardon the pun -- once again talking about apples and

1   oranges.  Or, on the other hand, we may have someone who's not

2   in court, is not subject to cross-examination.  I can't see

3   their faces.  I can't hear their voice.  They say Dr. Lott is

4   lying or is -- is inaccurate.  Dr. Lott says, "No, I'm

5   accurate."  You know what?  I'm going to look at this, and then

6   I'm going to make a decision.  That's what I get paid the big

7   bucks to do.  This is a -- a -- a trial on the bench.  It's not

8   a jury trial.

9         Even if, Mr. Echeverria -- even if -- even if

10  Dr. Lott maybe -- I'll give you the benefit of the doubt.

11  Maybe Dr. Lott is not telling the truth in connection with that

12  particular aspect of his testimony.  Perhaps.  Maybe.  But that

13  doesn't mean that -- that -- for example, that the rest of his

14  testimony, whatever it may be, is not worthy of consideration.

15        You know, our jury instruction says that when someone

16  is willfully false in respect to one part of their testimony,

17  the jury can -- can but is not required to disregard some or

18  all of the testimony.  Right?

19        So that's -- I'm going to take your motion in that --

20  in that respect.  I'm going to look at it.  And I don't want to

21  spend any more time on this.  I don't think it's fruitful.

22        So let's move on to the other motions that

23  Mr. Echeverria was about to argue about.

24              THE COURT:  Mandy, how are you doing?

25              THE COURT REPORTER:  Fine.

1          THE COURT:  You doing okay?

2          THE COURT REPORTER:  (Nods head.)

3          THE COURT:  Okay.  So, Mr. Echeverria, why don't you

4   argue the other motions.  I think one of them has to do with

5   Mr. Mocsary.  Is that correct?

6          MR. ECHEVERRIA:  That's right, your Honor.  So if the

7   Court will indulge us, my colleague, Mr. Zelidon-Zepeda, who

8   signed the motion in limine, is prepared to argue the motion in

9   limine in more detail and to address the Court's questions, if

10  that's okay.

11         THE COURT:  It's fine with me.

12         Mr. Zepeda.

13         MR. ZELIDON-ZEPEDA:  Good morning, your Honor.  José

14  Zelidon-Zepeda for the defendants.

15         Yes, we wanted to focus on the motion in limine.  And

16  rather than rehashing all of the arguments that we made in the

17  motion in limine, we wanted to focus specifically on certain

18  aspects of our motion without obviously prejudicing the other

19  arguments that we made in the motion.

20         And before I do that, I wanted to see if there are

21  specific questions that the Court would like me to address,

22  first.

23         THE COURT:  Well, no.  I want to listen to you, and

24  then I'll ask questions.  How's that?

25         MR. ZELIDON-ZEPEDA:  Okay.  So in that case, I wanted

1    to focus on -- the motion, overall, deals with six

2    depositions -- declarations, rather.  But we wanted to focus on

3    declarations specifically as to Mr. Brown, Mr. Ostini, and

4    Mr. Segal.

5            And these declarations -- focusing, first, on

6    Mr. Segal because I think it's the one that's most

7    straightforward for purposes of this motion in limine.  The

8    Court mentioned earlier how important the aspect of

9    cross-examination is.

10            Mr. Segal submitted a declaration, back in early

11    November, regarding certain -- the availability of certain

12    types of weapons.  Mr. Segal was not made available for

13    deposition during this particular litigation.

14            So that's an aspect that we don't -- that is

15    highlighted in my declaration --

16            THE COURT:  What do you mean he wasn't made

17    available?

18            MR. ZELIDON-ZEPEDA:  I mean that we tried to arrange

19    for a deposition date with plaintiffs' counsel for Mr. Segal,

20    so we can go ahead and cross-examine him on the substance of

21    his declaration and the basis for it, and we were never given a

22    deposition date for Mr. Segal.

23            THE COURT:  Well, let me -- let me interrupt you.

24            Mr. Lee?  Mr. Dillon?  What's that about?

25            MR. LEE:  That's absolutely correct, your Honor.  We

1    could not secure the appearance of Mr. Segal for deposition, so

2    Mr. Zepeda is correct.

3              THE COURT:  You tried?

4              MR. LEE:  Yes, of course.

5              THE COURT:  Okay.  But he -- what?  He would not

6    submit himself to a deposition?  Is that what you're telling

7    me?

8              MR. LEE:  Yes, your Honor.  That's the best way to --

9              THE COURT:  Okay.  Well, thank you.  I appreciate

10   your -- your mentioning that, Mr. Zepeda.

11             MR. ZELIDON-ZEPEDA:  And the other -- the other

12   witnesses, your Honor, besides the fact of the -- that we

13   couldn't cross-examine Mr. Segal, there are other evidentiary

14   issues regarding his declaration that overlap with evidentiary

15   issues for the declarations of Mr. Brown and Mr. Ostini.

16        Now, these individuals also submitted declarations

17   back in early November.  Mr. Brown and Mr. Ostini were made

18   available for deposition, and Mr. Brown was deposed.

19        Now, generally, these declarations talk about the

20   availability of certain types of firearms in certain places.

21   The problem with these declarations are that these individuals,

22   as plaintiffs concede in their opposition to the motion in

23   limine, this particular testimony really hinges on records that

24   have not been made available in this litigation.  Mr. Brown was

25   deposed, and he testified that basically he obtained the

1   information in his declaration from records maintained by

2   Benelli.

3           Now, Mr. Brown does not work for Benelli.  He works

4   for his own company, called Brown & Associates, I believe.  And

5   what Mr. Brown made clear at his deposition is that he is not

6   familiar with the way that Benelli keeps its records or any

7   other information regarding that.  He has limited access to

8   certain types of information.

9           So this is a problem for two reasons.  One, under the

10  best evidence rule, the best evidence of what the document says

11  is the document itself.  In this particular situation,

12  Mr. Brown is testifying as to certain records, apparently, that

13  have not -- that were not made available before regarding that.

14          THE COURT:  What's -- what's -- what's the

15  significance of his testimony, though?  What's the relevance?

16          What's -- what's the -- you know -- what do I care

17  about his testimony?

18          MR. ZELIDON-ZEPEDA:  Your Honor, according to --

19  according to plaintiffs, the reason why this testimony was

20  submitted is to show the availability, commonality aspect of

21  the legal analysis for this Court to assess regarding these

22  particular firearms.

23          THE COURT:  Mr. Zepeda, are you, as an officer of the

24  court, telling me that whatever these weapons are that

25  Mr. Brown was testifying to are not in fact in common use and

1   in common distribution and -- throughout the country?

2           MR. ZELIDON-ZEPEDA:  Your Honor, as an officer of the

3   court, I -- I -- our position is that whatever they're

4   testifying to, we do not know the basis for that, and we do not

5   have --

6           THE COURT:  But you're the state.  You have lots of

7   resources.

8           MR. ZELIDON-ZEPEDA:  But --

9           THE COURT:  And I don't want to waste time,

10  Mr. Zepeda, on -- on something that is not worth arguing about.

11          So are you telling me that based on all of the

12  research you, the state -- obviously, I'm assuming that the

13  legislature, when it passed these laws, it must have had some

14  idea of how many of these weapons were out there in -- in --

15  in -- in the market.  Otherwise, I would assume they have

16  better things to do than to pass laws about weapons that just

17  really aren't out there in the marketplace.

18          So what I'm asking you, in the interests of time, are

19  you telling me that the state has no information as to whether

20  or not these weapons that Mr. Brown was talking about are not

21  in fact in common use and out in the marketplace throughout the

22  country?

23          MR. ZELIDON-ZEPEDA:  Your Honor, there's two

24  responses to that.

25          The type of information that the declarations deal

1  with are the type of information that my understanding is --

2  and Mr. Echeverria being more familiar with those aspects of

3  the case can clarify.  But my understanding is those are not

4  the types of records that our office would keep.

5            And, secondarily, I think it's important to emphasize

6  that this is an issue in which plaintiffs have the burden of

7  proof.

8            THE COURT:  Well, I don't know that that is so,

9  Mr. Zepeda.  Maybe it is.  But the fact of the matter is that

10  on its face -- on its face, Mr. Zepeda, the Second Amendment is

11  pretty clear and the *Heller* opinion is pretty clear

12            And so I'm not sure if -- when we're talking about

13  depriving people of their constitutional rights by the state,

14  which has incredible power, that in fact it is true that an

15  individual defendant has to go out and dig for information that

16  it may not be able to obtain, when in fact it seems pretty

17  clear to me that either the state had the information and it

18  was sufficient for it to be able to make a legislative decision

19  on the subject or it did not.  And if it did not, then it

20  certainly strikes me that this is a constitutionally-flawed

21  statute.

22            So, once again, I'm going to ask you, Mr. Zepeda, as

23  a person who represents -- and, by the way, you represent both

24  people that like guns and people that hate guns.

25            So my question to you is, do you deny that the

1  weapons that Mr. Brown was testifying in his declaration were

2  or are in fact common weapons that are distributed throughout

3  the country to people who are interested in owning them?

4              MR. ZELIDON-ZEPEDA:  Your Honor, I don't have a basis

5  to be able to testify to that fact.

6              THE COURT:  Yeah.  Okay.  All right.

7              MR. ZELIDON-ZEPEDA:  Because of the particular --

8              THE COURT:  Yeah, all right.  Got you.  Go ahead.

9              MR. ECHEVERRIA:  Your Honor, this is John Echeverria.

10 Pardon me --

11             THE COURT:  John, John, let me do this.  Because this

12 can get really unwieldy.

13             MR. ECHEVERRIA:  Yes.

14             THE COURT:  I do this in trials, when I have more

15 than one lawyer.  A lawyer will argue -- you know, will

16 argue -- make an opening statement, will question a witness,

17 will do a closing argument.

18             But I can't have lawyers going back and forth and

19 back and forth and back and forth because it gets, (A),

20 confusing for me, and it takes up a lot of time.

21             So -- all right.  So let me -- Mr. Zepeda,

22 apparently, is the fellow who is most knowledgeable about this

23 motion in limine, so let me continue to hear from him.

24             All right.  Go ahead.

25             MR. ZELIDON-ZEPEDA:  And, your Honor, if I could add

1    to my response to the Court's questioning a couple of minutes

2    ago.

3          Mr. Brown's declaration -- and that was filed as

4    document 65, in the court's docket.  Mr. Brown talks about

5    specific weapons distributed by Benelli and certain types of

6    models distributed both within and outside California.  This is

7    testimony that is based on records of Benelli that have not

8    been presented and that Mr. Brown testified that he is not

9    aware of how the records are maintained and does not have

10   access to these particular records.  And that is what heightens

11   our concerns regarding the admissibility under the rules of

12   evidence.  And that's --

13         THE COURT:  Did you -- did you, by any chance, make

14   any effort to contact Benelli to see if what Mr. Brown was

15   saying was accurate or not?

16         MR. ZELIDON-ZEPEDA:  Your Honor, because the -- the

17   declaration of Mr. -- well, the short answer is no.

18         THE COURT:  No.

19         MR. ZELIDON-ZEPEDA:  But the reason for this is that

20   the declaration itself does not provide -- does not explain

21   that the basis for the testimony are records by Benelli.  We

22   did not find that out until Mr. Brown's deposition a week and a

23   half ago, or so.  And therefore, between now and then, we have

24   not had a chance to go to Benelli and see whether we can obtain

25   these particular records.

1          THE COURT:  Did you pick up the phone and call

2     someone at Benelli to see if they could tell you this was

3     anywhere near the ballpark?

4          MR. ZELIDON-ZEPEDA:  No, your Honor.  We did not do

5     that.

6          THE COURT:  Okay.

7          MR. ZELIDON-ZEPEDA:  Given the particular types of

8     evidence and given when we found out this particular aspect of

9     it.  And if we had had the information --

10          THE COURT:  Do you have -- do you have any evidence

11     that contradicts or disputes what Mr. Brown said?

12          MR. ZELIDON-ZEPEDA:  We have no evidence either way,

13     your Honor.

14          THE COURT:  Okay.

15          MR. ZELIDON-ZEPEDA:  We have no -- until his

16     deposition, we did not know the basis for this.  And when we

17     tried to cross-examine him regarding what he knows about how

18     the records are kept, it was apparent, based on his testimony,

19     that he did not know anything about the underlying records.

20          THE COURT:  How long have you had Mr. Brown's dec --

21     declaration, Mr. Zepeda?

22          MR. ZELIDON-ZEPEDA:  The declaration was filed in

23     early November, your Honor.

24          THE COURT:  Okay.  All right.  Go ahead.  What else?

25          MR. ZELIDON-ZEPEDA:  Now, as I -- we -- we discussed

1   earlier, the declaration of Mr. Segal -- which is very similar,

2   in terms of the type of information that it describes.  But as

3   plaintiffs' counsel --

4           THE COURT:  I'm inclined to strike his declaration.

5   If he won't submit himself to a deposition, his testimony is

6   worthless to me.

7           MR. ZELIDON-ZEPEDA:  And lastly, your Honor, for

8   purposes of argument in this particular aspect of the case, the

9   declaration of Mr. Ostini -- now, Mr. Ostini's declaration,

10  according to him, what he did is he went and surveyed different

11  websites for the availability of certain types of weapons.

12          Now, Mr. Ostini was not deposed, but he was made

13  available for deposition.  And the basis for our evidentiary

14  objection is similarly that Mr. Ostini is basically testifying

15  as to the truth of these particular websites that are

16  purportedly out there.  And, therefore, that it's inadmissible

17  under the best evidence rule and the under the rule regarding

18  compilation of voluminous records.  Because those underlying

19  records have not been shown to be within an exception to the

20  hearsay rule.

21          THE COURT:  Did you -- did you look at any of the

22  websites?

23          MR. ZELIDON-ZEPEDA:  I did look at some of the

24  websites, your Honor.

25          THE COURT:  Okay.  And what's the problem with his --

1  his discussion of what the website says?

2          MR. ZELIDON-ZEPEDA:  Well, the problem is, your

3  Honor, that the only reason why that -- those particular

4  websites and the only reason why the declaration itself is

5  relevant is if it shows the availability of these weapons,

6  which depends on whether the websites are indeed the truth of

7  the matter stated and -- because, to that extent, they are

8  hearsay, and the plaintiffs bear the burden to show that there

9  is an exception to the hearsay rule.

10         THE COURT:  So if I understand you correctly, I could

11 go and look up that website right now?  Right?

12         MR. ZELIDON-ZEPEDA:  For -- your Honor, yes.  For the

13 website --

14         THE COURT:  And so could Mr. Echeverria?  So could

15 Mr. Lee?  So could Mr. Dillon?  So could my law clerk?

16 Correct?

17         MR. ZELIDON-ZEPEDA:  To the extent it's still

18 available, that's correct, your Honor.

19         THE COURT:  So in fact it's a matter that's out

20 there, available for -- for public consumption.  Right?

21         MR. ZELIDON-ZEPEDA:  The websites themselves are out

22 there, available to any member of the public.  That is correct.

