1               UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3  JAMES MILLER, an individual;      )
   PATRICK RUSS, an individual; RYAN )
4  PETERSON, an individual; and SAN  )
   DIEGO COUNTY GUN OWNERS POLITICAL )
5  ACTION COMMITTEE, a membership    )
   organization,                     )
6                                    )  No. 19-CV-1537-JAH-AGS
            Plaintiffs,              )
7                                    )
   v.                                )  February 5, 2021
8                                    )
   XAVIER BECERRA, in his official   )
9  capacity as Attorney General of   )
   California; and MARTIN HORAN, in  )
10 his official capacity as Chief of )
   the Department of Justice Bureau  )
11 of Firearms,                      )
                                     )  Courtroom 5A
12          Defendants.              )
                                     )  San Diego, California
13 _____  )

14              TRANSCRIPT OF PROCEEDINGS

15                (Court Trial - Day 2)

16

17   BEFORE THE HONORABLE ROGER T. BENITEZ, SENIOR DISTRICT JUDGE

18

19

20

21

22 COURT REPORTER:        AMANDA M. LeGORE
                          RDR, CRR, CRC, FCRR, CACSR
23                        U.S. District Court
                          333 West Broadway, Suite 420
24                        San Diego, CA 92101
                          amanda_legore@casd.uscourts.gov

25

```
 1              APPEARANCES PRESENT VIA VIDEO TELECONFERENCE

 2    APPEARANCES:

 3    FOR THE PLAINTIFFS:    GEORGE LEE
                            Seiler Epstein, LLP
 4                          275 Battery Street, Suite 1600
                            San Francisco, CA  94111
 5                          (415)979-0500
                            gml@seilerepstein.com
 6

 7                          JOHN DILLON
                            Gatzke, Dillon & Ballance, LLP
 8                          2762 Gateway Road
                            Carlsbad, CA  92009
 9                          (760)431-9501
                            jdillon@gandb.com
10

11                          ERIK JAFFE
                            Schaerr Jaffe LLP
12                          1717 K Street NW, Suite 900
                            Washington, DC  20006
13                          (202)415-7412
                            ejaffe@schaerr-jaffe.com
14

15    FOR THE DEFENDANTS:    JOHN ECHEVERRIA
                            Office of the California Attorney General
16                          300 S. Spring Street, Suite 1702
                            Los Angeles, CA  90013
17                          (213)897-4902
                            john.echeverria@doj.ca.gov
18

19                          PETER CHANG
                            JOSE ZELIDON-ZEPEDA
20                          California Attorney Generals
                            455 Golden Gate Avenue, Suite 11000
21                          San Francisco, CA  94102
                            (415)703-5939
22                          peter.chang@doj.ca.gov
                            jose.zelidonzepeda@doj.ca.gov
23

24    ALSO PRESENT:          MARK BECKINGTON
                            ADAM KRAUT
25
```

```
 1                    (Friday, February 5, 2021; 10:08 a.m.)

 2

 3                         P R O C E E D I N G S

 4

 5              THE COURT:  Well, good morning.

 6              MR. LEE:  Good morning.

 7              THE ATTORNEYS:  Good morning, your Honor.

 8              THE COURT:  Call the case, Glenn.

 9              THE CLERK:  One on calendar, 19-CV-1537, Miller, et

10    al., versus Becerra, et al., day 2.

11              THE COURT:  All right.  Counsel, if you will do me a

12    favor and please register your appearances for the record.

13              MR. LEE:  Good morning, your Honor.  This is George

14    Lee with the firm of Seiler Epstein, LLP, on behalf of

15    plaintiffs.

16              MR. DILLON:  Good morning, your Honor.  This is John

17    Dillon with the firm Dillon Law Group, APC, on behalf of the

18    plaintiffs.

19              MR. JAFFE:  Good morning, your Honor.  This is Erik

20    Jaffe of Schaerr Jaffe, LLP, on behalf of the plaintiffs.

21              MR. ECHEVERRIA:  Good morning, your Honor.  This is

22    John Echeverria, Deputy Attorney General, for the defendants.

23              MR. CHANG:  Good morning, your Honor.  This is Peter

24    Chang, Deputy Attorney General, for the defendants.

25              MR. ZELIDON-ZEPEDA:  Good morning, your Honor --
```

 1          MR. BECKINGTON:  Good morning, your Honor.  Mark

 2   Beckington, Deputy Attorney General, also on behalf of

 3   defendants.

 4          MR. ZELIDON-ZEPEDA:  Good morning, your Honor.  José

 5   Zelidon-Zepeda, Attorney General's Office, also for the

 6   defendant.

 7          THE COURT:  All right.  Good morning to all of you.

 8   Sorry about the disruption last Wednesday.  I don't know what

 9   happened.  I assure you it was nothing personal, Mr. Lee.  But,

10   for whatever reason, we lost you all, and we were not able to

11   make reconnection.

12          And I hope I didn't inconvenience you too much by

13   asking you to be here this morning.  But anyway.

14          Hey, Glenn, how come it's not tiled like it was last

15   time, where I was able to see everyone at the same time?

16          THE CLERK:  I don't know, Judge.

17          THE COURT:  Okay.  All right.

18          Well, Mr. Lee, I think you were in -- in -- in the

19   process of making your combined opening/closing argument.

20          So if you want to pick up where you left off.

21          MR. LEE:  Certainly, your Honor.  And thank you very

22   much.

23          When we left off on Wednesday, I was about to start

24   (indiscernible) the testimony of Lucy Allen.  And, in

25   particular, her finding with regard to a number of shots that

1   were -- the average number of shots that were fired in

2   self-defense incidents at the home.

3           So we -- I'm prepared to discuss that issue -- that

4   particular issue of the average number of shots fired for

5   several minutes.  But once I discuss that, I -- I will be

6   passing on the -- this argument to my colleague, Mr. Dillon,

7   who will be addressing specifically the mass shooting analysis.

8           So with regard to Ms. Allen's testimony regarding the

9   average number of shots that were fired, she -- essentially,

10  her methodology, which is a methodology that she's employed in

11  several cases now, follows this line of thinking.

12          She has looked at what she calls an armed citizen

13  database, which is what -- she describes it as a database that

14  is maintained by the NRA or the National Rifle Association,

15  which collects a number of stories of self-defense incidents.

16  And her methodology was to go online to access the database, as

17  she calls it, to pick out the stories that only involve

18  self-defense in the home because, for some reason, they feel

19  that it's -- it should be limited to self-defense incidents at

20  the home.

21          So this excludes self-defense incidents outside the

22  home, in -- you know, where people have needed to defend

23  themselves in stores or convenience stores or gas stations;

24  robberies out in the street; or workplace defense; or, you

25  know, sadly, defensive incidences involving places of worship.

1          So all of those are excluded from her analysis.   The

2    only thing she's focusing in on is self-defense incidents in

3    the home, which plaintiffs have never contended that -- the

4    right to self-defense in the home, of course.   So -- nor are we

5    claiming that the claims in this case are limited to those

6    types of incidents.   So that's just the first overall backdrop.

7          But what I think Ms. Allen fails to appreciate -- and

8    I think it became apparent during the -- during the deposition

9    testimony, which your Honor will surely read with interest.

10   But I think Ms. Allen failed to appreciate that the armed

11   citizen database, as she calls it, is actually a collection of

12   stories that comes from a magazine that has been kept for many,

13   many years.   The NRA has -- for many years, has established a

14   number of publications, and publishes its -- its story in this

15   physical magazine.   And I think it's replicated across several

16   magazines now.   But, most prominently, the *American Rifleman*

17   magazine.

18          So when I asked Ms. Allen if -- at her deposition

19   whether or not she had any particular editorial insight as to

20   how the NRA goes about selecting its stories for publication in

21   the magazine, what editorial criteria they used, how many

22   stories were not published, that type of thing, she claimed to

23   have -- she absolutely claimed that she has editorial insight

24   as to how the NRA selects its stores.

25          THE COURT:   I'm sorry.   She said she did or did not?

1          MR. LEE:  Absolutely claims that she has editorial

2     insight as to how the NRA selects its stories.

3          THE COURT:  All right.  Go ahead.

4          MR. LEE:  When I pressed her on that, her supposed

5     knowledge of the NRA's editorial standards is only derived from

6     having read these stories for many years.  When I asked her

7     specifically, did you ever have a conversation with anyone at

8     the NRA?  Did you ever reach out to the NRA?  Did you ever ask

9     anyone how they select these stories?  What's the criteria?

10     Anything like that?  She recalls some vague attempts to try to

11     reach out to the NRA, but never got -- getting any type of

12     satisfactory response.

13          So I think we can infer from that answer is that, no,

14     she never was able to actually speak to anyone at the NRA as to

15     what their selection criteria is for these stories, and -- and

16     that type of thing.

17          So -- so her -- her supposed editorial insight comes

18     only from reading these stories over the years.  And, frankly,

19     that's a level of insight that you or I could have if we simply

20     were members of the NRA and we subscribed to the magazine every

21     year.  But I think it's -- it shouldn't be lost that this is a

22     feature that appears in the magazine that has been published

23     for many years.  And as she cited at her testimony, in her

24     deposition, she did not focus on the magazines at all.  So she

25     -- I mean, the -- the physical publications.  So -- so she

1    views this as a database.  But what this actually is is a

2    selection of stories.

3              And, your Honor, what I like to do is to show your

4    Honor what this publication is and how it appears in the

5    physical magazine.

6              So -- so, your Honor, this has not been marked as an

7    exhibit but I will mark it certainly next in order.  I think it

8    would be Plaintiff's Exhibit 34.

9              But this is the digital version of the *American*

10   *Rifleman* magazine.  And I just -- this is the copy that gets

11   sent to me every month.  And this is just, you know -- just for

12   convenience, this is this month's edition, February 2021

13   edition of American Rifleman magazine.  And the print version

14   of this is identical.

15             So once you get past all of the gold ads and

16   advertisements and the table of contents and all of this stuff

17   that typically appears in *American Rifleman* magazine and other

18   NRA publications, you get to this page called "The Armed

19   Citizen."

20             So this is typically what you'll see in "The Armed

21   Citizen" feature.  It's one page featuring a collection of

22   stories that purport to highlight some self-defense incidents

23   around the country.  So this is what constitutes "The Armed

24   Citizen" database, as she -- Ms. Allen calls it.

25             Now, if you look at this page, which is page 10 of

1   this -- this magazine, there's a collection of one, two, three,

2   four, five, six stories involving self-defense incidents.

3          Now, of these six stories, the first one involves a

4   robbery out in public.  So that wouldn't count.  The second one

5   involves a robbery at a restaurant, so that wouldn't count.

6   The fourth one involves a construction worker defending a home

7   where he was working on.  So that's not his home, so that

8   wouldn't count, presumably.

9          What we have here are two stories that -- that

10  describe self-defense incidents at the home.  That presumably

11  would be the types of stories that would be counted in this --

12  in her analysis.

13         So this third story, talking about three armed --

14  three armed individuals forcing their way into a home in Baton

15  Rouge, Louisiana, talks about the homeowner was able to get his

16  gun and fire the (indiscernible) the invaders, striking two of

17  them.

18         But this doesn't say, for example, how many shots

19  were fired.

20         THE COURT:  You know, Mr. Lee -- Mr. Lee, brilliant

21  minds think alike.  I was about to ask you that question.

22         And the reason why I was going to ask you that

23  question is because I also read some other articles that have

24  been submitted.  I can't recall the exhibit numbers.  I am

25  going to say that maybe they're -- I don't know, two or three

1    through six, or something, of plaintiffs' exhibits.  And in

2    reading those articles, I noted that maybe half of them

3    actually indicate how many shots were fired during the

4    incident.

5         It's not -- it's not a sexy -- it's not as sexy to

6    report that there were 30 shots fired as it is to report that

7    there were 30 bodies found at this shooting site.  So it

8    doesn't seem like it's something -- in fact -- and many of them

9    don't even describe the type of gun used.  Right?

10        So it doesn't seem like -- and the reason why I said

11   brilliant minds think alike is because that was something that

12   seemed to be so obvious to me, which is that, you know, a lot

13   of these news stories don't seem to report either the type of

14   gun that is used or the number of shots that are fired.  So I'm

15   sorry to interrupt you, but that seems so obvious to me.

16        MR. LEE:  No worries, your Honor.  The -- both that

17   third story and I believe the fifth story talk about

18   self-defense incidents in the home, where -- where a number of

19   shots were fired, but it doesn't specify the number of shots

20   that were actually fired.

21        So I actually asked Ms. Allen about this at her

22   deposition.  I asked her, well, what happens when you don't

23   have the number of shots that were actually fired that are

24   mentioned in the story?

25        THE COURT:  Good.  And what did she say?

1           MR. LEE:  And she said what they do is they imply --

2    they find an imputed number.

3           THE COURT:  What is that?

4           MR. LEE:  And the imputed number -- well, you'll have

5    to read her deposition testimony at pages 129 to 130 to find

6    out exactly how she arrives at the imputed number.

7           But what they do is if -- first, they take the

8    information that's available in the story.  For example, if it

9    says two people were shot, they know at least two people were

10   shot, or two shots were fired.

11          So then what they do is they take the average number

12   of shots that were fired that involved two or more shots.  And

13   she couldn't tell me what that number was or what that imputed

14   number was.  But that's the methodology -- methodology that she

15   employs to arrive at this number.

16          So, in other words, the very -- the average becomes

17   the source of its own validity.  So because -- if there's an

18   average that they impute, that that somehow -- they apply that

19   average.  And then that -- that somehow justifies or that --

20   that validates, in some way, the number of shots that they

21   presume to be -- were fired in this story.

22          Now, I think that's highly unscientific.  I think

23   it's anecdotal.  And I think that she admits -- and as -- at

24   her deposition testimony and actually as the district court in

25   New Jersey found, in -- in reviewing her -- her testimony on

1  the same issue, these stories were not compiled scientifically.

2          And her -- and so I don't think she can really come

3  up with this scientific analysis as to the actual number of

4  shots.  I think the only thing you can reasonably say or

5  conclude from her analysis is that these are the average number

6  of shots that were fired in stories that appeared in *American*

7  *Rifleman* magazine.

8          But, again, I -- I don't think it should be lost that

9  this is a collection of stories that appears in a publication.

10  And when I asked her, for example, did you have any insight as

11  to, like, were there page limitations?  Were there layout

12  limitations?  Does American -- does "The Armed Citizen" run on

13  one or two pages per -- per magazine?

14          They couldn't tell me that -- any of that because

15  she, frankly, didn't seem to realize that this is a magazine

16  article.  And -- and, most importantly, how many stories get

17  left on the cutting room floor?  I asked her that, and she had,

18  of course, no idea because she's not part of the NRA's

19  editorial board or anything like that.

20          So -- so I think that her study on this is extremely

21  fraught and limited.  And, moreover, it doesn't tell us

22  anything except what she believes is the average number of

23  shots fired in self-defense stories that are limited to the

24  home as reported by the NRA.  I think -- so that's a huge

25  stretch.

1          THE COURT:  Could I ask you a question?  I've been
2    thinking about this a lot.  As you know, this same issue, I --
3    I faced in the -- in the *Duncan* case.  I've given this a lot of
4    thought.  And it strikes me, does it really matter how many
5    shots somebody fired?
6          MR. LEE:  No.
7          THE COURT:  Because -- because -- let me tell you
8    why.  And I think I started to ask you this question the other
9    day.

10          I believe that there have been two nuclear bombs that
11   have been dropped in -- in -- in -- in wartime, in -- in -- and
12   correct me if I'm wrong.  And yet we have -- I don't know how
13   many -- hundreds, if not thousands of nuclear weapons in the
14   arsenal of the United States, in Russia, and China.  And I was
15   thinking that there must be a reason why there have only been
16   two nuclear bombs dropped during that time, notwithstanding the
17   fact that we've had all of these other wars in the meantime.
18   Vietnam, for example.  Iraq.

19          And the thought comes to me that it's not how many
20   bombs that you have actually used.  It's the knowledge that
21   there are bombs out there that if -- if you wish to push for
22   mutual destruction, the bombs are there.  And so the fact
23   that -- the fact that someone may just brandish a weapon,
24   which, of course, we would all hope would be the case.  Right?
25   That a weapon would never have to be used.  That would

1   certainly be ideal.  Right?  But the fact that the weapon is

2   brandished, the fact that a burglar or a robber or a rapist or

3   a murderer who is trying to do someone harm simply knows that

4   the other person has a weapon and that perhaps that weapon may

5   have the capacity to not just injure but possibly kill, that's

6   a deterrent.  That's actually a good thing, I suspect.  And

7   whether or not you actually have to fire 30 rounds out of a

8   magazine is irrelevant.  If you have to -- I mean, if you have

9   to, I guess, you know, that's good.  That's good.

10          But it seems to me that the actual number of rounds

11  fired is absolutely irrelevant to the discussion.  And -- I

12  mean, do you understand what I'm saying?

13          MR. LEE:  Yes, your Honor.  Absolutely.  It -- it

14  makes sense in that Ms. Allen's average (indiscernible) no

15  shots were fired at all.  The best outcome, when no shots are

16  fired.  So, naturally, when no shots are fired, zero number is

17  applied, and that will drag the average number down.

18          When I -- when I asked Ms. Allen, "Have you done an

19  analysis of the number of shots that were fired when shots were

20  necessary," she seemed to -- oh, she said, "No."  In fact, she

21  seemed to quarrel with me what it meant -- "I don't know what

22  necessary means."  So your Honor will see for yourself in the

23  deposition testimony that that was her -- that was her answer.

24  "I can't tell you what necessary is."  But, no, she's never

25  done that.  She's never done that analysis, as to the number of

1   shots that were fired when shots were actually fired, even

2   applying this flawed methodology, as we -- as we indicated.

3         But to your Honor's point, yes, the homeowner -- gun

4   owners have consistently -- responsible law-abiding gun owners

5   are consistently trained:  The best outcome is when no shots

6   are fired.  Use restraint.  Don't -- you know, don't shoot

7   blindly.  Know what you're shooting at.  Know what your target

8   is.

9         And now it seems that if you were to say, well,

10  because gun owners show restraint, that somehow that should be

11  used against gun owners.  Because, well, it seems like you only

12  need -- you only need, you know, what need means.  2.2 shots

13  per incident.  Well, then we're not going to allow you to

14  have -- or we don't think you should be able to have more than

15  ten rounds in a -- in a firearm.

16        So, yes, to your Honor's point, currently those

17  outcomes -- which are the best outcomes in which no shots are

18  fired -- drag that average down.  And so it's really not a true

19  reflection as to what -- for example, the deterrent capacity

20  or -- or the deterrent (indiscernible).

21        So I think for all of these reasons, I think that --

22  and as the district court in New Jersey found, Ms. Allen's

23  conclusions on this is really kind of tangential and -- and not

24  really scientifically supported.  And, frankly, in this case,

25  is really only relevant to the sole issue of whether or not

1   there are firearms with fixed magazines that have the capacity

2   to fire more than ten rounds or hold more than ten rounds.

3          And, again, when I asked Ms. Allen if she was aware

4   of any incidents involving those types of firearms with fixed

5   magazines, she wasn't able to identify any.

6          With that discussion regarding the number of rounds

7   fired, your Honor, I would at this time like to turn over the

8   remainder of the -- this argument to my colleague, Mr. Dillon,

9   who will address the mass shooting issue.

10          THE COURT:  All right.  Mr. Dillon.

11          MR. DILLON:  Good morning, your Honor.

12          So before discussing the mass shooting data that's

13   been presented in this case, I want to briefly address the

14   standard of review that's involved here.

15          So even if this Court were to apply the Ninth Circuit

16   two-step analysis, the defendants can't show that there's a

17   reasonable fit between the Government's claimed interests and

18   the assault weapons control act.

19          If any form of scrutiny is going to be applied, it

20   should be strict scrutiny.  But even under intermediate

21   scrutiny, this is a high bar.  In Second Amendment cases,

22   intermediate scrutiny is guided by First Amendment principles.

23   Therefore, if California's Assault Weapon Control Act cannot

24   alleviate the claimed harms to a material degree, it fails

25   under intermediate scrutiny.

```
 1              And, second --
 2              THE COURT:  Let me -- let me -- let me interrupt you,
 3    Mr. Dillon.
 4              So why don't you tell me what would be a better fit
 5    that would accomplish that?
 6              MR. DILLON:  A better fit?
 7              THE COURT:  Yeah, a better fit that would accomplish
 8    the state's important interest?
 9              MR. DILLON:  Well, your Honor, there's all sorts of
10    things that, you know, arguably can be done.  And, in
11    California, we've seen that they haven't hesitated to put in
12    place as many restrictions as they can when it comes to gun
13    control.
14              But, as you can see, the simple fact that the Assault
15    Weapons Control Act allows for a featureless rifle that shoots
16    a .223 round cartridge with a high-capacity magazine, that is
17    legal in California.  But if you take that exact same platform,
18    that exact same gun and stick a stock on it that can be
19    adjusted, it's now illegal.  So there's really no fit involved,
20    when it comes to, you know, this act and the state's control.
21              (Pause.)
22              THE COURT:  Okay.  I interrupted you.  I guess I
23    threw you off of your --
24              MR. DILLON:  Oh, yeah.  I didn't know if you wanted
25    to continue a question or anything, but I'll continue.
```

1       THE COURT:  That's okay.

2       MR. DILLON:  So at the foundation, the Government's

3  purported interest in banning these commonly owned guns can't

4  undermine the very reason that guns are protected.  There's no

5  doubt that guns are lethal.  And the state's justification that

6  the same characteristics that make the firearms in this case

7  more suitable for lawful use also make them effective tools in

8  crime if they're misused and, thus, necessitating a ban, would

9  ultimately gut the Second Amendment.

10      Inevitably, under the state's reasoning, the notion

11 that improving a firearm's capability -- making a firearm

12 better, safer, or more accurate for lawful use -- likewise

13 makes it better for unlawful use, leads to the absurdity that

14 firearms are never going to be improved.  Because the very fact

15 that it's more accurate and -- and even more lethal outweigh

16 the benefits and justify a ban.

17      So to give you an example here, you know, the

18 invention of rifling in firearms was a significant step forward

19 when it came to both the accuracy and lethality of a firearm.

20      They made firearms exponentially more accurate and

21 more lethal.  Yet the state couldn't justify banning all guns

22 that have rifling because they're more accurate than those who

23 don't have rifling.  And we can see the discussion of this in

24 Ashley Hlebinsky's deposition at page 135, line 15, through

25 page 139, line 5.

1          So considering these foundational factors, you know,

2   defendants' evidence, at best, meets only rational basis; not

3   the actual demanding standard of intermediate scrutiny, let

4   alone strict scrutiny.

5          So if we're go into the data here, if we're going to

6   make the argument that there's some distant correlation between

7   assault weapons and mass shootings, the simple fact is

8   defendants' evidence shows that assault weapons are not used in

9   the majority of mass shootings.

10         According to defense witness Lucy Allen, assault

11  weapons are used in 22 percent of mass shootings, and that's

12  Defense Exhibit A, paragraph 30.

13         This is consistent with Professor Klarevas's analysis

14  on gun massacres where he states, since 1980, 28 mass shootings

15  have involved assault weapons.  That's 27 percent.

16         THE COURT:  Is that -- is that nationwide?

17         MR. DILLON:  I believe that stat was nationwide, your

18  Honor.  Since 1980.

19         THE COURT:  Okay.

20         MR. DILLON:  But it's in Klarevas's declaration

21  exhibit -- Defense Exhibit E, paragraph 11, for your reference.

22         And similar to this, the state's focus on criminality

23  to justify --

24         THE COURT:  What would you say to the argument that

25  one mass shooting is too many?

1          MR. DILLON:  Well, I would say that's a dangerous,

2    slippery slope to base law and policy that would largely affect

3    law-abiding gun owners or even just law-abiding people in

4    general.  You don't have to relegate this to a gun issue.

5          If you're going to ban things because of one

6    anecdotal incident, it's going to be a very quick process to

7    see that most everything in life is going to be quickly banned.

8          You know, we can do all we can.  But the simple fact

9    is that bad guys who plan on doing really bad things are going

10   to do it.  And especially when you're considering things that

11   are well planned out.  You know, in fact, like these mass

12   shootings.  You have -- Las Vegas, for example, seemed to be

13   something that was planned for a significant period of time.

14   And there's nothing that's going to stop that significant

15   planning if someone is that determined.

16         THE COURT:  You just refreshed my recollection.

17         I thought I had asked for somebody to provide me with

18   the police reports, the investigation reports regarding that

19   Las -- the Las Vegas shooting.  I don't -- I don't remember

20   ever seeing that.

21         Am I mistaken that -- that -- (A), that I have not

22   received those; and (B), that I did not ask for those to be

23   produced to me?

24         MR. DILLON:  Your Honor, I remember the -- the

25   request.  But I personally don't -- am not aware of whether it

1   was produced.  But I'll allow the defense to answer that.

2            THE COURT:  Well, maybe I can ask.

3            Mr. Echeverria, I think I see you there.  There you

4   are.

5            Were there reports of the Las Vegas mass shooting --

6   because, clearly, that's -- that's -- that's, like, such an

7   aberration.  Were those reports ever submitted to me?

8            MR. ECHEVERRIA:  I believe they were, your Honor.

9   I'm actually looking into it right now.

10           If I recall correctly, your Honor had a discussion

11  with our expert, Louis Klarevas, about the Las Vegas shooting.

12  And you had asked for certain reports that he had looked at.

13           He did send those reports to me, and I do recall

14  filing them with the Court after the evidentiary hearing.  And

15  I will confirm what the docket entry is for you.

16           THE COURT:  Great.  Hey, thank you.  Appreciate it.

17           Okay.  I apologize.  Go ahead, Mr. Dillon.

18           MR. DILLON:  No worries.

19           All right.  So similar to this fact that, you know,

20  handguns are the -- most often found at the scene of a mass

21  shooting, the state's focus on the criminality to justify a ban

22  is similarly misplaced.

23           Even if there was a statistically significant effect

24  of an alleged higher incidence of assault weapons being used in

25  crimes or mass shootings or police shootings, it doesn't

1   justify the state's ban.

2           Overwhelmingly firearms are -- the firearm that's

3   most used in the commission of a crime is a handgun.  And we

4   saw this in *Heller*.  The Government argued that such a fact

5   established their interest in banning guns to prevent

6   firearm-related homicides.  The majority rejected that argument

7   and stated that it lacked any fit to further the Government's

8   interests under any level of scrutiny.  Here, the same thing

9   applies.

10          According to a 2018 FBI crime stats, the total number

11  of murders involving all types of rifles and shotguns,

12  regardless of their features, totaled 541 out of 10,265.

13  That's 5.3 percent.  And you can see this in Lott's

14  declaration, Plaintiffs' Exhibit 10, paragraph 15.

15          On top of that, more homicides occurred in that year

16  using hands, fists, and feet, than all murders committed with

17  rifles and shotguns combined.  And that's Exhibit 10, paragraph

18  16.

19          So even if this Court accepts defendants' claims that

20  assault weapons are used disproportionately against law

21  enforcement, this type of justification has been soundly

22  rejected by the Supreme Court in *Heller*.

23          Moreover, defendants' evidence underlying some of

24  these claims is lacking.  They allege that assault weapons are

25  used disproportionately in crime.  However, they state that

1   assault weapons account for 22 to 36 percent of crime guns.

2          However, when you look at the evidence that's relied

3   on for these numbers, it analyzes both assault weapons and all

4   semi -- semiautomatic firearms with large-capacity magazines.

5   That -- that's a -- significantly more guns than what would be

6   qualified as an assault weapon.  And without distinguishing

7   these two categories, the stat's utterly useless.

8          But going into the effect -- effectiveness of assault

9   weapons bans in reducing gun violence or mass shootings,

10  plaintiffs' evidence shows that there's no demonstrable

11  correlation between the two.  And you can see that in

12  Plaintiffs' Exhibit 10, paragraph 60 to 65.  This is Dr. Lott's

13  declaration, as well as his Exhibits 10-2 to 10-19.

14         So, in other words, while defendants may find some

15  distant correlation between assault weapons and mass shootings,

16  the correlation is not statistically significant.  Or, rather,

17  it's not different from zero.

18         So, over time, the rates of mass shootings -- public

19  mass shootings may rise and fall for any number of reasons.

20  But regardless of any other factors, if the federal assault

21  weapons ban was successful in reducing these attacks, the

22  percentage of attacks committed with assault weapons should

23  have decreased as a direct result of the ban.  Again, we see

24  that in Dr. Lott's declaration, Exhibit 10, at paragraph 46.

25         But this is not the case.  We do not see this

1    decrease in the percentage of assault weapons being used in

2    mass shootings during the federal assault weapons ban.   And

3    this fact is true, regardless of the data set being relied on.

4    Whether it's the data from *Rampage Nation*, the data from *Mother*

5    *Jones*, the data from the Crime Prevention Research Center, none

6    of them show any significantly significant decrease during the

7    federal assault weapons ban.

8         Now, we've heard this before, and you'll see this in

9    the defense experts' declarations.   The only rebuttal to this

10   fact is to simply deny it with a conclusory statement.   And

11   you'll see several references to the terms "spillover effect"

12   and "substitution effect."

13        The only problem here is that defendants' experts,

14   nor defendants, never actually give an explanation to what

15   these effects are and the extent of the effects.

16        The only expert who's provided any kind of

17   explanation with regard to substitutional effects of the

18   federal assault weapons ban was Dr. Lott.   And, specifically,

19   you can see this in Plaintiffs' Exhibit 32, starting at

20   paragraph 48.   And, in fact, the substitution effects that are

21   routinely stated, they work in the opposite direction of what

22   defendants would claim.

23        And, that is, if the federal assault weapons ban was

24   effective, some killers are not going to commit a mass murder

25   with an assault weapon.   Others -- or some may use a different

1   type of gun.  So, in both of these instances, you're going to

2   see a lower percentage of attacks using assault weapons.

3          Similarly, if the federal assault weapons ban --

4   after the federal ban sunsetted, there should have been an

5   increase in the percentage of attacks using assault weapons but

6   the percentage consistently falls after the ban.

7          And defendants have provided no evidence that there

8   was a statistically significant decline in the percentage of

9   attacks with assault weapons during the ban or statistically

10  significant increase after the ban.

11         Again, I direct you to Plaintiffs' Exhibits 10 and

12  32, Lott's declarations.

13         Moving forward, again, this Court has already

14  commented several times on this issue.  But the arbitrary

15  nature of defining assault weapons in mass shootings is also

16  repeatedly seen and highlighted in the declarations between

17  Dr. Lott and Professor Klarevas.

18         You know, we see Dr. -- Professor Klarevas claiming

19  that there are errors in Lott's analysis.  But, at the same

20  time, this is just because Klarevas is substituting his own

21  data because he defines assault weapons in mass shootings

22  differently than what *Mother Jones* or the Crime Prevention

23  Research Center would define mass shootings or assault weapons.

24  Again, that's --

25         THE COURT:  I think I began this hearing by

1  indicating that that was a real concern to me, the definition

2  of what's an assault weapon, the definition of what is a mass

3  shooting.

4       I may not have used this term.  But, you know, the

5  definition of what is an active shooting.  The definition of

6  what's a mass public shooting.

7       All of these definitions are -- seem to -- seem to be

8  malleable and -- and adapted -- I think by both sides -- almost

9  seemingly in order to arrive at a desired result.  Which makes

10  it very difficult, as the trier of fact.

11       So, for example, you know, I -- I -- I would have

12  liked to have had someone tell me, okay, well, here's how many

13  of these mass shootings occurred.  Again, assuming that we have

14  defined a standard for what a mass shooting is.  Right?  How

15  many of these mass shootings occurred where the weapon had a --

16  an adjustable stock?  Here's how many of the mass shootings

17  occurred where the weapon had a pistol grip.  Here's how many

18  of these mass shootings occurred where the weapon had a forward

19  pistol grip.

20       None of that appears to be -- as I pointed out

21  yesterday, I think I've been provided with about 13,000 pages,

22  just this last round of information.  And maybe I may have

23  missed it.  And if I have, that's why I make the comment.  But

24  I -- I don't remember seeing anything that would, for example,

25  define, you know, the dangerousness of a weapon with a specific

1    evil feature, if you will.

2            So it is -- it is troubling for me, Mr. Dillon.   It

3    has caused me considerable concern because, when I look at --

4    at all of this data -- and, frankly, I've looked at quite a bit

5    of it.   I asked myself, well, wait a minute.   First of all, is

6    this a mass shooting?   Is this a mass school shooting?   Is this

7    an active shooting?   Is this a shooting of three or more

8    people?   Four or more people?   Six or more people?   Does it

9    include the shooter?   Does this weapon have this particular

10   feature that is -- that is being banned?   Does it have that

11   other feature?   And it makes it -- (laughing).   It makes it a

12   rather difficult task.

13           Anyway, go ahead.   I interrupted you, and I

14   apologize.

15           MR. DILLON:   No problem, your Honor.   In fact, those

16   are some of the exact statements I was going to be making in a

17   little bit later here.

18           But one thing that should help in trying to figure

19   all of this data out is even if this Court were to accept all

20   of Professor Klarevas's figures, none of the results are

21   consistent with what you would predict.   The percentage of mass

22   shootings with assault weapons did not decline during the

23   assault weapons ban, and they did not increase after the ban's

24   sunset.   And, again, you'll see Lott's declaration, Plaintiffs'

25   Exhibit 10 and Exhibit 32.

 1          THE COURT:  I may have asked -- I think I asked this

 2  once before.

 3          It seems to me that there was a recent article or a

 4  recent study -- I'm not sure why, but I'm connecting it to

 5  *Bloomberg*.  I think it was the University of New Jersey.  Maybe

 6  I'm mistaken.  But, anyway, they came up with -- there was a

 7  study that said there was no correlation between assault

 8  weapons and -- and these mass shootings.  And the one

 9  correlation that they could find, I think, was magazines with

10  higher capacity than ten rounds.  Am -- does -- does that ring

11  a bell to anyone?  No?

12          MR. DILLON:  You know, your Honor, I'm not personally

13  aware of that study you're referring to.

14          THE COURT:  Okay.  All right.

15          MR. DILLON:  But, again, your line of thinking is

16  similar to my own here.

17          In Plaintiffs' Exhibit 10, you know, Dr. Lott

18  provided, you know, a summary analysis of many studies that

19  have been conducted that address assault weapon ban,

20  high-capacity magazine restrictions, and mass shootings.

21          And based off of his review of all of these studies,

22  their methodology, the factors that were considered in each of

23  these studies, Dr. Lott concluded that there is no evidence

24  that assault weapon bans had any meaningful effect on reducing

25  homicides, and no discernable crime reduction impact.  And

1    that's Exhibit 10, paragraph 63.

2         And, in fact, part of the studies that were viewed by

3    Dr. Lott are two surveys, at the end of his declaration, where

4    they did the very similar thing to what Dr. Lott did.  Is they

5    reviewed those same studies and they tried to come to a

6    conclusion based off of surveying all of the various studies

7    that were out there.  Both of those surveys concluded that

8    there was no statistically significant impact on the federal

9    assault weapons ban.

10        So all valid and credible research shows no

11   statistical significance of these bans.  And the few studies

12   that are out there that do show, Dr. Lott provided some very

13   important critiques regarding their methodologies that would

14   cause them to be, you know, questioned with regard to

15   reliability.  Or the fact that the changes that were found in

16   these studies were not statistically significant changes.

17        Fundamentally, you know, defendants' generalized

18   claim that the federal assault weapons ban may be distantly

19   correlated with some type of decrease in the number of mass

20   shootings or fatalities from mass shootings, it's just not

21   enough.  Because a correlation that's not statistically

22   significant is no different than zero.

