1
2
3
4
5
6
7                          UNITED STATES DISTRICT COURT
8                          SOUTHERN DISTRICT OF CALIFORNIA
9

10   JAMES MILLER, et al.,                    Case No.:  19-cv-1537-BEN (JLB)
11                              Plaintiffs,
                                              **DECISION**
12   v.
13   ROB BONTA, in his official capacity as
     Attorney General of the State of
14   California, et al.,
15                              Defendants.
16

17                          **I.  INTRODUCTION**

18       Like the Swiss Army Knife, the popular AR-15 rifle is a perfect combination of

19   home defense weapon and homeland defense equipment.  Good for both home and battle,

20   the AR-15 is the kind of versatile gun that lies at the intersection of the kinds of firearms

21   protected under *District of Columbia v. Heller,* 554 U.S. 570 (2008) and *United States v*

22   *Miller,* 307 U.S. 174 (1939).  Yet, the State of California makes it a crime to have an AR-

23   15 type rifle.  Therefore, this Court declares the California statutes to be unconstitutional.

24       Plaintiffs challenge a net of interlocking statutes which impose strict criminal

25   restrictions on firearms that fall under California's complex definition of the ignominious

26   "assault weapon."  Hearings on a preliminary injunction were consolidated with a trial on

27   the merits pursuant to F.R.C.P. Rule 65(a)(2).  Having considered the evidence, the Court

28

issues these findings of fact and conclusions of law,[1] finds for the Plaintiffs, and enters Judgment accordingly.

The Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S., at 635. The Supreme Court clearly holds that the Second Amendment protects guns commonly owned by law-abiding citizens for lawful purposes. At the same time, "the Second Amendment confers an individual right to keep and bear arms . . . that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *Id.* at 622. And although the Supreme Court cautioned that the Second Amendment does not guarantee a right to keep and carry "any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S., at 626, lower courts have often cited this proviso about extreme cases to justify gun laws in average contexts. There is no evidence that the Supreme Court intended that language to be a license to avoid its common sense holding in average contexts. Unfortunately, *Heller*'s acknowledgement of exceptions for gun laws at the extreme is in danger of swallowing *Heller*'s rule for the average case.

This case is not about extraordinary weapons lying at the outer limits of Second Amendment protection. The banned "assault weapons" are not bazookas, howitzers, or machineguns. Those arms are dangerous and solely useful for military purposes. Instead, the firearms deemed "assault weapons" are fairly ordinary, popular, modern rifles. This is an average case about average guns used in average ways for average purposes.

One is to be forgiven if one is persuaded by news media and others that the nation is awash with murderous AR-15 assault rifles. The facts, however, do not support this

---

[1] The characterization of a finding as one of "fact" or "law" is not controlling. To the extent that a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance prevails over form.

hyperbole, and facts matter.  Federal Bureau of Investigation murder statistics do not track assault rifles, but they do show that killing by knife attack is far more common than murder by any kind of rifle.  In California, murder by knife occurs seven times more often than murder by rifle.  For example, according to F.B.I. statistics for 2019, California saw 252 people murdered with a knife, while 34 people were killed with some type of rifle – not necessarily an AR-15.[2]  A Californian is three times more likely to be murdered by an attacker's bare hands, fists, or feet, than by his rifle.[3]  In 2018, the statistics were even more lopsided as California saw only 24 murders by some type of rifle.[4]  The same pattern can be observed across the nation.

## A.   Pre-*Heller* Origin of the Assault Weapons Control Act ("AWCA")

It is clear today, in the year 2021, that individuals have a right to keep and possess dangerous common arms."[5]  But California's Assault Weapons Control Act ("AWCA") was enacted in the year 1989.  In 1989, the California Legislature was concerned that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  *See* Cal. Penal Code § 30505(a).  AWCA then banned assault weapons by specific makes and models.  Cal. Penal Code § 30510.

AWCA was a policy choice unencumbered by constitutional considerations.  The California Legislature weighed only the firearm's value for sports and recreation against the relative dangerousness of the weapon and the danger of it being misused by criminals.

---

[2] https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-20.

[3] *Id.*  California recorded 102 murders in 2019 by an attacker's use of hands, fists, or feet.

[4] https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-20.

[5] *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., and Thomas, J., concurring) (citing *Heller*, 554 U.S., at 627, 636 ("If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.").

1    It was a different time in legal history.

2    **B.     Pre-*Heller* Second Amendment Jurisprudence**

3            In 1989, most judicial thinking about the Second Amendment was incorrect.  Prior

4    to 2008, lower court opinions did not acknowledge that the Second Amendment

5    conferred an individual right to own firearms, or that the right applied against the states.

6    *See e.g., United States v. Hancock*, 231 F.3d 557, 565–66 (9th Cir. 2000) ("[T]his court

7    has concluded that 'the Second Amendment is a right held by the states, and does not

8    protect the possession of a weapon by a private citizen.'") (citation omitted).[6]  When the

9    features-based definition was added for the year 2000, a citizen challenging AWCA in

10   the Ninth Circuit was still (incorrectly) regarded as lacking basic Article III standing.[7]

11   Judicial recognition of an individual right to keep and bear arms to be respected by the

12   states would come later with the *Heller* decision in 2008 and the *McDonald* decision in

13   2010.  *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) ("[I]n *Heller*, we

14   held that individual self-defense is 'the central component' of the Second Amendment

15   right.").[8]

16

17   _____

18   [6] *See also Hickman v. Block*, 81 F.3d 98, 101 (9th Cir. 1996) ("We follow our sister
     circuits in holding that the Second Amendment is a right held by the states, and does not
19   protect the possession of a weapon by a private citizen."); *Fresno Rifle & Pistol Club,
     Inc. v. Van De Kamp*, 965 F.2d 723, 731 (9th Cir. 1992) (rejecting the first attack on
20   California's AWCA because "until such time as *Cruikshank* and *Presser* are overturned,
     the Second Amendment limits only federal action, and we affirm . . . 'that the Second
21   Amendment stays the hand of the National Government only.'").

22
23   [7] *Silveira v. Lockyer*, 312 F.3d 1052, 1066-67 (9th Cir. 2002) ("Because we hold that the
     Second Amendment does not provide an individual right to own or possess guns or other
24   firearms, plaintiffs lack standing to challenge the AWCA.").

25
26   [8] S*ee also United States v. Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008) ("The home
     occupies a special place in the pantheon of constitutional rights.  Under the First
27   Amendment, the 'State has no business telling a man, sitting alone in his house, what
     books he may read or what films he may watch.'  The Second Amendment prohibits a
28   federal 'ban on handgun possession in the home.'" (citing *Heller*)).

4

In the year 1989, the California Legislature was not concerned with maintaining room for a citizen's constitutional right to have a common firearm of one's choosing to defend hearth and home.  In making its policy choice, the California Legislature neither mentioned a modern rifle as a means of self-defense, nor did the core Second Amendment right appear to have been any part of its consideration.[9]  The formal legislative findings say nothing about self-defense.  *See* § 30505(a).  The balance was simply about criminal use, on the one hand, versus sporting or recreational activities, on the other hand.  In the pre-*Heller* jurisprudential milieu, the pure policy choice made sense.

## C.  Amending AWCA Using a Prohibited-Features Approach

On January 1, 2000, Senate Bill 23 went into effect adding to AWCA the features-based definition of "assault weapons" (now codified at California Penal Code § 30515(a)).  At this juncture, it is not clear why § 30515(a) was enacted, as there is no legislative history in evidence.  The federal assault weapon ban was already in place.

It may have been the fact that manufacturers began producing new firearms with similarities to listed rifles to circumvent the ban.[10]  Important for today's constitutional evaluation is the fact that, once again, the California Legislature did not consider its citizens' federal constitutional right to keep a weapon for home defense.  As *Heller* says, "[t]he very enumeration of the [constitutional] right takes out of the hands of government

---

[9] In *Kasler v. Lockyer*, 23 Cal. 4th 472, 488 (2000), the California Supreme Court detailed the legislative history of AWCA and said, "[t]he Legislature was, in short, confronted with two conflicting societal interests, both of which it recognized as legitimate – the interest of all citizens in being protected against the use of semiautomatic weapons by criminals, and the interest of some citizens in using semiautomatic weapons for hunting, target practice, or other legitimate sports or recreational activities."

[10] In *Silveira v. Lockyer*, 312 F.3d 1052 at n.5 and n.56, as amended (Jan. 27, 2003), the court said that was the legislative impetus, but cited only a Los Angeles Times newspaper article.

19-cv-1537-BEN (JLB)

. . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  554 U.S., at 635 (emphasis in original).

Concerning AWCA's prohibited-features amendment, the Attorney General has not identified any relevant legislative history or legislative findings about the societal dangers of pistol grips, flash hiders, telescoping stocks, flare launchers or barrel shrouds. The State's legislative information website lists several committee reports leading up to the signing of Senate Bill 23 by California Governor Gray Davis on July 19, 1999.  *See* leginfo.legislature.ca.gov.  But there are no studies of criminal gun usage recounted. There are no assault weapon experiences of other states or cities recited.  There are no public hearings described.  There is one indication, however: Senate Bill 23 was said to be similar to Assembly Bill 2560, which was passed the previous year, but vetoed by California Governor Pete Wilson.  Governor Wilson issued a statement with his veto criticizing AWCA's prohibited-features approach and offered this analogy: "If this bill's focus were high speed sports cars, it would first declare them 'chariots of death' and then criminalize possession of Ramblers equipped with racing stripes and wire wheels."[11]

After AWCA was amended times changed.  The federal ban expired in 2004. *Heller* was decided in 2008.  *McDonald* was decided in 2010.  Nevertheless, California continues to restrict "assault weapons" under § 30515(a).  *See* Cal. Pen. Code §§ 30600(a), 30605(a).[12]  Section 30515(a)(1) through (8), the prohibited-features definition

---

[11] *See* www.leginfo.ca.gov/pub/97-98/bill/asm/ab_2551-2600/ab_2560 (last visited 4/14/21).

[12] California Penal Code § 30600(a) states, "Any person who, within this state, manufactures or causes to be manufactured, distributes, transports, or imports into the state, keeps for sale, or offers or exposes for sale, or who gives or lends any assault weapon . . . is guilty of a felony, and upon conviction shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for four, six, or eight years."

Likewise, California Penal Code § 30605(a) states, "Any person who, within this state, possesses any assault weapon . . . shall be punished by imprisonment in a county

of an "assault weapon," is the statute (along with its interlocking counterparts) which, today, Plaintiffs challenge as unconstitutional.[13]

**D.      Assault Weapons Defined**

Under § 30515(a), a rifle is labeled an "assault weapon" if it is one of three principal types.  The first type is a semiautomatic centerfire[14] rifle that does not have a fixed magazine but has one of the following prohibiting features: a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip. The second type is a semiautomatic centerfire rifle that has a fixed[15] magazine able to hold more than 10 rounds.  The third type is a semiautomatic centerfire rifle that has an

---

jail for a period not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170."  The statutes do not specifically criminalize the buying or borrowing of an assault weapon, but the criminalization of selling, lending, and manufacturing impinges on a citizen's constitutional right to acquire these firearms for self-defense. "This acquisition right is protected as an 'ancillary right' necessary to the realization of the core right to possess a firearm for self-defense."  *Renna v. Becerra*, No. 20cv2190-DMS (DEB), 2021 WL 1597933, at *6 (S.D. Cal. Apr. 23, 2021) (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017)) (*en banc*) (core Second Amendment right "wouldn't mean much" without ability to acquire arms).

[13] Plaintiffs do not challenge §§ 30505 or 30510.  On August 6, 2020, AWCA was again amended adding new subsections (9) though (11) to § 30515(a) to include semiautomatic centerfire firearms that are somehow neither rifle, nor pistol, nor shotgun, but have the prohibited features.

[14] Centerfire ammunition is generally more powerful and reliable than rimfire ammunition.  Defs. Exh. D, Graham Decl. at ¶ 22 (DEF0201-02); Kapelsohn Depo. at 29:10-13.

[15] A "fixed magazine" is "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action."  Cal. Pen. Code § 30515(b).

overall length of less than 30 inches.  Cal. Penal Code § 30515(a)(1)-(3).[16]

As an aside, the "assault weapon" epithet is a bit of a misnomer.[17]  These prohibited guns, like all guns, are dangerous weapons.  However, these prohibited guns, like all guns, can be used for ill or for good.  They could just as well be called "home defense rifles" or "anti-crime guns."

The mechanical design features that identify a rifle as a California "assault weapon," it is argued, tend to help a person shoot the rifle more accurately under pressure.  The Plaintiffs make the point that this is a better condition for all lawful uses, *i.e.,* a more accurate gun is better for everyone.  After all, responsible gun-owners worry about the ending point of every round fired.  If shooting in self-defense, a home defender wants every round to hit only attackers.

In contrast, the Attorney General argues that better accuracy makes it a more dangerous weapon.  According to the Attorney General, "assault weapons enable a shooter to fire more rounds rapidly in a given period with greater accuracy, increasing the likelihood that more individuals will be shot and suffer more numerous injuries."  The

---

[16] Based on prohibited features, AWCA also dubs "assault weapons" certain shotguns and pistols, and (recently) guns that are neither rifles, nor shotguns, nor pistols.  Antique firearms and certain pistols designed expressly for Olympic events are exempted.  Cal. Pen. Code §30515(d).

[17] *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) ("Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms.  It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance.") (quoting Kobayashi & Olson et al., *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 Stan. L. & Pol'y Rev. 41, 43 (1997)); *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1290 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("D.C. repeatedly refers to the guns at issue in this case as 'assault weapons.'  But if we are constrained to use D.C.'s rhetoric, we would have to say that handguns are the quintessential 'assault weapons' in today's society; they are used far more often than any other kind of gun in violent crimes.).

implied context is a mass shooting.  In the terrible mass shooting context, which fortunately is a rare event, reducing the number of innocent victims is the State's goal, although it is not at all clear that a less accurate rifle would reduce the number of victims. A less accurate rifle in the hands of a mass shooter may very well result in different victims, but not necessarily less victims.  On the other hand, in the self-defense context, which seems to be more common, taking accurate shots at attackers is vitally important for the innocent victim.  While the state ought to protect its residents against victimization by a mass shooter, it ought also to protect its residents against victimization by home-invading criminals.  But little is found in the Attorney General's court filings reflecting a goal of preventing violence perpetrated against law-abiding citizens in their homes.  Instead, the State's litigation stance is more like the view recently expressed by a police chief in Oakland, California: we do not want victims to arm themselves; we want them to be good witnesses.[18]  Of course, a dead victim is a lousy witness.

**E.     Criminal Penalties**

The State prefers a policy of residents not arming themselves with assault weapons, and for those who do, arresting residents.  California Penal Code § 30600 imposes a felony criminal penalty for anyone who manufactures, distributes, imports, keeps for sale, offers for sale, or lends an "assault weapon."  The prescribed prison sentences for violations of these *malum prohibitum* crimes are four, six, or eight years.

---

[18] *See* abc7news.com/Oakland-police-chief-leronne-armstrong-chinatown-opd/10346747/ (last visited 2-19-21).  On February 17, 2021, ABC7 News reported, "a woman was walking . . . around 6 p.m. Monday when she was approached by a suspect who attempted to take her camera.  During the struggle, investigators said a nearby resident came up and fired several rounds toward the suspect."  Afterwards, the police chief said, "[w]hen weapons are fired in our community, there could be unintended victims.  We don't want our business owners or others to begin to arm themselves.  We would really prefer them to be good witnesses."  Unironically, according to the report, "[n]o one was hit, but when police arrived, the man with the gun was arrested while the robbery suspect got away."

*See* California Penal Code § 30600(a).  One who merely possesses an "assault weapon" in California is guilty of a misdemeanor under California Penal Code § 30605(a) or a felony pursuant to California Penal Code § 1170(h)(1) ("a felony punishable pursuant to this subdivision where the term is not specified in the underlying offense shall be punishable by a term of imprisonment in a county jail for 16 months, or two or three years").  In other words, the criminal sanction for possession of any gun deemed an "assault weapon" is a wobbler and can be sentenced as either a felony or a misdemeanor.  If one possesses only one or two properly registered pre-ban assault weapons, the crime is a misdemeanor for the first offense.  Cal. Pen. Code § 30605(b).  Beginning January 1, 2020, a prosecutor may in lieu of criminal prosecution for mere possession of an assault weapon, institute a civil action for an injunction, fine, and destruction of the firearm as a nuisance.  Cal. Pen. Code §30800.

As one commentator describes it, "[m]ere possession of an object that is commonplace and perfectly legal under federal law and in forty-four states will land you in prison, [will] result in the loss of your rights including likely the right to vote, and probably [will] cause you irreparable monetary and reputational damages, as well as your personal liberty.  All of this despite the absence of even a single victim."[19]

## F.   Modern Rifles

The Second Amendment protects modern weapons.  *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016).  The firearms banned by California Penal Code § 30515 and deemed "assault weapons" are modern weapons.  They are principally AR-15 type rifles, pistols, and shotguns.  Plaintiffs and others refer to them as "modern sporting rifles" although they are clearly useful for more than just sport.  They are modern rifles that do not look like the iconic rifles from years gone by.  They are fabricated with synthetic

---

[19] Mark W. Smith, *Assault Weapon Bans: Unconstitutional Laws for Made-up Category of Firearms*, 43 Harvard J. Law & Public Policy 357, 360 (2020).  One could add to this list of consequences the forfeiture of the firearm itself.  *See* Cal. Pen. Code § 30800(d).

polymers and anodized aluminum in cerakoted colors of black and brown and green. Parts once made of solid wood on guns of the past are gone. These modern rifles are constructed of lightweight alloys and titanium nitride barrels in angular skeletonized shapes. To those who grew up watching movie "westerns" with John Wayne, or Chuck Connors ("The Rifleman") on television, modern rifles just do not look like rifles. The AR-15 platform in particular, is an "open source" design and includes firearms made by numerous manufacturers under different product names with countless variations and adaptations. In fact, the platform's ability to accept modifications with ready-made retail parts without the need for specialized tools or expertise, is part of what makes these rifles popular. What advances in firearm design the future holds for these arms are yet to be imagined. When the term "modern rifle" is used in this opinion, it principally refers to a rifle built on the AR-15 platform with prohibited features.

## II.  ANALYSIS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, **shall not** be infringed." U.S. Const. amend. II (emphasis added). The Supreme Court recognizes that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S., at 778. This right is incorporated against the states under the Fourteenth Amendment. *Id.*

Although the Attorney General sees it differently, the Supreme Court also recognizes that the Second Amendment guarantee includes a right to keep and bear firearms that have "some reasonable relationship to the preservation or efficiency of a well-regulated militia." *Miller*, 307 U.S., at 178. *Miller* implies that a weapon that is commonly owned and that is useful for the common defense for a militia member is also protected by the Second Amendment.

*Heller* and *Miller* are consistent. *Heller* took the already expansive zone of protection for weapons that could be used by the militia and focused on the core use of

firearms for self-defense. "The [*Heller*] Court determined that the right to keep and bear arms is an individual right held by the people, and not limited by the prefatory clause – 'a well regulated Militia' -- only to 'the right to possess and carry a firearm in connection with militia service.'" *Young v. State*, 992 F.3d 765, 782 (9th Cir. 2021) (*en banc*). As *McDonald* puts it,

> [i]n *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was "the central component of the right itself."

*McDonald*, 561 U.S., at 787. In *Caetano*, the Court underscored these two points. One, the Second Amendment extends at the very least to common modern arms useful for self-defense in the home. Two, Second Amendment protection includes both common arms and weapons that may also be useful in warfare. *Caetano*, 577 U.S., at 412 (quoting *Heller*, 554 U.S., at 582, 624-25); *contra Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) (*en banc*) (weapons most useful in warfare are not protected by the Second Amendment).

## A.   The *Heller* Test

With these principles firmly established, it is time to put the constitutionality of AWCA to the test. Two tests will be used: (1) the *Heller* test; and (2) the Ninth Circuit's two-step levels-of-scrutiny test.

The *Heller* test is a test that any citizen can understand. *Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes. It is a hardware test.[20] *Heller* draws a distinction between firearms commonly owned for

---

[20] Most of the Ninth Circuit's intermediate scrutiny analysis has developed in cases that are not hardware bans but more akin to time, place, and manner regulations. *See e.g.,*

lawful purposes and unusual arms adapted to unlawful uses as well as arms solely useful for military purposes.[21]  As applied to AWCA, the *Heller* test asks: is a modern rifle commonly owned by law-abiding citizens for a lawful purpose?  For the AR-15 type rifle the answer is "yes."  The overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home.  Under *Heller*, that is all that is needed.  Using the easy to understand *Heller* test, it is obvious that the California assault weapon ban is unconstitutional.  Under the *Heller* test, judicial review can end right here.[22]

### 1.  *Popularity in California*

Modern rifles have become immensely popular in the United States.  Even in California, despite being banned for 20 to 30 years, according to the State's own evidence, there are 185,569 "assault weapons" currently registered with the California

---

*Young*, 992 F.3d 765 (open carry outside the home); *United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) (prohibition on gun ownership for nonimmigrant visa holders); *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) (prohibition on gun possession by aliens illegally or unlawfully in the United States); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (*en banc*) (gun store in a particular location); *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) (using fees from firearm sales to fund law enforcement program); *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) (ten-day waiting period for firearm purchase); *Peruta v. Cty. of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016) (*en banc*) (concealed carry outside the home); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) (prohibition on domestic violence misdemeanant possession).

