ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**DEFENDANTS' BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 8, 2022**<br><br>Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

---

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California, and Acting Director of the Bureau of Firearms Blake Graham has succeeded former Interim Director Brent E. Orick. Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta and Acting Director Graham, in their respective official capacities, are substituted as the defendants in this case.

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................... 1

Argument ........................................................................................................ 3

    I.    *Bruen* Altered the Legal Standard for Analyzing Second
           Amendment Claims.................................................................... 3

    II.   On Remand, This Court Should Permit the Parties to Conduct
           Further Expert Discovery to Compile a Comprehensive Record
           Addressing *Bruen*'s Text-and-History Standard.................................. 8

    III.  The Court Should Enter a Scheduling Order Allowing Sufficient
           Time to Conduct Further Expert Discovery Responsive to *Bruen* ..... 14

Conclusion .................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page**

CASES

Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.
   No. 19-3142 (3d Cir. Aug. 25, 2022) ...................................................... 2

Caetano v. Massachusetts
   577 U.S. 411 (2016) .............................................................................. 4

District of Columbia v. Heller
   554 U.S. 570 (2008) ......................................................................passim

Duncan v. Bonta
   19 F.4th 1087 (9th Cir. 2021) .............................................................. 11

Flanagan v. Bonta
   9th Cir. Case No. 18-55717 .................................................................. 14

Heller v. District of Columbia
   670 U.S. 1244 (D.C. Cir. 2011).....................................................passim

Jackson v. City & Cty. of San Francisco
   746 F.3d 953 (9th Cir. 2014) ................................................................. 3

Kolbe v. Hogan
   849 F.3d 114 (4th Cir. 2017) ............................................................... 10

Leiva-Perez v.Holder
   640 F.3d 962 (9th Cir. 2011) ............................................................... 14

Martinez v. Villanueva
   9th Cir. No. 20-56233 (July 6, 2022) .................................................... 2

McDonald v. City of Chicago
   561 U.S. 742 (2010) ......................................................................passim

McDougall v. Cty. of Ventura
   9th Cir. No. 20-56220 (June 29, 2022).................................................. 2

Miller v. Bonta
   542 F. Supp. 3d 1009 (2021) ............................................... 8, 9, 11, 13

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*New York State Rifle & Pistol Association v. Bruen*
    142 S. Ct. 2211 (2022) ..................................................................*passim*

*Rupp v. Bonta*
    9th Cir. No. 19-56004 (June 28, 2022)................................................. 2

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016) ............................................................. 11

*United States v. Miller*
    307 U.S. 174 (1939) .......................................................................... 13

CONSTITUTIONAL PROVISIONS

United States Constitution
    Second Amendment.......................................................................*passim*
    Fourteenth Amendment .......................................................11, 13, 15

STATUTES

Senate Bill 1327 (Reg. Sess. 2021-2022) ................................................. 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2211 (2022), fundamentally altered the legal standard for evaluating Second Amendment challenges to firearms regulations.  Instead of the two-step framework that the Ninth Circuit and most other federal courts of appeals had adopted for resolving those claims, *Bruen* held that courts must apply a standard "rooted in the Second Amendment's text, as informed by history."  *Id.* at 2116–17.  Under this new "text-and-history" standard, courts must determine whether "the Second Amendment's plain text" protects the conduct in which the plaintiff wishes to engage, and if it does, then decide whether the regulation "is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.

In light of *Bruen*, while this case was pending appeal before the Ninth Circuit, the Attorney General and Director of the Bureau of Firearms ("Defendants") moved the Court to vacate and remand this case challenging the constitutionality of the Assault Weapons Control Act (the "AWCA"), consistent with the Attorney General's arguments in most other Second Amendment cases pending at the Ninth Circuit when *Bruen* was issued.  The Attorney General argued that vacatur and remand were appropriate to "allow the parties to compile the kind of historical record that *Bruen* requires" and to afford this Court the opportunity "to answer a number of important questions about how *Bruen* should be applied in the first instance."  Defs.' Opp'n to Mot. to Lift Stay & Mot. to Vacate & Remand for Further Proceedings (July 11, 2022), 9th Cir. Dkt. 22, at 1–2.  The Ninth Circuit granted Defendants' motion and remanded this case for further proceedings

consistent with *Bruen*.  9th Cir. Dkt. 27.[2]  Thereafter, on August 8, 2022, this Court ordered the parties to submit simultaneous "briefs addressing" *Bruen*.  Dkt. 125.[3]

