George M. Lee (SBN 172982)
     gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

John W. Dillon (SBN 296788)
     jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MILLER, an individual, et al., | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **PLAINTIFFS' BRIEF RE *NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN*** |
| vs. | |
| ROB BONTA, in his official capacity as Attorney General of California, et al., | Hon. Roger T. Benitez |
| Defendants. | |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................ 1

II.   RELEVANT PROCEDURAL HISTORY ........................................... 2

III.  APPLICATION OF *NEW YORK STATE
      RIFLE & PISTOL ASS'N v. BRUEN* ....................................... 3

      A. *BRUEN* REJECTED INTEREST-BALANCING
         TESTS IN SECOND AMENDMENT CASES ............................... 3

      B. THIS CASE WAS PRINCIPALLY
         DECIDED UNDER *HELLER* ....................................... 6

         1.  The AWCA Prohibits Firearms in Common Use. ................. 6

         2.  The State Has Already Failed to Show that
             Assault Weapons Were Dangerous and Unusual ................ 8

      C. THE STATE CANNOT MEET ITS BURDEN TO
         SHOW ITS REGULATIONS ARE PART OF AN
         HISTORICAL TRADITION UNDER *HELLER/BRUEN* ............ 11

         1.  The Second Amendment's Plain Text Unquestionably
             Protects Modern Arms ................................... 11

         2.  Defendants Have Already Argued to Historical
             Tradition – And the Record is Replete With History ........ 14

IV.   CONCLUSION ............................................................ 18

1

# <u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

3
## <u>Cases</u>

4
*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................ 8, 10

5
*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... *Passim*

6
7
*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........................................................................ 15

8
9
*Kachalsky v. County of Westchester*,
701 F.3d 81 (2d Cir. 2012) ................................................................................ 5

10
11
*Konigsberg v. State Bar of Cal.*,
366 U.S. 36, (1961) ............................................................................................. 5

12
*Miller v. Bonta*, 542 F. Supp.3d 1009 (S.D. Cal. 2021).…………………….. *Passim*

13
14
*New York State Rifle & Pistol Ass'n v. Beach*,
818 F.Appx. 99 (2d Cir. 2020) ........................................................................... 5

15
16
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. ___, 142 S.Ct. 2111 (Jun. 23, 2022) ……………………………….. *Passim*

17
*Rogers v. Grewal*, 140 S. Ct. 1865 (2020).......................................................... 4

18
*Rupp v. Bonta*, No. 19-56004 ............................................................................. 2

19
*United States v. Miller*, 307 U.S. 174 (1939) .................................................... 10

20
21
*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ...................................... 14

22
23
*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021),
*cert. granted, judgment vacated*, No. 20-1639, 2022 WL 2347578
(U.S. June 30, 2022) ........................................................................................... 4, 15

24
//

25
//

26
//

27
//

28

**Constitution**

Second Amendment ................................................................................ *Passim*


**Cal. Penal Code**

Section 30515 ................................................................ 9

Section 30515(a) ............................................................ 16


**Rules**

FRCP 65(a)(2) ................................................................ 2


**Other**

California's Roberti-Roos Assault Weapons Control Act of 1989 .................. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

Plaintiffs James Miller, et al. ("Plaintiffs") hereby submit this brief addressing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (Jun. 23, 2022) ("*Bruen*") pursuant to this Court's Order of August 8, 2022 [ECF 125].

*Bruen* does not change the outcome of this case. Instead, *Bruen* vindicates this Court's previous application of the "*Heller* test" and establishes that Plaintiffs must prevail in their challenge to the State's Assault Weapons Control Act ("AWCA").

In *Bruen*, the Court reasserted principles it clearly applied in *Heller*. There can now be no dispute over the proper approach to evaluating Second Amendment claims. First, the Court must determine whether "the Second Amendment's plain text covers an individual's conduct" that is being restricted by a challenged law or policy. *Bruen*, 142 S. Ct. at 2129–30. Second, if the answer is yes, the conduct is presumptively protected, and the burden then falls to the government to justify the challenged restriction by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation*." Id*. at 2130. If the government cannot make this demonstration, the restriction is unconstitutional, full stop. No interest-balancing or levels-of-scrutiny analysis can or should be conducted. *Id*. at 2127.

