George M. Lee (SBN 172982)
gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

JAMES MILLER, an individual, et al.,

Plaintiffs,

vs.

ROB BONTA, in his official capacity as Attorney General of California, et al.,

Defendants.

Case No. 3:19-cv-01537-BEN-JLB

**PLAINTIFFS' ADDITIONAL BRIEF RE *NEW YORK STATE RIFLE & PISTOL ASS'N V. BRUEN* [ECF 131]**

Hon. Roger T. Benitez

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................ 1

II. *BRUEN*'S REITERATION OF THE *HELLER* STANDARD AND BURDEN OF PROOF............ 1

III. PLAINTIFFS MUST PREVAIL UNDER *HELLER* AND NOW *BRUEN*.................................. 1

A. *BRUEN* COUPLED WITH THIS COURT'S PRIOR, UNDISTURBED FINDINGS MANDATE JUDGMENT IN PLAINTIFFS' FAVOR................................................. 1

IV. EVEN IF THE HISTORICAL WERE AN OPEN ONE, THE STATE COULD NOT MEET ITS BURDEN UNDER *BRUEN*.......................................................... 3

A. THE PLAIN TEXT OF THE SECOND AMENDMENT PROTECTS MODERN ARMS. .................................................................................. 3

B. THE RELEVANT HISTORY IS OF THE FOUNDING ERA. ........................................ 4

C. THE ASSAULT WEAPONS PROHIBITION CANNOT BE JUSTIFIED BY REFERENCE TO HISTORY........................................................................ 6

V. CONCLUSION.......................................................................................... 10

TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... *passim*

*Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960 (2019)............................... 4, 5

*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ................ 6

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) .................................................... 1

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................... 5

*Miller v. Bonta*, 542 F. Supp.3d 1009 (S.D. Cal. 2021) ........................................... 2, 7

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................................................ 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (Jun. 23, 2022)................................................ *passim*

*Staples v. United States*, 511 U.S. 600 (1994)............................................................. 7

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) .................................................................... 5

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ............................................... 10

*Virginia v. Moore*, 553 U.S. 164 (2008)....................................................................... 5

**Constitutional Provisions**

U.S. Const., Amend. II ............................................................................................. *passim*

U.S. Const., Amend. IV ................................................................................................ 5

U.S. Const., Amend. XIV ........................................................................................... 4, 5

**Statutes**

Cal. Pen. Code § 30515 ......................................................................................... 7, 8, 9

**Other Authorities**

Bruce-Briggs, Barry, *The Great American Gun War*, 45 PUB. INTEREST. 37 (1976).... 6

DiMaio, Vincent J.M., *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* (3d ed. 2016) ........................................................ 7

## I. INTRODUCTION

Pursuant to this Court's Minute Order of August 29, 2022 [ECF 131], Plaintiffs James Miller, *et al*. ("Plaintiffs") hereby submit this additional brief addressing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (Jun. 23, 2022) ("*Bruen*"). This brief is additive to, and supplements, Plaintiffs' prior submission of August 29, 2022 [ECF 130].

## II. *BRUEN*'S REITERATION OF THE *HELLER* STANDARD AND BURDEN OF PROOF

Throughout, Plaintiffs have always contended that the State has had the burden to justify the firearm prohibition at issue under *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Bruen* has made this explicitly clear, holding:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S.Ct. at 2126, 2129 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)); *see also*, *Bruen*, 142 S.Ct. at 2129-2130 ("We *reiterate* ... the standard for applying the Second Amendment …") (emphasis added). As shown below and throughout, the State has not, and cannot, meet its burden.

## III. PLAINTIFFS MUST PREVAIL UNDER *HELLER* AND NOW *BRUEN*

### A. *BRUEN* COUPLED WITH THIS COURT'S PRIOR, UNDISTURBED FINDINGS MANDATE JUDGMENT IN PLAINTIFFS' FAVOR.

Judgment should be entered for Plaintiffs under *Bruen* and this Court's undisturbed findings in this litigation. First, *Bruen* clarified that this Court got it right

when identifying the "*Heller* test" in its prior judgment. *Miller v. Bonta*, 542 F. Supp.3d 1009, 1021 (S.D. Cal. 2021). *See, Bruen*, 142 S. Ct. at 2143. Under the *Heller* test, the only types of bearable arms that the government can ban are those that are dangerous and unusual weapons. It follows from this that arms that are in common use for lawful purposes cannot be banned. In other words, "*Heller* draws a distinction between firearms commonly owned for lawful purposes and unusual arms adapted to unlawful uses as well as arms solely useful for military purposes." *Miller*, 542 F. Supp.3d at 1021.

