1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and*
   *Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                       CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................. 1

Background ............................................................................................. 6

    I.    Statutory Overview of the Assault Weapons Control Act ................. 6

    II.   Procedural History ............................................................................ 11

Argument .............................................................................................. 13

    I.    Overview of *Bruen's* Text-and-History Standard for Analyzing
        Second Amendment Claims ................................................................ 13

    II.   The AWCA Satisfies the Text-and-History Standard ....................... 19

        A.    Plaintiffs Cannot Establish that the AWCA Burdens
            Conduct Protected by the Plain Text of the Second
            Amendment ............................................................................ 20

            1.    The Combat-Oriented Accessories and
                Configurations of Semiautomatic Centerfire Rifles
                Regulated by the AWCA Are Not "Arms"
                Protected by the Second Amendment ........................... 23

            2.    Firearms that Feature the Accessories and
                Configurations Prohibited under the AWCA Are
                Not in Common Use for Self-Defense ........................... 25

                a.    The Second Amendment Protects Only
                    Those Firearms that are Commonly Used for
                    Self-Defense ........................................................ 26

                b.    Firearms Featuring the Regulated
                      Accessories and Configurations Are Not
                    Commonly Owned ................................................ 29

                c.    Firearms Featuring the Regulated
                        Accessories and Configurations Are Not
                    Suitable for Self-Defense ..................................... 32

                d.    There Is No Evidence that Firearms
                      Featuring the Regulated Accessories or
                    Configurations Are Commonly Used or
                  Needed for Self-Defense ...................................... 39

        B.    The AWCA's Restrictions on Assault Weapons Are
             Consistent with the Nation's Traditions of Firearms and
             Other Weapons Regulations .................................................. 41

            1.    The Second Amendment Does Not Limit the
                  States' Police Powers to Address Public Safety
                  Threats as They Arise .................................................. 42

            2.    Historical Regulations of Dangerous or Unusual
                  Weapons Are Ubiquitous in American History,
                  Including the Relevant Periods Surrounding the
                  Ratification of the Second and Fourteenth
                  Amendments ................................................................ 43

i

**TABLE OF CONTENTS**
(continued)

Page

a.   Defendants Need Only Show that the AWCA Is "Relevantly Similar" to the Historical Tradition of Regulating Dangerous or Unusual Weapons ................................................ 43

b.   Medieval and Pre-Founding English History ...... 50

c.   Colonial and Early National History:  Laws Enacted Around the Time of the Ratification of the Second Amendment .................................... 52

d.   Antebellum and Postbellum History:  Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment ............................ 56

e.   Twentieth Century History .................................. 63

3.   The Historical Firearm Restrictions Are Relevantly Similar to the AWCA ................................................ 66

a.   Comparable Burden ............................................ 66

b.   Comparable Justification .................................... 69

III.   Defendants Object to the Expedited Briefing Schedule of the Instant Remand Proceedings ................................................ 73

Conclusion ......................................................................................... 77

# TABLE OF AUTHORITIES

**Page**

CASES

*Andrews v. State*
    50 Tenn. 165 (1871) ................................................................. 58, 59

*Aymette v. State*
    21 Tenn. 154 (1840) ................................................................. 57, 58

*Buckingham v. United States*
    998 F.2d 735 (9th Cir. 1993) ............................................................ 75

*Burdick v. Takushi*
    504 U.S. 428 (1992) ...................................................................... 22

*Caetano v. Massachusetts*
    577 U.S. 411 (2016) ................................................................. 15, 28

*Clark v. Cmty. for Creative Non-Violence*
    468 U.S. 288 (1984) ...................................................................... 21

*Commodity Futures Trading Comm'n v. Bd. Of Trade of City of Chi.*
    657 F.2d 124 (7th Cir. 1981) ............................................................ 75

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ................................................................. *passim*

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021) ....................................................... *passim*

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) ............................................................ 63

*Fouts v. Bonta*
    561 F. Supp. 3d 941 (S.D. Cal. 2021) ................................................. 74

*Friedman v. City of Highland Park*
    68 F. Supp. 3d 895 (N.D. Ill. 2014) ................................................... 32

*Friedman v. City of Highland Park*
    784 F.3d 406 (7th Cir. 2015) ............................................. 38, 44, 67, 73

iii

1
2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3
4
*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) ................................................. 24

5
6
*Greene v. Solano Cnty. Jail*
  513 F.3d 982 (9th Cir. 2008) ................................................. 75

7
8
*Heller v. District of Columbia*
  670 F.3d 1244 (D.C. Cir. 2011) ........................................... 35

9
10
*Hertz v. Bennett*
  294 Ga. 62 (2013) ................................................................. 59

11
*Jackson v. City & Cnty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014) ................................................. 14

12
13
*Kasler v. Locker*
  23 Cal. 4th 472 (2000) ............................................................ 7

14
15
*Kennedy v. Bremerton Sch. Dist.*
  142 S. Ct. 2407 (2021) .......................................................... 22

16
17
*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) ........................................*passim*

18
19
*Konigsberg v. State Bar of Cal.*
  366 U.S. 36 (1961) ................................................................ 42

20
21
*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ......................................................*passim*

22
*Miller v. Bonta*
  542 F. Supp. 3d 1009 (S.D. Cal. 2021) ...........................*passim*

23
24
*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
  No. 22-cv-501-BLF, __ F. Supp. 3d __ (N.D. Cal. Aug. 3, 2022) .............21, 65

25
26
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
  142 S. Ct. 2111 (2022) ..................................................*passim*

27
28
*Norse v. City of Santa Cruz*
  629 F.3d 966 (9th Cir. 2010) ................................................. 75

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Nunn v. State*
    1 Ga. 243 (1846) ...........................................................................................59

*Peruta v. Cnty. of San Diego*
    824 F.3d 919 (9th Cir. 2016) ................................................................51, 52

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*
    662 F.2d 641 (9th Cir. 1981) ..........................................................75, 77

*Portsmouth Square Inc. v. S'holders Protective Comm.*
    770 F.2d 866 (9th Cir. 1985) ................................................................75

*Rupp v. Becerra*
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ....................................36, 37, 66

*Silveira v. Lockyer*
    312 F.3d 1052 (9th Cir. 2002) ..............................................................6, 7

*Staples v. United States*
    511 U.S. 600 (1994) ..............................................................................35

*State v. Reid*
    1 Ala. 612 (1840) ..................................................................................60

*State v. Wilburn*
    66 Tenn. 57 (1872) ..........................................................................58, 59

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018) ..................................................23, 24, 25

*United States v. Hasson*
    No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) ...........24

*United States v. Miller*
    307 U.S. 174 (1939) ........................................................34, 37, 38, 39

*Wilson v. State*
    33 Ark. 557 (1878) ................................................................................58

*Worman v. Healey*
    922 F.3d 26 (1st Cir. 2019) ............................................................27, 66

v

1

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Young v. Hawaii*
    992 F.3d 765 (9th Cir. 2021) ............................................................... 51

*Zablocki v. Redhail*
    434 U.S. 374 (1978) ......................................................................... 22

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    First Amendment ................................................................*passim*
    Second Amendment................................................................*passim*
    Fourteenth Amendment ........................................................*passim*

Idaho Constitution of 1896 ....................................................... 60

Utah Constitution of 1896 .......................................................... 60

**STATUTES**

United States Code
    Title 18 § 921(a)(25) ............................................................... 10
    Title 26 § 5841....................................................................... 27

Assault Weapons Control Act ......................................................*passim*

Defendants' Supplemental Brief in Response to Court Order of August 29, 2022
(3:19-cv-01537-BEN-JLB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Penal Code

§ 12276.5(a)(1)–(2) ........................................................... 7
§ 30505(a) ......................................................................... 6
§ 30510 ................................................................. 6, 11, 23
§ 30515 ............................................................................. 23
§ 30515(a) ................................................................. *passim*
§ 30515(a)(1)–(8) ............................................................ 11
§ 30515(a)(1)-(2) .............................................................. 9
§ 30515(a)(3) ............................................................... 9, 23
§ 30515(a)(4)-(5) ............................................................ 10
§ 30515(a)(6)-(7) ............................................................ 10
§ 30515(a)(8) .................................................................. 10
§ 30515(a)(9)–(11) .......................................................... 11
§ 30515(b) ........................................................................ 8
§ 30900(a)(1) .................................................................... 6
§ 30900(a)(2) .................................................................... 8
§ 32310 ............................................................................. 8

California Stat.

Chapter 29 ....................................................................... 11
Chapter 129 ....................................................................... 8
Chapter 129, § 3 ................................................................ 8
Chapter 129, § 3.5 ............................................................. 8
Chapter 793 ....................................................................... 7
Chapter 938 ..................................................................... 65

1804 Ind. Acts 108 ......................................................... 56

1905 Ind. Acts 677 ......................................................... 57

1798 Ky. Acts 106 ..................................................... 55, 56

1750 Mass. Acts 544, chap. 17, § 1 .............................. 55, 56

1799 Miss. Laws 113 ....................................................... 55

1804 Miss. Laws 90, § 4 ................................................. 56

National Firearm Act of 1934 ........................... 5, 27, 46, 65

vii

# TABLE OF AUTHORITIES
### (continued)

**Page**

**REGULATIONS**

California Code of Regulations, Title 11
 § 5471(ii) ................................................................. 10
 § 5471(x) .................................................................... 9
 § 5471(11) .................................................................. 9
 § 5471(jj) ................................................................. 10
 § 5471(*ll*) .................................................................. 9
 § 5471(nn) ................................................................. 9
 § 5471(oo) ................................................................. 9
 § 5471(r) ................................................................... 9
 § 5471(rr) ................................................................. 10
 § 5471(t) ................................................................... 9
 § 5471(z) ............................................................... 9, 10
 § 5499 ...................................................................... 7

**COURT RULES**

Federal Rules of Civil Procedure
 Rule 26(d)(4) ............................................................ 75
 Rule 65(a)(2) ............................................................ 11

**OTHER AUTHORITIES**

Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*,
 The Trace, Mar. 24, 2022 ................................................ 36

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the
 Evil Consequences Thereof, reprinted in Cumberland Gazette
 (Portland, Mass.), Nov. 17, 1786 ...................................... 55

ATF, Firearms Commerce in the United States, Annual Statistical
 Update 2021 (2021) ..................................................... 27

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and
 Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ...................... 44, 45

**TABLE OF AUTHORITIES**
(continued)

Page

Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide (2022)*, Gun Digest, June 10, 2022 .......................................... 28

Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022 ................................. 28

Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022) ............................................................................... 40

John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ........................... 49, 50

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 181 (2021) .......................................... 72, 73

Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021 ...................... 33

M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168 (2009) ........................... 45

Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022) ............................................................................... 71

Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) ................................... 65

United States Army, *Rifle Marksmanship M16/M4 - Series Weapons* (2008) ............................................................................... 36

ix

**INTRODUCTION**

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), fundamentally altered the legal standard for evaluating Second Amendment challenges to firearms regulations.  Instead of the two-step framework that the Ninth Circuit and most other federal courts of appeals had adopted for resolving those claims, *Bruen* held that courts must apply a standard "rooted in the Second Amendment's text, as informed by history."  *Id.* at 2127.  Under this new "text-and-history" standard, courts must determine whether "the Second Amendment's plain text" protects the conduct in which the plaintiff wishes to engage, and if it does, then decide whether the regulation "is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.  But, at the same time, the Court also made clear that the Second Amendment is not a "regulatory straightjacket."  *Id.* at 2133.  It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring), and "experiment[ing] with reasonable firearms regulations" to address threats to the public.  *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).

Under the Court's text-and-history standard, and consistent with the Supreme Court's Second Amendment precedents, California's Assault Weapons Control Act ("AWCA") is a permissible exercise of the State's police powers that fully comports with the Second Amendment's text and history.[1]  The Court should uphold the challenged provisions of the AWCA.

---

[1] In support of the AWCA's constitutionality, Defendants rely on evidence in the existing trial record as well as the testimony presented in the additional declarations filed herewith:  the Supplemental Declaration of Lucy P. Allen ("Suppl. Allen Decl."); the Declaration of Ryan Busse ("Busse Decl."); the Declaration of Saul Cornell ("Cornell Decl."); the Supplemental Declaration of John J. Donohue ("Suppl. Donohue Decl."); the Supplemental Declaration of Louis Klarevas ("Suppl. Klarevas Decl."); the Declaration of Brennan Rivas ("Rivas Decl."); the Declaration of Randolph Roth ("Roth Decl."); the Declaration of Robert Spitzer ("Spitzer Decl."); and the Declaration of Michael Vorenberg

**First**, under *Bruen*'s text-and-history standard, the party challenging a law or regulation under the Second Amendment must first demonstrate that the "Second Amendment's plain text covers [that] individual's conduct," *Bruen*, 142 S. Ct. at 2126—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" protected "Arms" for self-defense, U.S. Const. amend. II. The Constitution "presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. Here, however, Plaintiffs cannot show that the plain text of the Second Amendment covers their proposed conduct of possessing and carrying weapons that qualify as "assault weapons" under the AWCA. The AWCA does not prohibit anyone from "keep[ing]" or "bear[ing]" any "Arm[]." Instead, it merely regulates the use of certain *accessories* that can be attached to a semiautomatic centerfire rifle, such as an AR-platform rifle[2] (*i.e.*, a flash suppressor or telescoping stock affixed to a semiautomatic centerfire rifle) or a particular *configuration* of a firearm (namely, a semiautomatic centerfire rifle that is less than 30 inches in length). None of the regulated accessories are "Arms," nor are they integral to the functioning of any firearm; and semiautomatic centerfire rifles longer than 30 inches are plainly operable.

Plaintiffs' challenge fails as a textual matter for another reason: there is no evidence that firearms with any of the accessories or configurations regulated under ("Vorenberg Decl."). Defendants incorporate by reference herein the contents of those declarations.

[2] The AR-15 is a rifle originally developed by Armalite in the 1950s as a select-fire weapon, meaning that it could fire automatically or semiautomatically by operation of a selector switch. Pls.' Trial Ex. 1 (Kapelsohn Decl.) ¶ 18; Pls.' Trial Ex. 4 (Curcuruto Decl.) ¶ 7 n.1. The AR-15 was used by the military during the Vietnam War as the M-16, and was later introduced into the civilian market as a semiautomatic weapon. Pls.' Trial Ex. 1 (Kapelsohn Decl.) ¶ 18. The AR platform uses interchangeable component parts, allowing the user to interchange "trigger mechanisms, bolt and locking components, barrels, magazines, buttstocks, optical sights, bayonets, and other assorted furniture, with few specialized tools." Pls.' Trial Ex. 9 (Youngman Decl.) ¶¶ 14–15.

the AWCA are commonly used for self-defense.  As the Supreme Court has made clear three times over, "individual self-defense is 'the *central component*' of the Second Amendment right."  *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).  But weapons with the accessories or configurations regulated by the AWCA are not "commonly used" for "self-defense."  *Id.* at 2138.  To the contrary, they are military weapons that are practically indistinguishable from assault rifles "like" the M-16 and thus "may be banned" consistent with *Heller.  See, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) (en banc) (citing *Heller*, 554 U.S. at 627); *cf. Duncan v. Bonta*, 19 F.4th 1087, 1101 (9th Cir. 2021) (noting that extending *Kolbe*'s reasoning to large-capacity magazines had "significant merit"), *vacated on other grounds*, 142 S. Ct. 2895 (June 30, 2022).

    ***Second***, even if the plain text of the Second Amendment covers Plaintiffs' proposed conduct, Defendants have satisfied their burden in demonstrating that the AWCA is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  While the Supreme Court has examined relevant history to determine that law-abiding citizens have a right to keep handguns in the home for self-defense, *see Heller*, 554 U.S. 570; *McDonald v.*, 561 U.S. 742, and to bear handguns outside of the home for self-defense under certain conditions, *see Bruen*, 142 S. Ct. at 2138 n.9 (acknowledging permissible conditions on public carry), the Court has not yet examined the types of weapons (other than handguns) that may be kept and borne inside or outside the home.  As Justice Alito noted, nothing in *Bruen* "decide[d] anything about the kinds of weapons that people may possess." *Id.*. at 2157 (Alito, J., concurring); *id.* at 2161 (Kavanaugh, J., concurring) (underscoring the "limits of the Court's decision" in *Bruen*).

    In conducting the historical analysis that *Bruen* requires, the Court must afford governments sufficient leeway in establishing the requisite analogies.  Obviously, Defendants cannot identify restrictions like the ones challenged here from 1791 or

1868, for the simple reason that neither semiautomatic centerfire rifles nor the

regulated accessories existed at either time.  But that is not Defendants' burden.  As

*Bruen* makes clear, the Second Amendment does not require governments to

identify a "historical *twin*" or "dead ringer" to justify a law.  *Bruen*, 142 S. Ct. at

2133.  And that is especially true here, where the AWCA was adopted in response

to "dramatic technological changes," *id.* at 2132—the exponential increase in the

lethality of a single firearm—and the "unprecedented societal concern[]," *id.*, that

followed—mass shootings.  Under *Bruen*, the AWCA is constitutional so long as it

"impose[s] a comparable burden on the right of armed self-defense" as its historical

predecessors, and so long as the burdens of the modern and historical laws are

"comparably justified."  *Id*. at 2133.

That is the case here.  Throughout Anglo-American history, governments have

adopted restrictions on "dangerous [or] unusual weapons," *Heller*, 554 U.S. at 627,

while allowing law-abiding residents to possess and acquire other firearms for self-

defense purposes.  The AWCA is a part of that tradition.  As explained in the

accompanying declarations of historians and political and social scientists, which

supplement the existing trial record in this matter, the history of state and federal

regulation of firearms and other weapons—from the regulation of dangerous or

unusual weapons in pre-founding England, through the founding of the United

States and the antebellum and postbellum periods, and continuing into the 20th

century—reveals a well-established tradition of government regulation of particular

weapons deemed to pose a significant public danger, provided that other weapons

remained available for effective self-defense.  As one historian has observed,

alongside the right to keep and bear arms, "state and local governments maintained

broad police powers to regulate dangerous weapons," so long as their regulations

did not "utterly destroy" the right to keep and bear arms or "fail to allow for armed

self-defense."  Patrick J. Charles, Armed in America:  A History of Gun Rights

from Colonial Militias to Concealed Carry 155 (2018).  The numerous restrictions

on certain types of firearms and other weapons enacted around the time that the Second and Fourteenth Amendments were ratified—such as restrictions on Bowie knives, blunt weapons, and trap guns—responded to existing technologies and threats to public safety confronting governments at the time of enactment, including concealable weapons that were used frequently in interpersonal assault and homicide.  Weapons technologies changed after ratification of the Fourteenth Amendment, including the development of semiautomatic weapons that were not widely available among civilians at that time, governments shifted focus to address those new threats to public safety, culminating in the National Firearms Act of 1934 and, eventually, assault weapons restrictions like the AWCA.  This history provides ample analogues to the AWCA's restrictions on certain types of firearms with enumerated configurations, which impose comparable, minimal burdens on the right to armed self-defense that are comparably justified because they both target weapons that are were favored by criminals, not used for lawful purposes like self-defense, and posed special threats to the public's safety.

