ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **DECLARATION OF BRENNAN RIVAS** |
| | Courtroom:    5A |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Judge:          Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

**DECLARATION OF BRENNAN RIVAS**

I, Brennan Rivas, declare under penalty of perjury that the following is true and correct:

1.      I have been retained by the State of California to provide expert opinion and testimony regarding historical regulations that prohibited the public carry and possession of certain weapons.  I am being compensated at a rate of $130 per hour.

2.      I have evaluated the historical justifications and purposes of laws restricting the carrying of certain weapons, in addition to their scope in restricting the use of certain weapons associated with urgent societal problems of the time while simultaneously protecting the right to use other weapons for constitutionally protected, lawful purposes.

**BACKGROUND AND QUALIFICATIONS**

3.      I have a Ph.D. in history from Texas Christian University, awarded in 2019.  My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.

4.      I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period.

5.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

**OPINIONS**

6.      As discussed in this declaration, the proliferation of 19th century firearm restrictions, including those enacted in Texas, Tennessee, and Arkansas,

demonstrate a robust governmental response to the scourge of gun violence that swept the Nation.  Importantly, these restrictions did not flatly ban the carry or possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

## I.   BRIEF HISTORY OF THE COLT REVOLVER AND THE SPREAD OF HANDGUN VIOLENCE IN THE 19TH CENTURY

7.     The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more and better scholarship on the subject.  My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to California's assault weapons restriction.  Notably, during this period, several states prohibited the sale, gift, transfer, or importation of certain types of revolvers and other pistols which people of the time associated with criminal activity.

8.     The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

9.     The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and functionality of ammunition meant that later models of Colt's could

use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more swift—a boon on the battlefield, but a new danger in other contexts.

10.     Though Colt's revolver was a revolutionary device that represented a paradigmatic shift in firearm technology, his company struggled to reach its potential.  The expiration of Colt's patent in 1857 opened the door for other manufacturers to enter the market without having to endure the same decades-long startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect of war gave Colt what he had always wanted—substantial government patronage. Southern states ordered as many revolvers as they could in the lead-up to Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than willing to deliver.  But the far more important contracts came from the United States military, whose orders for pistols like Colt's revolver skyrocketed during the course of the Civil War.[1]  Wartime production by Colt, in addition to the new entrants into the market (like Smith & Wesson), created an unprecedented infrastructure to manufacture staggeringly large quantities of pistols.  As production capacity increased and the U.S. military demobilized, more of these weapons became available to and affordable for American consumers; by the 1870s, the net result was more and cheaper pistols spread throughout the country[2], introducing the United States to its first experience with rampant gun violence.

_____

[1] On the life of Samuel Colt and the history of his firearm manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[2] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367). Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online,

11.    The Civil War Era, making up the central three decades of the nineteenth century (1840-1870), marked a sharp departure for the United States in terms of violence and homicide in comparison to other Western nations.  Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the north remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again.[3]  Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined.  That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.  In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence

_____

see https://bit.ly/3VeUhHo.

[3] On homicide in American history, particularly as broken down into northern and southern regions, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp.185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time)

1   suffered primarily by Black Americans and their political allies.  The disruption of

2   war, occupation, and frequent changes in state government and constitutional

3   structure bred attitudes of vigilantism and disregard for the judicial process.  Rates

4   of violence and homicide remained quite high in the southern states across the

5   nineteenth century.[4]  The proliferation of deadly weapons, and especially easily

6   concealable pistols, to a point of near ubiquity in American communities rendered

7   the interpersonal conflicts that erupted as a result of urbanization, Reconstruction,

8   economic hardship, and social dislocation all the more deadly.

9   **II.     GOVERNMENTAL RESPONSES TO THE RISE IN HANDGUN VIOLENCE**

10          12.     The response to this gun violence varied across the United States.  The

11   most popular approach was the enactment or strengthening of public carry laws.

12   Jurisdictions that did not already have such laws were likely to enact them, and

13   those using the older mechanism of sureties to keep the peace were likely to

14   transition toward the implementation of criminal statutes mandating fines and/or

15   jail time for violators.[5] These public carry regulations targeted concealable items

16   like pistols, sword canes, and daggers that were used in the commission of crimes

17   and generally referred to as deadly weapons.  The closing third of the nineteenth

18   century saw a flurry of this activity as states and municipalities tried new penalties,

19   added new weapons to the lists of prohibited weapons, and generally attempted to

20   eliminate small, easily concealable weapons from the public sphere.[6]

---

[4] Roth, *American Homicide*, 411-434.

[5] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[6] In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes.

