```
                     UNITED STATES DISTRICT COURT

                    SOUTHERN DISTRICT OF CALIFORNIA


 JAMES MILLER, an individual;     )
 PATRICK RUSS, an individual;     ) CASE NO.: 3:19-cv-1537
 RYAN PETERSON, an individual;    )
 and SAN DIEGO COUNTY GUN OWNERS; ) DATE: MONDAY, AUGUST 29, 2022
 POLITICAL ACTION COMMITTEE, a    )
 membership organization,         ) SAN DIEGO, CALIFORNIA
                                  )
              Plaintiffs,         ) LEGAL MANDATE HEARING
                                  )
 v.                               ) HONORABLE ROGER T. BENITEZ
                                  ) UNITED STATES DISTRICT JUDGE
 XAVIER BECERRA, in his official  ) SOUTHERN DISTRICT OF CALIFORNIA
 capacity as Attorney General of  )
 California; and MARTIN HORAN, in )
 his official capacity as Chief   )
 of the Department of Justice     )
 Bureau of Firearms,              )
                                  )
              Defendants.         )
 _____)
```

APPEARANCES:

For the Plaintiffs:

DILLON LAW GROUP, APC
2647 Gateway Road, Suite 105, #255
Carlsbad, California  92009
(760) 642-7150
BY:  JOHN W. DILLON, ESQ.
     jdillon@dillonlawgp.com


For the Defendants:

CALIFORNIA ATTORNEY GENERAL
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
(415) 510-3479
BY: JOHN DARROW ECHEVERRIA, ESQ.
    john.echeverria@doj.ca.gov


Reported by:  Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891
tricia_rosate@casd.uscourts.gov

1    SAN DIEGO, CALIFORNIA; MONDAY, AUGUST 29, 2022

2    10:00 A.M. - 10:37 A.M.

3    - - - -

4    (Court called to order.)

5    THE COURT:  Good morning.

6    THE CLERK:  1 on calendar, 19-cv-1537,

7    Miller, et al. v. Becerra, et al., legal mandate hearing.

8    THE COURT:  Counsel, please register your

9    appearances for the record.

10   MR. DILLON:  This is John Dillon, counsel for

11   plaintiffs.

12   MR. ECHEVERRIA:  John Echeverria for the

13   defendants.

14   THE COURT:  All right.  Today we have spreading of

15   the mandate.  The Ninth Circuit has sent this case back to me

16   after the Supreme Court decision in Bruen.

17   I had asked for briefing to be submitted before

18   today.  In response, what I have is -- I have plaintiff's

19   notice or a letter advising me that they wish to amend the

20   complaint to challenge the new law that will go into effect in

21   January that would, as I understand the plaintiff's position,

22   deter people from being able to exercise their constitutional

23   rights by imposing attorneys' fees on them.

24   The second thing I have is I have a request by the

25   State to allow time for discovery, expert discovery.  It was

1   filed late last night; however, I have had a chance to skim
2   through it.
3            So let me give you my thoughts, preliminary
4   thoughts.  First of all, regarding the request for an
5   amendment, I don't think we need to enmesh this case and this
6   Court in the battle that you are foreseeing or think is
7   coming.  I think that's a battle to be fought some other day
8   but not in connection with this lawsuit.  It may possibly be
9   filed and heard by this court, but it may not.  I don't know.
10  So I don't really see any reason to grant additional time to
11  allow you to amend your complaint in that regard.  So my
12  tentative -- unless you have something really, really, really
13  persuasive that leads me to conclude otherwise, my tentative
14  is to deny your request.
15           Turning my attention to the State's late filing of
16  last night, I've read the expert's report, if you will.
17  Frankly, I have no doubt that he's a well-qualified expert,
18  but 702 provides that the reason for having an expert witness
19  is if by virtue of the expert's training, skill, or
20  experience, he would be of assistance to the trier of fact to
21  determine the issues that are before the Court.
22           So the history of the Second Amendment regulation
23  has been hashed out in every circuit in this country.  It has
24  been hashed out in this court in at least three -- maybe
25  four -- cases that I've handled, not because I chose to handle

