ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF BRENNAN RIVAS**<br><br>**VOLUME 1 OF 6**<br><br>Courtroom:     5A<br>Judge:          Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1 | 7 n.10 | 002-004 |
| 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 | 8 n.12 | 005-007 |
| General Laws of Texas, ch. XXXIV, §1 (1871) | 14 n.31 | 008-011 |
| 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1 | 7 n.10 | 012-020 |
| 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1 | 9 n.15 | 021-023 |
| 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 | 8 n.13 | 024-026 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 9 n.16 | 027-029 |
| Acts of the General Assembly of the State of Georgia (1894) | 6 n.7 | 030-042 |
| An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907) | 6 n.8 | 043-053 |

Compendium of Works Cited in Declaration of Brennan Rivas
(3:19-cv-01537-BEN-JLB)

| BOOKS[1] | | |
|---|---|---|
| Patrick Charles, Armed in America 152 (2018) | 9 n.17 | 055-058 |
| Randolph Roth, American Homicide 184, 185, 297-326, 386-388, 411-434 (Cambridge: Belknap Press of Harvard University Press, 2009) | 4 n.3, 5 n.4 | 059-092 |
| R. L. Wilson, The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present, at 173 (New York: Simon & Schuster, 1979), | 11 n.23 | 093-095 |
| Martin Rywell, Colt Guns 66-67, 4-93 (Harriman, TN: Pioneer Press, 1953) | 11 n.23 | 096-104 |
| Sears, Roebuck, and Co. Catalog No. 107, at 365-67 (1898) | 3 n.2, 12 n.27 | 105-112 |
| The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) | 12 n.25 | 113-117 |
| LAW REVIEWS AND JOURNALS | | |
| Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 161-62 (PhD diss., Texas Christian University, 2019) | 6 n.8 | 119-349 |
| Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2518-19 (June 2022) | 10 n.22 | 350-379 |

[1] The Declaration of Brennan Rivas cites certain books (in their entirety) as supplemental references, rather than as direct support for any particular statement in her declaration or as a specific basis for her opinions. *See* Rivas Decl. ¶¶ 10 n.1, 19 n.23, 23 n.30,  Accordingly, they are not included here.  These books are:  Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America (New York: Scribner, 2020); Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohcken, PA: Combined Books, 1996); and Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

| | | |
|---|---|---|
| Robert Leider, *Our Non-originalist Right to Bear Arms*, 89 Ind. L. Rev. 1587, 1619-20 (2014) | 13 n.28 | 380-446 |
| Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason Univ. Civil Rights L.J. 67, 74-75 (Summer 1991) | 13 n.28, 13 n.29 | 447-480 |
| **NEWS ARTICLES** | | |
| "Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, at 2 | 9 n.18 | 482-483 |
| Daily Arkansas Gazette (Little Rock, Arkansas), January 7, 1883, at 4 | 10 n.20, 10 n.21 | 484 |
| Daily Arkansas Gazette (Little Rock, Arkansas), May 13, 1883, at 4 | 10 n.20, 10 n.22 | 485 |
| Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), at 32-36 | 14 n.30 | 486-490 |
| Newport News (Newport, Arkansas), quoted in Daily Arkansas Gazette (Little Rock, Arkansas), April 27, 1875, at 2 | 10 n.19 | 491 |

4

# HISTORICAL STATUTES



**HEINONLINE**

DATE DOWNLOADED: Tue Oct 18 16:03:45 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1869-1870 28 .

ALWD 7th ed.
, , 1869-1870 28 .

Chicago 17th ed.
"," Tennessee - 36th General Assembly, 2nd Session : 28-29


AGLC 4th ed.
" Tennessee - 36th General Assembly, 2nd Session 28.

OSCOLA 4th ed.
" 1869-1870 28

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

28

boundary line; thence with said Wandville and Chestnut Bluff road, in a north-eastern direction, to a point where the Haywood and Lauderdale County line crosses said road, and that portion of Haywood lying west of said line as designated, be stricken off from Haywood and attached to Lauderdale County, also that portion of Thos. Lea's land lying in Haywood County, being about ten acres, be attached to Lauderdale County.

SEC. 2. *Be it further enacted*, The public welfare requiring it, that this Act take effect from and after its passage.

Passed June 6, 1870.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Approved June 17, 1870.

D. W. C. SENTER,
*Governor.*

———

## CHAPTER XIII.

AN ACT to Preserve the Peace and Prevent Homicide.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver. Any person guilty of a violation of this section shall be subject to presentment or indictment, and on conviction, shall pay a fine of not less than ten nor more than fifty dollars, and be imprisoned at the discretion of the Court for a period of not less than thirty days nor more than six months, and shall give bond in a sum not exceeding one thousand dollars to keep the peace for the next six months after such conviction.

*Carrying of arms privately.*

*Penalty.*

SEC. 2. *Be it further enacted*, That it shall be the duty of all peace officers in this State to see that the first section of this Act is strictly enforced, and if they know of its violation, it is hereby made their duty to report the same to the Grand Jury of their county at its next term after such violation, who shall proceed to make present-

*Duty of officers.*

29

ment without a prosecutor.   All Sheriffs, Deputy Sheriffs, Coroners, Justices of the Peace and Constables shall be deemed peace officers under the provisions of this Act. *Peace offic'rs.* If any of the aforesaid officers fail or refuse to perform the duties required of them by the provisions of this Act, they shall be liable to presentment or indictment, and on *Penalty for* conviction shall be fined not less than ten nor more than *neglect'g du-* fifty dollars, and shall be dismissed from office, and shall *ty.* be disqualified from holding said office for the period of their unexpired term.   It shall be the duty of the Grand *Duty of gr'nd* Juries to send for witnesses in all cases where they have *juries.* good reason to believe that the provisions of this Act have been violated, and upon satisfactory evidence of its violation, they shall make presentments of the same without a prosecutor.   It shall be the duty of the Circuit *Judges' duty.* and criminal Judges and all other Judges whose Courts have criminal jurisdiction, to give this Act specially in charge to the Grand Jury at each term of the Court.

SEC. 3. *Be it further enacted,* That the provisions of *Officers, po-* the first section of this act shall not apply to an officer or *licemen, etc.* policeman while *bona fide* engaged in his official duties in the execution of process, or while searching for or engaged in the arrest of criminals; nor to any person who is *bona fide* aiding the officers of the law or others in the legal arrest of criminals, or in turning them over to the proper authorities after arrest; nor to any person who is not on a journey out of their county or State.

SEC. 4. *Be it further enacted,* It shall be the duty of the several courts in this State to give this act a liberal *Duty of* construction, so as to carry out its true intent and mean- *Courts.* ing.   This act to take effect forty days from and after its passage.

Passed June 11th, 1870.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Approved June 16, 1870.

D. W. C. SENTER,
*Governor.*

 

DATE DOWNLOADED: Tue Oct 18 16:18:38 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1871 81 .

ALWD 7th ed.
, , 1871 81 .

Chicago 17th ed.
"," Tennessee - 37th General Assembly, 1st Session : 81-82


AGLC 4th ed.
" Tennessee - 37th General Assembly, 1st Session 81.

OSCOLA 4th ed.
" 1871 81

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

81

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.
Passed December 12, 1871.

JAMES D. RICHARDSON,
*Speaker of the House of Representatives.*
JOHN C. VAUGHN, ·
*Speaker of the Senate.*

Received at Executive Office December 15, 1871, and approved December 15, 1871.

JOHN C. BROWN,
*Governor.*

———

## CHAPTER XC.

AN ACT to preserve the peace and prevent homicide.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That it shall not be lawful for any person to publicly or privately carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol or revolver other than an army pistol, or such as are commonly carried and used in the United States Army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands, and any person guilty of a violation of the provisions of this section, shall be guilty of a misdemeanor, and subject to presentment or indictment, and, on conviction, shall pay a fine of not less than ten, nor more than fifty dollars, and may be imprisoned in the county jail not more than three months : *Provided, however,* the Court may commute the imprisonment altogether, and in lieu thereof, require the person convicted to give bond with approved security in not less than the sum of five hundren dollars, conditioned that he keep the peace for six months after such conviction.

*Not lawful to carry dirk sword cane, stiletto, or · pistol.*

*To do so a misd'meanor*

*Proviso.*

SEC. 2. *Be it further enacted,* That it shall be the duty of all peace officers in the State, including Sheriffs, Deputy Sheriffs, Constables, Coroners, and Justices of the Peace, to see that the first section of this Act be strictly enforced, and it is hereby made their duty to report without delay any violation thereof, to the grand juries of their respective counties, and it shall be the duty of the grand juries to send for witnesses in all cases where they have good reason to believe there has been a violation

*Duty of peace offic'rs*

6

Compendium_Rivas
Page 006

82

thereof, and, upon satisfactory proof, to make present-
ment of the same without a prosecution.

Not to apply
to peace offi-
cers.
SEC. 3. *Be it further enacted,* That the provisions of
the first section of this Act shall not apply to any officer
or policeman while engaged in the actual discharge of
his official duties, nor to any person who is on a journey
out of his county or State.

Construction
of.
SEC. 4. *Be it further enacted,* That nothing in this
Act shall be so construed as to operate as a pardon for
any offense heretofore committed, but persons indicted or
presented for carrying dangerous weapons under the laws
now in force, shall be tried under said laws, and punished

Proviso.
as therein required: *Provided,* the Courts shall have
discretionary powers in regard to the imprisonment for
said offences.

SEC. 5. *Be it further enacted,* That this Act shall take
effect from and after its passage, the public welfare re-
quiring it.

Passed December 14, 1871.

JAMES D. RICHARDSON,
*Speaker of the House of Representatives.*
JOHN C. VAUGHN,
*Speaker of the Senate.*

Received at Executive Office December 15, 1871, and
approved December 15, 1871.
JOHN C. BROWN,
*Governor.*

———

CHAPTER XCI.

AN ACT to change the county line between the counties of Haw-
kins and Hamblen, between Monroe and Loudon, between Meigs
and Monroe, between Warren and VanBuren, and between Haw-
kins and Hamblen.

County lines
betw'n Haw-
kins and
Hamblen
changed.
SECTION 1. *Be it by enacted the General Assembly of
the State of Tennessee,* That the county line between the
county of Hawkins and Hamblen be so changed as to
include within the county of Hawkins the entire tracts
of land that J. W. Keele, H. P. McCullough and Thomas
Moore now reside upon; the assent of said McCullough
and Moore having been exhibited in writing to this Gen-
eral Assembly.



**HEINONLINE**

DATE DOWNLOADED: Tue Oct 18 16:36:58 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1871 25 .

ALWD 7th ed.
, , 1871 25 .

Chicago 17th ed.
"," Texas - 12th Legislature, 1st Session, General Laws : 25-27

AGLC 4th ed.
'' Texas - 12th Legislature, 1st Session, General Laws 25

OSCOLA 4th ed.
'' 1871 25

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

GENERAL LAWS.          25

CHAPTER XXXIV.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

GENERAL LAWS.

bled for amusement or for educational or scientific purposes, or into
any circus, show, or public exhibition of any kind, or into a ball
room, social party, or social gathering, or to any elec.ion precinct
on the day or days of any election, where any portion of the people
of this State are collected to vote at any election, or to any other
place where people may be assembled to muster, or to perform any
other public duty, (except as may be required or permitted by law,)
or to any other public assembly, and shall have or carry about his
person a pistol or other firearm, dirk, dagger, slung shot, sword
cane, spear, brass-knuckles, bowie-knife, or any other kind of knife
manufactured and sold for the purposes of offense and defense, unless
an officer of the peace, he shall be guilty of a misdemeanor, and, on
conviction thereof, shall, for the first offense, be punished by fine of
not less than fifty, nor more than five hundred dollars, and shall for-
feit to the county the weapon or weapons so found on his person;
and for every subsequent offense may, in addition to such fine and
forfeiture, be imprisoned in the county jail for a term not more than
ninety days.

SEC. 4.  This act shall not apply to, nor be enforced in any
county of the State, which may be designated, in a proclamation of
the Governor, as a frontier county, and liable to incursions of hostile
Indians.

SEC. 5.  All fines collected under the provisions of this act shall
be paid into the treasury of the county, and appropriated exclu-
sively to the keeping in repair and maintenance of public roads, and
all weapons forfeited to the county under the provisions of this act
shall be sold as may be prescribed by the county court, and the pro-
ceeds appropriated to the same purpose.

SEC. 6.  It shall be the duty of all sheriffs, constables, marshals,
and their deputies, and all policemen, and other peace officers, to ar-
rest any person violating the first or third sections of this act, and
to take such person immediately before a justice of the peace of the
county where the offense is committed, or before a mayor or recorder
of the town or city in which the offense is committed, who shall in-
vestigate and try the case without delay.  On all such trials the ac-
cused shall have the right of a trial by jury, and of appeal to the
district court; but, in case of appeal, the accused shall be re-
quired to give bond with two or more good and sufficient sureties in a
sum of not less than one hundred nor more than two hundred dol-
lars, if convicted under the first section and in a sum of not less
than two hundred nor more than one thousand dollars, if convicted
under the third section of this act; said bond to be payable to the
State of Texas, and approved by the magistrate, and conditioned that
the defendant will abide the judgment of the district court that may

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7. Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8. That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9. It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April 12, 1871.

------

## CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Roberson county, Texas.

SEC. 2. That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.

Compendium_Rivas
Page 011

 

DATE DOWNLOADED: Tue Oct 18 16:10:24 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1874-1875 1 .

ALWD 7th ed.
, , 1874-1875 1 .

Chicago 17th ed.
"," Arkansas - 20th General Assembly, Regular Session : 1-255

AGLC 4th ed.
'' Arkansas - 20th General Assembly, Regular Session 1

OSCOLA 4th ed.
'' 1874-1875 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## 152        ACTS OF ARKANSAS.

[ °152 ]     °AN ACT to provide for filling township offices in the case of the forma-
             tion of new townships, and of the change of the boundary line
             between townships.

SECTION
  1.   County Court to order new election; when Governor may appoint.
  2.   Term of office.

*Be it enacted by the General Assembly of the State of Arkansas:*
· SECTION 1.   Whenever the County Court of any county
in this State shall order the formation of one or more new
townships, and such townships shall have been formed, or
shall change the boundary lines of any of the townships
in such county, which formation or change shall necessitate
more or additional township officers, if such necessity shall
arise more than six months before any general election,
the County Court shall order an election for such officers,
to take place within twenty days from the date of such
formation or change of boundary lines, such election to be
conducted in conformity with the law providing for special
elections; *Provided*, The Governor shall appoint such town-
ship officers if the formation or change of boundary lines
shall be made less than six months before the next general
election.
  SEC. 2.   The officers elected or appointed in pursuance
of this act shall hold their offices until the next general
election, and until their successors are elected and qualified.
  Approved February 12, 1875.

---

AN ACT to regulate the publication of legal advertisements in newspapers.

SECTION
  1.   Notices to be published in county newspaper.
  2.   Newspapers may be selected by officers or person where there is more than one.
  3.   Where there is no paper in county, certain papers in the State may be selected.
  4.   Proof of publication; same not required until account is paid.
  5.   Officers may refuse to publish notices, until money is advanced to pay for same.
  6.   Conflicting laws repealed, and act in force from passage.

  SECTION 1.   *Be it enacted by the General Assembly of the
State of Arkansas:*   That when any legal publication of
any character is required by existing or future laws (or the
order of any court, or the provisions of any deed of trust,
mortgage, or other agreement, or by any State, county,
district, township, or municipal officer) to be made by ad-
vertisement in a newspaper printed in this State, it shall
                    be published in some daily or weekly news-
[ *153 ] *paper printed in the county where the suit or
            proceeding is pending, or where the land, prop-
erty, or subject of the proceeding or publication is situ-
ated; *Provided*, There be any newspaper printed in the
county having a *bona fide* circulation therein, which shall
have been regularly published in said county for the period
of one month next before the date of the first publication
of said advertisement.

Compendium_Rivas
Page 013

Sec. 2.  If there be more than one such newspaper published in a county, then the officer, litigant, or individual (or the attorney of record, or agent of such person) whose duty it is to cause or direct such publication, may select any newspaper authorized by the proviso to section one hereof as the medium of publication of such advertisement.

Sec. 3.  If there be no such newspaper printed in a county, and there be occasion for publishing any such legal advertisement, then the person whose duty it is to cause such publication to be made as aforesaid, may select any newspaper printed in this State, and having a circulation therein, which is duly authorized to publish the same.

Sec. 4.  The affidavit of any editor, publisher, or proprietor, or the principal accountant of any newspaper, authorized by this act to publish legal advertisements, to the effect that a legal advertisement has been published in his paper for the length of time, and number of insertions it has been published, with a printed copy of such advertisement appended thereto, subscribed before any officer of this State authorized to administer oaths, shall be the evidence of the publication thereof, as therein set forth; *Provided*, That no editor, publisher, proprietor, or principal accountant of a newspaper shall be required to make such affidavit or deliver such proof of publication to the person ordering the said advertisement published, until the cost of said affidavit and the legal printer's fee therefor shall have been first paid.  The printer's receipt for the cost of proof and fee for printing shall be attached to such proof of publication, and the amount thereof shall be taxed and collected as other costs of the case.

Sec. 5.  Any officer who levies on goods or chattels, lands or tenements, or is charged with the duty of selling the same by virtue of any writ of execution, may refuse to publish a notice of sale thereof by advertisement in a newspaper, until the party for *whose benefit [ *154 ] such execution issued, his agent or attorney, shall advance to such officer so much money as shall be sufficient to discharge the legal fees of the printer for publishing such notice.

Sec. 6.  The act approved May thirtieth (30th), one thousand eight hundred and seventy-four (1874), entitled "An act to regulate the publication of legal notices," and sections four thousand and thirty-one (4031), four thousand and thirty-two (4032), four thousand thirty-three (4033), four thousand and thirty-four (4034), and four thousand and thirty-five (4035) of Gantt's Digest, and all other laws or parts of laws in conflict with the provisions of this act

10

Compendium_Rivas
Page 014

**155**         **ACTS OF ARKANSAS.**

are hereby repealed, and this act shall take effect and be in force from and after its passage.

Approved February 15, 1875.

---

AN ACT to define and make more perfect the line between the counties of Baxter, Izard and Fulton.

SECTION
1.  Boundary line described.
2.  Conflicting laws repealed, and this act in force from passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.   That section one of an act entitled "An act to create the county of Baxter and for other purposes," passed March 24, 1873, be amended so as to read as follows:

Beginning on the State line in the middle of township twenty-one (21) range eleven (11) west, at the point where the section line between section fifteen (15) and section sixteen (16) of said township strikes said State line; thence west by said State line to the point where the line divides ranges fourteen (14) and fifteen (15); thence south by said line eight miles to section line between twenty-four (24) and twenty-five (25) of township twenty (20), range fifteen (15); thence west by said section line to the middle of the main channel of White river; thence down said river by the meanderings thereof to the mouth of Buffalo Fork; thence up said Buffalo Fork to a point where the line dividing range thirteen (13) and fourteen (14) leaves said last named river; thence south by said line to the township line dividing townships fifteen (15) and sixteen [ *155 ] (16); thence east by said line to the range *line, dividing ranges twelve (12) and thirteen (13); thence north to the township line dividing townships sixteen (16) and seventeen (17); thence east by said line to the line dividing ranges eleven (11) and twelve 12) west; thence north to where the township line, dividing townships seventeen (17) and eighteen (18) crosses the same; thence east by said line to the point on said line where the section line between section thirty-three (33) and section thirty-four (34) joins it in township eighteen (18) north, range eleven (11) west; thence north by said line dividing townships eighteen (18), nineteen (19), twenty (20), and twenty-one (21), range eleven (11), in the middle, to the Missouri State line.

SEC. 2.   That all laws and parts of laws in conflict with the provisions of this act be and they are hereby repealed, and that this act take effect and be in force from and after its passage.

Approved February 16, 1875.

Compendium_Rivas
Page 015

AN ACT entitled an act to prohibit the carrying of side-arms, and other deadly
weapons.

SECTION
1. Penalty for carrying weapons; exceptions to same.
2. Disposal of fines collected under this act.
3. Penalty of Justices of the Peace for non-observance of this act.
4. Penalty on other officers.
5. Conflicting laws repealed and this act in force ninety days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.  That any person who shall wear or carry
any pistol of any kind whatever, or any dirk, butcher or
bowie knife, or a sword or a spear in a cane, brass or metal
knucks, or razor, as a weapon, shall be adjudged guilty of
a misdemeanor, and upon conviction thereof, in the county
in which said offense shall have been committed, shall be
fined in any sum not less than twenty-five nor more than
one hundred dollars, to be recovered by presentment or
indictment in the Circuit Court, or before any Justice of
the Peace of the county wherein such offense shall have
been committed ; *Provided*, That nothing herein contained
shall be so construed as to prohibit any person wearing or
carrying any weapon aforesaid on his own premises, or to
prohibit persons traveling through the country, carrying such
weapons while on a journey with their baggage, or
to prohibit any officer of the law wearing *or car- [ *156 ]
rying such weapons when engaged in the discharge
of his official duties, or any person summoned by any such
officer to assist in the execution of any legal process, or any
private person legally authorized to execute any legal pro-
cess to him directed.

SEC. 2.  That the fines collected by any officer, under
and by virtue of this act, shall be immediately paid into
the county treasury by the officer collecting the same, and
he shall take from the Treasurer duplicate receipts there-
for, one of which he shall file in the Clerk's office of his
county ; and the County Treasurer shall hold the fines col-
lected and paid over as aforesaid as part and parcel of the
school fund of his county, and shall be responsible on his
official bond for the safe-keeping and disbursement of the
same.

SEC. 3.  That any Justice of the Peace in this State,
who, from his own knowledge or from legal information
received, knows, or has reasonable grounds to believe, any
person guilty of the offense in section one, of this act de-
scribed, and shall fail or refuse to proceed against such
person, shall be adjudged guilty of a nonfeasance in office,
and upon conviction thereof shall be fined in any sum not
less than twenty-five nor more than three hundred dollars,
to be recovered by presentment or indictment in the Circuit
Court of the county wherein such offense shall have been
committed, and shall moreover be removed from office.

**157**  ACTS OF ARKANSAS.

Sec. 4.  That any Sheriff, Coroner, Constable, or any police officer, of any city in this State, who may have personal knowledge of the commission of the offense, in the first section of this act described, and shall fail or refuse to arrest such offender and bring him to trial, shall be adjudged guilty of a nonfeasance in office, and upon conviction thereof, shall be punished as provided for Justices of the Peace in the foregoing section of this act.

Sec. 5.  That all laws and parts of laws in conflict with this act are hereby repealed, and that this act take effect and be in force ninety days after its passage.

Approved February 16, 1875.

[ °157 ]  °"AN ACT to encourage Mining and Manufacturing in the State of Arkansas."

PREAMBLE.

SECTION
1.  What capital may be exempt from taxation; limit; how old corporations may receive benefit of act.
2.  Statement required by persons wishing to avail themselves of provisions of act; duty of Assessor.
3.  Proceedings when Assessor believes property is not really exempt under act.
4.  Act in force from passage.

WHEREAS, The Constitution of the State of Arkansas, article ten, section three, provides that the General Assembly may, by general law, exempt from taxation for a term of seven years from the ratification of said Constitution, the capital invested in any and all kinds of mining and manufacturing business in this State, under such regulations and restrictions as may be prescribed by law; therefore,

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.  All capital which is or may hereafter be invested and exclusively used in the manufacture of cotton and woolen goods, yarn, farming implements, tanneries, cotton seed oil, in mining and smelting furnaces, shall be exempt from taxation for a period of seven years from and after the thirtieth day of October, eighteen hundred and seventy-four, the date of the ratification of said Constitution; *Provided*, That the capital invested in such manufacturing establishments shall exceed two thousand dollars ($2,000); and, *Provided further*, That no person, corporation or company having prior to the passage of this act, invested capital in any such manufacturing enterprise in this State shall be entitled to the exemption herein provided for, unless the capital stock so invested shall be increased twenty-five per centum of its value, as determined by the last annual assessment.

Sec. 2.  All persons desiring to avail themselves of the provisions of this act shall annually, at the time provided

Compendium_Rivas
Page 017

## ACTS OF ARKANSAS. 158

by law for the assessment of real and personal property throughout the State, present to the Assessor of the county where said capital is so used, a list of the property sought to be exempted, together with a sworn statement of at least two persons, that the said property is actually engaged and exclusively used in manufacturing or mining, as aforesaid. The Assessor shall, thereupon, assess the said property in the usual manner, making a note upon the mar-*gin of the assessment-books of said exemp- [ *158 ] tion, and file the sworn statement in the office of the County Clerk, whereupon the property in said list shall be exempt from all taxes for the current year.

SEC. 3. Whenever any Assessor shall be of opinion that the property claimed as exempt from taxation is really not so exempt, he shall give notice in writing to the person, company or corporation, or to their superintendent, that he will apply to the County Court, ten days or more after the service of the notice, for leave to cancel such exemption, or so much thereof as is subject to taxation; and if, upon the hearing, the court shall be of the opinion that the property is not exempt from taxation within the meaning and intent of this act, it may order the Assessor to cancel such exemption, or so much thereof as is in the opinion of the court subject to taxation, and the tax as originally assessed as hereinbefore provided, together with fifty per centum penalty and the costs of the suit, shall be collected as other taxes are.

SEC. 4. This act shall take effect and be in force from and after its passage.

Approved February 16, 1875.

---

**AN ACT to protect the culture of Fish.**

SECTION
1. Penalty for taking fish from private ponds, without owners' consent.
2. Owner must give notice of his intention to cultivate fish.
3. Act in force from passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1. That if any person shall take fish from any inclosed or artificial lake or pond of water belonging to any other person, without the consent of the owner, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in the sum of one hundred dollars, or be imprisoned in the county jail not more than thirty days.

SEC. 2. That before any person shall have the benefit of this act, he shall first give notice of his intention to breed or cultivate fish in said inclosed or artificial lake or pond of water; he shall post up three or more notices in the precinct of said inclosed or *artificial lake [ *159 ]

Compendium_Rivas
Page 018

or pond of water of his intention, warning all persons not
to take fish from the same.

SEC. 8.  This act take effect and be in force from and
after its passage.

Approved February 16, 1875.

---

### AN ACT to prevent lotteries in this State.

SECTION.
1. Penalty for keeping an office for the selling of lottery tickets.
2. Penalty for selling same.
3. Act in force sixty days from passage.

SECTION 1.  *Be it enacted by the General Assembly of the
State of Arkansas:* That any person or persons shall here-
after keep an office, room or place for the sale or disposi-
tion of lottery tickets, gift concert tickets or like devices
in this State, he, she or they shall be deemed guilty of a
misdemeanor and liable to indictment, and, on conviction
for such offense, shall be fined in a sum not less than fifty
dollars ($50), nor more than five, hundred dollars ($500),
with costs of prosecution.

SEC. 2.  If any person shall vend, sell, or otherwise dis-
pose of any lottery ticket, gift concert ticket, or like device
in this State, he, she or they shall be deemed guilty of a
misdemeanor and liable to indictment, and, on conviction
thereof, fined in a sum not less than fifty dollars ($50), nor
more than five hundred dollars ($500), and shall stand com-
mitted to jail until the fine and costs are paid.

SEC. 3.  This act shall be in force and take effect sixty
days after its passage.

Approved February 17, 1875.

---

[ °160 ]  °AN ACT to regulate the collection of county taxes for the year eighteen
hundred and seventy-four (1874).

SECTION
1. Collectors prohibited from collecting more than one per cent. for county pur-
poses ; certain counties excepted.
2. Collectors to make reduction on tax-books where excess is levied and to have
credit for same.
3. Act in force from passage, and conflicting acts repealed.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.  That the collectors of the several counties
of this State be and are hereby prohibited from collecting
more than one-half of one per cent. for general county
purposes, or more than one-half of one per cent. to pay
indebtedness existing at the time of the ratification of the
present Constitution of the State, being in all one per
cent. of the assessed valuation of the property of the
county ; *Provided*, That the counties of Pulaski, Dorsey,
Crittenden, Lonoke, Lawrence, Lincoln, Van Buren and
Perry be excepted from the provisions of this act.

Compendium_Rivas
Page 019

ACTS OF ARKANSAS.　　161

Sec. 2.　That should the tax-books of any county when turned over to the Collector, show that more than one per centum has been levied for county purposes, the Collector of such county is hereby directed and required to make the reduction in his settlement with the taxpayer, and the County Courts are hereby required to give such Collector or Collectors credit for such reduction in the final settlement with the County Courts.

Sec. 3.　That this act take effect and be in force from and after its passage, and all acts and parts of acts in conflict with this act be and are repealed.

Approved February 19, 1875.

---

AN ACT to relieve the taxpayers of this State, and suspend the enforcement of the collection of taxes for the years eighteen hundred and seventy-three (1873) and eighteen hundred and seventy-four (1874).

PROVISO.

SECTION
1.　Sale of property for non-payment of taxes suspended.
2.　Sheriffs and Collectors required to file delinquent lists with the County Clerk.
3.　Delinquent lists of 1873 and 1874 to be included in tax-books for 1875, with penalty of fifteen per centum.
4.　Conflicting acts suspended, and this act in force for one year.

WHEREAS, The people are in a bankrupt and impoverished *condition, brought about by the enor-  [ *161 ]
mous taxes unjustly imposed upon them for the last five (5) years; and,

WHEREAS, In consequence of the extreme dry weather the crops are unusually short, and in many parts of the State almost an entire failure, and the people are unable to pay their taxes; therefore,

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.　That the sale of all property, both personal and real, for the non-payment of taxes for the years eighteen hundred and seventy-three (1873) and eighteen hundred and seventy-four (1874) be and the same are hereby suspended for the period of one year from and after the thirty-first (31st) day of March, eighteen hundred and seventy-five (1875), and the several Sheriffs and Collectors of revenue are hereby restrained from making sales of property, either personal or real, for said period of one year, for the non-payment of taxes for the years eighteen hundred and seventy-three (1873) and eighteen hundred and seventy-four (1874).

SEC. 2.　That if any person or persons shall fail to pay their taxes for the years eighteen hundred and seventy-three (1873) and eighteen hundred and seventy-four (1874), within the time now prescribed by law, it shall be the duty of the Sheriffs and Collectors of the several counties to make out a true and perfect list of such delinquent taxes, and file the same in the office of the County Clerk of the



DATE DOWNLOADED: Tue Oct 18 16:28:00 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1879 135 .

ALWD 7th ed.
, , 1879 135 .

Chicago 17th ed.
"," Tennessee - 41st General Assembly, 1st Session : 135-136

AGLC 4th ed.
" Tennessee - 41st General Assembly, 1st Session 135.

OSCOLA 4th ed.
" 1879 135

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

[  135  ]

## CHAPTER XCV.

AN ACT to change the day in which the Criminal Docket shall be taken up for Marshall County, Tennessee.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That an Act passed March 22nd, 1877, entitled, "An Act to repeal the Act establishing a Criminal Court in the counties of Williamson, Maury, Giles and Marshall," be so amended that Section 5 of said Act shall hereafter read, that the Criminal Docket shall be taken up on the second Monday of the term of court, instead of the first Thursday of the term, as heretofore fixed by said Act, and that the second Monday of the term shall be the day on which the criminal part of said term of court shall commence for said Marshall County hereafter.

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*
J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

———

## CHAPTER XCVI.

AN ACT to Prevent the Sale of Pistols.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the

[  136  ]

State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol ;  *Provided* that this Act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

*Sale of pistols forbidden.*

SEC. 2. *Be it further enacted,* That any person guilty of a violation of this Act, shall be subject to presentment or indictment, and on conviction, shall pay a fine of not less than twenty-five nor more than one hundred dollars, and be imprisoned at the discretion of the court.

