ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF BRENNAN RIVAS**<br><br>**VOLUME 4 OF 6**<br><br>Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

1

## INDEX

2

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1 | 7 n.10 | 002-004 |
| 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 | 8 n.12 | 005-007 |
| General Laws of Texas, ch. XXXIV, §1 (1871) | 14 n.31 | 008-011 |
| 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1 | 7 n.10 | 012-020 |
| 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1 | 9 n.15 | 021-023 |
| 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 | 8 n.13 | 024-026 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 9 n.16 | 027-029 |
| Acts of the General Assembly of the State of Georgia (1894) | 6 n.7 | 030-042 |
| An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907) | 6 n.8 | 043-053 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Compendium of Works Cited in Declaration of Brennan Rivas
(3:19-cv-01537-BEN-JLB)

| BOOKS[1] | | |
|---|---|---|
| Patrick Charles, Armed in America 152 (2018) | 9 n.17 | 055-058 |
| Randolph Roth, American Homicide 184, 185, 297-326, 386-388, 411-434 (Cambridge: Belknap Press of Harvard University Press, 2009) | 4 n.3, 5 n.4 | 059-092 |
| R. L. Wilson, The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present, at 173 (New York: Simon & Schuster, 1979), | 11 n.23 | 093-095 |
| Martin Rywell, Colt Guns 66-67, 4-93 (Harriman, TN: Pioneer Press, 1953) | 11 n.23 | 096-104 |
| Sears, Roebuck, and Co. Catalog No. 107, at 365-67 (1898) | 3 n.2, 12 n.27 | 105-112 |
| The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) | 12 n.25 | 113-117 |
| LAW REVIEWS AND JOURNALS | | |
| Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 161-62 (PhD diss., Texas Christian University, 2019) | 6 n.8 | 119-349 |
| Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2518-19 (June 2022) | 10 n.22 | 350-379 |

---

[1] The Declaration of Brennan Rivas cites certain books (in their entirety) as supplemental references, rather than as direct support for any particular statement in her declaration or as a specific basis for her opinions.  *See* Rivas Decl. ¶¶ 10 n.1, 19 n.23, 23 n.30.  Accordingly, they are not included here.  These books are:  Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America (New York: Scribner, 2020); Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohcken, PA: Combined Books, 1996); and Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

| | | |
|---|---|---|
| Robert Leider, *Our Non-originalist Right to Bear Arms*, 89 Ind. L. Rev. 1587, 1619-20 (2014) | 13 n.28 | 380-446 |
| Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason Univ. Civil Rights L.J. 67, 74-75 (Summer 1991) | 13 n.28, 13 n.29 | 447-480 |

**NEWS ARTICLES**

| | | |
|---|---|---|
| "Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, at 2 | 9 n.18 | 482-483 |
| Daily Arkansas Gazette (Little Rock, Arkansas), January 7, 1883, at 4 | 10 n.20, 10 n.21 | 484 |
| Daily Arkansas Gazette (Little Rock, Arkansas), May 13, 1883, at 4 | 10 n.20, 10 n.22 | 485 |
| Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), at 32-36 | 14 n.30 | 486-490 |
| Newport News (Newport, Arkansas), quoted in Daily Arkansas Gazette (Little Rock, Arkansas), April 27, 1875, at 2 | 10 n.19 | 491 |

4

threaten to kill himself one evening while he was drunk.[57] In 1893, the court conceded that a deputy postmaster could be considered a "civil officer," but only when engaged in his duties. Andrew Love, the defendant in this case, made the mistake of carrying his pistol "when on his private business or pleasure . . . on the public streets." Love made matters even worse for himself because he fired the gun on Christmas eve in the presence of a large crowd gathered near a tamale stand.[58]

The court chose to uphold expansive definitions for civil and peace officers, but there was no question that sheriff's deputies received an exemption. Some sheriff's deputies were salaried employees who assisted the sheriff in executing warrants, subpoenas, and policing the county. But sheriffs and justices of the peace alike had the authority to deputize private citizens to carry out specific tasks, like forming a posse to track down rustlers or other local criminals. These jobs overlapped with the Texas Rangers, but waiting for assistance from the Rangers could waste valuable time and allow a fugitive to escape. Deputies formed an important component in the administration of local justice in Texas, and little was required for them to join the ranks of those allowed to carry deadly weapons. The sheriff had to sign a document stating the name of the appointee, and the county registrar had to administer an oath of office. Sometimes, these part-time deputies tried to claim full-time exemption from the deadly weapons ban.

Beginning in 1878, the Court of Appeals began affirming convictions against part-time deputies and cracking down on their lawbreaking. One man, William Snell, claimed he had permission to carry a pistol with him while voting because a justice had deputized him five

---

[57] *West v. State of Texas*, 26 Tex. Cr. App. 99 (1888).
[58] *Love v. State of Texas*, 32 Tex. Cr. App. 85 (1893).

months earlier to arrest a specific defendant.[59] The court decided that the "emergency" that had justified his appointment "had ceased, and that a private citizen, so deputed, could not claim that he was . . . in the discharge of the duties imposed on him by law."[60] A decade later, a man deputized in one county to escort a prisoner moved to another county and claimed exemption there two years later.[61] The court handed down a firm precedent in yet another of these cases in 1893: If a citizen was specially appointed, he became a "peace officer" but "the authority terminates when the purpose of the appointment has been attained."[62] Still, the appeals kept coming and became more ridiculous. In one instance, a man named J. J. Ringer joined the Ranger's Frontier Battalion on a strictly volunteer basis. "Without having taken the oath required by the State" and "not having reported to his company, or having done a day's service," Ringer openly carried a pistol in Bell County and was arrested. During his trial he admitted that he knew he was breaking the law, and "that he had not and did not expect to do a day's work for the State, and only carried the pistol to prevent some one from pulling his nose or kicking him." Clearly he "was acting in bad faith" and deserved his conviction.[63] Deputized citizens overstepping their limited, temporary authority became such a problem that the legislature had to intervene by setting guidelines for their appointment and limiting the number allowed per county.[64]

During the late nineteenth century, the court and the legislature cracked down on private citizens claiming exemption as civil or peace officers. But sheriffs, their full-time deputies, and other police officers enjoyed a totally unrestricted right to carry deadly weapons at all times and

---

[59] Taking a firearm to a polling place during an election was prohibited by Sec. 3 of the 1871 deadly weapons ban (a word-for-word copy of its 1870 predecessor) as well as a separate statute that specifically outlawed any type of firearm at an active polling place *without any exceptions, even for peace officers*. Tex. Penal Code §180 (1879).
[60] *Snell v. State of Texas*, 4 Tex. Cr. App. 171 (1878).
[61] *Blair v. State of Texas*, 26 Tex. Cr. App. 387 (1888).
[62] *O'Neal v. State of Texas*, 32 Tex. Cr. App. 42 (1893).
[63] *Ringer v. State of Texas*, 33 Tex. Cr. App. 180 (1894).
[64] The laws referred to can be found in Gammel (comp.), *Gammel's Laws*, 9:1051 (1889); 12:192 (1903).

places. Unlike civil officers, their immunity from the pistol law was not confined to their time on duty. The story of Ben Thompson, an Austin town marshal, illustrates this point well. During the early 1880s, Thompson frequently spent his time off-duty visiting San Antonio's gaming halls, brothels, and theaters while wearing his pistol. On one of these trips, Thompson shot and killed another man over a game of cards. Though he was indicted for the homicide, a jury found him not guilty and he became a persona non grata in San Antonio. When he foolishly returned in 1884 (again, legally carrying a gun), San Antonio police and deputized citizens surveilled him and ended up fatally shooting him at a dance hall.[65] Cases of drunken, off-duty officers became problematic during the late nineteenth century because the law permitted them to arm themselves at all times.[66] The Court of Appeals had no choice but to uphold the letter of the law, ruling in 1886 that law enforcement officials were immune from the deadly weapons ban even when not on duty, and even when outside their jurisdiction.[67]

Peace officers sometimes pushed the envelope of legality and sparked deadly conflicts that might otherwise have been avoided. The Dallas policemen involved in the *Miller* case, for instance, undoubtedly elevated the tension level on their beat; they received exemption from the pistol law as "peace officers," but they seemed more interested in exerting power over others than actually preserving the peace. The sheriff of Hall County, in the Texas panhandle, similarly abused his office to settle a score. Several men, including Sheriff Pat Wolfforth and newspaper editor Eugene De Borenfiend, were arrested in 1891 for gaming, but the charges were dismissed within a few days. De Borenfiend then printed a misleading story that made it seem as though

---

[65] Story recounted in Charles L. Olmstead and Edward Coy Ybarra, *The Life and Death of Juan Coy: Outlaw and Lawman* (Austin: Eakin Press, 2001), 21-32.
[66] "The Pistol," *Brenham Daily Banner* (Brenham, TX), September 19, 1883; *Brenham Daily Banner* (Brenham, TX), May 9, 1884.
[67] *Clayton v. State of Texas*, 21 Tex. Cr. App. 343 (1886).

Sheriff Wolfforth was the only one involved. This escalated a preexisting conflict between them and set the two men on the path toward a "difficulty." Wolfforth had to go out of town for a few days, and during that time De Borenfiend approached Mrs. Wolfforth and propositioned her. Not surprisingly, she informed her husband, who rushed home. The two men encountered one another twice on the day of Wolfforth's return, each time trading insults or blows. The next day, Wolfforth went to the post office to mail a letter and saw his enemy standing outside the door. De Borenfiend ran inside, but Wolfforth followed him, pulled out his pistol, and fired four deadly shots.[68]

During his murder trial, Wolfforth made two claims to justify or explain his behavior. First, he said that he shot De Borenfiend in self-defense while trying to arrest him for illegally carrying a pistol. This flimsy excuse did not hold up in court because all the witnesses contradicted it. Second, he claimed that De Borenfiend's insulting language toward Mrs. Wolfforth drove him into such a rage that his reason became impaired. This was a classic "heat of passion" defense, which could reduce a murder charge to manslaughter if properly proven in court. The animating idea behind it was that men are naturally passionate; though they learn to control those passions, certain events can lead even the most buttoned-up of men to release them in a deadly gush of rage, terror, or resentment. The facts surrounding a homicide might make it seem like murder in the second degree, but certain extenuating circumstances justify reducing the charge to manslaughter because the defendant reacted to strong emotions, without intent to kill the victim.[69] Wolfforth's defense foundered on both grounds because he violated the standards of proper manly behavior, and then lied about it. He hid behind his badge, and when that failed, hid

---

[68] *Wolfforth v. State of Texas*, 31 Tex. Cr. App. 387 (1892).
[69] See Pettigrew article, p. 322-323; see also Thomas Johnson Michie, ed., *The Encyclopedic Digest of Texas Reports*, 4 vols (Charlottesville, VA: Michie Co, 1912-1914), 3: 557-570.

behind his wife's skirt. Wolfforth did not react violently to a provocation that had just taken place—he murdered a longstanding enemy in cold blood and then had the nerve to appeal the guilty verdict.[70]

Wolfforth's case is intriguing because he abused his position as a peace officer, but otherwise it fits within a much larger constellation of such cases where male defendants used the "heat of passion" defense. In some instances, the defense succeeded in persuading an all-male jury to either acquit or reduce a charge to manslaughter. Countless such cases reached American courts in the mid- and late-nineteenth century, though some garnered more media attention than others. In three particularly well-studied cases from Northern states, cuckolded husbands received acquittals after claiming a natural, "unwritten" right to kill their wives' lovers. The rise of companionate marriage, lenient divorce laws, and the women's rights movement had apparently prompted American men to feel embattled, becoming easy targets for manipulative defense attorneys who asked them to imagine for themselves how it would feel to discover a wife's adultery.[71] Similar scholarship on Texas "heat of passion" cases has determined that the legal defense represented a way "to uphold a certain male duty to protect women and also to maintain homosocial order."[72]

Cases involving the "heat of passion" defense or the "unwritten law" of husbandly vengeance rested upon juror sympathy above all else. Attorneys asked them to visualize themselves in the defendant's position and worked hard to introduce juicy testimony that

---

[70] *Wolfforth v. State of Texas* (1892).
[71] Hendrick Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997): 67-96. These are actually cases where the defense rested upon the "unwritten law" that a cuckolded husband had the natural right to kill his wife's lover. This was, in fact, a written law in Texas, though its application in exonerating homicidal husbands was rare.
[72] John C. Pettigrew, "Homosociality and the Legal Sanction of Male Heterosexual Aggression in the Early Twentieth Century," in *Lethal Imagination: Violence and Brutality in American History*, ed. Michael A. Bellesiles (New York: New York University Press, 1999), 322-324.

technically should have been inadmissible.[73] Unsurprisingly, jurors could easily drum up sympathy for a defendant, particularly if he happened to be the aggrieved party in an adulterous love triangle. One judge lamented "It has been common for citizens to serve on the jury, try criminals, acquit them, turn them loose onto society, go out of the court house and denounce the courts, denounce the . . . officers of state government for the lawlessness and crime," but those same jurors "never reflect that they had ever constituted the most important part of the organization of the courts."[74]

Trials in which a "heat of passion" claim worked toward the defendants' benefit have received scholarly attention because they reinforce the presence of the sexual double-standard in the nineteenth century, exemplify the preferential treatment enjoyed by white men (as against women, racial minorities, etc.), and inflame our sense of justice.[75] This is a reasonable and fair response. But the exceptional cases overshadow a much larger number of mundane ones, like *Wolfforth*, in which the defense failed abysmally. In Sheriff Wolfforth's case, the fact that he encountered the victim on two separate occasions *before* shooting him rendered his claim illegitimate. Other defendants failed to meet the "heat of passion" standards in other ways. For example, allowing too much "cooling time" to elapse between discovery of the provocation and the deadly conflict aborted a "heat of passion" claim.[76] Husbands who, after discovering a wife's adultery, armed themselves to confront the paramour did not meet the legal standards for the

---

[73] Hartog makes this point. Judges' acceptance of evidence of past adultery constituted a crucial innovation in the law without which the "unwritten law" concept would have faltered. Interestingly, in a Texas case, the Court of Appeals scolded a lower court judge for admitting evidence of an affair that was not directly relevant to the case at hand. Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law,'" 81-83. See also *Baker v. State of Texas* (1892).

[74] "Judge Fleming's Charge to the Grand Jury," *Frontier Echo* (Jacksboro, TX), November 10, 1876.

[75] Pettigrew, "Homosociality and Male Aggression," 317-325; Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law,'" 67-96.

[76] This was called "cooling time." The court never tied its definition to a specific duration, so it was a "matter of fact" left for the jury to decide. Michie, ed., *Encyclopedic Digest*, 2: 562-563.

"heat of passion" defense, either. Instead, their retrieval of deadly weapons indicated express malice toward the victim and made first-degree murder charges a distinct possibility.[77] Insulting language alone was insufficient provocation to justify a reduction from second-degree murder to manslaughter.[78] In 1874 the Redeemer Court said of one such case, "there was no necessity to resort to the use of a deadly weapon for self-protection," even though the language used was "insulting, and calculated to produce a difficulty."[79] A far cry from the antebellum honor culture, indeed! These mundane cases properly contextualize the more exceptional ones and give a fuller picture of the judiciary, from appellate judges to local jurors, policing new rules of manly behavior in the late-nineteenth century.

In a sense, this delineation of legal borders was just one part of the larger endeavor to redefine Southern manhood in the wake of the Civil War and Reconstruction. The antebellum years saw the near-universal arming of Southern men and the wide acceptance of extralegal justice through dueling. But the Civil War demonstrated the failure of that chivalric, Old South manhood and left Southerners with a "crisis in gender" that never really resolved itself.[80] The martially minded Redeemers sought to restore the pride of white Southern men, but the New South promoters played an important role, too.[81] Often well-educated, town-dwelling

---

[77] *Massie v. State of Texas*, 30 Tex. Cr. App. 64 (1891).
[78] Michie, ed., *Encyclopedic Digest*, 2: 565-70.
[79] *Meredith v. State of Texas*, 40 Tex. 447 (1874).
[80] LeAnn Whites used the phrase "crisis in gender" in Whites, *The Civil War as a Crisis in Gender*. On the longevity of this crisis, see Craig Thompson Friend, "From Southern Manhood to Southern Masculinities: An Introduction," in *Southern Masculinity: Perspectives on Manhood in the South since Reconstruction*, ed. Friend (Athens: University of Georgia Press, 2009), vii-xxvi.
[81] Craig Thompson Friend has identified two strains of Southern manhood after Reconstruction, the martial master and the Christian gentleman. See Friend, "From Southern Manhood to Southern Masculinities," xi-xii. The Redeemers fit the description of the former quite well—they used military power and martial skill with an ideological and political purpose of restoring white men to power in the South. The New South promoters fit the second type quite well by elevating self-control and traditional evangelical values (which generally flowered within urban middle classes, see Paul E. Johnson, *A Shopkeeper's Millennium: Society and Revivals in Rochester, New York, 1815-1837* (New York: Hill and Wang, 1978).

