Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF BRENNAN RIVAS**<br><br>**VOLUME 5 OF 6**<br><br>Courtroom:     5A<br>Judge:          Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

# **INDEX**

| **Works** | **Decl. Page** | **Compendium Page** |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1 | 7 n.10 | 002-004 |
| 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 | 8 n.12 | 005-007 |
| General Laws of Texas, ch. XXXIV, §1 (1871) | 14 n.31 | 008-011 |
| 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1 | 7 n.10 | 012-020 |
| 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1 | 9 n.15 | 021-023 |
| 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 | 8 n.13 | 024-026 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 9 n.16 | 027-029 |
| Acts of the General Assembly of the State of Georgia (1894) | 6 n.7 | 030-042 |
| An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907) | 6 n.8 | 043-053 |

| | | |
|---|---|---|
| **BOOKS[1]** | | |
| Patrick Charles, Armed in America 152 (2018) | 9 n.17 | 055-058 |
| Randolph Roth, American Homicide 184, 185, 297-326, 386-388, 411-434 (Cambridge: Belknap Press of Harvard University Press, 2009) | 4 n.3, 5 n.4 | 059-092 |
| R. L. Wilson, The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present, at 173 (New York: Simon & Schuster, 1979), | 11 n.23 | 093-095 |
| Martin Rywell, Colt Guns 66-67, 4-93 (Harriman, TN: Pioneer Press, 1953) | 11 n.23 | 096-104 |
| Sears, Roebuck, and Co. Catalog No. 107, at 365-67 (1898) | 3 n.2, 12 n.27 | 105-112 |
| The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) | 12 n.25 | 113-117 |
| **LAW REVIEWS AND JOURNALS** | | |
| Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 161-62 (PhD diss., Texas Christian University, 2019) | 6 n.8 | 119-349 |
| Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2518-19 (June 2022) | 10 n.22 | 350-379 |

[1] The Declaration of Brennan Rivas cites certain books (in their entirety) as supplemental references, rather than as direct support for any particular statement in her declaration or as a specific basis for her opinions. *See* Rivas Decl. ¶¶ 10 n.1, 19 n.23, 23 n.30. Accordingly, they are not included here. These books are: Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America (New York: Scribner, 2020); Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohcken, PA: Combined Books, 1996); and Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

3

| | | |
|---|---|---|
| Robert Leider, *Our Non-originalist Right to Bear Arms*, 89 Ind. L. Rev. 1587, 1619-20 (2014) | 13 n.28 | 380-446 |
| Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason Univ. Civil Rights L.J. 67, 74-75 (Summer 1991) | 13 n.28, 13 n.29 | 447-480 |

| NEWS ARTICLES | | |
|---|---|---|
| "Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, at 2 | 9 n.18 | 482-483 |
| Daily Arkansas Gazette (Little Rock, Arkansas), January 7, 1883, at 4 | 10 n.20, 10 n.21 | 484 |
| Daily Arkansas Gazette (Little Rock, Arkansas), May 13, 1883, at 4 | 10 n.20, 10 n.22 | 485 |
| Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), at 32-36 | 14 n.30 | 486-490 |
| Newport News (Newport, Arkansas), quoted in Daily Arkansas Gazette (Little Rock, Arkansas), April 27, 1875, at 2 | 10 n.19 | 491 |

average cost of nearly sixty dollars for guilty gun-toters (see Fig. 5.4). That amounts to $1,689.23 in 2018 dollars.

Fig. 5.3



Fig. 5.4



The costs associated with criminal prosecutions in the nineteenth century highlight the fee system that characterized the law enforcement process in Texas and much of the United States during the late nineteenth and early twentieth centuries. Much like the grand jury, the collection of fees by local officials was part of the English inheritance in North America. It was the standard across the Atlantic seaboard during the colonial period as well as between both sections during the antebellum years. The first states to turn away from the practice seem to have been those of the trans-Mississippi West, who condemned it as corrupt and inefficient during the decades following the Civil War. The underlying justifications for the system were twofold. First, varied population densities meant that some public officials spent the majority of their time fulfilling their duties, while others had few burdens placed upon them. Remuneration by fee seemed a rational way to equalize these disparities and pay officials according to work actually performed. Second, and following the theory of self-interest that undergirds classical liberalism and modern libertarianism, fees promised to rouse these part-time officials into action. If a local magistrate or sheriff's deputy received no extra income for the performance of his mundane duties, so the thinking went, he might be tempted to ignore the enforcement of the laws in favor of his own business pursuits.[21]

Despite the lofty intentions expressed in this legal inheritance, by the late nineteenth century the fee system had became a font of corruption and source of perennial criticism in Texas and elsewhere. Sheriffs, clerks, justices, and attorneys in some counties took home enormous fortunes of unknown proportions due to fee collection. Their earnings financed "rings" of local officials in cahoots with one another, and sometimes with criminals, to maximize their income at the expense of taxpayers. A critic of the system, writing in Wisconsin in 1898, told of

---

[21] Urdahl, *The Fee System in the United States*, 186-187, 216-222.

the conspiracy between sheriffs, justices of the peace, and vagrants to line the pockets of officials and secure warm bedding for the transients each winter. The "tramps" would be presented before a justice court under one name in the morning and another in the afternoon, allowing the sheriff and justice to collect two sets of fees for the arrest and judgment. The vagrant, of course, could not pay his fees and was therefore confined to the county jail for several weeks, while the sheriff received an extra allocation of funds to house and feed him. Wisconsin counties addressed this problem in the early 1890s by paying the sheriff a salary rather than a fee based on the number of inmates in his jail; they also mandated that county prisoners perform some public work on farms or roads. These measures removed the incentives for sheriffs and tramps to operate the scheme and, over the course of four years, reduced one county's expenses by twelve thousand dollars.[22]

Reform-minded Texans pursued similar strategies during the 1890s. Members of the Populist Party, who obtained their greatest gains during the elections of 1894, tried mightily in conjunction with reformist Democrats to revise the Texas fee system similarly to what had been done in Wisconsin. Their goal was to cap the salary of each official at two thousand dollars per annum and redirect all surplus to either the county or state treasury. Unsurprisingly, a strong and well-financed opposition movement emerged to prevent their reforms.[23] In 1895 state legislators added a clause to the deadly weapon law stipulating that those confined to the jail could be put to work on county projects for the duration of their incarceration, thus monetizing a stint in jail.[24] This particular innovation had an especially harmful effect upon black and Hispanic gun-toters after the minimum fine was raised to one hundred dollars in 1905. Unable to pay the fine and associated court costs, racial and ethnic minorities were much more likely than their white

---

[22] Urdahl, *The Fee System*, 211-216.
[23] Gregg Cantrell, *The People's Revolt: Texas Populists and the Roots of American Liberalism* (New Haven: Yale University Press, 2019), 408-411.
[24] Tex. Pen. Code, §338 (1895).

counterparts to receive jail sentences. For instance, Hispanic gun-toters were penalized by fine prior to 1905, but after that year the vast majority of them received jail sentences instead (see Fig. 5.5). Barring a special dispensation from the courts, these violators spent months working on county road and farming projects.

Fig. 5.5. Based on 64 Hispanic violators adjudged guilty in McLennan, Fayette, Parker, and Jefferson Counties.



Fines for unlawfully carrying deadly weapons tended, in the late nineteenth and early twentieth centuries, to be added to the county road fund. Prior to 1916, there was no state-level agency overseeing the construction of long-distance roads or highways. Instead, the counties had to pay for and construct roads on their own. After 1879, male residents were expected to labor on the road projects at least a few days a year, though the obligation tended to fall harder upon those who lived along the new road's path. Those with enough cash could buy their way out of the obligation and allow the county to pay a day laborer instead. Within the next decade, lawmakers authorized the collection of a county road tax improve overland transportation. County commissioners supplemented this labor force with the inmates crowding the county jail, sending

181

them to remote work sites under the supervision of construction managers and guards.[25] When the deadly weapon fine quadrupled in 1905, the number of arrests and guilty judgments increased.[26] It became a lucrative misdemeanor to enforce because it placed large amounts of cash into road fund coffers *or* provided jailed laborers to do the work for months at a time. Within the first eighteen months of the new provision, Fayette County had collected $1,500.00 for the road fund from convicted gun-toters.[27]

The higher fine for unlawful carrying coincides with the rise of a "good roads" movement in Texas and across the United States. This improvement impulse resulted in the establishment of some state-level highway departments that could properly fund and oversee the construction of intrastate roads, though the Texas movement did not. The Texas Highway Department (later Texas Department of Transportation) did not come into existence until 1916, and even then lawmakers hastily slapped it together to cash in on federal aid to highway improvements.[28] The same reform-minded Texans who objected so vehemently to the fee system and convict labor, like the Populists, tended to support the good roads movement. The difficulties entailed in building public roads and highways without state direction or sufficient funding challenged their principles and confronted them with the kind of decisions that make Americans despise realpolitik. For the Populists, this meant supporting legislation to ensure humane treatment of county-level convict laborers even though the practice was distasteful to them and their constituents.[29]

---

[25] Karl Edward Wallace, "Texas and the good Roads Movement: 1895 to 1948" (master's thesis, Univ. of Texas, 2008), 18-21. See also Cantrell, *The People's Revolt*, 403.

[26] This claim is based upon records of McLennan County Court Criminal Fee Books, which contain a noticeable and sharp uptick in deadly weapon cases after 1905. McLennan County Archives, Waco, Texas.

[27] "La Grange News," *Schulenburg Sticker* (Schulenburg, TX) Jan. 31, 1907.

[28] *Handbook of Texas Online*, John D. Huddleston, "Texas Department of Transportation," accessed February 11, 2019, http://www.tshaonline.org/handbook/online/articles/mctgn.

[29] Cantrell, *The People's Revolt*, 403.

If the county had a vested interest in pursuing and prosecuting gun-toters, so did the municipalities of Texas. Alongside rapid population growth came the proliferation of market towns and the development of the state's big cities. These entities wielded substantial power during the Gilded Age and Progressive Era due to the generous charters given them by the state. Following the Civil War, newly established cities received charters that gave them greater authority to police residents and collect tax revenue than had been the case in the past. Older cities, consequently, applied for new charters so that they could meet the demands of population growth and economic development. Buried within these lengthy legislative documents was an authorization for municipalities to regulate the use and carrying of deadly weapons within their city limits. Unsurprisingly, a cascade of local ordinances ensued from the 1870s through the early twentieth century.[30]

County and justice courts already shared "original concurrent" jurisdiction over misdemeanors like the deadly weapon law, and municipal ordinances added an extra layer of complication to their enforcement. Cities hired their own peace officers (a town marshal and deputies or professional policemen) and created municipal courts to enforce the law within the city limits, especially their city ordinances. The latter, usually called Mayor's or Recorder's Courts, formed another set of "inferior courts" within the state judiciary to enforce local ordinances. They were designed to work like justice courts in that jurisdiction was limited to small claims or misdemeanors and appeals received a trial *de novo* in county court. Thus, cities added a competing layer of enforcement in the form of municipal courts as well as a competing

---

[30] Cities enacting such ordinances included Fort Worth (1873, 1885), Dallas (1887), San Antonio (1899), McKinney (1899), and Marshall (1909). These are listed on the Duke University Repository of Historical Gun laws (https://law.duke.edu/gunlaws/), though dozens of other Texas municipalities enacted similar provisions. These included Denton, Waco, Houston, Galveston, and more. The size of Texas and the number of its incorporated towns and cities places a comprehensive accounting beyond the scope of the present study.

layer of legislation in the form of ordinances against unlawfully carrying deadly weapons. Ordinances sometimes restated the state law, but at other times provided alternative stipulations or penalties. Gun-toters arrested within the limits of incorporated cities and towns could be prosecuted under the auspices of either, leading to confusion and occasions for the miscarriage of justice.

A hotbed of deadly weapon injustice was Denison, a town in Grayson County along the Red River in far North Texas. In 1876, a Kansas resident named J. C. Hamilton passed through town on business. While there, he stopped in a store to purchase ammunition and was subsequently disarmed and arrested by a policeman. He was taken immediately to the Denison Mayor's Court, where the mayor declared him guilty and adjudged his penalty at "the lowest fine—five dollars and costs." Hamilton forked over the money to avoid spending the night in the city jail but felt that he had been ill-used by the fathers of Denison and said as much to the mayor the next day. The mayor then recommended a special lawyer, who interviewed the shop owner and promised to have the revolver and money returned as soon as possible. He lived up to his word, though it still cost Hamilton five dollars in legal fees. Hamilton felt as if not only the mayor and police, but the entire town were in on the joke against him: "I paid my attorney his five dollars, and he stepped outside and 'whacked up' with the police, at which the crowd laughed hugely." He wrote to a local editor about the experience, incensed at the "legal black mailing" that he had found "utterly disgust[ing]."[31]

Five years later, in 1880, a case from the Denison Recorder's Court worked its way to Grayson County Court and ultimately the Texas Supreme Court. John Boland, a man passing through Denison, carried a pistol on his travels. He was arrested for violating the city ordinance

---

[31] "To the Public," *Denison Daily News* (Denison, TX), Mar. 7, 1876.

against deadly weapons, which did not include an exemption for travelers as the state law did. Believing that he was justified in his actions, Boland was surprised to receive a guilty verdict both in Denison Recorder's Court and Grayson County Court. His next step was to decline to pay the fine, but Grayson County officials issued an arrest warrant for nonpayment. Upon this secondary arrest, Boland filed a writ of *habeas corpus* and argued to the state supreme court that the municipal ordinance abridged his constitutional and statutory right to carry a weapon for self-defense while traveling. The high court, though, disagreed with Boland's case by saying that he did not qualify for *habeas corpus* because his arrests were lawful; his failure to bring up the constitutionality issue at his appeal rendered the issue moot in the opinion of the judges.[32]

Cases like John Boland's were not the only ones in which city and municipal court systems cooperated in hustling unsuspecting victims. During the Gilded Age, one of the fastest growing Texas cities was Fort Worth, a cattle boomtown and important hub for the Texas and Pacific Railway. The city bustled with activity, particularly after the invention of refrigerated rail cars and the establishment of slaughterhouses. Fort Worth, meanwhile, played host to cowboys, stock purchasers, investors, and rail employees and looked for ways to capitalize on their stay. The city accomplished this through the regulation of a vice district and the collection of licensing fees and misdemeanor fines. It made sense for Fort Worth to prohibit the carrying of deadly weapons in town because there was a steady stream of cowboys looking for saloons and brothels, though this meant that police would not be enforcing the state law, whose fines went to Tarrant County. The city and county officials  appear to have worked out a system whereby arrested gun-toters were fined twice for the same offense, once in municipal court and once in a county-

---

[32] *Ex Parte Boland*, 11 Tex. Cr. App. 159 (1881).

affiliated court. The Tarrant County Court heard appeals from all inferior courts, and like Grayson County in John Boland's case, participated in the charade.[33]

In 1890, the city of Waco, a hub for the Missouri-Kansas-Texas Railroad Company about sixty miles south of Fort Worth, received a slap on the wrist from the Texas Court of Appeals for doing something similar. Waco city leaders had enacted numerous municipal ordinances, including one forbidding the unlawful carrying of weapons. Another policy of the fast-growing town was that, where municipal and state laws overlap, jurisdiction goes to that which has the higher fine. Conveniently for Waco officials, their municipal ordinances often provided a fine whose maximum range far surpassed that of the corresponding state law. The Waco deadly weapon ordinance, for instance, punished gun-toting with a fine ranging from twenty-five to two hundred dollars at a time when the state law prescribed twenty-five to one hundred. J. C. McNeil, a man arrested in Waco for carrying a pistol, used this discrepancy to argue in his appeal from municipal court that the case against him was unconstitutional. The McLennan County Court agreed, but then had him arrested for violating the state law instead. When he appealed his guilty verdict on the grounds of double jeopardy, the Texas Court of Appeals condemned Waco's deceptiveness but refused to overturn McNeil's conviction.[34]

There were some occasions, however, when the enforcement of the deadly weapon law bestowed positive effects upon communities. Reformers tended to perceive a drop in crime or other salubrious results after serious enforcement. But sometimes the town accrued the benefits without much comment or crooning about why. Events in Karnes County, a rural, ranch-oriented county south of San Antonio, exemplify this quite well. Feuding was nothing new to the people

---

[33] Dale L. Hinz, *Panther's Rest: History of the Fort Worth Police Department, 1873-21st Century* (Bloomington: Author House, 2007).
[34] *McNeil v. State of Texas* 29 Tex. Cr. App. 48 (1890).

of Karnes County. During the 1870s they had a front-row seat to the infamous Taylor-Sutton feud, which was more a police action against an organized crime ring than a family vendetta.[35] Local ranchers returning from service to the Confederacy, led by William Butler, confronted rustlers operating in Karnes County; it is likely that these were members of the Taylor family and their rustling ring. Having faced them down, Butler subsequently learned to coexist with their illegal activities and became one of the wealthiest and most powerful men in the county.[36]

Butler sidestepped involvement in one feud only to find himself at the center of another. In 1884, his son, Emmett, got drunk in the county seat of Helena and came to the attention of the sheriff and his deputies. The younger Butler, about twenty years of age, shot the sheriff during a confrontation and ran away. A posse, including deputy sheriff Lafayette "Fate" Elder, went after Emmett Butler and killed him. Elder assumed the position of sheriff and hired his brother, Bud, as a deputy. Despite his own son's recklessness, William Butler blamed the local authorities, and especially Fate Elder for the tragedy. Legend has it that when the townspeople of Helena defended Elder, Butler vowed to "kill the town that killed his son." Tensions rose in Karnes County, with residents divided in their allegiance between the wealthy, well-connected Butlers and the politically powerful Elders. When the San Antonio & Aransas Pass Railway arrived in Karnes County, Butler did everything in his power to have the line pass through the western half of the county, nearer his home and distant from Helena. In this sense, he "killed" the town by making it so inconvenient for travelers and residents that they subsequently selected an alternative county seat.

---

[35] Smallwood, *The Feud that Wasn't*.
[36] George W. Saunders, ed., *The Trail Drivers of Texas: Interesting Sketches of Early Cowboys and Their Experiences on the Range and on the Trail during the Days that Tried Men's Souls*, 2 vols. (San Antonio: Jackson Print Co, 1920-1923), 2:154-156.

Butler was a highly successful rancher, and his disdain for the Elders probably had as much to do with landownership and rail access as it did the manner of his son's death. Things came to a head in 1886 during a local option election. Butler arrived at the polling place armed to the teeth with his sons, sons-in-law, and cowboys. A cowboy and hired gun named Juan Coy was among them and attracted the attention of the sheriff because there was an outstanding warrant for his arrest. Coy fired upon Elder, initiating a shootout that engulfed the dusty intersection that was Daileyville, Texas. By the end of the fracas, the Elder brothers and another resident lay dead, though William Butler lost part of his ear lobe in the fighting. Butler, Coy, and a few other members of the Butler entourage were arrested on charges of murder and carrying firearms to an election. But when the district attorney presented the cases before the jury, it refused to hand down murder convictions. Instead, Butler was found guilty of unlawfully carrying a firearm at a polling place and fined one hundred dollars. This indicates juror sympathy for Butler's position along with a condemnation of his behavior. Between the shootout and guilty verdict against Butler, the air had cleared in Karnes County. Deadly weapon regulations had created a way for local residents to censure Butler without labeling him a murderer; the intervention of the legal system eliminated the need for reprisals, and the Butler-Elder feud fell out of memory.[37]

William Butler's arrest and prosecution took place rather quickly, as did those for most of his accomplices. Butler posted their bail, undoubtedly paid their attorney, and managed to obtain dismissals or acquittals for them. There was, however, one exception—Juan Coy. Descended from an old Spanish family, Coy's ancestors were among the earliest settlers in San Antonio. He had inherited family land in what became Karnes County, but economic difficulties prompted

---

[37] On the William Butler and the Butler-Elder feud, see John Perry, "Two Texas Shooting Affairs, Two Karnes County Sheriffs Killed—and the Butlers Did It," *Wild West* (April 2005): 10-12,61; Olmstead and Ybarra, *The Life and Death of Juan Coy*, 79-102; "San Antonio Scrapings," *Galveston Daily News* (Galveston, TX) Sept. 8, 1886; "More Victims of the Daileyville Tragedy," *Galveston Daily News* (Galveston, TX) Sept. 10, 1886.

him to sell it to Butler in the mid-nineteenth century. Coy then went to work for Butler, acting as a hired gun or cowboy as necessary and even introducing his distant relatives to life in the Butlers' employ. The murder charges against him were not dropped, nor was he able to get an acquittal. Instead, his attorney (surely paid for by Butler) repeatedly asked for continuances, or the witnesses summoned to testify failed to appear. The result was a perennial delay in his case, to the point that he died four years later under indictment for murder without ever going to trial.[38]

If the jurors of the district court in neighboring DeWitt County (the cases received a change of venue) showed some sympathy for Butler, they did no such thing for Coy. But for the stalling tactics of a slick attorney, Coy would have spent the final years of his life in the state penitentiary. Sykes Butler, one of William Butler's many sons, also had a reputation for trouble and had previously been involved in a shooting incident, but the paterfamilias succeeded in having his case stricken from the district court's docket. Some of the prejudice against Coy stemmed from his criminal past, but much of it arose from his identity as a Hispanic man.[39]

Coy's case occurred at a crucial moment in Texas and Southern history, during the decades in which states began constructing the systems of racial segregation called Jim Crow. With its substantial population of Hispanics (a numerical majority in several South Texas counties), parts of the Lone Star State segregated along ethnic lines in a system referred to today as Juan Crow. Though casual observers assume that this system of racial regulations appeared immediately after the Civil War, it was indeed a decades-long process that accelerated in the middle and late 1880s. This acceleration came as a response to the *Civil Rights Cases* (1883),

---

[38] DeWitt County, Texas, Office of the District Clerk, District Court Minutes, vols. H-K (1884-1893); Texas State Library and Archives Commission, Reels 1012068, 1012069.

[39] William Butler had eight sons, several of whom seem to have been engaged in illegal activities. Emmett, who died in 1884, had repeatedly been suspected of cattle rustling. His younger brother, Sykes, worked closely with the trigger-happy Juan Coy as a cowhand for his father. Olmstead and Ybarra, *The Life and Death of Juan Coy*, 41, 63.

which held that private corporations could enforce racially discriminatory policies without violating the Fourteenth Amendment—which, as readers will recall, was pared down by the US Supreme Court to apply only to actions taken by *state governments*.[40] The nation's high court validated the ensuing the avalanche of discriminatory state-level legislation in the landmark case of *Plessy v. Ferguson* (1896), famous for its mantra of "separate but equal."[41] Some southern states went yet a step further by revising or rewriting their constitutions to disfranchise black voters. In Texas, local Democratic party organizations began regulating their primaries to exclude black voters. Since the Democrats ruled over a one-party state, to sit out the primary was tantamount to sitting out the entire election. The policy of excluding black primary voters received support at the state level at the turn of the twentieth century with the passage of the poll tax in 1902, which along with the defeat of Populism greatly reduced the black electorate, and the Terrell Election Laws of 1903 and 1905, which established a more modern system of primary elections that greatly advantaged the Democratic Party. Thus the years around the turn of the twentieth century mark a sharp turning point in the history of racial segregation and discrimination in the United States.[42]

White Texans, however, were far from finished with their campaign for white supremacy in the first decade of the twentieth century. In fact, the federal judiciary indicated its acceptance of ever stricter discriminatory policies through the 1920s. For example, Texas Democrats followed up the Terrell Election Law with a statewide white primary in 1923. They held off on the move until it was clear to them, based on a US Supreme Court decision in 1921, that their

---

[40] *Civil Rights Cases*, 109 U.S. 3 (1883).
[41] *Plessy v. Ferguson*, 163 U.S. 537 (1896).
[42] Barr, *Reconstruction to Reform*, 205-207; *Handbook of Texas Online*, O. Douglas Weeks, "Election Laws," accessed March 04, 2019, http://www.tshaonline.org/handbook/online/articles/wde01; Michael Perman, *The Struggle for Mastery: Disfranchisement in the South, 1888-1908* (Chapel Hill: University of North Carolina Press, 2001), 32, 270-298.

attempt would not be interpreted as a violation of the Fourteenth Amendment. In *Newberry v. United States*, the high court held that political parties were, like railway companies, private organizations exempted from the Equal Protection Clause of the Fourteenth Amendment. Though black Texans protested and brought suits to federal court, the white primary persisted until 1944, and with few exceptions the legal structures of Jim Crow and Juan Crow remained solidly in place well into the middle of the twentieth century.[43]

It is not surprising that non-white criminal defendants would experience a greater degree of discrimination in the justice system during this time period in which the system of segregation had firmly established itself. Case studies of deadly weapon violators in Fayette and McLennan Counties reveal that the treatment of black and Hispanic defendants took a turn for the worse around 1890, declined further over the next twenty years, and reached a low point around 1920 that held steady at least through 1930. During this forty-year time period, black defendants went from being a small proportion of deadly weapon defendants to the majority of them, despite their shrinking share of the overall county-wide populations. In Fayette County, African Americans accounted for a higher proportion of the total population in 1870 than at any later time. Though their numbers grew over the next several decades, their percentage of the population fell from 33 percent in 1870 to 23 percent in 1920. Statistics for McLennan County tell much the same story over that half-century; in pure numbers the black population grew, but their share of the total population dropped from 34 percent in 1870 to 21 percent in 1920 (see Figs. 5.6, 5.7).[44]

---

[43] Campbell, *Gone to Texas*, 330-331, 366; Walter L. Buenger, *The Path to a Modern South: Northeast Texas between Reconstruction and the Great Depression* (Austin: University of Texas Press, 2001), 76-83; Darlene Clark Hine, *Black Victory: The Rise and Fall of the White Primary in Texas* (Millwood, NY: KTO Press, 1979); *Handbook of Texas Online*, Sanford N. Greenberg, "White Primary," accessed February 13, 2019, http://www.tshaonline.org/handbook/online/articles/wdw01; *Handbook of Texas Online*, O. Douglas Weeks, "Election Laws," accessed February 13, 2019, http://www.tshaonline.org/handbook/online/articles/wde01.

[44] These results are based upon a random sample of 177 deadly weapon defendants from among a total of 1,778 from those counties. Violator names were randomly selected from these counties and used as a starting point for research in census records. The race or ethnicity remained unclear for 7 sampled violators, or 3.9%. The overall

Fig. 5.6

| Fayette County Census Data, 1870-1920 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1870 | | 1880 | | 1890 | | 1900 | | 1910 | | 1920 | |
| White | 10,953 | 67% | 19,167 | 69% | 23,031 | 73% | 26,148 | 72% | 22,434 | 75% | 23,201 | 77% |
| Negro | 5,473 | 33% | 8,763 | 31% | 8,446 | 27% | 10,394 | 28% | 7,351 | 25% | 6,755 | 23% |

Fig. 5.7

| McLennan County Census Data, 1870-1920 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1870 | | 1880 | | 1890 | | 1900 | | 1910 | | 1920 | |
| White | 8,861 | 66% | 19,276 | 72% | 28,811 | 74% | 45,345 | 76% | 55,991 | 73% | 65,280 | 79% |
| Negro | 4,627 | 34% | 7,643 | 28% | 10,381 | 26% | 14,405 | 24% | 17,234 | 22% | 17,575 | 21% |

In the 1870s and 1880s, 31 percent of Fayette County deadly weapon defendants were black or mulatto, mirroring their share of the population almost perfectly. After 1890, however, their proportion of the county's arrested gun-toters began to increase and crossed the 50 percent mark by 1900. By 1920, black defendants accounted for nearly 70 percent of all deadly weapon violations in the county, though by then they constituted less than 25 percent of the county population (see Figs. 5.8, 5.9).

Fig. 5.8



% Total

Fayette County Violators, 1870-1879

Race
- Black/Mulatto
- White

32%

69%

---

sample is proportional to the number of individual violators arrested in these counties between 1870 and 1930 based on extant records. There were 102 sampled violators from a total of 1,021 in Fayette County, and 75 from a total of 757 in McLennan County. This sample size yields a confidence interval of ±7 when using the worst-case-scenario of 50% accuracy (the standard for polling statistics). Since my figures are based upon straightforward census records rather than subjective polling questions, and I have disregarded violators whose race could not be determined with some certainty, it is fair to consider the accuracy of this sample 95% or higher. Outside of this sample, I investigated *all* Fayette County violators from the 1870s (a total of 82), yielding highly accurate results for that particular decade.

Fig. 5.9



Racially discriminatory law enforcement was nothing new in Texas and the United States in 1890. Certain offenses, like vagrancy, had been applied much more strictly to black citizens than white since the early years of Reconstruction.[45] As the Fayette County data shows, though, the deadly weapon law was not enforced in a discriminatory way during the 1870s and early 1880s. The turning point around 1890 should be interpreted as the visible manifestation of a mostly obscured cancer of racism metastasizing in the state's justice system. Because we already know that black Texans were jailed in far higher proportions than their white counterparts, case studies of other misdemeanor offenses would likely produce similar results of discriminatory enforcement sharpening around 1890.[46]

---

[45] John K. Bardes, "Redefining Vagrancy: Policing Freedom and Disorder in Reconstruction New Orleans," *Journal of Southern History* 84, no. 1 (February 2018): 69-112.
[46] Donald R. Walker, *Penology for Profit: A History of the Texas Prison System, 1867-1912* (College Station: Texas A&M University Press, 1988), 165-167.

This timeline aligns with political events in Fayette County during the very late 1880s. During Reconstruction, Fayette County was firmly within the pro-Davis wing of the Republican Party. Though Democrats made great gains in the mid-1870s, Fayette County voters usually continued to send one Republican to Austin as a part of their delegation to the state legislature. This pattern broke after the election of 1889, when significant white immigration tipped the scales in favor of Democratic voters (see Fig 5.6). Republicans experienced a brief comeback during the zenith of the Populist movement with the elections of 1894, but their position as one commanding a regular seat among the county's representatives was over. The fall of Republicanism in Fayette County matches perfectly the rise of discriminatory law enforcement against black residents. The conclusion is clear: as long as Republican voters held enough political capital to secure a seat at the table, black residents of Fayette County received fair treatment within the fee-based local justice system.[47]

In McLennan County, home to the booming railway entrepot of Waco, a similar pattern discriminatory enforcement emerged. As the African American proportion of the population declined, their share of appearances in court for weapons violations increased. However, fewer extant records from McLennan County and the effects of the high rail traffic produced less clear-cut results than were obtained in Fayette County. Without records covering the years 1877 to 1895, it is impossible to see the kind of sharp break around 1890 that appeared in Fayette County. Waco's position as a rail hub and fast-growing city in need of laborers affected the results of its case study, too. There were more Hispanic violators in McLennan County than Fayette, and more of the gun-toters there seem to have been visitors or transients who proved impossible to identify with certitude. The proportion of non-white violators grew substantially

---

[47] See state senators and representatives of Fayette County, Texas Legislative Reference Library, Legislators and Leaders, https://lrl.texas.gov/legeLeaders/members/lrlhome.cfm.

over the half-century in question, from 13 percent in the early 1870s to 50 percent by 1930. However, this process played out in an ebb-and-flow way that produced temporary decreases around 1905 and 1915 (see Fig. 5.10).

Fig. 5.10



It is clear from the data collected in McLennan and Fayette Counties that the deadly weapon laws of Texas were not enacted to purposefully target black or Republican Texans for disarmament, nor was the law stamped from the beginning with a thinly veiled racism. It took decades for Democrats at the state and local levels to gain sufficient political strength to enact the laws and elect the officials who could preside over a campaign of discriminatory enforcement. The story of the deadly weapon law in these counties, whose substantial minority of black residents made them prime candidates for white-on-black violence, illuminates the reach of segregation far beyond private organizations to the justice system itself. It is the story of good intentions being turned to evil purposes, of the power of local officials over the lives of their constituents, of the necessity for voting rights in a bi-racial democracy.

Conclusion

The decade of the 1930s marked an important turning point in the history of firearm regulations in Texas and American history. That greatest of all "positive" progressive regulations, Prohibition, created a space for the proliferation of gangs, whose foot soldiers took to wielding automatic weapons. These types of firearms existed in the latter half of the nineteenth century but needed technological innovation and mass production techniques to make them widely available. A sharp rise in homicides committed by tommy guns produced a new wave of firearm regulations targeting automatic weapons for proscription. This time around, though, the federal government became involved through the passage of the National Firearms Act (NFA) in 1934. That legislation specified that certain types of firearms, including machine guns and short-barreled rifles and shotguns, must be registered. Furthermore, dealers in these "NFA" weapons had to pay an annual occupation tax intended to discourage sales. Some firearm accoutrements, like silencers and mufflers, also fell within the purview of the law.[1]

Technology proved to a driving force in the adoption of federal gun laws, marking a continuity with state- and municipal-level weapon regulations of the nineteenth century. In antebellum Texas, the prevalence of Bowie knives made them a special target for reformers who succeeded in passing a law that penalized manslaughter-by-knife akin to murder. In the postbellum era, industrialization and rail transport turned cheap revolvers into household items that almost any man could afford. Though high-quality pistols, like Colts, could cost upwards of forty dollars, sellers advertised inexpensive alternatives at five dollars or less. The growth of mail-order purchasing and reliable mail delivery made them widely available for consumers and problematic for reformers. It is no coincidence that "pistol laws" like the one in Texas emerged

---

[1] Winkler, *Gunfight*, 211-219.

when they did, during a period of transition away from blades and toward pistols (revolvers and later semi-automatics) as the weapon of choice for interpersonal disputes.[2] The commercial sale of machine guns in the decades following the First World War marked a similar technological innovation that disrupted the status quo pertaining to weapon laws, ushering in federal legislation. In the late twentieth century, the availability of small caliber, semi-automatic rifles, referred to frequently and contentiously as "assault-type" rifles began posing a comparable problem. Across American history, the technology and consumer appetite for weapons have generally run far ahead of law and courts, creating cultural debates that elevate social tensions.

The introduction of federal-level gun laws reshaped the regulatory landscape pertaining to firearms and ultimately made it a more controversial issue than it had been in the past. Dating back to the eighteenth century, there is a deep strain of antipathy among southerners against interventions by the national government, in large measure because a powerful national government might threaten the South's "peculiar" racial arrangements. Critics then and now portray such interventions as unconstitutional usurpations of state power on the part of the federal government. This cultural inheritance has given the "gun rights" discourse of the New Right a strong popular resonance in the South and in rural areas more generally. Grover Norquist, an important policy advocate in the Republican Party since the 1980s, credits his party's position on gun laws with turning many traditional Democrats into reliable Republicans.[3] This process played out in rhetoric on the subject of federal gun laws alongside policy changes in historically Democratic, newly Republican state legislatures to scale back or repeal their deadly weapon laws. These policies have been as much about the deregulatory platform of the post-

---

[2] The research of historian Randolph Roth indicates that the rise of the handgun in Texas and California occurred over the decades stretching from the late 1840s to the 1870s. Roth, *American Homicide*, 355-356.
[3] "Interview with Grover Norquist," *PBS Frontline* (2004), accessed March 7, 2019.
https://www.pbs.org/wgbh/pages/frontline/shows/choice2004/interviews/norquist.html

Reagan Republican Party as they have been measures to promote public safety by empowering "good guys" to pack heat.

In Texas, the dismantling of the deadly weapon laws began in the 1990s, amid the state's changeover from a Democratic to a Republican stronghold. Republican George W. Bush, running for governor against Democrat Ann Richards, promised to sign concealed-carry legislation that the incumbent had passionately opposed and indeed vetoed. Though it was not a central issue in the race, loosening the state's strict gun laws proved popular with important swing voters in East Texas. Richards's campaign manager, Mary Beth Rogers, believed that Republicans ran a "whisper campaign" aimed at flipping East Texas Democrats. Whether or not the Bush campaign intentionally used the "She's gonna take away your gun" idea to win in the piney woods, a rift among Democratic voters along cultural lines had suddenly become apparent.[4] Since then, cultural conservatism aided Bush's ascendancy to the White House and kept the Lone Star State firmly within the Republican Party's control. In 1995, Bush signed the state's concealed-carry law, which allowed residents who passed a background check and completed the requisite training to obtain a permit for carrying concealed handguns. Twenty years later, state lawmakers decided that permit-holders should also be allowed to carry their handguns openly.

The current debate in Texas and throughout the country over "gun rights" and "gun control" has become a heated one. Proponents of the former portray their political enemies as tyrants seeking to abolish the Second Amendment and confiscate all firearms; supporters of the latter declare that we live in a "crisis" of gun-related deaths even though most statistics show that homicides and violent crime are in decline. As so often happens in this age of mass media, the

---

[4] Patricia Kilday Hart, "Little Did We Know," *Texas Monthly* (Nov. 2004), accessed March 7, 2019. https://www.texasmonthly.com/politics/little-did-we-know/.

rational middle-ground is hard to find, obscured by click-bait and muffled by shrill voices. Examining the history of weapon regulations, however, offers us an opportunity to consider the topic in a way that is less subjective and contentious. This is possible because our American ancestors drew altogether different distinctions about weapons, their use, and their regulation than we do today.[5]

No matter what side of the debate they take, twenty-first-century Americans care about "guns"—although the word itself means different things to different people. When pressed, most gun-control advocates say that they are actually concerned about handguns or "assault-type" guns rather than *all* guns. The most ardent gun-rights supporters, on the other hand, care a great deal about protecting virtually every type of gun from further regulation by the state and federal governments. In the nineteenth century, however, regulators lumped together several kinds of weapons, which included *some* guns alongside knives, metal knuckles, and sword canes. What these weapons had in common was their concealability and their purpose as instruments of personal rather than military defense. For them, the weapons used for hunting and warfare were protected by the federal and state bills of rights and thus received exemption from regulation. All others, termed "deadly weapons" in the nineteenth century, could be regulated in some form. Some states chose to proscribe only the concealment of them while others, like Texas, opted for more far-reaching measures. Where we cringe at the thought of openly borne weapons and the commercial sale of military-grade weapons, our ancestors feared concealed weapons and refused to regulate military-grade weapons. Does this mean that we should follow in their footsteps? Not necessarily. But it does illustrate the extent to which technological innovation and the passage of time have changed the way Americans think about weapons and how to regulate them.

---

[5] An excellent examination of these opposing camps, including their origins and policy goals, can be found in Winkler, *Gunfight*, 15-94.

The 2008 *Heller* decision finally eliminated the longstanding distinction between weapons of civic defense and those of personal defense by holding that the Second Amendment protects all arms in "common use" rather than merely those employed in the common defense.[6] Though this was an important step in the evolution of federal law, it followed what had always been the case in Texas. All six state constitutions have protected individual citizens or residents in their right to own and use arms for both "defence of himself and of the State." Still, state lawmakers and appellate judges across multiple generations believed that some limitations on the carrying and sale of certain types of weapons were constitutional and necessary. In this sense, then, *Heller* is less a turning point than it initially appears. The controversy surrounding its protection of personal-defense weapons constitutes yet another federal red herring which distracts us from the much more dramatic and substantial arena of regulatory power: the states. If the gun-rights lawyers believe that widening the definition of protected weapons *de facto* limits governmental regulatory authority over them, the example of Texas stands firmly in their way.

The legal activists on the political right who seek to dismantle state-level firearm regulations, extend the protections of the Second Amendment, and incorporate it onto the states have found ways of undermining arguments from history that contradict them. One of the most common and least convincing is the contention that gun control is a form of racism. These scholars have argued that the oldest gun laws were those aimed at preventing slaves and free blacks from having them.[7] According to their line of thinking, it follows that all ensuing firearm legislation is the fruit of a racist tree that needs to be chopped down. This is a disingenuous and

---

[6] *District of Columbia v. Heller* (2008).
[7] Some examples include Clayton E. Cramer, "The Racist Roots of Gun Control," *Kansas Journal of Law and Public Policy* 4, (Winter 1995): 17-25; David B. Kopel, *The Truth about Gun Control*; Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*. See also Yuill, "'Better Die Fighting against Injustice than to Die Like a Dog'."

ahistorical position. Certainly all societies across human history which condoned slavery had to consider the wisdom of limiting their slaves' access to weapons, and the United States was no exception. Human beings devoid of legal rights or personhood, race notwithstanding, must always be viewed with suspicion by the governments sanctioning their subordination. But to say that this reality contaminated all future firearms regulations with the poison of racism is to set up a straw-man argument. Laws aimed at preventing American Indians from obtaining weapons, for example, were more about common-sense political security for colonial and state governments than racism per se. Moreover, the oldest North American laws pertaining to slaves and weapons required that households acquire sufficient firearms to arm male slaves if called upon by the Virginia government.[8] Indeed, aside from Kentucky, no Southern state attempted a blanket prohibition on black people carrying firearms. Slavery (and Indian policy) in North America was certainly grounded in racism, but to say that it was the sole animating force behind all state-level weapon laws, thereby justifying a retreat from measured gun regulations, is a deep misinterpretation of the historical record.[9]

A better way to think about race and weapon regulation in North America is to imagine it as an ever-present issue, sometimes in the foreground and other times in the background. In some cases, laws were racially discriminatory on purpose and by their very nature. The slave codes, antebellum laws targeting free blacks, and prohibitions against trading arms to Indians fall within this category. The forces of history made race a salient factor in white Americans' protection of their homes and communities from potential internal and external threats. The deadly weapon laws of Texas from 1836 to 1866 were, for the most part, overtly racial for this

---

[8] Breen and Innes, *Myne Owne Ground*, 25-27.
[9] For an incisive critique of the "gun laws as racism" argument made by contemporary legal scholars, see Charles, *Armed in America*, 287-289.

reason. The wielders of state power, Anglo-white men, did what they could to limit the access of slaves and Indians to arms and ammunition. In other cases, however, race looms in the background. Emancipation, Reconstruction, and their concomitant elevation of racial tensions provide the necessary context for the enactment of race-neutral, even pro-black, weapon laws. In Texas, the legislation of 1870-1871 was specifically designed to protect Republican voters from pro-Confederate intimidation. As federal judges lent their approval to the emerging system of segregation in the 1880s, local enforcement officials had the ability to apply these laws selectively in a racially discriminatory way. It is unlikely that this pattern is universally true across the South, but the best evidence gathered thus far indicates that it was the case for much of Texas. The development of racism in the enforcement of deadly weapon laws says far more about Jim Crow's corruption of the legal system and the rise of the "carceral state" than it does about the philosophical underpinnings of weapon regulation.

The motivations behind the race-neutral weapon laws of Texas emanated from class and political considerations, both of which went hand-in-hand with race. The antebellum legislation against knife-wielding killers alongside James W. Throckmorton's proposed tax upon the carrying of weapons targeted poorer men for moral reform because they, in the eyes of their social betters, resorted too frequently to violence and acted in irresponsible or unmanly ways. These men could be Tejanos, Anglos, or African Americans; the law considered them equally problematic if they fit the description provided by Throckmorton back in 1866: "men and boys, vagabonds and vagrants" carrying "arms about their persons on all occasions."[10] Of course, in postbellum Texas, freedmen clung to the bottom rung of the socio-economic ladder and, at least in the eyes of most white Texans, most closely resembled Throckmorton's portrayal. Though the

---

[10] *House Journal* (1866), 530.

deadly weapon laws of the early 1870s were initially enacted by Republicans to protect vulnerable black voters, the declining cost of purchasing pistols across the closing decades of the nineteenth century adds an important class element to the amendments passed during that time period. Gun-toting defendants tended to be young men who owned no land and held little in the way of social capital. The intersection of poverty and racism transformed these laws, laudable as they may have been in the beginning, into tools of oppression by 1900.

The rise of a new, middle-class masculinity during the post-Civil War period greatly affected the history of gun and weapon regulations in Texas. Where governor Throckmorton had seen financial means as a way of deciding who was "man" enough to carry a pistol, in the 1890s governor Jim Hogg asked Texas voters to be "man" enough *not* to use one.[11] Shifting societal expectations of men followed economic development and demographic growth in Texas during the postbellum era. The middle-class residents arriving daily from other states and countries wanted peace and safety in their newly established communities. In many respects, they got what they wanted. State jurisprudence closely guarded the "heat of passion" defense that men so frequently used to justify their recourse to bloody vengeance; family feuds and vendettas had largely burned out by the end of the century; professional police forces and bureaucratized sheriffs' departments provided more effective law enforcement than the state had ever seen before. Still, this was the era in which ritualized *racial* violence became more common and more culturally meaningful. Even into the late nineteenth century, the paradoxical intermingling of freedom and security for some with the oppression of others continued to define race relations in the United States. If black or Hispanic Texans opted not to carry guns, their decision likely had less to do with the adoption of middle-class values than with an attempt to avoid harassment by

---

[11] *House Journal* (1893), 24-25.

officers. As the ballad of Gregorio Cortéz showed, the very arms that made them arrestable on sight provided their best means of defense against persecution.

Turn-of-the-century Texans might have been trying to live out B. B. Paddock's slogan that "the revolver must go," but they did so during a time period in which national attention remained fixated on pistols and gun violence. Wild West shows, western novels, and the art of Frederick Remington and Charles Russell were popular. Writers turned Civil War figures into western heroes, most notably Jesse James, whose real-life escapades took him to Minnesota rather than Mexico.[12] Why did Americans gravitate toward a violent West filled with gunslingers and desperadoes? Some historians might point toward a shared "myth" of the West that united disparate Americans into a communal endeavor to "civilize" the continent.[13] Others might claim that the final three decades of the nineteenth century witnessed a "greater reconstruction" of the country, best epitomized by the settling of the West, which dominated American politics and culture.[14] Still others might theorize that desperadoes personified an outdated, dying vision of manliness that inhabitants of an industrializing world longed for.[15] Arriving at the question from the perspective of gun laws and their history, one might wonder whether the fascination has a much simpler explanation and grew from living in a "gun culture" or fearing the effects of a "gun crisis."

---

[12] Matthew C. Hulbert, *Ghosts of Guerrilla Memory: How Civil War Bushwhackers Became Gunslingers in the American West* (Athens: University of Georgia Press, 2016).

[13] Richard Slotkin, *Regeneration through Violence: The Mythology of the American Frontier, 1600-1860* (Middletown, CT: Wesleyan University Press, 1973); Richard Slotkin, *The Fatal Environment: The Myth of the Frontier at the Age of Industrialization, 1800-1890* (New York: Atheneum, 1985); Richard Slotkin, *Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America* (New York: Atheneum, 1992).

[14] Richard White, *The Republic for Which It Stands: The United States during Reconstruction and the Gilded Age, 1865-1896* (New York: Oxford University Press, 2017).

[15] Richard White, "Outlaw Gangs of the Middle Border: American Social Bandits," *Western Historical Quarterly* 12, no. 4 (Oct. 1981): 387-408.

A more fruitful line of inquiry than debating the presence or absence of a "gun culture" is an examination of the cultural changes, then and now, that produced problematic gun violence. There is no doubt that the postbellum era was a bloody one. The "war" of Reconstruction, the suppression of black voting, the subjugation of the Plains Indians, and rising urbanization made for a tumultuous thirty years. By contrast, the decades marking the turn of the twenty-first century have witnessed a decline in violent crime. Aside from a few notorious pockets of criminal activity, the American streets are as safe as they have ever been. The reason for parallels between the two time periods, which include media attention to gun-related deaths, the profitable mass production and wide availability of firearms, a cultural fascination with violence, and a strong gun-control movement, remain difficult to see.

If we zoom out and consider more holistically the similarities between the present, which Democrats have long referred to as "a second Gilded Age," and the closing decades of the nineteenth century, whose designation as "the Gilded Age" has only recently sparked academic controversy, a clearer picture emerges. Both eras have been marked by technological innovations that disrupted employment patterns and heightened the sense of vulnerability to irrational market forces. Some historians have argued that the two "Gilded Ages" are connected by globalization and its consequent feelings of atomization on the part of those left behind by new political and economic structures.[16] A growing divide is emerging between the well-connected members of a "global community" on the one hand, and the parochial inhabitants of "flyover country" on the other, who feel as though their values, skills, and political voice are under attack. Recent Democratic gaffes accusing these Americans of clinging to "God and guns" or being a collective

---

[16] Niall Ferguson, "Populism as a Backlash against Globalization—Historical Perspectives," *Horizons* 8 (Autumn 2016): 12-21. For an anecdotal, biographical example of this perspective, See J. D. Vance, *Hillbilly Elegy: A Memoir of a Family and Culture in Crisis* (New York: Harper, 2016).

"basket of deplorables" point to a cultural rift in America that even savvy politicians have trouble navigating. It is purely speculative, but this position offers some explanation for the cultural resonance of the gun debate today. No object, no issue (not even abortion) so perfectly draws the dividing line between these two camps. One side wants "gun control" to prevent maniacs with "mental health issues" from shooting up schools and workplaces; the other wants "gun rights" to guard themselves against the ever-present "criminal" who lurks around every corner. Both sides in their fearfulness overlook the common thread among shooting sprees, urban crime, and suicides—which tend to afflict young, hopeless men as the pullers of the trigger.

206

Bibliography

Archival Sources
DeWitt County, Texas, District Court Minutes, vols. H-K, Microfilm Reels 1012068, 1012069 (1879-1898), Texas State Library and Archives Commission.

*Fayette County Records, LaGrange, Texas.*
Office of the District Clerk of Fayette County.
District Court Minutes, vols. K-M (1867-1877).
Office of the County Clerk of Fayette County.
Judge's State Docket, vols. 1-6 (1872-1933).
Bar State Docket (1872-1879).
Bar Criminal Docket (1888-1894).
Office of the County Judge of Fayette County.
Justice Court Criminal Docket, Precinct 1 (1877-1880, 1883-1893, 1899-1901).
Justice Court Criminal Docket, Precinct 6 (1899-1902).
Justice Court Criminal Docket, Precinct 7 (1881-1890, 1893-1904).
Justice Court Criminal Docket, Precinct 8 (1890).
Justice Court Criminal Docket, Precinct Unlisted (1889-1897, 1893-1895, 1895-1897, 1897-1899).
*Jefferson County Records, Beaumont, Texas.*
Office of the County Clerk of Jefferson County.
County Court Criminal Minutes, vol. 1 (1897-1915).
Criminal Judgment Book (1910-1915).
County Court Criminal Index, (1914-1953).
*Jefferson County Records, Sam Houston Regional Library and Research Center, Liberty, Texas.*
Justice Court Criminal Docket, Precinct 6 (1908-1915).
Justice Court Civil and Criminal Docket, Precinct 1 (1874-1876).
Justice Court Criminal Docket, Examining Trials, Precinct 1 (1895-1902).
Justice Court Criminal Docket, Examining Trials, Precinct 1 (1921-1925).
*Liberty County Records, Sam Houston Regional Library and Research Center, Liberty, Texas.*
Justice Court Criminal Docket, Precinct 1 (1870-1875).
Justice Court Criminal Docket, Precinct 8 (1912).
*McLennan County Records, McLennan County Archives, Waco, Texas.*
Justice Court Criminal Docket, Precinct 1 (1901-1903).
Justice Court Criminal Docket, Precinct 3 (1894-1904).
Justice Court Criminal Docket, Precinct 5 (1896-1900).
County Court Criminal Fee Book, vols. K-W (1897-1930).
County Court Criminal Minutes, vols. A, H, L (1876-1881, 1896-1922).
County Court Criminal Case Files, Boxes 1-7 (1886-1887).
County Jail Register of Prisoners (1895-1900).
Texas, District Court Criminal Docket (1873-1874).
City of Waco Criminal District Court, Docket (1874-1876).

207

*Parker County Records, University of Texas at Arlington Central Library, Special Collections, Arlington, Texas.*
County Court Minutes, vols. 5-9 (1896-1937).
Justice Court Criminal Docket, Precinct 1, 9 vols. (1884-1923).

Legislative Documents
*Texas Documents.*
Bill Files, Legislative Records, Texas State Library and Archives Commission, Austin, Texas.
Journals of the Senate of the Republic of Texas, 1st-9th Cong. (1836-1845).
Journals of the House of Representatives of the Republic of Texas, 1st-9th Cong. (1836-1845).
Journals of the Senate of the State of Texas, 1st-41st Leg. (1845-1930).
Journals of the House of Representatives of the State of Texas, 1st-41st Leg. (1845-1930).
Gammel, H.P.N., editor. *Gammel's Laws of Texas*. 28 vols., 1822-1933. Austin: Gammel Book Company, 1897-1933.
Weeks, F. M., reporter. *Debates of the Texas Convention*. Houston: J. W. Cruger, 1846.
*Journal of the Reconstruction Convention, which met at Austin, Texas, 1868-1869.* Austin: Tracy, Siemering & Co., 1870.
*State Journal Appendix: Containing Official Report of the Debates and Proceedings of the Twelfth Legislature of the State of Texas.* Austin: Tracy, Siemering, & Co., 1870.

*United States Federal Documents.*
United States Senate. "Report of Carl Schurz." Senate Executive Document No. 2-39 (1865).
United States Congress. *Report of Joint Committee on Reconstruction* (1866).
United States Senate. "Report of W. E. Strong." Senate Executive Document No. 27-39 (1866).
United States Senate. "Report of Benjamin C. Truman." Senate Executive Document No. 43-39 (1866).
United States House of Representatives. "Memorial on Behalf of the Citizens of Western Texas." House Miscellaneous Document No. 35-42 (1867).
United States House of Representatives. "Condition of Affairs in Texas." House Executive Document No. 61-39 (1867).
United States Congress. *Report of the Joint Select Committee to Inquire into the Condition of Affairs in Late Insurrectionary States* (1872).
United States Senate. Senate Report No. 41-42 (1872).
Federal Writers Project. *Slave Narratives: A Folk History of Slavery in the United States from Interviews with Former Slaves*. Vol. 16. Washington: Works Progress Administration, 1941.

Legal Documents and Court Cases
Texas Legal Documents.
*The Penal Code of the State of Texas*. Galveston: The News Office, 1857.
*1879 Revised Statutes of Texas*. Austin: State Printing Office, 1887.
*1895 Revised Statutes of Texas*. Austin: Eugene Von Boeckmann, 1895.
*1911 Revised Civil Statutes and Revised Criminal Statutes of Texas*. Austin: Austin Printing Company, 1912.

*1925 Revised Civil Statutes and Revised Criminal Statutes of Texas*. Austin: A.C. Baldwin & Sons, 1925.

*1928 Complete Texas Statutes*. Kansas City, MO: Vernon Law Book Company, 1928.

*1931 Supplement to the 1928 Complete Texas Statutes*. Kansas City, MO: Vernon Law Book Company, 1931.

*Cases Argued and Adjudged in the Supreme Court of Texas*. Vols. 32-46, 1869-1876.

*The Texas Criminal Reports: Cases Argued and Adjudged in the Court of Criminal Appeals of the State of Texas*. Vols. 1-60, 1876-1911.

Thomas Johnson Michie, editor. *The Encyclopedic Digest of Texas Reports*. 4 vols. Charlottesville: Michie Co., 1912-1914.

State of Texas Court Cases

*Flournoy v. State of Texas*, 14 Tex. 387 (1856).
*Cockrum v. Texas*, 24 Tex. 394 (1859).
*English v. State of Texas*, 35 Tex. 473 (1872).
*State of Texas v. Carter*, 36 Tex. 89 (1872).
*Jenkins v. State of Texas*, 36 Tex. 638 (1872).
*Christian v. State of Texas*, 37 Tex. 475 (1873).
*Waddell v. State of Texas*, 37 Tex. 354 (1873).
*State of Texas v. Duke* 42 Tex. 455 (1874).
*Meredith v. State of Texas*, 40 Tex. 447 (1874).
*Maxwell v. State of Texas*, 38 Tex. 156 (1873).
*State of Texas v. Duke* 42 Tex. 455 (1874).
*Lewis v. State of Texas*, 2 Tex. Cr. App. 26 (1877).
*Reynolds v. State of Texas*, 1 Tex. Cr. App. 616 (1877).
*Jennings v. State of Texas*, 5 Tex. Cr. App. 298 (1878).
*Woodward v. State of Texas*, 5 Tex. Cr. App. 295 (1878).
*Snell v. State of Texas*, 4 Tex. Cr. App. 171 (1878).
*Lewis v. State of Texas*, 7 Tex. Cr. App. 567. (1880).
*Ex Parte Boland*, 11 Tex. Cr. App. 159 (1881).
*Carmichael v. State of Texas*, 11 Tex. Cr. App. 27 (1881).
*Brooks v. State of Texas*, 15 Tex. Cr. App. 88 (1883).
*West v. State of Texas*, 21 Tex. Cr. App. 427 (1886).
*Clayton v. State of Texas*, 21 Tex. Cr. App. 343 (1886).
*Darby v. State of Texas,* 23 Tex. Cr. App. 407 (1887).
*Harris v. State of Texas*, 22 Tex. Cr. App. 677 (1887).
*Cathey v. State of Texas,* 23 Tex. Cr. App. 492 (1887).
*Blair v. State of Texas*, 26 Tex. Cr. App. 387 (1888).
*West v. State of Texas*, 26 Tex. Cr. App. 99 (1888).
*Stilly v. State of Texas*, 27 Tex. Cr. App. 445 (1889).
*Baker v. State of Texas*, 28 Tex. Cr. App. 5 (1889).
*Shelton v. State of Texas*, 27 Tex. Cr. App. 443 (1889).
*McNeil v. State of Texas* 29 Tex. Cr. App. 48 (1890).
*Massie v. State of Texas*, 30 Tex. Cr. App. 64 (1891).
*Wolfforth v. State of Texas*, 31 Tex. Cr. App. 387 (1892).
*O'Neal v. State of Texas*, 32 Tex. Cr. App. 42 (1893).

*Miller v. State of Texas*, 32 Tex. Cr. App. 319 (1893).
*Love v. State of Texas*, 32 Tex. Cr. App. 85 (1893).
*Ringer v. State of Texas*, 33 Tex. Cr. App. 180 (1894).
*Price v. State of Texas*, 34 Tex. Cr. App. 102 (1895).

United States Federal Court Cases.
*Twitchell v. Commonwealth* 74 U.S. 321 (1868)
*U.S. v. Avery*, 13 Wall. 251 (1872).
*Slaughterhouse Cases*, 83 U.S. 36 (1873).
*Edwards v. Elliott*, 88 U.S. 532 (1874).
*Walker v. Sauvinet*, 92 U.S. 90 (1876).
*U.S. v. Cruikshank*, 92 U.S. 542 (1876).
*Miller v. Texas*, 153 U.S. 535 (1894).
*Plessy v. Ferguson*, 163 U.S. 537 (1896).
*U.S. v. Miller*, 307 U.S. 174 (1939).
*Saenz v. Roe*, 526 U.S. 489 (1999).
*District of Columbia v. Heller*, 554 U.S. 570 (2008).

<u>Websites</u>
Texas State Historical Association. *Handbook of Texas Online*. https://tshaonline.org/handbook.
Duke University School of Law. *Repository of Historical Gun Laws*.
    https://law.duke.edu/gunlaws/.
Texas Legislative Reference Library. https://lrl.texas.gov/.
University of North Texas. *The Portal to Texas History*. https://texashistory.unt.edu/.
Oklahoma Historical Society. *Encyclopedia of Oklahoma History and Culture*.
    https://www.okhistory.org/publications/encyclopediaonline.
Cato Institute. *Gun Control*. https://www.cato.org/research/gun-control.
Center for American Progress. *Gun Violence*. https://www.americanprogress.org/tag/gun-violence/.
United States Census of Population and Housing. *United States Resident Population by State: 1790-1850*. https://www.census.gov/prod/www/decennial.html.
"Interview with Grover Norquist," *PBS Frontline* (2004), accessed March 7, 2019.
    https://www.pbs.org/wgbh/pages/frontline/shows/choice2004/interviews/norquist.html

<u>Newspapers</u>
*Abilene (TX) Daily Reporter*
*Abilene (TX) Reporter*
*Albany (TX) News*
*Albany (TX) Star*
*Alpine (TX) Avalanche*
*Aspermont (TX) Star*
*Austin (TX) Weekly Statesman*
*Bastrop (TX) Advertiser*
*Bonham (TX) News*

*Brenham (TX) Daily Banner*
*Caldwell (KS) Post*
*Canadian (TX) Free Press*
*Cheyenne Transporter* (Darlington, IT)
*Christian Messenger* (Bonham, TX)
*Daily Fort Worth (TX) Standard*
*Dallas (TX) Daily Herald*
*Dallas (TX) Herald*
*Dallas (TX) Morning News*
*Denison (TX) Daily News*
*Denton County News* (Denton, TX)
*Fort Worth (TX) Daily Democrat*
*Fort Worth (TX) Daily Gazette*
*Fort Worth (TX) Gazette*
*Frontier Echo* (Jacksboro, TX)
*Galveston (TX) Daily News*
*Hallettsville (TX) New Era*
*Hillsboro (TX) Mirror*
*Honey Grove (TX) Signal*
*Houston (TX) Chronicle*
*Houston (TX) Daily Union*
*Jackson (OH) Standard*
*Lampasas (TX) Daily Leader*
*Los Angeles (CA) Times*
*Medical and Surgical Reporter* (Philadelphia, PA)
*North Texas Enterprise* (Bonham, TX)
*Northern Standard* (Clarksville, TX)
*Palo Pinto (TX) Star*
*Panola Watchman* (Carthage, TX)
*Plano (TX) Star-Courier*
*Polk County Enterprise* (Livingston, TX)
*Richmond (TX) Reflector*
*San Antonio (TX) Daily Express*
*San Antonio (TX) Express*
*San Marcos (TX) Free Press*
*Schulenburg (TX) Sticker*
*St. Tammany Farmer* (Covington, LA)
*Stephenville (TX) Empire*
*Telegraph and Texas Register* (Houston, TX)
*Temple (TX) Daily Telegram*
*Tri-Weekly State Gazette* (Austin, TX)
*Waco (TX) Daily Examiner*
*Waco (TX) Evening News*
*Weekly Democratic Statesman* (Austin, TX)
*Women's Wear Daily* (New York City, NY)

Books and Articles

Amar, Akhil Reed. *The Bill of Rights: Creation and Reconstruction.* New Haven: Yale University Press, 1998.

Ayers, Edward L. *Vengeance and Justice: Crime and Punishment in the 19th Century American South*. New York: Oxford University Press, 1984.

Baldwin, Joseph G. *The Flush Times of Alabama and Mississippi; A Series of Sketches*. New York: D. Appleton, 1853.

Bardes, John K. "Redefining Vagrancy: Policing Freedom and Disorder in Reconstruction New Orleans." *Journal of Southern History* 84, no. 1 (February 2018): 69-112.

Barr, Alwyn. *Reconstruction to Reform: Texas Politics, 1876-1901.* Austin: University of Texas Press, 1971.

Bean, Christopher B. *Too Great a Burden to Bear: The Struggle and Failure of the Freedmen's Bureau in Texas.* New York: Fordham University Press, 2016.

Beccaria, Cesare. *An Essay on Crimes and Punishments.* London: F. Newbery, 1775.

Bellesiles, Michael A., ed. *Lethal Imagination: Violence and Brutality in American History*. New York: New York University Press, 1999.

Bellesiles, Michael A. *Arming America: The Origins of a National Gun Culture*. New York: Knopf, 2000.

Bensel, Richard. *Yankee Leviathan: The Origins of Central State Authority in America, 1859-1877.* New York: Cambridge University Press, 1991.

Bercaw, Nancy. *Gendered Freedom: Race, Rights, and the Politics of Household in the Delta, 1861-1875.* Gainesville: University of Florida Press, 2003.

Blackburn, Edward A. *Wanted: Historic County Jails of Texas.* College Station: Texas A&M University Press, 2005.

Blackstone, William. *Commentaries on the Laws of England*. 4 vols. Oxford: Oxford, 1765-1769.

Blatt, Jessica "John W. Burgess, the Racial State and the Making of the American Science of Politics." *Ethnic and Racial Studies* 37, no. 6 (2014): 1062-1079.

Brands, H. W. *American Colossus: The Triumph of Capitalism, 1865-1900.* New York: Doubleday, 2010.

Breen, T.H. and Stephen Innes. *Myne Owne Ground: Race and Freedom on Virginia's Eastern Shore, 1640-1676.* Oxford: Oxford University Press, 1980.

Brice, Donaly E. and Barry A. Crouch. *Cullen Montgomery Baker: Reconstruction Desperado.* Baton Rouge: Louisiana State University Press, 1987.

Buenger, Walter L. *The Path to a Modern South: Northeast Texas between Reconstruction and the Great Depression.* Austin: University of Texas Press, 2001.

Burgess, John W. *Political Science and Constitutional Law.* 2 vols. Boston: Ginn & Company, 1893.

Campbell, Randolph B. *Grass-Roots Reconstruction in Texas, 1865-1880.* Baton Rouge: Louisiana State University Press, 1997.

Campbell, Randolph B. *Gone to Texas: A History of the Lone Star State*. 2nd ed., New York: Oxford University Press, 2012.

Cantrell, Gregg. *The People's Revolt: Texas Populists and the Roots of American Liberalism*. New Haven: Yale University Press, 2019.

Cantrell, Gregg. "Racial Violence and Reconstruction Politics, 1867-1868." *Southwestern Historical Quarterly* 93 (January 1990): 333-355.

Carroll, B. H. *Standard History of Houston Texas from a Study of the Original Sources*. Knoxville: H. W. Crew & Co., 1912.

Charles, Patrick J. *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry*. New York: Prometheus Books, 2018.

Clampitt, Brad R. "The Breakup: The Collapse of the Confederate Trans-Mississippi Army in Texas, 1865." *Southwestern Historical Quarterly* 108 (April 2005): 498-534.

Connor, Seymour V. *Texas: A History.* New York: Thomas Y. Crowell Company, 1971.

Cornell, Saul. *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America.* Oxford: Oxford University Press, 2006.

Courtwright, David T. *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City*. Cambridge: Harvard University Press, 1996.

Cramer, Clayton E. *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie.* Nashville, TN: Nelson Current, 2006.

Cramer, Clayton E. *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*. Westport, CT: Praeger, 1999.

Cramer, Clayton E. "The Racist Roots of Gun Control." *Kansas Journal of Law and Public Policy* 4 (Winter 1995): 17-25.

Crouch, Barry A. *The Governor's Hounds: The Texas State Police, 1870-1873.* Austin: University of Texas Press, 2011.

Crouch, Barry A. Larry Peacock, and James M. Smallwood. *Murder and Mayhem: The War of Reconstruction in Texas*. College Station: Texas A&M University Press, 2003.

Crouch, Barry A.  " 'All the Vile Passions': The Texas Black Code of 1866," *Southwestern Historical Quarterly* 97 (July 1993): 12–34.

Crouch, Barry. "A Spirit of Lawlessness: White Violence; Texas Blacks, 1865-1868." *Journal of Social History* 18, no. 2 (Winter 1984): 217-232.

Curtis, Michael Kent. *No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights.* Durham: Duke University Press, 1986.

DeConde, Alexander. *Gun Violence in America: The Struggle for Control*. Boston: Northeastern University Press, 2001.

Dixon, Thomas. *The Clansman: An Historical Romance of the Ku Klux Klan.* New York: Grosset & Dunlap, 1905.

Dougherty, Kevin. *Weapons of Mississippi.* Oxford: University of Mississippi Press, 2010.

Dunning, William A. "The Undoing of Reconstruction." In *Essays on the Civil War and Reconstruction and Related Topics.* New York: The Macmillan Company, 1904. First published 1897 by Peter Smith (New York).

Durrill, Wayne K. "Political Legitimacy and Local Courts: 'Politicks at Such a Rage' in a Southern Community During Reconstruction." *Journal of Southern History* 70, no. 3 (August 2004): 577-602.

Dykstra, Robert R. *The Cattle Towns.* New York: Knopf, 1968.

Edwards, George J. *The Grand Jury: Considered from an Historical, Political and Legal Standpoint, and the Law and Practice Relating Thereto.* Philadelphia: G. T. Bisel, 1906.

Edwards, Laura F. *Gendered Strife and Confusion: The Political Culture of Reconstruction*. Urbana: University of Illinois Press, 1997.

Edwards, Laura F. *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South.* Chapel Hill: University of North Carolina Press, 2009.

Ellis, Mark R. *Law and Order in Buffalo Bill's Country: Legal Culture and Community on the Great Plains, 1867-1910.* Lincoln: University of Nebraska Press, 2007.

Emberton, Carole. *Beyond Redemption: Race, Violence, and the American South after the Civil War.* Chicago: University of Chicago Press, 2013.

Emberton, Carole. "The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South." *Stanford Law and Policy Review* 17 (2006): 615-634.

Ernst, Daniel R. "Ernst Freund, Felix Frankfurter, and the American *Rechtsstaat*: A Transatlantic Shipwreck, 1894-1932." *Studies in American Political Development* 23 (October 2009): 171-188.

Felski, Rita. *The Limits of Critique.* Chicago: University of Chicago Press, 2015.

Ferguson, Niall. "Populism as a Backlash against Globalization—Historical Perspectives." *Horizons* 8 (Autumn 2016): 12-21.

Foner, Eric. *Reconstruction: America's Unfinished Revolution, 1863-1877.* New York: Harper & Row, 1988.

Foner, Eric. *The Fiery Trial: Abraham Lincoln and American Slavery.* New York: W.W. Norton, 2010.

Foreman, Grant. *Pioneer Days in the Early Southwest*. 1926; reprint, Lincoln: University of Nebraska Press, 1994.

Free, Laura E. *Suffrage Reconstructed: Gender, Race, and Voting Rights in the Civil War Era.* Ithaca: Cornell University Press, 2015.

Freund, Ernst. *The Police Power: Public Policy and Private Rights.* Chicago: University of Chicago Press, 1904.

Friend, Craig Thompson, editor. *Southern Masculinity: Perspectives on Manhood in the South since Reconstruction*. Athens: University of Georgia Press, 2009.

Gerstle, Gary. *Liberty and Coercion: The Paradox of American Government from the Founding to the Present*. Princeton: Princeton University Press, 2015.

Goldstein, Leslie Friedman. "The Specter of the Second Amendment: Rereading *Slaughterhouse* and *Cruikshank*." *Studies in American Political Development* 21 (Fall 2007): 131-148.

Goodwyn, Lawrence. *Democratic Promise: The Populist Moment in America.* New York: Oxford University Press, 1976.

Greenberg, Amy S. *Manifest Manhood and the Antebellum American Empire.* New York: Cambridge University Press, 2005.

Grossberg, Michael and Christopher Tomlins, eds. *The Cambridge History of Law in America: Volume II, The Long Nineteenth Century (1789-1920).* New York: Cambridge University Press, 2008.

Haag, Pamela. *The Gunning of America: Business and the Making of American Gun Culture.* New York: Basic Books, 2016.

Halbrook, Stephen P. *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876.* Westport, CT: Praeger, 1998.

Halbrook, Stephen P. "The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights." 41 *Baylor Law Review* (1989): 629-88.

Haley, James L. *The Texas Supreme Court: A Narrative History, 1836-1986.* Austin: University of Texas Press, 2013.

Hämäläinen, Pekka. *The Comanche Empire.* New Haven: Yale University Press, 2008.

Hamner, Laura V. *The No-Gun Man of Texas: A Century of Achievement, 1835-1929.* Amarillo: Laura V. Hamner, 1935.

Hart, Patricia Kilday. "Little Did We Know." *Texas Monthly* (November 2004). Accessed March 7, 2019. https://www.texasmonthly.com/politics/little-did-we-know/.

Hartog, Hendrick. "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America." *Journal of American History* 84, no. 1 (June 1997): 67-96.

Hine, Darlene Clark. *Black Victory: The Rise and Fall of the White Primary in Texas.* Millwood, NY: KTO Press, 1979.

Hinz, Dale L. *Panther's Rest: History of the Fort Worth Police Department, 1873-21st Century.* Bloomington: Author House, 2007.

Hogan, William Ransom *The Texas Republic: A Social and Economic History.* Norman: University of Oklahoma Press, 1946.

Howell, Kenneth Wayne. *Texas Confederate, Reconstruction Governor: James Webb Throckmorton.* College Station: Texas A&M University Press, 2008.

Hulbert, Matthew C. *Ghosts of Guerrilla Memory: How Civil War Bushwhackers Became Gunslingers in the American West.* Athens: University of Georgia Press, 2016.

Jennys, David R. "Holland Coffee: Fur Trader on the Red River." *The Museum of the Fur Trade Quarterly* 29, no. 3 (Fall 1993): 1-9.

Johnson, Frank W. *A History of Texas and Texans.* Chicago: American Historical Society, 1914.

Johnson, Paul E. *A Shopkeeper's Millennium: Society and Revivals in Rochester, New York, 1815-1837.* New York: Hill and Wang, 1978.

Jones, Stephen. *Criminology*, 5th ed. New York: Oxford University Press, 2013.

Kopel, David B. *The Truth about Gun Control*. New York: Encounter Books, 2013.

Lause, Mark. *The Great Cowboy Strike: Bullets, Ballots, and Class Conflict in the American West.* New York: Verso, 2017.

Leonardatos, Cynthia, David B. Kopel, and Stephen P. Halbrook. "*Miller versus Texas*: Police Violence, Race Relations, Capital Punishment, and Gun-Toting in Texas in the Nineteenth Century—and Today." *Journal of Law and Policy Review* 9 (2001): 737-766.

Les Benedict, Michael. "Preserving Federalism: Reconstruction and the Waite Court." *The Supreme Court Review* (1978): 39-79.

Light, Caroline. *Stand Your Ground: A History of America's Love Affair with Lethal Self-Defense.* Boston: Beacon Press, 2017.

Lott, John R., Jr. *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Chicago: University of Chicago Press, 1998.

Magliocca, Gerard N. "Why Did the Incorporation of the Bill of Rights Fail in the Late Nineteenth Century?" *Minnesota Law Review* 94, no. 1 (2009): 102-139.

McGirr, Lisa. *The War on Alcohol: Prohibition and the Rise of the American State.* New York: W.W. Norton, 2015.

McKanna, Clare V. Jr. *Homicide, Race, and Justice in the American West, 1880-1920.* Tucson: University of Arizona Press, 1997.

Middlebrooks, Audry J. and Glenna. "Coffee of Red River." *Southwestern Historical Quarterly* 69, no. 2 (October 1965): 145-162.

Moneyhon, Carl. *Republicanism in Reconstruction Texas.* Austin: University of Texas Press, 1980.

Moneyhon, Carl. *Texas after the Civil War: The Struggle of Reconstruction.* College Station: Texas A&M University Press, 2004.

Moneyhon, Carl *Edmund J. Davis of Texas: Civil War General, Republican Leader, Reconstruction Governor.* Fort Worth: TCU Press, 2010.

Moore, Jacqueline M. " 'Them's Fighting Words': Violence, Masculinity, and the Texas Cowboy in the Late Nineteenth Century." *Journal of the Gilded Age and Progressive Era* 13, no. 1 (January 2014): 28-55.

Moore, Jacqueline M. *Cow Boys and Cattle Men: Class and Masculinities on the Texas Frontier, 1865-1900.* New York: New York University Press, 2010.

Newsom, Kevin Christopher. "Setting Incorporationism Straight: A Reinterpretation of the *Slaughterhouse Cases*." *Yale Law Journal* 109, no. 4 (2000): 643-744.

Olmstead, Charles L. and Edward Coy Ybarra. *The Life and Death of Juan Coy: Outlaw and Lawman.* Austin: Eakin Press, 2001.

Page, Thomas Nelson. *The Negro: The Southerner's Problem.* New York: Charles Scribner's Sons, 1904.

Paredes, Américo. *"With His Pistol in His Hand": A Border Ballad and Its Hero.* Austin: University of Texas Press, 1958.

Parmlee, Maurice. *Criminology.* New York: The MacMillan Company, 1923.

Parsons, Chuck. *A Lawless Breed: John Wesley Hardin, Texas Reconstruction, and Violence in the Wild West.* Denton: University of North Texas Press, 2013.

Parsons, Elaine Frantz. "Midnight Rangers: Costumes and Performance in the Reconstruction-Era Ku Klux Klan." *Journal of American History* 92 (December 2005): 811-836.

Perman, Michael. *The Struggle for Mastery: Disfranchisement in the South, 1888-1908.* Chapel Hill: University of North Carolina Press, 2001.

Perry, John. "Two Texas Shooting Affairs, Two Karnes County Sheriffs Killed—and the Butlers Did It." *Wild West* (April 2005): 10-12, 61.

Postel, Charles. *The Populist Vision.* New York: Oxford University Press, 2007.

Rable, George C. *But There Was No Peace: The Role of Violence in the Politics of Reconstruction.* Athens: University of Georgia Press, 1984.

Ramsdell, Charles W. *Reconstruction in Texas.* New York: Columbia University Press, 1910.

Reed, Germaine A. "Race Legislation in Louisiana, 1864-1920." *Louisiana History: The Journal of the Louisiana Historical Association* 6, no. 4 (Autumn 1965): 379-392.

Richter, William L. *Overreached on All Sides: The Freedmen's Bureau Administrators in Texas, 1865-1868*. College Station: Texas A&M University Press, 1991.

Ritter, Gretchen. *Goldbugs and Greenbacks: The Antimonopoly Tradition and the Politics of Finance in America.* New York: Cambridge University Press, 1997.

Roberts, O. M. "The Experiences of an Unrecognized Senator." *The Quarterly of the Texas State Historical Association* 12, no. 2 (October 1908): 87-147.

Rodgers, Daniel T. *Atlantic Crossings: Social Politics in a Progressive Age.* Cambridge: Harvard University Press, 2009.

Roth, Randolph. *American Homicide.* Cambridge: Belknap Press of Harvard University Press, 2009.

Sanders, Elizabeth. *The Roots of Reform: Farmers, Workers, and the American State, 1877-1917.* Chicago: University of Chicago Press, 1999.

Saunders, George W. editor. *The Trail Drivers of Texas: Interesting Sketches of Early Cowboys and Their Experiences on the Range and on the Trail during the Days that Tried Men's Souls.* 2 vols. San Antonio: Jackson Print Co, 1920-1923.

Schmitz, Joseph William. *Texas Culture in the Days of the Republic, 1836-1846*. San Antonio: The Naylor Company, 1960.

Shaw, Albert. "The American State and the American Man." *The Contemporary Review* 51 (January 1887): 695-711.

Silber, Nina *The Romance of Reunion: Northerners and the South, 1865-1900.* Chapel Hill: University of North Carolina Press, 1993.

Slotkin, Richard. *Regeneration through Violence: The Mythology of the American Frontier, 1600-1860.* Middletown, CT: Wesleyan University Press, 1973.

Slotkin, Richard. *The Fatal Environment: The Myth of the Frontier at the Age of Industrialization, 1800-1890.* New York: Atheneum, 1985.

Slotkin, Richard. *Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America.* New York: Atheneum, 1992.

Smallwood, James M. *The Feud That Wasn't: The Taylor Ring, Bill Sutton, John Wesley Hardin, and Violence in Texas.* College Station: Texas A&M University Press, 2008.

Smallwood, James. "When the Klan Rode: White Terror in Reconstruction Texas." *Journal of the West* 25 (October 1986): 4-13.

Smallwood, James M. *Time of Hope, Time of Despair: Black Texans during Reconstruction.* Port Washington, NY: Kennikat Press, 1981.

Smith, Jesse Guy. *Heroes of the Saddle Bags: A History of Christian Denominations in the Republic of Texas.* San Antonio: The Naylor Company, 1951.

Spaw, Patsy McDonald. *The Texas Senate, Volume II: Civil War to the Eve of Reform, 1861-1889.* Austin: University of Texas Press, 1999.

Spitzer, Robert J. "Gun Law History in the United States and Second Amendment Rights." *Law and Contemporary Problems* 80, no. 2 (2017): 55-83.

Stanley, Amy Dru. *From Bondage to Contract: Wage Labor, Marriage, and the Market in the Age of Slave Emancipation.* New York: Cambridge University Press, 1998.

Stevenson, Eugene. "Our Grand Jury System," *Criminal Law Magazine* (December 1886).

Story, Joseph. *Commentaries on the Constitution of the United States.* Boston: Hilliard, Gray, & Co., 1833.

Thomas, George C. III. "The Riddle of the Fourteenth Amendment: A Response to Professor Wildenthal." *Ohio State Law Journal* 68, no. 6 (2007): 1627-1657.

Thompson, Jerry. *Cortina: Defending the Mexican Name in Texas.* College Station: Texas A&M University Press, 2007.

Tise, Sammy. *Texas County Sheriffs.* Albuquerque: Oakwood Printing, 1989.

Tosh, John. "Masculinities in an Industrializing Society: Britain, 1800-1914." *Journal of British Studies* 44, no. 2 (April 2005): 330-342.

Trelease, Allen W. *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction.* New York: Harper & Row, 1971.

Urdahl, Thomas Klingenberg. *The Fee System in the United States.* Madison, WI: Democratic Printing Company, 1898.

Vance, J. D. *Hillbilly Elegy: A Memoir of a Family and Culture in Crisis.* New York: Harper, 2016.

Virginia Assembly. "Acts of the General Assembly, Jan. 6, 1639-40." *William and Mary Quarterly* 4, no. 3 (July 1924): 145-162.

Walker, Donald R. *Penology for Profit: A History of the Texas Prison System, 1867-1912.* College Station: Texas A&M University Press, 1988.

Wells, Jonathan Daniel. "The Southern Middle Class." *Journal of Southern History* 75, no. 3 (August 2009): 651-662.

White, Richard. *The Republic for Which It Stands: The United States during Reconstruction and the Gilded Age, 1865-1896.* New York: Oxford University Press, 2017.

White, Richard. "Outlaw Gangs of the Middle Border: American Social Bandits." *Western Historical Quarterly* 12, no. 4 (Oct. 1981): 387-408.

Whites, LeAnn. *The Civil War as a Crisis in Gender: August, Georgia, 1860-1890.* Athens: University of Georgia Press, 1995.

Wiener, Martin. "Homicide and 'Englishness': Criminal Justice and National Identity in Victorian England." *National Identities* 6, no. 3 (November 2004): 203-213.

Wildenthal, Bryan H. "The Lost Compromise: Reassessing the Early Understanding in Courts and Congress on Incorporation of the Bill of Rights in the Fourteenth Amendment." *Ohio State Law Journal* 61, no. 3 (2000): 1051-1174.

Williams, Patrick G. *Beyond Redemption: Texas Democrats after Reconstruction.* College Station: Texas A&M University Press, 2007.

Winkler, Adam. *Gunfight: The Battle over the Right to Bear Arms in America*. New York: W.W. Norton, 2011.

Wyatt-Brown, Bertram. *Southern Honor: Ethics and Behavior in the Old South.* New York: Oxford University Press, 1982.

Younger, Richard D. *The People's Panel: The Grand Jury in the United States, 1634-1941.* Providence: Brown University Press, 1963.

Yuill, Kevin. " 'Better Die Fighting against Injustice than to Die Like a Dog': African-Americans and Guns, 1866-1941." In *A Cultural History of Firearms in the Age of Empire*, edited by Karen Jones, Giacomo Macola, and David Welch, 211-229. New York: Routledge, 2013.

Zuber, William Physick. *My Eighty Years in Texas.* Austin: University of Texas Press, 1971.

<u>Theses and Dissertations</u>

Brown, Donald Curtis. "The Great Gun-Toting Controversy, 1869-1910: The Old West Gun Culture and Public Shootings." PhD diss., Tulane University, 1983.

Clayton, Barbara Leah. "The Lone Star Conspiracy: Racial Violence and Ku Klux Klan Terror in Post-Civil War Texas, 1865-1877." Master's thesis, Oklahoma State University, 1979.

Jayne, Reginald G. "Martial Law in Reconstruction Texas." Master's thesis, Sam Houston State University, 2005.

Wallace, Karl Edward. "Texas and the Good Roads Movement: 1895 to 1948." Master's thesis, University of Texas, 2008.

VITA

| | |
|---|---|
| Personal Background | Brennan Gardner Rivas<br>Born February 14, 1988<br>Daughter of Randy and Vicky Gardner<br>Married to Alexis Rivas August 24, 2013 |
| Education | Diploma, Bethesda Christian School, Fort Worth, 2006<br>Bachelor of Arts with Honors, History, Oklahoma State University, Stillwater, Oklahoma<br>Master of Arts, Texas Christian University, Fort Worth, 2013<br>Doctor of Philosophy, Texas Christian University, Fort Worth, 2019 |
| Experience | TCU Benjamin W. Schmidt Memorial Scholar, 2018-2019<br>Teaching Assistantship, TCU, 2017-2018<br>Graduate Assistantship, TCU, 2014-2017 |
| Professional Memberships | Texas State Historical Association<br>Southern Historical Association<br>Society for Historians of the Gilded Age and Progressive Era |

ABSTRACT

THE DEADLY WEAPON LAWS OF TEXAS: REGULATING GUNS, KNIVES AND
KNUCKLES IN THE LONE STAR STATE, 1836-1930

by Brennan Gardner Rivas, Ph.D., 2019
Department of History
Texas Christian University

Dissertation Advisor: Dr. Gregg Cantrell, Professor of History and Erma and Ralph Lowe Chair
in Texas History

This dissertation examines the regulation of firearms and other weapons throughout Texas

history, from the founding of the Republic of Texas in 1836 until the eve of federal firearm

legislation in 1930. During that near-century, Texans lived with increasingly stringent laws

regulating the ownership, sale, and carrying of various weapons. During Reconstruction, Texas

stood out as a pioneer in the realm of comprehensive weapon regulations, going so far as to ban

pistols, knives, and sword canes in the public sphere. Some Texans enjoyed exemption from this

regulation, though over the course of the late nineteenth century such exceptions became

increasingly rare. Though Republicans enacted the initial legislation during their brief tenure in

power, Democrats retained the law and indeed amended it over the ensuing decades to make it

more effective. State courts had ample opportunity to assess its constitutionality and consistently

declared it to be a legitimate exercise of the state's police power. The popularity of this law over

the course of the late nineteenth and early twentieth centuries points to the rise of middle-class

values in Texas that eschewed rowdiness and male violence in favor of restraint. Alongside this

shift in societal conceptions of "manly" behavior, the retention of this "pistol law" illustrates the

early development of a progressive impulse among the inhabitants of the bustling market towns

in America's interior. The coercive side of this progressivism was on display in the enforcement

of the state's deadly weapon laws. Statistical evidence indicates that enforcement in the early decades was equitable but became racially discriminatory by 1890, aligning with the establishment of segregation laws around the same time. Despite the Lone Star State's reputation as a bastion of "Wild West" gun violence, by the eve of the First World War Texas actually boasted the most far-reaching gun and weapon laws. This dissertation focuses on the formulation, amendment, and enforcement of state-level legislation, a crucial part of the history of firearm regulation that has been overlooked by many scholars.

# The Myth of Open Carry

*Mark Anthony Frassetto*[*]

### TABLE OF CONTENTS

INTRODUCTION ................................................................................. 2515
   I.  THE SOUTHERN MODEL OF PUBLIC CARRY REGULATION ........ 2519
  II.  THE HISTORICAL REALITY OF OPEN CARRY ............................ 2525
     *A.*  *Case Law and Other Primary Legal Sources Acknowledge*
        *that Open Carry Was Unusual* ........................................ 2526
     *B.*  *Many Laws Prohibiting Concealed Carry Make Little*
        *Sense if Open Carry Was a Viable Option* ....................... 2529
     *C.*  *Carrying Weapons in Public, Especially Openly, Was*
        *Viewed as a Sign of Social Disorder and Chaos* ............... 2534
     *D.*  *When Open Carry Did Occur, It Was Viewed as Bizarre*
        *and Newsworthy* ............................................................ 2537
     *E.*  *Carrying Weapons Was Only Deemed Acceptable When a*
        *Person Faced a Specific Threat* ....................................... 2539
 III.  THE IMPACT OF A LACK OF OPEN CARRY TRADITION ON
     SECOND AMENDMENT DOCTRINE .......................................... 2543

### INTRODUCTION

Since the Supreme Court's 2008 decision in *District of Columbia v. Heller*, perhaps the most hotly disputed area of Second Amendment law has been the scope of the right outside of the home.[1] Federal courts across the country have heard Second Amendment challenges to state

---

   [*] Copyright © 2022 Mark Anthony Frassetto. Deputy Director Second Amendment History and Scholarship, Everytown for Gun Safety; B.A. Marquette University, J.D. Georgetown University Law Center. The author would like to thank Professor Joseph Blocher, Professor Darrell Miller, Professor Eric Ruben, Professor Jake Charles, Professor Saul Cornell, Janet Carter and Brittany Frassetto for their very helpful comments. The author would also like to thank the staff and editors of the UC Davis Law Review for putting on an excellent symposium and for their tireless work improving this article, all during a pandemic. Any errors or omissions remain my own. The views expressed in this article are solely the author's and do not necessarily represent the views of Everytown for Gun Safety.
   [1] District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

2515

public carry licensing laws.[2] Specifically, groups like the NRA have challenged "good cause" laws that require applicants for carry permits to show that they have a specific need to carry a gun for self-defense, rather than just the generalized need of a person concerned about crime.[3] The First, Second, Third, Fourth, and Ninth Circuits have upheld good cause laws,[4] but in 2017, the D.C. Circuit struck down D.C.'s law requiring applicants for public carry permits to show good cause.[5] The Supreme Court recently heard oral arguments in a challenge to New York's good cause public carry licensing law in a case called *New York State Rifle and Pistol Association v. Bruen*.[6]

Since *Heller*, federal courts have uniformly adopted a two-part framework for deciding Second Amendment cases. Under this framework, courts first look to text, history, and tradition to determine whether a challenged gun law falls within the scope of the Second Amendment.[7] That is, whether the law is consistent with the historical tradition of firearms regulation. If it is consistent, then there is not a viable challenge and the case ends. If the challenged law does fall within the scope of the Second Amendment right, the court then applies one of the tiers of constitutional scrutiny — either intermediate scrutiny or strict scrutiny depending on how significantly the law impacts the right.[8]

---

[2]  *See, e.g.*, Young v. Hawaii, 992 F.3d 765 (9th Cir. 2021) (en banc) (upholding Hawaii's public carry licensing law); Gould v. Morgan, 907 F.3d 659 (1st Cir. 2018) (upholding Massachusetts's public carry licensing law as applied in the cities of Boston and Brookline); Drake v. Filko, 724 F.3d 426 (3d Cir. 2013) (upholding New Jersey's public carry licensing law); Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) (upholding Maryland's public carry licensing law); Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) (upholding New York's public carry licensing law).

[3]  *See, e.g.*, HAW. REV. STAT. ANN. § 134-9(a) (2007) ("In an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police of the appropriate county may grant a license to an applicant[.]"); MD. CODE ANN., PUB. SAFETY § 5-306(a)(6)(ii) (2013) (requiring applicants for a carry license to show "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger").

[4]  *Gould*, 907 F.3d at 662; *Drake*, 724 F.3d at 428; *Woollard*, 712 F.3d at 868; *Young*, 992 F.3d at 773 (en banc); Kachalsky, 701 F.3d at 84.

[5]  Wrenn v. District of Columbia, 864 F.3d 650, 667 (D.C. Cir. 2017).

[6]  142 S. Ct. 333 (2021).

[7]  *E.g.*, United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).

[8]  Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party at 4, N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 333 (2021) (No. 20-843).

In challenges to good cause public carry licensing laws, gun lobby lawyers have constructed an ahistorical narrative in which the open carry of firearms was widely accepted throughout American history.[9] According to their narrative, Southern states typically had bans only on concealed weapons, while in the North, all carry was largely unregulated.[10] Going further, they argue that open carry was viewed as the valiant, socially acceptable, and constitutionally protected way to publicly carry firearms, as compared to concealed carry.[11] Thus, according to gun rights proponents, because a right to openly carry guns in public during a person's ordinary course of business was always recognized, good cause licensing laws violate the Second Amendment.[12]

During oral argument in *Bruen*, the NRA's lawyer, Paul Clement, drew on this invented tradition, stating:

> [D]uring time periods where open carry was allowed, [] some states did specifically restrict concealed carry on the precise theory that if we allow you to carry open, then, if you're carrying concealed, you're probably up to no good.[13]

Later, Justice Kavanaugh picked up on this theme in a question for Deputy Solicitor General Brian Fletcher:

> This might be a level of generality issue, but I think Mr. Clement responded to what -- some of what you're saying on history and tradition by saying you have to look at carry laws more generally. And there was open carry traditions in a lot of those states.[14]

This theory of Second Amendment history rests upon a very important premise — that during the Founding Era, Antebellum Period, and Reconstruction, openly carrying firearms in public was viewed as

---

9   *See, e.g.*, Brief for Petitioners at 30-40, *N.Y. State Rifle & Pistol Ass'n*, 142 S. Ct. 333 (No. 20-843) (detailing the history of the Second Amendment from its supposed origins in the 1689 English Bill of Rights).

10   Brief of Amici Curiae Professors of Second Amendment Law Supporting Petitioners at 21-23, *N.Y. State Rifle & Pistol Ass'n*, 142 S. Ct. 333 (No. 20-843).

11   *See* Jonathan Meltzer, Note, *Open Carry for All:* Heller *and Our Nineteenth Century Second Amendment*, 123 YALE L.J. 1486, 1516 (2014) (noting that concealed weapons were considered "a tool of the sneaky and the dishonorable."); Eugene Volokh, *The First and Second Amendment*, 109 COLUM. L. REV. SIDEBAR 97, 102 (2009).

12   *See, e.g.*, Brief for Petitioners, *supra* note 9, at 9 (discussing cases upholding prohibitions on concealed weapons because of availability of open carry).

13   Transcript of Oral Argument at 20, *N.Y. State Rifle & Pistol Ass'n*, 141 S. Ct. 333 (No. 20-843).

14   *Id.* at 98.

an acceptable practice and was common. Under the gun rights view, open carry embodied the widely understood scope of an essential liberty. Therefore, their argument goes, good cause carry laws are inconsistent with the historical tradition of firearms regulation and thus constitutionally suspect.

The problem for gun rights advocates is that they have produced virtually no evidence that this theory is true. There is no historical record supporting the claim that individuals at the Founding or the time of the ratification of the Fourteenth Amendment openly carried guns in populated areas during their day-to-day activities.[15] Instead, the historical record shows that openly carrying firearms was not simply unusual, it was virtually unheard of in populated areas and would have been viewed as acceptable only in limited circumstances, when a person faced a particularized threat to themselves or their property.[16] The norm for carry outside of the context of hunting or militia service was concealed — a decision necessitated by the strong social stigma attached to openly carrying arms. This was true in the South, where the carrying of concealed weapons was endemic even though nearly every Southern state specifically prohibited concealed carry.[17]

In *Heller*, Justice Scalia stated that the Second Amendment codified a "venerable, widely understood libert[y]."[18] The historical record discussed in this Article shows that, rather than "venerable" and "widely understood" as acceptable, open carry was always viewed as highly unusual and anti-social conduct.[19] There is no evidence widespread open carry ever occurred. More should be required before the Supreme Court strikes down democratically enacted gun regulations under the Second Amendment.

Part II of this Article will lay out the gun rights argument for a broad right to openly carry firearms in public based on the absence of specific open carry prohibitions in some states. Part III will present evidence that open carry was rare and socially unacceptable. Part IV will discuss the implications of the historical reality of open carry — namely, the

---

[15]  *Contra* Brief in Support of Petitioner, *supra* note 10, at 28-30 (asserting several examples of people in the founding generation carrying); *but see* Mark Anthony Frassetto, *Meritless Historical Arguments in Second Amendment Litigation*, 46 HASTINGS CONST. L.Q. 531, 538 (2019) (discussing the flaws in several anecdotes about the founders carrying).

[16]  *See infra* Parts III.C, III.D.

[17]  *See infra* Part II.

[18]  District of Columbia v. Heller, 554 U.S. 570, 605 (2008).

[19]  *See infra* Parts III.C, III.D.

absence of a widespread tradition of such carry — for Second Amendment doctrine.

### I.   THE SOUTHERN MODEL OF PUBLIC CARRY REGULATION

The best historical scholarship on the American history of public carry regulation divides states into two broad traditions, a Northern tradition and a Southern tradition.[20] This dichotomy was first laid out in the seminal Yale Law Journal Forward article by Eric Ruben and Saul Cornell, *Firearms Regionalism*.[21]

In Ruben and Cornell's telling, around the Founding, Northern states adopted the preexisting English Model, which broadly prohibited carrying weapons in populated public areas.[22] This model later evolved to create statutory exceptions for people who had a specific need to carry weapons in public, while still broadly prohibiting most carry.[23] In the second half of the nineteenth century, many Western states adopted a modified version of the Northern tradition, which completely prohibited carrying weapons in populated towns and cities, but left carrying in rural and frontier areas completely unregulated.[24]

---

[20] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015) [hereinafter *Firearms Regionalism*].

[21] *Id.*

[22] *See, e.g.*, STATUTE OF NORTHAMPTON, 2 Edw. 3, 258, ch. 3 (1328) ("That no man. . . be so hardy to come before the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their bodies to Prison"); 1786 Va. Laws 33, ch. 51 ("That no man. . . be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others.") For a detailed analysis of the history of public carry regulation, see PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018).

[23] *See, e.g.*, 1838 Wisc. Sess. Laws 381, § 16 ("If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months."); *Firearms Regionalism, supra* note 20, at 131-32 (describing enactment of good-cause public carry laws in several states).

[24] *See, e.g.*, 1889 Ariz. Laws, no. 13, § 1 (prohibiting the carrying of a pistol "within any settlement, town, village, or city"); 1869 N.M. Laws 312, ch. 32 § 1 ("It shall be

*University of California, Davis*

Southern states generally adopted a different approach by broadly prohibiting concealed carry but leaving open carry unregulated.[25] As this Article will discuss, that does not mean people actually openly carried guns. The weight of the evidence discussed below strongly suggests that they did not, and therefore, Southern laws were geared specifically to address concerns about publicly carrying concealed firearms.

Like any historical analysis spanning more than a century across dozens of states, there are myriad exceptions and nuances — some Southern states adopted the Northern model and some Northern states only prohibited concealed carry — but as a broad historical narrative, the Ruben and Cornell argument is accurate.[26]

The standard gun rights narrative regarding the historical scope of public carry regulation ignores the Northern tradition and focuses exclusively on the South. Under this narrative, in the nineteenth century, many states prohibited carrying concealed weapons because concealing a weapon showed a person had a nefarious intent.[27] Openly carrying weapons, on the other hand, was viewed as the manly, socially acceptable way to go armed during a person's everyday life.[28] Under this view, because there was a tradition of open carry even when concealed

---

unlawful. . .to carry deadly weapons. . .within any of the settlements of this Territory"); 1876 Wyo. Laws 352, ch. 52, § 1 (prohibiting a "resident of any city, town or village" from carrying a firearm "within the limits of any city, town or village").

[25]  *See, e.g.*, 1841 Ala. Laws 148-49 ch. 7, § 4 (prohibiting concealed carry of firearms and deadly weapons without "good cause to apprehend an attack"); 1838 Ark. Acts 280 (making the carrying of a concealed firearm or other weapon a misdemeanor); 1862 Colo. Sess. Laws 56 § 1 (making concealed carry of a firearm or weapon punishable by a fine); 1840 Fla. Laws 423 ch. 860 (prohibiting the carrying of "arms of any kind. . .secretly. . .or known to be secreted upon the person"); 1861 Ga. Laws 859 tit. 1, div. 9, § 4413 (making concealed carry a misdemeanor punishable by a fine and imprisonment).

[26]  For example, Virginia adopted a Northern model complete prohibition while Indiana adopted a Southern style concealed carry prohibition. 1847 Va. Laws 127, ch. 14, § 16; 1819 Ind. Acts 39 ch. 23, § 1.

[27]  *See generally* Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1152-70 (9th Cir. 2014) (vacated, en banc) (arguing historical case law supports a broad right to carry openly); Meltzer, *supra* note 11, at 1512-16 ("Most states that heard challenges to laws regulating the carry of weapons instead distinguished between open and concealed carry. They found open carry protected by the Second Amendment or the state analogue, while determining that concealed carry could be banned. In each case, courts emphasized that concealed carry did not vindicate the interests of legitimate self-defense that underscored the right to keep and bear arms.")

[28]  *See* Meltzer, *supra* note 11, at 1518-20.

carry was banned, there is a general Second Amendment right to public carry.[29]

To support their theory, gun rights advocates point to the Southern historical evidence discussed in this section, while ignoring not only the Northern tradition entirely, but also all evidence suggesting open carry was virtually nonexistent in populated areas of both the North and South. As noted above, they are correct that many Southern states adopted prohibitions on carrying concealed weapons that did not include openly carrying weapons.[30] And others explicitly excepted open carry from the scope of laws prohibiting concealed carry.[31] These laws, however, are sharply contrasted by a series of Northern and Western laws — which the gun rights narrative ignores — that either prohibited all carry absent good cause or completely prohibited the carrying of weapons in populated areas.[32]

---

[29]  *Id.* at 1518-19.

[30]  *See, e.g.*, 1841 Ala. Laws 148-49 ch. 7, § 4 (prohibiting concealed carry of firearms and deadly weapons without "good cause to apprehend an attack"); 1838 Ark. Acts 280 (making the carrying of a concealed firearm or other weapon a misdemeanor); 1862 Colo. Sess. Laws 56 § 1 (making concealed carry of a firearm or weapon punishable by a fine); 1840 Fla. Laws 423 (prohibiting the carrying of "arms of any kind. . .secretly. . .or known to be secreted upon the person"); 1861 Ga. Laws 859 tit. 1, div. 9, § 4413 (prohibiting the carrying of weapons "unless in an pen manner and fully exposed to view"); 1909 Idaho Sess. Laws 6 no. 62, § 1 (making the concealed carry of a weapon or firearm within "limits or confines of any city, town, or village, or in any public assembly"); 1874 Ill. Laws 360 ch. 38, § 56 (punishing concealed carry of a weapon by a fine); 1819 Ind. Acts 39 ch. 23, § 1 (making the carrying of a concealed weapon a misdemeanor); 1897 Iowa Sess. Laws 574, tit. 24, ch. 3, § 4775 ("If any person carry upon his person any concealed weapon. . .shall be guilty of a misdemeanor"); 1813 Ky. Acts 100 ch. 89, § 1 (fining any person who carries a concealed weapon); 1871 Ky. Acts 89 ch. 1888, § 1 (prohibiting the concealed carry of "any deadly weapons upon their persons"); 1872 Md. Laws 57 ch. 42, § 240 (prohibiting carrying a concealed weapon in Annapolis specifically); 1887 Mich. Pub. Acts 144 no. 129, § 1 ("[I]t shall be unlawful for any person. . .to go armed with a. . .dangerous weapon or instrument concealed upon his person"); 1859 Ohio Laws 56, § 1 (making carrying a concealed weapon a misdemeanor); 1872 Wis. Sess. Laws 17 ch. 7, § 1 (making carrying of a concealed pistol or revolver a misdemeanor).

[31]  *See, e.g.*, 1837 Ga. Laws 90 § 1 ("[p]rovided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view"); 1813 La. Acts 172 § 1 ("that do not appear in full open view"); JOHN P. DUVAL, COMPILATION OF THE PUBLIC ACTS OF THE LEGISLATIVE COUNCIL OF THE TERRITORY OF FLORIDA PASSED PRIOR TO 1840, at 423 (1839) ("[p]rovided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes.").

[32]  *See Firearm Regionalism*, *supra* note 20, at 130.

Gun rights proponents next point to a body of case law, again primarily adjudicated in the South, that facially supports their view.[33] The most significant of these cases is *Nunn v. State*, a challenge to a wide-ranging Georgia law prohibiting both the sale and carrying of handguns in Georgia.[34] The poorly drafted Georgia law prohibited any person "to keep or to have about their persons, or elsewhere, any . . . Bowie or any other kinds of knives . . . pistols, dirks, sword-canes, spears, &c." with an exception for "horsemen's pistols that would be used in militia service."[35] Like other Southern states, the Georgia legislature included an exception for openly carried weapons, which said, "no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view."[36] However, in an apparent drafting error, this exception neglected to include pistols, which was included in the concealed carry prohibition, and added "toothpicks," a kind of knife, which had not been expressly listed in the prohibition.[37] The Georgia Supreme Court noted this incongruity saying: "It would seem to have been the intention of the Legislature to make the *proviso* in the 4th section as broad as the enacting clause in the 1st. But such is not the fact."[38]

The Georgia Supreme Court used the federal Second Amendment to find that:

> [S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.[39]

Notably, applying the Second Amendment to state legislation was in contravention of the Supreme Court's decision in *Barron v. Baltimore*.[40] After Nunn, Georgia maintained a prohibition on carrying concealed

---

[33]  *See Meltzer, supra* note 11, at 1510-16.

[34]  Nunn v. State, 1 Ga. 243, 247 (1846).

[35]  Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90, 90.

[36]  *Id.* § 4.

[37]  *Id.*

[38]  *Nunn*, 1 Ga. at 246.

[39]  *Id.* at 251.

[40]  32 U.S. 243 (1833); AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 154 (1998) (discussing Nunn as an example of state courts rejecting the *Barron v. Baltimore* decision).

Compendium_Rivas
Page 357

weapons while allowing for open carry.[41] In 1870, during Reconstruction, the Georgia legislature limited the impact of the *Nunn* decision by creating a broad sensitive places law, prohibiting carrying guns "at a court of justice or an election ground or precinct, or any place of public worship, or any other public gathering in this State."[42] This law was part of a broader national movement to enact stronger firearms regulation, particularly in the case of public carry.[43] The Georgia Supreme Court upheld the law, saying:

> The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee.[44]

In *State v. Reid*, the Alabama Supreme Court endorsed the idea that openly carrying arms was protected by the Alabama version of the Second Amendment.[45] The case challenged a conviction under Alabama's law prohibiting carrying concealed weapons.[46] The court found the law did not violate the state constitutional provision protecting a right to "bear arms, in defence of himself and the State," because it still allowed for the carrying of weapons in self-defense.[47] In an aside, the court also said that if there were two laws, one prohibiting concealed carry and one prohibiting open carry, the court would strike

---

[41] GA. CODE ANN. § 4413 (1861) ("Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence, shall be guilty of a misdemeanor, and, on conviction, shall be punished by fine or imprisonment, or both, at the discretion of the court."). Courts in Alabama, Louisiana, and Indiana took a similar approach to the *Nunn* court, although applying their own state constitutions, upholding complete prohibitions on carrying concealed weapons because the option to carry weapons openly was still available.

[42] GA. CODE ANN. § 348 (1914).

[43] *See* Saul Cornell, Symposium, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 70 (2021).

[44] Hill v. State, 53 Ga. 472, 475 (1874). The *Hill* court also called into question the correctness of *Nunn* on various grounds, noting that the Second Amendment did not run against the states — which was true when *Nunn* was decided, but untrue when *Hill* was decided — and stating "I have always been at a loss to follow the line of thought that extends the guarantee to the right to carry pistols[.]" *Id.* at 474; *see* Andrews v. State, 50 Tenn. (3 Heisk) 165, 183 (1871).

[45] State v. Reid, 1 Ala. 612 (1840).

[46] *Id.* at 614.

[47] *Id.* at 614-16.

down the law prohibiting open carry because "it is only when carried openly, that they can be efficiently used for defence."[48]

The Indiana Supreme Court upheld the state's concealed carry prohibition, with the reported decision stating only: "It was *held* in this case, that the statute of 1831, prohibiting all persons, except travellers, from wearing or carrying concealed weapons, is not unconstitutional."[49] Another case a decade later clarified that carrying a gun in full open view would not violate the terms of Indiana's law.[50]

In *State v. Chandler*, the Louisiana Supreme Court rejected a challenge to the state's concealed carry prohibition, stating that the law was necessary to "counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons."[51] The *Chandler* court contrasted this with open carry, which was "calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."[52] A decade later, the Louisiana Supreme Court again upheld the law prohibiting concealed carry, finding it a "measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."[53]

The Kentucky Supreme Court took a more extreme line in *Bliss v. Commonwealth*.[54] In *Bliss*, the court struck down Kentucky's prohibition on carrying concealed weapons, finding that the right protected by the state's constitution contained "no limits short of the moral power of the citizens to exercise it."[55] *Bliss* was the high-water mark for claims to a right to carry arms in public, and its interpretation was uniformly rejected by other states.[56] It was also rejected by the people of Kentucky, who when they revised their state constitution in 1850, amended their Second Amendment analogue to include, "but the General Assembly may pass laws to prevent persons from carrying concealed arms."[57]

---

48   *Id.* at 619.

49   State v. Mitchell, 3 Blackf. 229, 229 (Ind. 1833).

50   Walls v. State, 7 Blackf. 572, 573 (Ind. 1845).

51   State v. Chandler, 5 La. Ann. 489, 490 (1850).

52   *Id.*

53   State v. Jumel, 13 La. Ann. 399, 400 (1858).

54   Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822).

55   *Id.* at 92.

56   Commonwealth v. Murphy, 166 Mass. 171, 173 (1896) (noting that Bliss's interpretation of the right "has not been generally approved"); Meltzer, *supra* note 11, at 1513.

57   Ky Const. of 1850, art. XIII, § 25.

Taking these Southern laws and cases together, there was clearly a constitutional tradition in parts of the South, and a legal tradition that existed more broadly, which allowed for the complete prohibition on carrying concealed weapons, but left openly carrying weapons largely unregulated.[58] This tradition has been consistently used by gun rights lawyers to argue that laws limiting the issuance of public carry permits only to individuals who face a specific threat are unconstitutional.[59] However, these arguments are made based on an insufficient historical record — namely, the handful of cases cited above. To truly understand how people during the relevant historical periods viewed the Second Amendment right, we have to understand what carrying weapons in public actually looked like at the time. The next Section of this Article will show that openly carrying weapons in populated public places without a specific need was never viewed as socially acceptable behavior.

## II.   THE HISTORICAL REALITY OF OPEN CARRY

The above-discussed laws and cases provide nominal support for the idea that some degree of open carry was acceptable in certain Southern states during the nineteenth century. However, gun rights advocates seek to use those materials to make a broader constitutional claim. They claim that the Second Amendment does not simply protect some right to carry guns in public, such as when hunting, when facing a specific need for self-defense, or when taking part in militia activity. Instead, they argue it protects a right to carry guns virtually all the time, with exceptions only for specific sensitive places and when prohibited by private property owners.[60] This broader claim to a right to always carry guns to protect against generalized risks requires more proof than the absence of regulation in several states. If gun rights advocates want to use this regional tradition to block states from regulating the carrying

---

[58] *See generally* Meltzer, *supra* note 11, at 1519 (noting that state courts approved of self-defense guaranteed by open carry but rejected a right to concealed carry).

[59] *See, e.g.*, Transcript of Oral Argument at 19-20, N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 333 (2021) (No. 20-843) (argued Nov. 3, 2021) (arguing that the limitations of awarding open carry permits to specific circumstances was unconstitutional); Appellants' Opening Brief at 28, Flanagan v. Becerra, 2018 WL 6330679 (9th Cir. Oct. 2, 2018) (No. 18-55717) (noting the historical interpretation of the Second Amendment suggests that the right to bear arms must guarantee some right of self-defense in the public setting).

[60] *See, e.g.*, Brief for Petitioners at 2, *N.Y. State Rifle & Pistol Ass'n*, 142 S. Ct. 333 (2021) (No. 20-843) ("The Second Amendment makes the right to carry arms for self-defense the rule, not the exception, and fundamental rights cannot be left to the whim of local government officials.").

of weapons in public, they should at least be required to show some historical tradition of consistently openly carrying guns in public.

On this front, their historical arguments are sorely lacking. There is virtually no evidence that anyone at the Founding or during the nineteenth century regularly openly carried firearms in populated areas. Gun rights advocates have failed to identify any examples. Searches of contemporary newspapers show none, instead identifying guns being openly carried as a sign of the collapse of social order.[61] In contrast, there are innumerable examples of guns being carried concealed, even when it was prohibited by law.[62] The evidence strongly suggests that openly carrying firearms was shocking and outrageous conduct that was a measure of last resort only in extreme circumstances.[63]

## A. Case Law and Other Primary Legal Sources Acknowledge that Open Carry Was Unusual

Nineteenth century case law and other legal sources discuss the rarity of openly carrying firearms in public. These cases provide critical nuance to the open carry line of cases. Even where it was believed a right to open carry existed, virtually no one viewed that right as a right to openly carry in populated places during a person's ordinary activities.

The most clear-cut discussion of the frequency of open carry comes in *State v. Smith*, an 1856 Louisiana Supreme Court case interpreting the state's 1813 statute against carrying concealed weapons.[64] The question in the case was the correctness of a judge's instruction that a jury could convict a defendant for carrying a concealed weapon if the weapon was "in the pocket, under the clothes, although partially exposed."[65] The court found the instruction accurately characterized the reach of the statute, which covered "weapons as ordinarily worn . . . where the partial exposure is the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon."[66] The court contrasted this prohibited carrying with "<u>the extremely unusual case of the carrying of such weapon in full open view</u>, and partially covered by the pocket or clothes."[67] Notably, the Louisiana Supreme

---

[61]  *See infra* Part III.D.
[62]  *See infra* Part III.B.
[63]  *See infra* Part III.
[64]  State v. Smith, 11 La. Ann. 633 (1856).
[65]  *Id.* at 633.
[66]  *Id.* at 634.
[67]  *Id.* (emphasis added).

Court did not believe it was required to read the scope of the law narrowly because:

> [The Second Amendment] was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[68]

A half century later, Judge James Campbell Moise of New Orleans expressed similar views in a grand jury charge.[69] Judge Moise criticized the state's prohibition on carrying concealed weapons, stating that "the law abiding citizen is at the mercy of desperate characters who disregard the law and stalk abroad armed."[70] The proto-gun rights judge then stated that when an "emergency" forces a respectable man into "dangerous contact with such men," prudence may require him to be "armed in self defense."[71] However, he continued, "he cannot, without being absurd, walk the public streets with his pistol exposed upon his person."[72] So in order to "avoid being ludicrous," respectable men responded to threats by breaking the concealed weapon law.[73] Judge Moise then urged the grand jurors to work to change public sentiment about carrying weapons in public rather than "direct your efforts towards enforcement of the law."[74]

In *State v. Reid*, discussed in detail above, the Alabama Supreme Court acknowledged that carrying weapons openly would not be something a person would do except in situations of exigency.[75] In *Reid*, the defendant asked for a jury charge saying that if he carried a weapon concealed to meet a specific threat, the jury should find him innocent.[76] This requested instruction assumed that carrying openly was not a

---

[68] *Id.* at 633.

[69] For a brief biography of Judge Moise, see 3 LOUISIANA: COMPRISING SKETCHES OF PARISHES, TOWNS, EVENTS, INSTITUTIONS, AND PERSONS, ARRANGED IN CYCLOPEDIC FORM 305-07 (Alice Fortier eds., 1914).

[70] *Judge Moise Makes Up His Grand Jury*, DAILY PICAYUNE, Dec. 3, 1895.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] State v. Reid, 1 Ala. 612, 621 (1840).

[76] *Id.*

viable option. The court upheld the trial court's rejection of the jury charge but accepted the premise that carrying arms openly would be unusual conduct, saying, "[i]f the emergency is pressing, there can be no necessity for concealing the weapon."[77] On a longer timeline, the court said that a person should seek to have their threatener "arrested and constrained to find sureties to keep the peace, or committed to jail."[78]

Similarly, in *State v. Huntly*, the North Carolina Supreme Court upheld a conviction for the common-law crime of "riding or going armed with unusual and dangerous weapons, to the terror of the people."[79] Huntly appealed his conviction, arguing going armed was not a crime and that a gun was not an unusual weapon.[80] The court found that, while North Carolina had repealed the English Statute of Northampton, which prohibited carrying weapons in public, the common-law crime of carrying weapons to the terror of the people remained in effect.[81] The court also found that while "there is scarcely a man in the community who does not own and occasionally use a gun of some sort," a "gun is an 'unusual weapon,' where with to be armed and clad."[82] The court continued:

> No man amongst us carries it about with him, as one of his every day accoutrements--as a part of his dress--and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment.[83]

---

[77] *Id.*

[78] *Id.*

[79] State v. Huntly, 25 N.C. 418, 418 (1843) (The substance of Huntly's crime was that he "did arm himself with pistols, guns, knives and other dangerous and unusual weapons, and, being so armed, did go forth and exhibit himself openly, both in the day time and in the night, to the good citizens of Anson aforesaid, and in the said highway and before the citizens aforesaid, did openly and publicly declare a purpose and intent . . . to beat, wound, kill and murder, which said purpose and intent, the said Robert S. Huntley, so openly armed and exposed and declaring, then and there had and entertained, by which said arming, exposure, exhibition and declarations of the said Robert S. Huntley, divers good citizens of the State were terrified, and the peace of the State endangered, to the evil example of all others in like cases offending, to the terror of the people, and against the peace and dignity of the State.").

[80] *Id.* at 420.

[81] *Id.* at 420-21.

[82] *Id.* at 422.

[83] *Id.*

The Huntly court went on to acknowledge that carrying a gun for "lawful purpose--either of business or amusement" was legal, but not in a manner "as will naturally terrify and alarm [] a peaceful people."[84]

Mirroring the language of the North Carolina Supreme Court in *Huntley*, one South Carolina grand jury issued a statement saying: "It is apparent to every good citizen and man of sense, that any gentleman would blush and feel deeply ashamed to be caught parading the streets on a public occasion, or, for the matter of that, on a private occasion, with a revolver swinging around his neck like a powder horn, or sticking vulgarly and threateningly out of his hip pocket, making him the picture of a pirate."[85] The grand jury went on to call carrying weapons openly "wrong and unmanly" and stated that "the best, most honored, bravest and most intelligent acquaintances, condemn it as ridiculous, and unnecessarily dangerous to the peace of the state and the lives of individuals."[86]

*Smith*, *Reid*, *Huntly*, and the grand jury materials support the view that openly carrying firearms during the course of one's everyday activities was not conduct that was viewed as normal or acceptable. With open carry off the table, a prohibition on carrying concealed weapons would have functioned much like a prohibition on carrying a weapon in public under most circumstances.

### B.   *Many Laws Prohibiting Concealed Carry Make Little Sense if Open Carry Was a Viable Option*

Additional support for the understanding that open carry was not acceptable conduct comes from the text of statutes prohibiting concealed carry. Many of these laws contained exceptions allowing concealed carry in certain circumstances. These exceptions make little sense if people understood openly carrying arms to be a viable and appropriate way to carry weapons. If it was a widely accepted practice to carry weapons openly, exceptions to the concealed carry prohibition would have been unnecessary.

Kentucky, the first state to enact a complete prohibition on carrying concealed weapons, included an exception for those carrying weapons "when travelling on a journey."[87] Similar standards existed in Arkansas,

---

[84] *Id.*

[85] *Presentment of the Grand Jury*, WKLY. UNION TIMES (S.C.), June 25, 1879, at 2.

[86] *Id.*

[87] An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1, 1813 Ky. Acts 100.

Tennessee, Wyoming,[88] Arizona,[89] and Boise, Idaho.[90] Indiana excluded "travelers" from its 1819 prohibition on carrying concealed weapons.[91] California and the City of Los Angeles did the same.[92] Many states effectively excluded travelers from their concealed carry prohibition coverage by limiting the concealed carry prohibition to populated areas.[93]

Like other states, in 1841, Alabama excluded from its concealed weapons statute those "travelling, or setting out on a journey," but also excluded any "person [who] shall be threatened with, or have good cause to apprehend an attack."[94] This mirrored language that had been adopted by Massachusetts and Wisconsin in 1836 and 1838, respectively, both of which excluded from general prohibitions on carrying weapons those who had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property."[95]

---

[88]  JOSIAH A. VAN ORSDEL & FENIMORE CHATTERTON, REVISED STATUTES OF WYOMING, IN FORCE DECEMBER 1, 1899, at 1253 (Chaplin, Spafford & Mathison 1899).

[89]  Crimes Against the Public Peace, 1901 Ariz. Sess. Laws 1251-53, tit. 11, §§ 381, 385, 390 ("Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one-half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.").

[90]  JOSIAH GOULD, A DIGEST OF THE STATUTES OF ARKANSAS ALL LAWS OF A GENERAL AND PERMANENT CHARACTER IN FORCE THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY 395 (1858) (prohibiting carrying concealed weapons "unless upon a journey."); JAMES H. SHANKLAND, PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858. BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 94 (1871).

[91]  An Act to Prohibit the Wearing of Concealed Weapons, 1819 Ind. Acts 39, ch. 23, sec. 1; 1905 Ind. Acts 687-68, sec. 449.

[92]  WILLIAM. M. CASWELL, REVISED CHARTER AND COMPILED ORDINANCES AND RESOLUTIONS OF THE CITY OF LOS ANGELES 85 (Evening Express Steam Printing Establishment 1878); THEODORE HENRY HITTELL, THE GENERAL LAWS OF THE STATE OF CALIFORNIA, FROM 1850 TO 1864, at 261 (H.H. Bancroft & Co. 1868).

[93]  An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, 1862 Colo. Sess. Laws 56, § 1; An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, 1864 Mont. Laws 355, § 1; An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, 1852 N.M. Laws 67, § 1.

[94]  Of Miscellaneous Offences, 1841 Ala. Laws 148-49, ch. 7, § 4. A few decades later Montgomery, Ala. enacted a local ordinance along the same lines. J.M. Falkner, THE CODE OF ORDINANCES OF THE CITY COUNCIL OF MONTGOMERY, WITH THE CHARTER 148-49 (Barrett & Brown 1879) (excluding from prohibition on carrying those "being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey.").

[95]  1836 Mass. Acts 750, ch. 134 § 16; 1838 Wis. Sess. Laws 381, § 16.

A similar standard was adopted in Ohio in 1859, which prohibited concealed carry but created an affirmative defense for those who:

> [A]t the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling or employment and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family. . .[96]

Kentucky adopted a similar standard in 1871, allowing the carrying of concealed weapons if a "person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime," while also adopting a more limited traveler exception for those "required by their business or occupation to travel during the night."[97] In 1878, Mississippi adopted a law with nearly identical exceptions, and by 1881, Nebraska did the same.[98] In 1872, Wisconsin passed a complete prohibition on carrying concealed weapons with an exception for when a person had "reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance."[99] The Wisconsin statute also included a catchall exception for when "it be made to appear that his possession of such weapon was for temporary purposes and with harmless intent."[100]

Again, these exceptions for travelers and people facing a specific threat make no sense in a world where openly carrying arms was viewed as acceptable and constitutionally protected conduct. State legislatures

---

[96]   1859 Ohio Laws 56, § 2.

[97]   An Act to Prohibit the Carrying of Concealed Deadly Weapons, 1871 Ky. Acts 89, ch. 1888, §§ 1-2, 5.

[98]   An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, 1878 Miss. Laws 175, ch. 46, § 1; Guy Ashton Brown, THE COMPILED STATUTES OF THE STATE OF NEBRASKA, COMPRISING ALL LAWS OF A GENERAL NATURE IN FORCE JULY 1, 1881, § 25, at 666 (1881) (stating "engaged in the pursuit of any lawful business, calling or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family"). Omaha, Nebraska enacted an ordinance along the same lines. *See* W. J. CONNELL, THE REVISED ORDINANCES OF THE CITY OF OMAHA, NEBRASKA, EMBRACING ALL ORDINANCES OF A GENERAL NATURE IN FORCE, APRIL 1, 1890, TOGETHER WITH THE CHARTER FOR METROPOLITAN CITIES, THE CONSTITUTION OF THE UNITED STATES AND THE CONSTITUTION OF THE STATE OF NEBRASKA 344 (Gibson, Miller & Richardson 1890).

[99]   1872 Wis. Sess. Laws 17, ch. 7, § 1.

[100]   *Id.*

would not create these narrow carveouts to their concealed carry prohibitions if openly carrying arms was a viable way to go about a person's life.

In the later nineteenth century, many states began to adopt concealed carry licensing systems while leaving open carry unregulated. This was true even in some Northern states that had historically regulated all carry, likely because there was no need to regulate open carry for the reasons discussed in this Article. Colorado broadly prohibited carrying concealed weapons but allowed local law enforcement to issue licenses for people to carry concealed weapons.[101] New Jersey,[102] Oregon,[103] California,[104] Delaware,[105] Connecticut,[106] and New York[107] did the same. Virginia and North Dakota gave the authority to issue licenses to local judges.[108] The cities of Buffalo, New York.; Evanston, Illinois; Lincoln, Nebraska; Fresno, California;[109] Spokane, Washington;[110] and Oregon City, Oregon,[111] also had discretionary licensing systems allowing for the carrying of concealed weapons.[112]

By 1881, New York City enacted a general prohibition on carrying concealed weapons, with a licensing system allowing any person "who

---

[101]  Charles Hayden & Paul Wayne Lee, The Compiled Laws of Colorado, 1921, § 248, at 1774 (The Smith-Brooks Printing Company 1922).

[102]  A Supplement to an Act Entitled "An Act for the Punishment of Crimes," 1905 N.J. Laws 324-25, ch. 172, § 1.

[103]  An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, 1917 Or. Laws 804-08, § 1, 3-A, 4, 4-A, 4-B, 4-C.

[104]  Statutes of California, 1917 Cal. Stat. 221-25, ch. 145, § 6.

[105]  Of Offences Against Public Justice, 1911 Del. Laws 739, ch. 275, § 1.

[106]  Sale and Use of Pistols and Revolvers, 1923 Conn. Acts 3707, ch. 252, § 2-3.

[107]  An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, 1911 N.Y. Laws, ch. 195, § 1.

[108]  An Act to Amend and Re-Enact Section 3780 Of the Code in Relation to Carrying Concealed Weapons, 1908 Va. Acts 381, § 3780.

[109]  Fresno, Cal., Ordinances of the City of Fresno § 8 (1896).

[110]  Spokane, Wash., An Ordinance to Punish the Carrying of Concealed Weapons Within the City of Spokane § 1 (1896).

[111]  Or. City, Or., An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers, and Owners of Disorderly Houses § 2 (1898).

[112]  An Act to Revise the Charter of the City of Buffalo, 1891 ch. 105, tit. 7, ch. 2, § 209, 1891 N.Y. Laws 129; Evanston, Ill., Concealed Weapons §§ 531, 537 (1893); Lincoln, Neb., Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XVI, § 6 (1895).

has occasion to carry a pistol for his protection" to apply to the local precinct commander for a license to carry.[113] In the 1890s, Evansville, Missouri adopted a concealed carry prohibition with exceptions for "persons moving or travelling peaceably through this state" and anyone "threatened with great bodily harm, or [who] had good reason to carry the same in the necessary defense of his home, person or property."[114] Oregon City, Oregon, excepted those who carried "in self-defense, in protection of property."[115]

In the early 1920s, the United States Revolver Association, in an effort to preempt legislatures from adopting more stringent restrictions, proposed a model law regulating firearms.[116] The USRA Model Act prohibited carrying concealed weapons but allowed for the issuance of licenses to carry concealed if "the applicant has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed."[117] This standard was adopted in California,[118] North Dakota,[119] Oregon,[120] and Indiana.[121]

Beginning in 1924, the National Conference of Commissioners on Uniform State Laws took up firearms legislation.[122] In 1926, the Conference selected the USRA Model Act "as the model of the draft of the Uniform Act," because it had "already gained ground" in the states.[123] The Conference expressed its belief that "the provisions of the proposed law present no constitutional obstacles" and "constitute no

---

[113]  N.Y.C., N.Y., Carrying of Pistols §§ 264, 265 (1881) (stating "engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family").

[114]  Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons §§ 1, 2 (1894).

[115]  Or. City, Or., § 2.

[116]  HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE THIRTY-FOURTH ANNUAL MEETING 1, 728 (1924).

[117]  *Id.* at 729.

[118]  Act of June 13, 1923, ch. 339, § 8, 1923 Cal. Stat. 695, 698-99.

[119]  Act of Mar. 7, 1923, Pistols and Revolvers, ch. 266, § 8, 1923 N.D. Laws 379, 381.

[120]  Act of Feb. 26, 1925, ch. 260, § 8, 1925 Or. Laws 468, 471.

[121]  Act of Mar. 12, 1925, ch. 207, § 7, 1925 Ind. Acts 495, 497.

[122]  HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE THIRTY-FOURTH ANNUAL MEETING, *supra* note 116, at 729 (1924).

[123]  REPORT OF COMM. ON ACT TO REGULATE THE SALE & POSSESSION OF FIREARMS, NAT'L CONF. ON UNIFORM STATE LAWS 569 (1930) (Conf. Rep.).

radical changes in existing laws."[124] After making modest revisions to the law, it was dubbed the Uniform Firearms Act and approved by both the National Conference of Commissioners and the American Bar Association.[125] The UFA, which retained the USRA Model Act's licensing provisions, was passed in Pennsylvania,[126] South Dakota,[127] Washington,[128] and Alabama.[129]

Again, the exceptions to the general rule prohibiting the carrying of concealed weapons in the USRA Model Act and UFA make little sense in a world where openly carrying firearms was viewed as acceptable conduct, let alone a world where it was common. No one would risk fine or imprisonment on the strength of their self-defense justification to carry a concealed handgun if openly carrying a gun was viewed as virtuous. There would be no reason to create exceptions for travelers if the normal way to carry arms was fully exposed. There would certainly be no need to create stringent licensing systems for the issuance of permits to carry concealed weapons if openly carrying firearms was viewed as a viable alternative. These laws only make sense if openly carrying firearms was not something people were willing to do in their everyday lives.

### C.   Carrying Weapons in Public, Especially Openly, Was Viewed as a Sign of Social Disorder and Chaos

The historical evidence shows people rarely talked about openly carrying weapons, but when they did, it was almost entirely negatively.[130] People carrying weapons in public, and especially openly carrying weapons, was understood to be a sign of anarchic conditions or a breakdown in social order.[131] Rather than being an exercise of a respected right, openly carrying guns was a sign that a place had devolved into chaos.[132]

---

[124] HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE THIRTY-FIFTH ANNUAL MEETING, at 574 (1926).

[125] REPORT OF COMM. ON ACT TO REGULATE THE SALE & POSSESSION OF FIREARMS, NAT'L CONF. ON UNIFORM STATE LAWS, at 568.

[126] Uniform Firearms Act, No. 158, § 7, 1931 Pa. Laws 497, 498-99.

[127] Adopting the Uniform Firearms Act, 1935 S.D. Sess. Laws ch. 208, § 7, 355, 356.

[128] Short Firearms, ch. 172, § 7, 1935 Wash. Sess. Laws 599, 601, 600-601.

[129] Act of Apr. 6, 1936, No. 82, § 7, 1936 Ala. Laws 51, 52.

[130] *See infra* Part III.C.

[131] *Id.*

[132] *Id.*

When setting the scene for a semi-mythical story about frontier outlaws in Texas, the American Review, a literary magazine, described the anarchic state of society in Shelby County:

> Every body knows that Texas has been the peculiar and favorite resort of restless adventurous men, and not those of this stamp simply, but as well the vicious and unprincipled, of nearly all nations . . . the quick wrath and bloody hand should be often simultaneous, *where the most formidable weapons were openly worn*, law and its restraints little regarded, and general sentiment favored a resort to them on trivial occasions.[133]

A newspaper editor in Louisiana described "a sad state of affairs" in Shreveport where "the citizens all, or nearly all, go armed."[134] And, in describing the chaos in Utah during the Mormon Wars, a newspaper correspondent noted that "[b]oth Mormons and Gentiles carry weapons openly in the streets."[135]

The open carrying of firearms during political activity was viewed as especially outrageous. In describing the "riot, disorder, violence and bloodshed" that accompanied an 1860 municipal election in D.C., the aggrieved candidate pointedly noted that "some of my opponents openly displayed their weapons, while many of them were known to the police to have weapons concealed."[136] In describing the alleged abuses of the Republican Party, one Democratic newspaper in Nashville noted: "Circulars of an inflammatory character have been freely distributed, falsehoods of the most outrageous character have been freely circulated, deadly weapons have been openly carried, and threats of personal violence indulged in[.]"[137]

In describing the highest casualty lynching in U.S. history, one D.C. newspaper noted that "the citizens [were] openly bearing weapons."[138] Another newspaper described "[a] [s]tate bordering on anarchy" where union strikers had gone "openly about with loaded weapons in their hands."[139]

---

[133] Charles Winterfield, *Jack Long; or, Lynch-Law and Vengeance*, 1 Am. Rev.: A Whig J. Pol., Literature, Art & Sci. 121, 121 (1845).

[134] *Murder*, Baton Rogue Gazette, July 30, 1842.

[135] *Mormons Won't Rent Nor Buy*, Cleveland Morning Leader, Aug. 2, 1858.

[136] *To the Board of Aldermen and Common Council of the City of Washington*, Evening Star (D.C.), June 11, 1860.

[137] *Yesterday's Work*, Nashville Union & Am., Aug. 7, 1874.

[138] *Like a Weird Dream*, Sunday Herald & Wkly. Nat'l Intelligencer (D.C.), Mar. 22, 1891, at 6.

[139] *Not Wanted in the Borough*, Waterbury Evening Democrat, July 12, 1892.

Inversely, the fact that people no longer carried weapons in public, either openly or concealed, was frequently described as a sign that law and order had been established in a community. A Nevada vigilance committee announced the restoration of order in its area by noting "our elections on three occasions have been peaceable and untainted by fraud, quiet and order reign in our streets; virtue is not openly outraged on the highways; deadly weapons are no longer publicly displayed and defiantly used."[140] In 1876, General August Kautz issued a report on the status of the Arizona Territory that began: "I am pleased to be able to state that peace and quiet prevails throughout the Territory, and that the inhabitants no longer think of going armed whilst pursuing their various avocations as was the case a few years ago."[141] Similarly, a Bozeman, Montana newspaper noted that people in the east thought that in Montana "people have to go armed to protect themselves," "while in fact, life and property are more secure here than elsewhere."[142] A Texas livestock trade publication suggested that the Texas beef industry should run ads informing people that "it was no longer essential that cowboys should go armed" in order to spur investment into the purportedly pacified state.[143]

The Wheeling Register in West Virginia laid out this dichotomy in an editorial criticizing the practice of carrying weapons in public, stating that carrying weapons might be appropriate"[i]f there were no law; if there were no officers of the law; and if the community were made up of lawless and uncivilized people."[144] The editorial further stated that if there is not "ample protection of life and property in the civil law," then a person is "entitled to arm himself and carry his weapons of defense openly and conspicuously—to strap them about him as the savage does in his native forest."[145] The paper, however, made clear that "there is, in fact, no occasion for this barbarous habit of going about with pistols and knives. It is an insult to civilization."[146] The paper noted that "even the custom of wearing swords, which for a long time was countenanced in European countries, and was supposed to give dignity and position

---

[140] *Address of the Executive Committee of Vigilance*, Nev. J., Oct. 23, 1857.

[141] *Gen. Kautz's Report*, Ariz. Wkly. Miner, Dec. 15, 1876.

[142] Samuel W. Langhorne ed., *Weekly Chronical Bozeman, Mont.*, Bozeman Wkly. Chron. (Dec. 5, 1883).

[143] *See The Apportionment Bill*, Wkly. Statesman (Austin, Tex.), Feb. 16, 1882, at 4 (summarizing a piece from the "Live Stock Journal").

[144] *See The Pistol*, Wheeling Reg., (Wheeling, W. Va.), July 11, 1879, at 2.

[145] *Id.*

[146] *Id.*

to the possessor, has been frowned down by the good sense of mankind three quarters of a century ago."[147]

An Oregon paper adopted a similar line, stating, "to carry fire-arms, or other dangerous weapons, is itself a crime; it proved murderous thoughts and intentions; it shows a latent disposition to slay if occasion arise, and it is not, except in rare cases, justified by personal danger."[148] The paper went on to say, "[a] man who carries pistols among men without pistols is not merely a coward—he is every unarmed man's enemy, and he ought to be driven out of the society he outrages."[149] In calling for enforcement of the prohibition on carrying weapons, the anonymous author stated: "Either let us all wear weapons openly, as in old times, or let the coward who concealed one be treated as a premeditating murderer, to whom is due neither clemency nor toleration."[150] An editorial in an Austin, Texas paper stated, "cowardly bullies go armed and the honest and upright obey the country's laws and are unarmed."[151] The piece went on to say, "no good and worthy citizen will bear arms, not only because it is violative of the law, but because it is a constant confession either of cowardice or of the purpose to kill."[152]

Taking these materials together, it is difficult to believe that openly carrying weapons during ordinary activities was understood as acceptable, constitutionally protected activity. It is hard to believe that conduct was understood to be a "venerable, widely understood libert[y]" when doing so was viewed as a sign of civilizational collapse.[153]

### D.   *When Open Carry Did Occur, It Was Viewed as Bizarre and Newsworthy*

While proving a negative, especially with incomplete historical records, is always difficult, there is virtually no evidence that anyone in the late eighteenth or nineteenth century consistently carried a gun

---

[147]   *Id.*

[148]   *Thou Shalt Not Kill*, DAILY ASTORIAN, Oct. 10, 1882, at 2.

[149]   *Id.*

[150]   *Id.*

[151]   *Fighting Played Out*, WKLY. DEMOCRATIC STATESMAN (Austin, Tex.), Oct. 24, 1878, at 1.

[152]   *Id.*

[153]   *See* District of Columbia v. Heller, 554 U.S. 570, 605 (2008).

openly in public.[154] There is certainly no evidence that openly carrying a gun in populated areas was viewed as acceptable conduct.

In an 1846 speech, future Senator Charles Sumner distinguished between the past, when "the sword was the indispensable companion of the gentleman, wherever he appeared," with the present, when a person would be "deemed a madman or bully" if he wore a gun in public.[155]

The small number of cases where people did openly carry received media coverage ranging from outraged to condescending. One example came in Omaha, Nebraska, where Tom Keeler, "a notorious rough and daring desperado" who "never was seen without a revolver openly strapped to his hip belt," was arrested for openly carrying a handgun.[156] The baffled authorities arrested him for carrying concealed weapons but were forced to release him because his conduct did not fall within the state's concealed carry prohibition.[157] The court did issue a reprimand before releasing Keeler "on condition that he not make an open exhibition of his arsenal."[158] Shortly afterward, Keeler was killed in a duel by a man who went armed in response to Keeler's threats.[159]

In D.C., the arrest of a man "with a pistol sticking out of his waist belt somewhat intoxicated looking like some bold knight" garnered a story in the local paper under the title, "A Dangerous Person."[160] The man was fined twenty dollars and, failing payment, was compelled to work on the D.C. penal farm for ninety days.[161] In another example from D.C., a young black man fearing "night doctors," mythical doctors who would abduct black people for medical experiments, openly carried a pistol in his hand while walking at night.[162] He was arrested and, presumably because his carrying did not technically violate D.C.'s prohibition on carrying concealed weapons, warned to "leave your weapons at home" and made to pay a bond for his future good

---

[154]   The author extensively searched the Library of Congress, Chronicling America newspaper archive. LIBR. OF CONG., https://chroniclingamerica.loc.gov/ [https://perma.cc/ DA2H-2K4H].

[155]   CHARLES SUMNER, THE TRUE GRANDEUR OF NATIONS: MR. SUMNER'S ORATION 76 (J. H. Eastburn, City Books 1845).

[156]   *How a Feud Was Settled in Nebraska—Dueling Without Formalities*, CHI. DAILY TRIB., Dec. 11, 1874, at 2.

[157]   *Id.*

[158]   *Id.*

[159]   *Id.*

[160]   *A Dangerous Person*, EVENING STAR (D.C.), Aug. 26, 1858, at 3.

[161]   *Id.*

[162]   *Afraid of Night Doctors*, EVENING STAR (D.C.), Dec. 5, 1887, at 5.

behavior.[163] A New York man openly carrying a pistol was apparently unusual enough that it made national news. When he was confronted by police while standing outside of a bank, the man explained that openly carrying was not technically illegal and said he was there to murder someone (this was likely sensationalized as the story made its way away from New York). The less-than-entertained police instructed him to move along.[164]

Another story that gained national attention was when "Babe" Hawkins, an Indiana "desperado of the worst character" who "terrorized the county for years" openly carried guns around town after being denied a reduction in his bond for a prior assault.[165] The story was apparently noteworthy enough that it was reported three states over in an Omaha paper.[166] Another story in a North Carolina paper discussed how wagons "guarded by three men with openly displayed weapons, naturally aroused much astonishment and inquiry" among New Yorkers.[167]

If openly carrying weapons in populated public places was widely understood to be socially acceptable, constitutionally protected conduct, then it would be odd for the exercise of the right to be met with shock and outrage. One would expect the exercise of a "venerable, widely understood liberty" to be viewed as normal rather than shocking. As far as the author can tell, there is no time in American history where that was the case.

### E.   *Carrying Weapons Was Only Deemed Acceptable When a Person Faced a Specific Threat*

Most commentators did not seem to believe that it was never acceptable to carry weapons in public; rather, they believed weapons should only be carried when a person faced a specific threat. In this context — a person faced with a specific threat — some commentators advocated for open rather than concealed carry. But such commentary does not support the gun rights view that there is a Second Amendment right to carry a weapon all the time. Rather, it shows the right was historically limited to carrying weapons when facing a specific danger. There are almost innumerable examples of newspapers advising people of specific threats and telling them to go armed in response.

---

163 *Id.*
164 *See He Carried His Big Revolver*, LANCASTER DAILY INTELLIGENCER, Feb. 7, 1889, at 1.
165 *Carried His Guns in Sight*, OMAHA DAILY BEE, June 14, 1893, at 6.
166 *See id.*
167 *Uncle Sam's Gold Train*, FISHERMAN & FARMER (Edenton, N.C.), Aug. 19, 1892, at 7.

For example, in one newspaper editorial criticizing the practice of carrying concealed weapons, the editor stated: "If a man is really in danger of assault let him openly carry such weapons as he needs."[168] The editorial then strongly implied that carrying weapons openly would have been seen as unusual, saying: "There is no disgrace in doing whatever is essential for public safety. Nothing would tend more powerfully to exhibit the defective protection of the laws, and to induce reform, than for everybody who is in danger of personal assault, or conceives himself to be, to appear armed in the streets."[169] Similarly, the Interior Journal, a Kentucky paper, stated: "If a man is afraid someone will hurt him, and feels the necessity of carrying a weapon let him do it openly and above board by strapping it on the outside of his clothing."[170] A West Virginia paper stated:"[t]he man who has necessity for carrying a weapon is free to do so, provided he is frank and manly enough not to conceal it—not to hide it about him that he take some one unawares, or shoot him in the back."[171]

Newspaper articles warning readers of a particular danger and advising them to go armed in certain places or situations were also common.[172] These threats ranged from generic crime[173] to run-away slaves,[174] pro-slavery vigilantes,[175] members of Congress,[176] ghosts,[177]

---

[168] *Concealed Weapons*, DAILY STATE J. (Alexandria, Va.), Feb. 17, 1872, at 2.

[169] *See id.*

[170] INTERIOR J. (Stanford, Ky.), Jan. 25, 1878, at 2.

[171] *The Pistol*, WHEELING REG., July 11, 1879, at 2. West Virginia's law followed the Massachusetts model, "If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance." 1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.

[172] *See, e.g.*, *Daring Attempt to Rob the Mail*, BOS. WKLY. MESSENGER (Bos., Mass.), Jan. 26, 1837, at 4 (reporting on a robbery attempt of mailman and call for citizens of D.C. to go armed because of out of control crime); CAIRO BULL. (Cairo, Ill.), Jan. 28 ,1869. at 1 (Call for people to carry firearms due to a rabid dog).

[173] *E.g.*, *Daring Attempt to Rob the Mail*, *supra* note 172 at 4; STAR OF THE N. (Bloomsburg, Pa.), Oct. 28, 1857, at 2; DAILY NAT'L REPUBLICAN (D.C), July 27, 1865, at 1; OMAHA DAILY BEE, Dec. 11, 1884, at 6; WASHINGTON CRITIC (D.C.), July 10, 1885, at 1; ARIZ. SILVER BELT, Nov. 13, 1886, at 1; EVENING BULL. (Maysville, Ky.), Feb. 16, 1888, at 1.

[174] *E.g.*, PLANTERS BANNER (Franklin, La.), July 17, 1852, at 2.

[175] *E.g.*, KAN. HERALD OF FREEDOM (Wakarusa, Kan.), Dec. 13, 1856, at 1.

[176] *E.g.*, *English and Montgomery Again*, MEIGS CNTY. TEL. (Pomeroy, Ohio), Dec. 28, 1858, at 2; *The Pistol Scene in Congress*, PORTAGE CNTY. DEMOCRAT (Raveena, Ohio), Jan. 25, 1860, at 2.

[177] *E.g.*, *The Connecticut Ghosts Again*, PENNY PRESS (Cin., Ohio), Feb. 17, 1860, at 1.

rabid dogs,[178] Democrats,[179] mountain lions,[180] garroters,[181] heavyweight champion John L. Sullivan,[182] a defendant's co-conspirators,[183] an escaped gorilla,[184] wolves,[185] wild dogs,[186] vagrants,[187] a half-bear half-man monster,[188] refugees from a flood,[189] and a mayor suffering from mental illness.[190] Other sources called for stronger enforcement of the laws to prevent society from spiraling far enough for carrying to become necessary.[191]

In the Iron County Register, Thomas Calahan wrote a series on the right to bear arms in Missouri.[192] Calahan rejected the popular claim that "the practice of carrying weapons openly is the action of a bully and a coward," mentioning that he had recently openly carried a shotgun when facing threats from a group of mounted desperadoes.[193] The Opelousas Courier criticized the practice of carrying weapons as cowardly, saying, "it looks cowardly to go armed when there is no immediate peril to the person from an enemy. Even then, we think the

---

[178] *E.g.*, *Abbreviated Telegrams*, ROCK ISLAND ARGUS (Ill.), Nov. 14, 1889, at 2; *Hydrophobia*, CAIRO BULL. (Ill.), Jan. 28, 1869, at 1.

[179] *E.g.*, *Presentment of Points by the Republican Counsel, Crimes of Bulldozers*, HELENA WKLY. HERALD (Mont.), Dec. 28, 1876, at 5.

[180] *E.g.*, *If Not a Mexican Lion, What Is It?*, DALLAS HERALD, Jan. 13, 1878, at 1.

[181] *E.g.*, *Crimes and Casualties*, SAINT LANDRY DEMOCRAT (Opelousas, La.), Feb. 4, 1882, at 2.

[182] *E.g.*, *Bostonians Arming to Meet Sullivan*, OMAHA DAILY BEE, Feb. 2, 1885, at 7.

[183] *E.g.*, *Wanted to Catch the Governor*, ST. PAUL DAILY GLOBE, Dec. 23, 1885, at 1.

[184] *E.g.*, *Scared by a Big Gorilla*, DAILY EVENING BULL. (Maysville, Kent.), Nov. 3, 1886, at 4. Racist caricatures often used great apes as stand ins for Black people. *See* Brent Staples, *The Racist Trope That Won't Die*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/opinion/roseanne-racism-blacks-apes.html [https://perma.cc/45AR-2365] (tracing the history of the use racist caricature and its continued prevalence today). There is no indication that is occurring in this article.

[185] *E.g.*, *Chased by Wolves*, ST. PAUL DAILY GLOBE, Apr. 1, 1888, at 7 (advising that citizens go armed for fear of wolves).

[186] *E.g.*, *Bismarck in Brief*, BISMARCK WKLY. TRIB., Apr. 27, 1888, at 5 (advising going armed for fear of wild dogs).

[187] *E.g.*, *Prepare for Them*, SALT LAKE HERALD, Aug. 3, 1888, at 4.

[188] *E.g.*, *The Corner Lounger*, MEM. APPEAL, Apr. 2, 1889, at 4.

[189] *E.g.*, *A Valley of Death*, EVENING STAR (D.C.), June 4, 1889, at 1.

[190] *E.g.*, *Reign of Terror*, DAILY TOBACCO LEAF CHRON. (Clarksville, Tenn.), May 15, 1890, at 1 (describing how citizens armed themselves because of the mentally ill mayor).

[191] *See, e.g.*, Editorial*, Capital Punishment*, COLUMBIAN CENTINEL (Boston, Mass.), Mar. 15, 1837, at 2; *Court Proceedings*, The Yorkville Enquirer (Yorkville, S.C.), Apr. 9, 1890, at 2.

[192] Thomas Calahan, *The Right to Bear Arms*, IRON CNTY. REG., Sept. 22, 1881, at 1.

[193] *Id.*

weapon should be carried openly, which would be no violation of the letter or spirit of the statute."[194]

In contrast to the specific instances when going armed was appropriate, generally going armed was viewed as reprehensible and criminal conduct.[195] Critiques of people for "habitually going armed" were widespread.[196] One Lexington, Missouri paper made the distinction between acceptable carry for immediate self-defense and condemnable habitually going armed, stating: "No truly brave man will go about habitually armed, year in and year out, or even for a short time, unless his life is in danger from someone who has sworn to take it."[197] Similarly, a Kentucky paper stated, "no brave or honorable gentleman would make a practice of wearing concealed about his person deadly weapons, unless his life was in danger from some particular person . . . none but bullies and brawlers habitually go armed."[198]

There seems to have been a clear distinction between purposive carry — carry to meet a specific threat — and habitual carry — carry as part of one's everyday activities. This distinction seems to have been applied beyond states where it was expressly part of their public carry statutory regime. For example, a Missouri court dismissed charges against a reporter for carrying concealed weapons after he presented "several witnesses that threats had been made against him" and the judge decided he "had sufficient reason for going armed."[199] Notably, necessity justified the reporter to carry a concealed weapon even when the law left openly carrying arms unregulated.[200] A West Virginia newspaper expressed a similar view when discussing the shooting of a former West Virginia congressman by a reporter who had been bullied and abused by the congressman for years after the reporter exposed an

---

[194] *Concealed Weapons*, OPELOUSAS COURIER, Jan. 28, 1888, at 1.

[195] *A Plea for a Higher Civilization*, PUB. LEDGER (Memphis, Tenn.), Jan. 27, 1883, at 3; *Weekly Intelligencer*, LEXINGTON WKLY. INTELLIGENCER, July 8, 1876, at 3.

[196] *See, e.g.*, *Enforce the Law*, WASH. CRITIC, Mar. 3, 1890, at 2 (criticizing habitually going armed and calls for stricter enforcement); *Local A.B.C.'s*, WKLY. CAUCASIAN (Lexington, Mo.), Dec. 3, 1870, at 2 (discussing the scourge of carrying concealed weapons habitually); *The Pistol*, LEXINGTON WKLY. INTELLIGENCER, Feb. 10, 1877, at 3 (complaining about those who go habitually armed); *What Others Say*, ABBERVILLE PRESS & BANNER, Mar. 26, 1879, at 2 (criticizing the Southern culture of violence and going armed).

[197] *Carrying Concealed Weapons*, WKLY. CAUCASIAN (Lexington, Mo.), Feb. 19, 1870, at 2.

[198] *The Pistol*, LEXINGTON WKLY. INTELLIGENCER, Feb. 10, 1877, at 3.

[199] Editorial, FAIR PLAY (St. Genevieve, Mo.), July 6, 1889, at 2.

[200] 1883 Mo. Laws 76 § 1274 (prohibiting "any person" from "carry[ing] concealed, upon or about his person, any deadly or dangerous weapon") (amended 1879).

affair.[201] In Los Angeles, permits appear to have been issued based on need as well. An 1888 Los Angeles Daily Herald article discussed a man seeking a permit to carry concealed weapons after being twice "held up by footpads" and having his house "three times burglarized."[202]

This tradition brings the Southern concealed carry tradition of regulation much more in line with the more expressly prohibitory traditions in the North and West.[203] Openly carrying guns in the ordinary course of business would have been viewed as anti-social behavior everywhere in the country outside of situations where carrying was needed for immediate self-defense.

### III.   The Impact of a Lack of Open Carry Tradition on Second Amendment Doctrine

So, why does any of this matter?

In *Heller*, Justice Scalia stated that the Second Amendment did not create a new right but instead protected "venerable, widely understood liberties." More broadly, modern originalism, of the type used by the Supreme Court in *Heller*, looks for the "original public understanding" of a right.[204] The gun rights argument is that there is a Second Amendment right to carry guns in public virtually all the time for any reason because open carry was historically the socially acceptable way to carry firearms and was traditionally not regulated. This Article shows that virtually no one understood open carry as part of a person's everyday activities to be acceptable conduct, let alone "a venerable, widely understood liberty." The absence of a law regulating conduct that no one engaged in, and most deemed unacceptable, is not a strong argument that such conduct is constitutionally protected. In contrast, concealed carry *was* widely regulated, and such regulations often included exceptions if people showed a specific need to carry a firearm. The presence of exceptions to broad concealed carry restrictions further undermines the gun rights narrative, as it hardly makes sense to set up rules and exceptions for concealed carry if everyone was free to bypass those and carry firearms openly.

---

[201] *The Truth About Kincaid and Taulbee*, Wheeling Daily Intelligencer, Mar. 3, 1890, at 2.

[202] *Fire Commissioners*, L.A. Daily Herald, Dec. 23, 1888, at 8.

[203] *See, e.g.*, Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 127 (2015) (discussing distinct Northern tradition).

[204] District of Columbia v. Heller, 554 U.S. 570, 605 (2008).

The Supreme Court is currently considering whether to strike down New York's law requiring applicants for permits to carry firearms in public to show a specific need to carry.[205] The gun rights argument about the history of open carry is at the core of the NRA's argument for why the law is unconstitutional.[206] When the Court considers the historical scope of the Second Amendment outside of the home, it should take into account what public carry actually looked like during the relevant historical period. In the nineteenth century, as today, openly carrying guns in public was not normal or acceptable conduct.

Second Amendment doctrine, especially public carry Second Amendment doctrine, is already among the most originalist and history-focused in American law.[207] Assuming this trend of originalist Second Amendment analysis continues, whether the Supreme Court accepts the view that open carry was an acceptable and widely practiced exercise of the Second Amendment right could have an enormous effect on what kinds of regulations state and local governments are allowed to impose on the carrying of firearms in public. The historical materials discussed above undermine one of the central historical arguments made in support of a broad right to carry in public. Rather than a nineteenth century where openly carrying weapons was a commonly accepted activity, such conduct was viewed as outrageous and only acceptable when a person faced an immediate threat. The Supreme Court should not ignore this history and strike down laws that clearly fit within the historical tradition.

---

[205]   N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 333 (2021).

[206]   Brief for Petitioners at 9, N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 333 (No. 20-843).

[207]   *See generally* Jamal Greene, Heller *High Water? The Future of Originalism*, 3 HARV. L. & POL'Y REV. 325 (2009) (discussing the impact of *Heller* with respect to its originalist interpretation and reliance on the history of the gun rights in America).

HEINONLINE

DATE DOWNLOADED: Wed Oct 19 02:32:46 2022
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
Robert Leider, Our Non-Originalist Right to Bear Arms, 89 IND. L.J. 1587 (2014).

ALWD 7th ed.
Robert Leider, Our Non-Originalist Right to Bear Arms, 89 Ind. L.J. 1587 (2014).

APA 7th ed.
Leider, R. (2014). Our non-originalist right to bear arms. Indiana Law Journal,
89(4), 1587-1652.

Chicago 17th ed.
Robert Leider, "Our Non-Originalist Right to Bear Arms," Indiana Law Journal 89, no.
4 (Fall 2014): 1587-1652

McGill Guide 9th ed.
Robert Leider, "Our Non-Originalist Right to Bear Arms" (2014) 89:4 Ind LJ 1587.


AGLC 4th ed.
Robert Leider, 'Our Non-Originalist Right to Bear Arms' (2014) 89(4) Indiana Law
Journal 1587

MLA 9th ed.
Leider, Robert. "Our Non-Originalist Right to Bear Arms." Indiana Law Journal, vol.
89, no. 4, Fall 2014, pp. 1587-1652. HeinOnline.

OSCOLA 4th ed.
Robert Leider, 'Our Non-Originalist Right to Bear Arms' (2014) 89 Ind LJ 1587

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
  *Copyright Information*

# Our Non-Originalist Right to Bear Arms

ROBERT LEIDER[*]

District of Columbia v. Heller *was a landmark, if controversial, opinion. Discussion has centered on the merits of its self-described originalist approach. Supporters praise its efforts to return to a more originalist and textualist approach to constitutional questions, whereas critics challenge the accuracy of* Heller*'s historical claims and criticize its departure from precedent.*

*This Article challenges much of the conventional wisdom about* Heller, *its use of originalism, and its relationship to nineteenth- and twentieth-century case law. This Article argues that, despite much of its rhetoric,* Heller *actually exemplified popular constitutionalism—not originalism—in the way it approached the most important practical question at issue in the case: determining the content of the right to bear arms. On that question,* Heller—*and not* United States v. Miller—*is largely consistent with the way, throughout most of American history, that both state and federal courts have adjudicated cases involving the right to bear arms. In particular, this Article argues that the dominant approach followed by nineteenth-century courts was neither "originalist" nor "textualist" about the right to bear arms. These courts did not look to how James Madison viewed the right in 1789 or how Americans in 1791 commonly understood the Second Amendment. Instead, they attempted to find compromise positions on the scope of the right to bear arms to accommodate a population divided between those believing in the right and those seeking stronger restrictions on weapons. To do this, the nineteenth-century courts shifted their understanding of the purpose of the right to bear arms over time, which, in turn, enabled them to reach conclusions about the content of the right that reflected the contemporaneous popular understanding of the right—and of the right's limits. In this revisionist account,* Miller *is the case that represented a break with the courts' historical approach because it arguably allowed access to common military weapons—an approach that did not readily allow courts to adjust the Second Amendment right to new circumstances as these military weapons became increasingly destructive. These difficulties prompted subsequent lower courts to adopt the "collective rights" interpretation of* Miller— *an interpretation that was too rigidly restrictive, and therefore, also difficult to adjust to reflect popular understandings. The Article concludes that* Heller *reflects a new compromise: expanding the individual self-defense rationale while diminishing the Second Amendment's military objectives. This new compromise recognizes an individual right to have self-defense weapons, while allowing greater*

---

†  Copyright © 2014 Robert Leider.

*  Law Clerk to the Hon. Diane S. Sykes, U.S. Court of Appeals for the Seventh Circuit. This article benefitted from the generous support of the Olin-Searle-Smith Fellowship and the University of Pennsylvania Law School. My sincere thanks to Reva Siegel for her advice and extensive feedback on previous drafts and Adam Winkler for his thoughtful input and suggestions. I also wish to thank Samuel L. Bray, George Mocsary, Michael P. O'Shea, Lee Liberman Otis, and Matthew Shapiro for additional comments and feedback. I am also grateful for the assistance of the editors of the *Indiana Law Journal* for their excellent feedback, specifically Mike Balser, Ben Gavel, Annie Milkey, Aaron Pettis, and Nick Roberts.

control over military-style weapons—which aligns with how mainstream Americans today view the right. Although Heller radically reshaped the Second Amendment right to fit the twenty-first-century popular understanding of the right, its methodological approach is quite consistent with how most courts have approached Second Amendment questions—an approach that sounds more in popular constitutionalism than originalism.

INTRODUCTION ............................................................................................... 1588
I. ANTEBELLUM PERIOD ................................................................................. 1595
    A. ANTEBELLUM STATE LAWS ................................................................ 1596
    B. ANTEBELLUM COURTS AND THE "REGULATION/PROHIBITION"
    DISTINCTION: FASHIONING A BROAD RIGHT FOR PRIVATE SELF-DEFENSE
    WHILE ALLOWING STATES TO REGULATE CONCEALED WEAPONS ............ 1601
II. THE RIGHT TO BEAR ARMS DURING AND FOLLOWING RECONSTRUCTION ...... 1619
    A. COMMUNITY STANDARDS AND THE LEGISLATIVE FRAMEWORK ........... 1620
    B. THE COURTS RESPOND ...................................................................... 1623
III. *UNITED STATES V. MILLER*: THE FAILURE TO REACH AN ACCEPTABLE SOCIAL
COMPROMISE ................................................................................................ 1629
    A. *UNITED STATES V. MILLER* ................................................................ 1630
    B. *MILLER* AND THE CONTEMPORANEOUS UNDERSTANDING OF THE RIGHT:
    THE FAILURE TO INCORPORATE THE POPULAR UNDERSTANDING OF THE
    RIGHT TO BEAR ARMS ........................................................................... 1634
    C. *MILLER* AND THE COURTS OF APPEALS: THE MYTH OF *MILLER* AS
    ACCEPTING A COLLECTIVE RIGHT .......................................................... 1636
IV. *HELLER*: REFRAMING THE RIGHT TO BEAR ARMS FOR A NEW GENERATION.. 1641
CONCLUSION .................................................................................................. 1650

## INTRODUCTION

Two debates are raging on the Second Amendment. First, commentators have dissected *District of Columbia v. Heller*[1] from every direction to determine whether it is "originalist" or not—and, if it is originalist, what kind. Original public meaning? Subjective intent of the Framers? New originalism? Old originalism? The second debate concerns what standard of review will (or should) apply to Second Amendment claims following *Heller*, which only determined that the review would not be rational basis.[2]

Like every debate on the Second Amendment, consensus on these questions proves elusive. With respect to the first question, Mark Tushnet accepts the characterization of *Heller* as "the most originalist opinion in recent Supreme Court history."[3] Randy Barnett calls Justice Scalia's majority opinion "the finest example of what is now called 'original public meaning' jurisprudence ever adopted by the Supreme Court."[4] Reva Siegel finds herself unable to concur in these assessments.

---

1. 554 U.S. 570 (2008).
2. *Id.* at 628 n.27.
3. Mark Tushnet, Heller *and the New Originalism*, 69 OHIO ST. L.J. 609, 609 (2008).
4. Randy E. Barnett, *News Flash: The Constitution Means What It Says*, WALL ST. J., June 27, 2008, at A13.

Compendium_Rivas
Page 382

For her, *Heller* is a product of twentieth-century social movements.[5] Saul Cornell states that Justice Scalia's majority opinion pitted original public meaning originalism against Justice Stevens's approach to look toward the Framers' intent.[6] The critiques of *Heller* pour in from liberals[7] and conservatives[8] alike.

The second question is no less controversial. Commentators have called for, and federal courts have applied, virtually every recognizable standard of review.[9] Unlike federal courts, state courts have nearly 200 years of experience adjudicating the right to bear arms. But analytical study into the state cases remains in its nascent stages.[10]

Adam Winkler, in *The Reasonable Right to Bear Arms*, notes that state courts distinguish between laws that purport to "regulate" the right to bear arms and those laws that result in the total destruction of the right.[11] With one exception,[12] courts have upheld laws that regulate the right but have struck down laws that prohibit exercise of the right entirely. Identifying the "regulation/prohibition" distinction is important when describing how courts have adjudicated claims under the Second Amendment and state analogues. But the "regulation/prohibition" framework leaves open a more basic question: What is the content of the right to keep and bear

---

5. Reva B. Siegel, *The Supreme Court, 2007 Term—Comment: Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191, 192–93 (2008).

6. Saul Cornell, *Originalism on Trial: The Use and Abuse of History in* District of Columbia v. Heller, 69 OHIO ST. L.J. 625, 625 (2008).

7. *See, e.g.*, Cass R. Sunstein, *The Supreme Court, 2007 Term—Comment: Second Amendment Minimalism:* Heller *as* Griswold, 122 HARV. L. REV. 246 (2008).

8. *See, e.g.*, J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253 (2009); Richard A. Posner, *In Defense of Looseness*, NEW REPUBLIC, Aug. 27, 2008, at 32, 33 (classifying *Heller* as "faux originalism").

9. *See* Lawrence Rosenthal, *Second Amendment Plumbing After* Heller: *Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 URB. LAW. 1 (2009); Jason T. Anderson, Note, *Second Amendment Standards of Review: What the Supreme Court Left Unanswered in* District of Columbia v. Heller, 82 S. CAL. L. REV. 547 (2009). *See generally* Stacey L. Sobel, *The Tsunami of Legal Uncertainty: What's a Court To Do Post-*McDonald?, 21 CORNELL J.L. & PUB. POL'Y 489 (2012) (collecting cases and commentary); Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. REV. 1551 (2009).

10. *See, e.g.*, CLAYTON E. CRAMER, FOR THE DEFENSE OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTERPRETATION OF THE RIGHT TO KEEP AND BEAR ARMS (1994); Joseph Blocher, *Reverse Incorporation of State Constitutional Law*, 84 S. CAL. L. REV. 323 (2011) (arguing, incorrectly in my view, that *McDonald* rejected the near-unanimous reasonableness review of state courts under gun control laws under the Second Amendment); Robert Dowlut & Janet A. Knoop, *State Constitutions and the Right to Keep and Bear Arms*, 7 OKLA. CITY U. L. REV. 177 (1982); David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359; David B. Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1113 (2010) (surveying analytical approaches of state courts); Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 AM. U. L. REV. 585 (2012).

11. Adam Winkler, *The Reasonable Right to Bear Arms*, 17 STAN. L. & POL'Y REV. 597, 601–02 (2006) [hereinafter Winkler, *Reasonable*]; *see also* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 717 (2007) [hereinafter Winkler, *Scrutinizing*].

12. *See infra* text accompanying notes 107–09.

*INDIANA LAW JOURNAL* [Vol. 89:1587

arms? Without the answer to this question, it is impossible to evaluate whether a law is a mere "regulation" or a total "prohibition."[13]

Analytically, a "right" can be divided into four components.[14] There is the *subject* of the right—that is, who holds the right.[15] Second, the *object* of the right consists of the persons or entities against whom the right is held. Third, we can ask, "Why do we have the right?"—that is, what is the *purpose* of the right. Finally, we have to define the *content* of the right. This Article is about how courts have shaped the *content* of the right to bear arms around contemporaneous public opinion, and how courts adjust their understanding of the *purpose* of the right when shaping and reshaping the content. In so doing, this Article synthesizes the originalism/popular constitutionalism debate with the nascent literature on state court review.

In analyzing Second Amendment questions about the content of the right, courts usually have not asked what the Framers intended when they drafted the Second Amendment, nor have they asked what Americans in 1791 understood the Second Amendment to mean. Instead, courts define the content of the right to keep and bear arms by looking to *contemporaneous notions of reasonableness*. The right, then, gets applied against jurisdictions that have strayed too far from the

---

13. A number of contemporary cases ask not just if the right is "prohibited" entirely, but . whether the challenged regulation "frustrates" the purposes of the right. *See, e.g.*, City of Tucson v. Rineer, 971 P.2d 207, 214 (Ariz. Ct. App. 1998) (prohibition of firearm in a city park "neither frustrates nor impairs" right to bear arms); Dano v. Collins, 802 P.2d 1021, 1022 (Ariz. Ct. App. 1990) (holding that the ban on concealed weapons did not frustrate the right to bear arms because individuals could carry their weapons openly); Benjamin v. Bailey, 662 A.2d 1226, 1235 (Conn. 1995) (upholding Connecticut's assault weapons ban under "frustrates" standard); State v. Comeau, 448 N.W.2d 595 (Neb. 1989); State v. Kessler, 614 P.2d 94, 99 (Or. 1980) (observing that courts generally ask whether "a regulation is valid if the aim of public safety does not frustrate the guarantees of the state constitution" and listing prohibitions on concealed weapons and bans on possession of firearms by felons as examples of permissible regulations); State *ex rel.* City of Princeton v. Buckner, 377 S.E.2d 139 (W. Va. 1988) (holding that a requirement to obtain a license to carry a handgun, which was only issued after proving the applicant's need to a judicial officer who had discretion to issue or not issue the license, frustrated the exercise of the right to bear a handgun for self-defense, and so was unconstitutional); State v. Hamdan, 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785 (invalidating prohibition of concealed weapons in a person's place of business on the grounds that the restriction would frustrate the right to bear arms for self-defense); *see also supra* note 10 (collecting literature discussing the "frustrates" framework). I treat the "frustrates" and "total prohibition" language as roughly synonymous. The question is rarely whether the challenged regulation "prohibits" exercising the right to keep and bear arms so thoroughly that people have no right to possess or carry any type of arm. With the exception of felons and related classes, American laws have not disarmed people entirely. Instead, the question courts generally ask is whether the law at issue totally prohibits a core component of the right, such as the ability to possess protected classes of arms or, in many jurisdictions, the ability to carry a firearm in public for self-defense. My thanks to Michael O'Shea for alerting me to this issue and for collecting the cases that use the "frustrates" test.

14. *See* DAVID RODIN, WAR AND SELF-DEFENSE 36 (2002).

15. In the case of the Second Amendment, the commentators generally debate whether the right belongs to individuals generally, to only those individuals in a "well-regulated militia," or to state governments. *See infra* text accompanying note 344.

Compendium_Rivas
Page 384

then-commonly accepted scope of the right. In other words, if a jurisdiction restricts the right to keep and bear arms beyond the contemporaneous popularly accepted limit, courts will strike the law down as a "prohibition" of the right. In contrast, laws within the popularly accepted mainstream are upheld as mere "regulations"—even if the laws are prohibitory in character (e.g., a complete ban on felons possessing guns[16]). Thus, when we ask how future courts will apply *Heller* to novel Second Amendment claims, we should ask not what the Framers understood the right to be, but how the contemporaneous population views the right to bear arms.[17]

This Article begins by examining the development of this doctrine in the nineteenth century. Since the nineteenth century, the population, legislature, and courts have engaged in a dialectic on the content of the right to keep and bear arms under the Second Amendment and state analogues.[18] Restrictions on weapons are almost always passed by legislatures in response to specific societal problems that prompt concerted calls for legislation.[19] Courts, then, get forced to mediate between diverse social movements. In mediating these disputes, courts are very sensitive to popular sentiments regarding the role of weapons in society.

While *Heller* employed originalism in determining the *subjects* of the Second Amendment right, *Heller* is best understood as a continuation of this nineteenth-century interpretive methodology when defining the *content* of the right to bear arms. The nineteenth century witnessed two phases in Second Amendment jurisprudence, one in the antebellum period and one following Reconstruction. In each time period, the courts refashioned the right to keep and bear arms in a way that respected the popular conception of the right as an individual right while giving legislatures adequate authority to resolve contemporaneous social problems involving weapons. Courts accomplish this by shifting their theory about the *purpose* of the right to bear arms over time. When courts shift their theory about

---

16. *See, e.g.*, People v. Swint, 572 N.W.2d 666, 671 (Mich. Ct. App. 1997) (felon-in-possession statute a "reasonable regulation" of the right to bear arms).

17. I say "novel" because courts (whether state or federal) have to contend with stare decisis. As I argue below, courts will retheorize the purpose (and therefore the content) of the right to bear arms when stare decisis becomes too much of an impediment to fashioning the right around contemporary public meaning. Until that happens, however, a jurisdiction's jurisprudence on the right to bear arms is generally a mixture of the contemporary public understanding of the right and holdover rules from earlier generations' understanding of the right. And even when the right gets refashioned, a few holdover rules remain, although often in greatly altered form (for example, the post–Civil War rule in many states allowing individuals to carry pistols openly in the hand for individual self-defense when the contemporary jurisprudence largely had stopped recognizing a general right to carry handguns for personal self-defense).

18. As I describe below, nineteenth-century courts viewed the Second Amendment and state analogues as codifying the same preexisting right to bear arms. The former bound the federal government, while the latter bound the states. Thus, state courts' analyses did not change significantly even if their constitutional provisions had slightly different wording from the Second Amendment or from the right-to-bear-arms provisions in sister states.

19. I describe three examples below, including antebellum Southern concerns with dueling, post–Civil War difficulties with handguns, and the use of submachine guns during Prohibition.

*INDIANA LAW JOURNAL*

the purpose of the right to bear arms, they are able to adjust concomitantly the *content* of the right to bear arms so that the content of the right reflects contemporaneous notions of reasonableness. *Heller*, for example, changed the right to be primarily about private self-defense in the home in order to justify prohibitions on individuals having military arms that comport with *today's* understanding of a reasonable right to bear arms. Although *Heller* radically reshaped the Second Amendment right to fit the twenty-first-century popular understanding of the right, its popular constitutional project is deeply rooted in our nation's historical Second Amendment jurisprudence.[20]

This Article has four parts. In Part I, I describe how the antebellum state courts resolved challenges to early state laws regulating weapons, especially initial prohibitions against the carrying of concealed weapons. Although many state courts gave a superficial history of the right to bear arms, the content of the right took on a dimension that, like *Heller*, looked more populist than historical. Nearly every state court recognized a right to bear arms for personal purposes under the Second Amendment and state analogues. This even included states, such as Tennessee and North Carolina, where the state constitution did not seem to protect a right to bear arms for private purposes at all (e.g., the right only extended "for their common defence"[21] or "for defence of the state"[22]). The broad scope of the right to bear arms was encapsulated in Chief Justice Taney's comment, in *Dred Scott*, that free blacks could not be citizens for, if they were, they would have a right "to keep and carry arms wherever they went."[23]

Although state courts approved a very broad right to bear arms for personal purposes, they also came under significant pressure to recognize the power of the legislature to regulate the right. Southern states were enacting laws against the carrying of concealed weapons in order to stop dueling and other honor-related killings. The Kentucky Court of Appeals, the first state court to hear a challenge to a law alleged to violate the right to bear arms, took an absolutist approach, denying any power of the legislature to regulate concealed weapons.[24] The court saw no difference between a "regulation" and a "prohibition" of the right to bear arms.[25] The Kentucky court's holding is a distinct outlier in American jurisprudence and was quickly repudiated by every other state court to consider the scope of the right. The foundation of the "regulation/prohibition" distinction came in this repudiation: courts gave state legislatures power to regulate weapons provided they did not abridge the right entirely, as defined by how the contemporaneous population then understood the right. And the antebellum right, consistent with popular sentiment, included the right to have arms in public for private self-defense. Courts permitted states to prohibit concealed weapons, but made it clear that prohibitions on unconcealed weapons would not be allowed. Some of these early cases began to

---

20. On the role of popular opinion in shaping the Supreme Court's jurisprudence, see BARRY FRIEDMAN, THE WILL OF THE PEOPLE: HOW PUBLIC OPINION HAS INFLUENCED THE SUPREME COURT AND SHAPED THE MEANING OF THE CONSTITUTION (2009).
21. TENN. CONST. of 1796, art. XI, § 26.
22. N.C. CONST. of 1776, Declaration of Rights, § XVII.
23. Scott v. Sandford, 60 U.S. (19 How.) 393, 417 (1857).
24. Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822).
25. *Id.* at 92.

restrict the "arms" that were protected by the Second Amendment and state analogues—generally excluding small weapons designed to be concealed—but a few antebellum courts went further and protected only military-type weapons. Courts sustained more pervasive regulation of select groups (e.g., prohibitions on free blacks carrying arms) only under the theory that the regulated group did not possess full constitutional rights.

In Part II, I explain how post–Civil War[26] courts adopted a different theory of the purpose of the right to bear arms in order to approve more severe regulations on handguns. Contemporaneous legislatures, especially in Southern states, faced two problems. First, while the Fourteenth Amendment made former slaves and free blacks full citizens of the United States, the Southern white community did not want black citizens to carry arms. Legislatures and courts could not rely on the previous justification that all blacks, including those who were free, were noncitizens beyond the full protection of the Bill of Rights. Second, the prohibitions on concealed weapons proved inadequate to accomplish contemporaneous crime-control objectives. There was widespread defiance of the prohibition, and juries largely refused to convict white violators. The crime control problem was exacerbated by the increasing deadliness of modern weapons, especially concealable revolvers, which were ubiquitous following the Civil War. While antebellum concealed weapon bans targeted Bowie knives, daggers, and similar edged weapons, Reconstruction-era laws targeted handguns. This targeting took several forms. First, virtually every new state and territory adopted laws on concealed weapons; the only states that lacked concealed weapons laws were some of the older Northern states. Second, many Southern states began to prohibit *all* carrying of handguns, regardless of whether the weapon was concealed. Generally, only travelers and peace officers were exempt. Third, a few jurisdictions—most notably Tennessee—enacted near-total prohibitions on the sale of handguns. Fourth, states began to restrict the places weapons could be carried, often banning weapons in courts, bars, polling places, and public gatherings.

Courts responded to these legislative concerns by largely upholding these laws. The power of states to prohibit concealed weapons became completely entrenched—so much so that, by 1897, the U.S. Supreme Court considered concealed weapons to be a historically understood exception to the right to bear arms rather than a regulation of it.[27] But state courts also redefined the right to keep and bear arms in order to uphold near-total prohibitions against the carrying of pistols. Instead of emphasizing the right to bear arms for private purposes, state courts viewed the right primarily in a "civic republican" lens.[28] They held that the right to bear arms primarily existed for defense of the community, not for private self-defense. Accordingly, the weapons that were protected were individual *military* weapons (i.e., "ordinary military equipment"), not weapons primarily

---

26. I am looking primarily in the time period of 1870–1900.

27. Robertson v. Baldwin, 165 U.S. 275, 282 (1897).

28. On civic republicanism and the Second Amendment, see, for example, Glenn Harlan Reynolds, *The Right to Keep and Bear Arms Under the Tennessee Constitution: A Case Study in Civic Republican Thought*, 61 TENN. L. REV. 647 (1994); David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 YALE L.J. 551 (1991).

carried for personal self-defense. Under this view, military rifles and carbines received the most constitutional protection, whereas handguns received almost none.

In Part III, I articulate a revisionist account of why the lower federal courts adopted the collective rights view of the Second Amendment after *United States v. Miller*.[29] My argument is that the lower federal courts' adoption of the collective rights view was a failure of courts to refashion the right to keep and bear arms in view of changing conceptions of the right. The "collective rights view" of the Second Amendment—the idea that the right to keep and bear arms is contingent on service in an organized state militia—was first adopted by the Kansas Supreme Court in 1905.[30] But it became the predominant view in the federal courts from 1935 until *Heller*.

Although the Supreme Court had considered Second Amendment claims several times before *Miller*, the Court always found ways to dispose of those claims on narrow grounds and thereby avoid any broad pronouncement on the scope of the Second Amendment.[31] *Miller* squarely raised the question of the Second Amendment's scope: relying on the 1905 Kansas Supreme Court case, the government's primary argument was that the Second Amendment only protected a collective right.[32] At issue was the constitutionality of the National Firearms Act, which regulated "gangster"-style weapons, including machine guns and sawed-off shotguns.[33] Miller had been indicted for transporting a sawed-off shotgun. Despite the fact that the government squarely raised the question in *Miller,* the Supreme Court assiduously refused—again—to make any broad pronouncements concerning the scope of the Second Amendment. Instead, the Court, following most nineteenth-century courts, held that only ordinary military weapons were protected.

While *Miller* cleanly disposed of a sawed-off shotgun case, it placed the lower federal courts in a difficult position. The military was transitioning toward automatic weapons, which were widely considered inappropriate for civilian use. But *Miller* seemed to entrench the nineteenth-century case law holding that "arms" included only "ordinary military equipment."[34] This left lower courts unable to adapt the Second Amendment to prevailing popular opinion regarding the scope of the right. Weapons considered appropriate for civilian possession, such as hunting rifles and handguns for individual self-defense, did not seemingly come within

---

29. 307 U.S. 174 (1939).

30. *See* City of Salina v. Blaksley, 83 P. 619 (Kan. 1905); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 244 (1983). I note below that at least one of the opinions in *State v. Buzzard*, 4 Ark. 18 (1842), may have held this view of the Second Amendment in the antebellum period, *see infra* text accompanying notes 190–95, but it was not a view that gained the acceptance of any court until *Blaksley*.

31. For example, in *Presser v. Illinois*, 116 U.S. 252 (1886), the Court held that the right to keep and bear arms was not infringed by a law that prohibited citizens (other than on-duty militia) from parading as an armed group in public.

32. Brief for the United States at 15, *Miller*, 307 U.S. 174 (1939) (No. 696).

33. National Firearms Act, ch. 757, 48 Stat. 1236 (1934) (codified as amended at 26 U.S.C. §§ 5801–72 (2012)).

34. *Miller*, 307 U.S. at 178.

Compendium_Rivas
Page 388

*Miller*'s scope of "ordinary military equipment." Conversely, military-style weapons, now considered inappropriate for civilian possession, received the highest constitutional protection. Unwilling to accept this, lower federal courts widely adopted the "collective rights view" of the Second Amendment.[35] Because the practical effect of the collective rights view is that no one can ever raise a successful Second Amendment challenge, adopting the collective rights view allowed the lower federal courts to withdraw from adjudicating Second Amendment claims and thereby removed them from the *Miller* conundrum.

*Heller* marked a revival of the nineteenth-century project of protecting the right of the people to keep and bear arms while recognizing the power of the legislature to deal with contemporaneous social problems. The only ostensibly originalist portion of *Heller* was when the Court correctly held that the Second Amendment right was not exercisable solely by active-duty militiamen in the performance of their official duties.[36] *Heller*'s originalism ended with defining the proper subjects of the right. Fleshing out the *content* of the right was a triumph of popular constitutionalism. The Court protected Heller's handgun because "handguns are [currently] the most popular weapon chosen by Americans for self-defense in the home"—not because the Framers viewed handguns as constitutionally protected weapons.[37] In contrast, the Court, in dicta, approved the constitutionality of complete prohibitions on weapons like the M16 rifle (which is the quintessential personal weapon of today's militiamen) on an ahistorical reading of the common-law prohibition against *carrying* (not possessing) "dangerous and unusual weapons."[38] Moreover, the Court's list of presumptively lawful regulatory measures, such as the "longstanding" prohibition on all felons from having guns (a prohibition that was so "longstanding" that Justice Alito, the *Heller* Court's youngest member, was eighteen years old when it was passed), reads more like *today's* understanding of the right to bear arms than it does the Framers'.[39] But in codifying the contemporaneous popular understanding of the right to bear arms, the Supreme Court has simply continued a conversation that began in the early eighteen hundreds.

## I. ANTEBELLUM PERIOD

Fashioning the right to keep and bear arms around the popular conception of the right began with the earliest court decisions on the right to keep and bear arms under the Second Amendment and state analogues. Although these decisions predate modern incorporation of the Bill of Rights, some state courts still applied the Second Amendment to state laws.[40] Others treated the Second Amendment and state analogues as generally coextensive because the federal and state constitutional provisions codified the *same preexisting right* to bear arms.[41] The only difference

---

35. *See infra* Part III.C.
36. District of Columbia v. Heller, 554 U.S. 570, 584 (2008).
37. *Id.* at 629.
38. *See id.* at 627.
39. *Id.* at 626–27.
40. *See, e.g.,* Nunn v. State, 1 Ga. 243, 250 (1846).
41. *See, e.g.,* United States v. Cruikshank, 92 U.S. 542, 553 (1876) ("[T]he right to bear

*INDIANA LAW JOURNAL*

between federal and state constitutional guarantees was that the former bound the federal government whereas the latter bound state governments.

These decisions are remarkable for several reasons. Very few of the cases engaged in any sort of "originalist" analysis: no one asked what James Madison thought in drafting the provision or looked to the ratifying conventions. Most cases focused on the English Bill of Rights—sometimes exclusively—as supplying the purpose for the right to bear arms, which was to resist political oppression.[42] The American right to bear arms was then treated as a broader version of the English privilege since, unlike the English version, the Second Amendment neither limited arms according to a person's social status nor did it contain the restriction "as allowed by law."[43]

Despite this political purpose, most antebellum state courts *additionally* recognized a very broad right to carry arms for private self-defense. Although these courts largely sustained prohibitions on concealed weapons as a permissible regulation of the right to bear arms, they also made clear that the right to carry weapons openly for private self-defense could not be infringed. This was true even when state courts construed state constitutional provisions that seemed to offer no protection for private self-defense. In an era when many men carried weapons, lawfully or not, the courts interpreted differently worded state constitutional rights to arms so they converged around popular beliefs about the scope of the right.

Finally, despite recognizing a very broad right to keep and bear arms, these courts took seriously the legislature's efforts at controlling crime with dangerous weapons. There was substantial popular outcry against the public carrying of weapons. Upholding the prohibitions on concealed weapons while striking down prohibitions on openly carried weapons was an attempt to mediate between a population torn between recognizing the right to carry weapons for private purposes while demanding legislative solutions to dueling and other honor-related killings.

### A. Antebellum State Laws

Antebellum state laws governing dangerous weapons generally fell into six categories. These laws (1) increased penalties for using weapons in crimes, especially when dueling; (2) regulated the discharge of firearms; (3) regulated arms for those enrolled in the militia; (4) prohibited prisoners from possessing weapons; (5) prohibited individuals from carrying concealed weapons; and (6) prohibited slaves, free blacks, and Indians from possessing or receiving weapons without a license. The first four of these categories did not seem to raise any constitutional

---

arms for a lawful purpose] is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed . . . ."); State v. Buzzard, 4 Ark. 18, 26–27 (1842) (opinion of Ringo, C.J.); Aymette v. State, 21 Tenn. (2 Hum.) 154, 157 (1840) (holding that the Second Amendment and Tennessee rights to bear arms have the same purpose).

42. *See, e.g.*, State v. Reid, 1 Ala. 612, 615 (1840); *Aymette*, 21 Tenn. (2 Hum.) at 156–57 (giving the English history but giving virtually no American history on the adoption of the Second Amendment).

43. *Aymette*, 21 Tenn. (2 Hum.) at 156–58; *see also* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1891, at 747 (1833).

Compendium_Rivas
Page 390

concerns about violating the right to keep and bear arms. The main antebellum judicial battles were fought over concealed weapons bans and, to a lesser degree, laws against slaves and free blacks having arms.

### 1. Antebellum Laws Triggering No Significant Judicial Scrutiny

Four types of weapons regulations did not seem to raise any significant scrutiny under the Second Amendment or state analogues. I will quickly note these in passing before moving to the concealed weapons laws, which received considerably more judicial scrutiny.

First, states passed laws increasing penalties for crimes when weapons were involved. Most commonly, states enacted comprehensive statutes designed to prohibit dueling.[44] These laws often declared a killing during a duel to be murder—not manslaughter—and subjected duelers to various disabilities such as prohibiting them from holding office.[45] Some of these laws remain on the books.[46] Other early laws also increased the penalties for non-dueling offenses (e.g., robbery) when armed.[47] Targeting the possession or use of weapons in conjunction with criminal offenses generally was not thought to raise any sort of Second Amendment issue.[48]

---

44. *See, e.g.*, Act of Apr. 7, 1810, 1809–1811 Ill. Laws 25(adopting the Virginia anti-dueling code); Act of Dec. 18, 1813, 1813 Ind. Laws 2d Sess. 442; Act of May 4, 1805, ch. 50, § 25, 1804 La. Acts 1st Sess. 416, 434; Act of Mar. 18, 1796, ch. 600, § 56, 1795 N.J. Laws 2d Sitting 92, 107; Act of Nov. 5, 1816, ch. 1, 1816 N.Y. Laws 3; Act of Apr. 22, 1794, ch. 238, § 10, 1793 Pa. Laws 546, 551; Act of Jan. 26, 1810, ch. 10, 1809 Va. Acts 9; *see also infra* note 45.

45. Act of Oct. 23, 1820, § 1, 1818–1820 Ark. Acts. 110, 110 (dueling causing death within three months declared murder); Offenses Against the Public Peace and Tranquility, § 7, 1816 Ga. Laws 178, 180 (removing from office any justice or other officer having knowledge of a duel and failing to arrest the participants); Act of Mar. 15, 1805, ch. 77, § 6, 1805 Mass. Acts. Jan. Sess. 643, 644–645 (prohibiting duelers from holding office for twenty years); Act of Jan. 30, 1802, 1801 Miss. Laws July & Oct. Extra. Sess. 156, 170; Act of Feb. 20, 1809, ch. 124, § 25, 8 Ohio Laws 534, 542–43 (lifetime ban on holding office or being a juror, and dueler to be stripped half naked and placed on view); Act of Jan. 15, 1805, ch. 1, 1804 Ohio Acts 1, 10 ("forever disfranchised"). Some of the comprehensive dueling codes cited *supra* note 44 also contain prohibitions on holding office.

46. *See, e.g.*, COLO. REV. STAT. ANN. § 18-13-104(2) (West 2013) (making dueling a class 4 felony); IDAHO CODE ANN. § 19-303 (2004) (giving jurisdiction if person dies in state from a duel out of state); KY. CONST. §§ 228, 239 (requiring officers and attorneys to swear that they have not participated in a duel and prohibiting those who have dueled from taking office); MICH. COMP. LAW ANN. § 750.319 (West 2004) (classifying dueling as first-degree murder); MISS. CODE ANN. § 97-39-3 (West 2011) (disenfranchising duelers and prohibiting them from holding office).

47. *See, e.g.*, An Act for Regulating New-Gate Prison, in Granby, and for Regulating and Governing the Same: And for the Punishment of Certain Attrocious Crimes and Felonies, 1790 Conn. Acts 392, 393 (May Sess.) (aggravated robbery); Act of Dec. 22, 1802, ch. 53, § 15, 1802 Ky. Acts 107, 115 (armed robbery); Act of Oct. 1, 1804, ch. 1, § 6, 1804 La. Acts Ind. Territory 3, 6. (burglary while armed); Act of Mar. 15, 1805 § 5, 1805 Mass. Acts. Jan. Sess. at 284 (assault while armed); Act of Feb. 28, 1799, 1799 Miss. Laws 41, 46 (aggravating penalty for burglary).

48. *See, e.g.*, United States v. Sheldon, 5 Blume Sup. Ct. Trans. 337, 346, 1829 WL

Second, states regulated the discharge of firearms within city limits and the storage of gunpowder to prevent fires.[49] Many of these statutes continued a practice of regulating firearm discharges that existed even in colonial times.[50] I have found no early court cases alleging any constitutional infirmities in these statutes, although modern incarnations of these statutes seem to be more controversial today.[51]

Third, both the federal government and the states passed militia regulations. These laws required able-bodied white male citizens between certain ages, often eighteen to forty-five, to own muskets and to report for militia duty.[52] Interestingly, I have not found early court cases or newspaper articles alleging that laws regulating weapons held by citizens *qua* militiamen violated the Second Amendment. No one seemed to recognize any libertarian right of militiamen to bring personal weapons into military service according to the militiamen's individual discretion. The lack of any concern that militia regulations could impair the right to bear arms is important: proponents of the collective rights view have the burden to articulate what the *right* to bear arms is, as opposed to a militiaman's *duty* to bear arms. Imposing fairly detailed affirmative obligations on the type of weapons with which citizens must report to militia duty seemed to trigger no constitutional concern whatever.[53]

---

3021 (Mich. 1829) ("[T]he grant of this privilege cannot be construed into the right in him who keeps a gun to destroy his neighbor. No rights are intended to be granted by the constitution for an unlawful or unjustifiable purpose."). I found one case where the contrary was argued. In *Cockrum v. State*, 24 Tex. 394, 401–03 (1859), the Supreme Court of Texas held that a Texas law, which punished manslaughter as murder when committed with a Bowie knife, was not a prohibition on the right to bear arms. Instead, the law regulated an abuse of that right. Only if penalties deterred the lawful exercise of the right completely would there be a constitutional difficulty.

49. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510–12, 515–16 (2004).

50. *Id.* at 502.

51. *See* Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) (striking down a ban on shooting ranges inside city limits).

52. *See* Cornell & DeDino, *supra* note 49, at 508–10; Winkler, *Scrutinizing*, *supra* note 11, at 709 n.148 (collecting examples of these laws).

53. That mandatory gun ownership triggered no constitutional concerns is important. A recent article by Joseph Blocher argues that the Second Amendment, as understood by *Heller*, grants a right not to bear arms. *See* Joseph Blocher, *The Right Not to Keep or Bear Arms*, 64 STAN. L. REV. 1 (2012). Blocher asserts that *Heller* redefined the Second Amendment to be about personal safety, unmooring it from its militia-related objective. Given that personal safety is sometimes enhanced by not having weapons present, the Second Amendment should be read to imply a negative right, just like the First Amendment recognizes a right not to speak. But as Blocher himself notes, this reading of the Second Amendment is completely ahistorical. *See id.* at 40–41 (trying to reconcile his view with the Militia Act of 1792). Blocher errs when he argues that the personal safety rationale of the Second Amendment *supplants*—rather than *supplements*—the militia objective. As I will describe below, antebellum state courts generally recognized a broad right to carry militia-type weapons for personal self-defense. Having weapons available for personal purposes did not alter the duty to bear arms when called for militia service. The government has always had the power to force people to bear arms.

Fourth, laws were enacted against transferring weapons to prisoners to prevent escapes.[54] While *Heller* in dicta approved "longstanding" laws prohibiting felons and the mentally ill from possessing firearms,[55] laws prohibiting prisoners from receiving weapons were the only "status" bans applied against citizens that I have discovered.[56] Some of these laws went further by more broadly prohibiting conveying weapons into the jails to allow an escape, whether transferred to the prisoner or not. Like the discharge statutes, I have found no court cases that raise any constitutional question about banning prisoners from having weapons or bringing weapons into the jails. In 1842, the Arkansas Supreme Court in *State v. Buzzard* said that the practice had long gone unquestioned.[57] State courts did not adjudicate cases involving total prohibitions on the right to bear arms in narrowly defined areas (e.g., polling places, bars, and courthouses) until after the Civil War.[58] Nor have I found any contemporaneous newspaper accounts suggesting that laws restricting weapons to prisoners implicate the right to bear arms.

Thus, although the antebellum right to bear arms included possessing arms for personal purposes, there seem to be several categories of weapons regulations that received virtually no scrutiny. Given the lack of discussion, it seems that these laws were not understood to raise any serious constitutional questions.

### 2. Antebellum Laws Triggering State Court Review

Two sets of laws did trigger state court review under the Second Amendment and state analogues. These were, first, prohibitions on carrying weapons in public and, second, laws that required licenses for free blacks and slaves.

In 1813, states began regulating the public carrying of weapons.[59] Kentucky passed the first prohibition of concealed weapons in 1813, and Louisiana followed later that year. These laws spread throughout the South and West, with Indiana,

---

54. Act of Feb. 25, 1824, ch. 282, § 11, 1824 Me. Laws 1000, 1006 (prohibiting conveying weapon to a prisoner or possessing weapon in a prison with a purpose to facilitate an escape); Act of June 21, 1811, ch. 32, § 8, 1811 Mass. Acts. May Sess. 418, 422 (prohibiting conveying a weapon to a prisoner with the intent of facilitating escape); Act of June 19, 1812, § 8, 1812 N.H. Laws June Sess. 18, 21–22 (prohibiting conveying a weapon to a prisoner or possessing a weapon in a prison with a purpose to facilitate an escape); Act of Nov. 9, 1808, ch. 78, § 9, 1808 Vt. Acts & Laws 107, 112.

55. District of Columbia v. Heller, 554 U.S. 570, 626–27 (2008).

56. *See* State v. Buzzard, 4 Ark. 18, 21 (1842) (opinion of Ringo, C.J.) ("Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned."); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009).

57. *Buzzard*, 4 Ark. at 21.

58. *See infra* note 277 and accompanying text.

59. Tennessee, which was at the forefront of gun control throughout the eighteen hundreds, did have an 1801 statute authorizing justices of the peace to require sureties of any person who (1) violated the common-law prohibition against going armed to the terror of the people or (2) privately carried any "dirk, large knife, pistol, or any other dangerous weapon" privately to the terror of the people. Act of Nov. 13, 1801, ch. 22, § 6, 1801 Tenn. Pub. Acts 259, 260–61.

Tennessee, Arkansas, Georgia, Virginia, Alabama, Florida, and Ohio adopting similar laws.[60]

Early concealed weapons prohibitions had a fair degree of uniformity. They generally enumerated several weapons that were of particular concern, including dirks or daggers, Bowie knives, swords concealed in canes, and pistols or some subset of pistols (e.g., "pocket pistols").[61] Many of these laws, therefore, did not explicitly regulate muskets, rifles, or shotguns, though most states enacted catchall provisions at the end of the enumerated list that applied to other dangerous or deadly weapons.[62] The first three concealed weapons statutes, in Kentucky, Louisiana, and Indiana, were punishable by a stiff fine,[63] but later statutes, while keeping the fines, also added short jail terms—typically no more than three or six months.[64] Only one state—Georgia—went further and prohibited openly carried weapons as well, a fact that would be constitutionally significant when the statute was challenged.[65] In addition to the ban on carrying concealed weapons, Georgia and Tennessee passed laws that prohibited the sale of Bowie knives and most pistols, respectively.[66]

The original concealed weapons laws had few exceptions. Some of the early statutes did not apply to travelers,[67] and this exception still exists in a number of states.[68] Most statutes contained no privilege for law enforcement officers.[69]

---

60. Act of Feb. 1, 1839, No. 77, 1838 Ala. Acts 67; ARK. REV. STAT. div. VIII, ch. 44 (1838); Act of Jan. 28, 1835, ch. 860, 1835 Fla. Laws 318; Act of Dec. 25, 1837, 1837 Ga. Laws 90; Act of Jan. 14, 1820, ch. 23, 1819 Ind. Laws 39; Act of Feb. 3, 1813, ch. 89, 1812 Ky. Acts 101; Act of Mar. 25, 1813, 1813 La. Acts 172; Act of Mar. 18, 1859, 1859 Ohio Laws 56; Act of Oct. 19, 1821, ch. 13, 1821 Tenn. Pub. Acts 15; Act of Feb. 2, 1838, ch. 101, 1838 Va. Acts 76.

61. See the Kentucky, Louisiana, Indiana, Alabama, Georgia, Virginia, Ohio, and Arkansas laws cited *supra* note 60; *see also* Act of Jan. 27, 1838, ch. 137, 1837–1838 Tenn. Pub. Acts 200 (fighting knives only).

62. Louisiana's law included "deadly weapons," Indiana's "unlawful weapons," Florida's "all arms," Alabama's fighting knives and firearms, Virginia's weapons "of like kind" to pistols and fighting knives, and Ohio's encompassed all dangerous weapons.

63. Kentucky's law had a minimum $100 fine. Louisiana's law allowed fines of $20–$50. And Indiana's law allowed a fine of up to $100.

64. For example, Florida ($50–$500, one to six months' imprisonment); Virginia ($50–$500, one to six months' imprisonment); Tennessee ($200–$500, three to six months' imprisonment); Ohio ($200 or thirty days on first offense; second offense, up to $500 or three months in jail or both). *See* laws cited *supra* note 60.

65. Act of Dec. 25, 1837, 1837 Ga. Laws 90; *see also* Nunn v. State, 1 Ga. 243 (1846).

66. Act of Dec. 25, 1837 § 1, 1837 Ga. Laws at 90; Act of Jan. 27, 1838 § 1, 1837–1838 Tenn. Pub. Acts at 200–01.

67. Specifically, Kentucky's statute, Tennessee's 1821 statute (but not its 1838 Bowie knife statute), and Indiana's statute did not apply to travelers. Neither did Alabama's 1841 version of the statute. *See* Of Miscellaneous Offenses, ch. 7, § 4, 1840 Ala. Acts 148, 148–49.

68. *See* ARK. CODE ANN. § 5-73-120(c)(4) (2005); COLO. REV. STAT. ANN. § 18-12-105(2)(b) (2013); MISS. CODE ANN. § 97-37-9(b) (West 2011); TEXAS PENAL CODE § 46.15(b)(2) (West 2011).

69. Alabama's, Kentucky's, Indiana's, Louisiana's, Tennessee's, and Virginia's statutes had no law enforcement exception, for example.

Compendium_Rivas
Page 394

Indeed, the first challenge to a concealed weapon ban in Alabama involved a local sheriff who was prosecuted for carrying his pistol concealed.[70] A few statutes, however, did exempt peace officers, but only while in the performance of their official duties.[71] None of the statutes privileged militiamen, even in the performance of their duties.[72] An Alabama concealed weapon ban and an Ohio statute allowed juries to acquit if they thought the person had reasonable cause to fear an attack.[73]

Laws that regulated free blacks and slaves having guns constituted a second category of laws that antebellum state courts scrutinized to see if they were compatible with the right to bear arms. These laws generally made it illegal for free blacks or slaves to have guns without a license. Licenses were issued for limited times either from the slave's owner or the justice of the peace.[74] The prohibitions generally extended both to public carrying and to possession in the home. The laws did not contain extensive guidance on issuing licenses, except to state the term of the license and the person authorized to issue it.

### *B. Antebellum Courts and the "Regulation/Prohibition" Distinction: Fashioning a Broad Right for Private Self-Defense While Allowing States to Regulate Concealed Weapons*

The antebellum right to bear arms was fought primarily over the early concealed weapons statutes. Much like today's courts, antebellum state courts found themselves caught between a divided population. On the one hand, the carrying of guns and knives was ubiquitous throughout the South and West. Many within the population thought that they had a right to carry weapons for personal protection. On the other hand, the public clamored for legislative solutions to high crime rates. The presence of guns and knives was widely thought to make ordinary arguments more deadly, as the conflicted parties resorted to weapons to solve their disputes.[75]

---

70. State v. Reid, 1 Ala. 612 (1840).

71. Georgia's statute had an early exemption. Act of Dec. 25, 1837 § 4, 1837 Ga. Laws at 90. Law enforcement officers have been granted increasing power to carry concealed weapons over time, as exemptions gradually expanded to allow the carrying of weapons off-duty in the officer's state or jurisdiction. Current federal law allows most current and retired law enforcement officers to carry concealed pistols throughout the country. 18 U.S.C. §§ 926B, 926C (2012).

72. Maryland had a proposal to ban all carrying of weapons, excepting militiamen. *See* MISS. FREE TRADER & NATCHEZ GAZETTE, Feb. 17, 1837 (citing NAT'L INTELLIGENCER).

73. Of Miscellaneous Offenses § 4, 1840 Ala. Acts at 148–49; Act of Mar. 18, 1859, 1859 Ohio Laws 56.

74. Act of Feb. 7, 1827, ch. 50, § 8, 1827 Del. Laws 120, 125–26; Act of Jan. 4, 1807, ch. 81, § 2, 1806 Md. Laws (requiring annual license issued on certificate of good conduct); Act of June 18, 1822, § 10, 1822 Miss. Laws 5th Sess. Adjourned 179, 181–82; Act of Mar. 30, 1799, 1799 Miss. Laws 112 (requiring a license for both slaves and free blacks); Act of Jan. 11, 1841, ch. 30, 1840–1841 N.C. Laws 61; Act of May 10, 1740, No. 695, § 23, 1731–1743 S.C. Pub. Laws 163, 168–69; *cf.* Act of Dec. 20, 1800, 1800 S.C. Acts 44, 46 (generally prohibiting nonwhites from carrying a weapon when in militia service, but providing some exceptions).

75. *See, e.g.,* FREDERICK LAW OLMSTED, A JOURNEY IN THE BACK COUNTRY 414–15 (1860).

*INDIANA LAW JOURNAL* [Vol. 89:1587

My argument in this Subpart is that the courts' approval of the concealed weapon statutes was a compromise solution that incorporated the popular conception of the right to bear arms as well as the public's demand for legislative solutions to stop people from carrying weapons. Antebellum courts mostly did not look to originalism or the Framing era to supply the scope of the right to bear arms. As *Heller* correctly recognized, personal self-defense did not lead to the right's codification.[76] Instead, after giving some discussion of the English Bill of Rights, antebellum state courts found a broad right to possess and carry arms for private self-defense, both inside and outside the home.

### 1. The Popular Dimensions of the Antebellum Gun Control Struggle

Much like today, the antebellum judiciary faced a divided populace on the role of weapons in society. There is a contemporary perception that the promiscuous carrying of weapons was socially acceptable in the eighteen hundreds in a way that it is not today; in actuality, nineteenth-century America struggled with the practice. In 1837, a grand jury in Baltimore said that "[t]he wearing of deadly weapons . . . is an intolerable nuisance, unnecessary in the present state of any civilized community, dangerous in its tendencies, prenicious [sic] in its consequences and destructive alike of good morals and the public peace."[77] A grand jury in Philadelphia reached a similar conclusion that same year. It "denounce[d] the habit of carrying deadly weapons as a dastardly and brutal practice" and issued a recommendation that the Pennsylvania General Assembly prohibit the practice.[78]

The grand juries' positions are easy to understand. Nineteenth-century newspapers were filled with stories about slight personal offenses escalating into deadly conflicts. The *National Intelligencer* and *Baltimore American* reported that a "resort [to deadly weapons] in individual affrays appears to be now a matter of almost daily occurrence, especially in the West and Southwest."[79] The newspaper then reported two examples.

In the first, Robert Binford, a candidate for the U.S. House of Representatives in Kentucky, went to the house of Judge James, a state senator. Binford accused James of saying something negative about Binford's recent election, which James denied. But James was unarmed and rushed back into his house. Binford followed with his pistol, but he was unable to get into the house and a bystander convinced Binford to go home. Two days later, the two met at a local tavern. When James asked if Binford was there to assassinate him, Binford responded, "What I came for, I came for."[80] Both drew pistols and fired. James killed Binford, which a court ruled was justifiable. Binford's shot hit an innocent bystander in the head, killing him.

---

76. District of Columbia v. Heller, 554 U.S. 570, 599 (2008).

77. *Wearing Deadly Weapons*, DAILY COM. BULL. & MO. LITERARY REG. (St. Louis), Apr. 10, 1837.

78. DAILY HERALD & GAZETTE (Cleveland), May 2, 1837.

79. DAILY NAT'L INTELLIGENCER (Washington, D.C.), Nov. 29, 1837 (citing the BALT. AM.).

80. *Id.* (citing the LOUISVILLE ADVERTISER, Nov. 22, 1837).

Compendium_Rivas
Page 396

The newspaper account of the second killing lacks the dramatic details of the first. It appears that a man in Mississippi got into a fight with some members of another family, one of whom shot and stabbed him. There was no indication of whether this attack was ruled murder or justifiable homicide, though from the sparse details given, it seems hard to imagine it was the latter.[81]

One can find many other accounts of the indiscriminate use of weapons, especially in the South. The University of Virginia, for example, had a "small rebellion" in September of 1836.[82] The student military company and the faculty were locked in a battle over whether the military company had to request faculty permission to drill with muskets on campus. At the end of October, after the military company made an application for permission, the university imposed its customary three conditions: the members had to wear the university uniform, muskets could not be discharged on the University Lawn, and muskets were only to be carried when performing military exercises.[83] The military company refused to accept these conditions, claiming that it was a state military company independent of the university and with authority to drill.[84]

With the military company's right to drill unsettled, the faculty demanded that the company return its weapons to the armory.[85] In response, the military company refused to disband and indicated that it would continue drilling until the faculty relented. The company backed its refusal with two hours of shooting on the University Lawn, which only escalated the situation. The faculty searched the dormitories for weapons and those involved in the shooting incident. The company, in turn, responded with a full-scale riot, which caused the professors to arm themselves in self-defense. Eventually, the sheriff, backed with a military unit, restored order to the university, and a grand jury was summoned.[86]

The riot was celebrated annually at the University of Virginia, but in 1840, the celebration had tragic results. Professor Davis, who objected to celebrating the anniversary, attempted to break up the demonstration. While attempting to remove the mask of a celebrating student, the student shot and killed the professor.[87] This senseless death caused the *South Carolina Temperance Advocate*, a Columbia, South Carolina-based newspaper, to implore nearby students to stop carrying weapons—which suggests that the paper thought that local students were frequently armed.[88]

The *Pennsylvania Inquirer and National Gazette* also thought that southern students were armed. The newspaper stated, "It is charged against some of the medical students of the South, that a few years ago, the wearing of concealed

---

81.  *Id.* (citing the LOUISVILLE J., Nov. 23, 1837).

82.  2 PHILIP ALEXANDER BRUCE, HISTORY OF THE UNIVERSITY OF VIRGINIA, 1819–1919, at 302 (1920).

83.  *Id.* at 303.

84.  *Id.*

85.  *Id.* at 303–04.

86.  *Id.* at 304–06.

87.  *Id.* at 309–10; *see also Beware of Carrying Deadly Weapons*, 2 S.C. TEMPERANCE ADVOC. 90, 90 (1840).

88.  *Beware of Carrying Deadly Weapons*, *supra* note 87, at 90.

weapons was by no means rare among them."[89] The paper then noted that even members of Congress carried weapons at the Capitol.

When contemporaneous newspapers railed against individuals carrying weapons, they mostly railed against the *entire* practice of publicly going armed with pistols and knives. The ire was not directed solely against weapons carried in a concealed manner. The *National Intelligencer*, for example, described the "murderous practice" as the *carrying* of a weapon, not the carrying of the weapon concealed.[90] A Cleveland paper, five years later, agreed with that assessment.[91] Likewise, the Baltimore and Philadelphia grand juries also complained about the wearing of deadly weapons, rather than merely their concealment.

When concealed weapons were singled out—which they often were—news articles assumed that individuals would not go armed with unconcealed weapons. In other words, if people stopped carrying concealed weapons, they would not be armed at all. Thus, in 1842, the *Pennsylvania Inquirer and National Gazette* lamented that an assault and battery had turned fatal due to the presence of a concealed weapon. But the article made clear that the problem was the accessibility of the deadly weapon, not the fact of concealment: "Had [the perpetrator] been without a deadly weapon, his offence, it is probable, would have amounted to nothing more than a mere assault and battery."[92] The article then criticized the "young men from the South and West—who carry deadly weapons" because, the paper argued, "a man who mingles in society with deadly weapons about him [may have murder in his heart]."[93] An 1837 Missouri newspaper article likewise equated "this fatal habit of carrying weapon[s] clandestinely" with having a weapon "ready at hand."[94]

The fact that contemporaneous sentiment within many quarters opposed all public carrying of weapons is important in trying to determine the purpose of concealed weapons laws at that time. Two rationales have been offered—both of which have some basis in the sentiments of the time. Under one view, the purpose of the concealed weapons ban was an attempt to stop individuals from carrying handguns and knives entirely. The Louisiana Supreme Court commented in a late nineteenth-century case that "[t]he manifest object of the statute was to prevent the carrying of dangerous weapons—to stamp out a practice that has been and is fruitful of bloodshed, misery, and death—and yet so to prohibit the carrying as not to infringe the constitutional right to keep and bear arms."[95] Although this decision dated from 1885, as the newspaper accounts above indicate, this was also an accurate description of the predominant antebellum sentiment.

---

89.  *Concealed Weapons: The Cases of Colt and Alexander.*, PA. INQUIRER & NAT'L GAZETTE (Phila.), Dec. 21, 1842.

90.  DAILY NAT'L INTELLIGENCER, *supra* note 79.

91.  *Carrying Deadly Weapons*, CLEVELAND DAILY HERALD, Aug. 14, 1843.

92.  *Concealed Weapons: The Cases of Colt and Alexander*, *supra* note 89.

93.  *Id.*

94.  DAILY NAT'L INTELLIGENCER (D.C.), Aug. 7, 1837 (quoting the ST. LOUIS BULL.).

95.  State v. Bias, 37 La. Ann. 259, 260 (1885). Perhaps, though, this reflected the views of Louisiana in 1885 more than the antebellum period. The Louisiana Supreme Court adopted the second theory in *State v. Chandler*, 5 La. Ann. 489 (1850).

The second theory was that *concealing* a weapon especially threatened public safety because one party could take the other by surprise. A lot of court cases cited this rationale, including some contemporaneous cases.[96] The newspaper story describing the University of Virginia shooting both decried the practice of going armed generally *and* the practice of using a hidden weapon upon "an unsuspecting opponent, who is ignorant that he is contending with an armed man."[97] But the predominant grievance seems to be against the carrying of an accessible weapon, rather than the concealing of it.

While the public's precise view on the right to bear arms is difficult to gauge, it seems fairly clear that many thought the right encompassed the public carrying of weapons apart from militia service. Every state law enacted before 1840 (except Virginia's) that prohibited concealed weapons was attacked as unconstitutional in state courts before the Civil War.[98] The only exception, Virginia, had no state analogue of the Second Amendment to apply until 1971.[99] Defiance of the concealed weapons laws, often on constitutional grounds, was widespread. The Kentucky governor—agreeing with the state's highest court[100] that the Kentucky concealed weapons statute was unconstitutional—quite openly defied the law by taking concealed pistols to church; the butt of one gun stuck out of his pants pocket during the service.[101] Alabama's constitutional challenge involved a local sheriff, who apparently thought he had a right to carry a concealed pistol.[102] The then-Republic of Texas legislature delayed adopting its concealed weapons statute until legislators were satisfied that the act would not violate the right to bear arms contained within Texas's constitution.[103] And there is the fact that weapons were so widely carried. Although this fact does not necessarily imply that weapon carriers thought they had a constitutional right to do so, combined with the other evidence, it does suggest that the popular understanding of the right to bear arms extended

---

96. *See, e.g.*, Dano v. Collins, 802 P.2d 1021, 1023 (Ariz. Ct. App. 1990); Sutton v. State, 12 Fla. 135, 136 (1867); Stockdale v. State, 32 Ga. 225, 227–28 (1861); State v. Button, 37 P.3d 23, 25 (Idaho Ct. App. 2001); State v. McAdams, 714 P.2d 1236, 1238 (Wyo. 1986).

97. *Beware of Carrying Deadly Weapons*, *supra* note 87; *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1522–23 (2009) (quoting and explaining an 1820 Richmond grand jury that inveighed against carrying weapons secretly).

98. State v. Reid, 1 Ala. 612 (1840); State v. Buzzard, 4 Ark. 18 (1842); Nunn v. State, 1 Ga. 243 (1846); State v. Mitchell, 3 Blackf. 229 (Ind. 1833); Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822); State v. Chandler, 5 La. Ann. 489 (1850); Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840); *cf.* Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833) (refusing to allow prosecution for going armed to the terror of the people, a common-law offense that the Tennessee legislature tried to recognize in 1801).

99. Virginia's constitutional provision was passed in 1971. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 215 (2006) (citing VA. CONST. art. I, § 13 (right added to preexisting 1776 provision extolling the popular militia)).

100. *Bliss*, 12 Ky. (2 Litt.) 90.

101. LOUISVILLE PUB. ADVERTISER, Sept. 10, 1825.

102. *Reid*, 1 Ala. 612.

103. TELEGRAPH & TEX. REG. (Hous.), Jan. 23, 1839, at 3.

beyond militia service. State courts, thus, adjudicated right-to-bear-arms claims against a backdrop of a public divided between a faction believing in the right to carry personal weapons publicly and another faction demanding that weapon carrying cease entirely because of the social externalities.

### 2. The Compromise of State Courts

State supreme courts responded to the divided public by compromising on the scope of the right to bear arms. Unlike the First Amendment, which did not receive significant judicial interpretation until the twentieth century, the Second Amendment and state analogues were heavily litigated in the nineteenth century. During the antebellum period, there were approximately two dozen cases that offered some guidance on the scope of the right to bear arms under the Second Amendment and state analogues.[104]

Most courts recognized a robust right to carry arms in public—often regardless of the precise way in which the state analogue of the right to bear arms was worded—but nevertheless recognized the state's police power to regulate the right for public safety. This was the origin of the "regulation/prohibition" distinction that Winkler identifies.[105] But the content of the right to bear arms, to which the regulation/prohibition distinction applied, was framed around contemporaneous understandings of the right to bear arms. The compromise position recognized a right to carry weapons in public—but not to conceal the weapons. The right to bear arms was then enforced against outlying jurisdictions that adopted unusually extreme legislation—just like how *Heller* and *McDonald* struck down unusually restrictive complete handgun bans.[106]

The compromise position of accommodating contemporaneous understandings of the right to bear arms—both in terms of the right and its limitations—developed

---

104. This number comes from a search on Westlaw using all reported cases of "bear arms" in state courts and excluding those cases dealing solely with military service. The cases found track what other researchers have discovered in compiling the early cases. *See* CRAMER, *supra* note 10; *see also* O'Shea, *supra* note 10, at 623–37 (analyzing the antebellum cases and categorizing them by the scope of the right protected).

105. *See* Winkler, *Reasonable*, *supra* note 11; Winkler, *Scrutinizing*, *supra* note 11.

106. *See* Nunn v. State, 1 Ga. 243 (1846) (striking down prohibition on unconcealed weapons); *see also* Reid, 1 Ala. at 615 (allowing ban on concealed weapons because persons could carry arms openly); State v. Chandler, 5 La. Ann. 489 (1850); Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833) (not allowing common-law prosecution for going armed to the terror of the people for fear that someone's unease at seeing a weapon would vitiate the right to bear arms). *Heller* and *McDonald*, likewise, only struck down complete bans on handguns that affected the District of Columbia, the City of Chicago, and a few Chicago suburbs. *See, e.g.*, Quilici v. Vill. of Morton Grove, 695 F.2d 261 (7th Cir. 1982) (sustaining handgun ban of a Chicago suburb); Brief for the National Rifle Association and the NRA Civil Rights Defense Fund as Amici Curiae in Support of Respondent at 28, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290) (noting that, of major cities, only the District of Columbia and Chicago had handgun bans and that San Francisco's ban had been struck down by state courts on state preemption grounds); Robert VerBruggen, *Self-Defense vs. Municipal Gun Bans*, REASON, June 2005, at 40 (discussing Chicago suburbs). Most states have preemption laws that forbid municipalities from banning or regulating handguns.

fairly quickly. Two early state courts that took absolutist positions found their doctrines quickly abandoned.

*Bliss v. Commonwealth*[107] was the first case litigated on the right to bear arms. Bliss was charged with having a sword concealed in a cane and was fined $100. The Kentucky Court of Appeals reversed in a 2–1 decision. Kentucky defended the law on the grounds that a prohibition on concealed weapons merely regulated the manner of bearing arms and was not a complete destruction of the right.[108] Over an unpublished dissent, the majority rejected this argument. While the court acknowledged that a prohibition on concealed weapons was not "an entire destruction of the right of the citizens to bear arms in defense of themselves and the state," the court held that "whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution."[109] And the court defined the right to bear arms as the same liberty to wear weapons that existed at the time of the Kentucky Constitution's adoption.

The Tennessee Supreme Court likewise took an absolutist position in *Simpson v. State*.[110] In that case, the defendant was charged with an affray, but since he had not engaged in actual fighting, the court examined whether to recognize the common-law offense of going armed with dangerous or unusual weapons to the terror of the people.[111] Unlike *Heller*, which saw the common-law prohibition as an early source of authority to ban military-style rifles,[112] the Tennessee Supreme Court declared that the Tennessee Constitution's guarantee of "a right [of freemen] to keep and to bear arms for their common defence" precluded recognizing that common-law offense.[113] The right to bear arms, the court stated, exists "without any qualification whatever as to their kind or nature."[114] Since the court defined the right to bear arms to mean that "the people may carry arms," the court refused to consider the possibility that publicly carrying weapons could be prohibited solely because some people might be frightened by exercising the right.[115]

Neither doctrine would last long. Kentucky's 1849 constitutional convention added to its right-to-bear-arms provision that "the general assembly may pass laws to prevent persons from carrying concealed arms."[116] Similar constitutional provisions to repudiate *Bliss*'s doctrine would be adopted throughout the South and West, most of which are retained in state constitutions today.[117] No court dared to

---

107.  12 Ky. (2 Litt.) 90 (1822).

108.  *Id.* at 91.

109.  *Id.* at 91–92.

110.  13 Tenn. (5 Yer.) 356 (1833).

111.  *Id.* at 358–60; *see also* 4 WILLIAM BLACKSTONE, COMMENTARIES *149 (discussing the offense).

112.  District of Columbia v. Heller, 554 U.S. 570, 621 (2008).

113.  *Simpson*, 13 Tenn. (5 Yer.) at 360 (quoting TENN. CONST. of 1796, art. XI, § 26).

114.  *Id.*

115.  *Id.*

116.  KY. CONST. of 1850, art. XIII, § 25.

117.  Constitutional provisions repudiating the doctrine in *Bliss* would be adopted in Colorado, Florida, Georgia, Idaho, Illinois, Louisiana, Mississippi, Missouri, Montana, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Utah. *See* Volokh, *supra* note 99, at 193–204 (compiling the historical state constitutional provisions).

strike down a prohibition only on the carrying of concealed weapons until the Wisconsin Supreme Court partially invalidated its concealed weapons statute in 2003.[118] In Tennessee, the dicta in *Simpson* was repudiated by *Aymette*,[119] a case that I will discuss below.[120]

Against this absolutist approach, states developed a "regulation/prohibition" doctrine incorporating contemporaneous notions of the right to carry arms publicly. *State v. Reid* was the first attempt by a court to flesh this out.[121] As I noted above, *Reid* involved a sheriff who was charged with carrying a concealed pistol after being threatened and believing that his life was in danger.[122] The Alabama Supreme Court sustained the act as a mere regulation of the right to bear arms. The court gave some discussion of the history of the right to bear arms, noting that the provision derived from the English Bill of Rights, which was designed to give the people the means of resisting illegal and arbitrary executive power.[123]

Although the purpose of the right was to resist executive power, the court still accepted a very broad right to carry arms for private defense. The Alabama Constitution provided that a citizen had the "right to bear arms in defence of

---

118. State v. Hamdan, 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785. Although the Wisconsin Supreme Court took the nearly unprecedented step of partially invalidating a concealed weapons statute, it limited its holding mostly to concealed weapons inside a person's home or business. *See* State v. Cole, 2003 WI 112, 264 Wis. 2d 520, 665 N.W.2d 328 (upholding the facial validity of the concealed weapons statute). The court placed a very high bar before someone could assert a right to carry a concealed weapon publicly. *See* State v. Fisher, 2006 WI 44, ¶ 18, 290 Wis. 2d 121, 714 N.W.2d 495, 499–500. The Delaware Supreme Court followed *Hamdan* in *Griffin v. State*, 47 A.3d 487 (Del. 2012), at least with respect to the carrying of a concealed weapon in a person's home. The Ohio Court of Appeals affirmed a trial court's attempt to invalidate Ohio's concealed weapon statute in 2002, but the Ohio Supreme Court quickly reversed. The court reaffirmed that a prohibition on concealed weapons was a mere regulation of the manner of bearing arms. Klein v. Leis, 99 Ohio St. 3d 537, 2003-Ohio-4779, 795 N.E.2d 633, *rev'g* 767 N.E.2d 286 (Ohio Ct. App. 2002). The Vermont Supreme Court, in *State v. Rosenthal*, 55 A. 610 (Vt. 1903), reversed a person's conviction for carrying a concealed pistol, but the statute at issue forbade all carrying of pistols. It is not clear how Vermont would have ruled if the act had only applied to concealed pistols. The Seventh Circuit invalidated Illinois's complete prohibition on carrying weapons, but it is unclear whether that decision translates into a right to have a concealed weapon or merely some right to carry a weapon outside the home for protection. *See* Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012). Because California prohibits all carrying of pistols without a license, the Ninth Circuit has required California counties to issue licenses to carry concealed pistols without regard to whether applicants can show that they personally are in special danger of victimization. Peruta v. Cnty. of San Diego, 742 F.3d 1144 (9th Cir. 2014). (A petition for rehearing en banc in *Peruta* was under review as of the time of publication.)

119. Aymette v. State, 21 Tenn. (2 Hum.) 154, 161–62 (1840).

120. *See infra* Part I.B.3.a.

121. *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833), was the first case to approve a concealed weapons statute. But that case was a one-sentence per curiam opinion simply stating, "IT was *held* in this case, that the statute of 1831, prohibiting all persons, except travellers, from wearing or carrying concealed weapons, is not unconstitutional."

122. 1 Ala. 612, 612–13 (1840).

123. *Id.* at 615.

Compendium_Rivas Page 402

himself and the State."[124] The *Reid* court could have very easily said that "defense of himself" meant self-defense from illegal executive power—the same reason that Protestants maintained a right to have arms against the Catholic monarchs—and that carrying a personal weapon for private self-defense was not within the scope of the right, as historically understood.[125] Instead, the Alabama Supreme Court allowed—consistent with the practice of the time—individuals to carry personal weapons for self-defense against "lawless aggression and violence."[126] The prohibition against concealed weapons merely prohibited one manner of exercising the right to bear arms that proved especially harmful. As long as the legislature did not require arms to be "render[ed] . . . wholly useless for the purpose of defence"— that is, prohibit the carrying of them openly[127]—the legislature had the power to regulate the right.[128] The court then quoted *Bliss* at length and explicitly rejected its absolutist position.[129]

One might argue that *Reid*'s analysis of the right to bear arms is irrelevant for the Second Amendment. The Alabama Constitution explicitly guaranteed the right to bear arms "in defence of himself," which is arguably broader than the Second Amendment's mere reference to "the right of the people to keep and bear arms." Moreover, Alabama's constitution lacks the militia prefatory language.

Although antebellum courts did sometimes briefly parse the different constitutional language, state courts never grounded their decisions in the minor variations in language. In fact, their decisions were remarkably uniform on the scope of the right. The theory underlying this was that both the federal and the various state constitutions "confer[red] no *new rights* on the people which did not belong to them before."[130] Whatever their minor variations in language, both the state and federal right-to-bear-arms provisions codified the same preexisting right. The various constitutions may have used different language to express the same proposition—but courts treated the proposition as identical despite these variations in language.

If one looks at the judicial outcomes, the decisions are mostly consistent regardless of the specific wording of the constitutional provision. *Nunn v. State*, which was cited in *Heller*, invalidated Georgia's prohibition on openly carried pistols while affirming the constitutionality of its ban on concealed weapons.[131]

---

124. ALA. CONST. of 1819, art. I, § 23.

125. *See infra* note 166 and accompanying text.

126. *Reid*, 1 Ala. at 617.

127. *Id.* at 616; *see also id.* at 619 ("[W]e incline to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."). The court's opinion on this point, however, was not completely clear. At times, the court's dicta suggested that the legislature could select the manner of bearing arms, provided that it left some method to carry arms in public. *See id.* at 616–17, 618–20 (discussing Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822)).

128. *Id.* at 616–17.

129. *Id.* at 617–20.

130. Nunn v. State, 1 Ga. 243, 249 (1846) (emphasis in original).

131. *Id.* at 251; *see also* District of Columbia v. Heller, 554 U.S. 570, 612–13 (2008) (citing *Nunn*).

Like the *Reid* court, the *Nunn* court restricted the legislature to regulating only concealed weapons. In so doing, the court relied on the Second Amendment, notwithstanding *Barron v. Baltimore*.[132] In striking down the prohibition on unconcealed weapons, we see an example of a court curtailing the legislative authority to regulate the right to bear arms when a legislature strayed beyond the remainder of the country.

The effect of popular sentiment can also be seen in *State v. Chandler*,[133] a Louisiana case. Like *Nunn*, *Chandler* relied on the Second Amendment, this time in approving Louisiana's ban on concealed weapons. The court found that weapons in open view "place[d] men upon an equality" and was the right secured by the Second Amendment.[134] Six years later, in *State v. Smith*,[135] the court determined that the Second Amendment applied only to those arms "such as are borne by a people in war, or at least carried openly."[136] The militia language in the Second Amendment did not limit the right to bear arms to carrying them in war; it included carrying them openly outside of war as well—consistent with the prevailing view of the time. Again, like in *Reid* and *Nunn*, the legislature could only regulate concealed weapons, rather than select the manner of bearing arms.

Perhaps most remarkable was *State v. Huntly*,[137] which arguably ignored textual limitations in its state constitutional provision. *Huntly* was an antebellum North Carolina Supreme Court case that, like *Simpson*, considered whether the state would recognize the common-law offense of going armed to the terror of the people. Huntly was indicted after openly arming himself with a gun and threatening to kill another man over the possession of certain slaves.[138] The North Carolina Constitution only guaranteed the right to bear arms for "defence of the State."[139] If any state constitutional right were to be limited to militia service, North Carolina's would qualify. Yet, the opinion does not even contain the word "militia."

The North Carolina Supreme Court, unlike the Tennessee court in *Simpson*, did recognize the common-law offense. As a preliminary matter, in contrast to *Heller*, the *Huntly* court held that *all* guns were "unusual weapons."[140] Although gun

---

132. 32 U.S. (7 Pet.) 243 (1833) (holding that the Bill of Rights did not apply to the states).

133. 5 La. Ann. 489 (1850).

134. *Id.* at 490; *cf.* Samuel L. Bray, *Power Rules*, 110 COLUM. L. REV. 1172 (2010) (discussing different ways in which the law protects vulnerable people from more powerful ones).

135. 11 La. Ann. 633 (1856).

136. *Id.* at 633.

137. 25 N.C. (3 Ired.) 418 (1843).

138. *Id.* at 418–19.

139. *Id.* at 422 (quoting N.C. CONST. of 1776, Declaration of Rights, § XVII).

140. *Id.* ("It has been remarked, that a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort. But we do not feel the force of this criticism. A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his every day accoutrements— as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment.").

*ownership* was common, the court felt that it was unusual to *carry a gun at all times* as part of one's everyday dress.[141]

Even if it was unusual, the court took great pains to explain that citizens were "at perfect liberty" to carry a gun "[f]or any lawful purpose—either of business or amusement."[142] The court held that Huntly's conduct was punishable because his carrying of the gun—for the purpose of terrifying others and in such manner as would terrify the public—was an *abuse* of the right to bear arms.[143] The court did not hold—as it could have—that carrying weapons for purposes other than defending the state fell outside the right to bear arms.

When state courts approved significant limitations on the right to bear arms outside of the mainstream, they did so on the grounds that the person—generally a free black—fell outside the constitutional guarantee. The North Carolina Supreme Court, in *State v. Newsom*,[144] approved a statute requiring free blacks to obtain a license to possess or carry a firearm. The *Newsom* court did make a brief attempt at arguing that the statute was a regulation, not a prohibition of the right. The court said that the statute did not "deprive the free man of color of the right to carry arms about his person, but subjects it to the control of the County Court, giving them the power to say, in the exercise of a sound discretion, who, of this class of persons, shall have a right to the licence, or whether any shall."[145] But the court was fairly transparent in holding that this statute was a "regulation" only as it applied to nonwhites, whose constitutional rights were less. The court repeatedly argued that "free people of color have been among us, as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation."[146] The decision left little doubt that licensing white citizens in the same manner would be unconstitutional. Licensing the right to bear arms might be a mere "regulation" of the right to bear arms in 2011,[147] but it was almost certainly a "prohibition" for full citizens in 1844.[148] *Dred Scott* would follow thirteen years later, saying that free blacks could never be full citizens, lest they have a right "to keep and carry arms wherever they went."[149]

---

141. *Id.*

142. *Id.* at 423.

143. *Id.*

144. 27 N.C. (5 Ired.) 250 (1844).

145. *Id.* at 253.

146. *Id.* at 252; *see also id.* at 254.

147. *See, e.g.*, Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013) (upholding New York City's $340 licensing fee); Heller v. District of Columbia (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) (largely upholding the District's registration requirements post-*Heller*); *see also* District of Columbia v. Heller, 554 U.S. 570, 631 (2008) (refusing to address the licensing requirement because Heller did not challenge nondiscriminatory licensing).

148. *See also* State v. Kerner, 107 S.E. 222 (N.C. 1921) (striking down a local requirement to obtain a license to carry a pistol openly).

149. Scott v. Sandford, 60 U.S. (19 How.) 393, 417 (1857).

### 3. Antebellum Outliers

The antebellum period had two outlier cases that did not fit neatly into recognizing the right to bear arms in conjunction with the contemporaneous understanding. The first was a Tennessee case, *Aymette v. State*,[150] that provided the civic republican version of the right to bear arms that would take hold in the second half of the nineteenth century. The second, the Arkansas case *State v. Buzzard*,[151] arguably provided the first precedent for the collective rights view that predominated in the twentieth century.

#### a. *Aymette v. State*

Although chronologically, *Aymette* was the fifth significant case on the right to bear arms—after *Bliss, Mitchell*,[152] *Reid,* and *Simpson*—intellectually, *Aymette* occupies a transitional position. Like most antebellum courts, *Aymette* seemingly accepted a general right to bear arms openly, despite the Tennessee Constitution only granting a "right to keep and to bear arms for their common defence."[153] But this recognition of a broad right is arguable—and almost forced—for reasons I will explain below.

On the other hand, *Aymette* provided the intellectual foundation for the civic republican theory of the right to bear arms—the theory that would take hold in the late eighteen hundreds.[154] *Aymette* was the primary authority on which the Supreme Court relied in *United States v. Miller*.[155] Its influence over Second Amendment jurisprudence was so profound that, until *Heller,* it was the single most important opinion ever delivered on the right to bear arms. Although Justice Scalia unfairly maligned the opinion in *Heller*,[156] the opinion is far more "originalist" than *Heller* or *McDonald*'s supposedly historical analysis in defining the purpose and scope of the right to bear arms.

William Aymette was convicted of violating Tennessee's 1838 law against carrying concealed Bowie knives. He had had an argument with another man and responded by later attempting to track him down at a hotel to kill him. As Aymette was searching for the man in various places, he occasionally drew his knife, which led to his concealed weapons charge. The court sentenced Aymette to a $200 fine and the statutory minimum three months' imprisonment.[157]

---

150. 21 Tenn. (2 Hum.) 154 (1840).
151. 4 Ark. 18 (1842).
152. *Mitchell* was a one-sentence per curiam opinion affirming Indiana's concealed weapon statute. *See supra* note 121.
153. TENN. CONST. of 1835, art. I, § 26 ("That the free white men of this State have a right to keep and to bear arms for their common defence."). Tennessee had amended its state constitution in 1835 to exclude free blacks, who were arguably protected by the 1796 constitution. TENN. CONST. of 1796, art. XI, § 26 ("That the freemen of this State have a right to keep and to bear arms for their common defence.").
154. O'Shea, *supra* note 10, at 632–34.
155. 307 U.S. 174, 178 (1939).
156. *See* District of Columbia v. Heller, 554 U.S. 570, 613–14 (2008).
157. Aymette v. State, 21 Tenn. (2 Hum.) 154, 154–55 (1840).

The opinion, written by Judge Nathan Green, Sr., began by giving a brief history of the purpose of the right to bear arms. The right to bear arms, he correctly recognized,[158] had its origins in the Glorious Revolution. The opinion skips much of the revolutionary details about the struggles between Parliament and the Crown: seventeenth-century England was torn between Catholic monarchs and a predominantly Protestant population. When debates over control of the nation's military forces reached an impasse, King Charles I sent a small contingent of a standing army—which did not even exist in England until the seventeenth century—to arrest members of Parliament. This action triggered a civil war between backers of Parliament and the Crown.[159]

Judge Green's opinion picked up after the Restoration. He noted that seventeenth-century English law only permitted subjects whose lands had a clear yearly value in excess of £100 or those whose social rank was above esquire to have guns.[160] Even among this limited group, King James II—without parliamentary sanction—disarmed the Protestants and quartered Catholic soldiers among the population to enforce his rule. By disarming the Protestant population and turning the army against the majority of the people, King James II enforced his rule in derogation of Parliament and, by extension, popular legitimacy. Judge Green wrote:

> The evil that was produced by disarming the people in the time of James II[] was that the king, by means of a standing army quartered among the people, was able to overawe them, and compel them to submit to the most arbitrary, cruel, and illegal measures. Whereas, if the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the king to respect their rights, or surrender (as he was eventually compelled to do) the government into other hands. No private defence was contemplated, or would have availed anything. If the subjects had been armed, they could have resisted the payment of excessive fines, or the infliction of illegal and cruel punishments. When, therefore, Parliament says that "subjects which are Protestants may have arms for their defence, suitable to their condition, as allowed by law," it does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws. This declaration of right is made in reference to the fact before complained of, that the people had been disarmed, and soldiers had been quartered among them contrary to law. The complaint was against the government.[161]

As a matter of original interpretation, this is considerably more accurate than Justice Scalia's opinion for the Court in *Heller.* It comports with Madison's

---

158. *Id.* at 156. *See generally* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994).

159. MALCOLM, *supra* note 158, at 16–23; *see also id.* at 58–76 (discussing the continuing conflicts after the Restoration).

160. 22 & 23 Car. II, c. 25, § 2 (1671); *see also Aymette*, 21 Tenn. (2 Hum.) at 156.

161. *Aymette*, 21 Tenn. (2 Hum.) at 157.

understanding of the right to bear arms in *Federalist Number 46*, in which Madison explains that an armed populace could resist government oppression.[162] Justice Story offers a similar view.[163] And it better fits with Blackstone's quotations, which *Heller* selectively—and misleadingly—edits.[164] *Aymette* also argues—contrary to Justice Stevens's analysis in *Heller*[165]—that early state constitutional provisions guaranteeing citizens the right to bear arms "in defence of themselves" meant in defense of the citizenry at large against oppression, not individual self-defense against criminals.[166] Under Judge Green's view, the Second Amendment and the state analogues are broader than the English right, though they serve the same purpose.[167]

The purpose of the right to keep and bear arms informs the content of that right.[168] Because the right is about resisting oppression, Judge Green draws several conclusions about the right's content. First, the right covers only those weapons that are "employed in civilized warfare, and that constitute the ordinary military equipment"—personal arms that citizens would carry "in their hands" to repel invasions of their rights.[169] Weapons that are used to commit crimes or in private fights, such as the Bowie knife, are not constitutionally protected "arms."

Second, although the right to bear arms is a "great political right," it is subject to legislative regulation to ensure that the right is not abused. Here, the opinion draws a very crucial distinction between the right to keep arms and the right to bear arms.[170] Citizens have an unqualified right to keep constitutionally protected arms in their homes.[171] This makes the weapons available if they are needed to provide

---

162. THE FEDERALIST NO. 46, at 321–22 (James Madison) (Jacob E. Cooke ed. 1961).

163. STORY, *supra* note 43, §§ 1889–1890, at 746–47; *cf.* Houston v. Moore, 18 U.S. (5 Wheat.) 1, 52–53 (1820) (Story, J., dissenting) (stating that the Second Amendment does not appear to have any "important bearing" on whether a state has concurrent power to arm the militia).

164. *See infra* notes 368–71 and accompanying text.

165. District of Columbia v. Heller, 554 U.S. 570, 642–43 (2008) (Stevens, J., dissenting).

166. *Aymette*, 21 Tenn. (2 Hum.) at 160–61. On the civic republican meaning of "in defence of themselves," see generally Nathan Kozuskanich, *Defending Themselves: The Original Understanding of the Right to Bear Arms*, 38 RUTGERS L.J. 1041 (2007).

167. Unlike the English provision, the American right to bear arms is not limited by one's status in life; all citizens have the right to bear arms, regardless of their net worth. *Aymette*, 21 Tenn. (2 Hum.) at 157–58.

168. This is also what *United States v. Miller*, 307 U.S. 174, 178–79 (1939), was following when Justice McReynolds wrote that the Second Amendment must be viewed with a purpose toward maintaining the militia.

169. *Aymette*, 21 Tenn. (2 Hum.) at 158–59.

170. *Id.* This also provides powerful evidence that, unlike Michael Dorf's argument (and a similar argument in Justice Stevens's dissent), "the right to keep and bear arms" was not commonly understood as a unitary phrase. *See* District of Columbia v. Heller, 554 U.S. 570, 651 (2008) (Stevens, J., dissenting); Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 CHI.-KENT L. REV. 291, 317 (2000).

171. *Aymette*, 21 Tenn. (2 Hum.) at 160 ("The citizens have the unqualified right to keep the weapon, it being of the character before described as being intended by this provision. But the right to bear arms is not of that unqualified character. [T]he citizens may bear them

Compendium_Rivas
Page 408

for the common defense against oppression. When collective rights opinions cite *Aymette* as supporting their argument[172]—usually because the opinion says "bear arms" refers exclusively to war[173]—they miss the unrestrained notion of the right to keep arms in *Aymette*. *Aymette* does not limit the right to have arms only to when the government enrolls the person in a well-regulated militia. If this were the limit of the right, then the government could refuse to enroll people in the militia and the people would have no right to possess arms—which means that there would be no impediment to illegal executive power.[174]

In contrast to the right to keep arms in the home, the right to bear arms in public is more limited, since the purpose of allowing citizens to carry weapons is to provide for the common defense.[175] Citizens have peacetime duties when exercising their right to bear arms—for example, not showing up to a public gathering heavily armed to the terror of the people. The legislature may regulate abuses of the right with criminal penalties.[176]

As a corollary of this second point, Judge Green argues that there is a "manifest" distinction between openly carried weapons and concealed weapons. When one bears arms for the common defense, the arms—such as rifles, muskets, and swords (note that pistols and knives are not included in the list)—have to be carried openly, as they would be in warfare. To deny the right to bear arms openly is to destroy the right, whereas this is not true for carrying weapons concealed.[177]

But in this last point, we see the transitional nature of *Aymette*. Judge Green could have argued—as did many courts during the late eighteen hundreds[178]—that the legislature could mostly restrict the right to bear arms, while maintaining a broad right to keep arms in the home. Someone carrying a rifle in public on a random occasion likely does not bear arms with the common defense in mind. The rationale of *Aymette* would seemingly support a legislative decision completely

---

for the common defence; but it does not follow that they may be borne by an individual, merely to terrify the people or for purposes of private assassination.").

172. *E.g.*, *Heller*, 554 U.S. at 613–14 (majority opinion) (noting that *Aymette* is cited by those advocating restricting the right to the militia); *id.* at 648 n.10 (Stevens, J., dissenting); Silveira v. Lockyer, 312 F.3d 1052, 1073 (9th Cir. 2002).

173. *Aymette*, 21 Tenn. (2 Hum.) at 161.

174. *See Heller*, 554 U.S. at 596; Andrews v. State, 50 Tenn. (3 Heisk.) 165, 182–85 (1871).

175. *See, e.g.*, Lucilius A. Emery, *The Constitutional Right to Keep and Bear Arms*, 28 HARV. L. REV. 473 (1915). Although this article has been widely cited by federal cases adopting the collective rights holding, Emery actually takes the *Aymette* approach of a broad right to keep war arms and a limited right to bear them; he sees defense of the community as the right's primary justification, with personal protection against criminals, at best, a secondary concern. *See id.* at 476–77.

176. *Aymette*, 21 Tenn. (2 Hum.) at 159–60.

177. *Id.* at 160–61.

178. *See, e.g.*, Hill v. State, 53 Ga. 472, 475–76, 479–80 (1874) (recognizing an "absolute" right to keep arms but upholding prohibition on carrying weapons in many locations and in a concealed manner); State v. Wilburn, 66 Tenn. 57, 62–63 (1872) (upholding prohibition against carrying all pistols, except openly in the hand); State v. Duke, 42 Tex. 455, 459 (1874) (upholding law that restricted the carrying of pistols to homes, places of business, when needed for public service, and in emergency defensive circumstances).

prohibiting weapons in public, except for militia duty or for individual incidents related to militia duty (e.g., bringing the gun home from a place of purchase or the person going target shooting, on his own accord, to increase his proficiency with the weapon).[179] Nevertheless, Judge Green still sees—consistent with the antebellum sentiment—that "a prohibition to bear them openly would be a denial of the right altogether."[180] This shows the profound constraining influence that contemporaneous popular sentiment of the right to bear arms has over courts' interpretations, even when, intellectually, judges think the right should have different dimensions.

*Aymette* thus fills a transitional role. It provides the intellectual framework for the second half of the nineteenth century, when the right to bear arms in public would be sharply curtailed. But, like nearly all antebellum cases, *Aymette* also recognizes a general right to bear arms openly. The right to keep and bear arms, according to Judge Green, is the right to keep military rifles, muskets, and swords in the home and to bear them openly in public.

### b. *State v. Buzzard*

The second major outlier is *State v. Buzzard*.[181] *Buzzard*, another concealed weapons case, is the only antebellum case that arguably takes a view that the Second Amendment belongs only to the militia. The case had limited precedential value in the nineteenth century—after the Civil War, Arkansas (the only state to adopt it) abandoned the doctrine in favor of the Tennessee approach[182]—but it became the predominant federal court approach beginning in the 1930s.[183]

Making matters more complicated, *Buzzard* has no court opinion. The 1842 Arkansas Supreme Court had three judges, and the opinions in *Buzzard* were delivered *seriatim*. The full court's holding is unclear. Two of the three judges— Chief Justice Daniel Ringo and Justice Townsend Dickinson—argue that the right belongs to "the people" solely so they may perform militia-related objectives.[184] Justice Thomas J. Lacy, in dissent, argues that the right includes personal defense. He also accuses Justice Dickinson of holding that "it is the militia alone who possess this right in contradistinction from the mass of the people."[185] I think Justice Lacy is wrong about Justice Dickinson's opinion, for reasons I will discuss momentarily.[186] But if I am incorrect about this assessment, then we have a *Bakke*-style breakdown: Justice Dickinson argues that the right is limited to militia

---

179. See *Andrews*, 50 Tenn. (3 Heisk.) at 178–79, which later took this approach.

180. *Aymette*, 21 Tenn. (2 Hum.) at 161.

181. 4 Ark. 18 (1842); *see also* George A. Mocsary, Note, *Explaining Away the Obvious: The Infeasibility of Characterizing the Second Amendment as a Nonindividual Right*, 76 FORDHAM L. REV. 2113, 2148 (2008) (analyzing the opinions in *Buzzard*).

182. *See, e.g.*, Wilson v. State, 33 Ark. 557 (1878); Fife v. State, 31 Ark. 455 (1876); *see also infra* note 360 (recounting the history).

183. *See* United States v. Adams, 11 F. Supp. 216 (S.D. Fla. 1935); *see also infra* Part III (recounting the post-*Miller* history).

184. *Buzzard*, 4 Ark. at 24–25 (opinion of Ringo, C.J.); *id.* at 30 (opinion of Dickinson, J.).

185. *Id.* at 35 (opinion of Lacy, J., dissenting).

186. *See infra* notes 201–06 and accompanying text.

service; Justice Lacy would hold that it encompasses the private use of arms; and
Chief Justice Ringo opines, like *Aymette*, that the right is not limited to those
enrolled in the militia, but the right exists only for the purpose of public defense.

Chief Justice Ringo's opinion reads similarly to *Aymette*: the right to bear arms
is designed to allow resistance to "those who should conspire to overthrow the
established institutions of the country, or subjugate their common liberties."[187]
Much of his opinion is dedicated to refuting that the right to bear arms is
absolute—which Chief Justice Ringo feared it would be if it were disconnected
from its militia-related objective.[188] Justice Dickinson makes a similar argument in
his opinion.[189]

Language in both majority opinions gives some support to the collective rights
view. Chief Justice Ringo, for example, does state that the right "enable[s] the
militia to discharge this most important trust [i.e., prevent overthrow of the
government], so reposed in them, and for this purpose only, it is conceived the right
to keep and bear arms was retained."[190] Justice Dickinson refers to the "power
given the militia to keep and bear arms"[191] as well as the power of the state to
regulate weapons "when . . . not required or necessary for military purposes."[192] He
further writes, "The militia constitutes the shield and defence for the security of a
free State; and to maintain that freedom unimpaired, arms and the right to use them
for that purpose are solemnly guarantied."[193] Chief Justice Ringo's quotation, along
with its surrounding text, provided support to the government's brief in *United
States v. Miller*, when the government cited *Buzzard* as one of three American
cases holding that the right to bear arms only belongs to people serving in a
militia.[194] One person who compiled a history of state court decisions on the right
to bear arms called it "by far the most extreme statement in opposition to an
individual right to keep and bear arms in the period before the Civil War."[195]

Treating *Buzzard* as a collective rights decision overreads the opinions. Both
majority opinions treat "militia" as synonymous with "able-bodied free white
men"; neither suggests that the right to bear arms is limited to only those citizens
who are currently enrolled in highly regulated, constantly drilling militia units (i.e.,
"select militia").[196] Indeed, Justice Dickinson says that the "militia" is *"necessarily*

---

187. *Buzzard*, 4 Ark. at 24–25 (opinion of Ringo, C.J.).

188. *Id.* at 21–22. A similar jurisprudential concern occurred in federal courts after
*Miller*. *See infra* text accompanying note 326.

189. *Buzzard*, 4 Ark. at 30–32 (opinion of Dickinson, J.).

190. *Id.* at 25 (opinion of Ringo, C.J.).

191. *Id.* at 30 (opinion of Dickinson, J.).

192. *Id.* at 32.

193. *Id.*

194. *See* Brief for the United States, *supra* note 32, at 16–18. The other two cases were
*City of Salina v. Blaksley*, 83 P. 619 (Kan. 1905), and *United States v. Adams*, 11 F. Supp.
216 (S.D. Fla. 1935). The latter case was the first reported decision on the constitutionality
of the National Firearms Act of 1934. *See infra* text accompanying note 294.

195. CRAMER, *supra* note 10, at 82.

196. *See Buzzard*, 4 Ark. at 27 (opinion of Ringo, C.J.) (treating the "free white men"
provision in the right to bear arms as securing the state's "republican institutions," that is, the
militia).

composed of the people"; unlike the collective rights view, he does not suggest that the "militia" includes only that subset of people whom the government chooses to enroll for military service.[197] Moreover, Justice Dickinson's opinion rejects the states' rights theory of the Second Amendment. He writes, "It is not contended that the General Assembly of this State could interfere with any regulations made by Congress, as to the organizing, arming, or disciplining the militia, or in the manner in which that militia are either to keep or bear their arms."[198]

Justice Lacy, in dissent, takes a libertarian view of the right to bear arms: he recognizes only the power of the state to regulate the dangerous *use* of weapons.[199] He argues that if the right to bear arms means nothing more than the right of a state to arm a militia, then the right is worthless since the state has that power anyway.[200] Contrary to the majority, Justice Lacy views the militia as including only those citizens designated by state authority as enrolled in military service.[201] As a result, if the majority's view were correct, the state could deprive people of their arms by not enrolling them in military service. For Justice Lacy, the right to bear arms means the "privilege of the people to keep and to bear their private arms, for the necessary defence of their person, habitation, and property, or for any useful or innocent purpose whatever."[202]

Justice Lacy's opinion is probably closest to the prevailing model that dominated other state courts.[203] Even though the Arkansas Constitution guaranteed the right to bear arms "for the common defence," his opinion recognized the right as being much broader.[204] The majority, of course, disagreed, holding that the right to bear arms exists only for purposes of public defense. With the possible exception

---

197. *Id.* at 30 (opinion of Dickinson, J.) (emphasis added); *see also* Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793, 802–04 (1998) (explaining that the militia has generally included the entire able-bodied political community). One might object that Justice Dickinson was simply referencing the popular militia of the nineteenth century. This would be wrong for two reasons. First, Justice Dickinson treats the militia as "necessarily composed of the people," not contingently composed. *Buzzard*, 4 Ark. at 30. Second, the universal militia system largely died after the War of 1812. *See, e.g.,* H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 119–26 (2002); Frederick Bernays Wiener, *Militia Clause of the Constitution*, 54 HARV. L. REV. 181, 188–93 (1940). Those who argue that "times have changed" and that today's "well-regulated militia" does not involve universal service ignore the fact that many antebellum cases, including *Buzzard*, arose thirty years following the collapse of the universal militia system and the primary emergence of volunteer units.

198. *Buzzard*, 4 Ark. at 29 (opinion of Dickinson, J.).

199. *See id.* at 39–40 (opinion of Lacy, J., dissenting) ("[I]f the right be innocent of itself, it cannot be interdicted; but its unlawful exercise, degenerating into licentiousness, is subject to regulation.").

200. *Id.* at 35–36.

201. *See id.* at 35.

202. *Id.* at 43.

203. But Justice Lacy would have struck down the prohibition on concealed weapons, so this places him closer to *Bliss*—and on the far end of the individual rights spectrum.

204. *See* ARK. CONST. of 1836, art. II, § 21 ("That the free white men of this State shall have a right to keep and to bear arms for their common defence.").

Compendium_Rivas
Page 412

of Justice Dickinson's opinion, no antebellum judicial authority supports limiting the right to bear arms to service in the militia. Nor does any authority suggest that the right is limited to the select (or volunteer) militia, even though the universal militia largely became extinct after the War of 1812.

In limiting the right to keep and bear arms to the right to have individual weapons of war for the purpose of resisting oppression, *Buzzard* and *Aymette* cut strongly against the prevailing broad view of the antebellum right to bear arms. But this view of the right to bear arms would predominate after the Civil War, when courts would struggle to adapt the right to bear arms against new social pressures to control handgun violence.

## II. THE RIGHT TO BEAR ARMS DURING AND FOLLOWING RECONSTRUCTION

The antebellum right to bear arms was a struggle between a divided citizenry, those who viewed public weapons as a nuisance and those who maintained a strong belief in the right to bear arms in public for individual purposes. Antebellum courts generally synthesized a compromise position that recognized both positions: allow states to prohibit only concealed weapons to control crime, while recognizing a broad right to bear arms openly, whether or not related to militia duty. The three courts that did not strike this compromise—two finding an absolute right to bear arms (the Kentucky Court of Appeals in *Bliss* and the Tennessee Supreme Court in *Simpson*) and one court limiting the right only to military purposes (the Arkansas Supreme Court in *Buzzard*)—found their doctrines overturned.

The post–Civil War period marked a failure of the antebellum compromise. Handguns proliferated after the Civil War, and concealed weapons bans largely proved inadequate to stem crimes committed with them. Legislatures and the people clamored for new authority to regulate—and even prohibit—handguns. Moreover, legislatures faced new challenges, including minors with guns, persons showing up to court armed, armed persons "intimidating" voters at the polls with weapons,[205] armed corporations breaking strikes, and the new legal recognition of blacks as full citizens with a right to have guns—something the Southern white community feared and resented.[206] The scope of the popularly accepted right to bear arms changed.

Faced with new pressures to allow legislatures to regulate guns more extensively, courts largely altered the scope of the right to bear arms. The right to bear arms following the Civil War was primarily the right contained in *Aymette*: a broad right to keep arms in the home, but a very limited right to have arms in public. Legislatures could regulate the right to carry handguns in a manner that made the right extremely difficult to exercise (e.g., limiting the right to military-style revolvers carried openly in the hand). Constitutionally protected "arms" were only those arms constituting the "ordinary military equipment"—arms, such as

---

205. Of course, many times these were Union soldiers guarding the polls and preventing the intimidation of blacks.

206. I am omitting discussion of the Black Codes, which, among other things, required the freedmen to obtain licenses before possessing firearms. These laws were overturned by Congress. *See* Stefan B. Tahmassebi, *Gun Control and Racism*, 2 GEO. MASON U. C.R. L.J. 67, 71 (1991).

rifles, appropriate for individual citizens to use when in military service. Handguns received little constitutional protection after the Civil War, with the exception that a majority of courts recognized at least the right to have military-style revolvers. Courts also reconstructed the "regulation/prohibition" distinction to fit the new legislative framework. Total prohibitions on carrying guns in certain places would be "regulations"—not prohibitions—provided they were not overbroad. This supplanted the old theory that prohibitions on concealed weapons did not restrict the right to bear arms because such laws merely prescribed the manner in which arms were borne.

### A. Community Standards and the Legislative Framework

Before the Civil War, gun control revolved primarily around concealed weapons, dueling, and honor-related killings. After the Civil War, the primary concern of legislatures was crime committed with handguns. Beginning in the 1870s—and continuing at various times throughout the twentieth century—states began banning the sale and carrying of handguns. Tennessee and Arkansas imposed this through outright bans on all handguns, except army- or navy-model revolvers.[207] Alabama, Texas, and Virginia taxed dealers or imposed transfer taxes on the sale of pistols.[208] North Carolina imposed a property tax.[209]

Although many commentators today malign these Southern laws as racist—which they were—they also had legitimate crime-control objectives, and calls for them were not limited to Southern states. In 1873, a New York grand jury requested a ban on carrying pistols or concealed weapons.[210] A few years later, these efforts met with some success when the New York City aldermen adopted a proposal to require a license to carry a pistol.[211] The *Philadelphia Inquirer* reported in 1880 that carrying pistols had declined in Pennsylvania outside of Philadelphia.[212]

Social pressures were clearly turning against carrying guns in public. In 1887, a Michigan man tried to defend himself against a concealed weapons charge by claiming that he showed the gun to persons with whom he came into contact and thus lacked the intent to conceal it. But he testified that he did not wear the gun openly, "lest people should think him a madman."[213] He pled for an acquittal, saying that honest citizens needed to be able to carry guns to defend themselves

---

207. Act of Apr. 1, 1881, No. 96, 1881 Ark. Acts 191, 191–92; Act of Mar. 14, 1879, ch. 96, 1879 Tenn. Pub. Acts 135, 135–36; *see also* Tahmassebi, *supra* note 206, at 74–75.

208. Tahmassebi, *supra* note 206, at 74–75.

209. Act of Feb. 26, 1867, ch. 72, § 14, 1866–1867 N.C. Pub. Laws 95, 103 (requiring a tax on pistols and making it a crime to carry a handgun without paying the tax). An 1866 act required a tax of $50 on pistols, Bowie knives, dirks, sword canes, or other deadly weapons worn upon the person without the permission of the board of aldermen. Act of Mar. 10, 1866, ch. 7, § 19, 1866–1867 N.C. Priv. Laws 53, 63.

210. *Concealed Weapons*, HARTFORD DAILY COURANT, Feb. 21, 1873, at 3.

211. *The Pistol Ordinance*, N.Y. HERALD, Mar. 20, 1878, at 10.

212. *The Law Supreme*, PHILA. INQUIRER, Dec. 17, 1880, at 4.

213. *A Fine Argument: Robert M. Buyse Gives Good Reasons Why He Carried a Revolver*, JACKSON WKLY. CITIZEN (Mich.), Dec. 13, 1887, at 5.

against robbers—an older form of today's "if you ban guns, only bad guys will have them" argument. The newspaper approved of his argument, noting that robberies were an everyday event.[214]

Indeed, the population was torn between those who favored banning the carrying of pistols and those who believed that, if this were done, honest citizens would be at the mercy of criminals. In 1889, the *Knoxville Journal* spoke quite approvingly of Tennessee's bans on carrying and selling pistols. The newspaper thought that the ban had reduced heat-of-passion killings and called for a complete prohibition of handguns.[215] These calls were not limited to the South. The San Jose *Evening News* reprinted a *Templeton Times* article calling for people to stop carrying guns, unless they had a legitimate need.[216]

On the other hand, many believed that they needed to carry guns for protection. In 1889, an Omaha news article detailed several people as examples of a "fad" to carry pistols for protection.[217] Members of Congress "very generally carried" pistols in the Capitol.[218] A Louisiana editorial complained that the Louisiana concealed pistol law was not working and that people needed to carry guns for protection.[219]

In addition to these legitimate crime-control objectives, anti-pistol laws had some racial overtones. There was widespread belief that blacks used guns to commit crimes against whites. One paper quite bluntly stated that "[e]ven the stalwarts who believe in John Brown, and regard Lincoln's emancipation proclamation as greater than the Sermon on the Mount, carry pistols in this city now to protect themselves from negro robbers and murderers."[220] An ex-Confederate officer was asked why he took his gun into an opera house when only "Democrats" would be present. He responded that he always carried his gun and thought that was the practice among both whites and blacks.[221]

Instead of Black Codes, legislatures responded by prohibiting "vagrants" or "tramps" from carrying weapons.[222] Commentators have noted that the ban on pistols—except army pistols—effectively priced black citizens out of weapons.[223] Army pistols were more expensive—out of the price range of most black Americans—and whites generally retained such pistols from their Civil War

---

214. *Id.*

215. *The Sacredness of Human Life*, KNOXVILLE J., May 10, 1888, at 2.

216. *Carrying Pistol*, EVENING NEWS (San Jose), Sept. 26, 1887, at 2.

217. *People Who Carry Pistols: How the Hip Pocket Fad Has Enveloped Male Omaha in Its Dangerous Embrace*, OMAHA DAILY HERALD, Apr. 28, 1889, at 10.

218. *Congressmen Who Carry Pistols: Pocket Pistols Very Generally Carried—Legislators Who Go Armed*, COLUMBUS ENQUIRER-SUN (Ga.), Aug. 6, 1886, at 5.

219. *Criminalities: Pistols*, DAILY PICAYUNE (New Orleans), May 16, 1874, at 6.

220. *The Negroes of the District: The Care Required by the Colored Vagrants*, WHEELING REG. (W. Va.), Feb. 3, 1880, at 1.

221. *A Very Frank Witness: Testifies Before the Danville Investigating Committee Today*, EVENING CRITIC (D.C.), Feb. 19, 1884, at 3.

222. *See, e.g.,* Act of Mar. 13, 1880, ch. 213, § 2, 1880 Me. Laws 212, 212–13; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Laws 355, 355; Act of Apr. 30, 1879, No. 31, § 2, 1879 Pa. Laws 33, 34; Act of Mar. 4, 1879, ch. 188, § 4 Wis. Laws 273, 274.

223. Tahmassabi, *supra* note 206, at 74–75.

service.[224] Indeed, the effect of the weapons laws was to produce a double standard: white citizens were usually left alone to possess and carry guns—enforcement of the law against them was viewed as violating the right to bear arms for defense—while black citizens were routinely prosecuted.[225]

There is some evidence that the population also began to divide on whether the right to bear arms existed for individual defense or only for militia-related purposes. From Louisiana to New York, articles began to appear which contained strong statements that the right to bear arms applied to individual self-defense.[226] The New York editorial expressed disapproval of police proposals to ban gun carrying while exempting the police. It argued against the militia-centric view of the right to bear arms, saying instead that the provision was intended to prevent one standard for government officers who carry guns and a separate standard for normal citizens.

But the modern collective rights argument also began to take hold in the late-1870s in some quarters. In response to armed strikebreaking, Illinois prohibited groups of people from parading with arms.[227] While the law was undergoing court review, editorials supported it by arguing that the right to bear arms only belonged to people when they were acting in a state-sponsored "well-regulated militia," not in private armed groups.[228]

The Supreme Court never accepted this militia-only position, instead affirming the constitutionality of the act on narrower grounds in *Presser v. Illinois*.[229] The Supreme Court very carefully said that the act did not affect the right of individuals to bear arms, but only to parade as groups with weapons.[230] Indeed, the Court said that "all citizens capable of bearing arms constitute the . . . reserve militia of the United States as well as of the States" and that states could not prohibit their citizens from keeping and bearing arms, since that would deprive the federal government of its power to call forth the militia.[231] But the right to keep and bear arms, the Court held, did not include the right to band together as armed groups.[232]

---

224. *Id.*

225. *The Right to Bear Arms*, WKLY. PELICAN (New Orleans), Feb. 9, 1889, at 2; *see also* Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity—The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307 (1995) (describing the history of racial disparities in firearms regulation following 1893).

226. *Criminalities: Pistols*, *supra* note 219; INDIANAPOLIS SENTINEL, May 15, 1882, at 4 (reprinting article from N.Y. J. COMMERCE).

227. Act of May 28, 1879, art. 11, §§ 5–6, 1879 Ill. Laws 193, 203–04.

228. *The Right to Bear Arms*, INTER OCEAN (Chi.), June 27, 1879, at 4.

229. 116 U.S. 252 (1886).

230. *Id.* at 264–65.

231. *Id.* at 265; *see also* Robert Leider, Federalism and the Military Power of the United States 91–92 (Sept. 24, 2013) (unpublished manuscript), *available at* http://papers.ssrn.com /sol3/papers.cfm?abstract_id=2330648 (explaining *Presser*'s holding and the theory of the militia on which it relies).

232. *Presser*, 116 U.S. at 267–68. Arizona and Washington would adopt language in their state analogues of the Second Amendment clarifying that the right to bear arms does not include the right of private corporations to employ armed groups. *See* ARIZ. CONST. art. II, § 26; WASH. CONST. art. I, § 24.

Thus, post–Civil War courts were being torn in several directions. New legislation was strictly regulating guns. These included prohibitions on most handguns, minors having guns,[233] carrying a gun while intoxicated, and the possession of guns in certain locations such as courthouses, polling places, and public gatherings.[234] Many citizens were frustrated with gun crimes, including robberies and heat-of-passion killings. White Southerners did not want black Americans possessing guns. At the same time, many citizens wanted the right to carry guns for personal protection against crime. And labor unions worked to stop private detective agencies from banding together as armed groups to break up labor protests. Finally, contemporaneous opinions on the scope of the right began to split between those who thought the right should belong to the government-sponsored "well-regulated militia"—which now primarily consisted of the National Guard— and those who retained the belief that the right included private self-defense.

## B. The Courts Respond

In response to these competing social pressures, post–Civil War courts reconceptualized the purpose and scope of the right to keep and bear arms. Instead of placing a high emphasis on personal defense, the civic republican view articulated in *Aymette* took precedence. The only constitutionally protected weapons were those that had value for militia service—the "ordinary military equipment." Most handguns did not qualify. Post–Civil War courts recognized a broad right to keep arms in the home and, in general, a very limited right to bear arms in public.[235] I should note two caveats: First, like their antebellum predecessors, different courts deviate from the rules I have identified above, so one can find a few exceptions in the case law. Second, some of the state constitutional provisions enacted during the post–Civil War period gave legislatures explicit authority to regulate the wearing (or bearing) of weapons, instead of the narrower permission to regulate only *concealed* weapons.[236]

As I articulated in Part I, *Aymette* had three main holdings. The first was that the only constitutionally protected weapons were those that "usually employed in civilized warfare" and that constituted the "ordinary military equipment." Second, the right to keep arms in the home was broader than the right to bear arms in public, the latter not including the right to carry a weapon concealed. Third, the right to bear arms was for public—not private—defense. Post–Civil War courts almost

---

233. *See, e.g.*, Act of Mar. 5, 1883, ch. 105, 1883 Kan. Laws 159 (prohibiting both minors and those of unsound mind); Act of Feb. 10, 1882, ch. 4, 1882 N.J. Laws 13; Act of Apr. 3, 1883, ch. 329, 1 1883 Wis. Laws 290.

234. *See, e.g.*, Act of Oct. 18, 1870, No. 285, 1870 Ga. Laws 421; Act of Mar. 16, 1870, No. 100, § 73, La. Acts 2d Sess. 145, 159–60; Act of Mar. 5, 1883, 1883 Mo. Laws 76 (prohibiting carrying a firearm while intoxicated); Act of Apr. 12, 1871, ch. 34, 1871 Tex. Laws 1st Sess. Gen. Laws 25; Act of Aug. 15, 1870, ch. 78, § 55, 1870 Texas Laws Gen. Laws 128, 139.

235. *See generally* O'Shea, *supra* note 10, at 641–59 (discussing cases).

236. *See* FLA. CONST. of 1885, Declaration of Rights, § 20; GA. CONST. of 1868, art. I, § 14; OKLA. CONST. art. II, § 26; TENN. CONST. art. I, § 26; TEX. CONST. art. I, § 23; TEX. CONST. of 1868, art. I, § 13; UTAH CONST. of 1895, art. I, § 6.

unanimously adopted the first holding. With respect to the second holding, no court during this period found a right to carry a concealed weapon.[237] But courts, again, wobbled on the third issue of whether they would recognize a right to bear arms in public for private purposes. Most of them did find a right for private purposes, but they further constrained the constitutional right of gun carrying to make the right to bear arms for private purposes basically useless. And they recognized that a legislature has wide latitude to ban guns completely in "sensitive locations," provided that the restrictions are not overbroad.

### 1. What Arms Are Protected?

In the post–Civil War era, the Tennessee Supreme Court would take the lead. In *Andrews v. State*,[238] the court reaffirmed *Aymette*, holding that protected arms included:

> Not every thing that may be useful for offense or defense; but what may properly be included or understood under the title of arms, taken in connection with the fact that the citizen is to keep them, as a citizen. Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we would hold, that the rifle of all descriptions, the shot gun, the musket, and repeater, are such arms; and that under the Constitution the right to keep such arms, can not be infringed or forbidden by the Legislature.[239]

The court then reversed the convictions of each defendant because the indictments did not specify the type of pistol. Army revolvers, the full-sized revolvers that were adopted by the U.S. Army as standard pistols, were constitutionally protected handguns, and as such, a total ban on them would be void.[240] All other handguns could be prohibited.[241] The Arkansas Supreme Court followed suit, holding that an 1875 ban on carrying all pistols (whether openly or concealed) did not apply to army pistols.[242] The court explicitly relied on *Aymette* and *Andrews* in reaching its decision. Georgia applied the term "arms" to militia weapons, such as "guns of

---

237. Most courts did not comment on the scope of the right to keep arms in the home since few laws restricted that. I discuss the sparse commentary on the scope of the right below. *See infra* Part II.B.2.

238. 50 Tenn. (3 Heisk.) 165 (1871).

239. *Id.* at 179.

240. *Id.* at 186–87.

241. *Id.*; *see also id.* at 192 (issuing holding). Handguns come in different sizes. Traditionally the military adopts full-sized handguns as its standard-issue pistol. The distinction between army pistols and other pistols is largely a distinction between larger handguns that have military value and are difficult to conceal and smaller handguns that have little military value but are easy to conceal.

242. Fife v. State, 31 Ark. 455, 458–61 (1876).

Compendium_Rivas
Page 418

every kind, swords, bayonets, [and] horseman's pistols" but not including "pistols, dirks, Bowie-knives, and those weapons of like character."[243]

West Virginia's Supreme Court of Appeals, assuming that the Second Amendment applied to the states, listed "swords, guns, rifles, and muskets" as protected, but "pistols, bowie-knives, brass knuckles, billies, and [other brawling weapons]" as excluded.[244] This was one of the few decisions to exclude handguns entirely.[245]

Between 1871 and 1874, the Texas courts took a broader view of permissible military weapons. In *English v. State*,[246] the Texas Supreme Court held:

> The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.[247]

This holding was under both state and federal constitutional guarantees. This is the only case I have found that protected weapons (artillery guns) that individuals could not physically bear, as opposed to only those ordinary personal arms of the infantry.

In 1874, the Texas Supreme Court reversed course on whether solely military arms were protected. In *State v. Duke*,[248] the court held that "arms" included "such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State."[249] The court held that this included double-barreled shotguns, the huntsman's rifle, and pistols not adapted for concealed carry, lest "the only arms which the great mass of the people of the State have, [would not be] under constitutional protection."[250] This is the only case to foreshadow the civilian common-use test announced by Justice Scalia in *Heller*.[251]

Thus, by 1900, the almost-unanimous view of state courts was that the "arms" protected by the Second Amendment and state analogues were only those arms that citizens would employ in war. They were generally individual weapons that a citizen would possess and carry, such as rifles, muskets, and army pistols. Weapons that were not ordinarily employed by soldiers as personal weapons were not included. This category generally included weapons that were not sufficiently powerful to be of military value, such as Bowie knives and small pistols—weapons

---

243. Hill v. State, 53 Ga. 472, 474 (1874).
244. State v. Workman, 14 S.E. 9, 11 (W. Va. 1891).
245. Some later cases also excluded pistols. *See, e.g., Ex parte* Thomas, 97 P. 260 (Okla. 1908).
246. 35 Tex. 473 (1871).
247. *Id.* at 476.
248. 42 Tex. 455 (1874).
249. *Id.* at 458.
250. *Id.* at 458–59.
251. *See* District of Columbia v. Heller, 554 U.S. 570, 624–25 (2008).

that were often employed for criminal purposes and which would lead to an
"offense against discipline" if carried by a soldier.[252] By curtailing the scope of
protected arms to only militia arms, the courts gave legislatures leeway to regulate
handguns and knives, and to address the social externalities caused by the illegal
use of such weapons.

### 2. Scope of the Right to Keep Arms

Not a single court, post–Civil War through 1900, held that the right to keep arms
in the home was contingent on active service in a well-regulated militia—even
though the National Guard system already had begun replacing the universal
militia. This was consistent with the majority post–Civil War view that citizens
have a right to keep arms. To the extent that Justice Dickinson's opinion in *Buzzard*
suggested it, by the time *Fife v. State* was decided, Arkansas had firmly abandoned
the militia-only approach in favor of the Tennessee approach articulated by Judge
Green in *Aymette*.[253] No court adopted the collective rights view until 1905, when
the Kansas Supreme Court became the first court in American history to limit the
right to keep and bear arms to only those citizens actively participating in an
organized militia.[254]

There are very few cases on the right to keep arms during the decades following
the Civil War. Most banned weapons were insufficiently powerful to have military
application, so courts simply held that the weapons at issue were not "arms." The
Tennessee Supreme Court in *Andrews* fleshed out fully what the court thought were
the incidents of the right to keep arms. These included the right to purchase arms,
repair them and keep them in a useable state, purchase ammunition, practice
shooting, and use arms for traditionally lawful purposes.[255] In *Jennings v. State*,[256]
the Texas Court of Appeals did not allow the forfeiture of a pistol that was illegally
carried, saying that the forfeiture violated the defendant's right to keep the arm.[257]

---

252. *English*, 35 Tex. at 477.

253. *See* Fife v. State, 31 Ark. 455, 458–59 (1876).

254. City of Salina v. Blaksley, 83 P. 619 (Kan. 1905).

255. Andrews v. State, 50 Tenn. (3 Heisk.) 165, 178–79 (1871). This is important to note
for contemporary case law, which is struggling with the question of whether the Second
Amendment extends beyond the home. *See, e.g.*, United States v. Masciandaro, 638 F.3d
458, 475 (4th Cir. 2011) (majority opinion of Wilkinson, J.) ("There may or may not be a
Second Amendment right in some places beyond the home . . . ."); Williams v. State, 10
A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court, in [*McDonald's*] dicta, meant its
holding to extend beyond home possession, it will need to say so more plainly."). As
*Andrews* makes clear, incidents of the right to keep arms in the home extend beyond the
home. These include the right to carry a gun to and from a place of purchase, repair, or target
practice. Courts, thus, do not mean to ask whether the Second Amendment extends beyond
the home; it clearly does. The actual question they are asking is whether the right extends to
carrying loaded guns outside the home for individual self-defense.

256. 5 Tex. Ct. App. 298 (1878).

257. *Id.* at 300–01.

### 3. Right to Bear Arms

With the increasing social pressure placed on legislatures to curtail handgun carrying, post–Civil War courts scrutinized legislation restricting public gun carrying less strictly than they did in the antebellum period. This is perhaps the most significant transformation of the right to bear arms from the antebellum to the post–Civil War period.

Unlike the Kentucky antebellum case *Bliss*, no court during this period upheld a constitutional right to carry a concealed weapon, regardless of whether claims were raised under the Second Amendment or state analogues.[258] Courts went so far as to even deny individuals a constitutional right to carry a concealed weapon in their own homes.[259] By 1900, it was clear that the right to carry concealed weapons was not part of the constitutional right to bear arms.[260] Thus, the U.S. Supreme Court stated in the 1897 case *Robertson v. Baldwin*[261] that the Bill of Rights had "exceptions, which continued to be recognized as if they had been formally expressed. Thus, . . . the right of the people to keep and bear arms (art. 2) is not infringed by laws prohibiting the carrying of concealed weapons . . . ."[262]

Courts began acknowledging that prohibitions on concealed weapons were designed to prevent *all* public carrying of weapons consistent with the right to bear arms. During the Civil War, the Georgia Supreme Court had held that the purpose of the concealed weapons statute was to alert people that a person was armed and to be avoided in a fight.[263] The South Carolina Supreme Court understood the South Carolina statute to have a broader purpose, , asserting that the "purpose was, as far as may be consistent with the right of the citizen to bear arms, absolutely to prohibit the carrying of deadly weapons, with a view to prevent acts of violence and bloodshed."[264] The Louisiana Supreme Court agreed.[265]

Indeed, for the first time, courts began allowing legislatures generally to prohibit unconcealed pistols. When the Tennessee Supreme Court held in *Andrews* that a ban on carrying pistols could not be applied to all handguns,[266] the Tennessee legislature responded by prohibiting the carrying of all handguns, except army pistols carried openly in the hand.[267] Obviously, this made the carrying of handguns extremely difficult.[268] Nevertheless, the Tennessee Supreme Court upheld the

---

258. *See, e.g.*, Smith v. State, 11 So. 71 (Ala. 1892); State v. Shelby, 2 S.W. 468 (Mo. 1886); State v. Johnson, 16 S.C. 187 (1881); *Andrews*, 50 Tenn. (3 Heisk.) 165.

259. Carroll v. State, 28 Ark. 99 (1872).

260. Wisconsin challenged this convention in 2003 when it found a right to conceal weapons in the home or a fixed place of business. *See supra* note 118.

261. 165 U.S. 275 (1897).

262. *Id.* at 281–82.

263. Stockdale v. State, 32 Ga. 225, 227–28 (1861).

264. Johnson v. State, 16 S.C. 187, 191 (1881).

265. *See* State v. Bias, 37 La. Ann. 259, 260 (1885).

266. Andrews v. State, 50 Tenn. (3 Heisk.) 165, 192 (1871).

267. Act of Dec. 14, 1871, ch. 90, 1871 Tenn. Pub. Acts 81.

268. Arkansas passed a similar law ten years later. As the Arkansas Supreme Court noted with reference to its law:

law.[269] A similarly restrictive law was upheld in Arkansas,[270] which, like Tennessee's law, was a legislative response to court holdings that there was a right to carry army pistols openly.[271] The Texas Supreme Court allowed a law banning the carrying of handguns, except while traveling or when a person had reasonable grounds to fear attack.[272]

Further, state courts upheld prohibitions on various "abuses" of the right. The Missouri Supreme Court approved restrictions on carrying firearms while intoxicated.[273] Other courts sustained prohibitions on carrying firearms concealed with unlawful intent[274] and pointing firearms at others,[275] and one court held that the right to bear arms did not extend to escaped convicts trying to avoid arrest.[276] Moreover, courts held that complete bans on the possession of firearms in narrowly defined areas, such as courthouses, polling places, and public gatherings, were permissible regulations of the right to bear arms, not complete prohibitions on exercising the right.[277] By the early nineteen hundreds, a few outlier states still afforded broad constitutional protection for individuals who carried pistols. In these states, courts did not allow legislatures to generally prohibit or broadly restrict the carrying of pistols; some decisions distinguished, for example, total prohibitions on carrying a pistol within an entire city from narrowly tailored restrictions on possessing weapons in courthouses, polling places, and public assemblies.[278]

Thus, to borrow Bruce Ackerman's term, we see intergenerational synthesis.[279] Courts held over some residue of a right to bear arms openly for private purposes. But post–Civil War courts severely curtailed the right in response to popular demand that handguns be further regulated. One need not analogize "guns as smut" to defend a largely homebound Second Amendment;[280] the civic republican reading

---

It must be confessed that this is a very inconvenient mode of carrying them habitually, but the habitual carrying does not seem essential to "common defense." The inconvenience is a slight matter compared with the danger to the whole community, which would result from the common practice of going about with pistols in a belt, ready to be used on every outbreak of ungovernable passion.

Haile v. State, 38 Ark. 564, 566 (Ark. 1882).

269. State v. Wilburn, 66 Tenn. 57 (1872).

270. *Haile*, 38 Ark. at 567.

271. *See, e.g.*, Holland v. State, 33 Ark. 560 (1878); Wilson v. State, 33 Ark. 557 (1878); Fife v. State, 31 Ark. 455 (1876).

272. State v. Duke, 42 Tex. 455 (1874).

273. State v. Shelby, 2 S.W. 468 (Mo. 1886).

274. Wright v. Commonwealth, 77 Pa. 470 (1875).

275. Davenport v. State, 20 So. 971 (Ala. 1896).

276. Tolbert v. State, 14 So. 462 (Miss. 1893).

277. *See, e.g.*, Hill v. State, 53 Ga. 472 (1874).

278. *See, e.g., In re* Brinkley, 70 P. 609 (Idaho 1902); State v. Kerner, 107 S.E. 222 (N.C. 1921) (striking down a licensing ordinance for unconcealed pistols); State v. Rosenthal, 55 A. 610 (Vt. 1903).

279. On intergenerational synthesis, see, for example, 1 BRUCE ACKERMAN, WE THE PEOPLE: FOUNDATIONS 90 (1991).

280. Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (2009). Miller also provides historical reasons to support his argument for limiting the Second Amendment to the home.

accomplishes this. By 1900, the right to keep and bear arms was the right to keep military-style weapons in the home and, in very limited cases, to bear them openly in public. This required changing the structure of the right to bear arms by emphasizing almost exclusively the right's purpose as public defense against oppression—and de-emphasizing individual self-defense.

### III. *UNITED STATES V. MILLER*:
### THE FAILURE TO REACH AN ACCEPTABLE SOCIAL COMPROMISE

*United States v. Miller*[281] is one of the most maligned cases in constitutional history. Justice Scalia, in *Heller*, writes that the case "did not even purport to be a thorough examination of the Second Amendment."[282] Brian Frye, who compiled a detailed history of the case, asserts that both individual and collective rights theorists find *Miller* to be "an impenetrable mess."[283] Discussion of *Miller* often involves mentioning Justice McReynolds's personal or professional failings.[284]

In this Subpart, I make two claims. First, *Miller* is completely clear as to its holding. Without retracing all of Frye's extensive analysis, I will review the parts of *Miller* that clearly establish that the Court was disposing of the case on grounds considered "startling" today[285]: sawed-off shotguns are not "ordinary military equipment." *Miller* held, following *Aymette*, that only military arms were protected. *Miller* explicitly refused to rule on the scope of the right.

*Miller*'s principal difficulty is not its opacity—the decision, fairly read, is unambiguous; instead, *Miller*'s failing is that it entrenched a Second Amendment right that could not adapt to changing popular constitutional norms concerning the scope of the right to bear arms. Changing technology, along with the failure of the militia system, created a situation where the contemporaneous population considered military arms to be inappropriate for civilian possession. By recognizing a right to have arms that the contemporaneous society was not prepared to accept, the Supreme Court jammed the lower courts after *Miller* between recognizing a collective right to keep and bear arms—which is essentially no right—and recognizing a right considered so extreme that it was beyond the pale. Faced with this choice, lower federal courts chose to adopt the collective rights view, thereby removing themselves from deciding the scope of the Second Amendment. Thus, *Miller* was not a failure because the case was opaque or wrongly decided; it was neither. (Indeed, it was more originalist than *Heller*.) *Miller* failed because it left courts unable to fashion a right to bear arms that comported with the popular understanding of the right.

---

281.  307 U.S. 174 (1939).

282.  District of Columbia v. Heller, 554 U.S. 570, 623 (2008) (citing Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & LIBERTY 48, 65–68 (2008)).

283.  Frye, *supra* note 282, at 49.

284.  *See id.* at 70.

285.  *Heller*, 554 U.S. at 624; *see also* Michael P. O'Shea, *The Right to Defensive Arms After* District of Columbia v. Heller, 111 W. VA. L. REV. 349, 354–62 (2009) (suggesting three possible interpretations of *Miller* and arguing that the best interpretation was that the weapon at issue did not constitute "ordinary military equipment").

*INDIANA LAW JOURNAL* [Vol. 89:1587

*A.* United States v. Miller

In 1934, Congress adopted the second major gun control law in this country's history: the National Firearms Act.[286] The Act was a response to gangster-era violence, which Prohibition fueled.[287] The Act attempted to ban gangster weapons, most notably the Thompson submachine gun.[288] Because Congress was concerned that it did not have the constitutional power to ban machine gun possession—the New Deal Commerce Clause jurisprudence had not yet been developed—Congress imposed a tax modeled on the Harrison Narcotics Act.[289] The law required an expensive license to manufacture, import, or deal in certain highly destructive weapons, most notably machine guns, short-barreled rifles and shotguns, silencers, and concealable weapons other than pistols and revolvers (e.g., pen guns or other gadget guns).[290] Unlicensed individuals could only obtain these weapons if they underwent a fingerprint-based criminal background check and paid a $200 transfer or making tax—a tax steep enough to deter nearly all sales.[291]

Jack Miller and Frank Layton were arrested on April 18, 1938, for possessing a sawed-off shotgun in interstate commerce in violation of the National Firearms Act.[292] The district court dismissed the indictment, holding, with no analysis, that the Act violated the Second Amendment.[293] The case came before the Supreme Court on direct appeal by the government.

By the time of the appeal, the district courts had split on this issue. A district court in Florida had upheld the Act, declaring, "The Constitution does not grant the privilege to racketeers and desperadoes to carry weapons of the character dealt with in the act. It refers to the militia, a protective force of government; to the collective body and not individual rights."[294] Despite the "collective body and not individual

---

286. National Firearms Act, ch. 757, 48 Stat. 1236 (1934) (codified as amended at 26 U.S.C. §§ 5801–72 (2012)). The first major gun control law was the Miller Act, which prohibited sending concealable firearms through the mail. *See* Act of Feb. 8, 1927, ch. 75, 44 Stat. 1059 (codified as amended at 18 U.S.C. § 1715 (2012)). Frye gives a brief summary of the history of the National Firearms Act. *See* Frye, *supra* note 282, at 60–63.

287. *See* H.R. REP. NO. 73-1780, at 1 (1934).

288. *See* David B. Kopel, *The Second Amendment in the Tenth Circuit: Three Decades of (Mostly) Harmless Error*, 86 DENV. U. L. REV. 901, 911 (2009). On the Thompson submachine gun and its relationship to state machine gun laws, see Marshall, *supra* note 56, at 705 n.57.

289. Frye, *supra* note 282, at 61. Congress decided in 1986 that it did have the power to ban machine guns. Firearms Owners' Protection Act, Pub. L. No. 99-308, sec. 102, § 922(*o*), 100 Stat. 449 (1986) (codified at 18 U.S.C. § 922(*o*) (2012).

290. National Firearms Act, 48 Stat. at 1236.

291. Frye, *supra* note 282, at 61. For the legal framework, see National Firearms Act, 48 Stat. at 1236–40. Congress subsequently reduced the transfer tax on certain concealable weapons when they decided that some of the weapons had legitimate purposes. *See* Act of June 16, 1938, Pub. L. No. 75-651, 52 Stat. 756 (establishing a $1 transfer tax); Act of June 1, 1960, Pub. L. No. 86-478, 74 Stat. 149 (raising the tax to $5). The tax remains at $5 today. 26 U.S.C. § 5811(a) (2012).

292. Frye, *supra* note 282, at 48–49.

293. United States v. Miller, 26 F. Supp. 1002 (D. Ark. 1939).

294. United States v. Adams, 11 F. Supp. 216, 219 (D. Fla. 1935).

Compendium_Rivas
Page 424

rights" language, the opinion was not entirely clear about what it held. The district court found that the Constitution did not apply to "weapons of the character dealt with in the act" and then cited *Workman* and *Hill*, both of which held that individuals have a right to possess ordinary military arms for public defense purposes.[295] It did not cite *Blaksley*, which held that the right only could be exercised in state-organized military units.[296] Thus, it is possible that the Florida district court was recognizing a right to have military arms for public defense but not for individual self-defense. Alternatively, the court may have been recognizing a collective right to bear arms and just failed to cite the Kansas case.

The government's brief in *Miller* contained two arguments.[297] First, the government argued that the right to bear arms "is not one which may be utilized for private purposes but only one which exists where the arms are borne in the militia or some other military organization provided for by law and intended for the protection of the state."[298] The government's brief cited and quoted heavily from the three precedents that arguably gave a collective rights view: Justice Dickinson's *seriatim* opinion in *Buzzard*, the Kansas Supreme Court's opinion in *Blaksley*, and the Florida district court opinion in *Adams*.

Second, the government argued:

> While some courts have said that the right to bear arms includes the right of the individual to have them for the protection of his person and property as well as the right of the people to bear them collectively, the cases are unanimous in holding that the term "arms" as used in constitutional provisions refers only to those weapons which are ordinarily used for military or public defense purposes and does not relate to those weapons which are commonly used by criminals.[299]

The "while some courts" language was an understatement. The government backed its second argument with nearly twenty cases directly on point. As I have described above, it was the overwhelmingly accepted view of the right to keep and bear arms at the time—unlike the government's collective rights argument, for which the government could muster only two court opinions and one concurrence.

The Supreme Court clearly adopted the government's second argument. The Court held:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of

---

295. *See supra* notes 243–44 and accompanying text.

296. City of Salina v. Blaskley, 83 P. 619 (Kan. 1905).

297. Brief for the United States, *supra* note 32, at 18; *see also* United States v. Emerson, 270 F.3d 203, 222–23 (5th Cir. 2001) (recognizing the government's alternative arguments); Frye, *supra* note 282, at 66 (same).

298. Brief for the United States, *supra* note 32, at 15.

299. *Id.* at 18 (citations omitted).

the ordinary military equipment or that its use could contribute to the common defense. Aymette v. State of Tennessee, 2 Humph., Tenn., 154, 158.[300]

*Miller*'s holding is as clear as day. Justice McReynolds was explicitly following *Aymette*, which held that only those weapons that constitute the "ordinary military equipment" are constitutionally protected.[301] The sawed-off shotgun was never ordinary military equipment. The whole essence of the sawed-off shotgun was that it was an ordinary shotgun specially adapted for concealment and criminal purposes, giving the user the destructive power of a shotgun and the portability of a handgun. *Miller* was following *Aymette* and the post–Civil War progeny that it had spawned: shortened weapons that have little or no military value—and were specially adapted for concealment and criminal purposes—fell outside the scope of "arms" protected by the Second Amendment. By the time *Miller* came down, there were nearly 100 years of case law holding this, albeit usually applied to pocket pistols rather than sawed-off shotguns.[302]

---

300. United States v. Miller, 307 U.S. 174, 178 (1939).

301. Aymette v. State, 21 Tenn. (2 Hum.) 154, 158 (1840); *see also* Hugo L. Black, *The Bill of Rights*, 35 N.Y.U. L. REV. 865, 873 (1960) ("Although the Supreme Court has held this Amendment to include only arms necessary to a well-regulated militia, as so construed, its prohibition is absolute.").

302. Nelson Lund reads the holding very literally. He observes:

> Note that the Court does not hold that short-barreled shotguns are outside the coverage of the Second Amendment. The Court says only that it has seen no evidence that these weapons have certain militia-related characteristics—which is no surprise given the procedural posture of the case—and that the Court could not take judicial notice of certain facts about the military utility of these weapons. After this statement, one would expect the case to be remanded to give the defendants an opportunity to offer the kind of evidence called for in the Court's holding.

Nelson Lund, Heller *and Second Amendment Precedent*, 13 LEWIS & CLARK L. REV. 335, 338 (2009) (noting also that the Court, in fact, remanded the case).

    While Lund correctly observes the cautiousness of the holding, he reads the holding out of its historical context. By the time *Miller* had been decided, a century of cases had held that weapons specially adapted to concealment, and thus criminal purposes, were beyond the scope of the right to bear arms. This is why the Supreme Court, at the end of its opinion, notes that the district court's opinion had no support in any state court decision. *See Miller*, 307 U.S. at 182 ("[No state court decision] seem[s] to afford any material support for the challenged ruling of the court below."). This would be an oddly sweeping condemnation if the district court's only failure had been to collect enough evidence of the military usefulness of a sawed-off shotgun. Even if sawed-off shotguns had *some* military value, they have never been *ordinary* military equipment—that is, commonly issued to soldiers, like muskets and rifles have been. This fact—not the failure of Miller and Layton to argue in the Supreme Court—is likely why the Court stated, "Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.* at 178. The remand that Lund cites was a remand for a criminal trial, not a remand for them to present more evidence about the military value of a sawed-off shotgun.

Indeed, *Aymette* clearly found that individuals have an "unqualified right" to keep military arms—and a more limited right to bear them—so that the people may resist oppression. If the Court had intended to hold that the right was collective, it would have cited *Blaksley* and argued that Miller and Layton were not active members of the National Guard.

Just because the Court followed *Aymette*'s negative holding—that arms having no military value are not constitutionally protected—does not mean that the Court followed *Aymette*'s affirmative holding that all citizens have a right to keep military arms.[303] The Court, in fact, did not adopt *Aymette*'s affirmative holding. This becomes clear when one analyzes the very end of the opinion—which, as far as I can tell, only Brian Frye has done.[304] The Court stated:

> Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed. But none of them seem to afford any material support for the challenged ruling of the court below.[305]

Frye concludes from this passage that "McReynolds assumed the scope of the Second Amendment guarantee depends upon the relevant state constitution. Or at the very least, the guarantees incorporated into the state constitutions illuminate the scope of the right guaranteed by the Second Amendment."[306]

Neither of Frye's conclusions quite accurately explains the function of this passage. In the next sentence, the Court stated, "In the margin some of the more important opinions and comments by writers are cited."[307] Here, the Court cited a number of state supreme court cases, including *City of Salina v. Blaksley*, the Kansas case upholding only a collective right to bear arms in a state-organized militia, as well as *Aymette*, *Duke*, *Fife*, *Workman*, and *People v. Brown* (a Michigan case described below)—all of which upheld various species of an individual right. In this final passage, the Supreme Court *acknowledged* the debate in state courts over the *subjects* and *content* of the right to keep and bear arms.[308] And it explicitly stated that it did not need to resolve this dispute because, whatever the scope of the right, it did not encompass possessing and carrying weapons specially adapted for criminal purposes. In the footnote, the Court cited cases holding that there was a

---

303. For a contrary assumption, see Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 655 (1989) (classifying bazookas and rocket launchers as possibly protected weapons).

304. Frye, *supra* note 282, at 76.

305. *Miller*, 307 U.S. at 182.

306. Frye, *supra* note 282, at 76.

307. *Miller*, 307 U.S. at 182.

308. These cases differed on whether they were applying the Second Amendment or state analogues, but the analysis would be the same regardless. Most of these decisions had long held that the federal and state constitutions were codifying the same preexisting right to bear arms. *See supra* note 18. In some cases, the Second Amendment was applied directly. *Workman*, for example, assumed the Second Amendment directly applied to the states. State v. Workman, 14 S.E. 9, 11 (W. Va. 1891). West Virginia did not adopt a state analogue to the Second Amendment until 1986. *See* Volokh, *supra* note 99, at 204.

private right to bear arms for self-defense (e.g., *Brown* and *Duke*), an individual right to bear arms only for public defense against oppression (e.g., *Aymette*, *Workman*, and *Fife*), and a collective right to bear arms only in a state-organized militia (*Blaksley*).[309] *No* line of cases supported sawed-off shotguns as protected weapons. That is likely why the Court's opinion was unanimous, in an otherwise bitterly divided Court.[310]

*B.* Miller *and the Contemporaneous Understanding of the Right:*
*The Failure to Incorporate the Popular Understanding of the Right to Bear Arms*

*Miller*'s drawback was not its holding or rationale. Excluding weapons with little or no military value that were adapted for criminal purposes comported with *Aymette* and nearly all of the case law from the post–Civil War era.[311] Limiting the Second Amendment's protection to the ordinary personal arms of civilized warfare would still guarantee that the people could resist oppression—the original purpose of the right to bear arms.

*Miller* failed as a constitutional decision because it entrenched an originalist version of the right to keep and bear arms that did not comport with the contemporaneous understanding of the right in 1939. The failure of *Miller* was in its timing.

By 1939, the militia system had disintegrated. Indeed, the system largely died out following the War of 1812.[312] Justice Story noticed the system was failing in the antebellum period.[313] The Tennessee Supreme Court in *Andrews*—an 1871 case—noted that the militia system had "passed away in almost every State of the Union, and only remains to us as a memory of the past, probably never to be revived."[314] The Dick Act, passed in 1903, divided the militia into an organized and reserve component and eliminated the requirement that all white, male citizens have firearms.[315] *All* able-bodied men between eighteen and forty-five were (and currently are[316]) part of the militia and subject to militia duty. As a practical matter, however, no president or governor will call forth a member of the "reserve" or "unorganized" militia. And by 1939, the United States had a sufficiently stable political system that citizens did not feel a need to be armed to resist public oppression. As a result, citizens had no ordinary use for militia-type weapons.

---

309. *Miller*, 307 U.S. at 182 n.3.

310. Given that the collective rights view was in the distinct minority among courts, it would have been shocking if the Supreme Court reached unanimity—even without a concurrence—on whether the right was individual or collective.

311. *See supra* Part II.

312. *See supra* note 197.

313. STORY, *supra* note 43, § 1890, at 746–47.

314. Andrews v. State, 50 Tenn. (3 Heisk.) 165, 184 (1871).

315. Act of Jan. 21, 1903 (Dick Act), ch. 196, 32 Stat. 775. The requirement to have arms only applied to whites because Congress never updated the Militia Act of 1792 after the Civil War. *See* Act of May 8, 1792, ch. 33, 1 Stat. 271.

316. *See* 10 U.S.C. §§ 311–312, 331–335 (2012); Perpich v. Dep't of Def., 496 U.S. 334, 352 n.25 (1990). The current minimum age of militia service is seventeen. 10 U.S.C. § 311.

Compendium_Rivas
Page 428

In the nineteenth century, courts could use the "military arms" formulation because the weapons associated with crimes and duels—Bowie knives and small handguns—were not sufficiently powerful to have military value. Courts could vindicate the full value of the right to bear arms to resist public oppression (or to use military arms for self-defense), while allowing states to ban weapons that had a high propensity to be used in criminal wrongdoing.

This situation changed in the twentieth century: the Thompson submachine gun became associated with the "public enemy," while the military was also transitioning to automatic weapons.[317] In 1936, the military adopted the semiautomatic M1 rifle, which would be the last standard-issue army rifle lawful for general civilian possession.[318] The advent of the machine gun and the submachine gun clearly foreshadowed that the military would issue soldiers automatic weapons as common military equipment. When the military adopted the automatic M14 in 1957, for the first time in American history the soldier's "ordinary military equipment" was considered too dangerous for civilians generally to possess.[319] Thus, in the nineteenth century, "war arms" and arms appropriate for "manly self-defense" were one and the same and were distinct from weapons having criminal application; in the twentieth century, "war arms" and "gangster weapons" were automatic weapons, whereas civilian guns for self-defense, hunting, or target shooting were not.

Making the timing worse for the Supreme Court in *Miller*, only a few state court cases recognized the problem. As early as 1921, the North Carolina Supreme Court noted that modern military technology had diminished the importance of personal small arms, especially the pistol, in warfare.[320] The court singled out poison gas, airplanes with bombs, and submarines as examples of weapons too powerful for general civilian possession. At the other end of the spectrum, it reaffirmed traditional prohibitions against certain knives carried as concealed weapons and having no military value. The court determined that the proper test was weapons

---

317. *See supra* note 288. A brief note on the terminology in this paragraph: semiautomatic firearms fire only one round each time the trigger is pulled, while fully automatic firearms continue to fire until the trigger is released. (Both types of guns are "automatic" in the sense that the gun automatically ejects the spent shell and reloads a new round in the chamber without the need for the shooter manually to reload.) For legal purposes, the term "machinegun" includes any firearm with the capability to shoot more than one round with a single pull of the trigger. *See* 26 U.S.C. § 5845(b) (2012).

318. By 1936, the military had a variety of fully automatic firearms in its arsenal. Although these weapons were military equipment, they were not "*ordinary* military equipment" because they were not issued to most infantry soldiers as part of their general equipment. On the meaning of ordinary military equipment, see *infra* text accompanying notes 338–43.

319. For a brief description of the U.S. Army's move to automatic weapons, see EDWARD CLINTON EZELL, SMALL ARMS OF THE WORLD 24–26 (12th ed. 1983). Although not generally illegal for civilians to possess under federal law until 1986, the M14 was a "machinegun" subject to the strictures of the National Firearms Act. *See* 26 U.S.C. § 5845(b) (2012). Many state laws did ban machine gun possession. In contrast, the M1 rifle was only semiautomatic. EZELL, *supra*, at 16. The M1 rifle would not have fallen within any state or federal prohibitions then existing.

320. State v. Kerner, 107 S.E. 222, 224 (N.C. 1921).

"in common use, and borne by the people as such when this provision was adopted"—including "rifles, muskets, shotguns, swords, and pistols"—even if such weapons presently lacked significant military value.[321]

The Michigan Supreme Court took a different approach to refashioning the right to bear arms around contemporaneous sentiments. In *People v. Brown*,[322] the Michigan Supreme Court changed the scope of the "arms" that were constitutionally protected to those arms useful for individual self-defense, rather than arms useful for militia service. The court recognized that the militia was "legally existent" but "practically extinct"—and, in any event, armed by the state.[323] The court asserted that "[s]ome arms"—almost certainly implying machine guns—"although they have a valid use for the protection of the state by organized and instructed soldiery in times of war or riot, are too dangerous to be kept in a settled community by individuals, and, in times of peace, find their use by bands of criminals and have legitimate employment only by guards and police."[324] As a result, the court held that the Michigan Constitution protected the "possession of those arms which, by the common opinion and usage of law-abiding people, are proper and legitimate to be kept upon private premises for the protection of person and property."[325] Although the Supreme Court cited *People v. Brown* in the *Miller* footnote, it did not address *Brown*'s critique of the nineteenth-century definition of "arms." This was a fairly new problem, and the Supreme Court did not have the benefit of many new state court cases reformulating the right. Instead, the Court accepted the almost-unanimous view of nineteenth-century cases that the Constitution protects, at a minimum, common military arms.

*C. Miller and the Courts of Appeals:*
*The Myth of Miller as Accepting a Collective Right*

Because *Miller* used the nineteenth-century definition of "arms"—that the only arms that were protected were militia arms—the courts of appeals became unable to fashion the right to keep and bear arms around the contemporaneous understanding of the right. No court wanted to entrench a right that seemed too countermajoritarian, that is, too extreme by contemporaneous standards. For the most part, the courts of appeals adopted the collective rights view—not because they necessarily thought it correct—but because they wanted to remove themselves from adjudicating Second Amendment questions. Given a choice between legitimizing the civilian possession of war arms and withdrawing from deciding Second Amendment claims, the courts of appeals selected to withdraw. Lower federal courts largely avoided defining the content of the Second Amendment right until *Heller* restored their authority to shape the right around contemporaneous standards of reasonableness.

The courts of appeals noticed the problem with *Miller* immediately. In 1942, the First Circuit opined that *Miller*'s "ordinary military equipment test" for "arms" was

---

321. *Id.* at 224, 225.
322. 235 N.W. 245 (Mich. 1931).
323. *Id.* at 246.
324. *Id.*
325. *Id.* at 247.

not meant to be a general rule applicable to Second Amendment cases. As a general rule, the "ordinary military equipment" test:

> would seem to be already outdated, in spite of the fact that it was formulated only three and a half years ago, because of the well known fact that in the so called 'Commando Units' some sort of military use seems to have been found for almost any modern lethal weapon.[326]

The court did not want to be left in the absurd situation of holding that Congress could only "regulate the possession or use of weapons such as a flintlock musket or a matchlock harquebus," while having no authority over machine guns and antiaircraft weapons—weapons private persons would lack "any legitimate reason for having."[327] The court held that the Second Amendment did not apply in the case because the defendant was "on a frolic of his own and without any thought or intention of contributing to the efficiency of the well regulated militia."[328]

The Sixth Circuit's 1976 opinion in *United States v. Warin*[329] also noticed the problem—though this time the court faced a defendant with a more sophisticated challenge. Francis Warin was charged with the possession of an unregistered machine gun, and as an able-bodied adult male, he was a member of the militia of the United States and the militia of Ohio.[330]

The Sixth Circuit agreed with *Cases* that *Miller* did not intend to lay down a general rule. (Of course this was wrong: *Miller* did lay down a general rule—the nineteenth-century rule.) But from the Sixth Circuit's perspective, if the "ordinary military equipment" test was out of date by *Cases*, the rule was positively nuts in a time of nuclear weapons.[331] The Sixth Circuit had developed a new rule: the right to bear arms "applies only to the right of the State to maintain a militia and not to the individual's right to bear arms."[332] Membership in the unorganized militia did not suffice; Warin would have to show that the gun was connected to the organized militia[333]—what the Framers would have called the "select militia." But in case this holding was erroneous, the Sixth Circuit alternatively held that the machine gun law was a reasonable regulation of the right to bear arms, which was not unlimited at common law.[334]

Both *Cases* and *Warin* became extremely influential as other federal courts cited them for the authority that individuals could not exercise the right to bear arms unless their particular conduct—not the particular weapon—would contribute to a well-regulated militia. These courts did not conduct significant further historical analysis of the scope of the right.[335] They simply paired citations to *Miller* with

326. Cases v. United States, 131 F.2d 916, 922 (1st Cir. 1942).
327. *Id.*
328. *Id.* at 923.
329. 530 F.2d 103 (6th Cir. 1976).
330. *Id.* at 104–05.
331. *Id.* at 106.
332. *Id.* (quoting Stevens v. United States, 440 F.2d 144, 149 (6th Cir. 1971)).
333. *Id.* at 106-07; *see also* United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977).
334. *Warin*, 530 F.2d at 107.
335. *See, e.g.*, Gillespie v. City of Indianapolis, 185 F.3d 693, 711 (7th Cir. 1999);

citations to other courts of appeals cases holding that the *person's possession of the weapon* had to relate to current organized militia service. These cases, thus, twisted *Miller*'s holding—that the *firearm* has to relate to the militia. To provide extra support for this bait and switch, these cases quoted the background principle stated in *Miller* that the Second Amendment must be "interpreted and applied with [the purpose of assuring the militia's effectiveness]."[336] A few cases, though, engaged in some perfunctory historical analysis to justify why the right to bear arms only belonged to organized militia.[337]

To be fair to Justice McReynolds, *Cases*, *Warin*, and their progeny created a straw-man argument. One can view the phrase "ordinary military equipment" in two ways. First, if the weapon is ordinarily somewhere within the military arsenal, then it is protected. This is the reading offered by *Cases* and *Warin* when they object that the contemporary military has a vast array of weapons. *Cases* worried that "commando units" could make use of virtually anything, and *Warin* stated that this was more ridiculous in the nuclear age. Professor Sanford Levinson made a similar claim in his groundbreaking article, *The Embarrassing Second Amendment*.[338]

Neither *Miller* nor *Aymette* took this extraordinarily broad view of "ordinary military equipment." Almost no nineteenth-century case extended the phrase beyond those weapons *ordinarily issued to individual soldiers* as part of their equipment.[339] Courts routinely provided examples, such as rifles, muskets, and army pistols. They never said that Gatling guns or heavy machine guns—which Hiram Maxim first invented in 1884[340]—were constitutionally protected. If one wanted further guidance on the phrase "ordinary military equipment," he could look to the constitutional purposes of the militia and ask what weapons soldiers are ordinarily issued when enforcing the laws, suppressing insurrections, and repelling invasions.[341] Even today, soldiers typically carry weapons like the M16 rifle, the M4 carbine, and the M9 pistol.[342] Although submachine guns, machine guns, and bombs have their places somewhere in the military arsenal, they are not the

---

Hickman v. Block, 81 F.3d 98, 102 (9th Cir. 1996); United States v. Hale, 978 F.2d 1016, 1019–20 (8th Cir. 1992) (citing *Cases* and *Warin*); Cody v. United States, 460 F.2d 34, 36–37 (8th Cir. 1972); United States v. Synnes, 438 F.2d 764, 772 (8th Cir. 1971) (citing *Cases*). A few cases simply cited *Miller* for the proposition that the right to bear arms only belonged to organized militiamen—as though *Miller* stood for the same proposition as *City of Salina v. Blaksley*, 83 P. 619 (Kan. 1905). *See, e.g., Oakes*, 564 F.2d 384; United States v. Decker, 446 F.2d 164, 166–67 (8th Cir. 1971); *Stevens*, 440 F.2d at 149.

336. United States v. Miller, 307 U.S. 174, 178 (1939).

337. *See, e.g.*, United States v. Wright, 117 F.3d 1265 (11th Cir. 1997); United States v. Tot, 131 F.2d 261 (3d Cir. 1942). *Tot* also provided an alternative holding that the right to bear arms was not absolute. The Ninth Circuit engaged in the best historical analysis of a collective rights court, as an effort to rebut the Fifth Circuit's similarly scholarly analysis in *Emerson. See* Silveria v. Lockyer, 312 F.3d 1052 (9th Cir. 2002).

338. *See supra* note 303.

339. *See supra* Part II.

340. *See* JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN 33–36 (1975).

341. *Cf.* Kates, *supra* note 30, at 259 (offering a different narrowing test).

342. *See PortfolioFY2013*, ARMY.MIL (April 2013), http://www.army.mil/factfiles /equipment/individual/index.html. Some of the heavier weapons listed (e.g., machine guns) are crew serviced—not ordinary individual—weapons.

Compendium_Rivas
Page 432

*ordinary* military equipment—commonly issued to each individual soldier to possess and carry, in the same way that the automatic rifle or pistol is. *A fortiori*, no military in the world ordinarily issues its soldiers nuclear bombs. Our paradigm mental image of the militiaman is the citizen with his musket, not a citizen with a private battleship or cannon.

But the courts of appeals were not trying to engage in a careful reading of *Miller* or of the history of the Second Amendment. They were trying to extricate themselves from deciding Second Amendment claims. Even if the Second Amendment protected ordinary army rifles, by the time Second Amendment cases were largely being heard—after the Gun Control Act of 1968—army rifles consisted of weapons like the M16 assault rifle, which is (legally speaking) a "machinegun" under the National Firearms Act.[343] Allowing the general civilian population to have free access to such weapons would not have comported with modern notions of a reasonable right to bear arms under contemporaneous standards.

The collective rights view of the Second Amendment removed the federal courts from this quagmire. In all of the law review pages discussing the individual versus collective right to bear arms, to my knowledge, no one has fleshed out how a person could ever successfully challenge a law as violating a "collective right" to bear arms. I suspect that this is because such a claim is impossible. Given the Supreme Court precedent on the Militia Clauses, the rub of the collective rights view is that courts can never hold that a law violates the Second Amendment.

Although there are a few different versions of the collective right,[344] generally one must assert that he is a member of a well-regulated state militia. But I am not sure how one proves that he is in a "well-regulated militia." The training of the militia is a political question, not subject to judicial scrutiny.[345] And yet, when *Warin* (and many other cases) denies that technical militia membership suffices—a person must be in a "*well-regulated* militia"—this assumes that the court has some background notion of how much training and organization a militia must have before the court can take judicial notice of the fact that it is "well-regulated." "Technical" militia members (i.e., members of the unorganized militia), like their organized counterparts, are subject to militia duty under the Constitution and federal law.[346] The fact that they are not subject to periodic training is a legislative choice. But suppose that the mass of people were assembled once a year—as Hamilton suggested in *Federalist Number 29*—would this make them "well-regulated"?[347] If not, how much training is required, and how does a court decide this? Deciding whether a militia is "well-regulated" presupposes the ability

---

343. 26 U.S.C. § 5845(b) (2012).

344. *See generally* United States v. Emerson, 270 F.3d 203, 218–20 (5th Cir. 2001) (explaining the different "models" and collecting scholarship).

345. Gilligan v. Morgan, 413 U.S. 1, 10 (1973) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence.").

346. 10 U.S.C. §§ 331–335 (2012).

347. THE FEDERALIST NO. 29, at 184 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) ("Little more can reasonably be aimed at with respect to the people at large than to have them properly armed and equipped; and in order to see that this be not neglected, it will be necessary to assemble them once or twice in the course of a year.").

*INDIANA LAW JOURNAL* [Vol. 89:1587

of the courts to *evaluate* the amount of training and organization that the militia has—an evaluation that *Gilligan v. Morgan* declares the judiciary incompetent to undertake.

And to the extent that the Second Amendment only applies to the organized militia, it is useless. No governmental body is going to organize and maintain a body of troops—especially to the degree that they are "well-regulated"—and then refuse to arm them.[348] Instead, Congress simply will not enroll them in an organized militia.[349]

With respect to individuals in an organized militia, even if the government armed them inappropriately, no court would dare interfere.[350] This would require a court to assess what weapons a militiaman *ought* to be armed with, and then pass judgment on whether Congress or the states handled the task appropriately. *Gilligan* clearly makes this improper for courts to do. In fact, today's National Guard members are *prohibited* by orders from possessing private firearms in the performance of their duties.[351] I cannot imagine a court enjoining the practice and requiring state and federal governments to allow Guardsmen to bring their personally owned weapons to war.

Nor as a "right of the state to arm the militia" does the collective rights view accomplish anything. A state does not have a right to have its own military force. In the *Selective Draft Law Cases*,[352] the Supreme Court held that the power to raise and support armies was not limited by the Militia Clauses. Congress could, if it wanted, draft every able-bodied citizen into military service, leaving the states with no one in the militia.[353] No federal court has *ever* held that the states can override federal military policy on the militia.[354] At most, by the end of the twentieth century, the right to bear arms stood for the proposition that the states had *concurrent power* to arm citizens in a state-organized part-time fighting force,[355] provided that (1) Congress did not wish to conscript the people in those state forces into federal military service and (2) the state forces were not organized contrary to

---

348. Moreover, this presupposes the conceptual possibility that one could be in a "well-regulated militia" while that militia lacked arms. But a militia without arms almost certainly would not be "well-regulated" in the Framers' use of that phrase.

349. *See* District of Columbia v. Heller, 554 U.S. 570, 600 (2008) (noting that Congress has plenary power over how to enroll in the militia).

350. *Gilligan*, 413 U.S. at 10.

351. U.S. Army Multi-National Corps–Iraq, General Order Number 1 (GO-1), Prohibited Activities for U.S. Dep't of Def. Personnel Assigned to the Multi-National Corps–Iraq (MNC–I) or Present Within the MNC–I Area of Responsibility (AOR) 2 (2009), *available at* http://lawprofessors.typepad.com/files/go-1.pdf (prohibiting private firearms in Iraq). Similar orders prohibit National Guardsmen from carrying private firearms at other times and locations.

352. Arver v. United States (Selective Draft Law Cases), 245 U.S. 366 (1918).

353. *Id.* at 382–83; *see also* J. Norman Heath, *Exposing the Second Amendment: Federal Preemption of State Militia Legislation*, 79 U. Det. Mercy L. Rev. 39 (2001).

354. *See Selective Draft Law Cases*, 245 U.S. 366; *see also* Perpich v. Dep't of Def., 496 U.S. 334 (1990).

355. The force could not be full-time since this would violate the constitutional prohibition on keeping "troops" in time of peace. *See* U.S. Const. art. I, § 10, cl. 3; 32 U.S.C. § 109(a) (2012).

otherwise-valid federal legislation on the military or militia. A subservient concurrent power hardly qualifies as a "right." As the Eighth Circuit candidly observed in 1992, "Since the *Miller* decision, no federal court has found any individual's possession of a military weapon to be 'reasonably related to a well regulated militia.'"[356]

The exploding popularity of a vacuous "collective" right to bear arms directly descends from *Miller*'s holding that only military weapons have constitutional protection. Before *Miller*, only two courts and possibly one concurring opinion had ever adopted the collective rights view.[357] The remaining courts tailored the right to bear arms to be compatible with prevailing social norms on the place that weapons have in society. *Miller* left the federal courts unable to do this, so the lower federal courts extricated themselves from deciding Second Amendment cases. Contrary to what Justice Stevens stated in his *Heller* dissent,[358] hundreds of judges were not *relying* on the holding in *Miller*; they were *avoiding* it.

## IV. *HELLER*: REFRAMING THE RIGHT TO BEAR ARMS FOR A NEW GENERATION

Justice Scalia's majority opinion in *District of Columbia v. Heller* was *not* a "Triumph of Originalism."[359] There is almost nothing originalist about the opinion's pronouncement on the content of the right to bear arms. The Court's originalism was limited to discerning the proper subjects of the right—that individuals, not in active military service, have a right to bear arms. The Court held that the right is not limited to being a member of a state-sponsored, highly organized militia—which, as I described above, is really no right at all.

Instead, *Heller* has a direct continuity with the nineteenth-century right to bear arms. In the eighteen hundreds, two generations of courts refashioned the scope of the right to comport with popular constitutional sentiment. The right—and the restrictions on the right—reflected contemporaneous notions of reasonableness. As crime with knives and concealed weapons became ubiquitous, antebellum courts allowed legislatures to pass laws governing concealed weapons, while still protecting the right to carry arms for private self-defense. The three courts that failed to do this—two courts that found an absolute right, and one court that found no private right at all—had their doctrines overturned *at the next available opportunity*.[360] In the post–Civil War period, courts allowed greater legislative

---

356. United States v. Hale, 978 F.2d 1016, 1020 (8th Cir. 1992).

357. *See* United States v. Adams, 11 F. Supp. 216 (S.D. Fla. 1935); State v. Buzzard, 4 Ark. 18, 33 (1842) (opinion of Dickinson, J.); City of Salina v. Blaksley, 83 P. 619 (Kan. 1905).

358. District of Columbia v. Heller, 554 U.S. 570, 638 (2008) (Stevens, J., dissenting).

359. Siegel, *supra* note 5, at 191 & n.5 (collecting sources celebrating *Heller* as an originalist opinion).

360. The three courts were the Kentucky Court of Appeals in *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), which held the right to be absolute; the Tennessee Supreme Court in *Simpson v. State*, 13 Tenn. (5 Yer.) 356 (1833), which although not holding that the right was absolute, had dicta to that effect; and *State v. Buzzard*, 4 Ark. 18 (1842), in which two of the three judges held that the right did not protect arms for private defense. The Kentucky Constitutional Convention in 1849 overturned *Bliss* by amending the right-to-bear-arms

latitude to deal with the problems inflicted with handguns. Post–Civil War courts recognized the right to bear arms as consisting primarily in the right to have arms for defense against public oppression, although they often held that individuals could carry them for private self-defense, too. But private self-defense, especially with a handgun, was in the outer perimeter of the right to keep and bear arms: by 1900, few types of pistols had constitutional protection, and courts were approving sharper limits on carrying weapons in public, even if not concealed.

*Heller* likewise refashioned the right for a new generation. With military weapons considered inappropriate for civilian use, *Heller* "clarified" the *Miller* common-use test. Military rifles were declared beyond the constitutional right. The Court, in dicta, approved limits on felons having guns, despite the restriction having no historical basis. *Heller* held that the *core* of the right to keep and bear arms consisted of possessing handguns in the home for personal self-defense—even though, in the nineteenth century, it was arguable whether handguns had constitutional protection and whether private self-defense fell within the scope of the right to bear arms. *Heller* did not rule on whether requiring a license is appropriate, even though antebellum courts only allowed licensing of free blacks, who were not full citizens. In short, *Heller*'s right to keep and bear arms is the Second Amendment right supported by a majority of Americans *today*. This right, then, was enforced against jurisdictions that adopted laws deemed unreasonable by *contemporary standards*.

Dick Heller was a special policeman living in the District of Columbia. He was too old to even be a member of the unorganized militia.[361] Heller attempted to register a .22 caliber revolver, a target-shooting gun that had no military value whatsoever and had little value for self-defense.[362] He attempted to register the

---

provision to exclude concealed weapons. *See* KY. CONST. of 1850, art. XIII, § 25 (1850) ("That the right of citizens to bear arms in defense of themselves and the State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying concealed arms."). *Aymette* repudiated *Simpson*. Aymette v. State, 21 Tenn. (2 Hum.) 154, 161 (1840). *Buzzard*'s overruling was a bit more complicated. The Arkansas Supreme Court nominally reaffirmed *Buzzard* in *Carroll v. State*, 28 Ark. 99, 101 (1872), but reinterpreted the decision to be about the authority of the legislature to regulate the "constitutional right to bear arms in defense of person and property." Four years later, *Fife v. State*, 31 Ark. 455, 458–61 (1876), explicitly held that citizens had a limited right to bear arms openly for private defense.

   One might object that *Aymette* did not recognize a right of bearing arms for private self-defense, and yet, was not overturned. Although *Aymette*'s dicta rejects the individual self-defense rationale, *Aymette*, 21 Tenn. at 157, the court nevertheless reaffirmed a general right to carry arms openly, *id.* at 160–61. Practically, therefore, individuals still had a right to bear arms for individual self-defense.

   361. Heller was sixty-six years old when the case was being decided and too old to be a part of the District militia. District of Columbia v. Heller, 554 U.S. 570, 707 (2008) (Breyer, J., dissenting).

   362. *See* Paul Duggan, *Having Toppled D.C. Ban, Man Registers Revolver*, WASH. POST, July 19, 2008, http://www.washingtonpost.com/wp-dyn/content/article/2008/07/18 /AR2008071801212.html. The Internet site has a picture of the revolver. According to the article, Heller also apparently had a .45 Colt M1911 pistol, which was the military's standard sidearm from 1911 until 1986. *See* Scott Engen, *The History of the 1911 Pistol*, BROWNING.COM (Jan. 24, 2011), http://www.browning.com/library/infonews/detail.asp

revolver, but the police denied his application because of a 1976 District of Columbia ordinance prohibiting new registrations of pistols.[363] Moreover, D.C. law prohibited carrying a pistol in the home without a license to carry, which was almost never issued.[364]

The District defended the law on three grounds. First, the District alleged that the right to bear arms was a collective right. Second, the District argued that since the law only applied to the District, the handgun ban had no relevance to protecting state governments from federal interference. Third, even if it were an individual right, complete bans on some kinds of protected arms were acceptable, provided other weapons were available.[365] The District did allow residents to register some rifles and shotguns, provided that the weapons were not semiautomatic with a detachable magazine.[366] In a poor strategic choice, the District did not argue that, regardless of the scope of the Second Amendment, the right did not protect handguns—or at least Heller's .22 caliber revolver. Given the "originalist" character of the Court, the District could have marshaled significant nineteenth-century precedent on this point.

The Court held that the Second Amendment protects "an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home."[367] Its historical support for a right of private self-defense required some creative liberties. After giving a fairly lengthy—and accurate—description of the right's genesis in the English Civil War and Glorious Revolution, Justice Scalia then cited Blackstone for the proposition that the right to have arms protects "the natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence."[368]

Justice Scalia's quotation of Blackstone is selective—and misleading. The full quotation reads that the right to have arms "is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the *violence of oppression.*"[369] Blackstone is talking about self-defense against the Crown—not

---

?id=301. But this was not part of the original *Heller* case because registering that would have required challenging D.C.'s machine gun ban, which also included virtually all modern semiautomatic weapons in its definition. *See* D.C. CODE § 22-4501(c) (2001) (including any weapon that could be readily restored to fire more than twelve times semiautomatically without reloading as a "machine gun").

363. *See* D.C. CODE § 7-2502.02(a)(4) (2001), *amended by* Firearms Control Amendment Act of 2008, L. No. L17-0372, § 3(a)(10). Before this amendment, the District had also passed temporary legislation changing the definition.

364. D.C. CODE § 22-4506 (2001), *repealed by* Inoperable Pistol Amendment Act of 2008, L. No. 17-0388, § 2(f); *see* Bsharah v. United States, 646 A.2d 993, 996 n.12 (D.C. 1994) ("It is common knowledge . . . that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and are virtually unobtainable.").

365. Brief for Petitioners at 11, 35, 41, *Heller*, 554 U.S. 570 (No. 07-290).

366. Such weapons would violate the machine gun ban. *See supra* note 362.

367. *Heller*, 554 U.S. at 570; *see also* McDonald v. Chicago, 130 S. Ct. 3020, 3044 (2010) (describing *Heller*'s holding).

368. *Heller*, 554 U.S. at 594 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES *144).

369. 1 WILLIAM BLACKSTONE, COMMENTARIES *144 (emphasis added).

self-defense against a burglar. And lest there be any doubt about the meaning, it becomes clear in Book Two of the *Commentaries*. Blackstone lists, among the various reasons for the game laws, "prevention of popular insurrections and resistance to the government, by disarming the bulk of the people: which last is a reason oftener meant, than avowed, by the makers of forest or game laws."[370] Blackstone never mentions any objection to not having arms available for personal self-defense against criminals. The concern is with the "bulk of the people" having arms so they can resist illegal executive power. And this view of the right comports with Madison's exposition of the value of citizens having arms in *Federalist Number 46*.[371]

But Justice Scalia is not aiming for historical accuracy on the scope of the right. He is changing the scope of the right, to make the right to bear arms primarily about individual self-defense with handguns. At the time *Heller* came down, 73% of Americans believed that they had a right to own a gun, versus 20% who thought it belonged only to the militia.[372] Another poll in 2009 by CNN asked:

> Which of the following comes closer to your interpretation of the Second Amendment to the U.S. Constitution? In addition to addressing the need for citizen-militias, it was intended to give individual Americans the right to keep and bear arms for their own defense. It was only intended to preserve the existence of citizen-militias, and does not give individual Americans the right to keep and bear arms for their own defense.[373]

Americans answered the question by selecting "self-defense" by a 77%–21% majority. And Americans are strongly against banning handguns, by a nearly two-to-one margin.[374] Interestingly, the population was more sympathetic to a handgun ban in the 1970s and 1980s, while the courts were adopting the collective rights view of the Second Amendment—so much for the Court acting as a countermajoritarian institution.[375]

Of course, although Americans do support the right to bear arms in principle, they are split on whether Congress should adopt greater gun controls. In 2007, two-thirds of Americans thought that handgun laws should be made stricter.[376] About half of Americans in 2009 supported bans on so-called assault weapons, which was down from 75% two decades earlier—but still much higher than the

---

370. 2 WILLIAM BLACKSTONE, COMMENTARIES *412.

371. *See supra* note 162 and accompanying text.

372. Joan Biskupic, *Do You Have a Legal Right to Own a Gun?*, USA TODAY, Feb. 27, 2008, http://www.usatoday.com/news/washington/2008-02-26-guns-cover_N.htm.

373. CNN/Opinion Research Corp. Poll, May 14–17, 2009, *available at* http://www.pollingreport.com/guns2.htm.

374. This and the following statistics come from a CBS News/New York Times Poll Report. *Guns and Violence*, CBS News/N.Y. Times Poll (Apr. 23, 2007), *available at* http://www.cbsnews.com/htdocs/CBSNews_polls/aprbhandguns.pdf.

375. Jeffrey M. Jones, *Record-Low 26% in U.S. Favor Handgun Ban*, GALLUP (Oct. 26, 2011), http://www.gallup.com/poll/150341/record-low-favor-handgun-ban.aspx (graphing support over the last fifty years).

376. *Guns and Violence*, *supra* note 374, at 1.

proportion of the population that supports banning handguns.[377] Convicted felons have the lowest popular support for their right to keep arms: a 2008 CNN poll found that 88% of Americans think the law should *ban* felons and those with mental illness from having guns.[378] And Americans, even those in somewhat red states, believe that some places are inappropriate for guns: a 2011 poll of registered voters in Virginia, for example, found that voters overwhelmingly (75%–20%) oppose guns on college campuses and oppose by a nearly two-thirds majority allowing persons with permits to carry concealed firearms to bring their guns onto a college campus.[379]

This modern view of the right to keep and bear arms is exactly the right we get in *Heller*. The most important part of *Heller* is its dicta on permissible government regulation of the right, which courts now use as precedent to decide Second Amendment challenges. With no analysis whatsoever, the Court declared:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[380]

Again without analysis, the Court reaffirmed these categories in *McDonald v. Chicago*.[381]

The problem is that many of these "longstanding" laws have no historical constitutional basis. Federal law banned felons from possessing guns in 1968; that is not very "longstanding."[382] The closest nineteenth-century analogues I have found are laws prohibiting prisoners and vagrants from having guns.[383]

This is not to say that the passage is completely inaccurate as a historical matter. Laws prohibiting guns in "sensitive places," for example, have a much more longstanding history.[384] As I explained above, the nineteenth-century courts upheld

---

377. Hart/McInturff Study #6098, NBC/Wall St. J. Survey, Oct. 22–25, 2009, at 23, *available at* http://online.wsj.com/public/resources/documents/wsjnbc-10272009.pdf. Due to recent mass shootings, public opinion on this question may be in a state of flux.

378. CNN/Opinion Research Corp. Poll, June 4–5, 2008, *available at* http://www.pollingreport.com/guns2.htm.

379. *See* Michael Sluss, *Poll: Most in Virginia Oppose Guns on Campus*, ROANOKE TIMES (Dec. 23, 2011), http://ww2.roanoke.com/politics/wb/302726/ (reporting a Quinnipiac University survey).

380. District of Columbia v. Heller, 554 U.S. 570, 626–27 (2008).

381. McDonald v. Chicago, 130 S. Ct. 3020, 3047 (2010) ("We repeat those assurances here.").

382. Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213; *see also* Marshall, *supra* note 56. A 1961 amendment to the Federal Firearms Act of 1938 barred all felons (instead of merely individuals convicted of a violent felony) from receiving firearms in interstate commerce. The law did not bar possession, however. *Id.* at 698 (citing An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961)).

383. *See supra* note 54 and accompanying text; *supra* note 222 and accompanying text.

384. The Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.), prohibited guns in

prohibitions on carrying weapons into polling places, courthouses, and public gatherings.[385] The usual concept was that such laws were permissible regulations of the right, provided they were not overbroad. The courts usually did not say that the conduct fell completely outside the scope of the right, but rather that the government could regulate a particular abuse of the right.

But the area where *Heller* completely divorces itself from history is its treatment of which weapons are constitutionally protected. Justice Scalia finds it startling to read *Miller* for the proposition that "ordinary military equipment" could mean that "only those weapons useful in warfare are protected."[386] Of course, this is exactly what *Aymette*, the authority cited in *Miller*, held: protected weapons were individual weapons of "civilized warfare."[387] In its place, the Court replaces this definition with the "common use" test: protected "arms" are those "typically possessed by law-abiding citizens for lawful purposes."[388] And why are handguns within the scope of the right? Because, Justice Scalia tells us, handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family."[389] Justice Breyer criticizes the new definition as circular—which it is—but then again, it is no more circular than "reasonable expectation of privacy."[390]

The move to the "common use" test was undoubtedly a change—but not an unprecedented one. The Michigan Supreme Court in *People v. Brown* made a similar change to the right to bear arms.[391] And in *State v. Duke*, the Texas Supreme Court protected *both* military weapons and those commonly possessed by law-abiding citizens, lest citizens find their everyday weapons without constitutional protection.[392] Most importantly, this test solved *Miller*'s principal drawback of approving weapons considered inappropriate for civilian possession.

Perhaps most extraordinary in formulating the new test is what happens to army rifles. In the nineteenth-century cases, the army rifle was at the *very core* of constitutional protection. Banning army rifles or muskets would have been to the Second Amendment what banning a particular mainstream political opinion would be to the First. Justice Scalia finds, in the common-law prohibition against carrying dangerous or unusual weapons, authority for banning "M-16 rifles and the like"— the core ordinary, individual weapon of today's infantry soldier.[393] As Reva Siegel correctly argues:

> In this remarkable passage, the majority imposes restrictions on the kinds of weapons protected by the Second Amendment that the

---

courthouses, marketplaces, and similar gatherings.

385. *See supra* note 277 and accompanying text.

386. District of Columbia v. Heller, 554 U.S. 570, 624 (2008).

387. *See supra* note 169 and accompanying text.

388. *Heller*, 554 U.S. at 625.

389. *Id.* at 628–29 (quoting Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007)); *see also* McDonald v. City of Chicago, 130 S. Ct. 3020, 3036 (2010) (collecting quotations from *Heller* about the popularity of handguns for self-defense).

390. *Heller*, 554 U.S. at 721 (Breyer, J., dissenting); *see also* O'Shea, *supra* note 285, at 384.

391. *See supra* note 323 and accompanying text.

392. *See supra* note 249 and accompanying text.

393. *Heller*, 554 U.S. at 627 (majority opinion).

Compendium_Rivas
Page 440

majority concedes would disable exercise of the right for the amendment's textually enunciated purposes. How could an originalist interpretation of the Second Amendment exclude from its protection the kinds of weapons necessary to resist tyranny—the republican purpose the text of the Second Amendment discusses and, on the majority's own account, "the purpose for which the right was codified"?[394]

Siegel's criticism is exactly right as a matter of originalism. Although Justice Scalia writes, "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense,"[395] he has no authority for this proposition—likely because Justice Scalia has it backward.

The tradition in England was that individuals would possess ordinary *military* weapons. This tradition dated at least from the Assize of Arms in 1181.[396] When the Crown required people to have arms, the Assize of Arms selected weapons and body armor that were in common *military* use—not weapons that individuals happened to otherwise possess in their civilian lives for lawful purposes like self-defense. In fact, individual self-defense against criminals was illegal in England at the time.[397] The Assize of Arms listed weapons like chainmail, a helmet, a sword, and a shield—clearly military weapons, just like the muskets, pistols, and related military equipment prescribed by the Militia Act of 1792.[398] I doubt seriously that twelfth-century Englishmen ordinarily kept chainmail, helmet, and a shield as part of their individual self-defense weapons in case a burglar broke into their home. The thought of someone trying to don all of this equipment in such an emergency is kind of ridiculous. Nor do I know of any evidence that ordinary citizens walked around in their helmets and chainmail in the usual course of their civilian lives. In fact, the common-law prohibition against carrying dangerous or unusual weapons may have originally punished exactly that: those who went out in public fully armed with their militia weapons and body armor in circumstances likely to provoke fear.

Justice Scalia's attempt to trace modern restrictions on military weapons to the common-law prohibition of going armed with dangerous or unusual weapons is unavailing. Although the crime is said to be a common-law offense, the Statute of Northampton implemented it and prescribed the punishment. That statute provided:

> That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also [upon a Cry made for Arms to keep the Peace, and the same in such places where such Acts happen,] be so hardy to come before the King's Justices, or other of the King's Ministers doing

---

394. Siegel, *supra* note 5, at 200.

395. *Heller*, 554 U.S. at 624.

396. Assize of Arms, 27 Hen. 2 (1181) (Eng.).

397. 2 FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I, at 478 (2d ed., Cambridge Univ. Press reprint 1968) (1895) (persons who killed in individual self-defense "deserve[d] but need[ed] a pardon").

398. Assize of Arms §§ 1–2.

*INDIANA LAW JOURNAL*

their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.[399]

Despite the seemingly broad textual prohibition on carrying arms everywhere, courts construed the prohibition very narrowly—on the rare occasions that the statute was enforced. The common-law prohibition applied to carrying weapons *in public*. The Court of King's Bench required that the carrier have the illegal purpose of terrifying citizens.[400] This was the construction given to it in the United States by the North Carolina courts, the only courts that have seriously enforced the prohibition.[401] The antebellum North Carolina Supreme Court, in *State v. Huntly*, stated that all guns are "dangerous or unusual weapons" for the purpose of this prohibition.[402] Although gun *ownership* was common among Americans (and included guns of all kinds), the court argued that most individuals did not frequently *carry* those weapons. The crime was committed by carrying deadly weapons in public only if the person carrying the weapons had both the unlawful purpose of terrorizing others and if he carried the weapons "in such manner as naturally will terrify and alarm a peaceful people."[403]

Other authorities claim that the prohibition extended, beyond those with a specific intent to terrify, to those carrying weapons under circumstances that would provoke fear in reasonable people.[404] William Hawkins distinguished between usual and unusual weapons. Because the public possession of common weapons does not cause fear in reasonable people, people are free to carry them for self-defense.[405] In contrast, going armed with unusual weapons in ordinary circumstances will provoke fear in reasonable people, so carrying them is generally prohibited. This prohibition often included not just the carrying of certain weapons, but also walking the streets in armor.[406] Nevertheless, no one violated the common-

---

399. The Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.) (brackets in original) (footnote omitted).

400. Sir John Knight's Case, (1686) 87 Eng. Rep. 75 (K.B.) 76; 3 Mod. 117, 118 ("[T]he meaning of the statute of . . . was to punish people who go armed to terrify the King's subjects."); R v. Sir John Knight, (1686) 90 Eng. Rep. 330 (K.B.) 330; Comb. 38, 39 (requiring evil intent); State v. Huntly, 25 N.C. (3 Ired.) 418, 423 (1843) (requiring both a purpose to "terrify and alarm" and carrying the weapons in public "in such manner as naturally will terrify and alarm, a peaceful people").

401. Tennessee declined early to recognize this common-law offense due to the right to bear arms. Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833). Most states have abolished English common-law offenses.

402. *Huntly*, 25 N.C. at 422–23.

403. *Id.* at 423.

404. 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN §§ 4–10, at 488–89 (8th ed. 1824); 4 WILLIAM BLACKSTONE, COMMENTARIES *149.

405. 1 HAWKINS, *supra* note 404, § 9, at 489; *see also* R v. Sir John Knight, 90 Eng. Rep. at 330 (recognizing "a general connivance to gentlemen to ride armed for their security").

406. 20 Rich. II, c. 1 (1396) (Eng.) (enumerating "sallets," "Skull[s] of Iron," and other armor); 1 HAWKINS, *supra* note 404, §§ 4–10, at 489; *cf.* 4 WILLIAM BLACKSTONE,

Compendium_Rivas
Page 442

law prohibition by defending his home (or the home of another) against unlawful violence or by defending the state against invaders and domestic disturbances.[407] In these circumstances, it is clear that the person carrying the weapons has no intention to breach the peace.

Justice Scalia erred in using this common-law prohibition as a historical precedent to justify a total ban on "M-16 rifles and the like." Today, the M16 rifle and its derivatives are at the very core of the contemporary soldier's individual arms. Without these, no militia could be "well-regulated."

Justice Scalia might respond that England did occasionally ban specific weapons completely. Two statutes of Richard II, which further implemented the Statute of Northampton, did prohibit lancegays, a type of spear.[408] Thus, there is some historical precedent for banning weapons completely, whether carried in public or not.

I doubt, however, that these statutes will support Justice Scalia's argument. The ban on lancegays was on a very specific type of weapon. The statute would be more analogous to a Prohibition-era legislature simply banning the Thompson submachine gun in light of the violence of organized crime. The ban on lancegays in no way deprived people of military arms generally, as does a complete ban on all military rifles.[409]

Moreover, this particular ban did precede the creation of the right to have arms in the seventeenth century. By the time the right to have arms found its way into the English Bill of Rights, this particular weapon was obsolete, and so it is not clear if an analogous seventeenth-century ban would have been met with approval. Likely, a narrow ban on a very particular kind of weapon creating large public externalities would have been compatible with the right to have arms, whereas banning the entire class of military arms for civilian possession would not.

By using the common-law rule to justify prohibitions against "M-16 rifles and the like," Justice Scalia completely inverted the Second Amendment from its nineteenth-century understanding: army rifles to resist tyranny are out; handguns in the home for private purposes are in. How could an originalist interpretation of the Second Amendment exclude from its protection the kinds of weapons necessary to resist tyranny? An originalist interpretation cannot. Justice Scalia is not engaged in originalism; he is engaged in Ackermanian-style intergenerational synthesis.[410]

*Heller* could have taken a different approach to the "machine gun problem." Contemporaneous detractors of the nineteenth-century definition of "arms" objected to the "ordinary military equipment" test on the grounds that it might invalidate the general federal prohibition on "machineguns."[411] For them,

---

COMMENTARIES *149 (discussing the Laws of Solon, which made Athenians finable for walking the street in armor).

407.  1 HAWKINS, *supra* note 404, §§ 8, 10, at 489.

408.  7 Rich. II, c. 13 (1383) (Eng.); 20 Rich. II, c. 1.

409.  *See, e.g.*, Benjamin v. Bailey, 662 A.2d 1226 (Conn. 1995) ("[A] statutory ban on assault weapons, because it continues to permit access to a wide array of weapons, does not infringe on the right to bear arms . . . ."); Volokh, *supra* note 97, at 1454–55 (analogizing from First Amendment doctrine that looks to alternative channels of expression).

410.  *See* 1 ACKERMAN, *supra* note 279, at 90. On Scalia's opinion being an example of living constitutionalism, see Siegel, *supra* note 5, at 192 & n.6.

411.  *See* 18 U.S.C. § 922(*o*) (2012) (generally prohibiting machineguns); O'Shea, *supra*

recognizing a general right of individuals to have automatic weapons was a *reductio ad absurdum* of recognizing an individual Second Amendment right to have arms that were useful for contemporary militia service.

In response, the Court simply could have said that the ban on machine guns was a *regulation*—not a prohibition—of a core component of the right to keep and bear arms. Bans on handguns were impermissible because they eliminated "an entire class of arms."[412] The machine gun ban does not do this. Handguns, rifles, shotguns, and other firearms become, in legal terminology, "machineguns" when they are capable of shooting multiple shots with a single function of the trigger.[413] The machine gun ban did not ban an entire class of weapons: the handgun, rifle, and shotgun are still lawful. The ban just narrowly restricts the mode in which these particular guns fire, limiting them to one shot per pull of the trigger—just like prohibiting guns in a courtroom narrowly restricts the right to bear arms in public. But this approach, of course, would not have totally refashioned the right to bear arms in the right's contemporaneous popular image—as a right to have arms primarily for personal self-defense—and that is what Justice Scalia was trying to do.

CONCLUSION

When it comes to the right to keep and bear arms, courts have never been originalists. Subsequent generations remake the right to fit the popular conception of what the right ought to be. In the antebellum period, this meant expanding the right to include private self-defense and the right to carry guns openly for personal protection—while allowing state legislatures to enact concealed weapons laws in an effort to prevent crime and dueling. After the Civil War, courts curtailed the right to have guns in public; to justify this, they adopted a different theory of the right to bear arms, one that recognized its civic republican character and diminished the importance of individual self-defense. The courts thus altered their understanding of the purpose of the right to justify altering the dimensions of the right—dimensions that comported with the popular conceptions of the right's scope and their demand for legislative solutions for the criminal use of weapons. Courts then applied the right against jurisdictions that adopted unusually severe laws for that time period. The content of the "regulation/prohibition" distinction that Winkler identifies is formed around contemporary notions of reasonableness.

*Heller* is not an originalist decision, and it should not purport to be. *Heller* remade the Second Amendment around its current popular understanding. The rule in *Miller*—while almost certainly historically accurate—failed to allow courts to refashion the right in a manner palatable to the contemporaneous population. This is why *Miller* failed. Likewise, the collective rights cases failed because few people seriously understand the right to bear arms to protect nothing.

The future of *Heller* remains uncertain. But I can say, with a fair amount of confidence, that how courts flesh out the right to bear arms tomorrow will strongly

---

note 285, at 361–62 (describing the potential invalidation of the machine gun ban as the Government's overwhelming concern in its *Heller* arguments).

   412.  District of Columbia v. Heller, 554 U.S. 570, 628 (2008) (quotation marks omitted).

   413.  *See* 26 U.S.C. § 5845(b) (2012) (defining "machinegun").

Compendium_Rivas
Page 444

resemble how the contemporaneous population understands the right—not what
James Madison thought when he drafted the provision in 1789.

.

Compendium_Rivas
Page 446

# GUN CONTROL AND RACISM

*Stefan B. Tahmassebi**

That all such free Mulattoes, Negroes and Indians . . . shall appear without arms[1]

## INTRODUCTION

The history of gun control in America possesses an ugly component: discrimination and oppression of blacks, other racial and ethnic minorities, immigrants, and other "unwanted elements," including union organizers and agrarian reformers. Firearms laws were often enacted to disarm and facilitate repressive action against these groups.

The first gun control laws were enacted in the antebellum South forbidding blacks, whether free or slave, to possess arms, in order to maintain blacks in their servile status. After the Civil War, the South continued to pass restrictive firearms laws in order to deprive the newly freed blacks from exercising their rights of citizenship. During the later part of the 19th century and the early part of the 20th century, gun control laws were passed in the South in order to disarm agrarian reformers and in the North to disarm union organizers. In the North, a strong xenophobic reaction to recent waves of immigrants added further fuel for gun control laws which were used to disarm such persons. Other firearms ownership restrictions were adopted in order to repress the incipient black civil rights movement.

Another old American prejudice supported such gun control efforts, then as it does now: the idea that poor people, and especially the black poor, are not to be trusted with firearms. Even now, in many jurisdictions in which police departments have wide discretion in issuing firearm permits, the effect is that permits are rarely issued to poor or minority citizens.

---

* Assistant General Counsel, Office of the General Counsel of the National Rifle Association of America. J.D., Georgetown University, 1987; B.A., University of Virginia, 1983. The author would like to thank Gina Abdo for her efforts in helping to prepare this article.
[1] 7 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 95 (W.W. Henning ed. 1823).

Compendium_Rivas
Page 447

Blacks, and especially poor blacks, are disproportionately the victims of crime. Yet, these citizens are often not afforded the same police protections that other more affluent and less crime ridden neighborhoods or communities enjoy. This lack of protection is especially so in the inner city urban ghettos. Firearms prohibitions discriminate against those poor and minority citizens who must rely on such arms to defend themselves from criminal activity to a much greater degree than affluent citizens living in safer and better protected communities.

Prohibiting firearms ownership among law-abiding citizens will do nothing to reduce violent crime since such behavior is virtually nonexistent among persons without previous records of serious violence or criminal behavior. However, as many studies indicate, such firearms prohibitions may significantly reduce the deterrent effect of widespread civilian gun ownership on criminals, especially in regard to crimes such as residential burglaries and commercial robberies.

Further, statistics and past history show that many millions of otherwise law-abiding Americans would not heed any gun ban, either prohibiting semiautomatic firearms or handguns. This response should be expected given the traditional American attitude towards guns and the banning of any commodity deeply valued by a substantial portion of society.

Finally, constitutional protections, other than the right to keep and bear arms, have been violated and are threatened by the enforcement of restrictive firearms laws. Present enforcement of firearms statutes account for numerous illegal searches and seizures by the police. Most often these unconstitutional searches and seizures are directed against the poor and racial minorities. Violent crime, however serious, does not justify the wholesale violation of fundamental freedoms, such as the right to be secure in one's person and effects from unwanted government intrusion.

## I. GUN CONTROL MEASURES HAVE BEEN AND ARE USED TO DISARM AND OPPRESS BLACKS AND OTHER MINORITIES

The historical purpose of gun control laws in America has been one of discrimination and disenfranchisement of blacks, immigrants, and other minorities. American gun control laws have been enacted to disarm and facilitate repressive actions against union organizers,

workers, the foreign-born and racial minorities.[2] Bans on particular
types of firearms and firearms registration schemes have been enacted
in many American jurisdictions for the alleged purpose of controlling
crime. Often, however, the purpose or actual effect of such laws or
regulations was to disarm and exert better control over the above-noted
groups.[3] As Justice Buford of the Florida Supreme Court noted in his
concurring opinion narrowly construing a Florida gun control statute:

> I know something of the history of this legislation. The original Act of 1893
> was passed when there was a great influx of negro laborers in this State
> drawn here for the purpose of working in turpentine and lumber camps. The
> same condition existed when the Act was amended in 1901 and the Act was
> passed for the purpose of disarming the negro laborers . . . . The statute was
> never intended to be applied to the white population and in practice has never
> been so applied. . . . [T]here has never been, within my knowledge, any ef-
> fort to enforce the provisions of this statute as to white people, because it
> has been generally conceded to be in contravention of the Constitution and
> non-enforceable if contested.[4]

Implicit in the message of such a law was the perceived threat that
armed negroes would pose to the white community. As applied, there-
fore, the statute sent a clear message: only whites could be trusted with
guns, while negroes could not.

## A.   Gun Control in the South

The development of racially based slavery in the seventeenth cen-
tury American colonies was accompanied by the creation of laws met-
ing out separate treatment and granting separate rights on the basis
of race. An early sign of such emerging restrictions and one of the
most important legal distinctions was the passing of laws denying free
blacks the right to keep arms. ''In 1640, the first recorded restrictive
legislation passed concerning blacks in Virginia excluded them from
owning a gun.''[5]

> Virginia law set Negroes apart from all other groups . . . by denying them
> the important right and obligation to bear arms. Few restraints could indicate

---

[2] Kessler, *Gun Control and Political Power*, 5 LAW & POL'Y. Q. 381 (July 1983).

[3] *See, e.g., Ex Parte Lavinder*, 88 W. Va. 713, 108 S.E. 428 (1921) (striking down
martial-law regulation inhibiting possession and carrying of arms).

[4] Watson v. Stone, 148 Fla. 516, 524, 4 So.2d 700, 703 (1941) (Buford, J., concurring).

[5] L. KENNETT & J. L. ANDERSON, THE GUN IN AMERICA; THE ORIGINS OF A NATIONAL
DILEMMA 50 (1975).

more clearly the denial to Negroes of membership in the White community. This first foreshadowing of the slave codes came in 1640, at just the time when other indications first appeared that Negroes were subject to special treatment.[6]

In the later part of the 17th Century fear of slave uprisings in the South accelerated the passage of laws dealing with firearms possessions by blacks. In 1712, for instance, South Carolina passed "An act for the better ordering and governing of Negroes and Slaves" which included two articles particularly relating to firearms ownership and blacks.[7] Virginia passed a similar act entitled "An Act for Preventing Negroes Insurrections."[8]

Thus, in many of the antebellum states, free and/or slave blacks were legally forbidden to possess arms. State legislation which prohibited the bearing of arms by blacks was held to be constitutional due to the lack of citizen status of the Afro-American slaves. Legislators simply ignored the fact that the United States Constitution and most state constitutions referred to the right to keep and bear arms as a right of the "people" rather than of the "citizen".[9]

The Supreme Court of North Carolina upheld a law prohibiting free blacks from carrying firearms on the grounds that they were not citizens.[10] In the Georgia case of *Cooper v. Mayor of Savannah*, a similar provision passed constitutional muster on the grounds that "free persons of color have never been recognized here as citizens; they are not entitled to bear arms, vote for members of the legislature, or to hold any civil office."[11] Chief Justice Taney argued, in the infamous *Dred Scott* case, that the Constitution could not have intended that free blacks be citizens:

> For if they were so received, and entitled to the privileges and immunities
> of citizens, it would exempt them from the operations of the special laws
> and from the police regulations which they [the states] considered to be nec-
> essary for their own safety. It would give to persons of the negro race, who

---

[6] W. JORDAN, WHITE OVER BLACK: AMERICAN ATTITUDES TOWARD THE NEGRO, 1550-1812, at 78 (1968).

[7] 7 STATUTES AT LARGE OF SOUTH CAROLINA 353-54 (D.J. McCord ed. 1836-1873).

[8] 2 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 481 (W.W. Henning ed. 1823).

[9] Halbrook, *The Jurisprudence of the Second and Fourteenth Amendments*, 4 GEO. MASON U. L. REV. 1, 15 (1981).

[10] *State v. Newsom*, 27 N.C. 250 (1844).

[11] 4 Ga. 68,72 (1848).

Compendium_Rivas
Page 450

were recognised as citizens in any one State of the Union, the right to enter every other State whenever they pleased, . . . [A]nd it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and to keep and carry arms wherever they went.[12]

After the conclusion of the American Civil War, several southern legislatures adopted comprehensive regulations, Black Codes, by which the new freed men were denied many of the rights that white citizens enjoyed. The Special Report of the Anti-Slavery Conference of 1867 noted with particular emphasis that under these Black Codes blacks were "forbidden to own or bear firearms, and thus were rendered defenseless against assaults."[13] Mississippi's Black Code included the following provision:

> Be it enacted . . . [t]hat no freedman, free negro or mulatto, not in the military . . . and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, . . . and all such arms or ammunition shall be forfeited to the informer . . . ."[14]

The firearms confiscated would often be turned over to the Klan, the local (white) militia or law enforcement authorities which would then, safe in their monopoly of arms and under color of the Black Codes, further oppress and violate the civil rights of the disarmed freedmen.

The United States Congress overrode these Black Codes with the Civil Rights Act and the fourteenth amendment. The legislative histories of both the Civil Rights Act and the fourteenth amendment are replete with denunciations of those statutes denying blacks equal access to firearms for personal self-defense. [15]

In support of Senate Bill No. 9, which declared as void all laws in the former rebel states which recognized inequality of rights based on race, Senator Henry Wilson (R., Mass.) explained that: "In Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them . . . ."[16]

---

[12] *Dred Scott v. Sanford*, 60 U.S. (19 How.) 393, 416-17 (1856).

[13] *Reprinted in* H. HYMAN, THE RADICAL REPUBLICANS AND RECONSTRUCTION 219 (1967).

[14] 1866 MISS. LAWS ch. 23, §1, 165 (1865).

[15] Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 256 (1983).

[16] CONG. GLOBE, 39th Cong., 1st Sess. 40 (1865).