1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*

9

10                  IN THE UNITED STATES DISTRICT COURT

11               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                            CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG** |
| **v.** | **VOLUME 2 OF 11** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:      5A |
| | Judge:      Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## INDEX

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867). | 18 n.17 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A. | 55 n.79 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 55 n.79 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 49 n.69 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 13 n.15 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 17 n.16 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 33 n.41 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 34 n.44, 54 n.78 | 0039-0041 |
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |

2

| | | |
|---|---|---|
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 31 n.34 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 177-202, 353-68. | *passim* | 0060-0096 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 31 n.34 & n. 35 | 0097-0104 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 20 n.22 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 9 n.3, 13 n.14, 25 n.26 | 0109-0217 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 40 n.53, 43 n.55 | 0218-0222 |
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 18 n.17, 20 n.21 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 18 n.19 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 19 n.20, 36 n.47, 40 n.53 | 0360-0397 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 28 n.29 | 0398-0424 |

3

| | | |
|---|---|---|
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 45 n.59 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 21 n.23, 25 n.25 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 45 n.59 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 10 n.9, 27 n.28, 30 n.33 | 0453-0464 |
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 36 n.47, 38 n.50, 39 n.51 & 52, 47 n.64 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 34 n.44 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 52 n.75 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 18 n.18 | 0489-0495 |

4

| | | |
|---|---|---|
| Allan Robert Purcell, "*The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 19 n.20 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 55 n.79 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 46 n.60 | 0563-0584 |
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 19 n.20 | 0585-0598 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana,for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 53 n.77 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 12 n.12, & 13 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 47 n.63 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 48 n.68 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 | 49 n.70 | 0620- |

5

| | | |
|---|---|---|
| "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | | 0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectory States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 48 n.67 | 0622-0627 |
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 12 n.13 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 28 n.30 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 24 n.24 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:211-12. | 17 n.16 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 47 n.62 | 0653-0656 |

6

| | | |
|---|---|---|
| **NEWS ARTICLES** | | |
| Army and Navy Journal, June 1, 1867, p. 350 | 29 n.32 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 27 n.27 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 37 n.49 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 2 | 56 n.61 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 32 n.37 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 32 n.38 | 0666 |
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 49 n.72 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 44 n.56 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.31 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 25 n.26 | 0679 |
| New Orleans Republican, June 1, 1873, p. 1 | 40 n.53, 42 n.54 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 46 n.61 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 32 n.40 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 33 n.42 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p. 1. | 42 n.54 | 0688 |

| | | |
|---|---|---|
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 34 n.43 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 45 n.58 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 35 n.46 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 44 n.57 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 37 n.48 | 0695 |
| *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4). | 27 n.27 | 0696 |
| **OTHER SOURCES** | | |
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 34 n.45 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 25 n.26 | 0701-0702 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 26 n.26 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 26 n.26 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 51 n.73 | 0716-0727 |

8

Miles in 1877. "He came out to the field, and I had him point out the location of the formality of surrender [sic], as he remembered." McWhorter to Joseph G. Masters, October 27, 1936, Masters Papers. McWhorter wrote to Wood about this new information, and Wood responded that he thought the site was "on higher ground." Nonetheless, McWhorter wrote Smith that "I had a talk with my Noyes, and he agreed that the location decided on by you should be marked on the map and promised me that he would so make it, as designated by you." McWhorter to Smith, November 8, 1935, folder 61, McWhorter Papers. (See also C. Raymond Noyes, plat, "Battle of the Bear's Paw," NA.) The next day, McWhorter told Smith that "I now have absolute proof that you are correct in the location of Col. Miles [sic] Headquarters being located up that 'draw' or canyon, at the mouth of which you pointed out where the surrender took place." McWhorter to Smith, November 9, 1935, folder 3, McWhorter Papers. McWhorter did not state the nature of his "absolute proof." Yet this site seems illogical from a military standpoint; besides being at variance with accounts that specifically mention Joseph riding up a hill, the fact that it was located on relatively open terrain—where Miles and Howard would be vulnerable to Nez Perce sharpshooters beyond the enclosed perimeter of the army line—would seem to negate it as the surrender site. The correspondent for the New York Herald (October 15, 1877) noted that "Joseph entered the lines established by General Miles." This postulated surrender site may also qualify as the place where Joseph approached during the cease-fire of October 1 (see Young Two Moon, Account).

114. Wood to Mason, October 6, 1877, entry 897, box 1, part 3, 1877, U.S. Army Continental Commands. The Charles K. Bucknam and G. H. Snow account in New York Herald, October 11, 1877, stated that "at half past two in the afternoon . . . Joseph came into General Miles' camp and shook hands and proposed a surrender, which was instantly granted."

115. C. E. S. Wood, "Pursuit and Capture," 329.

116. See also Wood to Storey, May 27, 1895, published in Oregon Inn-Side News, 1 (November-December, 1947), 5–6, copy in the C. E. S. Wood Collection. The gun that Chief Joseph delivered to Miles was a brass-receivered Model 1866 Winchester .44 rimfire lever-action carbine. Its serial number of 102596 indicates an 1872 manufacturing date. The gun was donated in 1957 to the Museum of the Upper Missouri, in Fort Benton, where it reposes today. Statement of William T. Morrison; accession agreement; and exhibit text, all provided to author by John G. Lepley, February 8, 1996. For a purported Joseph surrender weapon, see Charles Phillips, "Chief Joseph's Gun."

117. The account in Portland Daily Standard, October 13, 1877, supposedly by Sutherland (apparently using information provided by Lieutenant Wood when both were subsequently on the Missouri River), and Lieutenant Guy Howard's account of the Joseph-Howard-Miles incident in the New York Herald, October 22, 1877, are in agreement as to its essentials as described above. See also Woodward, "Service of J. W. Redington" (ca. 1934); C. E. S. Wood, "Pursuit and Capture," 329; and Wood, draft of letter account to Lyman, January 17, 1939, C. E. S. Wood Collection, all of which concur. An account published earlier in the New York Herald, October 15, 1877, is the apparent source for the scenario in which Joseph spurned Howard, passing by him "in surly silence" and approaching Miles to say, "I want to surrender to you." This version of the event—practically verba-

tim in some particulars—was pirated by Mulford in Fighting Indians!, 123–24, thus further compromising this book's value. While there may have been certain substance to this view of the event, there is no indication in the accounts of the primary participants—Joseph, Miles, and Howard—that such animosity existed between Joseph and Howard—in fact, every indication is that only an hour or so earlier Joseph had responded favorably in referring to Howard. Chicago Inter-Ocean, October 26, 1877, editorialized: "All that clap-trap about Chief Joseph of the Nez Perces contemptuously declining to surrender to General Howard . . . is exploded [by] a dispatch to the New York Herald and other reports by officers present at the surrender." See also Army and Navy Journal, November 3, 1877. Nonetheless, the story of Joseph's repudiation of Howard at the surrender persisted. In the 1920s, two civilian employees of the army in 1877, Jack Conley and James Boyd, maintained that it happened. Conley said that "Chief Joseph held out his gun and General Howard reached out to take it, but Chief Joseph pulled it back and handed it to General Miles. . . . We all threw our hats in the air and cheered." Butte Miner, May 26, 1925. James Boyd said of Joseph: "He had a Winchester rifle and presented arms, then handed the gun to Howard with the muzzle pointed towards the general. Howard reached out his only hand to take it and General Miles. This is just how it happened and we talked it over afterwards as to just what Joseph meant." Boyd, Interview. Samuel Tilden said it was commonly believed among the Nez Perces in Canada that "Joseph refused to give his gun to Howard but deliberately walked over and gave it to Miles," a view with which the Reverend Stephen Reuben, another Nez Perce, agreed. C. T. Stranahan to McWhorter, August 31, 1941, folder 44, McWhorter Papers. In an interview the year before his death, Joseph said in broken English of the event: "I give gun Miles. He say: 'Give gun General Howard,' I say: 'No, I give you my gun; Howard no catch me.'" Washington, D.C., Evening Star, December 12, 1903. McWhorter believed that the leaders had discussed in council who to surrender to and favored Miles because they thought that Howard would have the leaders hanged. McWhorter, Hear Me, 497 n. 10. But another prevailing view among the Nez Perces was that Howard would be more likely to take them back home than Miles would. McWhorter to Many Wounds, February 11, 1930, containing Many Wounds's responses to questions, folder 160, McWhorter Papers. See McWhorter, Hear Me, 497 n. 10, for yet further (and questionable) scenarios regarding the Joseph-Howard-Miles surrender incident.

118. Chicago Times, October 26, 1877. And in Joseph [Heinmot Tooyalakekt], "An Indian's Views," (429) Joseph stated that he said: "From where the sun now stands I will fight no more." In his 1903 interview, he stated: "I point to sun; I say: 'I fight white man no more.'" Washington, D.C., Evening Star, December 12, 1903. Baird wrote in Baird, "General Miles's Indian Campaigns" (364), and Miles wrote in Miles, Personal Recollections (275) that Joseph said: "From where the sun now stands, I fight no more against the white man." Thus, it is possible that Joseph uttered an abbreviated form of his earlier remarks. See Aoki, Nez Perce Texts, 121–22. More likely, these accounts may be among the earliest attempts to link the longer message to the formal surrender proceedings, contributing to the misconception about the delivery of the "speech" that is present today. By 1895, it seems, Wood himself had come to believe that Joseph made the speech in dramatic

gesture when he turned his weapon over to Miles. "Standing back, he folded his blanket again across his chest, leaving one arm free, somewhat in the manner of a Roman senator with his toga . . . [and began to speak.]" Wood to Storey, May 27, 1895, published in *Oregon Inn-Side News*, 1 (November–December, 1947), 5–6, copy in the C. E. S. Wood Collection. And in 1936 Wood wrote that Joseph "stepped back, adjusted his blanket to leave his right arm free, and began his speech." Wood to McWhorter, January 31, 1936, quoted in McWhorter, *Hear Me*, 497–98. (See also C. E. S. Wood, "Pursuit and Capture," 330.) And as he wrote Howard's son: "Joseph swung himself down from his horse and offered his rifle to your father, and your father signed to him to give it to Miles, which Joseph did. Joseph stepped back a little and began his surrender speech, which was translated by Chapman and I took it on my paper pad." Wood to Howard, February 20, 1941, folder 34, McWhorter Papers. Scout Redington claimed to have watched the surrender. "I have always thought writers took poetic license in translating Joseph's speech. . . . I heard Joseph say something and the interpreter blah blah blah something back. That was all. I don't know what was said." Quoted in Woodward, "Service of J. W. Redington."

119. C. E. S. Wood, "Chief Joseph, the Nez Perce," 142; and Wood to Brosnan, January 7, 1918, C. E. S. Wood Collection. Wood remembered that Howard turned to him "and said, 'Mr. Wood, take charge of Chief Joseph as a prisoner of war. See that he is made comfortable and in no way is molested or troubled.' Chapman translated this to Joseph. I approached him, smiling pleasantly, a guard was designated for us and we walked together to Miles' camp where a large tent had been prepared for Joseph. I entered the tent with him and remained some time, with Chapman to interpret, trying to make Joseph feel at home, conversing with him about the outbreak of this unhappy war." Wood, draft of letter account to Lyman, January 17, 1939, C. E. S. Wood Collection.

120. Tilton to Surgeon General, October 26, 1877, entry 624, box 1, Office of the Adjutant General. One report stated that Joseph, as a condition of his submission, insisted that Miles send out a force to try and find his daughter, which was agreed to. See comment of Second Lieutenant Ernest A. Garlington, Seventh Cavalry, cited in Cheyenne *Daily Leader*, December 6, 1877.

121. New York *Herald*, October 15, 1877.

122. Howard, *My Life and Experiences*, 299.

123. New York *Herald*, October 15, 1877. In addition, contemporary accounts of the surrender proceedings on which this description is based are in *Harper's Weekly*, November 17, 1877, which contains Wood's account (that in the Portland *Daily Standard*, October 13, 1877, purportedly by Sutherland, is in fact Wood's); Snyder, "Diary," October 5, 6, 1877; New York *Herald*, October 22, 1877; and Sutherland, *Howard's Campaign*, 44 (again, using information presumably acquired from Wood). Memoir accounts include Miles, *Personal Recollections*, 275; Miles, *Serving the Republic*, 178–79; Nelson A. Miles, "Chief Joseph's Surrender," New York *Tribune*, August 4, 1907, 6; and Howard, *My Life and Experiences*, 299–300; Howard, *Nez Perce Joseph*, 265–67; and Howard, *Famous Indian Chiefs*, 197–98. For the Palouses, see Trafzer and Scheuerman, *Chief Joseph's Allies*, 13.

124. Miles, "Report," 515.

125. These figures are based on the estimate of Black Eagle, himself an escapee, who told McWhorter that 233 people—140 men and boys and 93 women

and girls—had managed to leave the Bear's Paw village either at the outset of the fighting, breaking away in small parties during succeeding nights, or with White Bird at the end. McWhorter, *Hear Me*, 499. The numbers tally well with known Nez Perce surrender and death figures in accounting for the size of the Nez Perce village.

