1   Rob Bonta
    Attorney General of California
2   P. Patty Li
    Supervising Deputy Attorney General
3   Anna Ferrari
    Deputy Attorney General
4   John D. Echeverria
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*

9

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                          CIVIL DIVISION

13

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG** |
| **v.** | |
| | **VOLUME 4 OF 11** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:      5A |
| | Judge:          Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

1

**INDEX**

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867). | 18 n.17 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A. | 55 n.79 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 55 n.79 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 49 n.69 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 13 n.15 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 17 n.16 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 33 n.41 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 34 n.44, 54 n.78 | 0039-0041 |
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |

2

| | | |
|---|---|---|
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 31 n.34 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 177-202, 353-68. | *passim* | 0060-0096 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 31 n.34 & n. 35 | 0097-0104 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 20 n.22 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 9 n.3, 13 n.14, 25 n.26 | 0109-0217 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 40 n.53, 43 n.55 | 0218-0222 |
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 18 n.17, 20 n.21 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 18 n.19 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 19 n.20, 36 n.47, 40 n.53 | 0360-0397 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 28 n.29 | 0398-0424 |

3

| | | |
|---|---|---|
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 45 n.59 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 21 n.23, 25 n.25 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 45 n.59 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 10 n.9, 27 n.28, 30 n.33 | 0453-0464 |
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 36 n.47, 38 n.50, 39 n.51 & 52, 47 n.64 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 34 n.44 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 52 n.75 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 18 n.18 | 0489-0495 |

4

| | | |
|---|---|---|
| Allan Robert Purcell, "*The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 19 n.20 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 55 n.79 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 46 n.60 | 0563-0584 |
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 19 n.20 | 0585-0598 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana,for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 53 n.77 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 12 n.12, & 13 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 47 n.63 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 48 n.68 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 | 49 n.70 | 0620- |

| | | |
|---|---|---|
| "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | | 0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 48 n.67 | 0622-0627 |
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 12 n.13 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 28 n.30 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 24 n.24 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:211-12. | 17 n.16 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 47 n.62 | 0653-0656 |

6

| NEWS ARTICLES | | |
|---|---|---|
| Army and Navy Journal, June 1, 1867, p. 350 | 29 n.32 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 27 n.27 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 37 n.49 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 2 | 56 n.61 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 32 n.37 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 32 n.38 | 0666 |
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 49 n.72 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 44 n.56 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.31 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 25 n.26 | 0679 |
| New Orleans Republican, June 1, 1873, p. 1 | 40 n.53, 42 n.54 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 46 n.61 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 32 n.40 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 33 n.42 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p. 1. | 42 n.54 | 0688 |

| | | |
|---|---|---|
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 34 n.43 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 45 n.58 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 35 n.46 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 44 n.57 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 37 n.48 | 0695 |
| *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4). | 27 n.27 | 0696 |
| **OTHER SOURCES** | | |
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 34 n.45 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 25 n.26 | 0701-0702 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 26 n.26 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 26 n.26 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 51 n.73 | 0716-0727 |

8



twelve for the rifle, thirteen for the musket and nine for the carbine. The first 1878 catalog carried a warning that long range target cartridges with 85 or 90 grains of powder and a patched bullet of 450 to 500 grains "cannot be used through the magazine but must be used singly, loading through the top of the carrier block mortise." Such a cartridge for the

Sideplate of Presentation Model '76 Rifle in the Collection of
Maurice C. Clark

Model '76 was illustrated in the March 1 edition, but dropped in the very next issue.

An endurance test of the Model '76 was reported in *Forest and Stream* for November 1, 1877.² With the toggle-links on one side of the action removed, it was fired twenty times with normal charges. Then with the links restored powder loads were gradually increased until, on the seventh test with 203 grains of powder and six bullets of 480 grains, the charge "bent the breech pin, blew out the side plates, split the frame and otherwise disabled the arm." The new model was at first issued without a slide cover, an explanation being given in a letter³ from the company to *Forest and Stream*:

The slide placed upon the Winchester Guns, Model 1873, was left off in the Model of 1876, as a matter of safety and precaution. Of the great number of persons using our arms, Model 1873, many are ignorant of the proper use of them, and always close the slide cover over the carrier-block mortise; and if they fire a cartridge with an imperfect head, and it blows the head off, the gas escapes

Model '76 rifle inscribed "Col. Cody Buffalo Bill from the Wild West
London Eng. 1887"
*Collection of Gerald Fox*

into the breech and lock-work, thereby causing damage that would not occur if the cover was open.

Altogether 63,871 of the Model '76 were sold until manufacture was discontinued in 1897. Serials reached No. 1258 in 1877, No. 7965 in 1878, No. 8950 in 1879, No. 12,050 in 1880 and No. 20,050 by the end of 1881.⁴ Thereafter sales averaged about seven thousand a year until the new Model '86 pre-empted the market. Calibres .45-60 and .50-95 Express were added in 1879 for rifles and .40-60 in 1884, the carbine being only available in .45-75 until 1885. Of the first 15,000 serials, a count at the Winchester Museum indicates that



124                    THE FIRST WINCHESTER

12,962 were rifles, 1,861 carbines and only 177 muskets, although several hundred carbines were furnished with bayonets. Of the total number about 5,000 rifles were chambered for .45-60 and 700 for .50-95 Express. The octagonal rifle barrel was by far the most popular, some 9,100 being of this style as compared to 3,600 round barrels and 220 half-octagon. Nonstandard lengths were recorded at two-inch intervals from 22 to 34 inches, and there were 121 heavy barrels and 83 extra heavy issued.

Price per 1,000, $——.
Case contains 1,000.

Powder 90 grs.
Lead 420 "

ADAPTED TO
Winchester Rifle, Model 1876, for Long Ranges.
From Winchester Catalog, 1878

Mortise lids became optional with serial 1682, but were not in great demand. A few earlier serials were altered to take them. Set triggers are recorded for 4,618 rifles, half or short magazines for 637, and pistol grips for 362. Several hundred rifles had shotgun stocks or butts and some stocks made to particular specifications, one entry being "schutzen stock" and another "compass in stock." Of finishes, 975 case-hardened and 19 browned receivers were listed, besides 141 nickel-plated, five silver-plated and eight gold-plated arms. Ten rifles about serial 1950 were recorded as "gold and silver." Only about thirty of the arms counted were engraved, and twenty had names or initials of owners inscribed thereon. It should be noted that the foregoing figures apply only to the first 15,000 Model '76 serials. Multiplication by four will give a rough estimate of the total in any category.

Altogether fifty Model '76 rifles were marked "One of One

MODEL '76 AND THE NORTHWEST MOUNTED POLICE      125

Thousand" and eight "One of One Hundred." Eleven of the former were chambered for .45-60 calibre and two rechambered for .40-60. They were all numbered under serial 11,000.

Rear Sights of Model '76 Winchester
Above: N. W. Mounted Police Carbine
Below: Standard Carbine
*Courtesy of Winchester Repeating Arms Company*

and originally made prior to 1881. The designations (applied also to the Model '73) were explained in the 1875 and 1876 catalogs: "All of those barrels that are found to make targets of extra merit will be made up into guns with set triggers and extra finish, and marked as a designating name 'one of a thousand' and sold at $100. The next grade of barrels, not quite so fine, will be marked 'one of a hundred,' and set up to order

in any style at $20 advance over the list price of the corre-
sponding style of gun as shown in the price list." Neither
designation proved to be numerically exact, the standard of
excellence producing many more top grade guns than second.

The Model '76 was the last of the Winchesters having the
toggle-link design of breech action derived from the Volcanic
and Henry rifles. It is perhaps best known for its use in carbine
form by the Canadian Northwest Mounted Police. Their adop-
tion of it is well documented in the annual reports of the
commissioner, which indicate that a first lot of fifty Win-
chesters was acquired in 1878. At that time the force consisted
of only three hundred men, who had to cope with Indians
such as the Assiniboines, Blackfoot, Blood and Sarci already
possessing repeating rifles, not to mention renegade whites
and half-breeds. Sitting Bull's Sioux were likewise involuntary
guests in the "grandmother country." Among such company
the Snider single-shot carbines originally issued to the force
seemed less than adequate.[5] Thus the commissioner reported
in 1878:[6] "The Winchester rifles (fifty) supplied are admirable
weapons for our service. . . . I am in hopes that we may be
supplied with fifty more rifles this year . . . as all ranks are
very desirous of practicing with the new and popular arm."
By 1880 one hundred Winchesters had been issued to divisions
of the force stationed along the international border. Reveal-
ing comments were made on them in the commissioner's
report:[7]

There is now in use in the force the Snider carbine and the
Winchester rifle. On the organization of the force, the Snider
carbine was the only rifle issued; since then, however, one hundred
Winchester rifles, improved pattern, have been purchased, with
which "A" and "F" divisions are now armed. . . . The Snider
carbine is now considered in many respects an obsolete military
arm, and is somewhat unsuited to the wants of a force in this



Northwest Mounted Police Scouts, 1879
Courtesy of Royal Canadian Mounted Police

128                         THE FIRST WINCHESTER

country where a large portion of the Indian population is armed with an accurate shooting weapon. Still, however, bearing in mind the expense that a change of arms would necessitate, I think the Snider carbine may be utilized by us for some further time, at all events. The amount of Snider ammunition on hand is large.

The Winchester rifle, which is a repeating one, and capable of receiving eight cartridges in the magazine, has many good points, and is a favorite arm with the western prairie men. I do not, however, consider it a good military weapon. The system of rifling is good, but the rifle is altogether too weak in construction to meet the rough handling that at times it is impossible to prevent its receiving. As an example of its weakness: some time ago a man on sentry at night slipped and fell; in doing so the barrel of his rifle was broken at the joint where it is secured into the breech apparatus. Other similar instances have occurred. The back sight on the Winchester rifle is *badly* attached to the barrel. The sight slides readily from one side to the other, which, of course, interferes with accurate shooting.

The same comments were repeated the following year,[7] with the observation that "having the force armed with repeating rifles will not be without a good moral effect upon the Indian mind. The superiority of the rifles they now carry over the Snider carbine is well understood." In 1882 there was an increase of the force to five hundred in anticipation of the Canadian Pacific Railway's building westward into Alberta. The commissioner[7] again mentioned the Snider as "fast becoming unserviceable, in addition to the arm itself being an obsolete one, and inferior to that with which most of the Indians (*all* of those in the southern district) are armed." He went on to say: "In the new carbine, manufactured expressly for the force by the Winchester Arms Company, all the old defects have been obviated. I beg to recommend that the whole force be at once supplied with Winchester carbines (Model 1876)." By the next year he was able to report to Ottawa:[10] "The new pattern Winchester rifle supplied is a



Dennis Scouts in the North West Field Force, 1885, armed with Mounted Police Carbines

*Courtesy of Royal Canadian Mounted Police*



most excellent arm, and of very superior manufacture. It is, in every respect, well adapted to our use."

This satisfaction did not last long, however. No sooner was the Northwest Rebellion of 1885 over than complaints against the '76 carbine began, on the score of honeycombed barrels, defective sighting, high trajectory and broken stocks. The

Model '76 Northwest Mounted Police Carbine, Calibre .45-75
*Official R.C.M.P. Photo*

appearance of more up-to-date rifles undoubtedly prompted these criticisms, which the commissioner noted in his report for 1888 [11] recommending a change. Yet in 1890 [12] he commented, "The Winchester carbines are still in use, and are still complained of: they, however, answer our purpose very well, and with close supervision and a considerable number of new barrels, which are being put in, will last for sometime longer."

By 1895, the force had obtained 200 Lee-Metford bolt action carbines of .303 calibre, then the regulation British cavalry arm.[13] With the Winchesters, they did valiant service in the Yukon during the Klondike rush.[14] By 1902 two divisions of the force were supplied with the Lee-Metford, when a new contender appeared in the Ross rifle.[15] This Canadian-made arm was adopted after a trial against the Mauser and the older arms, but defects caused its withdrawal from use in 1907, Lee-Metfords being reissued to two divisions and Winchesters

MODEL '76 AND THE NORTHWEST MOUNTED POLICE    151

to others. Meanwhile, the Yukon divisions had acquired Lee-Enfield rifles.[16] Winchesters were still on general issue in 1912, after a fire at Regina destroyed most of the new Ross rifles.[17] In 1914 the commissioner reported [18] that the force had been

Butt of Police Carbine, stamped "N. W. M. P"
*Official R.C.M.P. Photo*

rearmed with the Lee-Enfield carbine, "a light, handy and accurate weapon . . . eminently suitable for Mounted Police use."

Serials of Model '76 carbines preserved in the Royal Canadian Mounted Police Museum at Regina establish that 300 Winchester .45-75's were obtained from the factory in May



152                          THE FIRST WINCHESTER

1882 and another lot of 446 in April 1885. The first were numbered in the 23,801 to 24,100 serial range and the second from the 43,900's to the 44,400's. Specifications of the first order called for a barrel with a large shank, a stock of good quality, and sights "Spanish meter." The latter is believed a

*Breech of Snider Rifle, Paris Exposition, 1867*

reference to a type of military rear sight fastened to the barrel by screws, such as Winchester's had supplied to the Spanish Government. A prototype carbine, serial 23,244, is in the Winchester Museum. Its characteristics clearly reflect the commissioner's criticisms of 1880. The second order is identified in company records with the initials "NWP" and the reference "Q of 82." Specimens at the Police Museum with N.W.M.P. stamped on the butt, right side, in crescent form, though barely discernible. The grain of the stock has more curl than that of the forearm.

CHAPTER XI

## EXTRACTOR PATENT LITIGATION

WHEN, in July 1855, Messrs. Palmer, Smith and Wesson turned over their patents to the Volcanic Repeating Arms Company, the assignment contained a provision including "all patents and patent rights which the said parties of the first part or either of them or their representatives and assigns may or can obtain or acquire for inventions or improvements in firearms or ammunition or upon the matters already patented." This clause was a very broad one, broader than assignors intending to continue in the arms business should perhaps have agreed to. By the same token it proved to be of great value to the successors of the assignee. Thus when the New Haven Arms Company commenced making ammunition for the Henry rifle, Oliver F. Winchester was enabled to utilize a cartridge patent developed in connection with Smith & Wesson revolvers long after the date of the assignment.

But there was one patent taken in Volcanic days that caused trouble. This had been issued to William C. Hicks [1] on March

153



10, 1857, shortly after he resigned as Volcanic superintendent. It covered a hook which served not only to extract cartridges, but as a firing-pin. Hicks' device could withdraw an unfired cartridge and in this respect improved on Smith & Wesson's 1854 design. Later on it was held to be the basic patent for a hook extractor, and hence of great significance. Hicks developed this invention early in Volcanic days, as early as August 1855, but the patent, being applied for at the time of the Volcanic collapse, did not come into company hands. The present type of release by employees as to inventions made "on company time" was not customary in those days.

Scant attention seems to have been paid the Hicks patent during the era of the New Haven Arms Company. His design had been utilized by the Volcanic Company and by its successor also, at least so he asserted in a letter to Oliver F. Winchester in 1858 or 1859. Henry's patent of 1860 described a hook ejector operating on the outside rim of a metallic cartridge, whereas Hicks' engaged an interior flange in the base of a loaded projectile. After, however, the Henry rifle had proved itself in the Civil War and its success seemed assured, the Hicks patent assumed new stature.

In a transaction of which the details are not fully known, the patent was assigned by Hicks to Edward S. Renwick of New York, as trustee for Hicks and the partnership of Smith & Wesson. Renwick was a well-known patent agent of the day, and his beneficiaries each had a half interest in the trust. Three reissues of the patent were granted, considerably broadening its language, and an extension obtained for seven years to March 10, 1878.

Whether because of the Hicks patent or for some other reason, a disagreement had meanwhile arisen between Oliver F. Winchester and Smith & Wesson over interpretation of the assignment of July 10, 1855. After an amicable correspondence

between the parties, in which Smith & Wesson suggested that their differences be brought into court, an action was commenced by Winchester in April 1869 in the Federal Circuit Court for the District of Connecticut, where the defendants

appeared voluntarily. The pleadings of the parties are all that are on file in this case; it was never brought to trial.

Winchester asked that various revolver and cartridge patents acquired by Smith & Wesson subsequent to 1855 be conveyed to him as successor to the Volcanic Repeating Arms Company, in accordance with a literal interpretation of the assignment. Smith & Wesson answered that this document had never been intended to have such scope, and that if it had, enforcement

would be contrary to public policy. The whole proceeding appears to have been a friendly one, possibly to set up an offset for Winchester in case suit were brought against his company on the Hicks patent.

The anticipated was not long in happening, but Renwick, the trustee, for reasons of strategy or convenience sued in New York instead. As defendant he selected Charles H. Pond, New York agent for Winchester arms, who was charged in May 1870 with selling infringements. The Pond case came to trial in June 1872, and Judge Blatchford of the Federal Circuit Court for the Southern District of New York sustained the broad scope of the patent, finding Hicks to be the first inventor of a practical hook ejector.[3] He held "it can make no difference, that the flange of the defendant's cartridge radiates outwardly from the longitudinal axis of the cartridge, and that the flange of the plantiffs' cartridge radiates inwardly" toward the same axis. "Nor can it make any difference that the defendant has a rigid flange in the cartridge, and causes the hook to spring to engage with the flange, while the plaintiffs have a rigid hook, and cause the flange to spring."

An accounting for past infringements was ordered, but in view of the extension of the patent to 1878, Renwick brought another suit against Albert Cooper to enjoin any further sale of Winchester arms in New York. The situation was described in another extractor patent suit brought by George W. Morse:

On June 8, 1872, in the suit of *Renwick v. Pond*, who was the selling agent of the Winchester Arms Company, upon the Hicks extractor patent, a decree was entered by the circuit court for the Southern district of New York, in favor of the validity of said patent. The court said in its opinion that Hicks' invention "dates back to a period shortly after the fourteenth of August, 1855, and anterior to the date of the invention shown in the Morse patent." A suit upon the Hicks patent against the defendant in Connecticut

was apparently imminent, which it feared would result in an injunction against the use of its extractor. About the same time, a suit upon the same patent, and a motion for a preliminary injunction, was brought by Renwick against Albert Cooper, in the Southern district of New York. This suit was also defended by



Gold-plated Model '66 Winchester Rifle and Engraved Carbine
*Collection of Joe W. Bates*

the Winchester Arms Company. A deliverance from the threatened injunction in Connecticut was deemed of great importance by W. W. Winchester, the vice-president of the company. The president was then in Turkey, making arrangements for a large contract for arms with the Ottoman government.

In June, 1872, Mr. Morse was applying for an extension of his patent before the patent-office, and was being opposed by the Winchester Company. About the time that the decision was rendered in the *Pond Case*, Mr. Morse informed Mr. Dodge, the



EXTRACTOR PATENT LITIGATION 139

attorney of the Winchester Company in the patent-office controversy, that he, Morse, could furnish oral and documentary proof that his gun, which was patented October 28, 1856, was invented before August 14, 1855, and that the documentary proof was contained in a *caveat* which he had filed before his application.

High Backed Wolf's Henry Rifle, Serial 1,729
*The House of Yesterday, Hastings, Nebraska*

W. W. Winchester, learning of Morse's assertion, negotiated with him for this proof, and in August paid him $10,000 cash plus a company note of $15,000. Part of the deal was that upon payment of the note Morse would give Winchester a release against having infringed Morse's extractor patent. It turned out, however, that Morse's caveat, because of a confusion of

Ivory-stocked Model '66 Carbine with Mexican Eagle. Serial 21,921
*Collection of William M. Locke*

drawings, did not in fact prove anticipation of Hicks, and it was held insufficient for this purpose when the Cooper case came on for trial in September.⁸ Judge Blatchford granted the requested injunction in New York, and Renwick soon afterwards brought suit for infringement directly against the Winchester Company in Connecticut.¹

"A Friendly Scout Signaling the Main Column" by Frederic Remington
*Century Magazine, March, 1891*

Caught between two fires, the Winchester Company refused payment on the $15,000 note, with the result that Morse also sued for infringement. This case was not finally decided until 1887, when the Federal Circuit Court for the District of Connecticut cleared the Winchester Company of infringing

Model '76 Rifle, "One of One Thousand," in the Winchester Museum, Serial 10,018

*Photograph Courtesy of James E. Serven*

Morse's patent, also sustaining its defense against paying the note.*

Meanwhile negotiations commenced between Oliver F. Winchester and Smith & Wesson for a settlement of all litigation pending between them. Winchester asked for an assignment of Smith & Wesson's interest in the Hicks patent. Their reply was that while their interest was not in assignable form, they would place it at his disposal. It was suggested that all suits be discontinued if Winchester would henceforward pay

Hicks alone a royalty of 12½ cents per gun, this being one half of what New York dealers were then paying to both parties in interest. Such a basis of settlement did not, however, appeal to Winchester, who apparently was averse to paying any royalty. His answer to the Renwick suit in Connecticut was

Winchester Rifles in the State Historical Society of North Dakota

1. Model '86, Calibre .50-110, owned by the Marquis de Mores
2. Model '86, Calibre .38-56, from Theodore Roosevelt's Elkhorn Ranch
3. Model '76, Calibre .45-60, marked "PEZI," the Sioux name of Chief Gall

amended to set up some French patents as anticipatory. It already embodied the statement that the defendants had recently altered the design of its guns "so that the said arms are not within the supposed invention of the said Hicks." This was apparently a reference to the Model '73, which still used a hook extractor, although the firing-pin had been changed. Winchester's did in fact own several extractor modifications patented by James D. Smith February 27, 1866 and Nelson King August 28, 1866, but they were never used.

Compendium_Vorenberg
Page 183

These defensive tactics appear to have been successful since the Renwick suit against Winchester's in Connecticut was not pressed for trial. Instead, another reissue of the Hicks patent was obtained, with the sole interest therein held by Hicks.⁹ This step extricated Smith & Wesson from an embarrassing position. Hicks alone then started suit in the District of Connecticut against new defendants, the Whitney Arms Company



Model '73 Rifle, Calibre .32 W.C.F., in the Woolaroc Museum, Frank Phillips Ranch, Bartlesville, Oklahoma

and Eli Whitney, Jr., its president, for violation of his reissued patent.¹⁰ In 1875 he brought another action in the Southern District of New York, charging Edwin S. Harris, a partner of Albert Cooper, with selling Winchester infringements since the latest reissue.¹¹ Neither suit reached the point of decision, although testimony was taken in the Whitney case, where the defendant employed the same counsel as represented Winchester's. It may be that some settlement was arranged.

Likewise neither of the earlier actions in Connecticut came to trial before final expiration of the Hicks patent in 1878.

In February 1879 Hicks testified as a witness on behalf of the Winchester Company against Morse, thus paying off an old score. Winchester's suit against Smith & Wesson was discontinued December 3, 1879, and Renwick's against the Winchester Company January 5, 1880. Hicks' action against Whitney was discontinued in 1889 and that against Harris remained pending, though dormant, until 1916. So far as known, no royalty was ever paid directly by Winchester's under the Hicks patent. As its president once wrote to another patentee, he preferred to "fight rather than talk."

CHAPTER XII

## THE GUN THAT WON THE WEST?

T̲H̲E̲ rhythmic slogan at the head of this chapter was coined after the First World War, when the long life of the Model '73 was drawing to a close. This model, according to an article¹ in a trade paper of 1920, was "the rifle that put the name Winchester on the map of the West" and "killed more game and more Indians, and more United States soldiers when the Indians awoke to its virtues, than any other type rifle." Had the writer specified the Model '66, which was in Indian hands at the Custer Battle,² the second part of his statement could be better substantiated. But as factory records indicate, relatively few of the Model '73 were in use before 1878, and they did not approach the "yellow boy" in numbers until the principal Indian campaigns were over.

If the slogan itself is taken seriously, the question arises as to what is meant by the winning of the West. Theodore Roosevelt wrote under this title regarding the territory between the Alleghanies and the Mississippi and the period ending

144



Poundmaker, Chief of the Crees
*Courtesy of Royal Canadian Mounted Police*







with the Louisiana Purchase. He never finished his design of carrying the narrative through the war with Mexico.[2] When the West that Roosevelt described was won, i.e., taken from the French, the English and the Indians, there still remained a trans-Mississippi West to conquer. It fell in segments, the

Model '66 Carbine inscribed "Wm B. Whetmore 6th Cavalry" Second Lieutenant, U.S.A., 1872 to 1876

*Collection of Gerald Fox*

near regions along the rivers and the far areas of the Pacific Coast before the Civil War,[4] leaving unvanquished only the center portion, the Great Plains and the Rockies. Even there, as in Colorado, Nevada and Utah, centers of white settlement flourished. It was then the unoccupied West of the plains and mountains that remained for winning when the Winchester came upon the scene.

We are told by historians of the post Civil War era that completion of the transcontinental railroads was the dominant factor in opening this territory.[5] The Union Pacific and Cen-

tral Pacific joining at Promontory Point, Utah, in 1869 were the first across. They were followed by the Santa Fé's juncture with the Southern Pacific in 1881 and the Northern Pacific's with the Oregon Railway in 1883.[6] Other lines crossed the continent later to provide competing transportation, but ex-

Model '66 Rifle "Presented to Edwin Want by O. F. Winchester, Esq. Jan. 1st 1868," Serial 16,001

The recipient was an ex-employee of the New Haven Arms Co.

*Collection of Maurice C. Clark*

cept for the Canadian Pacific, completed in 1885, little new land was opened. General Sherman was thus able to report to the Secretary of War in 1883:[7]

> Nothing has occurred to disturb the rapid development of the great West, which is now completely open to the immigrant in regions where a few years ago no single man could go with safety. . . . I now regard the Indians as substantially eliminated from the problem of the Army. There may be spasmodic and temporary alarms, but such Indian wars as have hitherto disturbed the public peace and tranquillity are not probable. The Army has been a large factor in producing this result, but it is not the only

148                    THE FIRST WINCHESTER

one. Immigration and the occupation by industrious farmers and
miners of lands vacated by the aborigines have been largely instru-
mental to that end, but the *railroad* which used to follow in the
rear now goes forward with the picket-line in the great battle of
civilization with barbarism, and has become the *greater* cause. . . .
The recent completion of the last of the four great transcontinental
lines of railway has settled forever the Indian question.

Building of the early roads through Indian country of course
involved the use of firearms, mainly in the hands of troops
guarding the surveyors and track layers. The protective task
usually fell to detachments of United States Cavalry, whose
official shoulder arm until 1873 was the Spencer or Sharps
carbine, after that the .45 Springfield. Infantry companies
garrisoning frontier posts carried Springfield muskets, breech-
loading by 1868. Such military forces, supplemented by scouts
and packers, undertook the advance expeditions and fought
the more remote engagements with hostile Indians. Thus
Captain Anson Mills' infantry at Fort Bridger in 1867 ex-
changed Springfield muskets for Spencer carbines to escort a
Union Pacific survey party through the Rockies to Oregon.[8]
Colonel Forsyth's scouts at the Arickaree River in 1868 stood
off Roman Nose with Spencer carbines and Colt revolvers.[9]
Major North's battalion of Pawnee Scouts defending the ad-
vancing rails of the Union Pacific in Wyoming had Spencers,[10]
as did General Stanley's cavalry escorting Northern Pacific
surveyors on the Yellowstone in 1873.[11] When General Crook
fought the Sioux at the Rosebud and General Custer attacked
them at the Little Big Horn in 1876, their troopers used
Springfields and Colts. The few Henrys and Winchesters see-
ing action in these fights were, ironically enough, fired by
Indian combatants.[12] Thus, if any guns won the West by open-
ing a way for the railroads, credit belongs primarily to the
Spencer, the Springfield and the Colt.



The Marquis de Mores, Medora, D.T., 1886
*Courtesy of Louis, Duc de Vallombrosa*

The western railroads brought professional buffalo hunters close to what had been Indian hunting grounds and took out, from such places as Dodge City, Cheyenne and Miles City, the hides that most of them came for. Killing off the bison, substantially effected by 1883, was a means advocated by the military of holding the Plains Indians on their reservations, where the only meat supply remained. But the hide hunters



From the *Austin City Directory*, 1877
*Courtesy of The New-York Historical Society*

generally employed heavy Sharps rifles so that the credit or discredit for the buffalo slaughter does not attach to the Winchester.[13] Buffalo Jones, for instance,[14] favored his Henry rifle for close quarters but used a Sharps to kill bison. In his opinion "the buffalo hunters conquered the whole Indian race—not by unerring aim at the red devils themselves—while perchance they encircled the camp, or in combat when they often met; but simply by slaying the buffalo and thereby cutting off their source of supplies."

With many civilians on the frontier the Winchester gained early and steady favor as a weapon for self-protection. Cowmen and sheepherders were advised in case of Indian attack[15] to "get into a buffalo wallow with a Winchester." Frederic Remington and Charles M. Russell have both dramatized its defensive use in paintings, some of which show the "yellow boy"

distinctly.[15] With much justification the company could say of its arm in the 1875 catalog: "It has become a household

Winchester Letterheads, 1878 to 1882
*Courtesy of Colt's Manufacturing Company*

word, and a household necessity on our western plains and mountains. The pioneer, the hunter and the trapper, believe in the Winchester, and its possession is a passion with every Indian." Such a reputation had of course been won primarily by the Model '66. The fire power of this repeater unquestion-



152

THE FIRST WINCHESTER

ably imparted a feeling of security to its possessors, whether white or Indian.

When settlers took up arms against each other, as vigilantes, rangers or simply as partisans, the Winchester often became the final arbiter. Thus it enforced frontier justice in Colorado, supplanted the Sharps first issued to the Texas Rangers, and

Model '76 Winchester Rifle "One of One Hundred," Caliber 45-60, Serial 714
Collection of Robert E. McMahon

reinforced them in pursuit of outlaws and cattle thieves. When the Panhandle stockmen organized in 1881 to resist contamination of their herds by infected cattle driven from South Texas, the movement became known as the "Winchester quarantine." And in the struggle between the Denver & Rio Grande and the Santa Fé for control of the route through the Royal Gorge, both sides resorted to Winchesters. These incidents illustrate the ubiquity of the arm in situations not involving Indians.

For sporting purposes, the Winchester shared honors with other makes in dealers' notices until introduction of the Model

THE GUN THAT WON THE WEST?

