ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG**<br><br>**VOLUME 5 OF 11**<br><br>Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

**INDEX**

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867). | 18 n.17 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A. | 55 n.79 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 55 n.79 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 49 n.69 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 13 n.15 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 17 n.16 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 33 n.41 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 34 n.44, 54 n.78 | 0039-0041 |
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |

2

| | | |
|---|---|---|
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 31 n.34 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 177-202, 353-68. | *passim* | 0060-0096 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 31 n.34 & n. 35 | 0097-0104 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 20 n.22 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 9 n.3, 13 n.14, 25 n.26 | 0109-0217 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 40 n.53, 43 n.55 | 0218-0222 |
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 18 n.17, 20 n.21 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 18 n.19 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 19 n.20, 36 n.47, 40 n.53 | 0360-0397 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 28 n.29 | 0398-0424 |

3

| | | |
|---|---|---|
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 45 n.59 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 21 n.23, 25 n.25 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 45 n.59 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 10 n.9, 27 n.28, 30 n.33 | 0453-0464 |
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 36 n.47, 38 n.50, 39 n.51 & 52, 47 n.64 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 34 n.44 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 52 n.75 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 18 n.18 | 0489-0495 |

| | | |
|---|---|---|
| Allan Robert Purcell, "*The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 19 n.20 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 55 n.79 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 46 n.60 | 0563-0584 |
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 19 n.20 | 0585-0598 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana,for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 53 n.77 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 12 n.12, & 13 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 47 n.63 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 48 n.68 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 | 49 n.70 | 0620- |

5

| | | |
|---|---|---|
| "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | | 0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 48 n.67 | 0622-0627 |
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 12 n.13 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 28 n.30 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 24 n.24 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:211-12. | 17 n.16 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 47 n.62 | 0653-0656 |

6

| NEWS ARTICLES | | |
|---|---|---|
| Army and Navy Journal, June 1, 1867, p. 350 | 29 n.32 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 27 n.27 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 37 n.49 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 2 | 56 n.61 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 32 n.37 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 32 n.38 | 0666 |
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 49 n.72 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 44 n.56 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.31 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 25 n.26 | 0679 |
| New Orleans Republican, June 1, 1873, p. 1 | 40 n.53, 42 n.54 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 46 n.61 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 32 n.40 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 33 n.42 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p. 1. | 42 n.54 | 0688 |

| | | |
|---|---|---|
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 34 n.43 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 45 n.58 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 35 n.46 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 44 n.57 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 37 n.48 | 0695 |
| *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4). | 27 n.27 | 0696 |
| **OTHER SOURCES** | | |
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 34 n.45 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 25 n.26 | 0701-0702 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 26 n.26 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 26 n.26 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 51 n.73 | 0716-0727 |

8





## Left page

### 40   FROM APPOMATTOX TO THE RECONSTRUCTION ACTS

try Dexter on two charges: defrauding the government, in that he had appropriated for his own use 3,426 bales of government cotton, and malfeasance in office, in that he had sold a subordinate position to a friend for $25,000. On the twenty-second, after the commission began the case, Dexter appealed to a newly-arrived federal carpetbagger judge, Richard Busteed, for a writ of habeas corpus. Busteed issued the writ, but Woods refused to comply, stating that Dexter was held by order of President Johnson and General Thomas and that the privilege of the writ had not been restored in Alabama. The next day Busteed ordered Woods arrested for disobeying the writ and ordered the commission to stop its proceedings. Since the general declined to be arrested and the judge had no physical force to compel it, the latter was stymied. An appeal to Johnson brought presidential approval of Woods's course, and the commission continued without interruption. On February 17, 1866, came the announcement of the judgment—and what a judgment: $250,000 fine, imprisonment for one year and until the fine was paid, and permanent disqualification from holding any office of honor, trust, or profit under the United States.[41] This was apparently the only instance during Reconstruction in which the sentence of a military commission included a political disability.

But the Dexter case did not rest there. Before announcement of the findings, the War Office had directed Woods to suspend the execution of whatever sentence the commission imposed until the Judge Advocate General could review the case. The review was a slow process, and in the meanwhile Busteed made another unsuccessful attempt to make the blue tunic bow to the black robe. Late in March Dexter filed a damage suit for $500,000 against Woods and the members of the commission, and the War Department promptly hired civilian counsel to defend them. The case was postponed, however, and on April 14 Woods turned Dexter over to the federal court in compliance with instructions from Washington.[42]

General Woods had displayed a commendable zeal in trapping miscreants, though at the same time a censurable lack of faith in the regular federal courts. He claimed that the military commission had begun

[41]GO 8, Dept. Ala., Feb. 17, 1866, Orders, 815, RG94, NA; copy of writ, Woods's return, and Court Clerk's briefs, Dec. 22–23, 1865, and Woods to Stanton, Dec. 13, Dept. Ala., 1, RG98, NA; *Army and Navy Journal*, III (Dec. 2, 9, and 23, 1865), 225, 242, 278.

[42]Townsend to Woods, Feb. 10, 1866, and to Henry Stansbury [Stanbury?], March 30, 1866, AGO, 42, RG94, NA; Woods to Gen. L. Thomas, AG USA, Feb. 19, 1866, and to McCulloch, April 15, and an undated response to a writ entered under April 9, 1866, Dept. Ala., 1, RG98, NA.

## Right page

### Working With (and Against) the Provisional Governors   41

*before* Busteed arrived in Alabama to establish his court, which may have been true. Yet in December, 1865, Woods requested permission to try federal offenses by military commission, claiming that the district court was not yet established and ready to handle cases, even though the judge was clearly in the state and firing writs at the general by mid-November. On the other hand, Busteed's motives are hard to fathom, especially in view of his Janus-like course with respect to reconstruction in 1867–68. Public sentiment in Alabama was on his side in the dispute, though this probably reflected a general desire to have the civil authorities deal with such affairs rather than any personal approval of Busteed, who seems to have been as notorious a scamp as Dexter himself.[43]

In addition to maintaining a close watch on miscreant treasury agents the Army was even directed on occasion to investigate federal courts themselves. In June, 1865, the War Department ordered a military inquiry into the Florida court. Irregularities had been complained of in certain prize and confiscation cases, and the investigating officer was expected to review the character and loyalty of the judge and marshal, the procedural rules of the court, the completeness of the evidence presented, *and the propriety of the judgments*. Nothing ever came of the incident, however, and it was indeed fortunate that such singular labors were not given to the Army as a regular matter of course.[44]

Even though conflicts with federal courts did arise on occasion, the generals nonetheless saw the need for speedy reestablishment of the courts and urged Washington to take the necessary steps. As the Texas commander put it: "Cases are constantly arising which are properly referrable to the District U.S. Court, and which call for prompt adjustment; and as they often involve nice points of law, I have not the means for properly deciding them, even if I conceived myself authorized to entertain them."[45]

Emancipation created a critical social and economic problem for the South and a different though equally serious one for the Army. In the spring of 1865 Congress formed the Bureau of Refugees, Freedmen, and Abandoned Lands, primarily to protect the interests of former slaves. It was a bureau of the War Department and its head was a regular Army officer, General Oliver Otis Howard. The existence of this bureau did not relieve the occupation forces from concern with the Negro;

[43]Fleming, *Alabama*, 413–14.

[44]Gillmore to Gen. I. Vogdes, CG Dist. Fla., June 22, 1865, Dept. South, 15, RG98, NA.

[45]Gen. H. G. Wright to AAG Div. Gulf, Nov. 20, 1865, in Sheridan Papers, LC.

indeed, it made the Army's task rather more difficult for three reasons. First, the organization and operation of the bureau at its lowest local level were slow in being perfected. Second, conflicts of jurisdiction among the bureau, the occupation forces, and the civil governments often occurred; and the local agents of the bureau were sometimes civilians, sometimes Army officers. Third, the natural dislike of many white Southerners for the bureau also manifested itself against the occupation forces since they were, in fact, the only power with which the bureau could enforce its policies.[46]

Freedom and the end of hostilities had a mischievous psychological effect on some Negroes, who wandered about from place to place, congregated around military posts, and generally thought ill of having to work for a living, if indeed they understood the practical necessity of doing so. In the weeks immediately after Appomattox, whites feared the Negroes would form gangs to loot and pillage, which did occur in some places. From the upper reaches of the Cape Fear River one North Carolinian asked for military protection after an armed gang of Negroes, claiming vaguely to be acting "under orders"—whose orders they did not say—raided his house. "They said their object and business was to examine papers, secure arms, get forage, drive Negroes off from the farms, and rectify the country, generally."[47]

Though turbulence on the part of the Negroes was not widespread, the Army still felt that prudent restrictions on their actions would speed the return of order to society. In eastern Virginia General George H. Gordon proclaimed that the Negro "must earn his own bread by the sweat of his own brow" and warned, "For the idle and lazy vagabond the penitentiary is provided, where compulsory labor lessens expense." General Francis Herron ordered the Negroes of northern Louisiana to stay on their former plantations and get the crops in, threatening to arrest and punish those found wandering about. He also forbade steamboats on the Red River to haul freedmen who could not show military passes. Other local commanders also took steps to prevent vagrancy and idleness.[48]

The Freedmen's Bureau made comparable regulations, and when

[46]The most recent and thorough treatment of the bureau is George Bentley, *A History of the Freedmen's Bureau* (Philadelphia, 1955). It should be supplemented by John A. Carpenter, *Sword and Olive Branch* (Pittsburg, 1964), a biography of General Howard.

[47]J. F. Oliver to Hawley, May 15, 1865, in Hawley Papers, LC. Original emphasis.

[48]*Army and Navy Journal*, II (May 20, 1865), 615; *Official Records*, Ser. I, Vol. XLVII, Pt. 2, pp. 854–55, and Vol. XLIX, Pt. 2, pp. 916, 1043–44.

some of the legislatures elected under the auspices of the Johnson governments met they too passed laws of similar nature—the Black Codes. Though on some subjects the latter were harsher than the military decrees, there is a remarkable similarity in the measures of the Army, the bureau, and the states which highlights the magnitude of the problem and makes passage of the Black Codes more understandable.[49]

These restrictive measures did not quiet public fears, however, and rumors of a Negro insurrection planned around Christmas time were heard with increasing frequency as the year wore on. In western Tennessee concern became so great that two white regiments, the 11th Missouri and 12th Iowa, had to be brought in from other parts of the state to offset possible danger caused by the presence of colored troops. In other states the newly-formed militia companies sought to disarm Negroes, an action which Army commanders disapproved. When asked about this matter with regard to Mississippi, President Johnson decided that only the Army had authority to disarm anybody, and that if the Army had to do so at all, it should disarm all troublemakers of whatever color.[50] In Louisiana, General Canby at Grant's direction forbade colored soldiers who were being discharged from the Army to purchase their arms.[51] This deviation from the standard practice can only be explained as a precaution to avert apprehended bloodshed.

Generals, bureau officials, and state legislators alike realized that the restoration of a stable economy required a reliable labor supply. The disinclination of some Negroes to work, induced by the tenacious belief that free lands would be given them at the end of 1865, and the bewilderment of some with their new freedom, which some planters used to the Negroes' disadvantage, proved major stumbling blocks to the solution of the problem. Army and bureau urged the Negroes to make written contracts with their employers, and one of the bureau's prime functions was to approve and supervise the execution of these pacts.

[49]A convenient if selective compilation of the bureau's circulars is *House Exec. Docs.*, 39th Cong., 1st Sess., No. 70. Similar works for the Black Codes are *Sen. Exec. Docs.*, 39th Cong., 2nd Sess., No. 6, pp. 170–230, and Walter L. Fleming, *Documentary History of Reconstruction* (Cleveland, 1906), I, 244–310. I first noticed the similarity among Army orders, bureau circulars, and the Black Codes several years ago in an unpublished seminar paper. More recently the same point has been made by Theodore B. Wilson in his study, *The Black Codes of the South* (University, Ala., 1965).

[50]AAG to Gen. J. E. Smith, CG Dist. West. Tenn., Dec. 26, 1865, Div. Tenn., 33, RG98, NA; Gen. T. J. Wood to Gov. B. G. Humphreys, Nov. 28, 1865, and Dec. 20, 1865, Dept. Miss., 2, RG98, NA.

[51]Gen. J. A. Rawlins, C/S HQA, to Sheridan, Oct. 26, 1865, in Drennan Papers, LC.



44    FROM APPOMATTOX TO THE RECONSTRUCTION ACTS

But the contract system did not always work well due to frequent violations, by design on the part of unscrupulous employers and by ignorance or laziness on the part of the Negroes. In some areas Negroes would only work on the crops themselves, neglecting ditches, fences, and outbuildings.

From time to time officers suggested other approaches, though none seemed to work with complete success. In Virginia General Terry considered a "peasant proprietor" system, wherein competent freedmen would be settled on abandoned land under bureau control with the understanding that through industry and frugality they could ultimately become owners. Terry also believed that working for a share of the crop was better than working for wages since the Negro had little concept of the value of money and would be more productive if he were paid in kind.[52] Bureau circulars and state Black Codes also sought to improve the situation. Although progress with many aspects of the Negro's elevation from slavery to freedom seemed slow, officers like General Canby realized that Southern society could not be transformed suddenly:

It is scarcely reasonable to expect, that we shall get out of the wilderness in forty days, or that society disintegrated and demoralized by a war of four years, and the emancipation of a race, can at once be restored to order and regularity. The facts stated by Mr. Sandodge, furnish in my opinion no just ground for his gloomy views of the present, or his desponding anticipations of the future, and it is neither policy nor wisdom, to condemn the policy the Government has adopted, or may hereafter adopt in relation to the colored population, until it has been fairly tested. On the contrary it is the duty of all well disposed persons to give to that policy such support as will ensure its being fairly tested.[53]

Protecting the Negro's civil rights caused the Army serious difficulties. The generals were quick to proclaim whites and Negroes equal before the law and also quick to enforce that equality. But they understood the desirability of having the civil authorities take the lead in this field and interfered only where prejudice marked the latter's course. In Mississippi General Slocum objected to his subordinates' taking Negroes from civilian custody where an intention to be fair had been displayed. "The object of the Government," he said, "is not to screen this class from just punishment; not to encourage in them the idea that

[52]Gen. C. Devens to Gen. L. Thomas, AG USA, Sept. 12, 1865, Dept. South, 15; Sickles to AAG Div. Atlantic, Dec. 14, 1865, Dept. South, 46; Terry to AAG Div. Atlantic, Sept. 15, 1865, Dept. Va., 14, RG98, NA.
[53]Canby to Gov. of La., July 24, 1865, Dept. Gulf, 79, RG98, NA.

*Working With (and Against) the Provisional Governors*    45

they can be guilty of crime and escape its penalties; but simply to secure to them the rights of free men, holding them, at the same time, subject to the same laws by which other classes are governed."[54]

In Virginia General Terry prohibited restraints on Negroes that did not also apply to whites but added that vagrancy would not be tolerated. Terry's chief of staff, General Joseph R. Hawley, received word of Northern public reaction. From a college fraternity brother: "I tell you his capital order hit the North exactly; it has made a hero of him again." From an Army colleague: "By the way, Senator Wilson was in high extasy [sic] over Gen. Terry's order in relation to the blacks in Virginia, and told me that he had been to Gen. Grant, and tried to have him order all other generals commanding Depts. to issue orders like it." From a Connecticut state legislator, noting the order's universal approval: "These F.F.V.'s find it difficult to learn that slavery is dead. They will learn after a while."[55]

But while the Army was sensitive to the necessity of legal equality for the Negro, social equality evoked different opinions. "I am in favor of elevating the Negro to the extent of his capacity and intelligence," General George A. Custer wrote from Hempstead, Texas, "and of doing everything in our power to advance the race morally and mentally as well as physically, also socially. But I am opposed to making this advance by correspondingly debasing any portion of the white race."[56] Even General Gillmore, a sincere friend of the Negro who had expressed his eagerness to "aid in the satisfactory solution of the great social question which this war has thrust upon us," complained about the bureau keeping possession of all Charleston schoolhouses, remarking, "There would seem to be neither reason nor justice in the Freedmen's Bureau retaining possession of all the houses, or in forcing the white and colored children to be mixed together in the same rooms to the annoyance and mortification of both races."[57]

The generals also endeavored to prevent the Negroes from being given unsound and inflammatory advice. Complaining about such goings-on in Charleston, Gillmore declared, "There has been too much public talking, and too little quiet and unobtrusive work." Launching a blast

[54]GO 10, Dept. Miss., Aug. 3, 1865, Orders, 900, RG94, NA.
[55]GO 77, Dept. Va., June 23, 1865, Orders, 983, RG94, NA; Charles Dudley Warner to Hawley, July 12, 1865, Gen. J. C. Abbott to Hawley, July 7, and V. B. Chamberlain to Hawley, July 8, in Hawley Papers, LC.
[56]Custer to Mr. and Mrs. Daniel S. Bacon (his parents-in-law), Oct. 5, 1865, in Marguerite Merington (ed.), *The Custer Story* (New York, 1950), 175.
[57]Gillmore to Howard, June 26, 1865, and to AAG Div. Atlantic, Oct. 28, 1865, Dept. South, 15, RG98, NA.



## 46  FROM APPOMATTOX TO THE RECONSTRUCTION ACTS

against unscrupulous former masters in addition to well-meaning Northern "friends of the Negro," Slocum observed: "The colored man can be improved and elevated; not by making him the tool of politicians; but by impressing upon him the importance of education and of forming habits of industry and economy." [58] Army officers themselves sometimes gave advice to the freedmen, and by so doing called forth objections from the bureau. In Mississippi, after receiving such complaints from the state's assistant commissioner, General Thomas J. Wood prohibited his officers from making speeches or issuing written addresses to the populace. This concern over freedmen receiving bad advice probably stemmed from the generals' common belief that Negroes were not yet qualified for the franchise. Custer opined, "As to trusting the negro of the Southern States with the most sacred and responsible privilege—the right of suffrage—I should as soon think of elevating an Indian Chief to the Popedom of Rome." [59]

Protests were lodged against officers suspected of anti-Negro prejudice, though upon investigation they often were proved false. Chief Justice Chase complained about one general who "promised [,] if he did not use [,] military force in compelling persons heretofore slaves of a railroad corporation to return to its service." Chase's reference, not at all clear, is probably to General James H. Wilson, then in Georgia; if so Chase was in error, as Wilson's correspondence shows him to be strongly anti-slavery. Vague, unspecific allegations that General John P. Hatch at Charleston was callous toward Negroes fell flat upon investigation and brought the observation from Hatch's superior that there were as many complaints about his being severe with Rebels as being unsympathetic towards Negroes. [60] At Savannah, however, a captain in a Connecticut regiment who showed great unfairness to Negroes while functioning as a provost judge was mustered out of the service. [61]

⁵⁸Gillmore to Howard, July 2, 1865, Dept. South, 15, RG98, NA; GO 10, Dept. Miss., Aug. 3, 1865, Orders, 900, RG94, NA.
⁵⁹Wood to AAG Dir. Tenn. Dec. 6, 1865, Dept. Miss., 2, RG98, NA; GO 46, Dept. Miss., Dec. 12, Orders, 900, RG94, NA; Custer to Mr. and Mrs. Daniel S. Bacon, Oct. 5, 1865, in Merington (ed.), *Custer Story*, 175.
⁶⁰Chase to Johnson, May 23, 1865, in Johnson Papers, LC (Reel 14); Wilson to AAG Div. Tenn., June 15, 1865, in Johnson Papers, LC (Reel 15).
⁶¹*House Reports*, 39th Cong., 1st Sess., No. 30, Pt. 2, pp 232–33. The statement in John Hope Franklin, *Reconstruction After the Civil War* (Chicago, 1961), 119, concerning troops oppressing Negroes is potentially misleading. Although no citation is given, the source appears to be Francis B. Simkins and Robert H. Woody, *South Carolina During Reconstruction* (Chapel Hill, 1932), 66–67. Franklin closely paraphrases a statement by Simkins and Woody based on some instances in South Carolina in 1867 and incorporates it in a paragraph

## *Working With (and Against) the Provisional Governors*  47

One of the basic problems complicating the Army's relations with the bureau was the latter's amorphous position in the hierarchy of military administration. It was a branch of the War Department; its head or commissioner was a general officer of the regular Army and senior in lineal rank to most of the occupation commanders; each state was under the jurisdiction of an assistant commissioner, and all of the first assistants to these posts, except in Louisiana, were also Army officers; the local agents were a variety of civilians, soldiers, and even a few Negroes (who did not last long). In May, 1865, Secretary Stanton directed the occupation commanders to detail temporarily to the bureau whatever officers and men it might request and to furnish such aid as it might require to carry out its duties. [62]

This directive had two defects. First, it meant that officers would frequently be absent from their commands and their more purely military duties, with consequent deterioration in morale, discipline, and effectiveness among the troops; and it raised the question of whether an officer on detached duty with the bureau was still responsible to his regular military superior. Second, it left unclear whether the Army had any discretion at all in furnishing aid to the bureau and in prescribing the duties of troops on such expeditions.

The first problem became even more severe as the number of troops in the South gradually diminished during 1865, and within the Army itself there were mixed feelings as to how the difficulty could be alleviated. In Virginia General Terry found it desirable in some localities to combine the offices of provost marshal and bureau agent. In Arkansas General Reynolds wanted civilian "labor agents" appointed to relieve officers of their present duties concerning contracts and employer-employee relations. He thought the best men would be persons who had never owned slaves and if possible had not lived in the Confederacy during the rebellion. [63]

Exactly the opposite sentiments prevailed on the Atlantic seaboard where the Carolina commanders, desiring to eliminate all civilians from the bureau, denounced them as "more mischievous and troublesome than beneficial—mere doctrinaires and agitators." But they could not prevail on the assistant commissioners to let the post and subdistrict com-

dealing with military activity in all states from 1867–77. If Franklin intends the statement as a broad generalization, it does not hold true.
⁶²GO 102, AGO, May 31, 1865, RG94, NA.
⁶³Terry to AAG Div. Atlantic, Sept. 15, 1865, Dept. Va., 14, RG98, NA; GO 5, Dept. Va., Jan. 24, 1866, Orders, 984, RG94, NA; Reynolds to Howard, July 13, 1865, Dept. Ark., 2, RG98, NA.



manders act as bureau agents ex-officio.[64] Perhaps the least objectionable resolution of a basically insoluble problem would have been to merge the office of assistant commissioner with that of department commander, and to let the local commanders serve as ex-officio agents with a trustworthy resident to aid them. During later years the first part of this plan was used in a few states, but it did not make Army-bureau relations fully satisfactory.

Discretion in aiding the bureau was a knotty problem for all concerned. Some commanding generals tried to phrase their instructions broadly to allow their own subordinates considerable leeway. Thus troops in Texas received orders to render all "proper and necessary aid" to bureau agents; Mississippi forces were cautioned not to interfere in cases unauthorized by law or orders. This latitude was desirable provided both the detachment commander and the bureau agent were discreet and cautious individuals, but such was not always the case. Any attempts of bureau officials to exercise military command over troops sent to aid them evoked resistance from the commanding generals. In Georgia one officer was told not to consider himself "Chief of Police for the Agents of the Freedmen's Bureau" but to exercise supreme command over his area until civil law was reestablished and to aid the bureau "in every reasonable way, consistent with the laws of the United States and the orders from these Headquarters." [65]

The existence of a special court system within the bureau led to frequent collisions with the occupation forces. There were minor variations from state to state, but typically these courts were comprised of three members, a Bureau official and two local citizens. Their jurisdiction encompassed all cases relating to compensation of Negroes up to $300, all other cases between whites and Negroes, and all criminal actions against Negroes where conviction would lead, at the most, to a fine of $100 or a jail term of thirty days. More important cases were heard before local civil courts where these existed and showed evidence of impartiality, or before military commissions.

