ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG**<br><br>**VOLUME 8 OF 11**<br><br>Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

## INDEX

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867). | 18 n.17 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A. | 55 n.79 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 55 n.79 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 49 n.69 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 13 n.15 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 17 n.16 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 33 n.41 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 34 n.44, 54 n.78 | 0039-0041 |
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |

2

| | | |
|---|---|---|
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 31 n.34 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 177-202, 353-68. | *passim* | 0060-0096 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 31 n.34 & n. 35 | 0097-0104 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 20 n.22 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 9 n.3, 13 n.14, 25 n.26 | 0109-0217 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 40 n.53, 43 n.55 | 0218-0222 |
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 18 n.17, 20 n.21 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 18 n.19 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 19 n.20, 36 n.47, 40 n.53 | 0360-0397 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 28 n.29 | 0398-0424 |

3

| | | |
|---|---|---|
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 45 n.59 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 21 n.23, 25 n.25 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 45 n.59 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 10 n.9, 27 n.28, 30 n.33 | 0453-0464 |
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 36 n.47, 38 n.50, 39 n.51 & 52, 47 n.64 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 34 n.44 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 52 n.75 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 18 n.18 | 0489-0495 |

4

| | | |
|---|---|---|
| Allan Robert Purcell, "*The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 19 n.20 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 55 n.79 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 46 n.60 | 0563-0584 |
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 19 n.20 | 0585-0598 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana,for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 53 n.77 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 12 n.12, & 13 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 47 n.63 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 48 n.68 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 | 49 n.70 | 0620- |

| | | |
|---|---|---|
| "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | | 0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 48 n.67 | 0622-0627 |
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 12 n.13 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 28 n.30 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 24 n.24 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:211-12. | 17 n.16 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 47 n.62 | 0653-0656 |

6

| NEWS ARTICLES | | |
|---|---|---|
| Army and Navy Journal, June 1, 1867, p. 350 | 29 n.32 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 27 n.27 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 37 n.49 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 2 | 56 n.61 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 32 n.37 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 32 n.38 | 0666 |
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 49 n.72 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 44 n.56 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.31 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 25 n.26 | 0679 |
| New Orleans Republican, June 1, 1873, p. 1 | 40 n.53, 42 n.54 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 46 n.61 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 32 n.40 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 33 n.42 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p. 1. | 42 n.54 | 0688 |

| | | |
|---|---|---|
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 34 n.43 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 45 n.58 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 35 n.46 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 44 n.57 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 37 n.48 | 0695 |
| *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4). | 27 n.27 | 0696 |
| **OTHER SOURCES** | | |
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 34 n.45 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 25 n.26 | 0701-0702 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 26 n.26 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 26 n.26 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 51 n.73 | 0716-0727 |

8

Considerable public support was generated for the militia movement as a result of these public utterances. When local political barometers indicated the propitious moment, governors then issued official appeals to their respective legislatures. Citing the obvious shortcomings of the existing situation, they urged immediate and effective remedies. Yet they couched their appeals in very cautious language and gave repeated assurances that if granted militia forces they would call them out only in cases of general resistance to the laws. Although the desired result was uniform throughout the Southern states, gubernatorial requests were quite different in nature. Where the Texas Legislature was merely urged to "look into the question" of making some provision for the temporary establishment of martial law,[7] Governor Clayton peremptorily demanded that the Arkansas Legislature, in the interests of public safety, must "proceed at once to provide for an efficient and well disciplined militia."[8] Governor Holden, in his message to the North Carolina lawmakers, virtually pleaded with them to enact laws that would enable him "to suppress violence and disorder"[9] and piously added that such action would allow his administration to appear equipped with both "the olive branch and the sword."[10] Governor Brownlow characteristically promised that if given a militia force he would bring peace to Tennessee if he had "to shoot and hang every man concerned."[11]

On the basis of these appeals, state legislators set about

[7] Hilary A. Herbert, ed., *Why the Solid South?* p. 371.
[8] Powell Clayton, *The Aftermath of the Civil War in Arkansas*, p. 41. (Hereafter cited as *Aftermath in Arkansas*.)
[9] William W. Holden, *Memoirs*, p. 121.
[10] James G. de R. Hamilton, *Reconstruction in North Carolina*, p. 401.
[11] Patton, *Reconstruction in Tennessee*, p. 86, citing *Nashville* (Tenn.) *Daily Times*, January 16, 1865.

20

*Negro Militia and Reconstruction*

the task of drafting and enacting militia laws. When completed, these laws authorized creation of military forces that were patterned largely after the United States Army and were, in the main, subject to rules quite similar to the Articles of War. Although varying in detail, the laws fundamentally had much in common. In general, they provided for a force made up of two components, a state guard and a reserve militia. The regular, or active-duty, personnel belonged to the guard, while the reserve militia furnished a reservoir of manpower for necessary mobilization. The number of troops authorized varied from state to state. Some states (for example, North Carolina) were quite specific about the maximum number that could be enrolled,[12] while others left the decision entirely to the discretion of the governor.[13] Usually the eligible age group was eighteen to forty-five years. The governor was ex officio commander-in-chief of the state forces and had explicit power to call out the militia whenever in his opinion circumstances warranted such action. He was further empowered to assess and collect taxes from troublesome counties in order to defray costs of militia operations therein. His personal grip on the militia was assured because he had complete control of the selection of officers. Exemption clauses, under which less belligerent members of the community might avoid military service in return for payment of an annual tax to the military fund, were frequently included in the militia laws. The tax ranged from

[12] The militia bill passed in North Carolina in 1868 prohibited the enrollment of more than 6,000 men. See Hamilton, *Reconstruction in North Carolina*, p. 358.

[13] The wording of the South Carolina militia law passed in 1868 authorized the governor to "employ as many persons as he may deem necessary and proper for the suppression of insurrection, rebellion, or resistance to the laws." (James S. Reynolds, *Reconstruction in South Carolina*, p. 114.)

as little as two dollars in North Carolina to much higher figures in other states.[14] North Carolina also provided an exemption from service for anyone who was excused by written authority of a competent physician.[15] Only two states seem to have recognized that some citizens rendered things other than to Caesar. Any North Carolinian imbued with peace-loving "religious scruples" was constitutitionally excused from performing militia duty,[16] and professed conscientious objectors in Arkansas were excluded from involuntary service by a specific clause written into the law.[17]

Several of the laws contained provisions that, although peculiar to the state concerned, throw additional light on the militia forces as they were eventually organized. In Mississippi, for instance, militiamen were immune from arrest while attending or going to and from musters.[18] A clause in the North Carolina law called for separation of the races into different companies.[19] The South Carolina law contained two unusual provisions. The first, reflecting a sound insight into the military importance of transport and communication, authorized the governor to take possession of telegraph and railroads in times of emergency, and the second imposed both fine and imprisonment as penalties against bodies other than the militia for organizing, drilling, or parading anywhere in the state.[20]

[14] For figures on North Carolina, see Hamilton, *Reconstruction in North Carolina*, p. 358. In Arkansas, the annual tax was five dollars. (Thomas S. Staples, *Reconstruction in Arkansas*, p. 289.)

[15] Hamilton, *Reconstruction in North Carolina*, p. 358.

[16] Specifically stated in the constitution of North Carolina drawn up in 1868.

[17] Arkansas constitution of 1868, Art. XI, Sec. 1.

[18] *Journal of the Proceedings in the Constitutional Convention of the State of Mississippi, 1868*, p. 641. This provision was included in the Mississippi constitution of 1868, Art. IX, Sec. 8.

[19] Hamilton, *Reconstruction in North Carolina*, p. 359.

[20] Reynolds, *Reconstruction in South Carolina*, pp. 115, 119.

22

*Negro Militia and Reconstruction*

Acting on these laws, Radical governors began organizing their militia forces. Although enrollment was legally open to both races, it soon became apparent that most of the volunteers would be Negroes. This should not have been surprising. Many whites were officially discouraged from joining because of justifiable Radical suspicions concerning their intent. On the other hand, Negroes had ample reason to be devoted to the Republican cause.

The Conservatives made a deliberate attempt to organize and receive arms under provisions of the militia laws. This infiltration was encouraged by their political leaders, who could foresee the real advantage inherent in having their personal supporters armed at the expense of the state.[21] This attempted wolf-in-sheep's-clothing maneuver was foiled, however. Opposition to the inclusion of Conservatives in the militia was spearheaded by loyal troops already mustered in. North Carolina's Governor Holden was warned against the possibility of Conservatives gaining control of the militia by being the first to offer their services "under the pretence that they are 'alright' and ancious to put down the depradations that [are] now being perpetrated in this state."[22] Many protests were heard from organized units:[23]

The present companies that have already been armed and equipped are loyal, peaceable, orderly, and efficient, and can be controlled for the good of the country. They are insenced over

[21] General J. Z. George, for example, consistently urged Mississippi Democrats to enroll in the militia. (James W. Garner, *Reconstruction in Mississippi*, p. 383.)

[22] I. C. Williams to William W. Holden, June 28, 1870, William W. Holden Papers.

[23] Letter from B. G. Yocum dated September 2, 1870, published in *Report of Joint Investigating Committee on Public Frauds in South Carolina, 1877–1878*, p. 674. Yocum was a colonel in the Fourteenth Regiment of South Carolina Militia.

the prospect of having an armed and authorized enemy to con-
tend against, and say if the Governor is going to arm the white
KK's to operate against them, he, the Governor, can take back
the guns and commissions that has already been sent to this
county. . . . It will not be so funny if our best men get killed off
by those villins. . . .

One militiaman penned his fervent hope that no Con-
servative would be allowed to enroll, "for if they git con-
trole of the state troots in the different counties as the
secessionists did after the surrender (at the close of the
war) of the county police our generals may be ever so
vigerlent but they will make but little success in putting
down the outrages." He closed his letter with a warning
to put "none on garde tonight but loyal citizens."[24]

Radical governors, taking their lead from the expressed
resentment of their own supporters, moved to exclude
Conservatives from the militia. In Louisiana, it was de-
manded that "men should prove they are loyal before
they can be trusted to go into the militia."[25] The Alabama
ordinance provided that commissions in the state militia
would be reserved for "persons of known loyalty."[26] Gov-
ernor Ames, of Mississippi, made the realistic observa-
tion that, since "the state government commanded the
respect of the colored race only, it must depend for mili-
tary support on colored troops."[27] In areas where white
companies of questionable loyalty had been allowed to
organize, disbandment, when considered necessary, was
easily effected by the expedient of appointing Negro

[24] I. C. Williams to William W. Holden, June 28, 1870, Holden
Papers.
[25] Ella Lonn, *Reconstruction in Louisiana after 1868*, p. 22. (Here-
after cited as *Reconstruction in Louisiana*.)
[26] *Harper's Weekly*, December 21, 1867.
[27] Garner, *Reconstruction in Mississippi*, p. 385.

24
*Negro Militia and Reconstruction*

officers to positions of command.[28] By these means, white participation in the militia was largely limited to those who had given previous evidence of Republican sympathies.

The Negro, on the other hand, had several positive motives for enlisting in the militia. In the novelty of his freedom, he did not forget the men who had made that freedom possible. Since the Negro was circumstantially a Republican, it was quite natural for him to support party programs. This was particularly true of the militia project, where participation could be interpreted as a personal defense of his freedom. Political affinity was, however, only one of the factors that made the Negro a willing recruit. The pay, normally the same as that received by soldiers of equivalent grade or rank in the United States Army, was enticing. Indeed, to the average field hand, the reward must have appeared magnificent. Too, the perennial appeal of the uniform exercised some influence, especially since regulations were lax enough to allow the sporting of an occasional plume or feather. The promised relief from the routine drudgery of plantation work probably accounted for many more volunteers. The drills, the parades, the barbecues, and the speeches offered a pleasant break in the monotony, and soldiering was considered a delightful game.[29]

Another reason for increased Negro enlistment was social pressure. Negro women, emulating the role played by their white sisters of the South during the Civil War, were very effective recruiters for the militia. Failure to show interest in the movement automatically caused the

[28] Claude G. Bowers, *The Tragic Era*, p. 359; Reynolds, *Reconstruction in South Carolina*, pp. 136–37.
[29] J. A. Leland, *A Voice from South Carolina*, p. 49.

Case 3:19-cv-01537-BEN-JLB   Document 150-7   Filed 10/21/22   PageID.13472   Page 15 of 86

male Negro to become politically suspect and gave rise to a most rigorous program of discrimination at the hands of the women. Negro men charged with political infidelity were socially isolated; they even encountered increasing difficulty in persuading a woman to wash their clothing. Expulsion from the local church was not considered too extreme a punishment, and on several occasions groups of irate females publicly assaulted and tore the clothing off suspected shirkers. In cases involving reluctant husbands, wives were known to impose restraints that certainly must have taxed the domestic relationship.[30] Such efforts were not without results, and under the additional pressure of circulated handbills bearing the appeal "To Arms! To Arms!! To Arms!!! Colored Men to the Front!"[31] the muster lists were rapidly filled.

Hand in hand with the actual formation of militia forces went the problem of officer procurement. Inasmuch as the selection of officers was generally left in the hands of the governor, no uniform system of appointment evolved. One qualification remained fairly constant, however: the appointee must be a person of known loyalty to the cause. During periods of militia activity, governors were overwhelmed by letters from commission-seekers. Some requests—and resulting appointments—were of a strictly political nature, while others were based on ability and experience. The Governor of Tennessee received the following straightforward appeal:[32]

[30] This sampling of Negro discrimination against other Negroes is taken from the testimony of the victims. (S. Misc. Doc. 48, Vol. I, 44th Cong., 2d Sess., pp. 556, 560, *et passim.*)

[31] Cited in H.R. Misc. Doc. 211. 42d Cong., 2d Sess., p. 319.

[32] N. C. Davis to William G. Brownlow, May 18, 1867, William G. Brownlow Papers.



## In the Name and by the Authority of

## The State of Texas.

**Know Ye,** *That I,* EDMUND J. DAVIS, *Governor of the State of Texas, reposing special trust and confidence in the patriotism, valor, fidelity and ability of* J. S. Dick *, do appoint him* Second Lieutenant *in Militia of Texas, to rank as* Such *from the* 3rd *day of* October *One Thousand Eight Hundred and Seventy . He is, therefore, carefully and diligently to discharge the duty of* 2d Lieutenant *by doing and performing all manner of things, thereunto belonging; and I do strictly charge and require all persons under his command to be obedient to his orders, as* 2d Lieutenant *; and he is to observe, and follow such orders and directions, from time to time, as he shall receive from his superior officers, set over him according to the rules and discipline, laid down for the guidance of the Militia forces of this State.*

*This commission to continue in force during the pleasure of the Commander-in-Chief, for the time being.*



**In Testimony Whereof,** *I have hereunto signed my name, and caused the Great Seal of the State to be affixed, at the City of Austin, the* 3rd *day of* October *in the year of our Lord One Thousand Eight Hundred and Seventy , and the Independence of Texas the Thirty* Fifth *.*

Edmund J. Davis
*Governor of Texas.*

By the Governor:

Oldright
*Act'g Secretary of State.*

*Recorded: Volume* 1 *, page* 252 *,*
*Adjutant General's Office,*
*Austin* Oct 3rd 1870

James Davidson
ADJUTANT GENERAL,
State of Texas.
X Edward Beck
Clerk
In charge

Second Lieutenant's commission, Texas Militia
(Texas State Archives, Austin)

Sir

As I am a man of few words I will tell you at once without any apology or preliminaries what I want. I want a Captain's commission to recruit a company of black soldiers for the state guards. I have served three years in the Federal army and can give the best of references as to character and ability.

In some cases the men were allowed to elect their officers, although this practice was by no means general. Commissions were sometimes placed on the auction block and fell to the highest bidder, and letters such as the following were common:[33]

Hamburg, S. C., June 3, 1876

Mr. Henry B. Johnson:

Sir: Would you be kind enough to see what it would cost me to get the commission for one captain and three lieutenants. If you will see Col. Walter R. Jones and ask him to assist you in getting the commissions for me, and send them to me, and i will return the expensy on the return mail. . . .

Col. John Williams

In order to obtain the services of physicians for the militia, private contracts were negotiated under whose terms medical officers were brought into service with a higher rate of pay than that of the troops.[34]

Having arranged for the organization of militia forces, the authorities were next faced with the problem of arming and equipping them. This proved to be a most difficult task. Militia appropriations were bitterly and often successfully opposed by Conservative blocs, and governors were forced to seek other methods by which to equip their forces. The first such measure was an attempt to

[33] S. Misc. Doc. 48, Vol. III, 44th Cong., 2d Sess., p. 585.
[34] Several copies of these contracts may be found in the files of the Tennessee Adjutant General's Office. (Hereafter cited as AGO files, state of Tennessee.)

28

*Negro Militia and Reconstruction*

borrow guns and ammunition from the armories of sympathetic Northern states. For this purpose Governor Clayton, of Arkansas, sent a personal envoy, Dr. J. M. Lewis, to enter a plea with the governor of Illinois;[35] Warmoth, of Louisiana, sent a representative to the capitals of Missouri and Illinois;[36] while Governor Reed, of Florida, personally called on Governor John Andrew, of Massachusetts, and Governor Reuben Fenton, of New York.[37] Although these appeals generally fell on deaf ears, Vermont, in answer to an appeal from the adjutant general of North Carolina, sent 1,000 Springfield rifles to aid in pacifying the citizenry of that state.[38]

Failing in this effort, the governors next turned to the federal government in hopes of securing arms for their troops. Their earliest overtures met with official rebuff. Clayton's request for arms was denied by the Army,[39] as was a similar plea from the Governor of Florida.[40] However, as violence in the Southern states continued unabated, the national administration gradually began to look with more favor on the possibility of furnishing arms to state governments. Apparently the adjutant general of South Carolina was the first to persuade the federal government to make an issue of arms to a state, for his opponents at home reported with noticeable chagrin: "He CAME to Washington, he SAW the Secretary, he CONQUERED all objections."[41] When Governor Holden, of North Carolina, sought federal aid in outfitting his troops, he re-

[35] Clayton, *Aftermath in Arkansas*, pp. 106–109.
[36] H.R. Misc. Doc. 154, 42d Cong., 2d Sess., p. 519.
[37] John Wallace, *Carpetbag Rule in Florida*, p. 92.
[38] Hamilton, *Reconstruction in North Carolina*, p. 346.
[39] Clayton, *Aftermath in Arkansas*, pp. 106–109.
[40] Wallace, *Carpetbag Rule in Florida*, p. 92.
[41] *Proceedings of the Tax-Payer's Convention of South Carolina, 1874*, p. 95.

ceived support from no less powerful a person than President Grant. Holden sent a political associate, William G. Clarke, to Washington as his agent. Clarke, on his arrival, wrote a formal request to General Montgomery C. Meigs, Quartermaster General of the Army, for equipment to outfit a full regiment of North Carolina infantry.[42] Clarke then secured a personal interview with Grant during which he gained the President's approval of the project. On the same day Grant wrote a letter to General Sherman endorsing the plan to outfit North Carolina troops at government expense and said that he was "willing to sign any legal order necessary" to accomplish it.[43] Sherman then agreed to issue the equipment in exchange for Governor Holden's signature on a bond that would be "payable at the day of Judgment."[44] Several days later, Holden was informed by Meigs that the quartermaster at Fortress Monroe had been instructed to issue the outfit.[45]

Eventually, Congress passed a law authorizing the distribution of federal arms to Southern states on a quota basis.[46] In practice, this system proved quite flexible. Governor Scott, for example, persuaded the authorities to issue South Carolina a sizable advance on its quota.[47] It is not too broad a generalization to say that this law pro-

[42] William G. Clarke to Montgomery C. Meigs, June 17, 1870, Holden Papers.

