1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                         CIVIL DIVISION

13

14  **JAMES MILLER et al.,**              Case No. 3:19-cv-01537-BEN-JLB

15                        Plaintiffs,     **COMPENDIUM OF WORKS
                                          CITED IN DECLARATION OF**
16       **v.**                           **MICHAEL VORENBERG**

17                                        **VOLUME 10 OF 11**

18  **CALIFORNIA ATTORNEY**               Courtroom:    5A
    **GENERAL ROB BONTA et al.,**         Judge:        Hon. Roger T. Benitez
19
                          Defendants.     Action Filed:  August 15, 2019
20

21

22

23

24

25

26

27
                                    1
28

# INDEX

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867). | 18 n.17 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A. | 55 n.79 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 55 n.79 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 49 n.69 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 13 n.15 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 17 n.16 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 33 n.41 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 34 n.44, 54 n.78 | 0039-0041 |
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |

2

| | | |
|---|---|---|
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 31 n.34 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 177-202, 353-68. | *passim* | 0060-0096 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 31 n.34 & n. 35 | 0097-0104 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 20 n.22 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 9 n.3, 13 n.14, 25 n.26 | 0109-0217 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 40 n.53, 43 n.55 | 0218-0222 |
| James E. Sefton, *The United States Army and Reconstruction, 1865-1877* (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 18 n.17, 20 n.21 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction, 1867-1869* (Knoxville: University Press of Tennessee, 2005), 1-119. | 18 n.19 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 19 n.20, 36 n.47, 40 n.53 | 0360-0397 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 28 n.29 | 0398-0424 |

3

| | | |
|---|---|---|
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 45 n.59 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 21 n.23, 25 n.25 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 45 n.59 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 10 n.9, 27 n.28, 30 n.33 | 0453-0464 |
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 36 n.47, 38 n.50, 39 n.51 & 52, 47 n.64 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 34 n.44 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 52 n.75 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 18 n.18 | 0489-0495 |

4

| | | |
|---|---|---|
| Allan Robert Purcell, "*The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 19 n.20 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 55 n.79 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 46 n.60 | 0563-0584 |
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 19 n.20 | 0585-0598 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana,for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 53 n.77 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 12 n.12, & 13 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 47 n.63 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 48 n.68 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 | 49 n.70 | 0620- |

5

| | | |
|---|---|---|
| "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | | 0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 48 n.67 | 0622-0627 |
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 12 n.13 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 28 n.30 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 24 n.24 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:211-12. | 17 n.16 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 47 n.62 | 0653-0656 |

| | | |
|---|---|---|
| **NEWS ARTICLES** | | |
| Army and Navy Journal, June 1, 1867, p. 350 | 29 n.32 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 27 n.27 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 37 n.49 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 2 | 56 n.61 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 32 n.37 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 32 n.38 | 0666 |
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 49 n.72 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 44 n.56 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.31 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 25 n.26 | 0679 |
| New Orleans Republican, June 1, 1873, p. 1 | 40 n.53, 42 n.54 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 46 n.61 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 32 n.40 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 33 n.42 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p. 1. | 42 n.54 | 0688 |

| | | |
|---|---|---|
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 34 n.43 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 45 n.58 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 35 n.46 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 44 n.57 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 37 n.48 | 0695 |
| *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4). | 27 n.27 | 0696 |
| **OTHER SOURCES** | | |
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 34 n.45 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 25 n.26 | 0701-0702 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 26 n.26 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 26 n.26 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 51 n.73 | 0716-0727 |

8

As Everette Swinney suggests, it certainly smacked of "poetic justice" that the federal *posse comitatus* would anchor Reconstruction as it had the Fugitive Slave Law of 1850. After all, the South had constructed and legitimized this architecture of power.[132] And the very success of the Fugitive Slave Law of 1850 made the federal *posse* a logical choice to enforce the Reconstruction Amendments. "Surely we have the authority," Trumbull suggested, "to enact a law as *efficient* in the interests of freedom . . . as we had in the interest of slavery when it prevailed in a portion of the country." In other words, the Reconstruction Congress appropriated the federal *posse comitatus* from the Fugitive Slave Law of 1850 because it was the most powerful law enforcement tool in their arsenal—a truly "extraordinary power," worried President Andrew Johnson. Senators Mason, Butler, and Clay had armed the 1850 law with the federal *posse comitatus* to assure "the loyalty of the people to whom it is directed."[133] Their successors in the 39th Congress did so, in the words of Senator Luke Poland of Vermont, to "enforce the provision . . . and *compel* its observance." Without "that provision," concluded Senator Henry Lane of Indiana, "this act would be mockery and a farce."[134]

But as Republicans consciously reenacted the enforcement provisions of the 1850 law, some wondered whether the stain of slavery rendered this form of federal compulsion morally circumspect. Pennsylvania's Edgar Cowan, himself a Republican, "hoped never to stand in this body and hear . . . Republican Senators excuse and apologize, or rather triumphantly cite the fugitive slave law of 1850 as a model for their present legislation."

---

The Enforcement Acts of 1870, 16 *U.S. Statutes at Large* 140 at 142 (1870), and 1871, 16 *U.S. Statutes at Large* 433 at 437 (1871). Lyman Trumbull, *Congressional Globe,* 39th Cong., 1st Sess., January 29, 1866, 475.

132. Swinney, *Suppressing the Ku Klux Klan,* 67. And Robert Kaczorowski is undoubtedly correct to claim that this fact was illustrative of the 39th Congress's belief that "civil rights," like those conferred in the Fugitive Slave Clause, were national in character. Robert J. Kaczorowski, "The Enforcement Provisions of the Civil Rights Act of 1866: A Legislative History in Light of *Runyon v. McCrary,*" *Yale Law Journal* 98 (1989): 589.

133. Lyman Trumbull, *Congressional Globe,* 39th Cong., 1st Sess., January 29, 1866, 475 [emphasis added]. Andrew Johnson, *Congressional Globe,* 39th Cong., 1st Sess., March 27, 1866, 1681. *Congressional Globe,* 31st Cong., 1st Sess., January 28, 1850, 233.

134. *Congressional Globe,* 39th Cong., 1st Sess., February 2, 1866, 603. Raoul Berger, *Government by Judiciary: The Transformation of the Fourteenth Amendment* (Cambridge: Harvard University Press, 1977), 227. *Congressional Globe,* 39th Congress, 1st Sess., February 2, 1866, 602. It should be noted that this movement to clothe the federal government with broader powers was tempered by a palpable sense that the conclusion of military hostilities necessitated rolling back "the Federal Government powers." "Let us go back to the original condition of things," pleaded Republican Senator (IA) James W. Grimes in 1866. Grimes, *Congressional Globe,* 39th Cong., 1st Sess., May 8, 1866, 2446, quoted in Benedict, *Fruits of Victory,* 13.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 554

Democrat Thomas A. Hendricks of Indiana lamented that a "wicked and odious" enforcement provision in 1850 was equally "wicked and wrong" in 1866.[135] Trumbull and his colleagues thus undertook to illustrate that, contrary to the assertions of abolitionists in the 1850s, a law with unjust ends did not necessarily invalidate the law's means. This was not so different from what Attorney General Cushing had asserted in 1854, that the "*posse comitatus* . . . is in the service of Government, not in the service of the individual who sues out the process." What, for Cushing, was a mere structural feature of executing federal process was, for Lyman Trumbull, legal "machinery." It was, to be sure, "the same machinery," but applied to "a very different" end. For Trumbull, it was no different than Union soldiers using "the weapons which they wrested from rebel hands."[136]

If the architects of Reconstruction claimed the federal *posse comitatus* as an instrument of power, their opponents resurrected the abolitionists' old critiques. For one thing, it appeared that the Fugitive Slave Law of 1850 and Reconstruction similarly warped the tenets of white society. Surveying the enforcement of the 1850 law on Boston, Richard Henry Dana had concluded, "our Temple of Justice is a slave pen! Our officers are slave hunters." Twenty-four years later, South Carolina's James Shepherd Pike pondered the ironies of emancipated slaves and subjugated confederates. "It is barbarism overwhelming civilization by physical force," he wrote in *The Prostrate State.* His "old aristocratic society" had been reduced to a "rude form" characterized by "the slave rioting in the halls of the master, and putting that master under his feet." Through occupation and compulsion, the federal *posse comitatus* had shaken to the core the longstanding power relations of the South.[137]

The South's reduced political condition did not escape mention in Congress. Under the influence of ignorance or outright disingenuousness—or some combination thereof—Senator Garrett Davis of Kentucky claimed that the federal government had "never, never" shown "such partiality . . . for the white man, the sovereign, citizen, and lord of this land." Pointing straight to the federal *posse comitatus,* Davis concluded that this "monstrous legislation" could exist only through the sinister motives of "the negro and his insane friends." His colleague, James Guthrie, took the matter even further. Where the federal government provided *posses* to reclaim fugitive slaves, it now did so to "put every one upon the track of the fleeing white man,"

135. Cowan, *Congressional Globe,* 39th Cong., 1st Sess., February 2, 1866, 604. *Congressional Globe,* 39th Congress, 1st Sess., February 2, 1866, 605.

136. *Extradition of Fugitives from Service,* 6 Op. Atty. Gen. 466 (1854). *Congressional Globe,* 39th Cong., 1st Sess., April 4, 1866, 1760.

137. Dana, *Journal,* 2:424. James Shepherd Pike, *The Prostrate State: South Carolina Under Negro Government* . . . (New York: D. Appleton and Company, 1874), 12.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

or "runaway white man." Continued another Democrat, this was the federal government's attempt to "make him their master."[138] The likeminded Charlottesville *Chronicle* perceived "a ring in the nose of every white man at the South—with the string in the hand of any unprincipled Yankee who chooses to pull it." Just like the Fugitive Slave Law of 1850, the Reconstruction Acts threatened to turn free men into slaves to their government.[139]

And the abolitionists' intransigence proved equally useful to the South. The few white southerners that obeyed the marshals' command to join the *posse comitatus* were ostracized, at best, or physically threatened, at worst. Such "social pressure" left the civilian *posse comitatus* "reluctant and undependable." As Representative R. T. W. Duke of Virginia put it in 1871, it was impossible for the North "to compel men to support measures which their judgments do not approve and their consciences must condemn." Recalled Senator Reverdy Johnson of Maryland, the Fugitive Slave Law of 1850 was solely "enforced by power, by military or civil power." That is, the law was *imposed* upon reluctant northerners—poorly in Johnson's opinion. If Republicans pursued their course of Reconstruction, "it must be enforced and the protection must be given by the bayonet."[140]

But what of the old Mansfield Doctrine and the use of the military "not as soldiers, but as citizens?" The United States Army did, in numerous instances, serve as a *posse comitatus* to compel obedience to federal court orders. But this was the exception rather than the norm. Military commanders had their own orders and, almost uniformly, hesitated to volunteer their forces for civilian law enforcement. In this way, the great Republican plans to reconstruct the South not only lacked the ability to command "bystanders" to aid in their enactment, they also faced the reality of a militant resistance.[141] Worse yet, the defeated rebels opened a new page in "resistance" to federal compulsion by employing systematic, tactical terrorism to subjugate the recently emancipated.[142] Compounding the "vir-

138. *Congressional Globe*, 39th Cong., 1st Sess., February 2, 1866, 599, 601. *Congressional Globe*, Appendix, 42nd Cong., 1st Sess., March 31, 1871, 81. Democratic opposition to the Reconstruction Acts is discussed in Pamela Brandwein, "Slavery as an Interpretive Issue in the Reconstruction Congress," *Law and Society Review* 34 (2000): 326–27. Generally, see William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* (Cambridge: Harvard University Press, 1988).

139. Charlottesville (Va.) *Chronicle*, n.d., 1866, cited in Anon., *Is the South Ready for Restoration* (s.n., 1866), 11.

140. *Congressional Globe*, 39th Congress, 1st Sess., January 30, 1866, 505.

141. Numerous examples of military *posses* are detailed in James E. Sefton, *The United States Army and Reconstruction, 1865–1877* (Baton Rouge: The University of Louisiana Press, 1967), e.g., 70, 219, 223. Hahn, *A Nation under Our Feet*, 263–313.

142. *Congressional Globe*, 39th Congress, 1st Sess., January 30, 1866, 505. For a discussion of the extent of Klan activities, see Foner, *Reconstruction*, 434. As Congressman A. F.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

tually insurmountable practical obstacles to civil rights enforcement" was a string of decisions—*The Slaughterhouse Cases* (1873), and the *United States v. Reese* (1876) and *Cruikshank* (1876)—that effectively removed the foundational rationale for Reconstruction. By 1874, the Reconstruction laws were all but dead letters. What began as a program to secure national equality ended as "a legislative solecism," noted a melancholic Republican Congressman some years later, because it "sought to conciliate the power it was endeavoring to coerce."[143]

In the glowering ruins of Reconstruction, the southern states, now again equal members of the Union, attempted to stamp out that persistent flickering cinder of national power, the federal *posse comitatus*. Ascendant Southern Democrats, like the abolitionists who had opposed the Fugitive Slave Law, now well understood the limits of federal power. If the South stood "shoulder to shoulder," counseled the Augusta (Ga.) *Constitutionalist*, and the North "can force these things upon us, God help us. If they cannot, *don't let us do it ourselves.*" The federal government could command the assistance of civilian bystanders as it pleased. Those civilians, like Castner Hanway, could simply refuse. So long as federal power depended upon the hearts and minds of the citizens, local custom could selectively appropriate and shape it. This rule was perfectly congruous with the post-bellum order, reminiscent of its antebellum predecessor, of "decentralized constitutionalism."[144]

That the federal government could not compel citizens to assist in enforcing political equality hung over both sides of the aisle during the 45th Congress. Democrat Augustus Merrimon of North Carolina took to the Senate floor to assert that "citizens of the United States" are "bound to aid in executing the laws of the United States." To this Republican George Edmunds of Vermont sardonically remarked, "I wish that had been so for the last fifteen years." Edmunds simply could not "shut my eyes to the

---

Perry of Ohio lamented in 1871: "The boasted courage of the South is not courage in their presence [the Klan]. Sheriffs, having eyes to see, see not; judges, having ears to hear, hear no; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices. In the presence of these gangs all the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detention." A. F. Perry, *Congressional Globe,* Appendix, March 31, 1871, 78.

143. Kaczorowski, *Politics of Judicial Interpretation,* 21, 140–60. Foner, *Reconstruction,* 524–34. Swinney, *Suppressing the Ku Klux Klan,* 317–18. *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36 (1873). *United States v. Reese,* 92 U.S. (2 Otto) 214 (1876); *United States v. Cruikshank,* 92 U.S. (2 Otto) 542 (1876). George W. Julian, *Political Recollections, 1840 to 1872* (Chicago: Jansen, McClurg & Company, 1884), 307.

144. Augusta (Ga.) *Constitutionalist,* n.d., 1866, quoted in *Is the South Ready for Restoration,* 9 [emphasis added]. Kaczorowski, *Politics of Judicial Interpretation,* 161–88; Skowronek, *Building a New American State,* 61–120.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

history of this country." What should the federal government do, asked
Edmunds, when "the marshal calls on the citizens," and "they say no . . .
'we will not go'?" "If he cannot do it at first, he must try again . . . he
must call the *posse comitatus,*" answered Merrimon. But, asked Edmunds,
"suppose they will not come then?" For Merrimon, this was to be brought
"to the attention of the court," for such disobedience was "indictable." But
Edmunds would not let the matter rest. "If when the marshal goes to ar-
rest a citizen the citizen will not go and nobody will help the marshal," he
continued, "what then?" Fittingly, Merrimon turned to a venerable icon of
the antebellum federal regime. Such a situation, he concluded, referring to
the Whiskey Rebellion "would warrant such action as was taken by General
Washington." No doubt, Merrimon also recalled that the perpetrators in
that fracas received presidential pardons.[145]

Vengeful southern Democrats took aim, then, not at the idea of the federal
*posse comitatus,* but at its specific use to coerce obedience to the Reconstruc-
tion Acts. When the laws are obstructed, shouted Merrimon, "the answer
. . . is not to apply for the Army . . . but it is to call in the aid of the *posse
comitatus,* the people around him, every citizen." But, "if the Army aid in
enforcing the law, it is despotism!" After all, he concluded,

> We know by sad experience that the Army has been used not once, but time
> and time again, in a way that not a court in this nation would sanction. The
> Army has not only been used in the collection of internal revenue in a way
> not authorized by law, but it has been used and prostituted to control elections
> repeatedly. State-houses have been seized. . . . The object of this section is
> to prevent a like prostitution of the Army in the future . . .

For Merrimon, what was so objectionable was that Reconstruction itself
had been enforced by external force rather than by "the people around . . .
every citizen." Slaveholders had designed this doctrine of federal power to
protect slavery. The South now sought to curtail it to protect what remained
of their racist social order.[146]

For Merrimon and his likeminded colleagues, the remedy was the Posse
Comitatus Act of 1878, which barred the use of the military as a *posse
comitatus.* It was a decisive rejection of the Mansfield Doctrine: what in-
deed differentiated "citizens" from "soldiers" was the geographic reality of
American federal governance. If the marshal sought a *posse* of civilians to
protect African-Americans, he would fail, as he had throughout Reconstruc-
tion. But military force came from without and it could not be controlled by
local norms. In short, the Posse Comitatus Act was a message to the North
and to the world, that it would take external force, with bayonets behind

145. *Congressional Record,* 45th Cong., 2d sess., v. 7, pt. 4, June 7, 1878, 4243–44.
146. Ibid., 4243, 4245.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 558

it, to compel the South to accept the basic doctrines of Reconstruction. As for the North, it remains to be seen whether or not it had succumbed to yet another dubious "compromise." Less obscure, however, is the fact that it had dropped the instruments of coercion, and located the tools of conciliation.[147]

In the end, the debate and passage of the Posse Comitatus Act of 1878 was a self-serving moment of historical absolution. Said Senator Aaron Sargent of California, it was a "doctrine invoked in behalf of slavery." It was then "a wrong enunciation," as it was now. Added a colleague, "it was never lawful, it never will be lawful." Yet another, recalling the Anthony Burns incident of 1854, concluded, "I do not believe that there ever was any authority for calling out the United States troops in Boston." In fact, Senator Henry Teller of Colorado continued, "I then reprobated the act. I did not believe that it was supported by law. . . . I do not want to see that done in the future."[148] The Posse Comitatus Act of 1878 was thus a convenient way to forget about this whole sorry era of statecraft—slavery, war, and the "sad experience" of military occupation.

### Obscuring Slavery: Emancipation and the Legitimacy of Federal Compulsion

The failure to enforce Reconstruction pointed to a sad historical truth about federal power and the interests it served in mid-nineteenth century America. How was it, asked Justice Harlan in 1883, that the United States had enacted "modes and . . . penalties, whereby the master could seize and recover his fugitive slave," but failed "to bring the whole power of this nation to bear upon States and their officers" that attempted to "abridge, impair, or deny rights

---

147. 20 *U.S. Statutes at Large* 145 at 152 (June 18, 1878): "From and after the passage of this act it shall not be lawful to employ any part of the Army of the United States, as a posse comitatus, or otherwise, for the purpose of executing the laws, except in such cases and under such circumstances as such employment . . . may be expressly authorized by the Constitution. . . ." For detailed discussions of the genesis of the Posse Comitatus Act, see David E. Engdahl, "The New Civil Disturbances Regulations: The Threat of Military Intervention," *Indiana Law Journal* 49 (1974): 596–603; Dominic J. Campisi, "Honored in the Breech: Presidential Authority to Execute the Laws with Military Force," *Yale Law Journal* 83 (1973): 130–52; James M. McPherson, "Coercion or Conciliation? Abolitionists Debate President Hayes' Southern Policy," *New England Quarterly* 34 (1966): 474–97. On the debate over whether there was a "Compromise of 1877," see C. Vann Woodward, *Reunion and Reaction: The Compromise of 1877 and the End of Reconstruction* (1951; Boston: Little, Brown, 1966); Michael Les Benedict, "Southern Democrats in the Crisis of 1876–1877: A Reconsideration of *Reunion and Reaction*," *Journal of Southern History* 46 (1980): 489–524.

148. *Congressional Record*, 45th Cong., 2d sess., June 7, 1878, 4242, 4246, 4248.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

confessedly secured by the supreme law of the land?"[149] As Harlan rightly pointed out, there could be no denying that slaveholders had harnessed federal compulsion to guard their property rights. And federal compulsion proved remarkably effective foundation for transforming men into soldiers. Its failure during Reconstruction, though, left the recently emancipated with only paper ballots to fend off bullets, lynching, and other horrors.[150]

Yet, success or failure, the federal *posse comitatus* doctrine remained incredibly consistent in at least one sense. From 1850 to 1865, the federal *posse comitatus* functioned to keep slaves as slaves and to force citizens to serve the state. Its failure from 1865 to 1878 permitted white southerners to maintain the subjugation of African-Americans. And throughout the next several decades, even as the federal state became professionalized, central-ized, and bureaucratized, the federal *posse comitatus* remained especially useful to crush challenges to the national power structure.[151] According to the Supreme Court, for instance, white men in a *posse comitatus* on Indian reservations, never really lost their "official" status. It was a simple method to multiply the federal presence on these "sovereign" lands.[152]

But the federal *posse comitatus* would be used most frequently against organized labor, or as one jurist derided, "men without authority to control others." Notably, during strikes in which the government's "slow move-ments" failed to provide companies with adequate protection, they fre-quently turned to a new variant of the *posse comitatus:* private security forces, or hired guns who "were united and armed to uphold law and order

149. *United States v. Stanley,* 109 U.S. 3 at 51–52 (1883).

150. Benedict, *Fruits of Victory,* 38. In *Masters Without Slaves,* 68, James Roark argues that "slavery's disintegration was not matched by a general falling away from central principles by planters." See also, George Rable, *But There Was No Peace,* 185, 163–85. On the legacy of this chapter of Reconstruction, see Edmund S. Morgan, *American Slavery, American Freedom,* 386–87; Stephen Middleton *The Black Laws: Race and the Legal Process in Early Ohio* (Columbus: Ohio State University Press, 2006), 251–61.

151. On the state that followed, see, e.g., Richard F. Bensel, *The Political Economy of Ameri-can Industrialization, 1877–1900* (New York: Cambridge University Press, 2000); Morton Keller, *Affairs of State: Public Life in Late Nineteenth-Century America* (Cambridge: Harvard University Press, 1977); William J. Novak, "The Not-So-Strange Birth of the Modern American State," *Law and History Review* 24 (2006): 193–200; Rodgers, *Atlantic Crossings;* Martin J. Sklar, *The Corporate Reconstruction of American Capitalism, 1890–1916: The Market, the Law, and Politics* (New York: Cambridge University Press, 1988); Skowronek, *Building a New American State,* 285–92; Michael Willrich, *City of Courts: Socializing Justice in Progressive Era Chicago* (New York: Cambridge University Press, 2003).

152. *Wright v. United States,* 158 U.S. 232 at 239 (1895). See also, 25 *U.S. Statutes at Large* 178 (1888). As part of the broader effort to "civilize" Indians during the late nineteenth century, the federal government attempted to gradually replace tribal law enforcement with federal authority. Russel Lawrence Barsh and J. Youngblood Henderson, "Tribal Courts, the Model Code, and the Police Idea in American Indian Policy," *Law and Contemporary Problems* 40 (1976): 35–49.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

. . . combined in defense of that great principle . . . that 'might makes right.'" And if it had been "poetic justice" for Lyman Trumbull and his radical colleagues to use the *posse comitatus* against slaveholders during Reconstruction, then Trumbull faced an irony of similar proportions in his 1895 defense of Eugene Debs. Declared the Supreme Court, "the strong arm of the national government," including "the army . . . and all its militia, are at the service of the Nation to compel obedience to its laws."[153]

Having been used so effectively, and so often, to preserve the power relations of the American social order, the federal *posse comitatus* doctrine, notwithstanding the act of 1878, had quietly become deeply ingrained in the fabric of federal governance. Just two years after the Posse Comitatus Act, the Supreme Court ruled in *Ex Parte Siebold,* that it was "an uncontrovertible principle, that the government of the United States may, by means of physical force, exercised through its official agents, execute on every foot of American soil . . . the power to command obedience to its laws. . . . " Without such powers, the court continued, "it is no government." Thus, the federal government "must execute them . . . on things as well as on persons." Thereafter, courts and legislatures carved so many exceptions into the Posse Comitatus Act of 1878 so as to render it a hollow shell in the present.[154]

153. Edward Paxson, Justice of the Pennsylvania Supreme Court (1892), quoted in David Montgomery, *Fall of the House of Labor: The Workplace, the State, and American Labor Activism, 1865–1925* (New York: Cambridge University Press, 1987), 39. Wilfred M. Peck, "Importation of Armed Men from Other States to Protect Property [Townsend Prize Oration]," *Yale Law Journal* 3 (1893): 26. On the use of private forces against strikers, see Robert P. Weiss, "Private Detective Agencies and Labour Discipline in the United States, 1855–1946," *Historical Journal* 29 (1986): 87–107. *In Re Debs,* 158 U.S. 564 at 582 (May 27, 1895). On the relationship between the state and labor in late nineteenth-century America, see Christopher L. Tomlins, *The State and the Unions: Labor Relations, Law, and the Organized Labor Movement in America, 1880–1960* (New York: Cambridge University Press, 1985); Montgomery, *Fall of the House of Labor,* 5, 37–39, 347; William E. Forbath, *Law and the Shaping of the American Labor Movement* (Cambridge: Harvard University Press, 1991).

