ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **COMPENDIUM OF WORKS CITED IN DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | **VOLUME 1 OF 13** |
| Defendants. | Courtroom:    5A |
| | Judge:          Hon. Roger T. Benitez |
| | Action Filed:  August 15, 2019 |

1

## <u>INDEX</u>

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |

| **BOOKS** | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020 (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

# HISTORICAL STATUTES

force en toutz pointz; et outre ceo est auxint assentuz q̃ sil ascun alien eit purchacez ou denore purchace ascun benefice de Seinte Esglise Dignite ou autre & en ppre psone p̃igne possession dicelle ou loccupie de fait, deinz mesme le Roialme, soit il a son oeps ppre, ou al oeps dautri sanz especiale congie du Roi, soit il comprie en mesme lestatut, & outre ceo encourge en toutz pointz tielx peines & forfaiture come sont ordeignez p un autre estatut fait en lan xxv del regne luy noble Roi E. aiel nr̃e p̃ le Roi qore est, contre ceux q̃ purchacent pvisions dabbeies ou Priories; et encoure au fyn q̃ tielx licences ne se facent desore enavant, le Roi voet & comande a toutz ses lieges & autres q̃lx lour abeisgnent de cy enavant de luy prier dascune tiele licences doner; et si voet auxi le Roi luy mesmes abeisegner de doner ascune tiele licence, durantes les guerres horspris au Cardinal de Naples ou a autre especiale psone a q̃ le Roi soit p especiale cause tenuz.

xij. Item est ordeignez & assentuz & le Roi defende q̃ desoreme nult homme chivache deinz le Roialme armez, encontre la forme de lestatut de Norhampton sur ce fait, ne ovesq lancegay deinz mesme le Roialme, les queux lancegayes soient de tout oustez deinz le dit Roialme come chose defendue p nr̃e p̃ le Roi, sur peine de forfaiture dicelx lancegaies armures & auti hernays quelconqes es mayns & possession de celluy q̃ les port̃a desore deinz mesme le Roialme contre ceux estatut & ordinances sanz especiale congie de Roi nr̃e p̃.

xiij. Item es briefs de p̃munire fac̃ est amentuz & accordez q̃ ceux q̃a queux tielx briefs sont portez, & q̃ sont de p̃sent hors de Roialme & sont de bone fame & aient faitz lo' gen̄alx atto'nes devant lo' depoir, q̃ le Chaunceller [Denglet're'] p̃ le temps esteant, p ladvis des Justices purra g'nter q̃ mesmes les psones purront apparoir & respondre & faire & resceivre ce q̃ la ley demande, p lo' gen̄alx atto'nes avanditz sivant come es autres cas & querelles; et ceux psones q̃ decy enavant passeront p licence nr̃e p̃ le Roi & soient de bone fame, q̃ a lo' requeste le dit Chaunceller p ladvis des Justices lour purra g'nter defaire lo' gen̄alx atto'nes en la Chancellerie p patent du Roi devant lo' passer, [a respondre'] aussi es ditz briefs de p̃munire fac̃, come en autres querelles en quei cas toutes voies soit exp̃se mencion [faite'] des briefs & querelles de p̃munire fac̃; et celle patente enai faite, purront des lors les ditz atto'nes en absence de lo' Meistres, respondre p eux & auт̃s atto'nes desouz eux, devant quelconq, juge du Roialme & faire & rescevire el dit cas, siavant come en nult autre cas nientcontrestant ascun estatut fait a contr̃ie avant ces heures.

Item sur la grevouse pleinte q̃est faite des meynteno'rs des querelles & chaumpto'rs; est ordeignez & assentuz q̃ lestatutz ent faitz en les ans du regne le Roi Edward aiel nr̃e p̃ le Roi qore est, et ensint auxint en lan nr̃e p̃ le Roi qore est primer, & auxint tenuz & gardez & duement execuиtz en toutz pointz.

Item est assentuz & le Roi defende estroitement q̃ decy enavant nulle psone aliene ou denazein de quelconq, estat ou condicion q̃il soit ameine ou envoie p p̃re ou p mer hors du face ameener ou envoier p p̃re ou p mer hors du Roialme Denglet're sa ascunes pties Descoce en prive ne en appt ascune maн̃e darmure de blee de brees ne dautre vitaille ou dautre refreschisement quelconq, sur peine de forfaiture de mesmes les vitailles armures & des autres choses avantditz ensemble avec les niefs vesseulx charrettes & chivalx q̃ les portent ou ameuent, ou de la P̃roie value dicelles, si enai ne soit q̃ le

*** Interlined on the Roll.

Force and Effect in all Points; and moreover it is assented, That if any Alien have purchased, or from henceforth shall purchase any Benefice of Holy Church, Dignity, or other Thing, and in his proper Person take Possession of the same, or occupy it himself within the Realm, whether it be to his own proper Use, or to the Use of another, without special Licence of the King, he shall be comprised within the same Statute; and moreover shall incur all Pains and Forfeitures in all Points as is before ordained by another Statute made the Five and twentieth Year of the noble King Edward the Third, Grandfather to our Lord the King that now is, against them that purchase Provisions of Abbeys or Priories; and to the Intent that such Licences shall not be from henceforth made, the King willeth and commandeth to all his Subjects and other, that they shall abstain them from henceforth to pray him for any such Licence to be given; and also the King himself will refrain to give any such Licence during the Wars, except to the Cardinal of Naples, or to some other special Person to whom the King is beholden for a special Cause.

ITEM, It is ordained and assented, and also the King doth prohibit, That from henceforth no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegays be clearly put out within the said Realm, as a Thing prohibited by our Lord the King, upon Pain of Forfeiture of the said Launcegays, Armours, and other Harness, in whose Hands or Possession they be found that bear them within the Realm, contrary to the Statutes and Ordinances aforesaid, without the King's special Licence.

ITEM, In Writs of Præmunire facias, It is assented and agreed, That they against whom such Writs be sued, and who at that Time be out of the Realm, and be of good Fame, and have made their general Atturnies before their departing, that the Chancellor of England for the Time being, by the Advice of the Justices, may grant, that the same Persons may appear to answer, to do, and to receive that Thing which the Law demandeth, by their general Atturnies aforesaid, as well as in other Causes and Quarrels; and those Persons which from henceforth shall pass by the King's Licence, and be of good Fame, that at their Request the Chancellor, by the Advice of the Justices, may grant to them to make their general Atturnies in the Chancery by the King's Patent, before their Passage, to answer as well in the said Writs of Præmunire facias, as in other Writs and Plaints; in which Case express Mention shall be made at all Times of the Writs and Plaints of Præmunire facias; and this Patent so made, the said Atturnies from henceforth, in Absence of their Masters, may answer [for them, and make'] other Atturnies under them, before any Judge of the Realm, [to'] do and receive in the said Case as much as in any other Case or Matter, notwithstanding any Statute made to the contrary heretofore.

ITEM, For the grievous Complaint that is made of Maintainers of Quarrels, and Champertors; It is ordained and assented, That the Statutes thereof made in the First and Fourth Years of King Edward, Grandfather to our Lord the King that now is, and also in the First Year of our Lord the King that now is, shall be holden and kept, and duly executed in all Points.

ITEM, It is assented, and the King straitly defendeth, That from henceforth no Person, Alien nor Denizen, of whatsoever Estate or Condition that he be, shall carry nor send, nor do to be carried nor sent, by Land nor by Sea, out of the Realm of England, to any Parts of Scotland, privily nor apertly, any Manner of Armour, Corn, Malt, or other Victuals, or any other refreshing, upon Pain of Forfeiture of the same Victuals, Armours, and other Things aforesaid, together with the Ships, Vessels, Carts, and Horses which shall bring or carry the same, or of the very Value of the same, except so it be

*who shall also be liable to the Penalties of 25 Ed.III. st. 5. c. 22.*

*The King's Licences to the contrary shall not be asked for.*

*XIII. No Man shall ride armed contrary to the Statute 2 Edw. III. chapter 3.*

*XIV. For enabling Parties out of the Realm to appoint Attorneys in Writs of Præmunire.*

*XV. Statutes 1 Edw. III. stat. 2. c. 14; 4 Edw. III. c. 11; 1 Ric. II. c. 4; against Maintenance, &c. confirmed.*

*XVI. No Armour or Victual shall be sent into Scotland without Licence of the King; on Pain of Forfeiture thereof.*

¹ by themselves and    ² and

1

# 20 Ric. 2, 93, ch. 1 (1396)

|
First, whereas in a Statute made the Seventh Year of the Reign of the King that now is, it is ordained and assented, That no Man shall ride armed within the Realm, against the form of the Statute of Northampton thereupon made, nor with Launcegays within the same Realm, and that the said Launcegays shall by utterly put out within the said Realm, as a Thing prohibited by the King, upon Pain of Forfeiture of the same Launcegays, Armours, or any other Harness, in the Hands and Possession of them that bear them, form henceforth within the same Realm against the same Statutes and Ordinances without the King's special License. Our Lord the King, considering the great clamour made to him in this present Parliament, because that the said Statute is not holden, hath ordained and established in the said Parliament, That the said Statutes shall be fully holden and kept, and duly executed; and that the said Launcegayes shall be clear put out upon the Pain contained in the said Statute of Northampton, and also to make Fine and Ransom to the King. And moreover, that no Lord, Knight nor other, little nor great, shall go nor ride by Night nor by Day armed, nor bear [Sallet] nor Skull of Iron, nor [of] other Armour, upon the pain aforesaid; save and except the King's Officers and Ministers in doing their Office. And Moreover, the King will and hath ordained, that the statute made the First Year of his Reign, of Liveries of Hats, shall be holden and kept upon the pain contined in the same Statute, and upon Pain to be imprisoned, and make Fine and Ransom of the King.

VI.
Proviso as to Persons whose Wives wear Velvet, &c.
[*See* § I.]

AND be it pvyded and enacted by aucͭie aforesaid, that if the Wif of any pson ͨͭ psons were any velvet in the lynyng or other part of her gowne other then in the cuffes or purfels of suche gowne, or ellͭ were any velvet in her kyrtell or were any peticote of silke, that then the husbande of evͭy suche Wiſ shall fynde one stoned horse of the stature above in this acte resyted, or shall incurre the aboveside penaltie and forfaiture of tenne poundes to be levyed and recoved as is afore declared : Provyded also that this Acte or any thing therin conteyned shall not extende to charge any pson or psons whose Wiſ or Wiſfes shall were any of the apparell or thing[ before rehersed during the tyme such Wiſ or Wyſfes shalbe devoryd from her or ther husbonde or husbondes, or shall willingly absent her self from her said husbound and duringe suche absence shall were any of the apparell or other thyng[ afore resyted : Provyded alwaies that heires w'in age being wardes whose landes tellͭ and hereditamentͭ amount to the yerely value of CC li. shall not be compelled by aucͭie of this acte till they clime to ther full age to kepe any horses, althoughe the wiſes of suche heires w'in age were any gowne of Sylke or any Frenche hood or Bonet of Velvet w' any habilyment past or egge of Gold Perle or Stone or any chayne of gold about ther nekkͭ or in ther plettͭ or in any apparell of ther bodie ; Any *thing in this Acte* to the contrary notw'stonding.

VII.
Proviso for replacing Horses killed in War, &c.

PROVYDED also that if all or any the horses kept by vertue of this acte shall happen to be kyllyd maymyd or lost in the ſrice of the Kingͭ warres, That then in evͭy suche case the owners of suche horse or horses so kyllyd maymed pished or lost in the warres shall have liſtie, by the space of twoo yeres next after suche chaunce of kylling maymyng pisshing or losing ther horses, to gvide other horses in the stede and place of the horses so kylled maymed pished or lost in the Warres, w'out any daunger losse or penaltie of this acte ; Any thing in this acte to the contrary therof notw'stonding.

VIII.
Cart-Horses and Sumpter-Horses.

PROVYDED also that cart horses or sumpter horses shall not be takyn reputed or reckned for any suche horses whiche any pson is or shalbe bounden to kepe by vertu of this acte.

---

# CHAPTER VI.

## AN ACTE concerninge Crosbowes and Handguns.

Recital of Stat. 25 H. VIII. c. 17, against shooting with Cross-bows and Hand-guns :

WHERE in the Parliament holden at Westiti the fyftenthe daye of Januarie in the twenty fyve Yere of the Kinges most gracious Raigne, and there contynued and kepte untill the thirtieth daye of Marche then next ensuynge, amonge divͭie and sundrie holsome and lawdable Actͭ Statutͭ and ordynͭncͭ one Statute and Ordyn'nce was made and ordeyned for the avoydinge and eschewinge of shotinge in Crosbowes and Handguns; synce the makinge of whiche Acte divͭie malicious and evill disposed psons not only ſhͭumynge wilfullye and obstynatlye the

Violation thereof ;

violacͭon and breach of the saide Acte, but also of their malicious and evill disposed myndes and purposes have wilfully and shamefully cͭmytted pͭetrated and done divͭie detestable and shamefull murthers roberies felonyes ryotͭ and routͭ with Crosbowes little shorte handguns and little hagbuttͭ, to the great pill and contynuall feare and daunger of the Kingͭ most lovinge subjectͭ, and also divͭie Kepers of Forestͭ Chases and Parkͭ aswell of our saide Soveraigne Lorde as other his Nobles and Cͭmons and divͭie Gentlemen Yomen and Servingemen nowe of late have layde aparte the good and laudable eͭcise of the longe bowe, whiche alwaye heretofore hathe bene the suertie savegarde and contynuall defence of this Realme of Englande, and an inestimable dread and terror to the Enemyes of the same, and nowe of late the saide evill disposed psons have used and yet doe daylie use to ryde and goe in the Kingͭ highe Wayes and elswhere, havinge with them Crosbowes and little handguns, ready furnished with Quarrellͭ Gunpowder fyer & touche to the great pill and feare of the Kingͭ most lovinge Subjectͭ : FOR REFORMACͤON wherof be it enacted ordeyned and established by the Kinge our Soveraigne Lorde the Lordes sͭpuall and temporall and the Cͭmons

Penalty on Persons, having less than £100. per Annum, keeping or using Cross-bows, &c. £10.

in this ſhͭent Parliament assembled and by thauctoritie of the same, in maner and fourme followinge That ys to saye ; that noe pson or psons of what estate or degree he or they be, excepte he or they in their owne right or in the right of his or their Wyeſſͭ to his or their owne uses or any other to the use of any suche pson or psons, have landes tellͭ fees annuyties or Officͭ to the yerely value of one hundred poundͭ, from or after the late daye of June next cͭmynge, shall shote in any Crosbowe handgun hagbutt or demy hake, or use or kepe in his or their houses or elswhere any Crosbowe handgun hagbut or demy hake, otherwise or in any other manner then ys hereafter in this ſhͭent Acte declared, uppon payne to forfeyt for everie tyme that he or they so offendinge contͭrie to this Acte tenne poundes.

II.
Length of Hand-guns, &c. to be kept.

AND furthermore be it enacted by thauctoritie aforesaide that no pson or psons, of what estate or degree soever he or they be, from or after the saide late daye of June shall shote in carye kepe use or have in his house or els where any handgunne other then suche as shalbe in the stock and gonne of the lenghe of one hole Yarde, or any hagbutt or demyhake other then suche as shalbe in the stock and gune of the lenghe of thre quarters of one Yarde, uppon payne to forfeyt for everie tyme that he or they shall carie use or have anye suche Gun being not of the lenghe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde, Tenne poundͭ sterlinge.

Those of less Length may be seized and conveyed by Persons having £100. a Year.

And that it shalbe laufull to everie pson and psons, w'h have landes tellͭ fees annuyties or officͭ to the yerelye value of one hundred poundͭ as ys aforesaide, to seise and take everie suche Crosbowe, and also everie handgun beinge in stock and gune shorter in lenghe then one whole Yarde and everie hagbutt and demyhake beinge shorter in lenghe then thre quarters of a Yarde, or any of them ; from the Kepinge or possession of everie suche Offender contͭrie to the forme of this Acte, and the same Crosbowe or Crosbowes to kepe and reteyne to his or their owne

use, and also the same handguns hagbutt' and demyhakt' so seised and taken within twenty dayes next after the same seisure or takinge to breake and distroye, upon peyne of fourtye Shillingt' for everie Gune so seised and not broken and destroyed, and the same so broken and destroyed to kepe & reteyne to his or their owne use.

