1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                      CIVIL DIVISION

13

14   **JAMES MILLER et al.,**              Case No. 3:19-cv-01537-BEN-JLB

15                        Plaintiffs,
                                         **COMPENDIUM OF WORKS**
16        **v.**                          **CITED IN DEFENDANTS'**
                                         **SUPPLEMENTAL BRIEF IN**
17                                       **RESPONSE TO THE COURT'S**
                                         **ORDER OF AUGUST 29, 2022**
18   **CALIFORNIA ATTORNEY**
     **GENERAL ROB BONTA et al.,**        **VOLUME 2 OF 13**
19
                         Defendants.     Courtroom:    5A
20                                       Judge:        Hon. Roger T. Benitez

21                                       Action Filed:  August 15, 2019

22

23

24

25

26

27

28                                  1

# INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss 1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |

**BOOKS**

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

4

| LAW REVIEWS AND JOURNALS | | |
|---|---|---|
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, *U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020* (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, *Defensive Gun Uses in the U.S.* (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

6

# Somerset Record Society.

## VOL. XX.

Digitized by Google

# CERTIFICATE OF MUSTERS

IN THE

# COUNTY OF SOMERSET.

TEMP. ELIZ. A.D. 1569.

EXTRACTED, AND WITH NOTES

BY

EMANUEL GREEN, F.S.A., F.R.S.L.

PRINTED FOR SUBSCRIBERS ONLY.

1904.

Digitized by Google

*Br 4051.4.13*

*Minot fund*

(XX)

LONDON:

HARRISON AND SONS, PRINTERS IN ORDINARY TO HIS MAJESTY,

ST. MARTIN'S LANE.

Digitized by Google

## THE ARQUEBUS.

The arquebus, sometimes miscalled a caliver, the next favourite weapon as "shot," was fairly light and about a yard in length.   Whilst considered of great use in woods or other ambush it was also especially the weapon for skirmishing as being "maniable," hence the smaller and younger men were chosen for this service as more nimble to traverse the ground.   The name is found spelled in several ways, and also as hacqbutt or hagbut, and so leads to the thought that different weapons may be intended, which may not always be the case.   Hacqbutt was the earlier name for the first form of the weapon ; the slight differences or improvements from time to time must account for the slight after-differences in the name.

An Act, 33 Hen. VIII., cap. 6, concerning crossbows and handguns, orders that no person should have any handgun other than being in the stock and gun of the length of one whole yard, or any hagbutt or demy hake other than shall be in the stock and gun the length of three-quarters of a yard.   Handgun sometimes meant what would to-day be called a pistol.

The barrel was at this time called the cannon.   The arquebus was in fact from origin a cannon in little, a diminutive cannon, reduced to "maniable" size.   The earliest form was simply this "cannon" with the usual touch hole at the breach end to which a lighted match—incandescent prepared rope—was applied by the hand to ignite the powder, as was the case with the cannon proper.   To avoid this plan of lighting which really employed one arm, next was introduced attached to the stock, a simple iron lever in which the match was fixed, and this, working on a pivot, being moved gradually by one finger, left the right arm free from strain and brought the light accurately to the touch hole at the breach end, more exactly and more easily than the man's hand could do it.   Then came a further improvement, when the lever carrying the lighted match was moved by a spring





# THE BLACK RIFLE

## M16 RETROSPECTIVE

### R. Blake Stevens • Edward C. Ezell

Edited by R. Blake Stevens

# Collector Grade Publications
INCORPORATED

# OTHER COLLECTOR GRADE BOOKS . . .

*Backbone of the Wehrmacht — the German K98k Rifle, 1934 – 1945*
(1991; Author's Revised Edition 1993) by Richard D Law

*The Black Rifle — M16 Retrospective*
(1987; Enhanced Edition 1992) by R Blake Stevens and Edward C Ezell

*The Bren Gun Saga*
(1986) by Thomas B Dugelby

*The Browning High Power Automatic Pistol*
(1984; Expanded Edition 1990) by R Blake Stevens

*EM-2 Concept & Design — A Rifle Ahead of its Time*
(1980) by Thomas B Dugelby

*Death from Above — The German FG42 Paratroop Rifle*
(1990) by Thomas B Dugelby and R Blake Stevens

*The Devil's Paintbrush — Sir Hiram Maxim's Gun*
(1989; Revised Edition 1993) by Dolf L Goldsmith

*The FAL Rifle*
1993 Classic Edition. Includes the entire three-volume *FAL Series* plus Index:
*North American FALs* (paper 1979; 10th Anniversary Hardcover Edition 1989) by R Blake Stevens
*UK and Commonwealth FALs* (paper 1980; 10th Anniversary Hardcover Edition 1989) by R Blake Stevens
*The Metric FAL* (paper 1981; 10th Anniversary Hardcover Edition 1989) by R Blake Stevens and Jean E Van
Rutten
*The FAL Series Index* (1989) by Eino Sierpe and R Blake Stevens

*The Grand Old Lady of No Man's Land—the Vickers Machinegun*
(1994) by Dolf L Goldsmith

*Modern Military Bullpup Rifles — the EM-2 Concept Comes of Age*
(1984) by Thomas B Dugelby

*The SPIW — The Deadliest Weapon that Never Was*
(1984) by R Blake Stevens and Edward C Ezell

*US Rifle M14 — From John Garand to the M21*
(1983; reprinted 1988; Revised Edition 1991) by R Blake Stevens

*WAR BABY! The US Caliber .30 Carbine*
(1992) by Larry L Ruth

*WAR BABY Comes Home — The US Carbine Volume II*
(1993) by Larry L Ruth

© 1994 COLLECTOR GRADE PUBLICATIONS INCORPORATED
ISBN 0-88935-115-5
Published by Collector Grade Publications Incorporated
PO Box 1046 Cobourg, Ontario Canada K9A 4W5

All rights reserved. Other than small excerpts used in a review, no part of this publication may be
reproduced, stored in a retrieval system or transmitted in any form by means electrical, mechanical or
otherwise without the written permission of the copyright holder.

Enhanced Second Edition
Printed in Canada

10 9 8 7 6 5 4 3 2

ever purchased. General LeMay was unable to get any further funding requests approved, the reason being that there were already sufficient numbers of earlier M4 and M6 survival rifles in Air Force stores. However, much had been accomplished for such a short time, and the "success" of the AR-5 had put ArmaLite on the military map, so to speak.

This, combined with the "know-how" which had accrued from building and testing the earlier designs, prompted a decision to apply the full force of Gene Stoner's considerable talents to the original, as-yet unformulated idea for an in-line military rifle. As a measure of the importance accorded this move by everyone concerned, no less a personage than the recently retired Commanding General of the Continental Army Com-

mand (CONARC), Jacob L. Devers, joined the staff of Fairchild as Military Liason Officer.

As discussed below, the fourth-prototype version of Gene Stoner's AR-10 was the first to be made in any but one-off numbers. When it burst upon the scene in 1955, the experience of first viewing and handling the AR-10's grey alloy metalwork and foam-filled plastic furniture seemed so utterly without precedent that for many it simply suspended the critical faculties, leaving nowhere to begin any comparison with ordinary wood-and-steel rifles. The AR-10 came complete with a very interesting "family tree", however, and in order to do justice to this epochal weapon itself we must retrace some steps and pick up yet another thread of our story.

# Flashback:
# The Great Johnson/Garand Controversy of 1940



Bitter controversy, denigrations and accusations; investigations and whiffs of scandal: all these and more have attended the manufacture and issuance of a number of US Army shoulder rifles since at least the first Allin conversion of the Springfield rifled musket in 1865. The whole process seemed about to begin again when the US adopted the world's first general-issue semi-automatic rifle, the .30-06 (7.62x63mm) M1 Garand: many minds, military and otherwise, were far from convinced that the Army had made the right move.

