ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022**<br><br>**VOLUME 3 OF 13**<br><br>Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

1

## INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |

**BOOKS**

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020 (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

dozens to hundreds—to enter the building while the legislature was debating whether to extend the Governor's emergency declaration.[40]

Michigan State Senator Dayna Polehanki described the scene in a tweet: "Directly above me, men with rifles yelling at us. Some of my colleagues who own bullet proof vests are wearing them. I have never appreciated our Sergeants-at-Arms more than today. #mileg."[41] She later told CNN: "I am no wimp. But what I saw at work yesterday at the Michigan State Capitol— which was a bunch of men on the balcony carrying rifles—I'm not embarrassed to say I was afraid."[42] She was not alone. Representative Sarah Anthony recalled the armed protesters teeming through the legislature as "one of the most unnerving feelings I've ever felt in my life . . . . You could feel the floor rumbling. You could hear them yelling and screaming."[43]

"It was intimidation," said State Senator Jeremy Moss. "They were heckling Democrats because they knew what our position was, but they were also calling the Republicans spineless for delaying the action."[44] Republican State Senate Majority Leader Mike Shirkey commended some of the protesters but criticized others for using "intimidation and the threat of physical harm to stir up fear and feed rancor."[45] Moss said his social media feeds were flooded with questions from people across the country. "'How can this happen?' they asked, according to Moss. 'You can't carry a gun into a courthouse, you can't even carry a phone into a courthouse, and yet we are literally operating with people hovering over us with their weapons.'"[46]

Despite continuing partisan disagreement about the scope of the Governor's powers to order a lockdown, the events of April 30 inspired widespread condemnation from across the political spectrum—with most critics decrying "intimidation" as the problem. Shirkey condemned the

---

[40] Burns, *supra* note 37. A state-police spokesperson explained that it is "legal in Michigan to carry firearms as long as it's done with lawful intent and the weapon is visible." Dartunorro Clark, *Hundreds of Protesters, Some Carrying Guns in the State Capitol, Demonstrate Against Michigan's Emergency Measures*, NBC NEWS (Apr. 30, 2020), https://www.nbcnews.com/politics/politics-news/hundreds-protest-michigan-lawmakers-consider-extending-governors-emergency-powers-n1196886 [https://perma.cc/A6GF-KLWD].

[41] Dayna Polehanki (@SenPolehanki), TWITTER (Apr. 30, 2020, 12:38 PM), https://twitter.com/SenPolehanki/status/1255899318210314241?s=20 [https://perma.cc/7BXR-N7CL].

[42] Mark, *supra* note 33.

[43] Lois Beckett, *Armed Black Citizens Escort Michigan Lawmaker to Capitol After Volatile Rightwing Protest*, GUARDIAN (May 7, 2020), https://www.theguardian.com/us-news/2020/may/07/michigan-lawmaker-armed-escort-rightwing-protest [https://perma.cc/C49C-WHNH].

[44] Jonathan Oosting, *Maybe It's Time to Rethink Allowing Guns in Michigan Capitol, Officials Say*, BRIDGE MICH. (May 1, 2020), https://www.bridgemi.com/michigan-government/maybe-its-time-rethink-allowing-guns-michigan-capitol-officials-say [https://perma.cc/32M7-8Y3I].

[45] *See* Mike Shirkey (@SenMikeShirkey), TWITTER (May 1, 2020, 3:20 PM), https://twitter.com/SenMikeShirkey/status/1256302431195070464?s=20 [https://perma.cc/A3RL-L8D5].

[46] Oosting, *supra* note 44.

"behavior and tactics" of some of the "so-called protestors."[47] "These folks are thugs and their tactics are despicable. It is never OK to threaten the safety or life of another person, elected or otherwise, period. The moment an individual or group embraces the threat of physical violence to make a point is the moment I stop listening."[48] Michigan Republican Party Chairwoman Laura Cox issued a statement saying that "violence and intimidation have no place in the American system and the Michigan Republican Party condemns any individuals who are resorting to such tactics."[49] Fox News host Sean Hannity joined the chorus, announcing that "[n]o one should be attempting to intimidate officials with a show of force."[50]

In the wake of the armed protests, the State Capitol Commission (the body responsible for maintaining the building and its grounds) met to decide whether it could prohibit weapons in the statehouse, or whether doing so would require a legislative act.[51] But the commission's virtual meeting was inundated with threats. The commission's vice-chairman warned that commentators "were saying things like they knew where people lived"; another commission member noted that "very vulgar" and "very racist" comments were posted.[52] Due to a concern for "public safety," the committee adjourned its meeting early—before public discussion.[53]

The threats directed at the commission were just the tip of the iceberg. That same day, the *Detroit Metro Times* published an article revealing four private Facebook groups (with a combined 400,000 members) "filled with paranoid, sexist, and grammar-challenged rants, with members encouraging

---

[47]  *See* Shirkey, *supra* note 45.

[48]  Editorial, *A Call for Civility Amidst Protests*, BEAVER DAM DAILY CITIZEN (May 23, 2020), [hereinafter *A Call for Civility*] https://www.wiscnews.com/bdc/opinion/editorial/editorial-a-call-for-civility-amidst-protests/article_d7cbee17-4f55-574a-84d5-6e665998cd67.html [https://perma.cc/5452-6GB2].

[49]  Steve Neavling, *Michigan GOP Leaders Condemn Death Threats Against Whitmer, but Oppose Banning Guns from Capitol*, DETROIT METRO TIMES (May 12, 2020, 1:15 PM), https://www.metrotimes.com/news-hits/archives/2020/05/12/michigan-gop-leaders-condemn-death-threats-against-whitmer-but-oppose-banning-guns-from-capitol [https://perma.cc/AE3K-QUJD].

[50]  Politics Video Channel (@politvidchannel), TWITTER (May 5, 2020, 3:28 AM), https://twitter.com/politvidchannel/status/1257572897763110912?s=20 [https://perma.cc/D4Y8-G8VL].

