Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022**<br><br>**VOLUME 4 OF 13**<br><br>Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

## <u>INDEX</u>

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |
| **BOOKS** | | |
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, *U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020* (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |

**NEWS ARTICLES**

| | | |
|---|---|---|
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |

**OTHER SOURCES**

| | | |
|---|---|---|
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, *Defensive Gun Uses in the U.S.* (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

the common law tradition incorporated by *Heller*, to preserve public safety by preventing weapons from interfering with equal liberties of all citizens.

### A.   *Preserving the Peace: Historical Antecedents of Gun Regulation*

If heavily armed men had invaded the seat of government in England in 1328, the applicable law would have been straightforward: the Statute of Northampton provided that "no Man great nor small" except the King's own men should "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms."[125] But the Statute did more than protect the sovereign; it also provided that no one may bring "force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere."[126] The "fairs" and "markets" of fourteenth-century England were important sites of community life, meaning that the Statute had a significant reach in public places. Blackstone described the Statute as confirming a tradition as old as the "laws of Solon," under which "every Athenian was finable who walked about the city in armour."[127] He wrote that "riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."[128]

The "peace" that the law protected encompassed more than physical safety—to ride armed in fairs and markets was an offense to the crown itself (there being at the time no broader body politic).[129] And as Blackstone made clear, "terrifying the good people of the land"—not just attacking them— was itself "a crime against the public peace."[130] Or, as William Hawkins put it in 1716, "where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People," he commits "an Offence at Common Law" and violates "many Statutes."[131]

---

[125] 2 Edw. 3, ch. 3 (1328), *in* 1 THE STATUTES OF THE REALM 258.

[126] *Id.* For extensive discussion of the Statute's interpretation and application, see Young v. Hawaii, 992 F.3d 765, 786–93 (9th Cir. 2021) (en banc).

[127] 4 WILLIAM BLACKSTONE, COMMENTARIES *149. Notably, this discussion comes in Book 4, Chapter 11, of the *Commentaries*, which is titled "Of Offences Against the Public Peace."

[128] *Id.*; *see also* State v. Huntly, 25 N.C. 418, 420 (1843) (stating the Statute of Northampton does not create the offense, but merely recognizes a common law crime).

[129] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 26 (2017) ("Merely traveling with arms impugned the majesty of the crown . . . .").

[130] BLACKSTONE, *supra* note 127, at *149.

[131] 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1716). Some prominent authorities specifically connected this rule to the legal interests of the unarmed. *See, e.g.*, JOS. KEBLE, AN ASSISTANCE TO JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (London, W. Rawlins, S. Roycroft & Edward Atkins 1683) ("Yet may an Affray be, without word or blow given;

---

165

Some advocates of broad gun rights argue that the Statute of Northampton applied only to "unusual" circumstances [132] or (echoing Lambert's view of brandishing[133]) only those involving malicious intent.[134] Professor Saul Cornell, a scholar of the Founding Era, disputes claims that intent was required to make out a violation of the peace, pointing out that in this era of English history, proof of intent to harm was not an element of most crimes; instead, according to Blackstone and others, intent could be inferred from the illegal act itself.[135] Other Second Amendment scholars go further in arguing that the Statute of Northampton broadly prohibited public carrying.[136]

Disagreement about the historical record is commonplace in Second Amendment scholarship. What is critical to appreciate here is the ground of *agreement* about the historical record. Even those who read the Statute narrowly agree that *terror*, not just physical violence, could justify regulating the carrying of weapons.[137] Second Amendment advocate Stephen Halbrook recently concluded, "the right to bear arms does not include the carrying of dangerous and unusual weapons to the terror of one's fellow citizens."[138] Precisely what actions are terrifying may be a factual and contextual question

---

as if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike fear upon others that be not armed as he is; and therefore both the Statutes of Northampton . . . made against wearing Armour, do speak of it . . . .").

[132]  *See, e.g.*, Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (concluding that the Statute "cover[ed] only those circumstances where carrying of arms was unusual and therefore terrifying").

[133]  *See supra* note 78.

[134]  David B. Kopel, *The First Century of Right to Arms Litigation,* 14 GEO. J.L. & PUB. POL'Y 127, 135–39 (2016).

[135]  Cornell, *supra* note 129, at 22 & n.82 (illustrating the point with justice of the peace manuals); *see also* Young v. Hawaii, 992 F.3d 765, 793 (9th Cir. 2021) (en banc) ("According to Blackstone, going armed with dangerous or unusual weapons was all that was required to terrify the people of the land, and thus the law required neither proof of intent to terrify nor proof that actual terror resulted from the carrying of arms.").

[136]  *See, e.g.*, Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 8 (2012) ("A textual reading of the Statute supports a broad prohibition on the public carrying of arms to prevent public injury, crime, and breaches of the peace."); Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278, 1317–18 (2009) ("In eighteenth century common law tradition, therefore, the right to assemble in public did not include a right to assemble armed.").

