ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022**<br><br>**VOLUME 5 OF 13**<br><br>Courtroom:     5A<br>Judge:         Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

# INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |
| **BOOKS** | | |
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

4

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, *U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020* (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, *Defensive Gun Uses in the U.S.* (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

restrict guns.[208] Consulting this history, judges endeavoring to apply a strictly historical approach to *Heller* would find a "constitutional principle" that government can regulate weapons for reasons that go beyond saving lives—they would find support for the constitutional principle that government can regulate weapons to prevent armed members of the polity from terrorizing or dominating others.[209]

Constitutional interpreters who do not understand the Second Amendment's meaning as fixed at the Founding or at the Fourteenth Amendment's ratification would find a history and tradition of regulating weapons that has continued to develop under state police power and under federal law. Not surprisingly, on this view, the understanding of the public safety interest in regulating weapons is dynamic, has evolved with our constitutional democracy, and continues to evolve with changing understandings of equal membership on the basis of sex and race. Indeed, judges committed to preserving original understandings are quick to emphasize that changing views of race are relevant to the interpretation of the Second Amendment—not only to our understanding of gun rights, but also to the state's authority to regulate the right to keep and bear arms under the Second Amendment.[210]

In the final Part, we explore how arguments about the government's public safety interest in regulating weapons—and an alternative account of the government's authority limited to protecting persons from physical injury—have manifested both inside and outside of courts.

## III. Protecting Public Safety Inside and Outside the Courts

The modern gun debate focuses overwhelmingly on the staggering number of Americans wounded and killed by guns, without fully attending

---

[208] *See supra* notes 175–180 and accompanying text. Unfortunately, advocates of the text, history, and tradition approach regularly minimize the breadth of the relevant history and tradition. *Compare* Mai v. United States, 974 F.3d 1082, 1084 (9th Cir. 2020) (Bumatay, J., dissenting from the denial of rehearing en banc) ("When the Second Amendment was ratified, times were different. Firearms were ubiquitous and their regulation was sparse."), *with Repository of Historical Gun Laws*, Duke Ctr. for Firearms L., https://firearmslaw.duke.edu/repository/search-the-repository/ [https://perma.cc/WH2Q-RARD] (providing text of more than 200 gun regulations prior to 1800, and—illustrating the broader "tradition"—1,635 such laws prior to 1936).

[209] A constitutional interpreter would need to apply that principle with attention to changing forms of community "unknown to the Constitution's Framers" that endow some members of the polity (women, racial minorities) with freedom, status, and voice they lacked at the Founding. For these reasons, regulation of weapons preventing terror and securing the peace would recognize that members of the community have freedoms in a constitutional democracy that they did not in the era of Blackstone as well as equal standing to assert them that those charged with enforcing gun laws can and should protect.

[210] *See, e.g., Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting) (observing that "[i]t should go without saying that [historic] race-based exclusions [from the right to bear arms] would be unconstitutional today").

to the literally uncounted number of people traumatized by those shootings and the risks to community and harms they present. Consider that some efforts to count school shooting "victims" tally only students shot or killed,[211] rather than those harmed by the *threat* of violence: the millions every year who must endure active-shooter drills (which themselves can be terrifying events),[212] or the fact that children exposed to gun violence have psychological difficulties and perform worse in school.[213] A recent Pew survey reports that "[o]verall, roughly one-in-four Americans (23%) say someone has used a gun to threaten or intimidate them or their family"; this includes a third of Black Americans (32%).[214]

Just as the government has historically had the power to protect people from weapons threats in "fairs" and "markets," as we have described in Part II, government today can enact laws in response to modern weapons threats, so vividly recounted in story-telling briefs that are starting to appear in litigation.[215] Our conception of public safety makes these harms legally

[211] *See, e.g.*, *10 Years. 180 School Shootings. 356 Victims.*, CNN (2019), https://www.cnn.com/interactive/2019/07/us/ten-years-of-school-shootings-trnd/ [https://perma.cc/2R7D-9VCL].

[212] Nona Willis Aronowitz, *Fake Blood and Blanks: Schools Stage Active Shooter Drills*, NBC NEWS (Feb. 14, 2014, 3:48 AM), https://www.nbcnews.com/news/us-news/fake-blood-blanks-stage-active-shooter-drills-n28481 [https://perma.cc/N4NU-MZDT].

[213] Marco Ghiani, Summer Sherburne Hawkins & Christopher F. Baum, *Gun Laws and School Safety*, 73 EPIDEMIOLOGY & CMTY. HEALTH 509, 510 (2019) (finding 7% of students reported "having been threatened or injured with a weapon at school," with 6.1% saying they missed at least one day of school because they felt unsafe. The study also found that stronger gun control was associated with a 0.8-percentage-point decrease in students being threatened or injured with a weapon at school, and a 1.1-percentage-point drop in the probability of missing school due to feeling unsafe. *Id.* at 513. Advocates are beginning to focus on these costs in gun-related litigation beyond the Second Amendment context. Safia Samee Ali, *Lawsuit's Novel Approach: State Is Responsible for Children 'Disabled' by Gun Violence*, NBC NEWS (Dec. 14, 2019), https://www.nbcnews.com/news/us-news/lawsuit-s-novel-approach-state-responsible-children-disabled-gun-violence-n1092711 [https://perma.cc/NK5H-KFVU].

