Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022**<br><br>**VOLUME 6 OF 13**<br><br>Courtroom: 5A<br>Judge: Hon. Roger T. Benitez<br><br>Action Filed: August 15, 2019 |

1

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

# INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |
| **BOOKS** | | |
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

4

| **LAW REVIEWS AND JOURNALS** | | |
|---|---|---|
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

| | | | |
|---|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020 (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

6

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

NORTHWESTERN UNIVERSITY LAW REVIEW

criticizing the dramatic failure of the Capitol Police to contain pro-Trump rioters on January 6 have drawn direct connections to the events in Michigan, construing the lack of enforcement as demonstrating a failure of evenhandedness along the lines of race and political viewpoint.[281]

The scene in Michigan is part of a growing trend. The FBI sent a memo to law enforcement around the country indicating that massive, nationwide armed protests were planned to oppose Joe Biden's inauguration.[282] Throughout that same period, open-carry activists have tried to normalize gun displays in shared public spaces, from big-box stores to coffee shops— a movement that even some gun-rights advocates have opposed.[283] When open-carry advocates in Texas started taking their rifles into fast-food restaurants in 2014, the NRA issued a statement saying that such activity "not only defies common sense, it shows a lack of consideration and manners . . . . Let's not mince words, not only is it rare, it's downright *weird*."[284] That statement led to backlash among gun-rights extremists, and the organization almost immediately retracted it.[285]

And just as the NRA backed down, so too do many law enforcement officers, in patterns sufficiently pronounced to create public meaning and to provoke public comment. Whether due to fear of, or perhaps agreement with, armed conservative protesters, police across the country have been slow to restrict—or apparently even to recognize—these displays of guns.[286] Armed vigilante groups have patrolled citizen protests, using weapons to intimidate if not terrorize those protesting police misconduct, with apparent permission and sometimes even the coordination of law enforcement.[287] At least in some

---

[281] *See supra* notes 89–100 and sources cited therein.

[282] *See supra* note 20 and sources cited therein.

[283] *See, e.g.*, David French, *Christians, Gun Rights, and the American Social Compact*, DISPATCH (Sept. 6, 2020), https://frenchpress.thedispatch.com/p/christians-gun-rights-and-the-american [https://perma.cc/KU2L-N8GA] (demonstrating the opposition of gun rights advocates to normalizing gun displays).

[284] Eric Lach, *NRA Issues Amazing Statement Admitting Bringing AR-15s to Chipotle Is Dumb*, TALKING POINTS MEMO (June 2, 2014), https://talkingpointsmemo.com/muckraker/nra-open-carry-texas-weird-statement [https://perma.cc/VK6P-NFCF].

[285] Eric Lach, *NRA Apologizes for Calling Guns-in-Restaurants Crowd 'Weird,'* TALKING POINTS MEMO (June 3, 2014), https://talkingpointsmemo.com/muckraker/nra-apologizes-open-carry-texas [https://perma.cc/JN59-RJBG].

[286] *See supra* text at notes 89–95 (recounting public commentary).

[287] Mara Hvistendahl & Alleen Brown, *Armed Vigilantes Antagonizing Protestors Have Received a Warm Reception from Police*, INTERCEPT (June 19, 2020, 12:55 PM) https://theintercept.com/2020/06/19/militia-vigilantes-police-brutality-protests/ [https://perma.cc/W6GD-ZF4F] (reporting on the spread of armed vigilantes in response to protests against police brutality and documenting how law enforcement has differently responded to those protesting police and to the armed vigilantes who are "policing" the protesters); Eric Litke, *Yes, Police Gave Kyle Rittenhouse Water and Thanked His Armed Group Before*

194

116:139 (2021) *When Guns Threaten the Public Sphere*

cases, this selective enforcement of gun laws has had the desired effect of driving people from the public sphere and chilling their ability to engage in free speech, assembly, and a host of other constitutional rights and interests.[288] We point out that, if not interrupted, the influence of evolving social practice on the interpretation of the law will only intensify. The expansion of open carry—often by persons dressed in militia gear and traveling in groups to new settings—will progressively alter the forms of conduct that law enforcers interpret as brandishing.

