1   Rob Bonta
    Attorney General of California
2   P. Patty Li
    Supervising Deputy Attorney General
3   Anna Ferrari
    Deputy Attorney General
4   John D. Echeverria
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                       CIVIL DIVISION

13

14   **JAMES MILLER et al.,**              Case No. 3:19-cv-01537-BEN-JLB

15                        Plaintiffs,
                                          **COMPENDIUM OF WORKS**
16        **v.**                          **CITED IN DEFENDANTS'**
                                          **SUPPLEMENTAL BRIEF IN**
17                                        **RESPONSE TO THE COURT'S**
                                          **ORDER OF AUGUST 29, 2022**
18   **CALIFORNIA ATTORNEY**
     **GENERAL ROB BONTA et al.,**        **VOLUME 7 OF 13**
19
                         Defendants.      Courtroom:    5A
20                                        Judge:        Hon. Roger T. Benitez

21                                        Action Filed:  August 15, 2019

22

23

24

25

26

27

28                                        1

## INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |

**BOOKS**

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020 (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

mode known to the court." In this result four of the judges concurred. Freeman, J., delivered the opinion of the court, in which the question is discussed at great length. Nicholson, Ch. J., and Deaderick, J., concurred in the general views expressed by him; but Sneed, J., dissented from so much of the opinion as questioned the right of the legislature to prohibit the wearing of arms of any description, or sought to limit the operation of the act of 1870. On the other hand, Nelson, J., dissented with much force, holding that the act was in derogation of the constitutional right to bear arms, and in derogation of the natural and inalienable right of self-defence. While it is difficult to say precisely what this long case does decide, it may be fairly said to be an affirmance of Aymette v. State, *supra*; and no doubt the following sentences represent the views of all of the four concurring judges, except Sneed, J., who goes further in support of the power of the legislature to regulate the wearing of arms: "What, then, is he [the citizen] protected in the right to keep and thus use? Not everything that may be useful for offence or defence; but what may (p 274)properly be understood or included under the title of arms, taken in connection with the fact that the citizen is to keep them as a citizen. Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defence of his own liberties, as well as of the state. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should he trained, we would hold that the rifle of all descriptions, the shot-gun, the musket and repeater are such arms; and under the constitution, the right to *keep* such arms cannot be *infringed* or *forbidden* by the legislature. Their *use*, however, may be subordinated to such regulations and limitations as are or may be authorized by the laws of the land, passed to subserve the general good, so as not to infringe the right secured, and the necessary incidents to the exercise of such right." * * * "We hold, then, that the act of the legislature in question, so far as it prohibits the citizen, either publicly or privately, to carry a dirk, sword-cane, Spanish stilletto, belt or pocket pistol, is constitutional. As to the pistol designated as a *revolver*, we hold this may or may not be such a weapon as is adapted to the usual equipment of the soldier, or the use of which may render him more efficient as such; and therefore hold this to be a matter to be settled by evidence, as to what character of weapon is included in the designation 'revolver.'" * * * * "We know there is a pistol of that name [revolver] which is not adapted to the equipment of the soldier, yet we also know that the pistol known as the 'repeater' is a soldiers' weapon--skill in the use of which will add to the efficiency of the soldier. If such is the character of the weapon here designated, then the prohibition of the statute is too broad to be allowed to stand consistently with the views herein expressed. * * * As we have said, the statute amounts to a prohibition to keep and use such weapon for any and all purposes. It therefore, in this respect, violates the constitutional right to keep arms, and the incidental right to use them, in the ordinary mode of using such arms, and is inoperative."

We must not here overlook the early Tennessee case of *Simpson v. The State, decided by the Supreme Court of Tennessee in 1833, and reported in 5 Yerger, 356*. The only question in that case was the sufficiency of an indictment for an *affray* which charged that the defendant, "with force and arms, at, etc., being arrayed in a warlike manner, then and there, in a certain public street and highway situate, unlawfully, and to the great terror of divers good citizens of the state, then and there being, an affray did make," etc. It was held that this indictment did not sufficiently charge an affray. The court consisted of four judges, among them Judge Green, who delivered the opinion of the court in Aymette v. The State, *supra*, and also Judge Catron, afterwards one of justices of the Supreme Court of the United States, who, two years before, had delivered the opinion of the court in the famous *Grainger case (5 Yerg. 459)* expounding the law of self-defence; and with these were associated Judges Whyte and Peck. Whyte, J., delivered the opinion of the court, Peck, J., dissenting. Two *reasons* were given for holding the indictment insufficient. The *first* was that in order to constitute an affray there must be, 1st, fighting; 2d, and between two or more persons, 3d, and in some public place so as to cause terror to the people. Now the indictment did not charge *fighting*, nor fighting *between two or more persons*. It was therefore held insufficient. It is difficult to conceive how there can be *fighting*, unless there be at least two persons, unless it be between a man and a beast; but we are stating accurately the reasoning of the court. The *second* reason, and the one with which we have to do, is embodied in the following language of Judge Whyte: "But suppose it to be assumed on any ground that our ancestors adopted and brought over with them this English statute [*2 Edw. III.*] or portion of the common law, our constitution [of 1796] has completely abrogated it. It says 'that the freemen of this state have a right to keep and to bear arms for their common defence.' (*Art 11, § 29.*) It is submitted that this clause of our constitution fully meets and opposes the passage or clause in Hawkins of 'a man's arming himself with dangerous and unusual weapons,' as being an independent ground of affray, so as of itself to constitute the offense cognizable by indictment. By this clause of the constitution an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived that it would be going much too far to impair by construction or abridgment a constitutional privilege which is so declared. Neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby. We must attribute to the framers of it the absence of such a view." In Aymette's case, *supra*, Judge Green characterized the above language as "only an incidental remark of the judge who delivered the opinion, and therefore entitled to no weight." To enable the reader to judge how far this declaration of law by Judge White was necessary to the determination of the question in the case, it should be remarked that it is an *argument* put forth to obviate the force of the following language of Sergeant Hawkins: "But granting that no bare words in the judgment of law carry with them so much terror as to amount to an affray, yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms

himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people, which is said always to have been an offence at common law, and is strictly prohibited by many statutes." (*Hawk. P. C. Book 1, ch. 28, § 4, Leach's ed.*)

The latest case upon this branch of the subject appears to be *English v. The State, 35 Tex. 473*. The statute considered in that case (*Act of 12 April, 1871, 2 Pasch. Dig. Laws, art. 6512*) provides with certain exceptions that "any person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offence or defence, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such grounds of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defence of the state, as a militia-man in actual service, or as a peace officer or policeman, shall be guilty of misdemeanor," etc. The second section provides that "any person charged under the first section of this act who may offer to prove by way of defence that he was in danger of an attack on his person, or unlawful (p.275)interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath his clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered a legal defence." *Section 3* provides that the governor may, by proclamation, exempt the frontier counties from the operation of the act. The remaining sections contain provisions which it is not necessary to notice. It will be seen that this statute is much stronger than any which we have previously cited. With certain restricted exceptions, it effectually prohibits the bearing of all small arms, whether openly or concealed, on horseback or on foot. It is doubtful whether so sweeping a statute can be sustained in the light of any of the adjudications already quoted. But the late Supreme Court of Texas nevertheless did, in English v. The State, *supra*, declare that it is neither in conflict with the second amendment of the federal constitution, nor with the provision of the constitution of that state quoted at the beginning of this article. The court (Walker, J.) say: "The word 'arms,' in the connection we find it in the constitution of the United States, refers to the arms of a militia-man or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster-pistol and carbine; of the artillery, the field-piece, siege gun and mortar, with side-arms. The terms dirks, daggers, slung-shots, sword-canes, brass-knuckles and bowie-knives belong to no military vocabulary. Were a soldier on duty found with one of these things about his person he would be punished for an offence against discipline. The act referred to makes all necessary exceptions, and points out the place, the time and manner in which certain deadly weapons may be carried as a means of self-defence; and these exceptional cases, in our judgment, fully cover all the wants of society. There is no abridgment of the *personal* rights, such as may be regarded as inherent and inalienable to man, nor do we think his *political* rights are the least infringed by any part of this law." The court also understand the word "arms" in the Texas constitution as having the same import and meaning which it has in the second amendment of the federal constitution; and they hold that the legislature may *regulate* the right to bear arms without taking it away, and that this has been done by the act under consideration.

[TO BE CONTINUED.](p.285)

[CONTINUED.]

3. A third question is, whether the natural right of self-defence will under any circumstances justify the carrying of a particular weapon, and in a particular manner, when such carrying is forbidden by statute. "In reason," says Mr. Bishop, "there may be circumstances in which the right of self-defence will justify the carrying of a concealed weapon for the purpose; and should such a case arise (and it must be an extreme one, out of the ordinary course of things, or it could not arise), doubtless this should be held to be an exception, engrafted by the common law upon the general terms of the statute." *Bish. Stat. Crimes, § 789*. This view would seem to be entirely consistent with reason and unavoidable. When we reflect on the question of what is termed the right of self-defence, we shall see that it is a most comprehensive right; that it is one and the same thing with the right to "life, liberty and the pursuit of happiness," which our fathers asserted in the Declaration of Independence. It would seem to follow from what has been said upon the subject by various writers that while society may *regulate* this right of self-defence so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and most odious form of tyranny. Thus, Sir Michael Foster says: "The right of self-defence in these cases [cases of felonious attacks upon person, habitation, or property] is founded in the law of nature, and is not, *nor can be*, superseded by any law of society; for, before societies were formed, * * * the right of self-defence resided in individuals; it could not reside elsewhere; and since, in cases of necessity, individuals incorporated into society cannot resort for protection to the law of society, that law with great propriety and (p.286)strict justice, considereth them as still in that instance under the protection of the law of nature." (*Foster Crown Law, 273-4*. See also *2 Rutherforth's Institutes, ch. 16*; *Grotius' De Jure Belli et Pacis, lib. 2 cap. 1*; *Gray v. Coombs, 7 J. J. Marshall, 478*; *Isaacs v. State, 25 Tex. 174*; *Com. v. Riley, Thacher's Crim. Cas. 471*; *United States v. Holmes, 1 Wallace, Jr. 1*.) It is within common experience that there are circumstances under which to disarm a citizen would be to leave his life at the mercy of a treacherous and plotting enemy. If such a state of facts were clearly proven, it is obvious that it would be contrary to all our notions of right and justice to punish the carrying of arms, although it may have infringed the letter of some

statute. To do so would be to make the law what it never was intended to be, an instrument of cruelty and injustice. Such a case might clearly be said to fall within that class of cases in which the previously existing common law interpolates exceptions upon subsequently enacted statutes. See *Bish. Stat. Crimes, §§ 7, 123, 131, 141, 351-359, 362, 789.*

Turning to the adjudications, we find it declared in one case, under an Indiana statute, probably the same already cited (*ante, 260*), that if a person, not being a traveller, carry a concealed weapon, he is guilty of an indictable offense and his *motive* for carrying the weapon is immaterial. *Walls v. The State, 7 Black. 572.* A similar ruling was made in *Cutsinger v. Commonwealth, 7 Bush. Ky. 392.* But these cases do not help our enquiries, because the defendants did not claim to have carried the weapons for the purpose of defence against any threatened or impending injury, but, in one case, for the purpose of exhibiting it as a curiosity, and in the other, for the purpose of conveying it to another person.

In *Hopkins v. Commonwealth, 3 Bush, Ky. 480*, there was sufficient proof that the defendant, on a certain day, carried a pistol concealed about his person, and the defendant attempted to excuse the act by proving that he had been shot at by strangers more than two years before, and that "for precautionary security of self-defence" against a like attack he had carried a pistol ever since. The court (Robertson, J.) said: "These facts were wholly *irrelevant*, as there was neither proof nor cause for apprehension of any such impending danger; and, therefore, there was no error in refusing to admit another witness to the same facts."

Another ground of error urged in the same case, was that the court should not have given the following instruction: "If the jury believe from the evidence that the defendant * * * carried a pistol concealed about his person, and that he had no *reasonable ground* to believe, and did not believe, that his person was in danger of great bodily harm, they should punish him by a fine," etc. To understand the force of this instruction, it should be observed that the Kentucky statute against carrying concealed weapons, in force at that time, made the carrying of such weapons lawful "where the person has *reasonable grounds* to believe that his person, or the person of some of his family, or his property, is in danger from violence or crime." *1 Stanton's Code, p. 414.* The defendant's counsel insisted that the defendant was rightfully the best judge of the necessity or prudence of carrying a concealed pistol for self-defence, and was the only person who could know whether he in fact apprehended danger; and hence objected to so much of the instruction as required *reasonable grounds* for apprehension. The court, however, did not see the instruction in this light. Judge Robertson said: "Were this erroneous, the salutary law against the pestilent and alarmingly prevalent habit among all classes, and especially among young men and even boys, of wearing concealed arms, through false and cowardly pride, and through mock chivalry, might soon become practically a dead letter. A statute so beneficent, and so often and so easily evaded, should be vigilantly upheld and stringently enforced by the judiciary, for repressing a dishonorable and mischievous practice, which, licensed or unlicensed, leads almost daily to causeless homicides and disturbances, which would otherwise never be perpetrated; and to that end, the accused should always be required to prove that he carried a concealed weapon only for the purpose of defending himself or family or property against an impending attack, *reasonably apprehended*, and which, if attempted, would justify the use of some such means of defence. But the superfluous addition of the words, 'and did not believe that his person was in danger,' relieves the instruction from the counsel's criticism, and makes it more favorable to the appellant than he had a right to demand or expect." Although this ruling was necessary in view of the terms of the Kentucky statute, yet it is thought that it would be the same on general principles; for it is in strict analogy with that numerous class of cases which makes the fears of *a reasonable man*, and not the fears actually entertained, the test of the justification of the degree of force and kind of weapon employed in one's defence. (*Selfridge's case, 1 Self-Defence Cases, 1*; *Sullivan's case, ib. 65*; *Shorter's case, ib. 258*; and many others.)

In one of the cases in Tennessee, already quoted, *Andrews v. The State, 3 Heiskell, 165, 188*, there are considerable *dicta* on the question whether a man can defend himself against an indictment for carrying arms forbidden to be carried by law, by showing that he carried them in self-defence. While admitting the question to be one of "some little difficulty," the learned judge who delivered the opinion of the court says: "The real question in such case, however, is not the right of self-defence, as seems to be supposed (for that is conceded by our law to its fullest extent), but the right to use weapons or select weapons for such defence, which the law forbids him to keep or carry. If this plea could be allowed as to weapons thus forbidden, it would amount to a denial of the right of the legislature to prohibit the keeping of such weapons; for if he may lawfully use them in self-defence, he may certainly provide them and keep them for such purpose, and thus the plea of right of self-defence will draw with it, necessarily, the right to keep and use everything for such purpose, however pernicious to the general interest or peace or quiet of the community. Admitting the right of self-defence in its broadest sense, still, on sound principles, every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good; and where certain weapons are forbidden to be kept or used by the law of the land, in order to the prevention of crime--a great public end--no man can be permitted to disregard this general end, and demand of the community the right, in order to gratify his whim or wilful desire, to use a particular weapon in his particular self-defence. The law allows ample means of self-defence without the means which we have held may be rightfully (p.287)proscribed by this statute, The object being to banish these weapons from the community by an absolute prohibition, for the prevention of crime, *no man's particular safety*, if such case could exist, ought to be allowed to defeat this end. Mutual sacrifice of

individual rights is the bond of all social organizations, and prompt and willing obedience to all laws passed for the general good is not only the duty, but the highest interest of every man in the land. * * * We admit that extreme cases may be put where the rule may work harshly, but this is the result of all general rules--that they may work harshly sometimes in individual cases. By our system, however, allowing the attorney-general to enter a *nolle prosequi* with the assent of the court, there is but little danger of the law being enforced in any such cases to the detriment of any one; and if such case should occur, an application to executive clemency may fairly be presumed to be the remedy provided by the constitution to meet all such exigencies." The court, therefore, hold that the testimony tending to prove "that there was a set of men in the neighborhood of defendant during the time he carried his pistol and before, seeking the life of defendant," was properly rejected, *because it did not appear what the character of the weapon was*, and it may have been such a weapon as could not be properly carried at all, and if so, the testimony would be no defence to the indictment. Comparing the above with that part of this case which was quoted on *page 274 of our last number*, it is seen that it decides that a man may not, even in his necessary defence, carry, either publicly or privately, a *dirk, sword-cane, Spanish stiletto, belt or pocket-pistol*, but that he may carry such arms for his private defence as are adapted to the equipment of the soldier. Much as we respect the general views of the learned judge and the commendable desire to promote peace and public order which his opinion manifests, yet we do not think that either his reasoning or his conclusion on this particular branch of the question can be commended. It entirely confounds the right of arming one's self for private defence against a threatened danger, with the policy of the constitution of Tennessee, which guarantees the right of bearing certain arms in order to educate the citizen for military duty. If a citizen is obliged to perform a journey where he is in danger of being attacked by highwaymen, or by assassins who seek his life, he may, if he have the arms used by a militiaman, arm himself with them;--we suppose he may even take a cannon along with him, if he have one. But if he have not, and cannot procure any of the weapons which are used in civilized warfare, he must go unarmed. Besides, in attempting to distinguish between the weapons which he may and may not use, the learned court descend into distinctions altogether too nice to be of any practical value. A belt or pocket-pistol may not be worn, but a "repeater" may. What is a large "repeater" but a belt-pistol, and what is a small "repeater" but a pocket-pistol? According to these distinctions, we suppose if the citizen have no other arms than an old-fashioned "pepper-box," he must needs leave it at home--to carry it to defend himself against the attack of a highwayman will be an indictable offence (and we don't know but it ought to be)--but he may lawfully carry a far more formidable and dangerous weapon--a cavalry-revolver, Colt or Remington. In short, before he may lawfully take with him any weapon for his personal defence, he must debate and settle in his mind whether such a weapon would be appropriate to the equipment of a soldier, and if it would, he may lawfully carry it for the purpose of defending himself; otherwise not. That such conclusions do not commend themselves to reason, need scarcely to be suggested. Nor do we perceive any ground for the distinction which the learned judge attempts to draw between the *right* of self-defence and the *means* by which that right may be secured. If the *means* are prohibited or withheld, can any one say that the right is of any substantial value? We think that upon this branch of the case the views of Judge Nelson, in his dissenting opinion, are much to be preferred. "I hold," said that learned judge, "that when a man is really and truly endangered by a lawless assault, and the fierceness of the attack is such as to require immediate resistance in order to save his own life, he may defend himself with *any weapon whatever*, whether seized in the heat of conflict, or carried for the purpose of self-defence."

In the principal Alabama case which we have already quoted, *The State v. Reid, 1 Ala. 612, 619*, the question, it will be remembered, arose on a constitutional provision which guaranteed the right to bear arms "in defence of *himself* and the state." The court thought that in view of that provision it would not be competent for the legislature to prohibit the wearing of arms *openly*, because "it is only when worn openly that they can be efficiently used for defence." And they also say: "We will not undertake to say that if in any case it should appear to be indispensable to the right of defence that arms should be carried concealed about the person, the act 'to suppress the evil practice of carrying weapons secretly' should be so construed as to operate a prohibition in such case." The right to bear arms *when threatened with, or having good reason to apprehend an attack, or travelling or setting out on a journey*, was subsequently recognized in Alabama by statute. *Ala. Code, 1852, § 3274*; *Owen v. State, 31 Ala. 388*.

In Texas, as we have already seen (*ante, p. 274*), it has been held within the power of the legislature to prohibit the carrying of all *small arms*, notwithstanding a constitutional provision similar to that of Alabama, guaranteeing the right to carry arms for the defence of *one's self*, as well as for the defence of the state.

Such appears to be the unsatisfactory state of the authorities on this branch of the question. On the one hand, as long as the machinery which society has afforded for the *prevention* of private injuries remains in its present ineffective state, society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger; and it will be in vain that the laws of society denounce penalties against the citizen for arming himself when his life is menaced by the attacks of wild beasts, of highwaymen, or of dangerous and persevering enemies. On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.

[TO BE CONTINUED.](p.295)

[CONCLUDED.]

4. We shall take leave of this subject by briefly considering whether the second amendment of the constitution of the United States is restrictive upon the states. This amendment provides that "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Mr. Bishop suggests that, "though most of the amendments are restrictions on the general government alone, this one seems to be of a nature to bind both the state and the national legislatures; and doubtless it does." Of the same view was the Supreme Court of Georgia in *Numn v. The State, 1 Kelly, 243*, where the question was discussed at considerable length, and where a statute of that state was held in part invalid because in conflict with this amendment. In the three Louisiana cases already quoted, the subject was discussed solely with reference to this amendment to the federal constitution, and it seems to have been taken for granted that it is restrictive upon the states. *State v. Chandler, 5 La. An. 489*; *State v. Smith, 11 La. An. 633*; *State v. Jumel, 13 La. An. 399*. So in the Arkansas case, *The State v. Buzzard, 4 Ark. 18*, all the judges appear to have understood this amendment as applicable to the states; and Judge Dickinson supposes it to pertain to the power possessed by the general government of organizing, arming and disciplining the militia. He says this provision of the federal constitution "is but an assertion of that general right of sovereignty belonging to independent nations, to regulate their military force."

This view of Judge Dickinson contains the only plausible reason we have met with for supposing that this amendment is binding upon the states. The decisions of the Supreme Court of the United States, expounding the early amendments of the federal constitution, leave little room to doubt that none of the first ten amendments apply to the states, but that all of them are merely restrictive upon the federal power. Thus, in *Barron v. The City of Baltimore, 7 Pet. 243, 247*, it was held that an act of the Maryland legislature, which it was alleged deprived the plaintiff in error of his property without just compensation, was not void as being in conflict with the *fifth* amendment of the federal constitution. Chief Justice Marshall, delivering the unanimous judgment of the court, said: "The question presented is, we think, of great importance, but not of much difficulty. The constitution was ordained and established by the people of the United States themselves, for their own government, and not for the government of the individual states. Each state established a constitution for itself, and in that constitution provided such limitations and restrictions on the powers of its particular government as its judgment dictated. The people of the United States framed such a government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The power they conferred on this government was to be exercised by itself, and the limitations on power, if expressed in general terms, are naturally and, we think, necessarily, applicable to the government created by the instrument. They are limitations of power granted in the instrument itself, not of distinct governments framed by different persons and for different purposes." This language would be equally decisive if applied to any of the first ten amendments. Again, in *Fox v. The State of Ohio, 5 How. 410, 434*, it is declared that the prohibitions contained in the amendments to the federal constitution "were not designed as limits upon the state governments in reference to their own citizens. They are exclusively restrictions upon federal power, intended to prevent interference with the rights of the states and of their citizens." "Such, indeed," said Mr. Justice Daniel, in delivering the opinion of the court, "is the only rational and intelligible interpretation which these amendments can bear, since it is neither probable nor credible that the states should have anxiously insisted to engraft upon the federal constitution restrictions upon their own authority--restrictions which some of the states regarded as the *sine qua non* of its adoption by them." So, also, it was held in *Smith v. The State of Maryland, 18 How. 71, 76*, that the provision of the *fourth* amendment of the federal constitution which prohibits the issuing of a warrant, "but upon probable cause, supported by oath or affirmation," had no application to the process of the state courts. Language equally decisive will be found in *Withers v. Buckley, 20 How. 84, 90*; *Twichell v. The Commonwealth, 7 Wall. 321*, and in other cases decided by the same court.(p.296)

In view of these decisions of the only court whose interpretations of the federal constitution are binding and decisive, there would seem to remain no doubt that if the question should ever arise in that court it would be held that the second amendment of the federal constitution is restrictive upon the general government merely, and not upon the states, and that every state has power to regulate the bearing of arms in such manner as it may see fit, or to restrain it altogether.

**106 Harv. L. Rev. 741**

Harvard Law Review
January, 1993

*Cass R. Sunstein*[a]

Copyright (c) 1993 by The Harvard Law Review Association; Cass R. Sunstein

# ON ANALOGICAL REASONING
## Commentary

Reasoning by analogy is the most familiar form of legal reasoning. It dominates the first year of law school; it is a characteristic part of brief-writing and opinion-writing as well. But exactly what is analogical reasoning, as it operates in law?

