Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **COMPENDIUM OF WORKS CITED IN DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF AUGUST 29, 2022** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | **VOLUME 8 OF 13** |
| Defendants. | Courtroom:    5A<br>Judge:           Hon. Roger T. Benitez |
| | Action Filed:  August 15, 2019 |

1

# INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss 1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |

**BOOKS**

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

4

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, *U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020* (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

COMMON USE, LINEAGE, AND LETHALITY, 55 U.C. Davis L. Rev. 2495

32    DUPUY, EVOLUTION, *supra* note 10, at 286.

33    A more rational test for a protected weapon would be not whether the weapon is in "common use" but whether the weapon is "unreasonably dangerous"-- that is, whether its utility for something like self-defense is outweighed by its risks on other margins. The notion of "dangerous and unusual" seems to contemplate such a cost-benefit analysis. Joseph Blocher & Darrell A. H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 HARV. J. ON LEGIS. 279, 297 (2016).

34    In this sense, our argument takes issue with a lower court judge who has suggested that "[n]othing in the Second Amendment makes lethality a factor to consider because a gun's lethality, or dangerousness, is assumed." Duncan v. Becerra, 366 F. Supp. 3d 1131, 1145-46 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *reh'g en banc sub nom*. Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021), *rev'd and remanded sub nom*. Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021). This is patently false, as the increased lethality of any arm (such as a hand grenade or landmine) is *certainly* relevant to whether it may be prohibited.

35    Robert Mcg. Thomas, Jr., *Trevor N. Dupuy, 79, Prolific Military Historian*, N.Y. TIMES, June 9, 1995, at B11, https://www.nytimes.com/1995/06/09/obituaries/trevor-n-dupuy-79-prolific-military-historian.html [https://perma.cc/DAE6-93J9]; Jack Walker, *Trevor N. Dupuy Dead at 79*, PHALANX, Sept. 1995, at 33; Susan Rich, *Trevor N. Dupuy*, DUPUY INST., http://www.dupuyinstitute.org/tndupuy.htm (last visited Feb. 10, 2022) [https://perma.cc/YNF7-R4N5]. On Dupuy's contributions to military history, see CHRISTOPHER A. LAWRENCE, WAR BY NUMBERS: UNDERSTANDING CONVENTIONAL COMBAT, at ix-17 (2017).

36    *See* Rich, *supra* note 35; Thomas, *supra* note 35, at B11. Dupuy regarded his chief contribution as integrating military theory with historical experience. *See* LAWRENCE, *supra* note 35, at ix-xii. *See generally* T.N. DUPUY, NUMBERS, PREDICTIONS AND WAR: USING HISTORY TO EVALUATE COMBAT FACTORS AND PREDICT THE OUTCOME OF BATTLES (1979) [hereinafter NUMBERS] (exemplifying Dupuy's commitment to integrating military theory and history); T.N. DUPUY, UNDERSTANDING WAR: HISTORY AND THEORY OF COMBAT (1987) [hereinafter UNDERSTANDING] (same).

37    Walker, *supra* note 35, at 33.

38    Thomas, *supra* note 35, at B11.

39    Rich, *supra* note 35.

40    *Id.*

41    Rich, *supra* note 35. On Dupuy's contributions to military history, see LAWRENCE, *supra* note 35, at ix-17.

42    Rich, *supra* note 35. *See* DUPUY, UNDERSTANDING, *supra* note 36, at X; *see also* DUPUY, NUMBERS, *supra* note 36, at xv; LAWRENCE, *supra* note 35, at ix-xii.

43    LAWRENCE, *supra* note 35, at x. For more information about the research on tactical weapons in the 1950s and 1960s, see, for example, James Fallows, *M-16: A Bureaucratic Horror Story Why the Rifles Jammed*, ATLANTIC (June 1981), https://www.theatlantic.com/magazine/archive/1981/06/m-16-a-bureaucratic-horror-story/545153 [https://perma.cc/QHN5-LE7E].

44   *See* CHARLES R. SHRADER, HISTORY OF OPERATIONS RESEARCH IN THE U.S. ARMY VOLUME I: 1942-1962, at iii (2006).

45   LAWRENCE, *supra* note 35, at ix.

46   *Id.*

47   LAWRENCE, *supra* note 35, at ix; DUPUY, EVOLUTION, *supra* note 10, at vii.

48   Rich, *supra* note 35; Walker, *supra* note 35, at 33.

49   DUPUY, EVOLUTION, *supra* note 10, at vii.

50   *Id.*

51   1 CARL VON CLAUSEWITZ, ON WAR 39-40, 106 (J.J. Graham trans. 1873) On the Pentagon's reliance on wargaming, see JOHN PRADOS, PENTAGON GAMES: WARGAMING AND THE AMERICAN MILITARY 4 (1987).

52   DUPUY, EVOLUTION, *supra* note 10, at 300-05; *see also* LAWRENCE, *supra* note 35, at 6-7.

53   DUPUY, EVOLUTION, *supra* note 10, at 287-94.

54   Shawn Woodford, *"Human Factors in Warfare: Fear in a Lethal Environment,"* THE DUPUY INST.: MYSTICS & STATISTICS BLOG (Nov. 2, 2018), https://urldefense.com/v3/__ http://www.dupuyinstitute.org/blog/2018/11/02/human-factors-in-warfare-fear-in-a-lethal-environment/;!! OToaGQ!-mUY72ZfkYxHD9d0dFNBpg31R_LGM5aZ8X6i7U0SGha2GUuyOLcaw_FlFfJmj7Hk2yg $ [https://perma.cc/Z7YJ-2K6L] (quoting Dupuy).

55   HIST. EVALUATION & RSCH. ORG., *supra* note 10.

56   Rich, *supra* note 35.

57   Walker, *supra* note 35, at 79.

58   Rich, *supra* note 35.

59   *Id.*; *see also* Thomas, *supra* note 35, at B11.

60   *See, e.g.*, N.K. JAISWAL, MILITARY OPERATIONS RESEARCH: QUANTITATIVE DECISION MAKING 317-18 (1997); CARL MOSK, NATIONALISM AND ECONOMIC DEVELOPMENT IN MODERN EURASIA 91 (2013); James J. Schneider, *The Theory of the Empty Battlefield*, 132 J. ROYAL UNITED SERV. INST. 37, 37 (1987). The most recent validations of combat models are described in Volume I, Nos 4, 5, and 6 and Volume III, Nos 1 and 2 of The Dupuy Institute's International Tactical, Numerical, Deterministic Model ("TNDM") Newsletter. *International TNDM*

*Newsletter*, TDI: PUBLICATIONS (last visited Feb. 21, 2022) http://www.dupuyinstitute.org/tdipub4.htm [https://perma.cc/36PD-Z4NW].

61  DUPUY, EVOLUTION, *supra* note 10, at 286.

62  *Id.* at 92, 309-10.

63  To account for these other factors, along with the TLI, Dupuy calculated an Operational Lethality Index ("OLI"). *Id.* at 309-10. A fruitful research question would be to construct a civilian version of the OLI with respect to different weapons. But that project is outside the scope of this paper.

64  *Id.* at 286.

65  *Id.* at 286.

66  *Id.* at 286.

67  *Id.* at 286.

68  *Id.* at 292.

69  *See id.* at 292-94. In the age of technological change, there were many other ancillary developments, including: the percussion cap, electronic communication, barbed wire (first adapted to military purposes in 1874), smokeless powder (1885), recoil mechanism, quick-firing artillery (1890-1910); radar (1938), and earth satellites in space. *See id.* at 296-98.

70  DUPUY, NUMBERS *supra* note 36, at 6.

71  The process of introduction and assimilation of these new weapons is described in a report that he produced, consisting of four volumes (342 pages).

72  *See* DUPUY, EVOLUTION, *supra* note 10, at 92.

73  Situating the modern AR-15 (a successor to the German StG 44, the first "assault rifle," that was used in World War 2) anywhere near the Maxim machine gun makes it exponentially more lethal than the flintlock musket of the Founder's era. The term "AR-15" is now most-commonly used to refer only to the civilian variants of the rifle which lack the fully automatic function. There are a variety of ways to convert an AR-15 to a fully automatic weapon, as explained by Mike Searson, *Turning Your AR-15 into an M-16*, RECOIL (June 5, 2019), https://www.recoilweb.com/turning-your-ar-15-into-an-m-16-150631.html [https://perma.cc/XGT9-4WBZ].

74  This table is constructed from Dupuy's data. DUPUY, EVOLUTION, *supra* note 10, at 92.

75  *Id.* at 287.

76  *Id.*

COMMON USE, LINEAGE, AND LETHALITY, 55 U.C. Davis L. Rev. 2495

77    *Id.* at 287-90.

78    *Id.* at 287.

79    *See* <u>Kolbe v. Hogan, 849 F.3d 114, 162 (4th Cir. 2017)</u> (Traxler, J., dissenting) (indicating that untrained civilians need more rounds because they are likely to miss the target).

80    *See* <u>*id.* at 127</u> ("[W]hen inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders.").

