1    ROB BONTA
     Attorney General of California
2    P. PATTY LI
     Supervising Deputy Attorney General
3    ANNA FERRARI
     Deputy Attorney General
4    JOHN D. ECHEVERRIA
     Deputy Attorney General
5    State Bar No. 268843
       455 Golden Gate Avenue, Suite 11000
6      San Francisco, CA  94102-7004
       Telephone:  (415) 510-3479
7      Fax:  (415) 703-1234
       E-mail:  John.Echeverria@doj.ca.gov
8    *Attorneys for Defendants Rob Bonta and*
     *Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                       CIVIL DIVISION

13

14   **JAMES MILLER et al.,**                Case No. 3:19-cv-01537-BEN-JLB

15                          Plaintiffs,
                                            **COMPENDIUM OF WORKS**
16        **v.**                            **CITED IN DEFENDANTS'**
                                            **SUPPLEMENTAL BRIEF IN**
17                                          **RESPONSE TO THE COURT'S**
                                            **ORDER OF AUGUST 29, 2022**
18   **CALIFORNIA ATTORNEY**
     **GENERAL ROB BONTA et al.,**          **VOLUME 11 OF 13**
19
                           Defendants.      Courtroom:    5A
20                                          Judge:        Hon. Roger T. Benitez

21                                          Action Filed:  August 15, 2019

22

23

24

25

26

27

28                                    1

---

# INDEX

| Works | Brief Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 7 Rich. 2, ch. 13 (1383) | 52 n.65 | 002 |
| 20 Rich. 2, ch. 1 (1396) | 52 n.65 | 003 |
| 33 Hen. 8, ch. 6 § 1 at 832 (1541) | 51 | 004-006 |
| 33 Hen. 8, ch. 6 § 18 at 835 (1541) | 51 | 007 |
| 4 Jac. I, ch. 1 (1606) | 52 | 008 |
| 1 Wm. & Mary ch. 2, § 7 (1689), https://press-pubs.uchicago.edu/founders/documents/bill_of_rightss1.html | 50 | 009-012 |
| The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894) | 55 n.67 | 013-014 |
| 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 | 55 n.67 | 015-017 |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 54 | 018-019 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 020-022 |
| An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1 | 55 n.67 | 023 |

2

| | | |
|---|---|---|
| 1786 Va. Acts, ch. XXII | 55 | 024-025 |
| 1798 Ky. Acts 106 | 56 n.69 | 026-027 |
| 1799 Miss. Laws 113, A Law for the Regulation of Slaves | 55 n.67 | 028 |
| Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) | 56 n.69 | 029-030 |
| 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; | 56 n.69 | 031-032 |
| 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | 56 n.69 | 033-034 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 53 n.66 | 035-036 |
| Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | 56 n.69 | 037-038 |
| 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1 | 56 n.69 | 039-040 |
| Tex. Const. of 1868, art. I, § 13 | 60 | 041-042 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 59 | 043-045 |
| The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881) | 56 n.69 | 046-047 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881) | 55 | 048 |
| Idaho Const. of 1896 | 60 | 049 |

3

| | | |
|---|---|---|
| Utah Constitution of 1896 | 60 | 050-052 |
| 1905 Ind. Acts 677 | 56 n.69 | 053-054 |
| 1927 Cal. Stat. 938. | 65 | 055-056 |
| **BOOKS** | | |
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141, 155, 312 (2018) | 4, 43, 51, 69 | 058-062 |
| Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms Ballistics, and Forensic Techniques* 69 (3d ed. 2015), https://bit.ly/3SaIKWV | 33 | 063-066 |
| Somerset Record Society, Vol. XX, at 332 (1904) | 51 n.64 | 067-070 |
| R. Blake Stevens & Edward C. Ezell, *The Black Rifle: M16 Retrospective* 24 (1994) | 45 | 071-074 |
| The Conductor generalis: or, The office, duty and authority of justices of the peace, high-sheriffs, under-sheriffs, coroners, constables, gaolers, jury-men, and overseers of the poor. As also, the office of clerks of assize, and of the peace, &c. Compiled chiefly from Burn's Justice, and the several other books, on those subjects, by James Parker, late one of the justices of the peace for Middlesex County, in New-Jersey; and now revised and adapted to the United States of America, by a gentleman (Albany: 1794) | 56 n.68 | 075-076 |
| Adam Winkler, *Gunfight* 113, 115, 117, 221 (2011) | 42, 52-54, 72 | 077-085 |

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of
August 29, 2022  (3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 181 (2021) | 72 | 087-150 |
| Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE | 71 n.74 | 151-152 |
| John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285, 287 (1874), https://guncite.com/journals/centlj.html | 49 | 153-159 |
| Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev., 741, 773 (1993) | 18 | 160-197 |
| Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) | 44 | 198-212 |
| M. Manring et al., *Treatment of War Wounds: A Historical Review*, 486 Clinical Orthopaedics & Related Research 2168, 2175 (2009) | 45 n.60 | 222-245 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) at 69 | 65 | 246-274 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2021*, at 16 (2021), https://bit.ly/3y3krmI | 27 n.33 | 276-303 |
| Bureau of Alcohol, Firearms, Tobacco and Explosives, National Firearms Act Handbook (2009) (chapter 4), https://bit.ly/3CdReXd | 27 n.33 | 304-305 |

5

| | | |
|---|---|---|
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928) | 65 n.72 | 306-316 |
| U.S. Census, U.S. Adult Population Grew Faster than Nation's Total Population from 2010 to 2020 (estimating the 2020 U.S. adult population to be approximately 258 million), https://bit.ly/3T7csNZ | 30 n.38 | 317 |
| **NEWS ARTICLES** | | |
| Julia Rothman & Shaina Feinberg, *This $20 Device Turns a Handgun into an Automatic Weapon*, N.Y. Times, July 1, 2022, https://nyti.ms/3y6LFZG | 36 n.54 | 319-332 |
| **OTHER SOURCES** | | |
| 1 Blackstone ch. 1 (1769) | 50 | 334-343 |
| Heritage Foundation, Defensive Gun Uses in the U.S. (updated Sept. 16, 2022), https://herit.ag/3SLwe1g | 40 n.58 | 344-345 |
| Eric Hung, *Featureless AR-15 Rifles [California Build Guide]*, PewPewTactical.com, Apr. 13, 2022, https://bit.ly/3STlCgl | 28 n.35 | 346-375 |
| Kyle Mizokami, *The Marines Are Issuing Silencers to Troops Around the World*, Popular Mechanics, Jan. 1, 2021, https://bit.ly/3M36bQx | 33 n.46 | 376-386 |
| Elwood Shelton, *Best AR-15 Options for Any Budge and Buyer's Guide* (2022), Gun Digest, June 10, 2022, https://bit.ly/3SFQAJm | 28 n.35 | 387-405- |
| Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace, Mar. 24, 2022, https://bit.ly/3E6FzMB | 36 n.54 | 406-413 |

