Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | |
| **v.** | **COMPENDIUM OF WORKS CITED IN SUPPLEMENTAL DECLARATION OF ROBERT SPITZER** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | **VOLUME 2 OF 5** |
| Defendants. | Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez |
| | Action Filed:  August 15, 2019 |

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| **CALIFORNIA** | | |
| 1927 Cal. Stat. 938 | 15 n.34 | 003 |
| 1933 Cal. Stat. 1169 | 12 n.30 | 004-007 |
| **DISTRICT OF COLUMBIA** | | |
| Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 652 | 12 n.30 | 009-014 |
| Pub. Law 73-474, ch. 757, 48 Stat. 1236 (1934) | 9 n.23 | 015-020 |
| **HAWAII** | | |
| 1933 Haw. Sess. Laws 117 | 13 n.32 15 n.35 | 022-023 |
| **ILLINOIS** | | |
| 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | 12 n.30, 13 n.31 | 025-028 |
| **LOUISIANA** | | |
| Act of July 7, 1932, no. 80, 1932 La. Acts 336 | 12 n.30 | 030-034 |
| **MASSACHUSETTS** | | |
| 1927 Mass. Acts 413, 413-14 | 12 n.30 | 036-040 |
| **MICHIGAN** | | |
| Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888 | 12 n.30 | 042-049 |

2

| | | |
|---|---|---|
| Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929 | 12 n.30 | 050-053 |
| **MINNESOTA** | | |
| Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 | 12 n.30 | 055-058 |
| **MISSOURI** | | |
| 1929 Mo. Laws 170 | 13 n.32 15 n.35 | 060-061 |
| **NEW HAMPSHIRE** | | |
| N.H. Rev. Stat. § 159:16 | 36 n.124 | 063 |
| 2010 New Hampshire Laws Ch. 67 (H.B. 1665) | 36 n.124 | 064-067 |
| **NEW JERSEY** | | |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 37 n.127 | 069-070 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881). | 36 n.125 | 071 |
| 1920 N.J. Laws 67, ch. 31, § 9 | 12 n.30 | 072-082 |
| 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | 13 n.31 | 083-086 |
| **NORTH CAROLINA** | | |
| 1917 N.C. Sess. Laws 309, ch. 209, § 1 | 12 n.30 | 088-089 |
| **NORTH DAKOTA** | | |
| 1931 N.D. Laws 305-06, ch. 178, §§ 1-2 | 13 n.31 | 091-094 |

3

| | | |
|---|---|---|
| **OHIO** | | |
| Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189 | 12 n.30 | 096-097 |
| **OREGON** | | |
| 1933 Or. Laws 488, §§ 72-201, 72-202, 72-207 | 13 n.31 | 099-102 |
| **PENNSYLVANIA** | | |
| 1929 Pa. Laws 777, §1 | 13 n.31 | 104-106 |
| **RHODE ISLAND** | | |
| 1927 R.I. Pub. Laws 256, 256 | 12 n.30 | 108-115 |
| **SOUTH CAROLINA** | | |
| Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288 | 12 n.30 | 117-119 |
| **SOUTH DAKOTA** | | |
| Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245 | 12 n.30 | 121-124 |
| **TEXAS** | | |
| 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6 | 13 n.31 | 126-128 |
| **UTAH** | | |
| 1901 Utah Laws 97-98, ch. 96, §§ 1-3 | 37 n.128 | 130-132 |
| **VERMONT** | | |
| 1923 Vt. Public Acts, No. 130, § 1 | 13 n.31 | 134-135 |

4

| | | |
|---|---|---|
| **VIRGINIA** | | |
| Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137 | 12 n.30 | 137-141 |
| **WASHINGTON** | | |
| Wash. 1933 Sess. Laws 335 | 13 n.32 | 143-145 |
| **WISCONSIN** | | |
| 1933 Wis. Sess. Laws 245, § 164.01 | 13 n.31 | 147-151 |
| **BOOKS**[1] | | |
| Derek Avery, Firearms 12 (Wordsworth Editions, 1995) | 7 n.14 | 173-175 |
| Virgil E. Baugh, Rendezvous at the Alamo 39-63 (University of Nebraska Press, 1985) | 29 n.96, 30 n.99 31 n.104 | 176-195 |
| Ryan Busse, Gunfight 12-15, 65 (Public Affairs, 2021) | 31 n.107 | 196-203 |
| Philip J. Cook & Kristin A. Goss, The Gun Debate 13 (Oxford University Press, 2d ed. 2020) | 9 n.22 | 204-208 |
| William C. Davis, Three Roads to the Alamo 164, 207-8, 582-83 (HarperCollins, 1998) | 29 n.95, 30 n.97, 30 n.99, 32 n.116 | 209-214 |
| John Ellis, The Social History of the Machine Gun 13, 149-52 (Pantheon, 1975) | 6 n.10 19 n.51 | 215-223 |
| Norm Flayderman, Flayderman's Guide to Antique American Firearms 303-5, 683 (Gun Digest Books, 9th ed. 2007) | 20 n.55, 22 n.63 | 224-230 |

---

[1] The Declaration of Robert Spitzer cites Dickinson Bruce, Violence and Culture in the Antebellum South (1979) in its entirety and without discussing the book in detail.  *See* Spitzer Decl. ¶ 30 n.89.  This book is not included with this filing.

5

| | | |
|---|---|---|
| Norm Flayderman, The Bowie Knife: Unsheathing an American Legend 25-64, 495-502 (Andrew Mowbray, 2004) | passim | 231-279 |
| Louis A. Garavaglia and Charles G. Worman, Firearms of the American West, 1866-1894, at 129, 131 (University of New Mexico Press, 1985) | 26 n.87, 26 n.88 | 280-289 |
| Pamela Haag, The Gunning of America 24, 51-52, 56, 60, 65, 96, 353 (Basic Books, 2016) | passim | 290-305 |
| Lee Kennett and James LaVerne Anderson, The Gun in America 91, 112-13, 203 (Greenwood Press, 1975) | 6 n.12, 25 n.79 | 306-317 |
| Larry Koller, The Fireside Book of Guns 112, 154 (Simon and Schuster, 1959) | 23 n.71, 25 n.82 | 318-326 |
| Chris McNab, Firearms and American Law Enforcement Deadly Force 97-98 (Osprey Publishing, 2009) | 7 n.15 | 327-332 |
| James McPherson, Battle Cry of Freedom 475 (Oxford University Press, 1988) | 24 n.74 | 333-334 |
| Jack O'Connor, Complete Book of Rifles and Shotguns 42 (Harper & Row, 1961) | 27 n.92 | 335 |
| Phillip Peterson, Buyer's Guide to Assault Weapons 4-7 (Gun Digest Books, 2008) (as quoted in Robert Spitzer, The Gun Dilemma 29 (Oxford University Press, 2023)) | 28 n.94 | 336 |
| Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter That Changed America 3-5, 54, 136, 390, 401 (Scribner, 2021) | passim | 337-343 |
| Randolph Roth, American Homicide 180-183, 210-217, 218-219 (Belknap Press, 2012) | passim | 344-365 |
| Carl P. Russell, Guns on the Early Frontier 91 (University of Nebraska Press, 1957) | 20 n.56 | 366-367 |

6

| | | |
|---|---|---|
| Robert J. Spitzer, The Politics of Gun Control 25-26, 195-196, 205-11 (Routledge, 8th ed. 2021) | 9 n.22 | 368-378 |
| Robert J. Spitzer, The Gun Dilemma 14-15, 30, 32-33 (Oxford University Press, 2023) | 11 n.29 | 379-389 |
| Richard W. Stewart, American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917, at 367-68 (Washington, D.C.: Center of Military History, 2008) | 5 n.7 | 390-395 |
| Donald M. Snow and Dennis M. Drew, From Lexington to Desert Storm: War and Politics in the American Experience 90, 105-106 (M.E. Sharpe, 1994) | 5 n.8 | 396-437 |
| James Winant, Firearms Curiosa 8, 9, 36, 166, 168, 219-21 (Bonanza Books, 1955) | passim | 438-443 |
| Lewis Winant, Pepperbox Firearms 30, 32 (Greenberg Pub., 1952) | 23 n.70, 23 n.71 | 444-452 |
| **LAW REVIEWS AND JOURNALS** | | |
| David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 849, 851, 852-54, 871-72 (2015) | 17 n.39, 20 n.54 | 454-489 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Problems 55, 63-67, 69 (2017) | 11 n.28, 27 n.90, 37 n.126 | 490-518 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838 | 31 n.110 | 520-521 |
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) | 8 n.17 | 522-532 |
| S. Rep. No. 72-575, at 5-6 (1932) | 9 n.20 | 533-545 |

7

| | | |
|---|---|---|
| Firearms Commerce in the United States Annual Statistical Update 2020, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15, https://www.atf.gov/file/149886/download | 9 n.22 | 555-568 |
| "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45 ; 47 Stat. 650, ch. 465, §§ 1, 14 (1932). Pp. 4, 36, 42, 45, 52 | passim | 569-738 |

**NEWS ARTICLES**

| | | |
|---|---|---|
| David Altheide, *The Cycle of Fear that Drives Assault Weapon Sales*, The Guardian, Mar. 2, 2013 | 31 n.107 | 740-745 |
| Bangor (Maine) Daily Whig, Oct. 27, 1870 | 37 n.129 | 746 |
| Rukmani Bhatia, "Guns, Lies, and Fear," American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear | 31 n.107 | 747-784 |
| Judson Hale, *When Lincoln Famously Used the Almanac*, Almanac.com, May 4, 2022 | 35 n.122 | 785-787 |
| Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The National Interest, Nov. 19, 2019 | 7 n.13 | 788-789 |
| John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.com, March 15, 2011 | 21 n.59 | 790-794 |
| David Kopel, *The History of Magazines Holding 11 or More Rounds: Amicus Brief in 9th Circuit*, Wash. Post, May 29, 2014 | 21 n.57, 24 n.73 | 795-797 |
| Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork, May 14, 2013 | 21 n.58, 21 n.60 | 798-800 |
| *The Man Trap*, The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870 | 38 n.131 | 801 |

8

| | | |
|---|---|---|
| Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*, War History Online, Apr. 26, 2019 | 7 n.14 | 802-811 |
| Philip Schreier, *A Short History of the Semi-Automatic Firearm*, America's 1st Freedom, at 32-39, July 2022 | 23 n.68 | 812-818 |
| *Shot by a Trap-Gun*, South Bend Tribune, Feb. 11, 1891 | 38 n.132 | 819 |
| **OTHER SOURCES** | | |
| "Browning automatic rifle," Britannica, September 8, 2022 | 7 n.13 | 821 |
| Phil Bourjaily, Blast From the Past: Winchester Model 1905, Field & Stream, Jan. 11, 2019 | 26 n.86 | 822 |
| "Bowie Knife," Encyclopedia of Arkansas | 29 n.95 | 823-824 |
| Giffords Law Center, Assault Weapons | 3 n.2 | 825-835 |
| Giffords Law Center, Large Capacity Magazines | 4 n.4 | 836-852 |
| "Gatling Gun," History.com, Sept. 9, 2021 | 5 n.7 | 853-856 |
| Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," Oldwest, n.d., https://www.oldwest.org/bowie-knife-history | 30 n.99 | 857-862 |
| Robert Johnson and Geoffrey Ingersoll, It's Incredible How Much Guns Have Advanced Since The Second Amendment, Military & Defense, Dec. 17, 2012 | 26 n.86 | 863-868 |
| Ian McCollum, "Mannlicher 1885 Semiauto Rifle," Forgotten Weapons, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/ | 22 n.67 | 869-872 |
| How The Machine Gun Changed Combat During World War I, Norwich University Online, Oct. 15, 2020 | 5 n.8 | 873-875 |
| Matthew Moss, From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun, Military History Now, Jan. 16, 2019 | 6 n.9, 9 n.24 | 876-886 |

9

| | | |
|---|---|---|
| "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., Oct. 4-10, 1932 | 8 n.18 | 887-906 |
| Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" The National Interest, July 3, 2020, | 6 n.11 | 907-911 |
| "The Puckle Gun: Repeating Firepower in 1718," Dec. 25, 2016 | 20 n.52 | 912 |
| Uniform Law Commission, *About Us* | 8 n.16 | 913-914 |
| U.S. Census, Historical Population Change Data (1910-1920) | 16 n.38 | 915-917 |
| U.S. Census, National Population Totals and Components of Change: 2020-2021 | 3 n.3, 4 n.5 | 918-921 |
| "Billy Club," Merriam-Webster | 34 n.119 | 922-924 |
| "Bludgeon," Merriam-Webster | 33 n.118 | 925-928 |
| "Slungshot," https://military-history.fandom.com/wiki/Slungshot | 34 n.121 | 929-930 |

Compendium of Works Cited in Supplemental Declaration of Robert Spitzer
(3:19-cv-01537-BEN-JLB)



*TRADE TYPE AMERICAN INDIAN "BEAVER TAIL" GENERAL PURPOSE KNIVES, often termed "stabbing knives." (Top) 12 inches overall with 5½-inch, double edged blade deeply marked in sunken hallmark-like motif: "I & H. So..." (last letters covered by handle). Two-piece buffalo horn handles fastened with small iron rivets surrounded by larger decorative brass inlays. (Bottom) By noted American maker; marked in center of 8½-inch blade "BALDWIN HILL & CO./NEW YORK/CAST STEEL." 14 inches overall; two-piece wooden grips fastened with large copper rivet and copper grommet. Illustrated with original "Plains" type, Indian pipe-tomahawk with brass tack decorated handle and brass studded Indian knife sheath.*



*The Bowie Knife: Unsheathing an American Legend*



*(left)* THERE IS NO EQUIVOCAT-ING ITS TERMINOLOGY *(by the cutler that made it, at least!)*. *Unique, long bladed, folding dirk, circa 1840-50. Marked on 10½-inch blade "MADE FOR THE UNITED STATES BY SAMUEL C. WRAGG/DIRK KNIFE MAKER NO. 25 FURNACE HILL SHEFFIELD." The lower 6 inches of blade (the part that protrudes when folded) is double edged, upper part is single edged. German silver mountings, with American eagle and shield motif on center of crossguard both sides. Two-piece ivory grips fastened by 6 pins. Original, matching, special fitted leather sheath with integral belt loop.*

*(facing page)* SAILOR'S KNIFE AND MATCHING FIDD *(tool for splicing rope). Obviously made by the same hand, there is no mistaking the significance of this matched pair as to its nautical association! Equally distinctive are the silver anchors and mother-of-pearl whiskey glass and decanter inlaid on the handles of each; reverse with stars, shield and heart inlays. German silver mounts on the dark wood handles with lanyard swivels affixed to each pommel. Knife 10½ inches overall with single edge, clip point 6-inch blade widening towards tip. Uniquely made, oversized, german silver sheath with iron belt clip. Illustrated with two typical, nautical carvings.*

The ominous sounding scalping knife was a vaguely defined name for a form of general, all-purpose knife widely sold in frontier areas and trading posts. Its intended use was unlikely for the grisly purpose its name implied. In nineteenth century literature, the term is often used interchangeably with butcher knife. Trading company inventories indicate their purchase and sale in very large quantities. Carl Russell, in the often-cited *Firearms, Traps & Tools of the Mountain Men* (1967), describes them as merely the least expensive form of the butcher knife.

Dirk is another commonly used term whose definition is ambiguous, with numerous possible interpretations, a word more or less "up for grabs" depending on the inclinations of the writer or viewer. Except for its application to a specific type of sailor's knife, *naval dirk*, which takes many dissimilar shapes and forms, and a particular Scottish weapon, *Highland dirk*, the word's usage is customarily generic for a variety of knives that are primarily regarded as weapons. A typical example is found in the Natchez *Statesman and Gazette* of December 29, 1829.

Had the words *Bowie knife* come into popular, fashionable use that early, it is most likely they would have been chosen to give the story greater impact: "So total is the disregard of the moral proprieties of civilized life that it is no uncommon thing…to see boys, young men and other idlers about the streets, with the pockets of their own Tom and Jerry coats full of pistols, and their bosoms full of dirks…"

### WHAT'S IN A NAME?
### THE BUTCHER KNIFE:
### HOW THE MIGHTY HAVE FALLEN.

*Butcher knife* sure lacks dashing image in this modern era. Certainly, use of such an unimaginative weapon would likely diminish the impact today of any romantic tale of Western adventure and gallantry. But, in its day, it represented a very formidable knife. Until the late 1830s and early 1840s it was among the most commonly applied American term to describe a large, if not ominous, fighting knife, one carried and used as a weapon in hand-to-hand combat with man or beast. Those words dually conveyed

*32*





*The Bowie Knife: Unsheathing an American Legend* 

*(right) "A REAL MISSISSIPPIAN" is the boldly etched motto and floral designs almost filling the obverse of the 9-inch, single edged, spear point blade; 5-inch false edge. Marked on ricasso "IBBOTSON & PEACE CO./ SHEFFIELD," and deeply stamped, parallel to blade: "OF THE BEST QUALITY." 13½ inches overall. One piece, deep checkered, black ebony grips with long escutcheon. German silver mounts with fluted shell, hollow pommel; relief floral motifs on the ferrule. Red leather sheath with narrow gold embossed designs; floral embossed panel in center; German silver mounts. Illustrated with pre-Civil War, State of Mississippi oval brass, lead backed belt plate and matched pair of circa 1830 American pill-lock "Hart's Patent" brass pocket pistols.*



all-purpose usage of a utilitarian edged implement as it is recognized in current times. *Butcher knife* was also the most often used description in contemporary accounts for the knife wielded by Jim Bowie at the fight on the Mississippi River sandbar, the seminal event in the knife's march into legend. The terminology was practically obligatory for anyone reporting on a large knife of almost any type that was used as a weapon, the phrase of choice to set a menacing tone. Bemoaning the endemic violence then rampant, the *Mississippi Free Trader & Natchez Gazette* of December 8, 1836, related: "[The] many sad consequences resulting from wearing weapons…almost a passion throughout the south and southwest… It is almost a strange sight in this section of the country to see a man whose bosom heaves not under a ponderous butcher knife."

The introduction and the acceptance of *Bowie knife* into the American language to describe a fighting weapon, an important moment in etymology, gradually supplanted *butcher knife*. Falling into disuse it was seldom again applied when reporting any affair where a knife was in evidence. In effect, *Bowie knife*, however visualized, served to define a knife's status in the public eye and to regard it solely as a weapon.

Today, the butcher knife is looked upon as a rather humble, unpretentious implement found in the kitchen drawer of most homes or relegated almost exclusively to the butcher shop or to the abattoir. Even modern dictionaries limit its definition to "…a large, sharp knife for cutting meat, etc.," removing it from status as a lethal weapon. With the earlier conception of butcher knife thusly transformed, it may now appear irreverent and beneath its dig-

---

*(facing page) SAILOR-MADE, SCRIMSHAW HANDLED DIRKS AND DAGGERS. (Left to right). (1) One-piece walrus ivory handled dirk. 9½ inches overall. Tapered 6-inch, double edged blade. (2) Scrimshaw carved, ivory handled whaleman's knife. One-piece carved handle with Turk's head knot design of the pommel with abalone shell inset at top, smaller bone and baleen inlays on various parts; carved initials and name of well-known whaling vessel "PERU." Brass crossguard. 10 inches overall; 6-inch double edged blade. (3) Ivory handled, scrimshaw carved dirk. 12 inches overall; 7½-inch double edged, tapered blade. Silver crossguard delicately designed. Tall ivory handle with classic scrimshaw motif of a clenched fist at pommel. Silver finished brass sheath with single carry ring. (4) Whalebone handle dirk. 8½ inches overall. Double edged, tapered 5-inch blade. Iron crossguard. Handle carved in spiral motif; entirely studded with high rounded head, silver tacks. Illustrated with scrimshaw carved cane and whaling logbook.*

Compendium_Spitzer
Page 242





nity to apply such unseemly terminology to any self-respecting weapon!

An assertion that 1834 was the earliest year to see the words *Bowie knife* in print has received some currency in the knife press in recent years. It appeared on an advertising broadside of one of the earliest known American makers of fine quality Bowie knives, the firm of Joseph English and H. & F.A. Huber & Co. of Philadelphia, c.1831 or 1832 to c.1835 or 1836 (Chap. XV) who operated under the tradename "Sheffield Works" (American Society of Arms Collectors *Bulletin*, No. 76; 1997 "The Sheffield Works" by T. K. Stapleton). Along with their line of various tools and cutlery, the broadside specifically offered "Bowie knives" as an individually inventoried item along with "tomahawks…Indian knives…hunting knives" and other specialty knives. The 1834 date was not printed on the broadside, but rather, was penciled in the margin by parties unknown. The authenticity of the broadside is unquestioned. However, the penciled date does not represent substantive evidence. It has not been generally accepted by the collecting community to wear the mantle accorded to it.

## A SURPRISING TURN OF EVENTS

Until recently, a letter dated August 29, 1835, to the editor of the Little Rock *Arkansas Advocate* by an Arkansas resident then visiting Boston was considered the earliest *mention* of Bowie knife. Published almost two months later in the October 16, 1835 *Advocate*, it had been regarded as the earliest *printing* of the term as well:

In a few words, little I, this mortal coil of a hundred pounds, would rather live in Arkansas than Massachusetts -- yet the good people here absolutely shudder at the bare mention of Arkansas, Bowie knives, Judge Lynch, Captain Slick, Negro insurrections, duellists, horse thieves, Indian savages, frontiers…very awful!

Both "firsts" have since been eclipsed by a few months. The *Boston Evening Transcript* of August 5, 1835, ran an article of dual interest to the American knife collector with the earliest mention of two types of Bowie knives! Under the heading "A FUGITIVE" and taking its story from an earlier issue of *The Philadelphia Inquirer*, it told of a Vicksburg gambler on the run. While at Louisville and downing one too many, he became loose-mouthed and was recognized: "In his sleeve he concealed a curious kind of butcher knife, the blade of which shoots in and out of the handle by a spring, and is known by the name of Bodie's Knife [*sic*] or the Arkansaw Tooth Pick [*sic*]. The whole conversation and manner of the man indicated his character."

Surprisingly, the very earliest mention of Bowie knives turned up in my own backyard, under my very own nose! It was in a letter dated Philadelphia July 20, 1835, by Nathan P. Ames (of the Ames Mfg. Co., famous sword and cannon makers), written to his brother, James T. Ames in Cabotville, Mass., while on one of his frequent business trips:

The bearer of this is Mr. Elgin, the patentee of the combined Bowie knife and pistol. He visits Springfield to ascertain whether arrangements can be made on manufacturing them…Shall leave it to you to decide if we can do anything for him…advised him to call Allen & Ball…hope you will give assistance.

The letter is cited in *The Ames Sword Company 1829-1935*, (John D. Hamilton, 1983) and, escaping notice of everyone, including myself, appeared and was sold in my own catalog No. 100, October 1976! The patent itself was not actually issued to Elgin until July 5, 1837. In describing the weapon on the patent application the inventor said "…the nature of my invention consists in combining the pistol and Bowie knife."

Only seven months later, in a lengthy letter written by Nathan Ames from New York to his brother at Cabotville on February 21, 1836, (L. Burke collection, Dallas, Texas) on securing a government contract for sabers and bemoaning having been called for jury duty, he discussed the success they had in the fall of 1835 at a trade exhibition at the Franklin Institute in Philadelphia where they displayed the weapons in a case of Ames-made cutlery: "The Bowie knives gave great satisfaction in Philadelphia and I think we shall get orders for a great number. There are a number wanted in Washington and I have engaged to send a box as soon as navigation opens to Mr. Fischer."

Thus, it is apparent that New England, for all its more moderate, temperate, "kinder and gentler" nature, played a much greater role in the development of the Bowie knife and its entry into the mainstream language than has been reported. As a matter of fact, the entire East was no slouch when it came to manufacturing such weapons for the trade. New York and Philadelphia were prominent players too. But the Ames letters have dual significance. Their early date and discussion of exhibitions clearly demonstrate the rising popularity of Bowie knives and the easy acceptance of the terminology into everyday use. The fact that Jim Bowie was still in the prime of his life when all this was happening obviously accounts for the absence of absurd knife stories. That sport was yet to begin.

Ames continued to make Bowie knives throughout the 1830s and later, clearly contradicting any belief that the

---

*(facing page) LONG CONSIDERED AMONG THE MOST HANDSOME OF EARLY AMERICAN BOWIE KNIVES THEY ARE ALSO INDENTIFIED AMONG THE EARLIEST. The Philadelphia firm that made them is known to have been in business between c.1831-32 and c.1835-36. Resourcefully named "SHEFFIELD WORKS" it was owned by the partnership of established Philadelphia cutlers, Joseph English with Henry and Frederick A. Huber. (See Chap. XV). Blades marked on ricasso "SHEFFIELD WORKS/PHILADELPHIA;" reverse marked "J. ENGLISH/& HUBERS." (Left) 15 inches overall with 10-inch broad, single edge, clip point blade with high, median ridge (or spine). One-piece dark wood grips profusely decorated with small brass studs; rectangular escutcheon both sides; all brass mounts. Thick, red leather sheath embossed with diamond and star-like motifs; wide, fancy edged brass mounts. All blades on these larger specimens bear the numeral "2" on ricasso between the two line markings, indicating the maker's model number or size designation. (Right) Identical in smaller size, 8-inch blade marked with numeral "3" on ricasso between the usual "Sheffield Works" markings. 12½ inches overall. Two deep fluted grooves on reverse ricasso in place of the usual "English & Hubers" markings. Iron crossguard with ball finials. German silver mounts. One-piece solid ivory grips with similar brass stud decorations. Deep, red leather sheath with similar diamond and star motifs; wide fancy edged german silver mounts; frog stud in the shape of fox head.*

Compendium_Spitzer
Page 244





*(previous page) THE AMES SWORD COMPANY OF MASSACHUSETTS, AMONG THE EARLIEST OF AMERICAN BOWIE KNIFE MANU-FACTURERS. A few unique artifacts and memorabilia from the Ames family estate (sold at auction c.1950s). Hand-carved, silver-mounted knife handle bearing multi-style, fancy inscription: "CARVED BY N.P. AMES… HIS LAST PIECE OF WORK/1847." Four original, unused castings or models of pommel caps for Ames presentation-grade swords; one model for scabbard mount. Also: two original Ames business cards, copy of original photograph of Nathan P. Ames (1804-1847) and a rare special exhibition (axe of the type purchased by U.S. Coast Survey 1842) uniquely decorated and with their usual markings, as observed on Ames sword blades.*

*(above) EXCEPTIONAL QUALITY CIRCA 1830-1840 AMES EXHIBITION HUNTING OR "BOWIE" KNIFE. Remarkable example of fine artistry by an American cutler of the early 19th century. 14½ inches overall. Straight, double edged, 10-inch spear point blade fully etched most of its length on both sides. Obverse: forested scene with standing Indian shooting bow and arrow at running deer; large urn overflowing with flowers, leaves and branches. Etched panel fills ricasso: "N. P. AMES/CUTLER/SPRINGFIELD." Reverse: 3 varied panels of (1) large standing Indian with bow and arrow (2) hunter shooting gun at bird with dog about to retrieve (3) standing stag by tree. One-piece dark wood grips with coffin shaped pommel fastened by 3 silver pins; engraved silver ferrule; gilt finished brass crossguard. Handsome, gilt finished brass sheath totally engraved with scroll and floral motifs; fox head at top; center panel with seated dog by fallen deer. Illustrated with relief carved Bedford County, Pennsylvania "Kentucky" rifle with engraved silver inlay of American eagle; by noted maker, William Defibaugh.*





*(left)* **EARLY N.P. AMES BOWIE KNIFE, MADE CIRCA 1830s FOR NOTED AMERICAN MILITARY OFFICER.** *12½ inches overall with 8-inch single edge blade widening towards tip and sharpened clip point. Exceptional quality etching both sides typical of the finer quality Ames sword blades of the same era. Obverse with panel ⅓ length of blade terminates in flame-like motif: displays large floral urn with wreath edged panel at base etched: "N.P. AMES/CUTLER/SPRINGFIELD." Reverse with varied style panel depicting American eagle holding riband with national motto and arch of 13 stars above. Near guard, a wide urn with circular wreath above etched with name "W. HOOD." German silver crossguard. One-piece, coffin shaped, rosewood handle fastened by four silver pins, each with small, square, silver escutcheon; large silver escutcheon center each side. Black leather sheath, reverse slotted for belt. Wide brass tip; no provision made for a top mount or throat, typical of other Ames sheaths. Illustrated with copy of portrait of Washington Hood; circa 1830s belt plate and a Pattern 1839 U.S. officer's crossbelt plate. Washington Hood (1808-1840) graduated West Point 1827 achieved a distinguished career in U.S. Army. A captain in Corps of Topographical Engineers, in 1839 he was sent to Indian Country to make maps of the territory and settle border delineations between various Indian nations… also to plot military roads and assess U.S. military needs along the Texas border. Illness contracted on that expedition resulted in his death, 1840. Hood had a close association with N.P. Ames; he had earlier designed the seven presentation swords Ames had been commissioned to make for State of Virginia for War of 1812 heros. (His name appears on those swords.) That design was eventually modified and adopted as the Model 1840 U.S. Army Medical Staff and Pay Department Officer's swords. It is highly likely N.P. Ames made this unique knife as a gift to Hood for his design services.*

*(above)* **EARLY COFFIN HANDLE AMES BOWIE KNIFE CIRCA 1830s.** *Although shown here with a Smith & Wesson Model 2 "Army". 32 r.f. revolver of Civil War era and copy of an illustration of Wild Bill Hickok carrying a closely similar knife in his belt (courtesy Kansas State Historical Society), this early Ames made knife with many features of the more ornate knife of Captain Washington Hood and will date to the same early era. 13½ inches overall; 9-inch single edge, clip point blade handsomely etched on both sides with large panels (almost length of blade). Obverse with eagle holding arrows and riband in beak inscribed "LIBERTY" along with standing figure of Indian holding spear and bow. Maker "N.P. AMES/CUTLER/SPRINGFIELD" etched in large script at base. Reverse panel with identical eagle and riband, floral, leaf and urn motifs. Two-piece, fancy grained wood grips, fastened with five copper pins and round grommets. Black leather sheath with integral flap at top, slotted for belt. The knife, now fitted with cross-guard, fits deeply into the sheath up to the lower quarter of handle. Quality of sheath almost identical to that of the Washington Hood knife with wide brass tip and no provision for throat piece.*



***GEORGE ELGIN PATENT PERCUSSION "CUTLASS PISTOL" WITH BOWIE KNIFE BLADE; MADE BY N.P. AMES; CIRCA 1837... AND EXPERIMENTAL BILLINGS PATENT COMBINATION BOWIE KNIFE-PISTOL. (Left) Percussion boxlock, single shot pistol; caliber .34. Fitted below the 4-inch round, screw-type barrel is an 8½-inch, single edge, straight blade with 5-inch false edge. Blade, made by Ames, is integral with the triggerguard. Typical Ames quality engraving fills most of both sides of blade. Obverse: large American eagle with riband and motto, cluster of stars and "ELGIN'S PATENT," floral spray and urn. Reverse: similarly decorated with identical motifs, etched in center "MORRILL MOSMAN/& BLAIR/AMHERST MASS." (Right) Unique, experimental, Charles E. Billings Patent of 1868, combination 12-inch clip point Bowie knife with a .32 caliber rimfire, single shot pistol built into the handle and crossguard (hammer concealed in the pommel). Brass hilt with silvered finish; dark wood grips. Inscribed "CHARLES E. BILLINGS... HARTFORD, CONNECTICUT" on pommel and crossguard. 17 inches overall. Leather sheath with silver mounts. Illustrated with copy of the original patent drawings; tintype photograph of Charles Billings as a young man when he worked for Colt Firearms Company and was a member of the Colt Company band.***

*The Bowie Knife: Unsheathing an American Legend* 

Northeast may have been unfamiliar with the weapon. Reporting on a display by that firm at an exhibition in the "rotunda" at Quincy Hall (a famous landmark in Boston, Mass.) mostly showing their various swords, the *Army and Navy Chronicle*, of October 10, 1839, made mention: "…[the] Bowie knife on the table, the only one in Boston we hope -- for a more terrific utensil it certainly is. These, Mr. Ames says are not very marketable, though he has tried his hand at a few."

