1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA 94102-7004
      Telephone: (415) 510-3479
7     Fax: (415) 703-1234
      E-mail: John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and*
    *Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                         CIVIL DIVISION

13

14   **JAMES MILLER et al.,**            Case No. 3:19-cv-01537-BEN-JLB

15                         Plaintiffs,
                                          **COMPENDIUM OF WORKS**
16        **v.**                          **CITED IN SUPPLEMENTAL**
                                          **DECLARATION OF ROBERT**
17                                        **SPITZER**

18   **CALIFORNIA ATTORNEY**              **VOLUME 3 OF 5**
     **GENERAL ROB BONTA et al.,**
19                                        Courtroom:    5A
                         Defendants.      Judge:        Hon. Roger T. Benitez
20
21                                        Action Filed: August 15, 2019

22

23

24

25

26

27

28                                   1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| **CALIFORNIA** | | |
| 1927 Cal. Stat. 938 | 15 n.34 | 003 |
| 1933 Cal. Stat. 1169 | 12 n.30 | 004-007 |
| **DISTRICT OF COLUMBIA** | | |
| Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 652 | 12 n.30 | 009-014 |
| Pub. Law 73-474, ch. 757, 48 Stat. 1236 (1934) | 9 n.23 | 015-020 |
| **HAWAII** | | |
| 1933 Haw. Sess. Laws 117 | 13 n.32 15 n.35 | 022-023 |
| **ILLINOIS** | | |
| 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | 12 n.30, 13 n.31 | 025-028 |
| **LOUISIANA** | | |
| Act of July 7, 1932, no. 80, 1932 La. Acts 336 | 12 n.30 | 030-034 |
| **MASSACHUSETTS** | | |
| 1927 Mass. Acts 413, 413-14 | 12 n.30 | 036-040 |
| **MICHIGAN** | | |
| Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888 | 12 n.30 | 042-049 |

2

| | | |
|---|---|---|
| Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929 | 12 n.30 | 050-053 |
| **MINNESOTA** | | |
| Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 | 12 n.30 | 055-058 |
| **MISSOURI** | | |
| 1929 Mo. Laws 170 | 13 n.32 15 n.35 | 060-061 |
| **NEW HAMPSHIRE** | | |
| N.H. Rev. Stat. § 159:16 | 36 n.124 | 063 |
| 2010 New Hampshire Laws Ch. 67 (H.B. 1665) | 36 n.124 | 064-067 |
| **NEW JERSEY** | | |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 37 n.127 | 069-070 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881). | 36 n.125 | 071 |
| 1920 N.J. Laws 67, ch. 31, § 9 | 12 n.30 | 072-082 |
| 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | 13 n.31 | 083-086 |
| **NORTH CAROLINA** | | |
| 1917 N.C. Sess. Laws 309, ch. 209, § 1 | 12 n.30 | 088-089 |
| **NORTH DAKOTA** | | |
| 1931 N.D. Laws 305-06, ch. 178, §§ 1-2 | 13 n.31 | 091-094 |

3

| | | |
|---|---|---|
| **OHIO** | | |
| Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189 | 12 n.30 | 096-097 |
| **OREGON** | | |
| 1933 Or. Laws 488, §§ 72-201, 72-202, 72-207 | 13 n.31 | 099-102 |
| **PENNSYLVANIA** | | |
| 1929 Pa. Laws 777, §1 | 13 n.31 | 104-106 |
| **RHODE ISLAND** | | |
| 1927 R.I. Pub. Laws 256, 256 | 12 n.30 | 108-115 |
| **SOUTH CAROLINA** | | |
| Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288 | 12 n.30 | 117-119 |
| **SOUTH DAKOTA** | | |
| Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245 | 12 n.30 | 121-124 |
| **TEXAS** | | |
| 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6 | 13 n.31 | 126-128 |
| **UTAH** | | |
| 1901 Utah Laws 97-98, ch. 96, §§ 1-3 | 37 n.128 | 130-132 |
| **VERMONT** | | |
| 1923 Vt. Public Acts, No. 130, § 1 | 13 n.31 | 134-135 |

4

| | | |
|---|---|---|
| **VIRGINIA** | | |
| Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137 | 12 n.30 | 137-141 |
| **WASHINGTON** | | |
| Wash. 1933 Sess. Laws 335 | 13 n.32 | 143-145 |
| **WISCONSIN** | | |
| 1933 Wis. Sess. Laws 245, § 164.01 | 13 n.31 | 147-151 |
| **BOOKS**[1] | | |
| Derek Avery, Firearms 12 (Wordsworth Editions, 1995) | 7 n.14 | 173-175 |
| Virgil E. Baugh, Rendezvous at the Alamo 39-63 (University of Nebraska Press, 1985) | 29 n.96, 30 n.99 31 n.104 | 176-195 |
| Ryan Busse, Gunfight 12-15, 65 (Public Affairs, 2021) | 31 n.107 | 196-203 |
| Philip J. Cook & Kristin A. Goss, The Gun Debate 13 (Oxford University Press, 2d ed. 2020) | 9 n.22 | 204-208 |
| William C. Davis, Three Roads to the Alamo 164, 207-8, 582-83 (HarperCollins, 1998) | 29 n.95, 30 n.97, 30 n.99, 32 n.116 | 209-214 |
| John Ellis, The Social History of the Machine Gun 13, 149-52 (Pantheon, 1975) | 6 n.10 19 n.51 | 215-223 |
| Norm Flayderman, Flayderman's Guide to Antique American Firearms 303-5, 683 (Gun Digest Books, 9th ed. 2007) | 20 n.55, 22 n.63 | 224-230 |

---

[1] The Declaration of Robert Spitzer cites Dickinson Bruce, Violence and Culture in the Antebellum South (1979) in its entirety and without discussing the book in detail.  *See* Spitzer Decl. ¶ 30 n.89.  This book is not included with this filing.

| | | |
|---|---|---|
| Norm Flayderman, The Bowie Knife: Unsheathing an American Legend 25-64, 495-502 (Andrew Mowbray, 2004) | passim | 231-279 |
| Louis A. Garavaglia and Charles G. Worman, Firearms of the American West, 1866-1894, at 129, 131 (University of New Mexico Press, 1985) | 26 n.87, 26 n.88 | 280-289 |
| Pamela Haag, The Gunning of America 24, 51-52, 56, 60, 65, 96, 353 (Basic Books, 2016) | passim | 290-305 |
| Lee Kennett and James LaVerne Anderson, The Gun in America 91, 112-13, 203 (Greenwood Press, 1975) | 6 n.12, 25 n.79 | 306-317 |
| Larry Koller, The Fireside Book of Guns 112, 154 (Simon and Schuster, 1959) | 23 n.71, 25 n.82 | 318-326 |
| Chris McNab, Firearms and American Law Enforcement Deadly Force 97-98 (Osprey Publishing, 2009) | 7 n.15 | 327-332 |
| James McPherson, Battle Cry of Freedom 475 (Oxford University Press, 1988) | 24 n.74 | 333-334 |
| Jack O'Connor, Complete Book of Rifles and Shotguns 42 (Harper & Row, 1961) | 27 n.92 | 335 |
| Phillip Peterson, Buyer's Guide to Assault Weapons 4-7 (Gun Digest Books, 2008) (as quoted in Robert Spitzer, The Gun Dilemma 29 (Oxford University Press, 2023)) | 28 n.94 | 336 |
| Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter That Changed America 3-5, 54, 136, 390, 401 (Scribner, 2021) | passim | 337-343 |
| Randolph Roth, American Homicide 180-183, 210-217, 218-219 (Belknap Press, 2012) | passim | 344-365 |
| Carl P. Russell, Guns on the Early Frontier 91 (University of Nebraska Press, 1957) | 20 n.56 | 366-367 |

6

| | | |
|---|---|---|
| Robert J. Spitzer, The Politics of Gun Control 25-26, 195-196, 205-11 (Routledge, 8th ed. 2021) | 9 n.22 | 368-378 |
| Robert J. Spitzer, The Gun Dilemma 14-15, 30, 32-33 (Oxford University Press, 2023) | 11 n.29 | 379-389 |
| Richard W. Stewart, American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917, at 367-68 (Washington, D.C.: Center of Military History, 2008) | 5 n.7 | 390-395 |
| Donald M. Snow and Dennis M. Drew, From Lexington to Desert Storm: War and Politics in the American Experience 90, 105-106 (M.E. Sharpe, 1994) | 5 n.8 | 396-437 |
| James Winant, Firearms Curiosa 8, 9, 36, 166, 168, 219-21 (Bonanza Books, 1955) | passim | 438-443 |
| Lewis Winant, Pepperbox Firearms 30, 32 (Greenberg Pub., 1952) | 23 n.70, 23 n.71 | 444-452 |
| **LAW REVIEWS AND JOURNALS** | | |
| David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 849, 851, 852-54, 871-72 (2015) | 17 n.39, 20 n.54 | 454-489 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Problems 55, 63-67, 69 (2017) | 11 n.28, 27 n.90, 37 n.126 | 490-518 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838 | 31 n.110 | 520-521 |
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) | 8 n.17 | 522-532 |
| S. Rep. No. 72-575, at 5-6 (1932) | 9 n.20 | 533-545 |

7

| | | |
|---|---|---|
| Firearms Commerce in the United States Annual Statistical Update 2020, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15, https://www.atf.gov/file/149886/download | 9 n.22 | 555-568 |
| "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45 ; 47 Stat. 650, ch. 465, §§ 1, 14 (1932). Pp. 4, 36, 42, 45, 52 | passim | 569-738 |

### NEWS ARTICLES

| | | |
|---|---|---|
| David Altheide, *The Cycle of Fear that Drives Assault Weapon Sales*, The Guardian, Mar. 2, 2013 | 31 n.107 | 740-745 |
| Bangor (Maine) Daily Whig, Oct. 27, 1870 | 37 n.129 | 746 |
| Rukmani Bhatia, "Guns, Lies, and Fear," American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear | 31 n.107 | 747-784 |
| Judson Hale, *When Lincoln Famously Used the Almanac*, Almanac.com, May 4, 2022 | 35 n.122 | 785-787 |
| Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The National Interest, Nov. 19, 2019 | 7 n.13 | 788-789 |
| John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.com, March 15, 2011 | 21 n.59 | 790-794 |
| David Kopel, *The History of Magazines Holding 11 or More Rounds: Amicus Brief in 9th Circuit*, Wash. Post, May 29, 2014 | 21 n.57, 24 n.73 | 795-797 |
| Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork, May 14, 2013 | 21 n.58, 21 n.60 | 798-800 |
| *The Man Trap*, The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870 | 38 n.131 | 801 |

8

| | | |
|---|---|---|
| Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*, War History Online, Apr. 26, 2019 | 7 n.14 | 802-811 |
| Philip Schreier, *A Short History of the Semi-Automatic Firearm*, America's 1st Freedom, at 32-39, July 2022 | 23 n.68 | 812-818 |
| *Shot by a Trap-Gun*, South Bend Tribune, Feb. 11, 1891 | 38 n.132 | 819 |

**OTHER SOURCES**

| | | |
|---|---|---|
| "Browning automatic rifle," Britannica, September 8, 2022 | 7 n.13 | 821 |
| Phil Bourjaily, Blast From the Past: Winchester Model 1905, Field & Stream, Jan. 11, 2019 | 26 n.86 | 822 |
| "Bowie Knife," Encyclopedia of Arkansas | 29 n.95 | 823-824 |
| Giffords Law Center, Assault Weapons | 3 n.2 | 825-835 |
| Giffords Law Center, Large Capacity Magazines | 4 n.4 | 836-852 |
| "Gatling Gun," History.com, Sept. 9, 2021 | 5 n.7 | 853-856 |
| Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," Oldwest, n.d., https://www.oldwest.org/bowie-knife-history | 30 n.99 | 857-862 |
| Robert Johnson and Geoffrey Ingersoll, It's Incredible How Much Guns Have Advanced Since The Second Amendment, Military & Defense, Dec. 17, 2012 | 26 n.86 | 863-868 |
| Ian McCollum, "Mannlicher 1885 Semiauto Rifle," Forgotten Weapons, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/ | 22 n.67 | 869-872 |
| How The Machine Gun Changed Combat During World War I, Norwich University Online, Oct. 15, 2020 | 5 n.8 | 873-875 |
| Matthew Moss, From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun, Military History Now, Jan. 16, 2015 | 6 n.9, 9 n.24 | 876-886 |

9

| | | |
|---|---|---|
| "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., Oct. 4-10, 1932 | 8 n.18 | 887-906 |
| Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" The National Interest, July 3, 2020, | 6 n.11 | 907-911 |
| "The Puckle Gun: Repeating Firepower in 1718," Dec. 25, 2016 | 20 n.52 | 912 |
| Uniform Law Commission, *About Us* | 8 n.16 | 913-914 |
| U.S. Census, Historical Population Change Data (1910-1920) | 16 n.38 | 915-917 |
| U.S. Census, National Population Totals and Components of Change: 2020-2021 | 3 n.3, 4 n.5 | 918-921 |
| "Billy Club," Merriam-Webster | 34 n.119 | 922-924 |
| "Bludgeon," Merriam-Webster | 33 n.118 | 925-928 |
| "Slungshot," https://military-history.fandom.com/wiki/Slungshot | 34 n.121 | 929-930 |

Compendium of Works Cited in Supplemental Declaration of Robert Spitzer
(3:19-cv-01537-BEN-JLB)

114     *The Gun in America*

ment of gunsmiths to the West, keeping pace with the frontier. Milwaukee had twelve gunsmiths in the 1840s, and San Francisco had even more shortly after its founding. Advertisements in the newspapers of the period indicate the volume of business carried on by these men.

Gunsmiths in the West were important members of the society, serving in elected positions in almost every major western town. They staged shooting contests for the community to advertise their commodities. Because of their speciality and involvements, they were among the first skilled craftsmen needed in the community.[17]

With tools in hand, the great westward migration was accelerated by the lure of gold in California. Thousands of settlers and dreamers moved westward. Books and travel pamphlets offered advice for travelers and contained lists of necessities. Chief among the items mentioned was a list of the types of weapons needed. Since many of these early emigrants were in need of more weapons than they had money for, the Congress passed a law in 1849 that persons moving to the territories of Oregon, California, and New Mexico could receive surplus weapons.[18] Although several senators wanted emigrants to pay the government for the weapons, Senator Thomas S. Rusk from Texas argued that "they were to travel over land to that country; and, as it was important that we should have an overland route, it was important to afford facilities and means of defense to emigrants; for, as they traveled through the unsettled parts of the country they would doubtless make valuable discoveries respecting the way thither."[19] The senators must have felt that it was less expensive for the government to provide weapons than to send armed soldiers along with the migrants. This was the first time in our history that the government provided surplus guns for civilians.

202    *The Gun in America*

most easily concealed and vital tool of his trade?"[63]

Yet within a few years the drive for federal action became so intense that the government did enter the field decisively. With the onset of the Depression criminal activity became even more rampant. Desperadoes such as John Dillinger, Clyde Barrow and his consort Bonnie Parker, the Barker-Karpis Gang, and others made the worst excesses of the 1920s pale in comparison. To the repertory of crime was added kidnapping on grand scale. The criminal added new and formidable weapons to his arsenal, weapons that in most cases were not covered by existing state laws. As early as 1922, Chicago police made the disquieting discovery that the city's lawbreakers were ordering sales catalogues from the Maxim Silencer Company.[64] New York hoodlums developed an interest shortly thereafter.[65] The term *silencer* was something of a misnomer since at best the device only muffled the report of a gun rather than rendering it inaudible. Even so, press and public began to talk of the sinister apparatus that made death "a ghostly visitation."[66]

Then too, there was the sawed-off shotgun, a weapon of devastating effect at close range. In itself the arm was hardly new. As early as 1898 Winchester had introduced a shotgun with a barrel shortened to twenty inches, advertising it as a police weapon useful in riot control.[67] This riot gun, as it was known, had been adopted by the American Expeditionary Force as a "trench gun," useful in close combat. The weapon got considerable publicity when the Germans officially protested its use as contrary to the laws of war.[68] By the mid-1920s the sawed-off shotgun began to find favor in criminal circles. Compact and effective even without careful aiming, it could be used from moving vehicles—though Clyde Barrow per-

fected a "quick draw" with one concealed in a special holster sewn into his trousers.[69]

But nothing quite symbolized the crime of the era as did the "Tommy Gun." This weapon was a product of World War I, having been devised by Colonel John M. Thompson of the United States Army. It too was designed for trench warfare; indeed, its inventor used the colorful term "trench broom" in describing its function.[70] It came too late to be used in the war, but Thompson and his associates formed a company called Auto Ordnance to market it commercially. Colt agreed to do the actual manufacture, and several thousand were made. Thompson called his weapon a submachine gun, to distinguish it from the bulkier and less portable machine guns that had been used in the war. It was a fully automatic arm, and would fire a stream of .45 caliber bullets until the trigger was released or the magazine exhausted.

After the war, military interest in the new weapon was not great. Thompson offered it to police departments —it was demonstrated to the Chicago Police in 1922[71]—but once again few sales were forthcoming. The United States government was also a poor prospect. Even as late as 1926, the Treasury Department had only four machine guns on its inventory. (Inexplicably, the Department of Agriculture had one.)[72] The original price of $225 was dropped by $50, but business scarcely improved. By 1925 Auto Ordnance had sold only 3,000 of the initial lot of 15,000 manufactured by Colt.[73] The company took what orders it could. Salesmen became, as a Colt official put it "a bit careless in their merchandising."[74] The first large order, subsequently seized, turned out to have been placed by the Irish Republican Army.[75]

204     *The Gun in America*

Chicago gangsters were the first to discover the sub-machine gun's formidable attributes in the winter of 1925-1926. It appeared in Philadelphia in 1927 and in New York in 1928.[76] By the early 1930s the Tommy Gun had become a household word, winning the endorse-ment of Mad Dog Coll, Ma Barker, and Pretty Boy Floyd. More than anything else, the submachine gun opened the doors to federal legislation. Like the silencer and the sawed-off shotgun, it seemed something no reputable person would want or need, and no criminal should be allowed to have. Here, at least, was a category of deadly weapons eminently deserving of the strictest regulation at the national level.

The clamor for federal action coincided with the ad-vent of the New Deal, an administration resolved to mobilize the full power of the national government and direct it at a whole range of besetting problems. Along with revolutionary economic programs, the New Deal intended a major assault on crime. A strengthened Fed-eral Bureau of Investigation would be one part of the plan and Federal firearms legislation another. Even be-fore he was elected, Franklin D. Roosevelt had raised the possibility of a federal law on weapons.[77] His newly ap-pointed attorney general, Homer Cummings, an-nounced in the summer of 1933 that existing laws on pistols were woefully deficient.[78] He and his staff began the preparation of a dozen anti-crime bills, including a proposed National Firearms Act.

The attorney general had every hope of success. The nation had the most forceful chief executive it had seen in decades, and Congress had accepted his leadership rather consistently. With newspapers daily placarding the latest exploits of the country's major criminals, the time seemed at hand for decisive federal intervention.

THE FIRESIDE BOOK OF GUNS

*By* **LARRY KOLLER**

**HAROLD L. PETERSON,** *Historian*   **HERB GLASS,** *Gun Consultant*

A RIDGE PRESS BOOK

SIMON AND SCHUSTER · NEW YORK



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

TS
520
.M81

# CONTENTS

*Editor-in-Chief:* JERRY MASON
*Editor:* ADOLPH SUEHSDORF
*Art Director:* ALBERT A. SQUILLACE
*Project Editor:* DON MYRUS
*Associate Editor:* RUTH BIRNKRANT
*Art Researcher:* JOZEFA STUART
*Art Associate:* ALBERT KAMP

*Book-jacket guns are Remington
Model 740 autoloader, Harpers Ferry
Model 1835 flintlock musket, and
Butterfield patent percussion revolver.
Photograph by Robert Mottar.*

© *1959 by Artists and Writers Press, Inc.
and The Ridge Press, Inc.
Library of Congress Catalog Card
Number: 59-9855*

*Prepared and produced by
The Ridge Press, Inc. and
the Artists and Writers Press, Inc.
Printed in the United States
of America by Western Printing and
Lithographing Company.
Published by Simon and Schuster, Inc.
Rockefeller Center,
New York 20, New York*

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



Cavalry tracking Sitting Bull and his Sioux in the valley of the Little Big Horn River, in southern Montana. He had split his command into three detachments, so that when the onslaught on his personal contingent began, Custer was forced to meet it with only five companies. The overwhelming Indian force—estimated at twenty-five hundred to three thousand warriors—swept Custer to higher ground where, at several points, he made his stand. His horses had been driven off, captured or shot. No relief could be hoped for. At two in the afternoon the fight began. At sunset the last man fell.

Controversy still surrounds the event. On balance, however, it appears that Custer was brave but foolhardy, and he is usually condemned for disobeying explicit orders, evidently in the hope of achieving personal glory—or "coup." That he made a big, fat mistake is incontestable.

Custer was both outnumbered and in a sense "outgunned" by the Sioux and their allies. By June of 1876, the warring Indians had collected many modern rifles, the best of which were Winchester 1866 repeaters. Estimates as to who was armed with what are varied, depending on who tells the story. It is a fair statement, however, that probably no more than twenty-five per cent of the Indians had repeaters, another twenty-five per cent single-shot firearms of many kinds, and the balance the basic bow and lance.

The Seventh Cavalry's issue weapon was the single-shot, breech-loading Springfield of .45/70 caliber. It was rugged and usually dependable as an all-around cavalry arm and had excellent ballistic qualities. On the best day it ever saw, however, it could not match the firepower of a repeater. In fact, after sustained firing (with black powder) the action frequently would foul and fail to close properly. When the gun was fired, the case head would sometimes break off in the extractor and jam the action. Springfields later

recovered from the Sioux in this condition conjured up the tragic picture of some of Custer's hard-pressed men expending the last moments of their lives trying to clear a useless weapon.

The cavalry had no repeaters other than Colt revolvers, which were fine for close work but inadequate for fighting off a full-scale attack. Ammunition was plentiful at the start and lacking at the finish. It is fairly certain that most of it was either with the pack train or carried in the saddlebags of the cavalry's mounts and that the Indians lost little time in stampeding many of these horses away from the scene.

Custer himself disdained to use the Army Springfield. His weapon was a Remington rolling-block sporting rifle with an octagonal barrel, a single-shot arm neither better nor worse than the breechloaders carried by his men. In addition he carried as side arms two English double-action revolvers with white grips and lanyard rings in the butts. The exact model of these revolvers has never been determined, but they were probably Webleys.

The General was an excellent shot by reputation—and by his own account—although Frank North, one of his scouts, thought otherwise. North once told of an expedition into the hills when Custer fired successive shots at three ducks swimming in a river and missed them all. North concluded modestly that he himself then decapitated the ducks with three more shots.

Despite Custer's crashing defeat, it was the Indian who made virtually his last stand at the Little Big Horn. The Plains Wars were nearly over. The military would be occupied until the 1880's in quelling outbreaks by Chief Joseph's Nez Percés, the Apaches of Cochise and Geronimo, and the Utes of New Mexico. But for the most part, the Indian was done. It was a triumph for the superior arms of the white man; for the Springfield as opposed to lance and bow, for the

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

111

repeater as opposed to the Springfield, and for the Sharps that eradicated the buffalo.

For the wars themselves were perhaps less decisive than the disappearance of the Indian's food supply. When the Texas legislature sounded the first official alarm at the decline of the buff, and proposed a bill to outlaw the hide hunter, "Little Phil" Sheridan hastened to Austin to protest. Restore the buffalo to the plains, he argued, and the Indian will never be defeated. Give the hide hunters medals for outstanding kills, he urged, rather than restrict or prohibit their operations. It was a cruel but valid philosophy. It convinced the Texans, and its echo undoubtedly influenced President Grant, who was considering a similar bill for the Territories, to exercise a pocket veto. The buffalo went and the Indian's resistance broke. The wars ended.

Civilian arms made great strides forward in the period of the Plains Wars. The Henry rifle, which loaded from the front of the magazine grew into the Winchester Model 1866, which loaded more easily and quickly through a gate on the right side of the receiver or, as a single-shot, through the top as well. The Model 66 was the dominant arm for hunters, scouts, and cattlemen for almost twenty years, but Winchester was constantly developing new ideas for improvements and variations.

In 1873, a new Winchester model was designed for sale to the Government as a military arm. The military did not want it, but it was a tremendous success with hunters and adventurers. Before it was discontinued in 1924, a total of 720,610 was sold. Aside from some simplifications of the mechanism and the use of stronger materials, its great advance lay in its ammunition. The powder charge for the .44-caliber bullet was increased from twenty-eight to forty grains, providing greater striking power and a flatter trajectory, and a more reliable center-fire primer

*High esteem in which firearms were held initiated custom of presenting fancy models as gifts. Gideon Welles, Secretary of Navy, received a Henry rifle, top. General W. E. Strong gave General P. H. Sheridan a Winchester Model '76, .50-95 caliber Express, center; and Buffalo Bill gave a Winchester Model '73, .30-20 caliber, to a boy, Robbie Campbell Adams.*
GUNS: WILLIAM SWEET. PHOTO BY ROBERT MOTTAR

replaced the old rim-fire. The Colt revolver was chambered for this same cartridge in 1878, just as the Model '73 was really getting into production, thus giving the plainsman two weapons for one load. Buffalo Bill and Theodore Roosevelt both thought highly of their '73's, and the list of westerners who joined them would read like a "Who's Who" of Indian fighters and rangers.

The disaster at the Little Big Horn might have been expected to convince the military that the day of the single-shot rifle and carbine was ended. There were other considerations, however. None of the repeaters then on the market could match the .45/70 Springfield ballistically. It had a flatter trajectory, less deviation in flight, and greater penetration than any other available arm. Also it had a higher muzzle velocity than most. Finally, it had a simpler action, a most important factor for a military arm. Thus, no repeating rifle of any kind was officially adopted by the Army until 1892, when the Norwegian Krag, adapted to accommodate the new smokeless-powder .30/40 cartridge, became the official shoulder weapon.

The defeat of the Indians and the arrival of smokeless powder began a new era in American firearms. The civilization of the West diminished the need for guns in work and war. At peace and at leisure, the modern rifle and shotgun emerged—sleek and efficient sportsman's weapons, to be fired in anger no more.

112

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



pistol. Suddenly sober, he groveled and begged for mercy, which was granted only after he had been thoroughly reviled by the Colonel and had received a few well-placed kicks. No one but Magruder knew that the seconds had loaded the derringers with black powder and bottle corks.

There are two interesting facts about this story. It is the first public mention of the der-ringer in California and it is probably the least lethal use to which the deadly little pocket pistol was ever put. On many other occasions in the sinful early days of California, it was employed with devastating effect.

The habit of carrying pocket pistols for personal protection was well-established by the time the Colonel thrashed the doctor, but men were still fretting over the lack of an ideal combination of accuracy, power, speed of firing, and ease of handling. Having seen men take a pair of pipsqueak loads from pocket pistols right in the chest, then reach for a big Colt "hog-leg," and

finish the antagonist with a single shot, the non-professional citizen-shooters knew they needed a small pistol of big bore that hit hard.

The first popular handgun that promised adequate personal protection was the pepperbox. Essentially, this was a series of barrels (usually three to six) grouped around a central axis so that they could be revolved and fired singly as they came beneath the hammer. This was not a new idea. It had been tried more or less successfully since the sixteenth century. The percussion ignition system greatly simplified its mechanics, however, and it became a vastly popular weapon for both civilians and soldiers during the 1830's and 40's. The brothers Barton and Benjamin Darling patented the first American pepperbox on April 13, 1836. They based their claim on a means of revolving the cylinder by cocking the hammer. (Sam Colt had obtained a patent on a similar device for the revolver on February 25, and the resultant patent fight did much

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

153

to put the Darlings out of business.)

The next important advance was made by Ethan Allen of Grafton, Massachusetts—the first American double-action pistol. It found a ready market. Popular pocket models came in .31 and .33 caliber and were percussion fired. To shoot, it was necessary only to pull the ring trigger repeatedly, until the gun was empty. As the fastest firing guns of their day they commanded immediate attention and completely overshadowed the Colt revolver. Sam Walker, writing Colt from Washington in 1847, complained that "nine men of ten in this City do not know what a Colt pistol is and although I have explained the difference between yours & the six barrel 'Pop Gun' [pepperbox] that is in such general use a thousand times they are still ignorant on the subject."

The pepperbox was by no means perfect. There were serious defects which turned the tide toward the revolver. Its caliber usually was small, its range was short, and, worst of all, it could not be aimed properly. The heavy trigger pull and the turning of the barrels disturbed the aim, and the hammer was placed directly in the line of sight. They also had a nasty habit of discharging all their barrels at once. No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim. Mark Twain commented on their lack of accuracy in telling of the experience of one of his fellow passengers on an early trip to California. The owner of the pepperbox was concerned about the effectiveness of his little weapon against Indians and holdup men and fired for practice out the stage-coach window. "He aimed at the bole of a live-oak tree," wrote Twain, "but fetched the nigh mule."

Twain also commented on another of the pepperbox's failings, the tendency for sparks from the barrel being fired to set off all the other bar-

rels in a multiple discharge. As one of the characters in *Roughing It* complains, "I should have shot that long gangly lubber they called Hank if I could have done it without crippling six or seven other people—but of course I couldn't, the old Allen's so confounded comprehensive."

Meantime, Henry Deringer Jr. of Philadelphia had come along with a handgun that represented a scaled-down version of his dueling pistols, for which he had long been famous.

As fate would have it, the most memorable shot ever fired by a Deringer was the .44-caliber bullet from the hand of John Wilkes Booth that assassinated Abraham Lincoln in 1865. This single act forever established Deringer among the pistol makers of history, even though his name—and the general name for his pistol—have been corrupted in spelling for almost a century: derringer rather than Deringer.

Deringer was a Pennsylvania German and a masterful craftsman. If he lacked some of the inventive flair of Sam Colt, he was nonetheless author of some of the most handsome single-shot weapons ever made in America. His product was notable for simple design, utter reliability, and heavy punch. The awesome blast of his big-bore handguns was acknowledged in a

*A man who wanted a gun in the mid-1800's and did not wish to be conspicuous about it carried one or more pocket pistols, which were made either by Henry Deringer, Jr., in Philadelphia, or were copied and modified from his design by others. Three pistols with wooden stocks were made by Deringer, trap-door pistol with ivory grip by James Warner, and all-metal pistol by National Arms.*

GUNS: WILLIAM SWEET. PHOTO BY ROBERT MOTTAR

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

remark by an Alabaman which survives from 1837. As challenger, the southern gentleman asked only "the chance of blowing a hole through his [the opponent's] carcass . . . that a bull-bat could fly through without touching airy wing." The bull-bat was probably the night-hawk, a fairly sizable bird. The blasting, of course, was to be done with a Deringer.

By 1852 his pairs of stalwart little power-houses were on sale in California, where they found eager buyers. In 1855 there were four hundred and five killings in California alone, a fair share of them over the gaming tables. *The Army and Navy Journal* reported: "In the pre-Vigilance Committee era of California, thousands of these pistols found a ready market in their new domain, 'the sharp crack of the Der-ringer' being heard in the land much more frequently than the voice of the turtle."

In writing of the Colorado gold rush of 1859, George F. Wilson remarks: "Liable at any time to challenge, confidence men and the worst class of gamblers adopt a weapon peculiarly their own, the derringer, a light gun of small caliber, so small that it can easily be concealed in a vest pocket or even in the palm of a large hand. As it has the shortest of barrels, its accurate range does not exceed five or six feet. But it is deadly within that range, which is apt to em-brace all at even the largest gaming table."

Deringer seems to have been among the first American pistol makers to use percussion igni-tion. He describes his first pair of pistols of this type as being made in 1825 for Major Arm-strong, who promptly called them "Deringers." All of the early Deringers were muzzle-loaders,

*Fancy women invited to English gentlemen's room in sedate Windsor Hotel, in Denver, shoot at insulators on Larimer Street telegraph poles.*
DRAWINGS FROM AMERICAN WEST BY LUCIUS BEEBE AND CHARLES CLEGG





FIREARMS AND
AMERICAN LAW ENFORCEMENT

# DEADLY
# FORCE

FROM THE WILD WEST
TO THE STREETS OF TODAY

CHRIS MCNAB

MASSACHUSETTS BAY
COMMUNITY COLLEGE LIBRARIES



First published in Great Britain in 2009 by Osprey Publishing, Midland House,
West Way, Botley, Oxford OX2 0PH, United Kingdom.
443 Park Avenue South, New York, NY 10016, USA.

Email: info@ospreypublishing.com

© 2009 Chris McNab

All rights reserved. Apart from any fair dealing for the purpose of private study, research,
criticism or review, as permitted under the Copyright, Designs and Patents Act, 1988, no part
of this publication may be reproduced, stored in a retrieval system, or transmitted in any form
or by any means, electronic, electrical, chemical, mechanical, optical, photocopying, recording
or otherwise, without the prior written permission of the copyright owner. Enquiries should
be addressed to the Publishers.

Every attempt has been made by the Publishers to secure the appropriate permissions for
materials reproduced in this book. If there has been any oversight we will be happy to rectify
the situation and a written submission should be made to the Publishers.

A CIP catalog record for this book is available from the British Library.

Chris McNab has asserted his right under the Copyright, Designs and Patents Act, 1988,
to be identified as the author of this book.

ISBN: 978 1 84603 376 6

Page layout by Myriam Bell Design, France
Index by Alison Worthington
Typeset in Perpetua and Walbaum LT
Originated by PPS Grasmere Ltd, Leeds, UK
Printed in China through Worldprint

09 10 11 12 13   10 9 8 7 6 5 4 3 2 1

For a catalog of all books published by Osprey please contact:

NORTH AMERICA
Osprey Direct, c/o Random House Distribution Center
400 Hahn Road, Westminster, MD 21157, USA
E-mail: uscustomerservice@ospreypublishing.com

ALL OTHER REGIONS
Osprey Direct, The Book Service Ltd., Distribution Centre, Colchester Road, Frating Green,
Colchester, Essex, CO7 7DW
E-mail: customerservice@ospreypublishing.com

Osprey Publishing is supporting the Woodland Trust, the UK's leading woodland conservation
charity, by funding the dedication of trees.

www.ospreypublishing.com

## DEADLY FORCE

While clubs remained a weapon of tradition, in the world of firearms there was much change. By the advent of the 20th century, bolt-action, magazine-fed rifles had become standard military issue, and in civilian markets were taking over from the lever-action rifles that dominated the second half of the 19th century. The bolt-action was reliable and relatively quick to operate, and the design could accommodate especially powerful cartridges for accurate long-range shooting. The bolt-action rifle in particular would provide the tool for the police marksmen, and the essential format of such weapons is little changed today when compared to rifles of 100 years ago.

The new kids on the block in terms of early 20th-century weaponry were semi-automatic and fully automatic firearms. While revolvers could fire a shot with every trigger pull, and the Gatling gun could spray out bullets by the hundreds, both relied upon manual power for the reloading process (in the Gatling's case, the turning of a handle). Automatic weapons used the physical forces generated on firing to perform the reloading process. Allied to magazine feed, this revolution meant that a single shooter could burn through cartridges at a dizzying rate. The first semi-automatic pistols were introduced in Germany in the late 1800s, and during the first two decades of the 20th century the design was perfected in weapons such as the M1911 Colt .45, still the bedrock design for many semi-auto handguns today.[98] The exploration of different methods of cycling the gun – gas, recoil, and blowback – led to the production of full-auto longarms: rifles, submachine guns, and machine guns.

The full-auto revolution transformed military firepower, as the opportunities to spray hundreds of bullets in a domestic law enforcement context were limited. Even in terms of handguns, the US police favored revolvers in most departments until well into the post-World War II period, with Colt automatics adopted by only a few isolated forces. Most police revolvers during the first half of the century were of .38 caliber and held six rounds, and so many police departments deemed the Colt's big, high-powered .45cal round and seven-round magazine capacity as "too dangerous for the rank and file."[99] Classic revolver types of the early decades of the century include Smith & Wesson's Model 10 and Model 1902 Military & Police Second Model, and Colt's Police Positive and Official Police. On the whole, these revolvers offered the most rudimentary personal firepower, especially as they were loaded with standard ball rounds, rather than the more effective hollow-point types used by most forces today.

Yet as our opening story in this chapter shows, there was some far more hefty firepower available to law enforcement agencies under special circumstances. Submachine guns (SMGs) emerged in the World War I period from Italy and Germany, and were quickly accepted into the military world as invaluable tools for close-range shooting. The rationale

96

## BLOOD AND WHISKY, 1900–45

behind the submachine gun was that it fired a pistol-caliber round at full-auto speeds, the pistol round meaning that the range was short but the recoil of the rapid fire was controllable. The principle was quickly appreciated by global firearms designers, and was given life in the United States through General John T. Thompson, who designed arguably the most notorious firearm in criminal history.

The Thompson SMG first entered production in 1921, its official designation being the M1921. Alongside a later variation, the M1928, the Thompson became a notorious success, able to fire .45 slugs at rates of 700–1000rpm from either 20- or 30-round box magazines or 50- or 100-round drum magazines. Most Thompsons, including the M1 and M1A1 variants that gave sterling service in World War II, went into military hands, but the weapon was also available to both police and, initially, civilians, albeit with a hefty price tag. The crushing firepower of the Thompson soon led the US authorities to restrict civilian purchase of the weapons (by the end of the 1930s even private security agencies needed permission from the US Attorney General himself for the purchase of a Thompson). Yet it is ironic that an overwhelmingly military gun should be so remembered for its contribution, on both sides of the blue line, to the "war on crime" in the 1920s and 1930s, hence becoming a virtual icon of the Prohibition era. It acquired nicknames that resonate to this day, some with visceral reminders of what it could do to a human body: the "Tommy gun," the "Chicago piano," and "Chopper" – the last of these terms was a sensitive coining from the gangster world.

We mustn't overplay the Thompson's role – illegal Thompson use was actually extremely limited. Criminals of every age have always favored compact weapons, usually pistols that can be tucked unobtrusively into a coat or trouser pocket. The Thompson was neither compact nor discrete, so relatively small numbers were acquired by the gangsters for more extreme criminal tasks; most Thompsons in illegal circulation were obtained by raids on police station arsenals, or through deals with military personnel. Yet although the Thompson was not the chief gangster weapon by any means, its public prominence was assured by its use in some very famous hands, and in the most notorious killings of the gangland era. In 1929, henchmen of Al Capone used Thompsons to mow down seven members of the Bugs Moran gang in a Chicago garage, the bloody outpouring becoming known to history as the St Valentine's Day Massacre. Two of the SMGs used in the killings belonged to infamous hitman Fred "Killer" Burke; these were discovered by police in Burke's girlfriend's house, and ballistic tests revealed their connection to the massacre and to the killing of another gangster, Frankie Yale, in July 1928. The arms cache also contained rifles, pistols and shotguns, as well as armored vests (which were another favorite steal from police stations). Burke was eventually arrested, sentenced to life

97

## DEADLY FORCE

imprisonment for the murder of a police officer, and died of a heart attack in Michigan State Penitentiary on July 10, 1940.

