Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>                                Plaintiffs,<br><br>        **v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>                                Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN SUPPLEMENTAL DECLARATION OF ROBERT SPITZER**<br><br>**VOLUME 5 OF 5**<br><br>Courtroom:      5A<br>Judge:             Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| **CALIFORNIA** | | |
| 1927 Cal. Stat. 938 | 15 n.34 | 003 |
| 1933 Cal. Stat. 1169 | 12 n.30 | 004-007 |
| **DISTRICT OF COLUMBIA** | | |
| Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 652 | 12 n.30 | 009-014 |
| Pub. Law 73-474, ch. 757, 48 Stat. 1236 (1934) | 9 n.23 | 015-020 |
| **HAWAII** | | |
| 1933 Haw. Sess. Laws 117 | 13 n.32 15 n.35 | 022-023 |
| **ILLINOIS** | | |
| 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | 12 n.30, 13 n.31 | 025-028 |
| **LOUISIANA** | | |
| Act of July 7, 1932, no. 80, 1932 La. Acts 336 | 12 n.30 | 030-034 |
| **MASSACHUSETTS** | | |
| 1927 Mass. Acts 413, 413-14 | 12 n.30 | 036-040 |
| **MICHIGAN** | | |
| Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888 | 12 n.30 | 042-049 |

2

| | | |
|---|---|---|
| Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929 | 12 n.30 | 050-053 |
| **MINNESOTA** | | |
| Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 | 12 n.30 | 055-058 |
| **MISSOURI** | | |
| 1929 Mo. Laws 170 | 13 n.32 15 n.35 | 060-061 |
| **NEW HAMPSHIRE** | | |
| N.H. Rev. Stat. § 159:16 | 36 n.124 | 063 |
| 2010 New Hampshire Laws Ch. 67 (H.B. 1665) | 36 n.124 | 064-067 |
| **NEW JERSEY** | | |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 37 n.127 | 069-070 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881). | 36 n.125 | 071 |
| 1920 N.J. Laws 67, ch. 31, § 9 | 12 n.30 | 072-082 |
| 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | 13 n.31 | 083-086 |
| **NORTH CAROLINA** | | |
| 1917 N.C. Sess. Laws 309, ch. 209, § 1 | 12 n.30 | 088-089 |
| **NORTH DAKOTA** | | |
| 1931 N.D. Laws 305-06, ch. 178, §§ 1-2 | 13 n.31 | 091-094 |

3

**OHIO**

| | | |
|---|---|---|
| Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189 | 12 n.30 | 096-097 |

**OREGON**

| | | |
|---|---|---|
| 1933 Or. Laws 488, §§ 72-201, 72-202, 72-207 | 13 n.31 | 099-102 |

**PENNSYLVANIA**

| | | |
|---|---|---|
| 1929 Pa. Laws 777, §1 | 13 n.31 | 104-106 |

**RHODE ISLAND**

| | | |
|---|---|---|
| 1927 R.I. Pub. Laws 256, 256 | 12 n.30 | 108-115 |

**SOUTH CAROLINA**

| | | |
|---|---|---|
| Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288 | 12 n.30 | 117-119 |

**SOUTH DAKOTA**

| | | |
|---|---|---|
| Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245 | 12 n.30 | 121-124 |

**TEXAS**

| | | |
|---|---|---|
| 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6 | 13 n.31 | 126-128 |

**UTAH**

| | | |
|---|---|---|
| 1901 Utah Laws 97-98, ch. 96, §§ 1-3 | 37 n.128 | 130-132 |

**VERMONT**

| | | |
|---|---|---|
| 1923 Vt. Public Acts, No. 130, § 1 | 13 n.31 | 134-135 |

4

| | | |
|---|---|---|
| **VIRGINIA** | | |
| Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137 | 12 n.30 | 137-141 |
| **WASHINGTON** | | |
| Wash. 1933 Sess. Laws 335 | 13 n.32 | 143-145 |
| **WISCONSIN** | | |
| 1933 Wis. Sess. Laws 245, § 164.01 | 13 n.31 | 147-151 |
| **BOOKS**[1] | | |
| Derek Avery, Firearms 12 (Wordsworth Editions, 1995) | 7 n.14 | 173-175 |
| Virgil E. Baugh, Rendezvous at the Alamo 39-63 (University of Nebraska Press, 1985) | 29 n.96, 30 n.99 31 n.104 | 176-195 |
| Ryan Busse, Gunfight 12-15, 65 (Public Affairs, 2021) | 31 n.107 | 196-203 |
| Philip J. Cook & Kristin A. Goss, The Gun Debate 13 (Oxford University Press, 2d ed. 2020) | 9 n.22 | 204-208 |
| William C. Davis, Three Roads to the Alamo 164, 207-8, 582-83 (HarperCollins, 1998) | 29 n.95, 30 n.97, 30 n.99, 32 n.116 | 209-214 |
| John Ellis, The Social History of the Machine Gun 13, 149-52 (Pantheon, 1975) | 6 n.10 19 n.51 | 215-223 |
| Norm Flayderman, Flayderman's Guide to Antique American Firearms 303-5, 683 (Gun Digest Books, 9th ed. 2007) | 20 n.55, 22 n.63 | 224-230 |

---

[1] The Declaration of Robert Spitzer cites Dickinson Bruce, Violence and Culture in the Antebellum South (1979) in its entirety and without discussing the book in detail.  *See* Spitzer Decl. ¶ 30 n.89.  This book is not included with this filing.

5

| | | |
|---|---|---|
| Norm Flayderman, The Bowie Knife: Unsheathing an American Legend 25-64, 495-502 (Andrew Mowbray, 2004) | passim | 231-279 |
| Louis A. Garavaglia and Charles G. Worman, Firearms of the American West, 1866-1894, at 129, 131 (University of New Mexico Press, 1985) | 26 n.87, 26 n.88 | 280-289 |
| Pamela Haag, The Gunning of America 24, 51-52, 56, 60, 65, 96, 353 (Basic Books, 2016) | passim | 290-305 |
| Lee Kennett and James LaVerne Anderson, The Gun in America 91, 112-13, 203 (Greenwood Press, 1975) | 6 n.12, 25 n.79 | 306-317 |
| Larry Koller, The Fireside Book of Guns 112, 154 (Simon and Schuster, 1959) | 23 n.71, 25 n.82 | 318-326 |
| Chris McNab, Firearms and American Law Enforcement Deadly Force 97-98 (Osprey Publishing, 2009) | 7 n.15 | 327-332 |
| James McPherson, Battle Cry of Freedom 475 (Oxford University Press, 1988) | 24 n.74 | 333-334 |
| Jack O'Connor, Complete Book of Rifles and Shotguns 42 (Harper & Row, 1961) | 27 n.92 | 335 |
| Phillip Peterson, Buyer's Guide to Assault Weapons 4-7 (Gun Digest Books, 2008) (as quoted in Robert Spitzer, The Gun Dilemma 29 (Oxford University Press, 2023)) | 28 n.94 | 336 |
| Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter That Changed America 3-5, 54, 136, 390, 401 (Scribner, 2021) | passim | 337-343 |
| Randolph Roth, American Homicide 180-183, 210-217, 218-219 (Belknap Press, 2012) | passim | 344-365 |
| Carl P. Russell, Guns on the Early Frontier 91 (University of Nebraska Press, 1957) | 20 n.56 | 366-367 |

6

| | | |
|---|---|---|
| Robert J. Spitzer, The Politics of Gun Control 25-26, 195-196, 205-11 (Routledge, 8th ed. 2021) | 9 n.22 | 368-378 |
| Robert J. Spitzer, The Gun Dilemma 14-15, 30, 32-33 (Oxford University Press, 2023) | 11 n.29 | 379-389 |
| Richard W. Stewart, American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917, at 367-68 (Washington, D.C.: Center of Military History, 2008) | 5 n.7 | 390-395 |
| Donald M. Snow and Dennis M. Drew, From Lexington to Desert Storm: War and Politics in the American Experience 90, 105-106 (M.E. Sharpe, 1994) | 5 n.8 | 396-437 |
| James Winant, Firearms Curiosa 8, 9, 36, 166, 168, 219-21 (Bonanza Books, 1955) | passim | 438-443 |
| Lewis Winant, Pepperbox Firearms 30, 32 (Greenberg Pub., 1952) | 23 n.70, 23 n.71 | 444-452 |
| **LAW REVIEWS AND JOURNALS** | | |
| David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 849, 851, 852-54, 871-72 (2015) | 17 n.39, 20 n.54 | 454-489 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Problems 55, 63-67, 69 (2017) | 11 n.28, 27 n.90, 37 n.126 | 490-518 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838 | 31 n.110 | 520-521 |
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) | 8 n.17 | 522-532 |
| S. Rep. No. 72-575, at 5-6 (1932) | 9 n.20 | 533-545 |

7

| | | |
|---|---|---|
| Firearms Commerce in the United States Annual Statistical Update 2020, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15, https://www.atf.gov/file/149886/download | 9 n.22 | 555-568 |
| "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45 ; 47 Stat. 650, ch. 465, §§ 1, 14 (1932). Pp. 4, 36, 42, 45, 52 | passim | 569-738 |

**NEWS ARTICLES**

| | | |
|---|---|---|
| David Altheide, *The Cycle of Fear that Drives Assault Weapon Sales*, The Guardian, Mar. 2, 2013 | 31 n.107 | 740-745 |
| Bangor (Maine) Daily Whig, Oct. 27, 1870 | 37 n.129 | 746 |
| Rukmani Bhatia, "Guns, Lies, and Fear," American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear | 31 n.107 | 747-784 |
| Judson Hale, *When Lincoln Famously Used the Almanac*, Almanac.com, May 4, 2022 | 35 n.122 | 785-787 |
| Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The National Interest, Nov. 19, 2019 | 7 n.13 | 788-789 |
| John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.com, March 15, 2011 | 21 n.59 | 790-794 |
| David Kopel, *The History of Magazines Holding 11 or More Rounds: Amicus Brief in 9th Circuit*, Wash. Post, May 29, 2014 | 21 n.57, 24 n.73 | 795-797 |
| Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork, May 14, 2013 | 21 n.58, 21 n.60 | 798-800 |
| *The Man Trap*, The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870 | 38 n.131 | 801 |

8

| | | |
|---|---|---|
| Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*, War History Online, Apr. 26, 2019 | 7 n.14 | 802-811 |
| Philip Schreier, *A Short History of the Semi-Automatic Firearm*, America's 1st Freedom, at 32-39, July 2022 | 23 n.68 | 812-818 |
| *Shot by a Trap-Gun*, South Bend Tribune, Feb. 11, 1891 | 38 n.132 | 819 |

**OTHER SOURCES**

| | | |
|---|---|---|
| "Browning automatic rifle," Britannica, September 8, 2022 | 7 n.13 | 821 |
| Phil Bourjaily, Blast From the Past: Winchester Model 1905, Field & Stream, Jan. 11, 2019 | 26 n.86 | 822 |
| "Bowie Knife," Encyclopedia of Arkansas | 29 n.95 | 823-824 |
| Giffords Law Center, Assault Weapons | 3 n.2 | 825-835 |
| Giffords Law Center, Large Capacity Magazines | 4 n.4 | 836-852 |
| "Gatling Gun," History.com, Sept. 9, 2021 | 5 n.7 | 853-856 |
| Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," Oldwest, n.d., https://www.oldwest.org/bowie-knife-history | 30 n.99 | 857-862 |
| Robert Johnson and Geoffrey Ingersoll, It's Incredible How Much Guns Have Advanced Since The Second Amendment, Military & Defense, Dec. 17, 2012 | 26 n.86 | 863-868 |
| Ian McCollum, "Mannlicher 1885 Semiauto Rifle," Forgotten Weapons, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/ | 22 n.67 | 869-872 |
| How The Machine Gun Changed Combat During World War I, Norwich University Online, Oct. 15, 2020 | 5 n.8 | 873-875 |
| Matthew Moss, From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun, Military History Now, Jan. 16, 2019 | 6 n.9, 9 n.24 | 876-886 |

9

| | | |
|---|---|---|
| "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., Oct. 4-10, 1932 | 8 n.18 | 887-906 |
| Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" The National Interest, July 3, 2020, | 6 n.11 | 907-911 |
| "The Puckle Gun: Repeating Firepower in 1718," Dec. 25, 2016 | 20 n.52 | 912 |
| Uniform Law Commission, *About Us* | 8 n.16 | 913-914 |
| U.S. Census, Historical Population Change Data (1910-1920) | 16 n.38 | 915-917 |
| U.S. Census, National Population Totals and Components of Change: 2020-2021 | 3 n.3, 4 n.5 | 918-921 |
| "Billy Club," Merriam-Webster | 34 n.119 | 922-924 |
| "Bludgeon," Merriam-Webster | 33 n.118 | 925-928 |
| "Slingshot," https://military-history.fandom.com/wiki/Slungshot | 34 n.121 | 929-930 |

Compendium of Works Cited in Supplemental Declaration of Robert Spitzer
(3:19-cv-01537-BEN-JLB)

and I say it with deference to your experience, what I anticipate is that the bulk of the responsibility will rest upon the State in the enforcement of those rules.

Mr. COOPER. There is no disposition on my part to argue with you. I am trying to get at something tangible, something we can take hold of, to see if there is some way to control this matter which we all want, you and I, and I am sure the other members of the committee too. My experience has not at all been along the line of that indicated by you with reference to the Narcotic Act. It so happens that I have had some limited experience with cases coming under that act. It has occurred that an offender might be indicted under the Federal act and under the State act at the same time, and in practice the State courts, in my part of the country, will wait for the Federal court to act and yield jurisdiction of the matter to the Federal court. It has also been my observation that in my part of the country there are perhaps 10 of these narcotic cases prosecuted in the Federal court where there would be one in the State court, although the offense would be a violation of both Federal and State law. When you make the statement that legislation of this type is going to require State legislation that will supersede the Federal legislation, and you base that upon the experience of the Narcotic Act, my experience prevents me from following in that conclusion.

Mr. IMLAY. I submit that to your judgment.

Mr. McCORMACK. What State do you come from?

Mr. IMLAY. I am from the District of Columbia.

Mr. McCORMACK. I appreciate what Mr. Cooper says, but I think that in our State our conditions are a little different. In my section there are a lot of prosecutions in the State courts. I suppose, if we were discussing the question as a question of experience, I would not want the gentleman to be placed in the position of making an argument which, at least, does not support some of the conditions which exist in some sections of the country. There is a tremendous number of prosecutions in the State courts in Massachusetts, the minor cases. The Federal courts take up the serious ones, but the police of Boston catch some with dope in their possession. They bring them in or catch them selling dope and the Federal court may later take jurisdiction, but there is a considerable number of prosecutions in the State courts. My only reason for that is not to contradict my friend from Tennessee but in order that if I were in this gentleman's position, and if I entertained the same thoughts, I would make the same argument he did, based on experience, assuming I agree with the gentleman.

Mr. IMLAY. Mr. Chairman, may I conclude in just about 2 minutes?

The CHAIRMAN. I hope you will be able to conclude soon. We desire to finish the hearing this morning.

Mr. IMLAY. I am willing to agree, in response to the suggestions just made, from a police standpoint, from the standpoint of prosecution, like Mr. Allen, that there are certain things that might be done that will make the law tight and will aid the police and aid the prosecutors, but you are legislating for citizens and when you take the history of firearms and their legitimate use in the history of this country, what do you find? You find that law and order has always been enforced by the citizen body and you can go now into some of our rural sections and you can find it is still true, as it was in the

early part of the Republic, that when the sheriff goes after a gangster, he can go from house to house and he can be sure there is a householder there with a weapon. It was once a shotgun or a rifle, but it is now a pistol, and the weapon is as much a part of the equipment of that household as the Bible on the mantle, but when you go into the city, and much of this legislation has come out of the city, you find a different situation. I ask you, before attempting a system of regulation like this, that you consider somebody other than the attorneys general, somebody other than the police, and consider the citizen, the one that is primarily affected. I thank you.

Mr. HILL. I want to ask 2 or 3 questions. Using the term "firearm" as it is defined in this proposed legislation, do you think that there is sufficient law now to properly and adequately regulate the use of them?

Mr. IMLAY. To regulate what?

Mr. HILL. The use of such firearms.

Mr. IMLAY. Yes.

Mr. HILL. That is, for the protection of society and having in view particularly the development of certain classes of criminals that have grown up in this country within recent times.

Mr. IMLAY. Yes.

Mr. HILL. In other words, you do not feel there is any need of any further regulation of firearms?

Mr. IMLAY. Not of Federal regulation.

Mr. HILL. You said it was impossible to regulate by Federal laws?

Mr. IMLAY. I think so, yes.

Mr. HILL. Did you mean it was impossible, or is it from your viewpoint undesirable?

Mr. IMLAY. I think both. Mr. Hill, I think when Mr. Keenan frankly confessed that he got by the Constitution by making the control measure a taxing measure that it is repugnant to me. It is repugnant for the Attorney General to tell you he gets by the Constitution by calling an act in the preamble a taxing measure and ending by saying that it may be cited as the National Firearms Act.

Mr. HILL. If it is lawful to do it, it is not a case of getting by the Constitution.

Mr. IMLAY. It is side-stepping the Constitution.

Mr. HILL. If you can do it lawfully under the taxing power, it is perfectly legitimate legislation, is it not?

Mr. IMLAY. It is legitimate when you take the letter of the law, but not the spirit.

Mr. HILL. You are opposed to any Federal regulation; that is your attitude?

Mr. IMLAY. Except in a limited sense.

Mr. HILL. And you say you have been working on the proposal of a uniform firearms regulation under State laws?

Mr. IMLAY. That is right.

Mr. HILL. You have not succeeded in obtaining uniformity in that respect?

Mr. IMLAY. We have made very good progress. Some 10 or 12 States have passed the uniform act.

Mr. HILL. But it has not in a material way contributed toward the suppression of kidnaping and bank robbery and general gangster

operations that cross State lines and are not within the jurisdiction of the State courts, in their full and comprehensive scope?

Mr. IMLAY. Not noticeably, and I do not know that any firearm law does, noticeably.

Mr. HILL. If you have Federal regulation such as is proposed here, whereby the Department of Justice and the Federal Secret Service force can take jurisdiction of the matter, do you not think that it would contribute largely toward the stamping out of this kind of crime, toward which the legislation is directed?

Mr. IMLAY. I think not.   If it would, I would be for it.

Mr. TREADWAY. I would like to follow you a moment and plead ignorance.   You referred to the possibility of side-stepping the Constitution.   The one feature of this bill that appeals to me is getting rid of machine guns.   If the Constitution is side-stepped to bring in a taxing measure in order to secure regulation of this nature, why could not we side-step it once more and prevent, by some kind of Federal statute, the manufacture of machine guns?   Where, in the Constitution, are we so terribly tied down that we cannot prevent the manufacture of instruments of such a serious destructive nature as these are to human life?

Mr. IMLAY. If the courts are willing to say that a machine gun is so far contraband, or such a dangerous thing; that was the theory of some of the earlier prohibition acts.   If the courts are willing to say that a machine gun is a nuisance, and insofar as Congress can legislate it legislates them out of existence, or for example, if they say they shall not ship any machine gun across the border at all, if the courts will go that far, I am perfectly willing to see some regulation of machine guns that will confine their manufacture and their use entirely to the police.   We have, Mr. Treadway, a uniform machine-gun act.   I have not mentioned that before, but this uniform machine-gun act has been approved by the American Bar Association, as well as the national conference, which approved it in its 1933 meeting, and this law is designed to accomplish in the States in legislation against machine guns the same thing that the uniform act is with reference to pistols.

Mr. TREADWAY. That is a recommendation you are making to the States?

Mr. IMLAY. Yes.

Mr. TREADWAY. It has nothing to do with the Federal Government?

Mr. IMLAY. I think perhaps a better answer to your question is that there is now pending before the Committee on Interstate and Foreign Commerce of the House H.R. 9399, which is a bill to prevent the shipment of machine guns, submachine guns, sawed-off shotguns and bullet-proof vests in interstate commerce.   I believe that if Congress were to pass that act, assuming that the courts would construe it as I think they would, as sufficiently dangerous to prevent their shipment altogether, I believe that is accomplished by that bill.

Mr. TREADWAY. That would not go as far as the Federal prohibition against manufacture, if we could get by with that.

Mr. IMLAY. It does not.

Mr. TREADWAY. You spoke about whether the courts would support such a proposition.   I am not a lawyer, as probably you will see from my line of questioning, but what defense is there of the possession or manufacture of machine guns outside of the country itself using them in case of war, or in connection with very dangerous police needs?   What other good purpose can be served by the manufacture of any such article?

Mr. IMLAY. There is no good purpose except police, bank guards, Government guards in buildings, et cetera; they are the only ones that ought to have them.

Mr. TREADWAY. As a matter of interest, in your judgment how many machine guns could be used for legitimate purposes such as you are naming now?

Mr. IMLAY. I should say, in the District of Columbia, perhaps 100 ought to be enough.   There are some wagons that go about the streets, from the Treasury Department to the Bureau of Engraving and Printing equipped with them.

Mr. TREADWAY. This has just come to my attention this morning, in a very unofficial way, but I understand that there is in this city today an automobile equipped with machine guns that was captured in Chicago by the Department of Justice agents that has the most complete mechanical devices conceivable against human life.   I cannot see why some form of legislation cannot be enacted within the provisions of the Constitution that will absolutely overcome the possibility, not of transporting it in interstate commerce—that I feel confident we could regulate—but why permit their manufacture? As a result of permitting their manufacture, even though they may be transported contrary to interstate commerce regulations they can be used in this terribly destructive way on an automobile, and they are set off, as I understand, by an electrical connection.

Mr. IMLAY. I am in favor of State laws that forbid the manufacture of machine guns except for those few uses.

Mr. TREADWAY. You cannot go as far as to say that we can sidestep the Constitution sufficiently to prevent their manufacture?

Mr. IMLAY. I think not.   I think you can pass a bill which says you cannot ship machine guns across State lines.   That is as far as the Mann Act goes.

Mr. TREADWAY. Mr. Evans mentions an interesting analogy of opium.   A Federal statute prevents that being manufactured, does it not?

Mr. IMLAY. I am not familiar with that.   I do not know whether there is a separate opium act or not.

Mr. REED. I want to ask the witness a question.   Do you know of any power other than the taxing power and the power to regulate interstate commerce by which we could prevent the manufacture of firearms?

Mr. IMLAY. I know of no other power.   Mr. Chairman, I think I have taken enough time.

Mr. KEENAN. I wonder if I might be permitted to ask the witness one question?

The CHAIRMAN. It is rather an unusual request.

Mr. KEENAN. Or, if I may have the question asked of the witness.

The CHAIRMAN. Without objection, you may ask a question.

Mr. KEENAN. Reference has been to the action of a member of a committee with which the witness served, and I got here a little late, and I do not know what the committee was, but a member of that committee made the open statement that he did not intend to comply with the State law which required registration of firearms. I only want to know what that committee was; was that a committee of the American Bar Association on Uniform State Laws, or how was the committee chosen?

The CHAIRMAN. Can you answer the question?

Mr. KEENAN. You told about a man who said he would not comply with a State law with respect to the registration of a pistol, a comember of a committee with you.

Mr. IMLAY. He was not on the committee; he was a citizen of Detroit.

Mr. KEENAN. Was he interested in the uniform State law, or was he connected with it?

Mr. IMLAY. He was talking with us about our act, and our proposed act.

Mr. TREADWAY. This hearing has run along here for several days and has kept going along the same lines. I do not know whether any representatives of the industry, manufacturers of pistols, desire to be heard. There have been gentlemen here continuously representing the industry, and if we are going to complete the hearings this morning, I wish they might be given time, if they want it.

The CHAIRMAN. The Chair will state that Mr. Nichols was in my office, and he said he would like 5 minutes.

## STATEMENT OF FRANK C. NICHOLS, VICE PRESIDENT, COLT PATENT FIREARMS MANUFACTURING CO.

The CHAIRMAN. The Chair will state that we must, if reasonably possible, close the hearings before noon. Mr. Nichols, I told you the other day that if it was agreeable to the committee, we would give you 5 minutes. Please give your name and in what capacity you appear.

Mr. NICHOLS. My name is Frank C. Nichols; I am vice president of Colt Patent Firearms Manufacturing Co. Mr. Chairman and gentlemen, there are two points I want to bring up, one in which I think you will be particularly interested, namely, the reference to machine guns. My company is the only manufacturer of machine guns in the United States, and our largest and principal client is the United States Government. The machine gun is not a weapon that can be used with any degree of convenience or satisfaction to the class of rascals that the Department of Justice is after. We do not make submachine guns.

Mr. TREADWAY. What is the distinction between a machine gun and submachine gun?

Mr. NICHOLS. A submachine gun is a small weapon, as described to you yesterday by Mr. Keenan, which can be carried under the coat. It is automatic, with a drum feed, holding as high as 500 cartridges, which simply spurts fire.

Mr. VINSON. Who manufactures those?

Mr. NICHOLS. We manufactured 15,000 of those in 1921 for the Auto Ordnance Co., New York. The Auto Ordnance Co. are referred

to on page 66 of the hearing of April 18.   They do not and never did manufacture a machine gun or a submachine gun.   How many they have left, and what their method of merchandising was, I do not know.   It was the invention of Col. John Thompson, formerly Chief of Ordnance, and was designed for purely a military weapon, shooting only a pistol cartridge.   It was not successful as a military weapon, and, unfortunately, I think we can state correctly, they were a bit careless in their method of merchandising.   It got into the hands of the dealers, and some of the dealers were not entirely responsible. I will ask the privilege of filing this catalog with the clerk, illustrating and describing exactly what a machine gun is.   It is not sold commercially; it is sold for strictly military purposes to this Government and to foreign governments, if we are lucky enough to get foreign contracts.

Mr. VINSON. Do I understand today that there is no manufacturer in this country making a submachine gun?

Mr. NICHOLS. No, sir; unless he is making it under cover.

The CHAIRMAN.   There would be no objection, if it is such a menace to society and there is no demand for it, to a law against its being transported in interstate commerce?

Mr. NICHOLS. None whatever, and frankly, gentlemen, it should not be manufactured.

Mr. HILL. Where did the machine guns come from that are in use in this country now?

Mr. NICHOLS. In my opinion, they have been stolen.

Mr. HILL. Stolen from what source?

Mr. NICHOLS. Stolen from police departments, prisons, and from dealers who got them shortly after the manufacture began, and before they were stopped or agreed to stop.

Mr. HILL. Is there any importation of that kind of gun?

Mr. NICHOLS. Not to my knowledge.

Mr. HILL. Where did the police departments get their supplies?

Mr. NICHOLS. From the Auto Ordnance Co.

Mr. HILL. Those 15,000 which you manufactured were for the Auto Ordnance Co.?

Mr. NICHOLS. Yes, sir.

Mr. HILL. That supply is gradually being exhausted, I take it, as far as the Auto Ordnance Co. is concerned?

Mr. NICHOLS. Yes.

Mr. TREADWAY. Those are submachine guns?

Mr. NICHOLS. Yes.

Mr. REED. Shortly after the war, the Ordnance Department put on sale quite a number of guns, among them some Colt .32 revolvers in a .45 frame, and they were sold to people out over the country for a small sum, I think, around $4.   Did they at that time have machine guns for sale, in the same way?

Mr. NICHOLS. No, sir.

Mr. REED. Do you believe that these machine guns are manufactured by the criminals themselves, or through some organization of the criminals?

Mr. NICHOLS. They could be, very easily.

Mr. HILL. Where do they get the ammunition for the submachine gun?

Mr. Nichols. They can buy the ammunition at any sporting-goods store.

Mr. Vinson. They shoot an ordinary pistol cartridge?

Mr. Nichols. Yes.

The Chairman. Of what caliber?

Mr. Nichols. .45.

The Chairman. Referring to the question of Mr. Reed as to the possibility of manufacturing machine guns by the unlawful element, it would require quite a set-up in the way of a factory to do that, would it not?

Mr. Nichols. No, sir. You are referring to the machine guns; I am referring to the submachine guns.

The Chairman. I am talking about submachine guns.

Mr. Nichols. A clever gunsmith or a clever locksmith could put one of those together but it would be a crude job, although it would shoot.

Mr. Hill. Mr. Treadway referred to a fully equipped automobile.

Mr. Treadway. Yes; it is in the city today.

Mr. Hill. That was not a crude affair, was it?

Mr. Nichols. That may have been a Thompson submachine gun. I cannot conceive, if you will study that catalogue, how they could use a machine gun.

Mr. Treadway. In an automobile?

Mr. Nichols. Yes; in an automobile, or anywhere else. Machine guns are only manufactured by my company in this country, and they are all chambered for shooting the high-power military cartridge.

The Chairman. What is the approximate weight of a machine gun?

Mr. Nichols. Sixty-five to ninety pounds.

The Chairman. They are too heavy to be carried.

Mr. Nichols. Yes.

Mr. Vinson. You certainly could equip an automobile with a machine gun.

Mr. Treadway. That was what I was told.

Mr. Vinson. You undoubtedly could plant a machine gun in an automobile and use it from an automobile.

Mr. Nichols. It would be a very inconvenient thing to do and I doubt very much if any criminal or crook or racketeer would resort to that type of weapon.

Mr. Evans. You said your market was almost exclusively to the United States Government?

Mr. Nichols. Yes; and such foreign governments as we can sell.

Mr. Evans. Do you have any other demands at all?

Mr. Nichols. No, sir.

Mr. Evans. If you should have, would you sell one?

Mr. Nichols. No, sir.

Mr. Evans. Are you restricted by law or regulation or otherwise?

Mr. Nichols. Not that I know of, exactly.

Mr. Treadway. You use your own good judgment as to the customers you ought to deal with?

Mr. Nichols. Yes.

Mr. EVANS. Your concern would not, under any conditions, sell anyone but some public functionary or governmental agency?

Mr. NICHOLS. Either the Government or a duly authorized subsidiary thereof.

Mr. EVANS. That is an invariable rule that you have?

Mr. NICHOLS. Absolutely; there is no exception.

Mr. EVANS. Has that always been your rule?

Mr. NICHOLS. Always.

Mr. EVANS. So that any machine gun that may be in the hands of racketeers did not come through your sales department, or otherwise?

Mr. NICHOLS. No, sir; and furthermore, I do not believe there are any machine guns in the hands of racketeers; submachine guns; yes, but we never sold them.

Mr. EVANS. You sold 15,000?

Mr. NICHOLS. Yes; to the Auto Ordnance Co.

Mr. EVANS. Are they restricted in their sale or distribution of those machine guns?

Mr. NICHOLS. I do not believe in the early days they were.

Mr. EVANS. That has not been so long ago.

Mr. NICHOLS. It was in 1921.

Mr. EVANS. That is 13 years ago.   Those machine guns could very well be in use yet, could they not?

Mr. NICHOLS. Yes; they are in use.

Mr. EVANS. Do you think those are the ones in the hands of the racketeers?

Mr. NICHOLS. Yes, sir.

Mr. EVANS. That explains where the racketeers are getting machine guns, in part, at least.

Mr. REED. That exactly is the point I was trying to make when I questioned the witness before, that right after the war they sold a great number of implements such as revolvers and things of that kind as surplusage.   They had been slightly used but they were apparently in good condition.   Does anybody know how many of these machine guns or submachine guns the Ordnance Department sold indiscriminately?

Mr. KEENAN. They did not sell any.   He refers to the Auto Ordnance Co., which is a private corporation.   Mr. Ryan, the president of that company, has already appeared.   As I understand, the Colt Co. manufactured and sold 15,000 submachine guns to the Auto Ordnance Co.

Mr. REED. What did they want them for?

Mr. KEENAN. They owned the patent on the Thompson machine gun and they wanted them to sell at a profit and make some money; it was a pure commercial transaction.

Mr. REED. They sold them to anybody, indiscriminately?

Mr. KEENAN. They sold them to dealers or anybody that wanted them.   I think there is no mystery about that; I think Mr. Ryan would admit it.

Mr. EVANS. I want to know if this bill is enacted into law, would it be possible for another batch of submachine guns to get into the market in some way?

Mr. NICHOLS. I do not see how.

Mr. EVANS. What do you say, Mr. Keenan?

Mr. KEENAN. I think in the first place there is not any legitimate manufacturer of machine guns.

Mr. EVANS. But they could still manufacture them.

Mr. KEENAN. I imagine they could, but it would require elaborate equipment.

Mr. VINSON. They can still manufacture, even with the law.

Mr. EVANS. Why not make it strong enough to make that impossible?

Mr. VINSON. You run into the constitutional provisions.

The CHAIRMAN. It would be a question of whether you took the profit out of it.

Mr. EVANS. I am in favor of making it impossible to manufacture instruments of that kind.

Mr. TREADWAY. Isn't this the unfortunate situation? According to Mr. Nichols, a submachine gun, crude though it may be, can be put together by an ordinarily bright mechanic. That is the situation, and if that is going to reach the racketeer, you cannot overcome it.

Mr. EVANS. He would be a bootlegger in the business, and you cannot stop bootlegging.

Mr. TREADWAY. You say that so far as the present supply of these dangerous submachine guns is concerned, you think they are being largely stolen from police headquarters?

Mr. NICHOLS. Those used by the gangsters. The Auto Ordnance Co., as I understand, still have, but I do not know how many, a quantity of the 15,000 that were made in 1921.

Mr. TREADWAY. They are allowed to sell them without any restrictions?

Mr. NICHOLS. I think not.

Mr. KEENAN. There is no Federal law.

Mr. TREADWAY. They are situated in New York; is there a New York State law that prohibits them from being sold in the State of New York?

Mr. KEENAN. I cannot answer that. There are several States which have laws. Illinois has such a law and Texas has also.

Mr. TREADWAY. New York you do not know about?

Mr. KEENAN. I cannot answer that.

Mr. TREADWAY. I assume these are stored in New York?

Mr. KEENAN. We have an agreement, a code agreement, whereby they do not distribute or sell them to anyone without the specific permission of the Department of Justice, and I would like to have the record show that this company has lived up to that agreement and has acted in an honorable fashion.

Mr. TREADWAY. Isn't it a fact that these three men who are on trial for murder in Massachusetts today, in connection with the killing of a policeman and bank officials secured their big supply of these weapons from an exhibition in an armory somewhere in Massachusetts which they broke into?

Mr. NICHOLS. That is my understanding.

Mr. TREADWAY. And that is an illustration that led you to say that the present supply is being stolen, I assume?

Mr. NICHOLS. Yes.

Mr. EVANS. Mr. Chairman, it occurs to me that 13 years ago, when this concern bought these 15,000 submachine guns, it undoubtedly had legal authority to buy and sell them at that time. Is it not very

156                    NATIONAL FIREARMS ACT

likely that they have the same legal authority to sell them now that they had then?

Mr. Nichols. As far as I know.

Mr. Evans. You would know about it if New York had passed a law in the meantime?

Mr. Nichols. I do not know of any law in New York that covers that point.

Mr. Evans. I presume they are selling those guns yet.

Mr. Vinson. Mr. Keenan, as I understood him, said that they had signed a code agreement and that this concern did not sell the submachine gun except where such sale was approved by the Department of Justice.

Mr. Keenan. That is correct. We have no practical problem with reference to machine guns made by legitimate manufacturers or dispensed by legitimate persons. There are, in several parts of our country, bootleg organizations that are manufacturing them, in accordance with reports from special agents.

Mr. Vinson. You are speaking of submachine guns?

Mr. Keenan. Submachine guns; yes.

Mr. McClintic. What is the name of the company that owns the machine guns in New York at the present time and how were they acquired?

Mr. Nichols. They are named the Auto Ordnance Co.   I do not know the address.   We manufactured under a contract in 1921, 15,000 of those submachine guns, not machine guns, but submachine guns, for them.

Mr. McClintic. For whom?

Mr. Nichols. For the Auto Ordnance Co., New York City.

Mr. McClintic. They bought them and paid the regular price?

Mr. Nichols. They bought them and paid us the contract price. We had nothing to do with the sale or distribution anywhere at any time.

Mr. Treadway. Until there was a code agreement reached with the firm, they were able to dispose of them legitimately to such customers as might apply, without restriction, either of a Federal nature or under the New York State law, as far as we can learn.

Mr. McClintic. Do you have any information as to how many they now have on hand?

Mr. Nichols. They have never ordered any since the original contract, and I do not believe they will.   If they can get out of that deal whole, I do not think they will go back.

Mr. Hill. What was the other proposition you wanted to submit?

Mr. Nichols. It was about the tax in the measure under discussion, and for this reason, for many, many years we have distributed our product through a selected number of jobbers, wholesalers, and retail dealers.   We do not sell to the consumer or the user under any circumstances.   There is no profit in this business, to speak of, to the dealer.   He will not pay this tax; he will go out of business.   You can quite appreciate, I believe, where that leaves us.   We will not sell the user; we refer him now to his nearest dealer, give him the name, if you please, if that will help him any.   I doubt very much, gentlemen, if, under this measure we would be justified in continuing in this small arms business.

Mr. Treadway. You mean pistols and revolvers?

Compendium_Spitzer
Page 728

**157**

Mr. NICHOLS. Yes; speaking solely as to pistols and revolvers.

Mr. TREADWAY. You feel that the inconvenience of this registration and the taxation would practically do away with the demand for a legitimate sale of your goods?

Mr. NICHOLS. Yes, sir.

Mr. HILL. You have reference to the size of the tax; not to the principle, but to the amount of the tax, do you not?

Mr. NICHOLS. Yes, to the amount of the tax; and also I am considering that in many States a law already exists where the dealers pays such a tax to handle small arms.

Mr. HILL. If you take away the tax feature entirely, this bill goes out of the picture.

Mr. NICHOLS. I understand that.

Mr. McCLINTIC. What other articles does your concern manufacture?

Mr. NICHOLS. We manufacture a molded compound material, such as bottle caps, tube caps, and certain lines of electrical equipment. We manufacture dish-washing machines of large types.

Mr. McCLINITC. You do not manufacture shotguns?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. Nothing of that character?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. You do have quite an extensive foreign business, do you not?

Mr. NICHOLS. On arms we have had, up to the present depression.

Mr. McCLINTIC. Then the placing of a tax on pistols does not necessarily mean that your concern would go out of business?

Mr. NICHOLS. No.

Mr. McCLINTIC. What you have in mind is that you might stop making pistols?

Mr. NICHOLS. We might stop making and selling pistols. I wonder if you gentlemen want that brought about. We were very valuable to the Government during the war. We cannot maintain a plant to assist the Government in case of war, unless we can stay in the business. We have been in business nearly 100 years, an honorable business and a legitimate business. We have used the utmost care in the distribution and sale of our product.

Mr. VINSON. What is the average State tax upon dealers for the sale of pistols and revolvers?

Mr. NICHOLS. I am very sorry, but I cannot give that.

Mr. VINSON. Can you give the maximum?

Mr. NICHOLS. $5 to $10.

Mr. VINSON. This substitute bill, as I see it, calls upon the dealer to pay $200 a year. That is quite some difference.

Mr. McCLINTIC. What would be the effect of this legislation if a new provision were added which would exempt duly organized rifle clubs or pistol clubs, organized under some Federal supervision? Would not that allow those that are interested in marksmanship and pistol shooting to carry on in a satisfactory manner?

Mr. NICHOLS. To a certain extent.

Mr. McCLINTIC. I think that such a provision along that line can be added to the legislation.

Mr. NICHOLS. The presentation along that line by General Reckord yesterday, I think, covers it very fully. I am not a lawyer; I am a

58278—34——11

plain, ordinary business man, and sometimes I think not a very good one. The other point I wanted to touch upon is this: That the rascals that the Department of Justice wants to get hold of is a difficult matter. The first thing the racketeer and the bad man does when he gets hold of a gun, and they won't buy it, is to chisel out every identifying mark on the weapon. We keep a record religiously, and we ask our customers to keep a record of where they are sold.

Mr. HILL. This bill provides against that; it provides for that contingency, where they obliterate the number, as I understand.

Mr. NICHOLS. Would that stop him from doing it?

Mr. HILL. It would not stop him from getting the gun.

Mr. NICHOLS. Would it stop him from taking off the number?

Mr. HILL. No; but it would make it an offense if he did take it off.

Mr. NICHOLS. But you are talking about the registration.

Mr. HILL. It is not expected, as I understand, that he will register.

Mr. NICHOLS. No.

Mr. HILL. He will have the gun in his possession; he may have chiseled the number off, but if you find him with that kind of a gun, not registered, then he has committed an offense.

Mr. NICHOLS. What is not registered? He does not register in the first place. I may be thick on this; Mr. Keenan has been the soul of courtesy to me on two occasions, but I cannot get through my head where the matter of registration, the licensing, the fingerprinting, photographing, if you please, are going to get that bad man or help to get him.

Mr. REED. I do not know that I can make it clear to you, but here is my understanding: That if they find the man with the weapon, with the number chiseled off, the then has in his possession something unlawful, and it raises a presumption of guilt against him.

Mr. NICHOLS. Yes, sir.

Mr. REED. And that aids the Department of Justice in the prosecution of the man; that is the theory of it.

Mr. HILL. It enables them to hold him until the case is investigated.

Mr. VINSON. It subjects him to a fine of $2,000 or imprisonment of not more than 5 years.

Mr. NICHOLS. Even so; but where is the advantage of registration?

Mr. EVANS. It seems to me that is the answer.

Mr. VINSON. His point is you could have that offense for that thing without the necessity for registration. You can trace a revolver from the factory; it has been done hundreds of times; it is more cumbersome, perhaps, than if you simply had to look at a list. The point the gentleman is making is you could have an offense with regard to the erasure of an identifying mark without the necessity of registration.

Mr. NICHOLS. That is my understanding.

Mr. EVANS. The primary purpose of the registration, as I get it, is to furnish a means whereby one may have legitimate possession of a gun, is it not?

Mr. NICHOLS. I beg your pardon?

Mr. EVANS. The purpose of registration is to legitimatize the possession of firearms.

Mr. NICHOLS. For pistols and revolvers.

Mr. Evans. I have a pistol which was given me 25 years ago.   I have not seen it for 10 years, but if this law passes I will have to have that pistol registered.   That means I am in lawful possession of that pistol and nobody can question it, but if my neighbor has a pistol, not registered, as Mr. Reed points out, there is some presumption that he has that illegitimately.   Is it not a good thing to have the registration, then?

Mr. Nichols. I am afraid on certain of your questions my reply would be prejudiced because I am in the business.

Mr. McClintic. I have before me a statement of your company which shows that in 1932 you had a profit of $20,795 and in 1933 it had increased to $675,132.   I was just wondering whether the increase of law violation, gangster operation, and so forth, had brought about any increase in the sale of articles which you manufacture?

Mr. Nichols. No, sir.

Mr. McClintic. How do you account for this enormous increase in profit?

Mr. Nichols. That increase in profit as you have read it was in connection with a contract I closed with the Argentine Government in 1926, and for one reason or another, we were unable to find out, we completed this contract but they did not pay it until 1933, and that is reflected in the increase.   That was for machine guns.

Mr. McClintic. That is anticipated profit?

Mr. Nichols. They paid it in 1933.

Mr. McClintic. Then the impression is left by you with the committee that your company deals extensively with many foreign nations?

Mr. Nichols. Yes, sir; we did prior to the depression.

Mr. McClintic. The fact that we would put in a limitation on pistols would not in any way cause you to go out of business, would it? It might reduce your pistol sales to a small extent, but it is liable to be made up by some situation in foreign countries which bring about an increase in business.

Mr. Nichols. No, sir; not in small arms.

Mr. Reed. The thing I have in mind, I cannot see the point in taxing all these small dealers.   I will take my own home town, which is typical of many towns in my district.   There are several hardware stores.   One man will be selling arms because he handles them in connection with sporting goods.   I do not know how many such stores there are in my town; I suppose in this little town of 17,000 there might be a dozen or more handling firearms.   If you put a tax of $200 on them, I can see where 9 out of 10 would go out of business rather than pay any such tax.   The profit is too small.

Mr. Nichols. And you would put that tax on revolvers and pistols, where he may sell 8 or 10 a year.

Mr. Reed. I think the tax is too large; I do not think it accomplishes any great purpose.   You may require them to keep records, but when it comes to a tax of that size, I think it is too large.

Mr. McClintic. Does the gentleman have in mind the thought that he pays no tax on the kind of firearms that are most in demand, shotguns and rifles, which are the two kinds of weapons bought by the sportsmen?

Mr. Reed. A lot of people have hobbies.   I have quite a number of revolvers; I like to shoot at targets.   I have a .22 Colt and I have the Colt .32 in .45 frames, which I take down to the farm and

shoot at targets with.   It is a hobby.   After you use one so long, you like to try something new.   I can see where the small dealer will sell a number of such weapons.

Mr. McCLINTIC. We are bound to admit that it would reduce the number of dealers.

Mr. REED. It seems we might accomplish the purpose without destroying the dealer, without taxing him out of business.

Mr. McCLINTIC. I have thought that if the present situation exists throughout the Nation, with respect to kidnaping, we require something pretty strong.

Mr. REED. I will do anything that stops kidnaping.   The question is, whether you are going to do it without putting on the heavy tax.

Mr. HILL. I think this is a matter for executive session.

Mr. EVANS. How many States in the Union have laws against carrying concealed weapons on the person?

Mr. KEENAN. I should say approximately three fourths.

Mr. EVANS. Some have no prohibition along that line?

Mr. KEENAN. No; some have none.

Mr. HILL. Who is the next witness?

General RECKORD. This gentleman was not our witness.   He and Mr. Harrington were mentioned by the chairman.

Mr. HILL. Does Mr. Harrington wish to make a statement?

General RECKORD. All we would like to say in closing is what we have stated repeatedly, that we are willing to withdraw any objection that we have interposed if this bill is made to apply to machine guns, submachine guns, and sawed-off shotguns.   We will go along with such a bill as that.   We will take either bill that has been proposed if they will eliminate pistols and revolvers, and we suggest they do it for a year or two and try it out.   If in a year or two, with all the other bills that have been passed, and the columns of newspapers stated last night that the Senate and House were in agreement on those bills, and with this as a machine-gun bill solely, we believe the Department of Justice will get the men they are after.   If they find they cannot do it, then we will come along and try to work out the matter of pistols and revolvers.

Mr. McCLINTIC. What would you say along the line of a com-promise by adding to the legislation a section which would allow pistol clubs and certain organizations to be exempt from the provisions of this legislation, in order to take care of those who are conscientious in the thought of promoting marksmanship and things of that kind?

General RECKORD. Mr. Cooper asked me practically that same question.   I told him that we had agreed, in an effort to get together with the Department of Justice, to accept such an amendment, although we are not favorable to it, because it will look like it is an effort on our part to force people to join our organization.

Mr. VINSON. There will be more folks affected who are not members of pistol clubs.

General RECKORD. Millions will be affected.   If this bill is basically right, you do not need to except our members, and we are not asking you to except them.   We ask you to eliminate pistols and revolvers and make it a machine-gun bill and let us try it.

Mr. McCLINTIC. We can take care of the membership business; we can write an amendment so as to fix it so that an organization that

had no membership fee could have the privilege of participating in matches of this kind.

General RECKORD. I would like, for the benefit of the record, if Mr. Seth Gordon might be permitted to read a resolution. He has handed me a resolution which his organization has passed.

## STATEMENT OF SETH GORDON, WASHINGTON, D.C.

Mr. GORDON. This is a resolution of the Izaak Walton League of America. The Izaak Walton League of America, at its convention in April, recommended that there be no legislation of this kind at this time and passed this resolution.

Mr. HILL. It may be included in the record.

(The resolution referred to is as follows:)

RESOLUTION ADOPTED BY THE TWELFTH ANNUAL CONVENTION OF THE IZAAK WALTON LEAGUE OF AMERICA, CHICAGO, ILL., JANUARY 20, 1934

Whereas some 13 million citizens in this Nation, both men and women, take part in the sport of hunting, both with rifle and shotgun, rifle and pistol target shooting, and the sport of shooting clay birds; and

Whereas it is most desirable that the youth of this land, both boys and girls, should be taught the proper use of firearms while young and thus, in a great measure, prevent the occasional accident generally born of ignorance of the proper handling of firearms; and

Whereas, during the past few years, this country has been experiencing a disgraceful wave of crime and domination of gangs and racketeers in many of our leading and most prosperous cities; and

Whereas a certain element of our citizens propose, as a control to this disgraceful crime wave, the control and restriction of the sale of all firearms of whatsoever nature, and to prevent by law the training of the youth of this land in the use of firearms; and

Whereas at the present time there are certain bills before the National Congress designed to restrict the use and sale of firearms in this country; and

Whereas such laws will merely disarm the law-abiding citizens and will in no way prevent the crook, the robber, and the gangster from getting firearms, and it is self-evident to any thinking person that the real remedy to our crime situation is not in disarming the law-abiding citizens but, on the other hand, the diligent enforcement of such laws as we now have; Therefore be it

*Resolved*, That the Twelfth Annual Convention of the Izaak Walton League of America, in its annual convention assembled, this 20th day of April 1934 go on record as being opposed to any and all antifirearms legislation that will in any way affect the right of our citizens to own and bear arms freely.

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

Mr. HILL. Mr. Keenan, do you have anything further?

Mr. KEENAN. I do; but I would as soon put it in the record. It is very brief; I will not burden the committee; it is merely this: For the purpose of the record, and so there will be no misunderstanding, a common impression has been created that the legitimate firearms-manufacturing companies of this country have opposed salutary regulations of firearms from a selfish viewpoint. I want to say that I have been in communication with the largest manufacturers, and I have found that their attitude was an extremely decent and fair one. They have attempted to work with the Department of Justice and in some way to preserve the legitimate business interests, and to work out the best proposal available.

Mr. TREADWAY. Isn't your statement borne out by the testimony of Mr. Nichols? He was emphatic in his statement that his company

wants to abide by the proper regulations of the Government in controlling the illegitimate sale of these weapons.

Mr. KEENAN. That is correct. I cannot overemphasize that. There has been a real effort made along that line, and we feel that the opposition to rules and regulations that would not be burdensome come from those whom we term hobbyists; but the legitimate enterprises, reflecting an investment of capital and the jobs of the employees, have shown a splendid spirit of cooperation with the Department of Justice. I do not want this occasion to go by with some contrary notion prevailing. It does appear—and I think it would be agreed to by Mr. Nichols—that today such companies as he represents are not making money in the manufacture and sale of small firearms to individuals. On the contrary, they are losing money; they are in red ink. Mr. Nichols says that is correct. If we do eventually curtail the distribution of firearms, we will not be destroying the profits of legitimate industry. The fact is, they are not operating at a profit in the manufacture and distribution of small firearms. We will let that speak for whatever it means. So many times reference has been made by members of the committee to this unconstitutional legislation. Before this hearing closes I would like respectfully to call attention to the·case of *Nigro* v. *The United States,* found in volume 276, United States 332, which is a decision by Chief Justice Taft, decided April 9, 1928, in interpretation of the Harrison Narcotic Act.

Mr. TREADWAY. Has that a direct bearing on our problem?

Mr. KEENAN. It has on the constitutionality of the provisions set forth.

Mr. TREADWAY. I suggest that Mr. Keenan furnish a synopsis of it.

Mr. HILL. How long a decision is it?

Mr. KEENAN. It is quite long and involved. I think it might be epitomized.

Mr. TREADWAY. Will you make a synopsis of it?

Mr. KEENAN. Yes.

Mr. VINSON. What is the constitutional point involved?

Mr. KEENAN. The point involved is where a tax is required to be paid by certain persons under the Harrison Narcotic Act, and whether other persons than those required to pay the tax can be required to perform acts to comply with the law, which the Congressmen will see is getting dangerously close in analogy to the precise matter involved here, as far as the constitutionality is concerned.

Mr. HILL. You are referring to the registration feature?

Mr. KEENAN. Yes. I think we ought to answer one question, particularly, asked by the Congressman from California, as to what good registration will do. I think the point has escaped some members of the committee that have not attended all of the sessions. Without registration, there is no way to get at the control of firearms now possessed, before the effective date of the act. It would be helpful in the prosecution of cases where firearms were in possession of those gangsters roaming the lands, which were acquired previous to the enactment of the act.

Mr. VINSON. Why did you not provide for registration in the original bill?

Mr. KEENAN. My answer to that is we had not given it sufficient thought to exhaust all the possibilities of Federal control.

Mr. VINSON. You had given it thought enough to cause the Attorney General to say that he was afraid it was not constitutional.

Mr. KEENAN. I think I ought to answer that the matter of registration, following the provisions of the narcotic act, not the terms of the act but the regulations promulgated, had not been taken up with the Attorney General at the time he made the statement.

Mr. VINSON. He expressed his view at that time.

Mr. KEENAN. I think the Attorney General expressed no definite opinion of its unconstitutionality, but he had some doubt.

Mr. VINSON. He said he was afraid it was unconstitutional.

Mr. KEENAN. He said he was afraid it was unconstitutional, and we got the suggestion while discussing it with the committee, and from further consultation with another branch of the Government, other than the Department of Justice.

Mr. REED. With regard to the registration, what we are seeking to do is when a criminal comes into court to prevent him from escaping prosecution by his saying that he purchased the weapon prior to the enactment of the statute.

Mr. KEENAN. Exactly.

Mr. VINSON. Criminal or law-abiding citizen, if he did have it prior to the effective date of the act, under the law there is no penalty.

Mr. KEENAN. There is a penalty if he transports it in interstate commerce.

Mr. VINSON. But I thought you indicated yesterday, or the day before, or some other time, that because there was no crime in the possession of it that there was some consideration to be given to the idea that you ought not to make it a crime to transport it across State lines.

Mr. KEENAN. I did not intend to convey that idea.

Mr. VINSON. You conveyed it to me.

Mr. KEENAN. I did not intend to say other than this: No penalty was provided for the failure to register, although the Treasury Department has suggested that such a penalty be provided in the act, but it was left out, because we wanted to get a bill, from a practical standpoint, that might receive the favorable consideration of the committee, realizing that there would be great opposition, as has developed, from those opposing the measure, even to the point of one man saying, "I am not going to the trouble of registering and giving my name and address."

(Mr. Keenan subsequently submitted the following estimate of the annual revenue to be derived from the proposed firearms tax measure and an amendment to section 4 of the proposed act upon the suggestion of Mr. McClintic:)

| | |
|---|---:|
| Sales of new firearms, 60,000 a year | $60,000 |
| Sales and transfers of used firearms, 40,000 a year | 40,000 |
| Revenue from tax on dealers and pawnbrokers: | |
| 200 wholesalers and 2,000 retailers at $100 each | 220,000 |
| 100 pawnbrokers at $300 each | 30,000 |
| Revenue from tax on machine-gun manufacturers: | |
| 20 sales at $200 each | 4,000 |
| 4 manufacturers at $500 each | 2,000 |
| Total | 356,000 |

Compendium_Spitzer
Page 735

The estimated number of new and used weapons has been made from figures showing the present revenue derived from the taxation of pistols and revolvers, from the number of machine guns sold annually, from the number of pistols and revolvers manufactured in this country, which has fluctuated from approximately 165,000 in 1929 to 60,000 in 1933, and from the number of licenses obtained in New York City in 1933 to purchase pistols and revolvers.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm, except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Commissioner. If the applicant is a member of any association, designated by the Commissioner, which, in good faith, is organized for the purpose of, and is engaged in, target shooting or hunting, such order shall identify the applicant as a member of such association. In all other cases such order shall identify the applicant by such means of identification as may be prescribed by regulations under this act: *Provided*, That if the applicant is an individual such identification shall include fingerprints thereof.

Mr. HILL. This closes the hearings on the bill, as far as I am advised.

General RECKORD. I desire to extend my remarks if it is agreeable to the committee.

Mr. HILL. Without objection you may file any additional statement you desire.

(The statement referred to is as follows:)

The circular relative to H.R. 9066, referred to by Mr. Allen, was not broadcast, because by the time it had been delivered to us by the printer and the necessary copy of the bill to accompany the circular had been obtained and printed, conferences were already under way with the Attorney General's Office, and indications were at that time that several important changes would be made in the original draft of the bill. Having no desire to spread misinformation, the mailing of this letter was withheld, and it was finally destroyed about a week ago. A considerable number of individual copies of the letter and the accompanying bill were mailed, principally in response to inquiries from sportsmen, but in each case a personal letter accompanying the printed circular pointed out that many of the comments would probably not apply to the redrafting of the bill on which we were working with the Attorney General's Office.

The attempt which was made by Mr. Allen to leave the impression in the minds of the committee that this circular was broadcast throughout the United States was therefore entirely unwarranted. In view of the fact that the representatives of the Department of Justice at the committee hearing on Monday the 14th had been personally advised that this letter was never broadcast, the effort on the part of Mr. Allen to leave this impression with the committee can scarcely be credited as anything more than a deliberate attempt to discredit the National Rifle Association in the eyes of the committee members.

The statements made in the circular were the result of careful examination of the provisions of the bill as originally drafted. Much of the fault that Mr. Allen found with this letter appeared to be based on the fact that the letter did not apply to the bill in its present form. The letter as written had nothing to do with the bill in its present form but referred to the original draft. Many of the comments do, however, still apply to the redraft as submitted on the 14th by Mr. Keenan. Every statement concerning the probable effectiveness of the bill is substantiated by what would appear to be ample evidence to warrant the expression of such opinion.

The history of the so-called "Sullivan law" in New York State is an excellent example. This law was originally enacted to take the place of the conventional prohibition against the carrying of concealed weapons more than 20 years ago. Additional efforts to add teeth to the law have been an almost annual occurrence and have finally reached the point of complete prohibition of the use of rifles in some sections of the State.

In Massachusetts, the history of the firearms law has been the same. Originally a law prohibiting the carrying of concealed weapons, the Massachusetts law, was amended so as to require that a permit be obtained from the police before a pistol or revolver might be purchased. The law also required that a permit be obtained to possess a pistol or revolver in the home or place of business, as well as a special form of permit to carry concealed. As in the case of the Sullivan law,

the Massachusetts law has had the practical effect of disarming honest citizens without disarming the criminal. Accordingly, this year in Massachusetts the conventional step was taken of introducing a bill which would require a permit from the police in order to purchase any firearm, rifle, or shotgun as well as pistol or revolver and the registration of such arms already possessed.

In Michigan the history of firearms legislation parallels that of New York and Massachusetts. Starting from the fundamental concealed-weapons law, the law has been expanded and made more severe until today the regulations cover rifles and shotguns as well as pistols and revolvers. This law has already been in effect in Michigan for 3 or 4 years, but fortunately it is being sanely administered by a superintendent of State police who is favorable to civilian small-arms practice. What will happen when a change in administrative officers becomes necessary cannot be foretold.

In Pennsylvania the same history of firearms regulation has applied. First, the concealed-weapons law, then a bill based on the uniform-firearms act, and now attempts on the part of the same reform groups to put more teeth into the uniform act by requiring a police permit for the purchase of rifles and shotguns and ammunition of all types.

The history of the situation in West Virginia has been the same. The reason that the uniform-firearms bill has not been adopted in Illinois up to this time has been because of the efforts of the reform element to add to the uniform act provisions requiring a permit to purchase, provision for the fingerprinting of bullets, so-called, and various other theoretical plans for disarming the criminal.

In California the story has been the same. From the basis of the concealed-weapons law, California went to a very excellent form of revolver, pistol, and machine-gun regulation based on the provisions of the uniform act. The women's organizations in California, particularly in one section of the State, have been particularly active in demanding that this law be made still more strict. And I suspect that some of the petitions mentioned by Mr. Keenan as having come from women's organizations favoring strict Federal firearms legislation have come from these particular groups in California, as we know that they have forwarded similar petitions to their Representatives and Senators in Congress from time to time.

There is no reason to believe, on the face of the evidence supplied from all parts of the country over a long period of time, that Federal firearms legislation would not follow the usual trend: First, the adoption of some kind of a Federal firearms bill; second, the effort to strengthen its provisions and to put more teeth into it; and finally, the effort to completely disarm the average citizen on the theory that by so doing we would be able to better arrest the armed criminal and save many people from suicide.

There is another reason for believing that this Federal legislation would take the turn indicated. The proponents of this bill, including the representatives of the Department of Justice, have repeatedly stated that they know this bill is not ideal but that they want to make a start. The logical question is "A start toward what?"

Furthermore, Mr. Keenan has said very frankly that the ideal solution of this problem would probably be to have the manufacture of all types of firearms entirely in the hands of the Government arsenals, because the Government could then refuse to sell arms to anyone it might choose to refuse.

When the importance of training our able-bodied citizens in the use of small arms as a measure of national defense was suggested to Mr. Keenan, he expressed the opinion that that was of relatively small importance, because the next war would not be won by small arms, and that in his opinion both the individual soldier, the small arms, and the ships of the fleet would be of no tangible value.

It was on the evidence presented by the Nation-wide history of firearms legislation in this country, plus the frankly expressed opinions of the Assistant Attorney General himself, that we pointed out in our letter the future possibilities of amendments to H.R. 9066.

The reference to possible dictatorial control by one or two men under the provisions of this bill which make it possible for the Secretary of the Treasury or the Commissioner of Internal Revenue to do many things by regulation which are not specifically mentioned in the bill was also based on numerous conversations with Mr. Keenan and Mr. Smith of the Department of Justice. They made it evident that many of the effective provisions under which the Narcotics Act is being administered were not included in the original law at all but had merely been added on as regulations.

NATIONAL FIREARMS ACT

It has seemed to us that while provisions written into a bill may easily be tested in the courts for constitutionality, it would probably be a much more difficult, long-drawn-out, and expensive proceeding to prove that a regulation was unconstitutional. As a matter of fact, we wonder if a regulation, not being a law, could be declared unconstitutional.

This is the evidence and these are the reasons lying behind the statements contained in our discussion of H.R. 9066.

(Thereupon, at 12:20 p.m., the hearings were concluded.)

Compendium_Spitzer
Page 738

# NEWS ARTICLES

**Contribute** →

News website of the year

**News**   **Opinion**   **Sport**   **Culture**   **Lifestyle**

**Opinion**

🕐 This article is more than **9 years old**

# The cycle of fear that drives assault weapon sales
## *David Altheide*

The cause of gun control in the US is lost unless we address the underlying anxiety that makes people feel safer armed

Sat 2 Mar 2013 08.00 EST



The future of guns in our society may be better understood if we knew more about what they *mean* to people and *why* people buy them.

Fear is a major factor for many firearm purchases. Recent trends in gun sales suggest that many citizens are becoming more fearful: Gallup poll data suggest that Americans are more fearful, at near-record high levels, about big government, compared to big business or big labor. This fear overlays the long-term public fear of crime and terrorism.

Reactions to mass killings, particularly the shooting of first-graders at Sandy Hook school in Newtown, Connecticut, sparked a national debate about gun control. But that, in turn, has heightened fear about government's role in regulating assault weapons, especially popular semi-automatic models like the AK-47 and AR-15 that are bought and sold throughout both the US and the world.

Public reaction to the latest assault weapon massacre is disturbing in view of worldwide trends. Studies show that price increases for semi-automatic assault weapons reflect public moods and fears about social instability. According to author James Barr, in many countries, "The Kalashnikov index is effectively a futures market for violence." More than 80m AK-47s circulate between countries in predictable patterns that are associated with social instability.

The cost of this weapon doubled and tripled in Iraq and Afghanistan just before the US invasions of those countries. Afghan arms merchants are selling the model favored by Osama bin Laden for $2,000, while Syrians are paying more than $2,100. Demand and prices fall only when citizens believe that things are settling down.

The US has around 4m assault rifles – about 1% of the 310m firearms owned by Americans according to estimates from the FBI. It is critical to understand the symbolic meaning of this weapon in the context of recent skyrocketing sales.

Then, there's the United States' gluttonous assault weapons market: ravenous buyers across the country flooded gun stores and gun shows after the Newtown shooting. AR-15s and other assault weapons became more expensive as citizens became anxious about gun control and depleted supplies.

For example, in Kansas City, AR-15s that, a year ago, sold for about $400 have lately been fetching $925, with some assault rifle models selling for $1,500 or more. Large capacity magazines that sold for less than $20 are now fetching $100; in some places, bullets for these weapons are costing as much as $1 apiece. All of this at a time when

the economy is bad and people are cutting corners just to get by.

The demand for assault rifles among people who, in many cases, had not previously owned or fired one can be attributed to the popular culture depictions of the weapon in movies, its numerous mentions in national and international news reports, and a paranoid narrative about government control of weapons and losing constitutional freedoms.

My two decades of research and analysis of news reports show that fear has become a staple of popular culture, ranging from fun to dread. This narrative is repeated as "the discourse of fear" - a pervasive communication or symbolic awareness - and with that comes an expectation that danger and risk are a central feature of everyday life.

Weapons in the United States create a paradox that engenders a cycle of fear: the more firearms are widely available and are used in crimes and incidents of mass-killing, the more media reports there are about gun crime, and that, in turn, leads people to buy more weapons like the AR-15. They do so not only to feel safe, but also to *choose a side*.

Owning a gun, especially a contested weapon, makes us direct participants in the battle. One gun industry analyst has observed that gun sales speak to the fact "that there are a lot of young men in the US who will never be in the military but feel that male compulsion to warriorhood."

The Friday after President Obama's first election was the largest ever day for gun sales. Much the same occurred four years later, when the volume of gun sales crashed the NICS (buyer identification system) twice upon his re-election. The FBI processing of nearly 2.8m background checks made November 2012 - the month of the presidential election - gunsellers' busiest month.

It is hardly news that the US is politically divided, but the empirical evidence of escalating stockpiling of semi-automatic weapons also suggests that the US is less socially stable. It is hard to see how this frenzy of fear that is driving a spike of emotional intensity over gun ownership will dissipate any time soon.

---

... we have a small favour to ask. Tens of millions have placed their trust in the Guardian's fearless journalism since we started publishing 200 years ago, turning to us in moments of crisis, uncertainty, solidarity and hope. More than 1.5 million

supporters, from 180 countries, now power us financially – keeping us open to all, and fiercely independent. Will you support us too?

Unlike many others, the Guardian has no shareholders and no billionaire owner. Just the determination and passion to deliver high-impact global reporting, always free from commercial or political influence. Reporting like this is vital for democracy, for fairness and to demand better from the powerful.

And we provide all this for free, for everyone to read. We do this because we believe in information equality. Greater numbers of people can keep track of the global events shaping our world, understand their impact on people and communities, and become inspired to take meaningful action. Millions can benefit from open access to quality, truthful news, regardless of their ability to pay for it.

If there were ever a time to join us, it is now. Every contribution, however big or small, powers our journalism and sustains our future. **Support the Guardian from as little as $1 – it only takes a minute. If you can, please consider supporting us with a regular amount each month. Thank you.**

| Single | Monthly | Annual |
|---|---|---|
| $7 per month | $20 per month | Other |

**Continue** →    **Remind me in November**    VISA  mastercard  AMERICAN EXPRESS  PayPal



**Most viewed**

Bangor (Maine) Daily Whig on October 27, 1870,
https://www.newspapers.com/clip/111681968/ (as of October 20, 2022)

—A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window. A few such "accidents" are needed to teach the thieves who have lately been operating in this city, a lesson.



**CAP** ↗ Inflation Reduction Act  January 6  Climate Change  Elections  COVID-19

Issues    Experts    Events    Press    Take Action    About Us    🔍    Donate

REPORT    APR 24, 2019

# Guns, Lies, and Fear

## Exposing the NRA's Messaging Playbook

The National Rifle Association uses messaging strategies employed by dictators and demagogues to advance its gun rights narrative within the United States.

AUTHORS

Rukmani Bhatia

Gun Violence Prevention

🐦 f in ✉ 🖨



An attendee walks by photographs of National Rifle Association executive vice president and CEO Wayne LaPierre (R), NRA chief lobbyist Chris Cox, and NRA TV commentator Dana Loesch outside the NRA Annual Meeting & Exhibits at the Kay Bailey Hutchison Convention Center on May 5, 2018, in Dallas. (Getty/Justin Sullivan)

## Introduction and summary

*"Our Second Amendment is freedom's most valuable, most cherished, most irreplaceable idea. History proves it. When you ignore the right of good people to own firearms to protect their freedom, you become the enablers of future tyrants whose regimes will destroy millions and millions of defenseless lives."*[1]

*– Wayne LaPierre, executive vice president and CEO, National Rifle Association*

The National Rifle Association (NRA), an organization originally established in 1871 to train hunters and marksmen on gun use and safety, has transformed into one of the most effective political lobbies in modern American history. The group advocates for gun rights, resisting any encroachment on what it deems to be an inalienable right to unhindered, unregulated gun ownership. To advance its mission, the NRA deploys a disinformation campaign reliant on fearmongering and the systematic discreditation of opposition voices in order to secure its position as a powerful lobbyist for the gun industry. The NRA has masterfully constructed a narrative based on gun rights propaganda, evoking images of a society devoid of rule of law and under constant threat of attack from an unidentified but ever-present enemy.

Due to the insidious nature of this messaging approach, the NRA has successfully embedded its false narrative throughout much of the country. By deploying a carefully crafted campaign of misinformation, deception, and confusion, the NRA has both undermined legitimate arguments for common-sense gun law reform and made it substantially more difficult for its emotive, provocative propaganda to be countered with fact and reason. In this way, the NRA's tactics are deceitful not only because they falsely allege to protect American freedoms but also because they mirror fundamentally un-American sources. The propaganda machine of the NRA is similar to that of authoritarian and undemocratic political regimes around the world that deploy disinformation campaigns to secure control over public discourse in their nations, enabling autocrats to maintain a vice grip over information and ensure their power is unchecked and unquestioned.

The efficacy of the NRA's deceitful tactics has been destructive. Gun violence shatters communities across the United States—particularly communities of color—and ravages the nation's youth.[2] Each day, more than 95 people die from gun violence.[3] This epidemic is a uniquely American experience, with the United States standing out as an outlier among its peers with both a disproportionately high percentage of the world's armed civilians and a disproportionately high rate of gun-related fatalities.[4] Yet despite the harsh realities of gun violence, as well as a plethora of attempts to pass legislative solutions to address the issue over several decades, the NRA has skillfully used its control over the narrative around guns to influence lawmakers, repeatedly blocking common-sense legislation on local, state, and federal levels. At the same time, the NRA has churned out a steady stream of messaging and marketing designed to increase American ownership of firearms and sell more guns.

This report examines how the NRA successfully both created the identity of the American law-abiding gun owner and vilified those in government, civil society, and academia working to reform gun laws to reduce firearm-related tragedies. It then illustrates the ways in which nondemocratic leaders construct narratives to secure political power, and how these tactics compare to the messaging strategy deployed by the NRA. By analyzing the messaging tactics used by NRA leadership and paid NRATV hosts, this report shows how the NRA has a specific strategy designed both to control the debate around guns and to influence legislators and policymakers to prevent the implementation of common-sense legislation focused on public safety. This report dissects the NRA's messaging approach and provides examples of the group's rhetoric in order to depict how the organization is mimicking the tactics of autocrats and demagogues.

As gun violence prevention advocates around the country seek to build on the recent public momentum demanding stronger gun laws at the state and federal levels, it is crucial to understand the underpinnings of the NRA's messaging strategy in order to develop a compelling counternarrative capable of challenging the NRA's messaging campaigns.

## Glossary of key terms

**Illiberal nation or regime:** A nation or regime whose leaders are democratically elected but who then implement policies that repress the political rights and civil liberties of their nation, standing in opposition to liberal democratic principles.[5]

**Authoritarian nation or regime:** A nation or regime where power is concentrated among the leadership.[6]

**Populist leader:** A politician who creates two groups within society: an established, corrupt political elite and a marginalized "common people" whom the leader seeks to uplift in social standing.[7]

# How the NRA mutated from supporting gun safety to advocating gun rights

The National Rifle Association has existed for almost 150 years. Today, it is one of the most powerful gun lobbies in the country. However, this modern manifestation would be unrecognizable to its founders. For the organization's first 106 years, its mission was to educate gun owners about guns, with no reference to the Second Amendment.[8]

On November 17, 1871, a group of Union army veterans founded the NRA to train men to be better marksmen. For decades, the group focused on training gun owners to be better hunters, teaching Boy Scouts how to shoot, and discussing hunting and conservation efforts.[9]

The organization's transformation began in the 1960s following a wave of gun control laws; for example, the passage of the Gun Control Act in 1968 created a category of people prohibited from legal gun ownership, including those convicted of violent felonies and domestic abuse.[10] With federal laws beginning to regulate gun ownership, factions within the NRA's membership base felt threatened. This perception resulted in an eventual leadership coup at the 1977 NRA Annual Meeting—often referenced as the "Cincinnati Revolt"—where a large contingent of gun rights radicals ousted the leadership, replacing them with individuals keen to advance an agenda that protected gun ownership rights.[11] The change in leadership also marked a pivotal moment for the organization's mission, with the group shifting starkly away from focusing on hunting and gun safety and instead engaging directly in the political debate around guns.

Following that meeting, the NRA became an organization focused almost exclusively on political issues related to gun rights. Under the guise of protecting civil liberties, the group cultivated a political reputation advocating for the protection of gun rights across federal, state, and local laws.

As the organization was establishing itself as a lobbying operation, it began to develop a stronger connection with the multibillion-dollar gun industry. According to analysis conducted by the Violence Policy Center, the NRA enjoys strong financial ties with the firearms industry, receiving millions of dollars in contributions from industry conglomerates such as the Freedom Group, Bushmaster, and Smith & Wesson.[12] Furthermore, as revealed by *Mother Jones*' investigative reporting, the NRA's "Golden Ring of Freedom" membership status, marking donors who contribute at least $1 million to the group, has numerous executives from firearms manufacturers.[13] The NRA also creates programming and messaging that is sponsored by specific firearms manufacturers.

For example, the NRA developed specific programs sponsored by different gun industry entities, including the creation in 2012 of the Smith & Wesson-sponsored NRA Women's Network,[14] which purportedly provides women gun owners a resource on gun use.[15] The linkages between the gun industry and the NRA's messaging are particularly visible when it comes to semi-automatic assault weapons.[16] The NRA staunchly advocates that these weapons of war continue to be unregulated and readily available on the civilian market, despite evidence that assault weapons increase the lethality of public mass shootings.[17]

In order to advance a political agenda and establish itself within the debate around gun rights, the NRA deploys an aggressive messaging strategy similar to the approaches dictators use to consolidate and secure power. At its core, the messaging strategy of the newly politicized NRA embeds the idea that the Second Amendment is the lynchpin for all other freedoms; the NRA's messaging bedrock rests on the claim that the right to own a firearm is the freedom that protects all other freedoms.[18] This basic concept has become the gun rights organization's rallying cry; stripped of all nuance, the anchor of the NRA's narrative is the idea that the group represents "freedom," making any opposition easily labeled as "anti-freedom."

NRA surrogate and actor Charlton Heston often used his prominent platform to echo this message. In 1997, after being selected to serve as the NRA's First Vice President,[19] the longtime gun rights supporter delivered a speech at the National Press Club, stating:

> **I simply cannot stand by and watch a right guaranteed by the Constitution of the United States come apart under attack from those who either can't understand it, don't like the sound of it, or find themselves too philosophically squeamish to see why it remains the first among equals: Because it is the right we turn to when all else fails. That's why the Second Amendment is America's first freedom.[20]**

Heston's words have become one of the NRA's most prolific slogans to ground its lobbying efforts in protecting American freedoms, and the sentiment of his remarks is routinely parroted by NRA leadership. Chris Cox, chief lobbyist for the organization, stated at the 2018 NRA annual convention, "Together, we're the most bare-knuckled defenders of individual freedom in American history."[21] In an NRATV ad campaign, NRA President Wayne LaPierre claimed, "The only truly free people who have ever walked this earth have been armed people capable of defending themselves and their families."[22] Meanwhile, the infamous sign-off line, "I'm the National Rifle Association of America and I'm freedom's safest place," is used by the group to end various testimonials and video advocacy campaigns, insinuating that the group is fighting to protect fundamental freedoms.[23] This message is, of course, tainted by the fact that the gun rights lobby's mission runs counter to public safety and advocacy efforts focused on reducing the high levels of gun violence that affect communities across the nation on a daily basis.

## Leveraging the demagogue's playbook

*"Every day of every year, innocent, good, defenseless people are beaten, bloodied, robbed, raped, and murdered ... When a criminal attacks, politicians aren't there to protect you. Their laws can't protect you. And the media's lies can't protect you, either. You're on your own. But you know what can protect you when no one else can, when no one else will? The ironclad, absolute safeguard of the Second Amendment right to keep and bear arms."[24]*

– *Wayne LaPierre, executive vice president and CEO, National Rifle Association*

The manipulation of fear and identity politics to develop a convincing narrative that can be shared widely across a population of people is not unique to the NRA. Indeed, it is a core strategy used by autocrats and aspiring dictators to secure power and influence. Demagogues consolidate power by exploiting fear, a primal human instinct, rather than using facts or logical arguments to secure their political standing.

Historically, the approach used by these strongmen includes a common set of tactics:

- Construct a political identity that also serves as a demagogue's target audience
- Craft a political narrative illustrating the existential crises that threaten the defined identity group
- Control the narrative, undermining critical media outlets
- Vilify, discredit, and malign any opposition voice

## Construct a political identity

Establishing a target group within the nation is vital for a political narrative to be constructed based on fear of impending doom. A specific group needs to be manipulated into believing itself to be a marginalized population, neglected by the existing power structures and facing demise or attack.

In recent years, President Recep Tayyip Erdoğan in Turkey has attempted to build a new Turkish identity that brings together his conservative religious base and the broader conservative nationalist constituency.[25] By targeting both these factions, Erdoğan seeks to create a more unified, dominant right-wing alliance on which he can rely to advance his political agenda and overwhelm any opposition to his power.

Similarly, Prime Minister Viktor Orbán has capitalized on the idea of a "Hungarian citizen," playing up fears about how the European Union and the migrant crisis would affect Hungary. Orbán's persistence in establishing a threatened Hungarian identity is evident in his public speeches, including one recently delivered in 2018 in which he declared, "We must state that we do not want to be diverse and do not want to be mixed: we do not want our own colour, traditions, and national culture to be mixed with those of others."[26] Through this xenophobic rhetoric, a marginalized Hungarian identity has emerged in a nation that is largely homogenous.[27]

## Craft a political narrative of crisis

Once an identity group is created, the next piece of the puzzle is to make that group fearful for its existence. By creating a narrative that outlines a pending threat to the group, the illiberal leader is able to manipulate that group and gain political power.

This approach was masterfully deployed by Orbán, who built a political platform centered on the "Hungarian" identity to propel his populist rise to power. He seized on moments of conflict and war in Hungarian history to evoke sentiments of "the glorious Hungarian nation," crystalizing the identity of the Hungarian people and claiming that they are under direct assault from both the large numbers of migrants seeking asylum from conflicts in the Middle East and the European leaders in Brussels who would allow Hungary to be overrun by migrants.[28] In Orbán's own words:

> We shall not allow it [Brussels] to force upon us the bitter fruit of its cosmopolitan immigration policy. We shall not import to Hungary crime, terrorism, homophobia, and synagogue-burning anti-Semitism. There shall be no urban districts beyond the reach of the law, there shall be no mass disorder or immigrant riots here, and there shall be no gangs hunting down our women and daughters.[29]

## Control the narrative

To perpetuate the fears embedded in the narrative, leaders of the political party—along with designated surrogates from different parts of society, including civil society, media, and academia—are used to emphasize the threats facing the chosen populace.

Russian President Vladimir Putin's regime has built effective and expansive systems that enable the Kremlin to control and manipulate narratives throughout the nation.[30] Putin's constructed paradigm claiming that the survival of the Russian state is at odds with liberal democracy justifies his vice grip over the media and information. Within the nation, there is limited independent Russian reporting that is free from the influence of either Kremlin officials or Russian oligarchs beholden to Putin's regime.[31] Moreover, academic research and teachings that deviate from Kremlin-approved narratives have come under bureaucratic attack. In 2018, for example, the European University at St. Petersburg, a private liberal arts college, had its teaching license revoked and was temporarily shuttered by Putin under the guise of failing to meet bizarre bureaucratic requirements.[32]

In the Philippines, in an effort to control the narrative around his controversial "war on drugs" and quash criticism of his regime, Rodrigo Duterte attempts to control the narrative by undermining the media's legitimacy, referring to the press as liars, spies, and distrustful members of society.[33] His targeted attacks on press freedom are part of a strategy that seeks to erode people's confidence in the media's reliability, resulting in critical reporting being discredited or deemed unreliable. Recently, Duterte has focused his efforts on silencing Maria Ressa, co-founder and CEO of Rappler, a prominent news outlet that conducts thorough investigative reporting that often criticizes Duterte's administration.[34] By transforming the media into an unreliable source of information, Duterte seeks to establish his rhetoric around the drug war as the only true narrative.

In Hungary, Viktor Orbán's regime engaged in suppressing press freedom by either systematically shuttering independent news outlets or having Orbán's allies seize control of outlets via hostile takeovers—such as in the case of *Népszabadság*, the nation's largest independent daily news outlet.[35] *Népszabadság* had a reputation for conducting quality investigative reporting on scandals involving members of Fidesz, Orbán's party, which many thought to be the reason the outlet was abruptly suspended in 2016 before being sold to an Orbán ally.[36] This crackdown on press freedom is a necessary part of Orbán's strategy to continue perpetuating the anti-immigrant, xenophobic political narrative that swung voters to support his illiberal party.[37]

## Vilify, discredit, and malign the opposition

Once the political narrative is clearly defined and an "us vs. them" dynamic is established, it becomes easier to sideline, discredit, or malign critics of the regime. Criticism is viewed as a form of treachery and a threat to the survival of the core identity the leader is claiming to protect.

The situation in the Philippines again provides an example. Duterte's unending "war on drugs" has resulted in the extrajudicial murder of thousands, with death estimates ranging from 12,000 to 20,000.[38] His harsh approach has been largely condemned by civil society and government leaders around the world, including Philippine Senator

Leila de Lima, who often used her position in the Senate to voice opposition to Duterte.[39] In February 2017, Senator de Lima was arrested on charges of drug trafficking; however, human rights organizations have denounced her arrest and charges as transparent efforts by Duterte to use his political power to silence a prominent voice of dissent.[40]

In Turkey, the attempted coup in 2016 provided Erdoğan with an opportunity to intensify his crackdown on political and civil rights and cast all opposition to his rule as a betrayal of the nation—as defined by his own conception of Turkish identity.[41] Erdoğan created a list of perpetrators and co-conspirators that extended far beyond those involved in the putsch itself, using the crisis to mark political enemies as traitors and enemies of the state.[42] By targeting critical members of the media, academics, and civil society activists, as well as members of the military and government civil service deemed to be disloyal to his regime, Erdoğan purged the state and body politic of dissent.[43] The state-sanctioned purges and widespread arrests have left him with total control of state institutions and the media in Turkey, virtually ending democratic politics in a nation once poised to join the European Union.[44]

In Hungary, Orbán's regime has challenged dissent or opposition to its xenophobic, anti-immigrant rhetoric by vilifying George Soros,[45] a philanthropist and democracy advocate, claiming he is allied with European bureaucrats who seek to require Hungary to accept migrants who will destroy the country.[46] The government even passed a law making it illegal to assist documenting migrants in any way—a measure dubbed the "Stop Soros" law.[47] Orbán's attacks seek to demonize Soros and undermine his advocacy efforts while also systematically removing links that Soros, a Hungarian American, has to the nation. Orbán's regime has forced the beleaguered Budapest office of the Open Society Foundations—which is funded by Soros and focuses on human rights and democracy advocacy—to relocate to Berlin due to the repressive environment in Hungary.[48] Similarly, the embattled Central European University, also funded by Soros, is relocating to Vienna after Orbán's relentless efforts to shutter the revered academic institution.[49] Orbán's continued attacks on Soros allow the populist leader to undermine a key opposition voice and continue to perpetuate the fear-based narrative that enabled him to secure power in the first place.

## Consequences of the playbook

Collectively, these tactics are regularly implemented in illiberal nations whose leadership is focused on stifling debate, with the extreme methods resulting in crackdowns on political rights and civil liberties in order to suppress a nation into submission. This technique of controlling information around key policies has been successfully used by authoritarians and populists throughout the world.

While the NRA is certainly not seeking complete control over a political system, a comparison to the messaging tactics of autocrats is still instructive, as the group is seeking to retain and maintain political power in order to challenge a growing movement to strengthen gun laws. The NRA's political power rests on its ability to embed a narrative about gun ownership into the American populace and key voting demographics. Therefore, the gun rights organization has needed to build a narrative capable of countering the realities of gun violence and the overwhelming evidence that weak gun laws are causing a public health crisis in the United States. To do so, the NRA chooses to draw from the demagogue's playbook and deploy a campaign based on fear and disinformation to retain power, regardless of the human cost.

# The NRA's core messaging pillars

Just like a demagogue, the National Rifle Association chooses to direct its messaging efforts toward one simple constructed identity: the "American patriot," a law-abiding

citizen who loves the United States and the freedoms enshrined in the U.S. Constitution—chief among them the right to bear arms.[50]

In keeping with the demagogue's playbook, the American patriot is constantly threatened by two different but related enemies. One existential crisis is represented by the security threats constantly facing the American patriot. In the NRA's crafted narrative, law-abiding citizens are preyed upon by lawless criminals who seek to commit acts of violence; a subcategory of lawless criminals are undocumented migrants or, to use the NRA's label, "illegal immigrants," who are undermining the safety and security of Americans throughout the nation.[51] Following the NRA's logic, the only way law-abiding citizens can address these constant threats and keep themselves and their families safe is by possessing a firearm—a right enshrined in the Second Amendment. In the words of NRA President Oliver North, "The Second Amendment is the purest metaphor for freedom because if you are not free to defend yourself and your loved ones, then you are really not free at all."[52]

This ostensible need to possess a firearm for self-preservation is connected to another existential crisis the NRA has constructed: The NRA has consistently undercut advocates for gun violence prevention and common-sense legislation in order to maintain power over the narrative. To achieve this goal, the NRA has turned its political opposition into an anti-American enemy poised to seize guns and suppress freedoms through its anti-gun agenda. Wayne LaPierre verbalized this message at the 2018 NRA annual convention, stating, "The leadership of the National Democratic Party is the most anti-Second Amendment bunch of socialists in United States' history. They'll aim to seize your firearms, destroy your NRA, and entirely obliterate our great Second Amendment."[53]

By routinely associating gun violence prevention advocacy with disarmament—even going so far as to label Democratic members of Congress "disarmocrats"[54] and the 2020 Democratic presidential primary the "disarmament primary"[55]—the NRA has insidiously developed an "us vs. them" dynamic, pitting the NRA's constructed gun-owning American patriot against those who want to pass common-sense reforms. The NRA depicts the conflict of ideas as an existential battle between the two groups in an NRA-constructed zero-sum game, in a manner similar to how Erdoğan brands political opponents in Turkey as existential threats, routinely labeling them as enemies and terrorists.[56] At the 2019 Conservative Political Action Conference (CPAC), Oliver North made clear this absolute fight for gun ownership: "Our opponents call themselves gun control advocates. They are not. They ought to call themselves what they really are: the vanguard of the disarm America movement. ... They want to disarm you. No 2nd Amendment, no individual freedom, no civilian ownership of firearms period."[57]

The NRA generically vilifies people who represent and advocate for liberal and progressive gun policies, labeling them the "violent Left."[58] It exploits and expands the political divisions between the law-abiding gun owner and the political left in an effort to discredit the work that is being done by gun violence prevention advocates, similar to how Duterte attempted to undermine Senator De Lima's credibility—and, subsequently, her investigation into his drug war—by making crass comments about her personal life.[59] NRATV program host Grant Stinchfield recently deployed this divisive tactic by claiming that law-abiding citizens were essentially at war with progressives, stating:

**The threats from many on the Left are turning to violence and intimidation. All of this tears at the heart of a nation because we aren't just divided anymore, we are in an all-out fight, a brawl. While we try to fight fair with truth on our side, the Left uses a win-at-all-costs mentality. It means they no longer play fair. That is the greatest threat to our nation.[60]**

The demonization of "the Left" in this manner tarnishes the work of members of Congress, civil society advocates, members of the traditional media, and academics who seek to advance common-sense gun legislation. Moreover, it likens these individuals to other perceived dangers facing the American patriot, such as "criminals" and "illegal immigrants."[88] As a result, the NRA never has to engage in the actual debate over policy around gun violence prevention, nor does it have to provide evidence and facts to support its opposition. Instead, the gun rights group can claim that freedom and fundamental American rights are again under attack from an anti-American faction of the "violent Left," thereby deflecting from real policy debate and shifting the focus to a narrative it has skillfully constructed.

## How the NRA spreads and engrains its message

Implementing this messaging strategy is effective both for political leaders seeking to retain power—such as Putin, who has held control over Russia's political system for two decades—and for the National Rifle Association, which seeks to hold political clout over lawmakers in the United States. The group uses both the Second Amendment and the constitutional right to bear arms as justifications for its lobbying and advocacy efforts around gun legislation.[89] It has infiltrated legislatures and offices in Congress with substantial effect. The NRA has had astounding success at using its messaging to support advocacy for legislation that expands gun rights while endangering public safety. For example, NRA board member and lobbyist Marion Hammer wields substantial influence within Florida and is known to have authored the state's "stand your ground" law.[90] And within Congress, the NRA's influence is pronounced, with some members parroting NRA talking points in hearings about gun violence.[91]

The NRA's narrative is accessible through its various media outlets, including Twitter, Facebook, and its own media channel. The gun rights group launched NRA News in 2004; the main programming was "Cam & Co," a TV show hosted by Cam Edwards that discussed gun-related news throughout the United States.[92] In 2016, NRA News transformed into NRATV, a 24-hour network with programming on gun rights as well as greater discussions of state and national politics in the United States.[93]

NRATV perpetuates the myths about gun legislation that sit at the core of the NRA's messaging. By using hyperbolic language and extreme examples that are often disconnected from the realities of gun violence, it maintains that guns are needed for self-defense and that legislation only burdens law-abiding citizens. Prominent NRATV host Grant Stinchfield has linked gun violence prevention advocacy to the Islamic State and the Iranian regime, stating: "You got ISIS wanting us disarmed, you got the ayatollah of Iran wanting us disarmed. Last time I checked, both are enemies of the U.S. that do not want us with an ability to fight back. And the Liberals think that's a good idea."[94] Stinchfield is likening those who seek common-sense gun legislation to violent actors who have publicly stated they seek to attack the United States. This not only serves to "other" those working on common-sense gun legislation but also underscores the NRA's crafted narrative that anyone who opposes its gun rights agenda stands in opposition to the freedoms granted to those living in the United States.

In addition to discussing the perceived challenges facing gun owners, NRATV's coverage has expanded beyond just discussing gun rights. In 2017, Wayne LaPierre's speech at CPAC focused more on the need to support newly elected President Donald Trump than protecting gun rights, matching the programming's expanding focus on other policy debates within the United States—such as immigration and women's rights.[95] For example, commentator Dana Loesch recently used her platform as the host of "Relentless" to criticize efforts to increase gender and racial diversity on children's TV program "Thomas the Tank Engine," depicting the animated characters in Ku Klux Klan hoods.[96] The NRA's expansion into policy discussions outside its

traditional bailiwick aligns with the populist tendencies of the current executive branch leadership under President Trump, thus attempting to further the political division between law-abiding gun owners and anyone aligned with the liberal or progressive political spectrum.[70] By expanding its coverage to include partisan issues such as immigration policy, access to health care, and free speech, the NRA is widening the political chasm between law-abiding gun owners and their supposed progressive enemies, creating fewer policy issues upon which the two constructed identities can agree, deepening the "us vs. them" dynamic.

Yet even with these tangents into other polarizing political issues, the core message of the NRA continues to be about protecting the freedoms and rights of the law-abiding American—a message that makes it easy for discussions to be spun back into the gun rights debate.

### Exploiting xenophobia on issues of border security

The issue of security along the U.S.-Mexico border is a prime example of the NRA's messaging tactics. President Trump campaigned on the proposal of installing a wall along the U.S. southern border to ebb the tide of people seeking asylum in the United States. The discussion surrounding this issue is not directly linked to firearms or the gun lobby, yet it has still dominated NRATV programming since President Trump's election.[71] Considering the demagogic approach the NRA uses to craft its narrative, the incorporation of immigration policy in its messaging makes sense.

The issue of immigration at the border presents an existential crisis for the so-called American patriot—a crisis narrative that is perpetuated by the president and his own staff, who have spread blatant falsehoods about the border and the scale of the problem of migrants seeking asylum in the United States.[72] NRATV pundits seized on this political debate, reporting on the alleged border crisis as if it were a threat to all Americans.[73] For example, in March 2019, Grant Stinchfield hosted Maria Espinoza, director of The Remembrance Project, to discuss migration at the border. Espinoza delivered a condemnation of undocumented immigrants that evoked the NRA's rhetoric around immigration that questions the character of undocumented immigrants, equating them with criminals.[74]

NRATV programming also often hosts so-called angel families, whose loved ones were killed by undocumented immigrants, to link the threat presented by the NRA to law-abiding American patriots.[75] Mary Mendoza, whose son was killed in a 2014 car crash with an undocumented immigrant driver, was interviewed by Stinchfield to share her story and thoughts on the congressional debate around border wall funding. Mendoza criticized politicians for ignoring the perceived violence associated with increased numbers of migrants entering the United States, at one point claiming, "We're set to see over a million people come over our border this year. This is an invasion. This is a national emergency."[76] Stinchfield did not fact-check her statements, nor did he counter with the overwhelming evidence showing that migration across the southern border does not increase crime in the United States.

The goal of this interview was not to describe the actual problem but rather to depict an imminent threat to the American people. This tactic continues to perpetuate a sense of insecurity that aligns with the NRA's core message that people need guns to protect themselves.[77] For example, after University of Iowa student Mollie Tibbetts was tragically murdered by an undocumented immigrant in summer 2018, her death became an NRA rallying cry not just for Trump's border security policies but also for more people to be armed. Yet these efforts neglected the fact that this incident was a tragic outlier and that cities with increased migrant populations do not see changes in crime rates.[78] Just like autocrats stir up fears among the populace and present themselves as the only political voice focused on protecting from that threat—something Orbán has done successfully for years in Hungary[79]—the NRA is fomenting fear of violent

immigrants to advance its political agenda: ensuring that people feel the need to buy firearms for their self-preservation.

The narrative spun by NRATV is devoid of facts, focusing instead on sustaining the myth of gun ownership being necessary for self-defense in an increasingly dangerous United States. In this way, the NRA's disinformation campaign mimics the rhetoric and approach of populist Hungary, as Orbán, too, often claims that accepting migrants would result in heightened levels of violence and crime.[80] Perhaps most disturbingly, the NRA seems aware of these similarities, as multiple reports on NRATV have equated the U.S. situation with Hungary.[81] Chuck Holton, a prominent correspondent for NRATV, will often discuss the issue of migration within the United States and compare it to the rise of people fleeing Syria and seeking refuge in Europe. Holton has claimed previously that the asylum seekers' arrival in Europe resulted in increased levels of crime and that the asylum seekers took "great advantage of the generous welfare policies and the more liberal social mores in countries like Germany, France, and the U.K."[82] The goal of these comparisons is to make people in the United States fearful of migrants crossing the U.S.-Mexico border, but it deliberately ignores the distinctions between the two cases. Unlike the demographics of asylum seekers entering Europe, the majority of migrants seeking asylum in the United States are women and children fleeing violence.[83] Moreover, evidence shows that U.S. communities with immigrants do not see increases in crime.[84]

## Manipulating gender stereotypes

The NRA also projects images of vulnerable women and children under attack in order to propel its message of fear to the American populace. The gendered nature of the NRA's approach manifests in two main ways: hypermasculinity and women's vulnerability.

The image of the American patriot is largely linked to the concept of hypermasculinity. In the NRA's narrative, firearms represent the only tools that will protect a person and their family from harm. The subtext of this narrative is related to imbalanced gender dynamics that frame men as protectors of their vulnerable families, thereby implying that to be a masculine man, one must also be a gun owner; otherwise, one is forsaking his duty as a man to his family.[85] It is worth noting, however, that the NRA's narrative about the "good guy with a gun" stopping "the bad guy with a gun" is patently false.[86] Armed civilians have rarely been successful in engaging with and stopping an active shooter. The FBI reviewed 250 active shooting incidents in the United States from 2000 through 2017.[87] In only seven cases was the shooter stopped by a civilian with a valid firearms permit; unarmed bystanders were more effective at intervening and stopping active shootings. Regardless of the evidence, the NRA continues to peddle this flawed rhetoric because it feeds into the fear-based narrative central to the NRA's message. It implies that the world is full of bad people and the only way to defend yourself is through owning a firearm.

Through its narrative, the NRA will also target women in an effort to encourage them to purchase firearms. The gun rights group uses the image of women in two intertwined, problematic ways. First, the NRA portrays women as vulnerable and susceptible to violence, again building on the fearmongering trope that is central to its messaging.[88] The gun rights group will also claim that gun ownership is a means of empowerment for women, giving them agency over their life and body.

In order to push the specific message that women are uniquely vulnerable, the NRA imagines a world in which women face constant attacks and threats from unknown entities that can only be addressed through gun ownership.[89] The organization will often highlight the experiences of individual women who are survivors of violence or harassment, using their stories as proof that all women need to be armed to defend against violent offenders.[90]

To advance the idea that guns are a means for women to feel empowered, the NRA has created programs for women gun owners. For example, "Armed & Fabulous" focuses on glorifying women and guns, linking the featured women to a female iteration of the law-abiding patriot—a women who is self-reliant and able to defend herself and her family because she carries guns.[91] The NRA also runs a women's leadership forum to cultivate young women aspiring to become Second Amendment activists.[92]

Dana Loesch, perhaps the most vocal NRA personality on this subject, has repeatedly pushed the idea of women needing firearms for self-defense and autonomy.[93] In an NRA campaign ad, Loesch delivered the following problematic statement:

> **Here's a message to every rapist, domestic abuser, violent criminal thug, and every other monster who preys upon women. Maybe you've heard the stories about millions of us flocking to gun stores and gun ranges for the first time, the second time, and the 100th time. Here's what that means for despicable cowards like you: Your life expectancy just got shorter because there's a very good chance your next target will be armed, trained, and ready to exercise her right to choose her life over yours. This is what real empowerment looks like.[94]**

This rhetoric—along with the rest of the NRA's messaging around women and guns—is merely designed to stir up emotions and fear rather than address the problem of violence against women within the United States.

The realities of women and violence are much more nuanced than the NRA's crafted message. While there is some anecdotal evidence of successful cases of women using guns in self-defense, academic research finds that defensive gun use is relatively rare. Prolific gun ownership is, however, associated with increased harm to women.[95] Analysis of National Crime Victimization surveys from 2007 through 2011 conducted by David Hemenway and Sara Solnick not only found that a firearm is rarely used in self-defense but also found that during the years reviewed, there were no reports of guns being used in self-defense in incidents of sexual assault.[96] Furthermore, research shows that firearms are used to intimidate and victimize intimate partners rather than defend against violent attacks.[97] In the United States, 4.5 million women have been threatened by an intimate partner with a firearm.[98] Moreover, evidence shows that in cases of domestic violence, a firearm's presence increases the risk that the woman will die by 500 percent.[99] In light of this evidence, the goal of the NRA's messaging becomes clear: It is only focused on advancing the idea of fear, vulnerability, and the need to buy a gun to feel safe.

## How the NRA quashes opposition

A critical part of maintaining a narrative based on misinformation is undermining critics who challenge the lies upon which the messaging is based. Typically, this effort requires either undermining the facts used by opponents, redirecting the debate through "whataboutism," or vilifying the opponents, making their opinions invalid since they seek to betray the law-abiding gun owner. For example, illiberal leaders, such as Duterte in the Philippines, will often openly mock their opposition,[100] while more established authoritarians such as Putin will silence critical voices through threats of violence and assassinations.[101] Similarly, the National Rifle Association deploys a multifaceted strategy to undercut criticism and gun violence prevention advocacy.

### Perpetuating myths and undermining facts

The NRA has a select set of allied researchers who produce academic articles purporting to provide evidence that supports the organization's extremely lax approach to gun

policy. One of the most prominent researchers often interviewed by NRATV is John Lott Jr.[10] Gun enthusiasts often tout his 1998 book *More Guns, Less Crime*, which argues that states that passed concealed carry laws saw decreases in crime rates—an argument that fits neatly within the NRA's narrative that more guns result in less crime.[103] However, Lott's flagship publication has been widely debunked: In 2002, Ian Ayres of Yale Law School and John Donohue of Stanford Law School published a report discrediting Lott's work. They found that, since 1997, in 14 jurisdictions that passed concealed carry laws, there was an increase in every category of crime studied by Lott, thereby undermining the core of Lott's argument.[104] David Hemenway at Harvard University went further than Ayres and Donohue, finding that the model used by Lott was academically unsound and deeply flawed, as miniscule changes to the inputs dramatically changed the results.[105] In response to growing academic criticism, Lott chose to create a fake persona to defend his research, rather than produce credible studies.[106] Further degrading his reputation as a reliable and ethical academic, Lott lied about producing a peer-reviewed article and has continued to manufacture or manipulate statistics to fit his—and the gun industry's—desired narrative around guns.[107]

Despite Lott's poor reputation, the NRA continues to provide him a platform to share his faulty research and malign the work of reliable academics whose findings deviate from the NRA's message.[108] For example, Dana Loesch hosted Lott, who she claimed "is never wrong,"[109] to challenge a Boston University School of Public Health study that linked presence of a gun in the home to youth suicide. Lott attempted to undercut the study by stating, "I don't take the study seriously. I think what's going on here is they have poorly done studies and if they keep putting them out again and again ... they'll just convince people over time that they'll be afraid to have guns in the home."[110] The irony of Lott's criticism is that he employs the very approach he is attacking—but in Lott's case, his work is routinely found to be flawed by credible academics. On Loesch's program, Lott has also challenged studies that Loesch deems to be "anti-gun"; he claims they are "misleading and biased."[111] The NRA and its supporters frequently employ this technique: lambast academic studies for being part of the "Left's anti-gun agenda"[112] in an attempt to negate evidence that indicates that more guns make communities less safe.

Further compounding the challenges around academic research on gun violence legislation, the Centers for Disease Control and Prevention (CDC) is unable to conduct any independent, nonpartisan research on the subject. The NRA strongly supported the passage of the Dickey Amendment, which restricted the CDC from using any funding "to advocate or promote gun control."[113] The amendment effectively chilled gun violence research, creating a vacuum. As a result, of the top 30 causes of death in the United States, gun violence is the least researched and second least funded, with many critical research questions left unanswered.[114]

## Whataboutism

Another tactic masterfully used by the NRA to avoid acknowledging clear contradictions within its rhetoric is the practice of "whataboutism," by which it will raise tangential facts or issues to direct the discussion away from the issue at hand. The approach—a favorite tactic of Putin's regime[115]—is often used by the NRA and its surrogates when covering issues of gun violence prevention in order to misdirect the debate, essentially requiring people to engage in different topics than the core issue at hand.

Recently, NRATV personalities have deployed this technique to argue against common-sense legislation introduced in the 116th Congress to implement a universal background check system for firearm sales. The bill would close existing loopholes in the background check process, which currently only requires licensed gun dealers to run a background check on buyers before selling them a firearm. By requiring private sales of

firearms—including online sales and sales made at gun shows—to require a background check on all buyers to ensure that they are legally allowed to obtain a firearm before completing the sale, the legislation would prevent prohibited people from exploiting gaps in the existing system to obtain a firearm. [■]

However, instead of engaging in policy discussion, the NRA chose to pivot the debate using lies and tangents. On his show, NRATV host Grant Stinchfield stated that this bill would make it harder for people to get firearms, arguing that it would "put law-abiding citizens in prison" and that "even though federal gun registries are illegal, this bill is the first step in creating one."[■] Stinchfield also made the following misleading statement to divert the debate around universal background checks:

> **This background check bill is a vendetta against gun owners and Trump supporters, turning patriots into criminals, stripping us of the right to transfer our gun, possibly holding that gun hostage at a gun store if that gun isn't registered for who knows how long. That government overreach to block us from exercising our constitutional right is a clear and present danger. It is a threat to our republic disguised as gun safety, two words which are a tip off to mean unconstitutional.** [■]

Stinchfield's claims are false. Nothing in the bill would criminalize law-abiding citizens, and the bill contains explicit language barring the creation of a gun registry.[■] Moreover, the expansion of background checks does not limit one's ability to legally possess a firearm or to purchase a firearm; the bill only ensures that all people purchasing a firearm are first determined to be legally able to own a lethal weapon. Stinchfield further muddied the debate by claiming that "the criminals, we know for a fact, will never abide to these background checks," effectively suggesting that gun laws do not work because criminals, by nature, do not obey laws. [■] This rhetoric has been repeated by NRATV pundits, who claim that criminals will not submit to background checks and, therefore, the bill would only punish law-abiding citizens.[■] This misdirection in conversation is deeply problematic, as it ignores the reality that this law would greatly limit the ability of prohibited individuals to easily obtain firearms to commit crimes.[■] Laws exist to set standards and norms within a civilized society with good governance practices; the argument that people break laws is not a reason to reduce legislation. Yet this is one of the NRA's primary arguments against gun legislation.

Stinchfield's and others' vocal opposition does not present a counterargument to universal background checks. It is simply a distraction from the policy debate intended to stoke the fear of losing guns and freedom upon which the NRA's narrative is based.

## Vilification of opposition

Much like demagogues and autocrats demonize their opposition, the NRA attacks advocates of gun violence prevention in order to justify its political agenda. In this vein, the group and its surrogates have repeatedly painted the opposition as traitors who seek to strip the law-abiding gun owner and American patriot of their fundamental freedoms. This tactic serves as an umbrella to vilify the media, government officials, and civil society members who advocate for legislation that would reduce gun violence.

NRA pundits often criticize the media—which they refer to as the "legacy liberal media"—for perpetuating what they deem a "gun-grabbing" narrative. The focus on painting traditional media as a self-aggrandizing disinformation machine is a common theme across NRA media platforms.[■] Dana Loesch accused the media of enjoying gun violence tragedies as a means to increase ratings, claiming that "many in legacy media love mass shootings. You guys love it. I'm not saying you love the tragedy but I'm saying

you love the ratings. Crying white mothers are ratings gold to many in the legacy media."[124] The NRA has repeatedly stated that the media increases panic and misinformation around shootings, arguing that the press coverage makes gun violence appear more prominent than it is.[125] Furthermore, NRA surrogates often imply that the media is deliberately withholding information from the public about gun violence.[126] Much like Putin's and Duterte's attempts to erode public trust in the media, the ultimate goal of the NRA and its surrogates' efforts is to make media sanctioned by themselves appear to be the only reliable source of information.

Members of Congress advancing gun violence prevention legislation face regular attacks from the NRA.[127] The NRA portrays these officials as gun-grabbing traitors who seek to make Americans more vulnerable to attack. For example, House Speaker Nancy Pelosi (D-CA), Sen. Dianne Feinstein (D-CA), and Sen. Chris Murphy (D-CT) are constantly attacked by NRATV personalities. The strikes against these elected officials are not based in policy or fact; instead, the NRA's rhetoric is apocalyptic, using its public platforms to portray those who oppose the group's political agenda as enemies of the American people. This tactic bears strong resemblance to those used by Turkish President Erdoğan, who uses his office and control over the state broadcaster to paint anyone who disagrees with Turkey's official narrative as a traitor seeking to undermine the state.

Speaker Pelosi's leadership has been targeted repeatedly, particularly given her strong stance on not funding a border wall. The NRA attempts to vilify the speaker by making her appear elitist and out of touch with the struggles of average Americans—willing to abuse her power in order to fulfill her personal agendas, including those that would allegedly limit the rights of gun owners.[128]

NRATV personalities depict Sen. Feinstein as someone who is morally opposed to the Second Amendment and American freedoms.[129] Her repeated leadership on legislation to ban assault weapons has made her a common target of the NRA. She has been dubbed "the queen of gun control"[130] on NRATV, with some NRATV personalities maintaining that "assault weapons" do not exist, making Feinstein's proposed legislation a slippery slope toward a universal gun ban.[131] Stinchfield used his show to discuss Sen. Feinstein's introduction of the 2019 Assault Weapons Ban, stating that by introducing a bill that would likely not advance in the Senate nor be signed into law by the president, the senator was "spitting in the eye of hardworking, patriotic Americans."[132]

The visibility of Sen. Murphy's gun violence prevention advocacy efforts increased following the 2012 shooting at Sandy Hook Elementary School in Newtown, Connecticut, where 20 children and six adults were murdered by a shooter with an assault rifle. The NRA directly links Murphy's efforts to pass common-sense gun violence prevention legislation to disarmament, which, it claims, will make American families less safe. In response to a speech delivered by Sen. Murphy in which he discussed the realities of gun violence as part of a call to encourage his fellow lawmakers to pass common-sense legislation, Stinchfield stated, "Chris Murphy and his band of loons in the U.S. Senate and the Democratically controlled House of Representatives want to disarm me. That could cost me and my family our lives."[133] Stinchfield presents Sen. Murphy as an enemy of gun owners, whose efforts are only focused on complete disarmament, making it impossible for someone to support both the senator's call for legislation and also the right to own a gun.

Civil society is actively engaged in the quest to end gun violence and prevent more families from being torn apart by preventable tragedies. The NRA has not missed the opportunity to undermine the efforts of gun violence prevention advocacy organizations by demonizing them as "disarmament advocates."[134] These groups are attacked for being mouthpieces for the coastal elite who are, according to the NRA, fundamentally at odds with the American patriot.[135] The NRA seizes on Michael

Bloomberg's prominence in the gun violence prevention movement through his affiliation with the organization Everytown for Gun Safety.[135] By linking the movement writ large to Bloomberg, the NRA minimizes the efforts being made across the nation at a local level to address this crisis, which is plaguing communities on a daily basis.[137] Furthermore, by linking gun violence prevention advocacy efforts to a prominent billionaire, the NRA is able to perpetuate arguments that the movement is disconnected from the average American—akin to the model used by Orbán to vilify George Soros and his efforts to spread democracy within Hungary.[138]

Nor is Soros free from the NRA's criticism. Personalities on NRATV will lambast him and Bloomberg for their alleged efforts to undermine American freedoms. The attacks from the NRA—and from Wayne LaPierre himself—against Soros mimic those of the populist, illiberal regime in Hungary.[139] The NRA refers to the philanthropist as a "left-wing gun-hater," and the "field general championing and funding liberal progressive causes that amount to an all-out assault on our freedoms."[140]

Shannon Watts, founder of Moms Demand Action for Gun Sense in America, is also targeted by the NRA for her work following the tragedy at Sandy Hook Elementary. Her organization's partnership with Everytown incited the NRA to amplify its claims that gun violence prevention advocacy groups are merely pawns of Bloomberg.[141]

## Consequences and implications of the NRA's illiberal messaging

Strongman leaders use fearmongering rhetoric as part of an overall agenda to gain power and retain control over a country. The National Rifle Association uses these tactics to control the debate around gun violence and ensure the gun industry continues to be profitable, regardless of the human toll.

The implications of the NRA's use of these tactics within the United States are devastating. By creating confusion around the realities of gun violence through misleading reporting, inaccurate academic studies, and false data, the NRA is weakening the public's ability to properly inform themselves about the realities of gun violence and common-sense legislation. Public opinion research indicates that the majority of people in the United States—across partisan lines—support policies to reduce gun violence, such as universal background checks for all firearm sales and assault weapons bans, yet polling data also indicate that a majority of Americans believe gun ownership increases personal safety.[142] Multiple academic studies have found that gun ownership elevates the risks of homicide, suicide, and unintentional shootings.[143] Americans' confusion about guns and safety is indicative of how deeply the NRA's messaging has penetrated the American public and how intractable the false narrative can be.

By perpetuating a culture of fear and divisiveness, the gun rights group is crippling legislators and lawmakers who want to address a public health crisis that kills more than 35,000 people a year in the United States.[144] The gun lobby has prominent political ties and has historically been able to advance or block legislation in many states and in Congress. Many members of Congress not only support or oppose legislation tied to the NRA's interests but also will repeat the organization's talking points in hearings or on the floors of Congress.[145]

## The NRA and Russia

The implications of the NRA's use of illicit messaging tactics is problematic for the health and strength of U.S. democracy, with questions arising following the 2016 election on the linkage between Russia and the NRA.[146] For years, gun violence prevention advocates have raised concerns about the

lack of information around who donates to the organization—which is notoriously tight-lipped about its funding streams.[147] Some links between the gun rights organization and foreign entities were exposed through the indictment of Maria Butina in 2018, who pled guilty to conspiring to act as an unregistered agent of Russia.[148] Butina established a relationship with members of NRA leadership, helping NRA leaders travel to Moscow, as well as meet with prominent Republican political figures.[149] Given Russia's desires to destabilize the United States, the connections between Butina, Russian officials, and NRA leadership are troubling. It brings into question whether the organization that brands itself as "freedom's safest place" could be associated with efforts to destabilize American democratic principles and norms.[150]

## Conclusion

*"Americans all over this country are so sick of the lies and the sanctimonious hypocrisy that has pushed good citizens in this country to the edge of fear, fear for the future of their country, fear of an increasingly unstable society."*[151]

*– Wayne LaPierre, National Rifle Association Annual Meeting, 2018*

While the strategy of the National Rifle Association has been remarkably effective thus far, the United States has recently experienced a shift around gun culture. In 2018, following the murder of 14 students and three staff members at Marjory Stoneman Douglas High School in Parkland, Florida, by a shooter armed with an assault rifle, several corporations severed ties with the gun rights organization.[152] Gun violence prevention has become a priority policy for many people in the United States, with many candidates campaigning on gun violence prevention legislation during the 2018 midterm elections and winning their seats—including in Virginia's 10th congressional district, where the NRA is headquartered.[153] Cracks are being exposed in the group's façade, and it is not responding well.

The vitriol in the group's messaging has become so pronounced that it has caused long-standing members of the organization to question its strategy. Prominent members such as Marion Hammer, one of the NRA's most revered lobbyists, have questioned whether NRATV's expanded messaging and inflammatory language are actually necessary to fulfill the group's stated goals. Jeff Knox, NRA member and director of The Firearms Coalition, a prominent grassroots gun rights organization, even noted that the programming seems to be more focused on providing "red meat for the hard right" than elevating the Second Amendment.[154] The internal debates on the value of NRATV and whether the organization needs to engage in fearmongering and demonizing rhetoric expose the truth behind the NRA's messaging strategy: The goal is not to protect gun rights but to secure power.

The NRA has established a narrative that frames the organization as the protector of freedom while combating the passage of legislation that would make communities safer from gun violence. Yet the group is not driven by a desire to protect fundamental freedoms. Much like a nondemocratic leader, its goal is centered around a desire to secure and sustain political power. While authoritarian regimes use the demagogue's playbook to suppress civil liberties and political rights, the NRA's playbook protects the gun industry and allows the epidemic of gun violence to continue ravaging the nation.

## About the author

**Rukmani Bhatia** is the policy analyst for Gun Violence Prevention at the Center for American Progress. She previously served in the Obama administration in the U.S.

Agency for International Development's Bureau for Europe and Eurasia. Prior to her political appointment, she served as the inaugural Hillary R. Clinton research fellow at the Georgetown Institute for Women, Peace & Security. She holds a master's degree from Georgetown's Edmund A. Walsh School of Foreign Service and a bachelor's degree with honors from Wellesley College.

## Acknowledgments

The author wishes to thank Chelsea Parsons for her indispensable counsel. She thanks Steve Bonitatibus for his vital advice and guidance in writing this report. She would also like to thank Katrina Mulligan, Max Bergmann, and Max Hoffman for their valuable input and feedback.

## Endnotes                                            Expand ⌄

1 NRA-ILA, "Wayne LaPierre Fights for the Second Amendment Before the United Nations," available at https://www.nraila.org/articles/20120711/wayne-lapierre-defends-the-second-amendment-before-the-united-nations (last accessed April 2019).

2 Chelsea Parsons and others, "America's Youth Under Fire" (Washington: Center for American Progress, 2018), available at https://americanprogress.org/issues/guns-crime/reports/2018/05/04/450343/americas-youth-fire/; Chelsea Parsons and Eugenio Weigend Vargas, "America Under Fire" (Washington: Center for American Progress, 2016), available at https://americanprogress.org/issues/guns-crime/reports/2016/10/11/145830/america-under-fire/.

3 Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at https://www.cdc.gov/injury/wisqars/fatal.html (last accessed April 2019).

4 Aaron Karp, "Estimated Global Civilian-Held Firearms Numbers" (Geneva: Small Arms Survey, 2018), available at http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf; Matthew Miller and others, "Household Firearm Ownership and Rates of Suicide Across the 50 United States," *The Journal of Trauma* 62 (4) (2007): 1029–1034, available at https://www.ncbi.nlm.nih.gov/pubmed/17426563; Anita Knopov and others, "Household Gun Ownership and Youth Suicide Rates at the State Level, 2005-2015," *American Journal of Preventive Medicine* 56 (3) (2019): 335–342, available at https://www.ajpmonline.org/article/S0749-3797(18)32383-3/fulltext; David Hemenway and Matthew Miller, "Firearm Availability and Homicide Rates across 26 High-Income Countries," *The Journal of Trauma* 49 (2000): 985–988, available at http://jonathanstray.com/papers/FirearmAvailabilityVsHomicideRates.pdf.

5 Fareed Zakaria, "The rise of illiberal democracy," *Foreign Affairs*, November/December 1997, available at https://www.foreignaffairs.com/articles/1997-11-01/rise-illiberal-democracy.

6 Robert Kagan, "The strongmen strike back," *The Washington Post*, March 14, 2019, available at https://www.washingtonpost.com/news/opinions/wp/2019/03/14/feature/the-strongmen-strike-back/?utm_term=.163314cdc84.

7 Uri Friedman, "What is a Populist?", *The Atlantic*, February 27, 2017, available at https://www.theatlantic.com/international/archive/2017/02/what-is-populist-trump/516525/.

8 Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* (New York: W.W. Norton & Company, 2011).

9 Joel Achenbach, Scott Higham, and Sari Horwitz, "How NRA's True Believers Converted a Marksmanship Group Into a Mighty Gun Lobby," *The Washington Post*, January 12, 2013, available at https://www.washingtonpost.com/politics/how-nras-true-believers-converted-a-marksmanship-group-into-a-mighty-gun-lobby/2013/01/12/51c62188-50b9-11e2-88d0-c4cf65c98d15_story.html?utm_term=.of8dfoc7a18.

10 Bureau of Alcohol, Tobacco, Firearms and Explosives, "Gun Control Act," available at https://www.atf.gov/rules-and-regulations/gun-control-act (last accessed April 2019).

11 Achenbach, Higham, and Horwitz, "How NRA's True Believers Converted a Marksmanship Group Into a Mighty Gun Lobby."

12 Violence Policy Center, "Blood Money II: How Gun Industry Dollars Fund the NRA" (Washington: 2013), available at http://vpc.org/studies/bloodmoney2.pdf.

13 Josh Harkinson, "Fully Loaded: Inside the Shadowy World of America's 10 Biggest Gunmakers," *Mother Jones*, June 14, 2016, available at https://www.motherjones.com/politics/2016/06/fully-loaded-ten-biggest-gun-manufacturers-america/.

14 Violence Policy Center, "Blood Money II"; NRA-ILA, "NRA Women's Network Now Presented by Smith & Wesson," available at https://www.nraila.org/articles/20121106/nra-womens-network-now-presented-by-smith-wesson (last accessed April 2019).

15 NRA-ILA, "NRA Women's Network Now Presented by Smith & Wesson."

16 Peter Overby, "Financial Ties Bind NRA, Gun Industry," National Public Radio, December 20, 2012, available at https://www.npr.org/sections/itsallpolitics/2012/12/20/167721735/financial-ties-

**17** Ibid.; Everytown for Gun Safety, "Assault Weapons and High-Capacity Magazines," available at (last accessed April 2019).

**18** Cam & Co, "David Harsanyi: First Freedom," NRATV, October 4, 2019, available at .

**19** Charlton Heston was voted by the NRA board to serve as the group's First Vice President in 1997. The following year, he was elected president of the organization. For more information, see Katharine Seelye, "Close Votes in NRA Elections Quash Hope for Internal Unity," *The New York Times*, May 6, 1997, available at ; David Kinney, "Charlton Heston Wins NRA Presidency," Associated Press, June 8, 1998, available at .

**20** C-SPAN, "National Rifle Association Future," September 11, 1997, available at . Quote appears at 15:01.

**21** Chris Cox, "Speech at 2018 NRA Member's Meeting," May 5, 2018, available at .

**22** Freedom's Safest Place, "Truly Free," NRATV, available at (last accessed April 2019). Quote appears at 00:01.

**23** NRATV, "Freedom's Safest Place," available at (last accessed April 2019).

**24** American Conservative Union, "CPAC 2015 – Wayne LaPierre, NRA," YouTube, February 27, 2015, available at (last accessed April 2019). Quote appears at 09:38.

**25** Max Hoffman, Michael Werz, and John Halpin, "Turkey's 'New Nationalism' Amid Shifting Politics," (Washington: Center for American Progress, 2018), available at .

**26** miniszterelnok.hu, "Prime Minister Viktor Orbán's Speech at the Annual General Meeting of the Association of Cities with County Rights," February 8, 2018, available at .

**27** World Population Review, "Hungary Population 2019," available at (last accessed April 2019).

**28** Website of the Hungarian Government, "Speech by Prime Minister Viktor Orbán on 15 March," March 15, 2016, available at ; Thomas Melia, "All In for Viktor Orbán," *The American Interest*, January 10, 2018, available at .

**29** Website of the Hungarian Government, "Speech by Prime Minister Viktor Orbán on 15 March."

**30** Nicholas Cull and others, "Soviet Subversion, Disinformation and Propaganda: How the West Fought Against It" (London: London School of Economics, 2017), available at ; Alina Polyakova and Spencer Boyer, "The Future of Political Warfare: Russia, the West, and the Coming Age of Global Digital Competition" (Washington: Brookings Institution, 2018), available at .

**31** Vera Zakem and others, "Mapping Russian Media Network: Media's Role in Russia Foreign Policy and Decision-Making" (Arlington, VA: CNA, 2018), available at

32 Ivan Nechepurenko, "In Russia, a Top University Lacks Just One Thing: Students," *The New York Times*, August 26, 2018, available at

; *The Moscow Times*, "License Restored for European University in St. Petersburg," August 10, 2018, available at

; Rebeka Foley, "The Bureaucratic Assault on a Liberal Russian University," Freedom at Issue Blog, January 31, 2018, available at
.

33 Samantha Schmidt, "Trump chuckled as Duterte called journalists 'spies.' That's no joke in the Philippines." *The Washington Post*, November 14, 2017, available at

; Editorial Board, "Duterte's autocratic regime cracks down on a vital voice in Manila," *The Washington Post*, February 15, 2019, available at

.

34 Editorial Board, "Duterte's autocratic regime cracks down on a vital voice in Manila."

35 Freedom House, "Freedom of the Press 2017: Hungary," available at
(last accessed April 2019).

36 Helene Bienvenu, "Newspaper closes in Hungary, and Hungarians see government's hand," *The New York Times*, October 11, 2016, available at
.

37 Bátorfy Attila and Tremmel Márk, "Data visualization: the definitive timeline of anti-Soros conspiracy theories," Atlatszo, February 10, 2019, available at
.

38 Human Rights Watch, "Philippines' 'War on Drugs'," available at
(last accessed April 2019); Ted Regencia, "Senator: Rodrigo Duterte's drug war has killed 20,000," Al Jazeera, February 21, 2018, available at

; Carlos Conde, "Duterte vows more bloodshed in Philippine 'drug war'," Human Rights Watch, July 23, 2018, available at
.

39 Hannah Reyes Morales and Emily Rauhala, "Witnesses to Duterte's drug war," *The Washington Post*, July 2, 2018, available at

; Human Rights Watch, "Philippines' 'War on Drugs'"; Matt Wells, "Philippines: Duterte's 'war on drugs' is a war on the poor," Amnesty International, February 4, 2017, available at
.

40 Human Rights Watch, "Philippines: Arrest of Duterte critic widens 'drug war'," February 24, 2017, available at
; Inter-Parliamentary Union, "Philippines PHI/08 – Leila de Lima" (Geneva: 2017), available at
; Phelim Kine, "Philippines Slammed for Senator's Politically Motivated Prosecution," Human Rights Watch, April 21, 2017, available at
.

41 Freedom House, "Freedom in the World 2017: Turkey," available at
(last accessed April 2019).

42 Nate Schenkkan, "The remarkable scale of Turkey's 'global purge'," *Foreign Affairs*, January 29, 2018, available at
.

43 Amberin Zaman, "Families fret as Turkey's Gulenist purge continues," Al-Monitor, February 19,

2019, available at

; Nate Schenkkan, "Turkey just snatched six of its citizens from another country," *The Washington Post*, April 1, 2018, available at

**14** Howard Eissenstat, "The hard truth about Turkey's opposition," *Foreign Affairs*, July 21, 2017, available at

**15** Soros founded Open Society Foundations, which is a contributor to the Center for American Progress.

**16** Zack Beauchamp, "Hungary just passed a 'Stop Soros' law that makes it illegal to help undocumented migrants," Vox, June 22, 2018, available at

; Website of the Hungarian Government, "Prime Minister Viktor Orbán's 'State of the Nation' address," February 10, 2019, available at

**47** Beauchamp, "Hungary just passed a 'Stop Soros' law that makes it illegal to help undocumented migrants."

**18** Marton Dunai, "Soros foundation to shut its office in 'repressive' Hungary," Reuters, May 15, 2018, available at

**19** Ronald J. Daniels, "Central European University is a remarkable school. It should stay in Hungary.", *The Washington Post*, January 22, 2019, available at

**50** Spencer Kimball and Scott Melzer, "'NRA is saying the gun is a symbol of freedom'," Deutsche Welle, January 11, 2013, available at

**51** NRATV, "Illegal Immigrant," available at

(last accessed April 2019).

**52** Speeches, "LtCol Oliver North: CPAC 2019," NRATV, available at

(last accessed April 2019).

**53** Speeches, "2018 NRA Annual Meetings," NRATV, available at

(last accessed April 2019). Quote appears at 34:43.

**54** Cam & Co, "Red Flag Bills Expose the Lies the Disarmocrats Are Telling," NRATV, available at

(last accessed April 2019); Relentless, "Disarmocrats Have Revealed Step 2 in Their Path to Confiscation," NRATV, available at

(last accessed April 2019).

**55** NRATV, "The Disarmament Primary," available at

(last accessed April 2019).

**56** David Kenner, "Turkey's war within," *Foreign Policy*, August 17, 2015, available at

**57** American Conservative Union, "CPAC 2019 – LtCol Ollie North," YouTube, available at

(last accessed April 2019). Quote starts at 03:40 and ends at 04:22.

**58** Stinchfield, "Dan Bongino: The Violent Left Attacks Conservatives," NRATV, available at

(last accessed April 2019). The capitalization of "Left" defers to the style of the onscreen text in the NRATV videos.

59 Emily Rauhala, "Duterte mocks woman senator investigating Philippine killings as 'screwing her driver' and nation," *The Washington Post*, September 22, 2016, available at

.

60 Stinchfield, "The Left Is Fighting Dirty, and It's the Greatest Threat to Our Nation," NRATV, available at

(last accessed April 2019). Quote appears at 01:06. The capitalization of "Left" defers to the style of the onscreen text in the NRATV videos.

61 Stinchfield, "Gun Hearings in D.C. Meant Solely to Slam Gun Owners, Not Find Solutions," NRATV, available at

(last accessed April 2019).

62 NRA-ILA, "Second Amendment," available at                                        (last accessed April 2019).

63 Gina Jordan, "The Lobbyist Behind Florida's Stand Your Ground Law," National Public Radio, March 29, 2012, available at

; Mike Spies, "The NRA Lobbyist behind Florida's pro-gun policies," *The New Yorker*, February 23, 2018, available at

.

64 Guns Down America, @ gunsdownamerica, February 11, 2019, 9:21a.m. ET, Twitter, available at

.

65 Timothy Johnson, "A guide to NRATV: NRA's news outlet is a hybrid of Breitbart and Infowars," Media Matters, December 26, 2017, available at

.

66 Ibid.

67 Stinchfield, "ISIS, Ayatollah, and Liberals Want Us Disarmed," NRATV, available at

(last accessed April 2019). Quote appears at 00:20. The capitalization of "Liberal" defers to the style of the onscreen text in the NRATV videos.

68 Chelsea Parsons and James Lamond, "The Russification of the NRA," *New York Daily News*, February 9, 2018, available at

; Stinchfield, "President Trump Exposes the Real Story at the Border During SOTU," NRATV, available at

(last accessed April 2019); Stinchfield, "Chase: '2A Rights Are Women's Rights'," NRATV, available at

(last accessed April 2019).

69 Niraj Chokshi, "N.R.A. show puts Thomas the Tank Engine in white hood to criticize diversity move," *The New York Times*, September 12, 2018, available at

; Relentless, "What a Week," NRATV, September 7, 2018, available at

.

70 Stinchfield, "Grant Stinchfield: The Aftermath of the State of the Union," NRATV, available at

(last accessed April 2019); Johnson, "The National Rifle Association's first year as Trump propagandists."

71 NRATV, "Border," available at                              (last accessed April 2019).

72 Salvador Rizzo, Glenn Kessler, and Meg Kelly, "Your fact-checking cheat sheet for Trump's

immigration address," *The Washington Post*, January 8, 2019, available at

; Stinchfield, "The Moment from the SOTU That Should Shock You," NRATV, available at

(last accessed April 2019).

73 Stinchfield, "Cutler: 'The Dems' Concern for Border Safety is an Illusion'," NRATV, available at

(last accessed April 2019); Stinchfield, "Ted Cruz Drops a Truth Bomb of Medieval Proportions," NRATV, available at

(last accessed April 2019); Stinchfield, "Matt Thomas: The Fight To Secure the Southern Border," NRATV, available at

(last accessed April 2019).

74 Stinchfield, "It's Compassion to Let the Good Ones In, Keep the Bad Ones Out," NRATV, available at

(last accessed April 2019); Stinchfield, "Maria Espinoza: Criminals Empowered by Lawless Leftists," NRATV, available at

(last accessed April 2019).

75 Stinchfield, "Durden: 'We Need the Protection of a Wall'," NRATV, available at

(last accessed April 2019); Stinchfield, "Mary Mendoza: Nancy Pelosi Doesn't Care About Angel Families," NRATV, available at

(last accessed April 2019); Stinchfield, "Laura Wilkerson: Living Every Day as an Angel Mother," NRATV, available at

(last accessed April 2019); Sarah Kinosian and Eugenio Weigend, "We're sending guns, crime to Mexico," *Los Angeles Times*, March 2, 2017, available at

; Chelsea Parsons, "American guns are killing our neighbors in Canada and Mexico," *Los Angeles Times*, February 6, 2018, available at

.

76 Stinchfield, "Mary Mendoza: The Need for a Border Wall," NRATV, available at

(last accessed April 2019). Quote appears at 04:03.

77 Stinchfield, "Durden: 'We Need the Protection of a Wall'"; Stinchfield, "Chuck Holton: Another Migrant Caravan Inches Closer to the Border," NRATV, available at

(last accessed April 2019).

78 NRATV, "Mollie Tibbetts Is an Inconvenience to Progressives," YouTube, August 22, 2018, available at                                            .

79 Ishaan Tharoor, "How Viktor Orbán became the real threat to the West," *The Washington Post*, April 6, 2018, available at

.

80 Reuters, "Hungarian PM steps up anti-immigrant campaign after by-election loss," March 2, 2018, available at

; Tharoor, "How Viktor Orbán became the real threat to the West."

81 Stinchfield, "Europe Has Become a War Zone of Cultures," NRATV, available at

(last accessed April 2019); Stinchfield, "Unrestricted Immigration Is Destroying European Culture," NRATV, available at

(last accessed April 2019); Stinchfield, "Chuck Holton: Battling the European Migrant Crisis," NRATV, available at

(last accessed April 2019).

**32** Stinchfield, "Europe has Become a War Zone of Cultures." Quote appears at 04:22.

**33** Eurostat, "Asylum statistics," available at
(last accessed April 2019); United Nations High Commissioner for Refugees, "Women on the Run" (Geneva: 2015), available at
.

**34** John Burnett, "Illegal Immigration Does Not Increase Violent Crime, 4 Studies Show," National Public Radio, May 2, 2018, available at
.

**35** Alia Dastagir, "'Guns don't kill people; men and boys kill people,' experts say," *USA Today*, October 10, 2017, available at
; Stinchfield, "Jeff Houston: Father saves family and protects restaurant employees," NRATV, available at
(last accessed April 2019); Cam & Co, "Evan Nappen: Carjaker Held Teen Hostage, but Then Her Dad Got a Gun," NRATV, available at
(last accessed April 2019).

**36** Five Million Voices, "Stephen Willeford: 'It's Not the Gun, It's the Heart'," NRATV, available at
(last accessed April 2019).

**37** CAP analysis of the following three sources: Federal Bureau of Investigation, "A Study of Active Shooter Incidents in the United States Between 2000 and 2013," available at
(last accessed April 2019); Federal Bureau of Investigation, "Active Shooter Incidents in the United States in 2014 and 2015" (Washington: U.S. Department of Justice), available at
(last accessed April 2019); Federal Bureau of Investigation, "Active Shooter Incidents in the United States in 2016 and 2017" (Washington: U.S. Department of Justice, 2018), available at
.

**38** Relentless, "Resign Robert Runcie," NRATV, January 16, 2019, available at
.

**39** Relentless, "To All Those So-Called Feminists: Whose Side Are You On?", NRATV, available at
(last accessed April 2019).

**90** Relentless, "Jeff Houston: Woman Murdered in Kansas City Had Order of Protection in Her Pocket," NRATV, available at
(last accessed April 2019); NRA, "No Victim," available at
(last accessed April 2019).

**91** NRA Women, "Love at First Shot," available at
(last accessed April 2019).

**92** NRA Women, "Women's Leadership Forum," available at
(last accessed April 2019).

**93** Relentless, "To All Those So-Called Feminists: Whose Side Are You On?"

**94** Freedom's Safest Place, "Real Empowerment," NRATV, available at
(last accessed April 2019). Quote appears at 00:01.

**95** David Hemenway, "Survey research and self-defense gun use: An explanation of extreme overestimates," *Journal of Criminal Law and Criminology* 87 (4) (1997): 1430–1445; David Hemenway, "The Myth of Millions of Annual Self-Defense Gun Uses: A Case Study of Survey Overestimates of Rare Events," *Chance* (*American Statistical Association*) 10 (3) (2007): 6–10, available at
: Philip

Cook, Jens Ludwig, and David Hemenway, "The gun debate's new mythical number: How many defensive uses per year?", *Journal of Policy Analysis and Management* 16 (3) (1997): 463–469.

36 David Hemenway and Sara Solnick, "The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007-2011," *Preventive Medicine* 79 (2015): 22–27, available at                    .

37 Ibid.; David Hemenway and Deborah Azrael, "The relative frequency of offensive and defensive gun use: Results of a national survey," *Violence and Victims* (15)(2000):257-272, available at                                                        ;

Deborah Azrael and David Hemenway, "In the safety of your own home: Results from a national survey of gun use at home," *Social Science and Medicine* 50 (2000): 285–291.

38 Maura Ewing, "An estimated 4.5 million women have been bullied with guns by abusive partners," The Trace, October 5, 2016, available at                    .

39 Center for American Progress, "Disarm All Domestic Abusers," available at

; J.C. Campbell and others, "Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study," *American Journal of Public Health* 93 (7) (2003): 1089–1097, available at                    .

40 Rauhala, "Duterte mocks woman senator investigating Philippine killings as 'screwing her driver' and nation."

41 John Herbst and David Kramer, "Another Putin critic silenced as human rights abuses continue in Russia," The Hill, February 7, 2017, available at                    .

42 Olivia Exstrum, "The Guy Behind the Bogus Immigration Report Has a Long History of Terrible and Misleading Research," *Mother Jones*, February 7, 2018, available at

.

43 University of Chicago Press, "An Interview with John R. Lott, Jr.," available at                    (last accessed April 2019).

44 John Donohue and Ian Ayres, "Shooting Down the 'More Guns, Less Crime' Hypothesis," *Stanford Law Review* 55 (2003): 1193–1312, available at

.

45 Peter Moskowitz, "Inside the mind of America's favorite gun researcher," *Pacific Standard Magazine*, June 2, 2017, available at

.

46 Richard Morin, "Scholar Invents Fan to Answer His Critics," *The Washington Post*, February 2, 2003, available at

.

47 The Coalition to Stop Gun Violence, "Who's Backing the Last Pro-Gun 'Academic,' John Lott?", available at                    (last accessed April 2019); Julia Lurie, "When the Gun Lobby Tries to Justify Firearms Everywhere, It Turns to This Guy," *Mother Jones*, July 28, 2015, available at

.

48 Relentless, "John Lott: Debunking Boston University School of Public Health's Study on Guns and Suicide Rates," NRATV, available at                    (last accessed April 2019); Stinchfield, "John Lott: Debunking Liberal Lies," NRATV, available at                    (last accessed April 2019); Relentless, "John Lott: Distortions and Misinformation in Anti-2A Firearms Studies," NRATV, available at                    (last accessed April 2019).

(last accessed April 2019).

9 Relentless, "John Lott: Debunking Boston University School of Public Health's Study on Guns and Suicide Rates."

10 Ibid.

11 Relentless, "John Lott: Distortions and Misinformation in Anti-2A Firearms Studies."

12 Stinchfield, "John Lott: Left Intentionally Misleads Firearms Statistics," NRATV, available at
(last accessed April 2019). The capitalization of "Left" defers to the style of the onscreen text in the NRATV videos.

13 Omnibus Consolidated Appropriations Act, Public Law 104-208, 104th Cong., 2nd sess. (September 30, 1996), available at
; Samantha Raphelson, "How The NRA Worked to Stifle Gun Violence Research," National Public Radio, April 5, 2018, available at

14 David E. Stark and Nigam H. Shah, "Funding and Publication of Research on Gun Violence and Other Leading Causes of Death," JAMA Network, January 3, 2017, available at
.

15 Danielle Kurtzleben, "Trump Embraces One of Russia's Favorite Propaganda Tactics – Whataboutism," National Public Radio, March 17, 2017, available at
.

16 Center for American Progress, "Frequently Asked Questions About Universal Background Checks" (Washington: 2018), available at
.

17 Stinchfield, "HR8 Is a Springboard for a Gun Registry," NRATV, available at
(last accessed April 2019). Quote appears from 00:04 through 00:40.

18 Ibid. Quote appears at 00:52.

19 Bipartisan Background Checks Act of 2019, H.R. 8, 116th Cong. 1st sess. (January 8, 2019), available at
.

20 Stinchfield, "HR8 is a springboard for a gun registry." Quote appears at 00:28.

21 Relentless, "John Lott: Background Checks Bill Would Turn Many Well-Intentioned Americans into Criminals," NRATV, available at
(last accessed April 2019); Stinchfield, "Universal Background Checks Are a Farce, and the Stats Prove It," NRATV, available at
(last accessed April 2019); Cam & Co, "Universal Background Checks Work Only for Sanctimonious Politicians," NRATV, available at
(last accessed April 2019).

22 Giffords, "HR 8, the bipartisan background checks act of 2019," available at
(last accessed April 2019).

23 We Stand, "People Think the Media Is an Absolute Joke," NRATV, available at
(last accessed April 2019).

24 NRATV, "Dana Loesch: 'I Call BS!'," available at
(last accessed April 2019). Quote appears at 00:12; Erik Wemple, "NRA spokeswoman Dana Loesch: 'Many in legacy media love mass shootings'," *The Washington Post*, February 22, 2018, available at
.

25 Relentless, "Dan Gainor: 'Media Contagion' Is Factor in Mass Shootings, Study Says," NRATV, available at

(last accessed April 2019).

26 We Stand, "Grant Stinchfield: Legacy Media Thrive on Mass Shootings," NRATV, available at

(last accessed April 2019).

27 Stinchfield, "Stacey Abrams Gives Her Rebuttal ... to a Speech She Didn't Listen To," NRATV, available at

(last accessed April 2019).

28 Stinchfield, "Stinchfield: If Nancy Will Cancel the SOTU, What Would She Do to the 2A?", NRATV, available at

(last accessed April 2019).

29 Stinchfield, "Dianne Feinstein Loves Herself Some Gun Control," NRATV, available at

(last accessed April 2019).

30 Cam & Co, "The Queen of Gun Control Re-Introduces New Flavor of 'Assault Weapons' Ban," NRATV, available at

(last accessed April 2019).

31 Cam & Co, "Feinstein's Facts Just Don't Add Up," NRATV, available at

(last accessed April 2019).

32 Stinchfield, "Dianne Feinstein Loves Herself Some Gun Control." Quote appears at 00:30.

33 Stinchfield, "Chris Murphy Says His Vote Could Save or Cost Thousands of Lives; He's Right," NRATV, available at

(last accessed April 2019). Quote appears 01:12.

34 Stinchfield, "The Left Will Pack the Court to Destroy the Second," NRATV, available at

(last accessed April 2019).

35 NRA, "We Don't Need You," available at

(last accessed April 2019).

36 for Gun Safety is a contributor to the Center for American Progress. Stinchfield, "Michael Bloomberg Has Proven His Commitment to Disarm Americans," NRATV, available at

(last accessed April 2019).

37 Stinchfield, "Bloomberg's Enlists his Crony Partners to End Gun Rights," NRATV, available at

(last accessed April 2019).

38 Stinchfield, "Bloomberg Is to Blame for Chaos in Washington," NRATV, available at

(last accessed April 2019).

39 Welch, "Why the Right Loves to Hate George Soros," *The Atlantic*, October 6, 2018, available at

; Cam & Co, "LtCol Oliver North: Our Votes Outweigh their Millions," NRATV, available at

(last accessed April 2019).

40 Stinchfield, "Anti-Gun Billionaire Babies," NRATV, available at

(last accessed April 2019). Quote appears 00:42.

41 NRATV, "Shannon Watts," available at

(last accessed April 2019).

**12** Mark Murray, "Poll: 58 percent say gun ownership increases safety," NBC News, March 23, 2018, available at                                                                                                          ; Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support" (Washington: 2018), available at

**13** German Lopez, "Poll: Most Americans say gun ownership increases safety. Research: nope.", Vox, March 23, 2018, available at
                                        .

**14** CAP analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data 2013 – 2017," available at
                        (last accessed April 2019).

**15** Guns Down America, @ gunsdownamerica, February 11, 2019, 9:21 a.m. ET, Twitter, available at
                                        .

**16** Pete Madden and Matthew Mosk, "NRA says 2015 Moscow trip wasn't 'official.' Emails, photos reveal gun group's role," ABC News, January 30, 2019, available at
                                                    ; Danny Hakim, NRA seeks distance from Russia as investigations heat up," *The New York Times*, January 28, 2019, available at

                                        .

**47** Alexandra O'Neill and Daniel O'Neill, "The NRA, a tax-exempt loaded with private interest," The Coalition to Stop Gun Violence, available at
                                (last accessed April 2019); Violence Policy Center, "Gun Industry Financial Support of NRA," available at                                                                  (last accessed April 2019).

**18** Rosalind Helderman, Tom Hamburger, and Michelle Ye Hee Lee, "Russian agent's guilty plea intensifies spotlight on relationship with NRA," *The Washington Post*, December 13, 2018, available at
                                                    .

**19** Peter Stone, "NRA in crisis: how the gun group became ensnared in the Russia inquiry," *The Guardian*, March 1, 2019, available at
                                                    ; Helderman, Hamburger, and Lee, "Russian agent's guilty plea intensifies spotlight on relationship with NRA."

**50** Freedom's Safest Place, "The Violence Of Lies," NRATV, available at
                                                    (last accessed April 2019); NRATV, "We Are The Cure," available at

                        (last accessed April 2019).

**51** Speeches, "2018 NRA Annual Meetings," NRATV, available at
                                                    (last accessed April 2019). Quote appears at 32:53.

**52** Maureen Sheeran, "NRA losing corporate ties amid calls for boycott in wake of Parkland shooting," ABC News, February 27, 2018, available at
                                        .

**53** Guns Down, "New poll: Public now strongly backs candidates who advocate for real policies to reduce gun violence," August 1, 2018, available at

                                        ; GBA Strategies, "National Voter Survey Findings: Polling on Guns" (2018), on file with the author.

**54** Danny Hakim, "Incendiary NRA videos find new critics: NRA leaders," *The New York Times*,

March 11, 2019, available at
.

The positions of American Progress, and our policy experts, are independent, and the findings and conclusions presented are those of American Progress alone. A full list of supporters is available here. American Progress would like to acknowledge the many generous supporters who make our work possible.

AUTHORS

**Rukmani Bhatia**

Senior Policy Analyst

## YOU MIGHT ALSO LIKE

ARTICLE

**Hospital-Based Intervention Programs Reduce Violence and Save Money**

Aug 4, 2022
Karenna Warden

FACT SHEET

**Community-Based Violence Interventions: Proven Strategies To Reduce Violent Crime**

Jun 15, 2022
Akua Amaning, Hassan Basha

FACT SHEET

**Gun Suicides Among Former and Current Military Members: A Summary of Key Challenges and Solutions**

Mar 10, 2022
Eugenio Weigend Vargas, Marissa Edmund

REPORT

**Gun Suicides Among Former and Current Military Members**

Mar 3, 2022
Eugenio Weigend Vargas, Marissa Edmund

## ALSO FROM CAP

ARTICLE

**What You Need To Know About Inflation and the Inflation Reduction Act**

ARTICLE

**Hurricane Fiona: 4 Ways the Federal Government Can Help Puerto Rico Rebuild Better**

ARTICLE

**What To Expect When the January 6 Hearings Resume**

ARTICLE

**ARPA Funds Continue To Support Community Safety Efforts Through Community Responder Programs**

Oct 6, 2022
Ross Khattar, Tymoni Correa-Buntley

Oct 6, 2022
Arohi Pathak, Laura Rodriguez, Frances Colón

Sep 23, 2022
William Roberts, Ga nna Cittelll

Oct 12, 2022
Akua Amaning

 The Center for American Progress is an independent nonpartisan policy institute that is dedicated to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. Our aim is not just to change the conversation, but to change the country.

    

 Learn about our sister organization, the Center for American Progress Action Fund, an advocacy organization dedicated to improving the lives of all Americans.

©2022 Center for American Progress

Terms of Use

Privacy Policy

CAP - En Español

Our Supporters

# Abraham Lincoln, the Almanac, and a Murder Trial

almanac.com/abraham-lincoln-almanac-and-murder-trial



Primary Image





Caption

Abraham Lincoln showing an 1857 almanac to the jury during the famous Armstrong murder trial in the spring of 1858. The original of this Norman Rockwell painting hangs in The Norman Rockwell Museum in Stockbridge, Massachusetts.

Photo Credit

Yankee Archives

## When Lincoln Famously Used the Almanac

Body

Abraham Lincoln, born on February 12 in 1809, pursued a legal career before turning to a political one that eventually led to the U.S. presidency. In our Dublin, New Hampshire, office hangs a reproduction of a painting by Norman Rockwell depicting him in front of a jury holding the 1857 edition of an almanac in his hand. Was it *The Old Farmer's Almanac?*

It's difficult to prove conclusively, but everything I've read about the case—and certainly my examination of the 1857 edition—indicates that it was.

## Abraham Lincoln Defends an Alleged Murderer

Lincoln was considered to be a very skilled and respected trial lawyer.

The occasion depicted in the Rockwell painting is the 1858 murder trial of an Illinois man named William "Duff" Armstrong. Armstrong was accused of murdering James Preston Metzker by striking him on the back of the head with a "slung-shot"—a weight tied to a leather thong, sort of an early blackjack—a few

minutes before midnight of August 29, 1857. Lincoln was a friend of the accused man's father, Jack Armstrong, who'd just died, and so he offered to help defend young Duff Armstrong, without pay, as a favor to Jack Armstrong's widow.

The principal prosecution witness against Armstrong was a man named Charles Allen, who testified that he'd seen the murder from about 150 feet away.

Lincoln asked Allen how he could tell it was Armstrong given that it was the middle of the night and he was a considerable distance away from the murder scene.

Allen replied, "**By the light of the Moon**."

## How Lincoln Used the Almanac

Upon hearing Allen's testimony, Lincoln produced a copy of the 1857 almanac, turned to the two calendar pages for August, and showed the jury that not only was the Moon in the first quarter but it was riding "low" on the horizon, about to set, at the precise time of the murder.

He argued that the witness could not possibly have had enough light to see what he claimed and asked the judge to take "Judicial Notice" of the moon's low position.

("Judicial Notice" is when a judge determines that something is a fact, and in a criminal case, tells the jury it is up to them whether to accept it as true.)

The judge agreed and the jury found Armstrong not guilty. Duff Armstrong was acquitted.

Now, discover the true story of *The Old Farmer's Almanac* and the German Spy Story!



# Browning automatic rifle



Browning automatic rifle

**Browning automatic rifle (BAR)**, automatic rifle produced in the United States starting in 1918 and widely used in other countries as a light machine gun. The BAR is a gas-operated rifle invented by John M. Browning (1855–1926), an American gun designer. It has been chambered for various ammunition, but most frequently for .30-06 Springfield. About 47 inches (120 cm) long, it has a 20-round magazine and weighs 19.4 pounds (8.8 kg). It can fire up to 650 rounds per minute but can also fire single shots or bursts of two or three to increase accuracy. It can be fired from the shoulder or mounted on a bipod.

The BAR was used by U.S. infantry forces in World Wars I and II and the Korean War. It remained in U.S. Army service until 1957.

This article was most recently revised and updated by Amy Tikkanen.

Citation Information

Article Title: Browning automatic rifle

Website Name: Encyclopaedia Britannica

Publisher: Encyclopaedia Britannica, Inc.

Date Published: 08 September 2022

URL: https://www.britannica.comhttps://www.britannica.com/technology/Browning-automatic-rifle

Access Date: October 18, 2022

# The Girandoni Air Rifle: Deadly Under Pressure :: Guns.com

John Paul Jarvis

Bartholomäus Girandoni, a clock maker from the Tyrolean region of Austria, was thinking outside of the box with his 1779 lethal inspiration, the Giradoni Air Rifle.  The Girandoni was a repeater with up to 30 deadly shots, unheard of in an era of single shot muzzle loaded matchlocks.



Guns remain an experiment in progress dating from the Song Dynasty's (960-1269 AD) discovery of gunpowder in China and then invention of the primitive hallow bamboo cannons shooting lances often set aflame. The earliest depictions of cannons can be see in 13th century Chinese art. Those archaic weapons evolved into cast hand cannons and took momentous strides in line with the technology of the day as the centuries added up—but this Giradoni creation was truly ahead of its time and brilliantly engineered for its era.



The Livrustkammarne Museum in Stockholm is home to the earliest example of a mechanical air gun dating back to 1580. The late 16th and early 17th century examples were used in the field for hunting, boar and deer and employed the same propulsion method, a rudimentary pneumatic pump to fill the butt stock chamber with pressurized air which provided muzzle velocities of 700-950 feet per second.



The Girandoni was the first pneumatic rifle and first repeating rifle ever used in warfare and it was special issue for the Austrian Army from 1780 to 1825. Specific training was required to utilize the weapon to its full potential (you have to remember this gun was unlike anything yet seen by the average peasant), but once the troops were educated as it were it was decidedly deadly as an ambush or skirmishing piece.



48 inches long and the gun weighed in at 10 pounds, similar in size and weight to the muskets of the era.  And believe it or not it was a stone cold killer at up to 100 yards, able to punch a hole in a 1 inch pine board for the first 30 shots on a single air reservoir. The power dissipated and required a 'pump up' after that but the gun was miles ahead of anything seen thus far.



My initial scepticism of these weapons was fuelled by the misconception that they were similar to a Daisy BB gun.  When I realized that the Girandoni propelled a .46 calibre ball  through a rifled barrel at a muzzle velocity of 900 fps, I realized how wrong I had been. Providing a high rate of fire, there was no smoke from propellants nor muzzle flash to reveal ambush positions nor concern for inclement battle conditions as you needn't worry about keeping powder dry.  And believe it or not, at the right distance, the gun has a comparable impact to a .45 ACP cartridge—without the bang of course.  A little overpowered for knocking squirrels off the bird feeder, but then again why not—unless they're watching the neighbours won't notice.



The battle advantages were significant when compared to the single shot muzzle loaders of the day. Chief among these was the fact that Girandoni was a repeater, capable of 20 rounds in sequence

with a unique tubular gravity feed magazine. A simple but ingenious push of a thumb slide lever loaded another ball and the budding rifleman was ready to shoot away. No reloading of delicate and dangerous powder that needed to be transported to the next skirmish. All the gravity feed magazine required was that the rifle to be tilted upward dropping the ball into the breech-block—still very much the same as muzzle loaders of the era.



Several other countries adopted the weapon for early "sniper" squads including Japan and France.

The Achilles heel was the butt stock reservoir and the pump. Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure. Once empty the reservoirs required a significant effort and 1500 strokes to restore full power. A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility. The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort.



The Austrian Soldiers carried 2 spare compressed air reservoirs, hand pump, 100 lead balls, 20 in the rifle and 80 in 4 tin tubes transported in a separate knapsack along with cleaning stick, lead ladle in the event they had to manufacture the balls in the field and a supply of the most necessary gaskets.

The importance to America was significant as the Lewis and Clark expedition used the Giradoni Air Rifle across the unsettled continent to great advantage as they were able to impress the Native American Indian tribes they encountered with peaceful demonstrations of the weapon and its repeating capabilities.



# The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit

David Kopel

Currently before the Ninth Circuit is an appeal in the case of Fyock v. Sunnyvale, a case which challenges a California's city's ban on magazines which hold more than 10 rounds. While the State of California outlaws the sale, import, or transfer of such magazines, the Sunnyvale ban goes further, by prohibiting possession of these magazines, with no provision for grandfathering. The District Court upheld the ban; part of the Court's analysis stated that magazines did not exist at the time the Second Amendment was ratified. Last Friday, amicus briefs in support of appellant were filed, including a brief which I co-authored on the history of magazines and of magazine prohibition.

My co-author on the amicus brief was the DC law firm of Bradley Arant Boult Cummings, and the brief was filed on behalf of the Center for Constitutional Jurisprudence (which is part of the Claremont Institute), and Gun Owners of California. As the amicus brief states, the NRA contributed funds supporting the preparation of the brief.

The longest section of brief provides the history of magazines, with a particular focus on magazines holding more than 10 rounds. The first such magazine was invented in the late 16th century. Over the next two centuries, many inventors created guns with magazines holding more than 10 rounds. The consumer demand for such magazines is easy to understand: when a gun is out of ammunition, the user is in effect disarmed, and does not possess an operable firearm until the gun is reloaded. As Heller teaches, the Second Amendment protects the right to an operable firearm.

By the time of the Second Amendment, the state of the art for multishot guns was the Girandoni air rifle, with a 20 or 22 round magazine. Ballistically, it was superior to the powder guns of its time, and had been created for elite marksmen in the Austrian army. Lewis & Clark carried a Girandoni on their famous expedition.

By 1791, much progress had been made in firearms design and it was easy to foresee that future progress would include improvements in multishot guns. However, as of 1791, the very large majority of American firearms were single-shot, likely because of the expense of multishot guns, and also perhaps because of concerns about reliability. The first half of the 19th century saw the first widespread commercial success of multi-shot guns—namely the revolvers from companies such as Colt's and Smith & Wesson, as well as multi-barrel handguns called "pepperboxes." There were some pepperboxes which could fire more than 10 rounds, but most pepperboxes held 8 or less.

The commercial breakthrough for guns holding more than 10 rounds began in the late 1850s, with a collaboration between Daniel Wesson and Oliver Winchester, producing the Volcanic Rifle. This rifle used two innovations: the metallic cartridge (holding the primer, gunpowder, and bullet in a metallic case, just like modern ammunition) and the lever action mechanism for ejecting an empty case and loading a fresh cartridge. The Volcanic Rifle was improved to become the 16-shot Henry Rifle during the Civil War. The Henry was in turn refined into the Winchester Model 1866, which became a huge commercial success. So by the time the Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds were common in America. The latter 19th century saw the proliferation of 11+ magazine rifles from companies such as Winchester, Colt's, and other manufacturers.

The first decades of 20th century brought dozens of models of .22 caliber "boys rifles" with magazines of 11 or more, from companies such as Stevens, Savage, Winchester, and Remington. The 1927 Auto-Ordnance rifles (still in production today) were another step forward. After World War II, the M1 carbine (15 round magazine) was purchased by the hundreds of thousands—many of them directly from the federal government at steeply discounted prices under the Civilian Marksmanship Program. The most popular rifle in American history, the AR-15, entered the market in 1963 with a standard magazine of 20. Springfield Armory's M1A rifle (20 rounds) and the Ruger Mini-14 (optional 20 round manufacturer magazine) came on the scene in 1974. These rifles remain popular today. All of them faced competition from a variety of European manufacturers (e.g., SIG, FN-FAL), and from some smaller American companies.

Great commercial success for handguns with more than 10 rounds came more slowly. By 1868, there were plenty of models available, including pinfire revolvers, chain guns, and the harmonica gun. But these handguns were more popular in Europe and in the United States. The semi-automatic pistols invented in the 1890s by Luger and Mauser had optional magazines of more than 10. In the 1920s and 1930s, the Spanish companies Gabilondo and Arostegui, Eulogio had handguns with standard magazines of more than 10. But if we are looking for huge sales in the United States market for a handgun typically holding more than 10 rounds, that did not come until 1935, with the 13-round Browning Hi-Power. With refinements, that popular gun remains in production today.

Next came the Plainfield Machine Company's 1964 pistol version of the M1 Carbine (1964), and then the Beretta Model 92 (16 rounds), introduced in 1976 (a huge seller, also still in production today). The Browning Double Action (14 rounds) entered the market the next year, and less famous companies, such as Germany's Heckler & Koch, also jumped in.

The history section of our brief ends in 1979, when Jimmy Carter was President, the Bee Gees bestrode the AM radio Top 40, Gaston Glock was manufacturing curtain rods in his garage, Americans were watching Love Boat on broadcast television, and people on the cutting edge of technology were adopting VisiCalc, the first spreadsheet program, run from huge floppy discs. Long before 1979, magazines of more than ten rounds had been well-established in the mainstream of American gun ownership. Indeed, they had been so established before almost everyone alive in 1979 had been born. The assertion by some 21st-century gun prohibition advocates that the only reason a person would want a magazine with more than 10 rounds is for mass murder is obviously false. Since 1866, tens of millions of law-abiding Americans have owned and used such magazines for lawful purposes.

While the pre-1979 history of magazines in the United States is long, the parallel history of magazine bans in much shorter. During Prohibition, Michigan in 1927 banned guns which fired more than 16 times without reloading, and Rhode Island enacted a 12-round limit that same year. Both statutes were later repealed. Only the District of Columbia's 1932 ban (more than 10 rounds) has endured, and the District is no model for conscientious compliance with the Second Amendment.

Finally, the brief explains the use 11+ magazines for what Heller calls the "core lawful purpose of self-defense." The District Court in Fyock erred, we argue, by attempting to count how often a trigger is pulled 11 or more times in self-defense. That approaches fails to follow the Supreme Court's methodology in Heller. If you read the Heller opinion, you will not find a scintilla of evidence indicating that in the entire history of the United States, any person has ever fired a handgun in self-defense. What you will find in Heller is repeated statements about how common it is for Americans to "possess" or "use" a handgun for self-defense. According to research by Gary Kleck, even the most confrontational uses of handgun for self-defense (drawing the handgun against an attacker), usually do not involve pulling the trigger. See Gary Kleck & Marc Gertz, Armed

Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun, 86 Journal of Criminal Law & Criminology 150, 173 (1995) ("Only 24% of the gun defenders in the present study reported firing the gun").

Whether a gun is used as a deterrent (simply by being present) or is used in the most common fashion a confrontation (drawn but not fired), or is used by pulling the trigger, the objective is always to stop the threat. In situations where the gun must be fired, not all shots hit an attacker. Of those that do, few are immediately incapacitating, unless they strike the heart or the central nervous system. Yet when the defender has sufficient reserve capacity, even multiple attackers may decide to desist from an attack. That is why American law enforcement officers ubiquitously carry handguns with more than ten rounds of ammunition, and often more than 15. It is also why their rifles typically have 20 or 30 round magazines, not 10.

If the firing of several shots has wounded one attacker, and has resulted in the other attacker putting up his hands, the defender needs to control the situation until the police arrive. That is why reserve capacity is so important for law enforcement and for citizens. Reloading is very difficult when the second hand is holding a cell phone. Even a two-handed reload will likely make the gun temporarily inoperable and cause the gun to move off target for at least a few seconds, giving the criminal(s) a new window of opportunity. Citizens do not carry police radios, and police response to a cell phone call about citizen in trouble is often slower than the response to a radio call about an officer in trouble. The reasons why magazines for greater than 10 rounds are the overwhelming choice for law enforcement officers for lawful defense of self and others apply a fortiori to citizens, who rightly  look to law enforcement officers as good models for gun safety practices.

All of the filings in the case are available here. These include amicus briefs from Pink Pistols (a LBGTQ rights organization), a large coalition of law enforcement organizations, and the National Shooting Sports Foundation (trade association).

# The Girandoni Air Rifle | Defense Media Network

*By Mike Markowitz - May 14, 2013*

The alpine region of Tyrol, a borderland between Italians and Germans, has long bred skillful hunters and tough mountain warriors. Around 1778, a Tyrolean master gunsmith, Bartolomeo Girandoni (1729-1799), invented the Girandoni air rifle, which attracted the attention of Joseph II, the Austrian emperor.

> Air rifles had been used since the 16th century, mainly to hunt small game. They were a favorite of poachers, because the lack of noise and smoke meant they could be used covertly.

Girandoni's extraordinary design had two innovations that made it a formidable military weapon, rather than a sporting gun for wealthy nobles. First, it was a breech-loader, with a 20-round tubular magazine fixed alongside the barrel. To load the weapon, the user simply elevated the muzzle and pressed a spring-loaded slider, which picked up a ball and snapped it into place. To reload the magazine, the user opened a plug at the front of the magazine and emptied the contents of a "speed loader" into it. Second, it used very high pressure: 800 psi (54.4 atmospheres, or 5515.8 kPa) held in a riveted sheet-iron pressure flask that formed the weapon's butt-stock. A fully-charged pressure flask was good for up to 80 shots.



Girandoni Air Rifle was an innovative design that was ahead of its time. The National Firearms Museum photo

The weapon's advantages included a high rate of fire, no smoke, relatively low recoil, and less noise than a musket. With no black powder residue to foul the bore,

it needed less cleaning. Shooters could load and fire while lying flat.

But there were significant disadvantages: The mechanism was complex and fragile. Like most rifles of the era, it was too fragile to mount a bayonet. It took 1,500 strokes on a hand pump (similar to a modern bicycle pump) to charge the air cylinder. The weapon became useless if the pump were lost or damaged. But above all, the Girandoni was simply incompatible with the tactical doctrine of the era. As much as weapons or terrain, doctrine shapes the behavior of armies.

In the late 18th century, black powder rifles were precision sniper weapons. In battle riflemen targeted aristocratic officers, conspicuous in their gaudy uniforms. The officers found the whole idea repugnant, and unsporting. Brave soldiers stood up in the open and traded musket volleys at point-blank range. Napoleon Bonaparte actually disbanded the French army's rifle units in 1807, because he considered rifles too expensive, and too slow to load and fire.

Issued to a few units of Tyrolean sharpshooters, the Girandoni served in combat against the Turks, but apparently never in Austria's Napoleonic wars.  By 1815, it was withdrawn from service. Around 1803, one of these weapons wound up in Philadelphia, Penn. An aide to President Thomas Jefferson, Capt. Meriwether Lewis (1774-1809) acquired the piece. When Jefferson sent an expedition to explore the newly purchased Louisiana Territory, Lewis took the Girandoni along, to impress the native tribes he encountered. This is mentioned repeatedly in the journals of Lewis and Clark.

> "My Air-gun...astonishes them very much, they cannot comprehend it's shooting so often and without powder..."
>
> -Meriwether Lewis Jan. 24, 1806

Somehow, this air rifle survived, and was eventually purchased by a collector. A gunsmith was commissioned to make some high-quality replicas. When the weapon was disassembled, he found that the main spring had been repaired exactly as described in the journals of Lewis and Clark. This historic weapon is now on loan to the museum of the National Rifle Association in Fairfax, Va.

The Girandoni air rifle is a might-have been; a footnote to military history. Each one was hand-crafted by master gunsmiths, making them very costly. Probably no more than 1,500 were ever built. Some of the materials and techniques used were carefully guarded "trade secrets" that died with the craftsmen.



The Girandoni Air Rifle on display at The National Firearms Museum. The National Firearms Museum photo

At the very same time that the Austrian army was struggling to keep the Girandonis in repair, an American inventor, Eli Whitney (1765-1825) was trying to manufacture muskets with moving parts machined so precisely that they would be "interchangeable" between weapons of the same type. It was a revolutionary idea in a world where every complex mechanism was individually filed and ground to fit.

The development of precision machine tools and gauges in the early 19th century had not progressed far enough to make Whitney's dream a reality until after his death. If Girandoni's brilliant design had connected with Whitney's interchangeable parts, armies equipped with mass-produced smokeless magazine rifles would have been quickly forced to adapt their tactics and doctrine, and subsequent history might have taken a very different path.

## Specifications

Caliber: .462 in  (11.68mm)

Muzzle velocity: 500 fps (152 m/s)

Weight: 10 pounds  (4.5 kg)

Length: 48 inches (1.2 m)

Magazine capacity: 22 rounds

Effective range: 150 yards  (137 m)

"At ... 50 feet, (15 meters) ... capable of placing ten shots into a group the size of a quarter."

"The Man Trap," The Buffalo Commercial, November 1, 1870; from
*N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF (as of Oct. 20, 2022)



# The Weapons of Bonnie & Clyde & the Guns That Stopped Them

Christian Oord, Guest Author

Photo: Hmaag / CC BY-SA 3.0

Who hasn't heard of Bonnie and Clyde, the audacious gangsters who were both heroes and villains?

There have been countless movies about this pair of gangsters, from the original 1967 classic starring Faye Dunaway to the more recent 2013 miniseries bearing the same name.

Then, even more currently, fans and the curious alike can get an alternative glimpse of the fugitives' tale through the eyes of the lawmen who eventually nabbed them. The Netflix production Highwaymen, starring Kevin Costner and Woody Harrelson, was just released on the streaming service in March 2019.



Bonnie and Clyde in March 1933 in a photo found by police at an abandoned hideout

Long gone are the days when the glorification of outlaws was almost the norm. And that is how it should be. However, no two American criminals managed to capture the American people's

imagination more than the lovers Bonnie and Clyde.

Their devilish actions created a myth of an almost indestructible couple who took what they wanted in a world ravaged by the Great Depression of the 1930s. Hunger, joblessness, and homelessness were prolific. The American public lived from one meal to the next, but Bonnie and Clyde prevailed with unrivaled swagger.



John M. Browning, the inventor of the rifle, and Frank F. Burton, the Winchester expert on rifles, discussing the finer points of the BAR at the Winchester plant

And there were always lots of guns.

Dressed in pretty dresses and three-piece suits, they gunned their way through the American Southwest. Bonnie and Clyde told their brutal story of weaponry and love for V8 engines, which to many was even glamorous, with a series of self-glorifying photographs. They knew how to harness the power of the selfie, putting any present-day influencer to shame.



Browning Automatic Rifle, this rifle is part of the Army Heritage Museum Collection. American Heritage Museum.

Together they attacked banks and small businesses, Clyde Champion Barrow with his trusty Browning Automatic rifle (BAR) and Bonnie with her favorite Remington semi-automatic Model 11 shotgun. The villainous pair was often caught on camera horsing around with their weapons.



Just 16 years old, W. D. Jones committed two murders in his first two weeks as Clyde Barrow's protégé. The cut-down shotgun is one of Barrow's "whippit" guns.

Barrow had stolen his weapon, which shot 30-caliber bullets, from the Missouri National Guard Armory. It was said that he particularly appreciated the BAR's high rate of firepower and the bullets' superior ability to penetrate automobile bodies.

The felonious couple shot a total of 13 people with their assortment of guns and drove through the southwestern United States for months before the police could stop them. Their bloody odyssey captivated millions of their contemporaries, who devoured brash newspaper articles about their overhyped crimes fed, of course, by Bonnie's incessant supply of pictures.



Bonnie i Clyde at field

In truth, Bonnie and Clyde were two lost, frightened, and desperate souls. He was raised to a life of crime from a very young age, and she always wanted to become a movie star. Parker was 19 and Barrow 21 when they met in 1930. It was love at first sight.

When Barrow landed behind bars, Parker went to visit him and smuggled a pistol into the prison – it was a Colt 32 revolver. As a result, Barrow broke out but was quickly caught again. However, he was released in 1932 on probation. That's when they started their hell-bent criminal tour of the country that would last two years.



John M. Browning with his Auto-5 ( Remington Arms sold a variant called the Remington Model 11 that was nearly identical)

By the time they were done, the authorities had attributed more than a hundred offenses to their name. There was murder, abduction, bank robbery, car theft, and other forms of larceny. However, unlike the myths of their great riches that abounded throughout the country, their escapades usually only involved small coups that brought in single-digit sums — literally a pittance in the grand scheme of things.



Clyde and Bonnie embraced.

## They died as brutally as they lived

The first bullet from Frank Hamer's Remington Model 8 was already deadly. It hit the windshield and then Clyde Barrow's skull, just above the left ear. Bonnie Parker also sank down, screaming for a long time.

Former Texas Ranger and most probably the USA's most famous lawman, Frank Hamer, and the five men in his posse continued firing, alternating among pistols, shotguns, and semiautomatic rifles until they were sure the wild gangster duo was dead. The autopsy later found a total of 43 bullet holes on the bodies.



Former Texas Ranger Frank Hamer, the Barrow Gang's relentless shadow after the notorious Eastham prison breakout.

That was the bloody end to one of the most infamous gangster careers in history. Bonnie and Clyde's demise had a whiff of Greek tragedy about it. Their mutual infatuation for one another fueled their aimless rampage across the country. They continued moving forward like Mark Anthony and Cleopatra, completely confident that their love would protect them until finally, death came knocking.

Bonnie was 23 and Clyde 24 when they died on May 23, 1934, on Highway 154 between Gibsland and Sailes, two small towns in northern Louisiana. Hamer's men waited for them in ambush thanks to a tipoff from a former gang member's father.



Gibsland posse. Front: Alcorn, Jordan and Hamer. Back: Hinton, Oakley, Gault

The troupe of lawmen immediately began firing and only stopped when the Ford, with its crumpled occupants, lay smoking in a nearby ditch.

Dallas County Sheriffs Ted Hinton and Bob Alcorn explained the happenings in their statements after the event:

> Each of us six officers had a shotgun and an automatic rifle and pistols. We opened fire with the automatic rifles. They were emptied before the car got even with us. Then we used shotguns.... There was smoke coming from the car, and it looked like it was on fire. After shooting the shotguns, we emptied the pistols at the car, which had passed us and ran into a ditch about 50 yards on down the road. It almost turned over. We kept shooting at the car even after it stopped. We weren't taking any chances.



Over a dozen guns and several thousand rounds of ammunition (including 100 20-round BAR magazines) were in the perforated Ford

One the day that Bonnie and Clyde were killed, the authorities found an arsenal of weapons in their car that was enough for a small army:

- Seven .45 Colt 1911 pistols
- One .32 caliber Colt automatic pistol
- One sawed-off 20 gauge Remington Model 11 shotgun (Bonnie's favorite)
- Three .30-06 Browning Automatic Rifles (Clyde's favorite)
- One double action Colt revolver
- One sawed-off Winchester 10 gauge lever action shotgun
- One .380 caliber Colt automatic pistol

Furthermore, there were also 3,000 rounds of various ammunition, and 100 BAR magazines with 20 cartridges in each.

Read another story from us: Guns in Movies and Television: The Best & Worst



"The Trail's End" was on a road deep in the piney Louisiana woods. 32°26′28.21″N 93°5′33.23″W

Word of the death of Bonnie and Clyde spread like wildfire. The now deceased lovers' macabre reality-show continued as hundreds of souvenir-seekers gathered around their car as it was towed into the nearby town.



M1911 A1 pistol

A frenzy of men and women cut and pulled on the bloody locks on Bonnie's head, and slivers of fabric and even one of Clyde's ears were taken.

Bonnie Parker and Clyde Barrow were laid to rest in separate cemeteries despite their wishes to be buried side by side. Thousands of people turned up for their respective funerals, bearing testament to the duo's incredible fame that would live on to this day.

"We believe that the Führer is obeying a higher call to fashion German history. There

# A Short History of the Semi-Automatic Firearm

by **PHILIP SCHREIER, SENIOR CURATOR, NRA MUSEUMS** posted on June 28, 2022

NEWS, FEATURES          **Support NRA America's 1st Freedom**     ( DONATE )



Philip Schreier (above), director of NRA Museums, is shown here in the vault for the National Firearms Museum located in Fairfax, Va. The museum has reopened to the public and still features one of the most-comprehensive collections of guns in the world.

Photo: Forrest MacCormack

When Congress passed, and then-President Bill Clinton (D) signed, the Federal Assault Weapons Ban in 1994, semi-automatic firearms had already been popularly sold to civilians for about a century. To name one, the still highly regarded Model 1911 semi-automatic pistol served as the standard-issue sidearm for the United States Armed Forces from 1911 to 1987, and, at the same time, was and is popular with American citizens for competition and self-defense.

The AR-15, meanwhile, was hardly the first semi-automatic rifle. Many popular semi-automatic rifles were made for civilians in the first years of the 20th century by Remington Arms, Savage and others. But today, when we think of semi-automatic rifles, the AR-15 jumps to mind; the thing is, even its development and introduction isn't popularly understood.



After years of development, in 1963, the U.S. military finally ordered 85,000 AR-15s for the Army and 19,000 for the Air Force. On July 1, 1964, the U.S. military ceased production of the semi-automatic M14. Soon the similar looking but very different full-auto military version of the AR-15 was dubbed the M16. It would become the iconic gun of the Vietnam War.

When this happened, Colt had already begun selling semi-automatic AR-15s to U.S. consumers, starting in 1963. The November 1964 issue of *American Rifleman* reported, "A semi-automatic model of the Colt AR-15 cal. .223 (5.56 mm.) automatic rifle is now offered by Colt's. Designated Colt AR-15 Sporter, it is made for semi-automatic use only, its magazine has a removable spacer which limits capacity to 5 rounds, and its bolt carrier assembly has a Parco-Lubrite finish. In other respects, it is the same as the AR-15 automatic military rifle produced by Colt's for the Army and Air Force."

When the 1994 "assault-weapons" ban sunset in 2004, Americans already lawfully owned millions upon millions of semi-automatic firearms of every type. With the ban gone, AR-type rifles became even more popular. Now over 21 million are owned by citizens for sport and self-defense.

Those are just a few footnotes in the history of semi-automatic designs, but it's worth revisiting this history in greater detail, because if President Joe Biden (D), U.S. Senate Majority Leader Chuck Schumer (D-N.Y.) and other politicians who oppose the Second Amendment could get their way, they would have you think that semi-automatic rifles are new, unusual and too dangerous for citizens to own. This isn't true, but they'd like to, once again, ban popular semi-automatic rifles before, perhaps, moving on to pistols.

To dispel their false history and politics, here is an abbreviated, but still profound history of the semi-automatic.

 

*Left: This is the oldest- known European depiction of a firearm by Walter de Milemete (1326). Right: This is James Puckle's patent for his "Defence" gun (1718). Among other uses, Puckle listed defense of "Houses" as a use for the gun. This was the first gun to be called a "machine gun."*

**Firearms Technology has Been Evolving for Centuries**

With the development of firearms in the mid-1320s, firearms designers concentrated on finding the most-efficient way to get their guns to actually fire. Lit embers, slow matches and linstocks were primitive and impractical in poor weather for igniting arms. The development of the flintlock in the early 17th century provided an efficient method for providing the primer with spark enough to ignite the main powder charge. Once that design gained acceptance, minds focused on how to make the advancement of arms more effective.

Englishman James Puckle (1667-1724) designed a repeating gun in 1718 that bore his name and that became the first gun to be called a "machine gun" in literature. The Puckle gun had a flintlock ignition system and a hand crank that rotated a number of preloaded chambers into battery so that each could be fired in turn. A revolutionary design in concept, only two Puckle guns were ever produced.



*This is Bartolomeo Girardoni's 20-shot air rifle, as used by the Lewis & Clark Corps of Discovery (1803-1806) Expedition.*

The first successful repeating rifle to see actual service in conflict was the famous air rifle designed in 1780 by Italian inventor Bartolomeo Girardoni (1744–1799) for the Austrian Army. This was a rifled carbine with an air reservoir that had a gravity-fed magazine and held twenty .46-caliber round balls. Each round was brought into battery by the flick of a thumb lever on the left side of the receiver, allowing a bullet to fall into the breech chamber. Just a cocking of the hammer primed the air chamber and a pull of the trigger released enough air pressure to propel the projectile with close to 700 feet per second velocity down range to the target, where at 100 yards it would penetrate into an inch of wood. Thought to have been used by the Austrians against Napoleon at the Battle of Wagram in 1805, it is most-famously associated as the force multiplier that Lewis & Clark used to intimidate the various Native Americans that they encountered during their Corps of Discovery between 1803-1806.

In 1818, American designer Artemus Wheeler (1781-1845) developed a revolving carbine that was field tested (without success) by the U.S. Navy. Wheeler's carbine utilized a flintlock ignition system with a cylinder that had six .50-caliber chambers and is one of the earliest examples of the revolver as we know it today. A year following Wheeler's revolving carbine, Boston-born Elisha Haydon Collier (1788-1856), working in England, patented a revolving handgun of similar design. There are some who postulate that a young Samuel Colt, while a merchant seaman in the far east, saw a Collier revolver, which gave him the inspiration to design his own percussion version that became the Colt Paterson revolving handgun in 1836.

The development of the percussion method of igniting firearms developed in the early 1800s, which made their use substantially more practical than the earlier flintlock method. The small percussioncap ignition system evolved into the self-contained metallic cartridge, as we know it today, by the mid-1850s.

 

*Left: The multi-barreled revolving gun of Dr. Richard Jordan Gatling (1818-1903) was the original "force multiplier" on battlefields around the world for over 30 years. Right: The the Mauser C96, or "broom-handle" pistol, was a popular handgun that inspired other semi-automatic designs.*

The self-contained metallic cartridge made the development of a repeating firearm, such as the Gatling Gun (1862), a possibility. The Gatling was able to lay down a sustained rate of fire of over 600 rounds per minute, a true revolution in arms development, but it had a fatal flaw relating to its use of black powder that, when cured, would also render it obsolete.

The history of firearms is easily broken down into three distinct areas, the three P's as we refer to them: Primer, propellant and projectile.

As we have discussed up until now, the evolution of firearms revolved around perfecting the primer or mode of igniting the main charge of propellant. The propellant, black powder, had been a constant since its invention in China around the year 800 A.D. Comprised of sulfur, charcoal and saltpeter, black powder tends to flash up instantly when ignited and is evidenced by a large cloud of white smoke. It leaves a thick residue of burnt powder called "fouling," which, over a period of multiple shots, will constrict the diameter of the gun's barrel, making it difficult to load further rounds of ammunition. This was not much of a concern in the age of smooth-bore muzzle-loading guns, but posed a serious problem for reloading and firing rifled arms, where the advantages of a rifle—range and accuracy—required a tight fit between the projectile and the barrel. Breechloading rifled flintlocks like the one developed by British Maj. Patrick Ferguson (1744-1780) were able to overcome this problem to a degree, but the fouling also tended to wreak havoc with most firing mechanisms after a period of time and use. With the exception of the air-rifle, black-
powder firearms tended to gum themselves up after a period of prolonged use, making innovations such as the Puckle, Wheeler, Collier and Gatling type guns unable to sustain their effectiveness under periods of extended use.

The French chemist Paul Marie Eugène Vieille (1854-1934) created Poudre B (White Powder) in 1884, and thereby changed the landscape of firearms propellants. Using a base of nitrocellulose, his new powder burned slow and hot, creating enormous chamber pressures, and left little or no fouling (residue) and very little smoke. Commonly called "smokeless-powder," Vieille's contribution to firearms development is still in common use today.

The advent of smokeless powder allowed firearms designers to make numerous changes to guns and how they worked. The slower- burning powder provided higher chamber pressures, increasing muzzle velocity significantly. This, in turn, led to the reduction in caliber of most small arms from .50-caliber- plus down to .30 caliber in most military arms of the period. The smaller the projectile, the further it would travel. Now rifled guns would not have to worry about fouling, so full-automatic mechanisms such as the one developed by Sir Hiram Maxim in 1884, and semi-autos, such as the ones designed by Ferdinand Ritter von Mannlicher (1848-1904), could not only sustain increased repeated firepower, but also contributed to greater range and accuracy.

Although Mannlicher's semi-automatic rifle designs failed to initially gain acceptance due to the fact that their main design elements were based on cartridges still using black powder, other European arms developers such as Borchardt, Bergman, Luger and Mauser were quick to adapt the new powder to handgun mechanisms in the early 1890s. The most-successful semi-automatic handgun of the time would become the Mauser C96, or "broom-handle" pistol, which found a large following around the globe with over one million produced between 1896 and 1937.

**Semi-Automatic Handguns**

The semi-automatic handgun is now considered to be the handgun of choice for personal protection, law enforcement and most of the world's military forces.

Although it was European designers who began the initial development of semi-automatic handguns, it was the inventive genius of American John M. Browning (1855-1926) that greatly refined and popularized them beginning with the development of the Browning/FN Model 1899/1900 in .32 ACP. Browning's initial pocket autos were followed up by improved models in 1910 and 1922, with millions produced in numerous countries.

In the United States, the Colt .32 ACP Pocket Hammerless Model 1903, also designed by John M. Browning, swiftly became one of the most-popular carry guns in history, with over 500,000 produced between 1903 and 1945. Weighing in at only 24 ounces and only 7 inches in overall length, it was, and still is, considered to be one of the best carry guns ever made. An identical model in .380 ACP was introduced in 1908, which widened the market that Colt had for pocket pistols.

Smith & Wesson entered the semi-automatic handgun market in 1913 with the introduction of their Model 1913 in .35 S&W auto. In a case of history repeating itself, S&W designed the pistol to fire a proprietary cartridge in hopes of capturing a share of the ammunition sales as well. The Model 1913 suffered the same fate as the S&W Schofield, another gun with a proprietary cartridge that failed to find a market. Only 9,000 of both models were made before they were discontinued.

Remington, America's oldest firearms manufacturer, followed suit in 1914 with their own semi-automatic pocket pistol in both .32 ACP and .380 ACP. Named the Model 51, it was chambered in cartridges that the public had grown to love (and still loves). The Model 51 enjoyed better sales than the Smith & Wesson semi-auto, with some 65,000 being produced before production stopped in 1926.

 

*In 1914 Remington introduced the Model 51 semi-automatic pocket pistol in both .32 ACP and .380 ACP. A Model 51 in .380 auto was gifted to Gen. George S. Patton Jr. (right)).*

Gen. George S. Patton Jr. always carried a sidearm of some sort with him, as he was well known to be quite the firearms aficionado. In the spring of 1945, Patton received a Remington Model 51 in .380 ACP as a gift from Maj. Gen. Kenyon A. Joyce. Gen. Joyce thoroughly enjoyed his own Model 51, and thought that Patton would appreciate its lightness and ease of concealment. Joyce wrote to Remington asking for one to be sent to him engraved with a presentation inscription to Patton, not knowing that the firm had not produced a Model 51 since 1926. The few that they had sold once production stopped were comprised of left-over parts and those were exhausted by 1935. Appreciating the public-relations coup that would follow if Gen. Patton was photographed wearing one of its pistols, Remington located one in a Denver gun shop and rushed it to France, where it was well received by the pistol-toting general of the 3rd Army.

One of the best-loved and most-widely manufactured semi-automatics of the 20th century was the John M. Browning-designed and Colt-manufactured Model of 1911 and its subsequent variants. This seven-shot .45 ACP pistol was the standard service arm of the United States from its adoption in 1911 until it was replaced by the Beretta M9 in 1987. It is interesting to point out that the Wright Brothers were still only known for their bicycle shop in Dayton, Ohio, when Browning took out his first patents on what would become the famed 1911. By the time the M9 replaced it, the entire history of manned flight had peaked with travel into space; meanwhile, the 1911 was pretty much still state-of-the-art in firepower with few changes or modifications.

European semi-automatics, many featuring design elements patented by John M. Browning, commanded the market on the continent well into the latter half of the 20th century. The Mauser Models 1910/1914/1934, as well as its HSc, competed with the Walther PP and PPK pistols and the Beretta Model 1934 for the concealed-carry market.

### Semi-Auto Shotguns

Perhaps the best-known and most- widely produced semi-automatic shotgun was the Browning Auto 5, designed in 1899. Manufactured between 1902-1998, it remains the most-produced shotgun of its type in history, having also been produced under license as the Remington Model 11, and Savage Model 720 and Model 745.

The Remington Model 1100, Beretta 3101, Benelli Super 90 and a host of other semi-auto shotguns have all proven their merits as superb hunting and sporting arms over the past century.



*(left) Mexican Gen. Manuel Mondragón developed the first practical military semi-automatic rifle in 1908 (right); however, Winchester and Remington had produced semi-automatics for the civilian market in 1903 and 1905, respectively. (right) John D. Pedersen (1881-1951), an employee of Remington Arms Company, designed the U.S. military's first semi-automatic rifle in 1917 with what was called the "Pedersen device."*

### Semi-Auto Ri es

The German military arms designer Ferdinand von Mannlicher is credited with developing the first semi-auto rifles in 1884, but, as we stated before, their reliance on black-powder cartridges rendered them obsolete before they were actually manufactured.

It was the Mexican Gen. Manuel Mondragón (1859-1922) who developed the first practical military semi-automatic rifle in 1908. But it was not the first semi-automatic rifle on the market at the turn of the last century, as Winchester and Remington had produced their own semi-automatics for the civilian market in 1903 and 1905, respectively. The Winchester Model 1903 was a semi-auto in .22 Winchester Automatic that eventually evolved into the Model 63 in .22 LR. Both Remington and Winchester began production of their own Models of 1905 in harder- hitting .30- and .35-caliber chamberings, which proved to be quite popular in the civilian and law-enforcement markets in the years prior to World War I.

Winchester introduced a whole series of semi-autos designed by T. C. Johnson (1882-1934)—the Model 1905, 1907 and Model 1910—all hard-hitting, magazine-fed semi-automatics that not only found a civilian following but were so well-regarded they were ordered in substantial numbers by the French, British and Russian governments during World War I.



*From the top: The M1 Garand, the M1 carbine and the Ruger 10/22.*

The development of what was then called self-loading rifles continued to evolve even as World War I turned Europe into a charnel house. The French Model 1917 was a gas-operated semi-automatic rifle chambered in 8 mm Lebel. About 85,000 were produced and issued to French troops who found that it was too heavy and jammed a lot.

John D. Pedersen (1881-1951), an employee of Remington Arms Company, designed America's first military semi-automatic in 1917 with what was called the "Pedersen device." By modifying a standard- issue Model 1903 Springfield rifle, Pedersen's device could easily replace the bolt with a blow-back mechanism that was fed .30-18-caliber ammo from a 40-round magazine. Gen. John J. Pershing was so impressed with the possibilities of arming every soldier of the American Expeditionary Forces (A.E.F.) with a 40-round semi-automatic rifle that he ordered 500,000 of them made in hopes of employing them in the big Spring offensive of 1919. Fortunately for the soldiers of the A.E.F., the Great War ended in 1918. Contracts to produce the Pedersen device were halted after only 65,000 had been made by Remington. They were kept top secret until 1932, when they were declared obsolete and all but 100 were destroyed.



*In 1963, at the same time the U.S. military began purchasing what became known as the M16 from Colt, the company also began selling semi-automatic AR-15s to the American public.*

Then came the M1. "In my opinion, the M-1 Rifle is the greatest battle implement ever devised," wrote Gen. Patton about the M1 Garand rifle in January of 1945. The M1 Garand rifle was the semi-automatic standard service arm of the U.S. military from 1936-1958. During its service run, nearly 6 million were produced, with 4 million manufactured during the 48 months we were involved in fighting the second World War. As the only military force in World War II fighting with a semi-automatic service rifle as their standard-issue arm, it is often credited with playing a major role in our eventual victory over the enemies of democracy and freedom. Jean (John) C. Garand (1888-1974) began working on the M1 in 1919 and perfected it in 1936. It remained in service until it was replaced by the similar, but selective-fire, .308-caliber M14 in 1958.

An entire library of books on the various semi-automatic rifles that soon followed have been written, but most concentrate on the military developments. The German G41 & G43 and its HK cousin; the Steyr -Aug, SKS, Beretta and FN rifles all dominated the battlefields of the late 20th century. And of course, America's rifle, the AR-15, dominates the competition field and hunting

grounds now, over 50 years since its introduction.

Sporting rifles such as the Remington Model 4 and 7400, the Ruger 10/22 and Mini 14 and the Winchester Model 63 have provided millions of Americans with endless hours of fun on the rifle range and in the hunting fields since their introduction in the post-World War II era.

Whether on the battlefield, carried in woods or marshes by hunters, their use at the National Matches and more, the semi-automatic has been a vital and efficient firearm that has been around for over a century and is the most-common firearm type owned by American citizens today.

© Copyright 2022 National Rifle Association



The South Bend Tribune (South Bend, Indiana) · 11 Feb 1891, Wed · Page 3

Downloaded on Oct 18, 2022



### Shot by a Trap-Gun.

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

A good record. "I have sold Cham.

**south bend tribune 2/11/1891**



Clipped By:

**spitzertess**
Sun, Jul 24, 2022

Copyright © 2022 Newspapers.com. All Rights Reserved.

# OTHER SOURCES

# Browning automatic rifle



Browning automatic rifle

**Browning automatic rifle (BAR)**, automatic rifle produced in the United States starting in 1918 and widely used in other countries as a light machine gun. The BAR is a gas-operated rifle invented by John M. Browning (1855–1926), an American gun designer. It has been chambered for various ammunition, but most frequently for .30-06 Springfield. About 47 inches (120 cm) long, it has a 20-round magazine and weighs 19.4 pounds (8.8 kg). It can fire up to 650 rounds per minute but can also fire single shots or bursts of two or three to increase accuracy. It can be fired from the shoulder or mounted on a bipod.

The BAR was used by U.S. infantry forces in World Wars I and II and the Korean War. It remained in U.S. Army service until 1957.

This article was most recently revised and updated by Amy Tikkanen.

Citation Information

Article Title: Browning automatic rifle

Website Name: Encyclopaedia Britannica

Publisher: Encyclopaedia Britannica, Inc.

Date Published: 08 September 2022

URL: https://www.britannica.comhttps://www.britannica.com/technology/Browning-automatic-rifle

Access Date: October 21, 2022

# Blast From the Past: Winchester Model 1905

### A reader shares a family heirloom rifle chambered in .35SL

BY PHIL BOURJAILY | PUBLISHED JAN 11, 2019 9:20 PM

It's a good guess that almost any firearms invention of the early 20th century should be attributed to John Browning. If not, your second guess would be Thomas Crossley Johnson, inventor of the Model 12, who was also a prolific gun designer.

Today we've got one of T.C. Johnson's lesser-known guns, the Model 1905 Winchester. The 1905 was a blow-back semiauto design, which by necessity had to be chambered for a fairly low-power cartridge. Winchester invented a couple of cartridges for the 1905: the .32SL (self-loading) and the .35SL. The 1905 held five or 10 rounds in a box magazine.

Only about 30,000 1905s were made between 1905 and 1920. The somewhat underpowered .35SL was replaced by the more powerful .351SL in the beefed up 1907 Winchester, another T.C. Johnson design which was made all the way until 1958.

And, while the public voted with its wallet for the heavier .351SL, in the right hands the .35SL could fill the larder, as evidenced by today's rifle.

## Nick's 1905 Winchester

*I have a model 1905 .35-caliber self-loading rifle. The rifle was originally owned by a cousin of my grandmother's and it has taken countless deer. Those people were a hardy bunch. My grandmother's cousin had an old run-down farm that his mother had built up over the years. Food was scarce, so when they needed meat Oliver took the rifle and filled the larder with deer. My grandpa had the gun refurbished when he owned it. It still has the original stocks and from what I can gather these were only made for a few years and the cartridge is a pistol load. Mine appears to be made around 1912.*

Keep the old gun pictures coming to fsgunnuts@gmail.com.

RIFLES    BLASTS FROM THE PAST    SHOOTING    WINCHESTER

---

SPONSORED CONTENT



### Camping Adventures: Don't Get Stuck in the Mud with General Tire.

BY GENERAL TIRE

**You Might Also Like**

# Bowie Knife - Encyclopedia of Arkansas

The bowie knife, made popular in the 1830s, has evolved into a specific form in current use. The bowie knife was worn for defensive purposes; its primary function was for personal combat. It was designed to be part of a gentleman's attire, and the key difference between the bowie knife and a hunting knife, a dagger, or a dirk was, initially, the quality of finish of the bowie. Bowie knives came in a variety of forms— with or without guards, with differently shaped blades—and often were adorned with silver and other decoration, sometimes including etching and/or engraving on their metal surfaces.

The knife got its name from a pioneer family who settled in early Arkansas and Louisiana. Jim Bowie, the best known of the brothers, killed one man and seriously injured another with a "big knife" in the "Sandbar Duel" on September 19, 1827, upriver from Natchez, Mississippi. He later moved to Texas and died at the Alamo. In the early 1830s, the term "bowie knife" began to be used, possibly shorthand for "knife like Bowie's" for the knives that were being worn in the Mississippi River Valley region especially. Jim Bowie's brother Rezin promoted the knife's association with the Bowie name by giving away several presentation knives and attributing the design of the "first" bowie knife, the one wielded by Jim at the Sandbar Duel, to Rezin himself. By his own account, this knife was a simple "hunting knife."

Among the early cutlers who made a knife more refined than the common hunting knife was James Black of Washington (Hempstead County), who claimed to have made a knife for Jim Bowie. An article in the Washington (Arkansas) Telegraph on December 8, 1841, first attributed the invention of the bowie knife to Black. Arkansas statesmen Daniel Webster Jones and Augustus Garland both heard stories from Black about his designing and making a knife for Bowie. Black's knives, embellished with silver plating on the ricasso (the part of the blade immediately above the handle) and silver around the distinctive, coffin-shaped handle, became the most copied of all bowie knives; many Sheffield, England, cutlers produced knives with the coffin handle and/or elements of the silver wrap around the handle. The connection of these knives to Arkansas, and the state's reputation for the use of the blade, inspired an alternative term to "bowie knife." "Arkansas knife" and then "Arkansas toothpick" were used synonymously for the bowie knife in the antebellum period. (Only a few references from that period make a distinction between Arkansas toothpick and bowie knife.) In the 1830s, several states passed laws establishing sanctions against the use of the bowie knife and the Arkansas toothpick. The state's reputation suffered because of its association with violence and the "toothpick," and some people called Arkansas the "toothpick state."

By the time of the Civil War, the term bowie knife had come to be used for any large knife, and many soldiers went off to war with such knives. They were not particularly useful in battle. Today, "bowie knife" usually is defined as a large knife with a cross guard and a blade with a clipped point, while the "Arkansas toothpick" is a knife with a double-edged blade coming to a point.

For additional information:
Flayderman, Norm. The Bowie Knife: Unsheathing an American Legend. Lincoln, RI: Andrew Mowbray Inc., 2004.

Worthen, William B., Jr. "Arkansas and the Toothpick State Image." Arkansas Historical Quarterly 53 (Summer 1994): 161–190.

———. "The Term 'Bowie Knife.'" Knife World 21 (November 1995): 1, 15–17.

William B. Worthen
Historic Arkansas Museum

Last updated:
August 21, 2020

"*" indicates required fields

HARDWARE & AMMUNITION

Assault Weapons

BROWSE STATE LAWS

SHARE   

Assault weapons are designed for the battlefield and pose a serious public safety risk, making it easier for shooters to kill more people more quickly.

In the past decade, shooters armed with assault weapons have wreaked havoc in our nation's public spaces, from movie theaters and schools to churches, festivals, and city streets. These civilian versions of weapons created for the military are designed to kill humans quickly and efficiently. In the absence of federal legislation regulating assault weapons, states must take it upon themselves to protect their residents from these deadly weapons.

## BACKGROUND

**MEMO: Regulating Assault Weapons under the National Firearms Act**



**DOWNLOAD PDF**

Assault weapons are a class of semi-automatic firearm specifically designed to kill humans quickly and efficiently. They are a relatively new class of weapon—during the 1980s, the gun industry sought to reverse a decline in consumer demand for guns by developing and marketing new types of weapons based on high-powered military designs.[1] Between 1994 and 2004, certain "semiautomatic assault weapons" were banned at the federal level, but currently there is no federal law regulating these highly lethal weapons.

Wounds caused by assault weapons are more severe and lethal than wounds caused by other firearms, and, particularly when paired with large capacity magazines, assault weapons can injure more people more quickly. **Because of this lethality, assault weapons are frequently the guns of choice for individuals who carry out horrific public attacks.**

Assault weapons have been used in the seven deadliest mass shootings in the last decade.

An analysis of public mass shootings resulting in four or more deaths found that more than 85% of such fatalities were caused by assault rifles.[2]

An assailant with an assault rifle is able to hurt and kill twice the number of people compared to an assailant with a non-assault rifle or handgun.[3]

**A growing body of research demonstrates that banning assault weapons can help to prevent gun violence.** Studies of both the lapsed federal assault weapons ban and state-level assault weapons bans show that these laws help to reduce fatalities and injuries from mass shootings, as well as the use of assault weapons in crime.

> During the 10-year period the federal assault weapons ban was in effect, mass shooting fatalities were 70% less likely to occur compared to the periods before and after the ban.[4]
>
> Studies also suggest that state level assault weapons bans help to prevent mass shooting deaths.[5]
>
> In several major cities, the share of recovered crime guns that were assault weapons declined by at least 32% after the federal ban was adopted.[6]
>
> Importantly, researchers have been able to demonstrate that the federal assault weapons ban prevented mass shootings and decreased the diversion of assault weapons to criminal use, despite limitations in law which allowed manufacturers to circumvent the regulations.

**The American public strongly supports efforts to better regulate assault weapons.** 67% of Americans—including half of all Republicans—support a ban on assault weapons.[7]

# SUMMARY OF FEDERAL LAW

## THE LAPSED FEDERAL ASSAULT WEAPONS BAN

In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act of 1994, which made it "unlawful for a person to manufacture, transfer, or possess" a semiautomatic assault weapon.[8] The law was adopted with a sunset clause, however, and expired in 2004, despite overwhelming public support for its renewal. Thus, **semi-automatic, military style weapons that were formerly banned under federal law are now legal unless banned by state or local law.**

The 1994 act defined the phrase "semiautomatic assault weapon" to include 19 named firearms and copies of those firearms, as well as certain semi-automatic rifles, pistols, and shotguns with at least two specified characteristics from a list of features.[9] The full "semiautomatic assault weapon" definition from the 1994 act is

available here. The federal ban also prohibited the transfer and possession of any new large capacity ammunition magazine.[10] Additional information is available in our summary on Large Capacity Magazines.

# SUPPORT GUN SAFETY

We're in this together. To build a safer America—one where children and parents in every neighborhood can learn, play, work, and worship without fear of gun violence—we need you standing beside us in this fight.

| $10 | $20 | $50 |
|---|---|---|
| $100 | | OTHER |

DONATE

---

**70%**

**LOWER LIKELIHOOD OF MASS SHOOTING DEATHS**

While the federal assault weapons ban was in effect, mass shooting fatalities were 70% less likely to occur.

As described above, **studies show that the federal assault weapons ban resulted in a marked decrease in the use of assault weapons and large capacity ammunition magazines in crime.**

The 1994 act did suffer from notable limitations, however. The two-feature test and the inclusion of some purely cosmetic features created a loophole that allowed manufacturers to successfully circumvent the law by making minor modifications to the weapons they already produced. The law also did not prohibit the continued transfer or possession of assault weapons manufactured before the law's effective date. Manufacturers took advantage of this loophole by boosting production of assault weapons in the months leading up to the ban, creating a legal stockpile of these guns.

## THE BAN ON THE IMPORTATION OF NON-SPORTING FIREARMS AND THEIR PARTS

Federal law prohibits any person from importing a firearm unless authorized by the US attorney general.[11] The

attorney general must authorize the importation of any firearm that "is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms."[12] Federal law also prohibits any person from assembling from imported parts any semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation.[13]

In 1998, ATF announced that semiautomatic rifles capable of accepting large capacity ammunition magazines "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes and are therefore not importable."[14] However, a 2011 report by three US Senators found that, "Since the Clinton Administration's efforts, the Gun Control Act of 1968's prohibition against non-sporting firearms has not been aggressively enforced, and many military-style, non-sporting rifles have flowed into the United States civilian market."[15]

## SUMMARY OF STATE LAW

### EIGHT STATES AND THE DISTRICT OF COLUMBIA HAVE ENACTED LAWS BANNING ASSAULT WEAPONS

California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and the District of Columbia prohibit assault weapons. The earliest of these assault weapon restrictions was enacted in the District of Columbia as part of a 1932 federal law, with the remainder of states first adopting legislation to prohibit assault weapons later in the 20th century.[16] In addition, Minnesota and Virginia regulate assault weapons.[17]

**Assault weapons bans can be categorized according to:**

1. The definition(s) of "assault weapon"

2. The activities that are prohibited

3. Whether pre-ban weapons are exempted

4. Whether exempted pre-ban weapons (legacy weapons) must be registered

5. How transportation, transfer, and possession of legacy weapons are treated

**State Assault Weapons Bans**

| State | List Banned by Name | Generic Feature Definition | Requires Registration of Legacy Weapons |
|---|---|---|---|
| California[18] | Yes | Yes (One-Feature) | Yes |
| Connecticut[19] | Yes | Yes (One-Feature) | Yes |
| Delaware[20] | Yes | Yes (One-Feature) | No |
| District of Columbia[21] | Yes | Yes (One-Feature) | N/A[22] |
| Hawaii[23] (assault pistols only) | No | Yes (Two-Feature) | Yes |
| Maryland[24] | Yes | Yes (Two-Feature) | No[25] |
| Massachusetts[26] | Yes | Yes (Two-Feature) | No |
| New Jersey[27] | Yes | No[28] | Yes |
| New York[29] | No | Yes (One-Feature) | Yes |

◀             ▶

**States that Regulate (But Do Not Ban) Assault Weapons**

Minnesota[30]

Virginia[31]

## DESCRIPTION OF STATE LAWS BANNING ASSAULT WEAPONS

Some state assault weapons bans prohibit specific weapons by listing them by name. Some state assault weapons bans list features that, when present, qualify a gun as an assault weapon. The latter are known as generic feature tests. **Generic feature tests—emphasizing high capacity and enhanced control during firing— are intended to identify assault weapons based on the military features that enhance a weapon's lethality**. Generic feature tests requiring a weapon to have only one of a list of features are more comprehensive than those that require two. A one-feature test captures more assault weapons and makes it harder for the gun industry to evade the law by slightly modifying banned weapons.

### Prohibited Activities

Assault weapons bans vary as to which activities are prohibited. California prohibits the broadest range of activities. Both California and Connecticut prohibit possession, distribution, importation, transportation, and keeping or offering for sale of assault weapons.[32] In addition, California prohibits the manufacture and transfer of assault weapons, while Connecticut also prohibits giving an assault weapon to another person. New Jersey and New York laws prohibit the manufacture, transportation, sale, shipping, transfer, disposing, and possession of assault weapons. Maryland prohibits the possession, sale, offering for sale, transfer, purchase, receipt, or transportation of assault weapons into the state. Delaware prohibits the manufacture, sale, transfer, receipt, and possession of an assault weapon.

### Legacy Weapons Owned Prior to a Ban

7

DEADLIEST MASS SHOOTINGS INVOLVED ASSAULT WEAPONS
Assault weapons were used in the seven deadliest mass shootings of the last decade. Designed for combat, assault weapons enable shooters to kill more people more quickly.

Assault weapons bans differ in their treatment of pre-ban weapons. The District of Columbia does not allow the possession of pre-ban weapons. Every state with a ban has legacy provisions that exempt pre-ban weapons, meaning that individuals who possessed prohibited assault weapons prior to the ban may generally keep them— provided that certain requirements are met. California, Connecticut, Hawaii, New Jersey, and New York, for example, require registration of such weapons.[33] New Jersey's law is particularly strong because only assault weapons with a legitimate target-shooting purpose may be registered (effectively requiring over 60 models, types and series of assault weapons to be transferred out of state, rendered inoperable, or surrendered to law enforcement). Maryland required registration of legacy assault pistols but not assault long guns. See our summary on the Registration of firearms for further information about registration systems.

California, Connecticut, Hawaii, Maryland, and New York prohibit transfer of all or most legacy weapons owned prior to the adoption of a ban. California, Connecticut, and Delaware limit the places where a legacy weapon may be possessed.[34] In Massachusetts and New Jersey, legacy weapons may only be sold and possessed if the owner has a license. Additional information on licensing of firearm owners is contained in our summary on Licensing.

**The Takings Clause**

Bans on assault weapons—whether they contain legacy provisions or not—do not present a problem under The Takings Clause of the Fifth Amendment.

**The Second Amendment**

Assault weapons bans have been upheld again and again over the years in both state and federal courts.[35] The notion that such laws violate the Second Amendment has been soundly rejected.

**GET THE FACTS**

Gun violence is a complex problem, and while there's no one-size-fits-all solution, we must act. Our reports bring you the latest cutting-edge research and analysis about strategies to end our country's gun violence crisis at every level.

**LEARN MORE**



## STATE REGULATIONS GOVERNING ASSAULT WEAPONS

**Minnesota**

Minnesota prohibits the possession of "semiautomatic military-style assault weapons" by persons under 18 years of age, as well as other prohibited persons, and imposes additional restrictions on transfers through firearms dealers.

**Virginia**

Virginia limits the knowing and intentional possession and transportation of certain semi-automatic "assault firearms" to citizens and permanent residents age 18 and older. These weapons may not be carried, loaded, in public places in certain cities and counties. Virginia also imposes a general ban on the importation, sale, possession, and transfer of the "Striker 12" and semi-automatic folding stock shotguns of like kind, but does not refer to them as "assault firearms."

**District of Columbia Tort Liability Law Governing Assault Weapons**

The District of Columbia imposes strict tort liability on manufacturers, importers, and dealers of assault weapons for all direct and consequential damages that arise from injury or death due to the discharge of an assault weapon in the District (with limited exceptions).[36]

## SELECTED LOCAL LAW

**Cook County, Illinois**

Adopted by Cook County, Illinois, in 1993, the Blair Holt Assault Weapons Ban prohibits the manufacture, sale, transfer, or possession of an assault weapon or large capacity magazines in Cook County, Illinois. The Ban was adopted in 1993, but was amended and renamed in memory of Blair Holt, a 16-year-old boy who was shot and killed as a bystander when gang violence erupted on a bus in 2007. The law includes an extensive list of prohibited assault weapon types, models, and series, and provides a one-feature test identifying other rifles, shotguns, and pistols as assault weapons. The law defines a large capacity magazine as any ammunition feeding device with the capacity to accept more than ten rounds. The 1993 ordinance enacting this law provided that any person who was legally in possession of an assault weapon or large capacity magazine at that time had 90 days to: (1) remove it from the county; (2) modify it so it was rendered either inoperable or so changed that it would fall outside the definition of "assault weapon" or "large capacity magazine;" or (3) surrender it to law enforcement. Only law

enforcement officers and members of the military are now allowed to possess assault weapons or large capacity magazines in the county.[37]

# KEY LEGISLATIVE ELEMENTS

The features listed below are intended to provide a framework from which policy options may be considered.  A jurisdiction considering new legislation should consult with counsel.

Definition of assault weapon is based on the generic features that characterize assault weapons (*California, Connecticut, Delaware, New York, and the District of Columbia have the most comprehensive definitions*).

Definition of assault weapon is based on a one-feature test (Delaware, *New York, the District of Columbia and Cook County, Illinois each use a one-feature test for shotguns, rifles, and pistols; New Jersey uses a one-feature test for shotguns; California and Connecticut use a one-feature test for rifles and pistols*).

Although a generic feature test is the most comprehensive approach, if the law also includes a list of banned weapons by name, it provides a mechanism authorizing an appropriate governmental official or agency to add new and/or modified models to the list (*District of Columbia*).

Definition extends to parts that may be readily assembled into an assault weapon (*Connecticut and New Jersey*).

Prohibited activities include possession, sale, purchase, transfer, loan, pledge, transportation, distribution, importation, and manufacture of assault weapons (*California has the broadest prohibition*).

Pre-ban weapons are not exempted from a ban and instead are to be rendered inoperable or removed from the jurisdiction (*District of Columbia and Cook County, Illinois; New Jersey exempted only a small category of assault weapons*).

Alternatively, if pre-ban weapons are exempted and treated as legacy weapons, there is a registration mechanism for legacy weapons, with strict limits on their transferability, use, and storage[38] (*California, Connecticut, Hawaii, New Jersey, New York*).

# RELATED

WHO CAN HAVE A GUN

**Extreme Risk Protection Orders**

Extreme risk protection orders provide a proactive way to temporarily restrict a person showing clear warning signs of violence from accessing firearms.

**BACKGROUND CHECKS**

### Universal Background Checks

Universal background checks are essential to close deadly loopholes in our laws that allow millions of guns to end up in the hands of individuals at an elevated risk of committing violence each year.

**HARDWARE & AMMUNITION**

### Large Capacity Magazines

Large capacity magazines are often used in mass shootings because they allow a shooter to keep firing for longer periods of time, increasing casualties and reducing victims' ability to escape or intervene.

## Notes 

ContactBlog

CareersPress

SUPPORT GIFFORDS

| First Name | Last Name |
|---|---|

| ZIP Code | Email Address |
|---|---|

**SIGN UP**

Terms & Conditions        Privacy Policy

© 2022 Giffords Law Center to Prevent Gun Violence. All Rights Reserved.



HARDWARE & AMMUNITION

Large Capacity Magazines

**BROWSE STATE LAWS**

SHARE

Large capacity magazines are often used in mass shootings because they allow a shooter to keep firing for longer periods of time, increasing casualties and reducing victims' ability to escape or intervene.

Large capacity ammunition magazines are a common thread in many high-profile mass shootings in the United States. Because shooters with such magazines can fire at large numbers of people without taking the time to reload, those in the line of fire do not have a chance to escape, law enforcement does not have the chance to intervene, and the number of lives shattered by acts of gun violence increases dramatically.

## BACKGROUND

Although the statutory definitions vary, magazines with a capacity of more than 10 rounds of ammunition are generally considered "large capacity" magazines.

**62%**

**HIGHER DEATH TOLL WITH LARGE CAPACITY MAGAZINES**

**GIFFORDS**
**LAW CENTER**
TO PREVENT GUN VIOLENCE

One analysis of mass shootings between 1990 and 2017 found that attacks involving large capacity magazines resulted in a 62% higher death toll.

NEWS

CONTACT          **DONATE**

While large capacity magazines are typically associated with semi-automatic assault weapons or machine guns, such devices can be used with any semi-automatic firearm that accepts a detachable magazine, including handguns.

Large capacity magazines (LCMs or LCAMs) have been used to perpetrate devastation on a massive scale in many high-profile mass shootings. In fact, **large capacity magazines have been used in all ten of the deadliest mass shootings in the last decade.** Large capacity magazines significantly increase a shooter's ability to injure and kill large numbers of people quickly because they enable the individual to fire repeatedly without needing to reload.

**The more rounds a shooter can fire consecutively, the more gunshot wounds they can inflict during an attack.**

Mass shootings that involve large capacity magazines result in twice as many fatalities compared to mass shootings that do not involve high capacity magazines.[1]

Using an assault weapon and a drum magazine that held 100 rounds, the assailant in the 2019 Dayton, Ohio mass shooting, was able to fire at least 41 rounds of ammunition in less than 30 seconds, killing nine people and wounding 26 others.[2]

The shooter in the 2017 Las Vegas massacre was able to fire 100 rounds in just 10 seconds—without having to pause and reload—because he used a large capacity magazine, bump stock, and an assault rifle in his attack which killed 50 and injured hundreds.[3]

The time a shooter takes to reload his weapon can be critical in enabling victims to escape and law enforcement or others to intervene. **When shooters have high capacity magazines, more bullets can be fired before this crucial time period for escape or other intervention.**

The 2011 mass shooting in Tucson, AZ, where six people were killed and 13 others were wounded, including US Representative Gabrielle Giffords, was interrupted when the gunman stopped to reload his weapon and was tackled by a bystander.[4]

Similarly, during the 2018 shooting at Marjory Stoneman Douglas High School, students were able to escape down a stairwell while the shooter paused to reload his weapon.[5]

**GIFFORDS LAW CENTER**          NEWS        **DONATE**
                                 CONTACT

In addition to their role in mass shootings, **firearms equipped with large capacity magazines significantly contribute to crime across the country.** Alarmingly, data suggests that the use of firearms with large capacity magazines in crime has substantially increased since the expiration of the federal assault weapons and large capacity magazine ban in 2004.

Firearms equipped with high-capacity magazines are estimated to account for 22 to 36% of crime guns in most places.[6]

Estimates also suggest that nearly 40% of crime guns used in serious violent crimes, including murders of law enforcement officers, are equipped with high-capacity magazines.[7]

The share of recovered crime guns equipped with large capacity magazines increased by between 49 and 112% in several major cities—and an estimated 33% nationally—after the 1994 federal ban on assault weapons and large capacity magazines expired.[8]

**A growing body of research shows that banning high-capacity magazines can help to prevent gun violence.** In particular, studies have found that the federal ban on large capacity magazines helped to prevent violence and the use of high-capacity magazines in crime during the 10 years in which it was in effect.

During the 10-year period the federal assault weapons and large capacity magazine ban was in effect, mass shooting fatalities were 70% less likely to occur compared to the periods before and after the ban.[9]

While the federal assault weapons and large capacity ammunition ban was in effect, the number of high-fatality mass shootings fell by 37%, and the number of people dying in such shootings fell by 43%. When the ban lapsed in 2004, there was a 183% increase in high-fatality mass shootings and a 239% increase in deaths from such shootings.[10]

**Polling consistently shows that a majority of Americans—nearly 70%—support laws that ban large capacity magazines.**[11]

# SUMMARY OF FEDERAL LAW

## THE FORMER FEDERAL BAN

GIFFORDS
LAW CENTER

NEWS
CONTACT

**DONATE**

In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, making it unlawful to transfer or possess a "large capacity ammunition feeding device" not lawfully possessed on or before the law's enactment.[12] The law also banned the manufacture, transfer, and possession of semi-automatic assault weapons. See our summary on Assault Weapons for more information. The law was adopted with a sunset clause, however, and expired in 2004, despite overwhelming public support for its renewal. Thus, large capacity ammunition magazines and assault weapons that were formerly banned under the federal law are now legal unless banned by state or local law.

The 1994 Act defined "large capacity ammunition feeding device" as "a magazine, belt, drum, feed strip, or similar device...that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition."[13] The ban contained a loophole, however, allowing for the continued transfer, and possession of large capacity ammunition magazines manufactured or possessed on or before enactment of the law.

Manufacturers took advantage of this loophole in the months leading up to the ban by boosting production of the magazines. As a result, they continued to be readily available—and legal—nationwide even during the time the 1994 Act was in effect, except where specifically banned by state or local law. Additionally, because most magazines do not have any identifying marks to indicate when they were manufactured, it was difficult to distinguish those made before or after the ban.[14]

# SUPPORT GUN SAFETY

We're in this together. To build a safer America—one where children and parents in every neighborhood can learn, play, work, and worship without fear of gun violence—we need you standing beside us in this fight.

**GIFFORDS LAW CENTER**
TO PREVENT GUN VIOLENCE

NEWS
CONTACT

| DONATE $20 | $50 |
|---|---|
| $100 | OTHER |

**DONATE**

## EFFECTIVENESS OF THE BAN

Despite these limitations, evidence indicates that **the federal ban worked to reduce the use of large capacity magazines in crime.** A Washington Post study analyzed data kept by the Virginia State Police and found a clear decline in the percentage of crime guns that were equipped with large capacity ammunition magazines after the federal ban was enacted.[15] The percentage reached a low of 10% in 2004 and then steadily climbed after Congress allowed the ban to expire; by 2010, the percentage was close to 22%.[16]

Similarly, since the end of the federal ban, the Los Angeles Police Department has recovered significantly greater numbers of large capacity ammunition magazines, from 38 in 2003 to anywhere from 151 to 940 each year between 2004 and 2010.[17]

Bans on large capacity ammunition magazines—whether or not they contain legacy provisions that allow possession of previously owned LCMs—do not present a problem under The Takings Clause of the Fifth Amendment.

## SUMMARY OF STATE LAW

**Twelve states and the District of Columbia have enacted laws banning large capacity ammunition magazines:** California, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Vermont. All of these jurisdictions except Colorado and Vermont also ban assault weapons.



State Large Capacity Magazine Regulations          NEWS
                                                   CONTACT          DONATE



NEWS
CONTACT

**DONATE**



NEWS
CONTACT

**DONATE**

## CATEGORIES OF LARGE CAPACITY MAGAZINE BANS

*For citations to these laws, please see the chart above.*

**States that Ban Large Capacity Magazines for Use with Any Firearm**

Eight states (California, Colorado, Connecticut, Maryland, Massachusetts, New Jersey, New York, and Vermont) and the District of Columbia all ban large capacity ammunition magazines for use with any firearm.

**State that Bans Large Capacity Magazines for Use with Handguns Only**

Hawaii prohibits the manufacture, transfer, and possession of large capacity magazines designed for or capable of use with a handgun.

**Definition of Large Capacity Magazine**



NEWS
CONTACT

**DONATE**

State laws vary as to how the term "large capacity magazine" is defined: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, and the District of Columbia define a large capacity magazine as a magazine that is capable of holding more than 10 rounds.[32] Colorado defines a large capacity magazine as a magazine capable of holding more than 15 rounds. Vermont restricts large capacity magazines that hold more than 10 rounds for use in a long gun, or more than 15 rounds for use in a handgun.

**Prohibited Activities**

**100%**

**OF THE DEADLIEST MASS SHOOTINGS USED LCMS**

Large capacity magazines have been used in 10 out of 10 of the deadliest mass shootings in the last decade.

California, Hawaii, New Jersey, and New York have the most comprehensive prohibitions, banning possession, manufacture, and transfer (including sale) of large capacity magazines.[33] New Jersey allows possession of large capacity magazines by a person who has registered a legacy assault weapon and uses the magazine in connection with competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the US Department of the Army.[34]

Other states ban various combinations of activities related to large capacity magazines. For instance, Colorado, Massachusetts, and the District of Columbia ban possession and transfer; Maryland bans manufacture and transfer; and Connecticut bans distribution, importation, purchase, transfer, and possession.

**Magazines Owned at the Time of the Ban**

State laws that ban the possession of large capacity ammunition magazines vary in their approach to large capacity magazines already in the possession of private individuals at the time a ban was adopted.

**States that Do Not Exempt Pre-Ban Magazines**

**GIFFORDS**
**LAW CENTER**
TO PREVENT GUN VIOLENCE

NEWS
CONTACT

**DONATE**

California[35] , the District of Columbia, Hawaii,[36] New Jersey, and New York generally do not allow continued possession of large capacity magazines that were obtained before these states enacted bans on those magazines. As a result, these jurisdictions effectively required any large capacity magazine owned at the time the ban was enacted to be converted to a more limited capacity magazine, destroyed, or transferred to a dealer, law enforcement, or out of state. New York extends a 30-day grace period to any individual in possession of such a magazine manufactured before September 13, 1994, who is unaware that their magazine is illegal. This individual is not required to dispose of the magazine until he or she is notified by law enforcement or county licensing officials that possession is unlawful. Once they receive notice, they have 30 days to surrender or "lawfully dispose" of illegal magazines.

**States that Exempt Pre-Ban Magazines**

The Connecticut ban does not apply to large capacity magazines that were lawfully possessed before January 1, 2014, but lawful owners of such legacy magazines must register them with the State Department of Emergency Services and Public Protection within a specified period.

Colorado, Massachusetts, and Vermont all exempt possession of large capacity magazines that were owned prior to the effective date of a ban.[37]

Maryland does not prohibit possession of large capacity magazines, although manufacture and transfer are banned. As a result, individuals who possessed such magazines before these states' bans may continue to possess them.

**States that Require Identification Markings for Magazines Manufactured after the Law**

As noted above, enforcement of laws exempting pre-ban magazines is difficult because most magazines do not contain any markings to identify those that were manufactured before or after the effective date of the ban. As a result, the Colorado law requires manufactures to include a permanent stamp or marking on all large capacity magazines manufactured after July 1, 2013. These markings must indicate that the magazine was manufactured after the state law went into effect and must be conspicuously engraved or cast on the outer surface of the magazine.

**Bans on "Conversion" or "Repair" Kits**

In 2013, California explicitly banned the use of "conversion" or "repair" kits that allow the purchaser to construct home-made large capacity ammunition magazines from spare parts.

**GET THE FACTS**

Gun violence is a complex problem, and while there's no one-size-fits-all solution, we must act. Our reports bring you the latest cutting-edge research and analysis about strategies to end our country's gun violence crisis at every level.



**SELECTED LOCAL LAW**

See the description in our summary on Assault Weapons of the Blair-Holt Assault Weapons Ban in Cook County, Illinois. This law includes a ban on large capacity ammunition magazines.



KEY LEGISLATIVE ELEMENTS

The features listed below are intended to provide a framework from which policy options may be considered. A jurisdiction considering new legislation should consult with counsel.

Definition of "large capacity ammunition magazine" includes magazines capable of holding more than 10 rounds *(Hawaii, California, Connecticut, Maryland, Massachusetts, New York, District of Columbia).*

Ban applies to large capacity ammunition magazines for use with all firearms *(California, Colorado, Connecticut, Maryland, Massachusetts, New Jersey, New York, Vermont, and District of Columbia).*

Prohibited activities include possession, sale, purchase, transfer, loan, pledge, transportation, distribution, importation, and manufacture of large capacity ammunition magazines *(California, Hawaii, New Jersey, and New York are the most comprehensive, banning manufacture, transfer, and possession).*

No allowance for pre-ban magazines *(California, District of Columbia, Hawaii, New Jersey, New York);* alternatively, if pre-ban magazines are exempted, the owner must register them before a specified date *(Connecticut).*

If the manufacturing of large capacity magazines is permitted, all magazines manufactured after the adoption of the ban must be identified by distinct and legible markings *(Colorado).*

"Conversion" or "repair" kits that can be used to build large capacity ammunition magazines from spare parts are prohibited *(California).*

# RELATED



WHO CAN HAVE A GUN

NEWS
CONTACT

**DONATE**

### Extreme Risk Protection Orders

Extreme risk protection orders provide a proactive way to temporarily restrict a person showing clear warning signs of violence from accessing firearms.

**HARDWARE & AMMUNITION**

### Assault Weapons

Assault weapons are designed for the battlefield and pose a serious public safety risk, making it easier for shooters to kill more people more quickly.

**HARDWARE & AMMUNITION**

### Ammunition Regulation

The ammunition used in guns is what renders firearms truly lethal—yet ammunition sales are not subject to the same federal regulations as firearms themselves.

## Notes

⌄

**About** **Donate**

**Contact** **Blog**

**Careers** **Press**

**SUPPORT** **GIFFORDS**

| First Name | Last Name |
|---|---|

| ZIP Code | Email Address |
|---|---|

**SIGN UP**

Terms & Conditions          Privacy Policy

© 2022 Giffords Law Center to Prevent Gun Violence. All Rights Reserved.



## Gatling Gun

**HISTORY.COM EDITORS • SEP 9, 2021**

George C. Dotter/Library of Congress/Corbis/VCG/Getty Images

In 1862, Richard Jordan Gatling invented a multi-barreled, rotating gun operated by a hand crank that could fire up to 200 rounds a minute. Used only a few times during the Civil War, the Gatling gun would later become the first widely successful machine gun.

Did you know? Richard Gatling had actually hoped that the tremendous power of his new weapon would discourage large scale battles and show the folly of war.

## Who Was Richard Jordan Gatling?

Born in North Carolina in 1818, Gatling helped his father, a wealthy planter, develop better farming implements, tools and machinery for sowing and harvesting cotton. In 1844, soon after obtaining his first patent, for a new type of seed planter, Gatling moved to St. Louis, Missouri, where he continued to develop farming implements and machinery for growing rice and wheat. In addition to creating, marketing and selling his inventions, Gatling also studied medicine, but never practiced as a physician.

When the Civil War broke out in 1861, Gatling was living in Indianapolis, Indiana. Though he had been born in the South, he was a staunch supporter of the Union. After seeing not only the gruesome wounds but the widespread disease that killed so many Union soldiers during the conflict, Gatling began thinking about creating a more efficient and effective weapon than the bayonets and muskets typically used in battle at the time.

In a letter to a friend written in 1877, Gatling explained his motivation for inventing the rapid-fire weapon that would bear his name: "It occurred to me that if I could invent a machine—a gun—which could by rapidity of fire, enable one man to do as much battle duty as a hundred, that it would, to a great extent, supersede the necessity of large armies, and consequently, exposure to battle and disease be greatly diminished."

## How Did the Gatling Gun Work?

Gatling received the first patent for the new firearm on November 4, 1862. The Gatling gun had six metal barrels arranged in a circle and mounted on a wheeled cart. As the gun's operator turned the crank, a bullet entered a barrel from a magazine and then rotated to the firing position. After each bullet was fired, that barrel continued to move and was reloaded with another bullet.

Gatling continued to make improvements to the gun's design, but even the earliest version was able to fire some 200 rounds per minute. While the first Gatling gun used paper cartridges loaded with gunpowder and .58 caliber bullets, the introduction of brass cartridges made it possible for later versions to fire up to 400 rounds per minute.

Scroll to Continue

Recommended for you



9 Unexpected Things Navy SEALs Discovered in Osama bin Laden's Compound

Hitler's Teeth Reveal Nazi Dictator's Cause of Death

8 Unusual Civil War Weapons

## Use of the Gatling Gun in the Civil War and After

Though efforts to invent a weapon that could fire multiple times in quick succession went back centuries by the time Gatling tried it, the Gatling gun represented a giant leap forward in the development of the rapid-fire machine gun. Yet despite its success in early trials, the U.S. Army Ordnance Department refused to adopt the relatively untested new weapon during the Civil War. Benjamin F. Butler became the only Union general to purchase Gatling guns during the conflict, and at least one of the dozen guns Butler bought saw action during the brutal siege of Petersburg, Virginia in the spring of 1865.

The Army officially adopted the Gatling gun in 1866, and its visibility grew steadily from there.

By the end of the 19th century, the weapon had become a terrifying symbol of power and dominance. U.S. troops used Gatling guns in their repeated campaigns against Native Americans, while British forces employed them in their wars against the Zulu in Africa (1879). From the 1870s-90s, a period of widespread labor unrest in the United States, law enforcement officers and state militias around the United States used Gatling guns in their violent clashes with striking workers.

## The Enduring Legacy of the Gatling Gun

Richard Gatling died in 1903 at the age of 85. He had obtained a total of 43 patents throughout his life, for devices ranging from a steam-driven tractor to an improved flush toilet. Meanwhile, his most famous invention faced increasing competition from newer repeating firearms based on the recoil mechanism rather than revolving barrels. By the time World War I broke out, the Gatling gun had been pushed aside in favor of the first completely automatic machine gun, invented by Maine-born Hiram Stevens Maxim in England in the 1880s.

While Gatling's original motivation may have been to decrease the violence and bloodshed of war, the smaller yet highly effective automatic weapons inspired by his innovation undoubtedly made warfare more devastating than ever before. The Gatling gun's reputation resurged after World War II, when it was used as the model for the Vulcan minigun, commonly mounted aboard U.S. fighter helicopters during the Vietnam War.

## Sources

Julia Keller. *Mr. Gatling's Terrible Marvel: The Gun That Changed Everything and the Misunderstood Genius Who Invented It*. (Viking, 2008)

Kelsey D. Atherton. "Union Soldiers Fired This Primitive Machine Gun During the Civil War." *Popular Science*, August 22, 2013.

Philip Van Doren Stern. "Doctor Gatling and His Gun." *American Heritage*, October 1957.

## Citation Information

Article Title

Gatling Gun

Author

History.com Editors

Website Name

HISTORY

URL

https://www.history.com/topics/american-civil-war/gatling-gun

Access Date

October 21, 2022

Publisher

A&E Television Networks

Last Updated

September 9, 2021

Original Published Date

March 4, 2010

**FACT CHECK:** *We strive for accuracy and fairness. But if you see something that doesn't look right,* **click here** *to contact us!*

VIDEOS

RELATED **CONTENT**

# Bowie Knives: The Old West's Most Famous Blade

Karen Harris

Colt revolvers aside, the Bowie knife was the weapon that made the Wild West wild. The unique design of the blade gave it its power and its name — thanks to James Bowie, a hero of the Alamo — gave it its prestige.

The Bowie knife began as a gift of love from one brother to another, but the weapon proved invaluable in the famous 1827 Sandbar Fight. As word of the new weapon grew from fact-based accounts to exaggerated tall tales and legends, more and more people sought bladesmiths to craft Bowie knives.

This is the story of the Bowie knife, its creation, rise to prominence, and how the public demanded laws to regulate it.

From the Alamo to the Texas Rangers, to Civil War soldiers and Wild West frontiersmen, the Bowie knife slashed and stabbed its way into American history.

## Who Were James and Rezin Bowie?

Rezin Pleasant Bowie and James "Jim" Bowie were Kentucky-born and Louisiana-raised. The brothers lived adventurous lives. In addition to being farmers, they smuggled slaves, became land speculators, explorers, and even built the first sugar mill in Louisiana that was powered by steam.



Source: Wikimedia Commons

Rezin Bowie, the elder brother, was a mercenary and even dabbled in politics, serving in the Louisiana House of Representatives for three terms. Jim Bowie was a frontiersman and soldier. A key figure in the Texas Revolution, Jim Bowie perished along with all his comrades at the Battle of the Alamo.



REZIN P BOWIE

[1892, John Henry Brown, History of Texas, Vol. 1, between pages 170-171]

Source: Wikimedia Commons

Although the brothers were polite, humble, and eschewed profanity, they were the guys you wanted on your side during a fight.

In fact, it was a fight that inspired Rezin Bowie to invent the knife that would bear his name. The Bowies line of work in the late 1830s meant they crossed paths with some unsavory characters.

When his little brother, Jim, was fired upon by unknown assailants, his life was spared because a gun misfired. Guns, in those days, were unreliable. Misfires and jams were common. When guns failed, fighters often resorted to hand-to-hand combat.

Rezin Bowie wanted to give his brother an advantage if he found himself in a gun fight without a gun. So, he sketched up a design for a modified hunting knife and had his buddy, Jesse Clifft, a blacksmith, forge the blade.



Featured Read

## The Blood of Heroes: The 13-Day Struggle for the Alamo — and the Sacrifice That Forged a Nation

"[This book] thoroughly captures and explains in the most interesting way the essence of the great personalities, in all their glories and defects, of William Travis, Stephen Austin, Jim Bowie, Davy Crockett, Sam Houston, and Santa Anna."
— Alan F. Sewell, Amazon review

Read Now

## The Infamous Sandbar Fight

Jim Bowie had an ongoing feud with a Louisiana sheriff named Norris Wright. It all started when Bowie endorsed Wright's opponent in an upcoming election for sheriff. Angry at the slight, Wright, who was a banker, denied Bowie's application for a business loan.

On September 19, 1827, Bowie and Wright both found themselves in the audience at the same duel, which was held on a sandbar offshore from Natchez, Mississippi. Naturally, they were rooting for opposing duelists.

The duel itself was anticlimactic. Both men fired two shots at each other and missed. Their disagreement was settled with a mere handshake.

But the members of the audience had other plans.

Some of the men in the crowd started arguing. The shouts turned into fist fights and soon, an all-out brawl broke out. Jim Bowie and Norris Wright took the opportunity to vent their hatred for each other.

At first, things didn't look good for Bowie. He took a bullet to the hip and another through his lung and went down. He struggled to his feet and charged at Wright. Wright tried to fire again, but his gun misfired.

Instead, he struck Bowie over the head with his pistol. The pistol broke into pieces and Bowie, once again, fell to the ground. Wright pulled out his sword cane and plunged it in Bowie's abdomen.

But Bowie wasn't finished.

Norris Wright placed one boot on Bowie's chest to give him the leverage he needed to pull out his sword cane. Bowie grabbed Wright by the leg and knocked him to the ground. With his Bowie knife, Jim Bowie sliced Morris Wright open from navel to neck, completely disemboweling him.

Wright died on the spot. A couple of doctors in the crowd tended to Bowie's wounds, helping him to make a full, speedy recovery.

## The Legendary Bowie Knife

News accounts of the Sandbar Fight circulated in newspapers around the country. In each one, Jim Bowie's actions became more and more superhuman. Witnesses backed up his claim that he did not instigate the fight with Wright but was the victim of his vicious and unprovoked attack.

Bowie was described as "near death" after being shot and stabbed. Some of the credit was given to Bowie's incredible strength and agile fighting skills, but most journalists focused on his unusual knife.



Bowie-knife.

Source: Wikimedia Commons

The weapon, they said, gave Bowie a competitive edge. After the Sandbar Fight, Jim Bowie earned a national reputation as an excellent fighter, and his knife became equally famous.

The Bowie knife was designed to be a lethal weapon in hand-to-hand combat. Other knives of the time may have been just as sharp, but they were designed as hunting knives. They were meant to skin deer and gut fish, so the grip was different.

Other knives that were intended to be used as weapons were balanced for throwing. The Bowie knife was the ultimate weapon to have in your hand when you were in a brawl. Your pistol might jam, but your Bowie knife would never let you down.

## What made the Bowie knife special?

The knife that Rezin Bowie designed had a blade that was thick and heavy, not unlike a butcher knife. Later Bowie knives featured a clip point at the end of the blade. Users would sharpen this clip point so that it could inflict a wound along with the blade.

It also has a cross guard at the base of the blade to offer some protection to the user's hand and prevent it from sliding over the blade. The blade itself was between eight to twelve inches in length. The handle, which was fastened on with washers and silver pins, were typically made from fire-hardened wood, animal bone, or deer antlers.

The Bowie knife was a simple, unpretentious instrument. It was not designed to be a fashion accessory or statement piece. It was built for combat. The Bowie knife fit well into the user's hand, making it comfortable to grip and easy to hold on to when fighting.

By design, it lacked the balance of throwing knives. It was meant for hand-to-hand combat, yet it was strong and durable enough to be used as a frontier tool and hunting knife. Users could cut saplings, gut a deer, dig a hole, and cut through canvas.

## Mass Producing Bowie Knives

The American public clamored for their own Bowie knives.

A few months after the Sandbar Fight, Jim Bowie brought his knife to Philadelphia. There, he presented his famous blade to Henry Schively, a well-known cutler who made expertly crafted surgical instruments.

He asked Schively to make a dozen or so knives patterned after the original one. For his brother, Rezin, Bowie asked Schively to add a silver sheath. His initials, RPB, were engraved into the blade.

By all accounts, Rezin Bowie enjoyed riding on the coattails of his mythical brother. He proudly wore his Bowie knife at his side. As for the other Bowie knives made by Schively, they were gifted to close friends and important acquaintances.

Henry Schively wasn't the only bladesmith to replicate the original Bowie knife. Daniel Searles, a cutler from Baton Rouge, Louisiana, also produced several Bowie knives at the request of Jim and Rezin Bowie.

Numerous other bladesmiths didn't wait for a commission from the Bowie brothers. They made their own versions of the famous knife. The Bowie knives were in such high demand that it was hard for cutlers to keep up. According to an article in the Louisiana newspaper, the Red River Herald, "All the steel in the country was immediately converted into Bowie knives."

## English Bowie Knives

During the early 1800s, the blades and knives made by English cutlers were far superior to American ones. With the introduction of the Bowie knife, they wanted in on the action, too.

Fueled by wild, exaggerated news stories about the lawless American frontier, English bladesmiths flooded the American market with their own Bowie knife knockoffs. They gave their blades catchy names in hopes of capitalizing on the American patriotism: "Arkansas Toothpick," "Patriot's Self Defender," "Americans Never Surrender," and "I'm A Real Ripper."

Historians today believe that about 80 to 90 percent of all Bowie knives of the 1830s and 1840s were English made.

## A Weapon of the People

Before Rezin Bowie designed the Bowie knife, the sword cane was the way for men to discreetly keep a weapon at their sides. But they appealed to a certain class of men. It was common for well-to-do gentlemen to add a sword cane as a fashion accessory.

At that time, most wealthy men were at least somewhat trained in swordsmanship. As for the working-class men of the day, it would be odd for them to carry a sword cane. This put them at a disadvantage when it came to self-defense. The Bowie knife changed that. In fact, in a relatively short time, the Bowie knife usurped the sword cane as the most popular blade in the land.

Upper society folks were instructed on using swords for battle. Using the Bowie knife for close combat, however, was a whole new concept. Greenhorns in particular needed instruction on how best to defend oneself with the Bowie knife. In the late 1830s and throughout the 1840s, there were even schools in the South and West that taught fighting and self-defense techniques.

## Bowie Knives and the Texas Rangers

The Texas Rangers added Bowie knives to their equipment list in 1846, when the Mexican-American War began. In fact, most Rangers carried two weapons at their sides: the Bowie knife and the Colt Dragoon pistol.

Key figures in the Mexican War, including John Coffee "Jack" Hays, Ben McCulloch, and future president Zachary Taylor were all big proponents of the Bowie knife. Jim Bowie himself was also a member of the Texas Rangers, albeit before they were officially organized by Stephen F. Austin in 1835.



John Coffee "Jack" Hays. Source: Wikimedia Commons

Initially established to keep law and order in Texas and to protect American settlers from attacks by indigenous people, the Texas Rangers grew into their own Wild West legend. The Bowie knife was an important part of their legacy.

Bowie knives played a role in the Siege of Bexar, one of the first skirmishes of the Texas Revolution. Using their Bowie knives, members of the volunteer Texan army, the precursor to the Texas Rangers, were able to slice through walls and roofs to engage the Mexicans in close combat.

## Bowie Knives and Civil War Soldiers

With the outbreak of the Civil War, the Bowie knife was viewed as a necessary weapon for Confederate soldiers. Since the blade was developed and popularized in the South, it was a mainstay for Southern soldiers, although plenty of Union soldiers also carried them.



Source: Wikimedia Commons

As the Civil War progressed, however, many Confederate soldiers replaced their Bowie knives with bayonets mounted to their guns. During the Civil War, cutlers seized the opportunity to etch slogans and messages onto the blades of the Bowie knives, in a show of support for the Southern cause.

Some blades read "Death to Yankees," while others were labeled "Confederate States Defender."

## Tall Tales and Bowie Knives

From its origins at the Sandbar Fight through the Civil War, the Bowie knife was often the subject of sensational news accounts. These reports added to the myth of the weapon. Folks in those days loved to hear about the exploits of frontiersmen and the accuracy of the stories were of little concern.

Many of the reports told of one brave man, armed with a Bowie knife, who successfully fended off multiple attackers at once. Tales like this, while crafting the legend of the Bowie knife, did a disservice to the weapon's wielder.

It was the fighter's skills at dodging and thrusting that saved him, in many cases, just as much as it was the quality of the knife. It is also likely that the number of assailants had been exaggerated for dramatic purposes.

Jim and Rezin Bowie did, however, have a well-documented incident in which they were able to fend off an attack by Indians thanks in part to their Bowie knives. The brothers had become interested in the lost San Saba Mine, an old Indian silver mine that had been seized by the Spanish. The whereabouts of the mine were unclear, but legends spoke of its vast riches. In 1831, the Bowie brothers and a group of ten other men set out to locate the mine.

At one point in the expedition, the men encountered an Indian raiding party. There were more than 150 men in the raiding party, so Jim and Rezin Bowie attempted to negotiate with them for safe passage on their journey. Things didn't work out in their favor. For the next 13 hours, the Bowie brothers and their men fought off the raiding party, even though they were outnumbered about 15 to 1.

As the battle waged, a Comanche scout arrived in San Antonio with word of the fight. He explained that the Bowies and their men were vastly outnumbered, and the outcome didn't seem favorable. The people of San Antonio assumed the worst. Even Jim Bowie's young bride, Ursula, donned widow's garb and entered mourning.

Meanwhile, the fighting wound down. About 40 Native Americans were killed in the battle, but miraculously Jim and Rezin Bowie lost only one of their men. A few weeks later, to the amazement of the residents of San Antonio, the Bowie brothers and their remaining men rode back into town, very much alive.

Tales of Jim and Rezin Bowie's adventure was circulated in newspapers across the country. It further cemented the legends surrounding Jim Bowie and the Bowie knife.

## A Call to Ban the Bowie Knife

News accounts of the Bowie knife and its lethal ability caused concern among the general population in the closing years of the 1830s. There were calls to either regulate the weapon or to ban it altogether.

The state of Tennessee passed the "Act to Suppress the Sale and Use of Bowie Knives" in January of 1838. More states followed suit, even though the ban was difficult to enforce.

The state of Arkansas's Speaker of the House attacked and killed another legislator on the floor of the Arkansas House of Representatives in 1837 after a heated exchange. His weapon of choice was a Bowie knife.

A law passed in Alabama stated that an attacker who used a Bowie knife to slay another person should "suffer the same as if the killing had been by malice," thus negating the idea that Bowie knives were used for self-defense.

## The Knife that Made the Old West

The durability and versatility of the Bowie knife made it a sought-after weapon and tool in the Old West. The blade that Rezin Bowie designed was effective in hand-to-hand combat but could also be used as a hunting knife.

In Texas and throughout the South, the Bowie knife was present at many historic events, including the Battle of the Alamo, in which Jim Bowie lost his life.

---

Read more about life in the American West:

- [7 California Ghost Towns that Capture the Golden State's Rich Mining History](#)
- [10 Famous Guns of the Old West, from Revolvers to Rifles](#)
- [The Origins of Scalping: A True and Surprising History](#)
- [8 Famous (and Infamous) Sheriffs of the Old West](#)
- [Why Did People Move West in the 1800s?](#)

Further Reading

1. [James Bowie: Texas Fighting Man](#), Clifford Hopewell
2. [The Blood of Heroes: The 13-Day Struggle for the Alamo–and the Sacrifice That Forged a Nation](#), James Donovan
3. [Three Roads to the Alamo: The Lives and Fortunes of David Crockett, James Bowie, and William Barret Travis](#), William C. Davis
4. [Cult of Glory: The Bold and Brutal History of the Texas Rangers](#), Doug J. Swanson
5. [The Gates of the Alamo](#), Stephen Harrigan



# INSIDER

Log in        Subscribe

HOME  >  MILITARY & DEFENSE

# It's Incredible How Much Guns Have Advanced Since The Second Amendment

**Robert Johnson** and **Geoffrey Ingersoll**   Dec 17, 2012, 9:49 AM

Last week's Connecticut shooting has once again focused the national spotlight on assault weapons and their place in America.



Wikimedia Commons

Everyone has heard of these guns. They've been available to the U.S. public for generations. Understanding where they came from goes a long way to understanding that they're not going away any time soon.

As soon as gunpowder was poured down a metal tube and lit to fire a bullet, the challenge became speeding the process along.

When colonial settlers in America took up arms against the British, technology was still where it had been when rifles were first introduced. Pour the powder down the barrel, tamp it down with a metal rod, shove in a ball of lead, and wait for the spark from the trigger to reach the powder in the barrel.

With this technology, the best soldiers could get off approximately 3 or 4 rounds a minute, and those rounds — sphere-shaped lead balls — had little accuracy.

The smooth bore of old rifles sent rounds jumping through the air like a baseball pitcher's knuckleball. Hitting a target was hard, and the inaccuracy of these guns was part of the reason British soldiers lined up to fire in unison, like they do in the movies.



**Rifling of a gun barrel** Wikimedia Commons

The invention of the <u>Minié Ball during the Civil War revolutionized</u> sharpshooting from a distance, and another innovation, the <u>rifling, or spiraling of the barrel</u>, not only made the long gun into the deadly tool it is today but became the general term given to the weapon.

The more standardized Minié round also allowed inventors to construct a feeding mechanism that drastically streamlined the loading and firing process.

Inventor <u>Benjamin Tyler Henry</u>, created the Henry Repeating Rifle in 1862, and "semi-automatic weapons" were born. Though the Henry repeater isn't a modern semi-automatic (it still had to be cocked before every shot, versus a true semi-automatic, which cocks itself and fires a round with every trigger pull), it allowed rapid firing of rounds up to about 12 a minute.

The invention was the Atom Bomb of the 1800s military world, and it set the stage for the beginning of American arms making.

"What saved us that day was the fact that we had a number of Henry rifles," Major William Ludlow's wrote in his account of the Battle of Altoona Pass during the Civil War. "This company of 16 shooters sprang to the parapet and poured out such a multiplied, rapid and deadly fire, that no men could stand in front of it and no serious effort was made thereafter to take the fort by assault."

Rifle technology remained, for the most part, unchanged over the next 50 or 60 years (there were slight modifications and enhancements, but the guns still had to be cocked for every shot).

What innovations there were came mostly in the field of automatic weapons, which were clunky and required at least two men to operate — like the <u>infamous Gatling Gun,</u> which required a cranking system and often fell victim to double feed and jams.

When World War I came around, ground troops were still largely using bolt-action one shot rifles, and shots per minute remained about the same as the days of Henry, about 12 per minute. The world was in desperate need of a rapid-fire rifle for light infantrymen.



Wikimedia Commons

There came the <u>Winchester Model 1905</u>, a "self loading" rifle, as they were called back then, that fired a bullet with every pull of the trigger. One key difference though was that these rifles had to be loaded like modern shotguns, with each shell manually fed into the rifle via a port on the side.

The manual loading made it difficult for troops under fire to reload and return fire. What the Army needed was self contained magazine style loading.

ADVERTISING



The M1 Garand came around the end of the World War I, and for the first time soldiers used small preloaded 'clips' or 'cartridges' that held eight rounds each. This was no assault rifle, and soldiers had to fire all eight rounds in the clip before reloading, which left them in a bind if they took cover with only one round left in the weapon. But it was a huge step up from manual shooting.



**Semi-automatic weapons are part of America's cultural fabric** Wikimedia Commons

It wasn't until the invention of two weapons, the Browning Automatic Rifle (BAR) and the M1 Carbine that the world saw the birth of 'Assault Style' rifles.

The BAR was a light infantry machine gun, which would later serve as inspiration for the light squad automatic weapons still used today.

The M1 Carbine came years later, in the early 1940s, as part of an Army initiative to provide soldiers with a light assault carbine that stored rounds in several interchangeable magazines. The M1 Carbine was the first magazine loaded, light semi-automatic weapon — and all designs since then, M16s and AK-47s, are based on this original rifle style.

In the history of weapons, the M1 Carbine is the father of what all of we now call "assault weapons." It is also something the writers of the U.S. constitution probably never imagined.

# Mannlicher 1885 Semiauto Rifle



Mannlicher 1885 semiauto "Handmitrailleuse"

Ferdinand von Mannlicher's Model 1885 self-loading rifle design as a failure, never seeing anything even resembling mass production. However, it was a failure which in many way set the stage for a huge number of the machine guns that would follow for the next several decades, including the famous Browning 1917/1919/M2 family. In fact, this 1885 semiauto had influence and impact far beyond its level of recognition today. It was a designed doomed to fail despite Mannlicher's formidable design talents, simply because the cartridge he based it on was the M1877 11mm Austrian black powder round used in the Werndl rifles. Self-loading weapons would not become truly practical in any form until the invention of smokeless powder, which drastically reduced the amount of fouling and residue from each shot. However, Mannlicher was able to at least make a reasonable attempt despite the use of black powder, and he was the first to do so.

The 1885 design (not to be confused with Mannlicher's model 1885 straight-pull bolt action rifle) was a recoil mechanism with a separate locking "tong". As with all recoil-operated designs, the barrel and bolt were locked together at the moment of firing, and remained locked together as they both recoiled rearwards. After a certain amount of travel, in this case about 1.25 inches (32mm) the bolt unlocks and continues rearward which the barrel stops. The locking mechanism in the 1885 Mannlicher is a fork-looking block, labeled #3 in the diagram below. It is pinned to the barrel and able to pivot up and down. When upward, it locks into a cutout in the bottom of the bolt (the bolt is #5 below, and the cutout area is #4). As the bolt and barrel move back, the lower fork of the locking block will eventually hit item #1, an angled projection that forces it downward, unlocking the bolt. Once separated from the barrel, the bolt is able to eject the empty case from the action, and a new cartridge drops down in front of it from the magazine (which is gravity-fed and has no spring). The main recoil spring then pushes the bolt forward, pushing that new cartridge into the chamber. As it moves forward, the hook on the bottom of the bolt (item #2) hits the upper fork of the locking block and forces it into the upward and locked position, thus making the system ready for another shot.



Mannlicher 1885 semiauto cutaway view (ready to fire). Image from WHB Smith, "Mannlicher Rifles and Pistols".

Another element in this action is the use of an accelerator (item #6). It moves back with the barrel until its bottom leg hits a block in the bottom of the receiver. At that point it stops the barrel, and it rotates around its pivot point, with its upper leg pushing on the bolt. What this effectively does it transfer the remaining momentum in the barrel into the bolt, giving it an extra push to help ensure reliable extraction and ejection.



Mannlicher 1885 semiauto cutaway view (full recoil). Image from WHB Smith, "Mannlicher Rifles and Pistols"

I should also point out that the magazine was offset to the left side of the action, and a loading lever was used to pivot cartridges into the action to feed. The lever was mechanically actuated by a protruding surface on the bolt that would strike it during the ejection cycle:



Mannlicher 1885 semiauto feed view. Image from WHB Smith, "Mannlicher Rifles and Pistols"

Today we thing of short recoil as being a common idea/mechanism that has always existed, but Mannlicher was the man who invented it with this rifle. As such, its principles heavily inform the design of most all the other short recoil machine guns that have been made since (fundamentally, the concept of the bolt and barrel traveling a limited distance locked together before some mechanical actuator separates them). The accelerator concept was also a concept used by Browning in his machine guns. And, of course, short recoil because the dominant mechanism for self loading handguns, by way of Browning's tipping barrel system. Don't take this as a suggestion that Browning copied Mannlicher's ideas, because he didn't – the two men's guns differ extensively in detail and simply share basic concepts (and Browning added in a huge does of original thought, such as the concept of a pistol slide). However, it is enlightening to understand where the concepts originated.

For the record, Mannlicher did build the 1885 self-loader in both semiauto and fully automatic versions, and he would go on to refine the design as a rifle in 1891 before turning to other operating systems for his later semiautomatic experiments. He never did explore the concept of a light machine gun, which ultimately proved to be a better role for recoil-operated long guns than the shoulder rifle.



Mannlicher 1885 parts breakdown (image from WHB Smith's, "Mannlicher Rifles and Pistols"

Parts identification key:

1. Bolt assembly

2. Bolt assembly (showing detail of locking lug engagement slots)

3. Feeder

4. Upper trigger plate

5. Locking tongs

6. Feeder spring

7. Trigger assembly

8. Striker head

9. Magazine holder

10. Striker cocking piece

11. Sear

12. Ejector

13. Trigger spring

14. Barrel (details)

15. Magazine

# How The Machine Gun Changed Combat During World War I

by Norwich University Online

## The Beginnings of the Machine Gun: Invention and Specs

Invented by Hiram S. Maxim in 1884, the first automatic machine gun was birthed in the United States. Maxim's machine gun was completely self-powered and worked by relying on the energy released in the firing cartridge that would then dislodge multiple bullets with nothing more than the pull of a trigger. This kind of technology was unheard of and it was what prompted this primitive powerhouse to be first demonstrated by the British armed forces. At this time, it released an initial 600 rounds per minute, what would be a detrimental number for the opposition in years to come. The "Maxim" gun had a water-cooled jacket that stretched round the barrel, holding one gallon of water and while this innovative technology was nothing short of epic, especially in its time, it had one peak pitfall... it weighed a whopping 136.5 pounds. It was difficult to move in times when quick thinking was critical but its size and clunky demeanor did not stop it from doing its job and doing it well.

## Moving Forward

It did not take long until Maxim sold the gun he had created and watched as it quickly catapulted to even larger stardom on the battlefield. At this time, it became known as the Vickers gun and was then capable of putting out 450.303 rounds of ammunition per minute. While this was good news in many ways, it was also about to be introduced into the wrong hands.

## Adopting the Machine Gun: Germany's History with the Vickers Gun

It was not until 1887 that the machine gun made its way to the German Army and with its mass capacity and devastating blow, it wasn't any wonder that the Germans wanted to produce the gun in their own right as quickly and effectively as possible at a Spandau arsenal. There were a meager 12,000 guns by the time the war broke out in 1914. That number, however, would explosively grow to become 100,000 guns in a very short time. By 1917, the Germans were reporting that the majority of their small arms ammunition, 90% to be exact, were going into the chambers of their machine guns. This was a sobering thought.

## Changing Battle Tactics with the Introduction of the Machine Gun

The earliest, most primitive renditions of the machine gun worked entirely from a hand crank but by the ending of World War I in 1918, the machine gun was entirely automatic and was capable of producing an output of up to 600 rounds per minute. Even still, there were more changes on the horizon. No longer a weapon fired by just anybody, the machine gunnery moved forward as an expertise and by this time were handled by specialists corps. These specialty corps would develop new firing methods that would change the way we see war and how battles are fought from the inside out.

It was in 1916 that the British and Allied Forces created barrage fire. Barrage fire was a method that allowed troops to fire over the heads of their own soldiers. This opened up the way for both planned and unexpected attacks as well as responses to SOS calls from the infantry. By late 1917, the Germans created elite sharpshooter attachments. They would use them in their specialized attack formations that they have become so notorious for.

# Machine Guns: The Future and Beyond

As we have seen over the course of this article, warfare is always evolving. Nothing stays the same forever and evolution always wins out to provide us with even more innovative forms of weapons that once seemed like they could grow no more advanced. Ever-changing technology continually influences machine gun designs and they are growing lighter and more accurate year after year, even in countries halfway around the world.

2015 brought us the introduction of the Cased Telescoped Light Machine Gun or the CT LMG. It was introduced at the Special Operations Forces Industry Conference of the same year. This impressively designed weapon weighed only 14.5 pounds. This is 8 pounds lighter than the 240... but if you want to get technical — compare it to the almost 200-pound machine gun of first invention and you can truly see how far the machine gun has come in all these years. This new machine gun was produced as a part of the U.S. Army's Lightweight Small Arms Technologies Program. The program works to lower ammunition weight by 40% and the weight of weapons as a whole by 35%. These changes are by no means small. They will allow soldiers to navigate faster, conserve energy and fight battlefield fatigue... all very important elements of staying safe and effective in high stress situations.

As we move forward in time, weapons like the machine gun are always being altered. This constant evolution will not stop with us. There are always new discoveries just on the horizon and it is these technologies that keep combat marching forward into the future.

## Learn More

Established in 1819, Norwich University is a nationally recognized institution of higher education, the birthplace of the Reserve Officers' Training Corps (ROTC), and the first private military college in the United States. Through its online programs, Norwich delivers relevant and applicable curricula that allow its students to make a positive impact on their places of work and their communities.

Norwich University's Master of Arts in Military History program takes an unbiased

and global approach towards exploring military thought, theory and engagement throughout recorded history. The unique curriculum of the online Master of Arts in Military History program was developed by the distinguished faculty of Norwich University and guided by the goals outlined by the American Historical Association. This highly regarded program is designed to help build your proficiency as a historian, and places our world's military achievements and conflicts in chronological, geographical, political and economic context.

# From Gangland to the Battlefield - 15 Amazing Facts About the Thompson Submachine Gun - MilitaryHistoryNow.com

Alex E says:



A U.S. Marine on Okinawa fires his Thompson submachine gun. (Image source: WikiCommons Media)

## "Over the past 90 years, it's been used in both war and peace in just about ever corner of the globe."

By Matthew Moss

THE THOMPSON SUBMACHINE GUN, better known as the Tommy gun, is famous and infamous in equal measures.

As part of the Allied arsenal, it helped liberate the world from tyranny; yet in the hands of gangsters and criminals, it became a symbol of the rampant crime and lawlessness of Prohibition America.

Nearly 3 million Thompsons have been produced since the weapon was first patented after World War One. Over the past 90 years, it's been used in both war and peace in just about ever corner of the globe.

Here are some fascinating facts about this iconic firearm.



John Thompson and his famous machine gun.(Image source: WikiCommons Media)

## Enter the 'Trench Broom'

A Kentucky gunsmith by the name of John Taliaferro Thompson first tinkered with the idea of a portable hand-held machine gun as early as 1915. The 56-year-old inventor and veteran of America's war with Spain founded the Auto-Ordnance Corporation the following year to explore the concept further. Following America's declaration of war on Germany in 1917, Thompson reenlisted and served as the Director of Arsenals for the U.S. Army's Ordnance Corps. Seeing the deadlock on the Western Front, he envisioned a gun that could act as a 'trench broom'— one that would enable a lone infantryman to clear whole dugouts of enemy troops in mere seconds. Following the war, Thompson retired from the service and continued working on his idea. By 1920, he patented a .45 calibre

machine pistol. At first, he considered calling his invention the Persuader or even the Annihilator, but eventually settled on the eponymous Thompson submachine gun.

## Specifications

The Thompson weighed in at more than 10 pounds. It could fire .45 ACP pistol bullets from 20-round vertical stick magazines or larger 50 and 100-round drums. Each gun was hand-assembled with precision-machined parts. Yet despite the fine craftsman ship, the weapon's 10-inch barrel and heavy ammunition limited its effective range to just over 150 feet.



A Model 1928A1 Thompson.

## The Thompson Family

Initial production began with the Model 1921. Later variants (there were at least a dozen) included a heavier 'squad support' version that was equipped with a longer barrel and a bi-pod. Known as the Model 1923, it fired a more substantial .45 Remington round. Conversely, the 1927AC3 was chambered for lighter .22 calibre ammunition. Then there were later models like the M1 and M1A1 that were simplified for cheap and speedy wartime production.

## Blistering Rate of Fire

In 1939 Time magazine described the Thompson as "the deadliest weapon, pound for pound, ever devised by man." The earliest models were capable of an astounding 1,500 rounds per minute. A Tommy gun could go through a 100-round drum magazine in four seconds. Later versions fired 600 to 700 rounds per minute.



An early advertisement for the Auto Ordnance Thompson submachine gun.
(Image source: Public Domain/Fair Use)

## Early Customers

In 1921, Auto-Ordnance began marketing the Thompson to private citizens as an 'anti-bandit' weapon. But with a price tag $200 each (equivalent of about $3,500 today), there were few takers. Interestingly, the first large-scale order came from the U.S. Postal

Service. The United States Marines were also early adopters. Regional police departments and even Latin American governments also bought Thompsons. Other customers included both Chinese and Irish nationalist movements. And of course, there was the criminal element.

## A Gangster Gun

Thompsons are perhaps best known for their use by crooks and thugs during the Roaring Twenties. Gangsters famously dubbed the weapons 'Chicago Typewriters'. Two Thompsons were used during the infamous 1929 St. Valentine's Day Massacre to pump 70 rounds into seven members of the Moran Gang in a Windy City parking garage. Tommy guns were also used by the likes of John Dillinger, 'Baby Face' Nelson, the Barker gang and 'Pretty Boy' Floyd.



Policemen proudly display their new Thompsons. The classic American firearm wound up on both sides of the law during the 20s and 30s. (Image source: National Public Radio)

## John Law's Tommy Guns

Although regional police departments had been buying Thompsons for years, it was not until much later that the FBI finally ordered the notorious firearm. In 1935, the bureau acquired 115 Thompsons in custom carrying cases. Ironically by that point, the vast majority of outlaws that the G-Men had initially bought the Thompson to combat were already dead or behind bars.



Edward G. Robinson (right) in the 1931 gangster film 'Little Caesar.'

## Lighting Up the Silver Screen

Tommy guns were hugely popular in films of the era. Audiences packed movie houses each week to see their favourite stars decked out in fedoras and pinstripes let loose with their trusty Thompsons. The same year the FBI began fielding the weapons, Hollywood adopted the Hays Code. The landmark movie industry guideline specified, among other things, that only law enforcement officers could be shown on-screen with machine guns. Almost overnight, the Thompson became Tinsel Town's gun-of-choice for cinema flatfoots. Tommy guns would go on to help glamorize G-Men rather than crooks. Since the 1930s, the Thompson has appeared in over a thousand films and TV shows.



J. Edgar Hoover examines one of the FBI's new Thompsons.

## Gun Control

The Thompson is partly responsible for one of the United States' first gun laws. The 1934 National Firearms Act was passed to regulate the sale of sawed-off shotguns, suppressors and machine guns, all of which were more likely to be used by criminals. The new law meant that sales of Thompsons were recorded and taxed with a whopping $200 tariff.



At first, Great Britain rejected the Tommy gun due to its association with American criminals. (Image source: Imperial War Museum)

## British Thompson

In 1925, Auto-Ordnance approached Britain's Birmingham Small Arms Company to produce Thompson's under license for sale in Europe. Despite successful demonstrations in the U.K., France and Belgium, no orders were forthcoming for the British Thompson. Production was halted in 1930.



The outbreak of World War Two created a new demand for the Thompson. (Image source: WikiCommons)

## Bankruptcy

In 1929, Auto-Ordnance was on the brink of liquidation. The company had sold just 10,300 guns and was more than $2 million in debt. The business was only saved by Thompson's son's stubborn refusal to shutter the plant. The firm struggled for years until the outbreak of World War Two, at which point new orders poured in.



A British soldier un-crates a consignment of Tommy guns from America.
(image source: WikiCommons Media)

## Tommy Goes to War

John Thompson died on June 21, 1940. Just weeks later, the U.S. government placed the largest orders on record for the Tommy gun. With Europe already at war and America's entry into the conflict seen as increasingly likely, Washington needed tens of thousands of firearms for its growing legions of GIs. Eventually, more than 2 million Thompsons rolled off assembly lines. It was soon on the frontlines in Europe, North Africa and the Pacific.

## Bye-Bye Blish

The original Thompson design featured the complex and expensive Blish lock — a friction-delayed blowback action. In 1941, the Savage Arms Company simplified the design by removing the Blish lock and giving the gun a less complicated blowback action. This allowed production to be sped up considerably and cut the price of a Thompson from $225 to $44.



More than 100,000 Thompsons were transferred to the Soviets under Lend-Lease.

## Red Thompsons

After the famous PPSh-41 and PPs-43, the Thompson was one of Soviet Russia's most widely issued submachine guns. Under the U.S. Lend-Lease program, almost 140,000 Thompsons were exported to the U.S.S.R. But compared to the 6 million PPSh-41s produced during the war, this was a drop in the ocean.



U.S. Special Forces personnel in Vietnam with Thompsons.

## Soldering On

Surplus Thompsons remained in the arsenals of dozens of nations for years after World War Two. The weapons served with UN armies in Korea, while American Special Forces and South Vietnamese troops used it in South East Asia into the 1970s. Thompsons were even seen as recently as the 1990s in the war former Yugoslavia. Today, the Tommy gun is much sought after by firearms collectors.

Matthew Moss is a British postgraduate student specializing in military history and small arms. He also runs historicalfirearms.info, a site that looks at the history, development and use of firearms as well as wider military history. Follow him on twitter.

SOURCES
The Thompson Submachine Gun, M. Pegler (2013)
Military Small Arms, I. Hogg & J. Weeks, (1985)
Soviet Submachine Guns of World War II, C McNab, (2014)
http://firearmshistory.blogspot.co.uk/2010/08/actions-blowback-action-blish-lock.html
http://www.fbi.gov/about-us/history/a-centennial-history/fbi_and_the_american_gangster_1924-1938
http://en.wikipedia.org/wiki/Thompson_submachine_gun

## Related

UNIFORM MACHINE GUN ACT

Drafted by the

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS

and by it

APPROVED AND RECOMMENDED FOR ENACTMENT
IN ALL THE STATES

at its

FORTY-SECOND ANNUAL CONFERENCE
AT WASHINGTON, D. C.

OCTOBER 4-10, 1932

WITH
PREFATORY NOTE

APPROVED BY THE AMERICAN BAR ASSOCIATION AT ITS MEETING AT
WASHINGTON, D. C., OCTOBER 12-15, 1932


The committee which acted for the National Conference of
Commissioners on Uniform State Laws in Preparing the Uniform
Machine Gun Act was as follows:

JOSEPH F. O'CONNELL, Boston, Mass., Chairman,
JAMES F. AILSHIE, Coeur d'Alene, Idaho, Chairman, Uniform Torts
and Criminal Law Acts Section,
WILLIAM M. HARGEST, Harrisburg, Pa., President, Ex-officio.
CHARLES V. IMLAY, Washington, D. C.,
CHARLES E. LANE, Cheyenne, Wyo.,
A. L. SCOTT, Pioche, Nev.,
HENRY UPSON SIMS, Birmingham, Ala.,
ROBERT S. STEVENS, Ithaca, N. Y.,
EDGAR K. THOMPSON, Charleston, S. C.,
W. H. WASHINGTON, Nashville, Tenn.

Copies of all Uniform Acts and other printed matter issued by the
Conference may be obtained from

JOHN H. VOORHEES, Secretary
North Dearborn St.
Chicago, IL


UNIFORM MACHINE GUN ACT

PREFATORY NOTE

A special committee on a "Uniform Act to Regulate the Sale
and Possession of Firearms" was appointed at the Minneapolis
meeting of the National Conference of Commissioners on Uniform
State Laws in 1923.  The subject having been brought to the
attention of the Conference by the United States Revolver Asso-
ciation, it was quite natural that in its initial effort the
committee submitted an act, finally approved in 1930 at Chicago,
dealing solely with firearms of the revolver, pistol, or sawed-

off shot gun type, which might readily be concealed.

But during the interim prior to approval of that act, the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun-the Thompson .45 inch caliber submachine gun becoming most popular, equipped with either 100 or 50 shot drum magazine, or 20 shot clip magazine, using the ordinary .45 Colt automatic pistol cartridge.

In the 1930 report, it was stated the committee believed unanimously that the Firearms Act should be confined entirely to guns of the pistol type; reference to machine guns and other offensive weapons was therefore eliminated from previous tentative drafts, and the drafting of a separate act to cover the machine gun was recommended.  In 1931, the committee presented a supplementary report, submitting a first tentative draft of such an act.  This draft was largely based upon the Pennsylvania Act of 1929.  At the 1932 meeting of the National Conference at Washington, D. C., the committee filed a second tentative draft, fully annotated.  That the subject was considered of grave importance by state legislatures was evidenced by the fact that it had already merited action in sixteen states and the District of Columbia.  Following a thorough study of the subject the Conference thereupon put the act in final form and approved it, and the act was subsequently approved by the American Bar Association.  The act is intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type.

The act defines a machine gun so that it will exclude automatic or semi-automatic sporting rifles or shotguns.

A "crime of violence" is defined as in the Uniform Firearms Act, except that kidnapping is added.

Possession or use of a machine gun of any kind in the perpetration or attempted perpetration of a crime of violence, is declared to be a crime; following the similar provision in the Uniform Firearms Act.  In this connection it may be proper to again call attention to experience in England, where it is still quite unusual to find crimes of violence committed by persons who are armed, undoubtedly because in that country a person found guilty of committing a crime of violence when armed receives, by a mandatory provision of the law, an additional sentence.

It is believed that this act has "teeth" enough in it to make it possible for the police departments throughout the nation to meet the challenge of the gangsters and racketeers who have been adopting the machine gun in criminal warfare.  Particular attention is called to the fact that this act gives great aid to the police in enforcing it by reason of the presumptions which are made part of this proposed law.  Heretofore, the police have been helpless in many instances, because it was legal to possess a machine gun.  Under the provisions of the act, however, the mere possession of a machine gun is presumed to be for offensive and aggressive purposes, except as provided in the act, and the exceptions are very limited.

Possession or use of a machine gun of any kind for offensive or aggressive purpose is likewise declared to be a crime; and its possession or use for such purpose is presumed if the gun is found on premises not owned or rented for legitimate use by the possessor or user of the gun, or if the gun is in possession of,

or used by, either an unnaturalized foreigner, or a person previously convicted of a crime of violence.

Possession for offensive or aggressive purpose is also presumed if the machine gun is of the kind most commonly used by criminals and has not been registered, or if shells adapted to use in that particular weapon are found in the immediate vicinity.  As stated above, the Thompson submachine gun, with wooden butt-stock removed, using ordinary .45 caliber Colt automatic pistol shells, is now used almost exclusively by criminals in the United States.  Although these cartridges have a limited range, the bullets have satisfactory "stopping" effect at short range, and therefore answer the purpose of the gangster, besides being easily purchased, at any hardware or sporting goods store, without arousing suspicion.  It was at first intended to make the presumption apply only to the .45 caliber guns and cartridges; but lest criminals evade the law by using a smaller caliber the act now specifies any pistol shell of caliber larger than .30 inch, or its metric equivalent of 7.63 millimeters.  Few, if any, pistol cartridges are on the market exceeding .45 caliber, and no pistol cartridge of less than .30 caliber is made with sufficient range and stopping power to answer the purpose of the gangster.

To overcome any danger of a presumption arising against one who has legitimate use for a machine gun, such person need only either avoid the use of ordinary pistol shells, or else use a type of gun not readily transported or concealable.  There are many such on the market, more effective for defensive purpose than the Thompson submachine gun.

The presumption contained in Section 5 is often found vital to successful prosecution of criminals.

The act requires manufacturers to keep a register of all machine guns handled, but only for purpose of inspection by police officers.  On the other hand, all machine guns of the prohibited type (adapted to use pistol cartridges of .30 or larger caliber) must be registered in the office of the secretary of state, or other state official.  Any failure to register raises the presumption of possession for offensive or aggressive purpose.  The act further permits, in Section 9, search for, and seizure of, machine guns of the prohibited type.

If speedily adopted in a sufficient number of states, the act will doubtless have a very beneficent effect, particularly through its registration requirements.

It was necessary to make this act supplementary to the Uniform Firearms Act because of the technical difference in describing firearms, as distinguished from the machine gun, and it will help the administration of the law as to the use of firearms to have this act separate and distinct, or at least supplementary to whatever laws may already have been enacted with reference to firearms.


UNIFORM MACHINE GUN ACT

AN ACT RELATING TO MACHINE GUNS, AND TO MAKE UNIFORM THE LAW WITH REFERENCE THERETO.

(Be it Enacted ........

1    SECTION 1. (Definitions.) " Machine Gun " applies to and

2 includes a weapon of any description by whatever name known,
3 loaded or unloaded, from which more than five shots or bullets
4 may be rapidly, or automatically, or semi-automatically dis-
5 charged from a magazine, by a single function of the firing
6 device.

7    "Crime of Violence" applies to and includes any of the
8 following crimes or an attempt to commit any of the same,
9 namely, murder, manslaughter, kidnapping, rape, mayhem,
10 assault to do great bodily harm, robbery, burglary, housebreak-
11 ing, breaking and entering, and larceny.

(Note: Crimes here enumerated to be modified to suit local
definitions.)

12 "Person" applies to and includes firm, partnership, associa-
13 tion or corporation.

1    SECTION 2. Possession or use of a machine gun in the
2 perpetration or attempted perpetration of a crime of violence
3 is hereby declared to be a crime punishable by imprisonment
4 in the state penitentiary for a term of (not less than twenty
5 years).


1.   SECTION 3. Possession or use of a machine gun for offensive
2 or aggressive purpose is hereby declared to be a crime punish-
3 able by imprisonment in the state penitentiary for a term
4 of (not less than ten years).

1    SECTION 4. Possession or use of a machine gun shall be
2 presumed to be for offensive or aggressive purpose:
3    (a) when the machine gun is on premises not owned or
4 rented, for bona fide permanent residence or business occu-
5 pancy, by the person in whose possession the machine gun
6 may be found; or

7    (b) when in the possession of, or used by, an unnaturalized
8 foreign-born person, or a person who has been convicted of
9 a crime of violence in any court of record, state or federal, of
10 the United States of America, its territories or insular posses-
11 sions; or

12   (c) when the machine gun is of the kind described in
13 Section 8 and has not been registered as in said section re-
14 quired; or

15   (d) when empty or loaded pistol shells of 30 (.30 in. or
16 7.63 mm.) or larger caliber which have been or are susceptible
17 of use in the machine gun are found in the immediate vicinity
18 thereof.

1    SECTION 5. The presence of a machine gun in any room,
2 boat, or vehicle shall be evidence of the possession or use of
3 the machine gun by each person occupying the room, boat, or
4 vehicle where the weapon is found.

1    SECTION 6. (Exceptions.) Nothing contained in this act
2 shall prohibit or interfere with
3    1. the manufacture for, and sale of, machine guns to the
4 military forces or the peace officers of the United States or
5 of any political subdivision thereof, or the transportation re-
6 quired for that purpose;

7    2. the possession of a machine gun for scientific purpose, or

8 the possession of a machine gun not usable as a weapon and
9 possessed as a curiosity, ornament, or keepsake;

10   3. the possession of a machine gun other than one adapted to
11 use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger
12 caliber, for a purpose manifestly not aggressive or offensive.

1    SECTION 7. Every manufacturer shall keep a register of all
2 machine guns manufactured or handled by him. This register
3 shall show the model and serial number, date of manufacture,
4 sale, loan, gift, delivery or receipt, of every machine gun,
5 the name, address, and occupation of the person to whom the
6 machine gun was sold, loaned, given or delivered, or from
7 whom it was received; and the purpose for which it was ac-
8 quired by the person to whom the machine gun was sold,
9 loaned, given or delivered, or from whom received.  Upon demand
10 every manufacturer shall permit any marshal, sheriff or police
11 officer to inspect his entire stock of machine guns, parts, and
12 supplies therefor, and shall produce the register, herein re-
13 quired, for inspection.  A violation of any provision of this
14 section shall be punishable by a fine of (not less than . . .
15 hundred dollars).

1    SECTION 8. Every machine gun now in this state adapted
2 to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger
3 caliber shall be registered in the office of the [secretary of
4 state], on the effective date of this act, and annually there
5 after.  If acquired hereafter it shall be registered within 24
6 hours after its acquisition. Blanks for registration shall be
7 prepared by the [secretary of state], and furnished upon appli-
8 cation.  To comply with this section the application as filed
9 must show the model and serial number of the gun, the name,
10 address and occupation of the person in possession, and from
11 whom and the purpose for which, the gun was acquired.  The
12 registration data shall not be subject to inspection by the
13 public.  Any person failing to register any gun as required
14 by this section, shall be presumed to possess the same for
15 offensive or aggressive purpose.

1    SECTION 9. Warrant to search any house or place and seize
2 any machine gun adapted to use pistol cartridges of 30 (.30 in.
3 or 7.63 mm.) or larger caliber possessed in violation of this
4 act, may issue in the same manner and under the same restric-
5 tions as provided by law for stolen property, and any court
6 of record, upon application of the (district attorney), shall
7 have jurisdiction and power to order any machine gun, thus
8 or otherwise legally seized, to be confiscated and either destroyed
9 or delivered to a peace officer of the state or a political sub-
10 division thereof.

1    SECTION 10. If any provision of this act or the application
2 thereof to any person or circumstances is held invalid, such
3 invalidity shall not affect other provisions or applications of
4 the act which can be given effect without the invalid provision
5 or application, and to this end the provisions of this act are
6 declared to be severable.

1    SECTION 11. (Uniformity of Interpretation.) This act shall
2 be so interpreted and construed as to effectuate its general
3 purpose to make uniform the law of those states which enact it.

1    SECTION 12. (Short Title.) This act may be cited as the
2 Uniform Machine Gun Act.

1    SECTION 13. (Repeal.) All acts or parts of acts which are

2 inconsistent with the provisions of this act are hereby
repealed.

1   SECTION 14. (Time of Taking Effect.) This act shall take
2 effect.........................................


NOTES TO UNIFORM MACHINE GUN ACT

NOTE TO SECTION I

MACHINE GUNS

Ark. Castle's supp. to Stat. 1931, s. 2804a et seq.
Describes machine gun as "any firearm of the type commonly known
as a machine gun."

Cal. Stat. 1927, ch. 552, s. 2.  Machine gun includes all
firearms "known as machine rifles, machine guns or submachine
guns capable of discharging automatically and continuously loaded
ammunition of any caliber in which the ammunition is fed to such
gun from or by means of clips, drums, belts, or other separable
mechanical device."

D. C. Pub. 275, 72nd Congress, approved July 8, 1932.
"Machine gun" means any firearm which shoots automatically or
semiautomatically more than twelve shots without reloading.

Ill. Cahill's 1931, ch. 38, s. 409.  Same as California
statute (supra) except gun must discharge "more than eight
cartridges successively without reloading" to be a machine gun.

Mass. Cum. Stat. 1929, ch. 140, s. 121. "Firearms" includes
machine guns irrespective of length of barrel, any gun of small
arm caliber designed for rapid fire and operated by a mechanism,
or any gun which operates automatically after the first shot has
been fired, either by gas action or recoil action.

Mich. See Section 3, infra.

Mo. Stat. 1932, s. 4427.  Machine gun includes all firearms
known as machine rifles, machine guns, or submachine guns capable
of discharging automatically and continuously loaded ammunition
of any caliber in which ammunition is fed to such guns from or by
means of clips, disks, drums, belt, or other separable mechanical
device.

N. J. Comp. Stat. 1925-30, s. 52-43R(1).  Machine gun or
automatic rifle means any weapon, mechanism or instrument not
requiring that the trigger be pressed for each shot and having a
reservoir, belt or other means of storing and carrying
ammunition, which can be loaded into the said weapon, mechanism
or instrument and fired therefrom at the rate of five or more
shots to the second.

N. Y. Laws 1931, ch. 792.  Machine gun is a weapon of any
description, irrespective of size, by whatever name known, loaded
or unloaded, from which a number of shots or bullets may be
rapidly or automatically discharged from a magazine with one
continuous pull of the trigger.

N. D. Laws 1931, ch. 178, s. 1. "Machine gun, sub-machine
gun or automatic rifle" is construed to mean a weapon, mechanism

or instrument not requiring that the trigger be pressed for each shot and "having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second."

Pa. Laws 1929, Act 829, s. 1.  Machine gun means any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

R. I. Acts 1927, ch. 1052.  Machine gun "includes any weapon which shoots automatically and any weapon which shoots more than twelve shots semiautomatically without reloading."  Firearms includes "any machine gun pistol."

## CRIMES OF VIOLENCE

Note: This definition conforms very closely to the definition in the Uniform Fire Arms Act (Handbook 1930, p. 530) and will therefore be found in those jurisdictions where the Uniform Fire Arms Act, or parts thereof, has been adopted, e. g, Hawaii (Act 206, 1927, 6. 1); Pennsylvania (Assembly Bill 158, approved June 11, 1931); and District of Columbia (Pub. Law No. 275, 72d Congress, approved July 8, 1932).

## PERSONS

Note: This definition is practically identical with that in the Uniform Fire Arms Act (Handbook 1930, p. 588) and occurs generally in those jurisdictions which have adopted that act.

## DECISIONS

## MACHINE GUNS

Ia. An ordinary 15 shot, 22 short automatic rifle which has been made over so that it keeps shooting as long as the trigger is held back is a machine gun.  Op. Atty. Gen, May 7, 1931.

## NOTE TO SECTION 2

Ark. See s. 6, infra; also s. 3, infra.

Cal. Stat. 1931, ch. 1050, amending Stat. 1927, ch. 552. Sale of, offer to sell, possession of, or knowingly transporting machine guns, except as otherwise provided (see s. 6, infra) punishable by imprisonment not to exceed five years or by fine not exceeding $5,000.00, or both.

Del. Stat. 1931, ch. 249.  Possession of machine gun entirely prohibited except (see s. 6, infra).  Punishment, fine or/and imprisonment in discretion of court.

D. C. Pub. 275, 72d Congress, approved July 8, 1932. Committing crime of violence when armed or having readily available any firearm may be punished, in addition to punishment provided for the crime: by imprisonment not exceeding five years; upon second conviction, by imprisonment not exceeding ten years; upon third conviction, by imprisonment not exceeding fifteen years; upon fourth or subsequent conviction by imprisonment not exceeding thirty years.

Ill. Cahill's 1931, ch. 58, s. 409, subs. 7.  Person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with machine

gun subject to imprisonment from five years to life.

Ind. Acts 1929, ch. 65.  Person over 16 years of age committing or attempting to commit rape, robbery, bank robbery, petit larceny, grand larceny while armed with machine gun, etc., or any person present and aiding or assisting while so armed is guilty of a separate felony in addition to other crimes named and is subject to imprisonment therefor from ten to twenty years.

N. J. Comp. Stat. 1925-30, s. 52-43R(2).  Identical with District of Columbia statute, supra, except as to the crimes enumerated, and penalty for fourth conviction is twenty years as a maximum, and the indictment must aver that the person was armed with such firearm.

N. Y. Laws 1931, ch. 791.  If any person while in the act of committing a felony, or attempting to commit a felony, or any person while in the act of committing a crime or attempting to commit a crime and being an occupant of a stolen automobile or an automobile carrying fictitious license plates, or an automobile which has been used in the commission of a crime or in an attempt to commit a crime, or in leaving the scene of a crime shall be armed with a machine gun or other dangerous weapon the punishment prescribed for the felony of which be is convicted shall be increased (1) by imprisonment from five to ten years; (2) upon second conviction, from ten to fifteen years; (3) upon third conviction, from fifteen to twenty years.  In no case shall such person punishable as above provided be put upon probation or have execution of sentence suspended.

Pa. Laws 1929, Act 329, s. 3.  Person who commits or attempts to commit any crime, when armed with a machine gun shall in addition to the punishment for the crime be sentenced to separate and solitary confinement at labor not exceeding ten years which shall not commence to run until the expiration of the sentence for said crime.

R. I. Acts 1927, ch. 1052, s. 2.  Contains practically identical provision.

Note: Laws not relating specifically to machine guns but referring generally to firearms, or dangerous or deadly weapons have achieved the same result in whole or in part in the following states:

Alaska, C. L. 1913, s. 1897; Ariz., Rev. Code 1928, s. 4723; Colo., Comp. Laws, 1921, s. 6698; Fla., Comp. Laws 1927, s. 7204; Ga., Penal Code, ss. 115, 115-1, 418, 504; Miss., Code 1930, s. 787; Mo., Stat. Anno. 1932, ss. 4031, 4032, 4033; Neb., Comp. Stat. 1929, ch. 28; N. C., Code 1931, s. 4267a; Ph. I., Penal Code 1930, Arts. 174, 250, 508; Tex., Comp. Stat. 1928, Arts. 1231, 1234, 1237, 1393, 1408; Vt., Pub. 1927, No. 127; Pub. 1919, No. 196; Wash., Pierce's Code 1929. s. 8699-1; Wis., Laws 1931, ch. 29.

NOTE TO SECTION 3

Ark. Castle's Supp. to Stat. 1931, s. 2804a et seq. Unlawful to keep, transport, store, possess, sell, or give away any machine gun.

Cal. See Section 2, supra.

D. C. Pub. 275, 72d Congress, approved July 8, 1932. Possession of machine guns forbidden.  See Section 6, infra, for

exceptions.

Ill. Cahill's 1931, ch. 38, s. 409.  Selling, keeping, offer to sell, loan or give away, purchase, possess, carry or transport machine guns unlawful except (see s. 6, infra).  Violation by manufacturer is punishable by imprisonment from one to five years.  Violation by any other person, one to ten years.  Person having been previously convicted of murder, robbery, burglary, or assault with intent to commit a felony will be punished for violation of machine gun act by imprisonment from three to ten years.

Ind. Burns Stat. 1929, ss. 2548.2, 3.  Whoever owns, possesses, or controls a machine gun in an automobile, or in any other way is subject to imprisonment from one to five years.  Whoever discharges, fires off, or operates any loaded machine gun is subject to imprisonment from two to ten years.  But see Section 6, infra.

Ia. Code 1931, ch. 564-B1.  Knowingly having possession or control of machine gun prohibited; also any act with intent to enable person, firm, etc., to obtain possession.  For exceptions see Section 6, infra.  Punishment--if accused has a prior conviction of felony, five years' imprisonment; if prior conviction not established, three years' imprisonment; in all cases a fine from $500.00 to $2,000.00.  Prior convictions must be pleaded if relied upon.  Duly authenticated copy of judgment of prior conviction shall be prima facie evidence of such conviction.

Mass. Cum. Stat. 1929, ch. 140, s. 131.  Minors, unless employed by bank, public utility corporation, or business of similar nature and over fifteen years of age, unnaturalized persons, persons convicted of felony, or unlawful use of drugs cannot get a license to possess a machine gun. Cum. Stat. 1929, ch. 269, s. 10.  Whoever possesses a machine gun without a license is subject to imprisonment from six months to 2 1/2 years in jail or house of correction, or 3 1/2 years to five years in the state prison.

Mich. Acts 1931, ch. 37.  Whoever manufactures, sells, offers to sell, or possesses any machine gun, which can be fired more than sixteen times without reloading commits a felony and is subject to imprisonment not exceeding five years or a fine not exceeding $2,500.00.  Whoever sells, delivers, offers or exposes for sale, or possesses for such sale any written or printed matter offering or containing an offer to sell or deliver within the state from without the state a machine gun commits a misdemeanor.

Mo. Stat. Anno. 1932, s. 4426.  To sell, transport, deliver, possess or have in control a machine gun or assist or cause these things to be done is punishable by imprisonment from two to thirty years, or by fine not exceeding $5,000.00, or both.

Nebr. Comp. Stat. 1929, ch. 28, ss. 1008, 1011, 1012. Unlawful for any person, firm, or corporation to sell, cause to be sold, or otherwise dispose of any machine gun, to any person except (see Section 6, infra); violation is a misdemeanor punishable by fine, from $1,000.00 to $10,000.00. Unlawful for any person except (see Section 6, infra) to transport a machine gun on any highway, or have in possession, for any unlawful purpose. Violation subjects one to imprisonment from one to ten years.

N. J. Comp. Stat. 1925-30, s. 52-43q(2).  To sell, give, loan, furnish, deliver, purchase, have, or possess any machine gun is a high misdemeanor except (see Section 6, infra).  Comp. Stat. 1925-30, s. 52-43r(1).  Pawnbroker shall not sell, or possess any machine gun; violation is a high misdemeanor.  Comp. Stat. 1925-30, s. 52-43r(4).  Person convicted of assault, robbery, larceny, burglary, breaking and entering shall not pur- chase, own or possess a machine gun.  Violation is punishable by imprisonment not exceeding five years.

N. Y. Cahill's 1931, ch. 41, s. 2187.  Person who attempts to use against another or carries or possesses a machine gun is guilty of a misdemeanor and if he has been convicted of any crime is guilty of felony.  Laws 1931, ch. 792.  Selling, keeping for sale, offering, giving, disposing of a machine gun is a felony except (see Section 6, infra).  Possession or use of machine gun is a felony.  Gilbert's Penal Laws, s. 1897, subs. 8.  Persons under sixteen years of age who have, carry or possess a machine gun, shall be guilty of juvenile delinquencies.

N. D. Laws 1931, ch. 178, s. 2.  Person who sells, gives, loans, or delivers a machine gun, etc., of a caliber larger than twenty-two, or person who shall purchase, have or possess any machine gun etc., of a larger caliber than twenty-two commits a felony, except (see Section 6, infra).

Pa. Laws 1929, Act 1929, s. 2.  Unlawful for any person, copartnership, association or corporation to sell, give, transfer, or purchase, own, have or possess any machine gun. Violation is punishable by a fine not exceeding $1,000.00, or imprisonment by separate or solitary confinement at hard labor not exceeding five years.

R. I. Acts 1927, ch. 1062, ss. 3, 4, 12.  No person convicted of crime of violence shall purchase, own, carry, possess or control any firearm.  No person shall manufacture, sell, purchase or possess a machine gun except (see Section 6, infra).  Changing, altering, removing or obliterating name of maker, model, manufacturer's number or other mark of identification on any firearm forbidden.

W. Va. Code 1932, Anno. s. 6060.  Unlawful to carry, transport, or possess any machine gun, submachine gun, or what is commonly known as a highpowered rifle, or any gun of a similar kind or character except on own premises leased for a fixed term, unless permit first obtained from superintendent of department of public safety, and approved by the governor, or a license is obtained from the circuit court as in the case of pistols.

Wis. Stat. 1931, s. 340.695.  Person who owns, uses or possesses a machine gun shall be punished by imprisonment from one to fifteen years, except (see Section 6, infra).

Note: Laws not relating specifically to machine guns but referring generally to firearms or dangerous or deadly weapons have achieved the same result in whole or in part in the following states:

Alaska, Comp. Laws 1913, ss. 1901, 1902, 1904; Ala., Code 1928, ss. 3300, 3301, 4043, 4045, 4047, 1397-140; Ariz. Rev. Code 1928, ss. 4615, 4726; Fla. Comp. Laws 1927, s. 7163; Ga., Penal Code, ss. 348, 349; Ida., Comp. Stat. 1919, ss. 8406, 8407, 8375, 8252; Ky., Carroll 1930, ss. 1308, 1242, 1166; La., Marr's Crim. Stat. p. 215; Kan., Rev. Stat. 1923, ss. 21-2411, 431; Me., Rev. Stat. 1930, ch. 142, ss.

10, 13; Minn., Mason's 1927, ss. 10255, 10563, 10505, 10097,
10314, 10290, 10291, 10413, 9921-2; Mont., Rev. Code 1921,
ss. 11354, 11565, 11566; Nev. Comp. Laws 1927, ss. 10252,
10095, 10121, 10292, 10293, 2300; N. H., Pub. 1926, ch. 376t
s. 6; Ib., ch. 385, s. 4; N. M., Stat. 1929 ss. 35-340,
3402, 3403, 3404, 3405, 3406; N. C., Code 1931, ss. 4213,
4214, 4215, 4216, 4441, 2141B; Ohio, Code 1930, ss. 12817,
12818, 12635, 12422; Okla., Stat. 1931, ss. 2584, 2589,
2590, 2591, 2592, 2595; Ore. Laws 1931, ch. 370, ss. 64, 39-
320; ch. 360, ss. 576, 215; Code 1930, ss. 72-113, 114, 101,
103; 14-233, 231; Ph. I., Penal Code 1930, Arts. 408, 572,
589, 526, 2691, 2692; P. R., Laws 1924, Act 14, ss. 1, 2;
Rev. Stat. 1911, s. 5822; S. C. Code 1932, ss. 1119, 1120,
1394, 255 (19); S. D., Comp. Laws 1929, ss. 4063, 4081,
3955, 4393, 4394; Tenn., Code 1932, ss. 11007, 11008, 10799;
Tex. Comp. Stat. 1928; Arts. 341, 329, 330, 326, 485, 474,
338, 339, 340, 480, 334; Utah, Comp. Laws 1917, ss. 8495,
2600; Vt. Pub. 1931, No. 164; Gen. Laws, ss. 6834, 6837,
6841, 6842, 6846, 63847, 7000, 7099; Va. Code 1930 s. 4675
(9) ; Wash., Pierce 1929, ss. 8836, 8827, 8838, 8839; Wyo.,
Rev. Stat. 1931, ss. 32-309, 407, 408, 410.


                    NOTE TO SECTION 4

    N. J. Comp. Stat. 1925-30, s. 52-43R(3).  Fact that person
committing or attempting to commit certain crimes (see Section 2,
supra) was armed or had in his possession a machine gun without a
license shall be prima facie evidence of his intention to commit
said crime of violence.  Presence of a firearm in a vehicle is
presumptive evidence of possession of all persons occupying or
using the vehicle at the time.

    R. I. Acts 1927, ch. 1052.  Fact that person accused of
committing or attempting to commit a crime of violence was armed
with or had available a machine gun is prima facie evidence of
intention to commit said crime of violence.  Possession of any
firearm upon which any mark of identification has been changed,
altered, removed, or obliterated shall be prima facie evidence
that the possessor has altered, changed, removed or obliterated
the same.

    Note: The same result is achieved by a general reference to
firearms or dangerous or deadly weapons in Oregon, Code 1930, s.
72-113.


                    NOTE TO SECTION 5

    Mass. Cum. Stat. 1921, ch. 140, s. 1.06.  Any placard, etc.,
maintained in a vehicle, shop, stand, tenement, or place of
common resort purporting to announce the keeping of firearms
(machine guns) shall be prima facie evidence that firearms
(machine guns) are kept for sale.

    Mich. See Section 9, infra.

    R. I. Acts 1927, ch. 1052, s. 15.  Negative allegations of
any kind need not be averred or proved in any complaint under
this act (Acts 1927, ch. 1052), and the carrying or use of any
firearm, including machine guns, contrary to the provisions of
this act shall be evidence that the possession, carrying or use
of any such firearm is unlawful, but the respondent in any such
case may show any fact that would render the possession, or use,
or carrying of such firearm lawful.

    N. Y. Laws 1931, ch. 792.  Presence of machine gun in any

room, dwelling, structure or vehicle is presumptive evidence of illegal possession by all persons therein, except (see Section 6, infra).  Every person while carrying or possessing a weapon shall carry with him license issued for such weapon and shall exhibit same upon demand to any policeman, state trooper, or other peace officer and failure to do so shall be presumptive evidence that such person is not duly licensed and shall cause a forfeiture of his license.

Note: Laws referring to firearms, or dangerous or deadly weapons have achieved the same result in whole or in part in the following states:

Minn, Mason's Stat. 1927; N. C., Code 1931, s. 4410.

NOTE TO SECTION 6

Ark. Castle's Supp. to Stat. 1931, s. 2804a et seq.  Excepts military authorities of state or nation, peace officers of state, counties or political subdivisions in performance of their duties.

Calif. Stat. 1931, ch. 1050, amending 1927 Stat. ch. 552. Excepts sale to, purchase, or possession of machine gun by any city, county, state or federal officer where required for official use, or transportation on behalf of police departments, members thereof, sheriffs, city marshals, or military or naval forces of state, or United States.  Superintendent of division of criminal identification, etc., to issue permits for possession and for transportation of machine guns upon good cause shown. The permit shall be open to inspection.  The person or firm receiving permit shall keep gun on person or at place where such firearms are kept.  Permit may be revoked when need for machine guns has ceased or holder of permit has used guns for purposes other than allowed.  License may be granted for not more than a year to sell machine guns, provided business of selling is carried on only in place provided in permit, and license is displayed on premises where it may be easily read and such firearms are not delivered to any person not authorized to receive same under the act.

Del. Stat 1931, ch. 249.  State military forces or duly authorized police departments permitted to have machine guns in their possession.

D. C. Pub. 275, 72d Congress, Approved July 8, 1932. Excepts members of Army, Navy, or Marine Corps of the United States, the National Guard, organized Reserves on duty, Post Office Department or its employees on duty, marshals, sheriffs, wardens, or their deputies, duly appointed law enforcement officers, officers or employers duly authorized to carry weapons, banking institutions, public carriers engaged in transporting mail, money, securities, or other valuables, wholesale and retail dealers licensed under Section 10 of the act.

Ill. Cahill's 1921, ch. 38, s. 409.  All duly appointed peace officers may purchase, carry, possess and transport machine guns; also the U. S. Army, Navy, Marine Corp, National Guards, organizations permitted by law to purchase and receive machine guns from the United States; also persons, organizations, institutions possessing machine guns as war relics, also guards, messengers employed by common carriers, banks and trust companies while employed in their duties and their employers may possess them when not so employed; manufacturers and merchants may possess, sell, etc., such guns.

Ind. Burns 1929, s. 2648.4.  Provisions set out, see section 2 supra, do not apply to members of military forces of United States, national guard of Indiana, when on duty or practicing, machine guns on display as relics which are harmless and not usable, and shall not apply to police or sheriff of the state in connection with their duties.

Ia. Code 1931, ch. 564-B1.  Exceptions referred to in Section 3, supra, are: Peace officers, members of national guard, persons in service of United States government, banks, provided their possession is in connection with official duties; relics unfit for use and which were in general use prior to November 11, 1918; persons or firms engaged or interested in improvement, invention, or manufacture of firearms; persons possessing by finding or summary seizure provided they deliver immediately to some peace officer of county where gun found.

Mass. Cum. Stat. 1929, ch. 140, ss. 131, 101.  License may be secured to possess machine gun to protect person or property or other proper person (see Section 3, supra, for persons who cannot secure license).

Mich. Acts. 1931, ch. 37.  Excepts person manufacturing by virtue of contract with United States government, any foreign government, municipality or subdivision thereof; peace officers of state, members of United States Army, Navy, or Marine Corps, or of organizations authorized to purchase or receive weapons from the United States or the state, or of the National Guard or other duly authorized military organizations when on duty or drill, or going to and from their customary places of assembly or practice, or to transportation as merchandise.

Mo. Stat. Anno. 1982, s. 4426.  Excepts sheriffs, city marshals, military and naval forces of state or United States, police departments and members thereof.

Neb. Comp. Stat. 1929, ch. 28, ss. 1008, 1011.  Excepts as to sale, etc., officers of the law, agents of the United States government, agents of law enforcement department of Nebraska. Excepts as to transportation or possession by officers of the law, soldiers of the United States Army, officers and enlisted men of the national guard of state.

N. J. Comp. Stat. 1925-30, ss. 52-43q2, 5, 6, 11.  Excepts (see Section 3, supra) person having license (see Section 8, infra) or his authorized agents, members of duly authorized military organizations, members of police force of any municipality, of state police force, sheriff or under-sheriff, prosecutor of the peace, his assistants, detectives and employees.  Upon application by banking institution, trust company, building and loan association, within state judge shall issue license to purchase and possess one or more machine guns for its own use and protection and the use and protection of its officers, servants and employees, to be recorded by the county clerk.  Railway, canal, and steamboat companies may get license for machine gun as aforesaid.  No person shall be prevented from carrying about his place of business or dwelling house or premises a firearm, or from carrying same from place of purchase to his dwelling house or place of business, or from dwelling place or place of business to place of repair to have repaired and return.

N. Y. Laws 1931, ch. 792.  Excepts manufacture, sale and shipment to police departments, sheriffs, policemen, other peace

officers, state prisons, penitentiaries and county jails, military and naval organizations; also state police, warden, superintendent, head keeper or deputy of state prison, penitentiary workhouse, county jail, or other institution for detention of persons convicted or accused of crime or held as witnesses in criminal cases, persons in postal service of the United States, common carriers while transporting machine guns to any police department, military or naval organization or person authorized by this section.

N. D. Laws 1931, ch. 178, s. 2.  Excepts officers and members of police force of any municipality and of a duly authorized military organization, sheriff, deputy sheriff, any other officer having police powers under laws of the state, any person possessing a license or his authorized agents or servants.

Pa. Laws 1929, Act 329, s. 4.  Excepts manufacture and sale of machine guns to the military forces of the United States, or of the state, or the latter's police department, or of its political subdivisions, and excepts the purchase by said government and departments; excepts any organization of veterans, or any veteran of war of the United States owning or possessing a machine gun as a relic if permit obtained from sheriff of county, which permit is attached at all times to the gun.

R. I. Acts 1927, ch. 1052, s. 6.  Excepts sheriffs, deputy sheriffs, superintendent and member of state police, prison and jail wardens or their deputies, members of city or town police force, other duly appointed police, officers. members of Army, Navy, or Marine Corps of United States, or National Guard, when on duty, or organizations by law authorized to purchase or receive arms from the United States, or the state, or duly authorized military organizations when on duty or members thereof at or going to or from their customary places of assembly.  Ib., s. 7, provides that the attorney-general may issue a permit to any banking institution doing business in the state, or any public carrier engaged in business of transporting mail, money, securities or other valuables to possess and use machine guns under regulations prescribed by the attorney-general.  Acts 1927, ch. 1062, s. 13 excepts antique firearms unsuitable for use, and collections of firearms as curios, souvenirs, and for educational, scientific and similar purposes without intent to use such firearms.

W. Va. Code 1932, ss. 6045, 6046.  May carry any weapon, including machine gun, on own premises, if in, good faith and not for felonious purpose, without a license; same as to carrying unloaded from place of purchase to home, or to place of repair and back to home.  Express companies, as common carriers, have absolute right to carry weapons, including machine guns, through their employees, etc., who have custody of money and other valuables provided the company executes a continuing bond in the penalty of $30,000.00, the amount of recovery for breach of conditions of bond shall not exceed $3,500.00 in any one case; such bond shall be filed with the secretary of state.  Upon trial for recovery of damage upon such bond, the burden of proof shall be upon the express company to establish that the employee, etc., was not actually engaged in duties for the express company. Railroad police officers have absolute right to carry weapons provided the railroad company posts bond in penalty of $10,000.00, otherwise practically the same as in case of express companies.  Ib. s. 6047 excepts sheriffs, regular appointed deputies who actually collect taxes, all constables, all regularly appointed police officers, all jailers and game protectors, members of department of public safety of the state,

provided they give bond in the penalty of $3,500.00.  Ib. ss.
6048, 6049 excepts posse authorized by Sheriff in emergency or
danger, no bond required.  Licenses may be revoked at any time
for sufficient cause by the circuit court granting the license,
the governor of the state, the superintendent of the department
of public safety.  Immediate notice of revocation shall be given
the licensee by registered mail, in person, or in same manner as
other notices are authorized by law to be served.

Wis. Stat. 1931, s. 340.695.  Excepts police officers,
national guardsmen, sheriffs and their deputies, or any person or
organization possessing a machine gun received from the
government as a war trophy.

Note: Laws referring to firearms, or dangerous or deadly
weapons have achieved the same result in whole or in part in the
following states:

Ga., Penal Code, s. 328; Neb. Comp. Stat. 1929, ch. 28,
ss. 1008, 1011; N. M., Stat. 1929, s. 35-3408; Okla., Stat.
1931, s. 2586; Ore., Laws 1931, ch. 370, s. 64; P. R., Laws
1924, Acts 14, s. 3; Tenn., Code 1932, s. 11012; Tex., Comp.
Stat. 1928, Art. 496.


NOTE TO SECTION 7

Cal. Stat. 1931, ch. 1050, amending 1927 Stat. ch. 552.
Complete record of sales must be kept by vendor showing name and
address of purchaser, his signature, and number and date of issue
of purchaser's permit.

D. C. Pub. 275, 72d Congress, approved July 8, 1982, ss. 8,
9, 10.  Only persons licensed may sell machine guns.
Commissioners may grant licenses for one year to sell machine
guns at retail provided (1) business carried on in building
designated in license; (2) license, or copy thereof, displayed
where easily read on premises; (3) machine guns shall be sold
only to persons designated in Section 14 of act (see Section 6,
supra) ; (4) a record be kept in a book provided, the form to be
prescribed by the Commissioners of all machine guns in possession
of licensee, containing date of purchase, caliber, make, model,
and manufacturer's number of weapon and date of sale.  A record
in duplicate of all machine guns sold shall be kept in a book
kept for the purpose, the form prescribed by the Commissioners
and signed by the purchaser and person effecting sale, each in
presence of the other, containing date of sale, name, address,
occupation, color, and purchaser's place of birth, caliber, make,
model, manufacturer's number of weapon and purchaser's statement
that he has never been convicted of a crime of violence.

Ill. Cahill's 1931, ch. 38, s. 409.  Manufacturer or
merchant can only pass possession of machine gun to manufacturer
or merchant, common carrier for shipment to manufacturer or
merchant, authorized agent of government in official capacity,
persons authorized to purchase under provisions of exceptions 1
and 4 of Section 2 of the act (see Section 6, supra), who have a
permit signed by sheriff of county where manufacturer or merchant
has place of business or delivers such gun.  They shall retain
the permit on file. 1b., subs. 4 of the Illinois act is
practically the same as this Section 7, except it does not
provide for keeping the model and serial number.

Mass. Cum. Stat. 1929, ch. 140, s. 123.  License granted to
vendor on condition that he before delivery make a true entry in

said sales record book specifying description of gun, make, number, whether single barrel, magazine, revolver, pin, rim or central fire, whether sold, rented or leased, date and hour of such delivery and that he state in said book his full name, sex, residence and occupation.  Book to be open for inspection by licensing authorities and the police at all times.  License to be displayed on premises where easily seen, no firearms to be displayed where easily seen from outside.  Copy of record of sales, rentals, end leases made during preceding seven days to be sent to licensing authority, each gun shall be delivered securely wrapped, fastened and unloaded.  No machine gun to be sold to a person who has not a license to possess.  Upon sale, etc., of machine gun license vendor shall endorse thereon licensee, vendee, etc., the place and time of sale, etc., and shall transmit notice thereof to the commissioner of public safety. Licenses expire April 30 of each year but may be granted during April to take effect May 1 next ensuing.  License may be forfeited on proof of violation of condition upon which granted. If forfeited, licensee is disqualified for one year after expiration of term of license.  Cum. Stat. 1927, ch. 140, ss. 127, 129.  Fine from $25.00 to $100.00 for giving false names. Cum. Stat. 1929, ch. 140, s. 131B.  Loans secured by mortgage, pledge, or deposit of machine gun are forbidden.

N. J. Comp. Stat. 1925-30, s. 52-43r(6).  Manufacturer and wholesale seller of machine guns shall be registered with the Secretary of State and furnish him with such particulars as may be prescribed by law for registration.  Secretary has discretion to refuse registration; he shall furnish certificate of registration to each person registered; he has power to revoke registration if person registered no longer carries on his business, or can no longer carry on business without danger to public; person registered has right to hearing and appeal to Supreme Court of state on question of revocation; person registered may surrender registration.  Manufacturer and wholesale dealer must keep detailed record of each firearm sold, to include date of sale, name of purchaser, description of arm and its serial number.  This information to be available to police and other public officials.  Violation is a misdemeanor. Comp. Stat. 1925-30, s. 52-43r(6).  No retail dealer shall sell, expose for sale, or possess with intent to sell any machine gun without being licensed.  Granting of license in discretion of common pleas judge for one year provided (1) business carried on in building designated in license; (2) license or copy thereof displayed in conspicuous place; (3) no advertising of sale to be displayed as to be seen from outside; (4) this clause deals with pistols and revolvers only.  Sale of machine guns to minors under eighteen years of age, person of unsound mind, drug addict, person convicted of committing or attempting to commit assault, robbery, larceny, burglary, breaking or entering prohibited and violation is a misdemeanor.

W. Va. Code Anno. 1932, s. 6051.  Unlawful to keep on display to passersby any machine gun, etc.  Dealers licensed to sell shall take name, address, age and general appearance of purchaser, maker of gun, serial number and caliber, and report information at once to superintendent of department of public safety.  Unlawful to sell, rent, give, or lend to unnaturalized person.

Note: Transfer of firearms, deadly or dangerous weapons is dealt with generally by regulation of sale of rather than manufacture of weapons or firearms in following states:

Ala., Code 1928, ss. 5542, 5446; Ariz., Rev. Code 1928,

s. 4700; Ga., Penal Code ss. 1467-79, 201; Me., Rev. Stat. 1930, ch. 129, s. 40; Ib., ch. 49, s. 47; Minn., Mason's 1927, s. 10256; Mo. Stat. 1932, s. 4030; Ohio, Code 1930, s. 12697; Ph. I., Penal Code, 1930, Art. 2690; P. R., Laws 1924, Art. 14, ss. 3, 4, 12; Tenn., Code 1932, ss. 11009, 11010; Tex., Comp. Stat. 1928.

## NOTE TO SECTION 8

Ark. Castle's Supp. to Stat. 1931, s. 9804d.  After April 1, 1931, persons permitted by law to possess machine guns shall file with Secretary of State sworn application giving his name and address and serial number of machine gun, said Secretary to register such person in a book, assign a number and issue a card which applicant shall keep with him while the machine gun is in his possession.

Cal. Stat. 1931, ch. 1060, amending 1927 Stat ch. 662. Applications for permits (see Section 6, supra) in writing shall state name, business address, business in which engaged and use to which machine gun to be put.  Applications shall be uniform throughout state.

D. C. Pub. 276, 72d Congress, approved July 8, 1932.  One copy of record of sale (see Section 7, supra) shall be forwarded by mail within seven days of sale to superintendent of police and other copy retained by seller for six years.

Ill. Cahill's 1951, ch. 38, s. 409.  Sheriff shall keep a record of all permits issued by him.

Mass. Acts 1922, ch. 485, s. 3; Acts 1927, ch. 326, s. 1. Licensing authorities in any town authorized to grant licenses to persons to sell, rent or lease fire arms and fix fee therefor; licenses shall specify address where business carried on and is only valid as to that address.  Licenses shall be recorded.

Mich. Acts 1931, ch. 37.  Vendor of firearms who fail to keep register with name, age, occupation and residence of purchaser together with number or other mark of identification, which register shall be open for inspection of peace officers at all times, shall be guilty of misdemeanor.

N. J. Comp. Stat. 1925-30, s. 52-43q(3)(4).  To purchase, have or possess machine gun person applies to Judge of Court of Common Pleas of county in which he resides for license.  Judge refers application to sheriff of county or chief police officer of municipality, in which applicant resides, for investigation, and approval; if approved, judge may issue license in his discretion for protection of applicant or his servants and employees.  Upon issuance, the county clerk enters record of license in a book provided for the purpose, stating date of issuance and name and address of licensee; after record made, said clerk delivers license to licensee.

N. Y. Laws 1931, ch. 762, ss. 9a, 10.  Police Commissioner of New York City may issue license only to resident of that city. Outside that city judge of court of record may issue license to resident of county in which the judge is located.  A qualified person principally engaged, or a merchant or storekeeper having his principal place of business in such city or county may be issued a license.  Expense of blank applications, licenses and records shall be charged against the county or City of New York as the case may be.  Forms shall be approved by the Police Commissioner for New York City and by the State Superintendent of

Police for the counties.  License fee is fifty cents, collected
by the judge or officer to be paid into the treasury of the
county.  The application, if the license is granted, shall be
filed in the city or county clerk's office, as the case may be,
where the applicant resides and a duplicate copy shall be filed
in the executive department, division of state police, within ten
days after issuance of license.  The license shall specify the
weapon for which issued and whether to be carried on person or on
premises.  It expires the 1st of January, though it may be
expressly limited to expire on an earlier date.  A householder
may possess a weapon, unlimited as to time.  All licenses,
however, may be revoked at any time by the police commissioner of
New York City, or by a judge of a court of record in any county
outside New York City.  A license with date of expiration thereon
may be renewed and time of license extended pending disposition
of application for renewal provided application made before date
of expiration.  License shall specify place where licensee shall
possess the weapon.  Each application for a license shall be
accompanied by a photograph in duplicate of the applicant taken
within thirty days of filing the application, one copy being
attached to the license and the other to the application.  The
officer to whom application is made shall ascertain before
license is issued if applicant has been convicted of crime and
shall cause fingerprints of such applicant, except householder,
to be taken in duplicate; one copy shall remain on file in office
of officer taking same, the other copy to be filed in office of
executive department, division of state police within ten days
after license issued.  Inspection of fingerprints not permitted
except by peace officers, or upon order of a judge of a court of
record on such notice, if any, to the person to whom the license
was issued as the judge may determine.  Person convicted of
illegally using, carrying or possessing a pistol or other
dangerous weapon; making or possessing burglars' instruments;
buying or receiving stolen property; unlawful entry of a
building; aiding escape from prison; interfering with any person
in any place by jostling against such person or unnecessarily
crowding him or by placing a hand in the proximity of such
person's pocket, pocketbook or handbag; unlawfully possessing or
distributing habit-forming narcotics, drugs, shall not be en-
titled to a license.  Gilbert's Penal Laws, 1931, s. 1897, subss.
11, 12.  A coupon shall be attached to each license which shall
be removed and retained by person selling or otherwise providing
the licensee with the weapon contemplated in the license.  Any
person who provides another with a weapon except upon
presentation, removal or retention of such coupon commits a
misdemeanor.

     N. D. Laws 1931, ch. 178, ss. 3, 4.  Person may acquire
license to purchase, sell, have, or possess a machine gun, etc.,
by application to the Judge of the District Court of the county
in which the applicant resides.  Application shall be in writing
and state in detail the reason why the license is desired.  The
judge shall refer the application to the sheriff of the county or
to the chief police officer of the municipality in which the
applicant resides for investigation and approval.  If approved
the judge in his discretion may issue a license.  The application
and license shall both contain a description of the gun licensed,
including name of manufacturer, number and caliber.  License
shall be issued in duplicate, the duplicate to be filed in the
office of State Superintendent of Criminal Identification.

     Pa. Laws 1929, Act 329, s. 4.  Sheriffs of the several
counties authorized upon application and payment of a fee of one
dollar to issue permits for ownership and possession of machine
guns by veteran and organization of veterans upon production of

evidence that organization is a bona fide organization or the veteran is of good moral character and reputation, and ownership and possession is actually desired as a relic.

W. Va. Code Anno. 1932, s. 6044.  To get license for possessing a machine gun person must publish a notice in one issue of newspaper published in county in which he resides, setting forth his name, residence, and occupation, and that he will apply to the circuit court of his county for such state license.  After ten days' publication of the notice and at the time stated in the notice the court may grant such license in the following manner: Applicant shall file with the court his application in writing, duly verified, showing (a) applicant is a citizen of the United States; (b) is a bona fide resident of state for one year and of the county sixty days; (c) that he is over twenty-one years of age, of good moral character, of temperate habits, not addicted to intoxicants, and never convicted of felony or any offense involving use of weapons; (d) purpose for which weapon desired, necessity therefor, and counties in which license to be effective.  Court shall hear evidence on matters stated in the application and all pertinent matters, and if satisfied it may grant such license, upon payment of license fee of twenty dollars to sheriff and file with clerk of court a bond in penalty of $3,500.00, with good security, signed by a responsible person, or by some surety company authorized to do business in the state conditioned that the applicant will not carry the weapon except in accordance with the application and as authorized by the court, and that he will pay all costs and damages accruing to any person by accidental discharge or negligent, improper or illegal use of such weapons. License good for one year, unless revoked and co-extensive with counties as the court may designate in the order granting the license.  Clerk of Circuit Court shall immediately furnish superintendent of department of public safety a certified copy of order of court granting license, for which clerk shall be paid a fee of two dollars, taxed as costs in the proceeding.  Licenses to railway police shall be co-extensive with state and deputy sheriffs having license are permitted to carry weapons any place while in performance of their duties.

Note: Registration of firearms and dangerous or deadly weapons is regulated by statutes which by construction cover machine guns in the following states:

N. C. Code 1931, s. 952-36; P. R., Laws 1924, Art, 14, s. 7.

NOTE TO SECTION 9

Ark. Castle's Supp. to Stat. 1931, S. 2804a et seq.  Upon conviction of illegal possession, etc. (see Section 6, supra) the machine gun shall be confiscated and title thereof pass to the political subdivision of the State making the capture.

Ill. Cahill's 1931, ch. 38, s. 409, subs. 6.  Practically same except delivery of gun shall be made to agency of state or its political subdivision authorized to possess machine guns and sale to person authorized to possess same may be ordered.

Ia. 1931 Code, ch. 564-B1.  Peace officers to deliver machine guns to sheriff who reports delivery to the district court, which may enter summary order for destruction or such order as necessary to preserve it for use as evidence.

Mass. Cum. Stat. 1929, ch. 269, s. 10.  Upon conviction (see

Section 3, supra) machine gun shall be confiscated by the commonwealth and upon written order of the court forwarded by common carrier to the commissioner of public safety who may sell or destroy same and in case of sale, after paying cost of forwarding, pay over net proceeds to the commonwealth.

Mich. Acts 1931, ch. 37.  On complaint to magistrate that machine gun is unlawfully possessed he shall upon reasonable cause issue warrant to any peace officer, commanding him to search person or place described and if found "seize and hold same as evidence of violation of" chapter 37; (see other sections herein).  Machine guns possessed contrary to chapter 37 are "hereby" declared forfeited to the state.

R. I. Acts 1927, ch. 1062, ss. 10, 16.  Firearms, including machine guns, are hereby declared to be nuisances and forfeited to the state.  When taken from any person such firearms shall be surrendered to superintendent or chief of police, or town sergeant who shall destroy them at stated intervals of one year, unless a justice of the superior court or the attorney-general certifies that non-destruction is necessary or proper to the ends of Justice.  Every officer may without complaint and warrant arrest any person who possesses any firearm whenever such "officer has reasonable ground to suspect that such person possesses or is using or is carrying such firearm contrary to law."  Any person so arrested may be detained 24 hours for investigation without complaint being made against him.

W. Va. Code Anno. 1932, s. 6050.  Upon revocation of any permit or if machine guns etc. are possessed etc. unlawfully the department of public safety shall confiscate them and shall safely store and keep same subject to the order of the governor.

Note: Laws referring to firearms, or dangerous or deadly weapons have achieved the same result in part in the following states:

Ala., Code 1928, s. 5499; Ariz., Rev. Code 1928, s. 5292; Fla., Comp. Laws 1927, s. 7205; Hawaii, Rev. Laws, 1925, s. 3974; Ida., Comp. Stat. 1919, s. 9328; Mont., Rev. Code 1921, s. 11763; Nev., Comp. Laws 1929, ss. 10761, 2300, 2301; N. J., Comp. Stat. 1925-30, s. 52-432(16); N. D., Comp. Laws 1913, ss. 10578, 11096, 11149; Ph. I., Penal Code 1930, Art. 607; lb., s. 2692, p. 831; P. R., Laws 1924, Art. 14, ss. 9, 10; Tenn., Code 1932, ss. 11018, 11019, 11015; Tex., Comp. Stat. 1928, Art. 487; Utah, Comp. Laws 1917, ss. 2600, 2601, 2602; Va., Code 1930, ss. 4578, 4675(9); Wyo., Rev. Stat. 1931, s. 34-411.



Published on *The National Interest* (https://nationalinterest.org)

Home > The Thompson Submachine Gun: Made for the U.S. Postal Service?

# The Thompson Submachine Gun: Made for the U.S. Postal Service?



**July 3, 2020**    Topic: **Security**    Blog Brand: **The Reboot**    Tags: **Gun, Guns, Tommy Gun, Technology, History, U.S. Postal Service**

---

The Thompson Submachine Gun entered production as the M1921 version, but the American military showed little interest.

---

by **Peter Suciu**

Here's What You Need to Remember: The first U.S. government customer was actually the United States Postal Inspection Service and the weapon was

carried by agents to protect mail on trains and in trucks.

During the Second World War, the Thompson submachine gun was used throughout the campaigns in Africa, Europe, and the Pacific. It was used not only by the United States Army and United States Marines Corps but also by the British military. It was a reliable and accurate small arm — but it was one that the military didn't originally want.

The history of the "Tommy Gun" goes back to the First World War when it first developed by John Taliaferro Thompson, who had served in the Spanish-American War as Chief Ordnance Officer. He proved so successful in running the supply operations to Cuba that he was the youngest officer to be promoted to the rank of colonel at the time.

It was during that brief war that Thompson first saw the effects of automatic weapons on the battlefield. Fittingly he was soon appointed chief of the Small Arms Division for the U.S. Army Ordnance Department, and he supervised the development of the M1903 Springfield rifle and chaired the board that approved the M1911 .45 caliber pistol.

For many career officers that could have capped a successful career, but when World War I broke out in 1914 Thompson again began to consider how an automatic weapon could be employed. With the U.S. Army on the sidelines in the early half of the war, he actually retired from the military and took a position with Remington Arms Company as chief engineer and oversaw production of the Pattern 1914 Enfield rifles for the British and the Mosin-Nagant rifles for Russia.

It was while he was working at Remington that Thompson devised a concept for a "trench broom" — a weapon that he envisioned could clear enemy trenches. He then founded Auto-Ordnance Company with his friend John Blish, a former commander in the U.S. Navy.

When the United States entered the war in the spring of 1917 Thompson was

recalled to active duty, was promoted to Brigadier General and served as Director of Arsenals. He was in the right place to develop his "trench broom" concept, but the war ended before his prototype, which was known as the "Annihilator" had a chance to be tested.

However, in early 1919 at an Auto-Ordnance meeting, the weapon was rebranded the "Thompson Submachine Gun." It was actually the first weapon to bear the moniker of "submachine gun," even if the German-designed Maschinenpistole 18/I (MP-18) had already had its baptism of fire in the trenches of the recently ended war.

The Thompson Submachine Gun entered production as the M1921 version, but the American military showed little interest. However, another Army showed interest — the Irish Republican Army, which secretly purchased 500 of the new weapons, marking it the first time a military adopted the weapon. The Thompsons were used during the Irish War of Independence and the subsequent Irish Civil War.

Back in the United States, the weapon was then marketed to civilians, complete with 20 round "stick" magazine, while the heavier 100-round drum magazine was typically sold as an accessory. One now famous ad from the time showed a rancher fending off rustlers with a Thompson with the tag line "The Most Effective Portable Fire Arm In Existence." The ad further suggested it was an "ideal weapon for the protection of large estates, ranches, plantations, etc." As shocking as was the fact that Auto-Ordnance Corporation had offices and even a small showroom at 302 Broadway in New York City.

The original price was around $200.00, which was a considerable amount of money in that day and age — and despite what movies might suggest where every gangster had at least one, the customers didn't line up. The cost was simply too high, and most people had no need for an automatic weapon.

The first U.S. government customer was actually the United States Postal

Inspection Service and the weapon was carried by agents to protect mail on trains and in trucks.

The United States Marine Corps had first tested the Thompson in 1920, but only in the mid-20s did the Corps finally commit to buying 700 of the new submachine guns. These were used during the Second Nicaragua intervention of 1927-1932, and in China. The USMC was the first to consider how an automatic, close-quarters weapon could be employed as part of a nine-man rifle squad, while the Army finally adopted the weapon in 1928.

As for the civilian market, the use of the weapon in the St. Valentine's Day Massacre in 1929, as well as the fact that it was used in a few high profile bank robberies, including the 1933 Kansas City Massacre that left several FBI agents dead, suggested that maybe civilians shouldn't so readily be able to buy the Tommy Gun.

Legislation was introduced in Congress that resulted in new laws that required automatic weapons to be registered and taxed, but not technically banned outright. The National Firearms Act of 1934 created a $200 tax, which was seen as prohibitive at the time, and covered machine guns, short-barreled rifles (SBR), short-barreled shotguns (SBS) as well as silencers.

Even today the tax remains at $200 to legally transfer a working Thompson and other automatic weapons. As for the price, an original working Thompson from the Second World War or earlier could cost $25,000 to $75,000 today — in line with a luxury automobile.

Peter Suciu is a Michigan-based writer who has contributed to more than four dozen magazines, newspapers and websites. He is the author of several books on military headgear including A Gallery of Military Headdress, which is available on Amazon.com.

This article appeared earlier this year and is being republished due to reader

interest.

Image: Wikimedia

More From The National Interest:

Russia Has Missing Nuclear Weapons Sitting on the Ocean Floor

How China Could Sink a U.S. Navy Aircraft Carrier

Where World War III Could Start This Year

---

**Source URL:** https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096

# "The Puckle Gun: Repeating Firepower in 1718"

The video "The Puckle Gun: Repeating Firepower in 1718," referenced in the Declaration of Robert Spitzer, Spitzer Decl. ¶ 19 n.52, is available at https://www.youtube.com/watch?v=GPC7KiYDshw.

# About Us - Uniform Law Commission

The Uniform Law Commission (ULC, also known as the National Conference of Commissioners on Uniform State Laws), established in 1892, provides states with non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law.

ULC members must be lawyers, qualified to practice law. They are practicing lawyers, judges, legislators and legislative staff and law professors, who have been appointed by state governments as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands to research, draft and promote enactment of uniform state laws in areas of state law where uniformity is desirable and practical.

- ULC strengthens the federal system by providing rules and procedures that are consistent from state to state but that also reflect the diverse experience of the states.
- ULC statutes are representative of state experience, because the organization is made up of representatives from each state, appointed by state government.
- ULC keeps state law up-to-date by addressing important and timely legal issues.
- ULC's efforts reduce the need for individuals and businesses to deal with different laws as they move and do business in different states.
- ULC's work facilitates economic development and provides a legal platform for foreign entities to deal with U.S. citizens and businesses.
- ULC Commissioners donate thousands of hours of their time and legal and drafting expertise every year as a public service, and receive no salary or compensation for their work.
- ULC's deliberative and uniquely open drafting process draws on the expertise of commissioners, but also utilizes input from legal experts, and advisors and observers representing the views of other legal organizations or interests that will be subject to the proposed laws.

ULC is a state-supported organization that represents true value for the states, providing services that most states could not otherwise afford or duplicate.

# Organization

The Uniform Law Commission (ULC) has worked for the uniformity of state laws since 1892. It is a non-profit unincorporated association, comprised of state commissions on uniform laws from each state, the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands. Each jurisdiction determines the method of appointment and the number of commissioners actually appointed. Most jurisdictions provide for their commission by statute.

There is only one fundamental requirement for the more than 300 uniform law commissioners: that they be members of the bar. While some commissioners serve

as state legislators, most are practitioners, judges, and law professors. They serve for specific terms, and receive no salaries or fees for their work with the ULC.

The state uniform law commissioners come together as the Uniform Law Commission for one purpose—to study and review the law of the states to determine which areas of law should be uniform. The commissioners promote the principle of uniformity by drafting and proposing specific statutes in areas of the law where uniformity between the states is desirable. It must be emphasized that the ULC can only propose—no uniform law is effective until a state legislature adopts it.

The ULC is a working organization. The uniform law commissioners participate in drafting specific acts; they discuss, consider, and amend drafts of other commissioners; they decide whether to recommend an act as a uniform or a model act; and they work toward enactment of ULC acts in their home jurisdictions.

U.S. Department of Commerce
U.S. Census Bureau

Change in Resident Population of the 50 States, the District of Columbia, and Puerto Rico: 1910 to 2020

| Area | 2020 Census Resident Population | 2020 Census Percent Change | 2010 Census Resident Population | 2010 Census Percent Change | 2000 Census Resident Population | 2000 Census Percent Change | 1990 Census Resident Population | 1990 Census Percent Change |
|---|---|---|---|---|---|---|---|---|
| Alabama | 5,024,279 | 5.1 | 4,779,736 | 7.5 | 4,447,100 | 10.1 | 4,040,587 | 3.8 |
| Alaska | 733,391 | 3.3 | 710,231 | 13.3 | 626,932 | 14.0 | 550,043 | 36.9 |
| Arizona | 7,151,502 | 11.9 | 6,392,017 | 24.6 | 5,130,632 | 40.0 | 3,665,228 | 34.8 |
| Arkansas | 3,011,524 | 3.3 | 2,915,918 | 9.1 | 2,673,400 | 13.7 | 2,350,725 | 2.8 |
| California | 39,538,223 | 6.1 | 37,253,956 | 10.0 | 33,871,648 | 13.8 | 29,760,021 | 25.7 |
| Colorado | 5,773,714 | 14.8 | 5,029,196 | 16.9 | 4,301,261 | 30.6 | 3,294,394 | 14.0 |
| Connecticut | 3,605,944 | 0.9 | 3,574,097 | 4.9 | 3,405,565 | 3.6 | 3,287,116 | 5.8 |
| Delaware | 989,948 | 10.2 | 897,934 | 14.6 | 783,600 | 17.6 | 666,168 | 12.1 |
| District of Columbia | 689,545 | 14.6 | 601,723 | 5.2 | 572,059 | -5.7 | 606,900 | -4.9 |
| Florida | 21,538,187 | 14.6 | 18,801,310 | 17.6 | 15,982,378 | 23.5 | 12,937,926 | 32.7 |
| Georgia | 10,711,908 | 10.6 | 9,687,653 | 18.3 | 8,186,453 | 26.4 | 6,478,216 | 18.6 |
| Hawaii | 1,455,271 | 7.0 | 1,360,301 | 12.3 | 1,211,537 | 9.3 | 1,108,229 | 14.9 |
| Idaho | 1,839,106 | 17.3 | 1,567,582 | 21.1 | 1,293,953 | 28.5 | 1,006,749 | 6.7 |
| Illinois | 12,812,508 | -0.1 | 12,830,632 | 3.3 | 12,419,293 | 8.6 | 11,430,602 | 0.0 |
| Indiana | 6,785,528 | 4.7 | 6,483,802 | 6.6 | 6,080,485 | 9.7 | 5,544,159 | 1.0 |
| Iowa | 3,190,369 | 4.7 | 3,046,355 | 4.1 | 2,926,324 | 5.4 | 2,776,755 | -4.7 |
| Kansas | 2,937,880 | 3.0 | 2,853,118 | 6.1 | 2,688,418 | 8.5 | 2,477,574 | 4.8 |
| Kentucky | 4,505,836 | 3.8 | 4,339,367 | 7.4 | 4,041,769 | 9.7 | 3,685,296 | 0.7 |
| Louisiana | 4,657,757 | 2.7 | 4,533,372 | 1.4 | 4,468,976 | 5.9 | 4,219,973 | 0.3 |
| Maine | 1,362,359 | 2.6 | 1,328,361 | 4.2 | 1,274,923 | 3.8 | 1,227,928 | 9.2 |
| Maryland | 6,177,224 | 7.0 | 5,773,552 | 9.0 | 5,296,486 | 10.8 | 4,781,468 | 13.4 |
| Massachusetts | 7,029,917 | 7.4 | 6,547,629 | 3.1 | 6,349,097 | 5.5 | 6,016,425 | 4.9 |
| Michigan | 10,077,331 | 2.0 | 9,883,640 | -0.6 | 9,938,444 | 6.9 | 9,295,297 | 0.4 |
| Minnesota | 5,706,494 | 7.6 | 5,303,925 | 7.8 | 4,919,479 | 12.4 | 4,375,099 | 7.3 |
| Mississippi | 2,961,279 | -0.2 | 2,967,297 | 4.3 | 2,844,658 | 10.5 | 2,573,216 | 2.1 |
| Missouri | 6,154,913 | 2.8 | 5,988,927 | 7.0 | 5,595,211 | 9.3 | 5,117,073 | 4.1 |
| Montana | 1,084,225 | 9.6 | 989,415 | 9.7 | 902,195 | 12.9 | 799,065 | 1.6 |
| Nebraska | 1,961,504 | 7.4 | 1,826,341 | 6.7 | 1,711,263 | 8.4 | 1,578,385 | 0.5 |
| Nevada | 3,104,614 | 15.0 | 2,700,551 | 35.1 | 1,998,257 | 66.3 | 1,201,833 | 50.1 |
| New Hampshire | 1,377,529 | 4.6 | 1,316,470 | 6.5 | 1,235,786 | 11.4 | 1,109,252 | 20.5 |
| New Jersey | 9,288,994 | 5.7 | 8,791,894 | 4.5 | 8,414,350 | 8.9 | 7,730,188 | 5.0 |
| New Mexico | 2,117,522 | 2.8 | 2,059,179 | 13.2 | 1,819,046 | 20.1 | 1,515,069 | 16.3 |
| New York | 20,201,249 | 4.2 | 19,378,102 | 2.1 | 18,976,457 | 5.5 | 17,990,455 | 2.5 |
| North Carolina | 10,439,388 | 9.5 | 9,535,483 | 18.5 | 8,049,313 | 21.4 | 6,628,637 | 12.7 |
| North Dakota | 779,094 | 15.8 | 672,591 | 4.7 | 642,200 | 0.5 | 638,800 | -2.1 |
| Ohio | 11,799,448 | 2.3 | 11,536,504 | 1.6 | 11,353,140 | 4.7 | 10,847,115 | 0.5 |
| Oklahoma | 3,959,353 | 5.5 | 3,751,351 | 8.7 | 3,450,654 | 9.7 | 3,145,585 | 4.0 |
| Oregon | 4,237,256 | 10.6 | 3,831,074 | 12.0 | 3,421,399 | 20.4 | 2,842,321 | 7.9 |
| Pennsylvania | 13,002,700 | 2.4 | 12,702,379 | 3.4 | 12,281,054 | 3.4 | 11,881,643 | 0.1 |
| Rhode Island | 1,097,379 | 4.3 | 1,052,567 | 0.4 | 1,048,319 | 4.5 | 1,003,464 | 5.9 |
| South Carolina | 5,118,425 | 10.7 | 4,625,364 | 15.3 | 4,012,012 | 15.1 | 3,486,703 | 11.7 |
| South Dakota | 886,667 | 8.9 | 814,180 | 7.9 | 754,844 | 8.5 | 696,004 | 0.8 |
| Tennessee | 6,910,840 | 8.9 | 6,346,105 | 11.5 | 5,689,283 | 16.7 | 4,877,185 | 6.2 |
| Texas | 29,145,505 | 15.9 | 25,145,561 | 20.6 | 20,851,820 | 22.8 | 16,986,510 | 19.4 |
| Utah | 3,271,616 | 18.4 | 2,763,885 | 23.8 | 2,233,169 | 29.6 | 1,722,850 | 17.9 |
| Vermont | 643,077 | 2.8 | 625,741 | 2.8 | 608,827 | 8.2 | 562,758 | 10.0 |
| Virginia | 8,631,393 | 7.9 | 8,001,024 | 13.0 | 7,078,515 | 14.4 | 6,187,358 | 15.7 |
| Washington | 7,705,281 | 14.6 | 6,724,540 | 14.1 | 5,894,121 | 21.1 | 4,866,692 | 17.8 |
| West Virginia | 1,793,716 | -3.2 | 1,852,994 | 2.5 | 1,808,344 | 0.8 | 1,793,477 | -8.0 |
| Wisconsin | 5,893,718 | 3.6 | 5,686,986 | 6.0 | 5,363,675 | 9.6 | 4,891,769 | 4.0 |
| Wyoming | 576,851 | 2.3 | 563,626 | 14.1 | 493,782 | 8.9 | 453,588 | -3.4 |
| United States[1] | 331,449,281 | 7.4 | 308,745,538 | 9.7 | 281,421,906 | 13.2 | 248,709,873 | 9.8 |
| Northeast Region | 57,609,148 | 4.1 | 55,317,240 | 3.2 | 53,594,378 | 5.5 | 50,809,229 | 3.4 |
| Midwest Region | 68,985,454 | 3.1 | 66,927,001 | 3.9 | 64,392,776 | 7.9 | 59,668,632 | 1.4 |
| South Region | 126,266,107 | 10.2 | 114,555,744 | 14.3 | 100,236,820 | 17.3 | 85,445,930 | 13.4 |
| West Region | 78,588,572 | 9.2 | 71,945,553 | 13.8 | 63,197,932 | 19.7 | 52,786,082 | 22.3 |
| Puerto Rico | 3,285,874 | -11.8 | 3,725,789 | -2.2 | 3,808,610 | 8.1 | 3,522,037 | 10.2 |

[1] Includes the resident population of the 50 states and the District of Columbia, as ascertained by the Decennial Census.

Compendium_Spitzer
Page 915

Change in Resident Population of the 50 States, the District of Columbia, and Puerto Rico: 1910 to 2020 (continued)

| Area | 1980 Census | | 1970 Census | | 1960 Census | | 1950 Census | |
|---|---|---|---|---|---|---|---|---|
| | Resident Population | Percent Change | Resident Population | Percent Change | Resident Population | Percent Change | Resident Population | Percent Change |
| Alabama | 3,893,888 | 13.1 | 3,444,165 | 5.4 | 3,266,740 | 6.7 | 3,061,743 | 8.1 |
| Alaska | 401,851 | 33.8 | 300,382 | 32.8 | 226,167 | 75.8 | 128,643 | 77.4 |
| Arizona | 2,718,215 | 53.5 | 1,770,900 | 36.0 | 1,302,161 | 73.7 | 749,587 | 50.1 |
| Arkansas | 2,286,435 | 18.9 | 1,923,295 | 7.7 | 1,786,272 | -6.5 | 1,909,511 | -2.0 |
| California | 23,667,902 | 18.6 | 19,953,134 | 27.0 | 15,717,204 | 48.5 | 10,586,223 | 53.3 |
| Colorado | 2,889,964 | 30.9 | 2,207,259 | 25.8 | 1,753,947 | 32.4 | 1,325,089 | 18.0 |
| Connecticut | 3,107,576 | 2.5 | 3,031,709 | 19.6 | 2,535,234 | 26.3 | 2,007,280 | 17.4 |
| Delaware | 594,338 | 8.4 | 548,104 | 22.8 | 446,292 | 40.3 | 318,085 | 19.4 |
| District of Columbia | 638,333 | -15.6 | 756,510 | -1.0 | 763,956 | -4.8 | 802,178 | 21.0 |
| Florida | 9,746,324 | 43.6 | 6,789,443 | 37.1 | 4,951,560 | 78.7 | 2,771,305 | 46.1 |
| Georgia | 5,463,105 | 19.0 | 4,589,575 | 16.4 | 3,943,116 | 14.5 | 3,444,578 | 10.3 |
| Hawaii | 964,691 | 25.5 | 768,561 | 21.5 | 632,772 | 26.6 | 499,794 | 18.1 |
| Idaho | 943,935 | 32.5 | 712,567 | 6.8 | 667,191 | 13.3 | 588,637 | 12.1 |
| Illinois | 11,426,518 | 2.8 | 11,113,976 | 10.2 | 10,081,158 | 15.7 | 8,712,176 | 10.3 |
| Indiana | 5,490,224 | 5.7 | 5,193,669 | 11.4 | 4,662,498 | 18.5 | 3,934,224 | 14.8 |
| Iowa | 2,913,808 | 3.2 | 2,824,376 | 2.4 | 2,757,537 | 5.2 | 2,621,073 | 3.3 |
| Kansas | 2,363,679 | 5.2 | 2,246,578 | 3.1 | 2,178,611 | 14.3 | 1,905,299 | 5.8 |
| Kentucky | 3,660,777 | 13.7 | 3,218,706 | 5.9 | 3,038,156 | 3.2 | 2,944,806 | 3.5 |
| Louisiana | 4,205,900 | 15.5 | 3,641,306 | 11.8 | 3,257,022 | 21.4 | 2,683,516 | 13.5 |
| Maine | 1,124,660 | 13.4 | 992,048 | 2.4 | 969,265 | 6.1 | 913,774 | 7.9 |
| Maryland | 4,216,975 | 7.5 | 3,922,399 | 26.5 | 3,100,689 | 32.3 | 2,343,001 | 28.6 |
| Massachusetts | 5,737,037 | 0.8 | 5,689,170 | 10.5 | 5,148,578 | 9.8 | 4,690,514 | 8.7 |
| Michigan | 9,262,078 | 4.4 | 8,875,083 | 13.4 | 7,823,194 | 22.8 | 6,371,766 | 21.2 |
| Minnesota | 4,075,970 | 7.1 | 3,804,971 | 11.5 | 3,413,864 | 14.5 | 2,982,483 | 6.8 |
| Mississippi | 2,520,638 | 13.7 | 2,216,912 | 1.8 | 2,178,141 | -0.0 | 2,178,914 | -0.2 |
| Missouri | 4,916,686 | 5.1 | 4,676,501 | 8.3 | 4,319,813 | 9.2 | 3,954,653 | 4.5 |
| Montana | 786,690 | 13.3 | 694,409 | 2.9 | 674,767 | 14.2 | 591,024 | 5.6 |
| Nebraska | 1,569,825 | 5.8 | 1,483,493 | 5.1 | 1,411,330 | 6.5 | 1,325,510 | 0.7 |
| Nevada | 800,493 | 63.8 | 488,738 | 71.3 | 285,278 | 78.2 | 160,083 | 45.2 |
| New Hampshire | 920,610 | 24.8 | 737,681 | 21.5 | 606,921 | 13.8 | 533,242 | 8.5 |
| New Jersey | 7,364,823 | 2.7 | 7,168,164 | 18.2 | 6,066,782 | 25.5 | 4,835,329 | 16.2 |
| New Mexico | 1,302,894 | 28.2 | 1,016,000 | 6.8 | 951,023 | 39.6 | 681,187 | 28.1 |
| New York | 17,558,072 | -3.7 | 18,236,967 | 8.7 | 16,782,304 | 13.2 | 14,830,192 | 10.0 |
| North Carolina | 5,881,766 | 15.7 | 5,082,059 | 11.5 | 4,556,155 | 12.2 | 4,061,929 | 13.7 |
| North Dakota | 652,717 | 5.7 | 617,761 | -2.3 | 632,446 | 2.1 | 619,636 | -3.5 |
| Ohio | 10,797,630 | 1.4 | 10,652,017 | 9.7 | 9,706,397 | 22.1 | 7,946,627 | 15.0 |
| Oklahoma | 3,025,290 | 18.2 | 2,559,229 | 9.9 | 2,328,284 | 4.3 | 2,233,351 | -4.4 |
| Oregon | 2,633,105 | 25.9 | 2,091,385 | 18.2 | 1,768,687 | 16.3 | 1,521,341 | 39.6 |
| Pennsylvania | 11,863,895 | 0.6 | 11,793,909 | 4.2 | 11,319,366 | 7.8 | 10,498,012 | 6.0 |
| Rhode Island | 947,154 | 0.0 | 946,725 | 10.1 | 859,488 | 8.5 | 791,896 | 11.0 |
| South Carolina | 3,121,820 | 20.5 | 2,590,516 | 8.7 | 2,382,594 | 12.5 | 2,117,027 | 11.4 |
| South Dakota | 690,768 | 3.8 | 665,507 | -2.2 | 680,514 | 4.3 | 652,740 | 1.5 |
| Tennessee | 4,591,120 | 17.0 | 3,923,687 | 10.0 | 3,567,089 | 8.4 | 3,291,718 | 12.9 |
| Texas | 14,229,191 | 27.1 | 11,196,730 | 16.9 | 9,579,677 | 24.2 | 7,711,194 | 20.2 |
| Utah | 1,461,037 | 37.9 | 1,059,273 | 18.9 | 890,627 | 29.3 | 688,862 | 25.2 |
| Vermont | 511,456 | 15.1 | 444,330 | 14.0 | 389,881 | 3.2 | 377,747 | 5.2 |
| Virginia | 5,346,818 | 15.0 | 4,648,494 | 17.2 | 3,966,949 | 19.5 | 3,318,680 | 23.9 |
| Washington | 4,132,156 | 21.2 | 3,409,169 | 19.5 | 2,853,214 | 19.9 | 2,378,963 | 37.0 |
| West Virginia | 1,949,644 | 11.8 | 1,744,237 | -6.2 | 1,860,421 | -7.2 | 2,005,552 | 5.4 |
| Wisconsin | 4,705,767 | 6.5 | 4,417,731 | 11.8 | 3,951,777 | 15.1 | 3,434,575 | 9.5 |
| Wyoming | 469,557 | 41.3 | 332,416 | 0.7 | 330,066 | 13.6 | 290,529 | 15.9 |
| United States | 226,545,805 | 11.5 | 203,211,926 | 13.3 | 179,323,175 | 18.5 | 151,325,798 | 14.5 |
| Northeast Region | 49,135,283 | 0.2 | 49,040,703 | 9.8 | 44,677,819 | 13.2 | 39,477,986 | 9.7 |
| Midwest Region | 58,865,670 | 4.1 | 56,571,663 | 9.6 | 51,619,139 | 16.1 | 44,460,762 | 10.8 |
| South Region | 75,372,362 | 20.0 | 62,795,367 | 14.2 | 54,973,113 | 16.5 | 47,197,088 | 13.3 |
| West Region | 43,172,490 | 24.0 | 34,804,193 | 24.1 | 28,053,104 | 38.9 | 20,189,962 | 40.4 |
| Puerto Rico | 3,196,520 | 17.9 | 2,712,033 | 15.4 | 2,349,544 | 6.3 | 2,210,703 | 18.3 |

Change in Resident Population of the 50 States, the District of Columbia, and Puerto Rico: 1910 to 2020 (continued)

| Area | 1940 Census Resident Population | Percent Change | 1930 Census Resident Population | Percent Change | 1920 Census Resident Population | Percent Change | 1910 Census Resident Population | Percent Change |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2,832,961 | 7.1 | 2,646,248 | 12.7 | 2,348,174 | 9.8 | 2,138,093 | 16.9 |
| Alaska | 72,524 | 22.3 | 59,278 | 7.7 | 55,036 | -14.5 | 64,356 | 1.2 |
| Arizona | 499,261 | 14.6 | 435,573 | 30.3 | 334,162 | 63.5 | 204,354 | 66.2 |
| Arkansas | 1,949,387 | 5.1 | 1,854,482 | 5.8 | 1,752,204 | 11.3 | 1,574,449 | 20.0 |
| California | 6,907,387 | 21.7 | 5,677,251 | 65.7 | 3,426,861 | 44.1 | 2,377,549 | 60.1 |
| Colorado | 1,123,296 | 8.4 | 1,035,791 | 10.2 | 939,629 | 17.6 | 799,024 | 48.0 |
| Connecticut | 1,709,242 | 6.4 | 1,606,903 | 16.4 | 1,380,631 | 23.9 | 1,114,756 | 22.7 |
| Delaware | 266,505 | 11.8 | 238,380 | 6.9 | 223,003 | 10.2 | 202,322 | 9.5 |
| District of Columbia | 663,091 | 36.2 | 486,869 | 11.3 | 437,571 | 32.2 | 331,069 | 18.8 |
| Florida | 1,897,414 | 29.2 | 1,468,211 | 51.6 | 968,470 | 28.7 | 752,619 | 42.4 |
| Georgia | 3,123,723 | 7.4 | 2,908,506 | 0.4 | 2,895,832 | 11.0 | 2,609,121 | 17.7 |
| Hawaii | 423,330 | 14.9 | 368,336 | 43.9 | 255,912 | 33.4 | 191,909 | 24.6 |
| Idaho | 524,873 | 17.9 | 445,032 | 3.0 | 431,866 | 32.6 | 325,594 | 101.3 |
| Illinois | 7,897,241 | 3.5 | 7,630,654 | 17.7 | 6,485,280 | 15.0 | 5,638,591 | 16.9 |
| Indiana | 3,427,796 | 5.8 | 3,238,503 | 10.5 | 2,930,390 | 8.5 | 2,700,876 | 7.3 |
| Iowa | 2,538,268 | 2.7 | 2,470,939 | 2.8 | 2,404,021 | 8.1 | 2,224,771 | -0.3 |
| Kansas | 1,801,028 | -4.3 | 1,880,999 | 6.3 | 1,769,257 | 4.6 | 1,690,949 | 15.0 |
| Kentucky | 2,845,627 | 8.8 | 2,614,589 | 8.2 | 2,416,630 | 5.5 | 2,289,905 | 6.6 |
| Louisiana | 2,363,880 | 12.5 | 2,101,593 | 16.9 | 1,798,509 | 8.6 | 1,656,388 | 19.9 |
| Maine | 847,226 | 6.2 | 797,423 | 3.8 | 768,014 | 3.5 | 742,371 | 6.9 |
| Maryland | 1,821,244 | 11.6 | 1,631,526 | 12.5 | 1,449,661 | 11.9 | 1,295,346 | 9.0 |
| Massachusetts | 4,316,721 | 1.6 | 4,249,614 | 10.3 | 3,852,356 | 14.4 | 3,366,416 | 20.0 |
| Michigan | 5,256,106 | 8.5 | 4,842,325 | 32.0 | 3,668,412 | 30.5 | 2,810,173 | 16.1 |
| Minnesota | 2,792,300 | 8.9 | 2,563,953 | 7.4 | 2,387,125 | 15.0 | 2,075,708 | 18.5 |
| Mississippi | 2,183,796 | 8.7 | 2,009,821 | 12.2 | 1,790,618 | -0.4 | 1,797,114 | 15.8 |
| Missouri | 3,784,664 | 4.3 | 3,629,367 | 6.6 | 3,404,055 | 3.4 | 3,293,335 | 6.0 |
| Montana | 559,456 | 4.1 | 537,606 | -2.1 | 548,889 | 46.0 | 376,053 | 54.5 |
| Nebraska | 1,315,834 | -4.5 | 1,377,963 | 6.3 | 1,296,372 | 8.7 | 1,192,214 | 11.8 |
| Nevada | 110,247 | 21.1 | 91,058 | 17.6 | 77,407 | -5.5 | 81,875 | 93.4 |
| New Hampshire | 491,524 | 5.6 | 465,293 | 5.0 | 443,083 | 2.9 | 430,572 | 4.6 |
| New Jersey | 4,160,165 | 2.9 | 4,041,334 | 28.1 | 3,155,900 | 24.4 | 2,537,167 | 34.7 |
| New Mexico | 531,818 | 25.6 | 423,317 | 17.5 | 360,350 | 10.1 | 327,301 | 67.6 |
| New York | 13,479,142 | 7.1 | 12,588,066 | 21.2 | 10,385,227 | 14.0 | 9,113,614 | 25.4 |
| North Carolina | 3,571,623 | 12.7 | 3,170,276 | 23.9 | 2,559,123 | 16.0 | 2,206,287 | 16.5 |
| North Dakota | 641,935 | -5.7 | 680,845 | 5.3 | 646,872 | 12.1 | 577,056 | 80.8 |
| Ohio | 6,907,612 | 3.9 | 6,646,697 | 15.4 | 5,759,394 | 20.8 | 4,767,121 | 14.7 |
| Oklahoma | 2,336,434 | -2.5 | 2,396,040 | 18.1 | 2,028,283 | 22.4 | 1,657,155 | 109.7 |
| Oregon | 1,089,684 | 14.2 | 953,786 | 21.8 | 783,389 | 16.4 | 672,765 | 62.7 |
| Pennsylvania | 9,900,180 | 2.8 | 9,631,350 | 10.5 | 8,720,017 | 13.8 | 7,665,111 | 21.6 |
| Rhode Island | 713,346 | 3.8 | 687,497 | 13.7 | 604,397 | 11.4 | 542,610 | 26.6 |
| South Carolina | 1,899,804 | 9.3 | 1,738,765 | 3.3 | 1,683,724 | 11.1 | 1,515,400 | 13.1 |
| South Dakota | 642,961 | -7.2 | 692,849 | 8.8 | 636,547 | 9.0 | 583,888 | 45.4 |
| Tennessee | 2,915,841 | 11.4 | 2,616,556 | 11.9 | 2,337,885 | 7.0 | 2,184,789 | 8.1 |
| Texas | 6,414,824 | 10.1 | 5,824,715 | 24.9 | 4,663,228 | 19.7 | 3,896,542 | 27.8 |
| Utah | 550,310 | 8.4 | 507,847 | 13.0 | 449,396 | 20.4 | 373,351 | 34.9 |
| Vermont | 359,231 | -0.1 | 359,611 | 2.0 | 352,428 | -1.0 | 355,956 | 3.6 |
| Virginia | 2,677,773 | 10.6 | 2,421,851 | 4.9 | 2,309,187 | 12.0 | 2,061,612 | 11.2 |
| Washington | 1,736,191 | 11.1 | 1,563,396 | 15.2 | 1,356,621 | 18.8 | 1,141,990 | 120.4 |
| West Virginia | 1,901,974 | 10.0 | 1,729,205 | 18.1 | 1,463,701 | 19.9 | 1,221,119 | 27.4 |
| Wisconsin | 3,137,587 | 6.8 | 2,939,006 | 11.7 | 2,632,067 | 12.8 | 2,333,860 | 12.8 |
| Wyoming | 250,742 | 11.2 | 225,565 | 16.0 | 194,402 | 33.2 | 145,965 | 57.7 |
| United States | 132,165,129 | 7.3 | 123,202,660 | 16.2 | 106,021,568 | 15.0 | 92,228,531 | 21.0 |
| Northeast Region | 35,976,777 | 4.5 | 34,427,091 | 16.1 | 29,662,053 | 14.7 | 25,868,573 | 22.9 |
| Midwest Region | 40,143,332 | 4.0 | 38,594,100 | 13.4 | 34,019,792 | 13.8 | 29,888,542 | 13.5 |
| South Region | 41,665,901 | 10.1 | 37,857,633 | 14.3 | 33,125,803 | 12.7 | 29,389,330 | 19.8 |
| West Region | 14,379,119 | 16.7 | 12,323,836 | 33.8 | 9,213,920 | 30.1 | 7,082,086 | 64.4 |
| Puerto Rico | 1,869,255 | 21.1 | 1,543,913 | 18.8 | 1,299,809 | 16.3 | 1,118,012 | 17.3 |

| Annual Estimates of the Resident Population for the United States, Reg District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2021 | | |
|---|---|---|
| Geographic Area | April 1, 2020 Estimates Base | Population (as of 2020 |
| United States | 331,449,281 | 331,501,080 |
| Northeast | 57,609,148 | 57,525,633 |
| Midwest | 68,985,454 | 68,935,174 |
| South | 126,266,107 | 126,409,007 |
| West | 78,588,572 | 78,631,266 |
| Alabama | 5,024,279 | 5,024,803 |
| Alaska | 733,391 | 732,441 |
| Arizona | 7,151,502 | 7,177,986 |
| Arkansas | 3,011,524 | 3,012,232 |
| California | 39,538,223 | 39,499,738 |
| Colorado | 5,773,714 | 5,784,308 |
| Connecticut | 3,605,944 | 3,600,260 |
| Delaware | 989,948 | 991,886 |
| District of Columbia | 689,545 | 690,093 |
| Florida | 21,538,187 | 21,569,932 |
| Georgia | 10,711,908 | 10,725,800 |
| Hawaii | 1,455,271 | 1,451,911 |
| Idaho | 1,839,106 | 1,847,772 |
| Illinois | 12,812,508 | 12,785,245 |
| Indiana | 6,785,528 | 6,785,644 |
| Iowa | 3,190,369 | 3,188,669 |
| Kansas | 2,937,880 | 2,935,880 |
| Kentucky | 4,505,836 | 4,503,958 |
| Louisiana | 4,657,757 | 4,651,203 |
| Maine | 1,362,359 | 1,362,280 |
| Maryland | 6,177,224 | 6,172,679 |
| Massachusetts | 7,029,917 | 7,022,220 |
| Michigan | 10,077,331 | 10,067,664 |
| Minnesota | 5,706,494 | 5,707,165 |
| Mississippi | 2,961,279 | 2,956,870 |
| Missouri | 6,154,913 | 6,154,481 |
| Montana | 1,084,225 | 1,086,193 |
| Nebraska | 1,961,504 | 1,961,455 |
| Nevada | 3,104,614 | 3,114,071 |
| New Hampshire | 1,377,529 | 1,377,848 |
| New Jersey | 9,288,994 | 9,279,743 |

Annual Estimates of the Resident Population for the United States, Reg
District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2021

| Geographic Area | April 1, 2020 Estimates Base | Population (as of 2020 |
|---|---|---|
| New Mexico | 2,117,522 | 2,117,566 |
| New York | 20,201,249 | 20,154,933 |
| North Carolina | 10,439,388 | 10,457,177 |
| North Dakota | 779,094 | 778,962 |
| Ohio | 11,799,448 | 11,790,587 |
| Oklahoma | 3,959,353 | 3,962,031 |
| Oregon | 4,237,256 | 4,241,544 |
| Pennsylvania | 13,002,700 | 12,989,625 |
| Rhode Island | 1,097,379 | 1,096,229 |
| South Carolina | 5,118,425 | 5,130,729 |
| South Dakota | 886,667 | 887,099 |
| Tennessee | 6,910,840 | 6,920,119 |
| Texas | 29,145,505 | 29,217,653 |
| Utah | 3,271,616 | 3,281,684 |
| Vermont | 643,077 | 642,495 |
| Virginia | 8,631,393 | 8,632,044 |
| Washington | 7,705,281 | 7,718,785 |
| West Virginia | 1,793,716 | 1,789,798 |
| Wisconsin | 5,893,718 | 5,892,323 |
| Wyoming | 576,851 | 577,267 |
| | | |
| Puerto Rico | 3,285,874 | 3,281,538 |

Note: The estimates are developed from a base that incorporates the 2020 Census, Vintage 202(
Demographic Analysis estimates.  For population estimates methodology statements, see
http://www.census.gov/programs-surveys/popest/technical-documentation/methodology.html. Se
and Definitions at http://www.census.gov/programs-surveys/popest/guidance/terms-
a list of the states that are included in each region. The estimates feature geographic boundaries
estimates series; the geographic boundaries for these 2021 population estimates are as of Janua

Suggested Citation:
Annual Estimates of the Resident Population for the United States, Regions, States, Distri
Puerto Rico: April 1, 2020 to July 1, 2021 (NST-EST2021-POP)
Source: U.S. Census Bureau, Population Division
Release Date: December 2021

| Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia, and Puerto Rico | |
| Geographic Area | Estimate (as of July 1) |
| | 2021 |
| United States | 331,893,745 |
| Northeast | 57,159,838 |
| Midwest | 68,841,444 |
| South | 127,225,329 |
| West | 78,667,134 |
| Alabama | 5,039,877 |
| Alaska | 732,673 |
| Arizona | 7,276,316 |
| Arkansas | 3,025,891 |
| California | 39,237,836 |
| Colorado | 5,812,069 |
| Connecticut | 3,605,597 |
| Delaware | 1,003,384 |
| District of Columbia | 670,050 |
| Florida | 21,781,128 |
| Georgia | 10,799,566 |
| Hawaii | 1,441,553 |
| Idaho | 1,900,923 |
| Illinois | 12,671,469 |
| Indiana | 6,805,985 |
| Iowa | 3,193,079 |
| Kansas | 2,934,582 |
| Kentucky | 4,509,394 |
| Louisiana | 4,624,047 |
| Maine | 1,372,247 |
| Maryland | 6,165,129 |
| Massachusetts | 6,984,723 |
| Michigan | 10,050,811 |
| Minnesota | 5,707,390 |
| Mississippi | 2,949,965 |
| Missouri | 6,168,187 |
| Montana | 1,104,271 |
| Nebraska | 1,963,692 |
| Nevada | 3,143,991 |
| New Hampshire | 1,388,992 |
| New Jersey | 9,267,130 |

| Annual Estimates of the Resident ֖ions, States, District of Columbia, and Puerto F | |
| --- | --- |
| Geographic Area | ֵ Estimate ֵ July 1) |
| | 2021 |
| New Mexico | 2,115,877 |
| New York | 19,835,913 |
| North Carolina | 10,551,162 |
| North Dakota | 774,948 |
| Ohio | 11,780,017 |
| Oklahoma | 3,986,639 |
| Oregon | 4,246,155 |
| Pennsylvania | 12,964,056 |
| Rhode Island | 1,095,610 |
| South Carolina | 5,190,705 |
| South Dakota | 895,376 |
| Tennessee | 6,975,218 |
| Texas | 29,527,941 |
| Utah | 3,337,975 |
| Vermont | 645,570 |
| Virginia | 8,642,274 |
| Washington | 7,738,692 |
| West Virginia | 1,782,959 |
| Wisconsin | 5,895,908 |
| Wyoming | 578,803 |
| Puerto Rico | 3,263,584 |

Note: The estimates are developed from a ba0 estimates, and 2020 Demographic Analysis estimates.  For populat http://www.census.gov/programs-surveys/pope Geographic Terms and Definitions at http://www.census.gov/progrand-definitions.html for a list of the states that are included in each reçfrom the Vintage 2020 estimates series; the geographic boundaries fary 1, 2020.

**Suggested Citation:**

**Annual Estimates of the Resident Populatict of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2021 (N**

**Source: U.S. Census Bureau, Population D**

**Release Date: December 2021**

 SINCE 1828

# billy club *noun*

 Save Word

### Definition of *billy club*

**:** a heavy usually wooden club

*specifically* **:** a police officer's club

↓ **Synonyms**

↓ **Example Sentences**

↓ **Learn More About** *billy club*

### Synonyms for *billy club*

**Synonyms**

bastinado (*or* bastinade), bat, baton, billy, bludgeon, cane, club, cudgel, nightstick, rod, rung [*Scottish*], sap, shillelagh (*also* shillalah), staff, truncheon, waddy [*Australian*]

**Visit the Thesaurus for More** ⓘ

### Examples of *billy club* in a Sentence

// rapping the shoes of the sleeping vagrant with his *billy club*, the officer told him to move on

**Recent Examples on the Web**

 SINCE 1828

— Greg Moran, *San Diego Union-Tribune*, 24 Feb. 2022

**//** My weapon was a *billy club*—a ball of lead wrapped in leather with a nine-inch stem and a loop handle.
— John Mcphee, *The New Yorker*, 31 Jan. 2022

**//** Dallas County Sheriff Jim Clark had prodded her in the neck with a *billy club* and ordered her to vacate the premises.
— *Washington Post*, 11 May 2021

**//** In the 2008 presidential election, Roman made a splash by promoting a video of two members of the New Black Panther Party standing outside a polling place in Philadelphia, one of them holding a *billy club*.
— Michael Biesecker And Garance Burke, *Star Tribune*, 2 Nov. 2020

**//** Lewis, a civil-rights pioneer, preached nonviolence even after a state trooper cracked his skull with a *billy club* as Lewis and other protesters were crossing a bridge in Selma, Ala., in 1965.
— *Arkansas Online*, 18 Oct. 2020

**//** As the police, beating *billy clubs* on their shields, got closer, Wallace urged the protesters to not run even as police hit some of them with pepper spray and pulled many to the ground before zip-tying their wrists to make arrests.
— Kristen Jordan Shamus, *Freep.com*, 4 June 2020

**//** The story of voter suppression today is no longer the stuff of *billy clubs* and hoses that Ms. Abrams heard about as a child.
— Elaina Plott, *New York Times*, 16 May 2020

**//** Testimony at the inquest revealed that on the day of his murder, Sturgus had left his *billy club*, handcuffs, money and identification at home.
— David Reamer, *Anchorage Daily News*, 13 Jan. 2020

**See Less** ^

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'billy club.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

## First Known Use of *billy club*

1885, in the meaning defined above



Learn more

## History and Etymology for *billy club*

BILLY entry 2

# Learn More About *billy club*

### Share *billy club*

 

### Time Traveler for *billy club*

 SINCE 1828

**Dictionary Entries Near *billy club***

billyboy

**billy club**

billycock

**See More Nearby Entries**

**Statistics for *billy club***

**Look-up Popularity**

Top 9% of words

**Cite this Entry**

"Billy club." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/billy%20club. Accessed 18 Oct. 2022.

**Style:** MLA

# More Definitions for *billy club*

# billy club  noun

**Kids Definition of *billy club***

**:** a heavy wooden club

*especially* **:** NIGHTSTICK



WORD OF THE DAY

bespoke

See Definitions and Examples »

 SINCE 1828

# bludgeon  noun

◻ Save Word

blud·geon  |  \ ˈblə-jən ◀) \

**Definition of _bludgeon_ (Entry 1 of 2)**

**1**  : a short stick that usually has one thick or loaded end and is used as a weapon

**2**  : something used to attack or bully
// the _bludgeon_ of satire

# bludgeon  verb

**bludgeoned**; **bludgeoning**; **bludgeons**

**Definition of _bludgeon_ (Entry 2 of 2)**

_transitive verb_

**1**  : to hit with heavy impact
// was _bludgeoned_ to death

**2**  : to attack or overcome by aggressive argument : BULLY
// mental _bludgeoning_
// We do not talk—we _bludgeon_ one another with facts and theories ...
— Henry Miller

⬇ **Synonyms**

⬇ **More Example Sentences**

⬇ **Learn More About _bludgeon_**

## Synonyms for _bludgeon_

**Synonyms: Noun**

bastinado (or bastinade), bat, baton, billy, billy club, cane, club, cudgel, nightstick, rod, rung [_Scottish_], sap, shillelagh (also shillalah), staff, truncheon, waddy [_Australian_]

**Synonyms: Verb**

bang, bash, bat, belt, biff, bob, bonk, bop, box, bust, clap, clip, clobber, clock, clout, crack, hammer, hit, knock, nail, paste, pound, punch, rap, slam, slap, slog, slug, smack, smite, sock,

 SINCE 1828

**Visit the Thesaurus for More**

## Examples of *bludgeon* in a Sentence

**Noun**

// guards armed with *bludgeons* roamed the compound

**Verb**

// remodelers *bludgeoned* the wall with a sledgehammer to join the two rooms

// the boxer *bludgeons* opponents with an assortment of punches

**Recent Examples on the Web: Noun**

// In the process, USC has become a punching bag, a *bludgeon* and a running thread in an increasingly acrimonious mayoral race.
— Matt Hamilton, *Los Angeles Times*, 11 Sep. 2022

// The bill's main tool, its proverbial *bludgeon*, is a new set of tax credits that could remake the way that America generates electricity.
— Robinson Meyer, *The Atlantic*, 28 July 2022

// Its leading office holders have demonstrated that the party will take a stand on principle even when doing so harms one of its most prominent members (and not only when the gesture can be used as a *bludgeon* against the other guys).
— Damon Linker, *The Week*, 6 Aug. 2021

**See More** ⌄

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'bludgeon.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

## First Known Use of *bludgeon*

**Noun**

1730, in the meaning defined at sense 1

**Verb**

1777, in the meaning defined at sense 1

 SINCE 1828

**Noun**

origin unknown

**Verb**

verbal derivative of [BLUDGEON entry 1](#)

## Learn More About *bludgeon*

**Share *bludgeon***

  

**Time Traveler for *bludgeon***

 **The first known use of *bludgeon* was in 1730**

[See more words from the same year](#)

**Dictionary Entries Near *bludgeon***

[bludge](#)

**bludgeon**

[blue](#)

**See More Nearby Entries**

**Statistics for *bludgeon***

**Last Updated**

17 Sep 2022

**Look-up Popularity**

Top 3% of words

**Cite this Entry**

"Bludgeon." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/bludgeon. Accessed 18 Oct. 2022.

**Style:** MLA

## More Definitions for *bludgeon*

# bludgeon  noun

blud·geon   |   \ ˈbləj-ən 🔊 \

**Kids Definition of *bludgeon* (Entry 1 of 2)**

**:** a short club with one end thicker and heavier than the other



 SINCE 1828

**Kids Definition of** *bludgeon* **(Entry 2 of 2)**

**:** to hit very hard **:** BEAT

**More from Merriam-Webster on** *bludgeon*

Nglish: Translation of *bludgeon* for Spanish Speakers



**WORD OF THE DAY**

**bespoke** 🔊

See Definitions and Examples »

Get Word of the Day daily email!

Your email address     SUBSCRIBE



**TEST YOUR VOCABULARY**

**Commonly Confused Words Quiz**

I went to the _____ store to buy a birthday card.

stationery     stationary

Can you spell these 10 commonly misspelled words?

TAKE THE QUIZ



ADVERTISEMENT


FANDOM




GAMES


ANIME


MOVIES


TV


VIDEO


WIKIS


START A WIKI

**Military**

 EXPLORE ▾    POPULAR PAGES ▾    PROJECT MAINTENANCE ▾

314,080 PAGES

in: Articles incorporating text from Wikipedia, Melee weapons, Flail weapons

# Slungshot

↻ ¹    🔒 VIEW SOURCE    ⋮

🔇 Play Sound

*Not to be confused with* slingshot.

A **slungshot** is a maritime tool consisting of a weight, or "shot," affixed to the end of a long cord often by being wound into the center of a knot called a "Monkey's fist." It is used to cast line from one location to another, often mooring line. The cord end is tied to the heavier line and the weighted end of the slungshot is thrown across the intervening space where a person picks it up and pulls the line across.


Analog of slungshot.

### ☰ Contents

1. As a weapon
2. Other names
3. Worldwide
4. References

## As a weapon

The slungshot was often used as a civilian or improvised weapon; however, the rope length became much shorter when used as a weapon. The cord is tied around the wrist, and the weight is carried in the hand or the pocket of the user. A slungshot may be swung in a manner similar to that of a flail.


Military Wiki    EXPLORE    POPULAR PAGES    PROJECT MAINTENANCE

ADVERTISEMENT

jurisdictions. The use as a criminal weapon continued at least up until the early 1920s.[1]

Carrying or attempting to use a Slungshot is a felony in the states of California,[2] Oklahoma,[3] and Michigan.[4] It is a gross misdemeanor in the State of Nevada and Washington State.[5] In Massachusetts it can be either a misdemeanor or a felony depending upon the circumstances.[6]

## Other names

They were also known as "slingshots," but had nothing to do with what is now known as a slingshot. Many jurisdictions' laws against "slingshots" were actually meant to refer to slungshots.

## Worldwide

They were also used in China and Japan, under different names. One variant was called "loaded sleeves," where a pair of long, flowing sleeves had weights concealed in them. According to Robert van Gulik, the reputation of "loaded sleeves" saved some Western nuns during an anti-Western uprising in China, when the nuns were cornered by a mob. As the nuns believed they were going to be killed, they raised their hands to pray. The crowd reacted believing them to have *Loaded Sleeves*. The Chinese had seen their breviaries, which they carried in the sleeves of their robes, believing the nuns to be dangerous. A path opened through the crowd, and the nuns escaped.

## References

1. "Egg Dealer Holdup" (http://query.nytimes.com/mem/archive-free/pdf?res=FB0913FB3B5810738DDDAA0A94D1405B818EF1D3). New York. September 23, 1921. http://query.nytimes.com/mem/archive-free/pdf?res=FB0913FB3B5810738DDDAA0A94D1405B818EF1D3.
2. California Penal Code section 12020, subdivision (a)(1)
3. 21 O.S. § 1282 (2012)
4. MCL 750.224
5. Nevada Revised Statutes 202.350
6. http://www.malegislature.gov/Laws/GeneralLaws/PartIV/TitleI/Chapter269/Section10

- Stone, George Cameron. *A Glossary of the Construction, Decoration and Use of Arms and Armor*, Jack Brussel, New York, N.Y., 1961, pg. 568.

- Van Gulik, Robert: *The Red Pavilion*, Charles Scribner's Sons, New York, N.Y., 1961. (Discussion of the use of weights on chains in story text)

- Van Gulik, Robert: *The Willow Pattern*, Charles Scribner's Sons, New York, N.Y., 1965. Loaded sleeves are explained in the afterword.

This page uses Creative Commons Licensed content from Wikipedia (view authors) (http://en.wikipedia.org/w/index.php?title=Slungshot&action=history).

FANDOM


GAMES


ANIME


MOVIES


TV


VIDEO


WIKIS


START A WIKI

Military Wiki    EXPLORE    POPULAR PAGES    PROJECT MAINTENANCE