ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
| **v.** | |
| | **VOLUME 1 OF 37** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:      5A |
| | Judge:           Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

1

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

1

2  McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

14  Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

18

19

20

21

22

23

24

25

26

27

28

9

# HISTORICAL STATUTES

*chattels stolen, etc., of less value than thirty-five dollars, etc.*

or chattels of less value than thirty-five dollars, that shall have been stolen or taken by robbers, knowing the same to be stolen or taken by robbers, with intent to defraud the owner, every person so offending shall, on conviction thereof, be fined in any sum not exceeding two hundred dollars, and be imprisoned in the cell or dungeon of the jail of the county, and be fed on bread and water only, for a term not exceeding thirty days, at the discretion of the court.

*Curwen's R. S., 181. Curwen's Laws, 361.*

An Act supplementary to an act providing for the punishment of crimes, passed March 7, 1835.

*[Passed April 4, and took effect May 1, 1859. 56 vol. Stat. 158.]*

*Seduction under promise of marriage, etc.;*

(210.) SEC. I. *Be it enacted by the General Assembly of the State of Ohio*, That any person over the age of eighteen years, who, under promise of marriage, shall have illicit carnal intercourse with any female of good repute for chastity, under the age of eighteen years, shall be deemed guilty of seduction, and upon conviction, shall be imprisoned in the penitentiary for not less than one, nor more than three years, or be imprisoned in the county jail not exceeding six months; but in such

*—Evidence required.*

case the evidence of the female must be corroborated to the extent required as to the principal witness in cases of perjury.

An Act to prohibit the carrying or wearing of concealed weapons.

*[Passed March 18, and took effect April 1, 1859. 56 vol. Stat. 56.]*

*The offense of carrying or wearing concealed weapons.*

(211.) SEC. I. *Be it enacted by the General Assembly of the State of Ohio*, That whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on

*Penalty.*

conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

*When the jury shall acquit the accused.*

(212.) SEC. II. If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon on weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

SEC. III. This act to take effect and be in force from and after the first day of April next.

An Act to protect literary societies.

*[Passed and took effect April 2, 1859. 56 vol. Stat. 113.]*

*Punishment for disturbing school or literary society.*

(213.) SEC. I. *Be it enacted by the General Assembly of the State of Ohio*, That if any person or persons shall hereafter willfully disturb, molest or interrupt any literary society, or any school or society formed for the intellectual improvement of its members, such person or persons so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not less than five nor more than twenty dollars, with costs of prosecution, and shall stand committed until such fine shall have been paid: Provided, such commitment shall not exceed five days; and provided, further, that the judgment for costs shall not be abated until such costs shall have been fully paid.

(214.) SEC. II.  That it shall be the duty of any judge of probate, *Prosecution*
justice of the peace, or mayor of any city, town, or incorporated vil- *therefor;*
lage in this state, upon information by affidavit, to issue his warrant,
causing the body of the accused forthwith to be brought before him,
and if, upon investigation, shall be found guilty, to adjudge against said
guilty party or parties, the penalty provided in the first section of this act.

(215.) SEC. III.  All prosecutions under this act shall be in the *Same, and dispo-*
name of the state of Ohio, and all such fines collected shall be paid *sition of fines.*
into the township treasury of the proper township, for the benefit of
common schools therein.

SEC. IV.  This act shall be in force from and after its passage.

An Act to amend the act entitled "an act to amend the act entitled 'an act for the *Swan's R. S. 306.*
    prevention of certain immoral practices,'" passed February 17, 1831—said last
    act being passed March 26, 1841.

*[Passed and took effect April 12, 1858.  55 vol. Stat. 151.]*

(216.) SEC. I.  *Be it enacted by the General Assembly of the State* *Selling liquors,*
*of Ohio,*  That no person shall sell, or expose for sale, give, barter, or *etc., within two miles of any relig-*
otherwise dispose of in any way, or at any place, any spiritous or other *ious meetings.*
liquors, or any article of traffic whatever, at or within the distance of
two miles from the place where any religious society, or assemblage of
people, are collected or collecting together for religious worship in any
field or woodland: Provided, that nothing in this act shall affect tavern
keepers exercising their calling, nor distillers, manufacturers, or others,
in prosecuting their regular trades at their places of business, or any
persons disposing of any ordinary articles of provision, excepting spir-
itous liquors, at their residences, nor any person having a written per-
mit from the trustees or managers of any such religious society or as-
semblage, to sell provisions for the supply of persons attending such
religious worship, their horses or cattle, such persons acting in con-
formity to the regulations of said religious assembly and to the laws of
the state.

(217.) SEC. II.  That any person found guilty of committing a *Prosecution*
breach of the provisions of this act, shall forfeit and pay for every such *therefor.*
offense a fine of not less than ten or more than one hundred dollars,
into the township treasury for the use of the common schools in said
township where said offense was committed; and any judge of the com-
mon pleas, sheriff, coroner, or justice of the peace of the county, or
any constable thereof, shall, upon view or information, and with or
without warrant, apprehend any person so offending, and seize all such
liquors or other articles of traffic, and the utensils or furniture contain-
ing them, and convey them before a justice of the peace; and the said
justice, upon the complaint under oath or affirmation of said officer
apprehending such offender, or any person giving information, shall issue
his warrant of arrest, which shall be formally served by the proper
officer, and proceed to inquire into the truth of said accusation, and if
found true, shall proceed to bind said offender in such amount not ex-
ceeding five hundred dollars, as he shall deem proper, to answer at the
next regular term of the common pleas in said county, to be proceeded
with by indictment, the fine and costs to be collected as in other crimi-
nal cases: Provided, that if such defendant or defendants shall plead
guilty, said justice shall affix the penalty and proceed to judgment; and
in such case he shall immediately issue an execution against the prop-
erty and body of the defendant or defendants for the fine and costs, un-
less paid or secured; and said defendant or defendants shall not be dis-
charged until said judgment and costs shall be fully paid or secured to
be paid.

Compendium_Roth
Page 0003

<div style="margin-left:2em">

*Accused on ac-*
*quittal to recover*
*double costs, etc.*

(218.) SEC. III.  That in any prosecution against any person or persons for a violation of the provisions of this act, if the defendant or defendants shall be acquitted, he or they shall recover of the person or persons filing the complaint double the amount of his or their costs, which said justice shall award.

SEC. IV.  That the act to which this is amendatory be, and the same is hereby repealed.  This act to take effect from and after its passage.

</div>

### An Act regulating the sale of poisons.

[*Passed April* 13, 1852.  50 *vol. Stat.* 167.]

*Preliminary re-*
*marks.*

(219.) SEC. I.  *Be it enacted by the General Assembly of the State of Ohio,* That it shall not hereafter be lawful for any apothecary, druggist, or other person in this state, to sell or give away any article belonging to the class of medicines usually denominated poisons, except in compliance with the restrictions contained in this act.

*What to be done*
*when poisons sold.*

(220.) SEC. II.  That every apothecary, druggist, or other person, who shall sell or give away, except upon the prescription of a physician, any article or articles of medicine belonging to the class usually known as poisons, shall be required: 1st. To register in a book kept for that purpose the name, age, sex and color of the person obtaining such poison.  2d. The quantity sold.  3d. The purpose for which it is required.  4th. The day and date on which it was obtained.  5th. The name and place of abode of the person for whom the article is intended.  6th. To carefully mark the word "poison" upon the label or wrapper of each package.  7th. To neither sell or give away any article of poison to minors of either sex.

*How arsenic to be*
*prepared before*
*sale.*

(221.) SEC. III.  That no apothecary, druggist, or other person, shall be permitted to sell or give away any quantity of arsenic less than one pound, without first mixing either soot or indigo therewith, in the proportion of one ounce of soot or half an ounce of indigo to the pound of arsenic.

*Penalty for violat-*
*ing two preceding*
*sections.*

(222.) SEC. IV.  That any person offending against the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than twenty nor more than two hundred dollars, at the discretion of any court of competent jurisdiction.

### An Act to prevent and punish fraud in the use of false stamps, brands, labels, or trade marks.

[*Passed and took effect March* 29, 1859.  56 *vol. Stat.* 86.]

*Forging brand,*
*stamp, label, etc.*

(223.) SEC. I.  *Be it enacted by the General Assembly of the State of Ohio,* That any person or persons who shall knowingly and willfully forge or counterfeit, or cause or procure to be forged or counterfeited, any representation, likeness, similitude, copy or imitation of the private stamp, brand, wrapper, label, or trade mark, usually affixed by any mechanic, manufacturer, druggist, merchant or tradesman, to and upon the goods, wares, merchandise, preparation or mixture of such mechanic, manufacturer, druggist, merchant or tradesman, with intent to pass off any work, goods, manufacture, compound, preparation or mixture, to which such forged or counterfeited representation, likeness, similitude, copy or imitation is affixed or intended to be affixed as the work, goods, manufacture, compound, preparation or mixture of such mechanic, manufacturer, druggist or tradesman, shall, upon conviction thereof, be imprisoned in the county jail for a period of not less than three months nor more than twelve month, and fined not exceeding five hundred dollars.

 

DATE DOWNLOADED: Tue Oct 18 16:47:26 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1870 63 .

ALWD 7th ed.
, , 1870 63 .

Chicago 17th ed.
"," Texas - 12th Legislature, Called Session, General Laws : 63-64

AGLC 4th ed.
'' Texas - 12th Legislature, Called Session, General Laws 63

OSCOLA 4th ed.
'' 1870 63

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# CHAPTER XLVI.

## AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

# CHAPTER XLVII.

## AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

Compendium_Roth
Page 0006

county of Hill ; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

SEC. 2. That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

SEC. 3. That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

SEC. 4. That this act be in force from and after passage.
Approved August 12, 1870.

---

# CHAPTER XLVIII.

### AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

SEC. 2. That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

SEC. 3. That this act shall take effect from and after its passage.
Approved August 12, 1870.

Compendium_Roth
Page 0007




DATE DOWNLOADED: Tue Oct 18 16:51:24 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1871 25 .

ALWD 7th ed.
, , 1871 25 .

Chicago 17th ed.
"," Texas - 12th Legislature, 1st Session, General Laws : 25-27

AGLC 4th ed.
'' Texas - 12th Legislature, 1st Session, General Laws 25

OSCOLA 4th ed.
'' 1871 25

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# CHAPTER XXXIV.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided,* that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

Compendium_Roth
Page 0009

GENERAL LAWS.

bled for amusement or for educational or scientific purposes, or into
any circus, show, or public exhibition of any kind, or into a ball
room, social party, or social gathering, or to any election precinct
on the day or days of any election, where any portion of the people
of this State are collected to vote at any election, or to any other
place where people may be assembled to muster, or to perform any
other public duty, (except as may be required or permitted by law,)
or to any other public assembly, and shall have or carry about his
person a pistol or other firearm, dirk, dagger, slung shot, sword
cane, spear, brass-knuckles, bowie-knife, or any other kind of knife
manufactured and sold for the purposes of offense and defense, unless
an officer of the peace, he shall be guilty of a misdemeanor, and, on
conviction thereof, shall, for the first offense, be punished by fine of
not less than fifty, nor more than five hundred dollars, and shall for-
feit to the county the weapon or weapons so found on his person;
and for every subsequent offense may, in addition to such fine and
forfeiture, be imprisoned in the county jail for a term not more than
ninety days.

SEC. 4.   This act shall not apply to, nor be enforced in any
county of the State, which may be designated, in a proclamation of
the Governor, as a frontier county, and liable to incursions of hostile
Indians.

SEC. 5.   All fines collected under the provisions of this act shall
be paid into the treasury of the county, and appropriated exclu-
sively to the keeping in repair and maintenance of public roads, and
all weapons forfeited to the county under the provisions of this act
shall be sold as may be prescribed by the county court, and the pro-
ceeds appropriated to the same purpose.

SEC. 6.   It shall be the duty of all sheriffs, constables, marshals,
and their deputies, and all policemen, and other peace officers, to ar-
rest any person violating the first or third sections of this act, and
to take such person immediately before a justice of the peace of the
county where the offense is committed, or before a mayor or recorder
of the town or city in which the offense is committed, who shall in-
vestigate and try the case without delay.   On all such trials the ac-
cused shall have the right of a trial by jury, and of appeal to the
district court; but, in case of appeal, the accused shall be re-
quired to give bond with two or more good and sufficient sureties in a
sum of not less than one hundred nor more than two hundred dol-
lars, if convicted under the first section and in a sum of not less
than two hundred nor more than one thousand dollars, if convicted
under the third section of this act; said bond to be payable to the
State of Texas, and approved by the magistrate, and conditioned that
the defendant will abide the judgment of the district court that may

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7.  Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8.  That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9.  It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April 12, 1871.

————

## CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas*, That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

SEC. 2.  That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.




DATE DOWNLOADED: Tue Oct 18 17:37:32 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

ALWD 7th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

APA 7th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

Chicago 17th ed.
"Public Law 65-68 / Chapter 83, 65 Congress, Session 2, An Act: To prohibit the
manufacture, distribution, storage, use, and possession in time of war of explosives,
providing regulations for the safe manufacture, distribution, storage, use, and
possession of the same, and for other purposes.," U.S. Statutes at Large 40, no. Main
Section (1917): 385-389

McGill Guide 9th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

AGLC 4th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917)

MLA 9th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917). HeinOnline.

OSCOLA 4th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /

Case 3:19-cv-01537-BEN-JLB   Document 153   Filed 10/21/22   PageID.15332   Page 22 of 111

the Act of March second, nineteen hundred and one, be, and the same is hereby, amended as follows:

"The Secretary of War is hereby authorized to permit, under such regulations as he may prescribe, any officer or enlisted man on the active list of the Army, any retired officer or enlisted man of the Army on active duty, and any permanent civilian employee under the jurisdiction of the War Department on duty outside of the continental limits of the United States, to make allotments of his pay for the support of his wife, children, or dependent relatives, or for such other purposes as the Secretary of War may deem proper. All allotments of pay of officers, enlisted men, and civilian employees that have been or shall be paid to designated allottees previous to the receipt by disbursing officer of notice of discontinuance of the same from the officer required by regulations to furnish such notice shall pass to the credit of the disbursing officer who has made or shall make such payments; and, if erroneous payment is made because of the failure of an officer to report, in the manner prescribed by the Secretary of War, the death of the grantor, or any fact which renders the allotment not payable, then the amount of such erroneous payment shall be collected by the Quartermaster General from the officer who fails to make such report, if such collection is practicable. Nothing herein shall be construed to invalidate allotments now in force."

*Allotment of pay.*
*Extended to officers and enlisted men on active duty and civilians in military service abroad.*

*Credit allowed for payments to designated allottees prior to notice of discontinuance.*

*Collection of erroneous payments.*

*Existing allotments valid.*

Approved, October 6, 1917.

---

**CHAP. 82.**—An Act To authorize the construction, maintenance, and operation of a bridge across Little River, in Poinsett County, Arkansas, at or near the section line between sections thirty-five and thirty-six, township eleven north, range six east.

October 6, 1917.
[S. 2938.]

[Public, No. 67.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Poinsett County, Arkansas, is hereby authorized to construct, maintain, and operate a bridge and approaches thereto across Little River, a tributary to Saint Francis River, at a point suitable to the interests of navigation, at or near the section line between sections thirty-five and thirty-six, township eleven north, range six east, fifth principal meridian, in Poinsett County, in the State of Arkansas, in accordance with the provisions of the Act entitled "An Act to regulate the construction of bridges over navigable waters," approved March twenty-third, nineteen hundred and six.

*Little River.*
*Poinsett County, Ark., may bridge.*

*Location.*

*Construction.*
*Vol. 34, p. 84.*

SEC. 2. That the right to alter, amend, or repeal this Act is hereby expressly reserved.

*Amendment.*

Approved, October 6, 1917.

---

**CHAP. 83.**—An Act To prohibit the manufacture, distribution, storage, use, and possession in time of war of explosives, providing regulations for the safe manufacture, distribution, storage, use, and possession of the same, and for other purposes.

October 6, 1917.
[H. R. 3932.]

[Public, No. 68.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That when the United States is at war it shall be unlawful to manufacture, distribute, store, use, or possess powder, explosives, blasting supplies, or ingredients thereof, in such manner as to be detrimental to the public safety, except as in this Act provided.

*Explosives.*
*Manufacture, etc., restricted in time of war.*
*Post, p. 1711.*

SEC. 2. That the words "explosive" and "explosives" when used herein shall mean gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuses, detonators, and other detonating agents, smokeless powders, and any chemical compound or me-

*"Explosive" and "explosives."*
*Articles included as.*

Compendium_Roth
Page 0013

386                 SIXTY-FIFTH CONGRESS.  Sess. I.  Ch. 83.  1917.

chanical mixture that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of, or any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects, or of destroying life or limb, but shall not include small arms or shotgun cartridges: *Provided,* That nothing herein contained shall be construed to prevent the manufacture, under the authority of the Government, of explosives for, their sale to or their possession by, the military or naval service of the United States of America.

*Proviso.*
Manufacture   for
Government use, etc.,
not affected.

"Ingredients."
Materials included as.

Sec. 3. That the word "ingredients" when used herein shall mean the materials and substances capable by combination of producing one or more of the explosives mentioned in section one hereof.

"Person."
Extension of term.

Sec. 4. That the word "person," when used herein, shall include States, Territories, the District of Columbia, Alaska, and other dependencies of the United States, and municipal subdivisions thereof, individual citizens, firms, associations, societies and corporations of the United States and of other countries at peace with the United States.

Unauthorized pos-
session, etc., forbidden.

Sec. 5. That from and after forty days after the passage and approval of this Act no person shall have in his possession or purchase, accept, receive, sell, give, barter or otherwise dispose of or procure explosives, or ingredients, except as provided in this Act: *Provided,* That the purchase or possession of said ingredients when purchased or held in small quantities and not used or intended to be used in the manufacture of explosives are not subject to the provisions of this Act: *Provided further,* That the superintendent, foreman, or other duly authorized employee, at a mine, quarry, or other work, may, when licensed so to do, sell or issue, to any workman under him, such an amount of explosives, or ingredients, as may be required by that workman in the performance of his duties, and the workman may purchase or accept the explosives, or ingredients, so sold or issued, but the person so selling or issuing same shall see that any unused explosives, or ingredients, are returned, and that no explosives, or ingredients, are taken by the workman to any point not necessary to the carrying on of his duties.

*Provisos.*
Ingredients in small
quantities, etc., al-
lowed.

Licensed use at
mines, quarries, etc.,
for workmen allowed.

Restrictions.

Interstate transpor-
tation not affected.

Sec. 6. That nothing contained herein shall apply to explosives or ingredients while being transported upon vessels or railroad cars in conformity with statutory law or Interstate Commerce Commission rules.

Manufacture without
license forbidden.

Sec. 7. That from and after forty days after the passage of this Act no person shall manufacture explosives unless licensed *so to do,* as hereinafter provided.

Licenses.
Information required
from applicants and
licensees.

Sec. 8. That any licensee or applicant for license hereunder shall furnish such information regarding himself and his business, so far as such business relates to or is connected with explosives or ingredients at such time and in such manner as the Director of the Bureau of Mines, or his authorized representative, may request, excepting that those who have been or are at the time of the passage of this Act regularly engaged in the manufacture of explosives shall not be compelled to disclose secret processes, costs, or other data unrelated to the distribution of explosives.

Secret processes ex-
cepted.

Itemized records to
be kept by licensees.

Sec. 9. That from and after forty days after the passage and approval of this Act every person authorized to sell, issue, or dispose of explosives shall keep a complete itemized and accurate record, showing each person to whom explosives are sold, given, bartered, or to whom or how otherwise disposed of, and the quantity and kind of explosives, and the date of each such sale, gift, barter, or other disposition; and this record shall be sworn to and furnished to the

Director of the Bureau of Mines, or his authorized representatives, whenever requested.

SEC. 10. That the Director of the Bureau of Mines is hereby authorized to issue licenses as follows: *Classes of licenses.*

(a) Manufacturer's license, authorizing the manufacture, possession, and sale of explosives and ingredients. *Manufacturer's.*

(b) Vendor's license, authorizing the purchase, possession, and sale of explosives or ingredients. *Vendor's.*

(c) Purchaser's license, authorizing the purchase and possession of explosives and ingredients. *Purchaser's.*

(d) Foreman's license, authorizing the purchase and possession of explosives and ingredients, and the sale and issuance of explosives and ingredients to workmen under the proviso to section five above. *Foreman's.*

(e) Exporter's license, authorizing the licensee to export explosives, but no such license shall authorize exportation in violation of any proclamation of the President issued under any Act of Congress. *Exporter's.*

(f) Importer's license, authorizing the licensee to import explosives. *Importer's.*

(g) Analyst's, educator's, inventor's, and investigator's licenses authorizing the purchase, manufacture, possession, testing, and disposal of explosives and ingredients. *Technical, etc.*

SEC. 11. That the Director of the Bureau of Mines shall issue licenses, upon application duly made, but only to citizens of the United States of America, and to the subjects or citizens of nations that are at peace with them, and to corporations, firms, and associations thereof, and he may, in his discretion, refuse to issue a license, when he has reason to believe, from facts of which he has knowledge or reliable information, that the applicant is disloyal or hostile to the United States of America, or that, if the applicant is a firm, association, society, or corporation, its controlling stockholders or members are disloyal or hostile to the United States of America. The director may, when he has reason to believe on like grounds that any licensee is so disloyal or hostile, revoke any license issued to him. Any applicant to whom a license is refused or any licensee whose license is revoked by the said director may, at any time within thirty days after notification of the rejection of his application or revocation of his license, apply for such license or the cancellation of such revocation to the Council of National Defense, which shall make its order upon the director either to grant or to withhold the license. *Issue by Director of Mines Bureau.* *Restriction.* *Discretionary refusal.* *Revocation.* *Appeals to Council of National Defense on refusal, etc.*

SEC. 12. That any person desiring to manufacture, sell, export, import, store, or purchase explosives or ingredients, or to keep explosives or ingredients in his possession, shall make application for a license, which application shall state, under oath, the name of the applicant; the place of birth; whether native born or naturalized citizen of the United States of America; if a naturalized citizen, the date and place of naturalization; business in which engaged; the amount and kind of explosives or ingredients which during the past six months have been purchased, disposed of, or used by him; the amount and kind of explosives or ingredients now on hand; whether sales, if any, have been made to jobbers, wholesalers, retailers, or consumers; the kind of license to be issued, and the kind and amount of explosives or ingredients to be authorized by the license; and such further information as the Director of the Bureau of Mines may, by rule, from time to time require. *Applications.* *Sworn statement required in.*

Applications for vendor's, purchaser's, or foreman's licenses shall be made to such officers of the State, Territory, or dependency having jurisdiction in the district within which the explosives or ingredients are to be sold or used, and having the power to administer oaths as may be designated by the Director of the Bureau of Mines, who shall issue the same in the name of such director. Such officers shall be entitled to receive from the applicant a fee of 25 cents for *Officers authorized to administer oaths.* *Fees, records, etc.*

388                SIXTY-FIFTH CONGRESS. Sess. I. Ch. 83. 1917.

each license issued.  They shall keep an accurate record of all licenses issued in manner and form to be prescribed by the Director of the Bureau of Mines, to whom they shall make reports from time to time as may be by rule issued by the director required.  The necessary blanks and blank records shall be furnished to such officers by the
Removal of licensing officers, etc.
said director.  Licensing officers shall be subject to removal for cause by the Director of the Bureau of Mines, and all licenses issued
*Ante*, p. 387.
by them shall be subject to revocation by the director as provided in section eleven.

