1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   JOHN D. ECHEVERRIA
    Deputy Attorney General
5   State Bar No. 268843
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3479
7     Fax:  (415) 703-1234
      E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta and
    Blake Graham, in their official capacities*

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                        CIVIL DIVISION

13

14   **JAMES MILLER et al.,**              Case No. 3:19-cv-01537-BEN-JLB

15                      Plaintiffs,        **COMPENDIUM OF WORKS**
                                           **CITED IN DECLARATION OF**
16          **v.**                         **RANDOLPH ROTH**

17                                         **VOLUME 2 OF 37**

18   **CALIFORNIA ATTORNEY**               Courtroom:    5A
     **GENERAL ROB BONTA et al.,**         Judge:        Hon. Roger T. Benitez
19
                       Defendants.         Action Filed:  August 15, 2019
20

21

22

23

24

25

26

27

28                                    1

**INDEX**

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, *Frontier Law and Order—10 Essays*, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| Reference | Cite | Pages |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶  14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of America in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America,*" Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

9

# HISTORY

OF

# EDGEFIELD COUNTY

## FROM THE EARLIEST SETTLEMENTS

TO

## 1897

---

BIOGRAPHICAL AND ANECDOTICAL; WITH SKETCHES OF THE
SEMINOLE WAR; NULLIFICATION; SECESSION; RECON-
TRUCTION; CHURCHES AND LITERATURE; WITH ROLLS
OF ALL THE COMPANIES FROM EDGEFIELD IN
THE WAR OF SECESSION; WAR WITH MEX-
ICO AND WITH THE SEMINOLE INDIANS.

BY

## JOHN A. CHAPMAN, A. M.,

Author of SECOND PART OF ANNALS OF NEWBERRY; SCHOOL HISTORY
OF SOUTH CAROLINA, ETC.

---

NEWBERRY, S. C.
ELBERT H. AULL, PUBLISHER AND PRINTER.
1897.

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

Generated on 2022-10-18 18:35 GMT  /  https://hdl.handle.net/2027/coo.31924028790356
Public Domain  /  http://www.hathitrust.org/access_use#pd

A 210395

Entered according to Act of Congress in the year 1897,
By JOHN A. CHAPMAN,
In the office of the Librarian of Congress,
At Washington, D. C.

Generated on 2022-10-18 18:38 GMT / https://hdl.handle.net/2027/coo.31924028790356
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

assumed the command, giving his lieutenancy to John Corley, and, the danger of the party requiring a resort to desperate measures, placed him in rear with an order to cut down the first man that gave way. It happened that Joseph Corley, among others, was about to give way, which would have left the small remnant of the Whigs to certain destruction. John Corley, true to his instructions, with drawn sword menaced his brother with instant death unless he returned to his post. Joseph did return and behaved well afterwards.

Vardell had been killed, and before his breath left him he begged his comrades not to let his body fall into the hands of the Tories. The wounded Watson, lying between the contending parties, had made a similar appeal, specially to William Butler: "Billy, do not let them take me."

The Whigs made one more charge and carrying off their comrades retreated, but found time to bury poor Vardell under a clay root and cover him with their swords. At some little distance from the scene of conflict they took refuge in a wooden outhouse, being pursued, but circumspectly, by the Tories. Watson, severely wounded, and the sudden apprehension of death, still maintained a military resolution. A woman happened to be in the house in which they entered whose infant, some three weeks old, was in a dwelling some distance off. Watson insisted she should be detained; that their weakened condition required concealment and she might betray them. They found, means, however, to get information of their perilous situation to Orangeburg, and Captain, subsequently General Rumph, hastened to their relief. Under his escort Watson was carried upon a litter in a dying condition to Orangeburg where he expired and was buried. William Butler superintended the military honors of his funeral.

While serving with Ryan the subject of our memoir was engaged in another expedition against the Tories in Orangeburg District. They were in force near the Court House. A number of Tories, finding their condition desperate, deserted to the Whigs, and Ryan, distrusting them, placed them in front with instructions to his men to shoot them if they proved false. In the fight which ensued his chief was again disabled and William Butler assumed the command. The Tories were defeated.

Generated on 2022-10-18 18:38 GMT / https://hdl.handle.net/2027/coo.31924028790356
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

In 1782 Cunningham made a second incursion into the Ninety-Six District. Perfectly familiar with the country in his youth, possessed of great sagacity, fertility in military expedients and endowed with all the physical qualities so essential to the partizan, he was no mean adversary to contend with. A favorite manœuvre with him was to divide his command upon the march into small detachments, to be concentrated by different routes near the point at which the blow was aimed. In this manner he had concentrated his force at Caradine's ford on Saluda. William Butler then was commanding a company of Rangers under the authority of General Pickens and, with a portion of his company marched to meet him. With a view to ascertain the enemy's position he resorted to a ruse. Approaching the residence of Joseph Cunningham, near the junction of Little Saluda with Big Saluda, he sent forward his brother, Thomas Butler, with Abner Corley to the house at night. Thomas Butler was an excellent mimic and, imitating the voice of one of William Cunningham's men, called Nibletts, asked from without where our friend Cunningham was. The wife of Joseph Cunningham replied that he had crossed at Caradine's ford. With that information William Butler himself rode up to the house and mounting Joseph Cunningham on a horse compelled him to guide the party across the ford.

They crossed the ford at 12 o'clock at night and next morning halted in a peach orchard near Bauknight's Ferry. The horses were unbridled but with the saddles on feeding upon peas out of a canoe when a grey mare, which Cunningham was known to have taken out of the neighborhood, was observed passing back, having escaped from his camp. This incident disclosed in some measure the state of affairs, and the Rangers received the orders to march. The Rangers numbered some thirty and Cunningham's men about twenty. The bloody scene of Cloud's Creek animated any encounter between Butler and Cunningham with more of the feelings of the duello than the battle-field. Approaching the Tory position unobserved, John Corley was detailed with eight men to gain their rear and upon a concerted signal to commence the attack, while the main body advanced under cover of a hedge. The Tories were drying their blankets by their camp fires; Cunningham, himself, was at a little distance off from his band. As it after-

Generated on 2022-10-18 18:31 GMT / https://hdl.handle.net/2027/coo.31924028790356
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

wards appeared, Butler's person being at one time exposed in advancing before the signal was given, he was observed by the Tories, but taken for their leader, for there was a striking personal resemblance between the two men.

Corley's furious assault, himself foremost in the charge, was the first intimation to the Tories that their exasperated foes were at hand.  Cunningham was promptly at his post, but, taken by surprise and attacked by superior numbers, thought only of safety.  Having no time to saddle his horse, but with partizan quickness seizing his holsters sprang to his seat, while Butler, singling him out, dashed in pursuit.  Both men were remarkably fine riders and tradition has preserved the names of the horses they rode.  Cunningham was mounted on a mare which had become celebrated in the service as "Silver Heels," while Butler rode a horse called "Ranter."  As Butler carried only a sabre and Cunningham only pistols that had been rendered useless by the rain of the night before, for he snapped them repeatedly over his shoulders at his adversary as he fled, life or death hung upon the speed of the horses.  As long as the chase was in the woods "Ranter" maintained his own, but when he struck an open trail in which the superior strides of Cunningham's thoroughbred could tell, turning in his seat and patting with triumph and confidence the noble animal that bore him, he tauntingly exclaimed, "I am safe," and dashing rapidly away from his adversary, he escaped by himself swimming the Saluda near Lorick's ferry.  When William Butler returned from the pursuit of Cunningham he found a portion of his command assembled at the Tory camp under circumstances which gave him great concern.  Turner, one of his prisoners, had been deliberately shot through the head after he had surrendered.  When Butler sternly rebuked the act Seysin, who had done the deed, justified himself by reciting an outrage the unfortunate Tory had inflicted upon his mother.  The verdict of the corps was in Seysin's favor and no court martial was held upon him.  There was certainly strong palliating circumstances in the case.  The Tory had stripped Mrs. Seysin to the waist and tying her had severely whipped her to force her to disclose where a party of Whigs, among whom was her son, were.

A pursuit of Cunningham's men was ordered for the pur-

Generated on 2022-10-18 18:31 GMT  /  https://hdl.handle.net/2027/coo.31924028790356
Public Domain  /  http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

pose of capturing or dispersing them, and some were overtaken while crossing the river. Butler, finding his men disposed to fire upon them, ordered De Loach, who was raising his rifle, to desist. Sherwood Corley was then in the river, had snapped his pistol at the retreating party, not heeding the order, he deliberately primed it afresh while in the water and killed a Tory named Davis while he was ascending the Edgefield bank. The result of this action was the dispersion of Cunningham's famous band. He, himself, retired to Cuba where he died, being prevented from returning to his native State after the war by a proscriptive proclamation of the authorities. He was awarded something like an ovation by the British. Goudy, a gallant partizan of the Revolution, visited Cuba after the war on account of his health. Cunningham, in the true spirit of hospitality, called upon him with an invitation to dinner. Whether Goudy accepted the invitation or not we cannot say; but Cunningham told him that on one occasion he had ridden up with an escort at his back to a house near Ninety-Six, in which Goudy and others were playing cards, with a view to ascertaining if William Butler was among them. ''Why did you not fire upon us?'' asked Goudy. ''I had no temptation to kill you,'' said Cunningham, ''but if Billy Butler had been there you would have had the floor flooded with blood.''

From this time until after the close of the war, William Butler continued at the head of the Rangers, under command of General Pickens, and was considered his favorite captain. He had, however, very little duty other than patrol to perform. His company of Rangers was not discharged until 1784, more than a year after the peace.

With the resumption of the pursuits of civil life, the soldier's thoughts reverted to the young girl of Saluda with whom his meeting during Green's retreat from Ninety-Six has already been mentioned, Nor had she forgotten the young officer of the cocade and plume, for when the household rejected him, (the stepfather forbade him to visit her), she told him to come, she would see him. They were married the 3d of June, 1784.

Miss Behethland Foot Moore, whom William Butler had thus selected as the partner of his life, was a woman of strong, and in many respects remarkable traits of character. She al-

Generated on 2022-10-18 18:31 GMT  /  https://hdl.handle.net/2027/coo.31924028790356
Public Domain  /  http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

ways exercised great influence with her husband and he relied much upon her judgment and advice.   He seemed to have inspired her with a deep feeling, almost amounting to a fascination; of itself a high tribute to his memory.

In 1794 William Butler was elected by the Legislature of South Carolina Sheriff of Ninety-Six District.   He discharged few of the ministerial duties, however, leaving them to his brothers, Thomas and Stanmore, who were his deputies; but he always conducted the military escort of the Judge coming into the District and presided as High Sheriff during the sitting of the Court.

The sheriff of that day was an officer of distinction and was generally detailed upon offices of honor.   William Butler, as Sheriff of Ninety-Six, received General Washington when upon the Southern tour, from the authorities of Georgia, and conducted him by the Pine House to the Ridge, which was near the termination of his territorial jurisdiction   At the Ridge, General Hampton, then sheriff of what was called Camden District, received and conducted him by Granby, through Camden and thence to Charlotte, North Carolina, where the authorities of that State received the illustrious patriot. (There is certainly an error here.   Washington passed through the District in 1791).

In 1796 General Pickens resigned the office of Major-General of the upper division of South Carolina militia and through his recommendation William Butler was elected by the State Legislature to fill the vacancy.   In 1800 General Butler became a candidate for Congress against Robert Goodloe Harper, the incumbent from the Ninety-Six District.   Mr. Harper had been elected as a Republican, but from conscientious motives joined the Federalists and supported what was peculiarly unpopular at the South—Jay's Treaty.   This raised opposition to him at home and General Butler was selected as the opposition candidate, his old commander, John Ryan, moving the nomination.   He succeeded in the election and took his seat in 1801.

When the resolution; charging General Wilkinson with complicity with Burr, in his attributed treason, was moved and adopted in the House of Representatives, the occasion gave rise to great sensation.   A discussion took place upon the floor as

Generated on 2022-10-18 18:38 GMT / https://hdl.handle.net/2027/coo.31924028790356
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

Compendium_Roth
Page 0110

# ARMED IN AMERICA

### A HISTORY OF GUN RIGHTS *from*
### COLONIAL MILITIAS *to* CONCEALED CARRY

PATRICK J. CHARLES



Prometheus Books

59 John Glenn Drive
Amherst, New York 14228

Compendium_Roth
Page 0111

Published 2018 by Prometheus Books

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry*. Copyright © 2018 by Patrick J. Charles. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, digital, electronic, mechanical, photocopying, recording, or otherwise, or conveyed via the Internet or a website without prior written permission of the publisher, except in the case of brief quotations embodied in critical articles and reviews.

Top cover image © Media Bakery
Bottom cover image © Jamie Carroll / Shutterstock
Cover design by Liz Mills
Cover design © Prometheus Books

Every attempt has been made to trace accurate ownership of copyrighted material in this book. Errors and omissions will be corrected in subsequent editions, provided that notification is sent to the publisher.

Inquiries should be addressed to
Prometheus Books
59 John Glenn Drive
Amherst, New York 14228
VOICE: 716–691–0133.  •  FAX: 716–691–0137
WWW.PROMETHEUSBOOKS.COM

22 21 20 19 18   5 4 3 2 1

Library of Congress Cataloging-in-Publication Data

Names: Charles, Patrick J. (Historian), author.
Title: Armed in America : a history of gun rights from colonial militias to concealed carry / Patrick J. Charles.
Description: Amherst, New York : Prometheus Books, 2018. | Includes index.
Identifiers: LCCN 2017028290 (print) | LCCN 2017039818 (ebook) | ISBN 9781633883147 (ebook) | ISBN 9781633883130 (hardback)
Subjects: LCSH: Firearms—Law and legislation—United States—History. | Gun control—United States—History. | BISAC: POLITICAL SCIENCE / Constitutions. | HISTORY / United States / General.
Classification: LCC KF3941 (ebook) | LCC KF3941 .C49 2018 (print) | DDC 344.7305/33—dc23
LC record available at https://lccn.loc.gov/2017028290

Printed in the United States of America

3 1223 12351 3096

*For my daughter, Addison Harper Charles.*

Compendium_Roth
Page 0112

# CONTENTS

Acknowledgments                                                                          9

Introduction                                                                            11

Chapter 1. "In Guns We Trust": Bearing Arms in America Today      19

Chapter 2. The Antecedents of the Second Amendment              41

Chapter 3. American Constitutionalism and the Second Amendment   70

Chapter 4. The Transformative Nineteenth Century               122

Chapter 5. The Gun-Rights Movement Develops                   166

Chapter 6. The NRA Commandeers the Gun-Rights Movement        194

Chapter 7. Gun Rights Under Fire                              231

Chapter 8. The Birth of the Gun-Rights Golden Age             273

Epilogue                                                      311

Notes                                                         317

Index                                                         541

Compendium_Roth
Page 0113

# CHAPTER 3

# AMERICAN CONSTITUTIONALISM AND THE SECOND AMENDMENT

As was addressed in the preceding chapter, at the outbreak of the American Revolution the Founding Fathers' understanding of the right to arms was rooted in the English experience.[1] The right was looked upon as a constitutional check to standing armies and ensured the people, through service in the militia, maintained a vital interest in the preservation of their liberty. For the most part, American conceptions of arms bearing were one and the same with English conceptions. As England developed into a global power and European nations turned to professional armies, however, England was compelled to become far less reliant on the militia, and the entire system fell into disrepute.[2] Yet in the American colonies the militia remained essential. The American colonies' preference for a militia made sense both economically and defensively. Not only was the cost of a militia significantly less than a standing army, the militia was also more geographically encompassing. Rather than maintain expensive military outposts, scattered across the colony, a militia could be easily assembled by any local township or county.[3] This is not to say the militia was without its faults. Nonetheless, the militia was revered as an essential function of republican government and liberty. This reverence for the militia as a republican institution was reflected in late eighteenth-century American constitutionalism.

The first uniquely American constitutions came immediately after the Continental Congress adopted the Declaration of Independence, when John Hancock, the president of the Continental Congress, sent letters to each of the colonial assemblies informing them of the Declaration's effects.[4] Hancock wrote that the Declaration first dissolved "all connection between *Great Britain* and the *American Colonies*" as to "declare them free and independent States," and second was to serve "as the *ground* and *foundation* of a future

Government."[5] On the same day that the Declaration was adopted, the Continental Congress pressed forward with what would eventually be the first United States Constitution, otherwise known as the Articles of Confederation.[6] This was followed by state constitutional conventions. In 1776 alone, Delaware, Maryland, New Hampshire, New Jersey, Pennsylvania, South Carolina, and Virginia all adopted their first constitutions. A year later, Georgia, New York, and Vermont followed suit, with Massachusetts adopting its first constitution in 1780. At the close of the eighteenth century, eleven out of the original thirteen states adopted constitutions.[7] Additionally, the first two United States territories to obtain statehood, Kentucky and Tennessee, passed their first constitutions.[8]

In the majority of these state constitutions was a Declaration of Rights, and the protections afforded in each were largely similar.[9] The liberty or freedom of the press, for example, was in virtually every state constitution. It was merely stated in different terms.[10] The same was true for the right to arms. Five state constitutions recognized the importance of having a "well-regulated militia" and four recognized a general right to "bear arms."[11] The language found within these state constitutions would ultimately find its way into the text of the Second Amendment, which states, "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."[12]

Much like Article VII of the English Declaration of Rights, the Second Amendment presents a number of questions, such as: what was a well-regulated militia by the late eighteenth century? Why was it so necessary to the security of a free state? Was the right to keep and bear arms intimately related to this well-regulated militia, and if so, how?

In recent decades, a handful of lawyers sought to answer these questions by focusing intently on the Second Amendment's text. They broke down the text piecemeal, defined each word or phrase as they understood it, and reassembled the whole.[13] While these lawyers must be credited with bringing new life and purpose into the Second Amendment, their approach and use of evidentiary sources, as this chapter will illuminate, fails to meet the historian's burden.

Historically speaking, it is simply not enough to approach the Second Amendment, or any constitutional provision for that matter, as a linguistic puzzle because historical context, the most relied upon, accepted, and important implement to recreating and understanding the past, is generally lost in the process.[14] Historical context is in fact the very first lesson every student of history learns, and it is particularly important when deducing a writer's words or intentions—what is otherwise known as the history of ideas, or intellectual

Compendium_Roth
Page 0114

history.[15] Historians know that words are inert and must be placed in the time of their construction. If a writer's meaning changes, it is only due to, in historian Joyce Appleby's words, the "imaginative processes" of later "human inventors and users," not the originating writer.[16] Thus, whenever historians seek to understand or dissect the past, they must remain aware in order to balance historical texts, images, and theories responsibly, with precision, and to connect them to a particular historical world.[17]

Historians must never assume meaning with a modern predisposition.[18] Rather, when seeking to understand the past, historians must import historical language into its proper construct, "point out conventions and regularities that indicate what could and could not be spoken in the language, and in what ways the language qua paradigm encouraged, obliged, or forbade its users to speak and think."[19] To state this differently, in order to understand the past the historian must do more than decipher text and hypothesize what the text could mean. Certainly deciphering text, including constitutional text, is an important part of any historical assessment. However, it is a useless endeavor if performed without historical context. And in order to obtain historical context the historian must retain historical consciousness.

Retaining historical consciousness is not the same as using one's historical imagination. Drawing conclusions from one's historical imagination is nothing more than building upon speculations and predispositions. Conversely, to retain historical consciousness is to understand the past on its own terms; that is what the evidentiary record assuredly informs us.[20] As Pulitzer Prize—winning historian Gordon S. Wood aptly put it, "To possess a historical sense does not mean simply to possess information about the past. It means to have a different consciousness, a historical consciousness, to have incorporated into our minds a mode of understanding that profoundly influences the way we look at the world."[21]

A fitting example to differentiate between retaining consciousness and using one's imagination is the history surrounding Article VII of the 1689 English Declaration of Rights, which was outlined in the preceding chapter. Recall how the evidentiary record, particularly the political commentary and debates surrounding Parliament's dissatisfaction over the 1661 and 1662 Militia Acts, showed that Article VII was adopted with the parliamentary right of self-preservation and resistance in mind.[22] This is the very epitome of retaining historical consciousness, for it is an assessment of the past based on historical context and what the evidentiary record provides, not what may be inferred or theorized. In contrast, using one's historical imagination would be to the follow the path of Joyce Lee Malcolm, who made a number of historical

inferences about Article VII that turned out to be unsubstantiated by the evidentiary record.[23]

In defense of Malcolm, there is certainly nothing wrong with her, or any historian for that matter, making some assumptions. Regardless of how much historical evidence is unearthed on a particular time, event, or subject, historians have to make assumptions about the past.[24] However, it is the duty of historians to minimize the size and number of assumptions that they make by eliciting historical context to the greatest detail. Moreover, historians must not organize historical knowledge upon assumptions without realizing what they are doing and then "make inferences from that organization and claim that these are the voice of history."[25] This is essentially where Malcolm faltered. Malcom built her entire thesis on the assumption that Article VII was meant to enshrine a right for Englishmen to have and to hold weapons for self-defense and then arranged all the historical evidence to fit that narrative. The important point to be made is that in order to fully understand the past, including the historical genesis of the Second Amendment, one must contextualize and accept the past on its own terms, as well as contextualize and accept the political, ideological, and philosophical origins from which the right developed.

