```
ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities
```

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 3 OF 37**<br><br>Courtroom: 5A<br>Judge: Hon. Roger T. Benitez<br><br>Action Filed: August 15, 2019 |

| | | | |
|---|---|---|---|
| 1 | **INDEX** | | |
| 2,3 | **Works** | **Decl. Page** | **Compendium Page** |
| 4 | **HISTORICAL STATUTES** | | |
| 5,6,7 | Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| 8,9 | An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| 10,11 | An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| 12 | Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| 13 | The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| 14,15 | The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| 16 | The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| 17,18 | **BOOKS**[i] | | |
| 19,20 | Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| 21,22,23 | Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| 24,25 | Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| 26,27 | J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1 2 3 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 4 5 6 7 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 8 9 10 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 11 12 13 14 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 15 16 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 17 18 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 19 20 21 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 22 23 24 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 25 26 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 27 28 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| Source | Cited at | Bates |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

But the French dueling tradition involved swords, and therefore "fatalities and even serious wounds were rare, for a scratch usually sufficed to bring the combat to an end."[10] American duelists used pistols and occasionally shotguns, rifles, carbines, and Bowie knives, with much deadlier results.[11] Louisiana, perhaps because dueling was so much a part of the Creole tradition, even compared to the South, was a late adopter of a dueling oath constitutional provision—in 1848. The measure was apparently never enforced.[12]

In the case of Louisiana, an interesting immigrant population appeared shortly before the Louisiana concealed weapon laws. Many French planter refugees from the Haitian Revolution had settled in Spanish Caribbean colonies. In 1809, Napoleon crowned his brother Joseph Bonaparte as King of Spain. A nationalistic reaction in Spanish America led to anti-French violence, followed by expulsion of the French. A contemporary report found that 9,059 of these expelled Frenchmen had moved to Louisiana. This population consisted of 2,731 whites, 3,102 free blacks, and 3,226 slaves, changing the Anglophone/Francophone balance of power. Many of the new arrivals were of a higher class than the native French population.[13]

If higher pretensions meant more dueling among this new aristocracy, this might well explain the timing of the 1813 concealed weapon law. The 1809 immigrants would not yet be American citizens, and therefore unable to exert political power to prevent passage of such a law. There is, however, no evidence from the English language press of Louisiana to support such a hypothesis. There is abundant evidence of what seems to have caused the concealed weapon law—not duelists, but backwoodsmen.

New Orleans in the first two decades of American rule was a riotous and violent town. A report to the Secretary of the Treasury about the newly acquired Louisiana territory described the sort of policing that New Orleans would require and why: "The Government of a city, exposed to the riots of untractable sailors, drunken Indians, and Kentucky boatmen, more vicious and savage than either, must be considerably energetic."[14] Several years later, the

---

10. Stevens, *Pistols at Ten Paces*, 130.
11. Stevens, *Pistols at Ten Paces*, 21-23, 88-91; Asbury, *The French Quarter*, 142-143.
12. Asbury, *The French Quarter*, 145.
13. Ingersoll, "Old New Orleans," 711-713.
14. John Pintard to the Secretary of the Treasury, September 14, 1803, *Territorial Papers* 9:52.

problem had apparently not subsided. John Watkins's letter to Governor Claiborne observed that, "From peculiar Circumstances we are surrounded with more than an ordinary portion of vicious men," requiring severe punishments, and a Black Code "to enforce all that Discipline which our situation requires. . . ."[15]

The opening of the Mississippi to duty-free trade dramatically expanded commerce from Kentucky, Ohio, Indiana, and Illinois.[16] This increased commerce, however, brought not only commercial expansion to New Orleans, but also a wild and violent population of flatboatmen. Known to the French-speaking population as *Kaintocks*, they sometimes worked their way downriver simply for the opportunity to visit the New Orleans fleshpots:

