1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
7   Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and
   Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                         CIVIL DIVISION

13

14 | **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
15 | Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
16 | v. | |
17 | | **VOLUME 4 OF 37** |
18 | **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez |
19 | | |
20 | Defendants. | Action Filed:  August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| Citation | Cite | Bates |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

istrates administer our good wholesome laws with some of Gov. Tacon's decisions.[2]

Another example of this increasing concern—or at least awareness—of an increasing level of concealed carrying of weapons appears in the *Clarke County* (Ala.) *Post*, that reported, "No dirk has been seen in the Ohio Legislature since a member appeared there with a wooden one stuck in his bosom, and a long corn-cob handle attached to it."[3] The symbolism of the corn-cob handle is obscure, but that it was intended as ridicule of the practice of carrying deadly weapons is clear.

As the Louisiana statute's preamble showed, and will be seen with some of the Alabama editorials, banning of concealed carrying of deadly weapons was often carelessly equated with a ban on *any* form of wearing deadly weapons. This suggests (but does not prove) that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying.

If any state typified the back country culture of violence better than Kentucky, it may well have been Arkansas. The same year that Arkansas became a territory, the commander of the territorial militia was killed in a duel. One superior court judge killed another in 1824 over a card game. In 1827, "the territorial secretary killed a territorial delegate in an affair of honor. To a greater degree than in other territories, violence in Arkansas involved some of the leading public officeholders."[4] Malcolm J. Rohrbough observed, "Arkansas had more than its share of bloodshed. Almost everyone went armed. The columns of the *Arkansas Gazette* carried numerous accounts of the violence and mayhem that human beings committed against one another, much of it in the name of personal honor."[5]

Many of the statutes adopted in the period 1837-1839 identified two specific weapons that were banned for concealed carry. One was the Bowie knife, first developed in Arkansas. The other was the Arkansas toothpick. These two weapons themselves have a story to tell, and it is a reminder that although terror is not a rational reaction, it often plays a part in the making of laws.

---

2. "Wearing deadly Weapons," (Tuscumbia) *North Alabamian*, June 23, 1837, 2.
3. "The force of Ridicule," *Clarke County* (Ala.) *Post*, June 16, 1837, 1.
4. Rohrbough, *The Trans-Appalachian Frontier*, 273-274.
5. Rohrbough, *The Trans-Appalachian Frontier*, 284.

The most feared weapon of the 1830s was not a firearm, but the Bowie knife. The Bowie knife (and its first cousin, the Arkansas toothpick) was "a favored weapon of the Southern aristocracy," a knife blade typically eight to twelve inches long, designed for close range fighting.[6] *Niles' National Register*, the preeminent national weekly newspaper of the period, carried a series of articles in 1836-1838 that quickly established the Bowie knife in the national consciousness as a weapon especially suited to killing, of which the incident in the Arkansas legislature (discussed later in this chapter) was an especially shocking example.[7]



**Bowie Knives from the Collection of R. L. Wilson**[8]

The Bowie knife had a fearsome image. At the Kentucky Constitutional Convention of 1849, delegates debated adding a provision

---

6. Williamson, "Bowie Knives," 40-53.
7. Thorp, *Bowie Knife*, 44; William F. Pope, *Early Days in Arkansas* (Little Rock, Ark.: Frederick W. Allsopp, 1895), 225; "The Murder in Arkansas," *Niles' National Register* 54:258, June 23, 1838.
8. Original photograph courtesy of R. L. Wilson. Sketches by Rhonda Thorne Cramer.

to the new constitution to discourage dueling. During those debates one of the opponents of the anti-dueling clause observed: "I ask gentlemen which has produced most misery and mourning in Kentucky, the duel or the bowie knife? Which, I ask, has shed most blood, the fair and open combat or the knife of the assassin?"[9]

A Texas Supreme Court decision from 1859 (*Cockrum* v. *State*) also gives some clues about the curious manner in which the courts regarded the Bowie knife. Article 610 of the Texas Penal Code punished manslaughter committed with a Bowie knife or dagger the same as murder. The defendant's attorney argued that by discriminating against an inexpensive weapon, this penalty enhancement would "substantially . . . take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol."[10] The Texas Supreme Court justified the enhanced penalty in a way that shows the fear of Bowie knives:

> The right to carry a bowie-knife for lawful defence is secured, and must be admitted. It is an exceedingly destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death. He who carries such a weapon, for lawful defence, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon.[11]

The *Cockrum* decision is clearly incorrect in its claims about the hazard of a Bowie knife relative to other weapons, and yet, a Bowie knife made a bloody mess of a person. A pistol or rifle made an almost surgical wound by comparison. The sight of a person disemboweled with a Bowie knife must have been a profoundly disturbing sight. The *Cockrum* decision's claim was factually incorrect, but completely understandable as a human reaction to a horrifying sight.

