1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and
   Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
| v. | |
| | **VOLUME 5 OF 37** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:  5A |
| | Judge:  Hon. Roger T. Benitez |
| Defendants. | Action Filed:  August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1, 2, 3 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 4, 5, 6, 7 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 8, 9, 10 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 11, 12, 13 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 14, 15, 16 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 17, 18 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 19, 20, 21 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 22, 23, 24 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 25, 26 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 27, 28 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1<br>2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| 3<br>4<br>5<br>6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| 7<br>8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 10<br>11<br>12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13<br>14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15<br>16<br>17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18<br>19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20<br>21<br>22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23<br>24<br>25<br>26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

vious issue, the *Arkansas Times & Advocate* admitted that this "unfortunate and much to be lamented affair took place, which we then thought proper not to make any notice of."[33] The *Arkansas State Gazette*, on the other hand, reported the incident immediately.[34] Arkansas papers more remote from Little Rock devoted an appropriate level of attention to it by calling it, somewhat hyperbolically, an "outrage . . . without a parallel in the annals of the history of our country."[35]

The *Arkansas Times & Advocate* appears not to have been alone in this desire to avoid discussion of this "unfortunate" incident. The official legislative journal's coverage of this event, published in the *Arkansas Times & Advocate* over the next several weeks, at first simply swept it under the rug. The legislative journal for the day of the killing has Representative Anthony presenting his "preamble and resolution, relating to the Real Estate Bank," his last actions before the fight began, and a few lines later, the House agreeing to a bill for the "relief of J. J. Anthony" (presumably a pension for his widow). Anthony's sudden death and Wilson's immediate expulsion were simply left out of that day's journal. Only in the following day's journal was there any mention of Anthony's death and Wilson's expulsion ("for disorderly behaviour").[36] One might conclude from the tone that this was just another only slightly unusual event. Not until January 22, 1838 did a revised version of the journal appear, in which a more accurate account of the day's activities appeared.[37]

It is hard to imagine that this deadly incident did not cause the Arkansas legislature to ban concealed carrying of deadly weapons, but there was simply no coverage of the 1838 Arkansas statute in the Arkansas newspapers. Even the summary of laws passed after

---

33. "Grandison D. Royston . . . ," "On Tuesday last . . . ," "Fatal rencontre!" *AT&A*, December 11, 1837.

34. "The Funeral of Major Joseph J. Anthony . . . ," "Unfortunate and Fatal Rencontre!" (Little Rock) *Arkansas State Gazette*, December 5, 1837, 2.

35. "Melancholy," (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2.

36. "General Assembly," *AT&A*, December 18, 1837, 2. The relief act was apparently backdated to before Representative Anthony's murder. See "An Act for the Relief of J.J. Anthony," *AT&A*, March 26, 1838, 1.

37. "General Assembly," *AT&A*, January 22, 1838, 2-3.

the session ended did not list it.[38] Why was there no discussion of this new law? Perhaps because it was not truly new.

The first session of the Arkansas legislature directed the governor to appoint two lawyers to "revise and arrange the statute laws of this State, and prepare such a code of civil and criminal laws as, in their opinion, may be necessary for the government of this State, in accordance with the constitution. . . ."[39] The editor of the published edition of these laws explained that, "in no State was ever such a revision more imperatively called for, more needful for the common weal." The laws in effect in Arkansas when it became a state were a mixture of statutes passed by the legislatures of Missouri, Arkansas, and Louisiana Territories, as well as laws "enacted . . . by the governor and judges of Arkansas territory." The result, according to the editor, "resembled some of those old baronial castles, still extant in England, where the Gothic mingles with the Corinthian, the Doric with the Chinese style of architecture, as different ages have added different portions to the heterogeneous structure."[40]

These revised laws were presented to the Arkansas legislature in October 1837, and examined piecemeal by various committees, which amended them "as seemed proper."[41] The adoption of these bills was apparently uncontroversial, with one newspaper commenting that "those that have passed, met with but little amendment."[42] It is entirely possible that Arkansas's concealed weapon law was not new, and therefore uncontroversial. If so, this tells us something of how seriously the law was taken, in that at least two members of the Arkansas legislature were violating it on that fateful day that Speaker of the House Wilson took offense at Representative Anthony's insult.

The 1838 Arkansas statute was upheld in an 1842 Arkansas Supreme Court decision that equated self-defense with revenge and implied there was no right to self-defense. It is also the only antebellum decision that denied that the "right of the people" was an in-

---

38. "List of Acts," *AT&A*, March 12, 1838, 3.

39. *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan and Co., 1838), v.

40. *Revised Statutes of the State of Arkansas*, vi.

41. *Revised Statutes of the State of Arkansas*, v-vi.

