ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
| v. | **VOLUME 6 OF 37** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom: 5A<br>Judge: Hon. Roger T. Benitez |
| Defendants. | Action Filed: August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1 2 3 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 4 5 6 7 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 8 9 10 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 11 12 13 14 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 15 16 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 17 18 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 19 20 21 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 22 23 24 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 25 26 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 27 28 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1<br>2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| 3<br>4<br>5<br>6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| 7<br>8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 10<br>11<br>12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13<br>14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15<br>16<br>17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18<br>19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20<br>21<br>22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23<br>24<br>25<br>26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | | |
|---|---|---|---|
| 1 2 3 | Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| 4 5 | Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| 6 7 8 | Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| 9 | Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| 10 11 12 | Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| 13 14 | Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| 15 16 17 | Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| 18 19 20 | **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| 21 22 23 | Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| 24 25 | Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| 26 27 28 | U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

MAIN

KF3941
C73
1994
MAIN

Library of Congress Cataloging-in-Publication Data

Cramer, Clayton E.
    For the defense of themselves and the state : the original intent
and judicial interpretation of the right to keep and bear arms /
Clayton E. Cramer ; foreword, Preston K. Covey.
      p.    cm.
    Includes bibliographical references and index.
    ISBN 0–275–94913–3 (alk. paper)
    1.  Firearms—Law and legislation—United States—History.
2.  United States—Constitutional law—Amendments—2nd—
Interpretation and construction.    I.  Title.
KF3941.C73    1994
344.73′0533—dc20
[347.304533]          94–13728

British Library Cataloguing in Publication Data is available.

Copyright © 1994 by Clayton E. Cramer

All rights reserved. No portion of this book may be
reproduced, by any process or technique, without the
express written consent of the publisher.

Library of Congress Catalog Card Number: 94–13728
ISBN: 0–275–94913–3

First published in 1994

Praeger Publishers, 88 Post Road West, Westport, CT 06881
An imprint of Greenwood Publishing Group, Inc.

Printed in the United States of America



The paper used in this book complies with the
Permanent Paper Standard issued by the National
Information Standards Organization (Z39.48–1984).

10 9 8 7 6 5 4 3 2 1

## Contents

Foreword .................................................................................................. vii

Preface ..................................................................................................... xiii

Acknowledgments .................................................................................. xvii

   I. Definitions ........................................................................................ 1

  II. European Origins ............................................................................ 19

 III. The Legislative History of the Second Amendment .................... 31

 IV. Problems of Judicial Interpretation ............................................... 63

   V. "To Keep and Carry Arms Wherever They Went" ...................... 69

 VI. "No Negro... Shall Be Allowed to Carry Fire-Arms" ................. 97

VII. "Carrying Concealed Weapons Is a Grievous Evil" .................. 141

VIII. "A Proper Reason for Carrying a Pistol" .................................. 165

 IX. Civil Rights, Civil Disturbances .................................................. 197

   X. The Right Comes Out of Its Coma? ............................................ 221

 XI. At the Crossroads ......................................................................... 269

      Selected Bibliography .................................................................. 275

      Index ............................................................................................... 281

> William Simpson, laborer, on the first day of April,... 1833, with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land, to the evil example of all others in the like case offending, and against the peace and dignity of the state.[11]

Simpson was convicted, and fined $20. On appeal, the Tennessee Supreme Court concluded that the indictment leading to conviction was defective, because the crime of making an "affray" requires:

> First. There must be fighting. Second. This fighting must be by or between two or more persons. And, Third. It must be in some public place to cause terror to the people. Hence it must follow, that if either of these requisites are wanting, to wit, fighting or actual violence, and the number of persons necessary for the constitution of it.[12]

After discussing Edward III's Statute of Northampton (1328) that prohibited the carrying of "dangerous and unusual arms," and Hawkins' interpretation of it as not prohibiting completely the carrying of arms, the Court went on to point out its inapplicability to this case:

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence." Article 11, sec. 26. It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous and unusual weapons," as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment. By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived, that it would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared; neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby; we must attribute to the framers of it the absence of such a view.[13]

The judgment against Simpson was reversed.

