1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
7   Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and
   Blake Graham, in their official capacities*
9

10             IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                        CIVIL DIVISION

13

14  **JAMES MILLER et al.,**  | Case No. 3:19-cv-01537-BEN-JLB

15                Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**

16       v.

17                            | **VOLUME 7 OF 37**

18  **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom:  5A
                                                       Judge:      Hon. Roger T. Benitez
19
20                Defendants. | Action Filed:  August 15, 2019

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 2 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 3 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 4 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 5 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 6 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 7 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 8 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 9 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 10 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1<br>2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| 3<br>4<br>5<br>6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| 7<br>8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 10<br>11<br>12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13<br>14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15<br>16<br>17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18<br>19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20<br>21<br>22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23<br>24<br>25<br>26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:19-cv-01537-BEN-JLB)

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | | |
|---|---|---|---|
| 1 2 3 | Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| 4 5 | Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| 6 7 8 | Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| 9 | Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| 10 11 12 | Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| 13 14 | Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| 15 16 17 | Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| 18 19 20 | **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| 21 22 23 | Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| 24 25 | Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| 26 27 28 | U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield*, Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

North Carolina Supreme Court was deciding *Huntly*. Newsom was convicted by a jury; but "on motion of the defendant's counsel, the court arrested the judgement, and the Solicitor for the State appealed to the Supreme Court." Newsom's attorney argued that the statute requiring free blacks to obtain a license to "keep and bear arms" was "unconstitutional, being in violation of the 2d article of the amended constitution of the United States, and also of the 3d and 17th articles of the Bill of Rights of this State."

The North Carolina Supreme Court quickly disposed of the first claim, that the Second Amendment was a limitation on state laws: "It is therefore only restrictive of the powers of the Federal Government." The North Carolina Supreme Court then cited *Barron* v. *Baltimore* (1833) (though it was miscited as "*Barrow* v. *Baltimore*"), to buttress that position.

Next, the North Carolina Supreme Court tackled the state constitutional guarantees, which had been used in *State* v. *Huntly* (1843), the year before. The "3d article" referred to by Newsom's counsel, prohibited "the granting of exclusive privileges or separate emoluments." The North Carolina Supreme Court acknowledged that the 1840 statute imposed a restriction on free blacks, "from which the white men of the country are exempt." The Court then asked if racially discriminatory legislation was therefore unconstitutional, and gave the answer:

> If so, then is the whole of our legislation upon the subject of free negroes void. From the earliest period of our history, free people of color have been among us, as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation.[40]

What followed was a long list of laws that affected free blacks only, dating from 1777. The Court held that since society had long acquiesced in such distinctions, from the time that the North Carolina Constitution was written, therefore the third article was not intended as a guarantee against racially discriminatory laws.[41]

The 17th article of the 1776 North Carolina Constitution declared:

> That the people have a right to bear arms, for the defence of the State; and, as standing armies, in time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power.[42]

The Court now addressed this constitutional protection, but in language subtly different from that used in *Huntly*: "We cannot see that the act of 1840 is in conflict with it... The defendant is not indicted for carrying arms in defence of the State, nor does the act of 1840 prohibit him from so doing."[43] But as seen in *Huntly*, the Court had acknowledged that the restrictive language "for the defence of the State" did not preclude an individual right.[44] The Court then attempted to justify the necessity of this law:

> Its only object is to preserve the peace and safety of the community from being disturbed by an indiscriminate use, on ordinary occasions, by free men of color, of fire arms or other arms of an offensive character. Self preservation is the first law of nations, as it is of individuals. And, while we acknowledge the solemn obligations to obey the constitu-

---

40 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 251, 252 (1844).
41 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 252, 253 (1844).
42 Thorpe, 5:2788.
43 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 254 (1844).
44 *State* v. *Huntly*, 3 Iredell 418, 422 (N.C. 1843).

