1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and
   Blake Graham, in their official capacities*
9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                          CIVIL DIVISION

13

14  **JAMES MILLER et al.,**  | Case No. 3:19-cv-01537-BEN-JLB

15                 Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**
16       v.
17                             | **VOLUME 8 OF 37**
18  **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom: 5A
                                                       Judge:     Hon. Roger T. Benitez
19
20                 Defendants. | Action Filed:  August 15, 2019

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1, 2, 3 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 4, 5, 6, 7 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 8, 9, 10 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 11, 12, 13, 14 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 15, 16 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 17, 18 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 19, 20, 21 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 22, 23, 24 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 25, 26 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 27, 28 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1<br>2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| 3<br>4<br>5<br>6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| 7<br>8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 10<br>11<br>12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13<br>14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15<br>16<br>17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18<br>19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20<br>21<br>22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23<br>24<br>25<br>26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |

**LAW REVIEWS AND JOURNALS**

| | | |
|---|---|---|
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶  14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

It also appears that a wildly distorted description of an insurrection at Morant Bay, Jamaica, in October of 1865 may have added fuel to the fire of fear.

White-dominated state governments that formed at this point rapidly began to form militias; their concern was that the federal troops which occupied the region would be insufficient, or perhaps unwilling, to protect whites from the feared insurrection of the freedmen. In many cases, militias formed without formal state recognition, and began searching black homes, confiscating the freedmen's firearms. In Eufala, Alabama, a militia company was joined by federal troops in confiscating arms from free blacks.[15]

Some white southern conservatives did recognize that the old laws would have to change, and that the old "criminal and police regulations" would have to be made color-blind, even before the Fourteenth Amendment had been proposed.[16] Many of the antivagrancy laws adopted in the South after the Civil Rights Act of 1866 "made no reference to race, to avoid the appearance of discrimination... But it was well understood... that 'the vagrant contemplated was the plantation negro.'"[17] As we examine the ostensibly color-blind laws completely prohibiting the carrying of weapons, suddenly adopted by the slave states after the Civil War, we should consider that color-blindness is as much in the application of the law, as the written statute itself.

It would be convenient if we could find clear-cut evidence that the post-war laws prohibiting the carrying of arms were passed for the purposes of selective enforcement. Certainly, with a great deal of work, it might be possible to ascertain the race of the defendants in some of the post-war cases, and to the extent that available records allow it, more detailed, state-by-state studies should attempt it.[18] But *if* these laws were passed for the purpose of selective enforcement, appeals through the courts might have been selective as well; it is interesting to find that many of the decisions from this period in the Southern states manage to uphold the laws, and release the defendants.

That arms were used frequently by the freedmen for self-defense, should come as no surprise:

> Blacks sought to arouse the conscience of the nation, but they also availed themselves of the right of self-defense. They were defending not only their individual lives but the lawful state and local governments established by Reconstruction... The night riders who set out on a lynching expedition often found in their targeted victim a fighter who would offer the greatest possible resistance. Collectively, groups of blacks fought back

---

14 Myrta Lockett Avary, *Dixie After The War*, (New York: Doubleday, Page & Co., 1906; reprinted New York: Da Capo Press, 1970), 263-278.
15 Dan T. Carter, *When The War Was Over: The Failure of Self-Reconstruction in the South, 1865-1867*, (Baton Rouge: Louisiana State University Press, 1985), 192-4, 199-201, 219-21.
16 Carter, 190.
17 Eric Foner, *Reconstruction*, (New York: Harper & Row, 1988), 200-1.
18 While county of original trial is present for nearly all cases, this may not always be the county of residence of the defendant; last names only are used in most of these decisions; unless the defendant was of long residence in the county in question, the chances of finding them in the previous or following decennial censuses are remote.

against the terror and, where offered the opportunity, blacks eagerly volunteered to serve in the militias organized by the Radical state governments.[19]

Eric Foner's *Reconstruction* gives many examples of white violence directed against former slaves, many for imagined crimes, and many because the former slaves failed to give the expected level of deference to their former masters. Violence directed against blacks engaged in political agitation was widespread, and blacks engaging in armed self-defense provoked "waves of fear among Southern whites."[20] In the words of one Louisiana black: "As one of the disfranchised race... I would say to every colored soldier, 'Bring your gun home'."[21]

In response to the murder of a black militiaman in 1876 in South Carolina, a protest meeting of 1000 blacks and 500 whites adopted a resolution that made it clear that such outrages carried a high risk:

