ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3479
Fax: (415) 703-1234
E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br>Plaintiffs,<br>**v.**<br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br>**VOLUME 9 OF 37**<br>Courtroom: 5A<br>Judge: Hon. Roger T. Benitez<br>Action Filed: August 15, 2019 |

**INDEX**


| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.



McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield*, Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

> wearing them in war or in peace. The word "arms," means "instruments or weapons of offense or defense," and is not restricted, by any means, to public warfare.[37]

Justice Nelson went on to explain how the carrying of pistols had been commonplace during the Civil War, and that after the war ended, the practice had continued, with "dangerous wounds, as well as frequent homicides" being the result, and that giving authority to the Legislature to regulate the carrying of deadly weapons was recognized by the 1870 Constitutional Convention as not completely prohibiting the carrying of weapons, but that:

> if worn upon the person, they shall be worn in a public manner. The act of 1870, instead of regulating, prohibits the wearing of arms, and is, therefore, in my opinion, unconstitutional and void...
>
> Regretting, as I do, that the nobler objects of bearing and wearing arms are too often and too horribly perverted, I can not approve legislation which seems to foster and encourage a craven spirit on the part of those who are disposed to obey the laws, and leaves them to the tender mercies of those who set all law at defiance.[38]

In the majority decision, the Court came to the conclusion that regulation of the *manner* in which arms could be carried on public property was, for some classes of weapons, within the purview of the Legislature, but that ownership was not; and furthermore, that the distinction between those weapons that could be restricted, and those that could not, was dependent upon whether or not the weapons were weapons of war—this being an especially protected class.

Determining the history of the 1870 Convention, the motives of the various parties involved, and the nature of the brawls which so frightened the Tennessee Court would be a worthwhile pursuit, though unfortunately outside the scope of this work. Nonetheless, it would appear that Tennessee's law reflected the will of the resurgent white majority of Tennessee. Throughout the 1870s, KKK violence operated to the detriment of Tennessee blacks.[39] It seems unlikely that the arms laws were intended as a restraint on the KKK.

Later that year, the Tennessee Supreme Court heard an appeal that led to a simpler decision—and one that has been widely cited in support of restrictive arms carrying laws, in spite of its inappropriateness. The defendant, Thomas Page, was convicted of carrying a revolver, "about eight inches long, but that it was not such weapon as is used as a weapon of war," and threatening to use it against an apparently non-aggressive person. The Court clarified that while the carrying of a weapon was not necessarily criminal, the case before them was definitely one of those criminal misuses of the right to bear arms:

> In the case before us, the intent with which Page was carrying his pistol was fully developed. He was carrying it that he might be armed, as was shown by his threatened assault upon [Page's victim]. It would probably be difficult to enumerate all the instances in which one of these weapons could be carried innocently, and without criminality. It is sufficient here to say, that, without the intent or purpose of being or going armed, the offense described in this statute can not be committed.[40]

---

37 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 193, 194 (1871).
38 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 194, 195, 201 (1871).
39 Cartwright, 19.
40 *Page* v. *State*, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871).



In 1871, in response to the *Andrews* v. *State* (1871) decision, the Tennessee Legislature revised the law prohibiting the carrying of pistols, such that it was illegal to carry a

> belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands...[41]

By exempting "army pistols" carried "openly in his hands," the Legislature hoped to write a law that would still prohibit the carrying of most deadly weapons, by allowing only one mode of carry—the mode which is the most aggressive and dangerous manner imaginable.

Robert Wilburn was charged with violating this new statute. The first count charged him with carrying "a belt and pocket pistol and revolver pistol, the same being an arm such as is not commonly carried and used in the United States army." The second count charged that Wilburn did "unlawfully and willfully carry an army pistol privately and concealed, and not openly in his hands..." which contradicts the claim in the first charge, since the Act of 1871 had defined an "army pistol" to be something other than "a belt or pocket pistol." The judge quashed the second count of the indictment, and at trial, Wilburn was acquitted on the first count. The State appealed the judge's decision quashing the second count of the indictment.[42] Since the Legislature had rewritten the law specifically to meet the requirements handed down by the Court in the earlier cases, the Court found the law, as written, constitutional.[43]

As part of the continuing effort to discourage concealable handguns, on March 17, 1879, Tennessee passed a law prohibiting the sale of "belt or pocket pistols, or revolvers, or any other kind of pistol except army or navy pistols." Persons already licensed to sell pistols were allowed to continue to sell them until their license expired, at which point no future sales were allowed.

