ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3479
Fax: (415) 703-1234
E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br>Plaintiffs,<br>**v.**<br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br>**VOLUME 10 OF 37**<br>Courtroom: 5A<br>Judge: Hon. Roger T. Benitez<br>Action Filed: August 15, 2019 |

# INDEX


| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.



McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield*, Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

sections, that the citizen may not always have arms, and be skilled in their proper use, whenever the common defense may require him to take them up."[55]

In *Dabbs* v. *State* (1882), the Arkansas Supreme Court upheld the third section of the Act of April 1, 1881, which prohibited the sale of any pistol other than those "used in the army or navy of the United States and known as the navy pistol." Dabbs pled guilty in Pulaski County, Arkansas, of selling such a pistol. On appeal, Dabbs' attorney cited a number of provisions of the U.S. Constitution with respect to regulation of interstate commerce, sought to use the Fourteenth Amendment and the "privileges and immunities" clause of the Constitution, as a basis for overturning the ban. Dabbs' attorney also pointed to the Georgia decision *Nunn* v. *State* (1846) which overthrew a similar law. He also claimed that *Fife* v. *State* was "no authority in this case. No act of this description ever sustained by any court. Not even this court has gone so far, although it has gone to considerable length..." Dabbs' attorney then cited *State* v. *Buzzard* (1842), and *Wilson* v. *State of Arkansas* (1878).

Attorney-General Moore, arguing for the law, claimed "The right to 'keep and bear arms' may be absolutely prohibited," and pointed to *State* v. *Buzzard* (1842) and *Fife* v. *State* (1876) as precedents.[56] While this is certainly an accurate description of the *Buzzard* decision, the *Fife* v. *State* (1876) decision, as we have seen, did not go so far as to completely deny such a right.

Justice Smith wrote the opinion of the Arkansas Supreme Court. First, he disposed of the interstate commerce provision, citing such well-known precedents as *Gibbons* v. *Ogden* (1824), to find that since the state had authority to regulate, "and even to suppress, the traffic in intoxicating liquors within its borders," it certainly had the authority to regulate or prohibit gun sales, at least with respect to the issue of interstate commerce.[57]

Next, Justice Smith dispensed with the Fourteenth Amendment since it was "to secure to negroes all the civil rights that white citizens enjoy, and to prevent discriminations against them as a class, or on account of their race." While Justice Smith did not say so explicitly, the implication was that because it was intended to protect blacks against racial discrimination, it could therefore *not* be relevant to the rights of citizens who were not subject to racial discrimination—a position that would certainly provoke a hearty laugh from the legal community today, when the Fourteenth Amendment has become the heart of lawsuits protecting all sorts of classes.

With respect to the "privileges and immunities" argument:

> Nor does it conflict with *sec. 2 of art. 4*, of the Constitution of the United States, which provides that the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States; for all are placed upon an equality by the act. The citizen of Tennessee can not sell the forbidden articles upon the territory of Arkansas any more than one of our citizens.[58]

55 *Haile* v. *State*, 38 Ark. 564, 567 (1882).

56 *Dabbs* v. *State*, 39 Ark. 353, 354, 355, 43 Am. Rep. 275 (1882).

57 The *Gibbons* decision had struck down a New York State granted monopoly on steamship operations, on the grounds that any commerce between two states was within the power of the Congress to regulate, and while a state could regulate internal commerce, it could not regulate interstate commerce. McDonald, 80-82.

58 *Dabbs* v. *State*, 39 Ark. 353, 356, 43 Am. Rep. 275 (1882).



But of course, such an argument ignores the natural rights view that the right of bearing arms for self-defense, recognized by the common law of England, was one of the "privileges and immunities" shared by citizens "of the several States," discussed in *Dred Scott* v. *Sandford* (1857).

Finally, the heart of the dispute is addressed in the last paragraph of the decision:

> The law was enacted as a measure of precaution for the prevention of crimes and calamities. It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare. *Fife v. State*, 31 Ark., 455.[59]

Don Kates argues that such statutes were passed to disarm blacks, by making the only affordable handguns unavailable.[60] The parallel to efforts in the 1960s and 1970s to ban so-called "Saturday Night Specials"—guns on average smaller, cheaper, and more concealable than military & police sidearms—should be obvious. If, in fact, the motivations for such laws were racial in nature, we should not be surprised that these statutes were all passed in former slave states.

