ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>                    Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>                    Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 11 OF 37**<br><br>Courtroom: 5A<br>Judge: Hon. Roger T. Benitez<br><br>Action Filed: August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 2 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

laws should be, in itself, the purest and best system of public morality. We will not say to what extent the early customs and habits of the people of this state should be respected and accommodated, where they may come in conflict with the ideas of intelligent and well-meaning legislators.

We now reach the part of this decision that suggests the "class" at whom this law may have been aimed, or at whom the Texas Supreme Court felt that it should be aimed:

> *A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system.* Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snovi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of these nations blended together in *a system by no means to be compared with the sound philosophy and pure morality of the common law.*[80] [emphasis added]

Are we to interpret this as indicating that the statute was aimed at the Hispanic population of Texas? None of the defendants have Hispanic names; yet this may indicate only the quality of justice, and possibility for appeal, available to Hispanics who violated this law. And, as we have also seen, the common law *did* recognize a right to self-defense, and a right to carry arms.

Three years passed, and in the intervening period, the Republicans lost control of Texas,[81] though not before Democrats and a black militia came close to armed warfare in the statehouse. The Democrats, once again in control of the legislature, rapidly repealed many of Governor Davis' measures, including the state police,[82] but not the weapons restrictions.

In the next case, *State* v. *Duke* (1875), George Duke was indicted for violation of this act; it was charged that Duke did "unlawfully carry on his person one pistol, known as a six-shooter." The trial judge in Caldwell County set aside Duke's indictment on the grounds that a violation of law had not been charged, because the carrying of a pistol, by itself, was not a violation of the law.[83] The technical nature of the indictment's inadequacy occupied much of the Court's decision in this case, and is uninteresting from the standpoint of the right to keep and bear arms.

However, the issue of what constitutes "protected arms" was addressed by the Texas Supreme Court, as was the extent of state and Federal Constitutional protections. The Court first excluded the Second Amendment from consideration, because, in the Court's opinion, the Bill of Rights was not a limitation on state laws. Next, the Court considered the Texas constitutional provision.[84]

While the Court in *State* v. *Duke* (1875) upheld the precedent of *English* v. *State* (1872), that the law limiting the carrying of weapons did not conflict with this constitutional provision, they did take issue with the *English* decision's definition of "arms":

> *We... do not adopt the opinion expressed that the word "arms," in the Bill of Rights, refers only to the arms of a militiaman or soldier.* Similar clauses in the Constitution of other

---

[80] *English* v. *State*, 35 Tex. 473, 478, 479, 480 (1872).
[81] Viault, 17-18.
[82] Ramsdell, 313, 316-7.
[83] *State* v. *Duke*, 42 Tex. 455, 456, 459, 460 (1875).
[84] *State* v. *Duke*, 42 Tex. 455, 457, 458 (1875).

States have generally been construed by the courts as using the word *arms* in a more comprehensive sense....[85] [emphasis added]

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State. *If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection. But beyond question, the dragoon or holster pistol is part of the arms of a soldier in that branch of the service.* (Coldwell v. The State, 3 Heiskell, 166,[86] and English v. The State, 35 Texas, 476). Regarding, then, some kinds of pistols as within the meaning of the word, we are of the opinion that the Act in question is nothing more than a legitimate and highly proper regulation of their use. We are not called on to lay down general rules, prescribing how far legislative regulation may be extended, without trespassing on the constitutional rights of the citizen. The question for our decision is the constitutionality of the Act under which this indictment was proved. It undertakes to regulate the place where, and circumstances under which a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business. We hold that the statute under consideration is valid, and that to carry a pistol under circumstances where it is forbidden by the statute, is a violation of the criminal law of the State.[87] [emphasis added]

And so the action of the district judge in overturning the indictment was upheld, but the statute was again upheld as constitutional.[88]

Immediately after the *Duke* decision, the Texas Supreme Court decided a number of other appeals in conjunction with the same law. While interesting in their own right, no constitutional issues were raised or discussed in *Young* v. *State* (1875), *Smith* v. *State* (1875), or *Williams* v. *State* (1875).[89]

The Georgia Court's prewar recognition of a right to keep and bear arms began to crumble after the Civil War. Most of the details of *State* v. *Hill* (1874) have not made it into the decision. Unfortunately, all that the headnotes tell us about the case is that the plaintiff was named Miles Hill, and that he was indicted "under section 4528 of the Code, prohibiting the carrying of pistols... to any court of justice...." The decision itself tells us nothing else about the circumstances under which Mr. Hill violated the law.

