ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3479
Fax: (415) 703-1234
E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

**JAMES MILLER et al.,**

Plaintiffs,

**v.**

**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**

Defendants.

Case No. 3:19-cv-01537-BEN-JLB

**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**

**VOLUME 12 OF 37**

Courtroom: 5A
Judge: Hon. Roger T. Benitez

Action Filed: August 15, 2019

# INDEX


| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield*, Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

immunities" of citizens of the United States would be protected from abusive state laws.

In the debates surrounding the Civil Rights Act of 1866, both opponents and supporters agreed that passage of it would restrict the authority of the states to disarm blacks. Opponents argued that it would prohibit racially discriminatory gun control laws, while supporters insisted it would protect the rights of blacks to have arms—a subject of some importance, as many of the Southern states and municipalities attempted to restrict or prohibit possession or carrying of arms by blacks.[104]

Considerable dispute still surrounds the intentions of the Fourteenth Amendment, but recent scholarship is increasingly willing to recognize that the Fourteenth Amendment was intended to extend *all* of the Bill of Rights to the states. When the Fourteenth Amendment was introduced in Congress in 1866, "a chief exponent referred to 'the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as freedom of speech and of the press; ... the right to keep and bear arms...'"[105]

The noted Reconstruction historian Eric Foner recently wrote:

> The states, declared Michigan Sen. Jacob Howard, who guided the Amendment to passage in the Senate, could no longer infringe on the liberties the Bill of Rights had secured against federal violation; henceforth, they must respect "the personal rights guaranteed and secured by the first eight Amendments." [Rep. John] Bingham said much the same thing in the House. Some portions of the Bill of Rights were of little moment in 1866.... *But it is abundantly clear that Republicans wished to give constitutional sanction to states' obligation to respect such key provisions as freedom of speech, the right to bear arms,* trial by impartial jury, and protection against cruel and unusual punishment and unreasonable search and seizure. The Freedmen's Bureau had already taken steps to protect these rights, and the Amendment was deemed necessary, in part, precisely because every one of them was being systematically violated in the South in 1866.[106] [emphasis added]

Other supporters argued for the amendment because it was needed to overturn laws that prohibited "colored men to carry weapons without a license."[107] Two years later, when the anti-Klu Klux Klan bill was debated in Congress, Bingham, the principal draftsman of the Fourteenth Amendment, repeated what the "rights and privileges" secured by it included:

> Mr. Speaker, that the scope and meaning of the limitations imposed by the first section, fourteenth amendment of the Constitution may be more fully understood, permit me to say that the privileges and immunities of citizens of a State, are chiefly defined in the first eight amendments to the constitution of the United States.[108]

In *U.S.* v. *Cruikshank* (1876), the Supreme Court had an opportunity to express its opinion about the Second Amendment and its relation to the Fourteenth

104 Halbrook, "The Fourteenth Amendment...", 70-71. Halbrook is a proponent of the view that the Fourteenth Amendment was intended, at least partly, to protect freedmen from state gun control laws; evidence corroborating Halbrook's understanding of the philosophy of the Radical Republicans from a less partisan source can be found in Avery Craven, *Reconstruction: The Ending of the Civil War,* (New York: Holt, Rinehart, and Winston, 1969), 168-71, 174-5.

105 Congressional Globe, 39th Congress, 1st Sess., pt. 3, 2765 (May 23, 1866), quoted in Halbrook, "The Fourteenth Amendment...", 72.

106 Foner, 258-9.

107 Halbrook, "The Fourteenth Amendment...", 72.

108 Congressional Globe, 42nd Congress, 1st Sess., pt. 2, Appendix, 84 (March 31, 1871), quoted in Halbrook, "The Fourteenth Amendment...", 75.



Amendment. The Supreme Court decision described this case as a mob of whites, including one William Cruikshank, who had broken up a freedmen's political meeting, deprived them of their arms, and prevented them from voting in a state election. In fact, more than one hundred black men were prevented from voting by being murdered by Cruikshank's mob.[109] Under the Enforcement Act of 1870, the whites involved were indicted, tried, and convicted in the federal courts.[110] On appeal, the Supreme Court overturned their convictions in an ingenious manner, completely subverting Congressional intent with respect to the Fourteenth Amendment and the Enforcement Act of 1870. While only some parts of the decision are relevant to the Second Amendment, the Court used the same arguments with respect to the First and Second Amendments.

