1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA 94102-7004
     Telephone: (415) 510-3479
7    Fax: (415) 703-1234
     E-mail: John.Echeverria@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** |
| v. | **VOLUME 13 OF 37** |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | Courtroom: 5A<br>Judge: Hon. Roger T. Benitez |
| Defendants. | Action Filed: August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1, 2, 3 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 4, 5, 6, 7 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 8, 9, 10 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 11, 12, 13, 14 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 15, 16 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 17, 18 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 19, 20, 21 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 22, 23, 24 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 25, 26 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 27, 28 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1 2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| 3 4 5 6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| 7 8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 10 11 12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13 14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15 16 17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18 19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20 21 22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23 24 25 26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

Compendium of Works Cited in Declaration of Randolph Roth
(3:19-cv-01537-BEN-JLB)

In response to the previously mentioned abuses of workers by the Illinois National Guard, a workers' militia was established.[126] Herman Presser led a march of this workers' militia, called the *Lehr und Wehr Verein* ("teaching and defense union"), through the streets of Chicago, with Presser on horseback carrying a sword in his hand, and the workers carrying rifles behind him. Presser was indicted under the 1879 Illinois militia statute, which prohibited any militia from organizing, drilling, or parading "without the license of the governor."

On appeal from the Illinois Supreme Court, the U.S. Supreme Court upheld the validity of the statute forbidding private militias. At the same time, in response to Presser's claim that his Second Amendment rights were being denied, the court ruled that: "A state cannot prohibit the people therein from keeping and bearing arms to an extent that would deprive the United States of the protection afforded by them as a reserve military force."[127] While the Court upheld the restrictions on unofficial militias, it argued that:

> We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of congress and the national government, and not upon that of the state.[128]

The Second Amendment was only a limitation on the power of the Federal Government—not the states. But the "right of the people to keep and bear arms," was in the Court's opinion, protected from federal interference. While Presser had invoked the "privileges and immunities" clause of the Fourteenth Amendment in asserting his protection from Illinois law,[129] the Court's acceptance of the Fourteenth Amendment incorporation doctrine was still many years in the future.

The Court also acknowledged:

> It is undoubtedly true that all citizens capable of bearing arms constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government, as well as of its general powers, the states cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.[130]

*Even if the Second Amendment was ignored*, the states could not prohibit the people from keeping and bearing arms. While maintaining the republican view of arms ownership, the Court implied that the widespread ownership of military arms in private hands, "for maintaining the public security," was a right guaranteed against state interference. Those who cite *Presser* as evidence that the Second Amendment is not a restraint on state laws, appear to have missed this other part of the decision.

What makes this decision so disturbing is that by acknowledging the validity of the Illinois statute that established a "select militia"—effectively a state army used to

suppress labor unionists, while denying the right of workers to defend themselves collectively—the Court had completely subverted the intent of the "no standing armies" requests. Is this what Madison had in mind in *Federalist* 46, when he suggested a standing army of 30,000 men would be opposed by a militia consisting of the whole people? The intent of the Framers had been perverted in the interests of maintaining the status quo of nineteenth century industrialism.

Ten years later, the Massachusetts Supreme Judicial Court heard *Commonwealth* v. *Murphy* (1896), a case quite similar to *Presser* v. *Illinois* (1886). Murphy and a number of associates had styled themselves as the "Sarsfield Guards," and marched together with inoperative rifles, in violation of: "St. 1893, c. 367, §124, which prohibits all but certain bodies of men from drilling or parading with firearms..." Murphy argued that the statute that he was convicted of violating was: "in contravention of the seventeenth article of the Massachusetts Declaration of Rights, which declares that 'the people have a right to keep and bear arms for the common defence.'"[131]

The Court did not agree:

> This view cannot be supported. The right to keep and bear arms for the common defence does not include the right to associate together as a military organization, or to drill and parade with arms in cities and towns, unless authorized to do so by law. This is a matter affecting the public security, quiet, and good order, and it is within the police powers of the Legislature to regulate the bearing of arms so as to forbid such unauthorized drills and parades. *Presser* v. *Illinois*, 116 U.S. 252, 264, 265. *Dunne* v. *People*, 94 Ill. 120.

