ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
　455 Golden Gate Avenue, Suite 11000
　San Francisco, CA  94102-7004
　Telephone:  (415) 510-3479
　Fax:  (415) 703-1234
　E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 14 OF 37**<br><br>Courtroom:　5A<br>Judge:　Hon. Roger T. Benitez<br><br>Action Filed:　August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| 1, 2, 3 | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| 4, 5, 6, 7 | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| 8, 9, 10 | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| 11, 12, 13, 14 | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| 15, 16 | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| 17, 18 | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| 19, 20, 21 | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| 22, 23, 24 | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| 25, 26 | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| 27, 28 | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1<br>2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51,<br>15 n.52 | 0330-0343 |
| 3<br>4<br>5<br>6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51,<br>15 n.52 | 0344-0358 |
| 7<br>8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9<br>10 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 11<br>12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13<br>14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15<br>16<br>17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18<br>19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20<br>21<br>22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23<br>24<br>25<br>26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | | |
|---|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |

**LAW REVIEWS AND JOURNALS**

| | | |
|---|---|---|
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

Compendium of Works Cited in Declaration of Randolph Roth
(3:19-cv-01537-BEN-JLB)

observed in the Constitution of this State. The first, it is declared, shall not be infringed, while the latter may be prohibited. Art. I, sec. 24.

> As the surest inhibition that could be put upon this *practice* deemed so hurtful as to be the subject of express mention in the organic law of the State, the Legislature has seen fit to enact that at no time, and under no circumstances, except upon his own premises, shall any person carry a deadly weapon *concealed* about his person, and it is the strict duty of the courts, whenever an occasion offers, to uphold a law thus sanctioned and approved. But without any constitutional provision whatever on the subject, can it be doubted that the Legislature might by law *regulate* this right to bear arms—as they do all other rights whether inherent or otherwise—and require it to be exercised in a manner conducive to the peace and safety of the public? This is as far as the statute assumes to go. It does not say that a citizen when beset with danger shall nor provide for his security by wearing such arms as may be essential to that end; but simply that if he does do so, he must wear them openly, and so as to be seen by those with whom he may come in contact. The right to wear *secret weapons* is no more essential to the *protection* of one man than another, and surely it cannot be supposed that the law intends that an unwary advantage should be taken even of an enemy.[153] [emphasis in original]

Open carry was protected; concealed carry was not—even in life-threatening circumstances.

In *State* v. *Pigford* (1895), Sam Pigford was arrested outside his home for "failure to work the public road." He was convicted, and sentenced to three days in jail, at which point, the jailer found that he was carrying a concealed pistol. While Pigford was serving his sentence, he was charged with the concealed weapons charge, and convicted. On appeal, the issue of the North Carolina Constitution's provision appears not to have been raised, but the North Carolina Supreme Court held:

> The defendant was not prohibited from carrying the pistol on his own premises, and if it had been made to appear that when arrested he had asked to be allowed to leave it at home and the officer had refused, here would have been some semblance of a defense, but even in that event it would still have been incumbent on the defendant to explain satisfactorily why he did not carry the pistol openly as he had a right to do, after leaving his premises, and not concealed about his person.[154]

The Court did not articulate where this right to carry openly came from; nor did they hold that there was a right to carry a pistol concealed at one's own premises—merely that it was not prohibited. Nonetheless, the decision in *Pigford* is consistent with the rest of the post-war North Carolina decisions—open carry was a "right," while concealed carry was not.

While Southern supreme courts were busy hearing cases involving the carrying of arms, and in many cases, denying that any individual right to bear arms was protected by either the Federal or state constitutions, the legal commentators up North seem not to have noticed. Broom & Hadley's edition of Blackstone's *Commentaries*, published in 1875, carries an annotation on Blackstone's statement of "The fifth and last auxiliary right of the subject... is that of having arms for defence" that quoted the Second Amendment. The same note then tells us: "The constitutions of several of the states contain a similar clause. The right of carrying arms for self-protection was discussed in *Bliss* v. *Commonwealth*..."[155]

---

153 *State* v. *Speller*, 86 N.C. 697, 700 (1882).
154 *State* v. *Pigford*, 117 N.C. 748, 749 (1895).
155 William Blackstone, *Commentaries on the Laws of England*, edited by Herbert Broom & Edward A. Hadley, (Albany, N.Y.: John D. Parsons, 1875), 1:121, note 64.

