ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 15 OF 37**<br><br>Courtroom:     5A<br>Judge:          Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

1

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, *Frontier Law and Order—10 Essays*, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of America in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

**26** HANDGUNS OF THE WORLD





FIGURE 1–18.   Three variations of the Colt Paterson percussion revolver. *Top:* .34 caliber (8.6mm) Belt Model with 127mm barrel. *Middle*, .28 caliber (7.1mm) Baby Model with 76mm barrel. The loading lever was installed at the Colt factory. *Bottom*, .36 caliber (9.1mm) Texas Model with 139mm barrel. This revolver weighed about 1,133 grams. *(Colt)*

Compendium_Roth
Page 0220

around. In attaching the barrel of the revolver to the pin around which the cylinder revolved, Colt demonstrated considerable cleverness. That method of connecting the barrel, cylinder, and pistol grip/frame would be employed by the Colt Company for nearly 40 years.

Sam Colt's revolvers were a success, but not an overnight success. To start with, Colt needed money with which to build prototypes, finance his patent applications, and establish a factory. Between 1831 and 1836, he drew on personal and family resources to finance his activities. Dudley Selden, a cousin and lawyer, was given the tasks of incorporating the Patent Arms Manufacturing Company in New Jersey and selling stock to potential investors.

Historian Russell Fries notes, "the business history of the Patent Arms Manufacturing Company, from 1836 to 1841, is primarily the story of gradual disenchantment between Colt and the company over the issue of sales to the government."[14] Colts believed military sales were essential and directed nearly all of his energies in that direction. The other stockholders wanted to market the revolvers to civilians until such a time as the military decided to purchase the Colt sidearm. Pressures on Colt to put the pistol, called the *Paterson* after the location of the factory in Paterson, New Jersey, into production revealed to the investors that the pistol still needed development and perfection. Colt had oversold its state of readiness for series production.

Early tests of Colt's revolving pistol by the U.S. Army in February and June 1837 revealed several weaknesses in the design. It had to be disassembled for reloading, and it required too many cumbersome accessories, which could be lost. Praised for its rapidity of fire, the revolver was judged to be too complex and too expensive to be easily manufactured. This trial was educational for all parties involved in the Patent Arms Manufacturing Company. Sam Colt learned that his pistol was not as perfect as he had been telling people. The shareholders discovered that Colt was more interested in making weapons for promotional purposes than for immediate sale. The company went bankrupt in 1841.

Many excuses have been given for the failure of Colt's first attempt to manufacture a mechanical revolver. As one writer saw it, "Colt failed because he did not yet fully understand the principles of machine manufacture, and because he did not develop his pistol sufficiently prior to marketing it." The result was "an imperfect product at an impractical price."[15] When Colt reentered the revolver business in 1847, he began on a more modest scale, and he kept control of the company in his own hands. His first factory had been established on too grandiose a scale to be immediately profitable. The second time around, Colt rented his factory, contracted out with other manufacturers, and expanded his operations only as his sales warranted.

Colt's Paterson revolvers sparked sufficient interest in this new type handgun to create a demand when America's war with Mexico began in 1846. Many of the Texans drawn into the confrontation had used pistols purchased in 1839 by the Texas government from Patent Arms Manufacturing Company. They found the Paterson to be sufficiently strong and reliable for the mounted fighting man. After a short period of negotiation with Captain Samuel H. Walker of the U.S. Mounted Rifles, Colt and the United States government signed a contract for 1,000 revolvers on 4 January 1847. In order to meet the contract deadline, Colt subcontracted the manufacture of the firearms to Eli Whitney, Jr., on 29 May 1847. The resulting pistol became popularly known as the Whitneyville-Walker. Whitney delivered the officially designated *Colt Model 1847 Army Revolver* the following July.

The Whitneyville-Walker Colt was a significant improvement over the Paterson model. Most important, it was much more robust and very powerful, but gained its strength and power at a severe weight penalty. Although still single-action, the new model had a permanently-fixed trigger and trigger guard, whereas the Paterson had a folding trigger. The Whitneyville-Walker also had an attached rammer and lever to assist in loading. In many Paterson revolvers, this function was carried out with a separate loading tool.

After this first successful contract, others followed. On 13



**FIGURE 1–19.   This model of the 1847 Army Revolver was manufactured at Eli Whitney's armory in Whitneyville, Connecticut. From Samuel Colt's own collection, this Whitneyville-Walker was supposedly Samuel Walker's own revolver, sent back to Colt from Mexico following Walker's death in October 1847. (Colt)**

28   HANDGUNS OF THE WORLD

## TABLE 1-1   COMPARISON OF THREE EARLY COLT MODELS

|  | Texas Model Revolver (1836–1841) | Whitneyville-Walker Colt Model 1847 Army Revolver | First Model Dragoon Colt Model 1848 Holster Pistol |
|---|---|---|---|
| Caliber | .40 (10.16mm) | .44 (11.18mm) | .44 (11.18mm) |
| Overall length | 355.6mm | 393.7mm | 355.6mm |
| Weight empty | 1133 g | 2070 g | 1984.5 g |
| Barrel length | 228.6mm | 228.6mm | 114.3mm |
| Number of shots | 5 | 6 | 6 |

July 1847, Colt received permission to build a second lot of 1,000 revolvers of a new model. Known variously as the *Dragoon Model*, the *Old Model Army*, and the *Model 1848*, this new revolver series was a winner. Between 1848 and 1860, approximately 20,000 Dragoons were manufactured. The U.S. military purchased more than 7,000 from 1848 to 1856. Colt moved his operations to Hartford, Connecticut in 1847 where over the next four years he moved from one building to another as his production levels grew. And he added new people to his production staff. His most important new employee was Elisha K. Root, who came to Colt in 1851 to be general supervisor of the manufacturing operations. Root went about adding many new machine tools—automatic drop hammers, turret lathes, barrel rifling machines—to the factory, speeding up the manufacturing process and reducing the machining time for each part to the minimum.

By the time the Dragoon model pistols were being manufactured, the Colt pistol mechanism had evolved to the form it would have until 1878 when a double-action mechanism would be introduced. Sam Colt, with designer-engineer Elisha Root's assistance, set out to capture the military and civilian markets of the United States and Europe. The size and shape of the handguns they produced varied, but the mechanism remained essentially the same. Their one attempt to develop a new revolver hammer mechanism, called the Root side-

hammer, was more suited to revolving rifles and muskets than pistols. (About 40,000 Root pistols and about 17,000 to 18,000 long arms were made.) Before 1873 when the new centerfire Model P was introduced, Colt had produced more than 850,000 single-action percussion revolvers.

