ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 26 OF 37**<br><br>Courtroom:   5A<br>Judge:   Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325-1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

i The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.



**Smith & Wesson post-World War II .32 Regulation Police Target, circa 1957.**





1949 when the factory assembled some unfinished parts completed prior to World War II. Postwar improvements to this model follow those incorporated in the .32 Hand Ejector and will not be repeated. In 1957, the .32 Regulation Police was stamped Model 31 in the yoke cut. This model number was changed to 31-1 when the frame was changed from I to J in 1960.

The .32 Regulation Police Model, like the .32 Hand Ejector, was available in 3¼", 4¾", and 6" barrel lengths with finishes in blue or nickel. The gun was generally sold as a service sight model but target-sight variations were offered. The last group of target-sighted Regulation Police models produced was in 1957 when the firm completed 196 units serial numbered between 657,174 and 657,369. This target model is truly one of the rare variations of this model. The .32 Regulation Police continues in production today as the Model 31-1 and remains the only .32 caliber revolver left in the long line of Smith & Wesson revolvers.

## .38 REGULATION POLICE & .38 TERRIER

The .38 Regulation Police is a companion to the .32 Regulation Police. The factory referred to this model as the .38/32 revolver, indicating it was a .38 revolver built on a .32 frame. It was identical to the .32 Regulation Police, except that it was serial numbered in its own series. Production of this model began on March 5, 1917 at serial number 1. It was produced until 1940 when it was temporarily discontinued at serial

number 54,474. Production was resumed on June 28, 1949, with the model incorporating a new style rebound slide-operating hammer block. The original serial number series was continued until January 17, 1969, when the serial numbers reached 122,678. At that time the serial numbers were changed to the R prefix and the .38 Regulation Police was serial numbered in the same series as the Model 60.

The .38 Regulation Police or Model 33 as it was later known, was available originally in only a 4" barrel

**Smith & Wesson .38 Regulation Police.**
**Top is post-World War II Model 33 .38 Regulation Police, circa 1960.**
**Middle is pre-World War II .38 Regulation Police, circa 1917-40.**
**Bottom is Model 33 .38 Regulation Police, circa 1970.**
**Collection of William J. Orr**

158     THE I-FRAME HAND EJECTOR MODELS

Smith & Wesson .38 Terrier or Model 32, as it was later called.
Top is .38 Terrier, circa 1956.
Bottom is Model 32 .38 Terrier, circa 1969.





length with either a blue or nickel finish. On June 10, 1936, a round butt 2'' barrel version became available. To separate this new model from the .38 Regulation Police, the factory called the new model the .38/32 Terrier. The serial number for this model began at 38,976 of the .32 Regulation Police series. The .38/32 Terrier or Model 32, follows the same developments as the 4'' model. When the change was made from I frames to J frames in 1960, the -1 designation was added to the model number. The change in serial numbers is identical to that of the Model 33. The Model 32 and 33 were discontinued from production in 1974, ending the production of any revolver firing the .38 Smith & Wesson cartridge.

Chapter X

# The K-Frame Revolvers

There is no doubt that the most important development for Smith & Wesson was the Model K line of handguns for, within this line are some of Smith & Wesson's most famous revolvers. The fact of the matter is that the K-frame size handgun has been and continues to be so popular that its production exceeds the combined quantities of all other handguns ever produced by Smith & Wesson. Let us quickly explore the various models produced on the K frame.

### .38 HAND EJECTOR MILITARY AND POLICE MODELS

Smith & Wesson recognized the weaknesses in the original Hand Ejector and continued to experiment with the design after the introduction of the .32 Hand Ejector in 1896. The firm wanted to eliminate the top-style cylinder stop and improve the method of opening the cylinder. To accomplish this, the cylinder lock was changed to a thumb piece on the left side of the frame. When the cylinder was closed, a spring-loaded center pin, previously used for opening and closing the cylinder, forced a bolt from the center pin hole in the frame, allowing the gun to be firmly locked. This bolt was directly connected to the thumb piece used to open the cylinder. To operate, the thumb piece was pressed forward so the bolt was flush with the frame, thus moving the center pin back into the cylinder and freeing the cylinder for opening. The cylinder stop was changed from the top strap to the bottom strap and, rather than operating off the hammer as on the previous model, the cylinder stop was pulled from the locked position by the downward movement of a forward hook on the trigger.

With the mechanical design completed, D. B. Wesson discussed the merits of this gun with his son, Joseph. The revolver was originally designed to fire the .38 United States Service cartridge (.38 Long Colt) but this cartridge had a reputation for lack of power. D. B. Wesson suggested the cartridge case be lengthened to allow the powder charge to be increased from 18 grains of black powder to 21½ grains. The bullet weight was changed from 150 grains to 158 grains, this new cartridge was called the .38 S&W Special and the factory literature showed the improved cartridge had a penetration of eight and one-half pine boards, each seven-eighths inch thick, a penetration

two inches greater than that of the U. S. Service load. With the development of the new cartridge, the factory introduced the .38 Military and Police Model. Little did they dream that they had introduced what would become Smith & Wesson's most famous model, plus a new cartridge that would become standard among competitive shooters and law enforcement agencies around the world.

The introduction of the .38 Military and Police occurred in 1899 and was referred to as the Model of 1899. It was produced in two calibers, the .32 Winchester center fire (.32/20) and the .38 S & W



Smith & Wesson .38 Hand Ejector First Model, sometimes called the Model of 1899, caliber .38 Special.

Special. Both models were available in blue or nickel having barrel lengths of 4'', 5'', and 6''. Guns of each caliber were serial numbered in a separate series.

Many engineering changes were made to this model during the course of its early production. The collector has classified these engineering changes, produced from 1899-1940, into eight model variations. These variations are important in a comprehensive study, but will not be listed here in detail. For the reader's convenience, however, a chart is included that illustrates these variations so the collector can identify them by serial numbers.

The .32/20 Hand Ejector was not an extremely popular revolver. Its sales were basically limited to sportsmen, since it made an excellent companion gun for those using a rifle of this caliber. (A word of caution: to fire the .32/20 Hand Ejector, the shooter must use pistol cartridges rather than the late production, high velocity, cartridges designed only for rifles.) The last of the .32/20 Hand Ejectors was produced on September 8

1939. In the same year, the firm officially dropped this model from its catalog after producing 144,684 revolvers.

The .38 Hand Ejector Military and Police was the most important caliber of the Model of 1899. In fact, it warrants a book of its own, but an effort is made here to help the individual understand some of the important guns produced within this series.

| | .32/20 Hand Ejector | | | | | .38 Hand Ejector Military & Police | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Serial Number | Barrel Length | Finish | Butt Style | Date | Serial Number | Barrel Length | Finish | Butt Style |
| First Model | 1899-1902 | 1-5,311 | 4''<br>5''<br>6½'' | Blue or Nickel | Round only | 1899-1902 | 1-20,975 | 4''<br>5''<br>6''<br>6½''<br>8'' | Blue or Nickel | Round only |
| Second Model, Model of 1902 | 1902-1903 | 5,312-9,811 | 4''<br>5''<br>6½'' | Blue or Nickel | Round only | 1902-1903 | 20,976-33,803 | 4''<br>5''<br>6''<br>6½'' | Blue or Nickel | Round only |
| Second Model, First Change | 1903-1905 | 9,812-18,125 | 4''<br>5''<br>6½'' | Blue or Nickel | Round and Square | 1903-1905 | 33,804-62,449 | 4''<br>5''<br>6½'' | Blue or Nickel | Round and Square |
| Model of 1905 | 1905-1906 | 18,126-22,426 | 4''<br>5''<br>6½'' | Blue or Nickel | Round and Square | 1905-1906 | 62,450-73,250 | 4''<br>5''<br>6''<br>6½'' | Blue or Nickel | Round and Square |
| Model of 1905, First Change | 1906-1908 | 22,427-33,500 | 4''<br>5''<br>6''<br>6½'' | Blue or Nickel | Round and Square | 1906-1908 | 73,251-120,000 | 4''<br>5''<br>6''<br>6½'' | Blue or Nickel | Round and Square |
| Model of 1905, Second Change | 1908-1909 | 33,501-45,200 | 4''<br>5''<br>6''<br>6½'' | Blue or Nickel | Round and Square | 1908-1909 | 120,001-146,899 | 4''<br>5''<br>6''<br>6½'' | Blue or Nickel | Round and Square |
| Model of 1905, Third Change | 1909-1915 | 45,201-65,700 | 4''<br>6'' | Blue or Nickel | Round and Square | 1909-1915 | 146,900-241,703 | 4''<br>6'' | Blue or Nickel | Round and Square |
| Model of 1905, Fourth Change | 1915-1940 | 65,701-144,684 | 4''<br>5''<br>6'' | Blue or Nickel | Round and Square | 1915-1942 | 241,704-1,000,000 | 2''<br>4''<br>5''<br>6'' | Blue or Nickel | Round and Square |

The first military purchase of the Smith & Wesson side swing .38 Hand Ejector occurred on June 25, 1900, when the U. S. Navy purchased 1,000 revolvers. These guns were serial numbered within the Smith & Wesson range of 5,000 to 6,000. On February, 1901, the U. S.

