Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | Case No. 3:19-cv-01537-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 27 OF 37**<br><br>Courtroom:    5A<br>Judge:    Hon. Roger T. Benitez<br><br>Action Filed:  August 15, 2019 |

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | |
|---|---|---|
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

4

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

5

| | | |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- 1326 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "*The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America*," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (*New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

increased across the country. Finally, it is assumed that handgun prohibition enjoys majority support, which is frustrated by the machinations of a "gun lobby" composed of well-heeled lobbyists for "the arms merchants."

In part these two misconceptions represent our relative ignorance of nineteenth century urban America, and the romanticized myth of the Old West perpetrated by cinematic and other fictional accounts. But the single most important factor is a projection into a past in which it did not exist of a fundamental division in present attitudes of the American people, of which the "gun control" controversy is symptomatic. B. Bruce-Briggs, a historian and social policy analyst who approaches this controversy as a neutral, has described that division in a brilliant essay aptly entitled "The Great American Gun War" [*The Public Interest*, Fall, 1976]:

> [The handgun prohibition controversy] represents a sort of low grade war between two alternative views of what America is and ought to be. On the one side are those who take bourgeois Europe as a model of a civilized society: a society just, equitable and democratic; but well ordered, with the lines of responsibility and authority clearly drawn, and with decisions made rationally and correctly by intelligent men for the entire nation. To such people, hunting is atavistic, personal violence is shameful, and uncontrolled gun ownership is a blot upon civilization.
>
> On the other side is a group of people who do not tend to be especially articulate or literate, and whose world view is rarely expressed in print. Their model is that of the independent frontiersman who takes care of himself and his family with no interference from the state. They are "conservative" in the sense that they cling to America's unique pre-modern tradition — a non-feudal society with a sort of medieval liberty writ large for every man. To these people, "sociological" is an epithet. Life is tough and competitive. Manhood means responsibility and caring for your own.

The position the first of the groups described by Bruce-Briggs believes its views to have occupied in American history is vividly expressed in a postcard I received a few weeks ago from an

eminent law professor. He wrote about a *Harper*'s article in which I argued that banning handguns was both futile and dangerous. He shared my concern that a handgun ban could only be enforced through repugnant police activities, but was appalled at what he took to be my advocacy "of an armed society." Presumably because his postcard bore a picture of the library at Monticello, he asked rhetorically, "What would Thomas Jefferson have thought?"

Before answering that question, it is useful to emphasize a distinction which my eminent colleague overlooked in reading my article. It is possible for me to oppose firearms restrictions without wholeheartedly endorsing the idea of an armed society — just as I can and do oppose anti-homosexual laws without advocating that people become homosexuals. Many criminologists and criminal law specialists oppose handgun restrictions as involving great financial, constitutional, and human costs in enforcement and no commensurate gain in reducing crime. Yet these same people do not own handguns, are not target shooters or sportsmen, and often disapprove of gun ownership for self-defense.

Laying aside for the moment Jefferson's views on firearms ownership, his attitude toward firearms restriction was entirely negative. Among the foremost guarantees in a model state constitution he penned in 1776 was "no free man shall be debarred the use of arms within his own land." But inquiry into Jefferson's reasons reveals that he and the rest of the Founding Fathers were guilty of the charge my eminent colleague leveled against me — they believed in, and advocated, "an armed people." In *The Federalist*, No. 46, Madison congratulates his countrymen on "the advantage of being armed, which the Americans possess over the people of almost every other nation"; he dismisses with contempt the despotisms of Europe that "are afraid to trust the people with arms." In No. 29, Hamilton asserts that all that is necessary to guarantee liberty "to the people at large" is that they be allowed to be "properly armed and equipped. . . ." Despite the enormous political gulf between these men and Patrick Henry at this time, the latter voiced the same sentiments: "The great object is that every man be armed . . . everyone who is able may have a gun."

Much of the Founding Fathers' advocacy of firearms ownership was based upon a belief that ultimately a free people must be able to defend their liberties physically. But they considered firearms not only politically expedient for the people, but personally

desirable as well. The foremost advocate of this view was Thomas Jefferson, who wrote his fifteen-year-old nephew:

> A strong body makes the mind strong. As to the species of exercises, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise and independence to the mind. Games played with the ball, and others of that nature, are too violent for the body and stamp no character on the mind. Let your gun therefore be the constant companion of your walks.

Jefferson was not only the greatest intellect of his generation in the United States, but also an ardent outdoorsman and naturalist, a superb horseman, a talented amateur gunsmith, and the keeper of a veritable armory of handguns and long guns at Monticello. What, indeed, would Thomas Jefferson have thought of modern notions that "hunting is atavistic ... and uncontrolled gun ownership is a blot upon civilization"?

When the idea of drastically restricting handgun ownership first surfaced in the United States, it was based upon philosophical concepts far removed from those of Jefferson or the rest of the Founding Fathers. But before ownership restrictions came restrictions of carrying and use of firearms, particularly of handguns. These began to surface even before Jefferson's death in 1826 — but on the frontier, not in the more settled areas of the country.

### Handguns and Handgun Laws on the Western Frontier

The myth of the Old West portrays it as a violent land where everyone carried a revolver. In fact, violence was not endemic to the West, its inhabitants rarely went armed, and when they did so it was rarely with a revolver. For most of the nineteenth century Western revolver ownership was largely confined to outlaws, the military, the police, and company security personnel. Practicalities and economics dictated the rifle and (to a lesser extent) the shotgun as the weapons of Western expansion. On the practical level, the Western settler needed a weapon first of all for hunting, and secondly for defense against Indians. The highly inaccurate and extremely short range black-powder handgun of the period was appropriate for neither use. To the settler who could afford a firearm — and many could not, after buying agricultural implements, livestock, seed, wagon, etc., for the trek West — the first choice was a rifle. If the family were lucky enough to be able to afford two firearms, it would be two rifles or rifle and shotgun. Excepting Indian attack, the Western settler had little to fear from other humans. Assuming the rare instance in which he did anticipate the kind of "shootout" portrayed in fiction, he would carry his shotgun or rifle and most likely have it all over any opponent so foolish as to appear with only a revolver.

For the Western settler, the revolver was a luxury and, until the late 1860s, an extraordinarily expensive one at that. When Samuel Colt's revolutionary weapon first appeared in 1835, it sold for $35.00, a then enormous sum representing many weeks' wages even for a regularly salaried clerk or skilled workman. As a result the Colt factory closed within six years; when business revived through military procurement orders during the Mexican War, Colt had to fill them by manufacturing guns at the Pratt and Whitney plant.

The handgun did not become financially accessible to most Americans until the end of the Civil War brought the sale of large stocks of military surplus weapons. Even then, the military surplus sale of enormous numbers of Henry and Spencer repeating rifles at comparable prices was a more attractive buy for the Western settler. Thus handguns did not begin to flood into the West in overwhelming numbers until the late 1860s with the appearance of numerous extremely cheap off-brands which, for obvious reasons, were generically termed "suicide specials." Even then, and certainly in the years preceding 1875, handguns were more widely distributed in the East than the West. By the 1870s the practice of Eastern manufacturers of men's ready-to-wear trousers was to sew a holster into the right hip pocket of every pair made, to allow the concealed gun-carrying which was still legal in the East.

As the Western frontier was the area in which handguns were most likely to be associated exclusively with criminals, it was the area in which the first restrictions on their use developed. The earliest of these banned the carrying of concealed weapons and applied to knives and other weapons as well as handguns. These laws appeared in the then frontier states of Kentucky (1813), Indiana (1819), and Arkansas and Georgia (1837). The only even arguably "Eastern" state to adopt such legislation was Virginia (1838), which at that time had its own western frontier (now West

12   RESTRICTING HANDGUNS

Virginia). By 1850 every Western state barred the carrying of concealed weapons. In contrast, none of the Northeastern states adopted even that mild a restriction until nearly the turn of the twentieth century. Until 1924, for instance, the only gun law in New Jersey was the prohibition of dueling.