23         THE COURT:  And whose websites are these?

24         MR. ZELIDON-ZEPEDA:  Well, that's the problem, your

25 Honor.  Because as -- as anything that's out there in the

1    Internet, it's not always clear whose websites --

2         THE COURT:  Well, who -- who does the website purport

3    to be from?

4         MR. ZELIDON-ZEPEDA:  It purports to be, your Honor,

5    from different businesses that are firearms dealers to --

6         THE COURT:  What better -- what better source would

7    there be for finding out how many of these weapons are out

8    there in circulation, Mr. Zepeda, than a website by someone who

9    is in fact distributing these firearms?  What -- what better

10   evidence can you think of?

11        MR. ZELIDON-ZEPEDA:  Presumably, your Honor, if

12   there's an overall agency in the country that's -- that keeps

13   some sort of regulation over these, I would submit to the Court

14   that that would be the better --

15        THE COURT:  You mean like the State?

16        MR. ZELIDON-ZEPEDA:  No, your Honor.  Because we're

17   talking about throughout the country, this would be more --

18        THE COURT:  What agency would that be then?

19        MR. ZELIDON-ZEPEDA:  Presumably some federal

20   agency --

21        THE COURT:  Is there such an agency?

22        MR. ZELIDON-ZEPEDA:  I -- I would say that an agency

23   such as the ATF might have something --

24        THE COURT:  Well, do you know that for a fact?

25        MR. ZELIDON-ZEPEDA:  I do not, your Honor.

1          THE COURT:  Then why are you arguing that to me?

2          MR. ZELIDON-ZEPEDA:  I'm just trying to answer your

3     Honor's questions.

4          THE COURT:  So, in fact, the most reliable

5     information that we would have as to whether or not these

6     weapons are out there, common in the -- in the marketplace,

7     would be the website of people that either sell them or

8     manufacturer them, wouldn't it?

9          MR. ZELIDON-ZEPEDA:  To the extent that the websites

10    are accurate and --

11         THE COURT:  Yes, but that's true of everything,

12    including your argument.  Right?  To the extent that your

13    argument is accurate, it has a certain value or certain weight.

14    But if it's not, then it loses its weight.  Correct?  We agree

15    upon that?

16         MR. ZELIDON-ZEPEDA:  As a general proposition, yes,

17    your Honor.

18         THE COURT:  But you're familiar with the residual

19    clause of 803?

20         MR. ZELIDON-ZEPEDA:  I am, your Honor.

21         THE COURT:  You've been given notice of the fact that

22    this is something that is at issue; i.e, the commonality and

23    use of these weapons?  You've had notice of that for a long,

24    long -- long, long time.  Right?

25         MR. ZELIDON-ZEPEDA:  We do not dispute that, your

1    Honor.

2              THE COURT:  I'm sorry?

3              MR. ZELIDON-ZEPEDA:  We do not dispute that.

4              THE COURT:  Okay.  All right.  Great.

5              Anything else about Mr. Brown or Mr. Ostini's

6    declarations?

7              MR. ZELIDON-ZEPEDA:  No, your Honor.

8              THE COURT:  All right.  Those objections will be

9    overruled under -- certainly under -- at least as to

10   Mr. Ostini.  Certainly, under the residual clause of Section

11   803, this Court finds that it's -- these websites are -- are

12   supported by sufficient guarantee of trustworthiness.

13             And, secondly, that they're more probative on the

14   point than any other evidence that could be submitted or has

15   been submitted to me.

16             And I note, further, that the state has not submitted

17   any evidence to contradict the information that's contained in

18   those websites.  And the Court, in any event -- since they're

19   publicly available to anyone -- the Court will take judicial

20   notice of them.

21             So, all right.  Anything else?

22             MR. ZELIDON-ZEPEDA:  Your Honor -- your Honor, if I

23   may, for clarification purposes, your Honor stated that the --

24   the Court was inclined to strike the deposition -- the

25   testimony of Mr. Segal because he wasn't available for

1   deposition.  And I just wanted to make --

2           THE COURT:  I think I said that.

3           MR. ZELIDON-ZEPEDA:  Yes.

4           And the other aspects of it is whether the Court

5   wanted me to address the testimony regarding Mr. Mocsary and

6   Mr. Kraut and Plaintiff Hauffen, or whether the Court deems the

7   argument in our papers to be sufficient.

8           THE COURT:  You know, I'll be happy to listen to you,

9   Mr. Zepeda, as I said.

10          Yeah, go ahead.

11          MR. ZELIDON-ZEPEDA:  In that case, I'll go next to

12  the testimony of Mr. Mocsary.

13          Mr. Mocsary testified at the evidentiary hearing the

14  Court held in the fall.

15          The aspect -- we're focusing specifically on aspects

16  of Mr. Mocsary's testimony that are really legal conclusions.

17  And our objection is that under the case law, the

18  determinations regarding the law are the problems for the Court

19  to decide --

20          THE COURT:  Yeah, let me -- let me save you some

21  time.  I know what -- what a witness can testify to, and I know

22  what my job is.

23          And so to the extent that a legal conclusion is

24  expressed by any witness, those legal conclusions will be

25  disregarded.  I'll make my own legal conclusions.

1          MR. ZELIDON-ZEPEDA:  In that case, that's all we have

2    on the motion in limine, your Honor.

3          THE COURT:  Well, good.

4          All right.  I guess I should -- you know, we've been

5    going quite a while.

6          So tell me -- tell me how -- how else -- so we've

7    heard the motions.  The motions in lim.  How do you propose

8    that we go on from here?

9          Let's start with Mr. Lee.

10         MR. LEE:  Yes, your Honor.

11         THE COURT:  Or Mr. Dillon.

12         What's -- what's -- what's your thought?

13         MR. LEE:  This is George Lee, your Honor.

14         Once again, I think that where the parties are

15   prepared, having gotten the preliminary motions out of the way,

16   to start discussing the evidence so that the Court can have the

17   parties understanding and view and characterization of the

18   evidence in mind as it starts to go through the evidence and

19   particularly to know where to look.  So we'll be prepared to --

20   to discuss and argue that next.

21         THE COURT:  All right.  Mr. Echeverria, do you agree?

22         MR. ECHEVERRIA:  Yes, your Honor.  We're prepared to

23   discuss the -- the facts that we propose that the Court finds

24   and to discuss the legal conclusions that could be reached from

25   those facts.

```
 1            THE COURT:  All right.  So -- so sort of, in essence,
 2    if I can -- if I can -- if I can draw an analogy, what we're
 3    talking about doing now is more or less a closing argument.
 4    Right?
 5            MR. ECHEVERRIA:  (Nods head.)
 6            MR. LEE:  Your Honor, this is George Lee.  It's sort
 7    of a hybrid opening and closing because we're going to talk
 8    about what the evidence that was just submitted yesterday has
 9    shown and will show.
10            So, yes, in that -- but, in that respect, that is --
11    that is what we intend to do.
12            THE COURT:  All right.  Mr. Lee, how long do you
13    anticipate?  As -- is it going to be you?  Mr. Dillon?  Who am
14    I going to be hearing from?  I don't want to be hearing from --
15    from a whole bunch of folks.  So --
16            MR. LEE:  It will -- for the plaintiffs, your Honor,
17    it will be me, except to the extent that the Court wishes to
18    discuss anything pertaining to John Lott's testimony.  I would
19    defer to Mr. Dillon as to any questions on the Lott testimony,
20    or rebuttal.
21            But other than that, to answer your Honor's first
22    question, how long can we go, well, how long do we have?
23            I mean, we -- there's a lot of evidence, as the Court
24    noted.  And we can talk about this stuff all day, if it pleases
25    the Court.  But if the Court wishes a more curtailed summary,
```

```
 1   we can certainly endeavor to do that.  But, as the Court noted,
 2   there is a lot of material.
 3            THE COURT:  Okay.  So -- so what do you -- you must
 4   have had some inkling of how long you were going to -- to talk
 5   about this, assuming that the judge didn't interrupt you and
 6   ask a bunch of questions.
 7            MR. LEE:  Assuming no colloquy, your Honor, I think
 8   we could probably go for 90 minutes or two hours.
 9            But, of course, I'm sure the Court's going to want to
10   engage in robust colloquy on --
11            THE COURT:  You know me too well.  (Laughing.)
12            Okay.  How about you, Mr. Echeverria?  What's your
13   plan?
14            MR. ECHEVERRIA:  So -- so our plan is to -- to make a
15   presentation to the Court, kind of like a hybrid closing
16   argument and opening statement highlighting the arguments that
17   we've presented to the Court in written form in our proposed
18   findings and conclusions of law.  And -- and highlighting
19   particular evidence related to those findings of fact and
20   conclusions of law.
21            I -- I -- I don't want to belabor points that are
22   already made in our proposed findings of fact and conclusions
23   of law.  And I would also emphasize, again, that we think it
24   would make sense, after the parties' presentations and after
25   the Court has formally admitted evidence into the record, that
```

1    the parties have an opportunity to provide in a succinct form

2    the proposed findings of fact and conclusions of law based on

3    all of the evidence and citations to the record.  And perhaps,

4    your Honor, it may make sense to have an additional round where

5    the parties can add a column to their proposed findings of fact

6    and conclusions of law for rebuttal findings of fact and

7    conclusions of law.

8         That might be a very helpful way to present the

9    evidence to the Court.  Because, you know, the defendants

10   appreciate that, you know, we do think that the statute is

11   straightforward in defining an assault weapon and that the

12   evidence about mass shootings and about the use of assault

13   weapons nationwide is pretty clear.

14        But we appreciate that there's a lot of evidence and

15   a lot of issues for the Court to handle and --

16        THE COURT:  I -- I -- I think you're -- you're right

17   on, Mr. Echeverria.  I shouldn't say "as always," but as most

18   often you are.  And I think that would be a great suggestion

19   for the parties to be able to present the rebuttal to the

20   findings of fact and conclusions of law.

21        Okay.  So I have something that I have to do at noon.

22   It will probably take an hour and a half.  So that means that

23   we would be back at 1:30.

24        We still have a few minutes.  I can listen for 15

25   minutes, or so, before we adjourn.

1          Mandy, are you still doing okay?

2          THE COURT REPORTER:  Yes.

3          THE COURT:  All right.  You let me know.  All right?

4          So who wants to go first?

5          MR. LEE:  Your Honor, I think the plaintiffs should

6   go first, and I'm not sure if the Court's going to entertain it

7   in the sense that there may be some rebuttal.  The Court can

8   structure it however it wishes, of course.

9          THE COURT:  Yes, we'll see.  We'll play it by ear.

10  This is kind of a novel situation.  We'll see how it goes.

11  Okay?

12         All right.  Go ahead.

13         MR. LEE:  Thank you, your Honor.

14         First of all, thank you for indulging your

15  understanding and for allowing the parties to present their

16  evidence and bring this process in this very -- "unprecedented

17  times" is sort of an overused statement.  But -- but for -- I

18  think Mr. Echeverria was right.  That we would all prefer to be

19  there in person, questioning witnesses, cross-examining

20  witnesses, doing the usual stuff.  And we certainly appreciate

21  the Court's indulging us and allowing to present the evidence

22  in this manner.

23         I think the benefit is that we were able to get this

24  matter to your Honor quicker this way for sure and in a

25  compressed time.  But all of the evidence is in.  And so we

1    appreciate the Court's indulgence in that regard.

2         Your Honor, we begin this discussion -- and we will

3    end it, of course, with *Heller*.

4         In *Heller*, the Court stated, in responding to the

5    suggestion that -- that only those arms in existence at the --

6    during the 18th century were protected by the Second Amendment,

7    the Court rejected that notion.  Flat out said that the Second

8    Amendment extends prima facia to all instruments that

9    constitute bearable arms, even those that were not in existence

10   at the time of the founding.  So we start with that principle.

11        And, of course, *Heller* went on to say that under all

12   of these principles that the -- when it comes to the

13   enshrinement of constitutional rights, that when that happens,

14   it necessarily takes certain policy choices off the table.

15        So we believe that this Court understands very well

16   these two principles when, at the beginning of the hearing back

17   in October, the Court sort of announced that this is the

18   framework under which the -- this Court would be viewing the

19   evidence.

20        And so -- but this is how we view the case.  This is

21   how -- the eye in which we view the evidence.  And I think it

22   makes sense for us to talk specifically -- as your Honor

23   referenced this morning, part of the confusion is that there's

24   many different definitions of assault weapons over the years.

25        So I think it's helpful for the plaintiffs now to

1    talk about what's at issue in this case and what isn't at issue

2    in this case.  Because even under California law there's

3    several different types of assault weapons or definitions of

4    assault weapons.

5         So I want to talk very briefly, in the 15 minutes

6    that we have before the break, about the three categories of

7    assault weapons.

8         Now, these three categories of assault weapons go

9    back to 1989.  And when I think about all of the various

10   assault weapons, laws that the State has attempted to enact

11   over the years, I think about the quote from that -- the Roman

12   orator, Marcus Tullius Cicero, who famously said that the more

13   laws there are, the less justice there is.

14        Nothing exemplifies this principle more than if you

15   take a look at California's tortured assault weapons bans that

16   from -- since 1989, have attempted, in an ever-expanding

17   definition, to justify the prohibition of the entire classes of

18   weapons by giving it a menacing label called "assault weapon."

19        There are three generally widely recognized

20   categories of assault weapons.  And this isn't just me saying

21   it to your Honor.  This is straight from the DOJ's website.  I

22   tried to get a stipulation from the defense on this issue, but

23   there's also arguably a fourth category of assault weapon,

24   which we can talk about.

25        But what's at issue in this case, your Honor, is the

1    third category.  Category 3.  And these are firearms that are

2    defined as assault weapons based upon specific --

3            THE COURT:  Just -- just very quickly.  When you said

4    "DOJ," I'm assuming that you're talking about the California

5    Department of Justice.  Right?

6            MR. LEE:  Correct, your Honor.  The California

7    Department of Justice.  And I think Blake Graham, who is the

8    DOJ agent supervisor who submitted declarations in this case,

9    we're all on the same page.  There's widely three --

10   recognized, three general categories of assault weapons.

11           Category 1 is a lists of firearms that are specified

12   and spelled out and stated right in the statute, which is --

13           THE COURT:  That's the roster.

14           MR. LEE:  It's not a roster, your Honor.  It's

15   called -- it's called the list.

16           THE COURT:  Okay.

17           MR. LEE:  And it's found at Penal Code Section 30510.

18   And these originally named assault weapons are listed by name,

19   type, series, and models.  And they pertain to rifles, pistols,

20   and shotguns.

21           Those are assault weapons by definition on the

22   California assault weapons law which are not at issue.

23           Category 1 is not at issue in this case.

24           The second category --

25           THE COURT:  Well, let me stop you because -- because

1  this is important.  You see, when we're talking about assault

2  weapons -- this -- this is what I said a little while ago that

3  is so concerning to me.  So when we're talking about assault

4  weapons, one police report, one newspaper article, one expert

5  report may be talking about an assault weapon.  Well, it kind

6  of makes a difference as to what is the assault weapon we're

7  talking about.  Are we talking about apples and oranges?