23        Defendants' evidence is empirically shallow.  And,

24   you know, frankly, it just merely totals up numbers and doesn't

25   give any consideration to the numerous other factors that have

1   a -- a determining effect on mass shootings.

2          You know, for example, you know, this shallow

3   analysis of the overall numbers don't account for whether

4   multiple guns were used in the mass shooting.  They don't

5   account for whether multiple magazines -- whether they were

6   ten-round magazines or high-capacity magazines or

7   large-capacity magazines were used.  (Coughing.)  Excuse me.

8   And, you know, frankly, all of defendants' evidence completely

9   ignores these factors.

10          You know, one other factor that is entirely ignored

11  is the intent of the shooter and what they were intending to

12  do.  All of these things will have an effect on -- on the

13  number of people shot and the number of people killed, but none

14  of this is actually analyzed in the data.

15          And like your Honor said a few minutes ago, there's

16  no evidence that any particular feature had a statistically

17  significant effect on any one mass shooting.  Even if there was

18  anecdotal evidence that guns with any combination of these

19  features have been used in a mass shooting, this anecdotal

20  evidence doesn't justify a ban under heightened scrutiny.  It's

21  pure speculation that these firearm characteristics have an

22  effect.  But they have -- defendants have offered no comparison

23  of whether mass shootings involving a featureless rifle versus

24  a mass shooting involving a rifle with a pistol grip -- we have

25  no such comparison.

1          And, in fact, defendants' expert admits that no

2    analysis was ever done to make a quantitative determination on

3    whether the presence of any identified assault weapon

4    characteristic made any difference in the outcome of a mass

5    shooting.  And you can see this in Lucy Allen's deposition,

6    page 217, line 17, through 219, line 7.

7          You know, another example of this is, you know, this

8    Court's never been presented with any evidence of any kind that

9    a shooter in a particular mass shooting couldn't be located

10   during the shooting because his gun had a flash hider attached

11   to it.  The defense would just like everyone to assume that a

12   flash hider makes a gun more deadly, without offering any proof

13   that it actually does.

14         So to conclude here, you know, defendants and their

15   experts' anecdotal evidence or personal opinions and their

16   general policy arguments relating to mass shootings, school

17   shootings, firearm ownership, the trauma involved to victims,

18   you know, after a mass shooting simply aren't relevant to the

19   legal considerations that need to be made and the protections

20   afforded by the Second Amendment to common firearms like

21   assault weapons.

22         THE COURT:  Let me ask you -- ask you a question.

23   So --

24         MR. DILLON:  Yeah.

25         THE COURT:  So I watched a video of -- is it

1   Mr. Kraut?

2            I'm not sure if he's a doctor or a -- or a Mr. --

3            MR. DILLON:  I think he would prefer Mr. Kraut.

4            THE COURT:  All right.  I -- I always hate to

5   disrespect people.

6            So I watched that video.  And then he fired a weapon

7   with the -- with -- with the -- again, what's been referred to

8   as the evil features.  And I frankly didn't see any difference,

9   either in the firing rate or in the -- or in the accuracy of

10  the weapon.

11           And so then I was sitting here thinking to myself,

12  okay, now, so if I'm someone who is thinking about

13  self-defense, there are two features -- again, I'm -- you know,

14  I'm limiting this mostly to the rifles because there really

15  doesn't seem to be a whole lot of, (A), discussion and, (B),

16  evidence on the pistols and the shotguns.

17           But regards to the rifles, I've read the -- the

18  deposition and heard testimony before about the fact that

19  not -- not a collapsible scope -- stock but certainly an

20  adjustable stock seems to make perfectly good sense.  As I

21  mentioned yesterday, in some homes where people -- their

22  economic level is such that they can't afford to have, you

23  know, a lot of guns -- let's say they may only have one.  And

24  there may be -- I think -- I'm trying to remember.  Was it --

25  is it -- is it Dr. Hemly (phonetic), who said she was 5' tall

1    and her husband is 6'2, in her deposition?  And -- and -- and

2    she pointed out that the adjustable stock makes it so that that

3    same weapon can be fired by her and her husband.

4            So if we go and we look at people that are in a lower

5    socioeconomic level, who may only be able to afford one

6    weapon -- whether it be for sport or for self-defense -- right?

7    It makes sense to me that the adjustable stock is something

8    that people might want on their weapons, so that if they wear

9    heavy clothing during the winter, they can adjust that.  Or if

10   there's more than one person that uses that weapon, they can

11   adjust the weapon accordingly.

12           And the other feature that struck -- struck me --

13   that I know is controversial.  But the other feature that

14   struck me that a person might want is to have the ability to

15   fire as many rounds as the circumstances warrant at the time,

16   which would mean a removable magazine.  Or at least, at a

17   minimum, a fixed magazine that would hold, you know, more than

18   2.2 (laughing) rounds.  And in one case I think that I read

19   where -- I don't know.  30 shots were fired.  And there were

20   six -- six intruders, I believe.  And there were 30 shots that

21   were fired.  So, anyway -- so it struck me that those two

22   things are certainly features that one might seriously argue

23   about.

24           But, other than that, it struck me that there really

25   was no difference between the weapon -- the -- the -- the

1   California-compliant weapon and the noncompliant weapon, such

2   that, I suppose, if the state wanted to regulate it, one might

3   say why not?  Say, you're a homeowner, and you've got the

4   weapon.  And the weapon -- I forgot about the pistol -- the

5   pistol grip.  Because the pistol grip adds -- yeah, adds

6   accuracy to the weapon.  Which one would hope that the state

7   would agree that we would want people who use weapons in

8   self-defense to have a more-accurate weapon rather than a

9   less-accurate weapon, I think.  I could be wrong.

10          But -- so -- so those three features strike me as

11  being features that, okay, those seem to be pretty essential

12  and seem to be defensible.  But the other features seem to me,

13  like, so what?  So -- so the -- the flash hider, the forward

14  pistol grip, the -- the -- the shroud, those just don't seem to

15  be features that, to me, would be very significant for purposes

16  of self-defense.

17          Now, we haven't even talked about -- yet about

18  (laughing) the other side of the coin, which is the militia

19  aspect.  That's -- that's -- that's a horse of a different

20  color.  But at least for the self-defense issues, which is what

21  almost everybody seems to be most -- most focused on.

22          And so what I ask myself, Mr. Dillon, is, okay -- and

23  I asked Mr. Lee this yesterday.  And he said, "No, you can't do

24  that."  But I'm sitting here thinking, okay, fine.  So -- so

25  California decides, no, you can't have a flash hider on -- on a

1   weapon.  No, you can't have a forward postal -- pistol grip on

2   a weapon.  No, you can't have a barrel shroud.  By the way, a

3   barrel shroud becomes necessary when you have fired so many

4   rounds that the barrel gets so hot that -- you know, which is

5   not likely to happen at least, again, in the civilian sense.

6          So -- so what do I do with that?  I mean, you see

7   what I'm saying?

8          MR. DILLON:  Well, your Honor, the Court has to

9   consider the fact that if the state can just arbitrarily, you

10  know, prohibit certain features because they have the opinion

11  that, you know, they really just don't make a big difference

12  in, you know, the person's ability to use a gun, the fact of

13  the matter is that's just the state taking away the person's

14  ability to choose what type of gun, what combination of

15  features is, you know, the most benefit to them in their

16  certain -- certain situations.

17         You know, like you said, this can't just be regulated

18  to self-defense scenarios.  You know, it's for all lawful

19  purposes.  And each one of these features has a distinct, you

20  know, advantage or benefit that can be used in all sorts of

21  various lawful purposes.

22         You know, and -- like I said, it's not limited

23  self-defense.  But a flash hider, that would help and assist

24  someone not to become blinded by the -- you know, the muzzle

25  flash, firing their weapon.  If they ever were to fire their

1    weapon in their home when the lights are out, in the middle of

2    the night during a break-in.

3              THE COURT:  Who would be more likely to be blinded by

4    the flash?  The person that's shooting the gun or the person

5    that's facing the gun?

6              MR. DILLON:  Well, your Honor, I'm going to say,

7    common sense -- probably, if it's in the middle of the night,

8    in the dark, there's going to be an effect on both the shooter

9    and the person being shot at.  But I think the person being

10   shot at is going to be more affected by the bullet impacting

11   them than the flash.

12             But, you know, all of these features -- whether it's

13   in a shroud that keeps your hand from being burned, or a

14   forward pistol grip or a pistol grip, they allow the firearm to

15   be configurable to that specific person so it can best suit

16   them.

17             And you see this in Ms. Hlebinsky's deposition.  She

18   makes multiple references to people who may have, you know,

19   some sort of handicap.  Where it's difficult to hold a gun in a

20   certain configuration.  And so they add, you know, a pistol

21   grip or, you know, a forward pistol grip to the gun to help

22   assist in handling that firearm.

23             You know, to say that the state can just arbitrarily

24   go through and decide, well, these aren't really that effective

25   and they're really not that necessary, so let's just take away

1    people's ability to choose.

2         THE COURT:  What about -- what about the threaded

3    barrel on the pistol?  I mean, I'm sitting here trying to --

4    trying to -- I've read so much of this, and I'm trying to think

5    to myself, really, what's the -- what's the utility of a

6    threaded barrel?  In the civilian context, okay?  In the

7    civilian context, what is the utility of a threaded barrel to

8    the average citizen out there who, again, may want to use

9    the -- the weapon for self-defense; either in the home, or in a

10   business, or somewhere else?

11        MR. DILLON:  Yeah.  So, first, the idea of a threaded

12   barrel is not categorically prohibited by the state.  You can

13   have, you know, rifles that have threaded barrels and shotguns

14   that have internal threading for chokes.  They only don't like

15   threaded barrels on pistols, for some reason.

16        And, you know, to answer the Court's direct question

17   here, the ability to put on some type of muzzle device on

18   your -- on your pistol can be beneficial in a number of

19   different situations.  If we're going outside of California,

20   you know, suppressors are in fact very legal and used all over

21   the country by a large number of people.

22        THE COURT:  What's a suppressor?  Is that a silencer?

23        MR. DILLON:  I'm sorry.  A suppressor, silencer; same

24   thing.

25        THE COURT:  Well, what the heck do you need a

1   silencer for?

2           MR. DILLON:  Well, in fact, there's a lot of argument

3   that it's actually beneficial for the shooter's hearing.  So

4   just like a flash hider prevents the shooter from being blinded

5   by a muzzle flash, a suppressor attached to a firearm protects

6   the user's hearing.  You know, if you get over a certain amount

7   of decibels, you get permanent hearing damage.  And, you know,

8   shooting a gun is a loud thing.

9           THE COURT:  In what context are you talking about?

10  Because, certainly, if you're talking about target practicing,

11  you're generally going to be wearing hearing protection anyway.

12  Right?

13          MR. DILLON:  Well, in fact, you know, I personally

14  know of many people who wear hearing protection and use

15  silencers because it's just that much more protection for the

16  hearing.

17          If you want to get away from silencers, when you go

18  to flash hiders and muzzle brakes -- muzzle brakes, their whole

19  purpose is to reduce the --

20          THE COURT:  Muzzle brakes -- all right.  So you just

21  may have answered the question.

22          So muzzle brakes, as I understand it, are not

23  prohibited under California statute.  Right?

24          MR. DILLON:  You can attach a muzzle brake to a

25  rifle.  Yes, your Honor.

1          THE COURT:  You can.  But you can't attach it to a

2     pistol because it's a threaded barrel.  And so you --

3          MR. DILLON:  It would require --

4          THE COURT:  I see.  Okay.

5          MR. DILLON:  Yeah.  So you can't put any muzzle

6     device on a pistol because it would require the firearm to have

7     a threaded barrel.

8          But, you know, for -- for women shooters, younger

9     shooters, people who have some sort of handicap, having a

10    muzzle device that would reduce the recoil impact of the

11    firearm is a significant thing and advantageous thing, you

12    know, to incorporate into your firearm.

13         You know, I believe Ms. Hoffman, in her declaration,

14    wanted to have the ability to attach various muzzle devices to

15    her concealed carry firearm.

16         If you're carrying at night, having some sort of

17    flash hider, again, will help if you are ever to discharge your

18    firearm at night.  Having a muzzle brake attached to your

19    pistol will help, you know, reduce the recoil and make you more

20    accurate.

21         You know, this is the one thing that we can gloss

22    over.  Is lawful owners and people that are, you know, using

23    their guns for lawful purposes, especially in self-defense, we

24    have an extremely high standard to meet.  We can't just be

25    shooting all over the place.  We have to be accurate.  We have

1  to be precise with where we fire the gun and how many shots

2  that are, you know, fired; or else we're going to be held

3  accountable.

4        A mass shooter who just wants to go and kill

5  everyone, not very concerned about being deadly accurate, you

6  know, because they're going to get in trouble from the law.

7  They've already, you know, committed to doing a mass murder.

8  Which is, you know, arguably, the worst thing you could do.

9        So the fact that a stray bullet goes and -- you know,

10  has some -- results in some property damage or hits someone

11  that he didn't intend to hit, a mass shooter is not really

12  going to be worried about that.

13        A law-abiding citizen, using their gun for lawful

14  purpose and self-defense, they are going to be worried about

15  those factors.  So they want to be the most accurate that they

16  can be.  And they need to be able to have the choice to look at

17  their firearm and decide what features are best suited for them

18  and their intended purposes.

19        And the fact that these things can be misused by a

20  criminal whose intent is to kill a bunch of people anyway can't

21  be the reason to restrict lawful use.

22        THE COURT:  Okay.  Are you still with us?

23        MR. DILLON:  Yeah, I'm here.  I just didn't know if

24  you had a follow-up question.  I'm sorry.  (Laughing.)

25        THE COURT:  Don't worry.  I will interrupt.  I'm not

1   shy.

2           MS. DILLON:  All right.

3           THE COURT:  I tend to be pretty active.  When -- when

4   I'm the finder of fact, I'm not shy about asking questions.

5   Don't worry.  Go ahead.

6           MR. DILLON:  All right.  Sounds good.

7           So just to end off that line of thinking, you know,

8   to try to make the determination of what specific features

9   are -- are good for the people is not something that the state

10  or the Court should, you know, even be doing.  This is

11  something that is personal to the individual shooter.  That --

12  and it depends on their specific -- specific circumstances.

13  You know, whether or not you have kids, whether or not you have

14  a handicap, whether or not you conceal carry or just have a gun

15  to go to the range; all of these things will change the

16  preferred combination and configuration of your firearm.

17          So the line of thinking that, you know, certain

18  features can be limited because we're just not sure how much of

19  a benefit for a lawful use it is, it borders along the lines of

20  absurdity.

21          And the fact that, you know, because a gun is more

22  accurate makes it more justifiably banned, you know, like I

23  said, would gut the Second Amendment.  Because we would never

24  be able to improve firearms, improve accuracy, improve safety.

25          So, you know, for all of the reasons that we've

1   discussed -- you know, the mass shooting data, the lack of any

2   decrease in the percentage of assault weapons used in mass

3   shootings during any ban, and the lack of the percentage rising

4   after the ban sunset -- you know, it is the plaintiffs'

5   position and we believe we have shown that the government/state

6   interest is not substantially related to the assault weapon

7   control act.  They're both intermediate scrutiny and strict

8   scrutiny.

9            THE COURT:  Let me -- let me ask you this.

10           MS. DILLON:  Your Honor -- yeah.

11           THE COURT:  The state basically makes the argument,

12   which is somewhat supported by some of the case law, that,

13   look, preventing mass shootings is an important state interest.

14           And this legislation -- without this legislation, the

15   state would be less able to satisfy that important state

16   interest.

17           Do you have any comments on that?

18           MR. DILLON:  Well, your Honor, I would say that the

19   State has never shown, you know, why they would be less able

20   to, you know.  And that's part of why Mr. Kraut's video was

21   offered into evidence.  It's to show that, you know, a person

22   who wants to hit a target at, you know -- I believe, if my

23   memory serves correctly, is 25 yards but we can confirm that, I

24   think, in the video.  If someone wants to shoot a target,

25   they're going to do it, whether or not the gun has a pistol

1   grip, or not, you know.  And Ms. Hlebinsky discusses this in

2   her deposition.  You know, all of these features have some

3   effect at, you know, improving accuracy or control.  But the

4   biggest determining factor is the shooter themselves and their

5   own personal ability.

6            You know, you can give the most decked out, you know,

7   rifle that has all of the features possible to improve accuracy

8   of that firearm -- you can give that to someone who's never

9   held a gun in their life.  They're not -- arguably, they're not

10  going to be very good at shooting if they don't know how to use

11  the gun.  You know, on the flip side of that, you can give a

12  very simple, you know, cheap handgun to a professional shooter,

13  and they're going to be deadly accurate with that gun.

14           So while these features do have an effect, like --

15  the state, you know, is ignoring the fact that it's the

16  shooter.  It's the intent of the shooter, it's the ability of

17  the shooter that really makes the determining factor.

18           THE COURT:  Let me -- let me ask you another

19  question.  Maybe -- maybe you're not the right person to ask.

20  Perhaps I should ask Mr. Lee.  And, if so, then I apologize.

21  But I can't recall.  One of the experts -- I think it was

22  Dr. Donahue -- or Professor Donahue who pointed out -- don't --

23  don't quote me on this because I could be off.  But I think it

24  was like 66 percent of the mass -- school mass shootings that

25  have occurred have occurred by young people, people under 25.

1          Now, one of the statutes that I think is at issue
2    here -- which, by the way, I really had not focused on until
3    this very hearing -- is the fact that we have a statute that
4    prevents people under 18 from possessing or using or in any way
5    having access to -- to -- to -- to one of these weapons,
6    however you may define an assault weapon.
7          So I'm wondering if you have a comment on whether or
8    not this legislation would work to the benefit or to the
9    detriment of society at large by not allowing, say, a parent,
10   for example, to take their child out target practicing or to a
11   range to shoot one of these weapons, so that they could see the
12   damage that these weapons can do.  Right?
13         What -- what -- but -- but, as I said to Mr. Lee,
14   we've had age restrictions on lots of things over the years.
15   So I'm not terribly concerned about the age restriction.  In
16   fact, it strikes me that there's plenty of evidence.  If you
17   have 66 percent of mass school shootings occurring by -- by
18   young people, then it seems to me that maybe, you know, we need
19   to be a little more careful about having young people get their
20   hands on weaponry to begin with.
21         But -- but I'm wondering if you have any thoughts
22   about the lack of exceptions to the statute?
23         MR. DILLON:  Yeah, several comments on that.  You
24   know, I can't attest to the 66 percent number off the top of my
25   head.

1          THE COURT:  Yeah, I wouldn't swear to that.

2          MR. DILLON:  Even assuming -- even assuming that's

3    true, that's incorporating a significant group of people that

4    are, you know, above 18 and above 21.  You know, under 25 is

5    incorporating adults.  You know, not -- we're not necessarily

6    talking about kids when we're quoting that stat, you know.

7          And, two, we already have -- you know, there are some

8    age restrictions when it comes -- nationally speaking, age

9    restrictions generally surround the age of 18, for the most

10   part.

11         And, in California, they restrict it to 21.  But

12   something to note is that, you know, while age restrictions

13   exist and historically have existed, they don't exist around

14   guns or rights, the constitutional rights.  They -- they --

15         THE COURT:  I acknowledge that.  I acknowledge that.

16         MR. DILLON:  They are based around smoking and

17   alcohol.

18         THE COURT:  Yeah, I acknowledge that.  And I'm very

19   reluctant to apply a historical perspective in one area to

20   another area.  But --

21         MR. DILLON:  Well --

22         THE COURT:  I was just wondering if you had a thought

23   on it.

24         MR. DILLON:  I do.  So, you know -- so we have these

25   restrictions.  Someone under 18 can't purchase a firearm.  And

1   that's any firearm.  You can't purchase it if you're under 18.

2       The assault weapon control act prohibits the

3   possession of someone under 18 with what would be considered an

4   assault weapon.

5       So, again, the state's trying to step into the home

6   and take away a parents' decision, an ability to be able to

7   teach their -- their kids, you know, proper firearm safety,

8   proper respect.  And, like you said, go to the range.  Really

9   see what can be done by firing a firearm.  You know, it's not

10  the state's job to jump in and assume the role of a parent.

11      And, you know, these laws and the assault weapon laws

12  preventing even the mere possession, preventing a parent from

13  even trying to teach their kid, you know, safe -- safety with

14  respect to guns, it goes well beyond preventing a minor from

15  purchasing a firearm.  That's already prevented by a separate

16  and distinct law.  If you're under 18, I can't go into a gun

17  store and buy a firearm.  I can't go into, you know, a gun show

18  and buy a firearm.  I can't buy a firearm through a private

19  party transfer if I'm under 18.  Yet the state just wants to,

20  you know, keep going further and take away the decision of the

21  parent to be able to go with their kids and teach their kids

22  about firearms with their gun.

23      It goes well beyond --

24      THE COURT:  All right.

25      MR. DILLON:  -- you know, preventing a kid.

1          So, in fact, if that restriction on possession was

2   entirely lifted -- you know, arguably, it would do nothing to

3   change, you know, the ownership or people under 18 possessing

4   firearms in any way.

5          THE COURT:  All right.  Anything else?

6          MR. DILLON:  No, unless your Honor has any more

7   questions, I would be happy to answer them.  But that's all I

8   have to say.

9          THE COURT:  All right.  Does the plaintiff have

10  anything else?

11         MR. LEE:  No, your Honor.

12         THE COURT:  Did you submit -- so -- so I was a little

13  confused.  So I have a binder.  I believe this binder comes

14  from the State.  And I believe that to be true because it seems

15  to have a state logo on it, I think.  And it has dep --

16  "deposition transcripts binder."

17         Maybe -- let me turn to Mr. Echeverria on this.

18  Mr. Echeverria, what -- what is this binder?  What is it

19  that -- that is in this binder that's before me?

20         MR. ECHEVERRIA:  Your Honor, it's my understanding

21  that that binder contains the excerpted pages from the

22  deposition transcripts that we designated and

23  counter-designated.

24         THE COURT:  All right.  Well, okay.  That's kind of

25  what I thought.  And I sort of got a little confused because,

1    for example, I didn't see anything in here -- is there more

2    than one volume?  Or -- or -- or is it just one volume?

3              MR. ECHEVERRIA:  I can check on the number of

4    volumes.  It's one volume for the deposition excerpts.

5              THE COURT:  Okay.  The reason why I asked that

6    question is I didn't see anything from Professor Donahue.

7    There were no excerpts to his deposition.

8              MR. ECHEVERRIA:  That's correct, your Honor.  He was

9    not deposed.  The plaintiffs -- the plaintiffs only deposed one

10   of our witnesses, and that was professor -- or, I'm sorry.  Not

11   Professor Klarevas.  Lucy Allen.  Lucy Allen --

12             THE COURT:  Oops, I lost you.  I couldn't hear you.

13             MR. ECHEVERRIA:  Sorry, your Honor.  Lucy Allen was

14   the only witness for defendants that plaintiffs elected to

15   depose.

16             THE COURT:  Okay.  All right.  Okay.  That answers

17   that.

18             Now, I did not see a similar binder from the

19   plaintiff.

20             MR. DILLON:  Your Honor, the binders that were

21   submitted by the plaintiffs, they included the full deposition

22   transcript with highlighted sections as our excerpts.

23             You know, since we were highlighting the -- the

24   deposition excerpts, we thought it would be somewhat redundant

25   to give you only highlighted portions and just give you an

1    entire folder of highlighted pages.  So we thought we would

2    just do it in one transcript, highlight the excerpts.

3             THE COURT:  Is there another document?  This happens

4    in some cases that I've had, where the parties submit a list

5    of -- of -- of the pages and lines that they want me to look

6    at.

7             Did -- did you do at that?

8             MR. DILLON:  We -- we exchanged lists with

9    defendants, your Honor.  And if we haven't already lodged that

10   with the Court, we will do so today.

11            THE COURT:  Okay.  That would be good.  Because --

12   because I tell you what (laughing), I'm not saying that I'm not

13   going to read the entire deposition.  Because if there's

14   something in the -- in the excerpts that triggers my curiosity,

15   I will go back and I will look.  But I really would rather not

16   have to read 13,000 pages worth of material, if I don't have

17   to.

18            So, anyway, okay.  So --

19            MR. DILLON:  Completely understandable.

20            THE COURT:  All right.  What time is it?  11:20?  Is

21   that right?

22            THE CLERK:  Yes, Judge.

23            THE COURT:  Okay.  So, let's hear from -- from the

24   State.

25            What do you want me to know?

1          MR. ECHEVERRIA:  Thank you, your Honor.  We have a

2     lot of discuss.

3          But before we get into the evidence now and -- and

4     our discussion about how that evidence shows that the assault

5     weapons control act is constitutional, there are a few issues,

6     I think, that we should kind of discuss up front.  Some issues

7     of potential confusion.

8          THE COURT:  Okay.

9          MR. ECHEVERRIA:  And also some housekeeping matters.

10          Regarding the Las Vegas report that your Honor

11     mentioned and discussed with Professor Klarevas, we -- we filed

12     those reports at Docket Entry 61, after -- after the October

13     hearing.

14          THE COURT:  All right.

15          MR. ECHEVERRIA:  Additionally, we lodged our

16     deposition designations and counter-designations on February

17     3rd, which was two days ago, at Docket Entry 25.

18          So those documents will have the particular page

19     numbers that we find to be most interesting and most relevant

20     to the Court's consideration of this -- of this case.

21          THE COURT:  Thank you.  That's helpful.

22          MR. ECHEVERRIA:  And we're going to get even more

23     specific for your Honor.

24          We -- we discussed the potential of having another

25     round of submissions, post-trial proposed findings of fact and

1   conclusions of law.  And it's our intention to have very

2   pinpointed citations to those excerpts, so that your Honor can

3   see not just what excerpts we find to be relevant but you --

4   you can see exactly why we find those excerpts to be relevant.

5   And we'll tie those excerpts to the facts and to the law.

6           THE COURT:  Outstanding.  All right.

7           MR. ECHEVERRIA:  The first -- the first issue that I

8   would like to discuss is the scope of the assault weapons

9   control act.  What exactly does the law being challenged do?

10  How does it define assault weapons?

11          The AWCA is tailored in scope to particularly

12  dangerous semiautomatic firearm configurations.  This is not a

13  ban on any class of weapons.  It is a restriction on the way in

14  which certain weapons are used and configured.  It prohibits a

15  certain enumerated list of configurations that relate to a

16  subset of firearms.  With respect to rifles, those enumerated

17  configures -- configurations are only applied if the rifle is a

18  centerfire rifle that does not have a fixed magazine, for

19  example.

20          The AWCA does not prohibit the sale or possession of

21  all semiautomatic guns.

22          THE COURT:  Why the centerfire versus rimfire?

23          MR. ECHEVERRIA:  Well, the evidence in this case

24  shows that centerfire rounds are generally more powerful than

25  rimfire rounds, and this is -- this was testified to by General

1    Youngman, for example.

2            So centerfire rifles are just, as a general

3    proposition, incrementally more dangerous than rimfire rounds.

4    And that would be another reason why the California statute is

5    tailored -- it is tailored to those rifles that are generally

6    more dangerous, not just all semiautomatic rifles.

7            It -- it doesn't prohibit the sale or possession of

8    semiautomatic modern sporting rifles, which is the phrase that

9    plaintiffs' expert, Curcuruto, uses throughout this case.  And

10   he also used that phrase in -- that phrase has also been used

11   in other cases involving challenges to similar assault weapon

12   restrictions.

13           Mr. Curcuruto -- Curcuruto testified during his

14   deposition that Californians can continue to enjoy modern

15   sporting rifles -- "enjoy" is my words -- for self-defense,

16   sports shooting, and hunting.  Your Honor can see that type of

17   testimony at pages 97, 98, and 103 to 104 of his deposition

18   transcript.

19           The AWCA does not prohibit the sale or possession of

20   essential components to operate centerfire semiautomatic

21   weapons, rifles, or other semiautomatic weapons.

22           And, under *Jackson*, the Ninth Circuit indicated that

23   the state cannot ban hardware that is necessary to operate the

24   firearm.

25           And -- and here, the -- the particular features that

1    are listed are not necessary to operate any of the firearms

2    that are subject to the assault weapons control act.

3          It's also important to note that California compliant

4    AR rifles -- AR platform rifles retain that straight line

5    design feature that Mr. Kapelsohn testified to in the video

6    demonstration.

7          If you recall during day one of the trial, during

8    redirect, Mr. Lee asked Mr. Kapelsohn to demonstrate what the

9    straight line design looks like.  And he -- Mr. Kapelsohn held

10   up an AR rifle, an AR-15, with the -- there was that yellow

11   tape that showed a straight line through the barrel and through

12   the stock --

13         THE COURT:  I think he did that at his deposition.

14   Right?

15         MR. ECHEVERRIA:  That's correct.  The redirect in the

16   deposition.

17         So a straight line runs through the barrel -- runs

18   through the barrel, through the stock.  And that design is

19   retained for California compliant rifles.

20         The particular weapon that Mr. Kapelsohn was

21   demonstrating with would qualify as an assault weapon under

22   California law because it had a pistol grip beneath the action,

23   and it apparently had a flash suppressor on the muzzle.  Take

24   away those features, that rifle still has the straight line

25   design that was such a great innovation, according to

1 plaintiffs' experts, with the M16 and the AR-15.

2          THE COURT:  All right.  Let me interrupt you there
3 for just -- just a question.

4          Does -- does the state believe that citizens should
5 have weapons for self-defense that are more accurate or less
6 accurate?

7          MR. ECHEVERRIA:  Well, in general, the state has a --
8 a -- a profound interest in ensuring that Californians have
9 access to safe firearms.

10         All firearms are dangerous but the state --

11         THE COURT:  Yeah, I understand that.  But my question
12 was does the state take the position that the more accurate the
13 weapon is for a California citizen to use, the better it is?
14 Or does the state take the position that it would rather its
15 citizens have weapons that are not very accurate?  Which of
16 those two is the state official position?

17         MR. ECHEVERRIA:  Well, I don't have the state
18 official position on accuracy generally.  I would assume that
19 the state -- because the state would want people to have more
20 accurate firearms generally.  But the accuracy concern that the
21 state is focused on in this case is accuracy in rapid-fire
22 applications.

23         So when the plaintiffs say that the state is trying
24 to saddle Californians with less-accurate weapons, that is just
25 a mischaracterization of the accuracy concerns that the state

1   has been discussing time and time again and through our

2   experts.

3          The -- the accuracy concerns arise when a

4   semiautomatic weapon is fired rapidly, even in cases where you

5   might have sustained fire, suppressive fire.  Those -- that

6   type of rapid firing is just not generally consistent with

7   lawful uses of firearms.

8          THE COURT:  Let me -- let me interrupt you.

9          As you know by now, Mr. Echeverria, sometimes I'll

10  play devil's advocate.

11         But there was an article, when -- when -- one that --

12  that comes to mind where a pregnant woman -- her husband was

13  being beaten to death.  And she had one of these weapons.  And

14  she fired -- I don't remember how many rounds but she fired a

15  lot of rounds.  Had it not been for the fact that she fired all

16  of those rounds, her husband might have easily been killed, and

17  so might have she.

18         So -- I don't know what a lot of rounds is.  I don't

19  know what rapid fire is.  But from reading that article, it

20  struck me that someone in that pregnant woman's position, we

21  would want her to be able to fire as many shots as she needs to

22  fire and hopefully to be as accurate as she could be in firing

23  those shots as she possibly could.  Don't you think that's a --

24  that that makes sense?

25         MR. ECHEVERRIA:  So I don't know exactly what article

1    your Honor is referring to and whether that victim was using an

2    assault weapon or a weapon that would qualify as an assault

3    weapon.

4              THE COURT:  It was an AR-15.  So -- so -- so -- so

5    the question, as I recall -- I think it's -- I think it's --

6    Bob, do you know which -- I think it's 3 or 4?  Plaintiffs' 3

7    or 4?  It was an AR-15.

8              So -- but just in a general -- in a general sense --

9    so you have this pregnant woman whose husband is being beaten

10   to death.  And she goes and she grabs a gun.  Whatever gun it

11   was, wherever it was, however she got it -- I'm not sure if she

12   made a conscious decision and said, well, look, I'm going to

13   grab a pistol; I'm going to grab a shotgun; I'm going to grab

14   an AR-15.

15             But, in any event, so she grabs this gun, and she

16   proceeds to --

17             (Judge handed document).

18             THE COURT:  What is it?  It's Plaintiffs' Exhibit

19   001-1.  So -- and she did use an AR-15.

20             So the question that I have is -- I put myself in the

21   position of -- of this pregnant woman.  If it was my wife, I

22   would want to have a weapon that will fire as many rounds as

23   can possibly be fired, however many I may need to fire.  And I

24   want them to be as accurate as they can possibly be in order to

25   stop these people from killing my -- my spouse.

1    So, again, when you talk about rapid fire, I fully

2 and completely understand what you're saying.  But I'm

3 wondering, sure.  But what about -- what about the person like

4 the pregnant -- pregnant Florida mom?  What would you say to

5 her?  Would you want her weapon to be more accurate or less

6 accurate?

7         MR. ECHEVERRIA:  Well, we would want to make sure

8 that that woman is operating a safe firearm.  I would note that

9 the --

10        THE COURT:  There's no such thing as a safe firearm.

11 A firearm is -- by its very nature, a firearm is dangerous.  We

12 would all agree with that.

13        MR. ECHEVERRIA:  Yes.

14        THE COURT:  So my question is more focused than that.

15        My question is would you want that woman to have a

16 weapon that is more accurate or less accurate?

17        MR. ECHEVERRIA:  As a general proposition, I would

18 say that we want individuals to have more accurate weapons.

19 But the evidence shows, in this case, that the use of rapid

20 fire is just not consistent with a self-defense use of an AR-15

21 or other assault weapons.  If your Honor --

22        THE COURT:  Well, let me ask you it about that

23 because this has troubled me.  And I've had -- I have had

24 this -- this has been bothering me for an awfully -- a long

25 time.  And that is this.

1          Look, when -- when did Sandy Hook happen?  When did

2    that happen?  Do you recall the year?

3          MR. ECHEVERRIA:  2012 -- 2012, I think.

4          THE COURT:  Okay.  It is not unusual for me today, in

5    2021, to pick up something -- some article, some newspaper

6    article that appears to -- something that indicates that

7    somebody is referring to the Sandy Hook shooting.  Okay?

8          I can't say that I had ever read about this pregnant

9    Florida mom using an AR to kill home intruders.  I can't say I

10   ever heard the news media report that.

11         I'm willing to bet you dollars to donuts that if they

12   did, they probably reported it very, very briefly, very

13   quickly, and everybody forgot about it.  So the fact is that

14   this is not sexy.  This is not something that the news media

15   would report.  This is not something that's going to be used by

16   many people.

17         It was -- it was something that troubled me about

18   Ms. Allen's deposition, which is that she talks about articles,

19   she talks about average shots, but she doesn't talk about --

20   for example, she doesn't talk about -- so -- my recollection

21   is, in California, we've had six mass shootings where assault

22   weapons have been used since 1989.  Six.

23         Now, I don't know how many times -- because nobody

24   has disclosed it.  We don't know how many times have

25   homeowners, business owners, others, used one of these weapons

1   and fired rapid fire more than 2.2 rounds.

2          Getting back to my question.  My question is

3   really -- and it's -- because I -- I see your point.  I see the

4   state's point.

5          I understand -- I understand the concern.  But I also

6   understand the concern of the people.  As I said, at one point

7   in time, look, there are people who hate guns.  There are

8   people who wish that all guns would go away.  There are people

9   who will do anything they can do to control and ban guns.  And

10  then there are people who will say, you know, there should be

11  absolutely no restrictions on guns.  I don't think either one

12  of those is -- is realistic or should be realistic.