[21] *Cf. Nordyke v. King*, 563 F.3d 439, 465 (9th Cir. 2009) (Gould, J., concurring), *vacated*, 611 F.3d 1015 (9th Cir. 2010) ("[N]o individual could sensibly argue that the Second Amendment gives them a right to have nuclear weapons or chemical weapons in their home for self-defense.").

[22] This Court is not the first jurist to read *Heller* this way.  *See Friedman v. City of Highland Park*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting) ("The fact that a statistically significant number of Americans use AR-type rifles and large-size magazines demonstrates *ipso facto* that they are used for lawful purposes.  Our inquiry should have ended here: the Second Amendment covers these weapons.").

Department of Justice.  Defs. Exh. CZ, Glover Decl. at ¶ 7 (DEF3222).  Another 52,000 assault weapon registrations were backlogged and left unregistered when the last California registration period closed in 2018.  *See* n.37 *infra.*  There are likely many more in California.  According to the State's evidence, a 2018 California Safety and Well-Being Survey reports 4.2 million adult Californians personally own a firearm.[23]  And Californians own an estimated 19.9 million firearms.[24]  According to this survey, of the 19.9 million firearms in the state, assault weapons make up 5%[25] or approximately 1,000,000.[26]

Californians buy a lot of firearms.  In the year 2020 alone, residents bought 1,165,309 firearms.[27]  From January 1, 2021 to March 12, 2021, they bought 180,058 more guns.[28]  Out of the total of 1,345,367 new guns purchased since January 1, 2020, *rifles* made up 368,337.[29]  If 48% of rifles sold nationally are modern "assault" rifles, it can be inferred that Californians would have purchased modern rifles at the same rate.  So, of the 368,337 rifles actually bought since January 1, 2020 in California, it is reasonable to infer that 176,801 additional modern rifles would have been added to the California stock, were it not for the assault weapon ban.  Some fraction of the 368,337

[23] Defs. Exh. DY, at 1 (DEF3578); Defs. Exh. DZ  (Nicole Kravitz-Wirtz et al., *Firearm Ownership and Acquisition in California: Findings from the 2018 California Safety and Well-Being Survey*, 26 Injury Prevention 516 (2020)) at DEF3579-80.

[24] *Id.*

[25] *Id.*

[26] Because it is generally now unlawful to own an "assault weapon" in California, it would not be surprising if survey participants underreported ownership of these firearms.

[27] *See* Asst. Dir. Blake Graham Decl. at ¶ 4 (Dkt. # 112).

[28] *Id.*

[29] *Id.* at ¶ 5.

rifles actually bought by Californians may well have been stripped-down "featureless" California-legal editions of modern rifles. Among the people of California purchasing all of these guns there were approximately 412,059 first-time buyers.[30]

### 2.    *Popularity Nationally*

Nationally, modern rifles are ubiquitous. In 2018 alone (the most recent year with data), 1,954,000 modern rifles were manufactured or imported into the United States. Over the last three decades, 19,797,000 modern rifles have been manufactured or imported into the United States and the numbers have been steadily increasing. Pls. Exh. 4-8, NSSF *Firearm Production in the United States*, at 7. Almost one-half of all rifles (48%) produced in 2018 were modern rifles. *Id.* at 18. That is 664,360 rifles. That same year, 34% of buyers purchased a modern rifle for personal protection, while 36% purchased for target practice or informal shooting, and 29% purchased for hunting. Pls. Exh. 4-5, NSSF Survey, at 9. In contrast, only 5% of traditional rifles were bought for personal protection. For female gun buyers in 2018, after a handgun, a modern rifle was the next most popular choice. *Id.* at 24. The same was true of all first-time gun buyers in 2018. *Id.* at 25. During 2018, approximately 18,327,314 people participated nationally in target and sport shooting specifically with modern rifles. Pls. Exh. 4-6, *NSSF Report on Sport Shooting Participation in the U.S. in 2018*, at ii. Nationally, 3-gun shooting is the activity with the highest mean days of participation (23.8 days), but the next highest activity is target shooting with a modern rifle (15.3 days). *Id.* at 32. In the West Region, target shooting with a modern rifle is the top activity. *Id.*

### 3.    *More Popular than the Ford F-150 Pickup Truck*

Modern rifles are popular. Modern rifles are legal to build, buy, and own under federal law and the laws of 45 states. There are probably more modern rifles in circulation than there are Ford F-150 pickup trucks. In 2018, 909,330 Ford F-150s were

---

[30] *Id.* at ¶ 10.

sold.[31]  Twice as many modern rifles were sold the same year.  Imagine, every time one passes a new Ford pickup truck, it is a reminder that two new modern rifles have been purchased.  That is a lot of modern rifles owned by Americans.[32]  Other courts agree. "Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."  *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015).   "We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'"  *Heller II*, 670 F.3d at 1261.

### 4.    *More Popular than Stun Guns*

The Supreme Court implied that as few as 200,000 stun guns owned nationwide by law abiding citizens is a sufficient number to show common ownership and receive constitutional protection.  *Caetano*, 577 U.S., at 420 (Alito, J., and Thomas, J., concurring) (approximately 200,000 civilians owned stun guns as of 2009) ("While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.").  Based on the evidence presented, it can be confidently said that between at least 200,000 and perhaps 1,000,000 modern rifles are owned in California alone.  Based on the lack of evidence at trial that these 200,000 to 1,000,000 California guns are often used in crime, it is reasonable to infer that most are owned by law-abiding citizens who use them only for lawful purposes.

After handguns, modern rifles are probably the most popular firearms in America. They are quietly owned by millions of law-abiding citizens for lawful purposes ranging

---

[31] *See* media.ford.com/content/dam/fordmedia/North%20America/US/2020/01/06/sales-4q2019.pdf (last visited 3/9/21).

[32] "[W]e note that in 2012, the number of AR- and AK-style weapons . . . was more than double the number of Ford F–150 trucks sold, the most commonly sold vehicle in the United States."  *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

from home defense to sporting competitions.  Yet, California has banned, and continues to ban, these popular rifles.  Perhaps the State has a long-range plan of taking incremental steps toward more and more gun control.[33]  But it should be obvious that barring total extinction of the Second Amendment, no amount of "common sense" gun control laws will prevent criminals from misusing guns.  Whatever the reason, these laws are still on the books.  Like Victor Hugo's Inspector Javert relentlessly searching for Jean Valjean, California continues to amend its statutes to prohibit more and more firearms.

At the core this is a simple case.  Like the cases of *Heller* and *McDonald*, here the government bans an entire class of very popular hardware -- firearms that are lawful under federal law and under the laws of most states and that are commonly held by law-abiding citizens for lawful purposes.  Under no level of heightened scrutiny can the law survive.

## B.   The Ninth Circuit's Two-Step Framework

The Ninth Circuit has yet to adopt the easy to grasp *Heller* test.  Instead, the Ninth Circuit uses what it calls "a two-step framework."  *Young*, 992 F.3d at 783.  In practice the two-step framework is not particularly simple.[34]  "We have understood *Heller* to

---

[33] The State's expert Dr. John Donohue testified, "I think California is trying to craft the wise restraints . . . but I think it's useful to take incremental steps, and if you are not getting the full benefits of reduction in mass killings, you could go further."  Tx preliminary injunction hearing (10/22/20) at 74:9-14.

[34] Some have criticized the schema.  *Rogers v. Grewal*, 140 S. Ct. 1865, 1867 (2020) (Thomas, J., dissenting from denial of certiorari) ("[T]he courts of appeals' test appears to be entirely made up.  The Second Amendment provides no hierarchy of "core" and peripheral rights.  And "[t]he Constitution does not prescribe tiers of scrutiny." Moreover, there is nothing in our Second Amendment precedents that supports the application of what has been described as "a tripartite binary test with a sliding scale and a reasonable fit.") (citations omitted); *see also Mai,* 974 F.3d at 1087 and 1106 (Bumatay, J., dissenting from denial of rehearing *en banc*) ("Indeed, when this court first adopted the two-step test, Judge Bea rightfully questioned whether applying tiers of scrutiny to a

17

require one of three levels of scrutiny: If a regulation amounts to a destruction of the Second Amendment right, it is unconstitutional under any level of scrutiny; a law that implicates the core of the Second Amendment right and severely burdens that right receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny." *Young*, 992 F.3d at 784 (quotation marks and citations omitted).  Most courts select intermediate scrutiny in the end.  Intermediate scrutiny, in turn, looks for a "reasonable fit."  California's modern rifle ban is suspect even under the most lenient form of scrutiny because the "assault weapons" laws are not a reasonable fit to achieve the State's interests.  This will become clear after considering the trial evidence.   But first, the Ninth Circuit's two-step framework requires a pre-check for Second Amendment coverage.

## 1.    *Step One -- Presumptively Lawful or Historical Regulation?*

The first step asks, "whether the regulation is one of the presumptively lawful regulatory measures identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (internal quotes and citations omitted); *Young*, 992 F.3d at 783.  In other words, if the regulation is presumptively lawful or historically approved, the inquiry ends.  *Young*, 992 F.3d at 783.

The California modern rifle ban is not excused from judicial scrutiny on either ground.  First, a complete ban on modern rifles is not one of the presumptively lawful

Second Amendment right was consistent with *Heller*.  As Judge Bea noted, 'unitary tests such as strict scrutiny, intermediate scrutiny, undue burden, and the like don't make sense . . . in the Second Amendment context because the language of *Heller* seems to foreclose scrutiny analysis.'") (citations omitted) and (VanDyke, J., dissenting from denial of rehearing *en banc*) ("Our toothless 'heightened' scrutiny of Second Amendment restrictions is broken, and not accidentally so.  But Second Amendment rights are fundamental, and litigants attempting to vindicate theirs deserve better than what we're currently offering.").

measures identified in *Heller*.  Second, a ban on modern rifles has no historical pedigree.  Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds.  In fact, prior to California's 1989 ban, so-called assault weapons were lawfully manufactured, acquired, and possessed throughout the United States.[35]

The Attorney General disagrees and claims that AWCA is analogous to a handful of state firing-capacity regulations from the 1920's and 1930's and one District of Columbia law from 1932.  The state laws were repealed long ago.  The only law in the United States that has remained in effect, the Attorney General describes as a District of Columbia law that is "a twelve-shot restriction on semiautomatic weapons."  Defs. Memo of Contentions of Fact and Law at 12 (quoting Pub. L. No. 275, 1932 – 72nd Cong. Sess. I, chapter 465).  The District of Columbia regulation seems to mix terms.  Section 14 prohibits possession of any "machinegun or sawed-off shotgun." Section 1 defines a "machinegun" as a "firearm that shoots automatically or semiautomatically more than twelve shots without reloading."  It is true that during its existence, the District of Columbia regulation has been applied to a semiautomatic pistol.  *See United States v. Woodfolk*, 656 A.2d 1145, 1147-48 (D.C. 1995) (9 mm semiautomatic Luger that could operate with a 13-round magazine qualified as an illegal "machinegun").

However, the 76-year existence of the District of Columbia regulation did not stand in the way of the Supreme Court when it dismantled the District of Columbia's handgun ban in *Heller*.  The District of Columbia regulation (that the California Attorney General relies on today) was not regarded as long-standing and presumptively lawful.  It was not even mentioned.  In fact, the *Heller* opinion broadly cautioned courts deciding

---

[35] One might argue that for a recent invention like the AR-15, a 30-year ban ought to be longstanding enough.  A better view is that recently invented guns and recently imposed bans are to be judged in the usual way.  The exception for longstanding regulations simply will not apply in that context.

whether an analogous regulation is long-standing saying that, "we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home." *Heller*, 554 U.S., at 632. Yet, that is what the Attorney General is proposing. In view of *Heller's* caution, this Court finds that the District of Columbia regulation is insufficient to demonstrate a longstanding prohibition on semiautomatic modern firearms. AWCA's ban has no historical pedigree. With the pre-check completed, the hard work begins.

### 2. *Step Two -- Closeness to the Core and Severity of the Burden*

Since AWCA's assault weapon ban is not presumptively lawful or historically permitted, the Second Amendment applies. At step two, a court selects one of the three levels of scrutiny. *Young*, 992 F.3d at 784. Here, a sort-of bull's eye test is used. A target is set up. At the center of the target is the core of the Second Amendment right. The first step measures how close the statute hits to the bull's eye. The second step measures how severely the statute burdens the core Second Amendment right. "Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'" *Bauer*, 858 F.3d at 1221-22 (quoting *Silvester*, 843 F.3d at 821).

The modern rifle ban strikes at the acknowledged core of the Second Amendment, which is the right of self-defense in the home. *Heller* held that the "core" Second Amendment right is for law-abiding citizens to defend hearth and home.[36] 554 U.S., at

---

[36] Courts have yet to address the subject of arms for militia use. Is the right to keep an assault rifle reasonably-related to militia use also a core right at the center of the bull's eye or does it fall on the periphery of Second Amendment concerns? In view of the

635; *see also Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("Second Amendment guarantees are at their zenith within the home."). "As we put it, self-defense [is] 'the central component of the right itself.'" *McDonald*, 561 U.S., at 787.

Going straight to the core, the California law criminalizes modern rifles kept or possessed everywhere, including in the home for self-defense. There are no current exceptions for ordinary citizens.[37] A Californian who picks up an unregistered AR-15 style modern rifle solely to defend his family in his home commits a crime. It does not matter if the home was burglarized last night or is likely to be invaded this night. When it comes to self-defense in the home, AWCA hits the bull's eye – a direct burden on the core right.

The California statutes not only directly burden the core, but impose the *severest*

_____

importance of keeping militia arms at the founding of the nation, and its continuing importance as a means of national self-preservation, this Court deems it to be a core right.

[37] There is a form of grandfathering for residents with previously registered firearms. Pursuant to California Penal Code § 30943(a), one may possess a modern rifle at home if it has been registered. The first registration period ended January 1, 1991. *See* § 30900(a)(1). A second registration period ended January 1, 2001. *See* § 30900(a)(2). A third registration period (which was for a bullet button-equipped firearm) ended July 1, 2018, provided the weapon was lawfully owned before December 31, 2016. *See* § 30900(b).

Although neither side addresses it, at some point the registration period will be re-opened for 90 days due to recent settlement agreement in *Sharp v. Becerra*, Case No. 2:18cv2317-MCE-AC, U.S. District Court for the Eastern District of California. *See* Order of Injunction and Consent Decree, filed 3/29/21. The *Sharp* case was brought after a flawed California registration system prevented many residents from registering their assault weapons. Allegedly, the online registration system was riddled with problems. Frequent glitches and computer crashes made weapons registration difficult. *Memorandum and Order* (filed 6/26/19), at 4. On the last day of the July 1, 2018 registration period the unregistered backlog had grown to 52,443 applications. *Id.*

burden – a complete ban.[38]   When a severe restriction on the core right of self-defense amounts to a destruction of the Second Amendment right, it is unconstitutional under any level of scrutiny.  "'A law that imposes such a severe restriction on the fundamental right of self-defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.'"  *Bauer*, 858 F.3d at 1222 (quoting *Silvester*, 843 F.3d at 821).  Once again, judicial review could end right here.  Other than *Heller* and *McDonald*, no federal court has applied this top tier of scrutiny.

### 3.   *Two Lower Levels of Scrutiny*

Assuming AWCA requires some form of lower scrutiny, which prudence dictates, a lower level must be selected under the Ninth Circuit's two-step framework.  "[A] law that implicates the core of the Second Amendment right and severely burdens that right receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny."  *Young*, 992 F.3d at 784; *Silvester*, 843 F.3d at 821.

The Attorney General argues that the lowest form, *i.e.,* intermediate scrutiny should apply.  Most courts select intermediate scrutiny.  *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) ("Although not dispositive of the question, we note that there has been 'near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate.'").  AWCA would fail strict scrutiny.  But even under intermediate scrutiny, AWCA fails to have "fit," as is discussed below.

### 4.   *Intermediate Scrutiny*

When intermediate scrutiny is selected, another two-part test is required: (1) the

---

[38] This is also the case for the Second Amendment militia right to keep a modern rifle, first recognized in *Miller*, and later acknowledged in *Heller* and *Caetano*.   AWCA's criminalization of assault weapon possession makes no exception for militia readiness.  Thus, AWCA both hits at a core right and imposes the severest form of burden.

government's interest must be important; and (2) the "fit" of the law to the objective must be reasonable. *Silvester*, 843 F.3d at 821-22. As always, the State's objective with these laws (*i.e.,* to reduce gun crime) passes the first prong of the test. Reducing gun crime is a very important objective. Part one is a given. Part two is where the rubber meets the road.

Part two requires a reasonable fit, but it does not demand the least restrictive means of furthering that objective. *Id*. at 827 (quoting *Jackson*, 746 F.3d at 969). Least restrictive means would be a test for strict scrutiny. "Instead," in the Ninth Circuit, "the statute simply needs to promote a substantial government interest that would be achieved less effectively absent the regulation." *Mai v. United States*, 952 F.3d 1106, 1116 (9th Cir. 2020) (quoting *Torres*, 911 F.3d at 123). This watered-down test has been criticized. *Silvester v Becerra*, 138 S. Ct. 935, 950 (2018) (Thomas, J., dissenting from denial of certiorari) ("The Ninth Circuit . . . dismissed any tailoring concerns by observing that intermediate scrutiny requires 'only that the regulation 'promote a substantial government interest that would be achieved less effectively absent the regulation.' But that observation was incomplete. Intermediate scrutiny also requires that a law not 'burden substantially more protected activity than is necessary to further the government's interest.' The Ninth Circuit did not ask this second question."). Even in its diluted form AWCA fails the intermediate fit test.

Under this relaxed test a state could enter a person's home without a warrant and seize him or his guns in violation of the Fourth Amendment prohibition on searches and seizures without a warrant or the Due Process Clause of the Fourteenth Amendment. What other governmental mischief might be tolerated by courts under such a deferential standard?

As an aside, this Court notes that such a deferential treatment of government restrictions of Second Amendment rights is not to be found anywhere in the Constitution, the Bill of Rights, or in the text of the Second Amendment. And there is hardly any governmental intrusion that cannot be rationalized as important (for example, a California

Japanese internment camp).  *See Korematsu v. United States*, 323 U.S. 214, 218–19 (1944), *abrogated by, Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ("Like curfew, exclusion of those of Japanese origin was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country.  It was because we could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal that we sustained the validity of the curfew order as applying to the whole group.").

While the Second Amendment intermediate scrutiny fit test is an overly relaxed standard, it is not a free pass, as other courts have pointed out.  When subjected to intermediate scrutiny, "the [State] is not thereby 'insulated from meaningful judicial review.'"  *Heller II*, 670 F.3d at 1259 (quoting *Turner Broad. Sys., Inc. v. F.C.C. (Turner I)*, 512 U.S. 622, 666 (1994)).  Even under intermediate scrutiny, a court must determine whether the legislature has based its conclusions upon substantial evidence.  *Turner Broad. Sys., Inc. v. F.C.C. (Turner II)*, 520 U.S. 180, 196 (1997).  The government "must do more than just simply posit the existence of the diseases sought to be cured," and "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Turner I*, 512 U.S., at 664.  "What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."  *Bd. of Trustees of State Univ. of New York,* 492 U.S., at 480 (citations and internal quotation marks omitted).  In *Turner II,* an expanded record permitted the Court to consider whether Congress' must-carry provisions "were designed to address a real harm, and whether those provisions will alleviate it in a material way."  520 U.S., at 195.  Moving through the trial record here, it becomes clear that AWCA's assault weapons ban-by-

prohibited-features was not designed to address a real harm, and even if it did, does not alleviate the harm in a material way. Guiding the intermediate scrutiny path are some checkpoints.

**5.   *Checkpoints***

      **a.   Checkpoint No. 1:   burden of proof**

Plaintiffs do not have to shoulder the burden of proving that they are entitled to enjoy Second Amendment rights. The command of the Amendment is that the right to keep and bear arms "shall not be infringed." It follows that when a citizen complains in a facial challenge that the government is infringing, then it is the government that must carry the burden of justifying its restriction of Second Amendment rights. The government must carry the burden of establishing that its regulations are reasonably tailored. "[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require." *Bd. of Trs. of State Univ. of N.Y.*, 492 U.S., at 480 (citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (government bears the burden of justifying its action under heightened standard of judicial review). If the burden of proof is shouldered, the government regulation survives scrutiny. If the government does not bear its burden of persuasion or its burden of proof, or does not support its case at all, the citizen prevails.