In the prior proceedings, the parties litigated this case—and this Court analyzed Plaintiffs' claims—under the now-defunct two-step approach.  But neither the parties nor the Court specifically addressed whether the AWCA imposes a "comparable burden on the right of armed-self-defense" as historical restrictions on dangerous or unusual weapons and other potential historical analogues, or whether the modern and historical regulations are "comparably justified," as *Bruen* now requires.  *Bruen*, 142 S. Ct. at 2133.  On remand, the Court should enter a scheduling order directing the parties to prepare cross-motions for summary judgment, allowing the Court to evaluate Plaintiffs' claims under the text-and-history standard articulated in *Bruen*.  Before doing so, the parties should be permitted to conduct focused expert discovery to supplement the existing legal and historical record in support of this analysis.[4]  This approach would serve the interests of the parties, allowing them a full and fair opportunity to address the new emphasis on historical analogues and to prepare a record responsive to the text-and-

---

[2] The Ninth Circuit has disposed of several other pending Second Amendment cases in this manner.  *See Rupp v. Bonta*, No. 19-56004 (June 28, 2022), 9th Cir. Dkt. 71; *McDougall v. Cty. of Ventura*, No. 20-56220 (June 29, 2022) (en banc), 9th Cir. Dkt. 55; *Martinez v. Villanueva*, No. 20-56233 (July 6, 2022), 9th Cir. Dkt. 45.

[3] The Ninth Circuit's mandate issued on August 23, 2022, and its judgment in the appeal took effect on that date.  9th Cir. Dkt. 28.

[4] As the Third Circuit recently observed in remanding a challenge to New Jersey's restrictions on large-capacity magazines, *Bruen* "provided lower courts with new and significant guidance on the scope of the Second Amendment and the particular historical inquiry that courts must undertake when deciding Second Amendment claims."  Order at 1 n.1, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, No. 19-3142 (3d Cir. Aug. 25, 2022) (Dkt. 147-1).  Despite a dissenting judge's view that the case could be resolved on the existing record, the court granted the government's request to engage in "further record development, targeted at the legal and historical analysis required under *Bruen*."  *Id.*

history standard.  It would also allow this Court to address important questions about how *Bruen* applies in the first instance.[5]

## ARGUMENT

### I.  *BRUEN* ALTERED THE LEGAL STANDARD FOR ANALYZING SECOND AMENDMENT CLAIMS

In *Bruen*, the Supreme Court addressed the constitutionality of New York's requirement that individuals show "proper cause" as a condition of securing a license to carry a firearm in public.  *Id.* at 2123.  Before turning to the merits, the Court announced a new methodology for analyzing Second Amendment claims.  It recognized that lower courts had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  *Id.* at 2125.  At the first step of that approach, the government could "justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the [Second Amendment] right as originally understood.'"  *Id.* at 2126 (citation omitted).  If that inquiry showed that the regulation did not burden conduct protected by the Second Amendment, lower courts would uphold the regulation without further analysis.  *Id.*  Otherwise, courts would proceed to the second step, asking "how close[ly] the law c[ame] to the core of the Second Amendment right and the severity of the law's burden on that right," and applying intermediate scrutiny unless the law severely burdened the "'core' Second Amendment right" of self-defense in the home, in which case strict scrutiny applied.  *Id.*; *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (same).

---

[5] On August 24, 2022, Plaintiffs asked whether Defendants would stipulate to the filing of a Second Amended Complaint, which would add claims regarding certain provisions of recently enacted legislation, Senate Bill 1327 (Reg. Sess. 2021-2022).  Defendants have informed Plaintiffs that they will stipulate to the filing of a Second Amended Complaint, provided Defendants are afforded 45 days to consider the new allegations and new claims and to file a response.  If an amended pleading is filed, the proposed case schedule should be further extended to account for potential motion practice concerning any new claims.