In addition to this general confirmation of the proper mode of analysis for Second Amendment claims, *Bruen* also has very specific relevance for this case, involving a ban on certain types of firearms. First, *Bruen* confirms that the Second Amendment's plain text covers the activity at issue—possession of a bearable arm. Reiterating what was said in *Heller*, *Bruen* states that "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." *Id*. at 2132 (emphasis added). Second, *Bruen* confirms that *Heller* already has conducted the relevant historical analysis for determining whether a particular arm falls within the Second Amendment's protection and therefore cannot be banned. In order for a ban of a type of arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is "dangerous and unusual." *Id*. at 2143. It follows that types of arms that

1    are in "common use today" simply cannot be banned. *Id.*

2    These principles decide this case. Once it is determined that the AWCA bans

3    arms that are in common use, it follows that the law is unconstitutional—period. And

4    this Court has *already* made that determination. In its prior opinion in this case, the

5    Court concluded that the banned arms are "very popular hardware—firearms that are

6    lawful under federal law and under the laws of most states and that are commonly held

7    by law-abiding citizens for lawful purposes." *Miller v. Bonta*, 542 F. Supp.3d 1009,

8    1023 (S.D. Cal. 2021). Accordingly, all that is left for this Court to do is reinstitute its

9    decision finding California's ban unconstitutional under the legal principles confirmed

10   by *Bruen*.

## II.   RELEVANT PROCEDURAL HISTORY

12   Plaintiffs commenced this action on August 15, 2019, challenging Defendants'

13   enforcement of California's Roberti-Roos Assault Weapons Control Act of 1989

14   ("AWCA"). Plaintiffs filed their First Amended Complaint [ECF 9] on September 27,

15   2019. On December 6, 2019, Plaintiffs filed their motion for preliminary injunction

16   [ECF 22]. On October 19, 2020, this Court commenced a three-day evidentiary hearing

17   on Plaintiffs' motion for preliminary injunction. At the conclusion of the evidentiary

18   hearing, the Court consolidated Plaintiffs' preliminary injunction motion with a trial on

19   the merits, pursuant to FRCP 65(a)(2). [ECF 55; Tx of 10/22/21 Hearing at 115]. Trial

20   commenced on February 3, 2021. Before trial, the parties submitted extensive pre-trial

21   memoranda of contentions of fact and law [ECF 65, 66], proposed findings of fact and

22   conclusions of law [ECF 85-87], witness and exhibit lists, and expert witness deposition

23   transcripts [ECF 89-90, 95, 98]. On June 4, 2021, this Court issued its 94-page decision

24   [ECF 115], and entered Judgment thereon [ECF 116].

25   Defendants filed their Notice of Appeal on June 10, 2021 [ECF 117] and

26   immediately moved the Ninth Circuit for an emergency stay pending appeal that same

27   day. On June 21, 2021, the Ninth Circuit motions panel ordered a stay pending

28   resolution of *Rupp v. Bonta*, No. 19-56004. On June 23, 2022, the Supreme Court

decided *NYSRPA v. Bruen*, discussed at length below, which invalidated a New York statute restricting the carrying of firearms in public. On August 1, 2022, the Ninth Circuit issued an order granting the Defendants' motion to vacate this Court's judgment and remand the case for further proceedings.  (9th Cir. Dkt. 27.) The Ninth Circuit's order stated: "This case is remanded to the district court for further proceedings consistent with the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___ (2022)." *Id.*

## III.   APPLICATION OF *NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN*

At the Court's request, this brief addresses the facts in this case consistent with *Bruen*. In summary, *Bruen* affirmed the constitutional review established by *Heller* and rejected the former practice of applying a two-part, interest-balancing test to Second Amendment challenges previously established by various circuit courts. In the present case, this Court principally decided the case using the *Heller* test, and further rejected the Defendants' claims that "assault weapons" were prohibitable as "dangerous and unusual" firearms. The test this Court used under *Heller* was wholly separate from the two-step approach previously used by the circuit courts. Thus, the <u>only</u> part of this Court's prior decision that was affected by *Bruen* is part II.B of its decision, 542 F.Supp.3d at 1023-33, in which this Court applied "The Ninth Circuit's Two-Step Framework." *Id.*, at 1023. This Court's judgment should be based on the *Heller* test, and rejection of the dangerous and unusual argument alone—a test entirely consistent with *Bruen*. The State cannot meet its burden to show that its regulations were part of an historical tradition, an argument that the Defendants have already made, and which was rejected. Judgment should now be entered in Plaintiffs' favor.

## A.   *BRUEN* REJECTED INTEREST-BALANCING TESTS IN SECOND AMENDMENT CASES.

On June 23, 2022, the Supreme Court decided *Bruen*, invalidating a New York statute restricting the carrying of firearms in public. In *Bruen*, the Court applied the "test that [it] set forth in *Heller*," and rejected "the two-step test that Courts of Appeals have developed to assess Second Amendment claims," holding "*Heller* and *McDonald* do

1    not support applying means-end scrutiny in the Second Amendment context." *Bruen,*

2    142 S.Ct. at 2118. In the Ninth Circuit, for example, that former test had required a

3    court first to ask "if the challenged law affects conduct that is protected by the Second

4    Amendment," basing that determination on a "historical understanding of the scope of

5    the right." If the challenged restriction burdened conduct protected by the Second

6    Amendment, the court then moved to the second step of the analysis to determine "the

7    appropriate level of scrutiny." *Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021),

8    *cert. granted, judgment vacated*, No. 20-1639, 2022 WL 2347578 (U.S. June 30, 2022).