The *Heller* test fits plainly into *Bruen*'s doctrinal prescription for Second Amendment analysis. At the outset is the question whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2126. And as a textual matter, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id*., at 2132. The inquiry thus proceeds to the historical analysis, which puts the burden on the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*., at 2126. And *Heller* already has done the relevant historical analysis to determine what types of bearable arms fall outside the Second Amendment's "unqualified command": those that are "dangerous and unusual" at the time of the analysis, a category that necessarily excludes firearms that are "in 'common use' for self-defense today." *Id*., at 2126, 2143.

The question in this case, then, is whether the arms California bans are in common use for lawful purposes and therefore not dangerous and unusual. And the Court has already answered that question in the affirmative: "the *Heller* test asks: is a modern rifle commonly owned by law-abiding citizens for a lawful purpose? For the AR-15 type rifle the answer is 'yes.'" *Miller*, 542 F. Supp.3d at 1021; *See also*, Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF 104], pp. 13-18 ¶¶ 44-61 (under heading: "Arms Banned by California as 'Assault Weapons' are Common and Constitutionally Protected."). "Under the *Heller* test"—as confirmed by

*Bruen*—"judicial review can end right here." *Id*. Judgment should be entered for Plaintiffs.

## IV. Even if the Historical Were an Open One, the State Could Not Meet Its Burden Under *Bruen*.

### A. The Plain Text of the Second Amendment Protects Modern Arms.

As explained above, because the plain text of the Second Amendment presumptively covers all bearable arms, and because the arms California bans are in common use, that is the end of the matter. The State simply cannot justify its ban under the Second Amendment's text and this Nation's history as construed by *Heller* and *Bruen*. For example, even if the State were able to point to laws that in the past banned firearms like those at issue here, that would not change the fact that those firearms are in common use *today*. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF 104], pp. 12, ¶ 31 (citing Curcuruto Decl., Plaintiffs' Exh. 004, ¶ 7-14; Exs. 004-1 to 004-8); *Id*., at pp. 12-13, ¶ 34 (citing Mocsary Decl., Plaintiffs' Exh. 003, at ¶ 44). It does not matter whether they were viewed differently at some point in the past. *See, Bruen*, 142 S.Ct. at 2143 (discounting relevance of colonial laws because "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today"). *Heller* and *Bruen* have decided the underlying historical principle: only dangerous and unusual arms can be banned. What is called for here is applying that historical principle to the facts on the ground today, and the Court has already done that. There is no need for any further historical analysis. Any attempt by the State to engage in such analysis would be in effect "ask[ing] . . . to repudiate the [Supreme] Court's historical analysis," which this Court "can't do." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

In any event, even if the question of what types of arms may be banned were an open one, California could not historically support the ban at issue here.

### B. The Relevant History is of the Founding Era.

To prevail under an historical tradition analysis under *Bruen*, the State has the burden of justifying its regulation by offering appropriate historical analogues from the relevant time period, *i.e*., the founding era. "Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Bruen*, 142 S.Ct. at 2132.

In *Bruen*, the Court noted that the respondents had offered historical evidence in their attempt to justify their prohibitions on the carrying of firearms in public. Specifically, the respondents had offered four categories of historical sources: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." 142 S.Ct at 2135-36. However, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id*., at 2136 (citing *Heller*, 554 U.S. at 634-35 (emphasis original). And thus, the Court cautioned against "giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citing *Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

Further, in examining the relevant history that was offered, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614).

*Bruen* made note of an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the

Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.,* at 2137 (citations omitted). Perhaps the Court was signaling that parties in future cases should address the issue for the Court, but it was certainly not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve." *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment). And while the Court in *Heller* itself had reviewed materials published *after* adoption of the Bill of Rights, it did so to shed light on the public understanding in 1791 of the right codified by the Second Amendment, and only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions. "The 19th-century treatises were treated as mere confirmation of what the Court had already been established." *Bruen*, 142 S.Ct. at 2137 (citing *Gamble*, 139 S.Ct. at 1976).

Therefore, under binding Supreme Court precedent, 1791 must be the controlling time for the constitutional meaning of Bill of Rights provisions incorporated against the States by the Fourteenth Amendment because, as in *Heller*, the Court has looked to 1791 when construing the Bill of Rights against the federal government and, as in *McDonald*, the Court has established that incorporated Bill of Rights provisions mean the same thing when applied to the States as when applied to the federal government. *See, McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010). *Bruen* did not disturb these precedents, and they are therefore binding on lower courts. *See, State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

This dispute aside, *Bruen* did make clear that 20th-century historical evidence was not even considered. *Id.*, at 2154, n.28 ("We will not address any of the 20th-

century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Therefore, *Bruen* makes clear that at least that some things *cannot* be appropriate historical analogues: 20th-century restrictions, laws that are rooted in racism,[1] laws that have been subsequently overturned (such as total handgun bans), and as noted, laws that are *clearly inconsistent* with the original meaning of the constitutional text. *Bruen*, 142 S.Ct at 2137 ("post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.") (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). These sources of evidence must be disregarded.