*Third*, if the evidence in the record, including the additional evidence submitted with this brief, is insufficient to justify the constitutionality of the AWCA, additional discovery is required to develop a more comprehensive record responsive to *Bruen*.  Following the Ninth Circuit's order remanding the case for "further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]," Dkt. 133, Defendants proposed an expedited discovery and briefing schedule that would allow the parties to compile the kind of record required under *Bruen* and brief dispositive motions on a reasonable timetable, *see* Dkt. 129 at 17–18.  The Court did not accept Defendants' proposal.  Defendants maintain that formal discovery on remand is warranted in a case of this complexity and importance.

Notwithstanding Defendants' concerns about the prospect of entry of judgment before Defendants receive a fair opportunity to develop the supplemental

record required by *Bruen*, the AWCA is constitutional under the Second
Amendment in light of currently available historical evidence and the evidence
previously adduced at trial.

## BACKGROUND

### I.   STATUTORY OVERVIEW OF THE ASSAULT WEAPONS CONTROL ACT

The AWCA was enacted over 30 years ago in the wake of two devastating
mass shootings in the State.  In 1984, a shooter used a semiautomatic UZI and a
semiautomatic Browning HI-Point rifle to kill 21 people and injury 19 others at a
McDonald's restaurant in San Ysidro, California, and in 1989, a shooter used a
semiautomatic AK-47 rifle to kill 5 schoolchildren and injury 32 others at an
elementary school in Stockton, California.  *See* Defs.' Trial Ex. D ¶ 68.  Later that
year, California enacted the AWCA to prohibit the manufacture, importation, sale,
and possession of certain semiautomatic firearms identified by make and model,
which were defined under the statute as "assault weapons."  Cal. Penal Code
§ 30510; *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on
other grounds by Heller*, 554 U.S. 570.[3]  In enacting the AWCA, the California
Legislature found that "the proliferation and use of assault weapons poses a threat
to the health, safety, and security of all citizens of this state."  Cal. Penal Code
§ 30505(a).  The Legislature further found that an assault weapon "has such a high
rate of fire and capacity for firepower that its function as a legitimate sports or
recreational firearm is substantially outweighed by the danger that it can be used to
kill and injure human beings."  *Id.* § 30505(a).[4]

---

[3] Plaintiffs in this case do not challenge the make-and-model definition of an assault weapon in California Penal Code section 30510.

[4] Individuals who owned firearms that qualified as assault weapons under the then-new provisions of the AWCA were permitted to keep them if registered.  Cal. Penal Code § 30900(a)(1).

The AWCA also included a mechanism for the California Attorney General to seek a judicial declaration in California Superior Court that certain additional weapons identical to the assault weapons listed in the AWCA are also deemed "assault weapons" subject to regulation under the AWCA.  *See* former Cal. Penal Code § 12276.5(a)(1)–(2); *Kasler v. Locker*, 23 Cal. 4th 472, 481–82 (2000), *abrogated on other grounds by Heller*, 554 U.S. 570.  Pursuant to this authority, the Attorney General added additional semiautomatic rifles to the prohibited list of "assault weapons," which are also identified by make and model.  *See* Cal. Code Regs. tit. 11, § 5499.[5]  The Attorney General's authority to designate additional weapons as "assault weapons" ended in 2006.  *See* 2006 Cal. Stat., ch. 793 (AB. 2728).

In 1994, the federal government enacted the "Public Safety and Recreational Firearms Use Protection Act," which, like the AWCA, restricted the manufacture, acquisition, and possession of assault weapons defined by make and model.  Pub. L. No. 103-322, § 110101(a), (b).  But the federal law also included an alternative definition of an "assault weapon," under which designated semiautomatic firearms were prohibited if they were equipped with two or more prohibited features, including a pistol grip that protruded conspicuously beneath the action, a flash suppressor, or a folding or telescoping stock.  Pub. L. No. 103-322, § 110101(b); 108 Stat. 1796 (1994).[6]  The original AWCA "was the model for [the] federal statute enacted in 1994."  *Silveira*, 312 F.3d at 1057.  The federal assault weapons

---

[5] Plaintiffs in this case do not challenge the make-and-model definition of an assault weapon in California Code of Regulations title 11, section 5499.

[6] The federal assault weapons ban also included restrictions on the sale and possession of ammunition magazines capable of holding more than ten rounds, which were defined as "large-capacity magazines."  Pub. L. No. 103-322, § 110103.

1   ban expired in 2004 in accordance with a sunset provision included in the law.  *See*

2   Pub. L. No. 103-322, § 110105.

3       Four years before the federal assault weapons ban lapsed, California amended

4   the AWCA to add an alternative, features-based definition of an assault weapon.

5   1999 Cal. Stat., ch. 129 (S.B. 23).[7]  The Legislature adopted this alternative

6   definition to address the proliferation of "copycat" weapons that were "substantially

7   similar to weapons on the prohibited list but differ[ent] in some insignificant way,

8   perhaps only the name of the weapon, thereby defeating the intent of the ban."

9   Defs.' Trial Ex. F at 4.  The AWCA's features-based definition defines assault

10  weapons as those that have many of the same accessories that had been listed in the

11  federal assault weapons ban attached to them, but deems a firearm to be an assault

12  weapon if it has one or more of the qualifying features instead of two.  The

13  features-based definition is set forth in California Penal Code section 30515(a).[8]

14      Under section 30515(a), a semiautomatic centerfire rifle with the following

15  accessories qualifies as an assault weapon: (1) it lacks a fixed magazine[9] and is

16  equipped with a pistol grip that protrudes conspicuously beneath the action of the

17

18

19      [7] As with the federal assault weapons ban, S.B. 23 added to the California

20  Penal Code restrictions on ammunition magazines capable of holding more than ten

21  rounds, which were also defined as "large-capacity magazines."  1999 Cal. Stat.,
    ch. 129, §§ 3, 3.5.  Those restrictions are currently codified at California Penal

22  Code sections 32310.

23      [8] As with the original 1989 law, the 2000 amendments permitted individuals

24  who owned firearms that qualify as assault weapons under the new definitions of
    the AWCA were permitted to keep them if registered.  Cal. Penal Code

25  § 30900(a)(2).

26      [9] A "fixed magazine" is "an ammunition feeding device contained in, or

27  permanently attached to, a firearm in such a manner that the device cannot be
    removed without disassembly of the firearm action."  Cal. Penal Code § 30515(b).

28

8

rifle,[10] a thumbhole stock,[11] a folding or telescoping stock,[12] a grenade or flare launcher, a flash suppressor,[13] or a forward pistol grip;[14] or (2) it is equipped with a fixed magazine capable of accepting more than ten rounds.  Cal. Penal Code § 30515(a)(1)-(2).  In addition, the statute defines semiautomatic centerfire rifles of less than 30 inches in length as assault weapons.  *Id.* § 30515(a)(3).[15]

---

[10] A "pistol grip that protrudes conspicuously beneath the action of the weapon" means a "grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing."  Cal. Code Regs. tit. 11, § 5471(z).

[11] A "thumbhole stock" is a "stock with a hole that allows through the stock while firing."  Cal. Code Regs. tit. 11, § 5471(11); *see* Defs.' Trial Ex. D (Graham Decl.) ¶ 30.

[12] A stock is the "part of a rifle, carbine, or shotgun to which the receiver is attached and which provides a means for holding the weapon to the shoulder."  Cal. Code Regs. tit. 11, § 5471(*ll*).  A stock may be fixed, folding, or telescoping.  *Id.* The length of a fixed stock cannot be adjusted, but a telescoping stock can be "shortened or lengthened by allowing one section to telescope into another portion," *id.* § 5471(oo), and a folding stock is hinged to allow it to be "folded next to the receiver to reduce the overall length of the firearm," *id.* § 5471(nn).

[13] A "flash suppressor" is "any device attached to the end of the barrel [of a firearm], that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision."  Cal. Code Regs. tit. 11, § 5471(r). This definition includes any device labeled or identified as a "flash hider."  *Id.*

[14] A "forward pistol grip" is any "grip that allows for a pistol style grasp forward of the trigger."  Cal. Code Regs. tit. 11, § 5471(t).  A "pistol style grasp" involves "the web of the trigger hand (between the thumb and index finger) [being] placed beneath or below the top of the exposed portion of the trigger while firing." *Id.* § 5471(z).

[15] A rifle is less than 30 inches in length if measured "in the shortest possible configuration [in which] the weapon will function/fire," with any adjustable stock collapsed prior to measurement.  Cal. Code Regs. tit. 11, § 5471(x).  The measurement is made from the end of the barrel (or permanently attached muzzle device) to the end of the stock that is furthest from the end of the barrel.  *Id.*

Under section 30515(a), a semiautomatic pistol with the following accessories qualifies as an assault weapon:  (1) it lacks a fixed magazine and is equipped with a threaded barrel[16] (capable of accepting a flash suppressor, a forward handgrip, or a silencer[17]), a second handgrip, a barrel shroud,[18] or the capacity to accept a detachable magazine outside of the pistol grip; or (2) it is equipped with a magazine capable of accepting more than ten rounds.  Cal. Penal Code § 30515(a)(4)-(5).

And under section 30515(a), a semiautomatic shotgun qualifies as an assault weapon if it (1) is equipped with an adjustable stock and a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip; or (2) lacks a fixed magazine.  Cal. Penal Code § 30515(a)(6)-(7).  The AWCA does not apply to any other type of shotgun, including pump shotguns, unless it is equipped with a revolving cylinder[19] that holds the shotgun's ammunition.  *Id.* § 30515(a)(8).[20]

---

[16] A "threaded barrel" allows certain accessories to be screwed onto the barrel of a firearm. Cal. Code Regs. tit. 11, § 5471(rr); Defs.' Trial Ex. D (Graham Decl.) ¶ 53.  The definition of "threaded barrel" includes barrels with "lugs" instead of threads, which can also be used to attach accessories to the barrel of the firearm. Cal. Code Regs. tit. 11, § 5471(z).

[17] A silencer is any device used for muffling, dampening, or diminishing the sound of the discharge of a firearm.  *See* 18 U.S.C. § 921(a)(25) (defining "silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm").

[18] A "barrel shroud" is a "heat shield" that is attached to or encircles the barrel of a firearm, "allowing the shooter to fire the weapon with one hand and grasp the firearm over the barrel with the other hand without burning the shooter's hand."  Cal. Code Regs. tit. 11, § 5471(jj).

[19] A shotgun with a "revolving cylinder" is a shotgun that "holds its ammunition in a cylinder that acts as a chamber much like a revolver," in which the "cylinder must mechanically revolve or rotate each time the weapon is fired."  Cal. Code Regs. tit. 11, § 5471(ii).  A cylinder that must be manually rotated by the shooter after each shot does not qualify as a "revolving cylinder."  *Id.*

[20] During this litigation, the AWCA was amended to expand the features-

## II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on August 15, 2019.  Dkt. 1.  The operative First Amended Complaint advances a Second Amendment challenge to all of the definitions of the term "assault weapon" in California Penal Code section 30515(a)(1)–(8), as well as a range of California statutes and regulations relating to assault weapons.  Dkt. 9 at 41–42.[21]  Plaintiffs challenged these provisions on their face and as applied to them and similarly situated individuals.  *Id.*

On December 6, 2019, Plaintiffs filed a motion for a preliminary injunction, Dkt. 22, which Defendants opposed on January 23, 2020**,** Dkt. 33.  The district court held evidentiary hearings on the preliminary injunction in October 2020, after which it set a trial to commence approximately three months later.  The court consolidated the trial on the merits with the hearing on Plaintiffs' preliminary injunction motion under Federal Rule of Civil Procedure 65(a)(2).  The parties engaged in expedited discovery and pretrial proceedings during the intervening months, and a two-day bench trial was held in February 2021.

---

based definition of an assault weapon applicable to semiautomatic centerfire firearms that are not rifles, pistols or shotguns.  2020 Cal. Stat., ch. 29 (S.B. 118).  Under the new definitions, a semiautomatic centerfire rifle that is not a rifle, pistol, or shotgun qualifies as an assault weapon if: (1) it does not have a fixed magazine and is equipped with a pistol grip that protrudes conspicuously beneath the action of the firearm, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, a forward pistol grip, a threaded barrel that can accept a flash suppressor, forward handgrip, or silencer, a second handgrip, a barrel shroud, or the capacity to accept a detachable magazine at a location outside of the pistol grip, (2) a semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun that has a fixed magazine capable of holding more than ten rounds, or (3) a semiautomatic centerfire firearm that is not a rifle, pistol, or shotgun that has an overall length of less than 30 inches.  Cal. Penal Code § 30515(a)(9)–(11).  These new definitions are not at issue in this litigation.

[21] Plaintiffs do not challenge the make-and-model definition of assault weapon.  Cal. Penal Code § 30510.

1    On June 4, 2021, the district court issued a decision concluding that the

2  challenged provisions of the AWCA violate the Second Amendment and enjoining

3  their enforcement.  Dkt. 115.  The court reasoned that the challenged restrictions

4  are unconstitutional under a "*Heller* test" as well as "the Ninth Circuit's two-step

5  levels-of-scrutiny test."  *Id.* at 12; *see id.* at 12–92.  The district court entered a final

6  judgment on the same day.  Dkt. 116.  Defendants filed a notice of appeal of the

7  final judgment on June 10, 2021, Dkt. 117, and obtained a stay of the judgment on

8  June 21, 2021, 9th Cir. Dkt. 13, *Miller v. Bonta*, 9th Cir. Case No. 21-55608.  The

9  Ninth Circuit stayed the appeal pending its resolution of an appeal in a related case

10  challenging provisions of the AWCA, *Rupp v. Bonta*, 9th Cir. Case No. 19-56004.

11  9th Cir. Dkt. 13.

12    After the issuance of *Bruen*, the Ninth Circuit sua sponte vacated the judgment

13  in the *Rupp* appeal and remanded the matter to the district court for further

14  proceedings consistent with *Bruen*.  9th Cir. Dkt. 71, *Rupp v. Bonta*, 9th Cir. Case

15  No. 19-56004.  Thereafter, Defendants successfully moved the Ninth Circuit to

16  vacate the judgment issued in this case and to remand the matter for further

17  proceedings consistent with *Bruen*.  Defs.' Opp'n to Mot. to Lift Stay & Mot. to

18  Vacate & Remand for Further Proceedings (July 11, 2022), 9th Cir. Dkt. 22, *Miller*

19  *v. Bonta*, 9th Cir. Case No. 21-55608, at 1–2.  On August 8, 2022, the Court

20  ordered the parties to submit simultaneous briefs addressing *Bruen*.  The mandate

21  issued on August 23, 2022.  Dkt. 133.

22    In their supplemental brief in response to the Court's August 8 order,

23  Defendants requested that the Court set a schedule for expedited discovery followed

24  by dispositive motions.  Dkt. 129 at 17–18.  Defendants proposed that the parties

25  exchange opening expert reports by December 9, 2022, rebuttal expert reports by

26  January 6, 2023, complete all fact and expert discovery by February 3, 2023, and

27  file motions for summary judgment by March 3, 2023.  *Id.*  At the appeal mandate

28  hearing on August 29, 2022, the Court denied Defendants' request and set a 45-day

12

deadline for the parties to file simultaneous briefs followed by simultaneous responses 15 days later.[22]

**ARGUMENT**

## I.   OVERVIEW OF *BRUEN*'S TEXT-AND-HISTORY STANDARD FOR ANALYZING SECOND AMENDMENT CLAIMS

In *Bruen*, the Supreme Court addressed the constitutionality of New York's requirement that individuals show "proper cause" as a condition of securing a license to carry a firearm in public. 142 S. Ct. at 2123. Before turning to the merits, the Court announced a new methodology for analyzing Second Amendment claims. It recognized that lower courts had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125. At the first step of that approach, the government could "justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the [Second Amendment] right as originally understood.'" *Id.* at 2126 (citation omitted). If that inquiry showed that the regulation did not burden conduct protected by the Second Amendment, lower courts would uphold the regulation without further analysis. *Id.* Otherwise, courts would proceed to the second step, asking "how close[ly] the law c[ame] to the core of the Second Amendment right and the severity of the law's burden on that right," and applying intermediate scrutiny unless the law severely burdened the "'core' Second Amendment right" of self-defense in the home, in which case strict scrutiny

_____

[22] As explained in their Brief in Response to the Court's Order of August 8, 2022, Dkt. 129, and reiterated herein, Defendants maintain that that this case should be resolved by dispositive motion after a brief discovery period to compile the kind of record required under *Bruen*. Notwithstanding Defendants' questions about the current procedural posture of this case, and subject to and without waiving their objections to the current remand proceedings, *see infra* at pp. 73–77, Defendants submit this brief and the accompanying supplemental evidence in accordance with the Court's August 29 order.

applied. *Id.*; *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (same).

The Supreme Court in *Bruen* declined to adopt the two-step approach. *See* 142 S. Ct. at 2126. The Court explained that its earlier decisions in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126–27. It then announced a new standard for analyzing Second Amendment claims that is "centered on constitutional text and history." *Id.* at 2128–29. Under this text-and-history approach,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30.

Applying that test to the case before it, the Court held that New York's "proper cause" requirement was inconsistent with the Second Amendment's text and history, and therefore unconstitutional. *Id.* at 2134–56. New York defined "proper cause" as a showing of "special need for self-protection distinguishable from that of the general community." *Id.* at 2123. This was a "demanding" standard, *id.*, and made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," *id.* at 2156 (Alito, J., concurring). The Supreme Court had "little difficulty" concluding that the "plain text" of the Second Amendment protected the course of conduct that the *Bruen* plaintiffs wished to engaged in—"carry[ing] handguns publicly for self-defense"—reasoning that the term "'bear' naturally encompasses public carry." *Id.* at 2134.[23] The Court

---

[23] No party in *Bruen* disputed that the "ordinary, law-abiding, adult citizens"

explained that because "self-defense is 'the *central component*' of the [Second Amendment] right itself," and because "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135.

Because the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the burden then shifted to the government to show that the prohibition was consistent with an accepted tradition of firearm regulation. 142 S. Ct. at 2135. The Court categorized the government's historical evidence into different historical periods: (1) medieval to early modern England, (2) the American colonies and the early Republic, (3) antebellum America, (4) postbellum America and Reconstruction, and (5) the late 19th and early 20th centuries. *Id.* at 2135–36. Given that the historical evidence is used to determine the scope of the Second Amendment as it existed at the time of ratification—and remains to this day—"not all history is equal," and the Court focused on the historical evidence from the period surrounding the ratification of the Second and Fourteenth Amendments. *Id.* at 2136.[24]

---

who were plaintiffs in the case were "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And no party disputed that the handguns that the plaintiffs sought to carry in public were in "common use" for self-defense and thus qualified as protected "Arms." *Id.* (citing *Heller*, 554 U.S. at 627, *and Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016)).