13.     Another strategy employed by state governments to reduce gun violence and gun crime was to tax certain types of firearms.  In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons."  A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business.[7]  In 1907, the Texas legislature placed a fifty-percent sales tax upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's office on a quarterly basis.[8]  Sales and occupation taxes like these tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally.  Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales tax (over loud complaints by dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."  As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[9]

---

[7]  Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; see https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.  Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet.

[8]  An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[9]  *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

14.     Arkansas and Tennessee, for example, adopted a two-pronged approach that displayed attributes of both public carry laws as well as dealer regulations.  The first prong was to prohibit the public carrying of pistols.[10]  Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[11]  But they were quickly amended to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand.  By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms enjoyed special protection from certain forms of regulation.

15.     Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited.  This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic and select-fire weapons for military use.

16.     When the Tennessee high court struck down the initial statute, which prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute

---

[10] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[11] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

that, "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[12]  It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand.  The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.  Arkansas's replacement statute was similar to that of Tennessee.[13]  The Tennessee Supreme Court upheld that state's replacement statute against constitutional challenge.[14]  The revised Arkansas statute received no notable challenge.

17.    The second prong which these states employed was a prohibition on the sale of certain pistols.  Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except

---

[12] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[13] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[14] *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

army or navy pistols."[15]  Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well.  "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[16]

18.    Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[17]  Condemnations of such behavior and calls for regulations rang out across the country and became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase.  Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse of their counterparts elsewhere.  The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun and the bludgeon too often do their bloody work."[18]  After the 1875 statute went into effect in Arkansas, news editors began praising it as "about the best law that

---

[15] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[16] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[17] For example, see Patrick Charles, Armed in America 152 (2018) (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

[18] "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

9

has ever been enacted in this state," and one that, had it been in effect since statehood in 1836, "would have saved the lives of thousands of good men who have fallen victim to the vice of carrying deadly weapons, or from the results and natural consequences thereof."[19]  Some judges in Tennessee began handing down penalties of a fifty-dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that] county."[20]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who viewed it as a social benefit that in Tennessee "men who for years converted themselves into walking arsenals discover that they can pursue their ordinary vocations without fear that they may at any moment be called upon to defend their persons against assault."[21]  From their perspective, the distrust of one's fellow community members that went along with habitual gun-toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public sphere.  Middle-class Americans, white southerners included, held the view that carrying deadly weapons was not honorable, and that such behavior should be stopped.[22]

_____

[19] *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[20] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'" *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[21] *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

[22] For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over

19.     To fully understand these regulations, it is necessary to understand the different kinds of pistols and revolvers available during this time period.  First, at the larger end of the spectrum was the "army pistol" or "holster pistol," which was originally fashioned after the "horse pistols" that had been adopted by mounted units in Europe and the United States.  Such pistols were typically designed to be carried in a saddle mounted holster and could weigh four pounds or more when loaded.  Though the firearm became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[23]  The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

20.     Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened[24]; during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological

---

other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

[23] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* (New York: Simon & Schuster, 1979).

[24] See note 23, above.

evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans under discussion here generally included "belt" pistols, so it remains unclear whether and to what extent the Colt's Navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

21.    Finally, the third kind of pistol available was the "pocket pistol." These were substantially smaller than the holster and belt models.  Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[25]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[26] These cheap revolvers could be had for a few dollars, with used ones selling for even less.[27]

---

[25] For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[26] See note 23, above.

[27] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

22.     It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood.  A confluence of technical advancements and social changes resulted in the widespread adoption of new weapons, causing new societal problems that increased levels of interpersonal violence and ratcheted up public fear.  In response, state legislatures enacted regulations targeting the source of that problem.  In addition to other dangerous weapons, Tennessee and Arkansas targeted "pocket pistols"—designed to be concealed from public view and increasingly easy to obtain by those wishing to cause harm, were a target of these laws.  The legislatures of both Tennessee and Arkansas prohibited both the public carrying of these weapons, as well as their sale to the general public.  These regulations remained in force well into the twentieth century.

23.     Previous scholarship addressing these statutes has cast them as racially motivated.[28]  Those articles did not investigate deeply the primary sources of the time.  My research shows that these accounts have misrepresented the Tennessee and Arkansas statutes, which were enacted as a public safety measure rather than an attempt to disarm Black residents.  The argument made by other scholars, again based on little more than inference, has been that most white men served in the Civil War or had the means to purchase a "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[29]

---

Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

[28] For example, Stefan B. Tahmassebi, "Gun Control and Racism," *George Mason University Civil Rights Law Journal* 2, no. 1 (Summer 1991), 74-75;  Robert Leider, "Our Non-originalist Right to Bear Arms," *Indiana Law Journal* 89, no. 4, 1619-1620.

[29] Tahmassebi, "Gun Control and Racism," 74-75.