1  them but because I got them as a result of the related
2  caseload.  It has been hashed out, as I said, in the
3  Ninth Circuit; it's been hashed out before the Supreme Court.
4  I just don't really know what there is that this expert would
5  be able to provide me that competent counsel from the
6  State Attorney General's office in the State of California has
7  not been able to provide for me in four cases that I've heard
8  before.
9        I know, Mr. Echeverria, that in this case, as I
10 recall, you devoted a considerable amount of time to arguing
11 about the historical bases for justifying this legislation.  I
12 frankly thought you did a pretty good job.  So I don't know
13 what this expert really could do for us.
14       Besides, what we'd really be looking at is:  Are
15 there any statutes or regulations of historical precedence
16 that would be of long standing and that would be persuasive
17 for my denying the plaintiff's request.  Frankly, I think
18 that's probably something that's best left to lawyers like the
19 Attorney General's office.  You have basically an unlimited
20 budget; you have an unlimited staff.  As I said before, so
21 far, you've done a really good job.  So I don't know why I
22 need an expert to help me after that.
23       So my tentative would be to deny any further expert
24 discovery.  It's just a delay.  Obviously some people don't
25 think that the Second Amendment is an important right, but I

1  disagree, and I think the founding fathers did, as well, when
2  they enacted it, and now I believe that the Supreme Court has
3  also said that it's an important right, notwithstanding the
4  fact that some people may disagree.  So I don't know what this
5  expert really would do for us other than delay, and I can't
6  see any reason for that.
7  　　　　　So, frankly, my tentative would be to deny the
8  request for additional expert discovery.
9  　　　　　I would grant you additional time, however, if you
10 wish to go back.  Not long.  Not long, because I don't think
11 we need it.  But I would be willing to give you additional
12 time to brief the issue and to provide any evidence that, at
13 anytime in the course of the history of this country, there
14 was sufficient statutes and regulations that would be
15 analogous to the regulation that's at issue here.
16 　　　　　So before I go any further, I guess I'll dissolve
17 the injunction that I had issued previously in response to the
18 Ninth Circuit's decision remanding the matter back to me
19 following the Bruen Supreme Court decision.
20 　　　　　Those are my thoughts, gentlemen.  I'll be happy to
21 hear from you if you have anything else you want to add.
22 　　　　　Let's see.  I guess I'll start with plaintiff.
23 　　　　　MR. DILLON:  With regard to Your Honor's tentative
24 ruling on the amended complaint, we're not going to try to
25 argue with you.  We feel that it's your decision, and what you

1  feel is right is probably the correct way to go.
2             With regard to the additional time to provide for
3  briefing, do we have an idea of what time frame the Court's
4  thinking of for the additional historical briefing?
5             THE COURT:  I think 30 days.
6             MR. DILLON:  30 days?
7             And would the Court be willing to grant plaintiffs
8  an additional couple days to at least have a response to
9  anything that the State provides?
10            THE COURT:  No, but I think what I would do is I
11 would grant both sides maybe 10 days to respond.
12            MR. DILLON:  Okay.
13            THE COURT:  So I don't --
14            Look.  Here's the way I see it:  This Court did a
15 lot of historical research on its own and found cases,
16 statutes, and so on.  You both can do the same thing without
17 having to rely on each other, as we normally do.  You know,
18 one side presents their position, the other side argues
19 against it, and so on.  But both of you can essentially do the
20 same thing.  You can do the same historical research --
21 right? -- and you can submit it, and then if you see something
22 in the other side's briefing that you think is incorrect, then
23 I'll give you 10 days to try to rebut it or tell me why that's
24 not correct.
25            Does that kind of a timeframe work for you,

1    Mr. Dillon?

2            MR. DILLON:  Yes, it does, Your Honor.

3            THE COURT:  How about you, Mr. Echeverria?

4            MR. ECHEVERRIA:  It does not, Your Honor.  I mean --

5            We would like to address some of the points that you

6    just made about the submission that we made this morning and

7    the declaration of Professor Schrag.  I think there's more to

8    discuss before we settle on a schedule.

9            THE COURT: Okay.  All right.  Fine.  Great.

10           So let's hear from you.

11           MR. ECHEVERRIA:  So this morning in response to the

12   Court's order of August 8th requesting a briefing addressing

13   the Bruen decision, we submitted our brief and proposed that

14   the Court allow for expert discovery that would be focused on

15   the text and history standard that the Supreme Court announced

16   in Bruen.  In support of that request, we submitted a

17   declaration of Professor Schrag, who is a historian, to

18   elucidate the difficulties and nuances that are required to

19   conduct the kind of historical research and the analogical

20   reasoning that the Supreme Court has now required of the

21   courts and of the parties.