*Penalty.*

SEC. 3. *Be it further enacted,* That it shall be the duty of the Criminal and Circuit Judges, and other Judges whose courts have criminal jurisdiction, to give this Act specially in charge to the grand jury at each term of the court.

*Judges to charge.*

SEC. 4. *Be it further enacted,* That it shall be the duty of the grand juries to send for witnesses, in all cases where they have good reason to believe, that the provisions of this Act have been violated.   And upon satisfactory evidence of its violation, they shall make presentments of the same without a prosecutor.

*Grand jury powers.*

SEC. 5. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

SEC. 6. *Be it further enacted,* That this Act shall take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*
J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

———

CHAPTER XCVII.

AN ACT to amend the Law Taxing Wagons.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That sub-Section 38 of Section 553a



**HEINONLINE**

DATE DOWNLOADED: Tue Oct 18 16:23:58 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1881 191 .

ALWD 7th ed.
, , 1881 191 .

Chicago 17th ed.
"," Arkansas - 23rd General Assembly, Regular Session : 191-192

AGLC 4th ed.
'' Arkansas - 23rd General Assembly, Regular Session 191.

OSCOLA 4th ed.
'' 1881 191

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

SEC. 2.   That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

------------

## *No.  XCVI.*

'AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION

1  Carrying of certain weapons constituted a misdemeanor; *proviso,* excepting officers, and persons journeying.
2  Carrying such weapons otherwise than in the hand, a misdemeanor.
3  Selling or disposing of such weapons, a misdemeanor.
4  Violation of act punishable by fine from $50 to $200.
5  Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6  Same penalty denounced any other officer knowing of such offense.
7  Violators of act how proceeded against.
8  Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.   That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor ; *Provided,* That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further,* That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

SEC. 2.   Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

SEC. 3.   Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

SEC. 4.   Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

SEC. 5.   Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

SEC. 6.   Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

SEC. 7.   All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

SEC. 8.   All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.



# HEINONLINE

DATE DOWNLOADED: Tue Oct 18 16:31:13 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1881 191 .

ALWD 7th ed.
, , 1881 191 .

Chicago 17th ed.
"," Arkansas - 23rd General Assembly, Regular Session : 191-192

AGLC 4th ed.
'' Arkansas - 23rd General Assembly, Regular Session 191.

OSCOLA 4th ed.
'' 1881 191

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

SEC. 2.   That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

---

## No.  XCVI.

'AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION

1  Carrying of certain weapons constituted a misdemeanor; *proviso,* excepting officers, and persons journeying.
2  Carrying such weapons otherwise than in the hand, a misdemeanor.
3  Selling or disposing of such weapons, a misdemeanor.
4  Violation of act punishable by fine from $50 to $200.
5  Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6  Same penalty denounced any other officer knowing of such offense.
7  Violators of act how proceeded against.
8  Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1.   That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor ; *Provided,* That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further,* That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

SEC. 2.   Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

SEC. 3.   Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

SEC. 4.   Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

SEC. 5.   Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

SEC. 6.   Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

SEC. 7.   All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

SEC. 8.   All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.

 

DATE DOWNLOADED: Tue Oct 18 15:07:21 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1894 18 .

ALWD 7th ed.
, , 1894 18 .

Chicago 17th ed.
"," Georgia - General Assembly, Acts and Resolutions : 18-29

AGLC 4th ed.
'' Georgia - General Assembly, Acts and Resolutions 18.

OSCOLA 4th ed.
'' 1894 18

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# TITLE II.

## .TAXES AND PUBLIC DEBT.

### ·ACTS.

General Tax Act for 1895 and 1896.
Creation of Sinking Fund to Retire State Bonds.
Manner of Entering on Digest Names of Colored Tax-payers.

### GENERAL TAX ACT FOR 1895 AND 1896.

### No. 151.

An Act to levy and collect a tax for the support of the State government and the public institutions, for educational purposes in instructing children in the elementary branches of an English education only; to pay the interest on the public debt, and to pay maimed Confederate soldiers and widows of Confederates such amounts as are allowed them by law for each of the fiscal years eighteen hundred and ninety-five and eighteen hundred and ninety-six; and to prescribe what persons, professions, and property are liable to taxation; to prescribe the methods of receiving and collecting said taxes; to prescribe the method of ascertaining the property of this State subject to taxation; prescribe additional questions to be propounded to tax-payers, and to provide penalties and forfeitures for non-payment of taxes, and for other purposes.

General ad valorem tax.

SECTION I. Be it enacted by the General Assembly of the State of Georgia, That the Governor be authorized and empowered, with the assistance of the Comptroller-General, to assess and levy a tax on the taxable property of this State for each of the fiscal years eighteen hundred and ninety-five and eighteen hundred and ninety-six of two mills and $\frac{80}{100}$ths of a mill, and the Governor be, and is, hereby authorized and empowered, by and with the assistance of the Comptroller-General, to assess and levy, in addition to the foregoing general State tax, a tax of one mill and one-half of a mill for each of the years eighteen hundred and ninety-five and eigh-

Ad valorem tax for school purposes.

teen hundred and ninety-six on all of the taxable property of this
State, for the purpose of raising the funds necessary to meet the
appropriations of this General Assembly for educational purposes
in instructing children in the elementary branches of an English
education only.

Sec. II. Be it further enacted by the authority aforesaid, That, in *Specific taxes.*
addition to the *ad valorem* tax on real estate and personal prop-
erty, as required by the Constitution and provided for in the pre-
ceding section, the following specific taxes shall be levied and col-
lected for each of said fiscal years eighteen hundred and ninety-
five and eighteen hundred and ninety-six.

*First.*—Upon each and every male inhabitant of the State, be- *Poll tax.*
tween the ages of twenty-one and sixty years, on the days fixed for
return of property for taxation, a poll tax of one ($1) dollar, which
shall be for educational purposes in instructing children in the
elementary branches of an English education only ; *provided*, this *Exemptions from poll tax.*
tax shall not be demanded of blind persons, nor of crippled,
maimed, or disabled Confederate soldiers, relieved of such taxes
under and by authority of an Act approved July 23, 1883.

*Second.*—Upon every practitioner of law, medicine, or dentistry, *Lawyers, doctors, dentists, corporation presidents, loan agents, etc.*
presidents of each of the banks of the State, each agent or firm
negotiating loans and charging therefor, the presidents of each of
the railroad companies, presidents of each of the express, telegraph,
telephone, electric light, and gas companies doing business in this
State, and in case the presidents of any such companies do not re-
side in this State, then, in such case, upon the superintendent or
general agent of such companies who may reside in this State, ten
($10) dollars, and no municipal corporation or county authorities
shall levy any additional tax on said professions either as a license
fee or otherwise.

*Third.*—Upon every daguerrean, ambrotype, photographic, and *Photographic artists.*
similar artist, ten ($10) dollars in each county in which they may *Exemption*
carry on business; *provided*, this tax shall not be required of any ex-
Confederate soldier.

*Fourth.*—Upon every person carrying on the business of auc- *Auctioneers.*
tioneer, for pay or compensation, twenty-five ($25) dollars for each
county in which they may carry on such business.

*Fifth.*—Upon every keeper of a pool, billiard, or bagatelle table, *Keepers of pool, billiard, or bagatelle tables.*
kept for public use, whether in a bar-room, hotel, or other public
place, twenty-five ($25) dollars for each table.

*Sixth.*—Upon every keeper of any other table, stand, or place *Keepers of gaming places, etc.*
for the performance of any game or play ; and upon the keeper of
any flying-horses, or any other game or play, unless kept for exer-
cise or amusement not prohibited by law, and not kept for gain,
directly or indirectly, twenty-five ($25) dollars in each county.

20          PART I.—TITLE 2.—TAXES AND PUBLIC DEBT.

General Tax Act for 1895 and 1896.

**Keepers of ten-pin alleys, etc.**
**Shooting galleries.**

*Seventh.*—Upon every keeper of a ten-pin alley, or alley of like character, kept for public play, and upon every keeper of a shooting-gallery, twenty-five ($25) dollars for each place of business.

**Peddlers.**

*Eighth.*—Upon every traveling vendor of patent or proprietary medicines, special nostrums, jewelry, paper, soap, or other merchandise, fifty ($50) dollars in each county where they may offer such articles for sale.

**Local insurance agents.**

*Ninth.*—Upon every local insurance agent or firm of agents, or insurance broker or firm of brokers doing business in this State, ten ($10) dollars for each county in which they shall solicit busi-

**Agents of matrimonial companies, etc.**

ness; and upon every agent of a matrimonial, natal, or nuptial company, one hundred ($100.00) dollars for each county in which they shall do business; and upon every traveling or special or general

**Travelling, special, or general insurance agents.**

agent of life, fire, accident, or other insurance company doing business in this State, fifty ($50) dollars, which said tax must be paid before said agents shall be authorized to act as agents for any of their companies.   Said tax shall be paid by said companies to the Comptroller-General, and shall be in addition to the license fee required of insurance companies by the Act approved October 24,

**License of such agents.**

1887.   The receipts of the Comptroller-General for the payment of this tax, together with his certificate, as provided by said Act, approved October 24, 1887, shall constitute the license for said agents to transact business for their companies as designated by said

**Exemption from.**

certificates; *provided,* this tax shall not be required of agents of assessment life insurance companies or mutual aid societies; *provided further,* that railroad ticket agents selling accident insurance tickets shall not be deemed insurance agents in the sense of this section, and this section shall not apply to railroad ticket agents selling accident insurance tickets, and that railroad ticket agents who sell accident insurance tickets shall not be required to pay the said tax; *provided further,* that this tax shall not be required of agents of industrial life insurance companies writing what are known as industrial life insurance premiums, on which are payable, in weekly instalments, not exceeding $1.05 per week.

**Emigrant agents.**

*Tenth.*—Upon each emigrant agent or employer or employee of such agents doing business in this State, the sum of five hundred dollars for each county in which such business is conducted.

**Vendors using boats**
**Tax to be lien on boat and contents.**

*Eleventh.*—Upon every traveling vendor using boats for the purpose of selling goods on the rivers or waters within the limits of this State, the sum of fifty ($50.00) dollars in each county where they may sell their wares, and said tax shall be a lien on the boat and its contents, without regard to the ownership thereof.

**Itinerant lightning-rod dealers or agents.**

*Twelfth.*—Upon all itinerant lightning-rod dealers or agents, the sum of fifty ($50.00) dollars for each and every county in which they operate.

Compendium_Rivas
Page 033

PART I.—TITLE 2.—Taxes and Public Debt.                    21

General Tax Act for 1895 and 1896.

*Thirteenth.*—Upon all shows and exhibitions (except such as [Shows and exhibitions] histrionic, musical, operatic, and elocutionary), including the side-shows accompanying circus companies, fifty ($50.00) dollars in each and every city or town of five thousand inhabitants; forty dollars in cities or towns of four thousand and under five thousand inhabi- [Tax to be used for educational purposes] tants, and thirty dollars in towns of less than four thousand inhab-itants; said tax, so collected, shall be for educational purposes.

*Fourteenth.*—Upon every circus company, or others giving an [Circus companies, etc.] exhibition beneath or within a canvas enclosure, advertised in print or by parade, or in any manner whatsoever as a circus, menagerie, hippodrome, spectacle, or show implying a circus, three hundred [Tax to be used for educational purposes] dollars each day it may exhibit in the State of Georgia; said tax shall be for educational purposes.

*Fifteenth.*—Upon all dealers in spirituous or malt liquors, intoxi- [Liquor dealers.] cating bitters, or brandy fruits or domestic wines, whether dealing in any or all thereof, one hundred dollars for each place of busi-ness in each county where the same are sold; *provided*, that parties engaged in the manufacture of spirituous or malt liquors under license by the government, who are prohibited by any local law from selling the same in the county where manufactured, shall not be subject to this tax unless they carry on the business of retailing or wholesaling such spirituous or malt liquors in some other county where the sale is not prohibited; *provided*, this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes, blackberries, or other fruits grown on their own lands when sold in quantities not less than five gallons; *provided*, that nothing [Exemptions from tax.] in this act shall be construed as to levy a tax on dealers in domestic wines manufactured from grapes or berries purchased by or grown [Tax to be used for educational purposes] on lands owned, leased, or rented by said dealer; said tax shall be for educational purposes.

*Sixteenth.*—Upon all dealers in pistols, toy pistols shooting car- [Dealers in pistols and other weapons.] tridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks, twenty-five dollars for each place of business in the county where the same are sold.

*Seventeenth.*—Upon every individual or firm, or his or their [Dealers in "futures."] agents, engaged in the business of selling or buying through regu-larly organized stock and cotton exchanges, or boards of trade, farm products, sugar, coffee, and salt and meat, railroad stocks and bonds, and stocks and bonds of all kinds, not intended for *bona fide* sale and delivery, but for future delivery (commonly called "fu-tures"), one thousand dollars each per annum for each county where [Exemptions from] such business is carried on; *provided*, that this tax shall not be de-manded of any cotton warehouseman, dealer in cotton, or any pro-

vision broker who takes orders in the regular course of their trade, only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where, by the terms of the contract, it is not left to the option of the party so ordering, or the party taking such order, to avoid the delivery of the produce or products by paying the difference in the market price of such produce or products at the time of delivery ; *provided further*, that such cotton warehouseman, dealer in actual cotton, or any provision broker does not carry on the business of buying " futures" in connection with his or their other business, and upon every individual or firm, or his or their agents, engaged in a like business, when they take orders·on their own account and determine the loss or gain between them and their patrons by market reports received from any source whatever, and whose business is generally denominated " bucket shops," the sum of ten thousand dollars.

**Peddlers of stoves or ranges.** *Eighteenth.*—Upon every peddler of stoves or ranges for cooking purposes, the sum of one hundred dollars in every county in which such peddler may do business; and upon each traveling vendor of patent churns and patent fences, the sum of ten dollars in each county in which they offer such articles for sale.

**Peddlers of churns and fences**

**Packing houses.** *Nineteenth.*—Upon all packing-houses or dealers doing business in this State, whether carried on by the owners thereof or by their agents, fifty dollars ($50) in each county where said business is carried on.

**Keepers for hire or sale of billiard tables, etc.** *Twentieth.*—Upon every person or firm, for himself or agent for resident or non-resident owners, who keeps or holds for hire or sale any billiard, pool, or other table of like character, fifty ($50) dollars for each county in which such person or firm does business.

**Clock peddlers.** *Twenty-first.*—Upon each peddler of clocks, one hundred dollars in each county of the State in which said peddler may do business.

**Itinerant doctors, dentists, etc.** *Twenty-second.*—Upon all itinerant doctors, dentists, opticians, or specialists of any kind doing business in this State, ten dollars for each county in which they may do business; *provided*, the provisions of this paragraph shall not apply to persons whose fixed place of business is in a county of this State and have paid the tax required by paragraph 2 of section 2.

**Exemptions from.**

**Brewing companies.** *Twenty-third.*—Upon all brewing companies, two hundred dollars.

**Pawn-brokers.** *Twenty-fourth.*—Upon each pawn-broker, fifty dollars for each place of business.

**Commercial agencies.** *Twenty-fifth.*—Upon all mercantile and collecting agencies, commercial agencies, and all other agencies of like character, fifty dollars in every county where they have established an office.

**General tax returns** SEC. III. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 1 and 2 of section 2 of this Act, shall be returned to the tax-receiver in the county of the resi-

Compendium_Rivas
Page 035

General Tax Act for 1895 and 1896.

dence of the persons liable to such tax, and shall, by the receiver of tax-returns, be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of section 2 of this Act shall be returned and paid to the tax-collectors of the counties where such vocations are carried on.

Sec. IV. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of section 2 of this Act shall be paid in full for the fiscal years for which they are levied to the tax-collectors of the counties where such vocations are carried on at the time of commencing to do business specified in said paragraphs. Before any person taxed by paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of section 2 of this Act shall be authorized to carry on said business, they shall go before the ordinary of the county in which they propose to do business and register their names, place of business, and at the same time pay their taxes to the tax-collector, and it shall be the duty of said ordinary to immediately notify the Comptroller-General and the tax-collector. Any person failing to register with the ordinary, or, having registered, failing to pay the tax as herein required, shall be liable to indictment for misdemeanor, and, on conviction, shall be fined not less than double the tax, or be imprisoned as prescribed by section 4310 of the Code, or both, in the discretion of the court. One-half of said fine shall be applied to the payment of the tax, and the other to the fund of fines and forfeitures for use of officers of court. *(margin: General rule as to whom and when taxes to be paid. Registration of business. Failure to register to pay business tax.)*

Sec. V. Be it further enacted by the authority aforesaid, That all foreign and home insurance companies, or insurance brokers placing insurance on property in this State, doing business in this State, shall pay one *per centum* on all premiums in money or otherwise received by them; *provided*, this shall not include return premiums on cancelled policies; *provided further*, that this shall not apply to mutual, co-operative, or assessment fire companies organized for mutual protection against losses by fire, and receiving no premiums other than the assessment of its own members; and in addition to the tax imposed by this Act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts, or exchange, lending money, or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed. *(margin: Tax on insurance companies or brokers. Exemptions from. Insurance companies doing brokerage business.)*

Sec. VI. Be it further enacted by the authority aforesaid, That all foreign and home fidelity guarantee companies, or other companies *(margin: Fidelity guarantee companies etc.)*

General Tax Act for 1895 and 1896.

furnishing bonds, or similar associations doing business in this State, shall pay one *per centum* on all premiums, in money or otherwise, received by them, and the agents, general or special or local, as the case may be, of said companies shall make returns to the Comptroller-General on the same terms and in the same manner as insurance companies.

**Returns of building and loan associations, etc.** Sec. VII. Be it further enacted by the authority aforesaid, That the president of all building and loan associations or other associations of like character shall be required to return to the tax-receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof (upon which, as shown by the books of such association, no advance has been made or money borrowed thereon by the individual stockholders therein), to be taxed as other moneyed capital in the hands of private individuals is taxed; *provided,* that no tax **Exemption from.** shall be required of building and loan associations to be paid upon any portion of their capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholders; *and provided further,* that the **This tax to be in lieu of others.** taxes required by this section shall be in lieu of all other taxes and licenses, whether State, county or municipal, against said associations, except a business license by the town or city in which the principal office of any such association is located, and except a fee required to be paid the State Treasurer by the Act approved October 19, 1891.

**Returns of corporations, other than railroad, insurance, express, etc., companies.** Sec. VIII. Be it further enacted by the authority aforesaid, That the presidents of all manufacturing and other incorporated companies, or their agents, other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, shall be required to return all their property whatever of their respective companies at its true market value to the tax-receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed ; save and except that all canal or slack-water **Canal or slack-water navigation companies.** navigation companies shall make, through their respective executive officers or stockholders in possession of the same, returns to the tax-receiver of each county in which the same is located, or through which the same shall pass, in whole or in part, of the right of way, locks and dams, toll-houses, structures, and all other real estate owned or used by the company or the stockholders thereof ; *provided,* this Act shall not make subject to taxation any property of canal or navigation companies which is not subject to taxation by **Questions to be answered by presidents of manufacturing companies.** the laws of this State as now existing. The president of every manufacturing company shall be required to answer under oath, in addition to those now provided by law, the following questions :

General Tax Act for 1895 and 1896.

*First.*—What is the value of raw material on hand on the day fixed for return of property for taxation?

*Second.*—What is the value of manufactured goods or articles on hand on the day fixed for the return of property for taxation?

*Third.*—What amount of money, bonds, notes, accounts, and choses in action of every kind did you own on the day fixed for return of property for taxation?

*Fourth.*—What other property of every kind did your company own on the day fixed for the return of property for taxation?

And such company shall be taxed upon its entire property so ascertained.

Sec. IX. Be it further enacted by the authority aforesaid, That all persons or companies, including railroad companies, doing an express or telegraph business and charging the public therefor, in this State, shall pay two and one-half *per centum* on their gross receipts, and all persons, or the superintendent or general agent of each telegraph or express company, or the president of each railroad company doing such business in this State, shall make a quarterly return, under oath, as follows: *[Tax on companies doing express or telegraph business.]* *[Returns of.]*

On the last day of March, June, September, and December, in each year, to the Comptroller-General, showing a full account of their gross receipts during the quarter ending on such date; and said taxes herein levied upon such gross receipts as shown by said quarterly returns shall be paid by the respective persons or companies to the Comptroller-General at the same time of making such returns; the gross receipts herein named shall be construed to mean the full amount of all money received from all business done within this State. If any person, superintendent, agent, or president, as the case may be, whose duty it is to make returns under this paragraph, shall fail to do so within thirty days after the time herein required, such person, superintendent, agent, or president shall be liable to indictment, and upon conviction shall be punished as prescribed in section 4310 of the Code of 1882. *[Failure to make return.]*

*Second.*—That each telephone company shall pay a tax of one dollar for each telephone station or box with instruments complete, rented or used by their subscribers, and the superintendent or general manager of the company, shall make returns, under oath, and payments to the Comptroller-General on the dates named in the first paragraph of this section. *[Tax on telephone companies.]* *[Returns of.]*

*Third.*—That each non-resident person or company, whose sleeping-cars are run in this State, shall be taxed as follows: Ascertain the whole number of miles of railroads over which such sleeping-cars are run, and ascertain the entire value of all sleeping-cars of such person or company, then tax such sleeping-cars at the regular tax rate imposed upon the property of this State, in the *[Sleeping-cars.]*

Compendium_Rivas
Page 038

26          PART I.—TITLE 2.—Taxes and Public Debt.

General Tax Act for 1895 and 1896.

same proportion to the entire value of such sleeping-cars, that the
length of the lines in this State over which such cars run bears to
the length of the lines of all railroads over which such sleeping-cars
are run.   The returns shall be made to the Comptroller-General by

*Returns of.* the president, manager, general agent, or person in control of such
cars in this State.   The Comptroller-General shall frame such ques-
tions as will elicit the information sought, and answers thereto shall
be made under oath.   If the officers above referred to in control of

*Failure to make proper return.* such sleeping-cars shall fail or refuse to answer, under oath, the
questions so propounded, then the Comptroller-General shall obtain
the information from such sources as he may, and he shall assess a

*Failure to pay tax.* double tax on such sleeping-cars.   If the taxes herein provided for
are not paid, the Comptroller-General shall issue executions against
the owners of such cars, which may be levied by the sheriff of any
county in this State upon the sleeping-car or cars of the owner who
has failed to pay these taxes.

*Sewing-machine companies or dealers.*      Sec. X. Be it further enacted by the authority aforesaid, That
every sewing-machine company selling or dealing in sewing-
machines, by itself or its agents in this State, and all wholesale and
retail dealers in sewing-machines selling machines manufactured by
companies that have not paid the tax required herein, shall pay two
hundred dollars for the fiscal year, or fractional part thereof, to be
paid to the Comptroller-General at the time of commencement of
business, and said companies or dealers shall furnish the Comptroller-

*Lists of agents.* General a list of agents authorized to sell machines of their manu-
facture, or under their control, and shall pay to said Comptroller-

*Tax on agents.* General the sum of five dollars for each of said agents for the fical
year, or fractional part thereof, for each county in which said agent

*Agent's certificate* may do business for said company.   Upon the payment of said ad-
ditional sum, the Comptroller-General shall issue to each of said
agents a certificate of authority to transact business in this State,
and such companies, dealers, and agents, having paid the taxes

*Exemption from county or corporation tax.* required herein, shall be exempted from any county or corporation
tax for selling said sewing-machines.   Before doing business under
this act, all sewing-machine agents shall be required to reg-

*Registration of agents, etc.* ister their names with the ordinaries of those counties in
which they intend to operate and exhibit to said ordinaries
their license from the Comptroller-General, and to keep such
license posted on their vehicles or at their places of business.

*Tax for each manufacture of machines.* Wholesale or retail dealers in sewing-machines shall be required to
pay the tax provided herein for each manufacture of sewing-machines
sold by them, except the manufacture of such companies as have paid

*Lien on unsold machines.* the tax required by this Act.   All unsold sewing-machines belonging
to sewing-machine companies, dealers, or their agents, in possession

of said companies, dealers, their agents, or others, shall be liable to seizure and sale for payment of such fees, license, and tax. Any person who shall violate the provisions of this section shall be liable to indictment for a misdemeanor, and on conviction shall be punished as prescribed in section 4310 of the Code. None of the provisions of this section shall apply to licensed auctioneers selling second-hand sewing-machines, or to officers of the law under legal process, or to merchants buying and selling machines on which a license tax has been paid, as herein provided, and who keep the said machines and sell and deliver them at their places of business, such sales not being on commission. *Penalty for violations of this section.* *Exemptions.*

Sec. XI. Be it further enacted by the authority aforesaid, That no tax shall be assessed upon the capital of banks or of banking associations organized under the authority of this State or of the United States, and located within this State; but the shares of the stockholders of such bank or banking associations, whether resident or non-resident owners, shall be taxed in the county where such bank or banking associations are located, and not elsewhere, at their true and full market value at the same rate provided in this Act for taxation of moneyed capital in the hands of private individuals; *provided,* that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them and provided for in section 8 of this Act. *Tax on bank stock.*

Sec. XII. Be it further enacted by the authority aforesaid, That the president of all railroad companies doing business in this State shall make returns to the Comptroller-General in the manner provided by law for the taxation of the property, of the gross receipt or net income of such railroads, and shall pay the Comptroller-General the tax to which such property or gross receipts or net income may be subject according to the provisions of this Act and the laws now of force relating to the tax on railroads; and, on failure to make returns or refusal to pay tax, said companies shall be liable to all the penalties now provided by law, and the Comptroller-General is hereby required, upon failure of such companies to make returns, or if made and not satisfactory to said officer, to proceed against such companies as provided in section 826(d) of the Code of 1882. *Returns of railroad companies.* *Payment of tax* *Failure to make return or pay tax.*

Sec. XIII. Be it further enacted by the authority aforesaid, That the president and principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the tax-receivers of the counties, shall make returns to the Comptroller-General, under the rules and regulations provided by law for such returns, and subject to the same penalties and the modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General. *Corporations to make returns to Comp.-General, etc*

Compendium_Rivas
Page 040

General Tax Act for 1895 and 1896.

**Questions to be answered by owners of vessels, etc.** Sec. XIV. Be it further enacted by the authority aforesaid, That any person or company, resident of this State, who is the owner of a vessel, boats, or water-craft of any description, shall answer under oath the number of vessels, boats, and other water-crafts owned by them **Returns of and tax on.** and the value of each, and make returns of the same to the tax-receiver of the county of the residence of such person or company, and the same shall be taxed as other property is taxed.

**General rule as to returns for ad valorem tax.** Sec. XV. Be it further enacted by the authority aforesaid, That in returning property for taxes, all property shall be returned at its value; promissory notes, accounts, judgments, mortgages, liens of all kinds, and all choses in action shall be given in at their value, whether solvent or partially solvent. Every person shall return for taxes all jewelry and other property of every kind owned by his wife and minor children, unless the members of his family or her **Additional questions for to be framed by Comp.-General** family return their property for taxation. In addition to the questions now propounded to tax-payers by the tax-receivers, questions shall be framed by the Comptroller-General to reach all property upon which a tax is imposed by this Act, and especially the following questions:

**Especially.** *First.*—The number of horses, mules, oxen, cows, sheep, hogs, goats, and of all other animals upon which a tax is imposed by law, and state the value of each.

*Second.*—The kind and value of property owned by the wife and minor children of the tax-payer and not returned for taxes by the owner thereof.

*Third.*—Whether solvent or partially solvent, give the value of your bonds, stock of non-resident companies or corporations, or of companies or corporations in this State whose capital stock is not returned by the president of such company or corporation, all notes, accounts, judgments, mortgages, liens, and other choses in action of every kind, whether such bonds, stocks, notes, etc., are held by the **No deduction on account of indebtedness of tax-payer.** tax-payers in Georgia, or held by some other person for him either in or out of this State. There shall be no deduction from the value of property returned for taxes on account of any indebtedness of such tax-payer.

**Oath of person making return.** Sec. XVI. Be it further enacted by the authority aforesaid, That the oath to be administered to all persons making returns of their taxable property shall be the oath required under the Act of October 20, 1885, to be attached to the printed list furnished under said Act and presented to each tax-payer; *provided,* that non-residents, females, and sick persons may subscribe the oath herein required before any person authorized by law to administer oaths, and cause same to be delivered to the tax-receiver.

General Tax Act for 1895 and 1896.

SEC. XVII. Be it further enacted by the authority aforesaid, That *When returns to be received* the Comptroller-General is authorized and empowered to order the tax-receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of each of the years eighteen hundred and ninety-five (1895) and eighteen hundred and ninety-six (1896), and that the Comptroller-General *When taxes to be paid.* is empowered and required to cause the taxes to be collected and paid into the State treasury by the 20th of December of each of the years 1895 and 1896.

SEC. XVIII. Be it further enacted by the authority aforesaid, *Exemptions of blind persons, soldiers, and persons deformed.* That blind persons, Confederate soldiers, and all other persons so deformed by nature as to render them unfit for manual labor, relieved by the proviso in paragraph 1, section 2, from the payment of the tax designated in that paragraph, shall be relieved also from the payment of the taxes designated in paragraphs 6, 7, 8, and 11 of section 2, if carrying on and dependent upon the kinds of business designated therein ; *provided*, that before any person shall be entitled to the benefit of any of the exemptions provided for in this section, he shall go before the ordinary of the county in which he proposes to carry on business, and make and file an affidavit setting forth the facts that he is entitled to such exemption, that he is proprietor of the business he proposes to conduct, and is conducting the same for himself, and not for others.

SEC. XIX. Be it further enacted by the authority aforesaid, That *Day for making returns, how fixed.* immediately after the first day of March of each of the years 1895 and 1896, the Governor, Comptroller-General, and State Treasurer shall fix a day between January the 1st and April the 1st of each of the years 1895 and 1896, as a day for making a return of taxes, instead of April 1st, which day shall not be fixed until March 1st of each of the years 1895 and 1896, as provided by Act approved December 20, 1893.

SEC. XX. Be it further enacted by the authority aforesaid, That all laws and parts of laws in conflict with this Act be, and the same are, hereby repealed.

Approved December 18, 1894.



**HEINONLINE**

DATE DOWNLOADED: Tue Oct 18 15:57:27 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1907 479 .

ALWD 7th ed.
, , 1907 479 .

Chicago 17th ed.
"," Texas - 30th Legislature, Regular and 1st Called Sessions, General Laws : 479-488

AGLC 4th ed.
'' Texas - 30th Legislature, Regular and 1st Called Sessions, General Laws 479

OSCOLA 4th ed.
'' 1907 479

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

GENERAL LAWS OF TEXAS.                    479

TAXES—PROVIDING FOR THE LEVY OF OCCUPATION
TAXES.