Compendium_Rivas
Page 241

professionals, this rising middle class wanted modernization and reform.[82] Their economic policies are well known, but their views on legal reform less so. New South critiques of the criminal justice system abounded. Newspapers in towns like Brenham, largely forgotten today but buzzing regional hubs in the nineteenth century, recommended radical legal reforms and questioned the value of the traditional Anglo-American judicial system. "It is true we live in an age of steam and electricity," the *Brenham Banner* editorialized, "but we are tenacious of old habits, old practices, and old ways, but when the utility of new things are fully demonstrated people will take hold of them. . . . some would make an entire change by wiping out juries and courts as now constituted and substituting an entire new plan for quicker trials and speedier justice."[83] The market towns of Texas were not filled with backward-looking imitators of the Old South ideal; rather, they sheltered a forward-thinking middle class that, after returning the state to the perceived safety of white rule, pursued innovation in all realms of life—including the standards of proper manliness.

The cultural project of redefining Southern manhood occurred in public spaces and within private homes, the product of innumerable interpersonal interactions and performative displays, but the creation and policing of new standards took place in the legal realm, between the legislature and the judiciary. Lawmakers at the state and municipal levels enacted new laws, like the deadly weapons ban, that demanded men to behave differently than they had before. This transformation did not go unnoticed. The *New York Sun* ran a lengthy story about it in 1884 saying, "A wonderful change has taken place in the minds of Texans concerning the proper costume of a gentleman and the correct way of righting wrongs. The immense immigration . . .

---

[82] Jonathan Daniel Wells, "The Southern Middle Class," *Journal of Southern History* 75, no. 3 (August 2009): 651-662.
[83] "Reform," *Brenham Daily Banner* (Brenham, TX) May 9, 1884.

from England, Germany, and the Northern States has got a good deal to do with this right about face in an important matter, but the native Texans themselves long ago saw the folly and danger of conducting business, society and politics on self-cocking principles."[84] Judges closely guarded the application of the "heat of passion" defense in murder cases, holding men accountable to a new middle-class, even Victorian notion of manhood that elevated restraint over excessive emotion.[85] At the same time that American men claimed the "unwritten law" to acquit themselves of murder, French gentlemen carried on the practice of dueling so recently dropped by Southerners. In England, where duels were a thing of the past and interpersonal violence was on the decline, many men read about or dreamed of an assignment in some far-flung corner of the empire where they could turn loose the aggressiveness that Victorian masculinity disdained.[86] Violent exceptions like these prove the rule of new, stifling expectations of men brought on by the cultural dominance of an industrial bourgeois class.

Texas courts may have done a good job of defining the limits of acceptable manly behavior, but that success did not come without some failures. Predictably, cases involving African American men proved much more complicated for juries and troublesome for appellate judges. On the whole, there were relatively few black men who appealed their convictions for violating the deadly weapons ban. The cost of an appeal likely placed it beyond the means of most black defendants, but those who had the money were about as likely to obtain reversals as

---

[84] From *New York Sun*, reprinted *The Waco Daily Examiner* (Waco, TX), August 26, 1884.

[85] The jurisprudence surrounding the "heat of passion" defense originated in precedent-setting cases from *Texas Criminal Reports*, a collection of appellate criminal decisions handed down by the Court of Appeals, and later Court of Criminal Appeals. The cases cited in *Encyclopedic Digest* defining "heat of passion" originate in volumes of *Texas Criminal Reports* from the post-1876 period, especially the 1880s and 1890s. See Michie, ed., *Encyclopedic Digest*, 2: 559-560.

[86] Martin Wiener, "Homicide and 'Englishness': Criminal Justice and National Identity in Victorian England," *National Identities* 6, no. 3 (November 2004): 203-213; John Tosh, "Masculinities in an Industrializing Society: Britain, 1800-1914," *Journal of British Studies* 44, no. 2 (April 2005): 330-342, 341.

their white counterparts (and that was not very likely).[87] But casting a wider net that includes murder and assault cases reveals some evidence of the problem posed by black men before the law, particularly when their rights as citizens and men had been violated by armed whites.

In 1875, a white man named George McKay was traveling horseback on a public highway. He (illegally) carried a pistol with him and, after dropping it, tried to retrieve it without dismounting. McKay could not reach the pistol and surely looked foolish grasping for it. Dan Duke, a young black man riding along behind him, laughed at the scene. Having admitted defeat and dismounted, McKay angrily shouted to the still-chuckling Duke, "I am the worst man in all these parts and would as soon shoot you as not." McKay then approached Duke and, pointing the pistol at Duke's head, forced him onto his knees for several moments. Duke presumably reported the incident to local police because McKay was arrested. As it turned out, McKay's pistol was not in working condition when he pointed it at Duke, so a prosecution under the deadly weapons ban could not hold water. Instead, local officials charged McKay with assault; Duke did not know that the pistol was broken, and the encounter caused him sufficient shame and mental agony that it qualified as an assault. The jury convicted McKay and fined him twenty-five dollars, but he appealed.

At the time of *McKay v. State of Texas*, the Texas Supreme Court still heard criminal appeals, and Oran M. Roberts was its chief justice. Roberts determined to reverse McKay's decision and twisted himself into knots in order to do so. In the *Duke* decision of the same year, another member of this Redeemer Court rejected the jurisprudence of Joel Prentiss Bishop, whose views on the Second Amendment had been an important part of the Reconstruction

---

[87] Reversals for black and white Texans most often resulted from some technical or procedural failure on the part of the State. On a few rare occasions the court ruled on substantive issues that had deprived defendants of justice. But overall the appellate judges tried to uphold jury convictions, as stated earlier in this chapter.

Court's *English* decision back in 1872. Roberts continued the Redeemer Court's attack on Bishop by rejecting his definition of assault. Bishop had said that actual peril is not necessary to an assault, only the apprehension of it, but Roberts disagreed. "This makes an apparent force sufficient if it creates a well-grounded apprehension of peril in the party assailed, and is believed to be contrary to the provisions of our [penal] code." In other words, Duke's perception of the encounter as a potentially deadly one had no bearing upon the facts of the case, which involved a dysfunctional pistol. The perception and intent of the defendant, the aggressor, were far more important than those of the victim.[88]

The decision in *McKay* departed from an old precedent established in 1856 and rooted in Bishop's definition of assault.[89] It is, then, part of this redefinition of Southern manhood in the postbellum period, and provides some insight into the ways in which race complicated that process. As enforcers of the new manliness, the judges of the Redeemer Court chose to endorse rather than condemn McKay's behavior because it involved a white man asserting his mastery over a black man. White southerners tended to approve of aggressive, martial behavior undertaken for some ideological purpose—as long as it was carried out by their own. In this particular case, McKay restored his pride by intimidating a young black man. Roberts's convoluted opinion in *McKay* sent the message that white men could lead black men to feel threatened without breaking the law. Some commentators disliked the idea that behavior like McKay's was not indictable as assault, asking "Ought we not to judge the act from the bystander's point?"[90] Their editorials accomplished nothing because more was at stake than

---

[88] On the importance of perception in lethal self-defense cases, see Light, *Stand Your Ground*.
[89] This precedent was *Flournoy v. State of Texas*, 14 Tex. 387 (1856).
[90] Quotation from "That Unloaded Gun Again," *San Marcos Free Press* (San Marcos, TX) February 9, 1878.

merely the legality of pointing an unloaded gun at someone; as Roberts realized, the crux of the matter was rendering it licit to purposefully instill fear in someone else's mind.

Despite this important alteration in precedent, tremendous changes had taken place in Texas and the South. Roberts was forced to admit that, had McKay's pistol been functional, the encounter would have constituted an assault. In the antebellum days, even in the immediate postwar era when the Throckmorton faction controlled state politics, such would not have been the case. Indeed, members of the federal congressional committee investigating political violence the former Confederacy had told the truth when they said in 1872 that:

> It is the general testimony of old citizens of the South that, notwithstanding the conspiracy known as the Ku Klux Klan, there is more general order and peace in the South than before the war; while this may surprise those familiar with the recent disorders, and unfamiliar with southern society before the war, we deem the statement not extravagant, for the conspiracy appears to us an attempt to exercise in localities, in despite of law, that tyranny and lawlessness which was, before the war, open and unrestrained, and more general, if not so cruel. We should remember how common it was to scourge colored men, and how perilous for northern citizens or southern emancipationists to be found in the Gulf States. How freely the revolver and the knife were used in the rencounter or the duel. It is admitted that in Mississippi, Arkansas, and Texas the general condition of society is better than ever before.[91]

An all-encompassing sea of violence perpetrated in the name of southern manhood had, through war, Reconstruction, and economic growth, been transformed into a mostly dry landscape with deep pools of ideologically driven brutality scattered about. These pools represent two types of violence, one a holdover from the past and the other a new creation. The former type consisted of men's persistent tendency toward settling disputes through extralegal violence, as evidenced by the rise of "heat of passion" defenses in the late nineteenth century; the latter were the racially charged lynchings that became communal rituals across the South during the height of the Jim Crow system of the late nineteenth and early twentieth centuries. The process of draining the sea

---

[91] Joint Select Comm. on Affairs in Late Insurrectionary States, S. Rep. No. 41-42, pt. 1 at 270-271 (1872).

of violence and rerouting the water into these pools began with the Republican governments during Reconstruction and accelerated as progressive Democratic reformers took the lead in Southern politics during the closing decades of the nineteenth century.

By the mid-1890s, the US Supreme Court and the appellate courts of Texas had given the deadly weapon ban their stamps of approval, and in doing so upheld an expansive view of state police power that rejected the incorporation of the Bill of Rights, especially the Second Amendment. Empowering state governments permitted the continuation of a racial caste system in the "new" South even while the socio-political elite talked of progress, innovation, and reform. It also preserved the locally oriented American judicial system from the shock of large-scale federal intervention in state and county affairs. Aware of their police power over Texas citizens, the state legislature embarked on a reformatory process in the late-nineteenth century that sought to end gun-toting in the Lone Star State once and for all. The efforts of these lawmakers are the subject of the next chapter.

Chapter 4
"The Revolver Must Go": Regulating Deadly Weapons, 1887-1918

As soon as the ink dried on the 1871 deadly weapons ban some Texas politicians began trying to change or eliminate it. There was nothing preventing the Democrats, who controlled the statehouse beginning in 1873, from repealing it along with the other measures enacted during the administration of Republican governor Edmund J. Davis. That they chose not to is one of the more interesting aspects of this law's history. Texas politicians understood that many constituents supported restrictions upon carrying deadly weapons in public, and when people chose to express their opinions most demanded harsher penalties or better enforcement rather than repeal. The press coverage pertaining to the deadly weapons ban in the half-century after its passage was overwhelmingly positive and illustrates the development of an early progressive impulse in Texas. Many legislators heeded the calls of these reformers, seeking to expand the deadly weapon law's scope, toughen its penalties, and protect it from its detractors. But conflict remained among Texans and their lawmakers, with a sufficient number in opposition to slow down the forces supporting regulation and sometimes undo their achievements. For this reason, the history of deadly weapon regulation in Texas between 1887 and 1918, the period during which the law received substantial amendment, is one of false starts, failures, and reversions.

By 1920, the persistence of the reformers had paid off. Though opponents had tried to maintain the original deadly weapon ban without expanding upon it, the forces of reform succeeded in making the law markedly more draconian. They additionally forced the passage of satellite laws, like a punitive tax on pistol sales and the creation of a harshly penalized crime called "assault with a deadly weapon" that supplemented the deadly weapon ban. Texas at the conclusion of the First World War could claim a far-reaching gun-control program that reflected

124

the triumph of progressivism in the state. The journey to that conclusion entailed a contest less over the existence of the law itself than the appropriate severity of punishment for violators and its efficacy as a crime-prevention measure. At the very heart of this debate stood the acceptance or rejection of a proactive, regulatory state as responsible for preventing evil as for prosecuting it.

*      *      *

A central concern for Texans in the late 1870s and 1880s was the continuation of lawlessness even after the Redeemers retook control of the state government. On the whole, Democrats failed to deliver the peace and justice they had promised to white Texans. One commentator compared Democrat Richard Coke to his Republican gubernatorial predecessor, Davis, and found Coke wanting. "Has not Gov. Coke's administration been almost a total failure? Is there not more lawlessness and crime in Texas than at any other period since the close of the war? Was there not better order in Texas under the Davis administration, when the heat of battle had not had time to cool, when all the bitter passions of the people engendered by the war had not subsided?" In other words, Davis may have been a tyrant in the eyes of Democrats, but his policies (especially the State Police) had been effective at quelling violence.[1]

Coke and his successors, Richard Hubbard and Oran M. Roberts, faced an interesting predicament in that Redemption reduced the political violence perpetrated by angry whites even while economic development in South and West Texas increased lawlessness there. Situated as it was on the border between South and West, the Lone Star State experienced the worst of both worlds in the late nineteenth century as homicide rates spiked in the western mining and cattle

---

[1] "Necessity for a State Police," *Galveston Daily News* (Galveston, TX), June 15, 1876.

125

boomtowns, as well as in some parts of the rural South.[2] At just the time when a Ranger-like force with statewide jurisdiction to recover bail-jumpers and criminals would have been helpful, Democrats eliminated it out of antipathy for Davis and a hypocritical sense that it was too great a centralization of power.[3] Hispanic majorities in South Texas counties distrusted law enforcement and celebrated rebels like Juan Cortina, whom Anglos derided as "bandits." Widespread cattle rustling in counties west of the Colorado River gave rise to all manner of violent conflicts, many of them emanating from a criminal enterprise referred to as the Taylor-Sutton feud. On top of that, the new railroad depots and towns along the frontier line between Wichita Falls to the north and Laredo to the south became a playground for gunslingers like John Wesley Hardin and Sam Bass.[4]

Significantly, Coke, Hubbard, and Roberts said and did very little about the persistent problem of lawlessness. Each governor, understandably, focused on ameliorating the state's fiscal woes without alienating investors. All three drew upon the seemingly limitless resource of public lands fund school systems, subsidize railroad development, and appease commercial investors. None of them made law enforcement a central policy concern or addressed the deadly weapon ban. If anything, they exacerbated the problem by ignoring it or, in Roberts's case, by pardoning a startling number of felons for the sake of economy.[5]

---

[2] Roth, *American Homicide*, 354-357, 375-384, 387, 403-404, 411-412. See also Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997).

[3] I call it a hypocritical idea because Democrats voiced no such opposition to the Texas Rangers, a force similarly under the authority of the governor (and later adjutant general) and granted statewide jurisdiction.

[4] On Juan Cortina, see Jerry Thompson, *Cortina: Defending the Mexican Name in Texas* (College Station: Texas A&M University Press, 2007). On the Taylor-Sutton feud, see James M. Smallwood, *The Feud That Wasn't: The Taylor Ring, Bill Sutton, John Wesley Hardin, and Violence in Texas* (College Station: Texas A&M University Press, 2008).

[5] On these governors and the highlights of their administrations, see *Handbook of Texas Online*, John W. Payne, Jr., "Coke, Richard," accessed December 03, 2018, http://www.tshaonline.org/handbook/online/articles/fco15; *Handbook of Texas Online*, Jean S. Duncan, "Hubbard, Richard Bennett, Jr.," accessed December 03, 2018, http://www.tshaonline.org/handbook/online/articles/fhu03; *Handbook of Texas Online*, Ford Dixon, "Roberts, Oran Milo," accessed December 03, 2018, http://www.tshaonline.org/handbook/online/articles/fro18.