126. White Bird's escape from Bear's Paw on the night of October 5 is documented in Zimmer, *Frontier Soldier*, 128; Snyder, "Diary," October 6, 1877; and Howard, "Report," 631, wherein the general stated that the chief, his 2 wives, and [sic]. Both the date and the number of people who left with White Bird's escapees numbered 103 and left with White Bird. In one instance, Yellow Bull said that White Bird's escapees numbered 103 and left the night of September 30. Yellow Bull, Interview, LBNM. Later, however, he stated that White Bird and 50 people escaped on the night of October 1. Yellow Bull, Interview, BYU, 719. Yet Edward Lebain also said the Indians left on the night of the thirtieth. Lebain "has talked with many of the old warriors about this & they all have said it was the night of the first day." Lebain, Interview, IU. White Bird's wife, Hiyom Tiyatkeht, told Camp that during the escape "they crept out quietly. Soldiers saw them but did not fire." See Yellow Bull, Interview, BYU, 719. No Feather also went with White Bird. He said that "more than 40 people" accompanied the chief. "We slipped out at night quietly and were not fired upon by soldiers." Weptas Nut (No Feather), Interview. Duncan MacDonald's sources (who included White Bird) said that there were 103 warriors, 60 women, and 8 children. MacDonald, "Nez Perces," 271.

127. New York *Herald*, October 15, 1877. This account related that when a Nez Perce man volunteered to go find White Bird if Miles would provide him with a mule, the colonel "turned to General Howard, saying—'I haven't got any use for White Bird. I've got all his traps [property?], and don't think he is worth a mule.'"

128. Howard, "True Story . . . Wallowa Campaign," 63.

129. McWhorter, *Yellow Wolf*, 225–26.

130. Wood to Mason, October 6, 1877, entry 897, box 1, part 3, 1877, U.S. Army Continental Commands. Sturgis received the notice on October 7. Miles, *Harvest of Barren Regrets*, 308; and Davison, "A Century Ago," 19. Mason had joined Sturgis on October 5. On the sixth, they had marched eighteen miles and, on the seventh, had gone ten miles when news of the surrender reached them. "Mem. of Marches." On October 8, Sturgis's camp was located "at the upper end of [Little?] Peoples Creek close to the [Little Rocky] mountains." Sturgis to Miles, October 8, 1877, entry 107, box 3, part 3, 1877, U.S. Army Continental Commands.

131. Miles to Assistant Adjutant General, Department of Dakota, October 6, 1877, in Terry, "Report," 515–16.

132. "Report of Indians . . . District of the Yellowstone." This figure aligns approximately with the Nez Perces' estimate of 87 men, 184 women, and 147 children—total 418—given in McWhorter, *Hear Me*, 499 and app. n. 14. The number 418 is the same as that given by Baird, "General Miles's Indian Campaigns," 364. Howard reported that about 100 warriors and 300 women and children surrendered. Howard, "Report," 631. Dr. Tilton reported that "the total number of Nez Perces who surrendered was 405, a large number of them squaws and children." Tilton to Surgeon General, October 26, 1877, entry 624, box 1, Office of the Adjutant General. Finally, Miles told a Chicago newsman that 424 Nez Perces

# THE GUNNING OF AMERICA

Business and the
Making of American Gun Culture

## PAMELA HAAG

BASIC BOOKS
A Member of the Perseus Books Group
New York

Copyright © 2016 by Pamela Haag.

Published by Basic Books,
A Member of the Perseus Books Group

All rights reserved. Printed in the United States of America. No part of this
book may be reproduced in any manner whatsoever without written permission
except in the case of brief quotations embodied in critical articles and reviews.
For information, contact Basic Books, 250 West 57th Street, New York, NY
10107.

Books published by Basic Books are available at special discounts for bulk
purchases in the United States by corporations, institutions, and other
organizations. For more information, please contact the Special Markets
Department at the Perseus Books Group, 2300 Chestnut Street, Suite 200,
Philadelphia, PA 19103, or call (800) 810-4145, ext. 5000, or e-mail special
.markets@perseusbooks.com.

Designed by Trish Wilkinson
Set in 11.5-point Goudy Oldstyle Std

Library of Congress Cataloging-in-Publication Data
Names: Haag, Pamela.
Title: The gunning of America : business and the making of American gun
   culture / Pamela Haag.
Description: New York : Basic Books, a member of the Perseus Books Group,
   2016. | Includes bibliographical references and index.
Identifiers: LCCN 2015036679 | ISBN 9780465048953 (hardcover) | ISBN
   9780465098569 (electronic)
Subjects: LCSH: Firearms—Social aspects—United States—History. | Firearms
   industry and trade—United States—History. | Capitalism—United
   States—History. | United States—Social conditions. | United
   States—Economic conditions. | BISAC: HISTORY / United States / 19th
   Century. | HISTORY / United States / General. | HISTORY / Military /
   Weapons. | BIOGRAPHY & AUTOBIOGRAPHY / Women.
Classification: LCC TS533.2 .H33 2016 | DDC 338.4/768340973—dc23
LC record available at http://lccn.loc.gov/2015036679

10 9 8 7 6 5 4 3 2 1

3 1223 11475 0491

In memory of my brother, Stephen L. Haag



64   THE GUNNING OF AMERICA

the fact that our new rifle is a success [mechanically], and will, in time, if pressed with vigor, retrieve our past losses."[48]

"Press with vigor" understated the matter. Having solved a mechanical problem of how, Winchester needed to crack a riddle of why. Just as crucial as the mechanical invention of a mass-produced repeater was the invention of a world in which it would be mass-purchased. Winchester asked Martin to take a leap of faith and support the company through a loan. "There has been but one sale of the stock, to my knowledge, and this was made recently upon this prospective value, at 25 cents on the dollar. . . . We should prefer to have you hold on, and help us. If you sell, however, it will help us indirectly, as the parties offering to buy do so with the purpose of seeing the thing through, if money will do it." As for himself, Winchester had reached a point of no return. He was seeing the thing through.[49]

CHAPTER 4

"MORE WONDERFUL
THAN PRACTICAL"

BEFORE IT KILLED THE GUN INDUSTRIALISTS (OR MANY OF THEM), the Civil War saved them. The New Haven Arms Company was tottering on bankruptcy, again, before the war. Remington's company had converted much of its manufactory to non-gun items during the comparatively halcyon 1850s: had the war not intervened, the company might well have failed. The war created the demand that gun capitalists desperately sought—and then abruptly withdrew it at war's end, while also leaving thousands of surplus rifles drifting through the country in its wake to depress commercial demand. All of this revealed the inherent pitfalls for the gun industrialist of construing the gun business as the war business.[1]

Abolitionist and famous clergyman Henry Ward Beecher animated the rifle, nicknamed a "Beecher Bible," with a "truly moral agency," giving it a reputation as the righteous instrument of a just war. Otherwise, he preached, you might as well "read the Bible to buffaloes" as try to persuade slaveholders to change their views. Winchester described himself and his outfit as "unconditional unionmen in every sense," refusing to sell to southern sympathizers, although Confederates acquired Henrys through indirect sales and thefts. Remington was a pacifist: he agonized over the drift toward war, and his worries were

Compendium_Vorenberg
Page 062

exacerbated by his foreboding about the war's burden on his manufactory. Among the gun-industrial elite, however, it was Samuel Colt who perhaps best epitomized the American gun industry's future as it moved even more decisively from a government phase to the non-exceptionalism of the commercial phase, in which gun sales, especially internationally, were untethered to belief, creed, politics, patriotism, or partisan agendas. For Colt, according to a biographer, "making and selling munitions was a business like any other"; and as Colt himself put it, guns were just something to "get out and sell." Although Colt was not a southern sympathizer, he "was busy shipping arms to the South up to the last possible moment" in crates vaguely marked "Hardware." Writing to his superintendents on the brink of war, Colt said, "Run the Armory night & day with a double set of hands. Make hay while the sun shines." Amos Colt, a company representative, departed from Washington, DC, in early January 1860 to go to Richmond, Virginia, and "thence to North and South Carolina, Georgia, Alabama, Louisiana, Mississippi, Arkansas, and Tennessee" to sell Colt's guns. About a year later, the *Sunny South*, a newspaper in Aberdeen, Mississippi, featured an ad for Colt's Patent Firearms at "GREAT REDUCTION IN PRICE," in "packages of 5, 10, and 20 each."[2]

Colt's letters detail his interest in establishing a gun factory in Richmond or elsewhere in the South. Toward the end of 1859, he dispatched his loyal representative William Hartley to Richmond to "convince them that we will do everything in our power to carry out [the governor's] designs, whether it is by creating a manufactory of arms . . . at Richmond or employing my armory here in his service." With the Virginia governor, Hartley surveyed the state armory and the adjoining penitentiary and grounds to estimate the costs for Colt to equip the place to make 5,000 rifles a year. The site had enormous water power, and Hartley surmised that the land would "increasing[ly] be of great value." He proposed that Virginia sell the old state armory to a company to be "incorporated with a capital of $500,000 to $1,000,000" at the site's present value of $150,000 or $200,000. The availability of "penitentiary labor of 200 men and the fine granite found here," he

wrote, would make it possible to build a "fine arsenal" that was more easily defended than the current installation.[3]

Hartley reckoned that the company's stock could be sold in Virginia, and that a gun factory would get a good "southern trade." He was willing to "head the list with a subscription of say 9/16th of the stock." Hartley followed up in January 1860 to say that there was a "great deal to be made out of the armory at Richmond. . . . You may look upon it as settled fact that they will erect and put in operation an armory in Richmond which will command the support of the southern states for their military arms." Hartley qualified this statement, saying that the arms could be made elsewhere and simply "assembled and marked" at the Virginia location. He estimated that "a cheap rifle should be made for the militia at 10 to 15 each." Colt also sent a gift pistol to the Georgia governor's son, as he was considering the establishment of an armory there. "I have no doubt that the understanding would result in mutual profit," he concluded, "to my state and yourself."[4]

The *New York Times* accused Colt of treason on the eve of the Civil War, noting that he was "incessantly occupied" in making arms for the South, an effort he made "no attempt to conceal." The *New York Daily Tribune* decried him as a "traitor," a man "base enough to sell arms" that would be turned against him. The paper proposed that "so bad a citizen," who would not work for a "fair share equivalent for the government" (instead abiding by the commercial muse and getting as much money as he could from whomever he could), should have his factory seized. Domestic policy eclipsed the tense antinomy of commerce and commonweal, but it was always there, waiting to be seen.[5]

Meanwhile, the Union was undergunned, having not tooled up in 1861 for a protracted war. "We must have arms—any arms, no matter what," wrote officer John Fremont, in command of the Department of the West, immediately after Bull Run. Rifle fluency was not much better. Historians of militia culture and gun experts have noted that militias were "virtually untrained," with activities limited by law to one-day musters, and sometimes even these were "devoted to getting drunk together." The North anxiously looked to the small community

of hobbyists, many of them of German and Swiss descent, for instruction in rifle use.[6]

Europe was a forgotten commercial frontline in the early Civil War. Marcellus Hartley, who would cross paths with Winchester and the WRAC several times, is recognized by gun experts as perhaps the most ingenious of American arms entrepreneurs. In 1854 he was just establishing his own shop on Maiden Lane, in lower Manhattan. Hartley was the eldest son of a religious man who was inspired to battle the vice and suffering that he saw around him in New York City. His most important work was an "Essay on Milk," against the "evil conditions" of milk production. Growing up in the glow of moral zealotry, Marcellus pivoted to commercial agnosticism. Beginning as a clerk with "no connections or capital," he learned a great deal about guns. But, like gunmakers who happily made other things, Hartley would sell whatever he could sell. On a trip to Europe, knowing that coral ornaments were in demand in the United States, he cornered the market on coral in southern Europe; on another trip, to Florence, Italy, a display of copies of the old masters intrigued him, so he bought the entire stock, filled a small vessel with his new cargo, and sold all of the paintings in the American West and South for a good profit. But guns interested him the most, and in the 1850s Hartley began taking trips out West, according to his memoirist, "for the purpose of creating a market for his wares."[7]

The secretary of war gave Hartley's partner, Jacob Schuyler, a secret assignment in July 1861 to buy guns in Europe "on the very lowest terms compatible with the earliest possible delivery." Two months after that, he reiterated loudly "the URGENT NECESSITY . . . for the IMMEDIATE delivery of all the arms" he could buy. Next, Hartley was dispatched to buy guns. He reported that Europe was crawling with southern agents, and they were purchasing generously and covertly shipping arms to the United States via Nassau in the Bahamas. Hartley worried that they would "clean the market out," but if he could corner the market, the South, with no means to produce its own guns, would have to "succumb." He succeeded in controlling almost all gun production on the Continent in 1862, purchasing over 200,000 stand of

arms, while also tracking down and undermining Confederate contracts by offering "unscrupulous manufacturers" somewhat higher prices to break their existing contracts and sell to the Union instead. Years later, Hartley rued these tactics: most members of the gun elite were fastidious about the trees of contractual ethics, if not the forest of their gun enterprise.[8]

Winchester had always envisioned his rifle as a military weapon, and with guns in short supply, the government tantalized him with the prospect of a guaranteed market. He provided the Ordnance Department with his Henry in 1861. Colonel George Talcott in the department rejected breech-loading weapons. To the secretary of war, he wrote, "There are now Colts, Jenks [the Remington design], Hubbels, Nuttings—and I know not how many other kinds of arms—that they will ultimately all pass into oblivion cannot be doubted."[9]