153

'76. This gave it pre-eminence, except perhaps in buffalo hunting, where the more powerful single-shot rifles like the Sharps still enjoyed a preference. With diminution of the herds the technique of skilled hunters had changed from chas-

"Lt. Genl P. H. Sheridan
U. S. Army,
From His Friend
W. E. S.
June 1, 1881"

Gold-plated Presentation by Gen. William E. Strong, Caliber 50-95
Courtesy of Herb Glass

ing buffalo on horseback to firing from concealment at long range. As a deer rifle and for similar game, the Winchester enjoyed the same popular favor it had in the matter of personal protection. An English visitor thus noted in 1880: "A capital weapon for general shooting on horseback is the latest model of the Winchester or Sharps rifle, the former being especially convenient, owing to its magazine, and the rapidity with which it can be fired."



However tempting the phrase, it is in the author's opinion dubious to name any gun as the one that won the West. Many arms and far more significant factors entered into the winning, a concept demonstrated to be itself variable in time and place. Inescapably the rhythmic slogan with its implied superlative has the sound of later day advertising. In its evolution to "a favorite arm with the western prairie men," quoting the commissioner of the Northwest Mounted Police, and "the best magazine rifle for sporting purposes" at the Philadelphia Centennial, the early Winchester has a much surer and fairer claim to laurels.

Yet in the conquest of popular fancy, the gun won more than the West. Like the name Colt, that of Winchester became in a few years the proper noun for a type of arm known the world over. So the *Oxford Dictionary* [33] recognizes it, not only as a place name in England, but as "the designation of a breech-loading rifle. . . ." The University of Chicago's *Dictionary of Americanisms* [33] completes the definition "usually of a lever-loading, tubular magazine type, manufactured by the Winchester Arms Co." Any suggestion of a generic meaning is avoided, perhaps purposely, by Webster's latest dictionary [44] in defining the term as "a trade-mark." But to readers of literature generally, the word imparts a clear picture, just as it did sixty years ago to Robert Louis Stevenson when he wrote [37] of the revolt in Apia: "Under the trees on the further bank sat a picket of seven men with Winchesters; their faces bright, their eyes ardent. As we came up, they did not speak or move; only their eyes followed us. The horses drank and we passed the ford."

## APPENDIX: *Turkish Contracts*

### CONTRACT OF NOVEMBER 9, 1870

Between His Excellency Hussein Avni Pasha, Minister of War, acting in the name and on behalf of the Imperial Ottoman Government, on the one part,

And Messrs. Azarian, *père* and *fils*, acting (in virtue of the powers that Winchester Repeating Arms Company has conferred upon them, powers which are found confirmed in the dispatch of this company to H. E. Hussein Avni Pasha, Minister of War, dated the 5th of November, 1870, of which a copy is annexed to the present contract), in the name and on behalf of Winchester Repeating Arms Company, of New Haven, Connecticut, of the United States of America, on the other part.

It has been agreed and determined as follows:

ART. 1ST.—The Imperial Ottoman Government purchases of Winchester Repeating Arms Company fifteen thousand (15,000) Winchester Repeating Muskets, without bayonets, and five thousand (5,000) Winchester Repeating Carabines, similar in system, calibre and dimensions to the two samples submitted to the Imperial Government, and sealed by the two parties, and containing the same component parts.

ART. 2D.—The fifteen thousand muskets and the five thousand carabines above mentioned must be of the first quality, both in the materials employed and in the workmanship; all the first materials which enter into the manufacture of the said arms shall be minutely and previously inspected in detail; all the phases of their manufacture shall be rigorously inspected during the de-

155



livery either of their integral parts, or of the whole number of pieces finished, by the delegates appointed on the part of the Imperial Ottoman Government, or by official controllers designated on the part of the Government of the United States of America, if the Imperial Government wishes it. These delegates shall be designated in the space of one month, beginning from the date of the present contract, and in either case the expenses of the examination and of the inspection will be charged to the Imperial Ottoman Government.

Art. 3d.—During the delivery of the arms inspected conformably to the preceding article, they shall be tested in the required number by the delegates until competent evidence of their perfection and of their adaptation to the use to which they are destined, conformably to the regulation in force on this subject.

Art. 4th.—The Winchester Repeating Arms Company engages to begin the delivery of the above said twenty thousand arms not later than the first of January, one thousand eight hundred and seventy-one, and before, if possible, at the rate of at least a thousand arms a week.

Art. 5th.—The delegates of the Imperial Government, or those appointed on the wish of the Ottoman Government by that of the United States of America, shall deliver to the above mentioned company, at each delivery of said arms, a certificate in duplicate stating the degree of quality required in the first materials, as well as the inspection of the parts during the manufacture, and of the whole of the work, at the same time the trial experienced in pursuance of the regulations in force on this subject of the arms delivered according to the 2d and 3d articles of the present contract.

Art. 6th.—The Imperial Ottoman Government accepts the above mentioned twenty thousand arms at the following prices: Fifteen thousand (15,000) Winchester repeating muskets, without bayonets, at the price of twenty-eight ($28) dollars in paper, with discount of five per cent., payable ready money in gold, at the rate of 117 (one hundred and seventeen), and deliverable at the wharf at New York, at the expenses of Winchester Repeating Arms Company; five thousand (5,000) Winchester repeating carabines, at the price of twenty ($20) dollars in paper, with a discount of five per cent., payable in gold, ready money, at the rate of 117 (one hun-

dred and seventeen), and deliverable at the wharf of New York, at the expenses of the said Company.

The packing expenses and the prices of cases shall be charged to the Imperial Ottoman Government.

Art. 7th.—The Imperial Ottoman Government shall designate, in the space of one month at the latest from the date of the present contract, the banker who shall make these payments to the foresaid Company in America, against the bill of lading to the wharf of New York, with the certificate of inspection and examination according to the 2d, 3d, and 6th articles hereinbefore.

Art. 8th.—In case that the above said Company shall not deliver the number of, at least, a thousand pieces a week, it engages to complete this quantity in the same time that it will effect the delivery of the following week, and in case that it should not complete it then, it engages to make a reduction of ten per cent. on the price of each arm delayed, obliging itself at the same time to complete at the next delivery the number wanting in the preceding.

Art. 9th.—It is well understood that the present contract will not be executed by Winchester Repeating Arms Company in case of superior force.

Done in duplicate for one single and same purpose, in Constantinople, the ninth of November, one thousand eight hundred and seventy N.S.

*The Minister of War,*

(Sig.)        HUSSEIN.

For Winchester Repeating Arms Company.

(Sig.)        AZARIAN, *Père* and *Fils,*

*Agents.*

## CONTRACT OF AUGUST 19, 1871

Between His Excellency Hussein Avni Pasha, Minister of War, acting in the name and on behalf of the Imperial Ottoman Government, on the one part.

And Messrs. Azarian *père* and *fils,* of Constantinople, acting in the name and on behalf of Winchester Repeating Arms Company, of New Haven, Connecticut, in the United States of America (by



158                    THE FIRST WINCHESTER

virtue of power of attorney from that Company, dated June 13, 1871, of which a copy is hereinafter), on the other part.

It has been agreed and determined as follows:

Art. 1st.—The Imperial Ottoman Government purchases from Winchester Repeating Arms Company thirty thousand (30,000) Winchester repeating muskets, without bayonets, in all respects similar to the fifteen thousand muskets delivered in virtue of the contract of ninth November, 1870 N.S., which sale is confirmed by the dispatch of this Company to the Imperial Ministry of War, received the 7th of August, 1871, and of which copy is equally hereinafter.

Art. 2d.—The aforementioned thirty thousand muskets must be of the first quality, in the materials employed as well as in the workmanship. All the first materials which enter into the manufacture of the aforesaid arms shall be minutely and previously examined in detail; all the phases of their manufacture shall be rigorously inspected during the delivery either of their integral parts or of the whole number of pieces finished, by the delegates appointed on the part of the Imperial Ottoman Government, or by official controllers designated on the part of the Government of the United States of America, if the Imperial Government wishes it. These delegates shall be designated in the space of one month, beginning from the date of the present contract; and in either case the expenses of examination and of the inspection shall be charged to the Imperial Ottoman Government.

Art. 3d.—As long as the arms shall be inspected conformably to the preceding article, they shall be tried in required number by the delegates, until the complete evidence of their perfection and their adaptation to the use to which they are destined, conformably to the regulations in force on this subject.

Art. 4th.—The Winchester Repeating Arms Company engages to begin the delivery of the above said thirty thousand arms on the fifteenth of September, 1871, at the rate from four hundred (400) at least to two thousand (2,000) maximum muskets a week, at the option of said company.

Art. 5th.—The delegates of the Imperial Ottoman Government, or those appointed on the desire of the Ottoman Government by that of the United States of America, shall deliver to the

APPENDIX                              159

above mentioned company, on each forwarding of said arms, a certificate in duplicate, stating the degree of quality required of the first materials as well as the inspection of the parts, during the manufacture and of the whole of the work, at the same time the proof made, in pursuance with the regulations in force on this subject, of the arms manufactured according to articles 2d and 3rd of the present contract.

Art. 6th.—The Imperial Ottoman Government accepts the above mentioned thirty thousand muskets at the price of twenty-eight dollars ($28) in paper each, with a discount of five per cent. (5 p. c.), payable in gold, at the rate of one hundred and seventeen (117), and deliverable at the wharf at New York, at the expense of the Winchester Repeating Arms Company.

Art. 7th.—The Imperial Ottoman Government engages itself to pay each week, beginning from the 3-15 of September, 1871, and on account of the price of the said arms, the sum of one thousand five hundred pounds sterling (£1,500) to Messrs. Azarian, père & fils, of Constantinople, agents of Winchester Repeating Arms Company, who in their turn will remit them to their agent as in the past.

Art. 8th.—The cost of the cases and the packing, fixed at two and a half dollars ($2½) currency per case of ten arms, as well as the costs of inspection and insurance, will be charged to the Imperial Ottoman Government.

The Winchester Repeating Arms Company will pay these expenses proportionally to each delivery, and will furnish for their amount in pounds sterling letters of credit at thirty-five days from date on the Imperial Ministry of War.

Art. 9th.—The Winchester Repeating Arms Company is charged with the forwarding to Constantinople of said arms, conformably to the instructions which shall be given on the part of the Imperial Ministry of War.

Done in duplicate for one single and same purpose, in Constantinople, the 7-19 of August, 1871.

(Sig.)              HUSSEIN.
(Sig.)              AZARIAN, père & fils,
          Agents of Winchester Repeating Arms Co.



virtue of power of attorney from that Company, dated June 13, 1871, of which a copy is hereinafter), on the other part,

It has been agreed and determined as follows:

ART. 1ST.—The Imperial Ottoman Government purchases from Winchester Repeating Arms Company thirty thousand (30,000) Winchester repeating muskets, without bayonets, in all respects similar to the fifteen thousand muskets delivered in virtue of the contract of ninth November, 1870 N.S., which sale is confirmed by the dispatch of this Company to the Imperial Ministry of War, received the 7th of August, 1871, and of which copy is equally hereinafter.

ART. 2D.—The aforementioned thirty thousand muskets must be of the first quality, in the materials employed as well as in the workmanship. All the first materials which enter into the manufacture of the aforesaid arms shall be minutely and previously examined in detail; all the phases of their manufacture shall be rigorously inspected during the delivery either of their integral parts or of the whole number of pieces finished, by the delegates appointed on the part of the Imperial Ottoman Government, or by official controllers designated on the part of the Government of the United States of America, if the Imperial Government wishes it. These delegates shall be designated in the space of one month, beginning from the date of the present contract; and in either case the expenses of examination and of the inspection shall be charged to the Imperial Ottoman Government.

ART. 3D.—As long as the arms shall be inspected conformably to the preceding article, they shall be tried in required number by the delegates, until the complete evidence of their perfection and their adaptation to the use to which they are destined, conformably to the regulations in force on this subject.

ART. 4TH.—The Winchester Repeating Arms Company engages to begin the delivery of the above said thirty thousand arms on the fifteenth of September, 1871, at the rate from four hundred (400) at least to two thousand (2,000) maximum muskets a week, at the option of said company.

ART. 5TH.—The delegates of the Imperial Ottoman Government, or those appointed on the desire of the Ottoman Government by that of the United States of America, shall deliver to the

above mentioned company, on each forwarding of said arms, a certificate in duplicate, stating the degree of quality required of the first materials as well as the inspection of the parts, during the manufacture and of the whole of the work, at the same time the proof made, in pursuance with the regulations in force on this subject, of the arms manufactured according to articles 2d and 3rd of the present contract.

ART. 6TH.—The Imperial Ottoman Government accepts the above mentioned thirty thousand muskets at the price of twenty-eight dollars ($28) in paper each, with a discount of five per cent. (5 p. c.), payable in gold, at the rate of one hundred and seventeen (117), and deliverable at the wharf at New York, at the expense of the Winchester Repeating Arms Company.

ART. 7TH.—The Imperial Ottoman Government engages itself to pay each week, beginning from the 3-15 of September, 1871, and on account of the price of the said arms, the sum of one thousand five hundred pounds sterling (£1.500) to Messrs. Azarian, père & fils, of Constantinople, agents of Winchester Repeating Arms Company, who in their turn will remit them to their agent as in the past.

ART. 8TH.—The cost of the cases and the packing, fixed at two and a half dollars ($2½) currency per case of ten arms, as well as the costs of inspection and insurance, will be charged to the Imperial Ottoman Government.

The Winchester Repeating Arms Company will pay these expenses proportionally to each delivery, and will furnish for their amount in pounds sterling letters of credit at thirty-five days from date on the Imperial Ministry of War.

ART. 9TH.—The Winchester Repeating Arms Company is charged with the forwarding to Constantinople of said arms, conformably to the instructions which shall be given on the part of the Imperial Ministry of War.

Done in duplicate for one single and same purpose, in Constantinople, the 7-19 of August, 1871.

    (Sig.)      HUSSEIN.
    (Sig.)      AZARIAN, père & fils,
    *Agents of Winchester Repeating Arms Co.*





## CORRESPONDENCE WITH V. AZARIAN & CO.

NEW HAVEN, CONN., May 3rd, 1870.

Messrs. V. AZARIAN & CO.,
Boston, Mass.

GENTLEMEN:—Your favor of the 2nd inst. is at hand. The substance of your letter is, as I understand it, that I should promise you a commission on any sales we may make to the Ottoman Government, whether the order comes through you or not. Under the circumstances I cannot do this, nor do I think you should ask this. Had you been the first one to engage in this matter I could have done so, but several other parties have been giving their attention to the matter, and to each I have promised a commission if the order comes through them, but not otherwise. You will see that if I did by them as you wish me to do by you, I should have at least four commissions to pay, and should have to refuse the order if it came, as it would break us to pay them all. If we should receive an order we must be governed by the circumstances under which it comes, and it may come through some party to which we are under no obligations in the form of a promise. In that case we should be in condition to meet your wishes, but any further or more definite promise would lead to serious embarrassments.

There are no second-hand Winchester or Henry carbines on hand, nor any Henry rifles in the market, new or old, and no more to be made, for the reasons you mention.

These facts I communicated to Halil Pasha before I had any letter from you on the subject.

I am
Very truly yours,
O. F. WINCHESTER,
Pres't W. R. Arms Co.
Per VEADER.

———

NEW HAVEN, CONN., July 23, '70.

Messrs. V. AZARIAN & CO.,
Boston, Mass.

GENTLEMEN:—I am in receipt of your favor of the 20th inst., in which you state that "After our Mr. A's interview with you last

Friday we communicated to our house at Constantinople the result of our conversation, without mentioning, however, your promise that you would withdraw your prices from the other three parties, and leave the matter clear in the hands of our house." To suffer this statement to pass without contradiction, would or might be construed into an assent to its correctness. My remarks on that subject was not in the nature of "a promise" to you, nor do I admit being bound by any obligation to you to do the thing mentioned. What I have done, and still propose to do, in that direction, was and is independent of your relations to me in the matter.

I am yours, respectfully,
O. F. WINCHESTER,
Pres't. W. R. Arms Co.
Per VEADER.

———

NEW HAVEN, CONN., Sept, 24, 1870.

Messrs. AZARIAN & SONS,
Pera, Constantinople, Turkey,

GENTLEMEN:—Many telegrams have passed between the Turkish Government and ourselves lately, and we have also received one from you, to which we replied recently, but in all these there is much want of clearness and much confusion of ideas.

I now write for the purpose of trying to state clearly what I am willing to do. I should be pleased to sell the Turkish Government five, or fifty thousand of our guns, if I can make anything on them. To this end I gave you a list of our lowest prices, and made them subject to a commission of 5 per cent. In reply to your telegram I offered to make a discount of 5 per cent from the prices quoted to you and to the Government since your Mr. V. Azarian left this country. On the net prices thus quoted we will pay you a commission of 5 per cent.

This is the best we can do. The offer made us by the Government was simply ridiculous. You say in your telegram that the Belgium Winchester is offered them cheaper; very likely, but we do not make the cheap kind of work done in that country; if it is good enough for the Turkish Government they will buy them.



Your Government does not seem to understand the method of doing business in this country. We are not in the habit of asking twice as much for our goods as we expect to get. We ask only a moderate profit and cannot work without and give good work.

We are now building a new and very extensive armory in this city, and propose to remove our works from Bridgeport (seventeen miles from this city) in about one month.

If an order is received before we move, we can finish it by deferring to move until the order is completed; if it is not received before we move, it will not be possible for us to commence on the order until we have completed our moving and fitting up, and this will occupy us until the first of January. Hence you will see the necessity of our receiving the order promptly, if the Government is in any haste to have it finished.

We have all we can attend to now, and shall have to refuse all further orders until yours is completed. I have, therefore, to ask you to telegraph at once on receipt of this, what your prospect is of closing a contract, so that I can make my arrangements accordingly.

I am yours very truly,

O. F. WINCHESTER,
*President Winchester Repeating Arms Co.*
*Per* VEADER.

---

NEW HAVEN, CONN., Oct. 7, 1870.

Messrs. AZARIAN, *Père & Fils,*
    Constantinople, Turkey.

GENTLEMEN:

I am in receipt of your esteemed favors of the 12th, 13th and 14th insts., to which I have replied briefly by cable.

I now propose to write to you definitely, so as to prevent any errors or misunderstanding.

First, I would say that no persons but yourselves are authorized to make any contracts for us with the Ottoman Government, or any department of that Government, at any price. The party who made the proposition to furnish our arms at a less price than that quoted to you in my letter of April 7, 1870, and to deposit £10,000

as security, is a swindler, who cannot carry out his promise, and will not put up the money. I trust this is decisive.

On the 7th of April last I offered, through your house, to furnish Halil Pasha with twenty thousand (20,000) of our arms at the following prices, viz.:

Carbines, . . . . . . . . . . . . . . . . . . . . . . $27 50
Muskets with angular bayonets. . . .  30 00
    "        "    sword        "      . . . .  32 00

Subject to a commission of (5) five per cent. on the net amount of sales.

I now authorize you to make a discount on those prices of (5) five per cent. to the purchasers, and will then allow you a commission of (5) five per cent. on the net amount of sales, after deducting the above discount.

The prices we give are always in currency of the United States, or, in lieu thereof, we will receive gold in payment at 1.15, or a premium of (15) fifteen per cent.

Packing-cases are always an extra charge. The price for these is $2.50 for each ten guns, net; that is no discount on them, but gold will be received for them at the same rates as for the guns.

Another condition is, that the purchaser shall receive and pay for them as fast as we can get them ready for delivery, in lots of not less than one thousand (1,000). We will deliver them here or in the city of New York, without charge. To prevent any misunderstanding, I send a *pro forma* invoice, showing the amount of one thousand guns of each kind—three thousand in all. Of course, you can divide your commissions with the Government or not—that is as you please; but we are not to be subjected to any other claims or charges of commissions from any one, of any description.

It would afford us much satisfaction and pleasure to be able to furnish the honorable gentlemen at the head of the Army and Navy of your Government with our arms, and it is for this reason we have made such large concessions in our prices and terms. I desire, however, to say that these are the lowest prices and best terms we can submit to, and under no circumstances can we reduce



them any more. I say this simply to save time, and in hope to bring the matter to a prompt decision. This is important to us, as we now have two other governments in treaty with us, and we can furnish but one, and that one will be the one which first reaches a favorable decision, as we cannot reject a certainty.

We cannot furnish these arms as soon by two months now, as we could have done one month ago, as we then had several thousand on hand which are all sold, and we are now selling all our guns as fast as we can make them, at prices netting us five dollars more than the price we give you.

We have sold all our Spencer arms at prices fifty per cent. higher than we offered them to Halil Pasha for last February.

Should H. E. Mahmoud Pasha prefer the Sporting Rifle with octagon barrel, we can furnish them, but they are more expensive than the regular Infantry Rifled Musket. They will cost (30) thirty dollars without bayonets, (33) thirty-three dollars with angular, and (34) thirty-four dollars with sword bayonets, subject to the same discount, commissions and terms as stipulated for the other arms.

I have endeavored to cover all the needful questions in this matter, and as clearly and forcibly as in my power, and trust they are sufficient to remove all embarrassments that you complain of, and enable you to obtain a prompt decision in this matter.

I am yours very truly,

O. F. WINCHESTER, *President*
*Winchester Repeating Arms Co.*

P. S.—It will be seen from what I have written, that any contract you may make must be with the reservation that it will not be binding on us, if we have previously made a contract with any other party that shall make it impossible for us to execute yours.

To obviate this difficulty, however, you have only to telegraph to us, when you shall have arranged a contract, thus: "Yes, for fifteen thousand" (more or less, as the case may be); or as soon as you ascertain that none can be made upon the terms offered, telegraph "No." This I shall understand, and will reply "All right," or "Too late," as the case may be.

NEW HAVEN, CONN., October 12, 1870.

Messrs. AZARIAN, PERE & FILS,
    Constantinople.

Gentlemen: We are in receipt of your esteemed favor of the 19th ult. We responded to your letters of the 12th, 13th, and 14th, on the 7th inst.

In reply to the remarks of H. E. Hussein Avni Pasha, I would say that we will sell the royalty to make our guns to him at ($2.50) two dollars and fifty cents each. We are, however, unwilling to do so for this reason, viz.:

Our gun requires great exactitude and perfect workmanship to insure its working with entire satisfaction, and there are not three establishments in Europe that I would trust to make them, because, if they are not well made, the reputation of the gun would suffer, and we would be great losers in consequence. And especially do we object to the gunmakers of Belgium; there is not one capable of making this gun properly; while their prices are the lowest, the quality of arms is notoriously the worst in Europe.

Nor can any of them make the guns as quick as we can. We can make and deliver here (20,000) twenty thousand guns before any one in Europe can get the first gun finished, because we have our tools and fixtures in complete working order, and are now turning them out every day, increasing the quantity, while it would take any other concern six months or more to get ready, no matter what they may say to the contrary.

We are selling all the guns as fast as we can make them, at (5) five dollars each more than we offer to furnish them to you at.

I have refused to sell any more at present, in order to give you your order with great expedition. I have therefore reserved (5,000) five thousand to deliver on your order in thirty days. We cannot, however, afford to do this long on an uncertainty. I telegraphed yesterday that I could do this if we got your answer in twenty-four hours. I will, however, keep ourselves in a condition to do this until the first day of November next, by which time you will have received this letter and my previous one. To do this will be attended with a loss of (25,000) twenty-five thousand dollars on the five thousand guns we shall thus carry, besides the interest, and, as you must see, we are kept in a very embarrassing position.

Compendium_Vorenberg
Page 196



There are patent laws in all the countries of Europe except Switzerland, and perhaps Turkey, and we have patents in England, Belgium, France, Russia, and nearly every other country in Europe. We will send the samples you wish by the first opportunity.

Trusting that you will be able to decide this matter promptly, by convincing the Minister of War and Navy of the liberality of our concessions, viz.:

*First*—(5) Five per cent., and then taking gold at one hundred and fifteen, when in all probability it will not be worth over one hundred and ten when we receive it—a concession virtually of ten per cent.—which will take, with your commission, nearly all the margin we had estimated for the profit we hoped to make on the order.

I am, yours very truly,

O. F. WINCHESTER,
*President Winchester Repeating Arms Co.*

NEW HAVEN, CONN., NOV. 7, 1870.

Messrs. AZARIAN PERE & FILS,

Constantinople.

Gentlemen:

Your dispatch of the 4th inst., as follows—

"Winchester Company,

"New Haven, Conn.

"Your Saturday telegram just received. Have sold to Turkish Government seventeen thousand muskets, without bayonets, at twenty-eight dollars; and five thousand carbines at twenty dollars currency, as per your telegram to War Minister dated August thirty-first; discount, five per cent; payment, cash on each delivery, gold, at one hundred and seventeen; delivery in New York, one thousand per week, beginning January 1st—sooner if possible. Telegraph War Ministry, ratifying sale we have made in your name, in order to sign contract. Telegraph us also.

"AZARIAN, Constantinople."

On receipt of the above I telegraphed as follows to the Minister of War:

"HUSSEIN, Minister of War,

"Constantinople.

"We are advised that our agent has accepted your order for five thousand carbines and seventeen thousand muskets at the prices quoted in my dispatch to you of August thirty-first, less a discount of five per cent., payable in gold at one hundred and seventeen. We confirm their action; the order shall be promptly filled.

"WINCHESTER."

And we telegraphed you simply "All right." I noticed that you quoted twenty dollars as the price for which you sold the carbines, but as I had never quoted that price I presume that it was an error of the telegraph operator, but on thinking it over since, it has occurred to me that the error was just as likely to have occurred in my dispatch to the Minister of War of the 31st of August as in yours. My dispatch of August 31st read as follows:

"HUSSEIN, Minister of War,

"Constantinople.

"Muskets twenty-eight dollars. Carbines *twenty-seven* dollars. Additional for angular bayonets, two dollars; for sword bayonets, four dollars. Packing cases for each ten guns, two dollars and fifty cents. Cartridges, twelve dollars and sixty cents per thousand. All in U. S. currency, delivered in New York. Cannot give prices delivered in Constantinople.

"WINCHESTER."

From this you will see that I quoted carbines at twenty-seven dollars, being fifty cents less than I had ever before quoted. I did this as a concession that I thought would have a good effect. I have had that dispatch repeated back from New York, and find that it left that city correct. If the mistake did not occur in transmitting your message of the 4th inst., will you have the kindness to examine my telegram of the 31st to the Minister of War, and see how it reads. If the telegraph company have made this mistake, are they not responsible? You will readily see, that if such a mistake has occurred, it is a very serious matter to us, as it makes a difference of seven dollars per gun on five thousand guns—or thirty-five thousand dollars. This would be attended with an absolute



168             THE FIRST WINCHESTER

loss to us of twenty-five thousand dollars, or all the profit we hoped to realize on the entire contract. It is possible that the Minister may not have read it correctly, or that the message was translated wrong.

The price of cartridges we quoted to you was twelve dollars and sixty cents per thousand; we will furnish them at twelve dollars net. This is the same discount as made on the guns. There is no profit on them at this price, and we can pay no commissions on them. We will furnish the shells (copper) complete, primed with fulminate, at (6) six dollars per thousand. In both of these cases boxes are included, and delivered in New York. Your inquiries about the cost of a set of machinery are not so easily answered, as there are several makers of these machines of different degrees of reputation, whose machines differ in style and quality of work; and of each kind of machine there are from three to six sizes, adapted to large and small cartridges; then there are different kinds of cartridges, viz., centre and rim-fire. The centre-fire cartridge requires much more machinery than the rim-fire, like ours.

Again, if you had but one kind to make—say, a small size rim-fire, like ours—smaller machines would answer; but to make two sizes, you must have machines heavy enough for the largest cartridges, and then it will make the smallest ones as well. So, too, when you have more than one size cartridge to make, you must have an additional set of fixtures for each different size—to change when you wish, &c.

You will thus see that while it is a simple question to ask what a set of machinery will cost, it is a very complicated one to answer. One thing is very certain, viz.: That, in the long run, the heaviest and best machines, at any reasonable cost, are cheaper than light ones of inferior quality.

I inclose you a page cut from an Ordnance Manual just published by our Government, showing the kinds and number of machines required to make one hundred thousand cartridges per day; to this I have added the prices. I also send other estimates of the cost; all these refer to medium sized machines and medium quality, and the cost will not vary much from thirty-three thousand dollars. I presume the machinery that our Government uses cost double that, as they will have none but the very best machines.

APPENDIX             169

Forty thousand dollars, gold, would, in my judgment, be as little as would procure what your Government should have. As your Government has no experience of what they want, their true policy would be to put the matter and money for the purpose in the hands of some honest man, with the best instructions they can give him, and leave all the rest to his discretion. I will send by European express to you a copy of a new work just published by our Government, giving results of experiments with cartridges; also drawings or photographs of all the machines used in making cartridges, &c.

You will please present this to Halil Pasha, Grand Master of Artillery. I think it will prove of interest and value to him.

If any changes from the model gun that you have, are required, particularly if iron mountings are wanted instead of copper or gun-metal, we should be advised at once, as it will take three months to make the change. I have little doubt but the mistake in price is in your telegram to me. If it should prove to be made in the transmission of my telegram to Hussein, then we are bound by your contract, and must look for redress to the Cable Telegraph Co.*

I am yours very truly,

O. F. WINCHESTER,
*President Winchester Repeating Arms Co.*

* The telegram was received in Turkey reading "Cartines twenty dollars," and this price was adhered to in the formal contract.



# NOTES

### CHAPTER 1: ANTECEDENT ARMS

1. Patent No. 6,663 of August 21, 1849; patent No. 6,973 of December 25, 1849.

2. Patent No. 10,535 of February 14, 1854; reissue No. 279 of October 10, 1854.

3. See testimony of William C. Hicks, Defendant's Main Case, *Morse Arms Mfg. Co. v. Winchester Repeating Arms Co.*, p. 560. This volume is in the Winchester Company's patent library.

4. Williamson, Harold F., *Winchester, The Gun That Won the West* (Washington, D. C., 1952).

5. *Leslie's Weekly*, Vol. VI, p. 291.

6. Patent No. 30,446 of October 16, 1860; reissue No. 3,227 of December 8, 1868.

7. See testimony of Thomas G. Bennett, Defendant's Main Case, *Morse Arms Mfg. Co. v. Winchester Repeating Arms Co.*, pp. 168, 215, 451, 486.