Friction was most likely to arise in commands where an elaborate system of provost courts existed, as in South Carolina. The Army wanted to try cases involving Negroes in the provost courts whereas the bureau preferred its own. Gillmore and Assistant Commissioner Saxton finally

[64]Gillmore to Gen. Rufus Saxton, Aug. 10, 1865, and to AAG Div. Atlantic, Oct. 28, 1865, Dept. South, 15; Sickles to Howard, Jan. 21, 1866, and to Grant, Jan. 22, Dept. South, 46, RG98, NA.
[65]C/S to Mower, July 22, 1865, Dept. Gulf, 79, RG98, NA; GO 10, Dept. Miss., Aug. 3, 1865, Orders, 900, RG94, NA; AAG to Gen. E. L. Molineaux, CG Dist. Nor. Ga., July 8, 1865, Dept. South, 15, RG98, NA.

reached a compromise: the provost courts would handle all Negro cases except where the bureau agent was located at a considerable distance from the nearest military force. In Georgia the policy was to try all cases involving Negroes by military commision in the absence of a bureau agent.[66] The bureau's court system may have had some beneficial effects in protecting the Negro from prejudice in the civil courts, but as a complicating factor in the Army's administration of justice, it was at best ill-advised.

All commanders were very sensitive to the last subject dealt with in General Steedman's prototype set of instructions—proper conduct of troops in their dealings with civilians. They had a difficult enough task as it was, and making the population hostile by ruthless and unprincipled action would make it more so. The garrisons of Alabama were warned, "All complaints on the part of citizens for outrages committed by officers or enlisted men will receive an honest investigation, and if sustained after due consideration in the case, the offenders will be held to a strict accountability, and visited with prompt, severe punishment." In neighboring Mississippi General Wood announced, "Commanding officers will be held to the strictest official and pecuniary responsibility for any unauthorized [sic] interference with the people of this State, and for all marauding, pillaging, or any other depredations committed by their commands, whether in camp, barracks, or en route." In Texas, any of Custer's cavalrymen who committed depredations on the persons or property of civilians had their heads shaved and took twenty-five lashes on the back. He claimed it was an effective punishment.[67]

As one officer pointed out, soldiers were likely to get into trouble because the fragmentation and dispersal of small commands bred a deterioration in discipline and because the men were "removed from the restraints of home." The midsummer mugginess of Tennessee got the better of some Knoxville soldiers, who resorted to raiding private watermelon patches and milking cows belonging to citizens—and even to officers. In New Orleans some soldiers thought the uniform gave them license to ride the streetcars without paying. Georgians looked askance at the "shameless indecency" of troops at Macon going swimming on

[66]Gillmore to AAG Div. Atlantic, Oct. 28, 1865, Dept. South, 15; AAG to Gen. J. M. Brannan, CO Savannah, Aug. 22, 1865, Dept. Ga., 1, RG98, NA.
[67]GO 36, Dept. Ala., Sept. 15, 1865, Orders, 815; GO 36, Dept. Miss., Nov. 24, 1865, Orders, 900, RG94, NA; Merington (ed.), Custer Story, 172-73.



Sunday afternoons in a public park undaunted by the quartermaster's neglect to issue them swimming trunks along with their uniforms.[68]

Drunkenness and brawling were common. "I want you to deal more vigorously with liquor sellers," was the directive of the Richmond commander to his provost judge. He was determined to punish both civilians and soldiers and added, "Let it be prima facie evidence to you, that when a crowd of drunken soldiers are collected in a rum shop, liquor has been sold. . . . I will not permit soldiers together in grog shops throughout the city creating noises and disturbances; and Citizens who permit it to be done under their roof must be held responsible." In Vicksburg a colonel was acquitted after having staggered down the street roaring: "Come out and show yourselves, you G—d d——d rebel s——s of b——s. War has been declared against you for insulting me. G—d d——n your Ethiopian hearts, you dare not come out and face me now. I have come amongst you both in my uniform and in citizen's dress, and you dare not meet me. I have cowhided one G—d d——d rebel s——n of a b——h, but I'll shoot the next one who insults me, by G—d!"[69] From Madison, Georgia, came complaints about cavalry officers letting Negroes take animals from nearby farms and swarm into the camps. The correspondent added, "And the Negro girls for miles and miles are gathered to the camps and debauched. In some instances this has occurred where ladies have taken the same pains to protect their virtue that they have exercised towards their own daughters." [70]

Relations between soldiers and civilians were made more delicate by the presence of colored troops in the South. Except for three regular Army regiments organized in the fall of 1866, these were volunteer regiments recruited during the last years of the war in both Northern states and occupied areas of the South. The problems raised by the presence of colored troops became more serious as 1865 went on. A large number of white regiments were mustered out, and the proportion of colored troops in the South consequently increased. The white volunteers were all anxious to go home soon after hostilities ended, even though the terms of enlistment of some regiments did not expire until well into 1866. The colored units, however, were more willing to stay in the service, since many Negroes did not have homes to which to return or much

[68] *House Reports*, 39th Cong., 1st Sess., No. 30, Pt. 3, pp. 139–40; C/S to Col. H. G. Gibson, CO Knoxville, July 17, 1865, Dept. Tenn., 22, RG98, NA; *Macon Daily Telegraph*, July 3, 1865.
[69] Gen. John W. Turner to Col. J. McEnter, Dec. 19, 1865, IMD, 72, RG98, NA; GCMO 5, Dept. Miss., Sept. 14, 1865, Orders, 900, RG94, NA.
[70] N. G. Foster to Gen. W. T. Sherman, May 10, 1865, in Johnson Papers, LC (Reel 14).

prospect of employment if they did leave the Army. Other reasons mitigated against keeping colored troops in the service. Most colored regiments had been organized late in the war and were less well trained and disciplined than the white volunteer units, which had been in service longer. Several cases of mutiny occurred in colored regiments but apparently none in white regiments serving in the South.[71]

A greater degree of antagonism naturally prevailed between colored troops and white civilians than when both parties were white, and this antagonism was the fault of both troops and populace. In referring to a petition from citizens of the Louisiana parishes of LaFourche and Terre Bonne, the commanding officer pointed out improprieties by both sides. The Army was willing to correct abuses by its own men, he said; but he added, correctly, that citizens were unwilling to accept from colored soldiers what they would have found less objection to in a white soldier.[72] On the other hand a North Carolinian—rather petty for the "leading man of the county"—worked himself into a "perfect fever" because a Negro soldier offered the "insult" of bowing and wishing him a good morning as he sat on his "piazza." In Florida it was possible to solve the problem partially by placing the colored troops in the coastal garrisons and larger seacoast towns, leaving the interior to be held by white volunteer forces or the small number of regulars available.[73]

The commanding generals were keenly aware of the difficulties which colored troops caused, and they did not like to have so many of them in the South. Every time muster-out orders were received which would seriously alter the proportion of white regiments to colored, the generals protested, citing the frequent calls made for replacement of colored garrisons.[74] Just after the surrender, Ord and Halleck had found it necessary to remove the whole XXV Corps from occupation duty in Virginia because its officers were incompetent, discipline was bad, the men had committed many crimes against civilians including numerous cases

[71] I base this statement on a survey of court-martial proceedings, and hence the affray caused by the 165th New York in Charleston is excluded, there having been no formal charge of mutiny in that case. For instances of mutiny in colored regiments see GCMO 12, Dept. Miss., Nov. 11, 1865, Orders, 900; GO 22, Dept. Tenn., Dec. 22, 1865, Orders, 969; GO 12, Dept. South, Sept. 19, 1866, Orders, 959, RG94, NA.
[72] Canby to Wells, Aug. 10 and 26, 1865, Dept. Gulf, 79, RG98, NA.
[73] *House Reports*, 39th Cong., 1st Sess., No. 30, Pt. 2, p. 178; Gen. J. G. Foster to Sheridan, Oct. 29, 1865, Dept. Fla., 6, RG98, NA.
[74] Sheridan to Stanton, Aug. 19, 1865, in Drennan Papers, LC; AAG to Gen. J. E. Smith, CG Dist. West. Tenn., Sept. 19, 1865, Dept. Tenn., 22, RG98, NA.



52    FROM APPOMATTOX TO THE RECONSTRUCTION ACTS

of "atrocious rape," and because its presence had a bad influence on the Negro population. It was replaced with a corps of white troops from the Army of the Potomac. In South Carolina, where out of 14,000 troops only 2,500 were white, General Gillmore complained:

I have found so many bad men among the non-commissioned officers and privates of some of my colored regiments—men, who by their false representations and seditious advice, have exercised a most baleful influence upon the plantation laborers,—that I have been forced to devolve upon the white troops—to a much greater degree than their numbers would justify—the onerous and delicate duties of instructing the inhabitants of the country in their rights and responsibilities as well as the ratifying and enforcing of labor contracts. In many instances nearly all the laborers on large plantations under extensive cultivation have violated their contracts and suspended their work in consequence of the pernicious influence of a few bad colored soldiers, who were formerly slaves in the neighborhood.

But while Gillmore did not want colored troops in the service, he felt reluctant to muster out those from Southern states because the discharged men would have caused trouble in the community.[75]

In September General Grant finally urged Secretary Stanton to have all colored regiments raised in Northern states mustered out. This, however, did not markedly reduce the number of colored troops remaining, because many regiments had been raised in the South. During the last half of 1865 and the first months of 1866 the proportion of colored to white troops in some parts of the South was 3 to 1 or higher. The order to muster out numerous white volunteer regiments in August, 1865, left General Stoneman in Tennessee with the 16th Infantry, a couple of batteries of artillery, and thirteen colored regiments of all arms. Five of these colored regiments were ordered to Alabama—where at the moment white troops predominated—so that General Woods could muster out five white regiments. In December, 1865, only one of twelve infantry regiments in Mississippi was white, and in the following month Sheridan reported 6,550 white and 19,768 colored volunteers in Texas and Louisiana. During 1866 the colored volunteer regiments were gradually mustered out, but some remained as late as November of that year.[76]

[75]Halleck to Grant, April 29 and 30, 1865, and reply, April 30, in *Official Records*, Ser. I, Vol. XLVI, Pt. 3, pp. 1005, 1016; Gillmore to Gen. L. Thomas, AG USA, Aug. 20, 1865, Dept. South, 15, RG98, NA.
[76]Grant to Stanton, Sept. 6, 1865, in Stanton Papers, LC; Thomas to Grant, Aug. 23, 1865, Div. Tenn., 33; Wood to AAG Div. Tenn., Dec. 6, 1865, Dept. Miss., 2, RG98, NA; Sheridan to Grant, Jan. 7, 1866, in Drennan Papers, LC. Thus it would seem that the statistical data on the number of colored troops

*Working With (and Against) the Provisional Governors*    53

The mere fact of colored troops being from the South did not justify keeping them there on occupation duty; indeed, the consistent application of any such principle as "duty-in-one's-home-territory" would have made it impossible to garrison frontier posts adequately. As the records of the subsequently organized 9th and 10th Cavalry demonstrated, colored units could have been sent to the frontier as easily as not. On the question of colored troops the Army and the white Southerners were in substantial agreement. Although they did not always share the same reasons, the agreement is understandable for, as a policy, keeping colored troops in the South was very clearly ill-advised.

Troops frequently performed acts of charity and kindness for citizens, like the soldier in Atlanta who, denouncing in thick Gaelic-English the laziness of the Negroes, helped an elderly woman each week with her washing and woodcutting. Or like General Edward O. C. Ord, who had his engineer officer supply a group of Virginia ladies with calcium lights so they could stage a tableau for the benefit of the poor. Or like General Thomas, who objected to the Quartermaster General's order directing the seizure of all government animals found in the hands of citizens. Thomas admitted that some of them had acquired the animals illegally, but he thought that in the interests of promoting agriculture the government should forget that fact.[77]

Popular sentiment toward the Army varied from place to place. In some areas which had always been heavily Unionist in sentiment or which had seen federal troops since early in the war, relations were better than in others. If a general evaluation applicable to the largest area of the South could be found, it might perhaps be that used by General James H. Wilson to describe the situation around Macon, Georgia: neither true loyalty and love for the Union nor hatred and desire for opposition, but some middle ground of willing acquiescence due to the thoroughness of the military defeat.[78] From this general attitude towards the Union it follows that the prevalent attitude towards the troops, as symbols of the Union, would be a showing of disdain and boorishness to make it obvious to the conquerors that what could not be prevented was at the most being endured. As one observer remarked, Southerners tended to divide Northerners into two groups, those who had

given in Franklin, *Reconstruction*, 35–36, while accurate, is potentially misleading.
[77]Myrta L. Avary, *Dixie After the War* (New York, 1906), 118–19; Macon (Ga.) *Daily Telegraph*, May 20, 1865; Thomas to Stanton, Dec. 14, 1865, Div. Tenn., 33, RG98, NA.
[78]Wilson to AAG Div. Tenn., June 15, 1865, in Johnson Papers, LC (Reel 15).

not been in the Army and those who had. The former were called "d——d Yankee s——s of b——s," while the latter were called "d——d bluebellied Yankee s——s of b——s." [78]

Some Southerners were polite and friendly, of course, but evidence of malevolence towards Union troops was easy to find. There were continual petty insults and indignities; officers' wives found Southern hospitality lacking in the Lake Charles, Louisiana, restaurant where they were refused service because it might "affect the custom of the house." The women of the South seemed to be strongly anti-Yankee. General Grant visited parts of Secessia late in 1865, and in Charleston one of his companions noted: "As we rode through the city I saw several who called themselves ladies make faces at the Yankee officers with us. It is useless to say they are only women—they express openly what their husbands and brothers feel but do not show." [79]

On Christmas, 1865, some citizens of Marshall, Texas, actuated by something other than the proper seasonal spirit, treated some soldiers of the 46th Illinois to liquid refreshment and then prompted them to shoot a Negro. After the post commander arrested the soldiers the city authorities demanded custody, but the commanding officer refused. The civil officials would probably have punished the soldiers not so much for murdering the Negro as for being soldiers. General Carl Schurz, who toured the South during the autumn of 1865, reported to the President that much hostility still existed and that the exceptions were "not numerous enough to affect the rule." Larger bodies of troops were not molested, but he did hear of frequent shootings of single soldiers and individual government couriers. Even so, a personal friend of Johnson, General C. C. Andrews, had written to the President from Selma, Alabama, that contact between the troops and the populace was desirable. "It has done our cause great good by having the people of the South see and converse with our brave, frank, and generous common soldiers. It causes a reaction." [81]

The Army often expressed its opinion that the best-disposed people in the South were the former Confederate soldiers, and the worst were those who had somehow escaped active duty. From a private stationed near Atlanta came the observation, "There is no feeling of enmity between the *true* soldiers of the two armies. Each has tried the other in

[78]*House Reports*, 39th Cong., 1st Sess., No. 30, Pt. 4, p. 126.
[89]C. B. Comstock, ms Journal, Feb. 2, 1866 and Dec. 1, 1865, in Comstock Papers, LC.
[81]*House Reports*, 39th Cong., 1st Sess., No. 30, Pt. 4, p. 49; *Sen. Exec. Docs.*, 39th Cong., 1st Sess., No. 2, pp. 7–8, 57–58; Andrews to Johnson, May 11, 1865, private, in Johnson Papers, LC (Reel 14).

the stern ordeal of the battlefield, and have [sic] learned to respect his sturdy valor." In Arkansas the returned soldiers of both sides were generally well-behaved, though some ex-Confederate officers caused trouble. Even Northern journalists who toured the South reported good relations between the erstwhile foes. [82]

The commanding generals read Southern newspapers regularly for evidences of disloyal attitudes and stopped the publication of some journals, though they did not carry out a wholesale suppression of adverse opinion. General Reynolds found fault with two Arkansas papers for editorials advising voters to violate a state law passed in May, 1864, prescribing an oath to be taken by voters. The Little Rock *Gazette* escaped suppression, but Reynolds closed the *Pantograph* after its editor refused to identify the offending author. Two Georgia papers, one at Macon and one at Americus, incurred military displeasure; and General Ruger stopped the *Daily Union Banner* of Salisbury, North Carolina. [83]

A Louisiana journal was the center of a more serious dispute. In the little town of Franklin two teenage boys, one a Negro and one white, got into a brawl. The mayor and the local provost marshal then argued over the disposition of the case, with the mayor wanting to make a grave case of assault and battery out of it and try it before the district court. The officials' dispute led to intemperate articles in the Franklin *Planters' Banner*, for which the provost marshal jailed the editor. The case ultimately found its way to Governor Wells and General Canby; the general settled it by releasing the editor, relieving the provost marshal, and urging the governor to remove the mayor. Canby ventured the correct if crusty remark that the affair would never have happened if the mayor and provost marshal "had been imbued with an ordinary degree of common sense." [84]

In Virginia General Terry carried on a running battle with the Richmond press. In July, 1865, the *Whig* undertook to call Johnson's amnesty proclamation "heathenish" and a law of Congress "mean, brutal, and cowardly, revoltingly absurd and atrociously unjust." For this Terry had his provost marshal general close the office, though after ten days he allowed the paper to resume operations. The editor had previously

[82]Letter signed "Blue Jacket," Macon (Ga.) *Daily Telegraph*, June 2, 1865, original emphasis; Reynolds to E. W. Gantt, Oct. 12, 1865, Dept. Ark., 2, RG98, NA; Sidney Andrews, *The South Since the War* (Boston, 1866), 95, 386.
[83]Reynolds to Atty. Gen. Speed, Sept. 12, 1865, Dept. Ark., 2; AAG to Gen. J. T. Croxton, CO Columbus, Aug. 10, 1865, Dept. Ga., 1, RG98, NA; *The Nation*, I (Aug. 10, 1865), 162.
[84]Townsend to Canby, Oct. 18, 1865, AGO, 41, and file 1507B1865, AGO, RG94, NA.



been loyal, had expressed his regret, and Governor Pierpont had urged clemency. Reading through the *Commercial Bulletin* in September, Terry found an article which he considered an "indecent insult" to the memory of President Lincoln and "an almost equally offensive reflection" on President Johnson. He had the paper closed and the editor arrested, there having been previous difficulty with the same journal.[83]

Some citizens manifested their dislike for the Army by instituting suits against officers and men for acts done during the war under orders of superiors. These suits usually stemmed either from false arrest for suspected disloyalty or from damages done to property. Criminal cases, most often for murder or assault, were less common. A complicating factor in these cases was the alleged loyalty of the aggrieved parties. They usually claimed to have been fierce Unionists during the war in the hopes of being more successful, though whether many of them actually were devoted to the Union is another matter.

A citizen most often began his quest for monetary redress with an appeal to the commanding general in his particular state. Such was the course followed by E. S. Chappell, of Mobile, who claimed that while he had been absent from his property for a time piloting Union troopships on the Mobile River, the 24th Indiana and 76th and 96th Illinois camped near his house and tore down his garden fence for firewood. Livestock thus invaded his garden and ruined it, the whole loss amounting to $2,000. His claim made the rounds of lower commanders before finally being sent to Washington. At length he received a reply: the troops in question being no longer in the service, the War Department could not compel them to pay; the government itself could not compensate him since no funds had been appropriated for the purpose; therefore such claims would have to wait until Congress decided to act in the matter. Shortly thereafter the Judge Advocate General issued a general ruling that Congress would have to act before anything could be done in such cases. In order to be prepared in case Congress did act, the War Department sometimes appointed boards to estimate the loss, as in the case of alleged damages done to the Armstrong farm in Dinwiddie County, Virginia. The Armstrongs were not paid, however, and most of the paperwork done by such investigating boards was left to gather dust in the War Department files.[84]

[83]GO 87, Dept. Va., July 11, 1865, GO 92, July 21, and GO 119, Sept. 30, Orders, 983, RG94, NA.
[84]Townsend to Chappell, Nov. 10, 1865, AGO 41, and file 1483C1865, AGO; Circ. 51, AGO, Nov. 27, 1865; Townsend to Terry, Sept. 22, 1865, AGO, 40, and file 1026A1865, AGO, RG94, NA.

Chappell gave up his case but others were more determined and took their claims to court, like the Louisianans who sued the officers who had used their homes as headquarters during the war.[87] If the judge were biased, a decision adverse to the soldier was very likely, and most of the defendants had little money to appeal the verdict to a higher court. These cases were alarming enough when pressed in Southern courts, but when they were initiated in federal courts in the North, even greater anxiety resulted. In Vermont a suit by a citizen against a provost marshal for false arrest, which originated in the state courts in August, 1864, and was transferred to the federal courts under the 1863 Habeas Corpus Act, resulted in an award of $1,000 to the citizen.[88]

Southern commanders closely watched the actions of Southern courts in these cases. In Texas, a captain of the 18th New York Cavalry while acting as provost marshal had seized the property of some gamblers, who then proceeded against him in the civil courts. Sheridan instructed the officer's superior, General Wesley Merritt at San Antonio, not to interfere in the slightest with the proceedings of the court but, once the decision was arrived at, to give the captain full protection against it. Acting on their own authority, most Southern commanders issued orders prohibiting state courts from entertaining such cases, whether civil or criminal; this policy received official sanction from Washington in January, 1866.[89]

While the Army did, on the whole, attempt to administer Southern affairs fairly and reasonably, in some cases an ill-advised action brought the perpetrator deserved reproach. One such affair was the great Alabama prayer crisis. Before the war the Methodist Episcopal Church had offered a prescribed prayer for the President "and all in civil authority." During the war this became a prayer for Confederate officials; and in June, 1865, Bishop Richard Wilmer of Alabama recommended, in a letter to the clergy, that the prayer not be said at all. He claimed that since it was a prayer for those in "civil authority," and the only authority in Alabama was military, the prayer should be dropped since nobody could reasonably pray for the continuance of military rule.

But General Thomas, a deeply religious man, took offense at this attitude and ordered General Woods to suspend the bishop and prohibit those clergymen who followed his suggestion from holding services.

[87]Canby to Howard, Nov. 6, 1865, Dept. Gulf, 79, RG98, NA.
[88]*Walker vs. Crane*, Fed. Cas. No. 17067 (USCC, Dist. Vt., Oct. 1865).
[89]Forsyth to Merritt, Oct. 21, 1865, in Sheridan Papers, LC; GO 42, Dept. Ala., Sept. 26, 1865, Orders, 815; GO 113, Dept. Va., Sept. 21, 1865, and GO 124, Oct. 11, Orders, 983; GO 3, AGO, Jan. 12, 1866, RG94, NA.



The order Woods issued was practically a prayer itself. He interpreted the Methodist invocation as simply one

For the temporal and spiritual weal of the persons in whose behalf it is offered—it is a prayer to the High and Mighty Ruler of the Universe that he would with his favor behold and bless his servant, the President of the United States, and all others in authority—that He would replenish them with the grace of His holy spirit, that they might always incline to His will and walk in His ways, that He would endow them plenteously with heavenly gifts, grant them in health and prosperity long to live, and finally after this life to attain everlasting joy and felicity. It is a prayer at once applicable and appropriate, and which any heart not filled with hatred, malice, and all uncharitableness could conscientiously offer.