[43] Ulysses S. Grant to William T. Sherman, June 17, 1870, Holden Papers.

[44] William G. Clarke to William W. Holden, June 18, 1870, Holden Papers.

[45] Montgomery C. Meigs to William W. Holden, June 21, 1870, Holden Papers.

[46] Act of March 3, 1873. See *Congressional Globe*, 42d Cong., 3d Sess., p. 300.

[47] B. R. Tillman, *The Struggles of '76*, p. 40 (pamphlet in the possession of the author). Tillman, in a highly partisan vein, estimates that Scott received a twenty-year allotment in advance.

30

*Negro Militia and Reconstruction*

vided the largest single source of arms and equipment for the various state militias.[48]

Since the organization and arming of the militia was not carried out in secrecy, it was accompanied by vociferous opposition from the Conservatives. Every news organ at their disposal carried on a vituperative campaign against the militia project, denouncing it as a flagrant encroachment on civil liberties. Editorials similar to the following appeared frequently:[49]

The whole affair is a weak and silly attempt to awaken the worst passions of the aggressive party with a view to make them a unit in support of executive violence, and to browbeat and intimidate. . . . He [Governor Clayton] wants 23,000 negroes armed to protect 70,000 white men and their families in order to promote future peace, quiet and permanency.

When militia bills were introduced in state legislatures, prominent Democrats led the fight against them.[50] The proposed laws were attacked as purely political in nature and as potential threats to the preservation of peace.[51] Nor was opposition confined to the South. As influential a newspaper as James Gordon Bennett's *New York Herald* matched and often outdistanced the provincial Southern press in rabid denunciation: "The fact is inevitable that bloodshed will follow. Reconstructed governments are bad

[48] For detailed information concerning federal issue of arms to Southern states from 1865 to 1872, see official figures cited in H.R. Misc. Doc. 191, 42d Cong., 2d Sess., p. 4.

[49] *Daily Arkansas Gazette*, November 26, 1868.

[50] Testimony of Plato Durham, H.R. Rep. 22, 42d Cong., 2d Sess., p. 317.

[51] A Louisiana senator stated flatly, "I believe the object of the bill, as it stands, is to perpetuate the power of . . . the Republican Party." (Cited in Lonn, *Reconstruction in Louisiana*, p. 60.) Democrats repeatedly warned that if militia bills were passed it would become impossible to preserve peace. (Testimony of H. C. Warmoth, H.R. Misc. Doc., 154, 42d Cong., 2d Sess., p. 519.)

31

*Organizing and Arming the Militia*

enough with negro legislators, negro magistrates, negro police, and negro Commissioners of Education and other matters; but when armed negroes appear as military forces to keep white men in order . . . the spirit . . . must revolt."[52]

When recruiting actually began, Conservatives loudly claimed they were being discriminated against in not being allowed to join up. They cited the difficulties put in the way to prevent their enlisting as clear evidence of official preference for Negro troops.[53] They tossed in an incidental complaint that recruiting among agricultural workers interfered with the harvesting of crops.[54] Great excitement prevailed over the question of arming the militia. In an attempt to prevent passage of a proposed act allowing the federal government to issue arms to Southern governors, Representative Nathaniel Boyden, of North Carolina, made this impassioned plea: "Great God, we cannot afford to fight each other. . . . I warn the House that if arms are sent there, we will be ruined; we cannot live there. If we need anything in the way of arms, in God's name send an army of the United States but do not arm neighbor against neighbor."[55] Loud protests were registered when rifles were issued for drill purposes; and when live ammunition was subsequently passed out, consternation reigned. The Conservatives maintained that conflict was inevitable after the "buck and ball" reached the hands of militiamen.[56]

The governors were not intimidated by the clamorings

[52] *New York Herald*, October 1, 1868.

[53] Garner, *Reconstruction in Mississippi*, p. 383.

[54] ——. ——. Stuart to Governor William G. Brownlow, April 1, 1867, Brownlow Papers.

[55] Hamilton, *Reconstruction in North Carolina*, p. 372, citing a speech made in the House of Representatives in August, 1868.

[56] Testimony of David R. Duncan, H.R. Rep. 22, Vol. II, Part 3, 42d Cong., 2d Sess., p. 880.

32

*Negro Militia and Reconstruction*

and threats of their political antagonists. They defended their action on the firm grounds that the right of a state to organize a militia was not a new principle but a very old one and that it was designed not to foment trouble but to preserve peace. In a speech at Lewisburg, Arkansas, at the very height of the militia-organization controversy in 1868, Governor Clayton courageously said: "I understand that the militia law is distasteful to some. I have only to say that it is a law that will be enforced. The militia forces will be organized in this county and throughout the state."[57]

The governors were not without support. Letters from all sections of their states poured into the capitals in praise of the militia movement. This correspondence demonstrated a widespread interest in the organization of the militia and the desire to see that it was made "both ornamental and useful."[58] In South Carolina, it was reported that "the colored people are rejoicing over their guns."[59] Governor Davis received this gratifying message from a fellow-Texan: "All the Union mens of this county is proud of the militia and Police law and hopes you will inforce them. We have many roughies here should be tried by the military."[60]

Out of the welter of accusations, exaggerations, recriminations, charges, and countercharges that resulted from the organization of militia forces, a few reasonable con-

[57] Clayton, *Aftermath in Arkansas*, p. 148.

[58] G. R. Dickson to William W. Holden, April 5, 1870, Holden Papers.

[59] Letter from J. A. Jackson to John B. Hubbard, July 3, 1870, quoted in *Report of Joint Investigating Committee on Public Frauds in South Carolina, 1877–1878*, p. 675.

[60] Undated letter of A. P. Brown to Edmund J. Davis, quoted in J. M. Brewer, *Negro Legislators of Texas*, p. 58. Brown was a Negro politician of Hopkins County.

clusions may be made. Certainly, the need for a protective force was a very real one, if the Radicals were to maintain their hold on Southern state governments. Their resolute action in forming militia units was an accurate indication of their political sagacity. Also, it does not seem likely that there was any deliberate attempt, except in a few isolated instances, to make this force exclusively Negro. That it became so was probably a great surprise to the originators, many of whom lacked the familiarity with Southern attitudes and behavior that usually comes only from long observation of sectional peculiarities. It is also true that in spite of an unfavorable publicity campaign of unprecedented proportions, the Radicals persevered in the work of arming their forces.

Once this was accomplished, the stage was set for the enactment of a drama of violence that was to last until the final disintegration of the Radical dream of a Republican South.

34

## III.   The Militia in Action

TOWARD THE END of January, 1889, twelve years after the
dissolution of the last Negro militia unit in the South,
there occurred a brutal murder in Conway County, Ar-
kansas. This crime is of particular interest because the
murdered man was John M. Clayton, brother of the Radi-
cal Governor who organized and employed Negro troops
in that state. During the investigation that followed the
murder it was rumored that Clayton had been killed by
Thomas Hooper, then a citizen of California, in revenge
for the killing of his father by Clayton's militia during the
hectic days of 1868.[1] Whether or not the rumor was true
is largely beside the point in so far as this book is con-
cerned, but it is certainly indicative of the fact that dur-
ing the period of militia activity seeds of ill-feeling were
sown that were to yield fruits of hatred for many years
to come.

Since much of this ill-feeling resulted directly from
deeds involving Negro militia forces, it is necessary to
analyze their activities in order to arrive at some accept-
able picture of their history. In attempting such an anal-
ysis, one must avoid the extreme positions reflected not
only in the uniform denunciations of those who opposed
the militia but also in the unparalleled praise of its ad-
vocates. Historians of the Reconstruction period offer little
aid here, since their accounts of the militia in action vary
almost as widely as did contemporary ones. Dunningites,
for example, persistently portray the militiamen as ar-
rogant, swaggering bullies bent on a rapacious campaign
of violence against and humiliation of the South. Revision-
ists, on the other hand, when they mention the militia

[1] For full account see Clayton, *Aftermath in Arkansas*, p. 191.

68

*Negro Militia and Reconstruction*

tirety, a survey of the local political scene becomes imperative.

As in several other Southern states, the Radical party that emerged triumphant in Louisiana as a result of the Reconstruction acts enjoyed a relatively short period of unity and was then rent by internal strife. The split among Louisiana Republicans began as early as 1870, when the anti-Warmoth group opposed the Governor in his successful maneuver to remove the restriction making him ineligible for re-election. Open rupture between the two wings of the party took place during the state convention of August, 1871. In the resulting coalitions, Governor Warmoth was supported by P. B. S. Pinchback, a Negro politician who exercised considerable influence over members of his race, while the opposition formed what became known in local circles as the "Custom-House" faction. The latter was built around the combined forces of United States Marshal S. B. Packard; George W. Carter, speaker of the House of Representatives; and J. F. Casey, brother-in-law of President Grant and collector of customs for the port of New Orleans. Actually, two conventions were held simultaneously; the Warmoth group met in Turner's Hall, and the Packard faction held closed sessions in the Custom House.[6]

The first test of strength between the two forces took place in November, 1871. On the twenty-second of that month, Lieutenant Governor Oscar Dunn died, and both factions attempted to install their men in the office.[7] Warmoth won by arranging for the election of Pinchback as president of the Senate, thereby automatically placing him

[6] *Ibid.*, pp. 10, 102.
[7] Alcée Fortier, *A History of Louisiana,* Vol. IV, p. 117. Subsequent citations to this work refer to Vol. IV.

next in line for the governorship. Whether or not the charges of bribery levied against Warmoth were true, there can be no doubt that his victory only widened the party breach.

When the Legislature reconvened in January, 1872, the bad feeling led to the outbreak of the Carter-Warmoth feud, during which the Louisiana Militia were organized and used for the first time. The feud was essentially a struggle to control the Legislature. On January 4, Speaker Carter was expelled from his position amid great confusion and excitement, and a Warmoth man was installed in his place.[8] The ousted Carter gathered his followers, moved into a room over the Gem Saloon on Royal Street, and set up another legislative body.[9]

The existence of this rival body spurred Warmoth into action, and he decided to call up the militia. In looking around earlier for a satisfactory leader, his eye had fallen upon James A. Longstreet, Lee's former corps commander who in 1866 had settled down in New Orleans to the routine life of a cotton-broker.[10] Longstreet's willingness to be reconstructed cost him both social and business standing in New Orleans, but President Grant, an old Army friend (in whose wedding, incidentally, Longstreet had been best man), appointed him surveyor of customs in New Orleans in March, 1869.[11] Warmoth followed suit by appointing him adjutant general of the state militia on May 13, 1870, with an annual salary of $3,000.[12] When the situation grew threatening in 1872, Longstreet was

[8] Lonn, *Reconstruction in Louisiana*, p. 119.

[9] Fortier, *A History of Louisiana*, p. 118.

[10] H. J. Eckenrode and B. Conrad, *James Longstreet: Lee's War Horse*, pp. 372–75. (Hereafter cited as *James Longstreet*.)

[11] Hesseltine, *U. S. Grant, Politician*, p. 153.

[12] D. B. Sanger and T. R. Hay, *James Longstreet*, p. 349.

70

*Negro Militia and Reconstruction*

placed in a position of active command upon receipt of the following letter, dated January 6:[13]

General: I have the honor to hand you herewith a commission constituting you Major General of Louisiana State Militia, and by order of his excellency the governor, to state that you are thereunder assigned to the immediate command and supervision of the entire militia, police, and all civil forces of the State of Louisiana and within the city of New Orleans.

<div align="right">O. D. Bragdon<br>*Private Secy.*</div>

As a result of this communication, Longstreet found himself in command of a strange force. Warmoth had found it "judicious" to arm and organize some 2,500 whites, "notwithstanding the fact they were soldiers in the Confederate Army," and another 2,500 Negroes.[14] The metropolitan police, under Superintendent A. S. Badger, were incorporated into the militia and were armed with Winchester rifles, breech-loading guns, and a 6-pound howitzer.[15]

By this time, a triangular situation existed in New Orleans. Warmoth and his legislature were in the Statehouse, protected by the militia and police; Carter and his legislature were in the Gem Saloon building, surrounded by a large number of deputized citizens; and a detachment of United States troops under General W. H. Emory stood by for any possible emergency.

On January 10, the Warmoth faction took forcible possession of the Gem building without any real opposition.

[13] H.R. Misc. Doc. 211, 42d Cong., 2d Sess., p. 811; Sanger and Hay, *James Longstreet*, p. 356.
[14] H.R. Misc. Doc. 211, 42d Cong., 2d Sess., p. 295.
[15] Testimony of A. S. Badger, *ibid.*, p. 103.

The dispossessed Carterites reassembled in the Cosmopolitan Club[16] and from this new headquarters mounted a premature counterattack that ended in a blustering and bloodless failure to take the Statehouse. Failing in his attempt to gain the support of federal troops, Carter sensed that he must either make a decisive move or surrender. On Saturday, January 20, therefore, thousands of circulars were distributed calling for a mass meeting on Monday and urging Negroes in particular to take arms against "Warmoth and his thieving crew."[17] On Sunday night, the Algiers armory was broken into by Carter followers, and the arms in storage there were distributed among the men.[18] The next day, several thousand men assembled in answer to Carter's appeal and were preparing to march on the Statehouse when word arrived that President Grant had telegraphed General Emory to use his troops if necessary to prevent violence.[19] The President's action made a Warmoth victory certain, and the Carterites returned to the Legislature on the Governor's terms. The state militia, on its first assignment, had been used primarily for guard duty and had not been called upon to do any actual fighting. Relative quiet returned to Louisiana, and within a few weeks General Longstreet was able to resign his command, giving as his reason the somewhat significant desire to remain "untrammeled in the approaching political canvass."[20]

[16] Fortier, *A History of Louisiana*, p. 118.
[17] Circular reprinted in H.R. Misc. Doc. 211, 42d Cong., 2d Sess., pp. 318–19.
[18] Lonn, *Reconstruction in Louisiana*, p. 132.
[19] *American Annual Cyclopaedia, 1872*, p. 472.
[20] J. A. Longstreet to H. C. Warmoth, April 19, 1872, Henry Clay Warmoth Papers.

# I'LL DIE
# BEFORE
# I'LL RUN

## The Story of the Great Feuds

## of Texas

★

## C. L. SONNICHSEN

*illustrated with drawings by José Cisneros*

University of Nebraska Press
Lincoln and London

Compendium_Vorenberg
Page 398

Copyright 1951, 1961 by Charles Leland Sonnichsen
All rights reserved
Manufactured in the United States of America

The paper used in this publication meets the minimum requirements
of American National Standard for Information Sciences—
Permanence of Paper for Printed Library Materials,
ANSI Z39.48-1984.

First Bison Book printing: 1988
Most recent printing indicated by the first digit below:
      3     4     5     6     7     8     9     10

Library of Congress Cataloging-in-Publication Data
Sonnichsen, C. L. (Charles Leland), 1901–
    I'll die before I'll run: the story of the great feuds of Texas / C. L.
Sonnichsen: illustrated with drawings by José Cisneros.
        p.      cm.
    "Bison."
    Reprint. Originally published: New York: Devin-Adair Co., 1962.
    ISBN 0-8032-9192-2 (pbk.)
    1. Vendetta—Texas—History—19th century. 2. Texas—
History—1846–1950.   I. Title.
F391.C734   1988
976.4—dc19     CIP 88-14320

Reprinted by arrangement with the Devin-Adair Company,
Publishers, Greenwich, Connecticut

976.4 So59i 1988

Sonnichsen, C. L.
(Charles Leland), 1901–
I'll die before I'll run
: the story of the

S.F. PUBLIC LIBRARY          3 1223 04254 5989

124 : The Terrible Seventies

"You're as good as hung already," they told him.

At first Green seemed very much taken aback, but pretty soon a happy thought struck him.

"Well," said he, "if I've got to be hung, I'm glad I'm goin' to be hung by my friends." [10]

The seventies were that way.

# HOT HEADS AND
# HAIR TRIGGERS

## The Horrell-Higgins Feud

A little after noon on the nineteenth of January, 1873, State Police Captain Thomas Williams and seven men, including one Negro, rode into Lampasas from the south looking for trouble.

They had come to the right place. In the summer, Lampasas was a resort town where people came from far and near to drink the potent sulphur water from the two big springs; during the rest of the year Lampasas was a dusty little cow village on the edge of the hill country where ranchers came to get their supplies and cowboys whooped it up in the saloons. The wonderful range country round about, with its high, rolling pastures, its limestone-bottomed creeks winding through post oak and mesquite, and its far, hilly horizons was possessed by many an old Texas family brought up to fight the Indians and hate the Yankees. And lately they had been getting into trouble among themselves.

Cattle stealing was at the bottom of it. There were shady characters about and a good deal of stock was being run out of the country. To complicate matters, the town was wide open and the saloonkeepers and gamblers had things their own way. The rough element was growing bold, and there was too much cowboy skylarking to suit the solid citizens.[1]

Five days before the captain rode in, Sheriff Denson had been killed while trying to make an arrest. The men who did it were protected by their pals (including three

## 126 : The Terrible Seventies

brothers named Horrell) and did not even go to jail.[2] When the news reached Austin, Adjutant General Britton sent a detachment of his State Police to straighten things out and disarm the cowboys.

This was a rather risky procedure. To the old-time Texans in the county the Yankee government was an abomination, and it is said that some of them had sent word to Governor Davis not to let any of his "nigger police" show their faces in that country unless he wanted to get rid of them.[3] That may have been the reason why Captain Williams took with him six white policemen and only one colored man, but he made no other peaceful gestures. On the road that morning he stopped Telford Bean, a freighter on his way to Austin, to ask how far it was to Lampasas.[4] Bean noticed that the captain had been drinking, and heard him remark as he rode off that he was going to "clean up those damn Horrell boys," whom he seemed to regard as ringleaders in the Southern party.[5]

The Horrell boys were not the kind that clean up easy. There were five of them—Mart, Tom, Merritt, Ben and Sam—who ran cattle in the country along the Little Lucies Creek and the Lampasas River north and east of town. They had been there since before the war and had never been in any trouble, but everybody knew they were dangerous to fool with. They stood up for their rights, as they saw them, and took nothing from anybody. They were dark men with solid powerful bodies and were famous locally for their skill with firearms. Though they didn't run with the church-going crowd, they were well liked and agreeable.[6] Even their friends and supporters admit, however, that some of their associates were not such desirable citizens, and one of their in-laws, Bill Bowen, was supposed to be pretty tough.

The Horrell boys were in town the day Captain Williams rode in. They usually congregated in Jerry Scott's saloon at the northwest corner of the square, where the

HOT HEADS AND HAIR TRIGGERS : 127

Candy Kitchen is now, and on this occasion they had the place practically to themselves, for an important trial was going on somewhere else in town and most of the male population was attending.

As the policemen drew up to the clump of live oaks in front of the saloon, they saw Bill Bowen, wearing a pistol, enter the door. With proper caution the captain sent three of his men to vantage points covering the building, instructed the Negro to watch the horses, and led the rest of his force inside. The place was quiet—it almost seemed as if they were expecting him. He strode up to the bar, ordered drinks for himself and his men, and turned to cast his eye around the room. About fifteen cowmen were standing about in easy attitudes, watching him. Bowen was there, still wearing his six-shooter.

"I see you are wearing a pistol," Williams said to him. "I arrest you."

"You haven't done anything, Bill," said Mart Horrell. "You don't have to be arrested if you don't want to."