154. *Ex Parte Siebold,* 100 U.S. 371 at 395, 396 (1880). See also, *In Re Neagle,* 135 U.S. 1 at 65 (1890); *In Re Quarles,* 158 U.S. 532 at 535 (1895). Contemporary discussions of the Posse Comitatus Act are simply too voluminous to list. Typically, scholars understand the Act as an unwarranted limitation or necessary check on the federal government's law enforcement capabilities. See, e.g., Linda J. Demaine and Brian Rosen, "Process Dangers of Military Involvement in Civil Law Enforcement: Rectifying the Posse Comitatus Act," *New York University Journal of Legislation and Public Policy* 9 (2005–2006): 169–250; Clifford J. Rosky, "Force, Inc.: The Privatization of Punishment, Policing, and Military Force in Liberal States," *Connecticut Law Review* 36 (2004): 879–1032, esp. 1017–32; Steven G. Calabresi and Christopher S. Yoo, "The Unitary Executive During the Second Half-Century," *Harvard Journal of Law & Public Policy* 26 (2003): 772–80; Richard H. Kohn, "Posse Comitatus: Using the Military at Home: Yesterday, Today, and Tomorrow," *Chicago Journal of International Law* 4 (2003): 165–92.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB  Document 150-9  Filed 10/21/22  PageID.13666  Page 17 of
113

Even so, it was inevitable that during the late nineteenth century, with its emphasis on "liberty of person," and the "citizen's right to dispose of his own labor as he desires," that such visible use of the *posse comitatus* would be met, "with instinctive hostility."[155] Such problems, though, were short-lived. "This compulsion," it turned out, was "settled in practice and sound in principle." Government compulsion of individuals was not "slavery." And it was not "involuntary servitude," declared the Supreme Court in *Butler v. Perry* (1916), because that term covered only "compulsory labor akin to African slavery." Finally, the *posse comitatus* was not "peonage." "There are many persons," reads the opinion in *The Peonage Cases* (1903), "who may be compelled against their will to perform 'labor or service.'" "Instances where such compulsory service may be enforced," included "certain services to be rendered the government . . . where the state exacts public duties of the citizen." These were simple "honorable public duties, which every patriotic citizen or subject owes to his government." Thus, even as slavery would remain a useful "metaphor" to understand the power relations of the household and marketplace, it no longer bore upon the relationship between the citizen and the state.[156]

155. *Lochner v. New York,* 198 U.S. 45 (1905). Anon., "Civil Conscription in the United States," *Harvard Law Review* 30 (1917): 265.

156. "Civil Conscription in the United States," 269. *Butler v. Perry,* 240 U.S. 328 at 333 (1916). *Peonage Cases,* 123 F. 671 at 681–82 (1903). On the latter, see Aziz Z. Huq, "Peonage and Contractual Liberty," *Columbia Law Review* 101 (2001): 351–91; Pete Daniel, "The Metamorphosis of Slavery, 1865–1900," *Journal of American History* 66 (1979): 88–99. The persistence of slavery as a frame of reference for understanding inequitable social relations is discussed by Eric Foner, "The Meaning of Freedom in the Age of Emancipation," *Journal of American History* 81 (1994): 435–60; Stanley, "Beggars Can't Be Choosers," 1265–93.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 562



Florida Courts and the Disputed Election of 1876

Author(s): Jerrell H. Shofner

Source: *The Florida Historical Quarterly*, Jul., 1969, Vol. 48, No. 1 (Jul., 1969), pp. 26-46

Published by: Florida Historical Society

Stable URL: https://www.jstor.org/stable/30145747

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Florida Historical Society* is collaborating with JSTOR to digitize, preserve and extend access to *The Florida Historical Quarterly*

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

# FLORIDA COURTS AND THE DISPUTED ELECTION OF 1876

### by Jerrell H. Shofner*

WHEN THE ELECTION of November 7, 1876 failed to resolve the presidential contest between Republican Rutherford B. Hayes and Democrat Samuel J. Tilden because of uncertain results in Florida, Louisiana, and South Carolina, both national parties sent prominent representatives to the three southern capitals to observe and work for their partys' interests. With Tilden only one electoral vote short of victory, the Republicans needed every one of the nineteen disputed votes. Because there had been less violence and corruption in Florida and because only a few votes separated the parties, many politicians believed it to be the crucial state. Under Florida law, a state canvassing board was empowered to exercise quasi-judicial authority in its examination of returns from the thirty-nine county canvassing boards. It could rule on the validity of those returns and decide whether or not to exclude them from the count. On the board there were two Republicans—Secretary of State Samuel B. McLin, a Southerner and long-time resident of Florida, and Comptroller Clayton A. Cowgill, an ex-Union army surgeon from Delaware— and one Democrat, Attorney General William Archer Cocke, a Virginian who came to Florida in 1863.

Under influence of the many "visiting statesmen" who crowded into Tallahassee on behalf of the national parties, the canvassing board decided to count the votes for presidential electors first and take up the state elections afterward. The Republican majority of the board, over the protests of the Democratic member, threw out about 2,000 votes and declared a majority of about 924 for the Republican presidential electors. This majority was large enough to assure a victory for the Republican gubernatorial candidate, Marcellus Stearns, who had run several hundred votes behind Hayes. In achieving this result the Republican majority on the canvassing board had acted so unfairly

---

* Mr. Shofner is assistant professor of history at Florida State University.

[26]

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB  Document 150-9  Filed 10/21/22  PageID.13669  Page 20 of
113

that the Democrats sought court action to correct what they believed to be a demonstrable injustice.[1]

The ensuing litigation pertained only to the gubernatorial election, but the Republican presidential victory had been achieved by the same canvassing board methods which the Democrats were attacking. As a result the nation continued to watch Florida developments for several weeks after the canvassing board adjourned and the electoral college met on December 6.

Before the canvassing board convened on November 27, the Democrats had insisted that it should use quasi-judicial powers and rule on the validity of returns. After losing the presidential count by this procedure they found it necessary to change their argument over the state count. George W. Biddle and David W. Sellers, Democratic visiting statesmen from Philadelphia, called on the board to hear evidence. Although the Northerners' view was consistent with precedent, R. B. Hilton, a Democratic elector, and George P. Raney, a Florida Democratic executive committeeman, suggested that the Democrats offer no evidence and refuse to participate in a quasi-judicial count before the state canvassing board. They preferred to insist on a simple ministerial count and seek redress in the courts if the board decided against them.[2] The Northerners were afraid the courts might not act once the board decided and they would have lost the election without a fight.

Samuel Pasco, Democratic state chairman, and other Florida Democrats deferred to the northern attorneys, and the Democrats demanded a full hearing before a quasi-judicial canvassing board. Then, in his last argument before the board on December 5, Sellers denied the board's authority to accept or reject county returns. At that time, his position was contradictory to everything the Democrats had done concerning the electoral count.

When the board decided against the Tilden electors, most of the Northern Democrats left Tallahassee, believing that Florida was lost and the case closed.[3] Former United States Senator

1. Jerrell H. Shofner, "Florida in the Balance: The Electoral Count of 1876," *Florida Historical Quarterly*, XLVII (October 1968), *passim.*
2. Robert B. Hilton to Manton Marble, January 7, 1877, Samuel Tilden Papers, Box 13, New York Public Library.
3. S. G. Thompson to Marble, December 12, 1876, George W. Biddle to

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

David L. Yulee, a Florida Democrat, and C. Gibson, a visitor
from Missouri, suggested that the Democratic electors meet and
cast their electoral votes for Tilden and apply for a *quo warranto*
action against the Hayes electors. This was done on December
6 while the Republican electors were assembling to cast their
votes for Hayes. Congress consequently received two electoral
certificates from Florida: one met all the legal requirements and
declared Florida's four electoral votes for Hayes while the other
was signed by the attorney general instead of the governor and
gave Florida's votes to Tilden. As the canvassing board began
considering the votes for state officials, Hilton and Raney took
the initiative in Democratic circles. In behalf of Democratic
gubernatorial candidate George F. Drew, they obtained an in-
junction from the circuit court forbidding the canvassing board
from counting the returns except by merely totalling the votes
shown on the county returns without any alterations. Such a
method would have meant a majority for Drew and the state
ticket. Gibson, who remained in Tallahassee after December
6, wrote Tilden that a circuit court decision for the Democratic
state candidates would benefit the Democratic presidential case
if Congress should later decide to investigate the electoral cer-
tificates before they were counted.[4] Neither Tilden nor his as-
sociates showed interest in the case, however.

   Ignoring the circuit court injunction, the board continued
ruling on the validity of returns and excluding them when neces-
sary. Its work was completed on December 8 with the results
favoring the Republican state candidates. Attorney General
Cocke refused to sign the resulting certificates and wrote a
lengthy protest against the entire canvassing board proceeding.
Circuit Judge Pleasant W. White cited the board for contempt
and ordered a hearing for December 11, but action on this case
was postponed at the request of the Democratic lawyers.[5]

      Marble, December 15, 1876, John R. Read to Marble, December 15,
      1876, Manton Marble Papers, Library of Congress.
   4. David L. Yulee to Hilton, November 27, 1876, Box 9, David L. Yulee
      Papers, P. K. Yonge Library of Florida History, University of Florida,
      Gainesville; Charles Gibson to Samuel J. Tilden, December 9, 1876,
      Tilden Papers, Box 13.
   5. *New York Herald*, December 12, 1876; *Augusta* (Georgia) *Chronicle and
      Sentinel*, December 12, 1876; Marcellus L. Stearns to William E. Chand-
      ler, December 9, 1876, William E. Chandler Papers, Library of Congress.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13671   Page 22 of 113

The Republicans were not concerned about an adverse court decision. They knew that Judge White was a pronounced Democratic partisan who would give every benefit of doubt to his political cohorts, but they gave notice that any circuit court decision would be appealed to the state supreme court which, like the state canvassing board, was composed of two Republicans and one Democrat. The supreme court was recessed but the justices agreed to hold a special session beginning December 12 because an early decision of the case was important to the state and nation.[6] Chief Justice E. M. Randall was a Republican, originally from Wisconsin. He had been appointed by Governor Harrison Reed in 1868, and he had often aided Reed from the supreme bench during his hectic administration. In 1876 Randall was hoping to replace North Florida District Judge Philip Fraser who had recently died. Randall and Governor Stearns, who was seeking reelection, were personal and political enemies. Associate Justice R. B. Van Valkenberg, the other Republican, was from New York, but he had been living in Jacksonville since the beginning of Reconstruction. O. B. Hart appointed him to the court in 1873. James D. Westcott, Jr., was the Democratic member. He had been appointed by Reed in 1868 after a brief term as attorney general. He was politically ambitious and had received significant Republican support for the United States Senate in 1873. He was also interested in the vacant federal judgeship, and it was believed that he had the support of Republican Senator Simon B. Conover for the post.[7]

At the urging of Judge White, R. L. Campbell, a Pensacola lawyer who had joined Hilton and Raney on the Drew case, agreed to drop the contempt case in the circuit court and enter the supreme court for a writ of mandamus ordering Cowgill and McLin to perform a ministerial count.[8] This method meant that the board would have to accept the county returns as certified from the counties without considering evidence or excluding votes. Board compliance with this court order would mean a state victory for the Democrats. Believing their chances

---

6.  *Atlanta Daily Constitution*, December 12, 1876.
7.  Macon *Georgia Weekly Telegraph and Journal and Messenger*, December 11, 1876.
8.  Pleasant W. White to Francis P. Fleming, July 23, 1901, Box 28, Manuscript Collection, P. K. Yonge Library of Florida History.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 567

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13672   Page 23 of 113

before the court good, the Republican board members agreed to abide by the court's decision. The *New York Times* expressed relief that the case had been transferred to the supreme court whose "decision will be respected, for it is beyond a suspicion of partisan action."[9] The *Times* also pointed out that the litigation pertained only to state officials and its result would have no effect on the presidential election.

The nation continued to watch proceedings in Tallahassee. William E. Chandler, who had managed the Republican case before the state canvassing board, wrote Governor Stearns that public opinion was favorable in the North and the Republicans should fight boldly in Florida. In answer to Governor Stearns' request, Chandler asked General Lew Wallace to return to Florida and assist the Republican lawyers there. Wallace did not arrive until December 17. In the interim J. P. C. Emmons of Jacksonville represented the Republican board members. Chandler sent funds to the now bankrupt Florida Republican party, part of which was used to pay Emmons $500 a week. Unlike Chandler and his national associates, neither Tilden nor any of his supporters showed any concern with the Florida proceedings until the local Democrats had won their case. As late as November 24, Manton Marble, former editor of the New York *World* and friend of Tilden, who had visited Tallahassee, advised the Democratic presidential candidate not to be "zealous for appeal in the Supreme Court of Florida."[10]

The Congress which met in December 1876 had a Republican majority in the Senate and a Democratic majority in the House of Representatives. The Democrats wanted information which would strengthen their case when Congress met in February to count the disputed electoral votes and the Republicans sought information to defend their position from attack. Both houses sent investigating committees to Louisiana, South Carolina, and Florida. The majority party in each house dominated its committee and both submitted majority and minority reports depending on partisan interpretations of their work. The Senate

---

9.  *New York Times*, December 12, 1876.
10. Stearns to Chandler, December 11, 13, 1876, F. B. Sherwin to Chandler, December 14, 1876, M. Martin to Chandler, December 21, 1876, Stearns to Chandler, December 22, 1876, Chandler Papers; *Atlanta Daily Constitution*, December 19, 1876; Marble to Tilden, December 24, 1876, Marble Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13673   Page 24 of 113

committee chairman, A. A. Sargent, later said that William E. Chandler was the author of the majority report. A Florida Republican stated that Sargent was the best replacement for Chandler that the party could have sent to Florida.[11] Both Senate and House committees were travelling in Florida taking sensational testimony while the court case was being argued. The publicity given the committees, together with the judicial proceedings, created suspense and uncertainty about the Florida case during December and January.

The writ of mandamus was issued by unanimous decision on December 14. Drew, claiming 24,613 votes to 24,116 for Stearns, argued that the board had usurped judicial functions and powers by going behind the county returns and accepting evidence. It had erred in rejecting the Manatee County return and in refusing to canvass Jackson, Monroe, and Hamilton counties according to the face of the returns. On December 16 McLin and Cowgill filed an answer. The Manatee return was so irregular that they were unable to determine the true vote. In Jackson, Hamilton, and Monroe, evidence had demonstrated that their returns were false and fraudulent. Cocke filed a separate answer saying that the order did not apply to him since he had voted to count the returns in question. The court refused to accept the answer from McLin and Cowgill because it was "argumentive and evasive." They were ordered to amend their answer and include specific grounds for their actions by noon, December 18.[12]

The Republican board members refused to answer the court order, claiming that the court had no jurisdiction. The board had met, performed its duty, and ceased to exist, they insisted. Having ceased to exist, no court could reach the board or its members. The Democratic attorneys answered that the board had not completed its duties properly and therefore its life had not ended. Counsel argued the case until December 22 when Cowgill and McLin decided to file their amended answer to the court. But on the following day they again declined to deliver

11. Leon Burr Richardson, *William E. Chandler: Republican* (New York, 1940), 197; Chandler to Rutherford B. Hayes, January 24, 1877, Sherwin to Chandler, December 21, 1876, Chandler Papers.
12. 16 *Florida Reports* 19-20, 27, 29 (1876); Washington *National Republican*, December 18, 1876; *New York Daily Tribune*, December 18, 1876.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 569

their answer and the court issued a peremptory writ directing them to count the votes as shown on the county returns and declare the results. They were to complete the count by December 27.[13]

The unanimous decision of the supreme court surprised the Democrats and alarmed Republicans. Although it specifically concerned only the gubernatorial election, a decision that the board had no power to throw out returns would indirectly affect the presidential election which had been decided by that procedure. The *New York Times,* which had praised the Florida court for its impartiality, termed the decision a "judicial crime." The Democrats had been uncertain about Judge Van Valkenberg's ruling, but they had expected Randall to support the Republicans because of his interest in the North Florida federal judgeship.[14]

Senator Sargent, however, thought the decision would have been the same no matter how the case was handled. He observed, "There are rivalries and jealousies here that have too much influence even on judicial minds . . . . The state is gone and forever." Governor Stearns declared, "This beats us in the state but we shall try to save Hayes. The opinion is a surprise to everyone here." Secretary of State McLin, who was also an aspirant for the vacant judgeship, wrote, "Randall was only glad of an opportunity to sacrifice Stearns. The traitor would have destroyed the electoral vote if necessary to make his spite on Stearns and one or two others."[15]

Senator Sargent advised northern Republicans that the principle of the decision left enough discretion for the board to save the electoral votes, but that the court proceedings would have to be watched closely. The local Republicans were without funds for lawyers and were no longer interested after having lost the local election. Worried about the *quo warranto* pending before Judge White against the Hayes electors, Sargent suggested providing a good lawyer with funds to try the case if it came up,

13.  16 *Florida Reports* 52 (1876); *New York Times,* December 24, 1876; *Atlanta Daily Constitution,* December 23, 1876; C. E. Dyke to C. W. Jones, New York *World,* December 23, 1876.
14.  *New York Times,* December 29, 1876; Hilton to Marble, December 23, 1876, Marble Papers.
15.  Aaron A. Sargent to Oliver P. Morton, December 22, 1876, Stearns to Chandler, Samuel B. McLin to Chandler, December 24, 1876, Chandler Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 570

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13675   Page 26 of
113

because "a judgment against our electors during the next month
might ruin the nation."[16]

McLin and Cowgill first decided to resist the court's order
and apply to the United States courts for relief if state authori-
ties arrested them. The Democrats had been careful to avoid
any reference to the presidential electors which might bring the
federal courts into the affair. But McLin and Cowgill had ob-
served a similar controversy in South Carolina in late November.
Federal Judge Hugh L. Bond ordered the release of South
Carolina canvassing board members who had been arrested for
disobeying a state court order. Bond reasoned that a federal
issue was involved because part of the board's duties were to
count votes for federal officers according to a federal law, and
they had been arrested for acts committed in performing these
duties.[17] The Florida canvassing board members believed they
could invoke this precedent if necessary.

Governor Stearns announced that the court decision settled
the state election and advised the board to comply with it. Cow-
gill agreed with Stearns and the matter seemed to be settled
without anyone going to jail. McLin notified Cocke and Cow-
gill to meet with him on December 27 and carry out the court
order. Meanwhile, Senators Chandler, Oliver P. Morton of In-
diana, and John Sherman of Ohio had considered the Florida
court activities in light of national public opinion. They decided
that even though the court was not dealing with presidential
electors, the state and national Republican majorities both de-
pended on the canvassing board's power to exclude returns. An
adverse decision against the state Republican candidates would
reflect on the national election. Chandler wrote Lew Wallace
that the country would stand for a total disregard of the court
order, but if the board once admitted that the court could direct
its actions there was nothing to prevent a similar decision per-
taining to the presidential election.[18]

---

16.  Sargent to Morton, December 22, 1876, Chandler Papers.
17.  Washington *National Republican*, December 23, 1876; Hilton to Marble,
     December 31, 1876, Tilden Papers, Box 14; Francis Butler Simkins and
     Robert H. Woody, *South Carolina During Reconstruction* (Chapel Hill,
     1932), 521-22.
18.  *Atlanta Daily Constitution*, December 27, 1876; *New York Daily Tri-
     bune*, December 27, 1876; *Cincinnati Commercial*, December 27, 1876;
     Washington *National Republican*, December 27, 1876; New York *World*,

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

On December 26, Chandler and his fellow Republicans took measures to prevent the court order from being obeyed. Wallace and Governor Stearns were instructed to disregard the Florida Supreme Court's order. It is not clear whether Stearns acquiesced in this move, but Secretary McLin notified the canvassing board members not to meet according to his earlier notice because he and Cowgill were filing a motion to set the mandamus aside. George H. Williams, former attorney general under President Grant, arrived in Tallahassee on December 28 to assist in legal matters and also to assure Florida Republicans of administration support. Senator Sherman telegraphed Federal Judge William B. Woods at Montgomery, Alabama, that the presence of a federal judge at Tallahassee might be necessary to secure justice. He asked if Woods would go to Tallahassee since there was no federal judge in that district. Woods replied that he would go wherever duty required.[19]

The Democrats attempted to create public opinion against this new maneuver and destroy the canvassing board members' confidence in national support. Democratic newspapers printed a report that Judge Woods would refuse to go to Tallahassee and intervene if McLin and Cowgill were arrested for contempt of court. Woods denied the report, but only after the crisis had passed. Attorney General Cocke disregarded McLin's notice that the board would not convene and reported to the secretary of state's office at the appointed time. He obtained McLin's permission to count the votes alone and announced the results showing a 497 majority for Drew and a ninety-four majority for the Tilden electors.[20]

---

December 27, 1876; *Savannah Morning News*, January 1, 1877, quoting Tallahassee *Floridian*; *Chicago Times*, December 27, 1876; 16 *Florida Reports* 52-54 (1876); Chandler to Lew Wallace, December 25, 1876, Chandler Papers.

19. *New York Daily Tribune*, December 27, 1876; *Cincinnati Commercial*, December 28, 1876; *New York Herald*, December 26, 1876; *New Orleans Daily Picayune*, January 4, 1877, quoting *Chicago Times; Washington Sentinel*, December 30, 1876; *Augusta Chronicle and Sentinel*, December 28, 1876; *Atlanta Daily Constitution*, December 28, 1876; William B. Woods to John Sherman, January 1, 1877, Sherman Papers, Library of Congress.

20. Tallahassee *Weekly Floridian*, January 2, 1877; *Augusta Chronicle and Sentinel*, December 29, 1876; Macon *Georgia Weekly Telegraph and Journal and Messenger*, December 26, 1876; *Cincinnati Commercial*, December 28, 1876; New Orleans *Daily Picayune*, January 4, 1877; *Savannah Morning News*, January 1, 1877; Tallahassee *Weekly Floridian*, January 2, 1877; Woods to Sherman, January 8, 1877, Sherman Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13677   Page 28 of 113

The two Republican board members then decided to obey the court order under protest and gratuitously to include a recount of the electoral votes showing a Hayes majority according to the method prescribed by the court. At four o'clock, December 28, McLin and Cowgill answered the writ, protesting that the board had ceased to exist and that the court could not revive it. The protest was accompanied by a certificate showing a majority for Drew and Noble A. Hull. The vote was 24,179 to 23,984. The certificate also showed a 208 majority for Hayes over Tilden. This had been accomplished by counting the Republican version of the Baker County return, which the board had unanimously thrown out during the original count, and excluding the entire Clay County return on the ground that it was irregular on its face.[21] Judge Cocke refused to join in the board action pertaining to the presidential count.

On January 1, 1877, Supreme Court Justice Westcott,, speaking for a unanimous court, refused to accept the canvassing board's answer and directed a strict compliance with the peemptory writ by five-thirty that same afternoon.[22] When the board corrected its answer, the court accepted it. This response to the court order elected Drew and Hull as governor and lieutenant governor. R. H. M. Davidson, Democratic candidate for the first congressional district, won over W. J. Purman. The Republican candidate for the second district, Horatio Bisbee, Jr., retained a majority over J. J. Finley, but Finley contested and was later seated by the House committee on privileges and elections. Both houses of the legislature had Democratic majorities. There was no reference to the presidential electors.[23]

All federal troops had been withdrawn from Tallahassee on

21.  16 *Florida Reports* 63 (1876); Macon *Georgia Weekly Telegraph and Journal and Messenger*, December 26, 1876; *New York Daily Tribune*, December 28, 1876; *Thomasville* (Georgia) *Times*, December 30, 1876; *Atlanta Daily Constitution*, December 29, 1876; New York *World*, January 18, 1877.
22.  16 *Florida Reports* 63 (1876).
23.  *A Historical and Legal Digest of All the Contested Election Cases in the House of Representatives of the United States from the First to the Fifty-Sixth Congress, 1789-1901*, 56th Cong., 2nd Sess., *House Document No. 510*, Serial No. 4172, p. 326; A. B. Hawkins to Matt W. Ransom, February 21, 1877, Ransom Papers, Southern Historical Collection, University of North Carolina at Chapel Hill; E. I. Alexander to Patterson Sanders, February 13, 1877, W. Carlton Smith Collection, Madison, Florida; Wallace to Chandler, January 1, 1877, Chandler Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

December 9, except one infantry company which remained until January 18, 1877.[24] General Thomas H. Ruger watched the Florida situation from his South Carolina headquarters, but instructed the company commander in Tallahassee not to interfere unless the civil authorities were unable to preserve order and then only on request from local officials. Governor-elect Drew asked Stearns to have some federal troops present on the capitol grounds during the inauguration.[25] Governor Stearns made no attempt to carry on a government in conflict with the new Democratic administration as had been rumored. Despite the assembly of a large crowd of Negro and white citizens, Drew and Hull were inaugurated peacefully on January 2, 1877.[26] President Hayes' subsequent removal of troops from Louisiana and South Carolina in April, long regarded as part of the "compromise of 1877" and the "end of Reconstruction in the South," had nothing to do with Democratic accession to power in Florida. Some of the legends which still circulate in Tallahassee and elsewhere in Florida about the dramatic inauguration are embellishments of the actual events.