AND be it further enacted by thauctoritie aforesaide, that noe pson or psons, other then suche as have landt' tent' rentt' fees annuyties or Offict' to the yerely value of one hundred Poundt' as ys aforesaide, from or after the saide laste daye of June, shall carrie or have, in his or their Jorney goinge or ridinge in the Kingt' highe waye or els where, any Crosbowe bent or Gune charged or furnished withe Powder fier or touche for the same, Except it be in tyme and Service of Warre, upon payne to forfeyt for everie suche Offence tenne poundt'; this psent Acte or any thinge therin conteyned to the contr'ie notwithstandinge.

*III. Penalty upon unqualified Persons riding, &c. with Guns charged, &c.*

AND be it further enacted by thauctoritie aforesaide, that no pson or psons from the saide laste daye of June shall in anywise shote in or withe anye handgune demyhake or hagbutt at any thinge at lardge, within any Cittie Boroughe or Markett Towne or within one quarter of a myle of any Cittie Boroughe or Markett Towne, excepte it be at a Butt or Banck of earth in place convenient, or for the defence of his pson or house, upon payne to forfeyte for everie suche Shott tenne poundes; this psent Acte or anny thinge therin conteyned to the contrarie notwithstandinge.

*IV. None shall shoot at large in Cities, &c.*

AND be it further enacted by thauctoritie aforesaide, that noe pson or psons of what estate or degre soever he or they be, shall from or after the saide laste daye of June comaunde any of his or their servauntt' to shote in any Crosbowe handgune hagbutt or demyhake of his or their saide Masters or of any other psons, at any deare fowle or other thinge excepte it be only at a butt or bank of Earth or in the tyme of Warre as ys aboveresaide, upon payne to forfeyt for everie suche offence tenne poundt': The one moytie of all w'h forfeytures and penalties in this psent Acte above specified shalbe to the Kinge our Soveraigne Lorde his heires and Successors, and thother moytie thereof to the partie that will sue for the same by bill playnt accon of Debte or Informacon in anny of the Kingt' Court' of Recorde in whiche suyte noe Essoyne gteccon nor Wager of lawe shalbe allowed.

*V. None shall order their Servants to shoot at Deer, &c. with Hand-guns.*

*Application of Penalties.*

PROVIDED alwaye and be it enacted by thauctoritie aforesaide, that it shalbe lavfull from henceforthe to all Gentlemen Yeomen and Servingemen of everie Lorde or Lordt' spuall or temporall and of all Knightt' Esquiers and Gentlemen, and to all the Inhabitauntt' of Cities Boroughes and Markett Townes of this Realme of Englande, to shote withe any handgune Demyhake or hagbutt at anye butt or bank of Earth onlye in place convenient for the same, so that everie suche handgune Demyhake or hagbutt be of the sevall lenghes aforesaide and not under; and that it shaibe lavfull to everie of the saide Lorde and Lordt' Knightt' Esquiers and Gentlemen, and the Inhabitauntt' of everie Cittie Boroughe and Markett Towne, to have and kepe in everie of their houses any suche handgune or handgunes of the lenghe of one whole Yarde, or any hagbutt or Demyhake of the lenghe of thre quarters of a Yarde as ya aforesaide and not under, to thintent to use and shote in the same at a butt or banke of Earthe onlye, as ya aboveraid, wherbye they and everie of them by thexcise thereof in forme aboveraid may the better ayde and assist to the defence of this Realme when nede shall requyre; this psent Acte or any thinge therein conteyned to the contr'ie notwithstandinge.

*VI. Shooting at Butts with Hand-guns allowed.*

AND be it further enacted by thauctoritie aforesaide, that it shalbe lavfull to everie pson and psons whiche dwelleth and inhabiteth in anye house standinge and being sett distant twoo furlongt' from any Cittie Boroughe or Towne, to kepe and have in his saide house for the onelye defence of the same handgunes hagbutt' and demyhakes beinge of the severall lenghes aforesaide and not under, & to use and exuse to shote in the same at any butt or bancke of earthe nere to his house and not otherwise; Any thinge conteyned in this Acte to the contr'ie notwithstandinge.

*VII. Hand-guns allowed out of Cities for Defence of Houses, &c.*

AND furthermore the Kingt' most lovinge Subjectt' the Lordes spuall and temporall and the Comons in this psent Parliament assembled, most humblye doe beseche the Kingt' Majestie that it be further enacted by thauctoritie aforesaide, that all fres patentt' Fraternyties, and also all other placardt' lycences and billt' assigned heretofore had made or signed by his Highnes or by any other authorised by his Highnes fms patentt' under his Great Seale to give licence and placarde to shote in Crosbowes & handgunes or any of them, shaibe from and after the saide laste daye of June frustrate voyde and of none effecte.

*VIII. Patents, &c. to shoot in Crosbowes, &c. declared void. [But see § XIV.]*

AND also that it may be further enacted by thauctoritie aforesaide that the saide Statute made in the saide xxv'h Yere of the Kingt' most gracious Raigne, and all other Statutt' heretofore made and gvided for thavoydinge and restreynt in shotinge of Crosbowes and handguns or for any of them, or for the usinge and kepinge of the same, be from henceforth utterlie voyde and of none effecte: Provided alwayes that everie pcesse suyte or Informacon conceaved comenced and nowe dependinge for any Offence done contr'ie to the forme of the saide Statute made in the said xxv'h Yere of the Kingt' moste noble Raigne, or of any other Statute made (') gvyded for and concerninge the shotinge in Crosbowes and handguns, not repealed, and for the kepinge of the same, shalbe as good and effectuall to the parties that have comenced the (') and shall stande and be in suche forme effecte and condicon as if this Acte had never bene made.

*IX. 25 H.VIII. c. 17, &c. repealed;*

*Except as to Suits depending.*

PROVIDED also that this Acte or any thinge therin conteyned be not in any wise hurtfull or pjudiciall to any pson or psons nowe beinge or that hereafter shalbe appoynted by the Kingt' Highnes, to kepe receyve or take any Crosbowes or Handguns that shalbe forfeyted or taken within the precincte or libtye of the Kingt' forrestt' parkt' or chaces, but that he or they may lavfully kepe and reteyne the same Crosbowes or Handguns from tyme to tyme untill suche tyme

*X. Proviso for Persons keeping Crosbowes, &c. seized in Forests;*

¹ or O.                * same O.

**for Makers of Crosbows, &c.**

as the further pleasure of the Kingẹ Highnes in that behalfe be to eṽy suche pson shewed & declared: Provided also that this Acte extende not to the makers of Crosbowes or Handguns, but that they may laufully kepe Crosbowes and Handguns Hagbuttẹ and Demyhakes in their houses, and shott in the same onlye for provinge & assayinge of them at a butt or bank of earthe in the place convenient and not otherwise, so that the saide Handguns Hagbuttẹ & Demyhakẹ

**and Merchants dealing therein.**

be of the seṽall lenghes in Stock and Gune as ys above lymitted: Provided also that this Acte nor any thinge therin conteyned extende not or be p̃judiciall to any Marchauntẹ whiche have or shall have any Crosbowes Handguns Hagbuttẹ and Demyhakẹ or any of them to sell within this Realme and to none other use, so that the same Handguns Hagbuttẹ and Demyhakẹ be of the seṽall lenghes in Gune and Stocke as ys above lymitted and not under.

**XI.**
**Proclamation of the Act in each County.**

PROVIDED also that noe manner of parson rune in any daunger or take hurte by reason of any penaltye or forfeiture conteyned in this Acte untill suche ryme as pclamaẽon be made of the same Acte, within the Countye where the partie that shall or maye offende contṝie to this Acte dwelleth, by the space of twentye dayes nexte after the makinge of the saide pclamaẽon.

**XII.**
**Housekeepers not liable to Penalty for their Lodgers keeping Crossbows, &c.**

PROVIDED also that yf any manner of pson bringe or cause to be brought withe him into his lodginge or in or to any other mans house any Crosbowe or Handgune, that then the penaltye and forfeyture, yf any suche be or hereafter shalbe forfeited by reason of this Acte, to rune and be onely upon the bringer of the saide Crosbowe and Handgune and not to the owner of the same lodginge or house, yf the saide [hownter¹] of the said lodging or house cause then saide bringer thereof to take & carrie awaye the saide Crosbowe or Handgune agayne withe him at his departinge; anye thinge in this Acte made to the contṝie notwithstandinge.

**XIII.**
**Offenders may be arrested by any Person.**

AND be it also enacted by thauctoritie of this p̃sent parliament that if any pson or psons, from or after the laste daye of June next comynge, see or fynde any pson or psons offendinge or doinge contṝie to the forme and effecte of this Acte, that then it shalbe laufull to everie suche pson or psons pceyvinge fyndinge or seinge anye suche pson or psons so offendinge contṝie to the fourme of this acte, to arrest and attache eṽy suche offendor or offendors and to bringe or convey the same to the next Justice of Peace of the same Countye where the said offendor or offendors shalbe founde soe offendinge; And that the same Justice of Peace upon a due examẽon and proeff thereof before him had or made by his discreẽon shall have full power and authoritie to sende or cõmytt the same offendor or offendors to the next Gaole, there to remayne till suche tyme as the saide penaltye or forfeyture shalbe trulye contented and paide by the saide offendor; the one moytie of the same penaltye to be paide to the Kingẹ Highnes and thother moytie thereof to the first bringer or conveyer of the saide offendor to the same Justice of Peace.

**XIV.**
**Licences, if given, (for § VIII.) shall specify at what Butts, &c. the Party licensed may shoot, and he shall give Security to obey such Regulations.**

AND be it further enacted by thauctoritie aforesaide, that yf any pson or psons doe at any tyme hereafter obteyne gett or purchase, of the Kingẹ Majestie his heires or successors, any placarde licence or bill assigned to shote in any Crosbowe Handgun Hagbutt or Demyhake contṝie to the tenor porporte and effecte of this p̃sent acte, that then there shalbe conteyned in everie suche placarde licence and bill assigned, at what beastẹ fowles or other thinges the saide pson or psons so obteyninge any suche placarde licence or bill assigned shall shote, withe any Crosbowe Handgunne Hagbutt or Demyhake, or els that everie suche placarde licence and bill assigned hereafter to be obteyned gotten or purchased shalbe clerely voyde frustrate and of none effecte: And also that everie suche pson or psons so obteyninge any suche placarde licence or bill assigned, before they shote in any suche Crosbowe Handgun Hagbutt or Demyhake, in any suche manner or forme as shalbe mencioned in any suche placarde licence or bill assigned, shalbe bounden in the Kingẹ Courte of Chauncerie by recognizaunce in the some of twenty poundẹ to the Kingẹ use withe and upon condiẽon that he so obteyninge or havinge the saide licence placarde or bill assigned, shall not shote in any Crosbowe Handgune Hagbutt or Demyhake at any other beastẹ or fowles then in any suche placarde licence or bill assigned shalbe conteyned and specified, and els all suche placardes licencẹ and billẹ assigned so hereafter to be made to any pson or psons not beinge so bounden by recognizaunce in the Courte of Chauncerie as is aforesaide, to be utterlie voide and of none effecte.

**XV.**
**Recovery and Application of Penalties.**

AND be it further enacted by thauctoritie aforesaide, that it shalbe laufull to all Justicẹ of Peace in their sessions and to all Stewardes and Baylieffẹ in their seṽall leetẹ and lawe dayes to enquyre heare and determyne eṽy suche offence after the saide laste daye of June to be cõmytted and done contṝie to the tenor of this p̃sent Acte; So that alwayes noe lesse fyne then tenne poundes be assessed upon everie suche p̃sentment and conviẽon made accordinge to the due course of the lawe; the same fyne so by the same Justicẹ of Peace upon everie suche p̃sentment and conviẽon made before them in their Sessions, to be payde and levyed onely to the Kingẹ use; and the one moytie of everie fyne to be assessed by the Stewardẹ or Baylyffẹ of any leete or lawe daye, upon everie p̃sentment and conviẽon before them, to be payde and levyed to the use of the Kinge our Soveraigne Lorde, and (²) the other moytie the one halfe to the owner of the saide leete or lawe daye by distresse or acẽon of debte, and thother halfe of the same seconde moytie of the same fyne, to be to the partie that will pursue for the same in any of the Kingẹ Courtẹ by bill playnte informaẽon or acẽon of debte, in the whiche none Essoyne gteẽon nor wager of lawe shalbe allowed.

**XVI.**
**Penalty on Jurors charged to enquire into Offences, who shall conceal the same, 20s.**

AND be it further enacted, that yf any Jurie beinge sworne and charged to enquyre for the Kinge our Soṽaigne Lorde before anye Justicẹ of the Peace or Stewardẹ of leetẹ or lawdayes, of any offencẹ cõmytted or done contṝie to this p̃sent Acte, doe wilfullie conceale any of the same offencẹ, that then the saide Justicẹ Stewardẹ or Bayliffẹ before whom any concealment shalbe had and done, shall have suctoritie by vertue of this p̃sent Acte from tyme to tyme to chardge and sweare an other Jurie of twelve or mo good and substantiall honest psons to enquire of everie suche concealment, and if any suche concealment be founde and presented by the saide Jurie so chardged to enquyre of the same, that

¹ owner O.        ² of O.

then everie one of the saide fyrste Jurie that so did conceale the same, shall leese and forfeyt for everie suche concealement of e$\tilde{v}$y suche offence twenty shillingₜ ; All whiche forfeytures and penaltyes of twentye shillingₜ for everie such concealment of everie suche offence so found and p̃sented before the same Justicₜ of Peace shall holye be levyed and payde to the Kingₜ use, and the moytie of all the same forfeytures and penaltyes of twenty shillingₜ, so founde and p̃sented before the Stewardₜ or Bayliffₜ of any leete or lawdaye, shalbe levied and paide to the use of the owner of the saide leete or lawdaye by dittresse or acc̃on of debte, and thother moytie thereof to be to the partie or parties that will sue for the same by acc̃on informac̃on bill or playnte in any of the Kingₜ Courtₜ, in the whiche acc̃ons informac̃ons billₜ or playntₜ no wager of lawe essoyne nor gtecc̃on shalbe allowed.

PROVIDED alwaies and be it enacted by thauctoritie aforesaide, that yf any pson or psons hereafter in any parte do offende or do contr̃ie to the purvewe and remedy of this Acte, whereupon cause of Acc̃on for the same offence shalbe geven to the Kinge his heires or successors or to any other pson or psons that will sue by vertue of this Acte for the punyshment of the saide offence or forfeytures, that yf the Kinge our Soveraigne Lorde his heires or successors within one yere next and ymediatlye after suche offencₜ and forfeytures had and made do not pursue their acc̃on or acc̃ons so given by this Acte or cause exilac̃on upon suche defaultₜ and offencₜ to be had and made before their counsaile, or other p̃sentmentₜ thereof to be had accordinge to the meanynge of the same Acte, and everie other pson whiche hereafter by vertue of this Acte maye have acc̃on or acc̃ons suyte or informac̃on upon this Statute within halfe a yere next and ymediatlye after suche offencₜ or forfeitures had and made do not comence their suytₜ informac̃on acc̃ons or p̃sentmentₜ of and upon the said forfeytₜ by acc̃on or otherwise us in this p̃sent Acte ys lymited and declared, that then aswell the Kinge our So$\tilde{v}$aigne Lorde his heires and successors, after one yere next after suche offencₜ and forfeytₜ had and made yf no suyte in his or their name be taken by acc̃on or otherwise as ys before exp̃ssed before the same yere ended & det̃myned, as everie other pson after halfe yere next after like Offencₜ had and done in the fourme aforesaide yf noe suyte thereupon be taken by none of them in fourme above declared, be utterly excluded and debarred of their saide suytₜ acc̃ons Informac̃ons and exilac̃ons to them gyven by vertue of the saide Acte, and the partyes and e$\tilde{v}$y of them so offendinge shalbe of all suche Offencₜ and forfeytₜ clerely dischardged and quytt ; Any thinge in this Acte comprised to the contr̃ie notwithstandinge.