The M1 was adopted in January, 1936. The following month, the original toolroom model of a new .30-06 short-recoil rifle mechanism was test fired for the first time. It was the brainchild of Melvin M. Johnson, Jr., a young man described in a later *American Rifleman* article as "a well-heeled Boston lawyer whose passion was the design of advanced rifles and machine guns". Johnson, also an officer in the Marine Corps Reserve, pursued the refinement and contract manufacture of several prototypes of his rifle with all of the considerable private resources he could muster. Nor was he hesitant about calling for help from his fellow officers: in March of 1938 he was allowed to conduct a week-long field demonstration before the Infantry Board at Fort Benning, with his rifle "serial no. 1". For his pains he received the following reminder that the US already had a rifle:

*...until the [Johnson] rifle can be subjected to intensive test firing, such as has been done with the US Rifle, M1, no sound conclusions can be made concerning the ability of the rifle or its parts to stand up.*

26. *John Cantius Garand and the M1 rifle, in a National Rifle Association photo taken at Springfield Armory shortly before his death in 1974. The M1 was the world's first general-issue semi-automatic rifle, and many felt that it was an impossible design to mass-produce. Mr. Garand here holds "U.S. Semi-automatic Rifle Caliber .30 M1" serial no. 1, the first of more than six million which were eventually made.*

# THE

# CONDUCTOR GENERALIS:

## OR, THE

## OFFICE, DUTY AND AUTHORITY

### OF

## JUSTICES OF THE PEACE,

HIGH-SHERIFFS, UNDER-SHERIFFS, CORONERS, CONSTABLES, GAOLERS, JURY-MEN, AND OVERSEERS OF THE POOR.

### AS ALSO,

## THE OFFICE OF CLERKS OF ASSIZE,

AND OF THE PEACE, &c.

---

Compiled chiefly from Burn's Justice, and the several other Books, on those Subjects, by James Parker, late one of the Justices of the Peace for Middlesex County, in New-Jersey ; and now revised and adapted to the United States of America,

### BY A GENTLEMAN OF THE LAW.

The whole Alphabetically digested under the several Titles; with a TABLE directing to the ready finding out the proper Matter under those Titles.

---

## ALBANY:

PRINTED BY CHARLES R. & GEORGE WEBSTER, On the West Corner of State and Pearl-streets, near the English Church, and opposite the City-Tavern, 1794 :

And sold at their Office, and at the Book-Stores of Webster & Steel, Thomas Spencer and Abraham Ellison, Albany ; by Mr. Wands, Lansingburgh, and Mr. Stoddard, Hudson ; AND, in the City of Philadelphia, at the Book-Stores of MR. MATHEW CAREY, AND MR. WILLIAM YOUNG.

Compendium_Supplemental Brief
Page 075

[ 26 ]

# AFFRAY.

I. *What is an affray.*
II. *How far it may be suppressed by a private*
III. *How far by a constable.* [*person.*
IV. *How far by a justice of the peace.*
V. *Punishment of an affray.*

### *I.* What is an affray.

AN affray is *a public offence to the terror of the king's subjects, and* is *an* English *word, and so called, because it affrighteth and maketh men afraid.* 3 Inst. 158.

From whence it seemeth clearly to follow, that there may be an *assault*, which will not amount to an *affray* ; as where it happens in a private place, out of the hearing or seeing of any, except the parties concerned, in which case it cannot be said to be to the terror of the people. 1 *Haw.* 134.

Also it is said, that no quarrelsome or threatening words whatsoever, shall amount to an affray ; and that no one can justify laying his hands on those who shall barely quarrel with angry words, without coming to blows ; yet it seemeth, that the constable may, at the request of the party threatened, carry the person who threatens to beat him, before a justice in order to find sureties. 1 *Haw.* 135.

Also, it is certain that it is a very high offence to challenge another, either by word or letter, to fight a duel, or to be the messenger of such a challenge, or even barely to endeavour to provoke another to send a challenge, or to fight ; as by dispersing letters to that purpose, full of reflections, and insinuating a desire to fight. 1 *Haw.* 135.

But altho' no bare words, in the judgment of law, carry in them so much terror as to amount to an affray, yet it seems certain that in some cases there may be an affray, where there is no actual violence ; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people ; which is said to have been always an offence at the common law, and is strictly prohibited by statute : For by 2 *Ed.* 3. *c.* 3. it *is enacted, that no man of what condition soever, except the king's servants in his presence, and his ministers in executing their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, shall come before the king's justices, or other of the king's ministers doing their office, with force and arms, nor bring any force in affray of peace, nor go nor ride armed, by night or day, in fairs or markets, or in the presence of the king's justices, or other ministers, or elsewhere ; upon pain to forfeit their armour to the king, and their bodies to prison at the king's pleasure. And the king's justices in their presence, sheriffs, and other ministers in their bailiwicks, lords of franchises and their bailiffs in the same, and mayors and bailiffs of cities and boroughs within the same, and borough-holders, constables and wardens of the peace within their wards, shall have power to execute* this



# GUNFIGHT

*The Battle over the Right to*
*Bear Arms in America*

## ADAM WINKLER

CALIF. ATTY. GENL
LIBRARY

JAN 2 2 2014

LOS ANGELES



W. W. NORTON & COMPANY
NEW YORK   LONDON

KF
3941
W56

Winkler, Adam
Gunfight : the battle over the
right to bear arms in America

Copyright © 2011 by Adam Winkler

All rights reserved
Printed in the United States of America
First Edition

For information about permission to reproduce selections from this book,
write to Permissions, W. W. Norton & Company, Inc.,
500 Fifth Avenue, New York, NY 10110

For information about special discounts for bulk purchases, please contact
W. W. Norton Special Sales at specialsales@wwnorton.com or 800-233-4830

Manufacturing by Courier Westford
Book design by Lovedog Studio
Production manager: Anna Oler

Library of Congress Cataloging-in-Publication Data

Winkler, Adam.
Gunfight : the battle over the right to bear arms
in america / Adam Winkler.
p. cm.
Includes bibliographical references and index.
ISBN 978-0-393-07741-4 (hardcover)
1. Firearms—Law and legislation—United States—History.
2. Gun control—United States. 3. United States. Constitution.
2nd Amendment. I. Title.
KF3941.W56 2011
344.7305'33—dc22
2011014429

W. W. Norton & Company, Inc.
500 Fifth Avenue, New York, N.Y. 10110
www.wwnorton.com

W. W. Norton & Company Ltd.
Castle House, 75/76 Wells Street, London W1T 3QT

1 2 3 4 5 6 7 8 9 0

Amendment, as there was for human evolution. "The resurgence of academic interest in the Second Amendment," Clark Neily observed, "produced a body of scholarship that could neither be ignored nor dismissed by opponents of the individual-rights model—or, it turns out, by the federal courts."[40]

* * *

IN THE Revolutionary Era, gun laws were strict. Because there was no standing army, the national defense depended upon an armed citizenry capable of fighting off invading European powers or hostile Native tribes. With national defense becoming too important to leave to individual choice or the free market, the founders implemented laws that required all free men between the ages of eighteen and forty-five to outfit themselves with a musket, rifle, or other firearm suitable for military service. It didn't matter whether someone didn't like guns or already had a shotgun good for hunting birds. Every man of age was legally mandated to acquire a militarily useful gun. This mandate was enforced at "musters," public gatherings held several times a year where every person eligible for militia service was required to attend, military gun in hand. At the musters, government officials would inspect people's guns and account for the firearms on public rolls—an early version of gun registration.[41]

In some states, like New Hampshire and Rhode Island, government officials conducted door-to-door surveys of gun ownership in the community. In case of an attack, the government needed to know where the guns necessary to mount a defense were. If the government decided that a privately owned gun was needed, the founding fathers used a temporary form of gun confiscation known as "impressment" to seize the gun from its owner. Ten of the thirteen colonies impressed privately owned firearms for the war effort against England. Impressed guns would eventually be returned to their owners, but the seizure itself might leave the owner without a firearm to defend himself against an ordinary criminal attack. To the founding fathers, leaving an individual without a gun to defend himself was

immaterial in light of the public need for that firearm. Guns were privately owned, but, in a sense, they were assets to be used if necessary for the public good.