[51]  Matt Durr, *Guns Can Be Banned at Michigan Capitol, Says AG Dana Nessel*, MLIVE (May 8, 2020), https://www.mlive.com/public-interest/2020/05/guns-can-be-banned-at-michigan-capitol-says-ag-dana-nessel.html [https://perma.cc/TV3P-CBTW] (reporting that Michigan's Attorney General Dana Nessel asserted that the commission could ban guns at the statehouse, observing "[p]ublic safety demands no less, and a lawmaker's desire to speak freely without fear of violence requires action be taken"); Craig Mauger, *Special Panel Formed to Study Michigan Capitol Gun Ban; Meeting Draws Threats*, DETROIT NEWS (May 11, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/05/11/nessel-issues-formal-opinion-guns-can-banned-capitol/3107509001/ [https://perma.cc/63GG-84VT].

[52]  Mauger, *supra* note 51.

[53]  *Id.*

151

violence and flouting the Governor's social-distancing orders."[54] The article cited dozens of calls for Whitmer to be assassinated, hanged, or shot.[55] In response to the article, Facebook deleted the page of Michigan United for Liberty,[56] which had begun organizing another protest—billed "Judgement Day"—scheduled for May 14.[57] A spokesperson for the group explained the rationale of the new protest: "We won't be bullied and we won't be happy until the state is back to normal again."[58]

Others had a different view of who was bullying whom. On May 12, multiple Democratic state senators delivered speeches decrying the threats against Governor Whitmer and calling for action to limit guns in the Michigan State Capitol building.[59] Whereas the only arrest at the April 30 protest was of a thirty-five-year-old male who was arrested for assaulting another protester,[60] law enforcement authorities communicated their intention to aggressively police violence, brandishing, and intimidation at the upcoming Judgement Day protest.[61] Attorney General Dana Nessel issued a press release asserting that "[y]ou cannot use a weapon to threaten or intimidate someone"[62] and warned that "[t]he Attorney General's office is prepared to prosecute actions [including brandishing] that may not have

---

[54] Steve Neavling, *Gov. Whitmer Becomes Target of Dozens of Threats on Private Facebook Groups Ahead of Armed Rally in Lansing*, DETROIT METRO TIMES (May 11, 2020, 9:38 AM), https://www.metrotimes.com/news-hits/archives/2020/05/11/whitmer-becomes-target-of-dozens-of-threats-on-private-facebook-groups-ahead-of-armed-rally-in-lansing [https://perma.cc/AE3K-QUJD].

[55] *Id.*

[56] *Id.*

[57] Justin P. Hicks, *Another Stay-Home Protest Planned at Michigan Capitol*, MLIVE (May 12, 2020), https://www.mlive.com/public-interest/2020/05/another-stay-home-protest-planned-at-michigan-capitol.html [https://perma.cc/ALS8-PPHX]; Tom Perkins, *Protesters Descend on Michigan Capitol but Rain Washes Away Demonstration*, GUARDIAN (May 14, 2020, 2:05 PM), https://www.theguardian.com/us-news/2020/may/14/michigan-protest-capitol-gretchen-whitmer [https://perma.cc/S8C7-ND4Z].

[58] Hicks, *supra* note 57.

[59] Craig Mauger, *Senator: Threats Are "About Spreading Blood" on Michigan Capitol Lawn*, DETROIT NEWS (May 12, 2020, 1:59 PM), https://www.detroitnews.com/story/news/local/michigan/2020/05/12/senator-threats-about-spreading-blood-capitol-lawn/3115275001/ [https://perma.cc/AD8F-JGZC].

[60] Lois Beckett, *Armed Protesters Demonstrate Against Covid-19 Lockdown at Michigan Capitol*, GUARDIAN (Apr. 30, 2020, 6:54 PM), https://www.theguardian.com/us-news/2020/apr/30/michigan-protests-coronavirus-lockdown-armed-capitol [https://perma.cc/SXZ4-X2AD]; Mauger, *supra* note 38.

[61] Todd Spangler, *New Stay Home Protest Planned in Lansing — and Cops, Leaders Have Message for Attendees*, DETROIT FREE PRESS (May 12, 2020, 5:34 PM), https://www.freep.com/story/news/local/michigan/2020/05/12/michigan-lansing-protest-whitmer-stay-home-order/3115967001/ [https://perma.cc/JF93-DYJ9].

[62] Carol Thompson & Kara Berg, *A Key Question Before Thursday Protest at Capitol: What Does It Mean to Brandish a Weapon?*, LANSING ST. J. (May 13, 2020, 10:57 PM), https://www.lansingstatejournal.com/story/news/2020/05/13/protest-michigan-brandish-gun-firearm-stay-home-order-capitol/5184735002/ [https://perma.cc/7KT7-5LSV].

received the same treatment during the April 30 protest."[63] Republican Senate Leader Shirkey argued that anyone brandishing guns in an intimidating or threatening way should be "properly handcuffed, properly taken in (and) fingerprinted."[64]

Despite these warnings and even though the legislature was in the midst of debate about regulating guns in the building, on the afternoon of May 13—one day before Judgement Day—both chambers of the Michigan legislature adjourned until May 19.[65] Though not explained as such, commentators noted that the adjournment seemed clearly to be a response to the threats and protest.[66] Despite the legislature's adjournment—and the arrival of heavy rain and lightning—about 300 people turned out for Judgement Day.[67] Even though authorities had warned that they would more aggressively enforce gun laws prohibiting brandishing and intimidation, the police made no arrests and issued no citations.[68]

In early October 2020, the FBI arrested thirteen men in connection with a wide-ranging plot to kidnap and possibly kill Governor Whitmer[69] (and, it later emerged, Virginia Governor Ralph Northam, much reviled by some for his support for gun laws[70]). As captured in the affidavit accompanying the

---

[63]  Beth LeBlanc, *Nessel: Protesters Breaking the Law Thursday Will Be Charged*, DETROIT NEWS (May 13, 2020, 2:44 PM), https://www.detroitnews.com/story/news/politics/2020/05/13/michigan-attorney-general-nessel-capitol-protesters-breaking-law-charged/5184657002/ [https://perma.cc/HGJ6-5X8H].

[64]  Spangler, *supra* note 61.

[65]  David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protesters*, BLOOMBERG NEWS (May 14, 2020, 10:52 AM), https://www.bloomberg.com/news/articles/2020-05-14/michigan-cancels-legislative-session-to-avoid-armed-protesters [https://perma.cc/A6WA-TZZZ].