[137]  *See, e.g.*, Stephen P. Halbrook, *Going Armed with Dangerous and Unusual Weapons to the Terror of the People: How the Common Law Distinguished the Peaceable Keeping and Bearing of Arms* 4–7 (2016) http://www.stephenhalbrook.com/law_review_articles/going_armed.pdf [https://perma.cc/8VT9-FY74] ("In sum, it was an offense under the Statute of Northampton to go or ride armed in a manner that creates an affray or terror to the subjects."); Kopel, *supra* note 134, at 135–36 ("Everyone in the case [of *Rex v. Knight*] agreed that the Statute of Northampton outlawed only carrying in a terrifying manner.").

[138]  Stephen P. Halbrook, *The Common Law and the Right of the People to Bear Arms: Carrying Firearms at the Founding and in the Early Republic*, 7 LINCOLN MEM'L U. L. REV. 100, 135 (2020).

166

with debatable answers, but the government interest in regulating weapons to prevent terror and preserve public order has ancient common law antecedents recognized by advocates on all sides of the modern gun debate.

American law embraced this concept, with a number of colonies adopting restrictions on public carry of firearms modeled on the Statute of Northampton. [139] Some states essentially copied Northampton's "to the terror" prohibition,[140] and "[l]egal commentators, both in popular justice of the peace manuals and learned treatises, treated the Statute of Northampton as a foundational principle for enforcing the peace." [141] A range of laws regulating the carrying of weapons were enacted to preserve peace and prevent terror. [142] Echoing the language of Northampton, a 1790s Massachusetts law gave justices of the peace the authority to arrest those who "shall ride or go armed offensively, to the fear or terror of the good citizens."[143]

Similar laws across the country permitted disarmament and the imposition of "sureties" (essentially bonds that had to be posted before the weapon was returned). For instance, an 1839 Wisconsin law imposed penalties "on complaint of any other person having reasonable cause to fear

---

[139] Young, 992 F.3d at 794 ("A number of colonies implemented restrictions on the carrying of arms similar to those found in the Statute of Northampton. Indeed, some colonies adopted the Statute of Northampton almost verbatim. The colonists shared the English concern that the mere presence of firearms in the public square presented a danger to the community."). *See generally* LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (2009) (discussing how localized law between 1787 and 1840 maintained "the peace"); Alfred L. Brophy, *"For the Preservation of the King's Peace and Justice": Community and English Law in Sussex County, Pennsylvania 1682-1696*, 40 AM. J. LEGAL HIST. 167, 167 (1996) (explaining the role of the civil court and William Penn's laws in creating harmony in one middle-Atlantic county in the late seventeenth century); *see also* Cornell, *supra* note 129, at 31–32 ("The offense was now one that harmed the body politic, not the King's Majesty.").

[140] Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 379–81 (2016); Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1719 (2016).

[141] Cornell, *supra* note 129, at 19.

[142] These and other examples are collected and discussed in Eric M. Ruben, *Justifying Perceptions in First and Second Amendment Doctrine*, 80 LAW & CONTEMP. PROBS. 149, 167–69 (2017), which similarly explores the government's power to regulate guns in the interests of perceived safety.

[143] 1795 Mass. Acts 436; *see also* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121, 129 (2015).

NORTHWESTERN UNIVERSITY LAW REVIEW

an injury *or* breach of the peace."[144] The disjunctive is crucial: the law could act prophylactically to prevent both injuries *and* breaches of the peace.[145]

Justices of the peace, sheriffs, and constables had a variety of legal tools at their disposal for enforcing the peace, including the common law crime of affray[146] or the imposition of a surety, which could include having a person disarmed and placed under a peace bond.[147] The power to impose such sureties traces back at least as far as Northampton[148] and was specifically designed to promote and protect freedom from fear. Michael Dalton's *The Countrey Justice* (1618)—an account of English common law that was popular in England and the colonies[149]—noted that "both 'the peace' and 'the good behaviour' could be infringed by the attendance of an extraordinary

---

[144] Prevention of Crime, ch. 144, § 18, *reprinted in* THE REVISED STATUTES OF THE STATE OF WISCONSIN 717, 719 (1849) (emphasis added). Near-identical language appears in various other contemporaneous statutes. ME. REV. STAT. ch. 169, § 16, *reprinted in* THE REVISED STATUTES OF THE STATE OF MAINE 707, 709 (1841) (omitting "reasonable" requirement); Proceedings to Prevent Crimes, ch. 112, § 18, *reprinted in* THE REVISED STATUTES OF THE TERRITORY OF MINNESOTA 526, 528 (1851); Proceedings to Detect the Commission of Crimes, § 6 (1861), *reprinted in* A DIGEST OF THE LAWS OF PENNSYLVANIA 248, 250 (John Purdon comp., 1862) (omitting "fear of injury").

[145] The *exceptions* in those statutes, meanwhile—the situations in which gun use was legally authorized—were linked to physical harm, applying only to persons having "reasonable cause to fear an assault or other injury, or violence to his person, or to his family, or property." *Supra* note 144 and the sources cited therein (nearly identical phrasings). This suggests that while guns' capacity to inflict physical harm cuts in favor both of their use (for self-defense) and their regulation (to save bodies), their capacity to terrify others—to infringe the peace—cuts in favor of regulation alone.