[214] Kim Parker, Juliana Menasce Horowitz, Ruth Igielnik, J. Baxter Oliphant & Anna Brown, *2. Guns and Daily Life: Identity, Experiences, Activities and Involvement*, PEW RSCH. CTR. (June 22, 2017), https://www.pewsocialtrends.org/2017/06/22/guns-and-daily-life-identity-experiences-activities-and-involvement/ [https://perma.cc/RW76-WU6Q]; *see also* Eugenio Weigend Vargas & Rukmani Bhatia, *No Shots Fired: Examining the Impact and Trauma Linked to the Threat of Gunfire Within the U.S.*, CTR. FOR AM. PROGRESS (Oct. 20, 2020), https://www.americanprogress.org/issues/guns-crime/reports/2020/10/20/491823/no-shots-fired/ [https://perma.cc/8SFC-JTRD] ("[I]n addition to the 103 victims killed and the 210 victims injured with a gun every day, at least another 1,100 victims are threatened with a gun during a violent crime.").

[215] *See, e.g.*, Brief for March for Our Lives Action Fund as *Amicus Curiae* in Support of Respondents at 3, 5, N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525 (2020) (No. 18-280) ("present[ing] the voices and stories of young people from Parkland, Florida, to South Central Los Angeles who have been affected directly and indirectly by gun violence," and painting a graphic picture of the direct and indirect costs of gun violence on young people, in an effort to "acquaint the Court with the pain and trauma that gun violence has inflicted on them, and the hope that their ability to advocate for change through the political process affords them"); Brief of Survivors of the 101 California Shooting

cognizable, in sharp contrast to the currently dominant focus on physical harm. The principle that government's public safety interest extends to threats as well as physical injuries is applicable to a wide range of gun laws, from rules regarding guns in polling places[216] to domestic-violence-linked restrictions.[217] Such laws—including those restricting particular classes of weapons—can protect people from the threat of weapons, whether or not weapons are directly pointed or fired at them.[218]

In this Part, we show that this understanding of public safety is crucial in debates over the enforcement of *Heller* in the courts, where judges in Second Amendment cases are increasingly demanding evidence that gun laws prevent *physical* harms. We then show that this understanding of public safety is crucial in arguments over the Second Amendment outside of the courts, where advocates are invoking physical harm as the only legitimate basis for limiting the public carry of firearms. Respect for public safety, properly understood, requires that regulatory power be exercised in ways that protect the freedom of non-gun owners "in being and feeling safe from armed violence"[219] and in pursuing their own constitutional interests on equal footing with those of gun owners. We conclude by demonstrating that a proper appreciation of the public safety interest is critical not only in litigation and legislation, but also in debates over the evenhanded enforcement of gun laws.

## A. *Adjudicating the Public Safety Interest*

Courts have rejected the majority of Second Amendment claims, usually finding that the challenged gun law is "longstanding" enough to be exempt from scrutiny or else appropriately tailored to a sufficient government interest—typically described as the prevention of "violent crime, injury, and death."[220]

---

and Giffords Law Center to Prevent Gun Violence as *Amici Curiae* in Support of Appellee and Affirmance at 22, *Rupp v. Becerra*, No. 19-56004 (9th Cir. argued Oct. 8, 2020) [hereinafter Giffords Brief] (arguing for the constitutionality of California's assault weapons prohibition in part because "[g]overnments also have a significant interest in securing for their communities the ability to engage in public and political life without the fear wrought by particularly intimidating weapons—those that are used to intimidate while they kill").

[216] *See infra* notes 260–261 and accompanying text.

[217] *See infra* notes 240–243 and accompanying text.

[218] In *Kanter v. Barr*, then-Judge Barrett extended this understanding of the common law tradition on which *Heller* draws to laws restricting gun possession by felons. *See supra* notes 205–206 and accompanying text.

[219] McDonald v. City of Chicago, 561 U.S. 742, 891 (2010) (Stevens, J., dissenting).

[220] Tyler v. Hillsdale Cnty. Sheriff's Dep't, 775 F.3d 308, 329, 335 (6th Cir. 2014), *reh'g en banc granted*, *opinion vacated* (6th Cir. Apr. 21, 2015), *on reh'g en banc*, 837 F.3d 678 (6th Cir. 2016); *see*

But if we focus on the set of opinions upholding Second Amendment claims, a different frame emerges: one in which this narrow conception of the government interest is paired with skepticism about the available empirical evidence. Judges in this frame simultaneously acknowledge the importance of saving lives while voting to strike down gun laws they say are insufficiently tailored to that physical-safety interest.[221] The undoubtedly compelling state interest in preventing physical harm thus becomes a dead end. For a variety of reasons, including longstanding limitations on research funding,[222] it will not always be possible to empirically demonstrate a link between a particular gun law—against brandishing, for example—and a reduction in gun violence.[223] The inquiry looks much different if one recognizes that the interest in gun regulation goes beyond the prevention of wrongful shootings.

Framing the governmental interest exclusively as the prevention of gun violence leads judges to ask the wrong questions and demand the wrong kinds of evidence—and it appears outcome determinative in some cases (and also in a rising tide of dissents). In *United States v. Chester*, for example, the Fourth Circuit remanded a challenge to the federal law prohibiting gun possession by domestic violence misdemeanants after finding that the government "ha[d] not attempted to offer sufficient evidence to establish a substantial relationship between § 922(g)(9) and an important governmental goal," which the court identified as "reducing domestic gun violence."[224] As

---

*also* Peruta v. County of San Diego, 742 F.3d 1144, 1148–49 (9th Cir. 2014) ("California's 'important and substantial interest in public safety'—particularly in 'reduc[ing] the risks to other members of the public' posed by concealed handguns' 'disproportionate involvement in life-threatening crimes of violence'—trumped the applicants' allegedly burdened Second Amendment interest." (quoting the district court opinion for this case)).