Contrast this lack of enforcement to the crushing public and private violence inflicted on many people attending Black Lives Matter protests throughout the spring and summer of 2020, often justified on the basis that a particular victim appeared "intimidating," especially if armed. Race helps code a person of color as threatening and warranting measures of self-defense, especially if people mass in groups. In the midst of Black Lives Matter protests following the police-involved killing of a young Black man in Lafayette, Louisiana, U.S. Representative Clay Higgins (R-La.) posted a photo of armed Black men to his campaign page, writing, "If this shows up, we'll consider the armed presence a real threat . . . . I wouldn't even spill my

---

*Kenosha Shooting*, POLITIFACT (Aug. 28, 2020), https://www.politifact.com/factchecks/2020/aug/28/facebook-posts/yes-police-gave-kyle-rittenhouse-water-and-thanked/ [https://perma.cc/X79L-NM72] (noting "[t]he relationship between Rittenhouse and police has drawn particular scrutiny" and describing how "15 minutes before Rittenhouse allegedly shot and killed two people . . . . [p]olice thanked [Rittenhouse's] group for their presence and gave them water"); *see also* Michael German, *Hidden in Plain Sight: Racism, White Supremacy, and Far-Right Militancy in Law Enforcement*, BRENNAN CTR. FOR JUST. (Aug. 27, 2020), https://www.brennancenter.org/our-work/research-reports/hidden-plain-sight-racism-white-supremacy-and-far-right-militancy-law [https://perma.cc/72Y4-8K3M] (citing FBI counterterrorism policy documents and other sources documenting "active links" between militia and white supremacist groups and law enforcement officers); Rachel E. Greenspan, *Oregon Police Told Armed White Men That They Didn't Want to Look Like They Were 'Playing Favorites' When They Advised Them to Stay Inside After Curfew*, INSIDER (June 5, 2020, 3:00 PM) https://www.insider.com/police-salem-oregon-protesters-stay-inside-curfew-proud-boys-white-2020-6 [https://perma.cc/6KMB-XEH2] (discussing an incident in Salem, Oregon in which "[a]rmed white men . . . were given a warning by a police officer to 'discreetly remain inside' before post-curfew arrests began during protests against police brutality").

[288] *See, e.g.*, Heath Druzin, *Bolstered by Lax Gun Laws, Armed Protesters Confront Anti-Racism Rallies*, KCUR (June 30, 2020, 1:24 PM), https://www.kcur.org/2020-06-30/bolstered-by-lax-gun-laws-armed-protesters-confront-anti-racism-rallies [https://perma.cc/Y95F-XCJP] (describing the prevalence of armed anti-racist protesters across the country); Holmes, *supra* note 93; Nicolle Okoren, *The Birth of a Militia: How an Armed Group Polices Black Lives Matter Protests*, GUARDIAN (July 27, 2020), https://www.theguardian.com/us-news/2020/jul/27/utah-militia-armed-group-police-black-lives-matter-protests [https://perma.cc/9TCK-EFQQ]; s*ee also* Miller, *supra* note 154 (arguing that safety is a sufficient but not necessary reason to regulate guns in "sensitive places"); Monica Youn, *The Chilling Effect and the Problem of Private Action*, 66 VAND. L. REV. 1473, 1475 (2013) (noting guns as a possible kind of heckler's veto).

195

beer. I'd drop any 10 of you where you stand."[289] At the same time as Representative Higgins (a former law enforcement officer and prominent gun-rights advocate) posted the message, heavily armed members of a right-wing militia group appeared at a peaceful Black Lives Matter protest in Lafayette. The group's "commander" announced, "[W]e're just not gonna let them go around burning flags and intimidating."[290]

Such comments are consistent with a general and well-established tendency to see African Americans as threatening.[291] Young Black men are seen as larger and more physically threatening than young white men,[292] and there is a direct, bidirectional link between Blackness and guns, such that police officers[293] and others[294] are more likely to connect the two. For many, armed and even violent responses to Black Lives Matter protesters are

---

[289] *Facebook Removes Congressman's Post Over 'Incitement,'* ASSOCIATED PRESS (Sept. 2, 2020), https://apnews.com/630a73be38d81e173fd66fd2fc2308d0 [https://perma.cc/28GX-HPCS]; Cristina Marcos, *Facebook Removes GOP Lawmaker's Post for Inciting Violence*, HILL (Sept. 2, 2020), https://thehill.com/homenews/house/514814-facebook-removes-gop-lawmakers-post-for-inciting-violence [https://perma.cc/GNB9-FVMP].