The subject receives little attention in the most influential works in Anglo-American jurisprudence and legal theory.[1] Often lawyers themselves are unenthusiastic about analogical reasoning, urging that this way of thinking about law is unconstrained or not a form of reasoning at all.[2] As a result, the legal culture lacks a sympathetic depiction of its own most characteristic way of proceeding.[3]

 *742  In the face of this odd combination of general indifference and critical attack, analogical reasoning maintains its status as an exceedingly prominent means by which both lawyers and nonlawyers think about legal and moral questions. The principal goals of this Commentary are to offer an account of analogical reasoning and to suggest that, at least for law, it has distinctive advantages over forms of thought that seem to be far superior. The discussion will bear on the role of analogical thinking in ethics and politics as well.

I also hope to say something about the nature and possibility of normative argument in law and to suggest how and when certain views about legal disputes can be shown to be persuasive or even correct.[4] What does it mean to say that a difficult case is "rightly decided"? How, if at all, does such a judgment differ from a political or moral claim about what the law should be? What is the difference between a legally correct decision and a morally correct decision? An understanding of analogical reasoning should provide some clues.

The Commentary is divided into three parts. Part I describes analogical reasoning, primarily by comparing it to other methods of thinking that also have a place in law. Part II tries to make the description more concrete by showing how analogies might be helpful in thinking about the problems raised by legal restrictions on cross-burning. The Supreme Court's decision in *R.A.V. v. City of St. Paul*[5] provides a focal point for the discussion.

Part III, evaluating analogical reasoning, is divided into two sections. The first explores the most prominent criticisms of this way of thinking. Here I challenge the view that analogical reasoning is indeterminate and that it depends on an apparatus - a set of principles - that it is unable to supply. The second section explores the vices and especially the virtues of analogical reasoning by contrasting it with some especially prominent approaches to legal reasoning, including those offered by Ronald Dworkin and economic analysts of law.  *743  In this section, I reject, as only part of a complex story, the view that analogical reasoning is a crude and incomplete version of the lawyer's search for "reflective equilibrium."[6] I also claim that analogical reasoning has important advantages over general theories, because those who use analogies are especially attuned to the diverse and plural goods that are at stake in legal and ethical decisions.

## I. ANALOGICAL REASONING AND SOME ALTERNATIVES

### A. Analogical Reasoning in the Law

Outside of law, analogical reasoning often helps to inform our judgments. I have a German shepherd dog who is gentle with children. When I see another German shepherd dog, I assume that he, too, will be gentle with children. I have a Toyota Camry that starts even on cold days in winter. I assume that my friend's Toyota Camry will start on cold winter days as well. This kind of thinking has a simple structure: (1) *A* has characteristic *X*; (2) *B* shares that characteristic; (3) *A* also has characteristic *Y*; (4) Because *A* and *B* share characteristic *X*, we conclude what is not yet known, that *B* shares characteristic *Y* as well. [7]

This is a usual form of reasoning in daily life, [8] but it will readily appear that it does not guarantee truth. The existence of one or many **\*744** shared characteristics does not mean that all characteristics are shared. [9] Some German shepherd dogs are not gentle with children. Some Toyota Camrys do not start on cold days in winter. For analogical reasoning to work well, we have to say that the relevant, known similarities give us good reason to believe that there are further similarities and thus help to answer an open question. Of course this is not always so. At most, analogical thinking can give rise to a judgment about probabilities, and often these are of uncertain magnitude.

Analogical reasoning has a similar structure in law. Consider some examples. We know that an employer may not fire an employee for refusing to commit perjury; [10] it is said to follow that an employer is banned from firing an employee for filing a workers' compensation claim. [11] We know that a speech by a member of the Ku Klux Klan, advocating racial hatred, cannot be regulated unless it is likely to incite, and is directed to inciting, imminent lawless action; [12] it is said to follow that the government cannot forbid the Nazis to march in Skokie, Illinois. [13] We know that there is no constitutional right to welfare, [14] medical care, [15] or housing; [16] it is said to follow that there is no constitutional right to government protection against domestic violence. [17]

**\*745** From a brief glance at these examples, we can get a sense of the characteristic form of analogical thought in law. The process appears to work in four simple steps: (1) Some fact pattern *A* has a certain characteristic *X*, or characteristics *X*, *Y*, and *Z*; (2) Fact pattern *B* differs from *A* in some respects but shares characteristics *X*, or characteristics *X*, *Y*, and *Z*; (3) The law treats *A* in a certain way; (4) Because *B* shares certain characteristics with *A*, the law should treat *B* the same way. For example, someone asking for protection against domestic violence is requesting affirmative government assistance, just like someone asking the government for medical care; it is said to "follow" from the medical care case that there is no constitutional right to protection against domestic violence.

As in the nonlegal examples, [18] it should readily appear that analogical reasoning does not guarantee good outcomes or truth. For analogical reasoning to operate properly, we have to know that *A* and *B* are "relevantly" similar, and that there are not "relevant" differences between them. Two cases are always different from each other along some dimensions. When lawyers say there are no relevant differences, they mean that any differences between the two cases either (a) do not make a difference in light of the relevant precedents, which foreclose certain possible grounds for distinction, or (b) cannot be fashioned into the basis for a distinction that is genuinely principled. A claim that one case is genuinely analogous to another - that it is "apposite" or cannot be "distinguished" - is parasitic on conclusion (a) or (b), and either of these must of course be justified. [19]

The major challenge facing analogical reasoners is to decide when differences are relevant. To make this decision, they must investigate cases with care in order to develop governing principles. The judgment that a distinction is not genuinely principled requires a substantive argument of some kind. For example, one difference between the Nazi march and the Klan speech is that the Nazi Party is associated with the Holocaust. This is indeed a difference, but American law currently deems it irrelevant. It appears unprincipled - or excessively ad hoc - for the states to ban prohibitions on political speech except when the speaker is associated with the Holocaust. [20] **\*746** As we will see, analogical reasoning goes wrong when there is an inadequate inquiry into the matter of relevant differences and governing principles. But what are the defining characteristics of a competent lawyer's inquiry into analogies?

In law, analogical reasoning has four different but overlapping features: *principled consistency; a focus on particulars; incompletely theorized judgments; and principles operating at a low or intermediate level of abstraction.* Taken in concert, these features produce both the virtues and the vices of analogical reasoning in law.

First, and most obviously, judgments about specific cases must be made consistent with one another. A requirement of coherence, or principled consistency, is a hallmark of analogical reasoning (as it is of reasoning of almost all sorts). It follows that in

producing the necessary consistency, some principle, harmonizing seemingly disparate outcomes, will be invoked to explain the cases.

Second, analogical reasoning focuses on particulars, and it develops from concrete controversies. Holmes put it this way: a common law court "decides the case first and determines the principle afterwards." [21] Ideas are developed from the details, rather than imposed on them from above. In this sense, analogical reasoning, unlike many forms of reasoning, [22] is a version of "bottom-up" thinking. [23]

Despite the focus on particulars, the analogizer's description of a particular holding inevitably has some general theoretical components. One cannot even characterize one's convictions about a case without using abstractions, and without taking a position on competing abstractions. [24] We cannot fully describe the outcome in case $X$ if we do  **\*747**  not know something about the reasons that count in its favor. We cannot say whether decided case $X$ has anything to do with undecided case $Y$ unless we are able to abstract, a bit, from the facts and holding of case $X$. The key point is that analogical reasoning involves a process in which principles are developed with constant reference to particular cases.

Third, analogical reasoning operates without a comprehensive theory that accounts for the particular outcomes it yields. The judgments that underlie convictions about, or holdings in, the relevant case are incompletely theorized, in the sense that they are unaccompanied by a full apparatus to explain the basis for those judgments. Lawyers might firmly believe, for example, that the Constitution does not create a right to welfare or that the state cannot regulate political speech without a showing of immediate and certain harm. But it is characteristic of reasoning by analogy, as I understand it here, that lawyers are not able to explain the basis for these beliefs in much depth or detail, or with full specification of the theory that accounts for those beliefs. Lawyers (and almost all other people) typically lack any large-scale theory. [25] They reason anyway, and their reasoning is often analogical.

Finally, analogical reasoning produces principles that operate at a low or intermediate level of abstraction. If we say that the state cannot ban a Nazi march, we might mean that the state cannot stop political speech without showing that the speech poses a clear and immediate harm. This is a principle, and it does involve a degree of abstraction from the particular case; but it does not entail any high-level theory about the purposes of the free speech guarantee or about the relation between the citizen and the state. Analogical reasoning usually operates without express reliance on any general principles about the right or the good. Some such principles may of course be  **\*748**  an implicit or even necessary basis for decision, but the lawyer who engages in analogical reasoning is not self-conscious about them.

Reasoning by analogy, understood in light of these four characteristics, is the mode through which the ordinary lawyer typically operates. He has no abstract theory to account for his convictions, or for what he knows to be the law. But he knows that these are his convictions, or that this is the law, and he is able to bring that knowledge to bear on undecided cases. For guidance, he looks to areas in which his judgment is firm. Analogical reasoning thus works when an incompletely theorized judgment about case $X$ is invoked to come to terms with case $Y$, which bears much (but not all) in common with case $X$, and in which there is as yet no judgment at all. [26]

We need to distinguish here between analogies that depend on a contestable substantive argument and analogies that are simply constitutive of the thinking of people in the relevant community. Some analogies, or perceptions of likeness, do not depend on arguments, but rest instead on the widely shared way that human beings order their world. We do not need an argument in order to say that one car is relevantly "like" other cars; we take the point for granted; it is part of our language. This form of categorization is different from the view, plausible but in need of an argument, that a ban on the work of Robert Mapplethorpe is "like" a ban on *Ulysses*. Of course the distinction between analogies that depend on contestable arguments and analogies that constitute how people arrange their world is only contingent and conventional - a function of existing social judgments. [27] Sometimes the two operate more like poles on a continuum than a sharp dichotomy, and there are important shifts over time from one category to another. Consider, for example, the current  **\*749**  consensus that *Brown v. Board of Education* [28] is "like" *Loving v. Virginia,* [29] to the point that the similarity between the two cases can almost be taken as constitutive of how lawyers arrange their world, rather than as a controversial proposition that requires a substantive argument. Much creativity in law consists of the effort to show that a judgment about likeness that seems constitutive of thought actually depends on contestable substantive arguments - or vice-versa.

These statements leave many ambiguities, and I will return to them shortly. For the moment it will be useful to try to get a better sense of analogical reasoning by comparing it with five other forms of reasoning that have a prominent place in law. [30] These alternative conceptions are general theories, the search for reflective equilibrium, reasoning from incompletely theorized practices, classification, and means-ends rationality.

### B. Other Forms of Legal Reasoning

*1. Top-Down General Theories.* - Legal problems are often discussed in terms of some general theory - indeed, this method seems to be increasingly popular in law schools, if not in courts. By a general theory, I mean an approach to law that is simple and unitary, operates at a high level of abstraction, has a distinctive "top down" character, brings the general theory to bear on particular cases, and disregards the fact that people are disturbed by particular outcomes that seem counterintuitive but that have been compelled by the general theory. Utilitarianism and economic analysis of law are especially familiar examples of this form of reasoning.

Top-down general theories operate deductively. Analogy plays no role. Legal outcomes in particular cases are the logical consequence of the general theory. For example: The law should maximize efficiency; a negligence regime is more efficient than one of strict liability; the law should therefore require a showing of negligence.

Many general theories give little weight to convictions about appropriate outcomes in particular cases, which are sometimes dismissed as "intuitions." Some Kantian approaches, for example, are famously indifferent if the approach will compel truth-telling even if many people will be killed as a result. The utilitarian analogue is the apparent obligation to kill an innocent person if social welfare will thereby be promoted. Economic approaches to law find a similar case in the acknowledgement that, on economic grounds, rape should perhaps **\*750** be legalized if rapists would pay more to rape than victims would pay to avoid rape. [31]

These examples can make believers in general theories seem fanatical; indeed, we might understand fanaticism in law and politics to consist precisely in the insistence on applying general principles to particular cases in which they produce palpable absurdity or palpable injustice. [32] The point is not that exponents of any of these views cannot avoid the seemingly bizarre counterexample. [33] It is instead that general theories usually do not make existing convictions about particular cases a constituent part of the method through which principles are constructed.

There are conspicuous differences between top-down theories and analogical reasoning. In top-down thinking, particular cases are not the source of principles; all judgments are completely theorized, in the sense that they are accompanied by a full explanation of their basis; and the relevant judgments operate at a high level of abstraction and generality. General systems are for these reasons a natural ally of codification, and a natural enemy of the common law. It is therefore no surprise that Jeremy Bentham was both the founder of utilitarianism and the most vigorous advocate of codification, a word that in fact he coined. [34] Thus Bentham wrote with palpable disgust about the disadvantages and irrationality of the common law approach, in which general inferences are deduced from particular decisions. [35]

*2. The Search for Reflective Equilibrium.* - Legal problems are also evaluated by comparing apparently plausible general theories with **\*751** apparently plausible outcomes in particular cases. Drawing on Rawls' notion of reflective equilibrium, [36] we might understand much reasoning, in law and elsewhere, to entail an effort to produce both general theories and judgments in individual cases by close engagement with a range of general theories and a range of considered judgments about particular disputes. Those considered judgments may serve as provisional "fixed points" for inquiry, in the sense that we have a high degree of confidence in them and cannot readily imagine that they could be shaken. In searching for reflective equilibrium, what we think tentatively to be the general theory is adjusted to conform to what we think to be our considered views about particular cases. In other words, the particular views are adjusted to conform to the general theory and vice-versa. Through this process, we hope finally to reach a form of equilibrium.

Many different conceptions of reflective equilibrium are possible. We might accord greater or lesser weight to particular situational judgments or to intermediate-level principles; make different decisions about what counts as a distortion of judgment; stress or downplay the role of philosophical arguments; evaluate in different ways the appropriate or possible amount of

congruence between the general and the particular; bring to bear a few general theories or a large number; reject or value apparently emotional reactions; [37] and counsel deference or indifference to very high-level theories. [38]

Some versions of the search for reflective equilibrium play a large role in law. Thus, for example, the notion that only political speech receives special constitutional protection might be abandoned if and **\*752** when it appears that that notion allows censorship of great art and literature. The goal of the resulting method would be to produce a full set of confident judgments about specific cases, accompanied by an abstract theory, or a set of principles, that is able to account for all of them.

There is an important commonality between analogical reasoning and the search for reflective equilibrium. In sharp contrast to top-down theories, both of these approaches depend heavily on judgments about particular cases. Here is a source of controversy. Sometimes lawyers rebel against the idea that theories should be adjusted if they lead to unacceptable particular outcomes. [39] For them, the adjustment is a form of brinkmanship, or strategic thinking, and a violation of the necessary commitment to general principle and neutrality itself.

This is an objection to both analogical reasoning and the search for reflective equilibrium; perhaps judgments about particular cases should not play a large role in developing theories or principles. The objection raises large issues that I cannot fully discuss here. But if judgments by human beings are inevitably a product of what human beings think, nothing need be wrong with changing one's general theory when that theory brings about results that seem to be an unacceptable part of one's approach to the subject. [40] To understand **\*753** what morality requires, or what the law is in hard cases, we need to explore what we - each of us - actually believe; there is no other place to look. For example, many people could not accept a system of free expression that would allow suppression of a relatively harmless political protest. The judgment in that case is indeed a fixed point for inquiry. For some people, any general theory about the Constitution must fail if it entails the incorrectness of *Brown v. Board of Education,* [41] or the validation or overruling of *Roe v. Wade,* [42] or a particular consequence for affirmative action.

It may well be wrong for any of these particular outcomes to have such foundational status. Disagreement in law is often based on disagreement about what are the appropriate fixed points for analysis. Some particular outcomes do, however, occupy so central a role that they constrain the category of permissible general theories. This is a conventional feature of practical reason, as it operates in law and elsewhere.

So much for an important commonality between analogical reasoning and the search for reflective equilibrium; there are important differences as well. The search for reflective equilibrium places a high premium on, first, the capacity to develop a complete understanding of the basis for particular judgments and, second, the development of abstract and general principles to account for those judgments. When reflective equilibrium is obtained, both horizontal and vertical consistency among cases are achieved. Every particular judgment becomes fully theorized, and at a highly general level.

Analogical reasoning is far less ambitious, [43] for it does not require anything like horizontal and vertical consistency. But because analogical reasoning requires at least a degree of generality, it is probably best to think of the difference between the two as one of degree rather than of kind. There is a continuum from the one to the other rather than any sharp discontinuities. This is so especially in view of the existence of many possible conceptions of reflective equilibrium, allowing for very different extensions in the direction of both particular judgments and high generality. Analogical reasoning might therefore be understood as a sharply truncated form of the search for reflective **\*754** equilibrium, with the truncation starting at just the point when the relevant principles go beyond a low level of generality. [44]

*3. Reasoning by Analogy - Incompletely Theorized Practices.* - Sometimes reasoning by analogy works by reference to incompletely theorized *practices* rather than incompletely theorized *judgments.* One might, for example, know that merchants behave a certain way in the world, or that men and women tend to have a certain relationship in most families. One form of analogical reasoning would involve the effort to bring to bear, on disputed cases, social practices that seem similar to those under review. [45]

Ideas of this kind are built on a time-honored view of law. [46] The common law - the product and the most celebrated locus of analogical reasoning - has often been understood as a result of social custom rather than an imposition of judicial will. According to this view, the common law implements the customs of the people; it does not impose the judgment of any sovereign body. [47] Judges need not theorize about or evaluate these customs to work from them. [48]

In some ways, reasoning by analogy to incompletely theorized social practices resembles reasoning from incompletely theorized judgments. The difference is that it builds on existing practices, not judgments. To that extent, it has a conspicuous Burkean caste. [49] Reasoning from incompletely theorized practices is founded on the assumption that those practices have a kind of legitimacy and sense that ought to be brought to bear on current dilemmas. [50] Here lies the source of its appeal but also of great controversy. Those who believe that existing practices are often a result of arbitrariness or force, rather than deep wisdom or rationality, will be quite skeptical. As I describe reasoning by analogy, it operates by reference to particular convictions or judicial holdings, rather than social practices. It **\*755** may be true, however, that these convictions or holdings are also the product of arbitrariness or force, and this problem may push us in the direction of a preference for reflective equilibrium or general theories. [51]

*4. Classification.* - Legal reasoning relies heavily on classification. Classification plays a large role in both analogical reasoning and the application of general theories. [52] In using the notion of classification here, I mean to refer to something far narrower and more mechanical - the effort to resolve a case solely by reference to purely semantic principles. By semantic principles, I mean the basic rules of grammar and diction. When someone says that a cat is an animal, he is using purely semantic principles. Substantive principles, by contrast, require an argument rather than a language lesson. [53] When people say that the term "liberty" includes the right to seek an abortion, they are resorting to substantive principles, not mere semantics.

Lawyers sometimes act as if semantic principles are all that is required to decide cases. [54] Because some cases can be resolved simply by deduction, a mundane version of legal formalism is indeed unobjectionable. For example, if a driver drives a Toyota Camry 90 miles per hour (mph) in a 60 mph zone, syllogistic reasoning can resolve the case: the Toyota Camry is a motor vehicle, the state has a speed limit ordinance of 60 mph; the driver violated the ordinance.

Classification of this sort is not always adequate. Suppose that the driver of the Camry claims that she was escaping a murderer who was shooting at her from his vehicle, or that she was a police officer **\*756** attempting to arrest a fleeing terrorist. To evaluate the guilt of a defendant found in either of these situations, classification in the purely semantic sense is inadequate. Both defendants may well have a legally sufficient excuse as a result of statute or judge-made law. If the speed limit statute is all the court invokes, we have what might be called *spurious classification*. It is spurious because to decide the cases, the court must actually be resorting to something other than the speed limit law. It must use an additional form of reasoning, or invoke some other cases or statutes.

Often reasoning by classification is indeed a sham, in the sense that some judgment of value is being made but not disclosed. This is a familiar kind of bad formalism, at least if we understood formalism as an effort to decide all cases in law solely by reference to decisions made by someone else. Consider, for example, the view that the liberty to contract is necessarily, and purely as a matter of semantics, part of the "liberty" protected by the Due Process Clause. [55] The problem here is that a supplemental value judgment is necessary. To conclude that liberty of contract is part of constitutional "liberty," the dictionary is insufficient. One has to make claims about morality, history, or probably both. The case is quite different from one in which someone decides that the category "dog" necessarily includes German shepherds. [56]

Spurious classification, or bad formalism, often masquerades as analogical reasoning. Sometimes people believe that case *A* is analogous to case *B*, and attribute the belief to pure deduction, when a supplemental judgment of some kind is necessary. [57] They find similarities between the two cases, ignore possible differences, and then announce the outcome of the case. In doing so, they fail to identify and defend the requisite supplemental judgment.

Formalist analogical thinking is no better than any other kind of bad formalism. Different factual situations are inarticulate; they do not impose order on themselves. Patterns are made, not simply found. Whether one case is analogous to another depends on substantive **\*757** ideas that must be justified. [58] The method of analogical reasoning that I am describing here is insistently antiformalist in the sense that it always stands ready to explain and justify the claim that one thing is analogous to another.

In comparing analogical thinking with classification, we should see, too, that analogical reasoning can go wrong not simply because it is formalist, but also because it is illogical. Consider, for example, Justice Holmes's notorious argument on behalf of compulsory sterilization of the feeble-minded in *Buck v. Bell*. [59] Holmes suggested that if people can be conscripted during

wartime, or can be forced to obtain vaccinations, it follows that the state can require sterilization of the "feeble-minded." [60] But this is a casual and unpersuasive claim. Many principles may cover the first two cases without also covering the third. Holmes does not explore the many possibly relevant similarities and differences among these cases. He does not identify the range of possible principles, much less argue for one rather than another. Instead, he invokes a principle of a high level of generality - "the public welfare may call upon the best citizens for their lives" - that is not evaluated by reference to low- or intermediate-level principles that may also account for the analogous cases.

The example shows that analogical reasoning can go wrong when one case is said to be analogous to another on the basis of a unifying principle that is accepted without having been tested against other possibilities, or when some similarities between two cases are deemed decisive with insufficient investigation of relevant differences. These are pervasive problems, linked to bad formalist thinking. When these problems occur, the right response is to say that the court has not properly engaged in analogical reasoning. It is a part of the analogical method, as I understand it here, that judges must identify and test the possible available principles, and evaluate them against one another. [61]

**\*758** *5. Means-Ends Rationality.* - Sometimes legal reasoning is simply a form of instrumental rationality. Suppose, for example, that a court must decide whether to impose an implied warranty of habitability on landlords. The court should consider the effects of the warranty on the housing market. Will such warranties increase rents, decrease available housing, or otherwise have disproportionately severe consequences for the poor? Or suppose a court is asked to rule that the First Amendment forbids the use of the libel law in any case involving a public official. A relevant question is the extent of the "chilling effect" of libel law on public discussion. In cases of this sort, courts must look at the facts. Reasoning operates simply by figuring them out, or at least by speculating as best we can.

Means-ends rationality should play a large role in law, both in the courts and elsewhere; indeed, it should play a much larger role than it now does. In the law of tort, contract, and property, for example, legislatures and judges should anticipate the effects of their decisions on, among other things, the allocation and distribution of resources. Conventional legal tools are ill-suited to this task. [62] Frequently, courts approach questions about consequences as if they could be answered by reference to other judicial holdings.

Analogical reasoning is often silent or unhelpful on the question of social consequences. To be sure, it may be possible to say that if *X* has certain consequences, *Y,* which closely resembles *X,* will have the same consequences; in this way one can indeed learn something about consequences through thinking analogically. But this is usually not the most systematic or reliable way to evaluate the effects of laws. To the extent that courts do attempt to consider consequences, they will not be engaging in distinctly legal reasoning. Lawyers might as well be doing something else, such as economics; analogical reasoning usually plays little role.