81    *See* <u>*id.* at 153</u>.

82    *But see* Wallace, *supra* note 2, at 16-17 (arguing that lethality as a stable metric is difficult to determine).

83    Currently history and historical analogs are part of the conventional two-step framework for Second Amendment adjudication. The question in *Bruen* is whether this historical test is the only step of the analysis.

84    DUPUY, EVOLUTION, *supra* note 10, at 292.

85    *See id.* at 92.

86    *See id.*

87    <u>Duncan v. Becerra, 366 F. Supp. 3d 1131, 1145-46 (S.D. Cal. 2019)</u>, *aff'd,* <u>970 F.3d 1133 (9th Cir. 2020)</u>, *reh'g en banc granted, opinion vacated,* <u>988 F.3d 1209 (9th Cir. 2021)</u>, *reh'g en banc sub nom.* <u>Duncan v. Bonta, No. 19-55376, 2021 WL 5577267 at \*119 (9th Cir. Nov. 30, 2021)</u>, *rev'd and remanded sub nom.*

88    *See* Cincinnati, Ohio, Ordinance to Prevent Accidents from the Firing of Cannon or Other Guns on Boats, in Front of the City of Cincinnati (Mar. 9, 1825) ("[I]t shall not be lawful for any person or persons having charge or being on board of any boat upon the Ohio river, when passing by, stopping at, or leaving the city of Cincinnati, to cause any cannon, gun or other fire-arms to be so fired as to discharge its contents towards the city ...."); Phila., Pa., Gun-Cotton Act of Assembly (Mar. 16, 1847) ("Whereas, an article called gun cotton, with properties of ignition and explosion similar to those of gunpowder, and equally if not more dangerous in towns and cities, has been introduced. Therefore ... no gun-cotton shall be introduced in Philadelphia, nor placed in storage therein, in greater bulk or quantity in any one place, than is permitted by existing laws, with regard to gunpowder ....").

89    <u>McDonald v. City of Chicago, 561 U.S. 742, 802 (2010)</u> (Scalia, J., concurring).

90    The quote is a sardonic remark by Justice Samuel Alito during oral argument over First Amendment protection of violent video games. Transcript of Oral Argument at 17, <u>Brown v. Ent. Merchs. Ass'n, 564 U.S. 786 (2011)</u> ( No. 08-1448).

91    For more on this move of "translation," see Lawrence Lessig, *Fidelity in Translation,* <u>71 TEX. L. REV. 1165, 1211 (1993)</u> ("[T]he practice of translation moves in two stages: first, understanding the contexts between which the translator must move; and second, locating something called an equivalence between the two contexts.").

92  Kolbe v. Hogan, 849 F.3d 114, 121 (4th Cir. 2017) ("[W]e have no power to extend Second Amendment protection to the weapons of war that the *Heller* decision explicitly excluded from ... coverage.").

93  *See* Tucker, *supra* note 9.

94  Saul Cornell, Symposium, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 67 (2021).

95  *Id.*

96  GA. CONST. of 1877, art. I, § 1, pt. XXII (emphasis added).

97  TEX. CONST. of 1869, art. I, § 13 (emphasis added).

98  For more on this point, see Darrell Miller, *New Research from the UC Davis Symposium: The Theoretical Lethality Index, Reconstruction Regulation and Enforcement*, DUKE CTR. FOR FIREARMS L.: SECOND THOUGHTS BLOG (Oct. 22, 2021), https://firearmslaw.duke.edu/2021/10/new-research-from-the-uc-davis-symposium-the-theoretical-lethality-index-reconstruction-regulation-and-enforcement/ [https://perma.cc/G7BC-QUNR].

99  James B. Astrachan, *The Bumpy Road to the Supreme Court: Does the Second Amendment Prevent States from Prohibiting Ownership of Assault-Style Rifles and High-Capacity Magazines?*, 47 U. BALT. L. REV. 337, 375 (2018) ("[I]t is not the role of the courts to take away from the citizens the means to most effectively oppose such a [tyrannical] government.").

100  *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT 169 (2018) ("The keeping and bearing of lethal arms to deter government officials may be connected to the Second Amendment, but it is likely that the value is primarily moral or political, rather than a judicially administrable constitutional entitlement."). But to the extent such an argument requires something other than speculation, the TLI offers some metric from which to assess what kind of weaponry in private hands would be necessary to counter a military armed with machine guns, artillery, and nuclear weapons. *See* Darrell A. H. Miller, *Second Amendment Equilibria*, 116 NW. U. L. REV. 239, 256-57 (2021).

55 UCDLR 2495

End of Document                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   ©2022 Thomson Reuters. No claim to original U.S. Government Works.

[ Back | Home ]

[ Originally published as *1 Cent. L. J. 259-261, 273-275, 285-287, 295-296 (1874)*. NOTE: The Central Law Journal was published weekly in St. Louis, Mo. This article was published in four installments: Thursday, May 28, 1874, Thursday, June 4, 1874, Thursday, June 11, 1874, and Thursday, June 18, 1874. These were issue numbers 22-25 respectively. The article bears no author name. It was presumably written by the editors of the Journal: John F. Dillon, Editor & S.D. Thompson, Ass't Editor.]

# The Right to Keep and Bear Arms for Private and Public Defence.

The second amendment of the constitution of the United States recites that "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Similar provisions will probably be found in the constitutions of most of the states. Thus the constitution of Texas declares that "every person shall have the right to keep and bear arms in the lawful defence of himself or the state, under such regulations as the (p.260)legislature may prescribe." *Art. 1, § 13*. So the present constitution of Tennessee provides that "the citizens of this state have a right to keep and bear arms for their common defence; but the legislature shall have power by law to regulate the wearing of arms with a view to prevent crime." These and similar provisions in the constitutions of other states have been discussed in several cases, and with the apparently growing habit of legislatures to restrict the wearing of arms, their exposition assumes increasing importance. The provision in the federal constitution does not appear ever to have received exposition in the Supreme Court of the United States, but the state tribunals have furnished a series of interesting decisions upon the subject, referring either to the federal or to the state constitution.

1. The first of these appears to have been *Bliss v. Commonwealth, 2 Littell, 90*, determined in the Court of Appeals of Kentucky in 1822, and relates to the question we shall consider first--the *manner* of carrying weapons. The constitution of Kentucky provided "that the right of the citizens to bear arms in defence of themselves and the state *shall not be questioned*." It was held that a statute providing that "any person in this commonwealth, who shall hereafter wear a pocket-pistol, dirk, large knife, or sword in a cane, *concealed as a weapon*, unless when travelling on a journey, shall be fined in any sum not less than one hundred dollars," etc. This statute was held to be in conflict with the constitutional guaranty, and hence void--one of the three judges dissenting. The court said : "That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defence of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons *concealed* in the manner described in the act, they may nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution it is not essential that the act should contain a prohibition against bearing arms in every possible form. It is the *right* to bear arms in defence of the citizens and the state that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. If, therefore, the act in question imposes *any* restraint upon the right, immaterial what appellation may be given to the act, whether it be an act *regulating* the manner of bearing arms or any other, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious." And the court further on declare that "in principle there is no difference between a law prohibiting the wearing of *concealed* arms and a law forbidding the wearing of such as are exposed." And, therefore, the defendant having been convicted and fined for carrying a sword concealed in a cane, the judgment was reversed.

The next case in order of time appears to have been *The State v. Mitchell, 3 Blackf. 229*, determined in the Supreme Court of Indiana in 1833. The ruling is diametrically opposed to that in the Kentucky case. The report does no more than mention the point ruled in the briefest terms, but it would seem that the Indiana constitutional provision was simply "that the people have a right to bear arms for the defence of themselves and the state." And the statute (*Laws of Ind., ed. of 1831, p. 192*) which was held not in derogation of this provision provided that

"every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon *concealed*, shall, upon conviction thereof, be fined in any sum not exceeding one hundred dollars."

This ruling was followed by the Supreme Court of Alabama in 1840, in *The State v. Reid, 1 Ala. 612*. The provision of the Alabama constitution was almost identical with that of Indiana. It provided that "every citizen has the right to bear arms in defence of himself and the state." And it was held that this provision was not infringed by a statute which provided that "if any person shall carry *concealed* about his person any species of fire-arms, or any bowie-knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or other concealed weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine of not less than fifty nor more than five hundred dollars," etc. The statute was held not in conflict with the constitutional provision. And this ruling was reaffirmed in *Owen v. The State, 31 Ala. 387*. The Supreme Court of Alabama in the former case say: "The constitution, in declaring that 'every citizen has the right to bear arms in defence of himself and the state,' has neither expressly nor by implication denied the legislature the right to enact laws in regard to the *manner* in which arms shall be borne. The right guarantied to the citizen is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the state.' The terms in which this provision is phrased seem to us necessarily to leave with the legislature the authority to adopt such regulations of police as may be dictated by the safety of the people and the advancement of public morals." And further on they say: "We do not desire to be understood as maintaining that in regulating the manner of bearing arms, the authority of the legislature has no other limit than that of its own discretion. A statute which, under pretence of *regulating*, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution." And the court also say: "Under the provision of our constitution, we incline to the opinion that the legislature cannot inhibit the citizen from bearing arms *openly*, because it authorizes him to bear them for the purpose of defending himself and the state, and it is only when carried openly that they can be effectively used for defence." *1 Ala. 616, 617, 619*.