Compendium of Works Cited in Defendants' Supplemental Brief in Response to Court Order of August 29, 2022  (3:19-cv-01537-BEN-JLB)

Subsequent categories of gun laws also include specific bans on particular types of weapons, like automatic weapons, and on weapons accessories, like silencers. These laws, and a few to come, make clear that gun banning—while not common—was not the sole province of 1960s anti-gun liberals.

## B. Brandishing Laws

States also enacted brandishing laws, designed to criminalize the threatening use of the weapons named in these laws.[40] The prohibited behaviors were typically described as "exhibit[ing] any of said deadly weapons in a rude, angry or threatening manner,"[41] or with similar language. Some laws in the later 1800s also identified the prohibited behavior as "draw[ing] or threaten[ing] to use" such weapons.[42] These laws also generally included exemptions for the use of such weapons in personal self-defense or for military purposes.

## C. Gun Carry Restrictions

Carry restriction laws were widely enacted, spanning the entire historical period under examination. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."[43] Massachusetts followed in 1750.[44] In the late 1700s, North Carolina[45] and Virginia[46] passed similar laws.[47] In the 1800s, as interpersonal violence and gun carrying spread, thirty-eight states joined the list;[48] five more did so in the early

---

(1894)).

40.   Generally, these laws covered pistols along with specific, named knives used for interpersonal violence, such as dirks, sword canes, stilettos, and Bowie knives, and weapons like a "slung shot," which was a hand weapon made up of a piece of metal or other weight attached to a strap or flexible handle.

41.   Act of Sept. 30, 1867, § 1, 1867 Ariz. Sess. Laws 21, 21.

42.   Act of Mar. 13, 1875, ch. XVII, § 1, 1875 Ind. Acts 62, 62 (Spec. Sess.).

43.   Robert J. Spitzer, *Stand Your Ground Makes No Sense*, N.Y. TIMES (May 4, 2015), http://www.nytimes.com/2015/05/04/opinion/stand-your-ground-makes-no-sense.html [https://perma.cc/Z7NY-84UL] (quoting *An Act Against Wearing Swords, (1686)*, *in* THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY, 289 (1758)).

44.   Act of Feb. 14, 1750, ch. 17, § 1, 1750 Mass. Acts 544, 545.

45.   FRANCOIS XAVIER MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (1792).

46.   A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Richmond, Augustine Davis 1794).

47.   *See* Spitzer, *supra* note 43 (discussing these early laws).

48.   Laws from 1800–1867: Alabama: An Act of Feb. 1, 1839, no. 77, § 1, 1838 Ala. Laws 67; Arkansas: ARK. REV. STAT. div. VIII, ch. XLIV, art. I, § 13 (1837); California: Act of Apr. 16, 1850, ch. 99, div. Eleventh, § 127, 1850 Cal. Stat. 229, 245; Colorado: Act of Aug. 14, 1862, 1862 Colo. Sess. Laws 56; Delaware: DEL. REV. CODE tit. fifteenth, § 13 (1852); District of Columbia: D.C. CODE REV. § 141–16 (1857); Georgia: Act of Dec. 25, 1837, 1837 Ga. Laws 90; Indiana: Act of Jan. 14, 1820, ch. XXIII, 1820 Ind. Acts 39; Kentucky: Act of Feb. 3, 1813, ch. 89, §1, 1812 Ky. Acts 100, 100–01; Louisiana: Act of Mar. 25, 1813, 1813 La. Acts 172, 172–73; Maine: ME. STAT. REV. tit. twelfth, ch. 169, § 16 (1840); Montana: Act of Jan. 11, 1865, 1864 Mont. Laws 355; New Mexico: Act of Jan. 14, 1853, 1852 N.M. Laws 67; Ohio: Act of Mar. 18, 1859, 1859 Ohio Laws 56; Oregon: OR. REV. STAT. ch. XVI, § 17 (1853); Pennsylvania: Act of Apr. 8, 1851, no. 239, § 4, 1851 Pa. Laws 381, 382; Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15, 15–16; Wisconsin: WIS. STAT. REV. tit. XXVII, ch. 176, §18 (1858). Laws from 1868–1899: Alaska: FRED F. BARKER, COMPILATION OF THE ACTS OF CONGRESS AND TREATIES RELATING

1900s.[49] Laws in the eighteenth century did not typically identify weapons concealment as criminal per se, but did restrict more general carrying of firearms, usually if done in crowded places, or groups of armed people. Among the earliest laws criminalizing the carrying of concealed weapons was that of Kentucky in 1813.[50] As with the brandishing laws, concealed carry laws normally targeted pistols as well as various knives, the chief feature of which was that they had long, thin blades that were favorites in interpersonal fights. Louisiana enacted a similar law that same year.[51] A particularly sharp comment on the intent behind such laws was expressed in Tennessee's 1837 law, which referred to "[e]ach and every person so degrading himself" by carrying pistols or other named weapons.[52] The preamble of Georgia's 1837 law began: "AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons."[53] Alabama's 1839 concealed carry law reflected similar antipathy to the practice it was prohibiting: "AN ACT To suppress the evil practice of carrying weapons secretly."[54] Concealed carry laws generally made exceptions for travelers passing through an area while armed.