That Elgin Bowie knife pistol is an especially fascinating American dual-purpose weapon. Although Ames played a role in its manufacture, it was more widely produced in smaller versions by Morrill, Mosman & Blair of Amherst, Massachusetts, possibly as early as 1836, its first year of operation. An early business survey published in Boston, 1837 "…for the year ending April, 1837" (*Statistical Tables* [of] *Condition and Products…of Industry in Massachusetts*) mentioned the company in regard to steel output: "Value of steel manufacture… $2,664; bowie knives and pistols, $2,000; hands employed 4; capital invested, $1,500."

Hypocrisy was obvious in the *Boston Courier's* contradictory article about Morrill, Mosman & Blair in its April 30, 1837 issue (variously reported as August 30'th). Its prejudice of the weapon is unmistakable, stating its purpose to be for hunting, when they quite clearly implied it was primarily designed for more desperate deeds. Neither does the irony of the situation escape notice, the Ames Company and other New England makers being among the pioneers in making Bowie knives. Describing the Morrill firm and its new operations, the article concluded:

The principal article which it produces is a weapon, which has yet hardly made its appearance, and which will not, probably, for many years, if ever, be much used in New England. It is called the Bowie-knife Pistol, a combination of these two articles, the knife being fixed by means of a spring to the lower side of the pistol barrel. These instruments were intended for the hunter, and the manufacturer has contract for one thousand for a Georgia man who is the patentee. They are made in three sizes. [There is no evidence to indicate the contract was ever fulfilled.]

## THE BOWIE KNIFE IN THE AMERICAN PRESS – 1835 TO EARLY 1840S

The first advertisement offering Bowie knives for sale, thus far recorded, was by Marks & Rees, Cincinnati, Ohio, makers of surgical instruments. The phrasing clearly indicates the weapons entered public recognition as distinct entities. Their claim of "superior quality" was not overstated, as will be seen in the superb example of their work. In the October 21, 1835 edition of the *Cincinnati Daily Gazette,* Marks & Rees offered: "…all kinds of Bowie knives on hand, of their own manufacture, finished in a superior style."

It probably was not a typographical error that misspelled Bowie's name in the December 18, 1835, Randolph, Tennessee, *Recorder*. Although aware of the knife, it was likely the editor had never seen the words in print form and was relegated to phonetic spelling in his description of the "…large, splendid and murderous look-

ing Boui [*sic*] knife." Similar looseness with that name is seen in other early accounts and advertisements.

By the beginning of the following year, Thomas Gowdey announced, in the January 9, 1836 issue of the *Nashville Republican* new arrivals at his "fancy store" of…"ARKANSAS AND BOOEY [*sic*] KNIVES" among his other weapons, jewelry, liquor and grocery items for sale.

New York City newspapers advised of Bowie knives being available by mid-1836. The *New York Herald* ran an ad by Adam W. Spies, well-known dealer and importer of swords, firearms, military goods and general hardware, in its May 13, 1836, issue informing the public of the availability of "…Bowie, Arkansaw [*sic*] and Texas knives."

Gravely & Wreaks, retailers in New York City, believed to be representatives of English cutlery firms and whose name is occasionally seen on early Sheffield knives, advertised in that same *New York Herald* offering "…Bowie, Arkansas, Texas and Hunters' knives."

By the end of 1836, following Jim Bowie's death, mention of the knife became more frequent. By then there is little question that most of the American public was well aware of the Bowie knife. The Savannah, Georgia *Republican* for November 16, 1836, showed an interesting alternative word for the knife: "WAR KNIVES…Twenty-Four Large Belt or Bowie Knives in Scabbards…Fine Finish. For Sale by…A. R. Knapp & Co."

There was no doubting the prominence and increased public awareness of the Bowie knife in the public announcement conspicuously placed in the October 19, 1836 issue of the *Philadelphia Mirror*: "NOTICE TO GAMBLERS AND OTHER SPORTSMEN: BOWIE KNIVES AND TOMAHAWKS SOLD HERE." Granted, the reader in 1836 must have been left hanging then, just as he is today, for that was the "NOTICE" in its entirety! No further commercial message or merchant's name accompanied it. A printer's or copy reader's error perhaps, but for the student a further indication of that weapon's early acquired notability.

By the beginning of 1837, the knives were apparently in such demand and supply, that they were advertised as being available in varying blade lengths. This was very possibly the first indication of Sheffield's early intensified rivalry. They were merely another item among a wide and eclectic inventory offered to the public by New Orleans dealers T. Toby & Brothers "…at the sign of the Golden Comb" on Chartres Street. Their lengthy ad in the January 26, 1837 issue of the *Picayune* gave notice of: "…poker, French and German playing cards, chessmen, billiard balls, 8, 9, 10 and 12 inch blade bowie knives, leather travelling cases, duelling pistols, double and single barrelled guns…hair, tooth, and nail brushes…suspenders, powder puffs and boxes…"

That both names used for the knife were one and the same was clearly implied by a well-known dealer's advertisement in the semiweekly *Missouri Argus* of June 20, 1837. Advising the availability of various guns, powder flasks, gunsmithing materials, special notice was made of "…a few Arkansas tooth picks, or as they are sometimes called Bowie knives, of a superior quality…by Henry M.

Compendium_Spitzer
Page 250





*(above) AND THERE IS LITTLE DOUBT THAT THE MAN WHO CARRIED THIS BOWIE PRIZED IT IN THE SAME ORDER THAT THE LEGEND EMBLAZONED ON THE BLADE STATED! A remarkable example of an early, circa mid-1830s forged bolster, Sheffield-made Bowie knife of superb quality. Boldly asserted on the etched panel, the full length of the sleek 10½-inch single edge blade: "THE HUNTERS COMPANION/MY HORSE, KNIFE AND RIFLE." Although spear pointed, the swage of the 5½-inch sharpened false edge lends it appearance of a clip point. Sheffield-made, it bears on the bolster only the markings of the American agent or dealer who marketed it: "GRAVELY/& WREAKS/NEW YORK." Listed in N.Y. directories 1837 and 1838 as importers of cutlery and pistols (Gunsmiths of Manhattan, Lewis q.v.) it is known (by their advertisement in the New York Herald in 1836) that they were in business earlier. Two-piece ivory grips fastened by 6 pins. Red leather sheath; German silver mounts. Illustrated with a silver decorated Kentucky rifle by "Jacob Snider" of Bedford County, PA. circa 1830 and a rare early image of a frontiersman wearing a guardless hilted, early Bowie knife on his belt (courtesy of Rick Mack).*

*(left) THEIR ADVERTISEMENT OFFERING BOWIE KNIVES FOR SALE IN OCTOBER 1835 IS THE EARLIEST THUS FAR RECORDED FOR THE FAMOUS WEAPON. A superb example of the work of these professional cutlers, carrying their name on both blade and sheath circa 1830s. 16 inches overall with an 11-inch, slightly clipped point blade; 7-inch false edge (lower half sharpened). The wide ricasso is layered with silver (not merely plated) as is the rudimentary iron crossguard. Coffin shaped pommel edged with silver; two-piece fancy grained walnut grips fastened to the full tang (edges of which are silver layered) with 7 high rounded, silver pins; narrow silver escutcheon. Tiny marking near ricasso on reverse of blade "MARKS/& REES/CINat." [sic] Red leather sheath with integral belt loop, gold embossed in center "MARKS & REES / CINCINNATI OHIO." Illustrated with an exceptional example of a silver-mounted Kentucky rifle by W.G. Higgins of Monroe County, Georgia, c.1830.*



*The Bowie Knife: Unsheathing an American Legend*

Brown of Olive Street between Main and Church Streets at the sign of Robinson Crusoe."

It did not take long for the words to enter into everyday language. In the same month that the Alamo fell, *Bowie knife* was already a commonly understood term, as this March 24, 1836 article from the *Greene County Gazette* of Xenia, Ohio clearly shows. In a detailed story headlined "MURDER BY A GAMBLER," a young lawyer taking passage on a Mississippi steamboat got into a discussion about gambling and gamblers. Among those listening was a "sportsman" of that persuasion who did not take kindly to the conversation: "At which the gambling assassin drew from his bosom a tremendous Bowie knife and striking it downward into the breast [of the lawyer] nearly laid it open."

Among the often-quoted periodicals of the 1830s is the *Niles' National Register*, a weekly journal published in Baltimore by Hezekiah Niles. It was considered one of the more reliable news sources of the era and achieved, for its time, a circulation much wider than its home territory. Like most of the press, however, many of its articles were second and thirdhand accounts taken from other newspapers throughout the country. Considered a valuable source of information for researchers, nevertheless the accuracy of many accounts are considered questionable and require further investigation before accepting them as fact. Two articles published by *Niles'* is among the earliest with significant mention of Bowie knives. Both are regularly mentioned in modern Bowie knife literature. The June 7, 1836 issue carried a story which is often quoted as the first factual evidence for the practice of dueling with Bowie knives. It is also considered among the earliest physical descriptions of the Bowie knife (Chapter XI). That article and another *Niles'* issue of December 24, 1836, with the following comments, left no doubt that Bowie knives were not only set in the fabric of popular culture, but had become voguish, in a lethal way:

The public prints, in all sections of the country are teeming with accounts of the most revolting murders and attempts at murder. In Philadelphia between Saturday and Monday last, no less than four attempts at murder with deadly weapons were made, in all of which severe wounds were inflicted, and in one case resulted fatally. In Natchez, a meeting has been held to suppress *street duelling!* [sic] And in most of the cities, the Bowie knife and pistol are daily used as a means of vengeance or to arrest the hand of justice.

By mid-1836 and early 1837, the knife had acquired enough widespread recognition throughout the country to stir up open controversy and lively dispute as to its origins and functions. The seeds of future distortions and misconceptions are immediately evident in the February 3, 1837 issue of the Little Rock *Arkansas Advocate*. The paper had reprinted an article "The Bowie Knife," which they credited only to an undated "New York paper" (presumed published in May 1836):

This weapon, of which too much has been said of late, is longer and heavier than a butcher's knife, and equally calculated for

cutting or thrusting. It was invented by Col. James Bowie…killed by the Mexicans at the capture of The Alamo… The circumstances which gave rise to this name, was about as creditable as the purposes which it has since subserved. Some twelve or eighteen months ago, three brothers by the name of Bowie, in…Mississippi, had a deadly conflict with seven other persons, armed with every species of weapon, among the rest, with a large knife of which we are now speaking. This was handled by the brothers with such dexterity as to decide the conflict in their favor, although numbers were against them – and it has since been called by their name, "the Bowie Knife." It is made to carry under the coat and is now very generally worn by "gentleman stabbers" in the South and West.

That same issue of the Little Rock newspaper seemed to take special delight by including a counterblast to the New York paper's story that had been subsequently published in the *Red River Herald\** of Natchitoches, Louisiana. Shooting straight from the hip in their opening remarks, the *Red River Herald* proceeded to introduce a novel, and possibly the earliest, version of the knife's propitious beginnings, concluding with Jim Bowie's glorious, final utterance:

The… account of the origin of the famed "Bowie knife" taken from [the] New York paper is entirely inaccurate. The first weapon of this description which has attained such a dreadful celebrity, was manufactured in the Parish of Rapides… Louisiana, near the plantation of Capt. Charles Mulhollan on Bayou Boeuf in 1820. This knife was made according to the instructions of Col. James Bowie, then known [as] Big Jim Bowie. It is originally intended to answer the double purpose of blazing trees, and of a hunting knife. The Colonel carried this weapon for five or six years, when the dreadful conflict yet fresh in the recollections of many, took place in… Mississippi, a circumstance which at once gave it an unrivaled reputation… The Colonel "in himself a host" never counted the number of his enemy, when a fight was [considered]. His battle cry was always "come boys let us jump them; we must conquer or die" and these we are told were his last words to his brave compatriots… who fell at the siege of The Alamo.

The knife was sufficiently fixed in the popular mind that mere passing reference to it was made in the *Niles'* issue of April 29, 1837, with a terse entry which left little to the imagination: "Two lads fought at Louisville, a few days since with Bowie knives. One of them died in a few hours after being stabbed."

A fertile source for early mention of the sale of Bowie knives in the western frontier is the St. Louis *Missouri Republican*. The popularity of the knife is obvious by the number of firms stocking and offering them for sale:

"25 Bowie and Alabama hunting knives … for sale by Mead & Adriance"                    (August 23, 1836.)

"…guns, rifles, pistols, bowie and dirk knives of various prices and qualities…by Spooner, Thomas & Ford"
(September 11, 1837)

"…a variety of desperate [sic] bowie knives and a large assortment of dirk knives and pistols by Spooner and Thomas"                    (May 21, 1838)

---

*\* Also undated, but generally believed an issue of June, 1836 which also included the memorable line about converting "All the steel in the country… into Bowie knives" (Chap. I).*

46



*The Bowie Knife: Unsheathing an American Legend*



**THE ELUSIVE "ALABAMA HUNTING KNIVES" MENTIONED BY MEAD & ADRIANCE IN THE ST. LOUIS NEWSPAPER, 1836… OR MERELY THE SALES STRATAGEM OF WILY SHEFFIELD CUTLERS?** *(Top) Massive folding Bowie with the popular half-horse, half-alligator motif on the large coffin pommel. Single edge, 6-inch, clip point blade marked in riband "ALABAMA HUNTING KNIFE" (a riband below indecipherable). Ricasso marked: "A. DAVY'S/CELEBRATED/AMERICAN HUNTING KNIFE." 7 inches closed; overall 12½ inches opened. Two-piece horn grips fastened by 6 pins; German silver die stamped mounts. (Center) Large fixed blade Bowie. 2-inch wide, heavy 9-inch, single edge, clip point blade marked on ricasso "I PREFER/W.F. JACKSON'S/SHEFFIELD." Circa 1850-60. Blade marked horizontally in small letters near the false edge: "ALABAMA HUNTING KNIFE" along with "ciphered" marks of hunter on horse firing rifle at stag chased by hounds; reclining lion marked "I SURPASS ALL;" liberty cap marked "LIBERTY;" another lion, marked "TRY ME." Thin, elliptical german silver crossguard; one-piece stag antler handle with flat pommel cap and ferrule. Leather sheath, gold embossed along edges and center; German silver mounts. (Bottom) Large folding Bowie, circa 1840-1850. 6½ inches closed; dark wood grips fastened by 6 iron pins; thick german silver mounts with unique motifs of grotesque faces, both sides. Single 5-inch clip point, single edge blade marked on ricasso: "S.C. WRAGG/NO. 25/FURNACE HILL/SHEFFIELD," decorated full length with typical "ciphered" designs (Chap XIV): soldier with sword; mermaid with legend "I SURPASS ALL"; British registry mark; another mermaid and legend "TRY ME"; riband "ALABAMA HUNTING KNIFE." Illustrated with circa 1860 "A.V.C." (Alabama Volunteer Corps) oval brass beltplate.*

"…a few splendid C.S. rifles and pistols and Bowie knives [and a large selection of double barrel shotguns]" offered by Alonzo Child & Co.        (November 23, 1838).

"LIFE GUARDS…Just received two dozen of Elgin patent Bowie knives with pistol attached which will shoot and cut at the same time…For sale by L. Deaver"
(December 3, 1838).

The latter 1830s saw the knife mentioned in print with increasing frequency. Those years also witnessed the beginnings of ill-conceived attempts by anonymous hack writers to characterize the weapon. Most accounts were

likely held in check by Rezin Bowie, who zealously guarded his brother's reputation. The self-proclaimed "authorities" laid low while Rezin still lived. With his passing in 1841 the floodgates opened. From that point on, it was anyone's game.

Interesting mention is made of Bowie and his knife by another American legend and fellow hero at the Alamo, Davy Crockett. In the 1837 edition of *Col. Crockett's Exploits and Adventures in Texas…Written by Himself* Crockett himself (!) states:

I found Col. Bowie of Louisiana in the fortress, a man celebrated for having been in more desperate personal conflicts than



*The Bowie Knife: Unsheathing an American Legend*



any other in the country, and whose name has been given to a knife of a peculiar construction, which is now in general use in the south-west… [And later, the concocted words uttered at the finale of the Alamo fight.] …the conduct of Col. Bowie was characteristic to the last. When the fort was carried he was sick in bed. He had also one of the murderous butcher knives which bears his name.

That popular book went through many printings during the nineteenth century, including simultaneous publication in England. Regardless of the brazen claim on the title page: "The narrative brought down from the death of Col. Crockett to the battle of San Jacinto by an eyewitness," there is little evidence to show that Crockett himself ever wrote the book. Of course, the latter section describing what occurred in those final, desperate hours at the Alamo were figments of some other fertile imagination. His biographical sketch in the *Dictionary of American Biography* (1934), states, "…to what degree the autobiographical writing published in his name were his own cannot be said, but it is noteworthy that they bear little resemblance, in substance or manner to such of his letters as have come down." That the knife was mentioned that early and in that manner in the story of an equally famous American legend is merely another indication of how well-known it had become during Bowie's lifetime.

Widely published and read in its day, *Davy Crockett's Almanack* [sic] played a role in the Bowie knife story that is seldom, if ever, credited (Chapter XIV). Despite the bold declaration on its cover that it was published in Nashville, Tennessee, the writing, illustrations and printing were quite likely done in Boston by Charles Ellms, notorious for lurid, sensationalistic stories. There is no evidence to indicate that the much celebrated Crockett ever wrote for the little booklets. The almanacs were among the first of a unique American comic form, marking the beginnings of what has been termed American humor of the old Southwest. They achieved wide circulation and broad public appeal in the United States. Much of their humor and numerous anecdotes found their way into the British press (Chap. XIV). Their stories were the delight of foreign travelers in this country, as well as those across the Atlantic. The tall, outrageous, exaggerated tales of backwoods adventures and incredible escapes were written in the ver-

nacular; phonetically spelled, in a drawling, garrulous manner as supposedly spoken by frontier folk.

Written and published strictly as entertainment, there is no doubt that the fictitious, hairbreadth adventures — in many of which Davy Crockett was the central character (literally walking on water in the second issue) — not only amused the *Almanack's* readership, but also, contributed to the perception of Americans in the less civilized parts of the country. The influence of those Crockett Almanacks was likely far greater than is generally acknowledged. First issued in 1835, they enjoyed more than a twenty-year run. Curiously, it seems like the words *Bowie knife* might have been distasteful, possibly abhorrent, to the almanac writers, for the term was not used until the 1839 issue…and very sparingly after that. Most references to knives used as weapons were simply "big knife" or "butcher knife."

The *Almanack* was the first to use a comical illustration — a satirical representation — of the "Arkansas toothpick;" probably that knife's first venture into the humor column! It appeared in the 1837 edition, unaccompanied by any explanatory text, undoubtedly received with great amusement, if not hilarity.

Frequent allegorical reference to Kentuckians as "half horse – half alligator" appear in many of the earlier Crockett almanacs. Although the motif's origins were well before the era of the Bowie knife, the imaginary creature was adopted by a few English cutlers in the late 1830s to decorate the pommels of those weapons (Chapter XIV). There is every likelihood the Crockett *Almanacks* were the source for the revival.

## THE 1850S AND MAYHEM IN THE SOUTH

A New Englander, A.A. Parker of Exeter, New Hampshire, wrote an incisive account of his extensive frontier travels in *Trip to the West and Texas [in] 1834-1835* (published 1835). His description of the land and the people is fascinating in that it was free of prejudice, and he was a keen observer who made detailed notes of everything he saw and experienced. Remarks made of his impressions of New Orleans are not typical of all other cities that he visited, but they set the scene for understanding the violence that was indigenous to many parts of America in those years:

---

*(facing page) LARGE, RUGGEDLY MADE, YET DISPLAYING QUALITY CRAFTSMANSHIP. FRONTIERSMAN'S (POSSIBLY CONFEDERATE) BOWIE KNIFE c.1840-1860. 15½ inches overall. Wide, 10½-inch, single edged, clip point blade with sharpened 3-inch false edge. No markings. Thick iron crossguard mostly diamond shaped with quillons terminating in flat disks. Artistically fashioned, ten-sided, carved wooden grips, relief ring turned at top and bottom; iron ferrule; wide, flat, iron pommel cap through which tang of blade is fastened with a domed, brass locknut. Thick leather sheath with simple diamond shaped, broad embossed designs.*

Compendium_Spitzer
Page 256

 *The Bowie Knife: Unsheathing an American Legend*

It is a place of great business, bustle and blandishment; and of dissipation, disease and death…As I passed along by its muddy pavements and putrid gutters, and saw many gambling houses, grog shops, oyster shops, and houses of riot and debauchery, surely, thought I, there are many things here exceedingly offensive… I saw the motley throngs, hurrying on to these haunts of vice, corruption and crime… Here the career of the debauchee is short. The poisonous atmosphere soon withers and wastes away his polluted life's blood. Death follows close upon the heels of crime [I cannot] account for the excesses of New Orleans…a place of disease and death. Its atmosphere pestiferous…and so considered by its citizens…New Orleans does not show that order, neatness and sobriety found in other large cities of the Union. Murders, robberies, thefts and riots are too common to elicit a passing notice…the police inefficient or shamefully negligent…the authorities aloof…this may be thought by some to be an exaggerated account… I wish that it might be…

Over one hundred accounts of duels and street fights, fought with a broad variety of weapons from pistols, rifles, knives, whips, umbrellas and even chairs, are seen in a remarkable personal journal kept over the years of 1835-1851. The work, *William Johnson's Natchez…The Ante-Bellum Diary of a Free Negro,* (Louisiana State University, 1951) is considered the "…lengthiest, most detailed personal narrative authored by an African-American" of that era. A fascinating record of daily life in that southern city, written by a man whose profession was that of a barber, but whose observant nature and curiosity of all that was happening around him, endowed him with "…all the characteristics of a good witness." As to be expected, the Bowie knife was found worthy of special mention; he even purchased one for himself. Johnson's daily entry for November 28, 1836 opened: "Today we had bloody work for awhile in the streets up at Throckmortons corner" and continued with a protracted account of a free-for-all that started over a discussion about a duel fought in South Carolina. The melee rapidly degenerated:

…Mr. Dahlgreen…advanced on [Mr. Charles Stewart] and shot him on left side of the face… he dropped on his knees and fell over on the pavement as dead, so dead that he barely breathed [shades of Yogi Berra!]. At the instant he fell, a Mr. Elick Stewart ran up and struck Dahlgreen with his fists. Dahlgreen then advanced on him with an empty pistol and in doing so, Dr. Hubbard shoved him back, E.S. drew a Bouye [*sic*] Knife and commenced cutting at him – Mr. D. had no weapon at this time and was fighting with his naked hands and Mr. E.S. with the knife…It was one of the gamest fights we have ever had in our city…"

January 17, 1839. "Quite dull in the way of business…today a fight took place over at the Barlow corner between Hary [*sic*] and Mr. D. Gibson…after striking several blows the coward Harvy [*sic*] drew out a large Bowie Knife and stabbed Mr. Gibson.

January 14, 1845. "Nothing new. Business dull quite so. I bot [*sic*] from Stockman & Taintor at auction today…one Boue [*sic*] Knife…$1.81 [and 4 other items including a barrel of rice, pair of flatirons, 3 shawls and one 26 yard piece of silk].

December 21, 1849. "Business only tolerable…last night a man by the name of Josh Smith cut Charly Brogan with a Bouie [*sic*]

knife pretty severely. Brogan run and jumped down in the barroom through a hole and the other, a Mr. Stirling Smith jerked a door off the hinges and sprung out of the window. I tell you they left in short order – Smith has left for the swamps some where…

The Johnson diary did have a surprise in store. Although I was well aware that Natchez was a popular stomping ground for Jim Bowie, I was singularly unsuspecting that the city harbored quite a number of local residents whose surnames were Bowie, none of whom appear to have been directly related to the knife's namesake. The most prominent of the Natchez Bowies may have been Dr. Alan T. Bowie, whom Johnson mentions in his entry of October 5, 1840, as having delivered a political speech for the Whig party at an important rally. Significantly, Dr. A.T. Bowie was also a duelist. Johnson's entry on April 16, 1838, quoted in full the public "posting" (Chapter XI) by Dr. Bowie: "…after the outrage that was offered to my person [and] I demanded of Colonel Nickolds that satisfaction to which I was entitled [a duel]." The complete text of that "posting" also appeared in the Natchez *Free Trader* newspaper of April 27, 1838. Whether that little nugget about a host of other Bowies in and around Natchez, will prove meaningful to the knife story remains to be seen. It does hold the makings for a bombshell, especially as it relates to the ambitiously labeled "original" Bowie knife, the so-called "Forrest knife" (Chapter XVI). Cursory inquiry, especially among Natchez City Cemetery records, has shown that among the many other Bowie's were a James (who died in 1907) and numerous other Bowies of African descent.*

Another exceptional record of the rampant violence so prevalent in the South and Southwest in the 1830s (and precursory to many of the ante-bellum years) is found in a work which had far reaching influence in its day, published in 1839 by the American Anti-Slavery Society: *American Slavery as it is: A Testimony of One Thousand Witnesses.* Authored by the preeminent abolitionist Theodore Dwight Weld, it is said to have been the inspiration for Harriet Beecher Stowe's *Uncle Tom's Cabin.* To make his point about violence endemic to parts of America, the inhumanity and brutality of that "peculiar institution," Weld amassed a huge amount of reports of mayhem and savagery, as printed in American newspapers, and quoted them in their entirety. Most importantly, he gave his sources for each story. In 1972, the University of Connecticut sponsored a critical study of Weld's work *Slavery in America: Theodore Weld's American Slavery as it is* (R.O. Curry and J.D. Cowden). The authors' insightful "Preface" is worthy of quote:

When we began this project we were somewhat skeptical as to Weld's use of evidence. [his book] was, after all, the most savage indictment [of slavery]. Much time was devoted to checking the accuracy of Weld's evidence and in gleaning useful information from published letters, manuscript collections, newspapers and contemporary journals. We discovered not only that all of the citations checked, a random sample of approximately thirty percent, and were accurate, but that Weld had used only a frac-

---

*Conveyance Records of Catahoula Parish, La. (Book A) 1808-1839, where many records of the Bowie brothers' land dealings may be found, also indicate that the name of a negro "James Bowie" appears in many of those documents. An example (from page 459C) 27 October, 1823: "JAMES BOWIE, a free man of colour [sic] paid $500 for a negro slave HENRY, about 20 years old…"*

Compendium_Spitzer
Page 257

*The Bowie Knife: Unsheathing an American Legend* 

tion of the evidence available to him [which] could have filled several volumes with similar information.