Yet the most famous criminal exponent of the Tommy gun is arguably the legendary John Herbert Dillinger. Born on June 22, 1903, John Herbert Dillinger appears to have been born for trouble. His mother died when he was three years old, and the young John felt at odds with his stepmother when his father remarried six years later. He grew into a troubled, restless teenager, easily bored by conventional living and unable to hold down a steady job or a period in the US Navy – he deserted ship in Boston. Dillinger was headed for trouble, and he found it in the mid-1920s in Indianapolis. In partnership with another local villain, Ed Singleton, Dillinger attempted to rob a grocery store, during which he battered the shop owner with a heavy iron bolt, but was apprehended and spent the next eight and a half years banged up in Indiana State Prison. During the incarceration, an already turbulent character was warped even further, and once released he began a blistering criminal career in bank robbery – in association with a gang of criminals whom he had met in prison – that made him public enemy No.1 for the police. The media loved him. The published photographs showed a dark, menacing character who was nevertheless handsome and exciting to a depression-blanched society. His exploits gripped the nation, including several violent jail breaks and numerous stylish bank robberies. One robbery was conducted by Dillinger and his gang pretending to be film producers and actors, "rehearsing" a bank robbery in convincing fashion in front of a crowd of smiling customers. But along with Dillinger's cash acquisitions – he and his gang managed to steal over $300,000 between September 1933 and July 1934 – the death toll of officers, accomplices, and innocent bystanders was also mounting. Dillinger was a gun enthusiast, and during raids on police stations in Auburn, Indiana, and Peru, Indiana, in late 1933 he acquired significant numbers of Thompson guns, as well as rifles, revolvers, and bullet-proof vests. Ironically, it wasn't his theft of such an arsenal, nor the gang's shooting of several prison guards and law-enforcement officers, that brought him to the attention of the FBI. During an escape from the county jail at Crown Point, Indiana, on March 3, 1934 (he was held in the jail charged with the murder of an East Chicago police officer), Dillinger stole the sheriff's car and drove it across the Indiana-Illinois state line, thus violating the National Motor Vehicle Theft Act. This was a federal offence, so now J. Edgar Hoover's boys were on the hunt for Dillinger.

It is interesting during this violent period to note how much the Thompson became a supporting actor in the whole drama. Dillinger was undoubtedly affectionate about the weapon, sometimes removing the shoulder stock to make it more discrete. In response, the police upgunned themselves, and the newspapers dwelt on the firepower equations developing between the police and the Dillinger gang. *The Daily Illini*, for example, carried

## BLOOD AND WHISKY, 1900–45

the front page headline "Army of Officers Train Machine Guns On Roads over Midwest to Intercept Dillinger," following Dillinger's escape from Crown Point (during which, incidentally, Dillinger managed to grab two more Thompsons for his collection). Dillinger enjoyed posing with the Thompson for photographs, but he was not shy of using the weapon in earnest. On March 30, 1934, FBI agents cornered Dillinger and one of the gang, Homer van Meter, in some apartments in St Paul. Van Meter pulled a handgun while Dillinger sprayed the upper corridors with deafening full-auto fire, creating the cover to escape through a back door. Police officers later found a Thompson, two automatic rifles, one .38 Colt automatic pistol, and two bulletproof vests in the apartment. Dillinger was cornered several more times, but along with associates that now included the equally unbalanced Lester Joseph Gillis – better known as "Baby Face Nelson" – shot his way out of almost every trap.

An infamous shootout was unleashed on April 23, 1934, around the Little Bohemia Lodge holiday resort north of Rhinelander, Wisconsin. Dillinger and his gang decided to take a break at the lodge, terrorizing the lodge owners in the process. Nevertheless, the owner's wife managed to post a tip-off to the authorities, and soon a heavily armed FBI task force was heading to Wisconsin. Like the Waco siege over 50 years later, the operation around Little Bohemia Lodge would stand as a black mark over FBI operational history. The lodge was surrounded under the cover of night, but events tumbled into disaster. Three innocent customers of the lodge exited and drove away in their car. The officers, thinking that the car contained gang members, opened up with everything they had, killing one of the men and seriously injuring the other two. With Dillinger now alerted by the sound of shots, the agents soon found themselves frantically curled up behind cover as Dillinger and others hammered at them with automatic fire. Two other agents and a local deputy went out to investigate a suspicious vehicle at a nearby cottage, and there found Baby Face Nelson with three hostages. Nelson fired a handgun, killing Special Agent W. Carter Baum and injuring the other agent.

They were pointless casualties – Dillinger and associates once again managed to slip through the net. The media had a field day reporting on the incident, and Hoover made changes to the leadership in the Dillinger hunt, appointing the rising star Special Agent Samuel A. Crowley to head the investigation. Finally, the law caught up with Dillinger, even as the rest of his gang started to fall. Following a tip-off from Anna Cumpanas (aka Anna Sage), a brothel madam in Gary, Indiana, on July 22, 1934, agents surrounded the Biograph Theater in Chicago, where Dillinger was watching the Clark Gable film *Manhattan Melodrama* with Sage and her girlfriend, Polly Hamilton. Crowley, in charge of the action, decided against entering the theater, naturally sensitive to the possibility of any civilian casualties following the Little Bohemia shootout. Instead he waited outside with his heavily armed officers.

99

The Oxford History of the United States

C. Vann Woodward, *General Editor*

Volume III
ROBERT MIDDLEKAUFF
THE GLORIOUS CAUSE
*The American Revolution, 1763–1789*

Volume VI
JAMES McPHERSON
BATTLE CRY OF FREEDOM
*The Civil War Era*

# BATTLE CRY OF FREEDOM

## The Civil War Era

JAMES M. McPHERSON



New York   Oxford
OXFORD UNIVERSITY PRESS
1988

ould succeed because double-timing infantry could cover the last eighty ards during the twenty-five seconds it took defending infantrymen to eload their muskets after firing a volley.

Rifling a musket increased its range fourfold by imparting a spin to a onical bullet that enabled it literally to bore through the air. This fact ad been known for centuries, but before the 1850s only special regi-ents or one or two companies per regiment were equipped with rifles. hese companies were used as skirmishers—that is, they operated in ont and on the flanks of the main body, advancing or withdrawing in oose order and shooting at will from long range at enemy targets of pportunity. Given the rifle's greater range and accuracy, why were not l infantrymen equipped with it? Because a bullet large enough to "take" e rifling was difficult to ram down the barrel. Riflemen sometimes ad to pound the ramrod down with a mallet. After a rifle had been red a few times a residue of powder built up in the grooves and had to e cleaned out before it could be fired again. Since rapid and reliable ring was essential in a battle, the rifle was not practicable for the mass f infantrymen.

Until the 1850s, that is. Although several people contributed to the evelopment of a practicable military rifle, the main credit belongs to rench army Captain Claude E. Minié and to the American James H. urton, an armorer at the Harper's Ferry Armory. In 1848 Minié per-cted a bullet small enough to be easily rammed down a rifled barrel, ith a wooden plug in the base of the bullet to expand it upon firing to ke the rifling. Such bullets were expensive; Burton developed a cheaper nd better bullet with a deep cavity in the base that filled with gas and xpanded the rim upon firing. This was the famous "minié ball" of ivil War rifles. The superiority of the rifle was demonstrated by British nd French soldiers who carried them in the Crimean War. As Secre-ry of War in 1855, Jefferson Davis converted the United States army the .58 caliber Springfield rifled musket. Along with the similar Brit-h Enfield rifle (caliber .577, which would take the same bullet as the pringfield), the Springfield became the main infantry arm of the Civil ar.

Because they were single-shot weapons loaded from the muzzle, these fles were still awkward to load. Even the most dextrous soldier could re no more than three shots per minute. Several inventors had devel-ped breechloading rifles by 1861, but with the paper-wrapped car-idges (containing bullet and powder) then in use, gas and sometimes ame escaped from the breech and made the weapon unreliable and

even dangerous to the user. Progress in solving this problem made the single-shot Sharps carbine and rifle popular with the Union cavalry and sharpshooter units that managed to obtain them. The development of metal cartridges enabled the northern army to equip its cavalry and some infantry units with repeaters by 1863, of which the seven-shot Spencer carbine was most successful. These weapons had a smaller powder charge and therefore a shorter range than the paper-cartridged Springfield and Enfield, and were more prone to malfunction. The muzzle-loaders thus remained the principal infantry weapons throughout the war.

Northern industry geared up to manufacture more than two million rifles during the war; unable to produce more than a fraction of this total, the South relied mainly on imports through the blockade and on capture of Union rifles. In 1861 neither side had many rifles, so most soldiers carried old smoothbores taken from storage in arsenals. During 1862 most Union regiments received new Springfields or Enfields, while many Confederate units still had to rely on smoothbores. This was one reason for the two-to-one excess of Confederate casualties in the Seven Days'. By 1863 nearly all infantrymen on both sides carried rifles.

The transition from smoothbore to rifle had two main effects: it mul-tiplied casualties; and it strengthened the tactical defensive. Officers trained and experienced in the old tactics were slow to recognize these changes. Time and again generals on both sides ordered close-order assaults in the traditional formation. With an effective range of three or four hundred yards, defenders firing rifles decimated these attacks. Artillery declined in importance as an offensive weapon, because its accuracy and the reliability of shells at long range were poor, and the guns could no longer advance with the infantry toward enemy lines, for marksmen could pick off the cannoneers and especially the horses at distances up to half a mile. Sharpshooters also singled out enemy officers, which helps to explain why officers and especially generals had higher casualty rates than privates. Officers on both sides soon began to stay off horse-back when possible and to wear a private's uniform with only a sewn-on shoulder patch to designate their rank. The old-fashioned cavalry charge against infantry, already obsolescent, became obsolete in the face of rifles that could knock down horses long before their riders got within saber or pistol range. The Civil War hastened the evolution of dis-mounted cavalry tactics in which the horse was mainly a means of transportation rather than a weapon in its own right.

As time went on experience taught soldiers new tactics adapted to the rifle. Infantry formations loosened up and became a sort of large-scale

1873, designed to employ the .44/40 centerfire cartridge. The 73 was for a long time the most popular of all deer rifles, and a lot of them are still used to get bucks every year. In fact, the rifle was largely responsible for the decimation of game on the Western plains. More important, the 73 was the rifle with which the pioneers protected their lives and property against attack from hostile Indians. The manufacture of this historically important Winchester model was not discontinued until well into the Twentieth Century.



Winchester Model 1866



Winchester Model 1873

Although built along the lines of the Henry and the Model 1866, the 73 was stronger. At first its frame was made of brass; later steel was employed. It was made in .44/40, .38 /40, .32/20 and also for the .22 short and long rimfire cartridges. All of these cartridges are

Copyrighted material

A widely circulated "Modern Sporting Rifle Pocket Fact Card"[27] says that such weapons are "widely misunderstood" because of their cosmetic resemblance to military weapons (even though these are intentional design features). It urges gun owners to use the information on the card and website "to correct misconceptions about these rifles." Among the "corrections" it offers: "AR-15-style rifles are NOT 'assault weapons' or 'assault rifles.' An assault rifle is fully automatic—a machine gun." It adds "Please correct them" if they use the term "assault weapon," claiming further that it "is a political term" created in the 1980s. (As noted above, this assertion is incorrect.)

An article in *Outdoor Life* belied the claim that assault weapons are limited only to those that fire fully automatically. That article, too, urged its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it correctly noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts."[28]

The effort to rebrand "assault weapons" as something more benign and severed from its military origins was seen in the publication struggles of Phillip Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[29] is a well-known reference work on the subject. As Peterson explained, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons. Peterson noted that the origin of the term "assault weapon" was the industry itself.[30] He found that the NRA refused to sell his book until he changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles*.[31] The very same pattern played out in Canada, where gun companies also used the term "assault rifle" in the 1970s and 1980s until political pressure began to build to restrict such weapons in the aftermath of the mass shooting in Montreal in 1989. By the 1990s, Canadian companies and their allies also adopted terms like "modern sporting rifles."[32]

## *The Regulatory History of Semi- and Fully Automatic Firearms*

Mass shootings in the late 1980s and early 1990s raised public concerns about whether to regulate assault weapons. Complicating this call was the fact that, like many other common weapons not modeled after military weaponry, the

# REVOLVER

## SAM COLT

### AND THE
### SIX-SHOOTER THAT
### CHANGED AMERICA

## JIM RASENBERGER

SCRIBNER

New York   London   Toronto   Sydney   New Delhi

Compendium_Spitzer
Page 337



Scribner
An Imprint of Simon & Schuster, Inc.
1230 Avenue of the Americas
New York, NY 10020

Copyright © 2020 by Jim Rasenberger

All rights reserved, including the right to reproduce this book or
portions thereof in any form whatsoever. For information, address
Scribner Subsidiary Rights Department,
1230 Avenue of the Americas, New York, NY 10020.

First Scribner hardcover edition May 2020

SCRIBNER and design are registered trademarks of The Gale Group, Inc.,
used under license by Simon & Schuster, Inc., the publisher of this work.

For information about special discounts for bulk purchases,
please contact Simon & Schuster Special Sales at 1-866-506-1949
or business@simonandschuster.com.

The Simon & Schuster Speakers Bureau can bring authors to
your live event. For more information or to book an event,
contact the Simon & Schuster Speakers Bureau at 1-866-248-3049
or visit our website at www.simonspeakers.com.

Interior design by Kyle Kabel

Manufactured in the United States of America

5   7   9   10   8   6   4

Library of Congress Cataloging-in-Publication Data is available.

ISBN 978-1-5011-6638-9
ISBN 978-1-5011-6640-2 (ebook)

3 1223 13645 5129

*For Ann*

began touring the country as a traveling showman, selling hits of nitrous oxide to audiences in dire need of amusement. (The country was suffering a cholera epidemic at the time.) At eighteen, he went up the Mississippi and Ohio Rivers in a steamboat, and, at nineteen, down the Erie Canal on a canalboat. He was rich by the time he was twenty-one, poor at thirty-one, then rich again at forty-one. He may have had a secret marriage and almost certainly had a son he pretended was his nephew. His brother John committed an infamous murder that could have been lifted straight out of an Edgar Allan Poe story—though in fact it went the other way; Poe lifted a story from *it*—and while John was waiting to be hanged in New York City, Sam invented a method of blowing up ships in the harbor with underwater electrified cables. In 1849, he visited the palace of St. Cloud near Paris and the Dolmabahçe Palace in Constantinople. In 1851, he went to the Crystal Palace in London (not really a palace, but enchanting nonetheless), and in 1854 to the Winter Palace in St. Petersburg. In 1855, he built his own palace, Armsmear, on a hill above his personal empire, called Coltsville, in Connecticut. Coltsville included homes for workers, churches, a music hall and library, schools, a dairy farm, a deer park, greenhouses fragrant with flowers and fruits in all seasons, a beer garden (for German employees), and, at the center of it all, the most advanced factory in the world. While Colt did not single-handedly develop the so-called American System of mass production—using machines to make uniform and interchangeable parts—he was a pioneer of the technological revolution of the 1850s that had nearly as much impact on the world as the American political revolution of the 1770s.

The life of Sam Colt is a tale that embraces many events and facets of American history in the years between the War of 1812 and the Civil War. But it is also—trigger warning—the story of a gun.

The broad thesis of this book is that we cannot make sense of the United States in the nineteenth century, or the twenty-first for that matter, without taking into account Colt and his revolver. Combined in the flesh of the one and the steel of the other were the forces that shaped what the country became: an industrial powerhouse rising in the east, a violent frontier expanding to the west. In no American object did these two forces of economic and demographic change converge as dynamically and completely as in Colt's revolver. Compared to other great innovations of the era, such as Cyrus McCormick's reaper, Charles Goodyear's vulcanized rubber, and Samuel Morse's telegraph—in which Colt played a small but significant part—Colt's gun, a few pounds in the hand, was a featherweight. But it did as much as, if not more than, those others to make the world that was coming.

## II

Before we can understand the significance of Colt's revolvers, we need to know what guns were before he came along. The first firearms, in the thirteenth century, were simple barrels or tubes of metal (though the Chinese may have used bamboo) filled with combustible powder and a projectile. When the powder was lit, it exploded in a high-pressure burst of gases—nitrogen and carbon dioxide—that forced the projectile out of the barrel and into flight. Besides perfecting the recipe for gunpowder, the earliest gun innovators focused on barrels and stocks, making guns safer and easier to hold and aim. They then turned their attention to the mechanism, called the lock, which ignited the gunpowder. Originally, a shooter simply held a burning ember to a hole near the back of the barrel. The so-called *matchlock* added a serpentine, or finger lever, that lowered a burning wick to the powder. That lever evolved into a trigger, and the firing mechanism evolved into the *wheel lock* and the more enduring *flintlock*, both of which created sparks from friction and dispensed with the inconvenience of keeping a lit match on hand. In 1807, seven years before Colt's birth, a Scottish clergyman named Alexander John Forsyth devised an important improvement called the *caplock* or *percussion lock*: a small self-enclosed capsule or "pill" of mercury fulminate ignited when sharply hit by the spring-loaded hammer of the gun.

Attempts to increase "celerity of fire," the rate at which projectiles could be discharged from a gun, went back nearly as far as guns themselves. A number of methods had been tried. One obvious solution was to add barrels to the gun—two barrels, four barrels, even six or more, bundled in a sheaf, laid side by side like organ pipes, or fanned out like the toes of a duck. Leonardo da Vinci conceived (though does not seem to have ever built) a giant duck-footed gun with ten splayed barrels. In 1718, James Puckle took a significant leap when he invented a large gun on a tripod with a single barrel and a revolving centerpiece with numerous chambers, but Puckle's gun never advanced beyond the prototype stage. Other attempts to use revolving cylinders had been made over the years. Colt later swore that he knew of none of them until after he invented his own. He may have been lying, as many of his rivals suggested, but his claim is not implausible. All these earlier guns were ultimately discarded and forgotten. They were too unwieldy, too heavy, too complicated, too impractical.

In short, while firearms were easier to use and more dependable at the start of the nineteenth century, the guns of 1830 were essentially what they

had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles. After every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile (cannonball, lead ball, or later bullet); then ignite the gunpowder and send the projectile on its way. Even the best rifles in the most experienced of hands required at least twenty seconds, and more likely thirty, to load between shots.

Such guns were most effective when deployed by vast armies—think Frederick the Great and his highly trained, flintlock-armed Prussians—in which hundreds or thousands of men, organized in ranks, loading and shooting in synchronized volleys, created a multishot or machine-gun effect. Of course, the critical element in this machine was the men who were its cogs. As long as guns were primarily used by armies on battlefields, and as long as living men could be supplied to replace the dead and wounded, the advantage went to whoever possessed more guns.

Which brings us back to the significance of Colt's gun. One place where single-shot firearms were *not* effective was in the American west before the Civil War. Western pioneers were usually small in number, facing unfamiliar terrain and Native Americans who resented their presence. When Indian warriors swept across the grasslands on horseback, firing arrows at a rate of one every two or three seconds, even the best-armed Americans—military personnel with Kentucky rifles—were sitting ducks. Not only did their rifles have to be reloaded after every shot; they had to be fired from the dismount, on the ground. An Indian warrior could get off as many as twenty arrows for every bullet, all the while galloping at thirty miles per hour toward the pinned and doomed rifleman.

Colt's revolvers and repeating rifles (which used similar technology) were to become the weapons of choice in engagements with Indians. They were brandished against the Comanche in Texas, the Apache in Arizona, the Cheyenne in Kansas, the Sioux of the Northern Plains, the Nez Perce in the Pacific Northwest, and nearly every other tribe west of the Missouri River. Colts also played a small but important role in the Mexican War in the late 1840s—the war put Colt on the path to riches—and accompanied gold rushers to California in 1849, becoming as indispensable to western sojourners and settlers as shovels, picks, and boots. Next to a Bible, a Colt revolver was the best travel insurance available. As such, it emboldened Americans contemplating a western journey. The west would have been settled sooner or later, but *how* it was settled and *when* it was settled owed a great deal to Colt's gun.

A sense of what the revolver meant in the antebellum west can be gleaned from an article published in a newspaper in Independence, Missouri, in the

summer of 1850, describing the guard that would accompany a wagon train delivering passengers and mail to California:

> Each man has at his side, strapped up in the stage, one of Colt's revolving rifles; in a holster, below, one of Colt's long revolving pistols, and in his belt a small Colt revolver, besides a hunting knife—so that these eight men are prepared in case of attack to discharge one hundred and thirty six shots without stopping to reload! This is equal to a small army, armed as in olden times, and from the courageous appearance of this escort, prepared as they are, either for offence or the defensive warfare with the savages, we have no apprehension for the safety of the mails.

### III

To contemporary ears, talk of warfare with "savages" sounds more like genocide and imperialism than triumph, but in the age of Manifest Destiny—a term coined in 1845, a year after the Texas Rangers first fired their Colts at the Comanche—Americans embraced it as moral rhetoric supporting the noble cause of westward expansion. During Colt's forty-seven years of life, the country grew in territory by 1.3 million square miles and from less than 10 million to more than 30 million inhabitants. This growth brought out many of America's finest qualities and some of its most compelling history, but it came at a moral price. Born as a puritanical theocracy in the seventeenth century, then born again as an Enlightenment-era republic in the eighteenth, the United States emerged in the first half of the nineteenth century as a nation still nominally defined by religious and political ideals but animated by purely practical pursuits. The Age of Enlightenment became the Age of Expediency. "I know of no country, indeed, where the love of money has taken stronger hold on the affections of men," wrote Alexis de Tocqueville in 1835, the same year Sam Colt, at age twenty-one, began seeking patents for his new gun.

During this period the program to remove Native Americans from their lands became official US government policy, slavery became more entrenched, and America forcibly took from Mexico half a million square miles of that nation's territory, in large part to provide more land for slave plantations. The government became more ethically compromised, as patronage under President Jackson evolved into flagrant corruption under President Buchanan, and more politically divided. Americans became more pious but also more violent, and more modern but less civil. Colt and his

found in this report, that this arm is entirely unsuited to the general purposes of the service.

There it was: *entirely unsuited to the general purpose of the service.* The best guns for the service, the board concluded, were those already in use, the standard US musket and Hall's rifles.

Colt would ever after think of ordnance boards as filled with pettifogging "grannies" too timid to adopt new technology. He had a point. Armies tended to be run by men of conservative temperament who were naturally averse to developments that challenged what they knew of war, which was, inevitably, war as it had been fought in the past. But the board's assessment made a good deal of sense given the peculiarities of Colt's gun. Some years later, Colt himself would acknowledge of his early guns that the board "very justly reported them to be complicated & liable to accident in the hands of the common soldier."

Because the board included reloading times in its measurements of "celerity of fire," it gave Colt only a minimal advantage. Had it tested a fully loaded Colt rifle, with eight charged chambers, against a loaded single-shot long gun of any description, and limited the test to, say, one minute, the board would have found that Colt's guns at least tripled or quadrupled the standard rate of fire. But the board started each trial with all guns unloaded, putting Colt's at a considerable and arguably irrelevant disadvantage. Nobody would ever walk into a fight with an unloaded Colt.

But, again, the board's test was not entirely unreasonable. A sustained battle by an army, lasting hours, not minutes, would see many reloadings of any gun, including a Colt after the initial rounds were fired. Every flurry of bullets would have to be followed by a pause of about two minutes (in ideal circumstances). Revolvers ran like the hare in Aesop's fable: a sprint, then a long rest, then another sprint. The single-shot US standard musket or rifle was a slower but steadier tortoise.

For a nineteenth-century army, tortoises made more sense. The reasons for this are circular: because armies were organized around single-shot firearms, single-shot firearms suited them best. For centuries, armies had achieved volley fire by forming columns of consecutive lines, or ranks, of men: each line fired, then retired to the rear to reload as the next rank fired, essentially turning columns of men into multishot weapons. An individual soldier could fire only two or three times per minute, but together, taking

turns, an army could achieve rapid high-density fire. In the late sixteenth century, a Dutch nobleman, Maurice of Nassau, Prince of Orange, had broken down firing and reloading into forty-two discreet actions, each named and assigned a command. In effect, infantrymen were expected to act as parts of a well-oiled machine, and the column was a multibarreled machine gun.

The problem with such a machine was that it was prone to breaking down. Men in formation were easy to kill, and as they fell, formations had to be reassembled with new men. This required soldiers to suppress their individual wills to survive for the sake of the machine, all "stepping as one man—all forming a line," as William Tecumseh Sherman put it in a letter from West Point around the time of Colt's visit. Centuries of men with single-shot guns in ranks had created not just a way of fighting, but an entrenched military culture of total discipline, self-sacrifice, and submission of autonomy to the machine.

As suggested in the *New York Star* article after the West Point trials, a problem with Colt's guns from a nineteenth-century military perspective was that they threatened to disrupt discipline, and the very culture, of armies. An infantryman with eight loaded chambers was liable to spew them all at once in an effort to preserve his individual life. At the very least, this would waste ammunition. But the guns challenged army discipline on a more basic level: by lending themselves to individual and improvisational fighting, they contravened the terms on which army discipline was imposed.

Under its own understanding of war, then, the Ordnance Board's verdict was correct. A repeating firearm was unsuited to battle between nineteenth-century armies. It called for a different kind of fighting force, against a different kind of enemy.

## VIII

The P.A.M.C. finally went into full production in the fall of 1837. The completed mill was a handsome stone building, four stories tall with a cupola that made it appear even taller, topped by a weather vane in the shape of a rifle. Despite the association Colt's name would come to have with six-shot handguns, the first model made at the mill was a rifle with a massive cylinder of eight chambers. After a number of these rifles were produced, the machinery was retooled for a run of small .28-caliber "pocket" pistols. Later there would be rifles and pistols of different sizes, then carbines, shotguns, and even muskers, all with revolving cylinders.

reaper produced abundant grain, Morse's telegraph provided better communications, and northern railroads offered better transportation—all critical advantages to the north. Yankee boot makers, too, having adopted from armories the machines they needed for mass production, gave the Union an advantage. By the end of the war, southern soldiers were often barefoot, while northern soldiers were shod in boots that fit.

The north also produced many more guns. Given the Civil War's modernity, it may seem anachronistic that most of these guns were muzzle-loading, single-shot muskets. But they were cheap to make, simple to use, and well suited to the conventional battle tactics favored by commanders on both sides of the conflict, which is to say ranks of infantry aiming and shooting in sync to lay steady fire. Part of what would make this war so bloody was that the muskets, while mechanically similar to earlier models, were rifled, rather than smoothbore, and shot minié balls, giving them much greater accuracy and range. Musket-armed soldiers during the American Revolution or the War of 1812 had been lucky to hit the enemy across 75 yards. These new muskets were accurate and deadly at 250 yards.

To infantry units, Colt's revolver was a sideshow through most of the war, a desirable but inessential accoutrement carried by officers and cavalry. Still, by one estimate—likely on the low end—the company sold nearly 112,000 revolvers in 1862, or 40,000 more than it had sold in 1861, and another 137,000 in 1863. The revolver found its true wartime niche in the internecine struggles of the trans-Mississippi west, where pro-Confederate bushwhackers and antislavery jayhawkers had been shooting at one another almost continuously since the summer of Bloody Kansas. At times these irregular troops joined Confederate and Union armies, but mainly they followed their own whims. They specialized in fast-moving, horse-mounted guerrilla warfare, with no front lines, no long-term strategy, no rules of engagement, and no objectives other than to kill the enemy.

The most notorious of the pro-Confederate bushwhackers was William Quantrill, leader of a gang that terrorized Missouri and eastern Kansas through much of the war. Quantrill operated more like a terrorist than a soldier. In the words of the generally equanimous Civil War historian James McPherson, Quantrill and his gang were "some of the most psychopathic killers in American history." Their principal arm was the Colt 1851 Navy. "Quantrill required results in pistol-firing," wrote an early biographer, "and the guerrilla understood this art much better than any other soldier." Every guerrilla carried at least two revolvers, and most carried between four and eight, tucked against their bodies or in saddle holsters on their horses. Thus armed, they would wait in ambush beside a road. When a Union patrol

drew near, they would charge out of the brush, revolvers crackling, puffs of black smoke darkening the air, bullets swarming. Before the Union troops could get off a shot, the whole affair would be over. The bushwhackers would strip valuables from the fallen soldiers—including more revolvers if any were to be had—and mutilate the corpses, then slip back into the woods or fields from which they had come.

Quantrill did not limit his violence to soldiers and jayhawkers. Sudden attacks on farms and towns were meant to flush out abolitionists and provoke fear among Union-supporting civilians. "No more terrifying object ever came down a street than a mounted guerrilla wild for blood," wrote one of Quantrill's early biographers, "the bridle-reins between his teeth or over the saddle-horn, the horse running recklessly, the rider yelling like a Comanche, his long unkempt hair flying wildly beyond the brim of his broad hat, and firing both to the right and left with deadly accuracy."

In his most infamous attack, on August 21, 1863, Quantrill led more than four hundred revolver-wielding fighters across the western border of Missouri to Lawrence, Kansas, the town founded by abolitionist Amos Adams Lawrence and previously been raided by bushwhackers in 1856. Quantrill's orders were simple: "Kill every male and burn every house." Before his men were done, they had slaughtered nearly two hundred males, including boys as young as ten.

A year after the Lawrence massacre, on September 27, 1864, another gang of bushwhackers, led by former Quantrill lieutenant William "Bloody Bill" Anderson, and including the brothers Frank and Jesse James, performed an equally terrifying raid on Centralia, Missouri. Revolvers were again the featured weapon.

Anderson's gang came to destroy the tracks of the North Missouri Railroad that ran through Centralia, but more generally to wreak sorrow and fear. They began their raid by pillaging local stores and houses. When a train appeared on the horizon, some galloped out to meet it with their revolvers, shooting at its engine and windows until it halted. Among the passengers on the train were twenty-three uniformed but unarmed Union soldiers returning home for furlough. Anderson ordered the soldiers off the train. Saving one to hold as a hostage, he forced the others to strip and stand in a line along the tracks. Then he gave his men the signal to open fire. As the other passengers watched in horror, Anderson's men emptied their revolvers into the Union soldiers, killing all. Then Anderson lit the train on fire, instructed the engineer to open the throttle full, and sent it chuffing and blazing down the tracks to the next town, like a messenger from hell.

That same afternoon, Anderson and his men were back at their camp

the six-shooter was as much an expression of American individualism and personal agency as it was a weapon. Unlike a rifle, a revolver was worn close to the body, almost as an extension of the body, and it gave the individual who wore it the power to defend himself or herself (women began to carry revolvers after the Civil War) against malefactors, protecting the weak against the strong and the one against the many. "God made man," went a popular western saying, "but Colt made them equal." There was no better weapon for the lone man on the range or, for that matter, the Lone Ranger. The actor who played the hero of the 1950s television show carried a pair of Colt .45s.

Yet the revolver was a double-edged sword. As it gave protection to the good and vulnerable, it also enabled dark tendencies in the postwar nation. Thousands of young men came out of the Civil War hardened to violence, proficient with firearms, and facing limited prospects. All seemed to have a revolver, either a memento from the war or newly acquired. At least four hundred thousand of the guns had been produced by Colt's company by the end of the war, and they were everywhere now. In the south and west, the once-rare sight of a man walking down the street with a revolver in his belt or holster became commonplace—and so did revolver-facilitated transgressions. The James brothers used revolvers to virtually invent the new crime of daylight bank robberies: two or three men would enter a bank during business hours, wave their revolvers and demand money, then take off before the alarm could be sounded. It was the brothers' ability to fire multiple rounds that made such robberies successful.

All over the American west, in boomtowns that rose with mining strikes or near cattle routes—or alongside the new railroad tracks that spidered across the plains after the Civil War—outlaws carried Colt revolvers and drew them with frequency. The Dalton Gang never traveled without Colts at their sides, nor did John Wesley Hardin, Pat Garrett, Wyatt Earp, Doc Holliday, or Butch Cassidy and the Sundance Kid. Perhaps the most famous and skilled Colt-slinger of them all was James Butler Hickok, better known as Wild Bill, who began his gun-fighting career in Kansas as a free-soil jayhawker and killed no fewer—and possibly many more—than seven men with his prized Colt 1851 Navies, before he was killed himself in Deadwood, South Dakota, by a bullet fired from a Colt 1873 "Peacemaker."

Shortly before her death in 1905, Elizabeth moved the remains of Sam and their children to nearby Cedar Hill Cemetery. To replace the tomb near Armsmear she commissioned one more monument to her husband, a giant statue of Colt standing high on a granite pedestal. At his feet was another

statue, of his boyhood self carving a gun out of wood. It was not for lack of effort by Elizabeth to turn her husband into a noble hero that he was nothing of the sort.

That said, it is not fair to charge Colt, as some scholars have, as an accessory to the crime of making America a gun-packed nation. According to these scholars, early gun manufacturers, including Oliver Winchester and Eliphalet Remington, but first and foremost Sam Colt, essentially created their own market with aggressive sales techniques. This argument draws on a popular idea that America was never *essentially* a gun culture, and that an affinity for guns was somehow lodged in the national psyche through the machinations of businessmen such as Colt.

While Colt *was* a master salesman, this view gives him too much credit and too much blame. As we have seen, he was often behind, not ahead, of the curve when it came to realizing the potential of his gun in the American west. Certainly he coaxed and expanded the market, sometimes cynically so, but he did not create the conditions that made his revolvers popular. John L. O'Sullivan and James K. Polk did that. Gold did that. American ambition and desire did that. Just as it is wishful thinking to believe that slavery and Indian expulsion were incidental to American history, it is willful blindness to downplay the appetite for guns that emerged in the United States in the middle of the nineteenth century, regardless of Colt.

The Colt revolver was the first widely used multishot weapon, but it was by no means the last. As mentioned earlier, other multishot guns, such as Henry's and Spencer's, were coming to market by the time Colt died, and many more, faster and deadlier, soon appeared. During the Civil War, an American named Richard Jordan Gatling invented a hand-cranked six-barrel revolving gun that looked like a giant pepperbox pistol but could fire two hundred shots per minute. Like many other gunmakers, including Colt, Gatling justified his invention by contending that it would *save* lives, allowing armies to reduce their numbers by more or less the same rate his gun increased celerity of fire. After the war, Gatling sold his patent to the Colt company, which made his guns through the nineteenth century, before they were outmatched by the invention of Hiram Maxim, a machine gun that could spew as many as six hundred bullets in a minute. In 1893, in South Africa, fifty British police officers armed with four Maxims and two other machine guns mowed down three thousand African troops in two hours. No one was any longer under the illusion that rapid-fire guns were going to save lives. Many wars, acts of terrorism, and psychopathic rampages since have further complicated the legacy of rapid-firing guns, perhaps most poignantly the 2012 massacre of schoolchildren and teachers

RANDOLPH ROTH

# American Homicide

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
2009

Compendium_Spitzer
Page 344



Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
    American homicide / Randolph Roth.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 978-0-674-03520-1 (cloth : alk. paper)
    1. Homicide—United States—History.   I. Title.

    HV6524.R68 2009
    364.152′0973—dc22        2009016830

3 1223 08609 1858

To Allison,
the memory of William Slothrop,
and God's second sheep

CHAPTER 5

# The Emergence of Regional Differences

*Homicide in the Postrevolutionary Period*

Homicide rates increased in most American communities during and immediately after the Revolution, but as the long-term consequences of the Revolution became clear, they began to fall in the North and the mountain South. By the 1820s rates in the North were at historic lows that ranged from under 1 to just over 6 per 100,000 adults. They would remain at that level through the early 1840s. Those rates were comparable to rates in Canada, Sweden, and the Low Countries, and lower than rates in the rest of Europe. The United States would never see numbers that low again.[1]

In the Ozark and Appalachian highlands of the South, where there were few slaves, homicide rates were as low as those in the rural Midwest by the 1830s and early 1840s. But the populations there were too small to affect the South's overall homicide rate. In slaveholding areas of the South, the homicide rate after 1800 ranged from 8 to 28 per 100,000 adults per year—at least twice what it had been for whites at its low point in the Chesapeake in the late 1750s and 1760s and three times what it had been for blacks in the 1780s and 1790s. After the Revolution homicide rates were thus most strongly linked to the presence or absence of slavery.[2]

It took time for these distinct patterns to take shape in the North, the mountain South, and the slave South. Backcountry violence was an interregional problem until the end of the War of 1812, when homi-

cide rates in Ohio finally fell below those in the Georgia Piedmont (Figures 4.1 and 4.2). Dueling was a national problem until the death of Alexander Hamilton in 1804, after which northerners made it clear that anyone who killed a man in a duel would be drummed out of public life. Homicide rates were high in northern and southern port cities through the War of 1812. Independence opened American ports to ships of all nations, and international tensions created hostility among American and foreign sailors, especially during the Napoleonic era. In Boston, for instance, in the decade after the British occupation, Portuguese, English, American, and French sailors were all involved in murders over women, national honor, or turf. In Savannah, Georgia, thirteen sailors were murdered from 1804 to 1815: a German, a Swede, a Norwegian, two Englishmen, two Frenchmen, two Irishmen, and four Americans. These homicides peaked in 1811–1813, when riots among sailors led to killings in New York, Norfolk, Charleston, Savannah, and New Orleans. The surge in such homicides subsided after the Napoleonic Wars as the maritime economy rebounded.[3]

After the War of 1812 it was clear even to contemporaries that homicide rates in the slave South were diverging from those in the rest of the nation. In the North and the mountain South the homicide rate among unrelated adults fell to its lowest level in American history as loyalist-patriot divisions disappeared and patriotism soared. People in those regions began to boast about America's superiority and to celebrate the unique character of America's political institutions. Edward Tiffin, Ohio's first governor, extolled the transformation of the government from one under which "we [could only] *breathe,* to one under which we may *live.*" The Reverend Samuel Williams of Vermont was confident that Americans had devised the finest government in the world. It was, he said, a government that "reverences the people." He considered the United States "the best poor man's country," a place of opportunity where "the highest perfection and felicity, which man is permitted to hope for in the present life, may rationally be expected."[4]

Widespread self-employment and the removal of many legal and institutional barriers to advancement based on religion, class, or race, including slavery, persuaded the vast majority of northerners and whites in the mountain South that their social hierarchy was becoming more legitimate. A "Citizen of Color" captured the optimism of northern blacks when he wrote in 1814 that "we dwell in safety and pursue our

180

honest callings" with "none daring to molest us, whatever his complexion or circumstances."[5] Homicide was still a problem in urban neighborhoods where the level of self-employment was low and on frontiers that did not yet have effective governments, and the decline in self-employment that began in the 1820s and 1830s caused widespread anxiety and prompted riots that were responsible for a number of deaths in northern cities. But elsewhere in these regions homicides were rare.