Explosives inspectors.
Appointment authorized.
Sec. 13.  That the President, by and with the advice and consent of the Senate, may appoint in each State and in Alaska an explosives inspector, whose duty it shall be, under the direction of the Director of the Bureau of Mines, to see that this Act is faithfully executed and
Pay, details, etc.
observed.  Each such inspector shall receive a salary of $2,400 per annum.  He may at any time be detailed for service by said director in the District of Columbia or in any State, Territory, or dependency
Administrative employees.
of the United States.  All additional employees required in carrying out the provisions of this Act shall be appointed by the Director of the Bureau of Mines, subject to the approval of the Secretary of the Interior.

Specified unlawful acts connected with licenses.
Sec. 14.  That it shall be unlawful for any person to represent himself as having a license issued under this Act, when he has not such a license, or as having a license different in form or in conditions from the one which he in fact has, or without proper authority make, cause to be made, issue or exhibit anything purporting or pretending to be such license, or intended to mislead any person into believing it is such a license, or to refuse to exhibit his license to any peace officer, Federal or State, or representative of the Bureau of Mines.

Unauthorized divulging of information forbidden.
Sec. 15.  That no inspector or other employee of the Bureau of Mines shall divulge any information obtained in the course of his duties under this Act regarding the business of any licensee, or applicant for license, without authority from the applicant for license or from the Director of the Bureau of Mines.

Distinctive marking of premises.
Sec. 16.  That every person authorized under this Act to manufacture or store explosives or ingredients shall clearly mark and define the premises on which his plant or magazine may be and shall conspicuously display thereon the words "Explosives—Keep Off."

Unauthorized presence at premises, etc., forbidden.
Sec. 17.  That no person, without the consent of the owner or his authorized agents, except peace officers, the Director of the Bureau of Mines and persons designated by him in writing, shall be in or upon any plant or premises on which explosives are manufactured or stored, or be in or upon any magazine premises on which explosives
Discharging firearms, etc.
are stored; nor shall any person discharge any firearms or throw or place any explosives or inflammable bombs at, on, or against any such plant or magazine premises, or cause the same to be done.

Effective rules, etc., to be made.
Sec. 18.  That the Director of the Bureau of Mines is hereby authorized to make rules and regulations for carrying into effect this Act, subject to the approval of the Secretary of the Interior.

Punishment for violations.
Sec. 19.  That any person violating any of the provisions of this Act, or any rules or regulations made thereunder, shall be guilty of a misdemeanor and shall be punished by a fine of not more than $5,000 or by imprisonment not more than one year, or by both such fine and imprisonment.

Investigations to be made of all explosions and fires.
Sec. 20.  That the Director of the Bureau of Mines is hereby authorized to investigate all explosions and fires which may occur in mines, quarries, factories, warehouses, magazines, houses, cars,
Localities, etc., specified.
boats, conveyances, and all places in which explosives or the ingredients thereof are manufactured, transported, stored, or used,
Report of findings, etc.
and shall, in his discretion, report his findings, in such manner as he may deem fit, to the proper Federal or State authorities, to the end that if such explosion has been brought about by a willful act the

Compendium_Roth
Page 0016

person or persons causing such act may be proceeded against and brought to justice; or, if said explosion has been brought about by accidental means, that precautions may be taken to prevent similar accidents from occurring. In the prosecution of such investigations the employees of the Bureau of Mines are hereby granted the authority to enter the premises where such explosion or fire has occurred, to examine plans, books, and papers, to administer oaths to, and to examine all witnesses and persons concerned, without let or hindrance on the part of the owner, lessee, operator, or agent thereof.

*Authority conferred on employees.*

Sec. 21. That the Director of the Bureau of Mines, with the approval of the President, is hereby authorized to utilize such agents, agencies, and all officers of the United States and of the several States, Territories, dependencies, and municipalities thereof, and the District of Columbia, in the execution of this Act, and all agents, agencies, and all officers of the United States and of the several States and Territories, dependencies, and municipalities thereof, and the District of Columbia, shall hereby have full authority for all acts done by them in the execution of this Act when acting by the direction of the Bureau of Mines.

*Utilization of Federal, State, etc., agencies.*

*Authority conferred for official acts.*

Sec. 22. That for the enforcement of the provisions of this Act, including personal services in the District of Columbia and elsewhere, and including supplies, equipment, expenses of traveling and subsistence, and for the purchase and hire of animal-drawn or motor-propelled passenger-carrying vehicles, and upkeep of same, and for every other expense incident to the enforcement of the provisions of this Act, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $300,000, or so much thereof as may be necessary: *Provided,* That not to exceed $10,000 shall be expended in the purchase of motor-propelled passenger-carrying vehicles.

*Appropriation for all expenses.*

*Proviso.*
*Amount for motor vehicles.*

Approved, October 6, 1917.

---

**CHAP. 84.**—An Act Extending the time for the construction of a bridge across Flint River, in the State of Georgia.

October 6, 1917.
[H. R. 4282.]
[Public, No. 69.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the times for commencing and completing the construction of a bridge authorized by Act of Congress approved April seventeenth, nineteen hundred and sixteen, to be built across the Flint River, Georgia, by Mitchell County, or by Baker County, Georgia, jointly or separately, are hereby extended one and three years, respectively, from the date hereof.

*Flint River.*
Time extended for bridging, by Mitchell County or Baker County, Ga.
Vol. 39, p. 52, amended.

Sec. 2. That the right to alter, amend, or repeal this Act is hereby expressly reserved.

*Amendment.*

Approved, October 6, 1917.

---

**CHAP. 85.**—An Act To provide for the reimbursement of officers, enlisted men, and others in the naval service of the United States for property lost or destroyed in such service.

October 6, 1917.
[H. R. 5647.]
[Public, No. 70.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Paymaster General of the Navy be, and he is hereby, authorized and directed to reimburse such officers, enlisted men, and others in the naval service of the United States as may have suffered, or may hereafter suffer, loss or destruction of or damage to their personal property and effects in the naval service due to the operations of war or by shipwreck or other marine disaster when such loss, destruction, or damage was without

*Navy.*
Reimbursement for losses of personal property.
Applications.

# CHAPTER XXXIV.

**AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.**

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

bled for amusement or for educational or scientific purposes, or into
any circus, show, or public exhibition of any kind, or into a ball
room, social party, or social gathering, or to any elec.ion precinct
on the day or days of any election, where any portion of the people
of this State are collected to vote at any election, or to any other
place where people may be assembled to muster, or to perform any
other public duty, (except as may be required or permitted by law,)
or to any other public assembly, and shall have or carry about his
person a pistol or other firearm, dirk, dagger, slung shot, sword
cane, spear, brass-knuckles, bowie-knife, or any other kind of knife
manufactured and sold for the purposes of offense and defense, unless
an officer of the peace, he shall be guilty of a misdemeanor, and, on
conviction thereof, shall, for the first offense, be punished by fine of
not less than fifty, nor more than five hundred dollars, and shall for-
feit to the county the weapon or weapons so found on his person;
and for every subsequent offense may, in addition to such fine and
forfeiture, be imprisoned in the county jail for a term not more than
ninety days.

SEC. 4.   This act shall not apply to, nor be enforced in any
county of the State, which may be designated, in a proclamation of
the Governor, as a frontier county, and liable to incursions of hostile
Indians.

SEC. 5.   All fines collected under the provisions of this act shall
be paid into the treasury of the county, and appropriated exclu-
sively to the keeping in repair and maintenance of public roads, and
all weapons forfeited to the county under the provisions of this act
shall be sold as may be prescribed by the county court, and the pro-
ceeds appropriated to the same purpose.

SEC. 6.   It shall be the duty of all sheriffs, constables, marshals,
and their deputies, and all policemen, and other peace officers, to ar-
rest any person violating the first or third sections of this act, and
to take such person immediately before a justice of the peace of the
county where the offense is committed, or before a mayor or recorder
of the town or city in which the offense is committed, who shall in-
vestigate and try the case without delay.   On all such trials the ac-
cused shall have the right of a trial by jury, and of appeal to the
district court; but, in case of appeal, the accused shall be re-
quired to give bond with two or more good and sufficient sureties in a
sum of not less than one hundred nor more than two hundred dol-
lars, if convicted under the first section and in a sum of not less
than two hundred nor more than one thousand dollars, if convicted
under the third section of this act; said bond to be payable to the
State of Texas, and approved by the magistrate, and conditioned that
the defendant will abide the judgment of the district court that may

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7. Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8. That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9. It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April 12, 1871.

---

# CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

SEC. 2. That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.

# NATIONAL FIREARMS ACT OF 1934

# 48 STAT. 1236

1236        73d CONGRESS.   SESS. II.   CHS. 756, 757.   JUNE 26, 1934.

available to pay claims on account of any check, the amount of which has been included in any balance so covered into the surplus fund.

<span style="float:left">Advances for land surveys.<br>U.S.C., title 43, sec. 863.</span>SEC. 22. So much of the Act of August 18, 1894 (U.S.C., title 43, sec. 863), as authorizes the Governors of the States therein named to advance money from time to time for the survey of certain townships located within such States, which money shall be reimbursable, is hereby repealed.

<span style="float:left">Moneys in U.S. court registries.</span>SEC. 23. Moneys in, or payable into, the registry of any United States court, in the discretion of the court, may be deposited in official checking accounts with the Treasurer of the United States, subject to disbursement on order approved by the court.

<span style="float:left">Survey of certain accounts to be made by Comptroller General.</span>SEC. 24. The Comptroller General of the United States shall cause a survey to be made of all inactive and permanent appropriations and/or funds on the books of the Government and also funds in the official custody of officers and employees of the United States, in which the Government is financially concerned, for which no accounting is rendered to the General Accounting Office; and he shall submit <span style="float:left">Report to Congress.</span>to the Congress annually, in a special report, his recommendations for such changes in existing law relating thereto as, in his judgment, may be in the public interest.

<span style="float:left">Existing provisions not affected.</span>SEC. 25. The provisions of this Act shall not be construed to alter or amend any existing authorization for an appropriation.

<span style="float:left">Saving clause.</span>SEC. 26. All Acts and/or parts of Acts inconsistent or in conflict with the provisions of this Act are hereby repealed to the extent of such inconsistency or conflict.

<span style="float:left">Short title.</span>SEC. 27. The short title of this Act shall be the "Permanent Appropriation Repeal Act, 1934."

Approved, June 26, 1934.

---

[CHAPTER 757.]

### AN ACT

<span style="float:left">June 26, 1934.<br>[H.R. 9741.]<br>[Public, No. 474.]</span>To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this Act—

<span style="float:left">National Firearms Act.<br>Limitation of terms for purposes of Act.<br>"Firearm."</span>(a) The term "firearm" means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

<span style="float:left">"Machine gun."</span>(b) The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

<span style="float:left">"Person."</span>(c) The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

<span style="float:left">"Continental United States."</span>(d) The term "continental United States" means the States of the United States and the District of Columbia.

<span style="float:left">"Importer."</span>(e) The term "importer" means any person who imports or brings firearms into the continental United States for sale.

<span style="float:left">"Manufacturer."</span>(f) The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

73d CONGRESS.  SESS. II.  CH. 757.  JUNE 26, 1934.  **1237**

(g) The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms.  The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

(h) The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia.

(i) The term "Commissioner" means the Commissioner of Internal Revenue.

(j) The term "Secretary" means the Secretary of the Treasury.

(k) The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

SEC. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $500 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year.  Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for.  The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancelation, and distribution of tax-paid stamps provided for in the internal-revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal-revenue laws shall, insofar as not inconsistent with the provisions of this Act, be applicable with respect to the taxes imposed by this Act.

(c) Under such rules and regulations as the Commissioner, with the approval of the Secretary, may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under this section has been paid by the manufacturer, the Commissioner shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in

*(marginal notes)*
"Dealer."
Exceptions.
"Interstate commerce."
"Commissioner."
"Secretary." "To transfer" or "transferred."
Registration requirements.
Taxes.
Fractional parts of year.
Failure to register and pay tax unlawful.
Transfer tax; stamps.
Applicable administrative provisions of narcotic tax law to govern.
Vol. 38, p. 785; Vol. 44, p. 92.
U.S.C., Supp. VII, pp. 592, 644.
Refund, if for exportation.
Unlawful transfers.

1238          73d CONGRESS.   SESS. II.   CH. 757.   JUNE 26, 1934.

*Proviso.*
Identification.

blank in duplicate for that purpose by the Commissioner.  Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided,* That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

Preparation and distribution of forms.

(b)  The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue.

Identifying marks, etc., to be indicated in orders.

(c)  Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner.  The original thereof with stamps affixed, shall be returned to the applicant.

Transferor to transfer stamp-affixed order for each prior transfer.

(d)  No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

Notice to Commissioner of transfers exempted.

(e)  If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

Registered importers, etc.

(f)  Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2(a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

Possessors of firearms to register with collector within 60 days.

SEC. 5.  (a)  Within sixty days after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided,* That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

*Proviso.*
Acquisitions after effective date need not be registered.

Prosecutions.
Presumption raised by possession.

(b)  Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of sixty days without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

Unlawfully receiving or possessing.

SEC. 6.  It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 3 or 4 of this Act.

Seizure and forfeiture.

SEC. 7.  (a)  Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and

73d CONGRESS.   SESS. II.   CH. 757.   JUNE 26, 1934.       **1239**

forfeiture, and (except as provided in subsection (b)) all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies.

(b) In the case of the forfeiture of any firearm by reason of a violation of this Act: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is in the possession of any officer of the United States except the Secretary, such officer shall deliver the firearm to the Secretary; and the Secretary may order such firearm destroyed or may sell such firearm to any State, Territory, or possession (including the Philippine Islands), or political subdivision thereof, or the District of Columbia, or retain it for the use of the Treasury Department or transfer it without charge to any Executive department or independent establishment of the Government for use by it.

SEC. 8. (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner.

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

SEC. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require.

SEC. 10. (a) No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory.

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction (including the Philippine Islands), in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported or brought in contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

SEC. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce.

*Margin notes:*
Provisions of internal-revenue laws extended.

Sale, etc., forbidden.

Disposition of.

Identification marks.

Obliteration, etc., unlawful.

Possession of, deemed sufficient evidence for conviction.

Exception.

Importers, manufacturers, etc., required to keep records.

Regulation of traffic in firearms in places under control of United States.

Unlawful acts. Fraudulent importations, possession, etc.

Receiving, concealing, etc.

Possession deemed sufficient evidence for conviction; exception.

Transportation in interstate commerce.

Compendium_Roth
Page 0025

1240          73d CONGRESS.  SESS. II.  CHS. 757, 758.  JUNE 26, 1934.

Rules, etc., to be pre-
scribed.
SEC. 12. The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of this Act into effect.

Transfers, when pro-
visions not applicable.
SEC. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is trans-ferred as a curiosity or ornament.

Penalty provision.
SEC. 14. Any person who violates or fails to comply with any of the requirements of this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

Excise taxes.
Firearms herein de-
fined exempt from.
Vol. 44, p. 93; Vol. 47,
p. 264.
U.S.C., Supp. VII,
p. 604.
SEC. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this Act has been paid.

Saving clause.
SEC. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or cir-cumstances, shall not be affected thereby.

Effective date.
SEC. 17. This Act shall take effect on the thirtieth day after the date of its enactment.

Citation of title.
SEC. 18. This Act may be cited as the " National Firearms Act."
    Approved, June 26, 1934.

---

[CHAPTER 758.]

AN ACT

June 26, 1934.
[H.R. 9769.]
[Public, No. 475.]
To amend the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes."

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segre-gated mineral land in the Choctaw and Chickasaw Nations, Okla-homa, and for other purposes ", is hereby amended so as to permit the Secretary of the Interior, in his discretion, to sell under the provisions of said Act the coal and asphalt deposits referred to therein in tracts of less than nine hundred and sixty acres where such smaller tract or acreage adjoins a developed tract on which active mining operations are being conducted and is needed by the operator in further developing the existing mine: *Provided,* That where the sale of such smaller tract or acreage is not deemed advis-able, the Secretary of the Interior may in his discretion, lease said tract under the same terms and conditions as developed tracts are leased under the Act of April 21, 1932 (47 Stat. 88), with the excep-tion that the minimum tonnage requirement contained therein is hereby waived as to leases on such small tracts.
    Approved, June 26, 1934.

Choctaw and Chick-
asaw Indians, Okla.
Vol. 46, p. 788.
Sales of coal and as-
phalt deposits author-
ized.

*Proviso.*
Leases.

Vol. 47, p. 89.
Minimum  tonnage
requirement waived.

# NATIONAL FIREARMS ACT OF 1938

# 52 STAT. 1250

Compendium_Roth
Page 0027

1250

PUBLIC LAWS—CH. 850—JUNE 30, 1938

[52 Stat.

June 30, 1938
[S. 3]
[Public, No. 785]

[CHAPTER 850]

AN ACT

To regulate commerce in firearms.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

Federal Firearms Act.
Definitions.
"Person."

(1) The term "person" includes an individual, partnership, association, or corporation.

"Interstate or foreign commerce."

(2) The term "interstate or foreign commerce" means commerce between any State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any Territory or possession or the District of Columbia.

"Firearm."

(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon.

"Manufacturer."

(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms or ammunition or cartridge cases, primers, bullets, or propellent powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this Act.

"Dealer."

(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breach [1] mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this Act.

"Licensed dealer."

"Crime of violence."

(6) The term "crime of violence" means murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.

"Fugitive from justice."

(7) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding.

"Ammunition."

(8) The term "ammunition" shall include all pistol or revolver ammunition except .22-caliber rim-fire ammunition.

Unlawful acts.
Transportation, etc., of firearms or ammunition without license.

Sec. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

Knowingly receiving same.

(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

Transportation, etc., to other than licensed manufacturer or dealer.

(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

---

[1] So in original.

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions (including the Philippine Islands), or the District of Columbia of a crime of violence or is a fugitive [1] from justice. *Shipment to person under indictment, etc.*

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime of violence or who is a fugitive [1] from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition. *Shipment by person under indictment, etc.*

(f) It shall be unlawful for any person who has been convicted of a crime of violence or is a fugitive [1] from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this Act. *Receipt by person convicted of crime of violence, etc.*

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen. *Transportation of stolen firearms, etc.*

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen. *Traffic in stolen firearms.*

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act. *Transportation of firearms from which serial number has been removed.*

SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum. *Licenses, application, fee.*

(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided,* That no license shall be issued to any applicant within two years after the revocation of a previous license. *Issuance.* *Proviso. Issuance after revocation.*

(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided,* That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secre- *Revocation on conviction of licensee.* *Proviso. Temporary continuance; bond.*

---

[1] So in original.





DATE DOWNLOADED: Tue Oct 18 17:33:17 2022
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

ALWD 7th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

APA 7th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

Chicago 17th ed.
"Public Law 91-452, 91 Congress, Session 2, An Act: Relating to the control of
organized crime in the United States.," U.S. Statutes at Large 84, no. Main Section
(1970): 922-962

McGill Guide 9th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).


AGLC 4th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970)

MLA 9th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970). HeinOnline.

OSCOLA 4th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
   *Copyright Information*

Public Law 91-450

October 14, 1970
[S. 4235]

### AN ACT

To continue the jurisdiction of the United States District Court for the District of Puerto Rico over certain cases pending in that court on June 2, 1970.

U.S. District
Court for the
District of Puerto
Rico.
Jurisdiction.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 13 of the Act entitled "An Act to provide for the appointment of additional district judges, and for other purposes", approved June 2, 1970 (Public Law 91–272; 84 Stat. 294), is amended by striking out the period at the end thereof and inserting in lieu thereof the following: "; however, nothing in this section shall impair the jurisdiction of the United States District Court for the District of Puerto Rico to hear and determine any action or matter begun in the court on or before June 2, 1970.".

Approved October 14, 1970.


Public Law 91-451

October 14, 1970
[H. R. 12943]

### AN ACT

To amend section 3 of the Act of November 2, 1966, to extend for three years the authority to make appropriations to carry out such Act.

Jellyfish
control.
Appropriation.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 3 of the Act entitled "An Act to provide for the control or elimination of jellyfish and other such pests in the coastal waters of the United States, and for other purposes", approved November 2, 1966 (16 U.S.C. 1203), is amended by striking out "for the fiscal year ending June 30, 1970" and inserting in lieu thereof "for the period beginning July 1, 1969, and ending June 30, 1973".