As with any constitutional right, the idea behind the Second Amendment did not materialize out of thin air. It arose from experience and dialogue. So far as historians know, the earliest conception of a right to arms appeared in the writings of Niccolò Machiavelli and James Harrington and subsequently flourished in England's political discourse of the late seventeenth century.[26] But despite a number of political writers emphasizing the importance of the right to arms and its intimate connection with a constitutional well-regulated militia, the English militia, as an actual functioning military defense system, had been inadequate since the time of Queen Elizabeth.[27]

This factual inconvenience did little to dissuade political writers from romanticizing the past—especially Roman and Florentine times, when militia service and arms-bearing were considered an important badge of citizenship—and restoring the militia to its proper historical pedestal.[28] Consider, for example, the 1699 political tract *A Letter to a Member of Parliament*, where a framework for the establishment of a constitutional militia was laid out.[29] In the tract, it was asserted that the safety and preservation of England should not be trusted to the "*Country Rabble*, or a *Giddy Multitude*," but to the "whole united Power of both" the landed gentry and all "capable of bearing Arms."[30] It was also emphasized that the entire militia be "well Arm'd and Disciplin'd" and "under good Discipline, and skilful Officers."[31] Militiamen were not to be armed, equipped, and merely sent on their way. Rather, to constitute a constitutional militia required

military discipline and training, both individually and collectively. This was due to the fact that in the late seventeenth century military efficiency and movement were premised on economy of force. The effectiveness and power of each volley or charge was useless unless the militia acted in unison. Moreover, a company or battalion could not defend itself from an assault, by either infantry or cavalry, if the entire militia did not maneuver and work together as one.[32]

The freethinking and progressive writings of Andrew Fletcher and John Toland, the most liberal militia proponents of the late seventeenth century, also conveyed this very basic yet important principle. Fletcher made sure to differentiate between a militia that was "under no other Discipline than that of an ordinary and ill-regulated Militia" and one that was well-regulated.[33] A "well-regulated Militia," wrote Fletcher, was capable of defending "against any Foreign Force" so that the "Nation may be free from the Fears of Invasion from abroad, as well as from the Danger from Slavery at home."[34] A well-regulated militia was not to be confused with an armed citizenry. Rather, a well-regulated, effective, and constitutional militia required men of all classes acting together as one.[35] This brought social and civic balance to the "minds of men, as well as forming their bodies, for military and v[irtuous] Actions."[36] Conversely, for society to do nothing but arm the militia served no other purpose than to create an armed mob because arms alone did not provide the requisite training and discipline necessary to defeat a professional army:

> A good Militia is of such Importance to a Nation, that it is the chief part of the Constitution of any free Government. For tho as to other things, the Constitution be never so slight, a good Militia will always preserve the publick Liberty. But in the best Constitution that ever was, as to all other parts of Government; if the Militia be not upon a right foot, the Liberty of that people must perish.[37]

Toland was also a proponent for "modeling and disciplining" the militia to preserve the English Constitution.[38] Also like Fletcher, Toland emphasized how virtue, education, and military and civil discipline were essential in establishing a well-regulated militia:

> [I]n a well-regulated Militia Gentlemen make their Discipline to be properly an Exercise or Diversion in time of Peace; and in War they fight not only to preserve their own Liberty and Fortunes, but also to become the best Men in their Country. . . . After all, if Gentlemen will be at the pains of fighting for their own . . . tis surely worth their while to learn the Art of doing it.[39]

Where Toland distinguished himself from Fletcher was in his rejection of the lower classes participating in the militia. While Fletcher did not see a problem with accepting "Servants"—that is, so long as "many Persons of Quality or Education be among them"—Toland was for limiting militia participation to "Men of Property, or Persons that are able to live of themselves."[40] According to Toland, what separated freemen from servants was their respective interests in society. While freemen fought "for their Liberty and Property," servants had "nothing to lose but their Lives."[41]

Although Fletcher and Toland disagreed on the composition of the militia, they agreed that only a well-regulated militia would do any service to the nation.[42] An effective well-regulated militia required, as one mid-eighteenth-century political writer put it, "nothing less than uninterrupted daily Exercise, penal Laws, severe Discipline, military Authority, and Subordination," for the "whole Strength" of a militia "consists of cohesion . . . of its Individuals; and their destructive Power, in their quick, yet cool Manner of Firing" as a "Body of Men" or one cohesive unit.[43] Without this cohesion it was foreseen:

> [S]hould you take your Fire-Arms along with you, that John in the Rear will be firing his Piece into the Back-side of his Friend Tom in the Front; or, which would be still worse, blow out the Brains of his noble Captain. To some of your intrepid Patriots and Heroes, who are resolved, dam-me! to fight, Blood to the Knees, in Defence of their Lives, Wives, and Properties, these may seem Considerations of no Importance. . . . But the Dangers to which you are about to expose yourselves are infinite. . . . Seriously, Gentlemen, I assure you, that a Firelock, with a Bayonet fixed on the End of it, is a very awkward Kind of Instrument; and that it requires more Dexterity than you may be aware of, to manage it, without wounding your Neighbors. Many and frequent are the Accidents . . . among regular Troops. . . . What therefore may be expected from half-disciplined Men, I need not inform you.[44]

This understanding of a well-regulated militia—that is, a constitutional body of citizens capable of bearing arms where men would train together in the Art of War and an *esprit de corps* would flourish—remained influential on both sides of the Atlantic. In 1739 Massachusetts, Reverend Samuel Mather, the son of Reverend Cotton Mather, published a tract entitled *War Is Lawful, and Arms Are to Be Proved.* While underscoring the importance of uniform and proper arms, Mather stated that such arms were useless if "their designed End is not attain'd."[45] This end required that citizens have knowledge in the "Use and Exercise" of arms and be able to demonstrate it.[46] And to those citizens who were not properly instructed in the Art of War, Mather was of the opinion:

Compendium_Roth
Page 0116

And, if any *pretend to appear in Arms*, which They *know not how to use*, because *They never exercised and proved Them*, *They deserve to be condemned for their Folly and Rashness . . . when and where Men have not known the use of warlike Instruments*, and have bin [sic] *unacquainted with Military Order*, the *strongest Party has generally*, if not always, *prov'd victorious and triumphant*.[57]

In addition to political tracts, the constitutional significance and purpose of a well-regulated militia was frequently conveyed in eighteenth century militia law preambles.[48] These preambles were not empty rhetoric. They served to remind the reader of the purpose and significance of the law.[49] As early as 1660, Massachusetts law recognized that "the well Ordering of the Militia is a matter of great concernment to the safety & welfare of this Commonwealth."[50] In 1724, New York adopted a militia law that proclaimed, "Whereas an orderly and well disciplin'd Militia is justly esteemed to be a great Defence and Security to the Welfare of this Province . . ."[51] Then there was Pennsylvania, which included the following preamble in its 1757 Militia Act:

> Whereas *Self-preservation* is the first principle and law of nature, and duty that every man dispensibly owes not only to himself but the *Supreme* Director and Governor of the *Universe*, who gave him *Being*; And Whereas, in a state of *political Society* and *Government*, all men, by their *original compact* and *agreement*, are obliged to unite in *defending* themselves and those of the same community, against such as shall attempt unlawfully to deprive them of their just rights and liberties, and it is apparent to every *rational creature*, that without defence no government can possibly subsist.[52]

The preamble's reference to the right of self-preservation was an acknowledgement of the much larger philosophical principle outlined in the preceding chapter, that is, that a well-regulated militia ensured the people's rights, liberties, and property were protected from destruction. Also, a well-regulated militia was seen as uniting the community for the greater good or, as the Pennsylvania Assembly put it, a "well-regulated Militia is the most effectual guard and security of every country" and essential "for the safety and security of our constituents."[53] But in order to accomplish the people's security and safety, the militia had to be properly "armed, trained, and disciplined, in the art of war."[54] Only then could the people, through the militia, effectively "assert the just rights of his majesty's crown" and "defend themselves, their lives and properties, and preserve the many invaluable privileges they enjoy under their present happy constitution."[55]

Noting the importance and purpose of a well-regulated militia in militia law preambles continued into the late eighteenth century, both prior to and after the ratification of the United States Constitution. In 1777, Maryland's militia law stated, "Whereas a well regulated militia is the proper and natural defence of a free government . . ."[56] In the same year, New York's militia law proclaimed, "Whereas the Wisdom and Experience of Ages, point out a well regulated Militia, as the only secure Means for defending a State, against external Invasions, and internal Commotions and Insurrections . . ."[57] In 1779, Rhode Island's militia law read, "Whereas the Security and Defence of all free States essentially depend, under God, upon the Exertions of a well regulated Militia . . ."[58] Meanwhile, North Carolina's 1777 militia law read analogous to the prefatory clause of the Second Amendment, stating, "Whereas a well regulated Militia is absolutely necessary for the defending and securing the Liberties of a free State . . ."[59]

What these late-eighteenth-century preambles collectively demonstrate is that a well-regulated militia was viewed as a crucial aspect of American liberty. The belief in a well-regulated militia as the people's birthright and security permeated throughout the American Revolution. As Thomas Paine wrote in *Common Sense*, "A well-regulated militia will answer all the purposes of self-defence, and of a wise and just government."[60] Joseph Reed, the President of Pennsylvania's Supreme Executive Council, delivered similar sentiments to the militia by reminding them of the "inestimable advantages of a well regulated militia."[61] Then there was Timothy Pickering, who inscribed on the title page of his 1775 treatise *An Easy Plan for the Militia* the following: "Almost every *free* State affords an Instance of a National Militia: For *Freedom* cannot be maintained without *Power*; and Men who are not in a Capacity to *defend* their *Liberties*, will certainly *lose* them."[62]

Pickering, a future secretary of war, secretary of state, and member of Congress, was a strong militia proponent.[63] Having studied under British military officers, Pickering authored two treatises on the organizing, disciplining, and training of the militia. In 1769, Pickering's first treatise appeared in the *Essex Gazette* under the penname "A Military Citizen" and received praise for diffusing "a true military Spirit throughout" Massachusetts.[64] It sought to address "the true Design of the Militia, and of Training-Days" by prescribing an effective system of military discipline.[65]

Pickering started his treatise by addressing the importance of the militia as a whole:

> The Design of a Militia . . . is principally for the Security of the Country against the violent Attempts of its Enemies. But this Security is to be

Compendium_Roth
Page 0117

obtained only by making the Militia acquainted with Military Discipline; and that is the *principle End* and Business of Training-Days. But the well disciplining [of] the Militia not only gives us this Security, but also answer these very important Purposes; it renders useless that dangerous power, and grievous Burden, a *standing Army*, and has a natural Tendency to introduce and establish good Order, and a just Subordination among the different Classes of People in the Community.[66]

In particular, Pickering observed how training days, as constituted, were highly inefficient in providing an effective militia. One day would be "spent in firing at Mark," yet the actual military maneuvers were nothing but a "mock-Engagement" where men "learn a little of Military Discipline."[67] Pickering queried, "Is it worth while to keep such a Militia on Foot? Is it not a real Injury to the Province? A useless, nay a mischievous Expence of Time, of Money, of Ammunition?"[68] He then proceeded to answer his own questions:

[B]ecause the Men learn nothing, or next to nothing, of Military Discipline . . . instead of good Order and a just and necessary subordination, such Training serves only to introduce, encourage and promote Licentiousness, a Disregard to all Order, and Contempt of those in Office. . . . The best Method of obtaining this Knowledge in Military Affairs, is by the Officers reading the Exercise repeatedly by themselves; and at certain Times meeting together, and then again reading and explaining it, and communicating to each other whatever Discovering they have made in any Points not so clearly expressed. . . . And let every Action, or Evolution, be tried and performed as soon as it is read.[69]

Pickering's views on the importance of military discipline and training to effectuate a well-regulated militia were quite common. As other military commentators before him, Pickering did not believe arms by themselves, the firing of arms, or the individual exercise of arms would constitute an effective well-regulated militia.[70] To merely comprise a militia of men in arms, with little military training and discipline, was an unregulated or ill-regulated militia, not a well-regulated one. In Pickering's words:

The Manner of loading and firing as explained in the *Manual Exercise* is designed . . . to teach us to do every Action together, as well in the most expeditious Manner. For it is not the scattering Fire of one here, and another there, just as they happen to get loaded, that will frighten regular Troops—



This British political cartoon was intended to be a humorous depiction of the ineffective nature of late-eighteenth-century militia training days. In the lower left corner, a militiaman is aiming a cannon in the direction of a completely unorganized and undisciplined militia formation. In the lower right corner, other militiamen are drinking heavily, with one of them handing his rifle to a prostitute. (Richard Godfrey, "A Field Day, or the City Militia," 1779. Image courtesy of the Library of Congress.)

Compendium_Roth
Page 0118



This British political cartoon sought to highlight how the militia was often comprised of nothing more than an armed rabble. The officer leading the formation is depicted as being sufficiently overweight. Meanwhile, the first row of the militia formation is comprised of a shoe cobbler, brick layer, artist, tailor, and barber, which is intended to convey that the militia, as constituted, was ill-suited as a military fighting force. (James Gillray, "Supplementary-Militia, Turning-Out for Twenty-Days Amusement," 1796. Image courtesy of the Library of Congress.)

No it is the close, compact Fire of large Number at once, by which whole Ranks are slaughtered, that dismays an Enemy and puts them to Flight. But granting that we had the most perfect Use of the Firelock (which is by no Means true) and could load and fire with the exactest Uniformity; and were besides, drawn up in the most complete Order to engage an Enemy. . . . For the Ranks and Files would by that Movement be so broken and disordered, that our bare Knowledge of the Firelock would do us very little Service, and before we could get into Order again, the Enemy might cut us to Pieces. The right Use of the Firelock therefore is not the whole, nay it is the smallest Part, of military Discipline.[71]

Six years later, Pickering published his second treatise, *An Easy Plan for the Militia*. It was such a respected work in the field of military discipline that General George Washington ordered six copies to assist in training the Continental Army, and the Massachusetts Provincial Congress officially adopted the treatise "to instruct and exercise" the Massachusetts militia at "all their publick Trainings and Musters accordingly."[72] Pickering was ultimately inspired to write *An Easy Plan for the Militia* because the customary training manual, known as the Norfolk exercise, was not "short and easy" as it should be.[73] He found many of the "actions and motions" to be "useless, or needlessly" repetitive, and therefore set out to reform militia training so that men might "learn all the essential parts of discipline."[74] To Pickering, the problem with all preceding military manuals and treatises was that maxims were "blindly adopted, without any examination of the principles on which they are founded."[75] While it was certainly important to instruct the militia in the art of war as the manuals intended, it was equally important that "the men be clearly informed of the Reason of every action and movement—or the Uses to which they can be applied."[76]

Here, what Pickering wanted to convey was the idea that knowledge was an essential part of military discipline. This is a military principle that carries on to this day. In its basic form, the principle requires that every member be able to perform the military functions of other members so that when one member falls another takes their place. The principle applies to all ranks, military subordinates, and superiors. No matter who falls on the day of battle, someone within the ranks must carry on and assume the role:

As the militia of America is composed of men of property, and will be engaged, not to make conquests for Ambition, but merely in their own defence; so they will need only information of their duty to dispose them to do it. . . . When men see the reason and use of any action or movement, they

Compendium_Roth
Page 0119

will learn it with much more alacrity and pleasure. 'Tis particularly requisite for the militia to be informed in what cases and circumstances the several parts of the exercise, but especially of the evolutions, may be applied, and used to advantage. There is a great variety of movements useful on different occasions, "but they ought never to be performed without explaining to the soldiers the *meaning*, and the *benefit* that may be drawn from them," by this means the men will be enticed into discipline, and be ready to perform what is required on all occasions. . . . Caesar mentions a remarkable instance in which the knowledge and experience of his private soldiers saves his army. . . .

Amidst these difficulties, two things, says Caesar, fell out to the advantage of the Romans: one was, the knowledge and practice of the soldiers; because, having gained experience in former battles, every soldier know what was proper to be done in such an emergency, as well as his officer. To remedy the want of experience as much as possible, the militia should be let into the ground and reason of every action and movement; to which it experience should ever be added, their ability to attack or defend must vastly exceed that of those whose skill is found on mere practice.[77]

Naturally, the acquisition of military knowledge required repeating the basic tenets of the military exercise.[78] These tenets included firing, marching, wheeling, maneuvering, evolutions, and understanding the importance of military subordination.[79] The tenets of the military exercise were not acquired by each individual exercising the motions, but by the professional exercise of the militia as a collective body.[80] This fostered an *esprit de corps* among the men, as well as ensured that the militia was an effective military force.

Suffice it to say, Pickering's overall approach to training the militia was a gradual one. Militiamen were instructed in single "squads" so that the officers could easily correct "what is amiss."[81] It was only once the militiamen performed "well in this manner" that they were exercised in ranks.[82] The process was slow but necessary in order to ensure the "greatest possible uniformity in the motions."[83] Uniformity, whether it was in maneuvers, evolutions, or firing, promoted discipline and produced an economy of force.[84] "These actions should be performed with quickness and uniformity, and with grace," wrote Pickering, because the entire purpose was "to throw as many shot as possible at your enemy; with *uniformity*, to prevent the interruptions to each other, [and] the confusion and dangerous accidents which would inevitably happen."[85] Certainly the uniform discharge of arms was important, but it was nowhere near as important at being able to maneuver. Pickering had briefly touched on this point in his first militia treatise and expounded on it in *An Easy Plan for the Militia*:

In the militia we are apt to lay too much stress upon, and almost to think ourselves disciplined, if we can perform the manual exercise . . . the principal part of this exercise depends upon the *legs*: and that to the legs we ought to apply ourselves. That is to say, the men should, above all things, be taught and accustomed to march in exact order, and in equal time, lifting up their feet and setting them down together, with perfect regularity. . . . [W]hoever does not follow this method, is ignorant of even the first elements of the art of war.[86]

Pickering was clearly knowledgeable on training the militia, and what his writings inform us is that the Massachusetts militias that assembled to face the British at Battle of Lexington and Concord, and later isolated the British within the Boston Neck, were viewed as much more than a random assemblage of armed men. Thanks in part to Pickering, these militias had been training, drilling, and preparing for almost a year.[87]



The above imprint captures the way many late-eighteenth-century Americans remembered the Battle of Lexington and Concord. While a group of militiamen evacuated colonists from the battleground, the bulk of the militia force is valiantly battling the British Army head on. (Elkanah Tisdale, "Battle of Lexington," 1790. Image courtesy of the Library of Congress.)

Compendium_Roth
Page 0120

Outlining the importance that the Founding Fathers placed on military discipline and training to effectuate a constitutional well-regulated militia is vital because there are many contemporary Americans who improperly equate a well-regulated militia as being one and the same within a mere armed citizenry.[88] Nothing could be further from the truth. The Founding Fathers would have categorized such militias as ill-regulated, unregulated, or an armed mob. To the Founding Fathers, a well-regulated militia indicated something far more specific—and far more important—than an armed citizenry. A well-regulated militia provided constitutional balance and united the people in defense of their rights, liberties, and property in order to unite the people as a common community.