> It was with good reason that the Creoles feared and disliked the *Kaintocks*, for the robustious river men, thousands of whom came ashore at New Orleans every year, caused more trouble than any other class in the history of the city. . . . [T]he flatboat bullies devoted themselves to the activities which combined to form what they call a frolic—drinking, fighting, gambling in the resorts. . . . Singly and in groups they issued from the dives and literally terrorized the town, invading and frequently wrecking the respectable coffee-houses, cabarets, restaurants, and theaters; and attended on these excursions by a horde of thieves and garroters who pillaged and murdered while the flatboat men kept the police and citizens fully occupied. The police were utterly unable to cope with such ferocious brawlers as the bullies of the Mississippi, and failed to

---

15. John Watkins to Governor Claiborne, April 2, 1806, *Territorial Papers* 9:821.
16. Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 12-13; Rohrbough, *The Trans-Appalachian Frontier*, 359-360; Asbury, *The French Quarter*, 94-95. Cuming, *Sketches*, 266, described commercial shipping from Kentucky to New Orleans in 1807. Fordham, *Personal Narrative*, 79, 106, 116, described commercial shipping between the Ohio River or Illinois Territory to and from New Orleans in 1817, and passenger travel that would allow him to leave Illinois and "be with you in Hertfordshire, via New Orleans, in two months." Carlton, *The New Purchase*, 185, described commercial ventures involving the floating of produce at least as early as the 1820s from the Kentucky/Indiana border to New Orleans.

maintain even a semblance of order in the city when the river men went on a rampage.[17]

Indeed, the New Orleans police were so effectively routed by the flatboatmen that they were disarmed by the city government for cowardice.[18]

Unlike for Kentucky, there are both legislative and newspaper accounts of the Louisiana Legislature's actions in passing the concealed weapon law. Unfortunately, the newspaper accounts of Lousiana's legislative actions tell us no more than the official legislative *Journal*—a simple statement of actions taken on bills.[19] A careful reading of the New Orleans, *Louisiana Gazette and Daily Advertiser* for 1812 and 1813 and the New Orleans, *Louisiana Courrier* for 1813 reveals nothing that might illuminate the legislature's reasons for adopting a concealed weapon law. There is more coverage of murders and duels in other states and nations[20] than in Louisiana itself.[21] Yet there are obscure references that suggest that there *were* high levels of murder in New Orleans that, for whatever reason, were not published: "☞No assassinations since our last!!"[22] In a town of 17,000 people,[23] a day passing without murder is a sobering thought indeed.

Why was there so little coverage of murders, if a day without a murder was worthy of attention? These murders, for the most part, took place among temporary residents from upriver. The population of New Orleans quadrupled during the first twenty years of American rule (from 1803 to 1823), and as much as "one-third to one-fourth of the increase was composed of thieves, ruffians, vagabonds, and prostitutes" becoming part of "the lowest and most vicious elements of New Orleans' population specialized in catering to the vices and appetites of the *Kaintocks*...."[24]

In a section of town known as "the Swamp," the flatboatmen and the ruffians engaged in mayhem and scores of fights every night, averaging, by some estimates, half a dozen murders each week, "none investigated by the municipal authorities, or, for that matter, even reported."[25] The police did not enter "the Swamp," much less attempt to impose any law within it. As long as the problem stayed among these troublesome men from out of town, murders would have been of little concern to the permanent residents of New Orleans. A concealed weapon law, however, provided an opportunity to suppress the carrying of weapons in respectable parts of the city, especially against a troublesome class of people whose presence was necessary for commercial reasons.[26]

When we analyze the 1813 law with the back country flatboatmen in mind, some of the law's interesting characteristics make a lot more sense. The law's preamble promised more than the body of the law delivered:

> Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be

---

17. Asbury, *The French Quarter*, 94-95. Michael Allen, *Western Rivermen, 1763-1861: Ohio and Mississippi Boatmen and the Myth of the Alligator Horse* (Baton Rouge: Louisiana State University Press, 1990), 45, 111, 123-126, similarly confirmed the violent nature of these hard working, hard drinking, usually illiterate backwoodsmen. Allen, 93-94, pointed to wharf records to demonstrate that these boatmen had overwhelmingly "English, Scotch, and Scotch-Irish surnames."