---

9. *Kentucky Constitutional Convention Debates 1849*, 822.
10. *Cockrum* v. *State*, 24 Tex. 394, 396 (1859).
11. *Cockrum* v. *State*, 24 Tex. 394, 402, 403 (1859).



**Modern Reproductions of the Bowie Knife and Arkansas Toothpick (1/4 scale)** [12]

While the Bowie knife's mid-1830s notoriety was too late to explain the 1813 statutes of Louisiana and Kentucky and the 1820 Indiana statute, the timing was perfect to explain the statutes adopted in the late 1830s. All of these laws included the Bowie knife, and a few of the statutes that we will examine in later chapters apply *only* to the Bowie knife—a symbol of human butchery

---

12. Sketches by Rhonda Thorne Cramer.

that seems to have been a primary target of many of these laws, even more than concealed handguns.

The Bowie knife was not intrinsically different from the daggers and hunting knives that were in common use before James Bowie handed James Black his model for what would become the Bowie knife.[13] While the Bowie knife developed a fearsome reputation (and the *Niles' National Register*'s horrified coverage of it may have created a national demand for what had been previously a regional specialty),[14] it represented a refinement (or perhaps brutalization) of existing knives rather than a fundamentally new technology.

Travelers' accounts and memoirs of Arkansas residents show that in territorial days it was a very aggressive, very violent society. Henry Rowe Schoolcraft's account of 1818 Ozark frontier culture is instructive. While staying in a settlement of two families, Schoolcraft pointed to the deplorable state of morals of the inhabitants: "In their childish disputes, boys frequently stab each other with knives, two instances of which have occurred since our residence here. No correction was administered in either case, the act being rather looked upon as a promising trait of character."[15] And Schoolcraft had been there only two weeks!

Arkansas was awash in dueling and less formal brawls by the 1820s.[16] In the words of an early settler, these were caused by "the want of action and constant occupation, and the great interest taken in local politics; or quarrels growing out of some real or fancied wrong, or disputes over a piece of land or other property...." But while a duel was often the outcome, "others resulted in a rough and tumble fight or a shooting or cutting scrape."[17] Similarly, in 1831, Arkansas Territorial Governor Pope expressed his concern about passions out of control, arguing that the willingness of juries to reduce murder to manslaughter encouraged killing: "Men should be brought to bridle their passions when life is at stake, and no excuse for shedding blood should be received but that of *absolute necessity*. The distinction between murder and manslaughter should

---

13. Thorp, *Bowie Knife*, 22-23. But see R. P. Bowie, "The Bowie Knife," *Niles National Register* 55:70, September 30, 1838, for a slightly different account of its origin, from James Bowie's brother.
14. Thorp, *Bowie Knife*, 47.
15. Schoolcraft, *Rude Pursuits*, 74.
16. Pope, *Early Days*, 33-44, 168-172.
17. Pope, *Early Days*, 102-103.

be abolished in all cases where a dirk, pistol or other deadly weapon is used, except in cases of *self-defense* [emphasis in original]."[18]

Unlike in Kentucky, there were newspapers—at least a few—during the period in which Arkansas apparently passed its first concealed weapon law. In examining these newspapers, there was no shortage of homicides, attempts at it, and other violent crimes. What makes the news coverage so interesting, however, is that the volume and nature of the crimes reported did not seem to justify a measure aimed specifically at concealed weapons. (Of course, as with the coverage of murder in New Orleans in the period 1812-1813, what newspapers thought appropriate to cover was not necessarily indicative of the volume and nature of the crimes that were actually taking place.)

Like other newspapers of 1837 examined for this work, the *Arkansas Times & Advocate* observed, "Scenes of murder and robbery appear to be the order of the day in the United States."[19] But also like other newspapers of the day, the murders and almost murders considered worthy of coverage in Arkansas newspapers seem to have been gathered from an astonishingly large part of the United States. Most of these events were reprinted from other newspapers and took place in other states.[20] In some of these reported crimes,

---

18. Pope, *Early Days*, 103.
19. "To Our Patrons," *AT&A*, January 22, 1838, 2.
20. "It is with heartfelt sorrow..." (newspaper editor killed in a Louisiana affray, weapon not specified), (Little Rock) *Arkansas State Gazette*, October 17, 1837, 2; "We learn from the *St. Louis Republican*...," *AT&A*, October 30, 1837, 2; "Murder" (in Louisiana), *AT&A*, November 13, 1837, 3; "Murder and Robbery" (discussing a Kentucky crime), *AT&A*, October 30, 1837, 3; "Arrest of a Murderer" (in North Carolina), *AT&A*, November 13, 1837, 3; "Murder in Texas," (Little Rock) *Arkansas State Gazette*, December 5, 1837, 2; "Wm. P. McGrew, who was arrested in this state last fall..." (murder in Alabama, weapon unidentified), (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2, also reprinted in (Little Rock) *Arkansas State Gazette*, December 5, 1837, 3; "Murder" (in Tennessee), *AT&A*, January 8, 1838, 2, with even more detailed coverage of the same murder in "Inhuman Murder," *AT&A*, January 15, 1838, 2; "Murderers Broke Jail" (in Mississippi), *AT&A*, January 15, 1838, 2; "Going Ahead of Arkansas" (in Kentucky), *AT&A*, January 22, 1838, 2; "An affray took place..." (in Mississippi), *AT&A*, January 29, 1838, 2; "Murder" (in Tennessee, weapon not identified), *AT&A*, February 10, 1838, 2; "Mail Robbery and Murder" (in Louisiana or Mississippi, weapon not identified), *AT&A*,