42. "The Legislature," (Little Rock) *Arkansas State Gazette*, November 28, 1837, 2.

dividual right to *carry* arms, though it recognized individuals had a right to *keep* arms.[43]

Most of the concealed weapon laws adopted in the period 1837-1839 were passed in the few weeks following this bloody and very publicized incident. It would be tempting to assume that the killing in the Arkansas statehouse had some significant influence on these laws that passed like falling dominoes in the weeks after this event. Oddly enough, if this killing had any influence on other states, it was relatively little, or at least left little evidence. Georgia's law, passed twenty-one days after this incident, does not appear to have been influenced at all. The first newspaper accounts of this bloody event did not appear in Georgia newspapers until January, 1838,[44] after the Georgia statute was signed into law. The first reference in Nashville's *Daily Republican Banner* was on December 21, 1837,[45] after the Tennessee Senate had already passed the Bowie knife bill. At most, it might have influenced the Tennessee House, but there are no further references to the Arkansas statehouse killing in the *Daily Republican Banner* before the new law was passed. Virginia and Alabama's laws prohibiting concealed carry could have been influenced by this exercise in rude lawmaking, but as will be seen in later chapters, the newspaper record for these states is unavailable.

Unfortunately, we do not have enough information to draw any conclusions about why Arkansas passed its concealed weapon law. There is nothing in the evidence that would argue against high rates of violence as a proximate cause of the law. While Arkansas could certainly fit into the "dueling oaths lead to assassination" model that fits some of the other states, there is also no evidence that confirms it.

---

43. *State* v. *Buzzard*, 4 Ark. 18, 22 (1842). The majority opinion on the nature of the right, and equating self-defense with revenge, was not followed by any other courts in the nineteenth century. See Cramer, *For the Defense of Themselves and the State* for an examination of American jurisprudence on this subject.

44. "The Tragedy in Arkansas," (Milledgeville) *Georgia Journal*, January 9, 1838, 3; "A Tragedy in the Arkansas Legislature," *Macon* (Ga.) *Telegraph*, January 15, 1838, 3; "The Tragedy in Arkansas," (Milledgeville, Ga.) *Southern Recorder*, January 16, 1838, 3. Milledgeville was the capital of Georgia during this period.

45. "A Tragedy in the Arkansas Legislature," *NDRB*, December 21, 1837, 3.

Compendium_Roth
Page 0179

# Appendix A

# Text of the Laws

Concealed weapon statutes adopted before 1846, in chronological sequence.

## KENTUCKY (1813)

CHAP. LXXXIX.

*AN ACT to prevent persons in this Commonwealth from wearing concealed Arms, except in certain cases.*

Approved, February 3, 1813.

Sec. 1. *BE it enacted by the general assembly of the commonwealth of Kentucky,* That any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on the presentment of a grand jury — and a prosecutor in such presentment shall not be necessary. One half of such fine shall be to the use of the informer, and the other to the use of the commonwealth.

144

This act shall commence and be in force, from and after the first day of June.[1]

## LOUISIANA (1813)

### AN ACT

Against carrying concealed weapons, and going armed in public places in an unnecessary manner.

Preamble. Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

Sect. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened*, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dollars nor less than twenty dollars, one half to the use of the state, and the balance to the informer, and should any person be convicted of being guilty of a second offence before any court of competent jurisdiction, shall pay a fine of not less than one hundred dollars to be applied as aforesaid, and be imprisoned for a time not exceeding six months.

Sect. 2. *And be it further enacted*, That should any person stab or shoot, or in any way disable another by such concealed weapons, or should take the life of any person, shall on conviction before any competent court suffer death, or

---

1. *Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky* (Frankfort: Gerard & Berry, 1813), 100-101.

such other punishment as in the opinion of a jury shall be just.

Sect. 3. *And be it further enacted*, That when any officer has good reason to believe that any person or persons have weapons concealed about them, for the purpose of committing murder, or in any other way armed in such a concealed manner, on proof thereof being made to any justice of the peace, by the oath of one or more credible witnesses, it shall be the duty of such judge and justice to issue a warrant against such offender and have him searched, and should he be found with such weapons, to fine him in any sum not exceeding fifty dollars nor less than twenty dollars, and to bind over to keep the peace of the state, with such security as may appear necessary for one year; and on such offender failing to give good and sufficient security as aforesaid; the said justice of the peace shall be authorized to commit said offender to prison for any time not exceeding twenty days.[2]

## INDIANA (1820)

### CHAPTER XXIII.

*AN ACT to prohibit the wearing of concealed weapons.*

Approved, January 14, 1820.

Sec. 1. *BE it enacted by the General Assembly of the State of Indiana*, That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: *Provided however*, that this act shall not be so construed as to affect travellers.[3]

## INDIANA (1831)

Sec. 58. That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other

---

2. *Acts Passed at the Second Session of the First Legislature of the State of Louisiana* (New Orleans: Baird and Wagner, 1813), 172-175.
3. *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville: Isaac Cox, 1820), 39.

dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars.[4]

## ALABAMA (1837)

### AN ACT

### To suppress the use of Bowie Knives.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person carrying any knife or weapon, known as Bowie Knives or Arkansas Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [*sic*] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

Sec. 2. *And be it further enacted,* That for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

Approved June 30, 1837.[5]

## GEORGIA (1837)

AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Georgia, in General Assembly met,*

---

4. *Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

5. *Acts Passed at the Called Session of the General Assembly of the State of Alabama* (Tuscaloosa: Ferguson & Eaton, 1837), chap. 11, 7.