Justice Peck, in a dissenting opinion, was unwilling to reverse the judgement, but his reasoning similarly supports the majority opinion with respect to the applicability of the statute of Edward III and the carrying of arms:

> One can commit an affray, as by arming himself, rushing into a public place and threatening to kill. Though the words do not make the affray, yet the acts coupled with them will, if fear ensue, amount to an affray... It is not true, as supposed, that to constitute an affray there must be a fighting of two in a public place. An assault by one in a public place will be an affray, though if in a private place, the same act would amount to nothing more than an assault.[14]

*None* of the justices on either side of this decision were prepared to hold the bearing of arms *by itself* as a violation of either common law or the Statute of Northampton, and the majority recognized Tennessee's "for the common defence"

---

[11] *Simpson* v. *State*, 5 Yerg. 356, 357 (Tenn. 1833).
[12] *Simpson* v. *State*, 5 Yerg. 356, 358 (Tenn. 1833).
[13] *Simpson* v. *State*, 5 Yerg. 356, 359, 360 (Tenn. 1833).
[14] *Simpson* v. *State*, 5 Yerg. 356, 363 (Tenn. 1833).

Compendium_Roth
Page 0188

Constitutional provision as protecting an individual right to carry such arms. Since the justices were concerned with the carrying of arms in such a manner as would induce "terror to the people," it is hard to see how they could have justified a law that prohibited concealed carry. Arms that could not be seen could hardly produce terror.

But something interesting happened in 1834, the year after the *Simpson* decision—the Tennessee state constitution was revised. Article 11, §26, adopted in 1796, had originally said: "That the freemen of this State have a right to keep and to bear arms for their common defence." The 1834 revisions changed this section to: "That the free *white* men of this State have a right to keep and to bear arms for their common defence."[15] [emphasis added]

In 1833, it guaranteed the right to all "freemen," regardless of race. Did the *Simpson* v. *State* (1833) provision cause the 1834 revision to the Tennessee Constitution? Was Simpson a free black? Or did the awareness of the potential that free blacks could carry arms provoke the change?

There is another, more likely explanation for the Tennessee constitutional change, and the increasingly ambivalent attitude about the right to carry arms during this period in the South. Nat Turner's rebellion, in August 1831 had provoked great fear in the South:

> Despite the fact that after 1831 no more slave insurrections were seen in the South, it was precisely then that the South became most victimized by its own fears, being "racked at intervals," as Clement Easton writes, "by dark rumors and imagined plots." These periodic upheavals over suspected revolts—characterized by furious vigilante hunts and wild confusion, all based on mirage—constitute one of the more bizarre chapters in Southern history.[16]

and:

> Under the antebellum color-caste system, the status of free Negroes in Tennessee steadily deteriorated. The state legislature, in 1831, barred the immigration of free blacks into the state.... The constitutional convention of 1834 produced a further restriction by withdrawing the legal right to vote which free blacks previously had held in Tennessee.[17]

It appears that concern about the dangers of armed free blacks providing arms to slaves was already on the rise, even before Turner's particularly bloody uprising. Florida had enacted a license procedure for carrying of firearms by free blacks in 1828, but repealed it in February of 1831, disarming free blacks in public. It may be, however, that Turner's rebellion hastened a process already under way, for Maryland and Virginia both passed prohibitions of free blacks carrying arms in December 1831 and Georgia completely prohibited black possession of firearms in 1833. Similarly, Florida authorized "white citizen patrols to seize arms found in the homes of slaves and free blacks…" However, the statute provided at least the possibility that a good reason might prevent punishment.[18]

---

15 Thorpe, 6:3424, 6:3428.
16 Stanley M. Elkins, *Slavery*, (Chicago: University of Chicago Press, 1968), 209, 220.
17 Joseph H. Cartwright, *The Triumph of Jim Crow*, (Knoxville, Tenn.: University of Tennessee Press, 1976), 4.
18 Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward An Afro-Americanist Reconsideration", in *Georgetown Law Journal*, 80:2 [December 1991], 337-8.