---

tion, as well in spirit as in letter, we at the same time hold, that nothing should be interpolated into that instrument, which the people did not will. We are not at liberty to give an artificial and constrained interpretation to the language used, beyond its ordinary, popular and obvious meaning. Before, and at the time our constitution was framed, there was among us this class of people, and they were subjected to various disabilities, from which the white population was exempt. It is impossible to suppose, that the framers of the Bill of Rights did not have an eye to the existing state of things, and did not act with a full knowledge of the mixed population, for whom they were legislating. They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require.[45]

The North Carolina Supreme Court also sought to repudiate the idea that free blacks were protected by the Bill of Rights by pointing out that the Constitution excluded free blacks from voting, and therefore free blacks were not citizens. Of course, article 17, unlike some other, more careful state arms provisions,[46] did not limit the right to bear arms to just *citizens*, but to *people*—and try as hard as they might, it would be difficult to argue that a "free person of color," in the words of the Court, was not one of "the people."

The North Carolina Supreme Court assumed that the framers of the North Carolina Constitution did not consider free blacks as being within the protections of the North Carolina Bill of Rights. Even at the first census in 1790, there were already 5,041 free blacks in North Carolina.[47] The other possibility—not considered by the Court—is that the framers of the North Carolina Constitution did not consider armed free blacks a worrisome matter.

To this point, all of these decisions have been based on the various state constitutional protections; none relied directly on the Second Amendment as the basis to overturn a law. But that changed with *Nunn* v. *State* (1846), when the Georgia Supreme Court became the first state supreme court to recognize the Second Amendment as a limitation on the states.

Georgia had passed a law in 1837 which prohibited the sale of "Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols..."[48] Other language contained in the statute strongly suggests that the intent was to stop the sale of concealable deadly weapons, and to prohibit the carrying of small handguns. The Georgia Supreme Court overturned this law as violative of the Georgia Constitution and the Second Amendment of the U.S. Constitution:

> The language of the *second* amendment is broad enough to embrace both Federal and State governments—nor is there anything in its terms which restricts its meaning... Is this a right reserved to the *States* or to *themselves*? Is it not an unalienable right, which lies at the bottom of every free government? We do not believe that, because the people withheld this arbitrary power of disenfranchisement from Congress, they ever intended

---

45 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 254 (1844).
46 Early constitutions limiting the right to bear arms to citizens: Connecticut (1818), Kentucky (1792 & 1799), Maine (1819), Mississippi (1817), Pennsylvania (1790)—but not the 1776 Pennsylvania Constitution, Republic of Texas (1838), State of Texas (1845).
47 Bureau of the Census, *Negro Population in the United States 1790-1915*, (Washington: Government Printing Office, 1918; reprinted New York: Arno Press, 1968), 57.
48 *Nunn* v. *State*, 1 Ga. 243, 246 (1846).

to confer it on the local legislatures. This right is too dear to be confided to a republican legislature.

It is commonly assumed that the doctrine of incorporation is a twentieth century interpretation of the Fourteenth Amendment; but here in *Nunn*, we are told, in relation to the Federal Bill of Rights:

> Questions under some of these amendments, it is true, can only arise under the laws and Constitution of the United States. But there are other provisions in them, which were never intended to be thus restricted, but were designed for the benefit of every citizen of the Union in all courts, and in all places; and the people of the several States, in ratifying them in their respective State conventions, have virtually adopted them as beacon-lights to guide and control the action of their own legislatures, as well as that of Congress.[49]

While the Fourteenth Amendment and the doctrine of incorporation caused some Southern state legislatures to recognize that the Second Amendment was a limitation on state power in the years immediately after the Civil War,[50] the Georgia Supreme Court in this decision recognized the Second Amendment as a restriction on the states well before the Civil War and the passage of the Fourteenth Amendment—even though the U.S. Supreme Court refused to recognize *any* of the Bill of Rights as limitations on state power. Nor was this interpretation of the Second Amendment's protection against both federal and state laws unique. William Rawle's *A View of the Constitution* (1829) also considered the Second Amendment to be a limitation on both federal and state power.