> We tell you that it will not do to go too far in this thing. Remember that there are 80,000 black men in this State who can bear Winchester rifles and know how to use them, and that there are 200,000 women who can light a torch and use the knife, and that there are 100,000 boys and girls who have not known the lash of a white master, who have tasted freedom, once and forever, and that there is a deep determination never, so help them God, to submit to be shot down by lawless regulators for no crimes committed against society and law.[22]

Both sides took up arms in the pursuit of their political goals, although the goal of conservatives in doing so was to reduce the freedmen to submission. A proposal by which South Carolina Democrats sought to recover control from the freedmen included:

> 3. That the Democratic Military Clubs are to be armed with rifles and pistols and such other arms as they may command...
>
> Democrats must go in as large numbers as they can get together, and well armed...
>
> 16. Never threaten a man individually. If he deserves to be threatened, the necessities of the times require that he should die...[23]

The first post-war decision, *Smith* v. *Ishenhour* (1866), took place in Tennessee. The Confederate state government had passed an ordinance ordering all arms to be taken from the citizens of each county, apparently for the purpose of arming Tennessee soldiers. Conrad Ishenhour was appointed by Governor Harris to effect this action in Cocke County; after the war, one A.E. Smith filed suit for the value of a gun seized from him, and won a judgement against Ishenhour. Ishenhour then appealed to the Tennessee Supreme Court.

While the decision in this case principally revolved around the postwar actions of the state government in declaring all acts of the Confederate state government, "null and void from the beginning," the Tennessee Supreme Court expressed its horror at such an effort:

> In the passage of this Act, the 26th section of the Bill of Rights, which provides, "that the free white men of this State have a right to keep and bear arms for the common de-

---

19 Herbert Shapiro, *White Violence and Black Response*, (Amherst, Mass.: University of Massachusetts Press, 1988), 21.
20 Foner, 119-123.
21 Foner, 120.
22 Shapiro, 21.
23 Benedict, 142.

Compendium_Roth
Page 0195

fense," was utterly disregarded. This is the first attempt, in the history of the Anglo-Saxon race, of which we are apprised, to disarm the people by legislation.[24]

Tennessee had returned to Conservative control in the 1869 state elections[25] because of factional rivalries within the Republican Party. The new Conservative majority in the legislature arranged for a constitutional convention in 1870 to revise the Tennessee Constitution. If there had been any doubt as to the goals of the new Conservative legislative majority, they were quickly dispelled as the legislature repealed laws designed to protect blacks from the Ku Klux Klan, rejected the Fifteenth Amendment (black voting rights), abolished the state school system established by the Republicans, and repealed a statute that guaranteed non-discrimination in railroad accommodations.

The 1870 constitutional convention made a number of changes, clearly intended to preserve white dominance: segregation of the public schools was mandated, and interracial marriage or cohabitation was prohibited.[26] Another provision allowed the Legislature to regulate the carrying of arms. The Legislature then passed "The Act of 1870, c. 13," which prohibited the carrying of "a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver," either openly or concealed.[27] (It appears that the law in question did not prohibit the open carrying of large pistols.) In 1871, the Tennessee Supreme Court heard three similar appeals, and gave a single ruling on all three: *Andrews* v. *State* (1871), *State* v. *O'Toole* (1871), and *State* v. *Custer* (1871).

In *Andrews* v. *State* (1871), Andrews was convicted of violating the new law, and appealed his conviction. In *State* v. *O'Toole* (1871), O'Toole was indicted, but the judge quashed the indictment on the grounds that the law in question was unconstitutional, and because the indictment was defective in not charging that the pistol O'Toole carried was a "belt pistol, or pocket pistol." The district attorney then appealed the judge's decision in quashing the indictment. In the third case, *State* v. *Custer* (1871), Custer appears to have pleaded guilty to the charge, was sentenced to prison, but the District Attorney asked that Custer be "required to give sureties to keep the peace, which being refused, he appealed for the State."[28]

The same attorney represented both Andrews and O'Toole; attorneys for all three defendants argued that, "by Article 2 of the amendments to the Constitution of the United States, the right to bear arms was protected." Andrews and O'Toole's attorney also argued that the 1870 Constitution's authority