Some time after the expiration of his license, Burgoyne was indicted for having illegally sold pistols prohibited under the ordinance. In this case, the Second Amendment was apparently not raised by the defendant, and the case was decided on the narrow grounds of whether it was within the authority of a state government to prohibit the sale of a good in the interests of public welfare—which the Court held that the state government possessed.[44]

While not strictly a "right to keep and bear arms" case, the Tennessee Supreme Court's decision in this case presents a disturbing question: can a right continue to exist if the mechanisms for the exercise of that right are no longer available for purchase? Would a law banning the sale of printing presses necessarily violate the First Amendment protections of free speech?

In *Carroll* v. *State* (1872), the Arkansas Supreme Court upheld the precedent in *State* v. *Buzzard* (1842). The defendant Carroll argued that he had carried a concealed pistol because he was in danger of "receiving great bodily violence," did so only within his own home, and asked the judge to charge the jury accordingly. The

---

41 *State* v. *Wilburn*, 7 Bax. 57, 61 (Tenn. 1872).
42 *State* v. *Wilburn*, 7 Bax. 57, 58 (Tenn. 1872).
43 *State* v. *Wilburn*, 7 Bax. 57, 62, 63 (Tenn. 1872).
44 *State* v. *Burgoyne*, 7 Lea 172, 173, 179, 40 Am. Rep. 60 (Tenn. 1881).

trial judge refused to do so. The Arkansas Supreme Court recapitulated the *Buzzard* decision:

> a constitutional right to bear arms in defense of person and property does not prohibit the legislature from making such police regulations as may be necessary for the good of society, as to the manner in which such arms shall be borne. Neither natural nor constitutional right authorizes a citizen to use his own property or bear his own arms in such way as to injure the property or endanger the life of his fellow citizen, and these regulations must be left to the wisdom of the legislature, so long as their discretion be kept within reasonable bounds. And it is not unreasonable for the legislature to enact that deadly weapons shall not be worn concealed, that those associating with the bearer may guard against injury by accident or otherwise.[45]

"Reasonable bounds," of course, is a highly elastic phrase—one that reappears throughout the judicial history of the right to keep and bear arms—and with substantially different meanings in different eras. The Court upheld the right of the Legislature to ban concealed carry, because that was "reasonable," but hinted that there were limits beyond which such laws were not "reasonable," and that banning open carry might well be beyond those limits. But over the next few years, the Arkansas Supreme Court gave a series of contradictory decisions about the meaning of this right—changing direction so readily as to make it questionable whether there was any overriding theory behind these decisions.

In 1874, the Republicans lost control of the Arkansas Legislature.[46] In 1875, Arkansas passed a law making it a misdemeanor to "wear or carry any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon..." with the usual exceptions for police officers, travellers carrying such weapons "with their baggage," or any person directed by a police officer "to assist in the execution of any legal process." Not only concealed carry, but also open carry had been outlawed. Later that year, in *Fife* v. *State* (1876), Alfred Fife was indicted for violating this law in Pine Bluff, Arkansas. Perhaps of some relevance to the decision of the court, Fife threatened a person who was apparently not a threat to him.

The Arkansas Supreme Court used Joseph Story's *Commentaries on the Constitution of the United States* and Thomas Cooley's *Constitutional Limitations* to decide that arms were protected by the Second Amendment as a restraint on "usurpation and arbitrary power of rulers," and that "the arms which it guarantees American citizens the right to keep and to bear, are such as are needful to, and ordinarily used by a well-regulated militia, and such as are necessary and suitable to a free people, to enable them to resist oppression, prevent usurpation, repel invasion, etc., etc.," but that the Second Amendment was "a restraint upon Federal, and not upon State legislation."[47]

The Arkansas Constitution contained a "right to keep and bear arms for their common defense" clause, which according to the Arkansas Supreme Court, was carried over from the 1836 state constitution; but the Court used "for their common defense," and quoted the Tennessee Court's decision in *Andrews* v. *State* (1871) to decide that only weapons

45 *Carroll* v. *State*, 28 Ark. 99, 100, 101 (1872).
46 Birdsall S. Viault, *American History Since 1865*, (New York: McGraw-Hill, 1989), 17-18.
47 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 557, 558 (1876).