It is asserted that the name, "Saturday Night Special" is derived from the phrase, "niggertown Saturday night,"[61] an uncomplimentary assertion about the level of violence among blacks. Attempts to verify this origin for the term "Saturday Night Special" were inconclusive. The OED defines it as, "a cheap, low-calibre pistol or revolver such as might be used by a petty criminal," with its first use in a *New York Times* article of 1968. "Saturday Night," used as an attribution, is defined as, "some form of revelry."[62] The leap from "revelry" to a petty criminal's gun, is mystifying. A search of several dictionaries of slang found no definition of "niggertown Saturday night," but did reveal a definition of "Saturday Night Special" as "a small handgun, often used in the many fracas that occur over Saturday night in a big US city."[63] A North Carolinian acquaintance reports having heard the terms "Niggertown" and "Saturday night" used in 1968 in a form that suggested that the combination of Saturday night, alcohol, and blacks, inevitably led to violence.[64] The leap from murder as a form of black revelry, to any cheap handgun being a "niggertown Saturday Night Special," to the cleaned-up "Saturday Night Special," is a logical one. However, this does not necessarily mean that it is etymologically correct, and this topic is in need of further research.

Texas, unlike the other states of the Confederacy, remained a frontier society. The close of the Civil War appears to have led to a dramatic increase in violence—though from the sketchy available evidence, in quite the opposite direction feared by the whites of the deep South. The Texas Constitutional Convention of 1868-69 compiled a report on lawlessness and violence from a variety of sources; while there is reason to suspect the accuracy and completeness of the data, even a historian with a strong bias against the report has agreed that violence had reached unprecedented levels during this period.

59 *Dabbs* v. *State*, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882).

60 Kates, "Toward A History of Handgun Prohibition...", 11, 13-14.

61 Kates, "Toward a History of Handgun Prohibition...", 25.

62 OED, 14:509.

63 Jonathan Green, *The Dictionary of Contemporary Slang*, (New York: Stein & Day, 1984), 241.

64 Joseph Knapp, Personal communication to the author, November 12, 1991.

From the close of the war to June of 1868 the report found 1,035 murders had been committed: 509 of the victims were white, and 409 victims were freedman. The Convention's report may have overemphasized political and racial motivations for these murders, but murder was a serious and increasing problem. The combination of disenfranchised whites, newly freed blacks about to get the vote, and a variety of adjustment problems as former slaves and masters worked out new economic relationships, would seem to have been factors in this problem.[65] The 1860 population of Texas was 604,000; by 1870, the population was 819,000.[66] If we accept the population during the period 1865-1868 as 700,000, this would give an annual murder rate of 49 per 100,000 population—more than four times the highest murder rate for the entire United States in the twentieth century.[67]

Circumstances leading to the 1869 state elections were highly irregular; General Reynolds, the military governor of Texas, appointed Edmund J. Davis as Provisional Governor. Actual control of the state government remained in the hands of General Reynolds until April 16, 1870. Governor Davis and the Radical Republican-dominated legislature passed a series of laws designed to deal with the problems of lawlessness: organizing a state militia; creating, for the first time, a state police force of 250 men, under the direct control of the governor; and a law to "put restrictions on the indiscriminate carrying of dangerous weapons."[68] It appears that the State Police succeeded in suppressing the Klan's violence, "providing freedmen with a real measure of protection in a state notorious for widespread violence."[69]

The act of April 12, 1871 made it illegal to carry arms openly. It was quickly challenged, and in 1872, the Texas Supreme Court wrote a single decision which covered three very different cases: *William English* v. *State* (1872), *State* v. *G. W. Carter*, and *State* v. *William Daniel*, appealed from the district courts of Marion, Kaufman, and Van Zandt counties, respectively. All involved a violation of the new law, which prohibited the carrying of pistols, Bowie knives, sword-canes, spears, brass knuckles,[70] "unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing," with the usual exemptions for peace officers, active members of the militia, and in one's own home or business.[71]

Each of the cases was somewhat different, and yet a single decision was rendered for all:

> In English's case the offensive weapon was a pistol, and it was proved that he was in a state of intoxication while wearing it about in the city of Jefferson. He proved, in defense, that the pistol was not loaded at the times it was seen by the witnesses against him;

65 Charles William Ramsdell, *Reconstruction in Texas*, (New York: Columbia University Press, 1910; reprinted Gloucester, Mass.: Peter Smith, 1964), 219-24. Also, see Foner, 119-23, for evidence that this problem of violence directed against freedmen was not confined to Texas.