Justice McCay, writing the opinion of the Georgia Supreme Court, quickly disposed of the Second Amendment as well as natural law:

> It is now well settled that [the Bill of Rights] are all restriction, not upon the states, but upon the United States. And this would seem to be the inevitable conclusion from the history of these amendments as well as from their nature and even their terms. I do not myself assent to that other limitation of the legislative powers of our general assembly

---

[85] But, as has been the case in many of these decisions, there are some disturbing errors in the cited cases: *Bliss* v. *Commonwealth* became *Bliss* v. *Cane* in the list of citations that followed.
[86] *State* v. *Duke*, 42 Tex. 455, 458 (1875). *Coldwell* v. *The State* is incorrect; the location cited is *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 8 Am. Rep. 8 (1871).
[87] *State* v. *Duke*, 42 Tex. 455, 458, 459 (1875).
[88] *State* v. *Duke*, 42 Tex. 455, 462 (1875).
[89] *Young* v. *State*, 42 Tex. 462 (1875); *Smith* v. *State*, 42 Tex. 464 (1875); *Williams* v. *State*, 42 Tex. 466 (1875).

Compendium_Roth
Page 0204

insisted upon in the argument, and sometimes announced by courts, to-wit: the "higher law," which is appealed to as above even the constitution.

But Hill also argued that the Georgia constitutional provision protected his right to bear arms—and in light of the decision of the Georgia Supreme Court in *Nunn* v. *State* (1846), it was a reasonable argument to advance. But there had been changes in the Georgia Constitution, and the changes created an loophole:

> At last, therefore, if this act be unconstitutional it must be because it is conflict with the state constitution. Article I., section 14, of the constitution of 1868 is as follows: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne." The act of October, 1870, upon which this indictment is based, is in these words: "No person in said state shall be permitted or allowed to carry about his or her person any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this state, except militia muster grounds."[90]

What was the purpose of this law? Violence had successfully intimidated blacks into not voting in Georgia in the 1868 elections, giving control of the Legislature to the Democrats.[91] The 1865 Georgia Constitution adopted the entire U.S. Bill of Rights, including the Second Amendment. The 1868 constitutional convention used the Second Amendment with the addition of "but the General Assembly shall have the power to prescribe by law the manner in which arms may be borne."[92] The exact reason for this addition is not clear, but at least one black Republican newspaper had advised its readers in 1866 that the Second Amendment protected their right to arms: "All men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves."[93]

In October 1870 the Georgia Legislature was under Republican control because of military intervention by the occupying Union army, and new elections were scheduled for December of that year. It would seem likely that the Republicans sought to protect blacks from intimidation in the courts and polling places. By 1874, when this decision was decided, Georgia was back in the control of the Democrats.[94]

The Georgia Supreme Court devoted more than a page to expressing Justice McCay's opinion that, "Were this question entirely a new one, I should not hesitate to hold" that the state and Federal provisions guaranteed "only the right to keep and bear the 'arms' necessary for a militiaman," and proceeded to explain:

> I have always been at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day. It is in my judgment a perversion of the meaning of the word arms, as used in the phrase "the right to keep and bear arms," to treat it as including weapons of this character. *The word "arms," evidently means the arms of a militiaman, the weapons ordinarily used in battle, to-wit: guns of every*

---

90 *State* v. *Hill*, 53 Ga. 472, 473, 474 (1874).
91 Abbott, 201.
92 Halbrook, *A Right To Bear Arms*, 116.
93 *The Loyal Georgian* (Augusta), Feb. 3, 1866, 3, col. 4, quoted in Halbrook, *A Right To Bear Arms*, 115-6.
94 Abbott, 209. Viault, 17-18.