Acknowledging that the Fourteenth Amendment had extended the rights of national citizenship to be protected from state abuse, the Court adopted a novel concept: such rights were protected *only* to the extent that they were related to the *national* government. The Court contended that, "The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for anything else connected with the powers or duties of the National Government, is an attribute of national citizenship and, as such, under the protection of and guarantied by, the United States." Similarly, the First Amendment "was not intended to limit the powers of the state governments in respect to their own citizens, but to operate upon the National Government alone." It is within this narrowly defined view of the Bill of Rights that the Court found:

> The right of bearing arms for a lawful purpose is not a right granted by the Constitution; neither is it any manner dependent upon that instrument for its existence. The Second Amendment declares that it shall not be infringed, but this means no more than that it shall not be infringed by Congress.[111]

The *Cruikshank* decision, in essence, held that the Bill of Rights was *not* incorporated by the Fourteenth Amendment, except as such rights related to the national government. Republican commentary on the *Cruikshank* decision is astonishing for the conclusions reached:

> Supreme Court decisions on the "right to bear arms" have repeatedly stated that the Second Amendment was conceived of as a restraint on the power of the federal government over the state militias. In *U.S. v. Cruickshank*, 95 U.S. 542 (1874), the Court held that while there may be an individual right to possess arms, it existed independently of the Second Amendment.[112]

In fact, there is no such statement of intent in the *Cruikshank* decision, contrary to the assertion in the first sentence quoted above, and no reference to "state militias." With respect to the second sentence above, the Court ruled that the right existed before the Constitution, and that the meaning of the Second Amendment was "that it shall not be infringed by Congress." Later in the decision, the Court declared:

109 Lucy E. Salyer, "Cruikshank, United States v.," in Kermit L. Hall, ed., *The Oxford Companion to the Supreme Court of the United States,* (New York: Oxford University Press, 1992), 209.

110 *U.S.* v. *Cruikshank*, 92 U.S. 542, 548, 555 (1876).

111 *U.S.* v. *Cruikshank*, 92 U.S. 542, 552 (1876).

112 Michael K. Beard and Samuel S. Fields, "National Coalition to Ban Handguns Statement on the Second Amendment", in *The Right To Keep And Bear Arms*, 92. Note that the spelling and citation of this case are incorrect. Since the spelling is incorrect throughout Beard & Fields' paper, it can't be a typo.

The Second Amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National Government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes, to what is called, in City of N.Y. v. Miln, 11 Pet. 129, the "powers which relate to merely municipal legislation, or what was perhaps, more properly called internal police," "not surrendered or restrained" by the Constitution of the United States.[113]

Levin, another member of the republican school, tells us:

*U.S. v. Cruickshank*, implied that there was a *personal* right to bear arms upon which Congress could not infringe. The central point of the opinion, however, was to state that the second amendment did not apply to state governments, and such governments could pass whatever legislation they desired without fear of federal sanction.[114]

But of course, this is *not* the central point of the opinion. The Court decided that the Fourteenth Amendment did *not* include all the protections of the Bill of Rights, and then set about determining which rights were incorporated. Beard, Fields, and Levin never tell us that the *Cruikshank* decision held that *only* the right to vote and assemble had come under the authority of the Federal Government, and then, only if voting for federal offices or assembling to petition Congress.[115]

Further, the Court made an interesting assertion with respect to the nature of the rights protected by the Bill of Rights. In discussing the right to peaceably assemble:

The particular Amendment now under consideration assumes the existence of the right of the people to assemble for lawful purposes, and protects it against encroachment by Congress. The right was not created by the Amendment; neither was its continuance guarantied, except as against congressional interference. For their protection in its enjoyment, therefore, the people must look to the States.[116]

The same logic and phrasing was used by the Court with respect to the Second Amendment:

The second and tenth counts are equally defective. The right there specified is that of "bearing arms for a lawful purpose." This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence.[117]

The Court asserted that these rights were not *granted* by the Constitution, but were pre-existing. The Amendments *recognized* those rights, and protected them against Congress' infringement. It is possible to quote "The right was not created by the Amendment..." in such a manner as to imply that the Court believed that no such right existed; within the larger context of the discussion, it is clear that the Court was resisting the incorporation doctrine clearly stated by the principal author, proponents, and opponents of the Fourteenth Amendment, but was not denying that these rights existed, at least in a moral sense.

113 *U.S.* v. *Cruikshank*, 92 U.S. 542, 553 (1876). *New York* v. *Miln* (1837) upheld a New York State law that required ship captains landing immigrants to post a bond against them becoming public charges. McDonald, 82-83.

114 Levin, 124-5. At least Levin cites the case location correctly; only the name is misspelled, but that error is made consistently. It appears that Beard, Fields, and Levin are all relying on a common (and erroneous) secondary source for their information about this case.