Up to this point, the decision was correct: armed bands marching through the streets certainly could be construed as an attempt at intimidating others—although intimidating the government might be argued as the purpose suggested in *Federalist* 46. Certainly, the *Dunne* and *Presser* decisions are correctly cited as precedent. But next:

> The protection of a similar constitutional protection has often been sought by persons charged with carrying concealed weapons, and it has been almost universally held that the Legislature may regulate and limit the mode of carrying arms... The early decision to the contrary of *Bliss* v. *Commonwealth*, 2 Litt. 90, has not been generally approved.[132]

It is certainly true that the right *of individuals* to carry arms, either openly or concealed, had been argued repeatedly before various state supreme courts. But the Court appears to have been unaware that *Bliss* v. *Commonwealth* (1822) was only one of several decisions that had recognized a right to carry concealed. Further, a more accurate comparison would have been to those cases where equivalent state constitutional provisions had been argued successfully, to protect the right of individuals to carry arms openly—for indeed, the rifles in question were carried openly by the "Sarsfield Guards." The Massachusetts Supreme Judicial Court made no statement about whether the right of *individuals* to openly carry arms, or to keep arms, was within the protections of the state constitutional protection, and the Second Amendment was apparently not raised by the defendant.

---

126 Levinson, 99:652-3.
127 *Presser* v. *Illinois*, 116 U.S. 252, 254, 255 (1886).
128 *Presser* v. *Illinois*, 116 U.S. 252, 265, 266 (1886).
129 *Presser* v. *Illinois*, 116 U.S. 252, 262 (1886).
130 *Presser* v. *Illinois*, 116 U.S. 252, 266 (1886).

131 *Commonwealth* v. *Murphy*, 166 Mass. 171, 172 (1896). Unfortunately, the decision of the Court gives us no information for determining to what purpose this private army was established.
132 *Commonwealth* v. *Murphy*, 166 Mass. 171, 172, 173 (1896).

Without question, industrial strife was a major concern of the period between the Civil War and World War I. The 1873 panic, induced by the bankruptcy of Jay Cooke and Co., provoked a depression of unprecedented length.[133] Contemporary accounts of the series of strikes which took place during 1877 show that armed violence and the threat of armed violence by labor unionists played a significant role in strengthening the union position relative to employers. Many incidents related in Joseph Dacus' *Annals of the Great Strikes* involved unionists preventing the carrying out of business with the threat of armed violence.[134] When confronting regular army units, the workers were, in at least one instance, markedly better armed than the soldiers; the workers "were supplied with Henry and Winchester repeating rifles, and from this circumstance were able to overawe any train-guard likely to be sent out." The Army still had not made the step up to repeating rifles, and were consequently less effectively armed than the civilian population.[135]

National Guard units in some instances refused to fight against unionists, apparently because they were insufficient in arms and numbers to be effective; and in a few instances, they joined the strikers in horror at the needless bloodshed caused by other National Guard units.[136] Francis Corbin's, "Are we not the militia? Shall we fight ourselves? No, sir; the idea is absurd,"[137] was found to be at least occasionally effective as a restraint on needless bloodshed. That the population took advantage of their right to keep and bear arms under such circumstances may be found in a description of a massacre in Reading, Pennsylvania, where the National Guard opened fire on an unresisting and peaceful crowd, in response to rock throwing by an related group of strikers. A number of people under attack by the Guardsmen responded with handguns, leading to injuries among the Guardsmen, some serious. Similarly, an overreaction by Guardsmen in Pittsburgh led to open armed warfare with not only strikers, but with ordinary citizens, sickened by the senseless killings. The widespread ownership of handguns and rifles made the Guardsmen's Gatling guns of limited value, as urban guerrilla warfare erupted.[138]

Arms were employed by factions other than strikers and National Guardsmen, however. In some cities, strikes did not remain peaceful, and not always because of Guardsmen shooting down unarmed and unresisting civilians. In Pittsburgh, rioting quickly extended beyond the property of the railroads:

> The militia having fled the city, and there being no United States regulars at hand, the citizens of Pittsburgh were at the mercy of a mob, without the least possibility of resisting its demands. Such was the situation late Sunday evening, when… a vigilance committee was raised for the purpose of preventing a further waste of property. The committee was rapidly recruited and its members were first supplied with base-ball bats, but these were afterwards exchanged for guns.… As soon as the force was organized they marched to Seventh avenue, where hundreds of spectators who had been waiting for some one to lead, joined with them in preventing further incendiarism.[139]

Concerned that the strikers might turn riotous in Buffalo, New York, the police department and sheriff swore in hundreds of ordinary citizens as temporary policemen to deal with the threat in July 1877; similar events took place in Indianapolis, Indiana, Chicago, St. Louis, and San Francisco at the same time.[140] Similarly, Governor Thomas Young of Ohio issued a proclamation on July 25, 1877:

> To avert all danger, and in order to successfully meet all resistance to thorough execution of the law, I hereby call on all law-abiding men in all our cities, towns and villages to tender their services to their respective civil authorities, and under their direction and control organize themselves into a volunteer police force sufficiently strong to overawe the lawless elements.[141]

In essence, *this* was the sort of militia envisioned by the Founding Fathers—though in this case, concerned about the problems of anarchy, not tyranny. Not all the strikes turned violent and, in some cases, arms in the hands of the strikers actually protected railroad property from drunken rioters, and prevented loss of life.