It would appear that the decisions of the Southern courts made little or no impact on Broom and Hadley, who clearly saw the Second Amendment and the state analogs as protecting a right to carry arms—even in that most extreme of decisions, *Bliss* v. *Commonwealth* (1822). This suggests that the South was, once again, pursuing a set of policies not generally shared with the rest of the United States.

The Reconstruction governments were ephemeral; Republican rule collapsed in Virginia, North Carolina, and Georgia in 1871; in Texas in 1873, Alabama and Arkansas in 1874, Mississippi in 1876. The last of the Republican-dominated state governments fell in South Carolina, Louisiana, and Florida with the removal of federal troops in 1877.[156] But the loss of the rights of blacks was usually a gradual process, not completed until the 1890s. Consequently, we should not expect, if firearms laws were racially motivated, that they would be passed immediately and completely on the collapse of the Republican governments.[157] Furthermore, the Reconstruction governments in many cases were coalitions of white Republicans (both Northern "carpetbaggers" and Southern "scalawags"), other whites who had remained loyal to the Union, and freedmen. The conventions that wrote new constitutions

> were, with only one and possibly two exceptions, predominantly white... [T]he new governments, as now formed, were never Negro-dominated, as was once thought. Only in South Carolina, and at times in Louisiana, was the Negro in a majority in any branch of government, and then it was in the lower house.[158]

As tempting as it might be to see these Republican state governments of freedmen and whites pursuing the social equality that Radical Republicans such as Thaddeus Stevens promoted, the evidence is otherwise. In many cases, the freedman's white allies saw blacks as members of an inferior, child-like race. In Mississippi, for example, Whigs were most of the whites who participated in the reformed Union government, and operated as a conservative influence. Similarly in Virginia and Tennessee, white Unionists were unenthusiastic about giving the freedmen the vote and full equality in the courts.[159] Even Northern Republicans began to look askance at the apparent lack of combativeness of Southern blacks in responding to the violence of the KKK: "'The capacity of a people for self-government,' a Northern friend lectured Judge Tourgee, 'is proved, first of all, by its inclination and capacity for self-protection... If people are killed by the Ku-Klux, why do they not kill the Ku-Klux?'"[160]

As we have already seen in the summary of the Texas decisions, the Republican Party was in control of the Texas Legislature when the statute prohibiting the bearing of arms was passed; similarly, Georgia was under Republican control at the time its restrictive law was passed. It is, however, important to remember that relations between white and black Republicans during Reconstruction were sometimes strained,[161] and Texas, where blacks were less essential to white Republicans than elsewhere, was no exception.[162]

---

156 Viault, 17-18.
157 Elkins, 12.
158 Craven, 229.
159 Craven, 235-6. Stampp, 162-3.
160 Foner, 435-6.
161 Abbott, 185-6, discusses how public accommodations and integrated schools bills split the Republican Party in Louisiana along racial lines. Abbott, 228-9, discusses how the actions of Southern

Compendium_Roth
Page 0213

Tennessee and Arkansas passed laws severely restricting open carry shortly after the loss of Republican Party control, and the resurgence of white conservatives in the legislatures. It is tempting to conclude from the combination of post-war fear of armed freedmen, and the dates of adoption of many of these statutes, that the purpose of these laws prohibiting or severely limiting open carry, was to make it impossible for blacks to carry arms for either defense or offense.