## Challenges to Colt's Monopoly

Sam Colt was successful, in part, because he had a virtual monopoly. As late as 1849, his main competitors were the builders of multibarreled revolving arms called pepperboxes. There were no revolver makers in England, and on the Continent only Devisme and Lenormand were making such weapons, and then by hand. In the United States, Colt did not have a rival until 1850 when the Massachusetts Arms Company of Chicopee Falls introduced a revolver. But the idea of a revolver was a good one, and naturally other manufacturers wanted to cash in on the business.

The firm of Wesson, Stevens, and Miller of Hartford, Connecticut, had been producing hand-rotated revolvers under designer Daniel Leavitt's American patent 182 of 29 April 1837. On 5 March 1850, the Massachusetts Arms Company was incorporated to manufacture a Leavitt revolver that had

## TABLE 1-2   COLT REVOLVER (HANDGUN) PRODUCTION, 1836–1873

| | |
|---|---:|
| **Patent Arms Manufacturing Company, Paterson, New Jesery** | |
| Paterson Pocket Model Revolver No. 1 (c. 1836–1838), ca. | 500 |
| Paterson Pocket Model Revolver No. 2 (c. 1838–1840), ca. | 800 |
| Paterson Belt Model Revolver (1838–1840), ca. | 900 |
| Paterson Holster Model Revolver (Texas Model) (c. 1838–1840), ca. | 1,000 |
| **Colt (Whitney Armoury), New Haven, Connecticut** | |
| Whitneyville-Walker, M1847 Revolver (Serial #1–1100) (1847), ca. | 1,100 |
| **Colt, Hartford, Connecticut** | |
| Whitneyville Hartford Dragoon Revolver ("Transitional Walker"; serial #1100–1340) (late 1847), ca. | 240 |
| First Model Dragoon M1848 Revolver (Serial #1341–about 8,000) (1848–1859), ca. | 7,000 |
| Second Model Dragoon M1848 Revolver (Serial # ca. 8000–10,700) (1850–1951), ca. | 2,700 |
| Third Model Dragoon M1848 Revolver (Serial # ca. 10,200–19,600) (c. 1851–1861), ca. | 10,500 |
| Model 1848 Baby Dragoon Revolver (Serial #1–15,500) (c. 1847–1850), ca. | 15,000 |
| Model 1849 Pocket Revolver (1850–1873), ca. | 325,000 |
| Model 1849 was also made in London (1853–1857), ca. (Serial # for both 12,000–340,000) | 11,000 |
| Model 1851 Navy Revolver (1850–1873) | 215,348 |
| Model 1851 was also made in London (1853–1857) (Serial # 1–215,348 and 1–42,000) | 42,000 |
| Model 1855 Sidehammer Pocket Revolver (Root sidehammer; made in two distinct serial series) (c. 1855–1870), ca. | 40,000 |
| Model 1860 Army Revolver (Serial #1–200,500) (c. 1860–1873), ca. | 200,500 |

Compendium_Roth
Page 0222

# ETERNITY STREET

*Violence and Justice in
Frontier Los Angeles*

JOHN MACK FARAGHER

W. W. NORTON & COMPANY

*Independent Publishers Since 1923*

*New York* · *London*

Compendium_Roth
Page 0223

FOR MICHELE HOFFNUNG.

Copyright © 2016 by John Mack Faragher

All rights reserved
Printed in the United States of America
First Edition

For information about permission to reproduce selections from this book,
write to Permissions, W. W. Norton & Company, Inc.,
500 Fifth Avenue, New York, NY 10110

For information about special discounts for bulk purchases, please contact
W. W. Norton Special Sales at specialsales@wwnorton.com or 800-233-4830

Manufacturing by Quad Graphics Fairfield
Book design by Marysarah Quinn
Production manager: Anna Oler

ISBN 978-0-393-05136-0

W. W. Norton & Company, Inc.
500 Fifth Avenue, New York, N.Y. 10110
www.wwnorton.com

W. W. Norton & Company Ltd.
Castle House, 75/76 Wells Street, London W1T 3QT

1 2 3 4 5 6 7 8 9 0

Christopher N. Wilson, and former ranchero J. J. Warner—met with federal officials and assured them of their peaceful intentions. What they required, the Indian leaders insisted, was federal protection of their homelands. "The danger to which they are now exposed," wrote a correspondent for the Sacramento *Daily Union*, "is that Congress, not finding any convenient lands in the south of California whereupon to place them, will propose to remove them to some distant reservation, . . . a separation as hopeless as the barbarous removal of the Acadian farmers immortalized by Longfellow in 'Evangeline.'"

Olegario insisted that the Luiseños still held legal title to their homeland, that it had never been ceded to the United States. Through the influence of Anglo friends, he traveled to Washington, D.C., where he met with President Ulysses S. Grant, who issued an executive order establishing reservations at the sites of several small rancherías. But the struggle was far from over. Some of those reservations were later disestablished and the residents forcibly removed from their homes and the graves of their ancestors.

In 1877, when several hundred acres of prime Luiseño grazing land came under threat of confiscation, Olegario organized his followers to protect them. The land had been leased by Antonio María "Chino" Varela, son of the late José Sérbulo Varela, former Manilla gangster and Confederate war veteran, who had lost a leg while in service to the South. When Varela and his vaqueros arrived with a herd of several hundred sheep, they were met by Olegario and sixty well-armed men, who escorted them off the property. Varela filed a complaint with the local justice, who issued a warrant for Olegario, but the Indians expelled the constable who came to arrest him. A few days later, however, Olegario died in his sleep. The protest collapsed and Varela took possession. The local press reported the cause as apoplexy or heart disease, but Olegario's followers claimed their leader had been poisoned.

The Luiseños continued to suffer from encroachments on their homelands. "These Indians have been badly treated and are subjects of sympathy," wrote the editor of the San Diego *Union*, but "sympathy

for the Indians that ignores the right of white property-holders and settlers is the most pernicious thing that can befall the Indians, for the effect is only to postpone action that alone can save them from going to the wall in a hopeless contest with an advancing civilization."

IN THE MEANTIME cheap Indian labor was being replaced by cheap Chinese labor. The growth of the Chinese community—like the surging demand for real estate or the expansion of the domestic fuel market—was another vital indicator of economic activity. Chinese men began moving to the pueblo in significant numbers during the postwar boom. The 1870 census counted 234 Chinese in the county, and 172 in the city, a snapshot of a rapidly expanding community. They came to California with the intention of working, saving, and returning home with a pile of money, a motive widely shared by immigrants of all backgrounds. Attracted to Los Angeles by expanding prospects for employment, they found work as domestics and cooks, farmworkers and common laborers, the kind of low-wage jobs formerly filled by emancipados.