Army followed with an order for 1,000 revolvers numbered in the serial range of 13,001-14,000. These purchases were the beginning of the Smith & Wesson .38 Military and Police Model used by the U.S. Armed Services, and it has remained a popular revolver with them.

The most important change made to the .38 M&P, as the gun was commonly called, occurred in 1904 when the firm introduced the model in its square-butt configuration. This important change allowed for better control, made it easier to shoot, and resulted in its becoming the standard frame configuration. This was the last major approval made by the aging D. B. Wesson, who passed away the following year.

The .38 Military and Police revolver soon became the bread and butter gun of Smith & Wesson, with the majority of the firm's production devoted to this model. This fact has remained true since the early 1900s. The only time production of this famous model was discontinued was from June 3, 1918, to February 6, 1919, when the U.S. Government took control of the plant in a concentrated effort to produce the .45 Hand Ejector Model of 1917 for military forces.



Smith & Wesson .38 Military and Police Model of 1905. This square-butt style was first introduced by Smith & Wesson in late 1904 and became popular immediately.

The most important variation of the .38 M&P is a group of revolvers produced for the British Commonwealth nations. These are identical in design to the .38 Hand Ejector Model of 1905 Fourth Change, except they were chambered for the .38 S&W instead of the .38 S&W Special cartridge. Because this cartridge was loaded with a 200-grain, round nose, lead bullet, the revolver was nicknamed the .38/200 British Service revolver. Production on this model began on March 11, 1940, and was serial numbered as a continuation of the



Smith & Wesson .38/200 British Service revolver, caliber .38 S&W, circa 1943. Collection of William J. Orr.

.38 M&P series. By September 1940, the firm concentrated its efforts on the production of only this model to meet the needs of England's war effort. The factory's production for the month showed 6,125 .38/200 British Service revolvers produced and only 149 various other models. From October 1940 until February 27, 1941, the firm's total production was concentrated on the British Service revolver. On February 27, 1941, Smith & Wesson sufficiently increased its production capacity to allow the .38 Military and Police Model to be placed back into production, and both models were produced from that date forward. Production on the .38/200 British Service revolver continued until March 29, 1945, when it was discontinued with the firm having produced 568,204 revolvers.

On April 24, 1942, Smith & Wesson's serial numbers on the original .38 M&P series reached 1,000,000, and a new series was started having a V prefix beginning at serial number VI. This series was nicknamed the Victory Model to signify the company's hope for a quick victory in World War II. Both the .38/200 British Service and the .38 M&P were serial numbered within this new series. The Smith & Wesson .38/200 British Service revolver was manufactured in 4'', 5'', and 6'' barrel lengths, with early production models having a bright blue finish and revolvers produced from December 4, 1941, to April 10, 1942, having a brush blue finish. After this date, the revolvers were supplied with a sandblast parkerized finish.

The .38 M&P Victory model was produced in the same finishes as the British Service revolver but was available only in 2'' and 4'' barrel lengths. It is marked for the .38 S&W Special cartridge, which distinguishes it from the British Service revolver. Many minor design changes were made during World War II to help increase production. The most important change was the incorporation of a new hammer block. The hammer block, used on the .38 Military and Police during most of World War II, was removed from the blocked position as the hand was raised to rotate the cylinder. The hand simply cammed the hammer block into the side plate. The return of the hammer block was dependent on spring action. Excessive dirt or heavy grease could prevent the hammer block from returning to the position of blocking the hammer, thus eliminating this secondary safety device to prevent accidental discharge of the revolver when dropped.







Smith & Wesson Victory Model, which was produced primarily for Unites States Armed Services, circa 1943, caliber .38 S&W Special.

The new-style hammer block was designed during a crash program in December 1944 after the plant superintendent, C. R. Hellstrom, received reports of a Smith & Wesson accidentally discharging when dropped. The new hammer block was directly connected to the rebound slide and operated in a slot in the side plate. It was mechanically forced back into position by the heavy spring action of the rebound slide. Failure of it to function would result in jamming of the revolver. This new hammer block was incorporated at serial number V769,000 of the Victory Model series. To allow for easy identification of

revolvers equipped with the new hammer block, the factory changed the prefix from V to VS. All revolvers at Smith & Wesson partially completed were changed from the old-style hammer block to the new. These revolvers can be identified by the stamped SV prefix.

The old buildings had begun to show signs of weakness after serving as a revolver manufacturing facility for eighty-five continuous years, and wartime production literally shook the old Smith & Wesson factory on Stockbridge Street in downtown Springfield, Massachusetts. But production proved rewarding to the company, since it raised it from near bankruptcy to prosperity. The hectic pace of wartime production ended on August 27, 1945, when the firm stamped the last wartime serial number VS811,119 on a .38 M&P Victory Model The company took a brief rest as it

The two styles of Smith & Wesson hammer blocks. Top illustrates the 1915 hand-operated cylinder stop called the wing style hammer block. Bottom illustrates the rebound slide hammer block incorporated in December 1944.

changed back to the production of revolvers for the commercial market. The first commercial revolvers accepted were 100 .38 Military & Police revolvers completed on September 12, 1945. The new commercial serial number for this model was a continuation of the Victory model series, but the victory had been won, the war ended; therefore, the V was dropped, and the S prefix stamped still signified the new hammer block. The new commercial series began with serial number S811,120.

The sales force at the factory stepped up its effort to sell revolvers on a commercial basis, with special emphasis on law enforcement agencies. The .38 M&P revolver had an outstanding reputation and was in demand by the U.S. law enforcement agencies and foreign governments. The U.S. agencies accepted the revolver in the .38 S&W Special caliber but some foreign governments adopted other calibers as standard. Therefore, in February 1947, Smith & Wesson found themselves back in production of a .38/200 revolver to satisfy a British Commonwealth country. The firm produced 10,009 of these revolvers, completing them on August 11, 1947. The firm received many contracts for revolvers of this .38 S&W caliber throughout the 1950s and early 1960s. When assigning model numbers during the 1950s period, the .38/200 revolver was called the Model 11.

One of the rarest groups of Military and Police revolvers completed was manufactured from January 19, 1948, to February 3, 1950. These guns, designated the .32 Military and Police, were designed to fire the .32 S&W Long cartridge rather than the .38 Special. The revolver was standard with a 4'' barrel, but the firm produced a limited supply of 2'' and 5'' lengths. When production was completed, the firm had produced a total of 4,813 revolvers. Today, one of these revolvers would be a rare find for the Smith & Wesson collector.

On February 11, 1948, at serial number S990,184, the factory further improved the .38 Military and Police series by incorporating a new short hammer throw developed for target revolvers. With this change, the .38 Military and Police Model became the revolver recognized today as the Model 10. By March 22, 1948, the factory completed its second million Military and Police revolvers and began a third serial number series having a C prefix. This series began at C1 and continued until November 27, 1967, when Smith & Wesson completed its third million .38 Military and Police revolvers. At this time, a new series having a

prefix D was begun and continues in use today.

During the period from 1948 to 1977, some interesting models have been serial numbered in conjunction with this model. These models are:

| | MODEL 10 M&P VARIANTS | | |
|---|---|---|---|
| Model | Date Introduced | Starting Serial Number | Special Feature |
| 45 | March 23, 1948 | S982,000 | .22 caliber M&P |
| 12 | September 11, 1952 | C223,999 | **Airweight** Model |
| 13 | September 1974 | | .357 M&P |
| 64 | September 1, 1970 | D224,001 | Stainless Steel M&P |
| 65 | September 1974 | | .357 Stainless Steel M&P |

The Models 13-1, 64, 65-1 are recent innovations of the factory. The Model 13 was originally designed for the New York State Police. When first sold to this agency, it was a special Model 10 heavy barrel in the .357 *Magnum* caliber and was marked with the Model 10-6 designation. It was changed to the Model 13-1 when it became a standard model in September 1974. The Model 65 was originally designed for the Oklahoma





Top is Smith & Wesson Model 64 Stainless Steel .38 Military and Police with original standard weight barrel. Bottom is Model 64-1 in heavy barrel as introduced in 1972.





**Top is Smith & Wesson Model 65 Stainless Steel .357 Military & Police.**
**Bottom is Smith & Wesson Model 13-1 .357 Military and Police.**



**Top is Smith & Wesson .38 Military and Police Model AIR-WEIGHT, referred to by the Air Force as the Model 13 Air-crewman.**
**Bottom is Model 12 .38 Military and Police AIRWEIGHT, circa, 1977.**



Highway Patrol and, like the Model 13, it was originally marked Model 64-1 in *.357 Magnum* with the official number of Model 65-1 adapted prior to being placed in Smith & Wesson's catalog.

The two most interesting variations listed are the Model 12 Military and Police *Airweight* and the Model 45. The *Airweight* Military and Police was designed to provide the user with an ultra-light revolver with a weight of 14-3/8 ounces in the 2'' round-butt model. This light weight was accomplished by using an aluminum alloy frame and cylinder, making this model the lightest weight 6 shot revolver available. In 1953, the U. S. Air Force purchased a large quantity of these revolvers for use by flight crews. This model was marked with an M13 on the top strap designating it as an Air Force Model 13, but it was not officially assigned a model number by Smith & Wesson. The Air Force experienced difficulty with the aluminum cylinder and they scrapped the gun. In 1954, the factory discontinued the use of the aluminum cylinder, replacing it with a conventional steel cylinder that brought the total revolver weight to 18 ounces.