### Development of Handgun Ownership Restrictions in the Post-Civil War South

The former slave states were the first to move beyond restricting handgun use to restricting handgun ownership. To understand why, it is necessary to consider the social upheaval resulting from the abolition of slavery. As I have said in another context ["Attitudes Towards Slavery in the New Republic," 53 *Journal of Negro History* 33, 37]:

> Slavery was not just an economic institution; it was a social, and by exclusion, a political one as well. By constitutional, statutory, decisional, administrative and customary law the position of the slave was fixed. He could not possess arms or liquor, make contracts, own land or personalty, travel freely, give testimony or learn to read or write, act independently as a religious leader, compete in the free labor market — above all, he had no political rights. The prohibition of arms, liquor and travel was enforced by a more or less well organized system of special and general searches and night patrols of the *posse comitatus*. Justice to the slave was, within the law or within its enforcement, summarily meted out by masters, possemen and judicial officials alike. As Mr. Chief Justice Taney succinctly expressed it [in the Dred Scott case, the slave had] "no rights which the white man was bound to respect."

Immediately after emancipation destroyed this ornate system of social and political control, the Southern legislatures restored it by enacting the Black Codes. These fixed the black population in serfdom, denying all political rights, excluding them from virtually any chance at economic or social advancement — and, of course, forbidding them to own arms. The indignant Congress of 1866 reacted with a Civil Rights Act, and then the Fourteenth Amendment.

*History of Handgun Prohibition*   13

Denied legal avenues for social control, the South substituted illegal methods: a system of massive private terrorism acquiesced in by the public authorities. Having accomplished its objectives by 1876, this campaign of beatings, arson, murder, etc. trailed off into the minimum amounts of intermittent violence necessary to maintain the social and economic status quo. Though a majority in many parts of the South after the Civil War, the blacks were highly vulnerable to such terrorism. Their organization and communications were poor, and above all, they possessed few firearms, and those mostly obsolete. Except for those who had served in the Union Army, blacks had virtually no experience with guns, for ante bellum laws made their possession by even free Southern blacks a highly penal offense. Few blacks had been able to afford revolvers or modern repeating rifles even in the military surplus sale period immediately after the war, much less when the prices returned to normal. Though in theory the Army was available to protect the blacks, it could not be everywhere at once. And when the Southern delegations returned to Congress they reduced it to a maximum of 25,000 enlisted men, many of whom were diverted West by the Indian wars. Though the withdrawal of the Army as part of the Electoral Compromise of 1876 has been pictured as a betrayal of black aspirations, it was actually more a formal surrender to a victory already won by violence-enforced white supremacy.

Meaningful black access to self-defense weapons occurred only in the mid-1870's when the cheap off-brand revolvers began to be sold in the South in large numbers. The Klan recognized in the mere existence of these a threat to its previous virtual monopoly of violence, although by this time the blacks were generally crushed and quiescent. Moreover, in ensuing years those who ruled the South found that there were challengers other than the blacks against whom the forces of social control might have to be exerted. Agrarian agitators arose to inform poor whites that they were trading their political and economic group identity for a fraudulent racial solidarity with a false imperative of preserving white supremacy. For a while men like Tom Watson even dared suggest that poor whites had more in common with poor blacks than with wealthy planters, produce dealers, railroad magnates, merchants, and manufacturers. In the cities of the South similar views were being expressed by other agitators as the laboring poor

began to organize for better wages and working conditions.

Though the reactions of Southern legislatures to the threats of racial and economic change differed in detail, they evinced a common purpose. Those who might menace the status quo must be denied access to arms, while the monopoly of those who would preserve it (if necessary by violence and terror) must be assured. The very next session of the legislature (1870) after white supremacists had regained control of Tennessee set the earliest pattern of legal restrictions. This was a ban on selling all but "the Army and Navy model" handgun, i.e. the most expensive one, which was beyond the means of most blacks and laboring people. Klansmen were not inconvenienced, having long since acquired their guns (many of them surplus Army and Navy weapons), nor were the company goons, professional strike-breakers, etc., whose weapons were supplied by their corporate employers. By 1881 white supremacists were in power in the neighboring state of Arkansas and had enacted a virtually identical "Saturday Night Special" law with virtually identical effect.

Instead of formal legislation, Mississippi, Florida, and the rest of the Deep South states simply continued (in effect) to enforce the pre-emancipation statutes forbidding blacks to possess arms, the Fourteenth Amendment notwithstanding. When blacks appeared with arms these were confiscated, though often the more kind-hearted sheriffs tolerated the possession of obsolete hunting weapons by blacks who were known not to be trouble-makers. No such indulgence was shown as to revolvers, however. Though the sale of these to blacks could not be prohibited per se, it was understood that retailers would report to local authorities when-ever blacks (or a white agitator) purchased pistols or ammunition. The sheriff would then arrest them and confiscate their pistols which would be either destroyed or turned over to the local Klavern. In short order, blacks, and whites unpopular with local authorities, learned that pistol purchases were a waste of hard-earned cash, and dangerous to boot.

Mississippi formalized this custom by enacting the first registra-tion law for retailers in 1906. It required them to maintain records of all pistol and pistol ammunition sales, making these available for inspection on demand. This was part of a trend toward formalizing firearms restrictions, which the Southern states ex-hibited toward the end of the century, perhaps because of the

increasing concern about handgun ownership by certain groups of whites (See discussion in the next section). Alabama in 1893 and Texas in 1907 imposed extremely heavy business and/or trans-action taxes on handgun sales in order to resurrect the economic barriers to ownership. Simpler yet was the approach South Carolina adopted in 1902, banning all pistol sales except to sheriffs and their special deputies — i.e., company goons and the KKK.

But in 1911 sophisticated, cosmopolitan New York State rendered obsolete all previous concepts in handgun ownership restriction with the introduction of the flexible, surgically clean Sullivan Law. Of proven success in dealing with political dissidents in Central European countries, this system made handgun owner-ship illegal for anyone without a police permit. New York City police thereby acquired official authority to implement the dis-favor with which they had long looked at possession of handguns by the city's Italian population.

The Sullivan Law established the pattern for police permit requirements which were adopted in the succeeding twenty-three years in Arkansas, Hawaii, Michigan, Missouri, New Jersey, North Carolina, and Oregon. These enactments represented the fruits of a nationwide handgun prohibition campaign by conservative busi-ness interests in the early part of the century. Across the land, legislators in conservative states were importuned by business lobbyists bearing glowing endorsements of the Sullivan Law concept from such (then) arch-conservative institutions as the *New York Times* and the American Bar Association. Among the most importunate were national and local businessmen's associations which emphasized the increasing incidence of armed robbery.

### Handgun Restrictions and "The Immigration Problem"

The great importance armed robbery seems to have played in this early campaign indicates yet another dimension of the handgun prohibition movement — its relationship to hatred and fear of the foreign-born. Armed robbery was associated in the public mind with foreign immigrants, not just because they were considered naturally lazy and inclined to violent acquisitiveness, but because armed robbery was a recognized tactic of the "foreign-born anarchist." In America from at least the turn of the

century, and in Europe from the 1870s on, revolutionaries used bank and commercial robberies as a means of gathering funds to finance their underground activities. The businessmen's associations could point out that Sacco and Vanzetti were originally apprehended for violation of Massachusetts' new handgun law, and that they were executed for murder committed in the course of several armed robberies of which they were convicted. Symptomatic of the concerns underlying the businessmen's campaign for Sullivan-type legislation is the fact that even the states that rejected that concept substituted, instead, a flat ban of the ownership of firearms, or at least handguns, by aliens.

It is no coincidence that the period 1870-1934, which saw far more states enacting far more drastic handgun restrictions than ever after, was also the most xenophobic period of American history. Though hatred of foreigners was nothing new, it reached its apogee in this era, as the stream of immigration was darkened by Southern and Eastern European peoples, and the Know Nothings gave way to the Immigration Restriction League and the American Protective Association. However, it must be recognized that such feelings were not the province of the ignorant and the foolish alone. Xenophobia was powerfully supported by the learning and social science of the day, and in ways that lent credence to the desirability of denying handguns to the foreign-born. Well before the turn of the century, an early social psychologist emerged from Ellis Island to announce that most of the foreign-born he had tested there (in English) were feeble-minded. It followed that such people should not be allowed to have handguns, particularly since contemporary criminologists believed that violent acquisitiveness was an inherited characteristic associated with mental retardation.

Many deemed this correlation between feeble-mindedness, violence, and Eastern or Southern European ancestry confirmed by the high incidence of crime among the new immigrants. Most of these had settled in or around the urban areas of the East. Employment opportunities were often scarce there for people with only an agricultural background and mediocre English skills, and in an era characterized by rampant xenophobia and by repeated economic slumps, panics, and depressions. Under these circumstances it is scarcely surprising that some of the new immigrants followed their adopted country's fine old tradition of

violent crime. In fact, like all ghettoized minorities, their depredations were largely confined to their own people and their own neighborhoods. But the average newspaper reader of the period would be unlikely to pick that fact out of the constant diet of stories and exposés of robberies committed by Italian, Jewish, or other immigrant gangs, and of helpless, innocent young white women kidnapped into vile slavery.