8        So what is it about the weapons that -- I realize

9  these are not in -- in dispute.  But it's important for me, in

10  a sense that -- so, for example, when I read -- I don't know.

11  Say -- say a newspaper article that says that, you know, John

12  Doe shot someone with an assault weapon.

13        Okay.  What I need to know is what was that assault

14  weapon.  What -- what are we talking about?  Are we talking

15  about Category 1, Category 2, Category 3?  Do you see what I'm

16  saying?

17        Does that make any sense to you?

18        MR. LEE:  Yes, your Honor.  And your Honor's latched

19  onto the importance -- the important point and how it ties in.

20        Because Lucy Allen, in her report, she was employing

21  the same methodology that she used in the *Rupp versus Becerra*

22  case in the Central District.

23        The plaintiffs in *Rupp* were challenging all of the

24  categories, including the Category 1 assault weapons.  So when

25  Lucy Allen in this case, the case before your Honor, submits a

1  report that includes a list of mass shootings -- 161 mass

2  shootings -- public mass shootings that she looked at that

3  includes the California definition of assault weapon, she is

4  including -- necessarily -- assault weapons that are not at

5  issue in this case, the Category 1 assault weapons.

6          So -- so, yes, that is an important point.  And I

7  think it undermines a lot of the reliance that the state has on

8  both the voluminous submissions that it -- that it submitted in

9  this case that relate to the *Rupp* case, as well as the expert

10 report of Lucy Allen.

11         I mean, if she's saying assault weapon is based on

12 purely the California definition -- and I -- by the way, I --

13 I -- I attempted to engage her in this in the deposition.

14         She refused to acknowledge that perhaps her -- her --

15 the scope of what she was asked to look at was broader than

16 what the plaintiffs are claiming in this case.  But that's --

17 but that's exactly right, your Honor.

18         Case in point -- and as far as news stories, that --

19 that is -- that is exactly the point, your Honor.

20         If I may attempt to put an exhibit on the screen --

21 I'm not sure if -- if the Court will allow or if I may do this.

22 But this is Plaintiff's Exhibit No. 29, which we submitted to

23 the Court.

24         THE COURT:  Okay.  I don't know if -- Glenn, can you

25 do that?

1          MR. LEE:  So I'm not sure if --

2          THE COURT:  Okay.  So I've got the exhibit in front

3    of me, but then I've lost you.  So --

4          MR. LEE:  And I'll switch off in a minute.

5          But here's -- here's a news report about a 2017

6    incident that took place here in San Francisco.  A UPS driver

7    or worker shot three of his colleagues, or -- or -- or some

8    number like that.  And it was reported in this -- in this news

9    report that this -- that they recovered two guns, including an

10   assault pistol.

11         And you simply take it as fact, when you read these

12   news reports, that this -- that this was a -- an assault

13   weapon, simply because the police may have described it as an

14   assault weapon or an assault pistol.

15         That -- as it turns out, the firearm that was used in

16   that case was a firearm that was an assault -- that was not

17   named as an assault weapon on the list.  It's -- it -- it was a

18   similar type, but it was not specifically named as an assault

19   weapon.  And I don't know what makes it an assault weapon in

20   anyone's analysis.

21         So I think that it's important to understand that --

22         THE COURT:  Well, just a second.  Because -- because

23   I read the exhibit.  And what I read was -- and it was either a

24   semiautomatic or a fully automatic pistol, neither of which

25   really is an assault weapon, necessarily.  A semiautomatic

1    pistol, I suppose, could be under some definitions.  The fully

2    automatic pistol would be just completely illegal unless you

3    registered, as Mr. Dillon pointed out a little while ago.

4            So -- so it seems, from reading that paragraph of the

5    news article, that it -- at least one is not really an assault

6    weapon, as we're talking about it, because it's a fully

7    automatic weapon.  Right?  And the other one may or may not be,

8    depending on whether it has any -- whether it's on this list of

9    Category I or whether it has any of the features that -- you

10   know, what people refer to as the evil features.  Right?

11           MR. LEE:  Correct.

12           THE COURT:  All right.

13           MR. LEE:  So if it's fully automatic -- which it's

14   never really been determined.  But if was it was fully

15   automatic -- and I don't think it was -- then it's not an

16   assault weapon.  An assault weapon is semiautomatic, by

17   statutory definition.

18           So this highlights -- and I don't mean to rely on

19   this as like the smoking gun, so to speak, evidence.

20           THE COURT:  (Laughing.)

21           MR. LEE:  And this just highlights the problems

22   that -- that we encounter, as your Honor noted, in trying to

23   determine what the scope of the analysis was in the various

24   textbooks that have presented some -- some evidence before your

25   Honor.

1          Neither -- neither Category 1 nor 2 are at issue in

2   this case, your Honor.  What is at issue are --

3          THE COURT:  What's Category 2?

4          MR. LEE:  Well, Category 2 is a second list that was

5   derived -- that -- that the Department of Justice published

6   pursuant to regulations.

7          And those are found at 11 California code of

8   Regulations Section 5499.  And that's a list of --

9          THE COURT:  If I could interrupt you.  What -- what

10  made these weapons assault weapons?  I mean -- (laughing.)

11         Okay.  By definition, they're assault weapons because

12  we call them assault weapons.  But what is it that made these

13  particular weapons -- what caused them to be on this Category 1

14  and Category 2 list as assault weapons that were prohibited by

15  citizens to own?

16         MR. LEE:  I think that if you look at the legislative

17  history and what was happening at the time, there was a real

18  concern about, really, public shootings.

19         THE COURT:  Yes.

20         MR. LEE:  And that spurred the legislature to say,

21  well, let's name a bunch of weapons that the shooters use.  For

22  example, the person who shot the McDonald's in San Ysidro -- I

23  think it was 1984 -- used an Uzi.  So let's put an Uzi on the

24  list.

25         The shooter at 101 California, down the street here

1    from where I am now, used an Intratec, tech -- tech --

2              THE COURT:  I get you.

3              So what the legislature did, they looked at weapons

4    that had been used in particular shootings, and then they said,

5    "These particular weapons are now going to be considered

6    assault weapons and are therefore banned or protected."  Right?

7              MR. LEE:  Correct.  Correct.

8              Category 2 is an interesting --

9              THE COURT:  By the way, Mr. Echeverria, do you agree

10   with that assessment?  Is that good enough for you?

11             MR. ECHEVERRIA:  Which assessment are you referring

12   to specifically?

13             THE COURT:  How we get to Category 1 and Category 2?

14             MR. ECHEVERRIA:  Yeah, that's a fair

15   characterization.

16             Category 1 is the make and model.  Category 2 is the

17   regulation list.

18             THE COURT:  All right.  But that -- but that they

19   were adopted or they were banned, or whatever, because they had

20   been specific -- types of specific weapons that were used in

21   incidents that were before the legislature.

22             In other words, as Mr. Lee pointed out, in the one

23   case someone used an Uzi.  In the other case they used an

24   Intratec.  And so the legislature was able to arrive at a list

25   of weapons that have been used in these particular shootings,

1    and that's how they came up with Category 1 and Category 2.

2            Is that -- is that fair?

3            MR. ECHEVERRIA:  I wouldn't say that that's an

4    entirely accurate assessment.  The legislature did not only

5    include firearms that had actually been used in documented mass

6    shootings.

7            I don't believe the record in this case has this

8    information.  But in the *Rupp versus Becerra* case, one of the

9    expert witnesses named by the plaintiffs in this case was an

10   individual named Steven Helsley.

11           Steven Helsley is a former Department of Justice

12   official who became an NRA lobbyist.  Mr. Helsley was the

13   individual who actually came up with the original list of

14   assault weapons that became what is now Section 30510.

15           The way in which he arrived at that list was an -- an

16   iterative process.  Some of the weapons had been used actually

17   in mass shootings.  Other weapons had similar features as those

18   weapons.  So the -- the way in which the actual list was

19   arrived at was an iterative process.

20           But, frankly, it -- the way in which the list was

21   compiled, it had to be amended by regulation in what became

22   Category 2.  Showed the problems with trying to regulate these

23   types of weapons and these types of configurations by listing

24   them.

25           And that's why California, in 2000, adopted the

1   features-based test.

2           THE COURT:  Okay.  Got you.  Okay.  All right.

3           MR. LEE:  And, your Honor, if your Honor really wants

4   to get into this, we can talk about how Category 2 came about.

5   It's an --

6           THE COURT:  The only reason why -- the only reason

7   why I'm asking the question is because I -- I'm going to assume

8   that our legislature doesn't act in a capricious and arbitrary

9   manner.  Okay?

10          They don't -- they don't just pull stuff out of the

11  air and then say, Well, we're going to ban this.  Why?  Because

12  we like it, or because we feel like it today.  Right?

13          So there has to be some reason why they do what they

14  do.  And I'm trying to figure out why there is a distinction

15  between Category 1, Category 2, Category 3.

16          I think Mr. Echeverria kind of explained it to me by

17  telling me that originally it started by -- by identifying

18  specific models.

19          And then, when they concluded that that was not

20  enough, that's how they came up with this evil features problem

21  that I'm faced with today.

22          So, okay, that explains it to me.  That's --

23  that's -- that satisfies my curiosity.

24          So sorry to interrupt you, but I hope you're ready to

25  be interrupted a lot because I ask a lot of questions.

1          MR. LEE:  I welcome it, your Honor.  I think it's

2   helpful for processing.

3          And I certainly can't adopt the Court's thinking that

4   the legislature does things -- doesn't do things arbitrarily.

5   I mean, I'm an advocate.  And maybe I can say this.  But I do

6   think that the list of weapons that they came up with, really,

7   are just arbitrary.  If sounds like something scary.  It sounds

8   like something they may have seen on *Miami Vice* at the time.

9   So let's just put it on the list.  I think that's how --

10  frankly, how a lot of legislation gets done in this field.

11  But, you know, that -- we're getting far afield on that issue.

12         But if your Honor really wishes to delve into how

13  Category 1 and Category 2 are limited, there are two California

14  Supreme Court cases that are interesting as background.  The

15  first is called *Kasler versus Lockyer*, and that's at 23 Cal 4,

16  472.

17         And the second case, which more limits -- is more

18  limiting of the first case, is called *Harrott versus County of

19  Kings*.  It's at 25 Cal 4th, 1138.  And that's a 2001 case.

20         And that really will tell you, your Honor, how the

21  Category 1 and 2 series of firearms were identified,

22  promulgated, and limited.

23         But, I should say, it's not that while those two

24  cases, *Kasler* and *Lockyer*, were working their way through the

25  court.  That's when -- that's when the -- the legislature comes

1   up with this third category, which is found at -- which is now

2   found at Code Section 30515.

3           THE COURT:  You know what?  I'm sorry.  I failed to

4   look at the clock.  And I realize that it is noon, and I have

5   somewhere that I need to be.  So why don't we pick up at 1:30.

6   Okay?

7           We'll be in recess until then.  Thank you.

8           MR. LEE:  Thank you, your Honor.

9           (Recess taken at 12:03 p.m.)

10          (Resuming at 1:30 p.m.)

11          THE CLERK:  Your Honor, there is someone in the

12  waiting room with a phone number and no name, so I don't know

13  who that is.  I'm not going to admit them.

14          MR. ECHEVERRIA:  Your Honor, I believe -- this is

15  John Echeverria.  I believe that's Peter Chang, who's counsel

16  for defendants.

17          THE COURT:  The phone number is 714-791-4214.  That's

18  what I'm showing.

19          MR. JAFFE:  That sounds like Adam Kraut, that we have

20  previously let in for the first part of the hearing.

21          THE COURT:  Okay.  All right.

22          Okay.  If it's Mr. Kraut, let him in.  If it's

23  Mr. Chang, let him in.

24          THE CLERK:  They're in.

25          THE COURT:  I see Mr. Chang on the video.

1         All right.  Well, good afternoon.  We're back.

2         I believe, Mr. Lee, you were telling me what you

3    thought was important about the case.  So why don't you go

4    ahead.

5         MR. LEE:  Thank you, your Honor.

6         So I think what we've been trying to emphasize in

7    this -- in the few minutes before we broke is that this lawsuit

8    pertains to the definition of assault weapon as it appears

9    under Section 30515(a), where those features or

10   characteristics -- some call them SB23 assault weapons.  But

11   those are the types of firearms that are issued in the case.

12        Now, beyond the magic incantations of capacity and

13   function, which is at the heart of the definition of assault

14   weapon, there are two unassailable facts that the state really

15   cannot reasonably dispute with regard to these firearms.

16        One, that these firearms are simply and functionally

17   semiautomatic firearms which are, today, by far and away a vast

18   majority of the firearms that are produced and sold today.

19        As we've established in the case, semiautomatic

20   technology has been around since the 1880s.  So this is nothing

21   new.  These are all, functionally, simply semiautomatic

22   firearms that are normal firearms.

23        And that the -- and, secondly, the state really

24   cannot dispute that these firearms are commonly owned in --

25   under any metric or under any measure -- or any way that you

1    want to look at it -- in the millions by our fellow Americans;
2    from our state of California to Maine.
3          So I don't really think that the state can dispute
4    that, or these two facts.  One, that these are simply
5    functionally semiautomatic firearms.  And, secondly, that they
6    are owned in the millions.
7          So I want to start, your Honor --
8          THE COURT:  Wait a minute.  When you -- when you say
9    they can't dispute that.  I -- I think I took Mr. Zepeda to
10   task because he was essentially objecting to -- I believe it
11   was Mr. Brown or Mr. Ostini's declarations.  And I thought that
12   the fact that there's millions of these out there, outstanding,
13   that that was sort of a given fact.  And I thought that the
14   state would not argue about something that -- that was so
15   obvious.  But Mr. Zepeda seemed to take issue with that.
16         So what -- what do you mean that the state doesn't --
17   doesn't -- doesn't take issue with the fact that these firearms
18   are commonly owned?
19         MR. LEE:  I'm not saying that they are taking issue.
20   I'm saying they can't.
21         THE COURT:  Oh, I'm sorry.
22         MR. LEE:  There -- there really is no dispute that
23   these are -- these are firearms that are commonly owned in the
24   millions by our fellow Americans.
25         THE COURT:  Well, there has to be a dispute.  Because

1   if there's no dispute, then they would agree to it.  And if

2   they agreed to it, then it wouldn't be an issue, we wouldn't

3   have wasted time talking about Mr. Ostini -- Ostini's

4   declarations and the websites, and all of that.

5           What -- what am I missing?

6           MR. LEE:  Well, I -- I think your Honor is correct in

7   the sense that I don't really know what there is to talk about.

8   Although, we certainly have submitted a substantial amount of

9   evidence on all of these points.

10          And I would like to start, I think, with the most

11  basic premise or the most basic aspect of this.  That under

12  *Heller*, as the Court is aware, the Court reaffirmed the right

13  of people to own firearms in common use for lawful purposes.

14  And commonality is the issue.  And that's -- but that's

15  measured in a few ways.