13         And I can see how there are competing interests.  The

14  state has competing interests.  They certainly want to minimize

15  the -- the unlawful use of these weapons.

16         My question, though, is to what extent do we then

17  jeopardize the safety and the security of people who may be in

18  a position where one of these weapons -- like this Florida mom

19  had to use this weapon and had to fire a lot of rounds?

20         So my thinking is -- I don't know.  Call me stupid,

21  if you wish, but I would think that I would want people to have

22  a weapon that is as accurate as the weapon can possibly be.

23         And, of course, that works to the disadvantage if you

24  have someone who wants to engage in criminal behavior.  Sure,

25  that works to the disadvantage.  But for the average

1    law-abiding citizen, who's not going to be going out shooting

2    up people, to me it makes perfectly good sense that we would

3    want them to use the most accurate weapon that they could.

4    Doesn't that make sense?

5           MR. ECHEVERRIA:  Well, I do see your Honor's concern

6    about that.  But the state is not -- the particular features

7    that the state has identified does not materially diminish the

8    ability of a law-abiding citizen to operate an AR-15 rifle for

9    self-defense in an accurate fashion.

10          THE COURT:  Isn't that the point of the pistol grip?

11   I'm not talking about a forward pistol grip.  I'm talking about

12   the rear pistol grip.  But isn't that the whole point of the

13   pistol grip?

14          MR. ECHEVERRIA:  The pistol grip beneath the action

15   of a rifle stabilizes the rifle when the rifle is fired rapidly

16   and repeatedly.  So it allows the shooter to maintain the sight

17   on the target.

18          And if you look at the exhibit to Plaintiffs' Exhibit

19   1 -- this is Exhibit -- this is the exhibit to Mr. Kapelsohn's

20   declaration, discussing the pregnant Florida mom.  It -- the

21   article does not indicate how many -- how many shots she had to

22   fire.  The article states that she used an AR-15.

23          If that individual lived in California, she could

24   have used any weapon for self-defense, including an AR-15,

25   provided the AR-15 had a fixed magazine, for example.  She --

1   she could have had a pistol grip beneath the action, in fact,

2   if she had a fixed magazine that didn't hold more than 30

3   rounds.

4           So while I appreciate your Honor's general concerns

5   about -- about accuracy of firearms, and share those concerns,

6   the particular concerns raised by restricting these features is

7   about having enhanced accuracy in rapid fire that is not

8   consistent with lawful uses.

9           The -- we have provided an exhibit, the U.S. Army's

10  training manual.  This is Exhibit L.  And at page DEF541 the

11  training manual discusses rapid semiautomatic fire as a combat

12  fire technique.  And the pistol grip helped stabilize the

13  weapon in that kind of rapid fire.  I have no -- I have not --

14          THE COURT:  That's a given.  Right?  I mean,

15  that's -- that's -- that's the whole purpose of the pistol grip

16  is to have more accurate shooting.  Right?

17          MR. ECHEVERRIA:  In rapid fire.

18          And I have seen no evidence presented by the

19  plaintiffs that -- that any of these seven anecdotes that the

20  plaintiffs have found, that were attached to Mr. Kapelsohn's

21  declaration, involved the kind of rapid fire that we're

22  discussing.

23          In addition, California compliant AR-15s use the same

24  kind of ammunition as other AR-15s.  .223 5.56 NATO rounds.

25  This is the kind of ammunition that General Youngman identified

1   as one of the other great innovations of the M16 in battle.  It

2   allowed soldiers to use the same kind of interchangeable

3   ammunition.  It was also an intermediate round, so it generally

4   weighed less so soldiers could carry more in battle.

5       And California compliant AR-15s can use the same kind

6   of ammunition.  They can be supplied by the same ammunition

7   supply chains that General Youngman discussed during his

8   deposition.

9       You can see that discussion at Youngman deposition

10  excerpt page 114 to 117.

11      I would also like to note that California

12  specifically authorizes the use of assault weapons in

13  competition shooting.  I know that your Honor emphasized

14  that -- that the law-abiding -- or the lawful uses that the

15  Second Amendment contemplates is not focused solely on

16  self-defense.  That is where the -- right under the Second

17  Amendment is most acute, when self-defense is in the home or

18  defense of hearth and home.

19      But with respect to competition shooting and other

20  sporting uses, Penal Code Section 30515(d)(2) -- this is

21  following the features definition in subdivision (d)(2).  The

22  statute provides a list of several pistols that would otherwise

23  qualify as an assault weapon under 30515(a).  And these pistols

24  are exempt from the statute because there is a determination

25  that these are -- these are suitable for competition shooting,

1    particularly in the Olympics.

2            And that list has been added to over time under

3    subdivision 3.  Also --

4            THE COURT:  But what about rifles?

5            MR. ECHEVERRIA:  So regarding rifle -- so subdivision

6    (d)(2) is only pistols.

7            Regarding rifles, sub -- Penal Code Section

8    30660(a)(3) and 30665 are relevant.  30660(a)(3) allows an

9    individual with a registered assault weapon -- which could be a

10   registered assault rifle -- to lend that weapon to somebody

11   else to use in a competition shooting at a target range.

12           And then Section 30665 allows a nonresident to import

13   an assault weapon, which could include an assault rifle, into

14   the state for the limited purpose of using that firearm in a

15   competition on a target range.  So --

16           THE COURT:  So just -- maybe I misunderstood

17   something.  And -- gosh.  So are you saying that somebody in

18   California can in fact own a weapon that would qualify as an

19   assault weapon under the California definition of an assault

20   weapon but only if they register it?

21           MR. ECHEVERRIA:  Only if they had registered it.

22   There were very -- there were defined windows under which

23   individuals who had lawfully owned firearms that were going to

24   be prohibited, they had an opportunity to register the weapon.

25   And, therefore, their weapons, if they were duly registered and

1   maintained possession by them, they would be grandfathered in

2   under the --

3           THE COURT:  Okay.  So that's -- that's -- that's what

4   I understood the law to be.

5           So -- so the problem is that -- so if they're aware

6   of those weapons, they could own them, you could register them.

7   But you could no longer buy new of these weapons, even if you

8   register them.  Right?

9           MR. ECHEVERRIA:  I believe that's correct, your

10  Honor.

11          THE COURT:  All right.  And there's a grandfather

12  clause -- and this is going to be like -- like the

13  large-capacity magazine.  Where, at some point in time, the

14  state's going to come in, and it's going to say that there was

15  a loophole.  That -- that -- that when we grandfathered

16  these -- these guns in -- well, there was a loophole, and we

17  shouldn't have done that.  And now they're going to be banned

18  as well.  Right?

19          MR. ECHEVERRIA:  I'm not aware of any -- any proposed

20  legislation to that effect or any discussion of that.  The law,

21  as it stands before the Court, provides for grandfathering.

22          And the Ninth Circuit, in *Duncan versus Becerra*, was

23  very concerned in that case.  And your Honor understands that I

24  have a different view in that case.  But the Ninth Circuit

25  panel did find the lack of grandfathering to raise

1  constitutional concerns under the Second Amendment.  We don't

2  have those concerns in this case.

3       THE COURT:  Okay.  I knew that.  But it was just that

4  you had said -- so -- so if I understand what you're saying,

5  Mr. Echeverria, is that right now there are certain people who

6  have these assault weapons in California.  They have been

7  registered.  And so to the extent that those people have those

8  weapons, they can use them for competition.  They can also loan

9  them to others.

10       But as these weapons become -- as we all know,

11  mechanical things have a finite lifespan.  As -- as these

12  weapons, then, begin to disappear from the inventory, there

13  will be fewer and fewer and fewer of these in the State of

14  California.  Agreed?

15       MR. ECHEVERRIA:  It's possible.  I hadn't -- and if

16  there is a concern about needing particular weapons in

17  particular competitions -- and there's no evidence in the

18  record that Californians are unable to compete.  But if there

19  is some issue where there are certain competitions that require

20  certain weapons that have been phased out due to deterioration,

21  maybe that's something that could be addressed by the

22  legislature at a later time.  It's not -- that particular

23  narrow prospective concern doesn't raise constitutional

24  concerns about the way the statute is constructed today and --

25  and the statute that has been challenged today in court.

1        THE COURT:  Okay.

2        MR. ECHEVERRIA:  And I would also like to note that,

3    you know, the statute has changed over time.  It -- it was

4    enacted in 1989.  It was amended in 2000 to add the feature

5    test that the plaintiffs are challenging here.  And then it was

6    amended again recently with another -- or relatively recently

7    with another window for registration to restrict the bullet

8    button issue.  And then there was another round of amendments

9    where the three new definitions targeting the Franklin

10   Armory-type weapon -- that is not at issue in this case.  But

11   there have been multiple amendments because the state -- the

12   state legislature has had to improve the law to address efforts

13   by manufacturers and retailers to circumvent that law.

14       THE COURT:  Have any of those laws -- let me ask you

15   this.  Have any of those laws made it easier for people to own

16   these weapons, as opposed to making it more difficult for

17   people to own these weapons?

18       MR. ECHEVERRIA:  If the -- if the state had been

19   enacting amendments that would make it easier to own these

20   weapons, I think it would be -- that would raise constitutional

21   concerns, frankly.  Because then the state would be basically

22   talking out of two sides of its mouth in effect --

23       THE COURT:  No, not necessarily so.

24       Let's suppose, for example, hypothetically, that the

25   state, exercising its best judgment, had concluded, for

1  example -- you know, we've looked at the number of mass

2  shootings that have occurred.  Say whether you want to use

3  nationwide or statewide.  And we have concluded that, you know,

4  very few, if -- maybe none of these have -- have ever had, say,

5  a flash suppressor or a forward grip pistol grip or a -- or a

6  barrel shroud.

7       One would think that the legislature would say, you

8  know, we enacted this law before but -- where we made it

9  difficult, if not impossible, for citizens to own this weapon.

10  But, in retrospect, we think that's overregulation.  We don't

11  really need it.  And so we're going -- we're going to get rid

12  of it.

13       Do you see what I'm saying?  Has that happened?

14       MR. ECHEVERRIA:  Oh, I'm -- I'm not aware of that.

15  Well, that has not happened with respect to the AWCA.  But I

16  can certainly appreciate that, you know, political judgments

17  can change over time, as evidence changes over time.  As the

18  views of the people who elect their representatives in our

19  country change over time.  So I'm not disputing that -- that

20  policies can change.

21       But, here, the state has been consistent in trying to

22  restrict access to these particularly lethal weapons and has

23  amended the statute over time consistently to make that goal a

24  reality.  Or as much of a reality as is possible.

25       So this is not an example of -- of a slippery slope

1   where the state -- where the state is in ad hoc fashion just

2   adding additional features.  You know, like adding a -- a

3   trigger, for example, as a prohibited feature; which would

4   definitely raise constitutional concerns, I would think.

5        So the state has been acting in a -- in a focused

6   manner since 1982 -- since 1989 in trying to restrict these

7   types of weapons.

8        You know, the state of California was the state that

9   innovated assault weapon restrictions like the AWCA and like

10  the federal assault ban.  And it was in response to the 1984

11  San Ysidro shooting with an Uzi and the Stockton shooting with

12  an AK-47.  We have experience in this state with mass

13  shootings, and we have been trying, since then, to restrict

14  access to those weapons and particularly to reduce their use in

15  mass shootings and in gun violence against law enforcement

16  personnel.

17       THE COURT:  You know, I recall the state's

18  representative being here in the *Duncan* case.  And I asked a

19  question -- I think I asked the same question of Dr. Donahue --

20  or Professor Donahue when he was here at the last hearing.  I'm

21  going to ask you the same question, and that is this.

22       So -- so let's just assume, hypothetically, that we

23  get rid of all of the assault weapons currently defined under

24  California statute.  We wave the magic wand.  We've sealed the

25  borders both in Mexico, Arizona, Nevada, Oregon, and the ocean.

1    And we have now gotten rid of all of these weapons -- okay? --

2    that are banned under this assault weapons control act.  That

3    will still leave available to the citizenry, by your own

4    admission, weapons like, say, the Ruger Mini-14, which is a

5    centerfire rifle with high-firing capacity that fires a similar

6    round.  That weapon is still legal in the state of California.

7            Now, when we get the next criminal or deranged person

8    who decides that he or she is going to go out and commit a

9    heinous crime, there's a good probability that -- at some point

10   in time -- they're going to start using these Ruger Mini-14s.

11           So the concern, of course, is that at some point in

12   time now, then the state -- because, remember, the San Ysidro

13   shooting occurred with an Uzi, which has been banned in the

14   State of California for, gosh, I don't know how long.

15           So the next set of mass shootings that we're likely

16   to see -- or at least some of them -- will be using the Ruger

17   Mini-14 and weapons like it.

18           And so then, based upon the logic that I'm hearing

19   from you, is that then the State, in the exercise of its

20   judgment, trying to deal with an important state interest --

21   i.e., the minimization of gun violence -- will then ban the

22   Mini-Ruger-14.

23           Does that -- does that make sense to you?

24           MR. ECHEVERRIA:  Yeah, I'm not aware of any plans to

25   expand the AWCA to apply to the --

1          THE COURT:  No, no.  I'm not asking you for plans.

2   But I'm asking you, looking for the historical development

3   of -- of -- of commonsense gun safety measures in the state of

4   California, that would be the logical progression, wouldn't it?

5          MR. ECHEVERRIA:  I -- I don't know, your Honor.

6   The -- the fact of the matter is, is that the state of

7   California is trying to be focused on the particular features

8   that make centerfire semiautomatic rifles more dangerous, more

9   lethal in criminal applications, particularly mass shootings

10  and gun violence against law enforcement.

11         THE COURT:  I understand.  I hear you.  And you've

12  said that several times.  And --

13         MR. ECHEVERRIA:  Yes.

14         THE COURT:  -- in your pleadings, and so on.

15         But the fact of the matter is that that logic -- when

16  you mentioned the slippery slope, that's what got me thinking

17  about this discussion.

18         I had the same discussion having to do with the

19  high-capacity magazines.

20         The logic is this.  So Lucy Allen says that, look,

21  you really only need 2.2 shots for a homeowner for

22  self-defense, on average.  That's all you need.  So if you can

23  get a derringer that will fire two and a half shots, you're in

24  pretty good shape.

25         The problem with the logic, as I see it, is that this

1    is a logic that is very, very faulty because criminals and

2    deranged people are going to use whatever weapons they can get

3    their hands on.

4           And if you get rid -- assuming you could wave this

5    magic wand and get rid all of the AR currently noncompliant

6    weapons, the next time around, what they're going to use is

7    California-compliant AR-15s and AR -- AK-47s.  And then you're

8    going to get rid of those because the same thing is going to

9    happen.

10          Criminals and deranged folks are going to use those

11   weapons, at least in some of the instances.  And then you're

12   going to get rid of those.  And then you'll be left with a

13   Ruger Mini-14.  And then that will become the weapon of choice.

14   And then once you have got rid of those weapons, there will be

15   something else.  It may be a five-round .30/06.

16          And so the slippery slope argument is not really just

17   a -- is not hyperbole.  It's real.  If you look at the

18   evolution of -- of California's gun control -- for example,

19   we -- we talked about -- what was it?  Category 1, Category 2,

20   and now Category 3.  And, in fact, we now have a Category 4.

21   And that's exactly what happens, is that as time goes by -- we

22   no longer have machine guns.  I don't know.  When was the last

23   time -- I don't remember reading or hearing about a mass

24   shooting in California or anyone using an M16 or an Uzi, or

25   anything of that sort.  So what have people been using?  Well,

1   among them, they've been using these AR-15, AK-47 rifles.

2   Right?

3           And so what the state did is they said, okay, we're

4   going to ban these, and we're going to ban them by lists.  So

5   they did that.

6           But that didn't solve the problem, so then they come

7   up with Category 2.  That didn't solve the problem, so now

8   we've got Category 3.  And then now we have Category Number 4.

9           And so the question becomes -- and it's -- it's a

10  really important question at the heart of all of this.  And

11  that is this:  What, if any, are the limits of the state

12  regulating the rights of law-abiding citizens to own or possess

13  guns?  Are there any limits?  What are those limits?

14          MR. ECHEVERRIA:  There are absolutely limits, your

15  Honor.  We have -- we have acknowledged those limits, and we

16  have been trying to legitimate within those limits.  And the

17  limits are -- are delineated by the two-step framework that the

18  Ninth Circuit has adopted for adjudicating Second Amendment

19  claims.  When the burden of the law on the core Second

20  Amendment right rises to the level of a severe burden, then the

21  state is subject to a high -- a higher form of scrutiny -- of

22  strict scrutiny, and it makes it harder for the state to

23  justify the law.  It's -- it's a spectrum.

24          And, right now, we are at one end of the spectrum.

25  Your Honor is concerned about the other end of the spectrum

1    that we're not at.  And the law that is before the Court in a

2    facial challenge that the plaintiffs' are making, it does not

3    contemplate or does not -- it's not relevant to the facial

4    claim -- like some hypothetical law that may happen in the

5    future.

6              You know, I tried to address the evolution of the

7    AWCA.  And I wanted to address the slippery slope argument

8    head-on because I know it's something your Honor is concerned

9    about.  I was the attorney arguing *Duncan* before you.

10             THE COURT:  Were you?  I'm sorry.  I forgot about

11   that.

12             MR. ECHEVERRIA:  It's okay.  I did not forget.  But

13   it's okay.

14             THE COURT:  (Laughing.)  Well, you did a good job,

15   just like you're doing a great job now.

16             But for some reason I thought there was a -- a female

17   AUSA --

18             MR. ECHEVERRIA:  Oh, I apologize.  Yes, Alexandra

19   Robert Gordon, who is now a superior court judge, she argued

20   the preliminary injunction in front of your Honor.  I argued

21   the summary judgment motion.

22             THE COURT:  Okay.  Okay.  All right.

23             MR. ECHEVERRIA:  Summary judgment argument was me.

24             THE COURT:  So -- so let me -- let me turn to a

25   different -- a different issue.  Because, again, it troubles

1    me.  And that is -- and I think I asked about this last time

2    that you were here.

3         In *Heller*, the Supreme Court did a wonderful job, I

4    thought, of reconciling two -- two aspects of the Second

5    Amendment.  The first -- the first aspect, as I recall, was

6    that the Supreme Court talked about the right of self-defense

7    not even really being a right protected or delineated in the

8    Bill of Rights.  It's -- it's a natural right.  It's a right

9    that exists and that nobody should be able to deny someone

10   else, which is the right to self-defense.

11        And so the Supreme Court said, look, there are

12   people -- back at the founding of our country, there were

13   people that had muskets and pistols.  And they had these

14   muskets and pistols, and they used them for several reasons;

15   whether it be for self-defense or for hunting or whatever.

16        But there was also something else that happened, they

17   said.  It was also this desire to have a militia, which is why

18   the prefatory clause of the Second Amendment addresses the

19   militia.  And the Supreme Court reconciled those two by saying,

20   obviously, if the people have a musket or a pistol for hunting

21   or for self-defense, if it should become necessary -- as it did

22   in Lexington and Concord -- for them to bring whatever weapons

23   they happen to have on hand, we need those people to bring

24   these weapons to be an effective fighting force as a militia.

25        By the way, if I have misstated anything, don't

1    hesitate to -- to correct me.

2           Now, here's the problem.  I think I asked someone to

3    brief for me the other *Miller* case.  I can't recall the --

4    the -- the citation, nor do I recall the date.  I think it was

5    like in the 1930s, or thereabouts.

6           My recollection of that *Miller* case was there was a

7    question about someone who had a shotgun -- a sawed-off

8    shotgun.  And apparently there was a taxation statute or

9    something that said you couldn't have these.  And, in the end,

10   the United States Supreme Court said that sawed-off shotguns

11   were not protected by the Second Amendment.  They said there is

12   no evidence which indicates that sawed-off shotguns have any

13   useful purpose for military purposes.

14          So the converse of that is that if a weapon has use

15   for military purpose, then in fact it is protected by the

16   Second Amendment.

17          Now, of course, I think *Heller* -- as I said, *Heller*

18   did a wonderful job of reconciling two different but -- but --

19   but somewhat -- sorry.  English is my second language, and

20   sometimes I lose -- I can't find the appropriate word.

21          But -- but *Heller* found a way to explain why people

22   could own certain weapons.  And those weapons would be useful

23   not just for hunting, not just for self-defense, but also if it

24   came time and they needed to bring these weapons to the

25   battlefield, they would have these -- they would be available

1  to them.

2         So, on the one hand, you can argue that, look, a

3  weapon with a flash suppressor, a pistol grip, a shroud, those

4  are weapons that would not be useful for self-defense.  But

5  they certainly are useful if in fact -- and I think I used this

6  phrase last time you were here.  If the dastardly Russians were

7  to be -- come marching down through Broadway, San Diego, they

8  would have to face a barrage of citizenry who would be armed

9  with these weapons.  They might not eventually succeed, but

10 they would certainly -- as they did in Concord and Lexington --

11 they would do significant damage.  Perhaps enough to make them

12 turn around and go back.  Who knows.

13        As best as I can tell, *Miller* has never been

14 overruled.  It's still good law.  I've had my law clerks look

15 into this over and over and over again.  I can't find a single

16 case that says that *Miller* has been overruled.  Why?  Because

17 it makes perfectly good sense when one reads the *Heller*

18 opinion.  Because there's a difference.

19        In other words, *Heller* -- *Heller* -- *Heller* reconciled

20 *Miller* and the natural right to self-defense and said, "Well,

21 there's a difference."  And I'm going to use my own -- my own

22 example.  But there's a difference between the citizenry, for

23 example, possessing hand grenades -- which really have no use

24 for self-defense or for hunting or for anything else -- or

25 flamethrowers or even M16s, that are submachine guns or -- not

1    submachine guns but machine guns; as opposed to a weapon that

2    law-abiding citizens can own for lawful purposes but which can

3    also be used in the event that a militia becomes necessary.

4            So when you say that we want the weapon to be

5    accurate for -- for -- for self-defense purposes but we don't

6    want it to be so accurate for rapid firing, well, that only --

7    that only addresses half of the equation.  It doesn't address

8    the other half of the equation.  Right?

9            What do you do -- is it not preferable should -- God

10   forbid -- we ever have a need to muster up the militia, would

11   we not want it to be preferable for the citizenry to have

12   weapons that in fact are effective in the battlefield?

13           (Pause.)

14           MR. ECHEVERRIA:  Your Honor?

15           THE COURT:  Yes.

16           MR. ECHEVERRIA:  If I may, I -- I don't want -- I

17   don't want the Court to infer from my silence that -- that we

18   don't have any thoughts on -- on your -- what your Honor was

19   saying.

20           I -- I agree with you that *Miller* is still good law.

21   I agree with you that *Heller* reconciled *Miller* with the -- with

22   the current scope of the Second Amendment as defined by the

23   Supreme Court in *Heller* and again in *McDonald*.

24           But the court in *Heller* did not reconcile *Miller* by

25   saying that the Second Amendment protects those weapons that

are useful for militia service, even though the *Miller* opinion did use some language that could be construed to that effect.

Justice Scalia was very clear in *Heller* -- in *District of Columbia v. Heller*.  On page 623 -- that's 554 U.S. 570, pin cite 623, quote:

> "*Miller* stands only for the proposition that the Second Amendment right -- whatever its nature -- extends only to certain types of weapons, period."

And then Justice Scalia went on to say that we might as well consider, at this point, what types of weapons *Miller* permits.

Read in isolation, *Miller*'s phrase, "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected.  That would be a startling reading of the opinion because then it would mean that machine guns could be legal.

THE COURT:  Well, no.  That only those weapons would be protected by the Second Amendment.  So, for example, perhaps a single-shot .410 shotgun or a double-barreled shotgun would not be.

MR. ECHEVERRIA:  Well, that's not exactly what Justice Scalia goes on to say.  He says that it would be a startled reading of *Miller* since it would mean that the National Firearms Act's restrictions on machine guns might be unconstitutional; not that individuals would only have access

1   to machine guns, if that makes sense.

2           THE COURT:  All right.

3           MR. ECHEVERRIA:   What -- what *Heller* was saying was

4   that *Miller* did not recognize a sawed-off shotgun as protected

5   because that is not a weapon in common use for lawful purposes

6   like self-defense.

7           The prefatory clause has been decoupled from the

8   operative clause over time.  And that -- that's what Justice

9   Scalia explained in *Heller*.  That at the time of the founding,

10  the same weapons that people had for common use, like -- like

11  self-defense in the home, were the same weapons that they

12  brought to militia service.

13          Today the gap between the preparatory clause and the

14  operative clause has -- has widened.  Because, you know, no

15  amount of small arms could stand up to, you know, the Russian

16  military, as your -- your Honor was referencing in the

17  hypothetical.

18          THE COURT:  Well, I think that's -- I don't -- I

19  don't want to argue with you, but I don't think that's true.

20          And as I pointed out to you last time, that's --

21  that's a complete inaccurate reading of -- of history.

22  Because, as you know -- and I think I pointed out -- people who

23  make that argument just refuse to -- what was it?  Somebody

24  said those who -- what is it?  Those who refuse to learn

25  history are bound to repeat it, or something.

```
 1              That -- that -- that's a totally invalid argument,
 2     but it's -- it's truly neither here nor there.  But the fact of
 3     the matter is, as you know, I was born and raised in Cuba.  I
 4     fled Cuba because a dictatorial government came into power.
 5     That -- that dictatorial government came into power because
 6     there was a very, very small -- small group of people -- I
 7     can't tell you how many.  But it was a very, very small group
 8     of people that came armed with old M1s, as I recall, and
 9     Garands.  And I think they had one or two machine guns.  And
10     that small group of people eventually overthrew a government
11     that had been largely armed by the United States, that had
12     bombers and tanks.  I've seen those tanks.  Tanks and -- and --
13     and howitzers, and all sorts of firepower.  So the idea -- I
14     mean, that idea is just -- is just flawed.  It's not -- it's
15     not supported by historical fact.
16              You know, in -- in -- in -- in Iraq, after we
17     defeated Saddam Hussein, again, a small group of people armed
18     with all kinds of strange weapons -- IEDs -- almost brought
19     this great country, the most powerful Army, Navy, and Air Force
20     in the world, brought us to our knees.  I mean, we almost lost
21     the Iraq war.  And during World War II, the Jewish resistance,
22     the French resistance, those are people that made a big
23     difference.
24              So the idea -- I mean, it's not even required -- the
25     Second Amendment doesn't require that -- that we be able to
```

1    defeat the enemy.  That's not what's required.  What's required

2    is that if there was a battle, as there was in Lexington and

3    Concord, that people be able to take up weapons and attempt --

4    maybe not succeed, perhaps -- as happened in Cuba, for example,

5    they did succeed.  But at least to attempt -- attempt to do

6    something, rather than just simply surrendering.  Right?

7         So *Miller* is pretty clear.  *Miller* says -- I mean,

8    the language in *Miller* is absolutely clear.  It says there is

9    no evidence to support the fact that a sawed-off shotgun has

10   any military use whatsoever, and therefore, is not protected by

11   the Second Amendment.

12        In that statement, what they're saying is in order

13   for a weapon to be protected by the Second Amendment, it has to

14   have some military use.

15        I think what *Heller* does, if I'm not mistaken, is

16   what *Heller* says is -- but there's a difference.  There's a

17   difference between a flame thrower, which has no real civilian

18   application, and other weapons such as, for example, a pistol.

19   Right?  A semiautomatic pistol.  Which can do both.  It can be

20   both -- be used both by the militia and by the people in --

21   other lawful purposes.

22        And so -- so it seems to me -- and maybe I've beaten

23   this dead horse too much.  But it seems to me that the problem

24   is that on the one hand we want weapons to be accurate, I hope.

25   But apparently the state says, but we don't want them to be too

1    accurate for too long.  Which may be fine except for that if in

2    fact those weapons became necessary for militia use, we would

3    want those weapons to be accurate and to be accurate for long.

4    Wouldn't we?

5           MR. ECHEVERRIA:  Well, your Honor, I think it's

6    important to -- to clarify that our -- again, our concern about

7    accuracies, about rapid fire, not -- you know, rapid fire can

8    happen over a long period of time, but it's the intervals

9    between the shots that make the rate of fire rapid, not the

10   duration of the firing, necessarily.

11          But, you know, we -- we -- we have a different -- the

12   state has a different reading of *Heller* and how *Heller*

13   reconciled the language in *Miller*.

14          This -- it's the state's position that *Heller*, in

15   effect, reread *Miller* or gloss -- provided a gloss over *Miller*.

16   That -- that it -- that the Second Amendment protects only

17   those weapons in common use for lawful purposes, and a

18   sawed-off shotgun is not one of those weapons.

19          Your Honor said that in *U.S. versus Miller* the

20   Supreme Court determined that the short-barreled shotgun had no

21   reasonable connection to militia service.

22          There are law enforcement agencies throughout the

23   country that use weapons that may qualify as short-barreled --

24          THE COURT:  No, but -- but you didn't hear me

25   correctly.  Because, in fact, what *Miller* said was that there

1   is no evidence -- in other words, the Court did not have any

2   evidence before it at the time that it made its ruling, that

3   would allow it to make that finding.

4           I don't think I ever said that those weapons are not

5   useful.  What I was saying is that that's what *Miller* said.

6   *Miller* said that --

7           MR. ECHEVERRIA:  Right.

8           THE COURT:  -- the evidence before it does not allow

9   me to make a finding.  Am I not correct?

10          MR. ECHEVERRIA:  No, I think that's fair.  Yeah,

11  that's fair.

12          THE COURT:  And you know what?  It's a quarter after

13  12:00.  And I -- I have been -- I've been grilling you long

14  enough, Mr. Echeverria.  How about if we take a lunch break,

15  and then give you a chance to -- to -- well, collect your

16  thoughts; give me a chance to go have some lunch; give my

17  reporter, who I'm sure must be worn out by now, give her a

18  chance to catch her breath.

19          So I think it's a quarter after 12:00, isn't it?

20  Right?  Yeah, that's right.  How about if we come back at 1:30.

21  And I really do want to wrap this up today.

22          And I know I ask a lot of questions, and I apologize

23  for that.  But I'm just a curious guy.

24          So anyway, all right.  We'll see you at 1:30.  Thank

25  you.

```
 1              MR. ECHEVERRIA:  Thank you, your Honor.

 2              (Recess taken at 12:17 p.m.)

 3              (Resuming at 1:32 p.m.)

 4              THE COURT:  Okay.  Good afternoon.  I hope everyone

 5   had a great lunch.

 6              Can you hear me?

 7              THE ATTORNEYS:  Good afternoon, your Honor.

 8              MR. ECHEVERRIA:  I can hear you.

 9              THE ATTORNEYS:  Good afternoon, your Honor.

10              THE COURT:  Before I go any further, listen, I had

11   alluded to a report that was -- that I had mentioned

12   previously.  And I found it over the lunch hour.  I know I had

13   mentioned this once before.  But it was -- it was a report by

14   the Bloomberg, Johns Hopkins group.  I think I said it was by

15   New Jersey.  But it wasn't.  It was a Johns Hopkins Bloomberg

16   School of Public Health.

17              And what I was alluding to was the following.

18   There's a sentence that says:

19              "In addition, the study did not find an

20              independent association between assault weapon

21              bans and the incidence of fatal mass shootings

22              after controlling for the effects of bans on

23              large-capacity magazines."

24              So, in other words, they found that large-capacity

25   magazines -- however you define those -- was -- did seem to
```

1   have an impact on -- on mass shootings.

2           Now, I also had a chance to find the article that I

3   was referring to, Mr. Echeverria, which is the -- the problem

4   that I have with the idea that citizens should not have

5   accurate weapons.  And the article is -- again, it's one of

6   plaintiffs' exhibits.  The title of the article is as follows.

7   It says:

8           "Deputies.  30 rounds fired from AR-15 in deadly

9           Florida home invasion."

10          So -- so it struck me from that -- and, again, you

11  know, most of these news articles seldom tell you how many

12  rounds are fired.  But here's one example.  Here's one perfect

13  example of folks who repelled a home invasion, and one of the

14  victims happened to get lucky enough to have an AR-15 and he

15  fired 30 rounds in repelling the invaders.

16          So it strikes me that perhaps the state is making a

17  determination that the value of a life of the victims is less

18  than the value of the life of the victims in mass shootings,

19  which is a -- a determination that I am not sure the state

20  should ever be entitled to make.

21          But, certainly, had these people not had this AR-15

22  and fired 30 rounds, who knows what might have happened to

23  them?

24          MR. ECHEVERRIA:  Well, that is -- your Honor, that is

25  absolutely not the position of the state.  The state would

 1    mourn the loss of any life, including the life of a -- of an

 2    individual trying to defend themselves in their home.

 3            The -- the fact of the matter -- the fact remains

 4    that even if somebody needs to fire 30 rounds in self-defense,

 5    the particular provisions being challenged in this case, in the

 6    assault weapons control act, do not limit the number of rounds

 7    that can be fired, with the exception of the fixed-magazine --

 8    fixed-magazine provisions.

 9            And otherwise, Californians -- if they so choose --

10    they can decide whether or not to arm themselves with an

11    AR-platform rifle in the state of California and --

12            THE COURT:  But -- but does it -- but -- and I'm not

13    trying to argue with you.  I'm just simply trying to figure out

14    the bases for the State's position.

15            So I argued -- or I asked you early on, does the

16    state believe that people should have accurate weapons or

17    less-accurate weapons?

18            And you conceded to me -- and I appreciate your doing

19    that -- that the state would prefer that people have accurate

20    weapons, and that makes sense.

21            And then I said to you, I said, "Well, with that sort

22    of speech in favor of people having the pistol grip -- not

23    necessarily the forward pistol grip, but certainly the pistol

24    grip behind the action.  And you said to me, "Well, but --

25    but -- but the reason why we have this ban is because what we

```
 1   want to do is we want to stop rapid firing."  Right?

 2           But this case -- in this instance, they fired 30

 3   rounds from the AR-15.  Which, you know, I'm -- I'm going to

 4   take a wild guess that that was rapid firing.  I mean,

 5   that's -- I know that's what I would do if I had to stop an

 6   intruder in my home.  I'm going to -- right?  So, in that case,

 7   you would also want that weapon to be accurate, wouldn't you?

 8           Because, if it wasn't, you might strike innocent

 9   people.  Or, as the state sometimes argues, the bullet might

10   penetrate -- this was a mobile home, by the way.  Might

11   penetrate the wall and perhaps strike someone next door.

12           So what's your response to that?

13           MR. ECHEVERRIA:  I -- so these are themes that I'm

14   sure are going to carry through the rest of the presentation

15   (indiscernible).

16           THE COURT REPORTER:  I'm sorry.  I couldn't hear.

17           THE COURT:  I'm sorry.  My court reporter can't hear

18   you because sometimes you lean --

19           MR. ECHEVERRIA:  Oh, I apologize.

20           THE COURT:  That's okay.  All right.  Go ahead.

21           MR. ECHEVERRIA:  Yeah.  So the -- the discussion that

22   we're having right now, your Honor, concerned themes that will

23   likely carry through the balance of my presentation to the

24   Court --

25           THE COURT:  Okay.
```

1        MR. ECHEVERRIA:  -- about the evidence in the case,

2   under the two-step framework.

3        The state is not trying to saddle Californians with

4   less accurate, less safe weapons.

5        The particular features that had been restricted on

6   particular types of firearms -- you can have a pistol grip with

7   a rimfire AR-15, in California.  The particular features that

8   are being restricted on certain types of firearms enable not

9   just accurate fire but accurate rapid fire.  There is no

10  evidence that when someone fires 30 rounds in self-defense --

11  you know, that that particular incident could last hours.  We

12  just don't know.