The Attorney General takes a different view. He says that Plaintiffs bear the burden at step one, citing *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 347 (3d. Cir. 2016) (*en banc*). Defs. Memo of Contention of Facts and Law, Dkt #65, at 8 ("It is Plaintiffs' burden to show that assault weapons are in 'common use' by law-abiding citizens for lawful purposes."). But *Binderup* placed the first step burden on a plaintiff for an as-applied challenge, which makes sense because in such cases the plaintiff claims to be the

exception to the rule.[39]  Plaintiffs in this case bring both facial and as-applied challenges.

The Attorney General also objects that the state should not have the initial burden of proving a prohibited arm is *not* commonly possessed for lawful purposes.  Defs. Supplemental Brief at 2.  But this is exactly wrong.  The constitutional imperative is on the government to not infringe.  The correct starting orientation is that no arm may be prohibited.  If a plaintiff challenges the government's prohibition, it is on the government first to prove the banned arm is dangerous and unusual, and if not that it is not commonly possessed, or not commonly possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness.  If the state cannot so prove, the challenged prohibition must be struck down.

The presumption in favor of rightfully possessing a citizen's arm was made during the adoption of the Second Amendment.  The government may carry its burden in a myriad of yet undefined ways, but it is the government's burden to bear.  In this case, there is sufficient evidence to prove that AR-15 type rifles are commonly owned by law-abiding citizens for lawful purposes like self-defense and hunting.  At the same time, there is very little evidence regarding the commonality of AK-47 type rifles, or semiautomatic shotguns, or "assault pistols" whatever they are.[40]  Likewise, there is little

_____

[39] *Binderup*, 836 F.3d at 347 ("Barton did not present 'facts about himself and his background that distinguished his circumstances from those of persons historically barred from Second Amendment protections,' so . . . his as-applied challenge could not succeed.") (citations omitted).

[40] Plaintiffs have introduced evidence of threaded pistol barrels for sale that easily replace a standard barrel.  Switching a threaded barrel for a standard barrel would transmute a typical and lawful Glock 17 into a banned "assault weapon" under AWCA and subject its owner to felony prosecution for manufacturing and possessing an "assault weapon."  Cal. Penal Code § 30515(a)(4)(A) ("Notwithstanding Section 30510, 'assault weapon' also means any of the following: . . . (4) A semiautomatic pistol that does not have a fixed magazine but has any one of the following: (A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.").  The crime of manufacturing an assault

1   evidence that semiautomatic AK-47 type rifles, or semiautomatic shotguns, or "assault

2   pistols," have been used often unlawfully in California.  Because the government bears

3   the burden in the first instance and has not proven they are uncommon and dangerous,

4   these arms are presumptively lawful to own.  The government must now demonstrate that

5   its outright prohibition on acquisition and possession survives scrutiny.  The State's

6   evidence is wide, but it is also shallow.  It is not enough to carry its burden.

### b.    Checkpoint No. 2:  the alternative guns argument

8        Re-phrasing the Attorney General's argument, California's modern rifle ban does

9   not destroy the fundamental right of self-defense of the home because some guns remain

10   lawful to keep in the home.  Running through his arguments is the rationale that no harm

11   is done because a citizen may still buy and keep traditional rifles and "featureless" rifles,

12   traditional shotguns, and handguns from the state-approved handgun roster.  (What is not

13   mentioned is that the handgun roster is a shrinking roster.)  *See* Unsafe Handgun Act,

14   Cal. Pen. Code § 31910(b)(7); *see also Renna v. Becerra*, Case No. 20cv2190-DMS, Dkt.

15   # 17, Order (filed 4/23/21) (describing California's shrinking handgun roster).  Therefore,

16   according to the Attorney General, the constitutional right is only mildly or moderately

17   burdened by an assault weapons ban because alternatives remain.  "The State's position is

18   that the configuration that is prohibited under the Assault Weapons Control Act is not a

19   configuration -- or is not a prohibition that severely burdens the core right, because

20   individuals, as Your Honor notes, can use a [Ruger] Mini-14.  An individual can use an

21   AR-15 so long as it's rimfire and takes .22 round caliber ammunition with all the

22

23

24   weapon can be committed by simply swapping in a prohibited part for lawful counterpart.
     It is more than a hypothetical trap for a gun owner.

25        Consider the case of Alan Bruce MacFarlane, a Vietnam veteran with limited
26   mobility in one arm, who purchased a rifle at a California gun shop legally and then
     modified it with a prohibited adjustable stock and forward pistol grip to accommodate his
27   disability.  "Unbeknownst to him, he asserted, his modifications rendered the firearm an
     illegal assault weapon under California law."  *People v. Macfarlane*, No. A141326, 2016
28   WL 3634286, at *1 (Cal. Ct. App. June 29, 2016).

features, or a centerfire semi-automatic rifle with a detachable magazine that has no pistol grip – telescoping stock, forward pistol grip, or flash suppressor."[41]

The problem is that the alternatives-remain argument has no limiting principle and would justify incremental firearm bans until there is only a single-shot derringer remaining for lawful self-defense. The same argument – that a handgun ban might be justified because government-approved alternatives are available – was rejected in *Heller* and it is rejected here. 554 U.S., at 629 (It is "no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."); *see also* III(B)(5) *infra*. (discussing *N.Y. State Rifle & Pistol Association v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)).

### c.   Checkpoint No. 3:  legislative history

As part of intermediate scrutiny review, a court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Fyock v. Sunnydale*, 779 F.3d 991, 1000 (9th Cir. 2015). While there are legislative findings for the enactment of AWCA, there are none for the prohibited-features amendments of § 30515. AWCA's enacted findings indicate that no consideration by the California Legislature was given to the ban's burden on home defense or militia use. This makes it challenging to precisely discern the State's rationale for later amending AWCA. "[T]he municipality's evidence must fairly support the municipality's rationale for its ordinance." *Jackson,* 746 F.3d at 969 (quoting *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 438 (2002)). And while courts "should not conflate legislative findings[42] with 'evidence' in the technical sense," (*Pena*, 898 F.3d at 979 (citation

---

[41] Deputy Attorney General Echeverria, Preliminary injunction hearing transcript 10/19/20, at 188.

[42] Where there are congressional findings, they may assist a court in evaluating the legislative judgment. *United States v. Lopez*, 514 U.S. 549, 563 (1995). Yet, Congress,

omitted)), neither should they credit facially implausible legislative findings. *Jackson*, 746 F.3d at 969.  The Ninth Circuit recently put it this way:

> In assessing congressional judgment, "we do not impose an 'unnecessarily rigid burden of proof,' and we allow the government to rely on any material 'reasonably believed to be relevant' to substantiate its interests."  That standard applies because "we are weighing a legislative judgment, not evidence in a criminal trial."  Thus, we do not require "scientific precision."  We ask only whether the evidence "fairly supports" Congress' "reasonable" conclusions.   When empirical evidence is incomplete, we "must accord substantial deference to the predictive judgments of Congress."

*Mai,* 952 F.3d at 1118 and 1119 n.8 (citations omitted) (concluding *scientific evidence fairly supported* the congressional judgment that persons involuntarily committed in the past continue to pose an increased risk of violence).[43]

### i.    *a faulty prediction*

In 1989, California's Legislature predicted an assault weapons ban would eliminate or reduce mass shootings.  It has not turned out that way.  As discussed later, even the State's evidence demonstrates that mass shootings with assault weapons continue to occur at the same average rate as before the ban.  If Congress is correct, the national assault weapon ban also did not work.  Congress passed the 1994 assault weapon ban with a ten-year sunset provision and allowed the ban to lapse on its own in 2004.

---

and by extension, a state or municipality, need not make formal legislative findings in order to legislate.  *Katzenbach v. McClung*, 379 U.S. 294, 304 (1964) ("Here, of course, Congress had included no formal findings.  But their absence is not fatal to the validity of the statute.").

[43] Note how robust the scientific evidence was that supported the law in *Mai*.  The scientific evidence was unequivocal.  The studies did not say that perhaps, after years more study, there might be some slight connection established.  Instead, the court noted, "[i]mportantly, the studies did not show merely a slight increase in risk for those involuntarily committed; the studies reported 'a suicide risk 39 times that expected.'" *Mai*, 952 F.3d at 1118.

1    Congress has not re-enacted a ban since that time.  There is disagreement by

2    academicians over the effect of the federal ban on reducing mass shootings and even

3    those who saw a good effect see the effect as slight and diluted by other aspects like the

4    associated ban on larger capacity magazines.

5           State level assault weapon bans that remain in effect have little to show.  Defs.

6    Exh. BL, Christopher S. Koper, *Assessing the potential to reduce deaths and injuries*

7    *from mass shootings through restrictions on assault weapons and other high-capacity*

8    *semiautomatic firearms*, Criminology and Public Policy (2020) at 148 (DEF 2015) (the

9    effects of state-level restrictions are not yet clear), and 158 (DEF2025) ("evidence has

10   been mixed").  Studies suggest that large capacity magazine ("LCM") bans may have a

11   greater effect.  *Id.* at 159 (DEF2026) ("Most notably, Webster *et al.* (2020), in their state-

12   level panel analysis . . . suggested that state LCM bans reduce mass murder incidents . . .

13   and fatalities whereas AW-specific restrictions do not.").  Nevertheless, California

14   continues its experiment.  No case has held that intermediate scrutiny permits a state to

15   impinge on the Second Amendment right by continuing to employ a known failed

16   experiment.

17                              **ii.    *the federal ban's history***

18          In addition to AWCA's legislative history, the Attorney General cites the

19   legislative history of the 1994 federal ban to justify AWCA.  Specifically, he cites House

20   Report No. 103-489 (Defs. Exh. J).  Defs. Memo of Contentions of Fact and Law at 17-

21   18.  The Attorney General says that Congress found assault weapons to be the weapons

22   of choice among drug dealers, criminal gangs, hate groups, and mentally deranged

23   persons bent on mass murder.  *Id.* (citing H.R. No. 103-489, at 13).  Actually, this part of

24   the House Report simply lays out some of the evidence received during five years of

25

26

27

28

hearings.  It does not contain findings approved by the full Congress.[44]  The Report describes other testimony along these lines, but it also describes the views of several victims to which the Attorney General does not cite.  One victim testified that although she had been shot with an assault weapon, she was angry that her tragedy was being used to deny law-abiding citizens the right to the firearm of their choosing.  "Enforce the laws against criminals already on the books . . .  You cannot ban everything in the world that could be used as a weapon because you fear it, don't understand it, or don't agree with it."  *Id*. at 16.  Another witness testified positively that he used a Colt AR-15 to capture a wanted criminal in the act of burglarizing his parents' home.  *Id*.  At least Congress considered the self-defense rights of law-abiding citizens before passing the federal ban.[45]

---

[44] Apparently, the Attorney General is not referring here to formal findings of Congress enacted as part of a statute as was done, for example, with the National Labor Relations Act, 29 U.S.C. § 151.  This informal kind of legislative history, is inherently suspect for the task of evaluating the constitutionality of a statute.  Justice Scalia observed, "[t]he greatest defect of legislative history is its illegitimacy.  We are governed by laws, not by the intentions of legislators.  As the Court said in 1844: 'The law as it passed is the will of the majority of both houses, *and the only mode in which that will is spoken is in the act itself . . . .'*  But not the least of the defects of legislative history is its indeterminacy.  If one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history."  *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (citation omitted).  Consistent with Justice Scalia's view, California law normally prohibits its own courts from construing a statute by considering the motives or understandings of an individual legislator (including the author of the statute).  *Cairns v. Franklin Mint Co.*, 120 F. Supp. 2d 880, 886 (C.D. Cal. 2000) (citing *Williams v. Garcetti*, 5 Cal. 4th 561, 569 (1993)).

[45] *See* Defs. Exh. J, at DEF0473.  The House Report also contains the dissenting views of Sensenbrenner, Jr., Gekas, Smith, McCollum, Coble, Schiff, and Goodlatte:

> We strongly oppose H.R. 4296 which would ban a variety of guns.  The primary problem with this bill is that it targets law abiding citizens.  If this bill passes, simply possessing a shotgun or rifle could land you in jail.  You don't have to shoot anybody.  You don't have to threaten anyone, just leaving it in the hall closet

The same cannot be said for AWCA.  It is also worthy of note that gun control has been a hot political issue for these seventeen years.  Yet, through both Republican and Democratic administrations the Act has not been renewed.

### d.    Checkpoint No. 4: news reports and police reports

News reports are normally considered inadmissible hearsay, but both sides offered into evidence news articles and magazine pieces and expert testimony relying on newspaper articles about gun-related events.  News reports to which the parties made no objection are admitted into evidence.  But it begs the question, "Where are the actual police reports or criminal court records?"  Why are the only collections of offensive or defensive gun use maintained by biased organizations?  How reliably can a news reporter after the fact, identify a firearm as an "assault weapon," or determine the size of an ammunition magazine, or count the number of rounds fired?  One would expect a police report to accurately record these kinds of raw facts.

While the Plaintiffs may have difficulty obtaining copies of actual police reports, surely the Attorney General has easy access.  But the Attorney General has not offered a single California police report.  There were 161 mass shootings in the last 40 years but there is no testimony from any percipient witness.  There were instances of defensive gun use but no testimony from any defensive gun user.  The Attorney General argues that a citizen defending himself really needs, on average, only 2.2 shots.  But there is no

is enough to land you in jail.  Even if you use the gun for self-defense, you can go to jail.

. . .

Finally, the problem of these guns has been greatly exaggerated.  Although semiautomatic weapons are used in the most high profile killings that make it on the nightly news, in fact, more than 99 percent of killers eschew assault rifles and use more prosaic devices.  According to statistics from the Justice Department and reports from local law enforcement, five times as many people are kicked or beaten to death than are killed with assault rifles.

Passing this legislation is an excuse to avoid the real issues of violent crime, and threatens the rights of law-abiding citizens.  Therefore, we oppose H.R. 4296.

19-cv-1537-BEN (JLB)

testimony from any home defender.  No victim was called to testify about how many shots he or she would have wanted to have ready to fire during their actual home invasion.

The defense of home and family by using a gun is not a hypothetical event.  While there are not hard numbers, it surely happens a lot.  Approximately 1,000,000 burglaries of a home while occupied take place each year, according to Department of Justice statistics.  *See* n.100 *infra*.

The Attorney General does not take offense at the fragility of his evidence.  Instead, the Attorney General argues that the law excuses it.  He reminds us that under intermediate scrutiny, the government may "rely on any evidence 'reasonably believed to be relevant' to substantiate its interests."  Defs. Memo of Contentions of Fact and Law, at 17 (citing *Fyock*, 779 F.3d at 1000).  He says that his evidence need not be particularly robust or persuasive.  On the contrary, he says the "evidence need only 'fairly support' the government's conclusions."  *Id*.  For Second Amendment scrutiny, many courts have applied a lowered standard, but even the lowest form of scrutiny does not require obeisance from the factfinder.

The Attorney General's lack of direct evidence is noted.  There is no direct testimony from criminal shooters.  The sociologists' studies disagree and speak of further study and hopes for better data.  As for the legislative history of § 30515, it tells only of prosaic interest balancing undertaken without regard for the constitutional rights of individuals.

## III. THE EVIDENCE

Approximately 14,000 pages of evidence and testimony have been submitted and reviewed by this Court.  Only the most salient evidence is addressed in this opinion.  Different types of trial evidence were presented and are evaluated in the manner required.  Fact witnesses were judged on accuracy and credibility.  Expert witnesses were judged, and their opinions given the weight deserved.

## A.    AR-15's in Home Defense

Because firearm possession for the defense of home, self, and family is at the core of the Second Amendment right, it is important to know if there is evidence of modern rifles used for self-defense or defense of the home and family.  Recall that AWCA's § 30515 has no present exception allowing a typical Californian to lawfully acquire a modern rifle for home defense.  There are no exceptions for urban dwellers and there are no exceptions for rural farmers.  There are no exceptions for wealthy targets of armed home invaders.  There are no exceptions for the impoverished who can afford only one self-defense firearm for all situations.

Without question, there is clear evidence that AR-15 rifles are and have been used for self-defense.  For example, in one case an AR-15 was used in Florida by a pregnant wife and mother to defend her family from two armed, hooded, and masked home intruders.  Pls. Exh. 1-1.  As soon as the armed intruders entered the back door of her home, they pistol-whipped her husband -- fracturing his eye socket and sinus cavity.  Then they grabbed the 11-year-old daughter.  Before they could do any more harm, the pregnant wife retrieved the family AR-15 from a bedroom and fired, killing one of the attackers while the other fled.  It does not require much imagination to guess what would have happened next if the wife and mother did not have the firearm, or if she had emptied the AR-15's magazine *before* the attackers had fled.  The quiet click would be sickening and probably with tragic results.  The State contends that one does not "need" more than ten rounds.  That is easy to say.  Perhaps one should imagine the terror that would have gripped this wife and mother, from the sound of a "click," out of ammunition, helplessly watching her husband being murdered, her daughter being raped or murdered, and the enraged men coming for her.

In another case, an AR-15 was used by a young man in Oklahoma to defend himself from three masked and armed home invaders wearing all black.  Pls. Exh. 1-7.  The intruders had selected the home because the family had money and expensive belongings and the criminals had previously burglarized an apartment on the property.

34

The three intruders broke through a rear glass door before, to their surprise, they were shot by the home defender using an AR-15.

When seven armed and masked intruders went to a home in Florida at 4:00 a.m., burst through the front door and fired a gun, the occupants of the home, one armed with an AR-15, fired over 30 rounds and stopped the attackers. Pls. Exh. 1-2.

An AR-15 was used to stop a knife attack at an apartment building in Illinois. Pls. Exh. 1-3. Dave Thomas grabbed his AR-15 explaining, "It's just a bigger gun. I think a little bit more than an intimidation factor definitely played a part in him actually stopping." No shots were fired. Thomas also said, "[t]he AR-15 is my weapon of choice for home protection . . . It's light, it's maneuverable."

An AR-style rifle was used by a homeowner across the street from the mass shooter in Sutherland Springs, Texas. The defender shot and injured the mass shooter, who then dropped his assault rifle and fled. Pls. Exh. 1-4.

An AR-15 was used to stop an intruder in Pennsylvania. Pls. Exh. 1-6. A criminal already awaiting trial for aggravated assault in another incident, forced his way into the couple's apartment late at night. One of the apartment-dwellers was able to retrieve an AR-15 and defend against the attacker who disregarded warnings to stop.

**1.** *Prohibited Features Are Good for Home Defense*

The evidence shows that one reason for the popularity of the modern rifle is that it makes a good weapon for self-defense at home. The AR-15, in particular, is an easy firearm to shoot accurately and is generally easier to fire accurately than a handgun. The AR-15 rifle is light in weight, and has good ergonomics, and is suitable for people of all statures and varying levels of strength.[46]

When burglars break and enter, a homeowner with a modern rifle has thirty rounds

---

[46] Kapelsohn testimony, Tx of 10/19/20 hearing at 25:16 – 26:20 and 26:21 – 27:8.

1   at the ready, assuming a standard magazine is used.[47]   Standard size magazines are

2   ubiquitous.   With the physiological stress of waking to the noise of home invaders, one

3   may need many rounds to overcome the difficulty of aiming in the dark at multiple

4   attackers making furtive movements.   The adjustable stock can be quickly set for one's

5   arm length.   The pistol grip gives a homeowner a secure hold with one hand while the

6   other hand holds a telephone or spare magazine.[48]   A flash suppressor prevents the night-

---

[47] California Penal Code § 30515(a)(2) also defines an "assault weapon" to include an otherwise featureless rifle that has a fixed magazine with the capacity to hold more than 10 rounds.   Likewise, Penal Code § 30515(a)(5) defines as an "assault weapon" any semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.   This Court has already described the utility of larger, standard capacity magazines in self-defense situations and California's unconstitutional 10-round limit. *See Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019).

   A detachable magazine of any size along with a prohibited feature qualifies as an "assault weapon."   Cal. Penal Code § 30515(a)(1), (4), (a)(7).   Yet, detachable magazines are useful for self-defense and provide a person with the ability to re-load a semiautomatic firearm.   If a person has a second magazine at hand that is already filled with loaded cartridges, he may remove the depleted magazine and re-insert another magazine fairly quickly.   However, the idea that the ability to accept detachable magazines "provides the soldier with a fairly large ammunition supply and the ability to rapidly reload," as suggested by the Attorney General, is not relevant in the context of citizen self-defense.   It is relevant, however, for considering AWCA's impingement on the right to keep a firearm for militia use.

   The Court rejects the notion that magazines capable of holding more than 10 rounds feature prominently in gun violence against law enforcement personnel as there is little evidence.   For example, among all of the incidents of gun violence toward law enforcement officers that occurred nationally from 1984 to 2019, California Assistant Director Department of Justice, Bureau of Firearms, Blake Graham lists only nine occasions involving larger capacity magazines. *See* Defs. Exh. D, Graham Decl. at ¶ 68 (DEF0215-18).