The Supreme Court in *Bruen* declined to adopt the two-step approach. *See* 142 S. Ct. at 2126. The Court explained that its earlier decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126–27. It then announced a new standard for analyzing Second Amendment claims that is "centered on constitutional text and history." *Id.* at 2128–29. Under this text-and-history approach,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30.

Applying that test to the case before it, the Court held that New York's "proper cause" requirement was inconsistent with the Second Amendment's text and history, and therefore unconstitutional. *Id.* at 2134–56. New York defined "proper cause" as a showing of "special need for self-protection distinguishable from that of the general community." *Id.* at 2123. This was a "demanding" standard, *id.*, and made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," *id.* at 2156 (Alito, J., concurring). The Supreme Court had "little difficulty" concluding that the "plain text" of the Second Amendment protected the course of conduct that the *Bruen* plaintiffs wished to engaged in—"carry[ing] handguns publicly for self-defense"—reasoning that the term "'bear' naturally encompasses public carry." *Id.* at 2134.[6] The Court explained that because "self-defense is 'the *central component*' of the [Second

---

[6] No party in *Bruen* disputed that the "ordinary, law-abiding, adult citizens" who were plaintiffs in the case were "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And no party disputed that the handguns that the plaintiffs sought to carry in public were in "common use" for self-defense and thus qualified as protected "Arms." *Id.* (citing *Heller*, 554 U.S. at 627, *and Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016)).

4

Amendment] right itself," and because "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135.

Because the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the burden then shifted to the government to show that the prohibition was consistent with an accepted tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2135. After conducting a lengthy survey of "the Anglo-American history of public carry," the Court held that New York had failed to justify its proper-cause requirement. *Id.* at 2156. The Court concluded that this history showed that the Second Amendment guaranteed a right to bear "commonly used arms" in public, "subject to certain reasonable, well-defined restrictions," which had not historically included a requirement that "law-abiding, responsible citizens . . . 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public.'" *Id.*

While *Bruen* announced a new standard for analyzing Second Amendment claims, it also made clear that governments may continue to adopt reasonable gun safety regulations. The Court recognized that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. Nor does it protect a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Indeed, as Justice Alito explained, *Bruen*'s majority opinion did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).

Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Like the majority opinion, Justice Kavanaugh's opinion indicates that States may require individuals who wish to carry a firearm in public to secure a license to do so, and they may require license applicants "to

undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162. Justice Kavanaugh also reiterated the majority's view that the Second Amendment is not a "regulatory straightjacket," *id.* (quoting *Bruen*, 142 S. Ct. at 2133), and *Heller*'s observation that "the Second Amendment allows a 'variety' of gun regulations," *id.* at 2162 (quoting *Heller*, 554 U.S. at 636).[7] In particular, Justice Kavanaugh emphasized that that the "presumptively lawful measures" that *Heller* identified—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," laws "forbidding the carrying of firearms in sensitive places," laws "imposing conditions and qualifications on the commercial sale of arms," and laws prohibiting the keeping and carrying of "dangerous and unusual weapons"—remained constitutional, and that this was not an "exhaustive" list. *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).[8]

Beyond these general observations, *Bruen* also provided more specific guidance about how lower courts should scrutinize Second Amendment claims under its new approach. As a threshold issue, *Bruen* directs courts to assess whether the "Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2126—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II. The Constitution "presumptively protects that conduct." *Bruen*, 142 S.

---

[7] These observations are consistent with the Court's assurances that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 561 U.S. at 785 (plurality opinion) (quotation marks and citation omitted).

[8] *See also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* ... about restrictions that may be imposed on the possession or carrying of guns."); *accord McDonald*, 561 U.S. at 785 (plurality opinion) (the Second Amendment "by no means eliminates" state and local governments' "ability to devise solutions to social problems that suit local needs and values").

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

Ct. at 2126; *see also id.* at 2129–2130 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); *id.* at 2134 (examining whether the "plain text of the Second Amendment" protected the *Bruen* plaintiffs' course of conduct); *id.* at 2135 (similar).