9    *Bruen* rejected this mode of analysis, and made clear that when a law restricting Second

10   Amendment activity is challenged, the burden falls squarely on the government to

11   "affirmatively prove that its firearms regulation is part of the historical tradition that

12   delimits the outer bounds of the right to keep and bear arms." *Id*., at 2127.

13       *Bruen* made it explicitly clear that "[u]nder *Heller*, when the Second

14   Amendment's plain text covers an individual's conduct, the Constitution presumptively

15   protects that conduct, and to justify a firearm regulation the government must

16   demonstrate that the regulation is consistent with the Nation's historical tradition of

17   firearm regulation." *Bruen,* 142 S.Ct. at 2126, 2130.

18       From Plaintiffs' complaint through trial, Plaintiffs have maintained that interest

19   balancing tests were inappropriate. See, *e.g.*, Plaintiffs' Motion for Prelim. Injunction

20   [ECF 22-1], at p. 18 n.11 ("Plaintiffs preserve and maintain their position that such a

21   test, and tiered scrutiny, are inappropriate for categorical bans, including the AWCA's

22   at issue here. *Heller*, 554 U.S. at 634, 635.").

23       And two years ago, Justice Thomas presciently warned Second Amendment

24   litigants that the two-step approach "raises numerous concerns. For one, the courts of

25   appeals' test appears to be entirely made up." *Rogers v. Grewal*, 140 S. Ct. 1865, 1867

26   (2020) (Thomas, J., dissenting from denial of cert.) Justice Thomas stated: "Instead of

27   following the guidance provided in *Heller*, these courts minimized that decision's

28   framework. […] They then 'filled' the self-created 'analytical vacuum' with a 'two-step

1  inquiry' that incorporates tiers of scrutiny on a sliding scale." *Id.*, at 1866 (citations
2  omitted). Now in *Bruen*, in rejecting the two-step test, the Supreme Court reaffirmed
3  what should have been clear from *Heller* fourteen years ago.

4      *Bruen* concerned review of the State of New York's licensing and permitting
5  scheme, whereby a showing of "proper cause" was required to carry a concealed
6  handgun outside of the home. The statute was upheld by the Second Circuit, purely on
7  the grounds that the proper cause requirement "was 'substantially related to the
8  achievement of an important governmental interest.'" *Bruen*, 142 S.Ct. at 2125 (citing
9  *New York State Rifle & Pistol Ass'n v. Beach*, 818 F.Appx. 99, 100 (2d Cir. 2020);
10 *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012)). The Supreme
11 Court reversed, and expressly rejected those interest balancing tests previously applied
12 by the circuit courts, holding:

13          In keeping with *Heller*, we hold that when the Second
14          Amendment's plain text covers an individual's conduct, the
            Constitution presumptively protects that conduct. To justify
15          its regulation, the government may not simply posit that the
16          regulation promotes an important interest. Rather, the
            government must demonstrate that the regulation is consistent
17          with this Nation's historical tradition of firearm regulation.
18          Only if a firearm regulation is consistent with this Nation's
            historical tradition may a court conclude that the individual's
19          conduct falls outside the Second Amendment's "unqualified
20          command."

21 142 S.Ct. at 2126 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).
22 "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second
23 Amendment context. Instead, the government must affirmatively prove that its firearms
24 regulation is part of the historical tradition that delimits the outer bounds of the right to
25 keep and bear arms." *Bruen*, 142 S.Ct. at 2127. The majority opinion in *Bruen* expressly
26 followed *Heller* to its logical conclusion that it did not support means-end scrutiny. *Id*.
27 The Supreme Court explained: "*Heller*'s methodology centered on constitutional text
28 and history. Whether it came to defining the character of the right (individual or militia

1    dependent), suggesting the outer limits of the right, or assessing the constitutionality of
2    a particular regulation, *Heller* relied on text and history. It did not invoke any means-
3    end test such as strict or intermediate scrutiny." *Bruen*, 142 S.Ct. at 2128-29.

4        The Court expressly reiterated: "[T]he standard for applying the Second
5    Amendment is as follows: When the Second Amendment's plain text covers an
6    individual's conduct, *the Constitution presumptively protects that conduct*. The
7    government must then justify its regulation by demonstrating that it is consistent with
8    the Nation's historical tradition of firearm regulation. Only then may a court conclude
9    that the individual's conduct falls outside the Second Amendment's "'unqualified
10   command.'" *Id.*, at 2129–30 (emphasis added).

11       As shown below, California's ban on so-called assault weapons unquestionably
12   prohibits commonly owned arms that are not both dangerous and unusual. Thus, these
13   firearms are protected under the Second Amendment, and they cannot be banned. As
14   such, this Court should enter judgment in favor of Plaintiffs without delay.