### C. THE ASSAULT WEAPONS PROHIBITION CANNOT BE JUSTIFIED BY REFERENCE TO HISTORY.

As explained, the "dangerous and unusual" test controls, and the State cannot meet it. But even apart from that test, the State cannot support its ban.

First, the State cannot appeal to the alleged longevity of its own ban to support that very prohibition at issue. California's modern features-ban originated with the passage of SB 23 in 1999.[2] In relative terms, this law is new,[3] and is so far removed from the founding era to be irrelevant under *Bruen*, and not a "longstanding

---

[1] Such as "Saturday night special" bans. *See,* Barry Bruce-Briggs, *The Great American Gun War*, 45 PUB. INTEREST. 37, 50 (1976) ("It is difficult to escape the conclusion that the 'Saturday night special' is emphasized because it is cheap and is being sold to a particular class of people.")

[2] Before that, a federal features-based regulation did not occur until 1994, in the Public Safety and Recreational Firearms Use Protection Act (the "Federal Assault Weapons Ban") (103rd Congress (1993-1994)), a subsection of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322), which was allowed to sunset 10 years later due to its lack of effect on crime. See Decl. of John Lott, Plaintiffs' Trial Ex. 010, ¶ 8.

[3] *Heller* itself struck down a handgun ban that had existed in the District of Columbia for over thirty years.

prohibition" of the kind discussed, or even contemplated, in *Heller*. Indeed, this Court has already rejected the State's historical analogues, when it concluded that "a ban on modern rifles has no historical pedigree." *Miller*, 542 F. Supp.3d at 1024-25.

Here the State will have an extremely difficult time showing that a prohibition on "assault weapons" has a relevant historical analogue from the founding era, because the entire term "assault weapon" is wholly a 20th century term to begin with. The term "assault weapon" is simply the derivation of "assault rifle," which is purely a 20th century term. As Dr. Vincent DiMaio observed in his treatise on ballistics and gunshot wounds: "The term 'assault rifle' refers to an autoloading rifle having a large-capacity (20 rounds or more) detachable magazine, capable of full-automatic fire and having an intermediate rifle cartridge." (DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques*, Defense Exhibit DA, at p. 169; *see also*, Depo. of Dr. Robert Margulies, at p. 18:17-25.) Dr. DiMaio's work correctly noted that "[t]he first true assault (*Storm*) rifle was the Sturmgewehr 44 (StG 44)," which was developed between the World Wars by the German Army, and first saw action during World War II. (*Id*., p. 170).

And the historical distinction between fully automatic firearms (or "select fire" weapons as the term was presented at trial) and semiautomatic firearms (which is the primary feature under California's definition of "assault weapon," Pen. Code § 30515(a)), has already been noted. *Staples v. United States*, 511 U.S. 600, 603 (1994). Firearms that fall outside of certain categories, including machine guns, "traditionally have been widely accepted as lawful possessions[.]" *Id.*, at 612. Thus, the State here cannot seek to simply conflate these two categories, and it would be foreclosed from arguing that ordinary semiautomatic firearms, classified as "assault weapons" by the State's reference to commonplace features, somehow transforms them into firearms *akin to* fully automatic weapons from an historical perspective.

And therefore, the wholly modern term "assault weapon" is obviously an attempt to create a firearm category from the term "assault rifle." But as historian Ashley Hlebinsky testified at her deposition, the term "assault weapon" has less of a

technical meaning, and is more of a "legislative catchall term" used to describe the "largely cosmetic features" found on modern semi-automatic firearms. (Hlebinsky Depo. at 21:7 - 22:1). Those features were first referenced in the 1994 federal Assault Weapons Ban, which focused on those features, and not the semi-automatic action of the firearm itself. (*Id.*, and at 22:17 - 23:10). It should be noted that repeating firearms themselves have long existed before semi-automatic technology was developed. (*Id.*, at 32:9:13; 33:14 - 34:3.) The first rifle accredited to be a semi-automatic action was the Mannlicher rifle, developed in the early 1890s. (*Id.*, at 34:12-17). Attached hereto as **Exhibit 1** is a true and correct copy of the deposition transcript of historian Ashley Hlebinsky, taken on January 7, 2021.

Thus, assault weapons bans are not longstanding prohibitions. California was the first state to implement such a feature-based firearms ban in 1999. The only federal regulation on semiautomatic firearms having characteristics at issue here did not occur until 1994 in the Public Safety and Recreational Firearms Use Protection Act (the "Federal Assault Weapons Ban") (103rd Congress (1993-1994)), a subsection of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322), which was allowed to sunset 10 years later due to its lack of effect on crime. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF 104], p. 13, ¶ 36 (citing Lott Decl., Plaintiffs' Exhibit 010, ¶ 8).