[24] The Court suggested that historical evidence long predating ratification may be relevant, however, if it "survived to become our Founders' law" and is consistent with the traditions during the relevant historical period. *Bruen*, 142 S. Ct. at 2136. Similarly, evidence from long after ratification of the Fourteenth Amendment, though less probative of the original understanding of the scope of the right, may still confirm the scope of that right if consistent with the text of the Second Amendment and the regulatory traditions at the time of ratification. *Id.* at 2137 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quoting *Heller v. District of Columbia*, 670, F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting))).

15

1      After conducting a lengthy survey of "the Anglo-American history of public

2  carry," the Court held that New York had failed to justify its proper-cause

3  requirement.  *Id.* at 2156.  The Court concluded that this history showed that the

4  Second Amendment guaranteed a right to bear "commonly used arms" in public,

5  "subject to certain reasonable, well-defined restrictions," which had not historically

6  included a requirement that "law-abiding, responsible citizens . . . 'demonstrate a

7  special need for self-protection distinguishable from that of the general community'

8  in order to carry arms in public.'"  *Id.* (citation omitted).

9      While *Bruen* announced a new standard for analyzing Second Amendment

10  claims, it also made clear that governments may continue to adopt reasonable gun

11  safety regulations.  The Court recognized that the Second Amendment is not a

12  "regulatory straightjacket."  *Bruen*, 142 S. Ct. at 2133.  Nor does it protect a right to

13  "keep and carry any weapon whatsoever in any manner whatsoever and for

14  whatever purpose."  *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  Indeed, as

15  Justice Alito explained, *Bruen*'s majority opinion did not "decide anything about

16  the kinds of weapons that people may possess."  142 S. Ct. at 2157 (Alito, J.,

17  concurring).

18      Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote

19  separately to underscore the "limits of the Court's decision."  *Bruen*, 142 S. Ct. at

20  2161 (Kavanaugh, J., concurring).  Justice Kavanaugh also reiterated the majority's

21  view that the Second Amendment is not a "regulatory straightjacket," *id.* (quoting

22  *Bruen*, 142 S. Ct. at 2133), and *Heller*'s observation that "the Second Amendment

23  allows a 'variety' of gun regulations," *id.* at 2162 (quoting *Heller*, 554 U.S. at

24  636).[25]  In particular, Justice Kavanaugh emphasized that that the "presumptively

25

26      [25] These observations are consistent with the Court's assurances that "[s]tate

27  and local experimentation with reasonable firearms regulations will continue under

the Second Amendment."  *McDonald*, 561 U.S. at 785 (plurality opinion)

28  (quotation marks and citation omitted).

Defendants' Supplemental Brief in Response to Court Order of August 29, 2022
(3:19-cv-01537-BEN-JLB)

lawful measures" that *Heller* identified—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," laws "forbidding the carrying of firearms in sensitive places," laws "imposing conditions and qualifications on the commercial sale of arms," and laws prohibiting the keeping and carrying of "dangerous and unusual weapons"—remained constitutional, and that this was not an "exhaustive" list. *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).[26]

Beyond these general observations, *Bruen* also provided more specific guidance about how lower courts should scrutinize Second Amendment claims under its new approach.  As a threshold issue, *Bruen* directs courts to assess whether the "Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2126—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II.  The Constitution "presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); *id.* at 2134 (examining whether the "plain text of the Second Amendment" protected the *Bruen* plaintiffs' course of conduct); *id.* at 2135 (similar).

If a challenged restriction regulates conduct protected by the "plain text" of the Second Amendment, *Bruen* then directs the government to justify its regulation

---

[26] *See also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *accord McDonald*, 561 U.S. at 785 (plurality opinion) (the Second Amendment "by no means eliminates" state and local governments' "ability to devise solutions to social problems that suit local needs and values").

by showing that the law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. And while the Court recognized that the historical analysis conducted at the first step of the two-step approach that lower courts had adopted for analyzing Second Amendment claims was "broadly consistent with *Heller*," *id.* at 2127, it clarified how that analysis should proceed in important respects. In some cases, the Court explained, this historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131. But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach." *Id.* at 2132.

To justify regulations of that sort, *Bruen* held that governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*." 142 S. Ct. at 2133 (emphasis in original). Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster. *Id.* Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773 (1993)). The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Id.* (quoting *McDonald*, 561 U.S. at 767, *and Heller*, 554 U.S. at 599).[27] After *Bruen*, a modern

---

[27] *See also Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right.").

1   regulation that restricts conduct protected by the plain text of the Second

2   Amendment is constitutional if it "impose[s] a comparable burden on the right of

3   armed self-defense" as its historical predecessors that is "comparably justified."  *Id.*

4   ## II.  THE AWCA SATISFIES THE TEXT-AND-HISTORY STANDARD

5          The AWCA is constitutional at both stages of the text-and-history standard.

6   First, Plaintiffs' facial challenge to the AWCA fails at the threshold inquiry because

7   they cannot demonstrate that the "plain text" of the AWCA covers their proposed

8   course of conduct of acquiring, possessing, and bearing weapons designated under

9   the features-based definitions of the AWCA as "assault weapons."[28]  The

10  challenged provisions of the AWCA prohibit the use of certain accessories that can

11  be attached to specified firearms and a particular configuration of semiautomatic

12  centerfire rifles, not the possession of those firearms per se.  Cal. Penal Code

13  § 30515(a).  The prohibited accessories are not integral to the functioning of any

14  firearm; and semiautomatic centerfire rifles that are at least 30 inches in length are

15  plainly operable.  Thus, the AWCA's regulation of certain accessories does not

16  prohibit the possession or use of any "bearable arms" protected by the Second

17  Amendment, *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).  In any

18  event, there is no evidence that firearms equipped with the prohibited accessories or

19  semiautomatic centerfire rifles of less than 30 inches in length are "commonly

20  used" for "self-defense," *id.* at 2138, and therefore do not warrant Second

21  Amendment protection.  Plaintiffs cannot demonstrate that the plain text of the

22  Second Amendment—the term "Arms"—applies to "assault weapons" regulated by

23  the AWCA.

24         Second, even if Plaintiffs are able to show that the AWCA burdens conduct

25  covered by the plain text of the Second Amendment, the AWCA is historically

26  ---

27  [28] Because Plaintiffs bring a facial challenge to the AWCA, they "must show
    that no set of circumstances exists under which [it] would be valid."  *Duncan*, 19

28  F.4th at 1101 (quotation marks and citation omitted).

justified.  The AWCA's restrictions are "relevantly similar" to historical restrictions on firearms and other weapons enacted during the founding era and the period in which the Fourteenth Amendment was ratified.  *Bruen*, 142 S. Ct. at 2132–33. Unlike the severe restriction on public carry struck down in *Bruen*, which made it "virtually impossible" for most "law-abiding people to carry a gun outside the home for self-defense," *id.* at 2159 (Alito, J., concurring), the accompanying declarations demonstrate the extensive history of government regulation of certain weapons that posed substantial risks to the public, provided that governments did not destroy the right to armed defense by leaving alternative weapons available for self-defense.  The AWCA is relevantly similar to laws enacted in England and the right to keep and bear arms in the English Bill of Rights, restrictions on certain weapons during the colonial and founding period, numerous dangerous weapons laws that proliferated around the ratification of the Fourteenth Amendment targeting concealable weapons, and firearms laws that addressed the criminal use semiautomatic and automatic weapons in the early 20th century.  The AWCA "impose[s] a comparable burden on the right of armed self-defense" by leaving available a range of alternative weapons for effective armed defense, and the burden that it imposes is slight in that it prohibits only the use of certain combat-oriented accessories on certain weapons and rifles configured to be less than 30 inches in length.  And this de minimis burden on the right to armed defense is "comparably justified" as the historical analogues, which regulated certain weapons used in the types of violence threatening public safety at that time.  *See Bruen*, 142 S. Ct. at 2133.

### A.   Plaintiffs Cannot Establish that the AWCA Burdens Conduct Protected by the Plain Text of the Second Amendment

Plaintiffs cannot demonstrate that the challenged provisions of the AWCA burden any conduct covered by the plain text of the Second Amendment.  Under the text-and-history standard for adjudicating Second Amendment claims, the party

challenging a restriction under the Second Amendment must first demonstrate that the law regulates conduct protected by the "plain text" of the Second Amendment. *Bruen*, 142 S. Ct. at 2126; *accord id.* at 2130, 2135. The Second Amendment "presumptively protects that conduct" only if covered by the plain terms of the amendment. *Id.* at 2126; *see also id.* at 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). To establish that the plain text applies, a plaintiff must demonstrate that each of the "textual elements" of the Second Amendment's operative clause covers the proposed course of conduct. *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592); *see also Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-501-BLF, __ F. Supp. 3d __, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then *shifts* to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation" (emphasis added)). *Bruen* makes clear that a party challenging a law under the Second Amendment (and not the government) bears this threshold, textual burden. *See Bruen*, 142 S. Ct. at 2134 (noting that the government "d[id] not dispute" that the plain text of the Second Amendment covered the plaintiffs' proposed conduct).

The Supreme Court's assignment of this burden to plaintiffs is consistent with how the Supreme Court "protect[s] other constitutional rights." *Bruen*, 142 S. Ct. at 2130. As explained in *Bruen*, in free speech cases under the First Amendment, "to which *Heller* repeatedly compared the right to keep and bear arms," the government bears the burden of justifying its actions only "[w]hen the Government restricts speech." *Id.* at 2130 (quotation marks and citation omitted). Plaintiffs who assert free speech claims are "oblig[ed]" to "demonstrate that the First Amendment even applies" to the "assertedly expressive conduct" in which they wish to engage. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). And when scrutinizing free exercise claims, the Court first asks whether the plaintiff has

shown that the government "has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2021). "Should a plaintiff make a showing like that," the burden then shifts to the government to justify its action. *Id.* at 2422. And in assessing whether an election law burdens other constitutional rights, the Court first asks whether the regulation imposes a "'severe'" burden on that right or, instead, only a "'reasonable, non-discriminatory restriction[].'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."). *Bruen* holds that this approach applies in the Second Amendment context. Here, Plaintiffs cannot satisfy their threshold, textual burden.

In any Second Amendment case, the plaintiff has the burden of establishing that the challenged law regulates protected "Arms." U.S. Const. amend. II. Whether a particular instrument, device, or weapon is protected by the Second Amendment's plain text involves an examination of whether it is a "bearable arm[]" at all, *Bruen* 142 S. Ct. at 2132, and, if so, whether it is "commonly used" for self-defense purposes, *id.* at 2134.[29]

---

[29] The common use inquiry occurs at the textual stage of the text-and-history standard. In *Bruen*, the Court situated the "common use" inquiry in the textual stage of its analysis, rather than the historical stage at which the government bears the burden. *Id.* at 2134. Before turning to whether the plain text of the Second Amendment covered the plaintiff's proposed course of conduct of carrying (*i.e.*, "bearing") handguns in public for self-defense, the Court confirmed that the plaintiffs were "part of 'the People' whom the Second Amendment protects and that "handguns are weapons 'in common use' today for self-defense." *Id.* (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016)).

1

2

**1.     The Combat-Oriented Accessories and Configurations of Semiautomatic Centerfire Rifles Regulated by the AWCA Are Not "Arms" Protected by the Second Amendment**

3

4

5

6

7

8

9

10

11

12

13

The AWCA prohibits the use of combat-oriented accessories on particular weapons.  *See* Cal. Penal Code § 30515.  Plaintiffs challenge these feature-based definitions of an "assault weapon."  Under these definitions, a firearm qualifies as an assault weapon only if it is equipped with certain accessories or is configured in a certain way.  But the AWCA does not prohibit anyone from acquiring or possessing any semiautomatic centerfire rifle, pistol, or shotgun without these accessories or configurations.[30]  *See* Busse Decl. ¶ 24; *see, e.g.*, Pls.' Trial Ex. 11 (Kraut Decl.) ¶¶ 5–6 (describing a demonstration with a California-compliant AR-platform rifle); Pls.' Trial Ex. 7 (Brown Decl.) ¶ 23 (testifying that Benelli sells a California-compliant version of the M1014 shotgun); Curcuruto Dep. at 97:12–98:3, 103:10–104:8.

14

15

16

17

18

19

20

21

22

23

24

None of the combat-oriented accessories regulated by the AWCA are, themselves, weapons that qualify as bearable arms protected by the Second Amendment.  And the minimum-length requirement in Penal Code section 30515(a)(3) effectively regulates the use of a short barrel or an adjustable stock (or both) with a rifle, Busse Decl. ¶ 21, neither of which is a bearable arm or essential to the operation of a rifle.  As the Supreme Court has explained, the Second Amendment protects "'instruments that constitute *bearable arms*'" that "facilitate armed self-defense."  *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).  For example, courts have held that silencers themselves are not protected, bearable arms.  *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that silencers are not protected by the Second Amendment because "[a] silencer is a

25

26

27

28

---

[30] The firearms listed in California Penal Code section 30510 "typically have one or more features that are listed" in Penal Code section 30515.  Defs.' Trial Ex. D (Graham Decl.) ¶ 47.

firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).[31]  Just as a silencer is not a protected arm, *Cox*, 906 F.3d 1170, a flash suppressor, a pistol grip, an adjustable stock, a fixed magazine capable of holding more than ten rounds, a threaded barrel, and a barrel of a certain length cannot themselves be used as a weapon, unless affixed to a firearm, and thus are not bearable arms protected by the Second Amendment.

Moreover, none of the accessories or configurations listed in section 30515(a) is necessary to operate any of the underlying firearms as intended, and they are not necessary to use a firearm effectively for self-defense or other sporting purpose, such as hunting.  Busse Decl. ¶¶ 12–24.  Indeed, Plaintiffs' own witnesses have characterized the AWCA as regulating "cosmetic" features,[32] suggesting that the prohibited accessories and configurations are not central, let alone essential, to the operation of any of the firearms listed in the AWCA (semiautomatic centerfire rifles, semiautomatic pistols, and shotguns).  To qualify for Second Amendment protection, a regulated item, device, or part must be integral to the functioning a firearm, such as ammunition or a trigger mechanism.  *See Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) ("[T]here must also be some corollary, albeit not unfettered, right to possess the magazines *necessary to render those firearms*

---

[31] Although these cases were decided prior to *Bruen*, *Bruen* did not abrogate their reasoning about what instruments qualify as protected arms.  *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (noting that *Bruen* did not "decide anything about the kinds of weapons [or accessories] that people may possess").

[32] Plaintiffs' firearms witness explained that a semiautomatic centerfire rifle with "none of the 'evil looking' cosmetic features addressed by the [AWCA]" would not be deemed an assault rifle.  Pls.' Trial Ex. 1 ¶ 35 (Kapelsohn Decl.) ¶ 35. And the witness noted that "even without these features, virtually any detachable-magazine, semiautomatic rifle firing the .223/5.56mm cartridge will have the same ballistics and same capabilities as the AR-15."  *Id.*

24

*operable.*" (emphasis added) (quoting *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014))); *see also Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (noting that the Tenth Circuit's holding that silencers are not protected arms did not extend to "items that are not themselves bearable arms *but are necessary to the operation of a firearm* (think ammunition)" (emphasis added)); *cf. Duncan*, 19 F.4th at 1108 ("In sum, we decline to read *Heller*'s rejection of an outright ban on the most popular self-defense weapon as meaning that governments may not impose a much narrower ban on *an accessory that is a feature of some weapons* and that has no usefulness in self-defense." (emphasis added)).  But Plaintiffs cannot show that the items regulated under the AWCA—pistol grips, flash suppressors, and adjustable stocks—are necessary to operate a firearm.  *See* Busse Decl. ¶ 12; Kapelsohn Dep. at 90 (magazines holding more than 10 rounds are not necessary to operate an AR-15); *id.* at 124 (testifying that pistol grips are not necessary to operate an AR-platform rifle); *id.* at 133 (explaining that a fixed stock is neither folding nor telescoping and that fixed stocks are available for the AR-15 and other semiautomatic rifles).  Because the accessories identified in the features-based definitions of an assault weapon under the AWCA are not themselves bearable "arms" within the scope of the Second Amendment, Plaintiffs' challenge to the AWCA based on those definitions necessarily fails.

> **2.   Firearms that Feature the Accessories and Configurations Prohibited under the AWCA Are Not in Common Use for Self-Defense**

Even if the Court views the AWCA as regulating firearms rather than particular accessories or configurations of those firearms, the regulated weapons are not protected "Arms" because they are not "in common use" for self-defense.  In *Bruen*, *McDonald*, and *Heller*, the Supreme Court held out "individual self-defense" as "'the *central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554 U.S. at 599).  And while the Court in those three cases invalidated strict laws that

effectively precluded most law-abiding citizens from possessing or carrying all handguns—"the quintessential self-defense weapon," *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629)—the Court made clear that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 2128 (quoting *Heller*, 554 U.S. at 626). On the contrary, the Second Amendment protects only those weapons that are "'in common use at the time' *for lawful purposes like self defense*." *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 142 S. Ct. at 2135 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). This "important limitation on the right to keep and carry arms," recognized in *Heller*, remains a critical limitation on the Second Amendment following *Bruen*. *See id.* at 2162 (Kavanaugh, J., concurring).

Here, even assuming that they are "bearable arms," firearms equipped with the accessories or that come in the configuration regulated by the AWCA are not "commonly used" for self-defense.

### a. The Second Amendment Protects Only Those Firearms that are Commonly *Used* for Self-Defense

According to the plain terms of the Supreme Court's Second Amendment precedents, the test for Second Amendment protection of a particular weapon is common *use*, not common *ownership*. In the prior proceedings, this Court distinguished between "firearms commonly *owned* by law-abiding citizens for lawful purposes and unusual arms adapted to unlawful uses as well as arms solely useful for military purposes." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1023 (S.D. Cal. 2021) (emphasis added), *vacated by* 2022 WL 3095986 (9th Cir. Aug. 1, 2022). But common ownership is not enough. The phrase "in common use" as used in *Heller* and *McDonald* does not simply refer to a weapon's prevalence in

society, or the quantities manufactured or sold.  In addition to the prevalence of the weapon in society—which remains relevant, because in order to be commonly used, the weapon must also be commonly possessed—courts must consider the suitability of the weapon and the actual use of the weapon for self-defense.  *See Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."); *see also Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand while the other hand dials the police).