1    Civil War soldiers on both sides of the conflict were unlikely to be issued a

2    revolver unless they were officers, cavalry, or artillery; a great number of enlisted

3    soldiers who possessed revolvers during the conflict had purchased them on their

4    own, and at times their carrying of the weapons caused sufficient trouble within the

5    ranks that officers confiscated them.  Others discarded heavy and seemingly

6    unnecessary pistols on long, grueling marches.[30]  Confederate service did not

7    automatically correlate to white possession of an exempted pistol.

8        24.    Rather than impute racism to these laws simply because of their

9    occurrence during Reconstruction, we should embed them within their appropriate

10   political and cultural context.  The fact that Tennessee's legislature amended the

11   public carry law so swiftly to add the army/navy exception could indicate to the

12   casual observer that white residents were dissatisfied with the original statute;

13   however, when the statutes and their constitutional challenges are placed in

14   chronological order and interpreted in light of the other primary sources of the era

15   (particularly newspapers and the widespread social contempt for publicly carrying

16   deadly weapons), it is clear that racism was not behind the army/navy exemption.

17   Instead, it represented the best effort of Tennessee lawmakers to emulate the kind

18   of comprehensive public carry prohibition that was in force in Texas[31] while also

19       [30] On pistols and other arms issued during the Civil War, see Katelyn Brown,

20   "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G.
     Bilby, *Civil War Firearms: Their Historical Background and Tactical

21   Use* (Conshohcken, PA: Combined Books, 1996); Graham Smith, *Civil War

22   Weapons* (New York: Chartwell, 2011); Jack Coggins, *Arms and Equipment of the
     Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the

23   Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the

24   Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside

25   House, 1989).

26       [31] Texas featured a comprehensive deadly weapon law that prohibited the
     open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane,

27   spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold

28   for the purposes of offense or defense."  There were a few exceptions, such as for

14

respecting the parameters set forth by the state supreme court in *Andrews v. State*. The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand.  Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

## III.  CONCLUSIONS

25.     Based on the experiences in Tennessee and Arkansas, among other examples,[32] there is historical precedent for California's assault weapons ban. These states targeted pocket pistols and other types of weapons that, due to their concealability, were associated with forms of criminal activity that were threatening the public at that time.  Like pocket pistols in the latter half of the nineteenth century, semiautomatic firearms, including assault weapons, in the later parts of the twentieth and earlier parts of the twenty-first became widely available for the first time.  And they are, like pocket pistols in the mid- to late-1800s, associated with new social problems and criminal use, including the rise of high-casualty mass shooting incidents.  California's regulation, being a prohibition on the sale, transfer, and manufacture of such firearms, is quite similar to the sale restrictions in Tennessee and Arkansas.  And like the Tennessee and Arkansas laws, that

_____

travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871).  The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception.  See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

[32] For example, see note 31, above.

Declaration of Brennan Rivas (3:19-cv-01537-BEN-JLB)

exempted army and navy pistols that were needed for lawful purposes, California's regulation does not ban all rifles, pistols, shotguns, or other weapons that may otherwise fall within its scope and may be used for self-defense.

26.     As stated above, and as with any historical research project, my work in this area is still ongoing.  There is significant research and analysis to be done on the drafting and enforcement of these statutes, as well as the attitudes of residents toward them as time wore on.  Very little research that is based upon primary sources, other than the review of case law and historical statutes, has yet been conducted.  Still, this brief account of pistol regulations from late-nineteenth century Tennessee and Arkansas demonstrates an important theme in the history of firearms and weapons regulations in the United States: that states enacted restrictions upon certain types of weapons, like pocket pistols, that were uniquely adaptable to and associated with certain types of crime that threatened public safety at the time, while also ensuring that the right of individuals to arm themselves for self-defense in an emergency or upon their private property was not destroyed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2022, at Fort Worth, TX.

_Brennan Rivas_
Brennan Rivas

# EXHIBIT A

# Brennan Gardner Rivas
## Curriculum Vitae · Oct 2022

## Employment

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022

Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
University, Clements Center for Southwest Studies, 2020-2021

Lecturer in American History (full-time), Texas Christian University, Department of History,
2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell

M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"

B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*

"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*

"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
on the Place of Guns in American Law and Society* (New York: Oxford University Press,
forthcoming)

"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
(May 2022)

"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
by History Blog* (Jun 2022)

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka

~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)

~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)

~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)

~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022

~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021

~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019

~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017

~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights

Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"

Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West

Status: Research and writing in progress

2

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                2019-2020
> "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
> "American History since 1877: The Quest for Equality" (HIST 10613)
> "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                2017-2018
> American History to 1877 (HIST 10603)
> American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
> ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
> ~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
> ~ Informal departmental program designed to ease the transition for incoming graduate students

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

**Languages**
Spanish (Proficient)
Latin (Proficient)