22           We are not offering Professor Schrag as an expert to

23   explain the history of firearms regulation.

24           THE COURT:  I'm sorry.  I hate to interrupt you.

25           MR. ECHEVERRIA:  Yes, sir.

1  THE COURT: So tell me again what his role would be.
2  MR. ECHEVERRIA: So his role would be limited to the
3  submission he already made. We would not be offering any
4  further testimony from Professor Schrag in this matter.
5  THE COURT: Okay.
6  MR. ECHEVERRIA: His testimony was limited to
7  explain that the historical method is not as simple as going
8  on Westlaw or Google Books and using search terms to try to
9  find statutes in the past; that history is much more
10 complicated. In order to develop the historical traditions
11 that the Supreme Court has said that the State can rely upon,
12 that is a fairly involved process. Your Honor is correct --
13 that the attorneys and the Court have a very important role in
14 interpreting that history and in framing that history and in
15 crediting the constitutional import of that history -- but
16 still the hard work of developing the history must be done by
17 experts, not by us. So that is why the State has asked for
18 discovery, discovery allowing for historical experts; not
19 Professor Schrag, but additional historians and political
20 scientists.
21 In the prior proceeding before the Court's
22 injunction, the parties did not have an opportunity to conduct
23 fulsome discovery including expert discovery. So we think
24 that the State is entitled to have discovery in this case.
25 THE COURT: Go ahead. I'm sorry. I hate to

1  interrupt.
2      MR. ECHEVERRIA:  Please, Your Honor.
3      THE COURT:  But I remember there was all this
4  discussion about the 1933-era --
5      MR. ECHEVERRIA:  Yes.
6      THE COURT:  -- ban on fully automatic weapons.
7  There was discussion about the historical precedent for the
8  statute.
9      As I recall, a similar approach was taken in the
10 Duncan case, if I'm not mistaken, and I think the same was
11 argued in the Rhodes case, which was the ammunition case,
12 which is still floating around in the ether somewhere.
13     I'm having a hard time understanding what it is that
14 these experts would tell me that would be of assistance to me.
15 If I found --
16     I mean, if the declaration from --
17     How do you pronounce his name?
18     MR. ECHEVERRIA:  Schrag.
19     THE COURT:  Schrag.
20     Yeah, from George Mason -- an excellent law school,
21 by the away -- but if, in fact, he somehow told me that that's
22 going to help resolve the issue, here's the issue.  The issue
23 is if we go back to the founding of this country, are there
24 any status, regulations, that were of any important or
25 significance that could possibly be analogous to the state [*]

1  state ate ban on misstates testimony ey automatic rifles like
2  the AR-15 or semiautomatic AK-47?
3       No.  That would be one thing.  But that's something
4  that can be accomplished in 30 days.  You county need
5  six months.  So I'm just -- I'm just having a Hartford time
6  understanding what it is you're really asking for.
7       MR. ECHEVERRIA:  Let me try to help with that.
8       So in the primarily proceeding when the
9  Supreme Court in Heller MacDonald explained that the state can
10 rely upon long-standing regulations, the Court had not
11 explained what that really means.  So the state relied upon
12 laws that were quite close in national to the assault weapon
13 ban.  These were instructions to the firing capacity of both
14 automatic and semiautomatic weapons that were enacted in the
15 1920s and the 1930s.  The Superior Court in brand-new has
16 since clarified that laws in the 1900s, they're not as
17 probative of what the original meaning and understanding of
18 the scope of the Second Amendment was at the founding in 1791
19 or when the Fourteenth Amendment was ratified.
20      So now we have more guidance from the Superior Court
21 in brand-new as to what kind of historical laws the state can
22 rely upon.  Now, the state doesn't need to find restrictions
23 on firearms that are analogous to the AR-15 or the AK-47.
24 These are weapons where the technology just wasn't available
25 at the founding or at the ratification of the