H. B. No. 4]                  CHAPTER XVIII.

An Act providing for the levy and collection of an occupation tax upon indi-
viduals, companies, corporations and associations pursuing any of the occupa-
tions, viz.: express companies; telegraph and wireless telegraph; gas; electric
light, electric power or water works, or water and light plant business; col-
lecting agency business; commercial agency business, commercial reporting
credit agency business; business of foreign corporations owning stock cars,
refrigerator and fruit cars, tank cars, coal cars, furniture cars, common box
and flat cars, and leasing, renting or charging mileage for the use of such
cars within the State of Texas; business of owning, operating, leasing or
renting pipe line or pipe lines; sleeping car, palace car, dining car business;
life insurance business, fire insurance business, fire and marine insurance
business, marine, marine and inland insurance company business, life and
accident, life and health, accident, credit, title, steam boiler, live stock and
casualty insurance business, surety and guaranty insurance company busi-
ness, business of wholesale dealers in coal oil, naptha, benzine and other
mineral oils refined from petroleum, and defining wholesale dealers; whole-
sale distributors or wholesale dealers in spirituous, vinous or malt liquors,
or medicated bitters capable of producing intoxication, and defining whole-
sale distributors and dealers; the business of street railway companies, the
business of interurban, trolley, traction or electric street railway companies,
the business of wholesale and retail dealing in pistols, the business of owning
or operating or controlling a telephone business; the business of publishing,
printing and selling text books or law books, or either; the business of own-
ing, controlling, managing or leasing oil wells, the business of owning, con-
trolling, managing or operating any terminal railway company or terminal
railway; and providing for the levy and collection of an occupation tax on
individuals, companies, firms, corporations and associations who begin the
pursuit of any such occupation taxed herein on or after the beginning date
of the quarter as fixed herein; and providing for penalties for violation of
the provisions of this Act; and giving the State Revenue Agent authority to
assist in the enforcement of the provisions of this Act; and repealing all laws
and parts of laws in conflict herewith; and to exempt all persons, associations
of persons, firms and corporations upon whose business an occupation tax is
herein levied from the operation of the Act, approved April 17, 1905, of the
Twenty-ninth Legislature, being Chapter 146 thereof, providing for the taxa-
tion of the intangible assets of certain corporations, associations and indi-
viduals, and to repeal all Sections of the Act approved April 17, 1905, of the
Twenty-ninth Legislature, being Chapter 148 thereof, imposing an occupa-
tion tax upon the occupations herein taxed, preserving all liabilities, obliga-
tions and penalties incurred or fixed under Chapter 148, Acts 20th Legislature,
approved April 17th, 1905, and all causes of action and suits arising there-
under, and to declare an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1.   Each and every individual, company, corporation or as-
sociation doing an express business by railroad or water, in this State,
shall, on or before the first day of March, 1908, and annually thereafter,
make a report to the Comptroller of Public Accounts under oath, of the
individual or of the president, treasurer or superintendent of such com-
pany, corporation or association, showing the amount of gross receipts
from charges and freights within this State paid to or collected by such
individual, company, corporation or association on account of money,
goods, merchandise or other character of freight carried within this
State during the twelve months next preceding. Said individuals, com-

panies, corporations or associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the year beginning on said date, equal to two and one-half per cent of said gross receipts as shown by said report.

Sec. 2.   Each and every individual company, corporation or association owning, operating controlling or managing any telegraph lines in this State or owning, operating, controlling or managing what is known as wireless telegraph stations, for the transmission of messages or aerograms, and charging for the transmission of such messages or aerograms, shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts under oath of the individual, or of the president, treasurer or superintendent of such companies, corporation or association showing the gross amount received from all business within this State during the preceding quarter in the payment of telegraphic or aerograms charges, including the amount received on full rate messages and aerograms and half rate messages, and aerograms, and from the lease or use of any wires or equipment within the State during said quarter. Said individuals, companies, corporations and associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to two and three-fourths per cent of said gross receipts, as shown by said report.

Sec. 3.   Each and every individual, company. corporation, or association, owning, operating or managing or controlling any gas, electric light, electric power or water works or water and light plant, within this State and charging for gas, electric lights, electric power or water, shall on or before the first day of July, 1907, and quarterly thereafter make a report to the Comptroller of Public Accounts under oath of the individual or of the president, treasurer or superintendent of such company, corporation or association, showing the gross amount received from the business done within this State in the payment of charges for gas, electric lights, electric power and water for the quarter next preceding. Said individual, company, corporation or association, at the time of making said report for any town or city of ten thousand inhabitants and less than twenty-five thousand inhabitants, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date, equal to one-fourth of one per cent of said gross receipts, as shown by said report, and for any town or city of twenty-five thousand inhabitants or more, the said individual, company, corporation or association, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date, an amount equal to one-half of one per cent of said gross receipts as shown by said report, Provided, that nothing herein shall apply to any gas, electric light, electric power or water works, or water and light plant within this State, owned by any city or town.

Sec. 4.   Each and every individual, company, corporation or association, owning, operating, managing or controlling any collecting agency, commercial agency, or commercial reporting credit agency within this State, and charging for collections made, or business done or reports made, shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts under

oath of the individual or of the president, treasurer, or superintendent of such company, corporation or association, showing from business done within this State the gross amount received in the payment of charges for collections made and business done and reports made during the quarter next preceding.  Such individuals, companies, corporations or associations at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to one-half of one per cent of said gross receipts as shown by said report.

SEC. 5.  Each and every individual, company, corporation or association, residing without the State of Texas, or incorporated under the laws of any other State or Territory, or nation, and owning stock cars, refrigerator and fruit cars of any kind, tank cars of any kind, coal cars of any kind, furniture cars or common box cars and flat cars, and leasing, renting or charging mileage for the use of such cars, within the State of Texas shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts under oath of the individual, or of the president, treasurer or superintendent of such company, corporation or association, showing the amount of gross receipts from such rentals, or mileage, or from other sources of revenue received from business done within this State, during the quarter next preceding.  Said individuals, companies and corporations, and associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to three per cent of said gross receipts as shown by said report.

SEC. 6.  Each and every individual, company, corporation or association whether incorporated under the laws of this State or of any other State or Territory, or of the United States, or of any foreign nation, which owns, manages, operates, leases or rents any pipe line or pipe lines within this State, whether such pipe line or pipe lines be used for transmission of oil, natural or artificial gas, whether such oil or gas be for illuminating or fuel purposes, or for steam, for heat or power, or for any other purpose, and whether such pipe line or pipe lines be used for the transmission of articles by pneumatic or other power, shall, on or before the first day of July, 1907, and quarterly thereafter, pay to the State of Texas an occupation tax equal to two per cent of its gross receipts if such pipe line or pipe lines lie wholly within this State; and if such pipe line or pipe lines lie partly within and partly without the State, such individuals, companies, corporations and associations shall pay a tax equal to two per cent of such proportion of its gross receipts, as the length of such line or lines within the State bears to the whole length of such line or lines; provided, that if satisfactory evidence is submitted to the Comptroller of Public Accounts at any time prior to the date fixed by this section for the payment of the tax herein imposed, that any other proportion more fairly represents the proportion which the gross receipts of any pipe line or pipe lines for any quarter, within this State bears to its total gross receipts, it shall be his duty to collect for such quarter from every such pipe line or pipe lines an tax equal to such other proportion of two per cent of its total gross receipts.

31

For the purpose of determining the amount of such tax, the individual or the president, treasurer or superintendent of such company, association or corporation, shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts, under oath of the individual, or of the president, treasurer or superintendent of such company, corporation or association, showing the gross receipts of such pipe line or pipe lines from every source, whatsoever, for the quarter next preceding, and shall immediately pay to the State Treasurer an occupation tax for the quarter beginning on said date, calculated on the gross receipts so reported.

SEC. 7. Every sleeping car company, palace car company, or dining car company, doing business in this State, and each individual, company, corporation or association leasing or renting, owning, controlling or managing any palace cars, dining cars, or sleeping cars within this State for the use of the public, for which any fare is charged, shall, on or before the first day of July, 1907, and quarterly thereafter, report to the Comptroller of Public Accounts, under oath of the individual, or of the president, treasurer or superintendent of such company, corporation or association, showing the amount of gross receipts earned from any and all sources whatever within this State, except from receipts derived from buffet service, during the quarter next preceding. Said individuals, companies, corporations and associations, at the time of making said report shall pay to the Treasurer of this State of Texas an occupation tax for the quarter beginning on said date equal to five per cent of said gross receipts as shown by said report.

The tax herein provided for shall be in lieu of all other taxes now levied upon sleeping car, palace car or dining car companies, except the tax of 25 cents on the one hundred dollars of the capital stock of such car companies, as provided by the act of the Twenty-third Legislature, Chapter 102.

SEC. 8. Every life, fire, fire and marine, marine, and marine inland insurance company, and every life and accident, life and health, accident, credit, title, steam boiler, live stock, fidelity, guaranty, surety, and casualty company and all other insurance companies doing business in this State, except fraternal life and domestic benevolent life insurance companies, at the time of filing its annual statement, shall report to the Commissioner of Insurance and Banking the gross amount of premiums received in the State, upon property located in the State, and from persons residing in this State, during the preceding year; and each of such companies shall pay an annual tax upon such gross premium receipts as follows: Each life insurance company shall pay a tax of three per cent of such gross premiums; all other companies enumerated above shall pay a tax of two per cent of such gross premiums; provided, that any company doing life insurance business in connection with any other class of insurance enumerated shall pay the same tax upon the gross receipts from life insurance of a company conducting a purely life insurance business; and the gross premium receipts are understood to be a premium receipt reported to the Commissioner of Insurance and Banking by the insurance com-

panies upon the sworn statement of two principal officers of such companies.

Upon receipt by him of sworn statements showing the gross premium receipts by such companies, the Commissioner shall certify to the State Treasurer the amount of taxes due by each company, which tax shall be paid to the State Treasurer for the use of the State, on or before the first of March following, whose receipt shall be evidence of the payment of such taxes, and no insurance company shall receive a permit to do business in this State until such taxes are paid. But any life insurance company that shall comply with the terms and provisions of the Act passed by the Regular Session of the Thirtieth Legislature of this State, approved April 24th, 1907, requiring the investment and deposit of 75 per cent of the reserve apportioned on account of policies of insurance written upon the lives of citizens of this State, shall pay an annual tax of one per cent upon its gross receipts so long as said investments and deposits are made as provided in said Acts. And that if any such insurance company shall have as much as one-fourth of its entire assets, as shown by said sworn statement, invested in any or all of the following securities: real estate in the State of Texas, bonds of this State or of any county, incorporated city or town of this State, or other property in this State in which by law such companies may invest their funds, then the annual tax of any such companies shall be one per cent of its said gross premium receipts; and if any such company shall invest as aforesaid as much as one half of its assets, then the annual tax of such company shall be one half of one per cent of its gross premium receipts, as above defined, and provided further that no occupation tax shall be levied on insurance companies herein subjected to a gross premium receipt tax, by any county, city or town. Provided also that all mutual fraternal benevolent associations, now or hereafter doing a life insurance or a life and accident insurance business in this State under the lodge system and on the assessment plan, whether organized under the laws of this State, or a foreign state or country, are exempt from the provisions of this section.

Any life insurance company heretofore or hereafter engaged in writing policies upon the lives of citizens of this State that shall cease writing such policies of insurance but shall continue to be engaged in collecting premium or renewal premiums upon such policies shall report under oath annually as provided above to the said Commissioner of Insurance of this State the gross amount of premiums so collected and shall pay to the State thereon the three per cent (3%) gross receipts tax above provided for. And any such life insurance company shall constitute and appoint the said Commissioner of Insurance of this State its duly authorized agent and attorney in fact for the purpose of accepting service for it or being served with citation in any suit brought against it in any court in this State in like manner as is provided by law for companies engaged in doing every character of insurance business in this State, and such appointment and agency shall be continued and kept in force so long as such company continues to collect premiums of insurance from citizens of this State, and failure to make such report and pay such tax or to make and keep up the appointment of the agency as herein provided shall subject such com-

pany to a penalty for each year of $5,000 and in addition in a sum equal to double the amount of such tax for such year which penalty may be recovered by the State in a suit brought in the name of the State, under the direction of the said Commissioner of Insurance by the proper officer in the District Court of Travis County.

The taxes aforesaid shall constitute all taxes and license fees collectable under the laws of this State against any such insurance companies, and no occupation or other taxes shall be levied on or collected from any insurance company by any county, city or town, but this act shall not be construed to prohibit the levy and collection of State, County and municipal taxes upon the real and personal property of such companies. Provided, that this shall not relieve agents from paying an occupation tax. Provided further that purely co-operative or mutual fire insurance companies carried on by the members thereof, solely for the protection of their own property and not for profit shall be exempt from the provisions of this bill.

SEC. 9. Each and every individual company, corporation or association created by the laws of this State or any other State or nation, which shall engage in his own name or in the name of others, or in the name of its representatives, or agents, in this State in the business of wholesale dealers in coal oil, naptha, benzine or any other mineral oils refined from petroleum, shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts, under oath of the individual, or of the president, treasurer or superintendent of such company, corporation or association, showing the gross amount collected and uncollected from any and all sales made within this State of any of said articles during the quarter next preceding. Said individuals, companies, corporations and associations, at the time of making said report; shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to two per cent of said gross receipts and amount uncollected from said sales as shown by said report.

A wholesale dealer within the meaning of this section is any individual, company, firm, partnership, corporation or association who buys any of the articles hereinbefore mentioned either in his own name or in the name of others, or in the name of their representative or agent and sells same either in his name or in the name of others, or in the name of their representatives or agents, to any person, firm, corporation or association to be sold again.

SEC. 10. Each and every individual, company, corporation or association owning operating or controlling any interurban, trolley, traction or electric street railway in this State and charging for transportation on said railway shall, on or before the first day of July, 1907, and quarterly thereafter make a report to the Comptroller of Public Accounts, under oath of the individual or of the president, treasurer or superintendent of such company, corporation or association, showing the amount of gross receipts from said charges for transportation on said railway paid to or uncollected by said individuals, company, corporation or association for the quarter next preceding. Said individual, company, corporation or association, at the time of making said report if in or if connecting any town or city containing twenty thousand

inhabitants, shall pay to the Treasurer of the State as an occupation tax for the quarter beginning on said date equal to one-half of one per cent of said gross receipts as shown by said report; if in a city of more than twenty thousand inhabitants, said individual, company or corporation or association, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to three-fourths of one per cent of said gross receipts as shown by said report. Provided that in ascertaining the population of any city or town, the same shall be ascertained by the last United States census, and provided further that where any interurban railroad shall connect any town having a population of more than 20,000 with another of a less population, that it shall be liable for the taxes measured by the population of the largest town. Provided, further, that the provisions of this Act shall not apply to any street railway or traction company wholly within any town of less than ten thousand inhabitants.

SEC. 11. Each and every individual company, corporation or association created by the laws of this State or any other State, who shall engage in his own name or in the name of others, or in the name of its representatives or agents in this State in the business of a wholesale dealer or a wholesale distributor of spirituous vinous or malt liquors or medicated bitters capable of producing intoxication, shall on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts, under oath of the individual, or of the president, treasurer or superintendent of such company, corporation or association, showing the gross amount collected and un-collected from any and all sales made within this State of any of said articles during the quarter next preceding. Said individuals, companies, corporations and associations, at the time of making said report shall pay to the Treasurer of the State of Texas, an occupation tax for the quarter beginning on said date, equal to one half of one per cent of said gross receipts from said sale as shown by said report.

A wholesale dealer or distributor, within the meaning of this Section, is any individual, company, association or corporation selling any of the articles hereinbefore mentioned either in his own or in the name of others or in the name of its representatives or agents to retail dealers, or who deliver on consignment to their agents for retail.

SEC. 12. Each and every individual, company, corporation or association created by the laws of this State or any other State who shall engage in his own name or in the name of others, or in the names of its representatives or agents in this State in the business of a wholesale or retail dealer of pistols shall, on or before the first day of July, 1907, and quarterly hereafter, make a report to the Comptroller of Public Accounts, under oath of the individual or of the president, treasurer or superintendent of said company, corporation or association, showing the gross amount collected and uncollected from any and all sales made within this State of all fire arms during the quarter next preceding. Such individuals, companies, corporations and associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on

Compendium_Rivas

said date, equal to 50 per cent of said gross receipts from sales of all firearms as shown by said report.

SEC. 13. Each and every individual company, corporation or association, whether incorporated under the laws of this State or any other State or nation, engaged in publishing, printing, or selling text books used in the schools of this State, or law books of any character, or owning, controlling or managing any such business, as text books or law books purchasers, within the State or out of it, and having State agencies within this State for the purpose of selling any book or books to be used in any of the schools of this State, or any law books shall on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts, under oath of the individual or of the president, Treasurer or Superintendent of such company, corporation or association, or of the person owning controlling or managing any such business, showing the gross amount received from such business done within this State from any and all sources during the quarter next preceding. Said individuals, companies, corporations and associations at the time of making said report shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date, equal to one per cent of said gross receipts, as shown by said report.

SEC. 14. Each and every individual company, corporation or association owning, operating, managing or controlling any telephone line or lines or any telephones within this State, and charging for the use of the same shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts, under oath of the individual, or of the President, Treasurer or Superintendent of such company, corporation or association, showing the gross amount received from all business within this State during the preceding quarter, in the payment of charges for the use of its line or lines, telephone and telephones, and from the lease or use of any wires or equipment within this State during said quarter. Said individuals, companies, corporations and associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax, for the quarter beginning on said date, equal to one and one-half per cent of said gross receipts, as shown by said report.

SEC. 15. Each and every individual, company, corporation or association, whether incorporated under the laws of this or any other State or Territory, or of the United States, or any foreign country, which owns, controls, manages or leases any oil well within this State, shall, on or before the first day of July, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts under oath of the individual, or of the President, Treasurer or Superintendent of such company, corporation or association, showing the total amount of oil produced during the quarter next preceding and the average market value thereof during said quarter. Said individuals, companies, corporations and associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date, equal to one half of one per cent of the total amount of all oil produced, at the average market value thereof, as shown by said report.

SEC. 16. Each and every individual, company, corporation or association, whether incorporated under the laws of this or any other State or Territory or of the United States, or any foreign country, which owns, controls, manages or leases any terminal companies, or any railroad doing a terminal business within this State, shall, on or before the first day of April, 1907, and quarterly thereafter, make a report to the Comptroller of Public Accounts, under oath of the individual, or of the President, Treasurer or Superintendent of such company, corporation or association showing the total amount of its gross receipts from all sources whatever within this State during the quarter next preceding, and the average market value thereof during said quarter. Said individuals, companies, corporations and associations, at the time of making said report, shall pay to the Treasurer of the State of Texas an occupation tax for the quarter beginning on said date equal to one per cent of the total amount of its gross receipts from all sources whatever as shown by said report.

SEC. 17. If any individual, company, corporation firm or association, in this Act mentioned, shall begin and engage in any business for which there is an occupation tax herein imposed, on or after the beginning day of the quarter for which said tax is imposed, then, and in all such cases, the amount of such tax for said beginning quarter shall be and is hereby fixed at the sum of fifty dollars, payable to the treasurer of the State of Texas, in advance, but for the next succeeding quarter, and all other succeeding quarters, the tax shall be determined by reports to the comptroller of Public Accounts of the business for the preceding quarter, or part thereof, as herein otherwise in this Act provided, and reports and payments of such tax shall be made subject to all other provisions of this Act.

SEC. 18. Any person, company, corporation or association, or any receiver or receivers, failing to make report for thirty days from the date when said report is required by this Act to be made, shall forfeit and pay to the State of Texas a penalty of not exceeding one thousand dollars.

SEC. 19. Any person, company, corporation or association or any receiver or receivers failing to pay any tax for thirty days, from the date when said tax is required by this Act to be paid, shall forfeit and pay to the State of Texas a penalty of ten per cent upon the amount of such tax.

SEC. 20. The penalties provided for by this Act shall be recovered by the Attorney General in a suit brought by him in the name of the State of Texas, and venue and jurisdiction of such suit is hereby conferred upon the courts of Travis County, Texas.

SEC. 21. No individual, company, corporation or association, failing to pay all taxes imposed by this Act shall receive a permit to do business in this State, or continue to do business in this State until the tax hereby imposed is paid. The receipt of the Treasurer of the State of Texas, shall be evidence of the payment of such tax.

SEC. 22. Except as herein stated all taxes levied by this Act shall be in addition to all other taxes now levied by law, provided that nothing herein shall be construed as authorizing any county or city to levy an occupation tax on the occupations and business taxed by this Act.

SEC. 23. If for any reason the Comptroller of Public Accounts is not satisfied with any report from any such person, company, corporation, cc partnership or association, he may require additional or supplemental reports containing information and data upon such matters as he may need or deem necessary to ascertain the true and correct amount of all taxes due by any such person, firm, or corporation.

Every statement or report required by this Act, shall have affixed thereto the affidavit of the President, vice-president, secretary or treasurer of the person, corporation, co-partnership or association, or one of the persons or members of the partnership, making the same to the effect that the statement is true. The Comptroller shall prepare blanks to be used in making the reports required by this Act.

SEC. 24. If the Comptroller has reason to believe, or does believe, that any individual company, corporation, association, receiver or receivers, subject to the provisions of this Act, has made a false return or has failed or omitted to make a full return of gross receipts, or other statement of business done, required by any of the provisions of this Act, he shall report the same in writing to the Governor and it shall be the duty of the Governor to immediately require the Revenue Agent of the State of Texas to examine any books, papers, documents, or other records or evidence showing or tending to show such unlawful Act or omission. Said Revenue Agent shall check the report made with such books, papers, documents or other records or evidence, and make his report to the Comptroller, and if it appears from said report that any false or incorrect return has been made, or that any individual, or the president, treasurer or superintendent of any company, corporation or association, or any member of any firm required by this Act to make reports, has failed or omitted to make a full return, as required by law, then the Comptroller shall notify such individual, or the president, treasurer or superintendent of any company, corporation or association, or receiver or receivers of any company, corporation or association or any member of any firm, to make forthwith an additional or supplemental report, and if any such individual or the president, treasurer or superintendent of any company, corporation or association, or any member of a firm, or any receiver or receivers of any company, corporation or association making said original report, shall fail or refuse to make said additional or supplemental report Ite shall be guilty of a misdemeanor, and on conviction shall be fined in any sum not less than two hundred nor more than five hundred dollars and venue of such prosecution is hereby fixed in Travis County, Texas.

If it appears from the report of the State Revenue Agent, or if the Comptroller has reason to believe or does believe that any individual, or any president, treasurer or superintendent of any company, corporation or association, or any receiver of any corporation or association or any member of any firm, has wilfully and deliberately made a false report, the Comptroller shall report the matter to the Grand Jury of Travis County, Texas, for its action, and venue of any offense arising out of such transaction is hereby fixed in Travis County, Texas. Said State Revenue Agent, in the performance and discharge of the duties imposed upon him by this Section, shall have the right to examine,

# BOOKS

# ARMED IN AMERICA

A History of Gun Rights *from*
Colonial Militias *to* Concealed Carry

Patrick J. Charles

**PB** Prometheus Books

59 John Glenn Drive
Amherst, New York  14228

Compendium_Rivas
Page 055

Published 2018 by Prometheus Books

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry.* Copyright © 2018 by Patrick J. Charles. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, digital, electronic, mechanical, photocopying, recording, or otherwise, or conveyed via the Internet or a website without prior written permission of the publisher, except in the case of brief quotations embodied in critical articles and reviews.

Top cover image © Media Bakery
Bottom cover image © Jamie Carroll / Shutterstock
Cover design by Liz Mills
Cover design © Prometheus Books

Every attempt has been made to trace accurate ownership of copyrighted material in this book. Errors and omissions will be corrected in subsequent editions, provided that notification is sent to the publisher.

Inquiries should be addressed to
Prometheus Books
59 John Glenn Drive
Amherst, New York 14228
VOICE: 716–691–0133. • FAX: 716–691–0137
WWW.PROMETHEUSBOOKS.COM

22  21  20  19  18     5  4  3  2  1

Library of Congress Cataloging-in-Publication Data

Names: Charles, Patrick J. (Historian), author.
Title: Armed in America : a history of gun rights from colonial militias to concealed carry / Patrick J. Charles.
Description: Amherst, New York : Prometheus Books, 2018. | Includes index.
Identifiers: LCCN 2017028290 (print) | LCCN 2017039818 (ebook) | ISBN 9781633883147 (ebook) | ISBN 9781633883130 (hardback)
Subjects: LCSH: Firearms—Law and legislation—United States—History. | Gun control—United States—History. | BISAC: POLITICAL SCIENCE / Constitutions. | HISTORY / United States / General.
Classification: LCC KF3941 (ebook) | LCC KF3941 .C49 2018 (print) | DDC 344.7305/33—dc23
LC record available at https://lccn.loc.gov/2017028290

Printed in the United States of America

3 1223 12351 3096

*For my daughter, Addison Harper Charles.*

public order and sense of security, which it is one of the first objects of the common law, and ought to be of the law of all regulated societies, to preserve inviolate—and they lead almost necessarily to actual violence. Nor can it for a moment be supposed, that such acts are less mischievous here or less the proper subjects of legal reprehension, than they were in the country of our ancestors. The bill of rights in this State secures to every man indeed, the right to "bear arms for the defence of the State." While it secures to him a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised.[169]

Gaston's opinion, although written decades after the Statute of Northampton was replaced in American statute and ordinance books, coincides with how the Statute was traditionally understood and applied. Gatson viewed the Statute as permitting individuals to carry weapons for lawful purposes such as "business or amusement," but restricting preparatory armed carriage in public places.[170] To state this differently, Gatson foresaw instances where a person might carry weapons for transport to a residence or location for repair, hunting, or to attend a militia muster. It was for this reason that Gatson found that the act of carrying weapons by itself constituted no crime *per se*. To be in violation of the Statute required a bit more. The question that needed to be asked before the Statute was deemed applicable was: "Why was the person carrying the weapon?" If the carrying was for a lawful purpose, there was no violation.[171] But if the person was merely carrying weapons among the public concourse in a preparatory fashion, they could be in violation of the statute.[172]

Looking at the Antebellum Era as a historical whole, the important takeaway is that there were two conceptions as to whether the right to arms embodied a right to preparatory armed carriage. While Northerners, by and large, did not recognize a right to preparatory armed carriage, particularly as it pertained to public places, many Southerners perceived such a right as being embodied within either the Second Amendment or their respective state constitution's "bear arms" provision. But as the United States came out of the Civil War and into the Reconstruction Era, Southerners began to assimilate Northern ideas and attitudes on the right to arms, the law, and armed carriage.[173] The South's gradual embrace of Northern ideas and attitudes can be largely attributed to the increase of lawlessness and violence within their communities.[174] Southern lawmakers initially responded by modifying their respective constitutions.[175] The Southern states of Georgia, Texas, Tennessee, Missouri, Louisiana, North Carolina, Mississippi, and Kentucky, as well as the states of Colorado, Idaho, Utah, and Montana, adopted express constitutional

language reinforcing the legislature's authority to regulate armed carriage, particularly weapons that could be concealed.[176]

This was followed by state and local governments introducing and enacting new laws that curtailed the practice of carrying dangerous weapons in public places.[177] In Texas, for example, Article I, section 13 of the 1869 state constitution stipulated that "every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulation as the legislature may prescribe."[178] Subsequently, relying on this very constitutional provision, Texas governor Edmund J. Davis urged the Texas legislature to pass new armed carriage restrictions, stating:

> I would, in this respect of prevention of crimes, call your attention to the provisions of section thirteen of the Bill of Rights, on the subject of bearing arms. The legislature is there given a control over the privileges of the citizen, in this respect, which was not in the old constitution. There is no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this state. I recommend that this privilege be placed under such restrictions as may seem to your wisdom best calculated to prevent the abuse of it. Other than in a few of the frontier counties there is no good reason why deadly weapons should be permitted to be carried on the person.[179]

New armed carriage laws were even passed within those states that did not maintain a police power or regulatory proviso in their constitution.[180] Eventually, these laws were subjected to constitutional challenges but were generally upheld by the courts as a constitutional exercise of police power. Comparing and contrasting these Reconstruction Era court decisions with their Antebellum Era counterparts reveals a noticeable shift in legal language and doctrine. Recall that during the Antebellum Era some Southern courts held that legislatures could prohibit the concealed carriage of dangerous weapons but could not outright prohibit their open carriage. However, these courts were generally silent as to whether state and local governments could regulate any aspect of open carriage—that is, in what manner, if at all, could the state and local governments restrict the open carriage of dangerous weapons. Did it matter whether the law restricted carriage in private, public, or both? The courts began gradually providing the answers, and through the process there developed a constitutional consensus that state and local governments could restrict the carrying of dangerous weapons in public places.[181]

Take, for instance, the Georgia Supreme Court, which had previously held in *Nunn v. State* that the Georgia legislature could not prohibit the car-

riage of arms openly but left open whether the legislature could regulate any facet of open carriage.[182] Nearly three decades after *Nunn* was decided, the court addressed the matter in *Hill v. State*. At the heart of the case was an 1870 Georgia law that prohibited any person from carrying "any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice of any election ground or precinct, or any place of public worship, or any other public gathering . . . except militia muster grounds."[183] By the time the Georgia Supreme Court was presented with *Hill*, the court had become cognizant of the growing problem of Southern violence and was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."[184] The court then proceeded to curtail its pronouncement in *Nunn*.[185] The court rationalized that any right to carry weapons could not supersede the right to peacefully assemble, vote, and worship in the public concourse "unmolested by terror, or danger, or insult."[186] For it to be the other way around—that is, for the right to carry arms to be the equivalent of the rights to peacefully assemble, vote, and worship—would mean the "whole scheme of law and order, and government and protection, would be a failure, and that the people, instead of depending upon the laws and the public authorities for protection, were each man to take care of himself, and to be always ready to resist to the death, then and there, all opposers."[187]

In *Andrews v. State*, the Tennessee Supreme Court arrived at virtually the same conclusion.[188] At issue was a law that prohibited the carriage of a "dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver" in both public and private.[189] As it pertained to the carriage of such arms in private, the court concluded the law was unconstitutional because it would have punished individuals who purchased such weapons and carried them to their residence.[190] In other words, the court held the law was unconstitutional because it needlessly intruded into the right to keep and maintain such weapons.[191] However, as it pertained to the armed carriage in public, the court found the law to be a constitutional exercise of government police power.[192]

Even in Texas, known for its firearm-toting frontier way of life, the law of the land was that state and local governments could restrict the carrying of dangerous weapons in public. Relying on a combination of precedent, contemporaneous legal commentary, and the historical genesis of the Statute of Northampton, the Texas Supreme Court concluded that the state's armed carriage law did not violate the right to arms.[193] The court reasoned that, if anything, armed carriage restrictions promoted liberty: "It is useless to talk about personal liberty being infringed by laws such as that under consideration. The

world has seen too much licentiousness cloaked under the name of natural or personal liberty; natural and personal liberty are exchanged, under the social compact of states, for civil liberty."[194]

Then there was the Missouri Supreme Court case of *State v. Reando*. The issue before the court was the constitutionality of an 1874 Missouri law that prohibited the concealed carriage of any firearms or dangerous weapons into "any church or place where people have assembled for religious worship, or into any schoolroom or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room, during the sitting of court, or into any other public assemblage of persons met for other than militia drill."[195] The law was constitutionally challenged on the grounds that it violated Article I, section 8 of the 1865 Missouri Constitution, which provided the "right of the citizens to bear arms in defence of themselves and the lawful authority of the State."[196] Judge Elijah H. Norton, who had previously served as a delegate to the 1861 Missouri Constitutional Convention and was considered the father of the 1875 Missouri Constitution, upheld the law as a constitutional exercise of government police power.[197] While Norton recognized that the court was only faced with a constitutional challenge to a concealed carriage restriction, he noted that the practice of carrying dangerous weapons habitually, whether open or concealed, was so repugnant to the "moral sense of every well-regulated community" that society would be "shocked by any one who would so far disregard it, as to invade such places with fire arms and deadly weapons."[198] Judge Norton then concluded his opinion by noting that all rights, including the right to arms, could be subjected to reasonable regulation in the interest of the public good. This was particularly the case whenever freedom of action was seen as negatively impacting the community at large:

The statute in question is nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make. Such, or similar statutes, have been upheld in all the States, so far as we have been able to ascertain. . . .

The right to own and bear arms necessarily implies the right to use them, and yet acts passed by the legislature regulating their use, or rather making it an offense to use them in certain ways and places, have never been questioned. . . .