Some Texas legislators joined the Redeemer governors in displaying an ambivalent attitude toward criminal justice reform during the 1870s and early 1880s. In 1873, a House member tried to repeal the deadly weapon ban. Daniel Short of Shelby County in East Texas was an acolyte and later law partner of Oran Roberts who shared his mentor's political sympathies.[6] The committee reviewing his bill immediately transformed it from a repeal measure into an amendatory one that would have settled for scaling back the provisions of the 1871 law. It prohibited only *concealed* weapons and required officers to obtain a warrant prior to any arrest unless they had personally witnessed the offense. Though this bill failed, it was more successful than a subsequent repeal effort that could not even pass the committee stage.[7] The only substantial alteration to the ban came in 1879 when the revised penal code mysteriously dropped the provision allowing convicted gun-toters to be sent to jail. A commentator at the time attributed the move to "deference to public opinion," though judges and juries rarely ever handed down prison sentences for carrying weapons during the 1870s.[8] That the critics of the pistol law failed in their attempts to weaken it and won a meaningless victory in 1879 demonstrates the unpopularity of their position among lawmakers and the general public.

If the deadly weapon ban had truly been unpopular among Texans, their lawmakers surely would have emulated their southern neighbors, most of whom enacted limited gun regulations or loosened the ones put in place during Reconstruction. With the exceptions of Texas, Tennessee, and Arkansas, all southern states prohibited *concealed* weapons only rather

---

[6] *Handbook of Texas Online*, Robert Bruce Blake, "Short, Daniel McDowell," accessed November 20, 2018, http://www.tshaonline.org/handbook/online/articles/fsh32.
[7] In 1876, William H. Jones of Gonzalez County introduced a repeal bill, but it did not make it past committee. See House Bill 54, 15th Leg., Reg. sess. (1876) TSLAC; House Bill 69, 13th Leg., Reg. sess. (1873) TSLAC.
[8] There is exceedingly little recorded opposition to the deadly weapons ban or its optional jail provision in the 1870s. This does not mean the commentator's explanation is untrue, but it does question the strength of such public opinion. See "Pistol Carrying," *Brenham Daily Banner* (Brenham, TX) July 24, 1881. Furthermore, the extant district, county, and justice court records from Fayette, Parker, Jefferson, and McLennan Counties show zero guilty defendants sentenced to jail time between 1871 and 1879.

than proscribing all small arms in public. In Tennessee, the administration of Republican governor Dewitt Clinton Senter confronted an explosion of political and racial violence. The Republican-controlled state legislature responded by passing "An act to preserve the peace and prevent homicide," which declared that: "It shall not be lawful for any person to publicly or privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver."[9] When Democrats retook the state a year later, as evidenced by the election of Democratic governor John Calvin Brown, the Democratic-controlled legislature changed its position by prohibiting deadly weapons "other than an army pistol, or such as are commonly carried and used in the United States army."[10] This language referred to the Colt 1861 Navy Model and Colt 1860 Army Model revolvers, firearms issued to many Civil War soldiers. During the 1860s they cost about fifteen dollars, placing them beyond the financial means of anyone who was cash-poor or lacked veteran status. Arkansas lawmakers similarly exempted these weapons from regulation in 1881.[11] Texans observed the actions of these southern neighbors, and some considered emulating them. A bill proposing to exempt "Army or Navy size revolvers" from the purview of the deadly weapons ban not only failed but died almost immediately. Senators refused to give a second reading to the proposal, which would have made weapon-carrying contingent upon wealth and military service rather than individual right and threatened another loophole for nefarious individuals to harass law-abiding Texans with impunity.[12]

---

[9] 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, §1.

[10] This is a fascinating policy change because the revised law stipulated that "in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands." Why the Tennessee legislature would opt to criminalize the less deadly modes of carrying pistols (stowed away, in a holster) in favor of the deadliest one (in the hand) is unclear. But the price of Colt Army and Navy Model revolvers placed them beyond the means of most black Tennesseans, and the law made licit the carrying of them by hand. 1871 Tenn. Pub. Acts 81, An Act to Preserve the Public Peace and to Prevent Homicide, ch. 90, § 1.

[11] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), §1; "Deadly Weapons," *Panola Watchman* (Carthage, TX), March 2, 1881.

[12] Senate Bill 219, 17th Leg., Reg. sess. (1881), TSLAC.

Texas lawmakers recognized the popularity of the deadly weapon ban and tried throughout the 1870s and early 1880s to strengthen it in one way or another. A new state constitution went into effect in 1876, and a highly accomplished jurist in the statehouse, James McLeary, worried that its slightly different wording in regard to the right to bear arms might render the pistol law unconstitutional. As of 1876, the state legislature was authorized to "regulate the wearing of weapons with a view to prevent crime."[13] McLeary introduced a bill that altered the deadly weapons ban in some slight ways, but its true purpose was to prove that the legislature intended the law to prevent crime. Ironically, the bill stalled because a minority raised questions about its constitutionality. It stated that "no person shall wear any arms except as hereinafter specified." The language, to them, seemed too extreme. "The citizen has the right to keep and bear arms and he should not be required to go to the statute book to ascertain when and where he can exercise it," the minority reported. Instead, a law should be framed in a more generous way, "to protect him in the right guaranteed" and simultaneously "point out the time, place and circumstances [in] which he shall not exercise it to the misery of social order and his fellow citizen." This conflict may seem like mere semantics, but it raised an important issue at the time; the 1871 pistol law operated very much like a prohibition, yet jurists and policymakers had to be careful to call it a regulation of a constitutional right.[14] Whether the phrase "except as hereinafter specified" became part of the law, the idea behind it had been part of its substance

---

[13] Tex. Const. of 1876, art. I, § 23.

[14] McLeary's bill and the committee substitute for it proposed reducing the minimum fine for carrying a deadly weapon from twenty-five to ten dollars. The bill also broke the few lengthy sections into a dozen or more very short ones, demonstrating an attempt to clarify and systematize the law. See Senate Bill 22 and Senate Bill 83, 15th Leg., Reg. sess. (1876) TSLAC. Quotation in *Senate Journal* (1876), 137-138. Reform-minded Texans like McLeary thought of the pistol law as a blanket ban or prohibition, though the constitutional guarantee required that they pay homage to the right to bear arms by refraining from calling it a prohibition as such. Oran Roberts addressed this complicated issue in *State of Texas v. Duke* 42 Tex. 455 (1874). On McLeary, see *Handbook of Texas Online*, Claudia Hazlewood, "McLeary, James Harvey," accessed November 16, 2018, http://www.tshaonline.org/handbook/online/articles/fmc87.

from the beginning. In fact, as the courts took the lead in interpreting the deadly weapon law, Texans wanting to exercise their right to arm themselves needed not only a statute book but access to appellate court reports in order to stay within the state-mandated guidelines.

There were abortive attempts to add several new weapons to the list of those prohibited in the public sphere. The earliest, considered in 1881, were the rifle cane and shotgun cane. These new devices originated in Europe but began appearing in the United States by the late 1860s.[15] The cane itself was hollow and formed the barrel of the rifle or shotgun. The handle included a trigger button and a breech-loading mechanism.[16] These boutique firearms were available on the market but not particularly common. In 1880, a doctor in Wills Point (about forty miles east of Dallas) showed one to a crowd gathered around him and inadvertently killed his friend.[17] The incident was reported as far away as Austin, so state senator James Wynne in nearby Henderson likely heard the story. The following year, he introduced a bill to include rifle canes and shotgun canes within the purview of the 1871 deadly weapon ban. That law already restricted sword canes, but not long guns like rifles and shotguns. Wynne's bill very nearly became law, passing the Senate and reaching a third and final vote in the House.[18] Nevertheless, it failed and no subsequent legislature addressed the issue. Rifle canes and shotgun canes continued to be sold in small numbers, but they were rare enough to elicit special attention in the press even into the twentieth century.[19]

---

[15] Rifle canes were advertised for sale in North Carolina in 1868. See Wayne K. Durrill, "Political Legitimacy and Local Courts: 'Politicks at Such a Rage' in a Southern Community During Reconstruction," *Journal of Southern History* 70, No. 3 (August 2004): 577-602, at 587.

[16] For a full description of the shotgun cane, see "Shotgun Canes," *Los Angeles Times* (Los Angeles, CA), July 6, 1896.

[17] "Texas Facts and Fancies," *Weekly Democratic Statesman* (Austin, TX), September 16, 1880.

[18] Senate Bill 20, 17th Leg., Reg. sess. (1881) TSLAC; *Senate Journal* (1881).

[19] The confiscation of a rifle cane by a New York Customs official in 1925 garnered significant attention, as did the sale of shotgun canes in 1927. In the latter case, a New York magazine remarked on their popularity among French women as devices "both ornamental and useful" against "the apaches of Paris." See "Weapon Surprises Officials,"

Denunciations of razors began in the early 1880s and continued for decades. Due to their easy affordability, razors became popular weapons of self-defense for the poor. African American men embraced the razor to such an extent that they were known as "the favorite slaying-tool of the colored man." Despite the racial overtone, Texas commentators discussed razors alongside pistols as dangerous weapons that should not be carried in public. If carrying a pistol was considered an antisocial, barbaric behavior, how much more so was carrying a razor? The problem was that the 1871 law did not specifically outlaw them. The failure first became a point of discussion in 1881 when an arms control measure in Arkansas included them in the list of prohibited weapons. Condemnations continued throughout the 1880s and increased significantly in the 1890s. At that point, the legislature took action by trying on several occasions to piggy-back a razor prohibition onto other amendments to the deadly weapons ban, but each time they failed.[20]

A third weapon to gain the attention of Texas lawmakers was the toy pistol. This pistol-shaped, spring-loaded device used cheap cartridges to ignite a firecracker in its barrel. The goal was to create a bright flash and loud noise that youngsters might find fun. Some toy pistols, though, could function just like a regular pistol by firing a lead ball.[21] Children subscribing to some magazines could order them by mail, or even receive them as prizes. Many a young woman took to carrying one "with a view to amusing her sweet heart."[22] But the toy pistol soon proved

---

*Los Angeles Times* (Los Angeles, CA), November 5, 1925; "Shotgun Cane Shown in Los Angeles Shop," *Women's Wear Daily* (New York City, NY), April 25, 1927.

[20] For examples of condemnations of razors, see "Entirely Too Many Revolvers," *Albany News* (Albany, TX), August 22, 1884; "A Little Pistol Practice," *Brenham Daily Banner* (Brenham, TX), March 31, 1892; "Must Not Carry Pistols," *Dallas Morning News* (Dallas, TX), July 4, 1899. On Texans taking notice of Arkansas weapon regulations, see "Deadly Weapons," *Panola Watchman* (Carthage, TX), March 2, 1881. Examples of failed bills seeking to add razors to the restricted list include House Bill 332, 23rd Leg., Reg. sess. (1893), TSLAC; Senate Bill 33, 24th Leg., Reg. sess. (1895), TSLAC; House Bill 54, 25th Leg., Reg. sess. (1897), TSLAC; House Bill 384, 27th Leg., Reg. sess. (1901), TSLAC.

[21] *Brenham Daily Banner* (Brenham, TX), December 7, 1881.

[22] "About a New Plaything," *Jackson Standard* (Jackson, OH), December 20, 1877.

131

deadly. Close-range shots could disfigure or kill people, and because the cheap cartridges consisted of a patented mixture of finely ground powder that included chemicals detrimental to the nervous system, repeated use could lead to lockjaw and death. These cartridges could be bought hundreds at a time, with one paper reporting that a single pack of six hundred cost only a nickel. This five-cent purchase produced enough toxins to kill a person (see Fig. 4.1). Boston and Baltimore led the way by enacting municipal ordinances that banned the sale, importation, or ownership of toy pistols, and reformers called for city leaders across the country to do likewise.[23] A Louisiana paper appealed to American boys directly, reminding them that they "can get along very well without" receiving a toy pistol for Christmas. "And they should always bear in mind the important fact that—Boys who ne'er with pistols play, Will live to die some other way."[24]

In Texas, denunciations of the toy pistol began in the 1870s and picked up steam in the 1880s. Commentators called it "the premium instrument of death in time of peace" and "a formidable rival of the real pistol as a means of destroying precious life." Papers encouraged parents to "think of the insidious influence of early habit, and be mindful of what little men are doing." At the same time, though, many called for state or municipal regulation. "Preventive measures" like declaring it to be a deadly weapon were popular. A Dallas newspaper argued that "if laws are made to suppress police gazettes and similar sheets, to close whiskey saloons and even barber shops to keep morals good, surely something should be done to suppress the toy pistol." Throughout the state, observers considered enactments against toy pistols to be sensible and legal exercises of local or state police power.[25] To their disappointment, however, cities did

---

[23] "The Boy Exterminator," *Cheyenne Transporter*, (Darlington, IT), September 11, 1882. Reprinted from *Emporia (KS) Republican*. "The Victims of the Toy Pistol," *Medical and Surgical Reporter* (Philadelphia, PA), August 6, 1881.

[24] "The Toy Pistol," *St. Tammany Farmer* (Covington, LA), December 22, 1883.

[25] There are hundreds of Texas newspaper articles denouncing the toy pistol in the late nineteenth century. Quotations from "Murder as Amusement," *Galveston Daily News* (Galveston, TX), July 31, 1881; *Brenham Daily Banner* (Brenham, TX), January 11, 1883. These articles also point toward a statewide or even regional conversation

not pass municipal ordinances against the toy pistol. The attempt by state lawmakers to prohibit

their sale died in committee review.[26]

Fig. 4.1



**TOY PISTOL PLAY-GROUND**
*Puck (1877-1918);* Aug 3, 1881; 9, 230; American Periodicals
pg. 369

## TOY PISTOL PLAY-GROUND.

UNDERTAKER:—LESS SEE—FIVE LITTLE COFFINS WILL BE WANTED SOON, SURE!

While governors ignored the perennial violence problem and legislators failed in their

attempts to strengthen the deadly weapons ban, political commentators stepped into the breech

and voiced the general public's concerns. Newspaper editorials incessantly called for better law

enforcement, legal reform, and an end to lawlessness. The most heartfelt of these challenged

---

about toy pistols by mentioning other newspapers by name, including the *Dallas (TX) Herald* and *Westliche Post* (St. Louis, MO).

[26] I have not seen evidence of any Texas city prohibiting them. The cause of this is uncertain, but a lack of authority in municipal charters might be an important factor. Since they were not technically weapons, toy pistols could not be regulated or prohibited as deadly weapons were. Depending on each city's charter, regulation in the name of public health might have been a possibility, but I have not found evidence of cities moving in this direction. See also House Bill 397, 18th Leg., Reg. sess. (1883), TSLAC.

133

readers to look in the mirror rather than point fingers at state lawmakers. Some denounced "weak-kneed juries" who were "too tender to enforce the law." As long as jurors failed to convict known criminals, people "will continue to settle their difficulties with knife and club and pistol." Others blamed the general public for succumbing to "the romance of assassination." When a wealthy or well-connected man committed murder, "there are sympathies aroused, and the lawyers plead, and the ladies weep, and the juries fail to agree, and the judge halts; a new trial is granted, and the case is postponed for witnesses that never come, and after a number of months in prison the door is opened and the murderer is out." This put society "back toward that state of barbarism" where "that man has the supremacy who has the strongest arm and the sharpest knife, and the stealthiest revenge, and the quickest spring of a trigger."[27]

As the 1870s wore on, some reform-minded Texans began latching on to the deadly weapons ban as the crucial component in any attempt to reducing violent crime. Associating firearm restrictions with crime prevention was nothing new; James W. Throckmorton had made that connection back in 1866. What was innovative this time was the sense that enforcing the deadly weapons ban held the key to securing safety, peace, and happiness in Texas. The movement really began in 1879 with B. B. Paddock, a newspaper editor and booster in North Texas. Paddock caused a statewide stir when he said: "If the South—if Texas—really desires to achieve that reputation for law and order which has been won by some states and by some communities, the ensign raised, the banner planted, must bear the unequivocal device, 'The Revolver Must Go.' There is too much revolver in this country. No sincere lover of his section, no honest friend of the South, can deny it."[28]

---

[27] Quotations in "That Jury," *North Texas Enterprise* (Bonham, TX), August 7, 1874; "The Suppression of Crime," *Richmond Reflector* (Richmond, TX), April 23, 1879.