General James Ripley of the Ordnance Department especially loathed the patented repeater guns, although he endorsed single-shot breech-loaders. He called the repeaters a "great evil" and believed they were a fad. In an 1862 congressional investigation of the nebulous means by which small arms contracts were granted, Ripley elaborated disdainfully that each of the "vast variety of new inventions [has], of course, its advocates, insisting upon the superiority of his favorite arm, . . . and urging its adoption." The doors of the Ordnance Department had been slammed shut on gun inventor Christopher Spencer, who decried Ripley as "the fossil of the Ordnance Department" who was irrationally opposed to all "newfangled Jim Crack" guns. They had been slammed on Winchester, too, who raged against the "immobility of prejudice" toward his repeater, and protested in a letter to his favorite journal, *Scientific American*, under the name "O.F.W.," that "General Ripley . . . has recently said that he prefers the old flintlock musket to any of the modern, improved firearms." The only reason, "or excuse," given for his opinion, he continued, was that the arms would waste ammunition. "The saving of life does not appear an element worthy of consideration," Winchester said. He accused Ripley, not inaccurately, of being a gun fogey. "Where is the military genius to grasp [the repeater rifle]," he fumed elsewhere, "and . . . best develop the



capacities of this terrible engine, the exclusive control of which would enable any government . . . to rule the world?"[10]

That military genius was not Ripley. And, in fairness, other tacticians worldwide also failed to understand the advances that had been made. One confessed on the pages of the influential *Field* magazine in Britain that "this most murderous weapon" puzzled him. And in advance of the illustrious Swiss munitions trials just after the Civil War, an international showcase for the exhibition (and sale) of new gun models, the Henry was much spoken of, but it was seen as both too delicate and too deadly, "more wonderful than practical."[11]

Ripley loathed the new semiautomatic weapons for several reasons. He thought them too complicated, too heavy, and too costly in comparison to the entirely adequate and lighter single-shot breech-loaders, and apt to waste ammunition. This last objection was a source of ridicule in the halls of the Winchester company decades later, when resistance to faster and more automatic assault weapons that "used too much ammunition" seemed "odd" and quaintly preposterous.[12]

Some of Ripley's resistance was more heatedly personal. He hated the inventors of the new repeater guns as much as he hated the guns themselves. He commented, accurately, that their inventions "owe many of their modifications and much of their successful working to the ingenuity and skill of the mechanics in government employ, for which the inventor obtains all the compensation and lays claim to all the credit." It must have been even more galling to see how Colt, especially, had described himself as a "poor devil of an inventor," a tenaciously abject figure of individual brilliance, when what he accomplished by way of invention owed so much to the freewheeling exchange of innovation about guns in the public armory system—and to what could arguably be described as his own poaching of earlier revolver designs from shop windows in Calcutta, and from those whom a lawyer in a Colt patent case had dismissed as "obscure men in obscure places." It is precisely the dense, tangled threads of gun technology and ideas that the narrative of the Lone Inventor, parallel to the Lone Gunman, obscures.[13]

Ripley stood at the juncture of the military-centric gun culture of the early 1800s and the civilian-centric one of the late 1800s. In a

broader sense, he loathed the patented guns because he did not seem to "vision" the new realities of the gun as an industry and a commercial business. He did not understand the new guns themselves—he insisted, for example, that they should have bayonets, when, as Winchester countered, "we do not consider it necessary for the reason that a body of men armed with the rifles would never get within forty rods of any enemy." But also he didn't understand the soul of the gun capitalist. Some were partisan, but their business was not, and followed its own commercial algorithm. Ripley wrote that the "many people urgent and clamorous" for gun contracts, with their eclectic "propositions to sell new and untried arms," were introducing a heterogeneity that undermined the uniformity of arms that defined the military and the idea of a soldier as part of a cohesive troop. But it was only by newfangled design—the glint of originality patentable into a piece of property—that the business now survived. John Gallagher and Company was incredulous that Ripley reserved the right to annul its entire contract for 20,000 rifle muskets if the order was late. Military contracts generically stipulate a hard deadline for delivery, more exacting technical tests and measurements, and definite, usually large, quantities. Ripley believed that armaments were valuable if delivered on time, to support a military mission, but this idea chafed against "capital," as Gallagher explained: the gun industrialist's expenses and risks were frontloaded, and such a clause would deter "the outlay of from one to two hundred thousand dollars, which capitalists are supposed to embark with us." When Ripley refused to remove the clause, Gallagher tried again to explain industrial capitalism. The clause "embarrasses" us, he wrote, as the gun industrialists could suffer "loss of both capital and labor" if it was enforced.[14]

The gun industry and government, with their respective directives of commerce and common defense, were put in the awkward position of being codependent but irreconcilable. For example, Winchester tended to imagine military trials to test new weapons largely as occasions for the government to give advice to private gun capitalists and manufacturers on how they could "perfect weapons of self-defense," as Winchester called them, but the government used trials to make more



practical, limited decisions about purchases and contracts. The interests of Winchester's bottom line and the requirements of public defense were not always the same, or in harmony.[15]

The shimmering military market that should have been so easy for the modern repeaters would have to be approached stealthily. After butting heads with Ripley, the gun manufacturer could appeal to political allies and collaborators. This meant getting a "reachable" politician, of whom there were plenty, and working the gun frontier of Washington's Willard and National hotels, where gun lobbyists and capitalists congregated. Patronage and bribery were ordinary facets of conducting any business and politics at the time. Gun lobbyists in the late 1900s and early 2000s are most identified with legislative campaigns against gun control, but there was no federal legislation in the mid- and late 1800s for the gun capitalist, or his lobbyist, to worry about. Instead, the first generation of gun lobbyists went about the business of business: they worked to secure federal government contracts and, in Colt's case, argued for invaluable patent extensions that would all but ensure gun market domination.[16]

In 1854, Congress had held hearings on whether Colt had bribed members of Congress or used other "illegal or improper means" to obtain the plum prize of a seven-year patent extension. Ultimately, the committee was divided on Colt's guilt, but the hearings are useful for what they reveal about the banally crooked practices of the gun business. Colt had lobbied with his usual ingenuous audacity. He wrote to a General Kingman, "I send by express today a half dozen boxes of champagne . . . with the compliments of the season and the cause of Patent Extension." David Augustus Wright of the *New York Day Book*, a weekly paper, testified that there had been a "good deal of gossip around the hotels" in Washington. On the piazza of the National, Wright chatted with Colt's brother, who said that Colt must have spent over $60,000 on "feasts, presents, etc.," to secure the patent. On another occasion, the Honorable G. Dean excused himself from Wright's room at the hotel, saying that he had to go down to one of the nightly suppers of persuasion hosted by Colt's devoted lawyer, Edward Dickerson. When he returned, he told Wright that a "dead set [i.e., a

strong sell] had been made at him to go for the renewal of Colt's patent." An unidentified lady next to him at the table had promoted Colt's cause because Colt had sent her two boxes of kid gloves from Paris. Others testified that one of Colt's opponents had made this or that congressman a large offer to help defeat the Colt extension. Dickerson had to pay off Horace Day, who controlled a group of "low letter writers" who were threatening to slander the Colt patent extension in the newspapers. Day chided Dickerson that he "was a fool not to have bought up all the correspondents at a thousand dollars a head for the purpose of writing the matter up"—presumably the going rate for DC journalists.[17]

On this frontier, Christopher Spencer had a substantial lead on his chief repeater rifle rival, Winchester. The secretary of the navy, Gideon Welles, wrote to Commodore John Dahlgren in 1861 saying that he would consider his attention to the Spencer rifle a "special favor" on behalf of his "special friend," silk manufacturer Charles Cheney, who was financing it. When the navy order was too small to justify an extensive retooling, Cheney and Spencer hired a lobbyist, Robert Denny, who worked out of the Willard to promote the rifle. A Spencer biographer thinks it most likely that James Blaine, Speaker of the House of Representatives, and possibly Welles were unpublished stockholders in the Spencer company, but this was never proven, and their confidential dealings never revealed whether this was true. Indisputably, however, Welles and Cheney had a close friendship, and Secretary of War Simon Cameron was reachable, to say the least, according to a gun historian. His cronies obtained and then resold gun contracts without competitive bidding.[18]

Spencer next took his case to President Abraham Lincoln, who was more broad-minded about the new patented guns, but disappointed in the Spencer. Spencer's repeater rifle had gotten "so out of order as to have been entirely useless in battle," Lincoln thought. Word of Lincoln's displeasure reached Spencer, who traveled to Washington on August 18, 1863, to demonstrate the rifle to the president personally. He arrived at the White House with rifle in hand and was ushered right in—with remarkable nonchalance—to the president's inner chambers.

Lincoln looked it over carefully and asked Spencer to take it apart, as he wanted to see "the inwardness of the thing." The next day, Lincoln and Spencer went to the spot where the Washington Monument now stands, with Lincoln's son Robert and his secretary, John Hay, to set up an impromptu shooting range. Lincoln did well with the target, hitting close around the bull's-eye. Hay, whose shooting that day was "lamentably bad," recalled Spencer, in the style of the day, as a "quiet little Yankee who sold himself in relentless slavery to his idea for six weary years before it was perfect." With such powerful allies, Ripley was overruled and an initial 10,000 Spencers were ordered by the Ordnance Department.[19]

Winchester worked the Willard, too, but not with Spencer's success. Despite good reports on the Henry from navy tests, and shipments of complimentary rifles to influential military officers bivouacked at the hotels, Winchester had no contract. He finally received a very modest one through Colonel Lafayette Baker, a well-connected, mysterious, self-impressed figure with a vivid imagination and a penchant for grandiosity. Baker might have been a claim jumper in the gold rush, but by the outbreak of the Civil War he had achieved an influential position in Washington as the leader of spy-detectives against the Confederacy. Later he became the provost marshal of Washington, DC.[20]

Time obscured the lobbying, cronyism, kickbacks, bribes, and dumb serendipity that defined the US military gun market. The gun industry in the 1900s found it good advertisement to point to arms contracts in the 1800s as certification of the quality of their guns, not their connections. "The selection of a fire arm by a government," Colt's company advertised, "is never based upon sentiment"—only on the arm's objective reliability and quality, and rigorous tests of the same. In another it assured, "You make no mistake, when you follow the government's example."[21]

———

WINCHESTER'S DREAM OF LARGE-VOLUME MILITARY SALES FADED early. Military indifference, if not hostility, drove him deeper into the

arms of the civilian or paramilitary commercial market, out of necessity if not preference.

If the army would not come to the newfangled guns, then the guns would go to the battlefield tents. First-generation gun capitalists were peripatetic—roaming the country in search of their markets. Spencer journeyed with rifle samples and ammunition to the frontlines of Murfreesboro, Tennessee, in February 1863. He kept a meticulous account of his frugal journey by horseback and train. He skipped breakfast, allocated fifty cents for lunch, and spent a dollar a night for a sleeping car. In the way that myths attach to American guns like tarpaper, Spencer recalled of his journey, years later, that he had dined with a Nashville woman after the Battle of Stone's River, and although his rifle was "dealing death to the innocent boys of the South," she bore him no animosity, only "wish[ed] that I had never been the cause of the invention." His biographer pointed out that he left Tennessee months, not days, after this battle, and that no Spencers had yet been used in combat, so his hostess most likely had no particular idea who he was, how his gun worked, or how many southern men it could kill. Curiously, in his recollection, Spencer interjected a voice of conscience against himself.[22]

For Winchester, the infamous "dark and bloody ground" of Kentucky beckoned. It was a state of divided loyalties on the near frontier, gripped by fear and danger, and in need of guns. Winchester made a pilgrimage there in 1863. Essentially, Kentucky was a paramilitary market, a place where civilians might be called upon to act as soldiers in personal self-defense against raiding Confederate rebels. The ideal customers in Kentucky, as Winchester envisioned them, were "substantial farmers, and good men," who "design to whip 'guerillas'" in defense of their homes and land, and to fight those whom Winchester chillingly described as "Indians or other varmint." This new kind of gun customer, not a soldier but a citizen-defender, was taking form in the shell of the old. He was an individual with a force of some fifty men, embattled on his home turf.[23]

Winchester had a powerful, garrulous ally in George Prentice, the pro-Union editor of the *Louisville Journal*, who was known as "The



Annihilator" of rebel interests. Winchester's traveling sales agent, William Stanton, had sold Prentice a Henry, and he extolled it in an editorial as "the most beautiful and efficient rifle we ever saw." On his pages Prentice vividly conjured a land of imperiled citizens and foreboding times. "Rebel outlaws are becoming more common in Kentucky," he said. "Guerillas are scouring different counties nightly and practicing the most atrocious outrages, . . . and . . . it is understood . . . that secret companies are on foot for a sudden and general insurrection. . . . It behooves every loyal citizen to prepare himself upon his own responsibility, with the best weapon of defense." The Henry was so perfect, he said, that there was "nothing left for inventors to do," ever, to improve guns.[24]

Stanton, working hard to cultivate the Kentucky paramilitary market, established three Winchester dealers. Each of them heavily advertised the Henry in the *Journal*. Then, Prentice decided to become a Winchester dealer himself. In the same office that housed his *Journal*, in which he touted the Henry so vigorously, he opened his own gun depot with $7,000 worth of Henry rifles (about 280). The other dealers abruptly stopped advertising in the paper, and Prentice became the sole Louisville agent for Henrys. Of the 900 Henrys produced and sold by October 1862, almost one-third had gone to Prentice. He was, single-handedly, a large chunk of Winchester's market. Confederate forces invaded Kentucky in the early fall of 1862. "Under the influence of panic"—as well as copious quantities of alcohol—Prentice then frantically sold his entire supply of Henry rifles below wholesale cost.[25]