8. On July 24, 1860, Oliver F. Winchester wrote the Commissioner of Patents: "I have been interested in all of Smith & Wesson's and Cortland Palmer's Patents, ever since their assignment to the Volcanic Repeating Arms Company in July, 1855; first as a stockholder and director in that company, and as the sole owner since its dissolution; and I beg leave to state that I have never been able to make the improvements claimed by them in their

171

Patent of February 14th, and the reissue of October 10th, 1854 (No. 279), sufficiently reliable to adopt, and put in the market for sale, but have always used the hollow ball. It has been esteemed an object of value to secure such improvements as would insure a certainty in the use of the metallic cartridge with a solid ball. To that end, the Volcanic Arms Co. employed skillful mechanics, without success; for the last two years I have pursued the same course, and have employed Mr. Henry as superintendent of our armory, with the understanding that he should give this subject his special attention. The result is now before you in the improvements which he claims. I esteem these to be new and valuable, and trust he may be successful in his application." Complainant's Main Case, *Morse Arms Mfg. Co. v. Winchester Repeating Arms Co.*, p. 599.

9. Patent No. 10,535 of February 14, 1854; reissue No. 279 of October 10, 1854; Patent No. 11,496 of August 8, 1854; Patent No. 14,147 of January 22, 1856.

10. Patent No. 27,933 of April 17, 1860; reissue No. 2,636 of June 4, 1867.

11. Letter of June 11, 1861, O. R. Series III, Vol. 1, p. 264.

12. Letter of December 9, 1861, O. R. Series III, Vol. 1, p. 733; see also Sen. Doc. 72, 37th Cong. 2nd Sess., Serial 1123, p. 425.

13. Cleveland, Horace W. S., *Hints to Riflemen* (New York, 1864) pp. 176-8.

14. Sen. Rep. 7, 40th Cong. 2nd Sess., Serial 1320; S. 279 passed Senate January 15, 1868, House February 20, 1868, signed February 25, 1868.

## CHAPTER II: THE HENRY IN THE CIVIL WAR

1. Letter book of the New Haven Arms Company, May 1, 1857 to March 28, 1859, October 8, 1862 to December 12, 1863, in library of the Winchester Repeating Arms Company.

2. Cleveland, Horace W. S., *Hints to Riflemen* (New York, 1864) pp. 180-2; Tenney, W. J., *The Military and Naval

History of the Rebellion in the United States* (New York, 1865) p. 429.

3. O. R. Series III, Vol. 2, p. 412.

4. O. R. Series I, Vol. 23, Pt. I, pp. 300, 302, 307, 308.

5. *Scientific American*, March 7, 1863, Vol. 8 (N. S.) p. 150.

6. *First Maine Bugle*, July, 1891, p. 73. See also Coburn, Lt. Jeff L., "The Battle-Field of Dinwiddie Court House," *Maine Bugle*, January, 1895. pp. 52, 60, stating that one battalion of the 1st Maine had Henrys, the other Spencers. Also Coburn, "An Episode of the Wilson Raid" (City Point to Roanoke, Va. June 21-30, 1864) *Maine Bugle*, July, 1895. pp. 187, 195: "It may be a good thing to be armed with a rifle that nothing can stand before, but the trouble is reciprocal, for nothing can stand long behind such guns."

7. Merrill, Samuel H., *The Campaigns of the First Maine and First District of Columbia Cavalry* (Portland, Me., 1866) p. 237. The 1st Maine later incorporated the Henry rifle in its reunion badge, described in the *First Maine Bugle* of January, 1891 as follows:
"It is of gold, mounted on a double strip of yellow ribbon. The bar at the top is in the shape of a Henry rifle, and bears on the stock the legend '1st Me. Cav.' Pending from this by spur straps are the crossed sabres, while rising from the centre of the sabres is a pine tree, the emblem of our beloved state. Below the sabres is a horse-shoe surrounding a horse's head."

8. Scott, William Forse, *The Story of a Cavalry Regiment* (New York, 1893) p. 284.

9. Tobie, Lt. Edward P., *History of the First Maine Cavalry* (Boston, 1887) p. 359. He used a more elaborate figure of speech in describing the action at Dinwiddie Court House: "The carbines were examined; the 'Spencers' loaded carefully with their seven deadly messengers, and the 'Henrys' wound up to unwind and set flying sixteen humming birds to sing in the ears of the enemy." Tobie, "Service of the Cavalry in the Army of the Potomac," Soldiers' and Sailors' Hist. Soc. of R. I., Personal



Narratives, 2nd Series, No. 14, p. 41 (Providence, 1882).

10. Ambrose, D. Leib, *History of the Seventh Regiment, Illinois Volunteer Infantry* (Chicago, 1868) p. 250; *Illinois in the War for the Union* (Chicago, 1887) p. 453.

11. Ludlow, Maj. William, "The Battle of Allatoona," Loyal Legion of the U. S., Michigan Commandery, War Papers, Vol. I (Detroit, 1891) p. 35.

12. Richard Rowett, colonel of the 7th Illinois, was in command of a Union brigade and was wounded in the battle. The over all Federal commander was Gen. John M. Corse, to whom Sherman sent the classic message: "Hold the fort, I am coming!" Hill, Capt. George W., "From Memphis to Allatoona and the Battle of Allatoona," Soldiers' and Sailors' Hist. Soc. of R. I., Personal Narratives, 4th Series, No. 13 (Providence, 1891).

13. French, Gen. Samuel G., *Two Wars: An Autobiography* (Nashville, 1901) p. 263.

14. O. R. Series III, Vol. 4, p. 598.

CHAPTER III: COMPETITION WITH THE SPENCER AND COLT

1. Cleveland, Horace W. S., *Hints to Riflemen* (New York, 1864) p. 164.

2. Letter of January 9, 1864 to William C. Dodge, *Scientific American*, March 12, 1864, Vol. X, p. 170.

3. Williams, Samuel C., *General John T. Wilder, Commander of the Lightning Brigade* (Bloomington, Ind. 1936) p. 14.

4. McGee, B. F., *History of the 72nd Indiana Volunteer Infantry* (La Fayette, Ind. 1882) p. 120.

5. Wilson, Gen. James H., *Under the Old Flag* (New York, 1912) Vol. 1, p. 331. The Spencer was included in the badge of Wilson's Cavalry Corps, Military Division of the Mississippi. Scott, William Forse, *The Story of a Cavalry Regiment* (New York, 1893) p. xxiii.

6. Endorsement of April 5, 1864, quoted in Fuller, Claude E., *The Breechloader in the Service* (Topeka, 1933) p. 140.

7. Report of Secretary of War (Chief of Ordnance) 1866, Serial 1285, pp. 163, 666.

8. Letter of August 15, 1864 to Secretary of War Stanton, O. R. Series III, Vol. 4, p. 618.

9. Sales of Arms and Ordnance Stores, House Doc. 89, 42nd Cong. 2nd Sess., Serial 1511, p. 9.

10. Ordnance Department Purchases, House Doc. 99, 40th Cong. 2nd Sess., Serial 1338, p. 843. For contract letters, see pp. 276-7.

11. Report of Secretary of War (Chief of Ordnance) 1866, Serial 1285, pp. 668-699.

12. Letter of Dec. 15, 1868 to Maj. Gen. John M. Schofield, in pamphlet "Selection of an Arm for the Use of the Infantry and Cavalry of the United States Army" (New Haven, 1868).

13. Barber, Edward C., *The Crack Shot* (New York, 1868) p. 173.

14. Denison, Lt. Col. George T., *Modern Cavalry* (London, 1868) p. 49. See also same author's *Soldiering in Canada* (London, 1900) p. 87.

15. Thrasher, Halsey, *The Hunter and Trapper* (New York, 1868) p. 75. "I like the Henry rifle on many accounts, for you need carry no powder-flask, bullet-pouch, cap-bag, nor ramrod. Your wiper is in the end of the breech. You need not cover this rifle from the rain, and it would go off just as well as if it had been under water all night. It carries a half-ounce ball, which is quite large enough."

16. *Army and Navy Journal*, January 14 to May 50, 1871, Vol. VIII, pp. 366-638. quotation is from January 28 issue, p. 382.

17. Sales of Arms by Ordnance Department, Sen. Rep. 183, 42nd Cong. 2nd Sess., Serial 1497, p. 167; Sales of Arms and Ordnance Stores, House Doc. 89, 42nd Cong. 2nd Sess., Serial 1511, p. 9.

18. *Army and Navy Journal*, February 23, 1867 to October 31, 1868, Vol. IV, p. 436 *et seq.*

19. *Scientific American*, December 11, 1869 to April 23, 1870.

176

THE FIRST WINCHESTER

Vol. XXI, p. 384 *et seq.*; *Army and Navy Journal*, January 14, 1871 to May 13, 1871, Vol. VIII. pp. 355-687.

### CHAPTER IV: CHARACTERISTICS OF THE HENRY

1. Quotations in this chapter are from the letter book of the New Haven Arms Company, Note 1, Chap. II.
2. This firm made music and crinoline wire, later pioneered in the development of barb wire. Washburn, Charles G., *Industrial Worcester* (Worcester, 1917) pp. 151, 155.
3. Quoted in full by Williamson, *Winchester*, Note 4, Chap. I, p. 395.
4. Ordnance Memoranda No. 5, pp. 16-22.
5. Patent No. 38,935 of June 23, 1863; reissue No. 1,635 of March 15, 1864; reissue No. 8,110 of February 26, 1878. The second claim of the latter is: "In a magazine firearm the combination . . . of a barrel, an opening in the side of the frame, through which the magazine is charged, and a carrier to receive a cartridge from the magazine and present it in line with the bore of the barrel."

### CHAPTER V: KING'S IMPROVEMENT

1. Patent No. 52,933 of February 27, 1866.
2. Patent No. 55,012 of May 22, 1866; reissue No. 9,157 of April 13, 1880.
3. Patent No. 58,937 of October 16, 1866. See also William C. Dodge's patent No. 58,790 of same date.
4. Patent No. 52,934 of February 27, 1866, Smith's second that day. Howard's patent No. 50,125 was later acquired by the Winchester Company.
5. Patent No. 57,808 of September 4, 1866.
6. Benham's *New Haven Directory*, 1865, p. 179.
7. *Bridgeport Directory*, 1867, p. 61.
8. *Bridgeport Directory*, 1869, p. 157; Benham's *New Haven Directory*, 1869, p. 496.
9. Benham's *New Haven Directory*, 1871-75; Price, Lee & Co., *Bridgeport City Directory*, 1876-78; *Merchants' Register*, Bridgeport, 1880, p. 23; Price, Lee & Co., *Waterbury*

177

*Directory*, 1880-89. John Hintlian has letters addressed to Nelson King as superintendent of the Sharps Rifle Co. in Hartford. The company moved to Bridgeport in 1876.
10. Much material in this chapter is derived from Veader, Daniel H., and Earle, Arthur W., "The Story of the Winchester Repeating Arms Company" (1918), a typescript history in the library of the Winchester Repeating Arms Company. Mr. Veader entered the employ of the company in 1869 and Mr. Earle in 1883.
11. Patent No. 57,636 of August 28, 1866.
12. *Army and Navy Journal*, September 12 to December 5, 1868, Vol. XI, pp. 63-255, article October 10, p. 126; *Turf, Field and Farm*, October 2, 1868 to February 12, 1869, Vol. VII, p. 648 to Vol. VIII, p. 109; *American Agriculturalist*, October to December, 1868, Vol. XXVII, pp. 386, 428, 466, also March to May, 1869; *Spirit of the Times*, September 12, 1868 to February 20, 1869, Vol. XIX, p. 64 to Vol. XX, p. 15.
13. *Harper's Weekly*, September 26 to December 18, 1868, Vol. XIV, pp. 624-814; *Rural New Yorker*, September 19 to December 19, 1868, Vol. XIV, pp. 306-411; *Scientific American*, September 30 to December 9, 1868, Vol. XIX, pp. 223-384, article October 14, p. 245.

### CHAPTER VI: THE MODEL '66 ON THE FRONTIER

1. Report of Col. Henry B. Carrington, 18th Infantry, January 3, 1867, Sen. Doc. 33, 50th Cong. 1st Sess., Serial 2504, p. 41. This report was not published for twenty years, probably because of its implication that Capt. Fetterman had shot himself. See also Reports of the Secretaries of War and Interior in relation to the Massacre at Fort Phil Kearney on December 21, 1866 (Gov. Print. Off., Washington, 1867) pp. 27, 32, 60.
2. Dodge, Gen. Grenville M., *How We Built the Union Pacific Railway* (New York, 1910) pp. 20, 108.
3. Toponce, Alexander, *Reminiscences of Alexander Toponce, Pioneer* (Ogden, Utah, 1923) pp. 114-117.

4. Grinnell, George B., *The Fighting Cheyennes* (New York, 1915) pp. 213, 218.

5. Letter of February 28, 1867 from Lt. A. H. Ward, 36th Infantry, reprinted in Winchester catalogs, 1867-1873.

6. de Trobriand, Col. Regis, *Army Life in Dakota* (Chicago, 1941) pp. 157, 289.

7. Kelly, Luther S., *"Yellowstone Kelly," the Memoirs of Luther S. Kelly* (M. M. Quaife, ed., New Haven, 1926) pp. 26, 32, illustration opp. p. 50.

8. Koch, Peter, "Life at Musselshell in 1869 and 1870," Contributions, Hist. Soc. of Montana, Vol. II (Helena, 1896) p. 303.

9. *Army and Navy Journal*, Vol. V, p. 486.

10. *Ibid.*, Note 8, p. 296.

11. Carter, William Alexander, "Journal of Transactions of the Post Trader at Ft. Bridger, November, 1869," mss. quoted by permission of Western Americana Collection, Yale University Library.

12. Jackson, William H., *The Pioneer Photographer* (Yonkers, N. Y., 1929) pp. 188, 196; "Photographs of Indians by William Henry Jackson selected from the Collection of the U. S. Geological Survey of the Territories" (1876), album in Western Americana Collection, Yale University Library.

13. Expedition against the Piegans, House Doc. 269, 41st Cong. 2nd Sess., Serial 1426, p. 31.

14. *Army and Navy Journal*, June 1, 1867, Vol. IV, p. 650.

15. Messiter, Charles A., *Sport and Adventures Among North American Indians* (London, 1890) pp. 215-217.

16. Townshend, Capt. F. Trench, *Ten Thousand Miles of Travel, Sport and Adventure* (London, 1869) pp. 93, 128.

17. Bell, William Abraham, *New Tracks in North America* (London, 1869) Vol. I, p. 66.

18. Rivington, Alex., and Harris, W. A., *Reminiscences of America in 1869* (London, 1870) p. 246.

19. *The Field, The Country Gentleman's Newspaper*, September 3, 10, 1870, Vol. XXXVI, pp. 207, 227.

20. Webb, William E., *Buffalo Land* (Philadelphia, 1872) pp. 152, 454.

21. Dellenbaugh, Frederick S., *A Canyon Voyage* (New York, 1908) pp. 12, 62, 161, 192, 205. The journal of Walter Clement Powell, cousin of the major, mentions besides a Spencer "4 Winchesters and 2 Henrys, the former 17 shooters, the latter 16 shooters." *Utah Historical Quarterly*, Vols. XVI-XVII, p. 347. Salt Lake City, 1948-9. See also Darrah, William Culp, *Powell of the Colorado* (Princeton, 1951) p. 119.

22. Roberts, Thomas P., "The Upper Missouri River," Contributions, Hist. Soc. of Montana, Vol. I (Helena, 1876) pp. 234, 239, 249, 253.

23. Hargrave, Joseph James, *Red River* (Montreal, 1871) p. 170.

24. Butler, Sir William Francis, *The Great Lone Land* (London, 1872) pp. 45, 116.

25. McDougall, Rev. John, *In the Days of the Red River Rebellion* (Toronto, 1911) p. 215; *On Western Trails in the Early Seventies* (Toronto, 1911) pp. 84, 105. See also Schultz, James Willard, *My Life as an Indian* (New York, 1907) p. 351.

26. Atwater, Isaac, *History of the City of Minneapolis, Minnesota* (New York, 1893) p. 893.

27. Millman, Dr. Thomas, "Impressions of the West in the Early Seventies, from the Diary of the Assistant Surgeon of the B.N.A. Boundary Survey," *Transactions, Women's Canadian Hist. Soc.*, No. 26 (Toronto, 1928) pp. 15, 23, 45.

28. For criticism of the Spencer by the North brothers, see Grinnell, George B., *Two Great Scouts and Their Pawnee Battalion* (Cleveland, 1928) p. 141. James H. Cook traded a Spencer for a Henry. *Fifty Years on the Old Frontier* (New Haven, 1923) p. 25.

29. Shields, George O., "Buffalo Hunting on the Texas Plains," *Outing*, February 1888, Vol. XI, p. 469: "Anything in the shape of a rifle could be had. Old Kentucky muzzle-loaders, 'five feet long in the barrel'; condemned army carbines of Spencers, Sharps and other patterns;

180

Springfield muskets; Henry and Winchester rifles; and a few of the old reliable Sharps 'buffalo guns' of 45 and 50 calibre using 100 to 120 grains of powder. These latter were taken, at good figures by the more knowing ones." See also Flory, Jacob Stoner, *Thrilling Echoes from the Wild Frontier* (Chicago, 1893) pp. 58, 127; Cook, John R., *The Border and The Buffalo* (Topeka, 1907) pp. 50, 83, 96; McCreight, Major Israel, *Buffalo Bone Days* (Dubois, Pa., 1939) p. 14; Sandoz, Mari, *The Buffalo Hunters* (New York, 1954) pp. 97-8.

30. Gillmore, Parker, *Gun, Rod and Saddle* (New York, 1871) has advertising cuts of these rifles in the appendix.

31. Charles Collins' *History and Directory of the Black Hills*, (Central City, D. T., 1878) p. 12, quoting pamphlet issued by Black Hills Exploring and Mining Association, Sioux City, Iowa, 1872-3.

32. Tallent, Annie D., *The Black Hills* (St. Louis, 1899) p. 23. See also frontispiece, Aken, David, *Pioneers of the Black Hills* (Milwaukee, 1920).

## CHAPTER VII: FOREIGN TRIALS AND MARKETS

1. British Patent No. 1,223 of May 15, 1863.

2. Pollard, Maj. H. B. C., *A History of Firearms* (Boston, 1936) p. 294; letter to the author from The Armouries, Tower of London.

3. von Ploennies, Wilhelm, *Neue Hinterladungsgewehre 1861-1867* (Germany, 1867) pp. 157-159.

4. Reports of a Special Committee on Breech-Loading Rifles, Report on Repeating Arms, February 11, 1869, House of Commons, Sessional Papers, 1868-9, Vol. 12, pp. 28-31, located through the courtesy of S. Basil Haw and Maj. G. Tylden.

5. Patent No. 60,814 of January 1, 1867. See also Logan, Herschel C., *Cartridges* (Huntington, W. Va., 1948) p. 95.

6. This arm has been characterized by a Winchester enthusiast, Admiral Selwyn, R.N., as follows: "The Swiss adopted the bolt system from the French Chassepot and stuck it

181

on to the Winchester-Henry, thereby spoiling the simple arm which is the favorite of all sportsmen and of light troops all over the world, with which every man who goes out to shoot or be shot at by Indians in America is armed, and which has proved itself, beyond doubt, to be thoroughly reliable." See *R.U.S.I. Journal*, Note 14 this chapter, p. 480, and Ordnance Notes, No. 220, p. 10.

7. Data in this paragraph is derived from Veader-Earle history, Note 10, Chap. V.

8. William Conant Church Collection of Letters, Manuscripts Division, Library of Congress, located through the courtesy of Capt. John D. Hayes, U.S.N.

9. Williamson, *Winchester*, Note 4, Chap. I, pp. 51-7.

10. Depositions of Aristakes Azarian and Joseph Azarian, witnesses on the part of the defendant, taken at Constantinople in *Christopher Oscanyan v. Winchester Repeating Arms Co.*, U. S. Circuit Court, S.D.N.Y. (New York, 1877) pp. 8-10.

11. Norman, Charles B., *Armenia and the Campaign of 1877* (London, 1878) p. 45; Maurice, Gen. Sir Frederick B., *The Russo-Turkish War of 1877* (London, 1905) p. 16.

12. von Harlessem, William, *The Defense of Plevna* (London, 1895) p. 352.

13. von Trotha, Capt. Philo, *Der Kampf um Plevna*, translated by Capt. G. MacDonald in *Royal United Service Institution Journal* (London, 1878) Vol. 22, pp. 715-751.

14. Fosbery, Lt. Col. G. V., "Magazine Rifles," *Royal United Service Institution Journal*, May 12, 1882, Vol. 26, pp. 456, 463, 478; reprinted in Ordnance Notes, No. 220, September 25, 1882, pp. 6, 15.

15. Fife-Cookson, Lt. Col. John C., *With the Armies of the Balkans and at Gallipoli in 1877-1878* (London, 1880) p. 27.

16. Vizetelly, Edward H., *The Reminiscences of a Bashi-Bazouk* (Bristol, 1897) pp. 144, 171, 204, 204, 277.

17. Stanley, Sir Henry M., *How I Found Livingstone in Central Africa* (London, 1901) pp. lxxi, 57, 63, 70, 266, 319, 426, 484.

CHAPTER VIII: VARIATIONS AND SERIALS

1. Collins' *Omaha City Directory*, July 4, 1868, p. 4. See also *Nebraska Railway Guide*, 1872, p. 209. Charles Collins' *History and Directory of the Black Hills*, 1878-9, lists McAusland Bros. at Deadwood, D. T.; and Knight's *Miles City Directory*, Montana, 1882, p. 99, lists A. D. McAusland as "gun repairing, fishing tackle." The firm appears to have followed the most active firearms market.

2. *Salt Lake City Business Directory*, 1869. See front end paper. Freund Bros. also advertised Winchesters at their "Wyoming Armory" in the *Cheyenne Daily Leader*, May 6, 1877.

3. Langley, Henry J., *Pacific Coast Business Directory for 1871-3* (San Francisco, 1871) p. 497.

4. *Ibid.*, p. xc, advertising department.

5. *Pacific Coast Business Directory*, 1876-8, p. lxii; *Pacific Coast Annual Mining Review and Stock Ledger* (San Francisco, 1878) p. xxiv.

6. *Salem Directory*, Oregon, 1871, p. 28.

7. *Rocky Mountain News*, Denver, Colo., May 14, 1873.

8. *Ibid.* See also Corbett, Hoye & Co.'s *Denver City Directory*, 1874, inside back cover. Gove's shop is described in Townshend, Richard B., *A Tenderfoot in Colorado* (London, 1923) p. 50.

9. Corbett, Hoye & Co.'s *Denver City Directory*, 1876, insert before p. 35.

10. *Daily Central City Register*, May 5, 1870, mentions "new goods just received . . . Winchester and other rifles."

11. *Idaho World*, January 1 to May 7, 1874.

12. Charles H. Pond as special agent advertised "Winchester repeating rifles 12 to 18 shots" in the *Army and Navy Journal*, August 20, 1870 to August 12, 1871, Vol. VIII, pp. 19 to 859.

13. Schuyler, Hartley and Graham advertised "Remington, Peabody, Sharps, Colt, Winchester, Spencer and other military items for Infantry and Cavalry" in the *Army and*

*Navy Journal*, February 10 to July 27, 1872, Vol. IX, pp. 424 to 808.

14. Veader-Earle, history, Note 10, Chap. V.

15. This table is found in Williamson, *Winchester*, Note 4, Chap. I, p. 457. Mr. Hall states that leeway of a year may apply for any serial.

16. Diameters were .445 for case and .458 for bullet of the Henry C.F. as compared to .4385 and .420 for the S. & W. American.

CHAPTER IX: ADVENT OF THE MODEL '73

1. Letter of August 2, 1869 to Rt. Hon. Edward Caldwell, M.P., Secretary of State for War, in pamphlet "The First Requisite of a Military Rifle" (New Haven, 1869).

2. British Patent No. 32 of January 6, 1871: "To lock the breech pin in this position to resist the recoil, a vertical bolt H is arranged in the frame to move up and down, and when up sets behind a shoulder *e* on the breech pin, and thus securely holds the breech pin forward."

3. Patent No. 111,500 of January 31, 1871.

4. Ordnance Memoranda No. 15 (Washington, 1873) p. 96; Report of the Secretary of War (Chief of Ordnance) 1873, Serial 1599, p. 154.

5. Patent No. 86,723 of February 9, 1869.

6. These letters are quoted through the courtesy of Colt's Manufacturing Co.

7. Parsons, John E., *The Peacemaker and Its Rivals* (New York, 1950) p. 100.

8. Patent No. 156,197 of October 20, 1874.

9. Patent No. 84,508 of December 1, 1868.

10. Sharpe, Philip B., *The Rifle in America* (New York, 1938) pp. 222-24; Goddard, Lt. Col. Calvin, "An American Heritage, Part V," *Army Ordnance*, November-December 1938, Vol. XIX, pp. 176-78; Watrous, George R., *Winchester Rifles and Shotguns* (New Haven, 1943) pp. 7-10; Satterlee, L. D., ed., *Ten Old Gun Catalogs* (Detroit, 1943); Amber, John T., ed., *Ten Rare Gun Catalogs* (New York, 1952).



11. *Army and Navy Journal*, August 26, 1876, Vol. IX, p. 43. See also Ordnance Notes No. LVI.

12. Ordnance Notes No. 115, October 1, 1879, pp. 153-5.

13. The table to 1900 is found in Williamson, *Winchester*, Note 4, Chap. I, p. 457.

14. The Model '73 carbine was copied in Belgium and marked on the top of the barrel "Henry Winchester Rifle Model 1873." Another type of foreign copy lacks barrel markings but has a crown surmounting the date 1881 on the left sideplate. Brass frame copies of the Model '66 carbine bearing Liège proofmarks are also known. A specimen examined is centerfire, with both sling swivels and saddle ring, and a lever catch indented at one end.

15. *Army and Navy Journal*, May 15, 1875 to May 13, 1876, Vol. XII, p. 625 to Vol. XIII, p. 637; *Forest and Stream*, October 21, 1875 to November 2, 1876, Vol. V, p. 176 to Vol. VII, p. 208. For earlier comment see *American Sportsman*, February 22, 1874, Vol. III, p. 338.

16. *The Field*, *The Country Gentleman's Newspaper*, January 9, 16, 23, 1875, Vol. XLV, pp. 22, 43, 86. See also Walsh, John Henry, *The Modern Sportsman's Gun and Rifle* (London, 1884) Vol. II, pp. 283-5.

17. Gillett, James B., *Six Years with the Texas Rangers* (Austin, 1921; Chicago, 1943) pp. 62, 82-3.

### CHAPTER X: THE MODEL '76 AND THE NORTHWEST MOUNTED POLICE

1. United States Centennial Commission, International Exhibition, Philadelphia 1876, Vol. 6, Group XVI, Class 269, No. 64, reported by George A. Hamilton.

2. Letters of October 20, 27 and 29, 1877, *Forest and Stream*, November 1, 1877, Vol. IX, p. 255.

3. Letter of October 31, 1877, November 8, 1877, Vol. IX, p. 275.

4. A table of serials issued from 1877 to 1898 is found in Williamson, *Winchester*, Note 4, Chap. I, p. 458.

5. Denny, Capt. Cecil E., *The Riders of the Plains* (Calgary, 1905) pp. 4, 18, 100, 158; Chambers, Ernest John, *The*

*Royal Northwest Mounted Police* (Montreal, 1906) pp. 51, 64; Haydon, Arthur L., *The Riders of the Plains* (Toronto, 1910) pp. 28, 93, 117; Steele, Col. Samuel B., *Forty Years in Canada* (London, 1915) pp. 55, 78.

6. Report of the Commissioner, North-west Mounted Police, 1878 [James F. McCleod], Sessional Papers No. 52, 1879, p. 25.

7. *Ibid.*, 1880 [A. G. Irvine], Sessional Papers No. 3, 1881, p. 10.

8. *Ibid.*, 1881, Sessional Papers No. 18, 1882, p. 18.

9. *Ibid.*, 1882, Sessional Papers No. 23, 1883, p. 21.

10. *Ibid.*, 1883, Sessional Papers No. 12, 1884, p. 31.

11. *Ibid.*, 1886 [L. W. Herchmer], p. 10; 1887, p. 12, 1888, p. 14. See also Donkin, John C., *Trooper and Redskin* (London, 1889) p. 229.

12. *Ibid.*, 1890, Sessional Papers No. 19, 1891, p. 7. See also Turner, John Peter, *The North-West Mounted Police* [1873-1893] (Ottawa, 1950), Vol. I, pp. 121, 425, 556, 620, 684; Vol. II, pp. 34, 162, 315, 449, 570.

13. *Ibid.*, 1894, p. 7; 1895, p. 11.

14. *Ibid.*, 1897, p. 12; 1898, p. 11, Pt. III, report of Supt. S. B. Steele, Yukon Terr., pp. 30, 50. Sessional Papers No. 15 for the following year contain the commissioner's report, 1894-1898.

15. *Ibid.*, 1902 [A. Bowen Perry], p. 11.

16. *Ibid.*, 1905, p. 13; 1906, p. 15; 1907, p. 14, Pt. III, p. 8.

17. *Ibid.*, 1912, pp. 36, 124, 135, 141, 239.

18. *Ibid.*, 1914, p. 25. Sessional Papers No. 28 for the following year contain the commissioner's report, 1902-1914.

### CHAPTER XI: EXTRACTOR PATENT LITIGATION

1. Patent No. 16,797 of March 10, 1857.

2. Deposition of Oliver F. Winchester, Complainant's Main Case, *Morse Arms Mfg. Co. v. Winchester Repeating Arms Co.*, p. 852.

3. Reissue No. 1,952 of May 9, 1865; reissue No. 3,796 of January 18, 1870; reissue No. 3,860 of March 1, 1870.



4. *Oliver F. Winchester v. Smith & Wesson*, U. S. Circuit Court, Dist. of Connecticut. In Equity No. 85, filed April 27, 1869.

5. *Renwick et al. v. Pond*, 20 Fed. Cas. 536 (Cir. Ct. S.D. N. Y., 1872).