He considered its omission as a violation of the canons of the church and evidence of a "factious and disloyal spirit" on the part of Wilmer and the clergy. "Such men are unsafe public teachers, and not to be trusted in places of power and influence over public opinion." Wilmer and the clergy could not resume services until they agreed to offer the prayer and also take the President's amnesty oath. Each clergyman constituted a separate case and had to apply individually to headquarters.[89]

The suspension caused a public outcry, understandably loud in the South but also in the North. Wilmer complained to Johnson, who declined to interfere other than to have the bishop's letter directed to Thomas. Three days before Christmas Thomas decided to reverse himself, and got out of his difficulty as neatly as he could manage. First he castigated Wilmer's action as an attempt to hinder "the spread of popular approbation and grateful appreciation of the magnanimous policy of the President in his efforts to bring the people of the United States back to their former friendly and national relations with one another." The bishop had been "animated with the same spirit through which temptation beguiled the mother of men to the commission of the first sin—thereby entailing eternal toil and trouble on earth." He (Wilmer) "took advantage of the sanctity of his position, to mislead the minds of those who naturally regard him as a teacher in whom they could trust, and attempted to lead them back into the labyrinths of treason." But Thomas concluded that since Alabamans were honestly trying to be loyal in spite of Wilmer's pernicious influence, the previous order stood revoked, and Bishop Wilmer was "left to that remorse of conscience consequent to the exposure and failure of the diabolical schemes of designing and corrupt

[89]GO 38, Dept. Ala., Sept. 20, 1865, Orders, 815, RG98, NA.

minds."[91] Perhaps Wilmer and the clergy were disloyal, but military interference with religious worship was clearly beyond the bounds of propriety and necessity.

By December, 1865, the South had made definite progress towards full restoration to the Union. New state governments elected under the auspices of Johnson's provisional appointees were functioning in all states except Texas, where the convention had not yet met. Economic progress, though slow, was increasing, and society was gradually recovering from the war. The Army's work had on the whole assisted rather than retarded this recovery. Without the Army, Johnson's governors would have been powerless, and the efforts of the Freedmen's Bureau to help the Negro would have come to naught. The soldiers also contributed materially to Southern economic recovery through the local purchase of supplies and equipment. But Northerners in the winter of 1865–66 focused their attention on the political aspects of Reconstruction—readmission to representation, punishment of traitors, and related questions. The forthcoming political conflict over such subjects was to increase the difficulty of the Army's task in the South. Writing from the plains of Kansas during the autumnal election excitement of 1866, General Custer expressed a view that was perhaps too infrequently heard in Washington in January of that year: "For the Government to exact full penalties, simply because it is constitutionally authorized to do so, would, in my opinion, be unnecessary, impolitic, inhuman, and wholly at variance with the principles of a free, civilized and Christian nation, such as we profess to be."[92]

[91]GO 40, Div. Tenn., Dec. 22, 1865, republished in GO 2, Dept. Ala., Jan. 10, 1866, Orders, 815, RG94, NA.
[92]Custer to unknown, Oct. 23, 1866, in Merington (ed), Custer Story, 187–88.

# A Struggle for Control of Policy

The first session of the Thirty-ninth Congress opened in December, 1865. All eyes, North and South, focused on Washington, anxious to learn what action the solons would take with respect to the South. After determining to reject consummation of the President's plan of reconstruction by excluding Southern representatives, Congress established the Joint Committee on Reconstruction. This group divided itself into four subcommittees which spent three months hearing testimony on conditions and attitudes in the South.

Witnesses, 139 in all, paraded through the capitol meeting rooms. Army officers were a potentially valuable source of information, but only twenty-six testified, not counting Freedmen's Bureau personnel. Moreover, only a minority of this small number were on duty in the South at the time or their testimony or immediately before. More up-to-date military opinion could have been obtained had the subcommittees held hearings in the states with which they were concerned. Or if the investigators had been enterprising, they could have mailed questionnaires to a number of officers in the South for their written replies. Only Sheridan's views were thus solicited, however. Few of the officers who testified held high commands. Only three—Terry, Thomas and Sheridan—commanded an area of one or more states. The 113 nonmilitary witnesses included Freedmen's Bureau agents, native Southerners who had remained loyal during the war, and former Confederates such as Robert E. Lee and Alexander H. Stephens.

Although few in number, the Army officers who testified did have important things to say. Fifteen out of twenty-six observed that employers generally were harsh and exploited the Negroes whenever they could.

All six who were asked if the South would willingly let the Negro vote replied in the negative. Most officers were not asked for their opinions on the desirability of congressional legislation touching the Negro, but the query, directed to Sheridan, brought this response: "I believe the best thing that Congress or State [*sic*] can do is to legislate as little as possible in reference to the colored man beyond giving him security in his person and property. His social status will be worked out by the logic of the necessity for his labor. It is the only labor that can be obtained in the southern States for some time to come." [1]

The examiners were especially anxious to know the extent of pro-Union sentiment in the South. Twelve officers found the attitude generally sullen and hostile; eleven emphasized that the amount of local variation made a general statement impossible. Those who thought that attitudes had changed over a period of time said that they had become worse rather than better. Some examiners asked questions about the effect of the President's liberal pardoning policy on Southern attitudes. Nine officers thought it had a deleterious effect; Sheridan found no change due to that policy; and Terry rather neatly sidestepped the issue with respect to Virginia by remarking cryptically that he could not trace results to specific causes. Proceeding on the premise that election results were a good indication of popular attitudes, some questioners asked whether Rebels or Unionists most often triumphed. The answers varied depending on the state or portion thereof in question. Four of the five officers who testified concerning Arkansas were certain that the senators and congressmen elected from that state and at the time seeking admittance to Congress were loyal men; but it was nevertheless to be over two years before an Arkansan would sit in Congress. Other committeemen thought Union sentiment could be measured by probable loyalty in case of a war with some European power, "say, France or England." Most of the respondents declared the South would side with the foreign enemy in hopes of thus securing its independence.

The few officers who were asked about the civil courts all declared them to be prejudiced against Union men. The committee also probed into the matter of personal relations between individual Southerners on the one hand and soldiers and Northern civilians on the other, but with inconclusive results. Remarking that he had no social relations with any-

[1]*House Reports*, 39th Cong., 1st Sess., No. 30, Pt. 4, p. 123. For a full treatment of the committee and its work see Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction* (New York, 1914), which contains an analysis of the entire body of testimony, though its treatment of the military viewpoint is much shallower than that given here.



one except known Unionists, General Terry said of the Virginians under his rule: "They do not seek me; and it is neither becoming to my position as the commanding officer of the department, nor consistent with my self-respect, to seek them first." [2]

One of the most important questions put to the witnesses was whether maintaining federal military control over the South was necessary or desirable. When asked if troops should remain there, twenty-one replied in the affirmative without offering substantive reservations or explanations; four more agreed but emphasized that the need was simply for small bodies of troops in specified areas; only one, speaking of Arkansas, said they were not necessary. Although a large proportion favored retention of troops, in only one instance was an increase in the current force recommended. That was in a report of an inspection tour through the White River District in northern Arkansas, included as part of the evidence concerning that state. [3] A closely related and equally important question concerned the admitting of Southern delegates to Congress. Only five officers of the twenty-six were asked for an opinion. Three favored admission of Southern representatives as a means of aiding the growth of loyal sentiment; two opposed it. General Thomas told the committee he thought Tennessee ought properly to be readmitted because "that State, of her own accord, has complied with every instruction of the President, and has done all that it was believed it would be necessary for her to do in order to gain admission into Congress." Tennessee had repudiated the Rebel debt, adopted the Thirteenth Amendment, disfranchised Rebels, allowed Negroes to testify in court, and elected loyal representatives and senators. Thomas believed admission of Tennessee would set a precedent for other states: "They can see at once the reasons why the Tennessee members are admitted, and that if they expect their members to be admitted they must do as she has done." [4]

As a general summary, most of the officers who testified probably would have agreed in substance with the evaluation offered concerning Texas and Louisiana by the flamboyant Custer: since Southerners had thus far failed "to manifest a penitent spirit for the great crime committed against the nation, or to give a proper and sufficient guarantee of future good conduct," federal control should be maintained for the time being. [5]

[2] *House Reports*, 39th Cong., 2nd Sess., No. 30, Pt. 2, p. 141.
[3] *Ibid.*, Pt. 3, pp. 168–70.
[4] *Ibid.*, Pt. 1, p. 110.
[5] *Ibid.*, Pt. 4, p. 78.

The testimony of the nonmilitary witnesses followed the same lines, but there was a tendency to paint a gloomier picture of conditions and attitudes. Freedmen's Bureau officers magnified the problems of the Negro. Northern civilians who went South on business complained of the rude and sullen treatment accorded them, and emphasized the need of federal protection. Plantation owners complained of the laziness of the Negro, and of course, former Rebel officers lauded the increasing loyalty of the region.

The 776 pages of closely printed testimony which accompanied the committee's final report received wide audience in the North and in the fall of 1866 served as a Republican campaign document. But certain characteristics of the testimony impeach its validity and usefulness. The amount of military testimony ought properly to have been greater since the Army was administering federal policy in the South. Some of the questions were entirely hypothetical, such as Senator Jacob Howard's favorite query: "Suppose they [the Southerners] got into power again, with their full representation in Congress, and with a President who, like Mr. Buchanan, should disavow the right of the government of the United States to coerce a state, and should decline to use the military force of the government to prevent secession; would they or would they not, in your opinion, again secede from the Union and attempt to set up an independent government?" [6] The answer was ordinarily affirmative, but Howard never asked for proof.

More important, the committee was not governed by legal rules of evidence and it accepted hearsay, *ex parte* testimony which would have been inadmissible in a court. At times solid factual evidence was presented, with details of specific cases; but too frequently the exchanges were elaborations of this condensed model:

*Q:* What is the general state of feeling towards the Union?
*A:* It is intensely hostile and bitter. The people have no love for the Union as a governmental system, for the individual Northern man, or for the Negro.
*Q:* Can you cite an example of individual cruelty or maliciousness towards Negroes or Union men?
*A:* Many reports of whipping Negroes have come to me from the interior, which is a generally lawless and turbulent portion of the State. The people have determined ideas of what they will do to the freedmen and Union men when the troops are withdrawn.

[6] *Ibid.*, Pt. 2, p. 142.



*Q:* Do you have personal knowledge of such threats having been made?

*A:* I have not heard them myself but they are frequently reported to me.

*Q:* By men in whose trustworthiness you have confidence?

*A:* Yes.

*Q:* Give us an instance.

*A:* Several days ago one of my staff officers reported a conversation he overheard on the cars to Atlanta, between two men who from their dress and manner of speech he judged to be Southerners. They expressed the intention of forming patrols to "regulate" the Negroes and drive the "Yankees" out, once the troops had left.

After receiving more vague and general replies the questioner would pass on to another subject.

The unreliability of some testimony evoked comment from officers in the South. The commanding general in Mississippi blasted those witnesses who "seem to think it necessary in order to acquire temporary celebrity to seize hold of isolated cases of abuse of the freed people to make out a theory of general oppression of this class of the community by the dominant [*sic*] or white race." Calling this practice "injurious to a just public sentiment," he noted two specific cases. A captain on bureau duty in Amite and Pike counties failed to report any abuses for months on end and then, when he was relieved, made a report "as marvelous as unreliable" and painted for the committee a picture of general oppression. General Wood also scored a regimental commander who, notwithstanding the size of his force, failed to make a single arrest or even ask for a military commission to try the outrages he had been reporting. "Such officers," the general closed, "expose themselves to the dilemma of having neglected their duty or of having made false reports; I leave them to choose which horn they will take." [1]

While the committee was endeavoring to find out the attitude of the South, the Army and the Southerners were wondering about the attitude and future policy of the federal government. It was apparent that Southern delegates would not be seated for a while, since the resolution establishing the committee charged it with reporting whether any of the rebel states were entitled to representation. Presumably the Congress would not act until the committee reported, and gathering evidence was a long process. Thus, for the time being the Army would continue to administer Southern affairs in much the same way as it had previously

[1] Wood to AAG Div. Tenn., March 27, 1866, Dept. Miss., 2, RG98, NA.

done. No change had taken place in the legal status of the Southern states, and no new formal instructions came down from the War Office.

One of the most significant legislative questions facing the new Congress was the size, organization, and structure of the peacetime regular Army. It was a paradoxical situation. Although Republican politicians thought that the condition of the South warranted the continued presence of an occupation force, the country as a whole, weary after four years of costly war, demanded reduction of the Army as a means of reducing governmental expenses. The first military bill of the new session, presented by Senator Henry Wilson, provided for five regiments of artillery, twelve of cavalry, and fifty-five of infantry, or a total of 60,000 men. This figure was a marked increase over the size of the regular Army before the war; the act of March 3, 1855, set the strength at 12,698 and new legislation of the summer of 1861 raised it to 39,273. In contemplating such an increase Congress was concerned not only with the Army's Southern duties, but also with the policing of the Plains and the Mexican border. Wilson's bill received the support of some officers and also of the *Army and Navy Journal.* [2] By the time it reached the House the number of regiments had been reduced and other changes made. Both houses then bogged down in minor questions of organization and small-item appropriations.

By May, 1866, Grant became anxious about the new legislation and wrote to Stanton in an effort to speed up action on it. After nearly seven months of arduous if intermittent debate the bill reached its final form late in the session. Much of the time had been consumed by interminable haggling over minor points, such as the number of commissaries of subsistence allotted to each regiment, or the special provisions applicable to majors of artillery but not to majors of cavalry. The new law authorized a force only slightly smaller in total strength than the 60,000 Wilson had first recommended in January. It also provided for one General (Grant), one Lieutenant General (Sherman), five major generals (Halleck, Meade, Sheridan, Thomas, and Hancock, in order of seniority), and ten brigadiers (McDowell, Cooke, Pope, Hooker, Schofield, Howard, Terry, Ord, Canby, and Rosecrans). [3] Not all officers

[2] *Army and Navy Journal,* III (Jan. 20, 1866), 341.

[3] The progress of the legislation can be followed in *Army and Navy Journal,* III (Jan.–Aug. 1866), *passim,* and the *Cong. Globe,* 39th Cong., 1st Sess. The officers listed were not designated in the act but were appointed to fill the positions authorized.



were pleased with the product, however; Sheridan objected to the insufficient amount of cavalry and to the provisions for disabled soldiers. He also thought the total strength inadequate for the size and condition of the country. With respect to the South he informed Senator Wilson, "My own opinion is that there should be a good compact force at two or three different points in these States for some time; not to interfere in civil affairs, but for precautions suggested by the history of all Rebellions, and by common sense." [10]

Another topic which received legislative attention was the prosecution of Union soldiers by civil authorities for acts done under orders during the war. Congress had already afforded some protection in the 1863 Habeas Corpus Act. Section 4 of that law made any order issued by the President or on his authority a defense against all civil and criminal proceedings for any search, seizure, arrest, or imprisonment done under such order or under any law of Congress. Section 5 allowed removal of cases from state to federal courts upon petition of the defendant; Section 6 allowed appeals to the United States Supreme Court; Section 7 was a two-year statute of limitations running from the date of the alleged offense. [11] In January, 1866, General Orders No. 3 from the War Department directed commanders in the South to "protect" soldiers from such proceedings in state courts and from any penalties or damages that might be adjudged. [12] This order notwithstanding, cases still continued and now began reaching the highest level of state courts. Critical questions were involved; for example, was a Union soldier punishable in a state court for a robbery committed in September, 1863? Yes, held the Supreme Court of Missouri. [13]

Considering the 1863 act to be insufficient and citing as an example the fact that more than 1,500 cases had arisen in Kentucky alone, Congress decided on new legislation. A bill to amend the old law emerged from the House Judiciary Committee in March, 1866, and became a law with the President's signature on May 11. [14] It was indeed blanket protection. It declared that the 1863 act applied to anything done by written or verbal order of the President, Secretary of War, or any officer in local command. Such acts were covered whether done by the person to whom the order had been given or by anyone aiding him. The defendant could remove a case to the federal circuit court at almost any stage in the proceedings in the state court, even after a final judgment

[10] Sheridan to Wilson, private, June 29, 1866, in Henry Wilson Papers, LC.
[11] 12 U.S. Statutes at Large 755.
[12] GO 3, AGO, Jan. 12, 1866, RG94, NA.
[13] Missouri vs. Rogers, 37 Missouri 367 (1866).
[14] Cong. Globe, 39th Cong., 1st Sess., 1368, 1387–90, 1423–26, 1530, 2052–66.

there. The new law stretched the rules of evidence considerably. If the order in question were a written one, either the original or a certified copy would be sufficient evidence. For telegrams, courts were told, "the production of the telegram purporting to emanate from such military officer shall be prima facie evidence of its authenticity; or if the original of such order or telegram is lost or cannot be produced, secondary evidence thereof shall be admissible, as in other cases." The law did not specify what evidence would be sufficient to prove that the action was based on a verbal order. Curiously, the law had begun by referring to acts done "during the said rebellion" but later stated that the defense provided did not apply to things done "after the passage of this act." [15] This provision was a rather neat way of skirting the important legal question of how long after April, 1865, the rebellion had continued; and of course, if the "rebellion" still had a legal existence in the spring of 1866, many occupation activities of the Army would be protected.

Grant with his General Orders No. 3 and Congress with its two statutes had the same goal of safeguarding soldiers, but the methods employed were different. Grant's instructions to "protect" were vague enough so that some individual commanders could prohibit damage suits completely, as some did, whereas Congress in both the 1863 and 1866 laws clearly provided that the suits could continue. Congress in effect declared that if it could be proven in court that the defendant had *not* acted under orders (admittedly difficult to prove), then the plaintiff was entitled to redress.

On one legal technicality or another cases continued to arise. In August, 1866, a trial court in Tennessee convicted a soldier of a murder committed in June, 1865, holding that since the orders under which he had acted were illegal, he was liable to prosecution. The state supreme court ruled the evidence insufficient, reversed the conviction, and ordered a new trial. [16] The rule of law used by the Tennessee trial court also figured in a Kentucky case shortly thereafter, although the facts were different. In July, 1864, a provost marshal had, under orders, taken a group of slaves from their master. Citing a federal decision of the 1850's, the state supreme court held the provost marshal liable to prosecution since his superior had no legal authority to issue the order, there being no immediate military necessity at the time. [17] The Supreme Court of Arkansas believed differently, however; private soldiers, it ruled,

[15] 14 U.S. Statutes at Large 46.
[16] Riggs vs. State of Tennessee, 3 Coldwell (Tenn.) 85 (1866).
[17] Jones vs. Commonwealth of Kentucky, 1 Bush (Ky.) 34 (1866). The federal case was Mitchell vs. Harmony, 13 Howard 128 (1852). A later Kentucky case on the question of orders being illegal is Elfort et al. vs. Bevins, 1 Bush 460 (1867).

might justify the taking of property under the orders of their commanding officers but the latter, having some discretion, were liable if property were taken without sufficient warrant.[18]

Early in the session Congress took up the future status of the Freedmen's Bureau. Even though Sheridan had recommended legislating sparingly on Negro affairs, many people were telling the Joint Committee on Reconstruction that the bureau had to stay in the South for the good of the Negro. On January 11, 1866, Senator Lyman Trumbull reported a bill to enlarge the bureau's powers and functions. The organization was to continue indefinitely and was now to encompass the border states as well as Secessia. Its agents and employees, whether Army officers or civilians, were all to be under "military jurisdiction and protection." Trumbull and his Judiciary Committee may have felt they were improving relations between the bureau and the Army by this provision, though a more complete consolidation might have been more successful. During the spring of 1866 the Army continued to aid the bureau, and subordinate officers commanding small units in towns or rural areas still wrote to their commanding generals for instructions in specific cases. These requests most often brought a reply of the following pattern: aid the bureau whenever possible and furnish details upon request, provided the men can be spared from their military duties without detriment to the interests of the service.[19] In at least one state, however, the commanding general was reluctant to furnish numerous small details because of the resulting fragmentation of his forces, which included many new recruits.[20] Most individuals attempted to maintain harmony; a complaint that "improper interference and injudicious advice" by Army officers were interfering with bureau policy towards the Negroes brought a gruff order from department headquarters: "Public harrangues [sic] or written addresses by such officers to the inhabitants of this Department, are strictly forbidden. Such officers are reminded that their duties are purely executive, to be carried out literally under the orders and regulations promulgated from time to time by competent higher authority."[21]

The heart of the Freedmen's Bureau bill was in the seventh and eighth

[18] Taylor vs. Jenkins, 24 Arkansas 337(1866).

[19] AAG to Maj. T. D. Ogilby, May 4, 1866, Dept. Ala., 1, RG98, NA.

[20] Terry to AAG Div. Atlantic, March 1, 1866, Dept. Va., 14, RG98, NA.

[21] Wood to AAG Div. Tenn., Dec. 6, 1865, Dept. Miss., 2, RG98, NA; GO 46, Dept. Miss., Dec. 12, 1865, Orders, 900, RG94, NA.

sections. The President, through the commissioner of the bureau, was to "extend military protection and jurisdiction" over all cases in which, because of a state or local law, custom, or prejudice, any of the civil rights and immunities belonging to white people were denied to Negroes or in which Negroes were subjected to punishment different from that of whites for the same offense. Such discrimination was to be a misdemeanor punishable at most by a $1,000 fine or one year in jail or both. Bureau officers were to hear and decide all such cases, under whatever rules and regulations the War Department might provide; this jurisdiction was to continue until readmission of the particular state and full restoration of the civil courts to their functions were effected. The vastness of this grant simply increased the abuses of power by the existing bureau courts; unfortunately an attempt to amend the bill to allow appeals from bureau decisions to federal courts fell in defeat by the strict party vote of 37 to 8.[22] The bill also contained provisions designed to confirm the Negroes in their possession of lands on the Sea Islands of Georgia, South Carolina, and Florida, and to acquire other lands for their use. "The proposition now before Congress," objected General Daniel E. Sickles, "cannot secure lands to more than a few thousand, yet *all* will expect land and will do *nothing* meanwhile but plunder and draw rations. How will you discriminate in making grants, and what will our soldiers and the widows and orphans of the fallen say when they see the lands in the South given away to Negroes and none being reserved for them? It is a great error."[23]

In spite of potent constitutional arguments against the vast jurisdiction of bureau agents, which Trumbull and his colleagues could answer but weakly, the Senate passed the bill on January 25 and the House on February 6.[24] Many people hoped Johnson would approve the measure, but on February 18 he vetoed it on many of the same grounds its congressional critics had urged. The Senate upheld the veto and it was not until July that Congress was able to pass a new bureau bill— basically the January one with some modifications—and this over another presidential veto. Southern commanders were publicly circumspect about Johnson's course, whatever they may have thought privately. Sherman wrote his brother, who in the Senate had voted to override the veto: "Sumner and Stevens would have made another civil war in-

[22] Cong. Globe., 39th Cong., 1st Sess., 399–400, 416.

[23] Sickles to Howard, Jan. 21, 1866, and to Grant, Jan. 22, Dept. South, 46, RG98, NA. Original emphasis.