There are two stories about what happened next. The Union newspapers reported that Williams grappled with Bowen for the pistol and was fired on by the Horrells. The other story is that as soon as Mart Horrell spoke, Williams drew like a flash and shot Mart, after which the firing became general.

When the smoke lifted, Captain Williams and T.M. Daniels were lying dead on the floor. Wesley Cherry had been shot down just outside the door, and Andrew Melville was drilled as he ran down the street. He got into the Huling Hotel, but he never came out alive. Two of the men who had been stationed outside the saloon managed to dodge the bullets.[7] A third, the Negro in charge of the horses, was never in much danger, for at the first shot he mounted the fastest horse they had and split the wind down the Austin road. One-eyed Tom Horrell, suffering from a shoulder wound, tried to stop him—ran

128 : The Terrible Seventies

to the corner of the square in order to get a shot and kicked up dust all around the man—but there was no stopping that Negro. They say he went so fast the stake rope tied to the saddle stood straight out behind, and that he ruined a fine horse in his haste to get away from there. When he reported at his Austin headquarters he protested to his commanding officer: "Captain, I thought you said this was a race horse. Why, Captain, he can't run for nothing." [8]

The next day Adjutant General Britton himself came up to arrest the Horrells. His men picked up Allen White-craft, James Grizell, and the wounded Mart Horrell at the home of Mart's mother in Lampasas.[9] Tom Horrell, Bill Bowen, and everybody else were long gone. The three captives were eventually taken to jail at Georgetown, half-way back to Austin, where Mart stayed until he was well enough to leave.

Lampasas now had its first experience with Feudist's Disease, the symptoms being a feverish feeling with sensations of panic. On January 30 the County Court met and five justices of the peace expressed their dismay in a letter to the governor. "With humiliation" they confessed that they were powerless, and added: "We respectfully ask that your Excellency give us a police force sufficient to enable our officers to enforce law and order. . . ." [10]

It was no use. Too many people were against the Davis men on general principles, and nobody was surprised to hear, a couple of months later, that Mart Horrell and his friends had been taken out of the Georgetown jail. Mart's wife had been allowed to stay with him as a nurse. When he was able to get on a horse, she notified his brothers. They made up a party, and one night they descended upon Georgetown in force. There was a fight, but the Horrells kept on shooting and soon discouraged the townspeople from interfering while Bill Bowen went at the jail door with a sledge hammer. They all rode back to

a shot and
ere was no
st the stake
nd, and that
from there.
he protested
you said this
nothing." [8]
self came up
llen White-
lorrell at the
Horrell, Bill
. The three
etown, half-
he was well

th Feudist's
g with sen-
urt met and
y in a letter
nfessed that
ectfully ask
sufficient to
." [10]

st the Davis
surprised to
rrell and his
a jail. Mart's
urse. When
his brothers.
y descended
ght, but the
uraged the
ven went at
rode back to

Little Lucies Creek together and got ready to leave the country.[11]

The great drift of cattlemen west to New Mexico was already beginning at this early date, and the Horrells had made up their minds to sell out and start life over again four hundred miles west—or even farther. Once back on the home range they began gathering cattle and making preparations to move.

Lampasas County was willing to let them go. They assembled their caravan, sold their cattle to Cooksey and Clayton to be delivered in Coleman County on their way west, and trailed out of the country. They notified the sheriff what day they would be going through Russell Gap so he could do something about it if he so desired. He did not so desire.

They got as far as the country just west of Roswell, New Mexico. Their old friends in Lampasas think they may have planned to go on to California eventually, but it was well into the fall when they reached the Ruidoso, and there they settled down, at least for the winter, near what is now Bonnell's ranch.

They could not have picked a more precarious location. The Murphy and McSween factions, who were shortly to begin exterminating each other in the Lincoln County War with the expert aid of Billy the Kid, were already jockeying for position and accumulating as many good fighting men as they could. The Horrells probably made some capital of this situation. Emerson Hough, who lived nearby and knew the local traditions, says that Major Murphy "staked" the Horrell boys in their ranching venture on the Ruidoso.[12]

In this tense atmosphere quarreling was apt to break out as if by spontaneous combustion. It took only two or three weeks for the Horrell boys to start reaching for their guns again. Undoubtedly race had something to do with it. The

130 : The Terrible Seventies

Mexican population of New Mexico never did have much time for the rough-hewn, pugnacious, and often arrogant *Tejanos* who seemed to think they had been specially commissioned by the Almighty to take the country away from an inferior population. On the other hand the *Tejanos* were not fond of the slipperiness, suavity, and superstition of the Mexicans. Often they fought about it, and it is amazing how differently the same set of facts could be recounted by the two sides when the shooting was over.

The exact truth about the "Horrell War" will probably never be known. The Horrell boys did not stay long, and when they were gone there was nobody to tell the story their way. As a result they have always been painted in New Mexico as a bunch of bloodthirsty villains. Without trying to make angels out of a gang of ruthless and efficient fighting men, it is only fair to point out that they had something to say in their own defense. They told their friends back in Texas that the New Mexicans had tried to rob them. They had a good deal of gold coin with them as a result of the sale of their cattle and other goods, and when the Mexicans heard of it they determined to make some easy money. Some of them died when they tried to collect.

The other side says that the trouble started over water rights—that "one of the Horrell crowd shot and killed one of the neighboring Mexicans while the latter was cutting a ditch." [13]

The first pitched battle happened on the streets of Lincoln on December 1, 1873. According to the natives, Ben Horrell and four of his friends came in and "undertook to run the town." When the last shot was fired in the ensuing free-for-all, Constable Juan Martinéz was dead. So were Dave Warner, Jack Gylam, and Ben Horrell of the other side. There are grounds for believing that Gylam and Horrell were shot after they had surrendered and given up their weapons. And that was not all. As the Hor-

HOT HEADS AND HAIR TRIGGERS : 131

rells told it later, Ben had a fine gold ring on one of his fingers. A Mexican deputy wanted it, and when he could not remove it by ordinary means, the finger came off too.

Whether or not this mutilation occurred, Ben's death was hard for Mart and Tom to take. They went to the authorities to demand justice and were told that justice had been done. Ben's slayers were merely policemen doing their duty.

Three days went by and the tide turned the other way. Two of the local Mexicans were found dead in the Horrell's pasture, and it was now the turn of their enemies to demand justice. Sheriff Ham Mills led a posse of forty men to the attack and found the Horrells forted up and ready. When Mills would not or could not guarantee them protection while under arrest, they refused to surrender and started shooting. A detachment of troops from Fort Stanton stood by and observed the light skirmishing which followed but took no action. At the end of a day of fruitless battle troops and posse alike withdrew and went home to supper.

The Horrells would not leave it at that. Two weeks later, on December 20, they came to Lincoln and broke up a wedding celebration. Several Mexicans were wounded and four were killed—Isidro Patron, Isidro Padilla, Mario Balazan, and José Candelaria. No attempt was made to arrest the attackers, who were beginning to seem a little too hot to handle.

By now the citizens had become wildly alarmed and fearful of a massacre. Juan Patron, a son of one of the victims of the fight at the wedding festivities, was sent to Santa Fe to lay the case before the authorities there. Governor Giddings immediately appealed to Washington for help. The answer came back that Federal forces had no authority to interfere in local affairs.

It began to seem that the feud might go on forever, but actually it was almost finished. There was one more skir-

132 : The Terrible Seventies

mish (at San Patricio) and one more murder when Deputy
Sheriff Joseph Haskins was dragged from his bed and killed
by Edward "Little" Hart (a Horrell man)—supposedly
because he had a Mexican wife. Already, however, the
Horrells had made up their minds that New Mexico was
not for them and they prepared to go back to Texas.

They did not depart unmolested. On their way to
Roswell they ran into an ambush and Ben Turner, a
brother-in-law, was killed. Bitterly angry, they held a
council of war and made up their minds to wipe out Lin-
coln once and for all. A few miles down the Lincoln road,
however, they changed their minds and left New Mexico
for good.

Two hundred miles on their way they were attacked
again. Part of the gang, composed of Zack Crumpton, Bill
Applegate, "Little" Hart, and a man named Still, had de-
tached themselves from the main party and picked up some
horses from Aaron O. Willburn of Roswell and Van C.
Smith of Seven Rivers. The Willburn brothers organized a
posse and hit the trail, catching up with the Horrells near
Hueco Tanks, thirty miles east of El Paso. Again there
was a pitched battle, and Crumpton and Still were killed
—possibly others. At least five Mexicans departed this life
at the same time—Seferino Trujillo, Reymundo and Sever-
iano Aguilar, Pablo Romero, and Juan Silva.[14]

When the Horrells got back to Lampasas County, where
they arrived during the last week in February, 1874, they
told their friends, "We fought them all the way to Fort
Davis." Mrs. Tom Horrell, who became Mrs. Mattie Ann
Harrison in her later years, used to tell her children how
they had an Indian scare on that trip and how she boiled
water to throw on the redskins if they got close enough.
She remembered that one of their men died while this was
going on. They buried him, and built a fire on his grave
to keep it from being discovered.[15]

No sooner did their wagons roll back across the Lam-

pasas skyline than they were in fresh trouble. The sheriff was out with a posse after them on the last day of February, before they had had time to catch their breath after the long pull from the Pecos.[16] He took fifty men with him, and since the strength of the Horrells, after the New Mexico subtractions, was estimated at ten men, some idea may be gained of the respect that was felt among those hardy Texans for the fighting prowess of the clan. There were rumors of a bloody battle. Over at Gatesville they heard that "Two members of the Horrell clan were killed. . . . The battle lasted more than six hours. . . . Help had been asked from the neighboring counties of Coryell, Williamson, and Bell." [17] When the facts were finally sifted out, it developed that there had really been a skirmish on the fifth of March with the sheriff and his "Minute Men" on one side and the remaining Horrells (plus Jerry Scott, Bill Bowen, Rufus Overstreet, and a couple more) on the other. Scott got a ball through a lung and was captured, along with Overstreet. A shot meant for the latter took effect in the stomach of one Johnny Green, who happened to be in the house where Overstreet ran for cover. Merritt Horrell was slightly wounded, but got away. Mart and Tom Horrell rode up during the engagement and were fired on, but they turned around and rode off without damage.

The most significant fact of the whole story was tucked away at the end of the newspaper dispatch which described the battle: "The Horrell party didn't fire a shot at the posse during the engagement." [18]

If that means anything, it means that the Horrells came back from New Mexico determined to keep peace, even if they had to go against their natures and run from the enemy.

Apparently the warlike impulses of the sheriff and the Minute Men were exhausted in this encounter, or perhaps they found the sentiment of the county against them. At

Compendium_Vorenberg
Page 409

134 : The Terrible Seventies

any rate there is no record of any further attacks on the Horrells during the summer of 1874. In September, on advice of their friends and probably on assurances from the other side that they would be fairly treated, Merritt Horrell and Bill Bowen came in and surrendered to answer to the charge of killing Captain Williams and his State Police the year before.[19] Each was able to raise ten thousand dollars bond, so they must have had some pretty substantial friends. When the case came to trial in October of 1876, they were acquitted.[20]

During all this time the Horrells were back in business as ranchmen, having established themselves about ten miles southeast of Lampasas on the Sulphur Creek just across the line in Burnet County down in the brush. By the time Merritt Horrell was turned loose in the fall of 1876, they were being accused of mishandling stock and were on their way toward more trouble.

What happened to them was what happened too often in the bad old days. They were no longer the carefree, independent, friendly boys of a few years before. They were hunted men, bitterly resentful of the life they had to lead, well aware of the fate they would probably meet, and determined not to be taken advantage of. If anybody got in their way, he was going to get hurt.

The man who accused them of rustling was the leader of a clan just as tough and just as well established as their own. His name was John Pinckney Calhoun Higgins. He was a long, limber-jointed ranchman from northeast of town across the Lampasas River, near the range the Horrell boys had formerly occupied. His people had also been in the country since before the Civil War, and the Horrell and Higgins families are said to have been on the best of terms in the early days. But things were different now.[21]

On Higgins' side were several formidable warriors—especially Bill Wren, a huge, ham-handed, good-natured rancher who later became a very efficient sheriff, and



Pink's brother-in-law Bob Mitchell, not as tall as the six-foot-three-inch Wren, but just as broad, and a terrific fighter. All were married and stood well in the district. Pink is remembered as apt to be fiery and blustery, and the first to get out in front when there was anything to be done. Wren was less apt to fly off the handle, and he and Mitchell usually tried to hold Pink back, but as time went on they lost control. Pink announced that he was going to kill "every goddam one" of the Horrells if they didn't let his cattle alone, and Wren and Mitchell realized that they were close to serious trouble.

Wren used to tell how the three of them were riding through the brush once and met Tom Horrell. Pink immediately goddamned him and said he was going to kill him. Tom replied with characteristic coolness, "Well, it won't be much credit to you—one against three." Bill Wren put in, "Keep your hand off that gun, Pink. We won't have any killing when it's three against one." The Horrells did not forget this when things went against them later.[22]

January 22, 1877, was the day which both sides have wished ever since they could forget. It was a Monday, and cold. Merritt Horrell rode into town and went to his

136 : The Terrible Seventies

accustomed haunt at Jerry Scott's saloon. A fire was blaz-
ing at the back end of the place, and there he went to
warm himself. Later Higgins and Mitchell rode in and
likewise came into the saloon. One story makes it appear
that Higgins came on purpose to have an accounting with
Horrell. The old men say he came in at the back door,
approached Merritt from the rear, and shot him dead. The
newspapers said that he entered the front door with his
Winchester, called Merritt by name, and shot him in the
body. "Horrell arose and crossed in front of the fireplace
and leaned on the shoulder of Ervin, when he received a
second shot, from which he fell to the floor, after which
he was twice more shot. . . . Horrell was dead in a few
seconds. Any of the four shots would have killed him.
Litigation and angry feeling have existed between the par-
ties for several months, Higgins charging Horrell with
tampering with his cattle. . . ." [23]

Mart and Tom Horrell joined a posse which brought in
four of Higgins's men next day, but Pink himself was not
to be found, though sixteen of Captain Sparks's Rangers
went out after him. [24] The old timers say now that Pink
never left the county and did pretty much as he pleased,
staying most of the time at the home of one of his friends.

In the midst of all this, on March 26, court opened in
Lampasas under that model of all frontier judges, W.A.
Blackburn. On the same day Captain Sparks of the Ran-
gers rode in with his company, and the first thing he heard
was news of a heroic action at a little creek four miles east
of town which has ever since been called Battle Branch.

Tom and Mart Horrell, for some reason, had to appear
at court that morning. On their way in they had reached
the creek just mentioned and were letting their mounts
drink when a party of ambushers cut loose at them from
behind the creek bank. Tom was seriously hit in the hip
(the man who shot him was an old Confederate veteran

HOT HEADS AND HAIR TRIGGERS : 137

who had learned that the saddle is the steadiest part of a man-horse combination).[25] He fell heavily and lay in the road. Mart's mount tried to bolt, and most men would have been more than willing to let him run; but Mart was not made of that kind of stuff. As soon as he could pull his horse down, he rode back, dismounted, stood there in the road under fire, and ran off the entire bunch of ambushers singlehanded with one Winchester and one ton of cold courage.[26]

He had a bad wound in the fleshy part of the neck himself, but he half-carried Tom to the home of Mr. Tinnins half a mile away. Then he rode into town and reported to Captain Sparks what had happened.

Sparks and his Rangers immediately got ready to go in pursuit and asked Sheriff Sweet for some help. To their surprise Sweet said he couldn't do a thing. Court was in session and all his men were busy. Sparks turned to Horrell and asked if he would show them the place of attack. Horrell would. And the chase was on.

As a result of considerable trailing and deducing, Bill Tinker was arrested. The Horrells identified him as one of the attackers, but he "proved" an alibi and got out of it. Papers were got out for Bill Wren too, but he hid out for a while, and when he came in at last nothing seems to have been done to him.[27]

Probably nothing could have been done to him without serious consequences. Judge Blackburn wrote to Major Jones on March 30 about the "hazardous condition" in the county. "I believe," he said, "that the most violent and bloody scenes would have been enacted here during this week, but for the presence of Capt. Sparks & his company." The only bright spot was the surrender of Pink Higgins and Bob Mitchell to Captain Sparks in the latter part of April. Sparks wrote to a friend in Austin reporting that Higgins and Mitchell "are now in my camp" and

"have been allowed bail, in the sum of ten thousand dollars each. It is hoped and we naturally expect better times in the future." [28]

The feeling of hope seems to have been general. The *Dispatch* remarked with rueful pleasantry, "we are all civil now, nobody having been killed in a week or more. By the time the summer visitors make their appearance, we will all be on our good behavior." [29]

The confidence of Captain Sparks and the Lampasas *Dispatch* was misplaced. Trouble was only just beginning. On Monday night, June 11, somebody jimmied the door of the courthouse, got into the district court room, and carried off every paper on file relating to the suits which were pending. Every scrap was gone next morning.[30]

On June fourteenth, as if to provide new material for the paper files, there was a big fight.

This battle was something of an accident. All through this year both factions had been wary of each other. When the Horrells came to town there were no Higgins supporters in sight ordinarily, but the minute the Horrells left, Mitchell or Wren or somebody else would drift in casually and ride off after a while in the direction which the other side had taken—just keeping an eye open. On the fourteenth this system of keeping just out of each other's way seems to have broken down somehow and both factions found themselves in town at the same time. It was about ten o'clock in the morning that seven Horrells and four Higginses ran into each other and started shooting. Bill Wren and Bob Mitchell were riding in together when the bullets began to whistle. They left their horses and ran in opposite directions, Wren heading for the wagon yard a long block north of the square. He reached the yard safely and tried to return the fire directed at him, but found that Mrs. Gracey, an Amazon who ran the hotel across from his refuge, was standing in her doorway com-

pletely indifferent to the fact that she was directly in his line of fire. In a little while he walked back to where he had left his horse, and about that time somebody shot him in the region described in the news stories as "the base of the spine." He was badly hurt, but dragged himself up a flight of stairs to the second story of an office building and managed to get in a shot now and then.

The firing was kept up for some time. About noon Pink Higgins managed to slip out of town and rode hard to get reinforcements. Before long he returned with more men and the fight was renewed "with great ferocity," but by this time some of the citizens had recovered themselves enough to act as go-betweens, and about one o'clock they persuaded the factions to cease firing and get out of town. It was discovered then that Bill Wren was not the only one hurt. Frank Mitchell, a younger brother of Bob, had been shot down and killed on one of the side streets. He had never been active in the feud, was busy unloading flour from a wagon at the time, and would undoubtedly have arranged to be somewhere else if he had known that powder would be burned. There was a rumor that one of the Horrell party was dead also, but it was probably only a rumor. It is certain, however, that when the fighting stopped, the Horrells "left the country" for some little time, which probably means that they kept to themselves in the brush down on the Sulphur, waiting to see what would happen next.[31]

What happened next was a visit from Major Jones, chief of the Frontier Battalion of Texas Rangers.[32] His presence, with fifteen men, was reported on June 28, and on July 10 he expressed his opinion of the situation to Adjutant General Steele as follows: "The Horrells, who left this county before I started to Austin, returned last Saturday and the people here are in constant dread of another collision between them and the Higgins-Mitchell party. This trouble is one of the most perplexing to me that I have

yet had to contend with. Putting the parties under bonds for their appearance at court will not prevent them from fighting if they meet. That has already been tried and failed—So I am taking the responsibility in the interest of peace and quiet, rather than in accordance with the dictates of law, to intercede and endeavor to reconcile the difficulty and thus terminate this long continued feud. I am on good terms with both parties and hope to effect something towards the desired object in a few days."