Newspapers in neighboring states hailed a great Democratic victory in Florida.[27] Drew's inauguration satisfied many members of both parties. Wilkinson Call, a Tilden elector, denounced some of his fellow Florida Democrats as unwilling to work for Tilden's election once they had won the state offices. This was one reason the Democratic lawyers had not insisted on a recount of the electoral votes under the court order.[28] Hilton, Raney, Campbell, and probably Samuel Pasco were satisfied with the state victory regardless of the outcome of the presidential con-

24. *New York Herald*, December 9, 1876; Jacksonville *Daily Florida Union*, January 20, 1877; Edward C. Williamson, "The Era of the Democratic County Leader: Florida Politics, 1877-1893" (unpublished Ph.D. dissertation, University of Pennsylvania, 1954), 43.
25. Adjutant General to Captain Mills, December 20, 1876, Thomas H. Ruger to Stearns, December 22, 1876, adjutant general to Captain Mills, December 30, 1876, Ruger to Mills, January 2, 1877, Telegrams Sent, Records of U. S. Army Commands, Department of the South, Record Group 98, National Archives; Washington *National Republican*, January 3, 1877.
26. *St. Louis Dispatch*, January 3, 1877; *New York Times*, January 4, 1877; *Chicago Daily Tribune*, January 4, 1877; James E. Yonge to Tilden, January 2, 1877, Tilden Papers, Box 13.
27. *Savannah Morning News*, January 3, 1877; *Atlanta Daily Constitution*, January 5, 1877.
28. Wilkinson Call to Marble, January 5, 7, 1877, Tilden Papers, Box 13.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13679   Page 30 of 113

troversy. Jesse T. Bernard, a Democratic lawyer just elected mayor of Tallahassee, wrote a Republican friend in Philadelphia expressing his satisfaction with Drew as governor and Hayes as president. The recipient of this news forwarded it to Hayes, noting his amazement at the speed with which Bernard and other southern democrats were dropping Tilden in lieu of the governorship.[29] Governor Stearns' secretary wrote Senator Chandler, "I believe it possible to have this incoming State administration thoroughly in accord with the Hayes government."[30] The Republican Jacksonville *Florida Union* editorialized: "If we have got to have a Democratic State government, we rejoice that there is so little of the old Democracy in it."[31]

The election of Drew, who had been defeated initially by the same count which defeated Tilden, encouraged the national Democrats but it did nothing for their legal position. When the Republican-controlled supreme court decided for the Democratic state candidates, Manton Marble and some of his northern associates became once more interested in Florida affairs. Some of them misunderstood and thought the court was ordering a recount of the entire election. R. B. Hilton cautioned that the mandamus related to the state election only. The arguments which he and the Florida Democrats were pursuing for a ministerial count were contradictory to the position taken by northern Democratic counsel when Tilden's case was lost before the canvassing board. Hilton explained that he had not insisted on correcting the final action of the board because Judge Westcott advised him that nothing could be done about it. He reminded Marble that the other two judges were Hayes supporters and inferred strongly that the indirect benefit for Tilden was much more than the northern lawyers had been able to achieve. "I remind you," Hilton concluded, "we are before an unfriendly court none of whom are men of the highest character. Our northern friends did not send *us* an ex-United States Attorney General to advise with."[32]

29. Thomas Donaldson to Hayes, December 18, 1876, microfilm of Hayes Papers relating to the election of 1876, Library of Congress.
30. Sherwin to Chandler, January 3, 1877, Chandler Papers.
31. Jacksonville *Daily Florida Union*, January 5, 1877.
32. Hilton to Marble, December 27, 31, 1876, January 4, 7, 1877, Tilden Papers, Box 13.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 575

Wilkinson Call, Edward A. Perry of Pensacola, and Edward
M. L'Engle of Jacksonville disagreed with Hilton, Raney, and
Pasco. They thought the mandamus decision for Drew should
be applied to the case of the Tilden electors. They announced
on January 2 that they would take the matter to the supreme
court.[33] This suit was quickly abandoned though, because the
board members went out of office when Drew was inaugurated.
Everyone agreed that a court order carried out by the Demo-
cratic officials who replaced McLin and Cowgill would be of
little value. After lengthy correspondence with Marble in New
York, Call abandoned plans for a writ of *quo warranto* from
the supreme court because that body refused to consider it
until the regular session beginning January 9, and there seemed
little chance that it would accept original jurisdiction even
then.[34] Call and other Democrats interested in Tilden's election
decided to proceed with the *quo warranto* action in Judge
White's court and at the same time have the state legislature,
a majority of which was sympathetic toward Tilden, enact legis-
lation providing for a new canvass of the presidential votes.[35]
Charles Gibson of Missouri had suggested in late November 1876
that the legislature be induced to memorialize Congress asking
that Florida's electoral vote be disregarded as a fraud. Charles P.
Thompson, chairman of the House of Representatives' investi-
gating committee in Florida, advised that nothing more could be
gained in the courts. He suggested that the state legislature call
for a new canvass for presidential electors. R. B. Hilton also sug-
gested that the Democrats rely on Governor Drew and the new
legislature.[36]

While the Democrats worked through the legislature on the
main floor of the capitol building and in Judge White's court
in the basement, the Republicans were still concerned about the

33. *New York Times*, January 4, 1877, Call to Marble and Marble to Call,
    January 5, 1877, Call to Marble, January 6, 1877, Marble to Call, Janu-
    ary 7, 1877, Tilden Papers, Box 13.
34. Call to Marble, January 7, 1877, Hilton to Marble, January 4, 1877,
    Tilden Papers
35. Call to Marble, January 8, 1877, Samuel Pasco to Marble, January 8,
    1877, Edward A. Perry to Clarkson N. Potter, January 22, 1877, Tilden
    Papers; *New York Daily Tribune*, January 12, 1877.
36. C. Gibson to Tilden, November 28, 1876, Charles P. Thompson to
    Tilden, January 4, 1877, Hilton to Marble, December 31, 1876, Tilden
    Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB  Document 150-9  Filed 10/21/22  PageID.13681  Page 32 of
113

supreme court justices and the vacant federal judge's office. Secretary of State McLin was seeking the appointment and had obtained recommendations from numerous Florida Republicans.[37] The Republican party was indebted to McLin whose political future had been destroyed by the Democratic state victory. Democratic officials were already preparing embezzlement charges against him for alleged acts committed as secretary of state.[38]

Judge Westcott proclaimed his satisfaction with the canvassing board's decision for the Democratic state officials and the Republican presidential electors. This position kept Westcott in Senator Conover's favor for the judgeship. Conover, opposed to Governor Stearns and favoring the Republican national administration, was expected to have an influential voice in filling the vacancy. Chief Justice Randall, who also disliked Stearns, said he thought the presidential electors' vote was a matter beyond the court's jurisdiction.[39]

As long as these men had hopes of receiving the appointment, they were not expected to desert the Republican electors. Early in December Governor Stearns, for this reason, had advised United States Attorney General Alphonso Taft that no appointment should be made until the election excitement had passed. In early January Taft was again cautioned against filling the office for a few weeks. Thomas Settle of North Carolina, to whom the party was indebted for recent election activities, was actually appointed in late December, but his name was quickly withdrawn from consideration.[40]

Lew Wallace, back in Florida for the third time to defend the Republican electoral vote, was relieved when the appointment was withdrawn. He warned, "in all earnestness, if that vacancy is filled I am broken down here completely. . . . Keep

---

37. McLin to Chandler, December 24, 1876, January 2, 5, 1877, Charles H. Pearce to Chandler, January 11, 1877, W. W. Hicks to Chandler, January 25, 1877, Chandler Papers.
38. Indictment, State *v.* Samuel B. McLin, Fall Term 1877, Circuit Court Records, Leon County, Florida.
39. Wallace to Chandler, January 15, 1877, Chandler Papers.
40. Stearns to Alphonso Taft, December 3, 1876, Horatio Bisbee to Taft, January 4, 1877, Letters Received, Attorney General's Papers, Records of Department of Justice, Record Group 60, National Archives; McLin to Chandler, January 2, 1877, Wallace to Chandler, January 15, 1877, Chandler Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 577

that vacancy open, and the vote of Florida for Hayes is under good protection so far as the courts of the state are concerned."[41] Meanwhile, Wallace promised McLin his support for the office, but explained that nothing could be said until the electoral vote was beyond recall by the supreme court.[42]

There was never much chance that any Florida Republican could obtain the appointment. Settle was a prominent Republican who was being considered for a possible cabinet position if Hayes was seated as President, but he preferred the certain judgeship to the uncertain Washington post.[43] He was acceptable to Conover, and Democratic Senator Charles W. Jones was opposed to any Florida Republican for the position.[44] Settle's nomination was sent to the Senate on January 26 after it was too late for adverse court action. McLin was promised a judgeship in New Mexico territory, but the Senate ultimately denied confirmation because of Conover's opposition.

In early January a joint congressional committee was still working out details of an electoral commission to count the disputed electoral votes, but the general principles of the bill were decided. It appeared that the electoral commission would consider evidence concerning electoral certificates which were referred to it. For the first time Abram S. Hewitt of New York, Tilden's campaign manager, showed concern for the Florida controversy. He recommended that Marble and other Tilden men draft suitable legislation for passage by the Florida legislature. He also wanted D. W. Sellers and G. W. Biddle sent back to assist the Florida lawyers in their *quo warranto* suit before Judge White.[45] Marble was already preparing two draft bills which were subsequently enacted by the Florida legislature. The first was passed and signed by Governor Drew on January 18, directing a "legal canvass of the electoral vote of Florida as cast at the November 7 election."[46] The new canvassing board, com-

41. Wallace to Chandler, January 15, 1877, Chandler Papers.
42. McLin to Chandler, January 16, 1877, Chandler Papers.
43. Thomas Settle letter, January 27, 1877, Settle Papers, Southern Historical Collection, University of North Carolina at Chapel Hill.
44. Jones to Edward M. L'Engle, January 17, 1877, L'Engle Papers, Southern Historical Collection, University of North Carolina at Chapel Hill.
45. Abram S. Hewitt to Tilden, January 8, 1877, Tilden Papers, Box 13.
46. Marble to Call, January 12, 1877, Tilden Papers; Governor Drew Letter Book, January 18, 1877, Florida State Library, Tallahassee; Tallahassee *Weekly Floridian*, January 23, 1877.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13683   Page 34 of 113

posed of Secretary of State William D. Bloxham, Attorney General Columbus Drew, and Comptroller Walter Gwynn, all Democrats, reported a Tilden majority of about ninety-four for each elector.[47] The legislature then passed the second bill declaring them duly elected and authorizing the governor to issue certificates of election.[48] They met on January 26, cast their votes for Tilden and Hendricks, and forwarded a third certificate of Florida's electoral votes to the United States Senate.[49]

Marble and his New York associates considered the *quo warranto* case important, but they did not send the Philadelphia lawyers as Hewitt had suggested. Neither Samuel Pasco nor R. L. Campbell, who had assisted in Drew's earlier litigation, was present during the case of the electors, but Wilkinson Call assured Marble that Edward Perry and Augustus E. Maxwell of Pensacola were well equipped to handle the Democratic case.[50] The case was argued from January 8 to the twenty-fifth. Lew Wallace argued that the Republican electors had performed their duties and ceased to be electors and that the court could not reach them. Meanwhile, he tried to get the case transferred to the United States Circuit Court and out of Judge White's jurisdiction.[51] White refused to consider the transfer, and the case proceeded in the state circuit court. On January 25 Judge White declared that the Republican electors were mere usurpers of the offices to which the Democratic electors had been duly elected.[52]

Wallace filed an appeal of the decision but the supreme court refused to hear it until the regular session in June. Before that

---

47. *Florida Assembly Journal, 1877,* 123; Call to Marble, January 19, 1877, Tilden Papers, Box 13; Jacksonville *Florida Sun,* January 20, 1877.
48. "An Act to Declare and Establish the Appointment by the State of Florida of Electors of President and Vice President," Official Documents Pertaining to Election of 1876 in Florida, Box 1, Manuscript Collection, P. K. Yonge Library of Florida History; New Orleans *Daily Picayune,* January 21, 1877.
49. "Certificate of Florida's Four Electoral Votes for Tilden and Hendricks, January 26, 1877," Official Documents Pertaining to Election of 1876 in Florida.
50. Call to Marble, January 12, 18, 1877, Tilden Papers, Box 13.
51. Call to Marble and Marble to Call, January 10, 1877, Tilden Papers; Wallace to Chandler, January 15, 1877, Chandler Papers.
52. "State of Florida *ex rel* Call, Bullock, Hilton, Yonge *v.* Pearce, Humphries, Holden, Long," Official Documents Pertaining to Election of 1876 in Florida; Potter to Tilden, January 26, 1877, Tilden Papers, Box 13.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB  Document 150-9  Filed 10/21/22  PageID.13684  Page 35 of
113

time the case ceased to be important and the national Republican party asked the Florida Republican electors to abandon the case.[53] Governor Stearns accepted the reality of a Republican presidential victory while the state was being turned over to the Democrats, but some of his Republican associates thought he should now apply for his own *quo warranto* action against Drew. When he did not, David Montgomery accused Stearns of selling out for a federal appointment. "If Hayes is President then Stearns is governor," he wrote after Hayes was inaugurated.[54] Others agreed with Montgomery that Stearns should try and oust Drew.

In reference to this sentiment, Stearns wrote Thomas W. Osborn, former United States Senator from Florida, that he was willing to file a *quo warranto* suit and would even furnish the money, but he would first have to have assurance that Judge Randall would uphold him. Since they were not friends, Stearns refused to go before Randall's court without prior guarantees that the judge would act favorably. Stearns prophetically warned Osborn that Hayes might withdraw support from the existing Republican governments in the South rather than try to establish new ones. He concluded, "we may look for the warm loving embrace of southern whites by the next administration."[55]

With the electoral count scheduled to begin on February 1 and with Florida the first disputed state to be reached because of its alphabetical position, Democrats hurriedly assembled their documentary evidence in Washington. There were three certificates before Congress purporting to be the electoral vote of Florida. Only the one signed by the Republican electors and Governor Stearns on December 6 met all the legal requirements. The second one was signed by the Democratic electors on December 6, but bore the attorney general's signature rather than that of the governor. The third certificate was signed on January 25, 1877, after the proper date for the electoral college, by the Democratic electors and Governor Drew, who had not been in office when the electoral college met. To support their certificates,

53. Call to Marble, January 18, 1877, Tilden Papers, Box 13; Stearns to Chandler, May 4, 1877, Chandler to Bisbee, May 29, 1877, Chandler Papers; *Augusta Chronicle and Sentinel*, January 19, 1877.
54. David Montgomery to Chandler, March 25, 1877, Chandler Papers.
55. Stearns to Thomas W. Osborn, February 21, 1877, Chandler Papers.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 580

the Democrats had Judge White's decision against the Hayes electors, as well as the administrative and legislative records pertaining to the second canvass which resulted in the third electoral certificate.

Call and Pasco went to Washington with printed copies of court records, legislative acts, and records of the new canvassing board. William D. Bloxham and Attorney General Cocke followed after the Florida case was turned over to the electoral commission, bringing with them the original returns and all related papers.[56] The Democrats were prepared to present overwhelming evidence supporting their claims to Florida's electoral votes if the commission agreed to go behind the certificates and determine which was the correct one.

Congress assembled on February 1, and the electoral count began. There were no objections until Florida's three certificates were reached. All three and accompanying documents were referred to the electoral commission. Both parties had excellent legal counsel, but little new information was introduced. The arguments of both sides had become public knowledge during the weeks following the election. The crucial question was whether the commission itself was a canvassing board with power to review evidence behind the certificates, one signed by Governor Stearns and another by Governor Drew.

The Democrats argued that Tilden had received a majority in Florida which had been changed by a dishonest canvassing board. They emphasized the *quo warranto* decision and pointed out that every branch of Florida's government supported the Tilden electors; they asked the commission to accept evidence which would prove their contention. The Republicans based their argument on the finality of the certificate signed by Stearns and the doctrine of necessity. According to them, the commission had no power to go behind a state's electoral certificate as certified by its chief executive. Furthermore, if the commission did go behind the returns it would be necessary to investigate the whole record. Since there was insufficient time for such an investigation, the commission was compelled to accept the certificate, which met the legal requirements, as final. Ac-

---

56. *Atlanta Daily Constitution*, February 1, 1877; William D. Bloxham to Marble and Pasco, February 5, 1877, Call to Marble, February 12, 1877, Tilden Papers, Box 14.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 581

cording to the Republicans, the framers of the Constitution had not intended the judiciary to have power over the election process. The court could not even correct mathematical errors or results of bribery if discovered after the electors had been certified by the governor.[57]

Argument of the Florida case ended on February 6, and on February 9 the fifteen-member commission, composed of eight Republicans and seven Democrats, awarded Florida's four electoral votes to Rutherford B. Hayes on the ground that it had no power to go behind the returns of a state as certified by its governor. Since the most important factor seemed to be the Republican majority on the commission, many observers believed that the Florida decision settled the election. The *New York Tribune* commented that "the decision of the Tripartite Commission in the Florida case is a great victory for . . . Governor Hayes, masked however in such a way that the Democrats . . . regard it as not quite a crushing defeat of Mr. Tilden."[58] The Democratic New Orleans *Daily Picayune* agreed.[59] James G. Blaine wrote that the Florida decision virtually settled the contest, and William Chandler advised Hayes to choose his cabinet and prepare his inaugural address.[60] The Louisiana and South Carolina cases were ultimately decided according to the Florida precedent by the same eight to seven vote. On March 2 the count was completed and Hayes was declared elected.

Democrats were incensed because the Republicans had won in Florida by advocating the canvassing board's power to accept evidence proving fraud, then won before the electoral commission by upholding the principle that state returns could not be investigated. The Democrats had built a strong case in the Florida courts if they had been able to get that case before the commission. But the Republicans also had a good case. They had met all the forms of law and were able to prevent the Demo-

57. Chester L. Barrows, *William M. Evarts* (Chapel Hill, 1941), 303; J. P. Root to W. M. Evarts, January n.d., 1877, Evarts Papers, Library of Congress; Frederick T. Hill, "Decisive Battles of the Law," *Harper's Monthly Magazine*, CXIV (March 1907), 563.
58. *New York Daily Tribune*, February 8, 1877.
59. New Orleans *Daily Picayune*, February 10, 1877.
60. James G. Blaine to Hayes, February 14, 1877, Hayes Papers; Charles C. Tansill, *The Congressional Career of Thomas F. Bayard, 1869-1885* (Washington, 1946), 179.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 582

FLORIDA COURTS AND THE DISPUTED ELECTION OF 1876   45

crats from showing the circumstances by which that was accomplished. Chandler's shrewd management of Republican activities in Florida had managed to convey the impression to the nation that the Florida canvassing board's original count showed a Hayes victory. Building on that tactical victory, he obtained the properly prepared certificate of the electoral vote and got it into the proper channels in Congress.[61] Although the Democrats won their arguments in the Florida courts, they were unable to present a duly executed electoral certificate. Each side realized that the public would not accept a decision which flagrantly violated the forms of traditional democratic practice, and used every available method to legitimize their arguments. While the Democrats succeeded in the courts, the Republicans were more successful in the administrative and legislative channels.

The returns sent from the Florida counties, questionable though some of them were, probably were not far from an accurate measure of the parties' relative strengths. The presidential election would have hinged on a mere handful of votes in 1876 regardless of the irregularities during the election or the canvassing activities which followed it. On the face of the returns the Democrats won the state election by several hundred votes while the difference between the presidential tickets was less than 100. The disparity was due to split-ticket voting by some East Florida Republicans. Had the state canvassing board excluded the more obviously irregular returns, counted a small Hayes majority, and left the Democrats a state victory, it is unlikely that the Florida Supreme Court would have entertained the case against the canvassing board members. The two Republican justices were Hayes supporters and believed he had been elected. They did not believe the Republicans had won the state election. Neither was friendly with Governor Stearns, a fact which made it easier to order the canvassing board to correct an obviously unfair decision. At the same time, the two Republicans were joined by Democratic Judge Westcott in limiting their court order so that the Hayes electors would retain a majority. Westcott and Randall had personal reasons for this decision, but in

---

61.  Shofner, "Florida in the Balance: The Electoral Count of 1876," *passim*.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

such a close election, the judges were also reluctant to substitute a court order for the canvassing board decision.

Drew and Hull received a clear majority in the election and earned the offices which they assumed in January 1877. The outcome of the presidential election is not as clear as that of the state contest. It is unfortunate that the Republican canvassing board members furnished such overwhelming evidence against the Republican presidential electors by their arbitrary efforts to count in the Republican state ticket. Their action is the basis for the long standing Democratic claim to the Florida electoral votes, but this contention glosses over the question of fraud and intimidation upon which the county returns were based. The election machinery was not accurate enough to resolve beyond a doubt an election as close as that between Hayes and Tilden. After both sides had exhausted all possible remedies and the inaugurations were held in Tallahassee and Washington, it is possible but not conclusive that an equitable resolution of the dispute had been obtained.

This content downloaded from
128.148.254.57 on Tue, 18 Oct 2022 16:35:22 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 584



The Texas Militia during Reconstruction

Author(s): Otis A. Singletary

Source: *The Southwestern Historical Quarterly*, Jul., 1956, Vol. 60, No. 1 (Jul., 1956), pp. 23–35

Published by: Texas State Historical Association

Stable URL: https://www.jstor.org/stable/30235276

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Texas State Historical Association* is collaborating with JSTOR to digitize, preserve and extend access to *The Southwestern Historical Quarterly*

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

# The Texas Militia during Reconstruction

## OTIS A. SINGLETARY

T HE PASSAGE of the first Reconstruction Act on March 2, 1867, marked the climax of a long and bitter struggle between the executive and legislative branches of the federal government over the right to determine and to implement the policies by means of which the Southern States were to be reconstructed. Prior to that date, the program had been the almost exclusive property of the executive department. President Abraham Lincoln originated his basic policy during the war years and continued it until the time of his death. His successor, Andrew Johnson, accepted the work done by Lincoln, and generally followed his course, though with certain specific modifications. The presidential program was essentially dedicated to the immediate and relatively painless restoration of the Southern States to their erstwhile position in the Union.

In the two years after the war during which the presidents dominated the Reconstruction process, Congressional opposition was steadily building, and in the eventual struggle to wrest control from the executive, the Radical-dominated Congress was motivated by several impulses. There were, first of all, those who felt strongly that Reconstruction was properly a function of Congress; because of this, the ensuing tug of war was actually one phase of the continuing struggle between the executive and legislative branches over formulation of policy. In addition, there were those who sincerely felt that the presidential program, with its emphasis on leniency, was a mistake; that the South deserved a more severe punishment for her misdeeds. There were also those who saw in the Reconstruction program a tremendous political potential, an opportunity to create Republican state governments in the South, thus assuring the ascendency of their party on the national scene. For whatever reasons, this opposi-

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13691   Page 42 of 113

tion eventually solidified and in March, 1867, as a result of a series of laws known collectively as the **Reconstruction Acts, the** overall direction of the program of restoration was abruptly taken out of the hands of the President and assumed by Congress.

On the same day the first Reconstruction Act was passed, Congress also enacted a bill abolishing all militia forces in the Southern States.[1] The timing of this law was a reflection of more than mere coincidence for this militia prohibition had a specific purpose. By eliminating existing armed counter-forces in these areas, it was felt that a milieu more favorable to the realization of the Radical plan for a Republican South would be created. But as these new Republican state governments were organized under the processes of the Reconstruction Acts, the Radicals were faced with the unhappy realization that it was one thing to create a government but quite another thing to maintain it. Because of the implacable hostility of many Southern whites to these newly-created governments, the Radicals realistically saw the urgent need for some sort of protective force to assure their perpetuation. In answer to this need, the Radicals, in spite of their recently enacted prohibition, sponsored the formation in the Southern States of loyal militia forces which, through a combination of local circumstances, developed into a "negro militia." Whites, in varying numbers, also belonged to these units, and though specific figures are not available, the evidence suggests that the heaviest concentrations of negro troops were in Arkansas, South Carolina, Louisiana, Mississippi, and Texas. Yet in spite of the fact that both races participated in the movement, it was stigmatized as "negro militia." Although these troops were neither organized nor employed with uniformity throughout the South,[2] in states where they were active, they became inextricably involved in the outbreaks of racial violence which were a preeminent characteristic of the Reconstruction period.

In Texas, the negro militia movement was closely associated with the political career of Edmund J. Davis, Radical governor of the state from 1870 to 1874. Davis had migrated with his fam-

---

[1]*Congressional Globe,* 39th Cong., 2nd Sess., 127.

[2]Virginia and Georgia had no regularly organized state forces; Alabama and Florida confined their activities merely to planning. In the other seven states, troops were organized and employed in varying degrees.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 587

ily from Florida to Texas in the 1830's and prior to the Civil War had enjoyed a successful law practice in Corpus Christi, Brownsville, and Laredo. When war came, he remained a steadfast Unionist, recruited troops for the United States Army and eventually attained the rank of brigadier general in that organization.[3] After the war, he served as delegate to the Constitutional Convention of 1866 and as presiding officer of the Convention of 1868-1869, during which time he began active agitation for the formation of militia forces. Immediately after presentation of a report by the Committee on Lawlessness, Davis gave his support to a resolution to Congress requesting permission to organize a loyal militia, insisting that without such a force, the provisional government remained "powerless."[4] No such authority was granted by Congress, however, and at the time of Davis' inauguration in early 1870, the state was still without a protective force, a deficiency which the governor immediately set out to rectify. On April 26, 1870, in one of his first messages to the Texas Legislature, Davis recommended passage of a militia act. The legislature answered the governor's request by drawing up not one but two bills; it was proposed to organize not only a state militia but a state police force as well. These two bills were considered jointly and precipitated a fierce debate. Supporters of these measures defended them on the grounds that they were necessary for the re-establishment of law and order in Texas; the opposition bitterly condemned them for deliberately creating a "military despotism," giving to the governor powers of "supreme dictation," and debasing the civil authority.[5] One prominent Republican openly joined the opposition because of his expressed fear of the concentration of so much power into the hands of one man. With almost prophetic insight, he warned his Republican colleagues of the danger of their course.[6] In order to offset such defections, the Radicals assured passage of their two bills by

[3]W. P. Webb and H. Bailey Carroll (eds.), *The Handbook of Texas* (2 vols.; Austin, 1952), I, 469-470.

[4]*Senate Miscellaneous Documents*, 40th Cong., 2nd Sess. (Serial No. 1319), Document No. 109, p. 6.

[5]For summary of this debate, see Marion H. Farrow, The Rise of Democrats to Power in Texas, 1872-1876 (Master's thesis, University of Texas, 1940), 28.

[6]Speech of Senator Webster Flanagan quoted in *Daily Austin Republican,* June 18, 1870.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13693   Page 44 of
113

having several conservative senators placed under arrest and ex-
cluded from the chamber while the vote was being taken.[7]

The Militia Act, as eventually passed, authorized the forma-
tion of a military force composed of men between the ages of
eighteen and forty-five, divided into two components; the State
Guards, or active duty troops, were to be enrolled, armed, and
drilled in each county; the Reserve Militia was to furnish a reser-
voir of manpower for emergency mobilization. The governor
was made ex officio commander-in-chief and was given explicit
power to call out the militia whenever, in his view, such action
seemed warranted. He was further empowered to assess and col-
lect taxes from troublesome counties in order to defray militia
costs therein. His personal grip on the militia was further
strengthened by placing in his hands complete control over the
selection of officers.[8]

Reaction to the militia law was instantaneous. Davis' oppon-
ents hastily forwarded a petition to Congress seeking relief, claim-
ing that the act created a standing army, and pointing out that
his actions were in violation of existing law.[9] Not all sentiment
was opposed to the militia, however, for the governor received
the following encouraging communication from a negro politi-
cian in Hopkins County: "All the Union mens of this county
is proud of the militia and Police law and hopes you will inforce
them. We have many roughies here should be tried by the mili-
tary."[10]

In spite of the existing federal law which prohibited the forma-
tion of militia forces in the Southern States, but apparently with
the tacit approval of Congress, Davis began to organize his force.
His first act was to appoint to the dual post of adjutant general
and chief of police an ex-Union Army officer, James Davidson,[11]

[7]*Senate Journal of the Twelfth Legislature of the State of Texas* (Austin, 1870),
248-249.

[8]H. P. N. Gammel (comp.), *The Laws of Texas, 1822-1897* (10 vols.; Austin,
1898), VI, 185.

[9]*Daily Austin Republican,* July 27, 1870.

[10]Letter from A. P. Brown to E. J. Davis, quoted in J. Mason Brewer, *Negro
Legislators of Texas* (Dallas, 1935), 57-58.

[11]Appointment dated June 24, 1870 (MS., Executive Record Book No. 284, Texas
State Library, Austin).