<span style="float:right">**XVII.**<br>Limitation of<br>Prosecutions ;<br>One Year to the<br>King, and Half a<br>Year to others.</span>

PROVIDED alwayes and be it enacted by thauctoritie aforesaide that this p̃sent Acte ne any thinge therin conteyned shall in anywise extende or be p̃judiciall unto the Kingₜ Subjectₜ resident or inhabitinge nere unto the Coastₜ of the Sea in any parte of this Realme, their houses beinge not above fyve myles distant from the same Costₜ, nor also to any of the saide Subjectₜ inhabitinge within twelve myles of the borders of Scotlande, nor to any the Kingₜ Subjectₜ Inhabitauntₜ of the Towne and Marches of Callice, nor to any of the Inhabit̃untₜ of the Isles of Jersey Gernesey Anglesey and the Isles of Weight and Man, but that it shalbe laufull for everie of the saide Inhabitauntₜ at all tymes hereafter to have exc̃ise and use their handguns hagbuttₜ and demyhakes of the lenghes abovestáide within the lymytₜ and Isles abovesaide, so that it be at noe manner of Dere heron Shovelr fesant partriche Wild Swanne or Wilde Elke or any of them ; this p̃sent Acte or any thinge therin conteyned to the contr̃ie notwithstandinge.

<span style="float:right">**XVIII.**<br>Proviso for<br>Inhabitants near<br>the Sea Coasts,<br>Scotland, Calais,<br>Jersey, &c.</span>

PROVIDED also that this Acte ne any thinge therin conteyned be in anywise hurtfull or p̃judiciall to any p̃r̃nte or pson that hereafter, from the saide laste daye of June, shall bend beare carrie charge use or assaye anye Crosbowe or any handgun demyhake or hagbutt of the lenghes abovesaide, by the cõmaundment of his Lorde [and̃] Master so that the saide p̃r̃nte or pson doe not shote at any fowle Dere or other Game of what Kynd or nature soever they be ; nor also to any suche p̃r̃nte pson or psons that shall after the saide last daye of June beare or convey any Crosbowe handgun hagbutt or Demyhake of the lenghes aforesaide to any place or places, by the comaundment of his lorde or master that maye shote by auctoritie of this Acte, to be amended repayred delyvered or assayed ; so that the saide Servaunte or other pson so bringinge or conveyinge the saide Crosbowe handgun hagbutt or demyhake have redye to shewe to e$\tilde{v}$y pson requiring the sight thereof one licence in Writinge sealed or subscribed by his saide Lorde or Master to carrie and convey the same Crosbowe handgun hagbutt or demyhake to thintent to be amended repayred assayed or delivered as ys aforesaide.

<span style="float:right">**XIX.**<br>Proviso for<br>Servants under<br>Orders of their<br>Masters.</span>

PROVIDED alwaies that this Acte or any thinge conteyned therein shall not extende to any Owner of any Shippe, for having or kepinge of any handgun hagbutt or demyhake of the seṽall lenghes in this Acte exp̃ssed or under, only to be had and occupied within their Shippe or other Vessell, or for the carriage and recarriage of them or any of them on lande, or kepinge of them for the onlye exc̃ise and occupyinge of them within their saide Shippe or Vessell ; Anye thinge in this Acte to the contr̃ie in any wise notwithstandinge.

<span style="float:right">**XX.**<br>Proviso for<br>Owners of Ships,<br>&c.</span>

₁ or *O.*

1134      4° Jac. I. c. 1.      A.D. 1606-7.

## CHAPTER I.

An Act for the utter abolicion of all memory of Hostilitie and the Dependances thereof beweene England and Scotland, and for the repressinge of occasions of Discord and Disorders in tyme to come.

**F**OR the honour weale and good of theis two mightie famous and auncient Kingdomes of England and Scotland, and for the furtherance and advancement of the happie Union already begun in his Majesties Royall pson : Be it enacted by the Kinges most excellent Majestie wᵗʰ the Assent of the Lordꝭ Spirituall and Temporall and the Cōmons in this p̅sent Parliament assembled and by the Authoritie of the same, That one Act made in the fowrth yeere of the Reigne of King Henrie the Fifth, whereby it is enacted, that fres of Marte or Reprisall be granted against the People of Scotland, in case where the Subjectꝭ of England have beene spoyled and have complayned and not received Redresse, shall for soe much thereof as soe concerneth the People of Scotland, be utterlie repealed and made void : And also that one Proviso conteyned in an Act made in the three and thirteth yeare of the Reigne of Kinge Henry the Eighte, by which Proviso the Kingꝭ Majesties Subjectꝭ inhabitinge within Twelve Myles of the Borders of Scotland are allowed and p̅mitted to use Crossebowes Handgunns Hackbuttꝭ or Demyhakes, or to use or keepe in his or their Howses or elsewhere any such Crossebowes Handguñes Hackbuttꝭ and Demyhakes, for soe much of the said Proviso as soe concꝭneth such as shall inhabite within Twelve Miles of the said late Borders, shalbe utterlie repealed and made void.

AND be it further enacted by the Authoritie aforesaid, That this other Statutes hereafter followinge, That is to say, One Act made in the seaventh yeare of the Raigne of Kinge Richard the Second, whereby it is enacted, That noe Armour Victuall or other Refreshment be caried into Scotland, uppon paine of seizure or forfeiture ; And one other Act made in the one and thirteth yeere of the Reigne of Kinge Henry the Sixt, wherebie it is enacted, That March Lawe be not used out of the Circuit of the Counties of Northumbland Cumberland and Westmiland or the Towne of Newcastle ; And one other Statute made in the seventh yeere of the Reigne of Kinge Henry the Seaventh, whereby it is enacted, That Scottishmen should avoyde out of the Realme of England within a tyme p̅fixed ; And one other Statute made in the three and twentieth yeere of the Reigne of Kinge Henrie the Eighte ; And a like Statute made in the first yeere of the Reigne of the late Queene Elizabeth, whereby the conveyinge of Horses out of England into Scotland is made Felonie ; And one other Statute made in the second and third yeeres of the Reigne of Kinge Philip and Queene Mary ; And the like Statute made in the three and twenteth yeere of the Reigne of the late Queene Elizabeth, wherebie it is enacted, That noe Landes or Tenementꝭ be lett to Scottishmen uppon the Borders ; shalbe utterlie abrogated repealed and made void ; And if there had appeared any other Statute of this Realme of England, wherein any thinge is ordeyned enacted or established expresly and by Name against Scottishmen as Enimyes, or Scotland as an Enemye Countrye, to the Kingꝭ of this Realme or the State of the same, Wee should for soe much of them as had soe conc̅ned Scottishmen or Scotland have utterly abrogated and adnulled the same, seinge all Enmitie and Hostilitie of former tymes betweene the two Kingdomes and People is nowe happily taken away, and under the Goverment of his Majestie, as under one Parent and Head turned into fratnitye or brotherlie Frindship.

Provided neverthelles and be it enacted by the Authoritie of this p̅sent Parliament, That none of the Articles Braunches or Clauses abovesaid in this Act before conteyned and exp̅ssed, shall take effect or be in force or in any wise be deemed or expounded to take effect or be in force to any intent construcc̅on or purpose untill theis Actꝭ of Parliament of the Realme of Scotland hereafter followinge, That is to say, One Act made in the tyme of James the First, Kinge of Scotland, by which it was enacted, That all psons remayninge in England without the Kingꝭ License did cōmytt Treason ; One other Act made in the tyme of the said Kinge James the First, wherebie any Assurance with Englishe men for takinge p̅teccion from them for Landes or Goodꝭ, is Treason ; One other Act [in'] the same Kingꝭ tyme, inhibiting all buyinge and sellinge of Englishe Goodꝭ forbidden, under payne of Escheate ; One other Act made in the tyme of James the Second, Kinge of Scotland, that none should passe into England in tyme of Warre wᵗʰout Licence, under payne of Treason ; One other Act made in the Reigne of the saide Kinge James the Second conteyninge that noe Englishman come into Scotland without conduct, and that noe Scottishman sit under Assurance wᵗʰ them ; One other Acte of the same Kingꝭ tyme, That noe Scottishman supply Barwick or Roxburgh, under paine of Treason ; One other Act made in the tyme of the said Kinge James the Second, That all men be ready for Defence of the Realme against England ; Two Actꝭ made in the tyme of James the Third, King of Scotland, for resisting Kinge Edward the Fourth ; One other Act made in the tyme of the said King James the Third, conc̅ning the upholding of Barwicke and Garisons upon the Borders ; One Act made in the Reigne of Mary late Queene of Scotland, by which it was enacted, That Scottishmen are charged to leave Assurance wᵗʰ Englishmen ; One other Acte made in the tyme of the saide Queene Marie, conc̅ninge assured Scottishmen assistinge the English Armye ; One Act made in the Parliament of Scotland, in the tyme of the most happie Reigne of our most gracious Soveraigne Lord the Kinge that nowe is, conteyninge that the Scottish Borderers are discharged to marry English Borderers Daughters ; And lastlye one other Act made in the tyme of our said Sovereigne Lorde the Kinge, injoyninge the Warden to putt in a Bill the Names of all Englishmen that occupie Landꝭ in Scotland and seeke Redresse accordinge to the Treaties ; shall by Act of Parliament of the said Realme of Scotland be utterlie repealed frustrate and made voide ; And untill alsoe the said

For promoting Union between England and Scotland, certain English Acts repealed ; viz. 4 H.V. st. 2. c. 7. Letters of Marque, against the Scots.

33 H.VIII. c. 6. § 18. Cross-Bows, &c. on the Borders.

II.
Repeal of certain other English Acts, viz. 7 Ric. II. c. 16. Importation of Arms, &c. into Scotland; 31 H.VI. c. 3. March Law ; 7 H.VII. c. 6. Scotchmen leaving England ; 23 H.VIII. c. 16. 1 Eliz. c. 7. exporting Horses to Scotland ; 2, 3 P. & M. c. 1. 23 Eliz. c. 4. letting Lands to Scotchmen. General Repeal of all other unfriendly Laws.

III.
The Effect of this Act to depend on the Repeal of certain Scotch Acts, viz.
Temp. Jac. I. Visiting England ; Assurance with English ; Buying English Goods.
Temp. Jac. II. Visiting England ; Englishmen visiting Scotland ; Supply to Berwick ; Defence against England.
Temp. Jac. III. Resisting Ed. IV. ; Supply of Berwick.
Temp. Mary, Assurance with English.
Temp. Jac. VI. Marriage of Borderers ; English holding Land in Scotland, &c.

† of O.

Generated on 2022-08-23 20:58 GMT / https://hdl.handle.net/2027/psu.000017915502 Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from PENN STATE

# Bill of Rights

**Document 1**

## Bill of Rights 1 W. & M., 2d sess., c. 2,

16 Dec. 1689

### An act for declaring the rights and liberties of the subject, and settling the succession of the crown.

Whereas the lords spiritual and temporal, and commons assembled at *Westminster,* lawfully, fully, and freely representing all the estates of the people of this realm, did upon the thirteenth day of *February,* in the year of our Lord one thousand six hundred eighty eight, present unto their Majesties, then called and known by the names and stile of *William* and *Mary,* prince and princess of *Orange,* being present in their proper persons, a certain declaration in writing, made by the said lords and commons, in the words following; *viz.*

*Whereas* the late King *James* the Second, by the assistance of divers evil counsellors, judges, and ministers employed by him, did endeavour to subvert and extirpate the protestant religion, and the laws and liberties of this kingdom.

1. By assuming and exercising a power of dispensing with and suspending of laws, and the execution of laws, without consent of parliament.

2. By committing and prosecuting divers worthy prelates, for humbly petitioning to be excused from concurring to the said assumed power.

3. By issuing and causing to be executed a commission under the great seal for erecting a court called, *The court of commissioners for ecclesiastical causes.*

4. By levying money for and to the use of the crown, by pretence of prerogative, for other time, and in other manner, than the same was granted by parliament.

5. By raising and keeping a standing army within this kingdom in time of peace, without consent of parliament, and quartering soldiers contrary to law.

6. By causing several good subjects, being protestants, to be disarmed, at the same time when papists were both armed and employed, contrary to law.

7. By violating the freedom of election of members to serve in parliament.

8. By prosecutions in the court of King's bench, for matters and causes cognizable only in parliament; and by divers other arbitrary and illegal courses.

9. And whereas of late years, partial, corrupt, and unqualified persons have been returned and served on juries in trials, and particularly divers jurors in trials for high treason, which were not freeholders.

10. And excessive bail hath been required of persons committed in criminal cases, to elude the benefit of the laws made for the liberty of the subjects.

11. And excessive fines have been imposed; and illegal and cruel punishments inflicted.

12. And several grants and promises made of fines and forfeitures, before any conviction or judgment against the persons, upon whom the same same were to be levied.

All which are utterly and directly contrary to the known laws and statutes, and freedom of this realm.

And whereas the said late King *James* the Second having abdicated the government, and the throne being thereby vacant, his highness the prince of *Orange* (whom it hath pleased Almighty God to make the glorious instrument of delivering this kingdom from popery and arbitrary power) did (by the advice of the lords spiritual and temporal, and divers principal persons of the commons) cause letters to be written to the lords spiritual and temporal, being protestants; and other letters to the several counties, cities, universities, boroughs, and cinque-ports, for the choosing of such persons to represent them, as were of right to be sent to parliament, to meet and sit at *Westminster* upon the two and twentieth day of *January,* in this year one thousand six hundred eighty and eight, in order to such an establishment, as that their religion, laws, and liberties might not again be in danger of being subverted: upon which letters, elections have been accordingly made,

And thereupon the said lords spiritual and temporal, and commons, pursuant to their respective letters and elections, being now assembled in a full and free representative of this nation, taking into their most serious consideration the best means for attaining the ends aforesaid; do in the first place (as their ancestors in like case have usually done) for the vindicating and asserting their ancient rights and liberties, declare;

1. That the pretended power of suspending of laws, or the execution of laws, by regal authority, without consent of parliament, is illegal.

2. That the pretended power of dispensing with laws, or the execution of laws, by regal authority, as it hath been assumed and exercised of late, is illegal.

3. That the commission for erecting the late court of commissioners for ecclesiastical causes, and other commissions and courts of like nature are illegal and pernicious.

4. That levying money for or to the use of the crown, by pretence of prerogative, without grant of parliament, for longer time, or in other manner than the same is or shall be granted, is illegal.

5. That it is the right of the subjects to petition the King, and all committments and prosecutions for such petitioning are illegal.

6. That the raising or keeping a standing army within the kingdom in time of peace, unless it be with consent of parliament, is against law.

7. That the subjects which are protestants, may have arms for their defence suitable to their conditions, and as allowed by law.

8. That election of members of parliament ought to be free.

9. That the freedom of speech, and debates or proceedings in parliament, ought not to be impeached or questioned in any court or place out of parliament.

10. That excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted.

11. That jurors ought to be duly impanelled and returned, and jurors which pass upon men in trials for high treason ought to be freeholders.

12. That all grants and promises of fines and forfeitures of particular persons before conviction, are illegal and void.

13. And that for redress of all grievances, and for the amending, strengthening, and preserving of the laws, parliaments ought to be held frequently.

And they do claim, demand, and insist upon all and singular the premisses, as their undoubted rights and liberties; and that no declarations, judgments, doings or proceedings, to the prejudice of the people in any of the said premisses, ought in any wise to be drawn hereafter into consequence or example.

To which demand of their rights they are particularly encouraged by the declaration of his highness the prince of *Orange,* as being the only means for obtaining a full redress and remedy therein.