The Revolutionary-era militia laws alone amount to a set of onerous gun laws that few modern-day gun rights advocates would ever accept. Imagine the outcry if Massachusetts announced that every gun owner of a certain age was required to appear with his or her guns at a public gathering where government officials would inspect the weapons and register them on state rolls.

The founders believed that ordinary people should have guns and that government shouldn't be allowed to completely disarm the citizenry. Yet their vision was certainly not that of today's gun rights hard-liners, who dismiss nearly any gun regulation as an infringement on individual liberty. Although the fact is rarely discussed in the individual-rights literature, the founding generation had many forms of gun control. They might not have termed it "gun control," but the founders understood that gun rights had to be balanced with public safety needs.

Government efforts to enhance public safety by regulating guns are as old as guns themselves. Credit—or blame—for inventing the first gun is often given to a Franciscan monk named Berthold Schwarz, who lived in Germany in the late 1200s and early 1300s. The exact dating of the invention is far from certain. Explosive powder goes back nearly a thousand years earlier. The Chinese reportedly had a handheld device made of bamboo that used gunpowder to shoot arrows in the 1100s. Guns, however, began to appear in Europe in the first decades of the 1300s, and laws restricting weapons quickly followed. In 1328, England enacted the Statute of Northampton, which provided that "no man great nor small, of what condition soever he be," shall "come before the King's justices, or other of the King's ministers doing their office, with force and arms" or "ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers . . . upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." The law was intended mainly to limit traditional arms, like swords and knives, which were

far more numerous at the time, but it applied equally to Berthold Schwarz's new invention.[42]

After gun control was abused by James II, the English Bill of Rights adopted in his wake didn't put an end to regulation of guns. Although that bill recognized the right to bear arms, the right was clearly limited. It applied only to Protestants, and even they were merely allowed guns "suitable to their conditions and as allowed by law." Soon after the English Bill of Rights was adopted, Parliament passed a law restricting the stockpiling of weapons by Catholics, whom the Protestant majority thought untrustworthy.[43]

Gun safety regulation was commonplace in the American colonies from their earliest days. The threat of hostile Native tribes led to government policies on gun ownership and use. In 1611, Governor Lord De La Warr of Virginia—after whom the state of Delaware is named—responded to a drawn-out battle with the Powhatan by ordering that all of the Jamestown settlers' muskets were officially part of the colony's public arsenal. By the end of that century, Massachusetts and Connecticut had both outlawed "matchlocks"—an early type of gun with a mechanism to ignite the firearm's gunpowder, freeing the shooter from having to lower the burning wick by hand—because they weren't effective enough in confrontations with the Natives. More dependable was the "wheel lock," an invention of Leonardo da Vinci that, like a modern-day lighter, used the rotation of a small wheel pressed against a flint to throw off sparks. In numerous colonies, governments used their regulatory authority to require men to carry guns to church and public meetings in order to, as a 1643 law in Connecticut explained, "prevent or withstand such sudden assaults as may be made" by Natives. Colonial laws frequently barred gun owners from selling firearms to the Natives. The right to bear arms in the colonial era was not a libertarian license to do whatever a person wanted with a gun. When public safety demanded that gun owners do something, the government was recognized to have the authority to make them do it.[44]

Selective disarmament was well within that authority, at least in the view of the founding fathers. They supported forcible disarma-

ment of slaves, free blacks, and people of mixed race out of fear that these groups would use guns to revolt against slave masters. Even if free blacks and people of mixed race were completely law-abiding, they were prohibited from owning or carrying guns. Certain states were more liberal, like Virginia, where an 1806 law permitted "every negro or mulatto" who wasn't a slave to own a gun. Even here, however, they had to obtain permission from local officials, who had complete discretion over whether to grant the request.[45]

American colonists didn't bar only racial minorities from having guns. White people, too, were the target of gun control. Before the Revolution, at least one colony, Maryland, passed a law barring Catholics from possessing firearms. Other colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms. Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns. Only those prepared to swear their loyalty to the cause were entitled to keep and bear arms. The Loyalists disarmed by these rules, like those in Pennsylvania, weren't criminals or traitors who took up arms on behalf of the British. They were ordinary citizens exercising their fundamental right to freedom of conscience.[46]

The number of people eligible for disarmament by founding-era gun control was considerable. In some states, slaves and free blacks far outnumbered the white population. Some historians estimate that Loyalists opposed to the Revolution constituted up to 40 percent of the white population. Adding these groups together leaves only a small minority of people who fully enjoyed the right to keep and bear arms. The founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy—a category so broadly defined that it included a majority of the people.[47]

The burdensome militia laws and the disarmament of select groups were not the only forms of gun control in early America. The pressures to implement gun control in urban areas were intense even back then. Some cities and states adopted equivalents of today's "safe storage" laws. In several places, laws required that gunpowder

be stored on the top floor of a building. The explosive power, which was being sold at the time by a start-up company named DuPont, was considered a safety hazard. In South Carolina before the Revolution, safe storage requirements were imposed on slave owners, who were required to keep their firearms locked up. Just as modern-day laws seek to prevent children from gaining access to guns, southern states sought to ensure that slaves couldn't get hold of a firearm.[48]

When public safety demanded it, the founding fathers were willing to go even further. In Boston, city leaders determined that the combustibility of gunpowder posed such a danger that all loaded firearms had to be kept out of buildings. A law from 1783 imposed a fine on "any person" who "shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop, or other building, within the town of Boston, any . . . fire-arm, loaded with, or having gunpowder." A second provision of the law effectively prohibited keeping a loaded firearm even in one's own home: "all . . . fire-arms . . . of any kind, that shall be found in any dwelling-house . . . or other building, charged with, or having in them any gun-powder, shall be liable to be seized" and forfeited. Given how time-consuming the loading of a gun was in those days, these two provisions imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home. Yet there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms. Even though the inspiration for this law was prevention of fires, not, say, protecting children from accidental shootings, the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city.[49]

The individual-rights literature that arose in the wake of Don Kates's article featured countless confident claims that gun control was a modern, twentieth-century invention. The facts suggest otherwise. The founding fathers had numerous gun control laws that responded to the public safety needs of their era. While our own public safety needs are different and require different responses, the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed.

Don Kates, for one, recognized that many forms of gun control wouldn't conflict with the Second Amendment. His article was one of the few endorsing the individual-rights reading that would also discuss permissible forms of gun control. If liberals ignored the long tradition of gun rights because of their politics, conservatives ignored the long tradition of gun control because of theirs. Liberals didn't like the idea that "the people" had a right "to keep and bear arms," and conservatives didn't like the idea that gun owners could be "well regulated." Kates, however, thought mandatory gun registration, bans on rifles and machine guns, and restrictions on carrying firearms in public were all consistent with the Second Amendment. The true diehards in the gun rights movement didn't want to hear this part of Kates's argument. They instead wanted to talk about the founding fathers' guns, not their gun control. In *American Rifleman*, Steve Halbrook, the NRA lawyer who would later try to scuttle Alan Gura's lawsuit, dismissed Kates's endorsement of some forms of gun control as "Orwellian Newspeak."[50]

•   •   •

WHEN ALAN GURA was preparing for his appeal in the D.C. gun case, he relied heavily on Don Kates's Second Amendment scholarship. Gura planned to use the history Kates uncovered as proof that the founding generation intended the Second Amendment to protect the right of ordinary individuals to own guns.