[66]  *Id.* (explaining that "Michigan closed down its capitol in Lansing on Thursday and canceled its legislative session rather than face the possibility of an armed protest and death threats against Democratic Governor Gretchen Whitmer").

[67]  Francis X. Donnelly, Craig Mauger & Beth LeBlanc, *Fight Erupts at Michigan Capitol Protest Over Noose; Police Take Ax*, DETROIT NEWS (May 14, 2020, 6:15 PM), https://www.detroitnews.com/story/news/politics/2020/05/14/protesters-begin-gathering-thursday-demonstration/5186937002/ [https://perma.cc/FP6Z-5QGF]; Perkins, *supra* note 57.

[68]  *MSP: Ax-Wielding Man Removed from Lansing Protests, but No Citations or Arrests Made*, WXYZ DETROIT (May 14, 2020, 6:38 PM), https://www.wxyz.com/news/coronavirus/police-recover-ax-after-altercation-at-state-capitol-during-protest [https://perma.cc/H6BB-DUPH].

[69]  Giulia McDonnell Nieto del Rio & Neil MacFarquhar, *Virginia Governor Was Also a Possible Target of Anti-Government Plot, F.B.I. Says*, N.Y. TIMES (Oct. 18, 2020), https://www.nytimes.com/2020/10/13/us/northam-kidnapping-whitmer.html [https://perma.cc/U8KK-EQCR]; Nicholas Bogel-Burroughs, Shaila Dewan & Kathleen Gray, *F.B.I. Says Michigan Anti-Government Group Plotted to Kidnap Gov. Gretchen Whitmer*, N.Y. TIMES (Jan. 27, 2021), https://www.nytimes.com/2020/10/08/us/gretchen-whitmer-michigan-militia.html [https://perma.cc/6ZC3-KQG8].

[70]  Kayla Ruble, Laura Vozzella & Devlin Barrett, *Whitmer Plotters Also Discussed Kidnapping Virginia Gov. Ralph Northam, FBI Agent Testifies*, WASH. POST (Oct. 13, 2020, 8:19 PM), https://www.washingtonpost.com/national-security/ralph-northam-gretchen-witmer-kidnapping-plot/2020/10/13/26b

---

153

NORTHWESTERN UNIVERSITY LAW REVIEW

criminal complaint, their language was both gendered (referring to Governor Whitmer as a "bitch")[71] and inflected with constitutional justification.[72] At least two of the men had participated in the April 30 protest and were among those pictured in Polehanki's viral tweet. [73] Campaigning in Michigan, President Trump continued to attack Governor Whitmer and joined supporters chanting "lock her up!" with a call to "lock them all up."[74]

### B.   "No One Has Ever Been Harmed"

No one was shot during the Michigan protests, and many protest sympathizers suggested that without evidence of past physical harm, the state had no legitimate interest in restricting guns in the legislature. Noting that there were no shootings or accidental discharges at the event, one protester said, "it's not a gun problem, it's a people problem."[75] Others discounted fear as a reason for limiting guns in the Michigan State Capitol. Ashley Phibbs, one of the organizers of the April 30 rally, said, "I don't think that anyone was there to really make anyone fearful. I didn't see anything that would have really caused fear, aside from loud noises from the people yelling. But

---

4e31a-0d5f-11eb-b1e8-16b59b92b36d_story.html [https://perma.cc/RP67-TFW3]. Gun rights advocates organized a large protest in Richmond after Democrats won control of the General Assembly. Gregory S. Schneider, Laura Vozzella, Patricia Sullivan & Michael E. Miller, *Weapons, Flags, No Violence: Massive Pro-Gun Rally in Virginia Capital*, WASH. POST (Jan. 20, 2020, 5:14 PM), https://www.washingtonpost.com/local/virginia-politics/2020/01/20/4b36852c-3baa-11ea-8872-5df698785a4e_story.html [https://perma.cc/U97V-D443] (noting that a "homemade guillotine that had been set up on the street, inscribed with the words: 'The penalty for treason is death'").

[71] Complaint at 5–6, United States v. Fox, No. 1:20-mj-416 (W.D. Mich. Oct. 6, 2020) (referencing Governor Whitmer as a "bitch").

[72] *Id.* at 2 (noting that conspirators "agreed to unite others in their cause and take violent action against multiple state governments that they believe are violating the U.S. Constitution"); *id.* at 2–3 (reporting that the "group talked about creating a society that followed the U.S. Bill of Rights and where they could be self-sufficient"); *see also* John E. Finn, *Plot to Kidnap Michigan's Governor Grew from the Militia Movement's Toxic Mix of Constitutional Falsehoods and Half-Truths*, CONVERSATION (Oct. 12, 2020, 2:17 PM), https://theconversation.com/plot-to-kidnap-michigans-governor-grew-from-the-militia-movements-toxic-mix-of-constitutional-falsehoods-and-half-truths-147825 [https://perma.cc/2BX6-GVGV] (discussing beliefs of self-described militia groups, including the Wolverine Watchmen involved in the kidnapping plot, the Proud Boys, Michigan Militia, and the Oath Keepers).

[73] Vandana Rambaran, *Suspects in Whitmer Plot Photographed with Long Guns at Michigan Capitol*, FOX NEWS (Oct. 9, 2020), https://www.foxnews.com/politics/2-charged-in-whitmer-kidnap-plot-photographed-with-long-guns-at-state-capitol-in-april-ag-says [https://perma.cc/URB8-3EJF]; Polehanki, *supra* note 41; *see infra* notes 97–100 and accompanying text.

[74] Jonathan Martin, '*Lock Them All Up': Trump's Whitmer Attack Fits a Damaging Pattern*, N.Y. TIMES, (Oct. 18, 2020), www.nytimes.com/2020/10/18/us/politics/trump-whitmer-michigan.html [https://perma.cc/V8RL-DP4L].

[75] Oosting, *supra* note 44; Sarah Rahal & Craig Mauger, *Armed Protesters in Michigan Capitol Have Lawmakers Questioning Policy*, DETROIT NEWS (May 2, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/05/02/armed-protesters-michigan-capitol-have-lawmakers-questioning-policy/3071928001/ [https://perma.cc/LFV9-BZ7Q].