[146] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 501 (2004) ("Under common law, justices of the peace, sheriffs, and constables were empowered to disarm individuals who rode about armed in terror of the peace. Defining exactly what circumstances constituted the crime of affray was precisely the kind of complex, context-bound judgment that defined common law jurisprudence."). In a televised interview after *Heller*, Justice Scalia similarly pointed to tort and criminal rules:

What the opinion in *Heller* said is that it will have to be decided in future cases what limitation[s] on the right to keep and bear arms are permiss[i]ble. Some undoubtedly are because there were some that were acknowledged at the time. For example, there was a tort called "afrighting," which if you carried around a really horrible weapon, just to scare people, like a head axe or something, that was, I believe, a misdemeanor. So yes, there are some limitations that can be imposed.

Maggie's Notebook, *Scalia: Full Transcript Video with Chris Wallace: Rocket Launchers, Privacy, Arizona Illegals*, FREE REPUBLIC (July 30, 2012), https://freerepublic.com/focus/f-bloggers/2912502/posts [https://perma.cc/7H23-7QD7].

[147] STEVE HINDLE, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND, 1550–1640, at 99 (2000) (discussing sureties).

[148] David Feldman, *The King's Peace, The Royal Prerogative and Public Order: The Roots and Early Development of Binding Over Powers*, 47 CAMBRIDGE L.J. 101, 102, 118 (1988) (noting that "the Keepers of the Peace in London were taking sureties of the peace as early as 1281, without explicit authority from either statute or their commissions of appointment," and that by 1361 this power encompassed "sureties for good behaviour").

[149] *The Countrey Justice: Containing the Practice of the Justices of the Peace as Well in and out of Their Sessions*, W&M L. LIBR. WYTHEPEDIA https://lawlibrary.wm.edu/wythepedia/index.php/Countrey_Justice [https://perma.cc/ZD4J-PF8L].

168

*When Guns Threaten the Public Sphere*

number of people; by carrying arms; by issuing threats tending to the breach of the peace; or by any activity which 'put the people in dread or fear.'"[150] Armed groups unauthorized by law were considered riots and punishable as such.[151]

   The common law tradition grew across continents and centuries, evolving with the legal systems of which it was a part.[152] Reasoning within this tradition, states recognized the broad authority of the government to prohibit guns in what *Heller* would eventually call "sensitive places."[153] Even some jurisdictions that generally permit public carry have excluded such activities at locations like polling places,[154] protecting them as what the Supreme Court has called in the First Amendment context "an island of calm in which voters can peacefully contemplate their choices."[155] Such regulation is about more than physical safety, as the Georgia supreme court wrote in an 1874 decision: "The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee."[156]

   This common law tradition concerned with preserving the peace and public order is also expressed in the broadly enacted and historically

---

   [150] HINDLE, *supra* note 147, at 100. Then-Judge Amy Coney Barrett has recounted ways that the Statute of Northampton and longstanding common law traditions authorized governments to "disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." Kanter v. Barr, 919 F.3d 437, 454, 456–58 (7th Cir. 2019) (Barrett, J., dissenting).

   [151] *See generally* Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. ILL. U. L.J. 61, 77 (2018) ("The court made clear that weapon possession could turn a lawful assembly into a riot, without other threatening conduct.").

   [152] Young v. Hawaii, 992 F.3d 765, 849 (9th Cir. 2021) (en banc) (O'Scannlain, J., dissenting) (concluding that the right to carry weapons publicly did not include a right to "do so in a way that would 'terrorize' . . . fellow citizens or intrude upon particularly sensitive places like churches or schools").

   [153] District of Columbia v. Heller, 554 U.S. 570, 626–27 (2008); *see infra* notes 175–176 and accompanying text.

   [154] *See* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 472–75 (2019) (describing the "history of keeping order [by] curtailing weapons in polling places and during elections"). States like Arizona, Georgia, Louisiana, and Texas have permissive public carry rules but prohibit guns at polling places. Reid J. Epstein, *It's Legal to Bring Guns to Polling Places in Five Battleground States, a New Study Says*, N.Y. TIMES (Sept. 23, 2020), https://www.nytimes.com/2020/09/23/us/elections/its-legal-to-bring-guns-to-polling-places-in-five-battleground-states-a-new-study-says.html [https://perma.cc/UJP6-MHD8].

   [155] Minnesota Voters All. v. Mansky, 138 S. Ct. 1876, 1887 (2018). In *Mansky*, Chief Justice Roberts's majority opinion specifically recognized the preservation of the "island of calm" as a state interest for purposes of scrutiny. *Id.*

   [156] Hill v. State, 53 Ga. 472, 475 (1874).

N O R T H W E S T E R N   U N I V E R S I T Y   L A W   R E V I E W

longstanding rules against brandishing weapons.[157] While the laws are too numerous to fully canvass here,[158] it is clear that the law of brandishing was designed to preserve the peace and protect citizens from terror and intimidation in public places. Mississippi's 1840 law is representative:

> If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self defence, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.[159]

Over the next few decades, states and territories across the country adopted laws with nearly identical core language.[160] Some used different words to describe the prohibited action, with "draw" and "exhibit" being among the most common;[161] roughly half had a specific exemption for self-

---

[157] *See* Robert J. Spitzer, *Why Are People Bringing Guns to Anti-Quarantine Protests? To Be Intimidating.*, WASH. POST (Apr. 27, 2020, 7:30 AM), https://www.washingtonpost.com/outlook/2020/04/27/why-are-people-bringing-guns-anti-quarantine-protests-be-intimidating/ [https://perma.cc/4HVH-EF8W] (cataloguing historical examples of historical rules against brandishing).