[221] This is in part, of course, a result of how government lawyers frame their own interests. *See, e.g.*, Duncan v. Becerra, 970 F.3d 1133, 1164 (9th Cir. 2020) (noting that the state attorney general characterized the government's interest as "preventing and mitigating gun violence, particularly public mass shootings and the murder of law enforcement personnel" (internal quotation marks omitted)); *see also id.* at 1164 n.27 ("We remind future litigants that it is still necessary to show that the stated interest is compelling and may not simply be presumed.").

[222] *See* Allen Rostron, *The Dickey Amendment on Federal Funding for Research on Gun Violence: A Legal Dissection*, 108 AM. J. PUB. HEALTH 865 (2018).

[223] As noted further below, the push to empiricize Second Amendment analysis is itself a notable doctrinal development seemingly out of step with other areas of constitutional law. Our approach would not make evidence of physical harm-reduction irrelevant but would broaden the base of relevant evidence to include prevention of terror and intimidation.

[224] 628 F.3d 673, 683 (4th Cir. 2010) (emphasis omitted); *see also* Binderup v. Att'y Gen., 836 F.3d 336, 353–54 (3d Cir. 2016) ("Here the Government falls well short of satisfying its burden—even under intermediate scrutiny. The record before us . . . contains no evidence explaining why banning people like them (i.e., people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety. The Government . . . must 'present some meaningful evidence, not mere assertions, to

NORTHWESTERN UNIVERSITY LAW REVIEW

we describe in more detail below, this demand for proof that a law restricting guns reduces *physical* harm minimizes the role of gun threats in maintaining relations of terror, coercion, and domination and in inflicting the life-altering emotional, dignitary, and material harms of domestic violence on individuals and their families.[225] In *Duncan v. Becerra*, a Ninth Circuit panel struck down California's prohibition on large-capacity magazines with a similar demand for proof that the law prevented physical injury: "Put simply, California fails to show a reasonable fit between [the law's] sweeping restrictions and its asserted interests,"[226] which the court identified as "preventing and mitigating gun violence, particularly public mass shootings and the murder of law enforcement personnel."[227] Missing from the analysis was any consideration (or, apparently, any argument from the State) that the government could ban high-capacity magazines to protect the public from gun *threats*, especially in light of recent mass shootings.[228]

A similar focus on the available evidence supporting physical harm reduction animated the D.C. Circuit's influential decision in *Heller v. District of Columbia* (*Heller II*). In that case, the court considered Second Amendment challenges to several D.C. gun laws, including prohibitions on certain semiautomatic rifles and large-capacity magazines and a registration requirement.[229] The panel majority noted that "the District has advanced, albeit incompletely—almost cursorily—articulated, two important

---

justify its predictive [and here conclusory] judgments.' In these cases neither the evidence in the record nor common sense supports those assertions." (quoting Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1259 (D.C. Cir. 2011))); Ezell v. City of Chicago, 651 F.3d 684, 709 (7th Cir. 2011) (striking down Chicago's ban on shooting ranges because "the City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified. At this stage of the proceedings, the City has not come close to satisfying this standard"); Wrenn v. District of Columbia, 864 F.3d 650, 655 (D.C. Cir. 2017) ("Constitutional challenges to gun laws create peculiar puzzles for courts. In other areas, after all, a law's validity might turn on the value of its goals and the efficiency of its means. But gun laws almost always aim at the most compelling goal—saving lives—while evidence of their effects is almost always deeply contested."); Rhode v. Becerra, 445 F. Supp. 3d 902, 946 (S.D. Cal. 2020) (striking down California's law requiring background checks for ammunition sales in part because "none of the studies suggest the new regulations will achieve the State's interest of reducing gun violence. In fact, it is not even close . . . . To be clear, at this point in the case, the evidence does not fairly support the notion of Proposition 63 that background check and anti-importation provisions for ammunition acquisition will make the public safer").

[225] *See infra* notes 263–272 and accompanying text.

[226] 970 F.3d at 1168 (9th Cir. 2020).

[227] *Id.* at 1164 (quotation marks omitted). The court added in closing: "Let us be clear: We are keenly aware of the perils of gun violence. The heartbreak and devastation caused by criminals wielding guns cannot be overstated. And we also understand the importance of allowing state governments the ability to fashion solutions to curb gun violence." *Id.* at 1168–69.

[228] *See, e.g.*, Giffords Brief, *supra* note 215, at 24 (defending California's assault weapons ban and emphasizing the nonphysical harms inflicted by mass shootings involving those weapons).

[229] 670 F.3d 1244, 1247–48 (D.C. Cir. 2011).

184

governmental interests it may have in the registration requirements, *viz.*, to protect police officers and to aid in crime control."[230] And although the panel upheld most of the challenged laws, it concluded that the registration requirement could not "survive intermediate scrutiny based upon the record as it stands because the District has not demonstrated a close fit [as required by intermediate scrutiny] between those requirements and its governmental interests."[231] The court thus effectively demanded evidence that the registration requirement could be shown to protect police officers or citizens from physical injury, and remanded on the basis that such evidence was insufficient.