[290] Bryn Stole & Jerry DiColo, *Clay Higgins Says on Facebook that Armed Demonstrators 'Won't Walk Away' from Louisiana Protests*, ACADIANA ADVOCATE (Sept. 1, 2020), https://www.theadvocate.com/acadiana/news/article_77138836-ecc4-11ea-a8d0-772b482469cb.html [https://perma.cc/4Y3U-4BPU].

[291] Michael C Gearhart, Kristen A. Berg, Courtney Jones & Sharon D. Johnson, *Fear of Crime, Racial Bias, and Gun Ownership*, 44 HEALTH & SOC. WORK 241, 244 (2019).

[292] *See, e.g.*, H. Andrew Sagar & Janet Ward Schofield, *Racial and Behavioral Cues in Black and White Children's Perceptions of Ambiguously Aggressive Acts*, 39 J. PERSONALITY & SOC. PSYCH. 590, 590 (1980) ("Cultural differences between subject groups were apparent in the greater tendency of the white children to read threat into ambiguously aggressive behaviors involving no physical contact and to assume that the perpetrators of such behaviors were stronger than the recipients."); John Paul Wilson & Kurt Hugenberg, *Racial Bias in Judgments of Physical Size and Formidability: From Size to Threat*, 113 J. PERSONALITY & SOC. PSYCH. 59 (2017) (pointing to seven different studies reaching this conclusion); *see also* Cynthia Lee, *Race, Policing, and Lethal Force: Remedying Shooter Bias with Martial Arts Training*, 79 LAW & CONTEMP. PROBS. 145 (2016) (exploring the relationship between race and the decision to shoot).

[293] Lois James, *The Stability of Implicit Racial Bias in Police Officers*, 21 POLICE Q. 30, 41–42 (2018) ("[O]fficers tended to have moderate (35%) to strong (37%) bias associating Black Americans with weapons. Approximately 12% of officers had slight anti-Black bias and a further 12% had no bias. Finally, a combined 3% of the sample had anti-White bias (associating White Americans with weapons).").

[294] Dee Lisa Cothran, *Facial Affect and Race Influence Threat Perception*, 30 IMAGINATION, COGNITION & PERSONALITY 341, 348 (2010) (finding that those primed with a white face were more likely to mistake a gun for a tool, while those primed with a Black face were more likely to mistake a tool for a gun); *see also* B. Keith Payne, *Prejudice and Perception: The Role of Automatic and Controlled Processes in Misperceiving a Weapon*, 81 J. PERSONALITY & SOC. PSYCH. 181, 190 (2001) ("Results of this research strongly support the hypothesis that the race of faces paired with objects does influence the perceptual identification of weapons. . . . Harmless distracters were more likely to be classified as guns when primed by a Black face than when primed by a White face.").

116:139 (2021) *When Guns Threaten the Public Sphere*

reasonable measures of "self-defense,"[295] whereas others see the gun displays as the expression of these underlying associations.[296]

The emergence of this public debate is a welcome development. Here, as in other aspects of law enforcement, Americans are now beginning to focus on the social dimensions of the public safety interest. Americans may not agree on what it means to enforce guns laws evenhandedly with respect to race or ideology, and in ways that respect the rights of both the armed and the unarmed. But sustained debate over these fundamental questions of public safety is likely to transform the standards by which we assess the enforcement of gun laws and promote the kind of security that protects all citizens' liberties.

CONCLUSION

The government's reasons for passing gun laws are rarely interrogated beyond the obvious and undoubtedly compelling interest in preventing direct physical harm. But guns threaten more—and government can protect more—than bodily integrity.[297] For centuries, gun laws have ensured citizens' sense