Here, then, is a basic account of analogical reasoning. Without relying on general theories, and without achieving reflective equilibrium, lawyers develop low-level principles to account for particular judgments, and apply those low-level principles to new cases in which there is as yet no judgment at all. [63] As we will see in Part III, this **\*759** method has important limits, but it is admirably well-suited to a system in which certain judgments must be taken as relatively fixed, and in which participants must deal with political dissensus and moral flux.

## II. AN EXAMPLE: CROSS-BURNING

Thus far the discussion has been quite abstract, but analogical reasoning is best understood by reference to examples. The law of free speech is an especially good area for investigation, because most of the reasoning in that area is analogical in nature. It will be useful to explore an issue of current controversy - the legal response to cross-burning and similar forms of expressive activity. I build the example from the recent case of *R.A.V. v. City of St. Paul,* [64] in which analogies played an important role.

I outline a set of responses to the cross-burning issue, attempting to show how much progress might be made by working from analogies and low-level principles. Large theoretical issues, and assessments of facts and incentives, are studiously avoided. We will see that analogies provide constraints on reasoning in a way that makes the correct legal outcome different from the correct moral outcome. But the key points involve method, not outcomes.

ON ANALOGICAL REASONING, 106 Harv. L. Rev. 741

It may be tempting to begin with the suggestion that cross-burning is action, not speech, and is therefore outside of the First Amendment altogether. We might suggest a low-level proposition:

 **\*760** (I) *Action is unprotected by the First Amendment. To claim constitutional protection, a person must be saying or writing words.*

As a matter of basic principle, it might be hard to say whether (I) is true. We know, however, that flag-burning qualifies as speech. [65] If this is so, it seems difficult to claim that cross-burning does not. In light of the flag-burning case, any claim that cross-burning is not speech must actually depend not on the "speech-action" issue, but on some other, as yet unspecified consideration.

Suppose that a prosecutor invokes the law of criminal trespass to proceed against someone who has burned a cross on a private lawn. [66] Here we have a content-neutral law - that of trespass - invoked to suppress an expressive act. Hence it might be suggested:

(II) *Content-neutral restrictions on acts that qualify as speech are generally permissible.*

How shall we evaluate (II)? By reference to the analogies, the use of the trespass law seems unexceptionable. At least in general, the analogies show that the law of property can be invoked to protect, in a content-neutral way, private lands and dwellings from invasion, whether through expression or otherwise. [67]

Suppose, however, that a locality believes that the law of trespass is inadequate. Suppose it believes that it is important to enact a special statute that explicitly forbids expressive conduct of a certain sort. The resulting law might make it a crime to "place on public or private property a symbol, including but not limited to a burning cross or a Nazi swastika, which one knows or has reason to know arouses anger or resentment in others on the basis of race, color, or creed." [68] Such a law might be invoked to forbid a public demonstration of cross-burning. This leads to another proposition, quite different from (II):

(III) *Acts that qualify as speech can be regulated if they produce anger or resentment.*

From the flag-burning cases, however, we know that (III) is false. [69] Proponents of (III) would have to show that cross-burning has particular **\*761** properties that take it out of the realm of constitutional protection. That is, they would be required to demonstrate a relevant difference between the ordinary anger or resentment that many expressive acts produce and the "anger or resentment on the basis of race, color, or creed." Thus, we have a new proposition:

(IIIa) *Acts that qualify as speech can be regulated if they produce anger or resentment on the basis of race, color, or creed.*

We might think that the speech identified in proposition (IIIa) is just a subcategory of that in proposition (III); or we might think that it is in a different class. On the first view, the anger or resentment produced by this kind of speech may be more intense than other forms, but the difference is only one of degree. On the second view, the anger or resentment produced by symbolic acts such as cross-burning, and based on race, color, or creed, is qualitatively different from other forms, and thus properly treated differently.

If we were starting fresh, there would be room for disagreement on this subject. But the legal analogies seem to foreclose the claim that there is a qualitative difference, at least in the context of an attempt to ban otherwise protected racist speech that produces anger or resentment. [70] Once again, the practice of law constrains the scope of analogical reasoning, even if analogical reasoning in ethics is not similarly constrained. Unless the legal analogies are to be rejected, defenders of the ban on cross-burning must concede that the hypothetical law is unconstitutional. [71]

We might, then, imagine that the locality proceeds to narrow the reach of its ordinance to encompass only expressive acts outside of the scope of First Amendment protection. [72] The locality prohibits cross-burning that produces anger or resentment if and only if the speech in question is regulable under existing doctrines as "incitement" or "fighting words." The prohibition will not be triggered unless the circumstances of the expressive conduct fit within an already-established exception to First Amendment

protection. How does this affect the analysis? At first glance, it seems to dispose of the issue. [73] By hypothesis, the law now covers only speech unprotected by the First Amendment. Thus, we have a new proposition:

**\*762** (IV) *Unprotected acts of expression may be regulated by the state as it wishes.* [74]

But we can prove by analogy that (IV) is wrong. Imagine that the state attempted to regulate only those "fighting words" directed at Republicans or at whites. Or imagine that the state made it a felony to engage in "incitement" if and only if the incitement was directed against people of a certain political view. Surely such regulations would be impermissible.

This analogical attack on proposition (IV) is one of the Court's principal arguments in *R.A.V.* "[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." [75] The principle that ultimately emerges from these analogies is that the state may not regulate some unprotected speech chosen from the class of all unprotected speech on the basis of point of view. [76] Viewpoint discrimination, in other words, is unacceptable even in the context of otherwise unprotected speech. [77] Hence it seems clear that:

(V) *Unprotected acts of expression may not be regulated on the basis of viewpoint.*

The question then becomes whether our hypothetical ordinance runs afoul of this prohibition. In a critical sense, the ordinance is different from those in the clear cases of viewpoint discrimination. Viewpoint discrimination occurs if the government takes one side in a debate, as in, for example, a law that requires that libel of the President be punished more severely than libel of anyone else. But the locality has not drawn a line between prohibited and permitted points of view. It has not said that one view on an issue is permitted and another proscribed. If cross-burning were all that it banned, we would have a case of viewpoint discrimination, because cross-burning has a particular viewpoint. But here the class of prohibited speech is far broader.

The locality has built on existing public reactions to certain kinds of speech within a subset of the categories of "incitement" and "fighting **\*763** words." It has regulated on the basis of subjects for discussion, not on the basis of viewpoint. [78] The final proposition to be evaluated is thus:

(VI) *If government singles out unprotected acts of expression for regulation when they cause "anger or resentment on the basis of race, color, or creed," it does not discriminate on any impermissible ground.*

This was the central proposition that divided the Justices in *R.A.V.* The analogous cases involving "fighting words" are a helpful start, because they show that regulation of "fighting words" is not by itself impermissibly viewpoint-based or otherwise objectionable. The doctrine is deemed permissibly neutral because any regulation of fighting words fails to single out for legal control a preferred point of view. It depends instead on whether the average addressee would fight. [79] The viewpoint of the speaker is relevant in the sense that addressees will be reacting in part to the speaker's viewpoint; but the government has not endorsed a particular point of view. So long as the fighting words doctrine has any viability, this is a crucial difference.

As the *R.A.V.* majority emphasized, however, the hypothetical ordinance is not a general proscription of fighting words. It reflects a decision to single out a certain category of "fighting words," defined in terms of audience reactions *to speech about certain topics.* The question is then whether a subject matter restriction of this kind is acceptable.

Subject matter restrictions are not all the same. We can imagine subject matter restrictions that are questionable ("no one may discuss AIDS on the subway") and subject matter restrictions that seem legitimate. As a class, they appear to occupy a point somewhere between **\*764** viewpoint-based restrictions and content-neutral ones. [80] Here too analogies are revealing. Sometimes courts uphold subject matter restrictions as a form of permissible content regulation. For example, the Court has permitted bans on political advertising on buses, [81] and on partisan political speech at army bases. [82]

When the Court upholds subject matter restrictions, it is because the line drawn by government gives no real reason for fear about viewpoint discrimination, and - what is close to the same thing - because government is able to invoke neutral, harm-based justifications for treating certain subjects differently from others. Thus, for example, the restriction on political advertising in the buses was justified as a means of preventing what would inevitably be a kind of governmental selectivity in choosing

among political advertisements. [83] The restriction in the army base was said to be a plausibly neutral effort to prevent political partisanship in the military. [84]

If the court is to accept the subject matter restriction in the cross-burning case, it must be persuaded that the state is not discriminating against particular viewpoints but is genuinely concerned about severe and distinctive harms. In his concurring opinion in *R.A.V.*, Justice Stevens wrote that "[t]hreatening someone because of her race or religious beliefs may cause particularly severe trauma or touch off a riot ...; such threats may be punished more severely than threats against someone based on, for example, his support of a particular athletic team." [85] Thus, there were "legitimate, reasonable, and neutral justifications" [86] for the special rule. In its response, the Court called this argument "word-play." [87] The reason that race-based threats are different "is nothing other than the fact that it is caused by a distinctive idea, conveyed by a distinctive message. The First Amendment cannot be evaded that easily." [88] Might analogies be helpful here?

An initial response to the Court, building on analogies, is that the fighting words doctrine itself shows that the state can ban speech even if the relevant harms are "caused by a distinctive idea, conveyed by a distinctive message." But this response is surely not enough, for  **\*765**  many harms are caused by ideas, and this cannot mean that we can therefore ban the ideas. Perhaps an additional analogy helps - Justice Stevens's reference to the especially severe ban on threats against the President. [89] If the government can single out one category of threats for special sanction because of the harm produced by those threats, why is the same not true for the fighting words at issue here?

Justice Scalia's response is perhaps the best that can be offered: "[T]he reasons why threats of violence are outside the First Amendment (protecting individuals from fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the President." [90] But the very same claim could be made about the hate-speech ordinance under discussion. [91] Here, as in cases involving threats against the President, we are dealing with a subcategory of unprotected speech challenged as involving impermissible selectivity, and the justification for the selectivity plausibly invokes the particular harms produced by the unprotected speech at issue.

An analogy pointing in the other direction would be a case in which the government banned fighting words critical of an ongoing war effort. The government could not justify the ban on the ground that this kind of fighting word produced special threats to national security. This form of selectivity is too likely to be connected with government's effort at self-protection. But the hate speech law in question seems more like the presidential threat case, in which the neutral justification is quite plausible.

To make this argument more fully, analogical reasoners would have to engage in a mildly extended form of reflective equilibrium. They would have to say that as in the presidential threat case, a legislature could reasonably decide that the harms produced by this category of speech are sufficiently severe as to deserve separate treatment. They would have to contend that an incident of cross-burning can have large and corrosive social consequences, and that a government could neutrally decide that the same is not true of a hateful attack on someone's parents or political convictions.

To be successful, an argument to this effect would have to depend critically on the fact that the subject matter classification occurs in the context of speech that is without First Amendment protection. Should a subject matter restriction on unprotected speech be upheld if the legislature can plausibly argue that it is counteracting harms rather than ideas? An analogy is helpful here as well. Supplemental criminal penalties for racially-motivated "hate crimes" seem to be a  **\*766**  part of current law; indeed, many states have enacted some form of hate crime legislation that enhances penalties for acts motivated by racial hatred. [92] The governmental motivation for the additional penalty - the harm produced by these crimes, in part because of their symbolic or expressive nature - is the same as in the cross-burning case. So long as we are dealing with otherwise unprotected speech, that motivation should probably not be fatal to the cross-burning enactment if it is not fatal to the "hate crimes" measures.

I do not by any means claim that this discussion has answered all the questions raised by legal bans on cross-burning. I suggest only that it is possible to make a good deal of progress on the issue through analogical reasoning, and without making broad pronouncements about the nature or scope of the free speech guarantee. At the very least, we have established a number of apparently controversial propositions. Cross-burning qualifies as speech. It can be regulated in a content-neutral way. Any viewpoint-based regulation is impermissible, even if narrowed to circumstances in which cross-burning is unprotected speech. Subject matter restrictions, however, are at least sometimes acceptable. A look at the analogies helps explain why all this is so, and why some such restrictions might be upheld.

Why might these conclusions be wrong? It is possible that cross-burning is materially different from flag-burning, not because it is less speech, but because it is more or differently harmful. It is possible that subject matter restrictions of the particular kind at issue here should alert the judge to the risk of unacceptable motivation. It is possible that the alleged harms cannot be said to be different from other harms without resort to impermissible considerations of viewpoint. These questions surely require more elaborate treatment than I have provided.

Analogical reasoning frequently involves dispute over these sorts of issues. No one should suggest that it will always yield closure. In the final step of the argument, something has to be said about whether a harm-based argument is sufficient in this context; a reference to analogies helps us to figure out what we think, but it does not dictate particular outcomes. Nor should it be denied that other, nonanalogical approaches would have real advantages. We might, for example, investigate the history, motivations, and consequences of cross-burning  *767  and laws against it. Alternatively, we could try to explain in great depth and detail the basis for the particular holdings and convictions at work here; analogical reasoning avoids these important tasks.

The analogical method is not always decisive. But it begins a discussion, one that may well lead to revision of preliminary judgments about a range of issues. Ideas that turn out not to be deeply held, or that seem unacceptable in other contexts, may be abandoned altogether. The most fundamental ideas will endure; they operate as fixed points against which other ideas may be evaluated (though we will not be sure what is a fixed point until the process begins, and here we may be surprised). [93]

This effort to compare cases with one another usually operates when no unitary general theory (say, utility maximization) is available against which individual instances can be simply measured. Eventually it yields something like a system - a complex range of results, all of them rationalized with one another - but one that falls far short of what social science and ethical theory are usually expected to provide.

## III. OBJECTIONS AND ALTERNATIVES

The method of reasoning by analogy has recently come under considerable attack. Critics claim that the method is far inferior to social science, that it is entirely indeterminate, and even that it is not a method at all. [94] In this section, I respond to these claims by exploring both the virtues and vices of analogical thinking. I first deal with general objections to this way of thinking and then examine some familiar alternative conceptions of legal reasoning.

### A. Objections

It will be useful to examine the three principal objections in what seems to me to be ascending order of persuasiveness. The first objection emphasizes the analogizer's lack of a sufficiently scientific, external, or critical perspective. The second objection is that analogical reasoning is either indeterminate or dependent on a consensus that it cannot justify. The third and most powerful objection, is that analogical reasoning rests on principles that tell us what makes one thing similar to or different from another, and that to discover such principles, we need something other than analogies.

*1. Absence of Scientific, External, or Critical Perspectives.*-The first criticism, traceable to Jeremy Bentham, is that the method of  *768  analogy is insufficiently scientific, unduly tied to current intuitions, and, partly for these reasons, static or celebratory of existing social practice. [95] On this view, analogical reasoning works too modestly from existing holdings and convictions, to which it is unduly attached. It needs to be replaced by something like a general theory - in short, by something like science.

At first glance, the claim seems mysterious. Whether analogical reasoning calls for the continuation of existing practice turns on the convictions or holdings from which analogical reasoning takes place. Without identifying those convictions or holdings, we cannot say whether existing practices will be celebrated. Legal holdings that are critical of some social practices may well turn out, through analogy, to be critical of many other practices as well. [96]

On the other hand, analogical reasoning does start from existing convictions or holdings, and judgments of sameness or difference receive their content from current thinking. In this way, analogical reasoning usually does have a backward-looking, conservative, incremental character. To what extent this is a virtue or a vice is a large question that I will not attempt to answer

here. But it should be acknowledged that insofar as analogical reasoning takes current legal materials as the basis for reasoning, it can indeed be an obstacle to justified change through law. [97]

The most important lesson to draw from this objection is that a full theory of legal reasoning would have to contain a theory of mistake. Such a theory should make it possible to identify those holdings and convictions that are wrong. Analogical reasoning, at **\*769** least as thus far described, seems ill-equipped to provide such a theory. It might therefore be said that efforts to reason from analogies are stuck in existing convictions, which are sometimes a morass, and that it is severely deficient in comparison to forms of reasoning that provide better resources for critical evaluation. [98]

Even this criticism is overdrawn. Sometimes reasoning by analogy does help to reveal mistakes. Reference to other cases helps show us that our initial judgments are inconsistent with what we actually think. The cross-burning problem established several propositions that might be jarring to those unarmed with analogies. Much of legal education consists in the testing of initial judgments by reference to other cases, and through this process of testing, it sometimes can be shown that those judgments must yield.

We should acknowledge that even if this is so, the use of analogies does not produce the full system achieved by people who have reached reflective equilibrium. For this reason, it seems possible to describe analogical reasoning, and to set out some of its virtues, while acknowledging that it will contain flaws exactly to the extent that the convictions or holdings from which reasoning begins are themselves flawed or insufficiently understood. [99]

*2. Indeterminacy; Dependence on Consensus.* - The second objection is that reasoning by analogy is indeterminate in the absence of social consensus or a degree of homogeneity that will exist in no properly inclusive legal system. In the face of heterogeneity, reasoning by analogy may seem empty or indeterminate. Without a good deal of agreement, analogical reasoning cannot even get started. Something like this idea lay at the heart of the antifederalist objection to the American constitutional system; the federalists responded that heterogeneity could be a creative rather than destructive force. [100]

Perhaps the antifederalists were correct. According to those skeptical of analogical thinking, we can reason in this way only if we already agree on fundamental matters. Otherwise people will simply differ, and there will be no way to reason through their differences. If so, reasoning by analogy merely uncovers agreement where it already **\*770** exists. Very little can be said on behalf of something so unambitious as that.

To some degree this objection is valid. If someone denies that a problem would be created by a prohibition of flag-burning, or of any expressive conduct, the inquiry into cross-burning will have a hard time getting off the ground. (Note, however, that it may be possible to undermine this very denial with analogies.) If someone thinks that the government can punish political speech whenever that speech poses any risk to the government, it will be hard to reason with them through analogies to a sensible system of free expression. [101] In this sense, it is correct to think that reasoning by analogy depends on a degree of commonality - even homogeneity - among participants in the discussion. [102] Analogical reasoning, it might be concluded, works most easily in these circumstances; it has a tendency toward bias or excessive complacency.

Some of these claims are undoubtedly true. We might begin, however, by asking whether they really amount to objections at all. The need for a degree of consensus is hardly a problem distinctive to analogy. It applies to all forms of reasoning. [103] In coming to terms with this objection, we need to distinguish between analogical reasoning in law and analogical reasoning elsewhere. Law imposes greater constraints on the analogical process. Existing legal holdings sometimes provide the necessary commonality and the necessary consensus. People who disagree with those holdings usually agree that they must be respected; the principle of stare decisis so requires. Within the legal culture, analogical reasoning imposes a certain discipline, and a widespread moral or political consensus is therefore unnecessary. We **\*771** have seen several examples of this in our examination of the cross-burning issue. [104]

Things are different outside of law, simply because of the absence of precedents that can help generate an "overlapping consensus" [105] on outcomes. The differences lead to two important conclusions. First, the method of analogy may indeed be less determinate outside of law. In law, we have a wide range of "fixed points" for inquiry, and this makes the analysis easier. Second, there will be a real difference between the legally correct outcome and the morally correct outcome. The difference lies in the fact that analogies operate as fixed points in legal reasoning, whereas in morality they are either revisable or entirely

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

open-ended. Consider, for example, the fact that lawyers must take *Roe v. Wade* as authoritative as long as it stands, even if they think the decision abhorrent. [106]

Even outside of law, the indeterminacy objection is not entirely persuasive. Very diverse people may have sufficient commonality on fundamental matters to permit considerable progress. Even if such commonality appears not to exist, a good deal of movement can occur through simultaneous engagement with what various participants in the discussion say and think - an engagement that would include narratives about diverse experiences or history, personal and otherwise, as well as more conventional "reasons." [107] (Note that the case method operates in part through narratives.) [108]

In order to provide relevant information, and to counteract parochialism and bias, it is important to ensure that, in law and elsewhere, people with different perspectives and experiences are permitted to participate. [109] It is equally important to ensure that judges are alert **772** to the range of possible low-level principles, and that they attempt to compare those principles with one another. But through some such route, people who initially disagree so strongly as to make conversation seem difficult can sometimes be brought together, at least to the point where analogical reasoning can start. Nearly everyone has had this experience.

In any case, we cannot know that the optimistic view is false until we try to talk. [110] And here the very concreteness of analogical reasoning is a large advantage. In cases in which there are major differences in starting points, people can often think far better about particular problems than about large-scale approaches to the world.

In this regard, we might consider a sharply disputed constitutional question, one related to the cross-burning problem: whether the government can regulate "hate speech." For some people, the proper analogy, in thinking about hate speech, is physical assault. [111] To them, hate speech is a form of visceral attack that has little or no connection to free speech values and produces severe and unique harm. For those who disagree, the proper analogy is speech by members of dissident political groups. [112] Hate speech is merely a form of controversial expression, subject to a risk of censorship, as is much expression, by people who want to use the arm of the law to enforce a particular orthodoxy.

A dispute of this sort may seem intractable. Perhaps people simply disagree. But it is necessary to ask people on both sides what features of hate speech make it analogous either to physical assault or to political dissent. Once that is specified, we are well on our way toward a discussion. For example, it might be said that hate speech is like an assault because the relevant words are not intended as a contribution to rational thought, because they deeply hurt, because they reflect and lead to second-class citizenship, or because they are inconsistent with prevailing, hard-won political convictions in relevant communities.

All of these claims can be evaluated. In the ensuing discussion, we might ask when words are not intended as a contribution to rational thought, when such words are properly excluded from protection as speech, and when expression can be banned because it is harmful or because (or although) it is inconsistent with prevailing **773** convictions. We might think about cases in which our convictions seem firm. We might agree, for example, that government can ban obscene telephone calls, or that it cannot ban even offensive and dangerous political speech.

An approach of this kind might well lead us to make distinctions between different forms of "hate speech." The racial epithet might seem similar to an obscene phone call; but racist speech, made as part of a statement of political view, might seem like protected expression. This is at best a start. But even this seemingly least tractable of disputes may well be soluble in this way. Surely the field of legitimate disagreement can be narrowed and better understood.

All this helps suggest the weakness in the view that analogical reasoning depends on a deep social consensus. Even without such a consensus, there is usually sufficient agreement, with respect to some matters of importance, to allow the process of reasoning to begin. None of this means that people will always be able to reach closure. Sometimes they really do disagree. But analogical reasoning can at least help to discover where they do, and why. [113]

*3. The Search for Relevant Differences - The Inevitable Need for Criteria Never Supplied by Analogical Reasoning.* - The final objection to analogical reasoning is that the process has yet to be adequately specified, and that when it is, it will emerge as a primitive and failed substitute either for a more general theory or for the effort to reach reflective equilibrium. This is, I believe,

the most powerful objection to analogical reasoning; in an important sense, it is correct. But the nature of the objection, and the possible responses, are surprisingly complicated.

The objection begins with a simple point. The method of analogy is based on the question: Is case *A* relevantly similar to case *B*, or not? Is a ban on homosexual sodomy like a ban on the use of contraceptives **\*774** in marriage, or like a ban on incest? Is a restriction on abortion like a restriction on murder, or like a compulsory kidney transplant? To answer such questions, one needs a theory of relevant similarities and differences. By itself, analogical reasoning supplies no such theory. It is thus dependent on an apparatus that it is unable to produce. [114]

In short: Everything is a little bit similar to, or different from, everything else. Perhaps better: Everything is similar in infinite ways to everything else, and also different from everything else in the same number of ways. [115] At the very least one needs a set of criteria to engage in analogical reasoning. Otherwise one has no idea what is analogous to what.

By themselves, factual situations tell us little until we impose some sort of pattern on them. [116] We say that something is like something else only because we have a principle that tells us so (or because we simply perceive the world this way). If this is true, it might seem better simply to identify the principle and the criteria, if we have them, rather than to proceed through analogies.