The distinction here taken in regard to the *manner* of carrying or wearing weapons, has been followed in several later cases. Thus in *Nunn v. The State, 1 Kelly, 243*, decided in 1846, the Supreme Court of Georgia held that a statute of that state, so far as it sought to suppress the practice of carrying certain weapons *secretly*, was valid, inasmuch as it did not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms; but that so (p.261)much of it as prohibited the wearing of certain arms *openly*, was unconstitutional and void. To the same effect, see *Stockdale v. The State, 32 Ga. 225*, and the very thoroughly considered case of *The State v. Buzzard, 4 Ark. 18*. So it has been held in several cases in Louisiana, that a statute prohibiting the carrying of *concealed* weapons did not infringe the right of the people to keep and bear arms, but was simply a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society. *The State v. Jumel, 13 La. An. 399*; *The State v. Smith, 11 La. An. 633*; *The State v. Chandler, 5 La. An. 489*. The same conclusion was reached by the Supreme Court of Tennessee in 1840 in *Aymette v. The State, 2 Humph. 154*, but upon somewhat different grounds, as we shall see further on; and is also supported by *Andrews v. The State, 3 Heiskell (Tenn.) 165*.

[TO BE CONTINUED.](p.273)

[CONTINUED.]

2. A second branch of the question relates to the *kind* of weapon, the carrying of which is within the constitutional guaranty. By far the most instructive case on this branch of the question is *Aymette v. State, 2 Humph. 154*. The constitution of Tennessee in force at that time provided that "the free white men of this state shall have a right to keep and bear arms *for their common defence*." And the question considered by the court was whether this constitutional provision was violated by a statute which provided "that if any person shall wear any bowie-knife, or Arkansas tooth-pick, or other knife or weapon that shall in form, shape or size resemble a bowie-knife, or Arkansas tooth-pick, under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof, shall be find," etc. Green, J., in an able

opinion traces the constitutional provision to its origin in the *English Bill of Rights, Stat. 1 W. & M., ch. St. 2, ch. 2, cl.* and then makes the following observations upon its policy and scope: "As the object for which the right to keep and bear arms is secured, is of a *general* and *public* nature, to be exercised by the people in a body for their *common* defence, so the *arms*, the right to keep which is secured, are those which are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution." It was accordingly held that the statute was not in derogation of the state constitution.

But by far the most elaborate discussion of the question will be found in *Andrews v. The State, 3 Heiskell, 165,* determined in the Supreme Court of Tennessee in 1871. The state was ably represented, and the synopsis of the argument of the attorney-general should not be overlooked. The court possessed the weight of being composed of six judges; but unfortunately they were by no means unanimous, either as to the result, or as to the reasoning by which the result was reached. The provision of the present constitution of Tennessee is that "the citizens of this state have a right to keep and bear arms *for their common defence*; but the legislature shall have power by law to regulate the *wearing* of arms with a view to prevent crime." *Const. of Tenn., art. 1, § 26.* The material provision of the statute whose validity was disputed was that "it shall not be lawful for any person to *publicly* or *privately* carry any dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver." *Act of Tenn., June 11, 1870; 2 Tho. & S. Code, § 4756 a.* It was held that this statute was not in derogation of the constitution of the state, except so far as it restrained the keeping of arms "in the ordinary mode known to the court." In this result four of the judges concurred. Freeman, J., delivered the opinion of the court, in which the question is discussed at great length. Nicholson, Ch. J., and Deaderick, J., concurred in the general views expressed by him; but Sneed, J., dissented from so much of the opinion as questioned the right of the legislature to prohibit the wearing of arms of any description, or sought to limit the operation of the act of 1870. On the other hand, Nelson, J., dissented with much force, holding that the act was in derogation of the constitutional right to bear arms, and in derogation of the natural and inalienable right of self-defence. While it is difficult to say precisely what this long case does decide, it may be fairly said to be an affirmance of Aymette v. State, *supra*; and no doubt the following sentences represent the views of all of the four concurring judges, except Sneed, J., who goes further in support of the power of the legislature to regulate the wearing of arms: "What, then, is he [the citizen] protected in the right to keep and thus use? Not everything that may be useful for offence or defence; but what may (p.274)properly be understood or included under the title of arms, taken in connection with the fact that the citizen is to keep them as a citizen. Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defence of his own liberties, as well as of the state. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should he trained, we would hold that the rifle of all descriptions, the shot-gun, the musket and repeater are such arms; and under the constitution, the right to *keep* such arms cannot be *infringed* or *forbidden* by the legislature. Their *use*, however, may be subordinated to such regulations and limitations as are or may be authorized by the laws of the land, passed to subserve the general good, so as not to infringe the right secured, and the necessary incidents to the exercise of such right." * * * "We hold, then, that the act of the legislature in question, so far as it prohibits the citizen, either publicly or privately, to carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, is constitutional. As to the pistol designated as a *revolver*, we hold this may or may not be such a weapon as is adapted to the usual equipment of the soldier, or the use of which may render him more efficient as such; and therefore hold this to be a matter to be settled by evidence, as to what character of weapon is included in the designation 'revolver.'" * * * * "We know there is a pistol of that name [revolver] which is not adapted to the equipment of the soldier, yet we also know that the pistol known as the 'repeater' is a soldiers' weapon--skill in the use of which will add to the efficiency of the soldier. If such is the character of the weapon here designated, then the prohibition of the statute is too broad to be allowed to stand consistently with the views herein expressed. * * * As we have said, the statute amounts to a prohibition to keep and use such weapon for any and all purposes. It therefore, in this respect, violates the constitutional right to keep arms, and the incidental right to use them, in the ordinary mode of using such arms, and is inoperative."

We must not here overlook the early Tennessee case of *Simpson v. The State, decided by the Supreme Court of Tennessee in 1833, and reported in 5 Yerger, 356*. The only question in that case was the sufficiency of an indictment for an *affray* which charged that the defendant, "with force and arms, at, etc., being arrayed in a warlike manner, then and there, in a certain public street and highway situate, unlawfully, and to the great terror of divers good citizens of the state, then and there being, an affray did make," etc. It was held that this indictment did not sufficiently charge an affray. The court consisted of four judges, among them Judge Green, who delivered the opinion of the court in Aymette v. The State, *supra*, and also Judge Catron, afterwards one of justices of the Supreme Court of the United States, who, two years before, had delivered the opinion of the court in the famous *Grainger case (5 Yerg. 459)* expounding the law of self-defence; and with these were associated Judges Whyte and Peck. Whyte, J., delivered the opinion of the court, Peck, J., dissenting. Two *reasons* were given for holding the indictment insufficient. The *first* was that in order to constitute an affray there must be, 1st, fighting; 2d, and between two or more persons, 3d, and in some public place so as to cause terror to the people. Now the indictment did not charge *fighting*, nor fighting *between two or more persons*. It was therefore held insufficient. It is difficult to conceive how there can be *fighting*, unless there be at least two persons, unless it be between a man and a beast; but we are stating accurately the reasoning of the court. The *second* reason, and the one with which we have to do, is embodied in the following language of Judge Whyte: "But suppose it to be assumed on any ground that our ancestors adopted and brought over with them this English statute [*2 Edw. III.*] or portion of the common law, our constitution [of 1796] has completely abrogated it. It says 'that the freemen of this state have a right to keep and to bear arms for their common defence.' (*Art 11, § 29.*) It is submitted that this clause of our constitution fully meets and opposes the passage or clause in Hawkins of 'a man's arming himself with dangerous and unusual weapons,' as being an independent ground of affray, so as of itself to constitute the offense cognizable by indictment. By this clause of the constitution an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived that it would be going much too far to impair by construction or abridgment a constitutional privilege which is so declared. Neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby. We must attribute to the framers of it the absence of such a view." In Aymette's case, *supra*, Judge Green characterized the above language as "only an incidental remark of the judge who delivered the opinion, and therefore entitled to no weight." To enable the reader to judge how far this declaration of law by Judge White was necessary to the determination of the question in the case, it should be remarked that it is an *argument* put forth to obviate the force of the following language of Sergeant Hawkins: "But granting that no bare words in the judgment of law carry with them so much terror as to amount to an affray, yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people, which is said always to have been an offence at common law, and is strictly prohibited by many statutes." (*Hawk. P. C. Book 1, ch. 28, § 4, Leach's ed.*)