These laws were enacted in most states of the union and all across the country, including territories. In nineteenth-century laws, the main emphasis was on prohibiting concealed carry, whereas early twentieth century laws generally

TO ALASKA FROM MARCH 30, 1867 TO MARCH 3, 1905, S. DOC. NO. 59-142 (1906); Arizona: Act of Mar. 18, 1889, no. 13, 1889 Ariz. Sess. Laws 16; Florida: Act of May 31, 1887, ch. 3777, no. 97, § 16 1887 Fla. Laws 181, 186; Illinois: Act of Apr. 16, 1881, 1881 Ill. Laws 73 (codified in 38 ILL. COMP. STAT. §54(d) (1882)); Kansas: KAN. STAT. ANN. ch. 19, art. 3, § 68 (1901); Maryland: Act of Feb. 26, 1872, ch. 42, 1872 Md. Laws 56; Michigan: Act of May 31, 1887, no. 129, 1887 Mich. Pub. Acts 144; Minnesota: MINN. STAT. ch. CIV, § 17 (1881) (as amended through 1878); Mississippi: Act of Feb. 28, 1878, ch. XLVI, § 1, 1878 Miss. Laws 175, 175; Missouri: Act of Mar. 3, 1873, art. III, § 15, 1873 Mo. Laws 322, 328; NEB. STAT. REV. pt. III, ch. V, § 25 (1881); New York: Act of Mar. 27, 1891, chap. 105, § 209, 1891 N.Y. Laws 127, 177; North Dakota: N.D. REV. CODE § 7313, N.D. PENAL CODE § 457 (1895); Oklahoma: Penal Code of the Territory of Oklahoma, ch. 25, art. 38, § 20, 1890 Okla. Sess. Laws 412, 476; Rhode Island: Act of May 3, 1893, ch. 1180, 1893 R.I. Pub. Laws 231; South Carolina: Act of Dec. 24, 1880, no. 362, § 1, 1880 S.C. Acts 448; South Dakota: S.D. REV. CODE, PENAL, ch. XXXVIII, § 457 (1883); Texas: Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Washington: WASH. REV. CODE ch. LXXIII, § 929 (1881); West Virginia: W. VA. CODE ch. CXLVIII, § 7 (1870); Wyoming: WYO. STAT. ch. LII, § 1 (1876).

49.   Connecticut: Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707 (codified in II CONN. GEN. STAT. tit. 59, § 6219 (1930)); Hawaii: Act of Mar. 19, 1913, no. 22, 1913 Haw. Sess. Laws 25; Idaho: Act of Feb. 17, 1909, H.R. 62, 1909 Idaho Sess. Laws 6; Iowa: Act of Apr. 16, 1929, ch. 57, § 30, 1929 Iowa Acts 81, 90; Nebraska: Act of Mar. 27, 1901, ch. 16, § 129-LV, 1901 Neb. Laws 71, 141 (codified at NEB. REV. STAT. part I, ch. 14, art. I, § XXV (1901)).

50.   This Kentucky law was struck down as a violation of the Kentucky state constitution in Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822). The court's decision did not involve or touch on the federal Constitution's Second Amendment, but instead was based on Kentucky's more expansive right-to-bear-arms-type provision. See id. at 90–92. In addition, this ruling was an anomaly in that concealed carry laws were widely held as constitutional when challenged in other states. See ROBERT J. SPITZER, GUN CONTROL, 96–99 (2009) (noting that the Bliss case was an exception to the prevailing trend of upholding state gun carry restrictions).

51.   Act of Mar. 25th, 1813, 1812 La. Acts 172.

52.   Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15.

53.   Act of Dec. 25, 1837, 1837 Ga. Laws 90. This was the law that was challenged in Nunn v. State, discussed supra in part III.

54.   An Act of Feb. 1, 1839, no. 77, 1838 Ala. Laws 67.

applied to all carrying, whether concealed or open. Aside from hunting and militia laws, they were among the most common and widely accepted gun regulations to be found in our post-1789 history. These laws therefore pose an especially stark contrast with the contemporary American political movement—dating to the early 1980s—spreading the legality of concealed carry.[55]

Many southern states were among those seeking to curtail gun carrying, as well as the enactment of other laws pertaining to criminal uses of guns, which is attributable to the fact that "the Antebellum South was the most violent region in the new nation."[56] After the Civil War, the ravaged South again witnessed violence at rates greater than the rest of the country.[57] Thus, states with greater violence, in the form of greater gun violence, turned in part to stronger gun laws as a remedy.

These historical concealed carry laws also recognized what modern gun control advocates stress: that, among all firearms, handguns pose a unique danger to public safety. Even though there are twice as many long guns as handguns in America, and long guns are generally easier to obtain, about eighty percent of all gun crimes are committed with handguns because of their ease of use, concealability, and lethality.[58] Little stretch of the imagination is required to infer that the same trend existed in the nineteenth century as well.

Before considering other types of gun laws, it should be noted that concealed and open carry restrictions were common in the American western frontier during the nineteenth century in the so-called "Wild West." The truth of life in the Old West, and the actual role of guns in it, is known, but not well known. Axiomatic expressions such as "the guns that won the West"[59] and "arm[s] that opened the West and tamed the wild land"[60] still too often typify what in actuality is a romanticized and wildly exaggerated assessment of the importance of guns in the settling of the West.[61] Indeed, some have gone so far as to claim that "the American experiment was made possible by the gun."[62] But these characterizations ignore the central role of homesteaders, ranchers, miners,

---

55. ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL, 68–70 (6th ed., Paradigm Publishers 2015) (1995).

56. Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1716 (2012) (citing RANDOLPH ROTH, AMERICAN HOMICIDE (2009); ERIC H. MONKKONEN, MURDER IN NEW YORK CITY (2001); Joshua Stein, *Privatizing Violence: A Transformation in the Jurisprudence of Assault*, 30 LAW & HIST. REV. 423, 445 (2012)); *see generally* DICKSON D. BRUCE, JR., VIOLENCE AND CULTURE IN THE ANTEBELLUM SOUTH (1979).