As an account of violence in those years, the Weld book is unique. For Bowie knife students, it offers a mine of reference, a mere handful quoted here. The use of knives is quite evident throughout those many newspaper accounts. They frequently, but not always, mention the Bowie knife by name. It is reasonable to assume that given a few more years, those same stories would use that label in place of other references to dirk, dagger, or knife.

Weld specifically noted that his extracts "…will not be made secondhand from Northern papers, but from the original Southern papers which now lie on our table…the only crimes which, as a general rule will be specified, will be deadly affrays with Bowie knives, dirks, pistols, rifles, guns or other death weapons and lynchings."

The following excerpts unmistakably illustrate not only the unquestioning acceptance of Bowie knife into the everyday vocabulary of Americans but also the level of violence into which it was introduced:

(From the *Planter's Intelligencer* taken from the Vicksburg *Sentinel* of June 19, 1838) "About one o'clock we observed two men pommeling one another in the street, to the infinite amusement of a crowd. Presently a third hero made his appearance in the arena, with a Bowie knife in hand and he cried out 'let me come at him'…he was most cruelly beat and cut through the skull with a knife…the wounds will prove mortal."

(From the Columbus, Georgia *Sentinel* November 22, 1838) "BUTCHERY…a Bowie knife slaughter took place a few days since in Honesville, Mississippi. A Mr. Hobbs was the victim; Strother the butcher."

(From the Natchez *Free Trader*) "…a violent attack was lately made on Captain Barrett of the steamboat 'Southerner' by three persons [one of whom] drew a Bowie knife upon the Captain which the latter wrested from him."

(From the Mississippi *Argus* of November 21, 1837) "…at a wood yard above Natchez…a difficulty arose between Captain Crosley of the steam boat 'Galenian' and one of his deck passengers. Captain C. drew a Bowie knife and made a pass at the throat of the passenger, which failed to do any harm…and ordered him to leave his boat."

Mayhem was not endemic nor confined only to the South in the first half of the nineteenth century. As the lead article in *Niles' Weekly Register* of September 5, 1835, seemed to indicate, violence and lawlessness were well recognized and remarkably commonplace throughout the United States in those years:

During the last and present week we have cut out and laid aside more than *five hundred* [*sic*] articles, relating to various excitements now acting on the people of the United States, public and private! *Society seems everywhere unhinged* [*sic*], and the demon of "blood and slaughter" has been let loose upon us! We have the slave question in many different forms, including the proceedings of kidnappers and manstealers — and others belonging to the free negros; the proscription and prosecution of gamblers; with mobs growing out of local matters — and a great collection of acts of violence of a private or personal nature, ending in death; and regret to believe, also, that an awful political outcry is about to be raised to rally the "poor against the rich!" We have executions, and murders, and riots to the utmost limits of the union! The character of our countrymen

seems suddenly changed, and thousands interpret the law in their own way — sometimes in one case, and then in another, guided apparently only by their own will! If this state of things is permitted to continue — if, at the call of the law, the people will not "rally round the standard of the law, and unite in common efforts for the common good," as was happily the case in times passed… many will be prepared to seek repose in the arms of a "legitimate sovereign."

The article then gave just one example of the "five hundred articles" that they had taken out of various papers of the previous week. Articles of that nature were reasonably commonplace in *Niles' Register.* Only four months later, their January 30, 1836 issue ruefully observed: "Acts of violence, of the most disgusting character, are very numerous in the United States. We seem to have lost our *caste* [*sic*]. The law of force has dominion, in many places. Blood is the order of the day."

## IN THE REMOTE BACK WOODS AND WILD FRONTIERS

There was no equivocating the Bowie knife's notoriety, enviable or despised, on the American frontier. Nor was its dependability and necessity for men of most walks of life and all callings ever in doubt. Both those inherent characteristics recommended the knife as a weapon of choice for most occasions in those remote, little traversed territories. Remarks in a letter by John Guild, an Ohio-based Indian trader, to his sister in Massachusetts on December 13, 1840 (quoted in full in the *Antique Bowie Knife Journal,* Fall 1999) attest to the weapon's necessity and indispensability. Just returning from an expedition to Wisconsin Territory, where he had some success, he related a harrowing escape while trading among the Indians (punctuation added):

We were attacked by three Mexicans and one Indian. One Mexican struck me with a dirk over the left eye. As I was on my knees to rise, I caught his wrist the next blow and drew mine from my belt and gave him the Belly Ache [*sic*] while Haven, my partner seized the other two Mexicans as they were in the act of taking our guns which stood by the side of a small musket [*sic*] bush. As they wear no hats and long hair [I] gave him a chance with his large hand to hold both until he finished them off with a large Bowie knife. We did not take the trouble [to] bury them in the morning.

## DOUBLE EXPOSURE: SECOND TIME AROUND FOR A NOTORIOUS AFFAIR

There are numerous instances in which students have the opportunity to compare differing versions of the same Bowie knife stories that were later to become legendary. The story of the Wilson-Anthony hand-to-hand clash during open session of the Legislature of Arkansas is a classic example. Two accounts follow, one from 1838, another from 1849. Both were written within a reasonable time frame to the fracas and have acquired the patina of age. The earliest report abounds with errors, but may be assumed to be closer to actuality. Reading how it was "improved" just a bit over ten years later, on its way into mainstream legend, is as amusing as it is instructive!

At an open session of the Legislature of Arkansas in

 *The Bowie Knife: Unsheathing an American Legend*

1837, during deliberations the speaker of the House of Representatives, John Wilson, took umbrage at words spoken by Representative Joseph J. Anthony. They soon went at each other with Bowie knives, Anthony perishing in the struggle. The Knoxville, Tennessee, *Register* reported the fight and the trial of Wilson with its verdict and aftermath on July 4, 1838, taking it from the earlier edition of the Arkansas *Gazette*. Only details germane to the Bowie knife are quoted here:

On the 14th of December last, Maj. Joseph J. Anthony, a member of the Legislature of Arkansas was murdered while performing his duty as a member of the House of Representatives, by John Wilson, Speaker of that House. The facts were these: a bill came from the Senate, commonly called the Wolf Bill. Among the amendments proposed, was one by Maj. Anthony [argument then followed] between Wilson and Anthony which were taken to be an insult by Wilson who ordered Anthony to '…take his seat'. Maj. Anthony said, as member, he had a right to the floor to explain himself. Wilson said in an angry tone 'sit down, or you had better', and thrust his hand into his bosom and drew out a large bowie knife, ten or eleven inches in length, and descended from the Speaker's chair to the floor, with the knife drawn in a menacing manner. Maj. Anthony, seeing the danger he was placed in, by Wilson's advance on him with a drawn knife, rose from his chair, set it out of his way, stepped back a pace or two and drew his knife. Wilson caught up a chair, and struck Anthony with it. Anthony, recovering from the blow, caught the chair in his left hand and a fight ensued over the chair. Wilson received two wounds, one on each arm, and Anthony lost his knife, either by throwing it at Wilson, or it escaped by accident. After Anthony had lost his knife, Wilson advanced on Anthony, who was then retreating, looking over his shoulder. Seeing Wilson pursuing him, he threw a chair. Wilson still pursued, and Anthony raised another chair as high as his breast, with a view, it is supposed, of keeping Wilson off. Wilson then caught hold of the chair with his left hand, raised it up, and with his right hand deliberately thrust the knife, up to the hilt into Anthony's heart, and as deliberately drew it out, and wiping off the blood with his thumb and finger, retired near to the Speaker's chair.

That seems to be a pretty clear-cut, unembellished account. The article went on to say, "…the members of the legislature are in the habit of wearing Bowie knives. Wilson's knife was ten or eleven inches long."

What a difference a decade makes! Retold by Alfred W. Arrington in his 1849 edition *Lives and Adventures of the Desperadoes of the South-West*, the Wilson – Anthony affair acquired added polish and glaze.

A preacher at eighteen years of age, Arrington's skeptical attitude toward religion caused him to abandon the ministry for law. First practicing in Missouri, he soon moved to Arkansas where his practice was said to have flourished. At some date during his three or four year residence in Arkansas he was elected to the state legislature. He moved to Texas in 1840. Visiting the East in 1847 and writing under the pseudonym of "Charles Summerfield," he published serially in newspapers a number of articles relating his experiences and observations. All were reprinted in 1849 in his *Desperadoes of the Southwest*,* "…an eloquently written, but lurid [account] drawn from person-

al experience" *(Dictionary of American Biography)*. Arrington's graphic recounting of the Wilson-Anthony knife fight is, indeed, "lurid." His portrayal of the bloody clash, the principals and the legislator spectators makes entertaining reading. In his introduction to that affair, Arrington wrote, "…the scenes presented…are not painted from memory alone. They are my experiences…"

In view of having served in the state legislature in that time frame, it is possible that Arrington was witness to the pandemonium. It was unquestionably a spellbinder when first serialized in 1847. In the light of reality, various inconsistencies lend cause to question the author's accuracy.** Prominent among them are the incorrect "1836" date and the fact that revolving handguns were unlikely to have been commonly carried weapons at that early year. It is as amusing as it is incongruous that Arrington managed to describe in minute detail the engraved ornamentation on each of the knives used by the battlers in that infamous encounter. No similar motifs have been viewed on any Bowie knife to this day (and hopefully will not prove the pattern for some enterprising scoundrel in the future!):

[John Wilson, a] notorious duelist…Speaker of the House [of Representatives]…was called "Horse Ears." When excited…his ears worked up and down…like those of a horse! Wilson was a man of great influence…He had… fought a half dozen duels [and] could show some honorable scars of bullet and bowie knife on his person… The session of the legislature which sat in 1836 [sic] was the most important that ever took place in Arkansas…the fury of the parties was intense…excitement knew no limits. Almost every member went to the House armed to the teeth, and in addition to those carried in pockets, each legislator had a good supply of revolving pistols in his desk also…I shall never be able to recall to mind, without horror, the corruption, perjury and infamy of that session, whose proceedings I witnessed from first to last.

In 1836 [sic] the bowie knife governed Arkansas. It was not asked of a legislator "how many ideas are in his head, but how many pistols stick out of his pocket?"…there was a member of the House by the name of Anthony; a peaceable…inoffensive sort…but an enemy of the banks [of which Wilson was President of the Association and chief proponent of Bills in the bank's favor]…one day the Bill to provide for the more effectual rewording of Wolf Killers, [known as "the wolf scrap bill"] came up for discussion…a standing reform measure…a tremendous debate ensued…Anthony moved to amend the bill…merely as a joke [not] intended to provoke anything but merriment…but Speaker Wilson received it as a deadly insult. The moment I caught his countenance, I was horrified at its savage expression…Wilson arose in a most rudely imperious tone, ordered [Anthony] to take his seat. Anthony [showed] neither fear nor surprise but replied "…he was entitled to the floor and would not resign it until he was ready to do so."

Wilson left the chair, drew his bowie knife, descended the steps…and deliberately advanced through the House… [towards] his foe…Anthony was generally considered a coward and when the spectators beheld Wilson advancing upon him with uplifted bowie knife glittering…ready for the dreadful blow, all present imagined [Anthony] would flee in terror… no one believed that he was armed or that he would fight…everybody was mistaken. While [Wilson] advanced toward him [Anthony] stood calm and motionless…not a muscle of his body nor a line of features betrayed fear or anger. His whole appearance of a

*Arrington's original 1849 passages about the Wilson-Anthony affair (as excerpted and directly quoted here) were reprinted in altered form in Arthur B. Hudson's 1936 anthology "Humor of the Old South" (Macmillian Co., N.Y.). Passages excerpted from the 1936 edition are occasionally seen in other Wilson-Anthony accounts and inaccurately cited to the 1849 edition.
**Another example of Arrington's looseness with details is read in his account of the "Mose Stevens Duel" (Chap. XI).

Compendium_Spitzer
Page 259



man that was passionless...would he stand there and be hewed down in his tracks [such were the questions I asked myself] We were all mistaken. For when the foe got within ten feet [Anthony] quickly drew from his bosom a bowie knife, stepped boldly forward to the affray...and then began a combat of the most bloody, ferocious and obstinate...ever witnessed in the southwest.

Wilson's knife was long, keen and so highly polished that you might see yourself in the reflection of its smooth, bright surface, as in the most perfect looking glass...On each side of the flashing blade was a picture, the exact copy of the other, wrought in exquisite gold enamel of two Indians, in their wild costume, engaged in mortal combat with bowie knives!

The bowie knife of Anthony was of the very largest size, of the class called, in that country 'Arkansas Tooth picks' the most savage looking weapon before which a human eye ever quailed. On one side of its broad gleaming blade, done in coarse etching, was the picture of a fight between a hunter and a brown bear, in a mountain cavern. The bear appeared to be squeezing the man to death in its iron hug; while he was fiercely digging out the heart of the monster with the sharp point of his knife. On the other side of the blade was the picture of a rattlesnake in its coil, with its head erect and its red fiery tongue brandished as if about to strike. Such devices are common on the weapons of the most notorious desperadoes in the West and are the objects of as intense a pride and vanity to their owners, as were ever the insignia of the most exalted chivalry, to the knights of the heroic ages!

Both parties fought with admirable coolness...and much skill...only slight wounds inflicted, whence blood began to trickle freely. The clatter of the knives thrusting and fending off and fiercely ringing on each other was hideous to hear [as the fight wore on both became severely wounded]...Anthony struck a heavy blow that cut his adversary's hand half off...Wilson changed his bowie knife to the left hand...paused an instant and again advanced, furious as ever to the fight...Anthony committed the insane act of throwing his knife at Wilson's breast, which missed its aim and fell to the floor… he was now wholly disarmed at the mercy of [Wilson] who never knew the meaning of the word…one fierce thrust ripped open [Anthony's] bowels and he caught them as they were falling with his hands… another thrust at the neck cut the main artery and blood spurted out in a crimson fountain…staining the robes and even the faces of several members...with its warm spattering shower… Anthony without uttering a single groan fell dead on the floor and Wilson fainting from loss of blood sunk down beside him. [Wilson survived] he was expelled from the House, bailed by a merciful Judge, to answer for the murderous offence and finally brought to trial and triumphantly acquitted. He then changed his political venue to Texas and now flourishes as a furious partisan [there].

That Wilson-Anthony knock-down-and-drag-out brawl may very well have played a greater role in naming Arkansas "The Toothpick State" than is generally credited. Even the noted English author Charles Dickens twice alluded to the infamous affair in his *American Notes* (1842). The unwelcomed notoriety heaped upon the ludicrous spectacle was underscored by William Worthen in his paper presented to the Arkansas Historical Association: "THE TOOTHPICK STATE:"*

The breach of legislative protocol received widespread and long-term attention. Over fifty years after this altercation [in 1889], Frederick Douglass could evoke Anthony's death while talking about Arkansas "...I can remember that a killing occurred in the halls of your legislature, in which an honored citizen was almost dissected by a bowie-knife, and the evil repute cast abroad by that event yet clings around the fair name of your state."

Among the prominent politicians who had a penchant for carrying the Bowie knife was the governor of Mississippi, Hiram G. Runnels. Upon leaving that exalted office, he was entrusted with the presidency of the Union Bank of Mississippi. Following financial reverses to that institution, Runnels' leadership abilities were subjected to censure during an open session of the state legislature. Runnels was in attendance and took personal affront to invective hurled at him. The Natchez *Free Trader* of January 16, 1840 reported:

A disgraceful scene occurred this afternoon near the door of the representatives hall, while the House was in session... Thomas Kearney...was roughly assaulted by the ex-Governor Runnels...in allusion to the management of the Union Bank... Runnels was...armed with pistols and a Bowie-knife, told Kearney to go and arm himself [for] a street fight...Kearney did prepare himself, but was arrested...Runnels [defied] the sheriff...one of the members of the House took part in the discreditable fracas.

## BOWIE KNIVES AND GAMBLERS, THE LAW, THE PRESS AND MALE COIFFURE

The year 1837 saw the first laws passed by various states that specifically labeled and attempted to suppress Bowie knives. Subsequently found unconstitutional nine years later, Georgia passed legislation restraining the sale of "Bowie or any other knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offense and defense; pistols, dirks, sword canes, spears, etc." That same year, Alabama taxed Bowie knives while ignoring handguns. It also passed legislation making killing with a Bowie presumptive of premeditated murder. The *Niles National Register* under the caption "USE OF THE BOWIE KNIFE" reported the newly enacted legislation in its Sept. 16, 1837, issue:

...if any person carrying the knife or weapon known as Bowie knives, or Arkansas tooth picks on sudden rencounter, shall stab or cut another with such a knife by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same, as if the killing had been by malice and aforethought...further enacted, that for every such weapon...person selling, giving, or disposing of the same shall pay a tax of one hundred dollars...Approved, June 30, 1837. A similar act has passed in the state of Mississippi.

Many other states followed suit, passing anti-Bowie knife legislation with varying degrees of restriction and penalties. Like anti-dueling laws, it did little, if anything, to stem the demand and the use of that weapon. Such ordinances were likely proposed with the most righteous intent, but judging from the almost universal lack of enforcement, their passage appears to have been mostly a sop to the more virtuous.

The *Mississippi Free Trader* of July 4, 1839, in an article taken from an earlier Louisville paper dated June 25th, discussed the state legislature's bill to put down the practice of carrying and concealing the weapon:

It is now a penitentiary offence in Mississippi to flourish a Bowie

---

* *Published in their Quarterly, Volume 53, No. 2, 1994.*

 *The Bowie Knife: Unsheathing an American Legend*

knife. Nevertheless those very interesting tools appear to be flourished in that latitude and longitude more freely than ever." [but the *Free Trader* modified the Louisville paper's quote, and added its own up-date]...the bill passed the House but was not reached in the Senate. The [Louisville] editor is in error when he says it is a penitentiary offense in Mississippi to flourish a Bowie knife.

Evidence that legislation outlawing the carrying and the use of the Bowie knife was not often enforced is quickly grasped from an article reported in the *New York Tribune* February 3, 1843. Such actions on the part of law enforcement were quite common; numerous similar accounts are to be found. Under the bold heading, "A BOWIE-KNIFE STREET FIGHT IN LOUISVILLE," the paper reported names of a local citizen and another Tennessean, each armed with a Bowie knife and firearm: "...pistols were discharged and Bowie knives drawn, and both were wounded, but not seriously. It evidences great dereliction of duty on the part of the police of Louisville, but neither of these disturbers of the public peace was arrested, but allowed to leave the City undisturbed."

But not every miscreant using that knife avoided the long arm of the law. Court records clearly show civil and criminal violations of all types. Enforcement, however, was considerably looser, depending on one's station in life, business and blood relationships, the locale where the offense took place and, certainly, how heinous the crime. The murder of a newspaper editor, then as now, ranked high on the list of loathsome offenses. Such a homicide was reported in the widely read New Orleans *Picayune* of January 25, 1847 regarding John Chalmers, editor of the Austin, Texas *New Era* and former Secretary of the Treasury of Texas, "...killed by a wound in the temple, inflicted by Joshua Holden, with a Bowie knife." The perpetrator was held on a charge of murder and committed to jail awaiting prosecution. It was incongruous that the adjoining column of that same issue ran what it termed, in all solemnity, a "sensible anecdote" of a pistol duel never consummated.

Fascinating testimony prominently mentioning the Bowie knife was given in a Louisville, Kentucky, court case in 1838-1839. Excerpted from an 1882 legal treatise *The Law of Homicide* by A.B. Carlton is the direct quote from the 1838 courtroom testimony. The prosecutor's remarks in this particular murder case clearly verify that carrying a Bowie knife cut across all social levels and certainly was not looked upon as ungentlemanly!

Go to Louisville when a portion of the city is enveloped in flames and you will see a thousand mechanics rushing into the devouring element for the protection of property, while the lawyer and the judge and the haughty aristocrat walk about as spectators with their hands in their pockets...where, then, are your Bowie-knife-and-pistol gentry, your duelists and your despisers of the man who lives by the sweat of his brow?

That same prosecutor also gave clear evidence of regional differences in the perception of the Bowie knife:

If you go into the Northern States, it is a rare thing if you can find a man in ten thousand with a deadly weapon on his per-

son. Go into other states that shall be nameless and you will hear of them as often as of corn-shuckings in Indian Summer. Go further South--to Arkansas or Mississippi, for instance, and though you would be a peaceable man, shuddering at the name of a 'Tooth-Pick' in the North, in these States you may arm yourself to the teeth, and track your steps in blood with impunity. Gentlemen, one question is, are we to tolerate the bowie knife system under the false pretense of self-defense? I say, let your verdict act like the ax laid to the root of the tree, and many a prayer will bless you for your timely check of its growth. Many a woman is made a mourning widow, many a child made a pitiable orphan and many a father childless by this accursed weapon.

## BOWIE WHISKERS?

Equally indicative that the weapon had become comfortably assimilated into the everyday language of Americans at an early date was its synonymous usage to describe men's muttonchops. The Baltimore *Commercial Transcript* of November 16, 1837, noted that: "...the *Philadelphia Ledger* insinuates that those who wear those appendages encircling the face are no better than they should be [and] says 'bowie whiskers' are the signs of Bowie knives."

## AND EVEN INTO THE HUMOR COLUMN

It's doubtful that those sideburns were all the rage for any appreciable amount of time, as the mode does not appear in other fashion columns that have surfaced. But the Bowie made its presence felt in other, unsuspected spheres of daily life too. In all likelihood, its first venture into the humor column was the 1837 comical rendition of the "Arkansas Toothpick" in the earlier mentioned *Davy Crockett Almanack*. By 1861, it is seen in the "Humors of the Day" column of *Harper's Weekly*. The November 23, 1861, edition related a trite, not too funny, story of a schoolmaster and a "patriotic pupil." Following the punch line, such as it was, "The pupil is patted on the hand and presented with a hundred-bladed bowie-knife by way of a prize."

## BOWIE MOMENTUM
## GATHERS AWARENESS

The Bowie knife, or at its very least, the terminology, was pervasive. With increasing frequency, it was mentioned in news articles throughout America. Just a modest sampling of the press readily bears that out. The widely read New Orleans *Picayune* of August 2, 1838, repeating a secondhand account from a source not given, made special note of a monstrous Bowie used in a dispute in which two men were killed and another suffered the loss of a hand: "...a most horrific slaughter with a Bowie knife twenty three inches in length and weighing five pounds took place not long since at St. Marks, Florida."

One wonders if the brusque owner of a Bowie knife and a rifle may have valued them greater than his servant in early days of the Republic of Texas. Handsome recompense was advertised in the Houston *Telegraph And Texas Register* on May 30, 1838 under the caption: "$50 REWARD. My negro man Bob runaway [*sic*] from me on the 23'd inst., he...took with him a rifle gun, shot pouch and powder horn, the latter is brass mounted, and a strong

Compendium_Spitzer
Page 261



*MASSIVE BOWIE KNIFE CIRCA 1840-60 WEIGH-ING ALMOST TWO POUNDS; 23½ INCHES OVER-ALL. 16-inch, single edge, clip point blade with 7-inch false edge; 2 inches wide. Marked on ricasso "V crown R/Ibbotson Bros. & Co./Sheffield" over small eagle holding riband marked 'HUNTING KNIFE." German silver mounts, thick fancy shaped crossguard; tall, one-piece stag antler grips with round brass inlay on the pommel crown. Octagon shaped ferrule. Green leather sheath, gold embossed along edges with fancy gold cen-ter panel; German silver mounts. Illustrated with a per-cussion Kentucky rifle circa 1830s by George Spangler of Liverpool, Pennsylvania.*



coarse Bowie knife and a black napsack [*sic*]".

"GAMBLERS IN MISSISSIPPI," headlined the article in the *Niles National Register* November 10, 1838, reprinted from the Columbus, Mississippi, *Argus* of the prior day, urging a pox upon houses of chance:

We have been and now are, infested with a numerous gang of "professional sportsmen" or, in common parlance, *gamblers*, who put law, gospel and everything pertaining to good order and morality at defiance...Cannot our wives and daughters traverse our streets without meeting street fighters, armed with double barreled guns, pistols and Bowie knives at every corner? [We ask] every good citizen who has the welfare of Columbus at heart to take immediate and legal measures to rid the city of gamblers...it is high time for the people of Columbus to speak out.

The Bowie knife was as familiar to folks in the state of Maine, at an early date, as it was to those in the South. The entire front page of the *Maine Temperance Gazette* published at the state capitol in Augusta on January 31, 1839, was devoted to the weapon. The editorial was provocative for its unequivocal, yet contradictory stand against the carrying of Bowie knives and other weapons, but sanctioning them for self-defense. Austerely titled "THE BOWIE KNIFE OUTLAWED," it briefly mentioned a homicide in Mississippi, then launched into its discourse of reason:

The common practice of wearing pistols, dirks, and Bowie knives, is as cowardly as it is dangerous. There is no part of our country...where a well behaved, peaceable, sober man, will not be secure from violence in his own good conduct; and if he will rely upon dignified, gentlemanly deportment, he will find it the best shield for his personal safety...however...if we choose...the companionship of gamblers, rioters and drunkards, it is necessary to be prepared...and where reason has lost supremacy, and common sense and decency never had any control… it is well enough to make due preparation for substantial defence, and the *bowie knife* [*sic*], and the pistol are perhaps as convenient and effective...if a man will haunt [*sic*] with savage, he must accommodate himself to their savage customs.

Religious organizations and their publications were equally concerned over the undiminished violence. Expressing their annoyance, the Western Unitarian Association of Louisville, Kentucky, ethically discussed the topic "WEARING WEAPONS" in its 1837 periodical, *The Western Messenger:*

The almost universal custom, in the South and West, of wearing deadly weapons, cannot be too strongly condemned. It is not only unchristian for men to go armed, and manifest the hateful spirit of war, in time of peace, but it is foolish. Their weapons serve more as a provocation to danger than a defence…What a sad spectacle our streets afford, to the friends of peace and humanity! In how many windows we see a glittering parade of pistols, dirks, dirk-knives, and those horrible weapons, Bowie-knives. Children in the streets must have their dirk and knives… What seems strange, is the facility with which Eastern men, who have never been used to the practice, adopt

it, when they visit the West…the cause lies in their erroneous ideas of Western and Southern society...

Hardly having "...few parallels in the annals of crime" as the following article stated, but representing a classic example of exaggerated reporting for the sake of sensationalism, was a story in the March 16, 1839 *Niles National Register*. Reporting (likely rewriting) a story from the Morgan, Alabama *Observer*, they told at great length and in lurid detail of a "...poor man walking west with his wife and three little children" and driving before them a small group of sheep and cows. Passing through Florence, Alabama, a coarse, mindless fellow on horseback scattered the group by riding straight through it. In the ensuing squabble, the assailant dismounted and:

...went into a grocery, got a gun, came out and deliberately shot the poor stranger in the presence of his wife and little children. The wounded man then made an effort to get into some house, when his murderous assailant overtook and stabbed him to the heart with a Bowie knife. This revolting scene, we are informed, occurred in the presence of many citizens, who, report says, never even lifted their voices in defense of the murdered man.