The situation was very different in the slave South. Revolutionary ideas and aspirations wreaked havoc with the status hierarchy of slave society in a number of ways. Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical. Prominent whites were subjected to the rough-and-tumble of democracy and were infuriated by the way they were treated. Blacks despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of black rebellion. As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw more than its share of deadly quarrels, property disputes, duels, and interracial killings.

People in the slaveholding South were also less likely than people in the North or the mountain South to trust the federal government and to identify with the new nation. Distrust blossomed in the 1820s and 1830s as proslavery southerners realized that the federal government had turned against them on a number of vital issues, including the admission of new slave states and territories and the suppression of abolitionist speech. The distrust may not have been strong enough to raise the homicide rate, but it was strong enough to nullify the dampening effect that the patriotism of the post–War of 1812 period should have had on the homicide rate among whites. In those decades, when American nationalism reached its nineteenth-century peak, identification with national heroes was weaker in the South than in the nation as a whole. The difference was so strong that a higher percentage of places were named in the North than in the South for the South's national heroes, including Washington, Jefferson, and Jackson. Regional differences in national loyalty would become even more marked in the 1850s, of course, and again in the 1890s. But they were substantial enough in the postrevolutionary period to help raise the homicide

rate above the levels of the middle and late eighteenth century.[6] The slaveholding South thus became the first region of the United States to deviate from the long-term trend toward lower homicide rates in North America and western Europe.

None of the correlates of lower homicide rates were present in the Southwest. In the Mexican borderlands rates tripled from the 1820s to the 1840s, probably reaching 40 per 100,000 adults per year in the Rio Grande Valley of New Mexico and in slaveholding areas of east Texas, and 100 or more per 100,000 in California and Hispanic areas of Texas. Mexico's war for independence from Spain (1810–1821) unsettled relations among classes and racial castes, just as the American Revolution had done in the slaveholding South, and led to murders that crossed class and racial lines. Government instability and frontier violence compounded the problem; Mexicans, Americans, and Native Americans killed one another over trade and territory. Mexico's counterrevolution of 1834 set off violent rebellions in nine of Mexico's twenty-seven states and territories, including Texas, California, and New Mexico, which led to a cycle of political killings, robbery murders, revenge murders, and vigilantism. Together, political instability, the failure of the federal and territorial governments to establish their legitimacy, the lack of national feeling, and the delegitimation of the social hierarchy made the Southwest one of the most homicidal regions in North America.

### The Decline of Homicide in the North

The turning point in homicide rates in the northern backcountry and in northern ports like New York City was the end of the War of 1812 (Figures 4.2 and 5.1–5.3). Elsewhere in the North, particularly in southern New England and eastern Pennsylvania, the turning point had occurred in the late 1780s (Figures 1.2 and 2.2). Homicide rates declined as soon as political conflict subsided, the Constitution was ratified, and a stronger national government emerged. In Pennsylvania, for example, moderates were determined to build a stronger, more inclusive state government and to lay to rest the divisions of the war years. In 1786 moderate assemblymen altered the Test Act so that pietists could affirm their loyalty without swearing oaths. Two years later they gutted the Militia Act by suspending the fines for refusing



Figure 5.1   Unrelated-adult homicide rate in New Hampshire and Vermont, 1775–1900 (per 100,000 adults per year).



Figure 5.2   Unrelated-adult homicide rates in rural Illinois, 1820–1900 (per 100,000 adults per year).

military service. As their hold on power strengthened in the 1790s, they abolished other unpopular wartime acts and implemented universal male suffrage and a volunteer militia—measures that proved widely popular. The legitimacy of government was rebuilt that way in every state, step by step.[7]

The Revolution had undermined fellow feeling in the North, especially among white Protestants, in ways that would take a generation to repair. Patriotic feeling did not really began to flourish until the 1820s and early 1830s (Figure 2.1), and many northerners still questioned the legitimacy of the central government and the character of the men who ran it. But the Revolution also fostered a belief in the unique promise of the new nation that seemed to help suppress homicide. America would be a country where everyone had a chance to be eco-



Figure 5.3   Urban homicide rates in the northern United States, 1797–1900 (per 100,000 adults per year).

nomically independent. The abolition of slavery, the extension of voting rights, increased toleration for religious dissenters, and high levels of homeownership and self-employment convinced the vast majority of northerners that they were on their way toward putting an end to the oppression and prejudice that had kept people in abject poverty for centuries in aristocratic and monarchical societies. Obviously there was room for improvement in their society, but most people believed that now everyone could get married, set up a household, and own a shop or farm. The sole requisite for success was hard work. Even the poor, Catholics, and former slaves shared that belief, despite the financial obstacles and social prejudices they faced. The social hierarchy that emerged in the North after the Revolution was thus perceived as far more legitimate than any that had preceded it.

The belief that they had created a society in which everyone had a chance to get ahead did not create the kind of solidarity that fear of Indians, anti-Catholicism, or patriotism had among European colonists in the late seventeenth century. But most northerners believed they had a shared interest in sustaining the social and political order that emerged after the Revolution. The hatred they might have harbored for wartime enemies—many of whom had packed up and left for Canada anyway—was displaced by pride in their extraordinary victory over the British. The hostile, defensive, and predatory emotions that lay behind the murders of friends, acquaintances, and strangers—never as strong in the North as in the South or on the frontier—were supplanted by the feeling that everyone in America could participate in this grand social and political experiment.

For most people this faith in the social and political order of the postrevolutionary North was justified. By the end of the War of 1812, 60 percent of all adult men in the North owned their own shops or farms; the proportion was closer to 80 percent for men in their mid-thirties and older. Most of those who did not own shops or farms at least owned homes or headed independent households. Owning a house or shop or farm was the standard by which people were judged. Those who owned property had a sense of accomplishment, greater resilience in the face of disappointments, and a strong bond with other property owners.[8]

It is impossible to prove that the growing legitimacy of the North's social hierarchy and the respect and satisfaction derived from eco-

nomic independence were responsible for the decline in homicide in the postrevolutionary North, but it is clear that high levels of self-employment and homeownership were strongly associated with low homicide rates. Of all the areas studied, northern New England and Holmes County, Ohio, where homeownership and self-employment rates were very high, continued to have the lowest homicide rates. Other factors undoubtedly had an impact on rates in the North. The presence of nonviolent pietists like the Amish and Mennonites kept rates low in parts of Ohio and Pennsylvania, for example, whereas the presence of sailors raised the rates of port cities. Like indentured servants, sailors were deprived of rights and wholly at the mercy of their employers, and the humiliation they endured left them predisposed to violence. But self-employment and home ownership were probably the most important deterrents to homicide, because they were the most important sources of respect in a society that judged people by their work ethic and their investment in the community.

Places with the lowest levels of self-employment and homeownership, such as Boston, New York City, and Philadelphia, had the highest homicide rates. The poor, tenement-ridden neighborhoods of those cities were the most homicidal areas of the North. In the first decades of the nineteenth century, these neighborhoods were packed with Scots and Irish immigrants who eked out a living doing work that most natives rejected. They found it very hard to live in such close quarters with others, especially in a society where homeownership was the norm and adult renters were viewed as failures. Crammed together in flats without water or sanitary facilities, they fought constantly to defend their territory and whatever scraps of dignity they still had. Trivial disputes easily escalated into murder. Peter Kain, for example, was driven to distraction by his noisy neighbors in New York City. One Saturday night he smashed all their doors and windows and stabbed one of them to death. Catherine Burney got into an argument with a fellow Scot, Margaret Dix, in their tenement in Boston. She picked up a flatiron and crushed Dix's skull.[9]

Poor urban laborers had less patience than other northerners when challenged or treated with disrespect, and on occasion they fought to the death over card games, elections, and neighborhood turf. After the War of 1812 some of this desperate hunger for respect was channeled into bare-knuckle fighting, which became popular among

working-class men in northern cities. Many early prizefights in New York, Boston, and Philadelphia grew out of the same sorts of disputes that everyday murders did. Fighting gave men an opportunity to earn prestige and perhaps a little money as well. Gang fighting offered similar opportunities. Among the first gang fighters were volunteer fire companies, which battled one another for the privilege of putting out fires. In 1839 two New York City companies went at each other with brickbats and sticks for more than an hour. The 1820s and 1830s also saw the rise of gangs engaged in gambling, prostitution, theft, and illegal liquor sales. They fought primarily to protect their businesses and to eliminate rivals, but on occasion they also fought for honor, for a political party, or for ethnic pride.[10]

There were some ominous incidents of collective violence in the postrevolutionary North, but they did not claim many lives before the late 1840s and had virtually no impact on the homicide rate. The nation's large cities, where competition for jobs, housing, and political power was most intense, saw riots that pitted Whigs against Democrats, blacks against whites, natives against foreigners, Protestants against Catholics, capital against labor, and proslavery against antislavery activists. In New York City in the 1820s, striking dockworkers beat up men who crossed their picket lines and attacked employers who refused to meet their demands. In Boston in 1819 sixty blacks mobbed city watchmen who were trying to arrest a fugitive slave. In Providence, Rhode Island, in 1824, whites went on a rampage after a group of blacks refused to make way for whites on a sidewalk; they destroyed twenty homes, taverns, and suspected brothels and ran blacks out of the "Hardscrabble" neighborhood. A weeklong riot in Cincinnati in 1829 drove all blacks out of the city. In New York City in 1824, Catholic weavers attacked Protestant weavers who had gathered to celebrate the Battle of the Boyne.[11]

The worst violence occurred in Philadelphia, where, in a portent of what was to come, riots between Protestants and Irish Catholics in 1844 left a score of people dead. But despite its fearsome reputation, urban collective violence was not usually lethal in this era. For the most part rioters and gang members fought to humiliate their opponents, not to kill them. The goal was intimidation: they wanted to exert control in their communities and show they could not be pushed around. Whenever postrevolutionary northerners began to feel that

the government was advocating for a competing group or that they themselves were competing against groups with antagonistic values or interests, lethal violence was possible.[12] But the promise of economic independence for all was still a unifying force. Only in the late 1840s and early 1850s, when the two-party system collapsed and many northerners came to believe that what divided them was far more important than what united them, did lethal violence spin out of control.

Outside cities the failure to achieve or sustain economic independence could have deadly consequences. In small towns and rural communities in the postrevolutionary North, where the majority of people owned shops and homes, almost all intentional homicides were committed by men and women who were socially beyond the pale: bankrupts, alcoholics, convicts, and people who had committed moral crimes. These people were treated with contempt by their neighbors. Otis Cox, for example, was an alcoholic, and when he died, a local man wrote in his diary that "no tears were shed over his remains but [he] was hurried to his grave . . . and in a very few days he will be forgotten."[13]

The effects of such social stigmatization were clear. It is remarkable how often violence erupted when people who had once enjoyed the respect of society suddenly found themselves outcasts. Josiah Burnham of Grafton County, New Hampshire, was well educated, the son of a Congregational minister, and a descendant of the Wolcott family of Connecticut. He had done very well as a surveyor and developer, but after a series of questionable property deals he landed in jail. He had been in prison for five years when he was joined by two other respected citizens who had overextended themselves financially: Joseph Starkweather Jr., a militia captain; and Russell Freeman, a former magistrate and town officer. Starkweather and Freeman taunted Burnham for his fecklessness and insinuated that he had cheated on his wife, who had worked tirelessly for years to support their children and pay his debts. Burnham stabbed both men to death.[14]

Like bankrupts, alcoholics were prone to respond violently to perceived injustices and slights, especially in the 1820s and 1830s, when the rural North was becoming increasingly preoccupied with respectability. Ephraim Briggs, a veteran of the Revolutionary War, and Daniel Palmer, once a successful farmer, had lost their good names through public drunkenness. One day at the Red Tavern in Danby,

Vermont, they called simultaneously for a drink. Palmer grabbed the first mug, and Briggs, his elder, ordered him to put it down. Palmer drank anyway, and Briggs slugged him. In the ensuing fight Briggs was killed. Dr. Elias Thomas of Goffstown, New Hampshire, could not abide the humiliation of being escorted home from the tavern every night by Charles Small, a young bartender. One night the drunken Thomas turned on Small and stabbed him. Although alcoholics were primarily a threat to their wives, as homicide rates fell and as they were increasingly marginalized in society they accounted for a growing share of the men who murdered unrelated adults.[15]

People who had flouted society's moral standards also contributed to the homicide rate. Rolon Wheeler, a hardscrabble farmer from Wallingford, Vermont, ran afoul of his neighbors for sleeping with his wife's sister. They came to his house one night to tar and feather him. When they broke into his bedroom, he killed one of them and wounded several others before escaping through a hole concealed under his bed. Jonathan Hall, who worked at a brothel run by the widow Grandy in Vergennes, Vermont, also refused to be run out of town. When a mob of thirty men showed up one night to make good on the community's threat to tear down the brothel, Hall shot the first man to come through the door.[16]

Predatory homicides such as those committed in the course of robberies and sexual assaults nearly disappeared, as did homicides over insults or property disputes. Gun homicides—a good proxy for intentional homicides—declined from 52 percent of homicides among unrelated adults in New England during the Revolution to only 17 percent by the 1820s and 1830s, and from 60 percent in Ross and Holmes Counties in Ohio to zero. Involuntary homicides caused by mental illness or by unlucky blows in ordinary fights accounted for a large portion of homicides among unrelated adults.[17]

By the 1830s and 1840s there were signs that northerners' confidence in their egalitarian social order was waning. Opportunities for self-employment declined after the War of 1812 as the population increased and the economy changed. The creation of integrated regional and national markets made it harder for small or inefficient firms to survive, and more capital was needed to create viable shops and farms. Population pressure further increased costs in the Northeast by raising the price of land in cities and the countryside, and the

capital costs of establishing new businesses in the Midwest were so high, especially for farmers, that they offset much of the advantage of cheaper midwestern land. As a result, self-employment declined in the North from 60 percent of all adult males in 1815 to 40 percent by 1860.[18]

The decline in self-employment did not occur overnight, but by the mid-1830s northerners knew it was under way. Per-capita income rose, even for farm laborers and factory workers, because of rising productivity, but incomes did not keep pace with the rising cost of establishing farms or shops, so fewer families enjoyed the prestige and security of self-employment. Few people referred to the decline as a crisis, because its onset was so slow. Most spoke instead of the "pressure of the times" and actively sought ways to cope with diminishing opportunities.

Both the Whig Party and the Democratic Party offered remedies for the decline in self-employment. The Whigs favored greater access to capital and markets, while the Democrats favored greater access to undeveloped land in the West, lower taxes, and limits on the power of banks, corporations, and other potential monopolies. Unions and workingmen's parties in cities like Boston, Philadelphia, and New York City called for shorter hours, a homestead law, and better pay, so that more apprentices and journeymen could rise from the ranks to become master tailors, shoemakers, and mechanics. Young people dealt with the "pressure of the times" in more immediate ways, by delaying marriage and children and saving the money they earned as laborers. They took a few more years to establish their economic independence. Faith in the republic and in prospects for individual success remained strong into the 1840s; but anxiety increased, because the path to home ownership and self-employment had become longer and more difficult.[19]

The fear of failure was palpable among churchgoing northerners, who tried in various ways to improve their children's chances of success. Discipline became stricter, and parents and ministers pressured young people to join temperance societies and to reject sexual temptation. The age at which young people began to worry about their reputations and their futures dropped precipitously. Northerners increasingly praised industry, restraint, and moral zeal, and they expressed scorn for people who failed to toe the line. But their crusade to ex-

pand church membership, curb drinking, and improve the moral tone of society ended up being divisive, because it alienated many hard-working people, especially those who drank occasionally, attended church irregularly, and had little use for people who told others how to live.[20]

The moral and spiritual crusades that divided northerners in the 1830s and 1840s did not have an immediate effect on the homicide rate among unrelated adults, in part because homeownership and self-employment remained widespread and because many drinkers and nonchurchgoers steadfastly ignored the reformers and crusaders. Abel Rich, a notorious skeptic from Strafford, Vermont, scoffed when a revivalist confronted him in 1835 before a crowd of neighbors and asked if he had got religion. "None to boast of, I tell ye," he said. Rich, whose fellow townsmen had elected him tithingman, later declared that he bore the preacher no grudge, but if the man "should be mobbed and I was the only witness, I would forget it before morning-g-g, that I would-d-d." In another Vermont town a church committee discovered that one of their members who was an alcoholic had backslid, and they posted a notice at the general store announcing his excommunication. "Whereas Mr. Lyon has not kept his promise to reform, we the Church Committee return him to the outside world from whence he came. By the church committee." The next day another notice appeared. "Whereas Mr. Lyon is so much worse than when he joined the church, we of the outside world refuse to accept him back. By the Outside Committee." The church committee never quite regained the status it had once enjoyed.[21]

Wit was a powerful leveler. It enabled the weak to tweak the noses of the strong, and it defused confrontations that might otherwise have turned violent. The seeds of class conflict were evident in the ongoing battle between Ira Hoffman, a poor farm laborer in Sutton, Vermont, and his employer, a well-to-do farmer who demanded moral rectitude in his employees. Hoffman repeatedly thumbed his nose at his boss, whom he characterized as "mean as cat piss," and infuriated him by using foul language, strutting about town in a fancy satin vest, and, in his most effective move, quitting at harvest time. To make matters worse, he used his quick wit and his thorough knowledge of current events to trounce his employer's beloved Whigs in a local debate over Texas.[22]

The conflict between this young outsider and his employer would

have been almost unthinkable in the plantation South. The difference between Hoffman's story and that of George Tucker, the Georgia carpenter who quit his job, asked for his pay, and was stripped naked and whipped by his employer, illustrates how wide the cultural divide was between the North and the slaveholding South. In the North, outsiders like Rich and Hoffman could assert their independence and proclaim their manhood in imaginative, nonviolent ways, whereas southerners were kept in their place by a more rigid class system, and young men who wanted to prove their manhood could do so only by fighting.

In the North, young men who enjoyed tavern life and were not regular churchgoers formed a distinct community in the 1830s and 1840s. They favored the Democratic Party, which appealed to religious dissenters, freethinkers, and antiprohibitionists by supporting the strict separation of church and state and by opposing laws that forced people to quit drinking or observe the Sabbath. The Democrats did not endorse drinking or atheism, as their Whig opponents often charged, but they believed that voluntary support for churches and for reform movements like temperance was the only constitutional way to improve the moral and spiritual tone of society. It may be that the critical turn of mind necessary to resist Christian proselytizing and prohibitionist indoctrination, together with the solidarity that pressure from respectable society created, helped keep the homicide rate low among these men, many of whom were of an age to be predisposed to violence. In the late 1840s and 1850s, however, when it became apparent that the decline in self-employment was not going to reverse itself and that the drinking poor might be fixed permanently at the bottom of the social hierarchy, these factors would not be strong enough to prevent an increase in homicide in this demographic.

Vigilante justice remained popular after the Revolution and was occasionally used against adulterers, brothel keepers, and petty criminals. Though illegal and unpopular with authorities, vigilante justice was not in most instances divisive. It usually reflected the will of the community, and supporters justified it as a direct expression of democracy. Vigilantes typically gathered in groups of fifty to one hundred. Sometimes they tarred and feathered their victims and tore down their houses, but in most cases they simply made noise, broke windows, burned people in effigy, and ordered their victims to change their ways or leave town.[23]

Vigilantes rarely killed people, except on the frontier, where homicide rates were higher and livestock theft endemic, and along major rivers like the Mississippi, Missouri, and lower Ohio, where criminal gangs flourished well into the 1840s, taking advantage of good roads, riverboats, and the proximity of state borders to escape capture. Iowa, for instance, experienced a terrible crime wave after the Black Hawk Purchase was opened to settlement in July 1833. Iowa did not have its own territorial government until 1838, and there were no secure jails, effective courts, or law enforcement until the early 1840s. As a result, Iowans felt they had to take the law into their own hands. They formed vigilance committees and hunted down murderers and horse thieves at considerable risk to themselves. After a mass meeting, citizens in Poweshiek County searched the woods north of Montezuma for members of the "Fox and Long" gang. They caught two, tried them "by a self-constituted jury," and shot them. W. W. Brown's gang plagued communities along the Mississippi River for several years, stealing horses, passing counterfeit money, pirating boats, and murdering witnesses, until residents of Jackson County formed a citizens' army to stop them. The vigilantes cornered the gang at Brown's Hotel in Bellevue. They killed three outlaws and captured all but six of the survivors, but they themselves suffered four dead and seven wounded.[24]

These postrevolutionary northern vigilantes made an effort not to be lawless or vengeful. In Iowa vigilantes executed only seven men in the 1830s and early 1840s, and in each instance they held a trial (a "lynch court") before condemning the accused to death. In every other case, they simply whipped and banished the accused or turned them over to territorial authorities. Their justice was rough—they extracted confessions under threat of death—but it was formal and democratic. At the end of the trial for the thirteen gang members captured after the shootout in Bellevue, the vigilantes voted with beans to decide the men's fate: a white bean for hanging and a red bean for whipping. The red beans prevailed, forty-two to thirty-eight, so the surviving gang members were not hanged, even though they had killed four vigilantes. They were given thirty-nine lashes each, placed on the Mississippi in a boat with three days' provisions, and told not to return on penalty of death.[25]

Despite such violence, homicide rates remained low into the early

1840s, even for African Americans. Blacks were murdered at the same rate as whites in New York City and at only a slightly higher rate in Philadelphia (Figure 5.4)—remarkable statistics given the poverty of most African Americans and the high proportion of African American men who worked as sailors or dockworkers. In Philadelphia several blacks lost their lives in drunken quarrels with other blacks, and a few blacks killed or were killed during robberies or beatings, but on the whole there were few homicides, intentional or unintentional, among blacks. Nor were there many homicides of either type between blacks and whites, except during the "Flying Horse Riot" of 1834, in which two black men died (and another was castrated) after a fight between blacks and whites over who would ride on a carousel.[26]

Homicide rates were also low for blacks in northern New England and in the Midwest. Once the War of 1812 ended, blacks were not in-



Figure 5.4  Homicide rates in New York City and Philadelphia by race, 1797–1900 (per 100,000 adults per year). New York City: all homicides. Philadelphia: homicides among unrelated adults, indictments only.

volved in a single homicide in the rural midwestern counties studied intensively, or in Cuyahoga County, Ohio, even though several of the counties had substantial black populations. In Vermont and New Hampshire only one African American—an ex-convict—committed a homicide between the late 1780s and the late 1840s, and none were murdered. In short, the patterns that were established in the North during and after the Revolution persisted. Whites seldom engaged in homicidal violence against blacks except during riots, when law and order broke down and assailants had a degree of anonymity; and blacks seldom engaged in homicidal violence against anyone.[27]

By contrast, the long-term impact of the Revolution on homicide rates for Irish Catholics in the North was mixed. Their rates were actually very low in small towns and in the countryside in the early nineteenth century, especially by the standards of contemporary Ireland. In the rural Midwest their homicide rate fell to only 4 per 100,000 adults per year, and in northern New England it fell to 1 per 100,000. That was two-thirds higher than the rates for African Americans or for other whites, but it was much lower than it had been in the eighteenth century. Some of the difference can be explained by proximate causes—that is, by the desperate competition for jobs and by the Irish tradition of recreational violence—but at bottom the higher homicide rate stemmed from a craving for respect, which was all the more powerful in a society dominated by Protestants of English descent who regarded the Irish as "white Negroes."[28]

Irish immigrants were seldom involved in the kind of predatory violence that runaway Irish servants had engaged in before the Revolution. Most Irishmen who were recent immigrants worked as unskilled laborers in mining, canal building, and railroad building. The number of workers usually exceeded the number of jobs, so laborers—many of them desperately poor—often had to fight for employment. Irish laborers were probably no more homicidal than their peers, but their concentration in these competitive occupations increased the likelihood that they would engage in fights or riots that could turn deadly.[29]

The Irish did have a penchant for recreational violence. They considered fighting a sport, and they glorified powerful fighters. But all too often, Saturday night brawls at dances, drinking parties, and brothels ended in death. Clearly, Irish immigrants brought this kind of vio-

lence with them to the United States; such killings, usually associated with heavy drinking, made up a large proportion of the homicides that occurred in Ireland in the nineteenth century.[30]

Still, like other rural northerners, rural Irish Catholics saw their homicide rates decline in the early nineteenth century. Optimism about the future probably played a role in moderating violence. Although anti-Irish prejudice and anti-Catholic laws did not die easily, in the late eighteenth and early nineteenth centuries new state laws established religious freedom for Catholics and separated church from state. In addition, America's successful rebellion against Great Britain and its bold stand against British aggression during the Napoleonic Wars fired the imagination of Irish patriots, many of whom came to see the United States as a model and an ally. Immigration to America meant emancipation from British oppression, from Protestant prejudice, from "tyrannous landlords" who worked them like slaves. As laborer John Quinlivan put it, America gave him a chance to be independent and to have "a place to Stop that I can call my own." To many Irish Catholics it was "the land that flows with milk and hon[e]y—the land of work and peace."[31]

But nativism was intensifying even in the rural North in the 1820s and 1830s as Catholics began to outnumber Protestants among Irish immigrants, and many Irish Catholic immigrants had very little hope of bettering themselves. They were simply too poorly paid ever to achieve economic independence, and the only positive recognition they could hope for from the Protestant majority was to be remembered upon their deaths as faithful servants. The newspapers of the period sometimes characterized Irish individuals in passing as "respectable," but such remarks only implied that most Irish men and women did not fit that description. Still, the Irish believed that their achievements in the United States went "far beyont what it was possible for them to have done had the[y] stop[p]ed in Ireland," and they did gain a degree of acceptance in the rural North, at least before the Great Famine.[32] They were a reliable source of cheap labor, and they posed no serious threat to the Protestant majority because they made up less than 5 percent of the population.

In cities like New York and Philadelphia, however, Irish Catholics faced hostility and discrimination from the 1790s through the early

1840s. Wherever they were numerous enough to threaten the jobs and the political power of Protestants, their homicide rate hovered around 12 per 100,000 adults per year—twice the rate for African Americans and three times the rate for non-Irish whites and for contemporary Ireland. They were often killed or implicated in homicides that occured during riots. They fought and died to defend their neighborhoods, their right to vote, and their right to enter skilled trades. Yet they were far more likely to die in fights with each other.[33] Living in tenements and working for wages had a demoralizing effect on all the urban poor—and Irish Catholics were disproportionately poor. But prejudice and discrimination made matters worse for the urban Irish, some of whom were so angry about their treatment at the hands of the Protestant majority that they turned to gang violence and to predatory crime, which further increased their homicide rate. That pattern would be repeated in the late nineteenth century in cities across the United States: the minority in each city that felt it was losing ground and being pushed to the bottom of the social hierarchy would have the highest homicide rate—the Chinese in San Francisco, for example, or African Americans in Philadelphia, or Hispanics in Los Angeles.

Urban Irish had a powerful ally in their effort to become full and equal members of American society. The Democratic Party courted Irish Catholic voters by opposing anti-immigrant laws and denouncing anti-Irish prejudice. It awarded them patronage jobs, supported their candidacies for state and local offices, and, perhaps most important, gave them a sense of belonging and empowerment. The party also encouraged the Irish to support an antiblack, proslavery agenda and persuaded them to begin thinking of themselves as more deserving than blacks by virtue of their skin color. Given the competition between African Americans and Irish Catholics for jobs and housing in northern cities, the Irish needed little encouragement. As yet they had not clashed with blacks in significant numbers, but clearly there was potential for trouble.[34] Serious violence did not erupt, however, until the late 1840s and 1850s, when the competition between the two groups increased homicide rates both directly—by spawning interracial riots—and indirectly, as disillusionment with politics and frustration with declining economic prospects led to a general increase in homicides of all kinds.

### White Homicide in the South

As in the North, homicide rates in the mountain South were probably at their lowest levels in history by the 1830s and early 1840s. Frontier disputes with Native Americans were at times a problem, especially during the forced removal of the Cherokees and other Native peoples to reservations in the West. In Gilmer County, Georgia, for example, several Cherokees murdered a teenaged farm laborer who had encroached on their land, and another murdered an ill-tempered white trader who was selling liquor to the Natives. But those were the county's only reported homicides, and once the frontier period had passed, homicide rates in northern Georgia, in the Ozarks of southern Missouri, and in the upper Cumberland in Kentucky and Tennessee fell nearly to zero (Figure 5.5).[35]

Southern mountain communities were very similar to rural commu-



**Figure 5.5** Homicide rates in mountain counties, 1816–1900 (per 100,000 adults per year).

nities in the North in the early national period. The land was still fertile, and timber was plentiful. People made a decent living raising hogs, sheep, and cattle, and population pressure was low. Slaves made up less than 5 percent of the population in these rugged counties, so white laborers did not have to compete against slave labor, and farmers did not have to compete against planters for land, political power, or social prestige, at least within their own communities. Land titles were less secure in the mountain South than in the North, and many settlers were still renting or squatting on land owned by speculators in the 1820s and 1830s, but by midcentury roughly two-thirds of adult white males owned at least a house and a small acreage. In plantation counties that figure was 50 percent or less.[36]

People in the mountain South did not need much land to make a good living. Their livestock usually ran free on the land of absentee owners, and without competition from slaves or free blacks, a third of all adult white males were able to earn most of their income outside agriculture, as opposed to a quarter or less in counties where slaves made up a tenth or more of the population. Food was plentiful, and the hazards of urban life were far away. As a result, the white inhabitants of the mountain South were among the tallest, healthiest people in the United States. The sense of empowerment and the expectation of economic independence were as strong in these communities as in the small towns and rural areas of the North. So, too, were patriotism and faith in the new nation, which is one reason why so many people in the mountain South were Unionists during the sectional crisis and the Civil War.[37]

In contrast, by the 1820s the homicide rate in the slaveholding South was at least twice what it had been at its low point in the mid-eighteenth century, and much higher than in the rest of the United States. Although the homicide rate varied widely in plantation counties in Georgia and South Carolina, in the North Carolina Piedmont, and in the Chesapeake and the Shenandoah Valley of Virginia, on the whole it was probably 10 to 25 per 100,000 adults per year for both blacks and whites (Figures 4.1, 5.6, and 5.7). That was double the rate in cities like Philadelphia and New York, which were the most homicidal places in the North. The plantation South was as prosperous as any other region in the United States, so poverty cannot explain the rising homicide rate. Nor can weak criminal justice institutions. The

South built prisons at the same rate as the North, and its cities had the first modern, uniformed police forces in the United States. In rural counties, slave patrols supplemented local sheriffs.[38]

The primary cause of the slaveholding South's higher homicide rate was the Revolution, which had a disruptive effect on slave society and on the relationship between proslavery southerners and the federal government. The Revolution undermined the pretensions of the *soi-disant* aristocracy and increased doubts about the rationale for slavery, but southern society was still firmly controlled by the slaveholding gentry, and many blacks and nonslaveholding whites felt frustrated and aggrieved at not having a share in the fruits of victory. Aware of these feelings, whites were more fearful of blacks, and slaveholders were more wary of nonslaveholding whites. Slaveholders were also distrustful of the federal government. They had been very patriotic during the War of 1812, but their patriotism declined quickly as the national controversy over slavery intensified in the 1820s and 1830s. They had not yet become southern nationalists, but they were rapidly becoming



Figure 5.6  Homicide rates in Virginia by race, 1790–1900 (per 100,000 adults per year). Amelia, Lancaster, Rockbridge, and Surry Counties.

alienated from whites in the North and the mountain South, and they viewed the nonslaveholding whites in their midst as actual or potential abolitionists.[39] Together, the loss of faith in federal government, the decline in fellow feeling among whites, the growing fear of blacks among whites, and frustration among blacks and poor whites with the social hierarchy gave rise to the anger and alienation that caused the increase in homicide.

Fear of the antislavery movement was responsible for the initial jump in the homicide rate. Slaveholders were afraid that the success of the movement in the North would encourage blacks to murder whites in the South. For the most part, slaves and free blacks in the South,



Figure 5.7  Homicide rates in plantation counties, 1815–1863 (per 100,000 adults per year). *Sources:* North Carolina: Bynum (1992: 82); Frederick County, Maryland: Rice (1994: 34, 100); Whitfield and Greene Counties, Georgia: Ayers (1984: 115).

like their counterparts in the North, chose other means to resist slavery and oppression, but whites were increasingly afraid of slaves, especially after the Haitian Revolution in 1791 and the exposure of slave rebellion plots in Virginia and North Carolina in 1800. Determined to do whatever it took to keep the institution alive, white militants used force ruthlessly to suppress abolitionists and to stop the spread of rebellion in the South.

The defeat of the southern antislavery movement was not a foregone conclusion in the 1790s and early 1800s, but southerners knew that their society was at a crossroads. As one anonymous Virginian put it, "The question now is a plain one. Shall we abolish slavery, or shall we continue it? There is no middle course to steer." The abolition of slavery in the North, the disappearance of convict servitude, and the rapid decline of apprenticeship and indentured servitude left southern slavery as the only formal remnant of the hierarchical society of the mid-eighteenth century. There were no longer degrees of servitude in America: only one remained, and African Americans were more impatient than ever to throw off that last form of bondage. George Tucker, a young Virginian from a prominent family, warned in 1801 that slave rebellions were inevitable.

> The love of freedom . . . is an inborn sentiment, which the God of nature has planted deep in the heart: long may it be kept under by the arbitrary institutions of society; but, at the first favourable moment, it springs forth, and flourishes with a vigour that defies all check. This celestial spark . . . is not extinguished in the bosom of the slave. It may be buried in the embers; but it still lives; and the breath of knowledge kindles it into flame. Thus we find . . . there never have been slaves in any country, who have not seized the first favorable opportunity to revolt.

The desire of the slaves for freedom was "an eating sore," rapidly growing worse because of "the very nature of our government, which leads us to recur perpetually to the discussion of natural rights."[40]

John Randolph of Roanoke saw the same dangers: since the Revolution blacks had acquired a "sense of their rights, and contempt of danger, and a thirst for revenge." Whites in the plantation South were divided—and would remain divided—about what course to take. The dangers of slavery, and the moral problems it posed, wore on an increasing number of slaveowners, some of whom manumitted their

slaves or let them hire out their own time so that they could save enough money to purchase their freedom. Others thought that they could make slavery safer by Christianizing the institution. They wanted to minister to the souls of slaves and slaveowners, teach generosity and forbearance to all parties, foster respect for slave families, and encourage everyone—especially slaves—to look to heaven for their ultimate reward. Still others, like Tucker and his friend Thomas Jefferson, rejected both positions, certain that blacks and whites could never live as equals in a free society but doubtful that slavery could be preserved, given its inherent dangers and its ability to corrupt the morals of even the most devout Christians. Where slavery was concerned, Jefferson wrote, "We have the wolf by the ears; and we can neither hold him, nor safely let him go. Justice is on one scale, and self-preservation in the other."[41]

The profitability of slavery, prejudice against African Americans, and fear engendered by the Haitian Revolution and slave plots in the United States gave the upper hand to whites who wanted to preserve white supremacy by force. Defenders of slavery scoffed at the naïveté of colonizers, Christianizers, and abolitionists and reminded southerners of the fate of whites in Haiti. Proslavery activists like Edward Clifford Holland warned that blacks would always be on the lookout for opportunities to rebel: they "should be watched with an eye of steady and unremitted observation. . . . They are the ANARCHISTS and the DOMESTIC ENEMY: the COMMON ENEMY OF CIVILIZED SOCIETY, and the BARBARIANS WHO WOULD, IF THEY COULD, BECOME THE DESTROYERS OF OUR RACE."[42]

Defenders of slavery made a special effort to demonize free blacks, who they claimed were fomenting rebellion among the slaves. They also pointed to their poverty and to the property crimes they committed as proof that blacks were unfit for freedom. Blacks had "no moral sensations," they declared, "no taste but for women; gormandizing, and drinking to excess; no wish but to be idle." Some even claimed that blacks were a different species. Their view of black character (which would become the dominant view among white Americans by the 1850s) not only legitimized slavery and racial inequality; it also fed fear and justified violence against blacks.[43]

Proslavery whites used their influence, particularly through churches and the Jeffersonian Party, to prop up slavery. They forced evangelical

churches to repeal antislavery resolutions, clamped down on manumissions, and strengthened fugitive slave laws and the slave patrol system. They encouraged prejudice and discrimination against free blacks, fought to admit new slave states and protect slavery in the Southwest territories, and rallied voters across the nation to support white supremacy. But the most militant defenders of slavery were not content with political victory. They were determined to crush black resistance and to silence white abolitionists—or anyone else who expressed sympathy for the suffering of slaves.[44]

The emotions roused by slave plots and the tirades of proslavery whites led to an increase in murders of African Americans by whites. Whenever rumors of a slave rebellion surfaced, proslavery whites responded with overwhelming force. Mass arrests followed by hangings of suspected rebels became routine after 1800. These actions had widespread support, for, whatever their opinions of slavery, southern whites were all deathly afraid of becoming victims of slave violence.[45]

Murders of suspected rebels and white sympathizers escalated after the publication in 1829 of an *Appeal to the Coloured Citizens of the World* by David Walker, a free black shopkeeper and civil rights activist in Boston. Walker threatened whites with violent retribution if they did not "throw away" their "fears and prejudices" and emancipate the slaves immediately. "We cannot but hate you, while you are treating us like dogs." North Carolina was abuzz with rumors that local blacks had read Walker's pamphlet, which was circulated in the South by black sailors and preachers. In Duplin County several slaves gave evidence under torture that they had heard about a conspiracy to rebel on Christmas Day 1830, and sixty-five slaves were arrested. In the countryside it was rumored that the uprising had already started, and 600 whites came streaming into the county seat. They stormed the jail and seized two of the conspiracy's alleged "ringleaders," cut off their heads, and strung up their bodies. The North Carolina legislature lent credence to all the rumors by passing fifteen new laws against blacks, including bans on manumissions and teaching blacks to read or write.[46]

The worst violence occurred in 1831 after Nat Turner's rebellion in Southampton County, Virginia, in which at least 58 whites were killed. Authorities in Virginia and North Carolina charged 91 men and women with conspiracy and hanged 35 of them, including Turner,

but militant whites were not satisfied. They went on a rampage, beating, burning, mutilating, and killing suspicious blacks and whites. When a guard unit in Murfreesboro, North Carolina, spied a strange black man walking down a road toward Southampton, they shot him, "cut off his head, stuck it on a pole, and planted the pole at the cross streets." That same day a black carriage driver "behaved imprudently" in the presence of his mistress, and he, too, had his head cut off and stuck on a pole. One militia unit cut off the heads of 15 slaves and put their heads on poles "as a warning to all." In the end, vigilantes killed over 120 men and women, most of whom had nothing to do with Turner's rebellion.[47]

The events of 1830–31 prompted people across the slaveholding South to take preventive measures whenever rumors of insurrection arose, and the nets they cast to capture suspects began to draw in whites as well. In 1835 a woman in Madison County, Mississippi, said she overheard her servants talking about a slave plot on a plantation outside Livingston. Before the scare was over more than two dozen blacks, slave and free, were dead, along with sixteen whites. Two slave preachers were the first victims; they were accused, as slave ministers and conjurors often were, of preaching abolition. Soon afterward a white man was accused of trading with blacks for stolen property. Vigilantes hanged him and his colleague. Then they turned their attention to Angus Donovan, a corn trader from Kentucky, and Ruel Blake, the owner of a slave who had been tortured by the vigilantes. Donovan and Blake had complained of the vigilantes' brutal treatment of blacks. The vigilantes hanged them both. Accusations, forced confessions, and lynchings continued for the next two months.[48]

Proslavery vigilantes were probably responsible for killing between 600 and 700 people in the first half of the nineteenth century. The deaths had a chilling effect on public debate: all but a handful of free blacks and antislavery whites were cowed into silence. But there were not enough of these deaths to affect the overall homicide rate in the plantation South. The rate rose largely because of individual murders of blacks by whites. Whites killed blacks at a rate of 5 per 100,000 adults per year in tobacco- and grain-growing counties in Virginia; 7 per 100,000 in Florida and in Edgefield County, South Carolina, a cotton-growing county; and 23 per 100,000 in Horry County, South Carolina, where the primary crop was rice.[49] These murders might ap-

pear at first glance to differ from vigilante murders, but they were caused by the same fears and discontents. Blacks were increasingly determined to assert themselves. Almost every black person who was murdered had at some point refused to do what was asked of him or made a demand that was considered unacceptable. Whites were increasingly determined to keep blacks in their place and more afraid than ever of what might happen if they failed. The individual whites who murdered slaves and free blacks may not have been directly involved in the militant movement to defend slavery, but they were every bit as determined to keep blacks in their place as the vigilantes, politicians, and racial theorists who spearheaded the movement.