80 Stat. 1149.

Approved October 14, 1970.


Public Law 91-452

October 15, 1970
[S. 30]

### AN ACT

Relating to the control of organized crime in the United States.

Organized Crime
Control Act of
1970.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Organized Crime Control Act of 1970."

#### STATEMENT OF FINDINGS AND PURPOSE

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money

obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

## TITLE I—SPECIAL GRAND JURY

SEC. 101. (a) Title 18, United States Code, is amended by adding immediately after chapter 215 the following new chapter:

62 Stat. 829.
18 USC 3321.

### "Chapter 216.—SPECIAL GRAND JURY

"Sec.
"3331. Summoning and term.
"3332. Powers and duties.
"3333. Reports.
"3334. General provisions.

### "§ 3331. Summoning and term

"(a) In addition to such other grand juries as shall be called from time to time, each district court which is located in a judicial district containing more than four million inhabitants or in which the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, certifies in writing to the chief judge of the district that in his judgment a special grand jury is necessary because of criminal activity in the district shall order a special grand jury to be summoned at least once in each period of eighteen months unless another special grand jury is then serving. The grand jury shall serve for a term of eighteen months unless an order for its discharge is

entered earlier by the court upon a determination of the grand jury by majority vote that its business has been completed. If, at the end of such term or any extension thereof, the district court determines the business of the grand jury has not been completed, the court may enter an order extending such term for an additional period of six months. No special grand jury term so extended shall exceed thirty-six months, except as provided in subsection (e) of section 3333 of this chapter.

"(b) If a district court within any judicial circuit fails to extend the term of a special grand jury or enters an order for the discharge of such grand jury before such grand jury determines that it has completed its business, the grand jury, upon the affirmative vote of a majority of its members, may apply to the chief judge of the circuit for an order for the continuance of the term of the grand jury. Upon the making of such an application by the grand jury, the term thereof shall continue until the entry upon such application by the chief judge of the circuit of an appropriate order. No special grand jury term so extended shall exceed thirty-six months, except as provided in subsection (e) of section 3333 of this chapter.

## "§ 3332. Powers and duties

"(a) It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district. Such alleged offenses may be brought to the attention of the grand jury by the court or by any attorney appearing on behalf of the United States for the presentation of evidence. Any such attorney receiving information concerning such an alleged offense from any other person shall, if requested by such other person, inform the grand jury of such alleged offense, the identity of such other person, and such attorney's action or recommendation.

"(b) Whenever the district court determines that the volume of business of the special grand jury exceeds the capacity of the grand jury to discharge its obligations, the district court may order an additional special grand jury for that district to be impaneled.

## "§ 3333. Reports

"(a) A special grand jury impaneled by any district court, with the concurrence of a majority of its members, may, upon completion of its original term, or each extension thereof, submit to the court a report—

     "(1) concerning noncriminal misconduct, malfeasance, or misfeasance in office involving organized criminal activity by an appointed public officer or employee as the basis for a recommendation of removal or disciplinary action; or

     "(2) regarding organized crime conditions in the district.

*Examination; filing as public record.*

"(b) The court to which such report is submitted shall examine it and the minutes of the special grand jury and, except as otherwise provided in subsections (c) and (d) of this section, shall make an order accepting and filing such report as a public record only if the court is satisfied that it complies with the provisions of subsection (a) of this section and that—

     "(1) the report is based upon facts revealed in the course of an investigation authorized by subsection (a) of section 3332 and is supported by the preponderance of the evidence; and

     "(2) when the report is submitted pursuant to paragraph (1) of subsection (a) of this section, each person named therein and any reasonable number of witnesses in his behalf as designated by him to the foreman of the grand jury were afforded an opportu-

nity to testify before the grand jury prior to the filing of such report, and when the report is submitted pursuant to paragraph (2) of subsection (a) of this section, it is not critical of an identified person.

"(c) (1) An order accepting a report pursuant to paragraph (1) of subsection (a) of this section and the report shall be sealed by the court and shall not be filed as a public record or be subject to subpena or otherwise made public (i) until at least thirty-one days after a copy of the order and report are served upon each public officer or employee named therein and an answer has been filed or the time for filing an answer has expired, or (ii) if an appeal is taken, until all rights of review of the public officer or employee named therein have expired or terminated in an order accepting the report. No order accepting a report pursuant to paragraph (1) of subsection (a) of this section shall be entered until thirty days after the delivery of such report to the public officer or body pursuant to paragraph (3) of subsection (c) of this section. The court may issue such orders as it shall deem appropriate to prevent unauthorized publication of a report. Unauthorized publication may be punished as contempt of the court.

*Report, copy to public officers.*

"(2) Such public officer or employee may file with the clerk a verified answer to such a report not later than twenty days after service of the order and report upon him. Upon a showing of good cause, the court may grant such public officer or employee an extension of time within which to file such answer and may authorize such limited publication of the report as may be necessary to prepare such answer. Such an answer shall plainly and concisely state the facts and law constituting the defense of the public officer or employee to the charges in said report, and, except for those parts thereof which the court determines to have been inserted scandalously, prejudiciously, or unnecessarily, such answer shall become an appendix to the report.

*Answer, filing.*

"(3) Upon the expiration of the time set forth in paragraph (1) of subsection (c) of this section, the United States attorney shall deliver a true copy of such report, and the appendix, if any, for appropriate action to each public officer or body having jurisdiction, responsibility, or authority over each public officer or employee named in the report.

"(d) Upon the submission of a report pursuant to subsection (a) of this section, if the court finds that the filing of such report as a public record may prejudice fair consideration of a pending criminal matter, it shall order such report sealed and such report shall not be subject to subpena or public inspection during the pendency of such criminal matter, except upon order of the court.

"(e) Whenever the court to which a report is submitted pursuant to paragraph (1) of subsection (a) of this section is not satisfied that the report complies with the provisions of subsection (b) of this section, it may direct that additional testimony be taken before the same grand jury, or it shall make an order sealing such report, and it shall not be filed as a public record or be subject to subpena or otherwise made public until the provisions of subsection (b) of this section are met. A special grand jury term may be extended by the district court beyond thirty-six months in order that such additional testimony may be taken or the provisions of subsection (b) of this section may be met.

*Additional testimony.*

*Special grand jury term, extension.*

"(f) As used in this section, 'public officer or employee' means any officer or employee of the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision, or any department, agency, or instrumentality thereof.

*"Public officer or employee."*

**"§ 3334. General provisions**

62 Stat. 829. 18 USC 3321. 18 USC app.

"The provisions of chapter 215, title 18, United States Code, and the Federal Rules of Criminal Procedure applicable to regular grand juries shall apply to special grand juries to the extent not inconsistent with sections 3331, 3332, or 3333 of this chapter."

(b) The part analysis of part II, title 18, United States Code, is amended by adding immediately after

"215. Grand Jury........................................................ 3321"

the following new item:

"216. Special Grand Jury................................................ 3331."

71 Stat. 595.

SEC. 102. (a) Subsection (a), section 3500, chapter 223, title 18, United States Code, is amended by striking "to an agent of the Government" following "the defendant".

(b) Subsection (d), section 3500, chapter 223, title 18, United States Code, is amended by striking "paragraph" following "the court under" and inserting in lieu thereof "subsection".

(c) Paragraph (1), subsection (e), section 3500, chapter 223, title 18, United States Code, is amended by striking the "or" following the semicolon.

(d) Paragraph (2), subsection (e), section 3500, chapter 223, title 18, United States Code, is amended by striking "to an agent of the Government" after "said witness" and by striking the period at the end thereof and inserting in lieu thereof: "; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.".

## TITLE II—GENERAL IMMUNITY

62 Stat. 856. 18 USC 5001.

SEC. 201. (a) Title 18, United States Code, is amended by adding immediately after part IV the following new part:

### "PART V.—IMMUNITY OF WITNESSES

"Sec.
"6001. Definitions.
"6002. Immunity generally.
"6003. Court and grand jury proceedings.
"6004. Certain administrative proceedings.
"6005. Congressional proceedings.

**"§ 6001. Definitions**

"As used in this part—

80 Stat. 378, 948.

"(1) 'agency of the United States' means any executive department as defined in section 101 of title 5, United States Code, a military department as defined in section 102 of title 5, United States Code, the Atomic Energy Commission, the China Trade Act registrar appointed under 53 Stat. 1432 (15 U.S.C. sec. 143), the Civil Aeronautics Board, the Federal Communications Commission, the Federal Deposit Insurance Corporation, the Federal Maritime Commission, the Federal Power Commission, the Federal Trade Commission, the Interstate Commerce Commission, the National Labor Relations Board, the National Transportation Safety Board, the Railroad Retirement Board, an arbitration board established under 48 Stat. 1193 (45 U.S.C. sec. 157), the Securities and Exchange Commission, the Subversive Activities Control Board, or a board established under 49 Stat. 31 (15 U.S.C. sec. 715d);

*Post*, p. 930.

"(2) 'other information' includes any book, paper, document, record, recording, or other material;

"(3) 'proceeding before an agency of the United States' means any proceeding before such an agency with respect to which it is

authorized to issue subpenas and to take testimony or receive other information from witnesses under oath; and

"(4) 'court of the United States' means any of the following courts: the Supreme Court of the United States, a United States court of appeals, a United States district court established under chapter 5, title 28, United States Code, the District of Columbia Court of Appeals, the Superior Court of the District of Columbia, the District Court of Guam, the District Court of the Virgin Islands, the United States Court of Claims, the United States Court of Customs and Patent Appeals, the Tax Court of the United States, the Customs Court, and the Court of Military Appeals.

*62 Stat. 872;*
*Ante, p. 294.*
*28 USC 81.*

## "§ 6002. Immunity generally

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

"(1)  a court or grand jury of the United States,

"(2)  an agency of the United States, or

"(3)  either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

## "§ 6003. Court and grand jury proceedings

"(a)  In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

"(b)  A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

"(1)  the testimony or other information from such individual may be necessary to the public interest; and

"(2)  such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

## "§ 6004. Certain administrative proceedings

"(a)  In the case of any individual who has been or who may be called to testify or provide other information at any proceeding before an agency of the United States, the agency may, with the approval of the Attorney General, issue, in accordance with subsection (b) of this section, an order requiring the individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

"(b) An agency of the United States may issue an order under subsection (a) of this section only if in its judgment—

"(1) the testimony or other information from such individual may be necessary to the public interest; and

"(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

## "§ 6005. Congressional proceedings

"(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before either House of Congress, or any committee, or any subcommittee of either House, or any joint committee of the two Houses, a United States district court shall issue, in accordance with subsection (b) of this section, upon the request of a duly authorized representative of the House of Congress or the committee concerned, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

"(b) Before issuing an order under subsection (a) of this section, a United States district court shall find that—

"(1) in the case of a proceeding before either House of Congress, the request for such an order has been approved by an affirmative vote of a majority of the Members present of that House;

"(2) in the case of a proceeding before a committee or a sub-committee of either House of Congress or a joint committee of both Houses, the request for such an order has been approved by an affirmative vote of two-thirds of the members of the full committee; and

"(3) ten days or more prior to the day on which the request for such an order was made, the Attorney General was served with notice of an intention to request the order

"(c) Upon application of the Attorney General, the United States district court shall defer the issuance of any order under subsection (a) of this section for such period, not longer than twenty days from the date of the request for such order, as the Attorney General may specify."

(b) The table of parts for title 18, United States Code, is amended by adding at the end thereof the following:

"V. Immunity of Witnesses------------------------------------------- 6001".

Sec. 202. The third sentence of paragraph (b) of section 6 of the Commodity Exchange Act (69 Stat. 160; 7 U.S.C. 15) is amended by striking "49 U.S.C. 12, 46, 47, 48, relating to the attendance and testimony of witnesses, the production of documentary evidence, and the immunity of witnesses" and by inserting in lieu thereof the following: "(49 U.S.C. § 12), relating to the attendance and testimony of witnesses and the production of documentary evidence,".

*Repeal.*   Sec. 203. Subsection (f) of section 17 of the United States Grain Standards Act (82 Stat. 768; 7 U.S.C. § 87f(f)), is repealed.

Sec. 204. The second sentence of section 5 of the Act entitled "An Act to regulate the marketing of economic poisons and devices, and for other purposes", approved June 25, 1947 (61 Stat. 168; 7 U.S.C. § 135c), is amended by inserting after "section", the following language: ", or any evidence which is directly or indirectly derived from such evidence,".

*Repeal.*   Sec. 205. Subsection (f) of section 13 of the Perishable Agricultural Commodities Act, 1930 (46 Stat. 536; 7 U.S.C. § 499m(f)), is repealed.

Sec. 206. (a) Section 16 of the Cotton Research and Promotion Act (80 Stat. 285; 7 U.S.C. § 2115) is amended by striking "(a)" and by striking subsection (b).

(b) The section heading for such section 16 is amended by striking ": Self-Incrimination".

Sec. 207. Clause (10) of subsection (a) of section 7 of the Act entitled "An Act to establish a uniform system of bankruptcy throughout the United States", approved July 1, 1898 (52 Stat. 847; 11 U.S.C. § 25(a)(10)), is amended by inserting after the first use of the term "testimony" the following language: ", or any evidence which is directly or indirectly derived from such testimony,".

Sec. 208. The fourth sentence of subsection (d) of section 10 of the Federal Deposit Insurance Act (64 Stat. 882; 12 U.S.C. § 1820(d)), is repealed. *Repeal.*

Sec. 209. The seventh paragraph under the center heading "DEPARTMENT OF JUSTICE" in the first section of the Act of February 25, 1903 (32 Stat. 904; 15 U.S.C. § 32), is amended by striking ": *Provided,* That" and all that follows in that paragraph and inserting in lieu thereof a period.

Sec. 210. The Act of June 30, 1906 (34 Stat. 798; 15 U.S.C. § 33), is repealed. *Repeals.*

Sec. 211. The seventh paragraph of section 9 of the Federal Trade Commission Act (38 Stat. 722; 15 U.S.C. § 49), is repealed.

Sec. 212. Subsection (d) of section 21 of the Securities Exchange Act of 1934 (48 Stat. 899; 15 U.S.C. § 78u(d)), is repealed.

Sec. 213. Subsection (c) of section 22 of the Securities Act of 1933 (48 Stat. 86; 15 U.S.C. § 77v(c)), is repealed.

Sec. 214. Subsection (e) of section 18 of the Public Utility Holding Company Act of 1935 (49 Stat. 831; 15 U.S.C. § 79r(e)), is repealed.

Sec. 215. Subsection (d) of section 42 of the Investment Company Act of 1940 (54 Stat. 842; 15 U.S.C. § 80a-41(d)), is repealed.

Sec. 216. Subsection (d) of section 209 of the Investment Advisers Act of 1940 (54 Stat. 853; 15 U.S.C. § 80b-9(d)), is repealed.

Sec. 217. Subsection (c) of section 15 of the China Trade Act, 1922 (42 Stat. 953; 15 U.S.C. § 155(c)), is repealed. *42 Stat. 853.*

Sec. 218. Subsection (h) of section 14 of the Natural Gas Act (52 Stat. 828; 15 U.S.C. § 717m(h)), is repealed.

Sec. 219. The first proviso of section 12 of the Act entitled "An Act to regulate the interstate distribution and sale of packages of hazardous substances intended or suitable for household use," approved July 12, 1960 (74 Stat. 379; 15 U.S.C. § 1271), is amended by inserting after "section" the following language: ", or any evidence which is directly or indirectly derived from such evidence,".

Sec. 220. Subsection (e) of section 1415 of the Interstate Land Sales Full Disclosure Act (82 Stat. 596; 15 U.S.C. § 1714(e)), is repealed. *Repeals.*

Sec. 221. Subsection (g) of section 307 of the Federal Power Act (49 Stat. 856; 16 U.S.C. § 825f(g)), is repealed.

Sec. 222. Subsection (b) of section 835 of title 18, United States Code, is amended by striking the third sentence thereof. *74 Stat. 811.*

Sec. 223. (a) Section 895 of title 18, United States Code, is repealed. *Repeal. 82 Stat. 162.*

(b) The table of sections of chapter 42 of such title is amended by striking the item relating to section 895.

Sec. 224. (a) Section 1406 of title 18, United States Code, is repealed. *Repeal. 70 Stat. 574.*

(b) The table of sections of chapter 68 of such title is amended by striking the item relating to section 1406.

930                          PUBLIC LAW 91-452—OCT. 15, 1970              [84 STAT.

76 Stat. 42.

SEC. 225. Section 1954 of title 18, United States Code, is amended by striking "(a) Whoever" and inserting in lieu thereof "Whoever" and by striking subsection (b) thereof.

62 Stat. 813.

SEC. 226. The second sentence of subsection (b), section 2424, title 18, United States Code, is amended by striking "but no person" and all that follows in that subsection and inserting in lieu thereof: "but no information contained in the statement or any evidence which is directly or indirectly derived from such information may be used against any person making such statement in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with this section."

Repeal, effective date.
82 Stat. 216.

SEC. 227. (a) Section 2514 of title 18, United States Code, is repealed effective four years after the effective date of this Act.

(b) The table of sections of chapter 119 of such title is amended by striking the item relating to section 2514.

Repeal.
68 Stat. 745.

SEC. 228. (a) Section 3486 of title 18, United States Code, is repealed.

(b) The table of sections of chapter 223 of such title is amended by striking the item relating to section 3486.

SEC. 229. Subsection (e) of section 333 of the Tariff Act of 1930 (46 Stat. 699; 19 U.S.C. § 1333(e)), is amended by striking ": *Provided*, That" and all that follows in that subsection and inserting in lieu thereof a period.

SEC. 230. The first proviso of section 703 of the Federal Food, Drug, and Cosmetic Act, approved June 25, 1938 (52 Stat. 1057; 21 U.S.C. § 373), is amended by inserting after "section" the following language: ", or any evidence which is directly or indirectly derived from such evidence,".

Repeal.
68A Stat. 586.
26 USC 4874.

SEC. 231. (a) Section 4874 of the Internal Revenue Code of 1954 is repealed.

(b) The table of sections of part III of subchapter (D) of chapter 39 of such Code is amended by striking the item relating to section 4874.

Repeal.
68A Stat. 893.

SEC. 232. Section 7493 of the Internal Revenue Code of 1954 is repealed.

SEC. 233. The table of sections of part III of subchapter (E) of chapter 76 of the Internal Revenue Code of 1954 is amended by striking the item relating to section 7493.

Repeal.
61 Stat. 150.

SEC. 234. Paragraph (3) of section 11 of the Labor Management Relations Act, 1947 (49 Stat. 455; 29 U.S.C. § 161(3)), is repealed.

Repeal.

SEC. 235. The third sentence of section 4 of the Act entitled "An Act to provide that tolls on certain bridges over navigable waters of the United States shall be just and reasonable, and for other purposes", approved August 21, 1935 (49 Stat. 671; 33 U.S.C. § 506), is repealed.

Repeal.
53 Stat. 1368.

SEC. 236. Subsection (f) of section 205 of the Social Security Act (42 U.S.C. § 405(f)) is repealed.

SEC. 237. Paragraph c of section 161 of the Atomic Energy Act of 1954 (68 Stat. 948; 42 U.S.C. § 2201(c)), is amended by striking the third sentence thereof.

Repeals.

SEC. 238. The last sentence of the first paragraph of subparagraph (h) of the paragraph designated "Third" of section 7 of the Railway Labor Act (44 Stat. 582; 45 U.S.C. § 157), is repealed.

SEC. 239. Subsection (c) of section 12 of the Railroad Unemployment Insurance Act (52 Stat. 1107; 45 U.S.C. § 362(c)), is repealed.

SEC. 240. Section 28 of the Shipping Act of 1916 (39 Stat. 737; 46 U.S.C. § 827), is repealed.

SEC. 241. Subsection (c) of section 214 of the Merchant Marine Act, 1936 (49 Stat. 1991; 46 U.S.C. § 1124(c)), is repealed.

66 Stat. 722.

SEC. 242. Subsection (i) of section 409 of the Communications Act of 1934 (48 Stat. 1096; 47 U.S.C. § 409 (l)), is repealed.

Sec. 243. (a) The second sentence of section 9 of the Interstate Commerce Act (24 Stat. 382; 49 U.S.C. § 9), is amended by striking "; the claim" and all that follows in that sentence and inserting in lieu thereof a period.

(b) Subsection (a) of section 316 of the Interstate Commerce Act (54 Stat. 946; 49 U.S.C. § 916(a)), is amended by striking the comma following "part I" and by striking ", and the Immunity of Witnesses Act (34 Stat. 798; 32 Stat. 904, ch. 755, sec. 1),".

(c) Subsection (a) of section 417 of the Interstate Commerce Act (49 U.S.C. § 1017(a)), is amended by striking the comma after "such provisions" and by striking ", and of the Immunity of Witnesses Act (34 Stat. 798; 32 Stat. 904, ch. 755, sec. 1),".   56 Stat. 297.

Sec. 244. The third sentence of section 3 of the Act entitled "An Act to further regulate Commerce with foreign nations and among the States", approved February 19, 1903 (32 Stat. 848; 49 U.S.C. § 43), is amended by striking "; the claim" and all that follows in that sentence down through and including "*Provided*, That the provisions" and inserting in lieu thereof ". The provisions".

Sec. 245. The first paragraph of the Act of February 11, 1893 (27 Stat. 443; 49 U.S.C. § 46), repealed.   Repeals.

Sec. 246. Subsection (i) of section 1004 of the Federal Aviation Act of 1958 (72 Stat. 792; 49 U.S.C. § 1484(i)), is repealed.

Sec. 247. The ninth sentence of subsection (c) of section 13 of the Internal Security Act of 1950 (81 Stat. 768; 50 U.S.C. § 792(c)), is repealed.

Sec. 248. Section 1302 of the Second War Powers Act of 1942 (56 Stat. 185; 50 U.S.C. App. § 643a), is amended by striking the fourth sentence thereof.