Another common misconception among some contemporary Americans is that the Founding Fathers understood the right to arms as embodying a "right to associate in militia companies independent of the government and use those arms against despotism."[89] While there were indeed "independent" militia companies both during and after the American Revolution, said companies existed at the behest of the colonial governments, and later the federal and state governments.[90] Consider the Fairfax County Militia Association, which was one of many independent Virginia militias under the direction of local committees of safety, each of which represented the interests of the local populace.[91] The impetus behind creating the independent Virginia militias was not to facilitate some independent right to assemble as a militia trained in the military discipline and exercise. They were assembled at the behest of the Virginia Convention. As Colonel George Mason, who would later draft the 1776 Virginia Declaration of Rights, wrote, the "Regulation & Establishment" of the Fairfax County Militia Association was only "to be preserved & continued, *until a regular and proper Militia Law* for the Defence of the Country shall be enacted by the Legislature of this Colony."[92]

Mason's reference to a "proper Militia Law" was the expiration of Virginia's militia law in July 1773.[93] This contextually explains why the Virginia Convention agreed to the formation of independent militia companies, each with their own rules and regulations.[94] Eventually, in 1775, the Virginia Convention passed a comprehensive militia law, and the independent militias were disbanded.[95] There were multiple reasons for this, but none more important than the fact that the independent militias lacked proper military discipline and training. As historian William E. White explains:

[T]he problems with discipline were great. The method of voting prior to each decision made the officers ineffective and enlisted men insubordinate. Officers refused to obey the command of their commander in chief, and

enlisted men as well as officers absented themselves as often as they liked for trips to the tavern. Disorder was the order of the day. . . . Men fired weapons for no apparent reason, an action which caused great confusion among green recruits fearful of attack and wasted precious powder.[96]

Virginia was not the only colony lacking a well-regulated and effective militia. A number of colonies, due to a number of reasons, were faced with a similar problem. It was primarily for this reason that General Washington and the Continental Congress formed the Continental Army. However, given that a standing army was the antithesis of republican government and liberty, selling the idea to the colonial assemblies proved to be a difficult task. What unfolded was a compromise in which the Continental Congress would only control the Continental Army, and the provincial assemblies would retain control of their respective militias. The compromise was later challenged by General Washington, who wanted the militias within his camp to be placed under his administrative and operational control.[97] Samuel Adams forcefully dissented:

It is certainly of the last Consequence to a free Country that the Militia, which is the natural Strength, should be kept on the most advantageous Footing. A standing Army, however necessary it may be at some times, is always dangerous to the Liberties of the People. [While] Soldiers are apt to consider themselves as a body distinct from the rest of the Citizens . . . The Militia is composed of free Citizens. There is therefore no Danger of their making use of their Power to the destruction of their own Rights, or suffering others to invade them. I earnestly wish that young Gentlemen of military Genius . . . might be instructed in the Art of War, and at the same time taught the Principles of a free government, and deeply impressed with a Sense of the indispensable Obligation which every member is under to the whole Society.[98]

Adams also divulged his feelings on the matter in a newspaper editorial signed "Caractacus." He noted the importance of ensuring that the militia was independent of federal control, writing that only "people of the smallest property, and perhaps of the least virtue among us" would join continentally paid minutemen.[99] Adams further noted, "It is needless to declaim long upon the advantages of a well regulated militia. A knowledge of the use of arms is the only condition of freedom."[100] He went on to add that military knowledge "often precludes the use of arms," proving that virtue and training was seen as a justifiable prerequisite for arms bearing.[101]

Other Founding Fathers were just as forthright in expressing their prefer-

ence for a well-regulated militia over a standing army. John Hancock, for one, preferred a well-regulated militia because from it "we have nothing to fear; their interest is the same with that of the state."[102] Hancock elaborated on this common "interest" as being akin to Machiavelli's *virtù*, writing that the militia "march into the field with that fortitude which a consciousness of the justice of their cause inspires . . . they fight for their houses, their lands, for their wives, their children . . . they fight for their liberty, and for themselves, and for their God."[103] Prominent attorney, advocate, and politician Josiah Quincy also preferred a well-regulated militia over a standing army. In the 1776 tract *Observations on the Act of Parliament*, Quincy wrote that in order to maintain a "free government," arms should be in the hands of "those who have an interest in the safety of the community, who fight for their religion and their children."[104] "Such are a well regulated militia," wrote Quincy, because it is "composed of the freeholders, citizen and husbandman, who take up arms to preserve their property as individuals, and their rights as freemen."[105]

The Founding Fathers preference for a well-regulated militia over a standing army was codified in the Articles of Confederation. Article VI, section 4 provided that "every State shall always keep up a well-regulated and disciplined militia, sufficiently armed and accoutred, and shall provide and constantly have ready for use, in public stores, a due number of field-pieces and tents, and a proper quantity of arms, ammunition, and camp equipage."[106] Article VI, section 4 was not empty rhetoric. On June 23, 1781, just months after the ratification of the Articles, Pennsylvania governor Joseph Reed attested to its importance. Confronted with an ineffective militia to defeat the British, Reed wrote to the Pennsylvania Assembly of the need for reforms in order to repel the British. A reformed militia would not only "render effective assistance" to the Continental force, but would also properly "avail ourselves of the disposition and virtue of this class of men."[107] To support his request, Reed invoked Article VI, section 4, writing, "I cannot therefore have any other view in this Address, than an anxious desire to preserve the honor and support the interest of the State, in maintaining a well regulated militia, which the Articles of Confederation and the voice of wisdom and sound judges declare not only to be highly proper, but indispensably necessary."[108]

In the end, the Articles never lived up to the Founding Fathers' expectations.[109] This was in part due to the Articles failing to sufficiently provide for the national defense. In August 1786, the events of Shays's Rebellion underscored this deficiency. The rebellion developed when Captain Daniel Shays, a Revolutionary War veteran from Massachusetts, led a group of dissolute farmers, who were having their lands confiscated for failure to pay their debts. Years prior to

the outbreak of the war, the courts were intentionally shutdown by the revolutionaries to prevent the Crown from officially seizing farmers' lands due to unpaid taxes. It took fifteen years for the Massachusetts courts to reopen, and, when they did, there remained many outstanding debts that created many insolvent farmers, many of whom were Revolutionary War veterans. Shays and others responded by taking up arms to prevent any of the courts from sitting.[110]

The military force that ultimately dismantled the rebellion was not the well-regulated state militias promised under the Articles of Confederation. Rather, it was defeated by a private army raised by former Continental Army major general Benjamin Lincoln. By January 1787 the rebellion was in check. As for the rebels' punishment, Lincoln wrote to Washington that it "must be such, and be so far extended as thereby others shall be deterred from repeating such acts of outrage in [the] future."[111] Still, the government could not be too stern. Lincoln felt that, in the "hour of success," the government should "hold out . . . terms of mercy."[112] Such an act of forgiveness would "apply to the feelings of the delinquents, beget in them such sentiments of gratitude and love by which they will be led to embrace with the highest cordiality that Government which they have attempted to trample under foot."[113]

To the dismay of Lincoln, Washington, and certainly others, Massachusetts did not propose such favorable terms. On February 16, 1787, the Massachusetts legislature granted Governor James Bowdoin the authority to pardon anyone who participated in the rebellion, but only on the following conditions:

> That they shall keep the peace for the term of three years . . . and that during that term of time, they shall not serve as Jurors, be eligible to any town office, or any other office under the Government of this Commonwealth, and shall be disqualified from . . . giving their votes for the same term of time, for any officer, civil or military, within this Commonwealth, unless such persons, or any of them, shall . . . exhibit plenary evidence of their having returned to their allegiance . . . That it shall be the duty of the Justice before whom any offender or offenders aforesaid may deliver up their arms, and take and subscribe the oath aforesaid . . . and it shall be the duty of the Justice to require such as shall take and subscribe the oath of allegiance, to subjoin their names, their places of abode, and their additions, and if required, to give to each offender who shall deliver up his arms . . . a certificate of the same under his seal . . . . and it shall be the duty of such Major General or commanding officer, to give such directions as he may think necessary, for the safe keeping of such arms, in order that they may be returned to the person or persons who delivered the same, at the expiration of said term of three years, in case

Compendium_Roth
Page 0122

such person or persons shall have complied with the conditions above-mentioned, and shall obtain an order for the re-delivery of such arms, from the Governour.[114]

Worth noting is the condition that the rebels forfeit their arms for a period of three years. Throughout the Revolutionary War, the forfeiture of arms was in fact quite common. Similar to the practice of their English forefathers, the Founding Fathers disarmed those deemed to be disloyal or who failed to take the oath of allegiance.[115] It was for this reason that there was no vocal objection to the Shays rebels' disarmament.[116] It did not matter that Article XVII of the 1780 Massachusetts Constitution's Declaration of Rights protected the right of the people to "keep and bear arms for the common defence."[117] For Article XVII was not understood as an individual right to acquire, own, and use arms for any and all purposes. Rather, Article XVII was viewed as being intimately tied to militia service.[118]

An act passed by the Massachusetts legislature immediately following Shays's Rebellion confirms this:

> Whereas in free government, where the people have a right to keep and bear arms for the common defence, and the military power is held in subordination to the civil authority, it is necessary for the safety of the state that the virtuous citizens thereof should hold themselves in readiness, and when called upon, should exert their efforts to support the civil government and oppose attempts of factitious and wicked men who may wish to subvert the laws and constitution of their country.[119]

Seven years later, in a general order, Massachusetts Militia adjutant general William Donnison delivered a similar construction of Article XVII:

> A well regulated Militia, composed of the great body of the Citizens, is always the chief dependence of a free people for their defence. Americans have ever esteemed the right of keeping and bearing Arms, as an honorable mark of their freedom; and the Citizens of Massachusetts, have ever demonstrated how highly they prize that right, by the Constitution they have adopted, and the laws they have enacted, for the establishment of a permanent Militia—by the readiness and alacrity with which they equip themselves, and march to the field—and by the honest pride they feel whenever they put on the exalted character of Citizen-Soldiers.[120]

Like many before him, Donnison understood the link between arms bearing, liberty, and the advancement of the public good. The right to arms was not a license to resist perceived tyranny. An anonymous 1789 editorial in the *Independent Chronicle* illustrated this very point by posing the question "What would you think of a militia who should use their arms to oppress, terrify, plunder, and vex their peaceable neighbours, and then say they were armed for the common good, and must be free?"[121] The question was posed to make the point that the "freedom of the press" could be regulated to protect the "reputation," "feelings," and "peace of a citizen."[122] The same premise held true for the right to arms. As the editorial pointed out, "There are laws to restrain the militia," and any laws that restrict the freedom of the press were similar because both "prevent the wonton injury and destruction of individuals" and ensured there was a legal "line some where, or the peace of society would be destroyed by the very instrument designed to promote it."[123]

The understanding that the right to arms did not include a right to resist perceived tyranny was sufficiently outlined in a series of newspaper editorial exchanges contemporaneous with the events of Shays's Rebellion. The editorials centered on the constitutionality of the Portland Convention, which was an assemblage of Maine counties considering a separation from Massachusetts. While the Convention was seeking the formation of an independent Maine, it raised public suspicions of another Shays's Rebellion.

The editorial exchange began with an article penned by the anonymous Senex, who described the different assemblages as nothing more than "mere mobs" in violation of the Massachusetts Constitution.[124] Senex thought these assemblages violated Articles VII and XIX of the Declaration of Rights. While the former embodied William Blackstone's right of governmental self-preservation, the latter was a constitutional predecessor to the First Amendment.[125] To Senex, it did not matter that there was not any Massachusetts law declaring that assemblages were illegal. In Senex's mind, they were still "evil and dangerous—subversive of all order, peace, or security."[126] They were in violation of the law because the Massachusetts Constitution already provided the people with a means to redress their grievances.[127] In Senex's words, "the people of each town [must] follow the dictates of their invaluable Constitution, by remonstrances to the legislature, and instructions to their several representatives."[128] Any other method of redress, according to Senex, would be to endorse "anarchy and confusion so incident to mobs and conventions."[129]

Under the pen name "Scribble Scrabble," Judge George Thatcher, a member of the Portland Convention and later member of the First Congress, responded to Senex's classification of lawful assemblies as mobs, and did so

Compendium_Roth
Page 0123

by distinguishing the Convention from Shays's Rebellion.[130] It was at this juncture that the exchange between Senex and Thatcher turned to late-eighteenth-century rules of constitutional interpretation. Senex's response was one of strict construction. He believed that if the Declaration of Rights provided the people with a constitutional means to redress injuries, it was only through that vehicle that the people might "request (or even demand)" that such injuries be resolved.[131] In contrast, Thatcher interpreted the Declaration of Rights as a social compact with constitutional limits. To Thatcher, the Declaration was not the totality of the people's rights but a list that the government could never usurp. Thatcher's principle disagreement with Senex's interpretation was the way it grouped the Shays's rebels, who were unlawfully armed and rebelling against Massachusetts, with the peaceful Portland Convention that was seeking "Enquiry and information" to erect themselves into a government.[132] Thatcher elaborated on this point:

> In one county the people meet in a Convention to collect the sentiments of the people, and lay them before the General Court. In another they assemble in town meetings, and consult upon the public good. In some counties the people assemble in bodies, and with force and arms, prevent the Courts of Justice sitting according to law . . .
>
>     When we consider the late Portland Convention, as to its constitution and to its end, it appears to me essentially different from the meetings of the people in some of the western counties.[133]

Worth noting is Thatcher's reference to the "public good," for it was the entire premise through which eighteenth-century lawmaking and constitutional interpretation was premised.[134] It was also the foundation from which Thatcher would explain the scope of right to arms.

Thatcher's reason for examining the right to arms was to illustrate the impropriety of Senex's limited interpretation of the Declaration of Rights. In Thatcher's words, "where the declaration secures a particular right, in itself alienable, or the use of a right, in the people, it does not at the same time contain, by implication, a negative of any other use of that right."[135] Applying this rule to Article XVII, which provided that the "people have a right to keep and to bear arms for the common defence," Thatcher noted it did not prohibit the people from "using arms for other purposes than [the] common defence."[136] Thatcher reasoned that because Article XVII "does not contain a negative," "the people have the full uncontrouled use of arms, as much as though the Declaration had been silent upon that head."[137]

Thatcher was not claiming that Article XVII afforded an unalienable right to arms for whatever purpose. Rather, he viewed the use of arms for other purposes as an "alienable right" that the legislature could "controul" in "all cases . . . whenever they shall think the good of the whole require it."[138] Ultimately what Thatcher was trying to constitutionally convey was that the Massachusetts Declaration of Rights recognized core "rights and privileges" that are "esteemed essential to the very being of society; and therefore guarded, by being declared such, and prefixed to the constitution as a memento that they are never to be infringed."[139] To state this differently, Thatcher viewed the Declaration of Rights as embodying a constitutional bottom upon which the legislature could never infringe. In the case of Article XVII, this meant the Massachusetts Assembly could never deprive the people from participating in the common defense. Conversely, all other uses of arms were alienable and could be "abridged by the legislature as they may think for the general good."[140]

On January 12, 1787, Senex replied to Thatcher's interpretation of the Declaration of Rights. He feared that Thatcher was inferring that the people had a right to abolish, separate, and reform government as they saw fit. Senex then proceeded to turn Thatcher's argument on its head. He argued that if Article VII "contains no negative," there was "no reason why [the people] have not this right" to "reform, alter, or totally change their government . . . even when their safety does not require it."[141] Senex then applied this same reasoning to Thatcher's interpretation of Article XVII:

> The people have a right to keep and bear arms for the common defence. Have they a right to bear arms against the common defence? According to the gentleman's reasoning, I answer yes; for to say that a man has a certain right, and that he is not denied any other use of the right, is most assuredly saying that he possesses that right for every purpose.[142]

Here, Senex sought to expose a serious flaw in Thatcher's interpretation of Article XVII. By the late eighteenth century, it was well-settled that the right to arms did not embody a right to armed revolt. Such an interpretation ran afoul of the constitutional restraints placed on the right since its inception in the 1689 English Declaration of Rights. It seems, however, that Senex missed the thrust of Thatcher's argument. At no point in his previous editorials did Thatcher advocate the lawfulness of armed rebellion; he actually denounced such behavior as "essentially different" and not seeking a redress of grievances "in a legal way."[143] Still, in order to clarify his argument, Thatcher offered the following response:

The right to reform or alter government, is not created by the Bill of Rights. . . . [I]t is a right independent of the Bill of Rights, and exists in the people anterior to their forming themselves into government. . . . Senex asks if the people have a right to bear arms against the common defence? I answer, that whatever right people had to use arms in a state of nature, they retain at the present time, notwithstanding the 17th article of the Bill of Rights.[144]

Thatcher's response clarifies that he was articulating the right of governmental self-preservation, or what Blackstone deemed the "fifth auxiliary right."[145] He understood that once a civil compact is created, the people "surrender a certain portion of their alienable rights; or rather, to vest in certain persons, a power to make laws for, and controul the alienable rights of, the whole."[146] At the same time, should the government fail to achieve the "end of government" (i.e., the "happiness of the people"), the people, through their representatives, retained the power to reform or alter government.[147] Thatcher elaborated on this point:

The right to institute government, and the right to alter and change a bad government, I call the same right: I see no difference between them. The end of this right is the *greatest happiness* of the greatest number of the people; and the means or object made use of, is government. This right I understand to be a physical power, under the direction of reason, to bring about this *happiness*. Therefore, when the people have agreed upon a certain set of rules, which they denominate government . . . they are binding, on the presumption that they will produce the degree of happiness before mentioned. . . . It is not the existence of government, or any agreement contained therein, that gives the people a right to destroy it when it does not answer the end for which it was instituted. The existence of a bad government only affords an opportunity for this *right* . . . to come into exercise.[148]

In its entirety, the Senex and Thatcher editorial exchange reveals much about late-eighteenth-century constitutional interpretation, including the Founding Fathers' views on the right to arms. Although Article XVII only guaranteed the right to arms for the "common defence," Thatcher did not foreclose other uses of arms for lawful purposes. As Thatcher stated in his penultimate editorial to Senex, "The question is not, whether two persons can have an exclusive right to the same thing, at one and the same time; but, whether the bill of rights, by securing to the people a right originally in them," in a state of nature, "thereby prohibits them the other uses of that right, which they also had originally a right to."[149]

In addition to outlining the legal contours of the right to arms, Shays's Rebellion was in part responsible for discarding the Articles of Confederation and forming the United States Constitution.[150] What Shays's Rebellion taught the Founding Fathers was that the federal government lacked sufficient authority to provide for the national defense. The problem with the Articles—at least from a national defense standpoint—was twofold. First, the Articles made it almost impossible to call forth and direct the militia without first convening Congress and nine of the thirteen states concurring. Merely assembling a congressional caucus was difficult enough, let alone obtaining the necessary supermajority to vote.[151] Second, even if Congress was quickly convened and voted to call forth the militia, there was no uniformity of arms, training, or discipline among the respective state militias—meaning that while some state militias qualified as well-regulated, others were ill-regulated, unregulated, or something resembling an armed mob.

The Founding Fathers sought to remedy these deficiencies when they adopted the Constitution, and they did so by coming to a political compromise; one where authority over the militia was divided between the federal and state governments.[152] Article I, section 8 empowered Congress to call "forth the militia to execute the laws of the union, suppress insurrections and repel invasions," as well as "organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States."[153] The states, meanwhile, retained the power to appoint militia officers and train their militias according to the mode of discipline "prescribed by Congress."[154]

Although this compromise was universally accepted by Federalists, who comprised the majority of delegates attending the Constitutional Convention in Philadelphia, Pennsylvania, anti-Federalists, who were the political minority, viewed it as impeding on states' rights and endangering republican liberty.[155] What was particularly concerning to anti-Federalists was the fact that the Constitution also afforded Congress the power to raise standing armies.[156] It did not matter that Federalists such as James Wilson, Alexander Hamilton, and James Madison each outlined the constitutional necessity of affording the federal government broad military authority.[157] Anti-Federalists believed that the Constitution, as constructed, would lead to the erosion of republican government and liberty.

To voice their concerns and overall dissatisfaction, anti-Federalists took to the press.[158] One anti-Federalist objected to the congressional power to raise and support a standing army because, unlike the militia, it would be composed of "a body of men distinct from the body of the people," "governed by different laws," and proven to be the "main engine of oppression, and the

Compendium_Roth
Page 0124

means of enslaving almost all the nations of the world."[159] Another opined that congressional misuse of the militia might lead to the destruction of both the "public liberty" and the "personal liberty of every man."[160] Meanwhile, Luther Martin, one of the Maryland delegates to the Constitutional Convention, opposed granting the federal government authority over the militia because it encroached upon the states' "*only defence* and *protection . . .* for the security of *their rights* against *arbitrary encroachments* of the *general government*."[161] Martin thought that if the Constitution was to vest authority over the militia in either the federal or state governments, the state governments were in a far better position to understand the "situation and circumstances of their citizens, and the regulations that would be necessary and sufficient to effect a well-regulated militia in each."[162] This would serve the best interests of the national defense and continue to provide the states with the means "to *thwart* and *oppose* the general government."[163] The militia was, in Martin's words, the "*last coup de grace* of the State governments."[164]

The anti-Federalists' approach to fixing these constitutional deficiencies, and others, was to proffer amendments at state ratifying conventions. In some cases the amendments accompanied the respective state convention's ratifying documents, and in others the amendments only appeared in the press.[165] One amendment, proposed by anti-Federalists at the New York Convention, requested that the militia would "not be subject to martial law, except in time of war, rebellion or insurrection," and that a standing army "ought not to be kept up, except in cases of necessity, and at all times the military should be under strict subordination to the civil power."[166] The anti-Federalists at the Maryland Convention proposed that the Constitution be amended to ensure the state militias could not be "marched out of the state without the consent of the legislature of such state."[167] Multiple state ratifying conventions proposed that "no standing army shall be kept up in time of peace, unless with the consent" of a supermajority of Congress.[168] Meanwhile, with the events of Shays's Rebellion still fresh in the mind of New Hampshire anti-Federalists, the New Hampshire Convention proposed that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion."[169]

In addition to proffering constitutional amendments that would curtail or supplant federal authority, anti-Federalists proposed a number of amendments that would form a Bill of Rights. Included in some of these proposals were variations on the right to arms. Anti-Federalists within the Pennsylvania Convention, otherwise known as the Pennsylvania Minority, were the first to propose such a right be included in the Constitution:

That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game, and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.[170]

The Pennsylvania Minority's right-to-arms proposal was essentially borrowed from the Pennsylvania Constitution's Declaration of Rights.[171] What separated the two was that the former included an additional protection for the "killing of game" and a declaration against disarmament except for "crimes committed" or if a "real danger of public injury" was possible.[172] The Pennsylvania Minority's call for hunting protections did not end there. Borrowing once more from the Pennsylvania Constitution, the Pennsylvania Minority proffered an amendment that provided the "inhabitants of the several states" shall be afforded the "liberty to fowl and hunt in seasonable times, on the lands they hold, and on all other lands in the United States," excluding private property.[173]

Federalist responses to the Pennsylvania Minority were rather dismissive. Noah Webster, for one, wrote a sarcastic critique that struck directly at the Minority's request for hunting protections:

But to complete the list of unalienable rights, you would insert a clause in your declaration, *that every body shall, in good weather, hunt on his own land, and catch fish in rivers that are public property.* Here, Gentlemen, you must have exerted the whole force of your genius! Not even the *all-important* subject of *legislating for a world* can restrain my laughter at this clause![174]

In delivering this criticism, Webster was trying to make the point that a national Bill of Rights should only include those protections that are deemed vital for continuance of a democratic republic. Hunting, fowling, and fishing did not qualify.