18. Asbury, *The French Quarter*, 95-96. Rousey, *Policing the Southern City*, 17-19, 33, mentioned an *attempt* to disarm the New Orleans police in 1806 because of an incident involving some brawling sailors and an innocent bystander whom the police injured—not because of cowardice.

19. (New Orleans) *Louisiana Courrier*, February 12, 1813; February 15, 1813; March 12, 1813; *Journal de la Chambre des Representans Pendant la Seconde Session de la Premiere Legislature de l'Etat de la Louisiane* (New Orleans: P. K. Wagner, 1813), 131. Examination of *General Index to the First Twelve Volumes, or First Series, of Niles' Weekly Register* (Baltimore: Franklin Press, 1818), and *Niles' Weekly Register*, 1-5, provided no information about the Louisiana statute.

20. "A Duel Between a Kentuckian and an Englishman," *LG&DA*, April 23, 1812; "Robbery and Murder," *LG&DA*, May 23, 1812; "From the London *Courier*, May 12th," *LG&DA*, July 21, 1812; untitled article about a Baltimore murder, *LG&DA*, August 7, 1812.

21. "Horrid Murder," *LG&DA*, August 8, 1812; "Robbery and Murder," *LG&DA*, February 6, 1813.

22. "☞No assassinations since our last!!," *LG&DA*, January 21, 1813. John Smith Kendall, *History of New Orleans* (Chicago: Lewis Publishing Co., 1922), 1:66-67, based on New Orleans death records, confirmed that homicide levels were extraordinarily high in New Orleans during this period.

23. Rousey, *Policing the Southern City*, 11.

24. Asbury, *The French Quarter*, 98-99.

25. Asbury, *The French Quarter*, 100.

26. Asbury, *The French Quarter*, 98-100.

attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner. . . . [27]

While the preamble suggests that the following law will deal with "going . . . armed in an unnecessary manner," and not just concealed weapons, the statute only prohibits *concealed* carrying of any weapon, "such as a dirk, dagger, knife, pistol or any other deadly weapon . . . that do not appear in full open view. . . ."[28]

The statute is similar to the Kentucky law in some respects. The punishment was a fine of $20 to $50, "one half to the use of the state, and the balance to the informer. . . ."[29] These would have been extremely heavy fines—and rewards—to flatboatmen who arrived in New Orleans with an average of $35 pay in their pocket.[30] But where the Kentucky statute's punishment was limited to fines, a second violation of the Louisiana law carried not only a fine of up to $100 but also up to six months imprisonment. A vaguely worded section provided for capital punishment for use of a concealed weapon against a person, though it is unclear whether death was reserved for those assaults that resulted in death or for any battery with a concealed weapon.

Finally, a section provided that persons convicted under this law could be ordered to post a bond to keep the peace, and anyone unable to post such a bond could be jailed for up to twenty days.[31] The most important difference between the Kentucky and Louisiana statutes, however, is that the Louisiana statute had no exemption for travelers—and the reason for this difference, and the ability to jail offenders who could not post a bond, becomes clear once it is understood that the Louisiana statute was aimed at back country flatboatmen, all of whom were "travelers."

How vigorously was this statute enforced? Against respectable members of society, apparently not very vigorously. Joseph Holt Ingraham visited New Orleans in the 1830s and described how

---

27. *Acts Passed at the Second Session of the First Legislature of the State of Louisiana*, hereinafter *Louisiana Acts* (1813) (New Orleans: Baird and Wagner, 1813), 172-175.
28. *Louisiana Acts* (1813), 172-175.
29. *Louisiana Acts* (1813), 172-175.
30. Allen, *Western Rivermen*, 102.
31. *Louisiana Acts* (1813), 172-175.