Compendium_Roth Page 0176

there was no use of deadly weapons, concealed or otherwise.[21] Others involved weapons unlikely to be restricted by any law, such as an axe.[22] A few Arkansas incidents did involve deadly weapons, though whether they were concealed or not is not clear from the report.[23]

One incident is unclear as to its applicability to concealed weapon statutes, since it involved two men engaged in a fight with shotguns in downtown Little Rock. The unintentional injury of a teenage girl who was a bystander certainly argued that some of Little Rock's citizens were both too willing to use firearms and too careless about who they hit.[24] Other crimes involving firearms reported from Arkansas were clearly crimes of premeditation, in which concealment was not an issue.[25] In their own category were many duels, some of which took place in Arkansas,[26] but most of which were reported from other states.[27]

Some of the acts of violence reported were clearly forms of rough justice. One account described a lawyer wanted for several felonies, apparently including rape, and his situation received an entirely humorous coverage: "The attorney . . . was a few days since shot through the suburbs of his 'unmentionables.' Wound said not to be mortal, although a transformation to the neuter gender may be seriously apprehended."[28]

One homicide that did involve concealed deadly weapons, however, was on center stage and involved players who could not be ig-

---

February 12, 1838, 2; "The Grand Jury of Shelby County" (in Kentucky), *AT&A*, February 12, 1838, 2; "Daring Attempt at Murder, Robbery and Arson" (in Missouri, using club and arson), *AT&A*, March 19, 1838, 3.

21. "An affray took place on the public square . . . " (location uncertain), (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2.

22. "Horrible" (location uncertain), (Helena, Ark.) *Constitutional Journal*, November 16, 1837, 2, reprinted as well in the (Little Rock) *Arkansas State Gazette*, November 28, 1837, 3.

23. "Homicide" (weapon not stated), (Little Rock) *Arkansas State Gazette*, October 31, 1837, 2; "Wm. McKinney was shot dead . . . " (in Arkansas), *NDRB*, January 12, 1838, 2.

24. "Unfortunate Occurrence," *AT&A*, March 19, 1838, 2.

25. "More Murders," *AT&A*, March 19, 1838, 2.

26. "A rencounter recently took place . . . ," *AT&A*, October 30, 1837, 2.

27. "Duel," *AT&A*, November 27, 1837, 2; "Duel," "Another Duel," *AT&A*, December 11, 1837, 2; "The Duel," *AT&A*, March 12, 1838, 2.

28. "Glorious Uncertainty of the Law," *AT&A*, February 12, 1838, 2.

nored. Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J. J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.

Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."[29] "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted."[30] While Wilson was expelled from the House on the spot,[31] the killing was ruled excusable by a jury in Wilson's home county causing "the most intense indignation through the entire State."[32]

Local coverage of this shocking crime in the *Arkansas Times & Advocate* was at first quite restrained. After reporting the election of Grandison D. Royston "in the place of John Wilson . . . expelled," the *Arkansas Times & Advocate* next reported on the expulsion. Finally, after admitting that they could have reported it in the pre-

---

29. Pope, *Early Days*, 225; "The Murder in Arkansas," *Niles' National Register* 54:258, June 23, 1838. Oddly enough, the newspapers closest in time and location to this crime gave the least detailed coverage of the struggle. See "General Assembly," *AT&A*, January 22, 1838, 3.

30. Thorp, *Bowie Knife*, 4.

31. Pope, *Early Days*, 225-226. But "General Assembly," (Little Rock) *Arkansas State Gazette*, December 12, 1837, 2, reported the expulsion as taking place two days later.

32. Thorp, *Bowie Knife*, 1-5; Pope, *Early Days*, 226, indicates that Wilson requested trial in his home county, perhaps because of the publicity in Little Rock. A contemporary account from a Georgia paper, however, claimed that Wilson was tried before three judges in Little Rock. See "The trial of John Wilson . . . ," (Milledgeville, Ga.) *Southern Recorder*, March 6, 1838. *Niles' National Register* 54:193, May 26, 1838, also reported that Wilson was indicted in Pulaski County. "The Murder in Arkansas," *Niles' National Register* 54:258, June 23, 1838.

Compendium_Roth
Page 0177