*and it is hereby enacted by the authority of the same.* That from and after the passage of this act, it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols, &c.

Sec. 2. *And be it further enacted by the authority aforesaid,* That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

Sec. 3. *And be it further enacted by the authority aforesaid,* That is shall be the duty of all civil officers, to be vigilent [*sic*] in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

Sec. 4. *And be it further enacted by the authority aforesaid,* That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: *Provided, nevertheless*, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: *Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: *And provided, nevertheless*, that

Compendium_Roth
Page 0182

the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

Sec. 5. *And be it further enacted by the authority aforesaid,* That all laws and parts of laws militating against this act, be, and the same are, hereby repealed.[6]

## TENNESSEE (1838)

### CHAPTER CXXXVII.

An Act to suppress the sale and use of Bowie Knives and Arkansas Tooth Picks in this State.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick, such merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons for every such Bowie knife or knives, or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick so sold, given or otherwise disposed of, shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a person not less than one month nor more than six months.

Sec. 2. That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum

---

6. *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837* (Milledgeville: P. L. Robinson, 1838), 90-91.

not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

Sec. 3. That if any person shall maliciously draw or attempt to draw any Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick, from under his clothes or from any place of concealment about his person, for the purpose of sticking, cutting, awing, or intimidating any other person, such person so drawing or attempting to draw, shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State for a period of time not less than three years, nor more than five years.

Sec. 4. That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State, for a period of time not less than three years, nor more than fifteen years.

Sec. 5. That this act shall be in force from and after the first day of March next. And it shall be the duty of the several judges of the circuit courts in this State to give the same in charge to the grand jury every term of the respective courts, and any civil officer who shall arrest and prosecute to conviction and punishment any person guilty of any of the offences enumerated in this act, shall be entitled to the sum of fifty dollars, to be taxed in the bill of costs, and the attorney general shall be entitled to a tax fee of twenty dollars in each case, when a defendant shall be convicted, and no prosecutor required on any presentment or indictment for any of the offences enumerated in this act.[7]

---

7. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8* (Nashville: S, Nye & Co., 1838), 200-201.

## ARKANSAS (1838)

Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.[8]

## VIRGINIA (1838)

Chap. 101.—An ACT to prevent the carrying of concealed weapons.

[Passed February 2, 1838.]

1. *Be it enacted by the general assembly.* That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offence forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and for each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

2. *And be it further enacted,* That if any person shall hereafter be examined in any county or corporation court upon a charge of murder or felony, perpetrated by shooting, stabbing, maiming, cutting or wounding, and it shall appear that the offence charged was in fact committed by any such weapon as is above mentioned, and that the same was hidden or concealed from or kept out of the view of the person against whom it was used, until within the space of one half hour next preceding the commission of the act, or the infliction of the wound, which shall be charged to have caused the death, or constituted the felony, it shall be the duty of the examining court to state that the fact did so appear from the evidence; and if the court shall discharge or acquit the accused, such discharge or acquittal shall be no bar to an indictment for the same offence in the superior court having jurisdiction thereof, provided the same be found within one year thereafter. And whether the accused shall be by such court sent on for further trial or discharged, it shall be lawful to charge in the indictment that the offence was committed in any of the modes herein before described; and upon the trial it shall be the duty of the jury (if they find the accused not guilty of the murder or felony) to find also whether the act charged was in fact committed by the accused, though not feloniously, and whether the same was committed or done with or by means of any pistol, dirk, bowie knife, or other dangerous weapon, which was concealed from or kept out of the view of the person on or against whom it was used, for the space before mentioned, next preceding such use thereof; and if the jury find that the act was so committed, they shall assess a fine against the accused, and it shall be lawful for the court to pronounce judgment as in cases of misdemeanor.

3. This act shall be in force from and after the first day of June next.[9]

## ALABAMA (1839)

AN ACT

To suppress the evil practice of carrying weapons secretly.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw [sic] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent ju-

---

8. *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan and Co., 1838), Div. VIII, Art. I, § 13, p. 280.

9. *Acts of the General Assembly of Virginia, Passed at the Session of 1838* (Richmond: Thomas Ritchie, 1838), 76-77.

Compendium_Roth
Page 0184

152    APPENDIX A

risdiction, pay a fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

Sec. 2. *And be it further enacted*, That it shall be the duty of the Judges of the several Circuit Courts of this State to give this act specially in charge of the Grand Juries, at the commencement of each term of said Courts.

Sec. 3. *And be it further enacted*, That the Secretary of State shall cause this act to be published for three months in the papers of Mobile, Montgomery, Tuscumbia, Huntsville, Wetumpka and Tuscaloosa, which publishers shall be paid out of any money in the Treasury not otherwise appropriated.

Approved Feb. 1, 1839.[10]

---

10. *Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.

Compendium_Roth
Page 0185

# FOR THE DEFENSE OF THEMSELVES AND THE STATE

*The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*

Clayton E. Cramer

Foreword by Preston K. Covey

PRAEGER

Westport, Connecticut
London