The next decision by the Tennessee Supreme Court was considerably different: *Aymette* v. *State* (1840). This is one of those cases with far-reaching impact, principally because it so narrowly defined the right to keep and bear arms. It was cited repeatedly during the nineteenth century as courts looked for precedents to uphold restrictions on the carrying of arms.

In 1837, the Tennessee Legislature had prohibited the carrying of concealed Bowie knifes; interestingly enough, no other weapons were similarly restricted. William Aymette, on June 26, 1839, at Pulaski, in Giles County,

> had fallen out with one Hamilton, and that about ten o'clock, p.m., he went in search of him to a hotel, swearing he would have his heart's blood. He had a bowie-knife concealed under his vest and suspended to the waistband of his breeches, which he took out occasionally and brandished in his hand. He was put out of the hotel, and proceeded from place to place in search of Hamilton, and occasionally exhibited his knife.

The jury, under the charge of the court, returned a verdict of guilty.

Aymette was fined $200, a stiff fine in 1840. On appeal, Aymette argued that the law was unconstitutional, based on article 11, §26 of the Tennessee Constitution. The Tennessee Supreme Court pointed to the laws of Charles II, prohibiting arms to those who had "not lands of the yearly value of £100," and argued that the English Bill of Rights (1689) protection of the right to arms:

> *does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws.* This declaration of right is made in reference to the fact before complained of, that the people had been disarmed, and soldiers quartered among them contrary to law. The complaint was against the government. The grievances to which they were thus forced to submit were for the most part of a public character, and could have been redressed only by the people rising up for their common defence, to vindicate their rights.

> The section under consideration, in our bill of rights, was adopted in reference to these historical facts, and in this point of view the language is most appropriate and expressive. Its words are, "the free white men of this state have a right to keep and bear arms for their common defence." It, to be sure, asserts the right much more broadly than the statute of 1 William & Mary. For the right there asserted is subject to the disabilities contained in the act of Charles II. There, lords and esquires, and their sons, and persons whose yearly income from land amount to £100, were of suitable condition to keep arms. But, with us, every free white man is of suitable condition, and, therefore, every free white man may keep and bear arms. But to keep and bear arms for what? If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove that doubt. It is declared that they may keep and bear arms for their common defence... The object, then, for which the right of keeping and bearing arms is secured is the defence of the public. *The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution.*[19] [emphasis added]

The right to possess military arms as tools of revolution and resistance were guaranteed not simply to organized militias, but to individual free white men:

> The words "bear arms," too, have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured is of a general and public nature, to be exercised by the people in a body, for their common defence, so the arms the right to keep which is secured are such as are usually employed in civilized warfare, and that constitute the

---

19 *Aymette* v. *State*, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840).

Compendium_Roth
Page 0189

not only upon constitutional grounds, but upon the immutable principles of natural and equal justice, that all men have a right to, and which to deprive them of amounts to tyranny and oppression. Can it be doubted, that if the Legislature, in moments of high political excitement or of revolution, were to pass an act disarming the whole population of the State, that such an act would be utterly void, not only because it violated the spirit and tenor of the Constitution, but because it invaded the original rights of natural justice?[37]

Lacy also illustrated how the same reasoning used to justify laws prohibiting concealed carry could be extended in equally absurd ways to deprive the people of other rights protected by the Federal and state constitutions:

> The people are secured in their persons, houses, papers, and effects, against unwarrantable searches and seizures; but on probable cause, supported by oath and affirmation. Now, if the Legislature possess the power claimed for it, it surely has the means of carrying it into effect. Can it, directly or indirectly, invade the sanctuaries of private life and of personal security, by authorizing a public inquisition to search for either open or concealed weapons? Besides, private property cannot be taken for public uses, without due compensation being first made according to law. A man's arms are his private property: how, then, can he be legally deprived of them? If they can forbid him, under the penalty of fine and imprisonment, to keep them concealed or exposed about his person, or on his own premises, although their unrestrained use may be necessary for all the purposes of his ordinary business and of personal defence, then certainly the right of keeping and bearing arms according to his own discretion, is infringed and violated, and his own free will in the management of this property abridged and destroyed.