The breadth of members of the class with an individual right to bear weapons (albeit, for an ultimately collective purpose), in the Georgia Supreme Court's understanding, was extraordinary:

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree; and all of this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right*, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, reestablished by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own *Magna Charta!* And Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans, plead eloquently for this interpretation! [emphasis in the original]

Finally, after this paean to liberty—in a state where much of the population remained enslaved, forbidden by law to possess arms of any sort—the Court defined the valid limits of laws restricting the bearing of arms:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[51] [emphasis in the original]

---

49 *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).
50 Halbrook, *That Every Man Be Armed*, 124-35.
51 *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).

Compendium_Roth
Page 0192

both white abolitionists and free black citizens. In the South, vigilantes suppressed all opposition to slavery...[81]

The problem of mob violence directed against abolitionists was sufficiently widespread during the 1830s, when the concealed weapons laws became increasingly common in the South, that President Martin Van Buren's Inaugural Address, delivered in March of 1837, addressed the problem twice.[82]

In the South, where slaveholders were overwhelmingly in control, laws to protect attacking mobs from the "unfair advantage" of abolitionists carrying concealed weapons would not be surprising. In the same church where William Lincoln had so poorly guessed the race of the men entering the church, he preached a sermon on the evils of slavery:

> As he spoke, Lincoln noticed that the attention of the congregation had been drawn to his side. "I turned and saw the sheriff & a deputy pointing 2 pistols at the pulpit & I said 'Ye seek to kill me, a man that hath told you the truth'..."

Indeed, before Lincoln left that valley, he narrowly missed being shot to death.

In the Northern states, where slaveholders had little direct influence on state governments, the need to keep abolitionists in fear might have been less obvious. One celebrated example of the abolitionist use of arms in the North is the Oberlin rescue of runaway slave John Price in September 1858. The slavecatchers and U.S. marshals were besieged by hundreds of armed abolitionists, black and white, thus effecting the non-violent release of Price.[83] The connection between arms ownership and revolution was expressed during the trial of the Oberlin Rescuers in a letter to the *Portage County Democrat*, "We must no longer submit to the despotism of the Federal government. Our wrongs we must right if we can through the Ballot Box, and if this fail us, through the Cartridge Box."[84]

The most obvious connection to prohibition of concealed carry of arms in the South is that most of these laws were adopted in the years immediately following Nat Turner's 1831 rebellion. While free blacks were banned from carrying weapons (openly or concealed) in statutes different from those that banned concealed carry, the curious grouping in geography and time of these laws suggests that fear of slave revolt, or of armed abolitionists, or both, provoked these laws. A detailed history of each state's concealed weapons statutes is beyond the scope of this work, but is necessary to resolve the question of why these laws appeared almost exclusively in slave states during the antebellum period.

## VI. "NO NEGRO... SHALL BE ALLOWED TO CARRY FIRE-ARMS"

After the Civil War, the modern understanding of the right to bear arms began to take shape, almost entirely in the former states of the Confederacy, and the border states where slavery had existed before the war—and this understanding accepted new, more restrictive laws on the open carry of arms. At least part of the impetus for these laws was related to the newly freed slaves.

At the end of the Civil War, the newly restored Southern legislatures adopted a series of laws known as the Black Codes; the purpose of these laws was to create restrictions on free blacks that would maintain the dominant position of Southern whites. Many of these restrictions were aimed at reducing the freedmen to a position of economic dependence; others seem designed to make them unable to defend themselves. (A case can be made that the two situations were connected.) An example is the Mississippi black code, which required "that no freedman, free Negro, or mulatto not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry firearms of any kind, or any ammunition, dirk, or Bowie knife..." Similarly, St. Landry Parish, Louisiana, passed a series of "Police Regulations" that included: "No negro who is not in the military service shall be allowed to carry fire-arms, or any kind of weapons, within the parish, without the special written permission of his employers, approved and [e]ndorsed by the nearest and most convenient chief of patrol..."[1] Alabama's variant did not even include a process by which a "freedman, free negro or mulatto" might obtain a permit.[2]