> to regulate did not involve the power to prohibit, and that this act was a prohibition. That in Aymette's case the arms carried were not arms of warfare, the wearing of which the Legislature had the power to prohibit; that this is the only point decided in that case—all else is *dictum*. He insisted that the words relied upon by Judge Green [the judge in the *Aymette* decision] as restrictive, *i.e.*, "for the common defense," could not be of any effect, as the right was guaranteed without any such restriction in the Constitution of the United States; that the necessity was not only to keep them at all times, to be inured to their use by constantly bearing them about with them; that the power in the

---

24 *State* v. *Ishenhour*, 43 Tenn. (3 Coldwell) 214, 215, 216, 217 (1866).
25 Richard H. Abbott, *The Republican Party and the South, 1855-1877*, (Chapel Hill, N.C.: University of North Carolina Press, 1986), 207-8.
26 Cartwright, 13-14, 18.
27 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 171 (1871).
28 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 166 (1871).

Constitution of 1870 to regulate the wearing of arms, implies a right to wear as well as to bear arms, and that this right was subject only to be regulated, not destroyed.[29]

Similarly, Custer's attorney, "insisted upon the protection of the Constitution of the United States, and of the State, and that the Legislature had no power over the arms of civilized warfare, but might prohibit the carrying of other arms."[30]

The Tennessee Supreme Court's decision cited *Barron* v. *Baltimore* (1833) as evidence that the Second Amendment like the rest of the Bill of Rights, did not apply to the states.[31] It appears that neither defense attorney argued that the recently ratified Fourteenth Amendment incorporated the protections of the Bill of Rights.

The Court went on to argue that because of similarities between the Second Amendment and Tennessee's 1834 constitutional protection that "the free white men of this State have a right to keep and bear arms for their common defense," that the same reasoning should be applied to both—even though the U.S. Senate specifically rejected "for the common defense." Next, the Court concluded that because both provisions were found in proximity to discussions of the militia, that the right in question was only for the purpose of collective defense, "when called into actual service for the security of the State"—although the principal concern of the Framers was not the security of the State, but the security of the civil liberties of the people.

The Court acknowledged that the right of keeping arms:

> necessarily involves the right to purchase and use them in such a way as is usual, or to keep them for the ordinary purposes to which they are adapted; and as they are to be kept, evidently with a view that the citizens making up the yeomanry of the land, the body of the militia, shall become familiar with their use in times of peace, that they may the more efficiently use them in times of war: then the right to keep arms for this purpose involves the right to practice their use, in order to attain to this efficiency. The right and use are guaranteed to the citizen, to be exercised and enjoyed in time of peace, in subordination to the general ends of civil society; but, as a right, to be maintained in all fulness....
>
> The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.
>
> But farther than this, it must be held, that the right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace; that in such use, he shall not use them for violation of the rights of others, or the paramount rights of the community in which he makes a part.[32]

This reasoning, with respect to "ordinary modes usual in the country" creates an interesting question: was the carrying of "pocket pistols" a mode "usual in the country"? From the speed with which three different cases came to trial after the Tennessee Legislature made carrying pocket pistols illegal, and from the comments in Kentucky's *Hopkins* v. *Commonwealth* (1868) decision, it would appear that, in-

---

29 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 167 (1871).
30 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 167, 168 (1871).
31 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 172, 173 (1871).
32 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 177, 178, 179 (1871).

Compendium_Roth
Page 0196

deed, it was a common practice, and could therefore be considered protected by this line of argument.

That there were limits to the authority of the Legislature to restrict the carrying of arms, at least arms of a military nature, may be found in the Court's statement:

> The Convention of 1870, knowing that there had been differences of opinion on this question, have conferred on the Legislature in this added clause, the right to regulate the wearing of arms, with a view to prevent crime.
>
> It is insisted by the Attorney General, as we understand his argument, that this clause confers power on the Legislature to prohibit absolutely the wearing of all and every kind of arms, under all circumstances. To this we can not give our assent. The power to regulate, does not fairly mean the power to prohibit; on the contrary, to regulate, necessarily involves the existence of the thing or act to be regulated... Adopt the view of the Attorney General, and the Legislature may, if it chooses, arbitrarily prohibit the carrying of all manner of arms, and then, there be no act of the citizen to regulate.[33]

The Court continued with its explanation of the nature of the right to bear arms:

> It is insisted by the Attorney General, that the right to keep and bear arms is a political, not a civil right. In this we think he fails to distinguish between the nature of the right to keep, and its necessary incidents, and the right to bear arms for the common defense. Bearing arms for the common defense may well be held to be a political right, or for protection and maintenance of such rights, intended to be guaranteed; *but the right to keep them, with all that is implied fairly as an incident to this right, is a private individual right, guaranteed to the citizen, not the soldier.* [emphasis added]
>
> It is said by the Attorney General that the Legislature may prohibit the use of arms common in warfare, but not the use of them in warfare; but the idea of the Constitution is, the keeping and use of such arms as are useful either in warfare, or in preparing the citizen for their use in warfare, by training him as a citizen, to their use in times of peace.