> adapted to the ends indicated above, that is, the efficiency of the citizen as a soldier, when called on to make good the defense of a free people; and these arms he may use as a citizen, in all the usual modes to which they are adapted, and common to the country. What then, is he protected in the right to keep and thus to use? Not every thing that may be useful for offense or defense, *but what may properly be included or understood under the title of "arms," taken in connection with the fact that the citizen is to keep them, as a citizen.* Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. *Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the legislature.*[48] [emphasis added]

While recognizing that large military handguns (what the Court called a "repeater") were protected, the Arkansas Court held that this "did not mean pocket revolver."[49] Without acknowledging that the Arkansas law had made it illegal to "wear or carry any pistol of any kind whatever," the Court held "that the plaintiff in error was carrying a pistol of that class or character intended to be prohibited by the legislature, and which we think may be prohibited, in the exercise of the police power of the State, without any infringement of the constitutional right of the citizens of the State to keep and bear arms for their common defense."[50] If we accept that pocket pistols were not arms of a soldier, and that the Second Amendment was not restrictive of state legislative authority, this decision, based on the "common defense" clause, was perfectly logical.

It is tempting to see the *Fife* decision as part of an increasingly restrictive attitude by the Arkansas Supreme Court towards the right to keep and bear arms. But two years later, in *Wilson* v. *State of Arkansas* (1878), the Court once again changed course. Chancy Wilson was indicted on the grounds that he did "unlawfully carry a pistol as a weapon, contrary to the statute such case made and provided, and against the peace and dignity of the State..." Wilson had borrowed "a large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting. Upon reaching his destination, Wilson spoke with his host, "pulled the pistol out of his boot, cocked it a few times to see if it would revolve, and then put it around under his coat, and went into dinner." It is not clear if the revolver was concealed in his boot, but it certainly was concealed under his coat. The trial court refused to allow a statement either by the owner of the pistol or Wilson as to the purpose of having the revolver, and refused to charge the jury that "an army size pistol" was not subject to the restriction of the Arkansas law.

The Arkansas Supreme Court, citing *Fife*, agreed that regulation was acceptable, but:

> No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc. *Andrews* v. *State*, 3 *Heiskell*, 182.
>
> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when

48 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).
49 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).
50 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 561 (1876).

acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.

If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[51]

In the same session, the Arkansas Supreme Court decided another weapons case, *Holland* v. *State* (1878):

James Holland was indicted in the Circuit Court of Yell county, for carrying a pistol as a weapon.

On the trial but one witness was examined. He stated, in substance, that the first time he ever saw defendant, was on the 1st of October, 1875, in Yell county. He had two large sized six shooting pistols, one of them a Remington, navy size and loaded, and the other a Colt's army pistol. The pistols were such as are commonly used in the United States military and naval service. Defendant was carrying them in his saddle-bags, and stated he was from Texas. Witness did not know whether he was on a journey or not.

Not surprisingly, Holland

asked the court to charge the jury that if they found from the evidence that the pistols, proven to have been carried, were army sized pistols, and were such as are commonly used in the United States military and naval service, they must acquit defendant.

The court refused this instruction, defendant was convicted, a new trial refused him, he took a bill of exceptions and appealed.[52]

Chief Justice English again delivered the opinion of the Arkansas Supreme Court: "The court erred in refusing to instruct the jury as moved by appellant." After citing *Fife* v. *State* (1876) and *Wilson* v. *State of Arkansas* (1878), the Arkansas Supreme Court reversed the conviction, and ordered a new trial. The pistols in question were apparently concealed "in his saddle-bags," but the defense of the pistols being standard U.S. military models was sufficient to justify their concealed carriage.