66 *Historical Statistics of the United States, Colonial Times to 1970*, (Washington: Government Printing Office, 1975), 35.

67 Bureau of Justice Statistics, *Report to the Nation on Crime and Justice*, 2nd ed., (Washington: Government Printing Office, 1988), 15.

68 Ramsdell, 285-6, 289, 291-2, 295-8.

69 Foner, 440.

70 *English* v. *State*, 35 Tex. 473 (1872). In a later case—*State* v. *Duke*, 42 Tex. 455 (1875)—the Texas Supreme Court quoted the entire law in question, but cites it as the act of April *11*, 1871, not April *12*.

71 *State* v. *Duke*, 42 Tex. 455, 456, 457 (1875).



> and further, that it was out of repair, and he had taken it along with him to have it mended, as he expected soon to go to a neighboring county after his mother, and wished to carry the pistol with him....
>
> The charge against Daniels was going "into a religious assembly, having about his person a butcher knife." The state's witnesses proved that they saw the defendant in church on the occasion in question, and that the handle of a butcher knife was sticking out above the waistband of his breeches, and between the skirts of his frock coat. They saw nothing but the handle. The court below charged that the handle raised a presumption of a blade.
>
> No transcript in Carter's case has come to the hands of the reporter, nor any brief in his behalf, or in behalf of Daniels.[72]

Of course, this is not surprising; from the form of the case names involving Carter and Daniel, it would appear that Carter and Daniel succeeded in persuading the district court judge that the cases against them were without merit, and that these were appeals by the prosecutor. In the case of Carter, the Texas Supreme Court reversed the district court's decision.

In the case of Daniel, or Daniels (for the Court referred to this defendant by both names, and to the case as both *State* v. *Daniel* and *Daniels* v. *State*), the Court affirmed the decision of the district court.[73] Was Daniels convicted by the district court, or released? The lack of brief on behalf of Daniels suggests that he was already a free man, and had no reason to appeal the district court's decision—a problem that repeatedly occurs in cases involving the right to keep and bear arms. Not surprisingly, without an advocate opposing such laws, the court would be primarily influenced by the brief filed by the attorney general.

The Court quoted Bishop's *Criminal Law* to the effect that the Second Amendment was a restriction not only on the federal government, but on the states as well, in language very similar to Rawle's statements in *A View of the Constitution*. The Court quoted Bishop's straightforward admission that there was no authority for the narrow view of "arms" given in *Aymette* v. *State* (1840):

> As to its interpretation, if we look to this question in the light of judicial reason, *without the aid of specific authority*, we shall be led to the conclusion that the provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free state.' In like manner the right to 'bear' arms refers merely to the military way of using them, not to their use in bravado and affray. [emphasis added]

The Court also quoted Bishop with respect to the Georgia decision *Nunn* v. *State* (1846), the antebellum Louisiana decisions, and Alabama's *Owen* v. *State* (1858). The Texas Supreme Court then cited Bishop as asserting that "the doctrine generally approved by the American authorities" is the one taken in *Aymette* v. *State* (1840), *State* v. *Reid* (1840), *State* v. *Mitchell* (1833), and *State* v. *Newsom* (1844)—and then tells us this doctrine was accepted by Blackstone: "[T]he offense of riding or going around armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land."[74]

72 *English* v. *State*, 35 Tex. 473, 474 (1872).

73 *English* v. *State*, 35 Tex. 473, 481 (1872).

74 *English* v. *State*, 35 Tex. 473, 475, 476 (1872).