> *kind, swords, bayonets, horseman's pistols, etc.* The very words, "bear arms," had then and now have, a technical meaning.[95] [emphasis added]

Justice McCay then went on to articulate his reasons for believing that "to bear arms" was specifically military, based on the use of this construction in a number of contexts which are military. No historical or lexicographical authority was cited for his understanding of this meaning of "bear arms," or his narrow definition of "arms." As we have already seen, contemporary use and dictionaries demonstrate that Justice McCay was incorrect about the Framers' meanings.

Justice McCay then admits that his own personal beliefs on the subject are insufficient justification:

> But assuming that the guarantee of our state constitution was intended to include weapons of this character, (which, considering that it was made a part of the constitution after the decision of *Nunn vs. The State*, in 1 *Kelly*, is not improbable,) we still are of the opinion that the act of October, 1870, is not unconstitutional. The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee. Take the clause in its largest sense; let the word "arms" include weapons of every kind; we think its guarantee would not cover so absurd, useless, defiant, and disorderly a practice as this act of 1870 forbids.[96]

Justice McCay then argued that the clause concerning a "well regulated militia" declared the purpose of the "the right of the people," and therefore the Constitutional provision restricted the purpose of the right:

> The constitution declares that as such a militia is necessary to the existence of a free state, the right of the people to keep and bear arms shall not be infringed. To effect this end, the right to have arms would seem to be absolute, since without this right, it would not be possible to attain the end contemplated, to-wit: an armed militia, organized and ready for the public exigencies. But it is obvious that the right to bear or carry arms about the persons at all times and places and under all circumstances, is not a necessity for the declared object of the guarantee; nay, that it does not even tend to secure the great purpose sought for, to-wit: that the people shall be familiar with the use of arms and capable from their habits of life, of becoming efficient militiamen. If the general right to carry and to use them exist; if they may at pleasure be borne and used in the fields, and in the woods, on the highways and byeways, at home and abroad, the whole declared purpose of the provision is fulfilled.[97]

At this point, the differences between this decision, and *Nunn* v. *State* (1846), are undramatic. Justice McCay acknowledged a right to possess arms out on the highways, but then held that this guarantee

> is in no fair sense a guarantee that the owners of these arms may bear them at concerts, and prayer-meetings, and elections. At such places, the bearing of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of proper respect for the majesty of the laws, and a marked breach of good manners. If borne at all under the law, they must be borne openly and plainly exposed to view, and under the circumstances we allude to, the very act is not only a provocation to a breach of the peace, but dangerous to human life.[98]

---

95 *State* v. *Hill*, 53 Ga. 472, 474 (1874).
96 *State* v. *Hill*, 53 Ga. 472, 474, 475 (1874).
97 *State* v. *Hill*, 53 Ga. 472, 475, 476 (1874).
98 *State* v. *Hill*, 53 Ga. 472, 476 (1874).

Compendium_Roth
Page 0205

On the one hand, they are "offensive" and a "provocation" if exposed to view, but may only be "borne openly." Justice McCay's notion of a right could easily be squeezed out between the requirement for open carry and the requirement to not offend or provoke.

To justify the idea that there were proper limitations on the power of the government that did not destroy that right, Justice McCay next cited a section of the Georgia bill of rights that requires, "The right of the people to appeal to the courts... shall not be impaired," and drew an analogy between that right and the right to bear arms:

> If the legislature restrict the appeal to certain times and places, and under certain reasonable conditions necessary for the public good; if it pass a statute of limitations, or regulate the rules of evidence or provide that one judgment of the court shall be conclusive, all these are limitations upon the right to appeal to the courts... One guarantee is not to swallow up all others, but each is to be construed reasonably in reference to its plain intent, and other rights guaranteed to the people. The right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.[99]

After arguing that the clause of the Georgia constitutional provision which provides, "the legislature may prescribe the manner in which arms may be borne," was broader than an allowance for the legislature to prohibit concealed carry," McCay seemed to back down, and admit that such regulations must be "reasonable":