115 *U.S.* v. *Cruikshank*, 92 U.S. 542 (1876).

116 *U.S.* v. *Cruikshank*, 92 U.S. 542, 552 (1876).

117 *U.S.* v. *Cruikshank*, 92 U.S. 542, 553 (1876).



In the twentieth century, this doctrine of incorporation has been recognized as extending nearly all of the Bill of Rights to protect citizens against state laws. To use *Cruikshank* as evidence that the Second Amendment does not protect an individual right is valid only if we accept *Cruikshank*'s reasoning with respect to free speech, freedom of assembly, and all the rest of the protections of the Bill of Rights that are now incorporated.

Nearly all the decisions during this period took place in former slave states; our next two decisions are remarkable in that they took place in states not experiencing the social dislocations of emancipation. *Wright* v. *Commonwealth* (1875), took place in Pennsylvania. A Jonathan Wright was indicted in April 1871 in Schuylkill County, charging that: "he 'did unlawfully and maliciously carry on and about (his) person, a certain concealed deadly weapon, commonly called a pistol, with intent, with the pistol aforesaid, unlawfully and maliciously, to do bodily harm to some other person, to the inquest unknown, &c.'"

While the jury found Wright innocent, they did order him to pay court costs. The defendant appealed the order to pay court costs, arguing that the May 5, 1864 county ordinance which prohibited the carrying of concealed weapons was a violation of the 21st section of Pennsylvania's Bill of Rights. Since his indictment was for an action which was not a crime, Wright felt that he should not be obligated to pay.

The Pennsylvania Supreme Court's ruling is short, without citation of either precedent or authority for their decision about the constitutionality of the law in question: "Such an unlawful act and malicious intent as this has no protection under the 21st section of the Bill of Rights, saving the right of the citizens to bear arms in defence of themselves and the state." The Court further held that the jury must have had a good reason for imposing court costs on the defendant, even if they found him innocent. While the headnotes for this decision assert that "prohibiting the carrying of concealed weapons, is not obnoxious to the Bill of Rights, sect. 21," the decision itself specifies both "an unlawful act and malicious intent,"[118] suggesting that the combination of the two elements was required to constitute a crime. But did the court consider the carrying of concealed weapons to be part of the malicious intent, or was some other evidence of criminal intent required?

An additional interesting question is what part, if any, the 1873 Pennsylvania Constitutional Convention played. The 1790 Pennsylvania Constitution, Article IX, §21, contained the guarantee: "That the right of citizens to bear arms, in defence of themselves and the State, shall not be questioned."[119] At the 1873 convention, an attempt was made to add the word "openly" after the word "citizens": "Thomas Struthers, the proponent of the change, argued that persons charged with carrying arms secretly 'fall back on the Constitution, which they say authorizes the bearing of arms, and therefore the act of Assembly is unconstitutional.'"

His opponents responded that this would require them "to walk the streets of this city at night without any protection whatever from ruffians"; another argued that the law in Pennsylvania "required showing of evil intent" in conjunction with concealed carrying of weapons, and was thus a constitutional law. The proposed

118 *Wright* v. *Commonwealth*, 77 Pa. St. 470, 471 (1875).

119 Thorpe, 5:3101.

amendment lost, 54-23.[120] It is not clear if the Pennsylvania Supreme Court took into account the actions of the constitutional convention two years before, or independently reflected the same sentiments held by the majority of the delegates.

Another Northern decision during this period was *Wiley* v. *Indiana* (1876). The defendant Wiley was convicted of carrying a concealed weapon. No attempt was made to challenge the law on constitutional grounds; the only dispute was whether the prosecution was required to prove that Wiley was *not* a traveller, and thus subject to the law, or whether the defense had an obligation to demonstrate that Wiley *was* a traveller, and thus exempt from the law. The Indiana Supreme Court held that the obligation was on the defense to prove that he was a traveller, not on the prosecution to prove that he wasn't.[121] This strongly suggests that the carrying of concealed arms was not recognized as a right by the Indiana Court, consistent with the decision in *State* v. *Mitchell* (1833).

Labor violence played a part in two decisions from Illinois during this period. One of these decisions is *Presser* v. *Illinois* (1886), one of the U.S. Supreme Court's often misquoted statements about the meaning of the Second Amendment. By examining the circumstances under which this decision was handed down, we can better understand—and be horrified—by the logic of the Court.