While contemporary accounts of murders committed with concealed weapons during the 1877 disturbances are scarce, the horrified tone of these accounts suggests that the murderous use of concealed weapons was considered especially execrable.[142] Concealed weapons in the hands of strikers also played a significant role in the eruption of violence at the Homestead Steel Works in 1892.[143]

Throughout the 1890s, the arms carried by strikers were a fundamental part of the process by which unions sought to counterbalance both company private armies and National Guard units. The disturbances in Anderson County, Tennessee, provoked by the use of convict labor as strikebreakers, provide an example:

> [M]iners from the surrounding counties, including some from Kentucky, armed with shotguns, Winchester rifles, and Colt pistols, began pouring into Briceville and Coal Creek, on trains and mules and even on foot. They formed a line and marched on the offending mine, spreading out into the mountain ranges and taking cover behind rocks and trees as they drew close. They sent a committee forward to demand the expulsion of prisoners. When a militia Colonel moved as if to capture the committee, one of its members waved a handkerchief as a signal to the miners, who sprang from cover. The 2,000 armed miners had little difficulty persuading the militia and guards to accompany them to the railroad station with the convicts, and return again to Knoxville.[144]

Another strike, in Pennsylvania, caused the following message to be delivered by the strikers to the strikebreakers and deputies who were protecting them from union intimidation: "We are heavily armed and will return bullet for bullet if the deputies fire on us."[145]

---

133 Jeremy Brecher, *Strike!*, (San Francisco: Straight Arrow Books, 1972), xiv.
134 Joseph A. Dacus, *Annals of the Great Strikes*, (Chicago: L.T. Palmer & Co., 1877; reprinted New York: Arno Press, 1969), 33, 59, 212-213. Dacus was a journalist, and *Annals of the Great Strikes*, while containing a vivid and detailed contemporary account of the events, suffers the deficiencies one might expect from a journalist: no sources, and no clear distinctions between eyewitness accounts, second-hand sources, and simple rumor. Dacus makes it clear that his sympathies, and that of many other Americans, were at least partially with the strikers. Dacus clearly distinguishes between the strikers, and mobs of hooligans, and "idlers," that Dacus called "Internationalists" and "Communists."
135 Dacus, 59. Robert V. Bruce, *1877: Year of Violence*, (Indianapolis: Bobbs-Merrill Co., 1959; reprinted Chicago: Quadrangle Books, Inc., 1970), 94, 96.
136 Dacus, 42, 212-3, 216, 156. Bruce, 194.
137 Elliot, 3:112-3.
138 Dacus, 208. Bruce, 165-7, 191-3.

139 Dacus, 141.
140 Dacus, 156-7, 296, 313, 385, 418. Bruce, 178-80, 200-1, 240-1. The San Francisco riots had the added element of anti-Chinese violence and arson.
141 Dacus, 274.
142 Dacus, 297, 300, 336-7.
143 Brecher, 57.
144 Brecher, 67.
145 *New York Times*, May 25, 1894, quoted in Brecher, 72.

Compendium_Roth
Page 0211

An example of conditions that should have caused the courts to retreat from the right to keep arms (if any labor violence could have done so), were associated with the Illinois Central Railroad strike of 1911. In Illinois and Mississippi, handguns and rifles were widely used by strikers in murderous attacks on strikebreakers, and "led to a complete breakdown of civil government in parts of Mississippi." Martial law was finally declared when ten National Guard regiments failed to restore order.[146]

One historian of the 1892 Homestead strike argues:

> The decisive effect of militiamen cannot be overemphasized; one searches United States labor history in vain for a single case where the introduction of troops operated to the strikers' advantage. In virtually all conflicts before and after 1892 the state guard acted, in effect, as a strikebreaking agency...[147]

It is in this context that we must consider the increasing unwillingness to admit that the "militia" referred to something wider than just the National Guard.

Somewhat after the close of Reconstruction is *State* v. *Wilforth* (1881). The defendant, Wilforth, was indicted and convicted for "going into a church house in said county where people were assembled for literary purposes, viz: for the purposes of a school exhibition, the same defendant having about his person fire-arms..." Apparently, Wilforth was carrying a pistol concealed, in violation of an 1875 state law that made it a misdemeanor to have "any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" upon one's person in "any church or place where people have assembled for religious worship."