Other evidence that tends to support this hypothesis is that the Texas statute contained so many exceptions, and these exemptions were phrased with such a lack of clarity (what constitutes "travelling"?) that it provided many opportunities for the prosecution to not charge a violation, and for juries to find the defendant innocent. That so many of the Texas decisions upheld the constitutionality of the law, while finding the defendants innocent, also lends credibility to this argument. The language of the Texas Supreme Court, comparing the "sound philosophy and pure morality of the common law" to the Spanish, "a people the most peculiar perhaps of any other" in *English* v. *State* (1872), certainly gives a credible basis for suspecting that the law restricting open carry may have been intended for "a class of the community"[163] (*i.e.*, Hispanics), other than criminals.

Don Kates, perhaps reflective of his years as a civil rights attorney in the South, sees a correlation between the availability of cheap handguns in the late 1860s, the struggle for political dominance in Reconstruction governments, and the sudden burst of laws severely restricting open carry, as part of an effort by the Klan to crush the freedmen into subservience, by limiting their right to defend themselves. In particular, the prohibition of the Tennessee Legislature on the carrying of any handguns but "the Army and Navy model," was an attempt, in Kates' opinion, to make all but the most expensive type of handgun unusable for self-defense away from home.

Kates argues that handguns did not become "financially accessible... until the end of the Civil War brought the sale of large stocks of military surplus weapons," and that until extremely cheap handguns, called "suicide specials," appeared on the market in the late 1860s, handguns were not common in the West or South. Further, that the practice of carrying concealed weapons was so widespread in the East that: "By the 1870s the practice of Eastern manufacturers of men's ready-to-wear trousers was to sew a holster into the right hip pocket of every pair made, to allow the concealed gun-carrying which was still legal in the East."[164]

Indeed, an examination of the decisions during the period after the Civil War shows that nearly all took place in states of the former Confederacy, or the former slave states that had stayed with the Union. Until 1890, when the West Virginia decisions started, the only Northern states where concealed weapons statutes were brought before state supreme courts were Indiana and Pennsylvania. In the case of

Pennsylvania, we saw evidence that concealed carry *by itself* was not a crime in the eyes of the Pennsylvania Supreme Court.

Kates sees the flood of cheap handguns as motivating these restrictions; a strong case can be made that the other event coincidental with the end of the Civil War—a huge increase in the percentage of free blacks in the former slave states—may be the real cause of this burst of activity in prohibiting *concealed* carry of arms.

What about the laws restricting *open* carry? Kates' position with respect to the suddenly lowered prices of revolvers after the Civil War might be a good explanation for the sudden emergence of open carry laws, as the "riffraff" could suddenly carry an effective arm of either defense or offense. But it fails to explain why such laws prohibiting open carry of cheap weapons, such as the much feared Bowie knife, did not appear before the Civil War everywhere, and also fails to explain why laws prohibiting open carry of arms did not appear in the North until the end of the nineteenth century or later.[165] Once again, the only obvious common denominator of the states that passed prohibitions on open carry is that they were former slave states.

Even in the absence of cheap revolvers, there is some evidence that cheap handguns of other types were common before the war. Henry Deringer's well-known design appeared originally in 1850, selling for three dollars.[166] To explain the laws regulating or restricting open carry—nearly all of which appear to have been passed in former slave states—we must look to the unsettled conditions and unsettling white fears that resulted from the Civil War, emancipation, Reconstruction, and the restoration of white hegemony (albeit, a nervous one) over the black population. Was there a real problem of public safety, or were these laws passed with the intention that only blacks would be subject to them?

What caused the Texas laws against open carry? The obvious answer—that there was a serious problem of murder in post-war Texas—may well be the correct one. The question that remains to be addressed is why the Democrats, who with great industry repealed many of the Republican laws,[167] did not repeal this one as well, since the available evidence suggests that the murder victims were disproportionately blacks, not whites.

Reconstruction remains a controversial period; historians continue to argue about the extent to which partisan political concerns, racism, and genuine Southern grievances determined the policies and actions of the various participants. While there is strong evidence that racism motivated this burst of laws restricting open carry, the evidence is not conclusive, and to some extent, this reflects the lack of scholarship which has been devoted to studying the motivations of the Reconstruction and "redeemed" Southern Democrat state governments on this issue. A more complete

---

Republican legislatures injured the prospects of the Republican Party in the North, leading to increasingly hostile statements towards blacks by Horace Greeley, Carl Schurz, and James Shepherd Pike.