Some brought entrepreneurial skills. Chinese farmers grew vegetables for the domestic market on leased land south of the city, and Chinese vegetable peddlers—their baskets suspended from long bamboo shoulder yokes—soon were a common sight in all neighborhoods. Chinese laundrymen opened the first commercial laundries in the early 1860s and quickly dominated the business, by 1871 operating eleven of the city's thirteen washhouses and employing a quarter of its Chinese residents. A cigar factory, an herb shop, and a restaurant were among other commercial ventures Chinese entrepreneurs aimed at Angelenos. Because Chinese names were recorded in various and inconsistent ways, it is virtually impossible to track the owners of these enterprises. In 1870 the census enumerator recorded most Chinese in Los Angeles by given name only, often with the addition of the honorific title *Ah*, in the original Cantonese conveying intimacy or affection, but in the way it was employed by Americans a term of estrangement,

effectively erasing individual identity. One of the few men listed by his complete name was physician Chee Long Tong (or, in the correct sequence, with family name first, Tong Chee Long), who established a traditional Chinese medical practice and treated a number of Anglo patients, who knew him as Dr. Gene Tong.

More than half the Chinese in the city, including Dr. Tong, lived in the sprawling adobes along Negro Alley, divided and subdivided into a warren of low-rent rooms. Over the years, the Coronel adobe, the building that anchored the alley's southwest corner, had been the site of numerous saloons and dives. It was where Sheriff Barton had first proved his mettle in a memorable July Fourth shoot-out with unruly gamblers, where Tom Smith had danced on the monte table before egging Frank Dana into a lethal gunfight, where John Buckley, Pancho Cruz, and Augusta Cañada had played out their lethal ménage à trois. By 1870 the Coronel building housed the Wing Chung general store, Dr. Tong's office and residence, a Chinese rooming house, a barbershop, and a café. Nearby, wedged between saloons and gambling houses, was a small Chinese theater and a temple or "joss house," several little fan-tan parlors and opium dens, as well as numerous brothel cribs. Negro Alley remained the pueblo's preeminent vice district, but it had also become Chinatown.

At first the local press treated the Chinese with bemused condescension, noting the exotic language, hair style, and costume of the "almond-eyed family" from the "Celestial Kingdom." But as the number of Chinese expanded, the tone of the coverage grew darker. The *Star* focused on what it claimed was the destructive competition between "the Chinese worker and the citizen laboring man," ignoring the fact that the Chinese filled jobs Anglos and Californios had traditionally scorned and assigned to Indian workers. The *Daily News*, edited by Jack King, was even more negative, publishing a series of deeply racist and inflammatory editorials on "the Chinese menace." The Chinese were a people "without one single redeeming feature," the *News* declared, "so utterly depraved and debased that no single thought of virtue or honesty ever entered their heads." In a particu-

larly vicious column, a reporter offered his impression of the "pariahs" who resided along "Nigger Alley."

> Within the buildings, herded like beasts, men, women and children dwell together, ignoring all distinctions of sex, and filthy to a degree absolutely appalling. Noisome vapors pervade the air, creating a stench sickening to senses unperverted by daily contact with these loathsome quarters. Here, crimes too horrible to name are undoubtedly matters of ordinary and perhaps daily or nightly occurrence.

With allusions to animals, filth, and unregulated lust, the press coverage portrayed the residents of Chinatown as barely human.

The negative reporting was accompanied by a dramatic upsurge in violence directed at Chinese residents. The records of the city's justice courts, reasonably complete for the 1860s, include no complaints of violence against Chinese individuals before the spring of 1869, when teamster George Enkhardt was found guilty of having "maliciously run his wagon, loaded with brick, into the cart of a Chinaman and smashing it to pieces." It was followed by no fewer than twenty violent attacks over the subsequent two years. Santiago Aguella was charged with "maliciously cutting and beating Ah Loy over the head and face with one wagon whip without cause or provocation." Andy Sharkey was fined for "beating and kicking a Chinaman without provocation." Patrick H. Gleason pled guilty to maliciously assaulting a Chinese man. When Justice William H. Gray asked Gleason whether he had anything to say in extenuation of his offense, he explained that a Chinese man had "called him hard names," leaving him so angry that "he pitched into the first Chinaman he met." He felt such "great antipathy to the Chinamen," Gleason said, he simply could not help himself.

The Chinese responded forcefully to the violence against them, filing complaints in justice court and pursuing the prosecution of their tormenters. Virtually every Chinese resident of Los Angeles was a member of a *huiguan*, or company, a mutual benefit association

designed to assist and protect overseas Chinese. Six *huiguan* established headquarters in San Francisco during the 1850s and 1860s, opening branches in other western cities as the need arose. Five of the six *huiguan* had members in Los Angeles, but a majority of the city's Chinese belonged to the Sze Yup Company. The companies assisted their members with employment and lodging, offered them meeting rooms and lounges where they could relax with their countrymen, and provided them with the assurance that in the event of an untimely death in a foreign land their remains would be returned to family members in China.

The companies also hired local lawyers to represent their members in court. California law forbade Chinese witnesses from testifying in cases involving white persons, but when the lawyer for a defendant moved to quash the complaint of a Chinese man on those grounds in 1869, Justice Gray overruled him, rejecting his "ingenious resort to legal technicalities." Thereafter Chinese residents enjoyed full access to Gray's court.

THE REVENUE of the Sze Yup Company came not only from membership fees but from the services it provided its members. Gambling and opium concessions offered lucrative returns. But with Chinese men outnumbering women by a ratio of five to one, the sex trade was the profit center. A handful of the approximately three dozen Chinese women who resided in the city in 1870 were the wives or mistresses of prominent men. The majority, though, were prostitutes, servicing not only their own countrymen but a growing number of Anglo and Latino customers as well.

Near the Plaza late one night, an off-duty patrolman was accosted by a Chinese streetwalker who tugged at his coat and asked him how he liked it. He played dumb, saying he didn't know what she meant. "You fuck me for two bits," she said. When he hesitated, she doubled down. "Me give you two fucks for two bits." Even at low rates like those, the typical Chinese prostitute produced an annual profit of sev-

eral hundred dollars for her pimp. The sex trade in Chinatown was valued at thirty or forty thousand a year, the equivalent of several million in today's dollars. While the Sze Yup Company did not manage the brothels itself, its members did, and a share of the revenue went to the company in exchange for referrals and protection.