The Model 45 .22 caliber Military and Police Model was originally designed as a training gun for the U. S. Postal Service and various police agencies. It was produced from 1948 to 1957 (C407,400 serial range) and again in 1963 (C622,700 serial range). Although

basically a special order gun, approximately 500 were sold through Smith & Wesson's distributors and, therefore, are seen by the Smith & Wesson collector.

Smith & Wesson has always tried to maintain a versatile line of Military and Police revolvers to meet the needs of all agencies; therefore, it was not a surprise when, on October 21, 1957, they began production of a heavy-barreled version of this model. With this new heavy-barrel variation, the factory offered the gun in round or square butt, steel or aluminum construction, and barrel lengths of 2'', 3'', 4'', 5'', and 6''; with the square butt also available in the 4'' heavy barrel. All were produced in blue or nickel, with blue being the most common finish.

On June 12, 1957, Smith & Wesson began stamping model numbers in the yoke cut of their

170   THE K-FRAME REVOLVERS



**Smith & Wesson Model 10-6 .38 Military and Police heavy barrel.**

revolvers, thus returning to identifying their revolvers by model number rather than by name. This numbering system also provided the factory with a method of marking the guns by the various engineering changes as each was incorporated. For example, since that date the Military and Police Model has been known as the Model 10, 10-1, 10-2, 10-3, 10-4, 10-5, and 10-6. There is no question that these designations have confused many a collector. To help solve the mystery, the following chart identifies the changes.

| MODEL 10 & Model 12 ENGINEERING CHANGES | | |
|---|---|---|
| Model Number | Date Incorporated | Engineering Change |
| 10 | June 12, 1957 | Start of model numbering |
| 10-1 | April 8, 1959 | Designation for heavy-barrel model |
| 10-2 | February 24, 1961 | Change from 1/10'' front sight to 1/8'' front sight. Extractor rod changed from right-hand thread to left-hand. |
| 10-3 | February 24, 1961 | Same as 10-2, except heavy-barrel model |
| 10-4 | January 15, 1962 | 1/10'' front sight, screw in front of trigger eliminated |
| 10-5 | January 15, 1962 | 1/8'' front sight, screw in front of trigger guard eliminated |
| 10-6 | January 15, 1962 | Same as 10-5 except heavy barrel |
| 12 | June 12, 1957 | Start of model number |
| 12-1 | January 15, 1962 | Left-hand extractor rod, screw in front of trigger guard eliminated |
| 12-2 | January 15, 1962 | Front sight changed to 1/8'' |

There is no question that the Model 10 and the companion models have not been the glamour guns for Smith & Wesson, but they certainly were the workhorses that never tired and pulled the factory forward to great success.

---

K-FRAME TARGET MODELS   171

## K-FRAME TARGET MODELS

The Model K with adjustable target sights was introduced in 1899. In 1900, records indicate the .38 Hand Ejector Target, or .38 Military and Police Target as this model was more commonly called, was used by many leading competitive shooters throughout the world. Smith & Wesson's statistics of 1913 show



**Smith & Wesson .38 Hand Ejector First Model with a rare 8'' barrel and fully adjustable target sights. This model was the first of the K-frame Target Models and was manufactured in 1899.**

twenty-seven of the forty U. S. Revolver Association (USRA) records were made with the Smith & Wesson target revolver. The USRA at this time was the largest competitive pistol association in the world. The most important and remembered record accomplished with a Smith & Wesson .38 M&P Target (serial number 640,792) took place in the Fergus Motor Gallery in Lewiston, Montana, on January 23, 1934, when Ed McGivern fired five shots into an area the size of a playing card in two-fifths of a second. There is no doubt that this feat has been the subject of discussion by revolver shooters the world over.

As early as 1927, Smith & Wesson began receiving suggestions from competitive shooters to develop a .22 caliber revolver with the same balance as the .38 M&P Target model. The factory began development of a new .22 caliber revolver that same year and, upon investigating various facets of the market, they found that a revolver of this kind was also in heavy demand by the sportsmen of the United States. Production of a new model began in 1930, but revolvers were not completed until January 30, 1931. Smith & Wesson's advertising proudly referred to this model as the K-22 Outdoorsman, signifying the market appeal for this revolver. The catalog simply referred to the gun as the K-22 Target revolver but the name Outdoorsman had been so strongly associated with this model that it became part of the name. To help separate it from later variations, the collector renamed it the K-22 First Model.

# Frontier Law and Order

## TEN ESSAYS

BY

PHILIP D. JORDAN

UNIVERSITY OF NEBRASKA PRESS    LINCOLN

Compendium_Roth
Page 0330

**UNP**
*Publishers on the Plains*

Copyright © 1970 by the University of Nebraska Press
All rights reserved
Standard Book Number 8032–0709–3
Library of Congress Catalog Card Number 70–88086

343.073

J765f

71-57

San Francisco Public Library

Manufactured in the United States of America

To Nibs

my beloved first grandson

CHAPTER ONE

## *The Wearing of Weapons in the Western Country*

The tools of assault are many—the poniard that severs soul from body, the whip that lacerates bare back, the pistol that points the path to eternity, the sharp-honed thumbnail that gouges the eye from its socket. The heavy bowie knife hefts well, and the lyncher's knot tightens well. The six-gun upon occasion was a greater equalizer than was the ballot box. Deadly weapons, grasped by men of vengeance and men of passion and held hard in the clutch of gentlemen at stand on the early morning duelling field, were common to the western country. Powder and ball and blade scarred an advancing frontier, seared low country and high country, and scorched and blistered a land of promise with unbelievable violence, so that murder and mayhem were thought by many to symbolize an age.

An old saw says that guns don't kill—that the man behind the gun does the slaying. It is equally true that, lacking a weapon, a man can neither threaten nor wound nor kill with it. Yet over-simplification deceives, and there are times when deadly devices are a necessity and, when properly used, support and strengthen society. Wise and prudent individuals know quite well what the fool and the bully never comprehend—the possession of weapons does not put the whole world in their hands.

Both purveyors and wearers of weapons throughout the western country justified the carrying of knives and hand-guns on grounds of self-defense. Scores of frontier lawyers, brought up on Blackstone, quoted his commentaries with enthusiasm. These backwoods legalists learned from the English jurist that self-defense is "The *defense* of one's self, or the mutual and reciprocal defense of such as stand in the relations of husband and wife, parent and child, master and servant." In such cases,

*1*

continued Blackstone, if the party himself or *any* of his relations be
forcibly attacked in person or property, "it is lawful for him to repel
force by force; and the breach of the peace which happens is chargeable
upon him only who began the affray." The commentaries, appearing in
the first American reprint in 1771 and selling some twenty-five hundred
copies in America before the Declaration of Independence, also carried
a warning: "Care must be taken that the resistance does not exceed the
bounds of mere defence and prevention; for then the defender would
himself become an aggressor."[1]

Blackstone's definition of self-defense, generally speaking, was ac-
cepted and written into state statutes and eventually found its way into
manuals published for the guidance of justices of the peace, sheriffs,
constables, and marshals. The law usually sought to prevent the need
for an individual to defend himself, his kin, and his property by stipu-
lating either that weapons not be carried openly or not be worn con-
cealed. Tennessee, for example, in 1801 passed an act making it illegal
for persons to "publicly ride or go armed to the terror of the people,
or privately carry any dirk, large knife, pistol, or any other dangerous
weapon, to the fear or terror of any person."[2]

A little more than a decade later, Louisiana statutes made it unlawful
for persons to carry weapons concealed in their bosoms, coats or any
other place, and permitted peace officers to stop and search those whom
they suspected of doing so.[3] Free colored persons in Louisiana were
permitted to carry weapons only if they secured a permit from a justice
of the peace, and slaves were forbidden, either by day or night, to carry
visible or hidden arms.[4] An Alabama act of 1841 was most specific,
saying that when a killing in any sudden encounter or affray was caused
by an assailant, "by the use of a deadly weapon, concealed before the
commencement of the fight, his adversary having no deadly weapon
drawn," such a slaying would be deemed murder in the second degree,
but stipulated that a jury would not be precluded from finding the assail-

[1] William Blackstone, *Commentaries on the Laws of England*, ed. with an intro-
duction and notes by George Sharwood, 3 vols. (Philadelphia: J. B. Lippincott
& Co., 1872, 1873), vol. 2, bk. 3, pp. 2–4; see also John H. Wigmore, *A Panor-
ama of the World's Legal Systems*, 3 vols. (St. Paul: West Publishing Co., 1928),
3:1094–95.

[2] Edward Scott, comp., *Laws of the State of Tennessee . . . 1715–1820*, 2 vols.
(Knoxville: Heiskell & Brown, 1821), 1:710.

[3] Meinrad Greiner, comp., *Louisiana Digest, 1804–1841* (New Orleans: Benjamin
Levy, 1841), p. 13.