The attitude of contemporary newspapers and many of their readers is well illustrated by the argument that Professor Kennett gives in repudiating a charge sometimes made against the Sullivan Law. It is not true, he says, that this law was a cynical political ploy by which corrupt politicians hoped to disarm the gangs of their rivals for office while keeping their own gangs armed. Rather, the Sullivan Law was a sincerely motivated answer to crime — within the framework of contemporary views of the nature of crime:

> [There] was the clear inference that the new measure would strike hardest at the foreign-born element who were seemingly responsible for most of the violence in the city. It had long been held that pistols were found "chiefly in the pockets of ignorant and quarrelsome immigrants of law-breaking propensities" [quoted from a newspaper editorial]. The Italian population seemed particularly addicted to criminality (the [New York] *Tribune's* annual index frequently crosslisted the entries "crime" and "Italians"). As early as 1903 the authorities had begun to cancel pistol permits in the Italian sections of the city. This was followed by a state law of 1905 which made it illegal for aliens to possess firearms "in any public place." This provision was retained in the Sullivan Law.

Beyond the issue of apolitical crime was that of the ideological fitness of these immigrants to have handguns. Almost all of them were known to be Jews, Catholics, or anarchists. Of the three, Jews were least suspect ideologically, being considered no more than usurious Christ-killers and perhaps congenitally criminal as well. But the influx of a vast mass of Catholic immigrants was necessarily a source of disquiet in a nation with an aggressively Protestant libertarian tradition, and particularly to generations raised on Macaulay's *History of England* and Lea's *History of the*

*Inquisition.* The hierarchical form of their Church was regarded as predisposing the immigrants against democracy and republican institutions, and toward the despotic governments of the lands from whence they came. As they were considered ignorant, prejudiced, superstitious — and utterly submissive to religious authority — it was easy to imagine them being led by the nose into any adventure their priests might choose for them.

But if the deeds of "Bloody Mary," Guy Fawkes, and James II gave ancient warning of the dangers of Catholicism, the evil done by "foreign-born anarchists" was a clear and present menace headlined daily in reports from here and abroad. "Anarchists" had assassinated Czar Alexander II (1881), the Austrian Empress Elizabeth (1898), Italian King Humbert (1900), Spanish Premier Canalejas (1912), and our own President McKinley (1901). McKinley's assassin, the foreign-born Leon Czolgosz, did indeed describe himself as an anarchist, but with a fine impartiality the newspapers of the time also bestowed that epithet on people who would more accurately have been classified as communists, socialists, syndicalists, Wobblies, or even peaceful trade unionists. The term anarchist, with the now almost redundant prefix "foreign-born," became synonymous with any radical or otherwise highly divergent political view; it was occasionally even applied to the assassin of President Garfield (1881) and the attempted assassin of former President Roosevelt (1912), though neither of them were foreign-born or even remotely an anarchist.

Similarly "anarchist" or "radical" was widely applied to any labor organization or agitation, it being reflexively assumed that such groups were largely composed of, and led by, foreigners of alien political persuasions. When Canada adopted its handgun permit law in 1919, the debate was replete with references to the recently crushed general strike. This was (erroneously) believed to have been engineered and led by foreigners, and the law's sponsors reviewed at length the absurdity of allowing handgun ownership to those who "bring their bad habits, notions, and vicious practices into this country."

Similarly, highly publicized incidents involving blacks, foreign-born radicals, or labor agitators seem to have provided the immediate occasion — if not the sole motivation — for most of the American handgun ownership restrictions adopted in the 1901-34 period. The 1934 Hawaii and 1913 Oregon statutes were responses

to the concern felt about labor-organizing by "foreign-born radicals" in the port of Honolulu and Oregon lumber mills respectively. The South Carolina law appears to have been an immediate response to the assassination of President McKinley some months before. It barred only the purchase of pistols weighing less than three pounds and having a barrel less than twenty inches long. Any pistol exceeding those specifications (and none existed, then or now) clearly could not have been concealed in a bandaged arm as Czolgosz's pocket pistol was. Though in the long run New York's Sullivan Law was aimed at every kind of crime to which the foreign-born were believed inclined, its immediate motivation seems to have been anarchists and radicals. It was enacted in the backlash from the London siege of the Houndsditch anarchists and an attempted assassination of New York's mayor by a crazed working-man, which recalled the McKinley assassination.

The Michigan version of the Sullivan Law was hurriedly enacted in the aftermath of a famous trial in which Clarence Darrow defended a black civil rights leader. (Dr. Ossian Sweet, who had moved into an all-white neighborhood, was accused of murder for shooting one of a mob that attacked his house while Detroit police looked on.) The Missouri permit law was enacted in the aftermath of a famous and bloody St. Louis race riot.

The Arkansas, Michigan, Missouri, and North Carolina laws were expressive of one of the lowest periods of race relations in modern American history. A younger generation of blacks — led by soldiers returning from World War I familiar with guns and willing to fight for the equal treatment they had received in other lands — had to be painfully reintroduced to the forces of social control. Once again in the 1910s and 1920s did the Klan become a major force in the South. Once again the public authorities stood by while murders, beatings, and lynchings were openly perpetrated. Once again the handgun legislation of Alabama, Arkansas, Mississippi, Missouri, Tennessee, and Texas deprived the victims of the means of self-defense, cloaking the specially deputized Klansmen in the safety of their monopoly of arms.

But the resurgent Klan of these years was not limited to the South geographically, nor was its concern with blacks alone. The Klan was a force in southern New Jersey and Illinois, in Indiana, Michigan, and Oregon. All of these enacted either handgun permit laws or laws barring alien handgun possession in the years

1913-34. A few years after the Oregon gun law, Klan support helped pass a law banning parochial schools in that state. The Klan opposed not only blacks, but Catholics, Jews, labor radicals, and the foreign-born in general, and these too often fell victim to lynch mobs or other, more clandestine, attacks.

It bears emphasis that such activities were not the sole province of the Klan. The businessman's Sullivan Law campaign occured during the years of a concerted effort by employers and employers' associations to destroy the emergent labor unions through a systematic campaign of drastic wage decreases, lockouts, imported strikebreakers, and surveillance, harrassment, black-listing, and physical attack upon trade unionists — all carried out with the acquiescence or active support of local authorities. One of the most blatant incidents occured in Bixbee, Arizona, where 221 supposed labor radicals were rounded up by a posse and forcibly deported from the state. A 1901 Arizona law barred the carrying of handguns within city limits and provided for the temporary confiscation of strangers' weapons, to be returned when they left town. Needless to say, the carrying ban was not applied to the members of the posse, and the provision for returning confiscated guns was omitted as to the deportees.

### A Caveat on Geography and Fear of Immigration

Though my discussion of this topic is already long, it is necessary to address an issue that may occur to some readers. Since the states that adopted drastic handgun ownership restrictions in the era 1870-1934 were remote from Ellis Island, how can it reasonably be thought that they felt themselves threatened by the dangers of immigration? The answer is simply that the phenomenon in question was hysteria, not a rational reaction. In every effort of workers in these and adjoining states to organize, to demand better wages and working conditions, was seen the lurking specter of "anarchism," and in every outbreak of "anarchism" was supposed to be the influence of the foreign-born.

I encountered such nativist hysteria in a somewhat different context when, as a lawyer for California Rural Legal Assistance, I brought a lawsuit to void California's English literacy requirement for voting as applied to our clients who were literate in Spanish. I found that this requirement had been introduced into

the California legislature in 1891 by a representative of the American Protective Association. Its purpose was not to disenfranchise the Chinese (this had been accomplished by the Constitution of 1879) nor blacks — though the author praised literacy requirements in Mississippi and other Southern states. Rather, his declared purpose was "to protect the purity of the ballot box from the corrupting influences of the disturbing elements from abroad." He seems to have expected these "ignorant classes, who are coming here from Europe, [which is] unloading the refuse of the world upon our shores," to be translated immediately to California from Ellis Island. For he predicted that, unless his measure were enacted, "it will soon come to pass that this element will direct in our politics and our institutions will be overthrown." Motivated at least in part by the same hysterical fears, legislatures (including California) also enacted drastic handgun ownership restrictions in general or against aliens in particular.