16          We don't think it's purely a numbers test, but the

17  most simple way to look at it is commonality of ownership.  Are

18  the arms in question commonly owned and by law-abiding people

19  for lawful purposes?  And I think, again, your Honor is

20  correct, we have shown overwhelmingly that the firearms in

21  question are commonly owned.

22          Semiautomatic firearms bearing these features that

23  are prohibited by Section 30515(a) are widely available and

24  popular.  These characteristics are most commonly found on

25  firearms that have the ability to accept a detachable magazine.

1              And the most popular among these firearms is, of
2    course, the AR-15 platform, or firearms that are modeled on the
3    AR-15 pattern.  And that is true, of course, both nationally
4    and in the state of California.  This is a hugely popular
5    rifle.  It's -- it's popular in wide civilian circles and used
6    throughout the United States; I think as this Court
7    acknowledged and found in the *Duncan* decision.

8              Now, the AR-15, in particular, is especially popular
9    because of its light weight, because it's easy to shoot -- as
10   Mr. Kapelsohn testified, because it has mild recoil, and
11   because it has good ergonomics.  All of which make it well
12   suited for (indiscernible due to interference) of all statures,
13   sexes, younger people.  Just makes it an easy rifle to shoot
14   and to train on.

15             So -- and this is nothing new.  The AR-15 rifle has
16   been existence since the 1950s.  So this is not some type of
17   new-found technology, this is something that has steadily been
18   gaining popularity for the last half century.

19             Now, for common use, of course, we look nationwide.
20   We don't just limit our -- our look in California.  And that
21   makes sense for several reasons.

22             First of all, the Second Amendment does mean
23   different things in different parts of the country.  As -- as
24   the Supreme Court indicated in the *Caetano* case, the more
25   relevant statistic is that hundreds of thousands of Tasers and

1    stun guns have been sold to private citizens who may lawfully

2    possess them in 45 states.

3            So, of course, if the Supreme Court is indicating

4    that the look is to be nationwide, that that has to make sense.

5    And as this Court -- as the Ninth Circuit noted in affirming

6    this Court in *Duncan*, protected arms may not be numerically

7    common in a particular jurisdiction by virtue of an

8    unchallenged unconstitutional regulation.

9            So you can't say that a firearms commonality is -- or

10   uncommonality, that -- that a prohibition is the source of that

11   uncommonality.  So that's why you have to look -- that's one

12   reason that you have to look nationwide and not just in that

13   particular jurisdiction.  And several other courts have agreed

14   with this proposition; that a law's existence can't be the

15   source of its own constitutional validity.

16           So we look nationwide to -- first of all, to

17   determine how popular this rifle or these types of rifles are.

18   And we've submitted, your Honor, the declaration and the

19   testimony at the hearing in October, Mr. Curcuruto, who is a

20   leading industry source and authority and the only one,

21   frankly, to author this type of study that is to look at what

22   are the numbers.  And, again, numbers are not dispositive but

23   numbers are helpful and certainly a guideline.

24           And in his declaration, your Honor, which we've

25   submitted as Plaintiffs' Exhibit 004 in this matter --

1          THE COURT:  I'm sorry.  Exhibit what?

2          MR. LEE:  004.  So this is the Curcuruto declaration.

3          THE COURT:  Okay.

4          MR. LEE:  And he's indicated that there are

5   currently -- his conclusion is that there are currently an

6   estimated 19.8 million modern semiautomatic rifles produced in

7   the U.S. or imported between the years of 1990 and 2018.

8          And which he called -- as your Honor might recall

9   from his testimony, he calls modern sporting rifles, which are

10  firearms that have these characteristics that shift -- that

11  have a detachable magazine.  Semiautomatic firearms that have a

12  detachable magazine.  And that -- and that most of them share

13  these characteristics.  Most notably, the pistol grip.

14         So I want to walk through Mr. Curcuruto's terminology

15  because I suspect that the state is going to dispute or nitpick

16  or take some issue with the way that Mr. Curcuruto arrived at

17  this number.

18         So this is laid out in his deposition --

19         THE COURT:  Let me ask you a question.  If I divided

20  that -- that number by ten -- okay?  If I said Mr. Curcuruto is

21  all wet, he doesn't know what he's talking about, so I'm going

22  to -- I'm going to apply a factor of 10 percent and say he's 90

23  percent wrong, that would give me 1.98 million of these.

24         Now, I can't think that the state -- especially not

25  Mr. Echeverria, is going to look me in the eye and is going to

1   say to me the following.  Number one, there are not 1.9 million

2   of these weapons in circulation in the United States.  And,

3   number two, he's not going to say to me that that is not a

4   large number of these weapons.

5          Am I right, Mr. Echeverria?

6          MR. ECHEVERRIA:  There is some truth in what your

7   Honor's saying but there are important points of clarification

8   that -- that I would make.

9          THE COURT:  Okay.  All right.  So we -- we can get to

10  those.

11         So this is why I was pressing Mr. Zepeda.  I didn't

12  mean to be rude to him.

13         But the fact of the matter is that even if you take

14  that 19 million and you say, okay, this -- this guy is all wet.

15  I'm only going to give him credit for 10 percent of these --

16  all right?  1.9 million is a lot.  It's a lot of weapons of

17  this type out there.

18         Now, I'm not saying I'm discounting Mr. Curcuruto's

19  analysis.  I'm not saying that.  I'm just simply posing --

20  putting myself in the position and saying, you know, that --

21  that -- I mean, I -- I don't know.  I think -- was it Kolbe?

22         I know that there are cases that have already talked

23  about the fact that -- that -- that there's no question that

24  there are a lot of these weapons out there.

25         So, frankly, I don't know why we're even spending

1   time on this issue.  But --

2          MR. LEE:  Thank you, your Honor.

3          There's two points to follow up on your Honor's

4   thoughts on this.

5          One is that, yes, the issue of commonality has

6   already been established in a number of cases.  Again, *Caetano*,

7   *Heller* 2, *New York State Rifle and Pistol Association*, the

8   *Kolbe* decision decision before it went en banc.  So in other

9   words, the 2016 *Kolbe* decision out of the Fourth Circuit.  A

10  district court case called *Shu verses Malloy* (phonetic), all of

11  these cases have already established -- and these were cases

12  that are several years old and older, in which they were only

13  talking about, you know, several million of these.  And we're

14  now talking about, now, 19, 20 million today in 2021.

15         So I think that your Honor's on the right track in

16  thinking that the commonality has already been established, for

17  sure.  But more to the point -- and I do think that the -- the

18  state is going to take issue with Mr. Curcuruto's numbers.

19         But if that's the case, what's the state's numbers?

20  What's the state's estimate?  Is it 5 million?  Is it 10

21  million?  Is it, as your Honor suggested, one -- you know,just

22  to take a round number, 1.9 million?

23         For as much issue as the state may take with

24  Mr. Curcuruto's methodology, they have not offered their own

25  number as to what the actual number of semiautomatic modern

1    sporting rifles or weapons that would be characterized as

2    assault weapons is, nationally speaking.  So -- so I think that

3    the Court's instinct on how to look at that is correct.

4            But if the Court is interested in -- as -- as the

5    Court seems to be, in what the state's own numbers reveal, even

6    the state's own estimates as to what is within the state

7    will -- will certainly establish commonality.

8            If you look at, for example -- well, first, let me

9    start with this.  I would like to put up Plaintiffs' Exhibit

10   24.

11           So, your Honor, Plaintiffs' Exhibit 24 is a

12   document -- and hopefully you can see it.  It's a budget

13   proposal that the -- that the California Department of Justice

14   Bureau of Firearms submitted to the legislature in advance of

15   what they saw as a need to register new firearms.  Excuse me.

16   Register assault weapons pursuant to a new registration scheme

17   that was going to take place in 2018.

18           So Plaintiffs' Exhibit 24 is this 2017 budget

19   document request by the California Department of Justice that

20   is submitted to the legislature.  And in anticipation of the

21   registration scheme, the -- the Bureau of Firearms estimated

22   that between 1.5 -- 1 and 1.5 million assault weapons will be

23   registered by approximately 250,000 different owners in the

24   State of California.  Now, that was just an estimate because

25   the state doesn't actually -- didn't actually have the number.

1    Didn't actually know how many people were going to.  But that

2    was their best estimate.  That there was going to be maybe

3    upwards of 1.5 million assault weapons that could be

4    registered, and it was in anticipation of this -- this budget

5    request.

6            So that's Plaintiffs' Exhibit 24.  If you look at

7    what was actually registered -- and this is a registration

8    that -- this is a registration that -- these are registrations

9    that took place over a number of years, over a number of

10   periods.

11           Defense Exhibit CZ -- Charlie, Zeda -- is a

12   declaration from an employee for the Department of Justice, I

13   believe, who indicated -- just to give this Court some numbers

14   as to what's registered.

15           There are approximately 200,000 assault weapons

16   currently registered with the California Department of Justice,

17   of which approximately 180,000 are rifles, 16,000 are pistols,

18   and 3400 are shotguns.  These are the approximations.

19           THE COURT:  I'm sorry.  What was that last number?

20           MR. LEE:  Well, I can pull up the exhibit.

21           THE COURT:  No, that's okay.  Just tell me.  What did

22   you just say?

23           MR. LEE:  Okay.  So -- so --

24           THE COURT:  200,000 --

25           MR. LEE:  200,039 assault weapons are currently

1    registered with the Department of Justice.

2              THE COURT:  Right.  180,000 rifles, 16,000 pistols.

3              MR. LEE:  3478 are shotguns.

4              Now, if you back out law enforcement, apparently --

5    according to the declarant, excluding assault weapons

6    registered to peace officers, there are approximately --

7              THE COURT REPORTER:  I need that number again.

8              THE COURT:  Sorry.  Can you do that again?

9              MR. LEE:  Sure.  185,569 assault weapons, in total,

10   of which 165,804 are rifles, 16,306 are pistols, and 3,459 are

11   shotguns.

12             Now, these are just the firearms that are registered,

13   of course.  We anticipate and would expect there is a lot of

14   noncompliance.  But even just looking at these numbers, it

15   would appear that assault weapons or firearms that are

16   characterized as assault weapons --

17             THE COURT:  What happened -- what happened to the 1

18   to 1 1/2 million estimate?

19             MR. LEE:  Well, I think that there was -- we can

20   argue a lot about why they -- there weren't that many.  I think

21   because, in the end, it turned out to be roughly about 70,000

22   who registered.

23             THE COURT:  70,000 people, as opposed to 250,000?

24             MR. LEE:  I believe 70,000 firearms were actually

25   registered in this latest period.  But that could be explained

1  by a number of reasons.  One, the lack of notice.  And I know

2  for sure that -- that the Department of Justice -- that there

3  wasn't enough notice to firearms owners, and a lot of people

4  are being taken by surprise as we speak about the new

5  registration requirement.  Secondly, I think that there's

6  simply a lot of distrust and resistance to the idea of

7  registration.

8          So nobody really knows, but I -- I would suspect that

9  the lack of knowledge or the lack of knowledge is probably the

10 main issue that prevented -- that is, that explains why so many

11 people have not registered firearms in the state of California.

12 At least those that qualify for registration in 2018.

13         But I don't think, again, that these numbers are

14 really the starting and ending point.  This is just sort of a

15 benchmark.  It -- it does establish that certainly many, many

16 people own these for -- for a number of reasons.

17         And, again, the cases that have already established

18 commonality of AR-15-type rifles are now several years old, and

19 we are only talking about several million.  So, again, as your

20 Honor stated, whether Mr. Curcuruto is off by a factor of a

21 half or a tenth, by any measure, just looking at the numbers,

22 there certainly is commonality in that sense.

23         But, again, these are functionally automatic firearms

24 like any other firearm.

25         THE COURT:  What would you -- what would you do --

1   how would one go about calculating the fact that many people

2   might want to have these weapons.   But because they're unlawful

3   unless you register them, they don't go out and purchase them?

4   Or at least perhaps they don't register them?

5            So how would you go about coming up with that number?

6            MR. LEE:   I don't know that one can really come up

7   with the number of people who haven't registered for various

8   reasons.   I mean, unless you were to do surveys.   And even

9   then, it's not going to be reliable because nobody's going to

10  admit to, you know, not having a registered firearm.

11           THE COURT:   Okay.

12           MR. LEE:   So -- so I don't think that that's

13  something that is easily ascertainable.

14           THE COURT:   Okay.

15           MR. LEE:   Another way that we've looked at this, your

16  Honor, is taking a jurisdictional approach.

17           And this is in -- as your Honor knows, we submitted

18  the declaration and testimony of Professor George Mocsary,

19  which is now set forth as Plaintiffs' Exhibit 003.

20           And the -- the reason why -- as Professor Mocsary

21  explains, is the reason why we look at this from a

22  jurisdictional perspective is because Caye -- the Supreme

23  Courts decision in *Caetano* seems to suggest that this is

24  another appropriate way of taking a look at it.

25           The total number of jurisdictions that prohibit these

1  types of devices -- or in *Caetano*, it was stun guns or Tasers.

2  And to -- and to examine whether or not a sizable number of

3  Americans may purchase them in other jurisdictions.  So what

4  Professor Mocsary did is -- taking sort of this line of

5  thinking further, is to take a look at all of the assault

6  weapons laws in the various states.

7          And his conclusions, which your Honor has questioned

8  him on already, is that citizens may possess semiautomatic

9  rifles in some form or another in all 50 states.  They may

10  possess any semiautomatic rifle in 44 states.  And there was

11  only a handful of -- of states -- I believe it was six -- that

12  had bans that were similar to the one that is before this Court

13  that pertains to assault weapons.

14          So -- so from a jurisdictional perspective, just

15  looking at it jurisdictionally, assault weapon bans themselves

16  are not common.  And it would appear that millions of weapons

17  that California defines as assault weapons by virtue of this

18  30515 characteristics may legally be owned by people in a large

19  majority of the States.

20          On a related note, we're noting -- also noting that

21  the ban here in California is not longstanding.  This is a

22  prohibition that goes back 30 years.  To -- again, to the

23  original Category I description of assault weapons.  This is 30

24  years old.  And it -- it's not longstanding.

25          If you take a look at *Heller*, for example, *Heller*

1   overturned a 33-year-old handgun ban in the District of

2   Columbia.  And so -- and on the federal level, as we've

3   explored already, the federal assault weapons ban only lasted

4   for ten years, from 1994 to 2004.

5         So assault weapons bans are neither a majority of the

6   states that we've looked at, nor are they longstanding bans;

7   including the first one here in California, which was enacted

8   in 1989.

9         So I think, to round out this commonality

10  discussion -- and, again, we have to emphasize that numbers are

11  not the -- or numbers are not the only measure of this.  It's

12  really a matter of function.

13        Are semiautomatic rifles themselves or semiautomatic

14  firearms themselves lawful in most of the states?  And the

15  answer is yes.  Of course they are.  They are the most popular

16  type of firearm that is being manufactured and purchased today.

17  The state can't prohibit a subset of these because they happen

18  to have characteristics which are also wildly popular.