13        And I -- I would caution the Court -- I would caution

14  the Court to read too deeply into anecdotes where, you know,

15  it's possible that that individual could have used another

16  weapon and fired 30 rounds in self-defense just as effectively.

17        The state of California is trying to make a judgment

18  based on the available -- the best available evidence to

19  protect public safety without unduly jeopardizing the ability

20  of individuals to protect themselves with firearms.  It's a

21  balancing act.

22        And under intermediate scrutiny -- and we'll get into

23  this later on, I'm sure, your Honor.  But under intermediate

24  scrutiny, the courts do generally defer to the judgments of the

25  legislature if the burden on the core Second Amendment right is

1   not severe.

2           And we -- we respectfully submit -- I don't like to

3   use the word "respectfully" because people say that, when an

4   advocate uses the word "respectfully" before a judge, you're

5   not going to be respecting the judge.

6           THE COURT:  It means quite the opposite.

7           MR. ECHEVERRIA:  (Indiscernible).  So I apologize for

8   using that word.

9           THE COURT:  That's okay.

10          MR. ECHEVERRIA:  But we -- we believe that the

11  intermediate scrutiny does apply because the burden is minimal.

12  And -- and -- and the evidence of the effective assault weapons

13  in mass shootings is demonstrated by the evidence in this case.

14          Concerning the Bloomberg John Hopkins study, I -- I

15  don't believe that -- that that was admitted -- or has been

16  submitted as evidence in this case.  I don't believe that any

17  of the experts had an opportunity to opine on it.

18          I hate to ask the Court for information about that

19  exhibit.

20          Do you happen to know the date of the Bloomberg Johns

21  Hopkins study?

22          THE COURT:  Yeah.  And I just happened to run into

23  this.  It popped up in one of my news services.  That's how I

24  learned of it.

25          Let me see.  I can tell you.

1              It's not going to tell you a lot, by the way, just so
2    that you know.  Because it's actually mostly focused -- it was
3    originally focused on the issues of licensing for private sales
4    and -- let's see.  What else?  (Pause, referring.)  I don't
5    recall.

6              But, anyway, so here's the citation --
7              MR. ECHEVERRIA:  Do you know what the date was?
8              THE COURT:  Huh?
9              MR. ECHEVERRIA:  Do you know what the publication
10   date was for that --
11             THE COURT:  Well, I'll give you -- I'll give you a
12   link.
13             It's www.j, as in John,
14   hsph.edu/news/news-releases/2020/firearm-purchaser.
15             Look, I'm not relying on this, to be honest with you,
16   but I thought it was -- but I thought it was interesting.  I
17   mean, Hopkins.  Can you imagine?  I mean, it's a Bloomberg
18   funded -- I mean, if you can imagine that -- (laughing) they
19   probably will lose their funding after publishing this.  But
20   the fact is that they -- they have this sentence, which I
21   thought was really interesting, that said:
22                  "In addition, the study did not find an
23                  independent association between assault weapon
24                  bans and the incidence of fatal mass shootings
25                  after controlling for the effects of bans on

1          large-capacity magazines."

2          So for whatever it's worth, in this study they also

3    concluded that, you know -- and I can understand -- I can

4    certainly understand their finding that high-capacity

5    magazines, as anyone with any common sense could figure out,

6    yeah, sure, it -- it could lead to more fatalities and more

7    injuries, of course.

8          So anyway, I --

9          MR. ECHEVERRIA:  Yeah -- yeah.  I see your Honor's

10   point.

11         So, I mean, there are studies that are focused on

12   other aspects of gun safety regulation that will make

13   observations about other aspects of gun safety legislation.

14   But our -- our experts were focused on studying assault

15   weapons.

16         None of the plaintiffs' experts, including Dr. Lott,

17   accounted for this particular article during the course of this

18   case.  But, in any event, the evidence that we have presented

19   does show that large-capacity magazines are used in most --

20   most public mass shootings.  This is from Lucy Allen's study.

21   We -- we acknowledge that -- we acknowledge that the fatality

22   and injury counts, on average, are substantially higher when

23   large-capacity magazines are used.

24         But if your Honor looks at Lucy Allen's declaration,

25   which has been marked as Defendants' Exhibit A, she -- she

1    finds that even more individuals, on average, are killed and

2    injured when you have large-capacity magazines used in

3    conjunction with an assault weapon.  So there is an association

4    of even greater fatality counts and greater casualty counts

5    when assault weapons are used.

6            But we can get to that -- that data later, when we're

7    discussing Step 2.

8            I would also like to address a point made by the

9    Court that there may be a concern that the assault weapons

10   control act discriminates against certain individuals on the

11   basis of income.

12           And I -- I think if I -- I think the argument was as

13   follows.  That in a household with multiple people who may have

14   different body sizes, they may want to have just a single go-to

15   rifle with an adjustable stock to fit the body size of

16   different members of the family.  And that the assault weapons

17   control act somehow forces them to purchase multiple firearms

18   to fit each person.

19           Is that -- is that a fair characterization?

20           THE COURT:  Yeah, I think that's fair.  Yeah.

21           MR. ECHEVERRIA:  Okay.  So the assault weapons

22   control act only restricts that feature if it's a centerfire

23   rifle without a fixed magazine.  So you can have other types of

24   weapons with the adjustable stock.  The evidence in this case

25   shows that there are fixed stocks available at varying lengths.

1          Now, I understand that there may be other individuals

2     in the household who have a different body size, but I'm aware

3     of aftermarket products and accessories that can be acquired to

4     attach to the buttstock of a fixed stock, to extend the length

5     of that stock, to -- to assist with recoil and -- and accuracy.

6     So it's not --

7          THE COURT:  Well, that's interesting.  Let me

8     interrupt you because that's an interesting -- an interesting

9     point.

10          So let's see.  So let me ask you, first of all, the

11     following question.  There's no limit to the amount of

12     adjustment on that -- on that -- on that stock.  Right?  In

13     AWCA, there's no limit.

14          So, for example, you could have a stock that could be

15     shortened four inches or lengthened four inches.  Right?  That

16     would be banned, assuming certain other configurations, under

17     AWCA.  That's why I thought I mentioned that -- that I can

18     certainly see a distinction, for example, between a collapsible

19     stock and an adjustable stock in -- in that, at best, one might

20     make a difference, say, for example, for 4 inches.

21          And I can't, for the life of me, understand why, so

22     long as the length of the rifle when that stock is collapsed,

23     does not exceed the minimum length, why -- why the difference?

24     What's the point?  What's the -- what's the reason for not

25     having an adjustable stock?  Do you follow what I'm saying?

1          MR. ECHEVERRIA:  The reason for -- for having the

2    adjustable stock?  Because --

3          THE COURT:  Okay.  Let me -- let me see if I

4    understand.

5          So I understand under AWCA the minimum length of the

6    rifle can be 30 inches.  Is that correct?

7          MR. ECHEVERRIA:  Correct.

8          THE COURT:  And under federal law it's 26 inches.

9    Right?

10         MR. ECHEVERRIA:  That's correct.  The overall length

11   of the rifle, yes.

12         THE COURT:  Okay.  So answer this for me.

13         If you have a rifle -- say an AR-15 -- and you

14   collapse that stock to its shortest configuration, if that

15   stock -- if that rifle at that point in time, the measurement

16   was 30 inches, what difference does it make, for example, if

17   that stock is now lengthened another four inches?  So in other

18   words, the rifle, instead of being 30 inches, would not be 34

19   inches.  Why -- why does that make that -- create any kind of

20   security risk to anyone?

21         And the reason that came to mind is because you

22   mentioned something that I thought, yeah, this is an absolutely

23   superfluous feature.  Because if you buy -- if you have a --

24   a -- a rifle that has a 30-inch length but you can attach a --

25   something to it that will make it longer than 30 inches but yet

1   allow another shooter to be more comfortable when they shoot

2   that weapon, what difference does it make?  What's -- what's --

3   what's the safety concern?  What you're concerned about --

4   which, by the way, I understand is the potential for that

5   weapon to be hidden or concealed.  Just like the sawed-off

6   shotgun.  You know, that's how the sawed-off shotgun became --

7   right.  Because bank robbers would put it under their -- under

8   their raincoats, or whatever, and walk into a bank and --

9   right?  So I understand that.

10          But the collapsible stock, to me, seems like a non

11  sequitur, as long as the rifle itself -- barrel, stock -- is 30

12  inches, who cares whether the stock can be extended another

13  inch or 2 inches or 3 inches or 4 inches?

14          MR. ECHEVERRIA:  Well -- that's a judgment that was

15  made by the legislature.  If the court doesn't --

16          THE COURT:  Yeah, but the legislature can't make

17  judgments on a whim.  They can't be capricious and arbitrary.

18          MR. ECHEVERRIA:  I'm not saying that, your Honor.

19          THE COURT:  No, I know.  But I'm saying it.

20          MR. ECHEVERRIA:  Okay.

21          THE COURT:  So tell me why, explain to me what's the

22  rationale for saying that, if you have a rifle, that all --

23  that in the shortest configuration is 30 inches.  What

24  difference does it make if that rifle can be extended another

25  one inch, two inch, three inch, four inches in -- in the stock?

1          MR. ECHEVERRIA:  So there is an incremental effect on

2     the concealability of that weapon.  And the ATF has determined

3     that a telescoping stock is a military feature.  It is part of

4     a military configuration of the M16.

5          This is another point that I would like to make for

6     the Court.  I think it's a helpful way to think about this.

7     And I -- I'm hesitant to bring in the large-capacity magazine

8     case here because they are different cases with different

9     records.  And, frankly, I think this case is a much stronger

10    case for the state of California with respect to assault

11    weapons, given that large-capacity magazines were -- were

12    determined by the Ninth Circuit to be half of all magazines,

13    which is a lot.  You know, but we're -- that's on appeal.

14         But I recall your Honor asking the state, me in

15    particular, about why the number of ten?  What's the magic

16    number about ten?  Why ten rounds?

17         And ten rounds happen to be the number that was

18    settled upon.  The first LCM restriction from the state of New

19    Jersey was 15 rounds.  They moved to ten.

20         But the determination -- we -- what the state knew

21    was that more rounds, as you approach the standard military

22    configuration of 30 rounds for the M16 or an AR-15, the more

23    rounds you have, the more dangerous those magazines are and the

24    more dangers they pose to the public; particularly in mass

25    shootings or shootouts with law enforcement.  So it was kind of

1   an inductive process.

2          But with respect to the features that the state of

3   California has identified in the statute, it was a deductive

4   process.  The starting point was let's look at weapons that are

5   not protected by the Second Amendment.  I mean, this happened

6   before *Heller*.  But we know that machine guns, they can be

7   banned under -- consistent with the Second Amendment.  So we

8   start at that position.

9          And we were asking what features are on that weapon?

10  And there's substantial evidence in the record from the federal

11  government, the two ATF reports about the suitability and

12  importability of certain semiautomatic weapons; and the pistol

13  grip, flash suppressor, and the telescoping or folding stock

14  were identified as standard military configurations.  So that

15  is why that feature is enumerated.

16         And we have evidence in the record showing that there

17  is an incremental effect on the ability of somebody to smuggle

18  or to -- to use that weapon in a concealed way with a

19  telescoping stock.  Maybe there are multiple shooters, and the

20  telescoping stock would help in that respect.

21         But if the Court finds that there's no real effect of

22  the telescoping stock and there are all of these other

23  accessories that can be used, then there is no burden on the

24  Second Amendment right.  And -- and --

25         THE COURT:  Well, let me ask you.  That's

1   interesting.  But let me ask you this.

2          I mean, you -- okay.  So in the case of the

3   pregnant -- the pregnant mother, whose husband was being

4   beaten, and apparently the daughter was also about to be in

5   jeopardy.  Okay.  So they have -- they have an AR.  And I don't

6   know.  I can't tell you whether or not this was a fact in that

7   case.  But a lot of what the state is doing is essentially

8   speculating.  And so I think we can speculate both ways.  And

9   here's my speculation.

10          So you have -- so you have a mother and you have a

11  father and somebody's being beaten up.  If that weapon is more

12  suitable to that pregnant woman by either shortening or

13  lengthening that stock at the moment, at the moment when they

14  need it, why not provide that additional safety to the civilian

15  who is having to protect -- in this case, the woman's having to

16  protect her husband and her daughter?

17          I can understand -- as I said, I can certainly

18  understand the argument.  That it makes sense to -- although,

19  of course, we know that a pistol is perhaps the most

20  concealable weapon that there is.  Right?  We know that.  All

21  right.  Fine.

22          And we know as, for example, with the shooting of

23  Representative Giffords and my friend Judge Roll that the

24  shooter used a -- used a pistol with a magazine that held more

25  than ten rounds.  That's pretty -- that's pretty concealable,

1   and that's pretty deadly.  Right?  As it proved, it's pretty

2   deadly.

3           But, okay, fine.  I'll give -- I'll give the state

4   the idea -- or the -- or the point that, well, we don't want

5   people walking around being able to conceal AR-15s or AK-47s

6   under their jackets.  Fine.  No problem.  I'll grant you that.

7           Okay.  But what I don't understand is the overbreadth

8   in -- in -- in this -- in this definition of a collapsible

9   stock if the collapsible stock, at the time that it is

10  collapsed to its minimum length, if the overall length of that

11  rifle is 30 inches, tell me the -- the danger to the citizenry

12  by allowing that same stock to be able to be expanded to make

13  that rifle 31 inches, 32 inches 33 inches, 34 inches?  The fact

14  that that may be a feature that's featured in the M16 or the M4

15  or some other rifle is irrelevant.  That doesn't make any

16  difference, does it?  What really matters is is this a weapon

17  that is safe for the civilian to use and which, according to

18  the state, is relatively safe for the purposes that it's

19  attempting to accomplish?

20          I don't see -- and if -- if this pregnant woman, when

21  her husband's being beat up, has to go find whatever it is that

22  she has to put on this weapon in order to make the weapon fit

23  her -- I've never been pregnant, so I have no idea what

24  happens.  But my guess is that somehow your reach may be

25  affected by that.  As opposed to being able to simply click a

1    button and extend that stock, I don't see it.  I mean, I'm

2    missing -- I'm missing the safety factor.

3              MR. ECHEVERRIA:  Well, the safety factor is the

4    telescoping stock.  Maybe -- maybe the weapon, when it's fully

5    collapsed, is no -- no less than 30 inches in length.  But

6    maybe it's a centerfire rifle that can hold attachable

7    magazines.  That makes it incrementally more dangerous.

8              An individual can have a telescoping stock on a -- on

9    a shotgun, for example.  Even the AWCA allows that, provided it

10   doesn't also have a pistol grip beneath the action.

11   Telescoping stocks are not being prohibited here.  An

12   individual can have a telescoping stock.  The -- I mean, your

13   Honor, the state has evidence -- hard evidence of assault

14   weapon -- of, sorry.  The state has hard evidence that these

15   features are classified as military features.  That's the

16   starting point.  We also have evidence showing that when

17   assault weapons are used in mass shootings, more people are

18   killed and injured.

19             THE COURT:  But there's also evidence -- there's also

20   evidence that there are civilian features, as well.

21             MR. ECHEVERRIA:  But the -- they're really -- they're

22   really hypotheticals.

23             THE COURT:  No, no.  No, no, no, no.  In 44

24   jurisdictions throughout this country, every one of these

25   features is acceptable for use by civilians.

1        MR. ECHEVERRIA:  Sure.  But the -- the -- the stories

2   that are in the record, the anecdotes concerning the use of the

3   AR-15 or other weapons for self-defense, do not show that any

4   of the particular features were -- were, you know, factored in.

5   You know, there's no evidence that --

6        I hate to keep on bringing up this victim from the

7   exhibit, but I am not aware of there being a number of shots

8   reported.  You know, we could assume -- you know, what if there

9   were a hundred people breaking into their home?  What if it's

10  the zombie apocalypse?  I mean --

11       THE COURT:  In which case I would want a

12  hundred-round magazine?

13       MR. ECHEVERRIA:  In which case I would like a

14  howitzer and a bazooka.

15       THE COURT:  But you can't have a howitzer because

16  it's solely -- because a howitzer has only one use, and that's

17  for military purposes and that's --

18       MR. ECHEVERRIA:  Let me -- let me back up.  The

19  zombie apocalypse is a hypothetical that can never happen.

20       THE COURT:  Are you sure?

21       MR. ECHEVERRIA:  The fact of the matter is that the

22  state of California is trying to make -- make a judgment call.

23  Do we -- you know, when faced with evidence, hard evidence of

24  these types of weapons being used by criminals, particularly

25  mass shootings; particularly by people who are in gunfights,

1  protracted gunfights with our law enforcement, peace officers,

2  who risk their lives every day to enforce the law, serving

3  warrants --

4           THE COURT:  Do this -- do this for me.  Because

5  you -- you tell me that these anecdotes are not -- are not

6  useful.

7           So let me ask you this.  All of the evidence,

8  basically, that is before me, that I have seen so far, is

9  pretty much anecdotal.  It's only anecdotal, perhaps -- it may

10  be anecdotal, reported to a so-called expert, who then reports

11  on it, anecdotally, based on his or her experience.  Right?

12  All of this --

13           MR. ECHEVERRIA:  Well --

14           THE COURT:  All of this is anecdotal.  I mean, I have

15  yet to see one controlled study done by anyone.  I mean, I

16  guess the closest we would come to would be Mr. Kraut's

17  exhibition of the firing of the weapons.  But I have yet to

18  see --

19           So I was going to ask you this.  Can you cite me --

20  to me, Mr. Echeverria, one case in the record where a

21  collapsible stock weapon was used in a mass shooting?

22           MR. ECHEVERRIA:  I would have to -- so this is

23  another point I want to tell the Court.

24           All of the information that Lucy Allen based her

25  analysis on -- which I guess your Honor would characterize it

1    as 161 anecdotes.  These are 161 incidents of mass -- mass

2    public shootings.  In exhibit -- sorry, Appendix C to

3    Defendants' Exhibit A, which is her declaration, she provides

4    all of the information about the weapons that were used in

5    those shootings that she and her team were able to find.  We

6    didn't just take, you know, *Mother Jones* and the *Washington*

7    *Post* and the Citizens Crime Commission at their word.  There

8    was supplemental research to try to gather as much information

9    as we can from public reports about the weapons used.

10          I don't know, off the top of my head, whether some of

11   the weapons featured an adjustable stock.  I think it's fair to

12   say that it's very likely that the shooting occurred in a

13   jurisdiction where there are not assault weapon restrictions

14   like California's.  But all of the information is available for

15   the Court, if the Court wants to take a deep dive into the

16   shootings.

17          THE COURT:  Well --

18          MR. ECHEVERRIA:  But we think the -- but -- so our

19   view is that Lucy Allen's evidence and the other evidence that

20   we have, including the legislative evidence relied on by the

21   five circuit courts that have uniformly upheld very similar

22   restrictions, those are not just anecdotes.  These are -- these

23   are studies of a -- a much larger data set than seven news

24   articles.

25          I am not saying that the AR-15 has never been used in

1    self-defense.  It apparently has.  But individuals in

2    California can arm themselves with the AR-15.  They can arm

3    themselves with the AR-15 with any of the features that they

4    like if it has a fixed magazine or if it's a rimfire.  There

5    are a lot of options for California citizens.

6         And I really just need to emphasize that the state is

7    not prohibiting individuals from possessing firearms that are

8    effective for self-defense.

9         THE COURT:  But, wait a minute.  So -- and I'm sorry.

10   I know I interrupted you.  But you asked -- you say things that

11   causes me to -- to ask questions.

12        But you can't have a fixed magazine that has more

13   than ten rounds.  Right?

14        MR. ECHEVERRIA:  Sure.

15        THE COURT:  Okay.  So getting back to this Florida

16   case where these people fired 30 rounds --

17        MR. ECHEVERRIA:  Was it -- I didn't see 30 rounds

18   fired in that case, your Honor.  I apologize.

19        THE COURT:  Oh, I'm sorry.  I thought I read it to

20   you.  30 rounds fired from AR-15 in deadly Florida home

21   invasion.

22        I think you're talking about -- I think you were

23   looking at the Florida -- at the woman -- the pregnant woman

24   article.  And you're right --

25        MR. ECHEVERRIA:  I'm looking at the exhibit.  Yeah.

1           THE COURT:  But the pregnant woman article does

2    not -- which, of course, is part of the problem.  Is that the

3    media seldom will tell us the type of weapon, the number of

4    rounds fired, the amount of time.  But they will certainly tell

5    us if there were 30 bodies found laying on the ground.  So

6    that's -- that's -- that's part of the problem with a lot of

7    this anecdotal evidence.

8           But here's -- here's -- here's a perfect case.  So

9    they have a picture of four -- four of the guys who broke into

10   this -- into this -- into this home.

11          And the people that were there, one guy grabs his

12   AR-15, and he fires 30 rounds.

13          Now, if he had only had a ten-round magazine -- if

14   you're -- he would have to -- and it was a fixed magazine.  He

15   would have to find some way to break that weapon down, reload

16   it, hopefully -- hopefully do a lot of praying, keep his -- his

17   fingers crossed and hope to heck that by firing the first ten

18   rounds, he was either able to hit these four guys or able to

19   drive them away.  And if he wasn't, then he would have to

20   reload the magazine again, and he would have to do this three

21   times in order to fire those 30 rounds.

22          Where does the state -- I mean, the arrogance of the

23   state is -- is incredible to say to these people, listen, you

24   only get ten rounds.  And if you can't deter the people that

25   are coming to rape you, rob you, or murder you, too bad, so

1    sad.  You have to surrender yourself, be killed, be raped, be

2    robbed.  And when it's all over, we, the state, are going to

3    investigate and we're going to hopefully find the perpetrator.

4    And then we will deal with them.  But, in the meantime, you're

5    dead, or you're raped, or you're robbed.

6         And so, you know, my -- my thinking is -- what I was

7    trying to get at and what I was trying to ask you is simply

8    this.  Is there an article?  Is there something that I could

9    look to that says that an AR-15 or an AK-platform rifle is in

10   fact more deadly, more dangerous with a stock that will

11   collapse or will expand to 31, 32, 33, 34 inches?  Is there

12   evidence in the record of that?

13        Because I'm willing to bet you dollars to donuts that

14   there's not.  Why?  Because the weapon itself is not more

15   deadly.  It is not.  The weapon is as deadly as it can be,

16   regardless of the length of the stock.  It doesn't make it more

17   deadly.  It may make it more portable if it's less than 30

18   inches.

19        But -- but the point that you can -- but expanding

20   that stock to 31, 32, 33, 34 inches, that doesn't affect the

21   lethality of that weapon.  Which, by the way -- as we all

22   know -- that's not a test.  I think *Heller* specifically talked

23   about lethality is not -- is not a test

24        But you see -- I don't want to argue with you.  I'm

25   sorry.  But it just seems to me that this is -- you see, I can

1   understand certain things in -- in this law.  And I can say

2   even though I agree that a 30 -- a -- a rifle that's 30 inches

3   long is much less maneuverable than if somebody broke into my

4   bedroom and I had to break out a 26-inch rifle as opposed to a

5   30-inch rifle -- with a 30-inch rifle, I may very well hit my

6   head -- my wife's head with the barrel, knock her out, and give

7   her a concussion; whereas I wouldn't with a 26-inch barrel.

8   But, to me, it's -- you know, it's a "so what?"  Okay.  26

9   versus 30 inches.  You know?  But the -- the collapsible stock,

10  as long as the overall length of the -- of the rifle remains no

11  less than 30 inches; the pistol grip, so long as the pistol

12  grip provides greater accuracy when you're table to fire that

13  weapon, so that you don't hit an innocent bystander or hit

14  someone outside -- those two things to me seem -- it just seems

15  arbitrary and capricious.

16          MR. ECHEVERRIA:  Well, the state has presented

17  evidence that all of these features have been identified for --

18  going back decades, by the -- by the ATF as military features.

19  They are the features on the M16.

20          The particular -- you know, whether your Honor is

21  going to find, on Lucy Allen's list of 161 public mass

22  shootings, a shooting involving a weapon with just a

23  telescoping stock; and whether we can determine that that

24  adjustable stock caused any more people being killed, I don't

25  think so.  The goal -- the goal being promoted by the

1   adjustable stock restriction and also the flash suppressor

2   restriction is that these weapons are more concealable.  Not

3   necessarily that they're going to cause more fatalities.  It's

4   possible.  But the fact of the matter is, is there is evidence

5   in the record that these features do make the weapons

6   incrementally more dangerous, especially when those weapons are

7   fired rapidly, which is not consistent with a lawful use.

8           I do know that there -- there is one article that the

9   Court has been referencing about 30 rounds fired.  The 30

10  rounds -- I will note that there was -- in that case it was a

11  home invasion, and there were -- many of the criminals were

12  firing rounds.  And there was an estimate by the victim, saying

13  how many rounds he fired.  The number of rounds is really

14  beside the fact for purposes of this case.

15          Individuals can arm themselves with shotguns, other

16  rifles, handguns to defend themselves in their home.  The state

17  of California is not -- in restricting particular assault

18  weapon configurations is not acting arrogantly.  It is acting

19  consistent with the way that the federal government acted in

20  1994, identifying many of the same features, applying a

21  single-feature test to try to target those features that make

22  the weapons incrementally more dangerous in mass shooter

23  situations or in gunfights against law enforcement.

24          That's -- I'm sure that we're going to be talking

25  about these issues as we go along.  But unless the Court has

 1   any -- anything further to discuss on the particular point --

 2          Okay.  So the other -- another -- I haven't even

 3   gotten into my -- into the nuts and bolts of my outline.  I'm

 4   trying my best, your Honor.

 5          THE COURT:  It's okay.

 6          MR. ECHEVERRIA:  Another topic that I planned on

 7   addressing up front -- and that your Honor raised again

 8   today -- is the different definitions that we have of assault

 9   weapons, and the different definitions that we have of mass

10   shootings.  The fact that there are different definitions does

11   not undermine the constitutionality of this law, of the assault

12   weapons control act.  And it -- it shouldn't muddy the waters

13   here.

14          THE COURT:  But it does make a difference, doesn't

15   it?

16          I mean, you will agree that if we define mass

17   shootings as, say, three or more, four or more, five or more,

18   six or more, it changes the database that is used in arriving

19   at our conclusion.  Right?

20          MR. ECHEVERRIA:  Absolutely.  Absolutely.

21          THE COURT:  And the same for -- the same for the

22   features of the weapon.  Because -- I don't know.  Maybe you do

23   know.  But I don't know if the features that California has

24   prohibited are identical to the features that were prohibited

25   under the -- under the federal ban.  I don't know that they're

1   identical.  Are they?

2          MR. ECHEVERRIA:  There are -- there is substantial

3   overlap.

4          If the Court looks at Exhibit J, pages DEF432 to 433,

5   there is a list under features that were prohibited under the

6   federal law.

7          THE COURT:  So what -- what has California added

8   that -- that federal ban did not have?

9          MR. ECHEVERRIA:  Added?  I would have to -- I -- I

10  was planning on reading through them.  I don't have a

11  side-by-side.

12         THE COURT:  That's okay.  I'll find it.

13         MR. ECHEVERRIA:  But I know that -- I know that

14  California law did add the -- the flare launcher.  I don't

15  believe that was a feature identified in the federal statute.

16         The federal statute identified a bayonet lug, or

17  bayonet mount, which is not present in the California Assault

18  Weapons Control Act.

19         But it -- at Exhibit J, page 432 to 433, the federal

20  law defines a semiautomatic rifle with attachable magazine as

21  an assault weapon if it has two qualifying features:  A pistol

22  grip beneath the action, a folding or telescoping stock, a

23  bayonet mount, a flash suppressor, or a grenade launcher.

24         So it appears that the federal statute does not have

25  a forward pistol grip listed, which is something that

1    California did add.

2            THE COURT:  So in the federal ban -- let me -- so in

3    the federal ban, you could use a semiautomatic weapon,

4    centerfire rifle that had a pistol grip, had none of the other

5    features, it would not be prohibited by the federal ban?

6            MR. ECHEVERRIA:  That's right.  It was -- it was --

7            THE COURT:  Why can't California do that?

8            MR. ECHEVERRIA:  Because that wasn't effective.  Or

9    it wasn't as effective.  I don't want to say it wasn't

10   effective.  You got me to trip up, your Honor.

11           THE COURT:  (Laughing.)

12           MR. ECHEVERRIA:  To the extent that people claim the

13   federal assault weapons ban was not effective, we dispute that

14   point.  That was not the finding of Dr. Koper in his 2004

15   study.  He said that more time was needed.  And he has

16   concluded that it was effective, after the fact, through

17   further research and more data.

18           But the federal assault weapons ban was not as

19   encompassing as California's assault weapons ban, which allowed

20   individuals to circumvent the restrictions much more easily

21   than they can under California's law, which has a

22   single-feature test for everything except for semiautomatic

23   shotguns.  There's still that two-feature test, if they have a

24   telescoping stock and pistol grip.

25           And then regarding semiautomatic pistols, a

1   semiautomatic pistol with a detachable magazine was defined

2   under the federal assault weapons ban as an assault weapon if

3   it had two of the following features:  A magazine that -- that

4   is loaded outside of the grip, consistent with California; a

5   threaded barrel capable of accepting a barrel extender, a flash

6   suppresser, a forward grip, or silencer, and a barrel shroud.

7           And then regarding a semiautomatic shotgun, there's a

8   two-feature test under federal law.  It would have to have a

9   folding or telescoping stock, pistol grip, fixed magazine of

10  holding more than five rounds, or the ability to -- to accept a

11  detachable magazine.

12          So those are the features that the federal government

13  listed.  And the federal government was, in many ways, building

14  off of what California started when California came up with the

15  make-and-model list in the wake of the Stockton shooting in

16  1989.

17          And then California, in 2000, followed the lead of

18  the federal government.  This is how federalism, frankly, is

19  supposed to operate, your Honor.  This is federalism at work,

20  when the state of California is leading the way and also being

21  informed by experiences in other jurisdictions.

22          And we came up with our own list of definitions, most

23  of which were consistent with the federal definition.  But, as

24  you can see, there's some variation.  And variation is totally

25  acceptable under the Second Amendment.  Variation between the

1    states that currently prohibit assault weapons is permissible

2    under the Second Amendment.

3           In *McDonald*, the Supreme Court made clear in the

4    plurality opinion that experimentation will continue under

5    *Heller*.  *Heller* does not require one-size-fits-all safety gun

6    laws throughout the country.  There are minimal constitutional

7    standards that have to be met, and the state of California has

8    met those standards here.

9           Regarding another -- another definitional issue, if I

10   may, is the different definitions of mass shootings.

11          Okay.  One -- one more thing about the definition of

12   assault weapon.  Even if a weapon is classified as an assault

13   weapon under federal law -- so let's say during the -- during

14   the federal assault weapons ban, there is a weapon used in a

15   mass shooting that was an assault weapon because it had two or

16   more of the features.  That definitional issue isn't a problem

17   for the assault weapons control act because our statute has a

18   single-feature test; it is generally more expansive.  So a

19   weapon that qualifies as an assault weapon under federal law

20   would in -- all likely, also qualify as a prohibited

21   configuration under California's law.

22          THE COURT:  Wait.  But that confuses me.  That

23   confuses me.  Let me tell you why.  Because I think what I

24   understood you to say, that under the federal law you could

25   have an AR-15, AK-platform rifle.  It could have a pistol grip.

1   And that would be sufficient to -- that would not be banned

2   under the federal --

3            MR. ECHEVERRIA:   Under the definitions that we laid

4   out in the features list.  If it only has one feature, then it

5   would not qualify as an assault weapon.

6            It was a -- it was a problem with the way that the

7   federal statute was designed.  And Dr. Koper, in the 2004

8   study, noted how several of the exceptions and the loopholes

9   built into the federal law made it difficult to see the true

10  effects of the assault weapons ban by the time the ban was

11  allowed to lapse.  That's why Dr. Koper wrote that it was

12  premature to make any judgments on the efficacy of the federal

13  assault weapons ban, and it's with why California improved that

14  regime by having a single-feature test.

15           Regarding the definition of mass shootings, mass

16  public shootings, active shooters, the differences in the

17  definitions -- while sometimes it can tend to muddy the waters,

18  it shouldn't muddy the water.  And it helps the state's case.

19           The fact that there are different ways of defining

20  these mass casualty events and the fact that this -- that the

21  data is consistent no matter how you define it -- of a shooting

22  three or more, a shooting of four or more in a public case, a

23  shooting of six or more anywhere -- which is what Klarevas

24  uses -- any way you define these mass casualty events, the data

25  is consistent in showing that assault weapons are associated

1   with more people being killed and injured.  That helps our

2   case.

3          But I would like to walk through, briefly, the

4   definition.  Just so we know when we're talking about a public

5   mass shooting or a mass shooting, we -- we are using the same

6   terms.  I think it's helpful to kind of set the definitions

7   straight.

8          Lucy Allen discloses, in Plaintiffs' Exhibit A, what

9   criteria she used in classifying a -- or -- or in identifying

10  shootings to count on her list of 161 public mass shootings.

11         And she borrowed from the list of mass shootings

12  identified by *Mother Jones* and the Citizens Crime Commission in

13  identifying those shootings.  In -- in *Rupp versus Becerra* and

14  in *Duncan versus Becerra*, she used a similar methodology for

15  identifying a mass shooting.

16         In this case, we took -- we took to heart some of the

17  concerns that your Honor expressed about *Mother Jones*.  We --

18  we don't share those concerns, but we -- we made sure that we

19  provided the Court with as robust a data set as we could.

20         So Lucy Allen and her team at NERA found two

21  additional --

22         THE COURT:  What is NERA?  What is that?  What is

23  NERA?

24         MR. ECHEVERRIA:  National Economic Research

25  Consultants.  It's a consulting organization that Lucy Allen is

1  employed by.  And it's -- so they have different teams that

2  provide different consulting services, and Lucy Allen is on one

3  of those teams.

4       But, anyway, so -- when they were -- when they were

5  trying to identify mass shootings or public mass shootings this

6  time, they looked at four sources:  Admin@theviolenceproject

7  listed public mass shootings and the lists identified by the

8  *Washington Post*.

9       Both of those sources postdated her work on *Rupp*

10  *versus Becerra*, which was the other assault weapons control act

11  case from the Central District.  That's now before the

12  (indiscernible) circuit.  So we have an even more robust set of

13  data.

14       I really found it puzzling -- and I assume it was

15  just a -- an accidental misstatement.  But the -- the data set

16  that Lucy Allen has presented in this case is larger than the

17  data set in *Rupp*.

18       I believe I heard plaintiffs' counsel state that the

19  data set is smaller in this case.  The *Rupp* case involved 109

20  public mass shootings, and this case has 161 public mass

21  shootings; even though it only has -- had a year or more in

22  addition to analyze.

23       And part of the reason why the number increased so

24  much for this case was that Lucy Allen was able to identify

25  additional shootings that satisfy the criteria she set out,

1    that she disclosed, to add to the list.

2            So, trying to plug in all of the gaps, in Plaintiff's

3    Exhibit A, Lucy Allen also explained that the shootings that

4    were added that were found through The Violence Project and the

5    *Washington Post* generally had fewer casualties, fewer

6    fatalities.  Kind of like the issue that your Honor was

7    discussing.  That, you know, the -- the news is less likely to

8    pick up a story that doesn't have 30 bodies.  You know, less

9    sensational incidents are harder to pick up in the media.

10   But -- but she was able to find additional shootings.  Same

11   result:  More people killed, more people injured.