[48] Pistol grips are a prohibited feature under Pen. Code § 30515(a)(1)(A).   Pistol grips are the most common of the prohibited features on just about all modern semiautomatic arms.   Curcuruto testimony, Tx of 10/19/20 Hearing at 65:2-6; Graham testimony, Tx of 10/19/20 Hearing at 129:17-12; Defs. Exh. D, Graham Decl. at ¶ 28 ("In my experience, this feature is the most prevalent feature of assault rifles prohibited under the AWCA.").

time home defender from being blinded by her own muzzle flash.[49]  It may also hide the

home defender's location from attackers.  A barrel shroud serves as a way to attach a

flashlight or laser pointer.[50]  The straight-line design of an AR-15 is easier to shoot

accurately because muzzle rise is reduced.  The gas piston design reduces the recoil so

that the young or old or not-particularly-strong have better control.  The light weight

---

        Pistol grips are important to good ergonomics, particularly on a straight-line design rifle such as the AR-15.  Kapelsohn Decl., Pls. Exh. 001, at ¶ 28; Kapelsohn testimony, Tx of 10/19/20 hearing at 32:23 – 33:2.  This enhances the firearm's accuracy.  *Id.*; Defs. Exh. D, Graham Decl. at ¶ 28 ("A shooter using an assault rifle without a pistol grip may shoot less accurately with repeated – and especially rapid – shots if the shooter's trigger hand is in an awkward position for a significant amount of time"); Defs. Exh. BA, p. 9 (pistol grips afford greater control of the rifle during firing).
        Like pistol grips, thumbhole stocks allow the shooter to gain a comfortable grip on the firearm and can facilitate accurate shooting.  Kapelsohn Decl., Pls. Exh. 001, ¶ 29.  By prohibiting both pistol grip stocks and thumbhole stocks, § 30515(a)(1)(B) relegates such firearms to be equipped in a manner that is less comfortable, less accurate, and less safe.  Kapelsohn Decl., Pls. Exh. 001, ¶ 29.
        A forward pistol grip is designed to enhance control of the firearm.  Forward pistol grips on rifles, also called vertical forends, are popular among some shooters in allowing them to control the rifle better for more accurate shooting.  Kapelsohn Decl., Pls. Exh. 001, ¶ 34.  Forward pistol grips may also serve as a "monopod" to assist in stabilizing the rifle for more precision shooting in the prone position.  *Id.*

[49] A flash suppressor is a device fitted on the end of a muzzle which diverts the muzzle flash through several slots or holes, most commonly arranged around the axis of the bore.  Kapelsohn Decl., Pls. Exh. 001, ¶ 33.  The most common type of flash suppressor on AR-15 rifles is the "birdcage" type of device.  *Id.* at Exh. 001-14.  The primary advantage of a flash suppressor is to reduce muzzle flash so as not to temporarily blind a shooter who is shooting in a dark environment.  *Id.* at Exh. 001, ¶ 33.  The use of a rifle without a flash suppressor under low light circumstances is likely to temporarily blind the user, or impair the user's vision, placing a law-abiding user at a disadvantage to a criminal attacker.  *Id.*; Kapelsohn Depo. at 124:25 – 125:8 ("I have fired ARs that don't have a flash suppressor and [they] throw out a God awful flame and muzzle blast as a result.").
[50]  Regarding an assault pistol, a barrel shroud also serves a functional purpose by cooling the barrel and insulating the non-trigger hand during rapid fire.  Kapelsohn Depo. at 171:12-17.

makes it easy to hold and use, while the short 30-inch length (compared to a 48"
traditional shotgun) makes it more maneuverable through the narrow doorways and
hallways of a home.[51]

On an AR-15 rifle, a telescoping stock is typically capable of adjusting to between
three and six different lengths.[52]  This enables the rifle stock to be quickly and properly
adjusted to fit the user, which is particularly beneficial to persons of smaller stature.[53]
Plaintiff Wendy Hauffen, a firearms trainer, says that the telescoping stock is preferred
for training women or younger shooters.[54]  Hauffen owns a featureless firearm, which she
accomplished by removing the features prohibited by § 30515(a)(1).  But Hauffen would
prefer to have standard AR-15 with ergonomic features, such as a pistol grip or a forward
vertical grip, to assist in controlling the firearm.[55] In addition, she would prefer to use and
train other women shooters with a telescoping stock, which can accommodate smaller
shooters.  The telescoping stock also makes a single weapon useful for different members

---

[51] Rifles that have shorter overall lengths are more advantageous to the user in a close
quarter's situation, such as the defense of a home, because it enables the user to be more
maneuverable moving through doorways and around corners.  Kapelsohn testimony, Tx
of 10/19/20 Hearing at 33:18 – 34:5; Graham testimony, Tx of 10/19/20 Hearing at
132:13 – 134:6.  The idea of a "carbine," which is a shorter rifle, typically refers to a rifle
with a barrel less than 20 inches.  Hlebinsky Decl., Pls. Exh. 002, ¶ 22.  Rifles with
shorter barrel lengths also have the added advantage of having less weight, which would
be important from a defensive perspective.  Kapelsohn testimony, Tx of 10/19/20
Hearing at 39:14 – 40:4.

[52] Kapelsohn Decl., Pls. Exh. 001, at ¶ 31.

[53] Kapelsohn testimony, Tx of 10/19/20 Hearing at 28:24 – 29:1; Youngman testimony,
Tx of 10/19/20 Hearing at 88:13-20.

[54] Hauffen Decl., Pls. Exh. 014, ¶ 8.
[55] *Id.* at  ¶¶ 5, 8.

of a household.[56]

A folding stock, though it makes the firearm more portable, does not turn a semiautomatic rifle into a common instrument of crime, since it does not make a rifle easily concealable for most criminal activities.[57]  Making a folding stock almost irrelevant, an AR-15 firearm is easily separated into two halves by pulling out two pins, as was demonstrated during one of the hearings by a Deputy U.S. Marshal.  Two halves of a 30-inch rifle are more concealable than a 30-inch rifle with an adjustable stock.  A pistol is far more concealable than either and much more often used in crime.

A drawback to the featureless AR-15 rifle is that the lack of a pistol grip makes it less safe when it comes to clearing malfunctions.[58]  In self-defense and in battle, malfunctions can be fatal.  Also, AWCA provides no exception for those that may have physical or medical reasons for seeking certain characteristics on a home-defense firearm.  Those of small stature or less strength may need an adjustable stock, pistol grip, or vertical foregrip to maintain proper control of their firearm.  For those that have trouble handling the recoil of a pistol, AWCA forces a choice between: (1) using a firearm that is difficult to properly control; or (2) a different and potentially inferior firearm.  Those with medical disabilities are left to operate firearms that lack characteristics that would make the firearm more comfortable or easier to operate.

### 2. *California's Reasons for Banning*

What is the reason for continuing to ban these modern firearms?  "So, the State here is concerned about the configuration of particular arms that have been proven to be

---

[56] The arbitrary and capricious nature of these restrictions is perhaps best reflected by the telescoping stock restriction.  If the total length of the rifle is 30 inches as required, what difference would it make if the telescoping stock would lengthen the rifle to 31, 32, or 34 inches?

[57] Kapelsohn Decl., Pls. Exh. 001, ¶ 30.

[58] Kapelsohn Depo. at 188:11 – 194:19.

the most lethal in mass shooting situations."[59]  The Attorney General says that the State is concerned with rapidly firing accurate rifles.  As the State's attorney explained during the first day of testimony,

> But I will tell you that, as the State has demonstrated in this case and in our pleadings in this case, that the State is concerned about . . . the particular configuration of certain centerfire semi-automatic rifles with a detachable magazine [that] allows someone to fire, not just 30 or 40 rounds, but to fire those rounds rapidly and maintain accuracy in rapid-fire scenarios.  That is the concern.  So there are other concerns as well, but that is what the State of California was concerned about.[60]

The Attorney General views rapid-fire accuracy as a danger to be outlawed.

### a.    The accuracy conundrum

Accuracy is very important for self-defense because a civilian is accountable for every round he fires.  If he misses the attacker, he will hit something he did not intend to hit, which may be an innocent bystander.[61]  The State does not dispute the importance of accuracy alone for self-defense.[62]

Does the state want rifles that are less accurate?  No and yes.  The State wants rifles that are less accurate during rapid firing because rapid firing, it is claimed, correlates with criminal use.  And there is no need for rapid firing for self-defense, according to the Attorney General.  The Attorney General argues that the features prohibited by § 30515 are characteristic of military weapons and military weapons are designed to be accurate with rapid firing.  Perhaps.  But that a civilian rifle has design features similar to a military rifle does not detract from its constitutional protection for

---

[59] Deputy Attorney General Echeverria, preliminary injunction hearing transcript 10/19/20, at 188.

[60] *Id*. at 187-88.

[61] Kapelsohn testimony, Tx of 10/19/20 Hearing at 27:24 – 28:6.

[62] Graham testimony, Tx of 10/19/20 Hearing at 134:15-18 ("If you're firing a weapon for self-defense, accuracy would be ideal").

self-defense.  At the same time, it actually enhances a firearm's constitutional protection for militia readiness.  The exception to this rule for civilian self-defense is a weapon's ability to fire in full-automatic mode.  The ability to fire fully automatic is, above everything else, what distinguishes an M-16 from an AR-15-type semi-automatic civilian rifle.  *See Staples v. United States*, 511 U.S. 600 (1994).  But the M-16 was modified to allow for burst and single fire (semi-automatic) capabilities because it was recognized that firing in full automatic is less accurate and wastes ammunition.  And this is where the mantra that an AR-15 is "almost as fast as the M-16" fails.  Because the M-16 provides fast but inaccurate shooting in full automatic mode, when accuracy is needed, the M-16 has the option of the slower single round semiautomatic firing like an AR-15.

The home defending victims described earlier needed to rapidly fire their modern rifles and needed to fire them accurately at their attackers.  Pls. Exhs. 1-1 through 1-7.  For home defense, accuracy is always important, not only for hitting an attacker, but also for hitting *only* an attacker.  Emanuel Kapelsohn testified,

> Accuracy is very important for self-defense because, unlike a criminal using a firearm, the civilian or the police officer, either one is accountable for every round they fire.  And any round that misses the attacker, who is attacking the civilian or the police officer, if it doesn't hit what they intended to hit, the attacker, then by definition it hits something they didn't intend to hit.  That may be an innocent bystander.  So the accomplishment of a good level of accuracy is paramount in civilian self-defense training with firearms, and the AR-15 permits that.[63]

The AR-15 type rifle is an accurate gun.  And it can be fired repeatedly, if need be, more rapidly than a bolt action or lever action rifle.

### b.   The featured vs. featureless AR-15 video

One video in evidence is particularly interesting.  In this short video, two AR-15 type rifles were fired repeatedly and reloaded with a detachable magazine at a target in

---

[63] Preliminary injunction hearing transcript 10/19/20, at 27:24-28:9.

daylight.  One rifle had all of the prohibited features prohibited by AWCA in § 30515(a).  The other rifle was a "featureless" California-legal variety of AR-15 rifle.[64]  The results were remarkably similar.  Each rifle fired at approximately the same speed and accuracy.  Any difference was hardly noticeable.[65]  Of course the video was staged for a purpose, but it clearly demonstrates little difference in the operation of a lawful and an unlawful AR-15.  The presence or absence of a flash suppressor made no difference in the daylight.  It might have, had the demonstration been conducted at night.  The person demonstrating modestly described himself as moderately experienced with guns.

The video demonstration raises questions.  The State says that a modern rifle without the prohibited features works just fine.  Since the features are just cosmetic, then there is no burden on Second Amendment rights.  The Plaintiffs say that if a modern rifle without the prohibited features is just as lethal, the State's ban of rifles with the features is pointless.  The Plaintiffs say that if what the state labels "combat-oriented features" have no effect, then they are not really combat-oriented features.  The ban fails to achieve its purpose of prohibiting a "more lethal" firearm.  The State says the features are not needed for lawful uses.  The Plaintiffs say the features make no difference in unlawful uses.  Even if they did make a difference, the Plaintiffs say that the notion, that improvements that make firearms better and safer for lawful use likewise make them comparably better for unlawful use, simply leads to the absurdity that firearms may never be improved because the harm of a more accurate firearm in a criminal's hands will always justify a ban.  The difference is the featureless rifle is more cumbersome for the

---

[64] The video also demonstrates that twenty years of state regulation has artificially shaped the firearm marketplace.  "Featureless" rifles would not exist if the prohibited features really do define the utility of the firearm.  In the absence of the Second Amendment, government policy may ban a firearm based on its looks.  The same policy cannot survive heightened constitutional scrutiny because a citizen's right to keep common firearms regardless of looks is protected by the Second Amendment.

[65] *See* Pls. Exh. 11, Adam Kraut Decl.

surprised homeowner who, unlike the intruder, may not be as ready to wield his or her firearm.

In the end, the Court finds that the prohibited features do not change an AR-15 rifle from a benign weapon into an "incredibly effective killing machine."  Another commonly espoused myth is that the caliber of these centerfire semiautomatic weapons are more lethal.  In fact, the evidence proves otherwise.  The usual ammunition for an AR-15, the .223/5.56 round, is designed to cause wounding, much more than death.  Dr. Margulies, M.D., testified that the 5.56 round was a NATO choice to inflict non-lethal wounds.  He explained that using the 5.56 round designed for wounding rather than killing furthered a military goal of reducing the enemy fighting force by diverting healthy enemy soldiers to caring for its wounded soldiers.[66] Hyperbole aside, AR-15 ammunition is designed to make the AR-15 type rifle a wounding machine rather than a killing machine.  *But see, Rupp*, 401 F. Supp. 3d at 992, 993 (firearms with assault-weapon configurations are "incredibly effective killing machines" because the prohibited features "increase the capabilities of semiautomatic rifles and thereby enhance their capacity for mass violence.").

### c.    The disproportionality bromide

The Attorney General stresses the notion that modern rifles are disproportionally used in crime.  Defs. Memo at 18.  It seems like it could be true, but it is not supported by the evidence.  More importantly, ~~important is understanding that~~ disproportionality is not a constitutional test.  *Heller* and *McDonald* demonstrate the opposite is true.  The Court struck down bans on handguns in the District of Columbia and Chicago at a time when handguns were disproportionately used in crime.  *Heller*, 554 U.S., at 697-98 (Breyer, J., dissenting) ("From 1993 to 1997, 81% of firearm-homicide victims were killed by handgun . . . .   Handguns also appear to be a very popular weapon among criminals.  In a

---

[66] Depo. Margulies, (Dec. 18, 2020), at 65:7-9; 67:7-17; 94:20-25.

1997 survey of inmates . . . 83.2% of state inmates and 86.7% of federal inmates said that they were armed with a handgun.").  By comparison, modern rifles are not used in crime nearly as often as handguns.

If use by criminals could justify a weapon's ban, it would amount to something like a disfavored "heckler's veto."  We might call it the "criminal's veto." *See e.g., Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1292-93 (9th Cir. 2015) (explaining "heckler's veto" doctrine) ("If speech provokes wrongful acts on the part of hecklers, the government must deal with those wrongful acts directly; it may not avoid doing so by suppressing the speech.").  Just as a heckler's veto wrongly punishes persons who speak their ideas, California's ban punishes persons who choose modern rifles for home defense.  In other words, if modern rifles are misused in crime (even disproportionately), government must deal with those wrongful acts directly; it may not deal with the problem by suppressing the rights of law-abiding citizens to have modern rifles for lawful uses.  Thus, disproportionality is not a valid constitutional concern.  Common ownership by law abiding citizens for lawful purposes is the test.

Moreover, there is little evidence that modern rifles are used disproportionately in crime.  The Attorney General cites the 1994 Congressional House Report as evidence. Defs. Mem., at 18.  The House Report actually said that assault weapons were "a growing menace to our society *of proportion to their numbers*," rather than out of proportion to their numbers.  Defs. Exh. J, at 13 (emphasis added).[67]  Perhaps the Report was published

---

[67] The House Report notes that the Director of ATF testified that while, in 1993, assault weapons made up only 1% of the firearms in circulation, they made up 8.1% of the guns traced to crime.  Whatever the ratio was in 1993, it has changed over the last 27 years. The State does not offer any current evidence.

For 2019, ATF's firearm tracing report shows 41,883 crime firearms traced and recovered in California.  (https://www.atf.gov/file/146966/download).  Of those, there were 7,655 rifles.  The ATF report does not categorize assault weapons as a separate category, but it does list firearms by ammunition type.  The 223/5.56mm caliber is most

with a scrivener's error.  Regardless, a single citation to a 27-year-old Report cannot be said to fairly support California's conclusions.  There is no evidence that California's Legislature relied on the 1994 House Report when it passed AWCA five years earlier in 1989, or later when it adopted a features-based definition in 1999.  There is no evidence that the California Legislature conducted its own study on whether modern rifles were being disproportionately used in crime in California in 1989, or 1999.  There is no evidence that the California Legislature relied on studies from other states.  There is no evidence that the State was making a sensitive policy judgment.  There is, however, evidence at the time of the federal ban that assault weapons were rarely used as crime guns.[68]  Even today, most national estimates suggest assault weapons are used in crimes less than 7% of the time.[69]

To sell the disproportionality bromide, the Attorney General also cites its expert, Professor Louis Klarevas.[70]  But Klarevas does not express an opinion about modern rifle use in general crime.  Instead, he opines that modern rifles are used disproportionately in

_____

often found on banned assault rifles.  *See* Def's Exh. BG, at 6.  Of course, the 223/5.56mm caliber is also found on the California-legal "featureless" modern rifles. Regardless, of the 41,883 firearms traced in California in 2019, only 1,154 (or .027%) were of the 5.56mm caliber.  During the same year there were approximately 20,000,000 guns owned in California.  The percentage of 1,154 possible assault rifles used in crime, as a percentage of the total guns owned in California, is ridiculously small.

This ATF report was not presented as evidence in the case and the Court does not rely on it as such.  However, it does suggest the reason why California does not offer current evidence of disproportional assault rifle use in crime.  There is none to be found.

[68] Defs. Exh. Y, Christopher S. Koper, *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms*, J. Urban Health (Oct. 2017), at 2 ("Studies conducted around the time of the federal ban found that [assault weapons] accounted for up to 8% of guns used in crime (generally between 1 and 6% and averaging around 2%).").
[69] *Id.* at 1 ("Results suggest assault weapons (primarily assault-type rifles) account for 2 – 12% of guns used in crime in general (most estimates suggest less than 7%).").

[70] Defs. Exh. E, Klarevas Decl. at ¶ 16.

what he calls "gun massacres" – not crime in general.  And Klarevas defines a "gun massacre" as a shooting event resulting in at least *six* deaths and where at least one assault weapon was discharged.[71]  No other expert witness, sociologist, economist, or government agency defines a mass shooting in this way.  The definition almost creates a tautology along the lines of assault weapons are used disproportionately in assault weapon events.

The Attorney General takes one more shot at it by citing another expert, Professor John Donohue.[72]  It is not convincing.  Like Klarevas, Donohue does not opine about general crime use.  Donohue opines more narrowly that modern rifles are used disproportionately in mass shootings.  He says, "[a]s Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings."  Donohue relies on Professor Christopher Koper's opinion.  But that does not help.  Koper's 2004 Study dramatically undercuts the whole trope of assault weapons supposedly being disproportionately used in general crime.[73]

In fact, Koper finds quite the opposite to be true.  In his landmark 2004 report, Koper surveyed national data and found, "the estimates consistently show that AWs [assault weapons] are used in a small fraction of gun crimes," and "most survey evidence on the actual use of AWs suggests that offenders rarely use AWs in crime."[74]  Koper also notes something that others tend to overlook.  Koper notes that many of the assault weapons used in crime, when they are used, are pistols rather than rifles.  He explains, "[n]ote also that the majority of AWs used in crime are assault pistols (APs) rather than

---

[71] *Id.* at Exh. 3, p.4.

[72] Defs. Exh. C, Donohue Decl. at ¶ 115.

[73] *See* Defs. Exh. BJ.
[74] Defs. Exh. BL, at 15-16.

assault rifles (ARs) . . . by a ratio of 3 to 1."[75]  Koper concludes, "while some surveys suggest that ownership and, to a lesser extent, use of AWs may be fairly common among certain subsets of offenders, *the overwhelming weight of evidence from gun recovery and survey studies indicates that AWs are used in a small percentage of gun crimes overall*."[76]  Koper's conclusions comport with the ATF firearm tracing report from 2019.

As to their presence in mass shootings, even Koper has explained that the highest correlation is with the presence of large capacity magazines, as opposed to the presence of assault weapons.  According to his 2020 study, Koper says, "[i]n summary, growing evidence suggests LCM restrictions reduce mass shootings and are more potent than AW-only restrictions.  Nonetheless, the evidence is not yet sufficient to draw definitive conclusions."[77]

Recall that to pass intermediate scrutiny, AWCA must have at least been designed to address a real harm and alleviate the harm in a material way.  *Turner II*, 520 U.S., at 195.  The evidence described so far proves that the "harm" of an assault rifle being used in a mass shooting is an infinitesimally rare event.  More people have died from the Covid-19 vaccine than mass shootings in California.  Even if a mass shooting by assault rifle is a real harm, the evidence also shows that AWCA's prohibited features ban has not alleviated the harm in any material way.  Perhaps recognizing AWCA's constitutional infirmity, the Attorney General attempts to draw attention away from the statute's small aim and maintains that citizens do not "need" more than 2.2 shots for self-defense, so AWCA's constitutional burden is mostly hypothetical.