If a challenged restriction regulates conduct protected by the "plain text" of the Second Amendment, *Bruen* then directs the government to justify its regulation by showing that the law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  And while the Court recognized that the historical analysis conducted at step-one of the two-step approach that lower courts had adopted for analyzing Second Amendment claims was "broadly consistent with *Heller*," *id.* at 2127, it clarified how that analysis should proceed in important respects.  In some cases, the Court explained, this historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century."  *Id.* at 2131.  But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach."  *Id.* at 2132.

To justify regulations of that sort, *Bruen* held that governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*."  142 S. Ct. at 2133 (emphasis in original).  Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster.  *Id.*  Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'"  *Id.*  The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment":  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  The Court

explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Id.* (quoting *McDonald*, 561 U.S. at 767, *and Heller*, 554 U.S. at 599).[9] After *Bruen*, a modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors, and the modern and historical laws are "comparably justified." *Id.*

## II. ON REMAND, THIS COURT SHOULD PERMIT THE PARTIES TO CONDUCT FURTHER EXPERT DISCOVERY TO COMPILE A COMPREHENSIVE RECORD ADDRESSING *BRUEN*'S TEXT-AND-HISTORY STANDARD

On remand, this Court should conduct further proceedings that will allow for additional expert discovery directed at *Bruen*'s text-and-history standard, and dispositive motions applying this new standard. The parties litigated this case—and this Court analyzed Plaintiffs' claims—under the now-defunct two-step approach, and Plaintiffs' claims must now be evaluated under the test articulated in *Bruen*. This would serve the interests of the parties, allowing them a full and fair opportunity to address the new emphasis on historical analogues and the analogical methodology prescribed in *Bruen*. It would also allow this Court in the first instance to address several important questions left open by *Bruen*.

For example, in the prior proceedings before this Court, consistent with the then-prevailing two-step framework, the parties focused on the burden imposed by the AWCA on plaintiffs' ability to defend themselves, and whether those restrictions satisfied the relevant standard of scrutiny.[10] In finding that the AWCA did not withstand intermediate scrutiny, the Court focused its analysis on the applications in which modern assault weapons are used in order to determine whether the AWCA's scope was "in proportion to the interest served." *Miller v.*

---

[9] *See also Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right.").

[10] *See* Pls.' Mem. of Contentions of Fact and Law, ECF No. 66, at 17–28; Defs.' Mem. of Contentions of Fact and Law, ECF No. 65, at 13–22.

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

1   *Bonta*, 542 F. Supp. 3d 1009, 1028 (2021) (citations and internal quotation marks

2   omitted).  More specifically, the Court's intermediate-scrutiny analysis considered

3   the parties' evidence regarding the use of firearms in the home-defense context,

4   *Miller*, 542 F. Supp. 3d at 1033–37; the State's rationale for restricting assault

5   weapons based on their features and characteristics, *id.* 1037–39; the relative

6   incidence of assault weapon use in criminal activity, *id.* 1039–41, and mass

7   shootings, *id.* 1046–49; a statistical analysis of the numbers of shots fired in recent

8   self-defense incidents, *id.* 1041–46; characteristics of bodily injuries and physical

9   damage caused by semiautomatic rifle fire, *id.* 1049–53; Second Amendment

10   decisions by other courts, *id.* 1054–1061, and the suitability of AR-15-platform

11   rifles for use by militias, *id.* 1061–66.  But *Bruen* has since made clear that "*Heller*

12   and *McDonald* do not support applying means-end scrutiny in the Second

13   Amendment context," 142 S. Ct. at 2127.  Rather, the test should be "centered on

14   constitutional text and history."  *Id.* at 2128–29.  Thus, post-*Bruen*, the parties and

15   the Court will need to address the historical tradition of regulating weapons in order

16   to inform the interpretation of the Second Amendment's scope as it applies to the

17   AWCA.  Evidence in the existing record and the Court's prior analysis can be

18   considered to the extent they are relevant to the new *Bruen* standard, but additional

19   work will be required to align the record and analysis to the text-and-history

20   standard.