15   **B.   THIS CASE WAS PRINCIPALLY DECIDED UNDER *HELLER*.**

16       **1. The AWCA Prohibits Firearms in Common Use.**

17       This Court's published opinion was decided under two separate and discrete tests.
18   *Miller*, 542 F.Supp.3d at 1021. The Court was acutely aware of the segregable nature
19   between the *Heller* test — particularly as applied to categorical firearm bans — and the
20   former two-step, interest-balancing approach. Accordingly, this Court took deliberate
21   and specific care to issue its judgment using two distinct approaches. The first and
22   primary approach was to decide whether California's assault weapons law was
23   constitutional under *Heller*. Indeed, this Court's opinion expressly stated: "*Two tests*
24   will be used: (1) the *Heller* test; and (2) the Ninth Circuit's two-step levels-of-scrutiny
25   test." *Id.*, at 1021 (emphasis added).

26       Applying *Heller* first, this Court stated: "The *Heller* test is a test that any citizen
27   can understand. *Heller* asks whether a law bans a firearm that is commonly owned by
28   law-abiding citizens for lawful purposes. It is a hardware test." *Miller*, 542 F.Supp.3d

at 1021; see, *Heller*, 554 U.S. at 624. And thus, this Court concluded:

> As applied to AWCA, the *Heller* test asks: is a modern rifle commonly owned by law-abiding citizens for a lawful purpose? For the AR-15 type rifle the answer is "yes." The overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home. Under *Heller*, that is all that is needed. Using the easy to understand *Heller* test, it is obvious that the California assault weapon ban is unconstitutional. Under the *Heller* test, judicial review can end right here.

*Miller*, 542 F.Supp.3d at 1021.

The arms banned as "assault weapons" under California's AWCA are common in all respects: 1) They are common categorically, as they are all functionally semiautomatic in their operation; 2) they are common characteristically, as they are all popular configurations of arms (*e.g.*, rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips, adjustable stocks, detachable magazines, and the like; and 3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting.

There is no constitutionally relevant difference between a semi-automatic handgun, shotgun, and rifle. While some exterior physical attributes may differ—wood vs. metal stocks and furniture, the number and/or location of grips, having a bare muzzle vs. having muzzle devices, different barrel lengths, etc.—they are, in all *relevant* respects, the same.

Indeed, they are all common, bearable firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature firing one round per pull of the trigger until ammunition is exhausted. They are all common under the same jurisdictional analysis. And they are all subject to the same constitutionally relevant history under which California's

AWCA is clearly and categorically unconstitutional.

At trial, Plaintiffs presented overwhelming evidence as to the commonality of semi-automatic firearms classifiable as "assault weapons" under California law. See, Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF 104], pp. 13-18 ¶¶ 44-61 (under heading: "Arms Banned by California as 'Assault Weapons' are Common and Constitutionally Protected.") Plaintiffs further presented substantial evidence that "The Arms Banned by California as 'Assault Weapons' Are Possessed and Used for Lawful Purposes Including Self-Defense." *Id.*, at pp 18-33, ¶¶ 62-133.

Applying the *Heller* test, this Court found in Plaintiffs' favor, that modern firearms (modern rifles) classified as "assault weapons" were overwhelmingly popular, both in California and nationally. 542 F.Supp.3d at 1021-1023. Comparing the numbers of modern rifles to stun guns, which were the subject of constitutional protection under Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring), this Court concluded that "[b]ased on the evidence presented, it can be confidently said that between at least 200,000 and perhaps 1,000,000 modern rifles are owned in California alone. Based on the lack of evidence at trial that these 200,000 to 1,000,000 California guns are often used in crime, it is reasonable to infer that most are owned by law-abiding citizens who use them only for lawful purposes." 542 F.Supp.3d at 1023. This Court concluded: "After handguns, modern rifles are probably the most popular firearms in America. They are quietly owned by millions of law-abiding citizens for lawful purposes ranging from home defense to sporting competitions." *Id*. These findings were wholly supported by the evidence presented at trial. Quite simply, the semiautomatic firearms the State bans under its AWCA are common in all relevant respects.

## 2. The State Has Already Failed to Show that Assault Weapons Were Dangerous and Unusual.

Defendants did not earnestly attempt to dispute that the AWCA prohibited firearms that are protected under *Heller*'s common use test. Instead, Defendants

1    submitted their own defense that the firearms classified as "assault weapons" could be

2    prohibited as "dangerous and unusual" weapons. But once it is demonstrated that a type

3    of arm is in common use, it cannot be both dangerous *and* unusual. An arm cannot be

4    simultaneously in common use and dangerous and unusual.