Indeed, as shown at trial, the specific features that were specifically prohibited by Pen. Code section 30515 were in existence long before the California legislature attempted to prohibit them in 1999. As Ms. Hlebinsky has noted and expounded upon at length, "several features listed in Penal Code [section] 30515 date back just about as long as some of these early firearms and firearms technology in some form or another, predating even semi-automatic technology." (Decl. of Ashley Hlebinsky, Plaintiffs' Trial Ex. 002, at 5:15-18). For example, a magazine has been an essential part of firearms technology since at least the 1600s (*Id.*, ¶ 12), and box magazines (including detachable magazines) date to the late 19th and early 20th centuries. (*Id.*, ¶ 13). The first firearm with a "detachable magazine," as we know it today, existed in

semiautomatic firearms since the early 1890s. (Hlebinsky Depo. at 38:3-15). Detachable magazines in other contexts date back to the 1860s. (Id., at 40:15-21).

Pistol grips (prohibited by Pen. Code ¶ 30515(a)(1)(A)) appear on long arms dating to at least the 1700s. (Hlebinsky Decl., Plaintiffs' Trial Ex. 002, at ¶ 17). A forward grip can be found on a rifle from the 1860s. (*Id*., ¶ 18). And flash suppressors, prohibited by Pen. Code section 30515(a)(1)(E), have appeared on firearms since the early 20th century, and specifically on AR platform rifles since they were invented in the 1950s. (*Id*., ¶ 23).

Quite simply, there is no constitutionally relevant difference between a semi-automatic handgun, shotgun, and rifle—regardless of the features attached. While some exterior physical attributes may differ—wood vs. metal stocks, the number and/or location of grips, having a bare muzzle vs. having a muzzle device, different barrel lengths, etc.—they are, in all relevant respects, the same. Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature. They are all common firearms that have the same cyclical rate of fire, firing one round for every pull of the trigger until ammunition is exhausted. The fact that the AWCA may act to ban thousands of discrete configurations of common semiautomatic pistols, shotguns, and rifles held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller*. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF 104], pp. 12, ¶ 31 (citing Mocsary Decl., Plaintiffs' Exh. 003, ¶¶ 47-52).

By now, this Court well understands the point: the State's ban on firearm features finds no relevant analogue in the founding era, or otherwise. Repeating firearms themselves have existed from the founding era on, and the State has pointed to no evidence indicating that the Founders would have understood banning such firearms to be consistent with the right to keep and bear arms.

The State has already offered 20th-century analogues, when it analogized the AWCA restrictions to restrictions in other states from the 1920s and 1930s, which had

restricted the number of rounds that semiautomatic firearms were capable of firing without being reloaded. (Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law [ECF 103], ¶ 18). The State also cited to a 1932 twelve-shot restriction on semiautomatic firearms in the District of Columbia. (*Id*., ¶ 19). The State expressly argued: "In regulating firearms based on their capacity for enhanced firepower, these laws provide a historical analog to the AWCA." (Id., ¶ 21 (citing *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) (noting that the challenged regulation need not "mirror" the historical regulation.))

But as demonstrated, 20th-century analogues are not relevant, as they provide no insight into our understanding of the scope of the Second Amendment right at the time it was adopted in 1791. *Bruen*, 142 S.Ct. at 2136. Thus, any argument (or reargument) by the State to these "firing capacity restrictions" of the 1920s and 1930s, as applied to magazine capacity, would be irrelevant, and this Court has already rejected the argument.

Finally, as shown, Plaintiffs presented a jurisdictional analysis, which showed that law-abiding citizens may possess any semiautomatic rifle in 44 states, and may possess some semiautomatic rifles in all 50 states. (Mocsary Decl., Plaintiffs' Trial Exh. 003, at ¶ 44). Further, semiautomatic firearms may be possessed by citizens in all fifty states. Forty-one states treat all semiautomatic firearms the same as every other legal firearm, without any additional restrictions, regardless of the features attached to the firearm. *Id.* This further historical evidence showed that nationally, the few laws restricting or banning semi-automatic firearms characterized as "assault weapons," were regulated to the very end of the 20th century, which is far removed from any relevant founding-era regulation.

## V. CONCLUSION

The record shows that Plaintiffs must prevail under *Heller* and *Bruen*, and the State has not and cannot justify its assault weapons ban by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

October 13, 2022

**SEILER EPSTEIN LLP**

/s/ George M. Lee
George M. Lee

**Dillon Law Group, APC**

/s/ John W. Dillon
John W. Dillon

*Attorneys for Plaintiffs*