A more holistic "common use" test that accounts for suitability and actual use, as opposed to mere ownership, is consistent with *Heller*.  Assessing "common use" based on mere prevalence in society would be circular.  *See Duncan*, 19 F.4th at 1126 (Berzon, J., concurring); *Kolbe*, 849 F.3d at 141–42 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015))).[33]  Under a mere popularity test, if the federal restriction on automatic

---

[33] This Court previously stated that the Supreme Court implied that 200,000 stun guns were sufficient to show "common ownership and receive constitutional protection," *Miller*, 542 F. Supp. 3d at 1023 (citing *Caetano*, 577 U.S. at 420 (Alito, J., concurring)), but that figure cannot be sufficient.  There are more than 700,000 machine guns registered in the United States.  *See* ATF, Firearms Commerce in the United States, Annual Statistical Update 2021, at 16 (2021), https://bit.ly/3y3krmI.  Since enactment of the National Firearms Act ("NFA") of 1934, machine guns have been heavily regulated by the federal government, imposing special taxes on the making or transfer of firearms regulated under the NFA and requiring any machine guns in lawful possession to be registered with the U.S. Secretary of the Treasury in the National Firearm Registration and Transfer Record registry.  26 U.S.C. § 5841; https://bit.ly/3CdReXd.  Even though there are

weapons were repealed, and just one populous state did not prohibit their sale, and some (unspecified) amount of those weapons were sold, fully automatic M-16 rifles could qualify for Second Amendment protection such that governments could no longer ban them.  Such an outcome would flatly contradict the Supreme Court's observation that the M-16 "may be banned" and that a contrary view, in which fully automatic machine guns are protected by the Second Amendment, would be "startling."  *Heller*, 554 U.S. at 624, 627.[34]  Or if firearm manufacturers decide to bundle AR-15 rifles not with 30-round large-capacity magazines, but with 100-round drum magazines, and those rifles sell at sufficient numbers such that 100-round drum magazines become commonly owned, such magazines would receive Second Amendment protection merely because a certain number of them are owned.  The same could be said about the accessories that can be attached to firearms that qualify them as assault weapons under the AWCA, which may come bundled with the underlying firearm when sold to consumers, or semiautomatic centerfire rifles of less than 30 inches, which manufacturers may choose to market and sell.[35]  Such a standard would effectively give firearm manufacturers the power

---

more registered machine guns than the number of stun guns discussed in Justice Alito's concurrence in *Caetano*, the Supreme Court has indicated that machine guns are not protected by the Second Amendment because they are not "in common use."  *Heller*, 554 U.S. at 627.  Accordingly, the numbers alone are not driving the Court's determinations that certain weapons are or are not protected by the Second Amendment.

[34] This Court's prior characterization of the *Heller* test as allowing prohibitions of weapons "solely useful for military purposes," *Miller*, 542 F. Supp. 3d at 1021, would not prevent this result because any weapon can conceivably be used for self-defense, even an automatic weapon.

[35] *See, e.g.*, Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide (2022)*, Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm (noting AR-platform rifles sold with flash suppressors and other accessories); Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl (describing isolated features that render AR-platform rifles assault weapons under the AWCA).

to decide what weapons receive constitutional protection.  *See Kolbe*, 849 F.3d at 141 (under a popularity test, manufacturers would need only "flood[] . . . the market prior to any governmental prohibition in order to ensure it constitutional protection").

As explained below, in terms of prevalence, suitability for self-defense, and actual use for that purpose, Plaintiffs cannot show that the accessories and configurations regulated by the AWCA are in common use for self-defense.

### b.    Firearms Featuring the Regulated Accessories and Configurations Are Not Commonly Owned

With respect to prevalence, Plaintiffs cannot show that the accessories and configurations regulated by the AWCA are commonly possessed by law-abiding citizens.  Indeed, even the AR-15 platform rifle—which is permissible under the AWCA so long as it lacks the combat-oriented accessories regulated by the AWCA, or is capable of firing only rimfire ammunition[36]—is not commonly owned. Industry data concerning the number of AR-platform rifles manufactured in or imported into the United States, *see* Pls.' Trial Ex. 4 (Curcuruto Decl.) ¶ 8, does not establish how many law-abiding individuals in the United States *own* such weapons.[37]  Such sales figures do "not necessarily show that [particular weapons] are in fact commonly possessed by law-abiding citizens for lawful purposes."

---

[36] Rimfire ammunition fires smaller bullets at slower speeds than centerfire ammunition.  Busse Decl. ¶ 11.

[37] Plaintiffs' comparison of the number of AR-platform rifles manufactured or imported with the number of Ford F-series trucks sold in the United States is inapt.  *See* Pls.' Trial Ex. 4 (Curcuruto Decl.) ¶ 8; *Miller*, 542 F. Supp. 3d at 1022–23.  F-Series trucks are manufactured by a single company and cost substantially more than an AR-platform rifle, *see* Pls.' Trial Ex. 4 ¶ 9, and unlike owners of an F-Series truck, owners of AR-platform rifles own many of them on average, *see* Pls.' Trial Ex. 4-4 at 6 (owners of "modern sporting rifles" own 3.1 on average); Suppl. Klarevas Decl. ¶ 15 (explaining how, according to industry estimates, 90% of all "modern sporting rifles" in the United States are owned by individuals who own more than one such rifle).

1   *Fyock*, 779 F.3d at 998.  And those figures strongly suggest that AR-platform rifles

2   are not common in comparison to other types of firearms; according to Plaintiffs'

3   own data, AR-platform rifles make up just 4.6% of all firearms in civilian

4   possession.  *See* Pls.' Trial Ex. 4 ¶ 15.  This figure is dwarfed by the number of

5   handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—in

6   the United States, which total approximately 50% of the civilian stock of firearms

7   in the United States.  *See* Suppl. Klarevas Decl. ¶ 17.  "Modern sporting rifles," like

8   AR-platform rifles, only began to sell in significant numbers in the late 2000s, and

9   particularly after the 2012 Newtown mass shooting.  Busse Decl. ¶ 11.

10      Moreover, AR-15s are not commonly owned among the smaller subset of

11   Americans who own any sort of gun.  *See* Suppl. Klarevas Decl. ¶15 (discussing

12   survey data indicating that approximately 80 million Americans own at least one

13   firearm and reviewing estimates of the number of gun owners who own an AR-15

14   or other "modern sporting rifle").  Available data indicate that AR-15s—whether

15   with or without accessories regulated by the AWCA—are owned by a relatively

16   small fraction of gun owners (less than 10%) and they comprise a small stock of all

17   firearms in circulation (approximately 5%).  *See id.*[38]  These figures are based on

18   industry estimates of the availability of "modern sporting rifles," a self-styled

19   category of rifle that includes AR- and AK-platforms, but these estimates are over-

20   inclusive in estimating the number of weapons in civilian ownership that would

21   qualify as assault weapons under the AWCA—the estimates include sales to law

22   enforcement agencies and include "modern sporting rifles" without any of the

23

24      [38] Based on these figures, it appears that only 3.1% of all American adults
own a "modern sporting rifle" (7.9 million/258 million).  *See* Suppl. Klarevas Decl.

25   ¶ 15 (determining that approximately 7.9 million Americans own a "modern

26   sporting rifle"); *see also* U.S. Census, U.S. Adult Population Grew Faster than
Nation's Total Population from 2010 to 2020 (estimating the 2020 U.S. adult

27   population to be approximately 258 million), https://bit.ly/3CP1kj6.

28

accessories or configurations regulated under the AWCA.  *See id.* ¶ 15 n.12.  Based on industry data, only approximately 7.9 million gun owners own a "modern sporting rifle," which is less than 10% of all civilian gun owners in the United States.  *Id.* ¶ 15.[39]  And AR-15 ownership is heavily concentrated within that population:  on average, civilians who own "modern sporting rifles" like the AR-15 own 3.1 such rifles, with only 35 percent owning a single such rifle.  Suppl. Klarevas Decl. ¶ 15.

Accordingly, notwithstanding the AR-15's purported popularity, AR-platform rifles are not commonly owned in the United States, even among law-abiding gun owners.  And there is scant evidence that that other rifles, pistols, or shotguns to which the regulated accessories can be attached—like AK-47 rifles, UZI assaual pistols, and "Streetsweeper" shotguns—are commonly owned.  Indeed, in an earlier proceeding, the Court noted that "there is very little evidence regarding the commonality of AK-47 type rifles, or semiautomatic shotguns, or 'assault pistols.'"  *Miller*, 542 F. Supp. 3d at 1029.  Notwithstanding any evidence of "common use," the Court viewed them as "presumptively lawful to own" only after assigning "the burden in the first instance" to the government to prove that "they are uncommon and dangerous."  *Id.*  As discussed, however, *Bruen* does not assign this threshold burden to the government.  *See supra* at pp. 20–22.  In the absence of any evidence from *Plaintiffs* that a weapon is commonly possessed—let alone that they are in common use—it is not entitled to a presumption of constitutional protection under the Second Amendment.  And of course, if AR-15s and other "modern sporting rifels" are not commonly owned, such weapons with the accessories and configurations regulated under the AWCA cannot be commonly owned.

---

[39] This figure is over-inclusive, as not all "modern sporting rifles" are assault weapons.  For example, Californians may possess AR-platform rifles that are defined by the NSSF as "modern sporting rifles" so long as they lack any of the prohibited features or fire only rimfire ammunition.  Suppl. Klarevas Decl. ¶ 15.

### c.     Firearms Featuring the Regulated Accessories and Configurations Are Not Suitable for Self-Defense

Not only are firearms that come equipped with the regulated accessories or in the regulated configuration not in "common use," they are not in "common use" for *self-defense* because they are not suitable for that purpose.  Each of the regulated accessories and the regulated configuration serve specific combat-oriented functions and are not needed or suitable for self-defense.  Weapons equipped with these tactical accessories or configurations are more suitable for offensive purposes, such as military use in combat.  *Kolbe*, 849 F.3d at 136 (holding that "the banned assault weapons" are most useful in military service); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 908 (N.D. Ill. 2014) (noting that submachine guns are "the analog for a civilian assault pistol" and "facilitate the assault and capture of a military objective" (citation omitted)).  This is because the particular features and configurations regulated by the challenged definitions of the AWCA serve specific combat-oriented purposes and are not well suited or adapted to self-defense.

- Pistol grips typically appeared (unsurprisingly) on pistols, but also were used on machine guns, like the Maxim and the Thompson, and some shotguns in the 20th century.  *See* Pls.' Trial Ex. 2 (Hlebinsky Decl. ¶ 17).  Pistol grips, when used with semiautomatic or automatic rifles, can enable a shooter to maintain aim and accuracy during rapid fire by reducing muzzle rise and can facilitate the quick reloading of a detachable magazine while maintaining aim with the trigger hand.  *See* Busse Decl. ¶¶ 13, 18.[40]  A pistol grip on a rifle, as opposed to a more traditional straight grip, is indicative of a combat-oriented weapon.  *Id.* ¶ 13 (noting use of pistol grips with some firearms to "control and aim the rifle during periods of rapid fire such as situations encountered during military firefights").

---

[40] Defs.' Trial Ex. D (Graham Decl.) ¶¶ 28–30, 38; Youngman Dep. at 134:17–21; Kapelsohn Dep. at 125–26, 130.

- A forward pistol grip on any firearm can help insulate the non-trigger hand from the heat generated during rapid fire.  Busse Decl. ¶ 18.[41]  A barrel shroud on a semiautomatic pistol serves a similar "combat-functional purpose."  Busse Decl. ¶ 23.[42]

- Adjustable stocks and rifles shorter than 30 inches in length make rifles more portable, and potentially concealable, and can enable a shooter to conduct room-to-room tactical maneuvers and maintain an element of surprise.  Busse Decl. ¶ 15.[43]

- Flash suppressors emerged during World War II with the "jungle carbine" and were adapted to AR-platform rifles (invented in the 1950s).[44]  Flash suppressors can enable a shooter to maintain accuracy during rapid fire in low-light settings and can help counteract muzzle rise during rapid fire.[45]  Flash suppressors can also help a shooter avoid detection in low-light conditions, Busse Decl. ¶ 17; flash suppressors affixed to "[m]odern military rifles and some civilian rifles" are "useful in combat to decrease the possibility of counterfire," Vincent J.M. DiMaio, Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques 69 (3d ed. 2015).

- Threaded barrels enable a shooter to quickly affix to a pistol a flash suppressor, forward pistol grip, or a silencer, each of which enhances the combat utility and concealability of the weapon.  Busse Decl. ¶ 22.[46]

---

[41] Defs.' Trial Ex. D (Graham Decl.) ¶ 54.

[42] Defs.' Trial Ex. J (H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act ("H.R. Rep. No. 103-489")) at 19; Kapelsohn Dep. at 171:12–17 (agreeing that a barrel shroud could be an important tactical feature of a firearm).

[43] Defs.' Trial Ex. D (Graham Decl.) ¶¶ 32, 43, 59; Youngman Dep. at 141:21–143:7; Defs. Trial Ex. M (Mersereau Decl.) ¶ 10.

[44] Pls.' Trial Ex. 2 (Hlebinsky Decl.) ¶ 23.

[45] Youngman Dep. at 139:5–9; Defs.' Trial Ex. H (ATF Rifle Importability Report) at 7; Defs.' Trial Ex. D (Graham Decl.) ¶ 37; Kapelsohn Dep. at 147–48.

[46] Defs.' Trial Ex. H (ATF Rifle Importability Report) at 6–7; *see also* Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021 (noting that the U.S. Marine Corps is issuing silencers to

33

- Grenade launchers serve obvious combat functions, and flare launchers do not serve any legitimate civilian, self-defense need on a rifle.  Busse Decl. ¶ 16.[47]

- The lack of a fixed magazine, which is a pre-requisite for a semiautomatic centerfire rifle to qualify as an assault weapon, enables the shooter to use detachable magazines, which "provide[] the soldier with a fairly large ammunition supply and the ability to rapidly reload"[48] and render[] a semiautomatic weapon "capable of killing or wounding more people in a shorter amount of time."[49]  *See also* Busse Decl. ¶ 20.  Similarly, fixed magazines holding more than ten rounds enable a shooter to fire more rounds repeatedly without reloading, potentially even 100 rounds, and "are indicative of military firearms."[50]  *See also* Busse Decl. ¶ 20.  And a rotating cylinder that feeds shells into a shotgun mechanically after each shot is also a combat-oriented weapon, as it enables a shooter to fire more shots without reloading.

- Rifles that are less than 30 inches in length are more portable and concealable, enabling surprise attacks.  *See* Busse Decl. ¶ 21.  Rifles can be configured to measure less than 30 inches by using an adjustable (telescoping or folding) stock or a short barrel (or both).  *Id.*  The federal government has long regulated short-barreled rifles,[51] and the

---

infantry units to "reduce the visual and noise signature of carbines and designated marksman rifles, allowing troops to fight more effectively," and to "reduc[] muzzle flash"), *available at* https://bit.ly/3M36bQx. .

[47] Defs.' Trial Ex. H at 7; Defs.' Trial Ex. D ¶¶ 34–35.

[48] Defs.' Trial Ex. H (Bureau of Alcohol, Tobacco & Firearms, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989) ("ATF Rifle Importability Report")) at 6; Defs.' Trial Ex. Z (ATF Rifle Suitability Report) at 21–22.

[49] Defs.' Trial Ex. F (S.B. 880 Report, 2015-2016 Reg. Sess., Assembly Comm. on Public Safety (June 14, 2016)) at 6.

[50] Defs.' Trial Ex. Z (ATF, Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (1998)) at 9.  And even fixed magazines can be rapidly switched out for fresh magazines if the rifle is assembled or modified in a way that allows for rapid separation and reconnection of the upper and lower receivers.  Defs.' Trial Ex. D (Graham Decl.) ¶ 42.

[51] *See Miller*, 307 U.S. at 175 n.1 (discussing the NFA's regulation of short-

1
2
     AWCA's restrictions on the use of adjustable stocks and short barrels is consistent with those longstanding regulations.  *See id.*

3    When these combat-oriented features are attached to semiautomatic weapons,

4 the resulting configuration is much more lethal and is only suitable for military

5 purposes.  Indeed, these weapons are identical to fully automatic or select-fire

6 weapons in every respect except for the capacity for automatic fire.  But this is not a

7 material distinction, given the extraordinarily high rate-of-fire of semiautomatic

8 weapons—fire that is rendered more lethal and effective when used in conjunction

9 with combat-oriented features like flash suppressors and pistol grips.

10 Semiautomatic and automatic weapons were developed for military applications in

11 the late nineteenth century, Spitzer Decl. ¶¶ 3–4, and the modern AR-platform rifle

12 is a "civilian version of the military's M-16 rifle," *Staples v. United States*, 511

13 U.S. 600, 612 (1994).[52]  They have exceedingly high rates of fire, with

14 semiautomatic firearms being capable of "fir[ing] almost as rapidly as automatics."

15 *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1263 (D.C. Cir. 2011).

16 And semiautomatic weapons that feature the regulated accessories or come in the

17 regulated configuration are "virtually indistinguishable in practical effect from

18 machineguns" and "can be fired at rates of 300 to 500 rounds per minute."  Defs.'

19 Trial Ex. J (H.R. Rep. No. 103-489) at 18.  As Plaintiffs' own witness testified,

20 most shooters can fire between five and seven rounds per second with a

21 semiautomatic weapon for "quite a while," Kapelsohn Dep. at 81:21–82:4; Oct. 19,

22
23   _____

24 barreled shotguns and rifles).

25    [52] *See also* Defs.' Trial Ex. D (Graham Decl.) ¶ 44; Defs.' Trial Ex. H (ATF Rifle Importability Report) at 6 (noting that the "military features and

26 characteristics (other than select fire)" of "modern military assault rifles" are

27 "carried over to semiautomatic versions of the original military rifle"); Youngman Dep. at 54:4–6; Kapelsohn Dep. at 82:24–83:13.

28

2020 Hearing Tr. at 23, which translates to 300 to 420 rounds per minute.[53]  In

addition, a semiautomatic weapons rate of fire can be boosted dramatically with

simple modifications, like "bump stocks" or "multiburst trigger activators," *Rupp*,

401 F. Supp. 3d at 988, or "binary triggers" that can fire a round with each pull *and*

*release* of the trigger, Roth Decl. ¶ 48, to mimic fully automatic fire.[54]  The

practical difference between the rates-of-fire of an automatic and semiautomatic "is

a distinction without a difference." *Rupp v. Becerra*, 401 F. Supp. 3d 978, 987

(C.D. Cal. 2019).  Even the military trains soldiers to generally fire select-fire

sidearms, such as M4 carbine rifles, in semiautomatic mode to enhance accuracy in

rapid fire combat situations and to conserve ammunition and maintain control.

Defs.' Trial Ex. L (Excerpt of United States Army, *Rifle Marksmanship M16/M4 -*

*Series Weapons* (2008)) at 7–12; Youngman Dep. at 51:6–13 (agreeing that fully

automatic weapons are less accurate generally than semiautomatic weapons when

fired rapidly).