1   Fourteenth Amendment.  These are new weapons, and they're
2   addressing new problems, mass shootings.  Mass shootings
3   didn't happen in 1791 or 1868.  This is a new phenomenon.
4           The Supreme Court has clarified that the historical
5   method of analogy must allow the State to have more
6   flexibility when we're dealing with new technologies or new
7   problems.
8           A more nuanced approach, in the words of the
9   majority the phrase of the majority, is required.  So that
10  kind of more nuanced approach is going to require a
11  substantial amount of work, because there aren't a lot of laws
12  that existed at the time of the ratification of the
13  Fourteenth Amendment or thereabouts, restrictions on specific
14  types of weapons.  There were also restrictions that were
15  analogous at the founding that we need to provide the Court
16  with more information about, and to also draw the type of
17  analogy that the Supreme Court requires.
18          The Court stated that the state can rely upon
19  historical laws if they are analogous in two respects.  There
20  must be a comparable burden and a comparable justification.
21  The comparable burden is the burden on the right to armed
22  defense; not the burden to possess or carry any particular
23  weapon, but the burden on individuals to exercise their
24  Second Amendment right to self-defense.
25          THE COURT:  Wasn't that fully addressed in Heller?

I mean I thought Heller --

I mean, I remember reading -- of course, I've read Heller now I-don't-know-how-many times, but I seem to recall that Justice Breyer did his own analysis, the historical record, on Second Amendment issues and what restrictions had occurred in the past, back to --

Gosh, what was the statute?

MR. ECHEVERRIA: North Hampton?

THE COURT: Yeah. It goes back to --

What was that? That was, like, 17-something, wasn't it?

MR. ECHEVERRIA: Much earlier.

THE COURT: I can't even remember the date, but it goes back a long, long, long, long ways. Justice Scalia did the same thing. They went through and they looked at all of that. And I remember discussions about the fact that judges are not historians, but if you follow --

I mean, circuit courts all over the country, Mr. Echeverria have gone through and have talked about the history of the Second Amendment, what was intended, what the drafters wanted to accomplish by it. I don't know what --

Look, I don't mean any disrespect to professors -- don't get me wrong -- but I don't know what they could do for me that you, a really good lawyer, came to do. So that's why I'm saying, "Look, all I need from you is you brief this."

1   You tell me what you think, and I'll let Mr. Dillon do the
2   same thing.  Then I'll take a look at it.  I'll decide -- if I
3   think I need more, you know -- as you know, I've never been
4   afraid to ask for more.  I'll ask for more.  We'll bring the
5   historians in.  I'll cross-examine them if I have to.  But I
6   just don't -- I don't want to slow-walk this.  This is a
7   really important case for the people, both for people who want
8   gun control and for the people who want the freedom to
9   exercise the Second Amendment.  I don't think there's any
10  reason that I can think of why this should be delayed.
11          I interrupted you.  I'm sorry.  If you want to keep
12  going, go ahead.
13          MR. ECHEVERRIA:  You can interrupt me whenever you
14  want, Your Honor.
15          So in terms of the historical analysis that's
16  already been conducted by the Supreme Court in Heller and
17  McDonald and again in Bruen, the historical record that the
18  Court was looking at was focused on what I refer to as -- it's
19  the right to carry firearms:  where can people carry firearms,
20  under what circumstances can people carry firearms in public,
21  when can they possess firearms in the home.
22          This case presents a qualitatively different
23  historical question.  This is a "what" case.  What kind of
24  firearms can the State restrict and how can the State regulate
25  those firearms?

1  There are also cases -- like age restriction cases,
2  for example -- that are "who "cases.
3       THE COURT:  I'm sorry.  There are what?
4       MR. ECHEVERRIA:  There are also cases that present a
5  different historical question, which could be referred to as
6  "who" cases:  Who has the right to keep and bear arms; for
7  example, age restriction cases; restrictions on the ability of
8  18- to 20-year-olds to purchase firearms, for example.
9       The historical record concerning "what" questions --
10 what kind of weapons can be regulated -- has been
11 underdeveloped and underexamined in the courts.  This type of
12 historical tradition needs to be built up, and we have a lot
13 of original work that must be done.  The historical --
14      THE COURT:  But will you agree with me that the
15 historical record already exists?
16      MR. ECHEVERRIA:  Well, the historical record exists,
17 but it must be excavated.  It must be interpreted.  There is a
18 substantial amount of work that remains to be done in
19 examining the types of weapons that have historically been
20 restricted by government consistent with the Second Amendment
21 and consistent with the Fourteenth Amendment.
22      THE COURT:  I can tell you that I did --
23      Sorry about that.  They sort of meld together.
24      Bob, which one was my billy club case?
25      MR. ECHEVERRIA:  Fouts?