The constitution protects a person in his right of property, and instances are numerous where the legislature has assumed to regulate and control it. A person has a right to own a mischievous or dangerous animal; yet under our statute, if the owner thereof, knowing its propensities, unlawfully suffer it to go at large or shall keep it without ordinary care, and such animal while

RANDOLPH ROTH

# American Homicide

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
2009

Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
     American homicide / Randolph Roth.
        p.   cm.
     Includes bibliographical references and index.
     ISBN 978-0-674-03520-1 (cloth : alk. paper)
     1. Homicide—United States—History.   I. Title.

   HV6524.R68 2009
   364.1520973—dc22      2009016830

3 1223 08609 1858

To Allison,
the memory of William Slothrop,
and God's second sheep



**Figure 5.1**  Unrelated-adult homicide rate in New Hampshire and Vermont, 1775–1900 (per 100,000 adults per year).



**Figure 5.2**  Unrelated-adult homicide rates in rural Illinois, 1820–1900 (per 100,000 adults per year).

military service. As their hold on power strengthened in the 1790s, they abolished other unpopular wartime acts and implemented universal male suffrage and a volunteer militia—measures that proved widely popular. The legitimacy of government was rebuilt that way in every state, step by step.[7]

The Revolution had undermined fellow feeling in the North, especially among white Protestants, in ways that would take a generation to repair. Patriotic feeling did not really began to flourish until the 1820s and early 1830s (Figure 2.1), and many northerners still questioned the legitimacy of the central government and the character of the men who ran it. But the Revolution also fostered a belief in the unique promise of the new nation that seemed to help suppress homicide. America would be a country where everyone had a chance to be eco-



**Figure 5.3**  Urban homicide rates in the northern United States, 1797–1900 (per 100,000 adults per year).

more likely than marital or romance murders to have been provoked by at least one of the factors that correlate with homicides among unrelated adults. Letitia Blaisdell was an extreme example of someone who was dissatisfied with her position in life and turned to murder because she desperately wanted to be as rich as her relatives were. But many native-born Protestants appeared to feel increasing levels of dissatisfaction with their economic progress, and their frustrated expectations were beginning to produce higher homicide rates not only in the society at large, but within their own families.

CHAPTER 7

# "All Is Confusion, Excitement and Distrust"

*America Becomes a Homicidal Nation*

Between the mid-nineteenth and early twentieth centuries homicide rates fell in nearly every Western nation. Wherever stable, legitimate governments took shape and people developed a strong sense of patriotism and national identity, homicide rates tumbled to historically low levels. The homicide rate in England and Wales fell twice during this period, after 1867 and 1884. Those drops correlate perfectly with two major reforms that changed the nature of the British political system. The 1867 Reform Act gave the vote to all men who were heads of households in incorporated cities and towns, adding just under a million voters to the rolls. The 1884 act enfranchised all male household heads in the countryside, adding six million voters. The homicide rate fell abruptly after each act was passed and then decreased gradually to an astonishing 1 per 100,000 adults per year on the eve of World War I (Figure 5.11).[1] Giving poor and middle-class Britons the vote reduced every kind of murder among unrelated adults, from rape and robbery murders to killings in tavern brawls and in employer-employee disputes.

Homicide rates continued to fall in Canada's core provinces after Canadians won the right to self-government and began to develop strong two-party systems and a clearer sense of identity and nationality. Homicide rates were extremely low in the Confederation provinces that achieved independence from Britain in 1867—Nova Scotia, New

Brunswick, Quebec, and Ontario—despite their ethnic and religious divisions. By the 1880s the homicide indictment rate was less than 1 per 100,000 adults per year (Figure 5.10). But in the 1850s and early 1860s the western frontier of Canada was as violent as the northwestern frontier of the United States. Among white settlers the homicide rate was at least 25 per 100,000 adults per year in British Columbia, and it was much higher among Native Americans. Homicide rates were probably also high in Newfoundland, where conflict persisted between English Protestants and Irish Catholics; and in Manitoba, where mixed-blood Métis twice rebelled against the central government to defend their land against encroachment by English and Scots-Irish settlers. Because of the homicide rates in its outlying provinces, Canada as a whole had a higher homicide rate in the late 1920s than England and Wales, but its rate was still low by historic standards: 2.3 per 100,000 adults per year.[2]

National unification and the emergence of a strong central government sent the homicide rate plummeting in Italy. The data from Germany are far from complete, but the rate at which Germans were tried for homicide also fell rapidly after national unification, dropping by a third between the early 1880s and the beginning of World War I. Only France saw its homicide rate rise slightly in the late nineteenth and early twentieth centuries. The French rate was not very high—perhaps a little more than 2 per 100,000 adults per year, or about the same as Canada's—but it was 50 percent higher under the Third Republic than it had been under the Second Empire of Louis Napoleon. Both regimes had representative assemblies and universal suffrage for men, but Louis Napoleon's constitutional monarchy was more widely popular and would probably have survived had it not suffered a disastrous defeat in the Franco-Prussian War. Conservative and moderate republicans governed well after 1870, but they governed from a narrow middle ground, and only by default, because the monarchist majority could not agree on whether to turn to a Bourbon, an Orleans, or a Bonaparte or to choose a strong man like former general and Minister of War Georges Boulanger. The right consolidated its power over the army and the Catholic Church, while the left turned to radical republicanism, socialism, and anarchism, and both the right and left threatened to overthrow the Republic. Politics became so heated that

assassinations and duels among public men reappeared. This constant political turmoil, with ideologues of all stripes warring over what form the government should take, was accompanied by an elevated homicide rate among unrelated adults. By World War I, France's homicide rate was double the rates in more politically stable and unified nations such as England, Wales, Sweden, and Norway.[3]

It was at this time that homicide rates in the United States truly diverged from rates elsewhere in the Western world. In the late 1840s and 1850s they exploded across the nation, not only in the plantation South and the Southwest, where higher rates already prevailed, but also in the mountain South and the North, which had previously had extremely low rates. The least homicidal places in the Western world suddenly became the most homicidal. By the end of the Civil War, homicide rates among unrelated adults were substantially higher in the North than in Canada or western Europe, and higher still by one or two orders of magnitude in the South and Southwest. All kinds of homicide increased: robbery murders, rape murders, and killings over insults, bar tabs, card games, property disputes, and small debts. Ethnically and racially motivated murders increased, as did murders in the workplace and along the nation's roads, railroads, and waterways. Everywhere and under all sorts of circumstances, Americans, especially men, were more willing to kill friends, acquaintances, and strangers.

Immigration, economic hardship, and the conquest of areas populated by Hispanic and Native peoples contributed to the rise in homicide in the late 1840s and 1850s. Irish, French Canadian, German, and Chinese immigrants were well represented both as victims and as perpetrators wherever substantial numbers of them worked as unskilled laborers; and Hispanic and Native peoples in the trans-Mississippi West saw their homicide rates rise because of dispossession, demoralization, and victimization by white settlers. Yet homicide rates also surged among native-born Protestants, and in most areas of the country their rates rose as quickly as those of immigrants or ethnic minorities.[4] Many native-born workers, particularly African Americans, saw their standard of living decline in cities around the nation as masses of immigrants flooded into the country from Ireland, Germany, and French Canada. But native-born murder rates continued to climb even in ru-

ral areas, where there was unprecedented prosperity in the late 1840s and 1850s. Immigration, war, and poverty may have contributed to the rise in homicide, but they did not cause it. The rise was too sudden and too widespread. Besides, Canadians and Europeans faced their own problems with immigration, war, and poverty, yet their homicide rates fell.

Ultimately the increase in homicide in the United States occurred because Americans could not coalesce into a nation. As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and the rise of industrialized cities—the patriotic faith in government that most Americans had felt so strongly after the Revolution was undermined by anger and distrust. Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors. They were losing the sense that they were participating in a great adventure with their fellow Americans. Instead, they were competing in a cutthroat economy and a combative electoral system against millions of strangers whose interests and values were antithetical to their own.

In his inaugural address of 1853, President Franklin Pierce tried to restore faith in America's destiny. He saw "abundant grounds for hopeful confidence." The future was "boundless." It didn't look that way to most Americans. In 1846 the United States had embarked upon a war of conquest to spread slavery into Mexico, a sister republic, and it appeared that slaveholders and proslavery politicians would govern new territory. A flood of immigrants usurped what are now referred to as entry-level jobs, and after three decades of steady decline in self-employment, the promise of opportunity began to ring hollow. Banking monopolies and federal subsidies for special interests fostered economic inequality, and politicians promoted the belief that government corruption was rife (even though the government was no worse than it had ever been). Tenements were overflowing, but more mansions were being built every day. People began to wonder if democracy was a lost cause in the United States. Their fears were exacerbated by the failure of the European revolutions of 1848, which ended in class conflict, socialist uprisings, and military repression. Americans had once hoped, as a writer to the *Southern Literary Messenger* said, that

"the rotten and antiquated foundations of every despotic and exclusive institution of the Old World" would "crumble into ruin." Instead, the United States appeared to be recreating old Europe at its worst.[5]

Politics polarized along ethnic, regional, religious, class, and racial lines, and the national polity disintegrated as people argued about whether immigrants, free blacks, Catholics, Hispanics, Asians, and Native Americans should become full citizens and whether slavery would be allowed in the western territories. The rise in homicide coincided with a nationwide decline in patriotism (especially in identification with national political symbols) and with a loss of faith in government and in moderate, mainstream political parties. The proportion of new counties named after national heroes fell from a high of 45 percent in the 1820s and 1830s to only 17 percent in the 1850s and 1860s (Figure 2.1). The Democrats failed as a national party and the Whigs failed altogether, leaving the two-party system in ruins. Parties that were more aggressive ideologically took their place. The leaders of these parties questioned the legitimacy of national institutions and challenged other Americans' morality, patriotism, and right to citizenship. They used extreme rhetoric to generate partisan enthusiasm, and they encouraged righteous and retributive violence, especially in defense of property or rights.[6]

Aggression and vitriolic language invaded personal as well as political relationships and turned everyday encounters over debts or minor offenses like trespassing into deadly ones. More people chose to protect their rights or interests by force, either because they felt that they could no longer count on the government to protect them or because they despised the government so much that they would not seek justice from it. Some even refused to recognize legal decisions that went against them because the government was no longer "their government." And as more Americans became frustrated by their inability to achieve economic independence or anxious about preserving it, the heightened sensitivity about social status and respect that had characterized male behavior in the plantation South and the Southwest spread to other areas of the country. People responded violently not only to threats to their property or person but also to disrespect. They killed over a word, a gesture, a glance. In every region, the majority of murders were everyday homicides—sexual assault murders, rob-

bery murders, property dispute murders, and so on—with no obvious connection to politics. But across the nation, the areas with the greatest political strife had the highest homicide rates.

## Homicide in the North

Homicide rates among unrelated adults in the northern United States followed the arc of the nation's political history. They rose in the late 1840s and 1850s, during the Mexican War and the Kansas crisis, remained high through the Civil War, and declined in most places in the late 1860s and 1870s as the nation emerged from chaos and the two-party system revived. Across the northern United States, homicide rates that had ranged in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to a high of 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities (Figures 4.2 and 5.1–5.3).[7] As with most previous surges in homicide, the increase affected everyone: blacks and whites, the native-born and immigrants, Protestants and Catholics, the rich and the poor. Murders of unrelated adults remained the near-exclusive province of men, but the rate at which women murdered and were murdered by unrelated adults also rose. Victimization and perpetration rates doubled or more than doubled for everyone.

Thousands of homicides that appeared to arise out of class, ethnic, religious, racial, or partisan hostility had an obvious political dimension. Like the killings of blacks by Irish rioters in New York, for example, or of German immigrants by nativists in Chicago, they were caused by conflicts over slavery and immigration and by the fear that the decline in self-employment generated. But the great majority of homicides seemed to have nothing to do with politics. They were the result of tavern brawls, fights over property, and other everyday disputes. Ultimately, however, they stemmed from the same emotions that political homicides did—anger about the government's failure to protect their interests, a decline in fellow feeling, and frustration over the declining opportunities for self-employment that undermined the legitimacy of the North's social hierarchy.

The decline in self-employment was critical. The key to achieving status in the United States was economic independence, but the pro-

portion of adult men in the North who were self-employed fell steadily from around three-fifths in 1815 to two-fifths by 1860 and a third in 1880. By the mid-nineteenth century many Americans faced the prospect of working their entire lives as "wage slaves." In time, the creation of high-paying jobs for skilled and semiskilled workers on railroads and in factories would make wage work more attractive, and Americans would come to consider it honorable for a man to spend his life working for a corporation. That was not yet the case in the mid-nineteenth century. Many Americans were demoralized by their failure to achieve self-employment and despondent about their children's chances of achieving it. It was all well and good for Abraham Lincoln to say that "there is no such thing as a freeman being fatally fixed for life, in the condition of a hired laborer," and that if a man spent his life working for others it was "not the fault of the system, but because of either a dependent nature which prefers it, or improvidence, folly, or singular misfortune." What had been true in the 1820s was no longer true in the 1850s and 1860s. Critics noted that men who thought like Lincoln lived in frame houses, not log cabins. Labor reformer Ira Stewart wondered if Lincoln wanted to be admired because he had once worked with his hands, or because he no longer had to. The Whigs' vision of boundless opportunity was compelling to many poor and middle-income men, but it did not lessen their anger and anxiety about the difficulty of getting ahead.[8]

Although real wages rose, even for the poor, working people experienced their loss of economic independence as a loss of dignity, and they blamed the rich for trampling on their fellow citizens to get ahead. Strikes and other labor conflicts proliferated in coal mining and railroading as workers realized that they would have to fight to improve their wages and working conditions or live like slaves on what their employers were willing to give them.

Mass violence in coal mining and railroading took nearly 200 lives in the 1860s and 1870s, and as workers in small firms grew increasingly frustrated over their wages, working conditions, and prospects, an increasing number of them murdered their employers in disputes over wages, firings, and arrests for disturbances in the workplace. Workers had become more jealous of their rights, and employers were less respectful of people who worked for wages. The relationships between employers and employees were most volatile when they lived together,

as they did on ships and on most farms. George Wilson, a sailor on the schooner *Eudora Imogene,* killed both the captain and the first mate after the captain denied him shore leave in New York City. Charles Stockley, a hired hand in Genesee County, New York, killed his employer, John Walker, because Walker did not think Stockley was good enough to court his daughter.[9]

The decline in self-employment would not have caused a general homicide problem in the northern United States, however, were it not for two events that shattered the American polity: the sudden rise in immigration from Europe and the controversy over slavery. Three million immigrants entered the United States in the decade after 1845. More than three-fourths settled in the North. Many of the new immigrants were desperately poor refugees from the potato famine of 1845–1850. Before the famine, 85 percent of all immigrants had worked as farmers, professionals, or skilled laborers. Afterward more than half worked as unskilled or semiskilled laborers.[10]

The American economy was robust in these years, but it could not absorb the vast number of poor immigrants who arrived in the late 1840s and early 1850s. In cities, unemployment rose and real wages fell for a time for all workers, including the native-born. Anti-immigrant feeling ran high among native-born workers in cities. They competed directly against the immigrants for jobs, housing, and political power. Labor leaders promised to defend "our mechanics and working men and women, who had been sorely pressed by the unfair competition and combinations of pauper Europeans." Nativist politicians blamed the immigrants for all of society's ills: rising crime rates, alcoholism, disease-ridden slums, and political corruption. Immigrants were "a noisy, drinking and brawling rabble." They "bring the grog shops like frogs of Egypt upon us." Nativists demanded that the government put a stop to immigration or at least curb the political power of immigrants by requiring them to spend twenty-one years in the United States before they could vote. "Have we not a right to protect ourselves against the ravenous dregs of anarchy and crime, the tainted swarms of pauperism and vice Europe shakes on our shores from her diseased robes?"[11]

Anti-Catholic feeling was even more intense. Before the mid-1840s, three-fourths of all immigrants had been Protestants; after 1845 two-thirds were Catholics from Ireland, Germany, and French Canada. Mil-

itant Protestants believed that the pope had sent the immigrants to the United States to subvert American democracy and establish a Catholic theocracy. They were afraid that the Catholic Church, "the child of Satan," was trying to extinguish liberty by "riveting Italian chains" upon the American people. The Catholic clergy lent credence to such fears by opposing the use of the Protestant Bible in public schools, demanding that tax dollars be set aside to support parochial schools, and requiring that all church property be in the hands of lay trustees be handed over to Rome. They also spoke about their hopes of making the United States a Catholic nation. In 1850 Archbishop John Hughes told the congregation of St. Patrick's Cathedral in New York City that "everybody should know that we have for our mission to convert the world—including the inhabitants of the United States—the people of the cities, and the people of the country, the officers of the navy and the marines, commanders of the army, the Legislatures, the Senate, the Cabinet, the President, and all!"[12]

Such talk led to a terror campaign against Catholics that peaked in the late 1840s and 1850s. Militant Protestants mobbed Catholic clergymen, desecrated and destroyed Catholic churches, assaulted Catholic voters, and ran riot through neighborhoods populated by German and Irish immigrants. Deadly riots broke out against Irish immigrants in Brooklyn and Philadelphia, against German immigrants in Chicago and Hoboken, New Jersey, and between German Protestants and Irish Catholics in Cincinnati. In the New York City Orange Riots of 1870 and 1871, street fighting between Irish Protestants and Catholics and an assault by the militia on Catholic demonstrators took seventy lives.[13]

Most interethnic homicides were the result of gang fights, turf battles, or personal quarrels in which ethnicity pushed the aggressor over the edge. An Irish immigrant killed an English immigrant in New York City in 1848 simply because he was an Englishman, and he told an English bystander that he would kill him too if he interfered. In 1853 a deadly brawl broke out in the factory town of Rollinsford, New Hampshire, when native-born boys attacked Irish boys who lived in shanties behind the woolen mills. In 1863 Schyler Courier, a native-born, middle-aged cooper in Chillicothe, Ohio, got angry when teenaged German boys pelted him with snowballs. He opened fire with his shotgun, killing Jacob Shears. In 1861 R. T. McHaney, a Scots-Irish farmer in Williamson County, Illinois, learned that an Irishman passing by

had insulted his wife, so he got his gun, tracked the man down, and shot him dead.[14]

The anxiety that many people felt about their prospects exacerbated the nativist hostility of the late 1840s and 1850s. Native-born northerners who were disreputable or down on their luck were particularly unwilling to countenance affronts from immigrants. Small indignities that might have been tolerated from other native-born Protestants—being hit by snowballs or having a passerby whistle at one's wife—became unendurable outrages when they were committed by immigrants.

The controversy over immigration also affected homicide rates indirectly, because it damaged mainstream political parties and left everyone feeling victimized. When nativists entered politics on the grassroots level in 1853–1855, they did well, winning state and local races throughout the Northeast. They did poorly to the west of Ohio and Michigan, where immigrants were more welcome and the status of slavery in the western territories was more important to people worried about their economic futures; but they attracted enough support in the nation as a whole to undermine fellow feeling and to contribute to the collapse of the two-party system.

Even more instrumental than immigration and the nativist campaign against it in undermining political stability, patriotic feeling, and faith in government was the conflict over slavery and race precipitated by the Mexican War, or "Mr. Polk's War," as its opponents called it. As it became clear that the purpose of the war was to seize territory and create new slave states, opposition intensified, particularly in the North. "Conscience" Whigs like John Quincy Adams, who were antislavery by conviction, accused Polk and his southern allies of trying to roll back "the happy progress" of Mexico, a sister republic that had abolished slavery, and "afflict her with what has been everywhere the shame of the white man, and the curse of both black and white." Moderate Whigs and Democrats had no quarrel with slavery where it existed, nor did they question the morality of the war, but they believed that the presence of slavery and blacks degraded white labor, and they feared for the future of free workers if newly acquired territories were opened to slavery. David Wilmot, a representative from Pennsylvania, asked in his famous "proviso" of 1846 that slavery and blacks be kept out of any territories acquired by the United States as a result of the war with

Mexico. "The negro race already occupy enough of this fair continent. . . . I would preserve for free white labor a fair country . . . where the sons of toil, of my own race and own color, can live without the disgrace which association with negro slavery brings upon free labor." Regardless of their feelings about blacks, Free Soilers saw the West as "a new country for poor folks," where those who lacked the money to succeed in the East could prosper. The proslavery powers would deny them that opportunity. As Abraham Lincoln said, they would "cancel and tear to pieces even the white man's charter of freedom" in their "greedy chase to make profit of the negro."[15]

Wilmot's proviso was defeated in Congress with the help of northern expansionists, but it became increasingly apparent that a rift had opened between northerners and southerners and among northerners themselves. Each side considered the other to have betrayed American ideals. Centrists like Stephen Douglas and Lewis Cass cobbled together the so-called Compromise of 1850, which admitted California as a free state and gave southerners the right to take slaves into the Utah and New Mexico territories. Southerners also got a tough new fugitive slave law and the de facto repeal of the Missouri Compromise, which quietly opened the door to slavery in Kansas, Nebraska, and other northern territories. But success for Douglas and Cass came at a price. Opening the western territories to slavery outraged most northerners, failed to placate southerners, and shattered the American polity. From that time forward, neither side would accept the legitimacy of a government run by the other, a law passed by the other, or a legal decision handed down by the other. As Ralph Waldo Emerson had predicted at the beginning of the Mexican War, "the United States will conquer Mexico, but it will be as the man swallows the arsenic, which brings him down in turn. Mexico will poison us."[16]

The stage was set for a strong surge in homicides. Naturally, the connection between the political rift and the homicide rate was most obvious where murders involving race and slavery were concerned. All sides in the slavery controversy were furious with the government, and among militants all feelings of kinship with and empathy for Americans who were on the wrong side of the issue evaporated. In the North, the controversy began to claim lives as soon as the Fugitive Slave Law was enacted. Frederick Douglass, a fugitive himself, said in the fall of 1850 that "the only way to make the Fugitive Slave Law a dead letter is

to make half a dozen or more dead kidnappers," and abolitionists repeatedly showed their willingness to do just that. Slaveowners and law-enforcement officers were murdered in Pennsylvania and Massachusetts for trying to return fugitives to slavery, and thieves were lynched in the Midwest for kidnapping and selling free blacks into slavery. Most efforts to defend fugitive slaves or free blacks ended without loss of life, but there were enough deaths to exacerbate hostile feelings on both sides of the issue.[17]

The North also saw violence spawned by the campaign for equal rights for African Americans. Antiblack violence was not as intense in the late 1840s or 1850s as it would become in the 1860s and early 1870s, after the Union committed itself to ending slavery and African American men won the right to vote. But militant white supremacists had already gained strength across the nation after the Mexican War, and they used violence to keep blacks in their place. Black workers were mobbed wherever they competed against whites for jobs, especially in northern cities. In New York City in 1847 a black laborer and a black tradesman were killed on their way to work by small bands of whites who wanted their jobs, and in 1858 a group of white paupers in Philadelphia killed a black man because he had a job and they were on relief. Black felony suspects were lynched, and black men who married white women were risking their lives. The California House tavern in Moyamensing, Pennsylvania, was owned by a black man whose wife was white. In 1849 the tavern was attacked and burned, and four people died. Such incidents were almost invariably the work of militant Democrats, for whom they were an integral part of the campaign for slavery and white supremacy. The campaign was tremendously successful in the late 1840s and 1850s. Blacks lost many of the skilled and service jobs they had held to whites. Their health declined, and their life expectancies reached new lows.[18]

Race also played a role in the increase in homicides of blacks by white acquaintances. Some whites murdered blacks for failing to acknowledge their superior status as white men. Captain Diehl of Cleveland, Ohio, got into an argument with an elderly black woman, took offense at her tone, and shot her dead. John Thorner, a German immigrant who worked as a laborer for the wealthiest farmer in Ross County, Ohio, took a dislike to the farmer's trusted African American

servant, James Cotton, and during a dispute over payment for goods he had sold Cotton he grabbed a shotgun and killed him.[19]

Racial hostility led to an increase in all kinds of murders of blacks by whites. For the first time since the early eighteenth century, black homicide rates in the North pushed past those of whites, solely because of white violence against blacks. Blacks killed blacks at lower rates than whites killed whites, but whites murdered blacks at roughly twice the rate at which blacks murdered one another in rural areas and at five times that rate in cities.[20]

Occasionally blacks responded in kind to white violence and abuse, further escalating the murder rate. Henry Raymond, a Philadelphian, threw a white man to the ground and cracked his skull when the man tried to interfere in a black political demonstration. Allen Nokes, another Philadelphian, stabbed a white man who had insulted him with racial epithets. In rural areas, such murders ensured that as many whites were killed by blacks as blacks were killed by whites. But in cities, where the surge in interracial homicide was one-sided and politically driven, twice as many blacks were killed in interracial confrontations as whites, even though defensive murders of whites by blacks became more common.[21]

The worst violence of the 1850s over slavery and race occurred in "Bleeding" Kansas, where scores lost their lives in the battle to determine whether the territory would be slave or free. It was a sign of how polarized the nation had become that elected officials were calling upon Americans to murder each other. Among them was Senator David Atcheson of Missouri, who told southerners to "mark every scoundrel among you that is the least tainted with free-soilism, or abolitionism, and exterminate him." He promised to send enough Missourians into Kansas "to kill every God-damned abolitionist in the Territory." Militant northerners responded in kind. The New England Emigrant Aid Company, an abolitionist organization, armed hundreds of antislavery settlers and shipped them off to Kansas. Eli Thayer, who had organized the company and secured its charter from the Massachusetts legislature, thought it "well for the Emigrant to be furnished with his Bible and his rifle; and if he were not protected in his rights according to the principles of the first, let him rely upon the execution of the latter." Antislavery settlers were determined to "fight fire with

fire," as settler John Brown put it, and they did. At least 200 people died in the fighting.[22]

Political hatred continued to inspire murders in the North during and after the Civil War. Violence between Unionists and Confederate sympathizers was rampant, particularly in Indiana, southern and western Illinois, and southern Iowa, where many residents came from the South. In 1863 a southerner passing through Henderson County, Illinois, was waylaid by several Union army veterans after a hotelkeeper informed them that the man was carrying a lot of cash. When confronted, he claimed to be looking for a place to live, but the veterans suspected that he was buying horses for the Confederacy. They robbed him, whipped him, hanged him till he was nearly dead, cut off his hands, and left him to die. When they returned the next morning he was still alive, so they shot him. In Keokuk County, Iowa, a prominent pro-Confederate Democrat, George Cyphert Tally, was killed in the Skunk River War in 1863. Tally had gathered a band of southern sympathizers to attack a meeting of county Republicans. Tally began the shooting, but the Republicans returned fire. The Democrats withdrew to the south of town and began to organize for another assault, but Governor Kirkwood sent militia units to disperse them.[23]

Perhaps the worst of this type of violence occurred in Williamson County, Illinois, a farming area in the south-central part of the state that was predominantly Democratic and southern. In 1862 Confederate sympathizers began to murder local Republicans, Union soldiers on leave, and informants who had revealed the hiding places of the county's many deserters and draft dodgers. The killing persisted even after the war. A few Republicans responded by murdering Democrats. By the time the killings and the family feuds they spawned played themselves out in 1875, more than a score of people had been killed.[24]

Political violence triggered a similar rash of homicides in southeastern Pennsylvania, a coal-mining area that was as divided as Williamson County during the Civil War. Most mine owners, foremen, and company store operators were Republicans, but the Irish miners were Democrats and increasingly antagonistic toward the war. They opposed emancipating the slaves, because they were afraid freedmen would move north and take their jobs, and they opposed the draft, which they rightly believed would fall more heavily on poor Catholics like themselves than on the wealthier Protestants they worked for. At a

Fourth of July celebration in Carbon County in 1862, mine foreman F. W. Langdon berated Irish miners who were demonstrating against the war, and they stoned him to death. In the fall of 1863 men with blackened faces burst into the home of mine owner George Smith and shot him dead in front of his family because Smith had been entertaining soldiers who had come to Carbon County to enforce the draft. Anger over the war, the draft, and emancipation led to a wave of murders and robberies of mine owners and their associates. Such killings pushed the homicide rate in coal country to 22 per 100,000 adults per year, a third higher than the rate in New York City.[25]

Racially motivated attacks on blacks also escalated during the Civil War and Reconstruction as the Emancipation Proclamation, the Civil Rights Act, and the Fifteenth Amendment (which gave men the right to vote regardless of race) removed the legal barriers to racial equality. Militant whites blamed blacks and their white abolitionist allies for the suffering caused by the war. The Democratic *Valley Spirit* of Chambersburg, Pennsylvania, proclaimed in the fall of 1862 that the abolitionists had "provoked the present war, and to prolong it to the 'bitter end' the nigger is dragged into the contest by his woolly-head at every turn until it has resolved itself into a war for the special benefit of Sambo, and his abolition admirers." Such attitudes led to deadly antiblack riots. In New York City in 1863, angry Democrats broke up the city's first draft lottery and went on a rampage against Republican officials, the Republican-controlled Metropolitan Police, and blacks, whom they blamed for the nation's problems. They burned an African American orphanage and killed at least thirty blacks, torturing and mutilating many of them. In 1871 Democrats in Philadelphia attacked blacks trying to cast their first ballots. Four died. But most victims of racially motivated violence were killed not by mobs but by individuals acting alone or in pairs.[26]

There is thus no question that the decline in self-employment and the controversies over immigration, slavery, and race were directly responsible for an increase in homicides motivated by class, ethnic, religious, racial, and political antagonism. These murders alone would have made the northern United States more homicidal than Canada or western Europe at midcentury. But the increase in such murders was overshadowed by an even greater increase in vigilante and predatory killings and in homicides over petty differences, turf, and prop-

erty. Most of these murderers were unaware that their behavior had any connection with political conflict or strains on the social hierarchy. But their behavior shows the impress of broader social and political forces. They were antagonistic toward others because they were anxious about their jobs and about the future, and that anxiety alienated them from others and made them more competitive in their struggle for status. They were also angry at the government and estranged from other Americans, who they felt were indifferent or even hostile to their interests.