[28] Paddock actually picked up the phrase from the Cleveland *Register*. He reprinted an article from that paper which said, "If the West and South would rally around the sentiment, 'The revolver must go,' it would be one more step in

Paddock's mantra received support from other papers and remained the slogan of a gun regulation movement that picked up steam over the next decade. An East Texas paper proceeded to "call upon the press and the people of the State to aid us in exterminating the pistol and bowie-knife in Texas" for "the good of society."[29] Commentators repeatedly voiced their belief that packing heat was the root cause of homicides. Protestant ministers preached respect for law and against concealed weapons, with some taking their message to the western towns bedeviled by outlaws.[30] Grand juries were a special target for reformers, who urged them to "speak out" on the subject and "send up reports, petitions and appeals regarding lawlessness and crime." One district judge reminded his grand jurors that: "The day has passed when it was necessary to carry arms in this country to insure personal safety. There can *now* be no excuse for this violation of the law." He portrayed the deadly weapons ban as a "wholesome law" whose strict enforcement "will do much towards the suppression of bloodshed and murder in this section."[31]

Hundreds of Texans living in the frontier counties exempted from the deadly weapons ban sent petitions to the governor's office and legislature asking for its enforcement. These requests began in the mid-1870s when the threat of Comanche raids had almost entirely subsided and rapid population growth destabilized isolated market towns. Petitions poured in from

the interest of civilization." See *Fort Worth Daily Democrat* (Fort Worth, TX), April 3, 1879; May 1, 1879. The slogan was still in use as of the mid-1880s. See "The Cattlemen," *Fort Worth Daily Democrat* (Fort Worth, TX), March 5, 1883; "Other Locals," *Austin Weekly Statesman* (Austin, TX), May 15, 1884; "Gordon Notes," *Palo Pinto Star* (Palo Pinto, TX), August 1, 1885.

[29] Paddock's article was reprinted in the *Waco (TX) Telephone* and received strong support from the *Galveston (TX) Daily News*; see *Fort Worth Daily Democrat* (Fort Worth, TX), May 15, 1879; *Galveston Daily News* (Galveston, TX), June 3, 1879. Quotation in "They Must Go!" *Panola Watchman* (Carthage, TX), July 30, 1879.

[30] For examples of general support for pistol regulations, see *Dallas Daily Herald* (Dallas, TX), October 3, 1884; "Pistols," *Fort Worth Gazette* (Fort Worth, TX), Feb 2, 1885; *Waco Evening News* (Waco, TX), January 27, 1893. On support for the cause by preachers, see "A Sermon," *Christian Messenger* (Bonham, TX), September 14, 1881; "Pistols Gone, Never to Return," *Waco Daily Examiner* (Waco, TX), August 26, 1884.

[31] "Judge Fleming's Charge to the Grand Jury," *Frontier Echo* (Jacksboro, TX), November 10, 1876; "To Grand Juries," *Weekly Democratic Statesman*, (Austin, TX), October 24, 1878; "Must Not Carry Pistols," *Dallas Morning News* (Dallas, TX) July 4, 1899; "Carrying Weapons Is Scored by Judge," *Dallas Morning News* (Dallas, TX), March 12, 1912. Quotation in "Judge Wheeler's Charge," *Albany Star* (Albany, TX), September 21, 1883.

Maverick County in South Texas, Kerr, Mason, Llano, Brown, Taylor, Callahan, Parker, and Montague Counties along the frontier line, and Wheeler County in the panhandle. In each case, the citizens stated that exemption was no longer necessary and had become a burden. As long as Indian raids remained a possibility, pistols and small firearms were a necessary evil, but as soon as the countryside became ready for settlement and the establishment of ranches, these weapons turned into a nuisance. "Lawless men" congregated in newly settled counties, and "law abiding Citizens are more liable to commit crimes when allowed to carry Six-shooters." Moreover, "residents from the surrounding country" visited nearby market towns a few times a year "for the purpose of business but principally to have a 'spree'." They unfailingly took advantage of the frontier exemption by carrying pistols and firing them "indiscriminately in the streets, thereby endangering the lives and greatly annoying the peaceable Citizens." Citizens of Brown County wrote, "when lawless men are disarmed we will have no trouble in enforcing law and order."[32]

Governors Coke, Hubbard, and Roberts had responded to these petitions by issuing proclamations removing counties from the purview of the deadly weapons ban on a case-by-case basis. In 1875, the Texas Senate tried to tackle the problem. The Judiciary Committee drafted a bill that recognized the governor's power to exempt counties based on the Indian threat but placed all incorporated cities within the purview of the deadly weapons ban. The proposed law prohibited the carrying of deadly weapons within one mile of a courthouse and empowered local officials to deputize as many special constables as they deemed necessary "to enforce the provisions of this act."[33] The proposed bill passed the Senate only to die in a House committee. A replay of this process occurred at the next legislative session when a senate bill eliminating the

---

[32] Brown, "Gun-Toting Controversy," 255-259, quotations at 256. See also Petition of Citizens of Eagle Pass, Senate Bill 720, 14th Leg., 2d Called sess. (1875), TSLAC.
[33] Senate Bill 720 (1875), TSLAC.

136

frontier exemption stalled in the House.[34] The inability of the legislature to pass a bill of this kind meant that a steady flow of petitions continued to reach Texas lawmakers.

Where the legislature dithered and previous governors shirked a comprehensive policy, John Ireland took decisive action. On paper Ireland looks quite similar to his predecessors. He had a long record of public service, supported secession, aided the Confederacy, and ran afoul of military officials during Reconstruction. He differed from the preceding governors, however, on the subjects of economic development and criminal justice. Where Coke, Hubbard, and Roberts had, for the most part, supported the policy of incentivizing railroad development through generous land grants, Ireland did not. Having inherited a state with shaky finances and a rapidly dwindling supply of public lands, he recognized the unforeseen negative consequences of their policy. A similar shift occurred on the subject of criminal justice. His predecessors failed to stem the tide of lawlessness or make legal reform a central part of their platforms, but Ireland did both. In 1884 he "extended the law prohibiting the carrying of six-shooters and other small arms to all parts of the State."[35] In both of his messages to the legislature he recommended increasing the penalty for illegally carrying deadly weapons.[36]

Ireland had the good fortune of being joined in his condemnation of gun-toting by the barons of the cattle industry. Charles Goodnight, the most influential rancher in the Texas Panhandle, had strictly controlled his cowhands' access to pistols from the time of his settlement there in the mid-1870s. Before ranching, Goodnight worked as freight driver and Texas Ranger but managed to insert himself in the cattle business and transform himself into a successful entrepreneur and investor. He recognized that violence and rowdiness led to disorder, which

---

[34] Senate Bill 51, 15th Leg., Reg. sess. (1876), TSLAC.
[35] Brown, "Gun-Toting Controversy," 258-259; *House Journal* (1885), 16.
[36] *House Journal* (1885), 16; *House Journal* (1887), 21.

undermined the financial interests of ranching.[37] As the industry grew in the early 1880s, other like-minded cattlemen arrived at same conclusion. Beginning in 1882, cattle- and stock-raisers' associations throughout the Plains began holding annual conventions to coordinate ranch activities (like annual round-ups, etc.) and address industry problems. One issue that consistently received attention was cowboy gun violence. A stock-raisers' association in Kansas unanimously adopted a resolution to "deprecate [the pistol's] use, except in extreme cases of necessity while on duty in protecting the rights of property against Indians and outlaws" and "in all cases while visiting the towns along the border." The following year, a statewide cattle-raisers' association met in Fort Worth, Texas. The convention used the district courtroom for its meeting hall, and organizers from the host city decorated it with a life-size plaster steer and numerous banners. One of the banners bore Paddock's old slogan, "The last relic of barbarism—The revolver must go."[38] Cattlemen across the West participated in a regional convention held in St. Louis, Missouri in 1884, which similarly denounced the widespread use of pistols by cowhands.[39]

Cattlemen felt the need to enact measures against carrying small firearms because a great many of the cowboys engaged in violent behavior. Cowboys used interpersonal conflict to settle difficulties and to claim manliness for themselves. Living devoid of the usual trappings of manhood—a wife and a home—they sought out other methods of asserting themselves. Newcomers to the trade often received advice from old-timers to purchase and carry a pistol lest they be disrespected by others. Fights erupted between colleagues in the bunkhouse, or between

---

[37] On Goodnight, see *Handbook of Texas Online*, H. Allen Anderson, "Goodnight, Charles," accessed November 26, 2018, http://www.tshaonline.org/handbook/online/articles/fgo11. Goodnight's aversion to gun-toting is also reflected in the title of a biographical representation of his life written by a family friend. See Laura V. Hamner, *The No-Gun Man of Texas: A Century of Achievement, 1835-1929* (Amarillo: Laura V. Hamner, 1935).

[38] Quotations in Brown, "Gun-Toting Controversy," 126; "The Cattlemen," *Fort Worth Daily Democrat* (Fort Worth, TX), March 5, 1883. See also *Brenham Daily Banner* (Brenham, TX), March 7, 1883.

[39] On the cattlemen's gun control movement, see Brown, "Gun-Toting Controversy," 113-164; "The Regenerated Cowboy," *Albany Star* (Albany, TX), March 9, 1883.

outfits on the range. Frequent drunkenness and gambling naturally played a role in creating and escalating these conflicts.[40] As much as the pistol was an aid against Indians and outlaws, it was a nuisance and danger to daily ranch work. When cowboys arrived in the cattle towns of Kansas, and later Texas, they perpetrated all manner of crimes with their weapons. The city fathers of Dodge City, Kansas, famously passed a city ordinance prohibiting the carrying of weapons in town so that they could reduce the lawlessness that came on the heels of the cattle drives. Other cowtowns followed suit, insisting on turning their boomtowns into law-abiding and peaceful communities for middle-class residents.[41]

Governor Ireland's elimination of the frontier exemption to the pistol law in 1884 should have disarmed Texas cowboys. But their daily work on the range and their frequent long-distance traveling placed them well within some of the remaining exemptions. This conundrum made the pistol-toting cowboy, once again, the cattlemen's problem. Large-scale ranchers created and operated modern business enterprises, and they used tactics similar to those of industrialists to enforce order among their workers. When cowboys went on strike in 1883, ranchers responded by hiring strike-breakers, holding out until their workers capitulated, or offering minimal salary increases. When the strike led to a sharp rise in rustling (likely the

---

[40] Jacqueline M. Moore, *Cow Boys and Cattle Men: Class and Masculinities on the Texas Frontier, 1865-1900* (New York: New York University Press, 2010), 178-182; Jacqueline M. Moore, "'Them's Fighting Words': Violence, Masculinity, and the Texas Cowboy in the Late Nineteenth Century," *Journal of the Gilded Age and Progressive Era* 13, no. 1 (January 2014): 28-55. See also "Pistols Gone, Never to Return," *Waco Daily Examiner* (Waco, TX), August 26, 1884.

[41] Robert R. Dykstra, *The Cattle Towns* (New York: Knopf, 1968); Robert R. Dykstra, "To Live and Die in Dodge City: Body Counts, Law and Order, and the Case of *Kansas v. Gill*," in *Lethal Imagination*, ed. Bellesiles, 211-226; Mark R. Ellis, *Law and Order in Buffalo Bill's Country: Legal Culture and Community on the Great Plains, 1867-1910* (Lincoln: University of Nebraska Press, 2007). There has been significant historiographical debate over the relative violence and deadliness of cowboys, cattle towns, and the West in general. Dykstra and Ellis hold firmly to the argument that the new towns of the West were generally law-abiding, and their residents went to great lengths to punish crimes. Criticism has come from McKanna in *Homicide, Race, and Justice in the American West* and Roth in *American Homicide*, who find the West to be an exceedingly violent place, particularly in boomtowns and newly settled areas. Much of the conflict centers on the efficacy of using homicide rates (homicides per 100,000 people) to evaluate violence in small communities of fewer than 1,000 people.

Compendium_Rivas
Page 263

handiwork of unhappy cowboys), cattlemen asked for a special detachment of Texas Rangers to solve the problem by any means necessary.[42] By the late-1880s, many cattlemen had laid down workplace rules that included provisions against carrying pistols in bunkhouses, on round-ups, and even on trail drives.[43] In their anti-pistol efforts, cattlemen discounted the cultural importance of six-shooters to their working-class cowhands; they tried to police the behavior of their workers even during their free time in much the same way that industrialists did.[44] An industry that we typically associate with an antiquated, romantic past was in fact a modern business made possible by the rapid development of industrial capitalism in the second half of the nineteenth century.[45]

Economic and demographic growth indeed provide the proper context for understanding the significance of Ireland's departure from previous governors in calling for tougher enforcement of the pistol law in Texas. The establishment of new towns, and an ever-increasing population in the old ones, meant more interpersonal encounters that could turn deadly. Between 1870 and 1880, the state population nearly doubled from just over 800,000 to almost 1.6 million. By 1900 there were over three million Texas residents.[46] The population was growing so quickly, and to such a degree, that customary methods of policing became inadequate. The small market towns and rural lifestyle of the antebellum decades could be policed by a sheriff with a handful

---

[42] Brown, "Gun-Toting Controversy," 136-38; Mark Lause, *The Great Cowboy Strike: Bullets, Ballots, and Class Conflict in the American West* (New York: Verso, 2017); *Handbook of Texas Online*, Robert E. Zeigler, "Cowboy Strike of 1883," accessed November 26, 2018, http://www.tshaonline.org/handbook/online/articles/oec02.
[43] Brown, "Gun-Toting Controversy," 142-143.
[44] Recent work by historians has drawn connections between cowboys and wage workers more generally. They shared important similarities in their working conditions, gender notions, and attitude toward violence and prohibition. Jacqueline Jones highlights these connections in *Cow Boys and Cattle Men* as does Marke Lause in *The Great Cowboy Strike*.
[45] For an account of the cattle business as a thoroughly modern, capitalist enterprise, see H. W. Brands, *American Colossus: The Triumph of Capitalism, 1865-1900* (New York: Doubleday, 2010), 182-205.
[46] *Handbook of Texas Online*, "Census and Census Records," accessed November 27, 2018, http://www.tshaonline.org/handbook/online/articles/ulc01.

of part-time deputies, but county seats with several thousand residents could not. Texas lagged behind the national average in terms of urbanization, but its town-dwelling population skyrocketed between 1850 and 1900.[47] Many cities established professional police forces, and sheriffs' offices hired more full-time deputies. But police officers were still not likely to know the residents they protected, nor were judges and juries likely to be familiar with the defendants who appeared before them. The old way of adjudicating differences based on knowledge of one's neighbors, their personalities, and their life stories had become a thing of the past.[48] Furthermore, a booming economy rendered the protection of property like land, cattle, and business assets more important than ever. The unfeeling, irrational market that wielded such disproportionate control over the lives of Americans meant that the loss of a valuable commodity, or the death of a family provider, at the hands of some rowdy could lead to financial ruin.

Within this larger context of intertwined economic growth and social instability, many Americans, including a large and vocal segment of the population of Texas, found a proactive government appealing. In the decades after the Civil War, when the northern states had become an industrial powerhouse and the southern economy developed as a result of railroad construction, Americans embraced all sorts of regulations. The most notable of these came in the form of state and local agencies designed to improve the health and safety of residents. For example, a Pennsylvania medical journal addressed the toy pistol epidemic of the early 1880s by calling upon state health boards across the country to gather data about deaths traceable to the

---

[47] *Handbook of Texas Online*, David G. McComb, "Urbanization," accessed November 27, 2018, http://www.tshaonline.org/handbook/online/articles/hyunw.