Almost overnight, Prentice had glutted Winchester's once-brisk gun market in the region. Prentice explained that he had only wanted, patriotically, to arm Kentuckians with the very best rifles. Indirectly, he armed Confederates, too, in a state with such divided loyalties (Henry #165, for example, was hastily inscribed, "5th Tenn Cavalry"). Prentice ruined Winchester's fledgling market and infuriated other dealers, who were suddenly deprived of customers and convinced that Prentice had gotten preferential prices. Winchester was a "unionman," but commerce, not patriotism, was his prime directive. Defiant commercial agnosticism was more pronounced in Colt, but it was very

much part of Winchester's character, too. He reassured an angry Indiana dealer that "there is not one [Henry] in Louisville for sale . . . nor shall we send any more to that market until we can place them in the hands that will maintain the price." Winchester promised that Prentice had indeed paid the same price for the rifles as other dealers, but said he had "fooled them away" in a silly panic. In another letter, Winchester explained that "regular dealers who do *business* for a living" could not afford to sell rifles for less than cost, however patriotic their motives. To his Ohio dealer, he promised that he would "send no more guns to Louisville until they become so hungry for them that some responsible house will guarantee to abide by the prices." He appealed to a potential dealer's "sense of justice" to maintain regular prices, "so as not to kill the goose that lays the golden egg."[26]

After having made such a mess of things, Prentice audaciously requested yet more guns in late October 1862. Winchester implored him not to sell at cut-rate prices again: "We perfectly understand that you pursued the course you did . . . from purely disinterested motives," he wrote, "but the result has proven very injurious to us . . . financially and morally." Especially financially: "You made nothing and we made but little more."[27]

Winchester was learning a nerve-wracking lesson about the martial market for guns that would further nudge him toward both civilian and foreign markets. "The demand" for guns, he found, was "very spasmodic." American gun demand is sometimes imagined today as a robust, stable line, like a steady heartbeat, but it was more the jagged arrhythmia of a cardiac arrest. The military was the most efficient source of high-volume orders, which were necessary in order to make good on the capital outlay in machines for industrial production. But the gun capitalist who relied on military markets was lashing himself to the boom and bust of war—bouts of frantic production and backlogged orders followed by potentially deadly peacetime doldrums.[28]

Even without large contracts, Winchester was finding that the Civil War itself was a series of small spasms of demand within the larger spasm of war. "Trade rather follows with the advance of our armies," he wrote to an Ohio dealer, "and is and will be most stirring near the

scenes of active movements and hostilities." On October 18, 1862, Winchester's orders were "one month ahead of supply." On November 4 they were "backed up for four months." By December 1, while orders were still "far in advance of supply, . . . lately we have gained on them." Sixteen days later, however, Winchester wrote that several orders had been "countermanded"; suddenly, they were "accumulating stock so fast that we cannot take back the rifles we sold you." But that could change any day, should a major order for a regiment come through, or if the army got paid. Two weeks later he pleaded to an important dealer, John Brown, "we have refrained from reading extracts from western papers, fearing that we might find an obituary notice of you among them. . . . We write to inquire if you are alive? We otherwise cannot account for your long silences. If you 'still live' can you not tell about the rifle business?"[29]

In April 1863, the market was brisk again, with sales several months ahead of supply, and Winchester had to tell Brown, whose business had suddenly jumped, that he had no extra rifles to send him. When a customer complained that the rifle was "worthless," an emboldened Winchester responded that, given "sales several months ahead of supply," he found the accusation "annoying." The idea might well have germinated in Winchester's mind that continuity in a steady nonmilitary market would be more valuable, and more compatible with industrial production, than spasmodically plentiful volume in wartime.[30]

WINCHESTER'S EFFORTS TO BUILD A MARKET FOR RAPID-FIRE GUNS was surprisingly close in, small scale, and intimate. This is one of the more striking themes of the company's archives from the 1860s. The individual dealer was as much a gun ambassador as a merchant before national advertising closed the gap between consumer and manufacturer. The commercial gun market was small enough that one dealer could sway gun tastes and sales.

In the early 1860s, gun merchant B. Kittredge in Cincinnati had a financial investment in the Wesson rifle, and he considered the Henry a threat. Winchester appraised Kittredge as a man of "large means, great energy and pertinacity of purpose, and entirely regardless of the

means he uses to attain his ends." In short, Kittredge was ruthless. Winchester explained to his loyal Ohio wholesaler John Brown that Kittredge had tried to prejudice customers against the Henry to "foist some other arm on the public" by "pointing out imaginary defects and flaws," including the gun slander that Winchester made "the meanest cartridges in the world." The thirst for gun business was such that Winchester both noticed and cared about this, and he refused to fill orders for Henrys from Kittredge. "We understand HIM," Winchester explained to Brown in November 1862. He closed his letter with a pep talk, as he often did, against poor sales. Kittredge persisted in trying to place an order, so a few days after writing to Brown, Winchester wrote directly to Kittredge: "We have reason to believe that your interest in another rifle has led you to use your influence to injure the sale of ours by means which appear to us at least unfair, if not dishonorable." Even worse, Kittredge seemed to be aiming to "monopolize sales" by offering extravagant discounts and forcing other dealers to do the same, "thus driving them out of the market." "Our purpose," Winchester admonished him, "is to guard our rifles from becoming a football in the market." And "for this purpose, we shall confine our business to fair business men who are willing to 'live and let live.'"[31]

In March 1863, Winchester dispatched Brown to buy all the Henrys already at Kittredge's store. With the rifle's serial numbers in hand, Winchester could "trace out" that a Kentucky wholesaler had sold the Henrys to a dealer in Cairo, Illinois, who then slyly sold them to Kittredge. Winchester wrote to the Kentucky dealer saying that he would rather pay the dealer a profit on the Henrys and take them back than have them used by Kittredge to corrode the rifle's good name.[32]

Thwarted, Kittredge suggested that perhaps there should be a public exhibition of the Henry and the Wesson. Winchester took the idea personally and saw the proposal as a "rather amusing, and hardly excusable" act of "egotism" on Kittredge's part. His and his rifle's honor were getting entangled (so much so that he interpreted employee errors as nothing less than acts of "faithlessness" against him). Winchester would have found it more "manly" had Kittredge simply admitted that his assessment of the Henry was wrong. But if he wanted

a public competition between the Henry and the Wesson, Winchester was prepared to wager "not less than $5,000 or over $10,000" that the Henry would win. Winchester's letter seems to have put an end to the idea.[33]

Indirectly, the Ordnance Department's resistance to the Henry and other patented repeater arms encouraged a quasi-military, private arming of soldiers who bought their own Henry rifles, produced by a business that was slowly but methodically shifting its eggs from one basket to another, envisioning a future market of "scattered" guns more than military contracts. At the end of 1863, Winchester wrote to a General Alfred, 1,500 Henrys had been made and sold, "none to the government, or to any organized body," except 104 furnished to a Kentucky company of sharpshooters. Most of the other Henrys had been sold to individual officers in the army and navy, or to soldiers. Winchester usually declined orders for 300 to 1,000 rifles to continue what would prove a prescient strategy of dispersing the rifle in small numbers, but widely. "We cannot fill [large orders] in time without cutting off calls for smaller quantities which scatter the goods and are more for our benefit," he explained to Lieutenant Colonel A. C. Ellithorpe (although he made an exception in this case, since Ellithorpe, who wanted 400 rifles, was a prominent politician-soldier with valuable connections).[34]

Gifting guns to influential figures was always an important part of seducing demand and building a market. Guns sometimes had to be given away before they were bought. Colt sent a pistol to a US captain to woo the elusive US military. The captain confessed that he "felt a delicacy about accepting it, as I presume having no claim of acquaintance or friendship, or services," with Colt whatsoever. Ultimately, however, he chose to accept it, and hoped that it was in his power at some future time to repay the favor "in any way that I can *legitimately* serve you" (italics added). But in 1862, gifts were a marketing luxury Winchester could ill afford. As he explained to a Judge Williams of Mayfield, who was enlisted to sell his guns in Kentucky, "our profits do not allow us to be as liberal as we could wish in the way of presents; notwithstanding, when judiciously made, they are good investments." So in this case he agreed to add one gift gun to every 100 that the judge



Early Henry's Rifle ad. *Courtesy of the Buffalo Bill Center of the West.*

ordered, "to be used as presents, in your discretion it may seem best" to stimulate demand.[35]

By the end of the war, the majority of the 8,500 Henrys used in the conflict had been purchased privately, compared to the 106,667 Spencers mostly purchased through the government. What seemed like Winchester's main misfortune during the war—his small orders to individuals, his focus on "guerillas" and citizens, his finesse with advertisement and marketing (which did not go unnoticed by rival firms), and his cultivation of a vexatious, dispersed group of dealers who could "scatter" his guns far and wide—would prove his good fortune afterward.[36]

For the gun capitalist, the Civil War (or any other war) was a peculiar new thing: an advertisement. Winchester aggressively sought "narrative," as he called it, from the (comparatively few) officers who were using Henrys. He wrote to the chaplain of the 12th Kentucky Cavalry, which he had furnished with Henry rifles, saying he had "heard that some very remarkable feats [had] been accomplished with them by the brave men of your Regiment." He implored that the reverend write "an authentic narrative" of "these stirring events as a just tribute to courage"—and, of course, as valuable advertisement for his gun's "power and efficiency."[37]

In the 1850s, Colt's had benefited from a fabular account of a miraculously efficient weapon that inspired sales-quickening awe in those who heard it. A Lesghian chief in the Caucasus armed with a Colt's revolver had slain several Russians, an English newspaper had said, and the Russians thought him "the prince of darkness himself, out on a sporting expedition for the express purpose of bagging Russian soldiers" with his magical "Devil's Pistol." Winchester's equivalent came with a thrilling story of a battle in southern Kentucky between a band of seven mounted guerrillas under "Tinker Dave's" leadership, and one man sympathetic to the federal government and armed with just one Henry rifle. James Wilson, the Unionist, was known to have a large amount of money in his house, which attracted the attention of the marauding, disloyal thieves.[38]

One morning, while Wilson's family sat at breakfast, the outlaws suddenly approached. Wilson seized his money box and his Henry rifle and stashed them outside. Then he returned to the table as the members of the gang began shooting their pistols. One shot "struck a glass of water his wife was raising to her lips, breaking the glass," a Kentucky newspaper reported. Wilson sprang to his feet and declared, "For God's sake gentlemen, if you wish to murder me, do not do it at my own table in the presence of my family!"[39]

In a fateful concession to honor, the gang consented to kill Wilson outdoors. As soon as he reached his front door, Wilson sprang into action, running for cover—and his Henry. Several shots passed through his hat as he ran. Wilson managed to kill five of the marauders in five

inexplicably quick shots. The other two, understandably, lunged for their horses, but the sixth shot took off the fingers of the sixth man's hand. The seventh shot killed him. With just one rifle and no help, Wilson, the "plucky defender," had killed seven (or eight . . . or nine . . .) of the gang, and had wounded others, sending Tinker Dave into a hasty, frightened retreat.[40]

Although the story appeared to come out of nowhere—an authentic, spontaneous account of the Henry's perfection—it was first published in Prentice's newspaper. On December 30, 1862, Winchester wrote to Prentice that he had "heard some marvelous stories in connection with the name Capt. J. Wilson of the 22nd Kentucky cavalry." Winchester admitted that he did not have "full confidence in their accuracy." The same day he wrote directly to Wilson: "I have heard a detailed and thrilling account of your adventures with Guerillas, in which your coolness and courage were conspicuous, aided by a skillful use of Henry's Rifle. I do not know how true the account is," he conceded, "but feel a great interest in obtaining a reliable statement." None was forthcoming. In March 1863, Winchester replied to a letter Wilson had sent him to complain about a glitch in the Henry's breech pin. "In your letter you omit to give me the particulars of your encounter with the 7 Guerillas," Winchester implored. "I presume the omission arose from a disinclination to repeat your own exploit," rather than, perhaps, that the incident never happened as told. "But incidents of this kind make up the romance of war," he argued, "and should be preserved." Winchester promised to rewrite the incident in the second or third person, to preserve Wilson's modesty in not wanting to boast.[41]

He never received a statement of the facts, or a confirmation, but the story was too tantalizing to relinquish. Once it was printed in the Winchester dealer-editor's paper, "naturally, the account of this remarkable fight spread quickly all over the country," the New Haven Register reminisced, and so did demand for the Henry, "a firearm which made every man a host in himself."[42]

In the fall of 1862, Winchester was optimistic. "Our progress in the last three months has been entirely satisfactory," he wrote in a shareholder letter. "Our rifle has, during that time, acquired a high reputation



down the barrel, draw out a ramrod from the gun's tube, and ram the ball and powder down. Then he'd prime the gun, replace the old cap with a new one, fully cock the rifle, and fire. A skilled shooter would fire perhaps two shots a minute, but almost never achieved that mark in the heat of battle. The repeater was a revolution in speed and rapid fire. The killing got faster—from a possible two to twenty-five shots a minute—and the soldier acquired a new feeling of omnipotence.[53]

As the semiautomatic ancestor of automatic machine guns, the Henry performed "a terrible work of death," Civil War regiments reported, opening an "astonishingly rapid fire." One private with a Henry said he could fire ninety rounds so fast, without having to stop, that his barrel was too hot to touch. "I spit on it and it would sizzle," he reported. At the "army of the Tennessee's Waterloo," the last great Confederate charge at the end of 1864, 20,000 rebel infantry advanced with bands playing "Bonnie Blue Flag." They charged into Henry-armed soldiers of the 65th Indiana Infantry, Company A, and a 12th Kentucky unit armed with Colt revolving rifles. The rebel major general recalled that the Yankee line "spit out a continuously living fringe of flame," the most deadly fire he had ever witnessed. Some rebels "pulled their hats over their faces as if to shield from a storm of hail."[54]