6. *Renwick et al. v. Cooper*, 20 Fed. Cas. 534 (Cir. Ct. S.D. N. Y. 1872).

7. *E. S. Renwick et als. v. Winchester Repeating Arms Co.*, U. S. Circuit Court, Dist. of Connecticut. In Equity, No. 233, filed November 26, 1872.

8. *Morse Arms Manufacturing Co. v. Winchester Repeating Arms Co.*, 33 Fed. 170, 179 (Cir. Ct. D. Conn. 1887).

9. Reissue No. 5,563 of September 9, 1873. In his specifications the patentee refers to "a pistol manufactured at about the date of my application for my original patent, by the Volcanic Arms Company, with my improvements applied thereto," said pistol being in other respects substantially the same as that described in the patent granted to Horace Smith and D. B. Wesson, February 14, 1854.

10. *William C. Hicks v. Whitney Arms Co.*, U. S. Circuit Court, Dist. of Connecticut. In Equity, No. 302, filed March 9, 1874.

11. *William C. Hicks v. Edwin S. Harris*, U. S. Circuit Court, S. Dist. of New York. In Equity, Vol. 7, p. 212, filed April 30, 1875.

CHAPTER XII: THE GUN THAT WON THE WEST?

1. Crossman, Capt. E. C., "With Captain Crossman at the Big Winchester Factories," *The Sporting Goods Dealer*, January, 1920.

2. Parsons, John E., and du Mont, John S., *Firearms in the Custer Battle* (Harrisburg, 1952) pp. 25-31. See also Quivey, Addison M., "The Yellowstone Expedition of 1874," *Contributions, Hist. Soc. of Montana*, Vol. I (Helena, 1875) pp. 279, 281: "Many of them [Sioux Indians] encountered April 18th had needle-guns of fifty caliber, center fire, as we picked up many battered bullets

of that size, and found a good many metallic shells that they had used. They also had Spencer and Winchester and other breechloaders, but probably a majority had muzzle-loading rifles and many revolvers. Many of them had bows and arrows in addition to their firearms"; also "Voyage of Lieut. Francis Vinton Greene from the Sweet Grass Hills, M.T. to Bismarck, D.T. along the Missouri River, September, 1874," a mss. diary quoted by permission of the Western Americana Collection, Yale University Library: "They [traders at Ft. Peck] spoke of the ammunition trade being very strictly prohibited, but I noticed a fine Henry rifle and a belt of full cartridges on about half the men. This large number of Indians are all Sioux."

3. Roosevelt, Col. Theodore, *The Winning of the West* [1769-1809] 4 vols. (New York, 1900) foreword, Vol. I.

4. See McElroy, Robert McNutt, *The Winning of the Far West* [1829-1867] (New York, 1914) intended as a continuation of Col. Roosevelt's study.

5. Athearn, Robert G., *Westward the Briton* (New York, 1953) p. 11.

6. Riegel, Robert E., *The Story of the Western Railroads* (New York, 1926) pp. 188, 206, 210.

7. Report of the Secretary of War (General of the Army) 1883, Serial 2182, pp. 44-6.

8. Mills, Brig. Gen. Anson, *My Story* (Washington, 1918) pp. 109, 110.

9. Forsyth, Brig. Gen. George A., *Thrilling Days in Army Life* (New York, 1900) pp. 11, 47.

10. Grinnell, George Bird, *Two Great Scouts and Their Pawnee Battalion* (Cleveland, 1928) p. 139.

11. Stanley, Bvt. Maj. Gen. David S., Report on the Yellowstone Expedition of 1873 (Govt. Print. Off., Washington, 1874) p. 7.

12. Parsons and du Mont, Note 2 of this chapter.

13. See Note 29, Chap. VI.

14. Inman, Col. Henry, ed., *Buffalo Jones' Forty Years of Adventure* (London, 1899) pp. 44, 91, 101.



15. Townshend, Richard B., *A Tenderfoot in Colorado* (London, 1923) p. 259.

16. See McCracken, Harold. *Frederic Remington—Artist of the Old West* (New York, 1947) "The Scout," Plate 8, used by permission on the jacket of this book, and *Portrait of the Old West* (New York, 1952) "A Desperate Stand" opp. p. 187.

17. Holloway, Carroll C., *Texas Gun Lore* (San Antonio, 1951) p. 170; Gillett, James B., *Six Years with the Texas Rangers* (Austin, 1921; Chicago, 1943) pp. 82, 105, 140, 320.

18. Haley, J. Evetts, *Charles Goodnight, Cowman and Plainsman* (Boston, 1936; Norman, Okla. 1949) p. 362; Douglas, Claude Leroy, *Cattle Kings of Texas* (Dallas, 1939) p. 272.

19. Marshall, James L., *Santa Fe, the Railroad that Built an Empire* (New York, 1945) pp. 154, 175.

20. See Hallock, Charles, *The Sportsman's Gazetteer and General Guide* (4th ed., New York, 1878) p. 549.

21. Murphy, John M., *Sporting Adventures in the Far West* (New York, 1880) p. 278.

22. *Oxford English Dictionary* (Oxford, 1928): "II. The name of Oliver F. Winchester (1810-1880), an American manufacturer, used as the designation of a breech-loading rifle having a tubular magazine under the barrel and a horizontal bolt operated by a lever on the underside of the stock."

23. *A Dictionary of Americanisms* (Mitford M. Mathews, ed. Chicago, 1951): "Winchester, n. [Oliver F. Winchester (1810-1880), Amer. manufacturer.] A breechloading rifle, usu. of a lever-loading, tubular magazine type, manufactured by the Winchester Arms Co. In full a Winchester *(repeating)* rifle."

24. *Webster's New International Dictionary* (2nd ed. unabridged, Springfield, Mass, 1951): "Winchester—a trademark applied originally to a breech-loading repeating rifle having a tubular magazine under the barrel and a horizontal bolt operated by a lever on the underside of the stock, which was made (first about 1866) by, and

named after, Oliver Fisher Winchester (1810-1880), American manufacturer; and applied subsequently to firearms of various types and other products of the manufacturer of this rifle."

Compare 1910 to 1951 definition: "Winchester rifle or Winchester [after Oliver F. Winchester (1810-1880) Am. manufacturer] a breech-loading rifle with a tubular magazine under the barrel holding five or more cartridges inserted one by one from the rear, the bolt being worked back and forth by a lever underneath. It is a development of the Henry rifle, was introduced about 1866, and is in world-wide use, esp. as a sporting arm. It is now made in various styles, but the above was the first, and is the best-known, type." In 1944 the last two sentences were shortened to: "It was introduced about 1866, and is in world-wide use, esp. as a sporting arm. It is now made in various styles, but the above was the first type."

25. Stevenson, Robert Louis, *Vailima Letters* (New York, 1897) pp. 244. The letter of June 24, 1895, to his friend and agent Sidney Colvin ends: "There, I have written this to you, and it is still but 7.30 in the day, and the sun only about one hour up; can I go back to my old grandpapa, and men sitting with Winchesters in my mind's eye? No; war is a huge *entrainment*; there is no temptation to be compared with it, not one."

Stevenson was fond of the word Winchester and used it also in South Sea stories: *The Beach of Falesá* (1897 ed., pp. 329-31), *The Ebb Tide* (same, pp. 518, 561, 563), *In the South Seas* (same, pp. 514, 531) and *A Footnote to History* (same, p. 461).

Its first use in fiction, other than dime novels, so far found is by Foote, Mary Hallock, *The Led-Horse Claim* (Boston, 1883) pp. 160, 165. This was a romance of a mining camp in Colorado, set in 1879. Thus it took the proper noun Winchester about twenty years to enter literature, and forty to get in a dictionary.

Compendium_Vorenberg
Page 208



# BIBLIOGRAPHY

PERIODICALS

*American Agriculturalist*, New York, 1868-1869.
*American Sportsman*, Meriden, Conn., 1874.
*Army and Navy Journal*, New York, 1867-1876.
*Century*, New York, 1891.
*Democratic Age*, New York, 1858.
*The Field, The Country Gentleman's Newspaper*, London, 1870-1877.
*Forest and Stream*, New York, 1875-1877.
*Harper's Weekly*, New York, 1868.
*Illustrated London News*, London, 1877-1878.
*Leslie's Weekly*, New York, 1858.
*Royal United Service Institution Journal*, London, 1878-1882.
*Rural New Yorker*, New York, 1868.
*Scientific American*, New York, 1869-1870.
*Spirit of the Times*, New York, 1868-1869.
*Turf, Field and Farm*, New York, 1868-1869.

NEWSPAPERS

*Cheyenne Daily Leader*, 1877.
*Daily Central City Register*, 1870.
*Dakota Herald*, 1876.
*Idaho World*, 1874.
*Louisville Journal*, 1862-1863.
*Rocky Mountain News*, 1872-1873.
*Salt Lake City Herald*, 1871.
*Sioux City Daily Journal*, 1873.

191

### DIRECTORIES AND GUIDES

Benham's *New Haven Directory*, 1865-1875.
*Bridgeport Directory*, 1867, 1869.
Charles Collins' *History and Directory of the Black Hills*, Central City, D. T., 1878.
Collins' *Omaha City Directory*, 1868.
Corbett, Hoye & Co.'s *Denver City Directory*, 1876.
Hallock, Charles, *The Sportsman's Gazetteer and General Guide*, 4th ed., New York, 1878.
Knight's *Miles City Directory*, Montana, 1882.
Langley, Henry J., *Pacific Coast Business Directory*, 1871-1873.
*Merchant's Register*, Bridgeport, 1880.
*Pacific Coast Annual Mining Review*, 1878.
*Pacific Coast Business Directory*, 1876-1878.
Price, Lee & Co., *Bridgeport City Directory*, 1876-1878.
Price, Lee & Co., *Waterbury Directory*, 1880-1889.
*Salem Directory*, Oregon, 1871.
*Salt Lake City Business Directory*, 1869.
Wolfe's *Nebraska Railway Guide*, 1872.

### GOVERNMENT REPORTS

Chief of Ordnance, 1866, Serial 1285.
Chief of Ordnance, 1873, Serial 1599.
Commissioner, Northwest Mounted Police, Ottawa, 1878-1914.
General of the Army, 1883, Serial 2182.
House of Commons, Sessional Papers, 1868-9, Vol. 12 (Special Committee on Breech-Loading Rifles).
House Doc. 99, 40th Cong. 2nd Sess., Serial 1338 (Ordnance Dept. Purchases).
House Doc. 269, 41st Cong. 2nd Sess., Serial 1426 (Expedition vs. Piegans).
House Doc. 89, 42nd Cong. 2nd Sess., Serial 1511 (Sales of Arms and Ordnance Stores).
House Doc. 340, Pt. 15, 52nd Cong. 1st Sess., Serial 3016 (Indians Taxed and Not Taxed).

Official Records of the Union and Confederate Armies in the War of the Rebellion.
Ordnance Memoranda, Nos. 5, 15.
Ordnance Notes, Nos. 115, 220.
Senate Doc. 72, 37th Cong. 2nd Sess., Serial 1123 (Ordnance and Ordnance Stores).
Senate Doc. 33, 50th Cong. 1st Sess., Serial 2505 (Fetterman Massacre).
Senate Report 7, 40th Cong. 2nd Sess., Serial 1360 (Patent Extension, 1868).
Senate Report 183, 42nd Cong. 2nd Sess., Serial 1497 (Sales of Arms by Ordnance Dept.).
United States Centennial Commission, International Exhibition, Philadelphia, 1876, Vol. 6, Group XVI, Class 269.

### COMPANY ARCHIVES

*Morse Arms Mfg. Co. v. Winchester*, 1887, 33 Fed. 130.
New Haven Arms Co. catalogs, 1864-1865.
New Haven Arms Co. Letterbook, 1857-1859, 1862-1865.
*Oosenyan v. Winchester*, 1874-1881, 103 U. S. 261.
*Renwick v. Cooper*, 1872, 10 Fed. Cas. 534.
*Renwick v. Pond*, 1872, 20 Fed. Cas. 536.
Vesder, Daniel H., and Earle, Arthur W., "The Story of the Winchester Repeating Arms Company" (New Haven, 1918).
Watrous, Geo. R., *Winchester Rifles and Shotguns* (New Haven, 1943).
Williamson, Harold F., *Winchester—The Gun That Won the West* (Washington, 1952).
Winchester Catalogs, 1867-1890.
Winchester, Oliver F., "The First Requisite of a Military Rifle" (New Haven, 1869).
Winchester, Oliver F., "Selection of an Arm for the Use of the Infantry and Cavalry of the United States Army" (New Haven, 1868).



ARTICLES AND MANUSCRIPTS

Burgher, A. S., "Hunting Buffalo on the Great Plains," S. D. Butcher's *Pioneer History of Custer County* (Broken Bow, Nebr., 1901).

Carter, William Alexander, "Journal of Transactions of the Post Trader at Ft. Bridger, November, 1869." Western Americana Coll., Yale University Library.

Church, William Conant, Collection of Letters. Manuscripts Division, Library of Congress.

Coburn, Lt. Jeff. L., "The Battle Field of Dinwiddie Court House," *The Maine Bugle*, Rockland, Maine, January 1895.

Crossman, Capt. E. C., "With Captain Crossman at the Big Winchester Factories," *The Sporting Goods Dealer*, January 1920.

Fosbery, Lt. Col. G. V., "Magazine Rifles," *Royal United Service Institution Journal*, May 12, 1882, Vol. 26, p. 456, reprinted in Ordnance Notes, No. 220.

Goddard, Lt. Col. Calvin, "An American Heritage, Part V," *Army Ordnance*, November-December 1938, Vol. XIX, p. 176.

Greene, Lt. Francis Vinton, "Voyage from the Sweet Grass Hills, M. T. to Bismarck, D. T. along the Missouri River, September, 1874." Western Americana Coll., Yale University Library.

Hill, Capt. George W., "From Memphis to Allatoona and the Battle of Allatoona," Soldiers' and Sailors' Hist. Soc. of R. I., Personal Narratives, 4th Series, No. 13 (Providence, 1891).

Jackson, William Henry, "Photographs of Indians Selected from the Collection of the U. S. Geological Survey of the Territories." Western Americana Coll., Yale University Library.

Koch, Peter, "Life at Musselshell in 1869 and 1870." Hist. Soc. of Montana, Contributions, Vol. II (Helena, 1896).

Lasson, Tage, "De Tidlige Winchester-Rifler," Vaabenhistoriska Arrhoger, Vol. VIIb (Copenhagen, 1953).

Ludlow, Maj. William, "The Battle of Allatoona," Loyal Legion of the U. S. Michigan Commandery, War Papers, Vol. I (Detroit, 1891).

Millman, Dr. Thomas, "Impressions of the West in the Early Seventies, from the Diary of the Assistant Surgeon of the B.N.A. Boundary Survey," Women's Canadian Hist. Soc. of Toronto, Transactions, No. 26, 1928.

Powell, Walter Clement, "Journal of Walter Clement Powell," Utah Hist. Quart. Vols. XVI-XVII, p. 347 (Salt Lake City, 1948-9).

Quivey, Addison M., "The Yellowstone Expedition of 1874," Hist. Soc. of Montana, Contributions, Vol. I (Helena, 1876).

Roberts, Thomas P., "The Upper Missouri River," Hist. Soc. of Montana, Contributions, Vol. I (Helena, 1876).

Satterlee, L. D., "The Model 1866 Winchester," *American Rifleman*, December 15, 1924, Vol. 62, No. 14.

Shields, George O., "Buffalo Hunting on the Texas Plains," *Outing*, February 1888, Vol. XI, p. 469.

Tobie, Lt. Edward P., "Service of the Cavalry in the Army of the Potomac," Soldiers' and Sailors' Hist. Soc. of R. I., Personal Narratives, 2nd Series, No. 14, p. 41 (Providence, 1882).

Volunteer Cavalryman, "Lessons of the Decade," *Army and Navy Journal*, January 14 to May 30, 1871, Vol. VIII, pp. 566-638.

CIVIL WAR

Ambrose, D. Leib, *History of the Seventh Regiment, Illinois Volunteer Infantry* (Springfield, Ill., 1868).

French, Gen. Samuel G., *Two Wars; an Autobiography* (Nashville, 1901).

*Illinois in the War for the Union* (Springfield, Ill., 1887).

McGee, Benjamin F., *History of the 72nd Indiana Volunteer Infantry of the Mounted Lightning Brigade* (LaFayette, Ind., 1882).



196                    THE FIRST WINCHESTER

Merrill, Samuel H., *The Campaigns of the First Maine and First District of Columbia Cavalry* (Portland, Maine, 1866).

Scott, William Forse, *The Story of a Cavalry Regiment* (New York, 1893).

Tenney, William J., *The Military and Naval History of the Rebellion in the United States* (New York, 1866).

Tobie, Lt. Edward P., *History of the First Maine Cavalry* (Boston, 1887).

Williams, Samuel C., *General John T. Wilder, Commander of the Lightning Brigade* (Bloomington, Ind., 1936).

Wilson, Gen. James H., *Under the Old Flag*, 2 vols. (New York, 1912).

AMERICAN FRONTIER

Aken, David, *Pioneers of the Black Hills* (Milwaukee, 1920).

Bell, William Abraham, *New Tracks in North America*, 2 vols. (London and New York, 1869).

Cook, James H., *Fifty Years on the Frontier* (New Haven, 1923).

Cook, John R., *The Border and the Buffalo* (Topeka, 1907).

Darrah, William C., *Powell of the Colorado* (Princeton, 1951).

Dellenbaugh, Frederick S., *A Canyon Voyage* (New York, 1908).

de Trobriand, Col. Regis, *Army Life in Dakota* (Chicago, 1941).

Flory, Jacob Stoner, *Thrilling Echoes from the Wild Frontier* (Chicago, 1893).

Forsyth, Gen. George A., *Thrilling Days in Army Life* (New York and London, 1900).

Gillett, James B., *Six Years with the Texas Rangers* (Austin, 1921; Chicago, 1943).

Grinnell, George B., *The Fighting Cheyennes* (New York, 1915).

——, *Two Great Scouts and Their Pawnee Battalion* (Cleveland, 1928).

BIBLIOGRAPHY                    197

Inman, Col. Henry, ed., *Buffalo Jones' Forty Years of Adventure* (London, 1899).

Kelly, Luther S., *"Yellowstone Kelly," the Memoirs of Luther S. Kelly* (New Haven, 1926).

Lewis, Alfred Henry, *Wolfville* (New York, 1897).

Messiter, Charles A., *Sport and Adventures Among the North American Indians* (London, 1890).

McCracken, Harold, *Frederic Remington, Artist of the Old West* (Philadelphia, 1947).

——, *Portrait of the Old West* (New York, 1952).

McCreight, Major Israel, *Buffalo Bone Days* (Dubois, Pa., 1950).

Mills, Gen. Anson, *My Story* (Washington, 1921).

Murphy, John M., *Sporting Adventures in the Far West* (New York, 1880).

Rivington, Alex., and Harris, W. A., *Reminiscences of America in 1869* (London, 1870).

Sandoz, Mari, *The Buffalo Hunters* (New York, 1954).

Schultz, James Willard, *My Life as an Indian* (New York, 1907).

Stanley, Gen. David S., *Report on the Yellowstone Expedition of 1873* (Washington, 1874).

Strong, Gen. William E., *A Trip to the Yellowstone National Park in 1875* (Washington, 1876).

Tallent, Annie D., *The Black Hills* (St. Louis, 1899).

Taylor, Joseph Henry, *Sketches of Frontier and Indian Life*, 3d ed. (Bismarck, 1897).

Toponce, Alexander, *Reminiscences of Alexander Toponce, Pioneer* (Ogden, Utah, 1923).

Townshend, Capt. F. Trench, *Ten Thousand Miles of Travel, Sport and Adventure* (London, 1869).

Townshend, Richard B., *A Tenderfoot in Colorado* (London, 1923).

Webb, William E., *Buffalo Land* (Philadelphia, 1872).

198

THE FIRST WINCHESTER

OTHER AMERICANA

Athearn, Robert G., *Westward the Briton* (New York, 1953).

Atwater, Isaac, *History of the City of Minneapolis, Minnesota* (New York, 1893).

Dodge, Gen. Grenville M., *How We Built the Union Pacific Railway* (New York, 1910).

Douglas, Claude Leroy, *Cattle Kings of Texas* (Dallas, 1939).

Foote, Mary Hallock, *The Led-Horse Claim* (Boston, 1883).

Gillmore, Parker, *Gun, Rod and Saddle* (New York, 1871).

Haley, J. Evetts, *Charles Goodnight, Cowman and Plainsman* (Boston, 1936).

Jackson, William H., *The Pioneer Photographer* (Yonkers, N. Y., 1929).

Marshall, James L., *Santa Fe, the Railroad That Built an Empire* (New York, 1945).

Mathews, Mitford M., ed., *A Dictionary of Americanisms* (Chicago, 1951).

McElroy, Robert McNutt, *The Winning of the Far West* (New York, 1914).

Riegel, Robert E., *The Story of the Western Railroads* (New York, 1926).

Roosevelt, Col. Theodore, *The Winning of the West*, 4 vols. (New York, 1900).

Thrasher, Halsey, *The Hunter and Trapper* (New York, 1868).

CANADIANA

Butler, Sir William Francis, *The Great Lone Land* (London, 1872).

Chambers, Capt. Ernest John, *The Royal North-West Mounted Police* (Montreal, 1906).

Deane, Capt. R. Burton, *Mounted Police Life in Canada* (London, 1916).

Denny, Sir Cecil E., *The Riders of the Plains* (Calgary, 1905).

Denison, Lt. Col. George T., *Modern Cavalry* (London, 1868).

——, *Soldiering in Canada* (London, 1900).

BIBLIOGRAPHY

199

Donkin, John C., *Trooper and Redskin* (London, 1889).

Hargrave, Joseph James, *Red River* (Montreal, 1871).

Haydon, Arthur L., *The Riders of the Plains* (London, 1918).

McDougall, Rev. John, *In the Days of the Red River Rebellion* (Toronto, 1911).

McDougall, Rev. John, *On Western Trails in the Early Seventies* (Toronto, 1911).

McInnes, Charles M., *In the Shadow of the Rockies* (London, 1930).

Ralph, Julian, *On Canada's Frontier* (New York, 1892).

Steele, Col. Samuel B., *Forty Years in Canada* (London, 1915).

Turner, John Peter, *The North-West Mounted Police*, 2 vols. (Ottawa, 1950).

FIREARMS BOOKS

Amber, John T., ed., *Ten Rare Gun Catalogs* (Chicago, 1952).

Barber, Edward C., *The Crack Shot* (New York, 1868).

Cleveland, Horace W. S., *Hints to Riflemen* (New York, 1864).

Fuller, Claude E., *The Breechloader in the Service* (Topeka, 1933).

Greener, W. W., *Modern Breech-loaders* (London, 1872).

Holloway, Carroll C., *Texas Gun Lore* (San Antonio, 1951).

Logan, Herschel C., *Cartridges* (Huntington, W. Va., 1948).

Parsons, John E., *The Peacemaker and Its Rivals* (New York, 1950).

Parsons, John E., and du Mont, John S., *Firearms in the Custer Battle* (Harrisburg, 1953).

Pollard, Major H. B. C., *A History of Firearms* (Boston, 1936).

Satterlee, L. D., ed., *Ten Old Gun Catalogs* (Detroit, 1943).

Schmidt, Col. R., *Les Nouvelle Armes à Feu Portatives Adoptées comme Armes de Guerre* (Geneva, 1889).

Sharpe, Philip B., *The Rifle in America* (New York, 1938).

von Ploennies, Wilhelm, *Neue Hinterladungsgewehre* (Germany, 1867).

Walsh, John Henry, *The Modern Sportsman's Gun and Rifle*, 2 vols. (London, 1884).

Zernin, Edward, *Die Rückladungsgewehre* (Leipzig, 1872).

200                    THE FIRST WINCHESTER

FOREIGN WORKS

Fife-Cookson, Lt. Col. John C., *With the Armies of the
    Balkans and at Gallipoli in 1877-1878* (London, 1880).
Maurice, Gen. Sir Frederick B., *The Russo-Turkish War of
    1877* (London, 1905).
Norman, Charles B., *Armenia and the Campaign of 1877*
    (London, 1878).
Stanley, Sir Henry M., *How I Found Livingstone in Central
    Africa* (London, 1904).
Stevenson, Robert Louis, *Collected Works*, vols. 4, 11, 17, 19
    (New York, 1898).
Vizetelly, Edward H., *The Reminiscences of a Bashi-Bazouk*
    (Bristol, 1897).
von Harlessem, William, *The Defense of Plevna* (London,
    1895).

## INDEX

Aarau, Switzerland, trial at, 82
Addis, Thomas Emmet, salesman, 49
Africa, Winchester in, 91
Albright, T. J., of St. Louis, Henry
    dealer, 15
Allatoona Pass, Henry in battle of, 22
American Institute, 7
Apia, revolt at, 154, 189
Arcade Malleable Iron Co., of Worcester,
    41
Arickaree River fight, 118
*Army and Navy Journal*, cited, 39, 57, 61,
    63, 68, 69, 118
Army of the Potomac, 9, 10
Army, Gov. W. I. M., of New Mexico,
    presentation to, 8
Assiniboine Indians, 77, 126
Auxiliary chamber, 54, illustrated, 55, 58
Azarian, Aristakes, quoted, 87
Azarian, V., & Co., of Boston, 57, 160; of
    Constantinople, 85, 87, 155, 157, 159,
    161, 165, 166

Baker, Col. Lafayette C., or D. C. Cav.,
    39
Ball, Albert, inventor, 46
Ball & Lamson carbine, 46, 82, 118
Ballard rifle, 47, 77, 78
Barrels, 41, 102, 124; marking, 10, 58, 53,
    100; lengths, 107, 114, 124
Barton, Alexander & Waller, of N. Y.,
    Winchester dealer, 94
Bashi-Bazouks, 90
Bates, R. H., 29th Texas Cav., 18
Bayes, S. G., inventor, 110, 112
Bayonets, 95, 106, 164
Beaman, E. O., photograph, 75
Bear hunting, 94, 95
Beardshield, Blackfoot, 85

Beck, William, & Son, of Portland, Ore-
    gon, dealer in Henry and Spencer, 96
    94
Belgian copies, 82, 183, 184
Bennett, Thomas G., 171
Black Hills, D. T., 77
Blackfoot Indians, 63, 68, 126
Blacque Bey, Turkish Minister, 87
Blake & Johnson, of Waterbury, 56
Blatchford, Judge, 196, 199
Blood Indians, 75, 126
Bowen, E. R., of Chicago, Henry dealer,
    15
Brands, Charles & James Favre, of Paris,
    84
Breech-bolts, 8, 100, illustrated, 58
Bridgeport, 54, 169; directory, 56
Briggs, George E., inventor, 55
British sportsmen, quoted, 50-72, 155
Brough, Gov., of Ohio, quoted, 24, 25
Brown, John W., of Columbus, agent for
    Henry, 14, 15, 25
Buffalo Bill, see Cody
Buffalo hunting, 70, 72, 73, 94, 100, 150,
    155, 179
Buffalo Jones, 150
*Buffalo Land*, cited, 72
Burnside rifle, 51
Butler, Lt. William Francis, 75
Butt plates, 98, illustrated, 97

Calibers
    .22 R.F., Model '73, 118
    .32 W.C.F., 116
    .32-20, Model '73, 116
    .38-40, Model '73, 116
    .38-56, Model '86, 151
    .40-60, Model '76, 123
    .44 Henry C.F., 107, 185
    .44 Henry R.F., 9, 51, 44, 116

201



## 202     INDEX

Calibres (Cont.)
.44 S. & W. American, 107
.44 Win. & Colt, flat, 112
.44-40, Model 73, 110, 112, 115
.45-60, Model 73, 123, 140
.45-70-260, 109
.45-75, Model '76, 121
.45-90, Model '76, 124
.47 C.F. 45-85
.50 Henry, 42
.50-95 Express, 123
.50-110, Model '86, 141
Canadian Pacific R.R., 128, 147
Carbines, 42, 44, 57, 65, 66, 94; volume, 104-107, 114-120, 124; for N.W.M.P., 128-132
Carrington, Col. Henry B., quoted, 64
Carter, C. W. photograph, 52
Cartridges, illustrated, 4, 37, 41, 45, 95; machinery, 168
Cavalry, Turkish, 89, 90; see also 1st D. C., 1st Maine, 12th Ks., U. S.
Central Pacific R.R., 147
Chapin, Henry A., sec'y of New Haven Arms Co., 84
Chassepot rifle, 85, 160
Cheyenne Indians, 66, 69
Cheyenne, Wyoming, 95, 150
Chickamauga, Spencer in battle of, 26
Chile and Peru, sales in, 49
Church, William C., 85
Cilley, Col. Jonathan P., 1st Maine Cav., 20
Circassian Cavalry, 89
Civil War, 9; in Virginia, 20; Atlanta campaign, 21, 26; veteran volunteers, 58; see also 1st D. C. Cav., 1st Maine Cav., 7th Ill. Inf., 66th Ill. Inf., 12th Ks. Cav.
Clark, Capt. William, 45
Cleaning rod, 59, 98; illustrated, 22
Codding, G. R., of Petaluma, Henry dealer, 15
Cody, Col. W. F., presentations to, 71, 145
Collins, Charles, quoted, 77
Colorado River, 73, 74
Colt, Samuel, 5, 80
Colt's Patent Fire Arms Mfg. Co., 40
Colt's revolver, 75, 148, 148
Colt's revolving rifle, compared, 28, 90, 35, 78; sales, 90, 96
Cook, James H., 179
Cooper, Albert, of N. Y., Winchester agent, 196

Cooper & Pond, of N. Y., dealer in Henry, 15, Winchester, 94
Corse, Gen. John M., 174
Cossacks, 89, 90
Crack Shot, cited, 54
Cree Indians, 75, 77, 145
Crook, Gen. George, 68, 148
Crystal Palace, 7
Custer battle, 144, 148
Custer, Gen. George A., 28, 79, 148