[24] Cong. Globe., 39th Cong., 1st Sess., 314–23, 415–21.



evitably [sic]—the President's antagonistic position saves us war save of words, and as I am a man of peace, I go for Johnson and the Veto." [22]

Making its way through Congress along with the Freedmen's Bureau bill was the Civil Rights bill, a measure of equal if not greater import. Reduced to its simplest terms, this bill prohibited racial discrimination by state or local law or custom in civil rights and immunities. These included making and enforcing contracts, being parties to civil suits, giving evidence in court, purchasing and holding real and personal property, being protected in one's life and property, and receiving the same punishment for a crime as anyone else would. Enforcement of the law was in the hands of the federal courts; any official serving a warrant or other process could call the Army to his aid and was protected from suit or prosecution in state courts for acts done while enforcing the law. [26]

This bill received heavier fire in congressional debate than did its companion measure, but the objections were quite similar: lack of constitutional authority to pass the bill and impropriety as well as illegality of military enforcement. In countering the constitutional argument, the proponents stretched the "war powers" and the Thirteenth Amendment to their limits. In countering the objections to military enforcement they revealed the principal reason for the bill: fear that local Southern officials could not be trusted to treat the Negro fairly. Inveighing against "rebels steeped in treason and rebellion to their lips," Indiana's Senator Henry S. Lane claimed that without military aid in enforcement the law would be "a mockery and a farce." [27] Speaking immediately after Lane, Senator Henry Wilson of Massachusetts pointed to the "black codes" which several Southern legislatures had passed, implying that the bill under consideration would void these discriminatory measures. As Wilson said, the enforcement of the "black codes" had already been suspended by military orders in some states. On January 12, as part of his directive in General Orders No. 3 to protect soldiers and loyal citizens against damage suits, Grant had also instructed the Army to protect Negroes from being punished more severely than a white man would be for the same offense. [28] Wilson considered that the "black codes" had made this order necessary and that it had doubtless been issued with

[25] Sherman to John Sherman, Feb. 23, 1866, in Thorndike (ed.), *Sherman Letters*, 263.
[26] *Cong. Globe*, 39th Cong., 1st Sess., 211–12.
[27] *Ibid.*, 603.
[28] GO 3, AGO, Jan. 12, 1866, RG94, NA.

the approval of Johnson. There is no positive evidence of such approval or, for that matter, of any disapproval. However, the order appeared the day after Trumbull reported the Freedmen's Bureau and Civil Rights bills out of committee, and the relevant part of the order was clearly designed to achieve the same purpose as the two bills. The proximity in dates may reflect a sudden and unilateral decision by Grant to institute the policy of the two bills immediately by military action in case Congress were delayed in enacting the measures, or it may be unverifiable circumstantial evidence of cooperation between the general and the senator. Or then it might have been sheer coincidence.

In objecting to the "black codes," the North gave the impression that Southern legislatures had passed them overwhelmingly and with great delight. Such was not always the case, however, as Army officers could attest. From South Carolina General Sickles informed Grant that the legislature had passed a "black code" with much hesitation and that the governor was reluctant to approve it. Not much encouragement on Sickles' part was required to induce the governor to withhold the necessary proclamation. [29]

During the early months of 1866 local commanders safeguarded the rights of Negroes in pursuance of Grant's January order. The Army peremptorily told Georgia's Governor Charles Jenkins that part of the state code which discriminated against Negroes could not be enforced. In Florida military influence was more subtly applied. The legislature passed a law prohibiting Negroes from bearing arms, thus ignoring the provision of the new state constitution which prohibited discrimination based on color. Instead of simply suspending the law, General Foster suggested that the governor ask the state attorney general, John Galbraith, if the law were not unconstitutional. When Galbraith came to that correct conclusion, Governor Walker directed the civil authorities not to enforce the law. Application of the Mississippi vagrancy law to recently discharged colored soldiers in Vicksburg brought a request from the commanding general that they first be given time to find employment. [30]

In following the spirit of Grant's order, commanding generals at times took questionable actions. In January, 1866, the Virginia legislature passed a vagrancy law. The classification "vagrant" included "all persons who not having the wherewith to support their families, live idly

[29] Sickles to Grant, Jan. 22, 1866, Dept. South, 46, RG98, NA.
[30] Gen. J. M. Brannan to Jenkins, Jan. 17, 1866, Dept. Ga., 1; Foster to Gen. L. Thomas, AG USA, March 13, 1866, Dept. Fla., 6; Wood to Mayor of Vicksburg, Jan. 18, 1866, Dept. Miss., 2, RG98, NA.

and without employment, and refuse to work for the usual and common wages given to other laborers, in the like work, in the place where they then are." On its face this looked like a reasonable and innocent statute; but General Terry, who had been a court clerk before the war and regarded himself as a lawyer by profession, detected a potential inequity. In some localities, he claimed, employers' meetings had led to "unjust and wrongful combinations" to depress freedmen's wages below their real value, thus making inadequate wages the "usual and common" ones. Reflecting the widespread Northern distrust of the white Southerner's intentions toward the Negro, Terry somehow found it "easy to foresee that even where no such combinations now exist, the temptation to form them, offered by the Statute, will be too strong to be resisted. . . ." He consequently forbade state civil officers to apply the law to any Negro.[21] However good Terry's intentions might have been, his order was wide open to an objection on grounds of principle, had anyone come forth to make it. The state law had not discriminated on the basis of color, whereas Terry in affording a shield against its operation had done so. As a practical matter it may not have been important since most laborers in the state were Negroes, but it amounted to the same discrimination, in reverse, to which the proponents of the Civil Rights bill had objected in many state laws.

The Virginia lawmakers had copied the errant provision verbatim from the Code of Pennsylvania, but nobody in the North worried about that fact in denouncing the law and applauding the order. In answering one approving letter the general explained that his order was intended to protect the Negroes from unfairness and "to show these people [whites] that there is yet 'a God in Israel.' " Wilson commended the order in the Senate debate on the Civil Rights bill but a Delaware Democrat, Willard Saulsbury, asked on what grounds Wilson thought Terry had the authority to issue it. Wilson's reply was primarily an oration in favor of passing the bill, in which he dismissed the point of Saulsbury's question by briefly remarking that Virginia was under martial law.[22]

Presidential approval of the Civil Rights bill was not forthcoming. Johnson met the bill with an able veto message which used some of the congressional arguments against the measure and emphasized the lack of constitutional authority for its passage. In arguing for overriding the veto Trumbull noted the President's observation that there was little

[21]GO 4, Dept. Va., Jan. 24, 1866, Orders, 984, RG94, NA.
[22]Richmond *Daily Dispatch*, Jan. 27, 1866; Terry to Hawley, Feb. 1, 1866, in Hawley Papers, LC; *Cong. Globe*, 39th Cong., 1st Sess., 603.

necessity for the bill and that adequate remedies already existed. Trumbull met this point by citing Terry's order and other similar military actions which he claimed were done and approved by presidential authority.[23] Thus Trumbull was trying to use presidential policies to refute presidential polemics. The argument had some theoretical validity, for in climbing up the chain of command from the generals one ultimately reaches the President as Commander-in-Chief; but in actual practice there was not as much presidential supervision or prior approval of generals' actions as Trumbull wanted to make it seem. Congress did not need too much convincing, however, and shortly voted to override the veto.

On July 3 Grant issued General Orders No. 44 concerning arrests in the South. It included no direct reference to the Civil Rights bill, but anticipation of military enforcement of that measure seems the best explanation for the instructions set forth. Grant ordered soldiers at all command levels in the South to arrest persons charged with crimes against "officers, agents, citizens, and inhabitants of the United States" where the civil authorities either could not or would not do so. The order did not contemplate military trials, but directed the culprits to be held "until such time as a proper judicial tribunal may be ready and willing to try them." This was a rather sweeping order, and Grant did not want the Army to take too drastic action under it, an attitude illustrated by a cautionary wire to the Florida commander emphasizing that, as a rule, arrests under No. 44 should be made only where the civil officials refused.[24]

The crisis over the Civil Rights bill was a high point in the friction which had gradually been developing between Johnson and Congress during the spring. To the increasingly stormy events the Army was an interested if usually circumspect witness. In December, 1865, the *Army and Navy Journal* had predicted there would be no clash at all, and until the Freedmen's Bureau question came to a head in mid-February that view had appeared to be sound. Sherman, who hated politics but always took firm stands, took one on Johnson's action: "Of course I agree substantially with the President. If we do not design to make a

[23]*Cong. Globe*, 39th Cong., 1st Sess., 1759.
[24]GO 44, AGO, July 3, 1866, RG94, NA; Grant to Foster, Aug. 7, 1866, HQA, C, RG108, NA. It is difficult to concur with Benjamin P. Thomas and Harold M. Hyman, *Stanton: The Life and Times of Lincoln's Secretary of War* (New York, 1962), 490, who see this order as "strengthening" General Orders No. 3. The two really deal with different problems.





complete revolution in our form of Government, but rather to preserve it, you must, sooner or later, allow representation from the South, and the longer it is deferred the worse will be its effect." [33]

Some officers left the Army and took an increased interest in politics. One such was Steedman, who after returning from his Georgia command became vice-president of a Washington National Union Club formed to support Johnson. Others kept watch on developments from their headquarters, like Terry, who closely followed Republican party affairs of his native Connecticut. [34] Another officer, General Custer, had returned from Texas and was spending a leave in Washington preparing to go Indian-fighting on the Plains. While the House debated passage of the Civil Rights bill, "Dear Old Sweetness" received this self-inflating news from her husband: "I think if I stay here much longer and Andy Johnson remains firm, the Constitution will be able to stand alone. . . . At least, that seems the present policy." A week later, this: "My confidence in the strength of the Constitution is increasing daily while Andy is as firm and upright as a tombstone. He has not uttered any speeches lately, but I am mightly expecting an outburst of his peculiar eloquence. However, I'm not partial to speechmaking. I believe in acts, not words. But, unlike some public characters, he does not swallow his own words. He has grown. . . ." [35]

The President believed in actions as well as words, and his veto of the Civil Rights bill on March 27 had been a vigorous specimen of both. A week later, on April 2, there appeared another product of his pen. This was his proclamation declaring that the rebellion had been suppressed and peace restored in all parts of the United States save Texas. He omitted that state apparently because it had not yet completed the election and organization of its new legislature. At any rate the proclamation came as a surprise to most people. Among the Cabinet only Seward had had prior knowledge of it, and even he had not been consulted until late the preceding afternoon. Navy Secretary Welles first learned about it in his morning newspaper on the third. Probably the President intended the proclamation as a counterstroke to the congressional enactments, since their supporters had been urging continuance of the "war powers" as justification for them. Welles so interpreted it

[33] Army and Navy Journal, III (Dec. 9, 1865), 243; Sherman to John Sherman, Feb. 28, 1866, in Thorndike (ed.), Sherman Letters, 265.

[34] Printed memorandum to all officers of the club, March, 1866, in Stanton Papers, LC; Terry to Hawley, Feb. 1, 1866, in Hawley Papers, LC.

[35] Custer to Elizabeth, March 12 and 18, 1866, in Merington (ed.), Custer Story, 177–79. Original ellipses.

and thought a "sudden determination" had possessed Johnson. If there were a "sudden determination" it could conceivably have been brought on by a letter from a pardoned Southerner running a plantation near Pine Bluff, Arkansas. Complaining about a few officers of the local command who were "burdened with self-importance" the planter observed, "They seem inclined to take advantage of the fact that the President has never issued a Proclamation, affirming that 'Peace' existed in the country, and until that was done they had a right to presume that war existed still, and of course War remedies." [38]

Just after Johnson's proclamation the United States Supreme Court further disturbed the already turbulent legal atmosphere with its decision in the Milligan case. Lambdin P. Milligan, a civilian, had been tried and convicted during the war by a military commission in Indiana while the civil courts there were open. His plea for a writ of habeas corpus brought the case to the Supreme Court. All the justices agreed that the military commission had been without authority and that he was thus entitled to the writ. Since there was disagreement over some aspects of the case, the formal written opinions were deferred until the following December term. [39] But in the interim any application of the decision to the South on the ground that military commissions could not function where civil courts were open would cast grave doubt on the legality of an important part of the Army's practice there.

If the President and Congress were playing a political version of chess, perhaps the most strategic move of the whole game was the passage late in the session of the Fourteenth Amendment. A prodigious number of resolutions proposing amendments had been introduced sporadically during the early months of the session, and these ideas had been refined and synthesized into the Fourteenth Amendment as passed and adopted. It embodied the principles of the Civil Rights bill and was in part made necessary by the doubtful constitutionality of that measure. Much of the constitutional oratory on the Civil Rights and Freedmen's Bureau bills was reiterated in debate over the amendment, but questions of military power and domination did not arise since the amendment included

[38] Beale (ed.), Diary of Gideon Welles, II, 473–74; S. R. Cockrill to Johnson, March 26, 1866, in Johnson Papers, LC (Reel 21). Original emphasis. There is no certainty that this letter reached the President by April 2 as the earlier practice of date-stamping incoming letters had apparently been abandoned by this time. I do not suggest that Cockrill's letter provoked the drafting of the proclamation, since internal evidence in the original draft shows it had been prepared earlier, but merely that the letter might have precipitated its issuance at that particular time.

[39] Ex parte Milligan, 4 Wallace 2 (1866).



76    FROM APPOMATTOX TO THE RECONSTRUCTION ACTS

no direct provision for military enforcement. On May 10 the House passed its version of the amendment; on June 8 the Senate passed a different one, to which the House agreed five days later. In one of its last actions, shortly before adjournment, the House admitted representatives from Tennessee after that state had ratified the amendment.

Congress adjourned on July 28. Its accomplishments of the past eight months included important legislation, to be sure, but whether that bundle of laws qualified as a "plan" of reconstruction in the same way that Johnson's May, 1865, proclamations had was quite another question. In truth Congress had adjourned without producing a step-by-step procedure for the South to follow in regaining admittance. Congress certainly expected ratification of the Fourteenth Amendment as a condition of restoration, but nobody in the South was certain what other requirements might later be imposed. The situation was as uncertain for the Army as for the South. Before December, 1865, there had been a clearer procedure for the South to follow; but from March, 1866, to March, 1867, the South and its military overseers were left with the congressionally discredited institutional remnants of Johnson's rejected plan, plus the legislative products of the spring which, as federal laws, had to be enforced and observed. In this fogbank of conflicting policies the task of giving prudent direction to the South's course was one that taxed the abilities of the well-disposed among Southern leaders; maintaining order and overseeing affairs in general taxed the abilities of the commanding generals.

4

The Fruits of Confusion

GLORY to God in the Highest!! for your magnanimous Proclamation of the ever memorable 2' Apl. 1866! Proclaiming Peace throughout the United States of America! and encouraging *Good will* to all Mankind!" That laudation greeted Johnson as he read his mail one day just after releasing his peace proclamation. Reading on, the President must have been somewhat let down as the eloquence of the writer's beginning descended to the supplication of his close, "Please find something for me to do." Just another of the multitudinous office-seekers who had beleaguered the President for the past year! That message had come from urban New Jersey; from rural Mississippi came more serious substance and less flowery prose: "We have just heard of your proclamation declaring the war at an end and that the writ of Habeas Corpus is again restored, & that for the future we are to be governed by the Civil instead of the Military laws, thank God for it. We are tired of Military [rule], we are tired of war, and wish to be again as we were before the late terrible and calamitous rebellion." [1] This was the interpretation which many Southerners gave to the proclamation. Rural Arkansans read in their weekly newspaper an editorial claiming the President had removed standing military occupation, martial law, and suspension of the habeas corpus privilege.[2]

But *had* the proclamation actually done the things Southerners credited it with doing? All Johnson had *proclaimed* was that the insurrection was at an end and was henceforth to be so regarded. The rest had all

[1] S. Corden to Johnson, April 3, 1866, and G. W. Williams to Johnson, April 12, in Johnson Papers, LC (Reel 22). Original emphasis.
[2] Batesville *North Arkansas Times*, April 14, 1866.

77



been in the proclamation's preliminary statements and constituted part of standard American governmental philosophy:

Whereas standing armies, military occupation, martial law, military tribunals, and the suspension of the privilege of the writ of *habeas corpus* are in time of peace dangerous to public liberty, incompatible with the individual rights of the citizen, contrary to the genius and spirit of our free institutions, and exhaustive of the national resources, and ought not, therefore, to be sanctioned or allowed except in cases of actual necessity for repelling invasion or suppressing insurrection or rebellion. . . .[8]

The Army was quick to see that more than one interpretation was possible and acted cautiously pending settlement of the matter. Department headquarters in Virginia temporarily suspended military arrests and trials of civilians. In Georgia the bureau chief asked Washington if the proclamation removed martial law, adding that the department commander was hesitant about making arrests now. In a day or two this inquiry brought forth a wire from General Townsend to the department commander: ". . the Secretary of War, *with the approval of the President,* directs me to inform you that the President's Proclamation does not remove martial law or operate in any way upon the Freedmen's Bureau in the exercise of its legitimate jurisdiction. It is not expedient, however, to resort to military tribunals in any case where justice can be attained through the medium of civil authority." The same instructions went out to all other military commanders.[4]

In Atlanta Townsend's telegram was rephrased thus for a local commander: "You should bear in mind that the right of the exercise of the writ of Habeas Corpus is not restored, but that the Military relinquish to the civil authorities the exercise of all power, compatible with the safety of the public and justice to all." [5] For his Louisiana command General Canby elucidated in greater detail what the proclamation meant.

[2]*Messages and Papers*, VI, 431–32.
[4]AAG to Maj. P. W. Stanhope, and to Gen. N. A. Miles, April 5, 1866, Dept. Va. 14; Brannan to AAG Div. Tenn., April 7, Dept. Ga., 1, RG98, NA; File 122F1866, AGO, and Townsend to Brannan, telegram, April 9, AGO, 42, RG94, NA. Emphasis added because the treatment of this point in Thomas and Hyman, *Stanton*, 478, is misleading. From their account it appears that Stanton and Grant, by sending a "secret circular," were circumventing Johnson without his knowledge. This would have constituted grounds for Stanton's instant ejection from the Cabinet. Moreover, there is no subsequent evidence that Johnson issued other instructions later on, which he would probably have done had the ones of April 9 not corresponded to his own view. The language of Townsend's telegram seems to clearly indicate Johnson's foreknowledge.
[5]AAG to Maj. R. Crofton, CO Savannah, April 19, 1866, Dept. Ga., 1, RG98, NA.

It did not remove martial law or affect the bureau. It did not allow state courts to interfere with persons legitimately held in federal custody. It did not impair the Army's power to stop forceful opposition to federal laws. It did not affect the jurisdiction of military tribunals over acts committed before the proclamation, but it did suspend that jurisdiction over subsequent acts. It had no effect on the protection against civil suits provided in Grant's January order. Military power was to be used when necessary to enforce federal court processes but unnecessary interference with the civil authority was barred. Officers called upon to act in jurisdictional conflicts between federal and state courts should be guided by the Supreme Court's 1859 opinion in *Ableman vs. Booth*—the general did not brief the case for his subordinates but did furnish them the proper citation from the printed reports.[6] In spite of the official interpretation, some officers still felt hampered by the proclamation; Thomas complained that it "virtually denies to the Military all supervision of the civil [power], all exercises of the functions of the civil [power], or the right to enforce their orders, where they in any degree collide with the decision of a civil Magistrate. . . ." [7]

On August 20 the President issued another proclamation. Now Johnson declared the rebellion ended in Texas, as well as in other states, since civil authority could enforce the laws there and the people were "well and loyally disposed." Johnson reiterated most of what he had set forth in April including his strictures on military government. The original draft of the August document contained a lengthy proviso concerning what the Army had previously done:

It is to be understood, however, that such military orders as have been heretofore issued with reference to any or all of the several States or any of them under the act to establish a Bureau for the relief of freedmen and refugees, approved March third, one thousand eight hundred and sixty-five and the act passed at the late session of Congress continuing the same in force, and all military orders now existing for the purpose of sustaining the civil authority of the Federal Government and the laws of Congress with reference to a possible renewal of resistance to that authority, are not affected by this proclamation, and the same will remain in force until hereafter specially revoked, or countermanded.[8]

This section did not appear in the proclamation's final form. Johnson may have felt that the substance of the omitted section was covered by

[6]*Army and Navy Journal*, III (May 5, 1866), 586.
[7]AAG to G. E. Grishan, June 11, 1866, Div. Tenn., 34, RG98, NA.
[8]Ms draft, filed under Aug. 20, 1866, Proclamations, in Johnson Papers, LC (Reel 49). The draft being a clerical one, it is impossible to determine whether Johnson or some advisor was responsible for the change.



80    FROM APPOMATTOX TO THE RECONSTRUCTION ACTS

language already included: "Whereas adequate provision has been made by military orders to enforce the execution of the acts of Congress, and the civil authorities, and secure obedience to the Constitution and laws of the United States within the State of Texas if a resort to military force for such purpose should at any time become necessary. . . ."[9] The original section, applying to all eleven states, was admittedly broader than this one, and the Army would probably have felt better had it been included.

As it was, the Army still worried about its legal position. After the proclamations appeared, Thomas used his troops sparingly in Tennessee, and then only when essential to help the civil authorities.[10] From the Gulf states also came signs of doubt. The Florida commander complained to Sheridan that some officials, thinking the proclamation amounted to total restoration of civil supremacy, were arresting soldiers and federal employees right and left for trifling infractions of municipal ordinances. Sheridan sent the letter on to Grant with an endorsement pointing out the "increasing insolence" of Florida and Texas officials since the proclamation's appearance. Louisiana he did not consider such a problem because there the proclamation had never been "officially promulgated." Since General Orders No. 3 and 44 had never been rescinded, Sheridan said, he had kept on in Louisiana as if no proclamation existed.[11]

Sheridan was not alone in thinking the President's actions had produced increasing hostility towards the government. Even in April the Baton Rouge commander had noticed such an attitude as a result of Johnson's first proclamation. According to him prominent men averred that if Congress tried to force distasteful measures on them, "another *tea party* will be gotten up."[12] On the question of the proclamations' effect on No. 3 and No. 44, Grant informed Sheridan in October that he considered the proclamations nullified the orders.[13] December instruc-

[9] *Messages and Papers,* VI, 438.
[10] Thomas to Stanton, Nov. 29, 1866, Div. Tenn., 34, RG98, NA.
[11] Foster to AAG Div. Gulf, Sept. 20, 1866, and endorsement of Oct. 6, in Sheridan Papers, LC. Sheridan's use of the phrase "officially promulgated" obscures his meaning, since commanding generals always received official copies of laws and proclamations in the form of general orders from the War Department. He probably meant that he had taken no steps to announce the proclamation in Louisiana.
[12] Col. A. J. Edgerton to AAG Dept. La., April 30, 1866, in Sheridan Papers, LC, Original emphasis.
[13] Maj. G. K. Leet, AAG HQA, to Sheridan, Oct. 17, 1866, in Sheridan Papers, LC. The treatment of this point in Thomas and Hyman, *Stanton,* 498–99, seems confused in that it credits Grant with sending out devious and contradictory instructions, to the end that Johnson's edicts would not hamper the Army. They mention an alleged letter from Grant to Sheridan of Oct 17, in which Grant told

*The Fruits of Confusion*    81

tions to subordinates from Headquarters, District of Texas show that this opinion of Grant's was the policy subsequently followed in that state, although one post commander probably went too far in refusing military aid to the bureau under it.[14] The Army's chief lawyer, Judge Advocate General Joseph Holt, was also drawn into the question. A wartime statute had limited to the duration of the war the authority of commanders of "separate brigades" to review court-martial proceedings. After Johnson's August proclamation, one of Sheridan's subordinates in Texas had exercised this authority, but Holt ruled that the proclamation had ended the rebellion in law and that the officer's action was thus incorrect. Since courts-martial only try soldiers for military offenses, the specific legal question involved did not concern civil-military relations; it was Holt's ruling on the effect of the proclamation on the rebellion that was significant.[15]

The uncertainties which Johnson's proclamations had raised concerning the Army's legal position in the South became greater due to the unsettling effect of the Supreme Court's action in the Milligan case. In October, 1865, Crawford Keyes and several friends had attacked a group of United States soldiers in South Carolina, killing several, for which a military commission tried them in January, 1866. Since the commission decreed the death penalty, the President had to review the case; and in July, upon Stanton's recommendation, Johnson commuted all the sentences to life imprisonment. The Secretary was unwilling to carry out a death sentence in view of the Milligan decision. In November, 1866, after the prisoners were transferred to Fort Delaware, they induced a federal judge to release them on a writ of habeas corpus on

Sheridan that the proclamations did not really revoke the general orders. They provide no footnote reference for this letter, and it could not be located in the Grant or Sheridan Papers. From *Leet's* dispatch of Oct. 17 (which Thomas and Hyman do not mention at all) it seems quite clear that Grant considered No. 3 and No. 44 nullified. Thomas and Hyman claim that in Grant's alleged letter of the seventeenth he told Sheridan to pretend he had never "officially received" Johnson's proclamation; actually it was Sheridan (in his endorsement on Foster's letter, referred to *supra,* note 11) who first suggested this, and Grant's concurrence in the idea is doubtful since Leet's letter of Oct. 17 transmitted, at Grant's order, official copies of the proclamations. Thomas and Hyman place the phrase "officially received" in quotes, as if it appeared in Grant's alleged letter of the seventeenth.
[14] AAG Dist. Tex. to Maj. S. H. Lathrop, Dec. 19, 1866, and to Capt. J. H. Bradford, Dec. 26, SMD, 111, RG98, NA.
[15] "Memo" filed under Sept. 26, 1866, in Sheridan Papers, LC. The treatment of this point in Thomas and Hyman, *Stanton,* 499, while technically correct as far as it goes, omits the most significant part of the problem.



the ground that the federal courts in South Carolina had been open during the trial.[16]

Another South Carolina military commission had tried eighty-year-old James Egan for the murder of a Negro boy and had sentenced him to life in the federal penitentiary at Albany, New York. In June, 1866, Justice Samuel Nelson of the United States Supreme Court, sitting as a circuit judge in New York, granted Egan a writ of habeas corpus. Nelson's opinion was an important statement of the proper bounds of martial law, which he defined as the will of the commander, capable of overriding all civil law. But, he said, martial law could be used in times of necessity and must end when the necessity ends. In addition, the existence of necessity must be shown by those employing martial law. In this case, Nelson held, the necessity ended with the suppression of the rebellion and the reorganization of the state government by Johnson.[17] This opinion was in tune with the Milligan edict of April; and since Nelson was a Supreme Court justice, the opinion seemed to suggest what might be forthcoming when the nation's highest court met in December. Yet this decision of Nelson's left two critical questions unanswered. First, at what date had the rebellion been suppressed? Among the conceivable points were the surrender of Lee, the surrender of Kirby Smith, and Johnson's April proclamation, with practically a year between the first and last. And second, when had Johnson reorganized the state government? One might choose his appointment of a provisional governor, the election of members of Congress, or Johnson's annual message of December, 1865, announcing the reorganization of the state. Small wonder that the Army could not look to the courts for clear guidance.