As an afterthought the major added to this letter a request that he be sent "three Springfield Carbines and belts and three pistols with belts and scabbards." Apparently he had a feeling that he and his men might see some action.[33]

The first half of his plan for "reconciling the difficulty" was carried out by Sergeant Reynolds (later Captain Reynolds, "the intrepid") who succeeded in rounding up the Horrell boys. On the night of July 27 Reynolds set out with a detachment of his men for the Horrell stronghold on the Sulphur. His guide was none other than Bill Wren, who was able by now to sit in his saddle and knew the country, even in the dark, as well as he knew the back of his hand.

The story of the arrest, as told by James B. Gillett in *Six Years with the Texas Rangers*, has become one of the famous exploits of Ranger history. According to his account the detachment came within a mile of the house in which the Horrells were spending the night, at which point the guide halted and said, "There is where the Horrell boys live. I am going back to town." He added, when they told him he was welcome to come along, "No, not for a million dollars!"

The Rangers quietly surrounded the house; waited until it was almost daylight; then moved in. Gillett continues: "Sergeant Reynolds and his men tiptoed right into the room in which the Horrells were sleeping. Some of

Case 3:19-cv-01537-BEN-JLB   Document 150-7   Filed 10/21/22   PageID.13504   Page 47 of 86

the men were on pallets on the floor, while others slept in beds in the one big room. Each Ranger pointed a cocked Winchester at the head of a sleeper. Reynolds then spoke to Mart Horrell. At the sound of his voice every man sat up in bed and found himself looking into the muzzle of a gun. The sergeant quickly explained that he was a Ranger and had come to arrest them. Mart replied that they could not surrender, and Tom Horrell said it would be better to die fighting than to be mobbed.

"This gave Reynolds his cue. He warned the outlaws that if anything was started there would be a dozen dead men in that house in one minute and advised them to listen to what he had to say. He then guaranteed the Horrells upon his honor that he would not turn them over to the sheriff to be put in jail and mobbed, but promised he would guard them in his camp until they could secure a preliminary examination and give bond.

" 'Boys, this seems reasonable,' said Mart Horrell, rising to his feet. 'I believe these Rangers can be relied on to protect us. Besides this fight has been thrust upon us. If we can get a hearing we can give bond.'

"They all agreed to this proposition of Sergeant Reynolds and laid down their arms, mounted their horses and under guard of the Rangers were marched into the town of Lampasas." [84]

The Wren family say that Gillett got some of his facts wrong. As they tell it, Bill Wren did not turn back a mile from the house, but went on in with the Rangers. When the Horrell boys woke up, they were willing to surrender because they saw Bill Wren, whom they trusted, among the strangers, and insisted that they be put in his charge. [85] Whichever way it happened the prisoners were taken to town and guarded day and night in the courthouse by a very alert and grim-looking bunch of officers. Would-be lynchers, if there were any, took one look at them and changed their minds about organizing a necktie party.

142 : The Terrible Seventies

Meanwhile Major Jones was busy with the second half of his plan, which was the arrest of the Higgins faction. He did it without fanfare and merely reported to the adjutant general on July 31 that he had in custody "twelve prisoners—five of the Horrell party, three of the Higgins party and four others."

"The cases of the parties to the feud in this county," he said, "have been undergoing investigation before the county Judge yesterday and to-day, and will probably be protracted through several days to come. So far, the Horrels have been held to bail in two cases each, and two cases are still pending against them.

"Higgins, Mitchell, Wren of the other party have given bond in one case and there are two cases pending against them." [36]

The major's plan was working out very well. He had arrested most of the responsible parties on both sides and put them under bond. His next step was, to get them to agree to a suspension of warfare. He knew it would do no good to bring them together to talk things over, for they would probably start shooting at once. So he went back and forth between them and collected signatures to a couple of remarkable documents. The first reads as follows:

Lampasas Texas
July 30th 1877

Messrs Pink Higgins Robert Mitchell and William Wren. Gentlemen:—

From this standpoint, looking back over the past with its terrible experiences both to ourselves and to you, and to the suffering which has been entailed upon both of our families and our friends by the quarrel in which we have been involved with its repeated fatal consequences, and looking to a termination of the same, and a peaceful, honorable and happy adjustment of our difficulties which shall leave both ourselves and you, all our self respect and sense of unimpaired

honor, we have determined to take the initiatory in a move for reconciliation. Therefore we present this paper in which we hold ourselves in honor bound to lay down our arms and to end the strife in which we have been engaged against you and exert our utmost efforts to entirely eradicate all enmity from the minds of our friends who have taken sides with us in the feud hereinbefore alluded to.

And we promise furthermore to abstain from insulting or injuring you and your friends, to bury the bitter past forever, and join with you as good citizens in undoing the evil which has resulted from our quarrel, and to leave nothing undone which we can effect to bring about a complete consummation of the purpose to which we have herein committed ourselves.

PROVIDED:—

That you shall on your part take upon yourselves a similar obligation as respects our friends and us, and shall address a paper to us with your signatures thereon, such a paper as this which we freely offer you. Hoping that this may bring about the happy result which it aims at we remain

> Yours Respectfully,
> Thos. L. Horrell
> S.W. Horrell
> C.M. Horrell

Witness
Jno. B. Jones
Maj. Frontier Battalion

The Higgins forces were given this letter for considera-
tion. They took several days to make up their minds, but
eventually sent this answer:

> Lampasas Texas
> Aug 2nd 1877

Messrs Mart. Tom and Sam Horrell
Gentlemen

Your favor dated the 30th ult was handed to us by Maj. Jones. We have carefully noted its contents and approve most sincerely the spirit of the communication. It would be

144 : The Terrible Seventies

difficult for us to express in words the mental disturbance to ourselves which the said quarrel with its fatal consequences, alluded to in your letter occasioned. And now with passions cooled we look back with you sorrowfully to the past, and promise with you to commence at once and instantly the task of repairing the injuries resulting from the difficulty as far as our power extends to do. Certainly we will make every effort to restore good feeling with those who armed themselves in our quarrel, and on our part we lay down our weapons with the honest purpose to regard the feud which has existed between you and us as a by gone thing to be remembered only to bewail. Furthermore as you say we will abstain from offering insult or injury to you or yours and will seek to bring all of our friends to a complete conformity with the agreement herein expressed by us.

As we hope for future peace and happiness for ourselves and for those who look to us for guidance and protection and as we desire to take position as good law abiding citizens and preservers of peace and order we subscribe ourselves

Respectfully &c

J.P. Higgins

R.A. Mitchell

W.R. Wren

Witness

Jno B. Jones

Maj. Frontier Battalion[37]

These documents were signed just in time. The Lampasas Fair was scheduled for August 21, 22, and 23. There were to be speeches by Governor Hubbard and others, trotting races, premiums, and even a balloon ascension. Everybody was glad that the feud was not going to be allowed to interfere with business.

Many a peace treaty has been signed by weary feudists in Texas, but the one between the Horrells and the Higginses is the only one on record so far which has amounted to more than a very brief breathing spell. The feud was over from this time on. It should not be supposed, how-

ever, that former enemies now fell on each other's necks and staged a feast of love and good will. The very next spring they were bristling at each other again.[38] Sergeant Collins of Company C rode into Austin on his way to Huntsville with some prisoners on April 9 and reported that the parties were aroused again. "There was a fear of collision before he left, both parties being in town and armed for fight. The Horrells were there to attend court, they having removed from the county after Major Jones made peace between the two parties last year. . . ."

There may have been some skirmishes, even after the second generation had taken over. When Mart Horrell's son J.S. Horrell, an El Paso dentist, died in Juarez in 1928, his friends recalled that he "was credited with slaying four persons at Lampasas, Texas, in his youth during a land feud," and gave the details as follows: "One night four men attacked him at his farm gate and shot him down. His wife hurried from the house and gave him a gun and he killed all four assailants." [39]

For the remaining Horrell boys there was not much time left to renew the feud. In 1878 Mart and Tom were to meet at the hands of a mob the terrible death they had always tried to avoid.

All the details of the story cannot be dug out at this late date, but it starts with an old bachelor storekeeper named J.F. Vaughan who lived at Rock School House on Hog Creek thirty miles west of Waco. He was supposed to be moderately rich himself, and had a habit of keeping other people's money in the safe in his store. On the night of May 28, 1878, a gang of robbers paid him a call.

They got him to open his store so they could get some tobacco and shot him down as soon as he had unlocked the door. His nephew, Mr. Cantell, and some of the neighbors heard the shooting and came up just as the gang was riding off. They managed to wound one horse, but the rider promptly got up behind one of his pals and all of

146 : The Terrible Seventies

them disappeared in the darkness, unharmed and unrec-
ognized. When Mr. Vaughan's safe was examined, it was
discovered that three thousand dollars was missing of
which seventeen hundred belonged to Bosque County and
a good share of the rest to Mr. Vaughan's friends. Thus a
good many people were affected by the murder.[40]

Several men immediately went to work to track down
the criminals—among them Deputy United States Marshal
John Stull of Coryell County. It happened that Stull was
on bad terms with a powerful and dangerous man named
Bill Babb, who was absolute ruler of that little section of
Texas. J.B. Cranfill, who was friendly with Babb, de-
scribes him as "one of the most picturesque characters
that West Texas ever knew. . . . His store at Babbville
was one of the largest general stores west of Waco. Not
only that, but he had extensive cattle and land interests,
and the men who companioned him were accounted
the most courageous and daring denizens of the western
plains. . . . He was feared by all of Hamilton and Coryell
Counties, and even as far down as Waco. When he was
sober, he was of amiable temper, but when on one of his
sprees, he was a dare-devil. . . . It was as much as a
man's life was worth to openly oppose him. . . ."[41]

This was the man on whom John Stull tried to pin the
Vaughan murder. One day in the middle of June he swore
out a warrant and brought Bill Babb, his son Bill Ike,
Dave Ware, Clark Ware, and John Mayfield to Meridian
under arrest. How Stull did it has never been revealed,
but his deed was certainly a minor miracle. Babb was
hustled off so fast that he was not able to pick up any
money and had to ask Captain Cureton of Meridian for a
loan in order to feed his men. Cureton gave him a twenty-
dollar gold piece and the men were able to eat while
Judge Childress was making up his mind that there was
enough evidence to hold them for the grand jury.[42]

They were all furious. Long John Mayfield stood

around with his hand on his six-shooter, first on one foot and then on the other, and if Bill Babb had just pointed a finger, John would have made it hot for somebody. In view of this state of affairs, it was no surprise to anybody when Stull was murdered outside his blazing house in the early morning of December 8, 1878, by unknown assassins.[43]

Meanwhile another detective, Captain W.H. Glenn of Waco, had traced down the wounded horse and the one which carried double as the robbers were leaving Vaughan's store. Glenn is supposed to have followed the trail to Mart Horrell's place.[44] On August 24 he arrived at Meridian with one of Horrell's men in custody—a twenty-five-year-old McLennan-County boy named Bill Crabtree.

Crabtree was described as "an accomplished desperado," but when his guns were taken away from him he promptly folded up and turned state's evidence. As a result of his testimony Mart and Tom Horrell were arrested on September 8 and brought before Judge Childress for examination. The hearing lasted two weeks. At the end they were refused bail and locked up. Bill Crabtree was the star witness against them, and after it was over he and his conscience hurried to get out of town. Before he reached the outskirts of Meridian, however, he was shot off his horse and left lying under an oak tree by persons who remain officially unknown.[45]

Mart and Tom Horrell were in a very bad spot, and they knew it. They saw a gleam of hope when Judge Blackburn, conducting the October term of District Court back in Lampasas, asked to have them brought back to answer "charges pending against them in Lampasas County," but Judge Childress refused to let them go. He remarked, with unconscious irony, that "They would be in danger from a mob if taken from the jail here." [46]

And so, about eight-thirty on the evening of December 15, 1878, while the good people of Meridian were at

148 : The Terrible Seventies

church listening to a sermon by the Reverend Mr. Weir, a band of masked men rode into town and surrounded the jail. One of them knocked on the jail door and said he was Deputy Sheriff Whitworth. Mr. Crandell, the jailer, believed him and opened the door to find himself looking into the muzzles of half a dozen pistols. He made no resistance.

Inside, the mob found the door to the cell block fastened securely and guarded by two men. For half an hour they argued and threatened. Then they began to discuss the possibility of soaking the building with kerosene and burning it down. Under this treatment the guards weakened and "opened the door to them, whereupon they proceeded to the cell in which the Horrells were confined and, forcing another prisoner to hold the light, shot both of the Horrells dead in their cages, literally riddling their bodies with bullets.

"Then they emerged in the streets, and, after firing several volleys, they rode out of town, shouting triumphantly and shooting as they went." [47]

Between one and three hundred men were in the mob. About fifty did the work in the jail, and the rest kept firing off their guns outside to discourage interference. It is said that at the first shot Mr. Weir found himself alone in his church talking to empty pews.

Ed Nichols, who lived near Meridian, was in town when it happened. He saw the bodies of the Horrells as they lay on the floor of the blood-spattered cell, and heard how they met their death. Tom weakened some and tried to dodge around the walls while they were shooting at him, but Mart took hold of the bars of the cell door and cursed the mob for the cowards and murderers they were. They pumped five or six shots into him, but he hung onto the bars and cursed them some more, saying that if he had any kind of gun he would run them all off singlehanded. They fired another volley at him and

he fell dead, but he didn't need to be ashamed of his exit.[48]

One more thing ought to be said. The old men at Lampasas are certain that Mart and Tom Horrell were not in on the Vaughan murder. "If Mart and Tom had been there," says Gus Coffey, "there wouldn't have been any killing."

That is about all of the story. Someday a good book will be written about Pink Higgins and the history he made after the feud was over.[49] The same could be done for Bill Babb, who was unsuccessfully tried for the assassination of John Stull and finally moved out to the trans-Pecos region near Langtry, where he often used to play poker with Judge Roy Bean, "The Law West of the Pecos." [50]

Of the Horrells only Sam was left. He reared two beautiful daughters and lived peaceably for the rest of his life. Mart's son Sammy, after serving in various city and county offices in Lampasas, went to school and became Dr. J.S. Horrell of El Paso. Pink Higgins's two boys became distinguished lawyers. As usual the second generation showed that the times more than the people are responsible for the breaking out of feuds.

# Lone Star Justice

## THE FIRST CENTURY OF THE TEXAS RANGERS

**Robert M. Utley**

OXFORD
UNIVERSITY PRESS

Oxford      New York

Auckland Bangkok Buenos Aires Cape Town Chennai
Dar es Salaam Delhi Hong Kong Istanbul Karachi Kolkata
Kuala Lumpur Madrid Melbourne Mexico City Mumbai Nairobi
São Paulo Shanghai Singapore Taipei Tokyo Toronto

and an associated company in Berlin

Copyright © 2002 by Robert M. Utley

Published by Oxford University Press, Inc.,
198 Madison Avenue, New York, New York 10016

Oxford is a registered trademark of Oxford University Press

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise,
without the prior permission of Oxford University Press.

Library of Congress Cataloging-in-Publication Data
Utley, Robert Marshall, 1929–
Lone Star justice: the first century of the Texas Rangers/
by Robert M. Utley.
p. cm.
Includes bibliographical references and index.
ISBN 0–19–512742–0
1. Texas Rangers—History—19th century.
2. Frontier and pioneer life—Texas. 3. Texas—History—1846–1950.
4. Texas—History—Republic, 1836–1846. I. Title.
F391 .U9 2002
976.4–dc21          2001036405

Book design by Charles B. Hames

1 3 5 7 9 8 6 4 2
Printed in the United States of America
on acid-free paper

Copyright © 2002. Oxford University Press, Incorporated. All rights reserved.

Utley, Robert M.. Lone Star Justice : The First Century of the Texas Rangers, Oxford University Press, Incorporated, 2002. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/brown/detail.action?docID=271832.
Created from brown on 2022-10-17 20:15:54.

169

Talking with stockmen and farmers, Arrington learned that they had lost patience with the reservation Indians. If the state or federal government would do nothing for the citizens, they would take matters into their own hands. Charles Goodnight said the same thing when Arrington dropped by his JA Ranch in Palo Duro Canyon.

The clash between Arrington and Davidson reverberated in Austin. The Wheeler County commissioners, Davidson lackeys, warned Governor Roberts that Rangers in the Panhandle would rekindle an Indian war. Davidson himself brought the quarrel to the governor's notice.

Arrington easily defended himself. The colonel and Fort Elliott's civilian sutlers had selfish motives that had nothing to do with Indians. The sutlers had labored hard but in vain to head off the organization of Wheeler County. The new county seat would attract merchants who would compete with the monopoly of the army sutlers. Employing military intimidation, Davidson had tried to thwart the will of the citizens. No one at the fort wanted Texas Rangers anywhere nearby.

Moreover, Arrington had most of the Panhandle population on his side, and he could make a good case for posting Rangers there. Back at Griffin by early July, he had found stock ranches "thick as could be" along the base of the caprock and immigrants arriving daily to settle on all the streams heading above the caprock. He had also learned that, besides Indian hunting parties, bands of white horse thieves ranged the plains all the way to Griffin, hurried their stolen herds up Blanco or Yellow House Canyon and across to the Pecos River in New Mexico, then returned with horses stolen there. In Arrington's view, the Panhandle needed its own company of Rangers.

Captain Neal Coldwell, inspecting Company C at Griffin shortly after its return, agreed and recommended its transfer to Blanco Canyon. "Capt. Arrington," Coldwell further observed, "has won golden opinions of the people where ever he goes." He was strict and efficient, but Company C harbored a "discordant element" that kept men dissatisfied. The unit's "moral tone" suffered from "the women and wine of Fort Griffin." Arrington expected to get rid of the worst men when he reorganized on September 1. But even in the Panhandle, distant from the temptations of Griffin, Arrington's rigid discipline would never truly unite the company behind him.[25]

By early September 1879, Arrington had established his new base near the mouth of Blanco Canyon, one of two gashes in the southern caprock. Visiting in October, Captain Coldwell pronounced the unit the best mounted and best disciplined company on the entire line. The tough captain had cleansed the outfit of the Griffin carousers and rebuilt it with new but yet untried men.[26]

Arrington devoted most of his efforts to trying to turn back straying parties of Comanches from the Fort Sill Reservation. He discovered ample evidence of their routes and watering places, as well as evidence of the regular passage of horse thieves between New Mexico and Texas. His most significant achievement, however, was geographical. In wide-ranging, exhausting expeditions seeking Indians, he fleshed out blank spaces on the map of the Staked Plain.[27]

Copyright © 2002. Oxford University Press, Incorporated. All rights reserved.

Utley, Robert M.. Lone Star Justice : The First Century of the Texas Rangers, Oxford University Press, Incorporated, 2002. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/brown/detail.action?docID=271832.
Created from brown on 2022-10-17 20:16:18.

170

As the cavalry at Fort Sill grew more effective at keeping the Indians at home, Arrington turned to exigencies that would increasingly relegate Indians to a minor annoyance as the Panhandle filled with immigrants during the 1880s. One was cowboy rowdyism that overpowered towns with weak or no local authority. More ominous, the vast carpet of Panhandle grass attracted more and more newcomers, mostly small operators, to demand their share of the open range. Big operators like Charles Goodnight, commanding small armies of cowboy-gunmen, did not take the challenge lightly.[28]

Attracted by the free grass himself, Arrington resigned the Ranger service in the summer of 1882. Popular neither with his own men nor with his fellow captains, whom he sometimes disparaged, he nevertheless had laid the basis for a stern brand of Texas law in the Panhandle, and for seven years he had won repeated plaudits for exemplary service in every Ranger grade from private to captain. As sheriff of Wheeler County for another seven years, he indulged in unseemly quarrels with his successor captains, but until his death in 1923 Panhandle residents proudly claimed "Cap" Arrington as one of their most venerated citizens.