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB Document 150-9 Filed 10/21/22 PageID.13694 Page 45 of 113

an act which brought forth this comment from the administration newspaper:

We predict that General Davidson will make his office anything but a sinecure, and we advise felons, assassins, desperadoes and *their abettors,* to act, if they are wise, upon the theory that if peace is not thoroughly kept, somebody will get hurt.[12]

Under Davidson's guidance, the recruiting was begun. Thirty-nine companies of State Guards were enrolled containing approximately thirty-five hundred officers and men, a considerable number of whom were Negroes.[13] Negro participation was less a result of Radical planning than of existing local circumstances. As one recruiting officer reported: "In raising volunteers for my command I found only eight or nine white citizens who showed a willingness to offer their services, consequently colored men were selected for the duty. Many hundreds more than were required offered their services. . . ."[14] In order to arm the militia, four pieces of artillery and five hundred and twenty Springfield rifles were obtained from the Federal government, one thousand Remington rifles were purchased in the North, and some fifteen hundred carbines which had been procured for frontier defense were borrowed from the state.[15]

The organization and arming of the militia were accompanied by a deluge of denunciations from the conservatives, who described the new force as "a standing army of negro soldiers and mercenary hirelings."[16] Many unsettling reports such as the following one from Cotton Gin, Texas, reached the governor:

. . . the Rebs is threatning to Resist the militia if they are organized in this county Some of them are getting pretty sasey and some is trying to seduse the Republican party. . . . they give me a good cusing once and a while and threatning to Kill me.[17]

---

[12]*Daily State Journal* (Austin), June 26, 1870.

[13]*Report of the Adjutant General of the State of Texas, 1870* (Austin, 1870), 6.

[14]A. G. Malloy to J. Davidson, October 22, 1871, Martial Law in Limestone County, 1871-1873 (MS., Reconstruction Papers, Texas State Library, Austin).

[15]*Report of the Adjutant General of the State of Texas, 1872* (Austin, 1873), 6; *Daily Austin Republican,* January 20, 1871.

[16]*Democratic Statesman* (Austin), September 5, 1871.

[17]James King to E. J. Davis, June 14, 1870 (MS., E. J. Davis file, Governor's Letters, Texas State Library, Austin).

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 590

In spite of this continuing opposition, Davis persevered in carrying to completion his militia project.

The subsequent career of the militia in Texas can be divided into two separate and distinct periods. The first phase lasted from its beginnings in 1870 to the spring of 1873, when the Thirteenth Legislature drastically revised the militia law. The second period of activity, concentrated in the month of January, 1874, centered about the short but exceedingly bitter struggle between Davis and Richard Coke for control of the State House.

During the earlier period, militia activity was directly connected with the State Police which had been created at the same time as the militia. The smoldering resentment which was generated by the very existence of this body was further heightened by the fact that many of its officers were Negroes. In attempting to perform assigned duties, these negro policemen met with determined resistance that not infrequently erupted into violence. When these uprisings were so serious as to be beyond control of the civil authorities, militia units were placed on a war footing and sent in to force gubernatorial declarations of martial law.

The first of these disturbances occurred in Madison County in November, 1870. In the wake of a local uprising against the State Police, it was rumored that several of these officials had been murdered by a mob of desperadoes who had freely expressed their intention to "kill every … Radical in Madison County and then go down and clean out Grimes County."[18] Governor Davis sent his adjutant general and three hundred State Guards to Madisonville to quell the riot. Order was easily restored and the troops were rapidly withdrawn from the area.

Shortly thereafter, in January, 1871, it became imperative to employ the militia in Hill County where the State Police attempted to arrest two persons for the murder of two freedmen. Acting upon a rumor that the suspects were hiding out in the home of J. J. Gathings, the police, without a search warrant, forcibly entered and searched the premises. Finding that the fugitives had in the meantime escaped, the police immediately took up the pursuit. While searching the neighboring countryside, the policemen were themselves captured by a group of irate citi-

---

[18]*Flake's Daily Bulletin* (Galveston), November 18, 1870.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13696   Page 47 of 113

zens and arrested on the charge of illegal entry. Spurred on by fear of mob violence, they escaped and hurriedly transmitted their superiors a report of conditions in Hill County. The adjutant general hastened to the scene, and after surveying the situation, requested that the governor proclaim martial law. This was done, and State Guards were ordered in. Davidson arrested Gathings and several other leaders and assessed them $3,000 to defray costs of militia activities.[19]

A more serious incident occurred in that same month which resulted in a proclamation of martial law in Walker County. L. H. McNelly, later to become a prominent Texas Ranger, was in command of a detachment of State Police which had been sent into the county to investigate the brutal slaying of a freedman, Sam Jenkins. McNelly arrested four suspects and brought them to trial. One was released; the other three were found guilty as charged. The announcement of these findings turned the courtroom into a shooting gallery. The prisoners, using guns smuggled to them by friends and sympathizers, opened fire and a general melee ensued. McNelly and another policeman were shot down, the judge and the district attorney were sent scurrying for cover, while the prisoners, aided by a sizable body of townsmen, escaped. When an effort was made to summon a posse, only two persons could be found who showed a willingness to be deputized.[20] When this incident was reported to the governor, he promptly proclaimed martial law and sent Adjutant General Davidson and a militia unit into Walker County to restore order.[21] Davidson immediately set up a military commission, before which some twenty citizens were tried. One of the escaped prisoners, Nat Outlaw, was captured, tried by the commission, and sentenced to five years imprisonment. Governor Davis, after reviewing the case, pardoned Outlaw, who thereupon filed suit on grounds of false imprisonment and was awarded $20,000 dam-

[19]Report of Adjutant General Davidson to Governor Davis in *Daily State Journal* (Austin), February 10, 1871.

[20]*Ibid.* A complete report of the incident was made on January 25, 1871, to Governor Davis by W. E. Horne.

[21]Proclamation dated January 20, 1871 (MS., Executive Record Book No. 284, Texas State Library, Austin). Martial law in Walker County was continued for two months, finally being revoked on March 20, 1871.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 592

ages.[22] Martial law was continued in Walker County for sixty days, and an assessment was levied and collected in the county to pay expenses of troops quartered there.

The last fierce outbreak of this sort occurred in September, 1871. On the last day of that month, in the town of Groesbeck, a citizen was shot and killed by a negro policeman in a barroom brawl. A wave of excitement swept through the town as the citizens armed themselves and prepared to attack the police. "Lawlessness and mobocracy prevailed,"[23] complained the mayor, who allowed himself to be cajoled by the townspeople into issuing a warrant for the arrest of two state policemen on the charge of murder. As the tension continued to mount, the governor ordered a detachment of two hundred militia-men to proceed to the disturbed area,[24] and on the following day issued a proclamation of martial law in both Limestone and Freestone counties.[25] As had been the case in Walker County, a military tribunal was convened and an assessment was levied against the inhabitants.[26]

These incidents contributed to a growing anti-administration sentiment, the intensity of which was in no way lessened by the governor's indiscreet use of negro troops for political purposes. For example, on August 9, 1871, just prior to a scheduled election, Davis issued a remarkable proclamation giving explicit instructions to prospective voters. He forbade loitering, assembling, shouting, jeering, drinking, and carrying firearms, and he instructed peace officers, State Guards, or militia on duty at the polls to enforce compliance with his instructions.[27] A storm of protest followed. The proclamation was denounced as subversive of liberty and repeated demands were made upon Davis to withdraw it.[28] His refusal to comply merely added fuel to the flames.

[22]*Daily State Journal* (Austin) April 9, 1872.

[23]A. Zadez to J. W. Oliver, October 5, 1871. Martial Law in Limestone County, 1871-1873 (MS., Reconstruction Papers, Texas State Library, Austin).

[24]E. J. Davis to A. G. Malloy, October 8, 1871, in *ibid*.

[25]Proclamation issued on October 9, 1871 (MS., Executive Record Book No. 284, Texas State Library, Austin).

[26]The military commission was convened on October 14, 1871, by means of Special Order No. 71, Adjutant General of Texas, Martial Law in Limestone County, 1871-1873 (MS., Reconstruction Papers, Texas State Library, Austin).

[27]*Daily State Journal* (Austin), August 13, 1871.

[28]*House Miscellaneous Documents*, 42nd Cong., 2nd Sess. (Serial No. 1526), Document No. 163, p. 256.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13698   Page 49 of 113

The untimely defalcation of the adjutant general furnished yet another opportunity for the conservatives to pillory the militia project. In November, 1872, Davidson absconded with over $30,000 of the state's money,[29] and his subsequent flight to Belgium gave uncomfortable support to the conservative's repeated assertions as to the improbability of the generals "voluntary return to the scene of his late brilliant military operations."[30] To fill this embarrassing vacancy, Davis appointed his nephew, Frank L. Britton,[31] who doubled as the governor's private secretary.[32]

Opposition to the governor's military establishment continued to grow and was more frequently and fervently voiced. In late September, 1871, a coalition of Democrats and conservative Republicans held a Tax-Payer's Convention in Austin. In addition to its indictment of the Davis administration's fiscal policies, the convention denounced the militia bill in extremely harsh language, and dispatched a protest to the Texas legislature requesting immediate repeal of the obnoxious law which made possible the existence of an army composed of "pets, favorites, and tools of the Governor."[33] Undoubtedly, this anti-militia sentiment was a factor in the election of November 5-8, 1872, one result of which was the restoration of Democratic control, though by a slender margin, of both houses of the legislature. When this newly-elected Thirteenth Legislature convened on January 14, 1873, the first order of business was revision of the military status quo in Texas. The State Police law was repealed over the governor's veto,[34] and the Militia Act was so amended as to deprive the executive of the power to declare martial law.[35] Existing militia units were not abolished, but the area of their operations

[29] Clarence P. Denman, "The Office of Adjutant General in Texas, 1835-1881," *Southwestern Historical Quarterly*, XXVIII, 302-323. See also *Report of the Adjutant General of the State of Texas, 1872*, p. 5.

[30] *Democratic Statesman* (Austin), December 31, 1872.

[31] *Report of the Adjutant General of the State of Texas, 1872*, p. 2.

[32] Executive Record Book No. 284 (MS., Texas State Library, Austin).

[33] *Proceedings of the Tax-Payer's Convention of the State of Texas* (Galveston, 1871).

[34] *Daily Democratic Statesman* (Austin), April 23, 1873.

[35] Gammel (comp.), *Laws of Texas*, VII, 456.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

was deliberately circumscribed. With this legislative curtailment, the first phase of militia activity in Texas came to an end.

The second phase occurred as an aftermath of the state election of December, 1873, in which Judge Richard Coke, the Democratic candidate, handily defeated Davis for the governorship. Davis, determined to hold on to his office in spite of his defeat at the polls, attempted to have the election results set aside on the grounds that the election had been held under the auspices of an unconstitutional law. In justification of his assertions, Davis pointed out that the Texas Constitution provided that elections were to be held at county seats until otherwise provided by law, and that polling places were to be kept open for four days. Significantly enough, in the Constitution those two provisions were separated only by a semi-colon. The election law, passed in March, 1873, and under the terms of which the election was actually held, made provision for elections to be held in each precinct and for the polls to be open one day rather than four.[36] Davis claimed that the legislature possessed the authority to change the place of voting, since this was expressly provided for in the Constitution; but he insisted that it had no authority whatsoever to change the number of days the polls were to be kept open. His argument was based on the assumption that the semi-colon between the two provisions was proof that the Constitution had two separate and distinct objects in mind.

On January 5, 1874, the Texas Supreme Court, in what has became known as the Semicolon Case, handed down a decision supporting Davis' position, stating that the recent election was unconstitutional.[37] This decision was obviously based more on politics than on punctuation since Davis, himself, had earlier approved the election law. Nonetheless, on the basis of the court's findings, Davis publicly announced that he would not yield the office. The Democrats were determined to install their man, however, and the conservative press insistently urged that "the new legislature should meet . . . and inaugurate the new Governor."[38]

---

[36]*Daily Democratic Statesman* (Austin), January 6, 1874.

[37]For full account of the Semicolon Case, see George E. Shelley, "The Semicolon Court of Texas," *Southwestern Historical Quarterly*, XLVIII, 449-468.

[38]*Daily Democratic Statesman* (Austin), January 6, 1874.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

With the arrival of Coke in Austin on January 8, 1874, tension in the capital mounted alarmingly.[39]

On Monday, January 12, Davis warned the assembling Democrats not to attempt to assume the position they claimed. As this warning was deliberately ignored, Davis, impressed by the gravity of the situation, sought aid from the Federal authorities. In answer to his urgent appeal, President U. S. Grant refused flatly to send troops, suggesting with a touch of hypocrisy, that Davis "yield to the verdict of the people."[40] Thus abandoned by the national Republicans, Davis, left to his own devices, barricaded himself in the State House protected by a hastily improvised negro militia force.[41] On that same night, a Coke supporter, seeing that the lower floor of the State House was occupied by Davis' troops, secured a pass-key and surreptitiously took possession of the legislative chambers on the second floor.[42] On the following morning, the newly-elected Fourteenth Legislature was organized. Davis refused to recognize this body, claiming that the Thirteenth Legislature, then meeting in the basement of the same building, was the official state legislature. The already confused situation was appreciably worsened when, on January 15, Coke was officially inaugurated.[43] Texas then had not only two legislatures but two governors as well.

The forty-eight hour period following Coke's inauguration was one of continual crisis as partisan feeling reached an ominous level. Reinforcements for Davis continued to arrive in the city and were issued arms from the state arsenal.[44] The Travis Rifles, a local volunteer military company, were called out by Davis but further confounded the confusion by offering their services to Coke instead,[45] thereby transforming Austin into an armed camp. Davis wisely closed down all saloons in the city,[46] an act

---

[39]*Ibid.*, January 9, 1874.

[40]New York *Herald*, January 13, 1874.

[41]*Ibid.*, January 17, 1874.

[42]For an excellent account of the Coke-Davis struggle see William Curtis Nunn, Texas During the Administration of E. J. Davis (Ph.D. dissertation, University of Texas, 1938) , 164.

[43]*Daily Democratic Statesman* (Austin) , January 16, 1874.

[44]*Ibid.*, January 17, 1874.

[45]*Ibid.*

[46]New York *Herald*, January 17, 1874.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 596

of considerable shrewdness calculated to lower the martial spirit on both sides. In spite of such precautions, several incidents occurred which came dangerously near to provoking hostilities. Within the State House, both groups were kept on edge by the flow of taunts and insults which passed from one to the other.[47] A threat by Davis' soldiers to shoot Coke supporters who used the stairway to the second floor brought excitement, at one point, to fever pitch.[48] On another occasion, a clash was barely averted when both sides maneuvered to gain control of the cannon located on the State House grounds. The greatest threat to peace, however, arose as a result of the Coke force's attempt to seize the state arsenal. The mayor of Austin, accompanied by the Travis Rifles, marched to the arsenal and demanded the surrender of all arms stored there. While these negotiations were under way, a squad of Davis' negro militiamen arrived and captured the mayor. The Travis Rifles, thereupon, prepared to open fire on the Negroes, but this was prevented by an earnest appeal from the mayor himself, who then lectured his captors, telling them that if they were not gone from the arsenal within sixty minutes, they would "all be dead men."[49] The militiamen held a hasty council of war, then answered that they would hold the arsenal or "die on the door sill."[50] They later reconsidered, however, and evacuated the building. Amidst such confusion and tension, the avoidance of open conflict was an amazing accomplishment which was achieved only because neither side really wanted a collision. Davis, on the one hand, was justifiably alarmed at the prospect of a race war; the Democrats, on the other, feared that an outbreak of violence might cause Grant to change his mind and sanction Federal intervention.

On the afternoon of January 16, a delegation from the Fourteenth Legislature conferred with Davis in his basement headquarters, and as a direct result of this meeting, a truce was arranged. The Radical leader agreed to disband his troops, and

[47]*Daily Democratic Statesman* (Austin), January 16, 1874.

[48]T. B. Wheeler, "Reminiscences of Reconstruction in Texas," *The Quarterly of the Texas State Historical Association*, XI, 56-65.

[49]*Ibid.*, 61.

[50]*Ibid.*

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13702   Page 53 of 113

from that moment, his ultimate defeat was assured. In one last spasm of desperation, he again telegraphed Grant for support and when the President reiterated his refusal to send troops,[51] Davis' resistance collapsed. At noon on January 19, 1874, Coke took formal possession of the executive offices; Radical rule had come to an end in Texas.

In retrospect, it appears that the negro militia movement was not nearly so active in Texas as it was in several other Southern States. The basic reason for this was the co-existence of the State Police, a unique organization created at the same time as the militia, and to which was assigned many of the unpleasant chores which in other states made the militia seem particularly obnoxious. Because of this peculiar agency, militia activity in Texas was restricted to enforcing martial law in areas where disturbances were beyond control of the police, and, after abolition of the State Police, to supporting the Radical governor in his abortive efforts to maintain possession of the State House after having been defeated at the polls. While it is perfectly true that the militia in Texas was never really effective in accomplishing its objectives, the movement was by no means insignificant. In fact, it is in no small measure attributable to the annoying activities and racial implications of the militia movement that the Davis regime was able to establish its unenviable reputation as one of the least popular administrations in Texas history.

[51]New York *Herald*, January 18, 1874.

This content downloaded from
128.148.254.57 on Mon, 17 Oct 2022 21:43:36 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 598

# LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS

# ANNUAL REPORT

OF THE

# ADJUTANT GENERAL

OF THE

## STATE OF LOUISIANA

FOR THE

YEAR ENDING DECEMBER 31, 1870.

NEW ORLEANS:
A. L. LEE, STATE PRINTER.
1871.

Generated at Brown University on 2022-18-18 18:31 GMT / https://hdl.handle.net/2027/njp.32101071984197
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

# REPORT.

ADJUTANT GENERAL'S OFFICE,
LOUISIANA STATE MILITIA,
December 31, 1870.

*His Excellency H. C. Warmoth, Governor of Louisiana:*

I have the honor to submit the report of our progress in organizing and arming a part of the Militia authorized by the act approved April 5, 1870.

The records and papers properly pertaining to this office had been lost or misplaced prior to my assuming the duties of Adjutant General, so that we were without information or precedent as to the most feasible plan, and best form, of organization for this peculiar service.

The act providing for Militia organizations, and for the enrollment of persons subject to military service under its provisions, seems to contemplate organizations under a system of conscription or draft, or at least to indicate a preference for such system, and required collectors and assessors of taxes to return to your Excellency, at the end of thirty days after its passage, correct rolls of all persons subject to military service. It became evident early in the summer that these returns would not be made in time to organize any considerable force within the year. This circumstance, connected with the fact that this plan of procedure in organizing our forces would require a large number of staff officers to visit different parts of the State, and their protection in some instances by armed forces, (incurring expenses that would consume our limited appropriation,) induced us to give preference to the volunteer system authorized by the law, and to adopt it as a substitute for that of conscription. Another reason leading to the same preference was the seeming importance of having some military force in hand for the preservation of quiet and order during the exciting time of our approaching fall elections.

Fortunately for the service a large number of patriotic citizens organized themselves into companies and regiments and offered their services; were accepted and duly mustered into service.

Many of the officers and soldiers being of the class of citizens



697067

Generated at Brown University on 2022-18-18 18:31 GMT  /  https://hdl.handle.net/2027/njp.32101071984197
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

4

supposed to be in opposition to the National and State authorities, by their voluntary action in placing themselves in the position of protectors and supporters of the law, gave greater moral tone and effect to our organization than could have been secured by other means—paralyzing at once the energies of such as may have been disposed to conspire against the honor and prosperity of the State.

### ORGANIZATION OF CITY TROOPS.

The First, Second and Third regiments of Infantry; regiment of Field Artillery; a squadron of Cavalry; two independent companies of Infantry, attached to the First regiment; two companies of Infantry, as part of the Fifth regiment, and one independent company of Infantry, City Guards, unattached.

The First regiment of Infantry and regiment of Field Artillery are the only complete regimental organizations; the Second and Third lacking one company each, and the Fifth, eight, to complete the regiment.

In the interior, the Fourth regiment has been accepted for service with six companies: two companies in East Baton Rouge, two in Thibodeaux, and two in Plaquemine parishes.

In June last a verbal understanding was made with the War Department that the Ordnance Bureau should have two thousand muskets deposited at Baton Rouge Arsenal, to be subject to special requisition of your Excellency in case that you should have especial need of them. Early in November representations were made by some of the citizens of Baton Rouge that they were apprehensive of serious trouble at that place unless a portion of the Militia could be armed and in condition to enforce order. A special requisition was made therefor upon the ordnance officer at that arsenal for sixty muskets (the number asked for) and ammunition. The requisition was not filled according to our understanding, owing, I suppose, to some failure to transmit instructions from the department in due form.

Two companies of Cavalry and two of Infantry have been mustered into service at and near Monroe.

### ARMS.

The Infantry and Artillery troops in the city have been armed with the Winchester and Enfield rifles. The former, a magazine gun of the first class; the latter the ordinary muzzle loading Enfield.

Generated at Brown University on 2022-18-18 18:31 GMT / https://hdl.handle.net/2027/njp.32101071984197
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

5

Two Companies of Infantry, Ouachita parish, are armed with Enfields.

About one half of our force is composed of officers and soldiers who were in the military service of the Southern States during the late civil conflict. As they could not take the test oath, the oath prescribed by act of Congress, approved July 11, 1868, for persons who were engaged on the side of the South during the war, was administered upon receiving them into service.

It may not be amiss to remark that the custom of receiving individuals and organizations from all classes of able-bodied men into military service, is almost universal, and that a compact between the government and the individual, where the life of the individual may be involved, is deemed of such high and sacred order as to entitle the parties voluntarily giving their service to the same benefits and advantages as the most privileged class of citizens.

I would respectfully suggest a partial revision of the act approved April 5, 1870, providing for a uniformed and armed Militia; particularly the portion of that act providing for the payment of troops when called into active service. The law requires that the pay rolls of the companies, after being duly certified, should be submitted to the Finance Committee for examination and approval. We have no Finance Committee at this time, so that the troops cannot receive their pay until the meeting of the Legislature and the organization of such committee. Meanwhile many of the men find it necessary to change their locality, and are thus subjected to great inconvenience, loss of time and some expense in collecting the amounts due them. It is the custom in every service to pay troops upon the rolls certified by company and regimental commanders. If the State troops can be paid upon the day that their service is rendered, much inconvenience and some expense will be saved to individuals and to the State, and such arrangement would induce prompt and more efficient service.

I respectfully submit returns of enrollment from the parishes so far as heard from. The returns from the parishes of Bienville, West Baton Rouge, Grant, Jefferson, St. Mary, and part of Orleans, are not yet received.

I also enclose a return of the organized Militia force of this State.
I am, with great respect,
Your most obd't servant,
JAMES LONGSTREET,
*Adjutant General.*

Generated at Brown University on 2022-18-18 18:31 GMT  /  https://hdl.handle.net/2027/njp.32101071984197
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

39

STATE OF LOUISIANA,
ADJUTANT GENERAL'S OFFICE,
*New Orleans*, July 19, 1870.

GENERAL ORDERS )
   No. 16.   )

I. Arms and equipments that may be issued by the State, will be duly invoiced to commanding officers of companies, who will receipt for the same, and become responsible for the preservation and good order until they are properly relieved of such responsibility by order of the Governor or other proper authority.

II. Arm-racks will be constructed in the different armories with numbers and the name of the soldier for each separate rack, where the arms will be kept when not in service.

III. ⁂A detail of one non-commissioned officer and one soldier for each armory of more than six companies, and one non-commissioned officer for other armories, will be made by commanders of regiments and battalions.

IV. The arms shall not be taken to pieces except by armorers, or under their supervision, and they shall make written reports to commanders of regiments or battalions, of soldiers who fail to keep their arms in good order.

V. Under no circumstances will the Winchester Rifle be taken to pieces, or any part of it removed from its proper place, unless authorized by the Division Commander, nor shall the troops parade or drill upon the streets or public highways under arms, without his authority.

By order of the Commander in Chief :

JAMES LONGSTREET,
*Adjutant General.*

--------

STATE OF LOUISIANA,
ADJUTANT GENERAL'S OFFICE,
*New Orleans*, July 20, 1870.

GENERAL ORDERS )
   No. 17.   )

The following is prescribed as the form of oath to be administered to the State Militia, under the authority vested in the Commander in Chief by section twenty of an act entitled "An Act to Organize, Arm and Equip a Uniformed Militia," etc., approved April 5, 1870:

You, each and all of you, do solemnly swear (or affirm) that you accept the civil and political equality of all men, and agree not to attempt to deprive any person or persons on account of race, color

Generated at Brown University on 2022-10-18 18:31 GMT / https://hdl.handle.net/2027/njp.32101071984197
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

| 42D CONGRESS, | SENATE | REPORT |
|---|---|---|
| 2d Session. | | No. 183. |

## IN THE SENATE OF THE UNITED STATES.

MAY 11, 1872.—Ordered to be printed.

Mr. CARPENTER, from the select committee appointed to investigate all sales of ordnance stores made by the Government of the United States during the fiscal year ending June 30, 1871, submitted the following

## REPORT:

*The select committee, to whom was referred Senate resolution passed February 29, 1872, as follows:  " Resolved, That a select committee of seven be appointed to investigate all sales of ordnance stores made by the Government of the United States during the fiscal year ending the 30th of June, A. D. 1871, to ascertain the persons to whom such sales were made, the circumstances under which they were made, the sums respectively paid by said purchasers to the United States, and the disposition made of the proceeds of said sales; and that said committee also inquire and report whether any member of the Senate, or any other American citizen, is or has been in communication or collusion with the government or authorities of any foreign power, or with any agent or officer thereof, in reference to the said matter; and, also, whether breech-loading muskets, or other muskets capable of being transformed into breech-loaders, have not been sold by the War Department in such large numbers as seriously to impair the defensive capacity of the country in time of war; and that the committee have power to send for persons and papers; and that the investigation be conducted in public," respectfully report:*

That your committee commenced their investigation on the 6th day of March, and held thirty-one meetings, concluding on the 23d day of April.

At the first meeting of the committee, and before any witnesses had been summoned, the chairman, by direction of the committee, addressed a letter to Senator Schurz, to which he replied, as follows:

" UNITED STATES SENATE CHAMBER,
" *Washington, March 6, 1872.*

" SIR : The select committee elected by the Senate to 'investigate all sales of ordnance stores made by the Government of the United States during the year ending the 30th June, 1871,' and for other purposes, having organized, I have been directed by the committee to request you to furnish the committee with any and all evidence in your possession or knowledge which will aid the committee in making a full and thorough investigation of the subjects named in the resolution.

" The committee will meet at the room of the Committee on Military

I—S A

Exhibit No. 13.