Having therefore an entire confidence, That his said highness the prince of *Orange* will perfect the deliverance so far advanced by him, and will still preserve them from the violation of their rights, which they have here asserted, and from all other attempts upon their religion, rights, and liberties.

II. The said lords spiritual and temporal, and commons, assembled at *Westminster,* do resolve, that *William* and *Mary* prince and princess of *Orange* be, and be declared, King and Queen of *England, France* and *Ireland,* and the dominions thereunto belonging, to hold the crown and royal dignity of the said kingdoms and dominions to them the said prince and princess during their lives, and the life of the survivor of them; and that the sole and full exercise of the regal power be only in, and executed by the said prince of *Orange,* in the names of the said prince and princess, during their joint lives; and after their deceases, the said crown and royal dignity of the said kingdoms and dominions to be to the heirs of the body of the said princess; and for default of such issue to the princess *Anne* of *Denmark,* and the heirs of her body; and for default of such issue to the heirs of the body of the said prince of *Orange.* And the lords spiritual and temporal, and commons, do pray the said prince and princess to accept the same accordingly.

III. And that the oaths hereafter mentioned be taken by all persons of whom the oaths of allegiance and supremacy might be required by law, instead of them; and that the said oaths of allegiance and supremacy be abrogated.

I *A. B.* do sincerely promise and swear, That I will be faithful, and bear true allegiance, to their Majesties King *William* and Queen *Mary:*

*So help me God.*

I *A. B.* do swear, That I do from my heart abhor, detest, and abjure as impious and heretical, that damnable doctrine and position, *That princes excommunicated or deprived by the pope, or any authority of the see of* Rome, *may be deposed or murdered by their subjects, or any other whatsoever.* And I do declare, That no foreign prince, person, prelate, state, or potentate hath, or ought to have any jurisdiction, power, superiority, pre-eminence, or authority ecclesiastical or spiritual, within this realm:

*So help me God.*

IV. Upon which their said Majesties did accept the crown and royal dignity of the kingdoms of *England, France,* and *Ireland,* and the dominions thereunto belonging, according to the resolution and desire of the said lords and commons contained in the said declaration.

V. And thereupon their Majesties were pleased, That the said lords spiritual and temporal, and commons, being the two houses of parliament, should continue to sit, and with their Majesties royal concurrence make effectual provision for the settlement of the religion, laws and liberties of this kingdom, so that the same for the future might not be in danger again of being subverted; to which the said lords spiritual and temporal, and commons, did agree and proceed to act accordingly.

VI. *Now in pursuance of the premisses, the said lords spiritual and temporal, and commons, in parliament assembled, for the ratifying, confirming and establishing the said declaration, and the articles, clauses, matters, and things therein contained, by the force of a law made in due form by authority of parliament, do pray that it*

*may be declared and enacted, That all and singular the rights and liberties asserted and claimed in the said declaration, are the true, ancient, and indubitable rights and liberties of the people of this kingdom, and so shall be esteemed, allowed, adjudged, deemed, and taken to be, and that all and every the particulars aforesaid shall be firmly and strictly holden and observed, as they are expressed in the said declaration; and all officers and ministers whatsoever shall serve their Majesties and their successors according to the same in all times to come.*

**The Founders' Constitution**
Volume 5, Bill of Rights, Document 1
http://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html
The University of Chicago Press

 Easy to print version.

# THE

# COLONIAL LAWS

OF

# NEW YORK

FROM THE

## YEAR 1664 TO THE REVOLUTION,

INCLUDING THE

CHARTERS TO THE DUKE OF YORK, THE COMMISSIONS AND IN-
STRUCTIONS TO COLONIAL GOVERNORS, THE DUKE'S LAWS,
THE LAWS OF THE DONGAN AND LEISLER ASSEM-
BLIES, THE CHARTERS OF ALBANY AND NEW
YORK AND THE ACTS OF THE COLO-
NIAL LEGISLATURES FROM 1691
TO 1775 INCLUSIVE.

## VOLUME II.

TRANSMITTED TO THE LEGISLATURE BY THE COMMISSIONERS OF STATUTORY
REVISION, PURSUANT TO CHAPTER 125 OF THE LAWS OF 1891.

**ALBANY:**
JAMES B. LYON, STATE PRINTER.
1894.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

and Execution shall not Exceed the sum of three pounds Current mony of this Colony.

And Be it further Enacted by the same Authority that the owner or owners of such slave or slaves which shall happen to be Executed by Virtue of this Act in the City and County of New York shall be paid for the same, and the mony shall be Assessed Collected and paid as in and by this Act the Justices of the Peace for the said City and County are directed and Impowered to Levy pay and discharge the prosecution and Execution of Slave or Slaves Provided the price to be paid for each Slave so Executed do not Exceed the sum of Twenty five pounds Current mony of this Colony

And be it further Enacted by the Authority aforesaid that it shall not be Lawfull for any Slave or Slaves to have or use any gun Pistoll sword Club or any other Kind of Weapon whatsoever, but in the presence or by the Direction of his her or their Master or Mistress, and in their own Ground on Penalty of being whipt for the same at the discretion of the Justice of the Peace befor whom such Complaint Shall Come or upon the View of the said Justice not Exceeding Twenty Lashes on the bare back for every such offence

And be it further Enacted by the Authority aforesaid, that every Such Justice of the Peace, Constable, Assessor Collector or any other officer as doe neglect delay or Refuse the several duties and Services hereby Enjond to be Respectively Done and performed by them shall for every such offence forfeit the sum of Fourty Shillings, and every freeholder summoned as aforesaid and neglecting or refusing to Serve shall forfeit the sum of Twenty shillings which Penaltie or Penalties shall be recovered befor any two Justices of the Peace dwelling in the City or County where Such Neglect delay or refusal shall happen, to be Levied on the goods and Chattles of the offender by a Constable by warrent from such Justices who are hereby Impowered and Directed upon such neglect delay or refusal to Issue their warrant for Levying the same and one half of Such penalties shall be for the use of the Prosecutor and the other half for the use of the Poor of the Place where such Penalty shall be Levy'd And for Preventing Doubts scruples or Confussion concerning the several Acts of General Assembly heretofore passed in Relation to Slaves

Be it Enacted by the Authority aforesaid that all and every the following Acts, and every Clause article and thing therein

Google

Original from
UNIVERSITY OF MICHIGAN

*And whereas* there are sometimes contingent and unforeseen charges that demand prompt payment,—

*Be it further enacted,* .

£100 for contingent charges.

[SECT. 16.] That the sum of one hundred pounds, being the remaining part of the aforesaid sum of seven thousand eight hundred and sixty pounds, be applied to pay such contingent charges, and for no other purpose whatsoever.

*Provided always,*—

Remainder to be and remain as a stock in the treasury.

[SECT. 17.] That the remainder of the sum which shall be brought into the treasury by the tax aforesaid, over and above what shall be sufficient to pay off the benefit tickets as aforesaid, shall be and remain as a stock in the treasury, to be applied as the general court of this province shall hereafter order, and to no other purpose whatsoever; any thing in this act to the contrary notwithstanding.

*And be it further enacted,*

Money to be paid out of the proper appropriations.

[SECT. 18.] That the treasurer is hereby directed and ordered to pay the sum of eight thousand and ten pounds, as aforesaid, out of such appropriations as shall be directed to by warrant, and no other, upon pain of refunding all such sum or sums as he shall otherwise pay; and the secretary to whom it belongs to keep the muster-rolls and accompts of charge, shall lay before the house of representatives, when they direct, such muster-rolls and accompts after payment thereof.

*And be it further enacted,*

Directors' allowance to be made by the general court.

[SECT. 19.] That the directors or managers by this act appointed, shall have such allowances for their services as the general court shall hereafter order, and in case of the death, refusal or incapacity of attendance of any one or more of said managers, the vacancy shall be fill'd up by the governour and council. [*Passed February* 8; *published February* 16, 1750–51.

## CHAPTER 16.

### AN ACT FOR GRANTING THE SUM OF THREE HUNDRED POUNDS, FOR THE SUPPORT OF HIS HONOUR THE LIEUTENANT-GOVERNOUR AND COMMANDER-IN-CHIEF.

*Be it enacted by the Lieutenant-Governour, Council and House of Representatives,*

Governor's grant.

That the sum of three hundred pounds be and hereby is granted unto his most excellent majesty, to be paid out of the publick treasury to his honour Spencer Phips, Esq[r]., lieutenant-governour and commander-in-chief in and over his majesty's province of the Massachusetts Bay, for his past services, and further to enable him to manage the publick affairs of the province. [*Passed February* 15;* *published February* 16, 1750–51.

## CHAPTER 17.

### AN ACT FOR PREVENTING AND SUPPRESSING OF RIOTS, ROUTS AND UNLAWFUL ASSEMBLIES.

Preamble.

WHEREAS the provision already made by law has been found insufficient to prevent routs, riots and tumultuous assemblies, and the evil consequences thereof; wherefore,—

\* See the note to this chapter, *post.*

Case 3:19-cv-01537-BEN-JLB   Document 151   Filed 10/21/22   PageID.13861   Page 22 of 72

*Be it enacted by the Lieutenant-Governour, Council and House of Representatives,*

[SECT. 1.]  That from and after the publication of this act, if any persons, to the number of twelve or more, being arm'd with clubs or other weapons, or if any number of persons, consisting of fifty or upwards, whether armed or not, shall be unlawfully, riotously or tumultuously assembled, any justice of the peace, field officer or captain of the militia, sheriff of the county or undersheriff, or any constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making, and shall openly make proclamation in these or the like words :— *Officers to make proclamation when persons are riotously assembled.*

Our sovereign lord the king chargeth and commandeth all persons being assembled, immediately to disperse themselves, and peaceably to depart to their habitations, or to their lawful business ; upon the pains contained in the act of this province made in the twenty-fourth year of his majesty King George the Second, for preventing and suppressing of riots, routs and unlawful assemblies.  God save the king. *Form of the proclamation.*

And if such persons so unlawfully assembled, shall, after proclamation made, not disperse themselves within one hour, it shall be lawful for every such officer or officers, and for such other persons as he or they shall command to be assisting, to seize such persons, and carry them before a justice of the peace ; and if such person shall be killed or hurt by reason of their resisting the persons so dispersing or seizing them, the said officer or officers and their assistants shall be indemnified and held guiltless.

[SECT. 2.]  And all persons who, for the space of one hour after proclamation made as aforesaid,—or to whom proclamation ought to have been made, if the same had not been hindred,—shall unlawfully, routously, riotously and tumultuously continue together, or shall wilfully let or hinder any such officer, who shall be known, or shall openly declare himself to be such, from making the said proclamation, shall forfeit all their lands and tenements, goods and chattles, to his majesty' (or such a part thereof as shall be adjudged by the justices before whom such offence shall be tried), to be applied towards the support of the government of this province ; and shall be whipt thirty-nine stripes on the naked back at the publick whipping-post, and suffer one year's imprisonment, and once every three months during said imprisonment receive the same number of stripes on the naked back at the publick whipping-post as aforesaid. *Penalty for disobedience.*

[SECT. 3.]  And if any such person or persons, so riotously assembled, shall demolish or pull down, or begin to demolish or pull down, any dwelling-house or other house parcel thereof, any house built for publick uses, any barn, mill, malt-house, store-house, shop or ship, he or they shall suffer the same pains and penalties as are before provided in this act.

*And be it further enacted,*

[SECT. 4.]  That this act shall be read at every general sessions of the peace, and at the anniversary meeting of each town, within this province, annually ; and no person shall be prosecuted for any offence contrary to this act, unless prosecution be commenced within twelve months after the offence committed. *This act to be read at the anniversary meeting of the towns and general sessions of the peace.*

*Provided always,—*

[SECT. 5.]  That where there shall appear any circumstances to mitigate or alleviate any of the offences against this act, in the judgment of the court before which such offence shall be tried, it shall and may be lawful for the judges of such court to abate the whole of the pun- *Judges empowered to abate the punishment of whipping, in case.* *

69

ishment of whipping, or such part thereof as they shall judge proper; anything in this act to the contrary notwithstanding.

Continuance of the act.

[SECT. 6.] This act to continue and be in force for the space of three years from the publication thereof, and no longer. [*Passed and published February* 14, 1750–51.

## CHAPTER 18.

AN ACT IN ADDITION TO AN ACT, INTITLED "AN ACT TO PREVENT DAMAGE BEING DONE ON THE BEACH, HUMOCKS AND MEADOWS BELONGING TO THE TOWN OF SCITUATE, LYING BETWEEN THE SOUTHERLY END OF THE 'THIRD CLIFT,' SO CALLED, AND THE MOUTH OF THE NORTH RIVER."

Preamble.

1749-50, chap. 14.

WHEREAS in and by an act made and passed in the twenty-third year of his present majesty's reign, intitled " An Act to prevent damage being done on the beach, humocks and meadows belonging to the town of Scituate, lying between the southerly end of the 'Third Clift,' so called, and the mouth of the North River," the penalt[y][*ie*]s for turning or driving neat cattle, horse-kind, sheep or goats upon such beach, humocks or sedge-ground adjo[y][*i*]ning to said beach, to feed thereon, are to be recovered from him or them that shall so drive said cattle, horse-kind, sheep or goats, or from the owner or owners of them that shall so order them to be driven ; and it is found, by experience, that proof thereof can seldom be obtained, whereby the good end and design of said act in a great measure is defeated,—

*Be it therefore enacted by the Lieutenant-Governour, Council and House of Representatives,*

Neat cattle and other creatures to be impounded if found feeding on the meadows, &c.

[SECT. 1.] That if any neat cattle, horse-kind, sheep or goats shall be found feeding on said beach, humocks, meadows or sedge-ground adjoyning to said beach, it shall and may be lawful for any person to impound the same, such person to observe the rules and directions in the said act prescribed in case of impounding ; and the owner or owners of them shall forfeit and pay to the impounder one shilling a head for all neat cattle and horse-kind, and twopence for every sheep or goat; and the said penalt[y][*ie*]s or forfeitures shall be paid, before the creatures, which shall or may be impounded by virtue of this act, be discharged or released by the pound-keeper.

*Provided, nevertheless,—*

Rates to be paid for such impounded creatures.

[SECT. 2.] The owner or owners of the creatures so impounded may, if they think fit, replevie such creatures, on condition they give sufficient bond, with one or more suret[y][*ie*]s, to prosecute such replevin to effect before some justice of the peace in the same county, within fifteen days from the date of such replevin, and to pay all such forfeitures and costs as shall be awarded or adjudged against them. [*Passed February* 8 ; *published February* 16, 1750–51.

## CHAPTER 19.

AN ACT FOR GRANTING UNTO BENJAMIN CRABB THE SOLE PRIVI-LE[D]GE OF MAKING CANDLES OF COARSE SPERMACÆTI OYL.

Preamble.

WHEREAS Benjamin Crabb, of Rehoboth, in the county of Bristol, has represented to this court that he, and no other person in the prov-

Compendium_Supplemental Brief
Page 017

1

# 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

|

And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-ayment thereof shall be committed to the common Gaol of the County for Six Months.

# Charles Nettleton, Laws of the State of New-Jersey Page 25-26, Image 52-53 (1821) available at The Making of Modern Law: Primary Sources.

|

An Act for the Preservation of Deer, and other game, and to prevent trespassing with guns (Dec. 21, 1771): Whereas the laws heretofore passed in this colony, for the preservation of deer and other game, and to prevent trespassing with guns, traps, and dogs, have, by experience, been found insufficient to answer the salutory purposes thereby intended, therefore — § 1. Be it Enacted by the Governor, Council and General Assembly of this colony of New Jersey, and it is hereby enacted by the authority of the same, That if any person or persons shall presume, at any time after the publication hereof, to carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor, every such person so offending, and convicted thereof, either upon the view of any justice of the peace within this colony, or by the oath or affirmation of one or more witnesses, before any justice of the peace of either of the counties, cities, or towns corporate of this colony, in which the offender or offenders may be taken or reside, he or she, or they, shall for every offence, forfeit and pay to the owner of the soil, or his tenant in possession, the sum of forty shillings, with costs of suit; which forfeiture shall and may be sued for and recovered by the owner of the soil, or tenant in possession before any justice of the peace in this colony, for the use of such owner or tenant in possession.