Litigants in federal appeals court don't get to choose which judges will hear their cases. Each federal appellate "circuit"—a geographical region in which all appeals go to the same court—has half a dozen or more judges. Traditionally, three judges are chosen at random to hear an appeal. A court clerk picks them by lottery.

In the D.C. gun case, the selection process worked in Gura's favor. The three judges impaneled to hear his case were Karen Henderson, Thomas Griffith, and Laurence Silberman. Henderson was a Reagan appointee who, in one of her best-known cases, pleased conservatives by voting to strike down a landmark campaign finance law. Bob Levy,

GANGSTERS, GUNS, AND G-MEN

broken: "The whole seemed but an agonizing dream, from which the audience was slowly and almost unconsciously awakening." The Court ruled unanimously in Webster's favor.[82]

Paul Clement might not have moved anyone to tears, but he also didn't have the luxury of three days to make his case. Because the United States wasn't formally a party to the dispute, the solicitor general was given just fifteen minutes. When the white light on the lectern clicked on, it signaled to Clement that he had only one minute left to wrap up. Fortunately for Clement, Chief Justice Roberts was more lenient than Chief Justice Rehnquist and permitted him and each of the two other lawyers in the gun case to go a few minutes over. The issues on the table were sufficiently important to warrant a bit more time.

"I would like to talk about the standard and my light is indeed on, so let me do that," said Clement. The spectators shifted and sat up in curiosity, waiting to hear whether Clement would stick with the position he took in his brief—in favor of a deferential test—or endorse the strict scrutiny test the gun rights people wanted. "I think there are several reasons why a standard as we suggest in our brief rather than strict scrutiny is an appropriate standard to be applied in evaluating these laws." Clement called his proposed standard "intermediate scrutiny," although it looked a lot like the reasonableness test Dellinger was advocating.

The right to keep and bear arms, Clement argued, "always coexisted with reasonable regulations of firearms." Even back in England before the American Revolution, where the right to bear arms was guaranteed by the English Bill of Rights, "the right was conditioned" on "what class you were, and also subject expressly to . . . the laws of Parliament." The right was not absolute. Just as Parliament could adopt laws regulating guns, so could the District of Columbia's lawmakers—and, more important in Clement's view, so could Congress.

Before Supreme Court justices make a rule or adopt a standard of review, they want to understand the implications, how today's decision will impact tomorrow's controversies. Justice Ginsburg noted that "there is a whole panoply of federal laws restricting gun posses-

# LAW REVIEWS AND JOURNALS

Copyright  2021 by  Joseph Blocher & Reva B. Siegel

Printed  in  U.S.A.
Vol.  116,  No.  1

# WHEN GUNS THREATEN THE PUBLIC SPHERE: A NEW ACCOUNT OF PUBLIC SAFETY REGULATION UNDER *HELLER*

*Joseph Blocher & Reva B. Siegel*

ABSTRACT—Government regulates guns, it is widely assumed, because of the death and injuries guns can inflict. This standard account is radically incomplete—and in ways that dramatically skew constitutional analysis of gun rights. As we show in an account of the armed protesters who invaded the Michigan legislature in 2020, guns can be used not only to injure but also to intimidate. The government must regulate guns to prevent physical injuries and weapons threats in order to protect public safety and the public sphere on which a constitutional democracy depends.

For centuries the Anglo-American common law has regulated weapons not only to keep members of the polity free from physical harm, but also to enable government to protect their liberties against weapons threats and to preserve public peace and order. We show that this regulatory tradition grounds the understanding of the Second Amendment set forth in *District of Columbia v. Heller*, where Justice Antonin Scalia specifically invokes it as a basis for reasoning about government's authority to regulate the right *Heller* recognized.

Today, a growing number of judges and Justices are ready to expand gun rights beyond *Heller*'s paradigmatic scene: a law-abiding citizen in his home defending his family from a criminal invader. But expanding gun rights beyond the home and into the public sphere presents questions concerning valued liberties and activities of *other* law-abiding citizens. Americans are increasingly wielding guns in public spaces, roused by persons they politically oppose or public decisions with which they disagree. This changing paradigm of gun use has been enabled by changes in the law and practice of public carry. As courts consider whether and how to extend constitutional protection to these changed practices of public carry, it is crucial that they adhere to the portions of Justice Scalia's *Heller* decision that recognize government's "longstanding" interest in regulating weapons in public places.

We show how government's interest in protecting public safety has evolved with changing forms of constitutional community and of weapons threats. And we show how this more robust understanding of public safety

139

NORTHWESTERN UNIVERSITY LAW REVIEW

bears on a variety of weapons regulations both inside and outside of courts—in constitutional litigation, in enacting legislation, and in ensuring the evenhanded enforcement of gun laws. Recognizing that government regulates guns to prevent social as well as physical harms is a critical first step in building a constitutional democracy where citizens have equal claims to security and to the exercise of liberties, whether or not they are armed and however they may differ by race, sex, or viewpoint.

AUTHORS—Joseph Blocher is the Lanty L. Smith '67 Professor of Law, Duke Law School; Reva B. Siegel is the Nicholas deB. Katzenbach Professor of Law, Yale Law School. For comments on the draft, we thank Laurie Benton, Jacob Charles, Saul Cornell, Joey Fishkin, Abbe Gluck, Genevieve Lakier, Bill Marshall, Darrell Miller, Melissa Murray, Robert Post, Eric Ruben, Ganesh Sitaraman, Nelson Tebbe, Adam Winkler, and participants in the *Northwestern University Law Review* Symposium and a faculty workshop at Yale Law School. For research help, we thank Duncan Hosie, Dylan Jarrett, Spurthi Jonnalagadda, Danny Li, and Matt Post.

INTRODUCTION ............................................................................................................140

I.   GUN THREATS AND THE BODY POLITIC ..........................................................146
     A.   *What Happened in Michigan* ................................................................148
     B.   *"No One Has Ever Been Harmed"* .......................................................154
     C.   *The Threat to Public Safety Was, and Is, the Harm* ...........................160

II.  GOVERNMENT'S CONSTITUTIONAL AND COMMON LAW AUTHORITY TO
     ENFORCE PUBLIC SAFETY .................................................................................163
     A.   *Preserving the Peace: Historical Antecedents of Gun Regulation* ............165
     B.   *Heller* ....................................................................................................172
     C.   *Applying* Heller......................................................................................176

III. PROTECTING PUBLIC SAFETY INSIDE AND OUTSIDE THE COURTS .....................180
     A.   *Adjudicating the Public Safety Interest* ...............................................182
     B.   *Legislating Public Safety* .....................................................................189
     C.   *Enforcing Equal Liberties* ....................................................................193

CONCLUSION ...............................................................................................................197

INTRODUCTION

Today, debate about regulating guns is overwhelmingly focused on the terrible physical harms guns can inflict. Concern about preventing physical harm shapes the ways that gun laws are written, enforced, and adjudicated. In this Essay, we demonstrate, first, that government's public safety interest

in regulating weapons includes preventing *social* as well as physical harms. Second, we demonstrate that *District of Columbia v. Heller*[1] recognizes that the government has a longstanding prerogative, rooted in the common law, to prevent weapons threats and threats to public order, which enables it to secure the equal freedom of all members of the public. Government can regulate weapons to protect the public sphere on which a constitutional democracy depends.