154

a lot of people are also sometimes afraid of guns in general."[76] Opposing proposals to ban guns in the capitol, some echoed the slogan captured on one protester's t-shirt (and popular among gun rights advocates): "My Rights . . . Don't End Where Your Fear Begins."[77]

Tom Lambert, the legislative director of Michigan Open Carry, Inc., combined both these arguments against regulation when he urged that guns should be permitted in the capitol building despite legislators' expressed fears: "If that's the standard we're going to use for things, where does that stop?" he asked. "Do we limit constitutionally protected assembly based on a subjective fear, especially one where *no one has ever been harmed*?"[78]

Lambert's question captures something important about the broader gun debate: transfixed by gun violence, we often reason about guns solely in terms of the physical harms they inflict. The claim of "no harm" makes sense in this universe. Yet Lambert's assertion that *no one was harmed* exposes what is wrong with the "physical-harm-only" view: it fails to account for the death threats to the Governor, the intimidation of state legislators, the shutdown of the state legislature in the midst of a global pandemic, and the adjourning of the commission that was planning to discuss public carry in the legislature—all of it witnessed within the state and across the country. These *were* harms to democracy, to the public sphere, and to the body politic.

The protesters were not threatening acts of random violence; they were a small group of individuals using their firearms to amplify their political power and stop legislators from acting on views about public health held by

---

[76] Patrik Jonsson & Noah Robertson, *Guns in Michigan Capitol: Defense of Liberty or Intimidation?*, CHRISTIAN SCI. MONITOR (May 4, 2020), https://www.csmonitor.com/USA/Politics/2020/0504/Guns-in-Michigan-Capitol-Defense-of-liberty-or-intimidation [https://perma.cc/M3KN-2QHK].

[77] Oosting, *supra* note 44 (including a photograph depicting a protester donning a shirt with the popular slogan). A tweet by the NRA, stating, "Our rights don't end where your feelings begin," was shared more than 9,000 times. NRA (@NRA), TWITTER (Aug. 8, 2020, 7:35 PM), https://twitter.com/NRA/status/1292243058784952321 [https://perma.cc/PY3T-BQ36]; *see also* Tomi Lahren (@TomiLahren), TWITTER (Mar. 26, 2018, 9:58 PM), https://twitter.com/TomiLahren/status/97845117044734361 [https://perma.cc/AX8T-9ZYJ] ("Sorry, #marchforourlives kids but my rights don't end where your feelings begin!"). A more partisan version of the slogan appears on t-shirts and bumper stickers bearing versions of the legend: "TRUMP 2020: Fuck Your Feelings." *See, e.g.*, "Funny Trump 2020 FUCK Your Feelings T-Shirt," AMAZON, https://www.amazon.com/Funny-Trump-2020-FUCK-Feelings/dp/B07JFM1PT1/ [https://perma.cc/AB3K-U3UZ].

[78] Oosting, *supra* note 44 (emphasis added). Lambert acknowledged Michigan's brandishing law but denied that any of the gun displays were intended to cause fear in a reasonable person. *Id.* One organizer of the event suggested that critics "should read the Constitution and 'live life without fear.'" *Michigan Militia Puts Armed Protest in the Spotlight*, WMEM (May 2, 2020), https://www.wnem.com/news/michigan-militia-puts-armed-protest-in-the-spotlight/article_f3a9e9de-8ca3-11ea-9333-d7c0fe0d4915.html [https://perma.cc/7XUW-73QM]. As to Lambert's question about regulation on the basis of fear, see *infra* notes 231–250 and accompanying text, which provide examples of areas where the Supreme Court has upheld the regulation of constitutional rights to prevent fear and to promote other nonphysical interests.

N O R T H W E S T E R N   U N I V E R S I T Y   L A W   R E V I E W

the majority of Michiganders.[79] All the participants understood the political character of the armed threat. As State Representative Anthony put it, "If I don't vote the way that these people want me to vote, are they going to rush the [floor] and start shooting us?"[80] Senate Majority Leader Shirkey angrily announced that he refused to listen to the group's political demands under "threat of physical violence,"[81] while President Trump argued that the legislators *should* listen, tweeting "[t]hese are very good people" and urging the Governor to "make a deal" with them."[82]

Despite some legislators' expressions of defiance, the armed threats were effective in shutting down debate. As we have seen, a state commission met in the wake of the protests to discuss whether to ban carrying guns in the legislature. But once protesters doxxed and threatened the state commission's members, the commission adjourned without taking action.[83] After warning that protesters who threatened officials would be arrested, the Republican-dominated legislature cancelled its own session, and the Judgement Day protest proceeded without a single arrest.[84]

So, if we ask what happened in Michigan—and value our *collective* life as well as our individual, physical lives—then we can identify the "harm" differently than those who focused exclusively on physical injury. Even though there was no shooting, there was an attack on public order and public safety. Armed protesters dominated and transformed the public sphere, employing their weapons to intimidate officials, to drown out the voices of others, and to elevate their claims over those of others.

---

[79] *See supra* notes 35–40 and sources cited therein.

[80] Beckett, *supra* note 43.

[81] *A Call for Civility*, *supra* note 48 ("The moment an individual or group embraces the threat of physical violence to make a point is the moment I stop listening.").

[82] Joan E. Greve, *Michigan: Trump Says Whitmer Should 'Make a Deal' with Protesters*, GUARDIAN (May 1, 2020), https://www.theguardian.com/us-news/2020/may/01/trump-michigan-protesters-gretchen-whitmer [https://perma.cc/BDA6-889C]; *cf.* Glenn Kessler, *The 'Very Fine People' at Charlottesville: Who Were They?*, WASH. POST. (May 8, 2020, 2:00 AM), https://www.washingtonpost.com/politics/2020/05/08/very-fine-people-charlottesville-who-were-they-2/ [https://perma.cc/UDJ3-VLCC] (noting President Trump's reference to "very fine people" on "both sides" at Charlottesville). Even after the FBI thwarted a plot to kidnap Governor Whitmer, President Trump continued to attack her publicly, saying among other things that she "wants to be a dictator." Cameron Peters, *The Return of "Lock Her Up": Trump Won't Stop Attacking Gretchen Whitmer*, VOX (Oct. 18, 2020, 2:00 PM) https://www.vox.com/2020/10/18/21521633/michigan-governor-lock-her-up-trump-attacking-gretchen-whitmer [https://perma.cc/9V4Q-2GS9]; *see also infra* notes 69–74 (discussing the kidnapping plot).