[158] The Duke Center for Firearms Law's Repository of Historical Gun Laws includes fifty-one brandishing laws adopted by twenty-seven states before 1934. *Repository of Historical Gun Laws*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/repository/search-the-repository/ [https://perma.cc/9SJW-MBUN]. For scholarly discussion, see ROBERT J. SPITZER, GUNS ACROSS AMERICA: RECONCILING GUN RULES AND RIGHTS 185–86 (2015) (listing twenty-seven state brandishing laws whose passages range from 1786 to 1909), and Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 63 (2017) (describing early American brandishing laws).

[159] VOLNEY ERSKINE HOWARD, THE STATUTES OF THE STATE OF MISSISSIPPI OF A PUBLIC AND GENERAL NATURE 676 (New Orleans, E. Johns & Co. Stationers' Hall 1840).

[160] For examples of state and territory laws with similar language to Mississippi's 1840 law, see 1864 Idaho Sess. Laws 304; 1873 Nev. Stat. 118; 1897 Fla. Laws 59; COLES BASHFORD, THE COMPILED LAWS OF THE TERRITORY OF ARIZONA 96 (Albany, Weed, Parsons & Co. 1871); WILLIAM H.R. WOOD, DIGEST OF THE LAWS OF CALIFORNIA: CONTAINING ALL LAWS OF A GENERAL CHARACTER 334 (San Francisco, S.D. Valentine & Son 1857).

[161] Of the laws surveyed, we found that twenty-three used the term "draw." *E.g.*, 1867 Ariz. Sess. Laws 21–22; 1868 Ark. Acts 218; CONN. GEN. STAT. § 53-206(c) (2019); 1864 Idaho Sess. Laws 304; 1875 Ind. Acts 62; 1885 Mont. Laws 74; 1873 Nev. Stat. 118; UTAH CODE ANN. § 76-10-506 (West 2020); BASHFORD, *supra* note 160 at 96 (Arizona); DORSET CARTER, ANNOTATED STATUTES OF THE INDIAN TERRITORY 228 (1899) (Oklahoma); JOHN K. DAVIS, THE CODE OF THE CITY OF CEDARTOWN 73 (1900) (Georgia); ALBERT R HEILIG, ORDINANCES OF THE CITY OF TACOMA, WASHINGTON 334 (1892); BRUCE L. KEENAN, BOOK OF ORDINANCES OF THE CITY OF WICHITA 45 (1900) (Kansas); JOSIAH A. VAN ORSDEL, REVISED STATUTES OF WYOMING 1252–53 (1899); WOOD, *supra* note 160 at 334.

Another twenty-one used the word "exhibit." *E.g.*, 1867 Ariz. Sess. Laws 21–22; CONN. GEN. STAT. § 53-20(c) (2019); 1897 Fla. Laws 59; 1864 Idaho Sess. Laws 304; MO. REV. STAT. § 571.030 (2020); 1885 Mont. Laws 74; 1873 Nev. Stat. 118; UTAH CODE ANN. § 76-10-506 (West 2020); 1854 Wash. Sess. Laws 80; 1884 Wyo. Sess. Laws 114; 2 WILLIAM LAIR HILL, BALLINGER'S ANNOTATED CODES AND STATUTES OF WASHINGTON 1956 (1897); HOWARD, *supra* note 159 at 676.

170

*When Guns Threaten the Public Sphere*

defense.[162] But all these laws concerned the ways in which guns were displayed, not merely the ways they were fired.

Although modern gun-rights advocates have sought to limit the reach of gun laws by amending them to include strict *mens rea* requirements,[163] the language of these historical statutes was generally keyed to the display itself rather than the mental state of the gun carrier. For instance, Mississippi's 1840 law criminalized brandishing a weapon in a "rude, angry and threatening manner," focusing on the manner of the weapon wielding rather than the intent of the carrier.[164] Meanwhile, some state statutes specifically provided that brandishing be punishable whether done "with or without malice."[165] Such brandishing laws, and their contemporary descendants (which include prohibitions on menacing and assault[166]), further confirm government's longstanding authority to protect the public from threatened as well as actual injury.

This account shows how a body of common law that regulated arms in the service of preserving peace and preventing intimidation could evolve over time to include laws that restricted certain types of weapons, the modes in which persons carry weapons, and the locations in which weapons could be carried. As the Georgia supreme court declared in the 1874 decision cited above: "The preservation of the public peace, and the protection of the

---

[162] *See* 1867 Ariz. Sess. Laws 21-22; 1868 Ark. Acts 218; CONN. GEN. STAT. § 53-206(c) (2019); 1897 Fla. Laws 59; 1880 Ga. Laws 151; 1864 Idaho Sess. Laws 304; 1875 Ind. Acts 62; 1885 Mont. Laws 74; 1873 Nev. Stat. 118; N.H. REV. STAT. Ann. § 631:4 (2019); 1886 N.M. Laws 56; 1893 Or. Laws 29–30; VT. STAT. ANN. tit. 13, § 4011 (2019); 1884 Wyo. Sess. Laws 114; CARTER, *supra* note 161 at 228; HOWARD, *supra* note 159 at 676; WOOD, *supra* note 160 at 334.