The demand that government prove that laws restricting guns prevent physical injury is even more prominent in the rising tide of concurrences, dissents, and other nondeterminative opinions that might be signaling the future of Second Amendment doctrine. Consider Justice Thomas's attack on the reasoning of *Friedman v. City of Highland Park*,[232] in which the Seventh Circuit upheld a local ordinance prohibiting assault weapons and high-capacity magazines based, in part, on public safety grounds.[233] Judge Frank Easterbrook explained, "If it has no other effect, Highland Park's ordinance may increase the public's sense of safety . . . . If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit."[234] In his dissent from the denial of certiorari, Justice Thomas (whose views have been a harbinger of Second Amendment change in the past[235]), wrote, "If a broad ban on firearms can be upheld based on conjecture that the public might *feel* safer (while being no safer at all), then the Second Amendment guarantees nothing."[236] Dissenting from a recent Third Circuit decision upholding New Jersey's prohibition on large-capacity magazines (LCMs), Judge Paul Matey echoed Justice Thomas's warning[237] and voted to

---

[230] *Id.* at 1258.
[231] *Id.* In a dissenting opinion, then-Judge Kavanaugh acknowledged that "D.C. alludes to the possibility that other rationales might be asserted to support a registration requirement. Therefore, if I were applying a form of heightened scrutiny to the registration requirement, I would remand for further analysis of the interests that might be asserted." *Id.* at 1295 (Kavanaugh, J., dissenting).
[232] Friedman v. City of Highland Park, 136 S. Ct. 447 (2015) (Thomas, J., dissenting from the denial of certiorari).
[233] 784 F.3d 406, 412 (7th Cir. 2015).
[234] *Id.* at 412.
[235] Printz v. United States, 521 U.S. 898, 938 n.2 (1997) (Thomas, J., concurring) (inviting consideration of whether the Second Amendment protects a "personal" right, as *Heller* would eventually hold).
[236] *Friedman*, 136 S. Ct. at 449 (Thomas, J., dissenting from the denial of certiorari).
[237] Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J., 974 F.3d 237, 260 (3d Cir. Sept. 1, 2020) (Matey, J., dissenting) (internal citations and quotation marks omitted).

strike down the law on the ground that the government should have provided even more proof of the link between the ban and physical injury to the public: "[T]he State rests on the ambiguous argument that 'when LCM-equipped firearms are used, more bullets are fired, more victims are shot, and more people are killed than in other gun attacks.' Perhaps, but 'this still begs the question of whether a 10-round limit on magazine capacity will affect the outcomes of enough gun attacks to measurably reduce gun injuries and death.'"[238]

A similar logic—demanding empirical evidence to show the vindication of physical safety—has surfaced in other opinions as well.[239] In *United States v. Skoein*, the en banc Seventh Circuit upheld the constitutionality of the federal law prohibiting gun possession by those convicted of domestic violence misdemeanors.[240] Writing for the majority, Judge Easterbrook focused on three physical-safety-based reasons for the prohibition, highlighting the "data" supporting them.[241] In the dissenting opinion, Judge Diane Sykes accused the majority of relying on "several pages of social-science research," most of which had "been supplied by the court."[242] Judge Sykes argued that "it [was] the government's burden to make a 'strong showing' of the danger-reduction justification . . . but in the end [the court made] the case for itself."[243]

Requiring government to prove, by empirical evidence, that gun laws save lives imposes demands on laws regulating guns that the Court has not imposed on other laws subject to constitutional challenge. In *Williams-Yulee*

---

[238] *Id.*; *see also* Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J., 910 F.3d 106, 131 (3d. Cir. 2018) (Bibas, J., dissenting) ("True, the government has a compelling interest in reducing the harm from mass shootings. No one disputes that. But New Jersey has failed to show how the ban advances its interest. Nor does it provide evidence of tailoring.").

[239] *See, e.g.*, Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1129 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part) ("Of course I agree public safety—at not too amorphous a level of generality—qualifies as an important government interest. But the government has not shown that successfully combating potential crime at this location—a run-of-the-mill post office parking lot in a Colorado ski town—hinges on restricting the Second Amendment rights of lawfully licensed firearms carriers."); *cf.* Kanter v. Barr, 919 F.3d 437, 469 (7th Cir. 2019) (Barrett, J., dissenting) ("[W]hile both Wisconsin and the United States have an unquestionably strong interest in protecting the public from gun violence, they have failed to show, by either logic or data, that disarming Kanter substantially advances that interest." (internal citation omitted)).

[240] 614 F.3d 638, 642–45 (7th Cir. 2010) (en banc).

[241] *Id.* at 643 ("[F]irst that domestic abusers often commit acts that would be charged as felonies if the victim were a stranger, but that are charged as misdemeanors because the victim is a relative (implying that the perpetrators are as dangerous as felons); second that firearms are deadly in domestic strife; and third that persons convicted of domestic violence are likely to offend again, so that keeping the most lethal weapon out of their hands is vital to the safety of their relatives. Data support all three of these propositions.").

[242] *Id.* at 651 (Sykes, J., dissenting).

[243] *Id.* at 651–52.