---

[295] *See, e.g.*, Eric Mack, *Mark McCloskey to Newsmax TV: Media Race-Baiting Case of Self Defense*, NEWSMAX (Aug. 26, 2020), https://www.newsmax.com/newsmax-tv/markmccloskey-selfdefense-race-rnc/2020/08/26/id/984034/ [https://perma.cc/XZS6-ZENN] ("Mark McCloskey detailed to host Sean Spicer how the dangerous situation at their home was defused, despite the protesters brandishing weapons, too. He hailed it as an example of why the Second Amendment works for public safety in America."); Tucker Carlson, *Ordinary Americans Stand Up as Politicians Continue to Cower to the Rage Mob*, FOX NEWS (June 30, 2020), https://www.foxnews.com/opinion/tucker-carlson-ordinary-americans-politicians-cower-rage-mob [https://perma.cc/7J5F-4C8K] (praising the McCloskeys' use of guns against a "murderous" mob); Justin Jouvenal, *Suspects in Kenosha, Portland Shootings Have Self-Defense Claims in Common*, WASH. POST (Sep. 4, 2020), https://www.washingtonpost.com/local/legal-issues/kyle-rittenhouse-kenosha-self-defense/2020/09/04/d1981726-ed1f-11ea-b4bc-3a2098fc73d4_story.html [https://perma.cc/WHC5-J7ZY] ("President Trump and other supporters of Kenosha, Wis., shooting suspect Kyle Rittenhouse have rallied around the teen, arguing he, too, was defending himself when, police said, he shot and killed two protesters and injured a third during unrest there last week.").

[296] *See, e.g.*, Jamelle Bouie, *Kenosha Tells Us More About Where the Right Is Headed Than the R.N.C. Did*, N.Y. TIMES (Aug. 28, 2020), https://www.nytimes.com/2020/08/28/opinion/sunday/kenosha-kyle-rittenhouse-trump.html [https://perma.cc/E5LL-D43N] (condemning commentators who "elevate Rittenhouse as a symbol of self-defense" because he "travel[ed] to protests ready [to] use . . . lethal force against protesters" and characterizing the McCloskey brandishing as "threatening protesters with death"); Robert Mackey, *Trump Supporters Rush to Defend One of Their Own Who Killed Protesters in Kenosha*, INTERCEPT (Aug. 27, 2020), https://theintercept.com/2020/08/27/tucker-carlson-defends-kenosha-shooter/ [https://perma.cc/DU4K-3H9M] (describing the "consensus explanation" among "pro-Trump" commentators that Rittenhouse, "the young man who had traveled to Kenosha from his home in neighboring Illinois to defend the city from residents enraged by the shooting of Jacob Blake, was merely acting in self-defense"); Eric Ruben, *Claiming Self-Defense Isn't a Get-Out-of-Jail-Free Card*, BRENNAN CTR. (July 23, 2020), https://www.brennancenter.org/our-work/analysis-opinion/claiming-self-defense-isnt-get-out-jail-free-card [https://perma.cc/7T36-PGLL] (discussing the McCloskey case as a "demonstration of how self-defense and the right to keep and bear arms are warped for political ends").

[297] *See* Siegel & Blocher, *supra* note 2, at 11.

197

NORTHWESTERN UNIVERSITY LAW REVIEW

of safety, their trust in public institutions, and their ability to engage in constitutionally salient conduct like education, speech, assembly, and voting. Laws enforcing public safety protect both individual and collective constitutional interests. Given the commitments that define our constitutional democracy, government can regulate weapons to ensure that all persons have equal claims to security and to the exercise of liberties whether or not they are armed and however they may differ by race, sex, or viewpoint.

We have attempted to identify and describe the government's public safety interest, but breathing life into it will require the work of many others. Legislators can create records—including fact-finding, legislative history, and precatory language—making clear that proposed gun laws are designed not only to protect life, but also to ensure that Americans have the security to equally enjoy the full range of constitutional freedoms, whether or not they choose to arm.[298] Police and prosecutors with responsibility to enforce those laws need not wait, as in Michigan, for a trigger to be pulled. In appropriate situations, they can and should arrest those who wield guns recklessly or dangerously.[299] Lawyers and judges debating and evaluating the constitutionality of those laws can consider the government's interest not only in preventing physical injuries, but also in promoting the kind of security necessary for individuals, families, and communities to flourish.