Thus, for example, if we are asking what sorts of speech are protected by the First Amendment, we might ask some questions about the purposes of that amendment, or the scope of its coverage, **\*775** and then apply our answers to various cases - rather than refusing to specify the general theory in advance and spending time examining the endless cases that are the staple of free speech law: perjury, misleading commercial speech, conspiracies, false cries of fire in a crowded theater, and so forth. On this view, reasoning by analogy is necessary only because of our failure to develop general principles, which ought to be evaluated in their own right.

The first and most modest response to all this is that analogical reasoning is helpful even if the criticism is fundamentally right. Even if we do need principles to decide cases, this is not an objection to analogical reasoning, which is an important part of the development of those principles. Without analogies, relevant principles often cannot be described in advance except at an uninformatively high and crude level of generality. The cross-burning case provides an example: How could a general theory be helpful on a problem of this sort? Any relevant criteria for free speech problems will emerge largely from the process of comparing various cases. Moreover, the criteria will not have any source other than what we think. There is no other source of criteria. We cannot know what it is that we think until we explore a range of cases. Principles are thus both generated and tested through confrontation with particular cases.

This humble response may establish only that analogies help us discover principles, which are in an ultimate sense freestanding. Analogies are like a ladder that can be discarded once we have climbed to the top. I think that this metaphor is misleading because it suggests that analogies are dispensable in a way that they are not; analogies are not a ladder to be tossed away, but rather an important basis for our judgments. But a fuller response to this criticism must go deeper. The fuller defense would start with the claim that our considered judgments about particular cases have a kind of priority in deciding what the law is or should be. My suggestion is that because of the distinctive requirements of a legal system, correct answers in law might consist precisely of those particular judgments, once they have been made to cohere. [117]

**\*776** At least it seems clear that general principles and general theories are sometimes inadequate for legal reasoning. Often too many factors are relevant, and too many variations are possible, to allow a general formulation adequately to capture the range of right results in the cases. [118] More particularly, any general theory will sometimes be too rigid and crude to account for the diversity and plurality of relevant goods. [119]

On this view, correct answers plausibly consist not of deductions from general theory, but instead of coherent convictions about particular cases. In the law of free speech, for example, the Court has not fully explained what speech counts as "high value" and what speech falls in a lower tier. [120] It is tempting to say that this is a major failure in constitutional law, and that the Court would do much better to tell us in plain terms what "test" it is using. But perhaps any test, described at a high level of generality, will be either vacuous or subject to decisive counterexamples. Perhaps this is not true for the First Amendment; it is possible that if we thought well enough, we would come up with a perfect general theory, or - a quite different point - that the advantages of an inadequately precise test might outweigh the disadvantages of having no general theory at all. All I mean

to suggest is that sometimes analogical reasoning might, in principle, be *777 preferred to a general theory, simply because no such theory can adequately account for particular convictions, and because those convictions deserve priority in thinking about good outcomes in law.

The objection and the response might be put in another way. It is tempting to think that with deductive reasoning, we can come up with truth. If, for example, utilitarianism is true, we can decide cases by figuring out how to maximize utility. But what is the relationship between analogical thinking and truth? Use of analogies produces principled consistency, at best, and not truth at all.

The response is that sometimes there may be no criteria for truth in law except for our considered judgments about particular cases, once those judgments have been made to cohere with each other. I have noted that there is obscurity in this suggestion. The obscurity comes in at least two places: What are considered judgments? How do we know when they cohere? Let me address a few of the ambiguities.

At a minimum, considered judgments include the judgments that serve as fixed points for moral or legal analysis (although we must note, as above, that we will not know what the fixed points are in advance). Some particular judgments do operate as fixed points in this sense. For some people, the notion that government may ban bribery or perjury has the status of a fixed point for free speech law. We might also understand the category of considered judgments to include those that have survived a degree of scrutiny through comparison with other cases and a good deal of other low-level principles. [121] Through some such route, we may come up with a catalogue of reliable particular judgments. Coherence in law might then be defined as consistency among particular judgments and low-level principles.

It would be good to achieve this kind of coherence; [122] but in the end, even this may be inadequate, because it is insufficiently ambitious. Judgments about particular cases probably deserve to be counted as considered only if they have survived encounter with principles of various levels of generality. To qualify as considered judgments, we should probably test our convictions about particular cases not simply by reference to other cases and low-level principles, but also by reference to principles described at higher levels of abstraction. On this view, reasoning by analogy should indeed be seen   *778 as an incomplete and truncated version of the search for reflective equilibrium. And on this view, we have not achieved real coherence unless a great deal is done both vertically and horizontally, that is, unless we have tested our particular convictions against many judgments of general principle as well as against many other particular convictions. If this is so, we do not have either considered judgments or coherence until we have thought through our high-level principles in far more detail than analogical thought ordinarily requires.

This argument suggests that some version of reflective equilibrium is indeed the appropriate end-state of analogical reasoning in morality and, under ideal conditions, in law. [123] An important qualification, however, is necessary for law: Some of the fixed points in law are precedents reached by others, not judgments genuinely accepted by oneself. These points may be fixed either because the legal culture genuinely renders them unrevisable (for the particular judge on, say, a lower court), or because the principle of stare decisis imposes a strong barrier to revision.

Unlike morality, in which revisability is a key aspect of the search for reflective equilibrium, [124] the law tends to fix many particular judgments. This point has major implications for the possibility that lawyers or judges can reach reflective equilibrium. Because of the sheer number of judges in a position to create fixed points in many particular cases, no single participant in the legal culture is at all likely to be able to achieve equilibrium. [125]

This fact should not be entirely lamented; it is a virtue as well as a vice. Because of the need for predictability and stability in law, many questionable outcomes must be taken as fixed. With this point in mind, analogical reasoning might be defended on the ground that the best approach to certain areas of law is principled consistency with respect to individual cases and low-level principles. At least under real-world constraints, this form of principled consistency may be what we mean by truth, or right answers, in law or even morality. [126] This point bears on the claim that analogical reasoning requires criteria that analogies cannot themselves supply. Of course one needs criteria to engage in such reasoning. But those criteria will emerge from the process of comparing various cases; often they are not given or even describable in advance, except at an unhelpful level of generality.

*779 The same point can be made in another way. The critics of analogical reasoning sometimes act as if analogies were "things," which either resolve or do not resolve contested cases. [127] If they do resolve contested cases, they are not mere

analogies but genuine rules; if they do not, they are nothing at all. [128] But analogies should not be seen in this way. Their meaning lies in their use. They are not simply unanalyzed fact patterns; they are used to help people think through contested cases and to generate low-level principles. In this way they have a constitutive dimension, for the patterns we see are a product not simply of preexisting reality, but of our cognitive structures and our principles as well. [129] The principles and patterns we develop and describe are in turn brought to bear on, and tested through confrontation with, other cases.

This process is not a game or a joke. It does not evade responsibility. It does not involve tricks. "Irony" is not its most distinctive feature. [130] It does not treat moral seriousness as an anachronism to   *780   be understood as one of the endless number of "social constructs" to be observed from the appropriate distance. It is not a substitute or a disguise for some other, preferable form of reasoning. Much less does it conceal something called "politics." [131] On the contrary, it treats both law and politics as forms of moral reasoning, and it attempts to engage in precisely that.

We might conclude that in hard cases in law, any "choice," if made well, is not a black box, but is instead founded on policies or principles that usually play a part in legal reasoning as it currently stands. And if the relevant grounds for choice are not in the current resources of legal reasoning, so much the worse for (current) legal reasoning. We should then change legal reasoning to ensure that it contains the appropriate resources for choice.

The process of reasoning by analogy is not science, [132] and it cannot be anchored in anything other than what human beings actually believe.   *781   But surely this does not disqualify it as a mode of reasoning. It may even be said to be the central feature of the common law method, prevalent of course in American constitutional law. And when analogical reasoning is working well, it provides a deep challenge to ordinary understandings of the rule of law - and to the occasionally prominent movements toward codification and the replacement of analogical reasoning with clear rules, to be laid down by the legislature or courts [133] in advance.

### B. Alternative Accounts and the Comparative Advantages of Analogical Thinking

We are now in a position to compare analogical reasoning with some other prominent approaches to law. I deal here with the search for reflective equilibrium; Ronald Dworkin's conception of law as "integrity"; and general theories, with special reference to the economic analysis of law.

*1. The Search for Reflective Equilibrium.* - Throughout I have emphasized that analogical reasoning is not fully theorized and that those who engage in this form of reasoning have not developed a comprehensive theory to account for their particular convictions. This limitation has emerged as a serious one. It seems plausible that the search for a relatively wide or extended version of reflective equilibrium is superior to analogical reasoning, and that the latter is a kind of crude, incomplete version of the former. Perhaps lawyers should ultimately abandon analogical reasoning and attempt to bring their particular judgments in accord with theories of varying levels of generality.

In some respects this is true, and something like it may well be the correct final assessment. Once one has reached reflective equilibrium, one has fully rationalized all particular judgments, and surely this is a major gain. Moreover, reflective equilibrium, once obtained, is likely to be better than analogical reasoning in the important sense that it subjects to scrutiny both particular convictions (that one holds) and particular holdings (of some court), and thus allows us to see if these results can fully survive encounter with a great deal else that is both particular and general. Once in reflective equilibrium, one is able to account in depth and detail for all of one's convictions.

*782   Precisely because of its lack of ambition, analogical reasoning is inferior on these counts. On the other hand, reasoning by analogy has four distinct advantages. Each of these advantages is especially important for people engaged in legal reasoning. They suggest that analogical reasoning may be a second-best alternative to the search for reflective equilibrium in light of the multiple constraints imposed on any legal system in the real world.

First, reasoning by analogy may be the best approach available for people of limited time and capacities. The search for reflective equilibrium may be simply too demanding for participants in law, or for others who attempt to reason through difficult problems. Often there are too many practical constraints to work out a fully general theory. As compared with the search for reflective equilibrium, analogical reasoning has the advantage, for ordinary lawyers and judges, of humility and circumspection. To engage

in analogical reasoning, one need not take a stand on large, contested social issues, some of which can be resolved only on a sectarian basis. A lawyer or judge who claims to have reached reflective equilibrium may seem immodest, insufficiently cautious, or even hubristic.

Second, reasoning by analogy may have the significant advantage of allowing people unable to reach anything like an accord on general principles to agree on particular outcomes. Sometimes it is exceedingly difficult to get people to agree on the general principles that account for their judgments. But it may be possible for them to agree on particular solutions or on low-level principles. [134] An overlapping consensus [135] is often possible on the view that case *A* is relevantly similar to case *B* - even if those who join the consensus could not decide as between utilitarianism or Kantianism, or come to agreement on the appropriate role of religion in society.

Third, analogical reasoning may be especially desirable in contexts in which we seek moral evolution over time. [136] If the legal culture really did attain reflective equilibrium, it might become too rigid and calcified; we would know what we thought about everything, whether particular or general. [137] By contrast, analogical reasoning has the important advantage of allowing a large degree of openness to new facts and perspectives. It enables disagreement and uncertainty to turn into consensus.

Fourth, analogical reasoning in law operates with precedents that have the status of fixed points; this is so even for people who sharply **\*783** disagree with the results embodied in those precedents. In searching for reflective equilibrium, by contrast, everything is potentially revisable. The fact that precedents are fixed points helps to bring about an overlapping consensus as well, by constraining the areas of reasonable disagreement. In this way, analogical reasoning introduces a degree of stability and predictability. These are important virtues for law, and they sharply reduce the costs of reaching particular decisions.

In short, lawyers could not try to reach reflective equilibrium without severely compromising the system of precedent. As noted, the judgments at work in the search for reflective equilibrium are subject to critical scrutiny, and any of them might be discarded. [138] The point helps explain Rawls's suggestion that "for the purposes of this book, the views of the reader and the author are the only ones that count. The opinions of others are used only to clear our own heads." [139]

Here we have a striking and illuminating contrast between the search for reflective equilibrium and analogical reasoning. In a legal system, precedents are far more than an effort "to clear our own heads." If a judge or lawyer is to attempt to reach reflective equilibrium, precedents will have at most the status of considered judgments about particular cases, and these might be subject to revision if they conflict with something else that he believes. In the legal system, precedents have a much firmer status. To be sure, precedents are not immune to revision; but the principle of stare decisis ensures that they operate as relatively fixed points. The search for reflective equilibrium is therefore a misleading description of law and in some ways an unattractive prescription. Participants in a legal system that aspires to stability should not be so immodest as to reject judgments reached by others whenever those judgments cannot be made part of reflective equilibrium for those particular participants. Of course, it is only a mixed blessing to have fixed points that are wrong as a matter of principle. Analogical reasoning may perpetuate confusion or injustice where reflective equilibrium would not.

*2. Hercules, Harlan, and Integrity.* - Ronald Dworkin has been the most influential critic of legal positivism - the view that law is a system of rules proceeding from authoritative sources. [140] Dworkin thinks that there is an inevitable evaluative or normative dimension **\*784** to statements "about what the law is." Often, at least, one cannot say "what the law is" without also saying something about "what the law should be." In other words, Dworkin believes that when lawyers disagree about what the law is with respect to some hard question, they are disagreeing about "the best constructive interpretation of the community's legal practice." [141] Thus, Dworkin argues that interpretation in law consists of different efforts to make a governing text "as good as it can be." [142] This is Dworkin's conception of law as integrity.

Hercules, Dworkin's infinitely patient and resourceful judge, approaches the law in this way. [143] Dworkin places a large emphasis on "fit" as a criterion for correctness in legal outcomes. On Dworkin's view, we do not look at moral theory until we have exhausted the inquiry into "fitness" (although Dworkin is not entirely clear on this point). The supreme lawyerly virtue of integrity is connected with achievement of principled consistency among cases.

These are illuminating suggestions. They do indeed help explain what people disagreeing in law are disagreeing about. They also show how the lawyer's task is different from that of the philosopher. Often a statement describing the law is not a statement

about some "plain fact"; often there is a large evaluative dimension to positions about what the law is. [144] Moreover, Dworkin's reliance on "fit" closely connects with the analogical reasoner's own effort. Both Hercules and the analogical judge are especially concerned to develop principles that organize cases. Both of them are focused on coherence as a criterion of truth in law. [145]

But it is notable that Dworkin says little about the role of analogical reasoning, which lies at the heart of how lawyers actually think. [146] His account does not give a proper place to this form of reasoning. In his hands, theories are produced largely on the basis of abstract **785** moral theory. These theories are then brought to bear on particular problems. [147] But this is not how lawyers proceed. In deciding whether a restriction on cross-burning offends the First Amendment, lawyers do not really ask which interpretation will make the Amendment the best it can be. They do not begin with a high-level conception of the value promoted by the Amendment. To develop such a conception, they would have to ask questions that are too broad and abstract - too hard, large, and open-ended for legal actors to handle. Such questions call for responses that are too deeply theorized.

In thinking about free speech issues, lawyers instead ask what particular sorts of practices seem clearly to violate the First Amendment, or the principle of free expression, and then whether a restriction on (for example) cross-burning is relevantly similar or relevantly different. Of course the description of relevant similarities and differences will have evaluative dimensions, and these should be made explicit. But lawyers and judges will not engage in general moral theorizing. [148] The resulting approach is the distinctive legal method. As we have seen, that method has some important defects in comparison with the search for reflective equilibrium, which Dworkin's approach seems to resemble. But it has some advantages as well.

From the standpoint of Dworkin's Hercules, we might respond in the following way. A judge who operates from the "bottom up," rather than from the "top down," might end up being Herculean too. At least he had better have that aspiration in mind. When our modest **786** judge - Harlan, say, rather than Hercules - uses analogical reasoning to say that case *A* is like case *B*, he must rely on a principle. And if he is reasoning well, he will have before him a range of other cases, *C* through *Z*, in which the principle is tested against other principles and thereby refined. At least if he is a distinguished judge, he will experience a kind of "conceptual ascent," in which the more or less isolated and small low-level principle is finally made part of a general theory, or of reflective equilibrium. In this way, we might conclude that analogical reasoning is indeed part of Dworkin's account, but only as an early step toward something both wider and deeper.

We have seen that there is a good deal of truth in this response. [149] But the same points that were made earlier need to be reiterated. Sometimes we can achieve an overlapping consensus on an analogy. This is a real advantage over Hercules's approach, under which, if we do well, we will arrive at a single general theory that could strike others as sectarian. At least Harlan has this virtue - a partial and ambiguous one - over Hercules. Sometimes participants in law do not have the time or capacities to think everything fully through, and hence analogical reasoning is the best that we can expect in the real world of law. Sometimes it may be best to have analogical reasoning, precisely because of the greater flexibility that it permits over time, and because of its distinctive contribution to moral evolution in society. Once in reflective equilibrium, Hercules's legal universe is frozen. Finally, it may even be possible that considered judgments about particulars count as truth in law, though I have suggested reasons to be cautious about this claim. [150]

One additional note. Dworkin's conception of law as integrity contains a theory of what it means for law to be legitimate. Hercules **787** can produce vertical and horizontal consistency among judgments of principle in law. Harlan can offer nothing so bold. A legal system pervaded by analogy will not yield anything like full coherence. Perhaps this is a decisive defect.

A complete response would require more detail than I can offer here, but a few remarks are in order. Full integrity, I suggest, consists of much more than a legal system of numerous, hierarchically-arranged courts can be expected to offer. Because of the need for predictability and stability in law, judges must reason from cases with which they disagree, and the resulting judgments are unlikely fully to cohere. If this is so, a legal system may well be able to claim the requisite legitimacy if it is democratic (broadly speaking) and if individual judges seek to produce the limited but important sorts of principled consistency that analogical thinking can yield. If this is correct, a system in which judges reason by analogy, and do not seek reflective equilibrium, might itself be justified as part of the reflective equilibrium reached by informed observers who take institutional issues into account.

*3. General Theories and Economic Analysis of Law.* - We might look, finally, at efforts to replace legal reasoning with general theories, symbolized most dramatically by the effort to ask what sorts of legal rules will promote economic efficiency. [151] The

advantage of economic analysis of law is that it appears to distrust ordinary intuitions altogether, showing that they are too crude to be a basis for law. Intuitions about the effects of legal rules may be completely wrong. In a sharp restatement of Bentham's attack on the common law, economic analysts sometimes claim that traditional legal reasoning is not reasoning at all, but instead is an encrusted system of unorganized and perhaps barely processed intuitions. [152]

There can be no question that economic analysis of law has led to major advances. Above all, perhaps, it has done so by helping to untangle the social consequences of legal rules, many of which are counterintuitive, and all of which are relevant to the proper evaluation of law. There can be no question that instrumental rationality is highly pertinent to those designing legal rules. Economic analysis is, for this reason, exceptionally valuable for lawyers. Here it has a major advantage over analogical reasoning, which is far less helpful on the matter of consequences. One cannot discover consequences by examining other judicial holdings.

In its normative form, however, economic analysis depends on too thin a repertoire for inquiry - that is, the notion that legal rules **\*788** should be designed so as to maximize wealth. This intuition can be shown to be too crude and general to be right, and by making reference to particular cases that appear to disprove it. [153]

A special advantage of analogical reasoning over economic analysis is that the former, unlike the latter, need not insist that plural and diverse social goods should be assessed according to the same metric. To make diverse goods commensurable in this way may do violence to our considered judgments about how each good should be characterized. [154] Those considered judgments are far from embarrassing; they are part of what it means to think well. Consider, for example, the view that we should see all of the following as "costs": unemployment, the loss of a species, higher prices for pencils, the adaptation of workplaces to accommodate people on wheelchairs, sexual assault, and chilling effects on speech. If we understand all these things as "costs," to be assessed via the same metric, we will disable ourselves from making important qualitative distinctions. It might be objected that a more differentiated approach, one that insists on the plurality and diversity of goods, is fatally unscientific. To this objection we should respond that this conception of science is ill-suited to good thinking about a certain range of legal problems. What is required is not science, but practical reason. [155]

The hard question, not yet fully elaborated in the philosophical literature, remains: How does one make choices in cases in which incommensurable social goods are at stake, and in which some of these goods must be sacrificed? An exploration of how analogical reasoning actually works may well be helpful in this important endeavor. **\*789** The analogical thinker is alert to the manifold dimensions of social situations and to multiple relevant similarities and differences. Unequipped with (or unburdened by) a unitary theory of the good or the right, she is in a position to see clearly and for themselves the diverse and plural goods that are at stake and to make choices among them. [156] The very search for relevant similarities and differences places a premium on this process of perceiving particulars.

In any case, there is a large difference between using economics to ascertain the social consequences of legal rules [157] and using economics as a complete moral or political system. Racial discrimination seems wealth-maximizing in some places; does this mean that we must eliminate laws forbidding it? The comparative advantage of analogical reasoning is that it provides a deep and broad resource for legal thought.

Economic analysis of law is an especially controversial top-down approach; but the limitations of the economic approach may be limitations of other such approaches as well. I cannot establish the point here. But consider the distinguished efforts to approach the free speech principle through the lens of a general theory of autonomy [158] or democracy. [159] The autonomy principle has considerable appeal, but it seems to run afoul of many considered judgments about particular cases, and its most prominent defender has repudiated it as a complete account. [160] A democratic approach to free speech runs into similar difficulties. [161] By itself, all this may prove little. But it suggests the possibility that any top-down approach to certain areas of law will be inadequate because ill-suited to the complexity and plurality of the relevant values at stake. And if the theory is adjusted to take account of this complexity and this plurality, it will cease to be a top-down theory at all, at least as I have understood it here.

**\*790** If the argument I have made is plausible, there may be much more to be said in favor of the common law method than is now popular. That method will have within it resources unlikely to be available to anyone laying down rules in advance. It follows that a large task for a legal system based on a general enthusiasm for rules is to introduce the virtues of analogical reasoning. Debates in contemporary administrative law are often about precisely this point. [162] Many people have tried to obtain,

in a rule-pervaded, statutory era, some of the advantages of analogical thinking and of particular examination of particular contexts. [163]

## IV. CONCLUSION

Analogical reasoning is the conventional method of the lawyer; it plays a large role in everyday thinking as well. Its distinctive properties are a requirement of principled consistency, a focus on concrete particulars, incompletely theorized judgments, and the creation and testing of principles having a low or intermediate level of generality. Because of its comparative lack of ambition, this form of reasoning has some important disadvantages. Compared with the search for reflective equilibrium, it is insufficiently theoretical; it does not account for its own low-level principles in sufficient depth or detail. Compared with economics and empirical social science, it is at best primitive on the important issue of likely social consequences. Law should be more attuned to facts, and on this score analogical thinking may be an obstacle to progress.

But in a world with limited time and capacities, and with sharp disagreements on first principles, analogical reasoning has some beneficial features as well. Most important, this form of reasoning does require people to develop full theories to account for their convictions; it promotes moral evolution over time; it fits uniquely well with a system based on principles of stare decisis; and it allows people who diverge on abstract principles to converge on particular outcomes. In any case it is unsurprising that analogical reasoning continues to have enormous importance in legal and political discussion.

A notable aspect of analogical thinking is that people engaged in this type of reasoning are peculiarly alert to the inconsistent or abhorrent result, and they take strong convictions about particular cases to provide reasons for reevaluating their views about other cases or even about apparently guiding general principles. [164] The emphasis on particular cases and particular convictions need not be regarded as an embarrassment, or as a violation of the lawyer's commitment to principle. [165] On the contrary, it should be seen as a central part of the exercise of practical reason in law (and elsewhere).

In this light, it seems most unfortunate that analogical reasoning has fallen into ill repute. To abandon this method of reasoning may be to give up, far too quickly, on some of the most useful methods we have for evaluating our practices, and for deciding whether to change them through law.

### Footnotes

[a]   Karl N. Llewellyn Professor of Jurisprudence, Law School and Department of Political Science, University of Chicago. For helpful comments, I am very grateful to members of the audience at a lecture on this topic at Harvard University's Program in Ethics and the Professions; to participants in legal theory workshops at Stanford Law School and the University of Southern California Law Center; and to Bruce Ackerman, Scott Brewer, Daniel Brudney, Joshua Cohen, Jon Elster, Richard Fallon, Abner Greene, Dennis Hutchinson, Laurence Friedman, Elena Kagan, Larry Lessig, Frank Michelman, Michael McConnell, Jennifer Nedelsky, Martha Nussbaum, Richard Pildes, Richard Posner, Margaret Jane Radin, Frederick Schauer, Lawrence Solum, David A. Strauss, Mark Tushnet, Edna Ullmann-Margalit, and Lloyd Weinreb.