The latest case upon this branch of the subject appears to be *English v. The State, 35 Tex. 473*. The statute considered in that case (*Act of 12 April, 1871, 2 Pasch. Dig. Laws, art. 6512*) provides with certain exceptions that "any person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offence or defence, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such grounds of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defence of the state, as a militia-man in actual service, or as a peace officer or policeman, shall be guilty of misdemeanor," etc. The second section provides that "any person charged under the first section of this act who may offer to prove by way of defence that he was in danger of an attack on his person, or unlawful (p.275)interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath his clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered a legal defence." *Section 3* provides that the governor may, by proclamation, exempt the frontier counties from the operation of the act. The remaining sections contain provisions which it is not necessary to notice. It will be seen that this statute is much stronger than any which we have previously cited. With certain restricted exceptions, it effectually prohibits the bearing of all small arms, whether openly or concealed, on horseback or on foot. It is doubtful whether so

sweeping a statute can be sustained in the light of any of the adjudications already quoted. But the late Supreme Court of Texas nevertheless did, in English v. The State, *supra*, declare that it is neither in conflict with the second amendment of the federal constitution, nor with the provision of the constitution of that state quoted at the beginning of this article. The court (Walker, J.) say: "The word 'arms,' in the connection we find it in the constitution of the United States, refers to the arms of a militia-man or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster-pistol and carbine; of the artillery, the field-piece, siege gun and mortar, with side-arms. The terms dirks, daggers, slung-shots, sword-canes, brass-knuckles and bowie-knives belong to no military vocabulary. Were a soldier on duty found with one of these things about his person he would be punished for an offence against discipline. The act referred to makes all necessary exceptions, and points out the place, the time and manner in which certain deadly weapons may be carried as a means of self-defence; and these exceptional cases, in our judgment, fully cover all the wants of society. There is no abridgment of the *personal* rights, such as may be regarded as inherent and inalienable to man, nor do we think his *political* rights are the least infringed by any part of this law." The court also understand the word "arms" in the Texas constitution as having the same import and meaning which it has in the second amendment of the federal constitution; and they hold that the legislature may *regulate* the right to bear arms without taking it away, and that this has been done by the act under consideration.

[TO BE CONTINUED.](p.285)

[CONTINUED.]

3. A third question is, whether the natural right of self-defence will under any circumstances justify the carrying of a particular weapon, and in a particular manner, when such carrying is forbidden by statute. "In reason," says Mr. Bishop, "there may be circumstances in which the right of self-defence will justify the carrying of a concealed weapon for the purpose; and should such a case arise (and it must be an extreme one, out of the ordinary course of things, or it could not arise), doubtless this should be held to be an exception, engrafted by the common law upon the general terms of the statute." *Bish. Stat. Crimes, § 789.* This view would seem to be entirely consistent with reason, and unavoidable. When we reflect on the question of what is termed the right of self-defence, we shall see that it is a most comprehensive right; that it is one and the same thing with the right to "life, liberty and the pursuit of happiness," which our fathers asserted in the Declaration of Independence. It would seem to follow from what has been said upon the subject by various writers that while society may *regulate* this right of self-defence so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and most odious form of tyranny. Thus, Sir Michael Foster says: "The right of self-defence in these cases [cases of felonious attacks upon person, habitation, or property] is founded in the law of nature, and is not, *nor can be*, superseded by any law of society; for, before societies were formed, * * * the right of self-defence resided in individuals; it could not reside elsewhere; and since, in cases of necessity, individuals incorporated into society cannot resort for protection to the law of society, that law with great propriety and (p.286)strict justice, considereth them as still in that instance under the protection of the law of nature." (*Foster Crown Law, 273-4.* See also *2 Rutherforth's Institutes, ch. 16; Grotius' De Jure Belli et Pacis, lib. 2 cap. 1; Gray v. Coombs, 7 J. J. Marshall, 478; Isaacs v. State, 25 Tex. 174; Com. v. Riley, Thacher's Crim. Cas. 471; United States v. Holmes, 1 Wallace, Jr. 1.*) It is within common experience that there are circumstances under which to disarm a citizen would be to leave his life at the mercy of a treacherous and plotting enemy. If such a state of facts were clearly proven, it is obvious that it would be contrary to all our notions of right and justice to punish the carrying of arms, although it may have infringed the letter of some statute. To do so would be to make the law what it never was intended to be, an instrument of cruelty and injustice. Such a case might clearly be said to fall within that class of cases in which the previously existing common law interpolates exceptions upon subsequently enacted statutes. See *Bish. Stat. Crimes, §§ 7, 123, 131, 141, 351-359, 362, 789.*

Turning to the adjudications, we find it declared in one case, under an Indiana statute, probably the same already cited (*ante, 260*), that if a person, not being a traveller, carry a concealed weapon, he is guilty of an indictable offense and his *motive* for carrying the weapon is immaterial. *Walls v. The State, 7 Black. 572.* A similar ruling was made in *Cutsinger v. Commonwealth, 7 Bush. Ky. 392.* But these cases do not help our enquiries, because

Compendium_Supplemental Brief
Page 217

the defendants did not claim to have carried the weapons for the purpose of defence against any threatened or impending injury, but, in one case, for the purpose of exhibiting it as a curiosity, and in the other, for the purpose of conveying it to another person.

In *Hopkins v. Commonwealth, 3 Bush, Ky. 480,* there was sufficient proof that the defendant, on a certain day, carried a pistol concealed about his person, and the defendant attempted to excuse the act by proving that he had been shot at by strangers more than two years before, and that "for precautionary security of self-defence" against a like attack he had carried a pistol ever since. The court (Robertson, J.) said: "These facts were wholly *irrelevant*, as there was neither proof nor cause for apprehension of any such impending danger; and, therefore, there was no error in refusing to admit another witness to the same facts."

Another ground of error urged in the same case, was that the court should not have given the following instruction: "If the jury believe from the evidence that the defendant * * * carried a pistol concealed about his person, and that he had no *reasonable ground* to believe, and did not believe, that his person was in danger of great bodily harm, they should punish him by a fine," etc. To understand the force of this instruction, it should be observed that the Kentucky statute against carrying concealed weapons, in force at that time, made the carrying of such weapons lawful "where the person has *reasonable grounds* to believe that his person, or the person of some of his family, or his property, is in danger from violence or crime." *1 Stanton's Code, p. 414.* The defendant's counsel insisted that the defendant was rightfully the best judge of the necessity or prudence of carrying a concealed pistol for self-defence, and was the only person who could know whether he in fact apprehended danger; and hence objected to so much of the instruction as required *reasonable grounds* for apprehension. The court, however, did not see the instruction in this light. Judge Robertson said: "Were this erroneous, the salutary law against the pestilent and alarmingly prevalent habit among all classes, and especially among young men and even boys, of wearing concealed arms, through false and cowardly pride, and through mock chivalry, might soon become practically a dead letter. A statute so beneficent, and so often and so easily evaded, should be vigilantly upheld and stringently enforced by the judiciary, for repressing a dishonorable and mischievous practice, which, licensed or unlicensed, leads almost daily to causeless homicides and disturbances, which would otherwise never be perpetrated; and to that end, the accused should always be required to prove that he carried a concealed weapon only for the purpose of defending himself or family or property against an impending attack, *reasonably apprehended*, and which, if attempted, would justify the use of some such means of defence. But the superfluous addition of the words, 'and did not believe that his person was in danger,' relieves the instruction from the counsel's criticism, and makes it more favorable to the appellant than he had a right to demand or expect." Although this ruling was necessary in view of the terms of the Kentucky statute, yet it is thought that it would be the same on general principles; for it is in strict analogy with that numerous class of cases which makes the fears of *a reasonable man*, and not the fears actually entertained, the test of the justification of the degree of force and kind of weapon employed in one's defence. (*Selfridge's case, 1 Self-Defence Cases, 1*; *Sullivan's case, ib. 65*; *Shorter's case, ib. 258*; and many others.)

In one of the cases in Tennessee, already quoted, *Andrews v. The State, 3 Heiskell, 165, 188,* there are considerable *dicta* on the question whether a man can defend himself against an indictment for carrying arms forbidden to be carried by law, by showing that he carried them in self-defence. While admitting the question to be one of "some little difficulty," the learned judge who delivered the opinion of the court says: "The real question in such case, however, is not the right of self-defence, as seems to be supposed (for that is conceded by our law to its fullest extent), but the right to use weapons or select weapons for such defence, which the law forbids him to keep or carry. If this plea could be allowed as to weapons thus forbidden, it would amount to a denial of the right of the legislature to prohibit the keeping of such weapons; for if he may lawfully use them in self-defence, he may certainly provide them and keep them for such purpose, and thus the plea of right of self-defence will draw with it, necessarily, the right to keep and use everything for such purpose, however pernicious to the general interest or peace or quiet of the community. Admitting the right of self-defence in its broadest sense, still, on sound principles, every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good; and where certain weapons are forbidden to be kept or used by the law of the land, in order to the prevention of crime--a great public end--no man can be permitted to disregard this general end, and demand of the community the right, in order to gratify his whim or wilful desire, to use a particular weapon in his particular self-defence. The law allows ample means of self-defence without the means which we