57. ROTH, *supra* note 56, at 180–249.

58. SPITZER, *supra* note 55, at 54–55.

59. JAMES WYCOFF, FAMOUS GUNS THAT WON THE WEST (1968).

60. MARTIN RYWELL, THE GUN THAT SHAPED AMERICAN DESTINY (1957).

61. RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988).

62. WYCOFF, *supra* note 59, at 5–6; *see also* RYWELL, *supra* note 60, at 4 (1957); JAMES B. TREFETHEN, AMERICANS AND THEIR GUNS: THE NATIONAL RIFLE ASSOCIATION STORY THROUGH NEARLY A CENTURY OF SERVICE TO THE NATION (James E. Serven ed., 1967); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 3 (1952).

tradesmen, businessmen, and other settlers across the western plains. The "taming" of the West was in fact an agricultural and commercial movement, attributable primarily to ranchers and farmers, not gun-slinging cowboys.[63] In fact, the six-shooter and rifle played relatively minor roles in the activities of all these groups—even the cowboys.[64] According to historian Richard Shenkman:

> The truth is many more people have died in Hollywood westerns than ever died on the real frontier . . . . In the real Dodge City, for instance, there were just five killings in 1878, the most homicidal year . . . . In the most violent year in Deadwood, South Dakota, only four people were killed. In the worst year in Tombstone, home of the shoot-out at the OK Corral, only five people were killed. The only reason the OK Corral shoot-out even became famous was that town boosters deliberately overplayed the drama to attract new settlers.[65]

Even in the most violence-prone western towns, vigilantism and lawlessness were only briefly tolerated. In his sweeping history of the West, historian Ray Allen Billington noted that local businesspeople and other leaders quickly pushed for town incorporation in order to establish local police forces, which were supported by taxes levied against local bars, gambling establishments, and houses of prostitution.[66] The prohibitions against carrying guns analyzed here were enforced, and there were few homicides.[67] The western-style shoot-outs glorified in countless books and movies were literally "unheard of."[68] In the most violent cow towns of the old West—Abilene, Caldwell, Dodge City, Ellsworth, and Wichita—a total of forty-five killings were recorded between 1870 and 1885, and only six of these killings were from six-shooters; sixteen killings were by police.[69] As cowboy experts Joe B. Frantz and Julian E. Choate observed, "the six-shooter has been credited with use entirely disproportionate with the facts."[70]

Even western outlaws illustrate the extent to which myth replaced fact with respect to guns and lawlessness. Many studies of the famed western outlaws demonstrate that "they were few, inconspicuous, and largely the invention of newspaper correspondents and fiction writers."[71] Moreover, "the western marshall [was] an unglamorous character who spent his time arresting drunks or rounding up stray dogs and almost never engaging in gun battles."[72] Most of the killing that took place on the frontier involved the wars between the U.S. Cavalry

---

63.   LEWIS ATHERTON, THE CATTLE KINGS, xi, 31–42, 241–62 (1961).

64.   PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 353–55 (2016).

65.   RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988); see also ROBERT R. DYKSTRA, THE CATTLE TOWNS 112–48 (1968) (detailing the exaggerated nature of frontier West violence).

66.   RAY ALLEN BILLINGTON, WESTWARD EXPANSION 587 (6th ed. abr. 1974).

67.   JOE B. FRANTZ & JULIAN ERNEST CHOATE JR., THE AMERICAN COWBOY: THE MYTH AND THE REALITY 78 and passim (1955).

68.   BILLINGTON, supra note 66, at 587.

69.   Id.

70.   FRANTZ & CHOATE JR., supra note 67, at 78.

71.   BILLINGTON, supra note 66, at 587.

72.   Id.; see also FRANK RICHARD PRASSAL, THE WESTERN PEACE OFFICER: A LEGACY OF LAW AND ORDER 22 (1972), and the numerous works cited by BILLINGTON, supra note 66.

and those Native Americans who rebelled against harsh and duplicitous treatment at the hands of whites.[73]

## D. Restrictions On Dangerous Or Unusual Weapons

States moved to enact laws restricting or barring certain dangerous or unusual weapons—also a subject that has contemporary reverberations. Such laws in the country's early decades were aimed in part at pistols and offensive knives, like most concealed carry laws, but also at the practice of rigging firearms to be fired with a string or similar method to discharge a weapon without an actual finger on the firearm trigger. Referred to as "gun traps," the earliest such law was enacted by New Jersey in 1771.[74] Some laws later referred to such weapons as "spring guns,"[75] "trap guns,"[76] and "infernal machines."[77]

The bulk of the laws that identified certain weapons as dangerous or unusual, however, appeared in the early 1900s, when most states moved aggressively to outlaw machine guns (usually meaning fully automatic weapons), sawed-off shotguns, pistols, weapons and mechanisms that allowed firearms to be fired a certain number of times rapidly without reloading, silencers, and air guns (which propels projectiles with compressed air rather than gun powder). The first state to enact an anti–machine gun law was West Virginia in 1925.[78] A number of states enacted anti–machine gun laws in 1927 alone—a year in which a concerted national push unfolded to regulate these and other gangster-type weapons. In all, at least twenty-eight states enacted anti–machine gun laws during this period.[79]

---

73.   RICHARD W. STEWART, AMERICAN MILITARY HISTORY VOL. 1: THE UNITED STATES ARMY AND THE FORGING OF A NATION 321–40 (2005); W. EUGENE HOLLON, FRONTIER VIOLENCE: ANOTHER LOOK 124–45 (1974). Hollon notes that "of all the myths that refuse to die, the hardiest concerns the extent of the unmitigated bloodletting that occurred in the Western frontier during the closing decades of the nineteenth century." *Id.* at x.

74.   Act of Dec. 21, 1771, ch. DXL, § 10, 1771 N.J. Laws 343, 346.

75.   Act of Apr. 21, 1915, ch. 133, part II, §§17(c), 18, 1915 N.H. Laws 173, 180–81.

76.   Act of Feb. 25, 1931, no. 58, 1931 S.C. Acts 78, 78.

77.   *E.g.*, Act of Mar. 14, 1901, ch. 96, 1901 Utah Laws 97, 97.

78.   Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24.