One generously circulated news article was quick to point out the hypocrisy of another northern state heavily engaged in Bowie knife production. It implied that it was beyond the dignity of the upstanding, respectable citizens of Pennsylvania to engage in knife-fighting, and conversely, they were only too willing to financially benefit from those so visited by the scourge. The *Natchez Free Trader*, May 30, 1839 retold a story from the Nashville *Whig* and the *Pennsylvanian* that took both Pennsylvania and the Bowie knife to task:

These worse than barbarous...instruments of human slaughter for sale in Tennessee...thanks to the moral firmness [of Tennessee's legislature]...we can hardly say the same in Pennsylvania, where, if the Bowie is not much used, it is certainly manufactured and sold in great abundance, for the amusement of the people of other states, whose "combativeness" and "destructiveness," are more largely developed, and who find recreation in unfortunate rencontres thinking that to be killed is no great matter, and that to kill is a very feather in the cap of youth...The Bowie knife found a ready market among those new settlers who thought the customs of the country sanctioned its use, but finding our citizens generally, peaceably disposed and unwilling to countenance of violence, they have fallen into disrepute and are seldom seen in the market.

Philadelphia was an important manufacturing source of Bowie knives. That is clearly shown in a story that ran just a few years later in the *New Orleans Commercial Bulletin* on October 14, 1842. The article is notable for its portrayal of the violence rife in America at the time and the implication of the Bowie knife as a contributor to the turbulence:

BOWIE KNIVES. The "PHILADELPHIA EVENING COURIER" states, that the demand for Bowie knives has abated recently,

*(facing page) EARLY CLIP POINT BOWIE MADE IN PITTSBURGH, a jump-off town for many emigrants heading to the frontiers. "JOHN CARTWRIGHT/83 WOOD STREET/PITTSBURGH" prominently marked parallel to the 9-inch, broad single edge, clip point blade with 3½-inch false edge. To the right of those markings in larger die stamp "PENNSYLVANIA" plus three small, star-like markings. Tall, two-piece, dark wood grips fastened by 3 brass pins; narrow, flat rectangular brass crossguard. 14 inches overall. Original, nicely made sheet iron sheath formed in the same shape as blade; brass frog stud. John Cartwright was listed as a maker of Bowie knives in Pittsburgh circa 1830–1858 (American Swords and Sword Makers, Vol. II; R.H. Bezdek). A strong likelihood that this well-proportioned specimen will date to the 1830s or early 1840s at latest. Illustrated with an Indian fur trade musket, displaying the classic dragon sideplate.*

Compendium_Spitzer
Page 263





"TEXAS" MARKED KNIVES: (Left) "H.D. NORTON & BRO/SAN ANTONIO" MARKED GENERAL UTILITY KNIFE WITH LEATHER SHEATH. (Center) Large, heavy, folding Bowie knife c.1840-1850. Leaf-shaped 7-inch single edge, spear point blade marked "THE TEXAS RANGER" in riband, parallel to it and, in very small letters almost at tip "ROUGH AND READY." Accompanied by ciphered marks of six hounds chasing stag. Ricasso marked "SAMUEL ROBINSON/SHEFFIELD." Smaller 3-inch penknife blade with identical "ROBINSON" markings. 13 inches overall opened. Two piece, thick stag grips fastened by 7 iron pins; narrow escutcheon. (Right) Large Bowie circa 1840-50 marked "TEXAS RANGER" in riband ciphered markings of hounds chasing stag and early depiction of a steam locomotive with coal car. Other parallel markings: "SAM'L ROBINSON'S/ORIGINAL BOWIE KNIFE;" ricasso marked "SAM'L ROBINSON/SHEFFIELD." Unusual copper finished, one-piece, heavy handle with relief scroll/leaf designs; matching scallop edged copper crossguard. Weighs 1 lb. Illustrated with U.S. Model 1842 percussion martial pistol and recruiting poster for a New York regiment for service in Texas at the end of the Civil War.

*The Bowie Knife: Unsheathing an American Legend* 

and that a dealer in cutlery in the city has disposed of a quantity bought for the Carthagena Market, $1.50/each, the original price being $20. The inference, therefore, is that the thirst for maiming and killing with these accursed weapons has declined in this country. The desire for murder declines in a ratio to the progress of temperance.

The popularity of the knife, or at least the very commonness of its name and a perception of what it may have represented, was sufficient to cause two Grenada, Mississippi, newspapers, the *Bulletin* and the *Grenadian* to merge and form the newly named *The Bowie Knife*. Issues under that masthead were very short-lived, from March to April 1839, when it was renamed the *Southern Reporter*. Consisting chiefly of advertisements, it is not known if its demise was due to its threatening name or merely to poor circulation.

## THE TEXAN WAR FOR INDEPENDENCE

Large knives were definitely part of the American scene and were intended for combat. That is obvious from a courageously phrased poster printed at Gonzales, Texas, October 2, 1835, with the opening shots of the Texas War of Independence. Under the blaring headlines "FREEMEN OF TEXAS...TO ARMS!!! TO ARMS!!!...NOW'S THE DAY AND NOW'S THE HOUR," volunteers were sought among fellow citizens to leave their homes immediately "...armed and equipped for war *even to the knife.*" Here, too, there is strong likelihood that "Bowie knife" would have been substituted had the words been more generally recognized. The significance of this broadside is the fact that it was taken for granted that each "fellow citizen" would have normally owned not only a firearm but also a fighting knife as well, one part and parcel of every settler's requisite protective inventory.

An 1835 "ORDINANCE AND DECREE TO PURCHASE MUNITIONS OF WAR, PROVISIONS, ARMS, ETC. FOR THE ARMY OF TEXAS…" issued by the General Council and Provisional Government of Texas is impressive documentary evidence that hand-to-hand combat was anticipated in their fight for independence and that large knives (and tomahawks) were among weapons to be issued. The Ordinance, was subsequently published in the Brazoria *Texas Republican*, August 22, 1835 (and likely many other Texas newspapers). It left no room for equivocation about the knife's importance when it included and "…declared necessary and decreed to be purchased… 1000 butcher knives and 1000 tomahawks well-tempered, with handles" among the various itemized cannon, muskets, "yagers" [*sic*], horseman's pistols and swords to be procured.

There is no doubting the popularity and the widespread use of Bowie knives during those momentous years in Texas. They reflected the first extensive use of the Bowie knife by American volunteers in a large armed conflict. Comprehensive research in literature concerning that heroic struggle, culminating in the birth of the independent Republic of Texas, is certain to reveal many more quotable passages about the Bowie knife than has been undertaken here. The project is worthy from an additional point of view. The diligent researcher might strike pay dirt and particular benefit in turning up with the unexpected, the earliest-recorded mention of "Bowie knife" in print or manuscript. Such a find would add significantly to the lore of the knife.

The general interest in Texas was intensified following the formation of the new republic. Articles about it appeared in all manner of publications. A typical example was the series of stories that appeared in the late 1830s in *The Hesperian: A Monthly Miscellany of General Literature*, published in Columbus, Ohio. Its October 1838 issue went to great lengths to describe the coarse, often violent frontier character of the territory. The author observed:

Some of the disturbances which took place during my stay at Houston, were of the most revolting description, and one or two rencounters occurred, which were attended with mortal consequences, under circumstances of peculiar horror. Some of the scenes...in the streets, exceeded description... [and offered proof] to what point of degradation human nature may descend.

*The Hesperian's* descriptions of duels and murders were balanced with comment on the sobriety of parishioners attending the first Christian sermon preached in Houston. The Bowie knife and Jim Bowie were duly mentioned in the January, 1839 issue in the magazine's continuing series on Texas. In a stirring account of the final moments of the battle at the Alamo, with the Mexicans upon the walls: "The desperate courage of the patriots was, however, too much, at first, for their enemies, and hundreds were either pitched from the walls or put to death by the Bowie knife or bayonet."

Among the legion of subsequent eyewitness claims to Jim Bowie's final moments was the *Hesperian's* account "...of a female servant who was [so] fortunate as to escape the general destruction." According to her supposed, unsupported story, the Mexicans rushed into Bowie's room, where he had been confined by sickness: "He was up in time to take his stand in the door; and with the knife which bears his name, he for some time kept the enemy at bay. When his mighty arm was at last tired with the work of death, he fell upon the heaps of the slain which he had thrown around him."

That Bowie knives were taken for granted as an ordinary, normal weapon of those Texas volunteers was demonstrated by their frequent offhand mention in the 1846 (first) edition of *Sam Houston and His Republic* by Charles Edwards Lester. Describing the decisive victory at San Jacinto, April 21, 1836, in which a volunteer army of but 700 Texans defeated a Mexican force over twice its number, Lester remarked on the role played by the knife:

The Texan soldiers rushed on. They were without bayonets, but they converted their rifles into war-clubs and leveled them upon the heads of Santa Ana's men. Along the breastwork there was little more firing off muskets or rifles...it was a desperate struggle hand to hand. The Texans, when they had broken off their rifles at the breech, by smashing in the skulls of their enemies, flung them down, and drew their pistols. They fired them once, and having no time to reload, hurled them against...their foes; and then drawing forth their bowie-knives, literally cut their way through dense masses of living flesh...[as the battle wore on]... the Mexican officers and men stood firm for a time, but the Texans stamped on them as fast as they fell and trampled the

Compendium_Spitzer
Page 266



*"TEXAS RANGER" PROUDLY AND BOASTFULLY PRO-CLAIMS THIS CIRCA 1840-1850 BOWIE. 9-inch, single edge blade; 4½-inch sharpened false edge. The etched panel almost full length with delicate branch, leaf and scroll designs; frosted background. 13½ inches overall. Ricasso marked "C.P. WRAGG & CO./25/FURNACE HILL/SHEFFIELD." German silver cutlery type, hollow handle with large, relief eagle and U.S. shield motif at top, center panel with stars, scroll and floral designs. Narrow, oval german silver crossguard. Red leather sheath entirely embossed full length both sides with fancy scroll, leaf, floral designs; German silver mounts. Shown with rare "Republic of Texas" $500 bond dated 1840 and broadside for the Tenth Brigade Texas State Troops.*

*The Bowie Knife: Unsheathing an American Legend* 

prostrate and the dying down with the dead, and clambering over the groaning, bleeding mass plunged their knives into the bosoms of those in the rear...[describing an individual instance of hand-to-hand combat]...a young man by the name of Robbins, dropped his gun in the confusion of the battle, and happening to run directly in contact with a Mexican soldier who had also lost his musket, the Mexican seized Robbins, and both being stout men, rolled to the ground. But Robbins drew out his bowie-knife, and ended the contest by cutting the Mexican's throat.

In 1855, C.E. Lester's book was reissued, under the title *The Life of Sam Houston . . .The Only Authentic Memoir of Him Ever Published*, without crediting the author. It was merely an expanded edition adapted to then U.S. Senator Houston's political campaign. Describing events immediately following the Battle of San Jacinto, the capture and then protest over the contemplated release of Santa Ana, symbolic reference to the famous knife was made as the Mexican general was removed from the vessel about to return him to his country:

Santa Ana remonstrated against the lawless outrage, and...declared he would die before he left...all other means failing, a military commander ordered him to be put in irons. When the irons were brought...the prisoner jumped up, adjusted his collar, put on his hat and stated his readiness to accompany us. And how else could a defenceless prisoner act, with a score of bayonets or bowie-knives at his breast?"...[later recounting that battle] "...that combat of San Jacinto...must forever remain in the catalogue of military miracles. 750 citizens, miscellaneously armed with rifles, muskets, belt pistols and knives under a leader who had never seen service, except as a subaltern, march to attack near double their numbers...the elite of an invading army.

The Lester volume also offered an interesting early, clear illustration of a classic type, long-bladed, clip point Bowie knife held in the hand of Sam Houston, who is seated before an open fireplace impassively whittling wood chips to feed the fire. That innocuous depiction, simply an artist's fancied, unstudied rendering of the room, and the knife, has been occasionally singled out, and with no further documentation, is said to be an exacting representation of Sam Houston's personal knife. Despite such unfounded claims, that knife and all other ill-defined weapons in illustrations throughout the book, remain but artist's renditions of generic types.

An astutely discerning observation, as dispassionate as it was disquieting, was offered in a letter from the office of the British governor of the island of Barbados on July 12, 1840.* The British Colonial Office was considering stationing an official government resident in Texas. Leaving no doubt as to the Bowie knife's high profile and pervading presence, it also addressed the unsettled, lawless conditions rampant in the immediate years following the Texan War for Independence:

The Government is carried on, as in America, and the laws of Texas have, with a very few slight alterations, been copied from those of the United States...the population...are chiefly Americans, a few Germans, and some English and Irish. These are principally bankrupts, swindlers and felons from the United States occasionally diversified with an oasis of respectability

which only renders the Desert of Villainy around more conspicuous by contrast...murder and every other crime is of great frequency in Texas, and the perpetrators escape with the greatest impunity...it is considered unsafe to walk through the streets of the principal towns without being armed.

The Bowie Knife is the weapon most in vogue and it may not be uninteresting here to state that the greater numbers of these weapons are manufactured in Sheffield and Birmingham and brought over in British ships as a profitable speculation. I have seen one manufactured by 'Bunting & Son' of Sheffield, the blade of which, was 18 inches long and ornamented in beautiful tracery on the steel as "The Genuine Arkansas Tooth Pick" and I have been offered another for sale also of English make, the vendor of which hinted that I ought to pay him a dollar more than he demanded, as he could assure me it had tasted blood.

Following the Texan War for Independence, an influx of settlers and homesteaders headed for the new republic. Among the host of guidebooks, route manuals and other published travel aids for prospective travelers, *The Texan Emigrant: Narration of the Adventures of the Author and Texas in a Description of the Soil, Climate,* [etc.] (1840) is numbered among the more thorough and inclusive. Not much is known about its author, Col. Edward Stiff. His stay in Texas appears to have been of short duration; he may have been a businessman from Baltimore and his military title is believed honorary or whimsical. Stiff espoused the cause of the "Peace Party" and was not in favor of Texan independence from Mexico; he felt those who fomented the revolution were dishonorable. Despite those obvious prejudices and an irascible nature, his guide proved valuable for accurately portraying the adversities faced by emigrants to the new country. As to be expected, the Bowie knife was found worthy of frequent mention. Col. Stiff was singularly unimpressed with the then seat of government at Houston, a town of but 3,000 inhabitants:

Pick-pockets and every description of bad characters abound here and are in promiscuous confusion mingled with the virtuous part of the community...the police of the City is [sic] entirely worthless...[after having possessions stolen] this was the first depredation of the kind I have been made to feel, with the exception of a few dollars picked from my pocket at two different times afterwards, and a Bowie-knife [stolen] out of my bosom when sleeping.

Sam Houston, president of the Republic, was given quite a mixed reception on his return to the city named for him. Stiff described two full days of revelry and mayhem "amid the beating of drums, firing of guns, cutting of throats." Attending theater on the eve of the second day:

The orchestra was discoursing sweet sounds when a peel of three cheers proclaimed the arrival of the President and suit [sic] which was speedily followed by a hissing, the discharge of pistols, the glistening of Bowie-knives, while many a knight proclaimed his prowess by a volley of profanity, some leveled at the President and some at the Mayor, some at the police; when at length all seemed exhausted, the field of battle was examined and three reported wounded; killed none.

The Colonel had wangled an appointment as police officer for Houston, but that career was short-lived. Upon his resignation, he succeeded in incurring the lifelong

*From "Correspondence From the British Archives Concerning Texas" as reprinted in Texas State Historical Association Quarterly, Vol.15, 1912.*

Compendium_Spitzer
Page 268



*GERMAN MADE BOWIE KNIFE FOR THE AMERICAN TRADE CIRCA 1840-50. 14½ inches overall. 9-inch single edge, clip point blade; 3-inch sharpened false edge. Blade etched almost full length with two large panels each side. Obverse upper panel depicts standing hunter with rifle and two racing hounds; the reverse upper panel with the second part of that same game scene, depicting hound chasing stag. Lower panels with crossed hunting sword, firearms, bow and arrow and scroll motifs. Engraved in script in narrow panel on obverse ricasso: "P. KNECHT." Reverse ricasso: "SOLINGEN." Brass cross-guard with acorn finials; brass pommel in shape of fluted shell; matching ferrule. One-piece, iron-wood grips. Leather sheath with wide brass mounts. Other known specimens of a near identical German-made Bowie knives are known with American eagle and patriotic motifs etched on blade. Illustrated with a figurine depicting the fictional American frontiersman "Leatherstocking" from James Fenimore Cooper's popular novels of the 1820s.*

*THE FRENCH MADE BOWIE KNIVES FOR THE AMERICAN TRADE, TOO.*
*Exceptionally fine quality, circa 1840-50, French Bowie knife, fashioned directly after*
*the popular pattern of William Butcher of Sheffield, including a similar Spanish notch*
*and his splayed (or flared) pommel. Heavy, engraved german silver, one-piece cast han-*
*dle fastened to tang by three iron pins. 14 inches overall; 8½-inch clip point blade*
*marked on ricasso "COLLIN./A. LANCRES." Top of the flat pommel is deeply incised*
*with a monogram seal indicating its use for impressing those initials when sealing doc-*
*uments. Handsomely made, heavy weight, matching german silver sheath; wide*
*engraved panels with leaf and scroll motifs. The frog stud is threaded and acts as a lock-*
*ing device for fastening the knife tight to the sheath. Illustrated with cased pair of French*
*percussion dueling pistols by noted maker "DEVISME/PARIS."*





*The Bowie Knife: Unsheathing an American Legend*

enmity of the mayor (who was also editor of the Houston newspaper) by offering unsolicited advice about the general state of affairs and criminal activity, including:

...the source of frequent depredations committed upon the property of others, from a wretch who for a few bits is tempted to allure his victim into a sink of iniquity...to say nothing of the impunity with which all order is set at defiance by disturbers of the peace who frequently use bowie-knives and other savage weapons with such effect, that if murder is not committed, the life of the victim is rendered a burden.

Recounting the Texan victory of April, 1836 at San Jacinto, Stiff wrote of the

"...Mexicans, who, unused to this mode of combat with huge Bowie-knives and the butts of guns, precipitately gave way; and while the shouts of Goliad and The Alamo rung in their ears, nearly one-half of the Mexican Army was laid asleep...in death." Waxing poetic on the battle, he injected a short verse with metaphorical reference to the famous knife:

> *"Stand up my noble bowie men,*
> *And face you right about;*
> *And shoot you straight, bold riflemen,*
> *And we will whip them out!*
> *My cavalry and musket men,*
> *If you'll prove true to me,*
> *I'll be the foremost man in fight,*
> *Said the Ex-Governor of Tennessee."*

In his travels to backwoods outposts, Stiff mentions his own carrying "...of a Bowie knife, about 12 inches long" and visiting a rough-hewn log "hotel"–trading post that "...on our arrival was full of men of every color, black excepted, and contained for sale, tomahawks, bowie-knives, powder and lead, Indian trinkets and a quantity of whisky, which last article was being consumed at no slow rate."

Among the more picturesque descriptions found in the *Texan Emigrant* is that of a group of travelers the author came across in the northern prairies: "The men were clothed in Texan costume, and were armed as usual with the deadly rifle and savage Bowie knife, and taken as a whole, were perhaps as forbidding a set of people as even imagination could well picture."

The Bowie knife maintained high profile in Texas in those years. Massive examples were in evidence and openly carried as seen in a short bit of local gossip in the *Texas Sentinel* of Austin February 11, 1841. The editor took a swipe at the errant carrying of the knife. His remarks carried a personal tinge: "A rowdy...we noticed a few days since...dashing about with a huge Bowie knife protruding from his bosom. We advised him to exchange this weapon for a corn-cob; you will find the latter much lighter and more convenient to wear, than the Bowie knife, and just as useful in a respectable society."

### AN ODD COUPLE!

Pickled herrings and Bowie knives...from Germany to Texas. It is difficult to resist levity at the combination of these commodities. The advertisement in the May 31, 1843, Houston, *Telegraph And Texas Register* has distinct relevance for collectors and students of Bowie knives, further evidence of the manufacture of Bowies in that country for the American market:

IMPORTATION FROM GERMANY. We just received per Brig Weser, F. Haesloop, master, direct from Bremen, the following cargo of new goods: ...80 kegs Holland Herrings, 1 barrel swiss cheese, 50 canvassed Westphalia Hams, 209 Hampers German potatoes...lot of powder horns, shot bags, caps, Bowie knives, Horn goblets, hunting bags, cigar boxes, snuff boxes, Bridles, bits, stirrups, shot and powder...which articles being imported direct from the cheapest sources will be sold very low for cash or produce...E.D. Kaufman& Co./ Strand, Galveston.

*The Bowie Knife: Unsheathing an American Legend* 

## VIEWING AND DESCRIBING BOWIE KNIVES

According to Harold Peterson, author of the influential pioneer work on American knives, there is a formalized procedure in practice by museum curators and archaists for properly viewing and describing knives of any type or age: the knife should be viewed horizontally with the edge down and the handle on the viewer's left…point of the blade to the right. In that position, the front side of the blade, facing the viewer is termed the "obverse." The opposite side, termed the "reverse" includes the maker's name and any blade decorations, mottos or legends. Everything described (on either side) that is towards the point of the knife is "forward" while features described in the other position toward the hilt are termed "…to the back" or "…to the rear" of the blade.

Injecting a minor stumbling block to its adoption, the untiring researcher of Bowie knife lore, the late William R. Williamson, recommended a slight change in the viewing procedure for Bowie knife collectors. As key elements of Bowies are the maker marks and the etched mottos and designs on the blades, he proposed viewing them with the handle in the opposite direction, on the viewer's right, allowing the reverse of the blade to be given principal attention.

Neither procedure appears to be in established vogue within the world of Bowie collectors. The norm continues to be somewhat casual, more by instinct than by design! By repeating the suggested rule…and variation thereof… collectors may choose to adopt the method as common practice.

# BIBLIOGRAPHY

Abels, Robert. *Classic Bowie Knives.* New York: Private pub. by R. Abels, Inc., 1967.

Adams, Bill; Voyles, J. Bruce; Moss, Terry. *The Antique Bowie Knife Book.* Conyers, Georgia: Museum Pub. Co., 1990.

Adams, James T. *Dictionary of American History.* New York: Charles Scribner's, 1961.

Albaugh, William A. and Simmons, Edw. N. *Confederate Arms.* Harrisburg, Pennsylvania: The Stackpole Co., 1957.

Albaugh, William A. *Confederate Edged Weapons.* New York: Harper & Brother, 1960.

Albaugh, William A. *Photographic Supplement of Confederate Swords.* Washington D.C.: Privately pub. for author, 1963. Enlarged ed. Orange, VA: Moss Pub., 1979.

Alger, William R. *Life of Edwin Forrest the American Tragedian.* Philadelphia: Pub. Lippincott & Co., 1877.

Archer, Stephen. *American Actors and Actresses: A Guide to Information Sources.* Farmington Hills, Michigan: Pub. Gale Group, 1983.

Arrington, Alfred W. *Lives and Adventures of the Desperadoes of the Southwest.* New York: Wm. H. Graham, Brick Church, 1849.

Asbury, Herbert. *The French Quarter: An Informal History of the New Orleans Underworld.* New York: Alfred A. Knopf, 1936.

Asbury, Herbert. *Sucker's Progress: History of Gambling in America.* New York: Dodd, Mead & Co., 1938.

Bagwell, B. *Bowies, Big Knives and Battle Blades.* Boulder, Colorado: Paladin Press, 2000.

Baldick, Robert. *The Duel: A History of Duelling.* [sic] New York: Clarkson N. Potter, 1965.

Baldwin, Joseph G. *Flush Times of Alabama and Mississippi.* New York: Appleton & Co., 1853.

Balentine, F.J.P. *Freund & Bro. Pioneer Gunmakers of the West.* Newport Beach, California: Graphic Publishers, 1997.

Ballentine, James. A *Ballentine's Law Dictionary 3rd Edition.* Rochester, New York: Lawyers Co.-Op. Pub. Co., 1969.

Barrett, Lawrence. *American Actor Series.* Boston: James R. Osgood & Co., 1881.

Bartlett, Napier. *Stories of the Crescent City.* New Orleans: Times Job Print, 1869.

Batson, James L. *James Bowie and the Sandbar Fight.* Madison, Alabama: Batson Engineering Pub., 1992.

Bexfield, Harold. *A Short History of Sheffield Cutlery and the House of Wostenholm 1745-1945.* Sheffield, England: Wostenholm Cutlery Ltd., 1945.

Billings, John. *Hardtack and Coffee: The Unwritten Story of Army Life.* Boston: G.M. Smith Co., 1889.

Billington, Ray Allen. *Land of Savagery: Land of Promise.* New York: W.W. Norton & Co., 1981.

Binfield, Clyde and Hey, David. *Mesters to Masters, A History of the Company of Cutlers in Hallamshire.* Oxford Univ. Press, 1997.

Black, Henry Campbell. *Black's Law Dictionary 4th Edition.* St. Paul, Minnesota: West Pub.-Co., 1968.

Blackmore, Howard L. *Hunting Weapons.* New York: Walker & Co., 1971.

Boatner, Mark M. *The Civil War Dictionary.* New York: David McKay Co., 1959, 1991.

Bon Gaultier (pseudonym) See: Theo. Martin and Wm. Aytoun.

Bonner, T.D. *The Life and Adventures of James P. Beckwourth, Mountaineer, Scout, Pioneer and Chief of Crow Nation.* New York: Harper & Bros., 1856.

Borcke, Heros von. *Memoirs of the Confederate War for Independence.* Edinburgh & London: Blackwood & Sons, 1866. (Earlier pub. 1865 in *Blackwood's Magazine*).

Bordman, Gerald M. *The Oxford Companion to the American Theater.* London: Oxford University Press, 1984.

Borthwick, J.D. *Three Years in California.* Edinburgh,

Compendium_Spitzer
Page 272



Scotland: Blackford & Sons, 1857.

Bowie, Walter Worthington. *The Bowies and Their Kindred.* Washington D.C.: Press of Cromwell Brothers, 1899. (Reprinted 1971 by Polyanthos, Inc. Cottonport, LA).

Bradford, William. *A Chronological History of New England.* Boston: Kneeland & Green, 1736.

Brinckerhoff, S.B. and Chamberlain, P.A. *Spanish Military Weapons in Colonial America 1700-1821.* Harrisburg, Pennsylvania: Stackpole Books, 1972.

Brown, James. *Life of a Pioneer.* Salt Lake City, Utah: G.Q. Cannon, 1900.

Brown, Rodney Hilton. *American Polearms. 1526-1865* New Milford, Connecticut: N. Flayderman & Co., Inc., 1967.

Brownlow, William. *Sketches of the Rise, Progress and Decline of Secession with a Narrative of Personal Adventures Among the Rebels.* Philadelphia: George W. Childs, 1862.

Bruce, Dickson D., Jr. *Violence and Culture in the Antebellum South.* Austin, Texas: University of Texas Press, 1979.

Burton, Kenneth J. *A Sure Defence: The Bowie Knife Book.* Balmain, Australia: K.J. Burton & Co., 1988.

Burton, Richard Francis. *City of the Saints and Across the Rocky Mountains to California.* London: Longman, Green, Longman & Roberts, 1861.

Campbell, John P. *Southern Business Directory.* Charleston, S.C. Walker & James, 1854.

Carlton, A.B. *The Law of Homicide.* Cincinnati, Ohio: Clark & Co., 1882.

Carter, A. and Walter, J. *The Bayonet: A History of Knife and Sword Bayonets 1850-1970.* New York: Scribner's Sons, 1974.

Cary, Capt. R.M. *Skirmishers' Drill and Bayonet Exercise.* Richmond: West & Johnston, 1861.

Chamberlain, Samuel. *My Confession – The Recollections of a Rogue.* (Originally written 1855-1861 as *My Confession* First Pub: New York: Harper & Bros., 1956.

Cody, William F. *The Life of William F. Cody known as Buffalo Bill, The Famous Hunter, Scout and Guide.* Hartford: Frank Bliss Pub., 1879.

Connelley, William E. *Quantrill and the Border Wars.* Cedar Rapids, Iowa: Torch Press, 1910.

Connelley, William E. *The Life of Preston B. Plumb 1837-1891.* Chicago: Browne & Howell, 1913.

Cremony, John C. *Life Among the Apaches.* San Francisco: Roman & Co., 1868.

Crockett, David. *Col. Crockett's Exploits and Adventures in Texas... Written by Himself.* Philadelphia: T.K.& P.G. Collins, 1837.

Curry, R.O. and Cowden, J.D. *Slavery in America: Theodore Weld's American Slavery as it is.* Itasca, Illinois: University of Connecticut Research Foundation, Peacock Publishers, 1972.