As in the eighteenth century, a high proportion of black homicide victims were killed unintentionally by masters or overseers during discipline. Overzealous whippings and beatings claimed the lives of roughly a third of all blacks killed by whites in the Chesapeake, the Shenandoah Valley, and the Georgia–South Carolina upcountry after 1800. But a growing proportion of slaves were deliberately killed by masters or overseers. A third of all blacks killed by individual whites were shot, and another third were stabbed, clubbed, or kicked.[50] This kind of violence, which went well beyond discipline, had not been seen at such levels since the late seventeenth and early eighteenth centuries, when slavery was first established. Clearly, it was part of an effort to underscore the legitimacy of slavery in the wake of the Revolution.

Slaveowners felt that they had to kill slaves who defied them in order to break the increased resistance they were facing from all their slaves. Like their counterparts in the late seventeenth and early eighteenth centuries, they were willing to accept the property loss and the cost of legal fees. Ann Powell, a slaveowner in Amelia County, Virginia, reported that her slave Tom was "a very bad negro." He had run away many times. When her neighbors caught him yet again, he swore that he would keep running away if they returned him to his mistress. They whipped him on the spot for that remark, but the whipping did not satisfy Powell's overseer. He tied Tom to a fence and beat him to death. Drury Moore, an Amelia County overseer whose master was away, sought permission from a justice of the peace to give a slave named Scott more than the usual twenty lashes because Scott had struck him and bitten him on the hand. The justice advised Moore to wait for his employer, but Moore refused. He ordered Scott whipped,

but Scott would not cooperate. As he walked away, Moore shot him in the back. Moore told the court that "he had always said he would shoot any negroe th[a]t was under his controll that struck him."[51]

White southerners were not of one mind about killing slaves. Masters and overseers who brutalized their victims were indicted for murder, and witnesses who testified in such cases—all of whom, by law, were white—often expressed horror at what they had seen. Yet none of these witnesses ever came to the aid of an enslaved victim other than to ask the assailant to stop once they thought the slave had had enough, and none of these murderers were convicted. Masters or overseers who killed slaves with less brutality were not even charged. The authorities believed that there was good reason not to interfere, especially if a master or overseer felt the need to use a gun or knife. Taking the side of a slave could undermine discipline and threaten the institution of slavery. Whites who had qualms about the brutal treatment of slaves simply learned to give the worst of their neighbors a wide berth.

Slaveowners and overseers were not the only whites guilty of increased violence against African Americans. In the mid-eighteenth century most men would have been reluctant to destroy someone else's valuable property. Certainly poor whites did not often take it upon themselves to kill a wealthier man's slave. But after 1800 even the poorest of whites felt licensed by the greater social mandate to keep slaves in their place. Robert McCutchen, a farmer in Rockbridge County, Virginia, had hired Harry, a neighbor's slave, to do some work for him. Harry asked for his pay several times, but McCutchen always refused. One Saturday night, Harry happened to meet McCutchen while the farmer was drinking with neighbors, and Harry once again tried to get what was owed him. "You damn'd black Sallymander," said McCutchen. "Clear out, [or] I'll take your life." The neighbors testified that Harry replied civilly, "Mr. McCutchen, I have not said any thing improper to you, nor done you any harm, and you would not go to hurt me." McCutchen said that he would "as soon kill him, as . . . a Lizard," and he grabbed an ax and split his head open.[52]

In the context of widespread fear that society was changing and that slaves were challenging white supremacy, a white man who let a slave embarrass him was seen as acknowledging the validity of the slaves' claims. Adding to the problem was the economic competition that poor whites faced from enslaved artisans. Such competition and the

cost of land made it difficult to sustain a small farm or shop and to establish a family, and many whites became mired in poverty. They had no status except that conferred by their skin color, and no way of earning the respect of other whites. As slaves became more aware of the workings of the larger society, they too began to look down upon the white underclass. Poor whites who found themselves competing with slaves for the next-to-lowest rung of the social ladder tried to salvage whatever remnants of pride they could by flaunting their mastery over black men.

Still, men who murdered blacks they did not own did not have the support from the justice system that masters, overseers, and vigilantes did. Slaveowners were not pleased to have their property destroyed for the sake of a poor man's pride. Robert McCutchen was sent to prison. John Hayslet murdered a free black and had to flee the state to avoid prosecution.[53] Proslavery militants confined their antiblack violence largely to their own slaves or to suspected rebels. They viewed murders by nonslaveholders as different from the murders they themselves committed. Yet murders by nonslaveholders were rooted in the same emotions that gave birth to the proslavery movement.

Those emotions also led militant whites to kill people they suspected of favoring abolition. Joseph Samuel confronted James Reynolds in the street in Hamburg, South Carolina, and accused him of having "run negroes to a free State" and "carried them money." Reynolds, who did business with local blacks, replied that "he had never denied earning them money" but that he had never helped a runaway. Samuel beat him to death anyway. Assassins tried several times to kill the South's only noted abolitionist, Cassius Clay. Militants also killed whites from the North who made careless remarks about slavery. An Ohioan standing on a crowded dock on the Mississippi River said in passing that "he would soon be in a free state." Several bystanders jumped him, nailed him up in a pork barrel, and threw him into the river, where he drowned. Governor John Floyd of Virginia applauded such attempts to bring abolitionist "villains" to justice. "The law of nature will not permit men to have their families butchered before their eyes by their slaves and not seek by force to punish those who plan and encourage them to perpetuate these deeds." As sectional conflict intensified, southerners killed northerners more frequently.[54]

In the long run, the Revolution destabilized relations among whites

in the slave South as much as it did relations between whites and blacks. After 1800 the homicide rate among whites in the slave South reached 6 per 100,000 adults per year in Virginia; 13 per 100,000 in Edgefield County, South Carolina; and 27 per 100,000 in Horry County, South Carolina.[55] With the spread of revolutionary ideas about equality, the region's caste and class system lost legitimacy in the eyes of the poor, while the well-to-do clung to their ideas about social class and became more obdurate in their efforts to enforce social distinctions.

Southerners from all walks of life also clung to their conception of honor, which was based in part upon the mastery of other men, black and white. By its very nature slave society conferred the greatest honor on men who dominated others. Georgia humorist Augustus Baldwin Longstreet once observed that the worst fate that could befall a man in the South was to be afraid of another man, because fear made a man a slave. And no white southerner could truly be content until he had "understrappers"—white men who worked for a slaveowner. George Keen, a settler in eastern Florida, recalled how much he had wished as a young man that he could have taken part in the "overseer talk" of the local planters he escorted on hunting trips.

> One would say, I've got the best overseer I ever had; another would say, my overseer is a worthless fellow, a third would say I am pretty well satisfied with my overseer, and so on. I would sit there like a bump on a log. You bet I never wanted anything worse in my life than I wanted a plantation of niggers so I could talk about my overseer. I had some niggers, but not enough to have an overseer; that's what worried me. When hunting time come round I was in but when overseer talk was the topic of the day I was ten feet above high water mark on dry land.

Ironically, it was mastery of white men—not slaves—that was the key to self-esteem in the postrevolutionary slave South.[56]

Whites who owned few or no slaves could still take comfort in their superiority to black men, although even that status was under siege. But it was far more difficult for white men to acquire a sense of mastery over other white men. The struggle for dominance among white men had been held in check in the century before the Revolution by the inherently hierarchical nature of British society, which fostered the belief that inferiors (especially indentured servants, convict servants,

and apprentices) had a duty to defer to their superiors. The Revolution eliminated that check, even as it heightened ambitions and intensified competition. Poor and middle-income whites who wanted to move up the social ladder in the plantation South had no more opportunity to do so after the Revolution than before because of the inherent economic inequality of slaveholding society and its restrictive definition of honor. They could not compete on an equal footing in a society in which wealth, power, and social prestige were concentrated heavily in the hands of the slaveholding elite. In some states, like Virginia and South Carolina, they could not even look to political participation for a sense of empowerment, since through the 1840s more than half of all white males in those states were still disfranchised by property restrictions.

The situation made relations among poor and middle-income whites more adversarial than in the North or the mountain South. Although many poor and middle-income whites in the slaveholding South tried, like their counterparts elsewhere, to empower themselves through churches, schools, and temperance societies, they did not do so to the degree that other white Americans did, and they turned to violence far more often as a way of venting their frustration. They had the example of southern gentlemen before them, but they embraced personal combat on their own terms as a way to protect their honor, property, or rights. Dominating others was as important to poor and middle-income whites as it was to wealthy whites.

The desire for mastery over others set in motion contests of will that no man felt he could afford to lose. At a husking bee in Rockbridge County, Addison Thompson picked up a rock to throw at a dog then accidentally dropped it. George Rowsey put his foot on it and said, "If you put that rock out of the yard I will put you out." Thompson pulled the rock out from under Rowsey's foot and threw it at the dog, and Rowsey stabbed him to death. A similar contest of wills cost Archer Wingo his life on the day of his father's funeral in Amelia County, Virginia. His mother had invited guests to the family home after his father's burial. A number of people demanded more liquor, but young Archer, who had custody of the key to the liquor cabinet, cut them off. Two neighbors ordered him to hand over the key, and when he refused they threw him to the ground and kicked him to death.[57]

Poor and middle-income men were also notoriously touchy around

other people's slaves. Losing face in front of a slave was degrading, and being told by a slaveowner not to touch his slave was a reminder of one's low status. In 1836 in Jasper County, Georgia, Richard Gregory got into an argument in Charles Morgan's store with one of Morgan's slaves and began to beat him. Morgan ordered him to stop, but Gregory ignored him. Another customer, William Nelson, intervened, saying that the slave was too drunk to understand his punishment and that Gregory should at least wait until the slave sobered up. Gregory drew a pistol and shot Nelson. Two years later Jasper County witnessed a similar murder. A slave asked Turner Horton in front of a crowd for a debt he owed. Horton started to beat the slave with a stick, but the slave's owner, Joseph Harrison, ordered Horton to stop. Horton kept beating the slave, so Harrison beat Horton with a stick, compounding his humiliation. That Sunday Horton cornered Harrison at a church service and shot him through the heart.[58]

Even when poor and middle-income whites competed against each other in games of chance or strength, there was potential for serious violence. Men who were eager to prove themselves found losing hard to stomach. Whites killed each other over who was the best at wrestling, who was the best at cards or pitching dollars, who had won more money. The same adversarial psychology led to an increase in homicides over economic disputes. William Johnson, a free black barber from Natchez, Mississippi, wrote a list in his diary of the material causes of murders among whites in that town: "a Barrell of oysters," "Cattle," or "Something about a 20 c[en]t Hat."[59]

Petty disputes had led to homicides in the eighteenth century in the North as well as the South, of course, but the chances of being killed because of a petty squabble were far higher in the slaveholding South in the early nineteenth century because of the changes the Revolution had wrought. It created a struggle for status and preferment that poor and middle-income white men could not win. Petty quarrels took on life-or-death significance. Men became more aggressive and more determined to win respect by dominating others. No one captured this spirit better than Augustus Longstreet. As a judge and a reformer, he was deeply troubled by violence among whites in his native Georgia, but he understood that it grew out of a desperate need for respect. His stories in *Georgia Scenes,* published in 1835, captured the braggadocio of men in the Georgia-Carolina upcountry. They could "knock out the

bull's eye" and take any man in a fight, and they ridiculed men who didn't measure up.[60]

The same antagonistic, belligerent spirit was apparent among public men in the slaveholding South. Unlike their northern counterparts, they continued to duel (or kill in ambush) their social and political rivals long after the two-party system took shape and institutionalized political conflict. They murdered one another over insults, slights, or revelations of embarrassing truths. As would-be seigneurs, they had trouble coping with democratic politics. They were used to dominating people and having others defer to them. Such expectations had not posed a problem in the mid-eighteenth century, when the social and political hierarchy was fairly stable and their place in it secure. Except for attacks during the Revolutionary War they had faced no serious challenge since the late seventeenth century, and they had seldom been subjected to public attacks. After the Revolution, however, challenges both real and imagined came from every corner.[61]

Public men with the loftiest political ambitions were the most likely to fight, since they needed to preserve their standing and protect their reputations. When William Crawford, the future U.S. senator and secretary of the Treasury, was an aspiring young politician in Georgia, he was asked by a group of speculators to join their latest venture. He wanted nothing to do with these men, who had been involved in the Yazoo scandal, so he spurned their offer publicly. Peter Van Allen, one of the speculators, challenged Crawford to a duel. Crawford killed Allen and became a political star.[62]

The South produced hundreds of similar stories. John Hampden Pleasants, the former editor of the Richmond *Whig,* became incensed when an essay in the Democratic Richmond *Enquirer* insinuated that he was an abolitionist. The charge stung because Pleasants had in fact supported gradual emancipation briefly in the wake of Nat Turner's rebellion and had published letters from Whigs who thought that slavery hurt Virginia's economy. Yet the *Enquirer*'s editor, Thomas Ritchie, had done much the same by publishing an even-handed account of the legislature's 1832 debate on emancipation. Now Ritchie wanted to claim that he and the Democrats had always been rock-solid in their defense of slavery. Pleasants denied that he was an abolitionist and said that he would like to see "some abolitionist leaders hanged." But with his reputation and his party's standing at stake, he had to chal-

lenge the author of the essay, Thomas Ritchie Jr. (the son of the *Enquirer*'s editor) to a duel. Pleasants was mortally wounded. As he lay dying, he lamented the southern obsession with reputation. "What a damned immolation this is to be our slaves to public opinion."[63]

The widely reported duels involving Henry Clay, Andrew Jackson, and John Randolph attest to their popularity among gentlemen with high aspirations. Few men from the backcountry engaged in duels. Duelists were primarily from cities, large towns, or county seats. They followed the rules of the *code duello*, codified for the English-speaking public by Anglo-Irish gentlemen in 1777 and adopted in the United States with some modifications. Usually they claimed to have resorted to violence only after exhausting all other options. Abiding by the rules demonstrated, at least in their own eyes and in the eyes of most fellow southerners, that they were men of restraint as well as passion, of civility as well as courage, tolerant men who nevertheless would not hesitate to cane or kill a man for an affront. Their code of behavior conflated the ideal qualities of statesman and slavemaster in a society that was at once elite-dominated and democratic, and it helped to legitimize slaveowners' mastery of society and politics.[64]

Many gentlemen, however, especially those with less lofty political ambitions, were not interested in following the rules of the challenge and simply went after each other in the street. McQueen McIntosh and Colonel John Hopkins, who were feuding in the local newspapers, ran into each other in Darien, Georgia, pulled out their pistols, and fired away. Hopkins was wounded; McIntosh died. Major John Cooper of Hampton, Virginia, and Thomas Allen, Esq., of York County were parties to a local feud about a school. Allen, who was visiting Hampton for the day with his family, had his two small sons in tow when he ran into Cooper. They exchanged harsh words, and Cooper pulled out his pistol and shot Allen as his children screamed for help.[65]

These killings reflected the persistent difficulty that southern political leaders had in coming to grips with the unruliness of political competition in postrevolutionary America. But the carnage extended well beyond the public realm. Young gentlemen imitated their elders and challenged friends who insulted them or gossiped about them or beat them at card games. They accused them of being "damned liars" or "cheats" or "rogues" and demanded that they fight or be labeled cowards. Some of them even challenged teachers who criticized their work

in class. Since the code dictated that men did not have to respond to inferiors, teachers merely had such students expelled.

Some men enjoyed intimidating people and killing those who refused to do their bidding. A farmer and his family were driving their sheep down a road near Florence, Alabama, when a man rode up and demanded that they make way. The road was too narrow for the farmer to turn his flock aside, so the man rode into the farmer's flock "and caused him some trouble to keep it together." The farmer shouted that he would throw a rock at the man if he did not stop. The man ignored him, so the farmer threw a rock. The man dismounted, went into a nearby store, came out with a gun, and shot the farmer. Then he got out his Bowie knife and stabbed him through the heart.[66]

The South swarmed with men who prided themselves on giving in to such violent impulses. Colonel Alexander McClung killed more than a dozen men during his lifetime. As a young man he fought a number of duels, and while he was in the army he killed a person in a duel. After moving to Vicksburg, Mississippi, he got into a feud and killed seven members of a local family. He also killed people frequently on the streets and in taverns. Even his friends shrank from him when he was angry. Yet southerners admired him for his hair-trigger temper and, in the belief that there was something noble about his willingness to kill people who offended him, gave him the sobriquet "the Black Knight of the South."[67]

Men like McClung were the South's conquering heroes. As Longstreet said, "the bully of the county never wants friends," and the more famous the bully, the more friends he had. A number of men like McClung, who were known to have killed men who crossed them, won seats in Congress or their state legislatures: William Yancey of Alabama, Louis Wigfall of Texas, George Tillman of South Carolina. McClung could have been successful in politics too, but he ran for Congress as a Whig in a Mississippi district where being a Democrat was an essential qualification. Longstreet was philosophical about the southern proclivity for electing violent men. He compared southern politicians to hounds that all "jump on the undermost."[68]

It is no coincidence that the culture that condoned this conduct also condoned vigilantism. Southerners admired men who were a law unto themselves. The citizens of Thomas County, Georgia, were plagued by criminals who crossed the nearby state line from Florida Territory to

burglarize homes and steal horses. They decided to take matters into their own hands. Anyone who was caught sneaking across the state line at night was shot on sight. After yet another body turned up, a circuit court judge instructed the county's grand jurors to indict the vigilantes. Instead the jurors used the occasion to express their appreciation for a job well done: "We have taken under our serious consideration the inquest upon the body of Mack M. Glass and after making diligent inquiry, we are decidedly of the opinion that the killing of him was a praiseworthy action and that the persons concerned therein are entitled to the thanks of the county for their conduct in executing the laws." Similarly, vigilantes in Vicksburg, Mississippi, decided they had had enough of the riverfront gaming industry. They armed themselves and set out to tear up all the gambling establishments. When some of the gamblers resisted and killed one of the attackers, the vigilantes were infuriated. After overpowering the gamblers they hanged five of them, then gave four others 1,000 lashes each and set them adrift on the Mississippi.[69]

This kind of collective violence was not confined to the plantation South, but it was probably two or three times more common there than in the rural North or the mountain South, and far more deadly. Vigilantism was especially pervasive in the lower Mississippi Valley and on the Gulf Coast. The wealth created by the cotton, sugar, rice, and real estate boom of the 1820s and 1830s attracted gamblers, robbers, horse thieves, slave stealers, and confidence men eager to profit from the region's success. These criminals hid out in swamps and woodlands, traveling up and down the Mississippi River, sailing around the Gulf, and crossing state lines. Vigilantes were confident that they could do a better job at catching these people than law-enforcement officials, since they knew the terrain better and could cross state lines at will; they had few qualms about taking over the law's role and lynching suspects who fell into their hands.[70]

Southerners had a tradition of ruthless vigilantism that went back to the Carolina Regulators and the Revolution. They were accustomed to acting on their own and ignoring the constraints imposed by the legal system. This tradition had been reinforced by slavery, since neighbors often had to band together to patrol the roads for runaways. Like patrolling, vigilante action could also be exciting, especially for young men. They got to saddle up and ride out with friends, often at night,

and some of them took pleasure in the suffering and humiliation of victims. Murderers elsewhere in the United States were certainly capable of sadistic violence, like the members of the Philadelphia mob who castrated a black man and raped a black woman during the Flying Horse Riot of 1834.[71] But northern whites rarely tortured other whites. Their peers in the slaveholding South practiced almost every form of sadism on whites, from eye gouging to castration to slow suffocation. The only torment they reserved solely for blacks was burning.

Southern humor in the postrevolutionary period reflected this propensity to cruelty. The plantation South had its share of ironists, like Longstreet, but its humor—of both the published and the everyday variety—more often than not involved physical suffering and humiliation, whereas northern humor specialized in poking fun at pretentious or self-righteous people.

The Tennessee humorist George Washington Harris wrote stories about a young man named Sut Lovingood, who was mean and proud of it. When the family's horse died and his father had to pull the plow himself, Sut thought it "wer pow'ful inturestin, an' sorter funny." He laughed uproariously when his father ran into a hornets' nest "es big es a hoss's head." He also found humor in the death of the kindly Mrs. Yardley. He broke up a quilting bee at her house by tying a line hung with quilts to a skittish horse and setting the horse off with a whack from a fence post. The horse "run plum over Missis Yardley," whose "heart stop't beatin'." Sut thought that was hilarious, but he did help "salt ole Missis Yardley down" afterward so that she could "rotten cumfurtably."[72]

Southern letters from the antebellum period abound with wry comments about victims of murders and brutal assaults. One Virginian described how his friend, John McDermott, had murdered an elderly man: "He sent the poor old fellow to the other country, both drunk and with a pain in his belly, that being the place where John's knife made acquaintance." A South Carolinian spoke of his delight at beating a man and making him beg "like a negro" for mercy. Others recalled with amusement seeing men who had lost an eye or an ear in a fight.[73]

Of course, whites in the slave South were not of one mind when it came to bullying, cruelty, and murder. Many did speak out against the rising tide of murder among whites. Laws against dueling passed

in nearly every southern state, and antidueling societies formed in Charleston, Savannah, Vicksburg, and other hotbeds of murder; but they had no impact on dueling or on the murder rate as a whole. Antidueling laws were never enforced, and antidueling societies had trouble even getting their own members to honor their pledges.[74] Some humorists, like Longstreet, tried to discourage violence by poking fun at men with violent tempers and by censuring the bloodthirstiness of those who egged them on, but they were swimming against the tide.

Most southerners wanted to attack the problem of increased violence more directly by outlawing concealed weapons. Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent. The proportion of homicides committed with such weapons is uncertain, since most records did not specify the kind of gun or knife used, but guns and knives accounted for a growing share of the known weapons that whites used to kill other whites. After the Revolution, guns or knives were used in 67 percent of homicides among whites in plantation counties in Virginia, Georgia, and South Carolina. According to contemporary observers, a substantial number of those weapons were pistols, dirks, or Bowie knives, manufactured expressly to kill people.[75]

Proponents of concealed weapons claimed that they were necessary for personal defense. Cassius Clay, who carried pistols and knives for protection against antiabolitionist mobs, said that "when society *fails to protect us,* we are authorized by the laws of God and nature to defend ourselves; based upon *the right,* 'the pistol and the Bowie knife' are to us as sacred as the gown and the pulpit." But opponents of concealed weapons believed that men carried concealed weapons for two reasons: to intimidate others and to seize the advantage in spontaneous disputes. In 1834 the grand jurors of Jasper County, Georgia, denounced "the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shoot-

ing & murdering so many of our citizens." The justices of the Louisiana Supreme Court echoed these sentiments. "Unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries. Those who opposed concealed weapons did not blame them for the slaveholding South's homicide problem, but they understood the psychology of white-on-white violence and believed that concealed weapons made the homicide problem worse by giving bullies and cowards the means to kill anyone they disliked.[76]

Opponents of concealed weapons won the public debate in the South. In an effort to stem the tide of backcountry violence, especially among boatmen on the Ohio and Mississippi Rivers, Kentucky and Louisiana passed the nation's first concealed-weapons laws in 1813. They were joined in the late 1830s by Alabama, Arkansas, Tennessee, Georgia, and Virginia. Whigs and Christian reformers lent the movement its most enthusiastic support in the 1830s and 1840s, but it was extremely popular in most states. It had the support of people who condemned violence outright, but it was also supported by people who believed that there would be fewer deaths if combatants were forced to "fight fair."[77]

Despite their popularity, concealed-weapons laws had no clear impact on homicide rates. They may have discouraged the carrying of handguns and fighting knives, but they were hard to enforce, and they did not address the underlying causes of violence. Men in the North and the mountain South had guns and knives, too, but they rarely used them to kill anyone. Only one free state felt the need for a concealed-weapons law in these years: Indiana, which had been settled predominantly by white southerners. The appeal of violence for men in the slaveholding South—its sporting nature, its excitement, and the opportunity it afforded to prove oneself in front of one's peers—was undiminished, as was the antagonistic spirit that prompted the violence in the first place.

As historian Bertram Wyatt-Brown has observed, a society that was at once a slave society and a revolutionary society could not demand "groveling, obsequiousness, and slavishness" from its freeborn white citizens. It had to give them a chance to prove that they were independent men who could command deference and respect from others. But in a slave society, men had to dominate other men to earn respect, and everyone understood that principle. As a young attorney in Ala-



# GUNS on the Early Frontiers

## A History of Firearms from Colonial Times through the Years of the Western Fur Trade

## Carl P. Russell

90          *Personal Weapons of the Traders and Trappers*

last flintlock model, was made by R. Johnson of Middletown, Connecticut, who contracted to manufacture Army pistols, Model 1836, in the late 1830's and continued production of them well into the 1840's. Excellently designed and well made, the pistol was in demand for civilian use in the later days of the fur brigades. The smoothbore iron barrel is of .54 caliber and is 8¾ inches long. The fore sight and pan are made of brass, but other metallic parts are iron. Metschl observes that in fine finish and shooting qualities the Model 1836 "was nearly the equal of the old-time dueling pistols." [55]

It is not surprising that trappers would adopt the Army guns, especially if they could be acquired at little cost from soldiers who carried pieces for which they were not personally accountable.

The personal pistol of Jedediah Smith, one of the most famous of the mountain men, is shown in figure 15, *c*. In 1831 Smith, Jackson, and Sublette, with Fitzpatrick as a "passenger," went to Santa Fe for a consignment of goods.

Near the present Ulysses, Kansas, while riding ahead of the train to search for water, Smith was lost from view (May 31), and though carefully searched for could not be found. On the arrival of the caravan at Santa Fé, on July 4, it was learned that he had been waylaid by Comanches and killed. His rifle and a brace of pistols had been bought from the Indians by some Mexican traders, who told the story of his death. [56]

The Indians presumably had found it difficult to obtain percussion caps for the weapons and for that reason were willing to part with them. Sabin [57] records that one of Smith's nieces obtained the pistol here illustrated. Dawson's *Catalogue*, 1926, reproduces a photograph of the weapon and reports that it was then the property of Walter Bacon of Los Angeles, Smith's grandnephew. [58]

Smith was a prominent man in the fur brigades, and this pistol would indicate that he armed himself in a manner befitting his station. It is marked by evidences of skilled workmanship, elegance of form, proper balance, and fine finish. The arm is the English duelling-pistol type, well made and, for its time, the *ne plus ultra* in handguns. The percussion system was just coming into general use

*Personal Weapons of the Traders and Trappers*          91

in the more civilized parts of the world at the time of Smith's death, and even then his more conservative contemporaries in the fur fields of Western America clung to the flintlock, which they regarded as the most dependable type of weapon. Other characteristics of this half-stocked pistol mark it as up-to-date for its day. The duelling pistol of 1800 was usually full-stocked, the wood reaching to the muzzle. In the period 1800–1810 the half stock with a rib under the barrel to carry the ramrod came into vogue, [59] and barrels were invariably octagonal throughout, as in the specimen shown in the illustration. About 1820, English gunmakers began to convert the earlier flintlock duellers to percussion and to manufacture new percussion pistols of the same lines and dimension. During the second quarter of the nineteenth century the duelling pistol fell into disuse. [60]

*Multishot pistols.*—The acceptance of the percussion system hurried the development of multishot pistols. Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, [61] but the loose priming powder in the pan of each cylinder constituted a hazard which was never eliminated. Inventors of revolvers were quick to take advantage of the relatively safe percussion system, and both the pepperbox (multiple barrels) and the conventional revolver featuring a series of revolving chambers which discharged into a single fixed barrel were patented in England, France, and the United States in the 1830's. Ethan Allen in 1834 patented the double-action mechanism for pepperbox revolvers in the United States, and the system was well established in Europe at least as early as 1830. [62] The pepperboxes ranged from .26 to .50 caliber and had barrels from two inches to about six inches in length. If these guns were of caliber large enough to do any notable damage to an adversary they were of necessity big and extremely heavy. Even the small-caliber pepperboxes were clumsy, and yet they were far from sturdy in construction. However, they were taken into the West in the heyday of the fur trade, and there was some demand for the peculiar guns right up to the time of the Civil War.

The Allen-Thurber pepperbox as made from 1837 to 1842 is illustrated in figure 16, *a*. It has six chambers and is of .32 caliber. Stamped

Compendium_Spitzer
Page 367

# THE POLITICS OF GUN CONTROL



HASTINGS COLLEGE OF LAW LIBRARY

# The Politics of Gun Control

**Robert J. Spitzer**
*SUNY, College at Cortland*

Chatham House Publishers, Inc.
Chatham, New Jersey 07928

HV 7436
S68
1995

*To Ted Lowi,*
*Mentor, Friend, Bon Vivant*

THE POLITICS OF GUN CONTROL

Chatham House Publishers, Inc.
Box One, Chatham, New Jersey 07928

Copyright © 1995 by Chatham House Publishers, Inc.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior permission of the publisher.

*Publisher:* Edward Artinian
*Editor:* Christopher J. Kelaher
*Production supervisor:* Katharine F. Miller
*Jacket and cover design:* Lawrence Ratzkin
*Composition:* Chatham Composer
*Printing and binding:* R.R. Donnelley and Sons Company

*Library of Congress Cataloging-in-Publication Data*

Spitzer, Robert J. 1953-
    The politics of gun control / Robert J. Spitzer.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 1-56643-022-4. -- ISBN 1-56643-021-6 (pbk.)
    1. Gun control--United States.    I. Title
HV7436.S68    1995
363.3'3'0973--dc20                                        94-46138
                                                              CIP

Manufactured in the United States of America
    10   9   8   7   6   5   4   3   2   1

## About the Author

Robert J. Spitzer is professor of political science at the State University of New York, College at Cortland. He received his Ph.D. from Cornell University in 1980. His books include *The Presidency and Public Policy* (1983), *The Right to Life Movement and Third Party Politics* (1987), *The Presidential Veto* (1988), *The Bicentennial of the U.S. Constitution* (1990), *Media and Public Policy* (1993), and *President and Congress* (1993).

Professor Spitzer has also contributed over fifty articles to a variety of journals and books. From 1986 to 1990, he served as a member of the New York State Commission on the Bicentennial of the U.S. Constitution, and served as chair of the political science department at Cortland from 1983 to 1989. Spitzer has also testified before Congress on several occasions; most recently, he testified in 1994 before the U.S. Senate Judiciary Committee on presidential power.

Compendium_Spitzer
Page 370



*A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.*

—Second Amendment
U.S. Constitution

## 2. The Second Amendment: Meaning, Intent, Interpretation, and Consequences

Any consideration of the gun control debate inevitably turns to questions of the Constitution and the law. That the two are inextricably linked is illustrated by this quotation from the constitutional scholar Lucilius Emery: "The greater deadliness of small firearms easily carried upon the person, the alarming frequency of homicides and felonious assaults with such arms, the evolution of a distinct class of criminals known as 'gunmen'. . . are now pressing home the question of the reason, scope, and limitation on the constitutional guaranty of a right to keep and bear arms."[1] That Emery raised this issue in 1915 underscores the long and important connection between the gun debate and the Second Amendment.

In the more public debate surrounding gun control, the Second Amendment is constantly invoked, especially by gun control opponents.[2] To pick a simple example from publications of the National Rifle Association (NRA), its October 1993 issue of *American Hunter* contained thirty-four references to the Second Amendment or the ownership of guns as a constitutionally protected right. Its November 1993 issue of the *American Rifleman* contained fourteen such references. Various polls have reported that most Americans believe that the Second Amendment protects an individual's right to own weapons. A 1978 poll commissioned by the NRA reported that 89 percent of Americans believe they have a right to own a gun.[3]

25

THE POLITICS OF GUN CONTROL

The Second Amendment warrants detailed treatment for two reasons. First, it is essential as a matter of public policy to know what the law does and does not allow, because public policy springs from and is defined by law. Specifically, does the Second Amendment pose any obstacles to gun controls? If so, what are they? If not, why is the Second Amendment so often cited as a barrier to gun control?

Second, an understanding of the Second Amendment and its consequences is essential precisely because it is a touchstone of the gun debate. In American political discourse, claims to rights abound. Some rights, like free speech and religious freedom, are indeed cornerstones of American life and spring directly from the Bill of Rights. Yet Americans claim a bevy of other rights as well. Some, such as the right to privacy, are deemed to arise from the Bill of Rights, even though privacy is not actually mentioned there. Other rights claims are far less well supported, among them the right to smoke, the right to drive, the right to drink (but not drink and drive), and the right to burn leaves in one's yard. The constitutional scholar Mary Ann Glendon has labeled this phenomenon "rights talk," a reference to "our increasing tendency to speak of what is most important to us in terms of rights, and to frame nearly every social controversy as a clash of rights."[4] This singularly American habit is founded in our historical tendency to view law as the preeminent vehicle for the articulation of American values, the enshrinement of political legitimacy, and our ever increasing emphasis on individual rights. Rights language is "universal, inalienable, inviolable." Rights claims tend to be absolutist; thus, this kind of debate "heightens social conflict, and inhibits dialogue"; it erodes mutual respect, and elevates the individual at the expense of social responsibility.[5] As Glendon notes, these attributes describe the gun control debate as well.

The purpose of this chapter is to assess the meaning and consequences of the Second Amendment. (Because this book is principally concerned with federal gun issues, the chapter does not deal with state court rulings or Second Amendment-like provisions found in many state constitutions.) Only after this assessment can we judge the abundant "rights talk" surrounding the gun control debate. Following up on the social regulatory policy analysis introduced in chapter 1, we would expect the courts to provide a key avenue for definition and change of the issue.

In order to clarify the meaning and consequences of the Second Amendment, we examine (1) the circumstances and thinking that led

26

*The Second Amendment*

to its insertion in the Bill of Rights, (2) its interpretation by the courts, and (3) its connection to the modern gun control debate. In order to accomplish this, we examine political and constitutional history leading up to and including the federal period, incorporating the thinking of the authors of the Bill of Rights; pertinent court cases; and the writings of Bill of Rights and Second Amendment specialists, including standard legal reference works. We then discuss the theories of those who take issue with the verdict of history and law. Above all, the reader should remember that claims to constitutional legitimacy hold special importance in American politics. Sometimes, the claim is even more important than the fact.

## Historic Roots

As discussed in chapter 1, firearms possession was a common and essential part of colonial and frontier life. Settlers found it necessary to band together to provide for mutual defense from foreign armies and hostile Indians. This reliance on volunteer militias, instead of on a regular, standing army was based on two facts of life. First, the emerging American nation did not possess the manpower or resources to raise, finance, supply, or maintain a professional army. Second, Americans shared a profound mistrust of standing armies. This suspicion stemmed from their knowledge of and experiences with standing armies in European history, where with depressing regularity professional armies had subverted or overthrown civilian governments and deprived people of basic rights.

### THE BRITISH HERITAGE

Great Britain had recently experienced such turmoil. For thirteen years in the middle of the seventeenth century, professional military forces under the control of Oliver Cromwell ruled England. The country was, in the words of the great British historian Thomas Babington Macaulay, "governed by the sword" in that "the civil power" was "subjected to military dictation." Under Cromwell's standing army, "the King had been murdered, the nobility degraded, the landed gentry plundered, the Church persecuted."[6]

Only a few years after Cromwell, King James II, a devout Catholic, attempted to promote the cause of "papism" by filling the leading ranks of the army with Catholics, to the exclusion of Protestants. James's oppressive practices in the cause of advancing Catholi-

27

force against intruders and thieves during nighttime hours. On 25 February 1994, an automobile repossessor was shot and killed by and in front of the home of the man whose vehicle he was repossessing for failure to keep up with his car payments. The shooter, Jerry Casey, admitted that he was not acting in self-defense when he killed the repossessor with a .30–30 telescopic rifle, and there seemed little doubt that Casey knew why his Ford truck was being towed away. Even though the repossessor was acting legally, no charges were brought against Casey by the local district attorney of rural Harris County, who argued that state law did and should protect such a use of deadly force by citizens because of its general deterrent value to crime.[34]

A similar circumstance has arisen in Colorado, which enacted a "make-my-day" law in 1985, allowing citizens to use deadly force against anyone who unlawfully enters a dwelling if the occupant believes a crime is being or might be committed. A year after the law's passage, state residents were horrified when a man who shot and killed a young couple and a third person in a neighborhood dispute was held immune from prosecution under the law.[35]

These examples hint at the broader consequences of a population armed with recognized discretion for the purpose of deterring crime. To return to the good guy-bad guy myth, the Texas instance in particular involved two "good guys"—one, a repo man simply doing his job; the other, a citizen without a past criminal record who committed a murder that the state would not prosecute under a law sanctioning wide citizen discretion to use deadly force as a means of deterring and thwarting crime. That more such cases have not arisen in Texas probably reflects a tougher line taken by prosecutors in other, less rural parts of the state.

Even if one accepts the good guy-bad guy myth, the security dilemma underscores the simple lesson, extracted from countless wars over many centuries, that people (and nations) with the best of intentions still find themselves inevitably drawn into escalating arms races and conflicts when they have no overarching government or authority in which to vest the responsibility for public order. The Texas law just described, enacted at a time when the existing government could provide little help to ward off horse thieves, enmeshes American citizens a little more deeply into the security dilemma.