Sec. 249. Paragraph (4) of subsection (a) of section 2 of the Act entitled "An Act to expedite national defense, and for other purposes", approved June 28, 1940 (54 Stat. 676; 50 U.S.C. App. § 1152(a)(4)), is amended by striking the fourth sentence thereof.   56 Stat. 179.

Sec. 250. Subsection (d) of section 6 of the Export Control Act of 1949 (63 Stat. 8; 50 U.S.C. App. § 2026(b)), is repealed.

Sec. 251. Subsection (b) of section 705 of the Act of September 8, 1950, to amend the Tariff Act of 1930 (64 Stat. 816; 50 U.S.C. § 2155(b)), is repealed.

Sec. 252. Section 23–545 of the District of Columbia Code is repealed.   *Ante*, p. 619.

Sec. 253. Section 42 of the Act of October 9, 1940, 54 Stat. 1082 (D.C. Code, sec. 35–1346), is repealed.

Sec. 254. Section 2 of the Act of June 19, 1934, 48 Stat. 1176 (section 35–802, District of Columbia Code), is repealed.

Sec. 255. Section 29 of the Act of March 4, 1922, 42 Stat. 414 (section 35–1129, District of Columbia Code), is repealed.

Sec. 256. Section 9 of the Act of February 7, 1914, 38 Stat. 282, as amended (section 22–2721, District of Columbia Code), is repealed.

Sec. 257. Section 5 of the Act of February 7, 1914, 38 Stat. 281 (section 22–2717, District of Columbia Code), is amended by striking out "2721" and inserting in lieu thereof "2720".

Sec. 258. Section 8 of the Act of February 7, 1914, 38 Stat. 282 (section 22–2720, District of Columbia Code), is amended by striking out "2721" and inserting in lieu thereof "2720".

Sec. 259. In addition to the provisions of law specifically amended or specifically repealed by this title, any other provision of law inconsistent with the provisions of part V of title 18, United States Code (adding by title II of this Act), is to that extent amended or repealed.   *Ante*, p. 926.

Sec. 260. The provisions of part V of title 18, United States Code, added by title II of this Act, and the amendments and repeals made by   Effective date.

932    PUBLIC LAW 91-452–OCT. 15, 1970    [84 Stat.

title II of this Act, shall take effect on the sixtieth day following the date of the enactment of this Act. No amendment to or repeal of any provision of law under title II of this Act shall affect any immunity to which any individual is entitled under such provision by reason of any testimony or other information given before such day.

## TITLE III—RECALCITRANT WITNESSES

<div style="float:left">62 Stat. 950;<br>82 Stat. 62.<br>28 USC 1821-<br>1825.</div>

Sec. 301. (a) Chapter 119, title 28, United States Code, is amended by adding at the end thereof the following new section:

### "§ 1826. Recalcitrant witnesses

"(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—
"(1) the court proceeding, or
"(2) the term of the grand jury, including extensions,
before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.
"(b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal."

(b) The analysis of chapter 119, title 28, United States Code, is amended by adding at the end thereof the following new item:

"1826. Recalcitrant witnesses.".

<div style="float:left">75 Stat. 795.</div>

Sec. 302. (a) The first paragraph of section 1073, chapter 49, title 18, United States Code, is amended by inserting "or (3) to avoid service of, or contempt proceedings for alleged disobedience of, lawful process requiring attendance and the giving of testimony or the production of documentary evidence before an agency of a State empowered by the law of such State to conduct investigations of alleged criminal activities," immediately after "is charged,".

(b) The second paragraph of section 1073, chapter 49, title 18, United States Code, is amended by inserting immediately after "held in custody or confinement" a comma and adding "or in which an avoidance of service of process or a contempt referred to in clause (3) of the first paragraph of this section is alleged to have been committed,".

## TITLE IV—FALSE DECLARATIONS

<div style="float:left">62 Stat. 773;<br>78 Stat. 995.<br>18 USC 1621-<br>1622.</div>

Sec. 401. (a) Chapter 79, title 18, United States Code, is amended by adding at the end thereof the following new section:

### "§ 1623. False declarations before grand jury or court

"(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(b) This section is applicable whether the conduct occurred within or without the United States.

"(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

"(1) each declaration was material to the point in question, and

"(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

"(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

"(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence."

(b) The analysis of chapter 79, title 18, United States Code, is amended by adding at the end thereof the following new item:

"1623. False declarations before grand jury or court."

## TITLE V—PROTECTED FACILITIES FOR HOUSING GOVERNMENT WITNESSES

SEC. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

SEC. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

SEC. 503. As used in this title, "Government" means the United    "Government." States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by

934                          PUBLIC LAW 91-452–OCT. 15, 1970            [84 Stat.

the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

Appropriation.

Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.

TITLE VI—DEPOSITIONS

62 Stat. 832;
82 Stat. 210.
18 USC 3481-
3502.

Sec. 601. (a) Chapter 223, title 18, United States Code, is amended by adding at the end thereof the following new section:

**"§ 3503. Depositions to preserve testimony**

"(a) Whenever due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved, the court at any time after the filing of an indictment or information may upon motion of such party and notice to the parties order that the testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place. If a witness is committed for failure to give bail to appear to testify at a trial or hearing, the court on written motion of the witness and upon notice to the parties may direct that his deposition be taken. After the deposition has been subscribed the court may discharge the witness. A motion by the Government to obtain an order under this section shall contain certification by the Attorney General or his designee that the legal proceeding is against a person who is believed to have participated in an organized criminal activity.

Notice.

"(b) The party at whose instance a deposition is to be taken shall give to every party reasonable written notice of the time and place for taking the deposition. The notice shall state the name and address of each person to be examined. On motion of a party upon whom the notice is served, the court for cause shown may extend or shorten the time or change the place for taking the deposition. The officer having custody of a defendant shall be notified of the time and place set for the examination, and shall produce him at the examination and keep him in the presence of the witness during the examination. A defendant not in custody shall have the right to be present at the examination, but his failure, absent good cause shown, to appear after notice and tender of expenses shall constitute a waiver of that right and of any objection to the taking and use of the deposition based upon that right.

Counsel, appointment.

"(c) If a defendant is without counsel, the court shall advise him of his rights and assign counsel to represent him unless the defendant elects to proceed without counsel or is able to obtain counsel of his own choice. Whenever a deposition is taken at the instance of the Government, or whenever a deposition is taken at the instance of a defendant who appears to be unable to bear the expense of the taking of the deposition, the court may direct that the expenses of travel and subsistence of the defendant and his attorney for attendance at the examination shall be paid by the Government. In such event the marshal shall make payment accordingly.

Expenses, payment by U.S.

"(d) A deposition shall be taken and filed in the manner provided in civil actions, provided that (1) in no event shall a deposition be taken of a party defendant without his consent, and (2) the scope of examination and cross-examination shall be such as would be allowed in the trial itself. On request or waiver by the defendant the court may direct that a deposition be taken on written interrogatories in the manner provided in civil actions. Such request shall constitute

a waiver of any objection to the taking and use of the deposition based
upon its being so taken.

"(e) The Government shall make available to the defendant for
his examination and use at the taking of the deposition any statement
of the witness being deposed which is in the possession of the Govern-
ment and which the Government would be required to make available
to the defendant if the witness were testifying at the trial.

*Statements of witnesses, availability.*

"(f) At the trial or upon any hearing, a part or all of a deposition,
so far as otherwise admissible under the rules of evidence, may be used
if it appears: That the witness is dead; or that the witness is out of
the United States, unless it appears that the absence of the witness
was procured by the party offering the deposition; or that the witness
is unable to attend or testify because of sickness or infirmity; or that
the witness refuses in the trial or hearing to testify concerning the
subject of the deposition or part offered; or that the party offering
the deposition has been unable to procure the attendance of the wit-
ness by subpena. Any deposition may also be used by any party for
the purpose of contradicting or impeaching the testimony of the
deponent as a witness. If only a part of a deposition is offered in
evidence by a party, an adverse party may require him to offer all of
it which is relevant to the part offered and any party may offer other
parts.

*Depositions, conditions for use.*

"(g) Objections to receiving in evidence a deposition or part
thereof may be made as provided in civil actions."

(b) The analysis of chapter 223, title 18, United States Code, is
amended by adding at the end thereof the following new item:

"3503. Depositions to preserve testimony."

## TITLE VII—LITIGATION CONCERNING SOURCES OF EVIDENCE

### Part A—Special Findings

Sec. 701. The Congress finds that claims that evidence offered in
proceedings was obtained by the exploitation of unlawful acts, and
is therefore inadmissible in evidence, (1) often cannot reliably be
determined when such claims concern evidence of events occurring
years after the allegedly unlawful act, and (2) when the allegedly
unlawful act has occurred more than five years prior to the event in
question, there is virtually no likelihood that the evidence offered to
prove the event has been obtained by the exploitation of that allegedly
unlawful act.

### Part B—Litigation Concerning Sources of Evidence

Sec. 702. (a) Chapter 223, title 18, United States Code, is amended
by adding at the end thereof the following new section:

*Ante, p. 934.*

### "§ 3504. Litigation concerning sources of evidence

"(a) In any trial, hearing, or other proceeding in or before any court,
grand jury, department, officer, agency, regulatory body, or other
authority of the United States—

"(1) upon a claim by a party aggrieved that evidence is inad-
missible because it is the primary product of an unlawful act or
because it was obtained by the exploitation of an unlawful act,
the opponent of the claim shall affirm or deny the occurrence of the
alleged unlawful act;

"(2) disclosure of information for a determination if evidence
is inadmissible because it is the primary product of an unlawful

PUBLIC LAW 91-452–OCT. 15, 1970       [84 STAT.

act occurring prior to June 19, 1968, or because it was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, shall not be required unless such information may be relevant to a pending claim of such inadmissibility; and

"(3) no claim shall be considered that evidence of an event is inadmissible on the ground that such evidence was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, if such event occurred more than five years after such allegedly unlawful act.

*"Unlawful act."*

*82 Stat. 212.*

"(b) As used in this section 'unlawful act' means any act the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

(b) The analysis of chapter 223, title 18, United States Code, is amended by adding at the end thereof the following new item:

"3504. Litigation concerning sources of evidence."

*Applicability.*

SEC. 703. This title shall apply to all proceedings, regardless of when commenced, occurring after the date of its enactment. Paragraph (3) of subsection (a) of section 3504, chapter 223, title 18, United States Code, shall not apply to any proceeding in which all information to be relied upon to establish inadmissibility was possessed by the party making such claim and adduced in such proceeding prior to such enactment.

## TITLE VIII—SYNDICATED GAMBLING

### PART A—SPECIAL FINDINGS

SEC. 801. The Congress finds that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof.

### PART B—OBSTRUCTION OF STATE OR LOCAL LAW ENFORCEMENT

*62 Stat. 769;*
*81 Stat. 362.*
*18 USC 1501-*
*1510.*

SEC. 802. (a) Chapter 73, title 18, United States Code, is amended by adding at the end thereof the following new section:

#### "§ 1511. Obstruction of State or local law enforcement

"(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—

"(1) one or more of such persons does any act to effect the object of such a conspiracy;

"(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

"(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

*Definitions.*

"(b) As used in this section—

"(1) 'illegal gambling business' means a gambling business which—

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

"(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

"(3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

"(c) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization, except as compensation for actual expenses incurred by him in the conduct of such activity. <span>68A Stat. 163.<br>26 USC 501.</span>

"(d) Whoever violates this section shall be punished by a fine of not more than $20,000 or imprisonment for not more than five years, or both." <span>Penalty.</span>

(b) The analysis of chapter 73, title 18, United States Code, is amended by adding at the end thereof the following new item:

"1511. Obstruction of State or local law enforcement."

### Part C—Illegal Gambling Business

Sec. 803. (a) Chapter 95, title 18, United States Code, is amended by adding at the end thereof the following new section: <span>62 Stat. 793;<br>75 Stat. 492, 498;<br>76 Stat. 42.<br>18 USC 1951-<br>1954.</span>

### "§ 1955. Prohibition of illegal gambling businesses

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both. <span>Penalty.</span>

"(b) As used in this section— <span>Definitions.</span>

"(1) 'illegal gambling business' means a gambling business which—

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

"(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

"(3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

"(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

938                PUBLIC LAW 91-452–OCT. 15, 1970                [84 Stat.

Seizure and
forfeiture.

"(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

Exception.

"(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal

68A Stat. 163.
26 USC 501.

Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity."

(b) The analysis of chapter 95, title 18, United States Code, is amended by adding at the end thereof the following new item:

"1955. Prohibition of illegal gambling businesses."

### Part D—Commission To Review National Policy Toward Gambling

#### ESTABLISHMENT

Sec. 804. (a) There is hereby established two years after the effective date of this Act a Commission on the Review of the National Policy Toward Gambling.

Members,
appointments.

(b) The Commission shall be composed of fifteen members appointed as follows:

(1) four appointed by the President of the Senate from Members of the Senate, of whom two shall be members of the majority party, and two shall be members of the minority party;

(2) four appointed by the Speaker of the House of Representatives from Members of the House of Representatives, of whom two shall be members of the majority party, and two shall be members of the minority party; and

(3) seven appointed by the President of the United States from persons specially qualified by training and experience to perform the duties of the Commission, none of whom shall be officers of the executive branch of the Government.

(c) The President of the United States shall designate a Chairman from among the members of the Commission. Any vacancy in the Commission shall not affect its powers but shall be filled in the same manner in which the original appointment was made.

Quorum.

(d) Eight members of the Commission shall constitute a quorum.

### DUTIES

Sec. 805. (a) It shall be the duty of the Commission to conduct a comprehensive legal and factual study of gambling in the United States and existing Federal, State, and local policy and practices with respect to legal prohibition and taxation of gambling activities and to formulate and propose such changes in those policies and practices as the Commission may deem appropriate. In such study and review the Commission shall—

<div style="text-align:right">Gambling, study and review.</div>

(1) review the effectiveness of existing practices in law enforcement, judicial administration, and corrections in the United States and in foreign legal jurisdictions for the enforcement of the prohibition and taxation of gambling activities and consider possible alternatives to such practices; and

<div style="text-align:right">Law enforcement.</div>

(2) prepare a study of existing statutes of the United States that prohibit and tax gambling activities, and such a codification, revision, or repeal thereof as the Commission shall determine to be required to carry into effect such policy and practice changes as it may deem to be necessary or desirable.

<div style="text-align:right">Legislation.</div>

(b) The Commission shall make such interim reports as it deems advisable. It shall make a final report of its findings and recommendations to the President of the United States and to the Congress within the four-year period following the establishment of the Commission.

<div style="text-align:right">Reports to President and Congress.</div>

(c) Sixty days after the submission of its final report, the Commission shall cease to exist.

<div style="text-align:right">Termination.</div>

### POWERS

Sec. 806. (a) The Commission or any duly authorized subcommittee or member thereof may, for the purpose of carrying out the provisions of this title, hold such hearings, sit and act at such times and places, administer such oaths, and require by subpena or otherwise the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as the Commission or such subcommittee or member may deem advisable. Any member of the Commission may administer oaths or affirmations to witnesses appearing before the Commission or before such subcommittee or member. Subpenas may be issued under the signature of the Chairman or any duly designated member of the Commission, and may be served by any person designated by the Chairman or such member.

<div style="text-align:right">Hearings, subpena powers.</div>

(b) In the case of contumacy or refusal to obey a subpena issued under subsection (a) by any person who resides, is found, or transacts business within the jurisdiction of any district court of the United States, the district court, at the request of the Chairman of the Commission, shall have jurisdiction to issue to such person an order requiring such person to appear before the Commission or a subcommittee or member thereof, there to produce evidence if so ordered, or there to give testimony touching the matter under inquiry. Any failure of any such person to obey any such order of the court may be punished by the court as a contempt thereof.

<div style="text-align:right">Court order requiring attendance.</div>

(c) The Commission shall be "an agency of the United States" under subsection (1), section 6001, title 18, United States Code, for the purpose of granting immunity to witnesses.

<div style="text-align:right">Ante, p. 926.</div>

(d) Each department, agency, and instrumentality of the executive branch of the Government including independent agencies, is authorized and directed to furnish to the Commission, upon request made by the Chairman, on a reimbursable basis or otherwise, such statistical

<div style="text-align:right">Federal and State information services.</div>

data, reports, and other information as the Commission deems necessary to carry out its functions under this title. The Chairman is further authorized to call upon the departments, agencies, and other offices of the several States to furnish, on a reimbursable basis or otherwise, such statistical data, reports, and other information as the Commission deems necessary to carry out its functions under this title.

### COMPENSATION AND EXEMPTION OF MEMBERS

SEC. 807. (a) A member of the Commission who is a Member of Congress or a member of the Federal judiciary shall serve without additional compensation, but shall be reimbursed for travel, subsistence, and other necessary expenses incurred in the performance of duties vested in the Commission.

(b) A member of the Commission who is not a member of Congress or a member of the Federal judiciary shall receive $100 per diem when engaged in the actual performance of duties vested in the Commission plus reimbursement for travel, subsistence, and other necessary expenses incurred in the performance of such duties.

### STAFF

SEC. 808. (a) Subject to such rules and regulations as may be adopted by the Commission, the Chairman shall have the power to—

(1) appoint and fix the compensation of an Executive Director, and such additional staff personnel as he deems necessary, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at rates not in excess of the maximum rate for GS–18 of the General Schedule under section 5332 of such title; and

80 Stat. 443, 467.
5 USC 5101, 5331.
*Ante*, p. 198-1

(2) procure temporary and intermittent services to the same extent as is authorized by section 3109 of title 5, United States Code, but at rates not to exceed $100 a day for individuals.

80 Stat. 416.

(b) In making appointments pursuant to this subsection, the Chairman shall include among his appointments individuals determined by the Chairman to be competent social scientists, lawyers, and law enforcement officers.

### EXPENSES

Appropriation.

SEC. 809. There are hereby authorized to be appropriated to the Commission such sums as may be necessary to carry this title into effect.

### PART E—GENERAL PROVISIONS

82 Stat. 216.

SEC. 810. Paragraph (c), subsection (1), Section 2516, title 18, United States Code, is amended by adding "section 1511 (obstruction of State or local law enforcement)," after "section 1510 (obstruction of criminal investigations)," and by adding "section 1955 (prohibition of business enterprises of gambling)," after "section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan),".

State laws, priority.

SEC. 811. No provision of this title indicates an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of a State or possession, or a political subdivision of a State or possession, on the same subject matter, or to relieve any person of any obligation imposed by any law of any State or possession, or political subdivision of a State or possession.

Compendium_Roth
Page 0049

# TITLE IX—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

Sec. 901. (a) Title 18, United States Code, is amended by adding immediately after chapter 95 thereof the following new chapter:    62 Stat. 683.

## "Chapter 96.—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

"Sec.
"1961. Definitions.
"1962. Prohibited racketeering activities.
"1963. Criminal penalties.
"1964. Civil remedies.
"1965. Venue and process.
"1966. Expedition of actions.
"1967. Evidence.
"1968. Civil investigative demand.

## "§ 1961. Definitions

"As used in this chapter—

"(1) 'racketeering activity' means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473, relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;

"(2) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

"(3) 'person' includes any individual or entity capable of holding a legal or beneficial interest in property;

"(4) 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

76 Stat. 1119.
78 Stat. 203.
62 Stat. 705.
80 Stat. 904.
76 Stat. 41.
82 Stat. 160.
75 Stat. 491.
62 Stat. 763.
70 Stat. 523.
62 Stat. 769.
81 Stat. 362.
Ante, p. 936.
62 Stat. 793.
75 Stat. 498,
492.
76 Stat. 42.
Ante, p. 937.
62 Stat. 806.
61 Stat. 157;
73 Stat. 537, 535.

"(5) 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

"(6) 'unlawful debt' means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

"(7) 'racketeering investigator' means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

"(8) 'racketeering investigation' means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

"(9) 'documentary material' includes any book, paper, document, record, recording, or other material; and

"(10) 'Attorney General' includes the Attorney General of the United States, the Deputy Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

## "§ 1962. Prohibited activities

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

"(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control

65 Stat. 717.

of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

## "§ 1963. Criminal penalties

"(a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

"(b) In any action brought by the United States under this section, the district courts of the United States shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including, but not limited to, the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as it shall deem proper.

*Court restraining orders.*

"(c) Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper. If a property right or other interest is not exercisable or transferable for value by the United States, it shall expire, and shall not revert to the convicted person. All provisions of law relating to the disposition of property, or the proceeds from the sale thereof, or the remission or mitigation of forfeitures for violation of the customs laws, and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions hereof. Such duties as are imposed upon the collector of customs or any other person with respect to the disposition of property under the customs laws shall be performed under this chapter by the Attorney General. The United States shall dispose of all such property as soon as commercially feasible, making due provision for the rights of innocent persons.

*Property, seizure and disposition.*

## "§ 1964. Civil remedies

"(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

*Jurisdiction.*

"(b) The Attorney General may institute proceedings under this section. In any action brought by the United States under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take

such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

"(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

"(d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

## "§ 1965. Venue and process

"(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

"(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

"(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

"(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

## "§ 1966. Expedition of actions

"In any civil action instituted under this chapter by the United States in any district court of the United States, the Attorney General may file with the clerk of such court a certificate stating that in his opinion the case is of general public importance. A copy of that certificate shall be furnished immediately by such clerk to the chief judge or in his absence to the presiding district judge of the district in which such action is pending. Upon receipt of such copy, such judge shall designate immediately a judge of that district to hear and determine action. The judge so designated shall assign such action for hearing as soon as practicable, participate in the hearings and determination thereof, and cause such action to be expedited in every way.

## "§ 1967. Evidence

"In any proceeding ancillary to or in any civil action instituted by the United States under this chapter the proceedings may be open or closed to the public at the discretion of the court after consideration of the rights of affected persons.