Federalist Tench Coxe was equally critical of the Pennsylvania Minority's proposed amendments.[175] Regarding the Pennsylvania Minority's concerns over the Constitution affording the federal government broad military powers, Coxe responded that nowhere in the Constitution did it permit the federal government to disarm the state militias, nor did the Constitution place a premium on a standing army over a well-regulated militia.[176] While Coxe conceded that the people should always be mindful of the risks associated with

Compendium_Roth
Page 0126

a standing army, he noted that the state militias would curtail the need for one. "The militia, *who are in fact the effective part of the people at large*, will render many troops *quite unnecessary*," wrote Coxe.[177]

The anti-Federalists attending the Virginia Convention were the second to proffer the right to arms to be included in the Constitution, and, much like the Pennsylvania Minority, their proposed amendment was borrowed from their Declaration of Rights. What differentiated the anti-Federalists' proposed amendment from the Virginia Declaration of Rights is that the former included the prefatory language "the people have a right to keep and bear arms." The proposed amendment read in full, "That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defense of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore that in all cases the military should be under strict subordination to, and governed by, the civil power."[178]

The anti-Federalists at the New York Convention followed Virginia's lead. Initially, New York anti-Federalists touted a much different right-to-arms proposal, one that effectively curtailed federal authority over the militia:

> That the militia should always be kept well organized, armed and disciplined, and include, according to past usages of the states, all the men capable of bearing arms, and that no regulations tending to render the general militia useless and defenceless, by establishing a select corps of militia, or distinct bodies of military men, not having permanent interests and attachment to the community, ought to be made; and that the military ought not be subject to martial law except in time of war, invasion or rebellion; and that in all cases the military should be under strict subordination to and governed by the civil power.[179]

But, upon further consideration, New York anti-Federalists went along with Virginia's proposal, albeit with one slight modification. Rather than stipulating that a well-regulated militia was comprised of the "body of the people trained to arms," they included the language "body of the people *capable of bearing arms*."[180] Although the variance in language was slight, the New York anti-Federalists' choice of language was more consistent with the larger anti-Federalist objection that the federal government might ignore the fact that classes of people were incapable of bearing arms, whether that incapability was due to physical, moral, or religious reasons.

In the end, the anti-Federalists' efforts at amending the Constitution proved

unsuccessful. Despite the anti-Federalists submitting 210 amendments for consideration, James Madison and the Federalist majority did not make one alteration to the Constitution, nor did they include a Bill of Rights.[181] All that mattered to the Federalists was that the Constitution was ratified and in full force. But over the next ten months James Madison developed a change of heart and sought to include a series of amendments that were to be placed in Article I, section 9. On June 8, 1789, Madison submitted the amendments to the House of Representatives. Although it took some time and deliberation, the House eventually approved Madison's request, so long as any amendments were separate from the Constitution itself. The House then submitted Madison's amendments to a select committee in which each state had one member.[182]

Considering the lapse in time from the state ratifying conventions to Madison submitting his proposed amendments, it is unknown how, if at all, the different right-to-arms proposals impacted Madison's drafting of what would become the Second Amendment. While Madison was undoubtedly aware of the different right-to-arms proposals, the evidentiary record does not provide any affirmative link between them and Madison's draft of the Second Amendment. Stylistically speaking, however, Madison's draft suggests it was in some way influenced by the different state ratifying conventions' right-to-arms proposals. Madison's draft read in full, "The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms shall be compelled to render military service in person."[183]

The select committee of the House, to which Madison's draft of the Second Amendment was referred, made two substantive changes. First, the select committee rearranged the amendment's composition by moving the militia language to the front. Second, the select committee suggested a more detailed definition of the militia. The amendment now read, "A well regulated militia, composed of the body of the people, being the best security of a free State, the right of the people to keep and bear arms shall not be infringed, but no person religiously scrupulous shall be compelled to bear arms."[184] This version of the amendment was subsequently delivered to the Senate for debate.

On August 17, 1789, Senate deliberation began with Elbridge Gerry of Massachusetts expressing concern over the "religiously scrupulous" clause. Gerry feared the inclusion of such a clause would allow the federal government to prevent certain individuals from bearing arms. As Gerry saw it, the federal government could accomplish this by excluding undesirable classes of people as "religiously scrupulous," thus making the amendment's protection useless.[185] After considerable debate as to whether the "religiously scrupulous"

Compendium_Roth
Page 0127

clause would in fact impede the amendment's purpose, it was moved that the clause be struck. The motion did not pass, with twenty-two voting for it, and twenty-four against.[186]

Gerry also expressed dissatisfaction with the amendment's language of a well-regulated militia "being the best security of a free state."[187] He feared the language insinuated that while a militia was the "best security," it also admitted a standing army was an analogous choice. Therefore, Gerry moved that the amendment should read a "well regulated militia, trained to arms," because this would ensure it was the federal government's duty to properly maintain the militia.[188] Although Gerry's motion was not seconded, the language, reading "being the best security of a free state," was eventually removed. The words "necessary to the" were put in place of "the best," thus making the amendment convey what Gerry wanted it to—that a well-regulated militia was the only security of a free state.[189]

Two days later, on August 20th, debate on the "religiously scrupulous" clause was once more initiated. Thomas Scott of Pennsylvania feared that since religion was on the decline such a clause would exempt those individuals from bearing arms.[190] Elias Boudinot of New Jersey disagreed and preferred the clause remain intact. Boudinot felt that by removing the "religiously scrupulous" clause the amendment would no longer protect those who "would rather die than use" arms in a military capacity.[191] In order to appease Boudinot the Senate agreed that the words "in person" be added after the word "arms."[192] The proposed amendment now read, "A well regulated militia, composed of the body of the people, being the best security of a free state; the right of the people to keep and bear arms shall not be infringed, but no person, religiously scrupulous, shall be compelled to render military service in person."[193]

On August 25th, the amendment was read to the Senate once more, and, before it was returned the House of Representatives, a number of substantive changes were made. The words, "composed of the body of the people" and "but no one religiously scrupulous of bearing arms shall be compelled to render military service in person" were removed. Additionally, the word "best" was removed in favor of "necessary to."[194] After all changes were made, the amendment was now in its final form and read, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."[195]

Unlike the 1787 Convention, where the Constitution was drafted and debated in secrecy, the legislative proceedings pertaining to the Bill of Rights were made public. Indeed, with such legislative transparency came critical commentary, particularly in the press. Yet as it pertained to what would become the Second

Amendment, commentary was sparse. From the commentary that was printed, every author to write on the amendment did so in context of limiting federal authority over the militia or of the federal government neglecting the militia and maintaining a standing army. Some commentators praised the Second Amendment.[196] Such was the case with Tench Coxe, who, under the penname "A Pennsylvanian," wrote, "As civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, and as the military forces which must be occasionally raised to defend our country, might pervert their power to the injury of their fellow citizens, the people are confirmed . . . in their right to keep and bear their private arms."[197] Other commentators criticized the Second Amendment. As one anonymous newspaper editorial put it, the Second Amendment was an insufficient protection against the federal authority because it did not "ordain, or constitutionally provide for, the establishment" of a well-regulated militia.[198]

Considering the historical record in its entirety, the reason why the Second Amendment was placed within the Bill of Rights is rather uncontroversial. Consistent with republican ideology up through the late eighteenth century, the Second Amendment was intended to serve as a counterpoise to federal military authority.[199] Left unanswered is how the Founding Fathers understood the Second Amendment would function.

Was the Second Amendment merely an affirmation of the states' desire to maintain the militia system, a reminder to the federal government to maintain a constitutional well-regulated militia, or was it about the people having and using arms? As with any historical question, finding a definitive answer can prove difficult.[200] But for those historians who have examined the genesis of the Second Amendment, the evidence ultimately leads to the conclusion that the Founding Fathers understood the right as being intimately tied to the sustained maintenance of a well-regulated militia.

Recall that one of the anti-Federalists' concerns with affording the federal government broad military powers was that it would lead to the erosion of republican liberty. The anti-Federalists feared this could be accomplished should the federal government decide to maintain a standing army and neglect the militia. This in turn would shift the power of "the sword" from the people, who maintained a vested interest in their liberty through service in the militia, to a standing army that was comprised of self-interested conscripts.[201] The Second Amendment protected against this.

This understanding of the Second Amendment can be found in the legal commentary that followed the ratification of the Bill of Rights. Consider the writings of prominent Virginia jurist St. George Tucker. Writing in 1803, Tucker noted how during the Virginia Constitutional Convention there was

Compendium_Roth
Page 0128

general concern among the attending delegates over the Constitution's division of militia powers between the federal and state governments."[202] As Tucker recalled, "all room for doubt, or uneasiness upon the subject" was "completely removed" upon including the Second Amendment in the Bill of Rights. As Tucker saw it, the Second Amendment ensured "that the power of arming the militia, not being prohibited to the states, respectively, by the constitution," was "consequently, reserved to them, concurrently with the federal government."[203] It was for this reason that Tucker then referred to the Second Amendment as the "true palladium of liberty," given that it balanced the Constitution in favor of the people.[204] Tucker knew that in "most governments" the "right of self-defense"—what Blackstone had referred to as the right of self-preservation and resistance—was kept under the "narrowest limits possible."[205] This was particularly the case whenever standing armies were "kept up, and the right of the people to keep and bear arms" was prohibited.[206] The Second Amendment, however, protected against this by ensuring the people, through service in the militia, were able to defend and preserve their liberty.[207]

Tucker was neither the first nor last legal commentator to describe the Second Amendment in this fashion.[208] Writing in 1833, fellow jurist Joseph Story also referred the Second Amendment as the palladium of liberty:

> The importance of this article will scarcely be doubted by any persons, who have duly reflected upon the subject. The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rules. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people. The right of the citizens to keep and bear arms has justly been considered, as the *palladium of the liberties of a republic*; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally even if these are successful in the first instance, enable the people to resist and triumph over them.[209]

In recent years, a number of lawyers and legal scholars have latched onto Tucker and Story's expositions to advance the theory that the Second Amendment was intended to protect a right to have and use weapons, for both public and private purposes, and that this accomplished the Founding Fathers' objective of maintaining a well-regulated militia.[210] Such an inter-

pretation, however, extends Tucker's and Story's commentaries beyond their intended context, and therefore breaks the bands of historical elasticity. Tucker and Story were describing the Second Amendment in the context of the militia, nothing more. At one point, Story even cautioned against the people being armed indiscriminately. He noted that although "the importance of a well regulated militia would seem so undeniable," it was "difficult to see" how "it is practicable to keep the people duly armed without some organization."[211] Story feared a time might come when the people were generally indifferent to the idea of maintaining a well-regulated militia, which was "certainly no small danger" because "indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by this clause of our national bill of rights."[212]

Another problem with the interpretation advanced by modern lawyers and legal scholars is that it is in direct conflict with what the Founding Fathers credited as being the palladium or bulwark of liberty. At no time did any political or legal commentator in the late eighteenth century or early nineteenth century refer to the ownership or use of arms as the palladium or bulwark of republican liberty. For those historians who have examined the origins of the right to arms, this is not at all surprising. Every political and legal commentator from the Glorious Revolution through the American Revolution agreed that the right to arms was useless unless the militia was properly trained and disciplined. To quote once more from Timothy Pickering, "The right Use of the Firelock therefore is not the *whole*, nay it is the *smallest Part*, of military Discipline."[213]

A well-regulated militia, however, was another matter. It was quite common for the Founding Fathers to toast the militia as the palladium or bulwark of republican liberty.[214] During the Revolutionary War, General Washington described the militia as "the palladium of our security, and the first effectual resort in case of hostility."[215] Similarly, Major General Nathanael Greene wrote that the militia is the "great bulwark of civil liberty," which "promises security and independence to this country."[216] In 1800, Massachusetts representative Harrison Gray Otis exclaimed that the "great national resource, the militia" was "the palladium of the country."[217] Meanwhile, Samuel Dana, a former Massachusetts representative of Congress, member of the Middlesex bar and chief justice on the Massachusetts Court of Common Pleas, described the militia as "palladium of our Country."[218]

Comparable testimonials as to the importance of a well-regulated militia appeared frequently in newspapers. A 1798 address to the militia published in the *Connecticut Gazette* emphasized the importance of "obedience to orders and exertions to perfect" themselves in the "military art" and reminded them:

Compendium_Roth
Page 0129

The importance and practicability of a well regulated and disciplined Militia, in a free country, cannot be doubted, this day you have evinced that such a thing is altogether practicable—You are the *palladium* of which your country leans for the protection against all foreign invasion: From the Militia are to be rallied the permanent and better disciplined Armies, in case of war; and in the hour of danger you are to be prepared to march, defend and protect your country and constitution.[219]

In an October 1785 edition of the *Independent Ledger*, it read that "all good citizens" consider a "well-regulated militia . . . as the national bulwark and defence of those liberties which have been earned at the expence of so much treasure and the blood of our best citizens."[220] Meanwhile, in a July 1789 edition of the *New-York Packet*, an editorial discussed how maintaining a well-regulated militia required the "habitual exercise" in military training and "manly discipline, which is the bulwark of the country."[221] Maintaining this knowledge was considered the "sole means to render a standing army useless" and to "form a truly warlike militia."[222] Thus, in line with militia commentators from the Glorious Revolution through the American Revolution, it was not the mere possession of arms that secured the nation, it was knowledge of the military art, for "education is a bulwark against tyranny, it is the grand palladium of true liberty in a republican government."[223] Without this knowledge the militia was nothing more than a "disorderly populace, or a mass of animal machines."[224]

What these historic newspaper testimonials inform us is *why* the Founding Fathers viewed a well-regulated militia as being the people's bulwark or palladium of republican liberty—this *why* being that a well-regulated militia would protect the nation and the Constitution from threats, both internal and external. And these testimonials were just a few of many instances where a well-regulated militia was referred to as the palladium or bulwark of republican liberty. For instance, in an 1811 address by Pennsylvania militia general John Hamilton emphasized how the militia was the "sure basis on which the liberties of [the] country must rest":

A well organized militia has been justly styled the bulwark of the nation; and so long as they are armed, and disciplined, they will super[sede] the necessity of employing that potion of idleness and corruptor of morals, *a standing army*. . . . [Remember] the spirit of '76, prove yourselves worthy of that inheritance of freedom and independence, bequeathed to you by the patriots and heroes of the revolution, meet on a parade, like a band of brothers, and maintain your rights, liberties and independence, with your last breath.[225]

Others were just as forthright in connecting the importance of a well-regulated militia in securing the people's rights and liberties. Federalist and Connecticut House representative Samuel Dana, for one, perfectly captured the link between serving in the militia, individual and communal virtue, and both appreciating and understanding the concept of liberty. "If we are to preserve our liberties, to perpetuate our nation, we must lay the foundation in the cultivation of virtue, in the dissemination of useful knowledge, we must learn to know our rights with certainty, we must cultivate a spirit capable of defending them," wrote Dana.[226] Much like Machiavelli, Trenchard, and other prominent militia commentators before him, Dana was conveying the time-honored republican principle that every citizen is a soldier and every soldier a citizen: ". . . in our military system, that the defence of our country be confided to our own citizens, that it should consist entirely of the people; that the soldiers should always be citizens, possessed of the same sentiments and dispositions as the other citizens. . . . We should most carefully guard against making our soldiers too distinct a body from the other citizens, of turning the profession of a soldier into the trade of a mercenary."[227]

To Dana, arms were not central to creating or preserving a well-regulated militia.[228] Arms were merely a tool to accomplish this constitutional end.[229] More important were a "knowledge of tactics, and a perfection of discipline."[230] These were "the great objects to attain to."[231] Dana knew militia without discipline was nothing but a "wieldy mass" that "instead of being a bulwark, a defence, they would prey upon, and finally destroy the very country they were designed to protect."[232] A militiaman's principal duty was not to be armed. Rather, the "first, second, and third duty" was "obedience."[233]

This is not to say arms were completely insignificant. As Dana noted, arms were the means, and the people were instructed and "constantly inspire[d]" to "bear them for their own defence."[234] By "own defence," Dana was articulating the principle that, in a well-regulated militia, every citizen maintained a vital interest in preserving their liberty and property, both individually and collectively, as well as the very government that secured their inalienable rights.[235] Dana made this point clear, noting, "Let us cheerfully submit to sacrifice some part of our time, some portion of our property, to acquire the art of defending the residue. It is the price, which must be paid for a national defence. The right of bearing arms for the common defence, is recognized among our unalterable laws. These arms must not be suffered to rust in our houses, which would render them as useless, as if they were stored in the enemies' magazines."[236]

Joel Barlow, a prominent Connecticut lawyer and literalist, also wrote on the importance of a well-regulated militia.[237] Although Barlow did not

Compendium_Roth
Page 0130

describe the militia as the palladium or bulwark of liberty, his legal philosophy corresponds with the aforementioned militia commentators.[238] Barlow knew that people had to sacrifice themselves for the greater good and it was imperative that they developed a balance in civil and military virtue. This sacrifice was necessary to properly effectuate a constitutional well-regulated militia: "Every citizen ought to feel himself to be a necessary part of the great community, for every purpose to which the public interest can call him to act; he should feel the habits of a citizen and the energies of a soldier, without being exclusively destined to the functions of either. His physical and moral powers should be kept in equal vigour; as the disuse of the former would be very soon followed by the decay of the latter."[239]

In addition to balancing civil and military virtue, the Founding Fathers understood a well-regulated militia as providing constitutional balance among the respective branches of government. Authority over the militia, as well as the military as a whole, had to be distributed proportionally among the branches of government and the people.[240] This was the only way to prevent the creation of a permanent "military establishment."[241] As Barlow put it, a true constitutional militia would prevent a scenario where people strove for "excellence in warlike achievements ... without regard to the cause" and for "no other motive than that of providing places for sons, brothers, cousins, or the voters themselves."[242]

As a matter of historiography, it is quite remarkable whenever contemporary Americans refer to the Second Amendment as merely the right to "keep and bear arms." They have all but forgotten the amendment's reference to a well-regulated militia, yet this was the very core of Second Amendment, at least as it was understood by the Founding Fathers. Much like their English ancestors, the Founding Fathers truly believed that a well-regulated militia would place a check on the federal government, and secure republican liberty for years to come. The military alternative, a standing army, was considered extremely dangerous because the interests of soldiers were seen as being detached from interests of the community, and therefore a standing army would be more likely to oppress the community that they were entrusted to protect. Conversely, it was believed that a well-regulated militia would never oppress the community because it was comprised of the people themselves.