"Every, or nearly every gentleman" carried a sword cane, or a concealed dirk, apparently with little fear of punishment.[32]

Other pieces of evidence from the same period suggest that the law was either not enforced vigorously, or that it was widely disobeyed. Judge Canonge, "in his charge to the grand jury of the criminal court of New Orleans . . . particularly calls attention to the prevalence of drunkenness, and the habit of carrying concealed weapons. From these, says he, results the greater part of those odious crimes which have added so many cases to the criminal docket of New Orleans."[33]

An incident in the Louisiana statehouse during the same period suggests that the law also was not taken very seriously by elected officials. On February 3, 1835, "a distinguished lawyer of New Orleans" entered the Louisiana House of Representatives chamber and struck the Speaker of the House with a cane. The Speaker drew a pistol (apparently concealed, unless the "distinguished lawyer" was suicidal) and fired through the lawyer's coat, without hitting the lawyer. The lawyer then drew a pistol and wounded the Speaker.[34]

Ingraham's observations and this incident involving the Speaker of the House suggest that the concealed weapon laws were not intended to apply to gentlemen, or at least that gentlemen did not believe themselves honor bound to obey the law. This would be consistent with a Kentucky flatboatmen theory of motivation, since gentlemen with concealed weapons were not considered a public safety concern.

Louisiana's 1813 statute waited until 1850 to be challenged on constitutional grounds, perhaps because the Louisiana Constitution had no guarantee of a right to keep and bear arms. When the challenge came, it was based on the Second Amendment to the U.S. Constitution. While the Louisiana Supreme Court accepted that the Second Amendment was a limitation on the state's power, it upheld the ban on *concealed* carrying of deadly weapons:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations commit-

---

32. Ingraham, *The South-West*, 1:89-90.
33. "Judge Canonge . . . ," (Little Rock) *Arkansas State Gazette*, December 12, 1837, 3.
34. Murray, *Travels*, 1:142-143.

ted upon unsuspecting persons. It interfered with no man's right to carry arms (to use its own words), "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[35]

This judicial elucidation of the purpose of the concealed weapon law took place almost forty years after its passage, at a time when the exact details of early New Orleans would have remained only in the memories of a few old men. While the Louisiana Supreme Court agreed that the problem was "a vicious state of society," it also argued that this vicious state grew "out of the habit of carrying concealed weapons . . ." rather than, as the historical evidence suggests, the other way around. This decision also seems oblivious to the targeted nature of the law, perhaps because it was easier to defend a general statute than one that was selectively enforced. As will become obvious in later chapters, Louisiana is unique in that it adopted a concealed weapon law not because of its residents, but because of its visitors.

---

35. *State* v. *Chandler*, 5 La. An. 489, 490, 491 (1850).

# Chapter 6

# Indiana

Indiana is often thought of as a northern state, but like other parts of the Northwest Territory, settlers in the southern part of the state were usually of southern origin, while settlers in the northern part of the state were often from Puritan-dominated New England. Southerners dominated early immigration to the Old Northwest, and "southern culture predominated in Ohio, Indiana, and Illinois until the 1830s."[1]

John Stillman Wright described 1818 southern Indiana and its settlers. From his description of their diet as consisting of "hominy, hoe-cakes, and hogs" and his reproduction of their accent, it is clear that these settlers were backwoodsmen from the southern states. To Wright's distress and disgust, the southern Indiana settlers resolved disputes personally:

> Although every county has its *seat of justice*, as they are termed, yet people, most frequently, depend on their own personal powers, for the redress of their real or imaginary grievances; and the most powerful arm generally wins the cause; except when, as has sometimes happened, the knife or dirk of one of the combatants ends the awful conflict. This heathenish mode of deciding controversies is so frequently resorted to, that the sight of persons disfigured by having an eye gouged out, or a nose, lip, ear, or finger bit off, is too common to excite sur-