Lacy pointed out a potential inequity from such an approach to this right:

> [S]uppose a citizen of the State were indicted upon a charge of murder, and he could make out a clear case of justifiable homicide, the laws of nature, upon which the laws of society are presumed to be based, instead of punishing, commends for the act; of course, he stands acquitted of all blame; but, on the trial, the evidence shows that he was compelled to take life with a concealed weapon, and the State thinks proper to indict him for this new offence, which is forbidden by an act of the Legislature; and the proof being clear upon the point, of course he may be convicted and rendered infamous for life. What then becomes of the right of self-defence? Is it not swept away from him by legislative discretion, and the doctrine of self-preservation destroyed, which nature has implanted in the breast of every living creature, and which no laws, either human or divine, can abrogate or annul?[38]

The majority opinion in the *Buzzard* decision is by far the most extreme statement in opposition to an individual right to keep and bear arms in the period before the Civil War. It not only is contrary to the liberal view of the right to arms, but it also lacks the republican understanding that arms, to be effective in defense of public liberty, required widespread possession among the people.

The following year, the *State* v. *Huntly* (1843) decision was handed down by the North Carolina Supreme Court. The North Carolina Supreme Court's decision far more accurately describes both the republican and liberal schools of the Second Amendment. A Robert Huntly was convicted of, "The offence of riding or going armed with unusual and dangerous weapons to the terror of the people… an offence at common law…."

---

37 *State* v. *Buzzard*, 4 Ark. 18, 36, 37 (1842).
38 *State* v. *Buzzard*, 4 Ark. 18, 37, 38, 39 (1842).

While Huntly's attorney tried to claim that North Carolina's constitutional protection of the right to "bear arms for the defence of the State" overrode the Statute of Northampton (1328), the North Carolina Supreme Court did not agree:

> While it secures to him a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised. If he employ those arms, which he ought to wield for the safety and protection of his country, to the annoyance and terror and danger of its citizens, he deserves but the severer condemnation for the abuse of the high privilege, with which he has been invested.

While acknowledging that the provision of the North Carolina Constitution was, as the text suggests, "for the defence of the State," this decision also recognized that an *individual* right was created by it.

For its justification of the conviction, the Court pointed to *Sir John Knight's case* in Hawkins' *Treatises of the Pleas of the Crown* to demonstrate that being armed for the purpose of terrorizing people was a violation of the common law, and that the Statute of Northampton merely codified and provided "only special penalties and modes of proceeding for its more effectual suppression." More important, North Carolina had specifically renounced the statutory law of England and Great Britain on January 1, 1838.

While agreeing that the actions for which Huntly was convicted were a violation of the common law, the North Carolina Supreme Court also held that:

> it is to be remembered that the carrying of a gun *per se* constitutes no offence. *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime.* He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people. [emphasis added]

The North Carolina Supreme Court acknowledged that the gun in question "a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort."[39]

At no point did the North Carolina Supreme Court address the issue of concealed carry of arms. In light of their agreement with the common law prohibition on carrying weapons "to terrify and alarm," it might well be argued that concealed carry of arms was therefore more socially responsible.

The following year, the North Carolina Supreme Court made a decision whose full significance would not appear until after the Civil War and passage of the Fourteenth Amendment. An 1840 statute provided:

> That if any free negro, mulatto, or free person of color, shall wear or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger or bowie-knife, unless he or she shall have obtained a licence therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying therefor, he or she shall be guilty of a misdemeanor, and may be indicted therefor.

Elijah Newsom, "a free person of color," was indicted for carrying a shotgun without a license, in Cumberland County in June of 1843—at the very time the

---

39 *State* v. *Huntly*, 3 Iredell 418, 420, 421, 422, 423 (N.C. 1843). This case has been frequently miscited as *State* v. *Huntley*, perhaps because the name is spelled both ways in the decision.