Of course, white Southerners had a different perspective on why such laws were needed, with even respected Southern historians arguing, half a century later, "The restrictions in respect to bearing arms, testifying in court, and keeping labor contracts were justified by well-established traits and habits of the negroes...."[3] Before the Civil War, free blacks had not been allowed to possess arms in many (perhaps all) of the slave states, so it is difficult to see how there could be "well-established traits and habits" with respect to bearing arms immediately on the end

---

81 Walker, 58.
82 Lott, 68, 70.
83 Brandt, 11-12, 68-111.
84 *Cleveland Plain Dealer*, May 11, 1859, quoted in Brandt, 201.

---

1 "Mississippi Black Code", in *Annals of America*, (Chicago: Encyclopedia Britannica, Inc., 1976), 9:634. Michael Les Benedict, *The Fruits of Victory: Alternatives in Restoring the Union, 1865-1877*, (New York: J.B. Lippincott Co., 1975), 87. Cottrol and Diamond, 344, quote a very similar Louisiana statute adopted in 1865.
2 Cottrol and Diamond, 345.
3 William A. Dunning, *Reconstruction, Political and Economic*, (New York: Harper, 1907), quoted in Francis L. Broderick, *Reconstruction and the American Negro, 1865-1900*, (London: Macmillan Co., 1969), 21.

Compendium_Roth
Page 0193

of the war.[4] Maryland, a slave state that had remained within the Union, had prohibited slaves from carrying guns without "a license from his said master" before the war, and free blacks were completely forbidden possession of either firearms or ammunition.[5] These arms prohibitions prohibited free blacks from owning *dogs* without a license, and authorized any white to kill an unlicensed dog owned by a free black, out of fear that blacks would use dogs as weapons. Mississippi went further, and prohibited *any* ownership of a dog by a black person.[6]

Maryland abolished slavery in 1864, and the slave codes were repealed the following year. In 1867, Maryland held a constitutional convention; at that convention, an attempt was made to add "and every citizen has the right to bear arms in defence of himself and the State" to the new constitution. Some delegates, including champions of compensation to slaveowners, argued against it, on the grounds that, "Every citizen of the State means every white citizen, and none other." Apparently, there was fear that the language would entitle blacks to carry arms. An attempt to add a considerably more narrow form of the right, "and the citizen shall not be deprived of the right to keep arms on his premises," was also rejected. Halbrook tells us: "Barnes's amendment may have been rejected so that former slaves in Maryland could not keep arms in their homes."[7] However, Halbrook provides no persuasive evidence to support his conjecture.

It had been widely recognized in the period before the Civil War that there was an inverse relationship between arms possession and slavery:

> [B]oth proponents and opponents of slavery were cognizant that an armed black population meant the abolition of slavery, although some blacks were trusted with arms to guard property, for self defense, and for hunting. This sociological fact explained not only the legal disarming of blacks, but also the advocacy of a weapons culture by abolitionists. Having employed the instruments for self-defense against his pro-slavery attackers, abolitionist and Republican Party founder Cassius Marcellus Clay wrote that "'the pistol and the Bowie knife' are to us as sacred as the gown and pulpit."[8]

An example of the terror that Southerners held of armed blacks may be found in a decision of the Confederate Congress, May 1, 1863. Black Union soldiers bearing arms would be treated as insurrectionary slaves under the laws of the state where they were captured—which almost certainly would result in the death penalty. The same decree "approved the death penalty for white officers captured while leading black units," and indeed, this had already been the practice in Arkansas in 1862.