The Court next quoted Joseph Story's remarks about the meaning of the Second Amendment that we examined on page 70, and observed:

> We cite this passage as throwing light upon what was intended to be guaranteed to the people of the States, against the power of the Federal Legislature, and at the same time, as showing clearly what is the meaning of our own Constitution on this subject, as it is evident the State Constitution was intended to guard the same right, and with the same ends in view. So that, the meaning of the one, will give us an understanding of the purpose of the other.
>
> The passage from Story, shows clearly that this right was intended, as we have maintained in this opinion, and was guaranteed to, and to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights....
>
> We may for a moment, pause to reflect on the fact, that what was once deemed a stable and essential bulwark of freedom, "a well regulated militia," though the clause still remains in our Constitutions, both State and Federal, has, as an organization, passed away in almost every State of the Union, and only remains to us as a memory of the past, probably never to be revived.[34]

---

[33] *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 180, 181 (1871). The Tennessee Attorney General, Joseph B. Heiskell, was also the reporter for Tennessee Supreme Court decisions; Heiskell took advantage of this opportunity to get the last word by footnoting this portion and asserting that this was *not* his argument.

[34] *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 182, 183, 184, 185 (1871). Perhaps this was the case in former states of the Confederacy, but it is by no means clear that the militia was fading away elsewhere in the United States. California, for example, appears to have maintained an active state militia;

The Court next used the *Aymette* v. *State* (1840) precedent, and quoted it that, "the object for which the right to keep and bear arms is secured is of a general nature, to be exercised by the people in a body for their common defense, so the arms—the right to keep which is secured—are such as are usually employed in civilized warfare, and constitute the ordinary military equipment." Further, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defense."[35]

The Court acknowledged that there was an individual right to possess military arms on private property. But on the subject of carrying arms off of private property, the Court held to a narrower definition of this right:

> The principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member.
>
> So we may say, *with reference to such arms, as we have held, he may keep and use in the ordinary mode known to the country, no law can punish him for so doing, while he uses such arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others.* Yet, when he carries his property abroad, goes among the people to public assemblages where others are to be affected by his conduct, then brings himself within the pale of public regulation, and must submit to such restrictions on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.[36] [emphasis added]

The Tennessee Court's opinion was not unanimous. Justice Sneed "dissented from so much of the opinion as questioned the right of the Legislature to prohibit the wearing of arms of any description, or sought to limit the operation of the act of 1870." Justices Nelson and Turney concurred in much of the majority decision, and agreed that the intent of the Legislature was "to promote the public peace," but:

> I am, nevertheless constrained by a sense of duty to observe, that, in my opinion, that statute is in violation of one of the most sacred rights known to the Constitution. Ever since the opinions were promulgated, it has been my deliberate conviction that the exposition of the Constitution by Judge Robert Whyte, in Simpson v. The State... was much more correct than that of Judge Green in Aymette v. The State.... The expression in the case last named, that the citizens do not need for the purpose of repelling encroachment upon their rights, "the use of those weapons which are generally employed in private broils, and are efficient only in the hands of the robber and assassin," is, in my view, an unwarrantable aspersion upon the conduct of many honorable men were well justified in using them in self-defense.... The provision contained in the declaration of rights in the Constitution of 1834, that "that the free white men of this State have a right to keep and bear arms for their common defense," is not restricted to public defense.... Had such been the intention, the definite article "the," would would [*sic*] have been employed, instead of the personal pronoun "their," which is used in a personal sense, and was intended to convey the idea of a right belonging equally to more than one, general in its nature, and universally applicable to all the citizens. The word "bear" was not used alone in the military sense of carrying arms, but in the popular sense of

---

this author has seen a certificate from 1879, issued by the Adjutant General of California, acknowledging seven years of good service in the state militia, which exempted the militiaman from jury duty.

[35] *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 184, 185 (1871).
[36] *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 185, 186 (1871).

Compendium_Roth
Page 0197