The Arkansas Legislature responded to the *Wilson* and *Holland* decisions by passing a new weapons law. The Act of April 1, 1881, prohibited "the carrying of army pistols except uncovered and in the hand." In *Haile* v. *State* (1882), the first two sections of this act (which regulated carrying of handguns) were challenged. The defendant, Haile, was convicted in Pope County of carrying "uncovered, and buckled around his waist... a large revolving pistol, known as the Colts army pistol, and such as is used in the army and navy of the United States..."

The Arkansas Supreme Court decided:

The question is, can the Legislature regulate the mode of carrying any arms which the citizens have the constitutional right to keep and bear for their common defense? We have decided that it may, to some extent, which means that it may, in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarrass its exercise.

At this point, the Court had taken a position which could be considered the "reasonable" regulation school—the manner could be regulated, but the right could not be destroyed.

51 *Wilson* v. *State of Arkansas*, 33 Ark. 557, 558, 559, 560 (1878).
52 *Holland* v. *State*, 33 Ark. 560, 561 (1878).



Next, the Court articulated its republican view of the nature of the right protected by the Arkansas Constitution:

*The constitutional provision sprang from the former tyrannical practice, on the part of governments, of disarming the subjects, so as to render them powerless against oppression.* It is not intended to afford citizens the means of prosecuting, more successfully, their private broils in a free government. It would be a perversion of its object, to make it a protection to the citizen, in going, with convenience to himself, and after his own fashion, prepared at all times to inflict death upon his fellow-citizens, upon the occasion of any real or imaginary wrong. The "common defense" of the citizens does not require that. The consequent terror to timid citizens, with the counter violence which would be incited amongst the more fearless, would be worse than the evil intended to be remedied. [emphasis added]

This paragraph, too, can be regarded as an honest statement of belief. But next, the Court explains its reasoning in upholding the 1881 statute:

The Legislature, by the law in question, has sought to steer between such a condition of things, and an infringement of constitutional rights, by conceding the right to keep such arms, and to bear or use them at will, upon one's own premises, and restricting the right to wear them elsewhere in public, unless they be carried uncovered in the hand. It must be confessed that this is a very inconvenient mode of carrying them habitually, but the habitual carrying of them does not seem essential to "common defense." The inconvenience is a slight matter compared with the danger to the whole community, which would result from the common practice of going about with pistols in a belt, ready to be used on every outbreak of ungovernable passion. It is a police regulation, adjusted as wisely as the Legislature thought possible, with all essential constitutional rights.[53]

If "timid citizens" were terrorized by the wearing of holstered guns, how would requiring those guns to be carried in the hand reduce the fear? The purpose of the law was to make the carrying of guns for defensive purposes so inconvenient, and so likely to provoke an accidental shooting, as to make it impractical to carry a gun.

The Court did not abandon the notion of a right to keep arms, however:

The constitutional right is a very valuable one. We would not disparage it. A condition of things within the experience of men, still very young, illustrates the importance of keeping alive in the mind, and well defined, these old land-marks of Saxon liberty. "*Semper paratus*," [always ready] is a good motto. Yet if every citizen may keep arms in readiness upon his place, may render himself skillful in their use by practice, and carry them upon a journey without let or hindrance, it seems to us, the essential objects of this particular clause of the bill of rights will be preserved, although the citizen be required to carry them uncovered, and in the hand, off his own premises, if should deem it necessary to carry them at all.[54]

The Arkansas Supreme Court referred to the Tennessee Bill of Rights, with its very similar protection of the right to keep and bear arms, and how the Tennessee Supreme Court had found a very similar law constitutional in *State* v. *Wilburn* (1872). Alas, the Court had transformed the name into *State* v. *Welburne*, which is not a particularly persuasive piece of evidence that they had actually read the decision.

The final paragraph of the *Haile* decision, however, contains a statement that was a reminder that there were limits to the authority of the state to regulate the possession of military weapons: "There need be no fear, from any thing in these

53 *Haile* v. *State*, 38 Ark. 564, 565, 566 (1882).
54 *Haile* v. *State*, 38 Ark. 564, 566, 567 (1882).