But of course, the decisions taken in *Aymette* and *Reid* are very different—only *concealed* carry was held to be unprotected in *Reid*, while open carry was clearly protected; in *Aymette*, the issue of open carry was not directly addressed, though it was implied that open carry was not protected. The Court next addressed the issue of what arms are protected:

> To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit. *The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.* The arms of the infantry soldier are the musket and the bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms. [emphasis added]

> The terms dirks, daggers, slungshots, sword-canes, brass knuckles and bowie knives, do not belong to military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline.[75]

The Court made a distinction between a bayonet, a piece of military equipment which every member of the militia was required to own under the Militia Act of 1792,[76] and a "dagger" or "bowie knife." (If such a distinction was valid in 1872, it has evaporated today, when bayonets have become equivalent to a nineteenth century Bowie knife in size, and combat knives are issued to soldiers.) But those arms that were unambiguously military weapons were completely protected. The discrepancy between this decision and *Cockrum* v. *State* (1859) is a yawning chasm.

Yet the Court did agree that there were circumstances under which the carrying of deadly weapons for personal defense was appropriate, if not constitutionally protected:

> The act referred to makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover all the wants of society. There is no abridgement of the personal rights, such as may be regarded as inherent and inalienable to man, nor do we think his political rights are in the least infringed by any part of this law.[77]

The Court then echoed the language of *Aymette* v. *State* (1840) about the evils of revenge:

> It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which states and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the state for redress. We must not go back to that state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.

75 *English* v. *State*, 35 Tex. 473, 476, 477 (1872).
76 *Annals of Congress*, 2 Cong., May 8, 1792, 1394.
77 *English* v. *State*, 35 Tex. 473, 477 (1872).



But as with *Aymette*, the Court blurred the distinction between revenge and self-defense—holding that having the ability to defend oneself was equivalent to taking away the state's authority to try and punish a criminal.

The Court's feelings on personal liberty are also explicated:

> It is useless to talk about personal liberty being infringed by laws such as that under consideration. The world has seen too much licentiousness cloaked under the name of natural or personal liberty; natural and personal liberty are exchanged, under the social compact of states, for civil liberty.[78]

With respect to the more narrowly worded Texas Constitutional provision:

> It is further claimed that this is a law in violation of the thirteenth section, first article, of our own constitution, which reads thus: "Every person shall have the right to keep and bear arms in the lawful defense of himself or the state, under such regulations as the legislature may prescribe." We understand the word "arms," when used in this connection, as having the same import and meaning which it has when used in the amendment of the federal constitution.[79]

But where the Court held that the Second Amendment did not protect an individual right for self-defense, the language of the Texas Constitution was explicitly individual ("Every person shall have the right to keep and bear arms") and explicitly for self-defense ("in the lawful defense of himself").

Without question, the Texas Constitutional provision gave the Legislature authority to regulate the keeping and bearing of arms. But unlike many other courts, which recognized that it was possible to regulate a right into non-existence, the Texas Supreme Court held that the legislature had regulated it by this law, without taking the right away.

That the Court intended some nineteenth century "social engineering" can be found in the closing paragraphs of its decision:

> But a law is not be to be set aside because it may be repugnant to the wishes, or distasteful to a class of the community, for it is generally to that class that the law is more especially addressed. Were such a rule to obtain in civilized states, it would operate a revocation of all legislative functions; the mob would assume to declare what should be law, and what should not. There could be no reformation of evils in society. Communities and states would degenerate just in proportion as their laws were wise and wholesome, or foolish and immoral.

Careful reading of these sentences leads to some disturbing questions: what "class of the community" was this law supposed to reform? What "mob" was the Court concerned about? Somehow, the language of this decision makes it hard to picture a small number of criminals as the class the Court felt compelled to restrain and chastise.

Even more astonishing is the wishful thinking and elitist sentiment expressed in the next paragraph:

> The law under consideration has been attacked upon the ground that it was contrary to public policy, and deprived the people of the necessary means of self-defense; that it was an innovation upon the customs and habits of the people, to which they would not peaceably submit. We do not think the people of Texas are so bad as this, and we do think that the latter half of the nineteenth century is not too soon for Christian and civilized states to legislate against any and every species of crime. Every system of public

78 *English* v. *State*, 35 Tex. 473, 477 (1872).
79 *English* v. *State*, 35 Tex. 473, 478 (1872).