> The right to "tote" them, as our colored people say, would be a bootless privilege, fitting one, perhaps, for playing soldier upon a drill ground, but offering no aid in that knowledge which makes an effective, to-wit: a shooting soldier. To acquire this skill and this familiarity, the words "bear arms" must include the right to load them and shoot them and use them as such things are ordinarily used, so that the "people" will be fitted for defending the state when its needs demand; and *when the constitution grants to the general assembly the right to prescribe the manner in which arms may be borne, it grants the power to regulate the whole subject of using arms, provided the regulation does not infringe that use of them which is necessary to fit the owner of them for a ready and skillful use of them as a militiaman. Any restriction which interferes with this is void, whether it relates to the carrying of them about the person, or to the place or time of bearing them.*
>
> The manner of bearing arms includes not only the particular way they may be carried upon the person, that is openly or secretly, on the shoulder or in the hand, loaded or unloaded, cocked or uncocked, capped or uncapped, but it includes, also, the time when, and the place where, they may be borne. It is no reply to this view of the subject to say that if the legislature may do this, they may, in effect, prohibit the carrying them altogether. The same reply may be made to the admitted right to prescribe the manner of carrying arms upon the person. *If the legislature were to say arms shall not be borne on the shoulder, nor in the hands, or on the arms, but they shall only be borne strapped or fastened upon the back, this would be prescribing only the manner, and yet, it would, in effect, be a denial of the right to bear arms altogether.* The main clause and the limitation to it are both to be construed reasonably, and in view of the declared object of the provision.[100] [emphasis added]

---

99 *State* v. *Hill*, 53 Ga. 472, 477, 478 (1874).
100 *State* v. *Hill*, 53 Ga. 472, 479, 480, 481 (1874).

What, exactly, does this mean? This decision is like a drunken driver, weaving from side to side, and narrowly missing clear statements of what is protected. The right does not exist in a church, a courtroom, or a concert, but it does exist on the highways, and apparently, in a number of other public places. The legislature may prohibit open carry, or concealed carry, or nearly any aspect of how a weapon is to be carried, except that such a restriction must not deny the right to bear arms altogether.

The history of the 1877 state constitutional convention suggests that the Georgia Supreme Court's willingness to uphold restrictions on open carry had an impact on the populace. The language of the 1868 constitution was again adopted, with only the deletion of the words "by law." When this clause was being debated, the arguments advanced suggest that the purpose was to allow the legislature to prohibit concealed carry; a proposal to allow the legislature to "prescribe the manner *and place* in which arms may be borne" was voted down. Concealed carry was not protected, but by implication, open carry, nearly anywhere, was protected.[101]

By the end of Reconstruction, the notion of a right to carry concealed arms had been so thoroughly denied by the courts of the former Confederacy that defense attorneys were no longer arguing it before Southern state supreme courts. Typical of a number of cases during this period is *Chatteaux* v. *State* (1875). Chatteaux, a fruit and vegetable dealer in Mobile, Alabama, carried a concealed pistol in the early hours of the morning, as he passed through a dangerous section of town on his way to the marketplace. Later that same evening, Chatteaux went to the post office, no longer concerned about his safety, but still carrying the pistol in his pocket, where it had been since morning. He removed the pistol from his pocket, though the decision does not tell us why he did so.

Citing the *Eslava* decision, in which the constitutional right to carry arms was neither asserted nor denied,[102] the Alabama Supreme Court held "that the right to carry a pistol, or other weapon concealed, for any of the reasons mentioned in the statute, was co-extensive only with the necessity or occasion on which the right depended." Chatteaux's conviction was upheld.[103] Neither the Second Amendment, nor the Alabama Constitution's protection of a right to keep and bear arms, was raised by the defense.

The *Dred Scott* decision had recognized that the rights of "citizens of the United States" were protected against state action; this should have been sufficient basis for Congress to pass federal laws protecting freedmen from state action. But since the *Dred Scott* decision had successfully drawn a line between "citizens" and "people," it is not surprising that a more explicit extension of the Bill of Rights to restrict state laws was desired. While rhetoric of the time was built around protecting the rights of the freedmen, crasser political motivations have been postulated as well. (Improving the conditions of free blacks in the South would tend to reduce migration of them to the North—where they were no more welcome than in the South.) As part of that effort, the Civil Rights Act of 1866 and the Fourteenth Amendment were passed, intended to guarantee that the "privileges and

---

101 Halbrook, *A Right To Bear Arms*, 116.
102 *Eslava* v. *State*, 49 Ala. 355 (1873).
103 *Chatteaux* v. *State*, 52 Ala. 388, 391 (1875).

Compendium_Roth
Page 0206