One of the original theses upon which research for this work was started was that fear of labor violence, and the desire to oppress workers, played a major role in the narrow republican interpretations of the right to arms that have appeared throughout the history of the Republic. But while there is some evidence to support this position, the bulk of the evidence suggests that labor unions were only a small part of this judicial misinterpretation of the Second Amendment and its state analogs.

There are a number of decisions in which the Second Amendment is merely an innocent bystander. These decisions reflect the increasingly severe violence associated with the development of large industrial combinations in late nineteenth century America, and the growth of labor unions in response. While sometimes cited as evidence by the republican school that no individual right is protected by the Second Amendment, a more detailed examination of the decisions suggests otherwise. Also of interest is what the circumstances that led to these decisions tell us about the loss of the ideal of a people's militia. The National Guard, by the period after the Civil War, began to play an increasingly important role in intimidating labor unions. In Chicago, a group of immigrant German socialists formed an armed club to defend themselves and their families against criminal attacks by the National Guard.[122]

The first decision in this vein is primarily *not* a "right to keep and bear arms" case. But exactly what it is, from the syllabus and decision, is a bit of a mystery. What should have been a straightforward case of refusing jury duty, turned into a decision eighteen pages long, with three pages of syllabus, and a baffling array of secondary issues. For those researching the issues of militia duties, and the relationship between the National Guard, standing armies, and military duty, *Dunne* v. *People* (1879) is a gold-mine of citations and issues.

120 Halbrook, *A Right To Bear Arms*, 116-7.
121 *Wiley* v. *Indiana*, 52 Ind. 516, 517, 518 (1876).
122 Sanford Levinson, "The Embarrassing Second Amendment", *Yale Law Journal*, 99 [December 1989], 637, 652-3.



Peter J. Dunne had been summoned to jury duty in Cook County, in September 1879. He attempted to excuse himself from jury duty by arguing that "he was an enlisted, active member of the 'Illinois National Guard'," and was therefore exempt under the statute of May 28, 1879. The court refused to accept his excuse, and fined him $50. There was apparently some question about the validity of this statute (at least in part), and both parties requested that the Illinois Supreme Court hear the case. They did hear it, in November of that same year.[123]

Mr. Dunne challenged, it appears, nearly every aspect of the law in question; of interest to us is the authority of the state government to regulate the private bearing of arms. The Illinois Supreme Court upheld the authority of the state to regulate private organizations parading with arms:

> The right of the citizen to "bear arms" for the defence of his person and property is not involved, even remotely, in this discussion. This section has no bearing whatever on that right, whatever it may be, and we will enter upon no discussion of that question. Whether bodies of men, with military organizations or otherwise, under no discipline or command by the United States or the State, shall be permitted to "parade with arms" in populous communities, is a matter within the regulation and subject to the police power of the state.[124]

The Illinois Supreme Court appears to have acknowledged that a "right of the citizen to 'bear arms' for the defence of his person and property" did exist, but then the Court backtracked and referred to it as, "that right, whatever it may be," and refused to discuss it further. Was this just clumsy writing, or were more sinister motives involved?

Immediately following this statement was an assertion far removed from both Revolutionary and modern notions of the proper limits of governmental power:

> In matters pertaining to the internal peace and well-being of the State, its police powers are plenary and inalienable. It is a power co-extensive with self-protection, and is sometimes termed, and not inaptly, the "law of overruling necessity." Every necessary act for the protection, safety and best interests of the people of the State may be done under this power. Persons and property may be subjected to all reasonable restraints and burdens for the common good. Where mere property interests are involved, this power, like other powers of government, is subject to constitutional limitations; but where the internal peace and health of the people of the State are concerned, the limitations that are said to be upon the exercise of this power are, that such "regulations must have reference to the comfort, safety and welfare of society." It is within the power of the General Assembly to enact laws for the suppression of that which may endanger the public peace, and impose penalties for the infraction of such laws. What will endanger the public security must, as a general rule, be left to the wisdom of the legislative department of the government.[125]

As will become apparent in the next case, opposition to the Illinois statute regulating private militias did not end with *Dunne*; the month after this decision, the issue of private militias ceased to be an abstraction. *Presser* v. *Illinois* (1886) presents an example of how the U.S. Supreme Court narrowly upheld the right to keep and bear arms, apparently as an individual right, based on a republican view of military obligation—while upholding a law that violated the spirit of the Second Amendment.

123 *Dunne* v. *People*, 94 Ill. 120, 123 (1879).
124 *Dunne* v. *People*, 94 Ill. 120, 140, 141 (1879).
125 *Dunne* v. *People*, 94 Ill. 120, 141 (1879).