While Wilforth attempted to argue that he was unaware of the law, the Missouri Court responded with "*Ignorantia legis excusat neminem*"—ignorance of the law is no excuse. Wilforth also argued that the law in question violated the Second Amendment. The Court acknowledged that some state courts had recognized that their state constitutions protected concealed carry of arms, including *Bliss* v. *Commonwealth* (1822), but erroneously included Tennessee in that category. The Missouri Court went on to cite the more common cases, including *Nunn* v. *State* (1846), *State* v. *Reid* (1840), and *State* v. *Jumel* (1858) to bolster their position that concealed carry was *not* protected by state constitution arms provisions.[148] However, *Jumel* was decided based on the Second Amendment, and *Nunn* was decided based on both the Georgia Constitution and the Second Amendment.

Finally, the Missouri Court expressed its opinion about the Missouri law being challenged:

> Whether such statutes are or not in conflict with the federal constitution, is an open question so far as the federal courts are concerned, the question never having been passed upon by any of them, as far as we know. Following the weight of authority as indicated by the state courts, and in the light of section 17, article 2 of the constitution of this State, which declares "that the right of no citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the prac-

---

146 Graham Adams, *Age of Industrial Violence 1910-15*, (New York: Columbia University Press, 1966), 132-5.
147 Leon Wolff, *Lockout, The Story of the Homestead Strike of 1892: A Study of Violence, Unionism and the Carnegie Steel Empire* (New York: Harper & Row, 1965), 228, quoted in Brecher, 236.
148 *State* v. *Wilforth*, 74 Mo. 528, 529, 530, 531 (1881).

tice of wearing concealed weapons," we must hold the act in question to be valid and binding, and as intended only to interdict the carrying weapons concealed.[149]

In so doing, the Missouri Supreme Court had recognized that the right to carry arms openly was protected by the state constitutional protection of the right "to keep and bear arms"—only concealed carry was within the Legislature's power to prohibit.

In 1883, Missouri passed yet another law regulating the carriage of deadly weapons; the new law prohibited "the carrying of concealed, dangerous, and deadly weapons upon the person, and the exhibition of the same, and the carrying of deadly weapons when intoxicated..." The defendant in *State* v. *Shelby* (1886) had withdrawn a revolver from his pocket in a saloon, while intoxicated. The Missouri Supreme Court reaffirmed its position that the Legislature had the authority to prohibit the concealed carrying of deadly weapons, and similarly held that the provision prohibiting possession of a deadly weapon while intoxicated was within the proper regulatory authority of the government. The only significant change from the *State* v. *Wilforth* (1881) decision was that the Missouri Court was now aware of the *U.S.* v. *Cruikshank* (1876) decision: "The second amendment to the constitution of the United States is a restriction upon the powers of the national government only, and is not a restriction upon state legislation."[150] But since the Missouri Court's decision in *Wilforth* had been based on the Missouri Constitution, this did not affect the precedent from the *Wilforth* decision.[151]

The first post-Civil War North Carolina case was *State* v. *Speller* (1882). L.R. Speller and a man named Jenkins had been engaged in a progressively more severe argument; according to Speller, Jenkins made an attempt to cut Speller on Saturday with a razor, and made death threats against Speller. Jenkins and Speller subsequently swore out complaints against each other, and when a police officer serving the warrant against Speller on Monday found a concealed pistol on him, Speller was arrested, indicted, and convicted of carrying a concealed weapon, in violation of an 1879 North Carolina law. It is easy to be sympathetic to Speller's fears; Jenkins lived half a mile from Speller, while the nearest peace officer was a mile and a half away. In an age before telephones and patrol cars, the chances of Speller successfully surviving an armed attack by Jenkins would have been remote.

On appeal, Speller's attorney argued that the jury should have been charged that the extenuating circumstances behind his carrying of a concealed weapon took precedence over the concealed weapon law.[152] Speller's attorney also raised the issue of the constitutionality of the concealed weapons law.

The North Carolina Supreme Court refused to overturn the lower court's decision, and in discussing the constitutional issues:

> We concede the full force of the ingenious argument made by counsel upon this point, but cannot admit its application to the statute in question. The distinction between the "*right to keep and bear arms*," and "*the practice of carrying concealed weapons*" is plainly

---

149 *State* v. *Wilforth*, 74 Mo. 528, 531 (1881).
150 *State* v. *Shelby*, 90 Mo. 302, 304, 305, 306, 2 S.W. 460 (1886).
151 The Missouri Court also cited "*Anderson* v. *State*, 3 Heiskell (Tenn.) 172" as evidence for the non-applicability of the Second Amendment to state laws — but of course, the case wasn't *Anderson*, but *Andrews*.
152 *State* v. *Speller*, 86 N.C. 697, 698 (1882).

Compendium_Roth
Page 0212