162 J. Mason Brewer, *Negro Legislators of Texas*, (Dallas, Tex.: Mathis Publishing Co., 1935; reprinted San Francisco: R&E Research Associates, n.d.), 26-27, contains examples of the needless hostility of white Republicans towards black Republicans in the Texas Legislature, to the detriment of common political goals.

163 *English* v. *State*, 35 Tex. 473, 479 (1872).

164 Kates, "Toward A History of Handgun Prohibition...", 11, 13-14.

165 It is also a valid question whether handguns were rare before the Civil War; this author's great-great-great-grandfather expropriated a Colt's revolver from a captured Confederate soldier after the Battle of Fishing Creek. Clayton E. Cramer, ed., *By The Dim And Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, (Monroe, N.Y.: Library Research Associates, 1990), 15.

166 Michael Newton, *Armed and Dangerous: A Writer's Guide to Weapons*, (Cincinnati, Ohio: Writer's Digest Books, 1990), 31-32. Newton's work is intended as an tutorial on guns for fiction writers; in spite of an impressive bibliography, few of the facts contained in it are footnoted, and it should be regarded with caution. It does provide, however, a painless introduction to the technology of firearms.

167 Brewer, 66-67.

Compendium_Roth
Page 0214

answer requires in-depth studies of gun control in each of the former slaveholding states.

# HANDGUNS OF THE WORLD

## Military Revolvers and Self-Loaders from 1870 to 1945

Edward C. Ezell

STACKPOLE BOOKS

Compendium_Roth
Page 0217

*...guns of the World* by Edward C. Ezell
...ference book for all collectors—
...rs and professionals alike—of
...ls and revolvers around the globe.
...handguns in use today, for business
...leasure both, have evolved from
...weapons. Between 1870 and
...effort was exerted to improve
...efficiency, and fire power for
...which in turn resulted in what
...consider classic firearms.
...*Handguns of the World*, Mr. Ezell
...upon his own expertise as well
...gun collectors, historians, and
...around the world. Interna-
...in Great Britain, Japan,
...mark, the Soviet Union, the
...and many other countries,
...ally assisted Mr. Ezell with
...ing with him hundred-
...ments and photographs,
...lowed him to handle and
...unique treasures from their
...
...wanting to research the
...of a privately owned an-
...book has all the answers:
...manufacturers, exact lo-
...are all here.
...photographs and line
...easy to pick out model
...your weapon to a re-
...classic models in this com-
...
...drama and reference
...beyond reproach. Mr.
...recorded here in vivid
...the pistols, the men
...and the companies
...Browning, Colt,
...Lefaucheux, Bor-
...many more.
...self loader, author
...design from the
...complicated innova-
...possible by im-
...equipment and

HANDGUNS OF THE WORLD

Copyright © 1981 by Edward C. Ezell

Published by
STACKPOLE BOOKS
Cameron and Kelker Streets
P.O. Box 1831
Harrisburg, Pa. 17105

Published simultaneously in Don Mills, Ontario, Canada
by Thomas Nelson & Sons, Ltd.

All rights reserved, including the right to reproduce this book or
portions thereof in any form or by any means, electronic or mechanical,
including photocopying, recording, or by any information storage and
retrieval system, without permission in writing from the publisher.
All inquiries should be addressed to Stackpole Books, Cameron and
Kelker Streets, P.O. Box 1831, Harrisburg, Pennsylvania 17105.

Printed in the U.S.A.

**Library of Congress Cataloging in Publication Data**

Ezell, Edward Clinton.
    Handguns of the world.