These women were very young and very vulnerable. Some were the victims of kidnappings in China; others had been sold into slavery by their impoverished families. Forcibly transported to the United States, they were indentured to brothel masters, typically for a term of four years, considered the maximum working life of a prostitute. If they complained or resisted, they risked punishment. The record overflows with accounts of Chinese prostitutes beaten, whipped, and sometimes tortured by brothel masters. One evening as two patrolmen made their rounds near Negro Alley they heard a woman's screams. Rushing down a dark corridor they came upon a group of Chinese men standing over a severely beaten woman who was bleeding profusely from cuts about her face and head. Nearby was her master, Sing Lee, headman of the Sze Yup Company. In halting English she told the patrolmen that she had been punished for resisting his plan to sell her to another man. Both Sing Lee and the woman were arrested and taken to jail, where he was released after paying a small fine. But, according to the *Star*, the woman "begged to be allowed to stay, stating that Sing was 'a big Chinaman,' and that, because she had been the cause of his going to jail, the other Chinamen would kill her [and] cut her body into little pieces." Nevertheless, she was turned out to an unknown fate.

Chinese prostitutes sometimes ran away, but when they did their masters often filed false complaints against them for theft, thus enlisting the authorities in their apprehension. Los Angeles patrolmen, easily corrupted with a little cash, proved eager to cooperate. In October 1870, when the Sze Yup Company offered a $100 reward for the return of a particularly valued woman, both City Marshal William Warren and Deputy Joseph Dye jumped into action. Dye learned where the woman was hiding, but it was Warren who made the arrest and col-

Compendium_Roth
Page 0227

lected the reward. He was escorting the woman to jail, trailed by a large crowd of Chinese, when Dye confronted him on Main Street. "Warren, what are you going to do in regard to this matter?" Dye demanded. "I want my money." Warren brushed him aside. "I don't want anything to do with you," he said. "But you have defrauded me," Dye exclaimed. "You're a damned dirty liar," Warren responded. Dye reacted instinctively, raising his walking stick to strike, but Warren had a derringer pistol concealed in his hand, and he fired first. The ball struck Dye in the forehead but miraculously glanced off, leaving him with nothing more serious than a bad bruise and a terrible head-ache. The two men pulled their revolvers and, in the words of one witness, "the pistol shots commenced coming thick and fast." Three bystanders were struck before Warren was hit in the groin and fell to the ground, mortally wounded. "I'm killed," he cried. He died the following morning. Tried for manslaughter in district court, Dye was released after Judge Morrison declared the homicide a clear case of self-defense and directed the jury to bring in a verdict of not guilty.

Most fugitive prostitute cases ended more prosaically in the court-room of Justice Gray, who resented the ability of Chinese brothel masters to corrupt the judicial system. Although slavery had been out-lawed by the Thirteenth Amendment to the Constitution, few public officials applied the law of the land to the bondage of Chinese women. Justice Gray was the exception. "The law does not recognize slavery," he exhorted the principals at the close of a hearing in which two Chinese masters disputed the ownership of a woman. Yet Gray had to acknowledge that he did not possess the authority to intervene and release her. "The Court," he declared, "regrets its want of power to punish both parties as they deserve, for the violation of the Laws of the Land and for contempt of this Court in attempting to make it a party to the transaction."

AS CHINATOWN GREW, other *huiguan* established branches in Los Angeles, and the Sze Yup Company slipped from its dominant

position. A power struggle broke out among headman Sing Lee's top lieutenants, Sam Yuen and Yo Hing, legitimate businessmen but brothel masters as well, both of them fined in justice court for "main-taining and residing in a house of ill fame." Reports of the conflict began appearing in 1868 and continued through the autumn of 1870, when both men resigned from the old company and led their factions into two *huiguan* that had recently established branches in Los Angeles. Sam Yuen became headman of the local Ning Yung Company; Yo Hing assumed leadership of the branch of the Kong Chow Company. With that move the struggle sharpened for control of the Chinatown vice trade. "Sunday evening, extensive preparations for a battle royal were made by the Chinese denizens of Negro Alley," the *Star* reported in January 1871. "Between the lines formed by the two companies were the headmen arguing the point at issue, which appearances indi-cated could only be settled by an appeal to the law of arms." But "the row was nipped in the bud" by the timely arrival of the newly elected city marshal, Francis Baker.

Sam Yuen quickly negotiated a defensive alliance with his old boss, Sing Lee. But Yo Hing took them both on. About thirty years old, Yo Hing was both charismatic and commanding, "a huge man," in the description of a contemporary, with "a voice that fairly rumbled when he talked." His Los Angeles career had begun several years earlier when he went to work as a cook in the household of Jack King and his family. He quickly worked his way up, leasing land to grow vegetables and investing his profits in a cigar factory and brothels in Chinatown. Yo Hing was fluent in English and maintained good relations with important Anglos. Horace Bell described him as "a fine fellow," and the *Star* praised him as "the best and most favorably known Chinaman in the city."

Yet in his struggle for control of Chinatown, Yo Hing did not hesi-tate to employ ruthless tactics. In the spring of 1871 his men abducted the wife of a prominent Chinese merchant, an ally of Sam Yuen's, and succeeded in keeping her hidden for several months. Sam Yuen was shamed as a leader unable to protect his own people, and after months

of humiliation he decided the time had come to eliminate his rival once and for all. He put a price on Yo Hing's head and arranged for two professional Chinese gunmen to come from San Francisco. In mid-October they arrived on the steamer, intent on collecting the reward. The contract on Yo Hing was common knowledge in Chinatown, and the cadre of the two companies prepared themselves for a battle royal, stockpiling arms and ammunition. The proprietor of a local hardware store reported he had "sold forty or fifty pistols to Chinamen within the last few days."

On the morning of Monday, October 23, as Yo Hing emerged from an apartment at the northern end of Negro Alley, Ah Choy and Yu Tak, the San Francisco hitmen, were waiting for him. "They fired at me," Yo Hing told the *Star*. "I ran into the house. Ah Choy's pistol got out of order, I think a cap caught in the cylinder, and that saved my life. One ball passed through my coat and shirt." The shooters fled and Yo Hing hurried to the office of his attorney, Jack King, where he swore out a complaint charging the two men "with the crime of assault with deadly weapons with intent to kill." They were arrested and jailed. At a hearing in Justice Gray's court the following afternoon, rival boss Sam Yuen posted their bail.

Yo Hing considered himself in mortal danger. "They are bound to kill me," he told a reporter for the *Star*. "They will kill me even if they are killed after. They don't care and will kill anybody who tries to arrest them." Yo Hing was determined to seize the offensive, which he did that afternoon, shortly before sundown. Sam Yuen later provided his version of what happened. The gunman Ah Choy, he said, "was eating his evening meal, at a back part of a house on the east side of Negro Alley, heard a fuss, and went out to the front door. Yo Hing and three others were around with pistols, and one of them shot Ah Choy in the neck." Moments later three or four of Sam Yuen's fighters burst from the Coronel building across the street and began firing at the assailants.