[4] Ibid., pp. 219, 500.

ant guilty in the first degree.[5] Shopkeepers and vendors of Georgia were
forbidden in 1837 to sell, keep in stock, or have about their persons
bowie or other knives or pistols, dirks, sword canes, and spears.[6]

How deadly dangerous weapons were is made dramatically clear by
the language of indictments for murder drawn up in courts throughout
the Kentucky country: "That whereas AB late of the county of . . .
merchant, and CD . . . laborer, not having the fear of God before their
eyes, but seduced by the instigation of the devil" assaulted and killed
EF and that AB with a pistol "then and there charged with gun powder,
and a leaden bullet, which gun the said AB in his right hand held upon
EF and feloniously, voluntarily and of his malice aforethought, did
shoot off and discharge" resulting in a fatal wound in the breast half an
inch wide and five inches deep.[7]

As the frontier worked its illegal will upon the land, territories and
states sought by statute to discourage the wearing of weapons openly or
concealed. From the laurel-crowned Alleghenies to the towering Rocky
Mountains, toward Colorado mining camps and on to sites where
diggers in California courted Lady Luck, the struggle was waged. It
continued throughout the Mississippi River basin and on into the south-
west. An Illinois act, rather ambiguous, stipulated a fine of not more
than a hundred dollars or imprisonment for anyone having "upon him
any pistol, gun, knife, dirk, bludgeon, or other offensive weapon."[8] The
words "upon him" could prove tricky in a court presided over by a
justice of the peace, for too many were notoriously ignorant of the law,
eager to collect their fees, and not anxious, unless imperative, to flaunt
popular custom.

It is equally difficult to learn precisely whether a Minnesota statute
prohibited the carrying of concealed weapons, although the presump-
tion is, if the law be read literally, that the act proscribed the wearing

[5] *Alabama Acts, 1839–1841* (Tuscaloosa: Hale & Eaton, 1840), p. 123.

[6] *Digest of Statute Laws of Georgia, 1851* (Athens: Christy, Kelsea & Burke, 1851),
p. 848; this entire statute was considered and declared *unconstitutional*, so far as it
*prohibited* the carrying of weapons; and *constitutional*, as it *prescribed the mode of
carrying them* (1 Kelly, p. 243).

[7] John Bradford, *The General Instructor; or, The Office, Duty, and Authority of
Justices of the Peace, Sheriffs, Coroners and Constables of the State of Kentucky . . .*
(Lexington: John Bradford, 1800), pp. 75–76. See also Abraham E. Gwynne, *A
Practical Treatise on the Law of Sheriff and Coroner, with Forms and References to
the Statutes of Ohio, Indiana and Kentucky* (Cincinnati: Derby, 1849); William Littell,
*The Statute Law of Kentucky* (Frankfort: Robert Johnson, 1814).

[8] *Illinois Revised Laws, 1832–1833* (Vandalia: Greiner & Sherman, 1833), p. 202.

of weapons openly or concealed. On the other hand, it most likely did neither, for it seemed to imply that a person might bear arms, either concealed or not, if he had "reasonable cause to fear an assault or other injury or violence to his person, or to his family or property."[9] On the other hand, a Nebraska act hinged upon the "intent" factor, and mere intent, upon occasion, is difficult to prove. This act, crisply put, held that a person might carry hidden or open weapons if he had no intent to make an assault.[10]

The code of North Dakota forbade the carrying of concealed arms, but said nothing about carrying them openly.[11] The Territory of Arizona forbade the concealment on the person of dirks, bowie knives, slung shots, brass knuckles, and pistols only within towns, villages, and cities. In addition, it stipulated that every person who, not in necessary self-defense, in the presence of two or more persons, drew or exhibited any deadly weapon in a "rude, angry, or threatening manner" was guilty of a misdemeanor.[12] A Texas act, making no mention of how a weapon was worn, offered somewhat of an innovation by stating that any person killed with a bowie knife or dagger, under circumstances which would otherwise render the homicide a case of manslaughter, "the killing shall nevertheless be deemed murder, and punished accordingly." The law, in this instance, defined a bowie knife and a dagger as any knife intended to be worn upon the person, which was capable of inflicting death, and "not commonly known as a pocket knife."[13] Such examples could be multiplied many times, but these are sufficiently typical to demonstrate the law's confusion, or, at least, its inconsistency.

Not until the frontier—that so-called "rough and wooly" period—was drawing its last gasp on the hangman's tree of public opinion which persisted in viewing the frontier only as lawless, did statutes become satisfactorily specific. Both the laws of New Mexico and of Oklahoma, extensive in their provisions and precise enough in their language, made

clear how weapons were to be borne, defined deadly weapons, and indicated where they might or might not be carried.

The New Mexico statute of 1880 stated categorically that it was unlawful for persons to carry deadly weapons, concealed or otherwise, within any settlement except in the lawful defense of themselves, their families, or their property, which, then and there, were threatened with danger. It defined deadly weapons, by whatever name they might be called, as those with which a dangerous wound could be inflicted. Conviction carried a fine of not less than ten dollars nor more than fifty dollars, or imprisonment of not less than ten days nor more than fifty days at the discretion of the jury trying the case. It provided penalties for persons who drew or used a deadly weapon at any ball, dance, election poll, or any other public place. It permitted travelers to carry arms within territorial settlements or towns for one hour after arriving and while traveling out of towns and away from settlements. It directed that operators of hotels, boarding-houses, and drinking saloons post in conspicuous places a "plain notice in both Spanish and English, to travelers to divest themselves of their weapons." Finally, the act stipulated that every person taking out a license for a ball, dance, or fandango must swear to preserve good order and enforce the law.[14]

The Oklahoma statute of 1890, although kin to the New Mexico act, offered significant variations. This act made it illegal to carry *concealed* on a person, on a saddle, or in saddlebags, any pistol, revolver, bowie knife, dirk, dagger, slung shot, sword cane, spear, metal knuckles, or any type of knife or instrument manufactured or sold for the purpose of defense. It also proscribed the carrying *openly* of the weapons just enumerated. The only arms persons were permitted to carry were shotguns and rifles for hunting or for repair, for killing animals, for use at public musters or militia drills, or while traveling from one place to another. It was made unlawful to sell or give deadly weapons to minors. It was unlawful for anyone, except a peace officer, to carry weapons to church, schools, places of amusement, shows, circuses, or into ballrooms, social parties or gatherings, or to any resort where intoxicating liquors were sold. The act permitted public officers to wear arms only while on duty or while going to and from their homes from their place of duty.[15]

[9] Moses Sherburne and William Hollinshead, comps., *Public Statutes of the State of Minnesota, 1849–1858* (St. Paul: Pioneer Printing Co., 1859), p. 742.

[10] E. Estabrooke, comp., *Statutes of Nebraska* (Chicago: Page & Hoyne, 1867), p. 624.

[11] *Revised Codes of North Dakota* (Bismarck: Tribune Co., 1896), p. 1293.

[12] Cameron H. King, comp., *Revised Statutes of Arizona* (Prescott: Prescott Courier Print, 1887), p. 726.

[13] *Penal Code of State of Texas* (Galveston: News Office, 1857), p. 96. See also S. Garfielde and E. A. Snyder, comps., *Laws of the State of California, 1850–1853* (Benicia: S. Garfielde, 1853), pp. 642, 645.

[14] L. Bradford Price, comp., *General Laws of New Mexico* (Albany, N.Y.: W. C. Little & Co., 1880), pp. 312–15.

[15] Will T. Little et al., comps., *Statutes of Oklahoma, 1890* (Guthrie: State Capital Printing Co., 1891), pp. 495–96.

Territorial and state statutes concerning the wearing of weapons were, in a manner, reflected in village, town, and city ordinances. A few examples must suffice. All were passed by western frontier municipalities. On May 6, 1837, the trustees of the recently incorporated town of Burlington, Iowa, then the Territory of Wisconsin, passed the following ordinance: "Any person who shall, except in defence of his person or property, shoot, discharge, or cause to be discharged any firearms of any description" upon conviction was subject to a fine of not less than five dollars, nor more than ten dollars.[16] Three years later Quincy, Illinois, forbade the firing of any musket, fowling-piece or other firearms, except in case of necessity, or in the performance of some public or lawful duty.[17] About the same time St. Louis passed similar ordinances.[18] Memphis, Tennessee, and other southern cities proscribed the firing of guns and pistols within city limits.[19] Not one of these examples, it will be seen, deals directly with the wearing of weapons, openly or concealed. City officials felt that their ordinances forbidding the discharge of guns covered, in a sense, the carrying of them. Furthermore, prosecution could always be initiated under state statutes.

The law then, on both state and local levels, seemed plain enough concerning both the carrying and the firing of weapons. Moreover, acts were equally clear when they spoke of the wearing and use of arms used for thrusting, cutting, and stabbing. Yet, as most persons should know, there is a chasm of difference between the passing of an act and its successful execution. A back-country lawyer once put it to me succinctly: "There's a helluva lot of difference between them legislators writin' an

16 Journal of the Proceeding of the Board of Trustees of the Town of Burlington, in the Territory of Wisconsin, Elected Agreeably to the Provisions of an Act of the Legislative Assembly of the Said Territory, Entitled "An Act to Incorporate the Inhabitants of Such Towns as Wish to be Incorporated," December 6, 1836, MS, City Clerk's Office, Burlington, Iowa.