In summary, however irrationally, Americans (and Canadians) in the era 1870-1934 felt themselves threatened by a number of forces they associated with the handgun: blacks who wouldn't keep their place; radicals, labor agitators, assassins, robbers, and, by a process of further association, the foreign-born. Reminded of Madison's contempt for "governments [which] are afraid to trust the people with arms," many late nineteenth- and early twentieth-century Americans would have responded that policies that were safe and sound in a population of fine Anglo-Saxon stock were foolish and irresponsible when that population became infected with the feeble-minded, the congenitally criminal, partisans of divisive alien philosophies, and others unable to understand and revere republican institutions. The association in the public mind of the handgun with blacks and the foreign-born criminal, anarchist or labor agitator was at least one major impetus behind the handgun ownership restrictions adopted in this country and Canada during the period 1870-1934. The spirit in which such permit laws were enacted and administered is well expressed by the following from a 1918 New Hampshire case upholding that state's ban of alien firearms ownership, which a 1924 California court repeated in upholding California's similar statute as to handguns:

Native citizens are justly presumed to be imbued with a natural allegiance to their government which unnaturalized

foreigners do not possess. The former inherit a knowledge and reverence for our institutions, while the latter as a class do not understand our customs or laws, or enter into the spirit of our social organization.

### Handgun Prohibitions and "Liberal" Thought Since the 1920s

Though many bases for the handgun restrictions in the era 1870-1934 would deeply offend present liberal sensibilities, they were not necessarily repugnant to those considered liberal then. While generally supportive of white laboring people, American liberalism had by the 1890s largely abandoned the Negro and was ambivalent toward the foreign-born. Liberals were themselves deeply concerned about crime and would not have opposed handgun prohibition in principle. If they opposed it at all, it was only because it diverted attention from their own pet solution to violence, the prohibition of alcohol. Loath as we modern liberals are to admit it, Prohibition was the *cause celebre* of four generations of American liberals, the brightest and the best, the most progressive and humane, political figures of their times. Susan B. Anthony started out as a Prohibition speaker. Others who saw in Demon Rum the cause of domestic and acquaintance homicide (as well as robbery and innumerable other social ills) included such luminaries of American liberalism as William Lloyd Garrison, Henry Ward Beecher, Theodore Parker, Frederick Douglass, Jane Addams, William Jennings Bryan, and at least in their youth, Eleanor Roosevelt and Hugo Black. Before dismissing their views as absurd, remember that liquor is a factor in more homicides than are handguns, by about 64 to 50 percent; as Professor Donald Lunde has noted, "Persons with a urine alcohol level of .20-.29 percent (about twice the level required for conviction of drunk driving) make up the largest group of persons arrested for violent crimes."

It was only after the failure of Prohibition became manifest that many of the people who had supported it found in handgun prohibition a similar promise of cutting through the complex social, cultural, and institutional factors that produce violent crime. The addition of this veteran core of social reformers to the already very influential forces calling for handgun prohibition seemed to make a national Sullivan Law a real possibility in the heady early New Deal days of expanding federal power. President

Roosevelt was known to be strongly sympathetic. As Governor of New York, he had vetoed a repeal of the Sullivan Law. The likelihood that handgun prohibition might divert attention from Prohibition was to F.D.R. not a disadvantage, but a major attraction. Whatever its substantive merits, as a political issue in the Democratic party Prohibition was highly divisive. During the preceding two presidential campaigns (1924 and 1928) it had been one of several factors that threatened to dissolve the party into its component sectional and ideological parts. The evident primacy of the national economic emergency enabled F.D.R. to dump Prohibition in 1932, as even the most die-hard Prohibitionists were far too liberal to support Herbert Hoover. (Indeed, as Harvard historian Frank Freidel notes in his analysis of the election, "the nine-point recovery program [adopted in the 1932 convention of the Prohibition party was] practically identical to that later adopted by" F.D.R.)

The commonality of goals and underlying assumptions between handgun and liquor prohibition gave F.D.R. hope that the former could be substituted for the latter in the hearts and minds of Prohibitionist Democrats. Since drinkers numbered in the many millions, but handgun owners less than ten million, the adverse effect on the party of this new prohibition crusade was likely to be considerably less. Thus, even as F.D.R. campaigned on his promise to repeal the Eighteenth Amendment, he was proposing strict federal regulation of handgun ownership. Soon after Prohibition repeal had become a reality, his Attorney General presented Congress with a proposal for national handgun registration along with a host of other firearms restrictions. (The fact that yet another foreign-born assassin had attempted to kill F.D.R. — and had killed the Mayor of Chicago who was with the President — was thought likely to spur sentiment for this proposal.)

But two factors on which the Administration had not counted resulted in a defeat so decisive that drastic handgun ownership restrictions were not to be again seriously considered by Congress for over thirty years. The first of these factors was that F.D.R. was not alone in perceiving the similarity of goals and assumptions underlying the two prohibitions. So also did a lot of other Americans who had become thoroughly disenchanted with the Great Experiment. Americans had grown both skeptical of the likelihood that trying to ban widely popular commodities could

stop crime and profoundly weary of the enormous police intrusions which such attempts necessarily entailed. Illustrative of how deep and widespread was the disenchantement is the opposition to a federal gun law voiced by a congressman whose state had earlier pioneered both liquor and handgun prohibitions: "I tell you that right now in the State of Arkansas there are more federal agents camped on its soil, nosing into the private affairs of individuals, than we have state, county, township, and municipal officers." And a *Saturday Evening Post* editorial offered the pertinent question: "If the federal government cannot prevent the landing of shiploads of rum, how can it stop the criminal from getting the most easily concealed and most vital tool of his trade?"

Another factor which combined with, and helped mightily to stimulate, such sentiments was the strong representations made by gun owners through such groups as the new United States Revolver Association and the older National Rifle Association. The growing threat of state, and now national, confiscation had induced great numbers of handgun owners (and long-gun owners who were afraid their weapons would be next) to join these organizations. By 1930 the N.R.A. had swelled from a tiny, elite organization concerned with arranging, organizing, and providing standards for marksmanship contests to a mass organization forcefully representing its members' fears for their rights and property. Faced with thousands of letters from little people they had never heard of, or from, before on any other issue, the Congress rapidly backed away from handgun prohibition — even while vehemently denouncing the NRA for organizing the letter-writing campaign.

### "The Gun Lobby" and the Defeat of Handgun Prohibitions

Thus was born the so-called gun lobby which is often credited (or blamed) for the failure of both federal and state legislatures to enact onerous restrictions on handgun ownership. The concept of the "gun lobby" is used by advocates of handgun prohibition as the concept of "the liquor lobby" was used by partisans of Prohibition to explain their many defeats before the eventual enactment of the Eighteenth Amendment and the Volstead Act. But both the comparison and the term "lobby" are highly misleading, for they call up pictures of a powerful industry

blocking legislation through insidious pressures or corrupt influence. However true this may have been of nineteenth-century liquor interests, the firearms industry has never been a major force in American business, nor has it opposed legislative regulation of its products.

As to its economic importance, an expert finds that "in no census year has small arms production exceeded .03 percent of total industry." Moreover, to the limited extent of its lobbying power, the domestic small arms industry has actually supported federal firearms restrictions. The federal Gun Control Act of 1968, which banned mail-order gun sales and imports of military surplus firearms, was something domestic manufacturers had been impotently urging for decades. Professor Kennett notes: "in their feelings about 'cheap mail-order guns' the major small arms companies antedated Senator Thomas Dodd by a half century."

Though the 1968 Act unquestionably made acquiring firearms more costly, the effect was not that the number of people buying guns was reduced (as the Act's sponsors may have hoped), but rather that the people had to buy their guns more expensively from domestic manufacturers (as the manufacturers had hoped). The fact is that when social conditions convince people that they need a firearm to protect themselves and their families, they are going to get one, no matter what the cost. Indeed, it is sometimes argued that the Act's sponsors knew this and intended only to restrict access to firearms by minorities and the poor: "The Gun Control Act of 1968 was passed not to control guns but to control blacks," claims liberal journalist Robert Sherrill — an advocate of gun laws. Similarly, B. Bruce-Briggs notes in his *Public Interest* article: "It is difficult to escape the conclusion that the 'Saturday Night Special' is emphasized because it is cheap and is being sold to a particular class of people. The name is sufficient evidence — the reference is to 'niggertown Saturday night.'"