19        So having established commonality of these firearms,

20  we look, also, to whether or not they have their -- they are

21  owned for lawful purposes, including self-defense.

22  Self-defense isn't, of course, the only lawful purpose but it

23  is a -- a primary purpose; a primary lawful purpose.  So I

24  think that it is not just common use but common use for lawful

25  purposes.

1          So let's focus on the self-defense aspect of it.   And
2     everyone agrees, of course, that AR-15s are one of the most
3     popular firearms in the country.   Or at least it's not
4     disputed.   And as the testimony has established, they are
5     commonly sold off the shelf, in other popular -- in other parts
6     of the country in their standard form, which contain pistol
7     grip, telescoping stock, and a flash suppressor.   And those are
8     the three features that I think I would like to focus on.   I
9     don't think we need to discuss all of them.   Your Honor
10    already -- has already heard testimony regarding all of this.
11    But I think these are the three characteristics that we should
12    really focus on because I think this is very important to the
13    self-defense aspect of these firearms.

14         So pistol grips, which the defense would agree -- at
15    least Mr. Graham agreed -- is the most prevalent feature of
16    weapons that are described as assault weapons, are simply grips
17    that protrude conspicuously beneath the action of the weapon.
18    And these are the most common of the prohibited features on
19    just about all modern semiautomatic firearms.

20         Pistol grips enhance the ergonomics of the weapon and
21    are basically important, as Mr. Kapelsohn has testified, in a
22    straight-line design, such as the AR-15.

23         THE COURT:   Wait a minute.   What about the detachable
24    magazine?

25         You said the three things that are most common are

1    the pistol grip, telescoping stock, flash suppressor.  What

2    about the detachable magazine?

3              MR. LEE:  A detachable magazine is simply a standard

4    feature on many, or if not most, semiautomatic rifles today.

5              THE COURT:  So that's another common feature?  Am I

6    wrong?  Or --

7              MR. LEE:  Sort of.

8              THE COURT:  Sort of.

9              MR. LEE:  Because the state doesn't -- the state

10   doesn't prohibit detachable magazines.  The state says you have

11   to have a fixed magazine if you're going to have one of these

12   other features.

13             THE COURT:  Okay.

14             MR. LEE:  So, in other words, it's requiring the --

15   it says, "If you are going to have these features, you have to

16   have fixed magazine."

17             So I could have a featureless firearm, as your Honor

18   knows, and -- and it could have a detachable magazine.  So the

19   state does not prohibit detachable magazines on a

20   featureless, as long as it doesn't have one of these 30515(a)

21   characteristics.  Which is why we're focusing on the 30515(a)

22   characteristics.  Because these are normal, standard fare that

23   appears on most firearms that have a detachable magazine.

24             So pistol grips, again, is not just a -- a feature

25   that -- it -- that is preferred but it is good ergonomics, and

1   therefore it enhances the firearm's accuracy.  And this is

2   something that Blake Graham, in his declaration, you know,

3   concedes.  That a shooter using a, quote, assault rifle without

4   a pistol grip may shoot less accurately when -- with repeated

5   and especially rapid shots.  And -- and this -- and pistol

6   grips themselves are nothing new.  Again, we have established,

7   through the testimony of Adam Hlebinsky that pistol grips

8   appear on long guns dating back to at least the 1700s.

9         So this is an important feature of -- of the 30515(a)

10  feature, is that -- are -- the prohibition of which is being

11  challenged in this case.

12        The second issue I would like to address is folding

13  or telescoping stocks.  Now, as your Honor knows or as has been

14  testified on an AR-15 rifle, a typical folding -- or a

15  telescoping stock will have an adjustable feature enabling it

16  to be capable between six and -- and three different positions

17  of adjustment; basically changing the length of the buttstock.

18  So this enables the rifle to be properly fitted to the user and

19  can be beneficial, as the Court has heard plenty of

20  testimony --

21        THE COURT:  And that's different than a folding

22  stock.  Right?

23        MR. LEE:  Correct.

24        THE COURT:  So what's the adjustment length on --

25  on -- on an adjustable stock versus the difference with a

1    folding --

2              MR. LEE:   A folding stock -- a folding stock is -- is

3    meant to make the firearm more portable.   It doesn't

4    necessarily make it more comfortable to shoot or enhance the

5    accuracy, or anything like that.   Because the purpose of a

6    folding stock is to -- is to make it more portable or

7    maneuverable.   That kind of thing.

8              The telescoping stock or the adjustable stock is --

9    enables the stock actually to be adjusted to a particular

10   length, depending on what the shooter needs.   So that's the

11   difference between the two.   But -- and the Court has heard

12   plenty of testimony that younger shooters, persons of smaller

13   stature, et cetera, may desire to and benefit from -- from

14   training and practicing and shooting a firearm with a

15   collapsible or adjustable stock.

16             I want to emphasize the training aspect of this for a

17   minute because I think this part sort of gets lost when we talk

18   about an individual -- you know, case-by-case assessment as to

19   whether a specific feature has utility in a specific

20   self-defense scenario.

21             I think what gets lost in this is that all of these

22   characteristics that we're talking about -- particularly the

23   pistol grip and the adjustable stock -- encourage and enhance

24   training and allows a shooter to train more, allows the shooter

25   to train more effectively.   And that's important.   Because if

1    you're not comfortable shooting, you're not going to train as

2    much and you're not going to be as accurate.  And training is

3    an important part of -- of self-defense.  Not in any one

4    specific scenario, of course, but cumulatively it is important

5    to allow people to be able to train effectively.

6           And, as Mr. Kapelsohn has testified, these features

7    allow somebody to train more often and more effectively.  So I

8    don't think that that -- I think that's a point that shouldn't

9    get lost in all of this.

10          The folding stock, your Honor, makes a firearm more

11   portable but it doesn't turn a firearm or a rifle into an

12   easily concealable firearm for most criminal activities.  And,

13   by far and away -- and as the Court knows and I'm sure the

14   defense would concede -- handguns are the most concealable and

15   the most prevalently used in crime of all of the firearms.  So

16   it's not that -- that all of a sudden because you have a

17   folding stock on a rifle, that all of a sudden that that rifle

18   becomes a commonly used instrument in crime.

19          And so as your -- as this Court knows, even without a

20   folding stock, an AR-15 is easily separated in just a few

21   seconds by separating the upper and the lower receiver, pulling

22   out two pins to the right, and you basically have two halves of

23   a firearm that can be put into a backpack.  So even without

24   special identified skill or training, a person can take an

25   AR-15 apart in a matter of seconds.

1           Again, folding or telescoping stocks have been --

2    long been a part of the features of firearms, dating back

3    centuries.   And as Ms. Hlebinsky has submitted in her

4    testimony, the flexibility of stock size became an important

5    issue in the civilian market in the 20th century as they're

6    trying to customize more firearms to individual types of

7    shooters.

8           THE COURT:   Let me ask you a question, Counsel.

9           The way this case is postured, is it -- is it

10   feasible or possible for the Court to find -- I mean, I know --

11   I know the broad general proposition.   Okay?   But is it

12   feasible or possible for the Court to find that restricting

13   this feature may violate the Second Amendment; this other

14   feature may not?

15          Say, for example, that I were to conclude, if you

16   will, that the collapsible stock, meaning an adjustable stock,

17   is protected by the Second Amendment.   On the other hand, let's

18   say, a folding stock is not.   Is there a severability clause in

19   the statute?   Or is that something that I'm able to do?

20          I'm not saying I'm going to do it.   I'm just simply

21   posing the -- the question.

22          The hand -- the grenade launcher -- again, getting

23   back to that thing -- could I, for example, find that a grenade

24   launcher, you know, feature is not protected for whatever

25   reason?   What do you think, Mr. Lee?

1       MR. LEE:  I would say no, your Honor, and -- and this

2  is why.

3       Well, first of all, if you look at -- the way we've

4  framed the case is, firstly, if it's a categorical ban of a

5  commonly owned popular firearm, in lawful use for lawful

6  purposes around the rest of the country in this form, then that

7  then is invalid.  It's a categorical ban that is invalid.  And

8  you don't have to get into any type of balancing test or any --

9  applying what's the state's rationale for it?  Why did they

10  need it?  That kind of thing.

11       THE COURT:  Okay.

12       MR. LEE:  So if -- so under that categorical *Heller*

13  approach, if we've met the test, we think that that -- the

14  entire ban fails.

15       THE COURT:  Okay.

16       MR. LEE:  If we get into, however, a tiered

17  discussion about what's the state's interest, then it still

18  fails because the State really hasn't provided any

19  justification as to why all the features must be prohibited.

20       So I don't think it's our burden, in that sense.  I

21  think we've put forth a prima facie case showing that the state

22  doesn't have a -- a legitimate interest in prohibiting all of

23  these features.  And, for that reason, we think that the --

24  that the entirety of the statute should fail the Court's

25  review.

1          THE COURT:  All right.

2          MR. LEE:  So the last of these features I would like

3    to discuss is the flash suppressor, which is a device that

4    diverts, you know, the muzzle flash through the holes on --

5    at -- extending out the barrel.

6          The primary advantage of this flash suppressor is to

7    reduce muzzle flash, so the shooter doesn't get blinded at

8    night.  And as the -- Mr. Kapelsohn testified in his

9    deposition, he -- he's fired ARs that don't have a flash

10   suppressor, and at night, and they throw up what he called a

11   God-awful flame and muzzle blast as a result.

12         So -- and that's actually the stated purpose of a

13   flash suppressor, as pursuant to the -- the -- the -- the

14   state's regulations, is not to conceal a shooter's position but

15   to protect the shooter from being blinded when shooting at

16   night or in dark -- dark conditions.

17         And, again, this is not some new type of device.

18   This is a device that has appeared on firearms since the early

19   20th century and has always appeared on AR-type firearms since

20   they were invented in the 1950s.

21         So let's talk about rifles under 30 inches, just very

22   briefly.  As -- as we've indicated, the federal limit on the

23   length of a rifle is 26.  California says it's 30.  So what

24   we're talking about are firearms between 26 and 30 inches in

25   length.

1      That's a difference.  Rifles that have shorter

2  overall lengths have more -- more advantages to the user

3  because they're able -- more maneuverable.  Especially if

4  you're defending your home, having to come around hallways and

5  doorways, and that kind of thing.

6      And even as Mr. Graham testified, he has a

7  shorter-barreled AR for his personal use.  And he -- you know,

8  depending on the mission, of course, is how he testified.  But

9  all things being equal, he would rather have one with a shorter

10  barrel for maneuverability purposes.

11      But there's another reason why a shorter barrel -- a

12  shorter firearm is -- is advantageous.  It's because of the

13  length weight.  The barrel that has a longer length is more

14  heavy.  And again, for training purposes or to be able to hold

15  the rifle out for an extended period of time, that could make a

16  difference.

17      THE COURT:  Well, is there a limit?  I mean, is there

18  some -- some limit that the state could adopt with regards to

19  the length of the barrel?  I mean, what about two inches?

20      MR. LEE:  16 inches is the minimum barrel length for

21  a rifle under federal law, as I know.  So most civilian

22  shooters would -- would want to have or tend to have rifles

23  that have barrels of 16 inches in length.

24      But the whole idea of a carbine -- which is basically

25  a shorter rifle, which is -- you know, this -- it's been around

1    for many, many years -- is -- it basically refers to a rifle

2    with a barrel that has less than 20 inches in length.

3            So let's talk about fixed-magazine firearms, because

4    this is how the -- this is how the magazine capacity issue

5    comes into play.

6            So a fixed magazine is a -- the state calls it an

7    ammunition feeding device that's permanently attached to a

8    firearm in such a manner that the device cannot be removed

9    without disassembly of the firearm mentioned.

10            So the state's statute prohibits a -- a firearm that

11   has a fixed magazine that has the capacity to accept more than

12   ten rounds.

13            Now, in *Duncan*, it prohibits it by calling it an

14   assault weapon.  So, in *Duncan*, this Court has already

15   addressed the legality of the laws that pertain to

16   large-capacity magazines as the state uses that term; as

17   defined by the Penal Code of being more than ten rounds --

18   being -- being able to accept more than ten rounds of

19   ammunition.

20            What we contend in this case is that the state can't

21   continue to prohibit the possession of large-capacity magazines

22   by calling firearms that have them assault weapons simply

23   because they're attached to them.  And I think that, for all of

24   the state's overkill in terms of addressing the large-capacity

25   magazine issue, the state has not presented any evidence in

1   this case about any crimes being committed with a rifle or

2   pistol that contained a fixed magazine that had the ability to

3   accept more than ten rounds of ammunition.  Nor has the state

4   presented any evidence to show that any mass shootings were

5   committed with a rifle or pistol that contained a fixed

6   magazine with the ability to accept more than ten rounds of

7   ammunition.  I'm not saying that that hasn't happened.  I'm

8   certainly willing to accept that that may have happened

9   somewhere along the way, or there may have been a crime with a

10  fixed-magazine rifle that has more than ten rounds.  But we

11  haven't heard about it.

12          So if -- if this is a problem, you think we would

13  know why the state exactly wants to prohibit the large -- a

14  fixed-magazine rifle with a capacity to have more than ten

15  rounds of magazine, aside from the capacity itself.  And,

16  again, it's not our intention or desire to re-litigate the

17  Duncan matter, which has been litigated extensively in several

18  courts now.

19          So if there cannot be a prohibition on magazine

20  capacity under the Constitution, then you can't -- the state

21  can't accomplish that same goal simply by calling a firearm an

22  assault weapon because it has a fixed magazine with the same

23  capacity.

24          THE COURT:  Well, let me -- let me -- let me

25  interrupt you for just a second.  Because this is -- this is

1   part of the problem and confusion that this case has -- has --

2   engendered, if you will.

3           All right.  So, for example, you say that there are

4   no cases that have been pointed out where a -- a rifle that had

5   a fixed magazine of more than ten rounds was used in a -- in a

6   mass shooting.  Right?

7           So -- so as you were saying that, I was thinking,

8   well, okay.  Well, what -- what about -- where -- where's the

9   evidence that, say, a shotgun -- like the one that's --

10  that's -- that is being banned, that that was used in -- in --

11  in a mass shooting?  Where's the evidence that -- and if we say

12  one is enough, boy, that's a pretty -- pretty slippery slope.

13  Same thing for a pistol.  A pistol with a detachable magazine.

14  You see what I'm saying?

15          So -- so when I was looking through some of the

16  material that I've looked at so far, it struck me that there

17  was a dearth of evidence to -- to support a finding that, you

18  know, these were weapons that were largely used in -- in these

19  mass -- mass shootings.

20          Do you follow what I'm saying?

21          MR. LEE:  Well, and I appreciate the Court's thinking

22  on this.

23          Because it's not like once there is one, then, ah-ha.

24  You know, now we can ban them.  Certainly that's not our -- the

25  suggestion.

1          THE COURT:  Right.  I -- I understand.

2          MR. LEE:  We're saying the state is -- is actively

3     providing solutions to things that are not problems.