12           Professor Klarevas, he looked at 103 mass -- mass

13   shootings that he -- there are particular kinds of mass

14   shootings that he calls gun massacres.  These are mass

15   shootings that occur anywhere:  In a private residence.  Could

16   be related to gang violence.  Could be a bank robbery.  Could

17   be an act of terrorism like the Fort Hood shooting.  And these

18   gun massacres involved six or more people killed.

19           In either Lucy Allen's data set and Klarevas's data

20   set, neither of them include the perpetrator encountered in the

21   house.  The perpetrator is excluded.

22           Additionally, Lucy Allen's data set is consistent at

23   a four-or-more-fatality threshold.  Because I -- I recall that

24   your Honor had some concerns that *Mother Jones* changed its

25   definition in 2013 to a three-or-more count.  So Lucy Allen's

 1    report in this case is consistent throughout the entire time

 2    period study.

 3              And we were -- and we're clear.  When we're talking

 4    about public mass shootings or mass shootings, we're very clear

 5    about what we're referring to, and the experts are very clear

 6    about what their definitions are.

 7              Another definition that's been offered in this case

 8    came from one of plaintiffs' experts, and that's John Lott.

 9    And he -- he claimed to apply a definition that was an official

10    FBI definition for mass public shooting.

11              And I would like to -- I would like to share my

12    screen with the Court, if I may, to share an exhibit with you.

13              (Pause, referring.)

14              MR. ECHEVERRIA:  Can your Honor see this document on

15    the screen?

16              THE COURT:  I can.

17              MR. ECHEVERRIA:  Great.  This document has been

18    marked by plaintiffs as Plaintiffs' Exhibit 32.  And this is

19    the declaration of John Lott in support of plaintiffs'

20    memorandum in opposition to defendants' *Daubert* motion.

21              This was the first time in this case that John Lott

22    disclosed to the Court and to the defendants what particular

23    definition his organization, CPRC, was using to identify the

24    incidents that he analyzed.

25              There was some confusion because his initial

1    declaration didn't explain the criteria.  Didn't explain the

2    definition.  And that's why when we had our expert, Professor

3    Klarevas, look at the data, you know, Professor Klarevas

4    noticed instantaneously that John Lott had misclassified a lot

5    of Klarevas's own data from *Rampage Nation*.  There were also

6    some errors concerning *Mother Jones*.  But it was kind of a

7    black box, how John Lott was deciding to include or exclude

8    shootings.

9         For example, the Fort Hood shooting was not

10   considered by John Lott, but it was a shooting considered by

11   Professor Klarevas.  And we were wondering why.  And that's why

12   Professor Klarevas's corrected declaration in support of our

13   *Daubert* motion showed there was such a high error rate for the

14   CPRC data.

15        It's not that high, we now know, because we know the

16   definition John Lott was using.  There still were errors in

17   CPRC's data set, but let's take a look at the definition that

18   the CPRC was claiming to use.

19        On page 14 of Plaintiffs' Exhibit 32, at paragraph

20   35, John Lott states:  "CPRC used, quote, the traditional FBI

21   definition of mass public shootings in all such posts."

22        And then there are three bullet points kind of

23   further explaining this traditional FBI definition.  He goes on

24   in the first bullet to say:

25        "The official FBI definition of active, as well as

1          public" -- I'm sorry.  "As well as mass public

2          shootings excludes shootings that resulted from

3          gang or drug violence or that occurred in

4          commission of another crime such as robbery."

5          And here John Lott cites a report by Blair and

6    Schweit, dated 2014.  In footnote 14, your Honor can see that

7    John Lott is citing to a report of the FBI entitled "A study of

8    active shooter incidents, 2000 to 2013."

9          This is -- this is generally referred to as the 2014

10   active shooter report.  It was a report about active shooter

11   incidents.

12         I would like to show your Honor this report which has

13   been marked as Defendants' Exhibit DS.  This is the -- a study

14   of active shooter incidents in the United States between 2000

15   and 2013.  On page 5, which is marked DEF3462, I have

16   highlighted a portion of this report.  The report states:

17         "This is not a study of mass killings or mass

18          shootings but, rather, a study of a specific type

19          of shooting situation law enforcement and the

20          public may face."

21         So, here, the report is clearly stating that it is

22   not providing a definition of a mass shooting or a mass public

23   shooting.  It is providing a definition of an active shooter

24   incident.

25         Going back to Exhibit 32, John Lott claims that the

1    traditional FBI definition from that report that he's applying

2    excludes shootings that resulted from gang or drug violence or

3    that occurred in the commission of another crime, such as

4    robbery.

5            We go back to the report.  We can go to page 10.

6    Page 10, marked DEF3467And I have -- I have created call-outs

7    for the Court, so that the Court can read it more easily,

8    hopefully.

9            But, here, I've called out the portion that says:

10            "Of note, male shooters also acted violently

11            against women with whom they had or once had a

12            romantic relationship."

13           This is discussing incidents of domestic violence.

14   So -- so the FBI definition of an active shooter does include

15   active shootings that may have been conducted in connection

16   with another crime.

17           Another type of crime that is included in the FBI

18   definition of an active shooting is terrorism.

19           Here on page 32, page DEF3489, I have a call-out.

20   The Fort Hood soldier -- the Fort Hood shooting which happened

21   on November 5th, 2009, was an act of terrorism; a crime that

22   happened to involve, also, an active shooter incident that

23   satisfied the FBI's definition of an active shooter.

24           Another example of -- of a type of incident that John

25   Lott and the CPRC excluded from its data set, even though it's

1    purporting to apply the FBI's definition, the Fort Hood

2    shooting is not included in the CPRC data set.  And it's not

3    clear why because he was claiming to apply the FBI definition,

4    at least, of active shooters.  There is no FBI definition of a

5    mass public shooting, like John Lott says.

6              And I would note that another part of the definition,

7    going back to Plaintiffs' Exhibit 32, John Lott testifies, in

8    paragraph 35, that the FBI also includes only shootings in

9    public places.  And it goes on to say that residents --

10             THE COURT:  Wait, wait, wait.  Let me stop you for

11   just a minute.

12             MR. ECHEVERRIA:  Sorry, your Honor.

13             THE COURT:  Go back to the report and show me where

14   they talked about robberies.

15             MR. ECHEVERRIA:  Well, I -- I am not accounting for

16   every single aspect of what John Lott was saying.  I was just

17   pointing out things that he didn't include that were included,

18   if that makes sense.

19             THE COURT:  I see.

20             MR. ECHEVERRIA:  There were aspects of the definition

21   that he did apply.

22             THE COURT:  Yeah.  Because -- go back to that -- to

23   his bullet points.

24             MR. ECHEVERRIA:  Okay.

25             THE COURT:  So --

1          MR. ECHEVERRIA:  Yes.

2          THE COURT:  So he's right -- let me make sure I

3    understand.  So he's right in that the report does not address

4    gang or drug violence.  And he's right to the extent that the

5    report does not address robbery.  He's wrong when he says that

6    it does not include shootings that occur during the commission

7    of any other crime, such as domestic violence or terrorist

8    attacks.

9          MR. ECHEVERRIA:  And the biggest mistake is that he's

10   wrong that the report provides an official FBI definition of a

11   mass public shooting.  I mean, that's the biggest, most glaring

12   error in this statement.

13          That -- see, we -- we don't want the Court to think

14   that there is some official FBI definition of a mass public

15   shooting that the state is not applying.  If there were an

16   official definition, we would apply that.  We --

17          THE COURT:  Yeah, I'm not -- that doesn't -- you

18   know, an official definition of the FBI doesn't -- doesn't do

19   anything for me.

20          What has troubled me is that here we have, for

21   example, a clear example of what I was talking about.  In some

22   cases they talk about mass shootings.  In some cases they talk

23   about mass public shootings.  In other cases they talk about

24   active shootings.

25          And so try to figure out who's talking about what and

1    trying to make -- create some consistency was difficult for me.

2    But I -- but I'm glad that you've pointed out what you pointed

3    out.  It's helpful.

4              MR. ECHEVERRIA:  Yeah, I just -- I want the Court to

5    understand that if there is confusion about the use of mass

6    public shooting and different criteria, the confusion is really

7    being generated by -- by John Lott and the type of bespoke

8    definition that he's providing here in Exhibit 32.

9              An additional inconsistency with the way he applied

10   the definition is in the -- the private residences point.  He

11   states, in the second bullet point, that the FBI only -- also

12   includes only shootings in public places.

13             And if I can address -- or direct your Honor's

14   attention to page 19, marked as DEF3476 of defendants'

15   exhibit -- I'm blanking on the number.

16             THE COURT:  Yeah, I see what -- what you're referring

17   to.  The seven incidents that occurred solely at a residence.

18   That's what you were getting at?

19             MR. ECHEVERRIA:  Right.  Right.

20             THE COURT:  I see it.

21             MR. ECHEVERRIA:  That first sentence is a blatant

22   contradiction.

23             It says that the FBI did include shootings that

24   occurred solely at a residence.

25             THE COURT:  Yeah, I got it.

1          MR. ECHEVERRIA:  It's really puzzling.  Honestly,

2    your Honor, it's puzzling how -- how John Lott purported to

3    apply a traditional FBI definition that the FBI doesn't

4    provide.

5          And even under that definition, he didn't accurately

6    apply it -- or accurately convey to the Court what that

7    definition is with respect to active shooters.

8          I would also like to note that at Exhibit DT --

9    Defendants' Exhibit DT at page DEF3576, Pete Blair, who's the

10   author of the FBI active shooter study cited by Lott, has

11   written an article, quote -- titled, quote, "Misrepresenting

12   the FBI active shooter report," colon, "a response to Lott."

13   The author of the 2004 active shooter study has been battling

14   with John Lott in public about how John Lott is conflating the

15   FBI's definition of an active shooter incident with a mass

16   shooting or a mass public shooting.  They're different things.

17          So I just think it's important that when we're

18   talking about mass public shootings or mass shootings, we

19   disclose what the criteria are being used to include and

20   exclude incidents.  Our experts have been fully transparent

21   about that criteria.  I would note that I have -- I'm not aware

22   of the plaintiffs identifying a single -- a single inaccurately

23   coded or inaccurately included shooting that Ms. Allen included

24   or that Professor Klarevas included.  They raise questions that

25   maybe Lucy Allen may have misquoted, whether an assault weapon

1    was used, without any evidence that she misquoted anything.

2    Or -- we are consistently applying the definitions that we have

3    conveyed to the Court.  And the plaintiffs are confusing the

4    matter with this made-up definition from John Lott that is

5    falsely being attributed to the FBI.

6            Unless your Honor has any other questions -- and I do

7    want to address any confusions that the Court has, going

8    forward -- I would like to -- to move on to the two-step

9    analysis and to -- to walk through how the evidence shows that

10   the AWCA is constitutional.  It's constitutional under both

11   steps but we -- we think, at a minimum, it -- it's

12   constitutional at the second step of the analysis under

13   intermediate scrutiny.

14           THE COURT:  Go ahead.

15           MR. ECHEVERRIA:  So at step one -- so step one is a

16   two-step framework adopted by the Ninth Circuit.  Asks whether

17   the regulated conduct is protected by the Second Amendment or

18   whether the statute that has been challenged burdens the Second

19   Amendment.

20           And there are many reasons why the AWCA does not

21   burden the Second Amendment.  Taking the dangerous and unusual

22   analysis first, this has been the focus of much of plaintiffs'

23   evidence.  Plaintiffs' evidence has been focused on whether the

24   restricted weapons and configurations are in common use.

25           And the Supreme Court has not established any

1  particular numerical threshold that has to be met.  Justice

2  Alito's concurrence in *Caetano* was not adopted by the

3  (indiscernible) opinion.  It has not been adopted as the law,

4  let alone in the Ninth Circuit.

5       THE COURT:  Has it been criticized?

6       MR. ECHEVERRIA:  It hasn't been adopted.

7       THE COURT:  That wasn't my question.

8       Has it been criticized?

9       MR. ECHEVERRIA:  I don't know, your Honor.  I can do

10  some additional research on that for you.  I didn't dwell on

11  the concurrence because it's not the law.

12       In addition, there is -- there is this -- this report

13  that was submitted by the plaintiffs from a -- Professor

14  Mocsary.  I just want to preserve, for the record, our

15  objection to the admissibility of Professor Mocsary's opinion

16  with respect to the common use legal analysis and Justice

17  Alito's concurrence in *Caetano*.

18       THE COURT:  But you -- you could preserve it.  But I

19  think I told you, I'm not paying any attention to that.  So --

20       MR. ECHEVERRIA:  Yeah, I just -- well, I recall your

21  Honor said that you would be able to tell what's admissible and

22  inadmissible testimony.  I just wanted to --

23       THE COURT:  Okay.  All right.

24       MR. ECHEVERRIA:  -- assert for the record that we

25  believe that this portion of the declaration is clearly

1   inadmissible legal testimony.

2          THE COURT:  I think -- I don't know.  I'm not the

3   brightest light bulb in the building, but I think I can

4   determine what -- what the law is, or at least as I interpret

5   the law.  And I don't need a lawyer, I don't need Professor

6   Donahue, I don't need Mr. Mocsary to tell me what the law is.

7   I -- I will -- I will muddle my way through it the best that I

8   can.

9          MR. ECHEVERRIA:  I appreciate that, your Honor.

10          The -- but what we do know, from a logical

11   perspective -- and, frankly, the plaintiffs admit as much -- is

12   that numbers -- numbers is not the dispositive (indiscernible).

13   We can't just count up how many -- how many weapons have these

14   configurations and determine that that satisfies or doesn't

15   satisfy the common use test necessarily.

16          A common use test based solely on numbers would be

17   circular, as the -- as the Fourth Circuit observed in *Kolbe* and

18   the First Circuit in *Mormon*.  And the plaintiffs agree that the

19   common use inquiry cannot turn on the fact-bound sales numbers

20   of particular makes and models or even specific configurations.

21   That's from paragraph 31 of plaintiffs' pretrial proposed

22   findings of fact and conclusions of law

23          We agree that numbers are not the end of the inquiry.

24   But we do want to address the numbers because I know that the

25   Court is curious about them and concerned about them.  And we

1  endeavored to provide to the Court the numbers that the state

2  of California has on these types of weapons.  And those numbers

3  were presented at Defendants' Exhibit CZ.

4       Exhibit CZ is a declaration -- the Glover declaration

5  that provides the registration figures for the state of

6  California.  In Exhibit CZ, Ms. Glover reports that there are

7  roughly 90,000 individuals -- sorry.  90,886 individuals, as of

8  December 3rd, 2020, with registered assault weapons.  And that

9  would be a registered assault weapon, assault rifle, assault

10 pistol, or assault shotgun.  And in paragraph 7 of Exhibit CZ,

11 Ms. Glover reports the breakdown of those registered weapons,

12 excluding weapons registered by law enforcement officers

13 because the Second Amendment common use test is about common

14 use among civilians.

15      So paragraph 7 reports that there are approximately

16 185,569 assault weapons currently registered with the

17 California Department of Justice.  And the breakdown of that is

18 that there was -- that there were 165,804 rifles, 16,306

19 pistols, and 3,459 shotguns.

20      So breaking that down, of the weapons that were

21 registered with the state of California since the inception of

22 the assault weapons control act during the different windows

23 for registration, assault pistols comprise 8.7 percent of all

24 registered assault weapons.  And assault shotguns comprised 1.7

25 percent of all registered assault weapons.  So with respect to

1    pistols and shotguns, they are a sheer minority of registered

2    assault weapons, which I think should impact the Court's

3    assessment of whether pistols and shotguns that qualify as

4    assault weapons are in common use as the plaintiffs indicate --

5              THE COURT:  But -- but don't we have to look at

6    national?

7              MR. ECHEVERRIA:  We do.  It is --

8              THE COURT:  Yeah.

9              MR. ECHEVERRIA:  That's another point of

10   clarification.

11             The state is not trying to cabin the Court's inquiry

12   to just California.  Any data that we present, we are trying to

13   provide national data.  So Lucy Allen looked at all mass

14   shootings nationwide.  Klarevas, mass shootings all over the

15   country.  We are trying to look at nationwide trends.  Even for

16   common use, we do not -- we concede that the common use

17   analysis is a national analysis.  But we are providing the

18   information that the state of California has -- has in its

19   possession that hopefully can help the Court determine what the

20   common -- how the common use test should apply nationwide.

21             But we don't have registration numbers from other

22   states.  We don't have that kind of information.  We have

23   estimates --

24             THE COURT:  Let me interrupt you there.

25             Since you had Ms. Allen do all of this other research

1    for you, why -- why -- why could she not compile this -- this

2    important number?  Why could she not research --

3            MR. ECHEVERRIA:  So we think there are other reasons

4    why, at step one, the assault weapons control act is

5    constitutional.  So it wasn't a priority for us.

6            Number two, we only had about a month to prepare

7    Ms. Allen's declaration in opposition to the preliminary

8    injunction motion.  And we have a -- you know, I -- we have

9    limited resources.  We are -- we are the state of California.

10    But we are defending California law with California tax money,

11    and we are --

12            THE COURT:  Okay.

13            MR. ECHEVERRIA:  -- we're trying to be judicious in

14    how we are allocating those resources to defend the law.  And

15    we do -- we do believe it's -- this would be something that

16    plaintiffs should be able to come forward -- as plaintiffs have

17    come forward in *Rupp* and in *Duncan* -- with -- with -- trying to

18    provide estimates of how many of these weapons are out there

19    nationwide.

20            But we do have numbers for how many -- how many

21    assault weapons were registered with the state of California,

22    and we believe those numbers speak for themselves.  That

23    pistols and shotguns just are not owned at the rates of rifles

24    that qualify as assault weapons.

25            THE COURT:  You know what?  That makes perfectly good

1   sense.   Maybe that doesn't necessarily mean that they're not

2   commonly owned, does it?

3              MR. ECHEVERRIA:   It's part -- it's part of the

4   Court's consideration.   It's part of the mix.

5              THE COURT:   Okay.

6              MR. ECHEVERRIA:   We think it's relevant information

7   for the Court to know.   And the Court asked for that

8   information, so we wanted to be as responsive as we could.

9              THE COURT:   Okay.   Thank you.

10             MR. ECHEVERRIA:   I would like to mark as a new

11  exhibit, this is Defendants' Exhibit DY.   I'm going to share my

12  screen with the court.

13             Can your Honor see this document?

14             THE COURT:   I can.   But -- let me see if I can read

15  it if I put on my glasses.

16             (Pause, referring.)

17             THE COURT:   Okay.   Yeah, I can read it.

18             MR. ECHEVERRIA:   So Defense Exhibit DY is a -- an

19  abstract reporting the results of a survey.   And the -- the

20  article was -- was titled, "Firearm ownership and acquisition

21  in California.   Findings from the 2018 California safety and

22  well-being survey."

23             And in this abstract, there's a reporting of the

24  findings that roughly one in four California adults live in a

25  home with a firearm, including 4.2 million adults who

1    personally own a firearm.

2            Additionally, this study found -- and this is based

3    on survey data.  This survey found that approximately half of

4    the firearm stock in California is owned by the 10 percent of

5    owners who own ten or more firearms, which is consistent with

6    Professor Donahue's opinion in his declaration that firearm

7    ownership is increasingly concentrated.

8            I would like to also mark, related to this exhibit,

9    Defendants' Exhibit DZ.  Defendants' --

10           THE COURT:  Wait, wait, wait.  What's the date --

11   what's the date of this report?

12           I could be wrong, but it seems to me that

13   particularly since COVID -- I have been reading articles in the

14   paper how the FBI and ATF, and other folks, that the background

15   check -- I think it's the NICS system, perhaps, has come to

16   a -- a grinding halt because of the increasing number of people

17   that have been buying firearms.

18           This is 2018.  Right?  This survey?

19           MR. ECHEVERRIA:  It's 2018.  I'm not representing to

20   the Court that this is a snapshot of current firearm ownership

21   rates in California today.  It is -- it is a survey from two

22   years ago.

23           And I have seen those media reports.  I don't have

24   any -- that evidence is just not in the record concerning any

25   increase in gun ownership in the state of California since

1   2018, especially in light of the pandemic.  But I would note --

2   THE COURT:  Since you were going to submit this to

3   me, I would have thought -- or I would think that the state

4   would easily be able to update this information.

5   I mean, this is all computerized.  Isn't it?

6   MR. ECHEVERRIA:  Well, this -- so this information

7   was not compiled by the state.  I want to make that clear.

8   And, also, I was going to point out why any increase

9   in firearm ownership rates does not affect the point that I'm

10   going to be making.

11   THE COURT:  Okay.

12   MR. ECHEVERRIA:  Because individuals are not

13   acquiring assault weapons in California because they're

14   currently prohibited under the AWCA.  So to the extent that

15   firearm ownership is increasing, the number of households that

16   do not own assault weapons is increasing.  And I'm going to

17   compare --

18   THE COURT:  But that's -- that's because of the --

19   you know, that's -- that's because of your legislation.  Right?

20   So you have legislation that prohibits buying these weapons.

21   And so one -- one doesn't have to be a genius to figure out if

22   the state prohibits being able to buy these weapons, the number

23   of households that are going to have these weapons is going to

24   go down.  Right?

25   MR. ECHEVERRIA:  Absolutely.  That's why we're not

1    making -- that's why it wouldn't be fair for us to rely on

2    firearm ownership rates today.  So I --

3            THE COURT:  The argument -- let me -- let me -- let

4    me -- this reminds me of an argument that was made in the

5    ammunition case before me.

6            The argument that the state made was, look, Judge,

7    the state has done such a wonderful job with this ammunition

8    background check that look at how few of people were actually

9    restricted purchasers who were deterred from purchasing

10   ammunition because of this great law that we enacted.

11           So that was the argument.  This was like, you know,

12   you've got a broken leg, you take two aspirins, six months

13   later your -- your leg heals.  And the people who sold you the

14   aspirin said, "See, that's -- look at what a great job the

15   aspirin did.  It healed your leg."

16           So the argument kind of goes like this.  There are

17   very few prohibited persons who were found as a result of this

18   reg -- background check.  And that's because they weren't able

19   to come and buy ammunition.  That same argument goes here,

20   doesn't it?

21           The fact is that we don't know how many people would

22   have bought these weapons but for the fact that there's a state

23   law that prohibits them from buying them.  Right?

24           MR. ECHEVERRIA:  Your Honor, it's impossible for me

25   to provide evidence of how many assault weapons would be

1    purchased in the state of California --

2             THE COURT:  Of course.

3             MR. ECHEVERRIA:  -- if there weren't an assault

4    weapons control act.  These type of counter-factuals are

5    impossible for us to provide.

6             THE COURT:  I agree.

7             MR. ECHEVERRIA:  But what we do know -- what we do

8    know is the number of assault weapons registered in the state.

9    And -- and we now have information about how many -- at least

10   in 2018, how many households personally owned firearms.  And

11   it's 14 percent of the adult population.  But that translates

12   into 2.1 percent of California gun owners owning a registered

13   assault weapon.  2.1 percent.

14            Now, maybe if you go back in time, closer to the

15   registration periods, maybe that number would increase.  I'm

16   just trying to provide the Court with the best available

17   information that we do have.

18            THE COURT:  All right.  So home -- how many -- how

19   many people does -- does this thing tell you -- how many

20   California residents do own assault weapons?

21            MR. ECHEVERRIA:  So this survey, if I can go back to

22   Exhibit DZ.  Exhibit DZ, on page DEF3579, provides a breakdown

23   of the survey results.

24            We were not able to get the survey itself in the past

25   like hour or so, two hours.  But we were able to find this

1   breakdown for the Court.  And this is -- this breakdown is

2   being reported by the University of California.

3            So, here, there's a chart titled "The majority of

4   guns in California are long guns such as rifles and shotguns."

5   And then it breaks down the ratio of long guns that are

6   assault-type weapons.

7            If your Honor can see the gray number?

8            THE COURT:  I can see it.  I can see it.

9            MR. ECHEVERRIA:  Yeah.  So according to the survey, 5

10  percent of California gun owners own a assault-type weapon.

11           Our -- if you compare the 4.2 million with our

12  number, the state's number of individuals who have registered

13  assault weapons of about 90,000, our number comes out to about

14  2.1 percent.  But either way you cut it, 5 percent or 2.1

15  percent, it's still a sheer minority of gun owners in the state

16  of California.

17           And the 5 percent is based on self-reporting.  So

18  someone may think they own an assault-style weapon because they

19  have a rimfire AR-15 with all of the features, even though that

20  weapon would actually not qualify as an assault weapon under

21  California law.

22           But all of this information --

23           THE COURT:  Let me ask you this, though.  Because

24  that also cuts the other way, doesn't it?  How was this survey

25  conducted?

1          MR. ECHEVERRIA:  I -- I do not know how the survey

2    was conducted.  I can go back to Exhibit DY.

3          THE COURT:  So how many people do you suppose -- in

4    keeping with your last comment -- how many people do you

5    suppose do own assault weapons but would never confess to

6    owning an assault weapon?

7          MR. ECHEVERRIA:  So this was a point that was raised

8    by plaintiffs' counsel.  That there's a high rate of

9    noncompliance.  I believe that -- I believe plaintiffs' counsel

10   used the phrase "a lot of noncompliance."

11         The state of California is not going to -- there

12   definitely is some incidence of noncompliance.  That's just the

13   nature of any -- any registration regime that you have in any

14   context.

15         But there's no evidence in the record of -- of a lot

16   of noncompliance or such widespread noncompliance that the

17   state's data reflected in Exhibit CZ would be inaccurate.  And

18   if that were the case, then the individuals who owned those

19   weapons that were not registered would no longer be law-abiding

20   citizens.

21         So we are taking plaintiffs at their word that these

22   gun owners are law-abiding citizens.

23         THE COURT:  Yeah.  That's not -- when they're talking

24   about law-abiding citizens, look, that's not what they're

25   talking about.

1          You know -- you know what they're talking about.

2     They're talking about people that don't use these weapons to --

3     to commit murder or to rob banks or to rape women.  That's what

4     they're talking -- I mean, that's what the law is obviously

5     talking about.

6          MR. ECHEVERRIA:  Well, I assume that's included, but

7     I didn't know that there were certain types of laws that they

8     were excluding from that calculus.  In any event, there is

9     no -- there is no --

10         THE COURT:  Well, tell me what the lawful -- tell me

11    what the lawful use is of someone who has a weapon that can't

12    be registered in the state of California?  So -- so what's the

13    lawful use?

14         MR. ECHEVERRIA:  Of a weapon that -- I'm sorry, your

15    Honor.  Can you repeat the question?  I was having difficulty

16    hearing you.

17         THE COURT:  So -- so *Heller* talks about commonly

18    possessed by law-abiding citizens for lawful purposes.  If I

19    own --

20         MR. ECHEVERRIA:  Yes.

21         THE COURT:  -- which I don't.  But if I owned one of

22    these, suppose I moved from -- oh, I don't know.  Arizona, or

23    whatever.  And I moved to California, and I have one of these

24    weapons.  I haven't used it unlawfully.  Right?  But -- but I'm

25    not registering it.  So you're right.  Technically, I mean,

1   there's a violation of the law.  But that's not what -- I don't

2   think that's what *Heller* was talking about.

3           But, in any event, certainly -- certainly, you don't

4   think that 5 percent of the population in the state of

5   California is -- is -- is commonly owned?  And if you

6   extrapolated that around -- assuming that the rate was that low

7   in, say, Arizona, Nevada, Oregon, Washington, New Mexico,

8   Texas, Oklahoma, and so on -- if you extrapolated that 5

9   percent across the nation, you don't think that would be a

10  pretty large number of these numbers possessed by law-abiding

11  citizens for lawful purposes?

12          MR. ECHEVERRIA:  The number -- so the number, in

13  connection -- in relationship to the population of the state of

14  California is even lower.  It's like .03 percent of the

15  California population.  We weren't -- we weren't relying on

16  that.  We're trying to provide a ratio of people with

17  registered assault weapons in connection with other -- with all

18  gun owners in the state of California.

19          I do assume -- I mean, we don't have evidence on this

20  because it's hard to get this evidence.  But I assume that the

21  ownership rates of assault weapons would be higher in other

22  jurisdictions and there would be fewer gun owners because

23  California is such a populous state.

24          We're not -- we're not representing to the Court that

25  this data shows that assault weapons are in common use or are

1   not in common use as a matter of law.  It's part of the

2   Court's -- it's part of the mix of facts that the Court needs

3   to consider.

4              THE COURT:  Yeah.  Okay.  I agree with that.  I agree

5   with that.

6              MR. ECHEVERRIA:  So -- so there's a lot of -- a lot

7   of issues, by looking at just the sheer numbers.  And in

8   this -- the evidence -- Defendants' Exhibit DY and DZ further

9   complicate the inquiry about how many of these weapons are

10  owned by civilians and whether that number is high enough.

11             Again, there has been no number that's been

12  designated by the courts as the threshold that qualifies for

13  common use.

14             THE COURT:  Let me -- let me ask you a question.  Let

15  me ask you a question.

16             That 5 percent in -- in that study you just showed

17  me, what's the number?  What's the actual number of long guns?

18  It doesn't talk about -- I don't know if shotguns are included

19  in the long guns or not.

20             MR. ECHEVERRIA:  Your Honor, I'll turn to Exhibit DZ.

21             THE COURT:  Yeah.  Okay.  That's pretty small for me

22  to read.  But, okay.  So -- so --

23             MR. ECHEVERRIA:  Can I try to zoom.

24             THE COURT:  Now, that's okay.  You can help me.

25             Okay.  So it's 5 percent.  But what's the number?

```
 1   What's the -- let's -- 5 percent is what?  Like -- what?
 2   10,000?  30,000?  50,000?
 3              MR. ECHEVERRIA:  I'm a lawyer.  Math is not my strong
 4   suit, your Honor.
 5              THE COURT:  (Laughing.)
 6              MR. ECHEVERRIA:  I can get that calculation for you.
 7              And we can also -- if your Honor would find it
 8   helpful, we -- we have these two exhibits, but we can endeavor
 9   to get the full text of the study, which may disclose more
10   information; if your Honor's interested if that.
11              THE COURT:  I'm trying -- yeah, it would be great
12   because I don't see the number.  I see a percentage.  But I
13   don't see --
14              MR. ECHEVERRIA:  Right.  And --
15              THE COURT:  I don't see -- by the way, I just noticed
16   that -- I guess long guns would include shotguns, apparently.
17              MR. ECHEVERRIA:  Oh, yes.
18              THE COURT:  Okay.  Does not include handguns.
19   There's no mention of handguns.
20              So let me ask you.  Down at the bottom there's the
21   wheel-type graph.
22              MR. ECHEVERRIA:  Yes.
23              THE COURT:  Why -- why does it have the gray say 6
24   percent?  Up at the top it says 5 percent.  What's the
25   difference?  Do you know?
```

1          MR. ECHEVERRIA:  Well, just looking at the face of

2   this document, it appears that the wheel chart for long guns,

3   the 6 percent for the gray area, is people who own the long

4   guns by way of inheritance.  So the color gray in the circle

5   charts --

6          THE COURT:  Is different.

7          MR. ECHEVERRIA:  -- corresponds to acquisition by

8   inheritance.

9          THE COURT:  Got it.

10          MR. ECHEVERRIA:  The color gray in the middle is

11   assault weapons.

12          THE COURT:  Got it.  Got it.  Okay.  That confused me

13   for the moment.

14          MR. ECHEVERRIA:  Actually, we're on it, your Honor.

15   Our library has obtained a copy of the full article, and we

16   will file that and number the exhibit appropriately for the

17   Court.

18          THE COURT:  Okay.  So we don't know what the number

19   is.  We don't know -- we know the percentage, according to this

20   survey, but we don't know the number?

21          MR. ECHEVERRIA:  We -- I do not know the number,

22   sitting here today, from the survey.  But we have even more

23   accurate numbers about the number of assault weapons.  And

24   people -- so I guess this issue is that some of the 5 percent

25   may own -- may possess an assault weapon that has not been

1    registered.  Like an illegally possessed assault weapon.  I
2    guess that is a possibility.
3         But the number that the state is confident in is the
4    number of registered assault weapons with the Department of
5    Justice.  And that number is reflected in Exhibit C --
6         THE COURT:  Okay.  Okay.  I'll buy that.
7         MR. ECHEVERRIA:  But if the Court looks at
8    defendants -- sorry, plaintiffs' estimates of the number of
9    these weapons that are in circulation, their numbers are
10   over-inclusive.  Mr. Curcuruto's estimates of the number of
11   modern sporting rifles is over-inclusive because the state of
12   California does not prohibit modern sporting rifles.  As I said
13   before, the AR-15 can be sold in the state of California in a
14   California compliant variation.
15        Curcuruto's estimates include rimfire rifles, which
16   are not assault weapons under the California law.  Rifles with
17   fixed magazines.  Rifles possessed by law enforcement agencies,
18   which should be excluded from the Court's calculation.  Rifles
19   that are no longer operable, can't be fired.
20        According to Plaintiffs' Exhibit 4-3, which is, I
21   believe, one of the NSSF reports, it's clear that their
22   estimates include lower receivers.  So the lower receiver,
23   without an upper receiver, is not an operable firearm.  And --
24   and those lower receivers are being included in the count.
25        If you look at the declaration of Ostini and Brown,

1   they also make clear that there are California variations of

2   the weapons they claim are prohibited that are available for

3   sale in California.

4           And I do -- I do want to preserve for the record -- I

5   understand that the Court has ruled on these -- on the motion

6   in limine.  But I do want to preserve our objection to the

7   declarations of Ostini and Brown.  We maintain that it is still

8   an inadmissible hearsay.  But to the extent that the Court

9   wants to look at those declarations, they actually help the

10  State's position in some ways.  Particularly in showing that

11  some of these weapons -- even if they may be sold with

12  qualifying features that would make them as -- that would

13  qualify them as assault weapons, they can be sold here in

14  California without those features.

15          Now, the plaintiffs -- the plaintiffs acknowledge,

16  and the parties agree on this, that numbers is not the end of

17  the survey.  That the Court should look at other aspects, too.

18          The state -- the state represents that *Heller*

19  instructs the Court to look at the qualitative characteristics

20  of the weapons that are being prohibited.  And -- and we

21  believe that the qualitative characteristics of the particular

22  features show that they are combat-oriented features.

23          In Defendants' Exhibit H, which is the -- or 1980s

24  ATF report, there's a description of each feature, and how each

25  feature is a military configuration and serves specific combat

1   functions.  So --

2           THE COURT:  But getting back to my question earlier,

3   the fact that it may be a combat-helpful feature doesn't mean

4   that it is a prohibited feature.  Because if in fact -- I mean,

5   what -- what kind of a militia weapon -- you know, I somewhat

6   sarcastically referred to the Second Amendment as not

7   protecting foam baseball bats and down pillows.  The Second

8   Amendment, specifically -- by its very clear terms -- seems to

9   include those weapons that would be useful for militia

10  purposes.  I'm not making that up.  That's the clear -- I mean,

11  one has to do a lot of gymnastics -- mental and linguistic

12  gymnastics to find that the Second Amendment -- the problem, of

13  course, as you know, Justice Breyer and others believe that

14  it's is a collective right.  It's a right of the militia.

15          Well, you can argue about that.  That's way above my

16  pay grade.  We're past that point.  The fact of the matter is

17  that clearly the Second Amendment says that weapons that are

18  useful for the militia are protected by the Second Amendment.

19          Now, how -- how -- how in the world can anyone -- I

20  mean, you can say that shouldn't be that way.  Okay?  You can

21  argue that.  You can say, well, you know, the -- the framers

22  were all wet.  They shouldn't -- they shouldn't have said that.

23  Or, you know, Justice Breyer's correct.  That it is a

24  collective right.  That it's only the militia that is entitled

25  to own these -- these weapons.