### d.   The myth of 2.2 shots

The Attorney General offers the old saw that large capacity magazines and

---

[75] *Id*. at 16.

[76] *Id*. at 17 (emphasis added).

[77] Defs. Exh. BL, at 161 (DEF2028).

accurate repeated firing are things needed only by mass shooters.  The story goes that for self-defense a citizen "needs" only 2.2 rounds.  It is a myth.  Take the case of the 80-year-old woman faced with a home invader who began attacking and stabbing her 75-year-old husband.[78]  When the intruder attacked her husband with a knife, she shot at the intruder.  According to her neighbor, "She emptied the gun."  Where there is only a single intruder, 2.2 shots may not be enough.  Where there are multiple attackers, it is self-evident that 2.2 shots will not be enough.

Where does this 2.2 shots myth originate?  According to a 2018 study by Professor Koper (evidence introduced by the Attorney General), "there is no national or state data source that captures information on shots fired in gun attacks."[79]  Attempting to fill this data gap with his own study, Koper reports, "this study finds that 20% – 28% of victims were wounded in incidents involving >10 shots, most of which seem likely to have involved high-capacity semiautomatics."

The 2.2 shots notion comes from the State's expert, Lucy Allen.  Allen is an expert in economics and statistics.[80]  Unlike Koper, who is an academician undertaking peer-reviewed studies for the advancement of understanding, Allen was hired specifically to conduct research for the State's litigation.  Her study is not peer-reviewed.  Her study cannot be tested because she has not disclosed her data.  Her study cannot be replicated.  In fact, the formula used to select 200 news stories for her study is incomprehensible.  Worse, the entire concept is suspect because it attempts to study an average defensive gun use based *not on police reports* but on events reported in the news media and often lacking in detail, all while acknowledging that many events are never reported.  Allen did

---

[78]  *See* www.q13fox.com/news/she-emptied-the-gun-home-intruder-shot-killed-by-80-year-old-woman-in-sultan-identified.

[79]  Defs. Exh. CO, at DEF3132-34.

[80]  Defs. Exh. A, at ¶ 1-3.

ask the State for police reports, but she did not receive them.[81] Allen testified that the first

thing she did was ask whether there were police records available.[82]

Here are the details.  Allen claims she has determined the average number of

rounds fired by an individual in a defensive gun use.[83]  To find the average, she says that

she conducted a word search with a database of news articles maintained by a news

aggregator called Factiva.  Factiva is a commercial database behind a paywall.  She also

conducted a search of stories published in the NRA Institute for Legislative Action

magazine between 2011 and 2017 called the Armed Citizen Database.[84]  From these

searches she or a member of her team coded each story and arrived at the conclusion that

on average, 2.2 shots were fired in a defensive gun use and 2.1 shots were fired if the

---

[81] *See* preliminary injunction hearing, 10/19/20, at 153:1-16.
   "THE COURT: Let me ask you a question.  Did you ever ask, for example,
[Deputy Attorney General] Mr. Echeverria if he would get you the law enforcement
reports of home defense shootings that may have occurred where the homeowner or the
person at home fired shots at someone that was intruding?
   THE WITNESS: Yes.  So I did ask both from the State of California as well as
from a number of other states that I have worked for, I have asked for data on incidents of
exactly that, or whether there was a broader set of data that they had that I could then
review.
   THE COURT: And did you get that from the State of California?
   THE WITNESS: I did not.  It was my understanding that the State of California
did not have that data or did not have that in a way that it could be reviewed.  That that is
not -- that is not a type of data that is collected."

[82] *See* preliminary injunction hearing, 10/19/20, at 171:8-15 ("And actually, the first thing
I did was, per their question, which was try to find out whether there were police records
on that . . . .  I agree with you that I think that would be helpful, so I first did try to
research and ask whether there was government data or other data, police records
available.").

[83] Allen Video Depo., Jan. 12, 2021 at 10:55.
[84] *Id*. at 11:06; Exh. A, at ¶ 11-13.

defensive gun use was in a home.[85]

Her methodology with the Factiva database is incomprehensible.  For the Factiva database of 70 million news stories, her word search returned 35,000 stories.[86]  From there she somehow selected 200 stories of defensive gun use in the home and set out to analyze the events.[87]  It is unclear how the stories were selected or what members of her "team" selected the stories to analyze.  She describes selecting 200 stories out of a sub-collection of 4,800 stories by reviewing 1,400 stories.  Where did the 4,800 stories come from?  Her methodology cannot be duplicated, but here it is:

> Using a random number generator, a random sample of 200 stories was selected for each calendar year [from 2011 to 2017], yielding 1,400 stories in total.  These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home.  This methodology yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories.  Thus, we found that out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home.  We analyzed a random selection of 200 of these stories.

It is a mystery how 4,800 stories were determined to be the universe of reports on self-defense with a firearm in the home.  In her deposition, she was not asked about the 4,800 stories.  ~~Also,~~ Allen also fails to provide~~s~~ ~~no~~any copies of the 200 stories she analyzed or the mythical 4,800 stories from which she says she drew the 200 analyzed stories.  There is no list.  There is no way to check her analysis or her math or try to reproduce or falsify her results – nor did she try to do so.

Allen's calculations also include other curiosities.  To arrive at her average of 2.2

---

[85] Video Depo. at 11:37; Exh. A, at ¶ 14-15 (and table).

[86] Exh. A at ¶18.

[87] *Id*. at ¶ 19.

shots, she includes in the averages those events where no shots were fired.,  This has the obvious effect of bringing the overall average number of shots "needed" down.[88]  She testified that she has never calculated the average number of shots fired only in events when shots were actually fired, but agrees that whatever that average is it would be greater than 2.2 because all of those events where no shot is fired would be removed from the equation.[89]  One would expect the impact of Allen's choice to include a zero for a no-shot event to be significant because 16.1% of the events in the home were no-shot events (according to Allen's table).[90]  For the California-only events average, 32.1% of the events in the home were no-shot events.[91]

For a study that set out to prove the number of shots required to defend one's home with a firearm, the effect of this statistical manipulation is significant.  What if, for example, a study sought to measure the benefit of airbags in car accidents but included both accidents where the airbags deployed as well as those where the airbags did not deploy?  The result would surely show airbags made a muted difference; their usefulness erroneously diminished by the multitude of minor accidents in which airbags did not deploy and yet no one sustained injuries.  But when airbags do deploy, they just as surely provide a substantial benefit to motorists.  The impact of an airbag's benefit would be lost

---

[88] Allen Depo. Jan. 12, 2021 at 119:10-18 ("Q.  So numerically speaking, inclusion of incidents where the number is zero would tend to drag the average number of shots fired down; would you tend to agree with that?  A.  So it includes those with zero.  That's correct.  Q.  Okay.  And have you ever looked at the average number of shots fired when shots were fired?  A.  No.")

[89] *Id*. at 120:10-15 (Q. Have you ever looked at average number of shots fired when shots were fired?  A.  I don't believe so.  Would you tend to believe that number is higher than 2.2?  A.  Yes.")

[90] Exh. A at ¶ 15.

[91] *Id*. at ¶ 16.

in this hypothetical study, drowned out by minor paint scratches and fender benders.

Allen's study suffers from the same flaw.  By including the number of events in which no shots were fired in its calculation of an "average," Allen's study inaccurately reduces the average number of shots needed to defend oneself during a home intrusion.

To compound the problem, Allen also used an "imputed" number of shots fired when a media report says "shots" were fired but did not report a specific number.[92]  This imputed number was averaged in, but Allen did not know and could not guess at the imputed number she used.[93]

Allen also used something called the Armed Citizen Database.  That database is problematic because it is not really a database but a list of published magazine stories.  First, the database compilers make no attempt to record all events or statistically representative events.  Second, Allen has no direct knowledge of how editorial decisions are made for including or excluding a particular story.[94]  She has deduced that only stories with successful outcomes are published.  One can only guess whether unsuccessful self-defense situations involve similar numbers of shots fired.  Third, Allen does not know how many stories are not published or not included in the database.[95]

---

[92] "When the exact number of shots fired was not specified, we used the average for the most relevant incidents with [a] known number of shots.  For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified."  Exh. A, at n.19.

[93] Allen Depo., Jan. 12, 2021 at 131:13-19 ("Q.  Can you tell me what that imputed number would be for purposes of this report?  A.  I can't, no.  Q.  An estimate [as] to what that imputed number is?  A.  I can't.  I mean, you might be able to figure it out, but I can't as I sit here now.")

[94] *Id.  passim.*

[95] *Id*. at 111:5-12 ("Q.  You don't know – if you don't know the number of stories that are submitted to the NRA for consideration in the Armed Citizen feature, then you don't

1    Fourth, like the Factiva collection, 736 incidents in the Armed Citizen Database were

2    analyzed but no list of the incidents have been placed in evidence.  As she acknowledged

3    in her declaration submitted in *Duncan v. Becerra*, the NRA-ILA Armed Citizen

4    Database is not compiled scientifically.[96]

5          Allen's 2.2/2.1 shot averages are suspect for larger reasons.  The whole statistical

6    exercise is based on news reporting rather than police reports.  A database of news

7    articles lacks the usual indicia of accuracy and reliability of admissible evidence.

8    Professor Koper observed that there exists no national or state database of defensive gun

9    uses or database of the number of shots fired during self-defense events.  But there are

10   surely large numbers of such events each year.  According to fifteen national polls

11   conducted by non-law enforcement agencies, there may be from 760,000 defensive

12   handgun uses to 3.6 million defensive uses each year.[97]  Even Allen's Factiva search

13   apparently identified 33,000 news stories, despite the likelihood that many events go

14   unreported to the police and many that are reported to the police are not reported by the

15   news media.

16         On the other side, a fully loaded modern rifle is surely a powerful psychological

17   criminal deterrent.  Simply brandishing such a weapon may cause an intruder to flee

18   precisely because it appears to be dangerous and fully loaded.  It is difficult to imagine

19   the same psychological effect on a home invader (or two invaders) from brandishing a 2-

20   shot derringer.  It is a reasonable inference that the visual threat presented by a

21   homeowner holding a modern rifle with a large magazine makes it an effective deterrent

22

23   _____

24   know how many stories are left on the cutting room floor or are never published, right?

25   A.  I'm not sure that question makes sense, but I don't – pretty sure I don't know the

26   answer one way or the other, but …")

27   [96] Allen Decl. (filed 6/5/17) at ¶ 6.

28   [97] Pls. Exh. 10-10, John R. Lott, Jr., *More Guns, Less Crime* 3d. (2010), at 12.

without firing a shot.

All considered, Allen's opinion about the number of shots fired in self-defense is entitled to little weight and fails the scientific method.[98]

e.    **You don't need more than 2.2 shots and you don't need seat belts or smoke detectors**

The Attorney General remonstrates that whatever the precise average number is, "it is extraordinarily relevant because it shows that the burden on the core right is minimal."[99] It may be minimal much of the time. A law that bans seat belts or smoke detectors would impose a minimal burden much of the time. One could drive 100,000 miles without needing seat belts. But when the unexpected collision occurs, seat belts are really needed. One could live 100 years without needing a smoke detector, but when fire starts in the middle of the night, a smoke detector is really needed. A person may not need more than 2.2 shots to defend themselves in the average situation. Yet, sometimes more than 2.2 shots – sometimes much more – are needed. That is when the burden on the core right of self-defense becomes extraordinarily severe.

According to the United States Department of Justice, it is estimated that 3,700,000 burglaries occur each year in the United States.[100] A household member is present during approximately 1,000,000 of those burglaries. Of the 1,000,000 household members

---

[98] *See also Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 317cv10507 PGSLHG, 2018 WL 4688345, at *12 (D.N.J. Sept. 28, 2018), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) ("The Court finds neither Allen nor [] provided a clear analysis based on the various studies. Allen's analysis, based on an NRA report, does not support with statistical reliability her claim that individuals only use an average of 2.2 or 2.3 bullets when using handguns in self-defense.").

[99] Transcript, Pre-Trial Conference, Dkt # 74, at 32:4-6.

[100] U.S. Department of Justice, Bureau of Justice Statistics, *Victimization During Household Burglary* (Sept. 2010), at 1 & 9.

54

present in their homes when burglars enter, approximately 266,560 end up victims of violent crime.  Seventy-seven hundred women are raped in their own homes.  Each of the 1,000,000 burglaries each year where a household member is present is a potential circumstance for defensive gun use.  Unfortunately, for 266,560 homeowners, either no firearm was at hand or it was not enough to prevent a violent attack.  It begs the question, are the lives of home invasion victims worth less than the lives of mass shooting victims?

For some citizens, a modern rifle is their first choice to prepare for home defense when this year's 3,700,000 burglaries take place.[101] For the future 266,560 new victims of violent crime during a home burglary this year, a modern rifle may be the thing they regret not having.

### f.    Modern rifles and mass shootings

"So, the State here is concerned about the configuration of particular arms that have been proven to be the most lethal in mass shooting situations, and that's what the evidence shows."  Deputy Attorney General Echeverria, preliminary injunction hearing (10/19/20), at 188.  Allen also opines about a correlation between modern rifles and mass shootings.  The specter of a mass shooting with a modern rifle is really the driving force behind the state's prohibition on AR-15s and the like.

On cue, Allen uses her private database of news articles to identify a correlation between mass shootings and modern rifles.  As of December 2019, Allen identifies 161 mass shootings.[102]  In a previous case she identified 109 mass shootings.[103]  In the

---

[101] See Pls. Exhs. 13-15 and 16-22.

[102] Defs. Exh. A, at ¶ 30.

[103] Defs. Exh. AQ, at ¶ 10 (*Rupp v. Becerra*, C.D. Cal. Case No. 17cv746-JLS-JDE, Expert Report of Lucy Allen (signed Oct. 25, 2018).

*Duncan v. Becerra* case, she identified 96 mass shootings.[104]  In a New Jersey case she identified 83 mass shootings.[105]  In a Maryland case she identified 69 mass shootings[106] and in a New York case 66 mass shootings.[107]  One might guess that the numbers keep changing because mass shooting events keep happening.

More recent events can account for 13 of the additional cases in the current tally of 161, but there is something else odd going on with the counting.  By comparing her 2019 declaration in this case to her 2018 declaration in *Rupp v. Becerra*, many unexplained changes are evident.  Sixteen events have been removed.[108]  Fifty-four new cases were

---

[104] Defs. Exh. BT, at ¶ 22 (*Duncan v. Becerra*, S.D. Cal. Case No. 17cv1017-BEN, Expert Report of Lucy Allen (signed Oct. 6, 2017).

[105] *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 317cv10507 PGSLHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018) ("Allen concluded that LCMs, which she defined as magazines capable of holding more than ten rounds, were known to have been used in 54 out of 83 mass shootings, where the magazine capacity was reported.").

[106] *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 795 (D. Md. 2014), District of Maryland Case No. 13cv2841-CCB, Docket No. 44-9, Decl. Lucy P. Allen (filed Feb. 14, 2014), ¶ 18.

[107] *New York State Rifle and Pistol Ass'n v. Cuomo*, W.D.N.Y. Case No 13cv291 (WMS), Docket No. 69, Decl. Lucy P. Allen (signed June 21, 2013) at ¶ 18.

[108] These might be explained by Allen removing events where three or less people died as the Mother Jones magazine database used began including lower-fatality events as "mass shootings" in 2013.  The events removed include three low-fatality California events (Yountville Veterans Home 3/9/18 ; San Francisco UPS 6/14/17; Fresno Downtown 4/18/17) and two national low-fatality assault weapon events (Baton Rouge Police 7/17/16 and Excel Industries 2/25/2016).

Other events that have been removed *without* explanation are: Rite Aid Warehouse 9/20/18;  Fifth Third Center 9/6/18; Suburban Denver Walmart 11/1/17; Edgewood Business Park 10/18/17; Pennsylvania Supermarket 6/7/17; Ohio Nursing Home 5/12/17; Planned Parenthood Clinic 11/27/15; Colorado Springs 10/31/15; Trestle Trail Bridge 6/11/15; Fort Hood 4/3/14; Fort Lauderdale 2/9/96 with six fatalities and no assault weapon).

added.  Of the 54 newly added cases, 13 occurred in 2019 after the *Rupp* declaration was signed.  Oddly, 41 new cases have been added from dates as far back as 1982.[109]  Allen's declaration is silent about the 41 newly added old cases.[110]

No one can blame Allen too much for her changing tallies of "mass shootings." The problem is a disagreement over the definition of a "mass shooting" combined with

[109] The 41 newly-added old cases are: Detroit 2/26/18; Taos and Rio Arriba Communities 6/15/17; Marathon Savings Bank 3/22/17; Club 66 2/6/17; Franklin Avenue Cookout 3/9/16; Tennessee Colony Campsite 11/15/15; Akron 8/7/11; Forum Roller World 7/23/11; Family Law Practice 6/2/11; Jackson 9/11/10; City Grill 8/14/10; Hot Sport Café Los Angeles California 4/3/10; Worth Street 11/1/09; Skagit County 9/2/08; Black Road Auto Santa Maria, California 3/18/08; Youth With a Mission 12/9/07; The Ministry of Jesus Christ 5/21/06; Sash Assembly of God 8/29/05; Fulton County Courthouse 3/11/05; ConAgra Food Plant 7/3/04; Stateline Tavern 10/24/03; Labor Ready 2/25/03; Bertrand Products 3/22/02; Burns International Security Sacramento, California 9/10/01; Bookcliff RV Park 7/3/01; Houston 1/9/01; Mount Lebanon 4/28/00; MiTFine Car Wash 3/20/00; Albertson's Supermarket 6/3/99; New St. John Fellowship Baptist Church 3/10/99; Erie Manufacturing 12/3/97; News and Sentinel 8/20/97; Fire Station 4/25/96; Fort Lauderdale 2/9/96; Little Chester Shoes 12/19/95; Puppy Creek 12/31/94; Unemployment Office Oxnard, California 12/2/93; Family Fitness Club El Cajon, California 10/14/93; Washington County Bar 7/8/93; Card Club Paso Robles, California 11/8/92; Phoenix 3/15/92; Restaurant 11/10/91; Post Office 10/10/91; Montefiore School 9/22/88; Old Salisbury Road 7/17/88; Anchor Glass Container 3/16/85; Other Place Lounge 7/24/84; Alaska Mining Town 5/17/84; College Station 10/11/83; Alaska Back-County 3/1/83; Upper West Side Hotel 2/3/83; The Investor 9/6/82; Western Transfer Co. 8/9/82; and Russian Jack Springs Park 5/3/82.

[110] Perhaps the newly added old cases are a byproduct of expanding her event databases to include the Washington Post database and the Violence Policy database.  The Attorney General has abandoned any reference to the Mayors Against Illegal Guns database offered previously in *Duncan v. Becerra*, although it sits silently among the voluminous trial exhibits submitted.  Now, the State's expert witness relies on four other sources for identifying mass shootings: Mother Jones magazine, the private Citizens Crime Commission of New York City, the Washington Post newspaper, and the private Violence Project.  Defs. Exh. A, at ¶ 25 and n.22-25.  The four databases cover a much longer period of time, but the overall picture is the same.

the lack of a reliable database maintained by a disinterested organization or governmental entity.[111] Instead, these unreliable collections of shooting stories are generally not based on police reports, but rather claim details from after-the-fact, sometimes sensationalized, news reporting, lacking access to crime scenes and based on random bystander perceptions.

Professor Louis Klarevas counts 103 gun incidents since 1980.[112]   As mentioned previously, Klarevas uses a metric few researchers use: "gun massacres."  Klarevas defines a gun massacre as an event with *six* or more victims instead of the more commonly accepted number of four.  He does not explain why he uses six fatalities for his studies.[113] Demonstrating another problem with data, Klarevas' count does not match Allen's count -- even where it should agree.  For example, one would expect that all of Klarevas' six-fatality events would be included on Allen's list of four-or-more fatality events.  Yet, several are not.  Just from the most recent decade, Klarevas lists ten events that inexplicably do not appear on Allen's list.[114] Adding to the unreliability of his

---

[111] "[T]here is no single official data source that regularly provides detailed and comprehensive information on mass murders and the guns used in these incidents. . . [and] detailed weapon information could not be found in public sources for many of these cases."  Defs. Exh. Y, Koper, *Criminal Use of Assault Weapons*, at 3.

[112] Defs. Exh. E, at ¶ 11.

[113] *Id*. (Curiously, in note 43 of his declaration, Klarevas cites Sherry Towers as an example of a researcher who uses the six-fatality metric.  However, the cited study shows Towers uses the standard metric of four fatalities.).