21      Accordingly, the parties need to develop evidence and present argument under

22   this new test.  In particular, Plaintiffs' claims must be tested through the submission

23   of evidence about whether California's restrictions on rifles, pistols, and shotguns

24   that qualify as assault weapons under the AWCA are "consistent with the Nation's

25   historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.  Here,

26   California has strong arguments as to why its restrictions on assault rifles are

27   constitutional under that test:  *Bruen* repeats *Heller*'s assurance that States may

28   regulate access to "dangerous and unusual weapons" consistent with the Second

Amendment, *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see also id.* at 2162 (Kavanaugh, J., concurring) (same).[11]  And further discovery will allow Defendants to develop a record on how the AWCA imposes a "comparable burden on the right of armed self-defense" as historical restrictions and that the modern and historical regulations are "comparably justified."  *Id.* at 2133.

To be sure, *Bruen* recognizes that the historical analysis conducted at step one of the former two-step approach was "broadly consistent with *Heller*."  142 S. Ct. at 2127.  In support of the first prong of the two-step analysis in the prior proceedings before this Court, California identified one subset of historical firearms regulations restricting their possession based on the number of rounds that the firearm could discharge automatically or semi-automatically without reloading.  In its memorandum of contentions of fact and law, California noted that such restrictions, which date back to the 1920s and 1930s, had been in place in the District of Columbia, Michigan, Ohio, and Rhode Island.  *See* Defendants' Mem. of Contentions of Fact and Law at 12–13.  By regulating firearm ownership based on their capacity for enhanced firepower, these laws provided a historical analogue for the AWCA's restrictions on firearms having fixed large-capacity magazines (LCMs), or capable of accepting detachable LCMs.  *Id.*

*Bruen* has now clarified how the historical inquiry must proceed, and the analysis it requires differs from analysis of "longstanding" laws employed by courts before *Bruen* in important respects.  Among other things, neither the parties nor this Court employed the reasoning-by-analogy method—with its emphasis on comparable burdens and comparable justifications—that *Bruen* requires.  *See* 142

---

[11] As the Fourth Circuit has observed, while *Heller* "invoked Blackstone for the proposition that 'dangerous and unusual' weapons have historically been prohibited, Blackstone referred to the crime of carrying 'dangerous *or* unusual weapons.'"  *Kolbe v. Hogan*, 849 F.3d 114, 131 n.9 (4th Cir. 2017) (en banc) (quoting 4 Blackstone 148-49 (1769)).

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

S. Ct. at 2133 (noting that these questions "are *central* considerations when engaging in an analogical inquiry" (quotation marks omitted)).

In addition, California's historical argument was consistent with guidance from the Ninth Circuit that laws from the early twentieth century could be considered "longstanding" and therefore presumptively constitutional under *Heller*. *See, e.g.*, *Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring) (concluding that a law that dated to 1923 was a longstanding regulation). Indeed, under the prior two-step framework, the analogies of modern hardware restrictions to the early 19th century firing-capacity laws in the prior proceedings before this Court had "considerable merit." *Duncan v. Bonta*, 19 F.4th 1087, 1102 (9th Cir. 2021) (en banc) (observing that there is "significant merit" to California's argument that its large-capacity magazine restrictions are longstanding because of a tradition of imposing firing-capacity restrictions that dates back "nearly a century"), *vacated and remanded*, 142 S. Ct. 2895 (2022). But *Bruen* has since suggested that when determining whether a law is historically justified, the focus should be on gun regulations predating the 20th century.[12] *See* 142 S. Ct. at 2137. Accordingly, the question of whether the AWCA has any "historical pedigree" cannot be answered without considering this time period. *Miller*, 543 F. Supp. 3d at 1024, 1025; *see also* Pls.-Appellees' Motion to Lift Stay (Jun. 30, 2022), 9th Cir. Dkt. 21, at 5–6.

*Bruen* also left open other questions that are best resolved by this Court, if necessary, after further briefing and argument. The Court did not decide "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" or look to the "public understanding of the right to keep and bear arms" when the

---

[12] Although the Court did not consider evidence from the 20th century in *Bruen* because it "contradict[ed] earlier evidence," *Bruen*, 142 S. Ct. at 2153 n.28, such evidence may be relevant if it is consistent with evidence pre-dating the 20th century.

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2138. More broadly, the Court "d[id] not resolve" the "manner and circumstances in which postratification practice may bear on the original meaning of the Constitution." *Id.* at 2162-2163 (Barrett, J., concurring).