5        With the benefit of a full presentation of their own evidence, Defendants argued,

6    *inter alia*, that "Assault Weapons Are Unusual," and that they are "Not Commonly

7    Owned by Law-Abiding Individuals" Def. Proposed Findings of Fact and Conclusions

8    of Law [ECF 103] at p. 11, ¶¶ 68-83. Defendants further argued, and presented evidence

9    to support such argument, that "Assault Weapons Are More Suited for Offensive and

10    Military Use and Are Not Well-Suited for Civilian Self-Defense." *Id.*, at p. 14, ¶¶ 84-

11    97. To bolster their "dangerous and unusual" argument, Defendants argued in essence

12    that "Assault Weapons Are Disproportionately Used in Crime, Mass Shootings, and

13    Against Law Enforcement, Resulting in More Casualties." *Id.*, at p. 17, ¶¶ 98-117.

14    Defendants expressly argued that "Assault Weapons Are Not Protected Under the

15    Second Amendment Because They Are Dangerous and Unusual and Not in Common

16    Use for Lawful Purposes." *Id.*, p. 22:17-18; ¶¶ 1-13.

17        In contrast, Plaintiffs argued, and submitted substantial evidence, that: "The arms

18    banned as 'assault weapons' under the AWCA and regulations are <u>not</u> both dangerous

19    and unusual, as the Supreme Court defined in *Heller*. To the contrary, they are common

20    in all respects: (1) they are common functionally, as they are all semiautomatic in their

21    operation; (2) they are common characteristically, as they are all commercially popular

22    types of arms with various common characteristics like pistol grips and the like; and (3)

23    they are common jurisdictionally, available in the vast majority of states. As further

24    proof, they are common numerically, in that they are owned by citizens by the hundreds

25    of thousands or more in California alone. All of the semiautomatic firearms California

26    bans in Penal Code section 30515 meet the *Heller* test and are constitutionally

27    protected." Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF 104], ¶

28    46. Further, the specific features of "assault weapons" were commonplace, and

1  important to law-abiding citizens for lawful uses, including self-defense. *Id.*, pp. 18-26,

2  ¶¶ 62-95. Plaintiffs further and expressly argued and submitted that "The Arms Banned

3  by California as 'Assault Weapons' Are Not More Lethal Than Arms That Are Not

4  Banned." *Id.*, pp. 37-40, ¶¶ 150-165. Plaintiffs also argued and submitted that "The

5  Arms Banned by California as 'Assault Weapons' Are Not Used in Most Mass

6  Shootings" *Id.*, at pp. 43-51, ¶¶ 183-224.

7       It should be noted that this secondary "dangerous and unusual" analysis was also

8  established by *Heller*, where the Court stated: "We also recognize another important

9  limitation on the right to keep and carry arms. *Miller* said, as we have explained, that

10  the sorts of weapons protected were those 'in common use at the time.' […] We think

11  that limitation is fairly supported by the historical tradition of prohibiting the carrying

12  of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citing *United States v.*

13  *Miller*, 307 U.S. 174, 179 (1939)). As Justice Alito later clarified, "this is a conjunctive

14  test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*,

15  577 U.S. at 417 (Alito, J., concurring) (emphasis original).

16       It naturally follows that the "dangerous and unusual" test is simply the corollary

17  of the common use test, both directly derived from *Heller*. For it is axiomatic that if a

18  class of firearm is established to be in common use—and overwhelmingly so—it

19  cannot, by definition, be "unusual." As Justice Alito explained in *Caetano*, under

20  *Heller*, the "relative dangerousness of a weapon is irrelevant when the weapon belongs

21  to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito,

22  J., concurring). This Court recognized the interplay when it held: "If a plaintiff

23  challenges the government's prohibition, it is on the government first to prove the

24  banned arm is dangerous and unusual, and if not that it is not commonly possessed, or

25  not commonly possessed by law-abiding citizens, or not commonly possessed for lawful

26  purposes or militia readiness. If the state cannot so prove, the challenged prohibition

27  must be struck down." *Miller*, 542 F.Supp.3d at 1029. And, this Court concluded, in the

28  context of the test established in *Heller*, that "[b]ecause the government bears the

1   burden in the first instance and has not proven they are uncommon and dangerous, these

2   arms are presumptively lawful to own." *Id.*

3        The State has already extensively litigated, and failed to meet their burden, that

4   the firearms that it classified as "assault weapons" are dangerous and unusual. That is

5   the end of the case.

6   **C.   THE STATE CANNOT MEET ITS BURDEN TO SHOW ITS REGULATIONS ARE**

7   **PART OF AN HISTORICAL TRADITION UNDER *HELLER/BRUEN*.**

8       **1.  The Second Amendment's Plain Text Unquestionably Protects Modern**

       **Arms.**

9

10        It is eminently clear that *Bruen* did not create a "new" test, but merely applied

11   the test which the Court established in 2008. *Bruen* expressly states, "*The test that we*

12   *set forth in Heller and apply today* requires courts to assess whether modern firearms

13   regulations are consistent with the Second Amendment's text and historical

14   understanding." 142 S.Ct. at 2131 (emphasis added).