　　　Courts have recognized that a weapon's similarity to a weapon commonly

used in the military is a permissible basis for prohibiting that weapon for civilian

use.  In *Heller*, the Court made clear that "M-16 rifles and the like"—"weapons that

are most useful in military service"—"may be banned." *Heller*, 554 U.S. at 627.[55]

---

[53] This rate of fire is comparable to the Gatling gun, which could fire up to 200 rounds per minute, and the Maxim machine gun, which could fire between 200 to 400 rounds per minute and changed the nature of warfare during World War I. *See* Spitzer Decl. ¶ 3.

[54] Semiautomatic weapons capable of fully automatic fire have been appearing more frequently in crime, with the widespread use of "auto sears." *See* Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB; Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG.

[55] The *Heller* Court made this observation in raising a potential objection to "limit[ing] the right to keep and carry arms" to weapons "in common use at the

Courts have extended *Heller*'s observation that fully automatic weapons may be banned to weapons featuring the regulated accessories and configurations, reasoning that these latter firearms are "like" automatic firearms. *See Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (citing *Heller*, 554 U.S. at 627)); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 988 (C.D. Cal. 2019) ("[T]he Court concludes that semiautomatic rifles within the AWCA's scope are virtually indistinguishable from M-16s . . . ."). Indeed, before *Bruen*, an en banc panel of the Ninth Circuit commented that this analogy to military use has "significant merit" when applied to large-capacity magazines, because such magazines are likely "most useful in military service" due to their limited "lawful, civilian benefits" and "significant benefits in a military setting." *Duncan*, 19 F.4th at 1102. Again, *Bruen* did not abrogate *Heller*'s view that weapons most useful in military service, like the M-16, may be banned, or undermine the conclusion that this line of reasoning applies to the use of large-capacity magazines in semiautomatic firearms. *See supra* at p. 17 n.26. What matters is whether the "arms" in question are commonly used by civilians for self-defense, not whether they are suitable for militia or military.

Citing the 1939 case *United States v. Miller*, 307 U.S. 174 (1939), this Court has suggested that Second Amendment protection extends to "weapons that may also be useful in warfare." *Miller*, 542 F. Supp. 3d at 1020 (citing *Miller*, 307 U.S. at 178). But *Heller* and now *Bruen* undermine this view of the Second

time"—that it would result in "the Second Amendment right [being] completely detached from the prefatory clause" and its reference to a well-regulated militia. *Heller*, 554 U.S. at 627. The Court then proceeded to reject that argument, concluding that the scope of the operative right "cannot change" merely because "the degree of fit between the prefatory clause and the protected right" has been "limited" over time. *Id.*

1    Amendment.  Although the Second Amendment's prefatory clause references a

2    "well-regulated Militia," U.S. Const. amend. II, *Heller* made clear that the operative

3    clause protects a right to armed self-defense, notwithstanding the language used in

4    *Miller* discussing whether the short-barreled shotgun in that case "is any part of the

5    ordinary military equipment or that its use could contribute to the common

6    defense." *Heller*, 554 U.S. at 622 (quoting *Miller*, 307 U.S. at 178).[56]  The *Heller*

7    Court explained that this phrase must be read in conjunction with *Miller*'s

8    subsequent observation that members of the militia "were expected to appear

9    bearing arms supplied by themselves and of the kind in common use at the time."

10   *Id.* at 625 (quoting *Miller*, 307 U.S. at 179).  Those weapons were "arms 'in

11   common use at the time' for lawful purposes like self-defense." *Id.*  Because short-

12   barreled shotguns were "not typically possessed by law-abiding citizens for lawful

13   purposes," they were held to not be protected by the Second Amendment—not

14   because they were not useful in military or militia service. *Id.*  "*Heller* understood

15   *Miller*" to allow states "to decide when civilians can possess military-grade

16   firearms, so as to have them available when the militia is called to duty."

17   *Friedman*, 784 F.3d at 410.

18        In addition, early American commentaries on the scope of the right to keep

19   and bear arms previously examined by the *Heller* Court further confirm that the

20   Second Amendment protects arms in "common use" for self-defense and not militia

21   use.  In the early 1800s, St. George Tucker "conceived of the Blackstonian arms

22   right as necessary for self-defense." *Heller*, 554 U.S. at 606.  Similarly, in 1825,

23   William Rawle's "influential treatise" that the Second Amendment "differentiated

24   between the people's right to bear arms and their service in the militia." *Id.* at 607.

25

26        ———————————

27   [56] The *Heller* Court cautioned against over-reading *United States v. Miller*, as
     "the case did not even purport to be a thorough examination of the Second
28   Amendment." *Heller*, 554 U.S. at 623.

1    The English right "had nothing to do with militia service."  *Id.* at 608.  These
2    commentaries "interpreted the Amendment as [the Court] do[es]."  *Id.* at 605.

3        *Bruen* repeatedly confirms that self-defense (and not militia or military
4    service) is the "central component" of the right protected by the Second
5    Amendment.  *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald v. City of Chicago*, 561
6    U.S. 742, 767 (2010)); *see also id.* at 2125 (noting that *Heller* and *McDonald* "held
7    that the Second and Fourteenth Amendments protect an individual right to keep and
8    bear arms for self-defense"); *id.* at 2128 (same).  Despite citing *United States v.*
9    *Miller*, *see Bruen*, 142 S. Ct. at 2128, the Supreme Court did not discuss *Miller*'s
10   reference to arms that have "some reasonable relationship to the preservation or
11   efficiency of a well regulated militia," *Miller*, 307 U.S. at 178.  Nor did the Court
12   premise the right to public carry on any need to bear arms for militia service.

13       Because the accessories or firearms configurations regulated under the AWCA
14   are not suitable for self-defense, and are designed for combat applications, they are
15   not "in common use" for self-defense.  Those items therefore do not receive Second
16   Amendment protection.

17                  **d.    There Is No Evidence that Firearms Featuring the**
                          **Regulated Accessories or Configurations Are**
18                        **Commonly Used or Needed for Self-Defense**

19       Plaintiffs cannot show that weapons that come equipped with the regulated
20   accessories or in the regulated configuration are commonly *used* in self-defense.
21   Like *Heller* and *McDonald* before it, *Bruen* repeatedly indicated that to qualify as a
22   protected "arm," a weapon must, like handguns, be commonly *used* for lawful self-
23   defense—not simply manufactured, produced, sold, or owned.  *See Bruen*, 142 S.
24   Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis
25   added)); *id.* at 2142 n.12 (finding that pocket pistols were "commonly *used* at least
26   by the founding" (emphasis added)); *id.* at 2143 (noting that certain belt and hip
27   pistols "were commonly *used* for lawful purposes in the 1600s" (emphasis added));
28   *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject"

(emphasis added)); *id.* (noting that American governments would not have broadly prohibited the "public carry of commonly *used* firearms for personal defense" (emphasis added); *accord Heller*, 554 U.S. at 636 (holding that the government could not impose an "absolute prohibition of handguns held *and used* for self-defense" (emphasis added)).

During the previous proceeding, Plaintiffs did not submit any studies demonstrating how frequently weapons featuring the regulated accessories or that come in the regulated configurations are used in self-defense.  Instead, one of Plaintiffs' witnesses presented seven news stories concerning the defensive use of an AR-platform rifle.  *See* Pls.' Tr. Ex. 1 (Kapelsohn Decl.), Exs. 1–7.  Those seven stories are insufficient to demonstrate that the weapons used in those stories are commonly used for self-defense.[57]  And they say nothing about the frequency of using pistols and shotguns that come equipped with the regulated accessories, like the Uzi pistol, in actual self-defense incidents, or the need for any of those accessories to engage in effective self-defense.  Instead, according to information reported by the Heritage Foundation on defensive gun-uses,[58] it appears that the use of rifles in actual self-defense situations is quite rare—likely approximately 2–4 percent of all defensive gun uses reported by the Heritage Foundation involved any type of rifle.  Suppl. Allen Decl. ¶ 10.  The number of incidents involving semiautomatic rifles is likely lower, and there is no indication that the weapons

---

[57] While an AR-platform rifle might have been used in these seven defensive incidents, the record evidence shows that such weapons have been used in 22% of public mass shootings from 1982–2019, Defs.' Trial Ex. A ¶ 30, and they were used in seven of the ten deadliest mass shootings, Defs.' Trial Ex. E ¶ 10 tbl. 1.  The use of AR-platform rifles has continued unabated since the prior proceedings in this case, including in two double-digit-fatality mass shootings that occurred in 2022— in Buffalo, NY (10 deaths) and Uvalde, TX (21 deaths).  *See* Suppl. Klarevas Decl. ¶ 9 & tbl. 1.

[58] Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g.

1   used in those incidents were equipped with any of the accessories or configured in a

2   way that would subject them to the AWCA.  In stark contrast to the use of rifles in

3   just 2-4% of defensive gun uses, handguns—the "quintessential self-defense

4   weapon," *Heller*, 554 U.S. at 629— were reportedly used in 41-90 percent of the

5   incidents in the database, Suppl. Allen Decl. ¶ 10.

6       In the absence of evidence that assault weapons or their combat-oriented

7   accessories or configurations are commonly used for self-defense, the Court cannot

8   conclude that they are "in common *use*" for self-defense.  The weapons regulated

9   by the AWCA are therefore not covered by the plain text of the Second

10  Amendment, and the analysis may end here.

11      **B.   The AWCA's Restrictions on Assault Weapons Are Consistent
12  with the Nation's Traditions of Firearms and Other Weapons
    Regulations**

13      Under the text-and-history standard, the government must justify a firearms

14  regulation if the regulation burdens conduct protected by the plain text of the

15  Second Amendment.  Even if Plaintiffs could meet their burden, the AWCA's

16  restrictions on combat-oriented accessories or configurations are consistent with the

17  Nation's tradition of regulating "dangerous [or] unusual weapons." *Bruen*, 142 S.

18  Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).[59]  As discussed in the accompanying

19  declarations of expert witnesses, governments have retained substantial latitude in

20  enacting restrictions on certain weapons deemed to be susceptible to criminal

21  misuse and to pose significant dangers to the public—from trap guns to certain

22  knives, blunt object, and pistols—provided that law-abiding citizens retained access

23  to other arms for effective self-defense.  Governments have regulated weapons in

24  this way throughout our Nation's history, including around the time that the Second

25  and Fourteenth Amendments were ratified.  As former U.S. Solicitor General Paul

26  ——————————————

27      [59] While *Heller* and *McDonald* refer to prohibitions on "dangerous and
    unusual weapons," Blackstone refers to the crime of carrying 'dangerous *or* unusual

28  weapons.'" *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148–49 (1769)).

Clement acknowledged during the *Heller* oral argument, the Second Amendment "always coexisted with reasonable regulations of firearms."  Adam Winkler, Gunfight 221 (2011).

### 1.    The Second Amendment Does Not Limit the States' Police Powers to Address Public Safety Threats as They Arise

The Second Amendment is not absolute.  Since the founding and even earlier, governments have exercised broad police powers to limit access to and use of certain types of weapons deemed to be especially dangerous.  As historian Saul Cornell explains, the "dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace."  Cornell Decl. ¶ 9.  Government regulation is permitted, even though the text of the Second Amendment provides an "unqualified command" that the right to keep and bear arms "shall not be infringed."  *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961).  *Bruen*'s quotation from *Konigsberg* makes clear that even unqualified commands concerning the inviolability of constitutional rights, such as the provision that the freedoms of speech and association must not be "abridg[ed]," U.S. Const. amend. I, should not be given "a literal reading."  *Konigsberg*, 366 U.S. at 49.  The Court indicated that such an absolutist view of the First Amendment "cannot be reconciled" with the host of exceptions to that right, including "the law relating to libel, slander, misrepresentation, obscenity, perjury, false advertising, solicitation of crime, complicity by encouragement, conspiracy, and the like," and that such absolutism should also not apply to "the equally unqualified command of the Second Amendment."  *Id.* at 49 n.10.  As with the First Amendment, the Second Amendment is not to be read literally.  "The provisions of the Constitution are not mathematical formulas," but rather are "organic living institutions transplanted

from English soil" and their significance is determined "by considering their origin and the line of their growth." *Id.* (quotation marks and citation omitted).

Unlike the First Amendment, the courts have only just begun to explore the historical origins of the right to keep and bear arms and to define its precise scope and exceptions. *See Heller*, 554 U.S. at 625–26 (noting that it should not be surprising that it took the Court so long to decide a Second Amendment case, given that the Court first decided a First Amendment case in 1931). The history of the Second Amendment demonstrates that governments enjoyed robust police powers to regulate weapons—including who may possess them, where they may be possessed, and what weapons may be possessed and used. Historical regulations on the right to keep and bear arms show that the AWCA's restrictions on *certain* accessories of *certain* weapons and a *particular* configuration of one weapon is consistent with the scope of that right as it was historically defined (and fixed in time):

> For most Americans, the right to own weapons for self-defense and other purposes, was, like other rights, limited by governmental police power, and therefore was subject to reasonable regulation, including limiting what types of weapons could be owned . . . .

Patrick Charles, *supra*, at 312.

### 2. Historical Regulations of Dangerous or Unusual Weapons Are Ubiquitous in American History, Including the Relevant Periods Surrounding the Ratification of the Second and Fourteenth Amendments

#### a. Defendants Need Only Show that the AWCA Is "Relevantly Similar" to the Historical Tradition of Regulating Dangerous or Unusual Weapons

As discussed above, *Bruen* does not require Defendants to identify a "historical twin" or "dead ringer" for the challenged AWCA restrictions. 142 S. Ct. at 2133 (emphasis omitted). That is because the law addresses "unprecedented societal concerns" and "dramatic technological changes." *Id.* at 2132. As discussed in the declarations of Professors Roth and Spitzer, the firearms

43

technologies regulated under the AWCA did not exist when the Second or Fourteenth Amendments were ratified, and the AWCA addresses threats to public safety that had not yet emerged at that time, including mass shootings and violence against law enforcement using firearms. *See* Roth Decl. ¶¶ 11–12 (discussing the technical limitations of muzzle-loading firearms and the infrequent use of firearms in homicide during the founding); Spitzer Decl. ¶¶ 18–30 (discussing differences in 19th century and the 20th century firearms technologies). As Judge Easterbrook explained in *Friedman*,

> The features prohibited by [the assault weapons] ordinance were not common in 1791. Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century. Semi-automatic guns and large-capacity magazines are more recent developments. Barrel shrouds, which make guns easier to operate even if they overheat, are also new; slow-loading guns available in 1791 did not overheat. And muzzle breaks, which prevent a gun's barrel from rising in recoil, are an early 20th century innovation.

*Friedman*, 784 F.3d at 410.

Indeed, innovative research into the relative lethality of weapons underscores just how "dramatic" the technological innovation has been with respect to firearms since the ratification of the Second and Fourteenth Amendments. *Bruen*, 142 S. Ct. at 2132. Colonel Trevor N. Dupuy, a senior U.S. Army officer during World War II, devised an index for the military of the relative "theoretical lethality" of various weapons, which measures the number of people who could be killed in one hour by a particular weapon. *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022). For example, according to Colonel Dupuy's research, firearms available at the time of the founding—flintlock muzzleloaders capable of firing spherical musket balls—had a Theoretical Lethality Index ("TLI") of 43. *Id.* at 2508. Between 1850 and 1860,

"firearms became more common and more deadly, " such that the firearms that predominated during the Civil War, like rifles capable of firing Minie ball conoidal bullets, had a TLI of 102.  *Id.*[60]  After the ratification of the Fourteenth Amendment, there was a "quantum jump in lethality" with the development and deployment of the mounted Maxim machine gun (1883) and the bolt-action Springfield rifle equipped with ammunition magazines (1903).  *Id.* at 2507.  The TLI of the Springfield Model 1903 rifle was 495, compared to the Civil War-era rifles' TLI of 102, and the TLI of the World War I machine gun was a staggering 3,463.  *Id.* at 2508.  Though Colonel Dupuy's research did not report a specific TLI for the M-16 rifle or its semiautomatic variant, the AR-15, the TLI of such weapons would be "exponentially more lethal than the flintlock musket of the Founder's era" or the rifles used in the mid-1800s if modern semiautomatic weapons are situated "anywhere near the Maxim machine gun."  *Id.* at 2508 n.73.  And as noted above, *see supra* at pp. 35–36, the rate of fire of modern semiautomatic weapons is comparable to fully automatic weapons, including the World War I-era Maxim machine gun that Dupuy studied.  *See* Spitzer Decl. ¶ 3.

And the AR-platform itself, which first appeared in 1955 with the AR-10, was an unprecedented design:  "[T]he experience of first viewing and handling the AR-10's grey alloy metalwork and foam-filled plastic furniture seemed so utterly without precedent that for many it simply suspended the critical faculties, leaving nowhere to begin any comparison with ordinary wood-and-steel rifles."  R. Blake Stevens & Edward C. Ezell, The Black Rifle:  M16 Retrospective 24 (1994).  The unprecedented design of the AR-platform inhibited its acceptance in the civilian

---

[60] The Minie ball significantly increased the lethality of firearms compared to the founding-era musket ball because it "traveled at a higher velocity and struck the body with greater force, shattering bone into small fragments and causing extensive soft tissue damage."  M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009).

1  market, and they did not begin to sell in significant numbers until the late 2000s.

2  *See* Busse Decl. ¶ 11.

3  Moreover, the primary threat to public safety that the AWCA seeks to

4  address—namely, mass shootings—is an "unprecedented societal concern," *Bruen*,

5  142 S. Ct. at 2132, that did not emerge until well into the twentieth century.  From

6  the colonial period into the early 20th century, mass murder occurred in the United

7  States, but typically as a group activity, because technological limitations impaired

8  the ability of a single person to commit mass murder.  Roth Decl. ¶ 35.  Mass

9  shootings by individual gunmen are a modern phenomenon.  Spitzer Decl. ¶ 1; Roth

10 Decl. ¶ 48 (describing how the problem of mass shootings "is a modern

11 phenomenon" and that "[t]he danger [semiautomatic weapons] pose is intrinsically

12 different from past weaponry").  While mass murder has existed throughout the

13 history of the country, mass-casualty incidents could only be orchestrated by

14 *groups* of individuals due to technological limitations.  Roth Decl. ¶ 38.  But the

15 "character of mass murder began to change" in the late 19th and early 20th

16 centuries, with the development of new technologies, including semiautomatic and

17 fully automatic firearms, like the Tommy Gun.  *Id.*  These new weapons enabled

18 individuals to wreak havoc on communities.  In testifying before the U.S. Congress

19 on an early draft of what became the National Firearm Act of 1934, which initially

20 proposed restricting both fully automatic and semiautomatic firearms, Attorney

21 General Homer Cummings expressed concern about the spread of these "deadly

22 weapons" and their use by criminals "warring against society."  Spitzer Decl. ¶ 8;

23 *see also id.* ¶ 4 (describing transition of automatic weapons from military use to

24 civilian circulation and their use in highly publicized killings, such as the St.