|   |   |
|---|---|
| 1 | THE COURT: So I remember doing a whole lot of |
| 2 | research on the Fouts case, because that was a significant |
| 3 | issue of the type of weapon that could be carried and who |
| 4 | could carry them and when they could carry them. There was |
| 5 | all kinds of -- |
| 6 | Again, that one also went back -- that case also |
| 7 | went back -- all the way back to before the 1700s; the 1500s, |
| 8 | I think it was. |
| 9 | So the record exists. It's there. So all that |
| 10 | somebody has to do, Mr. Echeverria, is sit down and catalog |
| 11 | what is there and then tell me -- basically say, "This is what |
| 12 | exists. This is what the historical record is, and this is |
| 13 | how it's similar or analogous to what this statute says, and |
| 14 | this is why the statute should be upheld" or not. |
| 15 | I just don't think -- I mean, I could be mistaken, |
| 16 | but I just don't think that that requires the kind of |
| 17 | discovery and the kind of expert that you're asking to get. |
| 18 | All that's going to do is basically delay this case. As I |
| 19 | know you know, important constitutional rights that -- people |
| 20 | have a right to have their constitutional rights enforced and |
| 21 | enforced in a timely fashion. This case has been around -- |
| 22 | When did I decide Miller? 2019, I believe? |
| 23 | MR. DILLON: Yes. |
| 24 | THE COURT: Maybe -- |
| 25 | Yeah. Here we are three years down the road, and |

there are still people out there --

In fact, I just got something today on file. Some individual, someone who wants to file a friend-of-the-court brief, who apparently is being prosecuted --

He's a retired sheriff's officer. He's being prosecuted because he has one of these weapons. These people need to know, Mr. Echeverria. One way or another, they need to be told, "Yes, you can possess these weapons," "No, you cannot possess these weapons."

Mr. Dillon, I need to give you a chance to respond to Mr. Echeverria. I've got the rest of the calendar I've got to get to. I apologize. I wish I had more time, but I don't.

MR. DILLON: I'll make it quick, Your Honor.

We agree with the Court's determination. We firmly believe that Heller has already conducted the relevant historical analysis when it comes to prohibiting arms.

We believe that this Court's prior decision in this case found correctly that these firearms that the State tries to ban are commonly owned, commonly possessed, both in the state and throughout the country. Because they are common, they are not both dangerous and unusual.

Based off of the decisions in Heller and now in Bruen, it seems that the Second Amendment protects all bearable arms, including modern firearms, and any prohibition isn't going to be justified unless the State can prove that

the arms in question are both dangerous and unusual.  So the historical inquiry is built into that analysis, and we feel that the Court's already done so.

We will go with the Court, and if additional briefing on historical regulations is requested, we'd be more than happy to provide a brief on plaintiff's behalf for that, but we firmly believe that this case has already been settled in the context of the Court's analysis under Heller and now just affirmed under Bruen.

THE COURT:  All right.  Well, here's what I'm going to do.  Mr. Echeverria, I'm going to give you a little longer.  I'll make it 45 days.

You've got 45 days to file briefings, declarations, anything you want to file in support of your position, keeping in mind that you have the burden to justify the restriction on the Second Amendment.  So I'll give you 45 days to file something in support.  Then I will take a look at it.

I will give each of you -- I'm going to give you 15 days to respond after that.

If I believe -- after having reviewed that material, if I believe that additional discovery or additional witnesses would be necessary for this Court to be able to make a reasonable determination, as I said before, you know I'm not afraid to do that.  I will do that.  We will have hearings, we will call witnesses, and we'll do whatever is necessary.  But

```
 1    I just think that the people have a right -- they have a right
 2    to know -- both the people that are pro gun control and the
 3    people that are pro being able to possess these weapons, they
 4    have a right to know.  Enough time has gone by.
 5              So that's my ruling.
 6              I thank you very much, both of you, for being here.
 7              The injunction previously issued is dissolved.
 8              All right?  All right.
 9              Thank you.  You take care.  Have a great day.
10              MR. DILLON:  Thank you.
11              MR. ECHEVERRIA:  Thank you.
12              (Proceedings concluded at 10:37 a.m.)
13                          -   -   -   -
14
15                           **CERTIFICATE**
16         I, Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891,
17    certify that the foregoing is a correct transcript from the
18    record of proceedings in the above-entitled matter.
19
20         /s/ Tricia Rosate, CSR No. 10891   Date: October 18, 2022
             Registered Diplomate Reporter
21           Registered Merit Reporter
             Federal Certified Realtime Reporter
22           Certified Realtime Reporter
23
24
25
```