Most of the homicides committed by northerners at midcentury stemmed from petty disputes. The victims and perpetrators of these homicides were almost exclusively men, and they came from every ethnic, religious, and racial group. Their quarrels took place wherever working-class people or middle-class people of modest means gathered—in the street, in taverns and dance halls, at work, and in private homes. To contemporaries, the causes of these quarrels seemed insignificant, but in fact men were fighting to retain their self-respect and their position in society. Like southerners in the postrevolutionary period, they were anxious about their standing in the social hierarchy, so they fought over anything that might put them at a competitive disadvantage with another man or show that they could be bullied. They killed each other over card games, races, dogfights, wrestling matches, and raffles. Men were killed for claiming that another country was better than the United States, for throwing a watermelon rind in fun, for teasing a dog, for rattling a door at night and making a ribald speech, for frightening a horse with a lighted pumpkin, for arguing over whose turn it was to unload the grain. One man died because he reminded a friend that he had once been flogged by a Dutch woman.[27]

Any word that touched on a man's work ethic, his faith, his honesty, or his willingness to pay his debts could elicit a lethal response, because these qualities determined a man's social standing in the North. Holmes Perry, a butcher in Lebanon, New Hampshire, was murdered after humiliating a day laborer who did not have thirty-five cents to pay for meat for his family. Addis Hayes, who worked for a small grocer in Philadelphia, was walking out of a tavern with friends when an acquaintance passed by and joked, "There goes another loafer." Hayes beat him to death. Jesse Kendall, the foreman of a road crew in Hillsboro, New Hampshire, slapped one of the paupers in his crew,

Levi Johnson, with the flat of his shovel "in jest" and told him to get to work. Johnson buried the blade of his shovel in Kendall's head. Claude Humphrey of Olmstead, Ohio, reprimanded George Hersnnel, a blacksmith, for working on the Sabbath, so Hersnnel stabbed him.[28]

This heightened sensitivity also showed itself when remarks were made about men's wives. When the wife of James Snow, a hardscrabble farmer, hunter, and fisherman in Walden, Vermont, told peddler John Stanton that she had no money to buy goods, Stanton said, "I guess you have money, as farmers generally have plenty of it." Furious at the insinuation that his wife was a liar, James Snow shot Stanton in the face. When John Gambs, a German farm laborer in Ross County, Ohio, accused farmer George Thacker's wife of stealing meat from him, Thacker beat him to death. These men were defending a northern ideal of personal and family honor—one rooted not in the domination of others, as in a slave society, but in the virtuous reputation needed to succeed in business in a society of free laborers and small businessmen.[29]

For similar reasons, northerners were likely to take offense whenever a proprietor refused them service. The refusal to accept a man's money, whether at a legal or an illegal business, was an affront to his standing in the community. Men killed hotel clerks, boardinghouse operators, tavernkeepers, dance hall bouncers, and brothel owners when they were ejected, refused service, or denied admission. Nearly all of these men were drunk and rowdy at the time, or they had been unruly or unwilling to pay their bills at these establishments in the past. But they did not see their behavior as sufficient reason to refuse them service. Even the dishonorable killed to defend their honor. And tavern and brothel workers, fearing for their lives, raised the death toll further by killing unruly customers.[30]

An alarming number of deadly quarrels had no precipitating causes, or at least none that were apparent to participants or bystanders. They occurred on the spur of the moment on the street, at the railroad station, in taverns and dance halls, at circuses and holiday celebrations—anywhere men came together to amuse themselves and to drink—and they show the degree to which forbearance and fellow feeling had collapsed among men in the North. Sometimes individuals were simply spoiling for a fight. In a remarkable number of cases, a half-dozen or

more men, some of them friends, some strangers, joined brawls that ended in the deaths of one or more people.[31]

During this period the North also witnessed another phenomenon previously confined to the slaveholding South: murders committed by bullies. Changing circumstances in the North produced a crop of men who cultivated a reputation for toughness. They challenged people for no reason at all, even women and strangers who had given no offense, and attacked their victims if they did anything other than cower in fear. These dominance displays usually happened in mixed company. Drunken bullies tried to humiliate men in front of women or humiliated women as a way of humiliating the men accompanying them. In Philadelphia Horatio Maloney walked up to a woman in a store and insulted her in front of her companion, Samuel Mangan. Mangan punched Maloney, and Maloney stabbed him to death. William Foster insulted two female passengers sitting near him on a streetcar in New York City. Avery Putnam told him to watch his mouth. Foster killed him. James Rodgers and his friends, spilling out of a Manhattan tavern at closing time, ran into a well-dressed couple, the Swansons, who were on their way home from a social engagement. They insulted Mrs. Swanson repeatedly, and when her husband tried to protect her, Rodgers knifed him.[32]

Gang members turned menacing behavior into an art form. They tattooed their bodies like sailors, adopted nicknames like the "Butcher," "Satan," and "Snake" (Snake was a Vermonter whose real name was Cyrus Putnam). One bare-knuckle fighter named Snatchem, who was a member of New York's Slaughter House Gang, won notoriety as the epitome of the northern bully. He was "a beastly, obscene ruffian" who dressed like a pirate, carried two pistols in his belt and a knife in his boot, and sucked blood from his victims' wounds. He described himself as a "kicking-in-the-head-knife-in-a-dark-room fellow," and he had a friend called Jack the Rat who would bite the head off a mouse for a dime and a rat for a quarter.[33]

This new masculine style had been taking shape in the North since the 1820s, but it was no longer confined to a few large cities, and the new toughs did not stop at fighting. Like their southern counterparts, they fought for the fun of it as well as for bragging rights, but from the late 1840s through the Civil War they killed people frequently and de-

liberately. Before this period fighting had resulted in only a few deaths in the North, and those were inadvertent.

As nativism gained strength in the 1850s and gangs and volunteer fire companies became ethnically less diverse, more fights pitted the native-born against immigrants and Protestants against Catholics. This was especially true in Philadelphia, where fighting between native-born and immigrant fire companies claimed at least nine lives between the Mexican War and the Civil War. Yet much of the deadly violence of this era had little to do with American-born or immigrant status. Like other northerners, members of gangs and fire companies killed each other to defend their standing among their peers. Bill "The Butcher" Poole was the toughest fighter in New York City and the undisputed champion of its nativist gangs. He became a prime target for anyone who wanted to advance in the ranks of nativist toughs. He was eventually brought down by two native Tammany fighters.[34]

These homicides proliferated as the feelings and beliefs that had restrained lethal violence in the 1830s and early 1840s dissipated. They were not an explicit response to the nation's political crisis or the disruption of the North's social hierarchy, as homicides motivated by racial, ethnic, class, and political hatred were. Men who engaged in such violence left no evidence that they saw beyond the immediate causes of their violent behavior, and although law-enforcement and other government officials were well aware that everyday quarrels caused most northern homicides, they cited nativist-immigrant hostility, drunkenness, and the proliferation of small weapons as the causes of the increase in violence. But alcohol consumption was actually one-half to two-thirds lower in the 1850s and 1860s than it had been in the 1820s, thanks to the temperance movement; and although handguns and knives made quarrels more deadly, together they were responsible for only half of all fatalities, and they were as much a response to the rise in homicide rates as a cause.[35]

Property-related and vigilante murders were also on the rise. By midcentury, strong county and township governments existed everywhere in the North except in Kansas and the Pacific Northwest. Law enforcement and criminal courts were well established. Yet more men —especially farmers—were taking the law into their own hands. Increasingly hostile to governments that did not promote their interests,

they rejected or bypassed the courts and enforced their own decisions. Men who had been law-abiding in the 1830s and early 1840s now acted as if they were in a war to decide who would make and enforce the rules concerning life and property.

Property-dispute murders were prompted by a wide range of issues: boundaries, trespassing, vandalism, crop damage, thefts of wood or produce, the ownership of movable property, and trades gone awry. The offenses in question were misdemeanors or civil matters that should have been ignored or decided in court or through arbitration. In a surprising number of cases, contentious parties did turn first to mediators or justices of the peace. But when legal decisions went against them or when they had no proof that their neighbors had broken the law, they were unable to let matters go.[36]

The Plumleys and the Balches of Shrewsbury, Vermont, had feuded for years over insults, boundary lines, and stray livestock. In August 1868 they were at odds again over whether the Balches should pay for damage their cattle had done to the Plumleys' cornfield. They agreed to arbitration. Three neighbors appraised the damage and ruled in favor of the Plumleys. It was the custom for the winner in such disputes to provide refreshments, so Ziba Plumley went to fetch liquor. By the time he reappeared, it was obvious that he had already begun to imbibe, and the restless Balches were wandering over his field. Ziba had had enough. Still angry at having been crippled in a fight with a Balch three years before, Ziba ordered his son Horace to prod a Balch friend, John Gilman Jr., out of the corn at gunpoint. When the frightened Gilman begged Horace to turn the rifle aside, Ziba told Horace to "shoot him." Horace did, and a furious gunfight broke out. The Plumleys hit one Balch in the arm and another in the leg, but the Balches found cover and returned fire. "God damn it," Ziba yelled at his sons, "can't you shoot straight?" The battle raged off and on until the next day, when a brave neighbor walked into the line of fire, berated both families, and took their guns away one by one. The Plumleys and the Balches then surrendered to the authorities.[37]

Legal proceedings often failed to contain hostile emotions in such disputes, now that trust in government had waned. Murder cases often emerged from situations in which large, powerful men who had lost their lawsuits would try to intimidate smaller, less powerful men. The smaller man would pull out a weapon, kill his tormenter, and then

claim self-defense. In 1860 in Warren, New Hampshire, for example, Vanness Wyatt's timber was hauled away by James Williams, who had a legal writ attaching the timber for a debt owed by Wyatt's father. Wyatt, a young married man with a ten-month-old child, desperately needed the money the timber would bring in and felt he had been bushwhacked by the courts. He took to carrying a three-foot stick and following Williams around town. One day, while Wyatt was following Williams near the freight depot, Williams, accompanied by a friend, brandished a pistol and said, "Vanness now don't come near me." Wyatt kept following him. Williams stopped and said that if Wyatt "step[p]ed another step he would blow him through," and at that moment he fired. As he lay dying, Wyatt said, "I havent touched you nor want a goeing to." Williams said, "I know you did not but you followed me with a stick." Because Williams had a friendly witness to support his story, he got away with a claim of self-defense. He later confessed that he felt his reputation was at stake. As he told a friend, he "did not like to dodge [Wyatt] & go across lots [to avoid him] & have people laughing at him."[38]

The majority of murders in defense of property were impulsive. They were committed by men who were determined to settle matters on the spot, without resorting to the law. Felix McCann of Sherburne, New York, came home drunk one day and learned that a neighbor who had previously killed two of his stray chickens had now killed a third. McCann grabbed his rifle and shot his neighbor through a window. Sylvester Cone, a farmer in Tamworth, New Hampshire, lost his temper early one Sunday morning when he caught two teenaged boys skinny-dipping in his pond. He told them to get out. They thumbed their noses at him. He returned with a gun and shot one of them dead.[39]

Property-dispute murderers like Cone were often ambitious, upwardly mobile men, deeply concerned about money and economic standing. After the shooting Cone worried about his legal expenses. He had been saving money for a trip to the Centennial Exposition in Philadelphia, and he wrote to his wife from jail, promising that they could still make the trip if she would perjure herself and say that the boys had assaulted him. She was too appalled at his conduct to help him, and he was sentenced to life in prison. Jesse Davenport of Manchester, Vermont, who warned young vandals to stay away from his

shop and stabbed the next one who happened by, was obsessed with making money and wrote long letters to his mother and sister about his wheeling and dealing. At one point he had decided that he and his wife did not have enough money to provide for more than three children, so he cut out one of his testicles, thinking that doing so would lessen his chances of having more. Having gone to such lengths to get ahead, he was not about to let neighborhood boys break his windows or carve their initials on his sign.[40]

Property-dispute murderers were utterly convinced that they were within their rights to kill, even if they were defending nothing more than their pride, and they believed, often correctly, that their neighbors would excuse them on the grounds of self-defense. Under English common law, people who were threatened had a "duty to retreat" if they could do so safely. They could use force only if they had their backs "to the wall" and could not get away from their attackers. American law upheld that doctrine in the postrevolutionary period, but at midcentury jurors, judges, and legislators in many jurisdictions moved away from it, arguing instead that people who were threatened had a right to stand their ground and even to attack preemptively if they believed that their lives were in danger. The Ohio Supreme Court finally ceded to lower court practice when it ruled in 1876 that a "true man" had a right to kill in self-defense as long as he did not initiate the hostilities. He had no "duty to retreat." The Indiana Supreme Court concurred in 1877. "The tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee when assailed." The "no duty to retreat" principle did not become the law of the land until 1921, when it was upheld by the Supreme Court. But by the 1850s it was the de facto law in the North, upheld by prosecutors who declined to prosecute and jurors who refused to convict.[41]

In the middle of the nineteenth century there was also an increase in vigilantism. Vigilantism had nearly disappeared in the Midwest after the frontier period, but it reappeared in a more virulent form in the late 1850s in the wake of Bleeding Kansas, as faith in government and in the impartiality of justice eroded. The Iowa vigilantes of the 1830s had been careful to follow the forms of the law, but their successors launched a reign of terror between 1857 and 1870, shooting or hanging at least forty-six men for murder, arson, or horse theft. These

men did not act because there were no sheriffs or jails. Those institutions were obviously effective by the 1850s; nineteen of the vigilantes' victims were already in custody when they were dragged off. The vigilantes simply wanted to bypass the court system, because they no longer trusted it to act swiftly or severely enough to deter crime. They presumed guilt and demanded immediate punishment. Only nine of their victims were tried in lynch courts. The rest were simply put to death.[42]

In 1857 William Barger was jailed in Clinton County, Iowa, awaiting trial for theft, when a mob of forty men led by a postmaster from Jackson County walked in and took him away. The sheriff had opened the cell door for the mob because he did not want them to break the lock. He did break the nose of one of the rioters with the butt of his gun, and he and a half-dozen volunteers grabbed Barger's legs as he was being hoisted into a wagon, but they lost the tug-of-war and left Barger to his fate. The mob made a leisurely progress through the countryside to a tree where previous victims had been hanged and strung Barger up. None of the vigilantes were charged, although the authorities knew them all. That was typical: none of Iowa's vigilante killers were ever convicted of a crime, and only one group of killers had to pay damages to a victim's family.[43]

As in the frontier period, vigilantism was most common along the Ohio, Mississippi, and Missouri Rivers, where many southerners had settled. But it enjoyed widespread support in the North from the 1850s into the 1870s, even after well-publicized incidents in which vigilantes executed men who turned out to be innocent, like Pleasant Anderson of Albia, Iowa. Anderson was accused of killing the son of a local financier in an attempt to steal $12,000. Like many mob victims, Anderson was widely disliked, and the townspeople suspected him of committing other crimes, even though he had never been convicted of anything. The murder was actually committed by the president of the local bank, Samuel Miller.[44]

Even in Vermont and New Hampshire, where no criminal suspect was ever killed by a mob, vigilantes forced confessions from suspects, whipped them, tarred and feathered them, and threatened them with hanging. It was common practice to gather outside jails where suspects in notorious crimes were being held and threaten to lynch them. Mobs were also sending a message to the authorities: if the suspects were not

punished, they would be taken by force and killed. The authorities obliged: between 1862 and 1882 they sent half of all the people ever executed in Vermont and a third of those ever executed in New Hampshire to the gallows. Like the vigilantes, they made mistakes: at least two of the condemned were probably innocent.[45]

As in property-dispute homicides, the lack of trust in government led to a widespread loss of faith in the criminal justice system. It was too weak, too slow, and too corrupt to stop crime. H. M. Mott, an Indiana "regulator" who believed that lynching counterfeiters and horse thieves had a salutary effect on society, said in 1859 that he and his compatriots "felt that their natural and God-given rights had been disregarded, and that the arm of the law was too weak to mete out a just retribution to the guilty, under the existing state of society." The editor of the *Tamaqua Courier,* a paper published in eastern Pennsylvania, shared Mott's views. Outraged by the murders committed by the Molly Maguires in the summer of 1875, he spoke out "in favor of a vigilance committee that will make it so hot for those who get the shooting done and those who harbor suspected parties that they can no longer remain among us. . . . Something *must* be done; that something must be *sure,* swift, and terrible."[46]

The increase in vigilante violence was also tied to skyrocketing rates of predatory homicides, particularly robbery murders, which were more closely linked than any other kind of murders to the precipitous decline in empathy and fellow feeling. Beginning in the late 1840s, even relatively nonhomicidal places like New England and the rural Midwest saw the rates of robbery murders rise. Very few of these murders were ever solved. In most cases there was no evidence. Most of the bodies, stripped of identification and badly decomposed, were found along roads, canals, rivers, and railroad tracks or near taverns, brothels, racetracks, shipyards, and factory yards.

A small proportion of robbery murders were the work of the organized gangs that plied the streets and waterfronts of American cities. New York had its Whyos, Bowery B'hoys, Dead Rabbits, and Plug Uglies; Baltimore its RipRaps, Regulators, and Blood Tubs; Philadelphia its Bulldogs, Reedies, and Schuylkill Rangers. Some of the more infamous members of these gangs were rumored to have been responsible for dozens of robbery murders. A few such crimes were the work of thrill killers, like John Capie and Carson Emos, who were caught

killing a randomly chosen victim in Philadelphia one Saturday night. Still others were the work of serial killers like Peter Bresnahan, a thief for whom murder was a way of making a living; or the Benders, a German family from Kansas that killed at least twelve unsuspecting travelers who accepted their invitation to stay the night.[47]

The great majority of robbery murderers, however, were probably down-and-out laborers who preyed on targets of opportunity. Not surprisingly, tramps and vagrants were widely feared. They often preyed on the elderly and on farmers or farm couples who lived alone. Charles Williams, a well-educated young immigrant from Bristol, England, had not been able to find steady work. He had been tramping around Vermont all winter, begging and stealing. One day, hungry and depressed, he stopped by a farm in Brandon to ask for a glass of milk and directions to the train station. He told the farmer that he hoped to take a train for Montreal and sail home from there. But he had no money for the trip, and as he cut through the woods on the way to the station, he ran into Frank Brasson, a fifteen-year-old farm laborer who was out hunting. Williams asked to look at his gun and then shot him with it. Apparently he hoped to sell the gun on his way north. He did not get far, however, and when he found himself surrounded by Brasson's neighbors, he turned the gun on himself.[48]

Immigrants like Williams were not as profoundly alienated from society as men who defined themselves by violence, like gang members. However, impoverished immigrants were more likely to kill in these decades than they had been before because they saw themselves not as prospective members of society, but as outsiders who would never have the success that their victims—many of whom were themselves immigrants or children of immigrants—enjoyed. These feelings were not an inevitable result of immigration or desperate poverty. There had been plenty of poor immigrants in the northern United States before the late 1840s, and there was still plenty of poverty and immigration in Canada, England, and other nations where robbery murders were becoming rare. Such feelings were the fruit of the politicized hostility that immigrants encountered in the midcentury North and of the pervasive sense that the path to self-employment and economic success was no longer open to working Americans.

A similar despondency about the future may have seeped into the lives of native-born working men who robbed and murdered their

neighbors, employers, or former employers. A few of these killers had had difficulties with their employers, usually over poor performance on the job; but most killed people they knew for money. They were young and ambitious, estranged from their families, and had little in common with their victims, who were usually of a different ethnic group. Perry Bowsher of Ross County, Ohio, was typical of such killers; a young, Ohio-born farm laborer of German ancestry, he desperately wanted to see the world. He had no money, however, so he robbed and murdered an elderly Scots-Irish couple who lived a few miles from his home.[49]

Older farm laborers usually robbed and killed their employers to provide for their own families. However heinous their crimes, these men were just trying to feed their children in a world where there were no safety nets. Hiram Miller, a Vermont-born French Canadian (his name had been anglicized) had served in the Union army, but after the war he had trouble finding work. He hired on with the Gowans in Weathersfield, Vermont, but he kept wandering off in search of more work, so the Gowans refused to pay him his full wages. Miller got into several heated arguments with them and finally quit, but after a couple of weeks he returned to the farm, killed them with an ax, and stole every cent they had.[50]

The attenuation of empathy and fellow feeling among northerners manifested itself most strikingly in the increased willingness of young working men to kill friends and acquaintances or to cozy up to people with money in order to rob and kill them. Anyone who had a substantial amount of cash was a potential victim. William Pendolph, a farmer in Sandgate, Vermont, killed his friend Dave Kinsman because he thought Kinsman had $600 stashed away. He was sorely disappointed to find only $6.[51]

Perhaps the most disturbing manifestation of alienation, however, was the sudden resurgence of rape murder. The number of lethal sexual assaults was not great, but such murders had nearly disappeared in the postrevolutionary period. A young domestic servant died after being gang-raped by six young men at a neighborhood party in Sandgate, Vermont. Charles Scudder, a trusted hostler in Commack, New York, broke into the home of Mary Robbins, tied her to her bed, brutalized her, cut her throat, and left her body in a degrading position. William Fee and Thomas Muldoon, who worked as boatmen on the

Erie Canal, were wandering about on their day off when they met a young woman going from house to house to ask for work. They propositioned her, perhaps offering money, and when she refused they raped her, strangled her, and threw her in a ditch. Annie Morrison was brutalized under similar circumstances by a gang of young men in the woods east of Manchester, New Hampshire.[52]

Like robbery murderers, rapists attacked targets of opportunity: women who were poor and socially isolated. They regarded these women with contempt and assumed they could assault them without sanctions. The Sandgate victim was poor, while her attackers came from respectable families. They had imprisoned her in an upstairs bedroom and invited other men "to go in and have a good time," and only two people were willing to stand up for her when she said she had been "wronged." Like most rape-murder victims, she was beyond the circle of people who mattered. By midcentury the social divide between middle-class and poor working-class women had become wider, and there was a growing presumption that working-class women were not respectable, unless they could prove otherwise. That presumption facilitated the return of rape murders as much as the arrogance and alienation of the rapists themselves.

It was during these decades that the United States also witnessed the appearance of serial killers who murdered young girls and women, subjected them to sexual mutilation, and performed sex acts on their dead bodies. Such killings had never been seen in the nation before. They marked the outer limits of the alienated, hate-filled violence that pervaded American society at midcentury. Such killings reappeared at the same time in Europe, where they had been largely absent since the late sixteenth and early seventeenth centuries, but they remained more common in the United States.[53]

Known serial sexual killers led peripatetic lives, a symptom of their inability to form lasting relationships or to feel themselves part of a broader community. Franklin Evans was a transient who had some success as an herbal doctor and an Adventist preacher. His second and third wives left him because of his violence (his first wife was supposed to have died of natural causes). He apparently began his criminal career in 1850 by murdering a five-year-old neighbor girl in Derry, New Hampshire, although he was not convicted of that crime, because her body was never found. Over the next twenty years he may have killed

several other girls, but he was not caught until 1872, when he murdered his teenaged grandniece, Georgiana Lovering. He followed her into the woods, raped her, strangled her, and then took a knife to her belly, genitals, and uterus.[54]

Joseph Lapage was a lumberjack who had fled his native Quebec after raping his sister-in-law. He, too, mutilated his victims, Marietta Ball, a young schoolteacher from St. Albans, Vermont, and Josie Langmaid, a teenager from Pembroke, New Hampshire. His killings were ritualized; he took the women's undergarments and hid them in various locations, cut out their reproductive organs (and probably ate parts of them), and cut off Langmaid's head and threw it into a swamp.[55]

Most of the known sexual serial killers were from the North, the region that also had the greatest increase in rape and marital violence. Although by any definition these men were mentally ill, the social changes that swept across the mid-nineteenth-century North may have helped trigger and shape their violence. The disconnect that they felt from all females (even those in their own families), the rage they manifested in their crimes, and the indifference that they showed to the families of their victims testify to the attenuation of empathy in the midcentury North and to the resultant feeling that the laws and institutions that had bound men in the past did not bind them any longer. Society's preoccupation with respectability, along with the companionate ideal of marriage and romance, which they were too emotionally crippled to attain, would have been both threatening and infuriating to them. They had failed in their relationships with respectable women, and they appear to have singled out their victims—children, students, and schoolteachers—because of their innocence and respectability. The mid-nineteenth-century rise of misogyny and commercialized sexuality may also have encouraged and confirmed their desire to punish and mutilate women.[56]

Sexual assaults and robberies were largely responsible for the increase in nondomestic homicides of women in the mid-nineteenth-century North. Homicide rates for women remained a tenth or less of those for men, ranging from 0.2 per 100,000 adult women per year in New Hampshire and Vermont to 2 per 100,000 per year in Cleveland and rural Illinois. However, they were substantially higher than they had been in the 1820s and 1830s, when there were almost no murders of women by unrelated adults. Apart from robberies and sexual as-

saults, women were killed in the same circumstances men were. Mary Laker, who farmed with her husband in Petersburg, New York, taunted her hired man, Hiram Coon, about his criminal past. Coon picked up an ax, held it over her head, and warned her not to say another word. She ignored his warning, and he split her head open. Miriam Berry, a widow who farmed in New Durham, New Hampshire, got into a pay dispute with the man who cut her wood, whom she had fired for being "disagreeable," and he shot her. In Calhoun County, Illinois, a Unionist mob fired on the house of a Confederate sympathizer in 1862, killing his pregnant wife. Such violence was so pervasive that it was bound to claim the lives of women as well as men.[57]

Far fewer women killed unrelated adults than were killed by them, but at midcentury women were committing murder more often than before. On occasion, female proprietors of taverns or brothels shot unruly customers, and women sometimes pitched in with male friends or relatives who were involved in brawls. Eliza Rickman, for example, helped her brothers kill William Campbell in rural Ross County, Ohio, because they believed he had stolen a watch; Margaret Kelly helped her husband beat Rose O'Malia to death while they were drinking at the Kellys' home in Cleveland. Women killed unrelated adults for more personal reasons than men did, but female victims were killed for the same reasons and under the same circumstances that male victims were.[58]

Northerners were at a loss about how to stem the rising tide of homicides. States, counties, municipalities, and businesses spent massive amounts on law enforcement. The creation of the North's first municipal police departments in the 1840s, the first private detective agencies in the 1850s, and the National Guard in the 1870s helped ensure that law and order did not break down completely and prevented the return of frontierlike homicide rates, but law enforcement was powerless to prevent high homicide levels and in some instances raised them. Many officers and militiamen were killed in the line of duty, and they were responsible for killing many of the people who died during strikes, robberies, and riots. In New York City in 1849 the militia killed twenty-three people, including an innocent bystander, when it was called out to put down a riot that had broken out at the Astor Theater over a performance by an English actor who had disparaged American audiences. In the 1850s the police gunned down a

dozen river pirates in an effort to break up theft rings that operated on the waterfront, and the river pirates retaliated, killing a number of watchmen and police officers. Rioters killed more than a dozen policemen and soldiers in the draft riot of 1863. In Philadelphia at least seven police officers were killed in the 1850s as they tried to stop fights or make arrests. Similar killings occurred in New England and the Midwest, in both cities and the countryside.[59]

The lack of professionalism among law-enforcement personnel contributed to the problem. Many officers were poorly trained, and aggressive or reckless men were rarely weeded out. Some officials turned vigilante. If they got a tip about a burglary or a jailbreak they would lie in wait and shoot the suspects as soon as they came within range. Occasionally they would hand criminals over to vigilante groups rather than take them to jail. But even law-abiding members of thoroughly professional police departments, like Boston's, killed or were killed in the line of duty much more frequently than present-day policemen.[60]

The high homicide rates that prevailed in this era thus affected all northerners, from the poorest members of society to the struggling middle class, and they ensnared law enforcement in a lethal web, as high homicide rates always do. Tasked with lowering the rates and saddled with the blame when they did not fall, law-enforcement officials died in great numbers and often succumbed to corruption or abandoned their mandate entirely. Only in the late nineteenth century, when the political crisis eased and society began to adjust its expectations and accord higher status to men who worked for others would homicide rates begin to decline in the North.

## Homicide in the South

Homicide rates did not rise everywhere in the South in the late 1840s and 1850s as they did in the North and the Southwest. In plantation counties in Georgia and South Carolina, where the debate over the status of slavery in the territories annexed from Mexico drew whites together, rates remained steady (Figure 4.1).[61] However, southern cities experienced the same surge in homicides that cities elsewhere did. Conflict between the native-born and immigrants, disagreements over slavery and race relations, and frustration among workers and small

proprietors over the decline in proprietorship led to high rates of individual and collective violence.

The violence appears to have been worst in New Orleans, the most ethnically diverse city in the South, where desperately poor Irish and German immigrants clashed repeatedly with equally poor native-born whites. The city's homicide rate soared to 60 per 100,000 adults per year (Figure 7.1). In the municipal election of 1854 the police, who owed their jobs to the Democratic Party, escorted Democratic voters from poll to poll so that they could vote "early and often." In response, members of the nativist American Party attacked the police, killing two Irish patrolmen and wounding Chief of Police Stephen O'Leary. The nativists won the election and appointed a new chief who had once threatened to kill every Irish person in the city. He purged the force of Democratic appointees, whom he called a pack of "damned Irish and Dutch, and a set of thieves," and replaced them with native-born Prot-



**Figure 7.1** Homicide rates in Louisiana, 1853–1900 (per 100,000 adults per year). *Sources:* Rousey (1996: 74, 93, 187n53); Vandal (2000: 21, 23).

# CHAPTER 8

# The Modern Pattern Is Set

*Homicide from the End of Reconstruction to World War I*

After the nation fell apart over slavery, immigration, the decline in self-employment, and the war with Mexico, national feeling and the empathy, trust, and goodwill that flow from it were never as strong again, except for a brief period during World War II and the Cold War. When the Civil War was over, northern Republicans did their best to revive patriotism and drum up support for the federal government. The Reverend Henry Bellows gave it the "divine" imprimatur and declared it "the great incarnation of a nation's rights, privileges, honor and life." With the war over, he said, Americans should unite to become "a homogeneous, enlightened nation," bound together by patriotic feeling and a commitment to the equality of all, regardless of race, nationality, or previous condition of servitude. Republicans thought that all Americans would eventually endorse that idea.[1] They could not have been more wrong.

Most Americans rejected this homogeneous vision of the Union and remained divided about fundamental questions like the meaning of equality and role of the federal government. Bitterness over the war and Reconstruction, anger over corruption in Congress and the Grant administration, and the continued politicization of racial, ethnic, and sectional hatred made it impossible for Americans to recover the faith they had once had in the federal government.[2] As national allegiances attenuated, the proportion of new counties named for national heroes

fell to its lowest level in history in the last three decades of the nineteenth century and the first two decades of the twentieth century: from a high of 46 percent in the 1810s and 1820s, when the nation's homicide rate was low, to only 18 percent. The proportion named for local and regional notables—pioneers, politicians, civic leaders—rose from 35 percent to 54 percent (Figure 2.1). The alienation reflected in those figures is in all likelihood one of the fundamental reasons that America's homicide rate has been high for the past 160 years.

Overall homicide rates did subside in the North, South, and Southwest in the late 1870s and early 1880s as the worst political violence ended, the two-party system revived, and state and local governments reestablished rudimentary law and order. Only the newest cattle and mining frontiers in the West remained extremely homicidal, with rates in excess of 100 per 100,000 adults per year. Rates fell in cities, small towns, and in the countryside. They dropped in Boston, New York, Philadelphia, New Orleans, and San Francisco; in northern New England and the rural Midwest; in mountain and plantation counties in Georgia; and in ranching and mining counties in California. With rare exceptions, the rates remained higher than they had been before the Mexican War, but they were lower than they had been during the Civil War and Reconstruction.

The character of America's homicide problem changed, however, in the late nineteenth and early twentieth centuries, in ways that have endured ever since. The decline in homicide continued in the Southwest through the first decades of the twentieth century, but not in the North, where rates rose gradually from the late 1890s to the eve of World War I, or in the rural South, where rates soared in the late 1880s and 1890s. In those years the South surpassed the Southwest as the most homicidal region in the United States. In addition, homicide rates among blacks surpassed those among whites in both the North and South. They remain higher to this day. Yet in California, homicide rates for blacks did not diverge from those for non-Hispanic whites. Blacks there were less likely than whites to kill one another in the 1880s and 1890s. But homicide rates among the Chinese remained above those of Anglos in San Francisco, as did rates among the Chinese and Hispanics in Los Angeles. High rates of intraracial homicide were thus peculiar to minorities that faced the greatest local prejudice and discrimination. That pattern persists today, except among the

Chinese, whose rate fell after World War I.[3] There are lower homicide rates among non-Hispanic whites in the North, the Southwest, and southern cities, higher homicide rates among whites in the rural South, and a divergence in intraracial homicide rates between non-Hispanic whites and the minorities that are most subject to discrimination (overt or institutional) in each region of the country.