[48] On the antebellum, customary way of policing neighborly behavior and preserving communal peace, see Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009).

device, presumably to advise lawmakers about possible solutions.[49] Though we often think of early twentieth-century progressives as the Americans who authored state and municipal regulations concerning sanitation, health, and child protection, such legislation flooded state capitals and city halls between 1870 and 1900.[50]

In addition to the well-documented efforts of regulatory agencies was a host of state laws and municipal ordinances aimed at policing individual behavior. City councils made rules about the use of public sidewalks designed to discourage loiterers and peddlers; in addition to the deadly weapons ban, the Texas legislature criminalized discharging firecrackers in cities, horse-racing on public streets, refusing to work on public infrastructure projects, and amended laws pertaining to bigamy, prostitution, and disturbing the peace.[51] One policy scholar wrote in 1887 that state governments across the country had enacted laws that "deal with the citizen in every conceivable relation" and "seem to have left nothing for future Legislatures to regulate."[52] In the case of both behavior-reform laws and regulatory agencies, people expected their governments to forestall *potential* problems by preemptively forbidding activities that might give rise to them. Observers typically interpreted such actions as justifiable and constitutional exercises of police power. They elevated the common good over individual interests and did not hesitate to use the coercion of some to protect the liberty of the many.[53]

During the final three decades of the nineteenth century, Texas reformers agitated for increasing the penalty for illegally carrying weapons, and in doing so they made use of this common-good discourse. A Houston writer described "the penchant for carrying arms" as "the

---

[49] "The Victims of the Toy Pistol," *Medical and Surgical Reporter* (Philadelphia, PA), August 6, 1881.
[50] An apt description of this regulatory impulse can be found in Albert Shaw, "The American State and the American Man," *The Contemporary Review* 51 (Jan. 1887): 695-711.
[51] Perusal of the Texas Penal Code of 1895 reveals dozens of such laws enacted or amended between 1870 and 1895. See Tex. Pen. Code (1895).
[52] Shaw, "The American State and the American Man," 698.
[53] The juxtaposition of liberty and coercion here is taken directly from Gerstle, *Liberty and Coercion*.

bane of civilized communities" for making criminals of otherwise upstanding men who thoughtlessly killed someone "when passion clouds judgment and sober sense is drowned in a terrific outburst of temper."[54] Another commentator on the subject asked whether the law's skeptics wanted "society turned over to the personal liberty of gambling, pistol carrying, opium smoking and whatever else man's appetite may demand as an inalienable right?"[55] According to these crusaders, man's liberty existed within certain bounds. Actions that *might* lead to bloodshed received condemnation just as forcefully as inherently violent acts. A central Texas paper declared: "In our opinion under ordinary circumstances the carrying of a concealed deadly revolver . . . ought to afford presumptive evidence that the party in possession of it is ready and willing to take human life . . . just as it ought to be presumed and is a fact that an armed midnight burglar contemplates murder to save himself if caught in a close place."[56] An east Texas critic went even further, accusing those who habitually carried weapons of being either "silly" or "murderous." Furthermore, anyone claiming diminished capacity for shooting someone while drunk should be disregarded. One writer declared: "He was, however, competent to premediate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."[57]

 This common-good approach to criminal justice led many reformers to the conclusion that violation of the deadly weapons ban ought to carry a mandatory state prison sentence. As it was written in the 1879 penal code, the deadly weapons ban did not include jail time—just a fine and forfeiture.[58] This was typical for Texas misdemeanor offenses, which were usually punished

---

[54] "The Deadly Revolver," *Stephenville Empire* (Stephenville, TX), April 5, 1884.

[55] *Fort Worth Daily Gazette* (Fort Worth, TX), August 1, 1887.

[56] "Suppress the Deadly Weapon," *Brenham Daily Banner* (Brenham, TX), December 12, 1889.

[57] "Entirely Too Many Revolvers," *Albany News* (Albany, TX), August 22, 1884.

[58] The fine could range from twenty-five to one hundred dollars. In 1878 the Texas Court of Appeals ruled forfeiture of the weapon unconstitutional. *Jennings v. State of Texas*, 5 Tex. Cr. App. 298 (1878).

by a fine, or perhaps a brief period in county jail. Felonies, on the other hand were those which could be punished by execution or confinement in the state penitentiary "either absolutely or as an alternative."[59] Reformers of the late nineteenth century supported "making it a penitentiary offense and a $500 fine for a man to be caught with a pistol or bowie-knife on his person."[60] Most agreed that "a year or more" seemed like a suitable length of time in prison for gun-toters.[61] North Texas representative William Kendall (Denton County) introduced a bill to amend the deadly weapons ban by requiring three to five years in the penitentiary, but it generated so much controversy that it could not pass.[62] The failure of Kendall's bill in 1883 may seem at first glance to indicate widespread disapproval of this "penitentiary offense" movement, but the actions of John Ireland say otherwise. He successfully ran for reelection in 1884, and upon taking the oath of office unambiguously stated that he wanted an "increase of the penalty, and that it be made a felony."[63]

The mandatory imprisonment movement reached an early high point in 1887 with the enactment of the first substantial amendment to the deadly weapons ban.[64] The story of its passage demonstrates the unpredictable nature of the legislative process. It began with a straightforward attempt in the House to close a potential loophole. A defendant had appealed his conviction for carrying brass knuckles by arguing that his weapon was made of steel rather than brass. The Court of Appeals upheld the conviction, but the episode revealed a potential weakness

---

[59] Tex. Pen. Code §54 (1879).
[60] "They Must Go!" *Panola Watchman* (Carthage, TX), July 30, 1879. See also "State Press," *Galveston Daily News* (Galveston, TX), January 6, 1887.
[61] See *Panola Watchman* (Carthage, TX), January 26, 1881; "The Deadly Revolver," *Stephenville Empire* (Stephenville, TX), April 5, 1884.
[62] H. B. 548, 18th Leg (1883); *House Journal* (1883), 416, 424.
[63] *House Journal* (1887), 21.
[64] In drafting the 1879 penal code, the option to jail offenders was taken away. This was a minimal change because 1870s offenders were not typically jailed for carrying deadly weapons; on top of this, the move was sneakily placed in a large penal code revision, which cut off any significant debate about it.

in the text of the law.[65] John M. Melson, a young Confederate veteran on the road to becoming a sharp and well-connected attorney, introduced a bill to drop "brass knuckles" in favor of "knuckles made of any metal or any hard substance."[66] E. Taylor Moore, a representative of the Austin area and chairman of the committee reviewing the bill, tacked on a heftier fine of fifty to two hundred dollars.[67] The bill passed the House without any difficulty.

In the Senate, however, Melson's bill generated tremendous controversy and turned into something altogether different from what he had intended. The reviewing committee in the Senate immediately dropped the minimum fine increase.[68] In their view, squeezing a few more dollars out of violators was not enough to solve the problem of persistent pistol-packing. Instead, they required confinement in the county jail for *all* offenders, whether first-time or repeat. This marked a compromise position between the proponents of a penitentiary sentence and their opponents, and it became one of those compromises that left all parties unhappy. One of the bill's strongest supporters only reluctantly cast his vote for it, believing that the required minimum confinement of twenty days was too harsh.[69] The debate over the mandatory imprisonment clause was a brutal process that played out over the course of several days. Opponents used every trick in the book to defeat it, only to see the pro-imprisonment forces use a technicality to force its ultimate passage. After all the strong-arming and machinations that took place in the Senate, the House members acquiesced to their amendments. A simple phraseology

---

[65] *Harris v. State of Texas*, 22 Tex. Cr. App. 677 (1887).

[66] House Bill 51, 20th Leg., Reg. sess. (1887), TSLAC; *Senate Journal* (1887), 156. On Melson, see Eugene C. Barker, ed., *A History of Texas and Texans* by Frank W. Johnson (Chicago: American Historical Society, 1914), 4: 1920-1921.

[67] The fine was set at twenty-five to one hundred dollars, so Moore's amendment effectively doubled the fine. See *House Journal* (1887), 62.

[68] They actually kept the maximum fine increase of two hundred dollars, though defendants rarely ever received more than the minimum. For more information on penalty and enforcement trends pertaining to the deadly weapons ban, see ch. 5.

[69] *Senate Journal* (1887), 195.

fix had evolved into a mandatory penalty of at least twenty-five dollars and twenty days in county jail.[70]

The 1887 amendment turned out to be a short-lived victory for pro-imprisonment agitators. Two years later, the legislature dropped its mandatory jail time. Instead, offenders could be punished by fine, county jail time, or both.[71] These lawmakers restored the sentencing discretion that the 1887 law had taken away from judges and juries. Until the very late nineteenth century, most county jails in Texas were exceedingly small. Many were wooden "dungeon"-style holdovers from the antebellum period; these consisted of a sheriff's quarters plus a windowless lockup accessible only via a trapdoor on the second floor. Other counties used prefabricated holding cells measuring approximately ten square feet. But even the newest, largest county jails from the period had limited capacity for prisoners and likely struggled to house dozens of them for weeks or months at a time.[72] It could be that the prospect of sending otherwise law-abiding men to such a degrading place prompted judges and juries to avoid handing down guilty verdicts for gun-toters.[73] It may also be that rigid enforcement of this law produced jail overcrowding, disease, and an undue burden upon county sheriffs. It was also much easier and financially rewarding for local officials to collect small fines and send violators on their way. Whatever the reason, the mandatory imprisonment amendment had detractors as vocal as its supporters, and the former leapt to action as quickly as possible after their failure in 1887.

---

[70] An Act relating to unlawfully carrying arms, General Laws of Texas, §9 (1887).

[71] Violators could be fined twenty-five to two hundred dollars, jailed from ten to thirty days, or both. One writer considered this alteration an annulment of the pistol law. See An Act relating to limiting the penalty for carrying concealed weapons, General Laws of Texas, §37 (1889); "The Pistol Bill," *Waco Evening News* (Waco, TX), January 17, 1889.

[72] Edward A. Blackburn, *Wanted: Historic County Jails of Texas* (College Station: Texas A&M University Press, 2005).

[73] State senator C. K. Bell expressed this view in 1885: ". . . while I am in favor of inflicting punishment upon all violators of the law commensurate with the crim committed, I am not willing to impose a severe and disgracing punishment upon a good man because a bad man has abused his privileges." See *Senate Journal* (1885), 62-63.

The most common argument against strengthening the deadly weapons ban grew from the ideas of eighteenth-century Italian political philosopher Cesare Beccaria. In the 1760s he authored a treatise called *Essay on Crimes and Punishment*, which criticized Italy's justice system as brutal, barbaric, and tyrannical. He particularly detested laws enacted by overzealous legislators who threw the proverbial baby out with the bathwater. Beccaria blamed what he called "false ideas of utility" for the passage of statutes attempting to prevent potential evils by prohibiting an otherwise harmless activity. These laws "would sacrifice a thousand real advantages to the fear of an imaginary or trifling inconvenience . . . would deprive men of the use of fire for fear of their being burnt, and of water for fear of their being drowned." Beccaria considered weapon regulations within this category. They disarm only the law-abiding and leave them vulnerable to intimidation by the criminals who disregard all statutes.[74]

Beccaria's argument persuaded many readers in the eighteenth century as well as many Americans living in the nineteenth and twentieth centuries. An influential American criminologist, Maurice Parmlee, subscribed to Beccaria's view to some degree. Petty offenses that caused no physical harm to anyone (he used the examples of spitting on the sidewalk or prohibiting alcohol) do more to erode confidence in the justice system than they do to promote the public good. They are unenforceable, he said, and therefore "furnish an admirable means of blackmail for the police." Worse still were those non-violent crimes that did not have overwhelming popular support. The substantial dissenting minority could easily "succeed in nullifying it in practice."[75] Some nineteenth-century Texans, namely the forces seeking to weaken or eliminate the deadly weapons law, agreed with this view. In 1885, one of the many

---

[74] "Of the Means of Preventing Crime," in Cesare Beccaria, *An Essay on Crimes and Punishments* (London: F. Newbery, 1775).

[75] Maurice Parmlee, *Criminology* (New York: The MacMillan Company, 1923), 345-350. For a current introduction to criminology, see Stephen Jones, *Criminology*, 5th ed. (New York: Oxford University Press, 2013).

dozens of bills affecting the pistol law received a scathing critique from Senator C. K. Bell. A North Texas (Denton County) attorney who later became a strong voice within the "wet" faction of the Democratic Party, Bell disliked moral legislation that impinged upon personal liberties. Though he did not oppose the deadly weapons ban per se, he rejected the idea of increasing its penalty by requiring jail time. In his view, the law should punish the crimes committed with pistols rather than criminalize carrying them altogether. He said, "I think the trouble with those who are in favor of more stringent laws with reference to the carrying of pistols is that they confuse the trivial offense of carrying a pistol, with the crime which is committed with the pistol."[76]

Jurists and lawmakers of the nineteenth century, however, did not subscribe wholeheartedly to Beccaria's views. Joseph Story found much to criticize in his claim that pardons and paroles undermined law enforcement.[77] Beccaria also said that there ought to be no gradations of crime, nor any consideration of mitigating circumstances that might justify a more lenient punishment. A perusal of any state's criminal statute book from the nineteenth century demonstrates Americans' rejection of this concept. Even in the Italian criminology field, Beccaria's theories, emblematic of the *classical* school, were quickly replaced by those of Cesare Lombroso and Raffaele Garofalo. These early *positivist* criminologists blazed a trail that their counterparts emulated across western Europe and the United States.[78] They found that environment and individual circumstances affected a person's criminal tendencies and recommended that governments take some preventive action to uphold the moral standards of the

---

[76] *Senate Journal* (1885), 62-63. On Bell, see *Handbook of Texas Online*, Anne W. Hooker, "Bell, Charles Keith," accessed November 29, 2018, http://www.tshaonline.org/handbook/online/articles/fbe34.

[77] Joseph Story, *Commentaries on the Constitution of the United States* (Boston: Hilliard, Gray, & Co., 1833), 343-344.

[78] On the exchange of ideas and "social experiments" across the Western world in the late nineteenth and early twentieth centuries, see Daniel T. Rodgers, *Atlantic Crossings: Social Politics in a Progressive Age* (Cambridge: Harvard University Press, 2009).

community. For Garofalo, the best way to achieve this goal was the institution of "a public moral education," and the enactment of a minimal number of laws that limited personal liberty; among those worthy of mention for him were "regulation of liquor-selling, gambling, and the carrying of arms."[79]

The supporters of a harsher deadly weapons ban in Texas took a seemingly odd approach to this philosophical argument over the efficacy of moral prohibitions. They often repeated Beccaria's argument while in the same breath calling for tougher enforcement of the law. For them, agreeing with the gist of Beccaria's assertion did not come at the cost of abandoning the regulation of pistol-toting altogether. For example, one promoter of making the deadly weapons law a felony offense observed that, "it is only the good citizen who is disarmed; the bully cares not a whit for it."[80] Another declared: "The bad men are always armed. The good ones, never."[81] The solution, in their opinion, was to raise the stakes for those choosing to continue packing heat. In other words: "Men will risk a fine freely and many men will risk a term in jail, but they will not, as a rule, risk the state prison at hard labor."[82] John Ireland agreed, stating during his term that the light punishment for carrying weapons was insufficient to intimidate the criminally disposed.[83] These writers firmly believed that, could the punishment be harsh enough, the overwhelming majority of men would voluntarily leave their pistols at home.

The "penitentiary offense" supporters, who continued singing their song well into the twentieth century, interacted with their opponents in interesting ways. Some flat-out dismissed

---

[79] Quoted in Parmlee, *Criminology*, 96.
[80] *Panola Watchman* (Carthage, TX), January 26, 1881.
[81] "They Must Go!" *Panola Watchman* (Carthage, TX), July 30, 1879.
[82] "Anti-Concealed Weapons Movement," *Dallas Morning News* (Dallas, TX), December 9, 1897.
[83] Ireland said, "It cannot be denied that the penalty for the violation of the law regulating the carrying of of arms is too small. No one who is evil disposed hesitates to run the risk of being fined, while peaceable persons, against whom evil is meditated, will, as a general thing, obey they law, and are placed at a great disadvantage. I recommend an increase of the penalty." *House Journal* (1885), 16.

the Beccaria argument and all its permutations as "weak and flimsy objections . . . allowed to have too much weight."[84] Others, including B. B. Paddock of Fort Worth, engaged in ad hominem attacks. Robert W. Loughery, an East Texas paper editor, took issue with Paddock's "The Revolver Must Go" slogan. He thought that "the prohibitory law has proved an unmixed evil," and "the best safeguard of society is to permit men to go armed if they see fit, and to enforce the law if arms are improperly used."[85] Paddock responded with a stinging barb against Loughery, calling him "representative of an extinct race" determined to "to go 'heeled' whenever they believe their lives or frontispieces to be in danger."[86] A pro-pistol Kansas editor received similar treatment, being berated as a veritable Rip Van Winkle who had fallen behind the times.[87] These overtly ageist attacks reveal a younger generation of westerners asserting themselves, along with their view that a government ought to enjoy more substantial exertion of power over its citizens.

The controversy over sending deadly weapons carriers to jail continued through the 1890s, and even into the twentieth century.[88] Lawmakers revised the state penal code again in 1895, and in so doing specified that anyone imprisoned for illegally carrying a weapon "may be put to work upon any public work in the county."[89] But at the next legislative session (1897), a critical mass of anti-imprisonment lawmakers took away the option to jail gun-toters. Ironically, the governor at the time, Charles Culberson, had opened the session by praising regulations

---

[84] "Suppress the Deadly Weapon," *Brenham Daily Banner* (Brenham, TX), December 12, 1889.
[85] *Marshall Herald*, quoted in *Fort Worth Daily Democrat* (Fort Worth, TX), April 3, 1879, and *Marshall Herald* quoted in "State Press," *Galveston News* (Galveston, TX), June 3, 1879.
[86] *Fort Worth Daily Democrat*, June 6, 1879.
[87] The editor of the *Caldwell Post* (Caldwell, KS) reprinted an article from *Texas Livestock Journal* (Fort Worth, TX) and used it to criticize the editor of *Hunnewell Independent* (Hunnewell, KS). See Brown, "Gun-Toting Controversy," 125-126; *Caldwell Post* (Caldwell, KS), February 23, 1882.
[88] Quotation from "Anti-Concealed Weapons Movement," *Dallas Morning News* (Dallas, TX), December 9, 1897. See also "Make It a Penitentiary Offense," *Dallas Morning News* (Dallas, TX), December 18, 1889; *Hillsboro Mirror* (Hillsboro, TX), January 17, 1898.
[89] Tex. Pen. Code, §338 (1895).