The soldier armed with a muzzle-loader often missed his mark, even if he did not misfire. The new repeaters were not only faster but also deadlier. A Texan recalled "men staggering to the rear covered with blood," shocked by the carnage and feeling as if "the world was coming to an end then and there." The 8th Michigan Cavalry, using Spencers, inspired "terror"—a recurring description—in the rebel soldiers, who thought them "a much stronger force than we were," an officer reported. "This was the first instance during the war," he said, "where the proportion killed was greater than the wounded." The ratio of killed to wounded was three to one, owing to the repeaters.[55]

The soldier with a muzzle-loader was not so omnipotent that he could imagine himself, or act, as an individual in battle, or stand alone. He was an armed but vulnerable figure with a killing capacity limited by accuracy, speed, and gun design. Soldiers fired their muskets on command, en masse, within fifty yards of the enemy. As Winchester

energetically explained to promote the Henry, his repeater magnified the power and lethality of the individual. Some tacticians worried that rifles would unleash individualist, "egotistical impulses" in a twenty-first-century phrase, an "army of one." The math was almost exponential, or, as the first Samuel Colt biographer described it, "geometrical." The revolver, he said, "cannot but 'demoralize' antagonists. Each fresh chamber . . . resembles a new head of the multiplying hydra." The *Louisville Journal* enthused that one man "armed with one of these rifles can load and discharge one shot every second, so that he is equal to a company every minute, a regiment every ten minutes, a brigade every half hour, and a division every hour." Reports from the battlefield praised that a command "armed with this rifle and possessed with a proper spirit to use it, could . . . defy ten times their number." Another officer, using Spencers, put the multiplying effect at five or six, and yet another estimated that a lone Henry shooter had a four-to-one advantage. During the Atlanta campaign, a swap of 2,000 Spencer-armed horsemen for 11,000 infantrymen was judged fairly equal. By its technology alone, the repeater invited and emboldened the individual, lone gunman, whether guerrilla, soldier, or civilian—and Winchester sensed this early in his gun enterprise.[56]

In terms of tactics, the Ordnance Department and others had worried that patent arms, so much faster in their action and more lethal, would corrode troop discipline with indiscriminate shooting, in contrast to the more plodding and deliberate tactics associated with single-shot rifles. Instead, Winchester retorted, his repeater allowed the shooter to hold fire, without fear of not having time to reload, and thus "make every shot count." Right after the war, still courting the British market, albeit not the American one, Winchester wrote to the British secretary of state for war to dispel objections voiced by a special committee on breech-loading and repeater rifles. "A gun is a machine made to throw balls," he wrote. "The one, then, that will throw the most in a given time, with equal accuracy and labor, everything else also being equal, must be the best gun," QED. The objection that his "fast firing" guns would waste ammunition "seems to have been based upon a vague



idea that because a gun could be made with which it was possible to fire very rapidly, it was impossible not to do so, that it must be a sort of self-acting machine, uncontrollable by the human will," Winchester wrote. Instead, a soldier would have "consciousness of reserved power that keeps him cool, and self-possessed." "Time spent in loading is time lost," he firmly concluded.[57]

The Civil War did show that such discipline was possible. The soldiers of a Spencer-armed Connecticut regiment fired their repeaters for a minute or two but ceased immediately at the bugle call. At the same time, Winchester's gun was to some extent a "self-acting machine" that inflected, even if it did not dictate, the psyche of the shooter. Guns would seem to move almost by teleology toward greater rapidity, faster killing power, and more indiscriminate shooting, with less ammunition held in reserve.[58]

Armed with such a fiery hot weapon, ironically, shooters became "cool men," as several commented. The obverse of "coolness," as Winchester often described the repeater-armed man, was terror at the other end of the barrel. Ohio governor John Brough fantasized in 1864 that thousands of "Henry-armed pro-Southern draft dodgers" would rise up against him. In the grips of Henry terror he frantically telegraphed the US secretary of war, Edwin Stanton, to get him to halt the sale of Henrys in Ohio (since the government had not contracted for Henrys, however, Stanton could not control their distribution). The repeater soldier had newfound "feelings of invincibility," and, according to another frequent description, "confidence." One invincibly cool soldier or guerrilla could become many. In his first advertisements, some written in his own hand, Oliver Winchester introduced a Henry-owning American who lived on the wire, with precipitously changing fortunes and imminent danger. The Henry was "always loaded and always ready" to fire sixteen cartridges in a few seconds; it was the perfect "house or sporting arm," especially for "citizens in secluded places," Winchester said. It could be "'INSTANTLY USED,' with . . . force sufficient to kill," even at 1,000 yards. "A resolute man, armed with one or more of these Rifles, particularly on horseback, CANNOT BE CAPTURED.'"[59]

The Henry was a momentous step in a journey toward an emboldened individual shooter capable of more automatic, rapid, and remote shooting—which as a general rule tends to make killing easier. The Henry shooter, in other words, was a distinctly modern character.[60]

AND YET THE NEW REPEATERS WERE TO THE CIVIL WAR WHAT THE American rifle was to the Revolutionary War—important, but overestimated and scarce. Most of the Civil War fighting still occurred with ungainly muzzle-loaders. By the end of the war, however, breech-loaders had shown themselves to be the weapon of the future and consigned the muzzle-loader to the dustbin of gun history; the breech-loading repeater, specifically, had begun its ascent. During the war, Winchester had learned what must have been hard yet invaluable lessons about the gun business. Out of the misfortune of not getting a large military contract, as we have seen, he came to appreciate instead the marketing benefits of scattering his guns as widely as possible. He had learned that the war's casualties, for the gun capitalist, provided "narrative" and could be sources of advertisement to reach individual customers. While he would continue to seek military business, Winchester could not have helped but appreciate that reliance on war business was a "spasmodic" and jagged enterprise in terms of demand—ill-suited to the new economy of commercial industrial production, which favored a constant, steady supply and distribution. Immediately after the war, as we will see in the next chapter, he would learn yet more lessons: about first-generation corporate warfare, the price of ambition, and the imperative that his fate, fortune, and business always remain within his family. Out of this process, the Henry rifle would finally become the Winchester rifle.[61]

mystique of the newer models. Seen from the commercial perspective and the eastern industrial economy to which it belonged, gun diffusion preceded mystique, and not vice versa, and even the American western gun market was indirectly bound up with international commerce, insofar as many of the most popular models were old European models. Accounts of the "Prussian percussion musket" or of US Model 1822 may not have much panache, but they may be more accurate than popular legends of "the gun that won the West."[25]

No federal laws delimited Winchester's cultivation of a gun market, although the West was a crucible of thousands of state and local gun-control laws concerning pistol-toting and gun etiquette. The gun today is mired in political fetishization, but the Second Amendment was a slumbering giant during the years of the gun's most intense diffusion. The gun was an ordinary, unexceptional object of commerce, treated unexceptionally.[26]

When it came to conquest—and race—the gun did, however, become more exceptional. In August 1876, after George Armstrong Custer's shocking demise at Little Big Horn, the federal government passed two resolutions that for the first time attempted to control gun commerce. These resolutions prohibited the sale of arms or ammunition to "hostile Indians of the northwest" and called for the confiscation of guns from "any Indian who may be proven to have committed any depredation on the white or friendly Indians." Before passage of the resolutions, Native Americans were able to acquire the latest patented Winchesters and other guns easily, if they could afford them, through licensed Indian agents who ran reservation trading posts, using government vouchers for hardware, through treaties that swapped Indian land for guns, or simply through traders. Custer and other officers had long been convinced that Native Americans were better armed than their own troops. A fur-trade expert noted that traders were first and foremost merchants, and their desire to sell trumped whatever "slight qualms" they might have felt in selling weapons to hostile Native Americans. Indeed, Oliver Winchester saw irresistible advertising fodder in the Native Americans' fascination with guns. He

promoted his rifle by saying that, among the Indians, "possession is a passion." Buffalo Bill agreed that "an Indian will give more for [a Winchester] than any other gun he can get."[27]

The arms trade and traffic went on after the 1876 resolutions pretty much as they had before. The Indian agent for the Apaches in New Mexico reported, characteristically, that he had "the power to order obnoxious persons off the reservation, [but] can go to one of [the] ranches right under my nose and laugh at me with impunity. They can carry on their trade with the Indians, and . . . they are as completely beyond my control as if they were in New York or Washington." The Ute had plenty of Winchesters, another agent reported, with traders "everywhere doing a thrifty business."[28]

The tenacity of this gun business disturbed the commissioner of Indian affairs, who concluded, "At least with some traders, the accompanying horrors of a war with savages have not always been sufficient to overcome their greed for gain" and "self-aggrandizement." The Indian agent for the Ute reservation shrilly condemned the trade and articulated the basic but unstated fact that the gun industry was selling a lethal commodity. "There is no offense against the commonwealth showing greater moral turpitude than the crime of those persons who recklessly place in the hands of savages all the improved pattern of arms, which they know will be used to destroy the lives of innocent white citizens." The 1876 resolutions were inadequate to stem the "murderous traffic" to "non-civilized Indians" and the "unhallowed trade in implements of death."[29]

In few other contexts at the time was the arms merchant or capitalist's "greed for gain" criticized, or the amoral gun business transmogrified into an immorality. In the darkened parlors and séance tents of spiritualism, the age's fugitive conscience, such distant connections and accountabilities might indeed be vividly perceived, but not in the empirical, laissez-faire world of the gun industrialist, with his narrow business accounting. The idea of the arms dealer or profiteer as "no better than a murderer," an abridgement of cause (selling a gun) and effect (killing a person), and an expansion of gun accountability was



178   THE GUNNING OF AMERICA

almost unheard of. The longer view of what the gun economy did in the world, how the commerce of one arms dealer could rend the social fabric by a murder elsewhere, was always there to be seen—even if, in the 1870s, it was seen most often through the lens of conquest and racism.

CHAPTER 9

# THE "MORAL EFFECT" OF A WINCHESTER

T HE WINCHESTER MODEL 73 BECAME A SORT OF GUN CELEBRITY— but mostly in the 1900s, looking through a glass darkly at the 1800s. Like other celebrities, it eventually went by only one name: Winchester. Like extremely successful celebrities, it then went by just one letter, a red, thunderous W. The family name, which became the rifle name, eventually stood for the genus, becoming a synonym for repeating, semiautomatic rifles. "The model '73 is the first rifle which went into every corner of the world and is still being used by every race of mankind," the company boasted in 1920.[1]

When considered from a business perspective, however, it becomes clear that the quintessential frontier rifle flourished later, in the "post-frontier" early 1900s. Its celebrity biography backdated its diffusion and even its popularity.[2]

Winchester production figures show that the Model 73 of legend was barely in circulation in 1873. Numbers #1 through #126 were manufactured in 1873, but only 18 shipped in this first year. In 1874 Winchester produced 2,599, but shipped only 108. The WRAC produced 41,515 Model 73s in the 1870s, or 5.7 percent of the total produced. The company produced two other gun models in the 1870s, and the Model 66 was by far the decade's staple Winchester, at 122,675

179

Compendium_Vorenberg
Page 075

produced, with the Model 76, introduced in 1876, adding production of 8,968. In the 1880s, Winchester produced over half a million guns (524,555) in seven models, and the Model 73 was the most heavily produced model, at 282,426 total for the decade, or 54 percent of all Winchesters produced in the 1880s, and 39 percent of all Model 73s ever produced. Only 55,015 were made of the decade's second most heavily produced Winchester, the Model 1885.[3]

Although it was the biggest seller in the 1880s (but not the 1870s), viewed in terms of the history of the model, it is interesting that roughly equal numbers of Model 73s were produced in the 1900s (234,050) and 1890s (217,362). Even though the company produced no Model 73s in 1907 or 1908, it still produced one-third of its Model 73s in the 1890s, and another third from 1900 to 1909, with the single highest yearly production ever (149,996, or 21 percent of the total) in 1904. Thinking in terms of per capita production, the WRAC produced one Model 73 per 547 Americans in 1904 (although it is, of course, not the case that all of the guns produced were sold domestically), and 1 per 5,116 Americans in 1875.[4]

Why did the Model 73 take off in the 1880s and 1900s? Technologically and materially, it was, quite simply, a better gun, and this certainly contributed to its (retrospectively enhanced) fame and stature. The Model 73 was identical to the Model 66 in mechanical principles, but with improvements in accuracy, power, and handiness. The cartridge was changed to center fire, and it held a charge of 40 grains of powder instead of 25. This capacity increased the gun's initial velocity from about 1,125 feet per second to 1,325. Winchester, still thinking, albeit with waning zeal, of martial use, touted two other mechanical improvements that prevented premature explosion or accidents and made the 73 "especially suited to Military Arms."[5]

The gun performed almost every operation automatically. Winchester wrote, "All the operation of loading and withdrawing the empty shell, in short, every function of the Gun, except pulling the trigger, is performed by two motions of the operating lever; vis., forward and back"—and he could not help but specify that this was "substantially *one* motion."[6]

The lever performed five functions in one: it opened the breech of the gun, extracted the shell of the fired cartridge, advanced the next cartridge from the magazine to the barrel, cocked the gun, and closed the breach. The entire process, from the loading of a cartridge from the magazine to the firing of the gun, could be executed in half a second, and repeated just as rapidly, delivering eighteen shots in nine seconds. Axiomatically, the more mechanically ingenious the gun became, the less skilled, gun-smart, or ingenious the shooter needed to be. Winchester assured potential customers that "a child ten years old can with half an hour's instruction load and fire it with perfect safety." And, if one cartridge should misfire, another was easily and quickly advanced.[7]

Speed (not power) and accuracy from a distance were the mechanical soul of all Winchesters. With each design advance, the volition of the rifle became more volitional. Small, mortal operations of armed conflict occurred through the technological ingenuity of the mechanical hand, and the confrontation became less intimate or physically immediate. The gun "did" more of the motions and actions of killing.