Dahlgren, Capt. John A., U.S.N., 10
Day, John, of Central City, Winchester dealer, 94
Deadwood, D. T., 182
Dellenbaugh, Frederick S., 73
de Mores, Marquis, 141; presentation by, 142; photograph, 141
Denison, Lt. Col. George T., quoted, 35
Dennis Scouts, North West Field Force, 129
Denver, Colo., 94, 182
Denver & Rio Grande R.R., 152
de Trobriand, Col. Regis, memoirs, 66
Dinwiddie Court House, Henry in battle of, 20, 175
Dodge City, Kansas, 150
Dodge, Gen. Grenville M., 18th Army Corps, 21; Union Pacific, 66
Dodge, William C., patent agent, 187
Dowd, G. S., of San Francisco, Henry agent, 15
Dyer, Gen. A. B., Chief of Ordnance, 34

Earle, Arthur W., 177
Eller, Gen. Alfred W., 17
English, Atwater & White, of New Haven, 41
Engraving, 49, 106, 124
Extractor, 9, 134, 136, 141

Fetterman Massacre, 64, 176
The Field, London, cited, 50, 118
Fife-Cookson, Lt. Col. John C., 90
51st Illinois Infantry, 19
1st Dist. of Columbia Cavalry, uses Henry, 19, 36
1st Maine Cavalry, uses Henry 20, 21, 36; reunion badge, 175
Fisher, Isaac, of Blue Springs, Nebr., 64
Folsom, Charles, of Chicago, Winchester dealer, 94
Folsom, Henry, & Co., of N. Y. and New Orleans, Winchester dealer, 94
Foote, Mary Hallock, 189

## INDEX     203

Forest and Stream, cited, 118, 122, 123
Forsyth, Col. George A., 148
Fort Benton, Montana, 66, 75
Fort Berthold, D. T., 66
Fort Boise, Idaho, 68
Fort Bridger, 68, 148
Fort Garry, Manitoba, 75
Fort Peck, Montana, 180
Fort Phil Kearney, Wyoming, 64
Fort Stevenson, D. T., 76
Fort Union, D. T., 66, 68, 76
Foskett, Lt. Col. G. V., quoted, 88
Franco-Prussian War, 87, 85
Freeman, Lt. D. M., presentation to, 24
French, Gen. Samuel G., C.S.A., quoted, 22
French Government, purchases, 85
Freund & Brother, of Salt Lake City and Cheyenne, dealer in Winchesters and Sharps, 95, 96
Fulton, G. W., presentation to, 18

Galt, Sioux chief, 141
Gardner, Dr. W. W., of Paducah, 15
Garibaldians, use Winchester, 85
Gaston, Nelson B., first pres. of Volcanic, 5
Gillett, James B., of Texas Rangers, 119; quoted, 120
Gordon's Stockade Party, 79
Golcher, William, of St. Paul, Winchester dealer, 94
Gove, Charles, & Co., of Denver, Winchester dealer, 94, 182
Grant, Gen. Ulysses S., 28, 51, 54
Greener shotgun, 75
Grubb, J. C., & Co., of Phila., dealer in Henry, 15, Winchester, 94
Growski, Col., presentation to, 122

Hahl Pasha, Grand Master of Artillery, 87, 160, 163, 169
Hancock, Gen. Winfield S., 31
Hardie, Inspector Gen. quoted, 68
Harris, Edwin S., of N. Y., Winchester agent, 142
Hawkins rifle, 89, 93
Henry, B. Tyler, sup't of New Haven Arms Co., 8, 50, 56, 61, 89; patent, 8; experiments with cartridges, 9, 172; inside contractor, 12; portrait, 19
Henry Repeating Rifle Co., 50
Henry rifle, patented, 8; criticized, 9, 78; barrel marking, 10, 12; trials, 10, 31, 33, 87; advertised, 12-14, 23, 30, 36, 47;

described, 24, 20, 73, 78; compared, 35, 35-65, 78; prices, 13, 30, 40, 73; dealers, 15; sales, 15, 31, 36, 49; in Civil War, 18-27; illustrated, 8, 11, 16, 18, 22, 23, 27, 34, 35, 45, 46, 48, 159; cartridges, 9, 47; characteristics, 58-64, 175; converted, 48; serials, 39, 58, 80; on frontier, 64, 66, 70, 75, 77; imitations, 80-82; abroad, 87, 90
Hicks, William C., sup't of Volcanic, 5, 8; patent, 133, 135, 142, 188
Hicks v. Harris, 142, 143
Hicks v. Whitney Arms Co., 142, 143
High Backed Wolf, Cheyenne, 66, 139
Hints to Riflemen, cited, 17, 98, 94
Holladay, Ben, 73, 78
Hooker, Gen. Joseph, 28
Hoover's Gap, Spencer in battle of, 26
Howard, Charles, inventor, 55
Howard, Gen. Oliver O., 68
Hone, Walter, foreman, 5
Hunter and Trapper, cited, 95
Hunting, see Bear, Buffalo
Hussein Avni Pasha, Minister of War, 87, 88, 155, 157, 159, 167
Indians, see Assiniboine, Blackfoot, Blood, Cheyenne, Cree, Nez Percé, Pawnee, Plains, Sarci, Sioux, Shoshone, Ute

Jackson, William Henry, photographs, 45, 66, 67, 68
Jennings, Lewis, inventor, 5
Johnson, E. C., of Peoria, Henry dealer, 15
Juarez, President of Mexico, 49

Kelly, Yellowstone, quoted, 66, 88
Kentucky, State of, 15, 17, 18
Kerr & Co., London agents for Winchester, 118
King, Nelson, sup't of Winchester's, 50, 52, 56, 177; quoted, 52, 110
King's improvement, 95, patented, 51, 56; described, 58; in Turkey, 57; illustrated, 58, 51, 60; serials, 109
Kingsley, C. S., of Idaho City, Winchester dealer, 94, 99
Kittredge, B., & Co., of Cincinnati, 15, 16
Klondike rush, 150

Laramie Mountains, 66
Laramie, Wyoming, 95
Lee rifle, 69, 93



Lee-Enfield rifle, 130, 131
Lee-Metford rifle, 130
Lever, finger, 59, 41, 114, 118
Liddle & Kaeding, of San Francisco, Henry dealer, 47, 93
Liddle, R., & Co. of San Francisco, Henry dealer, 25
Litchfield, Maj. H. G., 59, 61
Livingstone, Dr., 91; quoted, 92
London agency, 84
Louisville Journal, cited, 15
Low, James, & Co., of Louisville, Henry dealer, 15, 14
Lower, John P., of Denver, Winchester dealer, 94

Mackenzie, Col. Ranald S., 4th Cav., 115
Magazine, 41, 43, 50, 51; capacity, 63, 114, 122
Mansoul Pasha, 164
McAusland Bros., of Omaha, Winchester dealer, 89, 93; at Deadwood and Miles City, 282
McDougall, Rev. John, 73
Merwin & Simpkins, of N. Y., Winchester dealer, 94
Mexican eagle, 96, 199
Miles City, Montana, 159, 182
Mills, Capt. Anson, 148
Missouri River, 68, 73; trade, 75, 187
Mitchell, Lt. William, U.S.N., 10
Miolnar Pasha, 85
Model '66, illustrated, 45, 46, 57, 65, 67, 71, 73, 74, 76, 78, 86, 89, 104-106, 137, 139, 148, 147; advertised, 59, 69, 91, 98, 99; prices, 59, 79, 85, 88, 96, 98, 110, 156, 159, 165; trials, 63, 82, 115; on frontier, 68, 76, 76; for hunting, 70-73, 75; abroad, 85-91; dealers, 93, 94; described, 94-96; serials, 99-107; variations, 102, 106; centerfire, 107
Model '73, 109, 144; described, 210, 218; variations, 116, 114; advertised, 117-149; serials, 112, 116, 118; illustrated, 67, 109, 114, 115, 148; tested, 115; prices, 120; tested, 115
Model '76, 121; prices, 121, 125; tested, 122; illustrated, 123, 127, 129-131, 140, 241, 149, 153; serials, 123, 150; variations, 123-126, 132, 140; criticized, 128, 130
Model '86, 125; illustrated, 143
Modern Cavalry, cited, 56
Moore, John P., & Sons, of N. Y., Winchester dealer, 94

Morgan, Gen. John H., C.S.A., 18
Morris, Hon. Edward Joy, 91
Morse Arms Mfg. Co. v. Winchester, 136, 139, 140
Morse, George W., inventor, 136, 139, 148
Mortise cover, 110, 124; illustrated, 109, 155
Mosby, Col. John S., C.S.A., quoted, 20
Muskets, experimental, 83, 109; introduced, 94, 118
Musselshell, Montana, 66

New Haven Arms Co., 4, 6, 12, 24, 34, 44, 85; tales, 7, 17; catalog, 28, 82
New Haven, Conn.: 5, 41, 51; directory, 58
Nez Perce Indians, 43, 68
92nd Illinois Infantry, uses Spencer, 26
North bioshera, 148
Northern Pacific R.R., 147, 148
Northwest Mounted Police, adopt Model '76 carbine, 126-131; specifications, 132
Northwest Rebellion, 130
Northwestern Transportation Co., 76
Nuevo Leon, Mexico, State of, 84

One of One Hundred, 125; illustrated, 152
One of One Thousand, 125; illustrated, 140
Ordnance, Chief of, quoted, 9, 30
Ordnance Department, 9, 31, 33, 42
Oregon R.R., 147
Oregon Trail, 66

Paine, Capt. James M., 76, 78
Palmer, Cortlandt, 5, 135
Paris agency, 84
Parliamentary Subcommittee, 82
Patents, British
  May   15, 1863 (Clark), 80
  Jan.    6, 1871 (Hughes), 108, 183
Patents, United States
  Aug.   21, 1849 (Hunt), 5
  Dec.   25, 1849 (Jennings), 5
  Feb.   14, 1854 (Smith & Wesson), 5; extended, 12
  Aug.    8, 1854 (Smith & Wesson), 9
  Jan.   22, 1856 (Smith & Wesson), 9
  Oct.   28, 1856 (Morse), 139
  March 10, 1857 (Hicks), 133, 143
  April  17, 1860 (Smith & Wesson), 9
  Oct.   16, 1860 (Henry), 8, 11, 52
  June   23, 1869 (Bell), 46, 176
  Sept.  26, 1865 (Howard), 55

Patents, United States (Cont.)
  Feb.   27, 1866 (Smith), 50, 61, 141
  Feb.   27, 1866 (Smith), 55, 61
  May   22, 1866 (King), 51, 52, 60
  Aug.   28, 1866 (King), 61, 141
  Sept.   4, 1866 (Winchester), 53-55
  Oct.   16, 1866 (Briggs), 55
  Dec.   1, 1868 (Wheelock), 112-114
  Feb.    9, 1869 (Bayes), 111
  Jan.   31, 1871 (Wheelock), 60, 108
  Oct.   20, 1874 (Winchester), 111, 112
Pawnee Scouts, use Spencer, 148
Peabody-Martini rifle, 88, 182
Perrin, Lt. Col. Hector, 7th Ill. Inf., 22
Pennocks, J. C., of Austin, agent for Sharps, 150
Peri, see Gail
Philadelphia Centennial, 121, 154
Piah, Ute Chief, 67
Plains Indians, 69, 150
Plating, 42, 106, 124
Platte Bridge, 66
Platte, Department of, 84
Plevna, sortie from, 88
Pond, Charles H., of New York, Winchester agent, 136, 182
Portland, Oregon, 56, 94
Poundmaker, Cree chief, 243
Powder River, 66
Powell, Maj. John Wesley, 73
Powell, Walter Clement, quoted, 179
Prentice, George D., of Louisville, Henry dealer, 13, 15, 17
Prices, see Henry and Models '66, '73, '76
Prout, C., of St. Paul, Henry dealer, 15

Ramsay, Gen. George D., Chief of Ordnance, quoted, 30, 14
Roy, Benjamin, stock maker, 41
Read, William, & Son, of Boston, dealer in Henry, 15, Winchester, 94
Receiver, 50, 99, 100, 115, 169
Red Cloud, Sioux Chief, 69
Red River Rebellion, 73
Reloading tools, 112; illustrated, 111
Renwick, Edward S., patent trustee, 134, 136
Renwick v. Cooper, 136
Renwick v. Pond, 136
Renwick v. Winchester Repeating Arms Co., 139-142
Reopening, Frederic, 136, 130
Remington rifle, 47, 77; 95, 182
Reminiscences of America in 1869, cited, 79

Reouf Pasha, quoted, 89
Rice, William E., & Co., of Holyoke, 41
Riel, Louis, 75
Ripley, Gen. James W., Chief of Ordnance, 9, 20, 30
Roberts, Thomas P., 73
Redmond Gildens & Co., of San Francisco, Winchester dealer, 93
Roman Nose, Cheyenne, 148
Rood, M. L., of Denver, Winchester dealer, 94
Roosevelt, Col. Theodore, 144; presentation to, 145
Roselund battle, 148
Row rifle, 130, 131
Rotherinel, Lt. James A., 8th Cav., 66
Rowett, Col. Richard, 7th Ill. Inf. 22
Royal Bavarian Armory, 81
Royal Engineers, H. M. Boundary Commission, 29
Royal George fight, 154
Russell, Charles M., 159
Russo-Turkish War, 88

Salt Lake City, 93
Salute star, 112-114
San Francisco, 15, 47, 93, 94, 119
Santa Fe R.R., 147, 152
Sarsi Indians, 126
Sawtelle's Ranch, Idaho, 82
Schinzler, Hartley & Graham, of N. Y., dealer in Henry, 15, 21, 25, Winchester, 94, 189
Scientific American, cited, 19, 57, 82
and West Virginia Mounted Infantry, 19
Selwyn, Adm. Jasper H., R.N., quoted, 89, 181
Semple, A. B., & Co., of Louisville, agent for Henry, 14, 15, 40
Serials, Henry, 39, 40, 46, 48; Model '66, 61, 99-107; Model '73, 112, 116, 118; Model '76, 123, 150
Seven-shooter, 40, 55
7th Illinois Infantry, uses Henry, 22
72nd Indiana Infantry, uses Spencer, 26
Sharps rifle, 55, 57, 77, 98, 119, 148, 152, 180; advertised, 150
Sharps Rifle Co., 98, 177
Sheridan, Gen. Philip H., presentation to, 155
Sherman, Gen. William T., 26; quoted, 147, 174
Shoshone Indians, 68
Skinker, John, of San Francisco, Winchester agent, 94, 119

Side-plates, 99, 100, 110; serials on, 101
Sights, 37, 40, 128, 132; illustrated, 36, 101, 104, 123
Sioux City, Iowa, 79
Sioux Indians, 66, 68, 69, 77, 126, 286
Sitting Bull, 126
Sixteen shooter, no. 35, 69, 75
66th Illinois Infantry, (uses Henry), 21
Slings and swivels, 40, 95, 99; illustrated, 21, 90
Smith, James D., inventor, 50, 53, 61, 141
Smith, Horace, 2, 133
Smith & Wesson, 47, 133, 140, 141; letter of, 135
Snider rifle, 55, 89, 126; illustrated, 132
Southern Pacific R.R., 147
Spanish Model '73 carbine, 115, 118; musket, 118
Spencer rifle, criticized, 9, 118; in Civil War, 20, 26, 71, 148; testimonials, 26, 28; illustrated, 26, 29, 60; compared, 28, 30, 35; advertised, 30, 36, 47; ammunition, 51, 68; trials, 35, 82; sales, 30, 36, 165; on frontier, 68-70, 77, 187; abroad, 86, 87
Spies, Kissam & Co., of N. Y., Winchester dealer, 94
Spring cover, 100, 110; illustrated, 105
Springfield Armory, 115
Springfield rifle, 115, 148, 180
Springs, main and magazine, 41
Stacey, B. J., of London, 81
Stanley, Gen. David S., 148
Stanley, Henry M., 91
Stanton, E. M., Sec't of War, presentation by, 8; quoted, 24
Stevenson, Robert Louis, quoted, 154, 189
Steward, John F., in Glen Canyon, 74
Stocks, 51, 95, 124, 126, 131, 132
Strong, Gen. William E., presentation by, 155
Sutphen, J. D. & D. C., of Omaha, Winchester dealer, 94
Swim trial at Aarau, 82

Tallens, Annie D., quoted, 79
Texas Rangers, 119, 152
Three Forks, Montana, 73
Toggle-link action, 5, 126; illustrated, 6, 11, 27, 55, 106, 117
Topence, Alexander, freighter, 66
Trials, U. S., 40, 51, 115, 122; foreign, 61, 81, 87
Turkey, Sultan of, 87

Turkish contracts, 86, 88; text, 155-159; negotiations, 160-169
12th Kentucky Cavalry, uses Henry, 17-19
23rd Illinois Infantry, 19
Tri-kal-iza, Nez Percé, 42

Union Pacific R.R., 66, 76, 93, 147, 148
United States Cavalry, 77, 115, 148
Ute Indians, 52, 67, 68

Veader, Daniel H., 160-162, 177
Venard, Stephen, presentation to, 84; 75
Vetterli rifle, 84, 181
Vizetelly, Edward H., quoted, 90
Volcanic Arms, illustrated, 4, 6; described, 7; scarcity, 58
Volcanic Repeating Arms Co., 4, 5, 50, 133, 135

Wade & Butcher, barrel blanks, 41
Walsh, John Henry, quoted, 118
Want, Edwin, presentation to, 147
Ward, Lt. A. H., 36th Inf., 66
War Department, 8, 9, 18, 19, 34, 44
Washburn & Moen, of Worcester, 41
Watson, Peter H., Ass't Sec't of War, quoted, 18
Welles, Gideon, Sec't of Navy, presentation to, 8, 10
Wells Fargo & Co., presentation by, 84; 75
Wells, Kellogg & Co., of Evansville, Henry dealer, 15
Wesson, Daniel B., 5, 133; quoted, 135
Wesson, Frank, rifle, 47, 69, 77, 93
Wheatley, James S., of Blue Springs, Nebr., 64
Wheeler & Wilson, of Bridgeport, 54
Wherlock, Luke, inventor, 60, 108, 112
Whetmore, Lt. William B., 6th Cav., presentation to, 146
Whitney Arms Co., 142
Whitney, Eli Jr., 142
Wilder, Gen. John T., of "Lightning Brigade," quoted on Spencer, 28
Williams, Judge R. K., of Paducah, 15
Williamson derringer, 54
Wilson, Gen. James H., favors Spencer, 28, 175
Wilson, Capt. James M., of 12th Ky. Cav., 17-19
Wilson, Philip, & Co., of Phila., Winchester dealer, 94

Wilson Raid, 175
Winchester, Oliver F., frontispiece; early history, 3; character, 3, 54, 108, 143; Volcanic Arms Co., 5; New Haven Arms Co., 6; quoted, 16, 17, 19, 20, 36, 42, 85, 110, 160-169, 171; at trial, 51; takes patents, 54, 85; letter to, 137; presentation by, 147
Winchester quarantine, 152
Winchester Repeating Arms Co., 57, 58; chartered, 52; catalogs, 45, 59, 82, 91, 100, 110, 151; production, 59, 61, 101, 115, 123; advertising, 59, 61, 117; price lists, 85, 96; letterheads, 151; Turkish contracts, 88, 155-159

Winchester rifle, defined, 154, 188; see also Models '66, '73, '76, '86
Winchester, William Wirt, 95, 112, 137, 139
Winchester's Smith & Wesson, 132, 143
Wind River Adventure, 68
Woolwich, England, trial at, 81

Yellow Boy, 69, 144, 150
Yellowstone Kelly, quoted, 66, 68
Yellowstone River, 148
Yeni Zafrah, action at, 89
Young, Brigham, 51
Yukon territory, 130
Yusuf Izzedin Effendi, 87



# POLICING THE SOUTHERN CITY
## New Orleans, 1805–1889

DENNIS C. ROUSEY

LOUISIANA STATE UNIVERSITY PRESS
*Baton Rouge and London*



HV 8148
N 4
R 68

1996

Copyright © 1996 by Louisiana State University Press
All rights reserved
Manufactured in the United States of America
First printing

05  04  03  02  01  00  99  98  97  96    5  4  3  2  1

Designer: Amanda McDonald Key
Typeface: Janson Text
Typesetter: Impressions Book and Journal Services, Inc.
Printer and binder: Thomson-Shore, Inc.

Portions of Chapters 1, 2, 3, 5, and 6 were first published in the articles "Cops and Guns:
Police Use of Deadly Force in Nineteenth-Century New Orleans," *American Journal of Legal
History*, XXVIII (January, 1984), 41–66, and "'Hibernian Leatherheads': Irish Cops in New
Orleans, 1830–1880," *Journal of Urban History*, X (November, 1983), 61–84, copyright ©
1983 by Sage Publications, Inc., and are reprinted by permission. Portions of Chapters 1, 4,
5, and 6 were also published in the article "Black Policemen in New Orleans During Recon-
struction," *Historian*, XLIX (February, 1987), 223–43, and are reprinted by permission.

Library of Congress Cataloging-in-Publication Data:

Rousey, Dennis Charles, 1951–
   Policing the southern city—New Orleans, 1805–1889 / Dennis C.
Rousey.
      p.  cm.
   Includes bibliographical references and index.
   ISBN 0-8071-2046-4 (cl : alk. paper)
   1. Police—Louisiana—New Orleans—History—19th century.
2. Police administration—Louisiana—New Orleans—History—19th
century.  I. Title.
HV8148.N4R68   1996
363.2'09763'3509034—dc20
                                            95-50128
                                              CIP

The paper in this book meets the guidelines for permanence and durability of the Committee
on Production Guidelines for Book Longevity of the Council on Library Resources. ∞

*For Dad, Mom, and Linda
and for BJ, Chris, Bryan, and Matthew*



sanitary company inspected 34,828 premises and investigated 7,737 complaints. Its inspections resulted in the issuance of 6,810 work orders, most of which were complied with by the owners who received them. The company also compelled the cleaning of 6,092 privies and arranged for the removal of 1,332 dead animals and 32,850 loads of "night soil." The sanitary company was dissolved as a separate unit in July, 1870, but its men were individually detailed to serve the inspectors of the newly created Board of Health and continued to operate in that capacity.[9]

The efficacy of the Metropolitan Police was also enhanced by new technology. Responding to innovations in weaponry and escalating violence against the Republican government, the Metropolitans adopted new weapons. Police commanders issued Winchester repeating rifles to their men on several occasions when they anticipated riot or battle, and in some instances the Metropolitans employed cannon and Gatling guns. Such armament did not guarantee success, but it did give the Metropolitans a rough technological parity with their opponents.[10]

The Metropolitan Police also increased their tactical mobility. For the first time since 1805–1806, a portion of the men were put on mounted service. The expense of horses had become a serious objection to the mounted Gendarmerie early in the century, but the relatively large budget of the Metropolitan Police permitted some thirty-six men (about 5 percent of the force) to be deployed on horseback during 1870, primarily in the suburban periphery of the city. In 1873, the number of mounted men increased to about seventy, and when the size of the total force was reduced, the horse patrol represented more than 10 percent of the police. In addition to horses, the police made use of boats to patrol the river, including a steam launch, and rented steamboats to carry expeditionary forces into the

9. Acts of Louisiana, 1868, pp. 91–92; Annual Report, 1868/69, pp. 38–39, 1869/70, pp. 29, 65–67, 1870/71, p. 54, 1871/72, pp. 39–40, 1872/73, pp. 49–50, 1873/74, pp. 57–58. One of the sanitary company's cases resulted in a U.S. Supreme Court decision in 1873, which interpreted the privileges and immunities clause of the Fourteenth Amendment. The Crescent City Livestock Landing and Slaughterhouse Company enjoyed a licensed monopoly in the meat market and obtained an injunction barring the sale of meat by the Cavaroc Slaughterhouse in June, 1870. The Supreme Court declined to intercede in what it construed as intrastate commerce and left the monopoly intact.
10. Daily Picayune, December 14, 1872; Republican, March 6, 1873, Stuart Omer Landry, The Battle of Liberty Place: The Overthrow of Carpet-Bag Rule in New Orleans, September 14, 1874 (New Orleans, 1955), 123, 129.

countryside. Horses and boats served the broadened scope of the police in the Metropolitan District and the state at large.[11]

During the first four years of the Metropolitan administration, the police were stronger numerically than they had been since the Know-Nothings had decreased the size of the force from about 450 to 265 men (as a ratio of policemen per 10,000 of population, from approximately 31 to 19). From 1860 through 1867, the force had remained roughly stable at about 500 or slightly less, and the police/population ratio declined slightly in that time from 30 to 28 per 10,000. The Metropolitans enjoyed a substantial increase in personnel in their early years. The police force reached its greatest size of the nineteenth century in 1870, when its ranks included 679 active duty officers and 55 support personnel (almost 36 active duty policemen per 10,000 of population).[12]

The numerical strength of the Metropolitan Police allowed the force to patrol in pairs in the most densely populated parts of the city. One-man foot patrols had been the previous rule, except for detectives and day policemen on special assignment. In the face of a more frequently hostile public, the two-man teams made considerable sense. After 1870, however, a policy of fiscal retrenchment in state government compelled the Board of Police to scale down the force, and the police/population ratio dropped considerably. By 1874 the entire organization counted only 455 men (about 24 police per 10,000 of population). Not surprisingly, the number of annual arrests peaked in 1870, falling each year thereafter.[13]

Police commanders sought to improve the job performance of their men by providing more on-the-job training and drill. Under the command of Superintendent George L. Cain and later A. S. Badger, the Metropolitans drilled regularly in military style to instill discipline. The men also received more instruction in techniques of policing than had been the practice before, and their appearance was inspected frequently and rigorously. The Civil War experiences of the superintendents and some of their men evidently provided the impetus for this approach.[14]

11. Acts of Louisiana, 1868, p. 96; Annual Report, 1869/70, p. 7, 1870/71, p. 55, 1871/72, pp. 10, 40, 1872/73, pp. 10, 30–31.
12. Annual Report, 1868/69, pp. 6, 20–21, 1869/70, pp. 9, 36–37, 1870/71, pp. 5, 18–19, 1871/72, pp. 5, 10–11, 1872/73, pp. 20–21, 1873/74, pp. 7, 17–18.
13. Annual Report, 1868/69, pp. 6, 20–21, 1869/70, pp. 9, 36–37, 1870/71, pp. 5, 18–19, 1871/72, pp. 5, 10–11, 1872/73, pp. 20–21, 1873/74, pp. 7, 17–18; Daily Picayune, August 25, 1869; see also note 20.
14. Annual Report, 1870/71, pp. 31–32.



154 / POLICING THE SOUTHERN CITY

The Metropolitans arrived too late to stop the violence, but they did arrest several whites.[59]

Almost immediately the police were pressed into service again in their capacity as the Metropolitan brigade of militia. An expedition to keep the peace in a tense racial confrontation in the town of Amite proved uneventful, perhaps because the appearance of the police was sufficient to prevent any outbreak of violence. Two weeks later, in May, 1873, some 125 Metropolitans encountered more formidable opposition in the town of St. Martinville, which also lay outside the Metropolitan District. There the police faced an organization of whites who were resisting the authority of the state government to collect taxes. For several days the Metropolitan detachment was besieged in the courthouse by the tax resisters, who numbered somewhere between four hundred and six hundred men. The skirmishing resulted in few lives lost, and the arrival of police reinforcements brought the violence to an end about a week after it had begun. Back in New Orleans, the remaining elements of the police were alerted and stationed to guard the legislature against a rumored coup. The Orleans Parish grand jury protested the use of the Metropolitan Police outside the city, asking the district court judge to have the governor and Superintendent Badger indicted for usurpation of powers not properly belonging to their offices. No indictment was forthcoming, but the police were not obliged to do service outside the district again.[60]

The uneasy truce between the police and their conservative antagonists endured for a little more than a year. It ended on September 14, 1874, in the bloodiest struggle of the Metropolitan administration, the battle of Liberty Place. Beginning at Opelousas in April, 1874, Democrats throughout the state formed local groups called White Leagues to assert white supremacy and destroy the Republican government of William Kellogg. In New Orleans an organization that had been known as the Crescent City Democratic Club in the 1868 and 1872 elections served as the nucleus in

59. *Times*, April 7, 13, 16, 1873; *Republican*, April 22, 1873; Taylor, *Louisiana Reconstructed*, 267–73; Rable, *But There Was No Peace*, 126–29. The *Times* alleged that several policemen opposed being mobilized as militia, but the *Republican* denounced that claim as a "fabrication" (*Times*, April 23, 27, 30, May 1, 1873; *Republican*, April 26, 1873).
60. *Times*, May 6–11, 1873; *Republican*, April 22, 1873. The Board of Metropolitan Police contended that the deployment of the police as a militia unit was detrimental to their role in policing the Metropolitan District and asked the legislature to repeal the Metropolitan Brigade law (*Annual Report*, 1873/74, pp. 12–13).