Concern for the Negro had been one force motivating the enactment of the Freedmen's Bureau and Civil Rights bills, and events of the first half of 1866 showed the reality behind this concern. Among these events were prolonged riots in Memphis. On May 1 some discharged colored soldiers became disorderly and a police attempt to arrest them proved futile. The entire police force then mobilized and with the aid, whether asked or unasked, of numerous citizens made a general onset against the Negroes in South Memphis. The affair promptly got out of hand and troops had to be summoned. The department commander, General George Stoneman, cautioned his men to use discretion, especially if the

[16] *Army and Navy Journal*, III (July 14 and 21, 1866), 742, 758; *House Reports*, 39th Cong., 2nd Sess., No. 23; *United States vs. Commandant of Fort Delaware*, Fed. Cas. No. 14842.

[17] *In re Egan*, Fed. Cas. No. 4303.

mayor called upon them for aid. The soldiers were to assist the civil authorities in maintaining order but were to use firearms "only in case of extreme necessity of which you must be the judge." He also thought it advisable to patrol part of Memphis and to have some of his white troops keep the 3rd Colored Heavy Artillery at Fort Pickering to prevent the men from entering the city.[18] The riots continued sporadically until the fourth when additional troops ordered from Nashville arrived and comparative quiet was restored. Stoneman, who did not trust either the sincerity or the ability of the civil functionaries, addressed a long and tart letter to the mayor: "In conclusion I have to assure you and through you the people of Memphis that if they cannot govern themselves as a law abiding and Christian community that [*sic*] they will be governed—and that hereafter it will be my duty and privilege to see that there is [*sic*] no more riotous proceedings or conduct either on the part of whites or blacks or city authorities." [19] The subsequent military investigation placed principal blame on the civil officials and set the monetary loss to the Negroes at a total of $72,000, including both thefts and property damage.

Some question arose concerning what, if anything, the Army could do with respect to collection of damages and prosecution of the culprits responsible. On July 7 Grant sent a sheaf of papers to Stanton with the suggestion that legal proceedings ought to be pressed against the city of Memphis for damages caused by the riot and that the leaders should be arrested by the Army and held until the civil authorities should be willing to try them. In so doing Grant was apparently looking to action under his General Orders No. 44, issued four days previously and covering exactly such situations. Stanton and the President referred the question to Attorney General James Speed who returned his opinion a week later. The riots, he ruled, were no offense against the laws or dignity of the United States and the Army's role at Memphis ended with the suppression of violence. There being no war, and both federal and state courts in Tennessee being open, the people would have to appeal to them; the Army was powerless to redress private grievances or carry on "prosecutions for public wrongs." [20] In mid-August the wires brought a cipher telegram from General Thomas: the fulminators of the riot were known; the grand jury, long in session, had ignored the matter;

[18] *Army and Navy Journal*, III (May 19, 1866), 615; Stoneman to Capt. A. W. Allyn, May 1, 1866, and AAG to same, May 2, Dept. Tenn., 22, RG98, NA.
[19] Stoneman to Mayor John Park, May 5, 1866, Dept. Tenn., 22, RG98, NA.
[20] Grant to Stanton, July 7, 1866, HQA, C, RG108, NA; 11 Opinions of Attorneys General, 531–32.



should not the culprits therefore be arrested under No. 44? Grant sent the paper on to Stanton with the endorsement that he wished the arrests could be made in order to have a salutary effect on the civil officials but that he did not feel authorized to order such action.[21] "A strict and prompt enforcement of this order is required."—this had been Grant's gruff conclusion to No. 44, and the Memphis agitators were a clear case in point. If he did not feel authorized to order an arrest under a policy he had himself set forth, he must have been either exceptionally weak-willed or else doubtful of the legality of No. 44 in the face of Johnson's April proclamation.[22]

Of even greater significance than the Memphis disorder were disturbances in New Orleans just after Congress adjourned; they were almost a testimonial to the need for the legislation recently passed. The difficulties began when a remnant of the pro-Union 1864 state convention undertook to hold a session in New Orleans. The governor considered the meeting legal; the lieutenant-governor, attorney general, and mayor were determined to prevent it. On July 25, 1866, the mayor informed General Absalom Baird, commanding the Department of Louisiana, of the expected meeting. The mayor made it clear that he considered the meeting illegal; that it was "calculated to disturb the public peace and tranquility"; that he consequently obliged to disperse the meeting; and that he intended to do so by arresting its members, provided the convention lacked military sanction. Baird replied that the convention had never applied for permission to meet but that moreover, all loyal citizens had a right to assemble peacefully to discuss governmental questions. Considering the turbulent state of public opinion in postwar Louisiana, the general displayed singular political naïveté and wishful thinking: "If the assemblage in question has the legal right to remodel the state government, it should be protected in so doing; if it has not, then its labors must be looked upon as a piece of harmless pleasantry, to which no one ought to object." He questioned the propriety of a mere mayor assuming to decide on the legality of a state convention and thought the governor (and ultimately the federal government) should be the ones to deal with this question. As to the use of troops, Baird promised the civil authorities military and naval aid if public hostility

[21] Thomas to Grant, Aug. 15, 1866, and endorsement of Aug. 16, in Stanton Papers, LC. There are no further endorsements beyond Grant's.
[22] This case seems additional evidence of the incorrectness of the view in Thomas and Hyman, *Stanton*, 478, 498–99, that Grant was secretly circumventing Johnson's policy during 1866.

to the convention was such that the mayor's police force could not control the populace and protect the convention in its sessions.[23]

There the matter rested for a day or so, until speeches began to be made in preparation for the meeting. On the twenty-eighth the lieutenant-governor wired President Johnson describing affairs and asking if the Army would interfere with the contemplated arrest of the convention members under process from the local court. Johnson doubted the legality of the convention and also desired to maintain order; he consequently wired back to the lieutenant-governor: "The military will be expected to sustain, and not to obstruct or interfere with, the proceedings of the courts." [24] This telegram went out from the White House at 5:40 P.M.; four and a half hours later a telegraph key filled a room in the War Department with the staccato clicking of another message.

HON. EDWIN M. STANTON, SECRETARY OF WAR: A CONVENTION HAS BEEN CALLED, WITH THE SANCTION OF THE GOVERNOR WELLS [SIC] TO MEET HERE ON MONDAY. THE LIEUTENANT-GOVERNOR AND CITY AUTHORITIES THINK IT UNLAWFUL, AND PROPOSE TO BREAK IT UP BY ARRESTING THE DELEGATES. I HAVE GIVEN NO ORDERS ON THE SUBJECT, BUT HAVE WARNED THE PARTIES THAT I COULD NOT COUNTENANCE OR PERMIT SUCH ACTION WITHOUT INSTRUCTIONS TO THAT EFFECT FROM THE PRESIDENT. PLEASE INSTRUCT ME AT ONCE BY TELEGRAPH. A. BAIRD, BREVET MAJOR GENERAL.[25]

The War Minister failed to show the dispatch to the President and failed to send any reply on his own. These were perhaps the most crucial decisions made by anyone during the entire affair.

Sunday the twenty-ninth was quiet enough, but on Monday the convention met and a riot took place in which 37 Negroes were killed and 119 injured. In the relative quiet of Monday evening, after his troops had arrived and cleared the streets, Baird penned Stanton an account of the events. The military etiquette and stereotyped formality of his opening words hardly fit the subsequent details: "I have the honor to inform you that a very serious riot has occurred here today." The trouble

[23] John T. Monroe to Baird, July 25, 1866, and reply, July 26, in *House Exec. Docs.*, 39th Cong., 2nd Sess., No. 68, pp. 6–7. This is a compilation of relevant correspondence and telegrams, plus the findings of a subsequently established military board of investigation.
[24] Albert Voorhies to Johnson, reply, and Johnson to Gov. J. Madison Wells, all July 28, 1866, *ibid.*, 4.
[25] *Ibid.*, 4–5.

began when some Negroes, parading in Canal Street near the convention hall, got into a scuffle with a group of white citizens. As the dimensions and intensity of the affray increased, the police force, which had been massed and held ready by the mayor, made an all-out attack on the pro-convention elements of the crowd and inflicted numerous brutal and unnecessary injuries, predominantly on unresisting Negroes. The police, acting in concert with the anti-convention segments of the mob, brought the convention hall itself under siege and ultimately broke up the meeting. Since Jackson Barracks were three miles below the city, the troops did not arrive at the scene until after much bloodshed had occurred; but they did succeed in restoring order. Baird declared martial law in the city and appointed a military governor.[26]

As the week progressed, more details came to light, and attempts were made to shift the blame from one principal to another. In some respects these attempts were largely academic, for surely there was enough blame to go around. Sheridan, Baird's superior, returned from a visit to Texas just after the riot, and on August 1 he wrote Grant a dispatch calling the convention leaders "political agitators and revolutionary men" but throwing chief responsibility for the riot on the conduct of Mayor John T. Monroe's party. The White House released this dispatch to the press with the latter opinion omitted; and the publication of this version led to a journalistic cross fire between the pro- and anti-Johnson newspapers, an indignant complaint from Sheridan, and ultimate publication of the dispatches in full.[27]

Baird came in for his share of abuse, though some of it was undeserved. In the tumult of the thirtieth a Northern correspondent lashed at the general: "In the face of all these tremendous conditions, our own military commander sits down quietly to dinner, while the blood of such men as the former class [Unionists] is poured at his feet by the latter [Rebels] as if it were a libation to his incapacity and egotism." [28] Baird's troops had indeed appeared too late to prevent the riot, but this is not necessarily attributable to the commander's indifference. The gen-

[26] *Ibid.*, 6. Baird did not have all the details at the time he wrote this letter. It can be augmented by the findings of his board of investigation, summarized *ibid.*, 36–43. The inevitable congressional investigation resulted in *House Reports*, 39th Cong. 2nd Sess., No. 16.
[27] *House Exec. Docs.*, 39th Cong., 2nd Sess., No. 68, pp. 19–22; New York *Times*, Aug. 3, 1866; New York *Tribune*, Aug. 4–10. The question of the garbled dispatch is satisfactorily dealt with in McKitrick, *Andrew Johnson and Reconstruction*, 426–27 and n.
[28] New York *Tribune*, Aug. 6, 1866.

eral was under some misapprehension (perhaps deliberately perpetrated by the civil authorities) as to the time of the convention's meeting; he had expected it to start at 6 P.M. whereas it actually began at noon.

Stanton and Johnson also received censure. For the failure of Baird's telegram of the twenty-eighth to reach the President, the War Secretary alone is responsible. Stanton's motives, however, are less easy to determine. To ignore an officer's plain request for instructions from the Commander-in-Chief is at the least sheer incompetence. But the grounds for charging Stanton with deliberate deceit and conniving are much less firm. Stanton differed with the President on many points of policy towards the South, and perhaps he would not have minded seeing the President embarrassed by trouble in New Orleans. But the charge of deliberately fomenting bloodshed seems insupportable. Stanton's later defense was that Baird's telegram showed no fear of immediate violence and that Baird's "existing instructions" to preserve peace covered the case. This was a weak argument, however; any observant person, as aware of the state of affairs in Louisiana as Stanton was, could hardly have underestimated the urgency of Baird's request.[29]

The matter of Baird's "existing instructions" was an equally weak point in Stanton's defense. Of course Baird was expected to preserve the peace; he did not need the President to tell him that. The thorny question was, what course should Baird take with respect to the action of the courts? Troops all over the South had been called upon from time to time to help this sheriff or that marshal execute a civil process, and Army officers were not always certain what was the extent of their power in such cases. It seems clear that had Baird received definite instructions on the specific point of his relation to the civil authorities, the chances of any serious disturbance would have been slim. Had Baird received instructions to support the police in their execution of a court order to arrest the delegates, the convention would probably have melted away without the violence which actually transpired and which was the result of the police acting without any restraint. Had Baird's instructions been to prevent the arrest of the delegates, there would still have been little trouble since the New Orleans police would hardly have engaged in a pitched battle with regular United States troops. As was the case throughout Reconstruction, the moral and psychological effect of the blue uniform was great, but in this instance the War Secretary's inaction prevented the timely application of this suasion.

[29] Thomas and Hyman, *Stanton*, 496–97.



Some of Johnson's contemporaries believed that the President had helped to foment the trouble.[20] But this is farfetched. Three Johnson dispatches to the civil officials, two on the twenty-eighth and one on the thirtieth, show that he had three desires: that the convention, being of doubtful legality, should not meet; that the Army should uphold the court process; and that peace should be preserved. The crucial message was probably the one to the lieutenant-governor which left the Executive Mansion at suppertime on the twenty-eighth: "The military will be expected to sustain, and not to interfere with the proceedings of the courts." This had gone forth in response to an inquiry from the lieutenant-governor as to the Army's course.[21] Johnson was here informing a state official what he wanted the Army to do, without sending a simultaneous message to the Army officer concerned—seemingly an irregular procedure for the Commander-in-Chief to follow.[22] But there is an explanation. If Stanton thought Baird did not need to be told to keep the peace, Johnson doubtless did not need to be told to uphold the civil courts. Johnson had always wanted the civil authorities to have as much freedom as possible, with the Army exercising a supporting role. Hence he was simply informing the civil functionaries of a policy he then believed was already clear enough to the military power. Had he received Baird's message which came to the telegraph office five hours later he would have realized the policy was not clear to Baird and would most likely have sent him the same wire he had sent to the lieutenant-governor.

The blame distributed in Washington falls in greatest measure at the Secretary's door; that distributed in New Orleans belongs principally to the mayor and his police. After the affair Sheridan wrote: "It was no riot; it was an absolute massacre by the police, which was not excelled in murderous cruelty by that of Fort Pillow. It was a murder which the mayor and police of this city perpetrated without the shadow of a necessity; furthermore, I believe it was premeditated, and every indication points to this." The military investigation bore out most of this opinion. Conflicting testimony was offered on almost every important point,

---

[20]New York Tribune, Aug. 1, 1866. Thomas and Hyman, Stanton, 497, accept this idea.

[21]House Exec. Docs., 39th Cong. 2nd Sess., No. 68, pp. 4–5. It is difficult to concur in the opinion of Thomas and Hyman, Stanton, 497, that in this message Johnson was "acting in direct contradiction" to the position he had taken earlier in July with respect to the Tennessee legislature. The two situations were not parallel.

[22]Thomas and Hyman, Stanton, 497, censure Johnson for this.

---

but without much doubt Monroe was determined to break up the convention and wanted his police to have a free hand in doing it.[23]

Passions in New Orleans took a long time to cool. Nearly a month after the riot Captain William B. Armstrong, a quartermaster, sent Senator Lyman Trumbull a badly-spelled estimate of affairs: "You know that we union and military men live here rather insecurely in this rebelious riotous city, constantly exposed to the bullet or dager of the assasan [sic]."[24] Fortunately, conditions were not quite that bad every place in the South. Northerners, particularly ones of Republican proclivities, regarded the Memphis and New Orleans affairs as typical of Southern attitudes during 1866. It was not an accurate estimate, though, for violence on the scale of Memphis and New Orleans was the exception rather than the rule. But if such riots were not typical of 1866, they were more extreme than anything that had occurred in 1865. The malevolently disposed among Southerners probably thought they could get away with more in view of the conflict between Congress and the President. And whereas the President's intransigence likely alienated some moderate Republicans, it seems equally plausible that Congress' intransigence in refusing to accept Johnson's policy (even though the basis for the intransigence was natural and understandable) discredited the moderates among influential Southerners who had honestly counseled acquiescence in Johnson's plan on the assumption the President's actions would be ratified by Congress.

In protecting Negroes—and white Unionists as well—the Army was not often required to suppress large-scale riots so devised that the victims would be principally from those two "objectionable" classes. A more customary occurrence was military interposition in individual cases, sometimes specifically under the powers vested in the bureau or under the Civil Rights Act. Some difficulty arising from the conduct of the Natchez police force during a riot occurred in March, 1866, and the post commander felt it desirable to disarm the police. General Wood disapproved. Such action he thought was not in line with "what is believed to be the true policy for correcting the evils which exists [sic] in the society of the states lately in rebellion." Wood thought the "true policy" was not to modify state and municipal laws, but to deal with individual cases of abuse, and thus "educate a public sentiment which

---

[23]House Exec. Docs., 39th Cong., 2nd Sess., No. 68, pp. 11, 36–43.

[24]Armstrong to Trumbull, Aug. 24, 1866, in Lyman Trumbull Papers, LC.

Compendium_Vorenberg
Page 271



will finally (and it is hoped at no distant day) result in a system of laws, and such in [sic] enforcement of them, as will secure equal and impartial justice to all classes of the community." Nullifying existing laws or customs would just create chaos and extend the necessity for military rule. As to the Natchez police, when individual officers abused their power and harmed anyone, white or Negro, the post commander ought to report it to the city government and ask for redress. Only if the local officials refused to correct the abuse should the offenders be arrested. "If the mayor cannot control his police," Wood remarked sharply, "and see that they do not carry on the business of public highwaymen, the government of the City will of necessity revert to the Military, the necessity of which will be deplored by the General Commanding as much as it can be by good citizens." [32]

After the Civil Rights bill had become law, however, Wood took a stronger position with respect to "nullification" of local laws. In July, 1866, he told a justice of the peace in the little town of Kosciusko that three sections of the Mississippi black code which forced Negroes to make written contracts and have fixed homes were in conflict with the Civil Rights Act since they did not apply equally to whites. If Negroes made agreements and then did not live up to them, he said, they could be proceeded against for breach of contract, but not by the summary remedies set forth in the state law. [36]

On one occasion in South Carolina General Sickles prevented a white man from being lashed under a court order; on another he threatened to relocate the freedmen of Edgefield, Laurens, and Newberry districts and provide for them at local expense unless they were treated more fairly. Grant ordered Sheridan to see that all stockholders of the Buffalo Bayou, Brazos, and Colorado Railroad got to share in the reorganization of the company and did not suffer from usurpation of control of the road during the rebellion. When the mayor of Norfolk, Virginia, tried to interfere with a Freedmen's Bureau court case, the commanding general told him to desist. While General Charles Griffin commanded in Texas, he wrote many letters to Governor James W. Throckmorton requesting pardons for people unjustly convicted by civil courts. [37]

Protecting people's rights by interposition in specific cases naturally

[32] Wood to Col. H. A. McCaleb, March 19 and 26, 1866, Dept. Miss., 2, RG98, NA.
[36] Wood to E. M. Wells, July 10, 1866, Dept. Miss., 2, RG98, NA.
[37] Simkins and Woody, South Carolina, 57; Grant to Sheridan, Feb. 28, 1866, HQA, C, RG108, NA; AAG to Mayor of Norfolk, Feb. 8, 1866, Dept. Va., 14, RG98, NA; Griffin to Throckmorton, fall-winter 1866, passim, 5MD, 111, RG98, NA.

required close relations between the Army and civil officials, who varied in attitude from cooperative to recalcitrant. The simplest way of dealing with scoundrelly civil functionaries would have been their removal, but the Army was reluctant to make wholesale purges for misconduct. In March of 1866 Sheridan urged that New Orleans hold a municipal election to improve affairs there. "The present mayor is a military appointee," he wrote, "but defied General Canby, who appointed him, and conducted affairs as though he had been elected by the people; but if the courts found him at fault, he defied them by the facts [sic] that he was a military appointee and only subject to military jurisdiction; so he had a pretty good thing of it, not being particularly responsible to anyone." [38] In North Carolina General Ruger ordered the mayor of Wilmington to replace the marshal, but this action brought disapproval from Grant. "The eligibility of civil officers to office is a question for the courts and law officers of the Government to decide," he wrote, adding that state officials ought not, as a rule, to be interfered with unless found guilty of some offense. When, however, it turned out that the marshal was an unpardoned rebel general, Ruger's course was upheld. [39] The War Office wanted to keep close watch on projected removals and in July directed another commander to make a detailed report to Washington and await special instructions in each instance before removing anyone. Johnson too involved himself in the question of removals and ordered the Virginia commander to prevent the recently elected mayor of Portsmouth from exercising his functions until pardoned. [40]

During 1866, as at other times during Reconstruction, the fact that local conditions varied from place to place and over periods of time made it difficult for Washington to formulate general instructions for the field commanders. Consider Arkansas. An inspection tour through the northern part of the state early in the year resulted in a report of mixed popular sentiment. The only open resistance described took place at a little crossroads with the disarmingly peaceful name of Evening Shade, where a small command attempting to make some arrests was fired upon. The fire was returned and, there were no casualties, but the desperadoes the Army was after escaped. The area around Jacksonport,

[38] Sheridan to Lt. Col. C. B. Comstock, ADC HQA, March 2, 1866, in Daniel O. Drennan Papers, LC.
[39] E. G. Parker, Mil. Sec. HQA, to Gen. T. Ruger, Apr. 5, 1866, HQA, C, RG108, NA; File 130R1866, AGO, and Townsend to Ruger, April 9, 1866, AGO 42, RG94, NA.
[40] Townsend to Gen. J. C. Robinson, July 13, 1866, AGO, 43, and to Terry, May 29, AGO, 42, RG94, NA.



however, thirty-five miles away, was peaceful enough to warrant a recommended reduction in the local garrison. By the time annual report-writing time had arrived in the autumn, General Sherman could report the state as doing very well and not causing "a particle of trouble." [41]