THROUGHOUT THE EARLY MONTHS OF 1881, captains occasionally expressed concern for their chief's health. At the same time, Jones's grip on the Ranger force weakened. Surgery for an abscess on the liver promised relief, but the little man could not stand the shock. He died on July 18, 1881, aged forty-seven. His record fully confirmed the encomiums of newspaper obituaries.[29]

John B. Jones left a widow who had broken through his stodgy bachelorhood only two years earlier. He also left a wide circle of friends and admirers, not least among his captains. And in his quiet but firm way he left a legacy more vital to the Texas Rangers than any leader who had gone before or who would come after. He gave a lasting institutional continuity to the Texas Rangers, transformed them from Indian fighters into lawmen, and imparted to them a professionalism that would endure, with some dark and conspicuous lapses, into the twenty-first century.

Copyright © 2002. Oxford University Press, Incorporated. All rights reserved.

Utley, Robert M.. Lone Star Justice : The First Century of the Texas Rangers, Oxford University Press, Incorporated, 2002. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/brown/detail.action?docID=271832.
Created from brown on 2022-10-17 20:16:18.



# THE
THE CIVIL RIGHTS ACT
# GREATEST
OF 1866
# AND THE
FROM RECONSTRUCTION
# GRANDEST
TO TODAY
# ACT

EDITED BY CHRISTIAN G. SAMITO

Southern Illinois University Press
CARBONDALE

Southern Illinois University Press
www.siupress.com

Copyright © 2018 by the Board of Trustees,
Southern Illinois University
Chapter 1 copyright © 2018 by Michael Les Benedict; chapter 2
copyright © 2018 by Rebecca E. Zietlow; chapter 3 copyright
© 2018 by Michael Vorenberg; chapter 4 copyright © 2018 by
Millington William Bergeson-Lockwood; chapter 6 copyright ©
2018 by Jeff Strickland; chapter 7 copyright © 2018 by R. Owen
Williams; chapter 9 copyright © 2018 by George Rutherglen;
chapter 10 copyright © 2018 by Darrell A. H. Miller

All rights reserved
Printed in the United States of America

Frontispiece: Allyn Cox, *Civil Rights Bill Passes, 1866*, mural (oil on
canvas). ARCHITECT OF THE CAPITOL.
Cover image: detail from frontispiece, showing former slave Henry
Garnet speaking with newspaper editor Horace Greeley, who sup-
ported African American suffrage.

21  20  19  18    4  3  2  1

*Library of Congress Cataloging-in-Publication Data*
Names: Samito, Christian G., editor.
Title: The greatest and the grandest act : the Civil Rights Act of
1866 from Reconstruction to today / edited by Christian G.
Samito.
Description: Carbondale : Southern Illinois University Press, 2018.
| Includes bibliographical references and index.
Identifiers: LCCN 2017033595 | ISBN 9780809336524
(paperback) | ISBN 9780809336531 (ebook)
Subjects: LCSH: United States. Civil Rights Act of 1866.
| United States. Constitution. 14th Amendment | Civil rights—
United States. | African Americans—Civil rights—History—
19th century. | BISAC: history / United States / Civil War
Period (1850–1877). | history / United States / 19th Century.
| law / Civil Rights. | law / Legal History.
Classification: LCC KF4558 14th .G74 2018 | DDC 342.7308/
5—dc23 LC record available at https://lccn.loc.gov/2017033595

Printed on recycled paper. ♻

# CONTENTS

Introduction  1
*Christian G. Samito*

1. "Membership of a Nation, and Nothing More":
The Civil Rights Act of 1866 and the Narrowing
of Citizenship in the Civil War Era
9
*Michael Les Benedict*

2. The Other Citizenship Clause
37
*Rebecca E. Zietlow*

3. The 1866 Civil Rights Act and the
Beginning of Military Reconstruction
60
*Michael Vorenberg*

4. "In Accordance with the Spirit of the Times":
African American Citizenship and the Civil Rights
Act of 1866 in New England Law and Politics
89
*Millington W. Bergeson-Lockwood*

5. The Civil Rights Act of 1866 in Kentucky and Missouri
112
*Aaron Astor*

6. The Civil Rights Act of 1866 in South Carolina
137
*Jeff Strickland*

7. The Civil Rights Act of 1866 at the Supreme Court
163
*R. Owen Williams*

vi

## CONTENTS

8. The Civil Rights Act of 1866 and the Right to Contract
188
*Richard L. Aynes*

9. The Origins of Arguments over Affirmative
Action: Lessons from the Civil Rights Act of 1866
209
*George Rutherglen*

10. The Janus of Civil Rights Law
234
*Darrell A. H. Miller*

Appendix: The Civil Rights Act of 1866
265

Contributors
271

Index
273

## THE GREATEST AND THE GRANDEST ACT

# 3

## THE 1866 CIVIL RIGHTS ACT AND THE BEGINNING OF MILITARY RECONSTRUCTION

### Michael Vorenberg

As the essays in this volume suggest, the Civil Rights Act of 1866 was a turning point in the history of U.S. civil rights. But what is less well known about the act is this: it was a turning point in the history of U.S. warfare.

This is an odd-looking assertion, to be sure. We think of the Civil Rights Act as a peacetime measure proposed, debated, and adopted after the Civil War was over. Congress did not begin to consider it until the session that began in December 1865, eight months after General Robert E. Lee's surrender at Appomattox. The authority behind it lay not in the war powers of the Constitution but in the enforcement clause of the Thirteenth Amendment, which was ratified at the end of 1865 and thus is generally regarded as a *postwar* measure.[1] By contrast, the act for renewing the Freedmen's Bureau, passed at the same time as the Civil Rights Act, was justified by "war powers" invoked as if the Civil War was not yet over.[2] Historians have followed this pattern, treating the Civil Rights Act as a measure designed for peacetime and thus of a different genre from legislation such as the Military Reconstruction Acts, justified by Republicans on the basis that the nation was still in wartime. Recent scholarly work, most notably Gregory P. Downs's *After Appomattox*, has redirected our attention to the centrality of military force in the theory and practice of Reconstruction, but even this work tends to treat the Civil Rights Act as outside the scope of armed intervention. The scholarly tendency is understandable. The act relied on courts and civil officials, not on armies and soldiers, in most of its enforcement provisions.[3]

But not in *all* of its enforcement provisions. Embodied in the Civil Rights Act of 1866 is a set of clauses that reveals a wartime sensibility and explicit war powers. The act provided an unprecedented power to the federal government to take military action against those who threatened or even were suspected of threatening the nation's security. The government could invoke this power without a declaration of war and without visible provocation. The mere suspicion of an attack on the United States or its citizens, including (indeed, especially) newly freed African Americans declared citizens by the act, was grounds enough for federal military intervention. To use modern parlance, the Civil Rights Act provided a legal basis for preemptive war. Today's military theorists who write about the history of the preemptive war doctrine, which the administration of President George W. Bush made famous in justifying the U.S. war on Iraq beginning in 2003, have neglected the use of that doctrine in the Civil Rights Act. Historians of the Civil War and Reconstruction also have overlooked the clauses of the act that embody modern notions of preemptive war. Putting these clauses of the Civil Rights Act into the history of the preemptive war doctrine helps us make some interesting connections between our own time and the Reconstruction era. It also helps us to see the Civil Rights Act of 1866 in a new light—as an innovative measure for the practice of war as well as a crucial tool for securing civil rights.

This essay lays out the argument for the significance of the act's military provisions through a set of steps that requires a bit of jumping back and forth across the timeline of U.S. history. First, it discusses what the military provisions of the act said. Then, it draws out the origins of those provisions in a complicated history beginning in the 1830s and stretching into the Civil War. Bringing us next back to 1866, the essay explains why events of that moment made the military provisions of the Civil Rights Act not mere vestiges of irrelevant older events but in fact significant potential weapons in the hands of Republicans seeking to use military force in unprecedented ways to achieve their objectives for Reconstruction. In particular, the essay focuses on Secretary of War Edwin M. Stanton, who in 1866–67 came to realize the distinctive power of the military provisions of the act in granting him broad discretionary power over the army as the president and the Supreme Court whittled away at the other tools justifying broad military action that he had used to that point. Then the essay asks whether Stanton's understanding of such broad powers within the act's military provisions were entirely his invention or were in line with how the framers of the act considered the measures. To answer the question, the essay returns to the congressional debates of 1866 over the act to examine what the lawmakers of that moment understood to be the meaning of the military provisions. The essay argues that congressmen had an understanding of the provisions very much in line with Stanton's and therefore that Stanton's contemplated use of the act for preemptive

war purposes adhered to the original purpose of the act. Finally, the essay reflects on the significance of this underappreciated dimension of the act for today's civil rights law, the law of war, and the use of military power.

Like much scholarship on Reconstruction, this essay is engaged with whether this era represented a radical transformation in American law. For decades, scholars working on the question have focused primarily on African Americans' legal status, a subject at the heart of Reconstruction in general and of the Civil Rights Act in particular. More recently, the issue of Reconstruction's radicalism has been informed just as much by scholarship on the theory and practice of war, including pathbreaking studies on such topics as treason, the law of war, and military occupation. Inspired in large part by this newer strain of scholarship, this essay argues that the radical potential of the Civil Rights Act of 1866 lay at least as much in its enhancement of war powers as in its expansion of civil rights.[4]

### THE MILITARY PROVISIONS OF THE CIVIL RIGHTS ACT

It is easy to overlook the features of the Civil Right Act that resonate with today's preemptive war doctrine. They are buried within the long, detailed, legalistic explanation of how the civil rights provisions described in the crucial first section are to be enforced. Most of the scholarship on the act focuses only on Section 1, much of which made its way into the first section of the Fourteenth Amendment. Because Section 1 of the Civil Rights Act and Section 1 of the Fourteenth Amendment have become the foundation of much modern civil rights law, they are the sections that tend to get the most attention. As for the enforcement provisions of the Civil Rights Act that follow Section 1, they get some scrutiny by legal scholars but usually only to point out how the authors of the act cleverly copied the clauses from the Fugitive Slave Act of 1850. The act of 1866 was meant to turn the act of 1850 on its head. The act of 1850 put the power of the federal government—specifically, the power vested in civilian legal authorities such as marshals, attorneys, judges—in the hands of the Slave Power. The act of 1866 put the same power in the hands of those who sought to destroy all vestiges of the Slave Power.

Yet, the act of 1866 went further. Unlike the act of 1850, it explicitly gave a role to the president. Section 4 expanded the group who would enforce the act to include not only civilian legal authorities but also members of the armed services, specifically "officers and agents of the Freedmen's Bureau [which by this point was part of the War Department], and every other

officer who may be specially empowered by the President of the United States." Section 8 gave the president power to wheel all legal machinery into action in areas where violations of the act "have been or are likely to be committed." Section 9 authorized the president, "or such person as he may empower," to use any part of the U.S. Army, U.S. Navy, or a local militia "to prevent the violation" of the act. Taken together, these clauses, which might be called the "military provisions" of the Civil Rights Act, gave the president unprecedented power.[5]

The Fugitive Slave Act contained nothing similar; it did not mention the president or the armed services. Under the posse comitatus principle, local and national legal officers might call out the local militia to enforce the law.[6] But nothing in the law specified that the president would order armed men, either local or national, to intervene. It might be argued that those who supported the 1850 act believed that it implied that presidents could or even must use military power to enforce it. Presidents in the 1850s seem to have accepted this implication; President Franklin Pierce, for example, dispatched a dozen or so U.S. Army and Marine units to Boston in 1854 to make sure that the law was enforced in the infamous Anthony Burns episode. Pierce's secretary of war, Jefferson Davis, surely believed that the president had such power, even if only implicitly, under the Fugitive Slave Law.

In the Civil Rights Act of 1866, however, the presidential power was *explicit*. More important, the law clearly authorized the president to act preemptively. Under the Civil Rights Act, the president could deploy armed units not only to places where violations of the act were known to have occurred but also to places where they were "*likely* to be committed" (emphasis added). The military provisions of the Civil Rights Act thus gave broad discretionary powers to the president in his role as commander in chief. In theory, the mere suspicion of a conspiracy to abridge the civil rights of African Americans in some locale, southern or northern, was all the president needed as justification to send in the troops. The act thus took war powers under the Constitution to a new and potentially permanent new level, one with far-reaching implications for the Reconstruction era and for American society today.

### PREEMPTIVE WAR FROM THE *CAROLINE* AFFAIR TO THE CIVIL RIGHTS ACT

Where did the military provisions of the Civil Rights Act come from? In part, they were simply a carryover from the bill to renew the Freedmen's Bureau, which was a more obvious effort to use the U.S. military on behalf

of African American civil rights. But the part of the Civil Rights Act that spoke of the president using the military *preemptively* had roots in an episode of U.S. history that long predated the Civil War and Reconstruction. It was lifted directly from a law resulting from the "*Caroline* Affair," which took place almost thirty years before the Civil Rights Act was adopted.

The *Caroline* Affair and its aftermath are less familiar to U.S. historians than to international relations experts. Like many events neglected by historians, it began in Canada. In 1837, a group of Canadian rebels near Ontario looking to create a republic independent from Great Britain had found a number of sympathizers across the Niagara River in the United States. Near the end of that year, Canadian forces loyal to Britain received intelligence that the steamship *Caroline*, which flew a U.S. flag, was in fact owned by a Canadian rebel leader and that it was being used to transport arms and provisions to the rebels. Learning that the *Caroline* was moored on the U.S. side of the Niagara River, just upriver from the Falls, the loyalist commanders with a local militia crossed the river and fired rifles at the ship to drive those on board away. The scheme worked, though in the melee they killed a man aboard the vessel, Amos Durfee, an African American sailor. (American sympathizers with the rebels later propped up Durfee's dead body in front of a Buffalo tavern to whip up anger against the British; Alexander McLeod, a leader of the loyalist attack who boasted of killing Durfee, was eventually tried and acquitted in an American court for the murder.) Once the *Caroline* was unmanned, the British towed it to the middle of the river, set it afire, cut it loose, and let it drift to its destruction over Niagara Falls. The action led to further attacks on the British from the American side of the Niagara and to a minor diplomatic crisis between the United States and the United Kingdom. The diplomatic dispute dragged on for four years and was ultimately resolved as part of the Webster-Ashburton Treaty of 1842. Both sides agreed in that treaty that "self-defense" in certain situations justified the use of force by one nation against another. Yet Daniel Webster, the secretary of state whose name was on the treaty, always doubted whether the *Caroline* had been a serious enough threat to merit what the British had done. Webster's doubts presaged future skepticism about the doctrine of "anticipatory self-defense," later labeled "preemptive war," which was born with the *Caroline* Affair. What might be seen as self-defense by one party could be deemed outright aggression by another.[7]

Back in 1838, in the immediate aftermath of the attack on the *Caroline* and four years before the Webster-Ashburton Treaty, the U.S. Congress

passed a bill authorizing legal and military action against any U.S. citizens who plotted or took action against an ally or neighbor of the United States. President Martin Van Buren, a Democrat who, like his predecessor Andrew Jackson, believed in strong presidential power, signed the bill into law. The language of the law was very much in line with the "anticipatory self-defense" principle enshrined in the treaty adopted four years later. Sections 7 and 8 of the act explicitly authorized the president to enforce the law using federal legal and military power against those who violated it or were "likely" to violate it.[8] These two sections were lifted verbatim by the authors of the Civil Rights Bill of 1866 and ultimately appeared in the final act as Sections 8 and 9. As for the act of 1838, it had expired long beforehand; Congress had put a two-year limit on it, and it chose not to renew the act in 1840.

The *Caroline* Affair was not forgotten, though. For example, during the famous "*Trent* Affair" of 1861, Secretary of State William Henry Seward invoked the *Caroline* precedent and the Webster-Ashburton Treaty to justify the United States seizing from a British ship, the *Trent*, two agents of the rebellion, James Mason and John Slidell. British diplomats rejected the relevance of the *Caroline* Affair, and ultimately Seward released the Confederates.[9] The episode revealed among other things that U.S. authorities remembered the principle of justified preemptive action established in the *Caroline* Affair. But the principle could be invoked only in relations with Great Britain and only by referring to the Webster-Ashburton Treaty. Because the 1838 act had expired, there was nothing left in American law allowing for preemptive action against U.S. citizens contemplating activities that threatened national security.

The Civil Rights Act of 1866 remedied this deficit by bringing back into domestic law the key provisions of the 1838 act. This time, though, the primary danger was not American citizens plotting to help Canadian rebels against the British Crown. Such a danger still existed, to be sure: anti-British Fenians were more active than ever in the immediate aftermath of the Civil War on both sides of the U.S.-Canadian border.[10] But the greater threat lay to the south: unreconstructed Confederates keeping up their rebellious ways by refusing to accept the new status of African Americans as free people with rights. This was the threat targeted by the military provisions of the Civil Rights Bill. If adopted, the resulting act would be the only statute in U.S. law providing the president with the extraordinary power to use the armed forces in preemptive ways on American soil. Yet the lure of this power was not enough to sway Andrew Johnson to

sign the bill. He vetoed it. However, Congress overrode the veto to make the bill into law. Against his own protests, Johnson had become arguably the most powerful commander in chief in American history. But the new power he had, the power to make preemptive war authorized by the Civil Rights Act, was not a power he was interested in using.

If Johnson was not an advocate of the military provisions of the act, how did they enter the final version? Most likely, Senator Lyman Trumbull, the primary architect of the Civil Rights Act, had included the provisions as part of a larger political strategy to win Johnson's favor. Well aware of accusations against congressional Radical Republicans that they meant to seize all power from the president, Trumbull, a former Democrat and now a moderate Republican, saw in the military provisions copied from an 1838 act a way to reassure doubters that the presidency would have at least as much power during Reconstruction as it had had during the Civil War. Trumbull took to heart the advice he had received from trusted allies such as his fellow Illinoisan Charles Ray, the editor of the *Chicago Tribune*, who had stressed that congressional Republicans must not engage in "a war with the President," as such a war would lose the party much-needed grassroots support.[11] When opponents of the Civil Rights Bill protested that the military provisions would allow the federal government to replace local and state law with martial law, Trumbull and his fellow moderate Senator William Fessenden pointed out that no such result had followed from the adoption of similar provisions in 1838. And how radical could such clauses be, Trumbull asked, if they had been signed into law by a Democrat, President Van Buren? Yes, chimed in Fessenden. The 1838 act made for a "good precedent." It "was passed under a good Democratic Administration."[12]

Here was a familiar ploy. Trumbull had used a similar political strategy two years before to try to make Democrats less hostile to the Thirteenth Amendment, the antislavery measure that the Civil Rights Act was meant to enforce. When opponents of the amendment warned of the radical disruption it would cause—the demise of the white race, the destruction of the household order, and the obliteration of constitutional government— Trumbull had calmly reminded them that the language of the amendment was drawn from the Northwest Ordinance, a law drafted by Thomas Jefferson, the sainted father of the Democratic Party. How radical, then, could the amendment be? When the Republican senator Charles Sumner offered substitute language that had a more radical tinge, Trumbull had marshaled forces against his colleague from Massachusetts, claiming that

the traditional words of Jefferson the Democrat were preferable to any new ones crafted by a Republican.[13] Now he was doing the same thing, though this time he was seeking the favor not of congressional Democrats but of the Jacksonian Democrat in the White House, Andrew Johnson.[14]

Was Trumbull simply doing some rhetorical posturing in 1866 when he invoked a Democratic administration as the source of the military provisions of the Civil Rights Act? Only in part. He genuinely wanted support for the measure from moderate Republicans and particularly from Andrew Johnson. He thought he had been successful in wooing Johnson. He met with the president about the bill before the congressional debate began and received Johnson's assurance of support. Or at least that is what Trumbull remembered.[15] Johnson later denied ever having such a discussion. Most likely, Trumbull did discuss the bill with Johnson but Johnson never read it. Instead, he probably relied on the summary of it offered by Trumbull, who would have given it a conservative gloss: the measure merely enforced the Thirteenth Amendment, which Johnson had endorsed; it would not upend the political or racial order of the country; and it reaffirmed the power of the president. On this last point, Trumbull would have described the military provisions, which kept the armed forces entirely under the president and outside of any congressional control. Once debate on the bill began, Johnson heard a distorted version of the bill described by those he trusted most, northern Democrats and southern Unionists. This version, unlike Trumbull's, mandated black suffrage, the end of states' rights, and the congressional usurpation of all presidential powers. No wonder that Johnson denied ever talking about the bill with Trumbull. The bill he was hearing about was nothing like the one Trumbull had discussed with him, though they were of course exactly the same.