*Statement showing the number and description of arms retained by enlisted men under General Orders No. 101, A. G. O., Circular No. 13, 1865, Ordnance Office, War Department.*

| State and other organizations. | MUSKETS. | | | | | RIFLES. | | | | | | | | | | | | SWORDS. | | SABERS. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Springfield rifled. | Enfield rifled. | Austrian. | Prussian. | Harper's Ferry. | Spencer. | Henry. | Sharp's. | Ballard. | Colt's. | Whitney. | French. | English, (artillery.) | Smith & Wesson. | Windsor. | Joslyn. | United States. | Non-commissioned officers'. | Musicians'. | Cavalry. | Artillery. |
| Maine | 2,290 | 89 | | | | 3 | 62 | | | | | | | | | | | 1 | 2 | 132 | 11 |
| New Hampshire | 1,279 | 26 | | | | | | 36 | | | | | | | | | | 5 | | 104 | |
| Vermont | 1,491 | 295 | | | | | | 30 | | | | | | | | | | 10 | 1 | 34 | |
| Massachusetts | 6,796 | 1,180 | | | | 104 | | | | 44 | | | | | | | | 40 | 5 | 1,375 | 18 |
| Rhode Island | 342 | 181 | | | | | | | | | | | | | | | | 4 | | 85 | 9 |
| Connecticut | 2,345 | 227 | | | | 198 | | 1 | | | 63 | | | | | | | 2 | 3 | 195 | |
| New York | 11,708 | 3,591 | 257 | | | 298 | | 11 | | 98 | | 391 | | | | | | 51 | 1 | 2,391 | 54 |
| New Jersey | 2,296 | 132 | | 1 | | 3 | | | | | | | | | | | | 7 | | 280 | |
| Pennsylvania | 13,438 | 1,124 | | | | 314 | | 108 | | | | | | 35 | | | | 24 | 1 | 2,064 | 20 |
| Delaware | 77 | | | | | 127 | | | | | | | | | | | | | | | |
| Maryland | 276 | 84 | | | | | | | | | | | | | | | | | | 85 | 4 |
| West Virginia | 153 | 14 | | | | 15 | | | | | | | | | | | | 1 | | 176 | |
| District of Columbia | 5 | | | | | | 65 | | | | | | | | | | | | | | |
| Ohio | 6,576 | 1,228 | | | | 390 | | | | | | | | | 3 | | 1 | 19 | | 822 | 8 |
| Indiana | 4,536 | 1,801 | | | | 297 | | 32 | | | | | | | | | | 8 | | 493 | 6 |

SALE OF ARMS BY ORDNANCE DEPARTMENT.

167

168

SALE OF ARMS BY ORDNANCE DEPARTMENT.

*Statement showing the number and description of arms retained by enlisted men, &c.*—Continued.

| State and other organizations. | MUSKETS. | | | | | RIFLES. | | | | | | | | | | | | SWORDS. | | SABERS. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Springfield rifled. | Enfield rifled. | Austrian. | Prussian. | Harper's Ferry. | Spencer. | Henry. | Sharp's. | Ballard. | Colt's. | Whitney. | French. | English (artillery). | Smith & Wesson. | Windsor. | Joslyn. | United States. | Non-commissioned officers'. | Musicians'. | Cavalry. | Artillery. |
| Illinois | 9,423 | 1,527 | 8 | | 1 | 528 | | | | | 17 | 2 | | | 11 | | | 16 | | 1,279 | 36 |
| Missouri | 691 | 459 | | 5 | 22 | | | | | 126 | 20 | 2 | | | | | | 4 | | 539 | |
| Kentucky | 198 | 19 | | | | 138 | | | 13 | 37 | | | | | | | | | | 85 | |
| Tennessee | 3 | | | | | | | | | | | | | | | | | | | 70 | |
| Michigan | 4,226 | 494 | | | | 167 | | 197 | | | | | | | | | | 18 | 1 | 1,090 | 9 |
| Iowa | 2,654 | 452 | | | | 10 | | | | | | | | 11 | | | | 9 | | | |
| Wisconsin | 6,759 | 1,763 | | | | 95 | | 30 | | | | | | | 1 | | | 42 | 2 | 425 | |
| Minnesota | 1,989 | 108 | | | | | | | | | 6 | | | | | | | | | 155 | |
| Kansas | 70 | 157 | | | 1 | | | | | | | | | | | | | | | 107 | |
| Arkansas | 56 | 248 | | | 2 | | | | | | 2 | | | | | | | | | 70 | |
| Nebraska | 1 | | | | | | | | | | | | | | | | | | | 19 | |
| Nevada | 171 | | | | | | | | | | 7 | | | | | | | 5 | | 205 | |
| Colorado | | | | | | | | | | | | | | | | | | | | 4 | |
| California | 1,488 | | | | | | | 28 | | | 17 | | | | | | | 34 | 2 | 262 | 3 |
| Oregon | 308 | | | | | | | | | | | | | | | | | 8 | | 39 | |
| Washington Territory | 71 | | | | | | | | | | | | | | | | | | | | |
| Dakota | | | | | | | | | | | | | | | | | | | | 56 | |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Mexico............. | 6 | | | | 53 | 1 | | | | | | | | 14 | | | | | 7 | |
| Texas................. | | | | | | 156 | | | | | | | | | | | | | 430 | |
| North Carolina........... | 449 | | | | | | | | 14 | | | | | | | 3 | | | 3 | |
| Alabama............... | | | | | | | | | | | | | | | | | | | 2 | |
| Florida................. | | | | | | | | | | | | | | | | | | | 1 | |
| Louisiana ............... | 119 | 8 | | | | | | | | | | | | | | | | | | |
| Signal and Ambulance Corps................... | | | | | | | | | | | | | | | | | | | 172 | |
| Veteran Reserve Corps.... | 3,105 | 2,197 | | 1 | | | 1 | | | | | | | | | 206 | 4 | | 35 | |
| United States volunteers .. | 169 | | | | | | | | | | | | | | | | 1 | | | |
| United States volunteer engineers . ............... | 120 | | | | | | | | | | | | | | | | | | | |
| United States colored troops | 10,043 | 2,478 | | | 30 | | | | | | | | | | | 150 | 43 | | | 30 |
| Regulars ................. | 11 | | | | | | | | | | | | | | | | | | | |
| Miscellaneous ............ | 1 | | | | | | | | | | | | | | | | | | 146 | |
| United States veteran volunteers, (First Army Corps) ................ | 499 | | | | | | 681 | 2,966 | | | | | | | | 171 | | 202 | 39 | |
| Company E, 1st California Cavalry, special per Secretary of War .......... | | | | | | | | 14 | | | | | | | | | | | | |
| Total ............. | 96,238 | 19,882 | 270 | 26 | 89 | 2,844 | 808 | 3,454 | 13 | 305 | 146 | 406 | 35 | 4 | 11 | 171 | 15 | 869 | 105 | 13,437 | 208 |

SALE OF ARMS BY ORDNANCE DEPARTMENT.

169

Statement showing the number and description of arms retained by enlisted men, &c.—Continued.

170

SALE OF ARMS BY ORDNANCE DEPARTMENT.

| State and other organizations. | CARBINES. | | | | | | | | | | | | REVOLVERS. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Spencer. | Sharp's. | Burnside. | Maynard. | Smith's. | Starr's. | Joslyn. | Merrill's. | Gallagher's. | French. | Warner's. | Union. | Colt's. | Remington. | Beale's. | Lefaucheaux. | Savage. | Pettingill. | Starr's. | Whitney. | Adams. |
| Maine | 18 | | 44 | | | | | | | | | | 95 | 241 | | | | | 2 | | |
| New Hampshire | 84 | 180 | | | | | | | | | | | 51 | | | | | | | | |
| Vermont | | 35 | | | | | | | | | | | 30 | 4 | | | | | | | |
| Massachusetts | 156 | 301 | 1 | 264 | | | | | | | | | 271 | 341 | | | | | 41 | | |
| Rhode Island | | 14 | 8 | | | | | | | | | | 30 | 26 | | | | | 42 | | |
| Connecticut | 63 | | | | | | | | | | | | 118 | 189 | | | | | 1 | | |
| New York | 695 | 298 | 61 | | | | 70 | | | | | | 780 | 912 | 1 | | | | 11 | 4 | |
| New Jersey | 267 | 7 | | | | | | | | | | | 50 | 101 | | | | | | | |
| Pennsylvania | 750 | 171 | 31 | | | 50 | | | | | | | 783 | 723 | | | | | 15 | | |
| Maryland | 17 | 72 | | | | | | | | | | | 47 | 107 | | | | | | | |
| West Virginia | 78 | 20 | | | | | | | | | | | 184 | 53 | | | | | | | |
| District of Columbia | | | | | | | | | | | | | 40 | | | | | | | | |
| Ohio | 793 | 36 | 44 | | | | | 3 | 10 | | | | 187 | 301 | 6 | | | | | 30 | 2 |
| Indiana | 571 | 5 | 21 | 5 | 8 | | | | 22 | | | | 183 | 74 | | | | | | | |
| Illinois | 647 | 196 | 60 | | 132 | 8 | | | 109 | 8 | | | 909 | 836 | 15 | | | | 6 | 5 | |
| Missouri | 361 | 104 | 67 | | | 2 | 6 | 2 | | | | | 840 | 917 | | 2 | 1 | 1 | 1 | | |
| Kentucky | 241 | 9 | | 25 | | | 4 | | | | | | 263 | 93 | | | | | | | |
| Tennessee | | 6 | 7 | 3 | 13 | | | 1 | 3 | | | 3 | 202 | 468 | 2 | | | | | 14 | |
| Michigan | 901 | 18 | 5 | | | | 7 | 15 | | | | | 316 | 464 | | | | | 27 | | |
| Iowa | 263 | 278 | | | 29 | | 3 | | | | | | 1,078 | 630 | 17 | | | | | | |

Compendium_Vorenberg
Page 609

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wisconsin | 343 | | 35 | | 423 | | | 18 | | | 36 | 1 | 203 | 111 | | | | | | | |
| Minnesota | | 91 | 35 | | 423 | | | 1 | | | | | 369 | 71 | | | | | | | |
| Kansas | 381 | 182 | | 1 | 84 | 2 | | 2 | 19 | | | 3 | 701 | 456 | 1 | | | | 16 | 43 | |
| Arkansas | | 65 | | 381 | | 127 | | | 2 | | | | 28 | 1,164 | 1 | | | 91 | 1 | | |
| Nebraska | 3 | | | | | | 6 | 1 | | | | | 41 | 59 | | | | | | | |
| Nevada | | 128 | | | | | 120 | | | | | | 106 | 81 | | | | | | | |
| Colorado | | 3 | | | | | 9 | | | | | 1 | 3 | 6 | | | | | 81 | 19 | |
| California | | 259 | | 157 | | | | | | | | | 551 | 175 | | | | | | | |
| Oregon | 46 | | | 35 | | | | | | | | | 101 | | | | | | | | |
| Dakota | | 69 | | | | | | | | | | | 85 | | | | | | | | |
| New Mexico | 45 | | | | | | | | | | | | 40 | 2 | | | | | | | |
| Texas | 537 | | | | | | | | | | | | | 183 | | | | | | | |
| North Carolina | 1 | | | | | | | | | | | | 9 | 51 | | | | | | | |
| Alabama | 8 | | | | | | | | | | | | 17 | 1 | | | | | | | |
| Florida | 3 | | 8 | | | | | | | | | | | 4 | | | | | | | |
| Signal and Ambulance Corps | 7 | | | | | | | | | | | | 78 | 161 | | | | | | | |
| Veteran Reserve Corps | | | | | 6 | | | | | | | | 107 | 88 | | 21 | 16 | 1 | 587 | | |
| United States volunteers | | | | | | | 1 | | | | | | 8 | 1 | | | | | | | |
| United States colored troops | | 2 | | | | | 10 | | | | | | 9 | 24 | | | | | | | |
| Miscellaneous | 7 | | | | | | | | | | | | 84 | 57 | | | | | | | |
| Company E, First California Cav., special per Secretary of War | | | | | | | | | | | | | 50 | | | | | | | | |
| Total | 8,289 | 2,549 | 392 | 871 | 695 | 266 | 177 | 25 | 165 | 8 | 36 | 8 | 9,047 | 9,875 | 43 | 23 | 17 | 93 | 831 | 115 | 2 |

SALE OF ARMS BY ORDNANCE DEPARTMENT.

171

**172**     SALE OF ARMS BY ORDNANCE DEPARTMENT.

*Summary of statement of arms retained.*

| Description. | Number. | Remarks. |
|---|---|---|
| *Muskets.* | | · |
| Springfield...... | 96, 238 | Total number arms retained, 158,244. |
| Enfield ......... | 19, 882 | Total sabers and swords, 14,619. |
| All others ...... | 557 | |
| Total ......... | 116, 677 | Of which 4,117 arms and 241 sabers and |
| *Rifles.* | | swords were retained without pay by Hancock's Corps. |
| Spencer ........ | 2, 844 | |
| Henry .......... | 808 | |
| Sharp .......... | 3, 454 | The money value of the arms, &c., re- |
| Colt............ | 305 | tained and paid for is $1,072,565 06. |
| All others ...... | 629 | |
| Total ......... | 8, 040 | |
| Revolvers....... | 20, 046 | |
| Sabers.......... | 13, 645 | |
| Non-commissi'n'd | | |
| officers' swords. | 974 | |
| *Carbines.* | | |
| Spencer ...... .. | 8, 289 | |
| Sharp .......... | 2, 549 | |
| Burnside ....... | 392 | |
| Maynard ....... | 871 | |
| All others ...... | 1, 380 | |
| Total ....... | 13, 481 | |

WASHINGTON, *March* 14, 1872.

SILAS CRISPIN sworn and examined.

By the CHAIRMAN:

Question. What is your rank in the Army?—Answer. Major of ord-nance.

Q. Where are you stationed?—A. New York City.

Q. What is your particular business?—A. My particular business is to attend to the affairs of the Ordnance Bureau at that station. The more important duties are the execution of sales of public property, the purchasing of such supplies as the Ordnance Department need, and details connected with forts in the harbor of New York, and such other duties as would naturally come to that station.

Q. How long have you been on duty in New York in this capacity?— A. I have been nine or ten years in connection with that duty.

Q. Now give to the committee an account of the manner in which the

42D CONGRESS, } HOUSE OF REPRESENTATIVES. { REPORT
2d Session. } { No. 22, pt. 3.

# TESTIMONY

TAKEN BY

## THE JOINT SELECT COMMITTEE

TO INQUIRE INTO

# THE CONDITION OF AFFAIRS

IN

# THE LATE INSURRECTIONARY STATES.

## SOUTH CAROLINA.

VOLUME I.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1872.

Compendium_Vorenberg
Page 612

By the CHAIRMAN:

*Question.* The corruption which is attributed to the legislature, you speak of, I suppose, as all the citizens here do, from the general charges in the newspapers, from reputation, and not from any actual knowledge of the guilty parties in the legislature?
*Answer.* I cannot say that.

*Question.* If you have the actual knowledge, please to state who are the parties affected?

*Answer.* I am not willing to give their names now, because it involves a prosecution, and I do not care about beginning now.

By Mr. VAN TRUMP:

*Question.* A prosecution of what?
*Answer.* It involves an action contemplated before the court.

By the CHAIRMAN:

*Question.* You spoke of twenty-four or twenty-five members of the present legislature who are democrats?

*Answer.* Yes, sir.

*Question.* In these charges of corruption have they been exclusively confined to members of either party?

*Answer.* I have not heard the exclusion made, but it has been charged boldly upon the legislature and generally upon the others. There may be instances in the democratic party where the charge has been made, though I have never heard of one.

*Question.* The republican party having a majority in the legislature is of course held responsible for all general legislation?

*Answer.* Yes, sir.

*Question.* But have not the charges which have been made affected individual members of both political parties in the legislature?

*Answer.* I have heard no particular specification as to the party, but the legislature. The members I have reference to are of the republican party exclusively.

*Question.* Have there been no charges against any member of the democratic party for participating in corruption in the legislature?

*Answer.* I do not think I have heard of one. I do not remember the individual. That is my recollection.

*Question.* Speaking of this Greenville Railroad, the complaint made there, as I understand from the tenor of your testimony, is, so far as the State is concerned, first, the very low price at which the stock was sold to a few, and, secondly, the legislation?

*Answer.* Second, the funds of the State itself, or funds raised by hypothecation of bonds of the State, were used for the purchase of the stock by these individuals.

*Question.* At what price did the individual stockholders sell their stock, do you know?
*Answer.* I do not; it became very low, I think.

*Question.* Is it not a fact that the large body of stockholders sold their stock at the same price as that at which the stock of the State was sold?

*Answer.* I think some of it was sold very low. I think that some parties in interest went around and bought up, representing the low value of the stock, and they induced their friends to sell at a low price, and bought the stock in for those very parties who bought all that stock.

*Question.* I think it has been stated to us that it was by Governor Orr and Mr. Reed and a third director that the sale of the private stockholders was made?

*Answer.* There were three of them.

*Question.* Are there any party charges against these gentlemen of their acting in a partisan spirit? They were both directors of the Greenville Railroad?

*Answer.* Well, sir, I have heard it condemned as a very unclean thing.

*Question.* But the point I make is this: that Judge Orr belonging to one party and the other director to the other party, that charge had no political complexion?

*Answer.* No, sir.

*Question.* They were both members of parties, and opposite parties?
*Answer.* Yes, sir.

*Question.* But this stock was bought up from the stockholders at low figures, and the State stock was sold at the same time?

*Answer.* I have no information of the sum at which it was bought. I would take it from their testimony. I think upon this matter of the Greenville Railroad business, if it is of consequence, the committee had better examine those gentlemen who understand the thing.

*Question.* Did you own any of the stock?
*Answer.* No, sir.

*Question.* There is a public report on the subject?

*Answer.* Yes, sir. It was supposed, in other words, if I may go so far as to express the matter, it was supposed to be a regularly arranged affair, with a view to make fortunes for the parties engaged. It was to degrade the State stock in order to make a profit for the parties engaged.

30 †

*Question.* As to the legislation which followed subsequent to the purchase, was it any more favorable to the Greenville road than the legislation which has been extended to other railroads in the State both before and since the war?

*Answer.* They rather elevated a second-class mortgage to a first-class.

*Question.* As I understand it, there was a mortgage which gave the State priority of lien for stock which it held?

*Answer.* Yes, sir.

*Question.* Had it advanced anything?

*Answer.* I think it was old bonds, but I am not familiar with railroad matters.

*Question.* Then a subsequent mortgage was authorized, and the priority of lien was relinquished, but not the debt?

*Answer.* Precisely.

*Question.* Had not the same thing been done for other railroads; for the Charleston and Savannah Railroad?

*Answer.* I have heard so.

*Question.* Were not the privileges extended to the Savannah snd Charleston Railroad as great as those given to the Greenville Railroad; and is it not to-day, to a great extent, exempt from taxation?

*Answer.* I think the privileges were quite as large; but I do not think they ever put the State as second to any creditor.

*Question.* Were not large privileges accorded to it, and was not that done before the war?

*Answer.* Yes, sir; very large.

*Question.* Has not a considerable part of the feeling against the Greenville Railroad arisen from the fact that it is now owned and controlled principally by men who have come here from the North?

*Answer.* I think not. I think when the truth comes to be known in reference to that feeling toward persons coming from the North—I think I can speak for the entire intelligence of the State, that we would be glad to receive among us intelligent gentlemen of integrity, and especially, if they would bring enough money to help us, and buy out our lands, we would be very glad to see them. We have no such prejudice against the honest and intelligent portion of any part of the world. We are glad to get them.

*Question.* Do you consider, in itself, this aid to the Greenville Railroad an improper transaction?

*Answer.* Do you ask whether I consider the action in regard to that railroad as prejudicial to the State or improper?

*Question.* I ask whether the aid extended to the Greenville Railroad was, in itself, an exceptionable act for the legislature to do under all the circumstances?

*Answer.* I think so.

*Question.* In point of incurring the debt?

*Answer.* In point of hazarding the State's interests in the hands of reckless speculators who were using and were to use the funds of the State in this reckless manner; hypothecating bonds of the State for their own individual purposes; and not because they were gentlemen from abroad at all, but the act itself was considered nefarious.

*Question.* The fact is that the gentlemen chiefly interested in that railroad are from the North?

*Answer.* I think so but apart from that I wish that ten thousand gentlemen with as many million of dollars would come, if they were honest and industrious.

*Question.* Apart from the expediency of the measure, is there any evidence that it was carried by corrupt means sufficient to justify the charge?

*Answer.* Yes, sir.

*Question.* Was that a party question at all in the legislature?

*Answer.* I think the action of the legislature was by party.

*Question.* The movement was made by these parties outside?

*Answer.* Of course the legislature could not have been corrupted without corrupters.

*Question.* But when it came to voting upon this question of aid to the Greenville road, did the legislature vote by party?

*Answer.* I think so. I think that will appear by the record. I think you will see a protest there in that document. I considered it myself strictly a party movement.

*Question.* In relation to the debt I desire to ask one thing. I have heard it suggested since I have been in the State, with reference to these State bank notes, that they constituted a part of the State debt. Was not a considerable part of the issue of State bank notes issued in carrying on the war on the part of South Carolina?

*Answer.* Yes, sir; to some extent, but not mainly. I happened to be in a position where that subject was brought to my notice, because I was in control of the military department of South Carolina in 1862. I was, by appointment of the convention, called, or my style was, "chief of the military department," and I had the use of all the funds of the State in the support of the war in this State; and we carried that on chiefly after 1862 and during 1862 with confederate money. The issue of the State was but a handful to effect the purposes we had in view.

Compendium_Vorenberg
Page 614

*Question.* Can you tell us how much of the circulation of that bank for which the State credit was pledged was actually debarred by the constitutional amendment from payment?

*Answer.* I cannot speak of that.

*Question.* I believe the circulation was over a million; was it not?

*Answer.* I would not like to speak of that, for I cannot speak with accuracy.

*Question.* Has any complaint been urged against the executive or legislative branches of the government, the legislative for passing, and the governor for approving a measure which pledged the credit of the State to the payment of a debt of which a part was prohibited by the constitution—has there been any complaint on that score?

*Answer.* I have not heard it specifically.

*Question.* As to those burnings which you say led to these violences, did any of them occur in this northern tier of counties?

*Answer.* Yes, sir; I speak from information derived.

*Question.* Was that one of the causes that led to this state of affairs?

*Answer.* Yes, sir; they seemed contemporaneous.

*Question.* In the election of 1868, or prior to that, were not the white population armed to a great extent?

*Answer.* They were armed as far as they could get their fowling-pieces, but they were not organized. Every man had his arms. I had mine—sporting-pieces.

*Question.* Was there not a large importation of rifles into the State prior to that election?

*Answer.* I think there was an importation of arms immediately afterward; but no; I cannot say there was an importation, in general, of arms. Gentlemen who desired arms imported them. I cannot say whether it was before or after the election. I am very frank to say that the people of South Carolina felt apprehensive of their condition with this population turned loose, and lashed into fury by constant speeches before this time, and then this arming following, and their seeing everywhere burnings and robberies and persons being killed. I can mention instances of killing, and of white people killing them also. In that condition I felt it my highest duty to protect my own house, and I did prepare arms and have my own arms now.

*Question.* In view of that, and without judging of motives, I ask you, was it not alleged last year that the negroes were apprehensive of an attack upon them at the polls by persons in arms? I do not ask whether it was true or not, but was not that given as a reason for arming the negroes to whatever extent they were armed last year?

*Answer.* Possibly so. It may have been the allegation made by Governor Scott and his friends.

*Question.* As a matter of fact, was it not the reason assigned; I do not ask now whether it was the true reason?

*Answer.* I have heard that statement and seen it in the newspapers.

*Question.* Prior to the election had the negroes used those arms for any purpose of violence?

*Answer.* Yes, sir.

*Question.* Where?

*Answer.* They were shooting cattle in my country constantly; they were in the woods; they infested my plantation constantly.

*Question.* That was but private violence, and I am speaking of organized violence.

*Answer.* No, sir; that was private violence. There was no armed organization in my country. There was an organization called the Union League, which was in full force at that time. There were some burnings, &c., but they were instances of individual violence. There were cases of violence upon the white population below me.

*Question.* In the inquiry of Judge Van Trump, he assumed that these were all Winchester rifles; when in conversation with the adjutant general, in Columbia, he told me that that was a prevailing mistake, and I see by the official report that they are all designated rifle-muskets.

*Answer.* The Winchester has been imported to a great extent.

*Question.* But were the negro troops armed with them?

*Answer.* They were; all I saw armed had a splendid weapon; it was a Winchester rifle. I am familiar with the weapon.

*Question.* The adjutant general told me that there was but one company in the State armed with the true Winchester rifle.

*Answer.* He may put some little hitch upon the word "true;" but I examined those in the hands of my employés, and am familiar with the weapon. It was the Winchester rifle.

*Question.* I understand you to say that an organization formed among the gentlemen of your own county was followed by the fact, whether attributable to that or not, that there was no violence in that county by the young men?

*Answer.* That I may not be misunderstood, I should like to have the exact words used which I did say. I said that a number of gentlemen agreed, verbally, and acted

together on several occasions, to suppress incipient riots. It was a voluntary verbal association among gentlemen.

*Question.* That was followed by peace and good order?

*Answer.* Yes, sir; and I think we started with an advantage in our county. I know I addressed them, as did my associates, General Kershaw and others, tendering them amity and justice, and the maintainance of all their political rights, urging them to peace and industry, and offered them aid to the extent of our ability. It had an admirable effect upon them. But we we were succeeded by speakers on the other side, and they destroyed the effect, in a great measure, which we had produced. Still the seed did sprout to some extent. But we were followed by Randolph and other republican leaders, who did not accept the spirit in which we met them; and that spirit was still further crushed out by Whittemore, and Bowen, the bigamist, more especially, and others, and by negro speakers besides, so that all was done that could be done to lash this poor ignorant people into fury against those white people with whom they had to live.

*Question.* So far as its effect is concerned on the white people——

*Answer.* It has been good. I think they follow the lead of intelligent gentlemen to a great extent, possibly more so than in any other part of the State.

*Question.* When corruption in office was complained of another voluntary convention of gentlemen assembled in the capitol, and the result of that was an improvement in the affairs of the State?

*Answer.* Yes, sir; I think so.

*Question.* Now, bringing to bear more immediately upon this question of violence that principle of public sentiment, is it not your belief that a properly-organized effort on the part of the influential and intelligent men of each county where these outrages have occurred would in a great measure suppress them?