# Charles Nettleton, Laws of the State of New-Jersey Page 26, Image 53 (1821) available at The Making of Modern Law: Primary Sources.

An Act for the Preservation of Deer, and other game, and to prevent trespassing with guns (1771), § 1. Be it Enacted by the Governor, Council and General Assembly of this colony of New Jersey, and it is hereby enacted by the authority of the same, That if any person or persons shall presume, at any time after the publication hereof, to carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor, every such person so offending, and convicted thereof, either upon the view of any justice of the peace within this colony, or by the oath or affirmation of one or more witnesses, before any justice of the peace of either of the counties, cities, or towns corporate of this colony, in which the offender or offenders may be taken or reside, he or she, or they, shall for every offence, forfeit and pay to the owner of the soil, or his tenant in possession, the sum of forty shillings, with costs of sit; which forfeiture shall and may be sued for and recovered by the owner of the soil, or tenant in possession before any justice of the peace in this colony, for the use of such owner or tenant in possession. . . § 3. And be it further enacted by the authority aforesaid, That if the person or persons offending against this act be non-residents of this colony, he or they shall forfeit and pay for every such offence, five pounds, and shall forfeit his or their gun or guns to any person or persons, who shall inform and prosecute the same to effect, before any justice of the peace in any county of this colony, wherein the offender or offenders may be taken or apprehended.




DATE DOWNLOADED: Tue Oct 18 16:31:13 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1881 191 .

ALWD 7th ed.
, , 1881 191 .

Chicago 17th ed.
"," Arkansas - 23rd General Assembly, Regular Session : 191-192


AGLC 4th ed.
" Arkansas - 23rd General Assembly, Regular Session 191.

OSCOLA 4th ed.
" 1881 191

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

*ACTS OF ARKANSAS.* **191**

buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

SEC. 2. That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

---

## No. XCVI.

'AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION
1 Carrying of certain weapons constituted a misdemeanor; *proviso,* excepting officers, and persons journeying.
2 Carrying such weapons otherwise than in the hand, a misdemeanor.
3 Selling or disposing of such weapons, a misdemeanor.
4 Violation of act punishable by fine from $50 to $200.
5 Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6 Same penalty denounced any other officer knowing of such offense.
7 Violators of act how proceeded against.
8 Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided,* That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further,* That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

192                    ACTS OF ARKANSAS.

SEC. 2.    Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

SEC. 3.    Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

SEC. 4.    Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

SEC. 5.    Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

SEC. 6.    Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

SEC. 7.    All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

SEC. 8.    All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.

# 1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof. | Duke Center for Firearms Law

Whereas the provision already made by law for the preventing of routs, riots, and tumultuous assemblies and the evil consequences thereof has been found insufficient: § 1. Be it therefore enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, That from and after the publication of this Act, if any persons to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously or tumultously assembled, any Justice of the Peace, Sheriff or Deputy-Sheriff of the county, or constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making, and shall openly make proclamations in these or the like words. [Text of Massachusetts Riot Act] and if such persons, assembled as aforesaid, shall not disperse themselves within one hour after proclamation made, or attempted to be made, as aforesaid, it shall be lawful for every such officer to command sufficient aid, and he shall seize such persons, who shall be had before a Justice of the Peace; and the aforesaid Justice of the Peace, Sheriff or Deputy-Sheriff is hereby further empowered to require the aid of a sufficient number of persons in arms, if any of the persons assembled as aforesaid shall appear armed; and if any such person or persons shall be killed or wounded by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants shall be indemnified and held guiltless. § 2. And be it further enacted, That if any person being commanded by such Justice, Sheriff, Deputy-Sheriff or Constable, as aforesaid, shall refuse or neglect to afford the assistance required, and shall be convicted thereof upon the oath of either of the said officers so commanding or other legal evidence, he shall forfeit and pay a sum not less than forty shillings.



A Department of State of the
United States. 1 Jan.y. 1821.

# COLLECTION

OF ALL SUCH

# A C T S

OF THE

# GENERAL ASSEMBLY

OF

# VIRGINIA,

OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN
FORCE;

WITH A TABLE OF THE PRINCIPAL MATTERS.

TO WHICH ARE PREFIXED THE DECLARATION OF RIGHTS,
AND CONSTITUTION, OR FORM OF GOVERNMENT.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY, INTI-
TULED, " AN ACT PROVIDING FOR THE REPUBLICATION OF THE
LAWS OF THIS COMMONWEALTH," PASSED ON THE TWENTY-
EIGHTH DAY OF DECEMBER, ONE THOUSAND SEVEN
HUNDRED AND NINETY-TWO.

R I C H M O N D:

Printed by Augustine Davis, Printer for the Commonwealth, 1794.

C. 2.

1786.

terpofition difarmed of her natural weapons, free argument and debate, error's ceafing to be dangerous when it is permitted freely to contradict them :

II.  BE it enacted by the General Affembly, That no man fhall be compelled to frequent or fupport any religious worfhip, place, or Miniftry whatfoever, nor fhall be enforced, reftrained, molefted, or burthened in his body or goods, nor fhall otherwife fuffer on account of his religious opinions or belief; but that all men fhall be free to profefs, and by argument to maintain, their opinions in matters of religion, and that the fame fhall in no wife diminifh, enlarge, or affect their civil capacities.

*No man compelled to frequent or fupport any religious worfhip. All men free to profefs, and by argument to maintain their religious opinions.*

III.  AND though we well know that this Affembly elected by the people for the ordinary purpofes of legislation only, have no power to reftrain the Acts of fucceeding Affemblies, conftituted with powers equal to our own, and that therefore to declare this Act to be irrevocable, would be of no effect in law; yet we are free to declare, and do declare, that the rights hereby afferted, are of the natural rights of mankind, and that if any Act fhall be hereafter paffed to repeal the prefent, or to narrow its operation, fuch Act will be an infringement of natural right.

*Declaration that the rights by this Act afferted, are of the natural rights of mankind.*

General Affembly, begun and held at the Public Buildings, in the City of *Richmond*, on *Monday*, the 16th Day of *October*, in the Year of our Lord, 1786.

## C H A P.  XXI.

### An Act forbidding and punifhing Affrays.

[Paffed the 27th of November, 1786.]

BE it enacted by the General Affembly, That no man, great nor fmall, of what condition foever he be, except the Minifters of Juftice in executing the precepts of the Courts of Juftice, or in executing of their office, and fuch as be in their company affifting them, be fo hardy to come before the Juftices of any Court, or other of their Minifters of Juftice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prifon, at the pleafure of a Court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country, upon pain of being arrefted and committed to prifon by any Juftice on his own view, or proof by others, there to abide for fo long a time as a Jury, to be fworn for that purpofe by the faid Juftice, fhall direct, and in like manner to forfeit his armour to the Commonwealth; but no perfon fhall be imprifoned for fuch offence by a longer fpace of time than one month.

*Punifhment of perfons going armed before Courts of Juftice, or the Minifters of Juftice, or in fairs or markets in terror of the Country.*

## C H A P.  XXII.

### An Act againft Confpirators.

[Paffed the 27th of November, 1786.]

BE it declared and enacted by the General Affembly, That Confpirators be they that do confederate and bind themfelves by oath, covenant, or other alliance, that every of them fhall aid and bear the other falfely and malicioufly, to move or caufe to be moved any indictment or information againft another on the part of the Commonwealth, and thofe who are convicted thereof at the fuit of the Commonwealth, fhall be punifhed by imprifonment and amercement, at the difcretion of a Jury.

*Who fhall be deemed confpirators.*

I

Compendium_Supplemental Brief
Page 025




DATE DOWNLOADED: Thu Oct  6 22:25:42 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1798 105 .

ALWD 7th ed.
, , 1798 105 .

Chicago 17th ed.
"," Kentucky - 6th General Assembly, Public Laws, 2nd Session : 105-116

AGLC 4th ed.
" Kentucky - 6th General Assembly, Public Laws, 2nd Session 105

OSCOLA 4th ed.
" 1798 105

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

[   106   ]

on the seventeenth day of October, in the year one thousand seven hundred and eighty five, and the descendants of the females of them.

§ 2. No negro or mulatto, shall be a witness except in pleas of the commonwealth, against negroes or mulattoes, or in civil pleas where negroes or mulattoes alone shall be parties.

In cases they may be witnesses.

§ 3. No slave shall go from the tenements of his master or other person with whom he lives without a pass or some letter or token, whereby it may appear that he is proceeding by authority, from his master, employer or overseer; if he does it shall be lawful for any person to apprehend and carry him before a justice of the peace, to be by his order punished with stripes or not, in his discretion.

Not to go from home without passes.

§ 4. And if any slave shall presume to come and be upon the plantation of any person whatsoever, without leave in writing from his or her owner, or overseer, not being sent upon lawful business, it shall be lawful for the owner or overseer of such plantation to give or order such slave, ten lashes on his or her bare back, for every such offence.

Coming on the plantation of others without leave from their masters may be whipped.

§ 5. No negro, mulatto, or Indian whatsoever, shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto, or Indian, may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be, shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back, well laid on for every such offence.

Not to keep or carry arms.

§ 6. Provided nevertheless, That every free negro, mulatto or Indian, being a house keeper may be permitted to keep one gun, powder and shot, and all negroes, mulattoes and indians, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot and weapons offensive or defensive, by license from a justice of peace of the county wherein such plantations lie, to be obtained upon the application of free negroes mulattoes, or indians, or by the owners of such as are slaves.

Except those living on frontiers licensed by justices of the peace.

§ 7. Riots, routs, unlawful assemblies, trespasses and seditious speeches by a slave or slaves shall be punished with stripes at the discretion of a justice of

Riots, routs &c.

# 1799 Miss. Laws 113, A Law For The Regulation Of Slaves. | Duke Center for Firearms Law

[Slaves interdicted the carrying arms, etc.] No negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person, and upon due proof thereof made before any justice of the peace of the county where such seizure shall be, shall by his order be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

 

DATE DOWNLOADED: Thu Oct  6 23:15:15 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force (1803).

ALWD 7th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public & Permanent Nature, as are Now in Force (1803).

APA 7th ed.
Virginia. (1803). Collection of All Such Acts of the General Assembly of Virginia, of
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace.

Chicago 17th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace.

McGill Guide 9th ed.
Virginia, Collection of All Such Acts of the General Assembly of Virginia, of a
Public & Permanent Nature, as are Now in Force (Richmond: Printed by Samuel
Pleasants, Jun., and Henry Pace., 1803)

AGLC 4th ed.
Virginia, Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force (Printed by Samuel Pleasants, Jun.,
and Henry Pace., 1803

MLA 9th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace. HeinOnline.

OSCOLA 4th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

*I, A. B. do swear, that my removal into the State of* Virginia, *was with no intent of evading the laws for preventing the further importation of slaves, nor have I brought with me any slaves, with an intention of selling them, nor was any of the slaves which I have brought with me, been imported from* Africa, *or any of the* West India Islands, *since the first day of* November, *one thousand seven hundred and seventy-eight.* So help me GOD.

Nor to any persons claiming slaves by descent, marriage or devise; nor to any citizens of this Commonwealth, being now the actual owners of slaves within any of the United States and removing such hither; nor to travellers and others making a transient stay, and bringing slaves for necessary attendance, and carrying them out again. *a*

And of citizens claiming slaves by descent, devise, or marriage, or being now the owners & removing them from another state, and travellers carrying them out again.

In what cases negroes or mulattoes may or may not be witnesses.

Slaves not to go from home, without passes.

V. NO negro or mulatto shall be a witness, except in pleas of the Commonwealth against negroes or mulattoes, or in civil pleas, where negroes or mulattoes alone shall be parties. *a* †

VI. NO slave shall go from the tenements of his master or other person with whom he lives, without a pass, or some letter or token, whereby it may appear that he is proceeding by authority from his master, employer, or overseer: If he does, it shall be lawful for any person to apprehend and carry him before a Justice of the Peace, to be by his order punished with stripes, or not, in his discretion. *a*

Coming on the plantations of others without leave from their masters, may be whipped.

VII. AND if any slave shall presume to come and be upon the plantation of any person whatsoever, without leave in writing from his or her owner, or overseer, not being sent upon lawful business, it shall be lawful for the owner or overseer of such plantation, to give or order such slave ten lashes on his or her bare back for every such offence. *b*

Negroes and mulattoes not to keep or carry arms.

VIII. NO negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offence. *b*

Except those living on the frontiers licensed by the justices of the peace.

IX. PROVIDED *nevertheless,* That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons, offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves. *b*

Who shall be deemed mulattoes.

X. EVERY person other than a negro, of whose grand-fathers or grand-mothers any one is, or shall have been a negro, although all his other progenitors, except that descending from the negro, shall have been white persons, shall be deemed a mulatto; and so every such person who shall have one fourth part or more of negro blood, shall in like manner be deemed a mulatto. *c*

Punishment of slaves for riots, unlawful assemblies, seditious speeches, &c.

XI. RIOTS, routs, unlawful assemblies, trespasses and seditious speeches by a slave or slaves, shall be punished with stripes, at the discretion of a Justice of the Peace, and he who will, may apprehend and carry him, her, or them, before such Justice. *d*

No person shall permit the slaves of others to remain on his plantation.

XII. AND to prevent the inconveniences arising from the meetings of slaves, *Be it further enacted,* That if any master, mistress, or overseer of a family, shall knowingly permit or suffer any slave not belonging to him of her, to be and remain upon his or her plantation above four hours at any one time, without leave of the owner or overseer of such slave, he or she so permitting, shall forfeit and pay three dollars for every such offence; and every owner or overseer of a plantation, who shall so permit or suffer more than five negroes or slaves, other than his or her own, to be and remain upon his or her plantation or quarter at any one time, shall forfeit and pay one dollar for each negro or slave above that number; which said several forfeitures shall be to the informer, and recoverable with costs, before any Justice of Peace of the County or Corporation where such offence shall be committed. *e*

*(a)* 1.83, *ch.* 77, *sec.* 2, 3. † *Altered by act of Dec. sess.* 1805, *ch.* 70; *negroes or mulattoes, bond or free, are by that act made legal witnesses against each other. (b)* 23, *Geo.* 2, *ch.* 31, *sec.* 17, 18, 19. *(c)* 1793, *ch.* 78. *(d)* 46, *ch.* 7, *sec.* 4. *(e)* 32, *Geo.* 2, *ch.* 31, *sec.* 13.

 

DATE DOWNLOADED: Thu Oct  6 22:07:52 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1804 3 .

ALWD 7th ed.
, , 1804 3 .

Chicago 17th ed.
"," Indiana - Laws for the Government of the District of Louisiana : 3-136


AGLC 4th ed.
" Indiana - Laws for the Government of the District of Louisiana 3

OSCOLA 4th ed.
" 1804 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

108

juſtice of the peace to be by his order puniſh-
ed with ſtripes, or not, in his diſcretion.

§ 3rd.   And be it further enacted  That
if any ſlave ſhall preſume to come, and be
upon the plantation of any perſon whatſoe-
ver, without leave in writing from his or her
owner or overſeer, not being ſent upon law-
ful buſineſs, it ſhall be lawful for the owner
or overſeer of ſuch plantation, to give or or-
der ſuch ſlave ten laſhes on his or her bare
back for every ſuch offence.