Government has a compelling interest in regulating weapons, not only to deter injury, but also to promote the sense of security that enables community[2] and the exercise of all citizens' liberties, whether or not they are armed. Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping, going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.

The Court's decision in *Heller* recognizes government's ancient common law authority to protect public safety against weapons threats. The common law has always regulated arms to secure the public peace, and to prevent terror as well as physical injury.[3] What counts as terror and whose terror counts have changed over time with evolving forms of sovereignty and community, but there is continuity in the common law and constitutional principle that government can regulate weapons to prevent some members of the community from intimidating and terrorizing others. As we show, *Heller* specifically recognizes this evolving body of common law when reasoning about the roots, character, and scope of government's authority to regulate weapons in public life.[4]

Today, a growing number of judges and Justices are ready to expand gun rights beyond *Heller*'s paradigmatic scene of a law-abiding citizen in his home defending his family from a criminal invader.[5] But expanding gun rights beyond the home and into the public sphere presents questions concerning valued liberties and activities of those law-abiding citizens *not*

---

[1]  554 U.S. 570 (2008).

[2]  Reva B. Siegel & Joseph Blocher, *Why Regulate Guns?*, 48 J.L. MED. & ETHICS 11, 11 (2020).

[3]  *See infra* Part II.

[4]  *See infra* Section II.B.

[5]  We use the male pronoun purposefully here because the common law understood the household as governed by a male head responsible for representing and providing for its members. *See* Susan P. Liebell, *Sensitive Places?: How Gender Unmasks the Myth of Originalism in* District of Columbia v. Heller, 53 POLITY 207, 215 (2021) ("'Self-defense in the home' is unintelligible when detached from an essential historical context: the husband as head of household under common law coverture."). Justice Scalia's appeal to common law understandings to derive a right to defend home and family is an appeal to a tradition that recognized men as having authority over women and other household members.

141

NORTHWESTERN UNIVERSITY LAW REVIEW

wielding weapons.[6] Americans are increasingly wielding guns in public spaces, roused by persons they politically oppose or public decisions with which they disagree—as, for example, when gun owners carry weapons into a legislature or to the site of a racial-justice protest.[7] This changing paradigm of gun use has been enabled by changes in the law and practice of public carry: the spread of NRA-supported "right-to-carry" laws which have been adopted by twenty-five states since 1991[8] and the growth of an open-carry movement self-consciously seeking to shift norms about gun use.[9] As courts consider whether and how to extend constitutional protection to these changes in the law and practice of public carry, it is crucial that they adhere to the portions of Justice Scalia's *Heller* decision that recognize government's "longstanding" interest in regulating weapons to protect public safety—especially in public places.[10]

Yet, there are judges, legislators, and advocates—both inside and outside of courts—who argue that the government's interest in regulating guns is limited to the prevention of physical harm. In post-*Heller* Second Amendment cases, a small but growing number of judges have voted to strike down gun laws on the ground that the government has failed to produce sufficient evidence that the challenged laws reduce gun injuries and deaths.[11] A similarly narrow understanding of the public safety interest

---

[6] While this Essay was in its final round of edits, the Supreme Court granted certiorari in a case challenging New York's law restricting concealed-carry licenses to those who can show "proper cause." N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. Apr. 26, 2021), https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-843.html [https://perma.cc/V2JA-ME2E] (establishing the question presented as "[w]hether the State's denial of petitioner's applications for concealed-carry licenses for self-defense violated the Second Amendment"). A central question in the case is whether and to what degree the Second Amendment has been incorporated under the Fourteenth Amendment's Due Process Clause to restrict states' authority to regulate carrying guns outside the home.

[7] For an examination of this trend, see *infra* notes 92–100, 286–287 and accompanying text. For an examination of the armed invasion of the Michigan legislature in 2020, see *infra* Part I.

[8] These laws require the issuance of concealed-carry permits to anyone not specifically prohibited from possessing a gun. *See* "Concealed Carry | Right-to-Carry," NRA-ILA, https://www.nraila.org/get-the-facts/right-to-carry-and-concealed-carry/ [https://perma.cc/6PJG-LXLB] (celebrating this change and saying that such laws "are essential because self-defense is a fundamental right"). A growing number of states are doing away with permit requirements entirely—a policy change that supporters call "constitutional carry." *See* Adam Weinstein, *Understanding 'Constitutional Carry,' the Gun-Rights Movement Sweeping the Country*, TRACE (Feb. 28, 2017), https://www.thetrace.org/2017/02/constitutional-carry-gun-rights-movement-explained/ [https://perma.cc/U4UK-98US] (noting that ten states adopted such a policy between 2010 and 2017).

[9] *See infra* notes 282–286 and accompanying text (describing rise of open-carry movement).

[10] District of Columbia v. Heller, 554 U.S. 570, 626, 627 n.26 (2008) (calling various "longstanding prohibitions" "presumptively lawful"). For our discussion of these under examined passages of the *Heller* opinion, see *infra* Sections II.B–II.C.

[11] *See infra* Section III.A.

142

appears in legislatures.[12] Too often, lawmakers frame their task around violence prevention, not public safety; some argue that preventing violence is the *only* valid basis for laws restricting public carry and other forms of gun use.

In this Essay, we show that this "physical-harm-only" conception of public safety is deeply at odds with the common law tradition from which *Heller* draws its reasoning about the government's prerogative to regulate weapons. Reading the common law and the Constitution together, we show how the government interest in regulating arms to promote public safety extends beyond injury prevention to protecting the constitutional order and building a community in which citizens have an equal claim to security and to the exercise of liberties, whether or not they are armed, and however they differ by sex, race, or political viewpoint. Acting in the interest of public safety, government may regulate weapons to protect the body politic.

Understanding that government's public safety interest protects the exercise of liberties as well as physical survival can guide judgments about litigation, legislation, and the enforcement of gun laws. Recognizing that the way government secures public safety structures community, we are in a different position to understand the growing concern that selective enforcement of gun laws inscribes unequal membership and chills the exercise of rights.[13] We can ask a series of critical questions: Are gun laws underenforced in ways that privilege the security claims of armed members of the community over others? Are gun laws selectively enforced in ways that allow some members of the community to bear arms in ways that others are not? In our constitutional democracy, public safety includes an interest in evenhanded enforcement of gun laws so that some members of the community—whether identified by sex, race, or political viewpoint—are not allowed to use weapons to dominate or threaten others.[14] These questions disappear from view when we think about gun regulation solely in terms of physical harm.

We begin in Part I by reconstructing the story of the armed protest that shut down the Michigan legislature in the spring of 2020. We have chosen this episode to begin our account because it exemplifies an increasingly familiar form of gun use that was scarcely heard of at the time of the Court's

---

[12] *See infra* Section III.B.

[13] *See infra* Section III.C (describing concerns about the selective enforcement of gun laws in the protest context).

[14] Citizens and government officials can assert a public safety interest in evenhanded enforcement of gun laws under the Second Amendment in ways that may appeal to First and Fourteenth Amendment values of viewpoint neutrality and equal protection even in circumstances where a court would not find an independent judicially enforceable violation of those constitutional guarantees.

143

NORTHWESTERN UNIVERSITY LAW REVIEW

2008 decision in *Heller* and diverges in important particulars from the paradigmatic scene of criminal home invasion on which *Heller* focuses. It is now increasingly common for massed groups of heavily armed gun owners to engage in open carry, invading public spaces occupied by unarmed members of the community, as happened in Michigan.[15] Examining this episode, in which persons wielded guns in public spaces without inflicting physical injury on others, illustrates why government has a public safety interest in regulating guns to preserve the peace and to protect against weapons threats and intimidation, as well as to prevent physical injury.