[83] Mauger, *supra* note 51. After the January 6 assault on the U.S. Capitol, the Michigan commission voted unanimously to ban firearms in the state capitol. Kathleen Gray, *Michigan Commission Bans Open Carry at the State Capitol*, N.Y. TIMES (Jan. 11, 2021), https://www.nytimes.com/2021/01/11/us/michigan-bans-guns-state-capitol.html [https://perma.cc/DZ6L-45J7].

[84] Perkins, *supra* note 57.

The masses of heavily armed men flooding the state capitol asserted the authority of guns—authority many understood as gendered and raced—attacking the equality of membership at the root of a democracy. The protests at the capitol and online challenged women's authority to serve as governors, as attorneys general, as leaders. "[A]ll the criticisms are subtly veiled in gender stereotypes," said State Senator Adam Hollier. "You hear, 'hey, this isn't a nanny state.' I've heard folks saying, 'I didn't elect a mommy to take care of the state.' You've never heard someone refer to a male governor or the president saying 'I don't need my dad telling me what to do.'"[85] Online, the Governor was attacked "as an overbearing mother, a nanny, witch, queen[,] . . . a menopausal teacher," "nasty woman" (President Trump's sneering referent for Hillary Clinton), and "Tyrant b---h." [86] Threats of violence supercharged this stream of misogyny, with protesters boasting to one another about how it would be most satisfying to kill the Governor.[87] The Governor eventually acknowledged the gender roles that fueled hostility to her exercise of authority: "When you see some of the ugly threats that have been made online around these protests, I think you can conclude there is a gender facet to this."[88]

Many recognized the gun display as an expression of raced as well as gendered authority—a privileging of some citizens, views, and rights over others. Governor Whitmer condemned the demonstrators for "depict[ing] some of the worst racism and awful parts of our history in this country," pointing out that "[t]here were swastikas and Confederate flags and nooses and people with assault rifles."[89] Others commented on the implicit but unmistakable racial understandings the police response expressed.[90] That law

---

[85] Malachi Barrett, *Sexist Attacks Cast Michigan Gov. Whitmer as Mothering Tyrant of Coronavirus Dystopia*, MLIVE (May 22, 2020), https://www.mlive.com/public-interest/2020/05/sexist-attacks-cast-whitmer-as-mothering-tyrant-of-coronavirus-dystopia.html [https://perma.cc/LZ26-9RPD].

[86] *Id.*; *see also* Kathleen Gray, *Trump vs. the Women Who Lead Michigan: A Battle with 2020 Implications*, N.Y. TIMES (July 12, 2020), https://www.nytimes.com/2020/07/12/us/politics/trump-michigan-whitmer-benson-nessel.html [https://perma.cc/Y2HB-9265] (recounting President Trump's sexist animosity toward women, and specifically toward three female Michigan leaders, including Governor Whitmer).

[87] *See* Neavling, *supra* note 54.

[88] Barrett, *supra* note 85.

[89] Bryan Armen Graham, *'Swastikas and Nooses': Governor Slams 'Racism' of Michigan Lockdown Protest*, GUARDIAN (May 3, 2020), https://www.theguardian.com/us-news/2020/may/03/michigan-gretchen-whitmer-lockdown-protest-racism [https://perma.cc/M4E4-R53C].

[90] Congressional hearings have explored law enforcement's dramatically different responses to the January 6 riot and Black Lives Matter protests of the preceding summer. *See, e.g.*, Luke Broadwater & Michael S. Schmidt, *Officials Put 'Unusual' Limits on D.C. National Guard Before Riot, Commander Says*, N.Y. TIMES (Mar. 3, 2021), https://www.nytimes.com/2021/03/03/us/politics/dc-national-guard-capitol-riot.html [https://perma.cc/3XYB-8HHN]. Senator Ron Johnson validated this differential

---

157

enforcement allowed masses of overwhelmingly white and male protesters, armed with rifles, to threaten the Governor and shut down the legislature with impunity did not pass unremarked. U.S. Representative Rashida Tlaib put the distinction in clear terms: "Black people get executed by police for just existing, while white people dressed like militia members carrying assault weapons are allowed to threaten State Legislators and staff."[91] Journalist Michele Norris recognized Michigan as the outgrowth of armed protests that have increased in roughly the last decade.[92] During that time, it has become increasingly common to see groups armed with high-powered weapons and garbed in paramilitary gear, perhaps most dramatically in Charlottesville in 2017, as well as at gun-sanctuary rallies, anti-shutdown protests, Black Lives Matter counterprotests, and countless open-carry events in Walmarts and other retailers.[93] Like Representative Tlaib, Norris condemned the increasing "normalization of firearms at protests" as authorizing two-tiered racialized forms of citizenship: "Accepting the display of firearms at protests by some and not others means that we must also accept that some are rewarded with a kind of special citizenship that allows them to be seen as patriotic instead of threatening, and aggrieved instead of aggressive."[94] Remarking on racial dynamics in the history of American vigilantism, Lindsay Livingston has observed, "Brandishing a

---

response. *See* Bess Levin, *Senator Ron Johnson Says It's Not Racist to Say He's Afraid of Black People*, VANITY FAIR (Mar. 16, 2021), https://www.vanityfair.com/news/2021/03/ron-johnson-blm-capitol-riot [https://perma.cc/8UAH-PMM7].

[91] Graham, *supra* note 89.

[92] *See* Norris, *supra* note 28 (arguing that "Black or brown people . . . would not be tolerated" as armed white people are); *see also* Sara Burnett, *Michigan Militia Puts Armed Protest in the Spotlight*, U.S. NEWS (May 2, 2020), https://www.usnews.com/news/politics/articles/2020-05-02/michigan-militia-puts-armed-protest-in-the-spotlight [https://perma.cc/HEB2-UVT9] ("'Systemically, blackness is treated like a more dangerous weapon than a white man's gun ever will, while whiteness is the greatest shield of safety,' said Brittany Packnett, a prominent national activist who protested in Ferguson. The Michigan demonstrators, she added, 'are what happens when people of racial privilege confuse oppression with inconvenience. No one is treading on their rights. We're all just trying to live.'").