[163] *See supra* notes 104–106 and accompanying text.

[164] HOWARD, *supra* note 159 at 676.

[165] *See, e.g.*, 1883 Ind. Acts 1712 ("[I]t shall be unlawful for any person over the age of ten years, with or without malice, purposely to point or aim any pistol, gun, revolver, or other firearm, either loaded or empty, at or toward any other person, and any person so offending shall be guilty of an unlawful act, and upon conviction shall be fined in any sum not less than five hundred dollars."); 1931 Mich. Pub. Acts 670 ("Any person who shall intentionally, without malice, point or aim any fire-arm at or toward any other person, shall be guilty of a misdemeanor."); 1925 Or. Laws 172–73 ("It shall be unlawful for any person over the age of twelve years, with or without malice, purposely to point or aim any pistol, gun, revolver or other firearm, within range of said firearm, either loaded or empty, at or toward any other person, except in self defense . . . .").

[166] Blocher et al., *supra* note 93, at 111–17 (providing a brief overview of applicable rules). Notably, many of the contemporary versions of these laws do not require an intent to threaten. *See, e.g.*, United States v. Anthony, 401 F. Supp. 3d 720, 731 (W.D. Va. 2019) ("[T]he Virginia brandishing statute makes it unlawful to engage in a display of a firearm in a manner so as to reasonably induce fear in another, and does not require proof of an intent to threaten or cause harm to another . . . ."), *vacated on other grounds sub nom.* United States v. Keene, 955 F.3d 391 (4th Cir. 2020); State v. Bartolon, 495 P.2d 772, 777 (Or. Ct. App. 1972) ("[T]he offense is in the act of purposely pointing the gun, regardless of what the intention of the one doing the pointing may thereafter be. A person may, with a mistaken sense of humor, purposely point a gun at another and have no 'guilty intent' at all, but yet violate ORS 163.320 (now ORS 166.190).").

people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties."[167] The Georgia court recognized the "preservation of public peace" and the "protection of the people against violence" as two important duties of the legislature and emphasized the right to bear arms was to be interpreted in light of the government's ancient power and responsibility to regulate weapons.[168]

The sovereign imperative to regulate weapons in the name of public peace and public order is an ancient one, even as the prerogative—and the harms that the display of weapons can inflict—evolves with the structure of society itself.[169] Today, the government's authority to regulate weapons to promote public safety is rooted in democratic will and flows from the police power, or federal sources of power such as Congress's authority to regulate commerce and to enforce the guarantees of the Fourteenth Amendment.[170]

As we now show, the Supreme Court reasoned from this ancient and evolving common law tradition when it affirmed and described the scope of government's authority to regulate weapons in *Heller*.

### B. Heller

In 2008, *Heller* recognized a constitutional right of "law-abiding citizens"[171] to keep and bear arms for certain private purposes, defining the "core" of the Second Amendment as self-defense[172] and noting that "the home [is] where the need for defense of self, family, and property is most acute."[173] "Whatever else it leaves to future evaluation," the majority went on, the Second Amendment "surely elevates above all other interests the

---

[167] Hill v. State, 53 Ga. 472, 476–77 (1874).

[168] *Id.* at 477.

[169] *Cf.* Cornell, *supra* note 129, at 14 (observing that "[t]he American Revolution republicanized the concept of the King's Peace by transmuting it into the people's peace" and tracing the spread of English common law arms restrictions through justice of the peace manuals in the United States).

[170] *See* U.S. CONST. art. I, § 8, cl. 3; U.S. CONST. amend. XIV, § 5. *See generally* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW & REGULATION IN NINETEENTH-CENTURY AMERICA (1996) (demonstrating the pervasive history of government regulation in many different areas of American political, economic, and social life).

[171] District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

[172] *Id.* at 630; *id.* at 599 ("central component").

[173] *Id.* at 628 (noting that the D.C. handgun law "extends . . . to the home, where the need for defense of self, family, and property is most acute"). The Court repeatedly invoked the "home," often connecting it to that self-defense interest, *see id.* at 573, 575–77, 615–16, and indeed the first sentence of the opinion says the case is about the home, *id.* at 573 ("We consider whether a District of Columbia prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution.").

172

right of law-abiding, responsible citizens to use arms in defense of hearth and home."[174]

*Heller* depicted this "pre-existing" right as growing out of English common law traditions[175] and recognized government's authority to regulate weapons as growing out of this same tradition. Because few have examined the latter point—*Heller*'s derivation of government's authority to regulate weapons from the common law—we pause to examine these portions of the majority opinion.