186

*v. Florida Bar*, for example, the Court rejected a First Amendment challenge to a Florida law prohibiting judicial candidates from soliciting campaign funds.[244] Chief Justice Roberts's majority opinion upheld the law under strict scrutiny, finding that it not only helped prevent quid pro quo corruption but also advanced the "State's compelling interest in preserving public confidence in the integrity of the judiciary."[245] Importantly, this conception of the state interest had direct implications for the state's evidentiary burden on the tailoring prong. As the Chief Justice put it: "The concept of public confidence in judicial integrity does not easily reduce to precise definition, *nor does it lend itself to proof by documentary record*. But no one denies that it is genuine and compelling."[246] If speech can be limited in the name of increasing public confidence in judicial integrity, why could guns not be limited in the name of increasing public confidence in other shared institutions and spaces?

Similarly, in the voting rights context, the Court has suggested that voting restrictions can be upheld in the name of the government's compelling interest in preserving citizens' "right to vote in an election conducted with integrity and reliability."[247] The Court has even been willing to uphold restrictions on voter registration on the grounds that "public confidence in the integrity of the electoral process has independent significance" above and beyond the prevention of fraud, because the regulation might "encourage[] citizen participation in the democratic process."[248] If the hypothetical benefit of voter-fraud restrictions on registration is sufficient to sustain such legislation despite its burden on the exercise of a fundamental right, then should the same not be true of gun regulations that might encourage, for example, student participation in education?

Yet another example comes from the abortion cases, where the Court's conservatives have voted to uphold regulations that burden the exercise of a constitutional right on the ground that such laws express public values. In *Gonzales v. Carhart*, for example, the Court sanctioned a ban on a particular *method* of performing abortions, even though the ban would not stop abortions or save potential lives.[249] Rather, the Court reasoned that the law was justified because of the message of respect for human life it sent the

---

[244] 575 U.S. 433, 444 (2015).

[245] *Id.*

[246] *Id.* at 447 (emphasis added); *see also* Burson v. Freeman, 504 U.S. 191, 208–09 (1992) ("[T]his Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." (quoting Munro v. Socialist Workers Party, 479 U.S. 189, 195 (1986))).

[247] *Burson*, 504 U.S. at 199.

[248] Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 197 (2008).

[249] 550 U.S. 124, 169 (2007).

187

public and the medical profession.[250] If the Constitution permits legislation that restricts citizens' choice of what can medically be done to their bodies based on such a message, why should it forbid weapons regulations designed to protect a shared sense of public safety?

It is easy enough to multiply examples from throughout constitutional doctrine.[251] Why should courts hold the government to higher empirical standards in Second Amendment cases than in these other constitutional contexts? Of course, there is already robust empirical evidence that gun-related harms go far beyond physical loss,[252] and that these harms—like the direct gun casualties of gun violence—disproportionately impact vulnerable communities.[253] A law that demonstrably lessens those harms should survive scrutiny.

But not every gun law will, as the Chief Justice put it in the First Amendment context in *Williams-Yulee*, "lend itself to proof by documentary record."[254] In various contexts, the threat of gun violence undoubtedly chills

---

[250] *See, e.g., id.* at 157 ("The government may use its voice and its regulatory authority to show its profound respect for the life within the woman."); *see also id.* at 160 (observing that "[i]t is objected that the standard D & E [dilation and evacuation, a method of abortion] is in some respects as brutal, if not more, than the intact D & E, so that the legislation accomplishes little," but arguing that "[i]t was reasonable for Congress to think that partial-birth abortion, more than standard D & E, undermines the public's perception of the appropriate role of a physician during the delivery process" (internal quotation marks omitted)).

[251] Richard H. Fallon Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1321–25 (2007); *id.* at 1322 (noting that judicial conservatives are "more willing to find compelling interests implicit in the Constitution than to conclude that the Constitution implicitly creates or recognizes fundamental rights").

[252] PHILIP J. COOK & JENS LUDWIG, GUN VIOLENCE: THE REAL COSTS, at vii, ix (2000) (concluding that gun violence costs $100 billion per year, including investments in prevention, avoidance, and harm reduction, both public and private); David Hemenway, Sara J. Solnick & Deborah R. Azrael, *Firearms and Community Feelings of Safety*, 86 J. CRIM. L. & CRIMINOLOGY 121, 128 (1995) (providing "suggestive evidence that possession of firearms imposes, at minimum, psychic costs on most other members of the community"); Cary Wu, *How Does Gun Violence Affect Americans' Trust in Each Other?*, 91 SOC. SCI. RSCH. 1, 3 (2020) (demonstrating "that America's gun violence affects not only just those killed, injured, or present during gunfire, but it can also sabotage the social and psychological well-being of all Americans").

[253] Matthew Miller, Deborah Azrael & David Hemenway, *Community Firearms, Community Fear*, 11 EPIDEMIOLOGY 709, 710–11 (2000) (finding that fifty percent of respondents said they would feel less safe if more people in their community owned guns, compared to fourteen percent who would feel safer; women were 1.7 times more likely to report feeling less safe, and minorities were 1.5 times more likely).

[254] 575 U.S. 433, 447 (2015); *see also* Burson v. Freeman, 504 U.S. 191, 208–09 (1992) ("[T]his Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." (quoting Munro v. Socialist Workers Party, 479 U.S. 189, 195 (1986))). Analogous limitations of empirical argument arise outside of courts as well. Dan M. Kahan & Donald Braman, *More Statistics, Less Persuasion: A Cultural Theory of Gun-Risk Perception*, 151 U. PA. L. REV. 1291, 1292 (2003) (arguing *inter alia* that "empirical analyses of the effect of gun control . . . are unlikely to have much impact" on individuals' positions, and that scholars should instead work to "construct[] a new expressive idiom that will allow citizens to debate the cultural issues that divide them in an open and constructive way").