Analyzed from this vantage point, claims about values, freedom, feelings, and flourishing—the demand for security to protect family and to exercise rights—appear on both sides of the Second Amendment debate. Justice Thomas has disparaged laws that Americans have enacted in an effort to protect their families and their freedoms from gun threats, suggesting that such regulations are not constitutional if their only purpose is to make Americans feel safer.[300] Gun-rights advocates in Michigan and elsewhere are equally ready to discount the feelings of those who support laws restricting guns.[301] The argument echoes a slogan that President Trump's supporters display on t-shirts and other merchandise: "Fuck your feelings."[302] And yet,

---

[298] *Cf.* Joseph Blocher, *The Right Not to Keep or Bear Arms*, 64 STAN. L. REV. 1, 4 (2013) ("A person who believes her home to be safer without a gun is attempting to protect herself from a risk of future violence, just like a person who chooses to keep a handgun on her bedside table. If self-defense is the 'core' of the Second Amendment, why should only one of these decisions be constitutionally protected? Shouldn't the interests giving rise to the affirmative right also protect a person's freedom not to exercise it?").
[299] Blocher et al., *supra* note 93, at 112.
[300] *See supra* text accompanying note 236.
[301] *See supra* notes 75–78, 101–104 and accompanying text.
[302] *See supra* note 77.

198

116:139 (2021) *When Guns Threaten the Public Sphere*

as with so many other issues that divide our polarized society, the emphasis is on discounting the feelings of others. Fuck *your* feelings, not all feelings.

After all, many gun owners and gun-rights advocates are *also* acting on feelings, seeking safety and security in guns.[303] A recent Ninth Circuit opinion striking down California's prohibition on LCMs emphasized that "[m]any Californians may find solace in the security of a handgun equipped with an LCM."[304] Gun manufacturers tout their products as providing, in the words of one Beretta advertisement, "Protection, Peace of Mind and Self Confidence."[305] Others argue that the Framers believed gun ownership "foster[s] both personal and societal virtue."[306] And a growing body of scholarship defends broad gun rights as especially necessary in response to "months of wild and unchecked violence in cities across the country,"[307] "a time of lawless violence,"[308] or what an NRA article promoting such

---

[303] *See* Ruth Igielnik & Anna Brown, *Key Takeaways on Americans' Views of Guns and Gun Ownership*, PEW RSCH. CTR. (Jun. 22, 2017), https://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/ [https://perma.cc/82XK-P7DY] ("While many gun owners say they have more than one reason for owning a firearm, 67% cite protection as a major reason."); Kate Masters, *Fear of Other People Is Now the Primary Motivation for American Gun Ownership, a Landmark Survey Finds*, TRACE (Sep. 19, 2016), https://www.thetrace.org/2016/09/harvard-gun-ownership-study-self-defense/ [https://perma.cc/3WAV-CGJ2] (observing that 63% of gun owners cited protection against people as a primary reason for owning a firearm); American Conservative Union, *CPAC 2015 - Wayne LaPierre, NRA*, YOUTUBE (Feb. 27, 2015), https://www.youtube.com/watch?v=wfPkD4oqCVI [https://perma.cc/8D7H-B7TJ] ("You know what can protect you when no one else can, when no one else will? The ironclad, absolute safeguard of the Second Amendment right to keep and bear arms."); Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 TENN. L. REV. 679, 722 (1995) ("[I]f people feel safer because they carry a gun and in turn lead happier lives because they feel safer and more secure, then the carrying of guns makes a direct and nontrivial contribution to their overall quality of life.").

[304] Duncan v. Becerra, 970 F.3d 1133, 1141 (9th Cir. 2020).

[305] David Kairys, *Legal Claims of Cities Against the Manufacturers of Handguns*, 71 TEMP. L. REV. 1, 4 (1998).

[306] Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 468 n.32 (1995) (attributing this view to Thomas Jefferson, who wrote to a nephew that "[a]s to the species of exercise, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise, and independence to the mind").

[307] Joyce Lee Malcolm, *Self Defense, an Unalienable Right in a Time of Peril: Protected and Preserved by the Second Amendment* 1 (Liberty & L. Ctr. Research Paper No. 20-02, 2020), https://papers.ssrn.com/a=3703895 [https://perma.cc/T3WT-AA6Z]; *id.* at 17 ("The Second Amendment right to armed self-defense is more necessary than ever as Americans are left to protect themselves."). For similar arguments, *supra* notes 116–117 and sources cited therein; Josh Blackman, *The "Essential" Second Amendment*, 26 TEX. REV. L. & POL. (forthcoming 2021) (manuscript at 26–27), https://papers.ssrn.com/a=3827441 [https://perma.cc/XPY9-YYD5] (arguing that gun stores are "essential" businesses in times of civil unrest); John O. McGinnis, *Gun Rights Delayed Can Be Gun Rights Denied*, 2020 U. ILL. L. REV. ONLINE 302, 302 ("The looting and violence that occurred in cities across the nation provide new insights into the relation of the First and Second Amendments and raise new questions about the scope of Second Amendment rights.").