[1]   See RONALD DWORKIN, LAW'S EMPIRE (1986); RONALD DWORKIN, TAKING RIGHTS SERIOUSLY (1977); and H.L.A. HART, THE CONCEPT OF LAW (1961). The various essays in JUDITH J. THOMSON, RIGHTS, RESTITUTION, AND RISK 78-116, 257-260 (1986), are prominent nonlegal examples of the method of analogy, as I understand it here. Thomson's comments on her method are also relevant. Id. at 251.

[2]   See PETER GOODRICH, READING THE LAW 77-78, 160-61, 184-86, 197-98 (1986); RICHARD A POSNER, THE PROBLEMS OF JURISPRUDENCE 86-100 (1990); ROBERTO M. UNGER, THE CRITICAL LEGAL STUDIES MOVEMENT 8 (1983); James A. Boyle, The Anatomy of a Torts Class, 34 AM. U. L. REV. 1003, 1051, 1054-55 (1985); Mark V. Tushnet, Following the Rules Laid Down: A Critique of Interpretivism and Neutral Principles, 96 HARV. L. REV. 781, 818-19 (1983).

Compendium_Supplemental Brief
Page 179

3    The leading discussion of analogical reasoning in law is EDWARD H. LEVI, AN INTRODUCTION TO LEGAL REASONING (1947), discussed below in note 63. Helpful descriptions appear in STEPHEN F. BARKER, THE ELEMENTS OF LOGIC 186-95, 225-29 (5th ed. 1989); STEVEN J. BURTON, AN INTRODUCTION TO LAW AND LEGAL REASONING 25-40 (1987); MARTIN P. GOLDING, LEGAL REASONING 97-143 (1984); MARK T. KEANE, ANALOGICAL PROBLEM SOLVING 11-37 (1988); JOSEPH RAZ, THE AUTHORITY OF LAW 201-06 (1979); J.F. ROSS, PORTRAYING ANALOGY 202-11 (1981); and STEPHEN TOULMIN, RICHARD RIEKE & ALLAN JANIK, AN INTRODUCTION TO REASONING 148-150 (1979). For useful collections, see ANALOGICAL REASONING: PERSPECTIVES OF ARTIFICIAL INTELLIGENCE, COGNITIVE SCIENCE, AND PHILOSOPHY (David H. Helman ed., 1988) [hereinafter ANALOGICAL REASONING]; SIMILARITY AND ANALOGICAL REASONING (Stella Vosniadou & Andrew Ortony eds., 1989). For short, suggestive treatments, see HILARY PUTNAM, THE MANY FACES OF REALISM 73-75 (1987); W.V. QUINE & J.S. ULLIAN, THE WEB OF BELIEF 83-95 (2d ed. 1978); Brian Barry, *On Analogy,* 23 POL. STUD. 86, 93-99 (1975); *cf.* ALBERT R. JONSEN & STEPHEN TOULMIN, THE ABUSE OF CASUISTRY 279-303 (1988) (defending particularistic case analysis – "casuistry" – against the view that morality consists of the application of a code of general rules).

4    Skepticism about normative argument has become prominent in law. *See, e.g.,* Richard Delgado, *Norms and Normal Science: Toward a Critique of Normativity in Legal Thought,* 139 U. PA. L. REV. 933, 960 (1991) ("Normative discourse is indeterminate; for every social reformer's plea, an equally plausible argument can be found against it."); Robert W. Gordon, *"Of Law and the River," and Of Nihilism and Academic Freedom,* 35 J. LEGAL EDUC. 1, 2 (1985) ("[B]ecause ...[law] is founded upon contradictory norms, its principles cannot constrain a single set of outcomes even if intelligently, honestly and conscientiously applied. In contract law, for example, there is *always* a legitimate argument for maintaining one party's freedom of action and a contrary argument for protecting the other party's security; for every argument for enforcing the deal ... there is a counterargument for voiding the deal ....").

5    112 S. Ct. 2538 (1992).

6    *See* JOHN RAWLS, A THEORY OF JUSTICE 19-22, 46-51 (1971); *infra* p. 756.

7    What I am describing in the text is a form of inductive analogy, in the sense that it depends on predictive conjectures about an unknown case that are based on but go beyond stated premises. *See* BARKER, *supra* note 3, at 191-93; Theo A.F. Kuipers, *Inductive Analogy by Similarity and Proximity, in* ANALOGICAL REASONING, *supra* note 3, at 299, 301-09. Inductive analogy is different from the usual case of induction, which occurs by enumeration. An example of nonanalogical inductive reasoning is: I have seen 100 German shepherds, and they are all gentle with children. From the large number of gentle German shepherds, I infer that the latest German shepherd is also gentle with children.

    I deal throughout with analogical reasoning that is roughly propositional in a sense that should emerge from the discussion at pp. 744-49 below. I spend little time on the growing work dealing with analogy and metaphor at nonpropositional levels. *See, e.g.,* GEORGE LAKOFF, WOMEN, FIRE AND DANGEROUS THINGS 68-76 (1987); Mark Johnson, *Some Constraints on Embodied Analogical Understanding, in* ANALOGICAL REASONING, *supra* note 3, at 25, 39 ("[A]nalogies cannot be understood as propositional or conceptual mechanisms for reflecting on already-determinate experiences; rather, we can actually speak of them as *constitutive* of our experience, because they are partially constitutive of our understanding, our mode of experiencing our world. Analogy is a basic means by which form, pattern, and connection emerge in our understanding and are then articulated in our reflective cognition and in our language."). See also the brief discussion of metaphor and analogy below in note 26.

8    *See* Mary Hesse, *Theories, Family Resemblances and Analogy, in* ANALOGICAL REASONING, *supra* note 3, at 317, 317-18. Hesse writes:

    It has long been obvious that the human problem solver does not generally think deductively or by exhaustive search of logical space. Propositional logic relies upon enumeration of premises, univocal symbolization, and exclusively deductive connections, and these cannot be either a good simulation of human thought or an efficient use of computers. In real human thinking, the meanings of concepts are constantly modified and extended by parallels, models and metaphors,

and the rational steps from premises to conclusion are generally non-demonstrative, being carried out by inductive, hypothetical and analogical reasoning.

*Id.; see also* David E. Rumelhart, *Toward a Microstructural Account of Human Reasoning, in* SIMILARITY AND ANALOGICAL REASONING, *supra* note 3, at 298, 301 ("Most everyday reasoning does not involve much in the way of manipulating mental models. It probably involves even less in the way of formal reasoning. Rather, it probably involves assimilating the novel situation to other situations that are in some way similar – that is, reasoning by similarity.").

[9]   *See* GOLDING, *supra* note 3, at 44-45; Hesse, *supra* note 8, at 331. For an example of unacceptable analogical thinking, consider this: (a) *A*, a member of social group *F*, has undesirable characteristic *X*; (b) *B* is also a member of social group *F*; (c) *B* probably has characteristic *X*. This is a form of bad analogical reasoning - bad because the probability claim in (c) may be false, and because even if it is true, it may be wrong to judge people by statistical measures of this sort. This example illustrates a particular problem for analogical reasoning. In some contexts, it may be illicit to judge an individual case, or an individual, on the basis of a characteristic shared with another case or another person. *See also infra* note 61 (noting that analogical reasoning may distract attention from the particulars of the case at hand).

[10]   *See* Petermann v. Local 396, Int'l Brotherhood of Teamsters, 344 P.2d 25, 27 (Cal. 1959). In the examples cited in this note and below in notes 11-17, I am describing how many observers see these cases, not the court's actual opinions, which are a mixture of analogical and nonanalogical arguments.

[11]   *See* Svenko v. Kroser Co., 245 N.W.2d 151, 153-54 (Mich. 1976).

[12]   *See* Brandenburg v. Ohio, 395 U.S. 444, 444-45, 447 (1969).

[13]   *See* Collin v. Smith, 578 F.2d. 1197, 1201 (7th Cir. 1978).

[14]   *See* Dandridge v. Williams, 397 U.S. 471, 487 (1970).

[15]   *See* Harris v. McRae, 448 U.S. 297, 317-18 (1980).

[16]   *See* Lindsey v. Normet, 405 U.S. 56, 74 (1972).

[17]   *See* DeShaney v. Winnebago County, 489 U.S. 189, 196-97 (1989). In the legal examples we are dealing with non-inductive analogical reasoning. We are not making a prediction about likely facts in an unknown case, but are instead making claims about how an as-yet undecided case should be resolved in light of its similarity to a decided or clear case. *See* BARKER, *supra* note 3, at 225-29.

[18]   An important difference is that the dog and automobile cases involve analogies as a crude guide to statistical probabilities, whereas the legal examples involve normative judgments.

[19]   It should be clear from the text that in analogical argument, precedents cannot be said to be uncontroversially binding or "on all fours." An argument from analogy depends on the fact that there are both plausibly relevant differences and plausibly relevant similarities between the precedent and the case at hand.

[20]   The distinction between the principled and the excessively ad hoc is sometimes a matter of social convention. *See e.g.,* FredrickSchauer, *Exceptions,* 58 U. CHI. L. REV. 871, 886-91 (1991) (discussing the effect of social conventions on free speech principles and claims for exceptions).

[21]   Oliver W. Holmes, Jr., *Codes and the Arrangements of Law,* 44 HARV. L. REV. 725, 725 (1931) (reprinted from 5 AM. L. REV. 1 (1870)). In a way this suggestion is misleading. To decide the case at all, one has to have the principle in some sense in mind; there can be no sequential operation of quite the kind Holmes describes. *See* T.M. Scanlon, *The Aims and Authority of Moral Theory,* 12 OXFORD J. LEGAL STUD. 1, 9 (1992).

[22]   See, for example, the discussion of racial discrimination in DWORKIN, cited above in note 1, at 381-89, in which the principles are first generated at a high level of generality, and then applied to particular disputes - an example of "top down" reasoning. A similar method is at work in Ronald Dworkin, *The Coming Battles over Free Speech,* N.Y. REV. BOOKS, June 11, 1992, at 55 [hereinafter Dworkin, *The Coming Battles over Free Speech*]. An interesting contrast is provided by Ronald Dworkin, *The Original Position, in* READING RAWLS 16, 28-37 (Norman Daniels ed., 1989) [hereinafter Dworkin, *The Original Position*], in which the search for reflective equilibrium is described in a way that does not have this "top down" aspect.

[23]   *See* Richard A. Posner, *Legal Reasoning from the Top Down and From the Bottom Up,* 59 U. CHI. L. REV. 433, 434-35 (1992); *cf.* JON ELSTER, LOCAL JUSTICE 189-94 (1992) (distinguishing between "hard" and "soft" theories in the same way that Posner distinguishes between "top down" and "bottom up" approaches).

[24]   *See* BRIAN BARRY, THEORIES OF JUSTICE 264 (1989); Scanlon, *supra* note 21, at 9; *see also* RAZ, *supra* note 3, at 203 ("By its very nature the justification of a rule is more abstract and more general than the rule it justifies").

[25]   Consider in this connection a famous story of the early days of law and economics at the University of Chicago Law School. Edward Levi - the great champion of analogical reasoning, *see infra* note 63 - decided to introduce economics into his antitrust course, by allowing every fifth class to be taught by the economist Aaron Director, one of the fathers of modern law and economics. As the story goes, Levi would spend four classes in the lawyer's fashion, brilliantly rationalizing the seemingly inconsistent judicial holdings. In the fifth class, Director would explain, with the economist's tools, why everything Levi said was wrong. Eventually even Levi was converted. (The story is summarized in Ronald H. Coase, *Law and Economics at Chicago,* J.L. & ECON. (forthcoming 1993)). The supposed moral of the story is that lawyers' reasoning, even by its most able practitioners, is inferior to economics, primarily because it lacks clear criteria or specified governing values. In antitrust, this may well be true; but it is not true everywhere. And if this is so, there are places in which those now occupying the place of Levi should not be converted by those now occupying the place of Director. *See infra* pp. 787-90 (discussing diverse and plural goods).

[26]   A good deal of recent attention has been devoted to the relationship between analogy and metaphor. *See generally* ON METAPHOR (Sheldon Sacks ed., 1979). In much of this work, metaphor is said to have epistemic value, in science and elsewhere. Here there is much room for further thought about both analogy and metaphor in law. I make one brief point here. Consider the statement: "Abortion is murder," a statement that in the abstract, could be intended and received as a literal truth, a metaphor, or an analogy. If it is a metaphor, we know that the speaker believes that abortion is not literally murder, but is seeking to cast some light on the subject precisely by departing from literal description. ("Holmes was a lion of the law." "Michael Jordan is God.") But if the statement is an analogy, the speaker is claiming, and should be understood to be claiming, that abortion really is murder in the relevant respects; there is no acknowledgement that the statement is literally untrue. I believe that this is a large difference between metaphor and analogy, though I must be tentative on this point. *See* Donald Davidson, *What Metaphors Mean, in* ON METAPHOR, *supra,* at 29, 29-36 (challenging this conception of metaphor); Dedre Gentner, Brian Falkenhainer & Janice Skorstad, *Viewing Metaphor as Analogy, in* ANALOGICAL REASONING, *supra* note 3, at 171, 172 (claiming that metaphor is a kind of analogical process); Mark Johnson, *Some Constraints on Embodied Analogical Understanding, in* ANALOGICAL REASONING, *supra* note 3, at 25, 25 (same).

ON ANALOGICAL REASONING, 106 Harv. L. Rev. 741

27    *See also infra* note 53 (discussing the analytic-synthetic distinction).

28    347 U.S. 483 (1954).

29    388 U.S. 1 (1967).

30    Of course I do not mean to canvass all or most forms of human reasoning; I select those that are pervasive in the legal culture.

31    *See* Richard A. Posner, *An Economic Theory of the Criminal Law*, 85 COLUM. L. REV. 1193, 1198-99 (1985).

32    Sometimes the judgment that a particular outcome is palpably absurd or unjust should not be given much weight, because that judgment should itself be subject to critical scrutiny. *See infra* note 67 and accompanying text (suggesting that considered judgments about particular cases should count as such only if they have survived encounter with a good deal else that is both general and particular).

33    It is interesting that advocates of general theories often work very hard to show that deductions from the theory are indeed consistent with our judgments about particular cases. *See, e.g.*, ROBERT H. BORK, THE TEMPTING OF AMERICA 74-83 (1990) (attempting to explain why a reliance on the original understanding of the Constitution is consistent with the outcome in *Brown v. Board of Education*). Note also that a large part of the argument for the economic analysis of law is that economic analysis appears to "account for" or "explain" a large number of well-established and apparently satisfactory common law principles. *See, e.g.*, RICHARD POSNER, ECONOMIC ANALYSIS OF LAW § 2.2, at 23-25 (4th ed. 1992).

34    *See* JOHN DINWIDDY, BENTHAM 58 (1989).

35    *See* 3 JEREMY BENTHAM, THE WORKS OF JEREMY BENTHAM 206 (J. Bowring ed., 1843). Barker, cited above in note 3, at 286-90, contains a useful discussion, implicitly responsive to Bentham and highly relevant to lawyers, of how noninductive reasoning by analogy is necessary when deductive and inductive reasoning are not able to give us answers that we need. Barker offers the case of a bad check written by a student who is claimed to have violated an honor code that bars lying and cheating. How, Barker asks, could this case be resolved without resort to analogical thought? *See also infra* note 147 (discussing affirmative action).

36    *See* RAWLS, *supra* note 6, at 19-21, 46-51 (1971); John Rawls, *The Independence of Moral Theory*, 48 PROC. & ADDRESSES OF THE AM. PHIL. ASS'N 5, 7-10 (1974-75).

37    Rawls suggests that considered judgments count as such only if reached when we are calm and disinterested, *see* RAWLS, *supra* note 6, at 47-48. In general this seems right, but it may be that anger, indignation, and other emotions sometimes reflect better thinking rather than distorting influence. *See* Norman Daniels, *Wide Reflective Equilibrium and Theory Acceptance in Ethics*, 76 J. PHIL. 256, 258 n.3 (1979); MARTHA C. NUSSBAUM, *Perceptive Equilibrium: Literary Theory and Ethical Theory, in* LOVE'S KNOWLEDGE 168, 168-93 (1990); *cf.* RAWLS, *supra* note 6, at 440-46 (suggesting that shame and guilt are highly cognitive rather than referring to them as products of distortion).

38    There is thus a dispute about the real role, in the search for reflective equilibrium, of judgments about particular situations. *See generally* Daniels, *supra* note 37, at 258 n.3. Ronald Dworkin describes the search for reflective equilibrium in a way that relies heavily on particular judgments about particular situations, and this is closer to how I understand things in this essay. *See* Dworkin, *The Original Position, supra* note 22, at 28-30. It is interesting that the search for reflective equilibrium, if understood to require a great deal of attention to low-level judgments, plays little or no role in Rawl's book itself. The examples offered are "that religious intolerance and racial discrimination are unjust."

RAWLS, *supra* note 6, at 19. There is little reference to particular judgments, and little testing of the general principles against those judgments. *See* 1 BRIAN BARRY, A TREATISE ON SOCIAL JUSTICE: THEORIES OF JUSTICE 280-82 (1989). We should understand the search for reflective equilibrium to be a general concept of which Rawl's own version is a particular conception.

39   Herbert Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 HARV. L. REV. 1, 15-17, 31-34 (1959), is the most notable example of such criticisms. The search for reflective equilibrium is criticized as unacceptably dependent on existing intuitions in, among other places: RICHARD B. BRANDT, A THEORY OF THE GOOD AND THE RIGHT 16-23 (1979); R.M. Hare, *Rawls'* A Theory of Justice - *II,* 23 PHIL. Q. 241, 249-50 (1973); Joseph Raz, *The Claims of Reflective Equilibrium,* 25 INQUIRY 307, 318-19 (1982); Peter Singer, *Sidgwick and Reflective Equilibrium,* 58 MONIST 490, 515-17 (1974). *But see* Daniels, *supra* note 37, at 264-67 (defending the search for reflective equilibrium if it is sufficiently "wide"). A helpful treatment can be found in ELIZABETH ANDERSON, VALUE IN ETHICS AND ECONOMICS § 5.3 (forthcoming 1993) (qualifying coherence theories by acknowledging and incorporating criticisms while maintaining many of the best features of coherentist accounts).

Jon Elster makes the interesting suggestion that the "empirical foundations" of theories of justice should be not only "the intuitions of the philosopher," but also the results of (a) empirical studies of perceptions of justice and (b) investigations into the actual practices of institutions allocating scarce resources. JON ELSTER, LOCAL JUSTICE 192-94 (1992); *see also* NORMAN FROHLICH & JOE A. OPPENHEIMER, CHOOSING JUSTICE (1992) (providing such an empirical study). An approach of this kind would result in a quite different conception of reflective equilibrium than that presented by Rawls. In Rawls's conception, particular judgments are revisable; this would not be so under Elster's suggestion. *See* Scanlon, *supra* note 21, at 10 (describing the connection between revisability of judgments and Rawls's method).

40   I am drawing in this paragraph on various discussions of coherence in moral and ethical thought. *See, e.g.,* ELIZABETH ANDERSON, VALUE IN ETHICS AND IN ECONOMICS ch. 5 (forthcoming 1993); GILBERT HARMAN, CHANGE IN VIEW 29-63 (1986); RAWLS, *supra* note 6, at 19-22, 46-51; Rawls, *supra* note 36, at 5; John Rawls, *Outline of A Decision Procedure For Ethics,* 60 PHIL. REV. 177 (1951). To accept what I say here, it is not necessary to endorse all the details of these different and controversial accounts. Coherence accounts are criticized in Joseph Raz, *The Relevance of Coherence,* 72 B.U. L. REV. 273, 275-82 (1992).

41   347 U.S. 483 (1954).

42   410 U.S. 113 (1973).

43   On whether analogical reasoning can even occur without much more in the way of theory, *see infra* pp. 781-83; *see also* Rush Rhees, *The Language of Sense Data and Private Experience - II,* 7 PHILOSOPHICAL INVESTIGATIONS 101, 139 (1984) ("Suppose people are playing chess. I see queer problems when I look into the rules and scrutinise them. But Smith and Brown play chess with no difficulty. Do they understand the game? Well, they play it." (quoting a Wittgenstein lecture)). For examples of analogical reasoning that do not purport to search for reflective equilibrium, see the essays in Thomson, cited above in note 1.

44   I deal below with the comparative virtues of the two forms of reasoning. *See infra* pp. 781-83.

45   I think that something of this general sort underlies Charles Fried, *The Artificial Reason of the Law or: What Lawyers Know,* 60 TEX. L. REV. 35, 54-58 (1981).

46   *See, e.g.,* MORTON J. HORWITZ, THE TRANSFORMATION OF AMERICAN LAW, 1870-1960, at 120 (1992).

47  A usual response is that customs are not prelegal or prepolitical; they are themselves a function of law, and not independent of it. *But see* ROBERT C. ELLICKSON, ORDER WITHOUT LAW 123-55 (1991) (providing a basis for thinking that something like customary law is indeed possible).

48  This view of the common law has played a large role in fending off codification movements in the United States. Moreover, these systems account for a prominent and influential academic response to the Benthamite attack on judge-made law. Intriguingly, they appear to retain considerable appeal today.

49  *See* EDMUND BURKE, REFLECTIONS ON THE REVOLUTION IN FRANCE 348 (Gateway 1962) (1790).

50  *See* Robert C. Clark, *Contracts, Elites, and Traditions in the Making of Corporate Law,* 89 COLUM. L. REV. 1703, 1726-30 (1989).

51  I discuss this point in Part III. *See infra* pp. 770-71.

52  Hence Samuel Beckett's response to critics of his friend James Joyce: "The danger is in the neatness of identifications.... Must we wring the neck of a certain system in order to stuff it into a contemporary pigeon-hole, or modify the dimensions of that pigeon-hole for the satisfaction of the analogymongers? Literary criticism is not book-keeping." SAMUEL BECKETT, DANTE ... BRUNO. VICO ... JOYCE, *in* I CAN'T GO ON, I'LL GO ON 107, 107 (Richard W. Seaver ed., 1976). (I am grateful to Scott Brewer for providing this reference.) Law is not book-keeping, either; but this is an argument for analogical reasoning rather than against it. *See infra* pp. 787-90.

53  I am oversimplifying here. W.V. Quine famously argues that a familiar version of this distinction turns out to be untenable. *See* W.V. Quine, *Two Dogmas of Empiricism,* 60 PHIL. REV. 20 (1951). Adapted to the legal context, Quine's argument may be described in this rough way: There is no such thing as interpretation by reference to purely semantic principles (or purely analytic truths). Many substantive principles (or nonanalytic ideas) are at work in every case. In cases in which they are invisible, as they often are, and when we seem able to rely only on semantics, it is only because there is a consensus about the substantive principles (or nonanalytic ideas). *See id.* at 34. I believe that Quine's argument is related to the following point, stated very briefly: "The application of the concept of 'following a rule' presupposes a custom." LUDWIG WITTGENSTEIN, REMARKS ON THE FOUNDATIONS OF MATHEMATICS 322 (G.H. von Wright, R. Rhees & G.E.M. Anscombe eds., G.E.M. Anscombe trans., rev. ed. 1983). The distinction I am drawing in the text should thus be understood as a matter of custom or convention.

54  With the qualification noted above. *See supra* note 53.

55  *See* Lochner v. New York, 198 U.S. 45, 53 (1905).

56  I take the examples in this paragraph from Frederick Schauer, *Formalism,* 97 YALE L.J. 509, 512-13 (1988).

57  William James described this phenomenon as "vicious abstractionism":

We conceive a concrete situation by singling out some salient or important feature in it, and classing it under that; then, instead of adding to its previous characters all the positive consequences which the new way of conceiving it may bring, we proceed to use our concept privatively; reducing the originally rich phenomenon to the naked suggestions of that name abstractly taken, treating it as a case of 'nothing but' that concept, and acting as if all the other characters from out of which the concept is abstracted were expunged. Abstraction, functioning in this way, becomes a means of arrest far more than a means of advance in thought. It mutilates things ....