have held may be rightfully (p.287)proscribed by this statute, The object being to banish these weapons from the community by an absolute prohibition, for the prevention of crime, *no man's particular safety*, if such case could exist, ought to be allowed to defeat this end. Mutual sacrifice of individual rights is the bond of all social organizations, and prompt and willing obedience to all laws passed for the general good is not only the duty, but the highest interest of every man in the land. * * * We admit that extreme cases may be put where the rule may work harshly, but this is the result of all general rules--that they may work harshly sometimes in individual cases. By our system, however, allowing the attorney-general to enter a *nolle prosequi* with the assent of the court, there is but little danger of the law being enforced in any such cases to the detriment of any one; and if such case should occur, an application to executive clemency may fairly be presumed to be the remedy provided by the constitution to meet all such exigencies." The court, therefore, hold that the testimony tending to prove "that there was a set of men in the neighborhood of defendant during the time he carried his pistol and before, seeking the life of defendant," was properly rejected, *because it did not appear what the character of the weapon was*, and it may have been such a weapon as could not be properly carried at all, and if so, the testimony would be no defence to the indictment. Comparing the above with that part of this case which was quoted on *page 274 of our last number*, it is seen that it decides that a man may not, even in his necessary defence, carry, either publicly or privately, a *dirk, sword-cane, Spanish stiletto, belt or pocket-pistol*, but that he may carry such arms for his private defence as are adapted to the equipment of the soldier. Much as we respect the general views of the learned judge and the commendable desire to promote peace and public order which his opinion manifests, yet we do not think that either his reasoning or his conclusion on this particular branch of the question can be commended. It entirely confounds the right of arming one's self for private defence against a threatened danger, with the policy of the constitution of Tennessee, which guarantees the right of bearing certain arms in order to educate the citizen for military duty. If a citizen is obliged to perform a journey where he is in danger of being attacked by highwaymen, or by assassins who seek his life, he may, if he have the arms used by a militiaman, arm himself with them;--we suppose he may even take a cannon along with him, if he have one. But if he have not, and cannot procure any of the weapons which are used in civilized warfare, he must go unarmed. Besides, in attempting to distinguish between the weapons which he may and may not use, the learned court descend into distinctions altogether too nice to be of any practical value. A belt or pocket-pistol may not be worn, but a "repeater" may. What is a large "repeater" but a belt-pistol, and what is a small "repeater" but a pocket-pistol? According to these distinctions, we suppose if the citizen have no other arms than an old-fashioned "pepper-box," he must needs leave it at home--to carry it to defend himself against the attack of a highwayman will be an indictable offence (and we don't know but it ought to be)--but he may lawfully carry a far more formidable and dangerous weapon--a cavalry-revolver, Colt or Remington. In short, before he may lawfully take with him any weapon for his personal defence, he must debate and settle in his mind whether such a weapon would be appropriate to the equipment of a soldier, and if it would, he may lawfully carry it for the purpose of defending himself; otherwise not. That such conclusions do not commend themselves to reason, need scarcely to be suggested. Nor do we perceive any ground for the distinction which the learned judge attempts to draw between the *right* of self-defence and the *means* by which that right may be secured. If the *means* are prohibited or withheld, can any one say that the right is of any substantial value? We think that upon this branch of the case the views of Judge Nelson, in his dissenting opinion, are much to be preferred. "I hold," said that learned judge, "that when a man is really and truly endangered by a lawless assault, and the fierceness of the attack is such as to require immediate resistance in order to save his own life, he may defend himself with *any weapon whatever*, whether seized in the heat of conflict, or carried for the purpose of self-defence."

In the principal Alabama case which we have already quoted, *The State v. Reid, 1 Ala. 612, 619*, the question, it will be remembered, arose on a constitutional provision which guaranteed the right to bear arms "in defence of *himself* and the state." The court thought that in view of that provision it would not be competent for the legislature to prohibit the wearing of arms *openly*, because "it is only when worn openly that they can be efficiently used for defence." And they also say: "We will not undertake to say that if in any case it should appear to be indispensable to the right of defence that arms should be carried concealed about the person, the act 'to suppress the evil practice of carrying weapons secretly' should be so construed as to operate a prohibition in such case." The right to bear arms *when threatened with, or having good reason to apprehend an attack, or travelling or setting out on a journey*, was subsequently recognized in Alabama by statute. *Ala. Code, 1852, § 3274*; Owen v. State, 31 Ala. 388.

In Texas, as we have already seen (*ante, p. 274*), it has been held within the power of the legislature to prohibit the carrying of all *small arms*, notwithstanding a constitutional provision similar to that of Alabama, guaranteeing the right to carry arms for the defence of *one's self*, as well as for the defence of the state.

Such appears to be the unsatisfactory state of the authorities on this branch of the question. On the one hand, as long as the machinery which society has afforded for the *prevention* of private injuries remains in its present ineffective state, society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger; and it will be in vain that the laws of society denounce penalties against the citizen for arming himself when his life is menaced by the attacks of wild beasts, of highwaymen, or of dangerous and persevering enemies. On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.

[TO BE CONTINUED.](p.295)

[CONCLUDED.]

4. We shall take leave of this subject by briefly considering whether the second amendment of the constitution of the United States is restrictive upon the states. This amendment provides that "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Mr. Bishop suggests that, "though most of the amendments are restrictions on the general government alone, this one seems to be of a nature to bind both the state and the national legislatures; and doubtless it does." Of the same view was the Supreme Court of Georgia in *Nunn v. The State, 1 Kelly, 243*, where the question was discussed at considerable length, and where a statute of that state was held in part invalid because in conflict with this amendment. In the three Louisiana cases already quoted, the subject was discussed solely with reference to this amendment to the federal constitution, and it seems to have been taken for granted that it is restrictive upon the states. *State v. Chandler, 5 La. An. 489*; *State v. Smith, 11 La. An. 633*; *State v. Jumel, 13 La. An. 399*. So in the Arkansas case, *The State v. Buzzard, 4 Ark. 18*, all the judges appear to have understood this amendment as applicable to the states; and Judge Dickinson supposes it to pertain to the power possessed by the general government of organizing, arming and disciplining the militia. He says this provision of the federal constitution "is but an assertion of that general right of sovereignty belonging to independent nations, to regulate their military force."

This view of Judge Dickinson contains the only plausible reason we have met with for supposing that this amendment is binding upon the states. The decisions of the Supreme Court of the United States, expounding the early amendments of the federal constitution, leave little room to doubt that none of the first ten amendments apply to the states, but that all of them are merely restrictive upon the federal power. Thus, in *Barron v. The City of Baltimore, 7 Pet. 243, 247*, it was held that an act of the Maryland legislature, which it was alleged deprived the plaintiff in error of his property without just compensation, was not void as being in conflict with the *fifth* amendment of the federal constitution. Chief Justice Marshall, delivering the unanimous judgment of the court, said: "The question presented is, we think, of great importance, but not of much difficulty. The constitution was ordained and established by the people of the United States themselves, for their own government, and not for the government of the individual states. Each state established a constitution for itself, and in that constitution provided such limitations and restrictions on the powers of its particular government as its judgment dictated. The people of the United States framed such a government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The power they conferred on this government was to be exercised by itself, and the limitations on power, if expressed in general terms, are naturally and, we think, necessarily, applicable to the government created by the instrument. They are limitations of power granted in the instrument itself, not of distinct governments framed by different persons and for different purposes." This language would be equally decisive if applied to any of the first ten amendments. Again, in *Fox v. The State of Ohio, 5 How. 410, 434*, it is declared that the prohibitions contained in the amendments to the federal constitution "were not designed as limits upon the state governments in reference to their own citizens. They are exclusively restrictions upon federal power, intended to prevent interference with the rights of the states and of their citizens." "Such, indeed," said Mr. Justice Daniel, in delivering the opinion of the court, "is the only

rational and intelligible interpretation which these amendments can bear, since it is neither probable nor credible that the states should have anxiously insisted to engraft upon the federal constitution restrictions upon their own authority--restrictions which some of the states regarded as the *sine qua non* of its adoption by them." So, also, it was held in *Smith v. The State of Maryland, 18 How. 71, 76*, that the provision of the *fourth* amendment of the federal constitution which prohibits the issuing of a warrant, "but upon probable cause, supported by oath or affirmation," had no application to the process of the state courts. Language equally decisive will be found in *Withers v. Buckley, 20 How. 84, 90*; *Twichell v. The Commonwealth, 7 Wall. 321*, and in other cases decided by the same court.(p.296)

In view of these decisions of the only court whose interpretations of the federal constitution are binding and decisive, there would seem to remain no doubt that if the question should ever arise in that court it would be held that the second amendment of the federal constitution is restrictive upon the general government merely, and not upon the states, and that every state has power to regulate the bearing of arms in such manner as it may see fit, or to restrain it altogether.