79.   Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Feb. 25, 1931, ch. 249, 37 Del. Laws 813; Act of Apr. 27, 1933, no. 120, 1933 Haw. Sess. Laws 117; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 27, 1927, ch. 156, 1927 Ind. Acts 469; Act of Apr. 19, ch. 234, 1927 Iowa Acts 201; Act of Nov. 28, 1933, ch. 62, 1933 Kan. Sess. Laws 76 (Spec. Sess.); Act of July 7, 1932, no. 80, 1932 La. Acts 336; Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231; Act of June 1, 1929, H.R. no. 498, 1929 Mo. Laws 170; Act of Apr. 29, 1929, ch. 190, 1929 Neb. Laws 673; Act of Mar. 19, 1927, ch. 95, 1927 N.J. Laws 180; Act of Apr. 15, 1931, ch. 435, 1931 N.Y. Laws 1033; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 488, 489; Act of Apr. 25, 1929, no. 329, 1929 Pa. Laws 777; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206 §§ 1–5, 1933 S.D. Sess. Laws 245; Act of Oct. 25, 1933, ch. 82, 1933 Tex. Gen. & Spec. Laws 219; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335; Act of June 5, 1925, 1925 W. Va. Acts 24 (Extraordinary Sess.); Act of May 28, 1929, ch. 132, 1929 Wis. Sess. Laws 157.

Texas, for example, defined machine guns in 1933 as those from which more than five bullets were automatically discharged "from a magazine by a single functioning of the firing device."[80]

The lesson here is significant both for its historical context and for the contemporary debate over the regulation of new or exotic gun technologies. In these instances, new laws were enacted not when these weapons were invented, but when they began to circulate widely in society. So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I.[81] But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

E. Semi-Automatic Gun Restrictions

Of particular relevance to the modern gun debate is the fact that at least seven, and as many as ten, state laws specifically restricted semi-automatic weapons—weapons that fire a round with each pull of the trigger without manual reloading[82]—anticipating by seven decades the semi-automatic assault weapons ban debates, and related efforts to restrict large capacity bullet magazines, from the 1990s to the present.

States with laws in this category typically combined fully automatic and semi-automatic weapons under a single definitional category.[83] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[84] To compare, a 1927 Massachusetts law said: "Any gun or small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired . . . shall be deemed a machine gun . . . ."[85] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading.[86] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[87] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[88] Fully automatic .22 caliber "light sporting rifles" were

---

80. 1933 Tex. Gen. & Spec. Laws 219, 219.
81. NRA-ILA, *Fully-Automatic Firearms*, NRAILA.ORG, (July 29, 1999), https://www.nraila.org/articles/19990729/fully-automatic-firearms [https://perma.cc/NT68-ZEF6].
82. *See* Table 2.
83. *See* Table 2, laws of Mass., Mich., S.D., and Va.
84. 1927 R.I. Pub. Laws 256, 256.
85. 1927 Mass. Acts 413, 413–14.
86. Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.
87. Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.
88. *Id.*

also considered machine guns under the law, but .22 caliber semi-automatic "light sporting rifles" were exempted.[89] Ohio also barred both fully automatic and semi-automatic weapons in a 1933 law, incorporating under the banned category any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[90] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[91] South Dakota barred machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine . . . ."[92] Like several other states, Virginia outlawed weapons

> of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading.[93]

Aside from these seven states, another three included language that was ambiguous as to whether they extended prohibitions to semi-automatic as well as fully automatic weapons. Illinois enacted a 1931 law that prohibited "machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices."[94] Louisiana's 1932 anti–machine gun law,[95] and South Carolina's 1934 law,[96] both defined machine guns in the same way using identical language, including the eight cartridge standard. In the case of these three laws, the word "automatically" would seem to refer to fully automatic firing, but when that wording is married with "discharging more than eight cartridges successively without reloading," it would seem to encompass semi-automatic firing as well.

Table 2 summarizes the key portions of the laws from these ten states. The lesson of the previous part also applies here: new technologies bred new restrictions. And who would have guessed that the fierce controversy over regulating semi-automatic assault weapons in the 1990s and 2000s was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s.

---

89.  *Id.*
90.  Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.
91.  *Id.*
92.  Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245.
93.  Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.
94.  Act of July 2, 1931, 1931 Ill. Laws 452, 452.
95.  Act of July 7, 1932, no. 80, 1932 La. Acts 336.
96.  Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288.

**Table 2**
### STATE LAWS BARRING
### SEMI-AUTOMATIC WEAPONS, 1927–1934[97]

| STATE AND YEAR | PROVISION OF LAW |
|---|---|
| Massachusetts 1927 | "rapid fire and operated by a mechanism" |
| Michigan 1927 | "any machine gun or firearm which can be fired more than sixteen times without reloading" |
| Minnesota 1933 | "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." |
| Ohio 1933 | "any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." |
| Rhode Island 1927 | "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." |
| South Dakota 1933 | "a weapon of any description . . . from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine." |
| Virginia 1933 | "a weapon of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading." |

---

97. Source: Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413, 413; Act of June 2, 1927, No. 372, 1927 Mich. Pub. Acts 887, 888; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137; Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336, 337; Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288, 1288.

| AMBIGUOUS STATE LAWS | |
|---|---|
| Illinois 1931 | "machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." |
| Louisiana 1932 | "machine rifles, machine guns and sub machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device." |
| South Carolina 1934 | "machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device." |

## F. Dueling Prohibitions

A well-known category of gun laws with ties to American history is the prohibition against dueling. Prominent public figures from early American history, including Alexander Hamilton and Andrew Jackson, found themselves in highly publicized duels.[98] Hamilton's longstanding political feud with fellow New York politician Aaron Burr ended when the two men dueled in New Jersey in 1804.[99] Hamilton died from his wounds, and Burr's political career never recovered.[100] Jackson engaged in several duels, and was even injured during one

---

98.   DON C. SEITZ, FAMOUS AMERICAN DUELS (1929).

99.   Burr was vice president at the time; New York barred dueling, so they traveled to the neighboring state. LIN-MANUEL MIRANDA, *"Blow Us All Away," "Your Obedient Servant," "The World Was Wide Enough,"* on HAMILTON: AN AMERICAN MUSICAL, ACT II, (Atlantic Records 2015).