Custer, George A. *Wild Life on the Plains and Horrors of Indian Warfare.* St. Louis, Missouri: Sun Pub. Co., 1885.

Dahlgren, Cmdr. John A. *Boat Armament of the U.S. Navy*

Designed by and Executed Under the Direction of J.A. Dahlgren, Commander U.S.N. in Charge of the Ordnance Department U.S. Naval Yard, Washington D.C., Philadelphia, PA: King & Baird, 1856.

Davis, Nicholas. (Confederate Chaplain) *The Campaign from Texas to Maryland.* Richmond, Virgina: 1863. Reprinted *Chaplain Davis and Hood's Texas Brigade.* Edited by D.E. Everett: Baton Rouge: Louisiana State University Press, 1999.

Davis, William C. *Three Roads to the Alamo.* New York: Harper Collins Pub., 1998.

Davis, William C. *Jefferson Davis, The Man and His Hour.* Baton Rouge: Louisiana State University Press, 1991.

Devens, Richard M. *The Pictorial Book of Anecdotes and Incidents of the War of the Rebellion.* Hartford: Hartford Pub. Co., 1867.

Dickens, Charles. *American Notes* London: Wilson & Co., 1842.

Dickens, Charles. *Great Expectations.* London, England: Pub. 1860-1861 in serialized form in the periodical *All the Year Round; A Weekly Journal.*

Domenech, Abel. *Exhibition Knives: Joseph Rodgers & Sons. The Samuel Setian Collection.* Buenos Aires, Argentina: Samuel Setian, 1999.

Dobie, J. Frank. *Stories of Christmas and the Bowie Knife.* Austin, Texas: The Stack Co., 1953 (Reprinted 2003, Phillips Publications: Williamstown, NJ).

Duke, Basil W. *History of Morgan's Cavalry.* Cincinnati: Miami Printing & Pub. Co., 1867.

Durang, Charles. *History of the Philadelphia Stage From 1752-1854.* appeared serially in the Philadelphia *Journal.*

Faust, Patricia (Editor). *Historical Times Illustrated Encyclopedia of the Civil War.* New York: Harper & Row, 1986.

Featherstonhaugh, George W. *Excursion Through the Slave States, From Washington on the Potomac to the Frontier of Mexico.* London, England: John Murray, 1844.

Flayderman, E. Norman. *Scrimshaw & Scrimshanders; Whales and Whalemen.* New Milford, Connecticut: N. Flayderman & Co., Inc., 1972.

Flexner, Stuart B. *I Hear America Talking: An Illustrated Treasury of American Words and Phrases.* New York: Van Nostrand Reinhold Co., 1976.

Flynn, Jean. *Jim Bowie A Texas Legend.* (Stories for Young Americans Series) Austin, Texas: Eakins Press, 1980.

Foster-Harris, William. *The Look of the Old West.* New York: Viking Press, 1955.

Fremantle, Lt. Col. Arthur James Lyon. *Three Months in the Southern States April-June 1863.* New York: J.B. Bradburn, Pub., 1864.

Fuller, Claud E. and Steuart, Richard D. *Firearms of the Confederacy.* Huntington, West Virginia: Standard Publications Inc., 1944.

Gamble, Thomas. *Savannah Duels and Duelists 1733-1877.* Savannah, Georgia: (Printer Unknown), 1923.

Garavaglia, Louis A. and Worman, Charles G. *Firearms of the American West.* Albuquerque, New Mexico:

Compendium_Spitzer
Page 273

*The Bowie Knife: Unsheathing an American Legend* 

University of New Mexico Press Vol. I 1984; Vol. II 1985.

Garrett, Pat. F. *The Authentic Life of Billy the Kid.* Norman, Oklahoma: University of Oklahoma Press, 1954.

Gatty, Rev. Alfred. *Sheffield: Past and Present.* Sheffield, England: T. Rodgers, 1873.

Gihon, Dr. John H. *Geary and Kansas; Governor Geary's Administration in Kansas with History of the Territory Until July, 1857.* Philadelphia: Charles C. Rhodes, Pub., 1857.

Gilliam, Col. William. *Manual For Instruction for Volunteers and Militia of the Confederate States.* Richmond: West & Johnston, 1862.

Gladstone, Thomas H. *The Englishman in Kansas: or Squatter Life and Border Warfare.* New York: Wm. Reese Co., 1857.

Goodspeed, W.A. *Biographical and Historical Memoirs of Northeast Arkansas.* Chicago: Goodspeed Publishers, 1889.

Goodspeed, W.A. *Biographical and Historical Memoirs of Western Arkansas.* Chicago: Southern Pub. Co., 1891.

Gosse, Philip Henry. *Letters From Alabama, Chiefly Relating to Natural History.* London: Morgan & Chase, 1859.

Grant, Madison. *The Knife in Homespun America.* York, Pa: Privately published by author, 1984.

Hall, Basil Capt. Royal Navy. *Travels in North America in the Years 1827-1828.* Edinburgh, Scotland: Cadell & Co., 1829.

Hall, James. *Letter from the West: Sketches of Scenery, Manners, Customs and Anecdotes [from] First Settlements [etc].* London: H. Colburn, 1828.

Hamilton, John D. *The Ames Sword Company 1829-1935.* Providence, Rhode Island: Mowbray Co., 1983.

Hardin, Albert N., Jr. *The American Bayonet 1776-1964.* Philadelphia: Riling and Lentz, 1964.

Hardin, Albert N., Jr. *Light But Efficient.* Dallas, Texas: Taylor Publishing Co., 1973.

Harte, Bret. *The Outcasts of Poker Flat.* Osgood & Co. in *Overland Monthly* Jan. 1869.

Hartzler, Daniel D. *Confederate Presentation & Inscribed Swords and Revolvers.* Gaithersburg, Maryland: Olde Soldier Books, Inc., 1988.

Hempstead, Fay. *A Pictorial History of Arkansas from Earliest Times to 1890.* St. Louis, Missouri: Thompson Pub. Co., 1890.

Herringshaw, T.W. *Herringshaw's Encyclopedia of American Biography of the 19th Century.* Chicago: American Publisher's Association, 1901.

Hertzog, Peter. *Little Known Facts About Billy, the Kid.* Santa Fe, New Mexico: Press of the Territorian, 1963.

Hinman, Wilbur. *The Story of the Sherman Brigade.* Alliance, Ohio: Privately Pub. By author, 1897.

Hoffman, Charles F. *A Winter in the West by a New Yorker.* New York: Harper & Brother, 1835.

Holland, Barbara. *Gentlemen's Blood: A History of Dueling.* New York: Bloomsbury, 2003.

Holmer, Paul. *A Bibliography of Bowie Knives and Other Cutlery of Nineteenth Century America.* Prepared for the Antique Bowie Knife Association, 1998.

Holmes, F.L. *Badger Saints and Sinners.* Milwaukee, Wisconsin: E.M. Hale & Co., 1939.

Holmes, Oliver Wendell. *Autocrat of the Breakfast Table.* New York: Hurst & Co., 1857.

Hooten, Charles. *St. Louis Isle, or Texiana.* London: Simonds and Ward, 1847.

Hopewell, Clifford. *James Bowie; Texas Fighting Man.* Austin, Texas: Eakin Press, 1994.

Hoyt, Edwin P. *The Alamo: an Illustrated History.* Dallas: Taylor Pub. Co., 1999.

Hutton, Alfred. *The Sword and the Centuries; Old Sword Days and Old Sword Ways.* London: Grant Richards, 1901.

Irving, Washington. *History of New York by Knickerbocker.* New York: Inskeep & Bradford, 1809.

James, E.C. *The Story of Knives.* New York: G.P. Putnam's Sons, 1968.

Johnson, William. *William Johnson's Natchez... The Ante-Bellum Diary of a Free Negro.* Baton Rouge: Louisiana State University Press, 1951; reissued 1979.

Jones, John B. *A Rebel War Clerk's Diary.* Philadelphia: J.B. Lippincott & Co., 1866.

Jordan, Philip D. *Frontier Law and Order.* Lincoln, Nebraska: University of Nebraska Press, 1970.

Kane, Harnett. *Gentlemen, Swords and Pistols.* New York: William Morrow & Co., 1951.

Keleher, Wm. A. *Violence in Lincoln County 1869-1881.* Albuquerque, New Mexico: University of New Mexico Press, 1957.

Kelly, William Jr. *An Excursion to California.* London: Chapman & Hall, 1851.

Kerksis, Sydney C. *Plates and Buckles of the American Military 1795-1874.* Kennesay, Georgia: Gilgal Press, 1974.

Kovach, Bill & Rosenstiel, Tom *Warp Speed; America in the Age of Mixed Media.* Century Foundation Press, 1999.

Lake, Stuart N. *Wyatt Earp, Frontier Marshal.* Boston: Houghton Mifflin Co., 1931.

Lamar, Howard R. (Editor) *The New Encyclopedia of the American West.* New Haven, Connecticut: Yale University Press, 1998.

Landry, Stewart O. *Dueling in Old New Orleans.* New Orleans: Harmonson Pub., 1950.

Lasansky, Jeanette. *To Draw, Upset and Weld: The Work of the Pennsylvania Rural Blacksmith 1742-1935.* Lewisburg, Pennsylvania: Penn. State Univ. Press, 1980.

Leach, Joseph. *Bright Particular Star: The Life and Times of Charlotte Cushman.* New Haven: Yale University Press, 1970.

Lester, Charles Edward. *Sam Houston and His Republic.* New York: Burgess, Stringer & Co., 1846. (Later reissued 1855 by J.C. Derby, New York without using author's name as *The Life of Sam Houston the Only Authentic Memoir of Him*).

Levine, Bernard R. *Knifemakers Old of San Francisco.* San Francisco: Badger Books, 1978.

Logan, James. *Notes of a Journey Through Canada, the*

Compendium_Spitzer
Page 274

*The Bowie Knife: Unsheathing an American Legend*

*United States of America and the West Indies.* Edinburgh, Scotland: Fraser & Co., 1838.

Long, Jeff. *Duel of Eagles: The Mexican and U.S. Fight for the Alamo.* New York: Wm. Morrow & Co., Inc., 1990.

Lord, Francis A. *Civil War Sutlers and Their Wares.* New York: Yoseloff Pub., 1969.

Lossing, Benson. *Pictorial History of the Civil War in the United States of America.* Hartford: T. Belknap, Pub., 1868.

Lossing, Benson. *Popular Cyclopaedia of U.S. History.* New York: Harper & Bros., 1881.

Maillard, Nicholas D. *The History of the Republic of Texas, From the Discovery of the Country to the Present Time.* London, 1842.

Marjoribanks, Alexander. *Travels in South and North America.* London: Simkin, Marshall & Co., 1853.

Marryat, Frederick. *A Diary in America with Remarks on its Institutions.* London: Longman, Orme, Brown, Green, 1839.

Martin, Sir Theodore and Aytoun, William *Book of Ballads.* Edited by *Bon Gaultier (pseudonym)* London 1845, New York 1852.

Martineau, Harriet. *Society in America.* London, England: Saunders & Otley, 1837.

M'Caleb, Thomas. *The Louisiana Book: Selections from the Literature of the State. [etc].* New Orleans: R.F. Straughan 1894.

McAulay, John D. *Civil War Small Arms of the U.S. Navy and Marine Corps.* Lincoln, Rhode Island: Mowbray Pub. 1999.

McBane, Donald. *The Expert Swordman's Companion.* Glasgow, Scotland, 1728.

McClellan, H.B. *Life and Campaigns of J.E.B. Stuart.* Boston: Houghton & Mifflin, 1885.

McClure, Alexander Kelly. *Three Thousand Miles Through the Rocky Mountains.* Philadelphia: J.B. Lippincott, 1869.

McLoughlin, Denis. *Wild and Woolly: An Encyclopedia of the Old West.* New York: Doubleday & Co., 1975.

McWhiney, Grady. *Cracker Culture: Celtic Ways in the Old South.* Tuscaloosa, Alabama: University of Alabama Press, 1988.

Meine, Franklin J. *Mark Twain's First Story.* Iowa City, Iowa: Prairie Press Pub., 1952.

Melville, Herman. *Moby Dick.* New York: Harper & Brothers, 1851.

Mims, Sam. *Trail of the Bowie Knife.* Homer, Louisiana: The Guardian Journal, 1967.

Minnis, Gordon B. *American Primitive Knives. 1770-1870* Bloomfield, Ontario: Museum Restoration Service, 1983.

Morris, T.A. *Miscellany: Consisting of Essays, Biographical Sketches and Notes of Travel.* Cincinnati, Ohio: L. Swormstedt & J.H. Power for Methodist Episcopal Church, 1852.

Moore, Frank (Editor). *Rebel Rhymes and Rhapsodies.* New York: G.P. Putnam, 1864.

Moses, Montrose J. *The Fabulous Forrest: The Record of an American Actor.* Boston: Little, Brown & Co., 1929.

Murphy, John M. and Madaus, Howard M. *Confederate Rifles and Muskets.* Newport Beach, California: Graphic Publishers, 1996.

Murray, Henry A. *Lands of the Slave and the Free: or Cuba, The United States and Canada.* London: John W. Parker Son, 1855.

Murray, Thomas H. *History of the Ninth Connecticut Infantry.* New Haven: Price & Adkins, 1903.

Nabokov, Vladimir. *Lolita.* New York: Putnam Publishing, 1958. (Reprint 1997 by Random House).

Neilsen, James R. *Knives and the Law.* Knoxville, Tennessee: Knife World Pub., 1980.

Neumann, George C. *Swords & Blades of an American Revolution.* Harrisburg, Pennsylvania: Stackpole Books, 1973.

Nichols, E.J. *Zach Taylor's Little Army.* New York: Doubleday & Co., Inc. 1963.

Oates, S.B. *To Purge This Land With Blood; A Biography of John Brown.* Amherst, Massachusetts: University of Mass. Press, 1970.

Otero, Miguel Antonio. *My Life on the Frontier. 1864-1897* (2 vols.) New York: Press of the Pioneers, 1935.

Palmer, Ben; Moran, W.F. & Phillips, J. *Bowie Knives of the Ben Palmer Collection.* Williamstown, N.J. : Phillips Publications, 1992. (2nd Edition, 2002 *Bowie Knives & Bayonets of the Ben Palmer Collection).*

Palmer, Dr. J.W. *The New and the Old; California and India in Romantic Aspects.* London: Rudd & Carleton, 1859.

Pankiewicz, Philip R. *New England Cutlery.* Gilman, Connecticut: Hollytree Publications, 1986.

Parker, A.A. *Trip to the West and Texas… A Journey of Eight Thousand Miles 1834-1835.* Concord, New Hampshire: White & Fischer, 1835.

Parsons, John F. *Henry Deringer's Pocket Pistol.* New York: Wm. Morrow Co., 1952.

Peckham, Lt. Col. James *General Nathaniel Lyon and Missouri in 1861.* New York: American News Co., Pub., 1866.

Peterson, Harold L. *American Knives.* New York: Charles Scribner's Sons, 1958.

Peterson, Harold L. *How Do You Know It's Old?* New York: Chas. Scribner's Sons, 1975.

Peterson, Harold L. *Daggers and Fighting Knives of the Western World.* New York: Walker & Co., 1968.

Phillips, William A. *Conquest of Kansas by Missouri and Her Allies.* Boston: Phillips, Sampson & Co., 1856.

Pope, William F. *Early Days in Arkansas… Personal Recollections of an Old Settler.* Little Rock, Arkansas: F.W. Allsopp, Pub., 1895.

Price, George F. *Across the Continent with the Fifth Cavalry.* New York: Van Nostrand Co., 1883.

Read, J.A. *Journey to the Gold Diggins.* Cincinnati, Ohio, 1849.

Redpath, James. *The Public Life of Capt. John Brown.* Boston: Thayer & Eldridge, 1860.

Rees, James. *The Life of Edwin Forrest with Reminiscences and Personal Recollections.* Philadelphia: T.B. Peterson & Bros., 1874.

Reilly, Robert. *American Socket Bayonets and Scabbards.*

*The Bowie Knife: Unsheathing an American Legend* 

Lincoln, Rhode Island: Mowbray Publishing, 1990.

Rhodes, J.F. *History of the United States 1850-1909.* New York: Macmillan Co., 1928.

Rice, James and Besant, Walter. *The Golden Butterfly.* London: Chatto & Windus, 1876.

Ripley, Lt. Col. W.Y. *Vermont Riflemen in the War For the Union; A History of Company F, First U.S. Sharp Shooters.* Rutland, Vermont: Tuttle & Co., 1883.

Robinson, Charles. *The Kansas Conflict.* New York: Harper & Bros., 1892.

Rohrbough, Edward Gay, Jr. *James Bowie and the Bowie Knife in Fact and in Fancy.* Austin, Texas: Unpublished manuscript August, 1938 written for Master of Arts degree at University of Texas, Graduate School, Austin.

Russell, Carl P. *Firearms, Traps & Tools of the Mountain Men.* New York: A. Knopf, Inc., 1967.

Russell, William Howard. *My Diary North & South.* London: Bradbury & Evans, 1863.

Sabine, Lorenzo. *Notes on Duels and Duelling... With a Preliminary Historical Essay.* London: Samson, Low, Son & Co. Boston: Crosby, Nichols & Co., 1855.

Samuels, Samuel. *From Forecastle to the Cabin.* New York: Harper and Bros., 1887.

Sanborn, F.B. *The Life and Letters of John Brown.* Boston: Roberts Bros., 1891.

Schultz, Christian. *Travels on an Inland Voyage in the Years 1807 and 1808.* New York: I. Riley Pub., 2 vols., 1810.

Scott, Major John. *Partisan Life with Colonel John S. Mosby.* New York: Harper & Brothers, 1867.

Seibert, Percy. *Tiffany and Gaylord Express and Exhibition Belt Plates.* New York: Joel & Aronoff, 1950. (Entire book fraudulent, including publication date c.1970s).

Senour, Rev. Faunt LeRoy. *Morgan and His Captors.* Cincinnati: C.F. Vent & Co., 1865.

Simmons, M. and Turley, F. *Southwestern Colonial Ironwork.* Albuquerque, New Mexico: University of New Mexico Press, 1980.

Smedlund, W.S. *Campfires of Georgia's Troops 1861-1865.* Lithonia, Georgia: Privately published by author, 1995.

Smith, Professor Justin H. *The War with Mexico.* New York: Macmillan Co., 1919.

Smithwick, Noah. *The Evolution of a State or Recollections of Old Texas Days.* Austin, Texas: H.P.N. Gammel, 1900; reprinted Univ. of Texas, Austin, 1993.

Sneden, Robert Knox. *Eye of the Storm: A Civil War Odyssey.* New York: The Free Press; Simon & Schuster, 2000.

Sowell, Andrew Jackson. *Rangers and Pioneers of Texas.* San Antonio: Shepard Brothers & Co., 1884.

Speers, W.S. and Brown, John H., Editors. *The Encyclopedia of the New West.* Marshall, Texas: The U.S. Biographical Publishing Co., 1881.

Squier, E.G., Editor. *Frank Leslie's Pictorial History of the American Civil War.* New York: F. Leslie, 1861-1862 (2 volumes).

Stanley, Sir Henry Morton. *Autobiography of Sir Henry Morton Stanley.* Boston: Houghton Mifflin Co., 1909.

Stapleton, Tom K. *The Story of a Knife* Bulletin No. 67 Fall 1992. *The Sheffield Works.* Bulletin No. 76, 1997. American Society of Arms Collectors. (Both privately printed as monographs).

Steward, Dick. *Duels and the Roots of Violence in Missouri.* Columbia, Missouri: University of Missouri Press, 2000.

Stiff, Col. Edward. *The Texas Emigrant; Narration of the Adventures of the Author in Texas and a Description of the Soil, Climate, Productions, Minerals, [etc] with Principal Incidents of 15 Years Revolution in Mexico.* Cincinnati, Ohio: George Conclin, Pub., 1840. (Republished in 1847 as *A New History of Texas).*

Stone, G.C. *A Glossary of the Construction, Decoration and Use of Arms and Armor in All Countries and All Times.* Portland, Maine: Southworth Press, 1934.

Stowe, Harriet Beecher. *Uncle Tom's Cabin.* London: John Cassell, 1852.

Styple, William B. (Editor) *Writing and Fighting the Civil War: Soldier Correspondence to the New York Sunday Mercury.* Kearny, N.J.: Belle Grove Pub. Co., 2000.

Sullivan, Edward. *Rambles and Scrambles in North and South America.* London, England: Richard Bently, 1852.

Summerfield, Charles. (pen name; see Arrington, Alfred.) W. Tarassuk, L. Blair, C. (Editors) *Complete Encyclopedia of Arms and Weapons.* New York: Bonanza Books, 1986.

Thomson, Mortimer (pen name "Q.K. Philander Doesticks"). *Plu-ri-bus-tah A Song That's By No Author.* Phila: T.B. Peterson & Bros., 1856.

Thorp, Raymond W. *Bowie Knife.* Albuquerque, New Mexico: University of New Mexico Press, 1948.

Thorp, Raymond W. *Spirit Gun of the West. The Story of Doc W.F. Carver.* Glendale, California: Arthur H. Clark Co., 1957.

Thorp, Raymond W. *Crow Killer: The Saga of Liver-Eating Johnson.* [sic] Bloomington, Indiana: University Press, 1958.

Thorpe, T.B. Phila: *Big Bear of Arkansas.* Carey & Hart, 1847.

Thrapp, Dan L. *Encyclopedia of Frontier Biography.* (3 vols.) Spokane, Washington: Arthur H. Clark Co., 1988.

Throne, Mildred, Editor. *The Civil War Diary of Cyrus F. Boyd Fifteenth Iowa Infantry 1861-1863.* Iowa City, Iowa: State Historical Society of Iowa, 1953. Baton Rouge: Louisiana State University Press, 1998.

Tocqueville, Alexis de. *Democracy in America.* London: Saunders & Oakley, 2nd Edition, 1836. (Many later reprints).

Todd, Frederick P. *American Military Equipage.* 1851-1872. Providence, Rhode Island: The Company of Military Historians, Vol. I, 1974.

Todd, Reverend John. *Early Settlement of Western Iowa.* Des Moines, Iowa: Historical Department of Iowa, 1906.

Todish, Tim and Terry. *Alamo Source Book: Comprehensive Guide to the Alamo and the Texas Revolution.* Austin, Texas: Eakin Press, 1998.

Compendium_Spitzer
Page 276



Trollope, Frances. *Domestic Manners of the Americans.* London: Whittaker, Treacher and Co. 1832. (2 Volumes).

Truman, Benjamin C. *The Field of Honor… A History of Dueling in all Countries…* [with] *Descriptions of the Noted Hostile Meetings in Europe and America.* New York: Fords, Howard & Hubert, 1884. (Reprint/abridged Tabler Books, San Diego 1992).

Twain, Mark. *Roughing It.* New York: Harper Bros, 1872.

Tweedale, Geoffrey. *The Sheffield Knife Book. A History and Collectors Guide.* Sheffield, England: The Hallamshire Press, 1996.

Tweedale, Geoffrey. *Sheffield Steel and America: A Century of Commercial and Technological Interdependence, 1830-1930.* Cambridge, England: Cambridge University Press, 1987.

Utley, R.M. (Editor). *Encyclopedia of the American West.* New York: Random House, 1997.

Vandiver, F.E. *Ploughshares Into Swords.* College Station, Texas: A&M University, 1952.

Verne, Jules. *From the Earth to the Moon.* (De La Terre a La Lune)1865 in French; New York: Scribner, Armstrong & Company, 1873 (1st English version).

Viele, Mrs. E.L. *Following the Drum: A Glimpse of Frontier Life.* New York: Rudd & Carleton, 1858.

Villard, O.G. *John Brown; A Biography Fifty Years After.* Boston: Houghton Mifflin Co., 1910.

Walton, W.M. *Life and Adventures of Ben Thompson, The Famous Texan.* San Antonio, Texas: Privately Pub. by author.

Warner, Ken (Ed.) *11th Annual Edition: Knives.* Northbrook, Illinois: DBI Books, 1991.

Warner, Ken (Ed.). *Knives '94.*Northbrook, Illinois: D.B.I. Books, 1994.

Washer, Richard *Sheffield Bowie & Pocket-Knife Makers 1825-1925.* Nottingham, England: T.A. Vinall, 1974.

Watson, William. *Life in the Confederate Army: The Observations and Experiences of an Alien in the South During the American Civil War.* New York: Scribner & Welford, 1888.

Weld, Theodore Dwight. *American Slavery as it is: A Testimony of One Thousand Witnesses.* New York: American Anti-Slavery Society, 1839.

Wellman, Paul I. *The Iron Mistress.* Garden City, New York: Doubleday, 1951.

Whipple, Henry Benjamin. *Bishop Whipple's Southern Diary 1843-1844.* (Edited by Lester B. Shippee) Minneapolis: University of Minnesota Press, 1937.

Wilkes, Charles. *United States Exploring Expedition Commanded by Charles Wilkes.* Philadelphia 1845-1848. Vol III.

Williams, L.W. Ph.D. *Cassius Marcellus Clay: Emancipator with a Bowie Knife.* Unpublished manuscript; copyright 1996.

Williamson, William R. *I*XL Means I Excel: A Short History of the Bowie Knife.* (monograph) Pub. by Rob't E.P. Cherry. (Reprint; undated, from article *Antique Arms Annual of Texas Gun Collector Ass'n., 1971).*

Wilson, John Lyde. *The Code of Honor; or Rules for the Government of Principals and Seconds in Duelling.*

[sic] Charleston, South Carolina: (first published 1838 as a 22 page booklet) second edition 1858, pub. by James Phinney 46 pages included in the 1777 *Irish Code of Honor.* Two later editions of Wilson's code; 1873 pub. by Clark & Hofeline, New Orleans 1883 (retitled) by Brandao & Co., New Orleans.

Wilson, R.L. *Steel Canvas: The Art of American Arms.* New York: Random House, Inc., 1995.

Wilson, R.L. *The Peacemakers: Arms and Adventure in the American West.* New York: Random House, Inc., 1992.

Wise, Arthur. *The Art and History of Personal Combat.* New York: Arma Press/New York Graphic Society, 1971.

Worsham, John H. *One of Jackson's Foot Cavalry; His Experience and What He Saw During the War. 1861-1865.* New York: Neale Pub. Co., 1912.

(——) *Acts of the Confederate States Congress.* Richmond: 1861-1865 Vols. I & V.

(——) *Antique Arms Annual 1971.* Waco, Texas: Texas Gun Collectors' Association, 1971.

(——) *Appleton's Cyclopedia of American Biography.* Edited by James G. Wilson & John Fiske New York: D. Appleton & Co., 1898.

(——) *Francis Bannerman, New York City, Military Goods Catalog.* 1907 edition.

(——) *Bowie Knives: Origin and Development.* (Tabloid size 40 page on newsprint published by La Commission Des Avoyelles Avoyelles Parish, Louisiana, 1979 to accompany *Official Exhibit of Bowie Knives.*

(——) *The British Code of Duel: A Reference to the Laws of Honour and the Character of Gentleman.* [sic] London: Knight and Lacey, 1824.

(——) *British Interests and Activities in Texas 1836-1846.* Baltimore: John Hopkins Press, 1910.

(——) *Butterfield & Butterfield, Auctioneers: Catalog of the William R. Williamson Bowie Knife Collection.* San Francisco, Cal.: Butterfield, 1997.

(——) *Butterfield & Butterfield, Auctioneers Catalog of the Antique Bowie Knife Collections of Robert Berryman and Charles Schreiner III.* San Francisco, Cal., 1992.

(——) *Confederate Records of the State of Georgia.* (4 vols.) Compiled by A.D. Chandler under authority of Legislature of Georgia. Atlanta, Georgia: Pub. by State of Georgia, 1910.

(——) *The Descriptive Catalogue of Flags, Trophies and Relics Exhibited by the Bureau of Military Statistics at the Army Relief Bazaar.* Albany, N.Y.: Weed, Parsons Co., 1864.

(——) *Dictionary of American Biography.* (Edited by Allen Johnson) New York: Charles Scribner's Sons, Copyright 1927; Edition of 1964.

(——) *Dictionary of Americanisms on Historical Principles.* Chicago, Illinois: Univ. of Chicago, 1951.

(——) *The Dictionary of National Biography from the Earliest Times to 1900.* London: Oxford University Press, 1922.

(——) *Gold Rush; A Literary Exploration.* (anthology) Berkeley, California: Heyday Books, 1997. (assembled



by California Council for the Humanities, San Francisco).

(——) *A Guide to Understanding the Laws… Regarding Knives.* Burlington, Iowa: American Knife and Tool Institute (AKTI), 1999.