The self-defense question begs the most important issue distinguishing international politics from domestic politics: Americans have a government that possesses the legitimacy, power, resources, and

194

above all obligation to address the crime and related defense problem. Admittedly, a government of limited powers that places great store in individual rights and liberties is also limited in the solutions it can pursue. Such is the price of living in a free society. Yet living under a government means also that the individual accedes to the authority and legitimacy of the state.

As the French philosopher Jean-Jacques Rousseau observed, "Man loses, through the social contract, his natural liberty, along with an unlimited right to anything that he is tempted by and can get. He gains civil liberty . . . which is limited by the general will." A policy that surrenders a significant degree of state police power to individuals pushes society toward, rather than away from, the state of nature.

## Nonproliferation and Arms Control

A rejection of the armed-citizen argument returns us to the original question of this chapter and book, state regulation of guns. Just as some visualize an idyllic world without armies or nuclear weapons, some envision a nation without guns. While some argue on behalf of citizen disarmament, it is clear that a host of practical and other problems all but eliminates the citizen disarmament option, just as world nuclear disarmament can only be considered a "fantasy." The most obvious of these problems is the sheer number of weapons in America, along with the difficulty of tracking and retrieving them. Moreover, the current state of armament among the general population is the product of a long and deeply rooted social tradition that cannot simply be legislated out of existence.

A logical policy framework that balances competing values and preferences between hostile opponents is, to borrow again from international relations theory, *nonproliferation* of new weapons and technologies, combined with *arms control* for existing weapons. Nonproliferation is designed to fend off the proliferation of new, more destructive weapons, based on the assumption that it is far easier and more practical to block the distribution of new types of weapons *before* they flood the market than after.

Such a strategy is justifiable for limiting the criminological use of guns because of the inherent desirability of applying brakes to the domestic arms race, and because the active life of guns used in crime may actually be substantially less than for guns not used in crime.[36]

195

The effort to regulate assault weapons (especially assault-style pistols) falls loosely into this category. Although such weapons have been available, the purpose of regulation would be to stem their distribution before they become more widespread.

Critics of those seeking such regulations have argued that since assault weapons represent only a small percentage of weapons used in crimes, there is no reason to regulate or restrict their acquisition. Yet their destructive capabilities, offensive nature, and superfluousness to hunting and sporting purposes undercut this argument, even if they are never used in crime. The fact that many such weapons are being adopted for criminal purposes simply emphasizes the desirability of applying the nonproliferation principle to assault weapons before they spread further.

The effort in the 1980s to ban armor-piercing bullets (see chapter 5) represents another, more successful effort along these lines. More recently, Senator Daniel Patrick Moynihan (D-N.Y.) has spearheaded an effort to ban hollow-point pistol bullets (except to the police and the military), designed to expand on impact into a sharp-edged, starlike pattern that causes considerable damage to the victim. These bullets were designed for police use because they provided greater stopping power, yet were less likely to pass through the body of the intended target and hit a bystander. Like armor-piercing ammunition, these bullets were designed solely to increase the damage to individuals or targets being shot.[37]

Arms control has played a vital role in limiting the international nuclear arms race. At the same time, it has offered no panacea and has been most important as a means "to avoid the most provocative actions and limit the most provocative weapons."[38]

Applied to gun regulation, the arms-control principle similarly attempts to impose a greater degree of security by controlling guns' deployment, characteristics, uses, safety, and the like. Most recent gun regulation efforts, including those discussed in chapter 5, fall into this category. That is, they are relatively modest measures generally designed to create a greater degree of stability. Even though these measures are, in policy terms, marginal, they make more sense in an arms-control framework, just as international arms agreements may call for only marginal substantive changes yet are still important for their contribution to international security.

Recent efforts to impose more stringent regulations and fees on gun dealers is an obvious and previously overlooked means to im-

pose greater control over the general flow of guns into the national market.[39] While gun control opponents view these and other efforts as simply a prelude to disarmament—and indeed this is certainly the intent of some proponents of gun control—disarmament is a separate and distinct purpose. *The only way to reconcile the fears of control opponents with the efforts of control proponents is to recognize the fundamental distinction between arms control and disarmament.*

To deprive citizens of assault weapons and to make handgun acquisition extremely difficult, to cite two control objectives, are justifiable from a security dilemma perspective. Yet the achievement of these objectives could and should occur only with a concomitant guarantee of ownership protection of traditional hunting and sporting weapons for hunters, target shooters, collectors, and sports enthusiasts. It would mean, for example, that a hunter could use a standard semi-automatic hunting rifle, but not an AK-47. Those inordinately concerned with home protection and seeking a gun for this purpose would need to turn to a shotgun, for example, plus an array of home security devices and techniques, rather than a handgun.

It is obvious that control opponents, and especially the NRA, would recoil from any such agreement, although the NRA would be shrewd to press for, say, exclusive control over mandatory national gun-training programs for all gun owners in exchange for its support of a limited menu of gun regulations. Given the drift of events and changing national demography, the time may come when the NRA and its allies face the prospect of accepting either such an agreement or a more draconian (from their perspective) alternative. One can indeed argue that the hunting/sporting tradition legitimately warrants protection, but no such protective agreement can ignore the multiplicity of gun issues and problems that beset the American consciousness in the late twentieth century.

The theoretical elegance of an arms-control approach to this security dilemma problem is that it provides a structure through which bargaining and accommodation can take place between opposing, hostile interests. It offers no magic solution, but an ongoing process with which both sides can learn to live. That is, it offers a key to the social regulatory paradox.

NOTES

1. See, for example, Martin S. Geisel, Richard Roll, and R. Stanton Wettick, "The Effectiveness of State and Local Regulation of Hand-

# Index

ABM Treaty (1972), 200n. 19
Abramson, Paul R., 134n. 67
Accidents, gun, 74–75, 82
*Adams v. Williams*, 42, 54–55n. 54
Aldrich, John H., 134n. 67
Alexander, Andrew, 175n. 30
Allman, Christopher J., 89nn. 44, 49
Amar, Akhil Reed, 58n. 71
*American Hunter*, 25, 76, 179n. 62
*American Rifleman*, 25, 76, 100, 111, 177n. 45, 179n. 62
Anarchy, 187, 188, 199–200n. 14
Anderson, Elijah, 200n. 14
Anderson, James LaVerne, 20n. 28, 21nn. 33, 35, 50–51n. 13, 128nn. 8, 14, 171n. 2, 172n. 6, 198n. 3
Anderson, Jervis, 132n. 52
Applebome, Peter, 84n. 7
Armies, mistrust of standing, 27, 28
Armor-piercing bullets, 112, 114, 122, 124, 132n. 50, 196
Arms control, 195–97
Arms race, 189, 201n. 29
Arnett, G. Ray, 174n. 24
Asher, Herbert, 135n. 70
Assault weapons, 119, 152–57, 175n. 30, 191, 196

Atherton, Lewis, 21n. 38
AuCoin, Les, 177n. 42
Ayres, B. Drummond, Jr., 129nn. 24, 27, 177n. 50, 203n. 39

Bakal, Carl, 191n. 22
Baker, James, 112
Barone, Michael, 129n. 28
Barringer, Felicity, 137n. 76
Bartolucci, Alfred A., 88n. 38
Beckford, Charlene Bangs, 52–53nn. 32, 33, 34
Behan, Neil, 133n. 59
Bellah, Robert N., 50n. 5
Bennett, Wallace, 173n. 18
Bennett, William, 114
Bentsen, Lloyd, 153, 167
Berelson, Bernard R., 18n. 16
Berke, Richard L., 85n. 10, 137n. 79
Berkowitz, Leonard, 87–88n. 9
Berry, Jeffrey, 109, 131n. 43, 132n. 46
Best, Judith V., 58n. 72
Biersack, Robert, 131n. 41
Billington, Ray A., 11, 22nn. 41, 43, 44
Bill of Rights, 26–27, 35–36, 42–49, 58n. 71
Bikuspic, Joan, 129n. 33

Black, Henry C., 43n. 6
Black, Hugo, 54n. 50
Blackmun, Harry, 55n. 54, 60n. 84
Blair, Claude, 18n. 17
Bliven, Luther F., 86n. 16
Blood, Michael, 129n. 34
Boor, Myron, 89n. 39
Boorstin, Daniel J., 20n. 26, 21n. 33, 50n. 12, 51n. 18
Bordua, David J., 90n. 57
Bowers, William J., 198n. 1
Bowling, Kenneth, 52–55nn. 32, 33, 34
Boyd, Gerald M., 175n. 31
Brady, James, 14, 116, 157
Brady, Sarah, 209, 114, 115, 151, 157, 176n. 41
Brady bill, 1, 14, 23n. 51, 116, 119, 122, 157–63
Branch Davidian cult, 167, 178nn. 60, 62, 190
Brant, Irving, 43, 56n. 61
Brennan, Pauline Gasdow, 137n. 78
Brent, David, 89nn. 44, 48, 49
Brody, Jane E., 89n. 44, 45, 46
Brooks, Jack, 153, 154, 159–60
Brown, Tommy L., 20n. 30, 21n. 32
Bruce-Briggs, B., 77–78, 93n. 68
Bruns, Roger, 53n. 8
Buckley, William F., 162
Bureau of Alcohol, Tobacco, and Firearms (ATF), 6–7, 140, 163–68, 182
Burger, Warren, 42, 52n. 32, 55n. 56
Burrows, William E., 20n. 24
Bush, George, 106, 110, 114, 117, 124, 134n. 67, 152
Butterfield, Fox, 84n. 6
Butterfield, Herbert, 199n. 13

Caplan, David L., 56n. 57, 57n. 67, 59n. 74
Card, J.J., 88–89nn. 33, 39
Carter, Jimmy, 124, 162, 168
Center to Prevent Handgun Violence, 116
Chafee, John, 156
Choate, Julian E., 11, 22n. 42
Church, William C., 99
Citizens Committee for the Right to Keep and Bear Arms, 148, 172n. 5
Clark, Joseph, 105, 129n. 28
Clarke, Ronald V., 88n. 36, 89nn. 39, 40
Clines, Francis X., 85n. 10

Clinton, Bill, 1, 109, 114, 125, 153, 160, 162, 168
Clinton, Hillary, 109, 177n. 45
Clymer, Adam, 176n. 41, 202n. 37
Coalition to Stop Gun Violence (CSGV), 115, 133n. 62
Cohen, Richard E., 130n. 36
Constitution, U.S., 30–33
Constitutional Convention of 1787, 31–32
Consumer Product Safety Commission (CPSC), 18n. 18, 104–5, 110
Cook, Philip, 71, 76–77, 85–86nn. 16, 86nn. 19, 20, 87nn. 23, 28, 88nn. 30, 34, 35, 89nn. 43, 50, 90n. 56, 92n. 61, 93n. 68, 94n. 77
Cooley, Thomas, 43, 56n. 60
Corbin, Robert K., 179n. 62
Corrigan, Richard, 175n. 27
Cortner, Richard C., 57n. 65
Cottrol, Robert J., 57n. 67, 59n. 73, 60nn. 80, 81
Crane, Philip, 57n. 67
Cress, Lawrence D., 59n. 9
Culture, concept of, 19n. 21
Cummings, Homer, 171n. 4
Curvin, Robert, 134n. 64

Daly, Kathleen, 19n. 22, 22n. 48, 85n. 16, 87n. 22, 88n. 32, 89–90nn. 50, 51, 94n. 79, 199n. 9
Dao, James, 198n. 4
Davidson, Osha Gray, 23nn. 50, 51, 83n. 3, 94n. 73, 105, 113, 128nn. 9, 14, 129nn. 29, 31, 32, 132nn. 53, 56, 133nn. 58, 59, 61, 174n. 21, 175n. 26, 178n. 56, 199n. 9
Davis, James W., 128n. 18
Daynes, Byron, 5, 18n. 15, 23n. 54, 98, 127n. 4
Decker, Daniel J., 20n. 30, 21n. 32
Deering, Christopher J., 173n. 13
Defense, 76–79; alternative means of, 81, 83
DeWitt, Karen, 176n. 41
Diamond, Raymond T., 60nn. 80, 81
Dingell, John, 110, 111, 166
Disarmament, arms control and, 196–97
Discharge petition, 146, 149, 174n. 20
Dole, Robert, 148, 156, 169
Douglas, William O., 54–55n. 54
Dowlut, Robert, 59n. 74

*Dred Scott v. Sandford*, 47, 48
Drinan, Robert F., 9211. 64, 9411. 73
Dukakis, Michael, 117, 124, 13411. 67
Duke, Paul, 17311–7411. 19
Dye, Thomas R., 15, 1711. 5, 2311. 52

Eastland, James, 145
Eckholm, Erik, 1911. 23, 8511. 11, 8611.
18, 12911. 26
Edelman, Murray, 65, 8411. 5
Ehrman, Keith, 5011. 11, 5911. 78
Elders, Joycelyn, 65
Emery, Lucilius, 25, 4911. 1
Enck, Jody W., 2011. 30, 2111. 32
Epstein, Richard A., 6011. 80
Erikson, Robert S., 1311. 71
Erskine, Hazel, 13411. 68, 13511. 70
Escalation, pattern of mutual, 192–95
Eskridge, William N., Jr., 5411. 50
Everson, David H., 13611. 71

Farber, Daniel A., 5411. 50
Farrand, Max, 31, 51–5211n. 21–27,
5311. 37
Federal court of appeals, cases of,
5511. 55
Federal Firearms Act of 1938, 141
Federalism, 35–36, 181–83
*Federalist Papers*, 32–33
Federation of the NRA, and Cincinnati
Revolt, 113
Feighan, Edward F., 157, 158
Feller, Peter Buck, 5011. 9
Fenno, Richard F., 17311. 13
Filibuster, 146, 148, 151, 159, 160
Firearms, 6, 27, 5011. 11. *See also* Gun(s)
Firearms Owners Protection Act, 107,
112, 123, 130–3111. 40, 13111. 41, 147–
52. *See also* McClure-Volkmer Act
Fleeman, Michael, 13311. 61
Flexner, James, 5111n. 16, 19
Force Act of 1870, 5411. 48
Ford, Gerald, 123, 162
Foster, Carol D., 13611. 73, 19911. 10,
20111. 27
Fox, James D., 8411. 6
Fox, William T.R., 20011. 16
Fraleigh, Cynthia, 1711. 8, 1811n. 13, 14
Franklin, Grace A., 1811n. 11, 12
Frantz, Joe B., 11, 2211. 42
Frickey, Philip, 5411. 50
Fulbright, J. William, 122

Gaddis, John L., 184, 19911. 8
Gailey, Phil, 1711. 55
Gallup, Alec, 13611. 72
Gallup, George, Jr., 13611. 72
Gallup poll(s), 118–21, 134–3511n. 69–70
Gamarekian, Barbara, 13411. 66
Gates, Daryl, 13311. 59
Geisel, Martin S., 19711. 1
Gephardt, Richard, 153
Gerston, Larry N., 1711. 8, 1811n. 13, 14
Gibbs, Nancy, 8611. 17
Ginsberg, Benjamin, 1711n. 3, 7, 9,
5211. 21
Glendon, Mary Ann, 26, 5011n. 4, 5
Goetz, Bernhard, 12911. 32
Goldman, Peter, 13411. 67
Gotting, Karl L., 5011. 9
Gottlieb, Alan M., 4911. 2
Government: purpose of, 1–2; role of, 3
Government coercion, 3–4
Graham, Hugh Davis, 2011. 24
Grassroots activism, 98
Green, Gary, 90–9111n. 55, 57, 9111. 58
Greenhouse, Linda, 17411n. 22, 23, 24,
174–7511. 25
Gross, Jane, 8411. 4
Gun(s): availability of, 79–80, 83; con-
troversy over, 6–7; debate cycle of,
13–15; influence of, upon Indians,
2111. 37; injuries, 68–69; lifespan of,
20211. 36; as mark of maturity, 8–9;
possession of, as offensive, 190–92;
sources of, 79; state regulation of,
182–83; thefts of, 79; use of, as public
health issue, 65. *See also* Assault
weapons; Firearms; Handguns
Gun control: barriers to, 185–87; oppo-
nents of, 12711. 5; public opinion, 118
Gun Control Act of 1968, 13, 111, 116,
142–47
Gun culture, 7–13
Gun dealers, regulation of, 202–311. 39
Gun ownership, demographics of, 120
Gun Owners of America, 12711. 5, 148
Gun policy, alternatives to, 183–85
Gurr, Ted Robert, 2011. 24

Halbrook, Stephen, 5011. 12, 5611. 57,
5711n. 67, 68, 5811. 71
Hall, Richard L., 13111. 41
Hammer, Marion, 63–64
Handgun(s), 69–70, 82, 140–41, 191. *See*

*also* Firearms; Guns
Handgun Control, Inc. (HCI), 14, 97,
110, 115–16, 126, 150–51, 157
Hanley, Charles J., 17811. 53
Hardy, David T., 5011. 9
Harrington, Michael J., 12911. 23,
13211. 49
Hatch, Alden, 2011n. 27, 29
Hatch, Orrin, 47, 148
Hattori, Yoshihiro, 66–67
Hawkins, Gordon, 1911. 22, 2011. 24
Hays, Stuart R., 5711. 67, 5911. 79
Henigan, Dennis A., 5011. 11, 5611. 57,
5911. 78
Hennard, George J., 152, 17511. 29
Hennessy, Bernard C., 13611. 71
Herbers, John, 17411. 25
Herbert, Bob, 1911. 23, 8511. 11
Herndon, Nancy, 17511. 30
Herrnson, Paul S., 13111. 41
Herz, John H., 181, 188, 20011n. 17, 20
Higgins, Stephen, 167, 17811. 59, 19811. 4
Hilts, Philip J., 8511. 14
Hollerman, Jeremy J., 8611. 21
Hollon, W. Eugene, 2211. 44
Holmes, Steven A., 17411. 21, 17711. 42,
17811. 61
Homicide(s), 68–71, 8811. 31, 186
Horn, Steve, 17611. 35
Houk, Vernon N., 8911. 47, 48
House Judiciary Committee, 144, 146,
153, 159
Howell, John, 9411. 76
Hrebenar, Ronald J., 13211. 45
Hughes, William J., 149, 156–57
Hunt, Leigh, 74
Huntington, Samuel, 2, 1711. 4
Hyde, Henry, 153

Ifill, Gwen, 17611n. 37, 39, 17711. 42
Incorporation, 43, 5411. 50
Inouye, Daniel K., 148
Institute for Legislative Action (ILA),
105–6. *See also* National Rifle Asso-
ciation (NRA)
Interest groups, 151, 169–71
Interstate Commerce Commission, 5
Ippolito, Dennis S., 13711. 83

Jackson, Robert, 17211. 4
Jacobs, Andrew, 154
Jacobs, Nancy R., 13611. 73, 19911. 10,

20111. 27
Japan, and U.S. gun habits, 8411. 8
Jehl, Douglas, 17611. 32
Jensen, Merrill, 30, 5111. 17
Jervis, Robert, 188, 193, 20011n. 18, 24,
26, 20211. 33
Johnson, Dirk, 19811. 5
Johnson, Lyndon, 143, 146–47
Jones, Charles O., 17311. 13
Jones, Walter S., 20011. 21

Kassebaum, Nancy L., 156
Kates, Don B., 5711. 66, 5911. 74
Keller, Bill, 12811. 16, 13111. 42, 17711. 50
Kellerman, Arthur, 8811. 37, 8911n. 39,
41, 92–9311n. 65, 66
Kellert, Stephen, 1
Kennedy, Edward, 145, 148
Kennedy, John F., 78, 110, 111, 142
Kennedy, Robert F., 13, 111, 144
Kennett, Lee, 2011. 28, 2111n. 33, 35,
50–5111. 13, 12811n. 8, 14, 17111. 2,
17211. 6, 19811. 3
Kerasote, Ted, 20–2111. 31
Kessler, Ronald, 17811. 60
Ketchum, Ralph, 6111. 85
Key, V.O., 13511. 71
King, Martin Luther, Jr., 13, 111, 144
King, Wayne, 13411. 65, 17711. 47,
17811. 59
Kirby, Andrew, 19911. 7
Kleck, Gary, 76, 8611. 20, 8711. 26,
8811n. 30, 32–34, 8911. 39, 9011n. 51,
54, 57, 91–9211n. 57, 59, 60, 65, 94–95
n. 80, 135–3611n. 70–71, 20111. 31
Kleege, Stephen, 132–52
Knutson, Lawrence L., 13611n. 72, 74
Koop, C. Everett, 65
Kopel, David B., 1911. 22, 134–3511n. 69
Koresh, David, 17811. 60
Kraus, Jess F., 8511. 13
Krauss, Clifford, 17511. 29, 17611n. 33, 41
Kruschke, Earl R., 5511. 55

Labaton, Stephen, 17811. 60
Lacayo, Richard, 13011. 38
Lane, Gordon, 63
Langbein, Laura I., 130–3111n. 40–41,
17111. 27
LaPierre, Wayne, 107
Larson, Erik, 17811. 51
Layton, Frank, 40–41

Leddy, Edward F., 128n. 10
Lederman, Susan S., 137n. 82
Leff, Carol Skalnik, 127–28n. 8, 171n. 2, 172nn 4, 5, 6
Leff, Mark H., 127–28n. 8, 171n. 2, 172nn. 4, 5, 6
Lennon, John, 115
Le Page, Anthony, 87–88n. 29
Lester, David, 88nn. 36, 38, 89nn. 39, 40
Levin, Jack, 84n. 6
Levin, John, 56n. 57
Levinson, Sanford, 58n. 71
Lewis, John, 155
Lewis, Neil A., 128n. 11
Light, Paul C., 172n. 9
Lilley, William, III, 18n. 13
Lindgren, James, 94n. 75
Lizotte, Alan J., 137n. 78
Loftin, Colin, 90n. 53, 198n. 1, 201n. 30
Lotwis, Mark A., 130–31n. 40, 175n. 27
Lowi, Theodore J., 3, 15, 17nn. 3, 7, 9, 11, 18n. 12, 23n. 53, 52n. 21
Lund, Nelson, 54n. 52, 56n. 63
Luttbeg, Norman, 136n. 71

McAndrew, Mike, 202n. 39
McAneny, Leslie, 137n. 75
McClure, James, 147
McClure-Volkmer Act, 150–52. *See also* Firearms Owners Protection Act
McClurg, Andrew Jay, 126n. 1
McDowall, David, 90n. 53, 94n. 75, 137n. 78, 201n. 30
McElrath, Karen, 87n. 26, 88n. 30
McFarland, Andrew S., 130n. 37
McGrory, Mary, 177n. 50
McGuigan, Patrick B., 133n. 61
McIver, Mary, 199n. 7
McPhee, William N., 18n. 16
McPherson, James, 54n. 47
Magaddino, Joseph, 94n. 76
Mahon, John K., 21n. 34, 51nn. 15, 19, 52n. 31, 53nn. 38, 39, 40
Maisel, L. Sandy, 127n. 6
Malbin, Michael J., 131n. 41
Malcolm, Andrew H., 199n. 11, 202n. 32
Mann, Thomas E., 135n. 70
Markush, Robert E., 88n. 38
Marshall, Thurgood, 55n. 54
Martin, Luther, 33, 52n. 33
Masters, Brooke A., 128n. 18
Mathews, Tom, 134n. 67

Matlack, Carol, 129n. 35, 132n. 54, 133 n. 59
Matthews, Douglas, 129n. 28
Mauser, Gary A., 134–35n. 69
Mearsheimer, John, 200n. 25
Medoff, Marshall H., 94n. 76
Meese, Edwin, 150, 166
Meier, Kenneth J., 171n. 1
Mercy, James A., 89nn. 47, 48
Metzenbaum, Howard, 111, 148, 157
Militia(s), citizen, 10, 30, 35, 37
Militia Act of 1903, 37–38, 99
Miller, Jack, 40–41
Miller, James C., III, 18n. 13
Mitchell, George, 159, 160
Mohr, Charles, 175n. 31
Molinari, Susan, 177n. 42
Moore, Mark H., 94nn. 72, 74
Moore, W. John, 133n. 62
Moriarty, Michael, 83n. 1
Moynihan, Daniel Patrick, 196
Mydans, Seth, 176n. 35

National Board for the Promotion of Rifle Practice, 99, 101
National Coalition to Ban Handguns (NCBH), 102, 115
National Council to Control Handguns, 134n. 63
National Crime Survey, 76, 91–92n. 60
National Defense Act of 1916, 38, 101
National Firearms Act of 1934, 40–41, 141
National Guard, 37–38, 53n. 45, 54n. 46
National Rifle Association (NRA), 14; antiregulation movement of, 142; background of, 99–100; on Brady bill, 157; campaign costs of, 150; and gun industry, 103–5; influence of, 100–103; and government subsidies, 100–103; and gun industry, 103–5; influence of, 100–103; Institute for Legislative Action of, 97, 105–6; Legislative Division of, 141; member incentives of, 107–10; and police organizations, 133n. 59, 151; and political invincibility myth, 116–17; preemption efforts of, 183; purpose of, 131–32n. 44; and Second Amendment, 25; and self-defense issue, 76; as single-issue group, 99–100; strategy of, 170–71; tax-exempt entities of, 103
Naval militia, 54n. 46

Newport, Dr. Frank, 136n. 72
Newton, George D., 94n. 76
*New York Times*/CBS News poll, 69, 119, 137n. 80
Nixon, Richard, 67, 104, 110, 123, 162
Nonproliferation, and arms control, 195–97
Nossiter, Adam, 84n. 8
NRA-PAC, 106–7

O'Brien, John, 83n. 1
Omnibus Crime Control and Safe Streets Act of 1968, 55n. 54, 143–44
Order, as governmental purpose, 1–3, 190
Orren, Gary R., 135n. 69
Orth, Franklin, 113
Oswald, Lee Harvey, 78, 93n. 69, 111

Parker, Robert N., 88n. 31
Peairs, Rodney, 66–67
Perper, Joshua A., 89nn. 44, 49
Perry, Richard L., 51n. 14
Pfeffer, Cynthia, 89n. 44
Phillips, Llad, 94n. 76
Pierce, Glenn L., 198n. 1
Political parties, 98–99, 122–25
Polsby, Daniel D., 87n. 24
Pomper, Gerald M., 122, 134n. 67, 137n. 82
Powers, Richard Gid, 179n. 63
Pratt, Larry, 93n. 70
President, 140, 143, 169, 172n. 8
*Presser v. Illinois*, 39–40, 47, 56n. 60, 58n. 71
Public Citizen's Congress Watch, 130n. 39
Public opinion, 98; on gun control, 118; issues in, 18n. 16
Public policies, kinds of, 4

Rauber, Paul, 128n. 19
Reagan, Michael D., 198n. 2
Reagan, Ronald, 14, 110, 123, 147, 150, 162, 166, 168, 174n. 21
Reay, Donald T., 92–93n. 65
Rebhun, Linda-Ann, 88n. 31
Reckord, M.A., 139
Reinhold, Robert, 83n. 3, 175n. 28
Reiss, Albert J., Jr., 84n. 6, 92nn. 62, 63
Reno, Janet, 109
Richardson, James D., 53n. 42
Riker, William, 53n. 39, 198n. 2
Ripley, Randall, 18nn. 11, 12, 174n. 20

Roberts, Steven V., 131n. 42, 173n. 19
Robin, Gerald D., 88n. 31, 92n. 60
Rodgers, Raymond S., 126n. 1
Rodino, Peter, 148–49
Rohan, Jack, 21n. 36
Rohde, David W., 134n. 67
Rohter, Larry, 198nn. 4, 6, 201n. 28
Roll, Richard, 197n. 1
Rosenberg, Mark L., 87nn. 47, 48
Rossi, Peter, 19n. 22, 22n. 48, 76, 85–86 n. 16, 87nn. 22, 24, 25, 88n. 32, 89–90nn. 50, 51, 90n. 57, 93n. 71, 94n. 79, 199n. 9
Roth, Jeffrey A., 84n. 6, 92nn. 62, 63
Rourke, Francis E., 171n. 1
Rourke, John T., 200nn. 21, 22
Rushforth, N.B., 92n. 65
Russell, Carl, 21n. 37
Russett, Bruce, 188, 200nn. 15, 21, 202n. 38
Rutland, Robert A., 43, 56n. 62

Sabato, Larry J., 126n. 2, 131n. 41
Salamon, Lester M., 18n. 13
Salant, Jonathan D., 130n. 39, 202n. 39
Samaha, Joel, 53n. 35
Sanger, David E., 84n. 8
Sanzone, John G., 198n. 2
Schapsmeier, Edward L., 127n. 7
Schapsmeier, Frederick H., 127n. 7
Schlozman, Kay Lehman, 127n. 3, 130 n. 38, 135n. 70
Schumer, Charles E., 115, 162
Schwab, Robert, 17n. 8, 18nn. 13, 14
Schwartz, Bernard, 51nn. 28, 30
Scott, Ruth K., 132n. 45
Second Amendment, 26–61; and Bill of Rights, 26–27; colonial heritage of, 28–30; individualist approach to, 44–45, 57n. 67; Supreme Court rulings on, 38–42
Second Amendment Foundation, 127n. 5
Security dilemma, 188–97
Seelye, Katharine Q., 176n. 34
Seiden, Richard, 88–89n. 39
Self-defense, 45–46, 75–76, 82–83, 190, 192
Serven, James E., 128n. 13
Shalala, Donna, 85n. 12
Shalhope, Robert E., 57n. 67, 59n. 77, 60–61n. 84
Sheffield, Christopher, 22n. 40

THE POLITICS OF GUN CONTROL

Shenkman, Richard, 11, 22n. 39
Shenon, Philip, 134n. 66, 174n. 25
Sherrill, Robert, 19n. 22, 128n. 16
Shields, Pete, 63, 115, 134n. 63
Siegel, Mark A., 136n. 73, 199n. 10, 201n. 27
Silverman, Jeff, 22n. 46
Single-issue groups, 98, 132–33n. 57
Skowronek, Stephen, 37, 53n. 41
Sloan, John Henry, 88n. 32, 89n. 42, 93n. 67, 198n. 1
Slotkin, Richard, 12, 20n. 25, 22n. 45
Smelser, Neil J., 127n. 3
Smith, Douglas A., 90n. 55
Smith, Steven S., 173n. 13
Smith, Tom W., 22n. 47
Smothers, Ronald, 202n. 37
Social regulation policy, 15–16, 98–99, 140, 143, 169, 184–85
Sorauf, Frank, 131n. 41
Spitzer, Robert J., 17–18nn. 11, 12, 127 nn. 3, 5, 172n. 10, 173nn. 11, 14, 15
Sprecher, Robert A., 93n. 69
Stark, Pete, 128n. 18
Steber, Michael J., 63
Stewart, Jim, 175n. 30
Stone, Jeffrey R., 60n. 80
Stone, Peter H., 129n. 30, 130nn. 36, 37
Sugarmann, Josh, 22n. 49, 103, 128nn. 15, 17, 129nn. 21, 25, 27, 177nn. 47, 49, 178n. 54
Suicide, 71–74, 82
Sunstein, Cass R., 60n. 80

Tatalovich, Raymond, 5, 18n. 15, 23n. 54, 98, 127n. 4
Taubes, Gary, 84n. 4
Tedin, Kent L., 136n. 71
Teret, Stephen, 85n. 13
Tierney, John T., 127n. 31, 130n. 38, 135n. 7
Tonso, William R., 19n. 22
Trefethen, James, 128n. 13

Uchida, Craig D., 90n. 55
Ujifusa, Grant, 129n. 28
Uniform Crime Reports (FBI), 84n. 9, 186
Uniform Militia Act of 1792, 36–37
U.S. v. Cruikshank, 38–39, 47, 60–61 n. 84
U.S. v. Miller, 40, 47, 48, 55n. 54,

60n. 84
U.S. v. Nelson, 55n. 55
Useem, Michael, 127n. 3

Vancouver, Canada, 73
Veit, Helen E., 52–53nn. 32, 33, 34
VerHovek, Sam Howe, 202n. 34
Virginia, 33–35; Bill of Rights of, 29
Volkmer, Howard, 147
Votey, Harold L., Jr., 94n. 76

Walker, Jack L., Jr., 101, 128n. 12
Walker, Thomas G., 137n. 83
Waltz, Kenneth, 187, 199n. 14, 200n. 23
War Revenue Act of 1919, 140
Washington, George, 29, 30, 51n. 19
Wayman, Frank W., 131n. 41
"Weapon instrumentality effect," 70–71, 82
Weapons, 69–70, 82, 102. See also Fire-arms; Gun(s)
Weatherup, Roy G., 50nn. 7, 8, 51n. 19
Weaver, Randy, 178–79n. 62
Weinraub, Bernard, 175n. 31
Weisman, Steven R., 174n. 21
Weissberg, Robert, 93n. 68, 135n. 70
Werner, Leslie Maitland, 177n. 47
Wettick, R. Stanton, 197n. 1
Wiersema, Brian, 201n. 30
Wilcox, Clyde, 131n. 41
Will, George, 128n. 18
Williams, David C., 58n. 71
Wilson, James Q., 18n. 13, 108, 109, 131–32nn. 43, 44
Wintemute, Garen J., 85n. 13, 90nn. 51, 52
Wolfers, Arnold, 199n. 13
Wolff, Craig, 198n. 4
Woll, Peter, 171n. 1
Wootton, Graham, 122, 130n. 38, 135 n. 70, 138n. 81
Wright, James D., 19n. 22, 22n. 48, 49n. 3, 76, 80, 85–86n. 16, 87nn. 22, 24, 25, 88n. 32, 89n. 50, 89–90n. 51, 90n. 57, 93n. 71, 94n. 79, 199n. 9
Wycoff, James, 21n. 37

Yates, Douglas, 171n. 1

Zimring, Franklin E., 19n. 22, 20n. 24, 80, 86n. 19, 87nn. 21, 27, 89n. 51, 94nn. 76, 78, 171n. 2, 173n. 17

Compendium_Spitzer
Page 378

# The Gun Dilemma

*How History Is Against*
*Expanded Gun Rights*

ROBERT J. SPITZER

OXFORD
UNIVERSITY PRESS

# OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide. Oxford is a registered trade mark of Oxford University Press in the UK and certain other countries.

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America.

© Oxford University Press 2023

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, without the prior permission in writing of Oxford University Press, or as expressly permitted by law, by license, or under terms agreed with the appropriate reproduction rights organization. Inquiries concerning reproduction outside the scope of the above should be sent to the Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Library of Congress Control Number: 2022936391

ISBN 978-0-19-764374-7

DOI: 10.1093/oso/9780197643747.001.0001

1 3 5 7 9 8 6 4 2

Printed by Integrated Books International, United States of America

Conte
rooted
history
This is
gun ri
the de
standa
landm
2008.
recept
of ver
in par
doctri
fealty

In *Th*
exami
in the
assaul
silenc
displa
Amen
the in
this d
recorc
and ei
may v
Court
histor
straitj
inforn
how t

By uti
explor

CONT

12                        THE GUN DILEMMA

in other Southern states.[50] The white reaction, predictably, was to respond
with a variety of their own organizations, including armed organizations, the
most notorious of which was the Ku Klux Klan. Groups like these disarmed,
intimidated, and sometimes killed the Black Militia forces, among others.[51]
The lesson of this experience was as predictable as it was depressing. The fun-
damental problem in the post-Civil War South was not that Blacks were de-
prived of arms (or didn't have enough arms), but that they were deprived of
all rights, especially as Reconstruction came to an end and Jim Crow took
hold. All rights for Blacks were under attack: free speech, lawful assembly, ac-
cess to fair hearings before local magistrates, protection by local governments
(as opposed to the intimidation and harassment by local governments that
they faced), the right to vote (despite the Fifteenth Amendment), and more.
Historian Saul Cornell addresses this issue in a slightly different, although
insightful, way. In his extensive analysis of post-Civil War gun laws, he refers
to the "false historical narrative" that "Reconstruction-era Republicans op-
posed gun regulation because it was inherently racist and aimed at disarming
Blacks." Racist supporters of the notorious "Black Codes" in the South did
promote gun laws to keep guns from Blacks among many other such ra-
cially targeted laws, but Republicans promoted "racially neutral gun control
measures" aimed at improving public safety in an effort to "demilitarize the
public sphere, to restore order and empower freed people to participate in
civic life, most importantly elections."[52] Gun laws enacted by Republican-
dominated state legislatures during this period were not racist. Their over-
arching goal was to improve public safety and protect the rights of Blacks
and Republicans, including the right to vote, without fear of violence. When
Reconstruction ended and white segregationists reasserted control over state
and local governments, ushering in the era of Jim Crow, laws of every sort
were administered in a way to insure white racist hegemony.[53]

Second, for American Blacks, the prospect that ultimate or final self-
defense and safety in society could or can be effectuated outside of peaceful
legal remedies in a race-based armed conflict is one that finds no historical
or logical support. From the Colfax, Lousiana massacre of 1873 to the Tulsa,
Oklahoma race massacre of 1921—instances where Blacks were armed and
tried to protect themselves from attack by whites—the result was Black an-
nihilation. In the case of Tulsa, for example, the appearance of Black armed
defenders, including World War I veterans, provided the excuse for an
escalating white armed response.[54] As one analysis notes about the post-Civil
War period: "Extralegal violence and repression were pervasive responses to
Black freedom and citizenship."[55] Had Blacks during this period been able to

mount a stronger armed response, the ultimate result would have been more killing, more death, but with the same eventual outcome: white dominance and rule. One can find instances where armed Blacks did successfully protect themselves from violent whites, but such instances provide no comfort to any notion that widespread arming of Blacks was somehow a solution to the over-arching denial of the right of personal self-defense or equal citizenship in the post-Civil War segregationist South.[56]

Third, the right of personal self-defense is deeply embedded in American law. It long predates the Second Amendment and was never dependent upon it. It is found in the criminal laws of every state and the common law tradition, has existed in America for hundreds of years, and is traceable back to the British legal tradition from the Middle Ages.[57] This common law right can be added to the list of those made mostly unavailable to American Blacks in our history.

## *Justices Joining with Thomas*

Even as Thomas has led the charge for expanding Second Amendment rights, he has not marched alone, as witnessed by Gorsuch and Kavanaugh's agreement in two of the prior cases. In fact, political scientist Matthew J. Lacombe says that President Trump's nomination of "pro-gun" judges Kavanaugh and Gorsuch, "whom the NRA publicly supported—were seen by many as rewards for the organization's efforts."[58] Amy Coney Barrett was also endorsed by the NRA. In his 2010 majority opinion in *McDonald v. Chicago*, Justice Samuel Alito accused the defendants of asking the court "to treat the right recognized in *Heller* as a second-class right,"[59] even though the right had been established two years earlier and was now being applied to the states in *McDonald.* This theme of the Second Amendment as abused orphan would appear often in the years after this case.