## "§ 1968. Civil investigative demand

"(a) Whenever the Attorney General has reason to believe that any person or enterprise may be in possession, custody, or control of any documentary materials relevant to a racketeering investigation, he may, prior to the institution of a civil or criminal proceeding thereon,

issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such material for examination.

"(b) Each such demand shall—

"(1) state the nature of the conduct constituting the alleged racketeering violation which is under investigation and the provision of law applicable thereto;

"(2) describe the class or classes of documentary material produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;

"(3) state that the demand is returnable forthwith or prescribe a return date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

"(4) identify the custodian to whom such material shall be made available.

"(c) No such demand shall—

"(1) contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation; or

"(2) require the production of any documentary evidence which would be privileged from disclosure if demanded by a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation.

"(d) Service of any such demand or any petition filed under this section may be made upon a person by—

"(1) delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, or upon any individual person;

"(2) delivering a duly executed copy thereof to the principal office or place of business of the person to be served; or

"(3) depositing such copy in the United States mail, by registered or certified mail duly addressed to such person at its principal office or place of business.

"(e) A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be prima facie proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

"(f)(1) The Attorney General shall designate a racketeering investigator to serve as racketeer document custodian, and such additional racketeering investigators as he shall determine from time to time to be necessary to serve as deputies to such officer.

"(2) Any person upon whom any demand issued under this section has been duly served shall make such material available for inspection and copying or reproduction to the custodian designated therein at the principal place of business of such person, or at such other place as such custodian and such person thereafter may agree and prescribe in writing or as the court may direct, pursuant to this section on the return date specified in such demand, or on such later date as such custodian may prescribe in writing. Such person may upon written agreement between such person and the custodian substitute for copies of all or any part of such material originals thereof.

"(3) The custodian to whom any documentary material is so delivered shall take physical possession thereof, and shall be responsible for the use made thereof and for the return thereof pursuant to

this chapter. The custodian may cause the preparation of such copies of such documentary material as may be required for official use under regulations which shall be promulgated by the Attorney General. While in the possession of the custodian, no material so produced shall be available for examination, without the consent of the person who produced such material, by any individual other than the Attorney General. Under such reasonable terms and conditions as the Attorney General shall prescribe, documentary material while in the possession of the custodian shall be available for examination by the person who produced such material or any duly authorized representatives of such person.

"(4) Whenever any attorney has been designated to appear on behalf of the United States before any court or grand jury in any case or proceeding involving any alleged violation of this chapter, the custodian may deliver to such attorney such documentary material in the possession of the custodian as such attorney determines to be required for use in the presentation of such case or proceeding on behalf of the United States. Upon the conclusion of any such case or proceeding, such attorney shall return to the custodian any documentary material so withdrawn which has not passed into the control of such court or grand jury through the introduction thereof into the record of such case or proceeding.

"(5) Upon the completion of—

"(i) the racketeering investigation for which any documentary material was produced under this chapter, and

"(ii) any case or proceeding arising from such investigation, the custodian shall return to the person who produced such material all such material other than copies thereof made by the Attorney General pursuant to this subsection which has not passed into the control of any court or grand jury through the introduction thereof into the record of such case or proceeding.

"(6) When any documentary material has been produced by any person under this section for use in any racketeering investigation, and no such case or proceeding arising therefrom has been instituted within a reasonable time after completion of the examination and analysis of all evidence assembled in the course of such investigation, such person shall be entitled, upon written demand made upon the Attorney General, to the return of all documentary material other than copies thereof made pursuant to this subsection so produced by such person.

"(7) In the event of the death, disability, or separation from service of the custodian of any documentary material produced under any demand issued under this section or the official relief of such custodian from responsibility for the custody and control of such material, the Attorney General shall promptly—

"(i) designate another racketeering investigator to serve as custodian thereof, and

"(ii) transmit notice in writing to the person who produced such material as to the identity and address of the successor so designated.

Any successor so designated shall have with regard to such materials all duties and responsibilities imposed by this section upon his predecessor in office with regard thereto, except that he shall not be held responsible for any default or dereliction which occurred before his designation as custodian.

"(g) Whenever any person fails to comply with any civil investigative demand duly served upon him under this section or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the Attorney General may file, in the district court of the United States for any

judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of this section, except that if such person transacts business in more than one such district such petition shall be filed in the district in which such person maintains his principal place of business, or in such other district in which such person transacts business as may be agreed upon by the parties to such petition.

"(h) Within twenty days after the service of any such demand upon any person, or at any time before the return date specified in the demand, whichever period is shorter, such person may file, in the district court of the United States for the judicial district within which such person resides, is found, or transacts business, and serve upon such custodian a petition for an order of such court modifying or setting aside such demand. The time allowed for compliance with the demand in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such petition in the court. Such petition shall specify each ground upon which the petitioner relies in seeking such relief, and may be based upon any failure of such demand to comply with the provisions of this section or upon any constitutional or other legal right or privilege of such person.

"(i) At any time during which any custodian is in custody or control of any documentary material delivered by any person in compliance with any such demand, such person may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this section.

"(j) Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this section."

(b) The table of contents of part I, title 18, United States Code, is amended by adding immediately after

"95. Racketeering _____ 1951"

the following new item:

"96. Racketeer Influenced and Corrupt Organizations_____ 1961"

SEC. 902. (a) Paragraph (c), subsection (1), section 2516, title 18, United States Code, is amended by inserting at the end thereof between the parenthesis and the semicolon ", section 1963 (violations with respect to racketeer influenced and corrupt organizations)".   82 Stat. 216.

(b) Subsection (3), section 2517, title 18, United States Code, is amended by striking "criminal proceedings in any court of the United States or of any State or in any Federal or State grand jury proceeding" and inserting in lieu thereof "proceeding held under the authority of the United States or of any State or political subdivision thereof".

SEC. 903. The third paragraph, section 1505, title 18, United States Code, is amended by inserting "or section 1968 of this title" after "Act" and before "willfully".   76 Stat. 551.

SEC. 904. (a) The provisions of this title shall be liberally construed to effectuate its remedial purposes.

(b) Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title.   Federal and State laws, priority.

(c) Nothing contained in this title shall impair the authority of any attorney representing the United States to—

(1) lay before any grand jury impaneled by any district court of

the United States any evidence concerning any alleged racketeering violation of law;

(2) invoke the power of any such court to compel the production of any evidence before any such grand jury; or

(3) institute any proceeding to enforce any order or process issued in execution of such power or to punish disobedience of any such order or process by any person.

## TITLE X—DANGEROUS SPECIAL OFFENDER SENTENCING

<div style="margin-left:2em">62 Stat. 837.<br>18 USC 3561-3574.</div>

Sec. 1001. (a) Chapter 227, title 18, United States Code, is amended by adding at the end thereof the following new sections:

### "§ 3575. Increased sentence for dangerous special offenders

"(a) Whenever an attorney charged with the prosecution of a defendant in a court of the United States for an alleged felony committed when the defendant was over the age of twenty-one years has reason to believe that the defendant is a dangerous special offender such attorney, a reasonable time before trial or acceptance by the court of a plea of guilty or nolo contendere, may sign and file with the court, and may amend, a notice (1) specifying that the defendant is a dangerous special offender who upon conviction for such felony is subject to the imposition of a sentence under subsection (b) of this section, and (2) setting out with particularity the reasons why such attorney believes the defendant to be a dangerous special offender. In no case shall the fact that the defendant is alleged to be a dangerous special offender be an issue upon the trial of such felony, be disclosed to the jury, or be disclosed before any plea of guilty or nolo contendere or verdict or finding of guilty to the presiding judge without the consent of the parties. If the court finds that the filing of the notice as a public record may prejudice fair consideration of a pending criminal matter, it may order the notice sealed and the notice shall not be subject to subpena or public inspection during the pendency of such criminal matter, except on order of the court, but shall be subject to inspection by the defendant alleged to be a dangerous special offender and his counsel.

"(b) Upon any plea of guilty or nolo contendere or verdict or finding of guilty of the defendant of such felony, a hearing shall be held, before sentence is imposed, by the court sitting without a jury. The court shall fix a time for the hearing, and notice thereof shall be given to the defendant and the United States at least ten days prior thereto. The court shall permit the United States and counsel for the defendant, or the defendant if he is not represented by counsel, to inspect the presentence report sufficiently prior to the hearing as to afford a reasonable opportunity for verification. In extraordinary cases, the court may withhold material not relevant to a proper sentence, diagnostic opinion which might seriously disrupt a program of rehabilitation, any source of information obtained on a promise of confidentiality, and material previously disclosed in open court. A court withholding all or part of a presentence report shall inform the parties of its action and place in the record the reasons therefor. The court may require parties inspecting all or part of a presentence report to give notice of any part thereof intended to be controverted. In connection with the hearing, the defendant and the United States shall be entitled to assistance of counsel, compulsory process, and cross-examination of such witnesses as appear at the hearing. A duly authenticated copy of a former judgment or commitment shall be prima facie evidence of such former judgment or commitment. If it

appears by a preponderance of the information, including information submitted during the trial of such felony and the sentencing hearing and so much of the presentence report as the court relies upon, that the defendant is a dangerous special offender, the court shall sentence the defendant to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felony. Otherwise it shall sentence the defendant in accordance with the law prescribing penalties for such felony. The court shall place in the record its findings, including an identification of the information relied upon in making such findings, and its reasons for the sentence imposed.

"(c) This section shall not prevent the imposition and execution of a sentence of death or of imprisonment for life or for a term exceeding twenty-five years upon any person convicted of an offense so punishable.

"(d) Notwithstanding any other provision of this section, the court shall not sentence a dangerous special offender to less than any mandatory minimum penalty prescribed by law for such felony. This section shall not be construed as creating any mandatory minimum penalty.

"(e) A defendant is a special offender for purposes of this section if—

"(1) the defendant has previously been convicted in courts of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof for two or more offenses committed on occasions different from one another and from such felony and punishable in such courts by death or imprisonment in excess of one year, for one or more of such convictions the defendant has been imprisoned prior to the commission of such felony, and less than five years have elapsed between the commission of such felony and either the defendant's release, on parole or otherwise, from imprisonment for one such conviction or his commission of the last such previous offense or another offense punishable by death or imprisonment in excess of one year under applicable laws of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency or instrumentality thereof; or

"(2) the defendant committed such felony as part of a pattern of conduct which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise; or

"(3) such felony was, or the defendant committed such felony in furtherance of, a conspiracy with three or more other persons to engage in a pattern of conduct criminal under applicable laws of any jurisdiction, and the defendant did, or agreed that he would, initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or conduct, or give or receive a bribe or use force as all or part of such conduct.

A conviction shown on direct or collateral review or at the hearing to be invalid or for which the defendant has been pardoned on the ground of innocence shall be disregarded for purposes of paragraph (1) of this subsection. In support of findings under paragraph (2) of this subsection, it may be shown that the defendant has had in his own name or under his control income or property not explained as derived from a source other than such conduct. For purposes of paragraph (2) of

this subsection, a substantial source of income means a source of income which for any period of one year or more exceeds the minimum wage, determined on the basis of a forty-hour week and a fifty-week year, without reference to exceptions, under section 6(a)(1) of the Fair Labor Standards Act of 1938 (52 Stat. 1602, as amended 80 Stat. 838), and as hereafter amended, for an employee engaged in commerce or in the production of goods for commerce, and which for the same period exceeds fifty percent of the defendant's declared adjusted gross income under section 62 of the Internal Revenue Act of 1954 (68A Stat. 17, as amended 83 Stat. 655), and as hereafter amended. For purposes of paragraph (2) of this subsection, special skill or expertise in criminal conduct includes unusual knowledge, judgment or ability, including manual dexterity, facilitating the initiation, organizing, planning, financing, direction, management, supervision, execution or concealment of criminal conduct, the enlistment of accomplices in such conduct, the escape from detection or apprehension for such conduct, or the disposition of the fruits or proceeds of such conduct. For purposes of paragraphs (2) and (3) of this subsection, criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

"(f) A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant.

"(g) The time for taking an appeal from a conviction for which sentence is imposed after proceedings under this section shall be measured from imposition of the original sentence.

## "§ 3576. Review of sentence

"With respect to the imposition, correction, or reduction of a sentence after proceedings under section 3575 of this chapter, a review of the sentence on the record of the sentencing court may be taken by the defendant or the United States to a court of appeals. Any review of the sentence taken by the United States shall be taken at least five days before expiration of the time for taking a review of the sentence or appeal of the conviction by the defendant and shall be diligently prosecuted. The sentencing court may, with or without motion and notice, extend the time for taking a review of the sentence for a period not to exceed thirty days from the expiration of the time otherwise prescribed by law. The court shall not extend the time for taking a review of the sentence by the United States after the time has expired. A court extending the time for taking a review of the sentence by the United States shall extend the time for taking a review of the sentence or appeal of the conviction by the defendant for the same period. The taking of a review of the sentence by the United States shall be deemed the taking of a review of the sentence and an appeal of the conviction by the defendant. Review of the sentence shall include review of whether the procedure employed was lawful, the findings made were clearly erroneous, or the sentencing court's discretion was abused. The court of appeals on review of the sentence may, after considering the record, including the entire presentence report, information submitted during the trial of such felony and the sentencing hearing, and the findings and reasons of the sentencing court, affirm the sentence, impose or direct the imposition of any sentence which the sentencing court could originally have imposed, or remand for further sentencing proceedings and imposition of sentence, except that a sentence may be made more severe only

29 USC 206.

26 USC 62.

on review of the sentence taken by the United States and after hearing. Failure of the United States to take a review of the imposition of the sentence shall, upon review taken by the United States of the correction or reduction of the sentence, foreclose imposition of a sentence more severe than that previously imposed. Any withdrawal or dismissal of review of the sentence taken by the United States shall foreclose imposition of a sentence more severe than that reviewed but shall not otherwise foreclose the review of the sentence or the appeal of the conviction. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence. Any review of the sentence taken by the United States may be dismissed on a showing of abuse of the right of the United States to take such review.

"**§ 3577. Use of information for sentencing**

"No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

"**§ 3578. Conviction records**

"(a) The Attorney General of the United States is authorized to establish in the Department of Justice a repository for records of convictions and determinations of the validity of such convictions.

"(b) Upon the conviction thereafter of a defendant in a court of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof for an offense punishable in such court by death or imprisonment in excess of one year, or a judicial determination of the validity of such conviction on collateral review, the court shall cause a certified record of the conviction or determination to be made to the repository in such form and containing such information as the Attorney General of the United States shall by regulation prescribe.

"(c) Records maintained in the repository shall not be public records. Certified copies thereof—

"(1) may be furnished for law enforcement purposes on request of a court or law enforcement or corrections officer of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

"(2) may be furnished for law enforcement purposes on request of a court or law enforcement or corrections officer of a State, any political subdivision, or any department, agency, or instrumentality thereof, if a statute of such State requires that, upon the conviction of a defendant in a court of the State or any political subdivision thereof for an offense punishable in such court by death or imprisonment in excess of one year, or a judicial determination of the validity of such conviction on collateral review, the court cause a certified record of the conviction or determination to be made to the repository in such form and containing such information as the Attorney General of the United States shall by regulation prescribe; and

"(3) shall be prima facie evidence in any court of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof, that the convictions occurred and whether they have been judicially determined to be invalid on collateral review.

Compendium_Roth
Page 0060

952                        PUBLIC LAW 91-452–OCT. 15, 1970              [84 Stat.

Hearing notice.         "(d)  The Attorney General of the United States shall give reason-
able public notice, and afford to interested parties opportunity for hear-
ing, prior to prescribing regulations under this section."
         (b)  The analysis of chapter 227, title 18, United States Code, is
amended by adding at the end thereof the following new items:

"3575. Increased sentence for dangerous special offenders.
"3576. Review of sentence.
"3577. Use of information for sentencing.
"3578. Conviction records."

80 Stat. 215.        SEC. 1002. Section 3148, chapter 207, title 18, United States Code,
is amended by adding "or sentence review under section 3576 of this
title" immediately after "sentence".

### TITLE XI—REGULATION OF EXPLOSIVES

#### PURPOSE

         SEC. 1101. The Congress hereby declares that the purpose of this
title is to protect interstate and foreign commerce against interfer-
ence and interruption by reducing the hazard to persons and property
arising from misuse and unsafe or insecure storage of explosive
materials. It is not the purpose of this title to place any undue or
unnecessary Federal restrictions or burdens on law-abiding citizens
with respect to the acquisition, possession, storage, or use of explosive
materials for industrial, mining, agricultural, or other lawful pur-
poses, or to provide for the imposition by Federal regulations of any
procedures or requirements other than those reasonably necessary to
implement and effectuate the provisions of this title.
         SEC. 1102. Title 18, United States Code, is amended by adding after
68 Stat. 170;
74 Stat. 87, 808.
18 USC 831. chapter 39 the following chapter:

### "Chapter 40.—IMPORTATION, MANUFACTURE, DISTRIBU-
### TION AND STORAGE OF EXPLOSIVE MATERIALS

"Sec.
"841. Definitions.
"842. Unlawful acts.
"843. Licensing and user permits.
"844. Penalties.
"845. Exceptions; relief from disabilities.
"846. Additional powers of the Secretary.
"847. Rules and regulations.
"848. Effect on State law.

#### "§ 841. Definitions

         "As used in this chapter—
         "(a) 'Person' means any individual, corporation, company, asso-
ciation, firm, partnership, society, or joint stock company.
         "(b) 'Interstate or foreign commerce' means commerce between
any place in a State and any place outside of that State, or within
any possession of the United States (not including the Canal
Zone) or the District of Columbia, and commerce between places
within the same State but through any place outside of that State.
'State' includes the District of Columbia, the Commonwealth of
Puerto Rico, and the possessions of the United States (not includ-
ing the Canal Zone).
         "(c) 'Explosive materials' means explosives, blasting agents,
and detonators.
         "(d) Except for the purposes of subsections (d), (e), (f), (g),
(h), (i), and (j) of section 844 of this title, 'explosives' means any
chemical compound mixture, or device, the primary or common
purpose of which is to function by explosion; the term includes,

Compendium_Roth
Page 0061

but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters. The Secretary shall publish and revise at least annually in the Federal Register a list of these and any additional explosives which he determines to be within the coverage of this chapter. For the purposes of subsections (d), (e), (f), (g), (h), and (i) of section 844 of this title, the term 'explosive' is defined in subsection (j) of such section 844.

Publication in Federal Register.

"(e) 'Blasting agent' means any material or mixture, consisting of fuel and oxidizer, intended for blasting, not otherwise defined as an explosive: *Provided*, That the finished product, as mixed for use or shipment, cannot be detonated by means of a numbered 8 test blasting cap when unconfined.

"(f) 'Detonator' means any device containing a detonating charge that is used for initiating detonation in an explosive; the term includes, but is not limited to, electric blasting caps of instantaneous and delay types, blasting caps for use with safety fuses and detonating-cord delay connectors.

"(g) 'Importer' means any person engaged in the business of importing or bringing explosive materials into the United States for purposes of sale or distribution.

"(h) 'Manufacturer' means any person engaged in the business of manufacturing explosive materials for purposes of sale or distribution or for his own use.

"(i) 'Dealer' means any person engaged in the business of distributing explosive materials at wholesale or retail.

"(j) 'Permittee' means any user of explosives for a lawful purpose, who has obtained a user permit under the provisions of this chapter.

"(k) 'Secretary' means the Secretary of the Treasury or his delegate.

"(l) 'Crime punishable by imprisonment for a term exceeding one year' shall not mean (1) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate, or (2) any State offense (other than one involving a firearm or explosive) classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

"(m) 'Licensee' means any importer, manufacturer, or dealer licensed under the provisions of this chapter.

"(n) 'Distribute' means sell, issue, give, transfer, or otherwise dispose of.

"**§ 842. Unlawful acts**

"(a) It shall be unlawful for any person—

"(1) to engage in the business of importing, manufacturing, or dealing in explosive materials without a license issued under this chapter;

"(2) knowingly to withhold information or to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive for the purpose of obtaining explosive materials, or a license, permit, exemption, or relief from disability under the provisions of this chapter; and

"(3) other than a licensee or permittee knowingly—

"(A) to transport, ship, cause to be transported, or receive in interstate or foreign commerce any explosive materials, except that a person who lawfully purchases explosive

materials from a licensee in a State contiguous to the State in which the purchaser resides may ship, transport, or cause to be transported such explosive materials to the State in which he resides and may receive such explosive materials in the State in which he resides, if such transportation, shipment, or receipt is permitted by the law of the State in which he resides; or

"(B) to distribute explosive materials to any person (other than a licensee or permittee) who the distributor knows or has reasonable cause to believe does not reside in the State in which the distributor resides.

"(b) It shall be unlawful for any licensee knowingly to distribute any explosive materials to any person except—

"(1) a licensee;

"(2) a permittee; or

"(3) a resident of the State where distribution is made and in which the licensee is licensed to do business or a State contiguous thereto if permitted by the law of the State of the purchaser's residence.

"(c) It shall be unlawful for any licensee to distribute explosive materials to any person who the licensee has reason to believe intends to transport such explosive materials into a State where the purchase, possession, or use of explosive materials is prohibited or which does not permit its residents to transport or ship explosive materials into it or to receive explosive materials in it.

"(d) It shall be unlawful for any licensee knowingly to distribute explosive materials to any individual who:

"(1) is under twenty-one years of age;

"(2) has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

"(3) is under indictment for a crime punishable by imprisonment for a term exceeding one year;

"(4) is a fugitive from justice;

68A Stat. 565.
26 USC 4761.

79 Stat. 227;
82 Stat. 1361.
21 USC 321.
74 Stat. 57.
26 USC 4731.
"(5) is an unlawful user of marihuana (as defined in section 4761 of the Internal Revenue Code of 1954) or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4721(a) of the Internal Revenue Code of 1954); or

"(6) has been adjudicated a mental defective.

"(e) It shall be unlawful for any licensee knowingly to distribute any explosive materials to any person in any State where the purchase, possession, or use by such person of such explosive materials would be in violation of any State law or any published ordinance applicable at the place of distribution.