While the Second Amendment's reference to a well-regulated militia is obvious in light of the evidentiary record, there is less clarity as to what the framers meant by the "right of the people." Were the framers referring to "the people" as a state-sponsored militia or were they denoting something more individualized? There is an argument to be made in support of either inter-

pretation.[243] As it pertains to the interpretation that the Second Amendment guarantees the right of "the people," as a state-sponsored militia, to "keep and bear arms," one needs to look no further than historical tradition and practice. Ever since English subjects began settling in North America, colonial, local, and later state governments subscribed to a well-regulated militia as the people's birthright. As addressed earlier, this view was frequently expressed in militia laws, military and militia treatises, and political writings. The Founding Fathers firmly believed in the right of the people to take part in defending their community because this ensured constitutional balance and united the community in defense of their rights, liberties, and property.[244]

At the same time, there is an argument to be made that the Second Amendment must afford a more individualized right, one somewhat separate and distinct from defending the community. The Second Amendment does not stipulate the right of a "well-regulated militia" or "militia" to "keep and bear arms." The Second Amendment expressly provides it is a right of "the people," and if one scrutinizes the use of "the people" within the Bill of Rights as a whole, one sees that there is an argument to be made that the right is individualized, in one form or another.[245] This more individualized interpretation of the Second Amendment is bolstered by the fact that eighteenth-century militia laws generally required every militiaman to acquire, possess, and maintain his own arms and accoutrements.[246] While this was not always the case, these laws seemingly suggest that there is historical precedent for the people being armed in order to form a well-regulated militia. But recall the ideological and philosophical underpinnings of a constitutional well-regulated militia up through the late eighteenth century. As a matter of republican thought, a mere armed citizenry was the very antithesis of a well-regulated militia. This was nothing more than a "wieldy mass," that "instead of being a bulwark, a defence, they would prey upon, and finally destroy the very country they were designed to protect."[247] In other words, an armed citizenry by itself was predominantly viewed as dangerous to a republican liberty, not a guarantee or advancement of it. Considering this fact, it is almost impossible to historically accept any late-eighteenth-century interpretation of the Second Amendment that is distinct or separate from a well-trained, well-disciplined, government-sponsored militia. To quote from Associate Justice Joseph Story, it is "difficult to see" "how it is practicable to keep the people duly armed without some organization," for such a scenario would "gradually undermine all the protection intended by this clause in our national bill of rights."[248]

This militia-based assessment of the Second Amendment has been characterized by some modern lawyers and legal scholars as "patently nonsensical,"

Compendium_Roth
Page 0131

"gibberish," and "nonsense on stilts."[249] In its place, they assert that the amendment's reference to a well-regulated militia could have only been understood as amplifying the right to keep and bear arms, not qualifying it.[250] UCLA law professor Eugene Volokh is a proponent of this interpretation and frames the Second Amendment's reference to a well-regulated militia in the following terms:

> The Framers *may have* intended the right to keep and bear arms as a means towards the end of maintaining a well-regulated militia—a well-trained armed citizenry—which in turn would have been a means towards the end of ensuring the security of a free state. But they didn't merely say that "a well-regulated Militia is necessary to the security of a free State" (as some state constitutions said), or "Congress shall ensure that the Militia is well-regulated," or even "Congress shall make no law interfering with the security of a free State." Rather, they sought to further their purposes through a very specific means.
>
> Congress thus may not deprive people of the right to keep and bear arms, even if their keeping and bearing arms in a particular instance doesn't further the Amendment's purposes.[251]

As a matter of legal advocacy, Volokh's analysis is extremely clever. However, as a well-thought and objective history, Volokh's analysis is deficient.[252] What Volokh completely overlooks is that the Founding Fathers never associated a well-regulated militia, well-organized militia, well-ordered militia, well-disciplined militia, or any other variation with a mere armed citizenry. The armed citizenry equals a well-regulated militia conclusion is something that Volokh and others have simply manufactured out of thin air, with one writer going so far as to boldly claim that the Founding Fathers "never defined a 'well regulated' militia."[253]

Assessments like these are historically disingenuous, especially seeing that the aforementioned militia variations appeared regularly in eighteenth-century militia laws. This alone debunks how Volokh and others have articulated what constituted a well-regulated militia in the late eighteenth century, as well as its constitutional pieces. Still, despite manufacturing a past that never was, this ad hoc approach to understanding the Second Amendment has become commonplace among legal academics known as constitutional originalists. This group of legal scholars sees value in trying to uncover the "original meaning" or "original understanding" of the Constitution by legally scrutinizing the linguistic usage of its text for those who wrote and ratified it, as well as the general public to whom it was addressed.[254]

Consider for example Georgetown University law professor Randy E. Barnett, who claims as a matter of "empirical fact" that the Second Amendment's reference to a "well-regulated militia" was a synonym for "well-trained," embodied the promise of an armed citizenry, and cannot remotely be understood as qualifying the right to keep and bear arms in any way.[255] To the contemporary reader, unfamiliar with the late eighteenth century, its law, and its language, Barnett's conclusion is plausible. How are they to know of the abundance of historical evidence rebutting Barnett's claim, the intricacies of a well-regulated militia in late-eighteenth-century terms, or the ideological and philosophical underpinnings of the constitutional body? But for those familiar with the history of standing armies and militias, from the sixteenth century through the turn of the nineteenth century, Barnett's originalist conclusion directly flies in the face of republican liberty.[256]

The overarching problem with Barnett's and other originalists' take on the Second Amendment is that they are seeking to make sense of a late-eighteenth-century right in the twenty-first century. It also does not help Barnett and originalists that they often employ poor historical methodologies when reconstructing the past. Barnett and originalists have been known to sidestep historical context and conduct poor or incomplete research and therefore fail to reconstruct a past that meets the required evidentiary burden.[257] Whether originalists want to admit it or not, the unabashed truth is that the academic disciplines of intellectual history and originalism are not one and the same.[258] While both academic disciplines rely on the past, the discipline of intellectual history is the only one that adheres to history-objectivity norms and seeks to understand the past on its own terms.[259]

A prime example, as it pertains to the Second Amendment, is how originalists often associate the Founding Fathers' conception of right to arms as being one and the same with modern libertarianism. This is not contextual history, with the purpose of understanding the past for the sake of understanding the past. It is Whiggish history—that is, the subordination of the past by advancing the interests of the present. In this case the *interest* is gun rights. To state this differently, by injecting modern libertarianism into the Second Amendment, what many originalists have ignored is that the right to arms, like many late-eighteenth-century-rights, was more declaratory than concrete. As historian Jack N. Rakove has eloquently put it, "[A]t the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles rather than the codification of legally enforceable restrictions or commands."[260] It was this very conception of the Bill of Rights—as a list

Compendium_Roth
Page 0132

of vital republican principles and public rights—that was advanced by Congress when it submitted the amendments to the states for ratification. This fact is confirmed by the preamble Congress attached to the Bill of Rights for ratification by the states. The preamble read, "The Convention of the States having, at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further *declaratory* and *restrictive clauses* should be added, and as extending the grounds of public confidence in the Government will best ensure the beneficent ends of its institution."[261]

The fact that many eighteenth-century rights were declaratory did not mean they did not have legal teeth. The language of the Third Amendment plainly barred the quartering of soldiers in a person's home unless it was with the "consent of the owner" or expressly allowed by law.[262] The Fourth Amendment was also instructively restrictive in that it prohibited federal officials from issuing warrants unless "probable cause" was present.[263] While these rights clearly restricted federal action, other late-eighteenth-century rights were meant to embody republican principles with the purpose of balancing the Constitution in favor of the people. These rights, much like the right to keep and bear arms in a well-regulated militia, were frequently referred to in literature as palladiums of liberty. In the late eighteenth century, these rights included political representation, the writ of habeas corpus, the freedom of election, the right to trial by jury, and the freedom of the press.[264] Viewing the Second Amendment through this prism—as a right that balanced the Constitution in favor of the people—it is quite historically perplexing when anyone today declares that the Founding Fathers' right to arms was virtually an unfettered right to acquire, own, and use arms in both public and private.[265]

There are a number of reasons why such a broad conception of the Second Amendment fails to pass historical muster. First, there is no substantive evidence to suggest that the impetus for including the Second Amendment in the Bill of Rights was about anything other than checking federal military authority. Not even post-ratification commentary suggests otherwise. If anything, the Founding Fathers' refusal to incorporate the broader language suggested by the state ratifying conventions—most notably the amendment proposed by the anti-Federalist Pennsylvania Minority—conveys that the Second Amendment's purpose was tailored. Second and more importantly, up through the late eighteenth century legal practice conveys that arms, whether they were military arms or private arms, were regulated in the interests of the public good.[266] There were regulations pertaining to hunting, citizenship, loyalty to government, transportation, preparatory carriage in public, assembly,

the types of arms or weapons one might possess, and when and where one might legally discharge firearms.[267]

Somehow, in direct conflict with the breadth of historical evidence, there are those, such as National Rifle Association (NRA) lawyer and George Mason law professor Nelson Lund, who continue to assert that the Founding Fathers "enjoyed an almost unlimited right to keep and bear arms" and that there is "virtually no historical evidence" to support imposing any legal limits.[268] There are two reasons why Lund and others consistently arrive at such an ahistorical conclusion. The first is that the history of the right to arms and firearms regulations is central to the advancement of present day gun-rights, and this conclusion bodes well for their advancement (see chapter 8). The second reason why Lund and others have come to such an ahistorical conclusion is that they have embraced the tenets of originalism. What these tenets dictate is that the text of the Second Amendment guarantees two distinct rights, the right to "keep arms" and the right to "bear arms," and each must be defined by the common late-eighteenth-century usage of the words "keep" and "bear." Under this approach to decoding the past, the right to "keep arms" embodies a right to retain arms, or have them in custody, and the right to "bear arms" embodies a right to carry said weapons for self-defense, whether such carriage should happen to take place in public or private.[269] But when one unpacks the evidence supporting these originalist conclusions, there are a number objectivity concerns, as well as late-eighteenth-century linguistic miscalculations.

Consider the originalist claim that the phrase "bear arms" was generally understood by the Founding Fathers as meaning to "carry arms."[270] To the contemporary reader, unfamiliar with late-eighteenth-century linguistics, the historical claim seems sensible. However, a detailed investigation into the late-eighteenth-century usage of "bear arms" reveals that the phrase was overwhelmingly used in the context of military service.[271] For an individual or group to "bear arms" denoted that they were serving in a militia or military capacity. The term "bear arms" was rarely used to denote anything else. One historian conducted a linguistic analysis from 1750 to 1800 and found only 2 percent of all documents containing the phrase "bear arms" used it outside of the militia or military context.[272] Yet, in the landmark 2008 Second Amendment case *District of Columbia v. Heller*, Supreme Court of the United States justice, and faint-hearted originalist, Antonin Scalia somehow came to the opposite conclusion. According to Scalia, despite the breadth of historical evidence, the military context of "bear arms" was the idiomatic usage, not its general usage.[273]

Scalia's historical conclusion is mythmaking at its finest, but Scalia did not stop there. Scalia applied equally dubious reasoning in examining the late-

Compendium_Roth
Page 0133

eighteenth-century usage of the phrase "keep arms." Indeed, Scalia conceded that the phrase "keep arms" was not as prevalent in the "written documents of the founding period" that he could find, but he ultimately concluded that the phrase must have been understood by the Founding Fathers as protecting an individual right to have arms "unconnected with militia service."[274] What is principally significant about Scalia's concession is that it shows just how predisposed some originalists are to defining historical text with, at best, circumstantial evidence. In doing so, Scalia and other originalists seemingly ignored the fact that virtually all of the Second Amendment's language can be found in colonial and state militia laws. To state this differently, the legal usage of terms such as "well-regulated militia," "bear arms," and "keep arms" can all be found in militia laws, each of which denoted a military context.[275] This is a context that perfectly coincides with the intellectual origins of the right to arms, as well as the Second Amendment's drafting and ratification history.

The faulty logic that can be produced by originalist interpretations of the Second Amendment does not stop there. Recall how originalists interpret "bear arms" as meaning to "carry arms" for self-defense. If one applies this logic in order to determine the historical scope of the Second Amendment in public, one cannot help but conclude that it protects a right to preparatory armed carriage. Here is how one legal commentator recently framed it: "[If] the Second Amendment guarantees an individual right to bear arms in defense of both an individual and the state, this must imply the ability to carry those arms outside of one's home. It is difficult to imagine how one could exercise the right to bear arms in defense of the state from the confines of one's living room."[276] NRA lawyer Stephen P. Halbrook has advanced a similar rationale. Where Halbrook distinguishes himself from the preceding originalist is in how his approach centers around the absence of the word "home" and the inclusion of the word "militia" in the Second Amendment, as well as the text and structure of the Bill of Rights as a whole:

> [The Second Amendment] guarantees not only the right to "keep" arms, such as in one's house, but also to "bear arms," which simply means to carry arms without reference to a specific place. The explicit reference to the militia indicates that the right is not home-bound, nor is the right to bear arms limited to militia activity. When a provision of the Bill of Rights relates to a house, it says so plainly—the Third Amendment requires the consent of the owner for a soldier to "be quartered in any house." First and Second Amendment rights are not limited to one's house or other premises—the people have the right to "the freedom of speech, [and] of the press," "peaceably assemble, and to peti-

tion the government for redress of grievances," and to "keep and bear arms." Nothing in the text guaranteeing these rights limits them to the home.[277]

Then there is Volokh, who uses virtually the same legal reasoning to assert that the Second Amendment must have protected a right to preparatory armed carriage. As Volokh puts it, seeing that "self-defense has to take place wherever the person happens to be," nearly any "prohibition on having arms for self-defense in a particular place . . . is a substantial burden on the right to bear arms for self-defense" and therefore presumably unconstitutional.[278] Like Halbrook, Volokh seeks to invoke history. In Volokh's mind, Anglo-American tradition and practice dictated that only "public carrying 'accompanied with such circumstances as are apt to terrify the people' was . . . seen as prohibited," but "'wearing common weapons' in 'the common fashion' was legal."[279] What Volokh, Halbrook, and others failed to research, however, was the rich Anglo-American history of regulating armed carriage. As was outlined in the preceding chapter, armed carriage restrictions developed out of the English common law and date back to the thirteenth century. These restrictions were later codified in the Statute of Northampton and survived well into the eighteenth century, on both sides of the Atlantic, both prior to and after the ratification of the Constitution.[280]

Another problem with the historical conclusions of Volokh, Halbrook, and other likeminded lawyers is that they are built upon presentism, or how contemporary Americans perceive the right of self-defense to operate, not how it was perceived or operated in the late eighteenth century. The two eras are not one and the same. Today, many states have changed their laws in such a way that the person claiming self-defense is often indemnified. In the late eighteenth century, however, this was not the case. The law dictated a duty to retreat.[281] In other words, the law constrained individuals from needlessly killing each other under the auspices of self-defense. Moreover, there was no presumption of innocence should one person kill another under the auspices of self-defense. As James Davis articulated the principle in his 1774 treatise *The Office and Authority of a Justice of the Peace*, "Self-Defence is excusable only upon inevitable Necessity: The Party assaulted must giv[e] Back as far as he can, without endangering his own Life, and the mortal Wound must not be given till after such Retreat, otherwise it is Manslaughter."[282] Late-eighteenth-century jurist and legal historian John Haywood articulated the principle in similar terms, stipulating, "[T]he law requires that the person who kills another in his own defence, should have retreated as far as he conveniently or safely can to avoid the violence of the assault, before he turns upon his assailant."[283] But unlike Davis, Haywood added that self-defense was not

Compendium_Roth
Page 0134

a "preventive" right: "This right of natural defence does not imply a right of attacking, for instead of attacking one another for injuries past or impending, man need only have recourse to the proper tribunals of justice. They cannot therefore legally exercise this right of preventive defence."[284] Certainly, in the late eighteenth century, if a person was faced with an imminent threat, and could not retreat without endangering their own life, deadly force was authorized. However, this was the exception, not the general rule. Thus, whenever anyone today claims that the Founding Fathers viewed the preparatory carriage of dangerous weapons in public as a constitutional right or as some type of social good that deterred crime, they are not advancing history.[285] They are rewriting it to fit a modern narrative.[286]

This is not to say that people living in the late eighteenth century did not carry arms when it was deemed appropriate, whether during travels for self-defense, hunting, militia service, and so forth. They most certainly did. Rather, what these laws or restrictions historically illustrate is that the general carriage and use of arms was not considered as falling under the constitutional umbrella of the Second Amendment. There is no substantiated historical evidence to suggest otherwise. In fact, by the close of the eighteenth century, not one lawyer or legal commentator had referred to the preparatory carriage of dangerous weapons as being protected by the Second Amendment or the right to arms, nor was there any reference to the Second Amendment or right to arms in any self-defense or justifiable homicide cases, nor did any lawyer or legal commentator lump the Second Amendment or the right to arms with self-defense or justifiable homicide jurisprudence. The Second Amendment and the right to arms were simply not discussed in this fashion.

In an attempt to supplement a complete lack of historical evidence showing that the Founding Fathers conceived of the Second Amendment as protecting a right to preparatory armed carriage, Halbrook and other likeminded legal scholars have routinely advanced three arguments, none of which are historically substantiated. The first argument goes like this: because eighteenth-century colonial laws often required able-bodied men to carry firearms, whether it was for militia muster, security patrols, or watchmen duty, the Founding Fathers must have ratified the Second Amendment with the understanding that it protected a right to preparatory armed carriage in public places.[287]

In recent years, this argument has become a staple in legal briefs filed by gun-rights advocates.[288] To historically support this proposition, gun-rights advocates often cite a little known 1770 Georgia statute titled "An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons to Carry Fire Arms to Places of Public Worship."[289] The primary purpose of

the statute was to ensure that Georgia's colonists were adequately prepared to suppress slave revolts or attacks by indigenous tribes.[290] Putting aside the moral constitutional dilemma that the Georgia statute was an antecedent of slavery—that is, a means through which white male freeholders subjugated blacks and mulattoes—what this line of argument omits is that these types of laws made the carrying of arms compulsory. To be clear, the colonists were *required* to carry arms *by law*, and such carriage was at the license of government. The carrying of arms in these instances was not at the discretion of the colonists, nor was it because the colonists believed that they were exercising their constitutional right to bear arms. It is also worth noting that sometimes the very same laws that required colonists to carry arms restricted the time, place, and manner in which the arms were borne.[291] Needless to say, to claim that compulsory arms-bearing statutes are constitutional proof positive that the Second Amendment was ratified to protect a right to preparatory armed carriage in public places is to stretch the evidentiary record beyond the bands of elasticity, fabricate history, and therefore construct a late-eighteenth-century constitutional premise that never existed.

This brings us to the second argument that is often advanced by Halbrook and other likeminded legal scholars in order to claim that the Second Amendment protected a right to preparatory armed carriage. They claim that because George Washington, Thomas Jefferson, Patrick Henry, and perhaps other Founding Fathers, spoke positively about carrying firearms, whether for hunting or on travels through the countryside, it was inherently understood in the late eighteenth century that the Second Amendment protected the "carrying of ordinary arms" for preparatory self-defense almost anywhere and everywhere.[292] The outlandishness of this line of historical thinking is notable. Just because eighteenth century persons owned and used firearms, and carried those firearms at times, does not mean it was perceived by those same persons as a constitutionally protected right to do so, particularly in densely populated public places. First, at no point in any of the quotes attributed to Washington, Jefferson, or Henry is it even remotely suggested that they were carrying arms under the constitutional umbrella of the Second Amendment or a state constitutional right-to-arms provision, or even that the Second Amendment or a state constitutional right-to-arms provision was remotely implicated. Moreover, what this line of historical thinking completely sidesteps is the fact that the Founding Fathers maintained a number of firearms restrictions on the statute books with the purpose of preserving the public peace, preventing deadly affrays, and advancing the public good.[293]

For contemporary historians, jurists, legal scholars, or, for that matter,

anyone to interpret the statements of Washington, Jefferson, and Henry as constitutional proof positive that there was a right to preparatory armed carriage in public places would essentially mean that *any* statement, made by *any* of the Founding Fathers, attesting to *any* action must be interpreted today as enshrining a constitutional right to do so. But to accept this premise would be to flip the entire academic discipline of intellectual history on its head. Not to mention, from a constitutional jurisprudence standpoint it would open up a Pandora's Box of new rights and protections that the Constitution and Bill of Rights was never designed to even remotely protect.

The third and last argument often advanced by Halbrook and other like-minded legal scholars is that legal precedent decided long ago that English subjects retained a right to preparatory armed carriage in public. As historical support for this argument, they cite a rather obscure 1686 English case, *Rex v. Knight* (hereafter referred to as Knight's case), where Sir John Knight was prosecuted under the Statute of Northampton for carrying firearms into a church but was ultimately acquitted by a Bristol jury.[294] In particular, Halbrook and others claim that the Founding Fathers interpreted Knight's case as enshrining the legal principle that the "peaceable public carrying of arms is lawful, and that carrying with malicious intent to terrify people is not."[295]

To those unfamiliar with the ins and outs of history, this analysis of Knight's case may appear sound. However, a close examination of the evidence reveals some serious errors. One of the most serious is that there is no evidence available to suggest that the Founding Fathers—or any American living from the late seventeenth century through the close of the eighteenth century—interpreted Knight's case as enshrining a right to peacefully carry dangerous weapons in public places. In fact, Knight's case does not even appear in American print literature until 1843.[296] This includes all legal commentaries, manuals, treaties, opinions, and correspondence—at least not that any historian or scholar has been able to locate thus far. Considering this fact, it is historically odd for Halbrook and other likeminded legal scholars to come to the historical conclusion that Knight's case was generally understood by the Founding Fathers as enshrining a legal right to preparatory armed carriage in public.[297] How can such a conclusion be true if there is no substantiated evidence to support it?