---

1. Berwanger, *The Frontier*, 18.

Compendium_Roth
Page 0169

prise or disgust, after a person has been a short time in the country [emphasis in original].[2]

At the same time that travelers reported frequent violence, sheriffs seem to have left no documentary evidence of performing any official functions associated with these personal attacks. John Tipton served as sheriff of Harrison County, Indiana, from 1816 to 1820. One might conclude from reading his collected papers that his duties involved only disputes about runaway slaves and executing civil judgments; almost nothing in his papers and letters from this period indicates any serious crimes came under his jurisdiction other than those related to kidnapping of slaves.[3]

Examination of the only Indiana newspaper that covered the period provides little information about the level of violence, perhaps because the town of publication was so small—though still one of the urban centers of frontier Indiana.[4] Many of the reports of murders and violent attacks, moreover, provided no information about the weapon used, much less whether it might have been concealed.[5]

At least one murder given sensational coverage did apparently involve concealed weapons. Two young men were competing for the affections of a young lady in Lawrenceburgh, Indiana. Mr. Fuller offered Mr. Warren the chance to write a note disclaiming any interest in her, or engage in a duel. Mr. Warren declined to do either, at which point Fuller shot and killed Warren with a pistol. The report emphasized that Warren was "highly respected" and Fuller, his murderer, was "pleasing in his address, intelligence, and communicative." The report closes with, "Great God! Is this human nature? When the restraining power of offended Heaven is withdrawn, man becomes desperate, and dies by his own hand."[6]

There is some discussion of dueling in this Indiana newspaper, but mostly of duels fought in other states.[7] However, there is other

---

2. Wright, *Letters from the West*, 62-63.
3. Tipton, *The John Tipton Papers*, 1:119-225.
4. Rohrbough, *The Trans-Appalachian Frontier*, 363.
5. "Trial for Murder," *Brookville Enquirer & Indiana Telegraph* (hereinafter *BE&IT*), June 18, 1819, 2. Examination of indices for *Niles' Weekly Register*, 13-18, reveals nothing about the Indiana concealed weapon law.
6. "Communicated," *BE&IT*, January 14, 1820, 3.
7. "On the 6th inst. a duel was fought near Bladensburg . . . ," *BE&IT*, February 26, 1819, 2; "A man of the name of Stuard lost his life

evidence that dueling was common enough in Indiana to be worthy of discussion and condemnation. A letter to the editor from "Squib" complains about the pretensions of gentlemen, and humorously suggests that their code of conduct requires them to be ignorant of anything useful, to "swear with energetic eloquence," to gamble, and to "express an extraordinary sense of *honor*, and at the same time declare with the most unequivocal expression, your determination to wipe out every stain it receives by a challenge. Also, be frequent and loud in your complaints of the tyrany [sic] and oppression of the laws against dueling."[8] Squib's complaint certainly shows a class consciousness, but in this case, attacking those with pretensions of being members of a higher class—the men who believed that dueling was a sign of their aristocracy.

Somewhat less belligerent than those that "Squib" satirized, but still showing the importance of the culture of honor in Indiana, is an ad from a William Shannon. Shannon complained of a whispering campaign against him that alleged he had been jailed in Wayne County for a felony, which he strongly denied. "There are some people that will ransack a county to destroy the standing of a man, and thereby leave a lasting stain on families who had no control over the transaction. I will give a Reward of ONE HUNDRED DOLLARS to any creditable person that will announce to the Public the facts that I am charged with, supported by affidavit."[9]

A traveler's account described how the Indiana Legislature struggled with the problem of dueling in January 1818, and in a way that suggests a connection between brawling, dueling, and the use of deadly weapons, reminiscent of Kentucky's situation:

> A repeal of the old law against duelling has been obtained, and a new one enacted which subjects delinquents to corporal punishments, in addition to the other penalties of fine and disability to hold public offices. . . .
>
> This bill was thrown out at the third reading. The subject is involved in more difficulty than it is in Europe. Every State has attempted to put a stop to duelling, and some have nearly effected it, but the manners and dispositions have not become more moderate [or] more mild. There are a number of dissi-

---

last week . . . ," *BE&IT*, March 26, 1819, 2; "A pair of dunces agreed to shoot at each other . . . ," *BE&IT*, September 17, 1819, 2.
8. "Squib," *BE&IT*, March 5, 1819, 2.
9. "To The Public," *BE&IT*, March 5, 1819, 3.

Compendium_Roth
Page 0170

pated and desperate characters, from all parts of the world, assembled in these Western States; and these, of course, are overbearing and violent. It is nearly impossible for a man to be so circumspect, as to avoid giving offence to these irritable spirits, who, in fact, do not always want for provocation to be insolent. The Kentuckians on these occasions use their dirks, and the Ohio men are abusive. Men of education and manners will, if they can, fight with weapons and the vulgar bite, kick, and gouge each other.[10]

Apparently the bill was eventually passed, contrary to Fordham's description of its demise at the third reading. Like Kentucky, Indiana passed a dueling oath requirement for some elected officials in 1816, as part of the first legislature's acts.[11] Indiana expanded this dueling oath requirement in 1818 to cover all legislators, civil and military officials, judicial branch employees, and lawyers.[12] The oath was apparently too onerous for at least one occupation: it was repealed for lawyers in 1820.[13]

In that same year, Indiana adopted a ban on concealed carrying of weapons quite similar in form to the Kentucky law. A review of the legislative journals published in the *Brookville Enquirer & Indiana Telegraph* provided very little detail about its passage. The first mention of it was its third reading in the Indiana House on January 8, 1820. Its first mention in the Senate was also its third reading on January 14, 1820.[14]

In the absence of any other evidence, it seems likely that Indiana had made the same connection as Kentucky—that severe restrictions on dueling required regulation of the concealed carrying of deadly weapons so as to prevent insults from escalating to homicide.

The concealed weapon statute was concise. It provided, "That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not ex-

---

10. Fordham, *Personal Narrative*, 148-149.

11. Lewis, "Dissent," 37.

12. *Laws of the State of Indiana, Passed and Published at the Second Session of the General Assembly* (Corydon: A. & J. Brandon, 1818), 362-365.

13. Lewis, "Dissent," 37-38. What may be the law in question was reported under "State Legislature," *BE&IT*, December 31, 1819, 2.

14. "State Legislature," *BE&IT*, January 28, 1820, 2; "State Legislature," *BE&IT*, February 4, 1820.

ceeding one hundred dollars, for the use of county seminaries: *Provided however*, that this act shall not be so construed as to affect travellers [emphasis in original]."[15]

Like the Kentucky statute, this one punished concealed carrying of weapons only by a substantial fine. Like the Kentucky statute, and unlike the Louisiana law, it exempted travelers without defining who is a traveler. An interesting quirk of the statute, unique to the concealed weapon laws of the early Republic, was that the fines were to go to seminaries. One might read into this that the legislators saw some connection between carrying concealed weapons and a lack of religious instruction. (Indiana amended the law in 1831 so that fines no longer went to seminaries.)[16]

The Indiana Supreme Court upheld the constitutionality of this statute in *State* v. *Mitchell* (1833). The *entire* decision of the Indiana Supreme Court was a single sentence: "It was *held* in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional [emphasis in original]."[17] The *Mitchell* decision, in conjunction with the *Bliss* v. *Commonwealth* (Ky. 1822) decision, may explain why no states adopted concealed weapon laws between 1820 and 1837. The *Bliss* decision had firmly declared that the right to keep and bear arms was constitutionally protected, even for concealed weapons, and the opinions of constitutional commentators on the similar guarantee in the U.S. Constitution were as expansive as *Bliss* in their reading of the right.[18] Until 1833, the only precedent in American law concerning concealed weapon regulation was *Bliss*.