---

4 Stephen P. Halbrook, *A Right To Bear Arms*, (Westport, Conn.: Greenwood Press, 1989), 94, 111. While slaves were allowed to possess firearms in Georgia, it was only with permission of his master for specified purposes, and the arms were to be stored in the master's house. Also, see Featherstone & Gardiner, 102.

5 Halbrook, *A Right To Bear Arms*, 111-3. Halbrook, "The Fourteenth Amendment and the Right to Keep and Bear Arms: The Intent of the Founders", in *The Right To Keep And Bear Arms*, 70. Featherstone and Gardiner, 102.

6 Theodore Brantner Wilson, *The Black Codes of the South*, (University of Alabama Press, 1965), 26-30.

7 Halbrook, *A Right To Bear Arms*, 111-3.

8 Featherstone & Gardiner, 101. Featherstone and Gardiner cite the quote from Cassius Marcellus Clay as H. Greeley, ed., 7 *The Writings of Cassius Marcellus Clay*, 257 (1848).

Black Union soldiers were massacred by Confederate troops while trying to surrender at Fort Pillow, Tennessee, in April 1864.[9]

During the closing days of the Civil War, the Virginia Legislature passed a bill providing for the use of black soldiers; an opponent argued: "What would be the character of the returned negro soldiers, made familiar with the use of fire-arms, and taught by us, that freedom was worth fighting for?"[10] The South was not alone in its fear of armed blacks. Representative Thaddeus Stevens observed: "When it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, the snobs, and the male waiting-maids in Congress, were in hysterics."[11]

After the war, the fear of armed blacks remained strong. Senator Willard Saulsbury, a Delaware Democrat, expressed his opposition to the presence of black soldiers in the post-war Regular Army: "'What would be the effect,' he asked his fellow senators, 'if you were to send negro regiments into the community in which I live to brandish their swords and exhibit their pistols and their guns?'"[12] When the Civil Rights Act of 1866 was being debated, Senator Saulsbury spoke against it, on the grounds that if passed, it would invalidate the Delaware law that required "that free negroes shall not have the possession of firearms or ammunition."[13]

Myrta Lockett Avary's *Dixie After The War* contains a chapter on "Secret Societies" which articulates white fears of bloodthirsty freedmen, out to murder white men, in order to rape the white women. Many of the hearsay accounts involve armed blacks, engaging in wanton murders, and negligent discharges of firearms.[14]

Fear of black retribution provoked tremendous stress among white Georgians in the summer of 1865: "Everywhere there were vivid secondhand accounts of armed blacks drilling in nightly conclaves, waiting only for the signal that would trigger a coordinated massacre sometime during the Christmas holidays." Similar fears soon appeared in the Carolinas. While no evidence was found that such uprisings were actually planned, by November the panic had spread to more than sixty counties throughout the former Confederacy—largely in the states with the largest black populations. These fears increasingly centered on organized black rifle companies, and not surprisingly, many whites began to see disarming the freedmen as necessary for their safety (or at least found it necessary to use this as a cover for some other purpose):

> In the late summer of 1865 a Summerton, South Carolina, vigilance committee agreed to disarm the freedmen of the area because of the danger of insurrection. At the vigilance meeting, however, conservative planter Warren Manning challenged the plan to disarm the blacks. He recalled that some of his slaves carried weapons for the protection of the plantation before the war, and now these men had been "made free and therefore had a right to carry arms."

---

9 William S. McFeely, *Frederick Douglass*, (New York: W.W. Norton & Co., 1991), 227-8. Nalty, 44.

10 Halbrook, "The Fourteenth Amendment...", 69.

11 Kenneth M. Stampp, *The Era of Reconstruction, 1865-1877*, (New York: Vintage Books, 1965), 104.

12 Nalty, 51.

13 Cong. Globe, 39th Cong., 1st Sess., pt. 1, 474 (Jan. 29, 1866), quoted in Featherstone and Gardiner, 102.

Compendium_Roth
Page 0194