    Includes index.
    1. Pistols—History.  2. Revolvers—History.
I. Title.
UD410.E93 1981     623.4′43     82–8575
ISBN 0–8117–0816–0     AACR2

Photocomposition and camera by
General Graphic Services, York, PA

**24** HANDGUNS OF THE WORLD



FIGURE 1–16. Samuel Colt (1814–1862) died at the relatively young age of 48 years, but he left a giant imprint on the American and European firearms industry. (*Colt*)

bers were countersunk so that they would fit over the conical shape of the breech end of the barrel. Upon firing, a coil spring and wedge were forced forward by the falling cock, thus assuring that the barrel and cylinder chamber were aligned, a very important point in revolver design. The forward movement of the cylinder also reduced the loss of gas at the junction of the cylinder and barrel. This sealing effect helped to maintain projectile velocity and reduced the tendency for accidental discharge of adjacent chambers, a serious problem encountered in all revolvers using loose gunpowder in the cylinder. Existing Collier pistols have a cylinder with five chambers that revolve on a steel pin affixed to the underside of the barrel. Although these arms had a mechanically operated self-priming feature, the cylinder had to be turned by hand. A typical Collier revolver (No. 89) measured 355.6 millimeters overall, with a 155.58-millimeter barrel and a 47.63-millimeter cylinder. The barrel bore diameter was 12 millimeters.

No more than 300 Collier revolvers of all types were manufactured before 1827 when Collier went out of business. The gunmaker had originally intended that the cylinder of his design would be rotated mechanically, but in about 1824 he apparently abandoned mechanical rotation to simplify the firearm. The Collier revolvers were unsuccessful for two reasons. The guns were expensive to fabricate given existing manufacturing techniques. And they did not exploit the percussion system of ignition. Only a few Collier-type arms were adapted to the newer system of priming. Collier and his colleagues came along at a transitional period, but better designs based on more modern manufacturing processes and percussion priming would survive.[12]

## The Impact of Samuel Colt

Samuel Colt (1814–1862) was the first person to successfully solve the revolver problem.[13] Only 21 years old when he applied for an English patent on a percussion revolver, Colt demonstrated considerable sagacity and business sense. He applied for a British patent first because he knew that due to a peculiarity in British patent law a patent in that country would be voided by a prior patent in any other country. Colt's British and French patents did not prohibit him from obtaining an American one for the same invention, however. The multinational patents also indicate that he was intending to go after big sales. American inventors at this period did not usually patent their ideas abroad, but Colt was a marketing person. He wanted military contracts in as many places as possible. With that kind of market in mind, the gunmaker designed his revolver to be made by machine.

Colt was awarded British patent 6,906 on 22 October 1835 and U. S. patent 9,430X on 25 February 1836. Both protected the same fundamental ideas until 1857. He claimed the following new inventions in his American patent:

1. The application of the caps at the end of the cylinder.
2. The application of a partition between the caps.
3. The application of a shield over the caps as a security against moisture and the action of the smoke upon the works of the lock.
4. The principle of the connecting-rod between the hammer and the trigger.
5. The application of the shackle to connect the cylinder with the ratchet.
6. The principle of locking and turning the cylinder.
7. The principle of uniting the barrel with the cylinder by means of the arbor running through the plate and the projection under the barrel.
8. The principle of the adopter and the application of the lever, neither of which is used in pistols.

In modern terms, the Colt design worked as follows. The cylinder was rotated by cocking the hammer.* As the hammer was drawn to the rear, the pawl (lifter) linked to the hammer engaged teeth (ratchet) in the rear of the cylinder to turn it. A bolt locked the cylinder at the time of discharge. This was simpler than the Collier method of alignment. Colt employed percussion cap nipples at the rear of the cylinder, with their axes in line with the bore of the barrel. The partitions between them prevented simultaneous discharge due to a flash-

---

*Colt's revolvers until 1878 were single-action. Some helpful definitions include: *single-action*, a revolver in which the cylinder is rotated by cocking the hammer; *self-cocking*, a revolver in which the cylinder is rotated and the hammer actuated by pressing the trigger; *double-action*, a revolver that can be operated as either single-action or self-cocking according to need.



FIGURE 1-17.  Samuel Colt's British revolver patent number 6,909, 22 October 1835. (*British Patent Office*)