Mounted patrolman Jesús Bilderrain had been warned by Chinese informants to expect "a big China fight." He was a couple of blocks away when he heard the sound of gunfire. "Follow me," he shouted to fellow officer Esteban Sánchez. He sprang into the saddle and spurred his horse toward Negro Alley. As he approached, Bilderrain testified, "I saw six or seven Chinamen about the middle of the street shooting at each other." He charged into them and the gunmen scattered, running into open doors on either side of the alley. Bilderrain jumped down and nabbed one of them. That was when he saw Ah Choy lying in the doorway of an east side adobe, "dying from a shot he had received." Sánchez rode up. "I saw Bilderrain afoot, ahold of a Chinaman," he said. "At the same time I saw another Chinaman shoot at Bilderrain with a pistol in each hand." Sánchez jumped down and pursued the shooter around the corner of the Coronel, but was driven back by sustained gunfire from a group of Ning Yung fighters massing in the corral at the back of the building.

Bilderrain hailed a bystander and requested his assistance in taking his captive to jail. As they hurried along the south side of the Coronel, a Chinese fighter emerged from the Wing Chung store, fired at them, then darted back inside. Handing his prisoner off to the bystander, Bilderrain charged after the man, revolver in hand. He ran through the open door and someone slammed it behind him. "The house was plum full of Chinamen," Bilderrain said. One of them pressed a pistol to his chest, and he instinctively grabbed it with his left hand. The gunman pulled the trigger, but the hammer came down on Bilderrain's finger. "I went to smack him down," he said, "but some of the Chinamen then shot me." The bullet penetrated his right shoulder, disabling his gun hand. "I had no show for my life," as Bilderrain put it, realizing his only chance was to get out. "I thought I was mortally wounded and I was anxious to die outside," he said. He wrenched the door open with his good hand and stumbled out onto the veranda.

Walter Lyon, who operated a shop in the Arcadia Block, just steps away, saw Bilderrain "come running out with three Chinamen at his heels, pistols in each hand and firing promiscuously." A Mexican boy standing nearby was hit in the leg. Patrolman Sánchez charged after the gunmen, who retreated back into the Coronel, leaving the door ajar.

Bilderrain steadied himself against a post and blew several long blasts on his police whistle. Sánchez stepped up on the veranda, approached the open door, and warily peered in. The interior was thick with gun smoke, but through the haze he could see the figure of a man. "He leveled his pistol at me," said Sánchez. "I presented my pistol and we both fired at the same time." Both shots went wide. Sánchez jumped to the right side of the door and pressed himself against the adobe wall. Robert Thompson, a bystander summoned by Bilderrain's whistle, came running up with another man, and they positioned themselves against the wall on the left side. "What's the matter?" asked Thompson. "The Chinamen are shooting," said Sánchez. "They have shot Bilderrain," the other man added. Thompson pulled his revolver, reached around the door jamb, and blindly fired into the room. "Look out, there are two or three in there and they may shoot you," Sánchez warned. "I'll look out for that," said Thompson. Then, stepping directly in front of the threshold, he fired again. The answering fire from inside was instantaneous. Thompson staggered back, clutching his chest. "I'm killed," he said.

AN ANGLO AND TWO LATINOS had been shot by Chinese fighters. From that point on, that was all that mattered. Robert Thompson suffered a mortal wound, and although Bilderrain and the Mexican boy would recover, the rumors coursing through town placed all three at death's door. Nathan King, a security guard at the railroad depot several blocks away, heard that "the Chinese were killing the white men by wholesale in Negro Alley." He grabbed a rifle and a revolver and hurried there along with dozens of others. Groups of curious and confused men milled about the northern end of Los Angeles Street, where it met Negro Alley. Suddenly a burst of gunfire came from the Coronel building. "The Chinese discharged the contents of their revolvers promiscuously among them," wrote one observer, and "the crowd scattered like leaves before the whirlwind." They quickly regrouped with serious purpose. "Almost every man's hand sought the back pocket of

his pants, and a pistol was drawn, cocked and discharged at the Chinamen in less time than it takes to tell." The firing continued as the sun set behind the western hills and the streets began to darken. Gas street lamps had been installed on downtown streets the previous year, but they would not be lit that evening. The gunfire was intended to keep the attention of the crowd focused on the façade of the Coronel while most of the company fighters escaped out the back, slipping into the vineyards and orange groves, only a few steps away.

Finally the firing from the Coronel stopped altogether. But the crowd in the street kept up an indiscriminate fire at the building for another ten or fifteen minutes. No one realized that the company fighters had already fled. Inside the adobe walls of the Coronel were several dozen terrified Chinese men and women, none of whom had anything to do with the gunfight. Outside, at the head of Los Angeles Street, the crowd was intent on wreaking revenge.

It was a situation fraught with peril. Marshal Francis Baker might have organized his patrolmen and attempted to disperse the crowd, which at that point numbered fifty or seventy-five men. But he decided instead to form them into a posse. "I called to citizens to stop shooting," he testified, "and we would put a guard around the house." He issued orders to surround the Coronel and allow no one to cross the line. "If any Chinamen come out, let them have it," he told one man. "Hail any Chinaman attempting to escape," he instructed another, "and in case he would not stop, shoot him." Sheriff James Burns, who showed up a few minutes later, endorsed that plan. "Prevent anyone from going in or coming out," he told the crowd, and if they resist, "bring them down." This disastrous decision, legitimizing the use of lethal violence, led directly to the horrible events that took place over the next several hours.

BAKER AND BURNS had no sooner established their blockade than a Chinese man bolted from one of the buildings and made a desperate attempt to escape. "Here's one! Here's one!" someone cried.

The man was swinging a hatchet, attempting to cut his way through the crowd, and several men began pummeling him with canes and clubs. Two patrolmen waded in and grabbed him; assisted by a clerk named Charles Avery, they began marching him toward the jail, four or five blocks away, trailed by a mob of several dozen men shouting, "Hang him! Hang him!" At the corner of Main and Temple, the heart of the city's business district and only a block from the jail, someone struck Avery on the back of the head, and as he fell to the ground the mob closed in around the officers, pinioning their arms and seizing their prisoner. A big, burly man wielding a Colt's Dragoon shouted for a rope, and one of the mob ran into a dry goods store and emerged with a new coil. Benjamin McLaughlin, watching from the veranda of the Downey Block, was appalled and he confronted the man. "I said it was not right," McLaughlin later testified, "and he said I was a damned Chinaman."

"To the hill!" someone shouted, and the crowd took up the chant. The victim was dragged up Temple Street to the gate of Tomlinson's old corral, where Michel Lachenais had been lynched ten months before. The rope was thrown over the same crosspiece and a knot hurriedly fashioned at the other end. "Hoist him up!" cried the big man with the Dragoon. "God damn him, if you don't put that rope around his neck I'll shoot him anyhow." The noose was forced over the victim's head, and he was jerked up by three or four men. The new rope was stiff and the knot wouldn't slip, so one of the men shimmied up a gate post, and steadying himself against the crosspiece jumped up and down on the victim's shoulders several times, breaking both his collar bones. Several others pulled out their revolvers and riddled the swinging body with bullets. Then the mob hurried back to Negro Alley, celebrating its accomplishment.