17 Quincy, Illinois, Ordinance Book, 1840–1856, p. 13, MS, City Clerk's Office, Quincy, Illinois.

18 St. Louis, *Revised Ordinances . . . 1835–1836* (St. Louis: Missouri Argus, 1846), p. 197; also St. Louis, *Revised Ordinances . . . Revised and Digested by the Fifth City Council . . .* (St. Louis: Chambers & Knapp, 1843), p. 300.

19 *Digest of the Ordinances of the City Council of Memphis, 1826–1857* (Memphis: Memphis Bulletin Co., 1857), p. 161; see *Vicksburg Register*, September 18, 1834: "Be it ordained by the President and Selectmen of the town of Vicksburg, That if any person shall discharge a gun, pistol or other firearms within the limits of the town of Vicksburg, he or she shall incur a penalty of ten dollars for such offense . . . and it shall be the duty of the Town Constable to report to the president all violations of this ordinance."

act and passin' hit and gettin' anybody from the sheriff on down to enforcin' er obeying hit."

"The law," said the *New Orleans Bee*, "is tolerably strong relative to carrying dirks, pistols or other weapons of assault. Why is it not enforced?"[20] Three dynamic, viable factors thwarted the law. First, men liked weapons, wanted weapons, enjoyed the power that weapons lent them, and insisted on having and using and carrying and handling them as they pleased. Second, a good many gentlemen of one kind or another—some jurists and some vagrants—were disciples of a religion known as the "higher law." Third, personal weapons, upon occasion, were urgently needed for self-defense.

Arms of every description were easy to come by, and there was scarcely a town in the western country which did not boast of a gunsmith who, in addition to repairing weapons, also peddled them. In cities, several specialty shops and a variety of general stores catered to the gun trade. Newspapers advertised bowie knives, tomahawks, pistols, and daggers for sale not only to gamblers but also to sportsmen.[21] The *Philadelphia Public Ledger* complained in 1837 of the alarming extent to which its citizens were carrying concealed weapons.[22] "No excuse whatever can be used for this practice," said the editor. "As a measure of defence, knives, dirks, and sword canes are entirely useless. They are fit only for attack, and all such attacks are of murderous character. Whoever carries such a weapon has prepared himself for homicide."[23]

Alexander Marjoribanks, an English traveler, found the use of the bowie knife and revolving pistol most prevalent in Cincinnati, and thought that, in this respect, the Queen City was outstripping New Orleans.[24] Another Englishman, surveying the United States, said that throughout New Orleans stalls selling pocket pistols and knives were "scattered in all directions,"[25] T. H. Gladstone observed that "every white stripling in the South may carry a dirk-knife in his pocket, and play with a revolver before he has learned to swim."[26] Foreigners,

20 *New Orleans Bee*, August 10, 1835.
21 *Philadelphia Mirror*, October 10, 1836.
22 *Philadelphia Public Ledger*, March 20, 1837.
23 Ibid., January 25, 1837.
24 Alexander Marjoribanks, *Travels in South and North America* (London: Simpkin, Marshall, & Co., 1853), p. 277.
25 James Logan, *Notes of a Journey Through Canada, the United States of America, and the West Indies* (Edinburgh: Fraser & Co., 1838), p. 178.
26 T. H. Gladstone, *The Englishman in Kansas* (New York: Miller & Co., 1857), p. xxviii.

however, were not alone in describing both the prevalence and the use of weapons. Many a Yankee, such as a native of Maine and a clergyman from Minnesota, spoke as did visitors from abroad. The man from Maine taught languages at Jefferson College, Mississippi, and his elaborate literary style reflected his profession. He wrote of moonbeams touching bright hilts of Spanish knives stuck in the open bosoms of nearly every New Orleans gentleman. The minister, later to become the first Episcopal bishop of Minnesota, jotted in his diary that, although it was a penitentiary offense for Alabamians to carry concealed weapons in the streets, the law was broken daily.[27]

Wayfarers and travelers, no matter what their calling, were apt to see through a distorted lens and to write contrived observations. If a corrective is needed for those mistaken, out-of-focus, itinerant snoopers of American society, the native newspaper editor provided balance. But both visitors and journalists, however they might bicker over some aspects of frontier life, agreed that the wearing of weapons was both threat and hazard. The national press constantly reported assaults and murders with arms. "Every day," an editor said, "exhibits some portion of the *sovereign* people in arms against the laws of God and the country, and against their own rights and the rights of others." The *Boston Evening Transcript* in 1841 could never recollect a time when there was such an "extensive system of frauds, villainies, and robberies, and all kinds of rascalities." A Minnesota editor, a few years later, spoke of daily lists of sickening, bloody murders.[28] Nor must it be believed, although many travelers did think so and some scholars still do, that the South was more lawless during its frontier period than were other areas during their formative years.[29]

[27] Joseph H. Ingraham, *The South-West; by a Yankee*, 2 vols. (New York: Harper & Bros., 1835), 1:90; Lester B. Shippee, ed., *Bishop Whipple's Southern Diary, 1843–1844* (Minneapolis: University of Minnesota Press, 1937), pp. 86–87.

[28] *Philadelphia Public Ledger*, October 29, 1840; *Boston Daily Evening Transcript*, May 22, 1841; *Winona* (Minnesota) *Argus*, May 14, 1857. For additional editorial comment, see "The Mississippi—Spillway of Sin" and "The Derringer and the Ace of Spades: Reflections on Middle Border Law and Order," pp. 23 and 99, respectively, of this volume.

[29] At least some Southerners held this view. See A. B. Carlson, *The Law of Homicide, Together with the Trial for Murder of Judge Wilkinson, Dr. Wilkinson, and Mr. Murdaugh* . . . (Cincinnati: Robert Clarke & Co., 1882), p. 194, for the argument of Benjamin Hardin: "If you go into the Northern States, it is a rare thing if you can find a man in ten thousand with a deadly weapon on his person. Go into other States that shall be nameless, and you will hear of them as often as of corn-shuckings in an Indian summer. Go further South—to Arkansas or Mississippi, for instance, and

Everywhere, north, east, south, and west of the Bluegrass Country, rogues in buckskin and aristocrats in broadcloth snuffed out lives, and afterwards pleaded self-defense or invoked the higher law. The arguments made by both the prosecution and the defense in the famous Galt House murder are perfect examples of nineteenth-century attitudes. This unsavory affair occurred in Louisville, Kentucky, on December 15, 1838. In a barroom brawl, three Mississippians killed a local tailor and bartender in an argument over the fit of a suit of clothes. Feeling ran so high that a change of venue was taken from Louisville, Jefferson County, to Harrodsburg, Mercer County, and trial began on March 11, 1839. Prosecuting was the State, and both plaintiff and defendants were represented by legal talent, among whom were Benjamin Hardin, for the State, and Sergeant S. Prentiss, of Mississippi, for the defense.[30] Among the murder weapons was a bowie knife, "probably," so a witness described, "from eight to ten inches long in the blade, two inches wide, heavy, and shaped at the point like other knives of the same name."[31]

Prentiss, through the trial, harped upon the self-defense theme. "Why," he asked, "is the step of the Kentuckian free as that of the bounding deer; firm, manly and confident as that of the McGregor when his foot was on the heather of his native hills, and eye on the peak of Ben Lomond? It is because he feels independent in the knowledge of his rights, and proud in the generous consciousness of ability and courage to defend them, not only in his own person, but in the persons of those who are dear to him." Warming to his subject, the defense attorney continued: "When the rattlesnake gives warning of his fatal purpose, the wary traveler waits not for the poisonous blow, but plants upon the head his armed heel, and crushes out, at once, his 'venom and his strength.'" There was more to come. "When the hunter hears the rustling in the jungle, and beholds the large green eyes of the spotted tiger glaring upon him, he waits not for the deadly spring, but sends at

though you would be a peaceable man, shuddering at the name of a 'tooth-pick' in the North, in these States you would arm yourself to the teeth, and track your steps in blood with impunity. Why is this, but from the relaxation of the laws that are elsewhere enforced and obeyed?"

[30] Ibid., T. Egerton Browne, *Trial of Judge Wilkinson, Dr. Wilkinson and Mr. Murdaugh, on Indictments for the Murder of John Rothwell and Alexander H. Meeks* . . . (Louisville: T. E. Browne & Co., 1839).

[31] Carlson, *Law of Homicide*, p. 15. For accounts and descriptions of the bowie knife, see J. Frank Dobie, "Bowie and the Bowie Knife," *Southwest Review* 16 (April 1931): 351–68; *Niles' Register*, September 29, 1838. Innumerable foreign travellers and American newspapers commented upon both the knife and its use.

once through the brain of his crouching enemy the swift and leaden death." [32]

The defense's purple prose grew deeper and richer when it justified the substitution of the higher law for man-made statutes. Nowhere in legal pleading appears a better exposition:

> Sirs, there are sins against individuals, as well as sins against heaven, which can only be expiated by blood—and the law of Kentucky is, that the man who is attempted to be *cowhided*, not only *may*, but *must*, if by any possibility he can, *at the time*, kill the man who attempts thus to degrade him. I do not refer to a law of Kentucky, enacted by the Legislature of this State; I mean a law paramount to any enacted by the Kentucky Legislature, a law that emanates from the *hearts* of the people of Kentucky, and is sanctioned by their *heads*—a law that is promulgated in the *os ad coelum* of every Kentuckian, and proclaimed in the sparkling of every eye of *both* sexes and *all* ages—a law, the force of which every one feels, the import of which every one perceives by intuition. It is the law of the *Kentucky instinct* —none are so ignorant as not to know this law; few are so dastardly as to deny its injunction. [33]

Hardin, for the prosecution, generally deplored the wider latitude given to the restraints of law in southern states as against stricter enforcement in northern communities. He told the court that climate affected character, arguing that "he who on the iron-bound coast of the frozen North or on the arid rocks of New Plymouth, would illustrate every noble virtue of his nature, not less distinguished for his piety than his patriotism, for his endurance than his courage, and for his generosity than his bravery, when transplanted to the enervating regions of the South may become different and degenerated, trusting more to his interests than his patriotism, and to concealed weapons than to bravery."