In 1968, Smith and Wesson and six other major firearms manufacturers went on to endorse a national system of Sullivan Law-type mandatory licensing for handgun owners. Because Smith and Wesson has continued to push this (which is also the program of the subsequently organized National Coalition to Ban Handguns and National Council to Control Handguns) it is suffering a nation-wide boycott organized by outraged gun owners. (S&W has little to fear from such a boycott, for its back orders from

domestic and foreign police and other government agencies far exceed its annual handgun production.)

While the pejorative implications of "lobby" do not really apply to either side in the handgun prohibition controversy, the *proponents* come closer to it, while the opponents qualify only as a "people's lobby." Compare their sources of funding and respective means of influencing legislation: A few years ago a liberal millionaire who had himself heavily invested in the military arms industry loaned a new national handgun prohibition organization the money to finance a nationwide mail solicitation for funds. It collapsed when the responsive contributions barely exceeded the amount of the loan. In contrast, although the National Rifle Association does not itself lobby, and so could technically be qualified to receive tax-exempt contributions, it has never attempted to qualify. While it would doubtless not turn down a millionaire's contributions, its enormous funding comes almost exclusively from membership dues and contributions of $50.00 or less. The same is true of other organizations that do lobby, like the Citizen's Committee for the Right to Keep and Bear Arms, Gun Owners of America, the Firearms Lobby of America, and the NRA's own separate lobbying organization. In terms of influence upon legislative bodies, the forte of the handgun prohibition movement (like the liquor prohibition movement before it) is the articulate support given by many of the most humane, good-hearted, and progressive leaders in public and academic life. In contrast, the forte of the gun organizations, demonstrated time after time from 1934 to the present, is the marshaling of overwhelming numbers of individual citizens. These are often not particularly articulate people, and individually they are completely without influence. But in the aggregate they are a force to be reckoned with. Illustrative is a 1978 controversy in which Congress prevented the Carter Administration from imposing regulations on the firearms industry that the gun organizations had denounced as tantamount to national gun registration. Informed citizens should have been aware of the issue, for it was heavily and repeatedly publicized in the media during months of regulatory agency and Congressional hearings. In addition, the antigun organizations circulated repeated pleas for public support:

> This is our first opportunity in some time to let the Carter Administration know that the *majority* of the public wants

> reasonable gun control [National Coalition to Ban Handguns; emphasis in original]. The majority of Americans want stronger handgun control, but they must be heard. Write a letter or postcard. Urge friends *and* family to do the same . . . [National Council to Control Handguns].

over 62,000 postcards — 7,800 supporting the proposed regulations and 337,000 opposing them.

This is typical of public response whenever handgun restrictions are considered by any branch of federal or state government. Even the most ardently antigun legislators admit to being daunted by the fact that constituent response is always overwhelmingly hostile, sometimes by more than a 50-1 ratio. For liberals to dismiss such responses as "the gun lobby" is not only misleading, but hypocritical to boot. Such phenomena we correctly describe as "democracy in action" when letters from NAACP or Sierra Club members pour in on legislation they oppose.

### Public Opinion on Handgun Prohibition

The inability of the anti-gun organizations to marshall the majoritarian support they claim prompts deeper examination of those claims. They turn out to be based upon answers to questions in a series of polls that are so vaguely worded as to make the answers unintelligible. How can we assign meaning to inquiries like "should the laws covering the sale of handguns be made more strict?" [Gallup, 1975] without knowing how strict the respondent thought the laws were already? The only poll ever to explore that found that 79 percent of the public could not even identify three out of five of the simplest federal gun-sale restrictions. Predictably, the less restrictions the respondent knew about, the more likely he was to think "stricter" laws were needed. A recent poll in Missouri (a state with exceptionally stringent gun laws) was published with the headline "Voters Back Gun Control." Upon examination, the answers showed a majority did not support licensing procedures similar to those which (though they apparently didn't know it) have existed in Missouri for 65 years.

Even when the polls try to solicit opinion as to a specific kind of restriction, inadequate wording often renders the question meaningless. Thus the frequent question whether a "license" or

"permit" should be required for handgun ownership may be interpreted by a New Yorker in light of the Sullivan Law (i.e., virtual handgun prohibition) but by an Illinois resident in light of that state's automatic licensure for anyone free of criminal convictions. Other respondents may interpret it as implying some kind of proficiency testing, as in drivers licensing. The pollsters are ill-equipped either to formulate questions or interpret results because they are themselves lamentably ignorant of current law or proposed changes. Thus the commentary to a recent poll release finds its authors confusing handgun licensure (in any of its forms) with handgun registration. Similarly, Gallup releases contain gross mischaracterizations of state gun laws.

Handgun prohibition appears to enjoy only minority support — and that steadily dwindling — according to the results of the few polls that have directly asked whether respondents want to "outlaw handguns except for police use" [Gallup, September 4, 1959; June 5, 1975]. In the 1959 Gallup poll 59 percent of respondents favored outlawing handguns, with 35 percent opposed and the rest expressing no opinion. But by 1975 sentiment had reversed, the same question elicited a 55 percent negative response with 41 percent supporting. Harris' 1975 question as to a "law that banned the ownership of all handguns by private citizens" found 57 percent opposed and 37 percent favoring. Three years later the minority supporting handgun restrictions had dwindled still more, according to a Cambridge Reports (Patrick Caddell) national poll commissioned by one of the anti-gun organizations. Even as to the less drastic measure of leaving presently owned guns but banning "the future manufacture and sale of all handguns," 23 percent strongly favored this and 9 percent somewhat favored it (total 32 percent), while 36 percent were strongly opposed and 22 percent somewhat so (total 58 percent).

The mistaken impression that the public supports handgun prohibition has been powerfully aided by the strong personal support which Gallup, Harris, etc. give such legislation. The partisanship of Gallup releases is epitomized by one that began by describing three recent tragedies with guns and then continued: "the public today shows itself willing to adopt stricter firearms legislation which might possibly have averted [these incidents]." (A pro-gun fanatic could, of course, have picked out three incidents of people defending themselves with handguns and

proceeded to the effect that these people would be dead today if legislation now favored by the public, etc., etc.) Although Gallup releases headline even a one-percentage-point increase over several years in public *support* for "gun control," Gallup has never mentioned the complete reversal in sentiment on banning handguns between 1959 and 1975. Indeed, in the 1975 release, even the question and results on handgun prohibition are buried in the back; the release is headlined: "Public Overwhelmingly Favors Registration of All Firearms." Similarly, the 1975 Harris Poll, in which fewer people yet supported handgun prohibition, is headlined "Strong Support For Gun Control."

Greater yet was the opposition to handgun prohibition revealed by the 1975 Decision Making Information poll, one of two really extensive polls ever done of public attitudes on the gun issue. (The DMI and the 1978 Cambridge Report poll, both privately commissioned — though by opposite sides — involved many times more questions than the Gallup, etc., which are limited to three or four.) In the DMI poll, 39 percent of the respondents were strongly opposed to handgun prohibition and 31 percent inclined to opposition (total 70 percent) while 15 percent strongly endorsed it and 10 percent were inclined to (25 percent).

Handgun prohibition advocates dismissed the DMI poll because it had been commissioned by the NRA, even though it was independently conducted with scrupulous neutrality by a prestigious private polling organization. But the accuracy of the DMI results, as opposed to that of Gallup and Harris, seemed demonstrated when handgun prohibitionists put it to a public referendum in Massachusetts, a state they selected as electorally the most liberal in the nation. Though Gallup and Harris had said that a majority of Easterners and urbanites support banning handguns, the Massachusetts initiative lost by slightly more than 70 percent. It carried not one major city, not even Cambridge.

The trend in state legislation is itself strong evidence of a steady, long-term decrease in public support for handgun prohibition. In the first thirty-four years of the twentieth century nine states enacted laws either banning handgun sales completely or requiring a permit which the authorities had broad discretion not to issue. In the ensuing forty-five years only Puerto Rico added itself to this group, while New Jersey reaffirmed its membership and South Carolina repealed its law — the oldest and

most stringent of them all. (Two of the original nine had repealed their laws before 1934.)