4          There is no suggestion that what -- what is the

5     danger of a fixed-magazine firearm that has the capacity to

6     accept more than ten rounds; aside from what has already been

7     litigated in *Duncan*?  Okay?  If the state can't offer anything

8     more than what has already been litigated in *Duncan*, that's my

9     point.  Is that, okay, we understand the state thinks it's

10    accomplishing something by prohibiting firearms that can fire

11    more than ten rounds.  But aside from what's already been

12    litigated in *Duncan*, we're -- what's the concern about

13    fixed-magazine firearms in particular?  And that has not been

14    addressed in the evidence that at least has been submitted.

15         So -- so, in other words --

16         THE COURT:  That's -- that's sort of -- that --

17    that's -- that's sort of a given.  The idea -- which is the

18    same idea as in the -- in -- in the, quote, large-capacity

19    magazine, end of quote, issue; which is obviously the more

20    rounds that you have in a magazine, the more shots you can

21    fire.  The more shots you can fire, the more likely you are --

22    perhaps -- to injure or kill people.  I -- I -- I don't know

23    that that requires evidence.  I mean, that just requires common

24    sense.  Right?  To know that that's true?  We know that.

25         You know, there's no point in you telling me that you

1    don't believe that in fact, you know, if you have a -- one of

2    these rifles with -- with a fixed magazine that holds 30

3    rounds -- by the way, I remember in *Duncan* saying, for example,

4    that, you know, 30 rounds may not be unusual.  Because we all

5    know that the test is dangerous and unusual.  A hundred rounds,

6    on the other hand, might be.  Right?

7            So, again, if you have a weapon with a fixed magazine

8    with a hundred rounds, you know, you can fire a lot more shots

9    without reloading.  And the potential for injuring people and

10   killing people with those hundred rounds exist

11           Of course, you've got to go through further steps.

12   You've got to do more analysis than just that.  Because we all

13   know every gun is a dangerous gun.  Right?

14           I suspect that there are many people -- many in the

15   government -- who would want to ban all guns, if they had their

16   way.  If they could -- you know, somebody died and made them

17   king, they would ban all guns.  And maybe that's -- you know,

18   some people suspect that might be the ultimate goal.  But --

19   but I don't think I have to have evidence.  I don't think I

20   have to have Mr. Echeverria or -- or the state tell me that a

21   firearm that holds 30 rounds in a fixed magazine is, perhaps,

22   more dangerous -- right? -- than one that holds ten rounds?  In

23   a hypothetical sense.  Right?

24           MR. LEE:  Yes.

25           And -- and my point, again, is not to re-litigate

1   *Duncan* or to make the state -- you know, put them to the test

2   about what has already been litigated and decided in *Duncan*.

3          My only point is aside from what has already been

4   litigated in *Duncan*, what is the -- why are we fixing --

5   fixating on how -- or how can we fix -- how can we -- how can

6   you prohibit something by simply calling it an assault weapon,

7   if the issue has already been decided elsewhere.

8          I understand the state's arguments.  And I'm sure

9   your Honor does, too.  Your Honor heard them far more

10  extensively than I did.  But that's the only point.

11          THE COURT:  Okay.

12          MR. LEE:  Okay.  So I just wanted to just briefly

13  discuss pistols and shotguns.

14          You know, your Honor -- at the hearing in October,

15  the Court asked the parties to supply information pertaining to

16  the commonality of assault weapon pistols and assault weapon

17  shotguns.

18          The Court primarily asked the state to provide what

19  evidence it had pertaining to numbers that it may be able to

20  produce.  And I think that the State's response is set forth in

21  the defense exhibit that I referred to earlier, Defense Exhibit

22  CZ, which contains at least the registration numbers of assault

23  weapons that are broken down by rifle, pistol, and shotgun.

24          But, you know, we took it on ourselves, of course,

25  not just to rely on the state's evidence, which is, of course,

1    limited to this state.  But also to look at what else is out

2    there.  To give -- to try to give the Court some color and some

3    basic understanding as to how common are these types of

4    firearms and firearm parts?  And -- and how readily available

5    are they in the market?

6            And so we've submitted the declaration of Mr. Ostini,

7    who did this survey and looked at websites and catalog

8    information from 73 different firearm manufacturers.  And found

9    that there's plenty of manufacturers that are offering firearms

10   that are offered for sale, defined as assault weapons, pistols,

11   and shotguns under these definitions.

12           So the -- Mr. Ostini's survey is attached to his

13   declaration, which is Exhibit 005.  And no one is saying this

14   is a comprehensive list.  No one is saying this is the -- this

15   is the exclusive list of what types of weapons that are out

16   there.  But this gives the Court some general understanding as

17   to the types of firearms that are being offered for sale to

18   citizens in other parts of the country.

19           And this -- these are simply website links that --

20   that describe the product.  And the state has not -- you know,

21   the state has attempted to exclude Mr. Ostini's declaration but

22   they are not offered something of their own that criticizes any

23   of his particular findings.  Or saying that in any particular

24   instance a -- one of these items is not classified as an

25   assault weapon or that is severely over-inclusive for whatever

1    reason.

2          So this is just more in the context of what the Court

3    was -- trying to give the Court what it was asking for at the

4    hearing in October, in terms of providing some type of general

5    survey information.

6          We've also submitted the declaration of Mr. Brown,

7    who -- at least in this very limited slice -- has provided some

8    testimony as to the sales of the -- the number of sales of this

9    popular Benelli shotgun.  He called it M1014.  Which by --

10   according to the Department of Justice, is a shotgun assault

11   weapon.  And he's provided some sales figures in several

12   thousands of these that were distributed in his area, which is

13   the western region, from 2016 through 2020.

14         So, again, this is not meant to be comprehensive.

15   This is not meant to be a total, full explanation.  But when

16   your Honor asked us -- or the parties to try to get whatever

17   information we could pertaining to assault weapon shotguns and

18   pistols, you know, we reached out and tried to find your Honor

19   some numbers.  And these numbers are reflected in these

20   declarations.

21         So, your Honor, let's talk about the suitability of

22   the AR-15, in particular, for militia service.

23         We put through the testimony of General Youngman, who

24   is extremely well qualified to testify to this issue as he was

25   at -- a general for the state of Kentucky.  He's a career

1    military man who has been actively involved in planning and

2    readiness of our reserve forces and in the state of Kentucky.

3            And his opinion testimony that we've submitted, which

4    is set forth in Plaintiffs' Exhibit 009 and at the hearing back

5    in October, is that the AR-15 rifle, with its commonality of

6    parts and its standardized parts such as magazines -- and,

7    frankly, the -- the familiarity of many Americans, two

8    generations of Americans -- make the AR-15 an ideal weapon for

9    service in a militia.

10           Now, this Court has already found, in *Duncan*, that

11   *Miller* implied that -- the *United States versus Miller* case

12   implied that possession of a weapon that could be used for

13   militia service by a law-abiding citizen could contribute to

14   the common defense of the United States and, therefore, is

15   protected by the Second Amendment.

16           If we just take this one step further and say if a

17   weapon is particularly well suited for militia service, then it

18   must be protected both under *Heller* and under *Miller* because

19   this is the logical extension of this -- of this -- of this

20   argument.

21           So firearms that are in common use for lawful

22   purposes in the United States under *Heller*, those lawful

23   purposes include militia service.

24           Those would be protected by the Second Amendment

25   under both *Miller* and -- and under both *Heller* and *Miller*.

1          THE COURT:  Would an M16 be protected?

2          MR. LEE:  Well, I could argue yes, but I also

3    understand the limitation of -- that the Justice Scalia set

4    forth in *Heller*.  And I'm going to acknowledge that and --

5          THE COURT:  Which was -- which was what?

6          MR. LEE:  Which was that the -- that the Second

7    Amendment may not protect -- now, Justice Scalia did not say

8    that it does not protect.  He says there may be some

9    limitations, such as M16 firearms.

10          THE COURT:  Why would that be?

11          MR. LEE:  Why would that be?  I would suggest to your

12   Honor that the distinction between an M16 and an AR-15 is its

13   ability to fire in a fully automatic capability.  But I don't

14   think --

15          THE COURT:  And would that include the fact that --

16   that -- that people don't commonly own M16s because they're --

17   like bazookas, hand grenades, they're not useful in any other

18   sense other than for military purposes?

19          MR. LEE:  Well, I don't know that I'm ready to

20   concede that, your Honor.

21          I mean, I would say that -- that the problem that you

22   set up there is that, again, a weapon is rendered uncommon by

23   virtue of its prohibition.

24          So in the 1920s, for example, you could mail order a

25   Thompson submachine gun just in a catalog.  You can go to the

1    hardware store and buy a Thompson submachine gun --

2              THE COURT:  I got you.  I understand that.

3              But there's a longstanding prohibition against fully

4    automatic weapons.

5              MR. LEE:  Since the 1930s.

6              THE COURT:  Well, and that's enough for me.  Anyway,

7    at least -- at least at this moment.

8              But -- but the reason why there's that prohibition is

9    because M16s and fully automatic weapons really don't have much

10   use in any other purpose other than for military purposes.

11   Right?

12             MR. LEE:  And, to be clear, General Youngman said he

13   does not see the M16 in this role for militia.  Takes

14   additional training, et cetera.

15             This is a rifle that a -- an AR-15 rifle is one that

16   a person puts in their home, their house; hang it over their

17   fireplace; and be ready to -- to call to muster if your country

18   or your state or your community needs you.  So this is an ideal

19   weapon for that purpose.  And I don't think General Youngman

20   went to the extent to say that an M16 is something that fills

21   that role.

22             So I'm not -- I'm just saying I'm not willing to

23   exclude the possibility.  I'm just saying that that -- this is

24   what General Youngman has testified to.  So --

25             THE COURT:  But if you file that lawsuit, would you

1   do me a favor and file it in some other district or -- or file

2   a motion to recuse me?  So -- (laughing) because -- (laughing.)

3   I think the case law is pretty -- pretty clear.

4           Justice Scalia was a man who was a -- a wordsmith.

5   And -- and I understood -- I understood what he -- what he was

6   saying when -- when he talked about the fact that one -- one

7   might object that the M16, or weapons like the M16 -- but --

8   but it was pretty clear to me that what he was saying was that

9   there are weapons that are for military purposes, such as the

10  flame thrower and the bazooka and the hand grenade that serve

11  no other purpose in civilian life.

12          And so if you file a lawsuit to have a ban on the M16

13  as being unconstitutional, please file it somewhere else.

14  Okay?

15          MR. LEE:  We'll try to keep that in mind, your Honor.

16          THE COURT:  All right.

17          MR. LEE:  But I think that the distinction, though,

18  between these firearms is -- is a big distinction, despite what

19  the state is going to try to argue.  That an AR-15 is basically

20  indistinguishable from an M16 in this regard.

21          It is -- it is -- there is a big distinction, and

22  that's because -- as your Honor has suggested -- it's more -- a

23  fully automatic may be more akin to something like a bazooka or

24  a hand grenade because it takes -- (A), it takes additional

25  amount of training to become -- and, two, is that there's

1   greater potential for collateral damage if you have something

2   that is hard to control, from that perspective.  An M16 that

3   has -- capable of fully automatic fire is -- is -- is a

4   harder-to-control weapon.

5          And our focus in this case is these features that

6   enhance a firearm's accuracy -- because accuracy is the -- most

7   critical, important to a civilian shooter for a number of

8   reasons and certainly for self-defense.  It's more difficult to

9   make that argument in this context with -- with regard to M16s

10  because a fully -- something that's capable of fully automatic

11  fire has that ability to have more collateral damage.  So one

12  could make that argument that it's probably more akin to hand

13  grenades than -- than it is to a semiautomatic rifle.

14         One could make that argument over that distinction.

15  And I think that that's -- it's not just a matter of, well, an

16  AR-15 has a theoretical cyclical rate of being able to fire a

17  certain number of rounds per minute.  And so, therefore, it's

18  basically indistinguishable from an M16.  That simply is not

19  the case, and I don't think that that -- that's a very good

20  argument that I think the state is going to try to make.

21         So, your Honor, getting away from the militia issue,

22  there's other lawful purposes for these firearms, not just

23  self-defense, not just militia.  But there's many other

24  reasons.  There's hunting, self-defense, recreation,

25  competition, collecting.  As Mr. Curcuruto has testified to and

1    has plainly set forth in the exhibits to his declaration,

2    many -- many reasons why people desire to own these types of

3    firearms, and those are among the reasons.

4          And one actually doesn't need to look any further

5    than one of the defense exhibits, and that is a Defense Exhibit

6    BI --

7          THE COURT:  I'm sorry.  Is that D as in dog?

8          MR. LEE:  B as in bravo.  I as in India.

9          THE COURT:  Okay.

10         MR. LEE:  And at page 8 of their book called -- it's

11   a book by Patrick Sweeney called *The AR-15*.  He talks at length

12   about competition with the AR-15.  Discussing practical

13   competition, bench rest competition, long-range distance

14   shooting, varmint shooting.  Something called --

15         THE COURT:  You just raised an interesting point.

16   Something that has been troubling me, which is this.

17         So -- so -- there's a lot of focus on using these

18   weapons for self-defense.  And there's no doubt that, of

19   course, that is something that is important.  But it dawned on

20   me that the statute that bans this type of weapon actually

21   discriminates against people of lower income.  Why?  And tell

22   me if you think I'm wrong.  But here's why I think it does.

23         I -- I can afford to own a pistol at home, to -- for

24   self-defense.  I can also afford to own a sporting rifle.  I

25   can have both.

1          So if I -- if I like to do competition shooting or

2     hunting, I know there are people who say that you don't use

3     sporting rifles for hunting.  But, frankly, I think they're all

4     weapons.  It's not true.  They're a good firearm, for example,

5     to shoot coyotes with.  Which I know of a couple I wouldn't

6     mind taking out, since they have taken out my chickens.

7          But -- so -- so there are people out there who -- who

8     would like to own both a pistol for self-defense and a sporting

9     rifle for hunting or competition or target practicing or

10    self-defense.

11         If you are of a higher social or economic level, you

12    can afford to own both.  On the other hand, if you are of a

13    lesser economic level, you are going to have to make a choice.

14    You can have one.  So you've got a choice.  You can either buy

15    the pistol, in which case you can forget all about taking care

16    of the coyotes or taking care of -- you know, going out and

17    doing competition.  I suppose there's pistol competitions as

18    well.  But, you know.  But -- but it very much limits you as to

19    what you can do.  So you may have a much better shot -- that's

20    a terrible word to use.  No pun intended.

21         You may have a better -- a better argument for owning

22    that for self-defense but you've cut yourself out of a whole

23    bunch of other potential uses, like taking your kids out, for

24    example, and teaching them responsible gun ownership and

25    teaching them how to -- how to -- you know, what they call

1    plinking; how to shoot, how to aim, et cetera.

2            But if you're of a lower economic position, you may

3    have to choose one or the other.  You can't have both.  So

4    which would you much rather have?

5            Well, you might want to have a sporting rifle because

6    it can be used.  Not -- not that it will be used, not that it

7    has been used.  But that it has the potential for being used

8    for self-defense, as well as all of the other things.  Right?