1       But the fact of the matter is when you read the

2   Second Amendment and then you read *Heller*, you're left with the

3   conclusion that the weapons that the Second Amendment protects

4   are those weapons that are commonly owned by law-abiding

5   citizens.  That if it should become necessary for them to use

6   and bring to the battlefront, will be helpful to them in --

7   in -- in that endeavor.  I can't see any way that anyone can

8   possibly interpret the Second Amendment any other way.  Whether

9   it's a collective right or not, that's a different issue

10  altogether.  That's not before me.  And, as I said, that's

11  above my pay grade.

12       But clearly, if you're going to bring a weapon to a

13  battlefront, you want a weapon that's accurate and that's going

14  to provide the maximum amount of firepower that you can have at

15  the time.  I mean, that just seems so logical to me, I don't

16  understand what the argument is about that.

17       MR. ECHEVERRIA:  So, you know, we discussed this

18  earlier today.  The state has a different reading of *Heller* and

19  how *Heller* has interpreted *U.S. versus Miller*.

20       In our view, the Supreme Court made clear in Justice

21  Scalia's majority opinion that the preparatory clause does not

22  really impact the scope of the operative right, which is to

23  protect law-abiding citizens' access to weapons that are in

24  common use for lawful purposes; not weapons that are useful in

25  militia or military service.

1          I would -- I would also note -- I have -- for fear of

2    leading us off on another tangent, I think the concept of the

3    militia and the concept of the Second Amendment right as

4    providing a right for people to have weapons to serve in a

5    militia, it has never been adopted by the courts as part of the

6    scope of the right.  It has been talked about in the literature

7    about the Second Amendment; this right to insurrection, the

8    right to -- to have the weapons useful for militia service.

9          And I think that that conception of the Second

10   Amendment is problematic at any time, but especially in -- in

11   the wake of the events that happened in Michigan, where there

12   were the -- the people who were arrested for trying to kidnap

13   the governor and armed protesters who stormed state capitol,

14   armed with many of the very weapons that are being restricted

15   under California's law.

16         And then there was the uprising at the Capitol on

17   January 6th.  That -- that riot literally happened while I was

18   deposing General Youngman, who is plaintiffs' expert, who

19   opines that the AR-15 is ideal for militia service.

20         There were a lot of people in that crowd.  There were

21   a lot of people who went to Kenosha, Wisconsin, including Kyle

22   Rittenhouse, who may have thought that they were part of the

23   militia.  They were bringing the arms that they have in service

24   to protect property, to protect themselves, to protect others.

25         THE COURT:  Well, wait a minute.  Because I don't --

1          MR. ECHEVERRIA:  To be honest --

2          THE COURT:  On the January 6th incident -- and I

3     don't want to get us into a political debate.

4          MR. ECHEVERRIA:  I don't either.

5          THE COURT:  But in the January 6th incident, I read

6     about someone, supposedly, who took a pipe bomb to the RNC and

7     a pipe bomb to DNC.  I've never heard anything more about that.

8     I don't know if the fellow's been identified.  I don't know if

9     they were really bombs or if they just looked like bombs.  But

10    I haven't read a single article about the number of AR-15s or

11    AK-47s or Glocks or Sig Sauers that were seized during this

12    January 6th incident.  Am I missing something?

13         MR. ECHEVERRIA:  Yes, there are -- there have been

14    reports of people who tried to bring in assault weapons, or

15    people who were found in possession of illegal weapons in the

16    District of Columbia.  The reason why --

17         THE COURT:  Wait, wait, wait.  That were in the

18    District of Columbia is very different than having them at the

19    Capitol.  Those two things are not the same.

20         MR. ECHEVERRIA:  They are the same for the purposes

21    of making it difficult for anyone to go to the Capitol with

22    prohibited weapons.  It was more difficult for these people --

23    for individuals to smuggle in weapons that are prohibited in

24    the District of Columbia and then bring those weapons to the

25    Capitol.

1          THE COURT:  If that's true, why weren't they used,

2     Mr. Echeverria?

3          I mean, the way you make it sound is that there were

4     all of these people who came to D.C., and they were all armed

5     with AR-15s and AK-47s.  And they were going to mount this

6     insurrection.

7          MR. ECHEVERRIA:  Oh, no.

8          THE COURT:  Well, that's the way I interpreted what

9     you were saying.

10          MR. ECHEVERRIA:  Oh, I'm sorry, your Honor.  No, I

11     didn't -- no, that's the opposite of what I'm saying.

12          THE COURT:  Oh, okay.

13          MR. ECHEVERRIA:  What I'm saying is that there was

14     not widespread possession of assault-style rifles and weapons

15     at the January 6th --

16          THE COURT:  Okay.

17          MR. ECHEVERRIA:  -- rally and then riot.

18          THE COURT:  Okay.

19          MR. ECHEVERRIA:  And the reason why that is -- and

20     it's a good thing that those weapons were not present, as I am

21     sure your Honor would agree --

22          THE COURT:  I agree a hundred percent.

23          MR. ECHEVERRIA:  The reason why those weapons were

24     not present, in large part, was because the District of

25     Columbia has such strict regulations on the possession of

1   firearms, including assault-style weapons, which made it --

2           THE COURT:  You can't prove that.  You can't prove

3   that.  I mean, many of the people that -- that were in

4   Washington, D.C., drove their cars into Washington, D.C.  They

5   could have --

6           MR. ECHEVERRIA:  They did.

7           THE COURT:  Been like the guy in Las Vegas, who had

8   however many weapons in the trunk of their car.  That gets us

9   into a change, and I don't think we need to talk about it.  The

10   point simply is this.  I think the Second Amendment is pretty

11   clear.  It does talk about a militia.

12           The *Miller* case does talk about weapons that are

13   protected by the Second Amendment.  We've gone over this

14   already.

15           I think Justice Scalia did a wonderful point of

16   explaining why these two things do come together.  There's a

17   nexus between the two of them.

18           The fact that these weapons may also be useful in a

19   somewhat military concept, in my opinion, really doesn't add

20   anything to the equation.  In fact, I think it probably

21   detracts.  I think it's more in the plaintiffs' favor than it

22   is in the --

23           Now, granted.  I mean, you and I both agree -- I

24   hope -- that insurrection is hopefully never going to happen or

25   should not happen.  And I think we can agree on that.  And --

1   and that if it did, any kind of weapon, whatever the weapon may

2   be, could be used, would be used.  Right?  But hopefully that

3   will never happen.  But, nonetheless, that's what the Second

4   Amendment says.

5            I didn't make this up.  I mean, I can go find it for

6   you.  But that's what the Second Amendment says.  And it also

7   says "shall."  "Shall," which means there is no discretion.

8   "Shall."  In -- in the law, when you say "shall," it means

9   there's no discretion.  "Shall" not be infringed.

10           So I don't know.  To me, it doesn't make any

11  difference whether a weapon could be -- my hunting .30/06 could

12  be used, if -- if I was called upon, to fight the Russians or

13  the Chinese or the North Koreans, or whoever.  I would use my

14  .30/06.  But I will tell you what.  My .30/06 would not be as

15  good a weapon to use as an AR-15 platform rifle

16           MR. ECHEVERRIA:  Or a machine gun.

17           THE COURT:  Huh?  I'm sorry.  Go ahead.

18           MR. ECHEVERRIA:  Or a machine gun.  Machine guns are

19  an ideal weapon for militia or military service.  But those can

20  be banned.

21           But the point of the matter -- and I -- I *Heller* says

22  what it says.  And we can agree to disagree -- you're the

23  judge, so you --

24           THE COURT:  (Laughing.)  Well, thank you for

25  acknowledging that.

1          MR. ECHEVERRIA:  Yeah.  But -- but we think that

2     *Heller* says what it says.

3          But moving on to some of the -- some of the other

4     aspects that the plaintiffs say that the Court should look at,

5     they point to the functionality.  They claim that the regulated

6     weapons and configurations are functionally common in their

7     proposed findings of fact and conclusions of law.

8          And their functional commonality is based on the

9     simple fact that these weapons have a semiautomatic action.

10    Again, the state of California is not prohibiting semiautomatic

11    weapons.  We are prohibiting certain configurations on a

12    certain subspecies of semiautomatic weapons.

13         Regarding jurisdictional commonality, the fact that

14    there are different jurisdictions that allow these weapons to

15    be acquired in the state of California and Massachusetts and

16    Illinois, and other states prohibit these weapons, that's --

17    that's the federal design.  That is not -- that does not doom

18    those states that happen to be in the minority at this time.

19    Because that -- you know, the political winds can change.

20    That's just -- *Heller* -- *Heller* -- *Heller* accommodates

21    variation among the states, as explained in *McDonald*.

22         And then the plaintiffs say that the weapons are

23    characteristically common.  And this is really -- the

24    characteristic commonality is really just a rehash of the

25    numeric commonality point that they make.  Because they claim

1   that they are, quote, commercially popular types of arms with

2   various common types of characteristics.

3          The qualitative characteristics of these weapons, the

4   particular features that are enumerated, in the state's view

5   and as shown in the state's evidence, are combat-oriented

6   features.  They stabilize a weapon in rapid semiautomatic fire,

7   which is the -- the kind of default setting for soldiers in the

8   battlefield.  They are instructed to generally set their arms

9   for semiautomatic fire because it's more accurate and more

10  deadly.

11         And this -- this actually traditions into one of the

12  main reasons why in the state's view the assault weapons

13  control act does not burden the Second Amendment.  And that

14  is --

15         THE COURT:  If what you said was true, why don't we

16  just allow machine guns, then, instead of semiautomatic

17  firearms?

18         MR. ECHEVERRIA:  I'm sorry, your Honor.  What was the

19  question?

20         THE COURT:  If what you said was true, that the

21  semiautomatic rifle is more dangerous -- if the semiautomatic

22  rifle is more dangerous, then why don't we -- why don't we go

23  ahead and ban semiautomatic weapons but legalize machine guns

24  and -- and the M16s?

25         MR. ECHEVERRIA:  It's -- fully automatic fire is

1    dangerous in different respects.

2              THE COURT:  Agreed, agreed.

3              MR. ECHEVERRIA:  But -- and regarding banning all

4    semiautomatic weapons, that's just not what the AWCA does.

5              THE COURT:  I know.

6              MR. ECHEVERRIA:  Yeah.  We're prohibiting

7    semiautomatic weapons with the features that make them more

8    dangerous in combat applications.

9              The AWCA does not burden the Second Amendment because

10   the restricted assault weapon configurations make them like the

11   M16.  And under *Heller*, the M16 can be banned.

12             And this was a conclusion reached in *Kolbe*, where the

13   Fourth Circuit found that assault weapon restrictions do not

14   burden the Second Amendment because assault weapons are like

15   the M16.  And this was also a holding adopted by --

16             THE COURT:  How is it that they're like the M16,

17   again?

18             MR. ECHEVERRIA:  So they're like the M16 for a

19   variety of reasons, as Judge Staton determined in *Rupp versus*

20   *Becerra*.

21             The weapons have the semiautomatic -- well, the

22   weapons have the ability to fire multiple rounds repeatedly,

23   like a fully automatic weapon.  They have the same feature --

24             THE COURT:  But that's different.  A semiautomatic

25   weapon fires a round for every finger pull.

1        MR. ECHEVERRIA:  Correct.

2        THE COURT:  An automatic weapon fires many rounds

3   with a single finger pull.  So how is that like --

4        MR. ECHEVERRIA:  That's absolutely correct.

5        So the first point is that these weapons have the

6   same features.  The only distinction that has really been

7   identified is the distinction between semiautomatic and fully

8   automatic or select fire.

9        So the M16 is capable of fully automatic fire.

10  That's not really a material distinction for purposes of the

11  Second Amendment because there is legislative evidence,

12  legislative facts indicating that the rate of fire for a

13  semiautomatic weapon can approach 300 to 500 rounds per minute.

14  This was in Exhibit J, the legislation that enacted the federal

15  assault weapons ban.

16       THE COURT:  Is that -- let me interrupt you.

17       There's a difference between the cycling rate and the

18  firing rate.  The cycling rate is a hypothetical rate which is

19  a mechanical function, assuming that the weapon was adequately

20  lubricated, et cetera

21       MR. ECHEVERRIA:  Um-hmm.

22       THE COURT:  That it would -- if you were able to put

23  it on a machine that would be able to pull that trigger a

24  certain number of times without the machine getting tired --

25  right? -- that it would be able to fire a certain number of

1    rounds.

2         A firing rate, on the other hand, takes into account

3    the fact that you may be able to pull the trigger faster than I

4    do.  Your finger may not get as tired as quickly as my finger

5    would.  So -- so -- are we talking about firing rate or are we

6    talking about cycling rate?

7         MR. ECHEVERRIA:  So regarding the -- the House of

8    Representatives' report, I -- I do not know.  So typically

9    cyclic rates are discussed in the context of fully automatic

10   weapons, where you don't have to depress the trigger to fire

11   each round.

12        But we have testimony, in this case, that backs up

13   the determination of the U.S. Congress.  And that testimony is

14   from Mr. Kapelsohn, who testified at the October 2020 hearing

15   in this case that an average shooter can fire between five to

16   seven rounds per second in semiautomatic mode and can keep up

17   that rate of fire for quite a while.  That was his testimony at

18   the evidentiary hearing.  And that testimony would not be

19   referring to cyclic rate.  That would be the actual rate of

20   fire.

21        THE COURT:  Yeah, I heard him say that.  And I --

22   and -- as you know, we always talk about evidence.  And --

23   and -- and, for example, peer review of articles, and so on and

24   so forth.

25        But what -- what nobody asked him was how -- how he

1    arrived at that conclusion.  Because I wonder, for example, how

2    many -- how many people has he watched fire a weapon?  How many

3    has he timed?  There's a lot of variables that -- that -- that

4    I don't know that he ever testified to, or anyone has testified

5    to.

6         You know, we have -- normally, in a trial, very

7    often, we'll have a jury view.  I think it would be

8    fascinating --

9         Are you afraid of guns, Mr. Echeverria?

10        MR. ECHEVERRIA:  I'm not afraid of guns, to the

11   extent that's relevant.

12        THE COURT:  (Laughing.)  I'm going to tell you why I

13   ask that question.  It would be really interesting to get the

14   marshals to get us one of these AR-15s, and you and I go out

15   and run an experiment, and see how many times you and I could

16   pull the trigger for how long, and see how many rounds that

17   really could -- that gun could really fire.

18        Don't you think that would be interesting?

19        MR. ECHEVERRIA:  That would be fun, your Honor.  But

20   the evidence in this case is really not disputed on this point.

21        This is plaintiffs' expert.  The plaintiffs have put

22   forth Mr. Kapelsohn as an expert based upon his extensive

23   experience with firearms.  We have not contested his

24   qualifications.  We didn't file a *Daubert* motion to --

25        THE COURT:  He said 3- to 500 for a semiautomatic

1    weapon.  Now, what's a fully automatic weapon?

2            MR. ECHEVERRIA:  So he's testified it is 300 -- or

3    750 to 900 rounds per minute.

4            THE COURT:  Are those the same?

5            MR. ECHEVERRIA:  They are different.  They -- they

6    are different.

7            So -- there are more rounds that can be fired per

8    second from a fully automatic weapon.  We're not disputing

9    that.  But a five-to-seven rate of fire from a semiautomatic

10   weapon can be maintained for quite a while.  That is the

11   plaintiffs' expert testimony in this case.  And I asked him, as

12   he sat in deposition, where he still stood by that testimony;

13   and he said, yes.

14           THE COURT:  Yes.

15           MR. ECHEVERRIA:  That testimony backs up the evidence

16   that the U.S. Congress collected in enacting the federal

17   assault weapons ban.  So we have legislative evidence, we have

18   expert evidence, undisputed, that the rate of fire of a

19   semiautomatic weapon is between five to seven rounds per

20   second.  That is not a materially lower rate of fire when

21   you're getting -- if you're on the receiving end of -- of a

22   rain of bullets from a semiautomatic weapon being fired at that

23   rate or a fully automatic weapon being fired at a higher rate.

24   It's just not going to be a material distinction for Second

25   Amendment purposes.

1          THE COURT:  Well, let me ask you this, though.  But

2    that rate of fire doesn't change whether you have a California

3    compliant AR-15 or AK-47 and a noncompliant.  The rate of fire

4    doesn't change.

5          MR. ECHEVERRIA:  We -- we would dispute that.

6          The -- the analysis that we're offering the rate of

7    fire evidence for is to show that semiautomatic weapons that

8    fire in -- sorry.  Weapons that fire in semiautomatic mode fire

9    at a rate that is approaching fully automatic mode.

10          There are other -- and then it also has all of the

11    other factors.  So there -- there are other reasons why the

12    regulated assault weapon configurations make them like the M16

13    or like machine guns.

14          And -- and an additional reason is that the military

15    does instruct its soldiers to generally fire in semiautomatic

16    mode because it's more accurate.  And General Youngman backed

17    that -- that up.

18          So we have the Army training manual as Defendants'

19    Exhibit L, at page DEF545, quote:

20               "Automatic or burst fire is inherently less

21               accurate than semiautomatic fire."

22          THE COURT:  If I was -- if I was driving down the

23    road -- my numbers may not be absolutely accurate on this.  But

24    I think they're relatively close.  If I was driving down the

25    road and I got stopped by highway patrolman and the highway

1   patrolman said to me, "Judge Benitez, you were -- you were
2   driving 125 miles an hour."  And then I showed up before the
3   traffic referee, and I said to the traffic referee -- he said,
4   "Well, Judge, you were -- you were exceeding the
5   65-mile-an-hour speed limit.
6          And I said, "Yeah, but, look, judge.  I was only
7   going 125 miles an hour, which is -- which is almost like 65
8   miles an hour."
9          Do you think the traffic referee would let me off the
10  hook?
11         MR. ECHEVERRIA:  Yeah, I really don't know, your
12  Honor.  I --
13         THE COURT:  You know.  You do know.  And you know
14  what would happen is that the judge would -- the traffic
15  referee would say, "Thank you very much, Judge Benitez.  Leave
16  your check at the door as you go out."
17         If I owed the state -- if I owed the state $125,000
18  of state income tax but I showed up at your office and I said,
19  "Mr. Echeverria, here's -- here's a check for $50,000."  And
20  you would say, "Well, wait, wait, wait.  Wait a minute.  That's
21  not $125,000.  And I would say, "Yeah, but they're almost the
22  same."
23         Would you let me off the hook?
24         MR. ECHEVERRIA:  Well, I think when we're talking
25  about assault weapons and whether they are protected at step

1   one under -- under the Second Amendment, I think the rules are

2   different.  I -- I just don't know that the analogy is apt.

3          The fact of the matter is -- is there's undisputed

4   testimony that the rate of fire for semiautomatic weapons is

5   five-to-seven rounds per second and --

6          THE COURT:  Yeah.  Okay.

7          MR. ECHEVERRIA:  If you do the math, the cyclic rate

8   of fire for an automatic weapon is greater.

9          Your Honor can make the determination about whether

10  there's a material difference between -- between the relative

11  rates of fire.  There have been two courts that have concluded

12  that that difference, that delta doesn't -- doesn't save

13  semiautomatic weapons -- or does not raise semiautomatic fire

14  within the scope of the Second Amendment, necessarily.  It has

15  not been a material distinction from two other courts.

16         THE COURT:  Okay.

17         MR. ECHEVERRIA:  But the evidence is in there for the

18  Court to consider.  It's in the record.

19         THE COURT:  I read the deposition.

20         MR. ECHEVERRIA:  I would like to move on to step two

21  because a lot of this argument has dwelled on step one.  It's a

22  threshold inquiry to determine whether the AWCA is

23  constitutional.  It's been the focus of plaintiffs' evidence,

24  but it's not necessary.

25         The Court can assume some degree of burden on the

1    core -- or some degree of burden on the Second Amendment right,

2    to move on to step two and uphold the law at step two under the

3    applicable level of scrutiny.   This is what most courts have

4    done.

5         And when plaintiffs' counsel, Mr. Lee, suggested that

6    most courts have found that step one is satisfied, that's just

7    not correct.   Most courts have assumed for the purposes of its

8    analysis that there was some burden, without making a finding

9    on that prong, and move on to step two and uphold the laws of

10   step two.   And this Court can do the same thing.

11        So at step two of the two-step framework adopted by

12   the Ninth Circuit and employed by the vast majority of other

13   federal circuit courts in the wake of *Heller* asks what level of

14   burden is the law -- is the law -- is the law imposing on the

15   core Second Amendment right to use -- to use a firearm in

16   defense of hearth and home?   And then depending on the level of

17   burden, what level of scrutiny should apply?   And does the law

18   satisfy the level of scrutiny?

19        Here, the burden on the core Second Amendment right

20   of defense of hearth and home is minimal.   Every federal

21   circuit court that has examined this issue has concluded the

22   same thing.

23        The -- for all of the reasons that we discussed about

24   how the AWCA's narrow in focus shows that the burden is

25   minimal.   And, you know, your Honor mentioned that there are --

1         THE COURT:  Wait, wait.  Would you say that -- would

2  you say that to these people that fired 30 rounds from the

3  AR-15?  Would you -- would you say to them that, hey, you know,

4  if we had restricted you to, say, ten rounds, for example --

5  would you say to them that the burden upon you was minimal, if

6  in fact these four people that broke into their house had

7  killed one or more of the residents?  Would you say that to

8  them?

9         MR. ECHEVERRIA:  What if the Russians invaded and

10  invaded their house or there is a zombie apocalypse?  I mean --

11         THE COURT:  That wasn't my question.  My question

12  was -- in that particular case -- and this is not a -- this is

13  not a hypothetical.  This is not about the Russians marching

14  down Broadway.

15         MR. ECHEVERRIA:  The persons survived.

16         THE COURT:  Yes, they did.  I know.  I understand

17  that.

18         MR. ECHEVERRIA:  Right.

19         THE COURT:  They survived, at least in part, because

20  they fired 30 rounds from an AR-15, which is an assault weapon.

21  Right?  So they fired 30 rounds.  But had they not had -- had

22  the ability to fire those 30 rounds or had a weapon that was

23  able to be accurate and to fire the way they had to fire, had

24  they been shot, had they been killed, Mr. Echeverria, would --

25  would -- would you look at -- at their spouses or their mothers

1    or their fathers and you would say, you know, look, you know,

2    we're sorry that your loved one is now dead.  But -- but, you

3    know, we have these laws that impose a minimal burden on the

4    Second Amendment right.

5            Would you say that to them?

6            MR. ECHEVERRIA:  Well, as an attorney defending the

7    assault weapons control act, the burden on the core Second

8    Amendment right is not assessed by anecdotes and hypothetical

9    extrapolations from those anecdotes.

10           THE COURT:  How do you assess it?

11           MR. ECHEVERRIA:  Quite frankly, there -- you know,

12   there are actual mass shootings that happen with assault

13   weapons.

14           THE COURT:  Sure, here's --

15           MR. ECHEVERRIA:  People who are actually killed.

16           THE COURT:  Here's an actual shooting of someone who

17   fired 30 rounds in the defense of home.  That's -- that's no

18   different than the mass shooting in Sandy Hook or Parkland, or

19   anywhere else.  Those are real incidents.  These aren't -- you

20   know, this isn't a hypothetical.  These are real.

21           MR. ECHEVERRIA:  So the -- just to be clear, the

22   assault weapons control act does not limit the amount of rounds

23   that an individual can fire.  Neither does the -- the

24   large-capacity magazine restriction that's on appeal with the

25   Ninth Circuit.

1          The -- the -- an individual can fire 30 rounds.   An
2    individual in California can fire 30 rounds.   An individual can
3    fire 30 rounds from an AR-15.   I mean, there might be some
4    cases, your Honor, where someone may have needed a grenade
5    launcher to defend themselves from an invasion; from a
6    particularly well-armed --
7          THE COURT:  That's only useful for military purposes.
8    It's not really useful -- and it's not commonly owned by
9    law-abiding citizens.
10          MR. ECHEVERRIA:  Well, see, that's kind of bringing
11    in the step one analysis in step two.
12          I'm trying to focus on the burden of the core Second
13    Amendment right.
14          THE COURT:  And so am I.  So am I.  That's why I'm
15    saying to you, look, look, I fully and completely understand
16    your position.  And I fully and completely understand the
17    stakes.  But here's what you're telling me.  You're telling
18    me -- I'll just -- I'll leave it to the state of California.
19          Okay.  The state of California has had -- what?  Six
20    mass shootings in 30 years.  Okay?  Six.
21          MR. ECHEVERRIA:  With the assault weapons control act
22    in effect, yes.
23          THE COURT:  Okay.  Six mass shootings in 30 years.
24    That's two per decade.  Okay?
25          MR. ECHEVERRIA:  Right.

1    THE COURT:  When you look at it, in perspective,

2  that's not a lot.  I mean, that's not a lot.  It's a lot for

3  the poor people that were shot, I grant you.  Tragic, tragic,

4  tragic.  But it is also true that there are many instances

5  where people have to use a weapon -- for example, as in this

6  case -- where these people had to fire 30 rounds to -- to

7  defend themselves.  Otherwise, they would have been a

8  statistic.  And the statistic would have been that they would

9  have been a victim rather than being a survivor; they would

10  have been a victim.

11    And so that's why I don't understand, when you say

12  that it's a minimal burden on the Second Amendment right to

13  self-defense in your home and hearth, I don't understand what's

14  minimal.  I bet if you asked the people that fired those --

15  those 30 rounds, I bet you they wouldn't tell you that it was a

16  minimal burden.

17    MR. ECHEVERRIA:  Well, your Honor, I -- I can only

18  say that the position that -- that appears to be advanced by

19  the plaintiffs is that personal preferences trump political

20  judgments about public safety.  It's the balancing act that we

21  were discussing before.

22    Again, nothing is stopping an individual from arming

23  themselves in their home with any range of firearm they want,

24  provided it's not a prohibited weapon.

25    The -- the plaintiffs are proposing a standard that

1    would lead to more mass shootings.   More people would have

2    these assault weapons.

3            THE COURT:  Prove that?  Prove that?

4            MR. ECHEVERRIA:  Even though there would be --

5            THE COURT:  What's the evidence to support that?

6            MR. ECHEVERRIA:  Well, the evidence to support that

7    is in Louis Klarevas's analysis, where he shows that the

8    incidence of mass shootings went down during the federal

9    assault weapons ban and went up after the ban.  And

10   jurisdictions that have enacted an assault weapons ban

11   generally experience fewer mass shootings.

12           So when your Honor says that there were only X number

13   of mass shootings in California, and while your Honor

14   acknowledges that only -- you know, no --

15           THE COURT:  Nothing to celebrate.  Nothing to

16   celebrate.

17           MR. ECHEVERRIA:  Nothing to celebrate, exactly.

18           But it does indicate that the assault weapons control

19   act worked.  There are fewer of those incidents in the state of

20   California, generally, when compared to other jurisdictions.

21           THE COURT:  That takes me to the question that I

22   asked you earlier this afternoon.

23           What, if any, are the limits of the state restricting

24   the rights of law-abiding citizens to own or possess guns to

25   defend themselves and their family?

1          Where do I find -- where do I find that limit?

2          MR. ECHEVERRIA:  Can you repeat the limit that your

3   Honor is interested in?  I just want to make sure --

4          THE COURT:  I'm trying to find out what is the

5   limit -- so today if I -- let's assume that -- that I agree

6   with you and I find that -- that this ban is constitutional

7   under the Second Amendment.  Right?  Is that it?  Is that going

8   to be it?

9          And, if so, where do I find something that says,

10  okay, state of California, you've given it your best shot.  You

11  have all of these laws on the books.  You have more laws on the

12  books regarding guns than the Federal Internal Revenue Code.

13         Now, you've got Category 1, Category 2, Category 3,

14  and now Category 4.  This is it.  It's the end.  You can't --

15  you can't -- you can't interfere with a law-abiding citizen's

16  use of a weapon for home self-defense.

17         Is that it?  Is that the limit?

18         MR. ECHEVERRIA:  So I -- I was trying to -- I -- I

19  want to give the Court comfort that there is a limiting

20  principle.  The limiting principle is this -- the two-step

21  framework, about when a restriction crosses the line to impose

22  a severe burden on the core right of self-defense.  The AWCA

23  does not cross that line.

24         THE COURT:  According to -- according to your expert

25  witness, Lucy Allen, the limit is 2.2 shots.

1          MR. ECHEVERRIA:  That is not her testimony.

2          THE COURT:  Well, that's --

3          MR. ECHEVERRIA:  That is not Lucy Allen's testimony.

4          So Lucy Allen does not provide an opinion about how

5     many shots people need.  She provides an expert opinion based

6     on her -- her expertise as an economist about how many shots on

7     average are fired when a weapon is used in self-defense, and

8     she's consulted multiple sources about that.

9          And, frankly, plaintiffs' counsel has distorted

10    what -- what she analyzed and what she found, just today.  She

11    found that, on average, around two shots are fired.

12         And then the state is making arguments about that

13    average.  And the point that we're making in this particular

14    case is that a high rate of fire is not generally associated

15    with a use of a firearm in self-defense based on her analysis.

16    I would also like to note that the armed citizen database that

17    she looked at was not limited to home defensive gun uses.

18         If your Honor looks at Lucy Allen's declaration,

19    which has been marked as Plaintiffs' Exhibit A, she makes

20    clear -- it's right there on the chart -- that there's a

21    breakdown in the NRA reports between overall self-defense gun

22    uses.  And then she provided a breakdown of defensive uses in

23    the home.

24         And the reason why we asked to provide that more

25    narrow definition -- by the way, the numbers are remarkably

1   similar, whether the defensive gun use is outside or inside.

2   But we asked her to break that down.  Not because the state of

3   California thinks that firearms should -- or can only be used

4   in the home but because that's where the core of the Second

5   Amendment lies according to the Supreme Court and according to

6   the courts that have interpreted *Heller*, including the Ninth

7   Circuit.  That's why the focus has been on the home with Lucy

8   Allen and the 2.2 rounds that she has found based on her

9   analysis.

10          But the -- the fact of the matter is -- is that under

11  intermediate scrutiny -- which is the standard that applies

12  today.  There may be a higher standard that would apply some

13  other day in connection with some other law.

14          And I've tried to -- I've tried to give the Court

15  comfort about the limiting principle; not just under the

16  two-step framework but also based on how we got here under the

17  AWCA, with all of these amendments.

18          These amendments were enacted over time to respond to

19  attempts by gun manufacturers and firearm retailers to

20  circumvent the AWCA's restriction.  So these are basically

21  attempts by the legislature to plug the spouts, to plug the

22  holes; to make sure the law is as effective as possible in

23  restricting access to the weapons with these features.  And

24  that's including Category 4, where a gun manufacturer tried to

25  get around all of the restrictions by removing the stock.

1          So could there be some law in the future that adds a

2    feature -- like what if -- what if a trigger is an enumerated

3    feature?

4          THE COURT:  Well, I don't think it's going to be a

5    trigger because a trigger would, of course, affect the

6    functionality of -- of -- of the weapon.

7          MR. ECHEVERRIA:  Yeah, exactly.

8          THE COURT:  So you wouldn't be able to use that.

9    But, I mean, you know, in fact I think -- this is such a

10   difficult case because you can argue every one of these --

11   every one of these things two ways.

12         So you can also say that, as -- as I pointed out

13   earlier, that the next set of mass shootings -- if you were to

14   wave a magic wand and make these weapons go away completely,

15   the next set of mass shootings would probably be with

16   California compliant AR-15s, AK-47s, and so on.

17         And so given what you have told me --

18         MR. ECHEVERRIA:  Yes.

19         THE COURT:  -- as I'm listening to you, is that the

20   next step is that the legislature, in its wisdom, would sit

21   down and say, well, look.  You know, we've got to stop these

22   mass shootings.  And so we're going to do, now, is we're going

23   to close the loophole.  Number one, we're going to get rid of

24   the grandfathering clause.  And we're also going to ban any

25   further possession or sale of what was previously

1  California-compliant weaponry.  See?

2      So now -- now they've done that.  And you're going to

3  come in here, and you're going to make the very same argument

4  to me, Mr. Echeverria.  And the very same argument would make

5  perfectly good sense to you and to the state and -- and to the

6  legislature.  The people who it would not make sense to would

7  be the pregnant mother who had to defend her husband.  It would

8  not make sense to the person who was here trying to protect

9  themselves from these four intruders who broke into their home,

10  and so on.

11      MR. ECHEVERRIA:  Your Honor?

12      THE COURT:  Yeah.

13      MR. ECHEVERRIA:  Yeah, I don't know how I would

14  respond to that -- to a hypothetical lawsuit about a

15  hypothetical law.

16      THE COURT:  Well, you would, because you represent

17  the state.  And you would be doing your great job, just like

18  you are --

19      MR. ECHEVERRIA:  I don't know what the state's

20  position would be.  It's a fact -- your Honor, it's very hard

21  to -- to think about these slippery slope hypotheticals because

22  they're all going to be fact-bound.  The evidence is going to

23  be different.

24      I mean, if the evidence shows that after, you know,

25  assault weapons are effectively -- you know, the assault weapon

1    restrictions are effectively eliminated and mass shootings will

2    still happen.  Many of these incidents will still happen.  They

3    do.  That doesn't mean that the law is constitutional.  All

4    laws can be violated, as John Lott acknowledged in his

5    deposition.  But we have to look at the relative dangers.

6              You know, are the fatality rates involving certain

7    weapons much higher, like they are for assault weapons?  I

8    don't know.

9              The state is responding to data that shows that

10   there's a spike when assault weapons are used in mass

11   shootings.  We're responding to data that these weapons are

12   used disproportionately in gun violence against law

13   enforcement, which makes common sense.  Because law enforcement

14   officers are generally armed with either AR-15 or select-fire

15   weapons, like the M4.  So criminals are able to have the same

16   firepower to give back.  They -- they can engage in protracted

17   gunfights, putting law enforcement officers' lives at greater

18   risks, as we saw when the two FBI agents were murdered on

19   February 2nd, as reported by *The New York Times*, at the hands

20   of somebody with an assault weapon when they were trying to

21   serve --

22             THE COURT:  How do you respond, then, to -- I can't

23   remember his name now, but let me see if I can find it for you.

24             I think it was -- I think it was Mr. Kapelsohn who in

25   fact has and does and trains law enforcement people with the

1  use of firearms.  That -- I mean, this is -- this is -- you

2  see, this is -- to me, this is really significant testimony

3  because this is a guy who is not -- he's not getting paid to

4  come up with an opinion about something.  And he has --

5           MR. ECHEVERRIA:  That's incorrect, your Honor.  He is

6  being paid in this case.

7           THE COURT:  Yeah, I know.  But this is not his --

8  this is not his -- his -- this is not his livelihood.  He may

9  be getting paid for it but this is -- I mean, I -- I don't

10  know.  It didn't come out --

11           MR. ECHEVERRIA:  He runs a company to provide

12  consulting services and to provide services like this.  But

13  it's okay.

14           THE COURT:  Okay.  Fine.  So maybe I'm wrong.  It

15  would be the second time this year, and we're only in February.

16  So I guess I'm doing okay.  So maybe I'm wrong.

17           But here's a guy who actually -- he has hands-on

18  experience.  I mean, he not only teaches law enforcement people

19  how to use these weapons, and yet he is saying, you know, the

20  state's all wet.  Right?  So he obviously doesn't see these

21  weapons as being that much of a danger to law enforcement.

22           Do you follow what I'm saying?

23           MR. ECHEVERRIA:  Well, that was definitely not within

24  the scope of his expert opinion that he offered in this case.

25           There has been zero -- zero testimony and zero

1    evidence, to my knowledge, that plaintiffs have offered to

2    rebut our evidence about the dangers posed by assault weapons

3    to law enforcement officers.