[114] These events are cited as: Plano 9/11/17, Brookhaven 5/27/17, Piketon 4/22/16, Houston 8/8/15, Waco 5/17/15, Tyrone 2/27/15, Bell 9/18/14, Spring 7/9/14, Grapevine 12/25/11, Appomattox 1/19/10.  Defs. Exh. E-3.  Klarevas cites for data his own writings and the Gun Violence Archive which reports much higher totals of mass shootings, due to including events where four or more were shot, *but not necessarily fatally*.  "[T]he criteria are simple…if four or more people are shot or killed in a single incident, not involving the shooter, that incident is categorized as a mass shooting based purely on that

58

declaration, Klarevas also includes a shooting with an assault weapon in California after the passage of AWCA (Fresno, 1993) that does not appear on Allen's list.  And Klarevas omits an event before AWCA in California with an assault weapon (Stockton, 1989) that does appear on Allen's list.  Because of the unconventional aspects of his approach to mass shootings, little weight is given to Klarevas' testimony.  With disagreement and uncertainty about what is a mass shooting and how many have occurred, the Attorney General turns to national statistics to demonstrate the prolific use of assault rifles in mass shootings.  But the evidence is not what he thinks.

### i.  *The national experience*

Analyzing the list of 161 national events, Allen finds that 78% of mass shooting events did not involve an assault weapon.  Put differently, across the U.S. only 22% did involve an assault weapon.[115]  Her opinion comports with other evidence in the record.  Professor Mark Gius reports even less frequent use of assault rifles in mass shooting events.[116]  Gius says, "[c]ontrary to popular belief, however, assault rifles were not the predominant type of weapon used in these types of crimes.  In fact, according to a recent study, handguns were the most used type of firearm in mass shootings (32.99% of mass shootings); rifles were used in only 8.25% of mass shootings."[117]  That may come as a surprise to the public that is constantly told that assault weapons are often used in mass shootings.

---

numerical threshold."  *See* www.gunviolencearchive.org/methodology (last visited April 2, 2021)).

[115] Defs. Exh. A, at ¶ 30.

[116] Defs. Exh. BM, Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, Applied Economics letters (2014), at 1.
[117] *Id.*

ii.    *The California experience*

From Allen's list of mass shooting events, it is reported that in California there have been 25 mass shooting events over approximately 40 years.[118]  How well has the California ban on assault weapons worked?  *Before* AWCA, twice in a decade, an assault weapon was used in a mass shooting.  On average, *since* AWCA, twice a decade, an assault weapon was used in a mass shooting.[119]  The assault weapon ban has had no effect.  *California's experiment is a failure.*

To summarize, the average rate of mass shootings with assault weapons in California has not changed in the thirty years since the assault weapon ban was enacted.  Moreover, for all mass shooting events, assault weapons are used only either 8.25% (Gius), 10.3% (Koper), or 22% (Allen), of the time.[120]  In every California mass shooting event with an assault weapon, the shooter brought multiple weapons.  Professor Gius puts mass shootings and modern rifle bans in perspective.  He concludes, "it is important to note that mass shooting fatalities are a very small percentage of overall murders.  Hence, even if a certain type of gun control measure were found to eliminate mass shooting (which assault weapons bans do not), the overall murder rate would decline by a very

---

[118] Defs. Exh. A, at 28-50.

[119] According to Allen's testimony, prior to AWCA, there were three California mass shooting events.  Two events involved modern firearms – one was a rifle and one was a pistol.  (Stockton 1989 (AK-47 rifle) and San Ysidro 1984 (Uzi pistol)).  Since AWCA, there have been 23 California mass shooting events.  Six events involved modern firearms – five with rifles and one with a pistol.  (San Francisco 1993 (Tec DC9 pistol), Orange 1997 (AK-47 rifle), Sacramento 2001 (AK-47 rifle), Santa Monica 2013 (AR-15 rifle), San Bernardino 2015 (AR-15 rifles), Rancho Tahema 2017 (unknown rifles)).

[120] The low incidence rate is similar to that found by Professor Koper.  Defs. Exh. Y, Koper, *Criminal Use*, at 5 ("[Assault Weapon] and LCM use in firearm mass murders was examined for a sample of 145 incidents that occurred from 2009 through 2015 but could only be estimated within broad ranges due to high levels of missing weapons data in public accounts.  [Assault Weapons] were used in at least **10.3%** of these incidents.").

small amount."[121]

Furthermore, perspective is important.  Contrary to public misinformation, mass shooting events are rare events.  In contrast, as stated previously, there were 3.7 million burglaries per year in the years 2003 to 2007, 266,560 people suffered a violent victimization, 23,310 persons, or 9% of those victims, suffered serious injury, and approximately 7,700, or 3% of those victims, were raped.  During the same years, there was less than one mass shooting with an assault weapon per year.  According to Allen's list, the total number of persons, killed *or* injured, during *all* mass shooting events *with an assault weapon* during the years of 2003 to 2007 was 38.

Had laws been in place that prevented acquisition of assault weapons during the years 2003 to 2007, 38 people may have been spared being shot with an assault weapon (although they may or may not have been shot with a non-assault weapon).  In contrast, during the same five years, 7,700 women may not have been raped and 266,560 homeowners may not have suffered a violent victimization during the burglary of their homes had they been armed with an assault weapon.  Imagine calculating these figures over thirty years.  Of course, many victims do not choose to own a modern rifle.  And though victimized once, some may still choose not to arm themselves against future home invaders.  The Constitution does not force citizens to arm themselves for their own protection.  But it does protect the liberty and freedom of those who choose to do so.

Today, an assault weapon ban that trenches on the rights of 266,560 citizens to protect themselves from violent assault in their homes by criminalizing acquisition and possession of a common firearm that they might deem best for their defense, balanced against possibly reducing the shooting risk to 38 people, is lopsided.

### g.   Assault weapon wounds -- are they worse?

The Attorney General argues that victims of assault weapons generally suffer more

---

[121] Defs. Exh. BM, Gius, *Assault Weapons Bans,* at 3-4.

extensive and more numerous gunshot wounds, resulting in higher morbidity and mortality than victims of shootings from other weapons, relying on testimony from Christopher B. Colwell, M.D.  Dr. Colwell treated emergency victims from Denver, Colorado area tragedies at Columbine High School and the Aurora Theater.[122] Dr. Colwell opines that assault weapons enable a shooter to fire more rounds rapidly in a given period with greater accuracy, increasing the likelihood that more individuals will be shot and suffer multiple injuries, making it "far more likely" that the individual will suffer complications and die of those injuries.[123] He concludes that "while all weapons pose risk, assault weapons, especially when equipped with large capacity magazines, pose a far greater risk to the public from a medical standpoint than non-assault firearms."[124]

First, as Kraut's video demonstrates, the injuries from firearms like the AR-15 which are banned as "assault weapons" are no different from other firearms that are common and lawful to own.  Second, there is no difference in the lethality or accuracy or firing capacity between a "featureless" AR-15 and a banned AR-15.  Dr. Robert A. Margulies, M.D., has unusually impressive credentials.  He has practiced emergency medicine for more than 50 years.  For 24 years he served in active duty in the U.S. Navy including combat experience or the front lines of conflict.  Dr. Margulies also currently serves as a sworn reserve police officer and a certified police firearms instructor.[125] According to Dr. Margulies,

> The biggest flaw with Dr. Colwell's declaration is that he does not explain why the supposedly extreme wounds generated from an intermediate cartridge, such as the 223/5.56 round fired from a California-defined

---

[122] Defs. Exh. B, Colwell Decl. at ¶ 9 (DEF0054-55).

[123] *Id*. at ¶ 8.

[124] *Id*. at ¶ 12.

[125] *Id*. at ¶ 3, 7.

"assault weapon" bearing the features or characteristics set forth in California Penal Code § 30515(a) would present a greater wound profile than a wound suffered from the same round fired from a non-assault weapon, using the same barrel length. *See* for example, the declaration of Blake Graham, offered in support of the defense, at paragraph 45, in which he describes a Sturm Ruger Mini-14 ranch rifle that has none of the features that supposedly make it an "assault weapon." Dr. Colwell does not explain why or how the wounds generated from so-called assault weapons using the same round, and the same barrel length, are or would be qualitatively different from the wounds that would be generated from a "featureless" Mini-14 firing the same .223 round."[126]

Without first knowing what ammunition was used, one can only generally categorize a bullet wound. According to Dr. Margulies, "looking at a gunshot wound, one is able to determine during the treatment of that wound that it was either, relatively speaking, a low-velocity or a high-velocity injury. You couldn't tell the difference between a nine-millimeter and a .45 ACP injury just from looking at the injury; you couldn't tell the difference between a 5.56 x 45 or a 7.62 x 39 [by] simply looking at the injury. You could determine that one came from a higher velocity cartridge than from a lower velocity cartridge."[127]

It is not widely known, but the rounds typically used in "assault rifles" are lower velocity rounds than traditional military and hunting rifle rounds. According to Dr. Margulies,

> intermediate cartridges used in assault rifles possess significantly less kinetic energy than traditional military cartridges, as well as rifle cartridges designed for hunting. Therefore, an intermediate rifle cartridge can't produce . . . a more severe injury than a full-power cartridge which has been designed and accepted for military and hunting and long-range shooting purposes."[128] Dr. Margulies explains, "[t]he cosmesis of a firearm, whether

---

[126] *Id.* at ¶ 14.

[127] Margulies Depo. (Dec. 18, 2020) at 30:7-16.
[128] *Id.* at 62:23 – 63:6.

it has a flash suppressor or whether it has a forward grip or a pistol grip or a
detachable magazine or whatever, makes no difference.  A 5.56/.223 fired
from a bolt-action rifle -- one of which I own.  It's an old wood stocked,
bolt-action .223.  That -- that cartridge-bullet combination is going to
produce the same energy, and therefore the same wounding potential, if the
point of impact is the same, at the same distance as if it came from, quote --
quote -- an assault rifle, close quotes.[129]

As an emergency room physician, Dr. Margulies says, "[f]or me to talk about a wound, I have to know the cartridge, the bullet, the barrel, the distance and the point of impact.  It's going to make a lot of difference if it strikes somebody in the shoulder or strikes them in the middle of the forehead.  So I have to know all those things.  It's not going to make any difference to me treating the patient if it came from a bolt-action .223 or it came from a semiautomatic AR-15."[130]

To summarize the medical evidence, the severity of a gunshot injury depends on many things, perhaps the most important of which is the cartridge used and the velocity of the bullet.  Bullets achieve much higher velocities from long rifle barrels than short handgun barrels.  A modern rifle like the AR-15 platform rifle typically uses lower power cartridges than either military rifles or hunting rifles.  While there are exceptions, for purposes of the state regulation it does not matter.  This is confirmed by the Attorney General's own evidence.  As set forth by Vincent J.M. DiMaio, M.D., in the authoritative work *Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques,* 3d, CRC Press (2016), the wounds from assault rifles are less severe than hunting rifles.  Dr. DiMaio explains,

One of the common fallacies about assault rifles is that the wounds they
produce are more severe than those due to ordinary centerfire rifles.  In fact,
the wounds are less severe than those produced by virtually all hunting rifles
. . . .  [T]he severity of the wound is determined by the amount of kinetic

[129] *Id*. at 74:20-75:4.

[130] *Id.* at 83:2-9.

energy lost by a bullet in the body.  The intermediate cartridges used in assault rifles possess significantly less kinetic energy than a regular centerfire rifle cartridge designed for hunting.  In addition, since most ammunition used in these weapons is loaded with a full-metal-jacketed (FMJ) bullet, the wound is even less severe than one might expect.[131]

Section 30515(a) does not ban rifles based on whether a firearm is chambered for high-velocity or low-velocity rounds.  It does not ban rifles based on large caliber or small caliber bullets.

### h.    Stray bullets piercing walls and striking bystanders?

Some say that a bullet fired from an AR-15 in self-defense could penetrate a wall and strike a bystander.[132] The Court is unaware of any evidence that such an event has ever been reported.  One thing is clear, there is no evidence that home defenders using AR-15s hitting bystanders with stray bullets through walls is a common problem.  That a stray bullet fired in self-defense might penetrate a wall is an argument in favor of using a more accurate self-defense firearm.  And there is evidence that AR-15 type rifles are both accurate and easy to fire accurately.  There is also mixed evidence about whether AR-15 type rounds are more or less likely than handgun rounds to penetrate the walls of a typical home.

For example, Plaintiffs' expert Emanuel Kapelsohn testified in a deposition on January 8, 2021 that he had done demonstrations with various rounds fired at walls of drywall and lumber.  He testified that the wall penetrating capability of a .223 or 5.56 round depends more on the construction of the projectile than the particular firearm firing the round.[133]  Another study found that a 55 grain HP .223 round, one commonly used in

---

[131] Defs. Exh. AL, at 11 (DEF1333).

[132] *See e.g.,* Defs. Exh. K, *Assault Weapons, Mass Produced Mayhem,* Brady Center to Prevent Gun Violence (2008), at 16.

[133] Kapelsohn testified (at page 104-106):

modern rifles, penetrated walls *less* than a common .40 S&W handgun round and less than a common 12-gauge shotgun slug.  The study found, "[t]he 55 grain HP .223 has less penetration than any of the other ammunition tested.  Based on the results of this testing, there appears to be no basis for concern regarding the over penetration of the .223 round.  In fact, it seems even safer in this regard than .40 S&W handgun ammunition."[134] The idea, then, that a stray bullet fired from a modern rifle will penetrate the walls of a home and hit a bystander, would depend largely on the particular ammunition and whether the home is in a crowded complex or a rural tract.  It would depend less on the firearm, and not at all on whether the firearm had prohibited features described in §

_____

Q.  So what would -- so what -- what parts of a cartridge would enhance or reduce the penetrative capabilities of the round?
A.      The construction of the projectile itself is -- is primary.  The -- the weight of it.  What kind of jacket it [has].  Does it have a soft point, a hollow point, a ballistic tip.  Does it have a steel core because it's military ammunition made to penetrate armor.  Is it a 45 or 50 or 55 grain bullet, or is it a 70 or 75 or 80 grain bullet.  What kind of powder, and how much powder because that develops the velocity and that has to do with whether the bullet fragments or expands quickly, or whether it penetrates more deeply.  And the barrel length of the rifle from which it's fired, has to do, also, with its velocity because you take the same ammunition and fire it from a longer barrel, in some cases, and get more velocity or from a shorter barrel and get less velocity."
(And at page 108-109):
Q.  And which rounds -- which, in -- in your experience or in your professional judgment, which rounds would have greater penetration than others?
A.      For instance, the 5.56 millimeter steel core penetrator rounds would have more penetration.  That's a military round.  It's rarely seen or used in the civilian world, but there are some out there and some people buy it as surplus.  That would have more penetration.  Less penetration would be the 55 grain soft-point or hollow-point rounds, and even less penetration would be the 45 grain rounds that some police departments use for entry work and . . . they are generally available.  People use them for what is called varmint shooting, things like prairie dogs and similar small animals that are hunted or shot.  And those rounds are particularly -- the bullets are particularly fragile in their construction.  And so they come apart easily in wall construction, studs, Sheetrock and so forth."

[134] Pls. Exh. 1-9, at 35.

30515(a).

### i.    Blake Graham, Assistant Director, Cal. D.O.J. Bureau of Firearms

The Attorney General introduced testimony from another witness worth noting. Mr. Blake Graham is the Assistant Director of the California Department of Justice Bureau of Firearms.[135] He has worked as a firearms investigator for the State since 1994. He offers both percipient and expert testimony.[136] Graham says that the most common feature of a prohibited assault rifle is the pistol grip, and the next most common features are the telescoping stocks and flash suppressors.[137]  There is no evidence to the contrary on those points.

Graham's opinions on ammunition are less convincing.  For example, he says that centerfire rifles generally use rounds that are associated with increased lethality.[138] While true, it is only half so.  As Dr. Margolies explained, for rifles and pistols almost all centerfire ammunition is more lethal than the only other type of ammunition, which is rimfire ammunition.  Graham says that .223 caliber, 5.56 mm, and 7.62 x 39 mm ammunition is often used with assault rifles.  That is true.  He says that these rounds will typically defeat normal bullet resistant body armor used by law enforcement.  Again true, but only half so.  Dr. Margolies, who also serves as a police department armorer, says

---

[135] Defs. Exh. D, Graham Decl. (dated Jan. 22, 2020).

[136] The lines are sometimes blurred in his declaration.  For example, in his opinions section he says that the AWCA year 2000 amendment adding a features-based definition, was "[i]n response to attempts by firearm manufacturers to circumvent the AWCA." Defs. Exh. D, at ¶ 16.  Graham might offer such testimony as a percipient witness from that time, but it is not apparent why he would have any particular expertise on the legislature's motivation.

[137] *Id.* at ¶ 16.

[138] *Id.* at ¶ 22.

that most all rifle rounds from any rifle will defeat normal police body armor.  Typical police body armor is expected to resist only lower caliber ammunition fired from a handgun.[139]  Even Graham acknowledges that bullets fired from a handgun travel at a slower muzzle velocity than the same bullets fired from a rifle.[140]  The slower a bullet is travelling the less likely it is to pierce body armor; conversely, the faster the bullet is traveling, the more likely it is to defeat body armor.  The feature-based prohibition in § 30515(a) says nothing about types of ammunition or bullet velocities.  In fact, one might argue that by prohibiting rifles with barrels shorter than 16 inches, the statutes encourage state residents to use longer barrels with higher muzzle velocities resulting in more lethal rifles.

Graham also opines on magazines.  However, his opinions there lack precision.  For example, he opines that a detachable magazine "allows the shooter to rapidly exchange a depleted magazine with a fully loaded one, enabling a shooter to fire a large number of rounds near-continuously."  It is an overgeneralization.  A trained and composed shooter with a gun and two 75-round magazines may well be able to fire many rounds near-continuously.  An untrained homeowner awoken in the night, having a pistol, two 10-round magazines, and surging adrenaline, may not be able to fire many rounds near-continuously.  Graham also opines that "[a] person intent on doing harm to the public or law enforcement will often pair assault weapons and multiple LCMs to maximize the lethality of their attacks."[141]  Graham offers little support for his supposition.  Sociologists know very little about the motivations of mass shooters except

---

[139] Defs. Exh. AY, at 5 ("Soft armor is designed to offer protection against assaults with handguns.").

[140] Defs. Exh. D, ¶ 23.

[141] *Id.* at ¶ 27.

that they share a general quest for notoriety and infamy,[142] a factor influenced by seemingly endless reporting when a tragic mass shooting does occur.  Little, if any, reporting occurs when an intruder is shot or deterred by defensive gun use.

Graham says he researched several mass shootings.  But two shootings took place before he worked for the State.  Thirteen shootings occurred beyond the boundaries of California.  Two shootings took place beyond the Northern Hemisphere.[143] Of the seven shootings that did occur within California while he was working for the State, Graham does not say that he personally investigated the cases.  Graham does not say how many shots were fired.  Though surely he could access them, *Graham does not even offer the actual police reports*.  In short, much of Graham's testimony ventures beyond his experience and his expertise.

Put simply, the evidence indicates gun bans are ineffective at reducing gun crimes.  Plaintiffs' expert, economist John R. Lott, Jr., opines that "all credible evidence shows that assault weapon bans have little to no effect in reducing mass shootings, homicides, or violent crime in general."[144] Professor Koper, in his assessment of the ten-year federal assault weapon ban concluded, "[a]lthough the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are

---

[142] Defs. Exh. AC, at 1 (DEF0847) Adam Lankford and James Silver, *Why Have Public Mass Shootings Become More Deadly?*, Crim. & Pub. Policy (2019) ("[S]ocietal changes have led to more public mass shooters who are motivated to kill large numbers of victims for fame or attention, as well as to more shooters who have been directly influenced by previous attackers.").

[143] Defs. Exh. D, ¶ 69.

[144] Lott Decl. at ¶ 64.

1  used in crime much more frequently than AWs."[145] Bereft of hard evidence that gun bans

2  are effective, the Attorney General radios in for backup from other courts of appeal.

3  **B.     Decisions of Other Courts**

4          The Attorney General's position is that AWCA does not severely burden Second

5  Amendment rights.  After all, assault weapons are supposedly uncommon and unusually

6  dangerous, there are other guns available, and only 2.2 shots are needed for self-defense

7  so any gun will do.  Better to have a state citizenry armed with microstamping Saturday

8  Night Specials than accurate AR-15s.  Since the constitutional burden is mild,

9  intermediate scrutiny will be satisfied.  How can one argue with every other federal

10 circuit court to have considered assault weapon restrictions?[146] These opinions deserve a

11 look.

12         In the past, Second Amendment cases were wrongly decided by following a

13 majority of circuit courts down the wrong path.  That is what happened in 1996 when the

14 Ninth Circuit erroneously decided that the Second Amendment does not confer on private

15 citizens a right to possess a firearm, wherein the court said, "[w]e follow our sister

16 circuits in holding that the Second Amendment is a right held by the states, and does not

17 protect the possession of a weapon by a private citizen."  *See Hickman v. Block*, 81 F.3d

18 98, 101 (9th Cir. 1996), *abrogation in light of Heller recognized by, Nordyke v. King*, 563

19 F.3d 439, 445 (9th Cir. 2009), *vacated in light of McDonald,* 611 F.3d 1015 (9th Cir.

20 2010).  It happened the first time the Ninth Circuit considered AWCA.  *See Fresno Rifle*

21 *& Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723, 731 (9th Cir. 1992) ("The plaintiffs

22 argue that . . . the Second Amendment guarantee[s] an individual right of persons to

23 acquire and keep rifles, pistols, and shotguns. . . . *Cruikshank . . .* and *Presser* both make

24

25

26 [145] Defs. Exh. BJ, Christopher S. Koper, *An Updated Assessment of the Federal Assault*
27 *Weapons Ban* (June 2004), at 96 (DEF 1994).