In resolving these and other historical questions, *Bruen* directs district courts (and then, later, courts of appeals) to follow "various evidentiary principles and default rules," including "the principle of party presentation." *Id.* at 2130 n.6 (majority opinion). And as *Bruen* recognizes, this historical analysis "can be difficult," and sometimes requires judges to "resolv[e] threshold questions" and "mak[e] nuanced judgments about which evidence to consult and how to interpret it." *Id.* at 2130 (quoting *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring)).[13] That is especially true in cases like this one, which implicates "unprecedented societal concerns [and] dramatic technological changes." *Id.* at 2132; *see also id.* (recognizing that these cases "require a more nuanced approach"). The firearm technology regulated by the AWCA and the problem of mass shootings that it seeks to mitigate are undoubtedly modern advances and pose modern problems.[14] A "more nuanced" analogical approach is required in this case. *Id.* at 2130. The parties should have the opportunity to develop a record and arguments consistent with *Bruen*, and this Court should have the opportunity to conduct the analysis *Bruen* requires.

---

[13] *See also Bruen*, 142 S. Ct. at 2134 ("[W]e acknowledge that 'applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'" (quoting *Heller v. District of Columbia*, 670 U.S. 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting))).

[14] *See e.g.*, Suzanne Goldsmith, *Perspective: Ohio State's Murder Professor*, Columbus Monthly, Apr. 16, 2018 (history professor Randolph Roth explained that, historically, mass violence was a "group activity," but "[r]apid-fire guns and high-capacity ammunition changed the equation" and gave rise to "the current scourge of mass shootings"), *available at* https://bit.ly/3dPON4K; C-SPAN, Mass Violence in American History, at 00:45–01:38 (Jan. 7, 207) (interview with Randolph Roth) (noting that "mass killings were quite common, but it was a group activity . . . you just didn't have the type of technology . . . for an individual to kill as many people as an individual can kill today"), *available at* https://bit.ly/3dOzjOp.

1       Plaintiffs may contend here that further proceedings to apply *Bruen* are

2  unnecessary because the Court can summarily rule in favor of Plaintiffs under the

3  *Heller* common-use analysis set forth in the Court's original ruling.  *See Miller*, 542

4  F. Supp. 3d at 1020–23.  But this Court's application of "the *Heller* test" was based

5  on a view that *Heller* and *United States v. Miller*, 307 U.S. 174 (1939), extended

6  Second Amendment protection to "weapons that may also be useful in warfare."

7  *Miller*, 542 F. Supp. 3d at 1020 (citing *Miller*, 307 U.S. at 178) (emphasis added).

8  That is not the same as the text-and-history standard required by *Bruen*.  *Bruen*

9  suggests that this view is no longer correct, as it repeatedly confirms that self-

10 defense (and not militia service) is the "central component" of the right protected

11 by the Second Amendment.  *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald v. City*

12 *of Chicago*, 561 U.S. 742, 767 (2010)); *see also id.* at 2125 (noting that *Heller* and

13 *McDonald* "held that the Second and Fourteenth Amendments protect an individual

14 right to keep and bear arms for self-defense"); *id.* at 2128 (same).[15]

15      Further, the Court's common-use analysis was based on a view that the

16 Second Amendment protects "guns commonly *owned* by law-abiding citizens for

17 lawful purposes."  *Miller*, 542 F. Supp. 3d at 1014 (emphasis added).  *Bruen* casts

18 doubt on this interpretation.  In *Bruen*, the Court indicated that to qualify as

19 protected "arms," the weapon must, like protected handguns, be commonly *used* for

20 lawful self-defense—not simply manufactured, produced, sold, or owned.  *See*

21 *Bruen*, 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense"

22 (emphasis added)); *id.* at 2142 n.12 (finding that pocket pistols were "commonly

23 *used* at least by the founding" (emphasis added)); *id.* at 2143 (noting that certain

24 belt and hip pistols "were commonly *used* for lawful purposes in the 1600s"

25

26      ———————————
        [15] Despite citing *United States v. Miller*, *see Bruen*, 142 S. Ct. at 2128, the
     Supreme Court did not discuss *Miller*'s reference to arms that have "some
27   reasonable relationship to the preservation or efficiency of a well regulated militia,"
     *Miller*, 307 U.S. at 178.  Nor did the Court premise the right to public carry on any
28   need to bear arms for militia service.