15        Therefore, it is *Heller* which demands a test rooted in the Second Amendment's

16   text, as informed by relevant history. *Bruen* did not "establish" this test, but affirmed it.

17   As the Court made clear, "*Heller*'s methodology itself centered on constitutional text

18   and history. Whether it came to defining the character of the right (individual or militia

19   dependent), suggesting the outer limits of the right, or assessing the constitutionality of

20   a particular regulation, *Heller* relied upon text and history." *Bruen*, 142 S.Ct. at 2128-

21   29.

22        Here, the State cannot meet its burden that the AWCA is part of an "historical

23   tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142

24   S.Ct. at 2127. The plain text of the relevant provisions of the AWCA prohibits conduct

25   infringing on the right to keep bearable arms. And moreover, there is no appropriate

26   analogue in history that would support California's ban on keeping and bearing such

27   arms. Under *Heller*, as reaffirmed by *Bruen*, Plaintiffs must prevail.

28        To begin, the Second Amendment's plain text covers the Plaintiffs' proposed

course of conduct in seeking to acquire, keep, bear, and offer bearable arms. Plaintiffs have alleged that they seek to "engage in normal, peaceable, commonplace, and constitutionally protected conduct with normal, commonplace, constitutionally protected arms in the State of California." Plaintiffs' First Am. Complaint [ECF 9], ¶ 23. The individual Plaintiffs sought to acquire firearms bearing such features. *Id.*, ¶¶ 59 (as to plaintiff Miller), ¶¶ 64-66 (as to plaintiff Hauffen), ¶ 67 (as to plaintiff Rutherford), ¶ 68 (as to plaintiff Sevilla), ¶ 69 (as to plaintiff Peterson), ¶ 80 (as to plaintiff Phillips). Additional Plaintiffs sought to offer firearms with the features prohibited by Pen. Code § 30515(a) to the public. *Id.*, ¶¶ 69-71, 77-78 (as to plaintiff Peterson/Gunfighter Tactical), ¶ 82 (as to plaintiff Phillips), and ¶ 86 (as to plaintiff PWG). All of the Plaintiffs sought declaratory relief that the statutes in question prohibited conduct protected by the Second Amendment in that they prohibited Plaintiffs, and other law-abiding individuals from, *inter alia*, keeping, bearing, buying, selling, transferring, possessing, transporting, or passing down to heirs so-called "assault weapons" under California law. *Id.*, ¶ 87. All sought injunctive relief thereon. *Id.*, ¶¶ 88-89. All of the Plaintiffs sought their relief individually, and in a representative capacity. *Id.*, ¶ 14.

The first step is to determine whether the conduct that Plaintiffs wish to vindicate is conduct protected by the Second Amendment's plain text. The answer to this first inquiry is "yes." As *Heller* stated, and *Bruen* reinforced: "'the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Bruen*, 142 S.Ct. at 2132 (citing *Heller*, 554 U.S. at 582). Accordingly, since the conduct is covered by the Second Amendment's plain text, the State must justify its regulations as consistent with the Nation's tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2126.

But it must be noted that *Heller* has already established the relevant contours of this tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* dangerous *and* unusual. *Bruen*, 142

1    S.Ct. at 2128. And *Bruen* spelled out very clearly that this was an historical matter. See,

2    *id.* ("we found it fairly supported by the *historical tradition* of prohibiting the carrying

3    of dangerous and unusual weapons that the Second Amendment protects the possession

4    and use of weapons that are in common use at the time") (emphasis added, internal

5    quotation marks omitted). As demonstrated above, the State has already and extensively

6    litigated its "dangerous and unusual" defense at trial.

7         Reaffirming its prior findings as to common use under *Heller* is all that this Court

8    needs to do. To the extent that this Court has already considered and rejected the State's

9    dangerous-and-unusual defense, it has completed the required analytical inquiry,

10   because that very defense was necessarily an appeal to an historical tradition in the first

11   place. *Heller*, 554 U.S. at 627. There is simply no need for the Court to do anything else

12   as the analytical inquiry is complete.

13        Any further historical evidence or argument that the State wishes to submit now

14   would be irrelevant, because this Court has already found that the banned firearms are

15   in common use, for lawful purposes *today*, and *Heller* establishes that this is the relevant

16   question when banning specific types of firearms. *Bruen* is clear. For example, when it

17   discussed the State's argument as to colonial-era bans on the offense of affray (carrying

18   of firearms to "terrorize the people"), the Supreme Court in *Bruen* stated:

19             Even if respondents' reading of these colonial statutes were
20             correct, it would still do little to support restrictions on the
               public carry of handguns today. At most, respondents can
21             show that colonial legislatures sometimes prohibited the
               carrying of "dangerous and unusual weapons"—a fact we
22             already acknowledged in *Heller*. […] Drawing from this
               historical tradition, we explained there that the Second
23             Amendment protects only the carrying of weapons that are
24             those "in common use at the time," as opposed to those that
               "are highly unusual in society at large." […] Whatever the
25             likelihood that handguns were considered "dangerous and
26             unusual" during the colonial period, they are indisputably in
               "common use" for self-defense today. They are, in fact, "the
27             quintessential self-defense weapon." […] Thus, even if these
28             colonial laws prohibited the carrying of handguns because

1
2
3

> they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

4 *Bruen*, 142 S.Ct. at 2143 (citing *Heller*, 554 U.S. at 627, 629). In other words, under

5 the *Heller* analysis, history is used to establish the scope of the right. But here, *Heller*

6 has already done the historical analysis, and determined the scope of the right when it

7 comes to protected arms — those which include arms in common use, for lawful

8 purposes such as self-defense — because the only bearable arms that are not protected

9 are those that are both dangerous *and* unusual at the time the analysis is being done.

10 Therefore, any historical analysis was already "baked in" to this Court's *Heller*

11 analysis. When this Court rejected the State's defense that the firearms prohibited by

12 the AWCA are "dangerous and unusual," it necessarily dispensed with any argument

13 the State might conjure with regard to any alleged historical tradition of prohibiting

14 such firearms.

15
16

### 2. Defendants Have Already Argued to Historical Tradition – And the Record is Replete With History.

17 Beyond the dangerous-and-unusual defense, the rejection of which is already

18 dispositive of this case, it must also be emphasized that Defendants have already made

19 their appeal to historical traditions, by arguing that "The AWCA Is Presumptively

20 Constitutional Because It Is Similar to Longstanding Firing-Capacity Regulations."

21 Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law [ECF 103],

22 p. 25. Specifically, Defendants analogized the AWCA restrictions to restrictions in

23 other states from the 1920s and 1930s which had restricted the number of rounds that

24 semiautomatic firearms were capable of firing without being reloaded. *Id.*, ¶ 18.

25 Defendants also cited to a 1932 twelve-shot restriction on semiautomatic firearms in the

26 District of Columbia. *Id.*, ¶ 19. Defendants expressly argued: "In regulating firearms

27 based on their capacity for enhanced firepower, these laws provide a historical analog

28 to the AWCA." *Id.*, ¶ 21 (citing *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir.

2010) (en banc) (noting that the challenged regulation need not "mirror" the historical regulation.)

By directly arguing that these regulations represented an "historical analog," Defendants were making their own appeal to our nation's relevant history. As then-Judge Kavanaugh explained in his dissent in *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"):

> *Heller* was up-front about the role of text, history, and tradition in Second Amendment analysis—and about the absence of a role for judicial interest balancing or assessment of costs and benefits of gun regulations. Gun bans *and gun regulations that are longstanding*—or, put another way, sufficiently rooted in text, history, and tradition—are consistent with the Second Amendment individual right.

*Heller II*, 670 F.3d at 1285 (emphasis added). The analysis that *Bruen* demands is therefore one that Defendants have already argued. More importantly, as we have explained, *Heller* and *Bruen* already have established the relevant historical tradition—arms cannot be banned unless they are both dangerous and unusual.

This Court correctly rejected the Defendants' historical analogues, when it concluded that "a ban on modern rifles has no historical pedigree." *Miller*, 542 F.Supp.3d at 1024-25. This court made this finding in rejecting the Defendants' argument that the AWCA constituted a "longstanding regulation" that was presumptively lawful. And it would take a gross distortion of the law to argue that this Court's findings regarding "the lack of a historical pedigree" were somehow cabined to a now-abrogated two-step test. That is because the first of the former two-steps, itself, required a searching historical inquiry. As articulated by the Ninth Circuit, the first of the two steps required courts to base that first determination "on the 'historical understanding of the scope of the right,'" and in particular, "whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood." *Young*, 992 F.3d at 783 (citing *Heller*, 554 U.S. at 625). "Laws restricting conduct that can be traced to the founding

1   era and are historically understood to fall outside of the Second Amendment's scope

2   may be upheld without further analysis." *Id*.

3   As the Court stated in *Bruen*, the former two-step test was "one step too many,"

4   and elaborated that "[s]tep one of the predominant framework is broadly consistent with

5   *Heller*, which demands a test rooted in the Second Amendment's text, as informed by

6   history." 142 S.Ct. at 2127. Therefore, that Defendants' arguments were made in the

7   context of a now-abrogated two-step test, did not render the entirety of their arguments

8   insignificant. Indeed, because they were made in connection with the *first* of the former

9   two steps, they were appropriately made, submitted, and ultimately rejected.