25 Valentine's Day massacre in 1929).  Simply put, semiautomatic and automatic

26 weapons were materially different from firearms technology widely available at the

27 founding or during the 1860s, and they contributed to the rise in gun violence in the

28 1900s and the mass shootings confronting American communities today.

The data bear this out.  When semiautomatic weapons, including weapons with military accessories regulated under the AWCA, are used in mass shootings, more people are killed and injured on average.  Defs.' Trial Ex. A (Allen Decl.) ¶¶ 32–34; Defs.' Trial Ex. E (Klarevas Decl.) ¶ 17 & tbl. 2; Suppl. Donohue Decl. ¶ 19; Roth Decl. ¶ 48 & fig. 1 (explaining findings from mass shootings listed in the Violence Project showing substantially greater numbers of victims on average when semiautomatic rifles are used, and even greater numbers of victims that mass shootings involving automatic weapons).  Taking extremely high-fatality shootings involving ten or more victims killed, no such incidents reportedly occurred in the country's history until after World War II.  Klarevas Suppl. Decl. ¶¶ 11, tbl. 1, fig. 1.  And when they did begin to occur in 1949, they occurred relatively infrequently, with a cluster of incidents in the early 1980s, followed by a lull while the federal assault weapon ban was in effect, and then followed by a spike in the average rate of occurrence—since the expiration of the federal assault weapons ban in 2004, there have been 20 double-digit-fatality mass shootings out of the 30 identified throughout American history.  *See* Suppl. Klarevas Decl. ¶   The number of double-digit mass shootings increased dramatically in the period before and after the federal assault weapons law.  *Id.*¶¶ 11–13.

Because the AWCA addresses dramatic advances in firearms technology and unprecedented social problems, a "more nuanced" analogical approach is required here.  *Bruen*, 142 S. Ct. at 2132.  To determine whether the AWCA's restrictions on certain accessories and a particular configuration of semiautomatic centerfire rifles are constitutional, the court must "reason[] by analogy" and determine whether the AWCA is "'relevantly similar'" to is historical predecessors.  *Id.*  That, in turn, requires an analysis of whether the AWCA and its historical predecessors impose

"comparable burden[s] on the right to armed self defense" and whether the modern and historic laws are "comparably justified." *Id.* at 2133.[61]

Here, the Supreme Court has already recognized that governments have had the power to regulate "dangerous [or] unusual weapons" since at least the time of Blackstone. *Heller*, 554 U.S. at 627 (citing 4 Blackstone 148–49 (1769)). These restrictions are "'relevantly similar'" that the AWCA across both dimensions that *Bruen* directs are the "central considerations when engaging in an analogical inquiry." *Bruen*, 142 S. Ct. at 2132–33 (quotation marks and emphasis omitted). Like prior restrictions on dangerous or unusual weapons, the AWCA prohibits the possession, acquisition, and use of only a small number devices, while allowing law-abiding residents to access and use a wide variety of modern firearms. And from pre-founding England to the early 20th century, governments in England and the United States restricted access to weapons that were especially likely to be used for criminal purposes and those that were especially dangerous to the general population. These restrictions include prohibitions of certain, specified weapons in pre-founding England, the colonial era and the early national period surrounding

---

[61] This case is thus fundamentally distinguishable from *Heller*, which involved a "flat ban" on the possession of handguns in the home. *Bruen*, 142 S. Ct. at 2131. The "perceived social problem" addressed by the District of Columbia's law— namely, "firearm violence in densely populated communities"—existed at the time of the ratification of the Second Amendment. *Id.* The historical analysis in that case was "straightforward." *Id.* Similarly, in *Bruen*, the Court required very close analogues to New York's ban on public-carry for most law-abiding citizens, because "New York's proper-cause requirement concerns the same alleged social problem address in *Heller*: 'handgun violence,' primarily in 'urban area[s].'" *Id.* In those cases, the Court required a "*distinctly similar* historical regulation," and the fact that "earlier generations addressed the [same] societal problem" "through materially different means," *id.* at 2131—in the case of *Bruen*, by regulating the carrying of certain weapons with "evil intent or malice" instead of prohibiting public carry in all cases, *id.* at 2141—those historical approaches "could be evidence that a modern regulation is unconstitutional," *id.* at 2131 (emphasis added).

the ratification of the Second Amendment, and ante- and postbellum America surrounding the ratification of the Fourteenth Amendment.  These laws evidence a pattern of regulation that continued into the twentieth century, when governments first confronted the dangers of semiautomatic weapons and their use by criminals, resulting in the regulation of automatic and semiautomatic weapons and firearms that utilize ammunition feeding devices in the 1920s and 1930s.  Those laws, in turn, were early precursors to effects to regulate assault weapons, after they began to be used in mass shootings in the 1980s and 1990s.  And across each time period, governments adopted these restrictions *not* when new firearms technologies were first conceived or invented, but instead only once new firearms technologies began to circulate widely in society and spill over into criminal use, presenting public safety concerns that governments attempt to address through their police powers. Spitzer Decl. ¶ 15.

As we explain below, this history shows that governments have been able to adopt laws like the AWCA consistent with the Second Amendment—restricting particular weapons posing a danger to society and that were especially likely to be used by criminals, so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses.  *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ("It would seem to follow that while society may regulate this right . . . so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and odious form of tyranny."); *id.* at 287 ("On the one hand . . . society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger . . . . On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous

49

weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.").[62]

### b.   Medieval and Pre-Founding English History

The Second Amendment codified a pre-existing right "inherited from our English ancestors," *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599), and thus restrictions on that right recognized under English law prior to the founding of the United States are relevant in understanding the scope of the inherited right. Article VII of the English Bill of Rights of 1689, "the 'predecessor to our Second Amendment,'" *id.* at 2141 (quoting *Heller*, 554 U.S. at 593), guaranteed the "Protestants . . . may have Arms for their Defence suitable to their Conditions, *and as allowed by Law*," *id.* (quoting 1 Wm. & Mary ch. 2, § 7) (emphasis added). Among other things, the plain text of the English Bill of Rights incorporated the ability of government to "allow[]" (and disallow) individuals from having certain "Arms" for their defense.  *See id.*

This right was recognized by Blackstone as the "fifth and last auxiliary right." 1 Blackstone ch. 1 (1769).  According to Blackstone, the auxiliary rights were "subordinate rights" "declared, ascertained and protected by the dead letter of the laws" and "barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."  *Id.*  The fifth auxiliary right of English subjects was "that of having arms for their defence, suitable to their condition and degree, and *such as are allowed by law*."  *Id.* (emphasis added).[63]  Blackstone went on to explain that this right was "a public

---

[62] Additional historical research may uncover additional laws or traditions of regulation that are analogous to the AWCA.  *See infra* pp. 76–77 (explaining why additional research is necessary before this court can render judgment).  But in light of the ubiquity of dangerous weapons laws during the 18th and 19th centuries, modern assault weapon restrictions are "analogous enough to pass constitutional muster."  *Bruen*, 142 S. Ct. at 2118.

[63] Blackstone's use of the word "such" refers to the types of arms that

allowance, under *due restrictions*, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.* (emphasis added).  Accordingly, Blackstone recognized that the right to keep and bear arms was subject to "due restrictions." *See Young v. Hawaii*, 992 F.3d 765, 793 (9th Cir. 2021) (en banc) (noting that the English Bill of Rights "recognized that even the right of self-defense could be curtailed by government action 'as allowed by law'"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

Consistent with this conception of an auxiliary right that could be qualified by concerns over threats to public safety and order, for hundreds of years English monarchs had the power to identify certain arms that subjects could not possess or carry.  *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en banc) (reviewing English prohibitions on the carrying of certain arms in the 16th and 17th centuries), *abrogated on other grounds by Bruen*, 142 S. Ct. 211.  For example, in 1541, under Henry VIII, Parliament enacted a statute prohibiting the "use or ke[eping] in his or their houses or elsewhere any Crosbowe handgun hagbutt or demy hake."  33 Hen. 8, ch. 6 § 1 at 832 (1541).[64]  Henry VIII was concerned about safety issues associated with the particular prohibited weapons; the prohibition targeted "little short handguns" and "little haquebuts," which were a source of "great peril and continual feare and danger of the kings loving subjects." Patrick Charles, *supra*, at 62 (quotation marks and citation omitted). Notwithstanding these dangers, Henry VIII's prohibition exempted lords living within twelve miles of the Scottish border, allowing those lords to keep and bear those weapons to defend the border.  *See* 33 Hen. VIII, ch. 6 § 18 at 835.  But in recognition of the dangers posed by these weapons, and as a way to promote peace subjects were free to have.

---

[64] Hagbutts and demy-hakes referred to arquebuses. *See* Somerset Record Society, Vol. XX, at 332 (1904).

51

between England and Scotland, James I repealed this limited exception and prohibited all subjects from possessing those listed weapons, in 1607.  4 Jac. I, ch. 1 (1606).[65]  As explained by Granville Sharp, a "particularly important source" on the English Bill of Rights, whose account was discussed in *Heller*:

> [The] latter expression, '*as allowed by law*,' respects the limitations in the above-mentioned act of 33 Hen. VIII, c. 6, which restrain the use of *some particular sort of arms*, meaning only such arms as were liable to be *concealed*, or otherwise favour the designs of murderers . . . .

*Peruta*, 824 F.3d at 932.

Accordingly, the pre-existing right inherited from England and incorporated into the Second Amendment expressly permitted government regulation of particular weapons that threaten public safety and order, as demonstrated by the restrictions on crossbows and short pistols in the 16th and 17th centuries.

### c.   Colonial and Early National History:  Laws Enacted Around the Time of the Ratification of the Second Amendment

During the colonial period and through the founding, around the time of the ratification of the Bill of Rights, colonial and state governments imposed regulations on firearms hardware and accessories and other weapons deemed to pose threats to public safety.  Indeed, "[g]un safety regulation was commonplace in the American colonies from their earliest days."  Winkler, *supra*, at 115. Governments in the early years of our nation faced significant threats to public safety, and "[w]hen public safety demanded that gun owners do something"— including actions that would impair their ability to have arms at the ready for self-

---

[65] And before Henry VIII prohibited the possession of crossbows and handguns, Richard II prohibited the possession of the launcegay, a 10–12-foot-long lightweight lance.  *Bruen*, 142 S. Ct. at 2140 (citing 7 Rich. 2, ch. 13 (1383), *and* 20 Rich. 2, ch. 1 (1396)).  Launcegays "were generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace."  *Id.*  Because assault weapons, unlike handguns, are also most suitable for military use, *see supra* at pp. 32–35, the restrictions on launcegays remains relevant.

defense—"the government was recognized to have the authority to make them do it." *Id.*  In the colonial era, governments imposed several types of restrictions on the ability to keep firearms and firearm accessories inside the home, by regulating dangerous conditions, uses, or configurations.  In doing so, these governments did not believe they were eliminating the ability of colonists to defend themselves with arms.  *See* Winkler, *supra*, at 113.

First, during the colonial period and at the founding, governments heavily regulated guns and gunpowder, both to ensure the readiness of the militia, and to protect the public from harm.  In particular, governments regulated the storage of gunpowder inside the home.  Laws required gunpowder to be stored on the top floor of a building and permitted government officials to remove it when necessary to prevent explosions and to transfer the powder to the public magazine.  *See* Cornell Decl. ¶¶ 35–37.  Under these gun powder storage laws, individuals were not free to stockpile as much gunpowder as they may have wished—or felt necessary for self-protection—nor could they keep the gunpowder in the home in any manner that they wished.[66]

"When public safety demanded it, the founding fathers were willing to go even further," by prohibiting individuals from keeping loaded firearms inside the home."  Winkler, *supra*, at 117.  In 1783, Massachusetts enacted a law prohibiting storing a loaded weapon in the home, "a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb."  Cornell Decl. ¶ 36.  Given how "time-consuming the loading of a gun was in those days," this restriction "imposed a significant burden on one's ability to have a functional firearm available for self-defense inside the home," and yet "there is no record of

---

[66] Maine also enacted a law in 1821, authorizing town officials to enter any building to search for gun powder.  Cornell Decl. ¶ 40 (citing 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5).

anyone's complaining that this law infringed the people's right to keep and bear arms." Winkler, *supra*, at 117.  Even though this law was enacted to prevent accidental explosions and fires, rather than intentional harm with a loaded firearm, "the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city." *Id.*

Second, during the colonial period, states began to enact restrictions on "trap guns," laws that proliferated in the 19th century.  *See* Spitzer Decl. ¶¶ 50–53, App. 1 (listing years of enactment of trap gun laws); *id.*, App. 8 (providing text of trap gun restrictions).  A trap gun was a firearm that was configured in a way to fire remotely (without the user operating the firearm), typically by rigging the firearm to be fired by a string or wire when tripped.  Spitzer Decl. ¶ 50.  Trap guns were used to hunt wildlife and to protect personal or commercial property.  *Id.*  In 1771, New Jersey was the first colony to prohibit trap guns, noting that they represented "a most dangerous Method of setting Guns [that] has too much prevailed in this Province."  *Id.* (quoting 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.).  Just as Massachusetts prohibited the storage of loaded guns inside the home to prevent accidental harm, trap gun laws regulated the manner in which firearms could be kept and configured to protect the public from harm.  Restrictions on trap guns that originated during the colonial period were enacted due to the threat posed to innocent life.  *Id.*

Third, colonial governments enacted various prohibitions on the "carrying of dangerous [or] unusual weapons," "a fact [that the Court] already acknowledged in *Heller*."  *Bruen*, 142 S. Ct. at 2143; *see also* Spitzer Decl., Ex. E.  Some of those restrictions specified particular weapons that could not be carried.  For example, New Jersey (1686) enacted restrictions on the carrying of concealable weapons in public, prohibiting any person "privately to wear any pocket pistol, skeins, stilettoes, daggers or dirks, or other unusual or unlawful weapons."  *See* Spitzer

Decl., Ex. E (citing The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881)); *see also Bruen*, 142 S. Ct. at 2143 (discussing the 1686 New Jersey restrictions on the carrying of "dangerous or unlawful weapons"). These restrictions on "dangerous or unusual" weapons were adopted because the weapons induced "great fear and quarrels." Spitzer Decl. ¶ 49. Notably, this law "did not apply to all pistols, let alone all firearms," *Bruen*, 142 S. Ct. at 2143, leaving other arms available to carry for self-defense. And shortly after ratification of the Second Amendment in 1791, states enacted restrictions on the carrying of concealable weapons. Virginia, for instance, enacted a law in 1794 that prohibited the carrying of certain concealable weapons. Spitzer Decl., Ex. B. Some of these dangerous weapons laws restricted certain weapons by name, including "bludgeons" (the earliest enacted in 1799) and "clubs" (seven laws enacted in the 1600s–1700s). Spitzer Decl. ¶¶ 41, 43; *see also id.*, Ex. E.[67]

Fourth, the Conductor Generalis—a founding-era guide for justices of the peace, sheriffs, and constables that relied heavily on the 1791 treatise of William Hawkins on English law—provided that an "affray" was a public offense and that there may be an affray "where there is no actual violence," such as "where a man

---

[67] The anti-club laws enacted in the 18th century and earlier focused on the carrying of clubs by certain groups of prohibited persons, *see* 1798 Ky. Acts 106; 1799 Miss. Laws 113, A Law for the Regulation of Slaves; The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894), or in gatherings of groups of people in public, *see* An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1; 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[68]

These colonial- and founding- era enactments demonstrated that the right to keep and bear arms was tempered by the government's ability to regulate dangerous or unusual weapons to promote public-safety interests.  And the governments enacting these laws did not see themselves as eliminating the ability of individuals to use arms for self-defense, even if they made it marginally more difficult or less efficient in doing so.

### d.  Antebellum and Postbellum History:  Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment

During the antebellum and postbellum period, around the time that the Fourteenth Amendment was ratified, numerous states restricted particular weapons deemed to be particularly dangerous or susceptible to criminal misuse.  As homicide rates increased in the South in the early 1800s, states began restricting the carrying of certain concealable weapons.  *See* Roth Decl. ¶ 21; Spitzer Decl. ¶ 30; Rivas Decl. ¶ 12–25.  Throughout the 1800s, states enacted a range of laws restricting the carrying of blunt weapons:  12 states restricted "bludgeons"; 14 states restricted "billies"; seven states restricted "clubs"[69]; 43 states restricted

---

[68] The Conductor Generalis: Or, the Office, Duty, and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, and Overseers of the Poor, and also The Office of Clerks of Assize, and of the Peace, &c. Albany, 1794, at 26.

[69] These 19th century laws generally prohibited slaves from carrying clubs, *see* Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835); 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; 1798 Ky. Acts 106; 1804 Miss. Laws 90, An Act Respecting Slaves, § 4; Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803), or prohibited the throwing of clubs at trains or railroad, *see* 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With

"slingshots"; six states restricted "sandbags"; and 12 states broadly restricted any concealed weapon.  *See* Spitzer Decl., Ex. C.  Many of these laws were enacted shortly before and after the ratification of the Fourteenth Amendment.  *Id.*

In addition to prohibiting concealable, blunt weapons—which are dangerous weapons used mainly for criminal mischief—49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives" in the 19th century, including around the time that the Fourteenth Amendment was ratified.  *See* Spitzer Decl. ¶ 36; *id.*, Ex. C.  Most of these restrictions targeted the carrying of such knives, though Iowa banned their possession, along with the possession of other "dangerous or deadly weapon[s]," in 1887.  *See id.*, Ex. E at 24. The Bowie knife arose to prominence in the 1830s, as a distinctive long-bladed, single-edged knife with a hand guard.  Spitzer Decl. ¶ 36.  These knives were associated with brawling and other interpersonal violence.  As a grand jury in 1834 observed, people young and old armed themselves with fighting knives "under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity . . . [and] we so often hear of the stabbing shooting & murdering [of] so many of our citizens."  *Id.* (citation omitted). The Bowie knife became notorious in the 1830s, with "most of the American public [being] well aware of the Bowie knife."  *Id.* ¶ 37.  And this negative reputation fueled greater demand for the weapon.  *Id.*  In *Aymette v. State*, 21 Tenn. 154 (1840), the Tennessee Supreme Court upheld a conviction for carrying a concealed Bowie knife, noting that the weapons proscribed under the applicable statute, including the Bowie knife, "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."  *Id.* at 158.  The court

---

Trains or Railroads, chap. 79, § 1; the Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881); 1905 Ind. Acts 677.