## White Homicide in the North, 1877–1917

In the last two decades of the nineteenth century, homicide rates declined across the North (Figures 4.2 and 5.1–5.3), continuing a trend that had begun in most jurisdictions at the end of the Civil War. The rates bottomed out in the late 1880s or 1890s before inching up again in the late 1890s and early 1900s. On the eve of World War I, when a majority of states first met federal standards for death registration, the homicide rate (including family and intimate homicides) for adults of all races ranged from 1 to 4 per 100,000 in New England, 2 to 5 in prairie states, and 3 to 8 in the industrial states. With the exception of a few states with very low rates—Wisconsin, New Hampshire, Vermont, and Maine—the North was more homicidal than Canada or western Europe, but less so than it had been in the mid-nineteenth century.[4]

Homicide rates declined in the North in the late nineteenth century because of a drop in murders among unrelated whites. Labor violence increased, especially on railroads and docks, and around coal mines, steel mills, and logging camps, but it did not claim enough lives to have an appreciable effect on the white homicide rate. Most labor violence was instrumental, aimed at changing the behavior of employers, strikers, scabs, the militia, or the police, so the death toll was surprisingly low. Every other kind of homicide among unrelated whites decreased. Property disputes, tavern brawls, sexual assaults, robberies, and spontaneous quarrels claimed fewer lives than they did in the mid-nineteenth century.[5]

The decline in homicides probably escaped the notice of most northerners. They still read articles in the newspapers each week about murders in saloons and on city streets, and their neighbors could still turn on each other with shocking suddenness in arguments over felled trees, trampled crops, laundry bills, or fishing spots. George Poe, a carriage driver in Chillicothe, Ohio, got fed up with a drunken passenger,

pushed him out of the rig, and kicked him to death in the street. James McDuffee of Rochester, New Hampshire, blasted two drunken friends with a shotgun when they stopped by his house one night and refused to go home. A readiness to get rid of people who were annoying or troublesome, or who refused to be bullied or intimidated, was more common than it had been before the Mexican War. But on the whole, northerners were more forbearing and less concerned about dominating others than they had been from the Mexican War through the Civil War, and that change was reflected in the homicide rate.[6]

Robbery homicides were still a problem, especially in cities like Chicago, where they accounted for a fifth of known homicides among unrelated adults. In the seven years for which reliable data are available, Chicago robberies and burglaries claimed the lives of 16 suspects, 6 shopowners, 3 employees, 1 customer, 3 police officers, and 11 homeowners. Thieves were killed trying to steal fruit, shoes, soap, beer, or cash; police officers were killed while trying to arrest them. Elsewhere, however, robbery homicides were in decline and made up a similar or smaller percentage of homicides among unrelated adults in the 1880s and 1890s than they had at midcentury. The proportion fell from 17 percent to 10 percent in New Hampshire and Vermont and held steady at about 9 percent in rural Ohio and Illinois. In small towns and in the countryside, thieves still held up banks, waylaid travelers, invaded the homes of single women, and ambushed farmers on the way home from market. But such encounters—like all encounters among friends, acquaintances, and strangers—were less deadly than they had been at midcentury.[7]

The decline in homicide correlated with the greater sense of unity and purpose that emerged among northern whites after the Civil War. Winning the war reinforced northerners' conception of themselves as a group with shared values, characteristics, and goals. The political divisions of the mid-nineteenth century receded, Republicans and Democrats were gradually reconciled, and the two-party system was restored. Election riots, ethnic riots, and religious riots nearly disappeared in the late 1870s and 1880s as political parties turned their attention to traditional issues—tariffs, the monetary system, temperance, internal improvements—and away from issues that divided whites like race and immigration.[8]

Irish Americans were gradually assimilated into society. Second- and

blacks in Philadelphia, Omaha, and Chicago, and they had homicide rates to match. Hatred of the Chinese was so intense in these two cities that it played a pivotal role in securing a nationwide ban on Chinese immigration in 1882; and discrimination against Hispanics was so intense in Los Angeles that many Mexicans went home in the 1880s and 1890s, and few immigrants came to take their place. But where Hispanic and Chinese Californians were not forced by discrimination into deteriorating, crime-ridden neighborhoods, they did not kill one another at higher rates than whites did.

Ironically, African Americans did relatively well in California in the 1880s and 1890s because they were not the focus of Anglo hatred. They accounted for a smaller share of California's population than Hispanics or the Chinese did—less than 1 percent—and they benefited from the rights won during Reconstruction, especially the right to vote and the right to attend integrated public schools. California blacks were not numerous enough to gain much influence within the Republican Party, but because they posed less of a threat to Anglos than Hispanics or the Chinese did, they held on to coveted jobs in the service economy—domestic service, barbering, catering—and in some skilled and semiskilled crafts. Blacks were spared the need to get deeply involved in the criminal underworld in San Francisco and Los Angeles, and those who wanted to get involved had a hard time doing so, because Hispanic and Chinese criminals preferred to deal with their own people. As a result, by the 1880s and 1890s blacks were no more likely to kill one another than Anglos were, and they did not murder Chinese, Hispanic, or Anglo Californians. Like everyone else, however, they did kill Native Americans. Blacks were still occasionally victimized by hostile Anglos or Hispanics, who murdered nearly half of all black homicide victims. Those interracial homicides pushed the total homicide rate for African Americans somewhat higher than the rate for Anglos.[53]

The black experience in urban California is a strong indication that the surge in homicide among blacks in the urban North in the late nineteenth and early twentieth centuries was not caused, as some still argue, by a defect in black culture or black family life or by violence-prone migrants from the South. It was caused by political impotence, economic discrimination, and racial prejudice. Wherever those forces shut minorities out of mainstream urban society, undermined their

faith in government, and pushed them into criminal occupations and vice-ridden neighborhoods, minority homicide rates rose. Which minority had the highest homicide rate depended on which was most persecuted. In San Francisco, it was the Chinese, and in Los Angeles, the Chinese and Hispanics.

## Homicide in the South, 1872–1887

Homicide rates declined through much of the South from the mid-1870s to the late 1880s, just as they did in the North and the Southwest. They held steady in Virginia at 8 per 100,000 adults per year (Figure 5.6), but they fell drastically elsewhere as soon as white conservatives returned to power in states that had been politically turbulent during Reconstruction. When Redeemers—the coalition of white conservatives who wanted to "redeem" the South from the evils of Reconstruction—took charge in Louisiana in 1877, the homicide rate fell in rural counties from 89 to 35 per 100,000 and in New Orleans from 35 to 25 per 100,000 (Figure 7.1). When former Confederates returned to power in Georgia in 1872, the homicide rate fell in mountain counties from 53 to 12 per 100,000 and in plantation counties from 24 to 16 per 100,000 (Figures 4.1 and 5.5). These declines were caused by a sudden drop in the rates at which whites killed blacks and one another. Arrest rates for homicide also fell in southern and border cities in the late 1870s and 1880s, just as they did in northern cities.[54]

These declines were abrupt. Once conservative whites regained power, the need to kill blacks diminished, and antagonism among Unionist, moderate, and conservative whites receded. White murders of "uppity" blacks and black murders of overbearing whites fell off rapidly. So did political homicides. When former Confederates returned to power, white supremacists no longer felt a pressing need to enforce the color line violently, because they could use poll taxes, registration laws, felon disfranchisement laws, and gerrymandered districts to suppress the black vote; and blacks recognized that challenging white supremacy was no longer an option. The rate at which blacks murdered whites fell from 8.6 to 6.5 per 100,000 in rural Louisiana, from 2.4 to 1.7 in New Orleans, and from 3.4 to zero in Edgefield County, South Carolina.[55]

Deadly conflicts between whites and blacks played out on a smaller,

more personal scale than they did during Reconstruction. A black sharecropper who attacked a white landowner was still a dead man. In 1885 Jack Hopkins was shot through the window of his jail cell in Monticello, Georgia, before he could stand trial for stabbing his land-lord with a knife. But violence between black sharecroppers and white landowners was rare, unless one tried to steal from the other. One morning in 1879 sharecropper Cary Ashley found his corn being har-vested and hauled away by his landlord, Benjamin Jones. Ashley asked Jones what he was doing, and Jones replied that he was taking the crop and "would do as he damd pleased" with it. He then pulled out a pistol and said, "You came here for a fuss and I'll fix you." Ashley gave up, but his wife Jane continued to protest. Jones said later that he didn't shoot Jane Ashley, because two other sharecroppers standing nearby "begged so hard" for him "not to do it," but that he had to kill Cary Ashley to demonstrate his right to take what he wanted from his crop-pers. Nightriding against sharecroppers declined as whites became more confident of their power, but attacks by individual landlords still took the lives of blacks.[56]

Conflicts among whites also played out on a more intimate scale than they did during Reconstruction. The rate at which whites mur-dered one another did not fall as sharply as the rate at which they mur-dered blacks, but the conservative whites' return to power seemed to have a soothing effect on relations among all whites. They felt relieved and empowered by the restoration of a prewar-style order. Anxiety and anger over the standing of poor and middle-class whites in southern society and the nation as a whole diminished, and skeptics rallied to the supremacist cause.

Political homicides among whites did not disappear, however. Defer-ence and respect were still important to southern gentlemen, and in public life they were always encountering people who refused to defer to them. W. E. Bland, a physician, challenged one man's right to vote in an 1880 election in Edgefield County. The man had paid road taxes, but election officials had agreed that the man could not vote if he lived outside the town's corporate limits. A. A. Clisby, a merchant, rose to get a copy of the town plat. "We will prove that he does live in the in-corporation," he said. "You will prove it like you prove a dam sight of other things," Bland retorted. Clisby then uttered those time-honored words that always set off deadly violence in the South. He asked Bland

"if he intended to call him personally a liar." Bland jumped up and shouted that "he meant to call him a liar and he could construe it as he dammed please," and he struck Clisby in the face. Guns were drawn, and Bland was killed.[57]

If a political official deviated from popular policy, white southerners were not always patient enough to wait for the next election to throw the miscreant out. Many of them still mistrusted government and still believed that taking the law into one's own hands in the service of a just cause was an honorable course of action. In Breathitt County, in the mountains of eastern Kentucky, the county court nullified a state railroad construction tax and returned it to citizens as "refunds," which went to support local schools. The decision was popular among the county's voters, especially farmers, who opposed tax-supported railroads; but when newcomer J. W. Burnett won the presidency of the court as a Unionist-Republican in 1878 he tried to reverse the policy, believing that government-subsidized transportation was the key to Appalachia's economic development. He failed, but the effort made him so unpopular that he was shot dead in the street a few days later. The governor had to send in troops to restore order.[58]

Strictly speaking, most of the differences that whites fought over in the late 1870s and 1880s were personal rather than partisan. Whites did kill federal revenue agents, especially during the Hayes administra-tion, when the federal government stepped up efforts to collect excise taxes from distillers. Hayes, a temperance man, wanted to discourage the liquor trade, but he also wanted to establish federal authority in the South without challenging the South's treatment of blacks, and the collection of liquor taxes enabled him to do so. Revenue agents quickly became the most hated figures in the South. But moonshiners more often turned their wrath against the friends and neighbors who had told revenue agents about their stills.

Wyllis Dyar, a paid informant in the remote Gum Log and Red Hol-low districts of Franklin County, Georgia, had been working with fed-eral agents for six months when he was shot through the head as he re-turned home in his oxcart. Moonshiners also attacked neighbors who refused to support them when they were prosecuted. Robert Woody, a former Confederate soldier from Gilmer County who had switched sides during the Civil War and had been mustered out as a lieutenant in the Union army, signed a petition opposing a pardon for Walter

Webb Findley, an unreconstructed Confederate who was in prison for attacking a federal revenue officer. Woody and Findley had been friends, but they fell out when Findley and a band of twenty men burned the revenue officer's barn and storehouse in retaliation for the destruction of fourteen local stills. A few days after his release from prison, Findley confronted Woody at church. They opened fire on each other and accidentally killed a fellow parishioner.[59]

The convict labor system routinely produced homicides among whites in the years that followed Reconstruction. Redeemer governments used convict labor primarily to keep African Americans in their place and to exploit the labor of black vagrants and petty criminals, but poor whites were also forced to serve short sentences, and few of them could abide the indignity. Some were shot dead trying to escape, like J. W. Hammond, who made a run for it as his crew was grading a rail line in Gilmer County. Others, who were put out to work in the community, turned on their employers. Frank Sanders' time had been purchased by the Swillings, who owned a plantation in Franklin County. Sanders killed the Swillings and their three children with an ax, stole their valuables, and burned their house to the ground. Treating white petty criminals like blacks was dangerous, since it undermined efforts to forge a sense of solidarity among whites. The fact that the convict labor system produced so many homicides shows how important racial solidarity and a secure sense of mastery over blacks were to deterring homicide among whites.[60]

### Homicide among Blacks in the South, 1872–1887

Southern blacks lost the Reconstruction battle, and, much like former Confederates after their defeat in the Civil War, homicide rates among them rose. For the first time, blacks killed one another in the southern countryside at nearly the same rate as whites. In rural Louisiana, the annual rate at which blacks killed each other rose slightly, from 18 to 20 per 100,000. Edgefield County, South Carolina, saw a similar increase, from 5 to 7 per 100,000. But in New Orleans, blacks began to kill each other at three times the rate whites did. The rate soared, from 11 to 30 per 100,000.[61]

For blacks the post-Reconstruction urban experience in New Orleans was a disaster. Poor policing, unemployment, inferior schools,

political powerlessness, and dangerous neighborhoods made their lives hellish. They may have been the first African Americans to experience the full gamut of urban problems, because their political defeat was so sudden and complete. The Redeemers refused to provide public services for blacks and laid off more than half the city's police officers, leaving the residents of poor, mixed-race neighborhoods inundated with trash, deprived of access to schools, and almost completely defenseless against crime. The number of officers per capita fell from 34 to 15 per 10,000—a common trend in southern cities after Reconstruction—and the proportion of blacks on the police force fell from 27 percent to 7 percent. Blanket arrests of striking black workers and of black patrons of saloons and gambling parlors were routine. White officers, nearly all of them Democrats, had no qualms about breaking up peaceful, legal meetings of black Republicans. White officers even killed two black Republican voters at the polls in 1883.[62]

In the 1880s white officers treated blacks brutally, and blacks lost all faith in them. Two white officers shot and killed a black man simply because he refused an order to "move on." When officers ran into a gang of whites who were mugging and stabbing a black man, they arrested the victim. Police Sergeant Thomas Reynolds tried to arrest teamster James Hawkins, a "law abiding, peaceful man" of "Christian character," but Hawkins' neighbors attacked Reynolds with fists and frying pans. Reynolds stopped the crowd by shooting the innocent Hawkins dead. Indifferent or corrupt officers allowed vice and crime to flourish in black neighborhoods, sometimes profiting by it, and black New Orleans descended into lawlessness. Of course, the New Orleans police also did a poor job of protecting whites. As one editor said, "The wonder is that thieves don't pick up the town and carry it off."[63] The city's homicide rate in the 1880s was twice as high as San Francisco's, four times as high as Boston's, and six times as high as New York City's. Only Los Angeles had similar rates—for non-Hispanic whites. In New Orleans, blacks made up the majority of homicide victims.

The situation was nearly as dire for blacks in the countryside at the end of Reconstruction. After the dispiriting defeat of the Republican Party, they were threatened by white vigilantes and burdened with the injustices of the white-dominated legal system. They also had a very hard time making a living, both because of low commodity prices and because of a crop-lien system that overcharged them for seed, tools,

and dry goods and underpaid them at the end of the year for their crops. Thousands of blacks left Louisiana and east Texas for Kansas, hoping to establish safe, independent communities on the prairie. Blacks also left other areas of the South in droves. A freedman from Edgefield County, South Carolina, who had been a probate judge said he had had enough of "the miserable county of Edgefield" after the Hamburg Massacre of 1876, in which white vigilantes attacked the county's black militia company. He helped hire a steamship to take freed people to Liberia. Five thousand more blacks left Edgefield and surrounding counties for Arkansas, where public land was available. "We have tried to make money and have not been able to do so. We are poorer now than when we began. . . . We have exercised all the economy we knew how to use and we are going further down hill every day. There is no help for us here."[64]

Under such conditions, it is not surprising that the rate at which blacks killed one another rose at the end of Reconstruction. Black men were already angry about their treatment at the hands of white society, and they could be dangerous when friends or neighbors betrayed them to whites or made disparaging comments about them. Edgefield County saw dozens of assaults and murders that stemmed from such remarks. Tom Dorn asked Bill King why he had told their landlord, Mr. Miner, that Dorn "cursed him behind his back" every time Miner "called him out to work." Dorn certainly had good reason to curse his landlord; Miner still treated his sharecroppers as slaves and expected them to work his home farm without pay. Still, Dorn denied having cursed him, and King denied betraying him to Miner. They fought, and Dorn beat King to death.[65]

Many of these murders took place at social gatherings like dances or suppers, because these occasions offered rivals a chance to face off in front of their peers. At one Sunday gathering in Edgefield County, Andrew Harris shot a friend for "telling tales" about him. Cato Butler had resolved to kill Henry Turner for a similar affront, but he waited several weeks for the right occasion: a party at which everyone in the neighborhood could watch Turner die.[66]

Under the circumstances it seems remarkable that the homicide rate rose so little among rural blacks. The mindset of Aaron Bosket, an Edgefield County freedman who became a sharecropper after the war,

sheds some light on how so many blacks managed to cope with having their hopes for a better life dashed repeatedly. A decade after the Civil War, Bosket was still desperately poor. He had tried to make a living in the state capital, but there were no good jobs for blacks there, so he came home and tried farming, with little success. He and his family lived in a one-room shack that was not much better than slave quarters. But Bosket had seen great advances in his forty years, and he believed that one day he would see more. When whites called him "boy" or "uncle," he didn't show his feelings. He reminded himself that despite setbacks, blacks could now vote, hold office, attend school, bear arms, and move about freely. He just tried to "live lowly and humble" and have faith that God would make things better. W. E. B. Du Bois heard that faith in the words of every freedman he met. He noted that whatever happened, good or bad, their reaction was the same: God would "bring all things right in His own good time."[67]

In Jasper County, Georgia, blacks took advantage of their new freedom and formed a branch of the Judson Society, a Baptist missionary and benevolent society that cared for the sick, buried the dead, and financed the education of black children. They established a school, staffed it with black teachers, and taught themselves and their children to read and write. The editor of the county's Democratic newspaper took note of their efforts and advised whites to emulate them. "The colored people are wide awake on the subject of education, and are taking advantage of all the chances, while the white citizens are inactive and careless. Now, we think it is time for our people to wake up on this subject." The same editor also told whites to let go of their animosity toward free blacks. "The decree of Providence has thrown us together, and it is the duty of both races to so act and cooperate as to get along together harmoniously."[68]

In communities across the South blacks were looking beyond politics for a way out of poverty and ignorance and searching for ways to coexist with whites. They formed cooperative schools and Sunday schools in the 1870s and 1880s, determined to progress despite the refusal of Redeemer governments to support black education. "It was a whole race trying to go to school," as Booker T. Washington said.[69] Their efforts may have deterred some violence within the black community, but as conditions worsened it would prove difficult to per-

suade young blacks in particular—the majority of whom were literate by the end of the century—that patient resolve and trust in God were the solutions to their predicament.

## Homicide in the South, 1888–1917

The uneasy political peace that had settled upon the South after Reconstruction came to an end in the late 1880s and early 1890s, when the southern economy faltered and whites fell to bickering among themselves. It was a time of opportunity in politics for blacks and for poor and middle-class whites. They challenged the rule of conservative Democratic elites at mass demonstrations, at the polls, and through new voluntary organizations like the Farmers' Alliance and the Colored Farmers' Alliance. But it was also a time of anger, alienation, and bitterness. Conservative white-supremacist elites lost power briefly in a number of states, but they regained ascendancy in the late 1890s and early 1900s and created a political regime that was more brutal, corrupt, and nakedly antidemocratic than any the nation had seen since slave times. The consequence of political upheaval and the reaction that followed was once again a rash of lynchings, vigilante killings, and everyday murders.

The challenge to white conservatives came in part from the Republican Party, which was an unstable coalition of white Unionists, black civil rights advocates, temperance and educational reformers, and entrepreneurs who believed that the party's policies on banking, transportation, and other economic issues would spur the development of railroads, coal mines, textile mills, and lumber mills across the South. The Republicans were strong in the Upper South and parts of the Lower South. In the presidential election of 1892, they got over 30 percent of the vote in most counties in North Carolina and Tennessee and in nearly every county in Virginia, West Virginia, Kentucky, and Missouri. They were strongest in the mountain counties of eastern Tennessee, eastern Kentucky, southern West Virginia, western North Carolina, and northern Georgia, but they had pockets of strength in predominantly black counties in Louisiana and along the coasts of Texas, South Carolina, and Georgia.[70]

The Populist Party also challenged Redeemer rule. The party grew out of two farm groups, the Farmers' Alliance and the Colored

Farmers' Alliance, that wanted to emancipate farmers from the croplien system and help them remain independent. In the 1880s the two alliances represented three million farmers, yet neither the Republicans nor the Democrats would incorporate their proposals into party platforms. Frustrated with their inability to effect change, some members of the alliances founded the Populist Party.

In the South the Populists drew most of their support from farmers, who faced rising costs and falling prices for their crops. Many of them, black and white, had fallen into the ranks of tenants, sharecroppers, and farm laborers, and even those who were still independent were hamstrung by problems that were beyond their control: international competition, volatile markets, and lower prices for cotton and other commodities as efficiency and output increased. The Populists believed they could help by creating agricultural cooperatives to market crops on favorable terms and by forming exchanges to purchase fertilizer and other supplies at lower cost. They also favored establishing government subtreasuries that would extend credit to farmers at lower interest rates, and they wanted to nationalize the railroads and telegraph companies to eliminate price-gouging by rail barons and commodity speculators. The Populists realized, too, that the farmers' lot would never improve unless they were better educated, so they advocated establishing free public schools for blacks and poor whites.[71]

The Populists did well in a few places in the presidential election of 1892—the upper Piedmont and eastern plantation belt in Georgia, southwestern Missouri, central North Carolina, and parts of Florida, Mississippi, and Texas. Their appeal appeared to be increasing, and conservative Democrats considered them a real threat because so many of the South's dispirited farmers were flocking to them. As historian C. Vann Woodward put it, "The annual defeat of the crop market and the tax collector, the weekly defeat of the town market and mounting debt, and the small, gnawing, daily defeats of crumbling barn and fence, encroaching sagebrush and erosion, and one's children growing up in illiteracy—all added up to frustration. The experience bred a spirit of desperation and defiance in these people."[72]

Conservative Democrats faced challenges from within as well. Although white Democrats were not divided by faith or ethnicity as they were in the North and Southwest, they were divided by class and by their views on revenue laws, temperance, economic development,

and other political issues. The party had alienated its rural, white-supremacist base by failing to protect moonshiners from the federal government, and it had collaborated with home-grown and foreign capitalists in the same way the Republican Party did, increasing taxes and giving away public land to subsidize railroads and other corporations. And self-employment did not die an easy death among poor and middle-class white supremacists in the South, because wage work and tenancy were associated with being black. Working alongside blacks as sharecroppers, railroad laborers, coal miners, or convict laborers was utterly humiliating for southern whites. They wanted a government that would help them while keeping blacks in their place.

The Democrats had plenty of schemes to help people get rich, but those schemes were expensive, and they brought prosperity only to those few citizens who had the wherewithal to join the scramble to control coal, timber, and farm land. Those who were too poor or who lacked the entrepreneurial drive to participate became sharecroppers or wage laborers. The middle ground was shrinking. By the time the bottom fell out of the cotton market in the late 1880s, the Democrats were in disarray. The post-Reconstruction political settlement had finally failed, and with it went the political stability that had kept homicide rates in check.[73]

This political upheaval was responsible for the rash of lynchings that hit the South in the late nineteenth and early twentieth centuries. Terrorists and vigilantes did not kill as many people as they had during Reconstruction, but in the 1890s and early 1900s lynchings claimed at least 0.24 whites and 2.4 blacks per 100,000 adults per year across the South. Rates for everyday homicides also rose, from 12 to 23 per 100,000 in the mountains of north Georgia, from 16 to 30 per 100,000 in former plantation counties in the Georgia Piedmont, from 27 to 71 per 100,000 in South Carolina, and from 125 to 800 per 100,000 in the upper Cumberland of Kentucky and Tennessee (Figures 4.1, 5.5, and 8.1). These places were more violent than most, but by the late 1920s and early 1930s homicide rates had reached 15 to 25 per 100,000 in most border states and 25 to 40 per 100,000 in the Deep South. Those rates were much higher than they had been before the Civil War or in the late 1870s and early 1880s. Arrest rates for homicide also rose in cities in the South and the border states between the late 1880s and World War I. Homicide rates held steady only in Virginia, where white

conservatives did not face a serious challenge from Republicans or Populists or dissident Democrats (Figure 5.6). The South was not as homicidal as it had been during the Civil War or Reconstruction, but in these decades the South surpassed the Southwest as the most homicidal region of the United States.[74]

In northwestern Georgia, the authors of the renewed violence were frustrated Democrats, who turned to vigilantism to express their anger at the federal government's revenue laws and at violations of the color line. Some lived in the mountains; some lived in and around Dalton, a railroad town of 4,000 inhabitants that served as the metropolis of the area. The vigilantes had prominent spokesmen, but the rank-and-file were below average in wealth, and, like many southern farmers, they were trapped by the crop-lien system and low cotton prices, and they could not find a commodity other than liquor that could get them



Figure 8.1  South Carolina homicide indictment rate and Georgia homicide rates, 1885–1914 (per 100,000 adults per year). Georgia plantation counties: Franklin, Jasper, and Wilkes; Georgia mountain counties: Gilmer and Rabun. *Source:* South Carolina: Moore (2006: 130–131).

out of debt. They murdered people sporadically in the mid-1880s. In 1885, for example, nightriders gave notice that they would protect the "good people" of Dalton against thieves, prostitutes, and miscegenationists. They burned five suspected brothels in Dalton and killed Tom Tarver, a black man who lived with a white woman. In northern Georgia in 1886 moonshiners killed two federal deputies and four guides who had been helping revenue agents, and in Rabun County in 1888 the Hopkins brothers stoned to death a temperance man as he came out of a service at Mount Carmel Church.[75]

The violence escalated in 1888–89, when the vigilantes decided to put their activities on a more organized footing. In Murray County they began to work through the Distillers Union; in Gilmer County, through the Working Men's Friend and Protective Organization; and in Gordon County, through the Grange. John L. Edmondson, a wealthy landowner who supported the vigilantes, assured the public that they were "all good democrats, every one of them, and they voted all right, too." Nevertheless, these groups felt that the party had not gone far enough to protect white farmers and their families, and they were determined to take control of their communities. They horse-whipped prostitutes and shot three blacks in Dalton who were organizers for the Populist Party. They also used their organizations to settle personal scores. But most of their targets were people who interfered with the moonshine business. Henry Worley had been a moonshiner himself, but when he was indicted for whipping an informant, he cut a deal with federal agents and gave up his friends. Thirty men grabbed him, strung him up in a tree, and told him to leave town. He refused, and they shot him dead in his field two weeks later.[76]

The vigilantes launched at least sixty-six raids in northwestern Georgia between 1889 and 1894, but they could not withstand the combined opposition of the Republican Party, the Populist Party, the Farmers' Alliances, and Democratic merchants and townspeople who felt that lawlessness was bad for business, especially when it came to attracting outside investors. With the help of federal prosecutors, the principal vigilantes were brought to justice and their societies forced underground. However, the killing continued. Moonshiners continued their reign of terror against people who cooperated with law enforcement. Andrew Wilburn of Rabun County fired his Winchester into the home of Joseph Crumpton a few nights after his still was

destroyed. The bullet passed through Crumpton's body and killed his daughter Sallie. The Morrow brothers, who had belonged to the White Cap Club in Gordon County, discovered that although vigilantism was enjoyable, it was not very profitable. They graduated from killing informants to robbing trains, stores, and post offices.[77]

Ministers and temperance advocates wrestled with the moonshine culture, with very little success. The Reverend Jim Kimmons went on a crusade against moonshining in the neighborhood around Mount Pisgah Church in Gilmer County, and the moonshiners paid him back by drinking and rioting around his church on Sundays. The hostilities went on for five years, until Carter Lingerfelt, a teenaged moonshiner, returned from a few weeks in jail in Dalton. Kimmons had helped secure his early release, but Lingerfelt was convinced that Kimmons had informed on him. He made a grand entrance into Kimmons' church on Christmas Eve, then waited for him by the door. When Kimmons emerged, flanked by his brother, words were exchanged, and Lingerfelt took a swing at Kimmons. Kimmons and his brother pulled out their guns and opened fire. The wounded Lingerfelt tried to run, but the Kimmons brothers went after him and shot him until they were sure he was dead.[78]

The revenue war took dozens of lives in northern Georgia in the 1890s and early 1900s. It also reinforced hatred of the federal government and bred a backcountry lawlessness that still exists today. People died in feuds and revenge killings, many of which had originated years before in disputes over liquor. Similar conflicts broke out elsewhere in the South, although not all of them involved moonshine. In Cumberland County, Kentucky, near the Kentucky-Tennessee border, battles erupted between Republican farmers and the descendants of Democratic planters. The planters who lived in the fertile bottomlands had supported the Confederacy, but the farmers who lived in the uplands and made up the great majority of the county's population had supported the Union. After the war the county was firmly Republican, but frustrated Democrats fiercely contested every election, and confrontations between Republicans and Democrats were common.[79]

Cumberland County's Democratic minority could never defeat the white Republican majority, but some of them tried to reclaim a piece of the good old days by tormenting the county's blacks. Former slaves had purchased a colony called Coe Ridge, where they got along by

logging, farming, moonshining, and performing seasonal labor for whites. They lived without incident until the late 1880s, when young men from Democratic families—the Taylors, Shorts, Capps, Pruitts, Longs, and Vaughns—started to harass them. Most of the whites were related to a noted Confederate guerrilla, and they all lamented the Lost Cause. They had not prospered since the Civil War, and they resented the fact that the Coe Ridge blacks were doing well. They had also heard a rumor that Calvin Coe, a leader of the black community, had courted the wife of a Taylor who had been in prison. Coe denied that accusation, but the Taylors and their friends were determined to run Coe and the other Coe Ridge blacks out of the county and reestablish white supremacy.[80]

The whites began by harassing the Coe Ridge children. They stole chestnuts that the children had gathered. They vandalized the Coe Ridge school and destroyed the children's books and slates. Then they caught some of the children and tortured them, skinning their faces and burning their feet. Finally, in the summer of 1888, Will Taylor, Pat Pruitt, Ike Short, and Charles Short hiked up the ridge to kill Calvin Coe. They shot at Coe and his friends, wounding Oleson Wilburn. The blacks did not have guns, but they charged the whites with knives. Coe stabbed at Taylor and knocked down his gun every time he tried to fire, and when Taylor refused to give up, Coe cut his throat. Coe surrendered to the sheriff, claiming self-defense. He was released because Will Taylor's friends refused to testify: they wanted to kill Coe themselves.

One hundred whites planned to attack Coe Ridge later that month to "finish" the settlement. All but three Coe men and three teenaged boys were away on the Cumberland River rafting logs, but they were warned of the attack by a white neighbor. They immediately bought up all the ammunition at the local store and set up an ambush. When the firing began, all but fifteen of the whites fled. The battle went on for nearly twenty-four hours, until the whites finally rode off, their losses unknown.[81]

Emboldened by this victory, Calvin and Little John Coe began courting two white girls, Molly Ballard and Nan Anderson. The Coe Ridge colony had always been a place where "fallen" white women—unwed mothers, prostitutes, petty criminals—could find a home. But Ballard and Anderson were respectable young women who were simply at-

tracted to the Coes. The couples eloped in July 1889, but they were caught at a station just up the line. Vince Ballard, Molly's father, ambushed Calvin Coe, and Bill Irvin tried to kill Little John Coe, but they shot Oleson Wilburn and Joe Coe by mistake.[82]

Ballard and his friends gave up, but the Taylors tried one more time to kill the Coes. On election day in November 1892 George Taylor walked up to Calvin Coe, put a pistol to his head, and fired. The bullet failed to penetrate his skull, however, and Yaller John and Little John Coe ran after Taylor and shot him down. Yaller John, who had bent the barrel of his gun crushing Taylor's skull, grabbed Little John's gun and said to the whites who had gathered round, "Here's another one just as good. Do you take it up? If you do, step in his shoes. Any man here on the ground wants to take it up, let him step in his shoes." Calvin, who had just regained consciousness, asked, "did you kill the —— man?" "Yes," replied Yaller John, "we landed the son-of-a-bitch in hell."[83]

The Coes were vindicated in the county court. Little John was acquitted, and Yaller John was sentenced to two years in prison, not for murder but for abusing a corpse. Living in a county dominated by white Republicans, they had the sympathy of most whites. In most southern counties, blacks were not so fortunate.