150

pertaining to weapons, juvenile delinquency, and "immoral publications." He presumably opposed making the deadly weapons ban a fine-only offense because the revision took effect without his signature.[90]

Lawmakers subjected the deadly weapons ban to critical revision in 1905. In that year, not only was the jail option restored, but the minimum fine skyrocketed from twenty-five to one hundred dollars.[91] This move came in response to a perceived increase in violent crime. Rural areas had certainly experienced more violence in recent years, largely as a result of rising racial conflict. The Democratic Party's suppression of Populism required a restoration of cross-class, white solidarity. Securing it came at the cost of stoking race hatred, intimidating black voters, and ultimately disfranchising them.[92] It was at this crucial turning point that African Americans in Texas became most susceptible to the potentially discriminatory application of the deadly weapons ban. As recipients of the wrath of the Democratic establishment, they needed access to armed self-defense more than they had since Reconstruction. Yet, at that very moment Texas lawmakers pushed them out of the local, state, and federal democratic processes through poll taxes, and later the white primary. The sheriffs, constables, and deputies who patrolled the cotton-growing regions of East, Central, and North Texas did not need to worry about antagonizing African Americans, whose voice in filling those local offices had been silenced.

---

[90] An Act relating to amending the penal code…, General Laws of Texas, §25 (1897). Another noteworthy weapon-related regulation to receive attention in the 1890s was the sale of them to minors. There had long been a small voice in the legislature demanding that this be criminalized, beginning with Robert Zapp in the early 1870s. Zapp and later legislators of a similar sentiment received substantial support in the press. For example, "What use a minor can have for pistol or dirk-knife, it is hard to determine, but the Austin solons think every boy should supply himself with one or both of them." In 1897 the legislature finally passed a law against selling small arms to minors, and the penalty was actually harsher than that for carrying a pistol at the time (fine and/or brief jail time). An Act relating to preventing the barter, sale or gift…, General Laws of Texas, §155 (1897). Quotation in *Dallas Daily Herald* (Dallas, TX), March 28, 1885. See also *Weekly Democratic Statesman* (Austin, TX), June 23, 1881; *Weekly Democratic Statesman* (Austin, TX), April 5, 1883.

[91] An Act relating to carrying arms and fixing a penalty, Texas General Laws, §44 (1905). This revision received praise from Texas reformers, as well as positive attention from outside the state. For example, see "Pistol Toting Banned in Texas" *Aspermont Star* (Aspermont, TX), May 21, 1908. Reprinted from *Atlanta (GA) Constitution*.

[92] Roth, *American Homicide*, 418-434.

Similarly, black town- and city-dwellers could no longer vote for the municipal officials or commissioners who hired and fired police officers. Conviction for carrying a pistol or knife meant a fine so expensive that most black Texans simply could not pay; instead, they went to county jail for a month or more, which undoubtedly hurt their job prospects and took a toll on their families.

If legislators in the fast-growing counties of North and Central Texas could strengthen the deadly weapons ban as a way of imposing order within their districts, they found ready allies among some of their South Texas colleagues (see Fig. 4.2). Ethnic conflict in South Texas had long simmered and reached a boiling point around the turn of the twentieth century. Widespread cattle rustling, attributed to "Mexican bandits," poisoned white residents against the growing number of Mexican immigrants, and indeed their Hispanic fellow-Americans. The tremendous support among culturally Mexican Texans for Gregorio Cortéz exemplifies South Texas's deep ethnic divide as well as Hispanic skepticism of law enforcement officers. Cortéz, through no fault of his own, became a suspected horse thief. The Karnes County sheriff went to Cortéz's home to question him and proceeded to shoot his brother in a misunderstanding. Being on his own property, Cortéz made use of his right to carry a weapon, and he fatally shot the trigger-happy sheriff. Knowing that he would be found guilty of murder in a court filled with Anglo jurors, Cortéz ran from authorities. He avoided capture for ten days and became a folk hero among the Hispanic population of South Texas.[93] Just like Cortéz, these men and women recognized that the *cherifes* (sheriffs) and *rinches* (rangers) would not tolerate a Mexican shooting one of their own, even in self-defense. The law was not on their side, and the deadly weapons ban made their situation all the more precarious by providing officers with a way to

---

[93] Américo Paredes, *"With His Pistol in His Hand": A Border Ballad and Its Hero* (Austin: University of Texas Press, 1958).

keep them disarmed and disempowered. As with African Americans, most Hispanic Texans could not afford a hefty one-hundred-dollar fine and were likely to spend time in jail instead.

The momentum for a mandatory prison sentence continued gaining strength in the early twentieth century. In 1913 J. W. Ussery, a one-term representative from East Texas (Wood County), introduced a bill that declared pistol-carrying a felony. The original version only addressed pistols and required two years imprisonment in the state penitentiary, but House members applied it to all deadly weapons and reduced the prison term to between one and three years. Opponents of the Ussery bill declared it a radical measure, and some critics speculated that it could be declared an unconstitutional, "cruel and unusual" punishment. A ringing endorsement of the bill by long-time House member Thomas Rowell of East Texas (Marion County) stirred enough members to send it to the Senate. He declared: "Certainly it is a drastic measure . . . . So was the law making the running of a gambling house in Texas a felony a drastic



Fig. 4.2. Map of votes in support of HB 47, 1905

153

measure. So was the law making bootlegging a felony a drastic measure. But conditions were so bad that drastic measures were necessary, just as today, the effects of the pistol toting evil are so grave naught save drastic remedies may be applied."[94] In the Senate, the Ussery bill ran into some stiff opposition and had to be modified. In the end, legislators restored the fine (this time ranging from one hundred to five hundred dollars) and moderated the prison sentence. First-time offenses were treated as misdemeanors—violators could be fined, sentenced to no more than two years in the county jail, or both. Repeat offenses could be handled as misdemeanors with the very same consequences as first-timers, or they could be deemed felonies punishable by a state prison sentence ranging from one to three years. The Senate revisions followed the legislative trend of giving wide discretion to judges and juries rather than handing down potentially draconian requirements.[95]

The sitting governor, Oscar B. Colquitt, vetoed the Ussery bill in April 1913. Colquitt gave two reasons for his decision. First, he believed that the revised penalty "is severe, and places a law-abiding citizen, who might from threats or other cause have reason to defend himself against thugs and 'bullies,' at a disadvantage."[96] He preferred to leave the penalties as they were listed in the latest penal code (passed in 1911), unchanged since 1905. Second, he had signed into law a new crime called "Assault with a prohibited weapon." This measure provided exceedingly stringent punishment for anyone who "shall willfully commit an assault or an assault and battery upon another with a pistol, dirk, dagger, slung shot, sword cane, spear or

---

[94] "Felony to Carry Pistol," *Bastrop Advertiser* (Bastrop, TX) March 7, 1913.
[95] House Bill 102, 33rd Leg., Reg. sess. (1913), TSLAC. The Ussery bill received a good deal of attention in the state press. See, "Pistol Carrying," *Alpine Avalanche* (Alpine, TX), Feb. 6, 1913. Reprinted from *San Antonio Express* (San Antonio, TX); "Violence and Its Hoarde," *Lampasas Daily Leader* (Lampasas, TX), Oct. 10, 1914. Reprinted from *San Antonio Express* (San Antonio, TX); "Felony to Carry Pistol," *Bastrop Advertiser* (Bastrop, TX), March 7, 1913; *Schulenburg Sticker* (Schulenburg, TX), March 7, 1913; *Temple Daily Telegram* (Temple, TX), April 5, 1913; *Honey Grove Signal* (Honey Grove, TX), April 4, 1913; "Pistol Bill Passed Finally By Senate," *Plano Star-Courier* (Plano, TX), April 3, 1913; "Would Make Pistol-Toting a Felony," *Plano Star-Courier* (Plano, TX), March 6, 1913.
[96] Veto Proclamation, H. B. 102, 33rd Leg. (1913); *Abilene Daily Reporter* (Abilene, TX), April 18, 1913.

knuckles made of any metal or made of any hard substance, bowie-knife, or any knife

manufactured or sold for the purpose of offense or defense, while the same is being carried

unlawfully by the person committing the said assault." There were three options for penalty: a

fine of up to two thousand dollars; up to two years in county jail; or up to five years in the

penitentiary.[97] The sentence here was harsher than aggravated assault with a deadly weapon.

That offense could not be a felony because imprisonment in the state penitentiary was not among

the options; moreover, the penal code provided penalty ranges for the optional fine or jail time.[98]

Whenever a law specified ranges, offenders often received the minimum unless there was some

exacerbating circumstance.[99]

Legislators made some slight alterations to the deadly weapons ban over the next decade,

but nothing noteworthy. Never again did pro-imprisonment agitators mandate jail time as they

did in the late-1880s or come so close to declaring violation a felony as they did in 1913.[100] The

possible reasons for this decline in legislators' interest in gun-toting are endless. One of the most

plausible might be the expansion of police and sheriff's departments in the twentieth century.

More and better law enforcement may have reduced "the habit of pistol-toting."[101] But a more

persuasive possibility may be that a cultural shift had occurred in the half-century from 1880 to

1930. As early as 1887, some Texas locales had witnessed a remarkable reduction in the carrying

of deadly weapons. Grand jurors in the panhandle's Hemphill County bragged that "we find

---

[97] An Act relating to defining the offense of assault with a prohibited weapon, Texas General Laws, §114 (1913). As far back as 1878, some commentators wanted to see a law like this one that severely punished those *who committed crimes with* their deadly weapons. See "To Grand Juries," *Weekly Democratic Statesman* (Austin, TX), October 24, 1878.

[98] Tex. Pen. Code §1023-1024 (1911). The maximum fine for aggravated assault in 1913 was one thousand dollars, half that for assault with a prohibited weapon.

[99] I make this claim based upon my own observation of County Court and JP Court records for various Texas counties.

[100] Efforts to make it a felony continued. See "New Pistol Toter Bill," *Polk County Enterprise* (Livingston, TX), April 11, 1907.

[101] "Pistol Carrying," *Alpine Avalanche* (Alpine, TX), Feb. 6, 1913. Reprinted from *San Antonio (TX) Express*.

lawlessness and crime less in proportion than in the older counties, the deadly weapon called six-shooter banished from among us, our citizens are law-abiding, our courts are composed of solid and substantial men who have the interest of the county at heart."[102] As discussed above (ch. 3), the development of a solid middle class in Texas initiated some important behavioral and cultural changes, one of which entailed dropping the pistol and bowie-knife as everyday accoutrements. The louder and shriller calls throughout this period to make the deadly weapons ban a "penitentiary offense" actually demonstrate the general public's growing impatience with those few who still packed heat. In fact, as middle-class Americans reached a new consensus about the extent and supremacy of government power over individual liberties, Texans employed a new approach to the pistol problem that demonstrates their acceptance of a much more activist state.

For these progressive reformers, life in a modern society called for certain government actions to protect the commonweal. Some called these "positive regulations" because lawmakers pursued policies to actively change and improve society. For example, quarantine laws and railroad rate-setting agencies did not simply define certain illegal market activities. Instead, they conferred a positive effect upon all Texans by protecting them from the negative consequences of exposure to contaminated products and predatory pricing. In a similar vein, the deadly weapons ban was not just a "negative regulation" punishing an overtly criminal act; it was a "positive regulation" designed to lessen the potential for criminal activity throughout the future. Prohibitionists employed this rhetoric most skillfully in their descriptions of the happy, nay utopian, effects of an alcohol-free society. S. C. Padelford, a well-educated attorney in the North Texas town of Cleburne, spoke passionately in support of prohibition. In doing so, he also voiced

---

[102] Mark R. Ellis has used Lincoln County, Nebraska as a case study for the relative safety and lawfulness of newly settled towns on the Great Plains. See Ellis, *Law and Order in Buffalo Bill's Country*. Quotation from "Court Proceedings," *Canadian Free Press* (Canadian, TX), December 21, 1887.

support for the deadly weapons ban as a crime-prevention measure that promoted the common good. He disagreed with the anti-prohibitionists when they said that "the state must fix its limit of action by self-protection, by negative as opposed to positive regulation," and that the state "cannot . . . notice causes." Padelford used the pistol law to praise measures like prohibition, quarantine, and insurance laws that promoted the public good. By reducing gun-toting, which he blamed for "a great many fights, injuries and murders," the deadly weapons ban "strikes at the cause, and not altogether at the effect."[103]

The rapid rise to prominence of the social sciences, particularly sociology and criminology, provided an intellectual framework for understanding, justifying, and implementing "positive regulations." These fields produced scholars of law and public policy who wrote prolifically about new, pragmatic approaches to governance that influenced public servants and reveal much about the outlook of reform-minded Americans at the time. Important policy experts at the turn of the twentieth century saw the interests of the individual and the community in constant, if not irresolvable, tension.[104] John W. Burgess, a prominent American political scientist, defined the police power as "restraining the individual in the exercise of his rights when exaggerated by him to the point of becoming a danger to the community." Consequently, governments must wield "the power to *watch for and prevent* such abuse."[105] As a statist, Burgess wanted to see the national government grow in strength and reduce the "so-called

---

[103] Padelford confusingly then calls the weapon law, quarantine, and "fire limit" laws "negative regulations." This does not follow from the rest of his address and may be a typo. There are other typos in that particular issue of the *Dallas Herald*, notably the instructions guiding the reader through his multi-page speech. "Address of Hon. S. C. Padelford," *Dallas Herald* (Dallas, TX) July 25, 1887.

[104] Aside from the scholars mentioned specifically below, see also Parmlee, *Criminology*, 30.

[105] John W. Burgess, *Political Science and Constitutional Law*, 2 vols. (Boston: Ginn & Company, 1893), 2:216.

States" to minimal significance. The accumulation of state-level authority via police-power enactments frustrated him.[106]

Ernst Freund, one of the most notable public policy theorists of the early twentieth century, dedicated an entire volume to the police power, which he considered "practically a growth of the last thirty or forty years."[107] The interaction between private right and public good was crucial to his understanding of the concept, defined as "The power of promoting the public welfare by restraining and regulating the use of liberty and property."[108] For Freund, laws regulating weapons, poisons, and explosives were preventive measures. As far as the Second Amendment was concerned, Freund found no obstacle to sensible regulation: "Constitutional rights must if possible be so interpreted as not to conflict with the requirement of peace, order and security, and that regulations manifestly demanded by these requirements are valid, provided they do not nullify the constitutional right or materially embarrass its exercise."[109] Freund's position, published in 1904, aligned with the approach that Texas jurists had long taken in regard to the deadly weapons ban. Owning arms and participating in the militia remained legal; any other requirement aimed at crime prevention could be constitutionally enacted.

There was another similarity between Texas lawmakers' approach to the pistol problem and Freund's theory of police power, one which involved prohibitive taxation. Policy experts and reformers across the western world proposed legislative solutions to the social problems

---

[106] For a recent evaluation of Burgess and his influence upon American political scientists, with particular emphasis upon his racial views, see Jessica Blatt, "John W. Burgess, the Racial State and the Making of the American Science of Politics," *Ethnic and Racial Studies* 37, no. 6 (2014): 1062-1079. Burgess, *Political Science and Constitutional Law*, 1:184; 2:175-177, 184-185.

[107] On the importance of Freund to early progressives' formulation of a regulatory state, see Daniel R. Ernst, "Ernst Freund, Felix Frankfurter, and the American *Rechtsstaat*: A Transatlantic Shipwreck, 1894-1932," *Studies in American Political Development* 23 (October 2009): 171-188. Quotation from Ernst Freund, *The Police Power: Public Policy and Private Rights* (Chicago: University of Chicago Press, 1904), v.

[108] Freund, *Police Power*, 11-12.