The trajectory in guns was toward faster shooting and more reflexive operation for other gun capitalists as well. The *Sunday Herald and Weekly National Intelligence* compared the Smith & Wesson Schofield pistol favorably to Colt's. It could discharge empty shells "all at once. . . . You grab a handful of cartridges, fill the chambers without looking at them." What a contrast, this "easy and, above all, rapid, proceeding," in comparison to Colt's suddenly "slow and . . . tedious" reloading process.[8]

In a broadside, Winchester promoted the character capacities elicited by the repeater's technological ones. And this was a second component of the Model 73's gun celebrity: although Winchester still mostly promoted his rifles for their functionality and mechanical virtues, he was also deepening his feel for a gun's aura, sensing a competitive advantage in imbuing the rifle with character, or, more often, ascribing character attributes to its user. This tendency would only grow stronger in the twentieth century. "The great advantage of this rifle over all others consists in the *moral effect* it has . . . ," he wrote, "for if there is anything that will make a party of men, or one single man, stand up and



fight to the last moment, it is the knowledge that he has a gun in his hands that will not fail to do its duty just at the time when it is most wanted" (italics added). Winchester here elaborated the "coolness" of the semiautomatic shooter, earlier noted in the Civil War, and the Winchester as a boost of courage in the face of lopsided or insuperable odds. Its rapid fire and reliability made the 73 "an ideal arm for . . . the kind of mobile warfare that was typical of Indian-white man fighting" and for those threatened with "sudden attack." Colt, likewise, once described his revolver as perfect for conflicts of a "special and brief character, [when] it be desirable to throw a mass of fire upon a particular point for a limited time." In a sense, the Winchester rifle and Colt's revolver both promised the advantage of overkill. Winchester's advertisement imagined the rifle as protection for women and children in a jittery, dangerous world, "as it is at times necessary for all men to be away from home, consequently leaving [them] to fight for themselves."[9]

For the first time in the 1870s, Winchester stressed the rifle's nonmilitary attributes in his advertisement and promotion. He now shared testimonials and stories from civilians. For example, one concerned the Model 73, #289, which found its way to the Antelope Station in Cheyenne, Nebraska, where its owner proclaimed it the "BEST GUN" he'd ever used, saying, "I have often got from four to seven antelope out of a herd in less than a minute, where, with any other gun, I could not have gotten more than two shots." Then there was the route superintendent for mail coaches at a station in Texas who killed "three or four of the enemy [Indians], and as many of their horses, with [his] Winchester rifle."[10]

One of the most obvious but significant aspects of these stories is that they're usually about a lone gunman—one armed individual, in private battle against beast or man. In this sense, they are unlike tales of wartime bravery. Rebuffed by the US military and courting a civilian market, Winchester now self-consciously conflated the two, writing of the gun's moral effect "either upon an army or an individual"; either upon "a party of men or one single man." His testimonials routinely equated the firepower of a "single man" with the firepower "of an entire regiment of soldiers firing muzzle-loaders." Before this time, the use of

guns against humans was predominantly a social or national act, inspired by patriotism, or *esprit de corps*. It would prove one of Winchester's deepest but subtlest legacies: he conceived of the lone civilian, "scattered" throughout the country, as his customer, a figure who became the iconic twentieth- and twenty-first-century American gunman.[11]

Winchester's approach meshed with the hard paramilitary realities of conquest and settlement. Indeed, it is worth contemplating how much America's heavily armed civilian population owes to the peculiarly domestic nature of both the most cataclysmic nineteenth-century war, the Civil War, and its most violent conquest, of Native American cultures. Unlike in Europe, which kept the US gun business alive, but does not today have our civilian gun violence, in America war and conquest were both domestic, and the guns deployed stayed put within American borders. Western emigrants, de facto, were somewhere between soldier and civilian, their everyday existence to some extent militarized in a land in between battlefield and settlement. In Europe, conquest involved imperial expeditions; America's conquest blurred settler into soldier—and the Model 73, in both design and germinal mystique, suited that hybrid environment.

Military aims infiltrated nonmilitary sport and landscape in the West as well. The government supported a "martial ecology" after the Civil War that merged the agendas of rifle hunting and conquest, according to one historian. Plains Indians clashed with settlers for rights to the rich hunting ranges and game trails. In this context, the army encouraged sporting as an instrument of conquest: the more buffalo killed by sport hunters, the more endangered the Native American food supply became. The army gave rifle hunters logistical aid, hunting tips, protection, and ammunition. The only biography of Buffalo Bill written by a family member recounts how he guided three companies of the 5th Cavalry, along with some personal friends of General Emory from New York and England, on a twenty-day scout. "The expedition had two objectives," wrote Julia Cody Goodman, Buffalo Bill's older sister: "To hunt for game and to find hostile Indians." Game they found, but none of the other prey. The New Yorker was disappointed. He wanted to "see action," so Bill invented some. His Wild West show



was a show before it was a show; the West and its gun were postmodern before postmodernity, in the sense that stories and narratives of the West constructed the lived experience and reality of the West. Buffalo Bill "prevailed upon Pawnee scouts to disguise themselves as hostile Indians. When [the New Yorker] saw the 'enemy' warriors charging down upon him, he turned tail and galloped towards camp."[12]

There is a blasé seamlessness here and elsewhere between human and animal "prey." Indians were "all too often regarded by American frontiersmen as another breed of wild animal," historian Richard Hofstadter observed in his signal essay on the "gun culture." Colonel George Schofield, for whom the Smith & Wesson revolver was named, wrote to the company in 1875 to report his great success during his "second expedition against hostile Indians, . . . having killed almost everything—but an Indian—with [the Smith & Wesson gun]." Chillingly Schofield commented, in another context, "I want no other occupation in life than to ward off the savage and kill off his food until there should no longer be an Indian frontier in our beautiful country."[13]

The same world worked for war and the hunt, and it was advertised as such. Oliver Winchester advertised the Model 66 as the ideal weapon for "Indian, Bear or Buffalo hunting," blurring lines between the prey, and advertised its rifles "For Military and Sporting Purposes" in the *Army and Navy* journal. "For general hunting or Indian fighting," Buffalo Bill pronounced Winchester "the boss." In its 1877 catalog, Remington promoted the hunting or sporting rifle as the "frontier rifle," saying it had "furnished the interior department for arming the Indian police." Colt's condensed these markets into one ad on the pages of *Turf Field and Farm*, promoting the "Peacemaker" as a pistol not only for "officers of the army and navy" but also for "all who travel among dangerous communities." The weapon was good, Colt's advertised, for "public or private service."[14]

Winchester began to individualize the gun. He had to. This was the market he had, if not the one he had at first imagined or preferred. In this phase of the gun business, Winchester and other gun titans cultivated the US civilian market of individual customers. He needed to untether his rifle from formal war and the military market, and think

about the private army of one, in a kind of military-civilian market infiltration not evident in other contexts. To the extent that the rifle had a moral effect, it was an intricate one. For the Winchester customer, a life is lived alone in both self-reliance and vulnerability. It achieves heroic transcendence through speed, in fight and flight, and in the always-imminent "moments of emergency." Winchester's world, in his coinage, was one of "single individuals, traveling through a wild country." His gun business would prosper to the simple, elegant extent that he could convince other Americans that this was their world, too.[15]

FROM THE VANTAGE POINT OF THE GUN INDUSTRY, THE ASSOCIATION of Winchester's rifle with individualism was paradoxical. When Remington had embarked on the gun business in 1816, he had made guns on a customized and individual basis for customers, as gunsmiths had, on demand. W. W. Greener, one of Britain's foremost gun experts, opined in an 1881 opus that newfangled repeater rifles would fail commercially precisely because they were mass-produced. He saw as folly "the assumption that one type of gun will suit . . . everyone. . . . As no two persons are exactly alike," each would have his own gun preferences. Interchangeability worked fine for military purposes, Greener speculated, where the homogeneity of the mass over the individual soldier was essential, but for civilian arms, the "*sine qua non*" that all will be alike" of mass-produced guns precluded the true individualizing and value-creating "fancy of the workman, [the] incentive to produce a better arm" and preferences in ornamentation. The machine-made repeater was just an "assemblage of various synoforms, neither artistic nor symmetrical . . . at best only a mediocre production."[16]

In the 1870s, guns were being mass-produced, in the hands of the industrialist and not the gunsmith, in a more complex corporate economy; each Winchester was machined to within 1/1,000th of an inch and made with interchangeable parts by machine, and rifles achieved unprecedented diffusion. But the Winchester's diffusion and its germinal mystique were at odds. To some extent, the mystique relied, tacitly, on obfuscating the ties between the world of the gun business—eastern, industrial, corporate, and driven by interchangeability—and the aura



of the gun. In gun ownership, the feeling of individualism, or of secure autonomy for "single individuals," was—and is—an anxious, if not untenable, form of self-sovereignty, because everyone for whom the gun is mass-produced and sold has the same gun and the same idea.[17]

Winchester's "One of One Thousand" campaign in 1875 romantically elaborated this core gun paradox of mass-produced individualism, vividly demonstrating Winchester's growing feel for the gun mystique. Winchester had a strong self-conscious hand in making the Model 73 a gun "celebrity." One of a thousand rifles were promoted as the very best and the most "super accurate" of all 720,610 Model 73s made between 1873 and 1924, tweaked with set-triggers and extra finishing. The company sold them at the higher price for a Model 73 of $100— roughly $2,200 today. Gun mavens today consider these the most glamorous of the Winchester family: they were used by Billy the Kid and Buffalo Bill—celebrity guns owned by celebrities. A Winchester 1 of 1,000 sold in 2013 for $95,000, and antique gun collectors surmise that other guns of this model could sell for substantially more than that, perhaps even $200,000 or $400,000.[18]

Much of the American gun culture was built out of profitable malarkey—the 1 of a 1,000 campaign was another example. In 1936, Winchester executive Edwin Pugsley wrote to a Winchester admirer that "there is a great deal of mystery and hokum still clinging to the gun business." The "atmosphere of mystery" had been even worse in the days of gunsmiths, Pugsley felt. Still, the idea of a Winchester barrel with extraordinary mechanical properties, as with the Model 73, was a bit of hokum. One can readily see "that a part of a billet of steel might be made into a gun part and another part of the same billet into a mowing machine, and the part which went into the gun barrel would have no more mythical properties than its brother in the mowing machine," Pugsley said. "I realize that this is not good sales talk," he conceded, "for, unquestionably, we could charge many customers $10.00 extra for a selected barrel," as the company had in the 1870s and 1880s, he recalled, with barrels "engraved 'one in a thousand' and sold at an extra price."[19]

Whatever the case, a mass-produced, mass-marketed object was to become an enduring idiom of American individualism. The earliest

striation of this mystique was laid down by Winchester's own advertisements and testimonials, the most indelible of which were generously fabularized (recall Captain Wilson's Civil War battle in Kentucky against bandits, for example). The next layer consisted of stories written by others: journalism that blurred fact and fantasy, for example, and dime novels of the West published in the early decades of the commercial gun business. This layer wasn't any more true or accurate than others, but it and the gun industrialists' advertisements were there first and formed the bedrock, and would appear most proximate to historical fact as more layers of myth were piled on top of them in the twentieth century.

In February 1867, journalist George Ward Nichols published an article in Harper's on "Wild Bill" Hickok that became a trope for the western gun hero. Nichols told of Dave Tutt, a professional gambler and rebel scout during the war. Tutt arrived in Springfield, Missouri, intent on picking a fight with Hickok. There was an "undercurrent of a woman" involved, Hickok told Nichols, and he faced off against Tutt in the town plaza. The men fired, and the ball went through Tutt's heart. In a scene restaged into perpetuity, on silver screen and in backyards, Tutt "stood stock still for a second or two, then raised his arm as if to fire again, then he swayed a little, staggered three or four steps, and then fell dead." Hickok didn't even need to look back to know Tutt was dead. He said, "I knew he was a dead man. I never miss a shot." Hickok distilled the code of the gun: "He tried to degrade me, and I couldn't stand that, you know, for I am a fighting man, you know. . . . A man must defend his honor." Nichols concluded his piece: "I have told this story precisely as it was told to me . . . and I have no doubt of its truth."[20]

Perhaps not, but Nichols's local readers recognized it as hooey even in 1867, and their criticisms sent Nichols fleeing back to writing about music. The Springfield Patriot wrote that some citizens were "excessively indignant" at the outrageous fabrications in Harper's, and what they perceived as slanderous "caricatures" against their city that all of the fools of New England were gullible enough to swallow as gospel truth, but the "great majority [were] in convulsions of laughter." All

agreed that the piece should have been published in the company of "other fabricated more or less funnyisms," and not as the lead article. Some in Springfield remembered Nichols's stay there, and his "splurging among our 'strange, half-civilized people,' seriously endangering the supply of lager and corn whisky, and putting on more airs than a spotted stud-horse in the ring of a county fair." As for the portrait of Wild Bill, none in Springfield had suspected that he had dispatched "several murders with his own hands," as the article claimed. The editors of the *Leavenworth Daily Conservative* in Kansas opined reservedly that the article seemed "mythical."[21]