CRISIS OF LEGITIMACY / 155

forming the city's White League. John McEnery, regarded by Democrats as the legitimate winner of the 1872 gubernatorial race, became the statewide leader of the loosely affiliated White Leagues. The White League in New Orleans prepared for possible military action against the Kellogg administration by drilling secretly and ordering arms from outside the state. The Metropolitan Police became aware of the arms shipments and began seizing guns, some already in the city and others as they arrived by steamer, on September 8, 9, and 10.[61]

McEnery left the city, probably to protect himself against criminal charges in the likely event of a White League coup against the Kellogg regime, and his lieutenant governor, D. B. Penn, and militia commanders Frederick N. Ogden and John B. Angell prepared to seize the statehouse (the former St. Louis Hotel) and to use force if necessary to ensure that guns aboard a recently arrived steamer were unloaded and used to arm members of the White League. On September 13, the White League called for a mass rally at the Henry Clay statue on Canal Street for the following day. As a crowd of perhaps five thousand whites gathered on Canal Street on September 14, White League military units set up barricades along Poydras Street (roughly parallel to and four blocks upriver from Canal) all the way from Carondelet Street to the river (a distance of about twelve blocks).[62]

Most of the federal troops stationed in New Orleans had been sent out of the city to avoid the seasonal risk of yellow fever (an epidemic of the disease had ravaged New Orleans the previous year). To deal with the White League insurgency, the Kellogg administration could call on a force of black militiamen under the command of General James Longstreet, adjutant general of the state militia, and between five hundred and six hundred Metropolitan policemen under Superintendent Badger. With two Gatling guns and a battery of artillery, Longstreet and Badger led the Metropolitans from the Cabildo station on Jackson Square and the militia from the statehouse to Canal Street, establishing a line along Canal running about four blocks from the Custom House (at Canal and Decatur) to the levee. From the levee end of the line Badger led about half of the policemen toward the White League position, but detachments of White Leaguers

61. *Daily Picayune*, June 24, September 9–13, 1874; Taylor, *Louisiana Reconstructed*, 290–92; Rable, *But There Was No Peace*, 137–38.
62. *Daily Picayune*, September 10–13, 1874.

had sneaked onto the levee and were able to enfilade Badger's force, which received fire from its front and left flank. The Metropolitans did not make good use of their cannon and Gatling guns, and the White League fired effectively enough so that the police soon retreated, leaving Badger lying wounded in Canal Street. As the police retreated, the militia followed their example and fled. Many of the policemen threw down their guns and stripped off their uniform coats and hats. The armed forces of the White League had carried the day, losing sixteen killed and forty-five wounded to the Metropolitans' eleven killed and sixty wounded.[63]

The White League and its supporters celebrated their victory, mourned their dead, occupied the statehouse, and installed a new city police force under Chief Thomas Boylan, whose experience in law enforcement extended back to the 1850s. Their rejoicing was cut short, though, when they learned that on September 15 President Grant ordered the insurgents to lay down their arms within five days. They complied with the order, refraining as usual from direct confrontation with the federal government, and the Republican government was quickly restored. After only four days of forced retirement, the Metropolitan Police returned to duty.[64]

The battle of Liberty Place did not give Democrats control of the state and city governments, but it did vividly demonstrate the vulnerability of the Republicans and the Metropolitan Police. A few months later, in January, 1875, the Democrats attempted a legislative coup in the statehouse, using strongarm tactics but refraining from the sort of overt military action that had led President Grant to intervene on behalf of the Kellogg administration the previous September. A bloodless show of force by federal troops shored up the Republican regime once more, but the incident again showed that if the federal government failed to provide military support for the Republicans in Louisiana the Democrats might prevail. The Metropolitan Police grew weaker because financial problems forced retrench-

63. *Daily Picayune*, September 15–24, 1874; *Republican*, September 15–26, 1874; Taylor, *Louisiana Reconstructed*, 293–94; Rable, *But There Was No Peace*, 138–40; Landry, *Battle of Liberty Place*, 96–132. The number of militia under Longstreet's command is not clear; Taylor suggested three thousand, but the number near the battle certainly had to have been far fewer. Landry has estimated four hundred.

64. *Daily Picayune*, September 15–24, 1874; *Republican*, September 15–26, 1874; Taylor, *Louisiana Reconstructed*, 293–94; Rable, *But There Was No Peace*, 138–40; Landry, *Battle of Liberty Place*, 96–132.

ment and reduced the number of policemen still further, by some one hundred between 1874 and 1876.[65]

Louisiana Republicans entered the 1876 election with serious handicaps. Under Kellogg, the Republicans had relied largely on black voters, but many Louisiana African Americans believed he had appointed too many whites to political office and resented his failure to provide schools for their children. The Democratic candidate for governor, Francis T. Nicholls, had not been active in politics long enough to make many enemies, and he repeatedly assured blacks that he would protect their rights and interests. The Democrats succeeded in persuading some blacks to support Nicholls and intimidating many black and white Republicans into not voting. Both Nicholls and the Republican gubernatorial candidate, Stephen B. Packard, claimed victory, and they established rival state governments in New Orleans in January, 1877. Nicholls kept his supporters from resorting to violence, and both the lame duck president Grant and the incoming president Rutherford B. Hayes declined to intervene to support Packard. The Nicholls government gathered strength and money and spread its influence over the state, while the Packard government, barricaded in the statehouse, shrank away to nothing.[66]

The commander of the Democratic city police, Thomas Boylan, took possession of the Metropolitan Police stations and put his own force on duty on January 9, 1877. By February 1, only seventy-five Metropolitans remained at the statehouse to support the Republicans. On April 6, Packard received official word from a commission sent by Hayes to New Orleans that his administration would not be sustained by the federal government, and on April 24 the last of the U.S. troops boarded a steamer and left the city.[67]

Meanwhile, the Nicholls legislature considered a bill to return the police in New Orleans to the control of the municipal government and adopted it on March 31, 1877, after some debate. Restored to its former preeminence in law enforcement matters, the Common Council enacted an ordinance on April 26 to restructure the police. Thus ended a period of

65. Taylor, *Louisiana Reconstructed*, 304–305.
66. *Daily Picayune*, January 10, 11, 1877; *Republican*, January 10, 11, 1877; Rable, *But There Was No Peace*, 180–83; Taylor, *Louisiana Reconstructed*, 487–99.
67. *Daily Picayune*, February 1, April 25, 26, 1877.



THE

# UNITED STATES ARMY

AND

## RECONSTRUCTION

### 1865-1877

* * * * * * *

*by*

James E. Sefton

LOUISIANA STATE UNIVERSITY PRESS

BATON ROUGE



E668
S35

Copyright © 1967 by
LOUISIANA STATE UNIVERSITY PRESS

Library of Congress Catalog Card Number: 67-21377
Manufactured in the United States of America by
Thos. J. Moran's Sons, Inc.
Designed by Jules B. McKee

To
My Mother
and
the Memory of
My Father



## List of Footnote Symbols

| | |
|---|---|
| AAAG | Acting Assistant Adjutant General |
| AAG | Assistant Adjutant General |
| ADC | Aide-de-Camp |
| AG | Adjutant General |
| AGO | Office of the Adjutant General of the Army, Washington |
| BCA | Bureau of Civil Affairs |
| CG | Commanding General |
| CO | Commanding Officer |
| C/S | Chief of Staff |
| Dept | Department |
| Dist | District |
| Div | Division |
| Exec. Docs. | Executive Documents (of the House or Senate) |
| GCMO | General Court-martial Orders |
| GO | General Orders |
| HQA | Headquarters, United States Army, Washington (i.e., the headquarters of the General-in-Chief, not of the Secretary of War) |
| LC | Library of Congress (Manuscripts Division) |
| 1MD, 2MD, 3MD, 4MD, 5MD | The five military districts established in the First Reconstruction Act of March 2, 1867 |
| Misc. Docs. | Miscellaneous Documents (of the House or Senate) |
| NA | National Archives |
| PM | Provost Marshal |
| RG | Record Group (in the National Archives) |
| SO | Special Orders |
| USA | United States Army |

A word of explanation may be in order concerning citation of material in the National Archives. These records are of three basic types: original copies of letters, telegrams, and other documents, filed in correspondence boxes; retained copies of correspondence, in letterbooks; and printed broadsides of orders. Each type requires a special form of citation. For original copies of correspondence and other items filed in boxes, the "document file number" and headquarters designation are always given, e.g., "file 208B1867, 4MD." Box numbers are not needed as long as these "file" numbers are provided. For correspondence in letterbooks, the headquarters designation is given first, followed by the book number (or letter), e.g., "Dept. Ark.,

xix



xx                    *Footnote Symbols*

2," or "HQA, C." Page numbers are not necessary since letters are entered chronologically. For orders issued by field commands, the number, headquarters, and date of the order are followed by the number of the relevant volume in the AGO collection, e.g., "GO 20, Dept. Ga., Jan. 25, 1866, Orders, 278." Volume numbers are not given for orders issued at Washington since those volumes are arranged and designated by year rather than number. The last part of each reference to National Archives material is the record group number, e.g., "RG94, NA." Where one footnote contains several individual references, all of which are in the same record group, the group designation is placed at the end of the note. Where a footnote contains more than one reference of any kind, the contents of the note are arranged in the same order as the employment of the material in the text.

THE UNITED STATES ARMY
AND RECONSTRUCTION



# 1

## The First Confused Weeks

THE solemn scenes at Appomattox Court House which brought to a close four years of war launched the United States Army on another campaign—less costly in lives, with very different yet equally arduous requirements, and three times as long. In this new campaign the Army administered the national government's reconstruction policy throughout the defeated South. The Army was the only agency available, and it was ill-prepared for the task. American military history offered no precedents for the occupation of eleven states as conquered territory in time of peace.

The Army had gained some experience in military occupation and government from its efforts in Mexico under General Winfield Scott some twenty years earlier, but that situation and Southern reconstruction were fundamentally different. Mexico was a foreign country that had never been a part of the United States and was never seriously meant to become a part of it. To be sure, the exigencies of military government in Mexico led Scott to create the military commission to prosecute certain types of cases, and the military commission was of vital importance during the first five years of Southern reconstruction. But by 1865 the military commission had become a standard institution, and officers did not consciously look to 1847 for its origin.

It was also significant that of the thirty-five most important men who during the period 1865–77 held commands in the South appropriate to the rank of a general officer, seventeen either had not been in the Mexican War or had had service which did not bring them into direct contact with the problems of occupation. The lack of such personal experience was even greater among the field-grade and company offi-

5

cers who frequently commanded small posts and detachments in the South. Moreover, there is nothing to indicate that during the twelve postwar years the Adjutant General of the Army, in transmitting War Department or Executive instructions to commanders in the South, ever indicated precedents from the 1847 experience. Nor is there evidence that any of the highest field commanders noted such precedents, either in asking for guidance from Washington or in sending instructions to their subordinates.

A closer and slightly better precedent than Mexico, though still a highly imperfect one, was the experience gained in "reconstructing" parts of Louisiana, Arkansas, Tennessee, and Virginia from 1862 until the end of the war. But again, this wartime "reconstruction" was fundamentally different from that of the twelve postwar years. The existence of active military operations against hostile forces was the controlling factor during 1862-65, and the paramount goal of speedily concluding these operations eclipsed all "reconstruction" activities. Once hostilities had ended, "reconstruction" itself became the nation's main concern. Wartime "reconstruction" had affected only parts of four states; after Appomattox the entire South was involved, including considerable territory which had not been penetrated by Union troops until late in the war—Texas, western Louisiana, central Alabama, southern Georgia, most of Florida, and the interior of the Carolinas.

The government had made some attempt to provide a general guide for the policy to be followed during wartime "reconstruction" in Executive instructions to military governors and in the renowned "General Orders No. 100" of May, 1863. The latter, more descriptively titled "Instructions for the Government of the Armies of the United States in the Field," codified for military use those portions of international law governing the conduct of war and the relations of the conquering forces with the people in the occupied territory. But General Orders No. 100 and President Lincoln's instructions to the military governors were an imperfect basis for postwar occupation policy, and the Army recognized that fact. There is no evidence that after Appomattox Washington authorities or commanders in the South ever referred to these wartime guides. Nor did field commanders, in answering requests from subordinates for instructions, cite their own personal experiences in occupation duty prior to 1865.

If the actual practical experience which might have aided Army officers in their conduct of Reconstruction was slim, the constitutional and legal basis for their duties was equally unsatisfactory. The Constitution, though it anticipated the possibility of domestic insurrection, did not

anticipate the possibility of a division of the Union by secession and was naturally silent on the political problems stemming from such an attempt. Consequently all provisions concerning the governing of territories or the admission of new states were inapplicable. Unless the war powers of the Executive be considered to extend beyond the immediate termination of hostilities, little of consequence can be found in the Constitution, other than those of the first ten amendments which provide procedural legal guarantees.

Statute law also afforded little guidance, since secession had never taken place before. No federal legislation passed before the war applied directly to the Army's Reconstruction activities. Among wartime measures, only two were significant. The Habeas Corpus Act of March 3, 1863, protected officers from prosecution or civil suit for actions performed under orders of the President or his subordinates during the war and allowed the transfer of such cases from state to federal courts.[1] The other was an act passed in February, 1865, governing the use of federal troops at state elections.[2] But since Congress always denied, during the early Reconstruction period, that the Southern states were in fact states, this law did not apply until after Southern representatives again sat in Congress.

The Articles of War drafted in 1806 governed purely military offenses such as desertion or violation of orders; but martial law, which armies customarily employ for governing the inhabitants of occupied territory, was not dealt with in any federal statute. Thus martial law, which existed continuously in any given area of the South from the time Union troops first occupied the locale until the particular state was readmitted to representation—sometime between the summers of 1866 and 1870—was for practical purposes anything the commander said it was, unless higher authority overruled him.

Aside from lack of satisfactory precedent and practical experience and the amorphous state of the written law covering the situation, other general factors made the Army's task difficult. The Army itself was undergoing rapid and far-reaching change. Volunteer regiments whose members had enlisted "for the duration" were anxious to go home, and so peacetime duties would have to be performed by regular units. In any reorganization of the regular regiments, some way would have to be found of balancing postwar military need with the traditional American desire to reduce military expenditures as much as possible. Of the officers who wished to remain in the service—and who succeeded in

[1] 12 U.S. Statutes at Large 755.
[2] 13 U.S. Statutes at Large 437.

cers who frequently commanded small posts and detachments in the South. Moreover, there is nothing to indicate that during the twelve postwar years the Adjutant General of the Army, in transmitting War Department or Executive instructions to commanders in the South, ever indicated precedents from the 1847 experience. Nor is there evidence that any of the highest field commanders noted such precedents, either in asking for guidance from Washington or in sending instructions to their subordinates.

A closer and slightly better precedent than Mexico, though still a highly imperfect one, was the experience gained in "reconstructing" parts of Louisiana, Arkansas, Tennessee, and Virginia from 1862 until the end of the war. But again, this wartime "reconstruction" was fundamentally different from that of the twelve postwar years. The existence of active military operations against hostile forces was the controlling factor during 1862–65, and the paramount goal of speedily concluding these operations eclipsed all "reconstruction" activities. Once hostilities had ended, "reconstruction" itself became the nation's main concern. Wartime "reconstruction" had affected only parts of four states; after Appomattox the entire South was involved, including considerable territory which had not been penetrated by Union troops until late in the war—Texas, western Louisiana, central Alabama, southern Georgia, most of Florida, and the interior of the Carolinas.

The government had made some attempt to provide a general guide for the policy to be followed during wartime "reconstruction" in Executive instructions to military governors and in the renowned "General Orders No. 100" of May, 1863. The latter, more descriptively titled "Instructions for the Government of the Armies of the United States in the Field," codified for military use those portions of international law governing the conduct of war and the relations of the conquering forces with the people in the occupied territory. But General Orders No. 100 and President Lincoln's instructions to the military governors were an imperfect basis for postwar occupation policy, and the Army recognized that fact. There is no evidence that after Appomattox Washington authorities or commanders in the South ever referred to these wartime guides. Nor did field commanders, in answering requests from subordinates for instructions, cite their own personal experiences in occupation duty prior to 1865.

If the actual practical experience which might have aided Army officers in their conduct of Reconstruction was slim, the constitutional and legal basis for their duties was equally unsatisfactory. The Constitution, though it anticipated the possibility of domestic insurrection, did not

anticipate the possibility of a division of the Union by secession and was naturally silent on the political problems stemming from such an attempt. Consequently all provisions concerning the governing of territories or the admission of new states were inapplicable. Unless the war powers of the Executive be considered to extend beyond the immediate termination of hostilities, little of consequence can be found in the Constitution, other than those of the first ten amendments which provide procedural legal guarantees.

Statute law also afforded little guidance, since secession had never taken place before. No federal legislation passed before the war applied directly to the Army's Reconstruction activities. Among wartime measures, only two were significant. The Habeas Corpus Act of March 3, 1863, protected officers from prosecution or civil suit for actions performed under orders of the President or his subordinates during the war and allowed the transfer of such cases from state to federal courts.[1] The other was an act passed in February, 1865, governing the use of federal troops at state elections.[2] But since Congress always denied, during the early Reconstruction period, that the Southern states were in fact states, this law did not apply until after Southern representatives again sat in Congress.

The Articles of War drafted in 1806 governed purely military offenses such as desertion or violation of orders; but martial law, which armies customarily employ for governing the inhabitants of occupied territory, was not dealt with in any federal statute. Thus martial law, which existed continuously in any given area of the South from the time Union troops first occupied the locale until the particular state was readmitted to representation—sometime between the summers of 1866 and 1870—was for practical purposes anything the commander said it was, unless higher authority overruled him.

Aside from lack of satisfactory precedent and practical experience and the amorphous state of the written law covering the situation, other general factors made the Army's task difficult. The Army itself was undergoing rapid and far-reaching change. Volunteer regiments whose members had enlisted "for the duration" were anxious to go home, and so peacetime duties would have to be performed by regular units. In any reorganization of the regular regiments, some way would have to be found of balancing postwar military need with the traditional American desire to reduce military expenditures as much as possible. Of the officers who wished to remain in the service—and who succeeded in

[1] 12 U.S. Statutes at Large 755.
[2] 13 U.S. Statutes at Large 437.

getting appointments to regular regiments—many would have much preferred Indian fighting on the Plains to occupation duty in the South.

The soldiers' Southern task required calmness, patience, tact, and an ability to use wide discretion wisely. The ruthlessness, impetuosity, and aggressiveness in combat which had made generals like Philip H. Sheridan popular war heroes also made them poor choices for Southern command. A thorough knowledge of law would have saved officers considerable grief, but of the high-ranking commanders only Alfred H. Terry had studied law extensively. And when the political cannonading between President Andrew Johnson and Congress became fierce, generals on Southern duty found themselves caught in the cross fire. In 1867, several months before being sent to Atlanta himself, General George G. Meade wrote to a brother officer: "Undoubtedly one might be better off than at Omaha; at the same time, it is very easy to be worse off, and that in the service too, vide our friends in the Southern Dept. where you have not only to be a soldier, but must play the politician, a part which I am sure both to you and me would be not only difficult but disagreeable." [3] Of course, since the nature of Reconstruction policy was the subject of bitter political quarreling, and since the Army was the principal executor of the policy, the political opinions and leanings of the senior commanders were a matter of considerable importance. Ill-prepared and with some misgivings, the United States Army thus embarked on a campaign which it knew would be unpleasant and hoped would be short. In the first respect it reckoned well; in the other it was to be sadly disappointed.

In the weeks immediately after Lee's surrender one of the principal tasks of the Army was the administration of government in Southern cities and towns—a large problem after the complete collapse of Confederate authority. A typical solution was that effected in New Orleans, where the government was in the hands of loyal citizens who acted under military authority and were subject to military supervision. [4] Commanders desired to have as many local administrative posts as possible filled by civilians in order to foster better relations with the inhabitants and to spare Army officers for purely military duties. In some cities specific regulations on various subjects were deemed necessary. The commander at Little Rock, Arkansas, set up strict garbage regulations,

[3] Meade to Col. P. Regis deTrobriand, Aug. 28, 1867, in M. C. Post, *Memoirs of Count Regis deTrobriand* (New York, 1906), 347.
[4] Gen. E. R. S. Canby to Gen. Carl Schurz, Sept. 8, 1865, Dept. Gulf, 79, RG98, NA.

prohibited dogs and other animals from running at large, arrested people who used vulgar language in public, prohibited children from running about unclothed, and established speed limits for riding horses and driving carriages through the town. [5] To prevent disloyal Georgians from using the mails, the commander at Savannah was ordered to require everyone receiving mail at that city's post office to present a certificate showing he had taken the oath of allegiance. In Richmond General Henry W. Halleck went even beyond the Georgia commander by requiring Southerners who wanted to be married to take the oath of allegiance. In forwarding his order to War Secretary Edwin M. Stanton, Halleck added with typical pomposity but rare humor, "You will perceive from paragraph V that measures have been taken to prevent so far as possible the propagation of legitimate rebels." [6]

Because of unsatisfactory sanitary conditions in the larger cities, commanders had to enforce health regulations of various kinds. In Augusta, Georgia, the Army ordered streets, alleys, cellars, and outbuildings thoroughly policed and cleaned, lime thrown in the streets and gutters, and all outbuildings, sheds, fences, and tree trunks whitewashed. Unless manpower could be had by arresting vagrants, the occupants of the premises had to provide the muscles while the Army provided the foremen and the lime. In Mobile, Alabama, all "public women" had to register with the local provost marshal. [7]

The Army found it necessary to conduct or supervise the relief of the needy and destitute because local governmental agencies were entirely unable to handle it. Both whites and Negroes who could find no other means of subsistence received daily rations. The number issued reached an average of 29,000 per day in Virginia during August, 1865, and the numbers were comparable in other states. This work had an undesirable effect, however, because many persons, particularly Negroes, did not bother to look for other means of support as long as free government food was available. One commanding general even saw a political advantage in the cessation of the Army's dole. "I think," wrote General Alfred H. Terry, "that if it were announced that the issue of

[5] Thomas S. Staples, *Reconstruction in Arkansas, 1862–1874* (New York, 1923), 75–76.
[6] AAG to Gen. C. Grover, April 19, 1865, Dept. South, 15, RG98, NA; Halleck to Stanton, April 28, 1865, in *The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies* (Washington, 1880–1901), Ser. I, Vol. XLVI, Pt. 3, pp. 990–91, hereinafter cited as *Official Records*.
[7] AAG to Col. S. M. Benedict, CO Augusta, Aug. 7, 1865, Dept. Ga. 1, RG98, NA; GO 53, Dept. Gulf, May 8, 1865, Orders, 890, RG94, NA; Walter L. Fleming, *Civil War and Reconstruction in Alabama* (New York, 1905), 417.

rations to destitute whites would cease at a given day and if the views which I have given [of the desirability of thorough Unionists being elected to office] were presented to the minds of the people they would be likely to exercise a salutary influence upon the selection of members of Congress and of the legislature." [8]

Military men supervised repair work on Southern railroads. General Edward R. S. Canby had the line from Shreveport, Louisiana, to Marshall, Texas, which was held as captured property, rehabilitated and operated under the control of his quartermaster officers. The sad state of some Mississippi River levees also received attention, though Secretary of War Stanton refused Canby's request that $200,000 of the funds available from the sale of sequestered property be appropriated for the repair work. [9]

The soldiers saw the need of quickly restoring educational facilities. In eastern Virginia, schools operated by Army chaplains rapidly gained the appreciation of local residents. General Joseph R. Hawley, an early abolitionist, Connecticut politician, and journalist, took the lead in establishing schools in Wilmington, North Carolina. Some commanders were sensitive to distinctions between white and Negro children. When the commanding general at Savannah established free schools for white children, his superior, General Quincy A. Gillmore—of all Southern commanders one of the most sincerely interested in the welfare of the Negro—objected. It was unfair to Negro children, he claimed, adding that most of the whites were disloyal anyhow. This attitude brought from Savannah the reply that Negro children were better provided for by charitable organizations than were the whites. The schools stayed. [10]

Although these welfare and charitable activities were vital to the prostrate South, of much greater importance and delicacy in the long run were questions connected with the tenure of civil officials at all levels. Three courses were open. The first was to suspend completely all civil officials for an indefinite period and let Army officers perform all governmental tasks—in short, a military stewardship. The second was to permit the men who had held office under the Confederacy to continue to perform their functions, under military supervision, until elections for

[8] Terry to AAG Dept. Atlantic, Sept. 15, 1865, Dept. Va., 14, RG98, NA.
[9] C/S to Gen. J. P. Hawkins, CG West. Dist. La., Aug. 10, 1865, Dept. Gulf, 79, RG98, NA; Gen. E. D. Townsend, AAG USA, to Canby, Oct. 11, 1865, AGO, 41, RG94, NA.
[10] Lt. Col. O. L. Mann, PM East. Dist. Va., to Hawley, April 23, 1865, in Hawley Papers, LC; Gillmore to CG Savannah, May 10, 1865, in *Official Records*, Ser. I, Vol. XLVII, Pt. 3, pp. 466–67; Gen. C. Grover to AAG Dept. South, May 13, 1865, *ibid.*, 492–93.

new officials could be held. The third was to refuse to recognize any erstwhile Confederate officials, with the national government establishing "provisional" or caretaker regimes until permanent officers could be elected.

The first course, though advocated by many in the North, both in and out of political life, would have been impractical, to say nothing of its basic repugnance to many soldiers. It would have required the maintenance of a large force at considerable and unpopular cost and would have imposed upon officers duties for which they were ill-equipped. Many soldiers would have seconded the views of General Meade:

We of the Army have done our work, the military power of the rebellion is shattered. It remains for statesmen, if we have any, to bring the people of the South back to their allegiance and into the Union. How and when this will be accomplished no one can tell. In the meantime I presume our armies will have to occupy the Southern States. I am myself for conciliation as the policy most likely to effect a speedy reunion. If we are going to punish treason, as perhaps strict justice would demand, we shall have to shed almost as much blood as has already been poured out in this terrible war. These are points however for others to adjust. [11]

The idea of allowing Confederate officials to continue at their posts temporarily, though it seemed to nullify the military result of the war, received consideration in some quarters. The command of General George H. Thomas embraced Tennessee and parts of northern Georgia, Alabama, and Mississippi. Addressing a general order to the inhabitants of that area on the day before Lincoln's assassination, Thomas recommended that all judges, sheriffs, commissioners, and justices of peace continue to perform their duties according to the laws of the state as they existed prior to secession, "as far as it may be found practicable." Thomas promised them military aid and protection. Where vacancies existed, he said, "it is enjoined upon the loyal people of the neighborhood to hold regular elections and select officers competent to reorganize the civil courts, and uphold the authority of the civil laws." The order offered no criteria for "loyal people," though the mountainous regions of northern Georgia and Alabama had been among the strongest enclaves of Union sentiment in the South throughout the war.

Thomas' ideas met with mixed reactions. One Alabaman, complaining to President Johnson, expressed general faith in Thomas' loyalty but called the order "misguided" and asked that it be revoked—which it

[11] Meade to his wife, April 22, 1865, in Meade Papers, Historical Society of Pennsylvania.

was not. In Macon, Georgia, the *Daily Telegraph* hailed it as a truly liberal policy, and later castigated its readers for their seeming apathy in carrying out Thomas' suggestions.[12]

Recognition of Confederate governors and legislators raised more serious problems than recognition of lesser state officials. In several states governors who sought military permission to convene the Rebel legislatures were received coolly. Nothing came of a proposal to General Edward M. McCook by the Confederate governor of Florida that the state be brought back into the Union with all its existing officers still at their posts.[13] In Alabama many citizens signed a petition addressed to General Frederick Steele asking him to allow the governor to convene the legislature so that it could authorize a convention to be called. Steele sent the petition to Canby, the next higher commander, who in turn forwarded it to Secretary of War Stanton. In doing so Canby noted that he had received many such requests and had always replied that he lacked authority to entertain questions on the political status of the Southern states. He added that he thought the calling of a convention might be a good idea but warned that the legislature should be prohibited from doing anything else. The petition ultimately found its way to Johnson, who merely filed it.[14]

On May 10, 1865, Governor Joseph E. Brown, without asking the Army's permission, called a special session of the Georgia legislature to meet at Milledgeville on the twenty-second. Upon discovering that General James H. Wilson would not allow the legislature to meet without permission from Washington, Brown wired the President pleading that financial chaos and destitution made immediate legislative action imperative. Before Johnson could reply, General Wilson's superior, General Gillmore, sent a brigade of infantry to Milledgeville to "quietly" prevent the meeting and to detain any legislators who showed up. In explaining his action to Stanton, who approved it, Gillmore said, "I have feared that the assembling of the legislature might embarrass the future action of the Government by tending to perpetuate the political control over Georgia of men who have neither deep love for the nation nor sympathy in the national policy."[15]

[12]GO 21, Dept. Cumberland, April 13, 1865, Orders, 855, RG94, NA; Jeremiah Clemens to Johnson, April 21, 1865, in Johnson Papers, LC (Reel 13); *Macon Daily Telegraph*, May 24 and June 3, 1865.
[13]I. G. Harris to Johnson, May 21, 1865, in Johnson Papers, LC (Reel 14).
[14]Petition filed under May 1, 1865, in Johnson Papers, LC (Reel 14).
[15]Brown to Johnson, May 10, 1865, in Johnson Papers, LC (Reel 14); Gillmore to Stanton, May 10, 1865, in *Official Records*, Ser. I, Vol. XLVII, Pt. 3, p. 464, and reply, May 15, 1865, p. 505.

---

Nobody was entirely certain what the "national policy" was in May, 1865, but when finally announced it closely approximated the third of the possible courses—provisional regimes until permanent ones could be elected and installed. Before the fighting ended, and with increasing regularity during April and May, there had been much speculation concerning the course which the national government would pursue. Aside from the Wade-Davis Bill of 1864, to which Lincoln had given a pocket veto, the Congress had drawn up no formal plan of reconstruction. That body had adjourned in April, and President Johnson determined to proceed on his own authority rather than call a special session of Congress or wait until the new one convened in December.

Johnson received suggestions from politicians and ordinary citizens, from the informed and the uninformed, from the spiteful and the conciliatory. Many persons, believing that each Southern state should have a military governor, inundated Johnson's mail clerks with petitions and recommendations. From Natchez, Mississippi, came a request for General John W. Davidson, then in local command at that city. Loyal citizens of Ringgold, Georgia, stating that they could not think of a trustworthy native Georgian, asked for the colonel of the 18th Ohio, who had formerly commanded the post at Chattanooga. According to another writer who felt Georgia would do well under General William B. Hazen, one of that officer's best qualifications for the job was his pretty young wife, who kept him "free from that Rebel Petticoate [*sic*] influence so frequently and so successfully exercised over our officers in Tennessee."[16]

After some North Carolinians suggested General Innis N. Palmer, a fellow citizen objected, claiming that Palmer had fraternized with secessionists since coming to the state, that he had used his influence in New Berne in favor of the election of George B. McClellan in 1864, and that he had declared that Jefferson Davis should go unpunished. Then Palmer himself wrote to the President pleading to be spared the appointment.[17] When General Terry found out that Chief Justice Salmon P. Chase was touring the South at the President's request, he asked his chief of staff, who knew Chase, to listen for any intimation that he might be considered for military governor of North Carolina and if the idea arose, "to '*stamp upon it*' at once."[18]

[16]J. F. Hollingsworth to Johnson, May 25, 1865; W. C. Roberts, *et al.* to Johnson, May 26, 1865; and G. W. Ashburn to Johnson, April 30, 1865, all in Johnson Papers, LC (Reel 14).
[17]Petition dated April 29, 1865; J. W. Etheridge to Johnson, May 4, 1865; and Palmer to Johnson, May 30, 1865, all in Johnson Papers, LC (Reel 14).
[18]Terry to Hawley, May 6, 1865, in Hawley Papers, LC. Original emphasis.