Other parts of the South exhibited similar variances. In July the Florida commander found conditions in his state generally good but thought troops would be needed for one or two years, if not longer, to protect Negroes and Northern investors. Sheridan agreed in his annual report that Florida was doing well and that its people realized "that their best interest was to take off their coats and go to work to repair the disaster of the rebellion." This was quite a contrast to the most vexatious portion of Sheridan's command—Texas—where he found conditions "anomalous, singular, and unsatisfactory" and remarked that Indians killing white men on the frontier caused much greater consternation than white men killing Negroes in the interior. [42] As to the Carolinas, Sickles wrote, "In my Dept. I have not yet seen the American flag raised by a Carolinian. If it floated over a dwelling, or a hotel, or a shop, the population would avoid the place as they would shun a pest-house filled with lepers." [43]

With the condition of affairs thus varying in time and place, Grant as General-in-Chief was reluctant to attempt to formulate set policies covering all possible situations. The suppression of newspapers was one exception. Grant decided, after some Virginia difficulties in this regard, that the power of suspension should lie only at his headquarters. He asked Southern commanders to send him for review copies of papers containing disloyal sentiments, a policy which in Virginia resulted in a minor cause célèbre over whether the sample copies sent to Washington ought properly to be paid for. Suppressions were infrequent, though; perhaps, as Terry thought, the close scrutiny had some salutary effect on Southern editorial policies. [44]

In the general administration of affairs Grant left as much as possible to the local commanders. It might indeed be comforting to some lieutenant or captain commanding a post in backwoods Georgia to know he was

[41] Report of Col. L. H. Whipple to AAAG White River Dist., in *House Reports*, 39th Cong. 1st Sess., no. 30, Pt. 3, pp. 169–70; *Report of the Sec. of War, 1865–66*, p. 22 (1st pagin.).
[42] Foster to AAG Div. Gulf, July 8, 1866, in Sheridan Papers, LC; *Report of the Sec. of War, 1865–66*, pp. 48–49 (1st pagin.).
[43] Sickles to Stanton, private, July 19, 1866, in Stanton Papers, LC.
[44] Gen. T. S. Bowers, AAG HQA, to all So. cmdrs., Feb. 19, 1866, HQA, C, RG108, NA; Terry to AAG Div. Atlantic, March 1, 1866, and to Gen. J. A. Rawlins, C/S HQA, March 19, Dept. Va., 14, RG98, NA.

carrying out minutely detailed instructions he had received from Washington via intermediate headquarters; ultimate responsibility then clearly rested at the highest level. But on the other hand Grant was correct in his belief that, in many matters, it was the commander on the spot who was best qualified to determine the necessary action, though of course such action did run the risk of disapproval at one level of command or the next. In November Grant told General Edward O. C. Ord, recently assigned to the Arkansas command, that no instructions could cover all exceptional and extraordinary situations. Wherever cases arose under the Freedmen's Bureau or Civil Rights acts, those laws had to be the Army's guide. In other circumstances commanders ought to exercise a "wise discretion" and act in concert with the civil officials whenever possible. "In the exercise of the discretionary powers possessed by you, you will wherever it is possible be supported by the General-in-Chief." [45]

This problem of discretion harassed commanding generals when they wrote instructions for their subordinates. In Mississippi, where bureau agents often received instructions directly from department headquarters, one subcommissioner at Pass Christian received a directive to arrest a certain citizen in his area. Even so, "The use of Military power in times of peace must be exceptional," his instructions read, "and the exceptions can only be justified by the strongest circumstances; . . . you, in the duties which devolve upon you in this matter, will be expected to act with such discretion that while a firm obedience of orders is given, yet a proper and just respect for the Civil authorities may be kept in view." [46] A delicate situation arose in Arkansas involving cooperation with the bureau. Some plantation owners had reportedly abducted forty to fifty Negroes from the city workhouse in Nashville and were forcing them to work without a contract and treating them cruelly. General Ord sent a major with a small detachment from Little Rock to accompany a bureau agent and investigate. The troops were to turn over to the agent such Negroes as in the *major's* opinion were wrongfully held. If the *major* thought cruelty had been practiced, he was to inform the local civil authorities and turn the plantation owners over to them. If the *major* thought justice would not be had, he was to bring the men to Little Rock with him. "In the performance of this duty keep your party well under command and in perfect discipline; allow them to use no harsh or insulting language in carrying out your orders, and avoid the

[45] Col. C. B. Comstock, AAG HQA, to Ord, Nov. 24, 1866, HQA, C, RG108, NA.
[46] AAAG to Capt. R. F. Gardner, Sept. 18, 1866, Dept. Miss., 2, RG98, NA.



exercise of unnecessarily harsh or arbitrary measures. If force is necessary, use it with firmness and without hesitation, but as kindly as circumstances will admit." Clearly, then, the discretion lay with the Army officer and not with the bureau agent.[47]

If the presence of military forces with wide discretionary powers was to do more good than harm, the troops would have to be on their best behavior. Sometimes this seemed especially difficult. Eastern Mississippi garrisons gave cause for complaint during the spring of 1866; at Columbus there was so much misconduct by officers—conniving with citizens to swindle the government and one another, for one thing—that the district commander had to order a special inspection. "If you can keep that part of your command in good discipline and subjection, [and] make them attend to their duties and nothing else, you will earn an enviable notoriety," his instructions read. A young lieutenant at Meridian asked headquarters for more troops and received a pointed if grammatically defective reply: "From the conduct of your troops as reported by your letter I think the more you have the worse you would be off. . . . You will have to be exceedingly careful and vigilent [sic] and allow no tamperizing [sic] with your troops by citizens." The harried officer replied defensively that shielding citizens were inducing his men to desert and steal government property and that he was forced to put some of his men in the city jail for misconduct. He was trying his best to stop the irregularities, he said, but his corrective efforts were hampered by his first sergeant's being drunk more than half the time.[48]

One officer stationed at Victoria, Texas, caused a commotion by his lack of good judgment. He had left a gamecock and two hens under the watchful eye of a local hotel clerk. But the clerk's eye proved more covetous than watchful, and when the officer returned the clerk was gone and the poultry too. The enraged officer went back to camp, ordered his men to arrest the new clerk (who knew nothing about the case) and had him tied up by his thumbs and "subjected to the taunts and insults of a lot of Negroes, whose meanness would more than suffice to sicken the stomach of hell." The poor clerk was released through the intercession of the officer's superior, but the local newspaper editor, for using the objectionable language quoted, found himself under military arrest. Presumably the poultry was gone for good.[49]

[47] AAG to Maj. Jacob Rawles, Nov. 11, 1866, Dept. Ark., 3, RG98, NA.
[48] AAG to Col. G. Zeigler, March 19, 1866, and to Lt. A. Hedburg, April 23, Dept. Miss., 2; Hedburg's reply, April 24, 4MD, 85, RG98, NA.
[49] Galveston *Daily News*, Jan. 29, 1867, quoting the Victoria *Advocate*.

Among the worst cases of misconduct by troops during Reconstruction was the burning of Brenham, Texas, in September of 1866. There had customarily been a ball in town every Friday night, and on this particular Friday, two were held—one for Negroes and one for whites. Several soldiers of the 17th Infantry, a rather rowdy outfit generally, decided to attend the Negro ball. They refused to pay the requested admission price, and the ball subsequently closed for lack of patronage. The soldiers, still seeking excitement, next undertook to referee a street fight between a Negro and a drunken Indian. Who won does not appear, but the referees chastized the Negro and he fled to seek refuge at the white ball. The soldiers chased him and had an encounter with several of the white men present, who feared for the safety of their ladies. One soldier was shot in the scuffle and borne back to camp by his friends. Thinking him mortally wounded, they returned to town and set it afire, though the blaze was brought under control before too much damage was done. The soldiers involved then deserted, fearing that their lives would not be safe near the town.[50]

Most commanders realized that shielding their men from legitimate punishment would merely have worsened civil-military relations. Thus a soldier of the 38th Colored Infantry charged with murderous assault on a local policeman was held by the Army for delivery to the civil authorities under the 33rd Article of War. The municipal courts of New Orleans in late 1866 were allowed to prosecute soldiers in proper cases, whether it was Private James Donnelly of the 6th Cavalry, who let his Irish temper get the better of him while having a night on the town, or a trooper of the 9th Cavalry accused of murder.[51]

During 1866, as during 1865, the presence of colored troops was a sore point in civil-military relations. The first half of the year was especially difficult because of the continuing muster-out of white volunteer regiments and the fact that Congress was slow to pass the new law establishing the size of the regular Army. Maintaining a balance between white and colored troops was therefore difficult. In mid-March Grant sent Sheridan the 17th Infantry in hopes it would permit the re-

[50] Accounts of this espisode differ markedly. The one given here is principally from the report of a military investigating board, file 626G1866, AGO, RG94, NA, and from a brief made by Townsend in the Sheridan Papers, LC. This account places more blame on the soldiers than Sheridan did, but not so much as the official state investigation, which was printed as an appendix in the report of the House of Representatives of the Eleventh Legislature of Texas.
[51] AAG Dist. Tex. to Capt. J. H. Bradford, Dec. 26, 1866, 5MD, 111; AAG to Clerk of N. O. Recorder's Court, Oct. 15, 1866, Dept. Gulf, 258, and to CO 9th Cavalry, Dec. 5, Dept. Gulf, 274, RG98, NA.



lease of all remaining white volunteers. He added, "Unless you think security demands the retention of some of the white Volunteers muster the whole of them out as rapidly as possible. In the case of colored troops muster out such of them as you think can be spared." Ten days later came the further instruction to retain all the colored troops on the Rio Grande frontier for the present; in May the remaining white volunteers in Sheridan's command went out.[52]

The July 1866 law reorganizing the regular Army provided for two regiments of colored cavalry and four of infantry. The 40th Infantry was to be raised on the south Atlantic coast, the 38th Infantry and 10th Cavalry in Sherman's territory, the 9th Cavalry and 39th and 41st Infantry by Sheridan in Louisiana and Texas. Sheridan was supposed to recruit his colored regulars from volunteer regiments in his department, but he found the quality of the personnel to be generally unsatisfactory. The regiments at Greenville, Louisiana, were particularly bad. The issuance of passes was strictly regulated; all "huckster women and strumpets" were driven from the camps and colored women forbidden to enter except for "regularly authorized laundresses and servants." When some men of the 116th Colored Infantry assaulted a discharged Union soldier the damages were assessed against the regiment as a whole.[53]

Sheridan was not the only commander to be troubled by colored troops in 1866. From Arkansas General Reynolds grumbled about them to Sherman and urged that, if any were kept in the service at all, they should be kept together by regiments and not scattered in small detachments. He liked to send small commands roaming through the state periodically but thought it unwise to use colored troops for these patrols. In Georgia, when six men of the 103rd Colored Infantry were charged with assaulting citizens at Macon, General John M. Brannan remanded them to the civil authorities upon muster-out of the regiment; but he did take the precaution of ordering them tried in Savannah rather than Macon. Brannan felt that lax discipline by the officers caused most of the complaints against colored troops. "Use energy," he advised the Macon commander; "arrest and confine both Officers and soldiers, if they do not do their duty and preserve peace, among themselves, and

[52]Grant to Sheridan, March 19 and 29, 1866, and Col. Thomas M. Vincent, AAG USA, to Sheridan, May 18, 1866, in Daniel O. Drennan Papers, LC.
[53]AAG to CO's of colored regts., Oct. 15, 1866, and Gen. J. A. Mower, Nov. 13, Dept. Gulf, 258; AAG to CO 116th Col. Inf., Nov. 19, Dept. Gulf, 274, RG98, NA.

with Citizens."[54] Some colored volunteer regiments remained in the South until late 1866; the Carolinas had a regular infantry regiment until late 1868; and Louisiana and Texas had both infantry and cavalry for an even longer time.

Whatever is said about the relations between Army and populace generally, certain military actions had no justification at all. An example occurred in Galveston in January, 1867. The remains of Confederate General Albert Sidney Johnston, killed at Shiloh in 1862, were to pass through the city on their way to Houston for re-interment. General Charles Griffin, then commanding in Texas, refused to allow any kind of funeral escort or ceremony. The mayor appealed to Sheridan, who replied, "I have too much regard for the memory of the brave men who died to preserve our Government, to authorize Confederate demonstrations over the remains of any one who attempted to destroy it." This haughtiness was rather strange since Sheridan had not interfered with tributes while the remains passed through New Orleans, though conceivably both he and Griffin feared the possibility of uncontrolled Rebel demonstrations.[55] Griffin's stand brought great opprobrium down on his head—"an edict that would stain the escutcheon of a Nero," one paper called it. One of the more fanciful editors saw an allegorical resemblance between the Griffin in the blue uniform and the griffin of mythological fame: "The malignant hatred that can thus reach down into the grave to defile the bones of a dead soldier, the craven fear that invokes authority to protect it from the tears of a mourning people, should belong to something that does not walk in the likeness of mankind."[56] Even Northern papers, like the Alton Democrat in Illinois, blasted the general: "Griffin deserves a sword of lath and a crown of guano. If Griffin could be ordered to Fort Laramie and let loose a similar order against the Sioux and Cheyenne, what a crowd of redskins would be killed by the jawbone of an ass!"[57] Gradually the storm abated, and a group of ladies in Matagorda sent Griffin an oval leather medal, three inches by five, with all manner of fancy red and blue ribbons, which they requested him to wear only on the highest state occasions. The inscription was a calculated reference to a famous incident of wartime occupied New Orleans: "That the memory of General Griffin

[54]Reynolds to Sherman, March 1, 1866, Dept. Ark., 3; AAG to CO Savannah, April 13, and to CO Macon, Feb. 7, Dept. Ga., 1, RG98, NA.
[55]Galveston Daily News, Jan. 29, 1867.
[56]Ibid., quoting the New Orleans Times of the twenty-sixth.
[57]Galveston Daily News, Feb. 8, 1867, quoting Democrat of Jan. 28.

will be embalmed with that of Beast Butler and his spoons." [58] Maybe there was a danger of demonstrations getting out of hand, but interference with funeral tributes was a reprehensible display of authority.

In his July veto of Congress' second attempt to pass a Freedmen's Bureau bill, President Johnson had sounded a prophetic note of warning:

There is danger, too, that conflicts of jurisdiction will frequently arise between the civil courts and these military tribunals, each having concurrent jurisdiction over the person and the cause of action—the one judicature administrative and controlled by civil law, the other by the military. How is the conflict to be settled, and who is to determine between the two tribunals when it arises? In my opinion, it is wise to guard against such conflicts by leaving to the courts and juries the protection of all civil rights and the redress of all civil grievances. [59]

Various officers, both before and after the veto, shared Johnson's opinion. In March, 1866, just after the Virginia legislature had removed distinctions in punishment between whites and Negroes, Terry thought it would be well to give the state courts jurisdiction of all criminal offenses by Negroes—"experimentally." It would have to be done sooner or later, Terry said, and if done while the bureau still existed, individual abuses could be corrected. Early October brought a comprehensive order on courts from General Sickles in the Carolinas. The state courts being open to everyone and giving everyone equal civil rights without regard to color, they were now to try all accused civilians, and the bothersome provost courts were to be closed. But there was still the familiar threat: failure or unwillingness of the civil officials to perform their duties would provoke military action. The general also prohibited corporal punishment, his special intention probably being the abolition of public flogging, which was customary in some localities. This part of the order brought objection from the state officials and Johnson finally ordered it revoked. [60]

Johnson's prophecy was not really such a remarkable one; the collisions he alluded to had occurred before, and, try as it might, the Army could not prevent more of them. Perhaps the most tangled one, involving practically all the relevant elements of congressional legislation, executive policy, and military orders, was a case which made the Christ-

[58]Galveston Daily News, Feb. 19, 1867.
[59]Messages and Papers, VI, 424.
[60]Terry to AAG Div. Atlantic, March 1, 1866, Dept. Va., 14, RG98, NA; GO 15, Dept. South, Oct. 1, 1866, Orders 959, RG94, NA; Army and Navy Journal, IV (Jan. 5, 1867), 317.

mas season of 1866 a very unhappy one at the Galveston headquarters of General Samuel P. Heintzelman. The affair began in late summer when Bureau Agent J. Longworth at Seguin was arrested for swindling, although the acts were allegedly done in his official capacity. In September, under orders from General George Getty, then the senior officer in Texas, Heintzelman ordered the new bureau agent at Seguin, Captain John Craig, to make sure his predecessor was not held in jail and to cancel the bonds Longworth had given for his appearance. Craig seized the bonds, and for this he was himself arrested and jailed until released by military force. The local civil authorities then began legal proceedings against individual military officers. They indicted a young lieutenant—the acting assistant adjutant general who had signed the letter directing Craig to cancel the bonds—for theft, and on December 21 the Galveston County sheriff sought to arrest Heintzelman for ordering the lieutenant to write the letter. The general naturally refused to be arrested. [61]

For all practical purposes Heintzelman's adamance ended the matter because he had military power backing him up and the sheriff could hardly have prevailed against it. But contrary to what might be supposed, possession of superior physical force did not make the Army less concerned over the legal niceties of the case. The day after Christmas Heintzelman wrote the United States district attorney at Houston for advice. His New Year's Day was considerably cheered by a reply, complete with painstakingly copied excerpts from the Supreme Court's opinion in *Ableman vs. Booth* and bolstered by the district attorney's own ornate prose: "In the present case you have acted as an officer of the government of this nation, and it is not meet for you to be pestered and annoyed, even though the mischief-makers should clothe themselves in the counterfeit robes of 'loyalty' and falsely assume the counterfeit robes of 'Civil Authority.' . . . I think your conduct in the matter has been proper and becoming a heroic officer who loves his country and his country's laws." In the covering letter he abandoned the fanciness in favor of blunt humor: "The *rebels* are great sticklers for the constitution and laws just now. They profess to have always loved it, and I think a small dose of it unadulterated, right from the [sic] Chief Justice Taney, a 'Southern rights man,' would have a fine effect. It would be good for *Rabies* any how, and that appears the prevailing complaint in Texas just now." [62]

[61]AAAG Dist. Tex. to Heintzelman, Sept. 29, 1866, 5MD, 111, RG98, NA; Heintzelman to Benjamin F. Wade, Dec. 21, 1866, and ms Journal, Dec. 8–26, in Heintzelman Papers, LC.
[62]Heintzelman to B. J. Baldwin, Dec. 26, 1866, and reply, Dec. 29, in Heintzelman Papers, LC. Original emphasis.





Upon the attempted arrest of Heintzelman in December, the Army had at first held that Getty's order, under which Heintzelman had acted, enjoyed triple support: Grant's General Orders No. 3 of the preceding January, section 14 of the July Freedmen's Bureau Act, and section 3 of the Civil Rights Act. But because of Grant's October instructions to Sheridan that the presidential peace edict voided No. 3, and because the action against Longworth at Seguin had occurred in the interim between the August proclamation and the date of its official promulgation to the Army, No. 3 was dropped as part of the defense; and the Army ultimately rested its case on the Civil Rights Act. That law contained a protection against state prosecution for acts done in carrying out its provisions or those of any legislation relating to the bureau; and in January, 1867, the new Texas commander, Griffin, wrote to Sheridan's headquarters suggesting the Civil Rights Act as the best defense in all similar matters.[63]

Enforcement of the 1866 reconstruction legislation meant that the soldiers would have to continue to work with federal courts and law officers. The Army was a useful source of information for the courts; and commanders, like General Foster in Florida, regularly brought violations of the Civil Rights Act by sheriffs, coroners, and other officials to the attention of the federal courts.[64] Military assistance to other federal law officers continued, though the War Department took care to keep the Army in the background as much as possible. Typical of this policy were May instructions to the Department of Georgia: the commanding general was to furnish aid to enforce the revenue laws near Atlanta, but he ought not to make any arrests for treasury agents except under specific orders from Washington.[65]

Without doubt the greatest political question facing the South in the second half of 1866 was the Fourteenth Amendment—to ratify or not to ratify. The South would likely have been reluctant to accept the amendment anyway, but the fact of Johnson's opposition to it added to the determination to resist. Sickles wrote from Charleston that the President had missed an opportunity to moderate the influence of "Republican doctrinaires" and that the Carolinas would have adopted the amendment had Johnson favored it.[66]

[63] AAAG Dist. Text. to AAG Dept. Gulf, Dec. 22, 1866, and Griffin to same, Jan. 31, 1867, 5MD, 111, RG98, NA.
[64] Foster to Clerk of U.S.D.C. Nor. Dist. Fla., Oct. 19, 1866, Dept. Fla., 6, RG98, NA.
[65] Files 304T1866 and 305T1866, AGO, and Townsend to Brannan, May 16 and 17, 1866, AGO, 42, RG94, NA.
[66] Sickles to Stanton, private, July 19, 1866, in Stanton Papers, LC.

The Fruits of Confusion    101

Tennessee, the only Confederate state to ratify in 1866, did so amidst stormy scenes. The state senate accepted the measure but the other house balked. On July 14 the wires brought Grant a dispatch from Thomas: "Some members of the House of Representatives of the Tennessee General Assembly conduct themselves in a very refractory manner, absenting themselves to prevent a quorum, thus obstructing business. The Governor cannot manage them with the means at his disposal, and has applied to me for military assistance. Shall I furnish it?" This telegram received tardy and inefficient handling in Washington; Grant gave it to Stanton, who did not show it to the President until the Cabinet meeting of the seventeenth. Johnson directed that Thomas' question be answered with an emphatic negative. Before the message could reach Nashville, however, legislative sergeants-at-arms had arrested two members and held them so that a quorum would be present; upon taking the vote the amendment was ratified.[67] Governor "Parson" Brownlow jubilantly wired the Senate about the result, stating that two of "Andrew Johnson's tools" did not vote and adding with typical boorishness, "Give my respects to the dead dog of the White House."[68]

Grant hoped the South would accept the amendment. He told the Arkansas provisional governor in early December he was convinced that if one Southern state adopted it, "Congress would establish a precedent that would induce all others to adopt them [sic]." This was doubtless a reference to Congress' readmitting individual states upon ratification of the amendment, but the South was not as convinced of the good intentions of Congress as Grant was. The general considered it scarcely thinkable that the solons would accept anything less than ratification and he feared that delay in accepting the amendment would probably lead to further congressional demands. He declined to discuss the amendment's merits and demerits, considering it a "final solution from which there is no appeal." Grant was so anxious for ratification that he wanted the Army to use its good offices to secure this end. "I hope you will talk to the

[67] Army and Navy Journal, III (July 21, 1866), 759; Patton, Tennessee, 223–24; Francis F. McKinney, Education in Violence (Detroit, 1961), 462–64. McKinney says there was no doubt from the wording of Thomas' telegram that he favored the use of troops to force a quorum. It seems questionable that the telegram indicates this, although in September Johnson told one of Grant's secretaries that he thought Thomas had been in favor of interference. C. B. Comstock ms Journal, Sept. 22, 1866, in Comstock Papers, LC. Many accounts of this incident leave some questions as to whether the actual arrests were made by or in the presence of federal troops. A comparison of Nashville papers of varying political affiliations seems to indicate clearly that no troops were involved. Nashville Daily Dispatch, July 15–19, 1866, and Nashville Republican Banner, July 19.
[68] Quoted in Cong. Globe, 39th Cong., 1st Sess., 3957.