### WHY THE MILITARY PROVISIONS OF
### THE CIVIL RIGHTS ACT MATTER

If Johnson was not interested in using the power that the military provisions of the Civil Rights Act gave him, were the provisions irrelevant? Johnson's successor, Ulysses S. Grant, might have been willing to invoke them, but we will never know, as he did not have to. By the time Grant became president, Congress had adopted the Military Reconstruction Acts, which gave Grant all the military authority he needed to use the military on behalf of the freed people. So why, if at all, should historians care about the military provisions of the Civil Rights Act? President Johnson did not use them, and President Grant did not need them.

First, it is important to remember that when the Civil Rights Act was being debated, Republicans in Congress assumed that Johnson would sign it—doubters heard Trumbull promise that he would—and they did not, indeed could not, foresee the need for the Military Reconstruction Acts that came in 1867. From the perspective of congressional Republicans, the military provisions of the Civil Rights Act, along with the Freedmen's Bureau Act, represented all the enhanced war power that the new nation needed. Only an obstructionist president determined to avoid the use of force in the South impelled Congress to consider legislation beyond these 1866 measures.

Second, of all the military-oriented measures passed by Congress in the early years of Reconstruction, the relevant provisions of the Civil Rights Act were the most revolutionary. All the other acts, including the Freedmen's Bureau Act, were assumed to be limited in space and time. They applied only to the states that had rebelled, and they stopped operating in each state as soon as it returned to the Union. The Civil Rights Act, in contrast, applied to all states and had no time limit. All the other legislation required an overt act to trigger a federal response. The Civil Rights Act, though, allowed for military intervention in instances where a threat was merely "likely." This principle of preemptive action to protect American citizens from discrimination, harassment, and attack informed federal military intervention in the states from the Enforcement Acts of the early 1870s (also known as the Ku Klux Klan Acts) to the National Guard mobilizations of the post–World War II period.[16]

Finally, even though President Johnson was not interested in using the military provisions of the Civil Rights Act, his secretary of war, Edwin Stanton, was. And because the act gave the new military power not only to the president but also to "such person as he may empower" to command armed forces, the military element of the Civil Rights Act was very much a live weapon so long as Stanton remained in office. Did Stanton understand the potential power of the military provisions of the act? Absolutely. Indeed, at a crucial moment in the winter of 1866–67, after it became clear that the War Department would be stripped of the powers it had assumed during the Civil War but before Republicans had settled on the remedy, the passage of the Military Reconstruction Acts and the impeachment of Johnson, Stanton looked to the military provisions of the 1866 act as the legal tool that would allow him to continue to use the armed forces to carry out the Republicans' reconstruction program.

## STANTON AND THE MILITARY PROVISIONS
## OF THE CIVIL RIGHTS ACT

A flurry of unpredictable events led Stanton to realize the potential military power of the 1866 act. In February 1866, Johnson vetoed the bill renewing the Freedmen's Bureau. Congress was unable to override the veto and so set to work to craft a new bill that would keep the bureau alive. The bureau thus technically expired in March 1866. That meant that a major instrument for allowing military intervention in the South had disappeared. Congress would enact a renewal in July, though in March 1866, Stanton could not have predicted this development. He certainly could not have known what power this renewed bureau would give to the army. At about the same time the bureau expired, Congress passed the Civil Rights Bill. Johnson vetoed the measure on March 27. Among his many criticisms of the bill was that it seemed "to imply a permanent military force that is to be always at hand, and whose only business is to be the enforcement of this measure over the vast region where it intended to operate."[17] Less than a week later, on April 2, Johnson issued his proclamation declaring that a "cessation of hostilities" existed in all states but Texas. In Johnson's view, the Civil War was now over everywhere but Texas, and he was ready to renounce all the war powers that the federal government had assumed during the war.

The day after Johnson issued his proclamation, the U.S. Supreme Court made a move that some read as another signal that the war had ended. Two years earlier, in Indiana, the army had arrested Lambdin P. Milligan and four other men who planned to set free Confederates imprisoned in the North. Milligan and his associates sued to have their case heard by a civilian court. The petition for a writ of habeas corpus finally came before the U.S. Supreme Court in early 1866. On April 3, Chief Justice Salmon P. Chase announced the unanimous decision of the Court to issue the writ. Milligan was released. However, Chase did not say how the Court had come to its decision, and the Court issued no written opinion on the case for another nine months.[18] Without a published opinion, federal and state authorities did not know what relevance the case had, if any, to the issue of whether the Confederate states were under military control. The Court could have issued the writ on the narrow grounds that the Habeas Corpus Act of 1863 did not allow for suspension of the writ in areas where Union courts were operative and thus had no effect in Indiana. That line of

reasoning would leave open the possibility that martial law was still constitutional in the South. Or did the Court mean to invalidate martial law *everywhere*? That was certainly how President Johnson and his supporters read the Court's announcement—as a validation of Johnson's proclamation the day before declaring civil law restored everywhere in the South but Texas. As it turned out, this did indeed turn out to be the Court's position when it issued its decision nine months later. Like Johnson's proclamation, the majority opinion, authored by Justice David Davis, was effectively a declaration that the Civil War was over and that military trials of civilians were now unconstitutional. (Chase and three other justices issued a less sweeping, concurring opinion that allowed military trials and martial law in the South.) But the Court's position was not clear until it published *Ex Parte Milligan* in January 1867. In April 1866, nine months before, no one could say for sure what the Supreme Court's position was on the use of the army in the South. Johnson's conservative allies were quick to say that the Court had put the final stake in the war, but in reality, the Court at this moment had been anything but definitive.[19]

Beginning in April 1866, then, Stanton saw the army operating in a kind of limbo.[20] Already the size of the army had suffered major reductions because of demobilization. The occupying force in the South had been reduced from about two hundred thousand in the summer of 1865 to forty thousand in April 1866. Now, between the actions of the president and the Supreme Court, what few troops remained faced the prospect of being rendered irrelevant or even unconstitutional.

Stanton knew, though, that he still had much latitude with the army. His relations with Andrew Johnson remained amicable, and Johnson still deferred to him when it came to managing the military. During the summer of 1866, Stanton continued to oversee his department with little interference from Johnson, even while Johnson and the Radicals engaged in an increasingly fierce war of words. In July, with the passage of a new Freedmen's Bureau Act—this time Congress was able to override Johnson's veto—Stanton still had all the tools he needed to keep the army at the bidding of the Radicals.

Over the next six months, though, the fragile relationship between Johnson and his secretary of war became strained to the point of breaking, making it increasingly difficult for Stanton to use the army to enforce the Reconstruction policies of congressional Republicans. The two men were careful to be civil to one another in their public statements and even in their private correspondence (hence little evidence of animosity exists

in the historical record). Stanton did not want to give the president any clear reason to fire him. Nor did he want to resign. If he left his post, the Radicals would lose what little purchase they still had on the executive. Johnson, too, had to step carefully. If he fired Stanton or even voiced displeasure with him, he might lose the support of General-in-Chief Ulysses S. Grant, and that was sure to lose him the potential support of the many northerners who revered the general. So Johnson simply kept Stanton in place and used his power as commander in chief to undermine his secretary. Stanton would get no help from the Supreme Court, either, even though Chief Justice Chase was a fellow radical. The Court remained firm in its position that, with the war over, wartime legislation enabling the army to oversee civil affairs was no longer in effect. By the beginning of 1867, Stanton's tool chest of laws enabling military reconstruction stood nearly empty. The only implements left would be the military provisions of the Civil Rights Act.

The final stage of the inevitable split between Stanton and Johnson began on August 20, 1866, when the president issued his final proclamation declaring the Civil War at an end. A similar proclamation by Johnson on April 2 had declared the war over in all the states but Texas, but this one included Texas, and it went even further than the April proclamation in declawing the military. The "insurrection is at an end," the final proclamation announced, and "peace, order, tranquillity, and civil authority now exist in and throughout the whole of the United States of America."[21]

Did civil law now trump military law everywhere? That was certainly the interpretation given to the proclamation by local and state officials throughout the South. A U.S. Army officer who arrested a white man for beating an African American might now find himself arrested by a sheriff for assault or even kidnapping. U.S. troops stationed in a town might be rounded up by deputized white southerners for disturbing the peace. Such actions seemed justified under Johnson's proclamations, which declared the insurrection over, "civil authority" restored, and military law "in time of peace dangerous to public liberty."[22] Soon Stanton was receiving reports of southern police arresting and imprisoning scores of U.S. soldiers. When army commanders demanded their release, state authorities refused to comply, and local courts denied requests for writs of habeas corpus. Soldiers were just as vulnerable to arrest in states that had not seceded as in those that had. In Maryland, for example, the legislature passed laws granting compensation to state authorities for expenses incurred in resisting U.S. army interference with freed people. It also prohibited the

state comptroller from using state monies to pay bounties of Marylanders serving in the U.S. Army.[23] White southerners opposed to Reconstruction read Johnson's proclamation as a signal that the president meant to stand aside as the states chased out the army.

Johnson may indeed have had such a purpose when he issued his August 20 proclamation, but he was not ready to move against Stanton and Grant, both of whom remained determined to sustain the army's power in the South. Even as he proclaimed that civilian authority superseded military rule, the president let stand the general orders given by Grant and authorized by Stanton that protected U.S. forces from civilian arrest and interference.

Such general orders had been the legal foundation of military occupation since the beginning of the Civil War. They were the Civil War–era equivalent of a modern "status of forces" agreement, which protects U.S. troops from civilian arrest in an occupied region in, say, Afghanistan. Before President Johnson began issuing his end-of-war proclamations, the most important general order protecting troops in occupied areas was General Order No. 3, issued by Grant in January 1866. By this order, which Grant issued "to protect loyal persons against improper civil suits and penalties in the late rebellious States," the soldiers, federal officials, and African Americans in an occupied area could transfer any charges brought against them by local or state authorities to a federal or military court.[24] After Johnson issued his April 2, 1866, proclamation declaring the war over everywhere but Texas, Grant issued a new general order, General Order No. 44, which was meant to have the same effect as General Order No. 3 and to carry the message that, despite Johnson's proclamation, the army in the South was still protected from civilian prosecution. Stanton approved Grant's move and perhaps helped engineer it.[25]

Johnson's final end-of-war proclamation of August 20, 1866, did not explicitly overturn the general orders protecting soldiers from civilian prosecution, but it did understandably create confusion as to whether those orders were still in effect. In Asheville, North Carolina, for example, Major W. W. Rollins was shocked when local police arrested his men for obstructing civilian law. When he protested, he "was at once indicted and arrested and bound in heavy bonds" and dragged to court. He managed to secure his release and on September 4 wrote to the adjutant general, the head legal officer of the army, asking "at what date . . . the rebellion cease[d] to exist" and whether the general orders protecting U.S. soldiers were still in effect.[26] Obviously the end-of-war proclamation that President Johnson had issued

two weeks before, on August 20, had not struck Rollins as the final word on military authority in the South. In New Orleans, General Phil Sheridan, who commanded the Department of the Gulf, also regarded the general orders as still in effect despite Johnson's proclamation. But he conceded that the proclamation had caused "increased insolence on the part of the functionaries of the civil law in Florida and Texas."[27] Sheridan wrote to the adjutant general asking for confirmation that the general orders were still in effect. An officer in the adjutant general's office replied that the president's proclamation did indeed annul the general orders.[28] A surprised Sheridan asked for Grant's opinion. Grant replied that the Civil Rights Act could not be enforced without the general orders. And since he had received no word from above—meaning from Stanton or Johnson—that the general orders were revoked, they must still be in effect. Grant asked Stanton in late November to affirm his judgment, but Stanton offered no response.[29] To counter Grant's interpretation was to end military reconstruction. To confirm it was to make public his opposition to Johnson. So Stanton stayed silent, believing that his best strategy was to hold onto his office and thus to keep military reconstruction in place—at least until congressional Republicans could find some way to counter Johnson's moves.

Stanton's strategy became impossible to sustain when the U.S. Supreme Court finally published the *Ex Parte Milligan* decision on January 1, 1867. As Mark E. Neely has pointed out, the *Milligan* case did very little if anything in the long run to change the course of Reconstruction in the South.[30] But at the moment that the decision was issued, no one knew what that long run looked like, and the decision struck many as the death knell of military reconstruction. *Milligan* said that the army had no jurisdiction in areas where civilian courts were operative. Johnson's August 20, 1866, proclamation declared that civilian courts were operative everywhere. Taken together, the Court's ruling and the president's proclamation meant that the army had no legal authority in the South. General Order No. 3 and No. 44 protecting U.S. soldiers were now inoperative. Southern state officials might now deputize masses of white men and authorize them to arrest and imprison anyone in Union uniform.

What could Stanton and like-minded Republicans do to avert what amounted to a rebirth of the Civil War that President Johnson had declared over? Congress was in the process of creating a Military Reconstruction Act that would effectively put the entire South under martial law. But in January 1867, that bill seemed a long way from becoming law. Congress had to craft the final language and vote on it, then submit it to Johnson,

and then vote again on it after the president issued the inevitable veto. Another option to sustain the army—also too time-consuming—was to secure a new Supreme Court opinion that qualified *Milligan*. Stanton and leading legal officials of the War Department searched for a test case that might get the Supreme Court to allow military courts to trump civilian authority in at least some occupied areas.[31] But even if they could find the perfect case, getting the Court to hear it and rule on it could take months, even years. In the meantime, what legal basis could be found to allow the army to operate in the South?

The answer was the Civil Rights Act, specifically its military provisions. Because the legal authority for the act came not from open-ended wartime exigency but from the second clause of the Thirteenth Amendment, a measure surely meant for times of peace as well as war, the act could withstand the nullifying power of *Milligan*, which dealt only with legislation enacted specifically to prosecute the war, such as the Habeas Corpus Act of 1863.

In the face of an obstructive president and Supreme Court, Stanton and his Republican allies were ready to use the act's military provisions to sustain the army in the occupied South. Immediately after the *Milligan* decision was published, Senate Republicans pressed the president for something that Congress had been requesting for months: an investigation by the army into possible violations of the Civil Rights Act. The purpose was to force Johnson to concede that there had been overt violations, not to mention planned violations (the act covered both types). Johnson would then have to abide by the terms of the act and use the army on behalf of the freed people. From the perspective of congressional Republicans, this was not much to ask. Johnson merely had to keep doing with the army what he had done with it so far: leave it to Stanton to manage. The only difference would be that the legal basis for military action would now rest entirely on the Civil Rights Act. Stanton was in on this plan—he probably helped craft it—and he held out a narrow hope that Johnson would go along with it. On February 9, he drafted a new proclamation for Johnson to issue. He took a piece of War Department stationery, crossed out "War Department" and wrote in "Executive Mansion," and then began writing with his own hand but in the voice of Andrew Johnson. The proclamation began with a reprint of Section 9 of the Civil Rights Act, which Stanton had cut out and pasted to his draft. The proclamation then pointed out that this section had effectively become part of military law by General Order No. 50. That order, issued back in 1866, did nothing more than inform commanders of the text of the Civil Rights Act. Until this moment,

the order had been trivial compared to General Orders Nos. 3 and 44. But now that the *Milligan* decision effectively nullified those two orders, General Order No. 50 was all that was left in military law to authorize the army to operate unmolested in civilian areas. The presidential proclamation drafted by Stanton ended with an order to all military departments that they "employ the power of the United States . . . to prevent the violation and enforce the due execution" of the Civil Rights Act.[32]

At about the time that Stanton drafted the proclamation for Johnson— not at Johnson's bidding but on his own initiative—he began assembling a list of violations of the Civil Rights Act that had been reported to the War Department. Congress had demanded such a report from the president a month before. Stanton expected Johnson to forward the list to Congress and probably hoped as well that Johnson would include the proclamation invoking the Civil Right Act to authorize a military response.

Stanton's scheme for using the Civil Rights Act to sustain military power in the South was short-lived, which helps explain why historians have neglected it. At a cabinet meeting on February 15, 1867, less than a week after Stanton drafted the new proclamation for Johnson, the president and the war secretary finally had a public falling-out. Johnson was furious at the report of abuses that Stanton had prepared for the president to send to Congress. It was based on hearsay and rumor, Johnson snarled, though he sent it anyway to comply with Congress's request.[33] He rejected the proclamation enforcing the Civil Rights Act that Stanton had drafted. He would never again defer blindly to Stanton, and he began taking steps to remove him from office. Those steps led eventually to Johnson's impeachment in the House of Representatives and his near-conviction in the Senate. While that drama played out, Congress passed the Military Reconstruction Acts over Johnson's vetoes, enabling Stanton and Grant to continue to use the army to implement Reconstruction. In the avalanche of events rushing forward in the war between Johnson and the Radicals, the military provisions of the Civil Rights Act, which Stanton had briefly contemplated as the cornerstone of a military reconstruction program, would be forgotten.

### THE ORIGINAL INTENT OF THE MILITARY PROVISIONS

When Stanton in early 1867 came to regard the military provisions of the Civil Rights Act as a possible foundation of congressionally directed military reconstruction, was he inflating the power of those provisions? Put another way: Would the framers of the Civil Rights Act in 1866 have agreed

with the way that Stanton in 1867 interpreted its military provisions? A careful reading of the congressional debate does not yield a simple answer to this question, but the preponderance of evidence suggests that Stanton's understanding of the military provisions was generally in line with that of the Republicans who argued for the act months before.