*Answer.* It would have that influence to a great extent, I think. I am not sure but what they have been made to some extent—in many instances I think they have been made—but how far they have operated to diminish violence I cannot say. I presume they have had that effect, but still you must never lose sight of the other fact, that in all countries where you find people who have been accustomed to self-government, and whose institutions are suddenly and rudely subverted, discontent will naturally arise, and secret associations for their own protection be formed against their supposed jeopardy of life. Such associations will be formed under such circumstances all the world over.

### By Mr. VAN TRUMP:

*Question.* And I ask whether necessarily those who do not belong to such associations, but are affected by the general causes which you have specified, do not, under such circumstances, become inactive and indifferent?

*Answer.* Yes, sir; of course. But our wish is peace.

*Question.* State whether this arming of the negro militia did not commence last summer and go on up to the time of holding the election in October.

*Answer.* I cannot speak specifically as to when the arms were placed in their hands, but it was during that period, sir.

*Question.* By the official documents of the State government the dates, so far as they are given, to the official receipts show that it was from May to October; but many of them have no dates, but are blank receipts?

*Answer.* I would rather, as the record is at hand, that it should be consulted upon such points. If there was an honest, intelligent government, the trouble would cease with both parties.

### By Mr. STEVENSON:

*Question.* On the subject of the State debt I would like to see if we can distinguish a little more clearly. I refer you to the report of the committee of eleven. Judge Van Trump asked you whether there had not been an increase of the debt since 1867 of over fourteen millions of dollars. Are you aware that eleven hundred thousand dollars was for the payment of the interest on the old debt?

*Answer.* You will see the fuller statement there printed, and I prefer to answer by referring to that. My knowledge is entirely derived from the financial men at the head of the committee.

*Question.* That is what is stated here.

*Answer.* I presume it must be correct.

*Question.* I desire to see how far your answer to the judge's statement can be relied on.

*Answer.* I take it for granted that Mr. Trenholm is correctly informed, having no knowledge of it myself.

*Question.* I see also an item in that sum of $1,258,550 for funding bills of the Bank of the State of South Carolina. That is of the old bills of the State bank?

*Answer.* Is that in the comptroller's report?

*U.S. Congress.*

# TESTIMONY

TAKEN BY

## THE JOINT SELECT COMMITTEE

TO INQUIRE INTO

# THE CONDITION OF AFFAIRS

IN

## THE LATE INSURRECTIONARY STATES

## ALABAMA.

VOLUME I.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1872.

AMS PRESS
NEW YORK

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

## 414    CONDITION OF AFFAIRS IN THE SOUTHERN STATES.

*Question.* You have always lived in the South?

*Answer.* Yes, sir; I was never out of the South until after the war.

*Question.* What is your business?

*Answer.* I am now register and master of the chancery court of our district.

*Question.* What was formerly your business?

*Answer.* I was a teacher, up to the breaking out of the war; I was teaching when the war began.

*Question.* During the war were you connected with the rebellion?

*Answer.* I was an officer in the confederate army from nearly the beginning of the war.

*Question.* Did you serve during the whole war?

*Answer.* I served until I was appointed by the governor of my State as agent for the State at the Virginia Salt-Works. Salt became very scarce in the South; we had it manufactured; and I was appointed by the governor of the State as special agent for the State at those works, which were in Washington County, Southwestern Virginia.

*Question.* With what political party did you act before the war?

*Answer.* I was a whig, or acted with the party opposed to the democratic party immediately before the war. I supported Bell and Everett in 1860. My first presidential vote was cast then. In the constitutional convention of Alabama, in 1867, I was a member from my county. In that convention I opposed the disfranchisement of my people. The convention, in the article on the elective franchise, adopted a provision disfranchising from voting all who were disfranchised from holding office under the fourteenth amendment. I opposed that proposition in convention, entered my protest against it on the journal of the convention, and opposed the ratification of the constitution before the people on that account.

*Question.* What have been your political connections since the war?

*Answer.* I have been affiliating with the republican party since that time. I should say that the legislature of my State, which was republican, removed, at its first session after the admission of the State, all disfranchisement. I should not have acted with the republican party but for that. The legislature came to precisely the same ground that I had occupied in the convention. From that day on, I have coöperated with the republican party.

*Question.* Did you marry in Virginia?

*Answer.* I married twice in Alabama, in the county where I reside.

*Question.* Do the relatives of your wife reside there?

*Answer.* Yes, sir; the relatives of both my wives.

*Question.* What we wish to ascertain is the condition of things in your vicinity, and in your State so far as you know, in relation to the enforcement of the laws for the protection of person and property. We wish to know whether the laws are so enforced that person and property are protected, or whether there are acts of violence done to person and property, and especially whether such acts are done by bodies of men in disguise. Go on and state generally your views in relation to that question.

*Answer.* My county has been up to the present year perfectly peaceful.

*Question.* The county in which you live?

*Answer.* Yes, sir. Our last State election was as orderly and quiet as any I ever saw held. During the progress of the election I was sitting in company with some friends who differed with me in politics, and we remarked that we had never witnessed a more quiet election. I do not think there was any more disorder or any more noise during that election than there is in this room at this time. That was in November, 1870—the last State election. I speak of my own county, the county in which I reside.

*Question.* What county?

*Answer.* Perry County—just on the border of the cane-brake county. We held an election for State senator in January; I will not be positive as to the day, but my recollection is, it was about the 25th of January. There had been a resignation of our State senator. For some little time previous, and perhaps just after, there were bodies of men riding through the streets of the town at night in disguise. I must say I did not see these men. I reside on the outskirts of the town, on my little farm of eighty acres; my residence is not in the business part of the town. But there is no doubt at all about those men having been there. I heard it spoken of by many persons who saw them. There was no violence done. I was informed by a man who was formerly my slave (for I was a slaveholder) that the men rode in the direction of my house, and in the direction of the houses of some other officers of the county. But they did not molest us at all; and I did not know of the matter until the next day. They did no violence at that time at all.

*Question.* Was that previous to the election you spoke of?

*Answer.* It was a short time before—perhaps one, or two, or three nights before. My recollection is that they were in town two or three times just before the election, and just after; I know they were there once or twice before the election.

*Question.* About how numerous a body?

*Answer.* A body of twenty or twenty-five men on horseback, as I was informed. That

 Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

was the first I knew of the appearance in our county of bodies of disguised men—what we term "Ku-Klux." That was the first I knew of them from any reliable information. There was a negro in jail in my county on a charge of murder. He has never been tried. A body of disguised men came to the jail to take him out; they did not say what they wanted with him. The jailer, who was a man of some will and personal courage, had his father-in-law with him, and they were armed—one with a double-barrel shot gun, and the other with a Winchester rifle. They told the men in disguise, speaking to them from the window, that if they attempted to come in they would fire on them and would be enabled to kill several of them before they could get in. The men desisted from their attempt to take that negro.

*Question.* How large a body of men was that?

*Answer.* There were about twenty-five—not less than that number.

*Question.* In disguise?

*Answer.* Yes, sir; in disguise.

*Question.* The supposition was not that they wanted to rescue the negro, but that they wanted to take him out for some other purpose?

*Answer.* They wanted to take him out to punish him. He had struck a white man who had died from the blow.

*Question.* Perhaps we may as well inquire as to the circumstances of that case. What were they, so far as you know?

*Answer.* I never had any conversation with the gentleman who was struck, and who died from the blow. The negro man who gave the blow came to me, and I asked him in regard to it, as well as others. The gentleman at whose house he lived came to me also and told me the circumstances, as he understood them. They were detailed by this negro man and by his wife. It appeared that they were walking on the street about sundown, he and his wife. She was a washerwoman and had a basket of clothes, either on her arm or on her head; as they passed, the basket touched a gentleman named Stillings; the pavement was narrow, not much wider than this table, [about four feet.] She and her husband stated that Mr. Stillings pushed her violently from the sidewalk and struck her. The negro man remonstrated with him, and asked him why he did it Mr. Stillings stooped to pick a brick from the pavement——

*Question.* Did he say anything?

*Answer.* Yes, sir; he said that no negro should crowd him on the sidewalk. Perhaps he accompanied the remark with an oath, though I will not say as to the oath. When he did that, the negro man jerked a paling from the fence and struck him on the side of his neck and head, just below the base of his brain; he was insensible for some little time, and was taken up and carried home. My recollection is that this occurred on Friday or Saturday about night. On Monday Mr. Stillings was on the street; but he afterward became worse and died from the results of the blow, after, I suppose, nearly a month.

*Question.* Was this colored man arrested in the first place for the assault?

*Answer.* Yes, sir, he was arrested, carried before the mayor, and required to give bonds in $100. The acting mayor, who was a democrat, fixed that amount of bail for his appearance. The man appeared at the time designated.

*Question.* At that time it was supposed that the injury to Stillings was small?

*Answer.* It was supposed that it was not serious.

*Question.* But he did eventually, in about a month, die from that blow?

*Answer.* In several weeks, I think about a month.

*Question.* And then this colored man was arrested and put in jail?

*Answer.* Yes, sir, he was put in jail on a charge of murder.

*Question.* What time was that?

*Answer.* I think it was in the month of March last that the striking occurred; that is my recollection. These disguised men came to take the man from jail, during the session of our circuit court, which began the latter part of March or the first of April.

*Question.* Then it was not very long after he was first confined on this charge of murder?

*Answer.* These men came very soon after he was confined.

*Question.* The jailer made such resistance that they went away?

*Answer.* Yes, sir. The jailer told them he would fire upon them if they endeavored to break into the jail; that he would not surrender the keys.

*Question.* Was the colored man removed to some other place?

*Answer.* He was removed to Selma.

*Question.* Is he still in jail?

*Answer.* He is still in jail in Selma.

*Question.* Go on and state any other instances of the appearance of disguised men, and what they have done in your county since they first appeared there last winter.

*Answer.* About May, a colored man by the name of Isaac Hall was taken out and whipped.

*Question.* Where did he live?

*Answer.* In my county.

Digitized by Google Original from UNIVERSITY OF MICHIGAN

# REPORTS OF COMMITTEES

OF THE

# SENATE OF THE UNITED STATES

FOR THE

FIRST AND SECOND SESSIONS OF THE FORTY-SIXTH CONGRESS,

## 1879-'80.

------

### IN EIGHT VOLUMES.

Volume 1 contains Nos. 1 to 9, 1st session, and Nos. 10 to 340,
    2d session, except Nos. 277 and 303, parts 1 and 2.
Volume 2 contains Nos. 277 and 303, parts 1 and 2.
Volume 3 contains Nos. 341 to 487, except No. 388.
Volume 4 contains No. 388.
Volume 5 contains Nos. 488 to 571.
Volume 6 contains Nos. 572 to 670.
Volume 7 contains Nos. 671 to 725, and 693, part 1.
Volume 8 contains No. 693, parts 2 and 3.

------

### WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1880.

ward, some two hundred and fifty or three hundred men came in from the northern part of the State, commanded by Colonel Hudson. I talked with him; I assured him that there was no disturbance; I asked him to go back, and let us have no more excitement. They returned home, and that ended the Austin riot, so far as I know. There were troubles, riots, in other parts of Mississippi, but I do not know much about them; I did not travel much. I was informed that in some parts of the State the white men organized under the head of "Grangers," known by many as the White League, but what their real plans and purposes were I do not know; I never got into the society, and never heard particularly just what it was that they had organized for. It was reported that they were buying arms and preparing for the overthrow of the whole Republican party, but I didn't pay much attention to it. I was given a commission as colonel, but I thought and said that it was very foolish, on the ground that the colored people had no arms to fight with; and to appoint me a colonel only made me more conspicuous to be murdered. That was in 1875, I think.

Q. Were the colored people generally armed throughout the State?—A. No, sir; they were not. Only a few of them had old squirrel guns, inferior guns, of no account in a fight, if there should be any. There was not a Winchester rifle, nor a Henry rifle, nor a needle-gun, nor any other first-class weapon in the hands of any of the colored men in all my section of the country. I had one Henry rifle. I thought I was justified in having that, because I was sheriff. That is the only one I know of being in all our part of the country in the hands of colored men. I heard of plenty of them being in the hands of white men. Colored men came to me time and again, and told me that there were Winchester rifles and needle-guns, guns, &c., in the hands of certain planters of the county. That was some time before the Coahoma County riot. The disturbance occurred on Saturday. Three white men came up and arrested a colored man. They were not officers at all, but young white fellows, who were drunk. They said he had voted when he had not been in the county long enough. While these three white men were there, talking with a colored woman, they were standing close to a cane-brake, and the colored man dashed off into the cane-brake and got got away. They shot at him, but did not hit him, and he escaped. The white men went on through Shotwell's plantation, and there, it was said, they insulted a number of colored women. I do not know whether it was true or not, but that was the statement that went abroad. The colored men in Tallahatchee gathered and went down there to demand them. The white men armed and refused to give them up. About twelve o'clock Saturday night five men came down to my place and asked me to go and settle the trouble. I got up—I had been sick and was not yet well—and got on a horse and went to Doctor Pease's, and asked him to go out to help settle the riot; but he could not go. Then I went to Mr. Clark's and asked him to go with me; but he said, "Brown, I will trust to you; you can manage the matter yourself as well as a dozen could." I went on. The colored men in Coahoma County were armed, and the white men in Tallahatchee County were armed. The colored men agreed with me that it was best not to have any fuss. Then I went down to the white men and asked them if they would disband if I would get the colored men to go home, and they said they would. So both parties went home. So there was no riot.

Still these things kept up a feeling; the whites and the blacks were afraid of each other. The whites sent out spies among the colored people to see what they were doing and intending to do. They kept

42D CONGRESS, } HOUSE OF REPRESENTATIVES. { REPORT
2d Session. } { No. 22, pt. 13.

# TESTIMONY

TAKEN BY

## THE JOINT SELECT COMMITTEE

TO INQUIRE INTO

# THE CONDITION OF AFFAIRS

IN

## THE LATE INSURRECTIONARY STATES.

### FLORIDA.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1872.

By the CHAIRMAN:

*Question.* Have you ever examined particularly the various acts of Congress creating and maintaining the Freedmen's Bureau?

*Answer.* I have.

*Question.* Do you recollect whether the Secretary of War, or any other officer, was allowed or required to make regulations for the management of the Freedmen's Bureau?

*Answer.* The Secretary of War and the Commissioner of the Freedmen's Bureau were authorized to do so.

*Question.* The Commissioner of the Freedmen's Bureau was subordinate to the Secretary of War?

*Answer.* Certainly.

*Question.* And under those regulations these contracts were made, fees charged, &c.?

*Answer.* Yes, sir. I would like to refer to the matter of our getting out of Jackson County last fall, returning from a visit to our home, when the Ku-Klux picketed the roads. But as this is the last hour of the committee here, I shall not detain you. An article in relation to this from the Marianna Courier of August 13, 1870, I shall leave with you. As I was waiting outside of the door yesterday, I indirectly heard some testimony given by a man from Leon County, John Williams, who lives a hundred miles from Marianna—a man whom I do not know. I simply observed that he was discussing me, and at once withdrew from hearing.

By Mr. BAYARD:

*Question.* You refer to his account about you?

*Answer.* Yes, sir. He endeavored to trace back through five or six years the responsibility for the horrible crimes perpetrated there within the last two years; to trace the responsibility for them back to the time when I commanded that district. I will affirm that, during all the time I was in charge of the western district of Florida, but one outrage was perpetrated in the entire district. A colored man was shot on the highway by a man of the name of Parker, who immediately fled the county, and has never been heard of there since. I will say that I never received a direct personal insult in that county. I got into some difficulties soon after I went there, but I never really received an insult in that county. I state this simply to show that the horrid rumors of to-day were then not whispered. I have been abused and vilified by citizens in that county and out of it. I regret that you have not sent for some of the radical rebels in Jackson County, instead of men who really know nothing about affairs there, and base their statements upon inflated rumor. I challenge any democrat or Ku-Klux in the State, whether living in Jackson County or out of it, to put his finger upon one single official act of mine while there that was not warranted by necessity, and based upon right and justice, so far as I was able to determine right and wrong.

*Question.* How long did you remain there?

*Answer.* I was there from 1866 to January 1, 1868, when I was mustered out of the Army by the general order mustering out all officers of the Veteran Reserve Corps.

*Question.* At what time was the first act of violence committed there?

*Answer.* The first outrage perpetrated there, I think, was the assassination of Dr. Finlayson and the shooting of Major Purman, in February, 1869. I have some letters here from John Q. Dickinson, which, with the permission of the committee, I will append to my testimony. (See page 289.) I have also a petition of citizens of Jackson County to the then governor of the State, Governor Walker, and to General Foster, protesting against the loyal people of Jackson County celebrating the Fourth of July, 1866. The mayor and the people there forbid the bearing of the United States flag in the procession, under penalty of its being fired upon. But we had a glorious celebration. All turned out, white and black, and everything passed off quiet. I mention this only to show what was the sentiment of the people there in 1866. I find among my papers here the letter from the Secretary of State to which I referred a moment ago. It is as follows:

> "DEPARTMENT OF STATE,
> "*Washington, October 3, 1866.*
>
> "GENERAL: This Department has information that plans are on foot to lead freedmen to move abroad, and in particular to Peru, upon a promise of higher wages than they receive at home, and probably by other inducements. As there is reason to believe that these promises will not be fulfilled, it is deemed to be the moral duty of the Government to prevent the freedmen from being imposed upon by them. It is consequently suggested that officers of your Bureau be instructed to advise the freedmen to be cautious how they conclude bargains to go to foreign countries.
>
> "I am, general, your obedient servant,
>
> "WILLIAM H. SEWARD.
>
> "Major General O. O. HOWARD,
> "*Superintendent of the Freedmen's Bureau, Washington, D. C.*"

288   CONDITION OF AFFAIRS IN THE SOUTHERN STATES.

. "Official copy furnished for the information of Captain C. M. Hamilton, sub-assistant commissioner, &c., Marianna, Florida, who is directed to comply with the suggestions contained in the foregoing letter of the Secretary of State. Contracts with freedmen will not be approved by sub-assistant commissioners when they are required by the terms of contract to pass beyond the limits of the United States. Such proposed contracts, if any exist, must be forwarded for the consideration of the proper authorities.
"By order of Brevet Major General J. G. Foster, assistant commissioner.

"J. H. LYMAN,
"*Acting Assistant Adjutant General.*

"HEADQUARTERS DISTRICT FLORIDA,
"*Office Assistant Commissioner B. R. F. and A. L., October 16, 1866.*"

The nature of the people of Jackson County, and so pretty generally of the people of the South, has been so perverted by the institution of slavery, and the teachings of their leaders, that, as a general thing, they lack many of the finer sensibilities that belong to honorable manhood.

*Question.* Is that your criticism upon the mass of the people of that county?

*Answer.* Not only upon the people of that county, but upon the old slave-holders of the South generally. There is this difference between the northern and southern people. In the northern there is an individuality you don't find in the southern people. What I mean by that is, that slavery has been a barrier to civilization, and has tended to the degeneration of the people who have lived under its baleful influences for almost three generations; and the result is that, to a great extent, the southern people counsel with, and are moved, actuated, and controlled by the impulses of passion, prejudice, and sentiment, rather than by reason and cool judgment. This is a characteristic of all people in like condition. How few the minds which control the South is evident in the history of secession and rebellion.

*Question.* Are you now a Representative in Congress of the people of this State?

*Answer.* I am not now.

*Question.* You did represent them in Congress?

*Answer.* Yes, sir.

*Question.* You were sent from this State to act as their Representative in Congress, with such feelings toward them, and entertaining such opinions of them as you have just stated?

*Answer.* They can read my record in Congress. I trust I am not controlled by passion and prejudice. When I came here I had the kindest and most charitable feelings toward them.

*Question.* You were content to go there as their Representative, entertaining such opinions of them?

*Answer.* I could not help it; I was not responsible for their nature and condition.

*Question.* What office do you now hold?

*Answer.* I am postmaster of the city of Jacksonville.

*Question.* When did your congressional term expire?

*Answer.* With the Forty-first Congress.

*Question.* And you have held the office of postmaster here since that time?

*Answer.* For part of the time.

*Question.* Do you know what is the circulation of the Marianna Courier?

*Answer.* I do not.

*Question.* What is the population of Jackson County?

*Answer.* I could not give the exact figures; I think it is eight or ten thousand.

*Question.* The preponderance of negro population in that county is very great?

*Answer.* No, sir; not so much so.

*Question.* What do you mean by "not so much so?" How many negroes to one white are there in that county?

*Answer.* I mean not so preponderant as to be "very great." I think the two races are very equally divided there; the negroes are not much in the majority.

*Question.* Do you say that the population of Jackson County is pretty equally divided between the blacks and the whites?

*Answer.* The blacks are in the majority there, but they are in the minority in the State.

*Question.* You have here expressed your views of southern people and of the people of Florida. Have you constantly been in the habit, publicly and privately, of expressing such views in regard to them?

*Answer.* No, sir. These are my opinions founded upon observation, and I give them for your information.

*Question.* Have you in the course of your stay in this State indulged yourself in such expressions as you have used before this committee to-day?

*Answer.* No, sir. I am trying to discover some effective way to deal with these people; we have failed in an appeal to their reason.

Case 3:19-cv-01537-BEN-JLB   Document 150-9   Filed 10/21/22   PageID.13729   Page 80 of 113

*Question.* That is your opinion of the people among whom you have now made your home?

*Answer.* We have failed to accomplish anything by appealing to their reason. The only way of having peace here and erecting a secure government is by taking a pretty vigorous hold and repressing this spirit of rebellion, which, since the war, has become intensified ten times over what it was during the war.

*Question.* These sentiments you express to us are not those you ordinarily express here?

*Answer.* I do not express them at all publicly.

By Mr. LANSING:

*Question.* What, in your judgment, was the effect in the South of the defection of Andrew Johnson from his party and its principles?

*Answer.* To arouse the spirit of rebellion, which the national armies had only partially suppressed.

*Question.* Did it have the effect of reviving the latent hopes of the South?

*Answer.* Yes, sir; there is no doubt of it at all.

*Question.* What was the condition of the southern mind upon the accession of Johnson to the Presidency, and before he had abandoned his party and its principles?

*Answer.* I think they were willing to yield a ready acquiescence to the Government. They were satisfied they had committed a great error in rebelling, not only an error of the heart, but an error of judgment. And before his defection they would have been very well satisfied, and would have felt that they had more than justice done them, as I have often heard them express themselves, if they were "only allowed to remain unmolested in this country." The worst of them did not expect to ever again participate in the administration of the government.

*Question.* You think that was the condition of the southern mind from the time of the surrender to the treachery of Andrew Johnson?

*Answer.* Yes, sir; I have no doubt of it at all.

*Question.* Then do you look upon his treachery as the great cause of all the trouble and misfortune in the South?

*Answer.* Yes, sir. Allow me to state right here that when the reconstruction acts first passed Congress, the Yankees, as we are called, most of us soldiers who were in the South, rather stood back, did not really feel at that time that they had any particular right to interfere in politics, or to take part in them. But the reconstruction laws were passed; reconstruction was necessary; the Government of the United States was determined to reconstruct the South; the democratic party in the South adopted the policy of masterly inactivity, as they called it; there was a new element here that had been enfranchised who were without leaders. The northern men in the South, and there were but a handful of them in this State, who had been in the Army, took hold of this matter of reconstruction, and they have perfected it as far as it has been accomplished. At one time Florida was one of the most thoroughly reconstructed States; but since then—well, you have here learned as much as I know about it. In relation to the character of John Q. Dickinson, I desire to say a word. Among all my acquaintances in this State of Florida, or in my native State of Pennsylvania, I do not know a man who possessed more sterling qualities, one who was a more honorable man, a more moral and upright man, a more Christian man—for one not making a profession of Christianity—than Colonel John Q. Dickinson, native of Vermont, who was assassinated by the Ku-Klux of Marianna.

———

MARIANNA, *September* 30, 1869.

DEAR HAMILTON: Another and yet another murder. On Tuesday, the 28th, the colored people got up a picnic at the Robinson Spring, near the Natural Bridge. A company consisting of Washington Rivers, Wyatt Young, and Calvin Rogers, and twenty-three women and children, were on the road to attend. When just at the old Robinson sugar-house and still they were fired upon from out of the thick bushes with a repeating rifle—about thirteen or fourteen shots in rapid succession. Calvin Rogers was in a single ox-cart alongside of Della White, and only twenty-five yards from the tree under which the assassin stood. Four shots struck various parts of Calvin's clothes and wallet, one of them grazing his arm. Rogers had but one load, which he fired. Rivers was not armed so far as I learn. Wyatt had come on ahead and was then fishing in a hole in the creek directly opposite, (across the road from where the shooting came, about fifty yards distant.) He had Rogers' ammunition. Rogers called for him, but he did not answer. It seems he ran up, and finding in the confusion that one of the oxen was running away with Ben Livingston's little boy Stewart (about two years old) in the cart, he caught the boy out of the cart, and just then a bullet pierced the boy's head, passed through, and entered the left breast of Wyatt, killing them both instantly. Nobody else was hurt. I heard of it in about an hour, and in the course of another

19 B

Compendium_Vorenberg
Page 625

290     CONDITION OF AFFAIRS IN THE SOUTHERN STATES.

hour and a half was under way with about thirty men. We scoured about, but found no clew except a mysterious buggy-track that came from Marianna way, and left the Campbellton road at the foot of Dudley Hill. The track was fresh, and we followed it by the Natural Bridge to Greenwood, when darkness overtook us, and we got home late at night. I am holding an inquest which bids fair to remain in session two or three days. Lawrence Armistead is suspected, but nothing conclusive is reached yet.

Last night, about dusk, Columbus Sullivan and George Cox were hauling home a load of cotton, when they were fired upon. Sullivan's face is horribly mutilated and one eye put out. Cox was hit with small shot in the arm. Both will recover. My mind and my time are more than occupied, and I only snatch time to write this much. Send this to Purman if he isn't with you. I can't write to him this mail.

J. Q. DICKINSON.

Hamilton, can you get a first-class detective to come here? No half-way man will do. If I had one here now I believe something could be accomplished. The inquest may develop something, but I don't quite see what. If detectives can't be furnished, a few Henry rifles would have an excellent moral effect here.         .         J. Q. D.