§ 4th. And be it further enacted, That
no ſlave or mulatto whatſoever, ſhall keep
or carry any gun, powder, ſhot, club, or o-
ther weapon whatſoever, offenſive or defen-
five, but all and every gun weapon and am-
munition found in the poſſeſſion or cuſtody
of any negro or mulatto, may be ſeized by
any perſon, and upon due proof thereof made
before any juſtice of the peace of the diſtrict
where ſuch ſeizure ſhall be, ſhall by his order
be forfeited to the ſeizor, for his own uſe,
and moreover every ſuch offender ſhall have
and receive by order of ſuch juſtice any num-
ber of laſhes not exceeding thirty-nine on
his or her bare back, well laid on for every
ſuch offence,

§ 5th. And be it further enacted, That
every free negro or mulatto, being a houſe
keeper, may be permitted to keep one gun,
powder and ſhot ; and all negroes and mu-
lattoes, bond or free, living at any frontier
plantation, may be permitted to keep and uſe

Digitized from Best Copy Available

 

DATE DOWNLOADED: Thu Oct  6 22:46:56 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1804 3 .

ALWD 7th ed.
, , 1804 3 .

Chicago 17th ed.
"," Mississippi - 3rd General Assembly, 1st Session : 3-136

AGLC 4th ed.
" Mississippi - 3rd General Assembly, 1st Session 3

OSCOLA 4th ed.
" 1804 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

( 90 )

or some letter or token, whereby it may appear that he is proceeding by authority from his master, employer or overseer ; if he does, it shall be lawful for any person to apprehend and carry him before a justice of the peace, to be by his order punished with stripes, or not, in his discretion, not exceeding twenty stripes.

Sec. 3. *And be it further enacted,* That if any slave shall presume to come and be upon the plantation of any person whatsoever, without leave in writing from his or her owner or overseer, not being sent upon lawful business, it shall be lawful for the owner or overseer of such plantation to give or order such slave ten lashes on his or her bare back, for every such offence.

*Not upon the plantation of any person without leave in writing.*

Sec. 4. *And be it further enacted,* That no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress or overseer to carry the said articles from one place to another, but all, and every gun, weapon or ammunition found in the possession or custody of any slave, may be seized by any person, and upon due proof thereof made before any justice of the peace of the county or corporation, where such seizure shall be made, by his order, be forfeited to the seizer for his own use ; and moreover, every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty nine, on his bare back for every such offence : *Provided nevertheless,* That any justice of the peace may grant, in his proper county, permission in writing, to any slave, on application of his master, or overseer to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and recoverable, at any time within such term, at

*Slaves not to carry offensive or defensive weapons.*

*In what cases they may get leave to carry gun.*

Compendium_Supplemental Brief
Page 034



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

 Search this website

# 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5

## Subject(s):

- Storage (https://firearmslaw.duke.edu/subjects/storage/)

## Jurisdiction(s):

- Maine (https://firearmslaw.duke.edu/jurisdictions/maine/)

## Year(s):

- 1821 (https://firearmslaw.duke.edu/years/1821/)

Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPlIY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).




DATE DOWNLOADED: Thu Oct  6 21:59:23 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
J. Steele, Compiler; M'Campbell, J., Compiler. Laws of the Arkansas Territory (1835).

ALWD 7th ed.
Steele, J., Compiler; M'Campbell, J., Compiler. Ls of the Arkansas Territory (1835).

APA 7th ed.
Steele, J. (1835). Laws of the Arkansas Territory. Little Rock, Ark. Ter, Printed by
J. Steele.

Chicago 17th ed.
Steele J., Compiler; M'Campbell, J., Compiler. Laws of the Arkansas Territory. Little
Rock, Ark. Ter, Printed by J. Steele.

McGill Guide 9th ed.
J. Steele, Compiler; M'Campbell, J., Compiler, Ls of the Arkansas Territory (Little
Rock, Ark. Ter: Printed by J. Steele., 1835)


AGLC 4th ed.
J. Steele, Compiler; M'Campbell, J., Compiler, Laws of the Arkansas Territory
(Printed by J. Steele., 1835

MLA 9th ed.
Steele, J., Compiler, and J. M'Campbell, Compiler. Laws of the Arkansas Territory.
Little Rock, Ark. Ter, Printed by J. Steele. HeinOnline.

OSCOLA 4th ed.
Steele, J., Compiler; M'Campbell, J., Compiler. Laws of the Arkansas Territory.
Little Rock, Ark. Ter, Printed by J. Steele.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## SLAVES.                                                521

upon [the plantation] of any person whatsoever without Coming on
leave in writing from his or her owner or overseer, not any planta-
being sent upon lawful business, it shall be lawful for tion, &c.
the owner or overseer of such plantation, to give or order Punished by
such slave ten lashes on his or her bare back for every stripes.
such offence.—*Ib.*

Sec. 3. No slave or mulatto whatsoever, shall keep Not to keep a
or carry a gun, powder, shot, club or other weapon gun, &c.
whatsoever, offensive or defensive; but all and every
gun weapon and ammunition found in the possession or Arms and
custody of any negro or mulatto, may be seized by ammunition
any person and upon due proof made before any justice ed.
of the peace of the district [county] where such seizure
shall be, shall by his order be forfeited to the seizor,
for his own use, and moreover, every such offender Slave pun-
shall have and receive by order of such justice any num-ished by
ber of lashes not exceeding thirty nine on his or her stripes.
bare back well laid on for every such offence.—*Ib.*

Sec. 4. Every free negro or mulatto, being a house- Free negro
keeper may be permitted to keep one gun, powder and may carry
shot; and all negroes or mulattoes bond or free, liv- gun, &c.
ing at any frontier plantation, may be permitted to keep And all ne-
and use guns, powder shot and weapons, offensive and tain cases.
defensive, by license from a justice of the peace of the
district [county] wherein such plantation lies, to be ob-
tained upon the application of free negroes or mulattoes,
or of the owners of such as are slaves.—*Ib.*

Sec. 5. All riots, routs unlawful assemblies and se- Riots, &c.
ditious speeches by a slave or slaves, shall be punished How punish-
with stripes, at the discretion of a justice of the peace ed.
and he who will may apprehend and carry him, her or
them before such justice.—*Ib.*

Sec. 6. To prevent the inconvenience arising from Meetings of
the meetings of slaves, if any master mistress or over- slaves.
seer of a family shall knowingly permit or suffer any Persons per-
slave not belonging to him or her, to be and remain on mitting slave
his or her plantation, above four hours at any one time, to remain &c
without leave of the owner or overseer of such slave,
he or she so permitting shall forfeit and pay three dol-
lars for every such offence and every owner or over- Or at any
seer of a plantation, who shall so permit or suffer more time not
than five negroes or slaves, other than his or her own, more than 5.

K*





DATE DOWNLOADED: Thu Oct  6 22:13:08 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1855 153 .

ALWD 7th ed.
, , 1855 153 .

Chicago 17th ed.
"," Indiana - 38th Session : 153-155

AGLC 4th ed.
" Indiana - 38th Session 153

OSCOLA 4th ed.
" 1855 153

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# CHAPTER LXXIX.

AN ACT to provide for the punishment of persons interfering with Trains on Railroads.

[Approved March 1, 1855.]

Section 1.  *Be it enacted by the General Assembly of the State of Indiana*, That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons, on any railroad in this State, shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than ten nor more than one hundred dollars, and imprisoned in the county jail not less than ten days nor more than three months.

*Persons interfering with trains in any manner, guilty of misdemeanor.*

*Penalty.*

Sec. 2.  In case any person on such locomotive, car, or train of cars shall be injured or wounded by any such act, the person so offending shall, on conviction, be deemed guilty of assault, with intent to commit murder, and be imprisoned in the State's Prison for not less than one nor more than four years ; and if death ensue, such person shall be deemed guilty of murder in the first degree, and punished accordingly.

*If injury occur to any person, person so interfering guilty of assault with intent to murder.*

*Penalty.*

Sec. 3.  In case of prosecution under this act, it shall not be deemed necessary in the information or indictment to name or set out the names of persons injured or wounded, except in case of prosecution for murder.

*Not necessary to name person injured except in prosecution for murder.*

Sec. 4.  It is hereby declared that an emergency exists for the immediate taking effect of this act, and that the same shall be in force from and after its passage and publication in the Indiana State Sentinel and Indiana State Journal.

*Emergency.*

# CHAPTER LXXX.

AN ACT providing for an investigation of the affairs of the Madison and Indianapolis Railroad Company, authorizing a compromise therewith, if deemed of advantage to the State, and providing for the payment of said Company's floating and unfunded debt, and of certain debts of the Columbus and Shelby Railroad Company, and em-



342.7641
T31
1866

# THE CONSTITUTION

OF

# THE STATE OF TEXAS.

*We the people of Texas, acknowledging with gratitude the Grace of God in permitting us to make choice of our form of government, do ordain and establish this Constitution.*

### ARTICLE 1.—BILL OF RIGHTS.

That the general, great, and essential principles of Liberty and Free Government may be recognized and established we declare that—

Section 1. All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and they have at all times the unalienable right to alter, reform or abolish their form of government, in such manner as they may think expedient.

Sec. 2. All freemen, when they form a social compact, have equal rights; and no man, or set of men, is entitled to exclusive separate public emoluments or privileges, but in consideration of public services.

Sec. 3. No religious test shall ever be required as a qualification to any office or public trust in this State.

Sec. 4. All men have a natural and indefeasable right to worship God according to the dictates of their own consciences; no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; no human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion; and no preference shall ever be

( 857 )

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Case 3:19-cv-01537-BEN-JLB Document 151 Filed 10/21/22 PageID.13887 Page 48 of 72

be suspended, except when in case of rebellion or invasion the public safety may require it.

Sec. 11. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person, for injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law.

Sec. 12. No person, for the same offence, shall be twice put in jeopardy of life or limb, nor shall a person be again put upon trial for the same offence after a verdict of not guilty; and the right of trial by jury shall remain inviolate.

Sec. 13. Every citizen shall have the right to keep and bear arms, in the lawful defence of himself or the State.

Sec. 14. No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made, and no person's property shall be taken or applied to public use, without adequate compensation being made, unless by the consent of such person.

Sec. 15. No person shall ever be imprisoned for debt.

Sec. 16. No citizen of this State shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land.

Sec. 17. The military shall at all times be subordinate to the civil authority.

Sec. 18. Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed; nor shall the law of primogeniture or entailments ever be in force in this State.

Sec. 19. The citizens shall have the right in a peaceable manner, to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances, or other purposes, by petition, address or remonstrance.

Sec. 20. No power of suspending laws in this State shall be exercised, except by the Legislature or its authority.

Sec. 21. To guard against transgression of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

ARTICLE II.—DIVISION OF THE POWERS OF GOVERNMENT.

Section 1. The powers of the Government of the State of Texas

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Compendium_Supplemental Brief
Page 042

 

DATE DOWNLOADED: Fri Oct 21 12:11:30 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1881 191 .

ALWD 7th ed.
, , 1881 191 .

Chicago 17th ed.
"," Arkansas - 23rd General Assembly, Regular Session : 191-192


AGLC 4th ed.
" Arkansas - 23rd General Assembly, Regular Session 191

OSCOLA 4th ed.
" 1881 191

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

*ACTS OF ARKANSAS.*     *191*

buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

SEC. 2. That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

---

## No. XCVI.

'AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION

1 Carrying of certain weapons constituted a misdemeanor; *proviso*, excepting officers, and persons journeying.
2 Carrying such weapons otherwise than in the hand, a misdemeanor.
3 Selling or disposing of such weapons, a misdemeanor.
4 Violation of act punishable by fine from $50 to $200.
5 Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6 Same penalty denounced any other officer knowing of such offense.
7 Violators of act how proceeded against.
8 Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor ; *Provided*, That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

*192*          ACTS OF ARKANSAS.

SEC. 2.   Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

SEC. 3.   Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

SEC. 4.   Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

SEC. 5.   Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

SEC. 6.   Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

SEC. 7.   All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

SEC. 8.   All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.

 

DATE DOWNLOADED: Thu Oct  6 22:21:52 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
James S. Frazer, ed.; Stotsenburg, John H., ed. et al. Revised Statutes of Indiana:
Containing, also, the United States and Indiana Constitutions and an Appendix of
Historical Documents (1881).

ALWD 7th ed.
Frazer, James S., ed.; Stotsenburg, John H., ed. et al. Revised Statutes of Indiana:
Containing, also, the United States & Indiana Constitutions & an Appendix of
Historical Documents (1881).

APA 7th ed.
Frazer, J. (1881). Revised Statutes of Indiana: Containing, also, the United States
and Indiana Constitutions and an Appendix of Historical Documents. Chicago, E.B.
Myers.

Chicago 17th ed.
Frazer James S., ed.; Stotsenburg, John H., ed. et al. Revised Statutes of Indiana:
Containing, also, the United States and Indiana Constitutions and an Appendix of
Historical Documents. Chicago, E.B. Myers.

McGill Guide 9th ed.
James S. Frazer, ed.; Stotsenburg, John H., ed. et al., Revised Statutes of Indiana:
Containing, also, the United States & Indiana Constitutions & an Appendix of
Historical Documents (Chicago: E.B. Myers., 1881)

AGLC 4th ed.
James S. Frazer, ed.; Stotsenburg, John H., ed. et al., Revised Statutes of Indiana:
Containing, also, the United States and Indiana Constitutions and an Appendix of
Historical Documents (E.B. Myers., 1881

MLA 9th ed.
Frazer, James S., ed., and John H. Stotsenburg, ed. et al. Revised Statutes of
Indiana: Containing, also, the United States and Indiana Constitutions and an
Appendix of Historical Documents. Chicago, E.B. Myers. HeinOnline.

OSCOLA 4th ed.
Frazer, James S., ed.; Stotsenburg, John H., ed. et al. Revised Statutes of Indiana:
Containing, also, the United States and Indiana Constitutions and an Appendix of
Historical Documents. Chicago, E.B. Myers.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

CRITICAL

Case 3:19-cv-01537-BEN-JLB Document 151 Filed 10/21/22 PageID.13892 Page 53 of 72

one thousand dollars, and disfranchised and rendered incapable of holding any office of trust or profit for any determinate period.

**1953. Selling or secreting State arms.** 52. Whoever unlawfully sells, disposes of, hides, secretes, or detains or refuses to give up, to any person authorized to demand and receive them, any of the arms, accoutrements, ordnance stores, camp or garrison equipage belonging to this State, shall be fined in any sum not more than five hundred dollars nor less than five dollars, to which may be added imprisonment in the county jail not more than six months nor less than ten days.

**1954. Removing mortgaged goods.** 53. A mortgagor of personal property, in possession of the same, who, without the consent of the owner of the claim secured by the mortgage, removes any of the property mortgaged out of the county where it was situated at the time it was mortgaged, or secretes or converts the same or any part thereof to his own use, or sells the same or any part thereof to any person, without informing him of the existence of such mortgage, shall be fined in any sum not more than two hundred dollars nor less than five dollars.

**1955. Malicious trespass.** 54. Whoever maliciously or mischievously injures or causes to be injured any property of another or any public property is guilty of a malicious trespass, and, upon conviction thereof, shall be fined not more than two-fold the value of the damage done, to which may be added imprisonment in the county jail for not more than twelve months.

1. As to the indictment, see State *v.* Peden, 2 Blackf. 371; State *v.* Merrill, 3 id. 346; State *v.* Kuns, 5 id. 314; State *v.* Slocum, 8 id. 315; State *v.* Jackson, 7 Ind. 270; State *v.* Clevinger, 14 id. 366; Hayworth *v.* State, id. 590; State *v.* Williams, 21 id. 206; Harness *v.* State, 27 id. 425; Croy *v.* State, 32 id. 384; State *v.* Sparks, 60 id. 298; State *v.* Pitzer, 62 id. 362.

2. As to the evidence, see State *v.* Bush, 29 Ind. 110; Croy *v.* State, 32 id. 384; Palmer *v.* State, 45 id. 388; Lowe *v.* State, 46 id. 305; Dawson *v.* State, 52 id. 478; Gaskill *v.* State, 56 id. 550; Squires *v.* State, 59 id. 261; Lossen *v.* State, 62 id. 437; Gundy *v.* State, 63 id. 528.