   In Part II, we show that this conception of public safety has ancient roots in the common law, and we demonstrate that *Heller* draws on this common law tradition in the portions of the decision that recognize government's interest in regulating weapons. We go on to show how this reading of *Heller* bears on disputes over the constitutionality of restrictions on public carry and matters in the two dominant modes of applying *Heller*—the so-called "two-step" framework and originalist methods drawing on text, history, and tradition. In Part III, we invoke this understanding of the Constitution to respond to gun-rights advocates who assert, in courts and in politics, the limiting principle that government may regulate guns *only* to prevent physical harm. In cases challenging gun laws' constitutionality under *Heller*, judges demand evidence that the laws prevent physical harm. And in legislative arenas, advocates assert that preventing physical harm is the only reason for limiting public carry. As importantly, we show that focusing on physical harm obscures important questions about the evenhanded enforcement of gun laws. The enforcement of gun laws helps define and shape a constitutional democracy, whether it reinforces hierarchies or attests to the equal liberties of community members.

   As we were completing this Essay, the nation was transfixed by an assault on the body politic, one physical expression of which was the seditious invasion of the Capitol building by an armed mob.[16] While there

---

[15] *See infra* notes 92–100, 281–283 and accompanying text (documenting when these practices emerged).

[16] Because of stricter gun regulations in the District of Columbia, the rioters mobbing the Capitol on January 6, 2021 did not openly carry guns to the same extent as protesters did in Lansing, but reports suggest that many of the invaders carried concealed guns. *See* Jane Lytvynenko & Molly Hensley-Clancy, *The Rioters Who Took Over the Capitol Have Been Planning Online in the Open for Weeks*, BUZZFEED NEWS (Jan. 6, 2021, 5:38 PM), https://www.buzzfeednews.com/article/janelytvynenko/trump-rioters-planned-online [https://perma.cc/A6CQ-FHRT] ("Hundreds of extremists' posts discussed bringing firearms in violation of Washington, DC, law. Nevertheless, people displayed weapons that they had brought with them. 'All this bullshit about not bringing guns to D.C. needs to stop,' read one post from Tuesday with more than 5,000 upvotes. 'This is America. Fuck D.C. it's in the Constitution. Bring your goddamn guns.'"). Members of Congress reported exchange of fire in the Capitol chambers. *See* Paul

144

has been violence in the Capitol before,[17] the mob of January 6, 2021 was unprecedented in size and purpose, shocking even as it followed a recognizable social-mobilization script of the kind we describe playing out in Michigan, including extensive online plotting for an attack on sites of lawmaking and political life.[18] Threats continued through the spring, leading the U.S. government to deploy 25,000 National Guard troops in advance of

---

Bass, *As Battle Raged, DeLauro Hit the Floor*, NEW HAVEN INDEP. (Jan. 6, 2021, 10:12 PM), https://www.newhavenindependent.org/index.php/archives/entry/as_battle_raged_delauro_hit_the_floor [https://perma.cc/K9FZ-JQH2] ("'Rioters broke the glass on the doors,' [Representative] DeLauro recounted. 'Then they started to fire in. There was an exchange of gunfire.'"); Rebecca Traister, *'It Was No Accident' Congresswoman Pramila Jayapal on Surviving the Siege*, CUT (Jan. 8, 2021), https://www.thecut.com/2021/01/pramila-jayapal-surviving-capitol-riots.html [https://perma.cc/3C9M-N868] (interviewing Representative Pramila Jayapal about the guns, the shooting, and the rioters with zip ties, and drawing comparisons to those arrested for planning to invade the Michigan legislature and take officials hostage). At one point in the late afternoon when only thirteen people had been arrested, the Washington, D.C. police chief reported recovering at least five weapons. Associated Press, *5 Weapons Recovered, 13 Arrests at D.C. Protests*, PBS NEWS HOUR (Jan. 6, 2021, 5:57 PM), https://www.pbs.org/newshour/politics/5-weapons-recovered-13-arrests-at-d-c-protests [https://perma.cc/8N5L-B7AF]. In addition to recovering several pipe bombs and Molotov cocktails from the area, law enforcement observed that some invaders had zip ties to be used as handcuffs and law enforcement was investigating whether there was a plan to kidnap government officials as there was in Michigan. *See* Devlin Barrett, Spencer S. Hsu & Matt Zapotosky, *FBI Focuses on Whether Some Capitol Rioters Intended to Harm Lawmakers or Take Hostages*, WASH. POST (Jan. 8, 2021, 8:18 PM), https://www.washingtonpost.com/national-security/capitol-riot-fbi-hostages/2021/01/08/df99ae5a-5202-11eb-83e3-322644d82356_story.html [https://perma.cc/8CBK-95S6] ("Fresh in investigators' minds is the group of men charged last year in Michigan—self-styled militia members—who are accused of plotting to kidnap that state's governor and allegedly discussed storming the state Capitol and taking lawmakers hostage."); Elaine Godfrey, *It Was Supposed to Be So Much Worse*, ATLANTIC (Jan. 9, 2021), https://www.theatlantic.com/politics/archive/2021/01/trump-rioters-wanted-more-violence-worse/617614/ [https://perma.cc/MM4H-LFZ7] (noting online plans to kill Vice President Mike Pence and reporting the construction of a gallows outside the Capitol). Pro-Trump protesters at the Georgia State Capitol that same day openly carried long guns. *See* Emily Shapiro, *Beyond DC: Protests Rock California, Utah, Michigan and More*, ABC NEWS (Jan. 7, 2021, 12:17 PM), https://abcnews.go.com/US/dc-protests-rock-california-utah-michigan/story?id=75108241 [https://perma.cc/CCB3-4NKT].

[17]   *See, e.g.*, Nora McGreevy, *The History of Violent Attacks on the U.S. Capitol*, SMITHSONIAN MAG. (Jan. 8, 2021), https://www.smithsonianmag.com/smart-news/history-violent-attacks-capitol-180976704180976704/ [https://perma.cc/M2H6-MK8X] (noting "assailants with a range of motives have launched attacks on the [U.S. Capitol] with varying levels of success" throughout history). *See generally* JOANNE B. FREEMAN, THE FIELD OF BLOOD: VIOLENCE IN CONGRESS AND THE ROAD TO CIVIL WAR 4–6, 268–69 (2018) (documenting threats and acts of violence among congressmen in the decades before the Civil War and reporting that before the war members came armed).

[18]   *See* Rebecca Boone, *Armed Statehouse Protests Set Tone for US Capitol Insurgents*, AP NEWS (Jan. 7, 2021), https://apnews.com/article/election-2020-coronavirus-pandemic-oregon-elections-idaho-688fc8894f44992487bb6ee45e9abd77 [https://perma.cc/ZP8E-YN2G] (calling the state capitol protests in Michigan, Idaho, and Oregon "dress rehearsals" for D.C.); *id.* ("'There's a direct relationship between the growing paramilitary activity in the state Capitols, for sure, and what's happening in D.C.,' said Joe Lowndes, a political science professor at the University of Oregon who researches race, conservatism and social movements in politics. 'They have the same kind of organizations and people involved.'").

NORTHWESTERN UNIVERSITY LAW REVIEW

the inauguration[19] and then leading Congress to cancel a session on March 4 in response to a threat by a militia group to breach the Capitol in support of President Trump's return to power.[20]

Such actions have claimed lives and might ultimately claim more. But they also threaten our *collective* lives. The nation witnessed its leaders crouched under benches in the Capitol unable to count the electoral vote. The threats, assaults, and failures to evenhandedly police them transform the public sphere on which a constitutional democracy depends. The current escalating threat of violence grows out of, and exacerbates, political mistrust and polarization.[21] Weapons caught in this cycle no longer threaten individual lives only, if they ever did. Gun regulation becomes a defense of the body politic.