[93] Evelyn Holmes, *Armed Bystanders Line Black Lives Matter Protest in Indiana*, KABC-TV ( June 7, 2020), https://abc7.com/timely-armed-protesters-black-lives-matter-indiana-protest/6234854/ [https://perma.cc/4L8G-CNB8]; Norris, *supra* note 28. On open carry in the gun-sanctuary protests of 2020, see *supra* note 30. For analysis of the criminal law and Second Amendment implications of such gun displays, see generally Joseph Blocher, Samuel W. Buell, Jacob D. Charles & Darrell A.H. Miller, *Pointing Guns*, 99 TEX. L. REV. 1173 (2021).

[94] Norris, *supra* note 28; *see also* Lindsay Livingston, *Brandishing Guns: Performing Race and Belonging in the American West*, 17 J. VISUAL CULTURE 343, 351 (2018) ("The Bundys, by infiltrating public spaces and openly wielding their firearms, tap into a strain of American vigilantism that has almost always targeted racialized others . . . .").

158

gun, as a performance of belonging, is an exceptionalism afforded to only a very specific subset of US Americans."[95]

After an armed seventeen-year-old, who traveled across state lines to monitor racial-justice protesters in Kenosha, Wisconsin, shot and killed two people in the crowd, the state's Lieutenant Governor, Mandela Barnes (who is Black), said that white armed protest activity has been ignored for too long: "[H]ow many times across this country do you see armed gunmen, protesting, walking into state Capitols, and everybody just thinks it's OK?" He continued, "People treat that like it's some kind of normal activity that people are walking around with assault rifles."[96]

Witnessing the invasion of the U.S. Capitol building on January 6, 2021, Michigan State Senator Erika Geiss recounted that it "really made me feel like what happened here this past spring and summer was a dress rehearsal for what happened" in Washington, D.C. [97] Amy Cooter of Vanderbilt University, an expert on domestic terror groups, connected the U.S. Capitol invasion to what happened in Michigan and at other state capitols. She noted that "given the general lack of consequences" in Michigan, "this becomes normalized and legitimate and made it easier to scale up."[98] It took the invasion of the U.S. Capitol to tip the balance of debate in favor of restricting guns in the Michigan legislature.[99] Even then, the restriction applied only to open carry, eliciting criticism from Governor Whitmer and others, who argued that public safety demands a total ban on guns in the state capitol building.[100]

---

[95]  Livingston, *supra* note 94, at 352. This exceptionalism is longstanding and continues to pervade in historical understandings of memorials to past armed white mob actions. The plaque commemorating the Ku Klux Klan massacre at an armed march on the Grant Parish, Louisiana courthouse, reads "On this site occurred the Colfax Riot in which three white men and 150 negroes were slain. This event on April 12, 1873 marked the end of carpetbag misrule in the South." CHRIS MURPHY, THE VIOLENCE INSIDE US: A BRIEF HISTORY OF AN ONGOING AMERICAN TRAGEDY 98 (2020).

[96]  Stephen Groves & Scott Bauer, *17-Year-Old Arrested After 2 Killed During Unrest in Kenosha*, ASSOCIATED PRESS (Aug. 27, 2020), https://apnews.com/97a0700564fb52d7f664d8de22066f88 [https://perma.cc/S34Z-RK7Q].

[97]  Kathleen Gray, *In Michigan, a Dress Rehearsal for the Chaos at the Capitol on Wednesday*, N.Y. TIMES (Jan. 9, 2021), https://www.nytimes.com/2021/01/09/us/politics/michigan-state-capitol.html [https://perma.cc/AUZ9-45XH].

[98]  *Id.*

[99]  Joseph Choi, *Michigan Bans Open Carry of Guns Inside State Capitol*, HILL (Jan. 11, 2021, 3:14 PM), https://thehill.com/homenews/state-watch/533668-michigan-bans-open-carry-of-guns-inside-state-capitol [https://perma.cc/KCP5-UFVM].

[100]  *Id.*

NORTHWESTERN UNIVERSITY LAW REVIEW

### C. *The Threat to Public Safety Was, and Is, the Harm*

Why did Michigan officials fail to defend the public sphere and their own prerogative to govern in the public interest? Why were armed protesters allowed to threaten and dominate public spaces to such an extent that legislators were subject to what members of *both* parties described as intimidation?

A crucial part of the debate focused on whether we understand gun regulations as addressing physical safety only, or instead understand public safety as including social interests as well. Recall the argument of Tom Lambert, the legislative director of Michigan Open Carry, who claimed that guns cannot be regulated based on the fear they instill in others: "If that's the standard we're going to use for things, where does that stop?" he asked. "Do we limit constitutionally protected assembly based on a subjective fear, especially one where no one has ever been harmed?"[101]

A legal system in thrall to such a physical-harm-only conception of gun regulation will systematically fail to protect public safety. At stake is not only the constitutionality of laws regulating public carry, but many other forms of gun regulation. Like Tom Lambert, Justice Clarence Thomas has objected that guns cannot be regulated on the basis of public fear. Dissenting from the denial of certiorari in a challenge to the constitutionality of a ban on assault weapons and large-capacity magazines, Justice Thomas wrote, "If a broad ban on firearms can be upheld based on conjecture that the public might feel safer (while being no safer at all), then the Second Amendment guarantees nothing."[102] As we show below, growing numbers of judges are adopting Justice Thomas's approach to the Second Amendment.[103] These judges would dramatically restrict government's ability to respond to weapons threats, in ways that take no account of the common law tradition of regulating weapons in the interests of public safety that orients *Heller* itself.

In legislative arenas, gun regulations are too often conceptualized, worded, and enacted as if their only function is to save lives, not to prevent terror and intimidation. Indeed, Michigan's own brandishing law—the one that Lambert argued was not violated during the invasion of the Michigan legislature—was rewritten in 2015 with Lambert's support so as to apply only when a gun is displayed menacingly "with the intent to induce fear in

---

[101] Oosting, *supra* note 44.