In part III of *Heller*, Justice Scalia addressed the ways that government can regulate the right to bear arms, emphasizing that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[176] In this portion of the opinion, Justice Scalia prominently relied on Blackstone's account of the Statute of Northampton as support for government's authority to ban "dangerous and unusual weapons."[177] Recall that, in discussing the Statute of Northampton, Blackstone explained "*riding or going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."[178]

In relying on the Statute of Northampton as precedent for government's authority to restrict the right to bear arms, *Heller* affirmed a body of law recognizing that government has an ancient prerogative to regulate guns, not only to prevent injury but also to preserve the "public peace" and to restrict use of arms that would "terrify[] the good people of the land."[179] Other sources cited by Justice Scalia in this same passage of *Heller* make clear that the common law restricted the use of arms that inflicted terror, and not

---

[174] *Id.* at 635. For further discussion of the constitutionality of regulating arms in the home, see *infra* note 180 and accompanying text.

[175] Justice Scalia discussed how the right to bear arms grew out of English law so that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects," citing "Blackstone, whose works, we have said 'constituted the preeminent authority on English law for the founding generation,'" and who "cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen." *Heller*, 554 U.S. at 592–94 (quoting Alden v. Maine, 527 U.S. 706, 715 (1999)).

[176] *Id.* at 626.

[177] *See id.* at 627 ("We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" (quoting BLACKSTONE, *supra* note 127, at *148–49)).

[178] BLACKSTONE, *supra* note 127, at *149.

[179] *Id.*

173

merely physical injury.[180] These passages of *Heller*, and the authorities that Justice Scalia cites, give historical, common law, and constitutional warrant to government's public safety interest in enacting laws that restrict the right to bear arms in order to protect the public from weapons threats.[181]

*Heller* prominently relies on the Statute of Northampton in explaining government's authority to regulate the right the decision recognizes. The reasoning of these passages of the opinion makes clear that government has authority to regulate weapons to prevent threats, terror, and harm to public order, as well as to prevent physical injury. But the source of government's authority to regulate gun rights is not limited to the Statute of Northampton or its immediate American analogues.[182] Justice Scalia explains government's authority to regulate arms by invoking these ancient sources, as well as other laws that protected persons and activities from weapons threats in new ways. Part III of the *Heller* opinion not only appealed to an English common law tradition banning weapons that terrorize the public; the decision also sanctioned laws subsequently enacted in the United States banning weapons in "sensitive places"[183]—places where important social activities occur.[184] Drawing on a common law tradition spanning continents and centuries, Justice Scalia emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions" like those "forbidding

---

[180] Several sources to which Justice Scalia cites immediately after Blackstone repeatedly authorize the regulation of weapons to prevent conduct that would terrify the people and emphasize that no actual violence need be shown. *See, e.g.*, ELLIS LEWIS, AN ABRIDGMENT OF THE CRIMINAL LAW OF THE UNITED STATES 64 (Philadelphia, Thomas, Cowperthwait & Co. 1847) ("[W]here persons openly arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, an affray may be committed without actual violence."); 1 WILLIAM OLDNALL RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (Philadelphia, P.B. Nicklin & T. Johnson 1831) ("[I]t seems certain that in some cases there may be an affray where there is no actual violence; as where persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people . . . ."); FRANCIS WHARTON, TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 727 (2d ed. 1852) ("It has been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law."); 3 BIRD WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON, L.L.D. 79 (Philadelphia, Lorenzo Press 1804) ("In some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people.").

[181] *See* Sandra Day O'Connor, *Testing Government Action: The Promise of Federalism*, *in* PUBLIC VALUES IN CONSTITUTIONAL LAW 35, 36 (Stephen E. Gottlieb ed., 1993) ("History can illuminate the nature and strength of a state interest and also may suggest the degree of 'fit' between a challenged regulation and its objective.").

[182] *See supra* notes 139–151 and accompanying text.

[183] *Heller*, 554 U.S. at 626.

[184] *See supra* text accompanying notes 153–156.

174

*When Guns Threaten the Public Sphere*

the carrying of firearms in sensitive places such as schools and government buildings."[185]

*Heller*'s understanding of government's authority to regulate weapons is deeply historical, yet practical, and responsive to functional needs that evolve in history. Part III of the *Heller* opinion recognizes that government has authority to regulate weapons in the interests of preventing threats as well as physical injury, that the threats weapons pose to public life have evolved in history, and that government has the constitutional authority to respond to these threats by regulating weapons in the interests of public safety. As Chief Justice John Roberts put it at oral argument in *Heller*, "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well."[186] By invoking the Statute of Northampton as authority for regulating weapons and by reaffirming the constitutionality of laws forbidding the carrying of firearms in sensitive places, *Heller* aligned itself with those aspects of Anglo-American common law that recognize the power of governments to regulate weapons so as to prevent terror and preserve the peace—a power that applies equally to medieval "fairs and markets" and to modern polling places unknown in Blackstone's time.

The events in Michigan in 2020 and at the U.S. Capitol in 2021 vividly illustrate the logic and stakes of this tradition, which is rooted in both our Constitution and our common law. At stake in these location- or function-based restrictions on the right to bear arms is society's own "self-defense"—its determination to protect against disruption, intimidation, or other injury to the relationships and activities that are critical to the survival and health of the social order as a whole.