188

the exercise of rights, depriving Americans of the security to speak, protest, learn, shop, pray, and vote.[255] It will not always be possible to demonstrate that a particular gun law—a restriction on open carrying near polling places, for example—measurably increases people's confidence or security in exercising their rights. But that should not be fatal to gun laws any more than it would be to laws in other constitutional contexts.

Given the multiplicity of gun laws and enforcement contexts, it is impossible to translate the public safety interest into a single transsubstantive decision rule. Our goal here is to make it legally legible, so that judges do not systematically understate the case for gun laws by looking only for evidence of the physical harms they prevent.

### B.   Legislating Public Safety

The state's interest in public safety arises not only in the courtroom; it is also at issue in legislatures when gun laws are enacted or revised.

Legislative efforts to regulate—or deregulate—public carrying of weapons provide a striking illustration of governmental interests that are overwhelmingly articulated in terms of physical harm alone. In recent years, even as some states have tightened their gun laws,[256] others have broadly expanded the legality of public carry—some even doing away with permit requirements and allowing open carry.[257] Whatever their impact on violent crime,[258] these legislative changes must also be evaluated and justified in

---

[255] For some examples of chilling, consider the discussion of the use of weapons in intimate-partner stalking and domination discussed *infra* note 269, or the threat of weapons in schools and on the street, *supra* notes 211–213. For other examples of chilling, consider the shutdown protests directed at the Michigan legislators and Governor recounted in *supra* Part I, or the presence of armed militia and vigilante groups at Black Lives Matter protests, see *infra* notes 288–296 and accompanying text.

[256] *See, e.g.*, Mike Riopell, *Gov. J.B. Pritzker Signs Law Requiring State Licensing of Illinois Gun Dealers; Rifle Association Threatens Lawsuit*, CHI. TRIB. (Jan. 17, 2019), https://www.chicagotribune.com/politics/ct-met-jb-pritzker-signs-gun-legislation-20190117-story.html [https://perma.cc/2YQ8-3RZT] (describing Illinois law requiring "gun stores to get state certification[]"); Gregory S. Schneider, *Va. Governor Signs Gun-Control Laws, Delivering on Democrats' Campaign Promises*, WASH. POST (Apr. 10, 2020, 5:17 PM), https://www.washingtonpost.com/local/virginia-politics/va-governor-signs-gun-control-laws-delivering-on-democrats-campaign-promises/2020/04/10/b3a8acec-7b4d-11ea-a130-df573469f094_story.html [https://perma.cc/3ZCY-S9J5] (describing Virginia enacting laws that "limit handgun purchases to one per month; establish universal background checks" and to "give authorities the power to temporarily seize weapons from someone deemed a threat" among other things).

[257] *See* Matt Vasilogambros, *Another Big Year Expected for Gun Control in the States*, PEW TRS. (Feb. 7, 2019), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2019/02/07/another-big-year-expected-for-gun-control-in-the-states [https://perma.cc/E7HD-HDPV].

[258] *See* John J. Donohue, Abhay Aneja & Kyle D. Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. EMPIRICAL LEGAL STUD. 198 (2019) (linking right-to-carry concealed-handgun laws with increased rates of violent crime).

189

NORTHWESTERN UNIVERSITY LAW REVIEW

light of the public interests that we describe here: the freedom of citizens to be secure and confident in public spaces and in exercising their constitutional liberties. The expansion of gun rights into public spaces—whether accomplished legislatively or judicially—does not fit easily into *Heller*'s private-self-defense paradigm,[259] which makes it all the more crucial that the public safety interest be made legible.

For some, the public safety interest we have discussed will support restrictions on certain kinds or sites of public carry. After the 2020 protests and the discovery of the plot to kidnap Governor Whitmer, Michigan's secretary of state issued guidance to local election officials stating that the open carrying of firearms at polling places, clerk's offices, and absentee-ballot counting boards is prohibited.[260] This time, the language of public safety—not just physical safety—was paramount: "The presence of firearms at the polling place, clerk's office(s), or absent voter counting board may cause disruption, fear or intimidation for voters, election workers and others present."[261] Within days, Tom Lambert's Michigan Open Carry and other gun-rights groups challenged the constitutionality of the restriction.[262]

Appeals to the public safety interest are relatively rare in contemporary legislative debates about gun laws. Just as opponents of gun regulation suggest that prevention of *physical* harm is the *only* ground for gun regulation, advocates for such regulation too often treat the prevention of physical harm as the only interest they might vindicate. Our review of the legislative histories and debates surrounding many state and federal gun bills revealed little effort to frame, describe, or defend regulation on grounds other than violence prevention.

For example, federal law and the laws of many states restrict gun possession by those convicted of domestic violence misdemeanors or subject

---

[259] In its recent rejection of a challenge to California's public carry restrictions, the en banc Ninth Circuit conducted an extensive review of historical materials, noting that the law has "long distinguished between an individual's right of defense of his household and his business and his right to carry a weapon in public for his own defense, absent exceptional circumstances." Young v. Hawaii, 992 F.3d 765, 813 (9th Cir. 2021) (en banc).

[260] Craig Mauger & Beth LeBlanc, *Michigan Bans Open Carry of Guns Inside and Near Polling Places*, DETROIT NEWS (Oct. 17, 2020), https://www.detroitnews.com/story/news/politics/2020/10/16/michigan-bans-open-carry-guns-polling-places/3676462001/ [https://perma.cc/RXL7-RACF].