[308] Lund, *supra* note 116, at 81.

199

NORTHWESTERN UNIVERSITY LAW REVIEW

scholarship referred to as "uncertain times."[309] Such arguments read the summer's racial-justice protests through the law-and-order lens of *Heller*—coding them as crime, rather than speech or assembly. Doing so effectively conflates those *public* scenes with *Heller*'s paradigmatic scene: the use of a handgun against a home invader.

But the Second Amendment—the judicially enforceable right to keep and bear arms—does not resolve this debate in favor of gun owners. Laws protecting public safety remain, in the first instance, a prerogative of our democratic government, acting with the warrant of an ancient common law tradition that *Heller* recognized.[310] Even as courts expand the right recognized in *Heller*, judges must still address the government's interest in enacting laws to protect public safety that burden the exercise of the right—especially as that right expands into shared spaces where the public safety interest is implicated in ways that *Heller*'s home-based analysis does not adequately address. That is the logic of constitutional adjudication in a constitutional democracy.

Nor does the existing empirical evidence clearly resolve the question of whether guns "actually" make people more or less safe.[311] While the effects of some gun laws can be determined through strong empirical evidence,[312] further research is needed to assess the efficacy of others. Given the conflicting evidentiary record, courts evaluating the constitutionality of gun laws owe "substantial deference to the predictive judgments of [the legislature]."[313] As importantly, ongoing empirical contestation shows that there is no clear tradeoff between physical safety and public safety as we have described it.[314]

---

[309] *See Law Professors Make Case for Second Amendment Rights in Uncertain Times*, NRA-ILA (Oct. 19, 2020) https://www.nraila.org/articles/20201019/law-professors-make-case-for-second-amendment-rights-in-uncertain-times [https://perma.cc/2TAH-Y7ZA].

[310] *See supra* Section II.B.

[311] *What Science Tells Us About the Effects of Gun Policies*, RAND CORP. (Apr. 22, 2020), https://www.rand.org/research/gun-policy/key-findings/what-science-tells-us-about-the-effects-of-gun-policies.html [https://perma.cc/WE7P-ZV9W] (broadly surveying existing research and concluding that "[w]ith a few exceptions, there is a surprisingly limited base of rigorous scientific evidence concerning the effects of many commonly discussed gun policies. This does not mean that these policies are ineffective; they might well be quite effective").

[312] *Id.* (noting strong evidence that child-access-prevention laws save lives and that stand-your-ground laws raise homicide rates).

[313] Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997); *see also* Holder v. Humanitarian L. Project, 561 U.S. 1, 33 (2010) ("That evaluation of the facts by the Executive, like Congress's assessment, is entitled to deference.").

[314] *Compare* JOHN LOTT, MORE GUNS LESS CRIME (1998) (arguing that violent crime rates fall when states issue more concealed-carry permits for private citizens), *with* Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 STAN. L. REV. 1193 (2003) (arguing to the

200

116:139 (2021) *When Guns Threaten the Public Sphere*

      All too often, gun owners view their claims to security and freedom like constitutional trump cards. They are not. Claims to security and freedom of this constitutional magnitude support the case for gun regulation, as well as for gun rights. The increasing role of weapons in our polarized politics makes certain things clear. If we do not recognize the ancient role that weapons laws play in securing the peace and public order, we will allow the use of guns to define our constitutional democracy, rather than the other way around.

---

contrary that, while some seemingly plausible approaches might support Lott's hypothesis, more sophisticated approaches actually undermine it).

201

NORTHWESTERN UNIVERSITY LAW REVIEW

| VIEWPOINT | Regulating Assault Weapons and Large-Capacity Magazines for Ammunition |

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.



Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201



Supplemental content

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

### History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semi-automatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by John Echeverria on 10/18/2022

### Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

### The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shooting in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

### Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

### Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

ARTICLE INFORMATION

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

REFERENCES

**1**. Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know*. 2nd ed. Oxford University Press; 2020.

**2**. Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

**3**. Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

**4**. Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy*. RAND; 2020.

**5**. Duwe G. Patterns and prevalence of lethal mass violence. *Criminol Public Policy*. 2020;19(1):17-35. doi:10.1111/1745-9133.12478

**6**. Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

**7**. Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://www.theviolenceproject.org/mass-shooter-database/

**8**. Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

**9**. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3):291-299. doi:10.1001/jama.2016.8752

**10**. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by John Echeverria on 10/18/2022

Compendium_Supplemental Brief
Page 152

[ Back | Home ]

[ Originally published as *1 Cent. L. J. 259-261, 273-275, 285-287, 295-296 (1874)*. NOTE: The Central Law Journal was published weekly in St. Louis, Mo. This article was published in four installments: Thursday, May 28, 1874, Thursday, June 4, 1874, Thursday, June 11, 1874, and Thursday, June 18, 1874. These were issue numbers 22-25 respectively. The article bears no author name. It was presumably written by the editors of the Journal: John F. Dillon, Editor & S.D. Thompson, Ass't Editor.]

# The Right to Keep and Bear Arms for Private and Public Defence.

The second amendment of the constitution of the United States recites that "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Similar provisions will probably be found in the constitutions of most of the states. Thus the constitution of Texas declares that "every person shall have the right to keep and bear arms in the lawful defence of himself or the state, under such regulations as the (p.260)legislature may prescribe." *Art. 1, § 13*. So the present constitution of Tennessee provides that "the citizens of this state have a right to keep and bear arms for their common defence; but the legislature shall have power by law to regulate the wearing of arms with a view to prevent crime." These and similar provisions in the constitutions of other states have been discussed in several cases, and with the apparently growing habit of legislatures to restrict the wearing of arms, their exposition assumes increasing importance. The provision in the federal constitution does not appear ever to have received exposition in the Supreme Court of the United States, but the state tribunals have furnished a series of interesting decisions upon the subject, referring either to the federal or to the state constitution.

1. The first of these appears to have been *Bliss v. Commonwealth, 2 Littell,* 90, determined in the Court of Appeals of Kentucky in 1822, and relates to the question we shall consider first--the *manner* of carrying weapons. The constitution of Kentucky provided "that the right of the citizens to bear arms in defence of themselves and the state *shall not be questioned*." It was held that a statute providing that "any person in this commonwealth, who shall hereafter wear a pocket-pistol, dirk, large knife, or sword in a cane, *concealed as a weapon*, unless when travelling on a journey, shall be fined in any sum not less than one hundred dollars," etc. This statute was held to be in conflict with the constitutional guaranty, and hence void--one of the three judges dissenting. The court said : "That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defence of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons *concealed* in the manner described in the act, they may nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution it is not essential that the act should contain a prohibition against bearing arms in every possible form. It is the *right* to bear arms in defence of the citizens and the state that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. If, therefore, the act in question imposes *any* restraint upon the right, immaterial what appellation may be given to the act, whether it be an act *regulating* the manner of bearing arms or any other, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious." And the court further on declare that "in principle there is no difference between a law prohibiting the wearing of *concealed* arms and a law forbidding the wearing of such as are exposed." And, therefore, the defendant having been convicted and fined for carrying a sword concealed in a cane, the judgment was reversed.

The next case in order of time appears to have been *The State v. Mitchell, 3 Blackf.* 229, determined in the Supreme Court of Indiana in 1833. The ruling is diametrically opposed to that in the Kentucky case. The report does no more than mention the point ruled in the briefest terms, but it would seem that the Indiana constitutional provision was simply "that the people have a right to bear arms for the defence of themselves and the state." And the statute (*Laws of Ind., ed. of 1831, p. 192*) which was held not in derogation of this provision provided that "every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon *concealed*, shall, upon conviction thereof, be fined in any sum not exceeding one hundred dollars."