WILLIAM JAMES, THE MEANING OF TRUTH 135-36 (1975) (footnote omitted).

58   To the extent that analogical reasoning is not propositional but instead constitutive of our thinking, *see supra* note 7, however, we cannot make arguments, but must rest content with how it is that we think. For present purposes, I do not believe that this is an important qualification.

59   274 U.S. 200, 207 (1927) ("We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned .... The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. Three generations of imbeciles are enough." (citation omitted)).

60   *See id.*

61   *See supra* pp. 744-45; *infra* pp. 774-75. A related problem is that analogical reasoning can distract attention from the particular matter at hand by persuading judges to grapple with other cases and hypothetical examples that actually raise quite different issues. Resort to analogy can deflect the eye from the specific problem and thus induce a kind of blindness to what is really at stake.

     Note here Bishop Butler's phrase, "Everything is what it is, and not another thing," which Wittgenstein considered as a motto for his book, *Philosophical Investigations. See* RAY MONK, LUDWIG WITTGENSTEIN: THE DUTY OF GENIUS 451 (1990). At its best, analogical reasoning is especially alert to this fact. *See infra* pp. 784-90 (comparing analogical reasoning to general theories).

62   For a good discussion of the failure to examine means-end rationality in the legislative context, see Edward L. Rubin, *Legislative Methodology,* 80 GEO. L.J. 233, 268-81 (1991).

63   In his classic essay, *An Introduction to Legal Reasoning,* Edward Levi also describes the process as analogical. *See* EDWARD H. LEVI, AN INTRODUCTION TO LEGAL REASONING 1-2 (1949). My account diverges from Levi's on the important question of what happens when analogies appear to point in different directions. In my view, a judge must make some judgment about the best controlling low-level principle. By contrast, Levi says that in such cases, "words change to receive the content which the community gives to them." *Id.* at 104. "The process is one in which the ideas of the community and of the social sciences, whether correct or not, as they win acceptance in the community, control legal decisions." *Id.* at 6. For Levi, reasoning by analogy therefore has a crucial democratic component, found through the use of public desires (and social science). Levi did not, however, specify the mechanism by which community wishes help settle the play of analogies. There may be an historical explanation for this seemingly odd suggestion. Levi's book can be understood as a response to the legal realist attack on the autonomy of legal reasoning and to the associated claim, prominent after the New Deal, that legal reasoning is fatally undemocratic. When Levi was writing, it seemed crucial to establish the relative autonomy of law and especially of the common law method - to show that it had a logic and integrity of its own, but also to establish that it was not wholly independent of social desires. The enduring influence of Levi's account may stem from its apparent success in this endeavor.

     It would, however, be most surprising if one could identify any mechanism for translating community wishes into analogical reasoning. In hard cases, moreover, the community is badly divided. There may be no communal desire to which courts can look in making decisions. Reliance on community views is complicated further by the fact that the views of the community may be in part a function of what the courts say. The persuasiveness of any argument by analogy must turn on something other than community desires. Instead the process works by seeing to what principles people in positions of decision are most deeply committed.

64   112 S. Ct. 2538 (1992).

65    *See* United States v. Eichman, 496 U.S. 310, 315 (1990); Texas v. Johnson, 491 U.S. 397, 404-06 (1989).

66    I put aside issues of selective prosecution.

67    *See* Hudgens v. NLRB, 424 U.S. 507, 520-21 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551, 567-70 (1972). Note that here we have a potential problem with analogical reasoning. Some of these decisions, treated as "fixed points" for current purposes, might be attacked on the ground that they wrongly treat legally-conferred ownership rights as not being state action at all. *See* Cass R. Sunstein, *Free Speech Now,* 59 U. CHI. L. REV. 255, 267-77 (1992).

68    This is a variation on the ordinance at issue in *R.A.V. See R.A.V.,* 112 S. Ct. at 2541.

69    *See* Terminiello v. Chicago, 337 U.S. 1, 4-5 (1949); *supra* pp. 759-60.

70    *See Terminiello,* 337 U.S. at 4-5.

71    Critics of this view should see the later discussion of reflective equilibrium and the need for a theory of mistake in law below at pp. 768-69, 781-87.

72    The state Supreme Court did this by construction in *In re* R.A.V., 464 N.W.2d 507, 509-11 (Minn. 1991).

73    I am putting issues of overbreadth to one side by assuming that with the narrowing construction, the law applies only to speech unprotected by the First Amendment. In *R.A.V.* itself, four Justices concluded that there had been no sufficient narrowing construction. *See R.A.V.,* 112 S. Ct. at 2550, 2558-60 (White, J., concurring in the judgement).

74    *See id.* at 2552 (arguing that such a narrowed statute is constitutional).

75    *R.A.V.,* 112 S. Ct. at 2543.

76    *See generally* Geoffrey R. Stone, *Content Regulation and the First Amendment,* 25 WM. & MARY L. REV. 189, 197-200 (1983) (distinguishing viewpoint-based, content-based, and content-neutral First Amendment restrictions).

77    *See* American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 331 (7th Cir. 1985), *aff'd,* 475 U.S. 1001 (1986). One need not accept the application of the principle in *Hudnut,* which involved the controversial area of antipornography law, in order to agree with the general point. *Compare* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12-17, at 923-28 (2d ed. 1988) (defending *Hudnut) with* Cass r. Sunstein, *Neutrality in Constitutional Law,* 92 COLUM. L. REV. 1, 27-29 (1992) (criticizing the claim that antipornography law is unacceptably viewpoint-based).

78    The Court offers a tempting and clever response:

> In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination. Displays containing some words - odious racial epithets, for example - would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender - aspersions upon a person's mother, for example - would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc. tolerance and equality, but could not be used by that speaker's opponents.... St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules.

> *R.A.V.,* 112 S. Ct. at 2547-48. The short answer to this argument is that the distinction does not embody viewpoint discrimination as that term is ordinarily understood. Viewpoint discrimination is not established by the fact that, in

some hypotheticals, one side has greater *means* of expression than another, at least – and this is the critical point – if the restriction on means is connected to legitimate, neutral justifications. *See also* Akhil Reed Amar, *The Supreme Court, 1991 Term - Comment: The Case of the Missing Amendments:* R.A.V. v. City of St. Paul, 106 HARV. L. REV. 124, 132-51 (discussing the Supreme Court's recent development of this doctrine in *R.A.V.*).

79    *See* Chaplinsky v. New Hampshire, 315 U.S. 568, 574 (1942).

80    *See generally* Geoffrey R. Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions,* 46 U. CHI. L. REV. 81, 108-15 (1978) (arguing that subject-matter restrictions share characteristics with both viewpoint-based and content-neutral restrictions).

81    *See* Lehman v. City of Shaker Heights, 418 U.S. 298, 303-04 (1974).

82    *See* Greer v. Spock, 424 U.S. 828, 836-38 (1976).

83    *See Lehman,* 418 U.S. at 304.

84    *See Greer,* 424 U.S. at 839.

85    *R.A.V.,* 112 S. Ct. at 2561 (Stevens, J. concurring in the judgment).

86    *Id.*

87    *R.A.V.,* 112 S. Ct. at 2548.

88    *Id.*

89    *See id.* at 2570 n.9 (Stevens, J., concurring in the judgment).

90    *R.A.V.,* 112 S. Ct. at 2546.

91    *See id.* at 2570 n.9 (Stevens, J., concurring in the judgment).

92    *See* ADL LAW REPORT, HATE CRIMES STATUTES: A 1991 STATUS REPORT, App. C, 24-26 (1991). *But see* State v. Mitchell, 485 N.W.2d 807, 817 (Wis. 1992) (invalidating a "hate crimes" statute on First Amendment grounds); Susan Gellman, *Sticks and Stones Can Put You In Jail, But Can Words Increase Your Sentence? Constitutional and Policy Dilemmas of Ethnic Intimidation Laws,* 39 UCLA L. REV. 333, 354-80 (1991) (discussing the potential constitutional infirmities of ethnic intimidation statutes).

A valuable discussion of the neutrality issue in *R.A.V.,* focusing on the Civil War Amendments, is in Amar, cited above in note 78, at 151-61.

93    It seems obvious that reasoning frequently works through this sort of testing. *See* QUINE & ULLIAN, *supra* note 3, at 83-95.

94   *See* sources cited, *supra* note 2.

95   This sort of attack on analogy is traceable to Plato and to ancient attacks on "casuistry." *See* JONSEN & TOULMIN,
*supra* note 3, at 58-63; *see also* Bruce Ackerman, *The Common Law Constitution of John Marshall Harlan*, N.Y.L.
SCH. L. REV. 1, 7-8 (1992) (criticizing Harlan for his sympathy for common law adjudication and his failure to seek
external perspective on traditions).

96   Discrimination on the basis of sex and sexual orientation have thus been found objectionable because they have been
seen as analogous to discrimination on the basis of race. *See, e.g.*, Craig v. Boren, 429 U.S. 190, 197-99 (1976); Jantz v.
Muci, 759 F. Supp. 1543, 1546-51 (D.Kan. 1991), *rev'd*, 976 F.2d 623 (10th Cir. 1992); *see also* JUDITH J. THOMSON,
*A Defense of Abortion*, *in* RIGHTS, RESTITUTION, AND RISK, *supra* note 1, at 2-3 (arguing that prohibiting
abortion is analogous to coopting someone's body to save a stranger). Consider also the view that if miscegenation laws
are unconstitutional under the Equal Protection Clause, it follows by analogy that the ban on same-sex marriages is
unconstitutional too. *See* Sylvia A. Law, *Homosexuality and the Social Meaning of Gender*, 1988 WIS. L. REV. 187,
223-24; Andrew Koppelman, Note, *The Miscegenation Analogy*, 98 YALE L.J. 145, 162 (1988).

97   Thus Gulliver comments: "It is a maxim among ... lawyers, that whatever hath been done before, may legally be done
again: and therefore they take special care to record all the decisions formerly made against common justice and the
general reason of mankind. These, under the name of *precedents*, they produce as authorities to justify the most iniquitous
opinions; and the Judges never fail of directing accordingly." JONATHAN SWIFT, GULLIVER'S TRAVELS, 296
(Peter Dixon & John Chalker eds., 1967) (1726).

98   See the Levi-Director story recounted above in note 25 and the criticisms of reflective equilibrium noted above in note 39.

99   The view that analogical reasoning is not properly scientific raises some additional concerns to which I return below.
*See infra* pp. 787-89.

100  *Compare* Brutus, 2 THE COMPLETE ANTIFEDERALIST 369 (Herbert Storing ed., 1980) ("In a republic, the manners,
sentiments, and interests of the people should be similar. If this be not the case, there will be a constant clashing
of opinions; and the representatives of one part will be continually striving against those of the other.") *with* THE
FEDERALIST NO. 70, at 426-27 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (suggesting that the "differences
of opinion, and the jarring of parties in [the legislative] department ... often promote deliberation").

101  On this score reasoning in science is no different from reasoning elsewhere. Both depend on a certain degree of
consensus. The perceived differences between scientific and other thought may stem partly from the fact that we tend to
compare ethical or legal issues in which judgments are contested (affirmative action, the death penalty) with scientific
issues in which matters are settled (the earth goes around the sun, dropped objects will fall). This is probably misleading;
we might do better to compare the settled scientific judgments with the settled ethical ones (slavery is wrong, purposeless
human suffering cannot be justified). *See* Alan Gewirth, *Positive "Ethics" and Normative "Science,"* 69 PHIL. REV.
311, 312-13 (1960).

102  The point may be put in another way. Sometimes case *A* is found analogous to case *B*, rather than case *C*, simply because
the relevant judges are homogenous, and the homogeneity may damage judicial thinking. Analogical reasoning can go
wrong for this reason. Some people, for example, think that a prohibition on homosexual sodomy is like a prohibition on
incest, *see, e.g.*, Bowers v. Hardwick, 478 U.S. 186, 195-96 (1986); others think that the right analogy is a prohibition
on the use of contraceptives within marriage. It is at least possible that the former group thinks as it does in part because
of its homogeneity, that is, because it has not been systematically confronted with other views and perspectives.

[103] *Cf.* LUDWIG L. WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS ¶ 242, at 88 (G.E.M. Anscombe trans., 3d ed. 1958) ("If language is to be a means of communication there must be agreement not only in definitions but also (queer as this may sound) in judgments. This seems to abolish logic but does not do so.").

[104] I do not suggest that there is always such a consensus within law. Sometimes there are competing principles and competing analogies. But sometimes the analogies really do provide the requisite commonality; this is all I mean to claim.

[105] *See generally* John Rawls, *The Idea of an Overlapping Consensus,* 7 OXFORD J. LEGAL STUD. 1, 1-25 (1987) (advocating a political conception of justice to gain the support of an overlapping consensus).

[106] BARRY, cited above in note 24, at 275-80 (1989), criticizes on similar grounds Ronald Dworkin's analogy between moral and legal reasoning in his article *The Original Position,* cited above in note 22, at 28-29.

[107] *See, e.g.,* Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story,* 87 MICH. L. REV. 2320, 2323-41 (1989).

[108] A large topic, which I cannot discuss here, involves the relationship between cognition and emotions in law. This is a very large gap in our understanding: how analogical reasoning, and other forms of thought, involve different cognitive and affective capacities. This relationship is highly relevant to the problem of analogy, which engages narratives, which prominently affect emotions. Some of these issues are discussed in RONALD DE SOUSA, THE RATIONALITY OF EMOTION 21-46 (1990); GERALD GAUS, VALUE AND JUSTIFICATION 26-144 (1990); Jon Elster, *Sadder but Wiser? Rationality and the Emotions,* 3 SOC. SCI. INFO. 375 (1985); and Martha Nussbaum, *Emotions as Judgments of Value,* 5 YALE J. CRIT. 201, 203-210 (1992).

[109] This was the federalist view, *see supra* note 100. *See also* Frank I. Michelman, *The Supreme Court, 1985 Term – Foreword: Traces of Self-Government,* 100 HARV. L. REV. 4, 76-77 (1986) (defending plurality on courts).

[110] It follows that the process of reasoning by analogy carries with it a pragmatic conception of truth. *See* WILLIAM JAMES, PRAGMATISM 91-105 (Bruce Kuklick ed., 1981) (1907); John Dewey, *Propositions, Warranted Assertibility, and Truth,* 38 J. PHIL. 169, 169-72 (1941).

[111] *See* Charles R. Lawrence III, *If He Hollers Let Him Go: Regulating Racist Speech on Campus,* 1990 DUKE L.J. 431, 462.

[112] *See* Nadine Strossen, *Regulating Racist Speech on Campus: A Modest Proposal?,* 1990 DUKE L.J. 484, 537-39.

[113] Note that it does not follow from the mere fact of disagreement that there are no correct answers to disputed questions in law or ethics, any more than it does in science. Nor does it follow, from the fact that legal categories are our categories, and revisable by us, that everything is up for grabs, or that we are in some sort of abyss. It is true that human beings, including lawyers, do not have unmediated access to the world; we see things through human frameworks. But this need not entail any form of skepticism or relativism. It would do so only if the only possible knowledge were external or transcendental, and there is no reason to think that. Indeed, people who think that the absence of external or transcendental foundations leads to relativism or skepticism often have a great deal in common with their purported adversaries. They have the same odd conception about what correct answers must be, to count as such.

Stanley Fish makes this important error in *Doing What Comes Naturally,* in which he suggests that because all categories are human categories, all we are left with is conventions. *See* STANLEY FISH, DOING WHAT COMES NATURALLY 215-45, 342-55, 436-70 (1989). Richard Rorty comes very close to the same unfortunate position, *see* Richard Rorty, *Feminism and Pragmatism* 30 MICH. QUART. REV. 231, 234-36 (1991), and is criticized persuasively for this reason by Donald Davidson, *see* Donald Davidson, *The Structure and Content of Truth,* 87 J. PHIL. 279, 279-82 (1990), and by

Hilary Putnam, *see* HILARY PUTNAM, RENEWING PHILOSOPHY 104 (1992). *See also infra* note 130 (discussing postmodernism in law).

114   *Cf.* POSNER, *supra* note 2, at 88-92 (arguing that "reasoning by analogy ... is not actually a method of reasoning, that is, of connecting premises to conclusions."); Roberto M. Unger, THE CRITICAL LEGAL STUDIES MOVEMENT 8 (1986) ("Without such a guiding vision, legal reasoning seems condemned to a game of easy analogies.").

115   Westen makes the same argument against the notion of equality. *See* Peter Westen, *The Empty Idea of Equality*, 95 HARV. L. REV. 537, 540-42 (1982). Equality is parasitic on substantive ideas about relevant differences; so too with analogy. *See* Golding, *supra* note 3, at 102 ("[I]n fact two things may resemble each other in any number of respects and yet also be different in any number of respects"); *see also* NELSON GOODMAN, *Seven Strictures on Similarity, in* PROBLEMS AND PROJECTS 437 (1972) ("Similarity, I submit, is insidious.... Similarity, ever ready to solve philosophical problems and overcome obstacles, is a pretender, an impostor, a quack.").

116   *See supra* p. 746 (remarking on Holmes). The point suggests some reasons for skepticism about the intriguing efforts to program computers to engage in analogical reasoning. *See* KEVIN D. ASHLEY, MODELING LEGAL ARGUMENT (1990); Kevin D. Ashley, *Arguing By Analogy in Law: A Case-Based Model, in* ANALOGICAL REASONING, *supra* note 3, at 205, 212-22. The programmers act as if computers can be taught to decide what case a new fact situation is "more analogous to," but this depends on a crude picture of analogous reasoning. It is inadequate to treat "analogousness" as a kind of quantity, with some things being more analogous to others, and others things less so. Any such formulation tends to disguise the need to develop low-level principles with which to think analogies through; and it is unclear that the computer experiments have placed enough weight on this point. We should not, however, reject the possibility that in the long run (or the short run?), computers will indeed be able to make the good normative arguments that underlie assessments of analogousness, and that in the end it will be valuable for human beings to listen carefully to what they have to say. *See* ASHLEY, *supra*, at 238-47; *cf.* PUTNAM, *supra* note 113, at 1-18 (criticizing the analogy between the human mind and artificial intelligence).

117   *Cf.* THOMSON, *supra* note 1, at 257 ("[I]t is precisely our moral views about examples, stories, and cases which constitute the data for moral theorizing."). Thus Thomson writes as if we can "falsify" general propositions by "testing" them against particular judgments. *See also* DWORKIN, *supra* note 22, at 28-37 (treating judgments as data points); *cf.* T.M. Scanlon, *The Aims and Authority of Moral Theory*, 12 OX. J. LEGAL STUD. 1, 9 (1992) ("[W]e are very unlikely to have a considered judgement that a certain action would be wrong without having in mind some more 'theoretical' reason *why* it would [be] wrong. 'Considered moral judgements' are in this respect quite unlike 'data points': in the case of simple empirical observations we can be quite certain *that* something is the case without having any idea why it is so."). Scanlon's position may ultimately be right; but there are some uncertainties. Is it clear that there is a sharp difference between an observation that dropped objects fall, or for that matter that the earth is flat, unaccompanied by "any idea why it is so" and an observation that slavery or cruelty is wrong, unaccompanied by "any idea why it is so"? It may be that simple empirical observations and considered judgments about particular cases have the same (pragmatic) place in human reasoning.

118   It is possible, however, that one will tolerate many particular mistakes, and thus seek a general rule, because case-by-case decisions produce even more mistakes in light of the errors of human judgment in case-by-case systems. We can see the point by comparing the first *Restate of Conflict of Laws* with the second. The first *Restatement* is filled with rules, most of them susceptible to mechanical application, but the mechanics create many errors in the form of arbitrary rigidity. By contrast, the second *Restatement* uses lists of factors, in the effort to produce individualized judgments; but it creates something of a mess for those who must "apply" it. *See also* Schauer, *Formalism, supra* note 56, at 538-44 (defending rule-based decisions); Antonin Scalia, *The Rule of Law As a Law of Rules*, 56 U. CHI. L. REV. 1175, 1180-82 (1989) (describing problems with "reasonableness" standards and judicial balancing tests).

119   *See* ANDERSON, *supra* note 39, at ch. 1; *infra* pp. 786-90.

ON ANALOGICAL REASONING, 106 Harv. L. Rev. 741

120 *Compare* Cass R. Sunstein, *Free Speech Now,* 59 U. CHI. L. REV. 255, 315-16 (1992) (defending a political conception of First Amendment) *with* Dworkin, *The Coming Battles over Free Speech, supra* note 22, at 55 (arguing that free speech cases should be resolved on the basis of a "constitutive" approach that would forbid government to intrude on listener or speaker autonomy except under the rarest of conditions). Undoubtedly Dworkin is correct that ideas about autonomy should play a major role in First Amendment law. But the question remains how much progress can be made in hard free speech cases without consulting a wide range of particular settings. A "top down" approach that applied the notion of autonomy would probably prove inadequate in cases involving restrictions on commercial advertising, unlicensed medical and legal advice, child pornography, private libel, threats, and so forth. *See* T.M. Scanlon, Jr., *Freedom of Expression and Categories of Expression,* 40 U. PITT. L. REV. 519, 532 (1979) (rejecting his own earlier autonomy principle because of its inability to account fully for judgments in particular cases).

121 In his discussion of reflective equilibrium, Rawls does not understand the category in quite this way, and instead emphasizes judgments in which we have a great deal of confidence. *See* RAWLS, *supra* note 6, at 48-51. But it is unclear how we would have a great deal of confidence in a particular judgment if we have not submitted that judgment to scrutiny of this general kind.

122 *But see infra* pp. 778-79, 782-84 (questioning the desirability of doing this in a legal system).

123 *See also infra* p. 785 (discussing "conceptual ascent").

124 *See supra* p. 751.

125 The point counts against Dworkin's use of Hercules as a metaphor for a legal system. *See infra* p. 786 (discussing the advantages of analogical reasoning over the search for reflective equilibrium).

126 *See supra* note 63 (describing the discussion of Director and Levi); *see also* Davidson, *supra* note 113, at 279-82, 325-326 (offering a pragmatic conception of truth).

127 *See* POSNER, *supra* note 2, at 89-90; Tushnet, *supra* note 2, at 825 (criticizing the view that the search for neutral principles is a constraint on "judicial choices"). Wittgenstein wrote:

When we say that by our method we try to counteract the misleading effect of certain analogies, it is important that you should understand that the idea of an analogy being misleading is nothing sharply defined. No sharp boundary can be drawn round the cases in which we should say that a man was misled by an analogy. The use of expressions constructed on analogical patterns stresses analogies between cases often far apart. And by doing this these expressions may be extremely useful. It is, in most cases, impossible to show an exact point where an analogy begins to mislead us. Every particular notation stresses some particular point of view.

LUDWIG WITTGENSTEIN, THE BLUE AND BROWN BOOKS 28 (1958).

128 Posner appears to make this particular argument. *See* POSNER, *supra* note 2, at 89-90.

129 *See* Mark Johnson, *Some Constraints on Embodied Analogical Understanding, in* ANALOGICAL REASONING, *supra* note 3, at 25, 26-28; *supra* notes 57, 110, 113; *infra* note 130 (discussing pragmatism);

130 *See, e.g.,* RICHARD RORTY, CONTINGENCY, IRONY, AND SOLIDARITY 73-137 (1989). The method of analogy has a close connection with pragmatism, *see generally* JAMES, *supra* note 110 (discussing irony); but it is not allied with "postmodernism," a constellation of ideas with increasing influence on the study of law. The relationship between postmodernism and law raises some complex issues, and I restrict myself to two brief observations here.