Clin Orthop Relat Res (2009) 467:2168–2191
DOI 10.1007/s11999-009-0738-5

ORIGINAL ARTICLE

# Treatment of War Wounds

## A Historical Review

**M. M. Manring PhD, Alan Hawk, Jason H. Calhoun MD, FACS, Romney C. Andersen MD**

Received: 16 June 2008 / Accepted: 27 January 2009 / Published online: 14 February 2009
© The Association of Bone and Joint Surgeons 2009

**Abstract** The treatment of war wounds is an ancient art, constantly refined to reflect improvements in weapons technology, transportation, antiseptic practices, and surgical techniques. Throughout most of the history of warfare, more soldiers died from disease than combat wounds, and misconceptions regarding the best timing and mode of treatment for injuries often resulted in more harm than good. Since the 19th century, mortality from war wounds steadily decreased

Each author certifies that he or she has no commercial associations (eg, consultancies, stock ownership, equity interest, patent/licensing arrangements, etc) that might pose a conflict of interest in connection with the submitted article.
Disclaimer: The opinions or assertions contained herein are the private views of some of the authors and are not to be construed as official or reflecting the views of the Department of Defense or the US government. This work was prepared as part of their official duties and, as such, there is no copyright to be transferred.

M. M. Manring
Department of Orthopaedic Surgery, University of Missouri-Columbia, Columbia, MO, USA

A. Hawk
National Museum of Health and Medicine, Armed Forces Institute of Pathology, Washington, DC, USA

J. H. Calhoun (✉)
Department of Orthopaedic Surgery, The Ohio State University, N1043 Doan Hall, 410 W 10th Ave, Columbus, OH 43210-1228, USA
e-mail: jason.calhoun@osumc.edu

R. C. Andersen
Orthopaedic Traumatology, Walter Reed National Military Medical Center, Bethesda, MD, USA

R. C. Andersen
Orthopaedic Traumatology, Walter Reed National Military Medical Center, Washington, DC, USA

as surgeons on all sides of conflicts developed systems for rapidly moving the wounded from the battlefield to frontline hospitals where surgical care is delivered. We review the most important trends in US and Western military trauma management over two centuries, including the shift from primary to delayed closure in wound management, refinement of amputation techniques, advances in evacuation philosophy and technology, the development of antiseptic practices, and the use of antibiotics. We also discuss how the lessons of history are reflected in contemporary US practices in Iraq and Afghanistan.

## Introduction

The need for surgical care of survivors of accidents or animal attacks is part of the story of civilization, as is the story of medical care of those wounded in that other peculiarly human endeavor, warfare [41]. During the past 250 years, and particularly during the 20th century, developments in military trauma care for musculoskeletal injuries have greatly influenced civilian emergency medicine. The history of military trauma care must be understood in terms of the wounding power of weapons causing the injury and how the surgeon understood the healing process. Improvements in weapons technology forced surgeons to rethink their interventions in their effort to tip the odds of survival in favor of their patient.

Our purpose is to review the evolution of military trauma care during the past two and a half centuries in major conflicts in the West. The major areas of emphasis are medical evacuation and organization; wounds and wound management; surgical technique and technology, with a particular focus on amputation; infection and antibiotics; and blood transfusion.



## Medical Evacuation and Organization

Perhaps the most basic problem facing physicians during wartime historically has been whether (and how) to transport the wounded to care or transport the caregivers to the wounded. A secondary problem historically has been how best to organize the delivery of care as modern nations began to dispatch vast armies and navies to fight across vast distances.

For example, Pikoulis et al. [110] reviewed the wounds depicted in *The Iliad* and determined the arrow wounds such as the one suffered by Menelaus carried a mortality rate of 42%, slingshot wounds 67%, spear wounds 80%, and sword wounds 100%. These high mortality rates suggest surgeons were unable to get to wounded soldiers during the melee, treating only the higher class or those who survived after the battle had concluded. These Greek surgeons, whether they realized it or not, faced the same issues as all future practitioners engaged in wound care: wound management, The Golden Hour (the principle that a victim's chances of survival are greatest if he receives resuscitation within the first hour after a severe injury), and infection control.

During the American Revolution (1775–1783), the Continental Congress authorized one surgeon to serve in each regiment. Few of the regimental surgeons, mostly trained through the apprenticeship system as there were only two medical schools in the United States (King's College [now Columbia University] in New York, NY, and the University of Pennsylvania in Philadelphia, PA), had any experience treating trauma. The organization was minimal, and regimental surgeons tended to work for their unit instead of seeing themselves as part of the Hospital Department, which was rendered ineffective by bureaucratic infighting [116].

The outstanding military surgeon of the Napoleonic Wars (1792–1815), Baron Dominique-Jean Larrey (1766–1842), generally is regarded as the originator of modern military trauma care and what would become known as triage [131]. He placed surgical teams near the front lines to shorten the time elapsed after injury and instituted specially designed horse-drawn "flying ambulances" in which the wounded rode with an early version of emergency medical technicians [67, 103]. Care was prioritized to provide first for the most badly wounded, without regard to the patient's chances of survival or the need to restore less gravely wounded soldiers to the front lines quickly [11]. After Larrey's system was used during the Battle of Metz (1793), he was ordered to organize medical care for the entire French Army [131]. Rapid access to care and immediate amputation reduced morbidity and mortality.

The Crimean War (1854–1855) underscored the importance of methods used by Larrey decades earlier, particularly the importance of organized evacuation and surgical care close to the front line. The war revealed a stark contrast between the battlefield care provided by the French, with their expert organization and system of light ambulances, and the poorly organized British Medical Services. Outrage over the poor treatment offered to the British wounded led the War Office to send a young nurse, Florence Nightingale (1820–1910), and a staff of 38 volunteers to the British barracks in Istanbul, Turkey, where Nightingale's first act was to thoroughly scrub the hospital, provide clean bedding, improve ventilation and sewage disposal, and reorganize everyday sanitary procedures. She was an early theorist of sanitation and the design of hospital buildings. Although her efforts created intense resentment in the army bureaucracy, she was one of the founders of the modern nursing profession [48]. She broke the monopoly of health care as the sole providence of the physician, which led to the development of the healthcare team in modern medical practice.

Nikolai Pirogoff (1810–1881), who served in the Imperial Russian Army, brought skilled nurses into military hospitals and worked to modernize Russian medical equipment [133]. He is the namesake for a conservative technique of foot amputation [98].

At the onset of the American Civil War (1861–1865), the US Army and Navy combined had about 100 physicians, many with no experience with battlefield trauma [87], almost 30 of whom resigned to join the Confederacy [45]. The structure of the Medical Department was decentralized with no clear chain of command and control of supplies. The US Army Quartermaster's Corps, whose primary duties were supplying and provisioning troops, were responsible for direct battlefield evacuation. The Regimental Band served as litter bearers. The first Battle of Manassas (July 21, 1861) was a rout for the federal forces and the soldiers fled back to Washington. Ultimately, 2708 men were killed or wounded and the Medical Department could not handle the load. Regimental surgeons, because they worked for their unit only, were either swamped with casualties or idle. Regimental band members and civilian ambulance drivers hired by the quartermaster's corps fled from the battle. Most of the wounded had to walk the 27-mile distance from the battlefield to Washington to reach the hospitals in the rear. Those who could not walk remained on the battlefield for several days until they were picked up by ambulances, captured by Confederate forces, or died [62].

The Union Army quickly reorganized its Medical Department in 1862 after prodding by a Sanitary Commission created by President Lincoln [124]. Jonathan Letterman (1824–1872) (Fig. 1) reorganized the medical care in the Army of the Potomac. Wounded soldiers were removed from the battlefield by litter bearer, the

Clinical Orthopaedics and Related Research

**Fig. 1** Jonathan Letterman, seated at left with members of the medical staff of the Army of the Potomac, organized an efficient medical corps after the disasters of the initial battles of the American Civil War. (Courtesy of the National Library of Medicine, Washington, DC.)



predecessor to the medic or corpsman. Regimental Surgeons were responsible for dressing wounds and patients were evacuated in ambulances driven by Medical Corps noncommissioned officers to a division level field hospital for surgical treatment. By the end of the war, the Medical Department expanded this system by creating a national network of hospital trains, hospital ships, and general hospitals that could treat the patient near his hometown if he so desired [62]. The main advance in American medicine during the Civil War was the creation of an effective military medical corps with medical evacuation, hospitals, and surgical specialists. Health care was beginning to become a system. Still missing was a formalized approach to care that recognized the severity of injuries. The poet Walt Whitman, who worked at several Union hospitals in Washington, DC, noted, "The men, whatever their condition, lie there, and patiently wait until their turn comes to be taken up" [144]. Whitman's poem "The Wound Dresser" (1865) poignantly illustrates the state of care at the time (Appendix 1).

Johann Friedrich August von Esmarch (1823–1908) served as a young surgeon in German campaigns against Denmark in 1848 and 1864 and was appointed surgeon general during the war against France in 1870. His contributions to military medicine were comprehensive, from initial management of wounds, to surgical techniques, to the organizational structure of patient management. In the late 19th century, von Esmarch continued the development of organized trauma care pioneered by Larrey, who as early as 1812 had introduced clear rules for sorting patients: the dangerously wounded would receive first attention, regardless of rank; those with less acute injuries would be treated second. Historically, priority of care for the

wounded may have depended on the rank of the injured soldier, an individual surgeon's best guess, the order of arrival, or happenstance. von Esmarch emphasized prioritizing patients by severity of injury but did so to make the most effective use of medical resources, not necessarily to treat the most badly injured first [42]. The familiar concept of triage (from the French "trier", to sort) would be given its name by French physicians in World War I [77], but institution of a rationalized approach to prioritizing care was a decades-long development, from Larrey to von Esmarch to the massive armies of World War I.