100.   RON CHERNOW, ALEXANDER HAMILTON 704–05, 717–22 (2004).

in 1806.[101] Though not barred in every state, the practice declined in the North after the Hamilton–Burr duel, but persisted in the South until the mid-nineteenth century.[102]

## G. Felons, Foreigners, Others Considered Dangerous

Early gun laws aimed at preventing felons, foreigners, or others deemed dangerous from owning firearms focused on Native Americans, with at least five colonies enacting such laws[103]—including the 1619 Virginia law cited earlier.[104] The Massachusetts colony enacted a law in 1637 that required named individuals who expressed "opinions & revelations" that "seduced & led into dangerous errors many of the people" of New England to turn in all "guns, pistols, swords, powder, shot, & match," and it further barred them from "buy[ing] or borrow[ing]" any of the same until such time as the local court said otherwise.[105] If those disarmed admitted to their "seditious libel," they could have their weapons restored.[106] In the 1770s, Pennsylvania enacted a law to bar or strip guns from those who refused to swear loyalty to the new American government.[107] In fact, ten of the thirteen states had laws allowing the impressment—that is, taking—of privately held firearms during the Revolutionary War.[108] Massachusetts also enacted such a law in 1776, although it does not appear in Frassetto's list.[109] By the early 1900s, as anti-immigrant sentiment spread, many states enacted laws aimed at keeping guns from non-citizens, as well as the young, those who were inebriated, felons and other criminals, and non-state residents.

## H. Firing Location Restrictions

Concerns over the inherent harm and risk attendant to the firing of weapons near others spawned a steady stream of laws prohibiting such acts from the 1600s

---

101.   SPITZER, *supra* note 26.

102.   ROTH, *supra* note 56, at 181.

103.   Act of May 9, 1723, 1723 Conn. Pub. Acts 292; Act of Mar. 31, 1639, 1639 N.J. Laws 18 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (Edmund Bailey O'Callaghan, ed., 1868); Act of Feb. 23, 1645, 1645 N.Y. Laws 47 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (Edmund Bailey O'Callaghan ed., 1868); Pennsylvania Act of Oct. 22, 1763 *reprinted in* VI THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 319 (James T. Mitchell & Henry Flanders eds., 1899); Virginia Act of Feb. 24, 1631, Act. XLVI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (William Waller Henning ed., 1823).

104.   *The Laws Enacted by the First General Assembly of Virginia*, *supra* note 11.

105.   I RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211–12 (Nathaniel B. Shurtleff ed., 1853). This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

106.   RECORDS OF THE GOVERNOR, *supra* note 105, at 212.

107.   Act of July 19, 1776, ch. DCCXXIX, IX THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 11 (1903).

108.   WINKLER, *supra* note 8, at 113.

109.   Saul Cornell & Nathan DeDino, *A Well Regulated Right*, 73 FORDHAM L. REV. 487, 507 (2004). The Massachusetts law is Act of March 14, 1776, ch. VII, 1776 Mass. Acts 31–36. *See* Frassetto, *supra* note 17.

through the early 1900s. Early such laws prohibited not only the firing of firearms in or near towns, but firing after dark, on Sundays, or near roads.[110] Early laws also punished firing that wasted gunpowder, or that occurred while under the influence of alcohol.[111] A North Carolina law from 1774 barred hunting by firelight at night, citing this concern in its preamble: "WHEREAS many Persons under Pretence of Hunting for Deer in the Night, by Fire Light, kill Horses and Cattle, to the Prejudice of the Owners thereof."[112] In the 1800s and 1900s, such laws were focused almost exclusively on firing in, around, or near towns or other populated areas or events.

## I. Hunting Restrictions

Hunting laws are significant for the extent to which early ones reflect contemporary concerns. Though one imagines the America of the seventeenth to the nineteenth centuries as a nation little concerned—or not needing to be concerned—about matters related to wildlife management, safe hunting practices, or the like, these concerns are expressed early in American legislative histories, for example in the legislative history for the North Carolina night-time hunting law just quoted. Early hunting laws were aimed at those who hunted on private lands or in preserves, those who hunted certain types of game, most notably water fowl—often tied to prohibitions against hunting of such game from canoes, skiffs, or other water craft—and even the common deer.[113] For example, it comes as something of a revelation to note that Pennsylvania established a deer hunting season, penalizing out-of-season hunting, as early as 1721,[114] and North Carolina as early as 1768.[115] The penalty for violation of the North Carolina law was a fine of five pounds and "forfeiture of his gun."[116] Hunting even in this early period also sometimes required a license.[117] Similarly, laws in the 1800s also restricted what was by then termed "fire-hunting," hunting by firelight at night, poaching on private lands, and the use of certain restricted weapons, such as a "punt gun" or "swivel gun," defined as a smooth bored gun mounted on a swivel that fires a charge of shot to bring down water fowl, or any weapon not fired from the shoulder.[118] Measures were also enacted to protect certain game, to require

---

110.   Act of Oct. 1672, 1672 Conn. Pub. Acts 3; Act of Aug. 27, 1746, 1746 Mass. Acts 208; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of Mar. 3, 1642, Act XXXV, 1642 Va. Acts 261.

111.   Though a 1655 Virginia law specifically exempted drunken firing at weddings and funerals! Act of March 10, 1655, Act XII, 1655 Va. Acts 401.

112.   This quote is from North Carolina's 1777 version of this law, Act of May 8, 1777, ch. XXI, 1777 N.C. Sess. Laws, 33, 33.

113.   9 Del. Laws 263; Act of Jan. 8, 1857, 1856 N.C. Sess. Laws 22; Act of April 1, 1853, ch 161, 1852 Va. Acts 133.

114.   Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI.

115.   Act of Dec. 5, 1768, ch. 13, 1768 N.C. Sess. Laws 168.

116.   *Id.* § 2, at 168–69.