(——) *Heroes of Texas.* Waco, Texas: Texian Press, 1964.

(——) *Official Records of the Union and Confederate Navies in the War of the Rebellion.* Washington D.C.: Gov't Printing Office, 1895-1897.

(——) *Ohio Gunsmiths & Allied Tradesmen Vol. I.* Beverly, Ohio: Association of Ohio Long Rifle Collectors c.1990. Hutslar, Donald A.

(——) *Ohio Historical Society Catalog of Bowie Knives from the Collections of Robert Abels and the Ohio Historical Society.* Columbus, Ohio: April, 1962.

(——) *The Old West Series: The Gunfighters,* 1974; *The Texans,* 1975; *The Gamblers,* 1978. New York: Time-Life Corp.

(——) *Statistical Tables [of] Condition & Products…of Industry in Massachusetts.* Boston, Mass.: Boston Dutton and Wentworth State Printers, 1837.

(——) *Swords and Hilt Weapons.* New York: Barnes and Noble, 1993.

(——) *New Handbook of Texas.* Austin, Texas: Texas State Historical Assoc'n., 1996.

(——) *Voices of the Civil War: Gettysburg.* Alexandria, Virginia: Time Life Books, 1995.

(——) *Voices of the Civil War, Charleston.* Alexandria, Virginia: Time Life Books, 1997.

(——) *The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies.* (128 Volumes) Washington D.C.: Gov't Printing Office 1881-1901 (known as the "O.R.s").

## PERIODICALS

*Adventure Magazine.* Chicago, Illinois June 15, 1935.

*All the Year Round, A Weekly Journal.* Charles Dickens, Editor London: Chapman & Hall; May 25, 1861.

*The American Arms Collector.* Towson, Maryland: Collectors' Press Vol I. Jan., Apr., July, 1957.

*American History Magazine.* June 1999; October 1999.

*American Notes and Queries… For Literary Men, General Readers.* etc. Philadelphia: Westminster Pub. Co., June 2, 1888; Mar. 23, July 1889.

*American Society of Arms Collectors.* Various Bulletins and monographs.

*Antiques.* New York: April 1941.

*Antique Bowie Knife Journal.* Publication of Antique Bowie Knife Ass'n; Fall 1999.

*ARGOSY,* August 1956.

*Arkansas Historical Association Quarterly.* Little Rock, Arkansas Vol. 53, No.2, 1994. *Arkansas and the Toothpick State Image* by William Worthen, Jr.

*Army & Navy Chronicles.* Vol. 9 No. 15 Oct. 10, 1839.

*Army & Navy Journal.* April 13, 1878.

*The Confederate Veteran.* Vol. 30, No.2. *Incidents of the Peninsula Campaign.* Article by J.W. Minnich.

*Davy Crockett's Almanack.* [sic] Nashville, Tenn. (shown in the publications, however, publication believed in Boston by Charles Ellms annually 1835 and later)

Various Nashville, Tennessee publishers.

*DeBow's Southern and Western Review.* [Monthly] October 1852.

*Esquire,* November 1949.

*Florida Historical Quarterly.* Melbourne, Florida Historical Society, April 1994.

*Foreign Quarterly Review.* London: Chapman & Hall, 1845.

*Frank Leslie's Illustrated Newspaper.* June 9, 1860 (Potter Knife).

*Frontier Times.* June, July 1964.

*Fur-Fish-Game; The Magazine for Practical Outdoorsmen.* Columbus, Ohio: A.R. Harding Pub. Co., Nov. 1962.

*The Gun Report.* Aledo, Illinois: Oct. 1959.

*The Gunsmiths of Manhattan 1625-1900.: A Checklist of Tradesmen.* Bloomfield, Ontario: Museum Restoration Service, 1991.

*Harper's New Monthly Magazine.* New York: August, 1868; Vol 97 June-Nov. 1898.

*Harper's Weekly.* New York: Various issues, 1850s to 1900.

*The Hesperian; A Monthly Miscellany of General Literature.* Published Columbus, Ohio a.k.a. *The Hesperian* or *Western Monthly Magazine.*

*The Illuminated Magazine.* London: June 1844.

*The Illustrated London News.* Feb. 17, 1844.

*Knife World* magazine Knoxville, Tennessee: Knife World Pub. May 1999, Dec. 1992, 1995, 1996. Article by Zalesky, Gary.

*Knife World.* Knoxville, Tennessee: Knife World Pub. Article by Edmondson, J.R. *James Bowie: First Blood* ; 4 part series Oct.1995 to Jan. 1996.

*The Living Age.* Boston: Littel, Son & Co. May 5, 1860.

*The Magazine of Antique Firearms: A Monthly Periodical Devoted to the History of Firearms.* Pub. by John N. Clements Athens, Tennessee: 1911 & 1912.

*Man at Arms.* Mowbray Pub. Co. Lincoln, Rhode Island, June 1982.

*Maine Temperance Gazette.* Augusta, Maine: Jan. 31, 1839.

*Monituer de la Louisiana.* New Orleans Oct. 22, 1803.

*Journal of Mississippi History.* Mississippi Historical Society Vol. IV 1901; Feb-Nov. 1978.

*Outdoor Life* magazine. *Deadly Weapon, Useful Tool, Your Hunting Knife has a History.* October 1944. (No author listed).

*The Slave's Friend.* New York: American Anti-Slavery Society 1838 Vl III No.2.

*Southern Literary Messenger.* Richmond, Virginia: Jan. 1855

*Southwest Review.* Dallas, Texas: 1931.

*Spirit of the Times.* New York

*Stock and Steel.* Marshalltown, Iowa: Associated Firearm Collectors of America; July 1923.

*Tait's Edinburgh Magazine.* Edinburgh, Scotland Volume XIII 1846

*Temple Bar: A London Magazine for Town and Country Readers.* London England: July, 1861.

*Texas State Historical Association Quarterly.* Austin,



Texas: Vol. 15, 1912.
*Vanity Fair.* New York & London, Nov. 23, 1861
*The Western Messenger; Devoted to Western Unitarian Association.* Louisville, Kentucky: Norton & Smith, Printer Vol. II & III, 1836-1837.
*Wild West Magazine.* June 1994; Feb, 1999.

## NEWSPAPERS

Abilene (Texas) *Chronicle.* May 12, 1870.
Austin (Texas) *Sentinel.* Feb. 11, 1841.
Atchison (Kansas) *Squatter Sovereign.* May 6, 1856.
Baltimore *Commercial Transcript.* Nov. 16, 1837; June 9 & 11, 1838; Sept. 17, 1838.
Baltimore *Niles' National Register.* Various issues 1830s-40s.
Boston *Evening Transcript.* Aug. 5, 1835.
Boston *Transcript.* July 28, 1831.
Boston *Courier.* Apr. 30, 1837.
Cincinnati *Daily Gazette.* Oct. 21, 1835.
Columbus (Georgia) *Enquirer.* Jan. 29, 1845.
Dallas *Herald.* June 14, 1862.
Dallas *Morning Post.* Aug. 6, 1989.
Dallas *Journal.* Aug. 13, 1836.
Donaldsonville (Louisiana) *Planters' Advocate.* Aug. 24, 1838.
Fort Lauderdale (Florida) *Sun Sentinel.* Dec. 16, 1998; June 18, 1999.
Galveston (Texas) *Daily News.* March 6, 1880.
Greenfield (Mass.) *Gazette Courier.* June 21, 1852.
Hartford (Conn.) *Weekly Times.* May 8, 1847.
Hope (Arkansas) *Star.* June 26, 1936.
Houston *Telegraph & Texas Register.* May 30, 1838; May 31, 1843.
Houston *Democratic Telegraph & Texas Register.* Jan. 25, 1849.
Jackson (Miss.) *Tri-Weekly Mississippian.* Feb. 5 & 9, 1839.
Knoxville *Register.* July 4, 1838.
Las Vegas *Gazette.* Sept. 8, 1877.
Lawrence (Kansas) *Republican.* May 28, 1957.
Lexington (Missouri) *American Citizen.* Aug. 27, 1856.
Little Rock *Advocate.* Oct. 16, 1835.
Little Rock *Democrat.* Apr. 16, 1961.
Little Rock *Gazette.* June 11,1908; Nov. 20, 1919.
Louisville *Daily Journal.* Feb. 7, 1862.
Memphis *Daily Avalanche.* May 30, 1861.

Nashville *Republican.* Jan. 9, 1836.
Natchez *Statesman and Gazette.* Dec. 29, 1829.
Natchez *Ariel Extra.* Oct. 19, 1827.
Natchez (Miss.) *Daily Free Trader.* May 17, 1861.
Natchez (Miss.) *Mississippi Free Trader.* 1838, 1838, 1839.
New Orleans *Argus.* Oct. 1, 2, 1827.
New Orleans *L'abeille.* (The Bee) Jan. 8, 1845; April 22, 1845; Nov. 4, 1883.
New Orleans *State Gazette.* Nov. 13, 1826.
New Orleans *Crescent.* May 20, 1850.
New Orleans *Times Democrat.* Nov. 11, 1883; Apr. 5, 1890.
New Orleans *Picayune.* various issues.
New Orleans *Times.* Sept. 2, 5, 1875.
New Orleans *Commercial Bulletin.* Oct. 14, 1842.
Macon (Georgia) *Telegraph.* Feb. 11, 1862.
New York *Spirit of the Times.* July 14, 1838; Oct. 6, 1838.
New York *Tribune.* Feb. 3, 1843.
New York *New Weekly Tribune.* Nov. 9, 1844.
New York *Albion.* Feb. 11, 1854.
New York *Herald.* various issues May 13, 1836; July 12, 1836.
New York *The World: Morning Courier & Enquirer.* March 14, 1862.
New York *Times.* various issues.
New York *American.* July 29, 1837.
Petersburg (Virginia) *Daily Express.* July 23, 1861.
Philadelphia *Pennsylvanian.* July 19, 1838.
Randolph (Tenn.) *Recorder.* Dec. 18, 1835.
Richmond *Examiner.* Aug. 26, 1861.
Richmond *Dispatch.* various issues 1861.
San Francisco *Chronicle.* Various issues.
San Francisco *Examiner.* Various issues.
San Francisco *Alta California.* Various issues.
San Francisco *Evening Journal.* Sept. 19, 1854.
Savannah (Georgia) *Republican.* Nov. 16, 1836.
St. Louis *Argus.* June 20, 1837.
St. Louis *Reveille.* Dec. 29, 1844.
St. Louis *Republican.* various issues 1830s.
Washington (Ark.) *Telegraph.* Dec. 8, 1841.
Omaha *Daily Nebraskian.* Oct. 31, 1860.
Oregon City *Argus.* Oct. 13, 1860.
Xenia (Ohio) *Greene County Gazette.* March 24, 1836.
London (England) *Journal of Commerce.* Apr. 5, 1887.
Sheffield (England) *Daily Telegraph.* Jan. 19, 1888.

Compendium_Spitzer
Page 279

# FIREARMS OF THE

# AMERICAN WEST
## 1866–1894

LOUIS A. GARAVAGLIA

CHARLES G. WORMAN



University of New Mexico Press • Albuquerque

Compendium_Spitzer
Page 281

Library of Congress Cataloging in Publication Data
(Revised for vol. 2)

Garavaglia, Louis A., 1940–
  Firearms of the American West.

  Includes bibliographies and indexes.
  Contents: [1] 1803–1865 — [2] 1866–1894.
  1. Firearms, American—History.   I. Worman, Charles G.,
1933–   .   II. Title.
TS533.2.G36  1984  vol. 1    683.4'00973    83-12528
ISBN 0-8263-0720-5 (set)
ISBN 0-8263-0792-2 (v. 2)

© 1985 by the UNIVERSITY OF NEW MEXICO PRESS
All rights reserved.
International Standard Book Number 0-8263-0792-2.
Library of Congress Catalog Card Number 83-12528.
*First edition*


Designed by Whitehead & Whitehead

REF  oversize
f683.4.B162f v.2
Garavaglia, Louis A.
   Firearms of the
   American West

SAN FRANCISCO
PUBLIC LIBRARY

87 - 60

# CONTENTS

PREFACE                                                                                                    vii

ACKNOWLEDGMENTS                                                                             ix

PART I: Military Arms                                                                                 3

CHAPTER 1: Long Arms                                                                          7
Breech-Loading Infantry Arms: The Springfields of 1865 and
1866—The Springfields of 1868 and 1870 versus the
Remington, the Sharps, and the Ward-Burton—Cavalry
Carbines: The Spencer, the Sharps, and Others—The
Springfield .45-70s of 1873—New Single-Shot Springfields,
Repeating Rifles, and Shotguns—The High-Velocity, Small-
Bore Rifle

CHAPTER 2: Handguns                                                                          69
Percussion versus Cartridge Revolvers—The Colt and Smith &
Wesson .45s—Nonstandard Handguns and Cartridges—The
.38s

PART II: Civilian Arms                                                                             99

CHAPTER 3: Rifles                                                                                 103
Muzzle-Loaders—War-Surplus Breechloaders—The Spencer and
the Henry—The First Winchester—Single-Shot Rifles: The
Ballard, the Springfield, and Others—The Sharps and Its
Cartridges—The Remington Rolling-Block—More Single-Shot
Rifles—New Repeating Rifles: The Winchester, Marlin, and
Others—Improved Single-Shot and Double-Barreled Rifles—
The 1886 Winchester and the Ascendancy of the Repeater

CHAPTER 4: Shotguns                                                                            223
Muzzle-Loaders—Early Breechloaders and Repeaters—Improved
Breechloaders—Advanced Repeaters

CHAPTER 5: Handguns                                                                          253
Percussion Pistols and Revolvers—Multi-Shot Pocket Pistols for
Metallic Cartridges—Breech-loading Derringers—Evading the
Smith & Wesson Design: Front- and Side-Loading Cartridge

v

Revolvers—Large-Frame Rimfire and Centerfire Revolvers:
Smith & Wesson, Remington, and Colt—More Colts and
Smith & Wessons, and New Pocket Revolvers—New
Competitors: The Merwin & Hulbert, and Others—The
Predominance of the Colt and the Smith & Wesson

PART III: Indian Arms                                      351

   CHAPTER 6: Postwar Indian Guns                          355
      Percussion Arms—Metallic-Cartridge Arms—The Use of Older
      Arms Alongside the Newer

   NOTES                                                   381

   BIBLIOGRAPHY                                            399

   INDEX                                                   407

Compendium_Spitzer
Page 284

PART II: CIVILIAN ARMS



**Winchester Repeating Rifles !**

**Firing Two Shots a Second, as a Repeater, and Twenty Shots a Minute as a Single Breach-Loader.**

These powerful, accurate, and wonderfully effective weapons, carrying eighteen charges, which can be fired in nine seconds, are now ready for the market, and are sold by all responsible Gun Dealers throughout the country. For information send for circulars and pamphlets to the WINCHESTER REPEATING ARMS CO., New Haven, Conn.       oct7w229

Leavenworth (Kansas) *Times and Conservative*, October 1868.

**Dupont's Gunpowder, Safety Fuse,**
— AND —
**WINCHESTER REPEATING ARMS.**

DUPONT'S Superior Mining Powder (saltpetre), F-FF-FFF.

DUPONT'S Blasting Powder, in air-tight corrugated Iron Kegs, C-F-FF-FFF.

DUPONT'S Celebrated Brand, Diamond Grain, Nos. 1, 2, 3 and 4, in 1 lb. and ½ lb. canisters.

DUPONT'S Unrivalled Brands, Eagle Duck and Eagle Rifle, Nos. 1, 2, 3, in half kegs, qr. kegs, 5 lb. tins, and in 1 lb. and ½ lb. canisters.

DUPONT'S Standard Rifle, Fg-FFg-FFFg, in kegs, half kegs and qr. kegs, and in 1 lb., ½ lb., and ¼ lb. canisters.

DUPONT'S Superior Rifle, A. F. & Co., F-FF-FFF, in kegs, half kegs, qr. kegs, and in 1 lb., ½ lb. and ¼ lb. canisters.

DUPONT'S Cannon, Musket, Meal and Fuse Powder.

**EAGLE SAFETY FUSE** (manufactured near Santa Cruz, Cal. by the L. S. & P. Co.) Constantly on hand full supplies of their Celebrated Brands, Waterproof and Submarine, Triple Taped, Double Taped, Single Taped and Hemp Fuse. Fuse made especially to explode the Giant Powder and Hercules Powder Caps. The above named Fuse are warranted equal to any made in the world.

**WINCHESTER REPEATING ARMS** (Henry's Improved) and FIXED AMMUNITION.

A large and complete stock of these celebrated arms constantly on hand, to wit :

Repeating Sporting Rifles-Oiled Stocks.

Repeating Sporting Rifles-Varnished Stocks.

Gold, Silver and Nickle-plated Rifles-beautifully Engraved.

Repeating Carbines-Oiled Stocks.

Repeating Carbines-Gold, Silver and Nickel-Plated and Engraved.

Muskets-Angular or Sword Bayonets.

Full stock constantly on hand of all the different parts of the Winchester Arms.

Cartridges in cases charged Ely, manufactured by th W. R. A. Co., expressly for their arms.

A full and complete stock of the above named merchandise always on hand and for sale by

**JOHN SKINKER, Sole Agent,**
[illegible]

*San Francisco Mining and Scientific Press*, March 1872.

or fancy metalwork such as plating and engraving. With the magazine fully loaded and a round in the chamber, the rifle would hold a maximum of eighteen cartridges; similarly loaded, the carbine would hold fourteen. Because the Winchester and the Henry were sometimes used side by side on the frontier, the Henry might be mistakenly called an "eighteen shooter," or the Winchester a "sixteen shooter," by a casual observer.[42]

Although manufacture of the arm began in 1866, there were evidently no domestic sales until 1867. Company officials recalled that, except for one or two sample arms, the first two carbines sold in this country went to Major H. G. Litchfield, adjutant for the Department of the Platte, in late August of 1867. However, a small quantity may have left the factory before that: in the spring of 1867 a cavalry detachment in Wyoming surprised a band of Indians about to attack a wagon train on the Platte River; Finn Burnett and two soldiers chased one Indian into a hollow, where he put up a stiff fight before going down. Burnett "took from him the first Winchester rifle I had ever seen."[43]

Apparently neither Winchester nor its dealers made much of an effort to promote the new arms until 1868. They were advertised in Galveston and Brownsville papers in February of that year, and in March the Freund brothers, with large advertisements in the *Cheyenne Leader* and the *Frontier Index*, proclaimed

themselves "Sole Agents For the Whole West For the Celebrated Winchester's Patent Repeating Rifle And Carbine." A. D. McAusland of Omaha also advertised the Winchester in 1868, and in October of that year the Winchester firm itself placed ads in the *Omaha Republican* and the *Leavenworth Times & Conservative*, complete with illustrations of the carbine. An early and famous carbine that went West was the special-order arm acquired by Gen. Grenville Dodge, chief engineer for the Union Pacific railroad. This gun (se-

128

RIFLES



First camp of the John Wesley Powell expedition to explore and map the present state of Utah. A M1866 Winchester rifle leans against a clump of willows to the left of the tripod. During the 1860s and 1870s photographers such as William H. Jackson, Timothy O'Sullivan, and E. O. Beaman (who took this photo in 1871) created lasting images of the West and its inhabitants, despite the difficulties posed by their primitive equipment and techniques. (U.S. Geological Survey photo, courtesy National Archives)

rial no. 14,998) has a sporting-rifle buttplate and fancy wood; the left side of its frame is engraved: "Gen! G. M. Dodge/U.P.R.R."[44]

Distribution of the 1866 Winchester grew rapidly during and after 1868. William E. Webb, who traveled across the plains in that year, wrote that:

> I became very fond of a carbine combining the Henry and King patents. It weighed but seven and one-half pounds, and could be fired rapidly twelve times without replenishing the magazine. Hung by a strap to the shoulder, this weapon can be dropped across the saddle in front, and held there very firmly by a slight pressure of the body . . . and with a little practice, the magazine of the gun may be refilled without checking the horse. So light is this Henry and King weapon that I have often held it out with one hand like a pistol, and fired.

Charles Nessiter's party, which left Fort Belknap for Denver in 1868, took along "nine Winchester repeating rifles," four English double rifles, and a double-barreled, eight-bore duck gun (which when loaded

with about two ounces of shot in each barrel "would be grand at close quarters"); two Caddo scouts who accompanied the party had Spencer carbines. During a three-day on-and-off fight with Comanches, the Winchesters proved to be the most effective arms.[45]

Traveling across the frontier a year or two later, J. S. Campion and his men found that "our rifles especially interested the Indians, being of a pattern they had never seen before, for they were a then lately invented arm—Winchester's improved Henry's . . . Ours were carbine size, having, when loaded, fourteen shots in them." Winchesters also constituted the principal armament for the two parties that explored the Colorado River in 1869 and 1871.[46]

The popularity of the 1866 Winchester on the frontier continued to increase even after the company brought out an improved model in 1873. But a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader.

Compendium_Spitzer
Page 286



John F. Steward, photographed in Glen Canyon of the Colorado
River in 1871. In addition to the geologist's hammer in his belt,
he carries a Winchester M1866 rifle. (Courtesy National Archives)

Compendium_Spitzer
Page 287

RIFLES



Frank Wesson .44 single-shot carbine used by Gen. Phillip de Trobriand at Ft. Stevenson, Dakota Territory, in 1867–69. The forward trigger releases the barrel for loading. (Courtesy State Historical Society of North Dakota)

## SINGLE-SHOT RIFLES: THE BALLARD, THE SPRINGFIELD, AND OTHERS

Single-shot rifles did indeed possess some definite advantages over the early postwar repeaters; as late as 1892 A. C. Gould enumerated them:

> less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used.

The relative importance of these advantages would, of course, depend largely on the individual user, but in the main the factors which best accounted for the single-shot's longevity were simplicity, reliability, and the ability to chamber long, powerful cartridges.[47]

Due to the pressure limitations of rimfire cartridges, however, the early single-shot rifles were chambered for the usual short-case loads adapted to repeaters. For example, Frank Wesson's two-trigger carbine, one of the first single-shot arms to reach the frontier, was designed for the common .32 to .44 rimfire rounds, and there was no significant departure from this practice until the appearance of the .50-70 government cartridge, which prompted the development of various civilian centerfire loads. In April of 1872 Wesson patented a hammer with an adjustable firing pin, which allowed him to chamber his rifle for centerfire as well as rimfire rounds; this gave rise to somewhat more powerful cartridges, such as the Wesson .44 Extra Long Centerfire, loaded with a bullet of about 250 grains and a 48 to 50 grain powder charge.[48]

Although Wesson's rifle had seen limited military use during the war, it was far more popular in civilian circles, where it retained a measure of that popularity for many years after the war. In the late 1860s and early 1870s western dealers such as Carlos Gove of Denver, A. D. McAusland of Omaha, and Liddle and Kaeding of San Francisco handled it, and Wesson himself was still advertising it in the late 1880s.[49]

Another single-shot rifle developed during the Civil War was that patented by James P. Lee in July of 1862. The barrel of Lee's arm was joined to a long frame by means of a vertical pivot, which allowed the barrel breech to swing to the right for loading. Lee set up shop in Milwaukee, and in April of 1865 signed a government contract to supply 1000 of his guns in .44 rimfire. Because of a misunderstanding about chamber dimensions, however, government inspectors rejected the arms, whereupon Lee began manufacturing them for the civilian market. Most commonly Lee sporting rifles had 28 in. octagon barrels, chambered for the .38 Long rimfire cartridge, rather than the 21 1/2 in. round .44 barrels made for the contract arms. By mid-1868 Lee rifles were available from at least two frontier dealers, McAusland of Omaha and the Freund Brothers of Cheyenne, but they never became really popular; Lee's fame was to rest on guns other than his swinging-barrel rifle.[50]

Of the other single-shot rifles used on the postwar frontier—including the Browning, Maynard, Peabody, Phoenix, Stevens, Whitney, Winchester, and a few lesser-known makes—four were to become especially popular: the Sharps, the Springfield, the Remington, and the Ballard.

The first of these to be designed specifically for a self-contained metallic cartridge was the Ballard. As introduced in the spring of 1862, it was available in .32, .38, and .44 rimfire, with some subsequently sold to the military in both .44 and .56-.56 Spencer calibers. By the close of 1864 the Ballard was also available chambered for a new cartridge, the .46 Long rimfire, a load comprising a 300 grain bullet backed by a 35 to 40 grain powder charge. For a Ballard owner without ready access to metallic cartridges, a desirable accessory was the steel chamber insert patented by Merwin and Bray in January of 1864, which permitted the use of loose powder and ball.

Presumably the same range of calibers was still avail-

131

PART II: CIVILIAN ARMS



Lee .44 rimfire carbine. (Courtesy National Park Service, Fuller Gun Collection, Chickamauga and Chattanooga National Military Park)



Ballard rifle barrel and frame found near the site of Egan Station in Nevada along the Overland Trail route. To the left is the cylinder and frame of a Colt M1860 revolver, discovered at the site of the Shell Creek stagecoach station in the same state. (Courtesy St. Joseph [Missouri] Museum)

able by the spring of 1865, when the Ballard began arriving on the frontier in quantity. In March of 1866, however, William Hardy of Prescott, Arizona, advertised the Ballard rifle and carbine in only two calibers—.44 and .46 Long rimfire. But a Merwin & Bray ad for the Ballard, placed in the Central City, Colorado, *Miners' Register* three months later, stated that "within the past year we have made immense improvements in the ammunition used in these Rifles, increasing their accuracy and power full twenty per cent., equaling now the best Muzzle-Loaders." (Unfortunately, the ad failed to specify just what these improvements were.)[51]

In July of 1867 Merwin & Simpkins, successors to Merwin & Bray, advertised the Ballard in the *Rocky Mountain News* with these words:

Ballard Rifles and Carbines, of large calibre, as follows: 44-100, 46-100 and 50-100. This want has long been felt. Now, for the first time, are we prepared to furnish the Large Bores or Calibres. It will be remembered that the Ballard is The only Breech Loader That Can Be Loaded as well with Loose Ammunition as with copper cartridges. Made with long, heavy barrels, from 24 to 30 inch.

Whether the new .50 caliber Ballards were chambered for the .50-70 round or some lesser cartridge is un-

# THE GUNNING OF AMERICA

Business and the
Making of American Gun Culture

## PAMELA HAAG

BASIC BOOKS

A Member of the Perseus Books Group

New York

Compendium_Spitzer
Page 290

Copyright © 2016 by Pamela Haag.

Published by Basic Books,
A Member of the Perseus Books Group

All rights reserved. Printed in the United States of America. No part of this book may be reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews. For information, contact Basic Books, 250 West 57th Street, New York, NY 10107.

Books published by Basic Books are available at special discounts for bulk purchases in the United States by corporations, institutions, and other organizations. For more information, please contact the Special Markets Department at the Perseus Books Group, 2300 Chestnut Street, Suite 200, Philadelphia, PA 19103, or call (800) 810-4145, ext. 5000, or e-mail special .markets@perseusbooks.com.