Another case prompted Alito to express his displeasure with existing Second Amendment application. It came in a dissent he authored, joined by Gorsuch and Thomas (with the exception of one portion). This 2020 case, *N.Y. State Rifle & Pistol Association v. City of New York*,[60] involved a challenge to an arcane New York City gun law that barred the transport of firearms whose owners possessed premises licenses (i.e., a permit to have a gun at home, not a carry license) to a second home or shooting range outside of the city. The Supreme Court granted certiorari, a fact that was widely and immediately recognized as "the biggest guns case in over a decade,"[61] meaning one that might be used by the now more conservative majority to repeal gun

laws and expand gun rights. But the city changed the law to accede to the complaints against it. This prompted the court to render the case moot (that is, there was no longer a live controversy justifying judicial action).

Kavanaugh voted with the court majority to dismiss on the grounds of mootness, but he separately opined: "I share Justice Alito's concern that some federal and state courts may not be properly applying Heller and McDonald. The Court should address that issue soon."[62] Alito's lengthy and testy dissent objected that New York's repeal of the law in order to head off the legal challenge (which conforms to the very definition of mootness[63]) "permits our docket to be manipulated in a way that should not be countenanced."[64] Alito's conclusion was unequivocal: "The City violated petitioners' Second Amendment right, and we should so hold."[65] Had New York not repealed the law, anticipation was widespread that the court's acceptance of the case was the moment gun rights activists were waiting for: a new, even more strongly gun rights-leaning court majority jumping at a chance to further expand gun rights. As was widely noted at the time: "There is little doubt that a majority of the Court believes that the Second Amendment should be read aggressively to strike down a wide range of gun laws."[66]

Both Justices Kavanaugh and Amy Coney Barrett, President Trump's late day appointment to the high court coming a month before the 2020 election, came to the bench with a clear gun rights views consonant with Thomas, Alito, and Gorsuch. In 2011, Kavanaugh served as a judge on the District of Columbia Circuit which heard a follow-up to the 2008 *Heller* case. After losing the case, the District of Columbia wrote a new gun law that barred assault weapons and required gun registration, which resulted in a new challenge in *Heller v. D.C.*[67] (also known as *Heller II*). The D.C. Circuit upheld the new gun law provisions. Judge Kavanaugh issued a dissent in which he argued that even these laws ran afoul of *Heller*: "Our sole job is to faithfully apply Heller and the approach it set forth for analyzing gun bans and regulations. In my judgment, both D.C.'s ban on semi-automatic rifles and its gun registration requirement are unconstitutional under Heller."[68] Despite numerous legal challenges, assault weapons bans, limits on ammunition magazines, and gun registration schemes have been consistently upheld both before and after the *Heller* decision.

Kavanaugh's analysis leaves no doubt that he favors significantly expanding gun rights at the expense of existing gun laws. Seven states plus D.C. have assault weapons bans on the books as of 2021 (the first state to enact a ban, California, passed the law in 1989). But consider existing laws that could be swept aside if Kavanaugh's view prevailed. Ten states plus D.C. restrict large

capacity ammo magazines.[69] The federal government has maintained a system of gun registration for fully automatic weapons since 1934.[70] Over two-thirds of the states at one point or another enacted either gun registration or gun licensing or both, with some having such laws in place today.[71] Whether one agrees or disagrees with these laws, there is no doubt that Kavanaugh's view would have a momentous, disruptive effect on existing and otherwise well-established law.

As for Justice Amy Coney Barrett, she served as a federal judge for the Seventh Circuit U.S. Court of Appeals before joining the Supreme Court in 2020. She also clerked for Justice Scalia. In 2019, she dissented in the case of *Kanter v. Barr*,[72] where the majority upheld the denial of gun rights to the plaintiff Kanter, a man who had been convicted of a non-violent felony. Barrett objected, arguing that the historical record supported her contention that "legislatures did not strip felons of the right to bear arms simply because of their status as felons."[73] Rather, this was done "only to people who are dangerous."[74] Barrett's assertion that non-violent felons are entitled to gun rights is consonant with the conclusion of her dissent that, quoting from *McDonald*, the court majority "treats the Second Amendment as a 'second-class right' "[75] compared to other Bill of Rights protections. In her view, "dangerousness is the Second Amendment's exclusive limiting principle."[76] Barrett "appears to have an even broader view of gun rights than Justice Antonin Scalia."[77]

This leads to two questions. Does post-*Heller* Second Amendment treatment by the courts amount to some kind of mistreatment or denigration of gun rights? And what about the single-minded obsession with Originalism as the prism for ruling on the constitutionality of gun laws as reconciled with gun rights?

## The Second Amendment as Little Nell

It is clear that Justice Thomas and some of his colleagues are unhappy with the way in which Second Amendment rights have been defined since the *Heller* decision. As the previous sections make clear, a voting majority of the current court, as well as some judges in the rest of the federal court system, believe that gun rights have been defined too narrowly. They are entitled to that belief, of course, but their dismay provides no basis for concluding that the amendment has been treated "cavalierly," as "a disfavored right," a "second class right," or as a "constitutional orphan," especially as compared with other Bill of Rights protections. Nothing in post-2008 Second Amendment caselaw warrants these cartoonish labels (thus the reference to "Little Nell"[78] in the

A widely circulated "Modern Sporting Rifle Pocket Fact Card"[27] says that such weapons are "widely misunderstood" because of their cosmetic resemblance to military weapons (even though these are intentional design features). It urges gun owners to use the information on the card and website "to correct misconceptions about these rifles." Among the "corrections" it offers: "AR-15-style rifles are NOT 'assault weapons' or 'assault rifles.' An assault rifle is fully automatic—a machine gun." It adds "Please correct them" if they use the term "assault weapon," claiming further that it "is a political term" created in the 1980s. (As noted above, this assertion is incorrect.)

An article in *Outdoor Life* belied the claim that assault weapons are limited only to those that fire fully automatically. That article, too, urged its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it correctly noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts."[28]

The effort to rebrand "assault weapons" as something more benign and severed from its military origins was seen in the publication struggles of Phillip Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[29] is a well-known reference work on the subject. As Peterson explained, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons. Peterson noted that the origin of the term "assault weapon" was the industry itself.[30] He found that the NRA refused to sell his book until he changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles*.[31] The very same pattern played out in Canada, where gun companies also used the term "assault rifle" in the 1970s and 1980s until political pressure began to build to restrict such weapons in the aftermath of the mass shooting in Montreal in 1989. By the 1990s, Canadian companies and their allies also adopted terms like "modern sporting rifles."[32]

## *The Regulatory History of Semi- and Fully Automatic Firearms*

Mass shootings in the late 1980s and early 1990s raised public concerns about whether to regulate assault weapons. Complicating this call was the fact that, like many other common weapons not modeled after military weaponry, the

guns marketed to civilians fired semi-automatically—that is, firing one round
with each pull of the trigger. Still, California became the first state to enact
restrictions on assault weapons in 1989, shortly after a mass shooting at an
elementary school earlier that year where the shooter used an AK-47 semi-
automatic assault rifle. After several years of pressure, Congress enacted a lim-
ited national assault weapons ban in 1994. Written into the bill was a sunset
provision that called for the bill to lapse in 2004.[33] Congress did not renew
the ban, despite repeated efforts to do so in subsequent years.

Even with the law's limitations, a study reported to the National Institute
of Justice found that assault weapons crimes studied in selected cities declined
at a minimum of seventeen percent in the city with the smallest decline to
seventy-two percent in the city showing the greatest decline during the ban.
In addition, three studies concluded that it reduced the rate of mass shootings
and fatalities, which then climbed after the law lapsed.[34]

As of 2021, seven states (California, Connecticut, Hawaii, Maryland,
Massachusetts, New Jersey, and New York) plus the District of Columbia
ban assault weapons. (Hawaii bans assault pistols only.) Two more states,
Minnesota and Virginia, regulate but do not ban them.[35] Relevant to this dis-
cussion, nine states (California, Colorado, Connecticut, Hawaii, Maryland,
Massachusetts, New Jersey, New York, and Vermont) and D.C. ban high-
capacity ammunition magazines. In 2022, Washington State also enacted a
ban on these magazines. All these states limit capacity to a ten-round max-
imum except Colorado, which puts the limit at fifteen.[36] Yet the regulation
of semi-automatic weapons and ammunition magazines dates not just to the
1980s, but to the 1920s.

## Invention versus Regulation

As researchers and experts of gun history have noted, multi-shot guns existed
in the eighteenth century (with multi-shot experimental designs dating back
as much as two centuries earlier). The example often cited is the Girandoni
air rifle, a gun developed for crack shots in the Austrian army that was ca-
pable of firing up to twenty rounds. One of these was taken along on the
Lewis and Clark expedition of 1804–1806.[37] But such guns were a rarity, as
they were extremely expensive, fragile, and complex, and few were made.[38]
An early multi-shot gun, the "Puckle Gun," developed in the early 1700s,
could fire nine rounds per minute (hardly comparable to the far more rapid
firing capabilities of semi- and fully automatic weapons of the modern era).
It sat on a tripod, was too large and heavy to be used as a hand-held weapon,

and was basically a military weapon.[39] Even this weapon "never advanced beyond the prototype stage."[40] The more well-known "pepperbox," a multi-shot firearm where the number of shots fired coincided with the number of barrels bundled together, found some popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver. The reason: pepperboxes were "heavy, lumpy, and impractical."[41] Indeed, the Colt revolver was "the first widely used multishot weapon."[42]

Colt notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War.[43] The idea of an available, affordable, feasible multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s. Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[44] Even then, Colt could not make a go of manufacturing multishot weapons for many years because he could find no market for them, either from the government or the public. The government, in fact, dismissed such weapons as mere "novelties."[45] After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[46] Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s. The gun made appearances in the pre-Civil War West, but it took the Civil War to finally witness the proliferation of the Colt-type revolver and similar firearms.[47]

Nevertheless, in the *Duncan v. Becerra* case mentioned earlier, both the district court and appeals court made much of the fact that multi-shot guns existed in these early times, including a few capable of firing more than ten rounds. In the words of the appeals court: "After the American Revolution, the record shows that new firearm designs proliferated throughout the states and few restrictions were enacted on firing capacities."[48] This reasoning provided important support for striking down California's ten-round magazine limit. But the problem with this logic is not difficult to discern. It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission because no such regulation was enacted after Benjamin Franklin's experiments with electricity in the mid-eighteenth century. The fact that "firearms designs proliferated"—itself an arguable proposition—tells us nothing about the consequences of such designs for society. And more importantly, the existence of designs does not equal general availability, much less general use of these weapons.

THE GUN DILEMMA

Aside from the six-shot revolver and long guns like the Winchester rifle, very few guns in circulation in the late nineteenth and early twentieth centuries fired anything like ten or more rounds without reloading. Yet the rise in the circulation of multi-shot handguns was accompanied by the rapid spread of anti-concealed carry laws, precisely because of their contribution to escalating interpersonal violence.[49] By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun carry.[50] It was only in the post-World War I era when multi-shot long guns came into criminal use that they became a regulatory and public policy concern.

## The Roaring Twenties and Gun Violence

As discussed in Chapter 1, the 1920s was a time of considerable gun regulatory activity. At least twenty-eight states enacted laws to bar fully automatic weapons from the 1920s through 1934.[51] In 1934, Congress responded by enacting the first significant national gun law, the National Firearms Act.[52] It imposed restrictions on gangster-type weapons like the Tommy gun and other fully automatic weapons, sawed-off shotguns, and silencers.

Aside from prolific regulation of fully automatic weapons at the state and federal levels, however, at least eight (including D.C.), and as many as eleven states enacted laws to restrict or bar all semi-automatic weapons. These laws were enacted between 1927 and 1934. All eleven states also barred fully automatic weapons, often lumping semi-automatic and fully automatic (often referred to as "machine guns" and "submachine guns") under the same regulatory rubric.

For example, a Massachusetts law enacted in 1927 said this: "Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun."[53] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[54] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading.[55] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[56] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[57]

Ohio restricted to permit holders both fully automatic and semi-automatic weapons in a 1933 law, incorporating any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[58] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[59] South Dakota restricted access to machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device."[60] Virginia restricted weapons "of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading."[61] A 1932 law applying to the District of Columbia barred fully automatic weapons, described as those operating "Automatically, more than 1 shot by a single function of the trigger," and semi-automatic weapons "designed to shoot or can be readily converted to shoot . . . semiautomatically, more than 12 shots without reloading."[62] Aside from these eight states, another three—Illinois, Louisiana, and South Carolina—included language that may also have extended regulations to semi-automatic weapons as well as to fully automatic weapons.[63]

## Regulating Ammunition Feeding Devices

As an examination of these old laws shows, restrictions on fully automatic and semi-automatic firearms were closely tied to the regulation of ammunition magazines or their equivalent, as both types of weapons are predicated on some kind of reloading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired. As is the case with contemporary state regulations restricting ammo magazine capacity, all the state laws previously quoted imposed regulations based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

Magazine firing limits were imposed in three categories of state laws (see Table 2.1): twelve states regulating semi-automatic and fully automatic weapons (District of Columbia, Louisiana, Massachusetts, Michigan, Minnesota, Ohio, Rhode Island, South Carolina, South Dakota, and Virginia; New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one

# American Military History

## Volume I



## The United States Army
### and the
## Forging of a Nation, 1775–1917

*ARMY HISTORICAL SERIES*

# American Military History

## Volume 1

## The United States Army

### and the

## Forging of a Nation, 1775–1917

*Second Edition*

Richard W. Stewart
General Editor



MILITARY INSTRVCTION

Center of Military History
United States Army
Washington, D.C., 2009

Library of Congress Cataloging-in-Publication Data

American military history / Richard W. Stewart, general editor. — 2nd ed.
   p. cm. — (Army historical series)
  Includes bibliographical references and index.
  1.  United States—History, Military.  2.  United States. Army—History.  I. Stewart, Richard W. (Richard Winship), 1951– II. Center of Military History. III. Title. IV. Series.

E181.A44 2009
355'.00973—dc22                                                                 2009011595

Revised Edition—First Printed 2005—CMH Pub 30–21

---

For sale by the  Superintendent of Documents,  U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;  DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop SSOP, Washington, DC 20402-0001
ISBN 0-16-072362-0

EMERGENCE TO WORLD POWER, 1898–1902

> ## "I'LL TRY, SIR!"
>
> Company E, 14th Infantry, part of the allied relief expedition to Peking, held a position directly opposite the thirty-foot-high city walls on August 14, 1900. The unit had no ladders or ropes, but the company commander believed it possible to scale the wall using hand holds. He called for volunteers. A young soldier, Musician Calvin P. Titus, said, "I'll try, sir!" Titus, although under fire, made it to the top; the remainder of his company soon followed. It was a critical action toward allowing the allies to force their way into the city and relieve the besieged legations.

Seymour in an attempt to relieve the foreign quarter in Peking. Vastly outnumbered, the relief column failed to reach the imperial capital. Meanwhile, on June 17 coalition warships bombarded the Taku forts guarding Tientsin, the port city nearest to Peking. Regarding both the Seymour expedition and the assault on the Taku forts as hostile acts, the Chinese government declared war on the coalition nations and added its own troops to those besieging the foreign legations. Meanwhile, coalition forces besieged Tientsin, which finally fell to assault on July 13–14—an assault that cost the 9th Infantry eighty-eight casualties when coalition commanders committed the regiment to an ill-considered attack over marshy ground that stalled under heavy fire.

Tientsin's fall opened the way to Peking, and during the following weeks additional coalition troops arrived to create a second relief expedition, this time numbering 19,000 men. The American contribution to this second force, officially titled the China Relief Expedition, consisted of 2,500 soldiers and marines under Maj. Gen. Adna R. Chaffee. On August 4 the multinational force set out for Peking, seventy miles away, in temperatures that exceeded 100 degrees. Since the coalition lacked an overall leader, decisions were made by majority vote in a council of the various national commanders. Coordination between the various contingents was difficult at best and contributed to a friendly fire incident in which Russian artillery mistakenly opened fire on American infantry. Such shortcomings notwithstanding, the expedition succeeded in defeating the Chinese in several sharp engagements and arrived outside of Peking in mid-August.

A final council of war assigned each national contingent a gate to attack along the city's outer walls but agreed to postpone the assault when the Russian commander stated that his troops needed time to recuperate from the grueling march from Tientsin. The agreement was short lived, however, for on the evening of August 13 the Russians stole a march on the rest of the allies and attacked Peking on their own at the gate originally assigned to the Americans. News of the Russian action led first the Japanese and then the American and British contingents to make a mad dash for the city. There, on the morning of the fourteenth, they found the Russians pinned down at the Tung Pien gate unable to make further headway. Soldiers of the 14th Infantry scaled the city's outer wall and cleared the gate, relieving the trapped Russians and opening the way for additional soldiers to pour into the city. Meanwhile, the British penetrated the outer wall at another point and

367

## ARMY WAR COLLEGE

When Secretary of War Elihu Root took office in 1899, the Army lacked a senior service school. The officer corps of what had been scant years before a frontier Army required educational preparation for modern war. Recognizing this need, which his military advisers confirmed, Root in November 1901 directed



that a War College be established. In February 1903 President Theodore Roosevelt and Secretary Root spoke at the laying of the cornerstone for the Army War College building, designed by the prominent architectural firm of McKim, Mead, and White, at Washington Barracks (now Fort McNair), D.C.

*Army War College's Roosevelt Hall, Fort McNair*

relieved the legation quarter. The following day, Capt. Henry J. Reilly's Light Battery F of the U.S. 5th Artillery shattered the gates of the city's inner wall with several well-placed salvos, opening the way for the allied troops to occupy the central Imperial City.

The capture of Peking and the relief of the legation quarter did not end operations in China. The coalition organized a military government in which each nationality was given a section of Peking to govern, while expeditions combed the countryside to root out the last vestiges of Boxer resistance. The American contingent participated in only a few of these expeditions, partly because the United States was anxious to transfer troops back to the ongoing war in the Philippines and partly because it believed that the expeditions, often brutally conducted, did more harm than good. In a few months all resistance had ended, but prolonged negotiations delayed the final signing of the Boxer Peace Protocol until September 1901. Under its terms the Chinese government agreed to pay the coalition members $333 million and to give them exclusive control over the legation quarter with the further right to place troops along the Peking-Tientsin-Shanhaikwan railway to ensure open communications between the capital and the sea.

After the conclusion of peace, the American contingent left China except for a detachment from the 9th Infantry that remained in Peking as a legation guard until 1905 when marines resumed this duty. The Boxer Peace Protocol had long-term implications for the Army, however, for in 1912 the United States decided to invoke its right to station troops along the Peking-Tientsin-Shanhaikwan railway when revolution threatened China's internal stability. Thus began the 15th Infantry's long sojourn in China, duty that would last until 1938 when the United States, fearful of becoming embroiled in Japan's escalating aggression against China, withdrew the garrison after a 26-year stay.

All totaled, some 5,000 soldiers participated in the China Relief Expedition of 1900–1901. Of these, about 250 were killed, wounded,

EMERGENCE TO WORLD POWER, 1898–1902

or died of disease. The participation of the United States in the expedition marked the first time since the American Revolution that the country had joined with other powers in a military operation. The nation's first foray into coalition warfare had not been easy, marred as it was by poor planning, miscommunication, and national jealousies. Suspicious of the motivations of some of its "allies" and desirous of maintaining its freedom of action, the United States refused to put its troops under the command of foreign generals during the conflict. Nevertheless, the intervention in China represented one more instance of America's changing role in world affairs. Although many Americans still believed that the nation could adhere to its historic principles of isolationism, America's growing economic and political interests abroad demanded otherwise. The dawn of the twentieth century had heralded the first stirrings of the United States as a world power; and as events in Cuba, China, and the Philippines had demonstrated, changes would be needed in many long-established institutions and policies to meet the requirements posed by the nation's growing role in world affairs.

## Discussion Questions

1. How did political considerations influence the planning and execution of military operations in Cuba, the Philippines, and China? Do similar considerations influence military operations today?

2. How well prepared was the United States to project power beyond its borders in 1898?

3. What challenges did the U.S. Army face in waging expeditionary warfare at the turn of the century? Do these same challenges remain today?

4. Should the United States have intervened in Cuba at all? Explain your answer.

5. How did the Army overcome guerrilla warfare in the Philippines?

6. What lessons can be derived by studying multinational operations during the Boxer Rebellion?

## Recommended Readings

Birtle, Andrew J. *U.S. Army Counterinsurgency and Contingency Operations Doctrine, 1860–1941*. Washington, D.C.: U.S. Army Center of Military History, 2001.

Cosmas, Graham A. *An Army for Empire: The U.S. Army in the Spanish-American War*. College Station: Texas A&M University Press, 1998.

Gates, John M. *Schoolbooks and Krags: The U.S. Army in the Philippines, 1898–1902*. Westport, Conn.: Greenwood Press, 1973.

Linn, Brian M. *The Philippine War, 1899–1902*. Lawrence: University Press of Kansas, 2000.

Purcell, Victor. *The Boxer Uprising: A Background Study*. Hamden, Conn.: Archon Books, 1974, especially ch. 12.

369

SECOND EDITION

# FROM
# LEXINGTON
## TO
# DESERT STORM
## AND
# BEYOND

War and Politics in the
American Experience

Donald M. Snow and
Dennis M. Drew

*M.E. Sharpe*
Armonk, New York
London, England

Copyright © 2000 by M. E. Sharpe, Inc.

All rights reserved. No part of this book may be reproduced in any form
without written permission from the publisher, M. E. Sharpe, Inc.,
80 Business Park Drive, Armonk, New York 10504.

**Library of Congress Cataloging-in-Publication Data**

Snow, Donald M., 1943–
   From Lexington to Desert Storm and beyond : war and politics in the American
experience / Donald M. Snow and Dennis M. Drew.—2nd ed.
      p. cm.
   Includes bibliographical references and index.
   ISBN 0-7656-0698-4 (alk. paper) — ISBN 0-7656-0699-2 (pbk. : alk. paper)
   1. Politics and war. 2. Sociology, Military—United States. 3. Military art and
science—United States—History. 4. United States—History, Military. 5. Civil-military
relations—United States—History. I. Drew, Dennis M. II. Title.

UA23.S5247 2001
306.2'7'0973—dc21                                                                        00-038783

Printed in the United States of America

The paper used in this publication meets the minimum requirements of
American National Standard for Information Sciences
Permanence of Paper for Printed Library Materials,
ANSI Z 39.48-1984.

∞

BM (c)   10   9   8   7   6   5   4   3   2   1
BM (p)   10   9   8   7   6   5   4   3   2   1

vestiges of racism that continue as part of our social fabric. Certainly "recon-struction" and the harshness by which it was imposed contributed to nurtur-ing hostile will in such visible ways as formation of the Ku Klux Klan under the leadership of the brilliant Confederate cavalry general Nathan Bedford Forrest. The North, itself largely indifferent and even hostile to the freed slaves, did little to ameliorate the conditions of the Negro beyond the formal grant of freedom. White Southerners were punished for their misdeeds, but little was done to rebuild Southern society on the Northern model or to cre-ate prosperity in which all could find substance.

Could reconciliation have occurred in another way? Was there an alternative better state of the peace that would have removed hostile will more quickly and with less resistance? Removed as we are by more than a century from the suffer-ing of the war that gave rise to the spirit of vindictiveness, it is easier for us to see that a reconciliatory peace might have healed the national wounds far faster than was the case. Had Lincoln lived, reconstruction might have been different, or if the war had been shorter and less bloody, there might have been less cause for bitterness. For better or worse, the model of a punitive peace was imposed and would be repeated after the next major conflict in which the United States would participate, World War I.



# 4

# World War I

They called it the Great War. For many it was the "war fought to end all
wars" and, for the United States, it became a war "to make the world safe for
democracy." Battle after battle, campaign after campaign, and year after year
passed inconclusively amid unprecedented carnage, suffering, and destruc-
tion. It was the largest, bloodiest war in human history to that time. Literally
millions were mobilized to fight it, and millions died in the no man's land
between the opposing trenches that scarred the Western Front in virtually
unbroken lines from the Alps to the North Sea. According to demographers,
France would need 66 years merely to recoup the young men who died dur-
ing the war. The war's bloodiest battle claimed 650,000 lives and when it
was over, the lines had scarcely moved. That outcome symbolized the futil-
ity of the fighting generally and helped create an enormous cynicism in those
ordered to fight and die for no apparent reason or effect.

World War I changed the face of Europe and the face of war. The decline of
Europe as the center of Western civilization began during this time and would be
completed 20 years later in the second world conflagration. The once dominant
countries of Europe bled themselves dry of manpower and treasure and thereby
lost the physical wherewithal to control international politics after 1945. Militarily,
the Great War carried the logic of total war previewed in the American Civil War
forward toward its grisly fulfillment in World War II.

Although the United States was eventually drawn into the awful fray, it
was not really an American war. Certainly the issues that gave birth to the
war were, at most, peripheral to American concerns. Moreover, the United
States entered the fighting at an extremely late date. Our contribution to
pushing an exhausted Germany over the brink to defeat, while psychologi-
cally important, was minor compared to the effort of the other combatants.

90

Political scientists, historians, and others have struggled ever since to understand how and why this great human tragedy happened, and there are nearly as many explanations as there are explainers. Because our primary concern is with America at war, it is neither necessary nor fruitful to add to the mountainous literature on what ignited "the guns of August." Rather, we will look briefly at some of the common themes that run through that literature to show some of the flavor of the times that made it all possible.

As the vital center of the international system, Europe had been at relative peace with itself for the century following the Napoleonic Wars. Certainly there had been conflicts. Modern Germany and Italy had been forged on the anvil of war, and Russia had been restrained in the Crimea, but these were relatively short and isolated breakdowns in the structure of international peace. The major themes of European politics had instead been internal, adjusting both politically and economically to the impact of the industrial revolution, coping with nationalism, and witnessing the birth of the German Empire and Italy. This process itself was wrenching and consuming of energy and effort. Such foreign adventurism as occurred centered around colonialism, the subjugation of much of Africa and Asia, where colonial territory was relatively abundant and clashes between aspiring colonialists were infrequent and comparatively mild.

This tranquility between states began to break down around the turn of the twentieth century, and one of the major themes underlying the war emerged. This theme was a more contentious struggle for influence. One reason for the growing contentiousness was that the process of colonizing Africa and Asia was largely complete by the 1890s. After northern Africa fell under European control, there was essentially no place left where a European power could gain influence or control without challenging other powers. Closely related to this struggle for influence, the map of Europe was beginning to redraw itself. Two of the major empires of Europe, the Austro-Hungarian and the Ottoman, were disintegrating under the dual weights of atrophy and resurgent nationalism that had their roots earlier in the nineteenth century. As these empires crumbled, the other powers scrambled for influence in the newly emerging states. The competition focused particularly in the volatile Balkan States, and that area provided the spark that started the war when the Archduke Franz Ferdinand and his wife were assassinated by Bosnian Serb extremists at Sarajevo.

A second theme relates to the unwillingness of the major powers to prevent war once its possibility loomed on the horizon. Some Europeans actually relished the prospect, believing that war would be beneficial and that it would re-create a spirit of discipline in a generation that had not known war and that had grown soft and decadent as a result. While this purifying, mar-

tial view may not have been dominant, it was present. Despite the sentiment of those people and others, the issues that underlay the road to war were clearly inadequate to justify what followed. Yet no one acted decisively to keep it from occurring. When it began, young men rallied willingly to the banner and marched off to war. An embittered generation of widows and veterans, as well as countless analysts, would later ask why.

A large part of the answer was that no one understood the kind of war it would be. There were two visions of modern war available, and the Europeans chose to believe in the wrong one. One model was the quick, decisive, highly mobile warfare of the Franco-Prussian War. The other was the protracted and bloody American Civil War. For reasons of ethnocentrism that suggested the inherent superiority of the highly disciplined European soldier, they rejected the model of warfare based on Helmuth von Moltke's image of the "two armed mobs chasing one another across the countryside" and instead believed the 1866 and 1870 European models more appropriate. Moreover, Germany and France (the two major Western Front antagonists) believed that each could win quickly. In the process, both overestimated their own capabilities and underestimated those of their adversaries.

As the first troops left Berlin in the summer of 1914, the Kaiser promised them that they would be home amidst glory before the first leaves fell from the trees. Instead, the war quickly stalemated, the trenches were dug, and four years were spent in futile frontal assaults against heavy entrenchment, a tactic long since obsolete but all the generals could think to do. To make such tactics all the more futile, machine guns, barbed wire, and poison gas had been added to the defensive advantage. Had the leaders and people on either side possessed a premonition of these horrors, the war might have been prevented. We will, of course, never know.

A final theme that runs through the web of causation is the mediocrity of the political leadership when the war began. The institutional arrangements by which the European powers had moderated their conflicts through much of the nineteenth century, the so-called Concert of Europe, had fallen into disrepair after the Franco-Prussian War (some would argue earlier than that). Diplomatic relations had become personalized around such leaders as the German Kaiser and the Russian Tsar. As the Serbian crisis eventuated in the mobilizations and countermobilizations that greased the slide toward war, what was needed was the leadership, statecraft, and diplomacy of a Metternich, Talleyrand, Castlereagh, or Bismarck, but none was available. The war happened partly because the leaders could not figure out how to avoid it.

Americans watched these events from the sidelines. Although the United States had evolved after the Civil War into the world's largest industrial power (Germany was second), it seemed to be only peripherally involved in the

European-centered international political system. Separated from Europe by a broad ocean, the issues and problems that led to war did not appear greatly to affect American interests, nor did the Europeans have much of a sense that a totally immobilized United States could make any differences in the quick and decisive war they anticipated. Only when the war had dragged on for some time did Europeans peer across the Atlantic and ponder the contribution Americans might make to breaking the stalemate.

The initial American response to the European war was remarkably similar to our early attitudes toward the wars of the French Revolution and Napoleonic Empire a century before. That response was to declare American neutrality, a posture we maintained officially through the election of 1916 (President Woodrow Wilson campaigned vigorously and won largely on the promise of continued American noninvolvement). Also reflecting our reaction a century earlier, we adopted the policy of trading with both sides. As time went by, our trade with the Western Allies increased while trade with the Central Powers declined, but up until the eve of American entrance, the president was still calling for a negotiated settlement based on "peace without victory."

Formal American entrance into the conflict did not come until April 1917, when the hostilities were well into their third year. Other than the psychological lift it may have given the Allies, the declaration of war at that point had little practical effect on the fighting. As had been the case before, the United States entered the war totally unprepared to fight. We had essentially no standing armed forces, and it would take over a year to recruit and train the American Expeditionary Force that took part in the final push to Allied victory. America raised a 1.75 million-man army, but it was not declared fit for nor did it begin to engage in large-scale combat until the summer of 1918, about six months before the armistice.

## Issues and Events

When the war began in Europe, the initial American response was that it was none of our business. Reflecting well-entrenched attitudes and beliefs, most Americans agreed that we should remain aloof from the intramural European struggle and that sentiment prevailed during the early years of combat. This urge to neutrality in part reflected traditional American preferences that dated back to the formation of the republic. Both George Washington in his Farewell Address and Thomas Jefferson in his First Inaugural had echoed the theme that American interests were best served by remaining separate from and uninvolved in the tainted power politics of the old world. "Friendly relations with all but entangling alliances with none" had been US foreign policy for a century. At the same time, America contained sizable popula-

tions of both English and German extraction. It was therefore difficult to ascertain conclusively on which side popular sentiment lay at the outset. Neutrality was a convenient way to skirt the issue, while simultaneously providing the rationale for trading with both sides.

The American attitude was based on a myth (and it can only be described as such) that American destiny can somehow be fulfilled in isolation from the affairs of Europe. This belief was pervasive and did not really disappear until after World War II. Unfortunately, it was a myth based on a historical accident that never had much to sustain it for at least two reasons.

First, the myth was nurtured during an atypical time in European history, a period from the end of the War of 1812 until the First World War. This was a period when there were few major European upheavals. The idea took hold, however, that since the United States had remained above European power politics for nearly 100 years, this was a normal and preferable condition that was also a matter of American choice. Certainly, aloofness made a great deal of sense during the period of state-building that dominated nineteenth-century American history. Such a period lends itself to turning inward and that is what we did. What was missed, however, was that the same processes were occurring in Europe with the same effects. We did not perceive a need for Europe, and the feeling was mutual. However, at each end of the period, the United States became involved in the major European struggles that did occur. The War of 1812 was really only an extension of the Napoleonic Wars, and we eventually became involved in World War I. When the affairs of Europe have affected us and required our participation, we have not been able to avoid the call to arms. The myth could be nurtured only because Europe did not need us for a century.

The second reason was largely economic. As the United States moved to become a major industrial and commercial power during the nineteenth century, our prosperity increasingly required extensive trade with the world. The world's significant markets, of course, were in Europe and access to those markets was vital. As well, the immigrant waves that provided the manpower for industrial expansion came from Europe, and a great deal of the developmental capital that financed industrial growth came from private European banks. Without those sources, our pattern of development would have been quite different, but it has always been a curious aspect of the American worldview that economics and politics can be separated. The two in fact are cut from the same cloth.

The mythology of and desire for political aloofness while retaining commercial ties made neutrality appear attractive. Despite the illusion that the war was none of our concern, there were in fact economic and political issues that would eventually impel the United States into the war.

The economic issue had two essential aspects, one of which was the already mentioned desire to maintain normal commercial patterns with the belligerents. Such a posture was understandable from a sheerly economic viewpoint, but it was untenable politically. The reason, of course, was that both the Central Powers and the Triple Entente wanted trade with them to the exclusion of trade with the other. Although there was some US attempt to be evenhanded in the flow of trade early in the war, the pattern gradually shifted to a much closer relationship with the Western Allies, especially Great Britain. Germany eventually found this pattern intolerable, which helped create the proximate events leading to the American declaration of war. In many ways, the situation was a replay of the problems that had drawn the United States into the War of 1812, except that Germany and not Great Britain would be the enemy.

The other side of the economic coin arose from the prospect of a German victory that looked increasingly probable as German troops previously committed to the Eastern Front began to move to France in 1917 after Russia withdrew from the war. America's prosperity required trade with Europe. The security of that trade, in turn, rested on guaranteed access to European markets and safe, reliable means to get American goods to those markets. A German victory threatened to alter both of those conditions.

A German victory over France would, in all likelihood, ensure that continental Europe would be dominated by Imperial Germany. Since Germany was the chief industrial rival to the United States in many important areas of trade, such an outcome offered the reasonable prospect that Germany would exclude or sharply restrict American access to continental markets.

The defeat of Great Britain would also allow German naval domination in the Atlantic Ocean, and thus posed a threat to open and secure access to the sea-lanes between North America and Europe (as well as presenting a possible future menace to the US homeland). Gradually during the nineteenth century, the United States and Great Britain had reached a condominium ensuring the freedom of the high seas for commercial purposes. By the end of the century, the informal arrangement was that Great Britain enforced that policy in the North Atlantic and the United States enforced it in the Caribbean Sea.

The policy was to the clear advantage of both countries. Both were commercial, mercantile states, and Great Britain had the additional requirement for secure access via the oceans to her far-flung colonial empire. The commonality of interest between the United States and Germany, however, was not so obvious; commercial competition could easily spill over into naval competition for control of the trading routes.

There was an underlying political issue that Americans sought to avoid but could not. After the fall of the Tsar in early 1917 (and especially after the

Bolshevik Revolution resulted in the removal of the new Soviet Union from the war), the contest did, after all, pit the world's major democracies, Britain and France, against the world's major autocracies, Imperial Germany, the Austro-Hungarian Empire, and the Ottoman Empire. In the long run, a democratic United States could scarcely avoid greater sympathy for those who shared our political form over those whose political philosophy was diametrically opposed to our own.

Each of these underlying economic and political factors manifested itself in proximate events that made neutrality progressively less tenable. The economic issue came to a head over German attempts to interrupt the lucrative flow of American war materiel to the Western Allies and specifically focused on the question of unrestricted submarine warfare. The political issue gradually emerged in the depiction of the war as a moral crusade between democracy and autocracy.

The issue of German submarine attacks on Allied shipping, especially on ships carrying American passengers (for example, the Lusitania), became the most volatile issue between the United States and Germany. It was an issue, however, not entirely lacking in irony. That irony involves both the restrictions that were supposed to be placed on submarines in war and the reasons the German navy failed to stress the submarine more in her naval competition with Great Britain.

Anticipating the introduction of this new weapon system to naval arsenals at the turn of the century, the participants at the Hague Convention had attempted to devise and include in the rules of war permissible and impermissible uses of the submarine. The provisions that came into force included requirements that virtually ruled out effective employment of the submarine; before attacking any vessel, the submarine had first to surface, announce its intention to attack, and be prepared to take aboard any and all survivors after an attack.

These were, of course, totally unrealistic requirements that, if adhered to, would destroy the usefulness of the submarine as a naval weapon. One advantage the submarine possesses is the element of surprise, which surfacing takes away. When on the surface, submarines are especially vulnerable to attack, since they carry no effective surface armament. Moreover, they are too small to take aboard more than a few survivors after an attack. Thus the only way to use them effectively was in direct violation of the Hague Convention, and that is precisely what the Germans did. When they did so, they were loudly condemned in the United States for barbaric activity in violation of the laws of war. The result for Germany was thus a classic catch-22. They could use submarines legally but ineffectively, or they could use them effectively but illegally. It was clearly a no-win situation. To make the irony deeper, the Germans were prepared to back down to American objections on the eve

of our entrance into the war, in effect offering to suspend as a matter of policy (it had already been suspended in fact) unrestricted submarine warfare in return for continued American nonbelligerency.

The irony is made even greater because the U-boat was the most effective weapon (actually about the only one) Germany possessed for the naval competition with the British. Because of the influence of an American naval strategist, however, they entered the war with too few of them for decisive effect.

In 1890 the American strategist Alfred Thayer Mahan had published his seminal *The Influence of Sea Power upon History*, which argued the critical importance of control of the seas in warfare, and the book was widely read in Europe as well as America. A central tenet of Mahan's analysis was the need for a large navy with heavy capital ships as the crucial element in naval control and the consequent deprecation of naval strategies emphasizing what he called "commerce raiders," lone marauding vessels whose purpose was disrupting commercial trade routes through the capture or sinking of individual ships. The submarine, of course, perfectly fit Mahan's definition of a commerce raider, and one of Mahan's most ardent students was Kaiser Wilhelm. As a result, German naval development concentrated on the construction of heavy capital ships (in the extreme, the dreadnoughts). Germany was never able during the course of the war to get its fleet of these large ships out of the North Sea. At the same time, the Germans neglected the construction of submarines, which were able to escape the British blockade and which were quite effective against Allied shipping until the convoy became common practice.

Politically, the road to war was paved by the gradual conversion of American popular opinion away from neutrality and disdain for the entire war to a black-and-white depiction of the valiant democracies fighting desperately against evil autocracies. British propagandists were particularly influential in this effort, whereby the issues were simplified into terms of good and evil, so that, when the declaration of war occurred, the full support of the American people could be rallied behind the Allies and support for the "Huns" was equated with treason. The German submarine campaign, which enraged the American public, and devious actions like the Zimmermann note to Mexico, which proposed that Mexico declare war on the United States, simply added fuel to a growing anti-German fire.