Record requirements.
"(f) It shall be unlawful for any licensee or permittee willfully to manufacture, import, purchase, distribute, or receive explosive materials without making such records as the Secretary may by regulation require, including, but not limited to, a statement of intended use, the name, date, place of birth, social security number or taxpayer identification number, and place of residence of any natural person to whom explosive materials are distributed. If explosive materials are distributed to a corporation or other business entity, such records shall include the identity and principal and local places of business and the name, date, place of birth, and place of residence of the natural person acting as agent of the corporation or other business entity in arranging the distribution.

"(g) It shall be unlawful for any licensee or permittee knowingly to make any false entry in any record which he is required to keep pursuant to this section or regulations promulgated under section 847
Post, p. 959.
of this title.

"(h) It shall be unlawful for any person to receive, conceal, transport, ship, store, barter, sell, or dispose of any explosive materials knowing or having reasonable cause to believe that such explosive materials were stolen.

"(i) It shall be unlawful for any person—

"(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

"(2) who is a fugitive from justice;

"(3) who is an unlawful user of or addicted to marihuana (as defined in section 4761 of the Internal Revenue Code of 1954) or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954) ; or

"(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

68A Stat. 565.
26 USC 4761.

79 Stat. 227;
82 Stat. 1361.
21 USC 321.
74 Stat. 57,
26 USC 4731.

to ship or transport any explosive in interstate or foreign commerce or to receive any explosive which has been shipped or transported in interstate or foreign commerce.

"(j) It shall be unlawful for any person to store any explosive material in a manner not in conformity with regulations promulgated by the Secretary. In promulgating such regulations, the Secretary shall take into consideration the class, type, and quantity of explosive materials to be stored, as well as the standards of safety and security recognized in the explosives industry.

"(k) It shall be unlawful for any person who has knowledge of the theft or loss of any explosive materials from his stock, to fail to report such theft or loss within twenty-four hours of discovery thereof, to the Secretary and to appropriate local authorities.

## "§ 843. Licenses and user permits

"(a) An application for a user permit or a license to import, manufacture, or deal in explosive materials shall be in such form and contain such information as the Secretary shall by regulation prescribe. Each applicant for a license or permit shall pay a fee to be charged as set by the Secretary, said fee not to exceed $200 for each license or permit. Each license or permit shall be valid for no longer than three years from date of issuance and shall be renewable upon the same conditions and subject to the same restrictions as the original license or permit and upon payment of a renewal fee not to exceed one-half of the original fee.

"(b) Upon the filing of a proper application and payment of the prescribed fee, and subject to the provisions of this chapter and other applicable laws, the Secretary shall issue to such applicant the appropriate license or permit if—

"(1) the applicant (including in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not a person to whom the distribution of explosive materials would be unlawful under section 842(d) of this chapter;

"(2) the applicant has not willfully violated any of the provisions of this chapter or regulations issued hereunder;

"(3) the applicant has in a State premises from which he conducts or intends to conduct business;

"(4) the applicant has a place of storage for explosive materials which meets such standards of public safety and security against theft as the Secretary by regulations shall prescribe; and

PUBLIC LAW 91-452—OCT. 15, 1970 [84 STAT.

"(5) the applicant has demonstrated and certified in writing that he is familiar with all published State laws and ordinances relating to explosive materials for the location in which he intends to do business.

License authority.

"(c) The Secretary shall approve or deny an application within a period of forty-five days beginning on the date such application is received by the Secretary.

"(d) The Secretary may revoke any license or permit issued under this section if in the opinion of the Secretary the holder thereof has violated any provision of this chapter or any rule or regulation prescribed by the Secretary under this chapter, or has become ineligible to acquire explosive materials under section 842(d). The Secretary's action under this subsection may be reviewed only as provided in subsection (e) (2) of this section.

Denial or revocation, written notice.

"(e) (1) Any person whose application is denied or whose license or permit is revoked shall receive a written notice from the Secretary stating the specific grounds upon which such denial or revocation is based. Any notice of a revocation of a license or permit shall be given to the holder of such license or permit prior to or concurrently with the effective date of the revocation.

Judicial review.

"(2) If the Secretary denies an application for, or revokes a license, or permit, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation. In the case of a revocation, the Secretary may upon a request of the holder stay the effective date of the revocation. A hearing under this section shall be at a location convenient to the aggrieved party. The Secretary shall give written notice of his decision to the aggrieved party within a reasonable time after the hearing. The aggrieved party may, within sixty days after receipt of the Secretary's written decision, file a petition with the United States court of appeals for the district in which he resides or has his principal place of business for a judicial review of such denial or revocation, pursuant to sections 701–706 of title 5, United States Code.

80 Stat. 392.
Records, availability.

"(f) Licensees and permittees shall make available for inspection at all reasonable times their records kept pursuant to this chapter or the regulations issued hereunder, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary may enter during business hours the premises (including places of storage) of any licensee or permittee, for the purpose of inspecting or examining (1) any records or documents required to be kept by such licensee or permittee, under the provisions of this chapter or regulations issued hereunder, and (2) any explosive materials kept or stored by such licensee or permittee at such premises. Upon the request of any State or any political subdivision thereof, the Secretary may make available to such State or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State or political subdivision thereof, who have purchased or received explosive materials, together with a description of such explosive materials.

"(g) Licenses and permits issued under the provisions of subsection (b) of this section shall be kept posted and kept available for inspection on the premises covered by the license and permit.

"§ 844. Penalties

"(a) Any person who violates subsections (a) through (i) of section 842 of this chapter shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

"(b) Any person who violates any other provision of section 842 of this chapter shall be fined not more than $1,000 or imprisoned not more than one year, or both.

*Ante,* p. 953.

"(c) Any explosive materials involved or used or intended to be used in any violation of the provisions of this chapter or any other rule or regulation promulgated thereunder or any violation of any criminal law of the United States shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

82 Stat. 1230.
26 USC 5845.

"(d) Whoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned for not more than ten years, or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results, shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

70 Stat. 540.
18 USC 34.

"(e) Whoever, through the use of the mail, telephone, telegraph, or other instrument of commerce, willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of an explosive shall be imprisoned for not more than five years or fined not more than $5,000, or both.

"(f) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed, or used by, or leased to, the United States, any department or agency thereof, or any institution or organization receiving Federal financial assistance shall be imprisoned for not more than ten years, or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years, or fined not more than $20,000, or both; and if death results shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

"(g) Whoever possesses an explosive in any building in whole or in part owned, possessed, or used by, or leased to, the United States or any department or agency thereof, except with the written consent of the agency, department, or other person responsible for the management of such building, shall be imprisoned for not more than one year, or fined not more than $1,000, or both.

"(h) Whoever—

"(1) uses an explosive to commit any felony which may be prosecuted in a court of the United States, or

"(2) carries an explosive unlawfully during the commission of any felony which may be prosecuted in a court of the United States,

shall be sentenced to a term of imprisonment for not less than one year nor more than ten years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not less than five years nor more than twenty-five years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of such person or give him a probationary sentence.

Compendium_Roth
Page 0066

958  PUBLIC LAW 91-452—OCT. 15, 1970  [84 STAT.

"(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

"Explosive."

"(j) For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section, the term 'explosive' means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

82 Stat. 91.
18 USC 232.

## "§ 845. Exceptions; relief from disabilities

"(a) Except in the case of subsections (d), (e), (f), (g), (h), and (i) of section 844 of this title, this chapter shall not apply to:

"(1) any aspect of the transportation of explosive materials via railroad, water, highway, or air which are regulated by the United States Department of Transportation and agencies thereof;

"(2) the use of explosive materials in medicines and medicinal agents in the forms prescribed by the official United States Pharmacopeia, or the National Formulary;

"(3) the transportation, shipment, receipt, or importation of explosive materials for delivery to any agency of the United States or to any State or political subdivision thereof;

"(4) small arms ammunition and components thereof;

"(5) black powder in quantities not to exceed five pounds; and

"(6) the manufacture under the regulation of the military department of the United States of explosive materials for, or their distribution to or storage or possession by the military or naval services or other agencies of the United States; or to arsenals, navy yards, depots, or other establishments owned by, or operated by or on behalf of, the United States.

"(b) A person who had been indicted for or convicted of a crime punishable by imprisonment for a term exceeding one year may make application to the Secretary for relief from the disabilities imposed by this chapter with respect to engaging in the business of importing, manufacturing, or dealing in explosive materials, or the purchase of explosive materials, and incurred by reason of such indictment or conviction, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the indictment or conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief will not be contrary to the public interest. A licensee or permittee who makes application for relief from the disabilities incurred under this chapter by reason of indictment or conviction, shall not be barred by such indictment or conviction from further operations under his license or permit pending final action on an application for relief filed pursuant to this section.

## "§ 846. Additional powers of the Secretary

"The Secretary is authorized to inspect the site of any accident, or fire, in which there is reason to believe that explosive materials were involved, in order that if any such incident has been brought about by accidental means, precautions may be taken to prevent similar accidents from occurring. In order to carry out the purpose of this subsection, the Secretary is authorized to enter into or upon any property where explosive materials have been used, are suspected of having been used, or have been found in an otherwise unauthorized location. Nothing in this chapter shall be construed as modifying or otherwise affecting in any way the investigative authority of any other Federal agency. In addition to any other investigatory authority they have with respect to violations of provisions of this chapter, the Attorney General and the Federal Bureau of Investigation, together with the Secretary, shall have authority to conduct investigations with respect to violations of subsection (d), (e), (f), (g), (h), or (i) of section 844 of this title.

## "§ 847. Rules and regulations

"The administration of this chapter shall be vested in the Secretary. The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.

*Notice; hearing opportunity.*

## "§ 848. Effect on State law

"No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together."

(b) The title analysis of title 18, United States Code, is amended by inserting immediately below the item relating to chapter 39 the following:

"40. Importation, manufacture, distribution and storage of explosive materials_____ 841".

Sec. 1103. Section 2516(1)(c) of title 18, United States Code, is amended by inserting after "section 224 (bribery in sporting contests)," the following: "subsection (d), (e), (f), (g), (h), or (i) of section 844 (unlawful use of explosives),".

*82 Stat. 216.*

Sec. 1104. Nothing in this title shall be construed as modifying or affecting any provision of—

    (a) The National Firearms Act (chapter 53 of the Internal Revenue Code of 1954) ;

*82 Stat. 1227.*
*26 USC 5801.*

    (b) Section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control ;

*68 Stat. 848.*

    (c) Section 1716 of title 18, United States Code, relating to nonmailable materials;

*62 Stat. 781.*

    (d) Sections 831 through 836 of title 18, United States Code; or

    (e) Chapter 44 of title 18, United States Code.

*68 Stat. 170;*
*74 Stat. 808.*

Sec. 1105. (a) Except as provided in subsection (b), the provisions of chapter 40 of title 18, United States Code, as enacted by section 1102 of this title shall take effect one hundred and twenty days after the date of enactment of this Act.

*82 Stat. 1214.*
*18 USC 921.*
*Effective dates.*
*Ante, p. 952.*

(b) The following sections of chapter 40 of title 18, United States Code, as enacted by section 1102 of this title shall take effect on the date of the enactment of this Act: sections 841, 844(d), (e), (f), (g), (h), (i), and (j), 845, 846, 847, 848, and 849.

*Ante*, p. 952.
(c) Any person (as defined in section 841(a) of title 18, United States Code) engaging in a business or operation requiring a license or permit under the provisions of chapter 40 of such title 18 who was engaged in such business or operation on the date of enactment of this Act and who has filed an application for a license or permit under the provisions of section 843 of such chapter 40 prior to the effective date of such section 843 may continue such business or operation pending final action on his application. All provisions of such chapter 40 shall apply to such applicant in the same manner and to the same extent as if he were a holder of a license or permit under such chapter 40.

55 Stat. 863.
Repeal.
74 Stat. 87.
SEC. 1106. (a) The Federal Explosives Act of October 6, 1917 (40 Stat. 385, as amended; 50 U.S.C. 121–143), and as extended by Act of July 1, 1948 (40 Stat. 671; 50 U.S.C. 144), and all regulations adopted thereunder are hereby repealed.

(b)(1) Section 837 of title 18 of the United States Code is repealed.

(2) The item relating to such section 837 in the chapter analysis of chapter 39 of such title 18 is repealed.

Appropriation.
SEC. 1107. There are hereby authorized to be appropriated such sums as are necessary to carry out the purposes of this title.

## TITLE XII—NATIONAL COMMISSION ON INDIVIDUAL RIGHTS

SEC. 1201. There is hereby established the National Commission on Individual Rights (hereinafter in this title referred to as the "Commission").

Members,
appointment.
SEC. 1202. The Commission shall be composed of fifteen members appointed as follows:

(1) four appointed by the President of the Senate from Members of the Senate;

(2) four appointed by the Speaker of the House of Representatives from Members of the House of Representatives; and

(3) seven appointed by the President of the United States from all segments of life in the United States, including but not limited to lawyers, jurists, and policemen, none of whom shall be officers of the executive branch of the Government.

SEC. 1203. The President of the United States shall designate a Chairman from among the members of the Commission. Any vacancy in the Commission shall not affect its powers but shall be filled in the same manner in which the original appointment was made.

SEC. 1204. It shall be the duty of the Commission to conduct a comprehensive study and review of Federal laws and practices relating to special grand juries authorized under chapter 216 of title 18, United States Code, dangerous special offender sentencing under section 3575 of title 18, United States Code, wiretapping and electronic surveillance, bail reform and preventive dentention, no-knock search warrants, and the accumulation of data on individuals by Federal agencies as authorized by law or acquired by executive action. The Commission may also consider other Federal laws and practices which in its opinion may infringe upon the individual rights of the people of the United States. The Commission shall determine which laws and practices are needed, which are effective, and whether they infringe upon the individual rights of the people of the United States.

*Ante*, p. 923.
*Ante*, p. 948.

SEC. 1205. (a) Subject to such rules and regulations as may be adopted by the Commission, the Chairman shall have the power to—

(1) appoint and fix the compensation of an Executive Director, and such additional staff personnel as he deems necessary, without regard to the provisions of title 5, United States Code,

governing appointments in the competitive service, and without
regard to the provisions of chapter 51 and subchapter III of
chapter 53 of such title relating to classification and General
Schedule pay rates, but at rates not in excess of the maximum rate
for GS–18 of the General Schedule under section 5332 of such
title; and

    (2) procure temporary and intermittent services to the same
extent as is authorized by section 3109 of title 5, United States
Code, but at rates not to exceed $100 a day for individuals.

(b) In making appointments pursuant to subsection (a) of this
section, the Chairman shall include among his appointment indi-
viduals determined by the Chairman to be competent social scientists,
lawyers, and law enforcement officers.

Sec. 1206. (a) A member of the Commission who is a Member of
Congress shall serve without additional compensation, but shall be
reimbursed for travel, subsistence, and other necessary expenses in-
curred in the performance of duties vested in the Commission.

(b) A member of the Commission from private life shall receive
$100 per diem when engaged in the actual performance of duties
vested in the Commission, plus reimbursement for travel, subsistence,
and other necessary expenses incurred in the performance of such
duties.

Sec. 1207. Each department, agency, and instrumentality of the
executive branch of the Government, including independent agencies,
is authorized and directed to furnish to the Commission, upon request
made by the Chairman, such statistical data, reports, and other infor-
mation as the Commission deems necessary to carry out its functions
under this title. The Chairman is further authorized to call upon the
departments, agencies, and other offices of the several States to furnish
such statistical data, reports, and other information as the Commission
deems necessary to carry out its functions under this title.

Sec. 1208. The Commission shall make interim reports and recom-
mendations as it deems advisable, but at least every two years, and it
shall make a final report of its findings and recommendations to the
President of the United States and to the Congress at the end of six
years following the effective date of this section. Sixty days after the
submission of the final report, the Commission shall cease to exist.

Sec. 1209. (a) Except as provided in subsection (b) of this section,
any member of the Commission is exempted, with respect to his
appointment, from the operation of sections 203, 205, 207, and 209 of
title 18, United States Code.

(b) The exemption granted by subsection (a) of this section shall
not extend—

    (1) to the receipt of payment of salary in connection with the
appointee's Government service from any source other than the
private employer of the appointee at the time of his appointment,
or

    (2) during the period of such appointment, to the prosecu-
tion, by any person so appointed, of any claim against the Gov-
ernment involving any matter with which such person, during
such period, is or was directly connected by reason of such
appointment.

Sec. 1210. The foregoing provisions of this title shall take effect
on January 1, 1972.

Sec. 1211. There are authorized to be appropriated such sums as
may be necessary to carry out the provisions of this title.

Sec. 1212. Section 804 of the Omnibus Crime Control and Safe
Streets Act of 1968 (Public Law 90–351; 18 U.S.C. 2510 note) is
repealed.

80 Stat. 443,
467.
5 USC 5101,
5331.
*Ante*, p. 198-1.

80 Stat. 416.

Travel
expenses.

Agency
cooperation.

Reports and
recommendations
to President and
Congress.

76 Stat. 1121.

Effective date.

Appropriation.

Repeal.
82 Stat. 223.

962                    PUBLIC LAW 91-453–OCT. 15, 1970          [84 Stat.

## TITLE XIII—GENERAL PROVISIONS

Separability.    Sec. 1301. If the provisions of any part of this Act or the applica-
tion thereof to any person or circumstances be held invalid, the pro-
visions of the other parts and their application to other persons or
circumstances shall not be affected thereby.
        Approved October 15, 1970.


Public Law 91-453

October 15, 1970                        AN ACT
[S. 3154]        To provide long-term financing for expanded urban mass transportation
                            programs, and for other purposes.

Urban Mass          *Be it enacted by the Senate and House of Representatives of the
Transportation    United States of America in Congress assembled,* That the Congress
Assistance Act of  finds that the rapid urbanization and the continued dispersal of
1970.             population and activities within urban areas has made the ability
                  of all citizens to move quickly and at a reasonable cost an urgent
                  national problem; that it is imperative, if efficient, safe, and con-
                  venient transportation compatible with soundly planned urban areas
78 Stat. 302.     is to be achieved, to continue and expand the Urban Mass Transporta-
49 USC 1601       tion Act of 1964; and that success will require a Federal commitment
note.             for the expenditure of at least $10,000,000,000 over a twelve-year
                  period to permit confident and continuing local planning, and greater
                  flexibility in program administration. It is the purpose of this Act
                  to create a partnership which permits the local community, through
                  Federal financial assistance, to exercise the initiative necessary to
                  satisfy its urban mass transportation requirements.
Federal             Sec. 2. Section 3 of the Urban Mass Transportation Act of 1964,
financial assist- as amended (49 U.S.C. 1602), is amended—
ance.                   (1) by redesignating subsection (c) as subsection (e); and
78 Stat. 303.           (2) by striking out subsections (a) and (b) and inserting in
                  lieu thereof subsections (a), (b), (c), and (d), as follows:
Grants and          "(a) The Secretary is authorized, in accordance with the provisions
loans.            of this Act and on such terms and conditions as he may prescribe, to
                  make grants or loans (directly, through the purchase of securities or
                  equipment trust certificates, or otherwise) to assist States and local
                  public bodies and agencies thereof in financing the acquisition, con-
                  struction, reconstruction, and improvement of facilities and equip-
                  ment for use, by operation or lease or otherwise, in mass transporta-
Eligible facil-   tion service in urban areas and in coordinating such service with
ities and equip-  highway and other transportation in such areas. Eligible facilities and
ment.             equipment may include land (but not public highways), buses and
                  other rolling stock, and other real and personal property needed for
                  an efficient and coordinated mass transportation system. No grant or
                  loan shall be provided under this section unless the Secretary deter-.
                  mines that the applicant has or will have—

# BOOKS

**Princeton University Press**

Chapter Title: Front Matter

Book Title: Sacco and Vanzetti
Book Subtitle: The Anarchist Background
Book Author(s): Paul Avrich
Published by: Princeton University Press. (1991)
Stable URL: https://www.jstor.org/stable/j.ctv131bwkz.1

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Princeton University Press* is collaborating with JSTOR to digitize, preserve and extend access to *Sacco and Vanzetti*

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms



This content downloaded from 132.1__.51.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0074

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

_____

Sacco and Vanzetti

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

———————————————————————————

# Sacco and Vanzetti

## THE ANARCHIST BACKGROUND

*Paul Avrich*

PRINCETON UNIVERSITY PRESS

PRINCETON, NEW JERSEY

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

Copyright © 1991 by Princeton University Press
Published by Princeton University Press, 41 William Street,
Princeton, New Jersey 08540
In the United Kingdom: Princeton University Press, Chichester, West Sussex

All Rights Reserved

*Library of Congress Cataloging-in-Publication Data*
Avrich, Paul
Sacco and Vanzetti : the anarchist background / by Paul Avrich
p.    cm.
Includes bibliographical references and index.
ISBN 0-691-04789-8
ISBN 0-691-02604-1 (pbk.)
1. Sacco, Nicola. 1891–1927.  2. Vanzetti, Bartolomeo. 1888–1927.
3. Anarchists—United States—Biography.  4. Anarchism—United States—History.
5. Sacco-Vanzetti case. I. Title.
HX843.7.S23A97  1991
364.1'523'09227447—dc20
[B]  90-40838

This book has been composed in Linotron Primer

Princeton University Press books are printed on acid-free paper and meet the
guidelines for permanence and durability of the Committee on Production
Guidelines for Book Longevity of the Council on Library Resources

Third printing, and first paperback printing, 1996

Printed in the United States of America

10 9 8 7 6

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms



SAN FRANCISCO PUBLIC LIBRARY

3 1223 03955 8953

# ALL GOD'S CHILDREN

## The Bosket Family and the American Tradition of Violence

### FOX BUTTERFIELD

# ALL GOD'S CHILDREN

### The Bosket Family and the
### American Tradition of Violence

## FOX BUTTERFIELD



*Alfred A. Knopf   New York*

1995

Compendium_Roth
Page 0081

929.2089 B652b

Butterfield, Fox.