This is not to say that Knight's case was absent in all legal literature before 1843. Across the Atlantic, particularly in England and Ireland, there are a few scattered references to Knight's case. However, during this period, there is not one instance to be found in which Knight's case was interpreted as enshrining a right to peacefully carry dangerous weapons in public places. For instance, in the 1726 edition of William Nelson's *An Abridgement of the Common Law*,

Knight's case was cited for the proposition that the punishment for going publicly "armed with a Gun" is "Forfeiture of the Armour and Imprisonment."[298] In the 1793 edition of Sir John Comyns's *A Digest of the Laws of England*, Knight's case was cited in the section pertaining to the seizure of arms. In particular, Comyns referenced Knight's case for the legal proposition that there "may be an information against any one for going or riding in arms to the terror of the people."[299] Meanwhile, in William Hawkins highly influential *Pleas of the Crown*, Knight's case was cited for the following legal proposition:

> That no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People; from whence its seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons, or having their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace.[300]

Standing alone, this passage has been used by Halbrook and others to support their peaceable public carrying interpretation of Knight's case and the Statute of Northampton.[301] Hawkins's treatise was indeed well known by the Founding Fathers, and the above passage does state that in order for a person to be in violation of the Statute of Northampton required "Circumstances as are apt to terrify the People," or what was otherwise legally known as an affray.[302] History in context, however, rebuts any peaceable public carrying interpretation. For one thing, as both the text of the Statute of Northampton and an abundance of English legal treatises convey, it was the *act* of carrying dangerous weapons in public that was sufficient to amount an affray, "strike a feare," or "striketh a feare."[303] As Ferdinando Pulton, the prominent Elizabethan legal editor put it, the Statute of Northampton served "not onely to preserve peace, & to eschew quarrels, but also to take away the instruments of fighting and batterie, and to cut off all meanes that may tend in affray or feare of the people."[304]

Another problem with accepting Halbrook's and others' peaceable public carrying interpretation is that it completely dismisses Hawkins's previous passages on the Statute of Northampton.[305] In the above quoted passage, Hawkins was listing one of common law exceptions to the general rule, and a quite rare exception at that. Historians know this because immediately preceding the above quoted passage Hawkins writes that any Justice of the Peace may "seize the Arms" of anyone found to be violating the Statute, and that no one was

Compendium_Roth
Page 0136

excused in the "wearing of such Armour in Publick, by alledging that such a one threatened" them or "for the Safety of [their] Person from . . . Assault."[306] It is only after outlining the Statute of Northampton's general prohibition on wearing "arms" and "armour" that Hawkins lists the exceptions, which included the lawful assembling of the hue and cry, in defense of one's home (the Castle Doctrine), and the above quoted passage pertaining to "persons of Quality."[307]

As it pertains to the "persons of Quality" exception, one must read the entire passage to understand it. It contains time, place, and manner conditions that would have been subject to the discretion of government officials. Moreover, there is nothing in the passage that precludes government officials from enforcing the general prohibition. To read Hawkins's discussion on the Statute of Northampton otherwise—that is, in the way Halbrook and others would like us to—would make Hawkins's preceding passages superfluous, and therefore the exception would swallow the general rule and five centuries of history.[308]

The story of how Knight's case was first misappropriated by Halbrook and others goes back to the mid to late 1970s, when gun-rights advocates were intently searching for historical evidence that supported a rather broad interpretation of the Second Amendment. David I. Caplan, a devoted NRA member and lawyer, was notably the first to interpret Knight's case as enshrining a right to peaceably carry firearms in public places.[309] In a study paid for by the Indiana Sportsman Council, Caplan claimed that although the Statute of Northampton originally "banned all carrying of arms by private persons," by the late seventeenth century, as a result of Knight's case, the Statute was given a "narrow reading" requiring specific intent.[310] In coming to this historical interpretation, Caplan did not provide any supporting evidence other than the case summaries in the *English Reports*.[311] A year later, Caplan published the findings of his study in the *Fordham Urban Law Journal*, and from there, once it was widely distributed in the NRA's flagship magazine *American Rifleman*, it was accepted by gun-rights advocates as true.[312]

Unbeknownst to Caplan and the gun-rights advocates who followed him, until the late eighteenth century the *English Reports* were never meant to be a full historical account of the relevant cases. Rather, the *English Reports* were intended to instruct practitioners and students on the intricacies of legal pleading.[313] Herein entered historian Joyce Lee Malcolm, who was the first to research Knight's case beyond the *English Reports*.[314] On its face, Malcolm's research bolstered Caplan's claims. Malcolm noted how Knight, a former sheriff of Bristol, had long been a zealous enforcer of the English laws against religious nonconformists, and how one evening Knight, accompanied by the mayor and aldermen of Bristol, broke up a Catholic mass and

seized the attending Catholic priest.[315] Malcom went on to note that it was James II who was angered by Knight's actions and sought to use the Statute of Northampton to prosecute Knight, and later as a legal vehicle to disarm his political enemies.[316] But, according to Malcolm, James II's plan was thwarted by a Bristol jury. In Malcolm's words, after "due deliberation the jury acquitted" Knight because at that time Englishmen generally understood there was a general right to go armed and the court was "not prepared to approve the use of the [Statute of Northampton] to disarm law-abiding citizens."[317]

Malcolm's reading of Knight's case was emphatically embraced by gun-rights advocates and scholars.[318] However, none of them looked at the evidentiary record to see whether Malcolm's findings were historically valid. If they had looked they would have learned that other than pointing out that Knight was a zealous enforcer of laws against religious nonconformists and eventually prosecuted under the Statute of Northampton, Malcolm's account of Knight's case was severely misleading. For one, there was not one piece of historical evidence to suggest that James II intended on using the Statute of Northampton as a vehicle to disarm his enemies. This is a historical finding that Malcolm created out of thin air. Second, in reconstructing the history of Knight's case, Malcolm either failed to fully research the case background or purposefully omitted a substantial amount of primary source material. In doing so, Malcolm failed to sufficiently detail the overt political nature of Knight's prosecution. This includes the important fact that the Bristol mayor and alderman accompanying Knight were given clemency. Knight, however, was not.[319] Malcolm also failed to address the fact that Knight never rested his innocence on a common law right or privilege to go armed.[320]

In light of these factual discrepancies, and assuming that Knight was tried for going armed with the Bristol mayor and alderman, this author surmised that the only logical explanation as to why the jury acquitted Knight was that he had accompanied government officials—a legal exception to prosecution under the Statute of Northampton—and therefore would have been presumed innocent by the jury unless he carried the arms outside the bounds of prescribed government duties.[321]

This historical account of Knight's case, however, has also turned out to be suspect, due to an insightful article by English historian Tim Harris.[322] What Harris found on Knight's case that was particularly insightful was that Knight was not prosecuted under the Statute of Northampton for going armed in seizing the Catholic priest, but for an incident that took place shortly after this—an incident that was substantially more alarming to James II.[323] Harris's finding effectively altered the entire timeline of Knight's case.[324] It also revived

the historical question: "Why was Knight acquitted by the Bristol jury?" But, as Harris notes, providing a definitive answer to this question is almost impossible. The historical record does not specify on what legal grounds, if any, the jury acquitted Knight. Neither the *English Reports* nor the other historical accounts of Knight's case provides us with the jury's reasoning. What historians can state with certainty is that the jury impaneled in Knight's case did not necessarily have to acquit Knight on legal grounds. Up through the close of the seventeenth century it was quite common for English juries to issue acquittals for personal or political reasons.[325]

What everyone writing on the history of Knight's case did get right is that the story does indeed begin with the seizure of the Catholic priest. At the time of that seizure, James II was encouraging Catholics to worship openly in violation of law. While the people of Bristol applauded the actions of Knight, the mayor, and the aldermen, James II was displeased, to say the least.[326] Knight, the mayor, and the alderman were subsequently summoned to the king's Privy Council to answer for the entire affair.[327] Therein, the mayor and aldermen were given clemency and the blame fell upon Knight.[328] Fortunately for Knight, any case against him pertaining to the seizure quickly became legally moot once the Catholic priest informed the court that he did not want to move forward with legal proceedings.[329] This is not to say that Knight was legally free and clear. Before the seizure of the Catholic priest was rendered legally moot, Knight, accompanied by his servant, went armed in Bristol with a blunderbuss to an Anglican service. Regarding this incident, Knight testified that he generally did not go armed while in Bristol. Although Knight admitted that he generally rode to Bristol "with a Sword and Gun," he always left them "at the end of Town" when he entered and took them "when he went out."[330] But in this instance Knight broke protocol and carried his blunderbuss into Bristol.[331]

Contrary to what Halbrook and some others have insinuated, Knight was not peacefully carrying the blunderbuss in the streets just to do so, or because it was understood to be a privilege or right.[332] It was quite the opposite. Knight went armed because he feared for the safety of both himself and the Anglican parishioners, which he erroneously believed were in danger of being murdered by Catholics.[333] This was what Knight referred to as being "Godfreyed"—an intentional reference to the 1678 murder of London magistrate Sir Edmund Berry Godfrey, who had been found dead in a London ditch after having been investigating the Popish Plot. Knight's insinuation that the Protestant parishioners were to be "Godfreyed" would have been more alarming to James II than the seizure of the Catholic priest. Indeed, three Catholics were convicted of murdering Godfrey and subsequently executed. It turned out, however, that

the convictions were based upon the perjured testimony of Titus Oates, who was later branded "Titus the Liar."[334] Thus, Knight's insinuation that Protestants would be "Godfreyed" was not only a lie that undermined the rule of law, but it was also a lie that served to sensationalize Protestant fears of Catholics, fears that James II was trying to overcome under his rule.[335]

Here, it is worth noting that Knight's case would have never come to trial if Knight had admitted fault for his actions. Knight was in fact offered a pardon by the attorney general but chose to submit a plea of not guilty.[336] At trial, despite Knight having reason to fear for his safety, he never pleaded his innocence on the grounds that he went armed peaceably or under the auspices that he had a right to preparatory armed self-defense in public. While fearing for his own safety certainly made Knight a more sympathetic defendant to the jury, it would have been a poor legal defense for Knight to make.[337] Therefore, Knight pleaded his innocence on the grounds of "active Loyalty" to the crown and claimed that his actions were well intentioned.[338] This was a strong legal defense for Knight, who was a prominent figure within the town of Bristol. In 1682, he had been knighted by Charles II and also, at various times, had served as Bristol's warden, councilman, and sheriff.[339] In an attempt to sully Knight's reputation and loyalty to the crown, the attorney general provided evidence that Knight had expressly refused a "Commission to be a Captain in the time of Monmouth's Rebellion."[340] Knight sufficiently countered the attorney general's claim with "very good proofe" that he only refused the commission because of the distances involved with carrying out its duties.[341]

Knight's legal defense was not the only thing that was working in his favor. The people of Bristol overwhelmingly supported Knight's actions in suppressing religious nonconformists, including the Catholic priest.[342] Also, by the time of trial, it was widely known that the prosecution against Knight was political in nature.[343] Not only was it known that at multiple times the attorney general had refused to receive information on behalf of Knight's defense, but rumors within Bristol were swirling that the attorney general had tried to stack the jury with some of the religious "Fantaticks that Sir John Knight had tormented."[344] Fortunately for Knight, the jury that was paneled turned out to be quite favorable, and they ultimately returned a verdict of not guilty.[345] Among the members of the jury were a number of Bristol aldermen, including two former Bristol mayors, Sir William Hayman and Sir William Clutterbuck, all of whom had known and worked with Knight personally, as well as with Knight's father, for years.[346]

Despite the jury having acquitted Knight, under English law the King's Bench could have exerted influence and try to reverse the decision.[347] Knight

Compendium_Roth
Page 0137

Compendium_Roth
Page 0138

did in fact break protocol and carry arms through the streets of Bristol. But fortunately for Knight the presiding judge, Lord Chief Justice Edward Herbert, decided not "to be seveare upon Sir *John* . . . because the matter would not beare it."[348] Also, Herbert was troubled by the manner in which the attorney general handled the case. Herbert in fact scolded the attorney general, stating, "if there be any blinde side of the Kings business you will allwaies lay your finger upon it, and shew it to the Defendants."[349] But whatever sympathy Herbert may have held for Knight as a defendant, as a matter of law Knight was ultimately held accountable for his actions. In agreement with the petition of the attorney general, Herbert placed Knight on a bond as a surety for good behavior.[350]

Understanding the circumstances of Knight's indictment, trial, acquittal, and post-trial bond is important because it once more highlights the ease with which Second Amendment myths are produced and maintained. For over four decades, Halbrook and other likeminded legal scholars have sold us on the false conception that Knight's case stands for a right to preparatory armed carriage. Yet, as outlined above, this interpretation is completely without historical merit. Knight's case had nothing to do with a right to go armed, nor was it even later interpreted by the Founding Fathers as enshrining such a right. Perhaps there is a historical argument to be made that by the mid to late nineteenth century there were some legal minds that interpreted Knight's case as enshrining such a right. But this is far cry from historically claiming that Knight's case codified such a right in Anglo-American law, and that this right was generally understood and accepted up through the late eighteenth century. There is no substantiated evidence to support such a conclusion.

With that said, it is worth noting that Halbrook and other likeminded legal scholars are not the only ones to commit historical errors. Historians are equally fallible at times, including this author. This is an important aspect of researching and writing history. But what differentiates most legal writers from most historians is that the latter are willing to engage in critical discourse—that is, to receive historical criticism, reflect upon it, admit fault or error when presented with it, and formally correct it.[351] The historical point that needs to be emphasized is there are number of modern misconceptions and myths about the Second Amendment's origins, meaning, and purpose. As outlined above, much of the fault lies with modern lawyers, originalists, and legal scholars who approach the history of the Second Amendment as a legal thought experiment not as an objective inquiry into the past for the sake of understanding the past.[352] Essentially, what these modern lawyers, originalists, and legal scholars have done is advance one misleading or unsubstantiated historical claim after another and another, until the history of the Second

Amendment resembled a narrative akin to modern libertarianism. This is not history; it is mythmaking, period.

If a true and objective historical inquiry reveals anything regarding the ratification of the Constitution and the Bill of Rights, it is that the Second Amendment was premised upon the constitutional significance of a well-regulated militia in late-eighteenth-century political thought and the idea that the right to "keep and bear arms" would ensure the security and viability of the United States for years to come.[353] To the Founding Fathers, the Second Amendment right to arms was not intended for the independent whims of individuals acting alone, but for the people contributing to the communal greater good through the militia, which was concurrently regulated and controlled by the federal and state governments.[354] This right might seem odd to modern lawyers, originalists, legal scholars, and many Americans today, but historically understood the right to take part in defending one's liberties in a well-regulated militia, against enemies foreign and domestic, was a fundamental right. Its origins developed in mid-seventeenth-century England and was often characterized by the Founding Fathers as one of the palladiums of liberty. The historical record is clear in this regard. Not one political or legal commentator, from the Glorious Revolution in 1689 through the ratification of the Bill of Rights in 1791, advanced the notion that the individual ownership and use of arms was what secured the nation and the people's rights, liberties, family, and property. Rather, it was military training, discipline, and service in a well-regulated militia that was the palladium or bulwark of republican liberty.

While modern lawyers, originalists, and legal scholars are welcome to opine that such a late-eighteenth-century right is nonsense in twenty-first-century terms, this tells us nothing about the Second Amendment's origins, meaning, and purpose. The fact that a right to arms no longer functions the way it was originally intended and understood, because of other changes in society and the law, does not mean such a right never existed or is "nonsense," as one recent legal scholar put it.[355] It just means the historical basis of the right is foreign to us, and therefore is difficult for the modern mind to conceptualize and understand.[356]

Yet despite the origins and ratification history of the Second Amendment speaking strongly with one voice, in defense of modern lawyers, originalists, and legal scholars there are indeed historically based legal arguments to be made that the Second Amendment must be interpreted as protecting the individual ownership and use of arms as a means to check federal tyranny or to carry firearms for self-defense. These conceptions of the right began to appear in the nineteenth century, and they are the subject of the next chapter.

# THE
# BILL OF RIGHTS
## IN
# MODERN AMERICA

*Revised and Expanded*

Edited by DAVID J. BODENHAMER
and JAMES W. ELY, JR.

*Indiana University Press*
Bloomington & Indianapolis

Compendium_Roth
Page 0139

This book is a publication of

Indiana University Press
601 North Morton Street
Bloomington, Indiana 47404-3797 USA

http://iupress.indiana.edu

*Telephone orders*   800-842-6796
*Fax orders*   812-855-7931
*Orders by email*   iuporder@indiana.edu

First edition titled *The Bill of Rights in Modern America:
After 200 Years*
© 1993, 2008 by Indiana University Press
All rights reserved

No part of this book may be reproduced or utilized in any
form or by any means, electronic or mechanical, including
photocopying and recording, or by any information storage
and retrieval system, without permission in writing from the
publisher. The Association of American University Presses'
Resolution on Permissions constitutes the only exception
to this prohibition.

The paper used in this publication meets the minimum
requirements of American National Standard for Information
Sciences—Permanence of Paper for Printed Library
Materials, ANSI Z39.48-1984.

Manufactured in the United States of America

### Library of Congress Cataloging-in-Publication Data

The Bill of Rights in modern America / edited by David J.
Bodenhamer and James W. Ely, Jr. — Rev. and expanded
    p. cm.
  Includes bibliographical references and index.
  ISBN-13: 978-0-253-35159-3 (cloth : alk. paper)
  ISBN-13: 978-0-253-21991-6 (pbk. : alk. paper)  1. United States.
Constitution. 1st–10th Amendments. 2. Civil rights—United States.
I. Bodenhamer, David J. II. Ely, James W., [date]
  KF4550.A2B49 2008
  342.7308'5—dc22

                                    2007043211

1 2 3 4 5 13 12 11 10 09 08

and other government branches over the extent of this tension and the overlap of the two clauses. "Our decisions recognize," she noted, "that there is room for play in the joints between the clauses, some space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause."

As the United States grows more diverse, both religiously as well as ethnically, this "play between the joints" of the two religion clauses will no doubt invite further scrutiny by the courts, and in situations undreamed of by the framers. The rise to political prominence of the so-called "religious Right" in the Republican Party, and its demands upon government, will, if successful, undoubtedly lead to prolonged litigation. To take but one example, the Welfare Reform Act of 1996 included language that indicated religious groups could be eligible for participation as providers of some welfare-related services. President George W. Bush trumpeted his "faith-based initiative" that would have implemented that language. So far Bush's plan has not gotten off the ground, in large measure because many church organizations believe that the costs and problems related to accepting federal money would outweigh the possible advantages. Should this plan ever get started, and should a beneficiary program use some of the money to support a clearly religious activity, there would surely be a court challenge.

# 5

## Public Safety and the Right to Bear Arms

ROBERT J. COTTROL AND
RAYMOND T. DIAMOND

On Tuesday, November 20th, 2007, the United States Supreme Court grant-ed certiorari in a case involving the District of Columbia's ban on handguns. The statute had been successfully challenged in the United States Court of Appeals for the District of Columbia Circuit on the grounds that it violated the Second Amendment's guarantee of "the right of the people to keep and bear arms." With its decision to grant certiorari, the Supreme Court entered a constitutional controversy from which it had been largely absent for nearly seventy years, the meaning and scope of the Second Amendment. That con-troversy, the debate over the Second Amendment, has occupied a somewhat curious place in American constitutional discourse. It is the subject of a vast polemical literature in the popular press, part of the often strident debate over gun control. Where once the amendment suffered from an unfortunate scholarly neglect, it has over the last two decades become an arena of lively and sometimes acrimonious debate among historians, legal scholars, and political scientists. The Court's decision is likely to provide a definitive legal ruling on the amendment although it is unlikely to end the controversy over the amendment's original meaning and how it should be applied in modern America.[1]

The debate over the Second Amendment is part of the larger debate over gun control, and as such it focuses on whether or not the framers intended to limit the ability of government to prohibit or severely restrict private own-ership of firearms. It is a debate fueled, in part, by the fear generated by this nation's high crime rate, including an average of 10,000 homicides commit-ted annually with firearms. The debate is also fueled by the existence of broad public support for firearms ownership for self-defense and the fact

that roughly half the homes in the country have firearms. Two interpretations, broadly speaking, of the amendment have emerged from the debate. Some students of the Second Amendment stress the amendment's militia clause, arguing either that the constitutional provision was only meant to ensure that state militias would be maintained against potential federal encroachment or that the individual's right to keep and bear arms was meant to be protected only within the context of a highly regulated, regularly drilling state militia. Adherents of both variants of what might be called the collective rights view argue that the Second Amendment poses little in the way of an impediment to strict, even prohibitory gun control given the fact that most Americans at the start of the twenty-first century are not regularly engaged in the business of militia training.

Supporters of the individual rights view stress the amendment's second clause, arguing that the framers intended a militia of the whole, or at least a militia consisting of the entire able-bodied white male population. For them this militia of the whole was expected to perform its duties with privately owned weapons. Advocates of this view also urge that the militia clause should be read as an amplifying rather than a qualifying clause; that is, while maintaining a "well-regulated militia" was a major reason for including the Second Amendment in the Bill of Rights, it should not be viewed as a sole or limiting reason. The framers also had other reasons for proposing the amendment, including a right to individual self-defense.

The right to keep and bear arms became controversial in the late twentieth century, yet for much of American history constitutional commentators extolled the right as a fundamental cornerstone of liberty that could not be denied free people. This widespread agreement occurred in part because of the frontier conditions that existed from the colonial period through much of the nineteenth century. The role of privately owned arms in achieving American independence, particularly in the early years of the Revolution, strengthened this consensus. The often violent and lawless nature of American society also contributed to the widespread view that the right to possess arms for self-defense was fundamental.

But the Second Amendment and the right to keep and bear arms cannot be understood solely through an examination of American history. Like other sections of the Bill of Rights, the Second Amendment was an attempt to secure what was believed to be a previously existing right. The framers of the Bill of Rights did not believe they were creating new rights. Instead, they were attempting to prevent the newly formed federal government from encroaching on rights already considered part of the English constitutional heritage.[2]

To understand what the framers intended the Second Amendment to accomplish, it is necessary to examine their world and their view of the right

to bear arms as one of the traditional "rights of Englishmen." The English settlers who populated North America in the seventeenth century were heirs to a tradition over five centuries old governing both the right and the duty to be armed. In English law the idea of an armed citizenry responsible for the security of the community had long coexisted, perhaps somewhat uneasily, with regulation of the ownership of arms, particularly along class lines. The Assize of Arms of 1181 required the arming of all free men. Lacking both professional police forces and a standing army, English law and custom dictated that the citizenry as a whole, privately equipped, assist in both law enforcement and military defense. By law all men ages sixteen through sixty were liable to be summoned into the sheriff's posse comitatus. All persons were expected to participate in the hot pursuit of criminal suspects, the "hue and cry," supplying their own arms for the occasion. There were legal penalties for failure to participate. The maintenance of law and order was a community affair, a duty of all citizens.[3]

And all able-bodied men were considered part of the militia and were required, at least theoretically, to be prepared to assist in military defense. The law required citizens to possess arms. Towns and villages were required to provide target ranges in order to maintain the martial proficiency of the yeomanry. Despite this, the English discovered that the militia of the whole maintained a rather indifferent proficiency and motivation. By the sixteenth century the practice was to rely on select bodies of men intensively trained for militia duty rather than on the armed population at large.