Significantly, when other state supreme courts upheld bans on carrying of concealed weapons, most acknowledged the existence of

---

15. *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville: Isaac Cox, 1820), 39.

16. *Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

17. *State* v. *Mitchell*, 3 Blackford 229 (Ind. 1833). See Cramer, *For the Defense of Themselves and the State*, generally for a discussion of the role of this decision in setting the pattern of American jurisprudence on the right to keep and bear arms.

18. Cramer, *For the Defense of Themselves and the State*, 69-71, concerning early constitutional commentary on the federal guarantee, and 69-96 for an examination of all antebellum decisions on right to keep and bear arms.

Compendium_Roth
Page 0171

*Bliss* but instead concluded that *Mitchell*, a one sentence decision without precedent, citations, authorities, or even an argument, was more correct.[19] Perhaps the hiatus from passage of concealed weapon laws between 1820 and 1837 resulted from some question as to whether this approach was constitutional. Once the *Mitchell* decision appeared in 1833, there could be at least a legitimate argument as to the constitutionality of concealed weapon laws, with two different supreme courts coming to differing opinions.

There were many similarities between Indiana and its neighbors to the east and west with respect to violence. Elias Pim Fordham described a party he attended in the Illinois Territory in 1817 which had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards worn under the clothes)" to resist another such attempt, but later "In going away some of the gentlemen were insulted by the rabble, but the rumour that they [the gentlemen] were armed with dirks and pistols prevented serious mischief."[20]

Henry Bradshaw Fearon, a Briton traveling through America in 1818, described the behavior of the inhabitants of Illinois Territory in a way that sounds quite similar to Indiana during the same period: "Small provocations insure the most relentless and violent resentments. Duels are frequent. The dirk is an inseparable companion of all classes; and the laws are robbed of their terror, by not being firmly and equally administered."[21]

Southern Illinois and Ohio, like southern Indiana, were dominated by back country culture, yet they did not adopt concealed weapon laws during the early Republic. What made Indiana different? While southern culture was dominant in all three states, the level of dominance varied, with Indiana in the lead. The Indiana historian Andrew Cayton observed that, "Because Indiana remained far more southern and rural than its counterparts north of the Ohio River, opponents of moral and educational reform had much greater success there. Indiana was still debating the necessity of public schools long after Ohio and Illinois had committed themselves to them."[22]

---

19. *State* v. *Reid*, 1 Ala. 619, 620 (1840); *State* v. *Buzzard*, 4 Ark. 25, 28 (1842).

20. Fordham, *Personal Narrative*, 219-220.

21. Fearon, *Sketches of America*, 260.

22. Cayton, *Frontier Indiana*, 294. Also see Rohrbough, *The Trans-Appalachian Frontier*, 140-142, for an example of an *en masse* transplantation of New England village culture to northern Ohio.

Another significant difference is that Ohio, being east of Indiana, was further removed from the frontier stage of development. Ohio entered the Union in 1803; Indiana achieved statehood in 1816; Illinois became a state in 1818. Perhaps there was a stage in between wilderness and full settlement where high levels of violence made concealed weapon regulation seem like a good idea. While this "frontier stage" might explain Indiana's 1820 law, it fails to explain Kentucky's 1813 law. Kentucky entered the Union in 1792 and was certainly further removed from the frontier condition in 1813 than Indiana was in 1820.

There is one similarity between Indiana and Kentucky, however, that might explain why Illinois did not adopt a concealed weapon law during this period. Kentucky and Indiana both adopted severe law during this period. Kentucky and Indiana both adopted severe dueling oath measures two years or less before banning the concealed carrying of weapons. Illinois Territory had passed a dueling oath measure at some point before 1815, but this law was never published. The territorial legislature repealed it in 1815.[23] Because the Illinois Territory law had never been published, it is possible that it did not create the problems of insults escalating to homicide that motivated both the Kentucky and Indiana statutes.