"That fellow didn't kick over five seconds," Sheriff Burns heard one of the lynchers exclaim on their return. "They've hanged him," he heard another man say. Burns watched as the lynchers began infecting others in the crowd with their blood lust. "Damn it," shouted the man with the Colt's Dragoon, "we'll show them how to hang China-

men." Several men incited the crowd with incendiary speeches, and there were angry shouts of "¡carajo la Chino!"—fuck the Chinamen! Things were spiraling out of control and Burns figured he had just one more chance. At his urging, District Attorney Cameron Thom stepped up on a box and delivered a law-and-order speech that had little effect. Burns himself then mounted a barrel, shouted for attention, and as a group assembled around him, began pleading for calm. Suddenly the top of the barrel collapsed, Burns crashed to the ground, and the crowd roared with laughter. "No attention was paid to his words," lamented Charles Avery. "Many were anxious to put a stop to the affair," testified John M. Baldwin, a prominent local surveyor, "but there was no one to lead."

At 7 PM the local correspondent for the *Daily Alta California* of San Francisco filed a dispatch by telegraph, the first report to the outside world of the disaster taking place in downtown Los Angeles. "The excitement in this city is intense," he wrote.

> Citizens are arming and Negro Alley and the Chinese quarters are in a state of siege. Already upward of 100 men armed with Henry rifles and shotguns guard the street. One Chinaman has just been captured, taken through the main street, and hanged by the citizens on a lot formerly Tomlinson's Corral and Lumber Yard, the same spot where Lachenais was hung by the vigilantes for killing Mr. Bell a few months ago. . . . The sheriff and civil authorities have given up all attempts to restrain the mob, and no one can tell how far they may go.

ROBERT THOMPSON DIED shortly before 7 PM, and the news quickly circulated through the city. Within an hour the crowd at the head of Los Angeles Street had grown to five or six hundred men, a substantial portion of the three or four thousand adult males residing in the city. The Chinese inside the Coronel hunkered down, and the crowd grew restless. About 8 PM a group of men mounted the roof and

after chopping holes through the asphaltum began firing down on the people hiding inside. One Chinese man was immediately killed. Another bolted and dashed into the street. The armed crowd did precisely as it had been instructed by the marshal and the sheriff. "It seemed to me five hundred shots were fired at once," one witness testified. The man, hit numerous times, died in the middle of Negro Alley.

Someone threw a burning torch into the Coronel, and soon smoke began billowing from the holes in the roof. The great Chicago fire had taken place only a few weeks before, and everyone was acutely aware of the danger of general conflagration. One of the patrolmen demanded that the would-be arsonist retrieve the torch, and under the threat of the officer's revolver he warily ventured inside and dragged it out. Suddenly realizing that the Chinese inside had put up no defense, dozens of men began pouring into the building. "Half the horror of the scene was shrouded by the veil of night," wrote one observer. "But to the sense of hearing it stood forth more prominently than it could possibly have done during the day, when the busy hum of the wakeful city would have somewhat smothered the noise."

Young Joseph Mesmer also vividly remembered the furor. "My memories of that night of horrors are vivid and indelibly burned into my brain," he later wrote.

> During my youth my curiosity led me to see practically every lynching that took place in Los Angeles, and I had observed many gruesome sights. But the events that transpired that night were the most irresponsible and bloodthirsty I had ever witnessed. . . . What I saw and heard as a boy of sixteen stands before my eyes to this day as a realization of the extent to which maddened human beings can go. Many of the rioters seemed actually inhuman. They were wild-eyed and sweat-grimed. Knives, pistols, and sword-canes were in many hands; and some armed themselves with short iron-pipes and clubs. Nearly all dashed about trying to vent their brutality on the unfortunate Chinamen the moment they were within reach.

At least one more Chinese was shot and killed inside the Coronel. Another man was seen running from the building. "Like hounds sighting their quarry, a hundred men and boys dashed after him and seized his streaming queue, manhandling him roughly," said Mesmer. "A score at once dashed off with him at a run for Tomlinson's corral."

It was approximately 8:45 PM. Four Chinese men had already been killed. Over the next twenty or thirty minutes fourteen more would be lynched in one of the nation's most appalling episodes of collective violence. Four more men were hanged at Tomlinson's, including Dr. Gene Tong, the only one of the victims recognized by the mob. Dr. Tong pled for his life in both English and Spanish, offering the lynchers gold and silver if they would let him go. At the mention of money, someone pulled off the doctor's trousers and began going through his pockets, looking for cash. Finding none, a frustrated lyncher thrust his revolver in the doctor's mouth and pulled the trigger, blowing off the side of his face. He was probably dead before he was hanged. "It was a most heinous and gruesome scene," wrote Joseph Mesmer. "I have seen a good many men hung, both legal and by the vigilance committee, but nothing so revolting as what befell these Chinese."

Back at the Coronel men and women were being pulled from their hiding places. The lynchers ignored the women, but forced nooses over the heads of the men and dragged them down the street to John Goller's wagon shop, where the crossbar of his portico became a makeshift gallows. "I saw them bring a lot of Chinamen to my house," Goller testified, "and I remonstrated with them for bringing them where my little children were." One of the mob pressed the barrel of his rifle against Goller's cheek and cocked it. "Dry up, you son of a bitch," he said. Goller retreated into his house. Seven Chinese were hanged from his porch, pulled up by a group of men and boys on the roof, one of whom danced a quick step and called out to those below, "bring me more Chinamen, boys, patronize home trade."

Young attorney Henry T. Hazard, watched the proceedings with a mounting sense of self-loathing. With Goller's portico crowded with suspended bodies, the mob dragged several more victims to a large

and a woman who operated a boardinghouse across the street rushed over and offered her clothesline. "Hang them!" she shouted. "Hang them!" As the line was being cut and nooses fashioned, Hazard took a stand. Climbing onto the tongue of the wagon, he shouted to the mob. "Do you know if the man you're hanging is guilty?" There were catcalls. "You better dry up and get down or we'll hang *you*," one man shouted. "But it isn't right," said Hazard. His friends pulled him down as just someone fired a pistol and a bullet whistled past his face. Three more men were hanged from the high sides of the wagon.