Hardin attacked also Louisville's taverns and saloons, maintaining that their existence was due to political favoritism. "Even the municipal government," he charged, "is either influenced by paltry mercenary motives in its avidity for the revenue of licenses, or it has not the nerve or public interest to grapple with the monster." As no New Englanders turned wayward Southerners were involved in the case and as the only bar involved in the murder was the taproom of the Galt House, Hardin's arguments scarcely seem germane. He was on better, but still

---

[32] These and subsequent quotations are all taken from Carlson, *Law of Homicide*, pp. 150–51.

[33] J. S. Buckingham published this passage in his *The Eastern and Western States of America*, 3 vols. (London: Fisher, Son, & Co., 1842), 3:33.

shaky, grounds when he attacked the wearing of weapons; "Are we to tolerate this bowie-knife system under the false pretense of self-defense? I say, let your verdict act like the ax laid to the root of the tree, and many a prayer will bless you for your timely check of its growth. Many a woman is made a mourning widow, many a child made a pitiable orphan, and many a father childless by the use of this accursed weapon. Whenever you see men wearing bowie-knives and daggers—hunt them down as you would bears and their cubs, from whom you can expect nothing but injury."

Hardin's pleas proved most unpopular. In the first place, the defendants were being tried for murder, not for carrying weapons. Kentuckians and citizens of other states long had been accustomed to saunter about bearing what pistols and knives they pleased. Indeed, no Kentucky statute prevented them from so doing. It is true that, on February 3, 1813, the legislature had prohibited persons from wearing concealed weapons, but this act was declared unconstitutional by the Court of Appeals in 1822.[34] A similar prohibition was not passed until March 22, 1871.[35] In short, for almost fifty years, the carrying of weapons

---

[34] C. S. Morehead and Mason Brown, comps., *Digest of Statute Laws of Kentucky*, 2 vols. (Frankfort: Albert H. Hodges, 1835), 2:1289–90. Act to prevent persons in this Commonwealth from wearing concealed Arms, except in certain cases, February 3, 1813: "That any person in this commonwealth who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless travelling on a journey, shall be fined in any sum not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on the presentment of a grand jury; and a prosecutor in such presentment shall be necessary. One half of such fine shall be to the use of the informer, and the other to the use of this commonwealth." This act declared unconstitutional, *Bliss v. Commonwealth*, 2 Litt. 90.

[35] *Kentucky Acts, Adjourned Session, 1871* (Frankfort: Kentucky Yeoman Office, 1871), pp. 89–90. Act to prohibit the carrying of Concealed Deadly Weapons, March 22, 1871: "That if any person shall hereafter carry concealed any deadly weapon upon their persons other than an ordinary pocket-knife, except as provided for in the next session, he shall be fined, on the first conviction, not less than twenty-five dollars, nor more than one hundred dollars, or imprisoned not less than thirty days nor more than sixty days, or both so fined and imprisoned; and on any subsequent conviction not less than one hundred nor more than four hundred dollars, or imprisoned not less than two months nor more than six months, or both. That the carrying of concealed deadly weapons shall be legal in the following cases: 1st. Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. 2d. Where sheriffs, constables, marshals, and policemen carry such concealed weapons as are necessary to their protection in the efficient discharge of their duty. 3d. Where persons are required by their business or occupation to travel during the night, and carrying

openly or concealed was both permissible and allowable. Moreover, public sentiment favored it. One is not unduly surprised, then, to learn that the defendants in the Galt House murder trial were acquitted.

Many a man throughout the western country, as the frontier moved steadily toward the setting sun, believed firmly that his right to bear arms was guaranteed by the constitution of the United States, which recites that "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." State constitutions carried similar provisions. Indeed, a curious act was passed by the governor and judges of the Northwest Territory under the Ordinance of 1787. This act not only sought to suppress gambling for money, but also attempted to restrain the "disorderly" practice of discharging firearms. Guns were not to be fired near houses nor between sunrise and sunset. Every person shooting at wild game was prohibited from aiming in the direction of settled communities. But the law was careful, in its list of exceptions, to permit the use of weapons in self-defense.[36] There seems little doubt but that the territorial act influenced comparable laws in Ohio and other states carved from the territory.[37]

_____

concealed deadly weapons during such travel." The act defined "concealed" as follows: "That it shall be deemed concealed to carry deadly weapons in a scabbard or belt, if the belt is under the coat, fastened around the person."

[36] Salmon P. Chase, ed., _Statutes of Ohio and of the Northwest Territory, 1788–1833_, 3 vols. (Cincinnati: Corey & Fairbank, 1833), 1:106. Act for suppressing and prohibiting every species of gaming for money or other property, and for making void all contracts and payments made in consequence thereof, and also for restraining the disorderly practice of discharging firearms at certain hours and places, July 26, 1790: "That nothing herein contained shall be deemed or construed to extend to any person lawfully using fire-arms as offensive or defensive weapons, in annoying, or opposing a common enemy, or defending his or her person or property, or the person or property of any other, against the invasion or depredations of any enemy, or in support of the laws of government; or against the attacks of rebels, highwaymen, robbers, thieves, or others unlawfully assailing him or her, or in any other manner where such opposition, defence, or resistance is allowed by the law of the land." The passage relative to wild game is interesting: "Every person shooting at any of such game [buffalo, bears, deer, turkeys, geese, rabbits, etc.] is hereby required to discharge the ball or balls, shot, or missile weapon so employed in a direction from such city, town, or village, or station towards the country so as such ball or balls, missile weapon, or shot, shall pass by or from, and go clear of the buildings pertaining to the same."

[37] _Ohio Acts, Fifty-Third General Assembly, 2nd. Sess., January, 1859_ (Columbus: Richard Nevins, 1859), pp. 56–67. Act to prohibit the carrying of concealed weapons, March 1, 1859: "That whoever shall carry a weapon or weapons, concealed on or

The "constitutional" right of the people to keep and bear arms, no matter what the popular mind believed either in the nineteenth century or today, does not appear to be a common-law right, like that of trial by jury. The Statute of Northampton of 1328 forbade Englishmen to "go nor ride armed by night or by day in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere . . ." Upon the basis of this and other English statutes, it seems clear that the right to keep and bear arms was not regarded as a "fundamental" right of every Englishman. It must be remembered also that the phrase "to bear arms" is a military one, for an individual carrying weapons is not correctly spoken of as "bearing arms."[38]

The middle decades of the nineteenth century witnessed a series of legal wrangles which pivoted on this knotty question of the right of Americans to keep and bear arms. The earliest of these disputes in the western country involved the Kentucky act of 1813, which was ruled unconstitutional nine years later. The Kentucky constitution provided that "the right of the citizens to bear arms in defence of themselves and the state _shall not be questioned._" Therefore, the court of appeals, one of three judges dissenting, held the 1813 act to be in conflict with the constitutional guaranty, and hence void.

The court said: "That the provisions of the act in question do not import an entire destruction of the right of citizens to bear arms in defence of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons _concealed_ in the manner described in the act, they may nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution it is not essential that the act should contain a prohibition against

_____

about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than two months, or both, at the discretion of the court. If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused."

[38] Lucilius A. Emery, "The Constitutional Right to Bear Arms," _Harvard Law Review_ 28 (March 1914): 473–77. See also J. P. Chamberlain, "Legislatures and the Pistol Problem," _American Bar Association Journal_ 11 (September 1925): 596–98.

bearing arms in every possible form. It is the *right* to bear arms in defence of the citizens, and the state that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. If, therefore, the act in question imposes *any* restraint upon the right, immaterial what appellation may be given to the act, whether it be an act *regulating* the manner of bearing arms of any other, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious." And the court further on declared that "in principle there is no difference between a law prohibiting the wearing of *concealed* arms and a law forbidding the wearing of such as are exposed." And, therefore, the defendant having been convicted and fined for carrying a sword concealed in a cane, the judgment was reversed.[39]

Such, at times, is the caprice of the legal mind that in 1833 the Supreme Court of Indiana handed down a diametrically opposed ruling to that in the Kentucky case. And this ruling was followed in 1840 by the Supreme Court of Alabama and again a few years later.[40] The Alabama law forbade the wearing of concealed weapons, and the court held that the statute was not in conflict with the state constitution, which provided that citizens enjoyed the right to bear arms in defense of themselves and the state.