This dwindling of support for handgun prohibition may seem strange in light of the very one-sided debate on the subject over the past twenty years. The argument for handgun prohibition is a plausible one, and has been forcefully and articulately presented by distinguished political and academic figures. The other side has all too often been represented by people whose intellectual sophistication was insufficient to their argument, and whose manner of presentation did their position more harm than good. But more significant than this debate seems to have been social changes in American life and attitudes since the halcyon years of handgun prohibition in the early part of the century. When handguns were owned by less than 5 percent of the civilian population, it was easy to associate such ownership with groups stereotyped as congenitally or ideologically unfit to own weapons. Fortunately those stereotypes have disappeared — at least to the extent that people of Eastern and Southern European ancestry are accepted as good Americans and good neighbors. Few Americans today would openly argue that any racial or ethnic group should be barred from firearms ownership. Today, also, the innocent pleasures of target shooting and gun collecting are accepted by most Americans, and a less numerous, but still quite large majority, sees self-defense as a justifiable reason for handgun ownership. A major factor in these attitudes is that by the late 1970's nearly half of all American households contained at least one gun, and nearly a quarter contained a handgun. People are unlikely to support confiscation of their own property or of property they know to be owned and deeply valued by their families, friends, and neighbors.

## SECTION II: Crime, Suicide, and Accidents: Some Cross-national and Cross-cultural Comparisons

### Frequency of Problematic Cross-Societal and Cross-Cultural Comparisons

From the early part of the century, when American handgun restrictions were modeled on European legislation, the debate has continually involved cross-national and cross-cultural comparisons. Thus Congressman Robert Drinan (D-Mass.), the sponsor of several handgun prohibition bills, states that "alone among the Western nations, the United States permits the unrestricted availability of handguns, and alone it suffers an astronomical crime rate." If similar statements did not abound, it would be surprising that anyone — much less a legal scholar like Representative Drinan — could pack so many errors of law fact into one medium-sized sentence. First, the United States does not lead the Western nations in violent crime. Mexico, for instance, has a homicide rate several times greater than ours, though its handgun legislation approximates that urged by Representative Drinan. Second, the United States does not have unrestricted availability of handguns. Federal law bars sale to felons, minors, the mentally unstable, and narcotics addicts, among others. Several states have gone beyond this to impose the same kind of handgun permit requirements that Representative Drinan endorses. In some, these are administered more restrictively than in any other Western nation. In fact, a number of other Western nations have firearms restrictions approximating those of our least restrictive states. The rate of actual firearms ownership in countries like Switzerland or Israel well exceeds that in the United States. Moreover, those countries and several others allow, encourage, or even require widespread



# PISTOLS

## AN ILLUSTRATED HISTORY
## OF THEIR IMPACT

## Jeff Kinard



Santa Barbara, California    Denver, Colorado    Oxford, England

Copyright 2003 by Jeff Kinard

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, except for the inclusion of brief quotations in a review, without prior permission in writing from the publishers.

Library of Congress Cataloging-in-Publication Data
Kinard, Jeff, 1954-
Pistols : an illustrated history of their impact / Jeffrey Kinard.
    p. cm.—(Weapons and warfare series)
Includes bibliographical references and index.
ISBN 1-85109-470-9 (hardback : alk. paper)—ISBN 1-85109-475-X
(e-book)  1.  Pistols—History.  I. Title. II. Series.

TS537.K54 2004
623.4'432'  09—dc22
                    2004020415


07  06  05  04  03  02        10 9 8 7 6 5 4 3 2 1
This book is also available on the World Wide Web as an e-book.
Visit abc-clio.com for details.

ABC-CLIO, Inc.
130 Cremona Drive, P.O. Box 1911
Santa Barbara, California 93116–1911

This book is printed on acid-free paper.
Manufactured in the United States of America

Compendium_Roth
Page 0361

spite its double-action capability, the Model 1877 suffered a number of deficiencies. Although break-open designs had more than proved themselves, Colt persisted in using a loading gate, thus requiring the slow process of individually loading and unloading each cartridge. To make matters worse, shorter-barreled models were not even fitted with ejector rods, further slowing the reloading process. The pistol was also mechanically somewhat delicate and often required repair. Still, the Model 1877 proved an almost instant success. Known as the Lightning when chambered for the caliber .38 Colt cartridge and the Thunderer when for caliber .41 Colt cartridges, the new six-shooter quickly gained a following throughout the American West. Although not the best endorsement for the pistol, the infamous Billy the Kid was armed with a Lightning when killed by Pat Garrett in 1881. It was often said that the Kid preferred the Lightning because its rather small bird's-head grip fit his hand better than larger handguns.

### Colt Model 1878 (Frontier) and Model 1892

Although the U.S. government failed to place orders for the Model 1877, it eventually showed interest in its successor, the Model 1878 Frontier Double Action Revolver, the product of a collaboration by William Mason and Charles B. Richards. Colt produced the Frontier between 1878 and 1905 and, as it had with the Peacemaker, offered it on the civilian market in a number of calibers that were interchangeable with Winchester long arms. The standard Frontier was sold with checkered hard-rubber grips and was available with either a blued or nickel finish and in a variety of barrel lengths. It was, however, only toward the end of the Frontier's production run in 1902 that the government finally authorized a contract for some 4,600 revolvers chambered in caliber .45. The order for the Model 1902 (also known as the Alaskan Model or Philippine Model) was evidently in response to the combat failure of caliber .38 revolvers.

The Models 1878 and 1902 were among Colt's largest-frame handguns. The Model 1902, like the Model 1878, was loaded through a loading gate on the right side and was fitted with an ejector rod mounted under the right side of the barrel. Both were also equipped with lanyard swivels. The government-issue Model 1902 differed from its predecessor in that it was manufactured with a noticeably larger trigger and trigger guard. It was standard with a blue finish, a 6-inch barrel, and walnut rather than rubber grips.

A HISTORY OF THE AMERICAN COLONIES
IN THIRTEEN VOLUMES

GENERAL EDITORS:
MILTON M. KLEIN & JACOB E. COOKE

AUBREY C. LAND

# COLONIAL MARYLAND

A HISTORY

kto press

A U.S. DIVISION OF KRAUS-THOMSON ORGANIZATION LIMITED
MILLWOOD, NEW YORK

Compendium_Roth
Page 0363

REF
975.2,L229c
Land, Aubrey C
    Colonial Maryland, a
history

S. F. PUBLIC LIBRARY
83-41

© Copyright KTO Press 1981

All rights reserved.
No part of this work covered by the
copyright hereon may be reproduced or
used in any form or by any means—graphic,
electronic, or mechanical, including photocopying,
recording, or taping, or information storage
and retrieval systems—without written
permission of the publisher.

First printing

Printed in the United States of America

Library of Congress Cataloging in Publication Data

Land, Aubrey C
    Colonial Maryland, a history.

    (A History of the American colonies)
    Bibliography: p.
    Includes index.
    1. Maryland—History—Colonial period, ca. 1600–1775.
2. Maryland—History—Revolution, 1775–1783.
I.  Title.  II.  Series:  History of the American colonies.
F184.L34        975.2'02        80-21732
ISBN 0-527-18713-5

FOR
ANNE,
ALISON,
AND
ALEXANDRA

instead issued general pardons, insisting only on an oath of fidelity to the Lord Proprietor. Before leaving Virginia he had promised his soldiery money payment for their service to prevent wholesale pillage, the common compensation for troops. Now that he had accomplished peaceful investiture, he found himself without funds and, fearful of mutiny, prepared to satisfy pay claims from his personal assets or, if necessary, even proprietary monies. In the midst of these arrangements Calvert sickened and on 9 June appeared in the last extremity. He had already commissioned Robert Vaughan as captain general and commander, under himself, of Kent Island. On his deathbed he named Thomas Greene, a leading Roman Catholic, his successor as governor, and to administer his estate and personal affairs he nominated his kinswoman, Margaret Brent. The same evening he died after a ten year term as governor of his brother's province.

To this triumvirate—Greene, Vaughan, and Margaret Brent—fell the task of restoring tranquility to an unsettled province. Vaughan, once an indentured servant, had the job of securing Kent Island, now a separate county and something of a frontier march but still claimed by Claiborne. Governor Greene inherited the complexities of administering a province still small in population but dangerously unbalanced in religion, with Protestants outnumbering Catholics by three to one. But Margaret Brent had the most pressing and ticklish task of the three: satisfying the soldiers' demands for pay with something less than adequate funds in her hands.