9            MR. LEE:  That's a good point, your Honor.  And not

10   only that.  Because the law -- the self-weapon law prohibits

11   possession of an assault weapon by anyone under age 18 -- and

12   there's no exception to this, by the way.  There's no parent

13   supervision exception.  There's no training-day-at-the-range

14   exception.  Because of the -- the firearm's classified as an

15   assault weapon, I cannot train a younger shooter on this

16   firearm.  And then I have -- and, of course, therefore, if I

17   want them to learn how to shoot a firearm, I have to, of

18   course, purchase a different type of firearm that is not an

19   assault weapon, if I want to teach my -- my child, who's under

20   the age of 18, how to do that.  The law is severe.  It makes no

21   exception -- again, for parent training, for -- you know,

22   simply handing it to your child, to familiarize themselves for

23   a bit for --

24           THE COURT:  To learn to respect them.

25           MR. LEE:  Yeah, exactly.  That -- that -- that's --

 1  that's prohibited by the law.  So that's another -- that's

 2  another reason --

 3          THE COURT:  I have to tell you, I had not focused on

 4  that being part of this lawsuit until the other day when I was

 5  reading, I think -- well, it might have been something that you

 6  filed.

 7          And, I mean, that's part of the problem with this

 8  case is that there's so much that's at issue that, you know,

 9  I'm trying to keep it all, you know, in front of my mind.  It's

10  kind of difficult.  But I didn't realize that that was part of

11  what we were addressing here.  And did not realize, until you

12  pointed it out, that in fact there is no exception.

13          So, for example, you can't take a -- someone who's 17

14  to the gun range and let them fire an AR-15 so that they can

15  learn what -- you know, what kind of damage it can do, so that

16  hopefully that you can teach them that, hey, this is not

17  something that you want to take to your school and -- just

18  because you're -- you know, somebody stole your girlfriend, or

19  whatever.  Right?

20          I had no idea that this was part of this lawsuit

21  until the other day.  So I apologize for that.

22          MR. LEE:  Sure.  Quite all right.  Your Honor --

23          THE COURT:  Quite interesting.

24          But you know age can -- so age has been used, you

25  know -- as we all know, for example, you can't buy cigarettes

1    for a certain age.  You can't buy alcohol.  You can't get a

2    driver's license.  Right?  So age restrictions have been in

3    effect for a long, long, long, long time.  Right?

4           Perhaps the problem with the statute is that it has

5    no exceptions.  Which, again, strikes me -- again, I don't know

6    if that was intentional or whether it was just simply an

7    oversight on the part of the legislature, that realizing that

8    perhaps it might not be a bad idea to teach kids respect for

9    weapons.

10          I don't know.  Anyway.  So --

11          MR. LEE:  So, we were talking about just competition

12   and other lawful purposes, including competition.  And I just

13   wanted to point out one more thing on this issue.  Is that

14   there is also evidence in the record that muzzle brakes and

15   compensators, which are attached to pistols on -- with threaded

16   barrels, are very commonplace in competition.  So that's

17   another -- certainly a lawful use that could be -- that we --

18   we have submitted to the Court.

19          So I think, in conclusion, with regard to this lawful

20   purposes discussion we've shown that the *Heller* test has been

21   met and that -- that the statute bans a broad category of

22   firearms by reference to their features, which are not --

23   neither both dangerous nor unusual.  And, to the contrary,

24   they're -- they're common in every respect.  They're common

25   functionally because these are basically semiautomatic firearms

1   that function the same in their operation.  They're common

2   characteristically because it's basically the same type of

3   commercial -- commercially available firearm that's available

4   off the shelf.  They're common jurisdictionally in a majority

5   of the states.  And -- and not limited to -- of course, they're

6   common numerically, as they're owned by citizens in other

7   states by the millions.

8           And all of this means that these -- this class --

9   classification of firearms meets the *Heller* test for common use

10  for lawful purposes.  And, therefore, because it bans a -- a

11  sizable number of firearms that are overwhelmingly being chosen

12  by Americans for the lawful purposes, including self-defense,

13  it -- it fails this *Heller* categorical ban test, full-stop.

14  That we don't even have to get into a discussion about what --

15  what level of scrutiny to apply.  However, of course, you know,

16  we always go through the exercise and we always do discuss --

17  because I think we would be remiss if we did not discuss, you

18  know, whether a heightened level of scrutiny should apply.

19          And in taking a look at that, if the Court is

20  inclined to apply a -- a -- the two-part test that applies to

21  Second Amendment cases under the *Shomat* (phonetic) case, we

22  think that this new law fails that test as well.

23          First of all, it -- the law establishes a substantial

24  burden on law-abiding gun owners and their ability to own

25  firearms that are suitable and preferred for self-defense.

1    It's not enough for the state to say that you get to have a

2    featureless firearm, and therefore it's not a substantial

3    burden because a featureless firearm is some type of

4    second-rate substitute.

5           The very qualities that make the firearms

6    advantageous -- these -- these Section 30515(a) characteristics

7    that make them advantageous for purposes of self-defense is

8    what makes them advantageous for the law-abiding citizens to

9    have.

10           THE COURT:  Just out of curiosity, though, why are

11   you focusing on self-defense?  Because -- because the *Heller*

12   test, the *Heller* test is, is it dangerous and unusual?  Are

13   they commonly possessed by law-abiding citizens for lawful

14   purposes, including self-defense?

15           So -- is there a reason why you're focusing on

16   self-defense?

17           MR. LEE:  Well, because -- (A), because self-defense

18   is a lawful purpose.

19           THE COURT:  Yes, I agree.  I understand.

20           MR. LEE:  (Indiscernible.)

21           THE COURT REPORTER:  I'm sorry.  I couldn't hear.

22           THE COURT:  I'm sorry.  Could you repeat what you

23   just said.

24           MR. LEE:  Yes, certainly.

25           Because, first of all, self-defense is a lawful

1    purpose and may be one of the more important lawful purposes.

2            THE COURT:  Okay.

3            MR. LEE:  But, secondly, if the Court is inclined to

4    also look at this from a -- applying the Second Amendment test

5    that -- that the circuits have seemed to be applying to the

6    Second Amendment cases, one has to look at the impact that it

7    has on the core -- on the Second Amendment rights, including

8    the core right of self-defense.

9            So we think, of course, because it's categorical ban,

10   this Court can strike -- strike down the law, full-stop,

11   without having to get to this next section, this next inquiry.

12           But I think we also have to go through the motion of

13   discussing this -- this -- this second -- this secondary

14   discussion about whether -- what test to apply.

15           It's a substantial burden on law-abiding citizens

16   because it deprives them of an important choice.  A choice to

17   defend themselves in -- in the home, with a firearm that they

18   choose.

19           And it's not enough for the state to say you're okay;

20   that the private citizen is -- is -- is -- that he's not

21   burdened because they're relegated to featureless firearms.

22           So we've heard a lot in this case already about the

23   Ruger Mini-14 ranch rifle, which is depicted in the defense

24   Exhibit D.  And it's undisputed that the Ruger 14 in its common

25   form, which doesn't have a flash hider and has a traditional

1    stock, is legal to purchase and own in California.  And that
2    one can have a detachable magazine on -- on that firearm.
3            So it's a firearm that fires the exact same round,
4    which -- as the AR-15, which is a .223 round.  But the truth
5    is -- and this is, I think, borne out by all of the discussion
6    about the popularity of the AR-15.  The truth is that people
7    prefer the AR-15 because it's more comfortable by design.
8            And, by that, we've had testimony from Mr. Kapelsohn
9    that shows what he means by the straight-line design and what
10   makes it more controllable, with less muzzle rise than a
11   Mini-Ruger-14 or another firearm with a traditional stock.
12           Now, your Honor said that at the beginning of this
13   hearing that your Honor misses the ability to hear live
14   witnesses and see them and have them explain, et cetera.
15           I have cued up about six minutes of deposition
16   testimony from Mr. Kapelsohn that explains the differences
17   between an AR-15 and a Mini-14 in terms of the advantages the
18   AR-15 gives with this straight-line design.  And I am prepared
19   to play this for the Court, if the Court desires to actually
20   hear some witness testimony on the issue.
21           THE COURT:  I have that already, I assume, on --
22           MR. LEE:  Well, it's video.  And we only got the
23   video last night.  So we will lodge the entire video with the
24   Court by -- by way of a memory stick.
25           THE COURT:  Why don't you go ahead and play it now.

 1   Let's see what's there.

 2            MR. LEE:  Okay.

 3            MR. ECHEVERRIA:  Your Honor, this is John Echeverria

 4   for defendants, if I may very quickly.

 5            THE COURT:  Yes.

 6            MR. ECHEVERRIA:  It was defendants' understanding

 7   that there would be no -- no testimony.

 8            I -- I'm not going to object to this limited portion

 9   of the video deposition being played.  But it was our

10   understanding, based on a meet-and-confer with plaintiffs, that

11   there would be no presentation of witness testimony at this --

12   at this trial.  So we have not prepared any snippets of

13   deposition video that we want to present to the Court.  But

14   I -- so I just would like to make that point noted for the

15   record.

16            Thank you, your Honor.

17            THE COURT:  All right.  So -- but you don't have any

18   objection to this limited one?

19            MR. ECHEVERRIA:  This limited portion of the

20   testimony, no, your Honor.

21            THE COURT:  Okay.  Let's do that, and then we'll move

22   on.

23            Okay.  Go ahead and play it.

24            MR. LEE:  Your Honor -- and just for the record and

25   for Mr. Echeverria, this deposition excerpt starts at page 178,

1  line 17, and will go to page 183, line 4.

2          So this is Mr. Kapelsohn talking about the

3  straight-line design advantage.  And hopefully you can all hear

4  it.

5          THE WITNESS:  Thank you.

6          (The following video presentation was reported as

7          follows:)

8          UNIDENTIFIED SPEAKER:  Mr. Kapelsohn, I want to

9          ask you a follow-up on some of the questioning and

10         examination that Mr. Echeverria undertook" --

11         THE COURT:  Just a second.  Just a second.

12         (Video playing paused.)

13         THE COURT:  Is it okay with you if I do not have my

14  court reporter transcribe this?

15         MR. LEE:  Yes, your Honor.  It's -- it's all part of

16  the deposition transcript.

17         THE COURT:  Okay.  All right.  Go ahead.

18         (Video played off the record.)

19         THE COURT:  Okay.

20         MR. LEE:  So, your Honor, this -- Mr. Kapelsohn's

21  testimony, which is in the deposition, again, from page 178 to

22  183, demonstrates why a featureless firearm such as the Ruger

23  Mini-14 is not preferred or why an AR-15 rifle is preferred is

24  because it's more -- it has less muzzle rise, more

25  controllable, it's more accurate, and it's more ergonomic.

1          THE COURT:  But -- but the firing capacity is about
2     the same.  Right?
3          MR. LEE:  The firing capacity, in terms of how many
4     rounds it can fire, is solely a function of its magazine.  So
5     a -- you know --
6          THE COURT:  All right.  It's a centerfire rifle that
7     is a semiautomatic rifle.  Right?
8          MR. LEE:  Correct, yes.  Right.
9          THE COURT:  Okay.
10          MR. LEE:  And if they have the same barrel length, in
11     theory, using the same bullet, using the same projectile, it is
12     going to have an equivalent muzzle velocity and -- and a
13     similar ballistics.
14          So while AR -- so -- so that was a featureless Ruger
15     Mini-14.  And as the Court knows from the demonstration we did
16     from Mr. Kraut, AR-type firearms may also be made featureless
17     in that some of the key components of the standard AR -- such
18     as the pistol grip or the telescoping stock or the flash
19     suppressor -- can be removed and replaced by other devices.
20     And the video that we submitted by plaintiffs' witness,
21     Mr. Kraut, which is now set forth in Plaintiffs' Exhibit Number
22     11, demonstrates his ability to fire this same rifle -- one
23     with the features and one without the features.  And -- and the
24     purpose of the video was to demonstrate that in either
25     configuration it was possible for a shooter to shoot a man-size

1   target at 25 yards, in rapid succession, using either a

2   California featureless rifle or a standard configuration AR-15.

3          Now, what was the purpose of that?  It's to show that

4   if a person was determined and -- the existence of the

5   prohibited features aren't going to make any difference to a

6   person who is intent on committing a crime or mayhem.

7          A person may want to commit a crime with a weapon

8   simply to -- as a robbery, for example, to intimidate.  The

9   person could do that easily -- just as easily with or without a

10  pistol grip.  A criminal isn't going to care, necessarily,

11  about accuracy.

12         But to a law-abiding and responsible citizen,

13  firearms that enhance a -- features that enhance a firearm's

14  accuracy or the comfort or, most importantly of all, the

15  ability of that citizen to control the firearm accurately,

16  that's what's key and that's what's most important.  Because a

17  citizen must be accountable for every shot that they take.

18         A criminal doesn't necessarily care.  A mass shooter

19  doesn't necessarily care about accuracy.  Isn't -- obviously,

20  isn't being accountable for every shot.  Whereas every shot

21  that goes astray for a citizen is a round that goes someplace

22  where they didn't intend it do go.  It could injure an innocent

23  bystander.  It could create an intent -- a large amount of

24  liability.

25         So that's why accuracy is really important to a

 1    law-abiding citizen who is defending himself or herself.

 2    Whereas, to a criminal, it doesn't matter.

 3          So a featureless design which mainly lacks a pistol

 4    grip, basically, is less ergonomic.  It is less accurate.  A

 5    featureless AR-15 rifle which lacks standard pistol grip is

 6    also not ergonomic and is -- and is also of poor design.

 7          But there's another reason why the featureless AR-15

 8    firearm is not advantageous or not preferred or that it's less

 9    safe.  Now, the lack of a pistol grip makes it less safe when

10    it comes to clearing a malfunction.

11          On an AR-15 rifle, the standard process for clearing

12    a malfunction is to perform several steps to do that.  And

13    that's hindered by one's inability to wrap their hand around

14    the pistol grip because they don't maintain the same degree of

15    control when performing that function.

16          Now, I have another video cued up of Mr. Kapelsohn

17    who demonstrates this.  It lasts about seven minutes.  I can

18    play it for the Court.  Or if the Court would like me to move

19    on --

20          THE COURT:  Well, I think -- I think

21    Mr. Echeverria -- I don't know that that's necessarily a valid

22    objection that -- that -- I mean, I don't remember saying that

23    we weren't going to play portions of depositions, if they were

24    videoed, or whatever.  But I think in the interests of time, if

25    you would make sure to submit that to me by flash drive, I'll

1  watch it on my own.  And rather than spending time now -- and I

2  know Mr. Echeverria is going to object, as he did already.  So

3  there's no point in wasting time.  Okay?

4  MR. LEE:  Understood, your Honor.

5  I -- we will submit the entire video on a flash

6  drive.  And the portions that I was going to play for the Court

7  are at his deposition at -- starting at page 188 through page

8  193.