4           I am well aware, your Honor, that there are law

5    enforcement officers who support assault weapons bans and who

6    oppose assault weapons bans.  Law enforcement officers do not

7    all think uniformly about -- about these types of issues

8           But what I will tell you is that the evidence in this

9    case shows that assault weapons pose a higher danger to law

10    enforcement officers when law enforcement officers encounter

11    individuals equipped and armed with assault weapons.

12           But the burden in this case is minimal for an

13    additional reason.  This is not a categorical ban.  The

14    plaintiffs have been using that phrase, seizing on this Court's

15    use of that language in *Duncan*.  But this is not a categorical

16    ban.  It is a restriction on certain configurations of features

17    on certain types of weapons.  It is more akin to a use

18    restriction.

19           You can own an AR-15 in the state of California.  You

20    can own it in a rimfire form, with all of the features you

21    want.  You can own a semi -- or a centerfire version of the

22    AR-15 if you have none of the prohibited features.

23           There are -- and then there are, of course, the vast

24    range of other weapons that are not even touched by the AWCA

25    that can be lawfully possessed in the state of California.

 1    This is not a categorical ban.  And even if it were -- and it's
 2    not.  But the -- the Ninth Circuit, in *Duncan versus Becerra*,
 3    didn't adopt a categorical approach.  And even though the --
 4    the Ninth Circuit did determine that there was a severe burden.
 5    It applied strict scrutiny.  It still engaged in the
 6    tiers-of-scrutiny analysis that is called for by the two-step
 7    framework.
 8          But the fact that this is a use restriction on
 9    certain configurations is just -- it minimizes any burden there
10    is on the core Second Amendment right.
11          And the plaintiffs really haven't addressed this
12    argument.  It is critical to the state's position that this is
13    a restriction on certain configurations.  And there is evidence
14    in the record -- legislative evidence -- showing that those
15    particular configurations make already dangerous weapons even
16    more dangerous.  Particularly in mass shootings and shootings
17    with law enforcement.  Each of those shootings.
18          Another point I would like to clarify regarding the
19    flash suppressor.  We've discussed many of the features, so I
20    don't want to belabor the Court.  I -- I have in my notes to
21    cover them all, but we've been covering a lot of the features,
22    so I'm going to be kind of picking and choosing what I address
23    because I don't want to belabor the Court with points we've
24    already discussed.
25          But regarding the flash suppressor, plaintiffs'

1  counsel repeatedly claimed in its argument, on day one and

2  today, that flash suppressors do not include flash hiders.

3  That -- that flash suppressors are intended solely to mitigate

4  temporary blindness when a firearm is discharged in low-light

5  settings.

6          But according to Section 5471, Subdivision R of the

7  California Code of Regulations -- and your Honor may find this

8  regulation helpful, that Section 5471, because it provides

9  regulatory definitions for different terms in the assault

10 weapons control act.

11         And we do cite to the regulation in the way that we

12 describe the features, but it may be helpful for the Court to

13 consult the regulation as well.

14         And in the definition of a flash suppressor, the

15 definition expressly states, quote:

16             "A device labeled or identified by its

17             manufacturer as a flash hider would be deemed a

18             flash suppressor."

19         And, the experts did not meaningfully dispute that

20 there can be some flash-hiding effect with a flash suppressor,

21 even if the flash suppressor is not designed to -- to -- to

22 suppress the flash and hide the location of a shooter.

23         THE COURT:  How about somebody at risk -- and I don't

24 know the difference.  But somebody addressed a brake -- a

25 muzzle brake.

1          MR. ECHEVERRIA:  A muzzle brake?  That is not

2    prohibited under the AWCA.  You can have a hybrid, where it

3    could be a muzzle brake and a flash suppressor.  Those are

4    available.  Mr. Kapelsohn discusses that in his deposition

5    testimony.  But muzzle brakes are not prohibited.

6          Another -- another --

7          THE COURT:  But why is that?  Why --

8          MR. ECHEVERRIA:  The state of California -- so here's

9    the thing.  Every feature that is added incrementally adds to

10   the burden.

11         So, you know, intermediate scrutiny is not a

12   Goldilocks test.  You know, where if we restrict too few of

13   features, we're under-inclusive and we're violating the

14   Constitution.  And if we do too many features, we're

15   over-inclusive and violating the Constitution.  It would put

16   the state of California -- and any legislature, for that

17   matter -- in an untenable position, regulating a very important

18   area of gun violence and public safety.

19         But what we can see is that the burden on the core

20   Second Amendment right is minimal because the uses for which

21   the features are designed, combat-oriented applications, are

22   just not generally needed in a self-defense scenario.  I know

23   there are hypotheticals that can be conjured up or there could

24   be articles that could be interpreted in different ways where

25   there are anecdotal evidence where an individual may have used

1  an AR-15, with 30 rounds, to defend themselves.  But, in

2  general, the evidence shows that no more than 2.2 rounds are --

3  are fired in self-defense.

4         Mr. Lee, this morning, spent some time criticizing

5  Lucy Allen's analysis of the defensive gun uses and the point

6  that she was making, and regarding the Bactiva (phonetic)

7  study, in particular -- the Bactiva study was focused on

8  in-home defensive gun use, because that's where the core Second

9  Amendment right lies.  And the plaintiffs tried to suggest that

10 there was something improper that Lucy Allen had done in her

11 analysis.  It -- it was -- it was (indiscernible) that she

12 imputed an average when a news article that she found indicated

13 that shots were fired but she was unable to determine how many

14 shots were fired.  And Mr. Lee characterized her method as --

15 quote/unquote -- unscientific and -- quote/unquote --

16 anecdotal.  There is nothing unscientific with what Lucy Allen

17 did.

18        You can look up on Wikipedia statistical imputation.

19 It is a widely accepted method for filling out gaps in a data

20 set to provide more reliable statistical findings.

21        If Lucy Allen did not do statistical imputation, then

22 you would have a denominator of defensive gun uses that would

23 be larger than the data set that you're identifying, you know,

24 how many shots were fired in the numerator.  It would create

25 distortions in the data.

1        And the way that she imputed the data --

2        THE COURT:  Why not -- why not simply take -- why not

3   simply take the cases where you know how many shots were fired,

4   just take those.  And then figure out how many shots were

5   fired, and then divide those, and then come up with that

6   average?

7        MR. ECHEVERRIA:  Because that data won't be reliable.

8   Because you're excluding entire cases simply because you don't

9   have one piece of data, even though you know that that was a

10  case in which multiple shots were fired because the article

11  says "shots were fired."

12       And I believe that Mr. Lee mentioned, during this

13  morning's session, that Lucy Allen imputed the 2.2 average when

14  there was a gap.  She did not do that.

15       The Court can look to her declaration in this case,

16  which has been marked as plaintiffs -- or Defendants' Exhibit

17  A, where she explains, in her declaration, that she imputed --

18  that she did the imputation method.

19       So on page 5 of Lucy Allen's declaration, footnote

20  11, she states:

21           "When the exact number of shots fired was not

22           specified, we used the average for the most

23           relevant incidents with the known number of shots.

24           For example, if the story stated that shots were

25           fired, this would indicate that at least two shots

1            were fired.  And, thus, we" would -- "and thus, we

2            used the average number of shots fired in all

3            incidents in which two or more shots were fired

4            and the number of shots was specified."

5        She did not fill in the gaps with her conclusion of

6   2.2 rounds.  She did not include in the imputed average cases

7   in which no shots were fired, which would drive down the

8   average.

9        She took the average number that she was able to

10  determine when there were two or more shots fired, and then

11  used that number to fill it in.  It explain --

12            THE COURT:  Okay.  So wait a minute.  So what's the

13  scientific -- what's the scientific validity of that?

14        So let me just -- let's just talk about this -- this

15  article that I have been holding up, where it says, "30 rounds

16  fired from an AR-15."

17        Now, let's assume that it didn't say 30 rounds fired.

18  Okay?  It just said shots fired.

19            MR. ECHEVERRIA:  Okay.  Yes.

20            THE COURT:  Scientifically, how would it be valid for

21  her to attribute 2.2 shots to this article?

22        Where would the scientific bases be for that?

23            MR. ECHEVERRIA:  Well, if the article did not specify

24  the number of shots, then statistically, if Lucy Allen would

25  impute an average for that incident, that would be

1    scientifically valid, even if it would not -- ultimately, at

2    the end of the day, be inaccurate.

3            See, science is not about necessarily determining

4    truth and falsity.  It's about the process of trying to

5    interpret --

6            THE COURT:  My wife was a chemistry teacher,

7    Mr. Echeverria.  I think I have a pretty good handle on what

8    science is.

9            MR. ECHEVERRIA:  Regardless of your wife's

10   occupation, I'm sure you do.

11           I just want to make clear that what Lucy Allen did is

12   not unscientific, like the plaintiffs are claiming.

13           It was disclosed in her declaration the -- the exact

14   average -- or the type of average that she was using for her

15   imputations was explained in the declaration.  She discussed

16   this during her deposition.

17           So to make these allegations that she was, you know,

18   engaging in junk science is just -- it's kind of surprising,

19   your Honor, to be honest with you.

20           THE COURT:  Well, both sides have had -- look, this

21   is not the first case I've ever tried.  And I -- and I know

22   that both sides generally -- when we have a battle of the

23   experts, both sides tend to try to impugn the -- the other's

24   experts.  That's the name of the game.

25           But I have to tell you, I've looked at her study.

1    I've looked at it now twice.  I've got some problems with it.

2    I think there's a lot of assumptions that she make -- makes

3    that are not supported by the data that she has.

4            So I'm not saying it's junk science.  I'm not saying

5    that I necessarily agree with plaintiffs' counsel.  But I do

6    think this whole idea of, you know, we only have 2.2 shots per

7    incident is just not supported by -- by the data.

8            And I -- right here, I have a perfect example of, in

9    this article -- for example, the case of the pregnant woman.

10   It doesn't say how many shots were fired.  So she imputes 2.2

11   shots to that.  And of course --

12           MR. ECHEVERRIA:  No.  She -- she imputes the average

13   for incidents that have two or more shots.

14           2.2 includes no shots.

15           THE COURT:  So what is the average she imputed?

16           MR. ECHEVERRIA:  I don't have the average handy.

17           THE COURT:  Is it in her report?

18           MR. ECHEVERRIA:  I can try to find out what the

19   average is.  I don't believe plaintiffs asked her on the record

20   what the average is either, during her deposition.

21           But -- but it's okay, your Honor.  I just wanted

22   to -- to make clear that she was not just plugging in her

23   conclusion to fill in the gaps.

24           THE COURT:  Okay.

25           MR. ECHEVERRIA:  That would be improper.

1          THE COURT:  Okay.  Gotcha.  I don't want to do this

2     to you, but I do want to break at five o'clock.  And I would

3     like to give plaintiffs' counsel some time to -- for rebuttal.

4          So how much longer do you think you have?

5          MR. ECHEVERRIA:  I -- I can't say, your Honor.  It --

6     I think it depends on --

7          THE COURT:  (Laughing.)  Don't say it.

8          MR. ECHEVERRIA:  You know what I'm saying.

9          THE COURT:  (Laughing.)

10          MR. ECHEVERRIA:  I would love to get through this in

11     an hour.  I -- you know, our position is that the burden is

12     minimal and that intermediate scrutiny applies.  And I was

13     about to get into the discussion of intermediate scrutiny.

14          THE COURT:  Well, why don't you do that.

15          How about if I give you 20 minutes.  Then, after

16     that, I'll cut you off, and then I'll let Mr. Lee do some

17     rebuttal, or Mr. Dillon, or whoever.  Okay?

18          MR. ECHEVERRIA:  I will certainly try to get through

19     it as expeditiously as possible.

20          I will -- I will say, though, that we -- I do have a

21     lot of evidence to get through.  And the plaintiffs presented

22     their case for -- you know, day one and then half of -- you

23     know, the morning session today.  I think that the defense

24     needs to be given equal time, I guess, for lack of a better

25     phrase.  Especially where it's the state's burden under

1   intermediate scrutiny to defend the constitutionality of the

2   law.   But I will -- I will endeavor to get through it as

3   expeditiously as possible for the Court.

4          THE COURT:   All right.

5          MR. ECHEVERRIA:   So under intermittent scrutiny, the

6   state has to show that there's a reasonable fit.

7          Or another -- another way of describing it, as the

8   Ninth Circuit has described it, is the -- the state has to show

9   that the law would be less effective absent the regulation.

10         And, here, if the state -- if the state's definition

11  of an assault weapon, based on the features, is eliminated,

12  then the assault weapons control act would be less effective in

13  achieving its goal.   I mean, that's -- that's why the features

14  test was added in the first place, was to enhance the

15  effectiveness of the assault weapons control act.

16         So the question really is, is there a reasonable fit?

17  And -- the test for whether there's a reasonable fit can

18  involve an assessment of any evidence reasonably believed to be

19  relevant.   So the Court -- the state is presenting the Court

20  with evidence from other jurisdictions.   So this -- the Court

21  would have to consider mass shootings in other jurisdictions.

22  That's all relevant.

23         The Court should also consider the -- the evidence

24  cited in the five Federal Circuit cases that have all upheld

25  substantially identical assault weapon restrictions, which

1    discuss many of the same issues.  You know, this is -- this is

2    the last of -- of the most recent of a long line of cases that

3    have all upheld very similar restrictions.

4           And every case, while being repetitive in some ways

5    in the cases that came before them -- and I appreciate that

6    some of our case is repetitive of all of the rationales and

7    evidence that have already been credited by other Federal

8    Circuit courts.  But we have tried to build into this record

9    additional evidence that we hope can give the Court more of an

10   evidentiary basis for determining that the intermediate

11   scrutiny standard has been achieved -- has been satisfied.

12          Another point that I would like to address before I

13   get into the particular application of intermediate scrutiny is

14   the question of how instructive are First Amendment cases in

15   the Second Amendment context.

16          The plaintiffs over-rely on prior restraint cases

17   from the First Amendment context.  The -- the courts have made

18   clear that the First Amendment is a guide for how Second

19   Amendment jurisprudence is going to be developed over the next

20   many years, but it's not a one-to-one ratio.

21          The interests that are implicated in First Amendment

22   cases -- particularly freedom speech cases or freedom of

23   religion cases -- are qualitatively different than the

24   interests that are implicated in a Second Amendment case, which

25   concerns self-defense and gun violence and public safety.

1          In the First Amendment context, I would note -- this

2    is the area that has not been fully developed, so I don't -- I

3    just want the Court to be aware that there should be some

4    caution when the Court reads First Amendment cases being cited

5    to support Second Amendment propositions.

6          And the reason is that a Second Amendment claim

7    should not be evaluated as, like, a First Amendment exercise of

8    expression or exercise of an opinion or an exercise of a

9    political viewpoint.

10         The Second Amendment protects a right to

11   self-defense, which is less personal, less based on personal

12   preference.  And that's why, under the burden analysis, the

13   Court assesses whether there is a severe burden on the core

14   Second Amendment right.  And -- and the core Second Amendment

15   right is not really a right that involves individual

16   expression.  I -- I just wanted to make that point at the

17   outset.  So to the extent that the plaintiffs are relying on

18   prior restraint cases, they're not applicable necessarily to

19   this case.

20         But under intermediate scrutiny from the First

21   Amendment context -- but especially in Second Amendment context

22   as the Ninth Circuit has developed the two -- the two-step

23   framework -- the state has to show that there's an important

24   government interest and that the regulation being challenged is

25   reasonably related to that interest.

1          I -- I was a bit surprised in this case, your Honor,

2     that the plaintiffs appear to be contesting whether there is an

3     important government interest implicated in this case.

4          THE COURT:  Well, don't spend your time -- don't

5     spend your time on that.  Because of course I understand --

6          MR. ECHEVERRIA:  Thank you.

7          THE COURT:  Who could possibly quarrel with the

8     proposition that it's not important state interest to -- to --

9     to protect people?  The question -- the question --

10          MR. ECHEVERRIA:  I agree.

11          THE COURT:  -- that is more serious and more

12     difficult to answer is which lives are more important?  The

13     lives of a few criminals who abuse the use of weapons?  Or the

14     lives of people like the pregnant mother or this other fellow

15     that used the AR-15, the 30 rounds.  So therein lies the

16     balance.  Therein lies the question.  It's not whether it's an

17     important interest.

18          Who -- I can't imagine Mr. Lee or Mr. Dillon, or

19     anybody else, actually arguing with a straight face that it's

20     not an important state interest for the state to try to

21     minimize fatalities in connection with gun -- gun control.

22     Although I will say this.  It's kind of -- kind of odd that you

23     mentioned this because I just -- one of our cases here from San

24     Diego went up to -- went up to L.A. to be prosecuted.  A fellow

25     who allegedly killed two people.  There was a gun -- a gun

1    enhancement.   I remember when gun enhancements were enacted.

2    The -- you'll recall -- no, you're probably too young to

3    remember.   But the -- the phrase that was used was "Use a gun,

4    go to prison."   Why?   Because the state decided that if you use

5    a gun -- you misuse a gun, you should pay a price for it.

6            Well, interestingly, we're seeing that, throughout

7    the state, these gun enhancements are now being stricken.   So

8    it's kind of interesting to think about, well, okay.   So is

9    there -- has the state made a determination that the lives of

10   people who are shot in mass shootings are somehow more

11   important than the lives of people who are using these weapons

12   in defense of their home and their hearth?

13           The fact that it's --

14           MR. ECHEVERRIA:   Your Honor --

15           THE COURT:   -- an important right, nobody can quarrel

16   with that.

17           MR. ECHEVERRIA:   I appreciate that.   I -- I am -- I

18   understand that your Honor views the interests to be important.

19   I believe that your Honor expressed that view in *Duncan* as

20   well.

21           I -- I did -- I did hear the plaintiffs contesting

22   that point, however.   So I felt like it was my obligation --

23           THE COURT:   Well, don't spend time on it.   Don't

24   spend time on it.

25           MR. ECHEVERRIA:   I won't.

1          But I also want to make clear that in the reasonable

2    fit analysis, the state is not choosing whose life is more

3    important.  That is not what the state has done.

4          I would like to quote brief -- very briefly from the

5    *Worman versus Healey* from the First Circuit.  Case citation is

6    922 F.3d 26.  And on page 40, the court addressed this very

7    argument.  That in prohibiting features that could be used for

8    self-defense, to prevent criminals from using it, the state is

9    choosing to -- to punish law-abiding citizens, basically.

10   Here's what the court says.  Quote:

11          "According to the plaintiffs, the forbidden

12          assault weapons and LCMs are ideal for domestic

13          self-defense for many of the same reasons that

14          such weapons are ideal for mass shootings.  They

15          are easier to hold and to shoot, require less user

16          accuracy, and allow a shooter to fire many times

17          without reloading.  Thus, the plaintiffs assert

18          any regulation prohibiting law abiding,

19          responsible citizens from possessing such weapons

20          sweeps too broadly.  This assertion is too facile

21          by half, and we reject it."

22          THE COURT:  It is what?

23          MR. ECHEVERRIA:  And I asked the Court --

24          THE COURT:  I'm sorry.  What did the Court say?  It's

25   too what?

1          MR. ECHEVERRIA:  Facile.  That argument is too --

2    it's too cheeky, too easy, too facile.

3          THE COURT:  Yeah.  Okay.  Why?

4          MR. ECHEVERRIA:  Because it gives short shrift to the

5    legislative investigation and the legislative judgment in

6    assessing the dangers posed to the public at large by these

7    particular weapons.

8          And I would urge the Court to review the *Worman*

9    *versus Healey* decision, which is the most recent Federal

10   Circuit case analyzing assault weapons bans.  And it expressly

11   rejects the argument that the plaintiffs have been advancing in

12   this case, that the state has basically decided -- you know, is

13   picking and choosing who -- who should win and who should lose.

14   That is not what the state is doing here.

15         THE COURT:  Well, what -- when the Court made that

16   statement, why?  What did it say?  I mean, why -- why is it --

17         MR. ECHEVERRIA:  I can read on.

18         THE COURT:  Why is it too facile by half?

19         MR. ECHEVERRIA:  Yeah.  I can read on.  I didn't want

20   to, you know, dwell on this, but I'll read the rest into the

21   record.

22         The Court says:

23         "This assertion is too facile by half and we

24         reject it.  Although we acknowledge that in

25         dealing with a complex societal problem like gun

1        violence there will always be room for reasonable

2        minds to defer about the optimal solution, the

3        plaintiffs give unduly short shrift to the, quote,

4        legislative prerogative to weigh the evidence,

5        choose among conflicting inferences, and make the

6        necessary policy judgments.  The role of the

7        reviewing court is limited to ensuring that in

8        formulating its judgments, the legislature has

9        drawn reasonable inferences based on substantial

10       evidence.  And that the fit between the asserted

11       government interest and the means chosen to

12       advance them is close enough to pass intermediate

13       scrutiny."

14       In reading that passage from *Worman*, I have excluded

15  citations to other cases.

16       THE COURT:  Okay.  Great.  Thank you.

17       MR. ECHEVERRIA:  For readability.

18       So the reasonable fit, in this case, is established

19  for many of the same reasons that a reasonable fit was found in

20  *Worman* and in *Heller* 2, and the other -- and the *Niserpa*

21  (phonetic) case out of the Second Circuit.  That all of the

22  five Federal Circuit cases have similar rationales for why the

23  assault weapons control act is constitutional, and shows a

24  reasonable fit.

25       The first reason why there's a reasonable fit has

1   been discussed exhaustively in this argument and is covered in

2   the evidence.   That each of the individual features enumerated

3   in Section 30515(a) serve military purposes.   They're -- and --

4   and each of those features was identified by the ATF as a

5   military configuration of the M16.   So the -- the state has not

6   arbitrarily included features.   These are features that were

7   deduced.   That was why I was trying to make that point about

8   induction versus deduction.   These were features deduced from

9   prior research.

10          The evidence also shows that when assault weapons are

11   used in mass shootings, more people are killed and more people

12   are injured.

13          Defendants' Exhibit A, which is Lucy Allen's

14   declaration at page 18, she explains having 161 mass public

15   shootings involving four or more victims, excluding the

16   shooter, that occur in a public place, significantly more

17   individuals are killed, on average.   It's a 100 percent jump,

18   from six to 12 on average, for fatalities.   And there's also a

19   significant jump -- a substantial jump for injuries as well.

20          And -- and, again, I would like to -- to reiterate

21   that the plaintiffs have not identified, to my knowledge, a

22   single incident that Lucy Allen has incorrectly coded as an

23   assault weapon mass shooting.

24          But even if they're -- you know, I -- she was basing

25   her research off of the best available evidence.   So it is

1    possible that maybe there was some shooting that didn't

2    actually involve an assault weapon.  They haven't identified

3    one.  But even if they do, we're talking about a universe of

4    161 shootings.  So the numbers wouldn't -- wouldn't move that

5    much anyway.

6          Lucy Allen has consistently -- in all of the cases

7    she -- in *Rupp* and in this case, she has found a substantial

8    increase in the number of fatalities and injuries in mass

9    shootings involving assault weapons.

10          I would also note that the plaintiffs presented to

11   the Court, on day 1, a Plaintiffs' Exhibit 29, which was an

12   article -- if your Honor recalls -- about a UPS shooting that

13   occurred in San Francisco.  And the article reported that an

14   assault weapon had been used but it apparently was not an

15   assault weapon.  That particular shooting was not included in

16   Lucy Allen's analysis in this case.  So I just wanted to make

17   that clear.  That that particular article is irrelevant to Lucy

18   Allen's study.

19          I -- I would also note -- I believe I said this

20   before but I'll say it again.  It -- it's worth repeating.

21   That weapons that are listed -- so the plaintiffs are trying to

22   say maybe Lucy Allen coded a shooting as involving an assault

23   weapon that is solely an assault weapon because it's on the

24   make and model list of Section 30510.  And that maybe that

25   weapon didn't have any features that would also make it an

1   assault weapon under 30515.

2            In Defendants' Exhibit AT -- A, as in Apple; T as in

3   Tom.  At page DEF (indiscernible).

4            THE COURT REPORTER:  I'm sorry.  I didn't catch that.

5   I didn't hear what he said.

6            THE COURT:  Yeah, can you repeat that, please.

7   Exhibit AT --

8            MR. ECHEVERRIA:  I will, your Honor.

9            Defendants' Exhibit AT -- Apple, Tom -- at page

10  DEF1629.

11           Defendants' Exhibit AT is a rebuttal report from

12  Blake Graham in *Rupp versus Becerra*, where he states, on page

13  6, Footnote 2, quote:

14            "There may be certain assault weapons identified

15            in Penal Code Section 30510 that are rimfire or

16            have fixed magazines.  In other words, they would

17            not qualify as assault weapons under 30515."

18       Mr. Graham goes on:

19            "These, however, are extremely rare, and I have

20            yet to encounter one in my career."

21       Unquote.

22           So if Lucy Allen did happen to code something based

23  solely on 30510 -- which she doesn't say that she did -- it is,

24  in all likelihood -- that weapon would, in all likelihood, also

25  qualify as an assault weapon under the features test.  And,

1   again, plaintiffs have not identified any particular shooting

2   that she erroneously coded.

3          And Professor Klarevas also has a similar finding

4   with respect to the mass shootings that he analyzed, that

5   involved six or more killed anywhere; even if it's in

6   connection with domestic violence or gang-related violence,

7   similar -- a similar correlation is observed.

8          The -- the plaintiffs' counsel routinely acknowledged

9   that there may be some distant correlation -- I recall the

10   phrase "distant correlation" being used repeatedly during this

11   morning's presentation.  But we would -- we would say that the

12   correlation is not distant.  It's apparent in multiple ways of

13   defining mass shootings, and it has been uncontested in this

14   case.

15          The -- I would also -- and it's very important to --

16   to raise this point about John Lott.  John Lott testified

17   during the October 22nd hearing in this case, in response to a

18   question from your Honor, about whether he has observed that

19   assault weapons lead to more deaths.

20          I don't know if your Honor recalls that particular

21   discussion with -- with John Lott.  But he -- I'm sorry, your

22   Honor.  I'm looking for the particular pin cite to the

23   testimony at the hearing -- at that hearing.  I'm not seeing it

24   immediately.

25          THE COURT:  Just tell me what you think he said.

1          MR. ECHEVERRIA:  So -- so you asked him:

2          "Have you conducted any studies to determine

3          whether or not the guns, the weapons that are

4          banned under the California bans are any more

5          deadly?  In other words, had there been any more

6          fatalities or injuries using the weapons that are

7          banned in California, as opposed to other types of

8          weapons, like the California-compliant AR-15."

9          And John Lott responded:

10         "If you do a statistical test, if you say, well,

11         how about mass public shootings that are only

12         committed with assault weapons or only involve

13         people that use large-capacity magazines or only

14         involve multiple weapons or some combination of

15         those, you don't find any real statistically

16         significant difference in terms of the average

17         number of people that are killed in those

18         attacks."

19         So during the October hearing, Mr. Lott appeared to

20    suggest that he had conducted a statistical study comparing

21    mass shootings with assault weapons, with LCM, and with

22    multiple weapons.  And if you recall, during the -- during the

23    hearing, Mr. Lott indicated that it was the presence of

24    multiple weapons that was really driving an increase in

25    fatalities.

1         So I asked him, during his deposition, if he

2   conducted that kind of statistical test.  And he -- and he

3   testified that he did.  And that's at Lott deposition

4   transcript, excerpt page 314, lines 1 through 14.

5         And I asked him where this study is discussed.  And

6   he responded on line 20 to 22 that it was in his book, *The War*

7   *On Gun*.

8         *The War On Guns* was a book published in 2016.  And he

9   didn't attach any portion of *The War On Guns* to his

10  declaration.  And he did attach substantial excerpts -- I mean,

11  from *More Guns, Less Crime*.  The excerpts from his book *more*

12  *Guns, Less Crime* comprise a significant portion of his over

13  1,000-page preliminary injunction submission.  But he didn't

14  attach anything from *The War On Guns*.

15        And -- and we went to *The War On Guns* to try to see

16  what John Lott has found about the use of assault weapons in

17  mass public shootings.

18        And I'm going to put up, as a document that we have

19  previously lodged with the Court --

20        (Court and court reporter confer.)

21        MR. ECHEVERRIA:  Trying to do this as fast as I can,

22  your Honor.  I appreciate the Court's indulgence.

23        THE COURT:  That's fine.  I understand.

24        MR. ECHEVERRIA:  Thank you.

25        So this is a declaration that I filed with a notice

1   of lodging of defendants' impeachment Exhibit DX.  This is

2   where I explained to the Court how I found the excerpts from

3   *The War On Guns*.  I had to download the book onto a Kindle and

4   take screenshots of it.  So it's not the -- it's not an ideal

5   form of exhibit.  And the defendants are -- are more than

6   willing to lodge with the Court actual Xerox pages from the

7   book, *The War On Guns*, or better printouts if the Court is

8   interested in that.

9          So this is Exhibit DX.  And if we -- if we look at --

10  this is from Chapter 10 of his book, *The War On Guns*.  John

11  Lott asks:

12          "So are there more fatalities when assault weapons

13          are used?"

14          And he goes on, in this paragraph, to discuss the

15  Fort Hood shooting, which was included in the FBI report but

16  not included in the CPRC data set that he was using for his

17  declaration.

18          But he goes on to discuss the Fort Hood shooting,

19  which did not involve -- which did not involve an assault

20  weapon.  We do not argue that it did involve an assault weapon.

21  But this anecdote does not prove that assault weapons do not

22  cause more fatalities.

23          Instead, at figure 1 -- and I'm going to have a

24  call-out here which hopefully will make it more easy -- easy

25  for the Court to review.  It's a little out of focus,

1    unfortunately.

2           But he says:

3           "In figure 1, while the differences between

4           large-capacity magazines and multiple guns suggest

5           that multiple guns result in more mortalities,

6           none of the differences are statistically

7           significant.  But the results do indicate that

8           banning large-capacity magazines will do nothing

9           to reduce fatalities."

10          And then in figure 1 -- in figure 1, which is on the

11   next page, he provides a chart, which is very hard to read.

12   And I apologize to the Court.  And, again, we are willing to

13   lodge a cleaner exhibit, if the Court is interested.

14          But I have a blowup here of figure 1, which is

15   titled, "Number of people killed in mass public shootings in

16   cases 2009 to 2015."

17          I would note that the date range, 2009 to 2015, is

18   different than the date range that Lott was testifying about at

19   the -- at the October hearing.  It's also a very strange period

20   to analyze.  John Lott has explained that it's important for

21   researchers to disclose why they have selected certain time

22   periods to measure because it's possible for researchers to

23   leave out critical data if they are analyzing incorrect periods

24   of time.  There is no explanation for why 2009 is the starting

25   point for his analysis.  And I assume 2015 is the ending point

 1   because the book was published in 2016.

 2           But, in any event, if the Court looks at the

 3   different chart -- at the different bar graphs for figure 1,

 4   he's comparing the use of large-capacity magazines and multiple

 5   guns.  He is not analyzing assault weapons.  He did not do that

 6   study.

 7           In footnote 13, page DEF3575, footnote 13, it

 8   confirms that the study he's referring to is comparing

 9   large-capacity magazines and multiple guns, not assault

10   weapons.

11           Comparing large-capacity magazines without multiple

12   guns and multiple guns without large-capacity magazines finds

13   that the different means, 6 and 8.5, are only statistically

14   significant -- are only statistically significantly different

15   at the 37 percent level.  And there's a -- some statistical

16   reference.  A T-statistic.

17           Anyway, the Court can review footnote 13.  There is

18   nothing about assault weapons being studied there.  John Lott

19   had -- was extrapolating from this study, which is not

20   necessarily reliable in the first place, to conclude that there

21   is no difference for assault weapons being used in mass public

22   shootings, and that's just not the case.

23           I would also reiterate that -- or make the point that

24   the multiple gun comment is a red herring.  Multiple guns could

25   be multiple assault weapons in mass shootings, potentially

1    contributing to even more fatalities.  And the use of multiple

2    guns in mass shootings was a possibility even during the

3    federal assault weapons ban and after the federal assault

4    weapons ban.  But you didn't see -- you still saw a dip in the

5    number of shootings and in the number of people killed during

6    the federal assault weapons ban.  Then an increase after the

7    ban expired, even though multiple guns was an option throughout

8    the entire time period.  So the multiple guns point really is

9    not a material point.

10          But I think the -- there's a larger issue that's

11   raised by John Lott's misrepresentation of his study but also

12   comments he's made throughout this case that statistical

13   significance is some magic phrase.  I believe that Mr. Dillon,

14   earlier today, indicated that the absence of a statistically

15   significant difference means that the difference is no

16   different than zero.  This is a point that John Lott testified

17   to when he was discussing one of Dr. Koper's studies.  He said

18   that Dr. Koper didn't find statistically significant

19   relationships, so the difference is basically zero.

20          This is not how statistical significance operates.

21   Statistical significance is not an on-or-off switch.  A study

22   is not valid because it's statistically significant at the 10

23   percent threshold and invalid because it's significant at the

24   11 percent threshold.

25          And Dr. Lott explains this himself.  He explained

1    this in Exhibit 10 to his own declaration, which was

2    Plaintiffs' Exhibit 10.

3           This was an excerpt for *More Guns, Less Crime*.  And

4    on page -- this is marked page 772, from defendants' -- from

5    Plaintiffs' Exhibit 10.  Pardon me.  John Lott states:

6           "The simple conventions are, however, fairly

7           arbitrary.  And it would be wrong to think that we

8           learned nothing from a value that is -- that is

9           significant at only the 11 percent level, while

10          attaching great -- while attaching a great deal of

11          weight to one that is significant at the 10

12          percent level.  The true connection between the

13          significance level and what we learned involves a

14          much more continuous relationship.  We are more

15          certain of a result when it is significant at the

16          10 percent level, rather than at the 15 percent

17          level.  And we are more certain of a result at the

18          1 percent level than the 5 percent level.  The

19          fact of the matter is that statistical

20          significance lies on a continuum, a continuum of

21          confidence."

22          And the fact of the matter is, is that the state has

23   presented unrebutted evidence of a positive coefficient

24   relating to the use of assault weapons in -- in mass public

25   shootings to higher numbers of fatalities and higher numbers of

1    injuries.  Whether it's statistically significant does not

2    impact the fact that there is a correlation.  The correlation

3    is greater than zero.  It's a positive correlation.

4           And a statistically significant -- a requirement

5    imposed on the state of showing statistical significance would

6    be an unworkable way of adjudicating Second Amendment claims.

7    Correlative evidence is sufficient to show a reasonable fit

8    because I -- it's impossible to -- it's impossible.  I asked

9    Gary Kleck this.  He was an expert witness for the plaintiffs

10   in *Rupp versus Becerra*.  He was also an expert in *Duncan versus*

11   *Becerra*.  So your Honor does have some experience with Gary

12   Kleck.  Gary Kleck -- I asked him, what kind of experiments can

13   we conduct that can control for the intent of the shooter?  I

14   believe the plaintiffs, today, indicated that the intent of the

15   shooter is a variable that impacts the number of people who are

16   killed in a mass shooting.

17          And Gary Kleck said he didn't think that there could

18   be an experiment that could be conducted that way.  You can't

19   control for the intent of a shooter.  We can't do controlled

20   experiments to see what -- what -- to see how mass shootings

21   unfold when a shooter has just a flash suppressor or just a

22   telescoping stock.  These types of experiments cannot be

23   ethically conducted.

24          THE COURT:  All right.  I -- I hate to interrupt you

25   mid-thought, but -- but I get your point.  I understand what

1    you're saying.  Let's take a ten-minute recess.  Come back at a

2    quarter -- quarter till.

3         I'm going to give you 15 more minutes, and then I'm

4    going to give the plaintiff 30 minutes for rebuttal.  Okay?