28 [146] *See* Defs. Brief on Significant Disputed Issues of Law (filed Jan. 27, 2021), at 2.

19-cv-1537-BEN (JLB)

clear that the Second Amendment binds only the national government.  In this view we join the Seventh Circuit . . . .").  It also happened the last time the Ninth Circuit upheld AWCA.  *See Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), *as amended* (Jan. 27, 2003) ("Long the dominant view of the Second Amendment, and widely accepted by the federal courts . . . .").  Before *Heller*, hundreds of judges erroneously overread *Miller*, as *Heller* itself points out.  554 U.S., at 624 n.24 ("[T]heir erroneous reliance . . . cannot nullify the reliance of millions of Americans . . . upon the true meaning of the right to keep and bear arms.").  Thus, with heightened circumspection, it is time to see what can be learned from these decisions.

### 1.   *Wilson v. Cook County*

The Attorney General first cites *Wilson v. Cook Cty.*, 937 F.3d 1028, 1036 (7th Cir. 2019).  *Wilson* was not decided on facts or evidence.  *Wilson* was dismissed at the outset because an earlier Seventh Circuit decision was controlling, *i.e., Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 412 (7th Cir. 2015).

### 2.   *Friedman v. City of Highland Park, Illinois*

*Friedman* looked at facts*,* however, it did not apply intermediate scrutiny, as the Attorney General's citation suggests.  *Friedman* asked a question: "instead of trying to decide what 'level' of scrutiny applies, and how it works, we think it better to ask whether a regulation bans weapons that were common at the time of ratification or that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense."  784 F.3d at 410.

That is a reasonable question.  But *Friedman* did not rely on the answer.  *Friedman* ultimately upheld municipal assault weapon bans because it was a permissible experiment and good for the community psyche.  *Id.* at 412 ("If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit.").

 It is worth pointing out, however, that along the way, *Friedman* made some

observations that this Court makes today: that "perhaps 9% of the nation's firearms owners have assault weapons," and that assault weapons "generally are chambered for small rounds . . . suggest[ing] that they are less dangerous per bullet." 784 F.3d at 409. *Friedman* also observed, as does this Court, that assault weapons can work well for self-defense. "True enough, assault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large caliber pistols or revolvers. Householders too frightened or infirm to aim carefully may be able to wield them more effectively . . . ." 784 F.3d at 411. The dissent echoes this point about assault weapons: "their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense. While most persons do not require extraordinary means to defend their homes, that fact remains that some do." 784 F.3d at 413 (Manion, J., dissenting). Although it was a close call, it upheld a ban. Fair enough. But the Seventh Circuit was not using intermediate scrutiny.

### 3. *Worman v. Healey*

The Attorney General next cites *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019). In *Worman*, the district court and the First Circuit side-stepped answering the question of commonality while noting that (as of 2013) nearly 5,000,000 people owned at least one assault weapon. 922 F.3d at 36 ("[W]e are reluctant to plunge into this factbound morass."). The case was decided on summary judgment rather than by trial. In some respects, the record evidence in *Worman* was different. *Worman* said assault weapons can fire through walls and risk the lives of those in nearby apartments of streets. 922 F.3d at 37. By contrast, according to the evidence in this case, handgun rounds are more likely to fire through walls than typical .223/5.56 AR-15 rounds, and AWCA's ban is not based on particular calibers. More importantly, *Worman* noted that there was no evidence in its case about "even a single example of use of an assault weapon for home defense." The missing evidence in *Worman* is present in this case. As mentioned earlier, an AR-15 was used by a pregnant wife and mother to defend her family from two armed, hooded, and masked home invaders. Pls. Exh. 1-1; *see also* Pls. Exhs. 1-2, 1-3, 1-

72

4, 1-6, 1-7.  Finally, the *Worman* court unpersuasively rejected the main argument that the forbidden assault weapons were ideal for domestic self-defense by pronouncing the assertion "too facile by half" without explaining what it meant.[147] 922 F.3d at 40.

### 4.   *Kolbe v. Hogan*

The Attorney General next cites *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*en banc*).  *Kolbe* went its own direction and concluded that assault weapons are so much like M-16 machineguns that they lay outside the ambit of the Second Amendment.  In *Kolbe,* the court wrote, "[w]e conclude . . . the banned assault weapons . . . are not protected by the Second Amendment."  849 F.3d at 121.  As the dissent put it, "our court today has adopted an ad hoc analysis that excludes a weapon from Second Amendment protection if it appears to be 'like' an M-16 or 'most useful in military service.'  Under this approach, it is irrelevant that a firearm may have been commonly possessed and widely accepted as a legitimate firearm for law-abiding citizens for hundreds of years."  849 F.3d at 156 (Traxler, J., joined by Niemeyer, J., Shedd, J., and Agee, J., dissenting).

*Kolbe*'s conclusion is unpersuasive.  An AR-15 rifle may be like an M-16 machinegun in many ways, but the single major difference is also legally determinative. *Staples*, 511 U.S., at 611 (observing that AR-15s traditionally have been widely accepted as lawful possessions and distinguishing between the semiautomatic AR-15 and a fully automatic machinegun); *but see Rupp v. Becerra*, 401 F. Supp. 3d 978 (C.D. Cal. 2019). But, if in fact when the Supreme Court issued *Heller* and commented that "it may be objected that if weapons that are most useful in military service -- M-16 rifles and the like -- may be banned," knowing that there is a difference between the M-16 and the AR-15 (as is evident in *Staples*) and that the AR-15 is the more popular civilian owned of the

---

[147] The expression "too facile by half" is uncommon in American English and appears only one other time in American court cases.  *See United States v. Walker-Couvertier*, 860 F.3d 1, 13 (1st Cir. 2017).  It is not found in the Corpus of Contemporary American English, www.english-corpora.org/coca/.

1    two, why would it have chosen to mention the M-16 and not the AR-15?  The answer

2    seems obvious.  An M-16 is fully automatic solely suitable for military purposes; the AR-

3    15 is not!

4            In the alternative, *Kolbe* found that the state regulation did not impose a severe

5    burden and applied intermediate scrutiny.  849 F.3d at 138.  The burden was not severe,

6    according to *Kolbe*, because citizens were free to protect themselves with a plethora of

7    other firearms.  849 F.3d at 138.  Once again, the jurisprudence of firearm alternatives is

8    at odds with *Heller*.

9            *Kolbe* also deemed the burden not severe because, like the summary judgment

10   record in *Worman*, there was "scant evidence in the record" that the banned assault rifles

11   were possessed "or even suitable" for self-protection.  849 F.3d at 138.  Once again,

12   unlike both *Kolbe* and *Worman*, the trial record before this Court has opinion testimony

13   and a number of examples in evidence of AR-15 type rifles being useful and used in self-

14   defense.  Whatever was missing from the summary judgment record in *Kolbe*, it is not the

15   case today in this California trial.

16           **5.    *N.Y. State Rifle & Pistol Association v. Cuomo***

17           The Attorney General next cites *N.Y. State Rifle & Pistol Association v. Cuomo*,

18   804 F.3d 242 (2d Cir. 2015).  That decision applied intermediate scrutiny after deciding

19   that New York and Connecticut laws imposed a burden that was not severe.  804 F.3d at

20   260.  The Second Circuit also relied heavily on the jurisprudence of firearm alternatives.

21   In fact, the single reason given for finding the burden not severe was because of the

22   notion that "numerous 'alternatives remain for law-abiding citizens to acquire a firearm

23   for self-defense.'"  804 F.3d at 260 (quoting *U.S. v. Decastro*, 682 F.3d 160, 168 (2d Cir.

24   2012).  Curiously, although the decision relied on it, the Second Circuit's *Decastro*

25   decision was not about a ban on assault weapons or any particular firearm.  *Decastro*

26   highlighted the opposite situation.  The court said that 18 U.S.C. § 922(a)(3) does not

27   substantially burden the right to keep and bear arms because "it does nothing to keep

28   someone from purchasing a firearm in her home state, which is presumptively the most

1    convenient place to buy anything."  682 F.3d at 168.  *Decastro*, in turn, relied on *Nordyke*

2    *v. King*, 644 F.3d 776 (9th Cir. 2011), *on reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012).

3         *Nordyke*, unsurprisingly, decided merely that a ban on gun shows at county-owned

4    fairgrounds did not substantially burden the right to keep and bear arms.  *Nordyke* found

5    the fairgrounds-gun-show-ban left open regular avenues for buying a firearm.  644 F.3d

6    at 787 (citing *United States v. Marzzarella*, 595 F. Supp. 2d 596, 606 (W.D. Pa. 2009),

7    *aff'd*, 614 F.3d 85, 95 (3d Cir. 2010)).  *Nordyke*, at bottom, relied on *Marzzarella*.

8    *Marzzarella* unsurprisingly held that 18 U.S.C. § 922(k) is constitutional because it bans

9    *only* firearms with obliterated serial numbers and "leaves open ample opportunity for

10   law-abiding citizens to own and possess guns."  595 F. Supp. 2d at 606.

11        The jurisprudence of firearm *alternatives* has surely drifted far away from *Heller*.

12   *Heller* said, in 2008, that it is "no answer to say . . . that it is permissible to ban the

13   possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is

14   allowed."  554 U.S., at 629.  *Marzzarella* stepped slightly away and said it is permissible

15   to ban only firearms without serial numbers because alternatively *any other gun* is

16   permissible.  *Nordyke* said it is permissible to ban fairground gun shows because

17   alternatively *any gun* may be purchased anywhere else.  *Decastro* said it is permissible to

18   ban guns bought out of state because, alternatively, *any gun* may still be purchased within

19   one's home state.  *N.Y. State Rifle & Pistol* then took a long jump from *Heller,*

20   *Marzarella, Nordyke, and Decastro,* and said bans on assault rifles are permissible

21   because alternative guns remain.

22        Today, the Attorney General goes beyond *N.Y. State Rifle & Pistol and* suggests

23   that intermediate scrutiny should permit a class-wide ban on extremely popular assault

24   rifles, assault shotguns, and assault handguns, in addition to an existing ban on buying

25   any handgun not found on a shrinking list under California's "handgun roster" of "safe"

26   handguns, because some alternatives remain.  This is too far.

27   **6.    *Heller v. District of Columbia (Heller II)***

28        The last circuit decision cited by the Attorney General is *Heller II*, 670 F.3d 1244.

75

Decided on summary judgment, *Heller II* upheld prohibitions on assault rifles finding the burden to be insubstantial. *Heller II* accepted as fact that assault rifles are in common use. 670 F.3d at 1261. But on the summary judgment record before it, the court could not be certain "whether these weapons are commonly used or are useful specifically for self-defense or hunting." 670 F.3d at 1261. The *Heller II* court explained, "[a]lthough we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right . . . [because] the plaintiffs present hardly any evidence that semi-automatic rifles . . . are well-suited to or preferred for the purpose of self-defense or sport." 670 F.3d at 1262. Since District of Columbia residents were still permitted to possess a handgun or a "non-automatic long gun," *Heller II* agreed with *Marzzarella* (the obliterated serial number case) that the burden on Second Amendment rights was insubstantial and thus deserving of no more than the lower intermediate scrutiny. 670 F.3d at 1262.

One problem with relying on *Heller II* is that the California statutes go much further in the kinds of firearms banned. Section 30515(a) also criminalizes possession of certain semi-automatic pistols. Even *Heller II* conceded that a ban like that may be unconstitutional. "A narrower prohibition, such as a ban on certain semi-automatic pistols, may also 'fail constitutional muster,' but that question has not yet been decided by the Supreme Court." 670 F.3d at 1267 (appendix) (quoting *Heller*, 544 U.S., at 628). As noted in the dissent, *Heller II* drifted far away from *Heller*. "The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not traditionally been banned." 670 F.3d at 1285 (Kavanaugh, J., dissenting).

To sum up, in the Seventh Circuit, *Wilson* was simply bound by *Friedman,* and *Friedman* did not apply intermediate scrutiny. In the First Circuit, *Worman* lacked record evidence of use or usefulness of assault rifles for self-defense. In the Fourth Circuit, *Kolbe* decided a rifle like the AR-15 was like the M-16 machinegun and therefore outside

the ambit of the Second Amendment.  Alternatively, *Kolbe* had "scant evidence" in the record that assault rifles are used or useful for self-protection and there was a plethora of other permissible guns.  In the District of Columbia Circuit, *Heller II* also doubted whether assault weapons were used or useful for self-defense or hunting and drifted away from *Heller* into uncharted territory.  Even so, the court conceded that a ban on assault pistols might be unconstitutional.  The Second Circuit, in *N.Y. State Rifle & Pistol Ass'n,* completely relied on the notion rejected by *Heller* that where alternative firearms may be owned, intermediate scrutiny applies.

None of the out-of-circuit decisions comfortably fit this case.   None of the cases went to trial.  None of the cases had substantial evidence that AR-15 type rifles are useful and used by law-abiding citizens for lawful purposes like home-defense and sporting competition.  None of the cases considered an AR-15's militia use.  None of the cases scrutinized a statute like California's § 30515 that bans assault rifles, assault shotguns, and assault pistols, while at the same time prohibiting the sale of all potentially alternative handguns not included on the State's shrinking handgun roster.  *See* Calif. Pen. Code § 31910(b)(7); §§ 32000 *et seq.*; *see also Renna*, Case No. 20cv2190-DMS, Dkt. # 17 Order (filed 4/23/21) (describing California's shrinking handgun roster where three guns are dropped for every gun added).  Perhaps intermediate scrutiny is still required under our Ninth Circuit precedents, but not because the out-of-circuit decisions are similar to this case.

### 7. *Rupp v. Becerra*

The Central District of California rejected a similar challenge to AWCA's ban on assault weapons because, like *Kolbe*, it decided on summary judgment that AR-15s are "virtually indistinguishable from M-16s."  *Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 C.D. Cal. 2019), *appeal pending*, Appeal No. 19-56004.  That conclusion would be unsupported by the trial record here, unless one accepts the overgeneralization that all semiautomatics are "virtually indistinguishable" from all automatic machineguns.  *Rupp* decided alternatively that intermediate scrutiny should be applied because of the

alternative-guns-remain canard. *Id.* at 989 ("AWCA does not severely burden the core of the Second Amendment right because individuals 'remain free to choose any weapon that is not restricted by the AWCA or another state law.'"). *Rupp* also unfairly discounts the evidence that 30% of modern rifle purchases are made for self-defense by placing too much emphasis on purchases for recreational target shooting. *Id.* ("[W]hile individuals may sometimes purchase assault rifles for self-defense, it is not the primary purpose for doing so."). Both purposes are lawful and the ban burdens both. It is not convincing to say that stifling one's need to have a tool chosen 30% of the time for self-defense is not a severe burden on the core constitutional right of self-defense.

In any event, the AR-15 is not like the M-16 because one is a fully automatic machinegun and one is not. There is testimony in this case that an AR-15 may fire rounds at speeds up to five to seven rounds per second. Each round requires a finger trigger pull for each round. The AR-15 has no minimum rate of fire. Consequently, the AR-15 type rifle may be fired slowly or up to a hypothetical maximum rate of 300 to 420 rounds per minute, assuming no pause for reloading (which by itself is a purely unrealistic hypothetical assumption). Compare this to "[a] modern machine gun [that] can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (citation omitted). Federal law has codified the difference for decades. The Supreme Court recognized the difference in *Staples* and *Heller*. The Ninth Circuit most recently recognized the difference in *United States v. Kuzma*, 967 F.3d 959, 967 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 939 (2020); *see also Henry,* 688 F.2d at 640 ("We agree with the reasoning of our sister circuits that machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment."). Semiautomatic pistols also fire at a rapid rate, yet, neither *Heller* nor *McDonald* found them to be beyond Second Amendment protection for being virtually indistinguishable from prohibited machine pistols.

In fact, almost all of the negative aspects of the prohibited modern rifles, like faster

firing, are shared with Second Amendment-protected semiautomatic rifles like the Sturm Ruger Mini 14 and pistols like the Springfield Armory 1911.  For example, the Attorney General asserts that "detachable magazines enhance the ability of a semiautomatic firearm to fire a large number of rounds quickly, by eliminating the need to reload each round."[148]  This is true of the Mini 14 rifle and the venerable 1911 pistol.  The Attorney General says, "[t]he ability to accept detachable magazines provides the soldier with a fairly large ammunition supply and the ability to rapidly reload."[149]  The same is true for the 1911 pistol.  The Attorney General states, "[t]he ability to accept detachable magazines renders a semiautomatic weapon 'capable of killing or wounding more people in a shorter amount of time.'"  This is also true for the Mini 14 and the 1911 pistol.  The Attorney General claims, "[t]he use of LCM-equipped firearms in mass shooting results in a substantially greater number of fatalities and injuries than mass shootings not involving LCMs."  The same would be true for a Mini 14 or a 1911 pistol equipped with a large capacity magazine.  This was illustrated in the Virginia Tech mass shooting where two semiautomatic pistols were used to kill 32 people.[150]  The Attorney General says that a pistol grip enables a shooter to maintain accuracy during rapid fire and can enable a shooter to maintain aim and even fire while reloading a detachable magazine.[151]  The same is true for the 1911 pistol.  The Attorney General says that a folding or telescoping stock enhances the portability and concealability of a rifle.  A 1911 pistol is much more portable and concealable than any prohibited rifle.  The Attorney General argues that a flash suppressor enhances the concealability of a shooter in low-light settings.  The same would be true for a fixed flash suppressor on a Mini 14 or a 1911 pistol.  The Attorney

---

[148] Defs. Memo of Contentions of Fact and Law, at 3.

[149] *Id.*

[150] Pls. Exh. 31, Governor's Report of the Review Panel (2007).

[151] *Id.*

General sneers that "assault weapons have a military pedigree." *Id.* at 10.  The 1911 pistol also has a military pedigree.[152]

The point is that most of what the Attorney General says are dangerous features on a prohibited modern rifle are also features on a Second Amendment-protected semiautomatic pistol.  The Ruger Mini 14 is not banned by AWCA but it is capable of shooting the same ammunition, at the same speed, with the same type of large capacity magazines, as an AR-15.  Perhaps the different treatment is explained by the fact that the Mini 14 looks like an old rifle with a wooden stock.  At bottom, guns are dangerous.  Guns with removable magazines are dangerous.  Guns that can fire from 30-round magazines without reloading are dangerous for thirty rounds worth of uninterrupted time.  The Attorney General conflates the increased danger of high-capacity magazines with the innate dangerousness of any semiautomatic firearm and then rests on the conflation to justify a class prohibition on assault weapons.  The prohibited rifles shoot farther than pistols but not as far as other permissible rifles.  Beyond that, the prohibited firearms share most of the same dangerous characteristics as permissible pistols like the 1911 and the Glock 17.  The AR-15 is "virtually indistinguishable" from a semiautomatic pistol in function.  The AR-15 is "virtually indistinguishable" from the M-16 machinegun, but only in appearance.[153]

## C.   Militia Use

### 1.   *Banning the Ideal Arm for Militia Use Fails Intermediate Scrutiny*

The Attorney General does not address or acknowledge whether the ban also

---

[152] Preliminary injunction hearing (Hlebinsky) 10/19/20 at 56:7-8 (excess military 1911s sold to the public through the federal Civilian Marksmanship Program).

[153] Dennis P. Chapman, Colonel (Retired) U.S. Army, *Firearms Chimera*, 8 Belmont L. Rev. 191, 205 (2020) ("The same cannot be said about automatic fire; it exists for the purely military purpose of achieving fire superiority over an enemy force.  Automatic and selective fire is the only significant uniquely military firearms feature.").

19-cv-1537-BEN (JLB)

imposes a burden on the Second Amendment right to own a firearm that is the ideal weapon for use in the militia.  If the modern rifle is the ideal weapon, which it is according to the testimony of General Youngman, then the ban forces a choice of a less-than-ideal weapon for militia use.  That may not be a severe burden today when the need for the militia is improbable.  One could say the same thing about the improbable need for insurance policies.  The point is, neither the Attorney General nor current court decisions address the level of scrutiny to employ where a regulation burdens the Second Amendment right to keep and bear arms for militia service.  This Court assumes that for intermediate scrutiny, the "fit" of a total ban is judged on its application to all aspects of exercising the Second Amendment right: home defense, militia use, sporting competitions, hunting, target practice, and other lawful uses.

The concept of the citizens' militia, as protected by the Second Amendment, is an informal assembly of able-bodied, ordinary citizens acting in concert for the security of our nation.  *Heller*, 554 U.S., at 600 ("citizens' militia" is a safeguard against tyranny).  "[T]he Militia comprised all males physically capable of acting in concert for the common defense."  *Heller*, 554 U.S., at 595.  There are at least two reasons why the militia is thought to be necessary to the security of a free country.  First, it is useful in repelling invasions.  Second, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny."  *Heller*, 554 U.S., at 597–98.  For service in the citizens' militia, one is expected to bring for action a commonly used firearm such as a gun used for self-defense at home or for hunting game.  "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."  *Miller*, 307 U.S., at 179.  "[W]eapons used by militiamen and weapons used in defense of person and home were one and the same."  *Heller*, 554 U.S., at 624–25 (citation omitted).