(emphasis added)); *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject" (emphasis added)); *id.* (noting that American governments would not have broadly prohibited the "public carry of commonly *used* firearms for personal defense" (emphasis added).  Accordingly, the Court should have the opportunity to assess, through briefing on dispositive motions, the effects of *Bruen* on its prior application of *Heller* as well as the two-step framework.

### III.   THE COURT SHOULD ENTER A SCHEDULING ORDER ALLOWING SUFFICIENT TIME TO CONDUCT FURTHER EXPERT DISCOVERY RESPONSIVE TO *BRUEN*

As explained above, *Bruen* calls for a new and searching historical analysis that will raise "serious legal questions," *Leiva-Perez v. Holder*, 640 F.3d 962, 966–67 (9th Cir. 2011), about whether the AWCA is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see also id.* at 2162 (Kavanaugh, J., concurring) (same).  The weighty Second Amendment issues raised by Plaintiffs should be resolved based on a "historical record compiled by the parties," *id.* at 2130, n.6, which will require expert discovery to prepare.  Plaintiffs' claims are thus ill-suited for resolution based solely on the simultaneous briefs responding to the Court's Order of August 8, 2022, or other expedited proceedings.

This case stands apart from other matters in which *Bruen* plainly controls.  For example, the plaintiffs in *Flanagan v. Bonta*, 9th Cir. Case No. 18-55717, challenged California's requirement that to secure a permit to carry firearms in most public places, applicants must show that they have "good cause."  *See Flanagan*, Appellants' Opening Br. (Oct. 2, 2018), 9th Cir. Dkt. 16.  *Bruen* involved a challenge to New York's similar "proper cause" requirement that could be resolved by way of a "straightforward" inquiry. 141 S. Ct. at 2122, 2131.  California quickly recognized that its similar "good cause" requirement was unconstitutional in light of *Bruen* and therefore controlled the outcome in *Flanagan*.  *See Flanagan*, 9th Cir. Dkt. 64.  Plaintiffs' challenge to the AWCA's

14

restrictions, by contrast, will require a "more nuanced" analysis of historical traditions than *Bruen*'s "proper cause" requirement because the features and firing capabilities of modern assault weapons "implicat[e] unprecedented societal concerns" and "dramatic technological change" relative to the time periods in which the Second and Fourteenth Amendments were ratified.[16] *Bruen,* 141 S. Ct. at 2132.

Preparing a record that will discern these historical traditions will involve original historical research—an "unpredictable, labor-intensive, and time-consuming" process, albeit a necessary one.  Decl. of Zachary Schrag ("Schrag Decl.") ¶ 7.[17]  To identify possible historical analogues to challenged regulations, one must first devise the scope of the research project, clarifying what specific questions the research is intended to answer, and what time periods, geographic areas, and subject matters the research will encompass. *Id.* ¶¶ 9–11.  A researcher must also identify appropriate primary and secondary source materials to consult. *Id.* ¶ 13–17.  As *Bruen* recognizes, the types of source material that will elucidate whether a historical statute imposes a comparable burden on Second Amendment rights or has a comparable justification might not be limited to the plain text of historical statutes.  They may also include legal and non-legal source materials establishing the existence of a societal problem involving arms, whether that problem has historically been addressed by non-legal means, or whether there have been disputes over the lawfulness of an arms regulation. *See Bruen*, 141 S. Ct. at 2131, 2133.  Such sources might include court records, newspaper articles, books, and manuscripts, in addition to statutory and legislative materials.  Schrag Decl. ¶ 15.

---

[16] *See supra* n.14.

[17] Defendants respectfully submit the accompanying declaration of Zachary Schrag, PhD historian, history professor at George Mason University, and author of *The Princeton Guide to Historical Research* (Princeton University Press, 2021), to explain the complexities of sound historical research.  Defendants incorporate by reference herein the points made in the accompanying Schrag Declaration.