10   Finally, even beyond an examination of the history of the regulation itself, or the

11   20th century analogues which Defendants offered, we will note that the record is replete

12   with historical evidence upon which this Court can rely to justify its decision. First,

13   Plaintiffs presented testimony from firearms historian Ashley Hlebinsky, who testified

14   as to the history of the firearm features prohibited by section § 30515(a), and more

15   particularly, whether those features had historically been banned or were previously

16   considered "dangerous and unusual" features. Plaintiffs demonstrated that the

17   prohibited characteristics are not unique as all firearm characteristics are derived from

18   military functions, going back to the earliest firearms known. (Decl. of Ashley

19   Hlebinsky, Plaintiffs' Trial Exh. 002, ¶ 7). It has long been common for weapons used

20   in war to be sold on the civilian market both during and after wars' end, going back to

21   the Civil War. (*Id.*, ¶ 9). Plaintiffs showed that historically, firearm technological

22   advancements would also first form in the civilian market and then be adopted by the

23   military. (Hlebinsky Deposition, at 53:14-25, 62:15-64:19; see also Hlebinsky Decl.,

24   Plaintiffs' Trial Exh. 002, ¶¶ 7-8 ("Often the technology advanced too quickly and

25   would go beyond common battlefield use, finding popularity in the civilian population.

26   Military firearms in a general sense were limited by tactics and government bureaucracy

27   while civilian arms until recently were predominantly limited by individual budget.

28   Additionally, civilian arms could be applied in a far greater variety of uses (*e.g.*,

1  hunting, self-defense, sport.")).

2       Both Ms. Hlebinsky and Plaintiffs' expert General Allen Youngman testified to

3  the features utilized in the AR-15 firearm, what purposes they serve, and in Gen.

4  Youngman's case, why the AR-15 firearm in particular is particularly well-suited for

5  use in a militia, taking into account the historical role of the militia. (Hlebinsky Decl.,

6  Plaintiffs' Trial Exh. 002; Decl. Allen Youngman, Plaintiff's Trial Exh. 009, ¶¶ 13-14).

7       Plaintiffs also presented an exhaustive legal historical analysis which analyzed

8  whether semi-automatic firearms characterized as "assault weapons" had historically

9  been banned in 50 states and the District of Columbia. This jurisdictional analysis

10  showed that law-abiding citizens may possess any semiautomatic rifle in 44 states, and

11  may possess some semiautomatic rifles in all 50 states. (Mocsary Decl., Plaintiffs' Trial

12  Exh. 003, at ¶ 44). Further, semiautomatic firearms may be possessed by citizens in all

13  fifty states. Forty-one states treat all semiautomatic firearms the same as every other

14  legal firearm, without any additional restrictions, regardless of the features attached to

15  the firearm. *Id*. Moreover, Plaintiffs' historical evidence highlights the fact that of the

16  few laws restricting or banning semi-automatic firearms characterized as "assault

17  weapons," these laws are entirely regulated to the very end of the 20th century,

18  beginning with California's assault weapons ban enacted in 1989—a far cry from any

19  founding-era regulation.

20       In any case, the record amply supported Plaintiffs' historical legal arguments—

21  which are matters of law. Therefore, the only thing remaining for this Court to do is to

22  apply the principles established by *Heller*, and to reiterate its finding that the category

23  of firearms prohibited by the AWCA are in common use. It follows from that finding

24  that the category of firearms prohibited by the AWCA are not both dangerous and

25  unusual weapons and that the AWCA therefore has no historical pedigree. This finding

26  mandates judgment in Plaintiffs' favor.

27  //

28  //

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.    CONCLUSION

The Ninth Circuit's order remanding this case did so "for further proceedings consistent with" *Bruen*. *Bruen* vindicates this Court's application of the "*Heller* test" and mandates judgment for Plaintiffs. This Court's prior findings were—and clearly show why the relief Plaintiffs seek is—consistent with the requirements under *Bruen* and *Heller*. The State cannot offer any further relevant historical evidence because there is none. This Court has all of the evidence it requires to decide this case. And indeed, no amount of analogizing can save the Defendants from the ultimate conclusion under *Bruen* in this case.

The Second Amendment's text covers the conduct the Plaintiffs wish to engage in. The arms Plaintiffs wish to acquire, possess, and use are not dangerous and unusual as they are categorically semiautomatic "weapons that are unquestionably in common use today." And there is no analogous history supportive of the State's AWCA. This Court should therefore enter judgment for the Plaintiffs and enjoin the enforcement of the AWCA without further delays (or stays) so that the Plaintiffs and other law-abiding individuals like them may finally exercise their fundamental right to keep and bear arms that clearly fall within the "the Second Amendment's unqualified command."

August 29, 2022                    **SEILER EPSTEIN LLP**


                                   /s/ George M. Lee
                                   George M. Lee

                                   *Attorneys for Plaintiffs*


                                   **DILLON LAW GROUP APC**


                                   /s/ John W. Dillon
                                   John W. Dillon

                                   *Attorneys for Plaintiffs*