1    also indicated that the state had "a right to prohibit the wearing or keeping [of]

2    weapons dangerous to the peace and safety of the citizens, and which are not usual

3    in civilized warfare, or would not contribute to the common defence." *Id.* at 159.[70]

4         The proliferation of dangerous weapons laws was not limited to blunt weapons

5    and fighting knives.  Many state laws enacted during this time also included

6    revolvers and pistols in their lists of proscribed weapons.  *See* Roth Decl. ¶ 21

7    (discussing restrictions on the carrying of certain concealable weapons in Kentucky,

8    Louisiana, Indiana, Georgia, and Virginia between 1813 and 1838).  These laws

9    aimed to curb the use of concealable weapons that exacerbated rising homicide

10   rates in the South and its borderlands.  *Id.*  Later, in the 1870s, Arkansas and

11   Tennessee adopted restrictions on the public carrying of pistols, along with

12   regulations on dealers selling pistols.  Rivas Decl. ¶ 14.  These attempts to regulate

13   pistols were invalidated by the state courts for being overly broad in prohibiting the

14   keeping and carrying of all pistols in public.  *See Andrews v. State*, 50 Tenn. 165

15   (1871); *Wilson v. State*, 33 Ark. 557 (1878).  In *Andrews*, the Tennessee Supreme

16   Court struck down a law prohibiting the carrying of any pistol "publicly or

17   privately, without regard to time or place, or circumstances."  50 Tenn. at 187.  In

18   response, in 1871, Tennessee amended the statute to exempt the carrying of "an

19   army pistol, or such as are commonly carried and used in the United States army" if

20   the weapon was carried "only in his hands."  *State v. Wilburn*, 66 Tenn. 57, 61

21   (1872).  This exception applied to military officers, police, and persons on a

22   journey.  *Id.*  The purpose of Tennessee's law was "to preserve the peace and to

23   prevent homicide."  *Id.*  The Tennessee Supreme Court upheld the revised law as

24

25

26   _____

27   [70] The *Heller* Court viewed *Aymette*'s reading of the Second Amendment as
     "odd" and inconsistent with the right recognized in *Heller*.  *Heller*, 554 U.S. at 613.
     Nevertheless, *Aymette* articulates Tennessee's reasons for prohibiting the carrying
28   of Bowie knives and other dangerous weapons.

1    "clearly constitutional" under the state constitution, which expressly empowered

2    the legislature "to regulate the wearing of arms, with a view to prevent crime." *Id.*

3        Similarly, after the Arkansas Supreme Court invalidated the state's carry

4    restrictions on pistols, dirks, butcher or bowie knives, swords or spears in a cane,

5    brass or metal knuckles, or razors on the ground that the prohibition on the public

6    carry of pistols was too broad—it prohibited any "citizen from wearing or carrying

7    a war arm," which the court viewed as an "unwarranted restriction upon his

8    constitutional right to keep and bear arms." *Andrews*, 50 Tenn. at 187.  In response,

9    consistent with Tennessee's approach, Arkansas amended the statute to permit the

10   carry of army and navy pistols carried only in the hand.  Acts of the General

11   Assembly of Arkansas, No. 96 § 3 (1881); *see* Rivas Decl. ¶ 16.[71]  Tennessee's and

12   Arkansas' narrow exceptions for certain types of pistols reflect the states'

13   determined efforts to "curtail as much as possible the carrying of [the listed

14   dangerous] weapons in public spaces so that a person would only do so in the event

15   of a real emergency."  Rivas Decl. ¶ 16.

16       The Tennessee and Arkansas experiences demonstrate that the states retained

17   broad police powers to regulate the use of certain enumerated concealable weapons,

18   based on public safety concerns, while carving out exceptions for larger military

19   weapons. *See Bruen*, 142 S. Ct. at 2147 n.20 (noting that the "Arkansas Supreme

20   Court would later adopt Tennessee's approach, which tolerated the prohibition of

21   all public carry of handguns except for military-style revolvers").  Though the

22

23       [71] *Nunn v. State*, 1 Ga. 243 (1846), invalidated a Georgia law that broadly

24   prohibited the wearing or carrying of pistols, without distinguishing between open
     and concealed carry. *Bruen*, 142 S. Ct. at 2147. According to *Nunn*, the state could

25   not prohibit both open and concealed carry of pistols consistent with the Second
     Amendment. *Id.* But critically, *Nunn* "was never intended to hold that men,

26   women, and children had some inherent right to keep and carry arms or weapons *of*

27   *every description*." *Hertz v. Bennett*, 294 Ga. 62, 68 (2013) (emphasis added)

28   (quotation marks and citation omitted).

1   Supreme Court has since clarified that the Second Amendment protects the right to

2   keep and bear arms "in common use" for self-defense (rather than military use),

3   these cases illustrate that governments could prohibit certain weapons so long as

4   constitutionally protected weapons remained available.

5       While antebellum state-court decisions "evidence[d] a consensus view that

6   States could not altogether prohibit the public carry of 'arms' protected by the

7   Second Amendment or state analogues," *Bruen*, 142 S. Ct. at 2147, these decisions

8   demonstrate that states retained broad police powers, notwithstanding the Second

9   Amendment and its state analogues, to regulate particular weapons.  As explained

10   in one of the most important early American firearms cases, *State v. Reid*, 1 Ala.

11   612 (1840), the Second Amendment left "with the Legislature the authority to adopt

12   such regulations of police, as may be dictated by the safety of the people and the

13   advancement of public morals." *Id.* at 616.  The dangerous weapons laws that

14   proliferated before and after the ratification of the Fourteenth Amendment provide

15   substantial historical support for the AWCA's restrictions on certain combat-

16   oriented firearms accessories, which leave a range of other firearms and weapons

17   available for lawful self-defense and thus do not destroy the right protected by the

18   Second Amendment.  *See infra* pp. 43–73.

19       When the Fourteenth Amendment was ratified, the people at that time

20   understood the critical role that the state police powers would play in protecting the

21   public from harm.  For example, state constitutions adopted during Reconstruction

22   expressly linked the right to keep and bear arms to the state's authority to regulate

23   arms:  "Every person shall have the right to keep and bear arms, in the lawful

24   defence of himself or the government, under such regulations as the Legislature

25   may prescribe."  Cornell Decl. ¶ 35 (quoting Tex. Const. of 1868, art. I, § 13); *see*

26   *also id.* at 22 n.73 (describing similar constitutional provisions in the Idaho

27   Constitution of 1896 and the Utah Constitution of 1896).

28

1    During the Reconstruction, positive law was not the only means through

2  which governments regulated dangerous weapons.  During this period, the federal

3  government regulated access to particularly dangerous weapons, including

4  repeating rifles that began to circulate in the postbellum period.  *See* Vorenberg

5  Decl. ¶¶ 7–10, 103.  Following the Civil War, Henry and Winchester lever-action

6  repeating rifles were the most lethal, large-capacity firearms of their day.  *Id.* ¶¶ 18,

7  19.  These rifles enabled a shooter to fire numerous rounds repeatedly without

8  reloading, though the shooter had to manipulate a lever prior to each successive

9  shot.  *Id.* ¶ 18.  These weapons came to be associated with the military and law

10  enforcement, not individual self-defense, and their circulation remained low, with

11  few documented instances of possession by civilians.  *Id.* ¶¶ 21–25, 47, 91–92.

12  Despite their potency as a weapon of war, the military showed reluctance to

13  adopting Henry and Winchester rifles on account of the extraordinary danger posed

14  to the rifles' users as well as their targets.  *Id.* ¶¶ 21–22, 54, 59–60.

15    The end of the Civil War introduced a period of military occupation of

16  formerly Confederate states in which state-run militias (a couple of which armed

17  themselves with Winchester rifles, *id.* ¶¶ 37, 76) worked in partnership with the

18  U.S. military to control potential insurrectionists who threatened to undermine the

19  civil rights of Black Americans or in any way jeopardize pro-Union citizens and

20  institutions, *id.* ¶¶ [35–43].  State militias, the U.S. army, and even the president (as

21  commander-in-chief of the army) worked to prevent access to firearms by

22  insurrectionary groups, such as through executive orders to surrender their arms,

23  using private intelligence to identify and confiscate arms shipments.  *Id.* ¶¶ 44–45.

24  And after the U.S.'s humiliating defeat at the Battle of Little Big Horn by troops of

25  Plains Indians armed with Winchesters, *id.* ¶¶ 56–57 (possibly stolen from

26  emigrants and settlers headed west, *id.* ¶ 55), the U.S. army banned trade of

27  repeating rifles to Native Americans, while law enforcement targeted for arrest

28  traders who violated this policy, *id.* ¶ 59.  Thus, even where no state statute

expressly banned possession of high-capacity firearms, state officials acted to restrict their ownership and use through other means that were tailored to the particular dangers these weapons posed when in the hands of adversaries such as Native Americans and pro-Redemption Southerners.  This de facto regulation of repeating rifles effectively controlled the use and circulation of these weapons, *see id.* ¶ 8, reducing any need for legislative responses to the threats that they posed to public safety and post-war efforts to unify the country, *see* Spitzer Decl. ¶ 15 (explaining that government regulation of firearm technologies only occurs when the technologies circulate sufficiently in society and spill over into criminal and other harmful uses).  This regulation also coincided with other legislative efforts to restrict the carrying of certain concealable weapons that were uniquely susceptible to criminal use, did not have legitimate self-defense uses, and posed a significant threat to public safety at that time.

Laws restricting particular concealable weapons in the 1800s were enacted during a period that corresponded with dramatic societal changes following the Civil War and the development of new firearms technologies.  *See* Roth Decl. ¶ 21 (describing rise in homicide rates nationwide in the 1840s and 1850s, which "spiked even higher" during the Civil War and postbellum period).  The society that ratified the Fourteenth Amendment, during this period of intense social and technological change, was different that the generation that ratified the Second Amendment.  *See* Cornell Decl. ¶ 36.  The nature of government regulation of firearms and other weapons during that time is particularly relevant to understanding the scope of the right incorporated through the Fourteenth Amendment.  As noted in *Bruen*, the Second Amendment was made applicable to the states not in 1791, but in 1868, with the ratification of the Fourteenth Amendment.  *Bruen*, 143 S. Ct. at 2138.

The Court in *Bruen* did not have occasion to resolve whether courts should "primarily rely on the prevailing understanding of an individual right when the

1   Fourteenth Amendment was ratified in 1868" because, with respect to the law

2   challenged in *Bruen*, "the public understanding of the right to keep and bear arms in

3   both 1791 and 1868 was, for all relevant purposes, the same with respect to public

4   carry." *Id.*  Nevertheless, the Court did survey numerous statutes and cases from

5   the antebellum and postbellum periods in assessing the scope of the right.  And at

6   least one federal circuit court has focused on the public understanding of the right

7   as it existed in 1868.  *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir.

8   2011) ("*McDonald* confirms that when state- or local-government action is

9   challenged, the focus of the original-meaning inquiry is carried forward in time; the

10  Second Amendment's scope as a limitation on the States depends on how the right

11  was understood *when the Fourteenth Amendment was ratified*." (emphasis added).

12  Here, as in *Bruen*, the restrictions on dangerous weapons were enacted throughout

13  American history, and robust government regulation of arms was incorporated into

14  the pre-existing right inherited from pre-founding England.  But the antebellum and

15  postbellum period has particular importance because the Fourteenth Amendment

16  was ratified around that time and the framers of that amendment were confronting

17  new challenges and public needs.

18          **e.    Twentieth Century History**

19          Although *Bruen* re-focuses the historical analysis on the periods surrounding

20  the ratification of the Second and Fourteenth Amendments, laws enacted during the

21  early 20th century are also instructive and provide additional support for the

22  constitutionality of the AWCA.  In *Bruen*, the Court discounted the probative value

23  of public carry laws from the 20th century because they "contradict[ed] earlier

24  evidence" from periods closer to the ratification of the amendments, 142 S. Ct. at

25  2153 n.28, but here numerous early 20th century laws are consistent with the earlier

26  historical analogues.  In the early 20th century, state governments began regulating

27  automatic and semiautomatic firearms and firearms capable of receiving

28  ammunition from an ammunition feeding device when those weapons began to be

63

1  used in gun violence by organized crime.  *See* Spitzer Decl. ¶ 4 (describing the St.

2  Valentine's Day Massacre).  These restrictions presaged the assault weapon

3  restrictions, like the AWCA, enacted in the late 20th century when assault weapons

4  began to be used frequently in mass shootings.

5       In the prior proceeding in this case, Defendants cited several state restrictions

6  on semiautomatic weapons capable of firing a certain number of rounds repeatedly

7  without reloading:  Michigan, Rhode Island, and Ohio enacted restrictions on

8  semiautomatic weapons capable of firing sixteen, twelve, and eighteen shots,

9  respectively, without reloading.  Defs.' Trial Ex. S (Mich. Public Acts, 1927 – No.

10  372); Defs.' Trial Ex. T (R.I. Public Acts, 1927 – Ch. 1052); Defs.' Trial Ex. U

11  (Ohio General Code, 1933 – § 12819 3).  Additionally, in 1932, Congress enacted a

12  twelve-shot restriction on semiautomatic weapons in the District of Columbia.

13  Defs.' Trial Ex. V (Pub. L. No. 275, 1932 – 72d Cong., Sess. I, chs. 465, 466).

14  Notably, the National Rifle Association endorsed the District of Columbia

15  semiautomatic firing capacity law, stating that "it is our desire [that] this legislation

16  be enacted for the District of Columbia, in which case it can then be used as a guide

17  throughout the states of the Union."  S. Rep. No. 72-575, at 5–6 (1932); *see also*

18  Spitzer Decl. ¶ 6.

19       Since that prior proceeding, continuing historical research has uncovered

20  additional early 20th-century laws regulating automatic and semiautomatic

21  weapons, including restrictions on firearms capable of firing a certain number of

22  rounds or capable of receiving ammunition from an ammunition feeding device.

23  *See* Spitzer Decl. ¶¶ 12–14; *id.*, Ex. D.  Thirteen states enacted restrictions on

24  semiautomatic or fully automatic firearms capable of firing a certain number of

25  rounds without reloading; eight states regulated fully automatic weapons, defined as

26  a firearm capable of firing a certain number of rounds without reloading or

27  accepting an ammunition feeding device; and four states restricted all guns that

28  could receive any type of ammunition feeding mechanism or round feeding device

1    and fire them continuously in a fully automatic manner, including a 1927 California

2    law. *See* Spitzer Decl. ¶¶ 13–14; 1927 Cal. Stat. 938. Although these were state

3    laws, there were attempts to nationalize these restrictions. In 1928, the National

4    Conference of Commissioners on Uniform State Laws, adopted a model law

5    prohibiting the possession of "any firearm which shoots more than twelve shots

6    semi-automatically without reloading."[72] And finally, in 1934, Congress passed the

7    National Firearms Act, significantly restricting fully automatic weapons. An earlier

8    draft of the legislation included restrictions on semiautomatic weapons, and in

9    testifying before Congress on that version of the bill, former U.S. Attorney General

10    Homer Cummings testified that the goal of the bill was to undermine the ability of

11    "people in the underworld today armed with deadly weapons." Spitzer Decl. ¶ 8.

12    In the end, the National Firearms Act restricted only fully automatic weapons. *Id.*

13    ¶ 9.

14        These early 20th century firearm regulations followed the same regulatory

15    pattern of state and federal restrictions on assault weapons in the late 20th century

16    after the rise in mass shootings. *See* Robert J. Spitzer, *Gun Law History in the*

17    *United States and Second Amendment Rights*, 80 Law & Contemporary

18    Problems 55 (2017) at 69 (noting that assault weapons regulations were "presaged

19    by the successful, and at the time obviously uncontroversial, regulation of semi-

20    automatic weapons in the 1920s and 1930s"). These laws were also similar to the

21    regulatory approaches to addressing the prevalence of concealable weapons in

22    crime and homicide before the 20th century and even before the founding. *See*

23    *supra* at pp. 43–73.

24

25

26

27

28

---

[72] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

### 3.    The Historical Firearm Restrictions Are Relevantly Similar to the AWCA

The AWCA's modern restrictions on assault weapons are relevantly similar to the historical analogues.  *Bruen* explained that a modern law is relevantly similar to a historical analogue if they are comparable in two respects:  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2133.  The AWCA imposes a burden comparable to the historical analogues discussed above, and it is comparably justified in promoting public-safety goals.

#### a.    Comparable Burden

The AWCA imposes a comparable burden on the right to armed self-defense as the historical analogues, because it restricts only highly "dangerous" or "unusual" items, *Heller*, 554 —combat-oriented accessories and a particular configuration of semiautomatic rifles that makes them especially unusual—leaving law-abiding citizens access to a range of other firearms to exercise their right to armed self-defense.  Unlike burdens on free speech, which would be onerous if certain types of expression were outlawed, the Second Amendment does not protect a right to any particular arm, but instead protects a more general right to armed self-defense.  *See Bruen*, 142 S. Ct. at 2118; *see also Heller*, 554 U.S. at 603.  The AWCA does not impose a significant burden on the right to armed self-defense because "individuals remain free to choose any weapon that is *not* restricted by the AWCA or another state law."  *Rupp*, 401 F. Supp. 3d at 989 (citation and quotation marks omitted); *see also Worman*, 922 F.3d at 37 (holding that assault-weapon law "does not heavily burden the core right of self-defense in the home" because it "does not ban all semiautomatic weapons and magazines" and instead "proscribes only . . . semiautomatic assault weapons that have certain combat-style features").[73]

_____

[73] The reasoning of the pre-*Bruen* cases selecting intermediate scrutiny as the

The availability of non-assault weapons, including California-compliant AR-platform rifles, "most long guns plus pistols and revolvers," "gives householders adequate means of defense." *Friedman*, 784 F.3d at 411. The minimal burdens of the AWCA on the right to armed defense are comparable to, or even less than, than the burdens imposed on that right by the historical analogues for three different reasons.

*First*, the dangerous weapons laws enacted throughout American history did not prohibit the carrying of all weapons for self-defense. Rather, they targeted certain weapons uniquely susceptible to criminal use and associated with rising homicide rates at the time. *See supra* at pp. 50–73. They also ensured that individuals retained access to firearms to use for constitutionally protected purposes. Tennessee and Arkansas, for example, banned the public carrying of a range of knives, blunt weapons, and pistols, with an exception for large army and navy pistols so long as they were carried openly in the hand, reducing the burden on the right. *See* Rivas Decl. ¶ 19.

*Second*, the prohibitions on trap guns enacted since the founding regulated only the manner in which firearms could be configured, such as attaching a trip wire to a rifle, and did not prevent gun owners from using those firearms for self-defense. Like the trap gun laws, the AWCA prohibits gun owners from configuring their weapons in certain ways, but still permits them to possess and use the underlying weapons without the prohibited features. *See supra* at pp. 23–25.

*Third*, the gunpowder and firearm storage laws enacted during the colonial and founding periods imposed a burden on the ability of individuals to use firearms for self-defense, by limiting the amount of gunpowder that may be kept in the home and where it may be kept. *See supra* at pp. 52–54. Massachusetts went even

---

appropriate level of scrutiny to evaluate assault weapons bans remains relevant in assessing the degree to which the AWCA burdens the right to armed defense for purposes of conducting the historical analysis called for by *Bruen*.

further by prohibiting the possession of loaded firearms inside the home.  *See supra* at pp. 53–54.  Nevertheless, no one viewed these laws as preventing gun owners from keeping and bearing arms for self-defense.  The AWCA is less burdensome than these laws, because it does not limit the amount of ammunition that may be kept or the manner in which firearms may be stored in the home.