Militant Democrats also went after white Republicans and Populists during these years. Over 700 blacks and whites were lynched in the South between 1889 and 1893, the peak years for such crimes, and the numbers remained high for the next two decades as conservative whites fought for control of the South. Lynching victims were almost always accused of murder, attempted murder, arson, or rape, but the purpose of the lynchings was political. These crimes could have been handled by the criminal justice system, but vigilantes did not want justice to take its course: they wanted to send a message about who was really in charge to blacks and to whites whose actions they disapproved of. They did not lack faith in the government's ability to impose justice; they saw lynching as the only way to forestall change, maintain their position in society, and command respect from blacks.[84]

Anyone who threatened the conservatives' social order was a potential target: black landowners, interracial couples, and Republican and Populist politicians. Lynchings of blacks were most common in counties with the highest proportion of whites working as tenants or farm

laborers. They were also common in cotton counties, where landowners were determined to control and exploit black labor. When cotton prices were high, the number of lynchings fell, but when prices were low, and at times of the year when the demand for black labor was high, the number of lynchings rose. Lynchings were rare in counties along the coast of South Carolina and Georgia that were dominated by black Republicans and in mountain counties dominated by white Republicans. They were also less common in counties where the Populist Party flourished. But wherever the Democratic Party was strong, white militants vented their frustrations without fear of retribution.[85]

Much of the fight for control of the former Confederacy in the late 1880s and 1890s was overtly political. Fort Bend County, which like most of east Texas was firmly within the plantation South, saw eight political killings in 1888–1890. The county was divided between the Woodpecker faction, which had the support of blacks, who made up 85 percent of the population, and the Jaybirds, who had the support of most whites. It should have been impossible for whites to take over county government. But young white militants, led by "Red Hot" Frost, the owner of the Brahma Bull and Red Hot Bar, took up arms, paraded through the streets of the county seat, and threatened civil war if the Woodpeckers did not surrender. In the weeks before the election of 1888, a wealthy planter who had pressured blacks to vote for the Jaybirds was killed by a black man whom he had caught stealing cotton. Spurred on by that killing, the Jaybirds ran influential blacks out of the county, including the county clerk, two county commissioners, two schoolteachers, and two successful businessmen. The Woodpeckers tried to make peace by electing an all-white slate of officeholders, but the Jaybirds were not satisfied. The feud blew up again in June 1889, when the county assessor, Kyle Terry, killed a Jaybird, Ned Gibson. The Texas Rangers were sent to keep the peace, but in August a full-scale battle broke out in front of the county courthouse. Red Hot Frost was killed, along with two Woodpecker lawmen and a young black girl who was caught in the crossfire. Kyle Terry won a change of venue to Galveston, but it did him no good. He was murdered in the Galveston courthouse. Woodpecker leaders fled, and the Jaybirds took control. One Texas Ranger summed up whites' satisfaction with the outcome of their campaign: "The ne-

groes thereafter stayed on the plantations, worked and kept out of politics."[86]

Democratic militants terrorized and murdered Populists as well in the last two decades of the century. In the gubernatorial election in Georgia in 1892, Democrats murdered fifteen Populists and threatened others in an effort to keep Populist voters away from the polls. The Democrats won the election only because they controlled local election boards and committed massive voter fraud. In Hall County, in the Texas Panhandle, the Democratic cattlemen were pitted against Populist homesteaders. The governor once again sent the Texas Rangers to stop the killing, but the Rangers simply sided with the cattle barons. In San Saba County, in the hill country, Democratic vigilantes ran blacks and sheepherders out of the county in a running battle that took between twenty and fifty lives before it finally ended in 1896. In Orange County, located in the plantation belt of east Texas, Populists and Republicans together controlled the courts, the sheriff's office, and the county commissions. In 1899–1900 Democrats used every means at their disposal, including arson, lynching, assassination, and armed assaults, to cripple the Populist and Republican leadership, drive blacks out of the county, and restore white rule.[87]

In Grimes County, another plantation county in east Texas, Democrats organized the White Man's Union in 1899 to disfranchise blacks and restore Democratic rule. Waxing poetic, one of its members wrote that

> Twas nature's laws that drew the lines
> Between the Anglo-Saxon and African races,
> And we, the Anglo-Saxons of Grand Old Grimes,
> Must force the African to keep his place.

The White Man's Union took control of the county militia unit and simply assassinated the county's leading black politicians: Jim Kinnard, a Republican who had long served as country clerk; and Jack Haynes, a Populist farmer. After the killings, blacks and white Populists fled the county by the hundreds, leaving the county's Populist sheriff, Garrett Scott, to fend for himself. Scott told a Union leader to "go and get your Union force, every damn one of them, put them behind rock fences and trees and I'll fight the whole damn set of cowards." But

Scott and the remaining Populist leaders could not protect their constituents, and the Union triumphed in the election of 1900, garnering over 1,400 of the county's 1,800 votes (4,500 had voted in the election of 1898, before the terror began). The day after the election, the Union men rode into the county seat and started shooting. The gun battle lasted five days. Finally a light infantry company from Houston rescued the wounded sheriff and his deputies and escorted them out of town. The sheriff's brother and a Populist shopkeeper had been killed, as had the Union leader who had shot them. Similar fighting broke out in dozens of communities across the South where Democratic minorities tried to seize power.[88]

All southern Democrats wanted to avoid federal intervention in elections, and some hoped to lessen the need for fraud and violence at the polls. In pursuit of those goals they introduced new measures to maintain the color line and to suppress voting by political adversaries. Conservatives had passed an array of state laws since Reconstruction, all of which were carefully worded so as not to run afoul of the Fourteenth and Fifteenth Amendments or the Civil Rights Acts of 1866 and 1875. Redeemers in Louisiana, for instance, had simply repealed the 1869 law that banned segregated schools and left it to school boards appointed by their state superintendent of education to establish separate schools for blacks and whites. Virginia's conservatives passed a poll tax that effectively disfranchised the 20–40 percent of voters in predominantly black counties in the Tidewater and the area south of the James River who failed or were unable to pay the tax. By the end of the century, however, militant Democrats grew bolder. Henceforth, in the interest of ensuring peace and racial purity, blacks would be segregated from whites in all public places. To "improve the tone" of politics—that is, to check the power of poor voters—blacks (and in some states poor and illiterate whites) would be permanently disfranchised. Militant Democrats wanted to ensure that blacks and poor whites would never again be able to form a political coalition.[89]

Democrats passed a number of laws between 1889 and 1908 that brought them closer to that goal. Mississippi enacted an election law in 1890 that required voters to live in the state for two years prior to voting (and in the election district for one year), to register four months before an election, to pay a poll tax of $2 for two years before an election, and to "give a reasonable interpretation" of any passage of the

state constitution—requirements that made it difficult for the poor and transient to qualify and that allowed registrars to reject any applicant they wished by applying the "understanding clause" arbitrarily. A Louisiana law respected the federal government's right to regulate interstate commerce but required railroad companies to maintain separate passenger cars for blacks and whites on intrastate routes. The Supreme Court allowed such laws to stand, the former because it did not bar citizens from voting on the grounds of race, color, or previous condition of servitude, the latter because it merely provided separate facilities as a matter of public policy and did not stamp blacks "with the badge of inferiority," in the words of Justice Brown in *Plessy* v. *Ferguson* (1896).[90]

Civil rights activists tried to overturn such laws, but Congress had not been able to pass a civil rights bill since 1875, thanks to lukewarm support among some northern and western Republicans and implacable opposition from congressional Democrats, not one of whom had voted for a civil rights law since 1865. When the Democrats won control of Congress in 1892, they repealed the election laws of 1870–1872, making it impossible for federal officials to police elections or suppress political terrorism in the South. With the federal government stymied, southern Democrats were free to forge ahead with their agenda of disfranchisement and segregation.[91]

Republican leaders would not get very high marks for their efforts to protect voters and candidates from violence and to ensure that elections were fair, and Populist leaders contributed to their party's defeat by fusing with the Democratic Party in the presidential election of 1896 and giving up their platform in return for a promise to issue silver coins that could ease the credit crunch. But it is difficult to see how either party could have defended itself and its voters without launching another civil war, or how either party could have defeated the white-supremacist campaign. Too many blacks and whites still feared and distrusted each other, even when they had common interests, and too many whites were determined to kill rather than share power with blacks.

The impact of the Democrats' victory on homicide rates among whites in the South was complex. Militant Democrats certainly concocted the perfect recipe for higher homicide rates. They tolerated lynching and terrorism against white criminals, dissenters, miscegena-

tionists, and moral reprobates. They humiliated poor whites by making it more difficult for them to vote, and they crushed middle-class dissidents by stealing the votes they cast. They opposed policies that could have benefited poor and middle-class farmers and workers, and most of the time they were openly corrupt. Their governments were illegitimate in the eyes of many whites, and they made it impossible for many men to achieve the standing in society they felt they deserved. But militant Democrats accomplished one thing that had the power to deter homicide among whites: they created a caste society in which it was an honor simply to be white, and they invited poor and middle-class whites to help them enforce caste boundaries through racial terrorism. Men did not have to vote to feel the power that came from being white in a caste society, or to feel a kinship with other whites, regardless of class. These factors probably explain why the homicide rate declined modestly among whites in the first two decades of the twentieth century after peaking in the late 1880s and 1890s.

The impact of the militant Democrats' victory on homicide rates among African Americans was anything but modest. The violence, the denial of rights, the loss of life, the destruction of the black community's political leadership, and relegation to the bottom of the social hierarchy as de facto slaves left many blacks, especially young men, feeling angry, powerless, humiliated, and hopeless. They knew full well that southern governments were illegitimate, that they were supported by fraud, murder, and the denial of basic rights. They were also aware that they had been abandoned by the federal government.

Blacks who had grown up in slavery, like Aaron Bosket of Edgefield County, submitted humbly to such oppression, but their sons, to whom slavery was but "a dim recollection of childhood," reacted very differently. Du Bois observed that they either "sank into listless indifference, or shiftlessness," or swaggered with "reckless bravado." Aaron's son Pud was one of the reckless ones. Determined to win respect by being "bad," he cultivated a tough, menacing exterior and demonstrated repeatedly that he was willing to use violence. He and his contemporaries carried pistols and knives to protect themselves against white bullies and predators, but they were more likely to use those weapons on other blacks as they fought for scraps of dignity within their communities. Too many died trying to prove their manhood at each other's expense. A few of them gave vent to their frustrations by going on

rampages against whites, which almost invariably ended in their own deaths.[92]

On Coe Ridge, Calvin, Little John, and Yaller John Coe had reason to be proud of their victory over the Taylors on election day in 1892. They had fought bravely, and they believed that they would succeed in the end by being fearless, working hard, educating their children, and trusting in God. Younger men, however, took a different lesson from violence of that day and others like it. Racial oppression and the killing of innocent men like Oleson Wilson and Joe Coe convinced the next generation that they had no hope of changing southern society. The triumph of white supremacists across the South confirmed that conclusion and persuaded many young blacks that trying to live by their fathers' rules—work hard, go to school, trust in God—was pointless.[93]

Once the timber on the Coes' land was cut and the rocky soil on their mountain farms played out, they were forced to rely on gambling, prostitution, and moonshining, and young black men soon learned that the way to succeed in those businesses was to intimidate and prey on others. They didn't wait for trouble—they went looking for it, even within the black community. One Coe Ridge youth, Sherman Wilburn, tried to kill a teacher who had disciplined him, and when his father punished him for the attempt he ran away. He found work as a rafter guiding logs down a river, but the timber entrepreneur who purchased the logs from Wilburn's employer refused to keep him on, in violation of local custom. Two days later the man reconsidered and offered Wilburn the job, but Wilburn was so angry about being dismissed that he shot him. The fellow returned fire and killed Wilburn.[94]

Another Coe Ridge youth, Jesse Coe, got into an argument with a riverboat captain in Celina, Tennessee, in 1896. The captain pulled a pistol and shot him, but Coe wrenched the pistol from the captain and shot him dead. He did his time in prison, and when he came home he was "like a wild Indian," so full of rage that even his friends shied away from him. He left the Ridge for Indianapolis in 1901. There he quickly earned a reputation as a dangerous character. He carried a pistol with him at all times and boasted that he would "burn" any police officer who harassed him. One night two police officers asked him where his friends were, and he shot them both dead. He fled to Coe Ridge and

hid in a cave for months, but a neighbor who feared reprisals from whites revealed his hiding place, and local law officers crept up on him and killed him.[95]

Alienated young black men posed a problem everywhere in the South. Law enforcement responded by hounding young blacks, trying to stamp out rebelliousness when the first signs appeared. But police harassment drove some young black men to commit suicidal acts of aggression against whites. Centuries of white violence against blacks had convinced them that every black man was "born under a sentence of death," and they resolved that if they were ever caught in a situation in which they felt they might be killed, they would take as many whites with them as they could. In 1900 Robert Charles, a young Mississippian, was being bullied by a group of New Orleans police officers. He pulled a gun and started shooting. He killed seven whites (four of them police officers) and wounded twenty before he was killed. In revenge, white mobs killed six blacks and wounded seventy. Hundreds of similar incidents occurred across the South. In 1915 J. P. Williams, the police chief in Monticello, Georgia, raided a "blind tiger" (an illegal saloon) in the home of Dan and Matilda Barber. The Barbers and their customers jumped Williams, and they were beating him when Williams pulled a gun and shot Matilda Barber in the face. Dan Barber seized Williams' pistol, but it misfired, and he yelled to his son to bring his shotgun. Williams grabbed his gun again and fired twice, wounding Matilda again. At that point reinforcements arrived to rescue Williams and arrest the Barbers. Matilda survived, but a lynch mob came to the jail that night and hanged her husband, son, and daughters.[96]

Every kind of murder increased within the black community as the frustration of young black men intensified. Killings occurred when men faced off over a debt, a card game, or a point of honor. Abe Banks of Franklin County, Georgia, owed Orange Rucker a quarter, and Rucker owed Banks a dollar. One Saturday night Rucker asked Banks's wife for the quarter, and, not knowing about the dollar owed her husband, she paid him. Banks was furious when he found out about the quarter. He pounded on Rucker's door at midnight, demanding his money, and when Rucker wouldn't open the door he broke it down; Rucker grabbed his gun and shot Banks. Someone threw a bottle during a party in Machen, Georgia, hitting Tink Thompson. Thompson had no idea who had thrown the bottle or if it had

been aimed at him, but he was furious at having been treated with disrespect. His friends told him to put away his pistol, but he worked his way through the crowd, determined to find the man who had hit him. He picked King Johnson, a section hand on the railroad, and shot him in the head.[97]

Young men began carrying handguns everywhere—even to church. On the way home from a Sunday evening service in Jasper County, Georgia, Fred Nolley decided to make the boys walking behind him "hop" by firing his new, nickel-plated pistol at them. Unfortunately, his aim was poor, and he killed one of them. By 1905 this kind of recreational shooting had become extremely popular among both blacks and whites in the South. They shot off their guns after church, at revival meetings, at picnics, and at neighborhood dances. Unheard of in the rural North, the custom gave young men an opportunity to show off their guns, practice their marksmanship, impress women, and—perhaps most important—make other men lose face when they flinched. The authorities fined dozens of blacks and whites for carrying concealed weapons at each term of the county court, but these efforts had little effect: too many men felt the need to impress others. When asked about the custom, they claimed that they needed guns to protect themselves. Arms ostensibly carried for self-defense, however, were used most often against friends and acquaintances.[98]

Older members of the black community deplored the recklessness and viciousness of the new generation. To them it seemed that young men had lost their moral bearings, and events all too often seemed to confirm that belief. Katherine Curry, an elderly black woman who ran a kitchen in Lavonia, Georgia, had a reputation for kindness. She was up all hours, fed people whenever they needed a meal, and charged just enough to keep herself and her business going. Moot Teasley, a sixteen-year-old boy who chopped stovewood for her, decided that she must have lots of money, since her business was good, and one day he beat her to death, burned her body, and took all the money she had, which turned out to be $30. No one could explain why he did it—not even Teasley himself. He came from a good home, and Mrs. Curry had always treated him well.[99]

Segregation, disfranchisement, and lynching darkened the lives of young African Americans in ways that their elders could not always understand. Although the reversals of the late nineteenth and early twen-

tieth centuries did not completely destroy a sense of progress among those old enough to remember slavery, they crushed the hopes of blacks born free or freed at an early age. They were outraged at being treated like slaves. They could not abide being forced back down the social ladder and having their destiny controlled by outside forces. The reversals they suffered, like the persecution and discrimination that minorities endured in the urban North and Southwest, fostered resentment and alienation, led them to divert their energies into criminal enterprises, and created a heritage of anger and violence that was passed down through successive generations. The growing homicide problem among black southerners was not caused by slavery or by the failure of Reconstruction to create a racially egalitarian society. It was caused by the hopelessness and rage that the political disaster of the 1890s and early 1900s engendered. Only the frontier, the Revolution, the Mexican War, and the Civil War produced conditions that were more conducive to homicide than those that were created by turn-of-the-century white-supremacist governments.

CHAPTER 9

# The Problem Endures

*Homicide from World War I to the Present*

Unfortunately, the kinds of homicide statistics that are available for colonial times through the nineteenth century are not yet available for the twentieth century. The official data gathered by state and local governments and collated by the Census Bureau, the National Center for Health Statistics, and the Federal Bureau of Investigation should have made it relatively easy to carry the story of homicide in the United States down to the present day. State departments of vital statistics have collected data on homicides since the early twentieth century. However, the data record only the number of victims, not the circumstances of their deaths. The FBI has tried to address that problem since 1976 with its Supplementary Homicide Reports, but some law-enforcement agencies have not reported their data to the FBI, and those that have reported have been reluctant to specify motive and circumstance in cases that have not been closed by arrest or conviction.[1] Thus the data cannot be used to determine rates for specific kinds of homicides, like marital or robbery murders, or rates for specific demographic groups, like Hispanics or the Irish. Nor can they be used to determine homicide rates for minorities below the national level, because before 1968 the state and local data classified African Americans, Asian Americans, and Native Americans jointly as nonwhite. A comprehensive history of homicide since World War I will require the use of multiple sources to reconstruct individual cases, just as the his-

# The Colt Heritage

## by R. L. Wilson

### The Official History of Colt Firearms from 1836 to the Present

With Nearly 250 Original Illustrations in Full Color

Photographed by Sid Latham

Simon and Schuster

OTHER BOOKS BY R. L. WILSON

Samuel Colt Presents

The Arms Collection of Colonel Colt

L. D. Nimschke Firearms Engraver

The Rampant Colt

Colt Commemorative Firearms

Theodore Roosevelt Outdoorsman

Antique Arms Annual (editor)

The Book of Colt Firearms

The Book of Colt Engraving

The Book of Winchester Engraving

Colt Pistols

Paterson Colt Pistol Variations

All rights reserved
including the right of reproduction
in whole or in part in any form
Published by Simon and Schuster
A Division of Gulf & Western Corporation
Simon & Schuster Building
Rockefeller Center
1230 Avenue of the Americas
New York, New York 10020

"Model 'P'" and "Caliber and Types of Arms" (see
Table 5 in the Appendix) from *The Peacemaker and
Its Rivals* by John E. Parsons. Copyright © 1949, 1950
by John E. Parsons. By permission of William Morrow
& Company

Designed by Martin S. Moskof
Manufactured by A. Mondadori Editore, Verona, Italy

1  2  3  4  5  6  7  8  9  10

Library of Congress Cataloging in Publication Data
Wilson, Robert Lawrence, 1939-
The Colt heritage.

  Bibliography:   p.
  Includes index.
  1.   Colt firearms—History.   I.   Title.
TS533.2.W54          683'.4          79-10181
ISBN 0-671-24827-8

The Colt Heritage commemorative revolver, a special edition
of the Walker Model, totaling 1850 cased sets. The deluxe
edition of *The Colt Heritage* is serial-numbered to match
accompanying revolver. Specimen illustrated is the prototype
set.

and .30, and rimfire and centerfire .32, .38, and .41). Bird's-head-type grips predominated, and the shortest of barrel length was 2¼", the longest (a special order) 10". When removed, cylinder pins doubled as ejector rods. Of all types a 108,000 specimen total was produced, the last model leaving the assembly line in 1886.

One means of classifying the New Lines is if the configuration dates pre-1876 (the First Model) or post-1876 (Second Model). First Models are easy to recognize by the stop slots on the outside surface of the cylinder and the short cylinder flutes. Second Models have stop cuts on the back end of the cylinder and flutes running most of the chamber length; some examples were fitted with loading gates, and usually the barrels were stamped with an 1874 patent date. Quite desirable to the collector are pistols marked by the factory with special trade names, ordered by the prominent distributor B. Kittredge & Co., Cincinnati. The .22 was known as The Little Colt; the .30, The Pony Colt; the .32, The Ladies Colt; the .38, The Pet Colt; and the .41, The Big Colt.

In 1880 a fresh variation joined the New Lines, known as the New House Pistol. Featuring such Second Model styling as long cylinder flutes and a loading gate, these arms are easy to identify from the squared-off butt profile and the standard

2¼" barrel. COLT HOUSE or NEW HOUSE and the caliber designation are etched or stamped on the left side of most barrels.

The last of the New Line variations appeared in 1882 under the name "New Police." Because of the unusual grips, embellished with a police-and-robber motif, modern collectors call these arms the Cop and Thug. Pistols were built in a 2¼"-barrel type without ejector, or in 4½", 5", and 6" lengths with ejector. The Cop and Thug was the only New Line variation made with ejector rods mounted on the barrels. The entire production was of the Second Model styling, and standard on the left side of the barrel was the etched or stamped legend NEW POLICE [caliber] or COLT NEW [caliber]. The squared butt profile is another identifying detail of the Cop and Thug group.

In its series of deringer and pocket revolvers Colt's concentrated on a market increasingly glutted by cheap imitations. Stubbornly maintaining high quality standards, the firm was eventually forced to drop every model because of the successful proliferation of cheap competitor types. The cartoon "Our Colt and How We Drove Him" was devised as a pointed rejoinder to those manufacturers who were to blame for the high volume of inferior firearms, known today as "suicide specials."

Colt's cabinet of arms as photographed in the main building of the Philadelphia Centennial Exhibition, 1876. A potpourri of over 300 firearms made up this most imposing of all company displays. Examining the original photograph under powerful magnification reveals that most handguns were engraved, their grips of ivory, ebony, pearl, or select walnut. Over the years some pieces remained in factory service as show guns; most were sold off or given away. A few are now in the Colt Collection at the Museum of Connecticut History, Hartford. The splendid walnut display case was broken up for lumber by an incredibly ignorant janitor, and only the COLT'S FIRE ARMS CO. and rampant-colt finial have survived.

"Our Colt" is the sad tale of a gullible public rating products solely on price. Colt preferred to cease manufacture of pocket spur-trigger pistols, rather than lower quality standards.

172     173



# "OUR COLT,"
## and how we drove him.





# COLT
# GUNS

## By MARTIN RYWELL

## PIONEER PRESS
### HARRIMAN, TENNESSEE

# CONTENTS

| Chapter | Page |
|---|---|
| 1. Samuel Colt, biographical sketch by Martin Rywell | 5 |
| 2. Rotating Chambered-Breech Firearms by Samuel Colt | 18 |
| 3. Testimony Before Parliament Committee (Extracts) by Samuel Colt | 50 |
| 4. The Colt Revolver in 1863 by J. D. Butler | 57 |
| 5. Visit to Colt Armory in 1863 by Henry Barnard | 61 |
| 6. U. S. Army and Navy Orders of Colt Arms, 1841 to 1857 | 66 |
| 7. Colt Arms Manufactured from 1856 to 1865 | 68 |
| 8. Manual for Colt Revolvers | 69 |
| 9. Letter to Samuel Colt's Son by I. W. Stuart | 73 |
| 10. On the Death of Samuel Colt by L. H. Sigourney | 75 |
| 11. Did Colt Invent the Revolver? by Martin Rywell | 78 |
| 12. Antique Colt Arms and Their Current Prices | 84 |
| 13. History of Firearms by Martin Rywell | 94 |
| 14. Etymology of Firearms Terms by Martin Rywell | 97 |
| 15. Illustrations | 98 |

Compendium_Rivas
Page 097

CHAPTER SIX

# U. S. WAR DEPARTMENT AND NAVY ORDERS OF COLT FIREARMS

## AND PRICES PAID THEREFOR FROM 1841 TO 1857 INCLUSIVE

### UNITED STATES ORDERS—WAR DEPARTMENT

| Date | Quantity | Item | Price | Total |
|---|---|---|---|---|
| 1841—March 2........ | 100 | Carbines.......... | $45.......... | $ 4,500.00 |
| July 23......... | 60 | " | " | 2,700.00 |
| 1847—January 4....... | 1,000 | Holster Pistols.... | 28......... | 28,000.00 |
| November 2..... | 1,000 | " " | .... " | 28,000.00 |
| 1849—January 8...... | 1,000 | " " | 25...... | 25,000.00 |
| 1850—February 4...... | 1,000 | " " | .... " | 25,000.00 |
| 1851—May 8.......... | 2,000 | " " | .... 24 | 48,000.00 |
| 1853— " 26.... | 1,000 | " " | .... " | 24,000.00 |
| 1855—January 15..... | 1,000 | " " | .... " | 24,000.00 |
| July 27......... | 1,000 | Belts " | .... " | 24,000.00 |
| December 6..... | 100 | " " | .......... " | 2,400.00 |
| 1856—February 13.... | 200 | " " | .......... " | 4,800.00 |
| April 21........ | 370 | " " | .......... " | 8,880.00 |
| " 23........ | 125 | Holster " | .......... " | 3,000.00 |
| " 26........ | 100 | " " | .......... " | 2,400.00 |
| " 26........ | 100 | Belt " | .......... " | 2,400.00 |
| " 29........ | 55 | Holster " | .......... " | 1,320.00 |
| May 3.......... | 50 | " " | .......... " | 1,200.00 |
| June 10........ | 125 | Belt " | .......... " | 3,000.00 |
| August 14..... | 6 | " " | .......... " | 144.00 |
| September 19.... | 60 | " " | .......... " | 1,440.00 |
| 1857—January 7....... | 101 | Rifles.......... | 50. | 5,050.00 |
| " 7... | 500 | Belt " | .... 24 | 12,000.00 |
| April 13........ | 1 | " " | .... " | 24.00 |
| May 13........ | 250 | " " | .... 20.49 | 5,122.50 |
| " 18........ | 16 | " " | .... " | 327.84 |
| June 2........ | 100 | " " | .... " | 2,049.00 |
| " 4.......... | 10 | " " | .... " | 204.90 |
| " 13........ | 200 | " " | .... " | 4,098.00 |
| July 11........ | 150 | " " | .... " | 3,073.50 |
| August 12...... | 100 | " " | .... " | 2,049.00 |
| " 14...... | 300 | " " | .... " | 6,147.00 |
| " 20...... | 200 | " " | .... " | 4,098.00 |
| September 5.... | 150 | " " | .... " | 3,073.50 |
| November 3.... | 5,000 | " " | .... 18.47 11/12.... | 92,395.83 |
| " 21.... | 300 | Rifles.......... | .... 42.50 | 12,750.00 |
|  | 17,829 |  |  | $416,567.07 |

Compendium_Rivas
Page 098

*HANDBOOK OF COLT GUNS*

67

## NAVY DEPARTMENT

| | | | | | |
|---|---|---|---|---|---|
| 1852—July 10......... | 25 Army Pistols...... | $25.00 | .........$ | 625.00 |
| " " ......... | 50 Navy " | ...... " | ......... | 1,250.00 |
| " " ......... | 13 6-inch " | ...... 19.30 | ......... | 250.90 |
| " " ......... | 6 5-inch " | ...... 18.30 | ......... | 109.80 |
| " " ......... | 6 4-inch " | ...... 17.30 | ......... | 103.80 |
| 1856—June 16......... | 50 Navy " | ...... 18.64½ | ......... | 932.25 |
| 1857—May 21......... | 50 " " | ...... 19.43½ | ........ | 971.75 |
| June 16......... | 30 " " | ...... " | ........ | 583.05 |
| August 3....... | 50 " " | ...... " | ........ | 971.75 |
| September 28.... | 1,870 " " | ...... " | ........ | 36,343.45 |

19,979

$458,708.82

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | PRICE |
|---|---|---|---|---|---|---|
| Holster Texas Paterson | 36 | 4 to 6 7½ 9, 12 | Patent Arms Mfg. Co. Paterson, N. J. Colt's Pt. | 5s | Stagecoach Hold-up | $2500.00 |
| Belt Paterson | 31 34 | 4 to 6 | Patent Arms Mfg. Co. Paterson, N. J. Colt's Pt. | 5s | Centaur & Horsemen | $1250.00 |
| Pocket Paterson | 28 31 34 | 2½ to 4¾ | Patent Arms Mfg. Co. Paterson, N. J. Colt's Pt. | 5s | Centaur & Horsemen | $1000.00 |

84

**CHAPTER TWELVE**

**TABLES OF COLT ARMS**

*By MARTIN RYWELL*

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | MISC. & VARIATIONS | PRICE |
|---|---|---|---|---|---|---|---|
| Walker Dragoon | 44 | 9″ | Address Saml Colt, New York City U. S. 1847 | 6s | Indian & Dragoon Battle. Model U.S.M.R. Colt's Patent | No catch on loading lever. No. of Army Co. Mfgd. at Whitneyville 1847 | $1500.00 |
| Hartford Dragoon | 44 | 7½ | Address Saml Colt, New York City | 6s | Indian & Dragoon Battle | Shorter lever with two type catches | 300.00 |
| | | | | | Colt's Patent | 2nd Model—Locking bolt face rectangular | 300.00 |
| | | | | | | 3rd Model—7½, 8″ bbl. Cut for shoulder stock and had leaf sights | 300.00 |
| | | | | | | English Model—English Proofmarks but mfgd. at Hartford | 300.00 |
| Little Dragoon | 31 | 3 to 6 oct. | Address Saml Colt New York City Bracket marks are at both ends | 5s Held by pin | Indian & Dragoon Battle. Colt's Patent. | Straight Back Trigger Guard No loading lever | 150.00 |
| | | | | | | 2nd Model—Stagecoach holdup on Cyl., Round slots | 150.00 |
| | | | | | | 3rd Model—Has loading lever; rectangular slots | 150.00 |
| 1849 Pocket | 31 | 3 to 6″ Oct. | Address Saml Colt New York City Brackets at both ends Address Col. Saml Colt New York U.S. America Address Saml Colt Hartford Ct. Address Col. Colt London Saml Colt | 5s 6s | Stagecoach Hold-up Colt's Patent plus number | Few 6 shot cyl. | 50.00 |
| | | | | | | Wells Fargo Type 1-3″ oct. bbl.—no loading lever | 50.00 |
| | | | | | | 2nd type—Widened space bet. bbl. lug & cyl. | 40.00 |
| | | | | | | London Colt—2 British P.M. on cyl. and bbl. lug. Address Col. Colt London | 40.00 |

**HANDBOOK OF COLT GUNS**

85

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | MISC. & VARIATIONS | PRICE |
|---|---|---|---|---|---|---|---|
| Navy Belt 1851 | 36 | 7½ Oct. | Address Col. Saml Colt New York U.S. America. | 6s | Naval Battle Colt's Patent plus number | Few designed for shoulder stock. Few marked U.S. on frame or U.S.N. on butt. | |
| | | | Address Col. Colt London | | Type No. 1—Straight back guard; notched open top cyl. pin. | | 50.00 |
| | | | Address Saml Colt | | Type No. 2—Slotted cyl. pin. | | 60.00 |
| | | | New York City | | Type No. 3—Small rd. brass guard | | 60.00 |
| | | | Address Saml Colt | | Type No. 4—Larger guard—brass or iron | | 60.00 |
| | | | Hartford Ct. | | London Colt—P.M., rounder screw heads | | 70.00 |
| | | | Saml Colt (215,000 mfgd.) | | | | |
| Sidehammer Root Model Type No. 1 | 28 | 3⅜ oct. | Colt's Patent Address Saml Colt Hartford, Ct. U.S.A. | 5s rd. | Cabin & Indian | Standard Cyl. pin | $45.00 |
| Type No. 2 | 28 | 3½ Oct. | Colt's P't 1855 Address Col. Colt Hartford, Ct. U.S.A. | 5s rd. | Cabin & Indian | Standard Cyl. pin | 45.00 |
| Type No. 3 | 31 | 3½ Oct. | Colt's P't 1855 Address Col. Colt Hartford, Ct. U.S.A. | 5s fluted | Patented Sept. 10, 1850 | Standard cyl. pin | 40.00 |
| Type No. 4 | 31 | 3½ Oct. | Colt's Pt. 1855 Address Col. Colt Hartford, Ct. U.S.A. | | | m. "May 4, 1858" | 55.00 |
| Type No. 5A | 28 | 3½ rd. | Address Col. Colt New York, U.S.A. | 5s fluted | Patented Sept. 10, 1850 | Standard cyl. pin m. "May 4, 1858" | 50.00 |
| Type No. 5B | 31 | 4½ rd. | | | | | 45.00 |

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | MISC. & VARIATIONS | PRICE |
|---|---|---|---|---|---|---|---|
| Type No. 6A | 28 | 3½ rd. | Address Col. Colt New York, U.S.A. Larger type than 5A & B | 5s rd. | Stagecoach hold-up | Standard "May 4, 1858 V groove, end of cyl. pin | 45.00 |
| Type No. 6B | 31 | 4½ rd. | | | | | 45.00 |
| Type No. 7 | 31 | 3½ rd. | Address Col. Colt New York, U.S.A. | 5s rd. | Stagecoach | No marking and retained by screw thru cyl. rare | 45.00 |
| | 31 | 4½ rd. | | | | | |
| Type No. 8 | 31 | 4½ rd. | Address Col. Colt London | 5s rd. | Stagecoach hold-up (Mfgd. in Hartford) | "L" precedes No. & British P.M. | $50.00 |

Sidehammer Root Model 1855 common characteristics: iron; no trigger gd; stud trigger; creeping loading lever.