[109] Freund, *Police Power*, 90-91.

generated by industrialization, some of which involved taxes. Tax-based policies included the progressive income tax and Henry George's "single tax" on land.[110] In both of these cases, the tax had some ulterior motive aside from raising revenue—they promised beneficial results for the community. The approach to occupational taxes was much the same, with a tax designed to weed out irresponsible entrants into a field (like medical licensing), or one intended to eliminate a particular industry (like taxing peddlers). Freund considered an occupational tax to be a police measure whenever "its primary purpose is to restrain and control a dangerous business." According to him, prohibitive licenses or taxes were acceptable as long as the action being policed remained within the purview of state authority, and the state had made some attempt to regulate the trade in question. Freund detailed an approach to the "dangerous business" of pistol sales that progressive Texans had long espoused.[111]

Texans began toying with the idea of an occupation tax upon pistol dealers in the 1880s. As early as 1881, some pistol critics considered "the indiscriminate sale, and exhibition for sale, of deadly weapons" a central part of the state's crime problem.[112] In 1885, the House passed a bill proposing to tax all dealers in pistols or pistol cartridges two hundred dollars annually.[113] The issue came up again at the next session, though the bill in question would have raised the tax to five hundred dollars.[114] Discussion of an omnibus occupation tax bill became rather heated in the Senate due to disagreement over the insertion of a tax upon all dealers in firearms. That bill,

---

[110] Daniel T. Rodgers discusses the reorientation of progressive politics from concerns about state power to those about industrialization and the mass accumulation of wealth during the period 1870 to 1900. See Rodgers, *Atlantic Crossings*, 52-55.
[111] Freund, *Police Power*, 33-34; see also Thomas Klingenberg Urdahl, *The Fee System in the United States* (Madison, WI: Democratic Printing Company, 1898), 201.
[112] Quotation by William Homan, from committee report in support of a Senate bill to "prohibit the importation and sale of all deadly weapons, except guns and army or navy size pistols." See *Senate Journal* (1881), 136.
[113] House Bill 22, 19th Leg., Reg. sess. (1885), TSLAC. The initial bill taxes not only dealers in pistol cartridges, but dealers in all types of deadly weapons. The committee substitute, which reduced the scope of the weapons taxed, passed the House only to fail in the Senate. For its full text, see *House Journal* (1885), 94.
[114] House Bill 214, 20th Leg., Reg. sess. (1887), TSLAC; *House Journal* (1887), 105, 188.

too, failed.[115] House members tried yet again during a special session called during 1888.[116] James S. Hogg, whose election to the governor's office in 1890 signaled the ascendance of the reform-oriented wing of the state's Democratic Party, became a promoter of a prohibitive occupation tax. In 1893, he described "carrying concealed deadly weapons" as a sign of "unmanly spirit and cowardice." To disincentivize the habit, he proposed an annual tax upon all persons "engaged in the business of selling or offering for sale any deadly weapons," along with posting a bond promising not to sell "any such weapon to any minor, madman or person in a state of wrath or intoxication."[117]

Opposition to the occupation tax upon arms dealers remained strong throughout the late nineteenth century. Not even the cajoling of Hogg could overcome opponents' hostility to the idea. The argument most often employed by these anti-taxers emphasized the impracticability of it. Dry goods merchants would be affected as severely as those who specialized in selling guns, thus driving up the costs of many consumer items. Furthermore, Texas residents could easily order pistols by mail from out-of-state suppliers. Advertisements for these mail-order dealers filled the back pages of Texas newspapers throughout the late nineteenth century. Some sold cheap pistols, others even gave them away to customers who purchased cartridge packs.[118] A critical legislator in 1885 suggested that a hefty tax upon those actually carrying pistols and knives would be a more effective strategy.[119] The strength of this position held until the early twentieth century, and firearm dealers remained conspicuously absent from the omnibus occupation tax law enacted in 1897.[120]

---

[115] This is House Bill 150 and its senate substitute. See *House Journal* (1887), 989; *Senate Journal* (1887), 698-699.
[116] House Bill 21, 20th Leg., 1st Called sess. (1888), TSLAC; *House Journal* (1888), 269.
[117] Address of Gov. James S. Hogg, *House Journal* (1893), 24-25.
[118] For example, see *Daily Fort Worth Standard* (Fort Worth, TX), October 12, 1877; *Denison Daily News* (Denison, TX), May 14, 1878.
[119] The dissenters proposed $250 or even $500. See minority report for House Bill 22 in *Senate Journal* (1885), 178.
[120] An Act . . . relating to general occupation taxes, General Laws of Texas, §18 (1897).

As the progressives' pragmatic, social-scientific approach to governance gained momentum, a critical mass of Texas senators devised a way to tax pistol sales.[121] In 1907, as the legislature hammered out major revisions to the occupation tax laws, senators successfully inserted an exceedingly high tax on all pistol sales. The senators participating in the conference committee of both chambers insisted on the pistol tax, outraging many House members.[122] All wholesalers and retailers trading in pistols had to track on a quarterly basis the "gross amount collected and uncollected from any and all sales made within this State of all fire arms." At the end of each quarter, such businesses had to send a fifty percent tax upon the gross sales numbers to the state Comptroller of Public Accounts.[123] The "hardware men" and sporting goods suppliers had threatened to fight the tax. A number of attorneys believed they had a solid case, claiming that the prohibitory nature of the tax made it vulnerable to judicial review.[124] Others decided to get out of the pistol business and sold off their entire stock before the tax went into effect.[125]

Again, critics complained that that the tax could be shirked by mail-ordering pistols. For some, this was a doubly bad option because it failed to curb pistol-toting and increased the market share of "Squeers Rawbuck & Co, or Mummery Hard & Co," the hated companies "that are sapping the very life out of state mercantile and industrial enterprises."[126] As it turned out, though, there was an even simpler way to avoid the tax: leasing. Within months of the law's passage, many businesses had switched from selling pistols to renting them for brief periods or

---

[121] Support for a tax had been building for some time, with at least one state house member (Thomas Cobbs of San Antonio) making it a central part of his campaign. See "The Man with the Hog Leg," *Bonham News* (Bonham, TX), March 30, 1906.
[122] When a conference committee reports a revised bill, it must be accepted or rejected in full; no further amendments can be made. Thus any and all House efforts to remove the pistol sales tax were useless. See Hardware Men Hit Hard," *Houston Chronicle* (Houston, TX), May 13, 1907.
[123] An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).
[124] "Hardware Men Hit Hard," *Houston Chronicle* (Houston, TX), May 13, 1907.
[125] *Hallettsville New Era* (Hallettsville, TX), June 28, 1907.
[126] *Hallettsville Herald* (Hallettsville, TX), May 23, 1907.

161

leasing them for fifty years. This practice may have been "a violation of the spirit of the law," but it was "not a violation in truth and in fact." One dealer in Austin sent to the comptroller's office a quarterly tax of $4.50 for the sale of one pistol valued at $9.00. He had almost seamlessly transitioned from selling pistols to leasing them.[127] The ease with which this could be done likely stalled any organized effort to fight the tax, which would have been an expensive undertaking.[128]

The occupation tax was just another innovative way in which progressive Texans tried to put an end to their perceived pistol problem. There were some minor changes made to the deadly weapons law after 1913, though each was minimal. Recall that the original 1870 prohibition of deadly weapons in certain spaces remained within the text of the 1871 deadly weapons ban. For this reason, it became a part of the penal code in 1879 and continued to be included in the revisions to that document over the next century. This meant that there were two articles within the penal code under which gun-toters could be arrested, though the older one was seldom used. However, after the minimum fine hike in 1905, the secondary (and largely forgotten) article, whose minimum fine was only fifty dollars, became a loophole for violators to be given lenient treatment. In 1915, a bill raised the minimum fine to one hundred dollars so that *all* deadly weapon defendants faced the same penalties. In 1918, the legislature raised the maximum fine for unlawfully carrying a deadly weapon from two hundred to five hundred dollars; most offenders received the minimum fine, so this amendment qualifies as minimal. The 1918 revision also included agents of the newly created Game, Fish, and Oyster Commission within the definition of peace officers permitted to carry weapons when on duty. In 1923, the Texas

---

[127] "Just One Gun Sold," *Houston Chronicle* (Houston, TX), June 7, 1908.
[128] The *Houston Chronicle* pondered the absence of a lawsuit. On top of that, the tax remained in the statute books without notation or alteration for over twenty years. "Pistol Tax Law," *Houston Chronicle* (Houston, TX), September 12, 1907.

legislature made it a felony to possess "any pistol, arm or weapon" in conjunction with illegal drugs. Finally, after dozens of attempts over the course of nearly twenty years, lawmakers repealed the despised firearm occupation tax.[129]

These were the only anti-pistol laws that took effect in Texas, but they do not by any means exhaust the list of proposals bandied about in the public sphere during the late nineteenth and early twentieth centuries. Texans with all manner of ideas and alternatives rallied to Paddock's mantra "The Revolver Must Go."  Some supported doubling the penalty for homicides and thefts perpetrated with deadly weapons.[130] Providing a financial reward for officers who arrested gun-toters seemed like a good idea to others.[131] One judge even recommended that "when a man kills another man with a pistol which he is unlawfully carrying, the right to plead self-defense shall be taken away from him."[132] Lawmakers' scrambling for newer, better, or more effective ways to disincentivize the carrying of deadly weapons actually obscures the ingenuity of the original law that the Republicans passed in 1871. It was ambitious, innovative legislation for its day, even if its promised implementation of a gun-free public sphere remained more aspirational than real for some decades. Passing and maintaining Texas's principal weapons law, however was one thing; enforcement of it between the time of its passage and the mid-twentieth century was another, and it forms the subject of the following chapter.

---

[129] An Act to amend Article 477 (340) of the Penal Code of the State of Texas 1911 . . ., General Laws of Texas, §80 (1915); An Act to amend Articles 475 and 476 . . ., General Laws of Texas, §91 (1918); General Laws of Texas, §8 (1923).

[130] *Dallas Morning News* (Dallas, TX) January 24, 1893; "Will Now Hang for Robbery," *Denton County News* (Denton, TX), June 25, 1895; *Abilene Reporter* (Abilene, TX), March 5, 1897. See opposition to this idea in *House Journal* (1881), 340. "If a man murders another with a shotgun, the carrying of which is not unlawful, he may be hanged. If the murder is committed with a pistol, can we hang him twice?"

[131] This proposal would have revived a practice that occurred briefly during the Davis administration. See Brown, "Gun-Toting Controversy," 27-28.

[132] "Statutory Progress," *Dallas Morning News* (Dallas, TX), November 7, 1910.

Chapter 5
Enforcing the Pistol Law in Texas, 1870-1930

The first violators of the Texas deadly weapon law found themselves inserted into the local, postbellum judicial system. That structure consisted of constables, sheriffs, justices of the peace, and district judges who enforced the laws within their counties. Most of these officials were elected by eligible county voters and had no official training for their positions. Justices of the peace, for instance, held responsibilities as precinct-level judges and coroners without usually receiving a legal or medical education. They tended to be well-esteemed local landowners or businessmen whose perceived wisdom or political connections fit them for the job. Sheriffs similarly did not have standardized qualifications, though it stands to reason that many seeking the job after the Civil War had some military experience. This local justice system was in large measure a continuation of the antebellum, early American one in which reputation meant more than expertise, and sessions of district and county courts became local entertainment events. But in postbellum Texas, this system was in flux. First, military intervention during Reconstruction involved the removal of many county-level officials, like sheriffs, which led to instability and local conflict. Second, population growth following the Civil War was beginning to create docket overcrowding, which later led to significant changes in local judicial procedure.[1]

The case of Jake Dornwell, the first arrested pistol-toter in Fayette County, exemplifies this local justice system poised on the brink of serious changes. He was the son of Augustus

---

[1] *State of Texas v. Jake Donwell* (1873), Criminal Case Files, Office of the District Clerk, Fayette County, Texas. The defendant's name in this case appears as Jake Donwell or Jake Donnell. The documents pertaining to the case indicate that the grand jurors were unsure of the defendant's legal name, lending credence to the idea that the family name and even the eldest son's first name had become Americanized. I refer to the defendant as Jake Dornwell because the family used that name in various documents, including the US census. See US Census, 1860, Fayette County, Texas, M653_1294, 290; US Census, 1870, Fayette County, Texas, Beat 3, M593_1585, 394B; US Census, 1880, Lee County, Texas, Precinct 1, ED 091, 1316, 14C; Fayette County, Texas, District Court Minutes, vol. M (1871-1877).

Dornwald, a German immigrant, and arrived to the United States in utero during the early 1850s. Augustus became a landowning farmer and the family came to be known as the Dornwells. His neighbors elected him a Fayette County justice of the peace under the auspices of the Texas Constitution of 1869. Like many of those elected under this "Radical" Republican Constitution, and the German immigrants of central Texas more generally, the elder Dornwell probably held Republican sympathies. Prior to the elections of 1869, Fayette County had witnessed a revolving door of local sheriffs, all appointed by Union military officials before being removed as opponents to the Reconstruction program. Dornwell was among a class of newly elected (as opposed to appointed) officials, indicating the transition away from military rule and toward constitutional rule. His position gave him substantial local influence, such as being a notary public, an authorized coroner, and the presiding judge of the justice court within his precinct.[2] The five justices of the county together formed the county court, which appointed constables and governed local affairs.[3]

In 1873, Jake Dornwell, aged twenty-two, was arrested for unlawfully carrying a pistol, probably by the constable from his precinct or by the county sheriff. Upon his arrest, he would have been taken to the local justice of the peace (which may have been his own father) for a brief preliminary hearing. This hearing determined whether the case would progress through the legal system and whether bail money would be required for the defendant to avoid county jail. Because the record of Dornwell's preliminary hearing is no longer extant we cannot know

---

[2] Durrill, "Political Legitimacy and Local Courts," 577-602; Edwards, *The People and Their Peace*. On court day in the trans-Mississippi West, see Richard D. Younger, *The People's Panel: The Grand Jury in the United States, 1634-1941* (Providence: Brown University Press, 1963), 157.

[3] Tex. Const. of 1869, art. V, §19-21. I use the term justice court for the sake of clarity; it is not specifically stated in the 1869 constitution, but justices of the peace were described as officers of an "inferior court" which held "such civil and criminal jurisdiction as shall be prescribed by law." For the sake of clarity throughout this chapter, I will refer to these as justice courts which held different jurisdiction than county courts and district courts. On the sheriffs of Fayette County, see Sammy Tise, *Texas County Sheriffs* (Albuquerque: Oakwood Printing, 1989).

whether he had to post bond; however, his appearance in the district court minutes in 1873 indicates that the magistrate considered his case worthy of prosecution and transferred it to the district court. At regular intervals throughout the year, a district judge appeared in each of the counties within his district (usually three or so) to hold court sessions. The county's most serious criminal and civil cases came before him, including appeals from lower courts. Another important function of the district court was the grand jury, called for the duration of the session to determine whether accused criminals should be taken to trial. When Dornwell's case went to district court, the purpose was to put it before this grand jury. In 1873, the grand jury voted in support of his indictment. His case then disappeared from the district court records, suggesting that it was transferred back to justice court for adjudication. As an indicted defendant in justice court, Dornwell could enter a plea of guilty and pay the associated fine, or he could plead not-guilty and receive either a bench or a jury trial. A guilty verdict could be appealed to the district court, though its decision was final. The loss of local county and justice records has left the details of Dornwell's case a mystery, but his transfer in and out of district and justice courts opens a window into the workings of the local justice system in postbellum Texas. This system changed over the next sixty years as Texans wrote a new constitution and made substantial amendments to legal jurisdictions, local governance, and court procedure.

Tracking the enforcement of the pistol law between 1870 and 1930 is an important and informative part of this study of weapon regulations in Texas. It sheds some light upon the post-Civil War process of legal change by showing us which jurisdictions were likely to hear deadly weapon cases and why. Amendments to the deadly weapon ban as well as the laws governing the Texas judiciary had significant consequences for the county-level prosecution of this misdemeanor offense. Examining enforcement trends also illuminates the law enforcement

system within each Texas county and the ways in which local prerogatives affected the decisions of the constables, sheriffs, justices of the peace, and county attorneys who worked together to prosecute the burgeoning number of misdemeanors in Texas courts. As the market towns and cities of Texas grew during this time period, they made use of powers written into their corporate charters to create their own law enforcement networks of city attorneys, municipal courts, and police officers. These parallel systems had different, sometimes competing, interests that complicated the legal process in Texas cities.