Nichols's article included an account of Hickok's 1861 shooting of David McCanles and two others—a gang of "murderers and regular cut-throats," as Nichols had it—at Rock Creek Station in Nebraska, a stagecoach and Pony Express post where Hickok was employed. Another writer, Ramon Adams, a foremost expert on westerns, noted that Hickok and an accomplice had killed three men, including McCanles, in cold blood, with Hickok shooting from behind a curtain, and that McCanles had never pulled a gun. The "Wild Billians," as one review of gunfighters calls them, had Hickok as the valiant stagecoach defender of "government property" (the US mail) against thieves, but the consensus seems to be that McCanles, the owner of the Rock Creek property, went over unarmed to collect overdue rent, per a contract, and that tensions between the men might have been exacerbated by the fact that Hickok had made overtures toward McCanles's mistress.[22]

The McCanles gunfight was to become the core of the Hickok legend. The larger the legend, and the more it defines a culture, the more difficult it is for historians to trace its concrete production. But the story of the American gun culture is constructed in some part of the story of gunslingers and gunfighters, and as loamy and encompassing as these stories became in the 1900s, their tangible, literal origins are not impossible to trace forensically. The iconic American gun stories, like the iconic guns themselves, came from the Northeast. The guns came from the factories of New Haven and Hartford; and the dime novels that told of the gun's adventures came from what a *Ladies Home Journal* editor

aptly named the "literary factories" of New York. One dime novelist writer recalled that in a "little den on an upper floor" of the "worm-eaten old building" of publisher Beadle & Adams, he would "grind out dime novels day after day with the steadiness of a machine."[23]

Dime novels were not the only means of transmission for the first generation of gun legends—the sensationalist pink newspaper the *National Police Gazette* wrote luridly of the West's gunmen—but they were the most widely distributed and powerful. "Beadle's dime novels," roughly 100 pages, were sensational stories, but they were generically presented as real, thrilling, authentic, and true tales of the West. They flourished in the 1860s and through to the early 1890s. Beadle & Adams would publish 3,158 titles, mass-producing the story of the mass-produced Winchester rifle. Dime novels, one of the authors told an interviewer in 1902, required "only three things—a riotous imagination, a dramatic instinct, and a right hand that never tires." As scholar Michael Denning explained, dime novels followed interchangeable stock plots and characters and could be churned out by anonymous writers. Another dime novel author described the basic template of the tale: "Virtue must triumph, vice and crime must not only be defeated, but must be painted in colors so strong and vivid that there is no mistake about it." Owen Payne White, who wrote stories of "gun fighting murderers" for *Collier's* in the genre, recollected in his autobiography that, while the stories claimed to be "true and vivid," his editor encouraged him to write about topics that he hadn't researched and knew nothing about. He promoted "the sale of the magazine by killing someone in almost every paragraph."[24]

And it was through these dime novels and similar works that the 1867 Wild Bill story from Nichols's pen and imagination began its long reverse migration, from fable and legend into the more solid stature of history and settled wisdom by the mid-1900s. Other characters—Buffalo Bill, Billy the Kid, Belle Starr, Calamity Jane, and the California bandit Murieta, contrived out of whole cloth—would follow the same path—from lowbrow fiction into highbrow historical fact—and from there would be summoned either as a condemnation or as a celebration of America's gun culture.

In 1881, *Heroes of the Plains, or Lives and Wonderful Adventures of Wild Bill*, authored by James Buel, was published by "Historical Publishing" in St. Louis. Ramon Adams has noted that although this book wasn't a dime novel, it read like one. Its formidable length and large circulation encouraged readers to treat it as factual—and it replicated the false Nichols story. The next year, one of the most prolific of the dime novelists, Prentice Ingraham, penned *Wild Bill, The Pistol Dead Shot*, which, according to Adams, "made [Wild Bill] a superhuman, engaging in exploits with no semblance of truth to them." The same year, a book on the history of Nebraska tried to present a more realistic account of Wild Bill's Rock Creek fight, noting that he killed only three men, and that, far from demonstrating courage, he had simply displayed "skill in the use of firearms"—and cowardice. Nevertheless, Wild Bill was becoming a dime-novel favorite, and the "false true" story drowned out the modest and rare attempts at history. Ingraham reprised Nichols's narrative again in 1884, but embellished Hickok's gun lethality, in the predilections of the genre, by describing him as "one man [who] whipped ten desperadoes, killing eight of them." Subsequent stories did likewise: they took the core of the Nichols account and exaggerated both the number of gun victims and the atrocities of the McCanles "gang." Ned Buntline's 1886 dime novel had McCanles killing Hickok's father in front of the entire family, and an 1890 account, *Wild Jim, The Texas Cowboy*, had Hickok disemboweling his antagonist in retaliation.[25]

Hickok himself, like Buffalo Bill, must have been at least instinctively if not explicitly aware of the benefits of self-commodification, and he, too, exaggerated stories of his gun violence and its righteousness. He was fond of "loading easterners" with tall tales of his gun exploits, and he appeared in Buffalo Bill's Wild West show. He told author Henry Stanley (My *Early Travels and Adventures in America and Asia*) the malarkey that he had killed "considerably over a hundred" white men. It all started when he was twenty-eight years old and was robbed at a hotel in Leavenworth. He stabbed one man before using "his revolver on the others left and right," killing four more. He then fled, he said, but returned with soldiers to capture the entire villainous band of fifteen thieves. Hickok told the story of the McCanles fight to

General Armstrong Custer's impressionable wife, years after the fact, as a heroic stand against a ferocious gang of horse thieves and killers, and this account, too, accreted into fact.[26]

In the 1890s, the dime novels of the 1880s, which had drawn on Nichols's fiction of 1867, became the basis for stories of gunfighters that claimed authenticity. An anonymous 1893 account, *Buffalo Bill and His Wild West Companions*, used Ingraham, who drew on Nichols, as an authority; a 1901 book, *History of Our Wild West and Stories of Pioneer Life*, followed the false Buel narrative as fact. Another author, Emerson Hough, wrote an influential account in 1907, *The Story of the Outlaw*, that replicated the Nichols legend. Hough dignified Wild Bill by promoting him from a stable hand to agent of Rock Creek Station. The same year, an author considered "an able historian," according to Adams, repeated the Nichols fable in *The Great Plains: The Romance of Western American Exploration*, and embellished the gunslinger story in the typical fashion by having Wild Bill getting attacked by ten men, and then wiping out the entire "M'Kandlas" gang.[27]

Wild Bill stories published in the first decade of the 1900s would have more gravitas and authority than the dime novels of the 1880s, but would still draw on the dime novels' core. *Famous Scouts . . .*, published in 1910, dignified Buel and Hough as authorities by writing that Bill had dictated the "true" story to Buel. In 1911, a political science professor at the University of Wyoming perpetuated the Nichols-Buel-Hough legend as fact. A year later, another serious book, *Pioneer Tales of the Oregon Trail*, decried the "wide variance between the truth and fiction told by Emerson Hough," but the next year, the publisher L&M Oppenheimer, notorious for its wildly fictive "true" accounts of the West, published perhaps the most fabulized version ever of Bill's conflict: it confused Wild Bill with Buffalo Bill, and had him kill ten men single-handedly. One effort at history contended against a dozen narratives that took Nichols as bedrock, settled as fact, and told the fiction anew. It was an error written in 1867 into the DNA code for the marrow of America's "gun culture" that was replicated through the decades, with narrative mutations almost invariably in the direction of exaggerated lethality and greater moral righteousness.[28]



The Hickok story of Rock Creek illustrates a larger pattern. Gunmen began as legends, and their stories tended to burnish the impulsivity and stupidity of gun violence into an epic, scaffolding it with a purpose and a code: the Hickok origins story takes a mundane, ambiguous property dispute without a clear villain or hero, armed impulsivity, and banal but combustible sexual tensions and refashions them into a fable with an excess of both gun-riddled corpses and meaning.[29]

More than five hundred dime novels were written about Buffalo Bill Cody alone, and he became literally the most storied Winchester man. Like Hickok, Buffalo Bill did not become a myth so much as he began as one. His founding mythology was that he had killed and scalped the Cheyenne chief Yellow Hand in revenge for Custer's death. Julia Cody Goodman, his sister, recalled that from the Yellow Hand tale forward, the "hacks and historians, the myth makers and malingerers, the sugarcoaters and scandalmongers" all got in on the action, to write "panegyrics and diatribes" in which Bill was presented as "god or devil," early examples of the Manichean narrative style of the American gunman. Buffalo Bill's sister recalled that he only occasionally discovered the "skeleton of himself under the purple prose . . . outlandish adventures and superhuman feats" that, for example, dime novelist Ned Buntline concocted.[30]

Hickok's story, Buffalo Bill's story, and the story in general of the gun and the frontier got abbreviated into a few familiar plots and phrases: its morally stark narrative pitted the lone, repeater-armed gunman, equal to many, against a horde of desperados and bad men, as in this dime novel:

> Nearer and nearer came the rushing band of Indians, for what had two hundred mounted warriors to fear from one man?
>
> Nearer and nearer until presently, Buffalo Bill was seen to raise his rifle and a perfect stream of fire seemed to flow out of the muzzle, while the shots came in rapid succession.
>
> It was a Winchester repeating rifle, and Buffalo Bill had been testing it thoroughly.

> And the result was such that . . . down in the dust had gone several of their number. . . .
>
> With a wild, defiant war-cry, Buffalo Bill wheeled and rode away, loading his matchless rifle as he ran.[31]

The dime western put Winchester, if not the rifle itself, in the back pockets of boys who repeated its catechism of the frontier, perhaps without knowing exactly what it meant: "Crack crack crack went the Winchester and fifteen Indians bit the dust."[32]

Buffalo Bill himself invented fabulous stories, or sometimes had them ghostwritten to be published under his name. He once wrote to his publisher: "I am sorry to have to lie so outrageously in this yarn. My hero has killed more Indians on one war trail than I have killed all my life. But I understand this is what is expected of border tales. If you think



Buffalo Bill illustration for the cover of a dime novel. More than five hundred dime novels were written about Buffalo Bill. *Courtesy of the Denver Public Library, Western History Collection.*

the revolver and bowie knife are used too freely, you may cut out a fatal shot or stab whenever you deem it wise."[33] He also self-commodified with his Wild West show. The show was atrociously written, by Buntline, and wildly successful. The *Chicago Times* said in a review that "if Buntline had actually spent four hours in writing this play, it would be difficult to ascertain what he had been doing all that time." But the audiences loved it, and Buffalo Bill wrote home to his sister in 1886 saying that the public "looks upon me as the one man in my business. And if they will only think so for a year or two I will make money enough for us all for our life time." The Wild West show was a strange ritual of conquest: Bill slayed the Indians in a putatively authentic reenactment of the already mythic Yellow Hand tale, and the Native American actors, who restaged their own demise at the hands of Winchesters and Colts, left to thunderous applause—and then returned, resurrected with ghostly immortality, for the next performance.[34]

If the Winchester 73 rifle had been a book, it would have been a dime novel: mass-produced with interchangeable plots; mechanical, predictable, requiring little exertion by the user; and delivering its conclusion efficiently and precisely. Like the Winchester rifle, the dime novel was semiautomatic. It did more of the work for the reader. It was molded, "machined," and produced in much the same way as the rifle. The interchangeable, machined story, like the rifle itself, had a mystique based in heroic individualism. As society became less individualistic, the gun promised individualism; as Americans became less democratically equal in terms of wealth, the Winchester equalized them; as the world and economy became more complex and interconnected, the mystique conjured the lone gunman. The generic rifle and its owner were *sui generis*, in a class of their own. The reader gloried in the violent, triumphant life of a character who was just like the others in hundreds of dime novels with millions of readers—but entirely his own man.[35]

The gun mystique would gain momentum because, like any legend, it resolved contradictions that history could not manage. It is often said that Americans "love their guns" because of our tradition of individualism, but the gun's seduction involves a dual heritage: an ideal of

individual equality, and a reality where it sometimes falls short. The gun had a kind of narrative firepower to resolve this tension. It could transliterate the subjugated into the powerful lone gunman, and this aspect of the gun mystique was germinal in the 1800s.