Like Palmer and Terry, most generals preferred not to think of themselves as military governors, though there were some exceptions. General Robert H. Milroy, who had had difficulty as a field commander in the Shenandoah Valley in 1861 and was finding his current experience of a year on garrison duty at Tullahoma, Tennessee, "irksome," wanted to go to Alabama. His first choice was really to go to the Mexican border and help overawe Maximilian and the French, but if that could not be granted, the Alabama governorship would satisfy his desire for some active duty before leaving the service. He concluded (in vain), "Please try me."[19]

Making his suggestions on the installment plan, Chief Justice Chase described Southern conditions in a series of letters from various points along the Atlantic seaboard. In a letter from Hilton Head, South Carolina, written about midway through his tour, he presented a more systematic plan for restoring civil government than most of Johnson's volunteer advisors had offered. Prefacing his exposition with the firm belief that military supervision was necessary for a time, Chase explained that the mechanism of this supervision should resemble the regular state government as nearly as possible. Each state ought to be made into a separate military department with a commanding general or military governor. The commander should order a registration of loyal citizens of both races, either by provost marshals or by boards of loyal citizens in each county. Delegates would then be elected for a convention to write a new constitution or amend the old one. If the constitution were ratified by the people, a governor and other state officers should be elected. When these officers assumed their functions, the political duties of the military commander would cease, and his only remaining task would be the suppression of disorder in aid of the state authorities.

In choosing the commanders, Chase continued, care should be taken to select men completely loyal who were ready to maintain and promote the welfare of Negroes as well as whites—a revelation of one of Chase's favorite concerns. He thought that General John M. Schofield could be trusted with North Carolina. He regarded Gillmore very highly, probably because of Gillmore's concern for the Negro, and recommended him for Georgia. Rufus Saxton and John P. Hatch, he suggested, would be excellent command choices for South Carolina and Florida, respectively.[20]

Schofield himself had also been formulating a plan of reconstruction and had been in communication with Chase during the latter's tour.

[19]Milroy to Johnson, May 22, 1865, in Johnson Papers, LC (Reel 14).
[20]Chase to Johnson, May 17, 1865, in Johnson Papers, LC (Reel 14).

After receiving a letter from the Chief Justice, Schofield wrote to the General-in-Chief, Ulysses S. Grant, offering his own views. Chase was determined that Negroes should vote, and to facilitate this goal in North Carolina, he had favored basing suffrage on the state's constitution as it had stood in 1835. But Schofield demurred. Like numerous other officers, he believed the Negro population as a whole was not ready for suffrage, and he gave legal reasons for using the state constitution which was in effect immediately before the ordinance of secession.

The remaining details of Schofield's plan were similar to Chase's. He wanted all troops in the state put under the command of a military governor who would declare still in force such parts of the prewar state constitution and laws as did not conflict with federal law or Lincoln's wartime proclamations. The governor would appoint provisional sheriffs and other local officials. A registration of voters should precede an election for delegates to a state convention. Both candidates and voters would be required to take an amnesty oath and be otherwise qualified by state law—a reflection of Schofield's view that the federal government could not constitutionally prescribe state election qualifications. The convention thus selected would order an election for governor and legislators and for the ratification of its own acts. He expected this procedure to result in abolition of slavery, repudiation of secession, and restoration of normal federal-state relations. If it should fail, however, Schofield would feel that the people had violated their oaths and would consequently impose complete military government until they "should come to their senses."[21] In reply Grant agreed with Schofield's views but added that all the Army could do was to keep the peace until a uniform policy was adopted. A later note from Grant's secretary indicated that Stanton too had seen the letter and agreed with its contents. Johnson may not have known of Schofield's letter, but the Hilton Head message from Chase reached the President on May 22.[22]

Andrew Johnson spent his first six weeks in office trying to determine a policy for the defeated South. He had been a stern military governor of Tennessee during the war, and he maintained this attitude for a short time after succeeding Lincoln in the executive chair. He soon realized, however, that he could not impose total military rule on the South without abrogating Lincoln's spirit of clemency and generosity. Nor could he withdraw all military supervision without risking the return to power

[21]Chase to Schofield, May 7, 1865, in *Official Records*, Ser. I, Vol. XLVII, Pt. 3, p. 427; Schofield to Grant, May 10, 1865, *ibid.*, 461.
[22]Grant to Schofield, May 18, 1865, *ibid.*, 529; C. B. Comstock to Schofield, May 25, 1865, *ibid.*, 571.



of men who had originally favored secession in 1860. The result was a plan which in spirit resembled Lincoln's and in detail strikingly resembled the proposals of Chase and Schofield. Johnson unveiled his plan in two proclamations of May 29, 1865. In the first he offered amnesty and pardon to most persons who had aided the rebellion, provided they took an oath of future loyalty to the government.

In the other proclamation Johnson appointed William Holden provisional governor of North Carolina and directed him to proceed with registration of "loyal" citizens, election of a convention, ratification of a new state constitution or amendments to the existing one, and election of state officials and federal legislators, much as in Schofield's plan. The principal difference between the two was that Schofield envisaged the provisional governor and the military commander as being the same individual; Johnson's plan conceived the two offices to be distinct, with the governor a civilian. As for the military commander, Johnson's proclamation directed him to aid the governor in carrying out his duties and "to abstain from in any way hindering, impeding, or discouraging the loyal people from the organization of a State government as herein authorized."[23] In the following weeks proclamations similar to that for North Carolina appeared for six other Southern states; in Arkansas, Louisiana, Virginia, and Tennessee the loyal governments set up under Lincoln's guidance were recognized by his successor.

On June 27, while Johnson was still issuing his proclamations, the War Department reorganized the various military divisions and departments into which the country was divided for purposes of command and administration and shuffled the commanding generals—a procedure which occurred with irksome frequency during the next several years.[24] A month later some forty-six general officers of volunteers who were becoming supernumerary due to the rapid muster-out of the volunteer forces were ordered to the Southern departments for whatever duty the commanding generals might assign them. When War Department affairs were under discussion in the Cabinet one day shortly thereafter, Postmaster General William Dennison inquired about these new orders.

[23]James D. Richardson (comp.), *A Compilation of the Messages and Papers of the President, 1789–1897* (Washington, 1896–1901), VI, 310–14, hereinafter cited as *Messages and Papers.*
[24]Appendix A exhibits, as briefly as possible, the salient command changes during Reconstruction. An indispensable though hard-to-use guide is Raphael P. Thian (comp.), *Notes Illustrating the Military Geography of the United States* (Washington, 1881).

According to the Cabinet's indomitable diarist, Navy Secretary Gideon Welles, Stanton retorted peevishly that the question should be directed to Grant, since he himself had not given the General-in-Chief any advice on the subject. Stanton's disclaimer was probably not truthful because the preliminary drafts of the June order bear emendations in his handwriting.[25]

The largest unit of territorial command was the "military division," of which the June reorganization produced five: the Atlantic, the Gulf, the Tennessee, the Mississippi, and the Pacific. The first, embracing all the seaboard states from Maine to South Carolina, went to General George G. Meade, a West Point graduate of 1835 and the victor of Gettysburg. Rather spare, balding, and sharp-featured, "Old Snapping Turtle," as his men called him, was supposed by some of his contemporaries to have been a Democrat before the war, yet he always took pains to keep himself aloof from party politics. He favored a moderate treatment of the South and was determined to perform whatever duties he received without questioning the policies which induced them.[26]

Each of the three Southern states in Meade's command formed a separate "department." The Department of Virginia went to General Alfred H. Terry, who had attended Trinity College and Yale Law School rather than West Point. He maintained a close interest in Connecticut politics, but was without personal ambitions. His administration of Virginia affairs found favor in Republican circles. "I do not overestimate," wrote a friend of Terry's chief of staff, "when I say that among the Department Commanders, Genl. Terry holds the highest rank in public opinion for administrative capacity."[27]

The Department of South Carolina, at first intended for Terry, went instead to General Quincy Adams Gillmore, already in that state. Gillmore, a West Point graduate of 1849, was on friendly terms with Chief Justice Chase, having even enlisted his aid in 1864 to procure advance-

[25]GO 118, AGO, June 27, 1865, and GO 130, July 28, 1865, RG94, NA; Howard K. Beale (ed.), *The Diary of Gideon Welles* (New York, 1960), II, 355–56; undated draft of order on HQA stationery, filed under June 3, 1865, in Johnson Papers, LC (Reel 15); two similar drafts in Edwin M. Stanton Papers, LC, misdated by LC staff members as Dec., 1865.
[26]A handy compilation of information on the military careers of individual commanders is Mark M. Boatner, *The Civil War Dictionary* (New York, 1959). See also Francis B. Heitman, *Historical Register and Dictionary of the United States Army* (Washington, 1903). Additional data on senior officers is in *Dictionary of American Biography;* for lesser figures one must sometimes consult *The National Cyclopaedia of American Biography.*
[27]J. H. Almy to J. R. Hawley, Aug. 23, 1865, in Hawley Papers, LC.

of men who had originally favored secession in 1860. The result was a plan which in spirit resembled Lincoln's and in detail strikingly resembled the proposals of Chase and Schofield. Johnson unveiled his plan in two proclamations of May 29, 1865. In the first he offered amnesty and pardon to most persons who had aided the rebellion, provided they took an oath of future loyalty to the government.

In the other proclamation Johnson appointed William Holden provisional governor of North Carolina and directed him to proceed with registration of "loyal" citizens, election of a convention, ratification of a new state constitution or amendments to the existing one, and election of state officials and federal legislators, much as in Schofield's plan. The principal difference between the two was that Schofield envisaged the provisional governor and the military commander as being the same individual; Johnson's plan conceived the two offices to be distinct, with the governor a civilian. As for the military commander, Johnson's proclamation directed him to aid the governor in carrying out his duties and "to abstain from in any way hindering, impeding, or discouraging the loyal people from the organization of a State government as herein authorized."[23] In the following weeks proclamations similar to that for North Carolina appeared for six other Southern states; in Arkansas, Louisiana, Virginia, and Tennessee the loyal governments set up under Lincoln's guidance were recognized by his successor.

On June 27, while Johnson was still issuing his proclamations, the War Department reorganized the various military divisions and departments into which the country was divided for purposes of command and administration and shuffled the commanding generals—a procedure which occurred with irksome frequency during the next several years.[24] A month later some forty-six general officers of volunteers who were becoming supernumerary due to the rapid muster-out of the volunteer forces were ordered to the Southern departments for whatever duty the commanding generals might assign them. When War Department affairs were under discussion in the Cabinet one day shortly thereafter, Postmaster General William Dennison inquired about these new orders.

[23]James D. Richardson (comp.), *A Compilation of the Messages and Papers of the Presidents, 1789–1897* (Washington, 1896–1901), VI, 310–14, hereinafter cited as *Messages and Papers*.
[24]Appendix A exhibits, as briefly as possible, the salient command changes during Reconstruction. An indispensable though hard-to-use guide is Raphael P. Thian (comp.), *Notes Illustrating the Military Geography of the United States* (Washington, 1881).

According to the Cabinet's indomitable diarist, Navy Secretary Gideon Welles, Stanton retorted peevishly that the question should be directed to Grant, since he himself had not given the General-in-Chief any advice on the subject. Stanton's disclaimer was probably not truthful because the preliminary drafts of the June order bear emendations in his handwriting.[25]

The largest unit of territorial command was the "military division," of which the June reorganization produced five: the Atlantic, the Gulf, the Tennessee, the Mississippi, and the Pacific. The first, embracing all the seaboard states from Maine to South Carolina, went to General George G. Meade, a West Point graduate of 1835 and the victor of Gettysburg. Rather spare, balding, and sharp-featured, "Old Snapping Turtle," as his men called him, was supposed by some of his contemporaries to have been a Democrat before the war, yet he always took pains to keep himself aloof from party politics. He favored a moderate treatment of the South and was determined to perform whatever duties he received without questioning the policies which induced them.[26]

Each of the three Southern states in Meade's command formed a separate "department." The Department of Virginia went to General Alfred H. Terry, who had attended Trinity College and Yale Law School rather than West Point. He maintained a close interest in Connecticut politics, but was without personal ambitions. His administration of Virginia affairs found favor in Republican circles. "I do not overestimate," wrote a friend of Terry's chief of staff, "when I say that among the Department Commanders, Genl. Terry holds the highest rank in public opinion for administrative capacity."[27]

The Department of South Carolina, at first intended for Terry, went instead to General Quincy Adams Gillmore, already in that state. Gillmore, a West Point graduate of 1849, was on friendly terms with Chief Justice Chase, having even enlisted his aid in 1864 to procure advance-

[25]GO 118, AGO, June 27, 1865, and GO 130, July 28, 1865, RG94, NA; Howard K. Beale (ed.), *The Diary of Gideon Welles* (New York, 1960), II, 335–56; undated draft of order on HQA stationery, filed under June 3, 1865, in Johnson Papers, LC (Reel 15); two similar drafts in Edwin M. Stanton Papers, LC, misdated by LC staff members as Dec., 1865.
[26]A handy compilation of information on the military careers of individual commanders is Mark M. Boatner, *The Civil War Dictionary* (New York, 1959). See also Francis B. Heitman, *Historical Register and Dictionary of the United States Army* (Washington, 1903). Additional data on senior officers is in *Dictionary of American Biography*; for lesser figures one must sometimes consult *The National Cyclopaedia of American Biography*.
[27]J. H. Almy to J. R. Hawley, Aug. 23, 1865, in Hawley Papers, LC.



ment in the Army. Although Chase thought well of him, another observer—and of Chase's political persuasion, too—thought Gillmore a "good officer" but "not fit for the post" he then held.[28]

It was easily settled that the Department of North Carolina should go to General John M. Schofield, also a West Point man. His political views, though seldom prominently expressed, were of the "moderate Republican" variety, and his feelings towards the defeated South were similar: "The imperative need of the Southern States at the close of the war was temporary military government, and permission, under such full military protection, to reorganize their civil governments." He believed that the Negroes should be protected, but he did not favor immediate enfranchisement.[29]

Below the level of the department, the territorial divisions and their disposition were ordinarily left to the pleasure of the generals commanding the departments. At first each divided his department into two or more "districts" or "subdistricts" and placed in command of these the volunteer-force generals they had received in July. Gradually, as these officers were mustered out and the number of troops in the South was reduced, the district and subdistrict organization in many states fell by the wayside, and officers commanding local posts reported directly to the department commander.

The chief position in the Division of the Gulf, embracing the states of Florida, Mississippi, Louisiana, and Texas, went to General Philip H. Sheridan, already at New Orleans. A classmate of Schofield at the Academy, though far below him scholastically, Sheridan was a particularly belligerent cadet and required an extra year to finish the prescribed course of study. A wartime incident illustrates his temperament. Once while traveling by train he detected an army news vendor harassing some soldiers. Without asking for an explanation he came up behind the offender, took him by the back of the neck, and battered his head against the side of the coach—though he had to stand on tiptoe to do it.[30] Sheridan had built up a well-deserved reputation during the war and was a favorite of both the public and Grant. He did not think the South's problems could be solved by legislation but preferred instead to "wait and trust to a little time and the working of natural causes." [31] He pre-

[28]Gillmore to Chase, March 10, 1864, in Chase Papers, Historical Society of Pennsylvania; Francis Hawley to J. R. Hawley, Sept. 24, 1865, in Hawley Papers, LC.
[29]John M. Schofield, *Forty-Six Years in the Army* (New York, 1897), 373.
[30]W. F. G. Shanks, *Personal Recollections of Distinguished Generals* (New York, 1866), 161.
[31]Sheridan to Johnson, Nov. 29, 1865, in Johnson Papers, LC (Reel 19).

ferred a stern though not malevolent policy towards the defeated South, whereas Johnson's policy was a comparatively milder one. Still, Sheridan's convictions which never disqualified him for a Southern command had he been a man of more judicious and less irritable temperament.

General John G. Foster received command of the Department of Florida. An engineer officer, and a West Point graduate of 1846 along with such distinguished wartime commanders as George B. McClellan and "Stonewall" Jackson, Foster had held numerous commands along the Atlantic seaboard. Of undeterminable political views, he felt troops would be needed in the South for a considerable time.[32]

In a preliminary draft of the June order, the Department of Mississippi was slated for General John A. Logan; but Grant, in his own hand, crossed out Logan and wrote in "Slocum"—General Henry W. Slocum, who actually received the post. The reasons impelling Grant to make this change are a matter of speculation, but one distinct possibility exists. Logan had been a Democratic congressman before the war, and during the conflict his concern with politics exasperated Sherman to such a degree that he relieved him from command. On June 7, 1865, about the time the reorganization was in planning, Grant and Logan, by special invitation, attended a meeting arranged by New York City Democrats to show support for Johnson's reconstruction policy. During Logan's speech—Grant had contented himself with bowing in response to the crowd's cheers—the assembly acknowledged boisterously the purpose of the meeting. Logan replied: "So far as his administration has developed itself, I certainly have no fault to find with it. ['Good, Good'] What there may be to object to in the future I don't know; but if there is anything objectionable, then, as a matter of course, as the questions arise the country will have a right to decide for itself whether the President is in the right or in the wrong." [33]

Considered as a statement of American political practice Logan's remarks are unexceptionable. But Grant could still have been concerned that an officer with Logan's known penchant for politicking might not be well-suited to a Southern command. Moreover Grant had confided to a cousin in April that Johnson could understand "the wants and true interests of the country" better than anyone else.[34] Grant certainly knew

[32]Foster to AAG Div. Gulf, Dec. 11, 1865, in Sheridan Papers, LC.
[33]Undated draft, filed under June 3, 1865, in Johnson Papers, LC (Reel 15); George F. Dawson, *The Life and Services of General John A. Logan as Soldier and Statesman* (Chicago, 1887), 105–106. Original brackets.
[34]Grant to Silas A. Hudson, April 21, 1865, "Original Letters of General Grant," *Colorado Magazine,* XIV (March, 1937), 66–67.

Logan personally better than he knew Slocum; Logan's service had always been in the western theater, while Slocum had been in the Army of the Potomac until late 1863. Slocum, who had roomed with Sheridan at West Point, had led the Army of Georgia in Sherman's command at the close of the war. He did not last long in the South, however, for he resigned in September, 1865. He later became active in Democratic politics in New York.

General Edward R. S. Canby received command of the Department of Louisiana. A forty-eight-year-old Kentuckian, Canby graduated from West Point in 1839. His early action against the Confederates in New Mexico was instrumental in keeping that area (and California) for the Union. The close of the war found him in Louisiana. Sheridan soon came to doubt his administrative capacity, but Canby held various Southern commands during the early years of Reconstruction. He felt the Army's role was one of supervision rather than interference; and while he tried to keep aloof from questions of political policy, he believed the best course to be a firm but conciliatory one.[33]

The War Department entrusted the Department of Texas to General Horatio G. Wright, an engineer officer who was among the honor graduates in the Academy class of 1841. During the war he held both engineering posts and combat commands. He was chief engineer on the April, 1861, expedition to destroy the Norfolk Navy Yard, and later he commanded the VI Corps in the Army of the Potomac. He rarely expressed his political views.

The Division of the Tennessee, including the states of Kentucky, Tennessee, Georgia, and Alabama, went to General George H. Thomas, a forty-nine-year-old scholarly and distinguished Virginian. An Academy graduate of 1840, he later taught artillery and cavalry tactics there. He had earned the most complimentary of his many nicknames, "The Rock of Chickamauga," by preventing the defeat of General William S. Rosecrans' western army in September, 1863, from becoming a disaster. He was harsh on guerrillas and other marauders who infested the Tennessee area, where he served so long both during and after the war, but he favored a moderate policy towards the South as a whole. He hoped the Southern states would not be kept out of the Union for long.[36] Though many political factions sought to claim him, as they did every soldier with as illustrious a war record as Thomas', he was most taciturn and

[33]Max L. Heyman, *Prudent Soldier: A Biography of Major General E. R. S. Canby, 1817–1873* (Glendale, 1959), 271–73, 343–47.
[34]*House Reports*, 39th Cong., 1st Sess., No. 30, Pt 1, p. 110 (the report of the Joint Committee on Reconstruction).

circumspect on partisan questions. As one newspaper columnist wrote: "Thomas—'Old Steady'—is to my mind the finest soldier and citizen the Regular Army has given us. He is eminently a national man, is just, able, unbending, and endowed with great administrative abilities. In many respects he more resembles the historic George Washington than any public man now on the stage." [37]

General George Stoneman headed the Department of the Tennessee— so labeled because of the War Office's addiction to naming commands after rivers wherever possible. A New Yorker, Stoneman had been commissioned in the dragoons following his 1846 graduation from West Point and had seen extensive prewar service in the Southwest. During the war he conducted several successful large-scale cavalry raids, although one during Sherman's operations in front of Atlanta resulted in the capture of himself and seven hundred men. He was a Democrat in politics, but no charges of partisanship in his conduct of Tennessee affairs were levied against him.

Choosing a commander for the Department of Georgia posed some problems. The first man considered was youthful General James Harrison Wilson, already in command at Macon and respected in that area for his "energetic yet moderate" rule.[38] A member of the West Point class of 1860, Wilson was but twenty-eight years old at the end of the war. Renowned for his skill at mixing claret punches and other "tropical tipples," he was well-liked in the service and was a favorite of Grant. After he took over the Cavalry Bureau in 1864 his administrative rigor and financial watchfulness was found so revolutionary by the government's horse contractors that they were instrumental in his being returned to active duty with the cavalry under Sherman. That was fine with Wilson, who habitually sulked when he had no active duty to perform.

But Georgia, with Stanton's acquiescence if not at his urging, went to General James B. Steedman, besides Terry the only non-West Pointer to be given high station in the South at this time. Steedman was perhaps the most politically oriented officer initially to receive a Southern command. He had been a member of the Ohio legislature before the war and "was always a democrat of the hard-money, anti-tariff, anti-bankrupt law and anti-abolition and negro equality school, and was always the leader of what was known as the uncompromising wing of his

[37]*Army and Navy Journal*, IV (March 30, 1867), 514, as reprinted from the Worcester (Mass.) *Spy*. This article is a general analysis of the supposed political views of many leading generals.
[38]Macon *Daily Telegraph*, June 14, 1865.



party." [38] He resigned from the Army in 1866, took part regularly in the many political conventions and rallies of that year, and as a friend of Johnson remained loyal to the President throughout the difficulties with the Congress of 1867–68. Steedman weighed over two hundred pounds and in appearance was "like a hale, hearty farmer, with stout, burly form, largely made, and of great physical power and endurance." [39]

General Charles R. Woods received the Department of Alabama. His first wartime service had been as commander of the ill-fated *Star of the West* expedition to relieve Fort Sumter in April, 1861. Thereafter he campaigned exclusively in the western theater, helping to open the Mississippi and later marching to the sea with Sherman. His administration of affairs in Alabama, though it proved to be vigorous, did not bring about charges of political partisanship.

The Division of the Mississippi—principally the Great Plains but also including Arkansas—went to General William Tecumseh Sherman, senior in rank to every officer in the Army save Grant and Halleck. He was a West Point graduate of 1840 along with Thomas, Winfield Scott Hancock, and the distinguished Confederate Richard S. Ewell, all of whom he outdid scholastically. He had seen service in California during the Mexican War; following his resignation in 1853 he had dabbled in banking on the West Coast and had been the president of a military academy in Louisiana (now Louisiana State University). After action at First Bull Run, Sherman's wartime service was in the West, culminating in his famous (or infamous) march from Atlanta to the sea and north into the Carolinas. Described by one observer as "the concentrated quintessence of Yankeedom," he was tall, lean, and sinewy, with "dingy red" hair and whiskers that continually looked as though their owner were a victim of incompetent barbering. [40]

Sherman emerged from the war with a reputation and popularity second only to Grant's, and political factions constantly sought his allegiance. But all were disappointed, for whereas many generals were apolitical, Sherman was anti-political, and usually outspokenly so. "Washington is as corrupt as Hell," he wrote to his wife in May, 1865, "made so by the looseness and extravagance of war. I will avoid it as

[38] *Ibid.*, July 11, 1865; Shanks, *Recollections*, 276–88. Since the general pronounced his name as if spelled "Steadman," it is frequently thus encountered in contemporary documents, though the correct spelling is as "Steedman."
[39] Shanks, *Recollections*, 288.
[40] Boatner, *Civil War Dictionary*, 751, quoting Col. Theodore Lyman, a staff officer at Meade's headquarters; Shanks, *Recollections*, 57.

a pest house. . . ." [42] Rough language to one's wife, perhaps—but Mrs. Sherman was used to it. After capturing Savannah he wrote his brother, Senator John Sherman, "If you ever hear anybody use my name in connection with a political office, tell them you know me well enough to assure them that I would be offended by such association. I would rather be an engineer of a railroad, than President of the United States, or any political officer." [43]

Sherman's views brought disapproval from at least one newspaper commentator: "Sherman is organically wrong. He is a race-hater, and oligarchic by instinct. Though his brain may accept the issues of the war, his temperament will fight against their logical conclusions. He was a thorough Unionist, but intensely pro-slavery. He is of the same stripe still. I speak from some personal knowledge of his former opinions." [44] Perhaps Sherman was guilty as charged; he certainly did not favor Negro suffrage, which he felt was a trick "whereby politicians may manufacture just so much more pliable electioneering material." But another individual, who could speak from "personal knowledge of Sherman's former convictions" on the basis of their close association in Louisiana before the war, reminisced in 1875: "You [were] a Clay Whig (if you were of any party at all.)" [45]

Under Sherman the Department of Arkansas was commanded by General Joseph J. Reynolds, a friend of Grant, who had graduated from West Point with him in 1843 and served under him in the western theater during the war. At the end of the conflict Reynolds was already in Arkansas and was a logical choice for the command. He favored a cautious yet firm policy towards the South and believed that the former political leaders of Arkansas should not be allowed to participate in state politics until after the 1868 gubernatorial election. This goal he would have accomplished by a presidential grant of "amnesty as to all rights except the elective franchise." [46]

Except for one or two consolidations, this basic command structure remained in effect until the next major reshuffling in the summer of 1866, and these fifteen officers comprised the first group to be charged

[42] Mark A. DeWolfe Howe (ed.), *Home Letters of General Sherman* (New York, 1909), 352.
[43] Rachel Sherman Thorndike (ed.), *The Sherman Letters* (New York, 1894), 245.
[44] *Army and Navy Journal*, IV (March 30, 1867), 514, as reprinted from the Worcester (Mass.) *Spy*.
[45] Sherman to his wife, May 10, 1865, in Howe (ed.), *Home Letters*, 353; D. F. Boyd to Sherman, July 17, 1875, in W. T. Sherman Papers, LC.
[46] Reynolds to Attorney General Speed, July 5, 1865, Dept. Ark., 2, RG98, NA.

with the administration of federal reconstruction policy. Some of them—Woods, Gillmore, Slocum, Steedman—would soon fade from the picture. Others, along with comrades who in 1865 were on more traditional military duty, were to gain protracted experience with Southern problems before the end of Reconstruction.

2

## Working With (and Against)
## the Provisional Governors

JOHNSON'S spring and summer proclamations of 1865 helped both the Army and the South by outlining a step-by-step process for Southerners to follow in re-establishing civil government. But Johnson's instructions to the Army about its role were general rather than specific, and the individual commanders were left to fill in the details, as local conditions might require. Most commanding generals issued detailed instructions to their troops setting forth their conception of the proper relation of the military power to state and local governments and to individual citizens. No slate of instructions could have foreseen all aspects of the problems that were to arise in the months to follow, but the order issued by General Steedman to his Georgia command was among the most comprehensive.

The numerous provisions of Steedman's order fall into five categories. First, the general declared that upon request the Army would furnish the provisional governor or his agents any military assistance necessary for the performance of their duties. Further, the Army was not to interfere in any way with official actions of the governor: "The military authority should sustain, not assume, the functions of the civil authority except when the unsettled state of society requires such assumption, as a last resource, to preserve peace and quiet." Second, the order dealt with military arrest of civilians. The Army was to protect all citizens in their lawful rights, but "no citizen will be arrested upon the complaint of another citizen unless the accusation, supported by the oath of the complaint [*sic*] would justify the issuing of a warrant in time of peace."

Third, military aid was available to civil officers of the federal gov-



emment in performance of their duties and especially to agents of the Treasury Department who were engaged in collecting Confederate cotton. The fourth category embraced the problems of the Negro. Aid was to be given to the Freedmen's Bureau on request, and arrests could be made for an agent upon a full statement of the case. Persons arrested were to be held in military custody until they could be turned over to the civil authorities or until "duly authorized courts" could dispose of the cases. Plantation owners were not to force aged and helpless freedmen to leave their property, and able-bodied Negroes were warned not to be idle and vagrant. Finally, Steedman demanded that the troops maintain strict discipline and refrain from committing depredations upon private property. Officers were not "to obtrude upon families" but were to have social relations only with those who sought their company. Though the troops were naturally to prevent insult or indignity to the national authority, they were cautioned not to be offensive or provocative in their dealings with citizens.[1]

The first topic embraced in Steedman's order—relations between the military authorities and the provisional governments—was of paramount importance. The orderly progress of Presidential Reconstruction depended largely upon cordiality and cooperation by both sides. If the two jurisdictions worked at cross-purposes, much mischief could easily result since the civil governors had the responsibility for organizing the new government and the Army had the ability, through force or intimidation, to prevent any particular step in the process from being carried out. Naturally, civil and military authority overlapped in a number of areas: organization of local militia, administration of justice, appointment of subordinate local officials, and the rights of Negroes. But though both groups of authorities made an honest attempt to foster harmony in their relations, occasional notes of discord sounded.