Governor, and such members of the Legislature as you may have influence with, on this subject," he wrote. "It it not proper that officers of the Army should take part in political matters. But this is hardly to be classed as a party matter. It is one of national importance. All parties agree to the fact that we ought to be united and the status of every state definitely settled. They only differ as to the manner of doing this. It ought to be seen that no way will succeed unless agreed to by Congress." [69]

Whether the Arkansas commander tried to exert any influence is not clear, but General Schofield did discuss the amendment with Virginia leaders. Sometime during the winter of 1866–67 he prepared a written argument on the subject, in which he called the measure unjust and unwise. He was especially opposed to the third section, which in his view disqualified from office nearly everyone "whose social position, intellectual attainments and known moral character entitle him to the confidence of the people." Any punishment, he thought, should aim to serve the general good; punishment which proved injurious to the community as a whole he considered a crime. "It is folly," he argued, "to attempt to bring back a revolted people by disfranchising all leaders in whom they trust and confide. These leaders if they will act in good faith can bring their people back to their allegiance. Without them it can not be done during the existing generation." The cardinal question of course was whether the leaders could be trusted, and Schofield believed they could.

The general objected in principle to the federal government's prescribing qualifications for state offices or for voting in state elections. He also believed that section 3 was unfair to Negroes since its effect would be to allow more of the "poor whites" to hold local office, thus putting the Negroes in the hands of their only real enemies in the South. He thought any notion of universal suffrage, without regard to intelligence or other qualifications, was quite absurd. And his experience in postwar North Carolina and Virginia had given him some insight into the Southern attitude of mind: "Theorize as much as we please about the criminality of the late rebellion, it is folly to suppose that the present generation of Southerners can be made to acknowledge or believe that it was anything more than a legitimate war for the settlement of a great political

[69] Grant to jOrdl, Dec. 6, 1866, in Horace Porter Papers, LC. This letter is addressed simply "Dear General" and was to have been personally delivered by Porter while on a tour of inspection. A reference to the location of Headquarters, Department of Arkansas show it was clearly directed to the department commander, who at the time was Ord.

question left unsettled by the framers of the constitution. . . . Let us look at the matter in a practical common sense light, and not demand of men "repentance in sack cloth and ashes" when we know that any show of such repentance would be the purest hypocrisy." In spite of these potent objections, however, Schofield considered the matter "in a practical common sense light" and advised that Virginia accept the amendment to save the state from something worse. But his advice went unheeded and Virginia, along with the rest of Secessia, refused to ratify it. [70]

In the North the Fourteenth Amendment was a salient topic in the autumn election campaign of 1866, with the Johnson supporters fulminating against it and the bulk of the Republicans arguing for it. Texas was the only Southern state, except for Tennessee, where direct legislative action was had on the amendment prior to the election; and Texas decisively rejected it. Northerners were thus doubtless influenced by what they assumed would happen when the other states acted on the measure. [71]

During the late summer preparations for the Congressional elections got underway, and many wartime military leaders, now resigned or retired, took an active part. In August the National Union Convention met in Philadelphia to try to form a coalition in support of Johnson; Steedman, the ex-Georgia commander, was chairman of an important committee. He was also present at a Cleveland assembly in September, this time in the company of Custer, who had helped to reconstruct Texas, and Lovell H. Rousseau, a Johnson backer who was then out of the service but who would later exercise command in Louisiana. Pro-Republican conventions also attracted military figures, most of whom had been generals of volunteers during the war but by this time had been mustered out of the service.

The President bore his own share of the campaigning and embarked on a speaking tour through the North. His entourage featured a galaxy of starred gentlemen: the omnipresent Steedman, Custer, and Rousseau; now also George Stoneman, fresh from a year's experience with Tennessee troubles; and the most important one of all—Grant. The "swing

[70] Ms essay entitled "Reconstruction," in John M. Schofield Papers, LC. An attached statement dated at West Point in March, 1880, and signed by Col. William Wherry, who had been an ADC to Schofield, states the essay was written in the winter of 1866–67 and had been in Wherry's possession since. Also included is a shorter essay on general principles of government.

[71] The dates of Southern legislative action on the amendment are conveniently found in McKitrick, *Andrew Johnson and Reconstruction*, 358 n.



around the circle" began calmly enough, but paid Radical hecklers in the larger cities succeeded in arousing the fearsome Presidential wrath. Johnson's tirades evoked continued taunts and the dashing Custer, even though his March testimony before the Reconstruction Committee had been unfavorable to Johnson's policy, now ferociously reproached the insulting mobs from the rear platform of the Presidential train.[72]

The presence of an officer in the President's party did not always mean his approval of Johnson's viewpoint, however. Johnson wanted an impressive escort and amassed as many important dignitaries as he could. Finding that he could not do without a naval delegation, he induced Admirals David G. Farragut and William Radford to go with him. He perhaps hoped that the public would equate "presence" with "active support" especially in the case of Grant. But Grant, while certainly not a presidential opponent of the Thaddeus Stevens stripe, was not, like Steedman and Rousseau, a "Johnson man." Some of Grant's friends were not sure of his views, however, and feared that under pressure Grant might go over to Johnson. Writing to one of Grant's personal secretaries, General James H. Wilson expressed the hope that the general could be kept steady and "true to his principles." "If the general wavers now—it will be as fatal to himself and to the country, as hesitation or indecision would have been in the Wilderness."[73]

Wilson would have been somewhat reassured had he seen a confidential letter from Grant to Sheridan at New Orleans in October. The General-in-Chief expressed the fear that Johnson's rashness was increasing along with the dominance over him by people who had been disloyal during the war. Grant felt the nation was "fast approaching the time when he will want to declare the body itself [Congress] illegal, unconstitutional, and revolutionary." He hoped Southern commanders would make sure that "if a crisis does come, no armed headway can be made against the Union."[74]

Wild rumors intimated that Johnson might attempt some sort of military coup d'etat. Indeed, as early as May an Arkansas planter, having heard rumors brought by arriving steamboat passengers that the Radicals had impeached Johnson, dashed off a letter to the President saying that the thinking people of the state, whom he undertook to represent,

[72] Jay Monaghan, *Custer: The Life of General George Armstrong Custer* (Boston, 1959), 266–79.
[73] Wilson to Orville E. Babcock, Sept. 10, 1866, in Babcock Papers, Newberry Library. Original emphasis.
[74] Grant to Sheridan, Oct. 12, 1866, in Adam Badeau, *Grant in Peace* (Hartford, 1887), 51–52.

*The Fruits of Confusion*     105

hoped Johnson would disperse the Senate by military force if it sought to try him and would then call a national convention "to adjust the pending difficulties."[75] They would have taken considerable adjusting.

Johnson certainly never planned any such revolutionary use of the Army against his Northern opponents, but he would likely have been glad to effect some change in the military high command in order to influence affairs in the South. At least, Grant suspected some such sinister intrigue when Johnson tried to send him to Mexico as a military advisor to the American envoy. Maximilian and the French were certainly a problem that concerned the Army, and Grant would have been glad to see the Mexican difficulty speedily resolved. But he twice declined the mission, claiming that it was essentially a diplomatic one and that as General-in-Chief he ought properly to stay in Washington. At a Cabinet meeting Johnson tried once more to get Grant to agree to go and asked the Attorney General if there were any legal reasons why Grant could not. Grant interjected that as a military officer he would obey "any legal military order" of Johnson's, but since this was a civil duty he positively declined it. "No power on earth," he said as he left the room, "can compel me to it."[76]

Cyrus B. Comstock, of Grant's staff, in explaining the affair to Sheridan called the position designed for Grant "a polite banishment" from the capitol in effect and a very foolish role in reality since the minister could consult or ignore the general, as he chose. Almost certainly, Johnson's purpose was political rather than diplomatic because at the same time he tried to induce Sherman to be "Acting Secretary of War"—though what was ultimately to become of Stanton remained vague. With Grant in Mexico and Sherman in the War Office the Army would have been controlled by a man more openly favorable to Johnson's policy than either Grant or Stanton. But Sherman would not hear of it; hatred of politics plus personal friendship for Grant combined to make him refuse to play the game. Since the ostensible cause of the project had been the necessity of sending some prominent soldier with the minister, Sherman went to Mexico and Grant stayed home. Thus the incident closed, but its political overtones remained.[77]

"Things look squally here" was Comstock's summary of the situation as election day approached and, all things considered, it was an accurate estimate. But November, 1866, was to be only the squall before

[75] S. R. Cockrill to Johnson, May 7, 1866, Johnson Papers, LC (Reel 22).
[76] Badeau, *Grant in Peace*, 52–55.
[77] Comstock to Sheridan, Oct. 31, 1866, confidential, in Sheridan Papers, LC. Comstock had wanted the letter destroyed.



the hurricane; the elections were a complete triumph for the anti-Johnson forces who could now override presidential vetoes with impunity and devise what Southern policy they liked. Autumn was also time for annual report-writing by military commanders, and one general offered sage observations in the premises. After summarizing the state of affairs in Mississippi, General Wood added:

But when it is remembered what a terrible social, political, and military convulsion the nation passed through in the war of the rebellion; when it is borne in mind that a vast population of slaves was suddenly emancipated by the violence of war, and that the late slaves now occupy as freed people the very same soil, in the closest juxtaposition to the formerly dominant class, on which the two races lived in the relation of master and slave, it should not perhaps be [a] matter of surprise that so many outrages and crimes occur and go unpunished, but rather [a] matter of marvel that so few occur. Great social and political changes are not made in a day. Time, the potential lethe of deep-rooted, long-standing prejudices, and diffused education, the mighty elevator of the human race, must accomplish the great reforms necessary to the permanent prosperity of the white and colored inhabitants of the southern States.[78]

The next two years were to show that such perspicacity was at a premium in political circles at the North.

[78]*Report of the Sec. of War, 1865–66,* p. 54 (1st pagin.).



on Grant's adherence to the Radicals' view of reconstruction. Grant seemed to be moving in their direction, but thus far he had taken no overt action which irrevocably placed him in their camp.

Another part of the bill, equally as irrelevant to an appropriations act as Section 2, disbanded all existing militia organizations in the Southern states to prevent danger of armed interference with the procedures to be taken under the Reconstruction Act. Because these two sections had been attached to a critical piece of legislation, Johnson faced the dilemma of vetoing the entire bill and letting the Army go unpaid, or approving the bill in the face of Section 2. He did about the only thing he could under the circumstances: he signed the bill but sent Congress a written protest against the objectionable provision. Since Johnson had signed the bill no answer to his protest was necessary—and a sound answer would have been hard to devise.

"An Act regulating the Tenure of certain Civil Offices" also became law on the fateful second of March. The most significant provision was that cabinet officers should hold their posts "for and during the term of the President by whom they may have been appointed, and for one month thereafter, subject to the advice and consent of the Senate." [8] When this section is read in conjunction with the Appropriations Act proviso on the high command of the Army, the motives behind the Tenure of Office Act become clear. The Radicals wanted to freeze Stanton in the War Office just as they had frozen Grant in the General-in-Chief's position. No other motive is conceivable, for of all the cabinet posts the War Department had most to do with the administration of reconstruction, and of all the cabinet members Stanton was most in harmony with the Radicals. Since the Constitutional provision concerning presidential appointments was silent regarding removals, it was invoked both for and against the bill. But even if found constitutional, the wisdom of the measure remains doubtful. Johnson thought the bill unconstitutional and asked Stanton to help write the veto message; Stanton did so—it was a safe move even though the bill was a protection for him; and the veto fell in Congress, as expected.

The last of the acts of March 2, 1867, was a sweeping retroactive validation of all actions of the President or his subordinates regarding military trials for participation in the rebellion and related offenses. Such actions were made valid just as if each had been done in pursuance of some previously enacted law of Congress and were to be regarded, prima facie, as having been authorized by the President. This was yet another

[8]14 U.S. Statutes at Large 430.

step in broadening the protection afforded the Army against prosecutions and damage suits, and a greater broadening could hardly have been imagined. This bill, alone among the four, did not receive a veto.[9]

The Reconstruction Act set forth the framework of Congress' Southern policy, but some details still remained to be filled in. Although this first act had made provision for state conventions, it had omitted particulars as to the election of delegates. Therefore on March 23 a Second Reconstruction Act, passed over Johnson's veto, remedied the problem. Each commanding general was to order a registration of voters by September 1, and the oath to be taken upon registration—essentially that the registrant met the qualifications—was prescribed. The conventions were to consist of the same number of delegates as there had been members of the most numerous house of the state legislature in 1860, and the commanding general was to apportion the delegates in proportion to the registration figures. As many three-man boards of registration appointed by the commanding general as necessary were to conduct the registration and superintend the election. The commanding general was to promulgate the election results; and if a majority of the votes cast on the question favored a convention, he was to order the elected delegates, chosen at the same election, to assemble within sixty days.[10]

The power vested in the commanding generals by the March legislation was indeed sweeping. Previously during Reconstruction the Army had been primarily concerned with the detection and suppression of crime and with injustice towards loyal citizens; now, if military establishment of convention districts is a fair measure of authority, the amount of direct military supervision over the political activities of the Southern people was more complete than at any time previously. It was of course necessary that men of the greatest competence and discretion be assigned to exercise this far-reaching power. A general order of March 11 announced the selections. Virginia, the First District, went to Schofield; it was a logical choice, for he had been handling that state well since the preceding August. The Carolinas, the Second District, received General Daniel E. Sickles, who had exercised intermittent command in that area since the end of the war. Sickles was not a West Pointer but had risen to prominent command in the Army of the Potomac during the war. He was an impetuous, volatile individual, though to a lesser extent than Sheridan. Johnson thought him a "conceited cuckold"; if the noun was

[8]14 U.S. Statutes at Large 432.
[10]15 U.S. Statutes at Large 2.

# Tennessee's Radical Army

The State Guard and Its Role in Reconstruction,
1867–1869

BEN H. SEVERANCE

THE UNIVERSITY OF TENNESSEE PRESS • KNOXVILLE

*To Tara, Bea, and Josie—the Ladies of My Life*



Copyright © 2005 by The University of Tennessee Press / Knoxville.
All Rights Reserved. Manufactured in the United States of America.
First Edition.



Published in cooperation with the Tennessee Civil War National Heritage Area, which
is a partnership unit of the National Park Service.

This book is printed on acid-free paper.

Library of Congress Cataloging-in-Publication Data

Severance, Ben H., 1966–
Tennessee's Radical army : the state guard and its role in
Reconstruction, 1867-1869 / Ben H. Severance.— 1st ed.
    p. cm.
Includes bibliographical references (p.    ) and index.

ISBN 1–57233-362-6 (acid-free paper)

1. Reconstruction (U.S. history, 1865–1877)—Tennessee.
2. Tennessee—Militia—History—19th century.
I. Title.

F436.S48 2005
976.8'051—dc22                    2004014889

# Contents



| | |
|---|---|
| Acknowledgments | ix |
| Introduction | xi |
| | |
| Chapter 1. The Creation of a Radical Army | 1 |
| Chapter 2. Mobilizing the State Guard | 23 |
| Chapter 3. The Opening Shots of the Campaign of 1867 | 61 |
| Chapter 4. The State Guard in Full Blast | 85 |
| Chapter 5. The Radical Army Wins an Election | 121 |
| Chapter 6. Autumn Showdown | 145 |
| Chapter 7. The Year of the Paper Militia | 175 |
| Chapter 8. The State Guard versus the Klan | 193 |
| Conclusion | 229 |
| | |
| Appendix A. Tennessee State Guard, 1867 | 235 |
| Appendix B. State Guard Dispositions as of August 1, 1867 | 237 |
| Appendix C. 1867 Gubernatorial Election Returns from Militia Counties | 238 |
| Appendix D. Demobilization Chronology of the State Guard | 240 |
| Appendix E. 1868 Presidential Returns from Former Militia Counties | 241 |
| Appendix F. Tennessee State Guard, 1869 | 243 |
| Appendix G. State Guard Dispositions as of March 5, 1869 | 245 |
| | |
| Notes | 247 |
| Bibliography | 305 |
| Index | 315 |

larger role in Reconstruction than mere thugs marching to the governor's tune. To be sure, these militiamen, especially the officers, were all dedicated Radicals, but they had a vested interest in securing for the party not only power but also legitimacy. In this sense, the militiamen were active agents in making Reconstruction work for the Radical party and the Unionist populace. In the process, they made the State Guard an effective, and well-regulated, instrument of force.

# Chapter 7

# The Creation of a Radical Army

On January 11, 1867, a former Confederate guerrilla shot and killed Almon Case, a Radical state senator, near his home in Troy, Tennessee. Troy is in Obion County in northwestern Tennessee, a dangerous place for Radicals to live in the post–Civil War period. The majority of Obion's white males had voted for secession in 1861, and during the war the county was a haven for Rebel guerrillas. These whites did not like Senator Case, a wartime Unionist who firmly supported the Reconstruction administration of Governor William G. Brownlow. Case represented a small constituency that increasingly found itself the target of ex-Confederate harassment. In September 1866, an assailant murdered Case's son, Emmit. And at the time Case himself was killed, his assassin, Frank Farris, also wounded two Obion County deputy sheriffs. Although a reward of two thousand dollars was placed on his head, Farris enjoyed the protection of local Obion whites and was never arrested.[1]

Case's death sounded the political tocsin for the Radicals. After two years, their hold on power was still precarious in much of the state. Although the Radicals controlled all branches of the state government, their authority was routinely flouted by the state's large populace of ex-Confederates and a sizable group of Conservative Unionists—collectively, the anti-Radicals. The Tennessee General Assembly condemned the

Tennessee in the late 1860s

assassination. Radicals, in particular, regarded it as another example of "the spirit of hatred, malice, and uncharitableness, the legitimate fruits of treason" that plagued much of the state. According to the Radical Samuel Arnell, "No explanation but political feeling could be offered for the act." The time had come, so it seemed, for the Brownlow administration to crack down hard on lawlessness. The Obion incident added impetus to Radical efforts to secure the passage of a militia bill, one that envisioned a powerful State Guard as a means of protection for the party and the Reconstruction process, and a new franchise bill, one that extended suffrage to blacks. (Both bills were then being debated in the second session of the Thirty-fourth General Assembly.) The Radicals viewed 1867 as a critical year for Reconstruction and for their hold on power. The first of August would mark the first peacetime statewide election since 1860 and the first time that southern blacks had ever voted. Case's death, however, marked an ominous start to that year.[2]

The Civil War had produced great enmity between those Tennesseans who supported the Union and those who advocated secession. As the sectional crisis unfolded in early 1861, most Tennesseans generally repudiated the idea of disunion. Public opinion changed, however, with the outbreak of war in April. In early May, secessionist governor Isham G. Harris and his allies in the general assembly effected a declaration of independence, subject to approval by the voters on June 8. Harris then entered into a "military league" with the Confederacy and began raising an army to defend the state against Federal invasion. Unionists from East Tennessee, the stronghold of Unionism in the state, gathered in Knoxville on May 30 and denounced Harris's fait accompli. Nevertheless, their efforts to halt the slide into secession failed. With aroused passions, West and Middle Tennessee voted overwhelmingly for secession on June 8. A second convention of East Tennessee Unionists gathered in Greeneville on June 17 and called for separate statehood, but the Harris regime ignored their application.[3]

Thwarted in their peaceable efforts to resolve the situation, many Tennessee Unionists resorted to violence. With the Civil War well underway, Unionist guerrillas in East Tennessee launched an uprising in November 1861. They burned five important railroad bridges and threw the region into pandemonium. The Confederacy countered with military occupation and martial law. Nevertheless, Unionists in East Tennessee as well as the other regions of the state continued to fight; at



William G. Brownlow. Courtesy of Special Collections Library, University of Tennessee, Knoxville.

least thirty thousand of them joined the Federal army, forming more than thirty regiments of Tennessee volunteers. These Unionists fought not only for their nation but also for the defense of their own homes and communities, which had been overrun by Confederate forces. For four years, Tennessee suffered a violent mixture of conventional and guerrilla warfare, along with political persecution and social and economic chaos. In many localities, the war descended to the level of personal vendetta and atrocity begot counter-atrocity.[4]

As the Confederacy collapsed in 1864–65, Tennessee Unionists quarreled over how to restore civil government. Two competing political factions emerged: the so-called Unconditional Unionists, men who wholeheartedly supported the Lincoln administration and the Republican party, especially the Radical wing, and the Conservative Unionists, men who opposed secession but also opposed emancipation. The Unconditional Unionists, who increasingly identified themselves as Radicals, viewed the ex-Confederate majority as "traitors" and "rebels" who deserved some kind of punishment for rending the Union and disrupting the lives of loyal men. Conservative Unionists urged a more conciliatory attitude toward ex-Confederates. At a convention in Nashville in January 1865, the Radicals, most of whom came from East Tennessee, dominated the proceedings and restored civil government on their terms. William G. Brownlow, a prominent Radical Unionist whose *Knoxville Whig and Rebel Ventilator* had waged a venomous propaganda war against the Confederacy, became the new governor on March 4, 1865. Intent on consolidating Radical power, this former circuit-riding Methodist preacher implemented a stern Reconstruction program.[5]

From the outset of Reconstruction, Governor Brownlow's main priority was to establish an electorate in Tennessee "that shall be thoroughly loyal." To this end, the Radical Unionists in the general assembly enacted a franchise law in June 1865 that temporarily forbade some eighty thousand ex-Confederates from voting. To the Radicals, such a measure seemed logical and justifiable. As state senator Samuel Arnell reasoned, "Rebellion had no right or privilege of citizenship whatever. This was the legal status brought about by secession. . . . To say that people conquered with arms in their hands are to be handed over to themselves for reconstruction is to talk absurdly, without sense." To the anti-Radicals, however, such thinking was spurious reasoning for what amounted to a naked power grab—the essence of "Brownlowism." The

fall congressional elections of 1865 proved a disappointment for the Radicals. In many instances, anti-Radical forces violated the franchise provisions, particularly the discriminatory loyalty oaths, and only three Radicals, all from East Tennessee, won their races. Arnell later prevailed in his Middle Tennessee district, but only after Brownlow tossed out thousands of "illegal" votes. Similarly, county elections held in March 1866 resulted in numerous victories for former Confederates in West and Middle Tennessee. In the eyes of the Radicals, Conservative opponents of the Brownlow administration, in league with their ex-Confederate partners, were manipulating the letter of the franchise act in order to pervert its spirit.[6]

In May 1866, a second, more severe, franchise law was passed. This new act created commissioners of registration for each county under direct executive control and permanently disfranchised all ex-Confederates. Brownlow, while admitting that this franchise amendment was "a terrible bill," insisted it was necessary under the circumstances. Resistance to this measure resulted in the resignation of twenty-one Conservative members of the state house in an effort to prevent a voting quorum. Once again, Brownlow resorted to makeshift countermeasures to thwart what the Radicals called the "little rebellion." He held special elections and then seated candidates of Radical proclivities who helped pass the revised franchise bill.[7]

These franchise restrictions were crucial to Radical Reconstruction in Tennessee. There was simply no other practical way to ensure that those who had ruptured the Union in 1861 did not regain power in 1865. Brownlow said as much in one of his first executive proclamations, when he declared that the Franchise Act of 1866 "IS THE SUPREME LAW OF THE LAND, and will be *rigidly enforced*." He said further that those who defied its precepts would be "dealt with as rebels." As events demonstrated, Radicals increasingly viewed even Conservative Unionists as "rebels." Unfortunately for the Brownlow administration, the Radicals were discovering that proscriptive legislative decrees, stringent loyalty oaths, and truculent gubernatorial proclamations were hollow measures without the coercive power to back them up. In the absence of an armed deterrent, these measures only inflamed the opposition and invited defiance. "Brownlowism" in 1865 and 1866 had spawned hatred, not fear.[8]