The military provisions did not receive as much attention as other sections of the bill, especially Section 1, but they did lead to some of the most interesting discussions during the debate. Perhaps the most striking question raised by the provisions was this: Was the country still in a state of war, and if not, how could such proactive military measures be legitimate? On one side were those who declared that the nation was in a state of peace and therefore the military provisions were inappropriate if not dangerous. Unsurprisingly, this was the position of those who opposed the bill, such as Senator Garrett Davis of Kentucky. To believe Davis was to think that all violence had magically disappeared from the land. Just as incredible as the "magnitude of the conflict, and the fierce and determined energy with which it was fought on both sides," Davis said, was "the suddenness of its termination, the completeness of the submission of so many million insurgents, and their universal desire to return to the Government against which they had risen."[34]

Republicans were more skeptical about whether harmony reigned, but for the most part they acknowledged that the war was over. When Representative Schuyler Colfax of Indiana, the Speaker of the House of Representatives, opened the first session of the Thirty-Ninth Congress on December 4, 1865, he sounded almost as celebratory as Davis: "The Thirty-Eighth Congress closed its constitutional existence with the storm-cloud of war still lowering over us; and, after a nine months' absence, Congress resumes its legislative authority in these council halls, rejoicing that from shore to shore in our land there is peace."[35]

While all Republicans agreed with Colfax that armed combat had ended, most were more equivocal as to whether the state of the country might fairly be described as at "peace." Representative James Wilson of Iowa offered a typical view of the Republicans. Yes, he said, widespread "armed resistance" had ended, but the country was still in a state of war—hence the presence of the Freedmen's Bureau, an arm of the War Department, throughout the South. This position resembled the well-known "grasp of war" approach made famous by the U.S. attorney and international law expert Richard Henry Dana. In a speech at Boston in July 1865, Dana defended the U.S. government's power to impose black suffrage on the former states of the

Confederacy because the South was still in the "grasp of war." Dana came earlier than some white Republicans to the cause of black suffrage, but his "grasp of war" approach was in the Republican mainstream. He believed that the U.S. military should maintain power in rebellious areas and slowly yield that power to civilian authorities when their willingness to enforce federal policy could be trusted. The federal government would determine the exact mix of military and civilian control in the South, just as it had done during Lincoln's time. When Dana gave the speech, he regarded the country as in the same state of active war as before the Confederate surrenders of April 1865.[36] A year later, when Congress debated the Civil Rights Act, Republicans like James Wilson were more likely to regard the Civil War as genuinely over. But that only meant that the federal government had loosened its grip on the South, not that it had let go entirely. The U.S. military was not to behave as if still at war, ferreting out armed rebels everywhere. Rather, it was to act in a targeted way, seeking to identify and halt only those who sought to interfere with the principle of equality before the law described in Section 1 of the Civil Rights Bill. If such a surgical use of the armed forces was not possible, Wilson argued, then and only then would "a perpetual state of constructive war . . . be a great blessing to very many American citizens."[37]

The Republican contention that the nation was somewhere between a condition of war and peace left open a wide range of interpretation of what the U.S. military was actually allowed to do. Those of a more radical persuasion envisioned a long-term military presence in the South that would vigilantly protect African Americans and genuine white Unionists from the violence of white southerners who only pretended to be loyal. Senator Jacob M. Howard reported of a white man in Texas who had hoisted a U.S. flag over his house only to be confronted by neighbors demanding that he take it down. "They could submit to be conquered," they told him, "but that for him to stick up the old flag over his house was a little too much for them to bear." When the Unionist refused, the mob killed him. This was why the army was needed throughout the South: to stand between dangerous false Unionists on one side and true Unionists, black and white, on the other.[38]

Such statements gave fuel to the arguments of the bill's critics that it would lead to a vast military occupation of the South. That fear had been voiced by opponents of the Republicans from the start of Reconstruction. Now the scale of the imagined military tyranny of the future took on new dimensions. The army would occupy not only formerly seceded states but

loyal states like Kentucky, Senator Garrett Davis predicted. Davis could always be relied upon for hyperbole when it came to imagining Republicans' sinister intentions. "These military gentlemen think they have a right to command and control everywhere," Davis warned during the debate on the Civil Rights Bill. "The military power is now rampant and triumphant, and all we have to do is to bow our heads."[39] Even calmer congressmen could see doom ahead. If the army were empowered to act in any way it wished to protect needy black people in the South, speculated the Democratic congressman Charles A. Eldredge, the intervention would never stop. Troops might well be sent to Massachusetts to watch over the poor and insane.[40]

Dire predictions such as these spiced up the debate, but they bore little connection to the reality on the ground. It is true that some Republicans wanted to maintain a large army in the South. Francis Lieber, who had grown up in militaristic Germany and later crafted the first U.S. code of war, said that the United States should retain 150,000 troops for southern occupation.[41] But such arguments had gained little traction in a war-weary nation. After the Grand Review in Washington, D.C., in late May 1865, the demobilization of nearly one million Union soldiers moved at an astonishing pace. Numbering roughly 40,000 by the time of the Civil Rights Bill debate, the postwar army was twice as large as the prewar army, but it was small compared to what was needed simply to maintain the Freedmen's Bureau, and it was still shrinking. Hugh McCulloch, the Treasury secretary, confided to Charles Sumner that the nation could hardly afford to pay for an army that would occupy the South with any effectiveness.[42] Nations in Europe with populations comparable to the United States maintained armies at least three times the size of the Reconstruction era force. Historians continue to argue about many facets of Reconstruction, but they agree on at least one issue: the U.S. occupying army was much too small to accomplish even the most modest goals of the Republicans. The historian Mark Wahlgren Summers rightly contends that the paranoid fantasy of a "republic under siege" grew only more distorted during the debate over the Civil Rights Bill.[43] But the inflated rhetoric made for ineffectual propaganda. The reality of rapid demobilization made dubious the prospect of military despotism. "Although images of countless overbearing occupiers routinely graced popular literature (and eventually also film) in the years after the war," the historian Douglas R. Egerton writes, "the government demobilized rapidly after 1865, leaving but a skeleton force in place by the first months of 1866."[44] Anyone who knew the realities of the

military situation in early 1866 could not imagine a return to a militarized nation—unless there was another war.

And that was precisely what the Republicans were trying to prevent when they supported the military measures of the Civil Rights Bill. They did not seek to perpetuate the war; they sought to prevent its return. Specifically, they aimed to cut short any rebirth of slavery or the Slave Power. Regardless of their differences over the best course of Reconstruction, Republicans shared a common understanding of history. The institution of slavery and the conspiracy that supported it, the Slave Power, were together the cause of the Civil War. Let these evil buds bloom again, and a war as fierce as the one just passed would return. As Henry Wilson explained, "the gigantic system of human slavery that darkened the land, controlled the policy and swayed the destinies of the Republic, has forever perished," yet remnants still plagued the country in the form of discriminatory action and legislation such as the "Black Codes" adopted by southern states beginning in the summer of 1865. All prior antislavery legislation leading to the Thirteenth Amendment had crippled the wicked institution, but without the Civil Rights Bill to enforce the amendment, the institution would rise again. The military provisions were needed "for the better security of these new-born civil rights," and they would help make the law "the greatest and the grandest act in this series of acts that have emancipated a race and disenthralled a nation."[45]

Notions of the reenslavement of African Americans and the resurgence of the Slave Power were more than idle concerns. They were legitimate fears. They had driven the Republican agenda during the war—James Oakes's recent work makes this point powerfully—and they were only slightly diminished by Lee's surrender at Appomattox. Ten days after the surrender, a Republican politician captured the spirit of his party in a private letter: "Slavery made the rebellion and murdered the President and starved our prisoners and has brutalized the community that has tolerated and sustained it, and it must be wiped away, every vestige of it and that without conditions and without delay."[46] Four months later, the journalist Whitelaw Reid traveled through the South and reported that "the aristocracy of slaveholders, their power unbroken," still controlled the region. "Every traveler in the South tells the same story," Reid wrote. If the United States failed to act proactively against these men, then "under some other name, State control, contract system, or something of the sort, slavery is certain to be re-established."[47]

Short of a long-term, full-scale military occupation of the South, which most Republicans conceded was not a viable option, what type of military intervention did Republicans envision would assure the death of slavery and the Slave Power? There was, of course, no single answer to this question that satisfied all Republicans. But most had in mind a vaguely understood two-pronged approach. First, a short-term, large-scale military intervention would take the form of the Freedmen's Bureau, already in place. The party disagreed with one another and with President Johnson over how long the bureau might be needed, but all understood that it was not to be a permanent institution. The second prong, as represented in the military provisions of the Civil Rights Act, was to be permanent but small-scale—sometimes inoperative entirely. The federal military would take on the traditional role of a local police force, a posse comitatus, in those areas so under the spell of the Slave Power that they could not be trusted to police themselves in accordance with the act. Once an area was shed of slavery and the influence of the Slave Power, the federal military would withdraw. But it might return upon a relapse of the disease of slavery, or even the threat of infection.

But how would federal authorities determine if their intervention under the Civil Rights Act was warranted? This question was at the crux of the conflict over the act's military provisions. Members of the opposition battered Senator Trumbull for an answer. They could understand the idea that state officials might call for federal military assistance if the local police force could not enforce national laws. That had happened in the North under the Fugitive Slave Law. But what was this new power concerning the federal military acting proactively, before any overt violation of law and without any call for assistance from the states? "What is meant in the bill by the preventive power of the military?" asked Democratic senator Thomas A. Hendricks of Indiana. "Before a crime is committed, before a wrong is done under this bill, the President, or any person whom he may appoint, may call in the military power of the Government to prevent a crime. How is that in aid of the courts of the country?"[48]

It was an excellent question. Trumbull's answer revealed just how revolutionary the military provisions were. First, he invoked the well-known power of the national government to call up the militias to put down treason. That power had been used in the weeks and months after the firing on Fort Sumter, and no loyal Unionists had questioned it then. From there, Trumbull made a great leap in logic. Wouldn't it be better, he asked, if federal authorities could intervene *before* a war-starting act like the one

in Charleston in April 1861? Back then, if the government had slashed at the Slave Power when it was still conspiring to rebel, rather than waiting for the snake to strike first, then the Civil War could have been averted. In Trumbull's view, the government had already possessed this power before secession, it had failed to use it, and a preventable war had broken out. During the secession crisis, Trumbull argued, "if the men who were threatening rebellion . . . had been arrested for treason, of which, in my judgment, by setting on foot armed expeditions against the country, they were guilty; and if they had been tried and punished and executed for the crime, I doubt whether this great rebellion would ever have taken place." By the same logic, Trumbull reasoned, under the Civil Rights Act, the military could act preemptively to avoid another war. He offered a hypothetical situation: "Suppose that the county authorities in Muscogee county, Georgia, combine together to deny civil rights to every colored man in that county. For the purpose of preventing it, before they have done any act, I say the militia may be called out to prevent them from committing an act. We are not required to wait until the act is committed before anything can be done." Trumbull's scenario suggested a vision of military power that went well beyond the power to aid federal courts, such as had been used under the Fugitive Slave Law, and also beyond the power to react to overt acts of rebellion, such as had been used by Lincoln and Congress after the firing on Fort Sumter in 1861. The Fugitive Slave Law and the post-Sumter wartime acts of the Union government offered no precedents for the anticipatory military action that Trumbull described. He therefore had to reach back to the 1838 statute passed by Congress after the *Caroline* Affair. This was the only basis that he could find for the preventive war doctrine embodied in the Civil Rights Bill that he sponsored. Finally backed into a corner by Hendricks and the opposition, Trumbull read the 1838 statute to Congress and said it was a sound precedent for the military provisions of the Civil Rights Bill.[49]

Trumbull's invocation of the *Caroline* Affair was a remarkable move, not only from the perspective of his own time but from ours. On one level, it was a clever political trick. He reminded his Democratic opponents that it was a Democrat, Martin Van Buren, who had signed the 1838 act. That measure had not destroyed democracy then; its 1866 counterpart would not lead to military despotism now. On the level of legal doctrine, Trumbull's use of the 1838 act was even more innovative. In recent memory, the doctrine of preemptive war had been invoked by the Confederacy as justification for attacking the Union. The Confederate government in 1861 had reasoned

that war was the only way to prevent the new Lincoln administration from destroying the Union and the Constitution by dissolving all state governments, freeing all slaves, and imprisoning all dissenters.[50] For Trumbull to use this same doctrine, albeit for the nobler cause of the protection of the freed people, was arguably a legitimization of the Confederacy's military moves of 1861. Trumbull did not mention Confederate notions of preventive war. He invoked only the *Caroline* Affair, something Confederate authorities had not done in 1861, but he certainly knew that the Confederates had used a preventive war argument. He had turned the Fugitive Slave Law on its head to construct crucial sections of the Civil Rights Bill. Maybe it was not such a stretch for him to turn the Confederate justification for war on its head to support the creation of a new power of preventive war.

### RETHINKING THE MODERN SIGNIFICANCE OF THE CIVIL RIGHTS ACT

From the perspective of today, Trumbull's move is at least as remarkable as it was in 1866. His use of the *Caroline* Affair as the basis of broad preventive war powers anticipated the war powers doctrine of the twenty-first century. Only in the last decade or so, mostly in reaction to the U.S. invasion of Iraq in 2003, have legal theorists invoked the *Caroline* Affair to justify broad preventive war powers. Before then, most legal scholars and international lawyers used the *Caroline* Affair to argue for *narrow* preventive war powers. Their argument rested not on the 1838 statute but on the 1842 letter of Secretary of State Daniel Webster to Lord Ashburton clarifying the U.S. position. A sovereign power may act to stop a war, Webster wrote, but only if it could "show a necessity of self-defence, instant, overwhelming, leaving no choice of means, and no moment for deliberation."[51] In the build-up to the U.S. invasion of Iraq and then after that invasion, lawyers for the George W. Bush administration argued for a broader justification of preventive war. They coined the phrase "preemptive war." A preemptive war could be waged, so the argument ran, in reaction not only to immediate, overt threats, the sorts Webster had in mind in 1842, but also to *potential* threats, particularly those that jeopardized life on vast scale. Such threats included possible "weapons of mass destruction," which Iraq might possess or be close to acquiring. Today, those threats additionally include radical Islamic leaders planning or merely inciting attacks on the United States and its allies. When the Barack Obama administration used drone strikes against these people, some of them operating in countries allied with the United States, it invoked the preemptive war doctrine used by the prior administration. The preemptive war doctrine thus is not linked to any one political party, and by all accounts it is here to stay. It is also not new. It is a modern echo of the military provisions of the Civil Rights Act of 1866.

The 1866 military provisions, like the modern preemptive war doctrine, were based on a broad reading of the precedent of the *Caroline* Affair. Secretary of State Seward had taken a step in this direction in 1861 when he invoked the *Caroline* Affair as a precedent for stopping the *Trent*. But in that instance, the U.S. government was reacting against a known threat already underway: two Confederate agents heading to Europe to obtain foreign assistance. In 1866 Republicans were ready to act even in the absence of a known, overt threat. The potential for human abuse and treachery was all that was needed to justify strategic military intervention, Trumbull argued in 1866 during the Civil Rights Bill debate. A year later, Secretary of War Edwin Stanton was prepared to use a military provision of that law, Section 9, to keep the U.S. forces in the South in order to combat not only current, overt treachery but also plans for resistance that were merely embryonic. And as Stanton saw things, the power of Section 9 to justify preemptive strikes was untouched by either the presidential proclamation declaring the war over or the U.S. Supreme Court decision ruling military law in civilian areas unconstitutional. Preemptive strikes were as legitimate in times of peace as in times of war.

The position of Trumbull in 1866 and Stanton in 1867 was the same as that of the Bush administration in 2003: a small war was sometimes needed to slay a monster that could start a massive war. In Bush's time, the menace was weapons of mass destruction. In the post-Appomattox period, it was the Slave Power. Slavery might be outlawed, but the Slave Power remained. If the U.S. military did not attack it, or at least stand ready to do so, the Slave Power would deny African Americans their new rights and set the country once more on the road to war. As a group of French writers put it in a widely distributed pamphlet of 1866, slavery had been the "first negro question" inciting the country to Civil War; legal inequality was the "second negro question," destined to convulse the country like the first.[52]

That the Civil Rights Act of 1866 represented a new law of war, not merely a new law of rights, might at first seem surprising, but on reflection, the dual nature of the measure makes perfect sense. After all, the Emancipation Proclamation of 1863 had the same duality. As John Witt has argued in his important book on the U.S. laws of war, the same logic behind wartime emancipation lay behind the code of war that the U.S. government issued at nearly the same time and later used to justify some

of its most aggressive military actions of the nineteenth and twentieth centuries.[53]

The Civil Rights Act of 1866, like the Emancipation Proclamation, was as much an innovation in the international law of war as in the domestic law of freedom. Yet, Americans today remember the act only in the context of civil rights—if they remember it all. The context of war was surely as important. Indeed, understanding the act as a military measure leads to an even greater appreciation of its significance. This was no mere parchment promise of equal rights. It was a declaration of war: a vow to use every weapon in the U.S. arsenal to protect the country's most vulnerable citizens.

*Notes*

1. On the Civil Rights Act as justified by the Thirteenth Amendment's enforcement clause, a position taken by Republicans of the time and opposed by Democrats and some border state Unionists, see Rebecca E. Zietlow, "The Other Citizenship Clause," in this volume.

2. Michael Les Benedict, *A Compromise of Principle: Congressional Republicans and Reconstruction, 1863–1869* (New York: W. W. Norton, 1974), 148.

3. Gregory P. Downs, *After Appomattox: Military Occupation and the Ends of War* (Cambridge, Mass.: Harvard University Press, 2015), 123–24. Downs acknowledges that the act "authorized the president to use the army or militia to enforce its provisions" (124), though he sees the act generally as part of the effort by congressional Republicans "to construct defensible rights in peacetime" (123).

4. On treason law during the Civil War and Reconstruction, see William A. Blair, *With Malice toward Some: Treason and Loyalty in the Civil War Era* (Chapel Hill: University of North Carolina Press, 2014); on the law of war, see John Fabian Witt, *Lincoln's Code: The Laws of War in American History* (New York: Free Press, 2012); on military occupation, see Downs, *After Appomattox*. For an excellent overview of legal developments in the period, see Laura F. Edwards, *A Legal History of the Civil War and Reconstruction: A Nation of Rights* (Cambridge: Cambridge University Press, 2015). For an argument about the Civil Rights Act of 1866 as a radical, transformative measure in civil rights law, see Robert J. Kaczorowski, "To Begin the Nation Anew: Congress, Citizenship, and Civil Rights after the Civil War," *American Historical Review* 92 (February 1987): 45–68, but this view must be moderated by the scholarship of Michael Les Benedict, including his essay in the current volume as well as his many other works cited in the volume's other essays.

5. Civil Rights Act of 1866, 14 Stat. 27. The full text of the act is included in the appendix.

6. Gautham Rao, "The Federal *Posse Comitatus* Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," *Law and History Review* 26 (Spring 2008): 1–56.

7. Howard Jones, *To the Webster-Ashburton Treaty: A Study in Anglo-American Relations, 1783–1843* (Chapel Hill: University of North Carolina Press, 1977), esp. 20–32, 118–60.

8. Statutes at Large of the United States of America 5:212–13 (March 10, 1838).

9. See Lord Lyons to Earl Russell, January 6, 1862, *Official Records of the Union and Confederate Navies in the War of the Rebellion*, ser. 1, vol. 1 (Washington, D.C.: Government Printing Office, 1894), 195–202, esp. 197, 199, 200.

10. Mitchell Snay, *Fenians, Freedmen, and Southern Whites: Race and Nationality in the Era of Reconstruction* (Baton Rouge: Louisiana State University Press, 2010).

11. Charles H. Ray to Lyman Trumbull, February 7, 1866, Trumbull Papers, Manuscript Division, Library of Congress, Washington, D.C.

12. *Cong. Globe*, 39th Cong., 1st Sess., 605–6 (February 2, 1866). See also Trumbull's statement on the relevant sections of the act in his response to Johnson's veto message: ibid., 1760 (April 4, 1866).

13. Michael Vorenberg, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment* (Cambridge: Cambridge University Press, 2001), 55–59.

14. Johnson had been nominated to the presidential ticket in 1864 not as a Republican but as a candidate of an ostensibly nonpartisan "National Union" Party, though all recognized the party as the Republican Party in a new guise. Still, the appellation kept Johnson from having to renounce his longtime allegiance to the party of Andrew Jackson. On the depth of that allegiance, see Kenneth M. Stampp, *The Era of Reconstruction, 1865–1877* (New York: Random House, 1965), 50–82 ("Andrew Johnson: The Last Jacksonian").