————

MARIANNA, *October* 3, 1869, (*Sunday Night.*)

DEAR HAMILTON: The inquest on the case I wrote you of last has closed after a three days' session and found a verdict of "shot by unknown," &c. Everything was calm apparently. I heard no dissatisfaction expressed. The verdict was rendered at 4 p. m., Friday, the 1st October. At about 9 o'clock p. m. of that day Maggie Mc-Clellan was shot dead, and Colonel Mc. badly shot in the shoulder, as they were sitting on the piazza of the hotel with several others. Colonel Coker fired a pistol after the party or parties. Colonel Mc. recognized the voice of Calvin Rogers giving the word "fire." Calvin came into town in the morning, when lo! fifty or sixty armed men were stationed about. Not a word had been said to me about the guilt of Calvin, and I never once thought of it or I might have arrested him, and saved an immense expense and trouble. Calvin went along near White's, when about ten men with guns made a charge from near the old Courier office, and some one told Calvin they were after him. In fact, they yelled after the fashion of the "rebs" in a charge, which I have no doubt you have heard many a time. Calvin, I suppose, saw nothing but immediate death, and broke for parts unknown. People kept gathering from all parts of the county, armed mostly with double-barreled shot-guns, and many of them mounted. There are about two hundred of them. They scouted all the country round about. I have no idea which way Calvin went, as the news is sedulously kept from me. I heard, accidentally, that he was seen in the neighborhood of Bethlehem church. I kept on the street all day yesterday trying to keep down the tendency to further bloodshed. About 9 o'clock in the morning somebody arrested Oscar Granbury, and he was shot dead by some one while in charge of a party of drunken fellows.

The wildest part of the crowd are opposed to having an inquest, and the better class are afraid to urge it against these headstrong youngsters, who have always ruled their betters to the damage and disgrace of the county. As it is, an inquest would be but a farce, or, if it were good for anything, would be apt to provoke a fight. Terror reigns. I shall await the return of quiet, when I will hold the inquests in due form at least. I still hold to the opinion expressed in my last, and hope it may be consummated. After further developments I will write you. It is a small hell on earth here now. Write me about that convention right off.

Yours,

.         J. Q. DICKINSON.

————

MARIANNA, FLORIDA, *October* 7, 1869.

DEAR HAMILTON: I must take a moment to write you. First, don't come here, nor let Purman come, till I write you.

Since my two letters excitement and horror has increased, but only one life lost. I am uncertain just now whether I wrote you about Henry Reed. Monday night they went to his house and called him out. He begged—told them he was sick, and everything he could, but they insisted. His wife and son jumped the window and ran. They fired on the boy, but missed him. While looking for the boy, Henry escaped through another window, and ran and got under Mr. Ely's house, where he staid twenty-four hours. Saturday night they fired on Bill Bryan and wounded him, but not severely. Tuesday a colored man (name unknown) was killed on Ham Bryan's place—particulars unknown. Wednesday night (the 6th) they came to Richard Poore's house, hauled him out, and ordered him to march on ahead. He broke and ran. They fired and missed him. He ran under Dr. West's kitchen, and staid there till morning. Nothing

can at present be found out, and nothing done.   I look to the future for relief.   Send us a sheriff, and we can enforce the law ; as it is, I am a mere plaything.   Day before yesterday they notified Fleischman to leave.   He refused.   They gave him two hours ; afterward, till sundown.   He wouldn't go.   They came after him about 9 o'clock, and carried him over into Georgia by force.   It will ruin him.   Can you do anything ?   If so, do it ; but do not send any soldiers, and do not come yourself.   I have not a moment more.
        Yours,

                                                        J. Q. DICKINSON.

P. S.—A. H. Lowe has assessed Coker, and he thinks the assessment wrong, and this morning came and demanded that Lowe should annul it, or he would have it out of him.   Sweet, isn't it ?

                                                        J. Q. D.

                                        MARIANNA, *October* 11, 1869.

DEAR HAMILTON : About the time I was writing my last to you, on October 7, the most foul murder of all was being committed.   Three men went to the house of Matt Nickels, and took him, his wife, and son out, in broad daylight, and shot them dead at a lime-sink about a quarter of a mile from their house.   An inquest was held, and the jury, after consulting *one minute*, brought in a verdict against John T. Myrick, William Coker, and Edward S. Alderman.   They have left the county.   All quiet since till to-night, about an hour ago, I learned that some white man was lying dead over near Adam McNealy's.   Don't know who it is.   An inquest has been summoned.
   Total casualties so far :

Whites..................................................killed 2   wounded 2   total 4
Colored ...............................................killed 7   wounded 2   total 9
                                                              —             —          —
                                                               9             4          13
                                                              ═             ═          ═

That is including the last, which I hope is a rumor.   All this since September 28.
Good God, Hamilton, isn't this awful ?
        Yours,

                                                        J. Q. DICKINSON.

                            JACKSONVILLE, FLORIDA, *November* 14, 1871.

J. W. CHILDS sworn and examined.

   By the CHAIRMAN :

*Question.* State your age, where you were born, where you now reside, and what is your present occupation.

*Answer.* I am thirty-six years old.   I was born in Chatauque County, New York, and I now reside in Gainesville, Alachua County, in this State.   I am a merchant there.

*Question.* Have you on any occasion acted as deputy marshal ?

*Answer.* Yes, sir.

*Question.* When ?

*Answer.* During the past year and a half.

*Question.* Have you had any resistance to you in executing any process from the United States court ?

*Answer.* Last winter I had some resistance offered to the arrest of parties in Columbia County ?

*Question.* What were they charged with ?

*Answer.* With the violation of the enforcement act.   I attempted to make arrests of three of the party, and they violently resisted, and declared that they would not be arrested.   I found it impossible to make the arrest ; they used abusive and insulting language.

*Question.* Did they exhibit weapons ?

*Answer.* They drew several weapons upon me.

*Question.* Did they know you had authority to arrest them, and to summon citizens to help you ?

*Answer.* I read the warrant to them, and told them I had authority to summon a posse, and I called upon three who were present.

*Question.* What did they say ?

*Answer.* They said they had nothing to do with the damned radical institution ; they said that it would be impossible to make any arrests up there ; that they were not going to be taken away by niggers.

THE

# WAR OF THE REBELLION:

### A COMPILATION OF THE

## OFFICIAL RECORDS

OF THE

## UNION AND CONFEDERATE ARMIES.

PUBLISHED UNDER THE DIRECTION OF

**The Hon. ELIHU ROOT, Secretary of War,**

BY

BRIG. GEN. FRED C. AINSWORTH,

CHIEF OF THE RECORD AND PENSION OFFICE, WAR DEPARTMENT,

AND

MR. JOSEPH W. KIRKLEY.

**SERIES III—VOLUME V.**

WASHINGTON:

GOVERNMENT PRINTING OFFICE.

1900.

Generated on 2022-10-17 21:00 GMT / https://hdl.handle.net/2027/coo.31924079575381
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

# THE

# WAR OF THE REBELLION:

## A COMPILATION OF THE

## OFFICIAL RECORDS

### OF THE

## UNION AND CONFEDERATE ARMIES.

---

ADDITIONS AND CORRECTIONS

TO

**SERIES III—VOLUME V.**

(To be inserted in the volume   For explanation see General
Index volume, Serial No 130, page XXVIII.)

---

PUBLISHED UNDER THE DIRECTION OF

**The Hon. ELIHU ROOT, Secretary of War,**

BY

BRIG. GEN. FRED C. AINSWORTH,
CHIEF OF THE RECORD AND PENSION OFFICE, WAR DEPARTMENT,

AND

MR. JOSEPH W. KIRKLEY.

---

**Mr. JOHN S. MOODEY, Indexer.**

---

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1902.

Generated on 2022-10-17 21:01 GMT / https://hdl.handle.net/2027/coo.31924079575381
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

similar cases, as, for instance, in the case of discharges under General Orders, No. 77, of 1865.   There appears to be some misunderstanding in regard to it.   This does not change regulations and orders as to who shall be mustered out and who discharged for disability, but only applies General Orders, No. 36, of 1862, to partial payments, descriptive lists, transportation, &c., of men discharged under General Orders, No. 77, current series, and similar orders.

SAMUEL BRECK,
*Assistant Adjutant-General.*

(Copy to chief mustering officers.)

---

GENERAL ORDERS, }      WAR DEPT., ADJT. GENERAL'S OFFICE,
    No. 101.          }           *Washington, May 30, 1865.*

RETENTION OF ARMS BY SOLDIERS ON BEING HONORABLY DISCHARGED FROM SERVICE.

Upon an honorable muster out and discharge from the service of the United States, all volunteer soldiers desiring to do so are hereby authorized to retain their arms and accouterments on paying therefor their value to the Ordnance Department.

The payments will be made, under the regulations of the Ordnance Department, to the officer or representative thereof at the rendezvous in the State to which the troops are ordered for payment and final discharge.

By order of the Secretary of War:

E. D. TOWNSEND,
*Assistant Adjutant-General.*

---

WAR DEPARTMENT, ADJUTANT-GENERAL'S OFFICE,
*May 30, 1865.*

GOVERNOR OF MAINE:

An order has been issued directing all volunteer artillery in the Armies of the Potomac, Tennessee, and Georgia to be immediately mustered out and discharged the service of the United States.

THOMAS M. VINCENT,
*Assistant Adjutant-General.*

(Copy for the Governors of New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Ohio, Indiana, Kentucky, Illinois, Missouri, Iowa, Minnesota, Wisconsin, Michigan, and Kansas.)

---

GENERAL ORDERS, }      WAR DEPT., ADJT. GENERAL'S OFFICE,
    No. 102.          }           *Washington, May 31, 1865.*

Department, district, post, and other commanding officers will make such temporary details of officers and soldiers as may be required by assistant commissioners of the Bureau of Refugees, Freedmen, and Abandoned Lands, and render them, or other officers of said Bureau,

Generated on 2022-10-17 21:01 GMT  /  https://hdl.handle.net/2027/coo.31924079575381
Public Domain  /  http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

# R E P O R T

OF THE

## SUPERINTENDENT  AND  COMMISSIONERS

OF THE

# STATE  PENITENTIARY

OF THE

## STATE  OF  OREGON.

## ACCOMPANIED BY REPORTS OF THE PHYSICIAN AND CHAPLAINS.

FIFTH  REGULAR  SESSION,

SEPTEMBER,  1868.

SALEM,  OREGON :

W.  A.  McPHERSON,  STATE  PRINTER,

1868.

Generated at Brown University on 2022-10-18 13:54 GMT  /  https://hdl.handle.net/2027/mdp.39015866394958
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Compendium_Vorenberg
Page 631

## STATIONERY.

One-fourth ream letter paper.
Three-fourth " Spenc'n cap.
1,000 blank provision returns.
One flat ruler.

500 blan'k weekly reports.
Two doz. steel pens.
One bottle mucilage & brush.

## ACCOUNT OF LIVE STOCK.

One span work horses.
One span work mules. (Belong to building fund.)

100 hogs.
20 ch.ckens.

## GROUND IN CULTIVATION.

12 acres of garden.
$13\frac{1}{2}$ " " potatoes.
$10\frac{1}{2}$ " " beans.

5 acres of peas.
10 " " oats.

## FARMING IMPROVEMENTS.

2,800 feet of paling fence.
" " grub "
100 acres ground cleared off.
60 rods ditch dug.

30 acres of ground grubbed.
49 " " broke.
—— feet bridge across creek.

Two dwelling houses.
One suction pump.

One well house.

## ARMORY. LARGE AND SMALL ARMS.

13 Henry rifles.
One Spencer rifle.

Withdrawn and placed on sale.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 3:19-cv-01537-BEN-JLB  Document 150-9  Filed 10/21/22  PageID.13737  Page 88 of
113

Two Sharp's rifles.
Two Sharp's carbines.
12 army pistols (Colt's).
Two damaged.
Ammunition.

1,300 Henry cartridges.
50 Spencer cartridges.
200 pistol cartridges, with percussion caps.

## COMMISSARY BUILDING.

Frame 24x36; 20 feet high.
Two floors.
Two large double doors.
Two small double doors.
One single door.

I2 window lights.
Contains—
600 feet square timber.
7,000 feet sawed lumber.
12,000 shingles.

## CARPENTERS' SHOP.

Box house 20x30; 14 feet high.
One door.
18 window lights.

Contains—
2,973 feet sawed lumber.
5,000 shingles.

## BLACKSMITH' SHOP.

Box house 14x24; 15 feet high.
One door.

Contains—
1,372 feet lumber.
2,500 shingles.

## COAL HOUSE.

18x18; contains 1,341 ft. lumber.

Generated at Brown University on 2022-10-18 13:53 GMT  /  https://hdl.handle.net/2027/mdp.39015060364858
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



# A COMPILATION

OF THE

# MESSAGES AND PAPERS

OF THE

# PRESIDENTS

Prepared Under the Direction of the Joint Committee
on Printing, of the House and Senate,
Pursuant to an Act of the Fifty-Second Congress
of the United States

(With Additions and Encyclopedic Index
by Private Enterprise)

## VOLUME IX

PUBLISHED BY

BUREAU OF NATIONAL LITERATURE, Inc.

NEW YORK

4086 *Messages and Papers of the Presidents*

[The following messages were sent to the special session of the Senate convened by proclamation (see pp. 133-134) of April 20, 1871.]

WASHINGTON, *May 10, 1871.*

*To the Senate of the United States:*

I transmit to the Senate, for consideration with a view to ratification, a treaty between the United States and Great Britain for the settlement of pending questions between the two countries, signed at Washington on the 8th instant by the commissioners of the United States and Great Britain, respectively.

Copies of the powers and instructions to the commissioners on the part of the United States and the protocols of the conferences are also transmitted.

U. S. GRANT.

WASHINGTON, *May 15, 1871.*

*To the Senate of the United States:*

I transmit to the Senate, in answer to their resolution of the 10th instant, a report* from the Secretary of State and the papers which accompanied it.

U. S. GRANT.

WASHINGTON, *May 17, 1871.*

*To the Senate of the United States:*

In answer to a resolution of the Senate of the 15th instant, I transmit herewith a report † from the Secretary of State.

U. S. GRANT.

# PROCLAMATIONS.

## BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

### A PROCLAMATION.

Whereas it is provided in the Constitution of the United States that the United States shall protect every State in this Union, on application of the legislature, or of the executive (when the legislature can not be convened), against domestic violence; and

Whereas it is provided in the laws of the United States that in all cases of insurrection in any State or of obstruction to the laws thereof it shall be lawful for the President of the United States, on application of the legislature of such State, or of the executive (when the legislature can not be convened), to call forth the militia of any other State or States,

* Relating to claims of the subjects of foreign nations growing out of the War of the Rebellion.
† Relating to claims under the treaty of Washington of May 8, 1871.

*Ulysses S. Grant*                                          4087

or to employ such part of the land and naval force as shall be judged
necessary for the purpose of suppressing such insurrection or of causing
the laws to be duly executed; and

Whereas I have received information that combinations of armed men,
unauthorized by law, are now disturbing the peace and safety of the citi-
zens of the State of South Carolina and committing acts of violence in
said State of a character and to an extent which render the power of the
State and its officers unequal to the task of protecting life and property
and securing public order therein; and

Whereas the legislature of said State is not now in session and can not
be convened in time to meet the present emergency, and the executive
of said State has therefore made application to me for such part of the
military force of the United States as may be necessary and adequate
to protect said State and the citizens thereof against the domestic vio-
lence hereinbefore mentioned and to enforce the due execution of the
laws; and

Whereas the laws of the United States require that whenever it may
be necessary, in the judgment of the President, to use the military force
for the purpose aforesaid, he shall forthwith, by proclamation, command
such insurgents to disperse and retire peaceably to their respective abodes
within a limited time:

Now, therefore, I, Ulysses S. Grant, President of the United States,
do hereby command the persons composing the unlawful combinations
aforesaid to disperse and retire peaceably to their respective abodes within
twenty days from this date.

In witness whereof I have hereunto set my hand and caused the seal
of the United States to be affixed.

[SEAL.]    Done at the city of Washington, this 24th day of March,
A. D. 1871, and of the Independence of the United States the
ninety-fifth.

U. S. GRANT.

By the President:

HAMILTON FISH,
*Secretary of State.*


BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

A PROCLAMATION.

Whereas objects of interest to the United States require that the Sen-
ate should be convened at 12 o'clock on Wednesday, the 10th day of May
next, to receive and act upon such communications as may be made to
it on the part of the Executive:

Now, therefore, I, Ulysses S. Grant, President of the United States,
have considered it to be my duty to issue this my proclamation, declaring
that an extraordinary occasion requires the Senate of the United States

Compendium_Vorenberg
Page 636

to convene for the transaction of business at the Capitol, in the city of
Washington, on Wednesday, the 10th day of May next, at 12 o'clock on
that day, of which all who shall at that time be entitled to act as members of that body are hereby required to take notice.

Given under my hand and the seal of the United States, at Washington, the 20th day of April, A. D. 1871, and of the Independence of the United States of America the ninety-fifth.

[SEAL.]

U. S. GRANT.

By the President:

HAMILTON FISH,
*Secretary of State.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

A PROCLAMATION.

The act of Congress entitled "An act to enforce the provisions of the
fourteenth amendment to the Constitution of the United States, and for
other purposes," approved April 20, A. D. 1871, being a law of extraordinary public importance, I consider it my duty to issue this my proclamation, calling the attention of the people of the United States thereto,
enjoining upon all good citizens, and especially upon all public officers,
to be zealous in the enforcement thereof, and warning all persons to
abstain from committing any of the acts thereby prohibited.

This law of Congress applies to all parts of the United States and will
be enforced everywhere to the extent of the powers vested in the Executive. But inasmuch as the necessity therefor is well known to have
been caused chiefly by persistent violations of the rights of citizens of
the United States by combinations of lawless and disaffected persons in
certain localities lately the theater of insurrection and military conflict, I
do particularly exhort the people of those parts of the country to suppress
all such combinations by their own voluntary efforts through the agency of
local laws and to maintain the rights of all citizens of the United States
and to secure to all such citizens the equal protection of the laws.

Fully sensible of the responsibility imposed upon the Executive by the
act of Congress to which public attention is now called, and reluctant to
call into exercise any of the extraordinary powers thereby conferred upon
me except in cases of imperative necessity, I do, nevertheless, deem it
my duty to make known that I will not hesitate to exhaust the powers
thus vested in the Executive whenever and wherever it shall become
necessary to do so for the purpose of securing to all citizens of the United
States the peaceful enjoyment of the rights guaranteed to them by the
Constitution and laws.

It is my earnest wish that peace and cheerful obedience to law may
prevail throughout the land and that all traces of our late unhappy civil

*Ulysses S. Grant*   4089

strife may be speedily removed. These ends can be easily reached by acquiescence in the results of the conflict, now written in our Constitution, and by the due and proper enforcement of equal, just, and impartial laws in every part of our country.

The failure of local communities to furnish such means for the attainment of results so earnestly desired imposes upon the National Government the duty of putting forth all its energies for the protection of its citizens of every race and color and for the restoration of peace and order throughout the entire country.

In testimony whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.]   Done at the city of Washington, this 3d day of May, A. D. 1871, and of the Independence of the United States the ninety-fifth.

U. S. GRANT.

By the President:

HAMILTON FISH, *Secretary of State.*

### BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

### A PROCLAMATION.

Whereas unlawful combinations and conspiracies have long existed and do still exist in the State of South Carolina for the purpose of depriving certain portions and classes of the people of that State of the rights, privileges, immunities, and protection named in the Constitution of the United States and secured by the act of Congress approved April 20, 1871, entitled "An act to enforce the provisions of the fourteenth amendment to the Constitution of the United States;" and

Whereas in certain parts of said State, to wit, in the counties of Spartanburg, York, Marion, Chester, Laurens, Newberry, Fairfield, Lancaster, and Chesterfield, such combinations and conspiracies do so obstruct and hinder the execution of the laws of said State and of the United States as to deprive the people aforesaid of the rights, privileges, immunities, and protection aforesaid and do oppose and obstruct the laws of the United States and their due execution and impede and obstruct the due course of justice under the same; and

Whereas the constituted authorities of said State are unable to protect the people aforesaid in such rights within the said counties; and

Whereas the combinations and conspiracies aforesaid, within the counties aforesaid, are organized and armed and are so numerous and powerful as to be able to defy the constituted authorities of said State and of the United States within the said State, and by reason of said causes the conviction of such offenders and the preservation of the public peace and safety have become impracticable in said counties:

Now, therefore, I, Ulysses S. Grant, President of the United States of
131

America, do hereby command all persons composing the unlawful combinations and conspiracies aforesaid to disperse and to retire peaceably to their homes within five days of the date hereof, and to deliver either to the marshal of the United States for the district of South Carolina, or to any of his deputies, or to any military officer of the United States within said counties, all arms, ammunition, uniforms, disguises, and other means and implements used, kept, possessed, or controlled by them for carrying out the unlawful purposes for which the combinations and conspiracies are organized.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.] Done at the city of Washington, this 12th day of October, A. D. 1871, and of the Independence of the United States of America the ninety-sixth.  **U. S. GRANT.**

By the President:

 HAMILTON FISH,
   *Secretary of State.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

A PROCLAMATION.

Whereas by an act of Congress entitled "An act to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes," approved the 20th day of April, A. D. 1871, power is given to the President of the United States, when in his judgment the public safety shall require it, to suspend the privileges of the writ of *habeas corpus* in any State or part of a State whenever combinations and conspiracies exist in such State or part of a State for the purpose of depriving any portion or class of the people of such State of the rights, privileges, immunities, and protection named in the Constitution of the United States and secured by the act of Congress aforesaid; and whenever such combinations and conspiracies do so obstruct and hinder the execution of the laws of any such State and of the United States as to deprive the people aforesaid of the rights, privileges, immunities, and protection aforesaid, and do oppose and obstruct the laws of the United States and their due execution, and impede and obstruct the due course of justice under the same; and whenever such combinations shall be organized and armed, and so numerous and powerful as to be able by violence either to overthrow or to set at defiance the constituted authorities of said State and of the United States within such State; and whenever by reason of said causes the conviction of such offenders and the preservation of the public peace shall become in such State or part of a State impracticable; and

Whereas such unlawful combinations and conspiracies for the purposes

*Ulysses S. Grant* 4091

aforesaid are declared by the act of Congress aforesaid to be rebellion against the Government of the United States; and

Whereas by said act of Congress it is provided that before the President shall suspend the privileges of the writ of *habeas corpus* he shall first have made proclamation commanding such insurgents to disperse; and

Whereas on the 12th day of the present month of October the President of the United States did issue his proclamation, reciting therein, among other things, that such combinations and conspiracies did then exist in the counties of Spartanburg, York, Marion, Chester, Laurens, Newberry, Fairfield, Lancaster, and Chesterfield, in the State of South Carolina, and commanding thereby all persons composing such unlawful combinations and conspiracies to disperse and retire peaceably to their homes within five days from the date thereof, and to deliver either to the marshal of the United States for the district of South Carolina, or to any of his deputies, or to any military officer of the United States within said counties, all arms, ammunition, uniforms, disguises, and other means and implements used, kept, possessed, or controlled by them for carrying out the unlawful purposes for which the said combinations and conspiracies are organized; and

Whereas the insurgents engaged in such unlawful combinations and conspiracies within the counties aforesaid have not dispersed and retired peaceably to their respective homes, and have not delivered to the marshal of the United States, or to any of his deputies, or to any military officer of the United States within said counties, all arms, ammunition, uniforms, disguises, and other means and implements used, kept, possessed, or controlled by them for carrying out the unlawful purposes for which the combinations and conspiracies are organized, as commanded by said proclamation, but do still persist in the unlawful combinations and conspiracies aforesaid:

Now, therefore, I, Ulysses S. Grant, President of the United States of America, by virtue of the authority vested in me by the Constitution of the United States and the act of Congress aforesaid, do hereby declare that in my judgment the public safety especially requires that the privileges of the writ of *habeas corpus* be suspended, to the end that such rebellion may be overthrown, and do hereby suspend the privileges of the writ of *habeas corpus* within the counties of Spartanburg, York, Marion, Chester, Laurens, Newberry, Fairfield, Lancaster, and Chesterfield, in said State of South Carolina, in respect to all persons arrested by the marshal of the United States for the said district of South Carolina, or by any of his deputies, or by any military officer of the United States, or by any soldier or citizen acting under the orders of said marshal, deputy, or such military officer within any one of said counties, charged with any violation of the act of Congress aforesaid, during the continuance of such rebellion.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.]      Done at the city of Washington, this 17th day of October, A. D. 1871, and of the Independence of the United States of America the ninety-sixth.

U. S. GRANT.

By the President:

    J. C. BANCROFT DAVIS,

        *Acting Secretary of State.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

A PROCLAMATION.

The process of the seasons has again enabled the husbandman to garner the fruits of successful toil. Industry has been generally well rewarded. We are at peace with all nations, and tranquillity, with few exceptions, prevails at home. Within the past year we have in the main been free from ills which elsewhere have afflicted our kind. If some of us have had calamities, these should be an occasion for sympathy with the sufferers, of resignation on their part to the will of the Most High, and of rejoicing to the many who have been more favored.

I therefore recommend that on Thursday, the 30th day of November next, the people meet in their respective places of worship and there make the usual annual acknowledgments to Almighty God for the blessings He has conferred upon them, for their merciful exemption from evils, and invoke His protection and kindness for their less fortunate brethren, whom in His wisdom He has deemed it best to chastise.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.]      Done at the city of Washington, this 28th day of October, A. D. 1871, and of the Independence of the United States the ninety-sixth.

U. S. GRANT.

By the President:

    HAMILTON FISH, *Secretary of State.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

A PROCLAMATION.

Whereas in my proclamation of the 12th day of October, in the year 1871, it was recited that certain unlawful combinations and conspiracies existed in certain counties in the State of South Carolina for the purpose of depriving certain portions and classes of the people of that State of the rights, privileges, and immunities and protection named in the Constitution of the United States and secured by the act of Congress approved April 20, 1871, entitled ''An act to enforce the provisions of the four-

*Ulysses S. Grant*    4093

teenth amendment to the Constitution of the United States," and the persons composing such combinations and conspiracies were commanded to disperse and to retire peaceably to their homes within five days from said date; and

Whereas by my proclamation of the 17th day of October, in the year 1871, the privileges of the writ of *habeas corpus* were suspended in the counties named in said proclamation; and

Whereas the county of Marion was named in said proclamations as one of the counties in which said unlawful combinations and conspiracies for the purposes aforesaid existed, and in which the privileges of the writ of *habeas corpus* were suspended; and

Whereas it has been ascertained that in said county of Marion said combinations and conspiracies do not exist to the extent recited in said proclamations; and

Whereas it has been ascertained that unlawful combinations and conspiracies of the character and to the extent and for the purposes described in said proclamations do exist in the county of Union in said State:

Now, therefore, I, Ulysses S. Grant, President of the United States of America, do hereby revoke, as to the said county of Marion, the suspension of the privileges of the writ of *habeas corpus* directed in my said proclamation of the 17th day of October, 1871.