**1956. Injuring telegraph or telephone poles or wires.** 55. Whoever maliciously or mischievously injures any telegraph-pole or telephone-pole, or the wire or any part of the apparatus thereof, upon conviction thereof, shall be fined not more than five hundred dollars nor less than five dollars, and imprisoned in the county jail not more than six months nor less than thirty days.

**1957. Attacking public conveyance.** 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

**1958. Penalty if person is wounded or killed.** 57. In case any person on such stage-coach, locomotive, car, train of cars, street-car, or wharf-boat, steamboat, or other water-craft, shall be injured or wounded by any such act as is specified in the preceding section, the person so offending shall be deemed guilty of an assault and battery with intent to commit murder, and, upon conviction thereof, shall be imprisoned in the State prison not more than fourteen years nor less than two years; and if death .

# The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290; Image 293-294 (1881) available at The Making Of Modern Law: Primary Sources. | Duke Center for Firearms Law

An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

 **Idaho Constitution**

## CONSTITUTION OF THE STATE OF IDAHO

### ARTICLE I DECLARATION OF RIGHTS

Section 11.  RIGHT TO KEEP AND BEAR ARMS. The people have the right to keep and bear arms, which right shall not be abridged; but this provision shall not prevent the passage of laws to govern the carrying of weapons concealed on the person nor prevent passage of legislation providing minimum sentences for crimes committed while in possession of a firearm, nor prevent the passage of legislation providing penalties for the possession of firearms by a convicted felon, nor prevent the passage of any legislation punishing the use of a firearm. No law shall impose licensure, registration or special taxation on the ownership or possession of firearms or ammunition. Nor shall any law permit the confiscation of firearms, except those actually used in the commission of a felony.

How current is this law?

**Search the Idaho Statutes and Constitution**

Compendium_Supplemental Brief
Page 049

 Constitution of the State of Utah PREAMBLE

Grateful to Almighty God for life and liberty, we, the people of Utah, in order to secure and

perpetuate the principles of free government, do ordain and establish this CONSTITUTION.

ARTICLE I

DECLARATION OF RIGHTS

Section 1. [**Inherent and inalienable rights.**] All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

Sec. 2. [**All political power inherent in the people.**] All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require.

Sec. 3. [**Utah inseparable from the Union.**] The State of Utah is an inseparable part of the Federal Union and the Constitution of the United States is the supreme law of the land.

Sec. 4. [**Religious liberty.**] The rights of conscience shall never be infringed. The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution.

Sec. 5. [**Habeas corpus.**] The privilege of the writ of *habeas corpus* shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it.

Sec. 6. [**Right to bear arms.**] The people have the right to bear arms for their security and defense, but the Legislature may regulate the exercise of this right by law.

Sec. 7. [**Due process of law.**] No person shall be deprived of life, liberty or property, without due process of law.

Sec. 8. [**Offenses bailable.**] All prisoners shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption strong.

Sec. 9. [**Excessive bail and fines. Cruel punishments.**] Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.

Sec. 10. [**Trial by jury.**] In capital cases the right of trial by jury shall remain inviolate. In courts of general jurisdiction, except in capital cases, a jury shall consist of eight jurors. In courts of inferior jurisdiction a jury shall consist of four jurors. In criminal cases the verdict shall be unanimous. In civil cases three-fourths of the jurors may find a verdict. A jury in civil cases shall be waived unless demanded.

Sec. 11. [**Courts open. Redress of injuries.**] All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered

without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

Sec. 12. [**Rights of accused persons.**] In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to be confronted by the witnesses against him, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed, and the right to appeal in all cases. In no instance shall any accused person, before final judgment, be compelled to advance money or fees to secure the rights herein guaranteed. The accused shall not be compelled to give evidence against himself; a wife shall not be compelled to testify against her husband, nor a husband against his wife, nor shall any person be twice put in jeopardy for the same offense.

Sec. 13. [**Prosecution by information or indictment. Grand jury.**] Offenses heretofore required to be prosecuted by indictment, shall be prosecuted by information after examination and commitment by a magistrate, unless the examination be waived by the accused with the consent of the State, or by indictment, with or without such examination and commitment. The grand jury shall consist of seven persons, five of whom must concur to find an indictment; but no grand jury shall be drawn or summoned unless in the opinion of the judge of the district, public interest demands it.

Sec. 14. [**Unreasonable searches forbidden. Issuance of warrant.**] The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

Sec. 15. [**Freedom of speech and of the press. Libel.**] No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Sec. 16. [**No imprisonment for debt. Exception.**] There shall be no imprisonment for debt except in cases of absconding debtors.

Sec. 17. [**Elections to be free. Soldiers voting.**] All elections shall be free, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage. Soldiers, in time of war, may vote at their post of duty, in or out of the State, under regulations to be prescribed by law.

Sec. 18. [**Attainder. Ex post facto laws. Impairing contracts.**] No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be passed.

Sec. 19. [**Treason defined. Proof.**] Treason against the State shall consist only in levying war against it, or in adhering to its enemies or in giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act.

Sec. 20. [**Military subordinate to the civil power.**] The military shall be in strict subordination to the civil power, and no soldier in time of peace, shall be quartered in any house without the consent of the owner; nor in time of war except in a manner to be prescribed by law.

Sec. 21. [**Slavery forbidden.**] Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within this State.

Sec. 22. [**Private property for public use.**] Private property shall not be taken or damaged for public use without just compensation.

Compendium_Supplemental Brief
Page 051

Sec. 23. [**Irrevocable franchises forbidden.**] No law shall be passed granting irrevocably any franchise, privilege or immunity.

Sec. 24. [**Uniform operation of laws.**] All laws of a general nature shall have uniform operation.

Sec. 25. [**Rights retained by people.**] This enumeration of rights shall not be construed to impair or deny others retained by the people.

Sec. 26. [**Provisions mandatory and prohibitory.**] The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.

Sec. 27. [**Fundamental rights.**] Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government.

ARTICLE II

STATE BOUNDARIES

Section 1. [**State boundaries.**] The boundaries of the State of Utah shall be as follows: Beginning at a point formed by the intersection of the thirty-second degree of longitude west from Washington, with the thirty-seventh degree of north latitude; thence due west along said thirty-seventh degree of north latitude to the intersection of the same with the thirty-seventh degree of longitude west from Washington; thence due north along said thirty-seventh degree of east longitude to the intersection of the same with the forty-second degree of north latitude; thence due east along said forty-second degree of north latitude to the intersection of the same with the thirty-fourth degree of longitude west from Washington; thence due south along said thirty-fourth degree of west longitude to the intersection of the same with the forty-first degree of north latitude; thence due east along said forty-first degree of north latitude to the intersection of the same with the thirty-second degree of longitude west from Washington; thence due south along said thirty-second degree of west longitude to the place of beginning.

ARTICLE III

ORDINANCE

The following ordinance shall be irrevocable without the consent of the United States and the

people of this State:

[**Religious toleration. Polygamy forbidden.**] First:--Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited.

[**Right to public domain disclaimed. Taxation of lands. Exemptions.**] Second:--The people inhabiting this State do affirm and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries hereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. The lands belonging to citizens of the United States, residing without this State shall never be taxed at a higher rate than the lands belonging to residents of this State; nor shall taxes be imposed by this State on lands or property herein, belonging to or which may hereafter be purchased by the United States or reserved for its use; but nothing in this ordinance shall preclude this state from taxing, as other lands are taxed, any lands owned or held by any Indian who has severed his tribal

 

DATE DOWNLOADED: Thu Oct  6 22:17:04 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1905 584 .

ALWD 7th ed.
, , 1905 584 .

Chicago 17th ed.
"," Indiana - 64th Regular Session : 584-757


AGLC 4th ed.
" Indiana - 64th Regular Session 584

OSCOLA 4th ed.
" 1905 584

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

with, on conviction shall be fined not less than five dollars nor
more than five hundred dollars and imprisoned in the county jail
not less than thirty days nor more than six months.

### Electric Meters, Etc.—Injury.

SEC. 409.   Whoever unlawfully and intentionally injures or
destroys or permits to be injured or destroyed any meter, pipe,
conduit, wire, line, post, lamp or other apparatus belonging to
a company engaged in the manufacture or sale of electricity for
light, heat, power or other purposes; or whoever unlawfully and
intentionally prevents an electric meter from duly registering
the quantity of electricity supplied, or in any way interferes with
its proper action or just registration; or, whoever, without the
consent of such company, unlawfully and intentionally diverts
any electric current from any wire of such company, or other-
wise unlawfully and intentionally uses or causes to be used, with-
out the consent of such company, any electricity manufactured
or distributed by such company, shall be deemed guilty of a mis-
demeanor, and, on conviction shall, for every such offense, be
punished by a fine not exceeding one hundred dollars, or by im-
prisonment in the county jail not exceeding one year, or by both
such fine and imprisonment.

### Public Conveyance—Attacking.

SEC. 410.   Whoever maliciously or mischievously shoots a gun,
rifle, pistol or other weapon, or throws a stone, stick, club or any
other substance whatever, at or against any stage coach, or any
locomotive, railroad car, or train of cars, street car, or inter-
urban car on any railroad in this state, or at or against any wharf-
boat, steamboat, or other water-craft, shall be imprisoned in the
county jail not less than thirty days nor more than one year, and
fined not less than ten dollars nor more than one hundred dollars.

### Injury to Person—Penalty.

SEC. 411.   In case any person on such stage coach, locomotive,
car, train of cars, street car, interurban car, or wharfboat, steam-
boat or other water craft, shall be injured or wounded by any
such act as is specified in the preceding section, the person so
offending shall be deemed guilty of an assault and battery with
intent to commit murder, and, on conviction, shall be imprisoned
in the state prison not less than two years nor more than four-
teen years; and, if death ensue from such act such offender shall
be deemed guilty of murder in the second degree, and on convic-
tion, shall be imprisoned in the state prison during life.




DATE DOWNLOADED: Fri Oct  7 17:48:24 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1927 938 .

ALWD 7th ed.
, , 1927 938 .

Chicago 17th ed.
"," California - Extra Session of the 46th Legislature, 47th Regular Session :
938-938


AGLC 4th ed.
" California - Extra Session of the 46th Legislature, 47th Regular Session 938

OSCOLA 4th ed.
" 1927 938

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

ness connected with this office; said traveling expenses not to exceed one hundred dollars per year per supervisor.

Jurors. 15. For attending as a grand juror, or a trial juror in criminal and civil cases in the superior court, for each day's attendance, three dollars; for each mile actually traveled one way as such grand juror, or trial juror, in the superior court, under summons or order of the court, twenty-five cents. The county clerk shall certify to the auditor the number of days' attendance, and the number of miles traveled by each juror and the auditor shall then draw his warrant therefor and the treasurer shall pay the same.

Effect of act. SEC. 2. The provisions of this act, so far as they are substantially the same as existing statutes governing counties of this class, must be construed as continuations thereof and not as new enactments; and nothing in this act contained shall be deemed to shorten or extend the term of office or employment of any person holding office or employment under the provisions of such statutes.

---

## CHAPTER 552.

*An act to prohibit the possession of machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device, and providing a penalty for violation thereof.*

[Approved by the Governor May 16, 1927.  In effect July 29, 1927.]

*The people of the State of California do enact as follows:*

Possession of machine guns. SECTION 1. On and after the date upon which this act takes effect every person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment.

*Provided, however,* that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

"Machine gun" defined. SEC. 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

**BOOKS**

# ARMED
# IN
# AMERICA

A HISTORY OF GUN RIGHTS *from*
COLONIAL MILITIAS *to* CONCEALED CARRY

PATRICK J. CHARLES


Prometheus Books
59 John Glenn Drive
Amherst, New York 14228

Published 2018 by Prometheus Books

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry.* Copyright © 2018 by Patrick J. Charles. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, digital, electronic, mechanical, photocopying, recording, or otherwise, or conveyed via the Internet or a website without prior written permission of the publisher, except in the case of brief quotations embodied in critical articles and reviews.

Top cover image © Media Bakery
Bottom cover image © Jamie Carroll / Shutterstock
Cover design by Liz Mills
Cover design © Prometheus Books

For my daughter, Addison Harper Charles.

Every attempt has been made to trace accurate ownership of copyrighted material in this book. Errors and omissions will be corrected in subsequent editions, provided that notification is sent to the publisher.

Inquiries should be addressed to
Prometheus Books
59 John Glenn Drive
Amherst, New York 14228
VOICE: 716–691–0133. • FAX: 716–691–0137
WWW.PROMETHEUSBOOKS.COM

22  21  20  19  18     5  4  3  2  1

Library of Congress Cataloging-in-Publication Data

Names: Charles, Patrick J. (Historian), author.
Title: Armed in America : a history of gun rights from colonial militias to concealed carry
   / Patrick J. Charles.
Description: Amherst, New York : Prometheus Books, 2018. | Includes index.
Identifiers: LCCN 2017028290 (print) | LCCN 2017039818 (ebook) |
   ISBN 9781633883147 (ebook) | ISBN 9781633883130 (hardback)
Subjects: LCSH: Firearms—Law and legislation—United States—History. | Gun
   control—United States—History. | BISAC: POLITICAL SCIENCE /
   Constitutions. | HISTORY / United States / General.
Classification: LCC KF3941 (ebook) | LCC KF3941 .C49 2018 (print) |
   DDC 344.7305/33—dc23
LC record available at https://lccn.loc.gov/2017028290

Printed in the United States of America

3 1223 12351 3096

regulated militia."⁹³ However, the "civilized warfare" test first appeared in the 1840 Tennessee Supreme Court case *Aymette v. State*. The issue before the court in *Aymette* was whether an 1837 Tennessee statute, which prohibited any person from wearing concealed a bowie knife or Arkansas toothpick, violated the 1835 Tennessee Constitution's right to "bear arms."⁹⁴ The Tennessee Supreme Court ultimately upheld the statute as constitutional, with one of the justifications being that bowie knives and Arkansas toothpicks were not the types of arms contemplated by the framers of the Tennessee Constitution: "As the object for which the right to keep and bear arms is secured, is of general and public nature, to be exercised by the people in a body, for their *common defence*, so the *arms*, the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment."⁹⁵

In the decades that followed, other state courts incorporated the *Aymette* "civilized warfare" test into their jurisprudence. For instance, in 1870 the Texas Supreme Court upheld a comparable armed carriage statute under the rationale that neither the framers of the Second Amendment nor the framers of the 1869 Texas Constitution intended to protect those arms unsuitable for the militiaman or soldier.⁹⁶ Two decades later, the West Virginia Supreme Court did the same, when it held that the "kind of arms" contemplated by the framers of the Second Amendment were "weapons of warfare to be used by the militia," not weapons as are "usually employed in brawls, street-fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the State."⁹⁷

By the time the United States progressed into the Reconstruction Era, what it meant to "keep and bear arms" in the militia was not the only context in which the right to arms transformed. Armed individual self-defense also became associated with the right. Two notable changes in the law aided with this transformation. The first was a noticeable shift in constitutional language at the state level. Beginning in the Antebellum Era, "bear arms" provisions in state constitutions reflected a more individualized conception of the right to arms.⁹⁸ Consider that at the time of the Constitution's ratification only four of the thirteen state constitutions retained "bear arms" provisions, each of which reflected more of a communal view of the right to arms.⁹⁹ Meanwhile, five state constitutions included provisions highlighting the constitutional significance of a well-regulated militia.¹⁰⁰ Early on, this trend continued as new states joined the Union and adopted their own constitutions or old states modified existing ones. The states of Kentucky, Tennessee, and Ohio all included communal language in their respective "bear arms" analogues.¹⁰¹ It was not until 1817 that the individualized language began to appear. The first state constitution was that of Missis-

sippi, followed by the state constitutions of Connecticut and Alabama.¹⁰² This is not to say that each and every follow-on state constitution adopted the more individualized language.¹⁰³ But by 1868 the shift toward the more individualized language was certainly noticeable, with seven of the thirty-six state constitutions maintaining individualized "bear arms" provisions.¹⁰⁴

Coinciding with this change in constitutional language were modifications to state and local armed carriage laws. Recall that up through the late eighteenth century the Statute of Northampton was the prevailing rule of law. The Statute of Northampton essentially restricted the preparatory carriage of dangerous weapons in the public concourse, with the common law exceptions being government officials, militia musters and training, the hue and cry, and so forth. This is not to say that the Statute of Northampton restricted armed carriage outright. Up through the late eighteenth century, it was common for individuals to carry arms for trade, repair, on travels, and for hunting. However, should an individual carry dangerous weapons into the public concourse, say through the bustling streets of Boston, Massachusetts, it was within the discretion of the justice of the peace, sheriff, or constable to detain the offending individual, confiscate their weapons, or seek surety of the peace.¹⁰⁵ While this standard seems to have worked well up through the eighteenth century, state and local governments eventually modified or replaced it.