## I.   GUN THREATS AND THE BODY POLITIC

We have grown accustomed to assessing the costs of gun violence through reports of lives lost and persons injured. This mode of reasoning is so deeply entrenched on all sides of the gun debate, in the academy, and in popular media that it tends to obscure the many nonphysical but very significant social harms that guns can inflict. Taking account of the ways that gun use affects others' freedoms and other valued activities requires paying attention to the many—and evolving—modes of gun carry, including new forms of gun carry in public spaces. To illustrate the externalities of gun use and to enable examination of the government's public safety interest in

---

[19] Leo Shane III & Joe Gould, *Biden Inaugurated Commander in Chief amid Heavy Military Presence at Capitol*, MIL. TIMES (Jan. 20, 2021), https://www.militarytimes.com/news/pentagon-congress/2021/01/20/biden-inaugurated-commander-in-chief-amid-heavy-military-presence-at-capitol/ [https://perma.cc/HKK5-BT5F].

[20] *See* Mark Katkov & Scott Neuman, *House Cancels Thursday Session After Police Warn of Possible Attack on Congress*, NPR (Mar. 3, 2021, 12:27 PM), https://www.npr.org/2021/03/03/973310942/capitol-police-warns-of-another-possible-right-wing-attack-on-congress [https://perma.cc/VBZ9-B9DF]. In the wake of the Capitol attack, federal law enforcement mobilized in response to threats against state capitols and other democratic institutions. *See, e.g.*, Craig Timberg, Drew Harwell & Marissa J. Lang, *Capitol Siege Was Planned Online. Trump Supporters Now Planning the Next One.*, WASH. POST (Jan. 9, 2021, 5:01 PM), https://www.washingtonpost.com/technology/2021/01/09/trump-twitter-protests/ [https://perma.cc/PL3U-BMZF]; Tom Winter & Andrew Blankstein, *FBI Memo Warns Law Enforcement Across U.S. of Possible Armed Protests at 50 State Capitols*, NBC NEWS (Jan. 11, 2021, 2:07 PM), https://www.nbcnews.com/politics/donald-trump/fbi-memo-warns-law-enforcement-across-u-s-possible-armed-n1253750 [https://perma.cc/5G4R-SE7U].

[21] *Cf.* Nathan P. Kalmoe & Lilliana Mason, Lethal Mass Partisanship: Prevalence, Correlates, & Electoral Contingencies 37 (Jan. 2019) (unpublished manuscript), https://www.dannyhayes.org/uploads/6/9/8/5/69858539/kalmoe___mason_ncapsa_2019_-_lethal_partisanship_-_final_lmedit.pdf [https://perma.cc/3DZE-38YL] (finding that "[a]s more Americans embrace strong partisanship, the prevalence of lethal partisanship is likely to grow").

146

regulating weapons under *Heller*, we focus on the armed masses that flooded the Michigan legislature in the spring of 2020.

In the last several decades the law of public carry has evolved to allow more forms of gun carry in shared public spaces with less licensing.[22] Norms governing the practice of public carry have evolved as well. It is simply more common for people to openly carry weapons, including powerful classes of weapons, in social settings where they would not have done so a decade ago. Heavily armed and unarmed Americans comingle, not infrequently, in shared spaces—Walmarts,[23] parking lots,[24] movie theaters,[25] and restaurants[26] across the country. Many of these scenes increasingly involve forms of mass armed mobilization and intense political conflict.[27] At least since the Cliven Bundy ranching protests of 2014,[28] it is increasingly

---

[22]  *See supra* notes 8–9 and accompanying text.

[23]  Bill Chappell & Richard Gonzales, *Rifle-Carrying Man Faces Terrorism Charge After Causing Panic at Walmart in Missouri*, NPR (Aug. 9, 2019, 11:08 AM), https://www.npr.org/2019/08/09/749763786/rifle-carrying-man-arrested-after-causing-panic-at-walmart-in-missouri [https://perma.cc/84LX-8ATG]; Austen Erblat, *Shopper Charged with Pulling Gun in Walmart During Mask Dispute Posts $15,000 Bond*, SUN SENTINEL (July 24, 2020, 1:22 PM), https://www.sun-sentinel.com/news/crime/fl-ne-walmart-gun-mask-arrested-charged-20200723-tma2ajnkoraodlhjcuqt2szcaa-story.html [https://perma.cc/8BJR-XY8Z].

[24]  Jasmin Barmore & Sarah Rahal, *Two Arraigned After Gun Drawn Over Bump at Orion Twp. Chipotle*, DETROIT NEWS (July 3, 2020, 6:13 PM), https://www.detroitnews.com/story/news/local/oakland-county/2020/07/02/woman-pulls-gun-orion-township-michigan/5365854002/ [https://perma.cc/AN8F-2GB3].

[25]  *Evesham Township Police: Man Arrested After Bringing Loaded Gun into AMC Marlton 8*, CBS PHILLY (Nov. 21, 2019, 3:27 PM), https://philadelphia.cbslocal.com/2019/11/21/evesham-township-police-dennix-alicea-loaded-gun-amc-marlton-8/ [https://perma.cc/KY8N-4RZQ].

[26]  Justin Wise, *Armed Stay-at-Home Demonstrators Visit North Carolina Subway Shop*, HILL (May 11, 2020, 8:38 AM), https://thehill.com/homenews/state-watch/497073-armed-demonstrators-protesting-stay-at-home-order-visit-north-carolina [https://perma.cc/V6ZM-CZ85].

[27]  Mobilization of heavily armed masses was rare in modern American politics before the Cliven Bundy protests in 2014 but as discussion in text demonstrates, it has become increasingly normalized since then. Armed mobilizations do have antecedents, as the centennial of the Tulsa Race Riot vividly illustrates. *See, e.g.*, Yuliya Parshina-Kottas, Anjali Singhvi, Audra D.S. Burch, Troy Griggs, Mika Gröndahl, Lingdong Huang, Tim Wallace, Jeremy White & Josh Williams, *What the Tulsa Race Massacre Destroyed*, N.Y. TIMES (May 24, 2021), https://www.nytimes.com/interactive/2021/05/24/us/tulsa-race-massacre.html (last visited June 18, 2021) (reporting mob shooting and aerial attack in 1921 that demolished a Black neighborhood in Tulsa and left as many as 300 dead).

[28]  Modern protests appear to share roots with the mobilization of the 2013 open-carry movement. *See* Katlyn E. DeBoer, *Clash of the First and Second Amendments: Proposed Regulation of Armed Protests*, 45 HASTINGS CONST. L.Q. 333, 337–38 (2018); Michelle L. Norris, *We Cannot Allow the Normalization of Firearms at Protests to Continue*, WASH. POST (May 6, 2020, 4:23 PM), https://www.washingtonpost.com/opinions/firearms-at-protests-have-become-normalized-that-isnt-okay/2020/05/06/19b9354e-8fc9-11ea-a0bc-4e9ad4866d21_story.html [https://perma.cc/7ZPX-VAT4] ("Advocates for open-carry have been carrying handguns and rifles to department stores, Starbucks and state capitols since 2013 in an effort to normalize firearms in public."); Team Trace, *What You Need to Know About Open*

147

NORTHWESTERN UNIVERSITY LAW REVIEW

common for conservatives dressed in military-style garb to mass in protest bearing assault rifles, as they did in Charlottesville in 2017, [29] "gun sanctuary" rallies in 2019,[30] and racial-justice[31] and COVID-19-shutdown protests in 2020.[32]

The scenes of protesters armed with assault rifles invading the Michigan legislature may be extraordinary,[33] but they illuminate questions that guns present in "ordinary" cases as well.