[102] Friedman v. City of Highland Park, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari) (emphasis omitted).

[103] *See infra* Section III.A (collecting examples of judges focusing exclusively on physical harms, with examples of judges quoting Justice Thomas).

another person."[104] The inclusion of this *mens rea* requirement narrowed the brandishing statute[105] in a way that blinds the law to the experiences of others—others' fear is irrelevant unless the gun carrier specifically *intends* it—and imposes liability only on "bad guys" who openly carry guns.[106] Laws denying guns to domestic abusers have similarly been conceptualized solely in terms of preventing physical harm—not the broader harms of coercive control and terror that armed abusers inflict.[107]

But when we take account of the social as well as physical interests protected by the regulation of weapons—the understanding of public safety that we will show was vindicated at common law and recognized in *Heller*—there is a much stronger common-sense and constitutional basis for laws that restrict gun threats, whether by prohibiting brandishing, banning the possession of large-capacity magazines, or limiting public carry that might inhibit democratic participation. This social understanding of public safety must guide not only litigation and legislation, but also the enforcement of gun laws. As we recognize that public safety protects collective life as well as individual lives, we can better appreciate why public officials enforcing weapons laws must ensure that neither weapons use, nor weapons enforcement, exacerbates inequality of citizenship—whether between the armed and unarmed, or along lines of race, class, sex, and viewpoint.[108]

[104] Alex Mitchell, *Legal Uncertainties About Openly Carrying Guns in Michigan Present Challenges for Law Enforcement*, MLive (Jan. 20, 2019), https://www.mlive.com/news/kalamazoo/2014/05/open_carry.html [https://perma.cc/2GL2-EZRZ]; *see* Tom Lambert, *MOC-Backed Brandishing Bills Take Effect*, Mich. Open Carry (Aug. 10, 2015, 7:49 AM), https://miopencarry.org/news/2015/08/Brandishing-Definition-Takes-Effect [https://perma.cc/KYP4-NW7H]. For coverage of the Lambert demonstrations in Grand Rapids, see John Agar, *Open-Carry Advocates Target Grand Rapids City Commission, Streets to Share Message*, MLive (Apr. 3, 2019), https://www.mlive.com/news/grand-rapids/2014/02/open-carry_advocates_target_gr.html [https://perma.cc/9A5N-W6YY].

[105] Mitchell, *supra* note 104. According to at least one prosecutor, the change makes the brandishing prohibition duplicative of the crime of assault. *Id.*

[106] By the summer of 2020, newspapers were regularly reporting that groups of armed citizens were massing at racial-justice protests, usually with no police response. As shown in the video which accompanies the news story, an illustrative scene from a video shows white bystanders in Indiana carrying rifles standing on the side of the road along as Black Lives Matter protesters march past. The protesters saw a clear intent to intimidate: "They were just trying to stand there and intimidate us . . . . We were very peaceful," but the onlooking police responded, "You can carry a shotgun without a permit" and "[a]s long as they didn't point their rifles at anyone, it's legal to carry." *See* Holmes, *supra* note 93. These protests share roots with the recent rise of the open-carry movement. *See infra* notes 22–32 and sources cited therein.

[107] *See infra* 263–268 and accompanying text.

[108] There may be interesting connections between our approach to public safety in the context of gun regulation and efforts to reconsider "public safety" in debates over policing. *See* Barry Friedman, *What Is Public Safety?*, 102 Bos. U. L. Rev. (forthcoming Apr. 2022) (manuscript at 7), https://papers.ssrn.com/a=3808187 [https://perma.cc/Z2J4-ARXM] (arguing that public safety—"government's obligation to provide safety"—encompasses more than the "protection function" of preventing physical harm).

NORTHWESTERN UNIVERSITY LAW REVIEW

A concluding Section of the Essay therefore looks at concerns about selective enforcement of gun laws which this social conception of public safety helps make visible.[109] Certainly the armed protest in Michigan[110] elicited a different response from public officials than racial-justice protests in other settings, and a much more tolerant response than when armed Black Panthers entered the California legislature in the 1960s.[111] That incident prompted an immediate tightening of California's gun laws, signed into law by none other than Governor Ronald Reagan.[112] Masses of white citizens armed with assault rifles do not elicit the same response from police that masses of Black citizens armed with assault rifles would.[113] And protesters' political views also seem to matter to the police as they make decisions about how to respond.[114] In these accounts, state actors are responding in ways that violate principles of colorblindness and viewpoint neutrality that should guide law enforcement.

Recognizing the public safety interest in gun regulation does not necessarily require enacting more gun laws. Instead, it leads us to appreciate why concerns about racial and political evenhandedness should be a central part of all conversations about the passage and enforcement of gun laws and about killings in "self-defense."[115] Failure to appreciate the social nature of public safety and the importance of evenhanded law enforcement leads to

---

[109] *See infra* Section III.C.

[110] *See supra* Section I.A.

[111] Michael Sierra-Arévalo, *Is Armed Protest by African Americans Treated Differently? History Says Yes.*, WASH. POST. (May 21, 2020, 5:00 AM), https://www.washingtonpost.com/outlook/2020/05/21/is-armed-protest-by-african-americans-treated-differently-history-says-yes/ [https://perma.cc/GX2J-JS9Q].

[112] *Id.*

[113] *See infra* notes 289–290 and accompanying text (recounting the story of a Louisiana congressman, who happens also to be a gun-rights advocate and former law enforcement officer, who responded to a peaceful Black Lives Matter protest by posting a picture of armed Black men along with a caption saying that he would "consider the armed presence a real threat" and would "drop any 10 of you where you stand").

[114] *See supra* note 90 and sources cited therein.