In short, the discussion of "sensitive places" in part III of the *Heller* opinion is not an exception to an otherwise absolute constitutional right to bear arms. To the contrary, the discussion of "sensitive places" is an expression of the common law tradition on which the opinion as a whole draws. In these portions of the opinion, *Heller* affirms and incorporates the ancient common law tradition which, transplanted to America, developed in the law of the several states which authorized government to protect citizens' liberties against weapons threats and to preserve public peace and order.[187]

---

[185]  *Heller*, 554 U.S. at 626.

[186]  Transcript of Oral Argument at 77, *Heller*, 554 U.S. 570 (No. 07-290); *see also* Kanter v. Barr, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting) (quoting this passage).

[187]  Transplanted from England to the United States, this sovereign power to regulate weapons assumed democratic form. Its sources are rooted outside the Second Amendment in state police power, and in various sources of federal constitutional authority, including the Commerce Clause, the Spending Clause, and the power to enforce the Reconstruction Amendments.

NORTHWESTERN UNIVERSITY LAW REVIEW

Consistent with this tradition, *Heller* reaffirmed the Court's holding in *Presser v. Illinois* that the Second Amendment does not prevent the prohibition of private paramilitary organizations.[188]

Thus, in the same opinion that recognized the Second Amendment right to bear arms in self-defense, the Court explained that that right was to be interpreted in light of government's "longstanding" power to restrict the use of weapons to intimidate or otherwise unlawfully dominate members of the community. That governmental interest in regulation supports restrictions on the use of weapons that threaten valued civic activities—which we believe includes the activities and relationships of family life—whether that threat occurs inside or outside the home.[189] In these ways, *Heller* affirms that a constitutional democracy has authority to regulate guns to promote public safety and to protect against weapons threats which it can exercise to protect valued civic activities and the ability of all citizens to live free of terror and intimidation.

### C.  *Applying* Heller

Having shown how *Heller* recognizes the government's interest in public safety, we now demonstrate how this understanding of public safety matters in applying *Heller.*

We observe, first, that an understanding of the common law tradition of regulating weapons that Justice Scalia discusses in part III of *Heller* will be especially important in applying *Heller* to cases involving regulations of weapons employed outside the home, including the licensing of public carry.[190] Because the *Heller* decision involved the use of handguns for self-defense in the home, the Court in *Heller* did not have the occasion to address in any detail the externalities of gun use in the public sphere, nor to discuss how gun use can be coordinated with liberties and activities of other law-abiding citizens. The common law traditions of regulating guns Justice

---

[188] *Heller*, 554 U.S. at 620 (citing Presser v. Illinois, 116 U.S. 252, 264–65 (1886)).

[189] *Heller's* account of self-defense in the home presupposed that the head of household was himself law-abiding. *See id.* at 628, 635 (observing that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). For a critique of the opinion's gendered (and raced) presuppositions, see Liebell, *supra* note 5, at 207.

[190] *See, e.g.*, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. Apr. 26, 2021), https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-843.html [https://perma.cc/V2JA-ME2E] (granting certiorari on the question of whether New York's denial of "applications for concealed-carry licenses for self-defense violated the Second Amendment."); Young v. Hawaii, 992 F.3d 765 (9th Cir. 2021) (en banc) (dismissing challenge to state law requiring license for open carry of firearms); *id.* at 794 ("A number of colonies implemented restrictions on the carrying of arms similar to those found in the Statute of Northampton. Indeed, some colonies adopted the Statute of Northampton almost verbatim. The colonists shared the English concern that the mere presence of firearms in the public square presented a danger to the community.").

176

Scalia approvingly invokes in part III of *Heller* do, however. As we have seen, in England and in the United States, weapons employed in public were subject to many forms of regulation designed to protect valued activities and law-abiding persons (whether armed or unarmed) from threat and intimidation. [191] In recognizing the right of armed self-defense, *Heller* approvingly discussed these longstanding traditions of regulating weapons, some of which took root before the birth of our constitutional democracy and others of which grew up as a part of it.

We observe, second, that an understanding of the common law tradition of regulating weapons discussed in part III of *Heller* is important in enforcing the decision, whether a court implements the decision through the currently dominant two-part framework, or through the emerging "text, history, and tradition" alternative favored by some conservative judges.

So far, the dominant doctrinal framework for enforcing the right recognized in *Heller* is a two-part approach endorsed throughout the federal courts of appeals. [192] The first part of that framework asks whether the challenged regulation impacts arms, [193] people, [194] or activities [195] covered by the Second Amendment. For those that do, courts move on to some kind of means–ends scrutiny, the stringency of which typically depends on how close the law comes to the Amendment's "core" and "central component" of self-defense. [196] The public interest in regulation is most easily legible in the second part of the framework, when judges ask whether a particular

---

[191]  *See supra* Section I.A.

[192]  *See* Gould v. Morgan, 907 F.3d 659, 668 (1st Cir. 2018); N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 254 (2d Cir. 2015); United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194 (5th Cir. 2012); Ezell v. City of Chicago, 651 F.3d 684, 703–04 (7th Cir. 2011); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir. 2010); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010).