[261] *Id.* (quoting Jocelyn Benson, *Open Carry of Firearms at Polling Places on Election Day Prohibited*, MICH. DEP'T STATE (Oct. 16, 2020), https://www.michigan.gov/documents/sos/BOE_Open_Carry_Polling_Place_Instructions_10_16_2020_705274_7.pdf [https://perma.cc/2ED5-RLSK]).

[262] Dave Boucher & Paul Egan, *Open Carry Ban at Polls Prompts Lawsuits Against Michigan Secretary of State*, DETROIT FREE PRESS (Oct. 22, 2020), https://www.freep.com/story/news/politics/elections/2020/10/22/open-carry-polls-voting-lawsuit-michigan/6004659002/ [https://perma.cc/AN9M-LR28].

190

to a domestic violence restraining order.[263] When Congress adopted the Lautenberg Amendment in 1996, which prohibits gun possession by anyone convicted of misdemeanor domestic violence, the overwhelming focus was on the prevention of physical harms.[264] There can be no doubt that this interest is compelling and well documented. Roughly half of female murder victims in the United States are killed by an intimate partner, most of them with a gun.[265] Firearm-ownership rates are positively related to rates of domestic homicide,[266] especially in abusive situations.[267]

The number of women killed with guns is horrific. This horror can, perversely, direct attention away from a broader problem: the coercive control that is central to domestic abuse, and which "reflects the deprivation of rights and resources that are critical to personhood and citizenship."[268] Research has shown that most abusers use guns to intimidate their victims,

---

[263] *See* Joseph Blocher, *Domestic Violence and the Home-Centric Second Amendment*, 27 DUKE J. GENDER L. & POL'Y 45, 47 (2020).

[264] *See infra* note 272 and accompanying text.

[265] Emiko Petrosky, Janet M. Blair, Carter J. Betz, Katherine A. Fowler, Shane P.D. Jack & Bridget H. Lyons, *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence — United States, 2003–2014*, 66 WEEKLY 741, 743 (2017); *see also* Carolyn B. Ramsey, *Firearms in the Family*, 78 OHIO ST. L.J. 1257, 1278 n.109 (2017) (noting that, in cases in which the perpetrator could be identified, half of female homicide victims were killed by intimate partners, as compared to just 6% of male homicide victims); Elizabeth Richardson Vigdor & James A. Mercy, *Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?*, 30 EVALUATION REV. 313, 313 (2006) (concluding that roughly 60% of intimate-partner homicides are committed with a firearm).

[266] Aaron J. Kivisto, Lauren A. Magee, Peter L. Phalen & Bradley R. Ray, *Firearm Ownership and Domestic Versus Nondomestic Homicide in the U.S.*, 57 AM. J. PREVENTATIVE MED. 311, 311 (2019), https://www.ajpmonline.org/article/S0749-3797(19)30197-7/pdf [https://perma.cc/U5ZN-DZLB].

[267] Jacquelyn C. Campbell, Daniel Webster, Jane Koziol-McLain, Carolyn Block, Doris Campbell, Mary Ann Curry, Faye Gary, Nancy Glass, Judith McFarlane, Carolyn Sachs, Phyllis Sharps, Yvonne Ulrich, Susan A. Wilt, Jennifer Manganello, Xiao Xu, Janet Schollenberger, Victoria Frye & Kathryn Laughon, *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 AM. J. PUB. HEALTH 1089, 1092 (2003) (finding that the presence of a gun makes homicide five times more likely); *see also* Stephanie E.F. Folks, N. Zoe Hilton & Grant T. Harris, *Weapon Use Increases the Severity of Domestic Violence but Neither Weapon Use nor Firearm Access Increases the Risk or Severity of Recidivism*, 28 J. INTERPERSONAL VIOLENCE 1143, 1148–49 (2013) (finding that the presence of a firearm intensifies domestic violence).

[268] *See* EVAN STARK, COERCIVE CONTROL: THE ENTRAPMENT OF WOMEN IN PERSONAL LIFE 5 (2007) (arguing that "the primary harm abusive men inflict is political, not physical" and developing a conception of "coercive control," "an objective state of subordination"); Joyce E. McConnell, *Beyond Metaphor: Battered Women, Involuntary Servitude and the Thirteenth Amendment*, 4 YALE J.L. & FEMINISM 207, 210 (1992) (arguing that "some battered women are held in involuntary servitude" and that "a civil constitutional claim as well as a criminal constitutional claim could be brought against the batterer"); *see also* RACHEL LOUISE SNYDER, NO VISIBLE BRUISES 35–77 (2019) (chronicling incidents of intimate-partner violence, including but not limited to physical violence).