This ruling was followed by the Supreme Court of Alabama in 1840, in *The State v. Reid, 1 Ala.* 612. The provision of the Alabama constitution was almost identical with that of Indiana. It provided that "every citizen has the right to bear arms in defence of himself and the state." And it was held that this provision was not infringed by a statute which provided that "if any person shall carry *concealed* about his person any species of fire-arms, or any bowie-knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or other concealed weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine of not less than fifty nor more than five hundred dollars," etc. The statute was held not in conflict with the constitutional provision. And this ruling was reaffirmed in *Owen v. The State, 31 Ala.* 387. The Supreme Court of Alabama in the former case say: "The constitution, in declaring that

'every citizen has the right to bear arms in defence of himself and the state,' has neither expressly nor by implication denied the legislature the right to enact laws in regard to the *manner* in which arms shall be borne. The right guaranteed to the citizen is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the state.' The terms in which this provision is phrased seem to us necessarily to leave with the legislature the authority to adopt such regulations of police as may be dictated by the safety of the people and the advancement of public morals." And further on they say: "We do not desire to be understood as maintaining that in regulating the manner of bearing arms, the authority of the legislature has no other limit than that of its own discretion. A statute which, under pretence of *regulating*, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution." And the court also say: "Under the provision of our constitution, we incline to the opinion that the legislature cannot inhibit the citizen from bearing arms *openly*, because it authorizes him to bear them for the purpose of defending himself and the state, and it is only when carried openly that they can be effectively used for defence." *1 Ala.* 616, 617, 619.

The distinction here taken in regard to the *manner* of carrying or wearing weapons, has been followed in several later cases. Thus in *Nunn v. The State, 1 Kelly,* 243, decided in 1846, the Supreme Court of Georgia held that a statute of that state, so far as it sought to suppress the practice of carrying certain weapons *secretly*, was valid, inasmuch as it did not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms; but that so (p.261)much of it as prohibited the wearing of certain arms *openly*, was unconstitutional and void. To the same effect, see *Stockdale v. The State, 32 Ga.* 225, and the very thoroughly considered case of *The State v. Buzzard, 4 Ark.* 18. So it has been held in several cases in Louisiana, that a statute prohibiting the carrying of *concealed* weapons did not infringe the right of the people to keep and bear arms, but was simply a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society. *The State v. Jumel, 13 La. An.* 399; *The State v. Smith, 11 La. An.* 633; *The State v. Chandler, 5 La. An.* 489. The same conclusion was reached by the Supreme Court of Tennessee in 1840 in *Aymette v. The State, 2 Humph.* 154, but upon somewhat different grounds, as we shall see further on; and is also supported by *Andrews v. The State, 3 Heiskell (Tenn.)* 165.

[TO BE CONTINUED.](p.273)

[CONTINUED.]

2. A second branch of the question relates to the *kind* of weapon, the carrying of which is within the constitutional guaranty. By far the most instructive case on this branch of the question is *Aymette v. State, 2 Humph.* 154. The constitution of Tennessee in force at that time provided that "the free white men of this state shall have a right to keep and bear arms *for their common defence*." And the question considered by the court was whether this constitutional provision was violated by a statute which provided "that if any person shall wear any bowie-knife, or Arkansas tooth-pick, or other knife or weapon that shall in form, shape or size resemble a bowie-knife, or Arkansas tooth-pick, under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof, shall be find," etc. Green, J., in an able opinion traces the constitutional provision to its origin in the *English Bill of Rights, Stat. 1 W. & M., ch. St. 2, ch. 2, cl.* and then makes the following observations upon its policy and scope: "As the object for which the right to keep and bear arms is secured, is of a *general* and *public* nature, to be exercised by the people in a body for their *common* defence, so the *arms*, the right to keep which is secured, are those which are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution." It was accordingly held that the statute was not in derogation of the state constitution.

But by far the most elaborate discussion of the question will be found in *Andrews v. The State, 3 Heiskell,* 165, determined in the Supreme Court of Tennessee in 1871. The state was ably represented, and the synopsis of the argument of the attorney-general should not be overlooked. The court possessed the weight of being composed of six judges; but unfortunately they were by no means unanimous, either as to the result, or as to the reasoning by which the result was reached. The provision of the present constitution of Tennessee is that "the citizens of this state have a right to keep and bear arms *for their common defence*; but the legislature shall have power by law to regulate the *wearing* of arms with a view to prevent crime." *Const. of Tenn., art. 1, § 26.* The material provision of the statute whose validity was disputed was that "it shall not be lawful for any person *publicly* or *privately* carry and dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver." *Act of Tenn., June 11, 1870; 2 Tho. & S. Code, § 4756 a.* It was held that this statute was not in derogation of the constitution of the state, except so far as it restrained the keeping of arms "in the ordinary