First, any position about law and politics, in order to be worth holding, must be justified by reference to reasons. We should not understand the category of reasons to be a narrow one, or to be strictly Cartesian; but a view unsupported by reasons is unlikely to deserve serious consideration. Many postmodernists, however, appear to reject reason-giving altogether, putting in its place power, or play, or conventions. *See, e.g.,* JACQUES DERRIDA, OF GRAMMATOLOGY 50 (Gayatri C. Spivak trans., 1976) (play); FISH, *supra* note 113, at 40, 116 (conventions); MICHEL FOUCAULT, POWER/KNOWLEDGE 119 (Colin Gordon ed. & Colin Gordon, Leo Marshall, John Mephan, Kate Soper trans., 1981) (power). The substitution ensures that many postmodernists "can give no account of the normative foundations of [their] own rhetoric." JÜRGEN HABERMAS, THE PHILOSOPHICAL DISCOURSE OF MODERNITY 294 (Fredrick Lawrence trans., 1987) (1985).

Second, some of postmodernism appears to depend on the claim that if claims cannot be vindicated or grounded in some transcendental or extra-human way, we are left with chaos, or the free play of perspectives, and certainly without a discussion that can be mediated through reasons. But the failure of transcendental conceptions of knowledge need not have this implication. The fact that there are no extra-human foundations for human knowledge does not mean that knowledge is impossible. For discussions from various perspectives, see Davidson, *supra* note 26, at 43; DONALD DAVIDSON, *On the Very Idea of a Conceptual Scheme, in* INQUIRIES INTO TRUTH AND INTERPRETATION 183-98 (1984); PUTNAM, *supra* note 113, at 72, 123-28, 176-79, 186-200. John Rawls, *Kantian Constructivism in Moral Theory,* 77 J. PHIL. 515, 518-19 (1980); T.M. Scanlon, *Contractualism and Utilitarianism, in* UTILITARIANISM AND BEYOND 103, 103-28 (Amartya Sen & Bernard Williams eds., 1982); and MARTHA C. NUSSBAUM, *Sophistry About Conventions, in* LOVE'S KNOWLEDGE, cited above in note 37, at 220, 220-29 (1990). Claims about the alleged failure of reason, *see* Pierre Schlag, *"Le Hors de Texte, C'est Moi": The Politics of Form and the Domestication of Deconstruction,* 11 CARDOZO L. REV. 1631, 1631-32 (1990), seem to depend on an unnecessary conception of what reason must be, to count as reason. Many of the postmodern claims now influential in the study of law turn out not to be postmodern at all, but instead a part of the philosophical heritage of pragmatism.

[131] A claim of concealment is made at least implicitly in DUNCAN KENNEDY, LEGAL EDUCATION AND THE REPRODUCTION OF HIERARCHY (1983); and in Boyle, cited above in note 2, at 1045-46, 1062-63. The term "politics," as I use it here, refers to judgments of value, which should be based on good reasons. There may well, however, be a large distinction between law and politics, in the sense that the arguments that are admissible in law are often different from those that are admissible in politics. If this distinction is to be justified, it should be understood as a political distinction rather than metaphysical one. *Cf.* John Rawls, *Justice as Fairness: Political Not Metaphysical,* 14 PHIL. & PUB. AFF. 223, 224-26 (1985) (arguing that theories of justice should be drawn for political purposes and need not presuppose controversial metaphysical ideas). That is: The distinction is drawn for political reasons, in order, for example, to constrain the factors to which legal actors may point in making their decisions. Thus, in a contracts dispute, the wealth of the parties is ordinarily irrelevant, even though it is highly relevant for other officials in other settings. *See* DON HERZOG, HAPPY SLAVES 129 (1989).

[132] Of course there is analogical reasoning even there. *See* Hesse, *supra* note 8, at 325-34; Illhea Niiniluoto, *Analogy and Similarity in Scientific Reasoning, in* ANALOGICAL REASONING, *supra* note 3, at 271. Carl B. Boyer and Uta C. Merzbach write:

At first the primitive notions of number, magnitude, and form may have been related to contrasts rather than likeness - the difference between one wolf and many, the inequality in size of a minnow and a whale, the unlikenesses of the roundness of the moon and the straightness of a pine tree. Gradually there must have arisen, out of the welter of chaotic experiences, the realization that there are samenesses; and from this awareness of similarities in number and form both science and mathematics were born.

CARL B. BOYER & UTA C. MERZBACH, A HISTORY OF MATHEMATICS 3 (2d ed. 1991); *see also* G. POLYA, HOW TO SOLVE IT 37 (1957) ("Analogy pervades all our thinking, our everyday speech and our trivial conclusions as well as artistic ways of expression and the highest scientific achievements.").

[133] *See* Scalia, *supra* note 118, at 1179.

[134]   *See* JONSON & TOULMIN, *supra* note 3, at 16-20.

[135]   *See* John Rawls, *The Idea of an Overlapping Consensus*, 7 OXFORD J. LEGAL STUD. 1, 2-8 (1987).

[136]   I am grateful to Daniel Brudney for help with this point.

[137]   In searching for reflective equilibrium, avenues are of course open; new experiences and new data make it necessary to reassess provisional fixed points.

[138]   On revisability and the search for equilibrium, see T.M. Scanlon, *The Aims and Authority of Moral Theory,* 12 OXFORD J. LEGAL STUD. 1, 8-12 (1992); and pp. 788-89 below.

[139]   Rawls, *supra* note 6, at 50. I do not claim that the only function of this statement is to point to revisability. In the relevant section, Rawls discusses the analogy between the sense of grammar and the sense of justice, and suggests that a knowledge of one person's sense of either would be a "good beginning toward a theory of justice." *Id.*

[140]   For Dworkin's description of positivism, see DWORKIN, TAKING RIGHTS SERIOUSLY, cited above in note 1, at 17-22; and DWORKIN, LAW'S EMPIRE, cited above in note 1, at 33-35. For influential positivist works, see HART, cited above in note 1; and JOHN AUSTIN, THE PROVINCE OF JURISPRUDENCE DETERMINED (1832).

[141]   DWORKIN, LAW'S EMPIRE, *supra* note 1, at 225.

[142]   *Id.* at 239.

[143]   *See id.* at 240-50, 337-41, 379-91. I am compressing some complex issues here.

[144]   This issue is discussed in chapter five of CASS R. SUNSTEIN, THE PARTIAL CONSTITUTION (forthcoming 1993).

[145]   *See* SUSAN HURLEY, NATURAL REASONS 11-15, 36-39, 189-93, 318-22 (1989).

[146]   Joseph Raz takes Dworkin to have offered an argument for analogical reasoning and suggests that "Professor Dworkin has thus opted for the most conservative interpretation of the judicial role: Judges are neither legally nor morally entitled to assume a reforming role. They must rely only on analogical arguments which perpetuate and extend the existing legal ideology." RAZ, *supra* note 3, at 205-06 n.19. Raz suggests that Dworkin has provided in his early writings "the most extreme case of total faith in analogical arguments." *Id.*

The conflation of Dworkin's approach with analogical thinking is understandable in light of the fact that, like analogizers, Dworkin places a large stress on "fit" and coherence, and little weight on external challenges to current holdings. For reasons discussed in the text, however, I do not wholly believe that Raz accurately describes Dworkin's view as expressed in either DWORKIN, TAKING RIGHTS SERIOUSLY, cited above in note 1, at 106-15; or DWORKIN, LAW'S EMPIRE, cited above in note 1, at 240-50.

[147]   For examples of this approach, see the discussions of affirmative action in DWORKIN, LAW'S EMPIRE, cited above in note 1, at 393-97, and of free speech in Dworkin, *The Coming Battles Over Free Speech,* cited above in note 22, at 55.

At first glance it might seem as if statutory construction, at least, cannot involve analogical reasoning. But this appearance is misleading. In hard statutory cases, the issue is sometimes resolved by something like this: We know that the statute

applies to case *X*. We do not know if it applies to case *Y*. To resolve that issue, we have to decide whether case *Y* is relevantly like, or relevantly unlike, case *X*. We have to think analogically.

Something of this kind, I believe, underlies the dispute in *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979) in which the Court decided that private affirmative action is not barred under the Civil Rights Act of 1964. *See id. at 197.* Realistically speaking, the disagreement among the Justices was not about anything Congress said or meant – the relevant materials were indeterminate – but about whether affirmative action was relevantly different from ordinary discrimination. Though I cannot prove the point here, I believe that the dissenters' self-confidence about their view that the majority had distorted the law depended on their own judgment that affirmative action was not relevantly different. *See, e.g., id.* at 226-30 (Rehnquist, J., dissenting). That judgment may be correct, but it requires an argument, not a mechanical reading of the statutory language. Analogical reasoning was therefore at least implicitly at work.

[148]  It is true, however, that some such theorizing may be implicit, in the sense that particularistic case analysis may in some sense depend on it. But note that we can achieve an overlapping consensus on particular outcomes among people who would disagree about general theories, and also that general theories might be too hard to develop in advance, or to adapt to the complexities of particular areas.

[149]  *See supra* pp. 773-79.

[150]  *See supra* p. 779. Arrow's Impossibility Theorem, *see* KENNETH ARROW, SOCIAL CHOICE AND INDIVIDUAL VALUES (2d ed. 1963), raises important problems for coherence theories in law, notably including Dworkin's account. I cannot discuss those problems here, but on a multimember judicial body, there may be serious cycling problems, in which, paradoxically, result *A* is favored over result *B*, which is favored over result *C*, which is (and here is the paradox) favored over result *A*; or decisions may turn, arbitrarily, on the order in which issues happen to arise ("path dependence"). *See* Frank H. Easterbrook, *Ways of Criticizing the Court*, 95 HARV. L. REV. 802, 811-31 (1982). A strong theory of stare decisis, combined with a commitment to analogical thinking, may alleviate some of the cycling problems and thus produce greater stability in law, but it will simultaneously aggravate the problems of path dependence. *See id.* at 817-23. The point suggests that it will be difficult to achieve real coherence through decentralized, multimember courts, and that the Hercules metaphor will run into real difficulty. A system built on analogical reasoning aspires to less and can diminish cycling; but the problem of path dependence will result in a high degree of arbitrariness. *See generally* HURLEY, *supra* note 145, at 225-53 (arguing that coherence theories can survive the Impossibility Theorem); Lewis A. Kornhauser & Lawrence G. Sager, *Unpacking the Court*, 96 YALE L.J. 82, 107-17 (1986) (arguing that courts will not face severe problems under the Impossibility Theorem).

[151]  *See, e.g.,* POSNER, *supra* note 33, § 1.2, at 12-15.

[152]  *Compare* 3 BENTHAM, *supra* note 35, at 227-29 (discussing the irrationality of the common law approach) *with* RICHARD A. POSNER, THE ECONOMICS OF JUSTICE 323-31 (1981) (discussing privacy doctrine in this way).

[153]  Many illustrations of its weaknesses are contained in RICHARD A. POSNER, THE PROBLEMS OF JURISPRUDENCE 353-92 (1990).

[154]  *See* MICHAEL STOCKER, PLURAL AND CONFLICTING GOODS ch. 6 (1989); Elizabeth Anderson, *Values, Risks, and Market Norms,* 17 PHIL. & PUB. AFF. 54, 57-59 (1988); MARTHA C. NUSSBAUM, *Plato on Commensurability and Desire, in* LOVE'S KNOWLEDGE, *supra* note 37, at 106, 106-24 (1990); Richard H. Pildes & Elizabeth S. Anderson, *Slinging Arrows at Democracy,* 90 COLUM. L. REV. 2121, 2143-86 (1990); Charles Taylor, *The Diversity of Goods, in* PHILOSOPHY AND THE HUMAN SCIENCES 230, 243 (1985); Amartya Sen, *Plural Utility,* 81 PROC. OF THE ARISTOTELIAN SOC'Y 193 (1981); *cf.* Margaret J. Radin, *Market-Inalienability,* 100 HARV. L. REV. 1849, 1870-87 (1987) (critiquing universal commodification). A forthcoming discussion is ANDERSON, cited above in note 39, at chs. 1-4.

[155]   This is of course an Aristotelian point. *See* ARISTOTLE, NICOMACHEAN ETHICS 149-53 (David Ross trans., 1980) (1925); *see also* JONSEN & TOULMIN, *supra* note 3, at 23-46; MARTHA C. NUSSBAUM, THE FRAGILITY OF GOODNESS 290-317 (1986). Consider also Holmes's comment:

After a sociological riot I read Aristotle's Ethics with some pleasure. The eternal, universal, wise, good man. He is much in advance of ordinary Christian morality with its slapdash universals (Never tell a lie. Sell all thou hast and give to the poor etc.) He has the ideals of altruism, and yet understands that life is painting a picture not doing a sum, that specific cases can't be decided by general rules, and that everything is a question of degree ....

THE ESSENTIAL HOLMES 58 (Richard A. Posner ed., 1992).

[156]   *See* ANDERSON, *supra* note 39, at ch. 4. I think that something of this kind is at least part of the import of Wittgenstein's remarks on categorization: "What is common to them all? - Don't say: 'There *must* be something common, or they would not be called 'games'" - but *look and see* whether there is anything common to all. – For if you look at them you will not see something that is common to *all,* but similarities, relationships, and a whole series of them at that. To repeat: don't think, but look!" WITTGENSTEIN, *supra* note 103, ¶ 66, at 31.

[157]   Of course "social consequences" are not simply brute facts. Any effort to set them out will be interpretive and to that extent evaluative.

[158]   *See* Thomas Scanlon, *A Theory of Freedom of Expression,* 1 PHIL. & PUB. AFF. 204, 215-22 (1972); David A. Strauss, *Persuasion, Autonomy, and Freedom of Expression,* 91 COLUM. L. REV. 334, 336-37, 353-55 (1991).

[159]   *See* ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENTTTTTTT 3-27 (1948); Robert H. Bork, *Neutral Principles and Some First Amendment Problems,* 47 IND. L.J. 1, 26-34 (1971). I try to defend this view in Cass Sunstein, Free Speech Now (unpublished manuscript) (developing some of the ideas in Cass R. Sunstein, *Free Speech Now,* 59 U. CHI. L. REV. 255 (1992)).

[160]   *See* Scanlon, *supra* note 120, at 528-37.

[161]   *See* Martin H. Redish, *The Value of Free Speech,* 130 U. PA. L. REV. 591, 596-611 (1982).

[162]   Consider the view that administrative agencies should be permitted large room for discretion in statutory interpretation. *See* Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984). This view seems to contradict no less an authority than Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-80 (1803), and it has for that reason been highly controversial. But the principle might be defended as a means of allowing case-by-case adjustment of literal language in particular circumstances, some of them new and unforeseen. The interpretive power of regulatory agencies will permit them to accommodate apparent rules to the complexities of individual cases - and to do so, in significant part, through analogical, case-by-case reasoning.

[163]   *See* GUIDO CALABRESI, A COMMON LAW FOR THE AGE OF STATUTES 2-3 (1982) (calling for courts to have the power to declare "obsolete" certain statutes). The rules-standards issue is explored from different angles in Colin S. Diver, *The Optimal Precision of Administrative Rules,* 93 YALE L.J. 65, 66-80 (1983); Duncan Kennedy, *Form and Substance in Private Law Adjudication,* 89 HARV. L. REV. 1685, 1687-1713 (1976); Louis Kaplow, RULES AND STANDARDS: AN ECONOMIC APPROACH, 42 DUKE L.J. (forthcoming 1993); and Kathleen Sullivan, *The Supreme Court, 1991 Term - Foreword: The Justices of Rules and Standards,* 106 HARV. L. REV. 22, 95-122 (1992).

164    It may be tempting to conclude here that analogies can at most be persuasive, and never demonstrative. If what I have said here is right, this response depends on a too-narrow conception of what constitutes proof in law, and a too-sharp distinction between correctness and persuasiveness.

165    Consider in this regard William Blake's comment on the work of Sir Joshua Reynolds: "To Generalize is to be an Idiot. I thank God I am not like Reynolds." WILLIAM BLAKE, *Blake's Marginalia, in* BLAKE'S POETRY AND DESIGNS 429, 440 (Mary L. Johnson & John E. Grant eds., 1979). Note, however, that the second sentence undermines the first, by relying (implicitly) on a conception of relevant differences and similarities - and thus by generalizing. The first sentence, itself a generalization, is undermined even more severely by Blake's generalization in the same passage: "To Particularize is Alone the Distinction of True Merit." *Id.*

106 HVLR 741

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**55 U.C. Davis L. Rev. 2495**

U.C. Davis Law Review
June, 2022

Symposium

The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public

Darrell A. H. Miller [d1] [a1] Jennifer Tucker [aa1]

Copyright © 2022 by Darrell A. H. Miller & Jennifer Tucker

# COMMON USE, LINEAGE, AND LETHALITY

## TABLE OF CONTENTS

| | |
|---|---|
| I. LACK OF A COMMON METRIC FOR ARMS | 2498 |
| II. TREVOR DUPUY AND THE THEORETICAL LETHALITY INDEX | 2502 |
| A. Brief Biography of Dupuy | 2502 |
| B. The Theoretical Lethality Index | 2506 |
| III. LETHALITY AS A COMMON METRIC FOR ARMS | 2509 |
| CONCLUSION | 2513 |

Political and legal debates over assault rifles, large-capacity magazines, and other lethal technology are characterized by increasing rancor and hostility. Lack of a common vocabulary to describe the topics of debate, much less facilitate a constructive dialogue, only aggravates this trend. For example, gun rights advocates often disparage the term "assault rifle" as reflecting a practical illiteracy about firearms or treat it as some kind of "hoplophobic" smear.[1] Regulators sometimes **\*2496** class weapons based on features that gun-rights advocates say are purely cosmetic, leading to charges that these regulations are grotesquely over- or under-inclusive.[2]

The doctrine defining constitutionally protected arms is advancing without a clear sense of the object of Second Amendment protections. *District of Columbia v. Heller*--the first Supreme Court case to hold that the Second Amendment protects an individual right to keep firearms for personal purposes like self-defense-- uses various terminology for arms in its opinion. At its most general, the Court states that the constitution protects weapons in "common use" for "lawful purposes," as distinct from "arms" that are "dangerous and unusual."[3] But it doesn't take long for those broad categories to become muddled. *Heller* says that handguns capable of concealment are protected, but that short-barreled shotguns (which are modified specifically to be carried in one hand and concealed) are "dangerous and unusual" weapons that may be prohibited.[4] It suggests that "M-16s and the like" may be banned; but also that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"-- which would include not only M-16s, but "weapons useful in warfare" such as rocket launchers, hand grenades, and more exotic and deadly weaponry.[5] Some lower court judges, those who eschew conventional tailoring and are receptive to a "text-history-and-tradition-only" approach to Second Amendment questions, have begun to suggest that weapons that are "lineal descendants" of Founding Era arms are protected by the Second **\*2497** Amendment,[6] despite the fact that such familial metaphors more often obscure than illuminate historical relationships between technologies of different periods.[7]

Sorely missing from the current debate is a shared vocabulary for what the public policy and the constitutional doctrine is aiming to achieve. Terms like "common use," "dangerous and unusual," "lineal descendants" or "employed in civilized warfare"[8] cannot adequately discipline doctrine or debate without some common denominator for the task. This Article suggests that focusing on lethality is one way to converge on a shared metric for the discussion.[9]

The late Trevor N. Dupuy, a senior U.S. Army officer during World War II who later became a respected and prolific military historian, developed one such metric in the middle of the twentieth century--the Theoretical Lethality Index ("TLI"). In 1964, the United States Army contracted with Dupuy to analyze how the killing power of weapons had increased over time--he created the TLI to measure how many people a particular weapon could kill in one hour. [10] Dupuy  **\*2498**  worked on this project for a non-partisan entity which had an interest in the accuracy and utility of his formula--the United States military. As such, Dupuy's Theoretical Lethality Index offers a useful metric for quantifying the lethality of firearms in historical terms. His index can provide at least a starting point to construct a common scale to assess the functionality of weapons both within and across various time periods.

Part I of this Article outlines the state of Second Amendment doctrine with respect to which and what type of arms are protected, and the confused language and goals of that doctrine. Part II provides a short biography of Dupuy and his development of the TLI. Part III demonstrates how Dupuy's TLI can help guide policy makers and judges as they engage with the right to keep and bear arms in a post-*Heller* world.

## I. LACK OF A COMMON METRIC FOR ARMS

In *District of Columbia v. Heller*, the Supreme Court held for the first time that individuals have a right to keep arms in their home for lawful purposes such as self-defense, without regard to participation in any organized military unit such as the National Guard. [11] Key to that case was how to define the word "arms" in the Second Amendment. [12] It is indisputable that a strict dictionary-definition of the word "arms" in 1791 is radically over-inclusive. Justice Antonin Scalia states in *Heller* that "[t]he 18th-century meaning [of arms] is no different from the meaning today" and that "arms" simply means "weapons." [13] Indeed, he continues, it "borders on the frivolous" to suggest that only those arms that existed in 1791 are protected now: "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." [14] But no one really believes that. Not even Justice Scalia believes that.