The then-unprecedented mass casualties in World War I (1914–1919), with horrific wounds from machine guns and shell fragments, and the effects of poison gas, created terrific strains on British and French medical units. The advent of motorized transport helped make possible the establishment of British Casualty Clearing Stations (CCS) approximately 6 to 9 miles behind the front lines. These were advanced surgical units, staffed by surgeons, anesthetists, and nurses—the closest women had gotten to the front lines in a modern conflict [41]. The stations were designed to admit between 150 and 400 wounded at a time, but they often were overwhelmed with 1000 or more patients. Increasingly, instead of the most badly injured patients being given priority in triage, the time required to provide such treatment compelled British surgeons to prioritize in favor of patients with critical but less complicated wounds [77]. A British manual listed the goals of triage as first conservation of manpower and secondly the interests of the wounded [146].

As US Surgeon General during most of World War II (1939–1945), Norman Kirk (1888–1960) (Fig. 2) oversaw a medical organization more vast than any of his



**Fig. 2** Norman T. Kirk, the first orthopaedic surgeon to be named US Surgeon General, was responsible for numerous improvements in military trauma care, including guidelines for amputation and an enhanced system of stateside rehabilitation. (Courtesy of the National Library of Medicine, Washington, DC.)

predecessors: 535,000 medics, 57,000 nurses, 47,000 physicians, and 2000 veterinarians. Nearly 700 overseas hospitals were responsible for initial care of the wounded. Stateside, 78 military hospitals cared for nearly 600,000 patients during the war [101]. The chain of care began with combat medics, two of which generally were assigned to each company. They provided initial care and determined whether a wound required evacuation of the patient to a battalion aid station. If additional treatment were required, the patient was evacuated to a divisional clearing station, where the first formal triage of patients occurred and which also served as small surgical hospitals for urgent cases [28]. Definitive care took place at one of the overseas hospitals or a military hospital stateside, in the "Zone of the Interior."

The US Army Medical Department was in the process of reorganizing based on experiences of World War II when the Korean War (1950–1953) began. New Mobile Army Surgical Hospital (MASH) units were developed rapidly under the leadership of the pioneering surgeon Michael DeBakey (1908–1999) to provide resuscitative surgical care within 10 miles of the front lines (Fig. 3). Helicopter

ambulance companies supported the MASH, allowing treatment of patients within 3 to 12 hours of wounding [73]. Mortality from all wounds decreased to a low of 2.4% [39], with mortality from abdominal wounds decreasing to 8.8% [116].

Improvements in medical evacuation technology and organization, particularly the use of helicopters, again played a major role for US forces in Vietnam (1962–1974). Medics splinted and bandaged the wounded patient, frequently radioing the hospital and warning of his arrival and diagnosis. Helicopter evacuation minimized the use of morphine, eliminating an additional complication. The hospital mortality rate was slightly higher than in Korea, 2.6%, but that increase is probably misleading, as more rapid transport delivered wounded soldiers who would have been listed as killed in action in Korea [99]. Mortality from abdominal wounds declined to 4.5% [58]. Most soldiers wounded in Vietnam were delivered from the battlefield to fixed hospitals with the capacity to provide definitive treatment, eliminating the need for multiple transfers and levels of care (Fig. 4). Patients not expected to return to full duty within 30 days or less were evacuated to hospitals in Japan and the United States [60].

The nature of combat and improvements in evacuation during the Korean and Vietnam conflicts thus allowed for development of fixed hospitals. Although MASH units continued to provide care, the hospitals grew from 60 beds at the beginning of the Korean War to 200-bed fixed hospitals with metal buildings and concrete floors as the fighting settled into trench warfare by 1952. By 1990, the weight of all of the equipment for a MASH unit was more than 200,000 pounds, meaning the hospital was mobile in name only. Unlike previous wars, armies of the Persian Gulf War (1990–1991) moved rapidly, and even though several MASH units were staged in trucks, hospitals were unable to keep up with the rapidly advancing front. Although there were few casualties, it was painfully obvious MASH units were too cumbersome to effectively support armored units as they raced into Kuwait and southern Iraq. A new organizational structure was needed [100]. A 20-person Forward Surgical Team (FST) was created to provide resuscitative surgery close to the front lines. The role of the fixed-base hospital was taken by a Combat Support Hospital (CSH), a modular unit capable of supporting between 44 and 248 beds. The reorganization was completed in 2003 when the 212th MASH becoming the 212th CSH while in Iraq [100].

Trauma care for US soldiers in Iraq and Afghanistan currently is provided through five levels of care: Level I, front line first aid; Level II, FST; Level III, CSH, which is similar to civilian trauma centers; Level IV, surgical hospitals outside the combat zone, such as Landstuhl Regional Medical Center, Germany; and Level V, major US military

Compendium_Supplemental Brief
Page 225

Clinical Orthopaedics and Related Research

**Fig. 3A–B** (**A**) The 8208th Mobile Army Surgical Hospital was one of the MASH units created to provide care within a few miles of the front line during the Korean War. (Courtesy of Otis Historical Archives, National Museum of Health and Medicine, Armed Forces Institute of Pathology, Washington, DC.) (**B**) Mortality from all wounds decreased in Korea owing to more rapid transport via helicopter to operating rooms such as the one staffed by physicians at the 8055th MASH. (Courtesy of Otis Historical Archives, National Museum of Health and Medicine, Armed Forces Institute of Pathology, Washington, DC.)





hospitals, such as Walter Reed Army Medical Center in Washington, DC; The National Naval Medical Center in Bethesda, MD; San Diego Naval Medical Center in San Diego, CA; and Brooke Army Medical Center in San Antonio, TX (Table 1) [6]. At the front line, each squad has a combat lifesaver trained in resuscitation, and each soldier is equipped with a tourniquet. If surgical resuscitation is required, the patient is immediately moved to a higher level of care (Fig. 5A). Level III army hospitals are large (248 beds), with surgical specialists, laboratories, radiology, and





**Fig. 4** Casualties arrive at the Naval Support Activity Station Hospital in Da Nang, Vietnam, in 1968. The wounded were transferred from the helicopters to the triage area on canvas-covered stretchers. These were set on sawhorses, where they became examination tables and sometimes operating tables. (From Kelly PJ. Vietnam, 1968–69: a place and year like no other. *Neurosurgery.* 2003;52:927–943. Reproduced with permission of Wolters Kluwer Health.)

**Table 1.** Levels of care for US wounded in Iraq/Afghanistan

| Level of care | Description |
|---|---|
| I | Battalion Aid Station (unit level, combat medic, immediate first aid and transport) |
| II | Forward Surgical Team, limited emergency surgery capabilities |
| III | Army Combat Support Hospital (theater hospital with intensive care) |
| IV | Landstuhl Regional Medical Center, Germany (multidisciplinary surgical trauma management for catastrophic injury) |
| V | Major stateside trauma centers with teaching and research: Brooke Army Medical Center, Walter Reed Army Medical Center, National Naval Medical Center, San Diego Naval Medical Center |

(Modified and reprinted with permission from Nesson SC, Lounsbury, DE, Hetz SP. *War Surgery in Afghanistan and Iraq: A Series of Cases, 2003–2007.* Washington, DC: Office of the Surgeon General; 2008.)

blood banks. Definitive surgical treatment can be provided first at a Level IV hospital but may be provided at Level V, where limb salvage and reconstructive surgery are performed. All amputees begin rehabilitation at a Level V hospital; burn patients are sent exclusively to Brooke Army Medical Center. The military C-17 transports that have become known as the flying ICUs are capable of bringing the wounded to the United States in as little as 3 days of their wounding, although the actual number of days varies according to the individual patient's requirements (Fig. 5B) [63].

## Wounds and Wound Management

Perhaps the earliest literary account of wound management comes from Homer's epic poem *The Iliad* (circa 700 BCE), based on events of the Trojan War half a millennium earlier [70]. Combat during this period was chaotic, as opposing formations merged into hand-to-hand combat with edged weapons resulting in heavy casualties. The accounts depict surgeons as skilled and professional physicians who expertly treated wartime trauma. In the fourth book of *The Iliad*, surgeon Makaon treated King Menelaus of Sparta, who had sustained an arrow wound to the abdomen, by extracting the arrow, sucking blood out of the wound to remove poison [76], and applying a salve [70]. In the eleventh book, Achilles' friend Patroclus extracted an arrow from King Eurypylus of Thessaly, when he "cut out with a knife the bitter, sharp arrow from his thigh, and washed the black blood from it with warm water" [70], which may have been the first record of débridement and soft tissue management (Appendix 2).