117.   Act of Mar. 30, 1882, 1882 Md. Laws 257; Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254.

118.   14 Del. Laws 401; Act of Nov. 14, 1828, 1828 Fla. Laws 48, 75; Act of Sept. 21, 1882, 1880 Ga. Laws 142, 142; Act of Jan. 8, 1856, 1856 N.C. Sess. Laws 22, 22; Act of Apr. 20, 1874, 1874 Ohio Laws

licensing, and bar fishing "with any kind of gun."[119] In the twentieth century, in addition to the types of laws already mentioned, states barred hunting with silencers, from aircraft, by under-age persons, or with certain kinds of weapons—still including swivel guns, but now including automatic weapons.[120]

### J. Gun Manufacture, Inspection, Sale Restrictions

Gun laws also dealt broadly with manufacturing, inspection, and sale of weapons. Many of the laws in this category pertained to the manufacture, sale, transport, and storage of gunpowder. Gunpowder matters were of great concern because early firearms operated with the addition of loose gunpowder to serve as the igniting or explosive force to propel a projectile, so the two were inextricably linked.[121] But beyond the safety concerns about explosions or fires resulting from the mishandling of gunpowder, safety issues also led to other early regulations. In 1814, for example, Massachusetts required that all musket and pistol barrels manufactured in the state be first tested or "proved" to insure that they could withstand the firing process without rupturing.[122] Moreover, the law provided for a "person appointed according to the provisions of this act"—in other words, a state inspector—to oversee or conduct the testing.[123] This continued a long tradition in Massachusetts of giving local officials the power to survey, inspect, and even confiscate arms as needed. As early as 1642, "surveyors of arms" were empowered in colonial law to demand the delivery of gun powder and firearms from individuals in order for these items to be used in "times of danger."[124] New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site.[125] Twentieth century laws extended safety regulations pertaining to gunpowder and other explosives; one state, South Carolina, prohibited the use of explosives to kill fish (hardly a sporting enterprise).[126]

---

147, 148; 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254; Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823).

119.   Act of Dec. 23, 1878, no. 602, 1878 S.C. Acts 724, 724.

120.   Act of Apr. 4, 1931, ch. 97, 1931 Colo. Sess. Laws 399, 399–400; Act of Mar. 29, 1927, 1927 Del. Laws 516, 516; Act of Apr. 27, 1911, ch. 165, 1911 Del. Laws 322, 324; Act of May 10, 1901, 1901 Ill. Laws 212, 213; Act of Mar. 5, 1883, ch. CV, 1883 Kan. Sess. Laws 159, 159; Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386.

121.   Act of May 29, 1771, 1771 Mass. Acts 597; Act of Nov. 23, 1715, no. 234, 1715 Mass. Acts 311; Act of Feb. 28, 1786, 1786 N.H. Laws 383.

122.   Act of Feb. 28, 1814, ch. CXCII, 1814 Mass. Acts 464, 464–65

123.   *Id.*

124.   RECORDS OF THE GOVERNOR, *supra* note 105, at 26. *See also* RECORDS OF THE GOVERNOR, *supra* note 105, at 31, 73–74, 84 for similar references. This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

125.   Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274–76.

126.   Act of Feb. 16, 1903, no. 82, 1903 S.C. Acts 124, 124–25.

## K. Firearms Sales

At least eight states regulated, barred, or licensed firearms sales. For example, Florida (1927),[127] Georgia (1902),[128] and North Carolina (1905)[129] gave localities the power to license, regulate, or even bar the commercial sale of firearms. In a 1917 law, New Hampshire required the licensing of gun dealers, requiring them to record the name, address, date of sale, amount paid, and date of the purchaser's permit for all who made gun purchases.[130] In turn, this information was passed to the local city or town clerk or county office, and "[t]he records thus filed shall at all times be open to the inspection of the police departments, or other public authorities."[131] New Jersey prohibited pawn brokers from selling or in any manner transferring any firearms.[132] New York established a registration system for all handgun sales—part of the 1911 law known as the Sullivan Law—which required gun owners to obtain a permit for ownership.[133] In a 1925 law, West Virginia barred the "public display" of any firearms for sale or rent, or ammunition. Gun dealers were also to be licensed, and were required to record the name, address, age "and general appearance of the purchaser," as well as all identifying information about the gun, which was then to be immediately reported to the superintendent of the local department of public safety.[134]

## L. Militia Laws

The militia laws that appear on this list represent one category of early gun laws that have been carefully studied elsewhere.[135] Not surprisingly, the laws here replicate what is now well known about the early-American militia system. Early laws confirmed the power of state governments to impress or take the firearms of citizens if needed. Militia-eligible men were typically required to obtain and maintain in working order the necessary combat-worthy firearm, at their own expense, along with the necessary accoutrements of powder, shot, and the like.[136] In Virginia in the early 1600s, men were required to bring their firearms to church for fear of Indian attacks.[137] In some states, laws stipulated when, where, and under what circumstances guns were to be loaded or unloaded.[138] In Maryland,

---

127.  Act of June 6, 1927, ch. 12548, § 19(13), 1927 Fla. Laws 206, 212.

128.  Act of Dec. 18, 1902, part III, tit. I, no. 192, § 16, 1902 Ga. Laws 427, 434–35.

129.  Act of Mar. 6, 1905, ch. 188, § 6, 1905 N.C. Sess. Laws 545, 547.

130.  Act of Apr. 19, 1917, ch. 185, 1917 N.H. Laws 727, 727–30.

131.  *Id.* § 3, at 728.

132.  Act of Mar. 30, 1927, ch. 321, § 1, 1927 N.J. Laws 742, 742.

133.  Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442, 444–45.

134.  Act of June 5, 1925, ch. 3, § 7(b), 1925 W. Va. Acts 24, 32 (Extraordinary Sess.).

135.  CORNELL, *supra* note 8; JOHN K. MAHON, THE AMERICAN MILITIA: DECADE OF DECISION 1789–1800 (1960); JOHN K. MAHON, HISTORY OF THE MILITIA AND THE NATIONAL GUARD (1983); H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS: HOW THE SECOND AMENDMENT FELL SILENT (2002).

136.  The Uniform Militia Act of 1792, 1 U.S. Stat. 271.

137.  Virginia Act of Feb. 24, 1631, Act LI, *reprinted in* I Henning, *supra* note 103, at 174.

138.  Act of Mar. 16, 1877, 1877 Mo. Laws 298, 306; Act of Mar. 21, 1835, ch. 423, art. XI, 1835 Mo. Laws 512, 537; Act to Regulate the Militia, 1844 R.I. Pub. Laws 1, 16.

privates or non-commissioned officers who used their muskets for hunting were fined, according to a 1799 law.[139] These laws disappeared with the end of the old militia system in the mid-1800s.