Designed by Trish Wilkinson
Set in 11.5-point Goudy Oldstyle Std

Library of Congress Cataloging-in-Publication Data
Names: Haag, Pamela.
Title: The gunning of America : business and the making of American gun culture / Pamela Haag.
Description: New York : Basic Books, a member of the Perseus Books Group, 2016. | Includes bibliographical references and index.
Identifiers: LCCN 2015036679 | ISBN 9780465048953 (hardcover) | ISBN 9780465098569 (electronic)
Subjects: LCSH: Firearms—Social aspects—United States—History. | Firearms industry and trade—United States—History. | Capitalism—United States—History. | United States—Social conditions. | United States—Economic conditions. | BISAC: HISTORY / United States / 19th Century. | HISTORY / United States / General. | HISTORY / Military / Weapons. | BIOGRAPHY & AUTOBIOGRAPHY / Women.
Classification: LCC TS533.2 .H33 2016 | DDC 338.4/768340973—dc23
LC record available at http://lccn.loc.gov/2015036679

10 9 8 7 6 5 4 3 2 1          3 1223 11475 0491

*In memory of my brother, Stephen L. Haag*

into magic—it was incomprehensible, haunting, and, for all practical purposes, produced mysterious phantasms.[2]

Colt enlisted a local mechanic in Baltimore, John Pearson, to prototype his pistol in 1836. He envisioned a multi-firing arm, a revolver, with multiple chambers discharged through one barrel by use of a lock and spring design. It was, his first biographer wrote, a "new tool," a "miracle of much in little." The collaboration with Pearson did not go smoothly. Colt routinely disappointed Pearson—and others—by refusing to pay them on time, or at all. An increasingly bitter Pearson wrote Colt in the spring of 1836 that he was out of "patience and money." Colt had promised payment, but Pearson suspected that he was "very likely not one foot nearer than you was when you last wrote." He wasn't. Pearson had worked faithfully night and day, and although he had two small pistols ready for forging, he would not do so until he had his money. He could think of many other places to work where he could "get my pay every week." "You are in a devil of a hurry. But not to pay your men."[3]

Samuel Colt meanwhile was busy advancing his understanding of industry, especially processes applicable to gun manufacture, by interviewing personnel at iron mines, an ax factory, a sword factory, "all parts of the US Armory," and a gun manufacturer's operations in Middletown, Connecticut, where owner Simeon North was using a groundbreaking model of interchangeability. The government had been, and still was, a flourishing incubator for gun innovation and industrial advances in general. At Springfield, fledgling capitalists, technologists, and employees of the Ordnance Department worked toward a shared goal of interchangeability and machine production as well as toward their own individual goals. The federal contract system fostered—even demanded—cooperation and collaboration. By an open-door policy, any aspiring entrepreneur or mechanic could wander in, sketch, ask questions, and leave with new, potentially profitable ideas to apply to textiles and other vanguard industries. The collaborative advance of interchangeable production and the demise of the gunsmith—related processes that unfolded throughout the 1820s and 1830s—cleared the path for the commercial gun industry.[4]

Harpers Ferry put up the strongest fight. Lieutenant Colonel George Bomford, head of the Ordnance Department from 1821 to 1842, wanted to introduce efficient, rational production to Harpers Ferry and bring the armory up to Roswell Lee's standard at Springfield. Government representatives from the 1820s on descended upon the armory, emboldened by six shiny sets of gauges to keep rifles true to the template. They were devoted to what one self-proclaimed "soldier technologist" celebrated as "a knowledge and love of order and system." Bomford dispatched Thomas Dunn to Harpers Ferry in 1830, intent on the enforcement of the work regulations established in 1827. Dunn vowed to eliminate loitering, drinking, gambling, absenteeism, and other staples of the gunsmith's workday, pledging to enforce industrial discipline at any cost. And it was any cost that he paid: after six months, an outraged ex-employee named Ebenezer Cox marched into Dunn's office and shot and killed him. Other armory employees embraced Cox as a folk hero and told Dunn's tale in ominous, cautionary tones for any superintendent who might think to reform them.[5]

Undaunted, Major Henry Knox Craig next tried his hand. He was unpersuaded by armorers' protests against working on the clock, a reviled symbol of the regime of industrial discipline that deprived them of their freedom and spontaneity in movement, work, and play. In March 1842, the Harpers Ferry gunsmiths walked off the job. A delegation chartered a boat to sail down the Chesapeake and Ohio Canal to Washington, DC, to appeal directly to President John Tyler. They were reduced to slaves, they pleaded, "mere machines of labor."[6]

As the Harpers Ferry gunsmiths fought for their way of life and livelihoods, a figure who would loom large for both Colt and Winchester was appointed superintendent of the Springfield Armory. James Wolfe Ripley, who took over the armory in 1842 and who would eventually head the Ordnance Department, was a humorless, dour, deeply religious man, hell-bent on furthering the industrial gun regimen. He was burned in effigy from the Springfield Armory flagpole three times for his trouble. Ripley threatened to fire anyone who subscribed to the *Independent Democrat* newspaper after it criticized his work at the armory—and yet, impervious to his hoard of enemies, he also hoped to

convert all of Springfield to the Episcopal faith. During Ripley's tenure, gun expert William Hosley writes, the "open door" of public and private innovation and exchange began to close, and the quasi-public character of the fledgling gun industry faded. It was replaced by proprietary competition among fledgling gun industrialist-capitalists, who had availed themselves of armory ideas, and enjoyed the armory's development of uniform production, but now wanted to make money by keeping their own innovations secret and patentable. The gun industry was beginning to attract private capital, and its patented designs failed to impress the US government, which tended now to view the innovations as mere passing "novelties." The once cooperative bond between government and gunmaker was decisively severed by the late 1840s. Apparently, this shift embittered Ripley against the first group of gun industrialists—consequentially, as we will see—for years to come. The gun was being reconceptualized subtly from an exceptional martial tool, uniquely supported by the US government, to an unexceptional commercial commodity, whose makers, moving forward, would have an awkward relationship to the military and the imperatives of common defense.[7]

Meanwhile, established gunsmiths from the early 1800s were going extinct as a class, their disappearance traceable in the New Haven city directory and the US Census of Industry, whose tally moved over time from the number of "gunsmiths" to "arms manufacturers." The craft way of life, with gambling, drinking, and spontaneous production, had been replaced by the 1850s at the E. Remington & Sons manufactory with "work rules," such as: "Godliness, cleanliness and punctuality are the necessities of a good business. . . . [C]lothing must be of a sober nature. The staff will not disport themselves in raiment of bright colors," and "The craving of tobacco, wines or spirits is a human weakness and as such is forbidden." The modernization of arms production—the key shift from the craft to the industrial phase of the gun business's biography—would be complete by the 1850s. One gunsmith who still had "the machinery for making swords . . . rusting on [his] hands" correctly intuited that the emerging manufacturing system would spell a protracted but "certain death" for him. An observer of the process

noticed the effect of interchangeability on men. "Each workman becomes adept at his part. . . . The consequences . . . to the workman is that not one of them becomes a finished armorer." Although he makes firearms, "he cannot make a fire-arm." The gun's manufacture became a more fractured, microscopic process with each generation, and the totality of the gun, and its consequence, became harder to see.[8]

STANDING ON THE SHOULDERS OF PEARSON'S SPOTTILY REMUNERATED ingenuity, public armory advances in interchangeable, uniform production, and the ruins of gunsmithing as a craft, Samuel Colt established his first factory in Paterson, New Jersey, in 1836. Early on, Colt had a few thousand dollars' worth of guns out on consignment in the commercial market. He had intended originally to produce for both the US government and civilian markets. The main problem—and historical curiosity—is that Colt couldn't make a profit off of his gun. The civilian market was there to be created, not taken, as Colt, along with Smith and Wesson and Winchester, would soon discover.[9]

When his cousin and treasurer, Dudley Selden, asked about the price for guns in November 1837, Colt responded, "It is my opinion that the rifles now finished for market will readily sail [*sic*] in New York or Washington (if exhibited by a proper person) for $100 per peace [*sic*] wholesale and $125 at Retail. . . . Either of which prices will yield a handsome profit for the first lot," judging that they would not cost more than $50 apiece to produce.[10]

Colt placed his first advertisement on December 22, 1837, in the *New York Courier and Enquirer*. Flyers promised a public exhibition of the "Patent Repeating Rifle" at the Battery on a Monday afternoon. Colt, who called himself the "patentee," promised that the rifles were "eight times more effective and very little more expensive" than any other rifle. He quickly discovered that he had over-"visioned" his market. Only the very wealthy had any interest in considering his gun. The Paterson factory was equipped to produce a large quantity, but "they could not sell as much as they could make," a Colt biographer wrote. Of the first lot of two hundred rifles and five hundred pistols, not even one hundred pistols had sold. The problem was a complicated

England. Lieutenant Hans Buck, in London, wrote to Colt in 1859 that it seemed Europe was on the brink of a "long and sanguinary war" (although which imagined war he might have been referring to is not entirely clear). The "sad lot of incapables" would probably make a mess of things, but Buck and a few others "place[d] their trust in their 'Colt.'"[10]

Colt reasoned that Europeans would encroach on Asia, and the Asians would want to resist with the best guns they could find. He furnished Commodore Matthew Perry with sample rifles. "It has occurred to me that they would be invaluable in the expedition to Japan," Colt wrote in 1852, as Perry endeavored to "open" Japan to US trade. Colt happened to have five hundred pistols on hand, because he had contracted with General Juan Manuel de Rosas to supply the "Brasilian government . . . but Rosas having been defeated and fled the country," the guns might as well be sent with Perry to Asia. Years later, Perry reported back that the second king of Siam had praised the revolver. "He is well educated and a great lover of the arts," Perry wrote. "If you desire to present him a pair of your miniature pistols, in a pretty case, I will forward the gift." Perry had also stirred interest with "several of the princes of Japan, the governor of Shanghai, and the king of Lew Chew.[11]

So brisk were Colt's sales abroad that an 1858 advertisement included a back page devoted entirely to foreign notices and testimonials. Colt even opened a London factory in 1854 with the help of engineer Charles Manby, who assured him, "I am quietly working to produce the impression that your manufactory is to be established under government auspices and to work entirely for the trade of the army and navy. This impression must be made so as to disarm competitors." As Colt waited for the cunning Manby to close the deal on his London land, he worried that valuable time was being lost, and that "no such hoorah for Colt's arms can again be raised without grate [sic] efforts." To his representative abroad, Charles Dennet, he said, attuned as always to the marketing imperative, "You must keep the thing as much before the public as possible." He urged him to "have some of the arms at different publick [sic] places and occasionally get short spicey notice in the papers of some extraordinary performance by someone of Her Majesty's officers with one of them."[12]

IN THIS COMMERCIALLY FLINTY CONTEXT, WINCHESTER PONDERED inventor Benjamin Henry's rifle in the Artizan Street shop. It was mechanically possible to mass-produce rifles, but where was the point, profit, or logic in it? Henry's novelty, a self-acting repeater, able to mechanically but inscrutable treasure. The idea, now property, had first been sold by Walter Hunt to George Arrowsmith; then from Arrowsmith to inventor Lewis Jennings; then from Jennings to capitalist Cortlandt C. Palmer, a man who knew nothing about guns. Palmer had enlisted manufacturers Robbins & Lawrence, in Vermont, to try to produce a repeater—and Henry was the superintendent of the shop at that time.[13]

Palmer was interested in the idea of this new gun, but he needed mechanical help to develop it. In the complex but incestuous family tree of American gun design, orchestrated through patents, the story of Oliver Winchester's gun business begins with Horace Smith and Daniel Wesson. Palmer turned to Smith and Wesson. For some time, Smith had been working the mechanical Lorelei of how to design a gun that could function like a repeater—and his ideas came close to infringing on the Hunt and Jennings gun patents that Palmer now owned. When Palmer approached them, Smith and Wesson had only expenses, two patents, and depleted finances to show for their inventive efforts, and Palmer might have used the threat of patent infringement to pressure them to collaborate with him—or, more charitably, Palmer offered to finance them with $10,000 in desperately needed cash. Whatever the case, Smith and Wesson joined Palmer in a partnership on June 20, 1854, in Norwich, Connecticut, to see if they could mass-produce a repeater firearm. Henry continued to work on the riddle as well. The venture failed after one year. Smith and Wesson sold their assets— namely, their patents—to a group of New Haven investors, who founded the Volcanic Repeating Arms Company in 1855.[14]

A year earlier, Colt had established himself as the main stockholder of his new Colt's Patent Repeating Firearms corporation, the largest private armory in the world, so as to avoid being "subject to the whims of a pack of dam fools and knaves styling themselves as a board of

directors," doubtless recalling his Paterson debacle. The Volcanic Repeating Arms Company brought together forty damn fools, otherwise known as New Haven men of property and influence. They included seven clock makers, three carriage makers, two bakers, two grocers, and representatives of shipping. Shareholders exchanged control for protection from responsibility and for limited liability. They met for the first time on July 3, 1855, in New Haven, to pay the first installment on their shares and to elect directors.[15]

The company had been named not by Smith and Wesson or any other inventor but by *Scientific American*, because the rapid firing power of the gun had reminded one of the magazine's writers of a volcano's fiery eruption. Harnessing Henry's inventive talent and the valuable patent, the company intended to mass-produce the repeater firearm. That year, Oliver Winchester made his first modest foray into the arms business, buying 80 shares of the Volcanic Repeating Arms Company, valued at $25 par, out of 6,000 shares, for a corporation capitalized at $150,000.[16]

The American System involved making real people—craftsmen—disappear through mechanization, but it also involved making false people appear, through what historian Daniel Boorstin has called "a new mystery, a new unintelligibility," at the leading edge of the economy, to which we've long grown accustomed. In 1837, Connecticut had passed the prototype Incorporation Act. The corporation took many people—stockholders—and melded them into one legal "fictitious person" endowed with the real and true rights of an individual before the law. "A corporation," Supreme Court Chief Justice John Marshall had written in 1819, "is an artificial being, invisible, intangible, and existing only in contemplation of the law." Perhaps not unlike a ghost, or a spirit, the corporation was supernatural, unseen, and conjured only by the law as a medium. Others gravitated to the same vocabulary to describe the ghostly, immortal nature of the corporation, referring to the "romantic mysteries of high finance" that replaced many face-to-face methods of exchange in the early 1800s, or the "magic" of stock, which could alchemize to money. There was a core inscrutability in the corporate system and in the emerging industrial

economy—a contrived idea of property made real by social consensus and embodied in law. The willingness to believe that became normalized only with time.[17]

For as precise, empirical, and tangible as their methods of production were, the fortunes of the gun capitalists rested on the most fantastic, mysterious, and incorporeal of things: a corporate charter, a patent, an imagined market, and their own capacity to "vision the future." Like Colt, Winchester understood that his fortune depended on these most ethereal holdings, not the more concrete assets of a building or a set of gunsmith's tools, or even an invention that he had conceived himself. The two men with actual firearms backgrounds—Smith and Wesson—sold out and abandoned their patents to a man—Winchester—who knew nothing about firearms and yet who had an inexplicably perseverant faith in the patent's value.[18]

Why Winchester became so interested in the gun business is something of a mystery. He had no personal or abiding interest in rifles previously. Surely, he knew of Whitney's operations, and of Colt's enterprises, but the Colt's archive contains no correspondence between Winchester and Colt from the 1850s, and the Winchester letter book contains only a query from Winchester to Colt's foreman about a potential employee. Winchester had never shot a rifle, displayed one, or even owned one before starting his gun business, and even after entering the business, he only personally owned two—a pair of engraved, ivory-gripped pistols, numbers 1401 and 1506, from the early Volcanic days, kept in the family as heirlooms. By investing in the Volcanic gun, Winchester was venturing into an industry that had barely begun, to create a product that had yet to be perfected, about which he knew little, to be sold to markets that did not clearly exist, by the "fictitious person" of a corporation. On the surface, it wasn't a wise idea.[19]

The Volcanic plant occupied an unprepossessing building at the corner of Orange and Grove Streets. Compared to Winchester's shirt empire, this must have felt like a regression—perhaps thrilling, perhaps dispiriting. Winchester employed fifty men, mostly of English or Scottish descent, and four girls who made ammunition exclusively. When one of his customers complained that cartridges had been filled

with tobacco by mistake—or as a time-saving measure—Oliver dismissed the statement, "as none but girls fill them," and they did not use tobacco.[20]

At the beginning, the company would get a gun order, blow a whistle to call the help in, and send the help back to the farms after the order was completed. Volcanic pistols sold for $11.50 each at a time when city directories sold for $1. Following the breathless, self-interested journalistic hyperbole of the 1850s, which often merged advertisement and news, the *New Haven Palladium* touted the Volcanic pistol as "one of the most perfect things in the shooting line that we ever took into our hands," a gun that made Colt's pistol a mere "distortion," some "clumsy, uncouth and ridiculous affair of a fire-arm." Not to be outdone, the *New Haven Journal Courier* extolled the Volcanic as "the very perfection of firearms," certain to attract orders from all quarters.[21]

That didn't quite happen. As was evident with Colt, there was a perhaps immovable ceiling on what gun capitalists could sell in the United States in the mid-1800s, notwithstanding their energetic efforts to craft the market. The gun did not sell, and the chief investors and original founders withdrew from the company in 1856 and 1857. In one year, Winchester moved from a minor shareholder to a major investor and the president of the ailing corporation. He continued to loan the company his personal money to keep it afloat, acquiring more of its property, patents, and machinery as collateral.

Winchester was stubbornly obsessed by his idea of what the repeater might become. Intending to mesh the mechanically possible with the humanly desirable, he deepened his involvement as others fled. In 1857, with its cash down to $97.38, the Volcanic company had no choice but to sell its mortgages to pay Winchester back to cover his loans.[22]

Winchester's actions combined courage and rapaciousness: most likely, in calling in his mortgages, Winchester was making a play for nearly complete control over the company's fortunes. He knew, with the split consciousness of an individual and a shareholder, that the company couldn't cover his loans without forfeiting its collateral.[23]

After Winchester secured majority control of the company in 1857, he rechristened it the New Haven Arms Company. The name Volcanic still enchanted him, however, and he retained it for marketing purposes. Winchester held exclusive ownership of the patents, and he held 800 of the 1,900 shares issued. The list of stockholders included some of New Haven's most venerable founding families. One of them was Leonard Pardee, scion of one of New Haven's founding fathers, George Pardee. Leonard was a partner in a prosperous carriage manufactory. He was the father of just one son and five living daughters: Estelle, Isabelle, Mary, Antoinette—and Sarah.[24]

As president, treasurer, and chief stockholder of the New Haven Arms Company, Winchester set out to collect debts, no matter how small. In September 1857, he had his secretary write to the very first Volcanic dealer, F. G. Wheeler, "We are much in want of funds, [so] we take the liberty to call your attention [to an] account showing a balance in our favour of $202.50."[25]

The company then began to "turn out finished arms, and put them into the market," as Winchester put it in a letter to a stockholder. Americans reacted to the repeater with curiosity and guarded approval. Frank Leslie's *Weekly Illustrated* in October 1858 praised the Volcanic's pride of execution and "really marvelous rapidity." The *Milwaukee Daily Sentinel* called it a great "organ of destructiveness." To Winchester, who had embraced the industrial aesthetic, the Volcanic was a "beautiful and very effecting weapon."[26]

Winchester worked tirelessly to create a market for the Volcanic (because he had to) and began to build a dealer network. The energetic dealer Joseph Merwin established himself in New York City; in the next two years, Winchester found dealers in Philadelphia, Boston, New Orleans, and San Francisco. He circulated broadsides to agents and friends, and he posted advertisements that tended either toward effusive triumphalism or desiccated mechanical tutelage. Merwin advertised the Volcanic Repeating Fire Arm as "A TRIUMPH OF AMERICAN INGENUITY" in the *New York Times* of August 1859. He tried to appeal to the gold-rush customer, not realizing, as Colt had, that this gun market was saturated, with another *New York Times*

ad: "HO! For Pike's Peak, no mother's son should be allowed to go to the Gold Diggings without one of these Volcanic repeating rifles or pistols. . . . With a good conscience and a Volcanic pistol, you may sleep soundly and safely, with your hard-earned nuggets by your side. My friend, if you have regard for your life or your scalp, do not fail to get one or more of these invaluable weapons." Another ad dispensed with drama. It read: "Directions: Push the spring up in the tube, by the knob A, till the . . . cap B can be turned to the left, then put the cartridges . . . in the tube, replace the cap B, when the spring will allow the cartridge down, raise the hammer C and swing the lever D. CLEAR forward, which will elevate the carrier E with pin F, when the arm is in condition for discharge." Then, "in case of misfire, bring up another ball."[27]

The weapon might have been perfectly ingenious—arguably the "parent of all American magazine guns," reflected *Frank Leslie's* in 1878—but in practice it was not in fact perfect. Writing to a stockholder, Winchester had to concede that, "after a few months of vain efforts to sell them," he had found there were "radical defects" in his repeater that seriously dampened sales. Faulty ammunition diminished the gun's power and lethality, and was the primary technological hurdle to a repeater rifle. Whatever the reasons, the gun fell "dismally short of developing its potentialities to the fullest." As a company memoir recalls, "output soon exceeded demand." Other multi-firing gun ventures had fallen into bankruptcy, and Colt was also complaining of the stagnant market.[28]

Even in St. Louis, the most robust gun entrepôt in the nation, with six gun merchants in the late 1850s, the Volcanic had no luck. Nonetheless, it did find some customers. The New York City gun used it in 1858 to quell riots on Staten Island against a yellow fever hospital. The Volcanic #704, the only one inscribed to a woman, found its way to Lizzie Tomlinson in St. Louis, who may have been a madam (the gun was discovered in 1937). The adventurer William Cowper Prime introduced the Volcanic to Egypt but explained, in his 1857 volumes *Boat Life in Egypt and Nubia* and *Tent Life in the Holy Land*, that guns were "useful only for show in Egypt." And yet, confronted by a stone-throwing mob while on horseback, Prime drew his Volcanic, and a "shudder of fear" and "terror" rippled through the mob. King Farouk, an antique firearms enthusiast and known kleptomaniac, had two Volcanic pistols in his possession when he took the throne in 1936.[29]

Winchester's gun sales to these and other customers were remarkably casual and haphazard. When a customer's name was not known, the Volcanic sales ledger recorded, "Sold To a Stranger." Customers sometimes simply wrote directly to Winchester to order guns. Winchester responded to one customer: "In your letter you say 'send us more rifles and ammunition immediately.'" Apparently there was nothing else to go on, for he added: "Please send us a *definite* order stating number wanted . . . and how many cartridges." Samuel Colt's sales could be casual, too. He received a letter from one customer who tersely implored, "Please send me by express tomorrow without fail one of yr. Pistol with box and appendages," and another from a customer in Kentucky, who wrote saying he desired a "pair of your newly modelled repeating pistols, of a size not too large to be carried about one's person yet large enough to be relied upon in any emergency." He added, "Do not send me articles that will sometimes fire and sometimes fail. . . . I have any quantity of such pistols on hand already."[30]

The first and most basic problem for Winchester and his company was volume. He needed it. This was the transformative facet of the gun business as an industry rather than a craft, and arguably a prerequisite for a true gun culture. Gunmakers were no longer producing the guns that were needed, when they were needed, and supplementing their incomes with other crafts in between, but trying to sell all the guns that could be produced by machines that were tooled up to produce one design. When a customer in 1857 requested a "Navy" pistol (a Colt's model), Winchester responded frostily, "You do not seem to understand that to manufacture each different size of firearm involves a very large outlay of capital, which cannot be . . . entered upon but by degrees." The dynamic between gunmaker and buyer shifted from "I, a customer, need a gun, to my specifications. Make me one," to "I, an industrialist, have made many guns, to my template. I will sell them to you." Sociologist James Wright has stated as a truth of American guns

that "demand creates its own supply," but supply creates demand, too—or the economic imperative to find or invent demand for a product. Dealers and merchants needed to move more guns more quickly.[31]

In the 1850s, the Volcanic factory had limited production capacity—not even two hundred rifles a month—but it was still a daunting quantity. To encourage bulk sales, Winchester devised discount schemes for his merchants and dealers that were determined by volume. He wrote to one prospective dealer that he would offer a 20 percent discount on purchases of over $100, 25 percent on those over $1,000, and 30 percent on those over $5,000. The more the dealer sold, the larger his profit margin. In case the concept was unclear, Winchester explained, "We will leave with you to do the best you can for us in making a sale so far as to make the largest discount." Winchester insisted that his price lists be adhered to, and he emphatically avoided consignment as much as possible in favor of "absolute sales," which, obviously, increased the dealer's incentive to sell as many guns in stock as he could.[32]

Working through a third party, Winchester proposed to sell to one dealer all the "arms"—a novel abbreviation, requiring quotation marks—he could sell "at a discount of 20 percent . . . or 5 percent additional discount for CASH." In addition, the dealer could have exclusive rights to sell in his area if he agreed "to use all due effort by advertising, etc., to give them a *thorough chance to be known* and sold." To establish a depot in New York City, on Broadway, Winchester reached out to Smith and Wesson, in the gun capitalists' intimately competitive fashion, to propose that they sell their guns together.[33]

Colt pushed volume as well. Revolvers didn't just sell themselves, and it was the gun capitalist's ordinary, repetitive task to roll the boulder of demand up the hill, cultivate a market, and then do it again. Eventually, the companies would succeed in building their domestic markets, but at this time, even their best marketing and sales designs struggled against demand and price. In 1855, Colt was offering dealers a 25 percent discount for sales of under $3,000 a month, and a 30 percent discount for sales over that amount. If a dealer achieved a very high volume of $30,000 net and in cash, he provided an additional 5 percent discount. "But no such terms or discount will be given when

there is a combination of parties for such purchase," he warned, "with a view of dividing the Arms between them."

Dealers quickly caught on to the volume-driven arithmetic of industrial production. A Philadelphia dealer in 1850 asked Colt if "by ordering a considerable lot of your guns . . . the prices and terms will be put low so as to be advantageous." In the early 1850s, cranky dealers wrote to Colt to plead their cases and complain of the lethargic gun business. "I should be entitled to a larger discount," reasoned a Boston dealer, "than parties who order but a few of [the revolvers], and not as I sell them." Demand was not so great that the market could sustain Colt's prices. Like others among the gun elite, Colt tended to overestimate the market. "Cannot you reduce your prices?" a Philadelphia dealer asked. "We think if your Pistols were lower there might be more sold." Another Philadelphia dealer bluntly informed Colt that he wanted only four pistols, since "the extra discount . . . I do not consider a sufficient inducement to give larger orders; and I prefer getting just what pistols I want for present orders." The problem, said a New York dealer, was that "the profit on your goods is so small . . . there is but little encouragement to order largely." Other dealers rightly questioned whether they were getting the very best discounts from Colt and Winchester. "You will be kind enough to let us know," wrote one to Colt, "if the prices that you charge us are as low as you sell to others."[34]

Winchester had what appears in hindsight an ingenious if counterintuitive gun marketing strategy. While he coveted US government contracts, he realized that there was potentially more to gain in selling guns to individuals through dealers rather than in bulk to larger entities. He needed a high volume of sales, but, absent government contracts—surely the most elegant solution to the volume problem—he preferred that orders accumulate through small sales on a dispersed market. "We must advise against any efforts to sell to clubs at present," he wrote to an Indiana dealer, "unless small ones of ten or so. . . . We decline all large orders and give the preference to small ones, for the express purpose of *scattering our guns as much as possible*" (italics added). To another retailer, he likewise advised, "Do not sell to clubs if you

can take single orders," and to a lieutenant colonel he explained that
he had declined "most orders for three hundred to a thousand" be-
cause, given the company's limited production, it could only fulfill
them by "cutting off smaller quantities" that would be more beneficial
in terms of promotion and sales. The strategy was attuned preternatu-
rally to the civilian, commercial gun market—which was more about
individuals than about governments, units, regiments, or clubs. It
would prove crucial to sales years later.[35]

FOR NOW, IT SEEMED THAT WINCHESTER HAD OVERREACHED. BETWEEN
1857 and 1858, his company produced about 3,200 flawed Volcanic
repeaters, because they had "no way but to finish up those we had com-
menced." To do otherwise, Winchester explained, "would have been a
total loss," although it was close to a total loss, anyway. Most of the
3,200 repeaters collected dust for many decades until they were placed
on planks laid over sawhorses at the company's employee entrance and
sold for fifty cents apiece.[36]

With newfangled machinery churning out near-useless guns, the
New Haven Arms Company lumbered heavily in the red, and Win-
chester continued to bail it out by loaning it more and more capital, as
an individual, to keep it afloat as a corporation. Even his feistiness for
the enterprise faltered. Winchester contemplated abandoning the
whole project. "I have repeatedly offered to give all of my stock to
other stockholders, if they would reimburse my advances," he ex-
plained, as it would "relieve me from my responsibility for the Com-
pany, which covers its whole indebtedness." Unsurprisingly, the offer
didn't tempt investors, and Winchester continued to carry the weight
of what must have seemed a costly phantasm of a perfectly-functioning,
multi-firing gun and a gun-loving country and world hungry for as
many as he could produce.[37]

It looked like the foray into mass-producing guns would end in
bankruptcy for Winchester, as it had for other players in the business.
This had been Samuel Colt's fate with the Paterson company in 1842,
it had been the fate of the Wesson Rifle Company in 1849, and it
might have been Remington's fate, had he not diversified to non-gun

production at perilous moments of peace. Neither the gun market
nor industrial production had proven to be as seamless as they'd
imagined it.[38]

The bad luck continued in 1860. In order to raise desperately
needed operating capital for his company, Winchester contracted to
produce 3,000 revolvers for Cyrus Manville of New York. Unfortu-
nately for him, the revolvers never found their way into circulation.
"We calculated to clear some eight thousand upon the sale," Win-
chester lamented, but when the pistols were finished, Manville "failed
to respond," and "we now have them on hand, and the capital they
cost locked up in a lawsuit" against him.[39]

As the company produced defective weapons, Winchester did have
the consolation of time and experience to perfect certain improve-
ments on the repeater—and patent them. The new design features
"obviated the objections to the old arms." Winchester convinced his
board of directors to drop the Volcanic line and cast the company's fate
with the Henry rifle and cartridge. He enlisted Benjamin Tyler Henry
to resolve two problems with the repeater: one with the cartridge, the
other with the bolt and firing pin mechanics. Winchester continued to
advance large funds to the New Haven Arms Company, became a co-
signer for its debts, and took over Henry's house mortgage to ensure his
loyalty until he could solve the mechanical riddle.[40]

That would take three years.