## Political Objective

World War I was, of course, an allied operation and as is usually the case within coalitions, each of the allies had its own distinct political objective and its own vision of the better state of the peace. When the war broke out, it

is fair to say that none of the original combatants had particularly clear objectives beyond a generalized belief in the need to honor alliance agreements that committed various states to one another. This lack of clarity was not entirely surprising because none of them had any clear idea what the war would be like.

In some ways similar to the way the colonial side's objectives were formed in the American Revolution, political objectives flowed from the military state of affairs rather than the other way around. The major influences of the battlefield were to produce tremendous frustration, bitterness, and hatred. The result was an increasing impulse toward vindictiveness. Total warfare produced total political objectives. One side or another had to be defeated completely and the loser would be forced to pay. No one had talked this way as the troops were rallied in the summer of 1914, but after futile years in the trenches, revenge became a common desire.

These feelings were held with varying levels of intensity by the individual Allies, depending on the amount of suffering that they had endured. Among the Western Allies, the feeling was definitely strongest in France. Most of the war was fought in France; hence French territory bore the deepest physical scars of war, and French blood had flowed freely.

In this context, French objectives came to dominate Allied political aims. In its simplest form, the objective was to create a structure of the postwar peace wherein the war could not be repeated. Stated as an aim to make the Great War "the war to end all wars," there was substantial agreement among the Allies. There was disagreement, however, about what kind of structure would best ensure a peaceful world in the future. Determining what was necessary to guarantee the peace was partly a matter of determining who was responsible for the war in the first place.

In the French view, Germany bore special and unique guilt for the war and for French suffering. From the French premise, which was debatable (as we shall see in the final section), it followed that the structure of the peace must include a Germany incapable of instigating another war, and that meant a disarmed German state and a pastoral German society. Everyone wanted peace. France wanted peace and revenge. The disagreement over whether both should be objectives would dog the Versailles peace talks at the end of the war.

American wartime political objectives are what most concern us here. The figure of President Woodrow Wilson was of overarching importance in framing American objectives and engineering the process of change from neutrality to belligerency. As a result, one cannot fully understand American objectives without some insight into the character of the American leader.

At least three characteristics of Wilson are relevant in understanding his

view of the war. The first is that Wilson was an academic and an intellectual. He had gained early fame within the academic community by writing *Constitutional Government* (a study of political democracies first published in 1885, and one of the most respected works in the field we now call comparative politics). He later served as the president of Princeton University. Wilson's intellectual background predisposed him to democracies, which, the prevailing view in political science argued, were inherently superior systems. Second, Wilson was a deeply religious man and a lay Presbyterian minister. This aspect of his background predisposed him to see matters in moral terms and would assist him in framing the war's objectives in the terms of a moral crusade. Third and finally, Wilson was a Southerner. He had been born and reared in Virginia during Reconstruction and had witnessed the embitterment and suffering that the punitive peace created in a defeated Southern people. As a student of and participant in the aftermath of a particularly bloody, total war, Wilson sought consistently to avoid seeing the same mistakes made in Europe.

American objectives toward the war necessarily changed from the period of neutrality to that of military participation. When the United States was neutral, Wilson's hope was to act as a peacemaker. The operative phrase forming that objective was "peace without victory." This approach flowed naturally from Wilson's boyhood experiences and consequent conviction that a punitive peace settlement imposed by a victor would unnecessarily slow healing of the war's wounds. This theme, although later abandoned by the United States, had great appeal within Germany after American entrance into the war. Those who led the movement that overthrew the Kaiser and then sued for peace cited Wilson's statement as hope for a reasonable negotiated peace.

Fighting a war not to win, as peace without victory implied, was not the kind of cry that would rally the country to the banner, and it had to give way once the United States decided to join the hostilities. Military victory replaced military stalemate as the objective and, in a manner reflecting both Wilson's religiosity and the prevalent American worldview, had to be phrased in appropriately moral, lofty tones. Aided by the efforts of those British propagandists who had painted the issues in black and white, a rallying cry emerged to form the basis for the crusade. American purpose became an effort "to make the world safe for democracy." The moral tone is well captured in Wilson's war declaration to the Congress: "The day has come when America is privileged to spend her blood and her might for the principles that gave her birth and happiness. God helping her, she can do no other." So armed, the United States began to prepare for its entrance into the Great War.

## Military Objectives and Strategy

Each belligerent evolved specific political objectives as the war went on. Each objective required the defeat of enemy armed forces and in some cases their destruction. Events quickly showed, however, that victory would not be quick and clear-cut. Military victory could only be achieved by enemy exhaustion, and thus the war wore on endlessly. In a sense, the war itself became the objective.

No one dreamed the conflict would be so long and senseless. The general consensus at the time it began was that no country could wage a long war because of the incredible costs in blood and treasure. Modern wars, so the experts said, would be short and sharp, their brevity ensured by the perceived dominance of the offense over the defense. The side which could muster and mobilize huge modern armies first and put them on the offensive would have an overwhelming advantage. Attackers would smash into and crush ill-prepared defenders who would be unable to swiftly maneuver their own massive forces. In France, the cult of the offensive reached its zenith in the teachings of Ferdinand Foch at the Ecole Supérieure de Guerre (i.e., French War College). According to Foch, the essence of war was to attack and any improvement in firepower ultimately benefited the attacker. To attack successfully morale was critically important. No battle was lost, Foch reasoned, until the soldiers believed it was lost. With the proper *élan*, the French soldier was irresistible in the attack. And thus was born the rigid French doctrine of *offensive à ourrance*—the offensive to the extreme. The birth of the French offensive doctrine brought death to a generation of Frenchmen.

Of the major combatants, the Germans faced the most difficult military problem. Situated in central Europe, Germany faced potential enemies on opposite fronts. In the east, massive Russian armies threatened to overrun East Prussia and crush the Germans. In the west, the French waited to avenge the humiliation of 1870. The only solution was to take advantage of the interior lines afforded by their central position, to mobilize more rapidly and efficiently, to eliminate one or the other of the opponents quickly, and then to concentrate on the remaining enemy.

The original plan to accomplish this complex task was devised years before the war and modified several times. Its original author, Chief of the German General Staff Count Alfred von Schlieffen, assumed that the great masses of the Russian army could not be fully mobilized for at least six weeks after the commencement of hostilities. Thus the Germans must concentrate their forces in the west and knock out France with one quick crushing blow. The blow would be a giant "right hook" of German armies marching through the low countries into France along the English Channel coast. The invasion would wheel inward,

envelop Paris, roll up the French armies, and crush them back against the German border. Schlieffen expected the decisive battle to occur east of Paris within the six weeks' "grace" period while Russia mobilized. With the demise of France, the Kaiser's troops could be transferred to the east to dispose of the Russians. It was a bold plan and it was nearly successful.

When the war began, the Germans mobilized quickly in accordance with their elaborate plans and the offensive got under way. It moved through the low countries at a steady pace, pausing only to reduce the fortifications at Liège with giant siege mortars. On into France the Germans marched as the French and British forces fell back, all going according to the master plan. Unexpectedly, however, the German armies on the right flank began wheeling toward the German border before they enveloped the French capital city. Thus the German right flank was exposed to an attack from the garrison of Paris. Additionally, because of a breakdown in communications, a gap developed between two of the wheeling German armies, and this mistake presented an opportunity for the Allies. The result was a successful counterattack and the retreat of the German armies away from Paris.

Both sides dug in. Both quickly began a series of attempts to outflank the enemy's position—the so-called Race to the Sea—that resulted in the extension of defensive positions on both sides. These positions eventually stretched from the English Channel to Switzerland. The seeds of stalemate were sown. There were no longer any flanks to turn and both sides continued to improve their already formidable defensive positions. Thus the trench war that dominated the Western Front began within weeks of the outbreak of hostilities. The next four years saw a series of massive offensives, each yielding thousands of casualties but precious little progress. The war became one of physical attrition, and the loser was determined by exhaustion, not military skill.

Schlieffen's plan was boldly conceived, and its failure can be traced to many causes. First, the younger von Moltke, the chief of staff in 1914 and nephew of the victor of 1866 and 1871, weakened the right hook by shifting some troops to the east to meet a surprisingly rapid Russian thrust into East Prussia. Second, German communication and supply lines on the right flank became extremely long because of the rapid German advance. Third, German soldiers were exhausted by their long march while the Allies fell back on shorter and shorter supply lines. Fourth, the French high command did not collapse under pressure as it had done in 1870, and as the Germans suspected it might in 1914. Finally and most important, the plan assumed victory at every juncture, and that everything would go well and smoothly. There was little room for error or successful enemy counteractions. In other words, the plan was arrogant. It paid scant attention to the capabilities of Allied armies or their commanders.

By 2 April 1917, when the United States entered the war, it seemed that the Germans and their allies might finally win. They controlled a rich portion of northern France, as well as most of Belgium and Holland. At sea, German submarines threatened to starve Britain out of the war. Moreover, revolt was brewing in Russia. If the Russians dropped out of the war, the Germans could shift large formations to the Western Front. The question was whether or not fresh American troops could get to the front in time. The American Army was minuscule, with an authorized strength of only 100,000. Men had to be inducted, trained, equipped, and sent across the Atlantic. Despite the enormity of the task, more than one million American soldiers landed in France by the summer of 1918.

The United States entered the war late and pursued no innovative strategy of its own. Essentially, American troops were fresh blood with which to continue the war in the established manner. American numbers tipped the balance scale toward victory for the Allies as the exhausted Germans could not compensate for the fresh and numerous American soldiers.

The commander of the American Expeditionary Force, Gen John J. "Black Jack" Pershing, found his principal strategic battles to be with other Allied commanders who wished to use American soldiers as piecemeal replacements in their battered formations. Pershing resisted with President Wilson's support. Wilson, however, eventually bowed to Allied pressure and intervened on their behalf. Pershing recognized the authority of the civilian commander in chief and placed American units, rather than individuals, at the disposal of Allied commanders. However, after tactical training in France was complete and the American Army was fully ready to take to the field, Pershing managed to get back the units that had been amalgamated into the Allied armies.

Pershing has been praised as a leader, organizer, and manager. He has been criticized as a less than innovative strategist and technician. The praise is certainly justified as the task of building, equipping, and transporting a massive army overseas in a short period of time was formidable. The criticism also may be justified. Pershing offered little in the way of new strategic thought to the Allies and produced no novel tactical ideas. However, one must remember Pershing's circumstances. The war was four years old and the die was cast in terms of a strategy to exhaust and defeat the enemy. There was little room and no time for new strategic visions. Tactically, it is no wonder that American tactics mimicked those of our European allies. The rigors of trench warfare were new to the Americans (Petersburg being long forgotten) and, upon their arrival in Europe, the American units were often trained for combat by European veterans.

### Political Considerations

World War I was one of America's most popular wars. Public support for American intervention was high when Woodrow Wilson made his war declaration and that support never wavered. Given that neutrality had enjoyed overwhelming support only a year before, this was a remarkable turnaround. Only years after the war would the United States develop some degree of cynicism over having plucked European "chestnuts from the coals." Yet, once the fighting was over, the American urge to withdraw, to return to "normalcy," was overwhelming. It was a curious domestic situation, at least partially the result of factors in the American culture and, more specifically, the ways Americans go to war.

One reason that Americans rallied to arms and then recoiled quickly from their efforts is traceable to the American missionary zeal. The war was advertised as a moral crusade, and, as such, it appealed to that part of our national character that flows from a feeling of America as a special, morally superior place. Our goal was to "save" Europe from itself, and when that end was accomplished, we packed up and returned to the more normal state of affairs. When it became clear in the 1920s that Europe had not been cleansed as we had hoped, we turned inward once again, seeking to isolate ourselves from the vagaries of European power politics, but at the time support for the war was unquestioned.

Another reason for the high level of support was that the American part of the war was so short. As stated earlier, the United States was a formal belligerent for a year and a half, but engagement in combat was limited to the war's final six months. We began the war entirely unprepared to fight (a common theme in American military history) and set about mobilization in what our Allies found an irritatingly languid manner. The legislation to create a means to induct armed forces had passed at President Wilson's request in 1916, but our standing military was no more than a shadow in April 1917, when war was declared. Building the apparatus to induct, equip, and train a force that could be placed responsibly into combat required time. Starting from scratch with mechanisms and personnel inadequate to a task of such proportions further lengthened the process.

The effect was to romanticize the war. It was a time of parades, of soldiers coming home for leave from the training camps (most of which had had to be built for the occasion) in impressive uniforms. There was little mud and no blood and dying. The American Expeditionary Force did not arrive in Europe *en masse* until June 1918, and General Pershing was reluctant to throw it into combat even then. Instead, he maintained that the force required a period of orientation and further preparation for fighting in a new and strange environment.

The leisurely pace of American preparation and commitment created political tensions within the alliance, especially between the Allied military command and the American command. Reflecting the nature of the war and where it was being fought, the Allied general staff was dominated by France, and the supreme commander was Marshal Ferdinand Foch. The Allied command had a very different viewpoint of the American role than did its American counterpart.

From the vantage point of the Allied command, the chief contribution of the Americans should have been to provide fresh manpower to British, French, and other forces badly depleted and exhausted by the long years in the trenches. With France particularly near the brink of physical exhaustion and collapse, fresh bodies were the requirement against Central Power forces that appeared increasingly menacing after the fall of Russia. To that end, the Allies argued long and loud, if with little effect, for the Americans to speed the process of building their army and for getting that army into the field.

Pershing resisted these efforts successfully. He viewed these requests, probably correctly, as no more than an attempt to make cannon fodder of the American forces in the futile fighting, a usage that would have been unpopular at home. Moreover, he, like most observers, was less than overwhelmed with the tactical brilliance that had thus far marked the war effort on both sides. As a result, he insisted that Americans not be integrated into existing units and that, instead, there be created a distinctly American place on the lines. Foch resisted, but Pershing insisted, refusing to commit the Americans at less than the unit level until his end was achieved. Ultimately, the Allies' need for the American troops exceeded their feelings about how they should be used, and the Americans were given their own front for the final offensive.

There were, moreover, important political differences between the leaders of the principal Allied partners that simmered beneath the surface but which would become apparent when it was time to settle accounts in the peace negotiations. The major disagreements were between American President Woodrow Wilson and French Premier Georges Clemenceau. The heart of these disagreements centered on why the war was being fought and what its outcome should be.

As we have said before, the First World War was a total war. However, the war was more total for some than for others. For France and Britain, it was a total effort being fought for national survival, and both countries totally mobilized to fight it. For the United States, national survival was never a problem, and although we raised the largest army in our history to fight it, it was not a war of total mobilization for us. As an example of the contrast, the United States did not develop an armaments industry to support the effort; instead the United States relied largely on arms purchased from the British and the French.

The different levels of desperation with which the war's outcome was viewed translated into discordant views about what would constitute a satisfactory peace. While the fighting continued, these divergences were hidden behind the veil of common effort. When the guns were stilled, the discord came to the fore. The United States was disadvantaged by the combination of a lack of experience at coalition decision making (the only previous war in which we had allies was the American Revolution) and the intensity of French claims based in greater experience, sacrifice, and proximity.

The basis of disagreement was over the question of a punitive or a reconciliatory peace. Reflecting his background as a Southerner and an academic, Wilson wanted a reconciliatory peace that would feature self-determination for all countries (or at least those in Europe). He wanted a postwar world founded around the Fourteen Points, which declared these ideals and featured the League of Nations as its centerpiece to guarantee the peace. The Wilsonian vision was lofty and idealistic; Clemenceau viewed it as naive in the real world of European politics. Rather than seeking reconciliation, Clemenceau sought punishment of Germany and the reduction of the German state to impotency. During the war Clemenceau humored Wilson because he needed American help. When it came time to restructure the world, the gloves came off and the disagreements were laid on the table. The results of those interactions are discussed in the final section of this chapter.

## Military Technology and Technique

World War I has often been characterized as history's most senseless and poorly contested war. Given the objectives of the belligerents, particularly as the war progressed, the unending stalemate on the Western Front, and the incredible casualties caused by endless frontal assaults against enemy lines, it is difficult to argue against this unfavorable judgment. At the same time, however, World War I was a watershed in the evolution of modern warfare because of the technological innovations first demonstrated during the conflict. Two technological developments were of primary importance, either having a direct impact on the conduct of the war itself or foreshadowing the nature of warfare in the future.

The development that had the most immediate impact was the widespread use of rapid-fire weapons. Key to this development was the perfection of smokeless powder that did not obscure the field of fire or foul weapons to the extent previously common. Although rapid-fire weapons were used experimentally in the American Civil War (the Gatling gun, for example), it was not until 1882 that Sir Hiram Maxim designed the first machine gun widely adopted by military forces. By World War I, reliable designs permit-

ted rates of fire from 200 to 400 rounds per minute. The weight of such a machine gun was approximately 100 pounds including its mount, which made it a defensive rather than an offensive weapon. Weapons carried by individuals also improved greatly by World War I. Modern military rifles could fire up to 20 rounds per minute and their effective range was limited primarily by the vision of the soldier.

Field artillery followed the rapid-fire trend of smaller weapons. Without question, the finest field artillery piece in the world in 1914 was the 1897 French model 75 mm. It could fire 6 to 10 rounds per minute with great accuracy. Other excellent field pieces were the US model 1902 field gun and the Austrian 88 mm developed and produced by the Skoda works. In the years leading up to World War I, heavy artillery became much heavier. Large-caliber guns were common, including huge siege mortars. For example, the Germans possessed 420 mm mortars that delivered a one-ton projectile.

The development of rapid-fire weapons and heavy artillery pieces significantly affected the way in which World War I was fought. The most obvious effect was in the number of casualties. The human toll of the war dwarfed all previous experience. The second major effect was to give the advantage to the defense, a phenomenon which thoroughly surprised most military planners. Their failure to cope with superior defense added to the human carnage. Against rapid-fire weapons and heavy artillery, the techniques of previous wars led only to failure and casualties of unprecedented proportions. Finally, rapid-fire weapons used prodigious amounts of munitions. As a result, industrial capacity on the home front became of paramount importance in determining success or failure on the battlefield.

Although the development of rapid-fire weapons had a significant impact on the war itself, a revolution in transportation would portend the nature of wars to come, even if its impact on World War I was less than decisive. The transportation revolution was caused by the invention and application of the internal combustion engine, which led to the development of not only cars and trucks but also tanks, submarines, and heavier-than-air aircraft. These weapons would eventually change the face of warfare.

Although mules and horses continued in common use, all belligerents used trucks extensively during the war to overcome the inherent weaknesses of railroads. Railroads had revolutionized military transportation, but they also brought with them some unwanted baggage. First, they were relatively inflexible, since a great deal of preparation and construction was required to establish a rail line, particularly one that would be used heavily. Second, because they were both important and inflexible, they tended to dominate strategy. During the Civil War, campaigns revolved around rail lines as opponents sought to protect their own and cut those of the enemy. Trucks, on

the other hand, provided flexibility. They required no ties and rails. Troops and materials could be hauled rapidly from railheads to far-flung battlefields. Large-scale battles could now be fought wherever there were roads. Railroads did not, however, lose their military importance. In World War I (as well as in later wars) they remained critical to military success because of the quantity of men and materiel they could carry.

The tank was first introduced by the British in 1916. Its purpose was to break through enemy trench lines and clear the way for infantry to advance. Some visionaries thought that tanks could not only break through enemy lines but could also range far to the enemy rear and capture command centers, disrupt communications and supply lines, and spread panic. The World War I vintage tank did, however, have severe limitations. Although impervious to small arms fire, their slow speed, especially when used as infantry support weapons, made them tempting artillery targets. Near the end of the war, Allied planners (the Germans paid scant attention to the use of tanks) began to recognize better uses for tanks. In the last offensive thrusts of the war, the Allies massed tanks for attack rather than using them in small concentrations. In the interwar years, the relationship between tanks and infantry began to reverse, and infantry would be used for the support of armor. With this change of tactics and improved tank design, armored warfare would come of age in World War II.

The internal combustion engine was also important to the development of submarines. An undersea craft that could attack enemy warships and merchantmen had long been a dream of naval designers. The internal combustion engine provided a compact means of surface propulsion and a means to recharge the batteries used for submerged operations. Designs improved rapidly in the years preceding the war, and submarine warfare became an important part of overall German strategy as the Germans sought to starve Britain out of the war by cutting her sea-lanes.

With the development of the airplane, war entered a third dimension. Initially, the airplane was intended only for observation of enemy movements and artillery spotting. By the end of the war aerial photography of enemy trench lines was an indispensable tool of military planners. Of course, such a valuable tool had to be denied to the enemy, and as a result aerial combat began shortly after the war commenced. By the war's end, airplanes were conducting extensive air-to-air combat with sophisticated machine guns that fired directly through the propeller by the use of an ingenious interrupter gear. Airplanes also strafed enemy troops at the front and conducted bombing raids in rear areas. Finally, both sides made tentative attempts at strategic bombing. However, aircraft were not an overly important weapon in the Great War, primarily because aircraft and engine design were still primitive arts.

But aerial visionaries of the war, such as America's William "Billy" Mitchell and Britain's Hugh Trenchard, saw possibilities for a much greater role for the airplane in the future. Between the two world wars they pressed for better designs and for the development of air power doctrine that they believed would make air power a decisive factor in modern warfare.

The development of weapon systems based on the internal combustion engine represented a watershed in the evolution of modern warfare, and yet these weapons had only a limited impact on the techniques of warfare in World War I. Military tactics remained rooted in the past. The tactical problem on the Western Front, once the trench lines were firmly in place, was to achieve a breakthrough in the enemy's linear defenses and then exploit that breakthrough to bring a degree of mobility back to the war. The trench lines for both sides had no tactical flanks, and thus the only attack possible was a frontal assault.

Generals on both sides used several techniques in an attempt to achieve a decisive breakthrough. The most common method was to conduct a massive artillery barrage (some lasted for weeks) calculated to obliterate the enemy trenches. Once a gap was created, the infantry was supposed to pour through and exploit the advantage. Unfortunately, such a tactic sacrificed all surprise. Defending troops simply withdrew to deep dugouts during the barrage, waited for it to end, and emerged ready to fight. In addition, the barrage was often counterproductive for the attackers because it turned the no-man's land between the opposing trenches into a cratered, muddy moonscape through which the attackers wallowed at a snail's pace. With no surprise and slow movement, reinforcements could fill any gap in the defender's line. At that, even if an enemy trench was seized, no real breakthrough was achieved because the trench "line" generally consisted of three trenches separated by some distance. Thus the exhausted attackers, having captured the initial objective, still faced fresh troops and fresh defensive works just ahead. It is no wonder the front lines moved so little during the war.

Another innovative method was gas warfare. When first used on both the Eastern and Western fronts, it had considerable success. However, its effects often depended on the weather (especially which way the wind was blowing), and the introduction of protective equipment made gas a progressively less effective weapon.

The most innovative tactics (aside from the use of tanks discussed earlier) to achieve breakthrough were developed by the German Gen Oskar von Hutier. He employed a very short barrage combined with infiltration by specially trained assault troops who avoided strong points. Regular infantry, who reduced the bypassed strong points, followed the assault troops. The Germans used these tactics extensively during their final offensive in 1918

and had considerable success in achieving deep breakthroughs quickly. However, they could not move artillery and supplies forward fast enough to sustain the attacks. Hutier's tactics foreshadowed the blitzkrieg tactics of World War II.

For the most part, the tactics of World War I resembled the worst displayed in the American Civil War. Time after time masses of men lunged across open ground to assault well-entrenched defenders and were slaughtered at an incredible rate. It seemed the generals had learned nothing from experience. World War I tactics were not a tribute to human wisdom.

### Military Conduct

The Allies were exhausted after the hard fighting of 1917, and a revolt of the soldiers in the French army had further shaken their leaders. In these circumstances, they were content to sit on the defensive and await the arrival of the fresh American troops. The same was not true for the Germans. With the collapse of the Russians, the Germans moved massive numbers of troops to the west and, so reinforced, hoped to strike a decisive blow before the Americans turned the tide.

Gen Erich Ludendorff planned a series of German offensives all along the Allied lines in 1918. In addition to the new troops from the Eastern Front, he planned to incorporate the new tactics developed by Hutier. The first German attack came in March and was aimed at the British at the Somme River. The attack achieved astonishing success, advancing 40 miles in eight days, before it slowed. In early April the Germans struck the British again, this time at the Lys River, and again achieved some success. This was followed in late May by an attack on the French at the Chemin des Dames, an important ridge line northeast of the French capital. Once again the Germans were astonishingly successful by the standards of trench warfare. By the end of May they again threatened Paris from newly won positions on the Marne River at Château-Thierry.

At Château-Thierry the Americans were first sent into heavy combat. When the Germans attempted to cross the Marne, they were thrown back by the newly arrived American troops. Ludendorff attempted to renew his stalled offensive during the summer months, but the effort failed. The Germans had spent themselves and the Americans were now pouring into the lines. In all, ten American divisions took part in the summer operations; their presence was crucial to Allied success in stopping the German drive.

Allied counterattacks began as early as mid-July and were aimed at retaking the vast salients created by the surprising successes of the earlier German offensives. On 8 August the Allies massed several hundred tanks for an

110   FROM LEXINGTON TO DESERT STORM AND BEYOND

wonder the front lines moved so little during the war.

Another innovative method was gas warfare. When first used on both the Eastern and Western fronts, it had considerable success. However, its effects often depended on the weather (especially which way the wind was blowing), and the introduction of protective equipment made gas a progressively less effective weapon.

The most innovative tactics (aside from the use of tanks discussed earlier) to achieve breakthrough were developed by the German Gen Oskar von Hutier. He employed a very short barrage combined with infiltration by specially trained assault troops who avoided strong points. Regular infantry, who reduced the bypassed strong points, followed the assault troops. The Germans used these tactics extensively during their final offensive in 1918



American sector in the offensive was surrounded by the Meuse River and the difficult Argonne Forest. The fighting was bitter and extended, particularly in the Argonne, but by 10 October the Germans had been driven from the forest. By 5 November the Americans forced a crossing of the Meuse. The grand offensive rolled on, not just in the American sector but all along the front as the exhausted German defense finally disintegrated.

Germany would not be the master of Europe, at least not for two decades. But neither would the French or British, both of whom had suffered grievously. Nor would the Soviets reign supreme, as they sought to consolidate their internal position after the revolution. Austria-Hungary simply disappeared as a political unit. Europe would have to wait 22 years for a master to proclaim itself.

The United States entered the war late, but American participation was vital to the eventual Allied success. Fresh American troops stopped the final German offensive in 1918, and they broke the back of German resistance thereafter. American troops and their leaders acquitted themselves well on the battlefield, and the lessons learned about massive mobilization, training, and deployment would prove valuable in the future. The cost, in human terms, was staggering. During approximately six months of combat operations, 50,000 Americans died in battle, while 75,000 more died from non–battle-related causes. But the cost in American lives paled in comparison to the losses sustained by the other Allies. Nearly 1.5 million Frenchmen died in combat, as did nearly 1 million British and nearly 2 million Russians. The small price America paid in its short war affected the amount of influence the United States had in the peace treaty negotiations that followed the war. The United States also was spared the incredible casualties suffered by civilian populations during the war. Some estimates put the civilian death toll at over 15 million. Perhaps the price would have seemed a bargain if this war had been the war that ended all wars.

**Better State of the Peace**

The armistice that took effect on 11 November 1918 ended the formal hostilities that had raged for more than four years. When the victorious Allies gathered at Versailles, the palace of the Bourbon kings located outside Paris, their purpose was to re-create the peace that had preceded the outbreak of the Great War, to make a better state of the peace.

In essence, the Allies had three tasks facing them in their collective quest to ensure that the conflict had indeed been the war to end all wars. These were dealing with the enemy, restructuring the peace, and redrawing the political map. The first task was how to deal with the vanquished Central


Powers. German hostile ability had been finally overcome through exhaustion of German resources in its summer 1918 offensive and the Allied counteroffensive. The coup that overthrew the Kaiser and resulted in a suit for peace by the new German government demonstrated that German cost-tolerance had been exceeded as well. What remained to be decided was how to integrate Germany back into the international system. This was a question of fashioning a peace that Germany could or would accept and embrace for reordering a peaceful world. Two alternative visions were laid on the negotiating table.

As suggested earlier, the two chief protagonists in this debate were Wilson and Clemenceau. Harking back to his own childhood experience and his earlier call for a peace without victory, Wilson preferred a reconciliatory settlement toward Germany that would reintegrate the German state into the international system with a minimum of recrimination and punishment. He believed this to be the best way to overcome those vestiges of German hostile will that might resist acceptance of the policies governing the peace. Clemenceau, representing an embittered France, had other ideas. Given the suffering and privation France endured (admixed with some long-smoldering resentment arising from the settlement of the Franco–Prussian War 48 years earlier), France insisted upon a punitive peace. French insistence prevailed and Germany was punished for the war.

In essence, France had two preferred outcomes to the peace talks. The first was to recover the enormous physical and economic costs of the war (the French national treasury as well as those of virtually all the major combatants had been drained). The second objective was to destroy what France viewed as the cause of the war, which was an expansionist, militaristic Germany. The solution to the first problem was to make Germany pay for France's war expenses; the answer to the second was to transform Germany into a pastoral, permanently weakened state that could pose no future military threat to France.

The key to achieving those goals within the framework of the peace settlement was the infamous Article 231 of the Versailles Accords, the war guilt clause. That article, which the new German government was forced to accept, placed sole and complete blame for starting the war on Germany, and it served as the necessary justification and underpinning for the other punitive parts of the settlement. With German cupidity and responsibility formally established, France could justify exacting retribution, including a severe schedule of reparations aimed at compensating France for its wartime costs (a provision, one might add, in which a number of the victorious allies, notably Great Britain, rapaciously joined). Germany would pay for the war, although the effects of those payments would prove ruinous to the German

economy. At the same time, provisions were included that substantially disarmed the German state and reduced its territory to ensure against a militarily resurgent Germany.

A prostrate Germany had no choice but to accept these humiliating conditions, but the leaders who did so would later be vilified as traitors for their actions. The conditions were so severe and humbling that the German people could not possibly embrace these policies and hence have their hostile will (resistance to policies) permanently overcome.

There were several factors that made acceptance impossible. The first was the war guilt clause. That provision was, at best, questionable. As one tries to unravel who was to blame for the war in the first place, Germany emerges as but one candidate among several. There was too much guilt and stupidity to lay on a single doorstep.

Another factor that ensured the survival of German hostile will was the size of the reparations payments. These virtually ensured that Germany would not recover fully from the war economically (as some observers such as Lord John Maynard Keynes prophetically but futilely pointed out at the time). The result would be enormous inflation in Germany during the 1920s with which the democratic Weimar regime could not deal effectively and economic devastation when the Great Depression took hold. At the same time, the demilitarization of Germany left that country at the mercy of the rest of the international system and perpetuated German enmity. Suddenly, Germany was back where it started before unification, at the military mercy of the system. The seeds for the emergence of a Hitler-like figure could not have been more skillfully sown had that been the purpose of the peace treaty.

Although he objected to these aspects of the settlement, Wilson finally acceded, because his attention was focused on the second task which confronted the conferees, the establishment of a mechanism to ensure the future peace. The essential question was what had gone wrong with the Concert of Europe that had allowed the war to occur.

When it had operated properly, the Concert had served as a collective security arrangement: all the major states were members, and each agreed that a threat to or breach of the peace threatened their own interests and must be resisted. With that principle established, a potential aggressor knew that the community of states, and hence overwhelming power, opposed its action, making it futile and thus deterring aggression. The Concert appeared to work for a time, but ultimately the system failed. What had gone wrong?

The answer Wilson and others (rightly or wrongly) devised was that the Concert system (actually a series of irregularly scheduled meetings of the major countries called when the need arose) was inadequately institutionalized. What the system lacked, they reasoned, was a formal mechanism, an insti-

View Page 104

114   FROM LEXINGTON TO DESERT STORM AND BEYOND

tution that would always be available whenever crises arose and which conse-
quently could act in a timely and authoritative manner. That mechanism was to
be the League of Nations, which would serve as guarantor of the peace. Unfor-
tunately, that noble institution never had a chance to perform its role.

A collective security arrangement requires two conditions for effective
operation. The first is that the mechanism must have at its disposal obviously
overwhelming power to deter transgressors. Meeting that standard requires
that all major powers be represented in the arrangement. This condition was
never met. The United States never joined the League (to Wilson's bitter and
debilitating disappointment), the Soviet Union was not permitted to join the
organization until the 1930s, and it was during that decade that the countries
that formed the Axis in World War II resigned. The second condition for
success is the willingness of the major powers to enforce the peace, and that
translates into accepting the justice of the peace system that one is uphold-
ing. For reasons embedded in the third task facing the negotiators, this condi-
tion was also unmet.

The third task was redrawing the political map of the world. The operative
principle, as part of Wilson's Fourteen Points, was to be self-determination, the
right of all nations freely to determine their status as states. The principle in
truth applied only to Europe (nationalists in several Asian colonial states
would discover this truth to their dismay). Although the principle was ap-
plied with reasonable effectiveness in central Europe, there remained an-
other part of the agenda, which consisted of territorial rewards for the victors
and penalties for the losers.

The Austro-Hungarian and Ottoman empires collapsed and disappeared
as a result of the war. The European sectors of those empires were allowed to
engage in self-determination, resulting in such new states in eastern and cen-
tral Europe as Czechoslovakia, while the Ottoman Middle East was placed
largely under the trusteeship of Britain and France. The German Empire was
dismantled and apportioned among the victorious allies, and Germany's pre-
war boundaries were reduced through transfer of territory to France (the
return of Alsace-Lorraine) and through the recreation of a Polish state. Some
of these territorial adjustments placed German populations under non-
Germanic rule (for example, the Sudetenland), but Germany had no choice
but to accept its dismemberment—at least for the time being.

At the same time, some members of the victorious coalition, notably Italy
and Japan, had territorial claims that were not honored by the dominant mem-
bers of the alliance (Britain, France, and the United States). Italy had claims,
for instance, in the Balkan region and Japan expected to receive the bulk of
the former German dependencies in the Pacific, but most of these were placed
under American stewardship instead. Germany simmered under the loss of

empire and territory it considered rightfully a part of Germany, and Japan and Italy resented the rejection of "rightful" rewards for their contributions to the war effort. None of the three could be expected enthusiastically to endorse or enforce the territorial status quo, as participation in the League of Nations collective security system required. Ultimately, of course, none of them did.

All of this is to say that the better state of the peace was doomed from the beginning. The victors' policies were punitive and viewed as unjust by the vanquished and even by members of the victorious coalition. From an American vantage point, the irony was redoubled because, when Wilson returned with the peace treaty in hand, it was rejected after an acrimonious national debate by a resentful Senate. The official argument that led to the failure to ratify was the commitment to the League, which would tie the United States irrevocably to the affairs of Europe. Such a commitment, which Wilson felt was the linchpin in an enduring peace, was unacceptable to those Americans who continued to believe in the myth of American aloofness from European affairs. Underlying the failure, however, was a tactical blunder on Wilson's part; he had failed to take any senators to the Versailles conference, and hence they had no stake in the outcome (a mistake no subsequent president has made).

The outcome of the settlement of World War I is generally considered the classic case of winning the war and losing the peace. The war had been won militarily; German and other Central Powers' hostile ability and willingness to continue (cost-tolerance) had been broken on the battlefield. But that was not enough. Adversary hostile will, defined as resistance to the victor's policies, not only was not overcome, but the terms of the peace were almost guaranteed to increase that hostile will. Resistance to accepting these policies was, of course, most strongly felt in a humiliated Germany. Given the circumstances and conditions imposed upon the German state, it is hard to envision how the German people could have reacted otherwise. For policies to be embraced, they must be accepted as just, and the peace terms could hardly have been looked upon that way in Germany. In the end, short-sightedness and vindictiveness ruled the day. In the long run, the peace was lost. The manifestation of that loss was the need to fight World War II to resolve the differences that had been dealt with so abysmally in the peace ending the war to end all wars.



View Page 86

————————————————— 5

# World War II

The Great War had been the largest and bloodiest conflict to date in human history, but it was in many ways only a preview of what would follow. Approximately 20 years later World War II erupted and became the largest military event in history. It was a conflict that was total in all senses of that term and a *world war* in which virtually every corner of the globe served as a theater of action at one time or another. Although records are inadequate, the best guesses are that about 80 million people were in military service at a given time. Of these, between 15 and 20 million were killed and probably about the same number of noncombatants perished. There were around 10 million combatant casualties and almost that many additional civilian casualties in the Soviet Union alone. Even more than the First World War, World War II was a war between whole societies, a war of factories. The entire resources of the major combatants were dedicated to the war's conduct, and whole populations were mobilized for one aspect or another of the effort.

America's role in World War II was unique in at least two ways. World War II was almost two distinct conflicts: one in Europe, where the Western Allies (including the Soviet Union) faced Germany and her European allies, and the other in the Pacific, where Imperial Japan was the major antagonist. The US position was unique in that only the United States had major responsibilities in both theaters. In Europe the Allied effort was dominated by the triumvirate of the United States, the Soviet Union, and Great Britain, but American presence was of vital importance: the British depended heavily on the United States for the materiel and manpower necessary to open the Western Front, and the Soviets relied to some degree on American lend-lease. In

116

the Pacific the war was essentially a conflict between the Americans and the Japanese. Certainly others were part of the Pacific campaign: the British on the peripheries (e.g., Burma) and Chiang Kai-shek's Kuomintang Chinese (who occupied a million-man Japanese army that could not be used elsewhere). The task of defeating the military might of the Japanese Empire, however, was clearly an American task. As we shall see later in the chapter, this unique position created some friction within the government and with our Allies over which enemy should receive the greatest attention and even some interservice rivalries about resource allocations (the war in Europe was basically an Army enterprise, whereas the Navy dominated the Pacific war).

The other unique aspect from an American perspective is that the United States was the only Allied power that emerged from the war stronger than it entered. When the United States entered the fray following the attack on Pearl Harbor, the vast (and, thanks to the lingering effects of the Great Depression, underutilized) American industrial base was turned into the "arsenal for democracy." The conversion and the stimulation it provided the economy ended the depression and allowed the United States to emerge in 1945 as the unquestioned economic colossus of the world. The other Allies were "winners" in the sense of being on the prevailing side, but all the other Allies were wounded seriously by the effort. Britain's expenditure in blood and national treasure accelerated its gradual decline from great power status, a circumstance with which British governments continue to grapple today. The other major ally, the Soviet Union, arguably emerged more politically unified because of the enormity of effort necessitated by the Great Patriotic War (as the war was officially known in that country), but its land was scourged by the Nazi invasion that left two-thirds of its industry destroyed, countless towns, villages, and buildings reduced to rubble, and nearly 20 million citizens dead.