All God's children : the
 Bosket family and the
 1995.

THIS IS A BORZOI BOOK
PUBLISHED BY ALFRED A. KNOPF, INC.

Copyright © 1995 by Fox Butterfield
Map copyright © 1995 by David Lindroth, Inc.
All rights reserved under International and Pan-American Copyright Conventions.
Published in the United States by Alfred A. Knopf, Inc., New York, and
simultaneously in Canada by Random House of Canada Limited, Toronto.
Distributed by Random House, Inc., New York.

Grateful acknowledgment is made to the following for permission to reprint
previously published material:

*Alfred A. Knopf, Inc.:* "Harlem" from *The Panther and the Lash* by Langston Hughes,
copyright © 1951 by Langston Hughes. Reprinted by permission of
Alfred A. Knopf, Inc.

*University of North Carolina Press:* Excerpts from *Francis S. Pickens and the Politics of
Destruction* by John B. Edmunds, Jr., copyright © 1986 by the University of North
Carolina Press. Reprinted by permission of the University of North Carolina Press.

Library of Congress Cataloging-in-Publication Data
Butterfield, Fox.
All God's children : the Bosket family and the American tradition of violence /
Fox Butterfield. — 1st ed.
p.      cm.
Includes bibliographical references (p.   ) and index.
ISBN 0-394-58286-1
1. Bosket family.   2. Afro-Americans—Biography.
3. Afro-American prisoners.   4. Violence—United States.
5. Racism—United States.   6. United States—Race relations.
I. Title.
E185.96.B98      1995
929'.2'08996073—dc20        95-1540
CIP

Manufactured in the United States of America

First Edition

SAN FRANCISCO PUBLIC LIBRARY
WEST PORTAL BRANCH

3 1223 03955 8953

S.F. PUBLIC LIBRARY

CHAPTER I

# "BLOODY EDGEFIELD"

*Edgefield . . . has had more dashing, brilliant, romantic figures, statesmen,
orators, soldiers, adventurers, daredevils, than any county of South Caro-
lina, if not any rural county in America. . . . They gave to their village
and county a character that was South Carolinian, more intense, more
fiery, than was found elsewhere.*

William Watts Bell, *The State That Forgot*

IN EARLY NOVEMBER 1781, with the outcome of the American
Revolution much in doubt, Captain James Butler of the South Caro-
lina militia got word that a raiding party of Tory loyalists had seized a
herd of cattle and a bevy of horses from his neighbors. His fellow settlers
at Mount Willing, little more than a forest clearing in the backcountry
wilderness, urged him to lead a force to pursue the marauders. Butler
demurred. He had been released from eighteen months in a British jail
in Charleston only weeks before. He had suffered enough, he said, and
his farm needed tending.

Butler had immigrated to the South Carolina backcountry in the early
1760s over the great wagon trail that led from Pennsylvania through the
Shenandoah Valley of Virginia, then the most heavily traveled road in
America. With him came his wife, two sisters, and a growing family,
which now numbered eight children in all. The Butlers were of Scotch-
Irish descent, part of a huge wave of 250,000 immigrants who arrived in
Pennsylvania between 1715 and 1775 from the north of England, Scotland,
and northern Ireland. They spoke English, not Gaelic, but had a lilting
cadence in their voices, an accent preserved in the speech of the South
today. These Scotch-Irish were a poor but proud people who had left
their homelands after centuries of incessant warfare. In temperament,
they were tough, blunt, touchy, hard-drinking, and pugnacious.

The Butlers' new land in South Carolina was promising. It lay halfway
between the Blue Ridge Mountains and the Atlantic Ocean in what would

become Edgefield County. There were great primeval forests of oak and hickory and endless stretches of longleaf pine. In the spring, the undergrowth was clothed in splashes of pink, white, and magenta by dogwood and azaleas. Swarms of wild turkeys, geese, ducks, and pigeons darkened the sky. Everywhere there was an abundance of small streams and rivers for water. Along their banks, stands of sugarcane grew in profusion, often reaching higher than a man's head. The red clay soil was rich, good for growing corn and grazing cattle and horses. Some of the settlers experimented with cotton, but until Eli Whitney invented the cotton gin across the nearby Savannah River in Georgia in 1793, separating the seeds from the fiber was too difficult to make it a profitable crop. Still, a few of this first generation in the backcountry, including the Butlers, had already acquired enough wealth to buy black slaves.

But if the land was rich, life had proven vicious. Since 1760, spanning the whole time the Butlers had been in South Carolina, the area around them had been engaged in some of the cruelest fighting in American history. The conflict had started with a massacre in 1760 by Cherokee Indians that killed scores of settlers. In one attack, the seventy-six-year-old grandmother of John C. Calhoun, a future vice president of the United States and the greatest of all the Carolinians, was murdered in an ambush with twenty-two other people.

By 1761, when the Cherokee were defeated, much of the backcountry was devastated. Homeless veterans formed outlaw gangs that abducted young women from their villages and tortured wealthy planters and merchants to make them reveal where they had hidden their valuables. Infuriated by this lawlessness, the more respectable settlers formed themselves into "Regulators" to break up the gangs. It was the first organized vigilante justice in America.

The Regulators succeeded. But they were so brutal that the leading historian of the movement, Richard Maxwell Brown, has argued that "they introduced the strain of violence and extremism that was to be the curse of the upcountry and the nemesis of South Carolina" for more than a century. Often they were sadistic. One group of fifty Regulators who captured a "roguish and troublesome" fellow, said to be a horse thief, stripped him and tied him to a tree with a wagon chain. Then they each took turns giving him ten lashes, for a bloody total of five hundred stripes, to the accompaniment of a drum and fiddle.

An uneasy calm ensued in the early 1770s, but the fighting erupted even more violently with the advent of the American Revolution in 1775. Along with the battles between the Continental and British armies, there was a guerrilla war of family against family and neighbor against neighbor; it was carried on by ambush, atrocity, and plunder. "No conflict within

the borders of the United States has surpassed the South Carolina Back Country civil war in cruelty and bitterness," it has been said.

Some of the militia on both sides—the Tories and the Revolutionaries, or Whigs—were in the war explicitly for booty. Two of the leading South Carolina Whig officers, Andrew Pickens and Thomas Sumter, made plunder part of their troops' pay. "Each Colonel to receive three grown negroes and one small negro," one set of instructions advertised. "Each Major to receive three grown negroes; Captain two grown negroes; Lieutenants one large and one small negro; the Staff one large and one small negro; the Sergeants one and a quarter negro; each private one grown negro."

The most sanguinary episode in the backcountry feuding came in 1781 as a troop of three hundred Tory militia cavalry under Major William Cunningham, known as "Bloody Bill," moved out of British headquarters in Charleston, passed through the American lines, and advanced up the Saluda River on Mount Willing, where the Butlers lived. In background, Cunningham was much like Captain Butler. He, too, was of Scotch-Irish descent and had emigrated down the wagon trail from Pennsylvania and Virginia, settling with a group of his relatives only a few miles from Mount Willing. He had fought with Butler in some of the same battles against the Cherokee and at the outset of the Revolution had joined the colonists against the British. But he changed sides abruptly in 1778 after he received word that his brother, who was lame and an epileptic, had been whipped to death by a Whig militia captain.

On a vengeful raid, Bloody Bill's troop stole the horses and cattle from Captain Butler's neighbors. Butler's reluctance to join in the pursuit was finally overcome by a plea from his nineteen-year-old son, James, who refused to take part in the expedition unless his experienced father headed it. The Revolutionaries soon overtook a small band of Cunningham's raiders and recaptured their animals. The elated men stopped at dusk at a tavern ten miles southeast of Mount Willing near Cloud's Creek. The creek itself was named for a family that had been killed by the Cherokee a few years earlier. Thinking themselves safe, and unaware of the size of the rest of Bloody Bill's force, the colonists passed the night drinking happily, without posting a sentinel.

Early the next morning, while still drunk, Butler's men were roused by the tavernkeeper's daughter, who saw Cunningham's troops approaching. It was three hundred against thirty, and Cunningham had them surrounded. The Tory major demanded a surrender. But the younger James Butler was suspicious of the enemy commander and told his companions that he "would settle the terms of the capitulation." At that, he fired his flintlock rifle, killing a Tory and setting off a general

fusillade. James himself was mortally wounded while he knelt to prepare a second shot. As he lay dying, he handed the rifle to his father, who kept firing until he had exhausted all the balls in his pouch.

An unconditional surrender was arranged. The Revolutionaries were made to stand on a ladder suspended as a bench, and Bloody Bill then ordered that they all be put "to the unsparing sword." Captain Butler grabbed a pitchfork and tried to defend himself, until a saber stroke severed his right hand. Only two of the thirty men escaped.

Cunningham continued his raid up the Saluda River, massacring several more groups of settlers. At Mount Willing, Mrs. Sarah Smith, a sister of Captain Butler's, led a group of wives, mothers, and sisters to bury the dead. Only Captain Butler, with his severed hand, and his son were recognizable. The rest of the men were placed in a common grave, dug by the victims' slaves.

Major Cunningham fled South Carolina after the Revolution; one of his lieutenants, Matthew Love, did not. In November 1784, three years to the day after the Cloud's Creek massacre, Love was pardoned by a judge in accordance with the terms of the peace treaty with England. A crowd led by Butler's oldest son, William, was waiting at the courthouse. While the sheriff watched, the mob took Love outside and hanged him from a tree.

It was not until almost a century later, after the Civil War, that the African-Americans kept as slaves at Mount Willing were publicly identified. Before emancipation, virtually no records gave the surnames of slaves in South Carolina because, by law, slaves were deemed "chattels personal in the hands of their owners." As a South Carolina court succinctly put it, "they are, generally speaking, not considered as persons but as things." When slaveholders referred to their bondsmen at all, on bills of sale or in inventories of their plantations, they listed only the slave's first name. But in 1868, the name of Willie Bosket's great-great-grandfather, Aaron Bosket, appeared on the voter registration rolls for Mount Willing precinct, Edgefield County. It was the first election in which the former slaves were allowed to vote and the first public recording of Willie's family. Willie's ancestors had not chosen to live in Edgefield—they had been sold into slavery there—and legally they did not exist. Nonetheless, they tilled Edgefield soil, and as the years passed and generations of Boskets followed one another, they came to feel that the county was their home as much as it was the Butlers'. Like the white families, they came to be part of Edgefield. Aaron, born into hard servitude, had a phrase for it that he took from an old spiritual: "We are all God's children."

• • •

THE CLOUD'S CREEK MASSACRE and the era of violence in the backcountry from 1760 to the 1780s left an unhappy stamp on the early settlers. The physical destruction alone was awful; Edgefield was a wasteland. A minister who had fled another heavily fought-over district along the coast and returned at the end of the war found that "all was desolation." Every field, every plantation, he wrote, "showed marks of ruin and devastation. Not a person was to be met with in the roads." Society itself, he thought,

> seems to be at an end. . . . Robberies and murders are often committed on the public roads. The people that remain have been peeled, pillaged and plundered. . . . A dark melancholy gloom appears everywhere, and the morals of the people are almost entirely extirpated.

Inland, in the backcountry, it was worse, particularly around Mount Willing. John A. Chapman, a historian who was born in Edgefield early in the nineteenth century, said, "I doubt whether any part of the State, or of the United States, suffered more from the strife between Whig and Tory than did this particular section of Edgefield."

The constant fighting, looting, and killing left many people with a numbed, often casual attitude toward violence. Soon, the county acquired a reputation as "Bloody Edgefield" because of its high number of murders. Judge Thomas J. Mackey, who rode the South Carolina circuit, presiding over the regular fall and spring sessions of court week in Edgefield, said facetiously, "I am going to hold court in Edgefield, and I expect a somewhat exciting term, as the fall shooting is about to start."

Mason L. "Parson" Weems, an itinerant writer best known for the biography of George Washington that invented the pleasant fiction of little George and the cherry tree, visited Edgefield to peddle his books. He was inspired to pen a sensational tract, *The Devil in Petticoats, or God's Revenge Against Husband Killing*. It told the tale of Becky Cotton, an Edgefield lady who murdered her three husbands and deposited their bodies in a pool near her house. "Oh mercy!" Parson Weems began. "What! Old Edgefield again! Another murder in Old Edgefield! . . . Well, the Lord have mercy upon Old Edgefield! For sure it must be Pandemonium itself, a very district of Devils."

Cotton was the name of Becky's third husband. She killed her first spouse by running a mattress needle through his heart; the second she poisoned; Cotton's head she split with an ax. Put on trial in 1806, she

8                    ALL GOD'S CHILDREN

"came off clear," Weems discovered. Her tears and beauty, he said, conquered the judge and jury. One juror even became her fourth husband. In the end, though, Becky Cotton was killed by one of her brothers.

Judge John Belton O'Neall, a distinguished South Carolina jurist, recalled attending his first court session at Edgefield not long after the Becky Cotton trial. "The dockets were enormous," he said, with more than two hundred cases, a huge number for an agricultural county with a total population of twenty-four thousand whites and blacks. Edgefield's biggest town was Edgefield Court House, also known as Edgefield Village, with a mere three hundred inhabitants.

Determining crime rates in antebellum South Carolina is necessarily inexact; contemporary judges, juries, and sheriffs had limited interest in keeping statistics. But some rough estimates can be made. One careful study of judicial records for the period from 1800 to 1860 found that the murder rate in South Carolina, an overwhelmingly rural, agrarian area, was four times higher than that in Massachusetts, then the most urban, industrial state. This goes against a central theorem of modern criminology, which predicts higher homicide rates in densely populated urban regions, where crowding and anonymity break down traditional social ties and values. In South Carolina, prosecutions for all crimes of violence— including assault and rape as well as murder—made up almost sixty percent of the court cases, but only eighteen percent in Massachusetts, where the most common criminal acts were theft and public drunkenness. The records also show that the vast majority of people put on trial for violent crimes in antebellum South Carolina were whites; the slaves were thought to be a gentle people.

If the murder rate in South Carolina was high compared with the North, one scholar has suggested it was even higher in Edgefield, perhaps double the state average.

The prevalence of murder in Edgefield in the mid-nineteenth century can be crudely measured through the county coroners' reports of juries of inquest. From 1844 to 1858, the Edgefield coroners officially recorded sixty-five murders. That is probably an undercount, since a number of deaths were attributed to natural causes or "acts of God" that by a less charitable interpretation might have been the result of deliberate violence, such as a person who drowned after being beaten. Nevertheless, that works out to an annual rate of 18 murders per 100,000 inhabitants. In 1992, according to the FBI's Uniform Crime Reports, only one state in the entire country, Louisiana, approached this figure, with a homicide rate of 17.4 per 100,000.

These figures for antebellum Edgefield might be dismissed as an anomaly, given the county's small size. But Edgefield was part of the

South, and every statistical measure in the years that have followed has shown that the South, not the "Wild West" as popularly believed, was the most violent region of the United States. H. V. Redfield, a correspondent for the Cincinnati *Commercial* stationed in the South after the Civil War, was so struck by the frequency of murder there that he put together the first quantitative study of the subject in 1880, using figures gleaned from local newspaper reports. By his calculations, in 1878 the three Southern states of South Carolina, Kentucky, and Texas (which was then settled mostly by Southerners) numbered between 12.2 and 28.8 murders per 100,000 citizens. In urban Massachusetts that year, the rate was only 1.4. Vermont and New Hampshire, two Northern states that were predominantly agricultural, like most of the South, recorded only a single murder between them in 1878, Redfield pointed out. South Carolina had 128. Even New York City averaged only 3 to 7 homicides per 100,000 throughout the nineteenth century. "Have we not here two civilizations?" Redfield asked. He was the first of a series of writers and scholars to suggest that the South had produced a culture of violence.

The statistical differences persisted. In 1933, the year the federal government first published homicide data for the entire country, the ten states with the highest murder rates were all Southern or border states that had been involved in the Confederacy, from Virginia to Texas. South Carolina's homicide rate was almost four times the national average.

Over the years, many theories have been advanced for the South's propensity for violence. One is fanciful—that the region's hot climate produced hot tempers. Others offer what may be parts of the explanation. At least since Frederick Law Olmsted journeyed through the South in the 1850s and penned his three-volume work, *The Cotton Kingdom*, writers have pointed to the persistence of frontier conditions in the South. The frontier bred lawlessness, according to this thesis, and Southern plantation agriculture, with its widely scattered settlements and paucity of roads, bridges, and schools, remained a frontier until after the Civil War. Edgefield, with its early history of backcountry fighting, seems to support the theory. But not all parts of the South shared this gory military history. And recent studies of the American West contradict the stereotypes of pervasive violence in cattle towns there. In fact, the bloodshed that erupted on the Western frontier may have been Southern violence brought in via Texas.

Another contributor to Southern bellicosity was the heavy influx of Scotch-Irish among the region's settlers. These immigrants shocked the good Quakers of Pennsylvania, where they first arrived in the new world. Benjamin Franklin chastised them for being "white savages." Their way of life was an outgrowth of seven centuries of fighting between the kings

of England and Scotland over the borderlands they inhabited. They had grown inured to their towns being sacked and burned and their kinsmen tortured to death. Many had been forcibly resettled in Ireland. When they came to America, they brought with them a penchant for family feuds, a love of whiskey, and a warrior ethic that demanded vengeance. Their prevailing principle, "lex talionis," the rule of retaliation, helps explain the Cloud's Creek massacre and the bloodiness of the fighting in the South Carolina backcountry from 1760 to 1785.

One of their favorite sports was a savage form of wrestling, or "wrasling," which evolved in Virginia into "rough and tumble" and in South Carolina into "knock down and drag out." An Irish traveler, Thomas Ashe, described a fight between a Virginian and a Kentuckian. The contestants were asked if they wanted to "fight fair" or "rough and tumble." When they replied "rough and tumble," the crowd roared in approval. The Virginian began by pitching "himself into the bosom of his opponent," sinking his sharpened fingernails into the Kentuckian's head. "The Virginian never lost his hold . . . fixing his claws in his hairs and his thumbs on his eyes," and ripped his opponent's eyes from their sockets. Even after the eyes were gouged out, the fight continued. The Virginian sunk his teeth into the Kentuckian's nose and bit it in two pieces. He then tore off the Kentuckian's ears. Finally, the "Kentuckian, deprived of eyes, ears and nose, gave in." The victor, though maimed and bloodied himself, was carried around the grounds by the crowd.

In an effort to halt this pastime, South Carolina in 1786 made any defendant found guilty of premeditated mayhem subject to the death penalty. Mayhem was defined as "violently depriving" another person of a member of his body, excepting the ears and nose. The ears and nose were excluded because their loss only disfigured the victim. Despite the severity of the law, gouging flourished. Judge Aedanus Burke, who worked the Edgefield circuit, was appalled by the number of one-eyed men in his courtroom. "Before God, gentlemen of the jury, I never saw such a thing before in the world!" he once exclaimed. "There is a plaintiff with an eye out! A juror with an eye out! And two witnesses with an eye out! What a state of society you must have in this part of the country!"

Behind this brutality lay an ethic of "primal honor," brought with the Scotch-Irish to the new world. It had its roots in the blood feuds between families and clans dating to the Middle Ages. Above all, honor meant reputation; a man's worth resided in the opinion of others. Honor also meant valor; a man had to be prepared to fight to defend his honor if challenged or insulted. This concern with honor produced "rough and tumble" and an abundance of assaults and murders among the proletariat in the backcountry.

The slaveholding gentry of Virginia and the aristocracy of low-country South Carolina, along the coast, had developed a similar code in seeking to copy the manners of the English ruling class. "In the sixteenth and seventeenth centuries tempers were short and weapons to hand," Lawrence Stone has written.

> The behavior of the propertied classes, like that of the poor, was characterized by the ferocity, childishness and lack of self-control of the Homeric age. . . . The educational and social system of the age inculcated ideals of honour and generosity. Impulsiveness was not reproved, readiness to repay an injury real or imagined a sign of spirit. . . . Moreover, a gentleman carried a weapon at all times, and did not hesitate to use it.

Thus for the Southern upper class, just as for the lower class, honor became a compelling passion, an overwhelming concern with one's reputation and manliness. For the gentry, honor had an added element of gentility, requiring its adherents to be generous hosts and occasionally to improve their libraries and show religious devotion. But mostly a Southern gentleman was expected to be truthful and to be good at riding horses, playing cards, and handling firearms. Honor brought out both the best and the worst in its apostles. Contemporaries described Southerners as gracious and hospitable, but touchy and pugnacious. For honor required gentlemen to pay great attention to appearances to ensure proper respect, and when that was not forthcoming, violence could quickly erupt. In practice, this meant that it was as intolerable to call a man a liar as to hit or shoot him.

The code of honor reached its apogee in the duel. Dueling had virtually disappeared in the North after Aaron Burr killed Alexander Hamilton in 1804, and even in England, where Southern cavaliers looked for inspiration, dueling declined in the early nineteenth century. But in the South, and especially in South Carolina, the code duello, "affairs of honor," became the accepted means for gentlemen to settle disputes. A gentleman did not go to court; the law was seen as weak. As Andrew Jackson's mother told him when he was young, "The law affords no remedy that can satisfy the feelings of a true man."

There is no record of the number of duels fought, but contemporary accounts suggest they were frequent. William Faux, an English traveler, wrote that in Charleston he had been introduced to thirteen men, eleven of whom "had killed their man" in duels. The editor of the *Gazette* in Camden, South Carolina, saw nothing out of the ordinary in reporting that three duels had taken place there in a single week in 1817.

ALL GOD'S CHILDREN

In 1812, South Carolina outlawed dueling, levying a heavy fine and up to a year in jail for all participants, including seconds. If the duel was fatal, the survivor could be prosecuted for murder. But few men were tried for dueling, and none were convicted of murder. South Carolina law held that homicide could be either "felonious, justifiable or excusable," and juries were always ready to apply the two limitations to the duelist.