Although English law recognized a duty and a right to be armed, both were highly circumscribed by English class structure. The law regarded the common people as participants in community defense, but it also regarded them as a dangerous class, useful perhaps in defending shire and realm but also capable of mischief with their weapons, mischief toward each other, their betters, and their betters' game. Restrictions on the type of arms deemed suitable for common people had also long been part of English law and custom. Game laws had long been one tool used to limit the arms of the common people. The fourteenth-century Statute of Northampton restricted the ability of people to carry arms in public places. A sixteenth-century statute designed as a crime control measure prohibited the carrying of handguns and crossbows by those with incomes of less than 100 pounds a year. After the English Reformation, Catholics were also often subject to being disarmed as potential subversives.

The need for community security had produced a traditional duty to be armed in English law, but it took the religious and political turmoil of seventeenth-century England to transform that duty into a notion of a political or constitutional right. Attempts by the Stuart kings Charles II and James II to

disarm large portions of the population, particularly Protestants and suspected political opponents, met with popular resistance and helped implant into English and later American constitutional sensibilities the belief that the right to possess arms was of fundamental political importance. These efforts led to the adoption of the seventh provision of the English Bill of Rights in 1689:

> That the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law.[4]

By the eighteenth century, the right to possess arms, both for personal protection and as a counterbalance against state power, had come to be viewed as one of the fundamental rights of Englishmen on both sides of the Atlantic. Sir William Blackstone, whose *Commentaries on the Laws of England* greatly influenced American legal thought both before the Revolution and well into the nineteenth century, listed the right to possess arms as one of the five auxiliary rights of English subjects without which their primary rights could not be maintained:

> The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defense, suitable to their condition and degree and such as are allowed by law. Which is also declared by the same statute . . . and is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression.[5]

If some five centuries of English experience had transformed the duty to be armed for the common defense into a right to be armed, in part, to resist potential political oppression, a similar evolution in thought had occurred in the American colonies between the earliest seventeenth-century settlements and the American Revolution. Early English settlements in North America had a quasi-military character, an obvious response to harsh frontier conditions. Governors of settlements often held the title of militia captain, reflecting both the civil and military nature of their office. In order to provide for the defense of often isolated colonies, special effort was made to ensure that white men capable of bearing arms were brought into the colonies.

Far from the security of Britain and often facing hostile European powers at their borders, colonial governments viewed the arming of able-bodied white men and the requirement for militia service as essential to a colony's survival. The right and duty to be armed broadened in colonial America. If English law qualified the right to own arms by religion and class, those considerations were significantly less important in the often insecure colonies.

If by the seventeenth century the concept of the militia of the whole was largely theoretical in England, in America it was the chief instrument of colonial defense. While the English upper classes sought to restrict the ownership of arms on the part of the lower classes in part as a means of helping to enforce game laws, there were significantly fewer restrictions on hunting in North America with its small population and abundant game. From the beginning, conditions in colonial America created a very different attitude toward arms and the people.

Race provided another reason for the renewed emphasis on the right and duty to be armed in America. Britain's American colonies were home to three often antagonistic races—red, white, and black. For the settlers of British North America, an armed and universally deputized white population was necessary not only to ward off dangers from the armies of other European powers but also to ward off attacks from the indigenous Indian population that feared the encroachment of English settlers on their lands. And an armed white population was essential to maintain social control over blacks and Indians who toiled unwillingly as slaves and servants in English settlements. This helped broaden the right to bear arms for whites. The need for white men to act not only in the traditional militia and posse capacities but also to keep order over the slave population helped lessen class, religious, and ethnic distinctions among whites in colonial America. That need also helped extend the right to bear arms to classes traditionally viewed with suspicion in England, including indentured servants.

The colonial experience helped strengthen the appreciation of early Americans for the merits of an armed citizenry. That appreciation was of course further strengthened by the experience of the American Revolution. The Revolution began with acts of rebellion by armed citizens. And if sober historical analysis reveals that it was actually American and French regulars who ultimately defeated the British and established American independence, the image of the privately equipped ragtag militia successfully challenging the British Empire earned a firm place in American thought and helped influence American political philosophy. For the generation that authored the Constitution, it reinforced the lessons their English ancestors had learned in the seventeenth century. It revitalized Whiggish notions that standing armies were dangerous to liberty. It helped transform the idea that the people should be armed and security provided by a militia of the people from a matter of military necessity into a political notion, one that would find its way into the new Constitution.

This view that an armed population contributed to political liberty as well as community security found its way into the debates over the Constitution and is key to understanding the Second Amendment. Like other pro-

visions of the Constitution, the clause that gave Congress the power to pro-
vide for organizing, arming, and disciplining the militia excited fears among
those who believed that the proposed Constitution could be used to destroy
both state power and individual rights. It is interesting, in light of the current
debate over the meaning of the Second Amendment, that both Federalists
and Anti-Federalists assumed that the militia would be one that enrolled al-
most the entire white male population between the ages of sixteen and sixty
and that militia members would supply their own arms.

But many feared that the militia clause could be used both to do away
with the state's control over the militia and to disarm the population. Some
expressed fear that Congress would use its power to establish a select militia.
Many viewed a select militia with as much apprehension as they did a stand-
ing army. The English experience of the seventeenth century had shown
that a select militia could be used to disarm the population at large. Richard
Henry Lee of Virginia expressed the fear that a select militia might serve this
end.[6]

In their efforts to answer critics of the Constitution, Alexander Hamil-
ton and James Madison addressed the charges of those critics who argued
that the new Constitution could both destroy the independence of the mili-
tia and deny arms to the population. Hamilton's responses are particularly
interesting because he wrote as someone who was openly skeptical concern-
ing the military value of the militia of the whole. The former Revolutionary
War artillery officer conceded that the militia had fought bravely during the
Revolution, but he argued it had proved no match for regular troops. Hamil-
ton urged the creation of a select militia that would be more amenable to
military training and discipline than the population as a whole. Despite this
he conceded that the population as a whole should be armed.

But if Hamilton gave only grudging support to the concept of the militia
of the whole, Madison, author of the Second Amendment, was a much more
vigorous defender of it. In *The Federalist,* Number 46, he left little doubt that
he saw the armed population as a potential counterweight to tyranny:

> Let a regular army, fully equal to the resources of the country, be formed; and let
> it be entirely at the devotion of the federal government: still it would not be
> going too far to say, that the State governments, with the people on their side,
> would be able to repel the danger. The highest number to which, according to
> the best computation, a standing army can be carried in any country, does not
> exceed one hundredth part of the whole number of souls; or one twenty-fifth
> part of the number able to bear arms. This proportion would not yield, in the
> United States, an army of more than twenty-five or thirty thousand men. To
> these would be opposed a militia amounting to near half a million citizens with
> arms in their hands, officered by men chosen among themselves, fighting for

their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops. Those who are best acquainted with the late successful resistance of this country against the British arms, will be most inclined to deny the possibility of it. Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of. Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms.[7]

This desire to maintain a universal militia and an armed population played a critical part in the adoption of the Second Amendment. The amendment, like other provisions of the Bill of Rights, was designed to prevent the newly created federal government from encroaching on rights already enjoyed by the people. It is important to remember that firearms ownership, for self-defense and hunting, was widespread with few restrictions, at least for the white population. It is also significant that the universally accepted view of the militia, at the time, was that militiamen would supply their own arms. One year after the ratification of the Bill of Rights, Congress passed legislation reaffirming the notion of a privately equipped militia of the whole. The act, titled "An Act more effectually to provide for the National Defense by establishing an Uniform Militia throughout the United States," called for the enrollment of every free, able-bodied white male citizen between the ages of eighteen and forty-five into the militia. The act required every militia member to provide himself with a musket or firelock, a bayonet, and ammunition.[8]

The decades between the adoption of the Second Amendment and the Civil War brought little opportunity for judicial interpretation of the constitutional provision. While a number of jurisdictions had laws prohibiting the carrying of concealed weapons, there were few restrictions concerning the ownership or the open carrying of arms in antebellum America. Most laws restricting the possession of firearms were to be found in the slave states. These laws generally prohibited the possession of firearms on the part of slaves and free blacks. Outside of the slave states the right to have arms was generally not impaired, not even for free Negroes. There was no federal legislation restricting firearms ownership, and since *Barron v. Baltimore* (1833) held that the Bill of Rights only limited the power of the federal government, there was no occasion before the Civil War for the federal courts to examine the issue.

If in the antebellum era there was an absence of federal court decisions on the Second Amendment, there was nonetheless widespread agreement concerning the scope and meaning of the provision among commentators and in the limited number of state court decisions that examined the issue. Noted jurist and legal commentator St. George Tucker contrasted the Second Amendment's robust guarantee of a right to keep and bear arms with the more restrictive English guarantee, noting that class restrictions and game laws had not limited the American right in the way that the English right had been limited. Supreme Court Justice Joseph Story also regarded the right as fundamental:

> The right of the citizens to keep, and bear arms has been justly considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if they are successful in the first instance, enable the people to resist, and triumph over them.[9]

If leading antebellum commentators saw the right as central to a free people, federal courts were largely silent on the subject. The only pronouncement from the Supreme Court on the subject before the Civil War came in Justice Taney's opinion in *Dred Scott v. Sandford* (1857). Taney indicated that African Americans, slave or free, could be denied the right to possess arms just as they could be denied freedom of speech, assembly, and travel. Despite the silence of the federal courts on the subject, state courts began developing a jurisprudence of the right to keep and bear arms, interpreting relevant provisions of state constitutions. These cases attempted to balance the right to bear arms against competing interests in public safety. Generally state courts upheld prohibitions against carrying concealed weapons. Some state courts limited the right to carry arms to those weapons that were suitable for use in "civilized warfare," an attempt to prohibit the carrying of weapons that were thought to be used exclusively for criminal purposes. Most of these cases involved restrictions on carrying concealed firearms. In one antebellum case the Georgia Supreme Court decided that the Second Amendment applied to that state.[10]

It would take the turmoil of the Civil War and Reconstruction to bring the Second Amendment before the Supreme Court. The end of the Civil War brought about a new conflict over the status of former slaves and the power of the states. The defeated white South sought to preserve as much of the antebellum Southern social order as could survive Northern victory and national law. Southern states were not prepared to accord to the newly emancipated black population the general liberties enjoyed by white citizens. Indeed, former slaves did not even have the rights that Northern states had long given free Negroes.

In 1865 and 1866 Southern states passed a series of statutes known as the black codes. These statutes were designed, in part, to ensure that traditional Southern labor arrangements would be preserved. They often required black agricultural workers to sign labor contracts that bound them to their employers for a year. Blacks were forbidden to serve on juries and could not testify or act as parties against whites. Vagrancy laws were used to force blacks into labor contracts and to limit freedom of movement. And as further indication that the former slaves had not yet joined the ranks of free citizens, Southern states passed legislation prohibiting blacks from carrying firearms without licenses, which whites were not required to have. The Mississippi statute provides a typical example of restrictions of this kind:

> Be it enacted, . . . that no freedman, free Negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry firearms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof in the county court shall be punished by fine, not exceeding ten dollars, and pay the cost of such proceedings and all such arms or ammunition shall be forfeited to the informer; and it shall be the duty of every civil or military officer to arrest any such freedman, free Negro or mulatto found with any such arms or ammunition, and shall cause him or her to be committed to trial in default of bail.[11]

Such measures caused strong concerns among Northern Republicans. Many charged that the South was trying to reinstate slavery and deny former slaves those rights long considered essential to a free people. The news that the freedmen were being deprived of the right to keep and bear arms was of particular concern to champions of Negro citizenship. For them the right of the black population to possess weapons went beyond symbolic importance. It was important both as a means of maintaining the recently reunited union and as a means of ensuring against the virtual reenslavement of those formerly in bondage. Faced with a hostile South determined to preserve the antebellum social order, Northern Republicans were particularly alarmed at provisions that preserved the right to keep and bear arms for former Confederates while disarming blacks, the one group in the South with clear Unionist sympathies. This helped convince many Northern Republicans to seek national enforcement for the Bill of Rights.

The debates over the Fourteenth Amendment and the civil rights legislation of the Reconstruction era suggest the determination of Congress to protect the right to keep and bear arms and other provisions of the Bill of Rights against state infringement. Representative Jonathan Bingham of Ohio, the author of the Fourteenth Amendment's privileges or immunities clause, and other Republican supporters of the Fourteenth Amendment expressed

the view that the clause applied the Bill of Rights to the states. The Southern efforts to disarm the freedmen and to deny other basic rights to former slaves played an important role in convincing the Thirty-ninth Congress that traditional notions concerning federalism and individual rights needed to change.[12]

If the events of Reconstruction persuaded the Thirty-ninth Congress of the need for applying the Bill of Rights to the states, the Supreme Court in its earliest decisions on the Fourteenth Amendment moved to maintain the antebellum federal structure. The Supreme Court's first pronouncements on the Second Amendment came about after the enactment of the Fourteenth Amendment and concerned the extent to which the latter amendment extended the protection of the right to keep and bear arms. The first case, *United States v. Cruikshank* (1875), stemmed from charges brought by federal officials against William Cruikshank and others for violating the constitutional rights of a group of black men who were attempting to vote. The charges included claims that Cruikshank and his associates violated the right of the black men to peaceably assemble and that they also violated their right to bear arms. The Court in a majority opinion authored by Chief Justice Morrison R. Waite held that the federal government had no power to protect citizens against private action that deprived them of their constitutional rights. The opinion held that the First and Second Amendments were limitations on Congress, not private individuals. For protection against private criminal action the individual was required to look to state governments.[13]

The next case in which the Court examined the Second Amendment, *Presser v. Illinois,* more directly involved the question of whether or not the Second Amendment in combination with the Fourteenth set limits on the ability of states to limit the right to bear arms. That case involved a challenge to an Illinois statute that prohibited individuals who were not members of the organized militia from parading with arms. Justice William Woods's majority opinion noted that the statute did not infringe on the right to keep and bear arms. Woods nonetheless used the case to indicate that the Second Amendment did not apply to state governments even in light of the Fourteenth Amendment. Woods also indicated that the citizenry at large constituted a reserve militia that was a resource for the United States government and hence could not be disarmed by state governments, independent of Second Amendment considerations. *Presser* is still cited as precedent indicating that the Fourteenth Amendment does not incorporate the Second Amendment.[14]

The nineteenth century would come to an end with legal commentators in general agreement that the right to keep and bear arms was an important

one for a free people. Michigan jurist Thomas M. Cooley discussed the subject in his treatise on constitutional law. Anticipating some of the modern debate on the subject, Cooley expressed the view that the amendment should not be seen as restricted only to members of the militia. He noted that the purpose of the Second Amendment was to allow the people to provide a check against potential governmental usurpation of power. Cooley went on to note that a restriction of the right to arms to members of the militia, whose membership could be limited by the government, would allow the government to defeat the very purpose of the amendment.[15]

The nineteenth century would end with reasonably broad agreement among those constitutional commentators who considered the issue that the right to have arms was an important safeguard for the freedoms of the American people. It should be added that that agreement was a broad agreement in principle that usually did not extend to the messy details of what kinds of firearms regulation were and were not consistent with the principle. Because firearms regulation was a matter of state and local law, the federal courts, adhering to the view that the Second Amendment did not apply to the states, had little to say on the subject.

State courts did develop a jurisprudence on the right to have arms that examined state firearms regulation in light of provisions in state constitutions protecting the right to have arms. These cases usually provided state and local governments more leeway in regulating the carrying of arms, particularly concealed weapons, than in restricting the ownership of arms. Thus the 1871 Tennessee case of *Andrews v. State* held that the right to bear arms was an incident of militia service and subject to reasonably broad state regulation, while the right to own arms was a private right with limitations on state restriction.[16]

The early twentieth century would bring about new efforts at firearms regulation and with it new attitudes concerning arms and the Second Amendment. Traditional beliefs concerning the importance of arms were frequently being tempered by the view that whole classes of people were unfit to exercise this prerogative. In the South, state governments, freed from the federal scrutiny that existed in the Reconstruction era, used laws regulating concealed weapons to accomplish what had been attempted with the postwar black codes. Discriminatory enforcement of these laws often left blacks disarmed in public places while whites remained free to carry firearms. This state of affairs helped facilitate lynchings and other forms of racial violence during the Jim Crow era.

But the South was not the only region where social prejudice restricted the right of disfavored minorities to possess firearms. If the white South saw armed blacks as a threat, politicians in other regions saw a similar threat aris-

ing from large-scale immigration from southern and eastern Europe. The new immigrants, like others before them, often met hostile receptions. They were associated with crime and anarchy and stereotyped as lazy and mentally unfit. Many native-born Americans feared the immigrants would bring anarchist-inspired crime from Europe, including political assassinations and politically motivated armed robberies. These fears led in 1911 to passage of New York's Sullivan Law. This state statute was aimed at New York City, a place where the large, foreign-born population was believed to be peculiarly susceptible to crime and vice. The Sullivan Law went far beyond typical gun control measures of the day. It prohibited the unlicensed carrying of weapons and required a permit for the ownership or purchase of pistols. Violation of the statute was a felony. The first person convicted under the statute was a member of one of the suspect classes, an Italian immigrant.[17]

It was in this early-twentieth-century atmosphere that the collective rights view of the right to bear arms first began to attract the attention of the judiciary. In one of the earliest cases to adopt this view, *Salina v. Blaksley,* the Supreme Court of Kansas interpreted that state's constitutional provision protecting the right to bear arms as a protection that only applied to the militia and not for individual purposes.[18] In 1911 Maine chief justice Lucillius A. Emery authored an essay, "The Constitutional Right to Keep and Bear Arms," in the *Harvard Law Review,* urging that the right to bear or carry arms should be viewed as a right limited to militia service. He also noted that legislatures could not prohibit the keeping or ownership of arms, echoing the distinction made by the Tennessee court in *Andrews.*[19]

These developments affected relatively few Americans at the beginning of the twentieth century. The nation was still largely rural. Firearms ownership for both self-defense and hunting were fairly commonplace. And statutes regulating firearms ownership were relatively rare and unobtrusive. For most citizens access to firearms was largely unimpaired and there was not too much occasion for either the courts or constitutional commentators to say much concerning the Second Amendment.

This situation would change after the First World War. Prohibition brought about the rise of organized gangs engaged in the sale of bootlegged alcohol. Territorial rivalries among the gangs led to open warfare on the streets of the nation's major cities. That warfare was made even more terrifying by the introduction of a terrifying new weapon, the Thompson submachine gun. A fully automatic weapon, developed too late for use in World War I, the "Tommy Gun" was one of the first submachine guns in widespread use. Used by violent criminals in their wars on each other, the Thompson also claimed the lives of a fair number of members of the general public as well.

Compendium_Roth
Page 0153

The end of the twenties and the end of Prohibition did not bring a halt to notorious misuse of automatic weapons. The rise in the 1930s of such desperadoes as John Dillinger, "Pretty Boy" Floyd, "Ma" Barker, George "Machine Gun" Kelly, and Clyde Barrow and Bonnie Parker became a part of American folklore. The exploits of such criminals were made more vivid and terrifying by the new medium of talking motion pictures. Thus, the horrors of criminal misuse of automatic weapons were forcibly brought home to the public.

These events caused the Roosevelt administration to propose the first federal gun control legislation. The National Firearms Act of 1934 required registration, police permission, and a prohibitive tax for firearms that were deemed gangster weapons, including automatic weapons, sawed-off shotguns, and silencers. It is interesting in light of the current debate that the Roosevelt administration deemed the act a revenue measure, conceding that an outright ban on such weapons would probably be beyond Congress's powers.

The 1934 act gave rise to the Supreme Court's last decision to date on the Second Amendment, *United States v. Miller.* It was a curious case. Both sides of the Second Amendment debate have claimed that the decision authored by Justice James C. McReynolds supports their views. Interestingly, the Court only heard arguments by the government. The federal government appealed a decision by a federal district court invalidating the National Firearms Act of 1934 in a case involving the unlicensed transportation of an unregistered sawed-off shotgun. The Court focused on the weapon in question:

> In the absence of any evidence tending to show that the possession of a [sawed-off shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.[20]

Advocates of the collective rights view have emphasized the Court's focus in the *Miller* decision on the militia, claiming that it was an indication that the Court saw the Second Amendment as being concerned only with the preservation of state militias. But the Court's discussion of the militia indicates that it saw a clear relationship between the individual right and the maintenance of the militia:

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia

comprises all males physically capable of acting in concert for the common defense. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.[21]

Probably the most accurate way to view what the Court did in *Miller* is to see it as an updating of the nineteenth-century civilized warfare doctrine. McReynolds's decision relied on the antebellum Tennessee case *Avmette v. State,* which allowed the state to restrict the carrying of those types of weapons which were frequently used by criminals and not suitable for the common defense. The Supreme Court in *Miller* remanded the case to the lower courts to determine whether or not a sawed-off shotgun was a weapon appropriate for militia use. That determination was never made.[22]

Although *Miller* was the Court's most comprehensive exploration of the Second Amendment, it had little effect on either firearms regulation or the general public's view concerning the right to keep and bear arms. For nearly three decades after *Miller* little existed in the way of federal firearms regulation. State and local legislation existed but with few exceptions, such as the New York Sullivan Law, these were usually traditional regulations governing the manner of carrying weapons, not outright prohibitions. There was little serious attempt to mount constitutional challenges to these restrictions. The Second Amendment was thus bypassed in the postwar Supreme Court's process of applying most of the provisions of the Bill of Rights to the states. Justice Hugo Black, who was an advocate of the view that the Fourteenth Amendment made all of the Bill of Rights applicable to the states, argued that the Second Amendment should also apply to the states, but the Court has not heard a case on that issue since *Presser.* It is probably accurate to say that at least until the 1960s most people, including attorneys and judges, accepted the view that the Second Amendment protected an individual right but otherwise thought very little about the matter because firearms restrictions, even on the state and local levels, were slight.