Finally, there is one other significant difference between Illinois and Indiana. Illinois was apparently unique among antebellum American states in having executed a duelist. William Bennett was indicted, convicted, and hanged for causing the death of Alphonso Stewart in an 1820 duel.[24] Indeed, one of the startling aspects of the many laws passed to prohibit dueling is the rarity of antebellum convictions.[25] While this unique distinction seems hard to believe, others who have researched the matter have found antebellum trials for dueling extraordinarily rare, and convictions even rarer. By all accounts, dueling enjoyed widespread support from the antebellum southern population. One British traveler to America in the

---

Rohrbough, *The Trans-Appalachian Frontier*, 67-76, emphasizes the seminal role of Governor Arthur St. Clair (a Pennsylvanian) in establishing the laws of the Northwest Territories.

23. Lewis, "Dissent," 36. That a law was passed but not published seems implausible, though territorial governments, as will be seen in the discussion of Arkansas, were often "rough and ready" in their procedures. Lewis's source was an 1845 Illinois statute.

24. Lewis, "Dissent," 36-37.

25. Stevens, *Pistols at Ten Paces*, 93.

1830s, after describing in detail a duel in Virginia, decried this acceptance:

> It is only necessary to add, that both these parties were men of as high standing as any in their district, both members of the legislature, and that this duel was fought within fifty miles of the capital of the United States. Where can we find in the annals of early Rome, or of Gothic barbarism, or anywhere else (except, perhaps, some instances of more glaring atrocity in Louisiana), a personal quarrel carried on in a spirit more vindictive and barbarous? . . . [I]t does derive some importance, as a collateral indication of national character, from the fact that the parties were in respectable and responsible positions, and that the circumstances attending the duel were related to me in a manner rather laudatory of the courage, than deprecatory of the thirst of blood displayed. . . .[26]

Bennett's execution suggests that dueling had become unacceptable behavior to the people of Illinois. The underlying culture of honor that provoked dueling oaths and in turn, concealed weapon laws, was apparently no longer dominant in Illinois.

---

26. Murray, *Travels*, 1:115-117. Gamble, *Savannah Duels*, 134-135, pointed to evidence from Savannah Grand Jury presentments against dueling in 1808 and 1819 that show the practice was alive, well, and in no danger of leading to any convictions.

# Chapter 7

# Arkansas

From the laws that were passed, one might conclude that the concern about concealed weapons in the late 1830s was specific to a few southern states. Yet some evidence suggests that there were other places where concealed carrying of deadly weapons was becoming more regular, and of some concern, at least in a few quarters. In some of the settled cities of the East, as large numbers of immigrants arrived in the 1830s, the concealed carrying of handguns for self-defense became more common.[1]

The Tuscumbia *North Alabamian* reprinted a Baltimore grand jury report that asserted, "The wearing of deadly weapons . . . is an intolerable nuisance, unnecessary in the present state of any civilized community, dangerous in its tendencies, pernicious in its consequences, and destructive alike of good morals and the public peace." The grand jury then pointed to the example of Governor Tacon in Cuba, who ordered suppression of gambling, then of carrying concealed weapons:

> Gov. Tacon does not spend much time in talking or passing resolutions—but like Bonaparte, he issues his orders, and the thing is done. . . . Persons are now as safe in Havana at all times of night as they are in New York. Why cannot our mag-

---

1. Samuel Walker, *Popular Justice: A History of American Criminal Justice* (New York: Oxford University Press, 1980), 56-59; Richardson, *Urban Police*, 19-28; Kennett and Anderson, *The Gun in America*, 145-148; Lane, *Policing the City*, 3-13, 33-36.