LAWYER AND REAL ESTATE AGENT Robert M. Widney, leader of the Los Angeles vigilantes, was walking from his residence in the southern portion of the city to his office in the Downey Block, at the corner of Temple and Main, when he was hailed by Samuel C. Foy, a longtime resident who operated a harness and saddle shop on Los Angeles Street, only a few steps from Negro Alley. Foy was a vigilante from way back, and served with Widney as one of the leaders of the Law and Order Party. "They are killing all of the Chinese off," Foy exclaimed. Widney supposed he was joking. "It's a fact," said Foy, and he explained what was happening. Widney's first concern was that members of their organization might be involved in the violence. Foy assured him that was not the case. Widney told Foy to round up all the "old vigilantes" he could find and bring them to the corner of Temple and Main. He would be back as soon as he retrieved the revolver he kept in his office.

But Widney could not locate his Colt's Navy six-shooter, so when he came out onto the street and came face-to-face with a mob forcing two Chinese men up Temple toward Tomlinson's gate, he was unarmed. "Years of experience as a trapper and hunter and in the early days of Nevada mining camps," Widney later wrote, "had demonstrated that words were useless with such rioters." Not knowing what else to do, he followed them up the hill. At Tomlinson's he ran into John Baldwin, a vocal opponent of Widney's brand of vigilantism,

one of the few men who had turned out to help Sheriff Burns protect Michel Lachenais. That night, however, the two found common cause, both circulating through the crowd, remonstrating with the lynchers. One man—Widney described him as a broad-faced Irishman with square-cut whiskers—pushed a revolver in Widney's face and demanded that he shut up. They had important work to do, he said. Widney asked whether he was a vigilante. "Damn it," the man replied, "we are all vigilantes." He paused, then looked directly at Widney. "And there are a lot of white men here who ought to be hanged also." Widney was stunned. "I believe he referred to me." Widney and Baldwin moved off to the side and watched in silence as the Chinese victims were hoisted up.

Afterward Widney returned to the corner of Temple and Main, where he found Sam Foy and a few others, including grocer John Lazzarovich and Widney's brother William. The younger Widney had taken the revolver from the office and also had a single-shot pistol. He handed the Colt to his brother. Now they all were armed. Widney was determined to rescue the Chinese from the hands of the lynchers. He was equally determined to rescue the reputation of the vigilantes from any association with the mob.

"We saw two or three groups coming with Chinamen," he testified. It was do or die. The first group came up, led by the burly man with the Colt's Dragoon. "The cheap labor is done away with now," he shouted. "Every damned Chinaman will be hung by morning!" William Widney confronted him. "What are you going to do with that man?" he asked. "Hang him, by God," the man with the Dragoon replied. Widney thrust his little single-shot pistol in the big man's face as others grappled with him and seized his revolver. "I can get another in two minutes," the man sputtered. But in the face of this simple demonstration of force by a group of determined men, the mob released its victim, and Foy and young Widney quickly escorted the Chinese man down Spring Street to the jail. Within seconds another group of lynchers arrived, dragging a victim. Lazzarovich and the elder Widney waded into the crowd and seized him. The lynchers

resisted, and one of them leveled a revolver at Lazzarovich. Widney pressed his Colt against the man's chest. "Get out or I will kill you," he said in a low, threatening voice. The man went pale and moved aside, and as he did so the mob melted away. Lazzarovich and several others took the Chinese victim to the jail. Widney and the others repeated this several times, saving the lives of four or five men.

Their action succeeded in turning the tide, supplying the leadership that the authorities had failed to provide. One or two patrolmen rescued several more Chinese, but their action came late. At about 9:20 PM Sheriff Burns took charge of the armed vigilantes at the corner of Main and Temple and led them back to Negro Alley, where they established an armed guard around Chinatown. The lynchers retreated to the saloons, where they drank and celebrated until early morning. Over the years the vigilantes of Los Angeles had fostered the conditions which allowed this ghastly orgy of mob violence to take place. But give them their due. On that night of horrors they were instrumental in ending the lynchings.

· CHAPTER 29 ·

IMPERFECT JUSTICE

AT THE DIRECTION of County Coroner Joseph Kurtz, the mangled bodies of the eighteen Chinese victims were taken to the jail yard and laid on the ground in two parallel rows. The reporter for the *Daily News* saw them there early the next morning. "Their countenances were ghastly and distorted," he wrote, "many of them besmeared with blood and pierced with bullets." Among the approximately twenty Chinese successfully escorted to the jail, a number were wounded, some seriously. Many more had fled into the vineyards and orange groves east of Chinatown or found refuge in the homes of Angelenos. In the morning they went to the jail, searching for missing friends and relations. It was with their help that Coroner Kurtz was able to identify the dead, although the various iterations of his list, recorded in court documents or printed in the press, are inconsistent and feature almost no complete names. In addition to Dr. Tong, the victims included cooks, laundrymen, and common laborers. They were affiliated with four separate *huiguan*. Some had lived in Los Angeles for several years, others had just arrived. Kurtz summoned a coroner's jury, and once they had completed the gruesome task of examining the victims, their bodies were placed in redwood coffins and transported

# PISTOLS AND REVOLVERS

## AND THEIR USE

### By MAJOR JULIAN S. HATCHER

*Ordnance Department, U. S. Army*

Member of the Springfield Revolver Club.   Member of the United States Revolver Association.   Life Member of the National Rifle Association. "Distinguished Pistol Shot," U. S. Army



SMALL-ARMS TECHNICAL PUBLISHING COMPANY

MARSHALLTON, DELAWARE
U. S. A.

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

G.v 1175
H 3

COPYRIGHT, 1927, BY
SMALL-ARMS TECHNICAL PUBLISHING CO.



PRINTED IN U. S. A.

Generated on 2022-10-18 20:10 GMT / https://hdl.handle.net/2027/uc1.b3130270
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

arranged so that one movement of the lever placed a ball in the barrel, filled the chamber with powder, and then charged the pan with priming. In short, for each motion of the lever a shot could be fired. The great drawback to this and other repeating mechanisms that were tried before the day of metallic cartridges was that a magazine of loose powder had to be carried in the weapon itself, and without a metallic cartridge case the sealing of the breech was imperfect, so that a flash escaped, and the danger was always present that ignition of the loose powder in the magazine might occur with disastrous results to the user. That this danger was not imaginary is indicated by the fact that the remains of a Mortimer pistol that had been wrecked by such an explosion may be seen in the collection of arms loaned to the National Museum by the United States Cartridge Company.

Another device that occurred to the more inventive among the early gun makers was to arrange the gun with only a single barrel, but with two locks, so that if two charges were loaded into the barrel the one nearest the muzzle could be fired first, leaving the other one as a reserve. The disadvantage of this system was that occasionally leakage occurred past the wad dividing the two loads, which resulted in the explosion of both charges at the same time.