In the Alabama case of 1840, the court wrote that the state constitution in declaring that every citizen has the right to bear arms in defense of himself and the state, "has neither expressly nor by implication denied the legislature the right to enact laws in regard to the *manner* in which arms shall be borne. The right guaranteed to the citizen is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the state.' The terms in which this provision is phrased seemed to us necessarily to leave with the legislature the authority to adopt such regulations of police as may be dictated by the safety of the people and the advancement of public morals."[41]

[39] "The Right to Keep and Bear Arms for Private and Public Defence," *Central Law Journal* (St. Louis), nos. 22–23 (May 28 and June 4, 11, and 18, 1874), pp. 259–61, 273–75, 285–87, 295. No more succinct synopsis of *Bliss* v. *Commonwealth*, 2 Littell 90, is in print, and my account of the case is taken verbatim from p. 260 without quotation marks, except those originally used. To the unsigned author, I acknowledge appreciation.

[40] Alabama, *The State* v. *Reid*, 1 Ala. 612; *Owen* v. *The State*, 31 Ala. 387.

[41] Quoted from *Central Law Review*, p. 260, referring to *The State* v. *Reid*.

In the second Alabama case, the court, after viewing with approbation the findings in the 1840 case, commented further: "We do not desire to be understood as maintaining that in regulating the manner of bearing arms, the authority of the legislature has no other limit than its own discretion. A statute, which, under pretence of *regulating* the manner of bearing arms, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution." The court continued: "Under the provision of our constitution, we incline to the opinion that the legislature cannot inhibit the citizen from bearing arms *openly*, because it authorizes him to bear them for the purpose of defending himself and the state, and it is only when carried openly that they can be effectively used for defence."[42]

Another question remains: did a state possess authority, under its constitution to forbid the concealed wearing of *certain* kinds of weapons? Tennessee's constitution, for example, stipulated that free white men held the right to keep and bear arms "for their common defence." The legislature enacted a statute providing proper punishment for persons who carried concealed under their clothes any "bowie-knife, or Arkansas tooth-pick, or other knife or weapon that shall in form, shape or size resemble a bowie-knife, or Arkansas tooth-pick."

The act was challenged and moved up the legal ladder to the high court, which upheld its constitutionality. The court held, in what has been called the most instructive case on this particular point, that: "As the object for which the right to keep and bear arms is secured, is of a *general* and *public* nature, to be exercised by the people in a body for their *common* defence, so the *arms*, the right to keep which is secured, are those which are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are

[42] Ibid., referring to *Owen* v. *The State*.

usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[43]

Neither must it be believed that a person might carry a concealed weapon and justify both the carrying and concealment on the grounds that he, in the past, had been attacked and now, as a result, was wearing a weapon in self-defense. A Kentuckian, arrested and convicted of carrying a concealed weapon, justified his action by proving that he had been shot at by strangers more than two years previously and that, since that attempted assault, he habitually had worn concealed arms. The court declared these facts wholly irrelevant, because there was "neither proof nor cause for apprehension of any such impending danger." The conviction was upheld.[44]

When the frontier was closed formally in 1890, the time-honored, traditional, and established hobby of carrying and drawing deadly weapons had been curtailed in most states throughout the Union.[45] No longer was it legal to comport one's self as did many a disconsolate lover in a multitude of bathetic folk songs:

> She then drew out the silver dagger,
> And sank it in her snow-white breast,
> At first she reeled and then she staggered,
> Saying fare you well, I'm going to rest.
>
> He then drew out the silver dagger
> And sank it in his manly heart,
> Saying this should be an awful warning
> That all true lovers should never part.[46]

The law would not have approved such antics, for involved were the wearing of a concealed weapon, the carrying of a forbidden type of weapon, a suicide, and, in another version of the song, a homicide.

[43] Ibid., p. 273, referring to Tennessee, *Aymette* v. *State*, 2 Humph. 154. See also Tennessee, *Andrews* v. *The State*, 3 Heiskell, 165.

[44] Ibid., p. 286, referring to Kentucky, *Hopkins* v. *Commonwealth*, 3 Bush, Ky. 480.

[45] See the attached schedule of the statutes of the several states relative to the carrying or drawing of weapons. The schedule was compiled from Frederick H. Wines, "Report on Crime, Pauperism, and Benevolence in the United States," *Eleventh Census, 1890* (Washington: G.P.O., 1896), vol. 3, pt. 1, pp. 383, 398–411. John Edgar Hoover, *Uniform Crime Reports for the United States* (Washington: G.P.O., 1967), p. 113, reports a total arrest, all ages, of 51,474 for carrying and possessing weapons in 1966.

[46] Vance Randolph, ed., *Ozark Folksongs*, 4 vols. (Columbia: State Historical Society of Missouri, 1946–1950), 2:58.

Yet, to perpetuate a bromide, truth is stranger than folk song, and crimes of love and lust, passion and politics, avarice and arson plus a variety of crafty and cunning improvisations continued to haunt society.

## Appendix

### CARRYING OR DRAWING WEAPON, STATUTES OF THE SEVERAL STATES IN 1890

*North Atlantic Division*

| | | Min. | Max | |
|---|---|---|---|---|
| 1 | Maine | — | — | Persons who go armed may be bound over for one year to keep the peace. |
| 2 | New Hampshire | None | 2 yrs. | Or fine not exceeding $20, or both fine and imprisonment. |
| 3 | Vermont | None | 2 yrs. | Or fine not exceeding $200, or fine and imprisonment; for slung shot no more than five years. |
| 4 | Mass. | None | 1 yr. | Or fine not exceeding $50. |
| 5 | Rhode Island | — | — | |
| 6 | Conn. | — | — | |
| 7 | New York | — | — | |
| 8 | New Jersey | None | 3 mos. | — |
| 9 | Penn. | None | 1 yr. | Or fine not exceeding $50, or both fine and imprisonment. |

*South Atlantic Division*

| | | | | |
|---|---|---|---|---|
| 10 | Delaware | 10 days | 30 days | Or fine not less than $25 nor more than $100, or both fine and imprisonment. |
| 11 | Maryland | None | 6 mos. | Or fine not exceeding $500. |
| 12 | Dist. of Columbia | None | 6 mos. | Or fine not less than $50 nor more than $500, or both fine and imprisonment. |

Compendium_Roth
Page 0340

| 13 | Virginia | Fine | Fine | Fine not less than $20 nor more than $100. |
|----|----------|------|------|----|
| 14 | West Virginia | 1 mo. | 1 yr. | And fine not less than $25 nor more than $200. |
| 15 | North Carolina | — | — | Punishable by fine and imprisonment at discretion of court. |
| 16 | South Carolina | None | 1 yr. | Or fine not exceeding $200, or both fine and imprisonment. |
| 17 | Georgia | None | 18 mos. | Punishable under sec. 4310 of Georgia Code: "Accessories after the fact shall be punished by fine not to exceed $1,000, imprisonment not to exceed 6 months, to work in the chain gang on the public works or such other works as the county authorities may employ the chain gang, not to exceed 12 months, and any one or more of these punishments may be ordered, in the discretion of the judge: Provided, That nothing herein contained shall authorize the giving the control of convicts to private persons, or their employment by the county authorities in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor." |
| 18 | Florida | None | 6 mos. | Or fine not exceeding $100. |

*North Central Division*

| 19 | Ohio | — | 30 days | Or fine not exceeding $200. |
|----|------|---|---------|----|

| 20 | Indiana | Fine | Fine | Fine not exceeding $500. |
|----|---------|------|------|----|
| 21 | Illinois | Fine | Fine | Fine not less than $20 nor more than $100. |
| 22 | Michigan | None | 3 mos. | Or fine, not exceeding $100, or both fine and imprisonment. |
| 23 | Wisconsin | None | 6 mos. | Or fine not exceeding $100. |
| 24 | Minnesota | None | 3 mos. | Or fine not exceeding $100; persons who go armed may be bound over for one year to keep the peace. |
| 25 | Iowa | — | 30 days | Or fine not exceeding $100. |
| 26 | Missouri | 5 days | 6 mos. | Or fine not less than $50 nor more than $200, or both fine and imprisonment. |
| 27 | North Dakota | None | 1 yr. | Or fine not exceeding $500, or both fine and imprisonment. |
| 28 | South Dakota | None | 1 yr. | Or fine not exceeding $500, or both fine and imprisonment. |
| 29 | Nebraska | None | 30 days | Or fine not exceeding $100. |
| 30 | Kansas | None | 3 mos. | Or fine not exceeding $100, or both fine and imprisonment. |

*South Central Division*

| 31 | Kentucky | 10 days | 30 days | And fine not less than $25 nor more than $100. |
|----|----------|---------|---------|----|
| 32 | Tennessee | 3 mos. | 5 years | The penalty for carrying concealed weapons is imprisonment not less than 3 nor more than 6 months, and fine not less than $200 nor more than $500; for drawing a concealed weapon for purpose of assault or intimidation, imprisonment not less than 3 nor more than 5 years. |

| | | | | |
|---|---|---|---|---|
| 33 | Alabama | None | 6 mos. | Fine not less than $50 nor more than $500, and the offender may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than 6 months. The penalty prescribed is for carrying concealed about the person a bowie knife, or knife or instrument of like kind, or a firearm of any kind or description, or an air gun, or weapon of like description. The penalty in Alabama for carrying a rifle or shotgun cane is imprisonment in the penitentiary not less than 2 years and fine not less than $500 nor more than $1,000, or both such fine and imprisonment. |
| 34 | Mississippi | 1 mo. | 3 mos. | Or fine not less than $25 nor more than $100, or both fine and imprisonment. |
| 35 | Louisiana | None | 3 mos. | And fine not less than $25 nor more than $1,000. |
| 36 | Texas | 10 days | 30 days | And fine not less than $25 nor more than $200. |
| 37 | Arkansas | Fine | Fine | Fine not less than $50 nor more than $200. |