This remarkable woman proved herself intrepid as well as resourceful. When Governor Greene summoned his first Assembly Margaret Brent marched in to the gathering and "requested to have vote in the house for her selfe and voyce allso for that att the last Court 3d Jan: it was ordered that the said Mrs. Brent was to be looked upon and received as his Lordship's Attorney." When the governor as presiding officer "denyed" her request she protested all proceedings "unless shee may be present and have vote as aforesaid." Frustrated in her political demarche, Margaret Brent moved ahead in her most critical job of quieting the pay claims of the soldiery, whose murmurs threatened to grow into mutiny. She took the necessary assets from the estate of the late Governor Calvert and, when these proved insufficient, turned to the properties of the Lord Proprietor himself to stave off possible mutiny. When Lord Baltimore later objected to sequestration of his

funds the whole Assembly rallied to her and vouched for her justification in view of contemporary tensions.

In vividness and accomplishment Margaret Brent outmatched Governor Greene, whose administration lasted only fourteen months. In August of 1648 the Lord Proprietor superseded him with a Protestant governor, William Stone, a resident of Southampton County, Virginia, who guided the province through nearly a decade of perils that appeared almost as soon as he assumed his post.

—7—

Governor Stone could hardly have been ignorant of recent troubles in Maryland. Ingle had actually compelled Baltimore's duly commissioned chief magistrate to flee from the colony, a bit of news that spread throughout the Chesapeake even in a day of imperfect communication. Neither could Stone have easily previsioned the troubles in store for his administration, though they grew out of one of his earliest decisions.

> In the yeer 1649, many, both of the congregated Church, and others well-affected people in Virginia, being debarred from the free exercise of Religion under the Government of Sir William Berkeley, removed themselves, Families and Estates into the Province of Maryland, being thereunto invited by Captain Stone . . . with promise of Liberty in Religion and Priviledges of English Subjects.

Stone's invitation was consonant with Baltimore's desire to attract immigrants and with his policy of religious toleration in that intolerant age. The people of the congregated church—Puritans to use their common name—had incurred the wrath of Governor William Berkeley, a staunch Anglican, and some three hundred of them removed from Virginia to settle an area they named "Providence," in good Puritan tradition, at the mouth of the Severn River. Their leader, Richard Bennett, had preceded them by a few months when banished by Governor Berkeley and had selected the spot.

Stone had promised the Puritans land, toleration, and full civil rights. On each commitment he made good. His first Assembly passed the famous "Act Concerning Religion," which provided stiff fines for

such expressions of religious opprobrium as "heretick, Scismatick, Idolater, puritan, Independant, Prespitarian, popish priest, Jesuite, Jesuited papist, Lutheran, Calvenist, Anabaptist, Brownist, Antinomian, Barrowist, Roundhead, Sepratist" or any other. The operative clause of the act read, "no person or persons whatsoever within this Province . . . professing to believe in Jesus Christ, shall from henceforth bee any waies troubled, molested or discountenanced for or in respect of his or her religion nor in the free exercise thereof . . . nor any way compelled to the beleife or exercise of any other Religion against his or her consent." The language and intent are strikingly similar to the instructions Cecilius, Lord Baltimore, had given his brother for guidance at the time of first settlement. Equally protective of Catholic and Protestant confessions, the Act Concerning Religion enjoys the status of the earliest legislation in the English-speaking world explicitly granting toleration to all Christians. The Puritans themselves at the moment professed satisfaction with the "freedom and liberty in the exercise of our religion, under his Lordship's government and interest."

Before long their tune changed. Like their Puritan brethren elsewhere the men of Providence showed remarkable talent for discovering faults. They found in the oath of fidelity to Lord Baltimore certain pretensions to royalty, at a time when the king himself was standing trial for his life in England. Worse still they saw in the oath a commitment to support "that government and those officers who were sworn to countenance and uphold anti-Christ . . . the Roman Catholic Religion." Many among them "exceedingly scrupled" to take the oath.

Against this background of growing uneasiness a single untoward accident set off an avalanche of misfortunes for the proprietary establishment. In England the protracted struggle between the king and a Puritan-dominated Parliament ended when Charles I went to the executioner's block in 1649. Parliament immediately issued a decree making it treason to acknowledge "Charles Stuart, son of the late Charles, commonly called the Prince of Wales . . . to be king or chief magistrate of England or Ireland, or of any dominion belonging thereunto." Nevertheless Thomas Greene, acting as deputy governor during a visit of Governor Stone to Virginia, proclaimed Charles II as lawful sovereign. Stone hurried back to reverse his error but he could never expunge the memory of the blunder. Maryland stood condemned of defiance along with Virginia where Governor Berkeley had declared for King Charles II.

Parliamentary retaliation came in the form of a commission "to reduce all plantations within the Bay of Chesapeake" to obedience. The commission included two members well acquainted with Maryland affairs, Richard Bennett and William Claiborne, who lost no time proceeding to St. Mary's to accept the submission of Governor Stone and his acknowledgment of parliamentary authority. Actually Claiborne acted with considerable restraint. Instead of plundering and otherwise punishing men who had deprived him of Kent Island properties and had passed an act of attainder against him, he joined Bennett in placing the province temporarily in the hands of a "council" and a short time later restoring Governor Stone to office "until the pleasure of the State of England be further known." Bennett and Claiborne then returned to duties in Virginia. But the general effect proved to be a confusion of authority for many months in the future. Rumor and uncertainty left administration of the province in a state of near chaos, with Stone nominally the governor but the Puritans maintaining their autonomy on the Severn.

Not until 1654 did the stalemate disappear and then only to dissolve into civil war. In July the Puritans of Providence urged Bennett and Claiborne to return to Maryland on the pretext that Governor Stone had fallen into "rebellion" against the Commonwealth established by Oliver Cromwell at home. Late in the month Bennett and Claiborne in effect set Stone aside and appointed "for the conservation of the peace and public administration of justice" ten Puritans "to be Commissioners for the well ordering, directing, and governing the affairs of Maryland."

The new Puritan Commissioners convened an Assembly at Patuxent, miles away from St. Mary's City but more convenient to settlers at Providence. Without delay the Assembly overturned the proprietary and his policies, substituting for them a genuinely Puritan regime. Among six laws that members voted to repeal were the toleration act and the act outlawing William Claiborne. The forty-five acts put on the books at the end of the session included the usual Puritan blue laws against sabbath breaking, adultery and fornication, swearing, drunkenness, slander and tale-bearing. But more pointedly an "Act of Recognition" officially sanctioned the Puritan commissioners as the government, a new "Act Concerning Religion" restrained Catholics from the exercise of their religion, and legislation under the title "Concerning Rights of Land" excused provincials from taking the oath

of fidelity to Lord Baltimore. In one brief session during October of 1654 the Puritans had effectively wrested control from proprietary authorities and placed it in the hands of a commission headed by William Fuller, a leading Puritan of Providence.

Thus the stage was set for civil war in provincial Maryland, for Lord Baltimore had successfully appealed to the highest authority back home. Oliver Cromwell had dismissed Parliament and under the title Lord Protector had taken the government of Britain and the dominions into his hands. Lord Baltimore put his case before Cromwell and moved the Lord Protector to reprove the Puritans and to command them to desist from "disturbing the Lord Baltimore, or his officers, or people in Maryland." Once Cromwell had decided in his favor, the proprietor bestirred his governor, William Stone, to reassert his authority in Maryland.

The first step toward restoring proprietary authority proved easy. Governor Stone dispatched one John Hammond to Patuxent where the Puritans had deposited the provincial records at the house of Richard Preston, speaker of the Assembly that had seized control the previous October. Hammond recovered the records without serious difficulty and brought them back to St. Mary's. But the next steps toward restoring authority were less clear. Evidently Governor Stone thought his personal appearance with the symbols of authority most likely to impress the Puritan element in Providence. In March of 1655 he assembled upward of a hundred men, embarked them in a dozen small craft, and moved toward the Severn River.

In the prevailing state of tension and distrust a clash became almost inevitable. The detailed accounts of what happened and how contain much conflicting evidence, but the outline of events emerges quite unmistakably. Both sides sent messengers to the other; both sides received the messages with distrust. On Saturday, 24 March 1655, Stone moved his force close to the Severn River. The Puritans opposed him with even larger numbers of troops, assisted from the water by Roger Heamans, master of the armed ship *Golden Lion,* lying near the shore. As soon as Governor Stone led his men in formation toward the Puritan settlement, Heamans fired a volley with the ship's guns, and William Fuller, commander of the Puritan ground force, gave the word—so an eyewitness recounts—"In the name of God fall on; God is our strength." Outnumbered and outmanned, Governor Stone

yielded upon promise of quarter after losing nearly half his men as casualties.