9  But what Mr. Kapelsohn would demonstrate in the video

10  is that your -- the first step to clearing a malfunction on an

11  AR-15 is to tap the bottom of the magazine and to rack it --

12  the action back on -- on -- and to lock the bolt back.  To --

13  and then to push the bolt forward to see if that clears the

14  malfunction.

15  Now, if that doesn't work, the second step is to lock

16  the bolt back and to remove the magazine.  To rack the action

17  back several times to try to clear any malfunction or stovepipe

18  rounds, to reinsert a new magazine, and then to push the bolt

19  forward.

20  All of that requires you, your Honor, to be able to

21  hold onto that firearm with a firm grip, with your -- with your

22  dominant hand; as Mr. Kapelsohn demonstrates.

23  THE COURT:  Wait a minute.  Isn't the bolt on the

24  same side as your dominant hand?

25  MR. LEE:  The bolt is activated by a charging handle,

1   which one typically uses -- and there can be ambidextrous

2   versions.  But typically for a right-handed shooter, the

3   charging handle would be pulled back with the left hand.

4           THE COURT:  Okay.

5           MR. LEE:  Okay?

6           So what -- what the video that your Honor will see

7   demonstrates is that a featureless AR-15 is also less safe from

8   that regard because it impedes one's ability to maintain

9   control of the firearm and to perform properly the -- the

10  malfunction clearance procedure.

11          So what's the state actually getting at, though, when

12  it -- when -- when what it -- in trying to accomplish what it's

13  trying to accomplish here?

14          What it amounts to is what is set forth in the

15  state's brief, which is that rapid fire somehow -- which is

16  accurate is somehow dangerous.  And I think that this position

17  is frankly untenable.

18          There's -- the state can't really dispute that

19  semiautomatic firearms -- any semiautomatic firearms are

20  capable of rapid fire.  So what the state is saying here is

21  that, well, we can't have people who are rapidly firing

22  accurately.  That does nothing, again, except to punish the

23  law-abiding citizen; who, again, is accountable for every shot.

24  And it does nothing to deter someone like a mass shooter, who

25  isn't particularly trying to be careful but is simply

1    indiscriminately firing at a large group of people.

2           So I think that this is, frankly, an untenable

3    position for the state to take, to say that weapons are somehow

4    too effective.  That we can't allow weapons to be all that

5    accurate because, somehow, having accurate weapons is

6    dangerous.  I just don't really see how the state can really

7    make that argument in good faith.

8           Your Honor, the -- the argument that the state makes

9    is similar to arguments that were made pertaining to

10   semiautomatic firearms generally.

11          One of the defense exhibits, Exhibit CM -- that is

12   Charlie, Mike -- is an article that was written pre-*Heller*.  It

13   was an article by Koper in 2003.  And they were talking

14   about -- and this is before *Heller*, again.  But this is talking

15   about semiautomatic firearms in general.  And I'll just quote

16   from this article.

17          It says -- in talking about semiautomatic firearms,

18   it says:

19          "Pistol" --

20          And, actually, I can put it up on the screen, if your

21   Honor wants.

22          THE COURT:  Just tell me what it is.

23          MR. LEE:  Okay.  It -- it is Exhibit CM.

24          It says:

25          "Pistols enable shooters to fire more shots more

1              rapidly, potentially increasing the number of

2              persons hit and wounds inflicted per shooting

3              incident.  Accordingly, it is possible that the

4              increasing substitution of pistols or revolvers

5              has increased deaths and injuries from gun

6              violence.  Such concerns have spurred legislation

7              to restrict or deter the use of semiautomatic

8              weaponry"

9         So, your Honor, five years after this -- this type of

10   thinking was published, the Court decided *Heller*, in which the

11   Court said it doesn't matter that semiautomatic handguns are

12   used for criminal purposes or that they are more accurate or

13   that they allow someone to shoot more rapidly

14         This is the same argument, basically, that's now

15   being recycled as to the assault weapon debate or this assault

16   weapons case, in which the state is essentially trying to say,

17   well, it's the same kind of concern that we had before *Heller*,

18   pertaining to semiautomatic handguns, that they fire -- allow

19   someone to fire rapidly and accurately, and we just can't have

20   that.  And I -- again, I just don't think that that's a very

21   good argument for the state to make.

22         Your Honor, I would like to discuss a few other

23   items, at least, pertaining to what the -- the state is

24   claiming.

25         First, they're claiming that somehow the AR-15 is

1  easy to convert to fully automatic.  But that's simply not

2  true.  There's no evidence to that effect.  In fact, all of the

3  evidence that has been submitted in this case, including

4  Defense Exhibit DA, which is a book by Dr. Dimaya; the

5  testimony of General Youngman; and, again, Defense Exhibit BI,

6  which is "Bravo, India," all state that AR-15 rifles are not --

7  it's not something that is common or frequent, and it isn't

8  something that is easy to do.

9          THE COURT:  Well, let me ask you this:  Were there

10  any instances -- either by Ms. Allen or by anyone else -- that

11  showed that there was a frequency of -- of these weapons being

12  converted to be fully automatic and then subsequently used in

13  some mass shooting?

14          MR. LEE:  Not only are they not frequently, they're

15  not really even existent.

16          In any of the mass -- the high-profile mass shootings

17  that we looked at -- and, again, I'm not discounting the fact

18  of the possibility that there may be an isolated incident here

19  or there, depending if you look really hard.

20          But your Honor's point is good to follow up on.

21  Because if -- if this is the case, that AR-15 rifles are -- are

22  easy to convert to full-auto, where is the bloodbath of

23  full-automatic firearms fire that -- that we experience in the

24  streets?  It just simply doesn't exist.

25          There's -- none of the mass -- high-profile mass

1  shootings that we looked at involve fully automatic fire, they

2  all involve semiautomatic fire.  The last fully-automatic-fire

3  incident that I can think of -- and this is just from my

4  recollection -- is a shootout in North Hollywood in 19 -- it

5  was '97 or 2007, I believe, in which the -- the perpetrators

6  used converted fully automatic firearms.

7          But, again -- but no one was even -- no one was -- I

8  don't believe anyone was killed in that incident, so that

9  doesn't qualify as a mass shooting.

10         So where is all of these converted -- fully converted

11 to fully automatic AR-15s that we were finding on the streets?

12 I'm sure the state can find some, but this simply is not a

13 feature in the mass shootings that have been looked at.

14         In a related sense, the state is also trying to claim

15 that assault weapons somehow fire more powerful rounds.

16         They've submitted the testimony of Dr. Colwell, who

17 has opined that assault weapon victims generally suffer more

18 extensive and more numerous gunshot wounds, suggesting or

19 implying that the wounds that one suffers from an assault

20 weapon are somehow more dangerous or -- or lethal than firearms

21 that are fired from non-assault weapons.

22         And I think the Court has already addressed that.

23 And -- and the defense, ultimately, had to concede -- or

24 Dr. Colwell, at least, had to concede that for all of his hype

25 about the lethality of assault weapons, he would not be able

1    to -- himself, to distinguish between wounds that were caused

2    by an AR-15 as opposed to a non-assault weapon using the same

3    caliber such as the Ruger Mini-14.  So I think the Court

4    understands that point perfectly well.

5              Another argument, however, that the state tries to

6    make is that gunfire from assault weapons somehow are uniquely

7    able to pierce body armor worn by law enforcement.  And this

8    isn't just a suggestion.  This is a flat-out statement that

9    they make in their declarations.  But, again, your Honor, this

10   is simply nonsense.

11             Body armor worn by law enforcement is generally

12   intended to protect from handgun bullets and not rifle bullets.

13             As the testimony has shown, any rifle rounds,

14   including the intermediate cartridges fired by -- such as the

15   .223 5.56 round or the 7.62 by 39 millimeter round.  Any of

16   those rounds would penetrate body armor specifically worn by

17   law enforcement unless the body armor is specifically rated to

18   withstand that.  And that's not just us and our witnesses

19   saying that, your Honor.  Defense Exhibit AY -- or "alpha,

20   yankie" -- is a U.S. Department of Justice guide to body armor,

21   in which they talk about -- they say that's -- soft armor is

22   designed to offer protection against assaults with handguns and

23   is intended for daily wear.  And most police officers wear soft

24   body armor.

25             Whereas hard armor, which includes the plates that

1    are worn in tactical armor is for high-risk situations.  And

2    that -- the document goes on to say that rifle caliber bullets

3    will penetrate through soft armor panels.  Hard armor plates

4    are required to defeat them.

5         So even the state's own evidence suggests that if --

6    any rifle round will pierce body armor that's worn by most law

7    enforcement.  So I think that, again, this is just another one

8    of these arguments that -- the scare-tactic-type arguments to

9    suggest that assault weapons have some unique characteristic

10   that make them uniquely more lethal in that regard, and that's

11   simply not the case.

12        So let's talk -- I guess the big issue is mass

13   shootings.  And that's the issue, I think, that this state has

14   concentrated on.  And, frankly, that's the issue that has

15   spawned a lot of this -- the legislation that -- that's at

16   issue.

17        First of all, if we're going to make this argument

18   that there's some type of correlation between assault weapons

19   found at mass shootings or used at mass shootings, then the

20   plain fact of the matter is -- which the defense cannot deny or

21   dispute -- that assault weapons are not used in a majority of

22   the mass shootings.

23        According to Ms. Allen, in her analysis -- which is

24   Defense Exhibit A -- in her analysis of 161 incidents

25   constituting what she calls public mass shootings, as she

1    defined the term, assault weapons under California law --

2    which, again, may or may not include the 30510 Category 1

3    weapons.   But assault weapons were used in 32 percent of them.

4    And that's 22 percent where the type of weapon could be

5    determined.

6          If you were to assume that -- that assault weapons

7    were not used in all of the 161 -- or the -- the remaining

8    incidents where the type of weapon could not be determined, the

9    number is about 20 percent.

10         So four out of five of the public -- public mass

11   shootings that Ms. Allen looked at did not involve assault

12   weapons.   But if you're just going to say involving because

13   it's at the scene or that it's used, it -- and -- and you were

14   to say -- also take a look at what's the firearm that is most

15   prevalent or found at the scene of a mass shooting, it by far

16   and away has to be a handgun.   That's not just my --

17         THE COURT:   Refresh my recollection.   Did Ms. Allen

18   limit her analysis to California?   Or was it nationwide?

19         MR. LEE:   Nationwide.

20         THE COURT:   Okay.

21         MR. LEE:   She looked at 161.   In -- in rough, she

22   looked at a greater set of -- she looked at a greater sense of

23   mass -- what she called public mass shootings.

24         In this case, the *Miller versus Becerra* case before

25   your Honor, she changed the definition of public mass shooting,

1  and looked at 161 separate incidents.  And these are

2  nationwide.

3         And if you look at her -- her report -- or her

4  declaration, she attaches, as Mr. Echeverria notes, an Appendix

5  C, in which lists the type of firearm that is used, or that was

6  found or described.

7         And she didn't concede this.  She refused to concede

8  this at the deposition.  But it's really apparent that in

9  almost -- in a vast majority of those incidents, a handgun was

10 found at the scene.  But support for this is also found

11 elsewhere, your Honor.

12        If your Honor looks at Defense Exhibit CW, there's a

13 pictorial look at the types of weapons that are used in 19 mass

14 shootings that -- that that article featured.

15        Defense Exhibit CG, or "Charlie, Golf," is a *Mother

16 Jones* 2012 article.  It says in the 62 mass shootings we

17 analyzed, 54 of the killers had handguns; including in all 15

18 of the mass shootings since the surge of pro-gun laws began in

19 2009.  And the Defense Exhibit BM says, contrary to popular

20 belief --

21        THE COURT:  I'm sorry.  Say that again.  Is that --

22 is that "bravo" --

23        MR. LEE:  "Bravo, Mike."

24        THE COURT:  "Bravo, Mike."  Okay.

25        MR. LEE:  Contrary to popular belief, assault rifles

1   were not the predominant type of weapon used in these types of

2   crimes.  In fact, according to a recent study, handguns were

3   the most commonly used type of firearm in mass shootings.

4         So, again, if we're just going to look at the firearm

5   that's present and say that -- that were used in this respect,

6   as following Ms. -- Ms. Allen's logic or thinking on this, one

7   has to say that, well, the most -- assault weapons are not

8   involved in four out of five of the mass shootings that she

9   looked at.  And the most common and the most prevalent is the

10  handgun.

11        But also, her study, again, was over-inclusive

12  because it included a -- her study included all California

13  assault weapons, including the Category 1 and Category 2.  And

14  those may or may not also fit the description of Category 3,

15  but that's not how she framed the -- that's not how she framed

16  her study.  She framed it, if it met the definition of assault

17  weapon under California law, she was going to count it as a

18  mass shooting involving a -- a -- an assault weapon in that

19  regard.

20        MR. LEE:  Your Honor, another part of Ms. Allen's

21  declaration focuses on the shots fired per -- number of shots

22  fired per second -- I'm sorry, per incident in home defense

23  scenarios, involving her look into the armed-citizen database.

24        I can address that for the Court, if -- if the Court

25  is interested.  Or if the Court finds that this is

1    cumulative --

2              THE COURT:  You know, I was not persuaded by that in

3    the -- in the -- in the *Duncan* case.  I was not persuaded by

4    that when I saw her latest -- or her declaration.  I was not

5    persuaded by that when I heard her testify because I don't

6    think it's a really -- a very good case.  And I'll tell you

7    why.  Here's why.

8              How many -- how many -- how many nuclear bombs have

9    been exploded in war in the history of mankind?  I think two.

10             Uh-oh, what happened?

11             THE CLERK:  No idea, Judge.

12             (Pause.)

13             THE CLERK:  Hold on, Judge.  They're still there.

14   Hold on.

15             THE COURT:  Are you folks still there?  Because I

16   can't see you.

17             THE CLERK:  I can see them on my screen, Judge.

18             THE COURT:  Something happened.  I don't have any --

19   I don't have any audio, and I don't have any video.

20             THE CLERK:  Let me get IT over here, Judge.

21             (Pause.)

22             THE CLERK:  I texted them, Judge.

23             (Pause.)

24             THE CLERK:  Your Honor, I can message everyone here.

25   I don't know if you want me to take down a message but --

1          THE COURT:  All right.  So here's -- I have lost

2    connection.  I can neither see nor hear the parties at this

3    point in time.  We have tried to reestablish connection several

4    times and have not been able to do so.

5          I am going to conclude this hearing today.  We will

6    resume this hearing on Friday at 10:00 a.m.

7          We will hopefully try to get the -- the audiovisual

8    problems resolved between now and then.

9          So this hearing is concluded.  Thank you.

10          (Conclusion of proceedings at 3:30 p.m.)

11                          --oOo--

12

13    I certify, by signing below, that the foregoing is a correct

14    stenographic transcript of the oral proceedings had in the

15    above-entitled matter this 14th day of February, 2021.  A

16    transcript without an original signature or conformed signature

17    is not certified.  I further certify that the transcript fees

18    and format comply with those prescribed by the Court and the

19    Judicial Conference of the United States.

20          /S/ Amanda M. LeGore

21          _____

22          AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

23

24

25