5         So let's take a break.

6         MR. ECHEVERRIA:  Thank you, your Honor.

7         THE COURT:  Thank you.

8         (Recess taken at 4:34 p.m.)

9         (Resuming at 4:45 p.m.)

10        THE COURT:  Okay.  We're back.

11        I'm going to stop you at five o'clock.

12        So, if you notice, I've tried to keep my comments way

13   down since we started.

14        So, go ahead, Mr. Echeverria.

15        MR. ECHEVERRIA:  Thank you, your Honor.

16        So just to close up about the correlation evidence,

17   in *Rupp versus Becerra* Gary Kleck testified that there is a

18   correlation between the presence of assault weapons and higher

19   fatality and injury rates.  He thinks that the correlation is

20   not causation.  That the correlation is caused by the intent of

21   the shooter.  But he admitted it.

22        And he also testified that if two events are causally

23   related, it makes them -- or, sorry.  If two events are

24   correlated, it makes it more likely that they're causally

25   related.

1    There is a point that John Lott also admitted at

2    deposition transcript excerpt page 325, one to five.  And this

3    is a point that Judge Staton, in *Rupp versus Becerra*, concluded

4    with.  That the correlation evidence that the state has is

5    sufficient, and the state shouldn't be expected to turn a blind

6    eye to that evidence in the face of evidence that assault

7    weapons increase the lethality of mass shootings.

8    The assault weapons ban that was enacted by the

9    federal government was effective.  Louis Klarevas explains in

10   his declaration about how the incidence of mass shootings went

11   down during the assault weapons ban and went up after the ban.

12   The only rebuttal evidence that the plaintiffs have

13   presented in this case to address that expert opinion is this

14   share test that John Lott came up with.

15   And opposing counsel, today, towards the end of

16   the -- of their presentation, stated that Klarevas would

17   predict that the share of mass shootings involving assault

18   weapons would go down during the assault weapons ban, only to

19   go up after the expiration of the ban.  This is not something

20   that Klarevas would predict.  He's never predicted this.  This

21   is an idea that John Lott has come up with.  And Klarevas would

22   not predict this because of the -- the presence of

23   large-capacity magazine restrictions that were also lifted,

24   that caused an explosion in mass shootings involving

25   non-assault weapons with LCMs, that were able to kill the

1    requisite number of people to qualify as a mass shooting.

2         The share -- the share test makes no logical sense.

3    It doesn't account for large-capacity magazines.  It doesn't

4    account for substitution effects where John Lott admits that

5    individuals who can't acquire an assault weapon may use a

6    different weapon to try to commit a mass shooting.  He admitted

7    during his deposition that it's possible that the substitution

8    would be of a less-effective weapon, so that the shooter may

9    not kill the requisite number of people to qualify as a mass

10   shooting, drive -- driving down the denominator and possibly

11   keeping a stable share before, during, and after the federal

12   assault weapons ban.  And the spillover effect is seen if

13   somebody decides to not engage in any mass shooting, including

14   a mass shooting without an assault weapon.

15        So all of these can account for the phenomenon that

16   John Lott observed.  And when the data is corrected, Klarevas's

17   single share will be accounted for as well.  The share test is

18   not in the literature, it's not a reliable method, and it does

19   not rebut the evidence that the federal assault weapons ban was

20   effective.

21        Finally -- two final points.  It is important for the

22   state of California to restrict the ability to purchase assault

23   weapons.

24        John Lott, in his declaration -- Plaintiffs' Exhibit

25   10 -- had -- had a discussion about how criminals generally

1   obtain their guns illegally.  That was a red herring.

2           During his deposition he admitted, without any

3   resistance, that mass -- that individuals who engage in mass

4   shootings overwhelmingly acquire their guns legally.  You could

5   say the same for active shooters.  This is all consistent with

6   Lucy Allen's conclusion in her declaration at Defendants'

7   Exhibit A, paragraph 38, that over 70 percent of shooters who

8   engage in mass shootings acquire their guns legally.

9           And the final point is the other important and

10  compelling government interest that the state has, which is in

11  mitigating violence against law enforcement personnel.  Again,

12  there is no evidence in the record that plaintiffs have

13  presented to rebut that important interest.

14          And -- and, finally, for all of the reasons that we

15  discussed concerning a reasonable fit and the fact that the

16  interests are compelling, it's the state's position that even

17  under intermediate scrutiny -- which should not be the

18  standard -- the state still prevails and the assault weapons

19  control act is constitutional.

20          So, in conclusion, there -- that's -- that is the

21  conclusion of my presentation.  And I -- I -- I appreciate -- I

22  welcome any questions that the Court may have about -- about

23  those points.

24          But, in conclusion, I would like to reiterate that

25  the facts and the evidence present in the record in this case

1    are not properly seen as adjudicative facts.   These are

2    legislative facts that the legislature and this Court can --

3    can look at in determining whether the law is constitutional.

4          There aren't real factual disputes that the Court

5    needs to resolve by trial.   These are legislative facts that

6    should inform the constitutional analysis.

7          We also ask that if the Court is inclined to issue an

8    injunction in this case -- no injunction should issue.   But if

9    one should issue, we ask for an immediate stay of any judgment,

10   so that we can consider our appellate rights without having any

11   disruption of the status quo.

12         This is something that we requested after the fact in

13   *Duncan versus Becerra*.   And we are asking for it now, before

14   the fact, just in case.   Just to ensure that there would be an

15   orderly appeal, in the event that the Court is inclined to

16   enjoin any portion of the assault weapons control act.

17         Of final note, I would ask that the Court formally

18   admit into evidence the exhibits that the defendants have

19   marked, including impeachment Exhibit DX and the two additional

20   exhibits that I marked today, Exhibit DY and Exhibit DZ.

21         And -- and, finally, after the plaintiffs have had an

22   opportunity to make their closing presentation, I think that it

23   might be a good idea to discuss post-trial briefing and

24   scheduling of that.

25         With that, your Honor, I leave it to you and the

1   plaintiffs to close out this trial.

2             THE COURT:  Let me -- let me ask you a question

3   before you go.

4             I'm very troubled by -- by -- by the test.  When --

5   when you read me the quote from -- what is it, the First

6   Circuit?  Where they talk about the plaintiffs' argument --

7   argument being too facile by half --

8             MR. ECHEVERRIA:  Um-hmm.

9             THE COURT:  -- I'm kind of troubled by -- by that

10   test.

11            I -- I never -- never realized that we, the courts,

12   were that deferential to the legislative findings or

13   conclusions or enactments when it comes down to constitutional

14   issues.  And the test troubles me for the following reasons.

15            I think I indicated once before how many more crimes

16   could be solved, for example, if we just didn't require Fourth

17   Amendment warrants for searches and seizures?  For example, I

18   -- I have presided over cases where people have brought

19   drugs -- sorry, but it's usually women who have brought drugs

20   into prisons, you know, concealed within their bodies.

21            I've always wondered -- okay.  So I wonder, if the

22   state of California said, you know, it's an important state

23   interest to not have drugs smuggled into the -- into prisons.

24            And, you know, we could do a bod -- bodily -- a

25   search on every person that comes in to visit an inmate.  And,

1    in fact, we're going to require that.  Because -- because that

2    would accomplish the important -- or help us accomplish the

3    important state interest of not allowing drugs to be brought

4    into the prisons.

5            And I am wondering -- I wonder how long it would take

6    the First Circuit, the Ninth Circuit, or any other circuit in

7    the nation to say no.  No.  You can't do that.  I wonder if --

8            MR. ECHEVERRIA:  Of course.

9            THE COURT:  -- if the state said, you know, there's

10   an awful lot of drunk driving going on.  A lot of people being

11   killed by drunk drivers.

12           And, it's an important state interest for the state

13   to say we -- we need to avoid drinking and driving.

14           So we're going to stop -- start pulling people over

15   without probable cause.  Because that will assist us in

16   accomplishing the important state interest of not having drunk

17   drivers on the road.

18           I wonder how long it would take the First Circuit or

19   the Ninth Circuit or any other circuit to say, sure, that's an

20   important state interest.  It could be accomplished less

21   effectively without this road [sic].  I wonder how long that

22   would withstand judicial scrutiny.

23           MR. ECHEVERRIA:  Not long at all, your Honor.  And

24   the reason is that there is an additional hurdle that the State

25   would have to negotiate.  And they would fall flat on their

1    face at the first hurdle.

2             THE COURT:  What's that?

3             MR. ECHEVERRIA:  Which is assessing the burden.

4             THE COURT:  They pull people over.

5             MR. ECHEVERRIA:  The burden -- sorry?

6             THE COURT:  What's the burden to pulling somebody

7    over, and walking up to them, and saying, "Hey, have you been

8    drinking?"  What's -- what's --

9             MR. ECHEVERRIA:  What's the burden?

10            Your Honor, I -- there are a lot of hypotheticals

11   that were offered in the Fourth Amendment context.  But in

12   terms of -- you know, in cases of, you know, the individuals

13   who are smuggling drugs and having, you know, full body

14   searches, the -- I -- in the Second Amendment context, there

15   are two gates that have to be cleared at step two.

16            The first is the burden analysis.  The --The

17   principle doesn't change.  The principle doesn't change.  If we

18   use the analysis that says, look, we defer to the state.  When

19   the state finds that it's an important state interest and --

20   and the -- and the important state interest can be achieved

21   less effectively by having this law, if that's the principle,

22   does it really matter whether it's a Second Amendment, a First

23   Amendment, a Fifth Amendment?  Where would we find that in the

24   Bill of Rights, where it says, look, you can apply this

25   standard for First Amendment, Fourth Amendment, Fifth

1    Amendment, Sixth Amendment?  Use a different standard for the

2    Second Amendment.  Where would I find that?

3              MR. ECHEVERRIA:  Your Honor, different standards do

4    apply in connection with different enumerated rights.

5              If you look at the First Amendment, for example, the

6    First Amendment particularly -- particularly carves out of the

7    First Amendment true threats.  So these would be words that are

8    spoken that will lead to violence.  And the reason why true

9    threats are carved out of the First Amendment is that the words

10   will cause harm directly.

11             In -- in other contexts, the Fourteenth Amendment,

12   equal protection, there are various degrees of scrutiny that

13   are applied.  It's not -- it's not unfathomable that in a

14   Second Amendment context we apply different tiers of scrutiny

15   to different types of laws.  We do that in a First Amendment

16   context.  Commercial speech is subject to intermediate

17   scrutiny.

18             So if there is a burden that is severe, then the

19   state is not entitled to the kind of deference that the First

20   Circuit was referring to in *Worman*.  There would be -- they

21   would -- they would not have deference.  It would be strict

22   scrutiny.

23             Here, because the burden is minimal, the state is

24   entitled to deference.  And it's not just blind deference, your

25   Honor.  We're not asking for a blank check.  We are showing the

1    evidence that we have that supports the constitutionality of

2    this law.  And this evidence has been credited by not just one

3    court; five Federal Circuit courts and a sister district court

4    in the Ninth Circuit, in California, which is currently on

5    appeal.

6              There is a lot of evidence --

7              THE COURT:  Let me ask you something.  How long has

8    the *Rupp* case been on appeal?

9              MR. ECHEVERRIA:  How long has it been on appeal?

10             THE COURT:  Yes.

11             MR. ECHEVERRIA:  So *Rupp* was argued before the Ninth

12   Circuit, I believe, in October.  I did not argue the case.  But

13   it was in October, I believe.  And it is still being -- it's --

14   it's still under submission.

15             THE COURT:  If it's so clear -- if your position is

16   so clear, why is it taking so long?

17             I've sat with the Ninth Circuit.  I've written an

18   opinion in -- oh, I don't know.  Less than 30 days.

19             If it's so clear -- what you're saying to me is so

20   clear, why -- why is *Rupp* taking so long?  It should be a

21   slam-dunk case.

22             MR. ECHEVERRIA:  I -- why -- any case involving

23   constitutional rights, I think, is not -- shouldn't be -- I --

24   I -- look, your Honor, I don't know.  I'm not on the Ninth

25   Circuit.  I wouldn't know --

1          THE COURT:  Okay.  That wasn't a fair question.  That

2    wasn't a fair question.

3          MR. ECHEVERRIA:  It wasn't a preliminary injunction

4    appeal, so there was no expedited schedule for the appeal.  It

5    was a merits appeal.  I don't know.  That might explain some of

6    it.

7          THE COURT:  That wasn't fair.  I apologize.

8          But, look -- okay.  Mr. Lee, Mr. Dillon, do you have

9    any rebuttal?

10         MR. LEE:  Yes, your Honor.  Thank you.  And I --

11   hopefully you can near me okay.

12         I will endeavor to be brief.  I know that the Court

13   has heard a lot of argument on this.  There is a lot of

14   material to go through, and -- and the Court has heard

15   extensively from the parties.  So I'm just going to try to keep

16   it to some of the salient points that were raised.

17         MR. LEE:  And, in particular, the points that seem to

18   interest the Court, I would like to address.

19         Starting with the slippery slope argument, which

20   seemed to be a recurring theme in the Court's concern.  And

21   that's frankly the reason why we're here, is because this has

22   been a long cascading series of laws, starting from 1989 and

23   continuing to the present, which continues to -- to constrict

24   law-abiding gun owners and to continue to simply add to the

25   number of firearms and the number of ways that you will break

1    the law if you endeavor, intentionally or otherwise, to obtain

2    one of these weapons that has one of these features.

3              Now, Mr. Echeverria has done a great job of easing

4    all of our concerns about this is simply a legislative

5    experiment and that there is no real intent to go further.

6              THE COURT:  Well, he didn't really say that.  He

7    didn't say one way or the other.

8              MR. LEE:  Well, he said, I think, that this is --

9    this is where -- this is what the -- the legislature states,

10   and this is the only thing before the Court.

11             THE COURT:  Right.

12             MR. LEE:  And -- and there is no -- there is no real

13   danger of a slippery slope.

14             And if it was just up to Mr. Echeverria and I, I

15   think, you know, we could have a great discussion over lunch

16   about this, and leave it at that and part as friends.

17             But the fact of the matter is it's not Mr. Echeverria

18   that we're worried about.  It's his client, the legislature.

19   And when it comes to the legislature, we just have to take them

20   at their word.

21             The express language of Penal Code Section 30510(e),

22   which states the -- the -- the legislative intent in connection

23   with the original Category 1 assault weapons ban, said that

24   they've listed these firearms and any other models that are

25   only a variation of those weapons with minor differences,

1    regardless of the manufacturer.  That that's their intent to --

2    to prohibit those.  And -- and the legislature goes on to say

3    in that Section E:

4                "The legislature has defined assault weapons as

5                the types, series, and models listed in this

6                section because it was the most effective way to

7                identify and restrict a specific class of

8                semiautomatic weapons."  End quote.

9            So, when the legislature tells you that they intend

10   to ban a class of weapons, as much as I credit Mr. Echeverria

11   and -- and in good faith, that this isn't really a ban on a

12   class of weapons but a specific list of configurations -- is

13   how he put it -- I am going to have to just take the

14   legislature's word on it.  That their intention was to ban a

15   class of semiautomatic weapons.

16           And, in fact, to the specific statute in question,

17   which is enacted by Senate Bill 23, in connection with Senate

18   Bill 23, the legislature state -- stated expressly that it was

19   the original intent of the legislature, in enacting Chapter 19

20   of the statutes of 1989, to ban all assault weapons regardless

21   of their name, model number, or manufacturer.

22               "It is the purpose of this act to effectively

23               achieve the legislature's intent to prohibit all

24               assault weapons."  Close quote.

25           So, again, as much as Mr. Echeverria says this is a

1    limited application, we take the legislature's word for it.

2         And when -- when -- frankly, when legislatures go on

3    record and say -- the ones who are responsible for crafting

4    this legislation -- that -- that there will be no assault

5    weapon possession, no debate, no discussion, period -- which is

6    the way it was put -- well, then, that's what -- this is what

7    happens, your Honor.  A lawsuit happens.

8         When a -- when a United States senator says if it was

9    up to her, she would tell -- tell Mr. and Mrs. America to round

10   them all up, to turn them all in, we have to take the

11   people's -- the legislators who craft this legislation, we have

12   to take them at their word that this is their intention to ban

13   every assault weapon.

14        And the only reason why they haven't is because they

15   can't.  But the only reason why they can't is because they

16   can't do it all at once.

17        So this is an incremental series of -- of laws,

18   starting with that original assault weapons control act ban,

19   Category I.  They realized that that was under-inclusive, so

20   they need to go promulgate an extra list to Category 2.

21        They realize that we need to start banning features

22   because the federal assault weapon ban is expiring.  So

23   they're -- so they're coming up with these 30515(a) features,

24   prohibitions.

25        So, again, as much as Mr. Echeverria says this is

1    just a simple ban on a serious of configurations, we take his

2    client's word at it, that this is their intention.

3         And this leads to another point.  Is that if we start

4    simply banning all of these categories of weapons, is that

5    really going to accomplish anything as far as, for example, the

6    mass shootings?

7         Well, I -- I think everyone can agree that it

8    probably won't have a statistically relevant effect on crime

9    overall because assault weapons are used in a very small

10   percentage of crimes.  I think everyone acknowledges that.

11        But will it make a difference, for example, with mass

12   shootings?  Which I think is the -- the -- the very reason why

13   all of these laws are being enacted.

14        And your Honor raised the point, well, look, if the

15   only thing that is available is a Ruger Mini-14 or a

16   featureless rifle -- let's just say -- won't a mass shooter

17   simply use that?  And the answer is absolutely -- that's

18   absolutely correct.

19        And, again, I think in the hearing in October, I -- I

20   asked Professor Donahue about these incidents.  But there was

21   an incident -- a horrible incident in Norway in which the

22   shooter killed, I think, 69 people -- kids at a summer camp, on

23   an island -- this right-wing extremist, using a Ruger Mini-14.

24        Again, there was, likewise, a -- a terrible incident

25   in 1980s, in Canada, at a woman's college, in which a person

1    slaughtered a number of women at -- at a college using a Ruger

2    Mini-14.

3              So then the next round is, well, you know, clearly

4    these assault weapons bans aren't working to alleviate the --

5    the stated concern.  We need to go the next step.  We need to

6    incrementally start banning semiautomatic firearms in general,

7    semiautomatic rifles.  That's clearly the next step.  I -- and

8    so I -- I don't see how anyone can really, frankly, deny that.

9              But more to the point that your Honor was concerned

10   with, are shooters simply going to revert to the -- to what's

11   available?  And what's available is what they're going to use.

12   And I don't think you can say that it -- it's going to make any

13   meaningful difference in the outcome because the -- the facts

14   are -- or the defense in this case hasn't claimed that the

15   absence of any features is going to make a meaningful

16   difference.

17             I think the defense relies mostly on statistics in

18   saying that there is correlation.  But, again, correlation

19   doesn't mean causation.  And, not only that, I don't think that

20   the -- the -- the defense, in this case, is even suggesting

21   that there's causation.  The existence of a flash hider isn't

22   going to cause me to go out and commit a crime.  The existence

23   of a pistol grip or a collapsible stock isn't going to cause me

24   to go out and -- and to commit a crime.

25             THE COURT:  But -- but certainly -- certainly some of

1  the features may reduce the number of injuries or the number of

2  fatalities.

3  I don't know that I need -- I don't know that I

4  need -- I mean, I think it's common sense to understand that if

5  you have a semiautomatic rifle that fires a lot of rounds, that

6  that weapon -- if used -- is likely to cause more injuries or

7  more fatalities.

8  I mean, that seems like -- I don't know.  Do I really

9  need to have a study -- a scientific study to come up with a

10  conclusion that that's likely to happen?  I think not.

11  But my question -- and this is -- this is why I think

12  I asked Professor Donahue about this.  And this is why I was

13  pestering Mr. Echeverria with the issue, which is -- excuse me.

14  You get rid of the featured weapons, only thing

15  that's going to happen is that somebody is going to start using

16  the -- the featureless rifles.  And you're going to have an

17  increase in fatalities and -- and injuries.

18  And then the state will come around and will say,

19  well, we're -- we're going to get rid of the featureless

20  weapons.  And then you'll be left with the Ruger Mini-14.  And

21  then people who are intent on killing people or injuring people

22  are going to get the Mini-14.  At least some of them will, just

23  like some of them used the current assault weapons.  And

24  they're going to use those, and there will be people killed.

25  And so at some point in time, I suppose, the

 1   legislature will wind up down to -- I suspect -- the 2.2 shots.

 2   So you can only have 2.2 shots in your -- in -- in your weapon

 3   because the legislature deems it acceptable to have 2.2

 4   fatalities or injuries.  That's okay.  That's all right.  So

 5   we'll let you have that weapon that -- that will only kill or

 6   injure, perhaps, 2.2 people.  That -- that's my concern.

 7            MR. LEE:  Sure.

 8            And -- and not only will -- and not only will a --

 9   someone intent on committing a horrible crime use a featureless

10   weapon.  But, frankly, all they will do is take the features --

11   reattach the features.

12            It's -- it's -- the shooters at San Bernardino, for

13   example, they took completely legal -- California legal rifles

14   which were attached with bullet-buttons.  And they simply took

15   the bullet-buttons off and made them fully functional AR-15s

16   that they used in connection with that attack.

17            Now, who's -- who's going to comply with the law?

18   The -- both -- the people who are both law-abiding citizens and

19   responsible and the people who are knowledgeable about -- about

20   these laws.

21            THE COURT:  You know, let me interrupt you for just a

22   second.  I know it's your time, but I've got a question.

23            Because it dawned on me -- there was a question that

24   I was going to ask -- I was going to ask Mr. Echeverria, as

25   well as you.

1          But in some of these mass shootings, as I recall,

2    there's also called -- something called a bump stock.  And it

3    seems to me that in some of these mass shootings the shooters

4    used a bump stock.  Which, my recollection is, turns the weapon

5    into more of a fully automatic weapon.  And I don't know that

6    that was ever accounted for in any of the discussions that we

7    have had or any of the studies that have been conducted.

8          I believe that that feature is also banned in the

9    state of California.  Isn't it?

10         MR. LEE:  Yes, your Honor.

11         And -- and -- and we have largely not discussed that

12   because, frankly, it's an open question as to whether or not

13   bump stock was actually used in connection with that incident,

14   which is the Las Vegas incident.  It was alleged that the

15   shooter in that incident used -- allegedly used a bump stock.

16   At least that's the common allegation that's made.  I don't

17   think that that's yet been determined or proven.  And so I

18   think we hesitate to wade into that.

19         But it doesn't really matter because a bump stock

20   device, I think, is separately prohibited under California law.

21   So it doesn't --

22         THE COURT:  So what I was trying to get at is when

23   we're talking about weapons being like -- for example, being

24   like an M16 -- before me, nobody is challenging the prohibition

25   on the bump stock.  And I certainly could see how someone who

1    is somewhat skeptical about these prohibitions would say, yeah,

2    that bump stock really does make this weapon a lot more like

3    the M16 than the evil-featured AR-15 or AK-47.

4            I forgot to ask about that.  We had so many things

5    going on.

6            All right.  Go ahead.  I interrupted you.  I

7    apologize.

8            MR. LEE:  Thank you, your Honor.  And it's no

9    problem.

10           I -- I didn't want to raise the issue because I don't

11   think it's, frankly, germane to -- to this incident.

12           But -- but on the mass shootings incident, your Honor

13   is troubled -- and Mr. Echeverria spent some time talking about

14   the specific definition of the mass shooting.

15           And -- and while there are many different terms that

16   are used -- mass shooting, public mass shooting, active

17   shooter -- we haven't really quarreled too much with the

18   specific definition because largely, your Honor, it doesn't

19   matter.

20           Mr. Echeverria is -- by the way, is absolutely right

21   when I -- I mixed up Ms. Allen's report.  The report she did in

22   *Rupp*, in the *Rupp* case actually involved a smaller set of data

23   of -- of mass shooting incidents.  The report that she did in

24   the present case involved the 161 incidents, I believe.  And so

25   it was a larger data set.  But her conclusion actually went --

1   as to the number of -- of those incidents involving assault

2   weapons, actually went down.  I think it was from something

3   like -- if memory serves, something from like 26 percent to 22

4   percent.  But the reason why we don't really -- when she

5   changed her definition of -- of public mass shooting.

6          But the reason why it doesn't matter, because it's

7   still -- it doesn't really matter.  It is still not a majority

8   of the -- of the firearms that are used in public mass

9   shootings under -- under either of her cases.  And when I asked

10  her was she surprised that the -- that the number of -- that

11  the percentage of assault weapons went down when you look at a

12  larger data set, she wasn't surprised.  And I'm not surprised

13  either.

14          If your Honor really wants an eye-opening look at

15  simply totally raw mass shooting data in which all they do is

16  they take -- all they say is that if four people are shot,

17  period, end of story -- including the shooter.  If four people

18  are shot, they call it a mass shooting.  Doesn't matter where

19  it took place or -- or what the circumstances were.  And this

20  is a -- this is the database that's compiled at a place called

21  the mass shooting tracker site -- or massshootingtracker.site.

22  And this is really revealing.

23          MR. ECHEVERRIA:  I'm sorry.  This is John Echeverria.

24  I'm not aware of this study being offered as an exhibit in this

25  case.  This is the plaintiffs' reply.  I -- I -- I would need

1    an opportunity to review this and to consider it.  I don't

2    think it's fair to the defense, offering new evidence on reply.

3              MR. LEE:  Well, I understand Mr. Echeverria's point,

4    your Honor.  And I'm not going to introduce it or discuss it at

5    length.  All I'm saying is that when you just take raw data and

6    you just -- you -- you factor out all of the things, like

7    whether it was used in commission with another crime, or

8    whether it was in a public place, or any of these other things,

9    there's a lot of people being shot, your Honor, in what would

10   be called mass shootings.

11             And so would the number of assault weapons that are

12   used in connection with mass shootings, under that definition,

13   go down?  I'm sure it would.

14             I'm -- there's no -- been no study on this, but I'm

15   sure it would.  Because by and large, I think as everyone

16   acknowledges, crime in the United States -- or -- or gun crime

17   in the United States is largely a handgun issue.  And that's

18   borne out by the data and the -- and the information in the

19   exhibits that have been submitted to the Court in this case.

20             So the point is -- the point of all of this is, your

21   Honor, we haven't quibbled too much with the definition of mass

22   shooting because it doesn't matter.

23             According to Ms. Allen, four out of five of her

24   public mass shootings did not involve the -- the use of an

25   assault weapon.

1          By and large, if you look at all of the exhibits that

2     we've cited in our -- in our presentation on Wednesday, the

3     most prevalent firearm is a handgun.  And it doesn't -- and --

4     and the existence of an assault weapon ban does not have a

5     meaningful effect upon crime rates overall.

6          So I -- so I don't think we need to really quarrel

7     with all of that or quibble with the specific definition of

8     mass shooting or -- for -- for those matters.

9          But I think the most important aspect of why it's not

10     really important is because Ms. Allen doesn't say -- nor does

11     the defense claim in this case -- that the presence of any

12     particular assault weapon feature would have made a difference

13     in the outcome of any of those shootings.  They didn't look

14     at -- they didn't parse any one of these 161 incidents.  They

15     didn't say the shooter shot X number of people with assault

16     weapons and a Y number with non-assault weapons.  They are not

17     saying that -- that the existence of any of these 30515(a)

18     features would have made a difference in the outcome.  Nor can

19     they.

20          So, for these reasons, I think that's why -- I don't

21     think the Court -- while I certainly appreciate the Court's

22     concern over the various definitions that have been used, I

23     don't think, largely, that all of that -- that it matters all

24     that much because --

25          THE COURT:  Well, the only reason why I raised it,

1   Mr. Lee, is because, you know, it's like anything else.  You

2   have to have a standard to go from.  And if someone is act --

3   is talking about a mass shooting in one -- using one definition

4   and someone else is using another definition, as Mr. Echeverria

5   so competently pointed out with regards to Dr. Lott's FBI

6   report.  If -- if we're talking about apples and apples, well,

7   then it's meaningful.  But if we're talking about apples and

8   oranges, well, now you've got a different problem.  You're

9   talking about something different.  But I also understand your

10  point.  So anyway, go ahead.

11          MR. LEE:  I mean, we can -- we can debate all of this

12  stuff.  But, at the end of the day, even if you accept

13  Ms. Allen's findings in her report in Defense Exhibit A, four

14  out of five mass shootings did not involve the presence of an

15  assault weapon and they're not claiming that it would have made

16  a difference.

17          All we can say, your Honor -- which -- and I think

18  all they have been saying is that there is some correlation

19  between mass shootings and the presence of an assault weapon.

20  There is some correlation.  And that the fatalities tend to be

21  higher in those cases.  But, again, they're not saying that it

22  actually did make a difference.

23          Am I surprised that there is a greater -- a higher

24  fatality rate -- and another problem, of course, with these

25  studies is they conflate the term -- they conflate assault

1  weapon with the large-capacity magazine issue, too.

2          So that's a problem, is that the -- when you start

3  conflating these things, it becomes difficult to parse out what

4  exactly is the true cause of -- of the -- of the fatality.

5          But at -- at the end of the day, am I surprised that

6  there is a higher incidence than one might think of the use of

7  assault weapons or large-capacity magazines in connection with

8  these incidents?

9          I'm not surprised, because these are extremely

10  popular available firearms all around the country.  And that's

11  our very point.

12          Their very ubiquity, their very commonality which

13  makes them being held in common -- in common use, in this case,

14  for unlawful purposes -- sure.  The reason why people use these

15  is because they're popular and they're available.  So I'm

16  certainly not surprised.  But, again, there's no evidence that

17  it would have made a difference in the outcome in any of these

18  cases and particularly with regard to the 30515(a) features.

19          And, you know, we're not unmindful.  And neither

20  should this Court be unmindful of what the -- of what the

21  problem of -- that's posed by these incidents or in crime in

22  general.  But I -- I would say -- I mean, the very last

23  paragraph of the majority of opinion in *Heller*, Justice Scalia

24  said, quote:

25          "We are aware of the problem of handgun violence

1          in this country, and we take seriously the

2          concerns raised by the many amici who believe that

3          prohibition of handgun ownership is the solution.

4          The Constitution leaves the District of Columbia a

5          variety of tools for combating that problem,

6          including some measures regulating handguns, but

7          the enshrinement of constitutional rights

8          necessarily takes certain policy choices off the

9          table."  End quote.

10         One can be -- so, your Honor, one can be mindful that

11    there is a serious problem.  That the majority opinion was

12    mindful that there is a problem of handgun violence in the

13    District of Columbia.  No question.

14         But if certain policy choices are taken off the

15    table, and that includes a categorical ban of a class of

16    weapons that's overwhelmingly chosen by the American people for

17    self-defense and other lawful purposes, then that is a policy

18    choice that is taken off the table.  And it is not enough for

19    the Court or for Mr. -- or for the state to say, as

20    Mr. Echeverria argued, that the burden is minimal because other

21    types of firearms are available.  That was another argument

22    that the court rejected in *Heller*.

23         If the Court will recall, the District of Columbia

24    was attempting to say, well, the handgun ban doesn't really

25    burden Second Amendment interests or the right to self-defense

 1   because a homeowner in the District of Columbia had other

 2   options; such as a shotgun, for example.

 3          But the -- the Court rejected that argument.  It said

 4   you can't just simply ban an entire class of weapons that's

 5   overwhelmingly chosen by --

 6          THE COURT:  What -- what -- what do you say to the

 7   argument that Mr. Echeverria makes, which has -- has some

 8   weight.  Which is, look, this is not banning an entire class of

 9   weapons.  This is only banning certain features that make this

10   weapon more dangerous.

11          MR. LEE:  I could -- it is a ban of a class of

12   weapons, as the legislature expressly told us exactly what they

13   were going to do:  Try to ban an entire class of weapons, per

14   the legislative intent that I raised at the beginning of this

15   rebuttal.  But --

16          THE COURT:  But -- but -- but it's not a complete ban

17   if in fact there are other -- see, this is the -- this is why I

18   said at the very beginning that the definition of an assault

19   weapon is important.  And -- whether it's intentionally so

20   or -- or not, but it also confuses the issue.

21          So if an assault weapon is what we define an assault

22   weapon to be -- right?  We say, "This is an assault weapon."

23   Right?

24          Now, the legislature has left open other weapons that

25   one could arguably say are assault weapons.  Right?  In a

1   broader definition.  That is the featureless AR-15, AK-47

2   weapons.  Right?

3          So are those a class of assault weapon?  Are those

4   the kinds of weapons that the legislature is talking about

5   banning?  Will they be banning those in the future when we see

6   that those are the weapons that are then used, perhaps, by some

7   to commit these horrible crimes?

8          MR. LEE:  I would suspect, your Honor, that when

9   it's -- when it's determined that -- that that -- that banning

10  these features is not sufficient for the state, that they would

11  attempt to simply ban other -- other categories of weapons.

12         So -- but -- but, again, that's -- that's somewhat

13  supposition.  To your Honor's question, is this banning an

14  entire class of weapons?  Yes, of course it is.

15         The most -- all one has to do -- you know, this --

16  this commonality question, your Honor -- you know, we put

17  numbers up.  We put Mr. Curcuruto's testimony up.  We've done a

18  jurisdictional analysis.  This is all somewhat overkill in the

19  sense that all one has to do is to go into any gun store in any

20  other state in the country and look on the shelf and say -- and

21  look at what's available.

22         And one will see stores of AR-15 rifles.  The most

23  popular common rifle out there.  And if they're not on the

24  shelf, it's because, as Mr. Peterson testified before your

25  Honor back in October, it's because he can't keep them on the

1  shelf.  It's because they -- they're selling out so quickly

2  they can't -- their supply can't keep up with demand.

3            So Mr. Echeverria --

4            THE COURT:  Wait.  But he can't be selling -- he

5  can't be selling the weapons with the evil features in

6  California, can he?

7            MR. LEE:  He said he sells black rifles, which are

8  tactical rifles.  That, at this point, he's limited to -- he's

9  limited to featureless rifles.  Correct.

10           But what I'm saying is that -- is that if you go to

11 any gun store in any other part of the country, you'll see

12 AR-15s with all of the features.  And that's how they chose the

13 class.  That's how they chose these -- these configurations, as

14 Mr. Echeverria puts it.

15           Now, I think the state tries to have it both ways.

16 First, they try to say that --

17           (Videoconferencing call disconnected.)

18           THE CLERK:  Your Honor, I'm sorry.  But there's

19 technical issues.  I couldn't control it.

20           THE COURT:  Can we reconnect?

21           THE CLERK:  That would have to be through Bruno or

22 Brian, if they're still here.

23           (Pause.)

24           THE CLERK:  No, they're not here, Judge.  The call

25 was initiated from Bruno at his desk.  So --

 1               I can message everyone right now, I'm pretty sure.

 2               THE COURT:  I don't know if they can hear me.

 3               THE CLERK:  I don't think they can.

 4               (Pause.)

 5               THE COURT:  Okay.  Well, that's all we can do.

 6               I will issue an order.  The order will -- will set

 7    forth a schedule for the findings of fact and conclusions of

 8    law.  We'll issue a minute order on that.

 9               Because of technical issues, this hearings is

10    concluded.  Thank you.

11               (Conclusion of proceedings 5:31 p.m.)

12                              --oOo--

13

14    I certify, by signing below, that the foregoing is a correct

15    stenographic transcript of the oral proceedings had in the

16    above-entitled matter this 16th day of February, 2021.  A

17    transcript without an original signature or conformed signature

18    is not certified.  I further certify that the transcript fees

19    and format comply with those prescribed by the Court and the

20    Judicial Conference of the United States.

21
              /S/ Amanda M. LeGore
22              _____

23          AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

24

25