In this case, the evidence overwhelmingly shows that AR-15 platform rifles are ideal for use in both the citizens' militia and a state-organized militia.  Quite apart from its practicality as a peacekeeping arm for home-defense, a modern rifle can also be useful

for war.  In fact, it is an ideal firearm for militia service.  Major General D. Allen Youngman, U.S. Army (retired)[154] testified credibly about the usefulness for militia service of rifles built on the AR-15 platform.

He describes three tiers of militia service.  General Youngman testified that a state may or may not have a statute authorizing a state defense force.  California does have a state defense force of approximately 1,000 members.  During World War II, California used a state defense force much larger than 1,000 to secure critical infrastructure.  For this type of militia use, the AR-15 "would be absolutely the perfect weapon for the individual member of that force to be equipped for -- for a variety of missions to include infrastructure protection and ones like that."[155]

## 2. *Why the AR-15 Type Rifle is Ideal for Militia Readiness*

The "AR-15 pattern of rifle, with its highly standardized and interchangeable component parts, is a firearm not just well-suited, but ideal for militia service."[156]  The AR-15's use of standardized ("STANAG") magazines and common ammunition, and its reliability, low cost, and light weight, serve the same purposes sought to be achieved by the drafters of our Founding Era militia acts.  Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common ammunition sizes such as .223 and 5.56 x 45mm, and the interchangeability of

---

[154] In addition to his regular Army service, Youngman served two years as Adjutant General for the Commonwealth of Kentucky in charge of the Kentucky National Guard. Youngman Depo. (Jan 6, 2021) at 89:16-20.

[155] *Id.* at 97:19-23.  Youngman points out that while one may be a member of the larger militia, "that does not imply self-deployment or self -- you know, calling yourself into service and going doing something."

[156] Youngman Decl., Pls. Exh. 9, ¶ 14; Youngman testimony, Tx of 10/19/20 Hearing at 85:16-23 ("It would be the ideal weapon for the militia.").

parts, including magazines, makes it ideal.[157]

"For example," says General Youngman, "AR-15 rifles can interchange trigger mechanisms, bolt and locking components, barrels, magazines, buttstocks, optical sights, bayonets, and other assorted furniture, with few specialized tools.  Further, even if two AR-15s might be set up for vastly different uses (for example, long-range versus short-range engagement), the majority of wearable components remain interchangeable."[158] Youngman explains,

> The parts interchangeability of the AR-15 platform means any militia field armorer with a short list of components could service the militia's standard rifles, as well as special purpose armament.  It also means that virtually any standard rifle could be equipped by said armorer for a special purpose.  It is most certainly in the best interest of the militia for militiamen to have their arms serviceable in such a consistent, economical, and efficient way as is afforded virtually uniquely by the AR-15 platform.[159]

Moreover, for militia use the low cost is an ideal factor "because we would be asking individuals to acquire and maintain their own in the absence of being issued a weapon.  The AR-15 is a very affordable system for the average citizen who might be a member of the militia."[160] The light weight of the AR-15 also makes it ideal for militia use because "[i]t would accommodate a wide variety of physical[ly] conditioned individuals, as well as smaller stature, as well as female."[161]  The pistol grip beneath the

---

[157]Youngman Decl., Pls. Exh. 9, ¶¶ 15-19.

[158] *Id*. at ¶ 15.

[159]*Id*. at ¶ 16.

[160] Youngman Depo. (Jan. 2021) at 118:7-11.

[161] *Id.* at 119:2-4.

19-cv-1537-BEN (JLB)

action makes the AR-15 more useful for militia use.[162]  Without a pistol grip it would be much more difficult to train loading, unloading, and clearing malfunctions.  The pistol grip also enhances accuracy because it puts the trigger finger in the proper alignment and helps to control the firearm.[163] While a folding stock offers no advantage, according to Youngman, a telescoping stock offers "[t]he ability to properly fit the rifle or the weapon to an individual regardless of their stature, as well as the ability to accommodate body armor."[164] A grenade launcher may have some utility for militia use because it can fire teargas cartridges or flares.[165] A flash suppressor would be useful at night because, in Youngman's words, "you don't go blind after you fire the first round."[166]

A detachable magazine is "absolutely essential" for militia use.  Youngman explains, "[b]ecause in a militia setting . . . you need the ability to change magazines expeditiously rather than having to manually reload rounds into the -- into the firearm." A firearm that has an overall length of 30 inches would be useful in militia service because of its increased maneuverability particularly for urban operations.  The overall military is going in the direction of a 16-inch barrel rather than the older longer models.[167]

Youngman's testimony is uncontroverted.  Youngman is very well qualified to opine on the usefulness of an AR-15 for militia use.  He has served in the regular army and the army reserves.  He served as Kentucky's Adjutant General commanding the state's national guard.  He is a firearms trainer and armorer.  He was a member of the bar

---

[162] *Id.* at 133:19.

[163] *Id.* at 133:23 – 135:1.

[164] *Id.* at 136:25 – 137:3.

[165] *Id.* at 138:7-16.

[166] *Id.* at 138:22-23.

[167] *Id.* at 142:2-8.

and worked as a prosecutor.  His opinion that an AR-15 is an ideal firearm for use in a militia is unequivocal and uncontested.  Of the prohibited features in § 30515(a), most are important for militia use.

"*Heller* recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (citing *Heller*, 554 U.S., at 627).  Owing much to the commonality of its ownership, as well as its features and characteristics, the AR-15 is a modern rifle that is suited for use in the militia.  Because it is a weapon of light warfare that is commonly owned, commonly trained, with common characteristics, and common interchangeable parts, it is protected for militia use by the Second Amendment.  California's statutes impose criminal penalties for making and possessing, by ordinary citizens who would make up a militia, a firearm that is well-suited for militia service.  It is the exact opposite of a statute with a reasonable fit and places the most severe burden on those who are able to be part of the citizens' militia, and ultimately burden all of the people of the state and the nation.

Some courts have coined the AR-15 a "weapon of war."  *E.g., Kolbe*, 849 F.3d at 124.  Some courts have concluded that because the AR-15 is most useful in military service, it is not protected by the Second Amendment.  *See, e.g., Worman v. Healey*, 293 F. Supp. 3d 251, 266 (D. Mass. 2018) (AR-15s are most useful in military service, therefore they are beyond the scope of the Second Amendment).  Some courts have reasoned that an M-16 is most useful in military service and thus can be banned and that the AR-15 is "like" the M-16 so it also can be banned.  *See, e.g., Rupp*, 401 F. Supp. 3d at 987 ("the Court agrees with *Kolbe*'s conclusion that 'AR-15-type rifles are 'like' M16 rifles under any standard definition of that term.'").

But *Miller* held that it is precisely this type of firearm – a firearm that has a reasonable relationship to militia service -- that is protected by the Second Amendment. It is a principle that *Heller* grasped.  "This holding [of *Miller*] is not only consistent with,

but positively suggests, that the Second Amendment confers an individual right to keep and bear arms (though only arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia'").  *Heller*, 554 U.S., at 622; *see also Lewis v. United States*, 445 U.S. 55, n.8 (1980) ("the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'") (quoting *Miller*, 307 U.S., at 178); *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) ("We, however, attempted to evaluate the Highland Park Ordinance in more "concrete" terms by asking: 'whether a regulation bans weapons . . . that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense.'"); *Miller v. Sessions*, 356 F. Supp. 3d 472, 478 (E.D. Pa. 2019) ("In 2008, sixty-nine years after it last revisited the Second Amendment, the Supreme Court ultimately held that in addition to 'preserving the militia,' the Second Amendment guarantees an individual right to keep and bear arms."); *but see Hatfield v. Sessions*, 322 F. Supp. 3d 885, 889 (S.D. Ill. 2018), *rev'd on other grounds sub nom., Hatfield v. Barr*, 925 F.3d 950 (7th Cir. 2019) ("Another case jumps the ship and asks if the challenged regulation has 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' a test which contradicts *Heller* itself.").

The Attorney General does not agree that the militia clause can put the brakes on the state's power to ban arms that are ideal for militia use.  But the militia clause informs the full understanding of the right.  "The militia clause helps us understand the contours of the Second Amendment.  After *Heller*, the prefatory clause may not dictate the content of Second Amendment rights, but neither is it irrelevant to it."  *Young v. State of Hawaii*, 992 F.3d 765, 825 (9th Cir. 2021) (*en banc*).  Forty-four of the fifty states have a Second Amendment analogue and most have a clause referring to the militia and the right to defend self and state.  *Id.* at 816 (collecting provisions).

The point was made in this Court's decision in *Rhode v. Becerra*,

The Supreme Court also recognizes that the Second Amendment

guarantee includes firearms that have "some reasonable relationship to the preservation or efficiency of a well-regulated militia." *United States v. Miller*, 307 U.S. 174, 178 (1939). *Miller* implies that possession by a law-abiding citizen of a weapon and ammunition commonly owned, that could be part of the ordinary military equipment for a militia member and would contribute to the common defense, is also protected by the Second Amendment.

 *Heller* and *Miller* are consistent. *Heller* took the already expansive zone of protection for weapons that could be used by a militia and focused on the core use of firearms for defending the home. "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon .... Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 128 S. Ct. at 2818. As *McDonald* puts it,

> in *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was 'the central component of the right itself.' *McDonald*, 561 U.S. at 787. In *Caetano v. Massachusetts*, the Court underscored these two points. One, the Second Amendment extends to common modern firearms useful for self-defense in the home. Two, common firearms beyond just those weapons useful in warfare are protected. *See Caetano*, —— U.S. ——, 136 S. Ct. 1027, 1028 (2016) (per curiam) (quoting *Heller*, 554 U.S. at 582, 624-25, 128 S. Ct. 2783); *contra Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) (weapons useful in warfare are not protected by the Second Amendment).

445 F. Supp. 3d 902, 929 (S.D. Cal. 2020), *appeal stayed*, Appeal No. 20-55437. Major General Youngman did not address the utility of other modern rifles, such as the semiautomatic AK-47, for militia use. The evidence is clear, however, that the AR-15 type of modern rifle bears a reasonable relationship to the preservation and efficiency, as well as the effectiveness, of a modern well-regulated militia. It is therefore categorically protected by the Second Amendment.

### 3. *Citizen Militias are not Irrelevant*

Before the Court there is convincing and unrebutted testimony that the versatile AR-15 type of modern rifle is the perfect firearm for a citizen to bring for militia service. A law that bans the AR-15 type rifle from militia readiness is not a reasonable fit for protecting the Second Amendment right to keep and bear arms for the militia. It has been argued that citizens with nothing more than modern rifles will have no chance against an army with tanks and missiles. But someone forgot to tell Fidel Castro who with an initial force of 20 to 80 men armed with M-1 carbines, walked into power in Havana in spite of Cuba's militarized forces armed with tanks, planes and a navy. Someone forgot to tell Ho Chi Minh who said, "Those who have rifles will use their rifles. Those who have swords will use their swords. Those who have no swords will use their spades, hoes, and sticks," and eventually defeated both the French and the United States military. Someone forgot to tell the Taliban and Iraqi insurgents. Citizen militias are not irrelevant.

For this reason, state statutes ought to specifically preserve the right and ability of its law-abiding responsible citizens to acquire and possess such arms. But to purposefully *criminalize* acquisition and possession of an AR-15 type modern rifle, as California does, particularly because it would be useful in militia warfare, is contrary to one of the purposes of the Second Amendment and therefore displays no degree of fit.

### D. Experiments

The Attorney General objects saying the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id*. at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). How long does the experiment go on and what are its limits? California has had more than a reasonable opportunity to experiment. In the face of the failed federal experiment California persists with its experiment. The facts found in this trial are that the California statute has not solved the problem of mass shootings or the shooting of police officers despite 40 years of testing.

**E.      Deference**

The Attorney General maintains that under intermediate scrutiny, courts "afford substantial deference to the predictive judgments of the legislature." *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) (quotation omitted).  Deference makes sense when new problems arise and new solutions are needed.  At some point it becomes clear whether a legislature's predicted solution is incorrect.  At this point, in this case, is it clear that the California Legislature's predictions were incorrect when it passed AWCA in 1989 and amended AWCA in 1999.  The demonstrably incorrect predictions are no longer entitled to judicial deference.

**F.      Selecting among alternatives**

The Attorney General retreats to the principle that even when the record contains "conflicting legislative evidence," intermediate scrutiny "allow[s] the government to select among reasonable alternatives in its policy decisions." *Id.* (quotation omitted). The legislative record of AWCA makes clear that that respecting a citizen's constitutional right of armed self-defense was not among the considered alternatives – it was not a consideration at all.  Likewise, a citizen's constitutional right to be prepared for armed militia service was not a considered alternative.  The California Legislature did not choose among reasonable alternatives as none of the alternatives included protecting space for a citizen's Second Amendment rights.

The Attorney General argues that deferential review is particularly appropriate here because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks," quoting *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012).  A legislature may be better equipped, but in the end, a legislature must also actually make those sensitive judgments and must make them within constitutional boundaries.  However, the California Legislature made its AWCA policy judgment without protecting or considering a citizen's individual Second Amendment rights.  Therefore, its judgment is outside of the constitutional limits and

1  entitled to no deference.

2  **G.     No reasonable fit**

3         The end of the road is here.  AWCA fails intermediate scrutiny because it lacks a

4  reasonable fit.  It is a continuing failed experiment which does not achieve its objectives

5  of preventing mass shootings or attacks on law enforcement officers.  The evidence

6  suggests it has made no difference at all.  Where it has made a large difference is on the

7  lives of numerous law-abiding citizens who would make, buy, and use these prohibited

8  weapons for home defense and militia readiness, but for the threat of severe criminal

9  punishments.  A reasonable fit would, at the very least, include a broad exception for

10  home defense.  A reasonable fit would, at the very least, also recognize an exception for

11  maintaining an AR-15 type rifle for militia readiness.  But today there are no such

12  exceptions.  Thus, it burdens substantially more protected activity than is necessary to

13  further the state's goals.

14         AWCA certainly falls under the more demanding standard of strict scrutiny.

15  Narrow tailoring using the least restrictive means under strict scrutiny would go much

16  farther and include specific exceptions for a person to acquire and possess an assault

17  weapon for self-defense in other habitations such as a motorhome, houseboat, camping

18  tent, and hotel room, and an exception for those unable to comfortably afford more than

19  one firearm for self-defense to bear an assault weapon everywhere firearms are not

20  prohibited.  Narrow tailoring would include a safe-harbor provision for all home defense

21  use, self-defense use in any non-sensitive place, hunting, sports, and all other lawful

22  activities and militia readiness uses.

23         Perhaps there are better experiments that can be tried by the State to reduce mass

24  shootings.[168]  As stated previously, shooters seek notoriety and news coverage.  Perhaps

25

26  _____

27  [168] Defs. Exh. AC, at 17 ("In other words, the deadliest public mass shooters' murderous
28  intent is larger, but so is their criminal footprint.  And this makes sense: When more

restraint in news coverage might be a novel approach.[169] Perhaps the better education of our children or perhaps the expansion of our mental health care system will be the answer.

In the end, the Bill of Rights is not a list of suggestions or guidelines for social balancing.  The Bill of Rights prevents the tyranny of the majority from taking away the rights of a minority.  When a state nibbles on Constitutional rights, who protects the minorities?  The federal courts.  The Second Amendment protects any law-abiding citizen's right to choose to be armed to defend himself, his family, and his home.  At the same time, the Second Amendment protects a citizen's right to keep and bear arms to use should the militia be needed to fight against invaders, terrorists, and tyrants.  The Second

_____

ambitious attacks are planned over a longer period of time, that creates more opportunity for perpetrators to make mistakes and let incriminating information slip out, along with more opportunity for warning signs to be observed by the public and reported to law enforcement.  The deadliest public mass shootings have the worst impact on society, *but they should be the easiest to prevent.*") (emphasis added).

[169] Defs. Exh. AC, at 15 (citations omitted).  Sociologists Lankford and Silver suggest media restrictions.  "Fortunately, it may be possible to disrupt the reward system that incentivizes public mass shooters to kill large number of victims for fame and attention.  The key is changing how the news media cover these attacks. . . .  The consensus from scholars and law enforcement is clear: Stop publishing the names and photos of public mass killers (except during ongoing searches for escaped suspects), but continue reporting the other details of these crimes in a responsible manner.  An open letter calling for this approach has been signed by 149 criminologists, professors, and law enforcement professionals.  And similar recommendations have been supported by the FBI, the International Association of Chiefs of Police, the International Police Association, and the advocacy group "No Notoriety," along with some political leaders, families of victims, and media members themselves.

If this approach is implemented nationwide, it could result in deterring a substantial proportion of fame and attention-seekers from committing public mass shootings, while removing the incentive for them to kill large numbers of victims to forge a legacy.  The strategy of refusing to publish their names and photos would also be consistent with the core tenets of deterrence theory: It would be swift, certain, and severe."

Amendment is about America's freedom: the freedom to protect oneself, family, home, and homeland.  California's assault weapon ban disrespects that freedom.

## IV.  CONCLUSION

Plaintiffs challenge California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming certain "assault weapons" a public nuisance), 30915 (regulating "assault weapons" obtained by bequest or inheritance), 30925 (restricting importation of "assault weapons" by new residents), 30945 (restricting use of registered "assault weapons"), and 30950 (prohibiting possession of "assault weapons" by minors).  It is declared that these statutes unconstitutionally infringe the Second Amendment rights of California citizens.  These statutes and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8) are hereby enjoined.

You might not know it, but this case is about what should be a muscular constitutional right and whether a state can force a gun policy choice that impinges on that right with a 30-year-old failed experiment.  It should be an easy question and answer.  Government is not free to impose its own new policy choices on American citizens where Constitutional rights are concerned.  As *Heller* explains, the Second Amendment takes certain policy choices and removes them beyond the realm of permissible state action.  California may certainly conceive of a policy that a modern rifle is dangerous in the hands of a criminal, and that therefore it is good public policy to keep modern rifles out of the hands of every citizen.  The Second Amendment stands as a shield from government imposition of that policy.

There is only one policy enshrined in the Bill of Rights.  Guns and ammunition in the hands of criminals, tyrants and terrorists are dangerous; guns in the hands of law-abiding responsible citizens are better.  To give full life to the core right of self-defense, every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes.  In early America and today, the Second Amendment right of self-preservation permits a citizen to "'repel

force by force' when 'the intervention of society in his behalf, may be too late to prevent that injury.'" *Heller*, 554 U.S., at 594.  Then, as now, the Second Amendment "may be considered as the true palladium of liberty." *Id*. at 606 (citation omitted).  Unfortunately, governments tend to restrict the right of self-defense.  "[I]n most governments it has been the study of rulers to confine the right within the narrowest limits possible." *Id.* (citation omitted).  Fortunately, no legislature has the constitutional authority to dictate to a good citizen that he or she may not acquire a modern and popular gun for self-defense.

The Court does not lightly enjoin a state statute.  However, while the Court is mindful that government has a legitimate interest in protecting the public from gun violence, it is equally mindful that the Constitution remains a shield from the tyranny of the majority.  As Senator Edward Kennedy said, "[t]he judiciary is – and is often the only – protector of individual rights that are at the heart of our democracy."  Law-abiding citizens are imbued with the unalienable right to keep and bear modern firearms.

## V.  TEMPORARY STAY

The Attorney General asked for a stay of any injunction pending appeal.  A party seeking a stay must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of relief, that the balance of equities tip in his favor, and that a stay is in the public interest.  *Humane Soc'y of the United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009), citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 19 (2008).  The Ninth Circuit has held that a likelihood of success per se is not an absolute requirement and that serious questions going to the merits can support issuance of an injunction.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2014) (discussing the parallel preliminary injunction standard).  Serious questions are "substantial, difficult and doubtful . . . [and] need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

Because this case involves serious questions going to the merits, a temporary stay is in the public interest.  This declaration and permanent injunction are stayed for 30 days

during which time the Attorney General may appeal and seek a stay from the Court of Appeals.  After 30 days, the following Order will take full force and effect:

**IT IS HEREBY ORDERED that:**

1.  Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing the California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming those "assault weapons" a public nuisance), 30915 (regulating those "assault weapons" obtained by bequest or inheritance), 30925 (restricting importation of those "assault weapons" by new residents), 30945 (restricting use of those registered "assault weapons"), and 30950 (prohibiting possession of those "assault weapons" by minors) and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8).

2.  Defendant Attorney General Rob Bonta shall provide forthwith, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.  Within 10 days, the government shall file a declaration establishing proof of such notice.  Alternatively, the parties may file a stipulation.

**IT IS SO ORDERED.**

Dated: June 4, 2021

_____
**HON. ROGER T. BENITEZ**
United States District Judge

19-cv-1537-BEN (JLB)