The accessibility of these sources can vary greatly, especially for archival materials dating back to the 18th and 19th centuries.  *Id.* ¶ 20–21.  Even if the source materials from these time periods have been digitized, a thorough search spanning all U.S. jurisdictions would still require parallel searches across numerous databases and archives.  *Id.* ¶ 19.  Further, developing effective search criteria requires special expertise to account for linguistic developments since the 18th and 19th centuries; using modern language "can yield profoundly misleading results." *Id.* ¶¶ 18–21.

Review and interpretation of source materials also requires historical expertise, if such work is to be done correctly.  Although attorneys and judges are accustomed to performing textual analysis of laws, historical scholars are better situated to interpret 18th- and 19th-century statutes within their broader historical context, referencing what events or circumstances contributed to a law's enactment or the law's enforcement history.  *See id.* ¶ 31.  Accordingly, a complete and accurate supplemental record must include expert testimony and cannot, as Plaintiffs have suggested, be limited to judicially-noticeable facts.  *See* Pls.' Opp'n to Defs.' Mot. to Vacate & Remand for Further Proceedings (Jul. 21, 2022), 9th Cir. Dkt. 25, at 10.

This analysis should not be rushed.  Although Defendants cannot provide a precise estimate of how much time would be needed to conduct a thorough identification and review of source materials, at a general level, a historian conducting original research on primary-source materials would fairly expect to conduct many hours of work to yield several sentences of written historical analysis.  Schrag Decl. ¶ 35.  As a practical matter, most qualified historians would be unable to devote themselves to this endeavor full-time on account of other research, teaching, and professional obligations.  *Id.* ¶ 36.

Plaintiffs may contend that further expert discovery is unnecessary in light of the limited, post-1920 historical evidence already received by this Court.  *See* Pls.-

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

Appellees' Mot. to Lift Stay (June 30, 2022), 9th Cir. Dkt. 21, at 2, 5–6.  And they may argue that anything more than a summary resolution would prejudice Plaintiffs' interests in a swift determination of their Second Amendment rights.  *See id.* at 8.  But the Ninth Circuit already passed upon these concerns when it denied Plaintiffs' motion to lift its stay of the Court's prior order, vacated the judgment, and remanded the matter for further proceedings.  *See* Order, 9th Cir. Dkt. 27 (Aug. 1, 2022).  Indeed, Defendants' motion sought vacatur and remand precisely to "allow the parties to compile the kind of historical record that *Bruen* requires." Defs.' Opp'n to Mot. to Lift Stay & Mot. to Vacate & Remand for Further Proceedings (July 11, 2022), 9th Cir. Dkt. 22, at 1–2.  Had the Court of Appeals believed that the existing factual record and conclusions of law would be sufficient to address the new questions raised by *Bruen*, it would not have vacated the judgment and remanded the matter in the first place.

To be clear, Defendants do not seek to re-start this case from scratch or inject needless delay.  Substantial material adduced at trial remains relevant under the new *Bruen* standard.  But further expert discovery would directly address the historical questions raised by *Bruen*.  The parties would be free to rely on the existing record from the prior proceedings to support their claims and defenses, to the extent that evidence remains relevant.  In this way, the matter can be resolved expeditiously after a reasonable period of focused expert discovery, followed by cross-motions for summary judgment.

In order to provide sufficient time to develop the supplemental historical record and conduct expert discovery before further proceedings on the merits, California respectfully proposes the following schedule.[18]

- December 9, 2022 – Last day to designate expert witnesses and serve opening expert reports.

---

[18] As noted previously, if an amended pleading is filed in this action, these deadlines would need to be extended to accommodate potential motion practice concerning the new claims and expanded scope of the case.

Defendants' Brief in Response to Court Order of August 8, 2022 (3:19-cv-01537-BEN-JLB)

- January 6, 2022 – Last day to designate rebuttal expert witnesses and serve rebuttal expert reports.
- February 3, 2022 – Completion of fact and expert discovery.
- March 3, 2023 – Last day to file cross-motions for summary judgment.

## CONCLUSION

The Court should enter a scheduling order allowing the parties to conduct expert discovery to support the text-and-history analysis prescribed by *Bruen*, and to brief and argue cross-motions for summary judgment.

Dated:  August 29, 2022                              Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General

s/ John D. Echeverria

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendants Rob Bonta
and Blake Graham, in their official
capacities*

18