This minimal burden imposed by the AWCA and its historical analogues—restricting only the most dangerous accessories or configurations—stands in stark contrast to the burden imposed by the laws at issue in *Heller*, *McDonald*, and *Bruen*, which were found to effectively destroy the right to armed self-defense inside and outside the home.  The historical laws distinguished in *Bruen* were not comparably burdensome because those laws permitted public carry in certain circumstances, whereas the law in *Bruen* did not.  *See Bruen*, 142 S. Ct. at 2150 ("None of the[ antebellum] historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.").

Nor does it matter that many of the historical laws relied upon in this case regulated the carrying of certain weapons, instead of prohibiting their possession altogether.  Indeed, *Heller* makes clear that laws prohibiting the *possession* of especially dangerous weapons (like machine guns) is "fairly supported by the historical tradition of prohibiting the *carrying* of 'dangerous [or] unusual weapons.'"  554 U.S. at 627 (emphasis added).  Moreover, many states did prohibit possession of those weapons, or imposed sales taxes that made it very difficult to acquire them.  *See* Spitzer Decl. ¶ 39; Rivas Decl. ¶¶ 14, 17.  And there are historically grounded explanations for why states regulated weapons differently in the past.  Since 1791—and even since 1868—American society has become increasingly urbanized and has seen its population swell, demographic changes that have diminished social trust and required more restrictive laws to protect the public.

1   *See* Patrick Charles, *supra*, at 141 ("Needless to say, as the population of the United

2   States continued to grow, the small communal aspect of many American towns,

3   localities, and cities began to disintegrate, and would have required state and local

4   governments to adopt more tangible forms of restricting armed carriage."); Cornell

5   Decl. ¶ 25 ("[T]here was no comparable societal ill to the modern gun violence

6   problem for Americans to solve in the era of the Second Amendment.  A

7   combination of factors, including the nature of firearms technology and the realities

8   of living life in small, face-to-face, and mostly homogenous rural communities that

9   typified many parts of early America, militated against the development of such a

10  problem.").  Nothing in *Bruen* suggests that the historical analogues must have

11  selected the same mode of regulation (e.g., possession ban or carry restriction), so

12  long as the burdens on the right to armed self-defense are comparable.  *See Bruen*,

13  142 S. Ct. at 2132 ("[C]ases implicating unprecedented societal concerns or

14  dramatic technological changes . . . require a more nuanced approach.").

15      In any event, laws that regulate the carrying of certain dangerous weapons not

16  suitable for self-defense are sufficiently analogous to laws prohibiting the

17  possession of those weapons, as both impose a slight burden on the right to armed

18  self-defense.  What matters is the dangerous attributes and criminal uses of the

19  restricted weapons, and the fact that the AWCA does not impact a range of

20  alternative arms that may be used for effective self-defense diminishes the burden

21  on the Second Amendment right.  Prohibitions on the carrying of certain dangerous

22  weapons impose a comparable burden on the right to armed self-defense to

23  prohibitions on the possession of those weapons.

24          **b.   Comparable Justification**

25      In addition to imposing a comparable, minimal burden on the right to armed-

26  self-defense, the AWCA has a comparable justification to the historical analogues:

27  protecting the public from gun violence and mass injury.  More specifically, like its

28  historical predecessors, the AWCA regulates components or configurations of

69

1   weapons that are especially dangerous to the public's safety and especially likely to

2   be used for criminal purposes.

3        The first assault weapons ban in the Nation—the original AWCA—was

4   enacted following a mass shooting in Stockton, California in 1989, in which a

5   shooter used a semiautomatic AK-47 to kill five children and wound 32 others,

6   Spitzer Decl. ¶ 1, and the law was amended in 2000 to add the features-based

7   definition of an assault weapon challenged in this case, Cal. Penal Code § 30515(a).

8   Both before and after, empirical evidence shows that assault weapons are used

9   frequently in various kinds of mass shootings, consistently resulting in more deaths

10  and injuries when compared to mass shootings not involving assault weapons.  *See*

11  Defs.' Trial Ex. A (Allen Decl.) ¶¶ 32–34; Defs.' Trial Ex. E (Klarevas Decl.) ¶ 17

12  & tbl. 2; Suppl. Donohue Decl. ¶ 21.  Assault weapons were used in seven of the 10

13  deadliest mass shootings in the United States since 1980.  Defs.' Trial Ex. E

14  (Klarevas Decl.) ¶ 10, tbl. 1.  Accounting for all mass shootings in the United States

15  until 2022, 53% of all double-digit-fatality mass shootings (involving 10 or more

16  fatalities not including the shooter) involved the use of assault weapons (16/30), but

17  73% of such shootings in the past two decades involved assault weapons (12/16).

18  *See* Klarevas Decl., tbl. 1.  And 78% of mass shootings involving 20 fatalities or

19  more throughout U.S. history involved assault weapons (with 100% of such

20  incidents involving magazines capable of holding more than 10 rounds).  *Id.* ¶ 14.

21        Evidence also indicates that assault weapons and other semiautomatic

22  weapons equipped with large-capacity magazines account for 22 to 36 percent of

23  crime guns, and are used in a significant share of firearm mass murders (57%).

24  Defs.' Trial Ex. Y at 1; Defs.' Trial Ex. E (Klarevas Decl.) ¶ 16.  Assault weapons

25  are also used disproportionately in gun violence against law enforcement personnel

26  (13–16% of guns used in the murder of police were assault weapons).  Defs.' Trial

27  Ex. Y at 1, 7.  These figures far outpace the representation of assault weapons

28  among all firearms in circulation (approximately 5%).  Suppl. Klarevas Decl. ¶ 15.

70

1   Moreover, assault weapons cause extensive injuries due to the cavitation effect of
2   small caliber-high velocity rounds fired from AR-platform rifles.  Defs.' Trial Ex. B
3   (Colwell Decl.) ¶¶ 9, 12; Defs.' Trial Ex. AB at 181–82.

4        The evidence also shows that assault weapon restrictions like the AWCA are
5   effective in reducing the frequency and lethality of mass shootings.  States that
6   enacted assault weapon restrictions like the AWCA experience fewer mass
7   shootings and, when they occur, fewer deaths and injuries in those shootings.
8   Defs.' Trial Ex. E (Klarevas Decl.) ¶ 27 (states that enacted assault weapon
9   restrictions experienced a 46% decrease in the incidence rate of mass shootings and
10  a 57% reduction in the fatality rate).  This is consistent with the Nation's experience
11  before, during, and after the federal assault weapons ban—mass shootings and
12  fatalities in mass shootings declined during the decade in which the federal ban was
13  in effect, and spiked once the ban was lifted in 2004.  Defs.' Trial Ex. E (Klarevas
14  Decl.) ¶ 27 & tbl. 4; *see also* Suppl. Donohue Decl. ¶ 22 & fig. 2.  And according to
15  a 2017 New York Times survey of 32 current or former academics in criminology,
16  public health, and law, the measures deemed "most effective in dealing with the
17  mass shooting epidemic" in the United States was a restriction like the AWCA, and
18  "[t]he evidence in support of a ban has grown tragically stronger since then."[74]

19       These justifications—protecting people from gun violence, and targeting
20  weapons likely to be used for criminal purposes—accord with the justifications of
21  firearms restrictions through Anglo-American history in at least three ways.  *First*,
22  the dangerous weapons laws enacted throughout American history addressed
23  myriad firearms and other weapons that contributed to interpersonal violence and
24  rising homicide rates.  They were justified by a similar goal of preventing violence
25  in society by targeting on those weapons that are especially likely to be used for

26  ───────────────

27       [74] Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022),
28  https://bit.ly/3eaZZcE.

1  criminal purposes but are rarely used for lawful purposes like self-defense. *See,*
2  *e.g.*, Spitzer Decl. ¶¶ 26, 46; Rivas Decl. ¶ 12; Donohue Decl. ¶¶ 26–27 (discussing
3  threats of political violence).  As with these dangerous weapons laws, the AWCA
4  promotes public safety interests in reducing the incidence and lethality of mass
5  shootings and violence against law enforcement.[75]  Indeed, assault weapons have
6  been used frequently in mass shootings involving 10 or more fatalities—mass
7  casualty incidents that only started occurring in the mid-20th century—and 78% of
8  mass shootings involving 20 or more fatalities (excluding the shooter). *See* Suppl.
9  Klarevas Decl., tbl. 1.  At the same time—like Bowie Knives, or concealable
10 weapons—the accessories and configurations regulated by the AWCA are
11 especially likely to be used by criminals for illicit purposes—namely, mass
12 shootings-while there is hardly any evidence that they are used for self-defense
13 purposes. *See supra* at pp. 40–41.

14        *Second*, the AWCA is justified in a manner comparable to colonial and
15 founding era safe storage laws, which—like the AWCA—were adopted in response
16 to "pressing safety concerns," which "led [founding-era Americans] to effectively
17 ban loaded weapons from any building in [Boston]" and to tightly regulate the
18 storage of gunpowder—which was essential to operate a musket—inside the home.
19 Adam Winkler, *supra*, at 117.

20        And *third*, historical laws traced to England and the founding era prohibiting
21 the carrying of dangerous or unusual arms to the "terror of the people" promote
22 similar goals as the AWCA does—namely, protecting the public's sense of security
23 and safety. *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public*

---

25  [75] *See, e.g.*, Defs.' Trial Ex. E (Klarevas Decl.) ¶¶ 23–24, 27 & tbl. 2 (finding
26  that assault weapon restrictions reduced the incidence and lethality of mass
     shootings); Defs.' Trial Ex. C (Donohue Decl.) ¶ 119 (explaining how the federal
27  assault weapons ban was effective in reducing the use of assault weapons in gun
28  crime).

*Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 181 (2021) (noting that in addition to the victims of gun violence who are shot or killed, millions are "harmed by the *threat* of violence," including children "who must endure active-shooter drills (which themselves can be terrifying events)"). Government efforts to reduce the availability of particular weapons that are prominently associated with the current epidemic of mass shootings further similar public-safety interests as historical laws governing affrays. The government has an "interest not only in preventing physical injuries, but also in promoting the kind of security necessary for individuals, families, and communities to flourish." *Id.* at 198; *see also Friedman*, 784 F.3d at 412 (noting the benefit of the assault weapon restrictions in "increas[ing] the public's sense of safety").

The AWCA's restrictions on certain combat-oriented accessories being used on certain firearms, or a particular configuration of semiautomatic centerfire rifles—weapons that feature prominently in mass shootings—is justified by similar public safety interests that have historically been understood to justify the exercise of police powers in regulating the possession, use, and storage of firearms and other dangerous weapons and accessories.

## III. DEFENDANTS OBJECT TO THE EXPEDITED BRIEFING SCHEDULE OF THE INSTANT REMAND PROCEEDINGS

The current briefing schedule and procedural posture prejudices Defendants and deprives them of an adequate opportunity to prepare a record that *Bruen* requires and address potential counterarguments. The Ninth Circuit remanded this matter for "further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]," Dkt. 133. Where, as here, the challenged law addresses "unprecedented societal concerns or dramatic technological changes," *Bruen* recognized that its text-and-history analysis requires a "more nuanced approach." *Id.* at 2132; *and see supra* pp. 38–39. The expedited nature of the proceedings on remand threaten to impair Defendants' ability to develop a complete historical

1   record, given the breadth and complexity of the historical analysis that *Bruen* now

2   requires.  If the existing record (including the evidence submitted in support of this

3   brief) is insufficient to justify the constitutionality of the AWCA, Defendants

4   respectfully renew their request to conduct formal expert discovery to develop a

5   more comprehensive record responsive to *Bruen*.

6        Following remand, in response to this Court's direction to submit a brief

7   "addressing" *Bruen* within 20 days, Order dated Aug. 8, 2022 (Dkt. 125),

8   Defendants outlined a proposal for further proceedings involving a three-month

9   period of expert discovery, followed by summary judgment motions to be briefed in

10  early 2023.  Dkt. 129 at 17–18.  This proposal would have provided time for

11  Defendants' experts—as well as Plaintiffs'—to conduct original research and

12  analysis to address *Bruen*'s text-and-history standard, prepare expert reports, and

13  undergo depositions.[76]  To support this request, Defendants submitted a declaration

14  from research historian Zachary Schrag explaining the complexities of the general

15  process of conducting historical research that would be undertaken by Defendants'

16  experts.  Dkt. 129-1 (Schrag Decl.); *see also Fouts v. Bonta*, 561 F. Supp. 3d 941,

17  950 (S.D. Cal. 2021), vacated *by Fouts v. Bonta*, (9th Cir. Sept. 22, 2022)

18  ("[H]istory is the work of historians rather than judges.").  The proposed three-

19  month discovery period was reasonable in length and would not have caused undue

20  delay.

21       The Court did not accept Defendants' proposal, instead ordering the

22  preparation of simultaneous supplemental briefs on an aggressive timetable.

23

24       [76] Although the original complaint was filed in 2019, limited discovery was
     permitted during December 2020 and January 2021.  Following a three-day
25   evidentiary hearing on Plaintiffs' motion for a preliminary injunction in October
     2020, the Court set a bench trial for January 2021 (later continued to February
26   2021).  All expert depositions in this case took place within this brief two-month
     period, and such limited discovery did not address the historical methodology
27   required under *Bruen*.

28

Although there is no pending motion requesting a merits ruling, it is possible that the Court may determine to issue a final ruling on the merits following these supplemental briefs. If this briefing results in a grant of judgment sua sponte, the lack of formal discovery will have deprived all parties of a "full and fair opportunity to ventilate the issues" involved in the post-*Bruen* analysis. *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008); *see also Commodity Futures Trading Comm'n v. Bd. Of Trade of City of Chi.*, 657 F.2d 124, 128 (7th Cir. 1981).

To be sure, a district court may issue summary judgment on its own motion only under "certain limited circumstances." *Portsmouth Square Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985). These circumstances, include, at a minimum, no less advance notice than the parties would be entitled on a Rule 56 motion (including Local Rule 7.e.1, generally requiring 28 days' notice of motions). *See Norse v. City of Santa Cruz*, 629 F.3d 966, 972 (9th Cir. 2010). But "[r]easonable notice" encompasses more than strict compliance with the summary judgment notice period; it also "implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment." *Portsmouth Square*, 770 F.2d at 869; *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993) (A litigant must be given "reasonable notice" that "the sufficiency of his or her claim will be in issue"—which requires "adequate time to develop the facts on which the litigant will depend to oppose summary judgment."'). This includes time to take formal discovery and develop expert evidence. *See Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645–46 (9th Cir. 1981) (holding parties received reasonable notice where trial court allowed three-month discovery period prior to ruling on dispositive motion). As the advisory committee to the 1970 amendments to the Federal Rules of Civil Procedure noted, "[a] prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent." Fed. R. Civ. P. 26(d)(4), advisory committee's notes to 1970 amendment (explaining that

75

barring expert discovery frustrates its goals of "narrowing issues" and facilitating "effective rebuttal").

Despite working diligently since this case was remanded, there remain areas of inquiry relevant to *Bruen*'s text-and-history standard that Defendants have not yet able to explore fully, including a deeper canvass of historical state and municipal laws and additional primary-source research to further understand and contextualize the Nation's traditions of firearms regulation and the regulation of other weapons. In order to discern the nation's historical traditions, Defendants consulted the available text of historical state and local laws. But there are many other primary source materials that contextualize those laws and how they were understood and enforced, such as official reports, manuscripts, newspaper articles, and archival records. *See* Dkt. 129-1 (Schrag Decl.) ¶¶ 14, 23. A historical analysis of primary source materials can also identify historical traditions of restricting the availability and use of dangerous weapons through non-statutory means, such control by the U.S. military, state militias, and local law enforcement on possessing and transporting Winchester repeating rifles during Reconstruction. *See* Vorenberg Decl. ¶ 8. In time allotted to prepare this supplemental brief, Defendants have been able to consult a limited number of primary sources to develop evidence, but this work could be expanded across time periods and to include other types of dangerous weapons. And given limited time, Defendants' experts have conducted research using widely available electronic databases, *see* Vorenberg Decl., ¶¶ 13–15 ("Research Materials and Methodology" section), or by leveraging primary sources identified in prior historical research, *see, e.g.*, Spitzer Decl., ¶ 21 (discussion of Flayderman Bowie knife research). Of course, not all primary source materials are digitized, and even those that are can prove difficult to search. Dkt. 129-1 (Schrag Decl.)¶¶ 18–22. With additional time, Defendants' experts would be able to expand the scope of their research to include additional archival and unpublished sources. Dkt. 129-1 (Schrag Decl.) ¶¶ 23–28.

1   Because there is no formal pretrial schedule for post-remand proceedings, the

2   parties have not been required to disclose the experts on whose testimony they plan

3   to rely.  The parties will have only 15 days to rebut any new evidence submitted in

4   support of the opposing party's supplemental brief.  It will be infeasible to obtain

5   leave of court to re-open discovery, much less to depose any of Plaintiffs' experts,

6   before October 29.  Without knowing what evidence Plaintiffs plan to submit,

7   Defendants cannot predict in what specific ways the inability to conduct depositions

8   will prejudice their ability to defend this case.  But the absence of opportunity to

9   take formal discovery itself implies that there has been a lack of adequate

10  opportunity to develop facts.  *Cf. Portland Retail Druggists Ass'n*, 662 F.2d at 645–

11  46.

12   Accordingly, if the Court is not prepared to find that the AWCA is

13  constitutional based on the existing record, Defendants object to the post-remand

14  proceedings as failing to provide sufficient time to develop evidence, and they

15  respectfully request three additional months to complete additional expert

16  discovery, followed by further merits briefing.

17   **CONCLUSION**

18   For these reasons, the AWCA comports with the Second Amendment.

19

20

21

22

23

24

25

26

27

28

Defendants' Supplemental Brief in Response to Court Order of August 29, 2022
(3:19-cv-01537-BEN-JLB)

1    Dated:  October 13, 2022                           Respectfully submitted,

2                                                        ROB BONTA
                                                         Attorney General of California
3                                                        P. PATTY LI
                                                         Supervising Deputy Attorney General
4                                                        ANNA FERRARI
                                                         Deputy Attorney General
5

6                                                        s/ John D. Echeverria

7

8                                                        JOHN D. ECHEVERRIA
                                                         Deputy Attorney General
9                                                        *Attorneys for Defendants Rob Bonta
                                                         and Blake Graham, in their official
10                                                       capacities*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Supplemental Brief in Response to Court Order of August 29, 2022
(3:19-cv-01537-BEN-JLB)