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | MISC. & VARIATIONS | PRICE |
|---|---|---|---|---|---|---|---|
| Army Holster 1860 | 44 | 7½, 8 rd. | Address Col. Saml Colt New York U.S. America Address Saml Colt Hartford Ct. Address Col. Colt London (200,000 mfgd.) | 6s ¾" rebated rear | Ship scene "Patented Sept. 10, 1850" | Type 1—Fluted cyl; 7½ bbl; navy size grips | 50.00 |
| | | | | | | Type 2—Civilian model—lacks shoulder stock grooves; smaller frame | 50.00 |
| | | | | | | Type 3—Cut-out and groove for shoulder stock | 75.00 |
| | | | | | | London Model | 50.00 |
| | | | | | | Stamped, "U.S." and has mixes number—ARSENAL RE-ISSUE | 25.00 |
| Navy Belt 1861 | 36 | 7½ | Address Col. Saml Colt New York U.S. America | 6s | Ship scene | 38,000 mfgd. | 60.00 |
| | | | | | | Experimental; Several with fluted cylinders | 60.00 |
| Pocket of Navy Caliber 1861 | 36 | 4½ 5½ 6½ Oct. | Address Col. Saml Colt, New York U.S. America Address Col. Colt, London | 5s ⅝" rebated rear | Stagecoach Hold-up Colt's Patent plus no. | Frame similar to 31 cal. Pocket Pistol | 50.00 |
| | | | | | | London Model (Hartford Mfgd.) | 50.00 |

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | MISC. & VARIATIONS | PRICE |
|---|---|---|---|---|---|---|---|
| Police 1862 | 36 | 4½ 5½ 6½ rd. | Address Col. Saml Colt, New York U.S. America. Address Saml Colt Hartford, Ct. | 5s Semi-fluted ⅝″ rebated rear | Pat. Sept. 10, 1850 | Brass trigger guards; few of iron. Frame similar to Pocket of Navy Caliber | 50.00 |
| Derringer No. 1 | 41 r.f. | 2½ oval, flat | Colt's P. & F.A. Mfg. Co. Hartford, Ct. U.S.A. No. 1 | S.S. | | Button right side for lock. All metal frame. No. 1 & No. 2 originally mfgd. by National Arms Co. | 75.00 |
| Derringer No. 2 | 41 r.f. | 2½ oval flat | Colt's Pt. F.A. Mfg. Co. No. 2 | S.S. | | and Bought by Colt. Mfgd. 1870 to 1890 | 50.00 |
| Derringer No. 3 | 41 r.f. | 2½ round | Colt's | S.S. | | Mfgd. 1875 to 1912—snap latch Type 1—Hammer spur erect | 50.00 |
| | | | | | | Type 2—Hammer spur curled | 50.00 |
| | | | | | | Type 3—Larger Butt | 50.00 |
| Old Line 22 S.A. 1870 | 22 r.f. | 2½ | "Colt's Pat. F.A. Mfg. Co., Hartford Conn., U.S.A. | 7s | Unmarked cyl. | No bbl. strap; sheath trigger | 25.00 |
| | | | | | | Type 1—Side rod ejector | 25.00 |
| | | | | | | Type 2—Without side rod ejector | 25.00 |
| | | | | | | Type 3—3″ bbl. no ejector | 25.00 |
| | | | | | | Type 4—3⅜ bbl.no ejector | 25.00 |

| MODEL | CAL. | BBL. | BBL. MARKING | CYL. | CYL. MARKING | MISC. & VARIATIONS | PRICE |
|---|---|---|---|---|---|---|---|
| House Pistol Cloverleaf "Jim Fisk" 1871 | 41 r.f. | 3rd | Colt's House Pistol, Hartford, Ct. U.S.A. | 4s | Cyl. is shape of Cloverleaf | Has ejector rod | 45.00 |
| | | | | | | Type 2—1½″ oct. bbl. | 40.00 |
| | | | | | | Type 3—1½ rd. bbl. Brass frame. Bbl. m. "Colt" and frame m. "Pat. Sept. 18, 1871 | 50.00 |
| | | | | | | Type 4—2⅛ rd. bbl.-5s-no ejector. Rd. cyl. Bbl. m. "Patent Sept. 19, 1871, Colt's House Pistol. Hartford, Ct., U.S.A. | 35.00 |
| | | | | | | Known as "Jim Fisk" because Jim Fisk of Erie R.R. murdered by this weapon. | |
| Army 1871 (1860 Army type) | 44 r.f. | 7½ | Address Co. Saml Colt, New York, U.S. America | 6s | Naval Battle 1.563″ long Colt's Patent plus serial no | Right side-rod ejector; no groove in breech portion. Brass back strap; not cut for shoulder stock; 3½ ounces lighter than 1860 army; Transition type; about 5000 mfgd. rare | 200.00 |

Compendium_Rivas
Page 102

| Model | Cal. | Bbl. | Bbl. Marking | Cyl. | Cyl. Marking | Misc. & Variations | Price |
|---|---|---|---|---|---|---|---|
| 1873 Peacemaker S.A. Army | 45 cf | 7½ rd. | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6s | Half fluted | Frame marked "Pat. Sept. 18, 1871, July 2, 1872, Jan. 19, 1875, U.S." mfgd. for 68 yrs. and 360,000 produced. Ejector. 7½ bbl. calvary; 5½-Artillery; 4¾ Civilian, 3 & 4" Special | 40.00 |
| | | | | | | 1875-Cal. 44 r.f. Henry. | |
| | | | | | | Hammer strikes top and not center of cartridge. 1900 mfgd. | 40.00 |
| | | | | | | 1878. Frontier Six Shooter Cal. 44-40c.f. Winchester | 50.00 |
| | | | | | | 1885-Cal. 41 c.f., 1886-38 & 38-40; 1887-32 & 32-20; | |
| | | | | | | 1888-22; after 1896 designed for smokeless | 40.00 |
| New Line S.A. Pocket | 41 r.f. & c.f. | 2½ rd. | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A., Colt New .41." | 5s | Half fluted | Frame m. "41 Cal." plus serial no. | 25.00 |
| | | | | | | "PET" Model—Cal. 38 c.f. or r.f. | 30.00 |
| | | | | | | "LADIES" model—Cal. 32 c.f. or r.f. | 25.00 |
| | | | | | | "PONY" Model—Cal. 30 r.f. with 2¾" bbl. or 1¾" bbl. | 25.00 |
| | | | | | | "LITTLE" MODEL—Cal. 22 r.f. 2⅜" bbl. | 25.00 |

| Model | Cal. | Bbl. | Bbl. Marking | Cyl. | Cyl. Marking | Misc. & Variations | Price |
|---|---|---|---|---|---|---|---|
| New Line Police & Thug S.A. | 38 r.f. | 2½ to 6" rd. | Colt's Pat. F.A. Mfg. Co., Hartford, Ct. U.S.A. (New Police .38" | 5s | Half fluted | Side-rod ejector and loading gate. Rubber grip with embossed representation policeman capturing thug | 50.00 |
| | | | | | | Short-barrel Model— Cal. 38 c.f. or r.f.; 41c.f. or r.f.—bbl. 2¼ & 2½"—no ejector grips with police representation | 45.00 |
| Lightning D.A. New Model | 38 c.f. | 2½ 3½ 4½ 6 rd. | Colt's Pt. F.A. Mfg. Co., Hartford, Ct. U.S.A. Colt D.A. 38. | 6s | ⅔ fluted | Loading gate but without ejector | 30.00 |
| | | | | | | 41 c.f. Model—various bbl. lengths | 30.00 |
| | | | | | | Side-rod ejector model 38 c.f. | 45.00 |
| Army D.A. Frontier | 45 c.f. | 7½ rd. | Colt's Pt. F.A. Mfg. Co. Hartford, Conn. U.S.A. 45 Colt | 6s | ⅔ fluted | Lanyard ring in butt; side-rod ejector | 35.00 |
| | | | | | | Philipine Model—large trigger—6" bbl. | 35.00 |
| | | | | | | Variations: 3½, 4" bbl. no ejector. 4¾, 5½, 7½ with ejector. Cal. 38-40, 44-40, 38 w.c.f., 44 w.c.f., 44 S. & W. | 35.00 |
| New Navy D.A. | 38 s. & l. | 6 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6s | fluted | Side swing cyl.—3 & 4½ bbls. also 1892 to 1908 | 35.00 |
| | | | | | | 1892 Model Cal. 41 s. & l. Cal. 38 s. & l.—two notches for locking bolts | 35.00 |

| Model | Cal. | Bbl. | Bbl. Marking | Cyl. | Cyl. Marking | Misc. & Variations | Price |
|---|---|---|---|---|---|---|---|
| New Army D.A. | 38 c.f. | 6 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. Colt D.A. 38 | 6s | fluted | Side swing Cyl. 1892 | 35.00 |
| | | | | | | 1894 Model—locking lever to lock cyl. | 35.00 |
| | | | | | | 1896 Model marked on grip | 35.00 |
| | | | | | | 1901 Model—has oblong lanyard swivel | 35.00 |
| | | | | | | 1903 Model—Smaller grip | 35.00 |
| | | | | | | 1905 MARINE CORP MODEL —Frame of butt marked "U.S.M.C." | 25.00 |
| New Pocket | 32 | 2½ 3½ 6 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6s | fluted | Blue frame or nickeled; also 32 S. & W. as well as 32 l. & s. Colt | 35.00 |
| New Police | 32 | 2½ 4, 6 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6s | fluted | Target Model—6" bbl. | 35.00 |
| Bisley | 45 | 7½ | Colt's Patent F.A. Mfg. Co. Hartford, Conn. U.S.A. Bisley Model 45 Colt's | 7s | ½ fluted | 1895 to 1912. BISLEY is English town where inter-national target shootings held. Side-rod ejector. Bbl. 4¾, 5½ Cal. 44-40 w.c.f. 44 S. & W. Russian, 41 l. 38-40 w.c.f. 32-20 w.c.f. | 100.00 |
| | | | | | | TARGET MODEL—Cal. 455 Eley, 44-40 w.c.f. 44 S. & W. special, 44 S. & W. Russian, 41 l., 38-40 w.c.f. 32-20 w.c.f.—7½ bbl. | 75.00 |
| | | | | | | POCKET MODEL—3" bbl. no side rod-ejector. | 40.00 |

| Model | Cal. | Bbl. | Bbl. Marking | Cyl. | Cyl. Marking | Misc. & Variations | Price |
|---|---|---|---|---|---|---|---|
| New Service | 45 | 4½ 5½ 7½ | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6s | fluted | Lanyard swivel. Side swing action. Ejector rod. 44 R. 44-40, 38-40 Cal. | 30.00 |
| | | | | | | 1909 U.S. ARMY MODEL | 30.00 |
| | | | | | | U.S. MARINE CORPS MODEL—smaller grip and frame butt marked, "U.S.M.C." | 30.00 |
| | | | | | | 1917 ARMY—Cal. 45 automatic cartridge | 30.00 |
| Officers' | 38 | 6 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6s | fluted | Officers' Model Target Also used 38 S. & W., Cal. 22 l.r. | 35.00 |
| Police Positive | 32 | 2½ 4 6 | Colt's Pt. F.A. Mfg. Co., Hartford, Ct. U.S.A. | 6s | fluted | Also 38 Cal. Police Positive Special bbl. 4, 5", 6" Cal. 32-20 & 38 Cal. | 40.00 |
| Camp Perry | 22 | 10 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | s.s. | fluted | | 75.00 |
| Detective Special | 38 | 2 | Colt's Pt. F.A. Mfg. Co. Hartford, Ct. U.S.A. | 6 | fluted | Identical w th Police Positive except for bbl. length | 35.00 |
| Official Police | 22 | 6 | Colt's Pt. F.A. Mfg. Co.. Hartford, Ct. U.S.A. | 6 | fluted | Adapted for high speed cartridges | 30.00 |
| Shooting Master | 38 | 6 | Colt's Pt. F.A. Mfg. Co., Hartford, Ct. U.S.A. | 6 | fluted | | 30.00 |
| Bankers' Special | 22 | 2 | Colt's Pt. F.A. Mfg. Co., Hartford, Ct. U.S.A. | 6 | fluted | | 30.00 |



# SEARS, ROEBUCK AND CO.

INCORPORATED.

## CHEAPEST SUPPLY HOUSE

ON EARTH

OUR TRADE REACHES AROUND

THE WORLD

AUTHORIZED AND
INCORPORATED UNDER
THE LAWS OF ILLINOIS
WITH A CAPITAL AND SURPLUS
OF $ 450,000.00
PAID IN FULL.

REFERENCE BY
SPECIAL PERMISSION
METROPOLITAN NAT'L BANK, CHICAGO
BANK OF COMMERCE        "
NAT'L BANK OF THE REPUBLIC   "
GERMAN EXCHANGE BANK, N.Y.

# CONSUMERS GUIDE

78 TO 96 FULTON
73 TO 87 DESPLAINES
AND 13 TO 31 WAYMAN STREET

## CHICAGO ILL. U.S.A.

CATALOGUE
Nº 107



IN CUBA'S DAWN OF LIBERTY, UNCLE SAM IS NOT TOO BUSY TO DELIVER TO US 15,000 LETTERS PER DAY.

# Catalogue No. 107

### IS THE

### LARGEST, MOST COMPLETE

### AND CONTAINS THE LOWEST PRICES

#### OF ANY BOOK EVER PUBLISHED BY US OR ANY OTHER HOUSE

## Preserve this Book for Reference

IT QUOTES THE LOWEST WHOLESALE PRICES ON EVERYTHING, and will prevent your storekeeper at home and others from charging you too much for goods.

ALL GOODS ORDERED FROM PREVIOUS CATA-LOGUES WILL BE FILLED AT PRICES NAMED IN THIS OUR CATALOGUE NO. 107 UNTIL OUR CATALOGUE NO. 108 IS ISSUED ✹ ✹ ✹ ✹ ✹ ✹ ✹ ✹ ✹ ✹ ✹

WHEREVER THERE HAS BEEN A REDUCTION IN PRICE WE WILL GIVE YOU THE BENEFIT and refund the balance to you. If an advance in price, we will charge you the advance. . . .

Prices are subject to the fluctuation of the market without notice to the purchaser; but only very staple goods, such as Sugar, Flour, Steel, Nails, Chains, are liable to decline or advance in price during the life of this catalogue. Otherwise there will be no change in prices quoted until catalogue No. 108 is issued.

### OUR LARGE CATALOGUE......

(THE CONSUMER'S GUIDE) is completely revised twice a year (in March and September). Please preserve this book until March, 1899, then write us for Catalogue No. 108, enclosing 15 cents to partly pay postage.

SEARS ROEBUCK & CO. CHICAGO



# CONSUMERS GUIDE No 107

## FOR·15·CENTS

## WE MAIL THIS BOOK TO ANY ADDRESS

## THE POLICY OF OUR HOUSE

### It is the Policy of Our House
to supply the consumer everything on which we can save him money, goods that can be delivered at your door anywhere in the United States for less than they can be procured from your local dealer; and although our line covers about everything the consumer uses, there is scarcely an article but what will admit of a saving of at least 15 per cent., and from that to 75 per cent., to say nothing of the fact that our goods are as a rule of a higher grade than those carried by the average retailer or catalogue house, and we earnestly believe a careful comparison will convince you that we can furnish you more and better goods for your dollar than you can obtain from any other establishment in the United States.

**We are Able by Reason of our Enormous Output of Goods** to make contracts with representative manufacturers and importers for such large quantities of merchandise that we can secure the lowest possible prices. To this we add the smallest percentage of profit possible, and through the medium of catalogues offer the goods to our customers, and on our economic one-small-profit plan, direct from manufacturer to consumer, a large percentage of the merchandise we handle is owned by the purchaser at less than local dealers can buy in quantities.

**We Employ no Agents.** By the aid of our numerous catalogues our customers can deal with us direct. Thus the farmer, miner, mechanic, business man, in fact, anyone, can send in his or her own order and save money.

**Our Terms are Alike to All.** A trial order will convince you of the saving worked by our economic one-small-profit plan. If you will carefully read this catalogue and study our prices, it will be a safeguard against your paying someone else too much money. The prices we quote in this catalogue are the lowest wholesale cash prices which you can take advantage of whether you buy in large or small quantities.

**We Aim to Illustrate Honestly and Correctly Every Article.** So far as possible, illustrations are engraved from photographs taken directly from the article. Our illustrations and descriptions are such as will enable you to order intelligently; in fact, so that you can tell what you are getting as well as if you were in our store selecting the goods yourself from stock.

**Our Employees are Instructed** to treat every customer at a distance exactly as they would like to be treated were they in the customer's place; in fact, if you favor us with your patronage we will feel under obligations to do everything in our power to merit your trade, and no matter how small your order may be it will receive the same prompt and careful attention as if it were ever so large.

**We Aim to Treat Our Customers** in a manner calculated to secure their permanent patronage. The unprecedented growth of our business proves that we have succeeded in supplying the wants of the people in a satisfactory manner and at lower prices than they could possibly secure elsewhere.

**We Deem that the Best Advertisement** any firm can have is a well satisfied customer. We aim to bring the manufacturer and consumer closer together. The closer the relation between the manufacturer and consumer, the more economy to all concerned, and in a great measure it does away with the long chain of profits in the handling of merchandise.

## About our RELIABILITY

**As this Catalogue** may fall into the hands of some who are not acquainted with our reputation for fair and honorable dealing and do not know of our financial standing, would say we are authorized and incorporated under the laws of the State of Illinois, with cash capital and surplus of over $450,000.00 paid in full.

**We Refer by Special Permission** to the Metropolitan National Bank, Chicago, German Exchange Bank, New York, to any Express Company in Chicago, any old reliable business house or financial institu-

tion in this city, or, if you have any friends residing in this city, write them and ask them concerning our house.

**On Page 6 we Show** a fac-simile copy of the letter given us by the Metropolitan National Bank. Such a letter would not be given to any concern unless their reputation was beyond any question of doubt. Should you write for information to any of the references given, be sure to enclose a two-cent stamp for reply.

**We Give You this Privilege.** If you have any doubt as to our reliability you can send your order and money to the Metropolitan National Bank in Chicago, or any express company in Chicago, with instructions not to turn it over to us unless they know us to be thoroughly reliable and a concern that will do exactly as we agree.

## About our Prices

**It Will Ever be Our Aim** to maintain the reputation we have earned as the Cheapest Supply House on Earth.

**We Employ** The most competent buyers that money can obtain, and their long experience with us places them in a position to understand our customers' wants.

**You Can Get Your Goods** For as little or less money than your local dealer pays for his, if you buy from us. As our immense trade requires us to purchase in such large quantities from American and European manufacturers and always for cash, we are assured of the lowest possible prices.

**We Pay Cash for all Goods** No matter how large the quantity and our established reputation gives our buyers the inside track with every manufacturer, thereby giving us the benefit of first choice on the market.

**Then We Sell for Cash.** Having no bad debts, no traveling men's expenses, no expenses for collections, we can sell at a far lower margin of profit than any other dealer, and when you buy from us you are not helping to pay for all such useless expenses.

**Our Buyers are Always on the Alert for Special Sales.** If there is a manufacturer or importer who is temporarily embarrassed and must have money, we are ready to buy, and our customers always get the benefit of our bargains.

**Our Bargains are our Customers' Bargains.** Many articles in this catalogue are quoted at less money than the actual cost to produce. No matter how cheap we buy we add the smallest percentage of profit consistent with honest goods and honest representations, and that is our net price to one and all, the price against which no other concern can compete. Prices that establish us as the Cheapest Supply House on Earth.

**We Make no Reduction in our Prices.** To those who are inclined to write us for a reduction from the prices quoted in this catalogue we would state that we cannot afford to make any concessions, whether you order in large or small quantities. When making up our catalogue we realize that in order to guard against competition we must quote the very lowest price on each and every article. That we have succeeded in defying all competitors is proven by the large increase of our business daily.

## TERMS

### Our Terms and Methods of Shipment.
We desire to make our terms and methods of shipment as liberal and easy as possible, consistent with absolute safety and to prevent loss, which would otherwise add to our selling price.

**A Large Portion of our Merchandise** can be shipped by express or freight, C.O.D., subject to examination, where a sufficient amount of cash accompanies the order to cover transportation charges both ways. In such cases the amount sent with order will be deducted from the full amount of order and the balance you can pay upon receipt of goods.

**For a List of Goods** which cannot be shipped C. O. D., see page 3, and read carefully our instructions on "How to Order" and "How to Have Goods Shipped." Also article compendium Rivas

Case 8:19-cv-01587-BEN-JLB Document 149 Filed 10/21/22 PageID.12636 Page 112 of 112

# DEPARTMENT OF REVOLVERS.

**WE OFFER YOU ALL THE STANDARD MAKES OF REVOLVERS AT MANUFACTURERS' LOWEST PRICES,** added, and owning the revolver for less money than any dealer can buy in quantities. For the season of 1898 we have many special bargains to offer, as our contracts with the different manufacturers have been so very large that we are able to make the very closest prices, and a comparison of our prices with those of any other concern will convince you there is a saving of 25 per cent to 75 per cent.

When you get our price you are getting the manufacturers' price with only our one small profit

**IN ORDERING SINGLE REVOLVERS WE ADVISE SENDING BY MAIL.** This can be done where enough extra is inclosed to cover postage. The postage is one cent per oz., or fraction thereof. We will ship revolvers by express C. O. D., subject to examination, on receipt of $1.00 as a guarantee of good faith. You can examine the revolver at the express office, and if found perfectly satisfactory and exactly as represented, pay the express agent the balance and express charges, and the revolver is yours. We advise sending cash in full, and adding enough to cover postage, insurance or registry fee, and have the revolver sent by mail.

## Double Action Revolvers.



No. 34285 32 or 38-caliber, center fire, 2½-inch barrel, weight, 16 oz. Our price......$1.37
No. 34387 32 or 38-caliber, center fire, 4½-inch barrel, weight, 16 oz. Our price......$1.70
No. 34388 32 or 38-caliber, center fire, 6-inch barrel, weight, 17 oz. Our price......$1.90

These revolvers are strictly first-class in every respect. The quality of material and workmanship is the best. All have rifled barrels and are good shooters; all 5-shot. These are not toys, but good guns. No one can meet our prices on these goods. Remember, $1.00 must accompany all revolver orders to be sent C. O. D., balance to be paid at express office.

For 20c extra we will send by open mail, postpaid.
For 25c extra we will send by registered mail, postpaid.

No. 34390 Rubber handle, 7-shot, 22-caliber, long or short, rim fire, full nickel plated, weight, 7 oz., rifled barrel. Our price......$1.37
Postage, extra, 17 cents.

## Our $1.40 Revolver.



No. 34392 Forehand & Wadsworth New Double Action, Self Cocking Revolver, full nickel plated, rubber stock, rifled barrel, safe and reliable, accurate, rebounding locks, parts are interchangeable. 32-caliber, 2½-inch octagon barrel. Weight, 12 ounces. Our price.........$1.40
Postage, extra, 15 cents.

No. 34393 38-caliber, 2½-inch octagon barrel, 5-shot; weight, about 15 ounces. Our price......$1.40
Postage, extra, 17 cents.

## Our $1.45 Revolver.



No. 34395 Forehand & Wadsworth Safety hammer, double action Revolver, full nickel plated, rubber stock, rifled barrel, rebounding lock, safe, reliable and accurate, 32-caliber, 2½-inch octagon barrel, 5-shot, weight, 12 ounces.
Our price......$1.45
No. 34396 38-caliber, 2½-inch octagon barrel, 5-shot, weight, 15 ounces. Our price...... 1.45
Postage, extra, 17 cents.

These goods are genuine and new from the factory. Beware of imitations and shop-worn goods, which are sold for new goods by some firms. We handle nothing but first-class goods.

Forehand Perfection Automatic, small frame, rebounding lock, positive stop on cylinder, and hammer blocked, same as in other Forehand Automatics. Accidental discharge impossible.
No. 34397 32-caliber, 3-in. nickeled or blued.$2.90

## The Genuine Harrington & Richardson Automatic Revolvers.



### Our $2.75 Automatic.

No. 34298 This revolver would retail in any first-class gun store at from $5 to $8. It is the celebrated Harrington & Richardson improved automatic, self-extracting, double action, self cocking revolver, modeled on the Smith & Wesson pattern, beautifully nickel plated, rubber stock, as accurate and durable as any revolver on the market, and equal to the Smith & Wesson in shooting. Weight, 14¾ ounces. 3½-inch barrel, 5-shot, 32-caliber, center fire. Our price......$2.75
No. 34399 5-shot, 38-caliber, central fire. Our price......$2.75
Postage, extra, 22 cents.
No. 34400 32 or 38-caliber, 5-inch barrel. Our price......$3.30

**Beware of imitations.**

### Our $2.90 Forehand Automatic.



No. 34406 The Celebrated Forehand & Wadsworth Automatic Revolver for $2.90; a revolver that retails at from $5.00 to $6.00. The very latest improved model, automatic shell extractor, rebounding locks, double action, self cocking, simple and accurate, interchangeable parts made from drop steel forgings. The frame is cast steel, no malleable iron about it; nickel plated throughout; fancy rubber stock, every revolver is fully warranted, length of barrel, 3¼ inches, weight, 17 ounces, entire length, 7¾ inches. The fact that we sold over 15,000 of these revolvers during the last year is evidence of the general satisfaction they give. 32-caliber, Smith & Wesson center-fire cartridges, 6-shot. Our price......$2.90
No. 34407 Same, Smith & Wesson center fire cartridges, 5-shot. Our price......$2.50
No. 34408 Either 32 or 38-caliber, with 5-inch barrel. Our price......$3.65
We can furnish these revolvers in blued finish when so desired at 50c extra.
Postage, extra, 25c; 5-inch barrels, 35c.

### The Ivor Johnson Bicycle Revolver.



Made on the same principle as the regular automatic, but has a short barrel—2 inches in length. Expressly designed for cyclists. Can be easily slipped into the pocket, and is a sure protection against vicious dogs and highwaymen. Absolutely safe. No explosion till trigger is pulled. 32-caliber only. Center-fire, 5-shot.
No. 34409 Price......$2.95
Postage, extra, 16 cents.

## The Celebrated H. & R. Automatic Police Revolver for $3.35.



Nothing like it ever retailed for less than $5.00.

The above illustration, engraved from a photograph, will give you some idea of the appearance of this gun. It is the celebrated Harrington police, automatic, safety hammer, double action, self cocking, automatic shell extractor, fancy rubber stock, full nickel plated, center fire, 32 or 38-caliber. Postage, extra, 24 cents.
No. 34410 32-caliber, 6-shot, 3½-inch barrel, 18 oz......$3.35
No. 34411 38-caliber, 5-shot, 3½-inch barrel, 22 oz......$3.35
Extra for pearl stocks in place of rubber, $1.75.

## Our $3.90 Forehand Hammerless.



We offer you at $3.90 a hammerless revolver which has never been retailed at less than $6.00 to $10.00. No other house will meet our price. Make a comparison and decide for yourself. This is the celebrated Forehand & Wadsworth new style hammerless revolver, made by Forehand Arms Co. No better revolver made. Automatic shell extractor, double action, self cocking, rebounding lock, absolutely safe catch to lock hammer, made of best material, beautifully finished throughout, accurate and reliable. No revolver made will shoot better. All center-fire, nicely nickel plated throughout, uses Smith & Wesson center-fire cartridges, 32-caliber, 6-shot; 38-caliber, 5-shot. Beware of imitations. Our revolvers are genuine.
No. 34413 32-caliber, our price......$3.90
No. 34414 38-caliber, our price......3.90
We can furnish the revolver with 5-inch barrel when so desired at......$4.60
Postage, extra, 25 cents.

## The Genuine Hopkins & Allen Automatic Hammerless Double-Action Revolver for $3.70.



Consider our price, our liberal terms, and our C. O. D. offer, and the fact that this revolver will be sent by mail on receipt of 22c extra to pay postage, and you will then have the advantages to be gained by placing your order in our hands.

No. 34419 The above illustrated revolver is the genuine Hopkins & Allen automatic hammerless double action high grade finish, fine adjustments. Its trigger locking device makes it one of the safest revolvers to carry in the pocket. Automatic self-ejector, rebounding lock, safety trigger locking device, chambered cylinder, rifled barrel, nickel plated, 32-caliber, Smith & Wesson small frame, 5-shot, weight 13 oz., length of barrel 3 inches, a revolver that retails at from $7.00 to $10.00. Our special price......$3.70
Postage, extra, 22 cents.
No. 34420 38-caliber, Smith & Wesson small frame, weight 18 oz., length of barrel 3½ inches. Our price......$3.70
We furnish either of the above revolvers when so desired in blued finish at the same price. Pearl handles, $2.00 extra. Postage, extra, 22 cents.
**Beware of imitations.** There are many cheap revolvers made in imitation of this, but the genuine. Guaranteed to be exactly as represented.