A final insight from this examination pertains to the question of selective or racially biased enforcement of the state's deadly weapon law. This is an important issue in light of recent scholarship on the "carceral state" and the racial inequitableness of the justice system. Case studies of Fayette County and McLennan County, both of which had substantial African American minorities, suggest that the deadly weapon law was not generally enforced in a racially discriminatory way during its first two decades of existence. African Americans did not answer charges of violating the pistol law in numbers disproportionate to their segment of the county population until *after* 1890. Thus, discriminatory or selective enforcement on the basis of race evolved over time in conjunction with the construction of the Jim Crow system of segregation laws and black disfranchisement.

\*       \*       \*

Legal procedure is crucial to law enforcement today, just as it was in centuries past. Unsurprisingly, much of the scholarship on the subject focuses on current practices rather than historical ones. It is important to recognize that the law is not stagnant but evolves along with society. This embraces both changes to the substance of the law based upon its interpretation by appellate judges along with innovations in legal procedure. The former have tended to be well-

167

documented, composed as they are of judicial opinions and commentaries; we have seen the changes made to the deadly weapon law's substance and content after 1870. Procedural changes, on the other hand, are much more difficult to detect because they emanate from evolving social customs. Dramatic revisions to legal procedure took place in Texas and the United States during the late nineteenth and early twentieth centuries. The state of Texas revised is civil and penal codes and its code of criminal procedure four times between 1879 and 1925, amended its constitution to create new appellate courts, and repeatedly formed new judicial districts. This growth accelerated after the turn of the twentieth century because there were too many cases for the existing system to handle. The solution that lawmakers settled on was the formation of more courts, some with specialized jurisdictions. Today Texas houses more than four hundred judicial districts, with sixty of them in Houston's Harris County alone. The state's county- and municipal-level court systems constitute an equally complicated mess of overlapping jurisdictions and specialty courts.[4] The deadly weapon violators of the late nineteenth and early twentieth centuries, depending upon the year they were arrested, experienced wildly different legal procedures. The experiences of defendants from the 1920s differed from that of Jake Dornwell back in the 1870s. Not only did they face much higher fines, but their likelihood of being acquitted was lower and the legal system prosecuting them was highly impersonal and bureaucratic.

The most significant procedural change during this time period involved the grand jury and its fading role in the prosecution of misdemeanor crimes. Grand juries are called into a session by judges in order to decide whether an accused criminal should be indicted. In other words, they determine whether there is sufficient evidence and probable cause for a case to go to

---

[4] *Handbook of Texas Online*, Paul Womack, "Judiciary," accessed January 31, 2019, http://www.tshaonline.org/handbook/online/articles/jzj01.

trial. These bodies vary based on state laws (which themselves vary over time) and jurisdiction, but there are some general commonalities. A grand jury tends to be affiliated with courts that handle felonies, and the defense does not present evidence. Most importantly, the grand jury may indict based on a majority rather than a unanimous vote. In Texas, the grand jury has historically been associated with district court sessions and may indict based on the vote of nine out of twelve grand jurors.

Americans inherited this tradition from the British, who preserved it for many centuries as part of their Anglo-Saxon heritage. In the Anglo-Saxon past, grand juries wielded substantial power to investigate and redress crimes. The body took on a republican guise during the seventeenth century when Englishmen called to participate used it as a bully pulpit to denounce the Stuart kings who had centralized monarchical authority after the Restoration.[5] The US Constitution makes mention of grand juries, specifying in the Fifth Amendment that felonies and serious crimes prosecuted by the United States must proceed by indictment.[6] This is one of the few rights of the citizen enumerated in the Bill of Rights that has yet to be incorporated onto the states.[7] For this reason, state laws have traditionally determined which types of cases require an indictment and which do not. It has historically been a general rule of thumb that felony cases must proceed by indictment.[8] The harsh penalties for felonies, like long-term imprisonment, hard labor, or death, led Americans in centuries past to exercise caution in regard to felony cases.

---

[5] George J. Edwards, *The Grand Jury: Considered from an Historical, Political and Legal Standpoint, and the Law and Practice Relating Thereto* (Philadelphia: G. T. Bisel, 1906), 32.

[6] U.S. Const. amend. V.

[7] The other amendment not incorporated as yet is Amendment VII, which secures a jury trial in civil cases. The basic provisions of Amendments I-IV, VI, and VIII have all been incorporated. This process occurred for the Second Amendment in *McDonald v. Chicago*, 561 U.S. 742 (2010).

[8] There were some exceptions to this rule, as in colonial Maryland, where prosecutors did not put criminal cases before a grand jury. Instead, criminal cases required a bill of information filed with the appropriate judge, meaning that the prosecuting and defense attorneys had a chance to present arguments at a preliminary hearing. Ironically, this procedure has become increasingly common in the twentieth century as many states have dropped the grand jury system. See Younger, *The People's Panel*, 12.

Misdemeanor offenses of a serious nature, particularly those involving official misconduct, could also be presented to a grand jury.

This tradition of obtaining indictments illustrates the symbolic importance of the grand jury within the American legal system. By reviewing the decisions of "inferior court" judges in preliminary hearings, grand jurors acted as a democratic layer within the legal system. Cases against indicted defendants had a stamp of community approval that validated the prosecution as a fair and reasonable one. The significance of this reached far beyond the individual case to "inspire a general confidence" in the operation of the justice system. Massachusetts justice Lemuel Shaw, who spoke eloquently on the workings of the police power following the Revolution, also described the important function of the grand jury. He believed that the "peace and harmony of society" can only be preserved through a well-respected legal process, which included the participation of upstanding citizens. He said: "To accomplish this, nothing could be better contrived than the selection of a body . . . selected from among their fellow citizens, as persons deemed worthy of this high trust by their moral worth, and general respectability of character."[9]

By operating as a bulwark against unjust prosecutions, the grand jury effectively spoke for the people and protected their interests. Grand jurors sometimes used this power to influence lawmakers or the general public by making public statements. In 1887, one such body assembled in a Texas Panhandle county made a report about peace and prosperity in their county that was published on the front page of a nearby newspaper.[10] An anti-crime advocate in Austin called upon "grand juries in session throughout the State to send up reports, petitions and appeals regarding lawlessness and crime, and making suggestions in regard to the improvement of our

---

[9] Quoted in Edwards, *The Grand Jury*, 43.
[10] "Court Proceedings," *Canadian Free Press* (Canadian, TX), Dec. 21, 1887.

criminal laws."[11] When a grand jury assembled, the district judge swore them in and sometimes

gave them a rousing speech about the importance of their public duty. The most inspirational of

these "charges" could make headlines in newspapers across the district.[12]

The aspect of the grand jury system that concerns us here is its participation in the

prosecution of misdemeanors. Today, indictments are almost exclusively the terrain of felonies,

while misdemeanors are prosecuted without them. But it was not always this way. Grand juries

could respond to complaints presented to them by issuing indictments, or they could investigate

wrongdoing within their own realm of knowledge by issuing presentments (these served the

same function as indictments but bore a different name due to their unique origin). It was

common in the seventeenth and eighteenth centuries for grand juries to issue presentments and

indictments for misdemeanor crimes like drunkenness and breaking the Sabbath.[13] These

offenses might not have been felonies, but they represented a serious breach of the public peace

that threatened order and stability within the community. For much of Texas history, prosecuting

attorneys have held it within their discretionary powers to choose whether to proceed in

misdemeanor cases by indictment or another route called a bill of information.[14] A case

prosecuted by information begins with the district or county attorney filing a bill of information

with the appropriate judge; then the prosecution and defense participate in a preliminary hearing,

and the judge decides whether there is sufficient evidence to proceed to trial. This procedure is

---

[11] "To Grand Juries," *Weekly Democratic Statesman* (Austin, TX), Oct. 24, 1878.
[12] Some examples of published "charges" to grand juries include: *Frontier Echo* (Jacksboro, TX) Nov. 10, 1876;
"Judge Fleming's Charge to the Grand Jury," *Albany Star* (Albany, TX), Sept. 21, 1883.
[13] Younger, *The People's Panel*, 8.
[14] Tex. Code of Crim. Procedure (1879) §417. The same provision appears in the 1895 and 1911 editions as well.
See Tex. Code of Crim. Procedure (1895) §436; Tex. Code of Crim. Procedure (1911) §448.

far simpler than the grand jury, and it has become the standard for the prosecution of most misdemeanors in Texas.[15]

During the nineteenth century there were many misdemeanor cases in which prosecutors opted for grand jury indictment. The most likely contenders were serious misdemeanor offenses that carried a hefty fine, or newer laws that were controversial—much like the deadly weapon ban. Misdemeanor indictments were especially common in Texas during Reconstruction due to changes made to the judiciary branch by the Constitution of 1869. That document removed the judicial function that the county court had historically held in conjunction with its local governance responsibilities. Under previous constitutions, the county court heard misdemeanor cases alongside some civil and probate cases. Furthermore, appeals from justice court could be retried in county court. In their drive to centralize state power and prevent their Democratic enemies from holding important local offices, Republicans removed this layer of justice system. From 1869 to 1876, misdemeanors had to be adjudicated in justice court by a non-lawyer judge, even if the offense in question carried a severe financial penalty. This system was replete with opportunities for the miscarriage of justice, so law enforcement officials frequently directed misdemeanor cases to the district court's grand jury.

Tracking the deadly weapon cases illustrates this procedure in use during the years in which the 1869 constitution operated. Within a sample of 3,259 deadly weapon cases, there are 173 cases between 1871 and 1876 whose initiation procedure is known. In all but three of those cases the prosecuting attorney sought a grand jury indictment. In the subsequent decades, indictments against deadly weapon violators continued to decline (see Fig. 5.1). The Code of

---

[15] The only exception to this general rule is a misdemeanor case involving official misconduct, which must proceed by indictment and be adjudged in District Court. See Tex. Code of Crim. Procedure (1925) §64.

Criminal Procedure from 1879 specifically directed prosecuting attorneys to file a bill of information in misdemeanor cases, leading to a further drop in indictments for carrying weapons.

Fig. 5.1



Though indictments against deadly weapon violators were on the decline during the 1870s and 1880s, reformers called upon grand juries to investigate the problem in their counties and send a message to persistent gun-toters that their habit would not be tolerated. In 1883, a district judge from Albany, near Abilene, declared that "the grand jury is the most potent power in existence" for the suppression of the "nefarious practice" of carrying deadly weapons.[16] This judge asked the grand jury to use its traditional power of presentment by investigating and addressing local crime on its own without waiting for indictments to be presented by prosecutors. By drawing the jurors' attention to this misdemeanor offense when their primary responsibility was to review felony cases, he underscored the severity of the crime of unlawfully carrying weapons.

---

[16] "Judge Wheeler's Charge," *Albany Star* (Albany, TX), Sept. 21, 1883.

By about 1885, indictments for deadly weapon cases were becoming quite rare. Instead, prosecutors filed an information with the county court, whose judicial powers had been restored by the 1876 constitution. For most of the nineteenth century, the deadly weapon law was a misdemeanor, non-jail offense in which the highest fine was one hundred dollars. This placed it squarely within the jurisdiction of the justice courts, though as a misdemeanor it could be prosecuted in county court. This overlap between county and justice courts was known as original concurrent jurisdiction, meaning that cases could be adjudicated in either venue. The purpose was to keep the courts running smoothly without backlogs, so the case was handled in whichever court was first to receive the charges.[17] Cases frequently went to county court, but it was also commonplace for gun-toters spotted by a sheriff's deputy to be hauled into justice court right away. Between 1890 and 1905, the year the maximum fine for violation rose to two hundred dollars and moved the offense beyond the jurisdiction of justice court, that venue was just as likely as county court to decide deadly weapon cases. In Fayette County, where records from both jurisdictions are extant, there were about as many cases appearing in county court as in justice court between 1890 and 1905 (see Fig. 5.2).[18]

---

[17] Tex. Code of Crim. Procedure (1895, 1911) §63; Tex. Code of Crim. Procedure (1879) §64.
[18] This chart represents cases actually adjudicated within those jurisdictions, including those whose outcome is unknown. It does not include data for cases transferred out of the jurisdiction in question or arrest warrants.

Fig 5.2



The use of the grand jury became increasingly rare for misdemeanor offenses for two reasons. First, population growth and better policing generated far more misdemeanor cases than grand juries could handle. The process of transferring the case and waiting for the next district court session provided an opportunity for defendants to skip bail. It also wasted the district court's time upon petty offenses when there were much more serious civil and criminal cases requiring attention. The 1879 edition of the Texas Code of Criminal Procedure recognized this reality by recommending that misdemeanors be pursued via information and felonies via indictment. Second, the grand jury system itself was under assault in the late nineteenth and early twentieth centuries. Reformers looked upon this medieval procedure as an inefficient one that needed restructuring if not outright elimination. Their criticism built upon an anti-grand jury movement that had been bubbling in Britain since the Benthamites, a group of pragmatic-thinking reformers, came out against it during the eighteenth century.[19] By the 1880s, the grand

---

[19] Utilitarianism was the brainchild of Jeremy Bentham and holds that the people should seek the well-being of the greatest number of people in making decisions. Bentham's acolyte, John Stuart Mill applied the term "utilitarianism" to Bentham's ends-oriented philosophy during the nineteenth century.

jury had well-educated, progressive critics across the Anglophone world. They tended to harp upon its inefficiency, which they viewed as the result of its inexperienced grand jurors and the high cost of paying them for their service. One such reformer declared that "the summoning of a new body of jurors at each term insures an unfailing supply of ignorance." The attack in Texas emphasized the financial burden of the system by confronting Texans with the $100,000 to $200,000 annual cost of paying grand jurors across the state. Reformers across the country frequently cast their opponents as backward-looking, with one deriding them as people "wedded to antiquity" who "revel in cobwebs." Some states followed the advice of their modernizing lawyers and eliminated the system, pushing every criminal case through information and a preliminary hearing before a judge. Texas legislators, however, refused to abandon the grand jury.[20]

The three legal jurisdictions involved in prosecuting the Texas deadly weapon law interacted with one another in unpredictable and variable ways. For example, some deadly weapon cases were still being prosecuted via indictment at least to the close of the nineteenth century. In Jefferson County, on the state's eastern Gulf coast, several cases from the late 1890s took the very same procedural route as Jake Dornwell's twenty-five years prior. The cause of this is unknown and open to speculation. These indictments could have been generated by grand jury presentments and handed down independently of the prosecutor; the defendants might have asked specifically for an indictment, which the justice of the peace and district attorney accepted; or the prosecuting attorney may have responded to what he saw as egregious violations by seeking indictments. The decline of indictments for misdemeanors minimized the transfer of deadly weapon cases in and out of district court, but transfers remained quite common. The

---

[20] Eugene Stevenson, "Our Grand Jury System," *Criminal Law Magazine* (December 1886): 713-714; Younger, *The People's Panel*, 138-154, 141, 145.

procedure emerging during the late nineteenth century was to have a preliminary hearing in justice court and transfer the case to county court. After 1905, when the maximum fine doubled, this procedure became the standard for deadly weapon cases.

The transfer of cases from one jurisdiction to another affected the overall cost of the prosecution. In the event of a guilty verdict, the defendant bore the cost of prosecution, but acquittals and dismissals fell at the feet of the county treasury and ultimately state taxpayers. In addition to the fine, which went to the county's coffers, guilty defendants paid the justice of the peace for his time and the sheriff for his arrest. Accused persons who pleaded not guilty and went to trial owed additional fees to the county attorney for his services, to the sheriff for summoning witnesses, and to jurors. When a case was transferred from one jurisdiction to another, the costs transferred, too. Fayette County justices who transferred deadly weapon cases to county court typically recorded about ten dollars in court costs. Defendants found guilty not only had to pay their fine but the costs of prosecution from both jurisdictions. For this reason, cases handled in county court tended to be more expensive than those adjudicated fully within justice court. For example, guilty defendants in Fayette County's justice courts prior to 1905 tended to pay their twenty-five dollar fine plus another ten to twenty dollars in court costs, depending on whether they pleaded not guilty. Rarely did justice court cases amount to fifty dollars or more. Sometimes judges allowed defendants arrested for unlawful carrying to plead guilty to a reduced charge, like rudely displaying a weapon. Fines for this and other minor offenses ranged from one to fifteen dollars, and defendants usually walked away spending less than twenty dollars (see Fig. 5.3). In McLennan County, where the records of county court prosecution costs are extant, guilty defendants spent substantially more than this, even in the pre-1905 period when a typical fine was twenty-five dollars. That county's records indicate an