For example, as it became clear during Reconstruction that southern blacks would not enjoy the benefits of free citizenship or the protection of law against white mobs and lynchings, the appeal of the Winchester grew stronger for black leaders, such as scholar and activist W. E. B. Du Bois and journalist Ida B. Wells. Wells, who on another occasion bought a pistol after a lynching, wrote, "The Winchester rifle deserves a place of honor in every Black home."[36]

On a July evening in 1892 in New Orleans, Robert Charles, a black man, was sitting with a friend on a rowhouse stoop when the police approached and asked what his business was. The confrontation turned violent. The police grabbed Charles and wounded him, but he managed to return to his room, where he grabbed his Winchester and shot and killed the police captain who had pursued him. A mob descended on the city to attack the black community. The next day, the police found Charles hiding in a friend's home. He took his Winchester and let loose a barrage, but eventually realized that he was surrounded. Charles was shot and killed. In her telling of this story, Wells characterized Charles as a valiant gunman—or the Alamo, as historian Nicholas Johnson writes. "Charles made a last stand in a small building," she wrote, "and fought a mob of twenty thousand single-handed, and alone." The mob set fire to his building, but even then, "Charles was shooting and every crack of his death-dealing rifle added another victim to the price which he had placed upon his own life." The *Times-Democrat* of New Orleans noted Charles' acumen with his Winchester. "He worked his weapon with incredible rapidity," the paper said. "His wonderful marksmanship never failed him for a moment." When the fire was too much to endure, he appeared at the door, "rifle in hand, to charge the countless guns that were drawn upon him. . . . He raised his gun to fire again, but this time it failed for 100 shots riddled his body." Wells's narration of Charles's demise was the gunslinger story, complete with its exaggerated, individual omnipotence, transliterated to the side of the racially oppressed, a feat

achieved through the gun. For Wells and other African Americans, the Winchester was an extemporized steel bridge to get from the reality of racial subjugation to the ideal of equality.[37]

A popular inscription on the Winchester 73 read: "Be not afraid of any man, no matter what his size. When danger threatens, call on me. And I will equalize." Colt's first biographer believed that the firearm was a "blessing to mankind" because it gave protection to "the weak against the strong," the "dwarf some superiorities over the giant." Echoing Samuel Colt's promotional copy of the 1850s down to the 1870s, the *New Orleans Republican* predicted that the shotgun would become a "famous peacemaker" when juries and justice failed the black man. This idea became prominent again in the late 1960s, when a young black man in Chicago, for example, claimed the gun as "status," adding, "That's why they call it an equalizer. What's happening today is everybody's getting more and more equal because everybody's got one."[38]

"God made man, and Colt made them equal," one adage held. Of course, making men equal is presumably what the institutions of American law and democracy were supposed to do. For African Americans, Native Americans, and other groups, including women, who were disenfranchised or vulnerable, the Winchester promised a self-sovereignty and individual power that had not been achieved by institutions or law. If war is diplomacy by other means, then the Winchester was equality by other means: the gun, rather than being interpreted as the apotheosis of American individualism, could be seen as the individual's tool of last resort when the social contract has torn and the work of equalizing has fallen short: the dream that has deferred to the gun.[39]

It must be the American gun's most enduring and satisfying seduction: the notion that a gun can equalize—that the abused spouse, for example, can arm herself and be powerful and safe, her finger on the trigger razing years of degradation. Who can dispute that in the face of the institutional failures of injustice and indifference, the brandishing of a gun, even if it is never shot, would feel like, and *be*, a form of empowerment?

But it still matters who is at which end of the barrel. As dominant as constitutional debates are to gun politics today, the Supreme Court's first Second Amendment case, *United States v. Cruikshank*, was only heard in 1876, the same year the federal government restricted the gun trade to Native Americans. It emerged out of the single bloodiest day of violence during Reconstruction, and it tested the South's black codes—state legislation that, among other things, prohibited African American gun ownership in the most heavily armed region of the country. Colfax was the county seat of Grant Parish in Louisiana. The massacre that happened there on Easter Sunday in 1873 did not resemble the heroic narration of Robert Charles's last stand. The Radical Republican sheriff of Colfax had deputized 150 African Americans to defend the town against white Democrats who were outraged over a community of freedmen's efforts to assert and use their new political rights. For three weeks, the hastily drilled and armed men managed to hold off more heavily armed whites who surrounded the brick stable that served as the town's courthouse. On Easter Sunday, whites shot most of the town's black defenders dead as they tried to surrender.[40]

The defendant in *Cruikshank* was a member of the Colfax mob. Among other things, he'd been charged with restricting blacks' rights to bear arms. In this ruling, the Court upheld the right of states to pass civilian firearms controls and legislation. In other words, the justices found that the federal government did not have the power to restrict or limit state gun legislation, which meant that the racist agenda of effectively disarming African Americans through state gun laws would be permitted. (Subsequent laws in the early 1900s in the South were blatant in their intention to selectively limit gun ownership according to race.) In what seems like a negative image of twenty-first-century gun politics, the ruling supported state legislation—gun control—to limit African American citizens' access to the gun market as against the northern liberal campaign to protect emancipated slaves' unrestricted right to bear arms for their own protection and the protection of their families.[41]

As for the gun violence itself, it is more often intraracial than heroically deployed against inequalities or the oppressor. Renowned

sociologist Gunnar Myrdal observed in the early 1940s what more conservative black leaders, such as Booker T. Washington, had already feared, that the "custom of going armed" in the South, which was "taken over by negroes during Reconstruction days," and the "dangerous pattern" of having guns around "undoubtedly contributes to the high record of violent actions, most of the time directed against other negroes." The African American homicide rate in US cities by the mid-1920s was between seven and eight times that of whites. In practice, the philosophy of the gun deferred to the stupidity and impulsivity of its use. A gun imagined against a white mob gets used against a lover or neighbor, instead, or by the mob against the oppressed. We might love the gun for the lure of last-ditch individualism and equality, but that doesn't mean the gun loves us back.[42]

IF THIS GERMINAL GUN MYSTIQUE EXAGGERATED THE "QUALITY" of gun violence—tying it to values of individual agency, justice, and equality—it also exaggerated the quantity of gun violence. Tales of gunmen imagine America as more gun-violent than it was, when it would seem that bias should lean in the other, exculpatory direction. This gun overkill was evident early on in Daniel Boone's legend, and it persisted up to and beyond the Hickok story. We wrote, staged, advertised, filmed, debated, and televised our way into a gun culture more than we shot our way in.

Billy the Kid's story did not fade from fact into legend, but from legend into fact. Two years before the Kid's death at age twenty-three, the wife of the territorial governor of New Mexico wrote to her husband the false legend that he had killed a man for every year of his life, when it is doubtful that he killed more than eight. According to historian Gary Roberts, many old-timers spoke of how they knew Billy the Kid, and recounted stories of him as if they were their own eyewitness memories—but these stories were so similar to a *National Police Gazette* story that there could be no doubt as to their provenance. The Kid's overkill, like that of other famous gunmen, began immediately after his death with the publication of dime novels, including John Woodruff Lewis's *The True Life of Billy the Kid* (1881) and a serial account in

*Las Vegas Optic.* Subsequent accounts exaggerated the number of people he killed and injured, although he was portrayed as more sociopathic than other gunmen. Works concluded that he killed "just for the sport of it," "went about shooting folks just for the fun of it," and had "more individual killings to his credit" than any other. A very rare book prepared for each member of the Livestock Association in 1905 repeated the story that had been told by the New Mexico governor's wife, describing the Kid as an "infamous cutthroat" who had killed one man for each year of his "horrible life."[43]

Other narratives of the western gun followed the same pattern: The Johnson County "War of Wyoming" involved nothing more than "two inconspicuous ranchmen . . . over a line fence quarrel." Sam Bass had "not a few murders" to his name, it was said, when in fact he had none, and so on.[44]

These legends were to become a gun culture archive in the 1900s, but the forgotten archives of the gun culture, including the dispassionate figures of Marcellus Hartley's business ledger books, tell a different story about the quantity of gun violence. What American gun critics and lovers alike tend to take as a given, whether as a tool of condemnation or praise—that the United States is a "nation of cowboys"— gun devotees who know the most about the material world of nineteenth-century gun production cast into doubt. Herbert Houze's study of the Schuyler, Hartley & Graham ledger book, for example, reveals that SHG's earliest shipments to Missouri, the hub of the gun trade, consisted of large-bore hunting rifles and carbines suitable for self-defense. But "consumer demand for such arms rapidly decreased" from 1868 onward, replaced by demand for arms suitable for small game and bird hunting. Likewise, in Nebraska, the transformation from "a frontier state to a settled society," said Houze, is charted in SHG's arms shipments from Lower Manhattan, which shifted from personal defense weapons in the late 1860s to farmers' guns by 1879 and a substantially decreased volume in guns overall. The absence of carbine shipments, he argued, "indicates that settlers no longer perceived the native population as a threat." The gun depot A. D. McAusland, in Miles City, Montana, had been a major transit point



for gun commerce to buffalo hunters. By 1882, however, the area "had been tamed to such an extent" that SHG was shipping plain amber glass target balls for recreational trap-shooting instead of guns. Even in Texas, the dealer Comminge & Geisler ordered 3,040 Lagousky Patent Clay Pigeons in 1885 as gun orders decreased.[45]

In her groundbreaking work on western history, Patricia Limerick brilliantly revised the idea of an 1870s and 1880s frontier of adventuresome gun violence in a place of "free" land to be taken. "The events of western history represent not a simple process of territorial expansion," she argued, "but an array of efforts to wrap the concept of property around unwieldy objects." The battles in this jagged, complex process of conquest happened in the more quiet ellipses of the dime-novel plots. They happened in offices, over deeds, and through barbed wire and agriculture.[46]

A body of scholarship about gun violence on the "frontier" has found that gun violence and its historical consequences have been overestimated, not underestimated. Some of the scholarship on gun violence in the West, although not all of it, has questioned its assumed ubiquity while recognizing a core of truth. The West was more gun-violent than other places—but not as violent as we think. Law professor Adam Winkler noted that gun violence wasn't common on the frontier. We remember the Gunfight at the O.K. Corral in Arizona because it was an infrequent event. Historians Robert Dykstra and Eugene Hollon revisited frontier violence and couldn't find evidence that there had ever been shootouts in the five most important Kansas cattle towns. There were only 45 homicides overall in the 15-year span from 1870 to 1885, for an average of 1.5 homicides per cattle-trading season. Even when cowboys and range riders used guns, they almost never used them in Hollywood-style gunfights. "Getting the drop on"—that is, eluding and avoiding—rivals and enemies was more conducive to survival than shooting.[47]

As for guns and interpersonal violence, Roger Lane, a crime historian, found the mining country mountains far more murderous in the 1870s and 1880s than the plains. Bodie, California, which experienced a mining boom in the late 1870s, recorded 29 murders in a town of

only 5,000. When we talk about gun violence in America, we are often talking about booze, bachelorhood, and racial-ethnic strife. Shootings happened impulsively because of lethally obstinate notions of offense and honor among intoxicated, socially unattached men living in close quarters. The incidents often lacked the narrative intricacy or moral gravitas common to legends of gun violence.[48]

But the mystique would transform—or inflect—an older and larger tradition of American violence as it evolved from the late 1800s to the 1900s. The extraordinary violence of the gunman, American studies scholar Richard Slotkin brilliantly argued, masked the ordinary violence of the ages. That ordinary violence might include deadly clashes between capital and labor in the age of the robber barons, and the nonphysical brutality of conquest—the systematic unraveling of indigenous cultures to hew survivors, in the language of the 1800s, to the ways of "civilization" as opposed to "savagery."[49]

The cowboy's actual life embodied this ordinary violence as vividly as his mythic life embodied the extraordinary violence of the gunslinger. Cowboys, historian David Cartwright observed, "were lower-class bachelor laborers in a risky and unhealthful line of work" who lived in a disreputable "subculture" ravaged by whiskey. Novelist and historian Wallace Stegner depicted the true cowboy as almost entirely opposite of his mythic avatar—not the autonomous, armed hero of his own life in the wide open West, but an "overworked, underpaid hireling, almost as homeless and dispossessed as a modern crop worker." Through "moral surgery," Cartwright noted, the cowboy became an American icon of rugged individualism and risk taking, but dismounted from horse and myth, he was a "drunk sleeping it off on the manure behind the saloon."[50]

The cowboy was no more the product of American individualism than the Winchester rifle itself, although both were becoming its icons. The legends that would become "facts" about the American gun culture made gun violence both more common and more coolly righteous than it was. The violence of the lone gunman was not the violence we most had, but it was, apparently, the violence we most preferred.



CHAPTER 10

## BALANCING THE LEDGER

ON DECEMBER 11, 1880, OLIVER WINCHESTER DIED AT HIS Prospect Street estate. He was sixty-nine, and he had been ill and infirm for a few years before he finally succumbed to an unspecified affliction, perhaps heart failure. "Winchester's career was in the best American tradition," obituaries said, of the self-made man.[1]

Eulogies praised Winchester's imagination, for he had been able "to see the red and golden streaks of sunshine where to others it was cloudy and overcast." He had had the unique ability to see "future possibilities." It was true that much of Winchester's genius as a gun capitalist was creative, not mechanical, and rooted in his skills as a salesman and entrepreneur—to "vision" a gun market. His "fearfully destructive inventions and fabrications," noted a nineteenth-century biographical entry, might have done more good than anything else by "circumscrib[ing] the ravages of war, . . . reducing it to the absurdities of comparative suicide." It was an exculpatory idea, although there is no evidence that the repeater rifle stimulated a pacifism of mutually assured destruction. Instead, people and animals were shot faster, at greater distances, with a more mechanically volitional weapon.[2]

Oliver Winchester's motives for his life's work are elusive and conjectural. There were as few stories or legends about Winchester the man as there was a surfeit of them about Winchester the rifle. But from

Compendium_Vorenberg
Page 087

CHAPTER 19

# THE WEST THAT WON THE GUN

*The west may need to be seen to be believed, but it must be believed to be seen.*

—N. Scott Momaday

THE WINCHESTER "WON THE WEST" SEVERAL DECADES AFTER THE fact, in the 1900s. Everyone knows that the Winchester was the gun that won the West, not because it happened, but because it was a twentieth-century slogan in a Winchester marketing campaign. The slogan was devised by Winchester executive Edwin Pugsley; it was first introduced in a full-page magazine ad in 1919, and later disseminated in "French," English, Chinese, Spanish, everything," says Winchester curator Herbert Houze. "It's a bit of an overstatement. . . . Shall we say, Winchester did a wonderful marketing job."[1]

In 1959, the company's slogan was, "Winchester: More than a Gun. An American Legend": by then it could afford to be more abstract and gestural even than "the gun that won the West." And by 1995, there was almost a weary, slurred shorthand in how Winchester advertised the heavy cultural freight of its gun. The company's explanation of its modern logo, a horse and armed rider, leaves no cliché behind: it conveys "the cowboy, the Indian, the lawman, the pioneer, the mesa, the mountains, the desert, and the grandeur of the west."[2]

Compendium_Vorenberg
Page 088