One serious collision pertained to the organization of local militia in Mississippi. On August 19, 1865, Provisional Governor William L. Sharkey called upon the young men of the state, predominantly Confederate veterans, to form two companies of militia per county. He did not consult General Slocum, who would have been reluctant to approve the proclamation in any case. The general considered the existence of any such organizations not directly under federal military control to be a potential source of danger, and he was especially apprehensive of conflicts between the militia and the United States colored troops which were located in numerous garrisons throughout the state. Slocum received reports from General Peter J. Osterhaus, in the

[1]GO 4, Dept. Ga., July 14, 1865, Orders, 278, RG94, NA.

northern part of the state, protesting the governor's action. Osterhaus claimed that the outrages which gave rise to the proclamation were all Negroes; that they were probably gotten up purposely to afford an excuse for organizing militia; and that the persons responsible for them were likely to be the first ones to join the companies. Slocum therefore on August 24 prohibited the formation of militia companies. He was not unmindful of the ravages of outlaws and bandits, however, for his order also directed that any local commander receiving a report of lawlessness should send a detachment of troops to disarm everyone within ten miles of the place where the acts occurred. Anyone who refused to cooperate with the troops was to be arrested and held for trial; in addition the troops were to be quartered on his premises, and he was to be compelled to pay for their support.[2]

The matter had meanwhile received immediate attention in Washington. Two days after Sharkey's proclamation appeared, President Johnson had wired the governor advising against the formation of militia and suggesting that he call on Slocum for whatever military force was necessary to preserve order. This brought the reply that Slocum's force was too small to afford protection, included no cavalry, and contained too many colored troops who did "more harm than good when scattered throughout the country."[3]

The adequacy of Slocum's force was a matter of conjecture. Osterhaus had assured Sharkey that it was "amply sufficient" if the civil authorities cooperated with the military; but to Slocum he had complained that the governor thought "a few squads of young men, armed with fowling-pieces and the omnipresent revolvers, can suppress all irregularities, which the utmost vigilance and constant exertion of a large number of United States troops failed to suppress." In September, 1865, there were 13,873 troops in the state; and although this force was gradually being reduced, by December there were still twelve regiments of infantry (all but one of them colored) and two companies of light artillery occupying eleven central posts and numerous branches thereof.[4]

General Carl Schurz, on a tour of the South, was at Vicksburg while

[2]Osterhaus to AAG Dept. Miss., Aug. 21 and 22, 1865, in Sen. Exec. Docs., 35th Cong. 1st Sess., No. 2, pp. 102–103; GO 22, Dept. Miss., Aug. 24, Orders, 900, RG94, NA.
[3]Johnson to Sharkey, Aug. 21, 1865, and reply, Aug. 25, in Sen. Exec. Docs., 39th Cong. 1st Sess., No. 26, pp. 229–30.
[4]Osterhaus to Sharkey, Aug. 21, 1865, and to AAG Dept. Miss., Aug. 22, in Sen. Exec. Docs., 39th Cong. 1st Sess., No. 2, pp. 103–104; Monthly Return, Dept. Miss., Sept., 1865, RG94, NA; Wood to AAG Div. Tenn., Dec. 6, 1865, Dept. Miss., 2, RG98, NA.



the controversy raged, and he urged the War Department to uphold Slocum's action in the interests of preserving order. "It would at once put a stop to all vagaries on the part of Provisional Governors." [5] Sharkey in the meantime had protested to Johnson, claiming that the President had in an oral interview "distinctly stated" that the militia could be organized. The ultimate result was a directive from the War Office that Slocum rescind his order, which he did. [6]

In evaluating the President's attitude and actions, it is possible to argue that he was so intent on supporting the governments he had created that he did not mind embarrassing the Army in the process by overruling its actions. [7] A sounder analysis, however, is that he wanted to give the civil authorities every opportunity to show that they could handle their own affairs while at the same time recognizing the necessity of military supervision. For although he felt that militia would bolster the authority of the civil government and allow the number of troops in the state to be reduced—which for financial reasons the North desired anyhow—he also made it clear that the Army would "detect and suppress on the first appearance any move insurrectionary in its character" on the part of the militia. [8] Moreover Johnson supported the Army in conflicts with the civil governments over trials of civilians by military commissions. The necessity for these trials was clearly an embarrassment to Johnson's reconstruction policy, but he realized they were unavoidable when civil governments failed or refused to administer justice.

The formation of militia and similar organizations caused trouble in other states. In Florida General Foster approved Governor William Marvin's organizing of militia, but with the understanding that the 7th Infantry would be dispersed in small garrisons throughout the state to preserve order and that the militia would only be called out in a great emergency. The Army in South Carolina objected to the formation of militia on much the same grounds as had Slocum in Mississippi. [9] Since one of the principal reasons for forming such organizations

[5] Schurz to Stanton, Aug. 29, 1865, in Stanton Papers, LC.
[6] Sharkey to Johnson, Aug. 30, 1865, in *Sen. Exec. Docs.*, 39th Cong., 1st Sess., No. 26, p. 231; GO 23, Dept. Miss., Sept. 4, Orders, 900, RG94, NA.
[7] Eric L. McKitrick, *Andrew Johnson and Reconstruction* (Chicago, 1960), 192–95.
[8] Johnson to Schurz, Aug. 30, 1865, in *Sen. Exec. Docs.*, 39th Cong., 1st Sess., No. 26, p. 232.
[9] Foster to Gen. E. D. Townsend, AAG USA, Nov. 23, 1865, Dept. Fla., 6; Gillmore to AAG Div. Atlantic, Nov. 7, Dept. South, 15; Gen. D. E. Sickles to Gov. James Orr, Dec. 17, Dept. South, 46, RG98, NA.

was the fear of a Negro insurrection around Christmas—why during the holiday season was never made clear—some local curbs and judges ordered the establishment of "county patrols" to watch the Negroes. In Arkansas the commanding general outlawed such groups and judges governor agreed they were illegal. But in Tennessee, a similar force organized to "drive out desperadoes" received arms from federal stockpiles at the commanding general's direction. [10]

Generals and governors also warred over the appointment of local officials. In July, 1865, South Carolina's provisional governor, Benjamin F. Perry, issued a proclamation allowing all men who were in office when the war ended to resume their duties upon taking the amnesty oath. He did so because he felt it would be impossible to find enough new men to fill all the positions vacated and because, with the state government not yet fully reorganized, local elections would be a difficult and dangerous proceeding. But General Gillmore thought Perry had transcended his authority and consequently annulled the governor's action. [11] In Louisiana the mayoralty of New Orleans was a subject of dispute. Hugh Kennedy had received the office from General Stephen A. Hurlbut. In May Hurlbut's successor, Nathaniel P. Banks, removed Kennedy for conniving with Governor J. Madison Wells to supplant Union office-holders with rebels wherever possible and in his stead appointed an officer of the 73rd Colored Infantry. Wells and Kennedy complained to Johnson, but apparently without effect; in the June reorganization the Louisiana command went to Canby, who reinstated Kennedy without noticeable pressure from Washington. [12] General Reynolds, on the other hand, cooperated with the Arkansas Governor on appointments and arranged for the discharge of military men who became citizens of Arkansas and as such were elected or appointed to civil office. [13]

One of the most delicate political duties of the troops was their role on election day. It was clearly prudent to have military force available

[10] AAG to Gen. C. H. Morgan, CO White River Dist., Oct. 27, 1865, Dept. Ark., 2; AAG to Lt. C. F. Rockwell, Nov. 28, 1865, Div. Tenn., 33, RG98, NA.
[11] Gillmore to Gen. L. Thomas, AAG USA, Aug. 1, 1865, Dept. South, 15, RG98, NA; Gillmore to Chase, Aug. 22, in Chase Papers, Historical Society of Pennsylvania; Meade to Stanton, Aug. 28, in Stanton Papers, LC.
[12] Wells to Johnson, May 5, 1865, and Banks to Samuel Hooper and to Preston King, May 6, in Johnson Papers, LC (Reel 14); Canby to Schurz, Sept. 8, 1865, Dept. Gulf, 79, RG 98, NA.
[13] File 597A1865, AGO, and Gen. E. D. Townsend, AAG USA, to Reynolds, June 12, 1865, AGO, 40, RG94, NA.



in case of disorder, but it was desirable to avoid giving the impression of intimidating the voters. The Arkansas and Virginia commanders issued orders that illustrate the usual precautions: officers and men were strictly enjoined from approaching the actual polling places on election day unless a disturbance took place and they were called on for help by the civil authorities.[14] There is no clear evidence to show that the proximity of troops caused a different political result than the composition of the voting populace would normally have produced. In the Tennessee elections of July, 1865, for example, troops were dispatched to the areas of western and central Tennessee where conservative strength was greatest because the governor, William G. "Parson" Brownlow, feared disturbances. As a result election day was peaceful, and most of the conservative candidates won—which perturbed the good "Parson" since he had allied himself with the radicals. In at least one instance, however (Richmond, Virginia), the Army with President Johnson's sanction set aside the results of an election because too many unpardoned rebels had been elected.[15]

The administration of justice in the postwar South brought the Army more grief and headaches than almost any other aspect of its occupation experience. Four factors combined to make the problem a knotty one. The structure of the military judicial system itself was cumbersome and involved. Frequent conflicts of jurisdiction with the reopening civil courts occurred. The legal problems arising from the war were not always the easiest puzzles to unravel. Many officers had only a modicum of legal training, if that, and often this training had been confined to the law of the Articles of War. The wonder is not that some irregularities and unfortunate situations arose, but that there were not more of them.

The Army's courts were essentially of three types: the court-martial, the military commission, and the provost court.[16] The court-martial dealt with offenses committed by persons in the military service. Established by statute law and following specified rules of procedure, it tried cases arising under the Articles of War and the rules and regulations

[14] GO 93, Dept. Ark., Sept. 29, 1865, Orders, 829; GO 122, Dept. Va., Oct. 9, 1865, Orders, 983, RG94, NA.
[15] James W. Patton, *Unionism and Reconstruction in Tennessee, 1860–69* (Chapel Hill, 1934), 109–10; *Official Records*, Ser. I, Vol. XLIX, Pt. 2, p. 1093; *Harper's Weekly*, IX (Sept. 2, 1865), 547.
[16] For a general treatment of martial law and military legal systems see James G. Randall, *Constitutional Problems Under Lincoln* (Rev. ed.; Urbana, 1951), 140–85; Charles Fairman, *The Law of Martial Rule* (Chicago, 1930), esp. 197–205; and Robert S. Rankin, *When Civil Law Fails* (Durham, 1939).

of the Army. It had no jurisdiction over civilians and could not try infractions of civil law.

The military commission proceeded under rules similar to those for courts-martial, but it was not authorized by statute law. It derived its authority from the existence of martial law and from the powers of the military commander under the laws of war. It was used during the conflict to try civilians in occupied areas for military offenses or offenses against the laws of war, such as bushwhacking or guerrilla activities. It was a necessary instrument in such cases because the courts-martial could not adjudicate them and because the civil courts were not functioning.

After the cessation of hostilities the employment of the military commission continued, but with an alteration in principal function. Civilians were still tried for wartime military offenses, but the commissions were increasingly used to punish civilians for infractions of state and local laws in areas where the regular civil courts either had not yet been reestablished or refused to administer justice impartially. The Army felt that the commissions were necessary to ensure punishment of crime and that, since martial law continued after Appomattox, the legal basis for military commissions continued.

The provost court—the name derives from the Army's policemen being called provost marshals—was a peculiar institution which some commanders preferred not to use at all. It had the same source of authority as the military commission, though its jurisdiction was limited to cases of lesser degree. Its prime utility was to unburden the commissions of numerous petty criminal cases, and in this it served a desirable purpose. Whereas the rules of procedure for the military commission were fairly well standarized, those for the provost court were drawn up by the commander establishing them and often varied from one command to the next. Moreover, in some areas of the South provost courts heard minor cases involving Negroes and consequently clashed with the special courts operated by the Freedmen's Bureau.

Provost courts had been established in some commands during the war but had never been wholly satisfactory and had even incurred the displeasure of the Judge Advocate General. Before hostilities ended, General N. J. T. Dana had used them at Vicksburg and Natchez to handle various minor offenses by civilians—disobedience of military orders, charging soldiers exorbitant rates to ride on Mississippi River steamboats, and similar infractions. Unclear definition of jurisdiction led to considerable irregularity; in May, 1865, the Judge Advocate General decided the courts were illegal and Dana disbanded them. A similar fate



befell the provost court at New Berne, North Carolina, its fault having been the adjudication of civil disputes between individual citizens.[17]

The most comprehensive system of provost courts set up after the war was that of General Gillmore in South Carolina. Bearing no clear resemblance to either a military or a civil court hierarchy, it contained both "superior" and "circuit" courts which were to have concurrent jurisdiction. Appeals could be taken to the subdistrict or district commanders under whatever rules those officers cared to establish. Whether one might appeal from a superior to a circuit court, seemingly a reasonable enough procedure, was unstated. The superior courts were to have one officer as provost judge who could select one or two citizens, preferably with magisterial experience, to sit with him. The circuit courts were comprised of one member of a superior court and one or two civilians.

This involved system could try all disputes between citizens and between citizens and soldiers and all violations of orders or federal laws which did not come under the jurisdiction of other military courts. It could also try violations of Freedmen's Bureau orders, but crimes by civilians requiring greater punishment than a $100 fine or six months in jail still went to military commissions. The courts could issue process to compel the attendance of witnesses and also decrees for possession of property and payment of debts. These courts were intended to be only temporary and were gradually phased out in areas of the state where the regular civil courts resumed operations. The temporary nature of this provost court system was in fact a blessing, since the possibilities for arbitrariness and irregularity were legion.[18]

Among the various legal Gordian knots the Army sought to unravel, disputes between Southern civilians over property rights were particularly troublesome. In some of these cases the title had been in dispute even before the war, and during hostilities the property might have changed hands several times. Many such cases were made still more complicated by the property's having been captured or abandoned during the war and thus coming under control of the federal government. In some instances the United States had sold the property to third parties; in others it had held the property for use by the Army or other government agencies. Postwar attempts of the original owners to recover the

[17] GO 31, Dept. Miss., March 15, 1865, and GO 43, May 6, Orders, 900, RG94, NA; Gen. J. A. Rawlins, C/S HQA, and Col. T. S. Bowers, AAG HQA, to Schofield, May 20, 1865, in *Official Records*, Ser. I, Vol. XLVII, Pt. 3, pp. 541–42.

[18] GO 102, Dept. South, June 27, 1865, Orders, 958, RG94, NA.

property led to much confusion since the Confiscation Act of 1862 was silent on the matter of restoration. Disentangling the resulting legal snarls was not infrequently beyond the meager legal knowledge of some officers.

A particularly involved case concerned the plantation of Mrs. Patience Eustis, near Beaufort, South Carolina. She had died in May, 1860, and had left her estate to several legatees, one of whom was her stepson, F. A. Eustis. Two attorneys, whom she had appointed her executors, administered the estate until Union forces seized it in the fall of 1861 on the ground that the executors were disloyal. The Army placed Eustis in control of the land, and he worked it during the rest of the war for the benefit of the former slaves. In November, 1865, General Gillmore took the part of the dispossessed executors and restored them to control. Eustis protested and the case went to General Oliver O. Howard, head of the Freedmen's Bureau. He admitted he did not understand all the legal points, but he thought the crops and their revenues belonged properly to Eustis and the Negroes and recommended the revocation of Gillmore's order. The Judge Advocate General concurred, and Eustis regained possession. The ultimate solution of the title question was left to the federal courts.[19]

In July, 1865, General Gillmore announced a policy for such property disputes. Property was not to be restored if it had been sold to a third party after having been seized or if the owner were excepted from the provisions of Johnson's amnesty proclamation and still unpardoned. Where the Army was still temporarily using the property, the claim was to be handled by Gillmore's elaborate system of provost courts, and decisions adverse to the claimants could be appealed to his own headquarters.

Gillmore provided some basic rules for adjudication. Citing wartime instructions, he defined property as "abandoned" when its owner was absent for purposes of aiding the rebellion. "Captured" property was that taken from hostile possession by federal troops. The meaning of the term "confiscable" property caused more problems. Gillmore began simply enough: it was property subject to confiscation under the Act of July 17, 1862. Then he elaborated: "Conclusive proof of disloyalty is not needed to authorize the seizing and holding of property as confiscable, but on the other hand property cannot be seized or held on the ground that the owner may possibly be a rebel. A prima facie case of disloyalty must be made out, and if the owner has taken an oath of

[19] Files 2567M1865 and 109P1867, AGO; Townsend to Sickles, Jan. 5, 1866, AGO, 42, RG94, NA.



allegiance there must be good reason to suspect that he has taken it fraudulently, or is not within its provisions to authorize the withholding of his property." This last statement was cryptic, to say the least, and added to the general dissatisfaction with the whole provost court system.[20]

A safer and clearer policy concerning property rights than Gillmore's was that of General Canby in Louisiana. Referring to a specific claim, he held that the title to abandoned property automatically passed from the owner by the act of abandonment and that the claimant could only be reinstated by "executive remission" or through the United States Court of Claims. Canby thought the authority had not been delegated to subordinate officers of the War or Treasury departments and that his only function was to see that the property did not pass from the control of the government until proper authority had released it.[21]

In Tennessee, even though General Thomas returned property to the owner as soon as the Army had finished using it for military purposes, he still found himself engulfed by petitions not only for restoration but also for the payment of rent for the government's use of the property. The most troublesome individuals were disloyal owners who abandoned their property to serve in the Confederate forces or otherwise aid in the rebellion. When these persons could not get their way with Thomas they sometimes appealed to President Johnson himself.[22]

Vexatious situations arose from actions of the Confederate government or from wartime transactions based on Confederate currency. Shortly after the war ended General Halleck set up a special court of arbitration in Richmond to decide cases of property rights and debts where the contract involved Confederate money. This court was not to decide on property *titles*, but simply on rights of possession—provided the court's personnel could distinguish between the two—and its rulings were no bar to future legal action in civil courts. Perhaps fortunately, this court had a short life, for the civil tribunals soon reopened. But Virginia courts were notoriously slow in rendering verdicts—eighteen months in some instances—and General Terry disliked the injustice of these delays. He therefore extended over the whole state the jurisdiction of the city of Richmond's Court of Conciliation, so that it could decide cases of property belonging to Union men which had been seized under the Rebel Confiscation Act and sold. Proceedings in

[20]Gillmore to Gen. J. P. Hatch, CO Charleston, July 3, 1865, and to Capt. Lewis Reed, Provost Judge, July 29, Dept. South, 15, RG98, NA.
[21]Canby to Gov. of La., Aug. 5, 1865, Dept. Gulf, 79, RG98, NA.
[22]Thomas to Johnson, Aug. 26, 1865, Div. Tenn., 33, RG98, NA.

this court were summary and inexpensive compared to those in the regular state courts.[23]

The President finally took a hand in the matter of property rights, and in September, 1865, he had the War Department put a stop to most of the irregularities: "Military officers have no authority to interfere in any way in questions of sale or contracts of any kind between individuals or to decide any question of property between them without special instructions from this Department authorizing their action, and the usurpation of such power will be treated as a grave military offense." Johnson's edict seems to have been prompted by the case of an officer in Georgia trying to decide a dispute over 10,000 bales of cotton.[24]

The caution which General Steedman displayed in his guide concerning military arrest of civilians was typical of other commanders. Thomas had previously issued similar instructions in Tennessee, and Steedman's order was in fact closely modeled on that of Thomas.[25] This caution reflected not only the Army's general desire to leave as much as possible to the civil governments, but also the practical difficulty of finding sufficient competent officers to sit on a large number of military commissions. The generals' cautiousness did not mean, however, that they would sit quietly and see crime go unpunished. After all of the organized rebel armies had surrendered, anyone still remaining in arms against the government was subject to military trial as a guerrilla. Grant issued orders to this effect to the entire Army, and local commanders enforced them.[26] Military commissions also continued sentencing people to death for acts of guerrilla warfare committed before hostilities ended.[27]

The Army was especially concerned, too, about theft of government property. In September, 1865, an order from General Woods threatened Alabamans who stole government livestock with military trial and punishment as great as that provided by state law. A case the following month resulted in a sentence of four years at hard labor. In a

[23]GO 5, Div. the James, May 3, 1865, in *Official Records*, Ser. I, Vol. XLVI, Pt. 3, pp. 1074–75; GO 114, Dept. Va., Sept. 21, 1865, Orders, 983, RG94, NA; Terry to AAG Div. Atlantic, Oct. 2, 1865, Dept. Va., 14, RG98, NA.
[24]SO 503, AGO, Sept. 19, 1865, RG94, NA; GO 15, Dept. Ga., Sept. 20, Orders, 278, RG94, NA; *Army and Navy Journal*, III (Oct. 7, 1865), 99.
[25]GO 27, Dept. Cumberland, May 2, 1865, Orders, 955, RG94, NA.
[26]GO 90, AGO, May 11, 1865, RG94, NA; C/S to Gen. J. A. Mower, CG East. Dist. Tex., July 22, 1865, Dept. Gulf, 79, RG98, NA.
[27]GO 12, Dept. Tenn., Sept. 30, 1865, and GO 22, Dec. 22, Orders, 969, RG94, NA. Both trials took place in July.



similar case in Mississippi Johnson himself ordered a military trial.[28] Capital crimes such as murder and assault also claimed the Army's attention. In Arkansas a man accused of assault with intent to commit murder received the death penalty, but the commanding general in reviewing the case mitigated the sentence to ten years at hard labor. A Georgian was hanged for the murder of a Negro woman, both General Steedman and the President having approved the sentence. From Alabama, where the federal district court was not yet fully operational, came a request for permission, which Johnson gave, to try by military commission a man engaged in kidnaping Negroes and selling them into slavery in Cuba.[29]

Serious crimes by Negroes were not tolerated either. A Mississippi Negro received one year at hard labor on the Dry Tortugas for the attempted rape of a white woman. In Georgia a Negro was hanged for the murder of a white man, neither the commanding general nor the President seeing any reason to mitigate the sentence. And in the same state a Negro cook who failed to achieve her aim in serving her employer a special delicacy—butter flavored with strychnine—went to Fort Pulaski for one year, though the original sentence had been for three.[30]

In its administration of justice the Army had to work closely with civil officials. The soldiers sought to protect themselves and to minimize difficulty by issuing general instructions periodically and by asking higher headquarters for advice in doubtful cases. When acting to preserve order where the local authorities either could not or would not, troops in Mississippi were to go forth under the command of a "discreet" officer bearing written instructions "designating minutely, in every particular," what was to be done. The officer was to furnish a "minute written report" to higher headquarters.[31] Fairly typical were the directions sent to a young post commander in Tennessee: take a small detachment and go with the county sheriff to arrest a gang of outlaws; if the sheriff is reluctant to make the arrests, report him to headquarters. "You will consider your detachment simply as the Sheriff's posse, to be obedient to his requests and orders and those of his authorized

[28]GO 30, Dept. Ala., Sept. 4, 1865, and GO 1, Jan. 5, 1866, Orders, 815; Files 774G1865, 2227M1865, and 2250M1865, AGO; Townsend to Slocum, Aug. 21, 1865, AGO, 45, RG94, NA.

[29]GO 96, Dept. Ark., Oct. 3, 1865, Orders, 829; GO 32, Dept. Ga., Dec. 22, 1865, Orders, 278; Woods to Stanton, Dec. 9, 1865, file 1348A1865, AGO; Townsend to Woods, Jan. 4, 1866, AGO, 42, RG94, NA.

[30]GCMO 10, Dept. Miss., Sept. 28, 1865, Orders, 900; GO 14, Dept. Ga., March 12, 1866, and GO 27, Dec. 4, 1865, Orders, 278, RG94, NA.

[31]GO 36, Dept. Miss., Nov. 24, 1865, Orders, 900, RG94, NA.

---

deputies." Other generals sometimes gave the detachment commanders more discretion.[32]

On the whole the Army desired harmonious relations with the local authorities, but at times an overzealous officer or an indolent or incompetent civil official precipitated a conflict. The number of these civil-military clashes increased as more of the civil courts reopened. General Thomas H. Ruger, a subordinate commander in North Carolina, arrested three civilians for assaulting a Negro and held them for military trial. Provisional Governor Holden claimed the civil authorities could properly to try the case and were willing to do so. But Ruger refused to remand the prisoners. He felt the state had not yet been fully restored and that preservation of order and punishment of crime were matters for the Army to handle.[33]

A more serious conflict arose in Mississippi. On July 4, 1865, a white man, Joseph L. Jackson, shot and killed a Negro. General Slocum had him arrested and brought to Vicksburg for trial before a military commission. Jackson appealed to Daniel Merwin, a local judge appointed by the governor, for a writ of habeas corpus. The judge issued it, but Slocum refused to comply, holding that Mississippi was still under martial law and that the state laws gave greater protection to whites than to Negroes. He also arrested Judge Merwin for issuing the writ. On the twentieth Merwin appealed to Governor Sharkey; the general's action, he said, was a "violent and strong-handed injustice" to him personally and also "a blow by the mailed hand of military power against the civil authority in the exercise of its most valued and hitherto most respected function."

Sharkey in turn appealed to the President through Secretary of State William H. Seward. He claimed that the state laws provided the same punishment for murdering a Negro as for murdering a white man and that even if martial law had existed in Mississippi previously—which fact he had never heard of—the President's proclamation establishing a provisional government had removed it. On the twenty-fourth the wires carried Seward's reply: "The President sees no reason to interfere with General Slocum's proceedings. The government of the State will be provisional only until the civil authorities shall be restored, with the approval of Congress. Meanwhile military authority cannot be withdrawn." [34]

More appeals from Sharkey dragged the case on into August. Seward

[32]AAG to Lt John Carter, Sept. 4 and 5, 1865, Div. Tenn., 33, RG98, NA.

[33]Army and Navy Journal, III (Sept. 2, 1865), 24.

[34]Correspondence in Sen. Exec. Docs., 39th Cong., 1st Sess., No. 26, pp. 55-60.



finally asked Attorney General James Speed for a legal opinion on the relative power of the civil and military jurisdictions. Speed narrowly construed the powers of the provisional governors, stating, "There are now no legal and constitutional administrative functionaries of government in Mississippi except the Army." Navy Secretary Welles noted some disagreement between Johnson and Speed when this opinion was undergoing discussion in Cabinet, but the President finally told Seward to wire Sharkey that it was still inexpedient to restore the privilege of the writ of habeas corpus. That ended that.[35]

Relations between governors and generals were not always stormy, though. In South Carolina General Gillmore and Governor Perry compromised on the court problem with the assistance of Gillmore's superior, General Meade. Jointly announced in a September proclamation and general order, the new policy was that the provost courts were to have exclusive jurisdiction of all cases involving Negroes, and that state courts under state law should hear other cases. Civil magistrates could make whatever arrests were necessary to apprehend criminals, but any Negroes arrested were to be remanded to military custody.[36]

The Army also had to work in close cooperation with federal civil officers, of whom the most important were agents of the Treasury Department and the personnel of the gradually reopening federal courts. After hostilities ended, treasury agents scoured the South collecting cotton which had been the property of the Confederate government and hence was subject to seizure by the United States. They then shipped this cotton to designated agents in Northern cities for disposal. In this work they had to rely on the Army for protection.

In June, 1865, General Grant wired commanders in the South that in their efforts to seize holdings of the Confederate government they should be careful not to endanger private property, and that they should aid the treasury agents in protecting and bringing to market cotton already in federal possession. Grant's message touched the most delicate questions of all in the cotton chaos, those of titles and ownership. *Did a particular lot of cotton actually belong to the Confederate government, or was it really private property?* Some local commanders tried to decide such matters, though higher headquarters frowned on the practice.[37] General Canby became so disgusted with the administration

[35]Correspondence *ibid.*, 60; 11 Opinions of Attorneys General 322–26; Beale (ed.), *Diary of Gideon Welles*, II, 366–67.
[36]*Army and Navy Journal*, III (Sept. 16, 1865), 49, 61.
[37]Grant to Sheridan, June 26, 1865, in Daniel O. Drennan Papers, LC; GO 7, Dept. Miss., July 31, 1865, Orders, 900, RG94, NA; AAAG to CO Macon, Miss., July 8, 1865, and to CO Enterprise, Miss., Sept. 1, 1865, 4MD, 85, RG98, NA.

of the cotton question in Louisiana that he telegraphed Stanton recommending that the government give up the whole idea and simply relinquish the property to the original holders. In return for this concession he advocated a tax of $5.00 per bale on all cotton brought to market. But the collectors stalked through the land well into 1866.[38]

Opportunities for fraud and corruption abounded. Railroad conductors deliberately tampered with manifests, and carloads of cotton got mysteriously sidetracked. Steamboat captains made unscheduled stops at private docks. Treasury agents themselves perpetrated many of these frauds, and in consequence the Army had to guard not only the agents against irate Southerners but also the government against its dishonest employees. Numerous complaints about irregularities reached Treasury Secretary Hugh McCulloch, who enlisted the Army's aid to stop the abuse. He informed General Reynolds in Arkansas that any agents who took cotton which they could not prove was Confederate property overstepped their authority, and he asked Reynolds to do what he could to stop such theft. McCulloch also directed customs officers to assume the duties of receiving property in certain cases.[39]

General Woods was especially vigilant in ferreting out shady deals by Alabama cotton agents. In October, 1865, he ordered a military commission to try Thomas J. Carver for fraud. During August and September Carver, the agent for Choctaw County, had conspired with a private citizen to buy 227 bales of government cotton for himself at a price far below the market value. He was found guilty, fined $90,000, and sentenced to hard labor for one year and until the fine was paid. Woods, convinced that Carver was "the tool of more designing parties," remitted the imprisonment in consideration of Carver's advanced age and the fact that he gave evidence implicating numerous others. Woods was sure that more than 50,000 bales of government cotton had been stolen in Alabama and shipped out of the state or moved about from place to place so that all trace of it had disappeared. The Carver case furnished his first clues.[40]

Perhaps the most spectacular episode in the whole cotton drama was the case of T. C. A. Dexter, which the Carver prosecution had brought to light. On November 13 Woods convened a military commission to

[38]Canby to Sec. War, Aug. 12, 1865, Dept. Gulf, 79, RG98, NA. *Sen. Exec. Docs.*, 43rd Cong., 2nd Sess., No. 23, contains statistics on all cotton collected.
[39]Reynolds to CO Ouachita Dist., Dec. 16, 1865, Dept. Ark., 2; C/S to Gen. J. A. Mower, CG East. Dist. Tex., July 22, 1865, Dept. Gulf, 79, RG98, NA.
[40]GO 55, Dept. Ala., Oct. 30, 1865, Orders, 815, RG94, NA; Woods to Gen. L. Thomas, AG USA, Nov. 9, and to McCulloch, Nov. 10, Dept. Ala., 1, RG98, NA.