Hatred contributed to Senator Case's death. His assassination, however, was not an isolated event but the culmination of more than a year

a year of anti-Radical agitation throughout the state. Governor Brownlow warned his followers as early as 1865 that "the spirit of Rebellion and nullification still exists and must be defeated." Lawlessness in 1865, however, was attributable more to Civil War aftershocks than to a premeditated plan for counter-Reconstruction. But events in 1866 portended trouble for the Radicals. The most infamous example of Reconstruction violence in Tennessee is the oft-cited Memphis race riot in May. This terrible event left forty-six blacks dead and a nation in shock. To the Radicals, this atrocity was a harbinger of things to come. To be sure, the riot was a product of racial hostility, not political outrage, but it highlighted the precarious freedom enjoyed by blacks, a freedom the Radical party had the responsibility of defending. To protect blacks, and to overcome the numerical weakness of the Radical party in West and Middle Tennessee, the Radicals in the assembly began to consider black suffrage in 1866. Brownlow, like most other Radicals, had misgivings about bestowing the right to vote on blacks, but political survival demanded it: "Without their votes, the State will pass into disloyal hands, and a reign of terror . . . will be the result." Strengthening the party was understandable, but disrupting the racial order was risky. With blacks as voters, ones presumably loyal to the Radical party, the racial hostility and political tension already manifest in the state would be magnified.[9]

Anti-Radicals steadily fueled the political tension. Widespread criticism, especially from Conservative and ex-Confederate newspaper editors, tormented the Brownlow administration. These spokesmen rejected the legitimacy of Radical Reconstruction. A sedition act, passed by the Tennessee General Assembly in June 1865, theoretically stifled such criticism, but there is no indication that this law was ever enforced. The U.S. Army did arrest Emerson Etheridge, a prominent Conservative from Weakley County, for sedition and treason against the Brownlow administration, but he was exonerated by a federal military tribunal in November 1865 and soon resumed his vocal opposition to the Radicals. For the most part, the anti-Radical press, be it Conservative or ex-Confederate, lambasted the Brownlow government without mercy and without reprisal.[10]

More unsettling to the Radicals than "seditious" editorials and speeches was the emergence of a concerted anti-Radical effort to usurp political power. Through the spring of 1866, a political conspiracy unfolded in West and Middle Tennessee. Disgusted by the second

franchise law, a caucus of Conservative leaders met in April to devise a plan to overthrow the Radical state government. Anti-Radical newspapers in West Tennessee unabashedly promoted the conspiracy. The conspirators sought the backing of President Johnson. A schism between the president and the congressional Republicans had emerged, and this Tennessee cabal hoped that Johnson's political struggle would translate into support for a coup. Horace Maynard, one of Tennessee's Radical congressmen, assured Governor Brownlow that "the project of overturning the present state government . . . will not prevail." But Brownlow had already braced himself for conflict: "No earthly power can drive me from the support of the men and party who fought the battles of the late war, and put down the rebellion." Many Conservatives condemned this conspiracy (as did President Johnson), and the threatened coup never materialized, but to the Radicals, it was part of a pattern of growing insurrectionary opposition.[11]

Attempts at counter-Reconstruction reached a climax during a special session of the assembly to consider ratification of the Fourteenth Amendment and the readmission of Tennessee to the Union that would follow. President Johnson's obstruction of congressional Reconstruction encouraged many Tennessee Conservatives to block efforts by the Radicals to ratify the amendment. Governor Brownlow resorted to forcible measures to ensure passage. He initially called on the federal garrison for help, but Gen. George H. Thomas demurred. Therefore, Brownlow ordered the sergeant at arms to arrest certain "refractory" members (i.e., Conservatives who opposed the amendment) in order to achieve a quorum but forbade them to vote. The amendment was ratified on July 19, 1866, and Tennessee rejoined the Union on July 24. A Tennessee judge who later ruled the ratification process unconstitutional was impeached and removed by the Radicals. Coupled with his vote tossing in 1865, Brownlow's conduct during these proceedings provided the anti-Radicals with plenty of propaganda ammunition. From the Radical perspective, however, these were imperative measures taken against an intransigent foe.[12]

Unfortunately for the Radicals, readmission to the Union did not end their troubles. Stymied by Radical authority, many frustrated ex-Confederates began resorting to political violence in 1866; the state government found itself calling on the federal garrison for aid on numerous occasions. During the March county elections, Brownlow, dismayed by

ex-Confederate audacity in violating the Franchise Act of 1865, managed to get federal troops deployed to Marshall County, where they prevented efforts to disrupt the voting. Brownlow even reluctantly acquiesced to the U.S. Army's continued presence in his beloved East Tennessee due to open resistance in that area. By the summer, conditions had deteriorated to such an extent that one army officer compared the disloyal lawlessness of Middle and West Tennessee to the ex-Confederate defiance he had witnessed in Mississippi. According to another officer, conditions in the rural parts of Tennessee were "most deplorable. . . . Outrages of all kinds [were] being committed without any effort on the part of the civil authorities to arrest the offenders."[13]

It was during these restless months that the Ku Klux Klan was spawned in Giles County. Originating as a fraternal organization, the infamous KKK soon developed into an unofficial paramilitary wing of the anti-Radical forces. Although its full terror would not occur until 1867, by the end of 1866 the nascent Klan frequently engaged in racial and political intimidation in Giles and its neighboring counties of Middle Tennessee. As one historian of the Klan has written, "If Giles County . . . was not the most lawless county in Tennessee in 1866 and 1867, it ranked high on the list."[14]

Beyond the Klan's activities, instances of political obstruction and violence increased as the year went on. In August, Chancellor J. J. Noah of Maury County complained to Governor Brownlow that outgoing chancellor David Campbell, a Conservative in league with local ex-Confederates, including Klan leader John C. Brown, had "contumaciously" refused to permit him to take office and had, in effect, shut down the court system. Noah believed that Campbell's "pow-wow" of "rebel friends" was trying to incite trouble. He requested assistance, but immediate relief was not forthcoming. Army general George H. Thomas corroborated Noah's allegations in his annual report to the secretary of war and added that local law enforcers throughout the region were basically "rebel sympathizers."[15]

Maury's neighboring counties in Middle Tennessee experienced similar disturbances. Discharged Union soldiers from Grundy County petitioned the governor for aid in their ongoing fight against local ex-Confederate outlaws. And one desperate farmer from Marshall County described an atmosphere of virulent hostility toward Unionists and blacks: "We cannot get justice here. . . . It is dangerous for us to go

about, particularly a man who has served in the Federal army. . . . Here the civil law is a dead letter. . . . If the Governor and General Thomas don't send us some help, we are gone under. . . . We are in a worse condition than we had in 1861." While U.S. troops may have quelled disorder in March, during a special November election, with no troops in the vicinity, Marshall Conservatives violated the 1866 Franchise Act, ignored the registrar, and defeated a Radical candidate for local office. The Radical *Nashville Daily Press and Times* claimed that the situation in Marshall County was representative of that in many other parts of the state. To this newspaper, the "spirit which provoked secession and dragged the South into war is neither dead nor dormant, but a living and active feeling in the hearts of the reconstructed traitors."[16]

The *Daily Press and Times* was not exaggerating, for ex-Confederate lawlessness erupted elsewhere in Middle Tennessee. General Thomas reported that Unionists and blacks in Robertson County were "in constant danger of their lives." Sumner County proved especially troublesome. Under their old guerrilla commander, "King" Ellis Harper, a "gang" of about 150 ex-Confederates ruled the county like warlords, terrorizing Unionists and freedmen alike. The situation became so intolerable that the army sent a cavalry detachment under Capt. Edwin H. Leib to drive Harper's band out. Leib spent most of November and December hunting down these guerrilla outlaws, his efforts taking him throughout much of northern Middle Tennessee and into parts of Kentucky. Referring to the ex-Confederates as "barbarians," Leib informed his superiors that "if the troops are withdrawn . . . there will be no peace or quiet for the black man and the very few Union men in those counties." Leib's campaign was, in its essentials, indistinguishable from the dozens of such operations conducted in that region during the Civil War.[17]

Unfortunately for the Radicals, the withdrawal of U.S. troops was well under way in 1866. President Johnson, whom Governor Brownlow had recently dismissed as a "dead dog," saw no reason to maintain a large garrison in the Volunteer State. After readmission to the Union, troop strength in Tennessee dwindled from over seven thousand at the beginning of the year to less than two thousand by the end. Moreover, with the exception of Captain Leib's detachment, most of the federal troops were stationed in Nashville and remained in camp.[18]

Increasing anti-Radical defiance coupled with the decreasing presence of the federal garrison boded ill for the Radicals. The situation

prompted a delegation of twenty-two East Tennesseans to submit a petition to their congressmen. These Radicals proclaimed that "our prosperity as a people . . . depends almost entirely on the action of the loyal people of this section of the state." They urged their government to take decisive measures to subdue the opposition. Governor Brownlow and other Radicals believed a second civil war within the state of Tennessee was inevitable, perhaps imminent. A rumor of an assassination attempt against Brownlow himself circulated in October, charging certain ex-Confederates with trying to derail a train the governor had planned to use on a trip to Knoxville. In the autumn of 1866, Brownlow participated in the Convention of Union Loyalists, a group of southern Republicans who toured the North as part of a campaign to counter Andrew Johnson's anti-Radical stump of northern cities, the so-called Swing around the Circle. The Tennessee governor harangued his audiences about ex-Confederate efforts to restart the Civil War. He vividly described a condition of incessant hostilities and spoke of the need to march fresh armies into the South and finish off the traitors once and for all. Regardless of whether his assessment was accurate, it is notable that the key ingredient in his plan was military strength, something his own government lacked.[19]

On November 6, in an address before the legislature, Governor Brownlow formally condemned the growing anti-Radical agitation and violence. Describing what he called the "Threatened State of Revolution," Brownlow recited a familiar litany of political sedition, intimidation, and conspiracy, all designed to disrupt the state election of August 1867 and topple the loyal government. Explaining that "there is no military organization anywhere in the State," Brownlow implored the assembly to take "fearless action": "I recommend that you authorize the enlistment of a few regiments of loyal militia, to be armed and held as minute men, subject to the call of the Executive, to suppress insurrection or protect the ballot-box." He closed by promising to sustain the laws "be the consequences what they may." No doubt Brownlow exaggerated the threat of a second civil war and his own government's impotence, but given the unrepentant nature of many ex-Confederates, the Radicals were certainly confronted by an opponent who was both hostile and disloyal.[20]

Some three months after this address, on February 20, 1867, the assembly passed the Act to Organize and Equip a State Guard. Brownlow now had his much desired military strength. For all of the

criticism of Radical "tyranny" and "oppression," the Brownlow administration was remarkably slow to develop a reliable coercive instrument akin to a state militia. Not until two years after gaining power did the Radicals create this "loyal militia." A number of factors account for this delay. Cost was a primary concern for the state government. In the aftermath of the war, Tennessee was essentially bankrupt; many Tennessee legislators were loathe to add another expense, such as a militia organization, to the civil government's budget. State authorities preferred using the services of the free federal garrison in combating lawlessness, as long as it was available. Additionally, the issue of political legitimacy played a tacit, but crucial, role. Despite their suppression of ex-Confederate political liberties, the Radicals genuinely wanted a republican form of government. Cognizant of their minority political status, they were reluctant to create an armed force that would perforce be partisan. Only exigent circumstances could justify a standing army in peacetime. Besides, Conservative factions in the legislature were sure to oppose any militia bill that suggested the slightest political intent. To be sure, the anti-Radicals accused the Brownlow administration of tyranny anyway, but an arbitrary and excessive use of force would have confirmed it and possibly undermined Radical solidarity. Thus, Governor Brownlow adopted an incremental approach to the use of force. In this respect, the Tennessee State Guard marked the last resort, not the first choice, of Brownlow's "iron-glove regime."[21]

The Radical path to the State Guard Act of 1867 was circuitous and strewn with political obstacles. Tennessee legislators did debate the creation of a militia force from the time civil government was restored in the spring of 1865, but this early effort to augment executive power ultimately came to naught. Shortly after his inauguration on April 5, Governor Brownlow informed the legislature that armed bands of ex-Confederate guerrillas continued to roam the state and that the freedmen needed protection. Accordingly, he urged the creation of a "military contingent fund . . . confiding it under the control of the Executive." Unionists in the assembly agreed and soon presented several bills that went beyond a mere contingency fund and called for an actual militia. Roderick R. Butler of Johnson County, a leading member of the largely Radical state senate, presented on April 21 a bill titled "Amend the Militia Laws." Butler insisted that the militiamen be drawn from those Tennesseans mustering out of the army and believed that about three

thousand would be sufficient. West Tennessean Fielding Hurst agreed and endorsed the militia bill as a law that would "inspire confidence in the people." Similarly, the Radical John Trimble of Davidson County, echoing the sentiments of President Johnson, stated that "the people must form home companies and protect themselves like men." Despite some concerns over cost and priorities, W. K. Hall of Dyer County believed that the militia bill was "about as good as we shall be likely to obtain." In the course of this debate, some Radicals even suggested conscripting secessionist clergymen into the militia as a means of punishment. Amid such support, Butler's militia bill easily passed its third reading, after only a few days of deliberation, sixteen to four.[22]

Meanwhile, in the state house, William J. Smith, chairman of the military committee, forcefully moved various pieces of militia legislation. At the time, Smith was probably the most zealous advocate for a state militia. A wartime Unionist and slaveholder from the West Tennessee county of Hardeman, Smith had been arrested by Confederate authorities in 1861 and charged with treason. Although he was acquitted, local secessionists threatened Smith's life. At this point, he joined the Union army, serving as a scout in West Tennessee and later as a cavalry commander. He finished the war with a brevet brigadier generalship. A staunch Republican by 1865, Smith was a loud proponent of Radical Reconstruction for whom a loyal militia force was second in importance only to a strict franchise law. From the end of April to the beginning of June, he directed efforts to move some four militia bills through the house. He replaced Butler's original senate bill with his own bill "to Organize a State Guard," but the substantial number of Conservatives in the state house defeated this piece of legislation. Perhaps angered, Smith resisted efforts to pass a revised version of Butler's senate bill. Eager to get something passed before the session ended on June 12, however, he readily supported a new senate bill for "the Military Discipline and Defense of the State." Nevertheless, this bill was defeated, as was the hasty reintroduction of the Butler bill on June 7. Smith's parliamentary inexperience coupled with his apparent stubbornness contributed to the assembly's failure to enact any militia laws in 1865.[23]

However attractive a state militia may have sounded to Tennessee Radicals, there was no sense of urgency about creating such an organization in 1865. Many elected officials, most notably James R. Hood, a house Conservative from Hamilton County who voted against all of the militia



William J. Smith, 1865. Courtesy of the Massachusetts Commandery Military Order of the Loyal Legion and U. S. Army Military History Institute.

bills, believed a state militia was fiscally impractical and unnecessary given the presence of a large federal garrison (over sixteen thousand soldiers were stationed in Tennessee at the time). Accordingly, the assembly petitioned the president for military aid, reminding him of his constitutional duty to "guarantee . . . a Republican form of government." President Andrew Johnson assured the Brownlow administration that Gen. George H. Thomas, the department commander, would furnish "whatever amount of military force is necessary to sustain the civil authority and enforce the law." Brownlow and most Radicals happily accepted this military force. As the defender of Nashville against Confederate general John B. Hood's invasion in 1864, Thomas was popular with Tennessee Unionists. Moreover, Thomas was sympathetic to the Radical cause in the state. Though content to rely on U.S. troops, the general assembly did offer some comfort to county authorities confronted with guerrilla bands left over from the war. In June, it passed the Act For the Protection of Sheriffs, which authorized the creation of County Guards, posses of twenty-five men that local sheriffs could employ to combat outlaws.[24]

By 1866, as political tensions mounted, these means of law enforcement proved inadequate. The Sheriffs Act was designed to combat leftover guerrillas, not enforce a Reconstruction political agenda. Brownlow was generally pleased with how sheriffs in East Tennessee suppressed ex-Confederate lawlessness, but sheriffs elsewhere were less interested in promoting Radical policy. As for the federal garrison, General Thomas, in accordance with President Johnson's final proclamation ending the war, scaled down U.S. Army operations (fewer than two thousand soldiers were stationed in the state for most of the year). Moreover, after Tennessee's readmission, the federal government properly expected the state government to solve its own problems.[25]

To this end, the Radicals enacted the controversial Metropolitan Police Act in May 1866. This law granted the governor significant control over the police forces in three of the state's major urban centers: Memphis, Nashville, and Chattanooga. (Knoxville, Brownlow's hometown, was considered secure for the Radicals, although it did have a self-appointed "secret" police to keep crime in check.) The disappointing results of the March elections and the horrors of the Memphis race riot seemed to justify this increase in the executive's coercive powers, but the Metropolitan Police was only partially effective in suppressing anti-Radical activities. In Chattanooga, police commissioners appointed by

15



George H. Thomas, 1863–64. From Miller's *Photographic History of the Civil War.*

Brownlow did help the Radicals win that city's December municipal elections, but most of the city's residents found this use of force distasteful and protested the partisanship of the police. In Memphis, the Metropolitan Police became mired in that city's complicated politics. The commissioners divided their loyalties between rival Republican factions, undermining Brownlow's influence in the process. In Nashville, the popular Conservative mayor Matt Brown, who habitually reminded people of his steadfast refusal to take the state's loyalty oaths, levied an injunction against Brownlow's commissioners that inhibited the organization of the Metropolitan Police for months. Not until October 1867, when the Radicals won mayoral power, would a viable Radical police force materialize in Nashville. Even when fully employed, however, the Metropolitan Police Act limited Brownlow's reach to the cities, leaving the majority of the state unpoliced.[26]

To achieve real and lasting power, the Radicals needed a strong, reliable force at the Governor's immediate disposal. Enter the Tennessee State Guard. Past elections demonstrated to the Radicals that the Franchise Act of 1866 required vigilant enforcement, something only a militia force could provide. Furthermore, the necessity for the State Guard was decidedly urgent given the Radicals' pending efforts to enfranchise blacks. The Radical party was making a major effort in 1867 to implement its final version of Reconstruction—a Republican political hegemony that promoted public education, economic development, and a measure of racial equality. The potential for a second civil war, Brownlow's "State of Revolution," threatened to wreck these plans. The success of this Reconstruction venture, and the political survival of the Radicals, demanded a powerful militia to counter any armed resistance. By the autumn of 1866, the Radicals were on the verge of force politics.

Conservatives viewed with growing alarm both Brownlow's request for a militia force to prevent a rumored second civil war and the Radical party's gravitation toward black suffrage. Misperceptions concerning the creation of a large state militia circulated throughout the autumn. Edward H. East believed that the Radicals intended to "arm about 30,000 soldiers (white & negroes)." Alvan C. Gillem claimed that the recent political tension was the fault of the Radicals, who sought a "pretext to arm the militia, which in Middle & West Tennessee will be mostly *colored.*" John S. Brien urged President Johnson to replace General Thomas with an army commander more favorable to the Conservatives, noting that "if Brownlow Sucedes in arming the negroes and organizing them as Malitia," then Conservatives would need white troops to maintain order.[27]

Governor Brownlow left the particulars of the militia to the discretion of his Radical cohorts in the legislature. Within weeks of the Governor's November "State of Revolution" address, they dutifully presented two militia bills for consideration. Words of encouragement came from the Radical *Daily Press and Times,* which declared "A Well Organized Loyal Militia" to be one of the party's principal objectives for the upcoming year. The sense of urgency notwithstanding, the state house military committee took a long time—nearly two months—to draft a single, suitable bill. The assassination of Senator Case, however, accelerated the process. Shortly after this instance of ex-Confederate violence, William J. Smith, the champion of earlier efforts to create a state militia, presented a lengthy, complex militia bill that incorporated ideas from all previous bills on the matter. Smith's bill—No. 727, "To Provide for Organizing, Arming, and Disciplining the Militia"—

16

17

contained twenty-nine sections dealing with every imaginable detail and contingency from personnel qualifications and recruitment procedures to training regulations and supply matters. Smith envisioned militia formations as large as divisions and volunteers who would serve for three years. The bill further stipulated that regiments would consist of an equal number of white and black troops. But the bill was plagued by extraneous details. Section 7 explained at length the adjutant general's responsibilities, although James P. Brownlow had already been performing quite ably in that capacity for two years. Section 10 described how soldiers were to dress and exactly what gear they would carry. Section 16 required so many days of military exercise per calendar year. Section 17 explained how and when subordinate commands were to report to higher headquarters. Section 24 provided instructions on employing artillery (a "four gun battery" was assigned for each brigade), even though there were no field pieces in the Tennessee arsenal. One portion of the bill even forbade the enrollment of "idiots and lunatics." A Conservative newspaper mockingly declared that this "lunatic clause" exempted the Radicals from participation in the militia altogether.[28]

However cumbersome Smith's bill, the Radicals passionately pushed for its "immediate passage." James A. Doughty of Campbell County reportedly exclaimed that "the loyal men intended to control the State; if they could not control her peaceably they would control her by blood-shed." As an afterthought, he added that "there had not been blood enough shed." James S. Mulloy of Robertson County echoed Doughty's statements. Accusing the ex-Confederates of "rape, robbery, murder and arson" throughout the state, he endorsed the militia bill, claiming that he "had rather be radically right that radically wrong." The Conservatives were appalled by such statements and attempted to postpone the bill's passage. John Lellyett of Davidson County warned that "armies and troops produced more murders and crimes than they suppressed." Nevertheless, Conservative delay tactics were defeated when William J. Smith forced a roll-call vote on the bill. It passed its second reading thirty-nine to twenty-three, but the tally reflected significant opposition.[29]

Outside observers took a keen interest in Smith's militia bill No. 727, and state newspapers weighed in on the legislative discussions. The Radical *Nashville Daily Press and Times* applauded the assembly's decisive action. It described the bill as the surest means to "exterminate the

intolerable evil" of ex-Confederate violence, and it reminded readers that this bill limited Governor Brownlow to little more than eight thousand men, whereas Confederate governor Isham Harris had mobilized fifty-five thousand men in 1861. The Conservative *Nashville Union and Dispatch* condemned the militia bill as a "despotic scheme" engineered by the Radicals to secure their tyranny. Repudiating the Radical claim of Rebel lawlessness and ignoring the manifest political violence, the *Union and Dispatch* marveled that such legislation could be provoked by the death of a single man—Almon Case. This newspaper claimed that a state militia "will be a disgrace to the civilization of the age." In response to such criticism, the *Daily Press and Times* smugly retorted, "Let them wail." The *Knoxville Whig*, Brownlow's personal propaganda machine, offered a reasoned justification for the militia. It reassured Conservatives that "no very large number [of militiamen] will ever be called into actual service." It further insisted that the militia was not designed to control elections but to uphold the law where "a general spirit of defiance reigns supreme." Finally, it proclaimed that the Radicals would triumph "without brute force," and that with a militia, the governor could ensure that the Rebels also refrained from "brute force." Unconvinced, the *Union and Dispatch* rhetorically asked, "How much of republican government will there be left when these Praetorian bands are turned loose?"[30]

Realizing the seriousness of creating a standing army for the governor, even some Radical politicians urged caution. Smith's version of the militia bill ultimately proved too unwieldy, and other bills paraded the assembly floor in early February. In an effort to conciliate fellow Radicals and maintain his central role on the militia issue, Smith submitted a simplified version of his militia bill, but the house rejected it in a close vote (thirty to twenty-six). Conservatives consistently maintained that a militia was an excessive response to "the usual criminal outcroppings incident to every community" and recommended the cessation of debate on the topic. The Radicals, however, though still undecided on a final version, made the militia the "special order" of business for the house.[31]

As house legislators wrangled over the issue, Radicals in the senate crafted the militia bill that eventually passed into law. Alfred M. Cate, one of the Unionist heroes of the 1861 bridge-burning episode in East Tennessee, maneuvered a more succinct militia bill, An Act to Organize a State Guard, through the senate despite some reservations by several members. Conservatives presented two amendments which stipulated