15. *Cong. Globe*, 39th Cong., 1st Sess., 1755 (April 4, 1866).

16. The exact wording of Section 9 of the act was repealed in 1957 and replaced with wording much to the same effect in 10 U.S.C., Sec. 332 (Supp. 2009). See George Rutherglen, *Civil Rights in the Shadow of Slavery: The Constitution, Common Law, and the Civil Rights Act of 1866* (New York: Oxford University Press, 2013), 192n77.

Case 3:19-cv-01537-BEN-JLB Document 150-7 Filed 10/21/22 PageID.13533 Page 76 of 86

17. Lillian Foster, ed., *Andrew Johnson, President of the United States: His Life and Speeches* (New York: Richardson, 1866), 277.

18. Because the Court issued the writ to Milligan in April 1866 but did not deliver its opinion justifying its action until January 1867—Chief Justice Chase explained when Milligan was freed that the Court would offer its full opinion at the next term—historians sometimes mistakenly date the opinion to 1866 instead of 1867. See Downs, *After Appomattox*, 148.

19. Witt, *Lincoln's Code*, 312–13; Samuel Klaus, ed., *The Milligan Case* (New York: Da Capo, 1970), 40–47, 82–83.

20. For fuller details of Stanton's approach to administering the army during this period, see Benjamin P. Thomas and Harold M. Hyman, *Stanton: The Life and Times of Lincoln's Secretary of War* (New York: Knopf, 1962), 476–500, which, unless otherwise noted, is the source of the narrative here provided of the widening split between Stanton and Johnson.

21. Andrew Johnson, "Proclamation 157—Declaring that Peace, Order, Tranquillity, and Civil Authority Now Exists in and Throughout the Whole of the United States of America," August 20, 1866, The American Presidency Project, http://www.presidency.ucsb.edu/ws/index.php ?pid=71992.

22. See Andrew Johnson, "Proclamation 153—Declaring the Insurrection in Certain Southern States to be at an End," April 2, 1866, The American Presidency Project, http://www.presidency.ucsb.edu/ws/index.php ?pid=71987; and Johnson, "Proclamation 157."

23. *Pennsylvania Freedmen's Bulletin*, May 1867, 216.

24. Thomas and Hyman, *Stanton*, 476.

25. See Downs, *After Appomattox*, 147, though Downs mistakenly implies that Grant invoked the Civil Rights Act to authorize General Order No. 44. In fact, the correspondence between Grant and Stanton makes clear that Grant believed that the authority preexisted the act—that it came from the United States still being in a state of war, even in the view of President Johnson—and that this preexisting authority could be used to enforce both the act and the Freedmen's Bureau Act; see Thomas and Hyman, *Stanton*, 499.

26. W. W. Rollins to Adjutant General, U.S. Army, September 4, 1866, Attorney General Papers, Letters Received, War Department, box 7, RG 60, National Archives, College Park, Md.

27. P. H. Sheridan to U. S. Grant, October 6, 1866, in Edward McPherson, ed., *A Political Manual for 1868* (Washington: Philp and Solomons, 1868), 309.

28. George K. Leet to P. H. Sheridan, October 17, 1866, in ibid., 309.

29. U. S. Grant to Edwin Stanton, November 22, 1866, in ibid., 308.

30. Mark E. Neely, *The Fate of Liberty: Abraham Lincoln and Civil Liberties* (New York: Oxford University Press, 1991), 160–84.

31. H. S. Fitch to Orville H. Browning, February 6, 1867, Andrew Johnson Papers, vol. 109, #14454–55, Library of Congress.

32. Draft proclamation in Stanton's hand, February 9, 1866, #14468, ibid.

33. For Stanton's report, see 39th Cong., 2nd Sess., serial set 1277, S. Exec. Doc. 29 (February 18, 1867), 12–43. For the cabinet meeting of February 15, 1867, see Theodore Calvin Pease and James G. Randall, eds., *The Diary of Orville Hickman Browning* (Springfield: Illinois State Historical Library, 1933), 2:130; and *Diary of Gideon Welles* (Boston: Houghton Mifflin, 1911), 3:42–45.

34. *Cong. Globe*, 39th Cong., 1st Sess., appendix, 185 (April 6, 1866).

35. Ibid., 5 (December 4, 1865).

36. Richard Henry Dana, "'Grasp of War' Speech," June 21, 1865, delivered in Faneuil Hall, Boston, Mass., reprinted in Richard Henry Dana Jr., *Speeches in Stirring Times and Letters to a Son*, ed. Richard H. Dana III (Boston: Houghton Mifflin, 1910), 234–72. See Harold M. Hyman, *A More Perfect Union: The Impact of the Civil War and Reconstruction on the Constitution* (New York: Alfred A. Knopf, 1973), 289.

37. *Cong. Globe*, 39th Cong., 1st Sess., 1119 (March 1, 1866).

38. Ibid., 503 (January 30, 1866).

39. Ibid., 599 (February 2, 1866).

40. Ibid., 1156 (March 2, 1866).

41. Francis Lieber to Charles Sumner, November 17, 1865, Francis Lieber Papers, Henry E. Huntington Library, San Marino, Calif.

42. Hugh McCulloch to Charles Sumner, August 22, 1865, Charles Sumner Papers, Houghton Library, Harvard University, Cambridge, Mass.

43. Mark Wahlgren Summers, *A Dangerous Stir: Fear, Paranoia, and the Making of Reconstruction* (Chapel Hill: University of North Carolina Press, 2009), 111.

44. Douglas R. Egerton, *The Wars of Reconstruction: The Brief, Violent History of America's Most Progressive Era* (New York: Bloomsbury Press, 2014), 119.

45. *Cong. Globe*, 39th Cong., 1st Sess., 603 (February 2, 1866).

46. Stanley Matthews to Salmon P. Chase, April 19, 1865, in *The Salmon P. Chase Papers*, vol. 5, *Correspondence, 1865–1873*, ed. John Niven (Kent, Ohio: Kent State University Press, 1998), 29.

47. "AGATE," August 8, 1865, Whitelaw Reid Papers, Manuscripts Divisions, Library of Congress.

48. *Cong. Globe*, 39th Cong., 1st Sess., 602 (February 2, 1866).

49. Ibid., 605–6.

50. For Confederate aggression in 1861 as "preventive war," see James M. McPherson, "The Fruits of Preventive War," *Perspectives on History* 41 (May 2003): 5–6.

51. Webster to Ashburton, July 27, 1842, *Treaties and Other International Acts of the United States of America* (Washington, D.C.: Government Printing Office, 1934), 4:449.

52. *Letter from MM. de Gasparine, Martin, Cochin, and Laboulaye, to the Loyal Publication Society of New York*, trans. Mary L. Booth (New York: C. S. Westcott, 1866), 9.

53. Witt, *Lincoln's Code*.

WALTER PRESCOTT WEBB

# *The* TEXAS RANGERS

*A CENTURY OF FRONTIER DEFENSE*

ILLUSTRATED WITH DRAWINGS BY
LONNIE REES AND WITH PHOTOGRAPHS



Boston · HOUGHTON MIFFLIN COMPANY · New York

The Riverside Press Cambridge



COPYRIGHT, 1935, BY WALTER PRESCOTT WEBB

ALL RIGHTS RESERVED INCLUDING THE RIGHT TO REPRODUCE
THIS BOOK OR PARTS THEREOF IN ANY FORM

976.4
W 384 t
654158

The Riverside Press
CAMBRIDGE · MASSACHUSETTS
PRINTED IN THE U.S.A.

## McNELLY'S SUCCESSORS

was because the old man and his sons riten a hole lot of blackguard and put it all over the shilow church.... Now you know very well that thare is two things that has and must be done, and that is that you can send after those men and bring them back and allow them bale, or you [and four others]... have got to die.... There is over twenty-five men that have you all five pick out, and they will give you two weeks from the day this letter is mail to bring them back and allow them bale.' [19]

In spite of the threats, Judge Pleasants remained firm and the accused men were kept in jail for a long time. In June, 1877, they were in Austin and were conveyed from there to Cuero by Hall, who stated that he would not trust them to the sheriff.[20] Apparently these men were never convicted, but it is a current report among the Texas Rangers that they were kept in jail until their careers were broken up. It is said that the wife of one of the men brought some peaches to the jail and that her husband ate them and dropped the seeds out the window and that he remained in the same jail long enough to pluck through the bars fresh peaches from a tree that had grown from one of the seeds.

The Special Force was reorganized at Victoria, probably on January 26, 1877. Hall was made first lieutenant, John B. Armstrong second lieutenant, and McNelly's name was dropped. Prior to that time General Steele had instructed Hall to make reports direct to him rather than through Captain McNelly. Steele stated that he had retained the best men in McNelly's old company, a statement that was resented by McNelly's friends.[21]

In February Hall broke his command into small squads and sent them through the southwest with instructions to report to Austin. The men were moving so fast that he could not keep up with them. His force was crippled because he had to keep several men in DeWitt. Eagle Pass asked for Rangers during district court and let it be known that if Hall's men would come, the juries and witnesses would take courage and indict King Fisher and his followers. Hall reported that two of the boys had just come to camp with a murderer, that a thief had been arrested in Karnes, that the shotguns had arrived, and that he wanted five or six copies of the crime book.[22]

On March 2, Lieutenant Hall made a lengthy report of his activities

[19] Letter dated, Clinton, DeWitt, January 16, 1877, *Galveston News*, January 26, 1877.
[20] Hall to Steele, June 5, 1877; D. Beale to Steele, June 5, 1877, A.G.P.; *Galveston News*, June 26, 1877.
[21] D. Beale to Steele, January 26, 1877. A.G.P.
[22] Hall to Steele, February 8, 16, 1877. A.G.P.

291

## THE TEXAS RANGERS

from the time he took charge of the company on January 25. He had captured numerous fugitives, depositing them in convenient jails as he went along, but had been less successful with the cow thieves and skinners. In February he sent Ranger Hardy and two men to San Patricio County, where they captured twelve hundred and fifty stolen hides from different parties, but made few arrests because the sheriff, county attorney, and other officials were implicated.[23]

From John B. Armstrong, Hall learned that thirty miles from Eagle Pass a noted Mexican desperado and thief had a ranch on the Rio Grande which served as a resort for thieves and cutthroats from both sides of the river. At the time the Mexican was out of favor with the Mexican authorities and Hall had assurances that if he would drive the band into Mexico the Mexicans would assist in annihilating or capturing it. There was also a gang of white renegades in the same vicinity.[24]

Upon Eagle Pass the Rangers bore down in three squads and their sudden appearance there from April 9 to 11 caused a general stampede to the Mexican side of the river. District court was in session at Fort Clark. Hall sought out the grand jurors and assured them of protection. 'I am happy to state that upon these assurances and our presence they seem to be doing their full duty, as they have found bills against King Fisher and others who have gone scott free heretofore, though several grand juries have been held since they have been guilty of the most heinous crimes.' Before Hall arrived, Armstrong had arrested four men and driven four others across the river. Hall went with Lieutenant Armstrong and Sergeant Parrot to Piedras Negras to consult the Mexican officials and arrange for extradition. But, before seeing any official, the Rangers 'happened' upon the criminal on the main plaza, arrested him and later 'extradited him according to law.' On May 16, Hall wired that he had arrested King Fisher and others charged, along with Ben Thompson, with the killing of Wilson in Austin. 'My men are now engaged in guarding the jail, bringing in witnesses, and protecting them in appearing before the grand jury.' [25]

In the spring, reports began to circulate that the state would disband the Special Force as an economy measure. In May, letters began to pour into General Steele's office urging that Hall's company be continued in service. A DeWitt citizen wrote: 'If Hall and his men are disbanded the reign of terror and assassination will be renewed and those who have been prominent in bringing to justice those suspected

[23] T. H. O'Callaghan to Steele, February 17, 1877; Hall to Steele, March 5, 1877. A.G.P.
[24] Hall to Steele, February 22, 1877. A.G.P.
[25] *Ibid.*, May 16, 1877, letter and telegram. A.G.P.

292

## McNELLY'S SUCCESSORS

of crime will be the first to suffer. This will produce anarchy by inducing rival organizations, and no one can predict the end.'[26] After some agitation the West Texas Stock Association assembled at Goliad and subscribed over seven thousand dollars to be used in keeping the Rangers in the field. Among the subscribers were such prominent men as H. Runge, W. A. Pettus, Coleman, Mathis and Fulton and Thomas O'Connor.[27]

By summer the border was feeling the effects of the revolution in Mexico. Valdez and Escobedo had disbanded their forces on the Rio Grande, owing to the success of Díaz, and a horde of thieves and cutthroats were at large among the people. There was a big camp twenty miles east of Eagle Pass which would be investigated.

Hall and Sergeant G. W. Arrington of the Frontier Battalion attacked Valdez's camp near Eagle Pass on August 3. The Mexicans and outlaws heard that the Rangers were coming and a hundred, mostly fugitives, escaped. Fifty were captured and such as could be identified as wanted men were held. Eagle Pass was surrounded and searched with the result that sixteen men were arrested — seven for murder and three for horse theft — and delivered inside the Castroville jail.[28]

August 21 found Hall at Rio Grande City, where McNelly had received the Las Cuevas cattle in 1875. Hall had come because on August 12 a band of outlaws had a 'jail opening' at Rio Grande City, liberating several prisoners, who accompanied their deliverers into Mexico. There was much excitement and many accusations of conniving and double-dealing from both sides. Hall sent spies into Mexico, consulted the consul at Camargo, and interviewed Colonel Price, commanding at Ringgold. He heard that the raiders were within three miles of the river and that the authorities of Camargo knew their whereabouts. When he called on Colonel Gómez, *commandante*, to arrest the criminals, Gómez replied that he was making every effort to do so. Hall did not believe him, intimated as much, and demanded that the jail-breakers be delivered in four days. Three of the least influential were delivered, but Hall wanted them all. Gómez reported to General Canales that Hall had threatened an invasion, something which the Ranger declared he was careful not to do. Hall believed that the Mexican officials made no attempt to carry out the terms of the treaty of 1868 regarding

[26] W. R. Friend to Steele, May 27, 1877. A.G.P.

[27] Proceedings of the West Texas Stock Association, Goliad, June 11, 1877, on file A.G.P. The counties represented were Goliad, Victoria, DeWitt, Refugio, Bee, San Patricio, Aransas, Calhoun, Jackson, Lavaca, Gonzales, Wilson, Live Oak, Bexar, Nueces, Duval, Karnes, Uvalde, Maverick, Frio, Webb, Cameron, Zapata, Starr. Hall to Steele, May 31, 1877. A.G.P.

[28] Hall to Steele, August 6, 15, 1877, letters and telegrams. A.G.P.

293

## THE TEXAS RANGERS

criminals, and that the entire population was in favor of the men who raided or annoyed the Gringos.[29]

Without doubt the Mexicans recalled McNelly's raid in November of 1875, and when it was reported that another invasion was pending, the effect was described as 'electric.' *The Mier Whip* declared that the news came like an electric shock at midnight. Fearful for the national dignity, the sons of Mier 'presented themselves mounted and armed to the first political authority.' By dawn of August 13, more than a hundred citizens, animated by the sacred fires of patriotism, were ready to 'sacrifice themselves for the independence and dignity of their country.' Battalion No. 11 and the cavalry under Major Regino Ramón marched forward as to a festivity, 'and said they went with pleasure to kill "Gringos."' Battalion No. 11 exerted itself so greatly in getting to Camargo that seventeen soldiers died of sunstroke and were solemnly declared to be 'victims of the Gringo politics.' The editor did not know where the trouble would end, but thought the government out to arm the people on the river.[30]

Since there was little more for him to do around Rio Grande City, Hall proposed to go to Nueces County where an organization was killing inoffensive sheep-herders and driving the Mexican laborers from the country.[31] For the remainder of the year Lieutenant Hall made few reports; we may now leave him and follow his second lieutenant, a man who had learned much from McNelly and was truly his successor.

### 3. JOHN B. ARMSTRONG THINS OUT THE BAD MEN

John B. Armstrong went with McNelly to the Rio Grande in 1875 and participated with him in the Palo Alto and Las Cuevas affairs. He became a sergeant, and was made a second lieutenant in January, 1877, when Hall was given command of McNelly's company. One does not have to follow John Armstrong's career very far to recognize that he was a man after McNelly's own heart. His methods were McNelly's methods and he never hesitated to administer extreme unction to those who could not be handled in a more gentle manner. It is only fair to say that he shared with Hall in the work of cleansing Southwest Texas. These operations have been followed at some length,

[29] Hall to Steele, August 29, 1877. A.G.P.

[30] Extract from *The Mier Whip*, sent by Hall to Steele. A.G.P.

[31] Hall to Steele, September 1; September 15, 27, 29. A.G.P. For an account of the killing of the Mexican sheep-herders see testimony of Julius G. Tucker, 'Texas Border Troubles,' p. 230.

294

# WINCHESTER

## THE GUN
## THAT WON THE WEST

*By*  HAROLD F. WILLIAMSON



**South Brunswick and New York: A. S. Barnes and Company**
**London: Thomas Yoseloff Ltd**

3   35695 SFPL: C-BKS
106 SF   08/11/95 5153-

SAN FRANCISCO
PUBLIC LIBRARY

3  1223  03268  7171

*(The Winchester trade mark is used with permission of the Winchester Repeating Arms Company)*

*Copyright 1952 by Association of the U.S. Army*

All rights reserved

No portion of this book may be reproduced in any form without permission.

MANUFACTURED IN THE UNITED STATES OF AMERICA

*Library of Congress Catalog No. 52-11409*

SBN: 498 08315 2



*Cover of 1863 New Haven Arms Company Catalogue*

Prentice on as a dealer, but in the letters written subsequently, Winchester was careful to admonish Prentice not to sell below the established price.

In another instance rifles were sold to Messrs. B. Kittredge & Company of Cincinnati, Ohio, who, according to reports received by the New Haven Arms Company, not only resold the guns below the established prices, but made disparaging remarks about their performance as well. Winchester attempted to stop this practice by refusing to sell to Kittredge & Company. He was not immediately successful and a few months later he asked one of his dealers to go around to the latter's place of business, buy up the stock of Henry rifles, and find who was supplying them. Kittredge & Company was pushing the Frank Wesson rifle at this time, and during the course of correspondence insisted that it was a better gun than the Henry. Winchester offered to wager "not less than $5,000 nor more than $10,000" that in a competition between the two guns, the Henry would prove the better performer, a challenge that seems to have ended this episode.

Winchester aided his dealers by doing a certain amount of advertising in newspapers in the chief marketing areas.[9] Early in 1863 he began gathering material for the first catalog to be published by the company. He asked A. A. Vanwormer, a dealer in St. Louis, to make tests of the accuracy of the Henry rifle at various distances from the target, explaining: "We have no expert nor anyone in this vicinity who has tested the rifle as you have. In fact few in this vicinity know even of the existence of the weapon. While the demands from the border states have been and still are beyond our means to supply and used so far away from us that we have no means of getting exact results, as we desire to publish."

He also solicited personal accounts of combat performances of the rifle, explaining that the "Romance of War as a matter of history should be preserved."

Late in 1863 the Company issued a small catalog which included a number of testimonials concerning the effectiveness of the Henry rifle as a combat weapon, in addition to a description of the gun and ammunition. This catalog appears to have been distributed quite widely. It was translated and sent to prospective

**37**