And I do hereby command all persons in the said county of Union composing the unlawful combinations and conspiracies aforesaid to disperse and to retire peaceably to their homes within five days of the date hereof, and to deliver either to the marshal of the United States for the district of South Carolina, or to any of his deputies, or to any military officer of the United States within said county, all arms, ammunition, uniforms, disguises, and other means and implements used, kept, possessed, or controlled by them for carrying out the unlawful purposes for which the combinations and conspiracies are organized.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.]    Done at the city of Washington, this 3d day of November, A. D. 1871, and of the Independence of the United States of America the ninety-sixth.    U. S. GRANT.

By the President:

HAMILTON FISH, *Secretary of State.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

A PROCLAMATION.

Whereas by an act of Congress entitled "An act to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes," approved the 20th day of April, A. D.

4094          *Messages and Papers of the Presidents*

1871, power is given to the President of the United States, when in his
judgment the public safety shall require it, to suspend the privileges of
the writ of *habeas corpus* in any State or part of a State whenever com-
binations and conspiracies exist in such State or part of a State for the
purpose of depriving any portion or class of the people of such State of
the rights, privileges, immunities, and protection named in the Consti-
tution of the United States and secured by the act of Congress aforesaid;
and whenever such combinations and conspiracies do so obstruct and
hinder the execution of the laws of any such State and of the United
States as to deprive the people aforesaid of the rights, privileges, immu-
nities, and protection aforesaid, and do oppose and obstruct the laws of
the United States and their due execution, and impede and obstruct the
due course of justice under the same; and whenever such combinations
shall be organized and armed and so numerous and powerful as to be
able by violence either to overthrow or to set at defiance the constituted
authorities of said State and of the United States within such State; and
whenever by reason of said causes the conviction of such offenders and the
preservation of the public peace shall become in such State or part of a
State impracticable; and

Whereas such unlawful combinations and conspiracies for the purposes
aforesaid are declared by the act of Congress aforesaid to be rebellion
against the Government of the United States; and

Whereas by said act of Congress it is provided that before the Presi-
dent shall suspend the privileges of the writ of *habeas corpus* he shall first
have made proclamation commanding such insurgents to disperse; and

Whereas on the 3d day of the present month of November the Presi-
dent of the United States did issue his proclamation, reciting therein,
among other things, that such combinations and conspiracies did then
exist in the county of Union, in the State of South Carolina, and com-
manding thereby all persons composing such unlawful combinations and
conspiracies to disperse and retire peaceably to their homes within five
days from the date thereof, and to deliver either to the marshal of the
United States for the district of South Carolina, or to any of his deputies,
or to any military officer of the United States within said county, all
arms, ammunition, uniforms, disguises, and other means and implements
used, kept, possessed, or controlled by them for carrying out the unlaw-
ful purposes for which the said combinations and conspiracies are organ-
ized; and

Whereas the insurgents engaged in such unlawful combinations and
conspiracies within the county aforesaid have not dispersed and retired
peaceably to their respective homes, and have not delivered to the mar-
shal of the United States, or to any of his deputies, or to any military
officer of the United States within said county, all arms, ammunition,
uniforms, disguises, and other means and implements used, kept, pos-
sessed, or controlled by them for carrying out the unlawful purposes for

*Ulysses S. Grant*                                      4095

which the combinations and conspiracies are organized, as commanded by said proclamation, but do still persist in the unlawful combinations and conspiracies aforesaid:

Now, therefore, I, Ulysses S. Grant, President of the United States of America, by virtue of the authority vested in me by the Constitution of the United States and the act of Congress aforesaid, do hereby declare that in my judgment the public safety especially requires that the privileges of the writ of *habeas corpus* be suspended, to the end that such rebellion may be overthrown, and do hereby suspend the privileges of the writ of *habeas corpus* within the county of Union, in said State of South Carolina, in respect to all persons arrested by the marshal of the United States for the said district of South Carolina, or by any of his deputies, or by any military officer of the United States, or by any soldier or citizen acting under the orders of said marshal, deputy, or such military officer within said county, charged with any violation of the act of Congress aforesaid, during the continuance of such rebellion.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.]     Done at the city of Washington, this 10th day of November, A. D. 1871, and of the Independence of the United States of America the ninety-sixth.

                                            U. S. GRANT.

By the President:

HAMILTON FISH,
    *Secretary of State.*


## EXECUTIVE ORDER.

### BY THE PRESIDENT OF THE UNITED STATES.

#### EXECUTIVE ORDER.

WASHINGTON, *March 31, 1871.*

The act of June 15, 1852, section 1 (10 U. S. Statutes at Large, p. 10), provides:

That whenever any officer of either of the Territories of the United States shall be absent therefrom and from the duties of his office no salary shall be paid him during the year in which such absence shall occur, unless good cause therefor shall be shown to the President of the United States, who shall officially certify his opinion of such cause to the proper accounting officer of the Treasury, to be filed in his office.

It has been the practice under this law for the Territorial officers who have desired to be absent from their respective Territories to apply for leaves to the head of the proper Department at Washington, and when such leave has been given the required certificate of the President has been granted as a matter of course.

# OFFICIAL OPINIONS

OF

# THE ATTORNEYS GENERAL

OF

## THE UNITED STATES,

ADVISING THE

## PRESIDENT AND HEADS OF DEPARTMENTS

IN RELATION TO THEIR OFFICIAL DUTIES,

AND EXPOUNDING THE CONSTITUTION, TREATIES WITH FOREIGN
GOVERNMENTS AND WITH INDIAN TRIBES, AND
THE PUBLIC LAWS OF THE COUNTRY.

---

EDITED BY

## J. HUBLEY ASHTON.

---

VOLUME XI.

[PUBLISHED BY AUTHORITY OF CONGRESS.]

WASHINGTON, D. C.:
W. H. & O. H. MORRISON.
1869.

Entered according to act of Congress, in the year 1869, by

W. H. & O. H. MORRISON,

In the Clerk's Office of the District Court of the District of Columbia.



This volume is printed on acid free paper by
WILLIAM S. HEIN & CO., INC.

Surrender of the Rebel Army of Northern Virginia.

bay was, no doubt, within the contemplation of the legis-lature, though we cannot say so as a matter of law.

I am of opinion, therefore, that without further legisla-tion the money appropriated by the act of February 20, 1863, cannot be applied for the purchase of land for the purpose indicated.

I am, sir, very respectfully,

Your obedient servant,

JAMES SPEED.

Hon. EDWIN M. STANTON,
        *Secretary of War.*

---

SURRENDER OF THE REBEL ARMY OF NORTHERN
VIRGINIA.

1. By the terms of the surrender to General Grant of the army under the rebel Lee, on the 9th of April, 1865, the officers of that army who resided before the rebellion in the loyal States and went to Virginia or elsewhere and entered into the rebel service, are not entitled to return to their former homes in the loyal States.
2. Persons in the civil service of the rebellion are not embraced by the terms of the surrender of that army.
3. Officers of that army have no right after the surrender to wear their uniforms in public in the loyal States.

ATTORNEY GENERAL'S OFFICE,
        *April* 22, 1865.

SIR: I have the honor to acknowledge the receipt of your letter of the 22d of April. In it you ask me three questions, growing out of the capitulation made betwixt General Grant, of the United States army, and General Lee, of the rebel army.

You ask, first, whether rebel officers, who once resided in the city of Washington and went to Virginia or else-where in the South and took service, can return to the city under the stipulation of the capitulation, and reside here as their homes? Second, whether persons who resided in Washington about the time the rebellion broke out, left

Surrender of the Rebel Army of Northern Virginia.

the city, and went to Richmond, where they have adhered to the rebel cause, entered into the civil service, or otherwise given it their support, comfort, and aid, can return to Washington since the capitulation of Lee's army and the capture of Richmond, and reside here under the terms of the capitulation? Third, you state that since the capitulation of General Lee's army, rebel officers have appeared in public in the loyal States wearing the rebel uniform; and you ask whether such conduct is not a fresh act of hostility on their part to the United States, subjecting them to be dealt with as avowed enemies of the Government.

Your letter is accompanied with a copy of the terms of capitulation entered into betwixt Generals Grant and Lee. It is as follows:

"Rolls of all the officers and men to be made in duplicate, one copy to be given to an officer designated by me, the other to be retained by such officer or officers as you may designate. The officers to give their individual paroles not to take arms against the Government of the United States until properly exchanged, and each company or regimental commander sign a like parole for the men of their commands. The arms, artillery, and public property to be packed and stacked, and turned over to the officers appointed by me [General Grant] to receive them. This will not embrace the side-arms of the officers, nor their private horses, nor baggage. This done, each officer and man will be allowed to return to their homes, not to be disturbed by United States authority so long as they observe their parole and the laws in force where they reside."

1. In giving construction to these articles of capitulation, we must consider in what capacity General Grant was speaking. He of course spoke by authority of the President of the United States as commander-in-chief of the armies of the United States. It must be presumed that he had no authority from the President, except such as the commander-in-chief could give to a military officer.

The President performs two functions of the Govern-

206                    HON. JAMES SPEED

ment, one civil, the other military; as President of the
United States, and its civil head, he possesses the pardoning
power; as President of the United States he is commander-
in-chief of the armies of the United States, and is the head
of its belligerent power.   His power to pardon, as a civil
magistrate, cannot be delegated ; it is a personal trust, in-
separably connected with the office of President.   As com-
mander-in-chief of the armies of the United States, he has,
of necessity, to delegate a vast amount of power.   Regard-
ing General Grant, then, purely as a military officer, and
that he was speaking as one possessing no power except
belligerent, and considering that fact to be well known to
the belligerents with whom he was making the stipulation,
let us come to the consideration of the first question which
you have propounded.

It must be observed that the question is not as to the
extent of the power that the President, as commander-in-
chief of the armies, possesses; it is not whether he, as
commander-in-chief of the armies of the United States,
could grant parole, by virtue of his military authority, to
rebels to go and reside in loyal communities, communities
that had not been in rebellion against the Government of
the United States; but the question is whether, by and
under he terms of the stipulation, he has granted such
permissions.

In the cases in 2 Black, commonly called the Prize
Cases, the Supreme Court of the United States decided
that the rebels were belligerents; that this was no loose and
unorganized insurrection, without defined boundary, but
that it had a boundary marked by lines of bayonets, which
can only be crossed by force; that south of that line is
enemy's territory, because claimed and held by an organ-
ized, hostile, and belligerent power; that all persons resid-
ing within that territory must be treated as enemies, though
not foreigners; and it is well settled that all persons going
there without license, pending the hostilities, or remain-
ing there after hostilities commenced, must be regarded
and treated as residents of that territory.   It follows, as a

**Surrender of the Rebel Army of Northern Virginia.**

matter of course, that residents of the territory in rebellion cannot be regarded as having homes in the loyal States. A man's home and his residence cannot be distinct the one from the other.   The rebels were dealt with by General Grant as belligerents.   As belligerents, their homes were, of necessity, in the territory belligerent to the Government of the United States.   The officers and soldiers of General Lee's army, then, who had homes prior to the rebellion in the northern States, took up their residences within the rebel States and abandoned their homes in the loyal States, and when General Grant gave permision to them, by the stipulation, to return to their homes, it cannot be understood as a permission to return to any part of the loyal States. That was a stipulation of surrender, and not a truce. Vattel lays it down (p. 411) that " during the truce, especially if made for a long period, it is naturally allowable for enemies to pass and repass to and from each other's country, in the same manner as it is allowed in time of peace, since all hostilities are now suspended; but each of the sovereigns is at liberty, as he would be in time of peace, to adopt every precaution which may be necessary to prevent this intercourse from becoming prejudicial to him.   He has just grounds of suspicion against people with whom he is soon to recommence hostilities.   He may even declare, at the time of making the truce, that he will admit none of the enemy into any place under his jurisdiction.

" Those who, having entered the enemy's territories during the truce, are detained there by sickness, or any other unsurmountable obstacle, and thus happen to remain in the country after the expiration of the armistice, may, in strict justice, be kept prisoners; it is an accident which they might have foreseen, and to which they have, of their own accord, exposed themselves; but humanity and generosity commonly require that they should be allowed a sufficient term for their departure.

" If the articles of truce contain any conditions either more extensive or more narrowly restrictive than what we

Surrender of the Rebel Army of Northern Virginia.

have here laid down, the transaction becomes a particular convention. It is obligatory on the contracting parties, who are bound to observe what they have promised in due form; and the obligations thence resulting constitute a conventional right."

Now, if the rights of enemies, during a long truce and suspension of hostilities, are thus restricted, it would seem evident that their rights under a stipulation of surrender, without any suspension of hostilities, could not, without express words in the stipulation to that effect, be anything like as large as under a truce and suspension of hostilities.

Regarding General Grant, then, as speaking simply as a soldier, and with the powers of a soldier; regarding this war as a territorial war, and all persons within that territory as residents thereof, and, as such, enemies of the Government; and looking to the language of the stipulation, I am of opinion that the rebel officers who surrendered to General Grant have no homes within the loyal States, and have no right to come to places which were their homes prior to their going into the rebellion.

II. As to your second question: The stipulation of surrender made betwixt Generals Grant and Lee does not embrace any persons other than the officers and soldiers of General Lee's army. Persons in the civil service of the rebellion, or who had otherwise given it support, comfort, and aid, and were residents of the rebel territory, certainly have no right to return to Washington under that stipulation.

III. As to the third question: My answer to the first is a complete answer to this.

Rebel officers certainly have no right to wear their uniforms in any of the loyal States. It seems to me that such officers, having done wrong in coming into the loyal States, are but adding insult to injury in wearing their uniforms. They have as much right to bear the traitor's flag through the streets of a loyal city as to wear a traitor's garb. The stipulation of surrender permits no such

TO THE SECRETARY OF THE TREASURY.   209

Appointment of Assistant Assessors of Internal Revenue.

thing, and the wearing of such uniform is an act of hostility against the Government.

I am, sir, very respectfully,

Your obedient servant,

JAMES SPEED.

Hon. E. M. STANTON,
*Secretary of War.*

———

## APPOINTMENT OF ASSISTANT ASSESSORS OF INTERNAL REVENUE.

1. The 1st section of the act of March 8, 1865, providing for the appointment of assistant assessors of internal revenue by the assessors, is unconstitutional.
2. The 16th section of that act, repealing all provisions of any former act inconsistent therewith, repealed so much of the act of June 30, 1864, as conferred on the Secretary of the Treasury the power of appointing, with the approval of the Commissioner of Internal Revenue, the assistant assessors.
3. Under these circumstances, the President, since the passage of the act of March 3, 1865, is authorized to commission the assistant assessors.
4. It is the duty of the President, before any judicial determination has been had of the constitutionality of the provision of the act of March 3, 1865, before mentioned, to exercise his constitutional power of appointment in the case of assistant assessors

ATTORNEY GENERAL'S OFFICE,
*April* 25, 1865.

SIR: I have duly considered the important and interesting questions suggested by the Commissioner of Internal Revenue, touching the recent legislation of Congress with reference to the office of assistant assessor of internal revenue, which you have submitted to me for my opinion.

The questions may be thus stated:

I. Whether the provision of the act of March 3, 1865, vesting the appointment of assistant assessors in the assessors of the respective assessment districts, is constitutional?

vol. xi.—14

| 46TH CONGRESS, } | SENATE. | { REPORT 693, |
|---|---|---|
| 2d Session. } | | { Part 2. |

## REPORT AND TESTIMONY

OF THE

# SELECT COMMITTEE

OF THE

# UNITED STATES SENATE

TO INVESTIGATE THE CAUSES OF

## THE REMOVAL OF THE NEGROES FROM THE SOUTHERN STATES TO THE NORTHERN STATES.

IN THREE PARTS.

## PART II.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1880.

Compendium_Vorenberg
Page 653

# PART II.

## PROCEEDINGS

#### OF THE

## SELECT COMMITTEE OF THE UNITED STATES SENATE

##### TO INVESTIGATE THE CAUSES OF THE

### REMOVAL OF THE NEGROES FROM THE SOUTHERN STATES TO THE NORTHERN STATES.

*Sessions held at Washington, beginning Tuesday, March 9, 1880.*

1 N E

520 · NEGRO EXODUS FROM SOUTHERN STATES.

Q. And the result has been that they are going to leave ?—A. Yes; they are going to leave, world without end! You have not seen any exodus yet; O, no!

Q. Does the condition of things in that parish among the colored people affect other parishes there ?—A. Well, the murder of these men in Tensas Parish at the last Congressional election down there in 1878, when John Floyd King was elected to Congress from that district—the murdering of these men——

Q. How many were murdered there ?—A. About seventy-five were murdered in the parish of Tensas during the Fairfax and Peck scrape —I guess you have read of it. There was in the parish of Tensas about seventy-five men killed—in Tensas and Concordia together.

Q. Were they all colored men, or colored and white both ?—A. They were colored.

Q. Were no white men killed ?—A. Not over two at the highest. Peck was killed—shot in Mr. Fairfax's house. And, by the way, Governor Nicholls said in his message to the legislature, when it met, that he condemned the action of Mr. Peck—that he was wrong to go to Mr. Fairfax's house, and it was to be regretted, and the Democrats got mad at him for saying that much, and got rid of him as soon as possible.

Q. Was anybody punished for the Tensas outrages ?—A. They arrested some of them, and had a sort of mock examination, and sent them back on their bonds, and some of them went back to whipping negroes again. In that Tensas massacre three-fourths of them that were killed were my friends—good friends of mine—whom I was acquainted with, and I can give you the names of some of them that were killed. One of these men I saw hanging in the swamp there. My wife was in Saint Joe at the time of the disturbance, and I was in town during the time. The yellow fever was about, and I helped the Howard Association. The yellow fever was about in my town, the reason I did not go up. It is about forty miles from my town to the town of Saint Joe. It is the parish-seat, Saint Joe is, of Tensas Parish. These colored men were killed in Tensas Parish, and my friends that I spoke of, that I am personally acquainted with, are in the parish of Tensas.

There was Doc. Smith; he was killed in 1878. I saw Doc. Smith as he was hanging there, as I went through the swamp. He was hanging up a tree, with a bran-new grass rope around him. And there was another man hanging by the side of him, by the name of William Hunter. I was not acquainted with Hunter, but I knowed Smith and recognized him. I went on up the plantation there, and I asked some colored men why they did not cut the poor fellows down and bury them, and they said to me, " Why these white folks said that if any man attempted to cut them down and bury them they would be treated the same way." I was told afterwards that some white farmer had sent some colored men and had them taken down and buried them. And no one will deny this—even the Democrats won't deny that themselves.

Now, these men were killed in Tensas Parish, only thirty-five to forty miles from my town. This of course excited the colored people in my parish at that time. And they proved to be good prophets. They said it was only the question of another election, and they would reach Madison, too. And their prophecies came too true. Now, in the parish of Concordia, during all of this same trouble, they killed Hymus Wilson, and Wash. Hillson, and John Robinson, and Charles Cornell, and Peter Young. These men are now dead. They were killed during that time.

Q. What were they killed for ?—A. Well, you know it was near the Congressional election, and the Democrats said they were going to carry

NEGRO EXODUS FROM SOUTHERN STATES.                521

Tensas. Tensas was the banner Republican parish, and Concordia is the third, my parish of Madison is next; and the Democrats said they were going to carry the Congressional district, and it didn't make any difference what it cost, they were going to carry it. And these men from Catahoula and men from Mississippi came over there, five or six companies of them, well drilled and well armed and equipped. And I will tell you here, now, that the white people in Louisiana are better armed and equipped now than during the war, and they have a better standing army now in the State of Louisiana than was ever known in the State, and I defy any white man in Louisiana, Democrat or Republican, to deny that assertion. We have brigadiers all over the State, and we have not got a ragged corporal and not a colored militia company in all the State, not one. And we have an excellent army there. You see them parade the streets of New Orleans with their gray uniforms on, and with their improved Winchester rifles and their Gatling guns, and they have now got everything except the rebel flag—even to the gray uniform.

Q. Why do not the colored people get arms to defend themselves?— A. We are going to get arms. The State authorities will not give them; and the white people are not armed under the authority of the State and appropriation from the State government. They have got rifle companies in every parish and every town in the State of Louisiana. They are well organized with rifle companies. We had a secret meeting among the colored people to decide for ourselves whether we would resist these men that were coming in or not; whether we would make a fight or not to defend ourselves against them; and out of eight hundred colored men assembled in this meeting we discussed the question whether we would arm ourselves with such arms and buy ammunition to defend ourselves in case it was necessary, and it was a fact that we could not buy any powder. And whenever these men got ready to come you can always tell—they put out what we call "a feeler"; the white people begin to talk this way; they say "The negroes are going to burn the white folks' gin-houses; a massacre will come; the negroes are getting ready to burn our gin-houses." And whenever you hear that kind of talk our people understand and know very well that they are fixing to come. That is the excuse they make beforehand.

Well, we held this meeting to decide——

(The hour for adjournment of the committee having come, witness was cut short in his examination.)

Adjourned to Saturday, April 3, 1880.

————

THIRTY-SIXTH DAY.

WASHINGTON, D. C., *April 3*, 1880.

Committee met this day at 10.30 a. m. Present Messrs. Voorhees (chairman), Vance, Windom, and Blair.

By Mr. WINDOM:

Question. Mr. Murrill, when the committee adjourned yesterday, you were speaking about a meeting that the colored men held in Madison Parish; go on, and finish what you were saying in regard to that.— Answer. Yes, sir; we held a meeting in Madison Parish, when we heard that those bulldozers from adjacent parishes were coming in there to

# NEWS ARTICLES

*Army and Navy Journal*, June 1, 1867, p. 650

## JUNE 1, 1867.

### A GOOD WORD FOR THE INDIAN BUREAU.

*To the Editor of the Army and Navy Journal.*

SIR:—Having learned through a copy of your paper which was taken from the body of a soldier recently killed, scalped, and cut up generally, by one of my young chiefs, that you invite correspondence on the various branches of the public service, I have been induced to address you, in the hope that, through your valuable paper, some of the wrongs under which we suffer might be brought to the public attention, and meet redress.

You are aware that for a number of years the Indians of this section of the country have been on the most friendly terms with the Indian Bureau—that we have never lost an opportunity of stealing stock, robbing a mail, or committing a murder, whenever and wherever it could be done with a moderate (or no) personal risk. You are aware that by thus attending to business, we have prevented travel over the highways of the country, retarded emigration, the advance of civilization, the development of wealth, the dissemination of news—have rendered children orphans, parents childless, blighted many a happy future, and created consternation and alarm, until the good white people of the States have voted millions upon millions of dollars to be paid to us upon the condition that we would let you have our country, and let white people alone.

Now, sir, those millions of dollars, we understood, were intended to buy blankets, arms, ammunition, agricultural implements, and many other goods, which would become necessary to us as we changed our habits from those of a nomad to those of a peaceable, law abiding citizen.

Mr. Editor, very little of those millions ever reach the Indian; and where one conscience more tender than another does suffer that little to come to us, the same conscience is so elastic that it snaps it back again in trade.

We know the Indian Bureau is our friend, because it says so, and as the "agents" and superintendents say they belong to the Indian Bureau, they must be our friends also, though it is rather hard to see in the atmosphere of Dakota. We do all the fighting, keep up all the trouble, run all the risk, and get all the blame, while the friends (?) get the largest share of our pay for being peaceful and good Indians.

Of course it is necessary for our business that we should have arms and ammunition. These they give us in fair proportion, and for the last year or two we have been able to make things quite lively; but as the white men are now coming out here armed with long range and repeating weapons of various kinds, the chances are not so much in our favor as they were, and business is getting unsafe.

I think the agents could afford to give us Spencer or Henry rifles, and the regulation allowance of ammunition. I'm sure it would make trade better for both of us. Thus far we have succeeded in getting a few from the soldiers, but not nearly enough to go round. We got quite a number of fire-arms at Fort Phil. Kearney from the soldiers there, but they were so obstinate about parting with them, that although there were only about three thousand of us, we pitched in and killed the whole party, about ninety.

We got some good rifle muskets at Fort Reno the other day from some poor devils of soldiers, who had been pent up in their stockade all Winter, feeding on salt bacon until their legs were rotting off and their teeth were dropping out with scurvy. They came out where about forty of us were hiding, to kill some buffalo, and when they got scattered we jumped upon three of them, shot them, scalped them, cut off their heads, gouged out their eyes, and otherwise left our marks.

Sometimes we can supply ourselves from the train or lone wagon of some enterprising emigrant, who, placing his trust in that pleasant fiction of the Bureau termed a peace, ventures into our hunting grounds; or again, from the solitary miner, who prospects amid the solitudes of the mountains, in hope of digging from the earth the means of wealth, comfort, or even support for a loved wife and little ones away in his distant Eastern home. In all such cases the neglect of the Bureau obliges us to resort to what plain-spoken people would call stringent measures—mostly such as killing, scalping, ripping up, etc., and other time-honored institutions peculiar to our race.

I know that this sort of thing is somewhat shocking to the whites, but it is our way; it brings the appropriations, and fattens the Bureau to which we belong. Some of the agents draw rations from the military posts, which they feed to us when we are too sick, tired, or lazy to hunt or steal. I think that involves a useless expense to the Bureau, because it must repay the war appropriation from the funds of which the rations are purchased.

Earlier in the season all the posts along this route were well supplied with beef cattle, but the soldiers would sometimes get tired of herding them, and we would then step in and take them for our own use, which saved the trouble of making a requisition upon the Commissary, and answered our purpose just as well. These things do not seem to be appreciated by the soldiers, as they are obliged to do without beef until the period for which they had been supplied has elapsed; and as many months have now expired since the cattle disappeared, they are nearly all sick with scurvy and unable to fight, even if the Bureau was inclined to let them, which suits us again.

The only thing we now require to be masters of the situation is a few field pieces of heavy metal, which the Bureau ought to supply at once. With these we could knock down all the cottonwood stockades around the posts in this territory, and from a safe distance burn all the cottonwood or pine log villages the soldiers call forts, for the use of which dignified title, I am informed, the officers pay

a monthly rent of twenty cents on each ration allowed to them by the Government. It is true this destruction of the posts would be a favor to the officers, for it would enable them to draw the fifty cent ration, which more than compensates for the difference in comfort and accommodation between a tent and the miserable and mud-bedaubed hut called "quarters;" but it would at the same time enable us to clean out or drive off all the sickly, scurvy-stricken recruit garrisons on the Big Horn route.

Then, sir, there would be peace. With the assistance of the Bureau we would control the trade and emigration to the metalliferous regions and to the Pacific coast. Rail-