Certainly each state and local government maintained its own reasons and rationales as to why they modified or replaced the longstanding Statute of Northampton. In most cases, the legislative reasons and rationales have been lost to time, but there are a few postulations as to why state and local governments felt compelled to modify or replace the Statute of Northampton. One is the technological advances in firearms and other dangerous weapons. These advances made firearms and dangerous weapons more readily available to the public at large, and therefore resulted in an increase of deadly encounters and violence. Another postulation as to why the Statute of Northampton was eventually modified or replaced in the early nineteenth century was changes in demography. Consider that from 1790 to 1830 the population of the United States more than tripled, from 3,929,214 to 12,860,353 people. The state of New York led the way, with a population increase from 340,120 to 1,918,608 people. From 1830 to 1870, the population once again tripled, to 38,558,371 people. This time, the state of Illinois led the nation with a population increase from 157,445 to 2,539,891 people. Needless to say, as the population of the United States continued to grow, the small communal aspect of many American towns, localities, and cities began to disintegrate, and would have required state and local governments to adopt more tangible forms of restricting armed carriage.

so at large and not confined, kill any human being, such owner is liable to be punished as for manslaughter in the third degree. It is provid[ed] in the constitution of the United States that the freedom of speech and of the press shall not be abridged by any law of Congress, and yet this provision has never been so construed as to deny to Congress the power to make it offence for libelous matter to be published, rendering the offender liable to prosecution and punishment for the libel so published.[199]

Viewing these Southern Reconstruction Era cases together reveals that as the United States progressed into the Reconstruction Era Southern governments and courts came to embrace Northern attitudes on the law and armed carriage. This included the state of Mississippi, which in 1878 adopted a variant of the Massachusetts Model. Recall that the model prohibited all forms of armed carriage unless the person was able demonstrate an "imminent" or "reasonable" fear of assault or injury. What differentiated the Mississippi law was that it only applied to the carriage of concealable weapons. The Mississippi law stipulated that "any person, not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling . . . or setting out on a journey, or peace officers, or deputies in discharge of their duties," shall not carry a concealed weapon.[200] Like other Southern armed carriage laws, the Mississippi law was eventually challenged in court. The case, *Tipler v. State*, involved George W. Tipler, who was tried and found guilty of carrying a concealed weapon, despite Tipler having informed the jury that a railroad employee had uttered threats of "serious personal injury" against him.[201] The case ultimately made its way up to the Mississippi Supreme Court, where Tipler challenged the law on both constitutional and circumstantial grounds.[202] As it pertained to the constitutional issue, although the court did not fully explain why the Mississippi law was constitutional, the opinion, written by Judge Josiah A. P. Campbell, suggests that the court did not see any issue with the legislature determining when in fact a person was justified in publicly carrying dangerous weapons, particularly when it involved the carrying of concealable weapons.

The court then addressed whether Tipler's circumstances fell within the Mississippi law's "being threatened" exception—that is, whether Tipler was legally justified in carrying a concealed weapon for self-defense. The answer provided by the court essentially mirrored Northern attitudes as to when it was necessary to go armed in self-defense:

The term "threatened" in the statute does not mean that a mere denunciation of evil will license the person denounced to carry concealed weapons. The

person excepted from the prohibition of the statute is one so menaced as to have good reason to believe that he is in danger of an attack from which he may properly defend himself by the character of weapon he carries concealed. The statute permits one justly apprehensive of attack to provide against it by carrying weapons concealed; but apprehension must not be simulated or too easily excited; and idle threats, the ebullition of passion, or the offspring of intoxication, which import no serious danger, must not be made a pretext for carrying concealed weapons, which is permitted only to him who has "good and sufficient reason to apprehend attack."[203]

The *Tipler* case provides another historical example as to how integrated Northern and Southern attitudes on the law and armed carriage became during the Reconstruction Era. Indeed, the *Tipler* case merely involved a law regulating the concealed carriage of dangerous weapons, not their open carriage. The same was true for other Southern courts examining the constitutionality of armed carriage laws in the late nineteenth century. Faced with only the constitutionality of a concealed-carry prohibition, Southern courts were able to summarily uphold the respective armed carriage law on the grounds it did not prohibit all forms of carriage.[204] However, this does not diminish the fact that as Southern armed carriage laws evolved to cover aspects of open carriage so too did its jurisprudence.[205]

This in turn led to the development of a national standard on the law and armed carriage. The standard provided that state and local governments maintained broad police powers to regulate dangerous weapons, so long as they did not utterly destroy the armed citizenry model of the right to arms or fail to allow for armed self-defense in extreme cases.[206] As jurist John Forrest Dillon summarized the matter in the first law review article on the issue, "It is within common experience that there are circumstances under which to disarm a citizen would be to leave his life at the mercy of a treacherous and plotting enemy. If such a state of facts were clearly proven, it is obvious it would be contrary to all our notions of right and justice to punish the carrying of arms [in that instance], although it may have infringed the letter of some statute."[207] In all other cases, however, Dillon noted that state and local governments were acting within their authority "to regulate the bearing of arms in such manner as [they] may see fit, or to restrain it altogether."[208]

Michigan Supreme Court chief justice Thomas M. Cooley provided a similar exposition on the law and armed carriage. In *A Treatise on the Law of Torts*, while acknowledging the prevalence of the armed citizenry model, Cooley noted how the right to arms did not necessarily extend to the carrying of dangerous weapons in public places, particularly concealable weapons:

military commentator up through the late eighteenth century attested, arms
were not the central component of a well-regulated militia. Arms were merely
a tool to achieve the constitutional end of republican liberty—liberty that the
Founding Fathers thought would be undermined should the public's trust in a
well-regulated militia ever cease to exist.[2]

In less than half a century, the Founding Fathers fears had been realized.
Due both to political inaction and public disfavor with militia service, the civic
republicanism model of the Second Amendment eventually died. In place of
the civic republicanism model arose its antithesis—the armed citizenry model.
Accompanying this conceptual change in American thinking was the recogni-
tion of a new Second Amendment right to armed individual self-defense. This
new right, although legally actionable, was severely limited in constitutional
scope. Certainly, in the Antebellum Era, some Southern state courts recognized
a more robust right to armed self-defense both in private and public, but it was
a right that only applied to a small segment of the country. For most Americans
the right to own weapons for self-defense and other purposes, was, like other
rights, limited by governmental police power, and therefore was subject to rea-
sonable regulation, including limiting what types of weapons could be owned
as well as time, place, and manner restrictions. After the Civil War, the majority
view of the Second Amendment completely consumed the minority view, and
a national consensus developed. The national consensus was that state and local
governments maintained broad police powers to regulate dangerous weapons in
the interest of public safety—that is, so long as they did not utterly destroy the
armed citizenry model of the Second Amendment or fail to allow for individuals
to exercise their right to armed self-defense in extreme cases.[3]

In the early part of the twentieth century, although many Americans had
come to believe that the Second Amendment protected a right to own firearms
arms for lawful and legitimate purposes outside of service in the militia, the
Supreme Court of the United States had never defined the Second Amend-
ment in such broad terms. In fact, it is fair to say that Supreme Court juris-
prudence was ambiguous as to what individual rights, if any, the Second
Amendment afforded. This ultimately placed the burden on the lower federal
courts to settle the matter. One after the other, every twentieth-century appel-
late court to examine the Second Amendment held that the right to keep and
bear arms was tied to the militia, in some form or another.

Undeterred by the federal courts was a group of staunch believers in the
right to own and use firearms for legitimate and lawful purposes. Provoked
to action by the unceasing growth of firearms restrictions, these believers
assembled the first gun-rights advocacy groups. During these earlier years,

the primary agenda of gun-rights advocacy was to promote model firearms
legislation. However, as gun-rights advocates achieved one political victory
after another and the gun-rights community continued to grow, their resolve
for larger conceptual change reached new heights. To gun-rights advocates,
in order to achieve this conceptual change the *end* almost always justified the
*means*. Whatever was necessary to rouse the gun-rights community to action,
influence lawmakers, or garner public opinion was morally justifiable. This
often meant vilifying the intellectual opposition, relying on sensationalism,
and fabricating political motives. At the same time, firearms regulations were
whimsically assailed as being ineffective, promoting crime, and nothing more
than a slippery slope toward complete disarmament.[4]

For most of the twentieth century, the political agenda advanced by gun-
rights advocates—although undoubtedly effective at rousing the gun-rights
community to stall or defeat firearms legislation—did little to sway the general
public, who overwhelmingly supported firearms controls. But, through persis-
tence, gun-rights advocates eventually succeeded in changing the general pub-
lic's perception. This ultimately culminated in the Supreme Court recognizing
an individual right to armed self-defense in one's home. In achieving this con-
ceptual change, gun-rights advocates surprisingly did not advance any new
arguments. Rather, they recycled old ones, with more nuance and sometimes
with new rationales. What was fundamentally different was the increasingly
partisan nature of American politics. What was also different was the manner
in which the gun-rights message was presented.[5]

From the early to mid-twentieth century, gun-rights advocates pushed
their agenda with little, if any, substantiated evidence. However, following the
1977 Cincinnati Revolt, gun-rights advocacy began recruiting, fostering, and
promoting academic literature that coincided with longstanding gun-rights
theology. Almost everything gun-rights advocates had claimed for decades was
now being packaged and sold as academically true. This was particularly the
case for the Standard Model Second Amendment. Whether the period was
the American Revolution, the Reconstruction Era, the Civil Rights Move-
ment, or some other period in time, the Standard Model of firearms ownership
and use was historically cast as a societal good that promoted liberty, facili-
tated civil virtue, and reduced crime. Conversely, any historical event, chain of
events, person, group, or action that curtailed the ownership and use of fire-
arms was historically vilified.[6]

There are a number of examples in Standard Model literature to this effect,
including the longest standing arch-nemesis of gun rights—the Sullivan Law.
Recall that it was primarily the Sullivan Law that prompted the editors of



# GUNSHOT WOUNDS

**Practical Aspects of Firearms, Ballistics, and Forensic Techniques**

**Third Edition**

**Vincent J.M. DiMaio**

Practical Aspects of Criminal and Forensic Investigations Series

**CRC Press**
Taylor & Francis Group

# Third Edition

# GUNSHOT WOUNDS

## Practical Aspects of Firearms, Ballistics, and Forensic Techniques

## Vincent J.M. DiMaio



CRC Press
Taylor & Francis Group
Boca Raton  London  New York

CRC Press is an imprint of the
Taylor & Francis Group, an **informa** business

Copyrighted material

Winchester is a trademark of Olin Corporation and is used with permission.  Neither the author nor the publisher are sponsored by or associated with Olin Corporation

CRC Press
Taylor & Francis Group
6000 Broken Sound Parkway NW, Suite 300
Boca Raton, FL 33487-2742

© 2016 by Taylor & Francis Group, LLC
CRC Press is an imprint of Taylor & Francis Group, an Informa business

No claim to original U.S. Government works
Version Date: 20150611

International Standard Book Number-13: 978-1-4987-2570-5 (eBook - PDF)

This book contains information obtained from authentic and highly regarded sources. Reasonable efforts have been made to publish reliable data and information, but the author and publisher cannot assume responsibility for the validity of all materials or the consequences of their use. The authors and publishers have attempted to trace the copyright holders of all material reproduced in this publication and apologize to copyright holders if permission to publish in this form has not been obtained. If any copyright material has not been acknowledged please write and let us know so we may rectify in any future reprint.

Except as permitted under U.S. Copyright Law, no part of this book may be reprinted, reproduced, transmitted, or utilized in any form by any electronic, mechanical, or other means, now known or hereafter invented, including photocopying, microfilming, and recording, or in any information storage or retrieval system, without written permission from the publishers.

For permission to photocopy or use material electronically from this work, please access www.copyright.com (http://www.copyright.com/) or contact the Copyright Clearance Center, Inc. (CCC), 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400. CCC is a not-for-profit organization that provides licenses and registration for a variety of users. For organizations that have been granted a photocopy license by the CCC, a separate system of payment has been arranged.

**Trademark Notice:** Product or corporate names may be trademarks or registered trademarks, and are used only for identification and explanation without intent to infringe.

**Visit the Taylor & Francis Web site at**
**http://www.taylorandfrancis.com**

**and the CRC Press Web site at**
**http://www.crcpress.com**

sucked into the barrel, chamber, and firing mechanism of the gun. A pillow may absorb all the soot coming out the muzzle with none present in the wound. Entrance wounds through pillows may show a wide irregular abrasion around them (Figure 4.12b).

## Muzzle Brakes/Compensators

Silencers are rarely encountered. More common are muzzle brakes and compensators. Just as in a silencer, they may be integral with the barrel or attached to the muzzle. A muzzle brake works by redirecting some of the gases so as to generate a forward thrust on the muzzle countering the force of recoil, i.e., reducing recoil. A compensator diverts gas upward to counteract the tendency for the muzzle to rise on firing. The terms muzzle brake and compensator are often used interchangeably, however, with muzzle brakes often functioning as compensators as well. Figure 4.13a shows a contact wound under the jaw from a 7 mm Magnum rifle equipped with a muzzle brake.

In its simplest form, a compensator consists of gas ports (openings) cut in the top of the muzzle of the barrel. These direct gas upward to counter upward muzzle travel. In contact wounds, the jets of gas escaping out the ports may produce characteristic patterns on the skin or clothing. Figure 4.13b shows a *rabbit-ear* pattern produced by a .22-caliber target pistol with a compensator having two slits. Figure 4.13c and d shows a similar pattern from a large-caliber weapon. Because the ports were much larger, there was searing of the skin and powder tattooing. Figure 4.13e shows a pistol with ports.

## Flash Suppressors

Modern military rifles and some civilian rifles have flash suppressors attached to the muzzle. These devices are intended to reduce muzzle flash, i.e., an incandescent cloud of gas that emerges from the muzzle of the rifle when fired at night. Such a device is useful in combat to decrease the possibility of counter fire.

Muzzle flash is determined by the nature of "the propellant (type, chemistry, burning rate, flame temperature, gas volume at the muzzle), barrel length, muzzle pressure, nature of the gas products, projectile type and primer composition."[7] The longer the barrel, the less the muzzle flash. Gases from combustion of the propellant (carbon monoxide and hydrogen) and carbonaceous particles from the powder are expelled from the muzzle under high pressure and temperature where on mixing with oxygen they ignite, producing the muzzle flash. Some propellants, including that used in U.S. military ammunition, contain flash retardants.

The duration of a muzzle flash is 0.01–0.03 s.[7] In comparison, the average duration of an involuntary blink of the eye is approximately 0.1–0.4 s. Because of this, two individuals could be looking at a gun at the time of discharge with only one seeing the muzzle flash as the second individual just happened to blink at the time of discharge.

Flash suppressors generally consist of a cylinder, having a number of longitudinal slits along its length that is attached to the muzzle of the weapon (Figure 4.14a). On firing, the gas emerging from the muzzle is bled out the slits rather than emerging as one large cloud. Soot is present in this cloud of gas. If the muzzle of such a weapon is held in contact with the body, the flash suppressor will produce a distinctive pattern of seared, blackened zones around the entrance due to the emerging jets of hot gas. If fully formed, this results in