### A.  What Happened in Michigan

On March 23, 2020, as the COVID-19 pandemic intensified, Michigan's Democratic Governor Gretchen Whitmer issued the first in a series of executive orders forbidding residents to leave their homes unless they needed to perform essential jobs, go grocery shopping, or go to the

---

*Carry in America*, TRACE (July 18, 2016), https://www.thetrace.org/2016/07/rise-of-open-carry-explained [https://perma.cc/P8G7-R9B3]. It has also been connected to the revitalization of the patriot militia movement in 2014. *See* Sam Jackson, *"Nullification Through Armed Civil Disobedience": A Case Study of Strategic Framing in the Patriot/Militia Movement*, 12 DYNAMICS ASYMMETRIC CONFLICT 90, 93 (2019); *see also* Daniel Horwitz, *Open-Carry: Open-Conversation or Open-Threat*, 15 FIRST AMEND. L. REV. 96, 110–11 (2017) (referencing the Bundy demonstration as an example of an open-carry protest where the opposing party was not frightened to argue that guns at protests should only be banned in instances where the other side might be intimidated); Desni A. Scaife & Imani Robinson-McFarley, *The Hammond Guards and the Intersection of Race, Guns, and Patriotism*, 8 C.R. LITIG. 12, 14 (2020) ("Bundy's criminal offenses were heralded as a 'victory for all Americans.'"); Patrick J. Charles, *The Second Amendment in the Twenty-First Century: What Hath* Heller *Wrought?*, 23 WM. & MARY BILL RTS. J. 1143, 1160–61 (2015) (describing the political climate that gave rise to the Bundy standoff and conservative support for the armed resistance).

[29]   Jon Sharman, *Militia Force Armed with Assault Rifles Marches Through US Town Ahead of White Nationalist Rally*, INDEPENDENT (Aug. 12, 2017, 4:33 PM), https://www.independent.co.uk/news/world/americas/militia-assault-rifles-unite-right-rally-charlottesville-virginia-white-supremacy-latest-a7890081.html [https://perma.cc/69GT-9HV3].

[30]   Chelsea Parsons, Adam Skaggs & Erica Turret, *Second Amendment Sanctuaries: A Legally Dubious Protest Movement*, 48 J.L. MED. & ETHICS 105, 105–06 (2020); *Armed US Gun Rights Activists Rally Against Proposed Virginia Gun Laws*, REUTERS (Jan. 20, 2020, 10:05 AM), https://www.cnbc.com/2020/01/20/thousands-of-armed-activists-gather-at-virginias-pro-gun-rally.html [https://perma.cc/2PHE-H8WD].

[31]   *See infra* Section III.C.

[32]   Abigail Censky, *Heavily Armed Protesters Gather Again at Michigan Capitol to Decry Stay-at-Home Order*, NPR (May 14, 2020, 10:01 AM), https://www.npr.org/2020/05/14/855918852/heavily-armed-protesters-gather-again-at-michigans-capitol-denouncing-home-order [https://perma.cc/PE2M-CA2N].

[33]   For scenes from inside the Michigan legislature, see Michelle Mark, *Because of Michigan's Gun Laws, Protesters Were Allowed to Carry Their Assault Weapons into the State Capitol—but Not Their Protest Signs*, BUS. INSIDER (May 1, 2020, 5:41 PM), https://www.businessinsider.com/michigan-open-carry-laws-legal-protesters-guns-at-state-capitol-2020-5 [https://perma.cc/8FJ3-3U7L].

148

hospital.[34] The orders—which most Michiganders supported[35]—were opposed by a group that assembled outside the legislature to protest, some openly carrying firearms.[36] The morning after one such armed assembly, President Trump tweeted "LIBERATE MICHIGAN!"[37]

One month later, on April 30, a crowd of roughly 1,000 people gathered outside the Michigan capitol building to demonstrate against the lockdown order.[38] Again, many openly carried AR-15s and other long guns.[39] Law enforcement permitted some of the armed protesters—estimates range from

---

[34] *See* Ken Haddad, *Michigan Issues Stay-at-Home Order amid Coronavirus: Here's What It Means*, CLICK ON DETROIT (Mar. 23, 2020, 2:42 PM), https://www.clickondetroit.com/news/2020/03/23/michigan-issues-stay-at-home-order-amid-coronavirus-heres-what-it-means/ [https://perma.cc/8U4P-W98X].

[35] A poll surveying 600 Michigan residents between April 15 and 16 found that 57% of Michiganders approved of Governor Whitmer's handling of the crisis, compared to 37% who disapproved. Grace Panetta, *Despite High-Profile Protests, Michiganders Overwhelmingly Approve of Gov. Gretchen Whitmer's Handling of the Coronavirus*, BUS. INSIDER (Apr. 20, 2020, 1:36 PM), https://www.businessinsider.com/michiganders-approve-of-whitmer-on-coronavirus-despite-protests-poll-2020-4 [https://perma.cc/Z5GE-MKXJ]. In mid-May, 86% of the state's voters viewed the virus as a threat to public health and 69% of Michigan voters agreed that the protests sent the wrong message, including 55% of Republican-leaning voters. Todd Spangler, *Poll: Michigan Voters Show Support for Gov. Whitmer's Handling of Coronavirus*, DETROIT FREE PRESS (May 20, 2020, 3:40 PM), https://www.freep.com/story/news/local/michigan/2020/05/20/republican-men-views-coronavirus/5227671002/ [https://perma.cc/4QTC-CRND]. Only one group had a majority that believed the protests sent the right message: Republican men, by a margin of 58%–30%. *Id.*

[36] *See* Mike Householder & Ed White, *'Not Prisoners': Conservative Protesters Converge on Michigan Capitol Over Governor's Stay-Home Order*, BALT. SUN (Apr. 15, 2020, 5:30 PM), https://www.baltimoresun.com/coronavirus/ct-nw-lansing-michigan-state-capitol-protests-20200415-xgojwxczjzhq7mtbyhifdbpcyy-story.html [https://perma.cc/L72J-3CKP] (featuring photos of protesters in front of the state capitol toting arms).

[37] Donald Trump (@realDonaldTrump), TWITTER (Apr. 17, 2020, 11:22 AM), https://twitter.com/realDonaldTrump/status/1251169217531056130?s=20 (since the initial writing of this Essay, Donald Trump's Twitter account has been suspended and his prior Tweets may be unavailable); Katelyn Burns, *Armed Protesters Entered Michigan's State Capitol During Rally Against Stay-at-Home Order*, VOX (Apr. 30, 2020, 9:04 PM), https://www.vox.com/policy-and-politics/2020/4/30/21243462/armed-protesters-michigan-capitol-rally-stay-at-home-order [https://perma.cc/Q9E8-MRBY] (reporting Trump's tweet).

[38] Craig Mauger, *Protesters, Some Armed, Enter Michigan Capitol in Rally Against COVID-19 Limits*, DETROIT NEWS (Apr. 30, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/04/30/protesters-gathering-outside-capitol-amid-covid-19-restrictions/3054911001/ [https://perma.cc/AMF8-CFW9].

[39] *Id.*; Josh K. Elliott, *'Very Good People': Trump Backs Armed Effort to Storm Michigan Capitol over Coronavirus Rules*, GLOBAL NEWS (May 1, 2020, 9:51 PM), https://globalnews.ca/news/6892207/coronavirus-protest-michigan-donald-trump/ [https://perma.cc/XW7M-AF4V] (reporting and showing video of people carrying AR-15-style long guns).