[115] We resist efforts to associate race emancipation exclusively with gun rights. *See, e.g.*, NICHOLAS JOHNSON, NEGROES AND THE GUN: THE BLACK TRADITION OF ARMS (2014) (emphasizing the use of guns by Black Americans defending themselves against racist violence and other threats). Race plays a complex role in gun use, gun death, and gun regulation, as in every other part of American life and law. There are racial considerations supporting the case for gun regulation as well as for gun rights. *See, e.g.*, JAMES FORMAN, JR., LOCKING UP OUR OWN: CRIME AND PUNISHMENT IN BLACK AMERICA 57, 71 (2017) (observing, in the context of the D.C. law later struck down by *Heller*, that in 1975, "85 percent of those killed by guns in the District of Columbia were black"); *see also* Tom Rosentiel, *Views of Gun Control — a Detailed Demographic Breakdown*, PEW RSCH. CTR. (Jan. 13, 2011), https://assets.pewresearch.org/wp-content/uploads/sites/12/old-assets/pdf/gun-control-2011.pdf [https://perma.cc/9WRX-FEMQ] (finding in September 2010 that white respondents were roughly twice as likely as Black or Hispanic respondents to say that it is "more important to protect the right of Americans to own guns" rather than "to control gun ownership").

162

116:139 (2021)                                    *When Guns Threaten the Public Sphere*

forms of talk about guns and self-defense that privilege the fears and choices of an armed few. A growing number of articles use the racial-justice protests of 2020 as paradigmatic scenes to argue that the Constitution gives special protection to armed citizens in a time of "lawless violence."[116] All citizens may act from fear, Professor Nelson Lund argues, but the Constitution privileges those who demonstrate the "virtue" and "courage" to arm in self-defense, rather than those who give in to "the urge to trade liberty for an illusion of safety" by relying on gun laws.[117] Such arguments make appeals to tradition. But as we now show, when the government regulates guns to preserve the peace and to protect citizens from weapons threats, it is exercising a traditional common law and constitutional authority that *Heller* itself recognizes.

## II.   GOVERNMENT'S CONSTITUTIONAL AND COMMON LAW AUTHORITY TO ENFORCE PUBLIC SAFETY

In what follows we offer a new account of government authority to enforce public safety under the Supreme Court's 2008 decision in *District of Columbia v. Heller*.[118] We do so in three steps. First, we show a longstanding common law tradition regulating weapons to protect public safety and not only to prevent physical harms. Second, we show that *Heller* incorporates this common law tradition in the portions of the decision that recognize government's power to regulate guns. Finally, we show how this reading of

---

[116] *See, e.g.*, Nelson Lund, *The Future of the Second Amendment in a Time of Lawless Violence*, 116 NW. U. L. REV. 81, 84 (2021) (arguing, *inter alia*, that the Second Amendment "plays a significant role in fostering the kind of civic virtue that resists the urge to rely on the government for one's well-being"); David E. Bernstein, *The Right to Armed Self-Defense in Light of Law Enforcement Abdication*, 19 GEO. J.L. & PUB. POL'Y 177, 180 (2021) ("[I]f law enforcement is unwilling or unable to preserve basic law and order, citizens will inevitably try to address the breach themselves, and it's desirable that law-abiding individuals be given the lawful means to do so."); Glenn Harlan Reynolds, *Riots of 2020 Have Given the Second Amendment a Boost*, USA TODAY (Oct. 8, 2020, 4:00 AM), https://www.usatoday.com/story/opinion/2020/10/08/riots-2020-have-given-boost-second-amendment-column/5901798002 [https://perma.cc/TYS3-DAUD] ("Riots over George Floyd predictably resulted in billions in property damage, but it might be a surprise that they have strengthened the argument for gun rights."); *see also Law Professors Make Case for Second Amendment Rights in Uncertain Times*, NRA-ILA (Oct. 19, 2020) https://www.nraila.org/articles/20201019/law-professors-make-case-for-second-amendment-rights-in-uncertain-times [https://perma.cc/TZE4-VEMX] ("[A] trio of law professors from the George Mason University Antonin Scalia School of Law have released articles that highlight the importance of the right to armed self-defense during tumultuous periods and explain how the history of the Second Amendment makes clear that it was intended to preserve this right under the present conditions.").

[117] Lund, *supra* note 116, at 83–84 (urging that in weighing the claims of democratic bodies to regulate, consideration should be given to the "broader and longer-term interest of the public in the preservation of a robust right to keep and bear arms," and that "judges should give no weight to unsubstantiated fears about the dangers supposedly posed by an armed populace").

[118] 554 U.S. 570 (2008).

163

NORTHWESTERN UNIVERSITY LAW REVIEW

*Heller* matters in the two prominent approaches judges employ to enforce the decision.

Regulating arms to protect public safety is a basic precept of sovereignty and of police power that has deep roots in the common law. In the Anglo-American tradition, governments have regulated guns to preserve public peace and public order, not only to prevent violence and save lives. This longstanding sovereign prerogative shaped weapons laws long before the Founding of our constitutional democracy and the writing of the Second Amendment. In England, the government regulated weapons to protect public order and community life, safeguarding the liberty and security of the polity through laws that prohibited armed members of the community from inflicting terror on others.[119] This legal tradition continued in the United States, through state laws that prohibited carrying weapons to the terror of the people.[120]

As we show, in *Heller*, the Supreme Court presented the Second Amendment as growing out of the Anglo-American common law. In the section of the opinion discussing government's authority to regulate weapons, *Heller* emphasized that the right to keep and bear arms is subject to "longstanding prohibitions,"[121] and looked to ancient common law traditions of weapon regulation for guidance,[122] even citing William Blackstone's discussion of weapons that are dangerous and unusual.[123] *Heller*'s analysis of "presumptively lawful" regulations[124] is not merely an enumeration of exceptions to the right, but rather an identification of the grounds for the government's regulatory authority—an authority that derives from the common law as it has evolved over the centuries, and in public-sphere regulatory contexts not at issue in *Heller* itself.

Two primary frameworks have been advanced for applying *Heller*. The first dominant approach focuses on the scope of the right and whether regulations that fall within that scope survive the requisite level of scrutiny. The primary alternative approach reasons directly from text, history, and tradition. In both of these frameworks, an accurate understanding of the government's regulatory interest is paramount—including its interest, under

---

[119] *See infra* notes 125–137 and accompanying text.

[120] *See infra* notes 157–166 and accompanying text.

[121] 554 U.S. at 626.

[122] *See id.* at 593–94.

[123] *See id.* at 627 (recognizing an "important limitation on the right to keep and carry arms" and observing that the "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" citing Blackstone's discussion of the Statute of Northampton).

[124] *See id.* at 627 n.26.

164