[193]  *See Heller*, 554 U.S. at 627 (excluding "dangerous and unusual" weapons from constitutional coverage).

[194]  *Id.* at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . .").

[195]  *Id.* at 610–14; *see also* Peruta v. County of San Diego, 824 F.3d 919, 939 (9th Cir. 2016) (en banc) ("We therefore conclude that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public.").

[196]  *See, e.g.*, Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify."); *see also* Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. REV. 63, 64–69 (2020) (noting that, despite the identification of self-defense as the "core" interest of the right to keep and bear arms, Second Amendment doctrine has done little to incorporate self-defense principles such as necessity and proportionality, which are designed to steer confrontations away from life-threatening violence).

N O R T H W E S T E R N   U N I V E R S I T Y   L A W   R E V I E W

regulation is appropriately tailored to serve a sufficiently important governmental interest.[197]

But in applying the two-part approach, courts need to determine whether a law is appropriately tailored to achieve some government end, and the critical question then becomes how courts understand the government's interest in regulating guns. Do courts view the government's interest as preventing physical injury only—or do judges recognize government's ancient role in regulating weapons to prevent terror and preserve peace? This, of course, was the form of authority exercised by the Statute of Northampton and the many laws modeled on it in American colonies and states, and it is the form of authority exercised by state laws that restrict how and where gun owners can carry weapons.[198] As we have shown, Justice Scalia's discussion of the government's authority to regulate weapons references many of these laws, which offer historical antecedents for restricting weapons that threaten public safety and the security of rights exercised in sensitive places.

And yet few judges have examined the historical roots of the public safety interest that the Supreme Court recognized in *Heller*. As we demonstrate in Part III of this Essay, courts are likely to ask the wrong questions and demand the wrong types of evidence if they only recognize the government interest in protecting individuals from physical injury and fail to recognize the government interest in securing public safety as protecting both the individual's and society's ability to engage in valued activities—from child-rearing to education, commerce, worship, voting, and governing—free from weapons threats and intimidation.

Some prominent conservative judges and Justices have argued that the two-part framework should be jettisoned in favor of a test that would evaluate the constitutionality of gun laws based *solely* on text, history, and tradition[199]—an argument often traced to a dissenting opinion by then-Judge Brett Kavanaugh,[200] and applied in various forms by others, including then-Judge Amy Coney Barrett.[201] Judge Kavanaugh recognized that historical sources will not always speak directly to a modern question, in which case

---

[197]  For examples of courts focusing on the governmental interest in preventing physical harm—and the pitfalls of that focus—see *infra* notes 220–231 and accompanying text.

[198]  *See supra* Section II.A.

[199]  *See* Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852, 893–907 (2013).

[200]  *Heller II*, 670 F.3d at 1276 (Kavanaugh, J., dissenting).

[201]  Kanter v. Barr, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting).

178

one must reason by analogy[202]—identifying "principles" that are relevantly similar in the two time periods: "The constitutional principles do not change (absent amendment), but the relevant principles must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers."[203]

In *Kanter v. Barr*, Judge Barrett reasoned from the common law tradition that Justice Scalia invoked in *Heller* and concluded that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety."[204] Judge Barrett looked beyond the specific subjects of historical gun laws to identify the underlying function of the regulations, concluding that "[t]here is no question that the interest identified by the governments and supported by history—keeping guns out of the hands of those who are likely to misuse them—is very strong."[205] Judge Barrett was undoubtedly correct to emphasize that ancient practices can be expected to evolve in form, and that English common law regulations of weapons "appeared in the American colonies, adapted to the fears and threats of that time and place."[206]

In this Essay and in other work, we draw on history in interpreting the Second Amendment without employing originalist methods, including the method of historical analogies.[207] That said, we understand the history we have reviewed to be of consequence to interpreters who employ very different methods. Those who interpret the Amendment through originalist methods must reckon with the common law history of regulating weapons to preserve the peace and prevent terror—the history Justice Scalia invokes in *Heller* when reasoning about the government's prerogative to enact laws that

---

[202] *Heller II*, 670 F.3d at 1275 (Kavanaugh, J., dissenting); *see also* United States v. Skoein, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) ("[A]lthough the Justices have not established that any particular statute is valid, we do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791.").

[203] *Heller II*, 670 F.3d at 1275 (Kavanaugh, J., dissenting).

[204] 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).

[205] *Id.* at 465.

[206] *Id.* at 457.

[207] Each of us looks to history for guidance in interpreting the Constitution, without endorsing originalist methods as a preferred framework, and each of us has raised questions about the ways that originalist methods function in the Second Amendment context. *See* Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191, 194 (2008) (showing through extensive historical analysis how the self-defense understanding of the Second Amendment in *Heller* grew out of twentieth-century law-and-order politics). For a brief arguing against adoption of the historical test as the sole means of Second Amendment analysis, see Brief of Second Amendment Law Professors at 7, N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525 (2020) (No. 18-280), 2019 WL 2173981, at *7–8 (brief coauthored by Joseph Blocher, Darrell A.H. Miller, and Eric Ruben).