NORTHWESTERN UNIVERSITY LAW REVIEW

rather than physically harm them.[269] Hostile weapon displays "can create an ongoing environment of threat and intimidation" that encompasses psychological (and not just physical) abuse,[270] and are a significant predictor of post-traumatic stress disorder symptom severity.[271] On at least one occasion, Senator Frank Lautenberg (sponsor of the federal law prohibiting possession by domestic violence offenders) noted these broader harms:

> We are not just talking about the use of a gun in a murder; we are talking about a gun that is used in intimidation, to threaten and to strike fear and harass. Imagine what a child must think when he sees a man holding a gun, threatening a woman, even if he does not pull the trigger.[272]

But the law was framed, and has been evaluated by courts,[273] in terms of physical violence alone. Had Congress articulated a more inclusive public safety interest (in a preamble, for example), and provided evidence to support it, it would be easier for courts and litigators to see the full range of governmental interests at play when they evaluate the constitutionality of such laws.[274] Consider that the federal law protecting the gun industry from civil liability lists among its purposes: "To protect the right, under the First

---

[269] Susan B. Sorenson, *Guns in Intimate Partner Violence: Comparing Incidents by Type of Weapon*, 26 J. WOMEN'S HEALTH 249 (2017). Gun threats are commonly accompanied by other threatening behaviors, such as stalking. T.K. Logan & Kellie R. Lynch, *Dangerous Liaisons: Examining the Connection of Stalking and Gun Threats Among Partner Abuse Victims*, 33 VIOLENCE & VICTIMS 399, 403 (2018) (finding that three-fourths of callers to the National Domestic Violence Hotline who reported being threatened with a gun *also* reported stalking).

[270] Maura Ewing, *An Estimated 4.5 Million Women Have Been Bullied with Guns by Abusive Partners*, TRACE (Oct. 3, 2016), https://www.thetrace.org/2016/10/nonfatal-gun-use-domestic-violence/ [https://perma.cc/63M2-AGJ5]; *see also* Susan B. Sorenson & Rebecca A. Schut, *Nonfatal Gun Use in Intimate Partner Violence: A Systematic Review of the Literature*, 19 TRAUMA, VIOLENCE & ABUSE 431, 437 (2018) (concluding that "about 4.5 million U.S. women have been threatened by an intimate partner with a gun and nearly 1 million have had an intimate actually use a gun against them").

[271] Tami P. Sullivan & Nicole H. Weiss, *Is Firearm Threat in Intimate Relationships Associated with Posttraumatic Stress Disorder Symptoms Among Women?*, 4 VIOLENCE & GENDER 31, 34 (2017).

[272] 142 CONG. REC. S9459 (daily ed. Aug. 2, 1996).

[273] *See supra* notes 240–243 and accompanying text (describing intrapanel debate in *United States v. Skoein*, 614 F.3d 638 (7th Cir. 2010)); *see also* United States v. Chester, 628 F.3d 673, 692 (4th Cir. 2010) (David, J., concurring) ("[S]ound research of unquestionable reliability (much of it empirical) indicates that the presence of firearms greatly increases the risk of death for women suffering from domestic abuse."); United States v. Staten, 666 F.3d 154, 167 (4th Cir. 2011) ("[W]e have no trouble concluding that the government has indeed established that the use of firearms in connection with domestic violence is all too common, increases the risk of injury or homicide during domestic violence, and often leads to injury or homicide."); Stimmel v. Sessions, 879 F.3d 198, 209 (6th Cir. 2018) ("Essential here is that the victim is more likely to be killed when a gun is present."); United States v. Lippman, 369 F.3d 1039, 1044 (8th Cir. 2004) ("Congress had a compelling government interest in enacting § 922(g)(8) to decrease domestic violence.").

[274] To be clear, litigants and courts evaluating government interests are not strictly limited to those specifically enumerated in legislative history. *See* Fallon, *supra* note 251, at 1321 ("[T]he Supreme Court has frequently adopted an astonishingly casual approach to identifying compelling interests.").

192

Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely, to assemble peaceably, and to petition the Government for a redress of their grievances." [275] If Congress can act to protect gun manufacturers' rights "to speak freely" and "to assemble peaceably," then surely it can do the same for private citizens. Clearly articulating the public safety interest in the text of legislation is all the more important as gun-rights advocates seek to shift more and more issues from legislatures to courts.

## C. *Enforcing Equal Liberties*

Once we recognize that public safety includes the protection of social as well as physical interests, we can begin to reason differently about the underenforcement and selective enforcement of existing gun laws, including prohibitions on brandishing, assault, menacing with a firearm, reckless display, and the like.[276] In many cases, law enforcers defer to persons openly carrying guns. Yet deference to gun displays is not mandated by the right to keep and bear arms, as many suppose; instead, it privileges some people's safety and security over that of others in ways not required by *Heller* or the common law tradition on which it draws.

Perhaps believing that *Heller* mandates deference to gun displays, some law enforcement officers and prosecutors have failed to hold citizens accountable for wielding weapons to threaten or intimidate. This lack of enforcement has enabled the new and increasingly prevalent practice of armed groups engaging in displays of force as previously discussed in Part I. None of the overwhelmingly white and male gun carriers were arrested at any of the Michigan protests despite plausibly violating a variety of legal prohibitions and threatening public officials.[277] Under the state's common law, threatening behavior—even without physical contact—can constitute assault.[278] Michigan's code also criminalizes, as misdemeanors, "recklessly or heedlessly or wil[l]fully [handling] any firearm without due caution and circumspection for the rights, safety or property of others" [279] and "intentionally but without malice point[ing] or aim[ing] a firearm at or toward another person."[280] And yet Michigan officials made no attempt to enforce these laws against those who invaded the state legislature. Many

---

[275] Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7901(b)(5) (2018).

[276] Blocher et al., *supra* note 93.

[277] Barrett, *supra* note 85 (observing that one Detroit man was later arrested for allegedly making online death threats against the Governor).

[278] People v. Carlson, 125 N.W. 361, 362 (Mich. 1910).

[279] MICH. COMP. LAWS § 752.863a (2021).

[280] *Id.* § 750.233.

193