There are numerous modern weapons that "constitute bearable arms" that are categorically outside the Second Amendment's coverage--no matter what "bearable arms" literally means. Let's start with bearable arms of catastrophic lethality--vials of weaponized smallpox or VX nerve agent, for example. These are indubitably weapons; they also are  **\*2499**  capable of being carried, but no one treats these weapons of mass destruction as raising any prima facie Second Amendment question. [15] Moving down the spectrum of lethality, *Heller* itself categorically excludes from Second Amendment coverage machine guns, "M-16 rifles and the like," and short-barreled shotguns, notwithstanding Justice Scalia's assertion that the Second Amendment extends prima facie to these types of weapons. [16] Lower courts have followed suit, excepting weapons like hand grenades from Second Amendment coverage, despite their falling within a literal class of "bearable arms." [17]

Instead of a radically over-inclusive textual definition of "weapons," Justice Scalia concedes the Second Amendment really doesn't protect all "bearable arms," but only those arms in "common use," and in particular, those weapons "typically possessed by law-abiding citizens for lawful purposes." [18] Handguns, according to the majority, are a popular form of self-defense technology, commonly owned by individuals for self-defense, and therefore are protected by the Second Amendment. But this common use test sets up a vicious circularity, one that Justice Stephen Breyer in his *Heller* dissent exposed. *Heller*'s common use test means that "if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress ... had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so." [19] It can't be, according to Justice Breyer, that the only permissible regulations are those regulations that currently exist. [20]

For a decade now, lower courts and scholars have struggled to break out of this circularity. Some try to identify a reference group from which to assess "common use." [21] At its most crude, this can reduce to comparing the inventory of a certain weapon to that of another  **\*2500**  commercial product-- like a pickup truck. [22] The presumption here is that a weapon as widely possessed as this other product must be in "common use." [23] Other, more sophisticated approaches attempt to identify a more relevant reference set. For example, scholars such as Michael O'Shea and Nelson Lund have suggested the measure for common use should be the weapons possessed by ordinary law enforcement. [24] Others have argued that civilians should be capable of owning even *more* firepower than the police. [25] Still others believe the reference group for common use should be some kind of military body, such as the National Guard, or at the most extreme, the standing army. [26]

A recent development in Second Amendment doctrine is to analogize modern weapons to historical ones. This move first appeared in the District of Columbia Circuit Court opinion that eventually became *Heller*. In that case, *Parker v. District of Columbia*, the court suggested that "[t]he modern handgun-- and for that matter the rifle and long-barreled shotgun--is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era *2501 weapon." [27] Chief Justice John Roberts echoed this "lineal descendant" line during *Heller* oral argument when he speculated: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." [28] Some lower courts and advocates have picked up on this strain of reasoning. Occasionally, this search for "lineal descendants" of modern weapons can become arcane. For example, in 1718, an Englishman named James Puckle patented a multi-round "Puckle gun." The weapon was never widely produced and contemporaries ridiculed it for its impracticality. [29] Nevertheless, some argue that today's 100 round magazines must be constitutionally protected, because someone patented this curio in England in the eighteenth century. [30]

None of these attempts to break out of *Heller*'s definitional morass is satisfactory, and that's partially because these tests tend to focus on epiphenomenal rather than functional factors. Searching for answers in analogs from automotive sales or eighteenth-century patent applications fails to consider what rule of relevance makes the analogy analytically sound. [31] What makes weapons relevantly similar is their lethality. [32] Comparing the sales of AR-15s to pickup trucks or asking what features of an AR-15 resemble those of a Founding era flintlock is far less useful for assessing utility or dangerousness than focusing on how lethal an AR-15 is compared to some other kind of weapon. Lethality may not resolve all the definitional problems of what an "arm" *2502 is under the Second Amendment, [33] but it has the advantage of being relevant, functional, and unitary. [34]

## II. TREVOR DUPUY AND THE THEORETICAL LETHALITY INDEX

### A. Brief Biography of Dupuy

In the middle of the twentieth century, a retired colonel named Trevor Nevitt Dupuy developed a metric to measure a weapon's lethality. Dupuy was one of the most respected and prolific American military thinkers of the last century. [35] Combat during World War II gave him a practical bent, which, combined with his analytical approach to military history provided a new outlook on the study of weapons and warfare. He developed sophisticated combat models that drew on his extensive archival research as well as his personal experience as a World War II commander. [36] His derivation of a theory of combat and *2503 philosophy of war from these materials was unusual and widely praised inside the military. By the time of his death, he had published scores of books and articles in military and professional journals across the globe. [37]

Dupuy was born in New York, the son of Richard Ernest Dupuy, who was himself a military historian and veteran. After graduating from the U.S. Military Academy at West Point in 1938, the younger Dupuy fought in Burma during the war and by age twenty-seven had been promoted to lieutenant colonel. [38] He commanded artillery units across several military theaters for the United States, the United Kingdom, and the Chinese military, [39] and received honors for service and valor from all three governments. [40]

Following the war, after a stint working for the military in Europe and Washington, Dupuy began his academic career, first at Harvard and then at the Ohio State University. His writing began in earnest while teaching at Harvard. Seeing no text on military science that he could use to teach his students, he approached the elder Dupuy to assist in writing a textbook. What began as a mimeographed set of class materials [41] eventually turned into a two-volume publication, *Military Heritage of America*, one of many projects father and son would complete together. [42]

Dupuy focused on understanding the complexities of modern warfare through the review of massive amounts of historical data. [43] Roughly contemporaneously, major military institutions began to invest heavily in a discipline called "operations research" that sought to bring quantitative tools to bear on military strategy. Analytical centers and think tanks, [44] like RAND (for "research and development"), as well as other "civilian defense planners" became an "integral part" of United *2504 States security planning at this time. [45] However, "even after 3,300 years of recorded military history" reliable data was hard

to come by. [46] This lack of hard data led Dupuy to reach for new techniques on which to base operational analysis and combat modeling. His research attempted to link combat modelers who needed reliable data on combat operations with the existing information present in the unit records of actual historical engagements. [47]

Intense, professional, and tenacious, Dupuy believed that the study of historical combat could and should be used to prepare for future conflicts. [48] In more than two dozen works, he analyzed the patterns of warfare from ancient times to the present. He summarized his historical approach in his book, *The Evolution of Weapons and Warfare.* [49] While Dupuy was a great believer in quantifying the dynamics of warfare, he thought that the data should be drawn from the history of past wars. [50] He was skeptical about the value of war-gaming and simulation exercises divorced from what Carl von Clausewitz described as the "fog" and "friction" of war. [51]

From 1960 to 1962, Dupuy worked for the Institute of Defense Analysis, where he was frequently consulted for advice and expertise. For the next thirty years, he published books and gave lectures to military audiences about the role of technology in war. He documented a historical cycle for weapons technology: stagnant for long periods, followed by bursts of intense change. He understood that it could take decades--even centuries--for new technologies to be incorporated into the tactics and organizational structure of armies. [52] His research documented technological change (from the stirrup to the gun)--and showed that the pace of that change accelerated exponentially with the nineteenth-century industrial revolution and then again with the intense state-led innovations of the two world wars. [53]

In part to study these technological and military dynamics, in 1962 Dupuy formed the Historical Evaluation and Research Organization  **2505** (HERO) and would serve as its President and Executive Director for the next two decades. At HERO, he conducted many studies for the U.S. Army, for which he accumulated detailed, recorded data from actual battlefield experience. As he often remarked, military history was the true "laboratory of the soldier." [54]

In the process Dupuy developed an analytic procedure for comparing, quantitatively, the lethality of individual weapons (the Theoretical Lethality Index), described below. [55] He also continued his work as an author, lecturer, and military analyst until the end of his life. American diplomats and military leaders consulted with him during the first Gulf War, and he testified before Congress several times. He kept up a steady media schedule, appearing on over thirty television and radio programs, including spots on all of the major networks, C-Span, and CNN. [56]

Dupuy died at the age of seventy-nine on June 5, 1995, of a self-inflicted gunshot wound, three weeks after being diagnosed with terminal pancreatic cancer. [57] At the time of his death he was considered "one of the world's leading military historians." [58] He left behind several unfinished projects, including his own autobiography, which he planned to call "A Footnote to History." [59]

The metrics on lethality that Dupuy pioneered are still being used in policy papers and military history projects as well as in analysis of modern military operations and combat. [60] Dupuy's work showed that even military planners--whose profession is the study of weapons--have repeatedly struggled to fully understand the impact of new, improved weaponry on combat and society. Despite his prominence as a military commander and military historian, little has been written  **2506** about him, leaving a gap in our historical understanding of this important figure.

### B. The Theoretical Lethality Index

A significant and underappreciated contribution of Dupuy is his creation of a single metric, the Theoretical Lethality Index ("TLI") that provides apples-to-apples comparisons of the lethality of weaponry across time. As he wrote in his *Evolution of Weapons and Warfare*, "All weapons have at least one common characteristic: lethality--the ability to injure and if possible to kill people." [61] The TLI reduced to a single value how many persons a particular weapon could theoretically kill in one hour, considering a spectrum of different technological factors, including range, rate of fire, accuracy, reliability, mobility, "radius of action" and vulnerability. [62]

Dupuy constructed the TLI by exhaustively examining the historical record of real battles across time, where the lethal capacity of the weapon was one among a host of other factors, including weather, terrain, and the defensive and offensive capabilities of opposing forces. His TLI represented an attempt to isolate, in one number, the lethality of technology alone, based primarily on the characteristics of that technology. Hence, the TLI number is not influenced by a military or civilian context; it does not take into account factors like combat tactics, how dispersed or bunched the targets may be or what defensive positions they occupy. Nor does it account for the social or psychological state of the individual using the weapon. [63] The TLI is solely about the lethality of the weapon as a technology designed to kill.

In contrast to those who analyzed warfare with abstract calculations based on combat modelling and wargaming, Dupuy based his analysis on scrupulous investigation of actual historical military engagements. As he put it, "The history of warfare is a review of the manner in which groups of men have ... [used] their weapons more effectively than the opponents, or in other words, by realizing, or at least approaching, the ultimate degree of lethality of their weapons." [64] He explained: "Lethality **\*2507** is necessarily a comparative thing." [65] A sword wielded by a trained combatant is lethal, "[b]ut its comparative lethality is limited by the factors of time, range, and the physical limitations of the man who wields it." [66] Dupuy recognized that "[b]y assigning values to these factors it is feasible to compare the lethality of the sword with the lethality of the hydrogen bomb, or the tank, or whatever other weapon one pleases." [67]

Dupuy divided world history into three primary eras of weapons technology. The "Age of Muscle" (c. 350 BC to 13th century) was the era of the short sword and longbow. The "Age of Gunpowder" (14th century to middle of the 19th century) introduced the bayonet, the flintlock and the first cannons. But it was the "Age of Technological Change" (middle of 19th century to middle of 20th century), he thought, that ushered in major advances in weaponry. "The weapons of this period constitute a quantum jump in lethality over their predecessors of the age of gunpowder." [68] This era saw the development of the conoidal rifle bullet (Minie ball) (1841); the breech-loading rifle (c. 1848); the Maxim machine gun (1883); the bolt-operated magazine rifle (1895); the tank (1916); the fighter-bomber (1917); the ballistic missile (1944); and the atomic bomb (1945). [69] Dupuy identified one of the most profound changes in combat occurred between 1850 and 1860, when firearms became both more common and more deadly. [70]

Under contract with the U.S. Army, Dupuy and HERO analyzed the relationship between weapons and military doctrine from the fourth century BC to the end of the Korean War. [71] The four-volume report that he and his team produced included the TLI as a unitary metric for lethality.

The report demonstrated that the TLI of weapons increased exponentially in the past 200 years. While an eighteenth century soldier with a flintlock musket could kill 43 people an hour, a soldier in the Civil War era using the Minie ball could kill 102 people per hour: a **\*2508** more than twofold increase. [72] Breech-loading rifles, metal cartridges, and magazines boosted the TLI of infantry rifles even higher, to 495 by the end of the nineteenth century: a ten-fold increase over the flintlock musket. The introduction of automatic fire machine guns at the end of the nineteenth century again vastly increased the kill rate. The TLI of a World War I machine gun was 3,463, and that of World War II, 4,973. [73]

**Dupuy's Theoretical Lethality Index** [74]

| WEAPON | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |

| | |
|---|---|
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |
| 16th century 12-pdr cannon | 43 |
| 17th century 12-pdr cannon | 224 |
| Gribeauval 18th century 12-pdr cannon | 940 |
| World War I tank | 6,926 |
| World War II medium tank | 575,000 |
| One-megaton nuclear airburst | 695,385,000 |

Dupuy was convinced that there was a "relatively small" number of major advances in weapons throughout history. He defined a "major advance" as a "new development that changes the nature of warfare." [75]  A major advance was "a revolutionary" change, which might be followed by "a series of evolutionary changes." [76]  One such **\*2509** "revolutionary weapon" was the Maxim recoil-operated, belt-fed machine gun which later became the model for other machine guns. [77]  He constructed the TLI using a standard formula. As he pointed out, "Obviously the weapons that kill more people in shorter periods of time have greater lethality." The TLI showed that "there have been few major advances in weapons lethality through the ages, and most of them have occurred since about 1850." [78]

## III. LETHALITY AS A COMMON METRIC FOR ARMS

Currently, the analysis to determine whether any given "arm" is constitutionally protected fails to display much analytical rigor. The very features of large-capacity magazines that one judge thinks are essential for self-defense [79] are the very same features other judges consider unreasonably dangerous. [80]  Trying to avoid the impasse by searching for "lineal descendants" of muskets in the Sig Sauer catalog, or by comparing the sales of rifles to pickup trucks [81] threaten to make Second Amendment analysis even more unmoored from anything rational or functional.

At the very least, the TLI offers proof of concept that one can construct a single metric for lethality that may provide a basis for systematic comparisons of arms within and between time periods. [82]  Moreover, to the extent any question about gun rights and regulation turns partially or wholly on historical analogs, [83] the TLI supplies vital historical context using a common denominator.

First, the TLI shows that weapons have increased sharply in lethality from the mid-nineteenth century to the present day. Speaking of the period between the 1850s and 1860s, Dupuy described weapon advancement over prior ages during this time as a "quantum jump in **\*2510** lethality." [84]  Another period of steady acceleration in lethality followed in the early to mid-twentieth century. Using apples-to-apples comparisons, based on this index, one can see that in 1903 it would only take two people with five-round Springfield rifles to kill as many as an eighteenth-century cannon. [85]  By World War II it would require a battery of *five* eighteenth century cannon to be as lethal as a single machine gun. [86]

Contrary to the implausible proposition that "[n]othing in the Second Amendment makes lethality a factor" in Second Amendment analysis, [87] it is apparent that the people's representatives have considered lethality a relevant factor in the costs versus benefits of weapon technology from the beginning. [88] To the extent judges follow Justice Scalia's proposition that "traditional restrictions go to show the scope of the [Second Amendment] right," [89] the TLI can help courts ask the right questions. It is fruitless to ask counter-factuals like: "How would the founding generation have regulated widespread private ownership of AR-15s?" That's akin to basing a First Amendment decision about home console entertainment on "what James Madison thought about video games." [90] It's a more useful question to ask: "What is the lethality threshold of the word 'arms' in the Second Amendment?" Using a single metric-- lethality--can also help translate regulatory justifications to new technological environments as well as recognize the fact and pace of **\*2511** change in lethality between different eras. [91] The TLI or similar tools can also help give content to distinctions between weapons suitable for personal self-defense and those "weapons of war" not covered by the Second Amendment. [92] By using lethality as a metric, rather than less functional traits like the shape of a weapon, its materials, or its popularity, researchers can make inferences across different times along a margin that is of practical relevance.

The Founders lived in a period when they could perhaps be forgiven for thinking that "a gun is a gun is a gun," because the basic flintlock hadn't really become significantly more lethal in the previous 150 or so years. If the Constitution had been written in the middle of the nineteenth century, instead of the 1780s, the Founders would have been much more aware of the pace of innovation. [93] But we don't have to speculate about how lawmakers may have reacted to knowledge of technological change. As Saul Cornell has noted, the nineteenth century, especially during and after Reconstruction, witnessed a flurry of regulation and constitution-drafting just as technological change was making firearms more common, concealable, and deadly.

The massive battlefield casualties of the American Civil War vividly revealed the lethality of new firearms technologies-- especially the Minie ball. Cornell has argued that "Reconstruction ushered in one of the most intense periods of gun regulation in American history." [94] He has documented how--in a significant act of constitution drafting during Reconstruction--many states both guaranteed a right to arms in their state constitutions, but were "equally committed to enacting strong racially neutral gun regulations, aimed at reducing interpersonal violence and preserving the peace." [95] For example, Georgia's Reconstruction constitution of 1877 stated: "[T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be **\*2512** borne." [96] The 1869 Constitution of Texas stated "Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe." [97] Indeed, a brief examination of many of these Reconstruction and Gilded Age constitutions show both a statement about the right to keep and bear arms and a right to reasonably regulate such a practice. The TLI shows that these lawmakers were not operating in a technological vacuum; they were securing an express ability to regulate weapons at precisely the time that firearms were becoming dramatically more lethal. [98]

Finally, whether you adhere to a theory that the Second Amendment is for self-defense against common criminals or against rogue governments, the TLI provides a tool to assess the weapon technology along a single dimension. For example, if one believes that right metric for self-defense weaponry is that kind of defensive armament most effective at countering a typical criminal threat, the TLI offers a number. How many people per hour is it necessary to kill in order to supply an adequate deterrent to common criminal perpetrators? Alternatively, although we are highly skeptical that the anti-tyranny purpose the Second Amendment contains much legally enforceable content, if one truly believes that weapons must be in the hands of private parties to counter the capacity of the United States military, [99] this metric provides some common denominator for that argument as well. [100]

**\*2513** Granted, the TLI cannot provide answers to all interpretive challenges of the Second Amendment. The TLI itself does not provide metrics for a host of twenty-first century weapons. (Military experts must extrapolate from Dupuy's methods to say what the theoretical lethality index of a modern 9mm pistol would be, for example). Non-experts, or those without access to the proprietary methods of the Dupuy Institute, can only provide estimates about where modern technology fit (a modern AR-15 is almost certainly more lethal than an eighteenth century musket and less lethal than a World War II medium tank, for instance). However, even with these limitations the TLI does provides a reliable benchmark from which to generate judgments about comparative lethality. The TLI, and derivative indices, offer a useful metric for understanding the lethality of different weapons, across time, and can therefore make an important contribution to the debate over the right to keep and bear arms.

COMMON USE, LINEAGE, AND LETHALITY, 55 U.C. Davis L. Rev. 2495

## CONCLUSION

After a decade of slumber, it is clear the Supreme Court, with its new conservative super-majority, is now awakening to decide Second Amendment matters left undecided after *Heller*. In the next few years, the Court is almost certain to address what counts as a constitutionally protected "arm." In doing so, it is also likely to rely on history and tradition to a greater degree than most other rights. Lethality, and the Theoretical Lethality Index constructed by Dupuy and his team, offers one way for the justices to anchor their analysis to historically-driven metrics that are functional, intelligible, and relevant; rather than those that are rhetorical and trivial.

### Footnotes

d1   Copyright © 2022 Darrell A. H. Miller & Jennifer Tucker.

a1   Melvin G. Shimm Professor of Law, Duke University School of Law.

aa1   Associate Professor of History, Wesleyan University. Thanks to Joseph Blocher and Jake Charles for discussing or reviewing previous versions of this essay. Thanks especially to Peter Rutland, who is working on a broader study on Trevor Dupuy, for bringing Dupuy's Theoretical Lethality Index to our attention.

1   Stephen P. Halbrook, *Banning America's Rifle: An Assault on the Second Amendment?*, 22 FEDERALIST SOC'Y REV. 152, 152 (2021) ("The term 'assault weapon,' while usually applied to some kind of rifle, is actually a pejorative term without a definite meaning."). Gun violence prevention advocates respond that the term is an accurate reflection of gun manufacturers' own marketing materials, which emphasized "the military pedigree of its products." VIOLENCE POL'Y CTR., THE MILITARIZED MARKETING OF BUSHMASTER ASSAULT RIFLES 5 (2018), https://vpc.org/wp-content/uploads/2018/04/Bushmaster2018.pdf [https://perma.cc/U8N8-G6E5]. "Hoplophobia" is a neologism that roughly translates to "fear of weapons." For more on the idea of anti-gun animus, see Jacob D. Charles, *Second Amendment Animus*, 116 NW. U. L. REV. 1, 14-32 (2021).

2   *See* Erica Goode, *Even Defining 'Assault Rifles' Is Complicated*, N.Y. TIMES (Jan. 16, 2013), https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html [https://perma.cc/A3M8-GDEW]; *see also* Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301, 303 (2018) ("Critics of assault weapon bans complain that these laws irrationally draw distinctions among firearms based on cosmetic features ...."). *But see* E. Gregory Wallace, *''Assault Weapon'' Lethality*, 88 TENN. L. REV. 1, 14 & n.64 (2020) (arguing for functionality of certain features).

3   District of Columbia v. Heller, 554 U.S. 570, 627 (2008). Elsewhere, the Court uses the phrase "dangerous *or* unusual." *Id.* at 623 (emphasis added).

4   *Id.*

5   *See id.* at 624.

6   *See, e.g.,* Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J., 974 F.3d 237, 257 (3d Cir. 2020) (Matey, J., dissenting) (stating that "I believe the proper interpretive approach is to reason by analogy from history and tradition" and citing the "lineal descendant" language from *Heller* oral argument (internal quotation marks omitted and citations omitted)); Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007) ("The modern handgun--and for that matter the rifle

and long-barreled shotgun--is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon ....").

7     *See* Joseph Blocher, *Bans*, 129 YALE L.J. 308, 363 (2019) ("Is the modern AR-15 a 'lineal descendant' of the colonial-era musket? Guns have no progeny, so one cannot trace their lineage directly through some kind of family tree."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1478 (2009) (describing this analytical technique as "largely indeterminate").

8     Aymette v. State, 21 Tenn. 154, 158 (1840).

9     *See* Jennifer Tucker, *Now That Guns Can Kill Hundreds in Minutes, Supreme Court Should Rethink the Rights Question*, CNN (Oct. 20, 2021, 7:31 AM EDT) https://www.cnn.com/2021/10/20/opinions/supreme-court-gun-rights-case-lethality-tucker/index.html [https://perma.cc/8JMV-XR48]. We are not the first to identify lethality as a potential metric. *See* Wallace, *supra* note 2, at 17. We have a number of disagreements with Professor Wallace's assessment of lethality in his piece, as well his estimation of comparative lethality. For purposes of this Article, however, we differ in particular with his belief that lethality of a technology cannot be reduced to a single number--the TLI is proof of concept that it can--and his skepticism of the utility of such a metric within and between time periods.

10    HIST. EVALUATION & RSCH. ORG., FINAL REPORT ON HISTORICAL TRENDS RELATED TO WEAPON LETHALITY (1964), https://apps.dtic.mil/sti/pdfs/AD0458760.pdf [https://perma.cc/K48C-FKDD]; *see also* TREVOR N. DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE 92 (1980) [hereinafter EVOLUTION] (reprinting Theoretical Lethality Index table).

11    *See* District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

12    The Second Amendment states in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

13    *Heller*, 554 U.S. at 581.

14    *Id.* at 582.

15    *See* Nordyke v. King, 644 F.3d 776, 797 n.6 (9th Cir. 2011) (Gould, J., concurring in part) ("[T]o me it is obvious that the Second Amendment does not protect the right to keep a nuclear weapon in one's basement, or a chemical or biological weapons in one's attic, or a tank in one's backyard."), *reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012).

16    *See Heller*, 554 U.S. at 572.

17    *See* Hollis v. Lynch, 827 F.3d 436, 448 (5th Cir. 2016) (acknowledging that hand grenades and machine guns are unprotected "dangerous and unusual weapons for the purposes of the Second Amendment").

18    District of Columbia v. Heller, 554 U.S. 570, 625 (2008).

19    *Id.* at 721 (Breyer, J., dissenting).

20    *Id.*

[21]    For a discussion of this effort, see Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 TENN. L. REV. 231, 278-83 (2015).

[22]    Kolbe v. Hogan, 813 F.3d 160, 174 (4th Cir. 2016) ("[W]e note that in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States."), *reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

[23]    Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1293 (2009) ("A gun might be common because it is widely owned ....").

[24]    Michael P. O'Shea, *The Right to Defensive Arms After* District of Columbia v. Heller, 111 W. VA. L. REV. 349, 392 (2009); *see also* Craig S. Lerner & Nelson Lund, Heller *and Nonlethal Weapons*, 60 HASTINGS L.J. 1387, 1411 (2009) (arguing for a rebuttable presumption "that civilians have a right to use weapons commonly used by the police").

[25]    Brief of Pink Pistols in Support of Plaintiff-Appellants at 16, Fyock v. City of Sunnyvale, 779 F.3d 991 (9th Cir. 2014) (No. 14-15408)) ("If police need standard-issue magazines holding 15 to 17 rounds, a fortiori law-abiding citizens need the same firepower, if not more.").

[26]    Andrew P. Napolitano, *The Right to Shoot Tyrants, Not Deer*, WASH. TIMES (Jan. 10, 2013), http://www.washingtontimes.com/news/2013/jan/10/the-right-to-shoot-tyrants-not-deer [https://perma.cc/ WW48-S9WP] ("[The Second Amendment] protects the right to shoot tyrants, and it protects the right to shoot at them effectively, with the same instruments they would use upon us."). Part of the reason for this confusion is *Heller*'s unwillingness to expressly overrule *United States v. Miller*. In *Miller*, the Court held that short-barreled shotguns were not Second Amendment weapons because they were not suitable for military use. United States v. Miller, 307 U.S. 174, 178 (1939). However, in *Heller* the Court held that military application of a weapon was not required, and indeed, if a weapon was suitable only for military use that's a reason why it is *not* protected. District of Columbia v. Heller, 554 U.S. 570, 589, 624-25 (2008).

[27]    Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007).

[28]    Transcript of Oral Argument at 77, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290).

[29]    David B. Kopel, Clayton E. Cramer & Scott G. Hattrup, *A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts*, 68 TEMP. L. REV. 1177, 1195 (1995). Other arcana common in briefing has to do with a multi round weapon taken by Meriwether Lewis and William Clark on the Corps of Discovery. *See* Halbrook, *supra* note 1, at 165.

[30]    Duncan v. Becerra, 970 F.3d 1133, 1147 (9th Cir. 2020) ("Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders, as the first firearm that could fire more than ten rounds without reloading was invented around 1580. Rapid fire guns, like the famous Puckle Gun, were patented as early as 1718 in London."), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *reh'g en banc sub nom*. Duncan v. Bonta, No. 19-55376, 2021 WL 5577267 (9th Cir. Nov. 30, 2021).

[31]    *See* Cass R. Sunstein, *Analogical Reasoning* 10 (Harvard Pub. L., Working Paper No. 21-39, 2021), https://ssrn.com/ abstract=3938546 [https://perma.cc/C9V8-FYHY] ("For analogical reasoning to operate properly, we have to know that cases A and B are 'relevantly' similar, and that there are not 'relevant' differences between them.").