One of the longest-enduring rules of wound care, one that would have implications for centuries, came from the works of Hippocrates (460–477 BCE), whose extensive writings included such innovations as chest tubes for drainage, external fixation, and traction to restore proper alignment of fractured bones and important observations about head trauma. Hippocrates believed wounds should be kept dry, only irrigating with clean water or wine, and suppuration in the wound was a part of the healing process as it expelled spoiled blood [116]. This belief in "laudable pus" persisted from at least ancient Greece for more than a millennium. Galen (130–200 CE), author of hundreds of works describing surgical techniques such as trepanning of the skull and treatment of penetrating abdominal wounds, was probably the first to use the Latin term "pus bonum et laudabile" after observing that suppurating wounds were often the first to heal [41]. Although succeeding generations of surgeons who studied wound care had no reason to question the concept of laudable pus, there were a few dissidents, such as the Dominican friar Theodoric (1205–1296), who asserted, "It is not necessary that pus be formed in wounds" [113]. By the mid-19th century, the formation of pus was considered an inevitable consequence of surgery, but not part of the healing process. Surgery that healed without pus was described as "healing by first intention," and surgeons distinguished between creamy white or yellow laudable pus with the bloody, watery, foul-smelling malignant pus that indicated pyemia often followed by death [15].

Because the physician held higher status than the surgeon during the Middle Ages, few treatises on surgery or wound care were published. One notable exception was Guy De Chauliac (1298–1368), who proposed five

🕭 Springer




**Fig. 5A–B** (**A**) US Army soldiers transport a trauma victim to a US Army medical helicopter in Tarmiyah, Iraq, September 30, 2007. (US Navy photograph by Mass Communication Specialist 2nd Class Summer M. Anderson. Courtesy of the US Department of Defense, Washington, DC.) (**B**) More seriously wounded patients are loaded onto a C-17 "flying ICU" in March 2007 for transport out of Iraq to Level IV facilities. (Photograph by Tech Sgt Mike R. Smith. Courtesy of the National Guard Bureau, Arlington, VA.)

principles for treating wounds: removal of foreign bodies, rejoining of severed tissues, maintenance of tissue continuity, preservation of organ substance, and prevention of complications. De Chauliac described a weighted system for continuous traction to reduce femoral fractures. He also was an early advocate of topical anesthesia [79] and described techniques for hernia, cataract, and amputation [41].

The development of firearms made cautery a universally accepted treatment for gunshot wounds throughout the 16th century. Gunshot wounds resulted in gross tissue destruction that was an excellent medium for infection. However, because surgeons of the era had no knowledge of bacteria, they concluded infection was the result of poisonous gunpowder, and sought to destroy the poison by pouring boiling oil into the wound [116]. The precise origin of this practice is uncertain, but it was widely popularized through medical texts written by an Italian surgeon, Giovanni da Vigo (1460–1525) [41]. During the siege of Turin in 1536, Ambroise Paré (1510–1590), a surgeon with the French Army, ran out of boiling oil and substituted a salve of egg yolk, oil of rose, and turpentine, which, to his astonishment, reduced inflammation and enhanced patient comfort, at least compared with "seething oil" [7]. He concluded conventional wisdom was incorrect and published his observations in his *Treatise on Gunshot Wounds* in 1545.

During the American Revolutionary War, surgeons from the British and American sides emphasized conservative care. John Hunter (1728–1793), surgeon general of the British army, directed physicians to resist aggressive

débridement in smaller wounds. Wine was applied topically to minor burns, and hog lard to full-thickness burns [96]. John Jones (1729–1791), a veteran of the French and Indian Wars (1754–1763) and Professor of Surgery in King's College, New York, advised surgeons to delay primary wound closure and apply:

> … nothing but dry, soft lint to recent wounds; which is generally the best application through the whole course of the cure. At first it restrain the hemorrhage with less injury than any styptic medicines; and afterwards, by absorbing the matter, which is at first thin and acrimonious, it becomes, in effect, the best digestive. During incarnation (granulation) it is the softest medicine than can be applied between the roller and tender granulations; and at the same time an easy compress on the sprouting fungus. For these reasons I shall not recommend to you any ointments for recent wounds, unless some mild, soft one, to arm a pledget of tow, to cover the lint. … Incised wounds are to be brought together with sticking plaster and bandages. The use of a suture is unnecessary in longitudinal wounds. Transverse wounds require the suture. The interrupted suture is used and the needle dipped in oil. A plaster is applied over the sutures, which may usually be removed in two or three days [40].

Bullets were removed only if within easy reach of the surgeon. If a wound had to be closed, a piece of onion was placed in the cavity before closure, and the wound



reopened in 1 to 2 days. As in the past, Colonial physicians saw the development of pus a few days after injury as a sign of proper wound digestion [96].

By the time of the Crimean War, wound management had changed little in a conflict that saw the first use of the Minié ball in combat. These bullets traveled at a higher velocity and struck the body with greater force, shattering bone into small fragments and causing extensive soft tissue damage. The resulting compound fractures, as noted by Dr. George Macleod (1828–1892), a staff surgeon at a general hospital in Sebastopol, the Ukraine, forced British surgeons to learn hard lessons:

> Of all the severe injuries recorded in battle, none are of more frequent occurrence or of more serious consequence than compound fractures. … In the Crimea, these injuries were peculiarly embarrassing and extraordinarily fatal. … It can hardly be doubted that the great striving after conservatism, which influenced all the surgeons of our army, was one main cause of that mortality which attended these injuries [90].

Hemorrhage was classified as primary, occurring within 24 hours of wounding; intermediate, occurring between the first and tenth days; and secondary, occurring after the tenth day. Macleod [90] believed a patient was vulnerable to hemorrhage until the wound had fully closed but was unlikely to have problems 24 days after wounding.

The devastating trauma caused by the Minié ball was seen on a much larger scale during the US Civil War. Fatality rates were high for penetrating gunshot wounds to the abdomen (87%) and chest (62%) [12]. Early in the war, cautery and tourniquets were the primary approach to controlling hemorrhage, but as physicians grew more experienced, ligature became the primary means for hemostasis. Primary hemorrhage became rarer, but intermediate hemorrhage, after 3 or 4 days, was more frequent and carried a mortality rate of 62% [13].

Although von Esmarch is rightly remembered for his improvements in organization and evacuation, his most famous innovation was the triangular Esmarch bandage ("Dreieckstück" or "triangular piece"), a piece of cotton twice as long at the base as along the sides, which can be folded in numerous ways to act as a dressing or sling [42]. von Esmarch also urged the use of ice packs to reduce inflammation in wounds, leading colleagues to give him the nickname "Fritz the Ice Pack" [42].

The Spanish-American War (1898) was notable for the introduction of smaller-caliber, high-velocity, metal-jacketed bullets, which were first used in the Battle of Santiago, Cuba, on July 1, 1898. The metal-jacket bullet was conceived as a more humane form of ammunition that would produce cleaner wounds and less deformation [51]. This was not the case, as a higher-velocity missile turned out to produce greater cavitation and extensive soft tissue damage beyond the path of the bullet [147].

The British orthopaedic surgeon, Robert Jones (1857–1933), applied lessons from his medical family and his civilian work to great effect during World War I. Jones' uncle, Hugh Owen Thomas (1834–1891), first described the use of braces and splints in fracture management in his 1875 book *Diseases of the Hip, Knee and Ankle Joints* [55]. Robert Jones began practicing medicine in 1878 and a decade later became surgeon for the massive, 7-year Manchester Ship Canal Project, which involved 20,000 workers and provided numerous opportunities to practice new techniques in fracture care. By the time World War I began, Jones had narrowed his practice from general surgery to orthopaedics and became director general for orthopaedics for the British military. At this point, the death rate from battlefield fractures of the femur was approximately 80%. In response, Jones reintroduced his uncle's splint to immobilize the leg immediately on the battlefield. Medics and stretcher bearers were blindfolded during training sessions so that they would be ready to apply the splint in total darkness. By 1915, better immediate management of femur fractures had reduced the mortality rate to approximately 20% [55].

In 1945, the Office of the Surgeon General summarized the general approach to wound care during the Second World War:

> As the initial wound operation is by definition a limited procedure, nearly every case requires further treatment. Soft part wounds, purposely left unsutured at the initial operation, are closed by suture, usually at the time of the first dressing on or after the fourth day. Fractures are accurately reduced and immobilized until bony union takes place. Designed to prevent or cut short wound infection either before it is established or at the time of its inception, this phase in the surgical care of the wounded is concerned with shortening the period of wound-healing and seeks as its objectives the early restoration of function and the return of a soldier to duty with a minimum number of days lost [102].

The major change in the evaluation of wounds during World War II involved the timing of closure. In World War I, surgeons learned the value of delayed primary closure in aiding recovery and fighting infection. Cultures would be the main determinant of whether a wound was ready for closure. However, physicians found judging the clinical appearance of the wound—whether tissues looked healthy, with absence of drainage, foreign material, and edema—led to better results. Edward D. Churchill (1895–1972), a US surgeon in the Mediterranean and North African