## M. Gun Access By Minors And Irresponsible Others

Numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s, becoming more common in the early 1900s. Some states added other barred categories, including convicts or those of poor moral character, those inebriated, and people of unsound mind.[140] In 1907, the then-territory of Arizona barred

> any constable or other peace officer . . . while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike any person with a pistol, gun or other firearm . . . .[141]

## N. Arms And Ammunition Trafficking

Arms and ammunition trafficking was also a concern as early as the seventeenth century, just as it is today. Various registration or taxation schemes sought to address this concern. For example, a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals.[142] A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also "of arms and munitions."[143] Twenty years later, Virginia required that "all ammunition, powder and arms, other than for private use shall be delivered up" to the government.[144] In the 1800s, three southern states imposed taxes on personally held firearms. Georgia in 1866 levied a tax of "one dollar a piece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation . . . ."[145] In 1867, Mississippi levied a tax of between $5 and $15

> upon every gun and pistol which may be in the possession of any person . . . which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain [to seize property for money owed] and seize such gun or pistol, and sell the same for cash . . . .[146]

---

139.   A Supplement to the Act, Entitled, An Act to Regulate and Discipline the Militia of this State, ch. 100, § 30, 1798 Md. Laws 69, 75.

140.   Act of Mar. 5, 1907, ch. 16, 1907 Ariz. Sess. Laws 15; Act of Feb. 4, 1881, ch. 3285, 1881 Fla. Laws 87; Cook County Ordinance chap. 53 of Chicago (Ill.) Code of 1911.

141.   Act of Mar. 5, 1907, ch. 16, § 1, 1907 Ariz. Sess. Laws 15, 15–16.

142.   Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128.

143.   Virginia Act of Feb. 27, 1631, Act LVI, *reprinted in* I Henning, *supra* note 103, at 174–75.

144.   Articles at the Surrender of the Countrie of Virginia, Mar. 22, 1651, *reprinted in* I Henning, *supra*, note 103 at 365.

145.   Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27–28.

146.   Act of Feb. 7, 1867, ch. CCXLIX, § 1, 1867 Miss. Laws 327, 327.

In 1856 and 1858, North Carolina enacted taxes on pistols and other weapons "used or worn about the person."[147] An 1851 Rhode Island law taxed anyone who owned or kept a pistol or rifle shooting gallery in certain locations;[148] Louisiana and Mississippi did the same in 1870[149] and 1886, respectively.[150] Alabama imposed a tax on firearms dealers in 1898.[151] That same year, Florida required a license for anyone owning "a Winchester or repeating rifle," and further required the licensee to "give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the county commissioners."[152] Hawaii licensed firearms for sporting purposes in 1870,[153] as did Wyoming in 1899,[154] and Georgia imposed a pistol dealers' tax in 1894.[155] Nebraska granted to city mayors the power to issue licenses to carry concealed weapons, adding mayoral discretion to "revoke any and all such licenses at his pleasure."[156]

## O. Registration And Taxation

Registration and taxation laws were enacted with greater frequency beginning in the twentieth century. At least twelve states imposed various gun sales or dealer registration, regulation, taxation, or gun registration schemes.[157] The earliest applicable to purchasers of all firearms, was enacted in Michigan in 1913;[158] New York's 1911 Sullivan law applied to handguns only.[159] Michigan also mandated in 1927 that all pistols be presented by their owners "for safety inspection" to local officials, if they lived in an incorporated city or village.[160] Perhaps most remarkable was this sweeping law, enacted by Montana in 1918, titled "An Act providing for the registration of all fire arms and weapons and regulating the sale thereof":

---

147.   Act of Feb. 16, 1859, ch. 25, sched. A, § 27(15), 1858 N.C. Sess. Laws 28, 35–36; Act of Feb. 2, 1857, ch. 34, § 23(4), 1856 N.C. Sess. Laws 28, 34.

148.   Act of Jan. 20, 1851, § 2, 1851 R.I. Pub. Laws 9, 9.

149.   Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126, 127.

150.   Act of Mar. 18, 1886, ch. II, § 1, 1886 Miss. Laws 12, 19.

151.   Act of Feb, 23, 1899, no. 903, § 16, sixty-seventh, 1898 Ala. Acts 164, 190.

152.   Act of June 2, 1893, ch. 4147, 1898 Fla. Laws 71, 71–72.

153.   Act of July 18, 1870, ch. XX, 1870 Haw. Sess. Laws 26, 26.

154.   Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

155.   1893–1894 Treasurer's Report, 1894 Ga. Laws 325, 326.

156.   LINCOLN REV. ORD. ch. XIV, art. XVI, § 6 (Neb. 1895).

157.   Act of June 19, 1931, ch. 1098, § 1, § 9, 1931 Cal. Stat. 2316, 2316–19; Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707; Act of Apr. 7, 1909, ch. 271, 25 Del. Laws 577; Ga. General Tax Act, no. 260, § 2, ninety-third, 1921 Ga. Laws 38, 65; Act of Jan. 9, 1934, act 26, 1933 Haw. Sess. Laws 35 (Spec. Sess.); Act of July 2, 1931, 1931 Ill. Laws 452; Act of May 7, 1913, ch. 250, 1913 Mich. Pub. Acts 472; MISS. CODE ch. 114, § 3887 (1906) (published in 1906 Miss. Laws 346, 367 (Spec. Sess.)); Act of Feb. 20, 1918, ch. 2, 1918 Mont. Laws 6 (Extraordinary Sess.); Act of Mar. 10, 1919, ch. 197, 1919 N.C. Sess. Laws 397; Act of Mar. 26, 1923, no. 11, § 11, 1923 S.C. Acts 12, 19–20; Act of Feb. 18, 1933, ch. 101, 1933 Wyo. Sess. Laws 117.

158.   Act of May 7, 1913, No. 250, 1913 Mich. Pub. Acts 472.

159.   Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442.

160.   Act of June 2, 1927, no. 372, § 9, 1927 Mich. Pub. Acts 887, 891.