At the end of that time, Winchester wrote, they finally and truly
had "made a perfect thing as applied to a rifle." The Henry was an "ut-
terly revolutionary" weapon, according to a military scholar. Other
gun experts have called it a "winner to begin with" and the most "tech-
nically advanced" gun to emerge in the Civil War years. It was stream-
lined, with a magazine beneath the barrel that had the huge capacity
of fifteen rounds. The shooter did not have to manually cock the ham-
mer, which increased its killing speed. Winchester called the Henry
the "coming gun"; it was endowed with lethal "simplicity" and "not at
all liable to derangement," a reviewer said in praising it. Winchester
saw Henrys as "peculiarly adopted for cavalry and for picket and scout-
ing purposes, and very efficient for all infantry uses. . . . They will put

the fact that our new rifle is a success [mechanically], and will, in time, if pressed with vigor, retrieve our past losses."[48]

"Press with vigor" understated the matter. Having solved a mechanical problem of how, Winchester needed to crack a riddle of why. Just as crucial as the mechanical invention of a mass-produced repeater was the invention of a world in which it would be mass-purchased. Winchester asked Martin to take a leap of faith and support the company through a loan. "There has been but one sale of the stock, to my knowledge, and this was made recently upon this prospective value, at 25 cents on the dollar. . . . We should prefer to have you hold on, and help us. If you sell, however, it will help us indirectly, as the parties offering to buy do so with the purpose of seeing the thing through, if money will do it." As for himself, Winchester had reached a point of no return. He was seeing the thing through.[49]

CHAPTER 4

# "MORE WONDERFUL THAN PRACTICAL"

BEFORE IT KILLED THE GUN INDUSTRIALISTS (OR MANY OF THEM), the Civil War saved them. The New Haven Arms Company was tottering on bankruptcy, again, before the war. Remington's company had converted much of its manufactory to non-gun items during the comparatively halcyon 1850s: had the war not intervened, the company might well have failed. The war created the demand that gun capitalists desperately sought—and then abruptly withdrew it at war's end, while also leaving thousands of surplus rifles drifting through the country in its wake to depress commercial demand. All of this revealed the inherent pitfalls for the gun industrialist of construing the gun business as the war business.[1]

Abolitionist and famous clergyman Henry Ward Beecher animated the rifle, nicknamed a "Beecher Bible," with a "truly moral agency," giving it a reputation as the righteous instrument of a just war. Otherwise, he preached, you might as well "read the Bible to buffaloes" as try to persuade slaveholders to change their views. Winchester described himself and his outfit as "unconditional unionmen in every sense," refusing to sell to southern sympathizers, although Confederates acquired Henrys through indirect sales and thefts. Remington was a pacifist: he agonized over the drift toward war, and his worries were

Compendium_Spitzer
Page 300

exacerbated by his foreboding about the war's burden on his manu-factory. Among the gun-industrial elite, however, it was Samuel Colt who perhaps best epitomized the American gun industry's future as it moved even more decisively from a government phase to the non-exceptionalism of the commercial phase, in which gun sales, especially internationally, were untethered to belief, creed, politics, patriotism, or partisan agendas. For Colt, according to a biographer, "making and selling munitions was a business like any other"; and as Colt himself put it, guns were just something to "get out and sell." Although Colt was not a southern sympathizer, he "was busy shipping arms to the South up to the last possible moment" in crates vaguely marked "Hard-ware." Writing to his superintendents on the brink of war, Colt said, "Run the Armory night & day with a double set of hands. Make hay while the sun shines." Amos Colt, a company representative, departed from Washington, DC, in early January 1860 to go to Richmond, Vir-ginia, and "thence to North and South Carolina, Georgia, Alabama, Louisiana, Mississippi, Arkansas, and Tennessee" to sell Colt's guns. About a year later, the *Sunny South*, a newspaper in Aberdeen, Missis-sippi, featured an ad for Colt's Patent Firearms at "GREAT REDUC-TION IN PRICE," in "packages of 5, 10, and 20 each."[2]

Colt's letters detail his interest in establishing a gun factory in Rich-mond or elsewhere in the South. Toward the end of 1859, he dis-patched his loyal representative William Hartley to Richmond to "convince them that we will do everything in our power to carry out [the governor's] designs, whether it is by creating a manufactory of arms . . . at Richmond or employing my armory here in his service." With the Virginia governor, Hartley surveyed the state armory and the adjoining penitentiary and grounds to estimate the costs for Colt to equip the place to make 5,000 rifles a year. The site had enormous wa-ter power, and Hartley surmised that the land would "increasing[ly] be of great value." He proposed that Virginia sell the old state armory to a company to be "incorporated with a capital of $500,000 to $1,000,000" at the site's present value of $150,000 or $200,000. The availability of "penitentiary labor of 200 men and the fine granite found here," he

wrote, would make it possible to build a "fine arsenal" that was more easily defended than the current installation.[3]

Hartley reckoned that the company's stock could be sold in Vir-ginia, and that a gun factory would get a good "southern trade." He was willing to "head the list with a subscription of say 9/16th of the stock." Hartley followed up in January 1860 to say that there was a "great deal to be made out of the armory at Richmond. . . . You may look upon it as settled fact that they will erect and put in operation an armory in Rich-mond which will command the support of the southern states for their military arms." Hartley qualified this statement, saying that the arms could be made elsewhere and simply "assembled and marked" at the Virginia location. He estimated that "a cheap rifle should be made for the militia at 10 to 15 each." Colt also sent a gift pistol to the Georgia governor's son, as he was considering the establishment of an armory there. "I have no doubt that the understanding would result in mutual profit," he concluded, "to my state and yourself."[4]

The *New York Times* accused Colt of treason on the eve of the Civil War, noting that he was "incessantly occupied" in making arms for the South, an effort he made "no attempt to conceal." The *New York Daily Tribune* decried him as a "traitor," a man "base enough to sell arms" that would be turned against him. The paper proposed that "so bad a citizen," who would not work for a "fair share equivalent for the gov-ernment" (instead abiding by the commercial muse and getting as much money as he could from whomever he could), should have his factory seized. Domestic peace eclipsed the tense antinomy of com-merce and commonweal, but it was always there, waiting to be seen.[5]

Meanwhile, the Union was undergunned, having not tooled up in 1861 for a protracted war. "We must have arms—any arms, no matter what," wrote officer John Fremont, in command of the Department of the West, immediately after Bull Run. Rifle fluency was not much bet-ter. Historians of militia culture and gun experts have noted that mili-tias were "virtually untrained," with activities limited by law to one-day musters, and sometimes even these were "devoted to getting drunk together." The North anxiously looked to the small community

he'd had any choice, because he had lacked the capital to "get up a machine" to produce it). Henry was caught between the old gun ways and the new, in which capital triumphed over craft. As a superintendent, Henry paid all of his employees, and he kept the difference between employee costs and the contract price to the company as his income. He might make around $15,000 over five years, but he was working to earn that. Winchester didn't give royalties to inventors of the patents he held, so Henry was not really making anything for having conceived the repeater rifle.[2]

Instead, the person who knew the least about the gun was profiting the most off of it. Winchester seemed to hold all the cards. Gun inventors, heirs to the gunsmiths, who knew how to make guns, were in many ways getting marginalized from the gun industry. When Henry's contract expired in 1864 and he left the New Haven Arms Company, he was bitter. Winchester simply engaged new superintendents and increased the workforce from thirty-seven to one hundred. Henry seemed to have little recourse—except that he was a stockholder in the New Haven Arms Company. The most tangible power he had lay in the most intangible leverage that he owned: his name and his stock. Henry saw his chance for justice when Oliver Winchester left in April 1865 on a long-awaited journey to Europe.

WHEN HE LEFT ON HIS TOUR, WINCHESTER AND HIS BUSINESS partner John Davies had just retired from the shirt business and cast their lot entirely with rifles. Winchester traveled first to sun-washed Naples, and then planned to take in the Rheine Falls at Schauffhausen and the rejuvenating waters of the Baden Baden resort in Germany, a station of the cross for ambition-weary men. On his European journey, where others took in spectacular scenery, Winchester peered deeply into the guts of a rifle. He wanted to tinker with the mechanisms in the Henry magazine that had caused the rifle to clog with mud during the Civil War.[3]

Judging from his agenda, Winchester was thinking of his rifle's post–Civil War future in foreign markets. He intended to enter the Henry in the Swiss munitions trials in Zurich to create interest and sales. He made valuable personal contacts for European markets, including Baron von Nolcken, his future German agent, and the French gun dealer François de Suzanne, who brokered a deal to send 1,000 Henrys to the French forces in Mexico serving Emperor Maximilian. Suzanne shipped them via Cuba to preempt any potential US objection about the French, with Winchester as their commercial conduit, violating the Monroe Doctrine. Winchester also intended to talk with a Swiss arms maker about designing a rifle that would solve both the crankiness of the Henry repeater and the crankiness of its inventor: Winchester wanted to commission a rifle with Henry-like action but a different magazine—a magazine so different from Henry's that it would avoid patent conflicts with him. At least in part, and sometimes large part, gun designs reflected the constraints imposed by the labyrinth of existing patents.[4]

In his 1865 catalog copy, Winchester deployed his reckoning skills to tout improvements to the Henry. A gun "requiring NO TIME to load," he wrote, "would be the perfect weapon." He compared the Henry to the Spencer. The latter required "three motions, and is good for twenty shots per minute, while the Henry rifle requires but *two* motions and is good for thirty shots per minute." And, he couldn't help but parse further, the Spencer "actually requires a compound motion" that the Henry did not, "and, if so counted, it would make the difference as four to two, instead of three to two [motions]." He had thus "mathematically demonstrated the theoretical superiority of the Henry." Winchester was still looking wistfully toward the military market, and he concluded that improvements made the Henry particularly adaptive "to cavalry and infantry service" and "military men."[5]

Winchester had planned to be gone for several months, so before he set sail he assigned power of attorney for the New Haven Arms Company to its secretary, Charles Nott. Winchester hadn't been in Zurich long when he received a telegram that he must have read with stunned, infuriated disbelief. Henry and some sympathetic stockholders had made a move for control of the company. Nott was a traitor. In collaboration with Henry, he had used his power-of-attorney authority to petition the Connecticut state legislature to have the stockholders turn

control over to him—and to change the name of the New Haven Arms Company to the Henry Repeating Rifle Company. Henry was trying to maneuver Winchester out of the gun business.

Winchester headed back to New Haven immediately. Then he went to war, of the bloodless corporate style. He called in all the mortgages that he and his son Will held, for immediate collection. This essentially deprived Henry of the factory—at that time located in Bridgeport, not New Haven—which crippled Henry's chance to attract capital or begin gun production. It also gave Winchester a new factory site to make an "improved" repeater that would tweak Henry's design just enough to outwit patent litigation.[6]

Next, Winchester dispatched with the company's traitorous stockholders who had followed Henry by forcing an unwanted vote on Nott's role as secretary and his own role as president. Winchester won and Nott lost, since Oliver and Will Winchester and John Davies controlled a large chunk of the stock. Winchester maintained operational control over the remains of the company, but, in July 1865, he also signed articles of association with his son Will and John Davies to establish a Winchester Arms Company.

Henry's move to strip Oliver Winchester of control of one arms factory had instead put Winchester and his family in complete, direct control of two, and laid the groundwork for a rifle empire in Winchester's name, not the inventor Henry's.

Just as Winchester had intended, the deftly gutted Henry (née New Haven) Arms Company starved. Orders, revenue, and the workforce dropped precipitously from July to December. At a stockholders' meeting on December 31, 1865, Winchester essentially offered a takeover. He would assume all the credits and liabilities of the foundering New Haven company, either by the outright purchase of its existing stock, or through an exchange of company stock for stock that he would issue for the new corporation that he would create in 1866, the Winchester Arms Company.[7]

Stockholders with only a commitment to profit and none of Henry's added incentives of personal dignity or revenge didn't have the stout

hearts for this. The fact that Henry filed a breach of contract suit against Winchester in January 1866, while seemingly a bold move, only revealed to stockholders how desperate things really were for the company. Reading between the lines, the majority voted to accept Winchester's offer at their meeting on February 3, 1866.[8]

The incident must have affirmed Winchester's fierce lifelong resolve that control and leadership remain always with the family men—the only men, along with Davies, whom he could trust. On February 1, 1869, out of 4,500 shares issued, he personally held 2,040, and his immediate family owned another 450. The industrial economy was feckless. Only family and land last.[9]

Winchester decided to move the works from Bridgeport a few miles up the road to New Haven, and he laid the cornerstone for the New Haven factory that would bear his name in May 1866. He chose farmland, just north of New Haven proper that was approached by ordinary country roads, convenient to the Northampton canal, and surrounded by cow pasture. In the next few years, Winchester employees would test their rifles informally by firing randomly out of second- and third-story windows onto these pastures, occasionally killing a stray cow in the process.[10]

Gun manufactories of the 1860s were disorienting, clamorous caverns that smelled of machine oil, gas lamps, tobacco, and sweat. Great water wheels (Colt's had a one-hundred-foot circumference and ran half a mile in a minute) or coal-powered steam engines rumbled deeply; metal machines cutting metal screeched loudly. E. Remington & Sons had a steam engine with 150 horse power and a series of water wheels moved by steam, and the welding and forge rooms, where future guns underwent trials by fire and hammer, sent "the clang of [their] incessant industry throughout the village" of Ilion. Mark Twain toured Colt's factory in 1868 and found "every floor a dense wilderness of strange iron machines that stretches away into the remote distance and confusing perspective—a tangled forest of rods, bars, pulleys, wheels and all the imaginable and unimaginable forms of mechanism." Colt biographer Henry Barnard marveled at how "bewildered in wild-eyed wonder" the



CHAPTER 19

# THE WEST THAT WON THE GUN

*The west may need to be seen to be believed, but it must be believed to be seen.*

—N. Scott Momaday

THE WINCHESTER "WON THE WEST" SEVERAL DECADES AFTER THE fact, in the 1900s. Everyone knows that the Winchester was the gun that won the West, not because it happened, but because it was a twentieth-century slogan in a Winchester marketing campaign. The slogan was devised by Winchester executive Edwin Pugsley; it was first introduced in a full-page magazine ad in 1919, and later disseminated in "French, English, Chinese, Spanish, everything," says Winchester curator Herbert Houze. "It's a bit of an overstatement. . . . Shall we say, Winchester did a wonderful marketing job."[1]

In 1959, the company's slogan was, "Winchester: More than a Gun. An American Legend": by then it could afford to be more abstract and gestural even than "the gun that won the West." And by 1995, there was almost a weary, slurred shorthand in how Winchester advertised the heavy cultural freight of its gun. The company's explanation of its modern logo, a horse and armed rider, leaves no cliché behind: it conveys "the cowboy, the Indian, the lawman, the pioneer, the mesa, the mountains, the desert, and the grandeur of the west."[2]

As with the "gun that won the West," much of the history we know about the frontier and guns never happened. The Wild West of the 1800s, recall, was not so wild or gun-violent as it is perceived. There is the gun that won the West, but also the West that won the gun: the social fiction, out of so many contingencies and historical possibilities, which allied to the gun and amplified its cultural mystique. This conquest occurred in the early and mid-1900s, not the 1800s, and most energetically through the braiding of fiction, history, and legend in the mediums of advertisement, film, and story. The gun industry itself helped to deepen its product's mystique, which increasingly traded on the currency of desire and affinity, rather than utility.

The western and the frontier hero dominated movie theaters, magazine stands, bookstores, and televisions in the 1950s before declining as a genre. The body count of gun casualties on the frontier at Saturday matinees far exceeded the number of casualties on the actual frontier. At least 650 westerns were released between 1935 and 1940, and then 501 from 1950 to 1955, and over 250 from 1955 to 1960. Eight of the top ten television prime-time shows in 1959 were westerns, with a total of 39. Publishers sold an average of 35 million paperback westerns a year in the 1950s. Scores of "Old West" magazines, also described as men's magazines, appeared in the mid-1900s, including *Gunslingers of the West*, *True Frontier*, *Outlaws of the Old West*, *Badmen of the Old West*, and *Best of the West*. By one metric of content analysis, the mention of "cowboys" in English printed material peaked in 1939.[3]

In 1969, Ramon Adams compiled an annotated bibliography of 2,491 works on western gunmen. Excluding state and local history guides with only a passing mention of gunmen, or entries without a date, of the 1,951 remaining publications, all but 241 were published in the 1900s; the greatest number of books was published in 1936, followed by the years 1957, 1958, 1960, and 1955, in that order. This is not a precise or exhaustive census of all published material on gunmen, but it roughly quantifies the character's fluorescence in the mid-1900s. This vernacular proliferation extended even to plastic-mold play figurines. The Marx Company debuted its first of 134 Wild West playsets in 1951 and offered more than 400 Wild West figures, with which

children in the 1950s played "Cowboys and Indians," Patricia Limerick observed, not "masters and slaves."[4]

In this way we advertised, wrote, filmed, staged, played, and televised our way into a gun culture. As with the earlier example of Buffalo Bill, the West that won the gun was a prematurely postmodern narrative of the fictionalized real: it was important that the truth be asserted, and equally important that it not be told.

———

BUSINESS PROFESSOR DOUGLAS HOLT HAS DESCRIBED HOW commodities that become icons, as Winchester and Colt did in the 1900s, compete and win on a "myth market." The product has intangible value and charisma as a commodity that embodies a powerful cultural myth, contoured through advertisement. The most powerful myths, Holt argued, are those that resolve "acute tensions people feel between their own lives and society's prevailing ideology," and promise to resolve cultural anxieties and antinomies. Like gun legends, the myth flourishes in the space between what happened and what we wish had happened.[5]

Advertisements in the 1900s about the Winchester in the 1800s ran the gamut from international sloganeering to window displays at hardware stores in small towns that were supported by the fledgling Winchester marketing department. The *Winchester Herald*, a company magazine for its sales force, praised a Colorado City window display that created a "lifelike scene of the prairie in the wild days." The window depicted a "treat 'em rough roundup," a "wild show for wild men."[6]

Ad men had discovered the gun's history—or myth. As Colt's concluded in one ad, its gun had been "famous in its past." In the mid-1900s, Smith & Wesson ran an extensive ad campaign under the banner, "Makers of History . . . Arms and the Man." Each ad took a year in American history and airbrushed the gun into the narrative. The year 1891 began with, "Chicago remodels its shore line to prepare for the Columbian Exposition . . . U.S. Patent Office celebrating 100 years of service . . . McKinley races to political prominence . . . Smith



# The Gun
## in
## America

### The Origins of a National Dilemma

*Lee Kennett*
*and*
*James LaVerne Anderson*

Contributions in American History
Number 37

GREENWOOD PRESS

Westport, Connecticut ● London, England

**Library of Congress Cataloging in Publication Data**

Kennett, Lee B
    The gun in America

    (Contributions in American history; no. 37)
    Includes bibliographical references and index.
    1.  Firearms—History.  2.  Firearms—Laws and
regulations—United States—History.  3.  Firearms
industry and trade—United States—History.  I.  Ander-
son, James L.  II.  Title.
HV8059.K45        363.3        74-5990
ISBN 0-8371-7530-5

Copyright © 1975 by Lee Kennett and
James LaVerne Anderson

All rights reserved. No portion of this book may be repro-
duced, by any process or technique, without the express
written consent of the authors and publisher.

Library of Congress Catalog Card Number: 74-5990
ISBN: 0-8371-7530-5 Cloth Edition
ISBN: 0-8371-8715-X Paper Edition

First published in 1975
Second printing 1976
Paperback edition 1976

Greenwood Press, a division of Williamhouse-Regency Inc.
51 Riverside Avenue, Westport, Connecticut 06880

Manufactured in the United States of America

90     *The Gun in America*

oxide, or "laughing gas," under the name Dr. Coult. At the same time he obtained arms patents in the United States and Europe. Finally, in 1836, he was able to open a factory in Paterson, New Jersey, and begin production. The revolver was not a new idea, but had never been commercially successful. The pistols made in Paterson were complicated in mechanism and very expensive; buyers were few and the company was forced into bankruptcy in 1842.[17]

Many of Colt's early products found their way to Texas, where they soon gained a reputation. Captain Samuel Walker of the U.S. Dragoons became convinced of their value as military sidearms, and when the Mexican War broke out he prevailed upon the government to order a thousand of them.[18] Since the Paterson factory had closed by then, Colt arranged for them to be made at the Whitney plant. The new dragoon pistol was much simpler in mechanism and better adapted to serial manufacture. (It was also an enormous weapon, weighing nearly five pounds.) This time Colt's revolver was launched for good. Its inventor was a born salesman; he entered the commercial market and traveled across Europe demonstrating his weapon.[19] To meet the flood of orders that poured in he built the largest private armory in the world.[20] The new facility was completed in 1855, at a time when business was very brisk. During the Crimean War (1854-1856) British, Turkish, and Russian forces used his revolvers—Lord Cardigan carried one in the charge of the Light Brigade.

By 1860 Colt and others had transformed the industry. In addition to machine manufacture, the "patent" firearm came to the fore, with constantly improving designs entering the market. Competition was keen, and patent infringements and suits were common. Henry

Compendium_Spitzer
Page 308

Deringer's attempts to protect his name and trademark produced one of the landmark cases in the development of American copyright law.[21] Private capital was by now more readily available in the industry, and profits from other fields of manufacture were drawn into the arms trade. Parker Brothers, manufacturers of shotguns, had branched out from a modest start making coffee mills.[22] Oliver Winchester went from the production of shirts to that of rifles.[23] Private capital thus took the place of government money as contracting fell off and the military showed little interest in newer weapons. Though the revolver had proved itself, the official sidearm of the United States Army remained a single shot pistol. In 1860 the War Department adopted a policy against paying any royalties on patent firearms, which effectively ruled out their adoption.[24]

Then, in 1861, government and industry found themselves suddenly thrown together. The Civil War produced a demand for weapons that completely outstripped the capacities of government armories. The Harper's Ferry installation, having survived John Brown's raid, soon fell into Confederate hands. The government issued contracts for thousands of stands of regulation arms and patent firearms of all kinds were pressed into use. Agents of the federal government scoured the armories of Europe to supply their own needs and to keep the Confederates from getting arms.[25] In all, it has been estimated that the Union used some four million small arms, of which perhaps a million were imported.[26] The South was, of course, in an even more perilous situation; with its limited production facilities it probably produced no more than 70,000 shoulder arms. It relied heavily on importation and on what it could scavenge from the enemy after successful battles.[27] Pro-

Compendium_Spitzer
Page 309

duction increased enormously in the North as contractors, impelled by patriotism and profit, responded to the government's call. In the initial haste to rearm, the federal authorities sometimes offered to pay too much and sometimes awarded contracts to businesses which could not meet contract terms. These blunders soon bred a scandal that drove Secretary of War Simon Cameron from office and sparked an official investigation. A governmental commission went over more than 100 contracts, involving claims of $50 million. It canceled some and rewrote others, saving the government about $7 million.[28]

In addition to its role in expanding the small arms industry, the war encouraged innovation. It was largely responsible for the rapid switchover from percussion arms to breechloading ones based on the principle of the modern cartridge. Repeating rifles made their appearance. President Lincoln himself tested one of these designed by Christopher Spencer and pronounced it excellent.[29] Inventors redoubled their efforts in this direction, filing some 500 patents in the years 1860-1871.[30]

The war brought prosperity to the industry, but its aftermath created severe problems. Many firms had made heavy and long-term investments in expanded facilities, so that with the cessation of hostilities and the end of government business they faced a difficult transition. The Remington Company, which had accepted contracts totaling some $29 million, suddenly found its huge plant at Ilion, New York, idle when the government canceled its orders, effective immediately, three days after Appomattox. Remington survived, skirting the edge of bankruptcy for several years while it financed

the service and supply."[7] As a result, civilians were better armed than the military, which had become progressively resistant to change. Army ordinance had lagged behind in adopting breechloaders, rifles, or anything that might waste too much ammunition.[8]

Weapons privately owned by army officers and most civilians were the most modern on the frontier. Though the wilderness is in a sense the most backward area of civilization, men who lived on the frontier rapidly adopted the most sophisticated firearms. By 1836, half of the firearms in Texas had a percussion ignition system. This modern weapon apparently gave the Texans a distinct advantage over the Mexicans who carried flintlocks at the Battle of San Jacinto.

Samuel Colt would have had tremendous difficulties marketing his revolver if westerners had not adopted it so rapidly and had not continuously ordered more of his new invention. A case in point is the original Paterson Colt which was only in production a short time after 1836 before the inventor ran out of money. Many of these rare revolvers were purchased for use in Texas by the Republic's navy and some found their way to New Mexico by 1838.[9] The impact of this new weapon is shown by a remark made by Indians who had an encounter with Kit Carson in 1841: "White man shoot one time with rifle and six times with butcher knife [Colt Revolver]. . . ."[10] Several decisive battles occurred in the early 1840s between Indians and Texas Rangers armed with Colts. With the Ranger victories, the fame of the Colt spread. Two Ranger leaders wrote in 1850: "We state, and with entire assurance of the fact, that your sixshooter is the arm which has rendered the name of Texas Ranger a check and terror to bands of our frontier Indians."[11] Walter P. Webb used this quotation to underscore his

112     *The Gun in America*

belief that the evolution of the six-shooter was the "first radical adaption made by the American people" to frontier conditions.[12] More importantly, the use of the Colt revolver shows that the frontiersmen were concerned about being armed with the foremost weapon of the period. So valuable were these pistols that a .44 caliber Colt Hartford Dragoon model worth $25 at the factory sold for $300 in the California gold fields.[13]

The standard Kentucky rifle did not last long in its eighteenth-century form. New percussion locks were fitted to many of these weapons. In addition, as hunters needed to kill bigger, more powerful animals at greater ranges, the bore of the rifle was increased to a larger caliber and shortened for use in dense areas. This was an understandable change since the old Kentucky style rifle did not have the stopping power to halt a charging grizzly and could not be used easily from horseback. The most famous producers of the new mountain rifle were the Hawkens brothers in St. Louis. Before the invention of repeating or breechloading rifles, mountain men employed various odd types of weapons in an attempt to have multiple shots.[14]

As soon as repeating rifles were available, the frontiersmen adopted the new varieties. Josiah Gregg, writing in the late 1830s, recorded: "The repeating arms have lately been brought into use upon the prairies and they are certainly very formidable weapons, particularly when used against an ignorant, savage foe."[15] The Colt Paterson revolving rifle was in use on the frontier at this time. Many of these early revolving rifles were as great a danger to the user as to the intended victim, yet frontiersmen willingly accepted the potential hazard in order to gain the additional firepower.

After the Civil War, when a great number of breech-

Compendium_Spitzer
Page 312

Firearms and the Frontier Experience    113

loading and repeating rifles became available, west-
erners likewise acquired them. The first of this type of
rifle to appear were the breechloading Sharp's rifles, or
similar types used by hunters. Next to be accepted were
the repeaters with their self-contained cartridges, the
Henry and the Winchester being the most famous. The
enthusiastic reception given the Winchester created a
rapidly expanding market for that company. Since
Texas lagged behind in providing modern weapons for
the Rangers, individual members used their pay to buy
the new styles of Winchesters as soon as they were avail-
ble. In the summer of 1876, the buffalo hunter Wright
Mooar traveled to New England where he purchased the
new Model 1876 Winchester and was using it on the
frontier that fall. Without the westerners' favorable re-
sponse to the Winchester that company would have had a
difficult time surviving. The Winchester became so
popular that citizens in Idaho named a town after it.[16]

Moving along with the frontier, of course, was the
necessary gunsmith. In the early days of the westward
movement, the gunsmiths continued to make individual
arms. Fur companies employed skilled gunsmiths to ac-
company expeditions into the wilderness. Railroad com-
panies also hired gunsmiths and maintained private ar-
senals at the head of the tracks as they were building
across country. The Union Pacific maintained 1,000
rifles and trained its men to use the weapons against
Indians. The company also provided its own craftsmen
to repair these weapons. But as technological changes
developed, the gunsmiths became repairers of the more
complex modern weapons produced in eastern factories.
They became salesmen for the popular brands and, at
the same time, continued to make custom guns for indi-
viduals. There seems to have been a fairly quick move-

Compendium_Spitzer
Page 313