The United States avoided those disasters. After the surprise attack at Pearl Harbor, American continental soil was never seriously attacked during the war, so that there was no physical reconstruction to deal with after the war's end. Our material contribution to the war had been enormous (the war cost the United States more than $500 billion in the dollars of the day), but our 300,000 casualties were comparatively light; the war did not bleed us dry in the literal sense of that phrase. Moreover, the war effort revitalized an American industrial plant gone flabby during the hard years of the depression. American industry was more productive at war's end than at the beginning.

The major effect of World War II was to critically alter the power map of the world. In the broadest sense, the roughly 150 years of European history from the onslaught of the French Revolution through World War II was a contest between France and Germany to dominate the continent and hence

to dominate the international system. Ironically, World War II ensured that neither of them would. France had been defeated, humiliated, and occupied, and even though it rode to "victory" on the coattails of the victorious Allies, France clearly emerged from the war diminished in spirit and power. For Germany the outcome was even more disastrous. Its armed forces were decimated, it was occupied by its former enemies, it bore the unique moral stigma of Nazi excesses, and it was once again physically divided. Division was the cruelest blow of all, both because it returned the German people to the weakened status of a divided state and because the shadow of the Nazi past raised serious questions of when, if ever, the international system would allow a German resurgence.

The other actors were not in materially better shape. Great Britain was a member of the victorious coalition and hence technically a winner, but the British economy lay in ruins. The war would force Britain through the agony of gradual reduction from a global to a regional power. The British Empire, like that of its principal rival, France, would wither under nationalist demands for independence, setting in motion a whole new series of dynamics that are yet unfolding. Japan, like Germany, was defeated and occupied, and its reemergence would require massive assistance and nearly two decades to accomplish. The other major combatant, China, simply resumed the civil war that had raged between the Communists and Kuomintang in the 1930s.

The war ended with only two states possessing significant power, the United States and the Soviet Union. Of the two, the United States was clearly the more powerful. Although allied against the Nazi and Japanese menaces, the Soviets and the Americans moved into the postwar power vacuum with very different worldviews and motives that almost guaranteed a clash as they sought to reorder the power map.

## Issues and Events

There are, of course, various ways to look at the question of what caused World War II, and numerous explanations have been put forward. In essence, however, there were two interactive underlying issues: Franco–German competition for dominance of the European continent that went back over a century, and the failure of the peacemakers at Versailles to create a structure for the interwar peace that could be embraced and supported by the participants in the Great War.

Competition between modern France and Germany is historical and longstanding, and treating it in its breadth and richness would only divert us from present concerns. In the modern era, however, one can usefully date it back to the Napoleonic campaigns, when Prussia, the precursor to and leader in

the unification of the German state, was soundly defeated by the French *levee en masse*. From that humiliation arose the Prussian determination to unify Germany and to produce a strong, militarized state that would no longer be forced to suffer such indignities. The process of unification took nearly a half-century and was climaxed by Prussia's easy victory over Louis Napoleon in the Franco-Prussian War of 1870. A critical outcome of that conflict was the reannexation of Alsace-Lorraine to Germany, which in turn was an important element in forming the static alliance systems that contested World War I.

The Great War, round three in the competition, left Germany in essence back where it had started: politically dismembered, territorially reduced, and economically and militarily debilitated and vulnerable. Germany was once again reduced to being the "weak sister" of Europe, and the history of the German states had taught that this condition was intolerable. Moreover, the economic system that the Second Reich erected was saddled by reparations ensuring that economic recovery was virtually impossible. It was also burdened with a democratic political system that was both alien to the German political tradition and, by virtue of signing the Versailles peace treaty, held responsible for German humiliation by sizable parts of the population (a vulnerability that Hitler used to form the basis of his assault on democratic elements in Weimar Germany).

Given this unacceptable outcome of the third round of Franco-German rivalry, the Versailles peace was doomed from the beginning. Its centerpiece, the League of Nations, never had a realistic chance to organize the peace effectively: too many of its members were unwilling to defend a status quo they viewed as unjust, and others excluded themselves (the United States) or were excluded (the Soviet Union, on the premise that the way to arrest the spread of the "cancer" of bolshevism was through isolation).

Proximate events of the 1930s would transform these underlying issues into the bloodiest conflagration in human history. These events, in turn, can be traced to two related sources reflecting dissatisfaction with the peace ending World War I: economic nationalism and the effects of the Great Depression, and the rise of fascist regimes that would become increasingly aggressive and expansionist in the face of tepid responses from the Western democracies.

Economic nationalism and the depression are related events. The core of economic nationalism, which was to manifest itself in unprecedented protectionism of national industrial plants, can be found in the attempts of the drained countries of Europe to recover and recuperate from the ruinous economic effects of the First World War. National coffers had been emptied, industries had been turned to the war effort and had to be reconverted, and there were widespread scars of war (especially in France) that required re-

building, all at considerable cost. Governments were forced to foot these bills, and one of their strategies for recovery (especially of the industrial plant) was to erect high protective tariffs against goods and services from elsewhere. Combined with the artificial flow of wealth resulting from reparations, the economic base of Europe became increasingly shaky.

The Great Depression represented the final blow to the international economic system. As businesses failed, banks defaulted, and the jobless lines increased throughout the continent, commerce between states came to a virtual standstill. The result was even more protectionism and an economic maelstrom that continued to get worse. As the times worsened, so did the political situation. In this climate, the rise of regimes that promised an end to the economic chaos, even if through escapism and adventurism, became progressively stronger. In no place was the cry louder and more inexorable than in Germany.

Fascism was not, of course, entirely a phenomenon of the 1930s. Mussolini came to power in Italy in the early 1920s, and the Japanese imperial monarchy predated the Great War. The factors that made fascism different in the 1930s and that led to war were the coming to power of fascism in its most virulent form through the National Socialist (Nazi) party in Germany and the progressively expansionistic form that the various fascist regimes exhibited as the decade progressed.

The rise of Nazism was the key factor, because only a resurgent Germany had the potential to mount a major threat to the peace; Japan and Italy could also engage in mischief, but their reaches were limited. Germany, particularly when expanded to something resembling its pre-1919 borders, could pose a threat to the whole of Europe, as had been the case in the Great War.

Hitler's Germany and its Führer have been and continue to be the source of enormous, if macabre, fascination, and there is little we can add to the voluminous literature that surrounds the Nazi era. A few points can, however, be made that are germane to our general theme.

The first is that the terms of Versailles virtually guaranteed that something like Nazism would emerge in interwar Germany. Although the monstrous directions that Hitler's policies took were not preordained by the Paris peacemakers, the combination of humiliation and degradation that Germany suffered, the artificial nature of the political system imposed on Germany, and a German political culture that associated authoritarian rule with prosperity (many Germans even today consider the Kaiser's Second Reich the golden age of German history) certainly made a militaristic, authoritarian movement seem quite appealing.

Second and significantly, the appeal of Nazism was inadequate to gain power in the relatively affluent 1920s but was inexorable in the depression-

plagued 1930s. When Hitler began to organize his political movement and made his first clumsy attempt to seize power (the "Beer Hall Putsch"), he was ridiculed, rejected, and thrown in jail. A little less than a decade later, with Germany in the depths of the depression, his simplistic analyses of Germany's woes and his grandiose solutions met a more responsive audience. Granting that many of the power brokers who helped him come to power viewed him as a comic figure they could manipulate and control, nonetheless Hitler had enough popular appeal to be elected chancellor.

The pattern of unchecked aggression provided the proximate events on the road to war. Each of the three major powers in what became the Axis participated in this process, and in each case timid responses (when there was any response at all) not only did not deter future actions but almost gave them tacit approval.

Some observers maintain that World War II really began in 1931. In that year Japan made its first major expansionist move, invading the Chinese province of Manchuria (the industrial heart of the country). In fighting of enormous ferocity punctuated by numerous atrocities against the civilian population, the Japanese succeeded in establishing their domain and installing a puppet ruler on the throne of the country they called Manchukuo. The West stood idly by. The strongest condemnation came from the United States, which promulgated the so-called Stimson Doctrine of Non-Recognition. This doctrine stated that it was American policy not to recognize governments that came to power by force (a tenet that has been selectively applied ever since). The practical effect was that the United States did not recognize the government of Manchukuo but continued to deal with Japan virtually on a business-as-usual basis. So encouraged, the Japanese Sphere of Co-Equality continued to expand through the decade. By 1941 the proximity of that empire and American interests meant that something had to give.

The Fascist government of Benito Mussolini also got into the act, albeit in a more modest way. The major adventurism in which Italy engaged was the 1935 campaign against Ethiopia. Using the Italian colony of Eritrea as his base of operation, Mussolini unleashed his mechanized army against the pitifully underarmed Ethiopian tribesmen (some of them actually confronted tanks and other armored vehicles with spears). The world was shocked but not enough to act.

When the attack began, the Ethiopian Emperor Haile Selassic, the "Lion of Judah," went to the League of Nations and appealed to that organization to invoke the collective security provisions of the covenant and to come to Ethiopia's defense. After long debate, the League voted *voluntary* sanctions against the Italian regime and omitted petroleum, oil, and lubricants (on which Italy was particularly dependent) from the list of proscribed materials. Of

the major powers, only the Soviet Union (which had been admitted to the League after Germany withdrew) argued strongly for effective, mandatory sanctions to reverse the situation. Britain and France, unwilling to risk war over that barren corner of the Horn of Africa, wavered. In the wake of the Ethiopian affair, League collective security was effectively a dead letter.

Center stage in the tragedy was, of course, reserved for Nazi Germany. Using the dual assertions of the "destiny and right" of all German peoples (broadly defined) to be ruled together and the need for *lebensraum* (living space) as his justifications, Hitler began his campaign of expansionism in 1935. Initially, the reaction of the major Western democracies was weak and ineffectual. When they finally determined to react, it was too late.

Hitler's first and riskiest action was the remilitarization of the Rhineland. Sharing a long common border with France, the Rhineland had been demilitarized by the Versailles accords to assuage French fears of a new German onslaught. Timing his move to coincide with one of the frequent crises in the French Third Republic (one coalition government had collapsed and a successor had not been organized), Hitler moved his forces into the area. It was a gamble because at that time the armed forces of France were clearly superior to his own (almost all his military advisers opposed the plan) and could have forced him to back down. Hitler, however, counted on the paralysis caused by the French political crisis to preclude effective action. He proved correct; neither France nor Britain reacted and he was able to present the world with a fait accompli. So emboldened, Hitler turned his attention to bigger things.

The list of Hitler's aggressions is familiar enough and need not be treated in detail here. Under the guise of the "Greater Germany," Hitler annexed the Sudetenland area of Czechoslovakia (which had a majority German population) and in the Anschluss, German troops occupied Austria as well. Confused and irresolute, the Western powers refused to respond forcefully, instead believing Hitler's assurances that each expansion would be the last or believing that domestic public opinion would not support a forceful response. The nadir of the process was British Prime Minister Neville Chamberlain's return from Munich and his announcement of "peace in our time."

Not everyone, of course, was deceived by Hitler's designs. In England Winston Churchill led the cry to prepare for a war he knew would come, but citizens still war weary from the Great War turned a largely deaf ear. Only when Hitler launched the blitzkrieg against Poland in September 1939 did the situation change. Because of treaty obligations with the Polish state, Great Britain and France were forced to make the declaration of war that marks the formal beginning of World War II. That declaration and the period that fol-

lowed it, symbolically enough, were known as the "phony war": no fighting occurred because neither Britain nor France was mobilized to fight. Only when Hitler turned his war machine against France the following June did the British and French become directly involved.

America's role and reactions to this chain of events should be noted. Except in the Pacific, the chain of Axis advances did not directly involve American interests nor have much of an impact on the American people. Isolated by the Atlantic and Pacific oceans from the gathering war clouds, Americans could and did largely ignore these events, instead concentrating their energies and emotions on coping with the debilitating effects of the Great Depression. The rumblings in Europe were Europe's problem, and there was little sentiment for plucking European "chestnuts from the fire" yet another time.

This was, after all, the era of splendid isolationism in American foreign policy, a period when the lessons of the inextricable link between the destinies of Europe and North America were still not realized nor appreciated. During the rise of the fascist movements, there was even some support for the emerging regimes and particularly for the Nazis.

Because Americans generally opposed the idea that these events affected them, or ignored the situation altogether, there were adverse consequences as the "winds of war" approached. On one hand, those Americans like President Franklin D. Roosevelt who realized that our participation would eventually be necessary were greatly hampered in their efforts to prepare the country for war. Because of legislation enforcing American neutrality, aid for the Western Allies had to be supplied surreptitiously. The American armaments industry could only be developed slowly, and authorization for even a standby draft (i.e., preparing the mechanisms for a draft) passed only in 1940. In the American tradition, we entered the war almost totally unprepared to fight it. As a consequence, it was not until 1943 that the full brunt of American military power could be brought to bear.

On the other hand, the ostrich-like attitude that the war did not concern us affected our reactions when the conflict was finally forced upon us. Active and hot war had been going on in Europe for a year and a half before the attack on Pearl Harbor, and the forces of geopolitics, if closely watched, suggested that American involvement was, in the long run, inevitable. Moreover, many US leaders believed that in all likelihood Japan would be one of our opponents. Yet, the average American did not see the war coming. The "infamy" of the Japanese attack was accentuated and American outrage was all the greater for the surprise. In our reaction to the shock, our objectives were shaped by and pursued with a moral indignation that they might not have had if we had been better prepared.

## Political Objective

The American declaration of war against Japan the day after Pearl Harbor, followed by the German counterdeclaration, threw the United States into its second coalition war of the twentieth century. As had been the case in the Great War, not all who fought together shared the same political and military objectives. The Allies were united in a joint desire to defeat the Axis (especially Germany) militarily, but there were differences of opinion about what constituted that military victory. Their most serious differences were political and largely focused on the postwar map. The greatest divisions among the major Allies were between the Soviet Union and her two major English-speaking partners, but there were some items of disagreement between Great Britain and the United States.

The Americans and the British had many common objectives. Probably the clearest statement of agreed goals was articulated well before America's entrance into the hostilities, when Prime Minister Churchill and President Roosevelt met off the Canadian coast and announced the Atlantic Charter. That document, setting forth eight points, had essentially two thrusts. The first was a statement about how the postwar world should be organized. As a statement of the better state of the peace, the charter emphasized such things as abjuring territorial gains, promoting self-determination as the basis for the postwar political map, and protecting free access to trade and resources for all nations. The other thrust called for the disarmament of the aggressors and a peace that would ensure the physical security of all countries.

The first thrust was primarily political and the second military. Where the two allies disagreed was in the relative emphasis that should be placed on each, and their positions largely reflected national attitudes toward war and politics. From the American perspective, the primary purpose of the war was to rid the world of the absolute evil posed by fascism. This was a highly moralistic goal, reflecting the American tendency (so well illustrated in other conflicts) to view issues in terms of good and evil. Defining the purpose once again as a moral crusade naturally emphasized the second thrust of the Atlantic Charter rather than the underlying political purposes that made the violence necessary. Defining the better state of the peace would have to wait for the end of violence.

The British view, epitomized by Churchill, placed greater emphasis on the postwar map. Recognizing the mortal peril represented by Hitler and the consequent need to vanquish the Nazi opponent, the British view was more geopolitical, placing emphasis both on the military task at hand and on the shape of the postwar map. In Churchill's mind, the primary problem for postwar Europe would be the power vacuum created in eastern and central Eu-

rope by the defeat of Germany and how to blunt and contain Soviet aggres-
sive, imperialistic designs on those areas. The Americans downplayed this
problem, initially because Roosevelt thought he could contain Stalin's ambi-
tions. This disagreement produced friction among the Western Allies through-
out the war and became particularly evident at the time of the final offensive
against Germany in 1945.

The Soviet objective was quite different and considerably more desper-
ate. After the failure of the Soviet initiative to re-create the Triple Entente of
World War I, Stalin entered into the notorious Molotov–Ribbentrop (Nazi–
Soviet) Non-Aggression Treaty in 1939. The Soviet purpose, beyond the
partitioning of Poland in the secret protocol, was to provide breathing space
to mobilize and rebuild its military capability, which had been ravaged by the
purges of the 1930s. When the Nazi onslaught (Operation Barbarossa) began
on 22 June 1941, the initial Soviet objective became survival of the fatherland.
This was not an easy chore as German armies spread further and further into
Soviet territory. The Soviets came within a hair's breadth of losing the war
(some have argued that had the invasion not been delayed for six weeks be-
cause of disturbances in the Balkans, Hitler might well have succeeded).

After the infamous Russian winter bogged down the German advance,
the political objectives of the Great Patriotic War became twofold and se-
quential. The first objective was to ensure the territorial integrity of the So-
viet homeland, and its primary imperative was the physical removal of the
German army. This was, of course, an objective with which the Western
Allies could scarcely disagree, although there was considerable disagree-
ment between Stalin and his allies about the strength, location, and timing of
American and British efforts to alleviate pressure on the Soviets and hence
to facilitate accomplishing the task.

Disagreement was fundamental on the second Soviet objective, which
was to create a physical circumstance in Europe that would preclude a repeat
of Barbarossa. One aspect of this objective was to create a buffer zone be-
tween Russia and Germany to ensure that a future thrust toward Russia could
be confronted in eastern Europe. A buffer zone required states in eastern
Europe at least not unfriendly (preferably sympathetic) to the Soviet Union,
and it was this aspect that troubled Churchill most as he contemplated the
postwar European map. The second aspect was the disposition of postwar
Germany. In a manner of reasoning not dissimilar to France's after World
War I, Stalin wanted a permanently weakened Germany that would not
be capable of again posing the menace already twice visited on the home-
land during the century. This desire came to mean a permanently parti-
tioned Germany, neither part of which would be strong enough to threaten
Soviet security.

Because the Pacific theater of the war was essentially a conflict between the United States and Japan (albeit with a major theater in China and other more minor theaters elsewhere in Asia), American political objectives against Japan were neither complicated nor compromised by the problem of coalition policy-making to the degree they were in Europe. In the Pacific, Allied and American objectives were essentially the same (at least until the Soviets entered the conflict in 1945 with the apparent—now if not then—purposes of gaining a buffer zone in North Korea and a voice in the future of Japan).

The American political objective was straightforward, and was heavily influenced by the Japanese sneak attack on Pearl Harbor. The purpose was the destruction of the Japanese Empire and the abdication of the Japanese emperor, whom most Americans identified—probably erroneously—as the instigator of the Pearl Harbor raid. Roosevelt's description of that attack as a "day of infamy" set the moral tone for a crusade against the perpetrators. Nothing less than the total defeat of the enemy could create atonement; and because the emperor was, in the popular mind, the embodiment of Japan, the emperor had to go. As we shall see in a later section, this absolute requirement may well have lengthened the war in the Pacific and may even be loosely related to the later fighting in Korea.

The final consideration regarding the objective was the relative importance of attaining the political objectives of overthrowing German Nazism or Japanese imperialism: on which end should primary attention be focused? From the viewpoint of the European allies, Nazism represented the greater threat and should be dealt with first. On this point there was agreement within the alliance: Hitler should be defeated first, and then attention should be shifted to Japan. In practice military objectives and strategy only imperfectly reflected this agreement.

#### Military Objectives and Strategy

The military situation upon the entrance of the United States into World War II was fundamentally different from the situation faced by Americans when they entered the Great War in 1917. In World War I the United States entered on the side of viable allies and tipped the scales toward victory. On 7 December 1941 Americans had many allies, but few were in a position to shoulder a significant portion of the burden. The United States was suddenly thrust center stage into a war for which it was ill prepared.

Most of Europe had been overrun by the Nazi war machine. France, the low countries, Norway, and the Balkans were all controlled by the Germans. The Soviet Union was reeling from the lightning-war blows of the Wehrmacht

and was in the painful process of trading its vast spaces for time to recover and counterattack. Britain had survived the German air assault and prevented a Nazi invasion, but its survival was still in doubt. German submarines were taking a fearsome toll on British shipping, and the British army was heavily engaged in North Africa against a superb German general bent on seizing Egypt. Besieged as they were, the Soviet Union and Great Britain were America's only significant allies in Europe.

In the Pacific and Far East, China continued to survive despite the heavy blows of the Japanese but could offer little help to the United States other than to tie down a large portion of the Japanese army. Japan was running rampant across the Pacific. By the end of December 1941, Wake Island and Hong Kong had fallen and Japanese forces had invaded Malaya, the Philippines, and the Gilbert Islands. By mid-March 1942, Malaya, Singapore, Rabaul, and Java had all fallen; the remnants of an Allied fleet had been destroyed in the Battle of the Java Sea; and Gen MacArthur had been evacuated from the Philippines. The European colonial powers were besieged in Europe and could do little to stem the Japanese tide. Help was available from Australia and New Zealand, but it was clear the United States would have to shoulder the majority of the load.

If the world situation was bad, the condition of the American military was worse. Most of the Pacific fleet's firepower rested on the bottom of Pearl Harbor. The American Army was still building and was untested in combat. American air power was still a paper force. Although first-class heavy bombers were coming off the assembly lines, no US fighter could match those fielded by Germany or Japan. In sum the situation at the end of 1941 was dismal.

The overall Allied strategy for the war was actually mapped out well before the United States entered the war. In the winter and spring of 1941, American-British-Canadian (ABC) staff conversations produced a generalized military strategy should the United States enter the war. The plan's first priority was to stop the enemy onslaught. The first American objective was to preserve a secure operating base in the Western Hemisphere. For the British the essential task was clearly to maintain the integrity of the British Isles and, if possible, its dominions in the Far East (particularly India). The second British priority was to maintain control of its sea lines of communication, without which all else would crumble.

The most important agreement reached during the ABC talks had to do with overall Allied priorities. Germany was considered the predominant member of the enemy camp. Thus the staffs agreed that the European theater was the decisive theater and the area for the initial concentration of effort. These priorities dictated that in the Far East the military strategy would have to be defensive at the outset. Later during the war, however, this agreement

would cause considerable consternation (particularly in the US Navy, which considered the naval war against Japan to be at least equally important to the war in Europe).

The offensive campaign against Germany and Italy was envisioned in stages. The first stage was to bring to bear economic pressure, including the denial of raw materials. The second stage was a sustained heavy air offensive against the German homeland. The third stage was to eliminate Italy from the war, since it was considered the most fragile of the three Axis partners. Raids and minor offensives against the enemy were envisioned at every opportunity while forces for the major offensive were built. The fourth and last stage was a major offensive against the Germans on the European continent itself.

In the European theater, the most lasting and vexing questions were where and when to invade the continent in force. The British were wary of a cross-channel invasion. The ghosts of a generation of youth lost on Flanders fields during the Great War haunted the British. They feared that they would again be bogged down in a stalemated war of attrition that they could not afford. They also feared attacking before they were finally prepared and again being thrown off the continent. The memory of Dunkirk died hard.

The Americans desired a cross-channel invasion as soon as possible and argued hard for such an undertaking as early as 1942. The situation was complicated by the need to keep the Soviet Union in the war. The Soviets badly needed a second front, and Stalin used every opportunity to press for an invasion at the earliest possible moment.

The cross-channel invasion controversy would continue throughout the war. The Americans and Soviets pressed for early invasion. The British constantly suggested such alternative (and presumably safe) invasion sites as Italy, Greece, and the Balkans.

Churchill won the first round of the controversy by posing a series of difficult questions that emphasized the enormous problems involved in mounting a cross-channel invasion in 1942. Roosevelt, however, was convinced that the Allies, particularly the Americans, must take dramatic offensive action as soon as possible. With the invasion of France put into the "too-difficult-at-present" category, he agreed to an invasion of North Africa. The object was to trap the German and Italian forces between British forces advancing from Egypt and the Anglo-American invasion forces advancing from Morocco and Algeria.

North Africa offered many advantages over a cross-channel invasion. First, and most important, the landings would not be directly opposed by seasoned German troops. Rather, the invading troops would land on shores controlled by the Vichy French. Although the French would probably oppose the landings, there was the possibility that there would be no resistance and, in any



Charles Noé Daly, wearing cuirass with nineteen pistols. Photograph courtesy Stephen V. Grancsay.

# FIREARMS CURIOSA

*by Lewis Winant*

GREENBERG : PUBLISHER
New York

COPYRIGHT 1955 BY LEWIS WINANT

PUBLISHED IN NEW YORK BY GREENBERG : PUBLISHER, AND
SIMULTANEOUSLY IN TORONTO, CANADA, BY AMBASSADOR BOOKS, LTD.

ALL RIGHTS RESERVED UNDER INTERNATIONAL AND PAN AMERICAN
COPYRIGHT CONVENTIONS.

*Library of Congress Catalog Card Number: 54-7114*

MANUFACTURED IN THE UNITED STATES OF AMERICA

623.44
W72f
707368

REFERENCE

## CONTENTS

Foreword ................................................................

1. Combination Weapons ..........................................

2. Miniature Firearms ............................................ 4

3. Two-Barrel Revolvers .......................................... 5

4. Two-Cylinder Revolvers ....................................... 7

5. Squeezers and Knuckledusters ................................ 7

6. Alarm and Trap Guns .......................................... 9

7. Knife Pistols and Cane Guns .................................. 12

8. Other Disguised Guns ......................................... 14

9. Superposed Loads ............................................. 16

10. Turret and Chain Guns ........................................ 19

11. Miscellaneous ................................................ 20

12. Fancy Free ................................................... 26

    Bibliography ................................................ 27

    Index ....................................................... 27

I wish to acknowledge that I received friendly co-operation and valuable assistance from officers, representatives, and employees of various companies and institutions here and abroad. I wish to mention particularly—Colt's Manufacturing Company, of Hartford, Connecticut; the Library of Congress, the Smithsonian Institution, the National Archives, the United States Patent office, of Washington, D. C.; the Metropolitan Museum of Art, the New York Historical Society, the New York Public Library, of New York City; the Newark Public Library, the New Jersey Historical Society of Newark, New Jersey.

Curiosa is a term that embraces variations from custom not always spoken of as oddities. I settled for *Firearms Curiosa* as a title because there are disagreements as to what are or are not firearms oddities. It is often fully as impossible to analyze a gun to determine why or if it is an oddity, as to analyze a joke to determine why or if it is funny.

With a few controversial or misunderstood guns I have gone to considerable length, but in general I have confined descriptions of oddity guns to their radical features and have omitted minutiae such as barrel lengths, types of rifling if any, even calibers.

The photographs were taken at various times and places, by both amateur and professional photographers. Where a shoulder gun is shown on the same page with a pistol or revolver it is improbable the illustrations will be on the same scale. Where two or more short guns are shown on the same page they will be roughly to scale, with the length of one or another sometimes given. No sizes will be given in the case of pocket knives, pipes, and canes which are of ordinary dimensions.

8

## Chapter 1

## COMBINATION WEAPONS

Of all peculiar firearms the most unbelievable have resulted from man's fondness for combining a gun with something else.

Firearms combined with edged weapons, such as knives, seem reasonable. Pistols combined with table forks seem ill-devised, but they exist. In fact, there is one instance—I believe one only—where a small flintlock pistol was built into a spoon as well as into the companion pieces, the knife and fork.[°]

Guns have been built into purses, canes, police truncheons, flash lights, cameras, and even sundials, with some reason. They have also been built into wrenches, pipes, helmets, stirrups and fish hooks. We shall come to those later.

In starting with combination weapons it may be well to point out that only weapons combined with guns are shown. There are many other forms of combined weapons, such as spears combined with axes, and swords with throwing knives in the scabbards. In this volume no piece is shown that is not capable of shooting, using powder as a propellant. Any miniature pistol, or any tinderlighter for that matter, that is illustrated, can shoot.

We usually think of a combination weapon as combining a gun with another weapon designed for offense. One of the very early combinations was of a pistol and a weapon of defense.

[°] Illustration #267

9

36                    FIREARMS CURIOSA

Sword". The revolving pistol is a percussion cap model with double-action lock and cylinder automatically turned by the trigger shown inside the sword hilt. The ramrod is held by the attachment at the middle of the scabbard.

Mr. Colvin secured another patent, 44,784, on October 25, 1864, for an extraordinary combination of revolver and bayonet. This probably was never put in production. A copy of the patent drawing is shown in illustration 31.

This is a triple threat weapon. Mr. Colvin states his invention can be attached to any gun and he says, "The gun being fired, the pistol is then operated, and afterward the bayonet can be used." The patent has expired and any one may now make as many of these guns as he wishes. Just put in a second trigger and attach it to a rod so it will fire a revolver that is attached to a bayonet that fits over the barrel muzzle. If complications develop, I suggest the reading of Mr. Colvin's patent specifications —and see if that helps.

Inventions of firearms naturally increase greatly when war comes or threatens. Many patents are granted for arms that die a-borning. These range from meritorious and valuable inventions that are overlooked, to the absurd and bizarre.

The remaining illustrations in this chapter are of patents for combination weapons which if marketed at all, sold in very small numbers.

The combination piece, illustration 32, was not invented under the stress of war. Several examples are believed to exist, but none is available for illustration. R. W. Andrews, the inventor, was given his patent, #328, in July, 1837. In the patent drawing, "A" and "B" show the two parts of the weapon. The stock, the lock, and the knife are in one part; the barrel and the scabbard form the other part. The pistol is made whole by simply pushing the blade home in the scabbard. There are two triggers, one for firing, the other for releasing a catch so the two parts may be disengaged. "If an antagonist seizes hold of the barrel and scabbard, for the purpose of wresting the weapon from the hand of the holder . . . he . . . leaves in the hand of his adversary an unsheathed dagger . . . ready for his destruction"—to quote the patent specification.

Another 1837 patent was that granted to Robert B. Lawton,





FIREARMS CURIOSA

30. Colvin Pistol-Sword/ Smithsonian Institution collection.

31. Colvin Revolver-Bayonet patent drawing.

## Chapter 9

# SUPERPOSED LOADS

It happened many times in the days of cap lock muskets that a soldier in battle would not notice if his musket misfired. In case of an unnoticed misfire, he might ram a second charge on top of the first. The barrel then, by mistake, had superposed loads.

The guns with which this chapter is concerned are not those muskets unintentionally charged with superposed loads. The guns here considered are those repeaters with barrels purposely charged with superposed loads.

Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new.

Superposed load guns were of two types, widely different in operation.

In one type the operator had no control of the interval between shots; he could not stop the firing once he had started it. Let's call this kind the Roman candle type. It was charged like a Roman candle, one load on top of another; it also functioned like a Roman candle in that it was self-acting in firing.

Let's call the other kind the controlled type. This, too, was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several fixed locks. Each shot could be fired by trigger pull, presumably when the operator felt he had the proper aim.

166

With the Roman candle type the best the operator could do after the first shot, was to estimate when the self-firing gun would fire its next shot, and try to have the gun properly aimed at that time.

In one form of Roman candle gun the foremost charge was set off by a fuse lighted at the gun muzzle, as a fireworks candle is set off. In the other form the firing was started by gunlock ignition through a touch hole. Roman candle guns were made at least as early as the 17th century, and as late as the 19th, using wheel lock, flintlock and cap lock ignition, but examples of any such guns are extremely scarce. In fact, no American gun with the name Chambers or Kesling on it is known to be still in existence. Joseph Chambers, in flintlock days, and George Kesling, in cap lock days, were probably the only American inventors of Roman candle guns. The Kesling is known to have been a Roman candle type because the Kesling patent is clear on that point. Final proof that the Chambers was of Roman candle ignition came this year with the discovery by John C. McMurray of an early 19th century description of the Chambers invention. More of the Chambers and the Kesling guns later, and of a pistol that might be of Chambers construction.

We do not know just how far back the idea of self-igniting cartridges goes. It would seem that in 1682 Charles Cardiff had the idea "which hitherto by none but himselfe hath been invented or knowne." The quotation is from British Patent #216, granted to "our trusty and wellbeloved Charles Cardiff, Gentleman", by Charles II. The patent described the invention as "an Expedient with Security to make Musketts, Carbines, Pistolls, or any other small Fire Armes to Discharge twice, thrice, or more severall and distincte Shotts in a Singell Barrell and Locke with once Primeing . . .". It further stated that "the Mistery (is) in the Charge."

Mr. Cardiff's patent implied that double locks could be used and that one or more shots could be reserved "till occasion offer." It would seem Mr. Cardiff had in mind two fixed locks, with a separate touch hole for each, the forward one to fire a Roman candle series of charges, and the rear one to fire one or more charges after the series of explosions started by the forward lock was completed. The wording of the patent is indefinite and we can not be completely sure that Mr. Cardiff planned to insert a

solid rather than a perforated bullet somewhere in a series of superposed loads so as to stop the Roman candle effect and to permit resumption of firing by means of another lock.

A very rare and fine German piece is shown in figure 193. This most remarkable gun is capable of doing everything we assume Mr. Cardiff's double-lock gun may have been capable of doing, and it appears to antedate Mr. Cardiff's patent. No maker's name is on it, but the Nuremberg mark is clear.

As illustration 193 shows, there are two locks, the forward being a conventional wheel lock, and the rear an unusual combination wheel lock-matchlock. There is but one trigger.

The gun may be used as a single-shot, employing the rear lock only, or it may be charged with sixteen superposed loads so that the first pull of the trigger will release the wheel on the forward lock and fire nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot.

A safety catch which prevents movement of the wheel on the rear lock at the first trigger pull must be released, after the first series of nine shots, before the second series of six shots can be discharged. To fire the final shot by the third trigger pull it is necessary either again to span the wheel of the rear lock, or to use the match ignition.

The trigger is connected to the forward lock by a wire running through the frame. When the trigger is pulled the priming powder is ignited and fire goes from the pan directly through a touch hole to the foremost powder charge. If the gun be properly loaded the first shot will be followed by eight more self-acting and unpreventable discharges going off in quick succession.

The ignition of the first of the six shots in the second series requires that a train of priming powder be laid from the pan of the rear lock to a touch hole located some six or more inches frontward. A tube is provided that runs under the lockplate and along the barrel. This tube is detachable so it may be readily filled with the flash powder and is held to the barrel by a clip.

After the firing of both series of Roman candle shots the gun remains a loaded single-shot weapon. For the final shot the pan of the rear lock must be reprimed, and a sliding gate between the pan and a rearmost touch hole moved aside. The shot may



193. and 194. Wheel lock gun/ Frank E. Bivens, Jr. collection.

# PEPPERBOX
# FIREARMS

## by Lewis Winant



**New York**

## GREENBERG : PUBLISHER

 Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



COPYRIGHT 1952, BY GREENBERG: PUBLISHER, A CORPORATION.

PUBLISHED IN NEW YORK BY GREENBERG: PUBLISHER AND SIMULTANEOUSLY IN TORONTO, CANADA BY AMBASSADOR BOOKS, LTD.

ALL RIGHTS RESERVED UNDER INTERNATIONAL AND AMERICAN COPYRIGHT CONVENTIONS.

LIBRARY OF CONGRESS CATALOG CARD NUMBER: 52-5627

MANUFACTURED IN THE UNITED STATES OF AMERICA

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 3:19-cv-01537-BEN-JLB Document 152-2 Filed 10/21/22 PageID.14806 Page 143 of 145

Ethan Allen was a gunsmith in Bellingham when the Darling brothers lived there, but just before the Darling patent was secured, Allen moved to Grafton. There he set up a shop with his brother-in-law, Charles Thurber, and there they made pistols and later pepperboxes. The Allen companies were always a family affair. T. P. Wheelock, of Allen & Wheelock, was another brother-in-law. Messrs. Forehand and Wadsworth were sons-in-law and partners of Ethan Allen after Wheelock's death.

Ethan Allen was a pioneer in the transition from handmade to machine-made and interchangeable parts. He probably produced more different kinds of guns—everything from cane guns to fowling pieces and Fourth of July pistols—than any other manufacturer, but we are concerned here only with pepperboxes.

The Allen pepperbox was the first American double-action pepperbox and it was a big success. Trigger action rotated the cylinder and raised the hammer. As quickly as the trigger could be pulled fully back, the hammer was released and the gun fired.

For a dozen years and more after the Colt revolver was first made, sales of Allens far outstripped those of Colts. In 1847, according to the Connecticut Historical Society report, Captain Walker wrote Colt from Washington that ". . . nine men of Ten in this City do not know what a Colt Pistol is and although I have explained the difference between yours & the six barrel ,,Pop Gun,, that is in such general use a thousand times they are still ignorant on the subject . . ."

It will not detract from the renown of the manufacturer who made the first immediately successful American multishot firearm to correct two major mistakes about him that persist in print. The first error lies in associating the firearms manufacturer with the Revolutionary War officer; the second, in referring to Ethan Allen's 1837 patent as a patent for a pepperbox. Misunderstanding became so rooted that a current dictionary incorrectly defines a pepperbox as "a popular name for a pistol invented by Ethan Allen about the time of the American Revolution."

Several independent investigations fail to disclose any relationship between Ethan Allen, the firearms manufacturer born in Bellingham, Mass. in 1808, and Ethan Allen, the hero



Digitized by Google     Original from UNIVERSITY OF MICHIGAN



Fig. 18 Allen Patent Model—6¾″ overall—six-shot—.30 caliber.
(SMITHSONIAN INSTITUTION COLLECTION.)



Figs. 19 and 20 Frames of various Allens with grips and side plates removed.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

of Ticonderoga, who died in 1789. Family relationship between the two men is easily possible, but the Massachusetts Historical Society in Boston states that to its knowledge the fact of relationship has not been established.

The 1837 Allen patent related only to a method of both raising the hammer and driving it down with one pressure of a trigger. It pictured and described the double-action lock mechanism as being for a single-shot pistol.

The Allen pepperbox could be put in action fast. It met the need for a reliable weapon of defense at close quarters and was welcomed by travelers—and emigrants particularly. In those days men rarely traveled any distance unarmed; they were familiar with and knew how to handle a firearm, and they usually kept one under the pillow. Thieves entered at their peril. The Allen imparted a feeling of security not given by a single-shot pistol, and its rapidity of fire over the single-action revolver outweighed the revolver's greater accuracy in the minds of men looking for a weapon for emergency use. A sudden emergency gave no time for deliberate aim.

The Allens were very popular with the Forty Niners. Allens reached California by the cross-country route, by way of the Isthmus of Panama—over, not through, in those days—and by the long way 'round the Horn.

The pepperbox was the fastest shooting hand gun of its day. Many were bought by soldiers and for use by state militia. Some saw service in the Seminole Wars and the War with Mexico, and more than a few were carried in the Civil War. A report by the American Ordnance Bureau, listing firearms that had been used regularly by the U. S. Army, from "Earliest Times to 1903," mentions "Revolving pistols—pepperbox—percussion." In *The History of the United States Army* by William Addleman Ganoe, mention is made of the use of Allens in battles as late as 1857 between U. S. Cavalry and the Cheyennes. But because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use. It could not be properly aimed. The heavy trigger pull and the turning of the barrels disturbed the aim. Furthermore, the top