The elaborate handbook on which duelists relied, *The Code of Honor*, was written by a former governor of the state, John Lyde Wilson, who deplored the Christian doctrine of turning the other cheek. Such forbearance, he said, is "utterly repugnant to those feelings which nature and education have implanted in the human character." If the antidueling laws were enforced, Wilson insisted, "all that is honorable in the community would quit the country and inhabit the wilderness with the Indians." Duels are necessary, Wilson argued, because "words are no satisfaction for words."

Dueling became a cherished part of culture for many planters. Louis T. Wigfall, the son of a prominent Edgefield family, who had lost one brother in a duel, ran into trouble himself at the University of Virginia when he invited a Southern belle, a Miss Leiper, to dance during a social gathering. She refused, Wigfall was insulted, and so he challenged her escort to a duel. Later, back in Edgefield, he was accused by another young planter, Preston Brooks, of being a coward. Since Brooks was out of town, Wigfall challenged Brooks's father instead. When the older man declined, Wigfall went to the courthouse and, in keeping with the code duello, put up a public notice calling him a scoundrel. He also shot and killed a member of the Brooks clan who tried to tear the note down. Eventually, Wigfall and Preston Brooks met in a duel, leaving both wounded. Each went on to become a Southern hero, Brooks as a congressman from South Carolina, Wigfall as a senator from Texas.

Another of Wigfall's brothers, Arthur, an Episcopal priest, denounced the slaughter produced by all this dueling. "There exists in our country a privileged class, *soi disant*, men of honor, who have established for themselves a higher law," he said in a sermon. "They put their foot upon the criminal code and trample it in the dust. They may and they do commit murder with impunity." Reverend Wigfall had no objection to a privileged class, if it was built on virtue and intelligence. "But we do protest, and shall with our dying breath protest against an aristocracy of crime."

Reverend Wigfall had espied something significant—these cavaliers of honor placed themselves above the law. In the antebellum South, there

Compendium_Roth
Page 0092

was a fine line between heroism in the name of honor and criminality, between deeds of valor and acts of violence. Honor could make men brave, or cruel; it could make them nobly rash, or simply self-destructive. Honor was a powerful quotidian force, determining men's destinies and even affecting the course of state and national politics.

THE SAME SENTIMENTS of honor that compelled Louis Wigfall to duel led other citizens of Edgefield into more mundane forms of violence: street fights, drunken brawls, and shootings over card games. These eruptions, known as "personal difficulties," were the most common form of violence in Edgefield and accounted for a large percentage of the county's high murder rate. Southerners' copious consumption of whiskey and the proclivity of most Southern white men to carry firearms, even in the romanticized mint-julep-and-magnolia days of the antebellum period, contributed to the problem. But it took honor, the need to prove one's manhood and protect one's good name, to ignite these fights. "There is no one here but carries arms under his clothes," a young Alabama lawyer told Alexis de Tocqueville in a remark that could have been said in Edgefield. "At the slightest quarrel, knife or pistol comes to hand. These things happen continually; it is a semibarbarous state of society."

In the barroom of Edgefield's Spann Hotel in July 1851, two friends fell into an argument while drinking at the counter. Philip Goode, the more belligerent of the two, accused his friend, William Cloud, of boasting that he could whip Goode in a fight. Cloud denied making the claim and said "he had nothing against him," according to witnesses. One patron recalled that Cloud "tried to retreat as honorably as he could."

But Goode persisted, calling Cloud "a damn liar," the worst offense to honor. Soon, Goode climbed off his bar seat, grabbed Cloud by the coat collar, and fired his "large six barrel revolver" into his friend's chest. The two were so close that the murdered man's coat "took fire from the shot."

"God damn you," Goode swore, standing over the dead man and firing twice more. "That will satisfy you."

The dictates of honor ensnared even members of Edgefield's most esteemed families in "personal difficulties." In July 1856, George Tillman, a lawyer and member of the state legislature, was playing a game of faro in the Planters Hotel. There was a history of violence in his family—his father, a wealthy planter, had once killed a man during a card game, and two of his brothers were shot and killed after insulting gentlemen—and Tillman himself had been in a duel and wounded two men. Now, during

14

the faro game, Tillman got into an argument over how much money he
had bet. When a bystander backed his opponent, Tillman denounced
him as "a God damn liar" and shot him dead.

At his trial, Tillman was let off with a two-year sentence for man-
slaughter since the shooting was regarded as unpremeditated. In jail,
Tillman was treated more like a guest than a felon; he was given comfort-
able quarters and allowed the pursuit of a courtship and the resumption of
his law practice. Afterward, Tillman was repeatedly elected to Congress.
Homicide was no bar to elective office.

Tillman's mild punishment was hardly unusual. In the sixty-five cases
of homicide recorded by the Edgefield coroners between 1844 and 1858,
only thirty-three people were tried for murder. Eighteen were acquitted,
ten were found guilty of the lesser charge of manslaughter, and only five
were convicted of murder.

Juries, given the choice of deciding whether a homicide was "feloni-
ous, justifiable or excusable," were readily prepared to entertain argu-
ments that a defendant had acted in self-defense or been provoked on a
point of honor. They shared the opinion of an Edgefield lawyer who
wrote, "We have a sort of honorable crime. . . . Whenever the Southern
dagger is drawn, there is something manly and chivalrous in the use of
it." Southerners did not think of themselves as lawless; they believed
passionately in the Constitution and they took their Bible literally. Both,
after all, could be read to justify slavery.

EDGEFIELD TYPIFIED the up-country South, yet there was also
something that set it apart, that made Edgefield's residents even more
pugnacious, reckless, and prone to shed blood. By the middle of the
nineteenth century, mere mention that a person hailed from Edgefield
was enough to explain his character to other South Carolinians. During
the war between the United States and Mexico in 1846, a South Carolina
judge who had volunteered with his state's Palmetto Regiment came
across a young soldier busy dodging bullets. "You seem to be rather pert
to get out of the way of the bullets," the judge said.

"Wall," replied the soldier, "I don't hanker after bullets as a general
thing."

"Then why in the deuce did you come down here?" inquired the
judge.

"Wall! you see capen'," replied the stranger, "I b'long to old Edgefield
deestrick and I jes' kim here to get away from danger."

A South Carolina journalist later calculated that Edgefield "has had
more dashing, brilliant, romantic figures, statesmen, orators, soldiers,

adventurers, daredevils, than any county of South Carolina, if not of any rural county in America." Most Edgefield families, he noted,

> were kin, by blood or marriage, and they gave to their village and county a character that was South Carolinian, more intense, more fiery, than was found elsewhere. . . . They seemed to be, if they were not, harder riders, bolder hunters, more enterprising and masterly politicians. Their virtues were shining, their vices flamed. They were not careful reckoners of the future, sometimes they spoke too quickly and so acted, yet in crises an audacity that might have been called imprudence by milder men made them indispensable to the state.

One reason for Edgefield's special character may have been that it was a major point of contact between the up-country Scotch-Irish settlers, who were Presbyterians and Baptists, and the low-country gentry, who were of English stock and Episcopalian. These two peoples each brought its own culture of honor, one coarser, one seemingly more genteel; the resulting mixture was highly combustible, producing a level of tension absent elsewhere in South Carolina.

Edgefield's history also played a role in setting it apart. Many of its famous characters, including George Tillman, descended from the settlers who survived the brutal warfare between 1760 and 1785. They grew up in families where stories of the battles and massacres of that generation were told and retold as a living legacy, and some of them had treasured souvenirs. The eldest son of Captain James Butler, the militia commander killed at Cloud's Creek, narrowly missed capturing his father's nemesis, Bloody Bill Cunningham, in a horse race through the forest; but he did manage to seize the Tory officer's sword and pocketbook. These were handed down in the family. Over time, the early settlers' experiences took shape as legend, and legend grew into the Edgefield tradition. This heritage gave Edgefield a character that made it different from other communities in the South in much the same way that New York is different from Boston, and Los Angeles is different from San Francisco.

It was not just physical violence that Edgefield inherited from the days of the Cloud's Creek massacre. It was also a penchant for political extremism. Edgefield, along with Charleston, South Carolina's only city before the Civil War, produced a disproportionate share of the state's political leaders, most of them "fire-eaters," or pro-secession radicals in the local lexicon. Edgefield was "a breeding ground for the species." Although its white population never exceeded seventeen thousand before 1900, the county turned out ten of South Carolina's nineteenth-century governors. It has also been home to one of South Carolina's two United

States senators for most of the period from 1842 to the present. The
incumbent is Strom Thurmond, a native of Edgefield Court House who
has been in the Senate since 1954, making him the Senate's most senior
member. He originally came to national attention as the rebellious Dixie-
crat candidate for president in 1948, opposing Harry Truman as too
liberal on civil rights.

During the nineteenth century, these governors and senators, as well
as a flock of congressmen from Edgefield, served as key participants at
every crucial juncture in South Carolina's radical history. They were
ardent advocates of nullification, declaring the tariff of 1828 illegal and
proposing to use force against the federal government. In 1860, they
helped lead South Carolina and then the South into the Civil War. In
1876, leaders from Edgefield ended Reconstruction in South Carolina by
intimidating, killing, and defrauding African-American voters. And in the
1890s, a politician from Edgefield led the effort to impose segregation
on South Carolina. Edgefield may have been small in size, but its impact
was large. What South Carolina—the hotspur state—was to the nation,
Edgefield was to South Carolina.

ONE OF EDGEFIELD'S POLITICIANS was Preston Brooks, the
man who fought a duel with Louis Wigfall. Brooks, too, was a descendant
of the settlers massacred at Cloud's Creek; his grandmother was a sister
of Captain James Butler. Six feet tall, with a proud military record in the
Mexican War, Brooks was elected to Congress and once half-humorously
proposed that representatives be required to check their firearms in the
cloakroom before appearing on the House floor.

On May 19, 1856, he had listened with rising anger as Senator Charles
Sumner of Massachusetts, a leading abolitionist, excoriated his cousin,
Senator Andrew Pickens Butler, for supporting the pro-slavery govern-
ment of Kansas. Speaking from the Senate floor, Sumner branded Butler
as the Don Quixote of slavery, a man who "has chosen a mistress to
whom he has made his vows, and who, though ugly to others, is always
lovely to him . . . the harlot, Slavery." Sumner also mocked the elderly
Butler's slight labial paralysis, charging that "with incoherent phrases"
he "discharged the loose expectoration of his speech." Brooks was further
outraged by Sumner's claim that South Carolina suffered a "shameful
imbecility from Slavery."

The Massachusetts senator had "insulted South Carolina and Judge
Butler grossly," Brooks wrote to his brother. Under the code of honor,
Butler was obliged to flog Sumner, but "this Butler is unable to do,"
Brooks reasoned, because Sumner was thirty pounds heavier and in more

robust health. "Under the circumstances," Brooks concluded, "I felt it to be my duty to relieve Butler and avenge the insult to my State."

Although Sumner's remarks were slanderous, Brooks did not even consider bringing a lawsuit. This was a matter of personal honor. Nor did Brooks think of challenging the Massachusetts senator to a duel, feeling that since an abolitionist was "incapable of courage," Sumner would not accept. But mainly Brooks would not challenge Sumner because, under the code duello, a duel must be between social equals. Brooks did not want to grant Sumner that respectability. The punctilio of honor also ruled out Brooks's using a pistol or sword to punish an insulting inferior. In the end, the instrument he chose was a gold-headed gutta-percha walking stick given him by a friend.

On May 22, Brooks found Sumner at his desk in the Senate, autographing printed copies of his speech for admirers. Brooks was fuming with anger, but honor required that he wait until some ladies who were in the visitors gallery left the chamber. At last, "under the highest sense of duty," he approached Sumner.

"I have read your speech twice over carefully," Brooks began. "It is a libel on South Carolina, and Mr. Butler, who is a relative of mine." Sumner tried to rise from his desk, but his long legs were tucked under it and it was bolted to the floor. Before the senator could move, Brooks gave Sumner "a slight blow" with the smaller end of his cane. When Sumner tried to cover his head with his arms, Brooks felt "compelled to strike him harder than he had intended," raining down blow after blow.

Blood was now streaming from Sumner's head. Finally, with a huge effort, he ripped the desk from the floor and staggered down the aisle semiconscious. "Toward the last he bellowed like a calf," Brooks told his brother. "I wore out my cane completely."

It took Sumner three years to recover from his wounds, and the assault polarized the nation. Northerners were outraged; protest meetings were held in virtually every city and dozens of small towns. In the South, Brooks became an instant hero. "Every Southern man sustains me," he wrote his brother. "The fragments of the stick are begged for as sacred relics." In Charleston, a group of merchants bought a new cane for Brooks, which they inscribed, "Hit him again."

The news even made its way to the slaves on his plantation in Edgefield, where some of them regarded "Marse Preston" as a hero. "One day he marched right in de Senate, wid his gold head cane, and beat a Senator til him fainted," recalled an ex-slave many years later. It was "'bout sumpin' dat Senator say 'bout him old kinsman, Senator Butler," the former slave remembered. "Dat turn de world up side down."

The House of Representatives moved to expel Brooks but fell well

short of the two-thirds vote required; ominously, every Southern congressman but one supported Brooks. In a gesture of bravado, Brooks resigned anyway and was reelected overwhelmingly.

The incident underscored how strongly the dictates of honor governed life in Edgefield. To Northerners, Brooks's attack had been brutal and lawless, a criminal act. To Southerners, Brooks had been a gentleman, justifiably defending a relative and his state. As Brooks himself explained, "Public opinion distinguishes between crime and honorable resentment." In coming years, the code of honor would persist and deeply influence all those who lived in Edgefield. Honor, along with violence, was part of the region's heritage.



THIS
BITTER-
SWEET
SOIL

*The Chinese in
California Agriculture,
1860–1910*

SUCHENG
CHAN

*University of California Press*
*Berkeley • Los Angeles • London*

325.251,C3605t
Chan, Sucheng
    This bittersweet soil

*To the memory of Asian immigrants
who made California so green*

University of California Press
Berkeley and Los Angeles, California

University of California Press, Ltd.
London, England

© 1986 by
The Regents of the University of California

Typeset by Asco Trade Typesetting Ltd., Hong Kong
Printed in the United States of America

Library of Congress Cataloging in Publication Data

Chan, Sucheng.
    This bittersweet soil.

    Bibliography: p.
    Includes index.
    1. Farmers—California—History.   2. Chinese—
California—History.   3. Agriculture—Economic aspects—
California—History.   I. Title.
HD8039.F32U62 1986      338.1'089951'0764      85-1084
ISBN 0-520-05376-1

1  2  3  4  5  6  7  8  9

SAN FRANCISCO
PUBLIC LIBRARY

### Violence and Persistence

Several waves of anti-Chinese activities swept agricultural California in 1876–79, 1886, and 1893–94, all of which were years of economic hardship. A number of writers, particularly Carey McWilliams and Victor and Brett de Bary Nee, have concluded that these activities drove the Chinese out of rural areas, but such was in fact not the case. The Chinese not only persisted in agriculture, increasing both in numbers and in the amount of land they leased in several of the major agricultural regions in the decades just before and after the turn of the century, but also survived in one area—the Sacramento–San Joaquin Delta—where a small Chinese farming community was established and has remained to this day.

The economic dislocations of the 1870s enabled anti-Chinese groups in San Francisco to gather increasing support, as the Chinese were blamed for the economic problems all workers faced. Anti-Chinese sentiment spread to the countryside where the Order of Caucasians (sometimes known as the Caucasian League), a white supremacist group, was established in the late spring of 1876. The group first came to public notice in July 1876 when, in the aftermath of the shooting of a white man named Cheer by a Chinese worker at the American House in Truckee in Nevada County near Donner Summit, a mob had gathered menacingly in front of the Truckee jail where three Chinese witnesses were confined. On discovering that the man who had done the shooting was not in the jail, the mob dispersed, but someone apparently notified the engineer of the local fire brigade that he would be shot should he attempt to put out any fires in Chinatown. A reporter then sent telegrams to the leading newspapers along the Pacific Coast spreading the rumor that the Caucasian League would burn Chinatown. On July 14 two prominent millmen, George Schaffer and Elle Ellen, received similar threatening notices that said:

Dear Sir: You are respectfully requested without further warning to discharge the Chinamen in your employ, and give your work to whites instead, whom you well know are suffering from the effects of all those heathens in our midst. Think well of the country of your adoption, and try to assist

the poor white man in making an honest living. Take heed lest the course you are now pursuing shall fall upon your own head with tenfold vengeance. [Signed]—Native Americans.[1]

The public charged the Caucasian League with threats to burn the town. In response, the organization's president, Hamlet Davis, one of Nevada County's oldest pioneers, issued a denial. A meeting was held, with some 150 of the 200 reported members of the League in attendance. The group issued a statement saying they deprecated mob violence and regretted that

[a] certain bad element has sprung up in our midst, which has shown a tendency to riotous conduct by appearing upon our streets during the night, armed and masked, and by sending certain anonymous, threatening letters to some of our citizens and property-holders.[2]

The Chinese, meanwhile, left their wooden buildings and barricaded themselves in the few brick or stone houses they had. The *San Francisco Bulletin* reported that the Chinese had bought six hundred revolvers since the troubles began and could be heard daily practicing their shooting. They sent for a detective, said to be paid by the Chinese Six Companies in San Francisco, to help them, while the Central Pacific Railroad Company sent its own detectives to Truckee to guard the company's property. Insurance companies began canceling the fire insurance policies they had issued.[3]

The Order of Caucasians also led rallies in Red Bluff in April and in Marysville in May 1876. The group held its first state convention in Sacramento the following September.[4]

In February and March, 1877, a series of violent anti-Chinese acts occurred in Chico and its vicinity in Butte County. In mid-February, the soap factory of John Bidwell, which had been leased to some Chinese for use as a slaughter house, was burned. A threatening note sent to Bidwell said, "Sir, you are given notice to discharge your Mongolian help within ten days or suffer the consequences." Then, on February 28, some men set fire to the barn on the ranch of the widow, Mrs. Patrick, who had leased her orchard and garden to Chinese. Six horses were burned alive, and the dwelling house of the Chinese tenants

was consumed by flames as well. Shots were fired at the Chinese as they attempted to put the fire out. The Chinese suffered an estimated loss of $1,500.[5] A third incident took place on March 5 when the home of some Chinese in Nord was burned. The inhabitants escaped before fire engulfed the building, but the arsonists shot at the Chinese as they retreated. The day after, a washhouse operated by Ah Shu on Chico Creek was burned.[6]

Several unsuccessful attempts to burn both the "old" and the "new" Chinatown in Chico were made in March,[7] but the event that respectable citizens of Chico found most deplorable was the murder on the evening of March 14 of several Chinese who had been hired to grub and clear a piece of land on the Chris Lemm ranch, located about a mile outside of Chico on the Humboldt Road. Five armed men went to the ranch, shot four of the Chinese, doused their house with kerosene, and set it on fire. Two other Chinese were wounded but managed to escape. One died later, and the other managed to reach town to report the incident to the police. John Bidwell formed a Committee of Safety to patrol the town. Professional detectives were hired to search for suspects, and the citizens of Chico contributed $1,000 as a reward for their capture. The flood of threatening letters continued.[8]

Finally, on March 27 five men suspected of murdering the Chinese on the Lemm ranch, and seven others suspected of the other acts of arson, were captured. The confession of Ned Conway, who was caught first as he dropped a threatening letter in the mail, led to the arrest of the others. Confessions by Conway, Thomas Stainbrook, Henry C. Wright, Adam Holderbaum, H. T. Jones, and Charles Slaughter, which were published in the *Chico Enterprise* on March 30, 1877, revealed that members of the Laborers' Union—an off-shoot of the Order of Caucasians—and particularly those belonging to a group known as the Council of Nine, had planned to instigate a reign of terror in the Chico countryside in an attempt to oust the Chinese from the area. According to some of the confessions, Ned Conway, Charles and John Slaughter, Eugene Roberts, and Thomas Stainbrook, had gone to the Lemm ranch with the intention of robbing the Chinese, who they believed had plenty of money. They entered the cabin of the Chinese, held them at gunpoint, and searched for money. Only then did Roberts suggest that they each choose

a Chinese to shoot. Some of the others objected, but four Chinese were killed anyway. Roberts had a bottle of kerosene in his pocket, threw it over the heads and clothes of the Chinese, and one of the Slaughter brothers lighted a match to set their victims on fire.[9]

The grand jury rushed through the hearings in three days. Five men were held for murder and arson, and six for arson. Pleasant Slaughter, brother of Charles and John, was sentenced to ten years for burning Bidwell's factory. Stainbrook, Roberts, Charles Slaughter, and John Slaughter each received a life sentence, while H. T. Jones, who refused to confess to anything, received twenty years. Writing in the Yuba City and Marysville *Independent Herald* three-quarters of a century later, a reporter commented:

> Had their victims been white men they would have been hanged. In fact, they would have been, undoubtedly, accorded that special type of hanging termed lynching.[10]

John Bidwell's factory was rebuilt, but on the night before it was to reopen, it was burned to the ground again.

Other acts of wanton violence against the Chinese continued after the Chico incidents. At the same time, employers elsewhere also received threatening notices. In August 1877 the San Francisco *Daily Morning Call* reported that white farmers in the Sacramento Delta had received letters dated July 1877, which said:

> Notice is heare given to all men who owns lands on the Sacramento River is heare ordered to dispense with Chinese labour or suffer sutch consiquinces as may follow within tenn days. We have heaved and puked over Chinese imposition long a nuff. Good-by John Long Taile.[11]

Sixty farmers, "in the main sturdy old pioneer settlers" who employed Chinese, met in Courtland under the leadership of J. V. Sims and O. R. Runyon and declared that "the Chinamen were of necessity employed and found to be sturdy, sober and industrious, the whites being the very reverse."[12] They bemoaned the fact that

> modern labor has degenerated.... It is no way for workmen to act, to demand work and then be resort to riot, arson