It would take the turmoil of the 1960s and the tragedy of three assassinations to bring about the birth of the modern gun control movement and create the current debate over the meaning of the Second Amendment. The assassination of President John F. Kennedy in 1963 brought calls for stricter national controls over the sale of firearms. Urban riots and the assassinations of civil rights leader Martin Luther King, Jr., and Senator Robert F. Kennedy helped lead to the passage of the Gun Control Act of 1968, the first federal legislation that seriously affected the purchasing of firearms for large numbers of Americans. This legislation limited the purchase of firearms through the mails and also restricted the importation of surplus military rifles. The act also prohibited the purchase of firearms by those with felony

## 102 | MODERN RIGHTS IN CONTROVERSY

convictions, even though the legislation provided no means of checking a purchaser's record. Some of the provisions of the 1968 act would later be modified by legislation passed in 1986.

The 1968 act proved to be something of a watershed. Since then a national debate over gun control and a subsidiary debate over the meaning of the Second Amendment have become perennial features in American politics. The rise of a highly visible national gun control movement since the 1960s during has been something new in American political life. Some adherents of this new political movement have advocated relatively moderate measures. These have included screening measures designed to prevent individuals with suspect backgrounds, criminal records, or histories of mental instability from purchasing firearms. Such measures are essentially extensions of firearms regulations that have long existed in many states, attempts to limit firearms use by undesirable persons. These kinds of regulations have long existed even in states with state constitutional protection for the right to bear arms and courts willing to enforce such guarantees. The more modest measures pose little threat to the general public's right to possess firearms.

But since the 1960s, others have argued for more radical measures. Their view has been that state and local government and, more importantly, the federal government can and should outlaw the general public's right to possess whole categories of firearms that had previously been owned by large numbers of law-abiding citizens. Many in the gun control movement argued that ownership of guns for self-defense or as part of a universal citizens' militia was dangerous and atavistic. They claimed that the only legitimate reason for civilian firearms ownership was for sporting purposes, usually hunting, and that even that ownership should be permitted only under stringent licensing. Efforts were made to ban firearms that did not meet this "sporting purposes" definition. In the 1970s and 1980s gun control advocates urged the banning of handguns, particularly cheap ones popularly known popularly as "Saturday Night Specials." In the 1990s many gun control supporters advocated bans on "assault weapons," a term employed without great precision to include semiautomatic rifles with military features such as bayonet lugs and pistol grips, or virtually all semiautomatic rifles, depending on the user's definition. The gun control movement scored some success with its campaign against assault weapons. A handful of states enacted bans on some semiautomatic firearms. Congress enacted a ten-year prohibition on the sale of semiautomatic rifles with military-style features in 1994. Congress refused to renew the ban in 2004.

This advocacy of wholesale restrictions on firearms ownership helped bring about the modern debate over the meaning of the Second Amendment. Much of the effort to reinterpret the Second Amendment as a collec-

tive right has been an attempt to justify proposed firearms restrictions that at earlier periods in American history would have been regarded as unconstitutional. Since the 1960s a vigorous polemical debate over whether the amendment should be seen as a broad individual right or as a right limited to a highly controlled militia context has been waged in the nation's editorial pages and broadcast media.

Despite the passion of the public debate, the Supreme Court kept a curious silence on the issue. The Court had opportunities to address it: the lower federal courts in the 1970s and 1980s upheld gun control legislation either by citing *Miller* for the proposition that the Second Amendment only protected the right to bear arms in a militia context when addressing federal legislation, or *Presser* for the proposition that the amendment did not apply to the states. The Supreme Court declined to grant certiorari in these cases and provide a definitive modern ruling on the issue.

If the Court has been reluctant to directly address the issue of the Second Amendment and its applicability to the gun control issue, it has, curiously enough, been willing to acknowledge the right to bear arms as dicta in cases extraneous to the gun control issue. Starting with Justice Harlan's dissent in the 1961 case *Poe v. Ullman,* involving a Connecticut anti-contraception statute, the right to bear arms has frequently been noted in privacy cases:

> [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; *the right to keep and bear arms . . .* [italics added][23]

Statements by other justices, sometimes in dicta, sometimes in statements to the press, have given heart to supporters of either the individual or collective rights viewpoints, but the Court retained its institutional silence on the subject.

If the Supreme Court in recent decades has been reluctant to address the controversy, other important legal actors have been making pronouncements on the Second Amendment and the right to arms more generally. Forty-four of the fifty states have right to keep and bear arms provisions in their constitutions. While the federal jurisprudence on the right is somewhat thin, state courts have developed a rather robust jurisprudence, ranging from fairly restrictive to fairly expansive views of the right. Congress has also played a role in Second Amendment interpretation. In 1982 the Senate Judiciary Committee's Subcommittee on the Constitution issued a report supporting the individual rights view of the amendment. Four years later Congress passed the Firearms Owners Protection Act, protecting the right

of interstate travel with firearms. The statute was prefaced with congressional findings declaring the Second Amendment an individual right.

The 1980s would see the rise of the academic debate over the Second Amendment. At first it was a debate that mainly engaged independent scholars not affiliated with universities and usually connected to groups supporting or opposing stricter gun controls. Because the subject inherently involves a debate over original intentions or understandings, historians tended to enter the debate sooner than scholars in the legal academy. Something of a milestone in the history of the debate came in 1989 with the publication of Sanford Levinson's "The Embarrassing Second Amendment," in the *Yale Law Journal*. For the first time since gun control had become a national issue in the 1960s, a major constitutional scholar was arguing in a leading law journal that the Second Amendment deserved a serious examination and that the individual rights view was likely the more accurate one. Levinson's article spurred other scholars in law, history, and political science to take up the issue with such leading scholars as Akhil Amar, Saul Cornell, Leonard Levy, Jack Rakove, Laurence Tribe, William Van Alstyne, and Garry Wills, among many others.[24]

The new scholarship probably played a part in reawakening interest on the part of the judiciary in the Second Amendment. Supreme Court Justice Clarence Thomas indicated a favorable disposition toward the individual rights reading of the amendment in the 1997 case *United States v. Printz*.[25] Justice Scalia has expressed support for the individual rights view in scholarly commentary. A major breakthrough for individual rights advocates came in 2001 with the Fifth Circuit case *United States v. Emerson*.[26] In *Emerson*, which involved a Second Amendment challenge to a prosecution of an individual who possessed a firearm in violation of a restraining order, the Fifth Circuit Court of Appeals held that the Second Amendment was an individual right but that a restraining order prohibiting possession of firearms on the part of an individual suspected of domestic violence was reasonable regulation. A 2002 decision by the Ninth Circuit Court of Appeals in *Silveira v. Lockyer* upheld California's ban on assault weapons, holding that the Second Amendment was a collective right. The decision seemed written in part to rebut the Fifth Circuit's opinion in *Emerson*.[27]

National politics would also play a role in issues of Second Amendment interpretation. The election of George Bush in the very close election of 2000 brought to national office an administration that had enjoyed the support of the National Rifle Association, which probably tipped the electoral balance in a number of states. One result of this was a new attitude in the Justice Department more supportive of the individual rights view than had been the case in recent decades. In 2004 the attorney general's office under Attorney

General John Ashcroft's direction issued a formal memorandum on the Second Amendment. The memorandum reflected Ashcroft's long-standing support for the individual rights interpretation. As might be expected, the memorandum met with strong criticism by proponents of stricter gun control and strong support by its opponents. The Ashcroft memorandum was interesting for its detailed analysis of the history and meaning of the Second Amendment, reflecting much of the new scholarship that had developed since the 1990s.[28]

The debate continues into the twenty-first century. It continues to be waged in academic journals and the popular media. The Supreme Court still retains its institutional reluctance to enter the fray, although Chief Justice John Roberts in his 2005 confirmation hearing indicated that he believed the proper interpretation of the Second Amendment was still an open issue and one that the lower federal courts had not resolved. The political branches of government seem largely sympathetic to protecting the right to have arms. During the 1990s and continuing into the first decade of the twenty-first century, an increasing number of states have passed legislation liberalizing the right of citizens to carry guns for self-protection, a reflection of both public fears of crime and the political skill of the National Rifle Association. Some forty states have statutes permitting almost anyone eligible to own a firearm to obtain a license to carry a concealed weapon. In 2006 Congress passed legislation prohibiting lawsuits against firearms manufacturers for criminal misuse of firearms. The legislation contained findings that the Second Amendment protected a right of individuals regardless of whether or not they were members of the militia. That same year Congress also passed legislation prohibiting public officials from disarming citizens during times of natural disaster. This measure was enacted in part in response to actions taken by New Orleans officials during Hurricane Katrina. During that crisis New Orleans police confiscated guns from citizens in New Orleans, sometimes in dramatic confrontations played out on national television.

The March 2007 decision by the U.S. Court of Appeals for the D.C. Circuit overturning the District of Columbia's handgun ban on Second Amendment grounds undoubtedly played a key role in ending the Supreme Court's traditional reluctance to consider Second Amendment cases. In a 2–1 decision in the case *Parker v. District of Columbia*, a three-judge panel of the D.C. Circuit declared the District of Columbia's ban on handguns unconstitutional.[29] The majority opinion authored by Judge Laurence H. Silberman of the D.C. Circuit held that the Second Amendment was a right of individuals and that the District of Columbia's ban contravened that right. It was the first time that a federal court had held that a specific piece of gun control legisla-

tion violated the Second Amendment. The full D.C. Circuit denied the District of Columbia's petition for an en banc hearing or hearing by the full D.C. Circuit, thus letting the panel opinion stand.[30] The government of the District of Columbia filed a petition for certiorari which was granted in November.

This chapter is being completed in early December of 2007. As we are writing, parties and amici are preparing briefs for what will be the most important Second Amendment case in United States history. Oral arguments in the case involving the handgun ban in the District of Columbia will take place in the spring of 2008 with a decision likely in the early summer. We, of course, do not know how the Court is going to rule but its decision is not likely to end the academic and popular debate over the amendment. The debate over arms and rights in contemporary America is fueled by mixed feelings and often contradictory impulses on the part of the American people. Times of crisis, natural disasters like Hurricane Katrina, or the attacks on September 11, 2001, illustrate one dimension of the debate. During such occasions we often see media reports of dramatic increases in sales of guns as an indication that large numbers of ordinary citizens see firearms ownership as useful when public officials seem powerless to protect the population. Another dimension of the debate is often seen when particularly horrible killings occur with firearms; mass shootings in schools and workplaces are vivid, albeit rare, examples. At such times the public often demands new measures designed to keep guns out of the hands of those likely to commit random acts of violence. These highly visible occurrences intensify the debate over gun control and the subsidiary debate over the meaning of the Second Amendment.

In many ways the time has come for a new debate over the Second Amendment, its meaning and how it might be applied in the twenty-first century. The idea that the right to keep and bear arms was meant to be tied so closely to membership and participation in a militia over which the government has total power to organize or fail to organize is one that can only be sustained through a highly strained reading of the history. Like nineteenth-century jurist Thomas Cooley we also believe that such a reading creates a right that the government can defeat at any time simply by the way it decides to organize the militia. We would accept no such reading with any other provision of the Bill of Rights, nor should we with the Second Amendment.

But to say that the individual rights reading of the Second Amendment is the more plausible and stronger reading of the provision should not end debate on the issue. There should be a debate over whether or not the amendment should simply be repealed. Clearly many advocates of strong

gun control measures believe the amendment to be an anachronism, a relic of an atavistic age of universal militias, posses, slave patrols, vigilantes, and citizens armed against each other. If this is so, they should make that case. It is a hard case to make in an America with widespread gun ownership and some forty-four states that have enacted or reenacted right to bear arms provisions in their state constitutions in the twentieth century, but in the final analysis radical constitutional change should be the result of sustained debate and amendment, not simply ignoring or creatively reinterpreting key constitutional provisions.

There is, however, an even more interesting debate that might be had with respect to public safety and the right to bear arms. That debate would involve examining how best to recognize and protect the right while also allowing legislatures leeway to develop criminologically sound measures designed to limit, insofar as possible, access to weapons on the part of career criminals and those who are mentally unstable. Such a debate would involve recognizing that the right to have arms has been and remains part of the American constitutional tradition, that it is valued by large segments of society, and that the right sets real limits on governmental regulation. It also involves recognizing that measures designed to keep weapons out of undesirable hands are not necessarily inconsistent with this right. In the second half of the twentieth century, we were unable to develop this kind of debate on the national level precisely because of the effort to redefine the Second Amendment into meaninglessness. Perhaps in the first half of the twenty-first century a greater willingness to recognize the Second Amendment will allow the dialogue to begin.

# 6

## The Enigmatic Place of
## Property Rights in Modern
## Constitutional Thought

JAMES W. ELY, JR.

The notion that property ownership is essential for the enjoyment of liberty has long been a fundamental tenet of Anglo-American constitutional thought. Property is more than the physical possession of an object. The concept of ownership encompasses a range of interests, including the right to use, develop, and dispose of one's property. Envisioning property ownership as establishing the basis for individual autonomy from government coercion, the framers of the Constitution placed a high value on the security of property rights. Echoing the philosopher John Locke, John Rutledge of South Carolina advised the Philadelphia convention that "Property was certainly the principal object of Society."[1] Further, the framers believed that respect for property rights was crucial to encourage the growth of national wealth. In the main the framers relied upon a variety of institutional arrangements, such as the separation of powers, to guard the rights of property owners. Still, the Constitution and Bill of Rights contain important provisions designed to restrain legislative incursions on property rights.

Not surprisingly, therefore, throughout most of American history the Supreme Court functioned as a guardian of property and economic rights against legislative encroachments. Although the Progressive movement of the early twentieth century challenged the high constitutional standing of property and called for greater governmental management of the economy, the Supreme Court remained leery of laws that limited the rights of property owners. The Court's defense of traditional property rights in the 1930s, however, threatened the New Deal program to combat the Great Depression, eventually causing President Franklin D. Roosevelt to propose his plan to

# Concealed Weapon Laws of the Early Republic

*Dueling, Southern Violence, and Moral Reform*

Clayton E. Cramer

PRAEGER

Westport, Connecticut
London

Compendium_Roth
Page 0163

**Library of Congress Cataloging-in-Publication Data**

Cramer, Clayton E.
    Concealed weapon laws of the early republic : dueling, southern
violence, and moral reform / Clayton E. Cramer.
      p.  cm.
    Includes bibliographical references and index.
    ISBN 0–275–96615–1 (alk. paper)
    1. Firearms—Law and legislation—Southern States—History—19th
century.  2. Southern States—Social life and customs—1775–1865.
I. Title.
    KF3941.C729  1999
    344.75′0533—dc21     99–18014

Copyright © 1999 by Clayton E. Cramer

All rights reserved. No portion of this book may be
reproduced, by any process or technique, without the
express written consent of the publisher.

Library of Congress Catalog Card Number: 99–18014
ISBN: 0–275–96615–1

First published in 1999

Praeger Publishers, 88 Post Road West, Westport, CT 06881
An imprint of Greenwood Publishing Group, Inc.
www.praeger.com

Printed in the United States of America



The paper used in this book complies with the
Permanent Paper Standard issued by the National
Information Standards Organization (Z39.48–1984).

10 9 8 7 6 5 4 3 2 1

# Contents

| | | |
|---|---|---:|
| *Acknowledgments* | | vii |
| 1. | What Is the Mystery? | 1 |
| 2. | Social Control of Free Blacks | 9 |
| 3. | The Back Country Culture of Violence | 17 |
| 4. | Kentucky | 47 |
| 5. | Louisiana | 67 |
| 6. | Indiana | 77 |
| 7. | Arkansas | 85 |
| 8. | Georgia | 97 |
| 9. | Tennessee | 105 |
| 10. | Virginia | 113 |
| 11. | Alabama | 117 |
| 12. | "That Dog Won't Hunt" | 127 |

Compendium_Roth
Page 0164

rebellion.[2]  Alexis de Tocqueville quoted a Louisiana planter named Brown in 1831: "It is an odd thing, at New Orleans the coloured men always make common cause with the whites against the blacks."[3]  A U.S. Navy officer, appointed to a post at New Orleans shortly after the Louisiana Purchase, observed that the question remained open as to whether "[T]he free quadroon mulatto and black people . . . will be entitled to the rights of citizens or not. . . . It is worth the consideration of government they may be made good citizens or formidable abettors of the  . . . slaves if they should ever be troublesome."[4]

General James Wilkinson's report to the Secretary of War early the next year also expressed an interesting mixture of hope and fear with respect to the free black population of Louisiana:

> The Jealousies of the People of Colour & the Whites seem to be increasing, & if I may judge from what I see & hear, the former are most to be relied by us for they have universally mounted the Eagle in their Hats & avow their attachment to the United States—while the latter still demonstrate their love for the Mother Country and do not conceal the fond Hope, that some incident of the depending War [the Napoleonic Wars], may return them to Her Bosom—I speak generally—The People of Colour are all armed, and it is my Opinion a single envious artful bold incendiary, by rousing their fears & exciting their Hopes, might produce those Horrible Scenes of Bloodshed & rapine, which have been so frequently noticed in St. Domingo [Haiti].[5]

2. Laura Foner, "The Free People of Color in Louisiana and St. Domingue," *Journal of Social History* 3 [Summer 1970]:420-421.  H. E. Sterx, *The Free Negro in Ante-Bellum Louisiana* (Rutherford, N.J.: Fairleigh Dickinson University Press, 1972), 84-89, and less directly, Gwendolyn Midlo Hall, *Africans in Colonial Louisiana: The Development of Afro-Creole Culture in the Eighteenth Century* (Baton Rouge: Louisiana State University Press, 1992), 323-324, describe this same balance of power position of free blacks in Spanish Louisiana in the 1780s and 1790s.

3. Tocqueville, *Journey*, 62.

4. Benjamin Morgan to Chandler Price, August 7, 1803, Clarence Edwin Carter, ed., *Territorial Papers of the United States* (hereinafter *Territorial Papers*) (Washington, D.C.: Government Printing Office, 1940) 9:7.

5. James Wilkinson to the Secretary of War, January 11, 1804, *Territorial Papers* 9:160.

The well-known "Address from the Free People of Color" to Governor Claiborne, also in January of 1804, expressed the desire of the colored militia to continue to serve the new government.[6]  Governor Claiborne accepted this volunteer colored militia, for which he received much criticism,[7] suggesting that the hostility of Louisiana whites to armed blacks remained strong.  The fear was perhaps understandable; the records for early Louisiana are full of evidence and rumors of slave rebellion, in which the whites believed the free blacks would take the slave side.[8]

Significantly with respect to the question of concealed weapons, one of the free mulatto informants against a French agitator named Le Grand accused him of asking, "if the Slaves in General were acquainted with the use of fire Arms whether they were allowed to wear them. . . .  They were to make themselves masters of all the Arms Ammunition &c. and to assassinate all those persons who should refuse to join them or made the smallest resistance to their measures."[9]

Unlike Kentucky, dueling apparently was *not* a factor in Louisiana's ban of concealed carrying of arms in 1813.  France appears to have played a major role in the revival of dueling in the late eighteenth century in Europe, and the Francophone population of Louisiana certainly preserved this French tradition, with duels still fought in New Orleans at the beginning of the twentieth century.

6. *Territorial Papers* 9:174-175.

7. Governor Claiborne to the Secretary of State, January 26, 1805, *Territorial Papers* 9:381; Governor Claiborne to the Secretary of State, January 8, 1806, *Territorial Papers* 9:561.  See Secretary of War Dearborn's suggestion to Claiborne to diminish the colored militia in H. Dearborn to Governor Claiborne, February 20, 1804, William C. Claiborne, Dunbar Rowland, ed., *Official Letter Books of W.C.C. Claiborne* (Jackson: Mississippi Department of Archives and History, 1917), 2:54-55.

8. Governor Claiborne to the President, April 15, 1804, *Territorial Papers* 9:222; Secretary Graham to the Secretary of State, September 9, 1805, *Territorial Papers* 9:499; John Watkins to Secretary Graham, September 6, 1805, *Territorial Papers* 9:500-504; Secretary Graham to the Secretary of State, *Territorial Papers* 9:556 (a message in code, because of its delicacy); James Mather to Governor Claiborne, January 8, 1809, *Territorial Papers* 9:817-819; Thomas H. Cushing to Governor Claiborne, January 10, 1809, *Territorial Papers* 9:819-820.

9. John Watkins to Secretary Graham, September 6, 1805, *Territorial Papers* 9:501.

Compendium_Roth
Page 0165