These were some of the means by which gunmakers struggled to increase the number of shots available, but another system which was more popular than any of these was to make a gun with several barrels pivoted around a central axis and arranged to be turned so as to bring one barrel after another into line with the lock. This was the beginning of the "revolver" principle. It was employed at least several centuries ago, as matchlock pistols are in existence which are built on this pattern. The early guns of this kind were of the pepperbox style, with all the barrels of the same length, and

Generated on 2022-10-18 19:47 GMT / https://hdl.handle.net/2027/uc1.b3130270
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

many of them had no mechanism for turning the barrels, which had to be brought in line with the locks by hand each time a shot was fired. See Figs. 12 and 13.

In these pepperboxes all barrels pointed forward, as will be seen by the illustration, and this is an important point because sometimes in these old muzzle-loading guns with loose black powder there was danger of the flash from one barrel being communicated to the next, and they might all go off at once.

One inventor made up a revolving pistol in which the chambers were all arranged in a flat cylinder like the spokes of a wheel. This system had the disadvantage of some of the chambers pointing backward toward the user. It is said that the inventor of this gun was killed in experimenting with it because all the chambers went off at once and one of the bullets, which was pointing toward him, was discharged to the rear with fatal results. Fig. 5.

In 1835 Colonel Colt made his invention, which produced the first successful revolver as we know the weapon today. The simple, but ingenious mechanism which he produced provided for a cylinder with six chambers, pivoted so the chambers could be brought successively into line with the barrel.

By an arrangement of levers and ratchets the cocking of the hammer first caused the cylinder to revolve, then locked it in line with the barrel. This invention marks the advent of the first successful repeating firearm.

The revolver became highly popular, and time has proved that Colonel Colt's device was singularly well designed for its purpose, for with the changes necessary to adapt it to the use of metallic cartridges the original mechanism exists almost unaltered in the Colt single-action Army revolver, which is manufactured in large quantities today and is still popular.

The early Colt revolvers were made for cap-and-ball, and the patent covered a cylinder closed at the rear end

Generated on 2022-10-18 19:47 GMT  /  https://hdl.handle.net/2027/uc1.b3130270
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA



**EXAMPLES OF EARLY HAND FIREARMS DATING FROM THE MATCH-LOCK AND WHEEL-LOCK PERIOD TO THE INVENTION OF THE COLT REVOLVER**

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

**10**          *PISTOLS AND REVOLVERS*

and fitted with nipples for percussion caps. The important feature of this construction was the fact that between each two caps there was a wall of metal, which prevented the possibility of the explosion of one cap setting off the next one.

After the invention of the Colt revolver there were a host of other revolvers that gradually came on the market.



DETAILS OF AN EARLY COLT REVOLVER. FROM "AMERICAN INVENTIONS" (1872)

Many of these did not have this feature of a partition between the nipples, and as a result it was not uncommon for two or more of the cylinders to go off at once.

The Colt revolvers were also made in the form of carbines and rifles with the same revolving cylinder mechanism. These Colt rifles were not as practical as the revolvers, because there is always a flash of fire between the front of the cylinder and the rear of the barrel in any revolver, and in using these Colt rifles this flash used to burn the user's arm, because his left arm was extended in the usual manner of holding the rifle.

Digitized by Google          Original from
UNIVERSITY OF CALIFORNIA

cv-01537-BEN-JLB   Document 153-14   Filed 10/21/22   PageID.15686

The most unfortunate thing about these revolving rifles was that occasionally, from one cause or another, two or more chambers would go off at once, and this always resulted in shooting away part of the left hand, which is placed in front of the cylinder in grasping the gun in the usual way. For this reason these revolving rifles did not have any lasting popularity.

The muzzle-loading, or cap-and-ball revolvers were used exclusively up to 1859, when cartridge revolvers were introduced, and they were used for a long time after 1859 because it was some years after the first introduction of the cartridge revolvers before they were as reliable or powerful as the cap-and-ball types. "American Inventions in Small Arms," by General Norton, which was published in 1872, shows the .36-caliber Navy revolver with the caption, "Pattern now used by U. S. Navy." And there are thousands of cap-and-ball revolvers in use in the United States even today (1927) in the backwoods sections, especially in the Southern States, where cartridges are difficult to obtain from the village general stores, and where the cost of fixed ammunition by the usual boxful is locally almost prohibitive to a large proportion of the poorer inhabitants.



COLT'S NAVY PISTOL.

PATTERN ONCE USED BY THE U. S. NAVY (AS LATE AS 1872). CALIBER OF BORE .36, CARRYING 50 ELONGATED OR 86 ROUND BULLETS TO THE POUND. FROM "AMERICAN INVENTIONS," NORTON (1872)

Generated on 2022-10-18 20:12 GMT / https://hdl.handle.net/2027/uc1.b3130270
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

## CHAPTER II

### FURTHER PROGRESS—THE DEVELOPMENT OF MODERN TYPES

Although the cartridge revolver was introduced by Smith & Wesson in 1859, a type of metallic cartridge had been invented some time before that. It was a rim-fire cartridge patented by Flobert, of Paris, in 1845. It consisted of a small copper shell containing fulminate only and a small ball. This ammunition was used only in the so-called "saloon" pistol, a single-barrel arm made in France and occasionally sold in America. The Flobert cartridges were the so-called "B. B." and "C. B." caps which most of our readers used in their boyhood days and which are still widely sold.

In 1854 Harold Smith and D. B. Wesson designed the .22-caliber rim-fire cartridge, and began its manufacture in Springfield, Mass. On February 14 of the same year they obtained patent No. 10535 for a repeating pistol, which pistol is shown in the photograph. They formed a limited partnership on June 5, 1854, and began its manufacture at Norwich, Conn., under this patent.

The repeating pistol that they invented was indeed remarkable and deserves more than passing notice. Not only was it a cartridge weapon but it had an entirely new and distinct repeating action and one of the most successful ones in the world, for the mechanism of this Smith & Wesson pistol was afterwards incorporated in the famous Henry rifle, which later became the Winchester "Model of 1866" and was succeeded by the well-known Winchester "Model of 1873," which contained almost identically the same mechanism as that first de-

12

Generated on 2022-10-18 20:08 GMT / https://hdl.handle.net/2027/uc1.b3130270
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

Compendium_Roth
Page 0242



# A HISTORY

*of*

# THE COLT REVOLVER

Compendium_Roth
Page 0243

A HISTORY OF THE COLT REVOLVER

COPYRIGHT · · · 1940

BY CHARLES T. HAVEN AND FRANK A. BELDEN

All rights reserved. This book
or parts thereof may not be
reproduced in any form with-
out permission of the publisher.

623.4
H29
830227
REFERENCE
$85.00

PRINTED IN THE UNITED STATES
BY QUINN & BODEN COMPANY, INC., RAHWAY, N. J.