*Western Division*

| | | | | |
|---|---|---|---|---|
| 38 | Montana | Fine | 3 mos. | The penalty for carrying concealed weapons is fine not less than $10 nor more than $100; for drawing deadly weapons, imprisonment not less than 1 nor more than 3 months, or fine not less than $10 nor more than $100, or both fine and imprisonment. |
| 39 | Wyoming | 5 days | 20 days | And fine not less than $5 nor more than $50. The penalty in the table is for carrying deadly weapons whether concealed or not. Any one who has in his possession or upon his person any offensive weapon with intent to commit an assult is punishable by imprisonment not more than 6 months or fine not exceeding $500. |
| 40 | Colorado | None | 30 days | Or fine not exceeding $100, or both fine and imprisonment. |
| 41 | New Mexico | 10 days | 50 days | Or fine not less than $10 nor more than $300. |
| 42 | Arizona | Fine | Fine | Fine not less than $50 nor more than $300. |
| 43 | Utah | None | 6 mos. | Or fine not less than $300, or both fine and imprisonment. |
| 44 | Nevada | None | 6 mos. | Or fine not exceeding $500. This penalty is for drawing a deadly weapon. The penalty for carrying concealed weapons by minors is imprisonment not less than 30 days nor more than 6 months, or fine not less than $20 nor more than $200. |
| 45 | Idaho | 20 days | 50 days | Or fine not less than $50 nor more than $100, or |

| | | | | |
|---|---|---|---|---|
| | | | | both fine and imprisonment. |
| 46 | Washington | None | 30 days | Or fine not less than $20 nor more than $100, or both fine and imprisonment. |
| 47 | Oregon | 5 days | 100 days | Or fine not less than $10 nor more than $200, or both fine and imprisonment. |
| 48 | California | None | 6 mos. | Or fine not exceeding $500, or both fine and imprisonment. |

CHAPTER TWO

## *The Mississippi— Spillway of Sin*

The Mississippi flows a long course, twisting and turning as if it were a fugitive escaping from its own misdeeds. Many have depicted the stream's beauty—its verdant islands, secluded swamps, pictured rocks. Lovers of the Great River sing of it as an explorer's highway, as a personality which helped tie a nation together, as the pulsing heart of the Valley of Democracy. Few have conceived of the river as a highway for highwaymen and as a waterway down which coursed a flood of crime and sin. Concealed beneath the river queen's royal robes of romance were the filthy rags of the vagrant, and, although she beckoned with a swamp lily, she wore a dirk at her belt. To some who knew her and lived with her, she was a lovely Cinderella, symbol of the happy ending; to others she was the beguiling prostitute of mid-America, companion of thieves, gamblers, and murderers.

The Mississippi was both the Green Thumb and the Black Thumb, and these are interesting expressions whose origins are shrouded in uncertainty but whose meaning is unmistakable. The Green Thumbs, so an old river rat told me when I was a boy foolish enough to pole a leaky skiff through the sloughs of Big Island, were those honest settlers up and down the river who took up land, plowed it, and forced it to bring forth corn and rye and wheat. They tended to their own business and bothered no man.

The Black Thumbs were the bearded ones with their slatternly women who never settled down, but who followed the gospel of force and rape and pillage. They were the horse thieves, the makers of bogus green, the river pirates. When I asked my grandfather about the Green Thumbs and the Black Thumbs, he recognized the terms and said his father, who had come into the Iowa country in the 1840s, spoke of honest folk as Green Thumbs and of dishonest folk as Black Thumbs.

*23*

Compendium_Roth
Page 0343



"Can I get it back when the cops go on strike?"

# Restricting Handguns

## The Liberal Skeptics Speak Out

*Edited by*

DON B. KATES, JR.

*Foreword by*

FRANK CHURCH



NORTH RIVER PRESS, INC.

© Copyright 1979 by Don B. Kates, Jr. All rights reserved. Except for brief quotes for review purposes, no part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information retrieval system, without written permission from the publisher.

Manufactured in the United States of America

Library of Congress Cataloging in Publication Data
    Main entry under title:

    Restricting handguns.

        1. Firearms — Law and legislation — United States — Addresses, essays, lectures.   2.  Firearms — Addresses, essays, lectures.   I. Kates, Don B., 1941-
KF3941.A75R47            344'.73'0533        79-12043
ISBN 0-88427-033-5
ISBN 0-88427-034-3 pbk.

*347.1*
*A313*

S. F. PUBLIC LIBRARY

### ACKNOWLEDGEMENTS

The author gratefully acknowledges permission to reprint from the following sources:
    The *New York Law Forum*, for permission to reprint portions of Mark Benenson's article "A Controlled Look at Gun Controls," which originally appeared in Vol. 14 thereof.
    The Second Amendment Foundation, for permission to reprint portions of David T. Hardy's monograph *No Case for Stricter Firearms Control: A Rebuttal to the Report of the General Accounting Office.*
    *The Chicago-Kent Law Review*, for permission to reprint portions of an article by David T. Hardy and John Stompoly entitled "Of Arms and the Law," which appeared in Vol. 51 of the *Law Review.* This material, revised and supplemented, is the discussion of the Second Amendment herein.
    The *Civil Liberties Review* for permission to reprint portions of my debate with Rep. Robert Drinan that appeared in Vol. 3, Nos. 2 and 3 (June/July and August/September, 1976), Copyright © 1976 by the American Civil Liberties Union.
    The frontispiece cartoon is by Bill Mauldin. © Copyright 1978 Chicago Sun-Times. Reprinted courtesy Chicago Sun-Times and Bill Mauldin.

## DEDICATION

To B.K.P., J.E.B., and K.M.O. (in order of appearance), this book is affectionately dedicated.

equal administration or the self-defense utility of handguns. The fundamental question is: Do we want to send Jimmy Washington and hundreds of thousands of others like him to jail? After all, sending people to jail is what making it a crime to own a handgun is all about.

The leaders of the movement for a national Sullivan Law are proposing a *mandatory* minimum one-year sentence for anyone found with a handgun — not for misusing it, just for having it. They realize that nothing less drastic will suffice for a serious attempt to enforce national confiscation. As the author of this proposal frankly explained it, "we have to terrify the people," to make them more frightened of the law than of not having the handgun they believe is vital to their survival. I cannot accept "terrify[ing] the people" as a legitimate tactic in a democratic society — particularly not when the source of the problem is the government's failure or inability to protect the people in the first place.

Even if I believed that sending Jimmy Washington to jail would eventually reduce crime, I would find it no more acceptable than arming the police with the Gestapo-like powers that sometimes are also promoted as a way to reduce crime. Doubtless some more "tough-minded" readers will disagree. They will feel that if banning handguns would sharply reduce crime this would justify the imprisonment of any number of Jimmy Washingtons. But at the very least the example of Jimmy Washington should establish where the burden of proof lies. It is up to the advocates of handgun prohibition to prove that there is a sufficient crime-reductive effect to justify jailing Jimmy Washington. The burden of proof should lie upon the proponents of a national Sullivan Law in any event. In a free country, it is up to those who want to restrict the liberty of the people to show that the benefits which are likely to accrue outweigh the likely costs. But that burden of proof is particularly heavy when the liberty in question is so deeply valued by a large part of the population that it can be abrogated only by severely punishing many.

As you read each of the following essays, I hope you will ask yourself whether the argument for handgun prohibition is sufficiently strong and convincing to justify the costs it will impose on the Jimmy Washingtons of our nation.

# SECTION I: Toward a History of Handgun Prohibition in the United States

DON B. KATES, JR.

### Introduction

Though the debate on handgun prohibition bristles with historical assumptions, there has been no specialized inquiry into the development of such legislation in the United States, nor would it be possible to cover in detail so extensive a topic in the limited space available here. I have chosen therefore to focus on two major, and a number of attendant minor, misconceptions which appear to be shared alike by proponents and opponents of handgun prohibition — though, of course, their attitudes toward these historical assumptions are deeply colored by their views on the general issue.

The first of these misconceptions is that unfettered handgun ownership was the pattern of the raw Western frontier, while legal restrictions on handgun ownership developed initially in the Northeast and thence moved West and South in direct relationship to the growth of urbanization. The second misconception is that the movement for handgun probhition had its origins in Eastern, liberal, labor-oriented social philosophy and had as its purpose the control of criminal, rather than political, activity. (Reactions to these misconceptions generally vary according to whether the assessor views himself as liberal or conservative, the East as civilized or "sissified," and the Western tradition as one of brutal *machismo* or of an independent, self-reliant yeomanry.) Corollary to these misconceptions is the assumption that handgun prohibitions are more likely to characterize our urban and densely populated states and that popular support for them has increased in linear progression as urbanization and population density have