The aftermath of the Battle of the Severn, described by the most objective of the witnesses as a "skirmish," did nothing to ease bad feelings between proprietary partisans and Puritans. Within three days the victors condemned ten prisoners to death and actually executed four of the number. Governor Stone, slightly wounded in the fighting, was held prisoner along with his council for over a month. Even the interposition of Cromwell himself, who ordered the Puritans to desist pending a hearing of both sides, did not end the uncertain outlook for the proprietary regime.

For more than two years final disposition hung in abeyance until late November of 1657 when a "treaty" between Lord Baltimore and Richard Bennett for the Puritans effected a settlement of the "very sad and distracted condition" of Maryland. Baltimore received confirmation of his patent and agreed to a general amnesty. One of the articles of agreement restored the toleration previously provided in the first "Act Concerning Religion" of 1649. To all appearances Maryland returned to the status quo ante bellum. And yet tribulations had not ended.



—8—

It may have seemed to Lord Baltimore in 1658 that he had finally succeeded in his protracted effort to maintain his patent to Maryland and to keep the lid on the boiling cauldron there. Certainly he had seen the end of imprints in the fierce war of polemics published during the time of troubles. The controversy had produced five major pamphlets, beginning in 1653 with *The Lord Baltimore's Case,* a short piece cast in the form of objections and answers, the answers wholly favorable to the Lord Proprietor. After the fashion of polemical warfare of the time the rejoinder came two years later under the verbose title, *Virginia and Maryland, or the Lord Baltimore's Printed Case Uncased and Answered.* The tone and thrust are clearly indicated in the 218 word subtitle, which includes such phrases as "the illegality of his Patent . . . The Injustice and Tyranny practiced in the Government . . . the Papists late Rebellion against the Government of his Highness the Lord Protector . . . assault on the Protestants . . . the oppression of the poor," and so on. Pamphleteers of the day pulled all the stops. Another imprint,

*Babylon's Fall* (1655), by one Leonard Strong, "Agent for the People of Providence in Maryland," gave a dramatic, anti-proprietary account of the Battle of the Severn and had its counterpart in John Langford's *Refutation of Babylon's Fall,* containing a contradictory but more temperate story of the battle. Exchanges came to a close in 1656 with the longest of these writings, *Leah and Rachel, or, The Two Fruitful Sisters Virginia and Maryland,* by John Hammond, who had been a resident in both colonies. Hammond's piece contained vivid descriptions of both provinces, frequently quoted by later historians, and, as a kind of coda, a brief homily enjoining the provinces to live in peace and fruitfulness as the two sisters Leah and Rachel did in biblical days.

And indeed peace did come to Maryland and Virginia. After signing the agreement with Bennett, Lord Baltimore was finally rid of that "pestilent enemie to the welfare of the Province" as he called William Claiborne. It was among his own people and specifically his own subordinate, Governor Josias Fendall, that the Lord Proprietor had his next vexing problem.

A sturdy supporter of his lordship, Fendall became governor, in name at least, during the months between Stone's imprisonment and the "treaty" with Bennett in late 1657. But not until February of 1658 did Fendall shed his purely nominal role and perform the actual duties as appointed first magistrate. In the following two years he took the province a considerable distance away from the worst disorders of the decade. He managed to persuade the Puritans in the Severn area, now erected into a new county named Anne Arundel, to send representatives to an Assembly that he tactfully held in recently established Calvert County, halfway between their seat and St. Mary's City. Now that the turmoil appeared past, the legislature, formerly unicameral, sat as two separate bodies, an upper house consisting of the governor and council and a lower house of elected delegates from each of the four counties: St. Mary's, Kent, Calvert, and Anne Arundel. At last Maryland had a miniature parliament. Fendall showed legislative skill in shepherding several much needed laws through the Assembly, and he pressed forward in administrative organization of the province when he erected two additional counties, Charles to the west and Baltimore in the frontier area at the head of the bay.

Just as Maryland regained a degree of tranquility a novel occurrence brought fresh trouble. The overt act that gave the name Fendall's

Rebellion to the new disturbance came during a meeting of the Assembly in February and March of 1660, a momentous year for both Maryland and the mother country. As the Assembly convened, General Monck, Cromwell's successor in power, was marching toward London, and a revived Parliament at Westminster was restoring its excluded members preliminary to the recall of Charles Stuart as rightful monarch. These decisive events back home could not have been known on the Chesapeake when Fendall and his council met the elected burgesses for a session unique in Maryland history.

From beginning to end the transactions of this Assembly were unprecedented and obscure. The meetings took place not at St. Mary's City in formal chambers but at "Mr. Thomas Gerrard's howse" for two initial days and thereafter at the house of Robert Slye, elected delegate from St. Mary's County. On the tenth day the elected delegates sent a message to the governor and council, namely, the upper house:

> The Assembly of Burgesses judging themselves to be a lawfull Assembly without dependence on any other power in the Province now in being is the highest court of Judicature And if any Objection can be made to the Contrary, Wee desire to heare it.

To this startling manifesto the upper house returned a message posing two main questions. Did the burgesses mean that the lower house was a complete Assembly without governor and council? All present could easily remember the day when the Commons of England had abolished the House of Lords and made themselves alone the Parliament of the realm. Secondly, did the burgesses mean that they were wholly independent of "the Lord Proprietary yea or nay?" Again Parliament had dethroned the Stuarts, as all could remember.

Two days of conferences did little either to bring the two houses into rapport or to clarify the aims of the burgesses. On Wednesday, 14 March, the only formal record, the upper house journal, abruptly ends with the governor and council sitting in a single body with the burgesses, as demanded during the conferences. Maryland had slipped back to the primitive unicameral legislature of earlier times. Governor Fendall accepted these conditions and the further stipulation that the speaker of the house, not the governor, have power to adjourn the

# The 1838 Mormon War in Missouri

### Stephen C. LeSueur



University of Missouri Press
Columbia, 1987

**MAIN**

Copyright ©1987 by
The Curators of the University of Missouri
University of Missouri Press, Columbia, Missouri 65211
Printed and bound in the United States of America
All rights reserved

Library of Congress Cataloging-in-Publication Data

LeSueur, Stephen C.
The 1838 Mormon war in Missouri.

Bibliography: p.
Includes index.
1. Mormons–Missouri–History–19th century.
2. Missouri–History. I. Title.
F466.L47 1987 977.8'03 86-16090
ISBN 0-8262-0626-3 (alk. paper)

∞™ This paper meets the minimum requirements of
the American National Standard for Permanence of Paper
for Printed Library Materials, Z39.48, 1984.

To Arthur Cobery and John Taylor LeSueur
*History Teachers*

F466
L47
1987
MAIN

# 10

## Surrender

Mormon leaders still hoped to negotiate a compromise with the militia. Reed Peck, John Corrill, and W. W. Phelps, named by General Doniphan to return to the militia camp for discussions with the officers, were opponents of the Mormons' recent military activities. Joining them in the discussions were Col. George Hinkle and Arthur Morrison, apparently added by Smith to balance the representation on the Mormon committee. Hinkle was a religious and military leader among the Mormons, while Morrison served as a captain in the militia and as a Caldwell County judge. It is not known why Smith and his counselors did not negotiate directly with the officers; perhaps they feared their lives would be in danger outside of Far West.[1]   Responsibility for settling the conflict peacefully thus fell upon Hinkle and the others.

On Wednesday morning, 31 October, the Mormons requested an interview with the Missouri militia officers. General Lucas replied that he was too busy organizing his troops and suggested that they meet at 2:00 p.m. instead.[2]  The committeemen were able to speak briefly with General Doniphan, who informed them that General Atchison had been relieved of command and that Lucas now directed the troops. Doniphan also informed them that the militia had been called out by order of the governor, but he did not give them the particulars of the extermination order. According to both Corrill and Peck, Doniphan told

---

1. Smith believed that his enemies had been plotting to kill him from the time he arrived in Missouri in early 1838 (*HC* 3:368, Joseph Smith, "A Bill of Damages," 4 June 1839; cf. Swartzell, *Mormonism Exposed*, p. 36). He later hesitated to go to the militia camp (when General Lucas demanded that he surrender as a hostage), partly because he believed it unsafe. Both Peck and Hinkle believed their own lives were in danger outside of Far West (Peck, "Manuscript," p. 32; Hinkle, "Letter to W. W. Phelps, August 14, 1844," published in S. J. Hinkle, "A Biographical Sketch of G. M. Hinkle," *Journal of History* 13 [October 1920]: 449–50).

2. *Document*, p. 73, General Lucas to the Governor, 2 November 1838.

Compendium_Roth
Page 0371