ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-3479
 Fax: (415) 703-1234
 E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** <br><br> Defendants. | Case No. 3:19-cv-01537-BEN-JLB <br><br> **COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH** <br><br> **VOLUME 28 OF 37** <br><br> Courtroom: 5A <br> Judge: Hon. Roger T. Benitez <br><br> Action Filed: August 15, 2019 |

INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 24 n.86 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 20 n.77 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 21 n.78 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 30 n.101 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 30 n.100 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 30 n.100 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 30 n.101 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 29 n.97 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 8 n.29, 25 n.88 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 26 n.89 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 25 n.88 | 0103-0109 |

| | | | |
|---|---|---|---|
| | Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 7 n.28 | 0110-0138 |
| | Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 14 n.51 | 0139-0162 |
| | Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 11 n.37, 14 n.50, 14 n.51 | 0163-0185 |
| | Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 14 n.51 | 0186-0215 |
| | Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 17 n.64 | 0216-0222 |
| | John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | n.80 | 0223-0234 |
| | Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 17 n.64 | 0235-0242 |
| | Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 17 n.64 | 0243-0274 |
| | W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 26 n.89 | 0275-0282 |
| | Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 18 n.65, 19 n.69 | 0283-0329 |

| | | | |
|---|---|---|---|
| 1, 2 | Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 14 n.51, 15 n.52 | 0330-0343 |
| 3, 4, 5, 6 | Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 14 n.51, 15 n.52 | 0344-0358 |
| 7, 8 | Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 19 n.69 | 0359-0362 |
| 9 | Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 25 n.88 | 0363-0368 |
| 10, 11, 12 | Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987) | 25 n.88 | 0369-0375 |
| 13, 14 | Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 13 n.49 | 0376-0401 |
| 15, 16, 17 | Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 5 n.11 | 0402-0476 |
| 18, 19 | Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 13 n.49 | 0477-0504 |
| 20, 21, 22 | David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 29 n.97 | 0505-0553 |
| 23, 24, 25, 26 | Randolph Roth, *American Homicide* 42, 45 61-144 (especially the graphs on 38, 39, and 91), 145-79, 158, 163, 180-198, 199-203, 204-224, 297-299, 299-302, 354-384, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 0554-0663 |

| | | |
|---|---|---|
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 27 n.91 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | n.11 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | n.11 | 0684-0689 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 27 n.92 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 28 n.93, 29 n.96 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 14 n.51 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 4 n.3 | 0772-0794 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 25 n.88 | 0795-0819 |

| Reference | Cite | Pages |
|---|---|---|
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 6 n.18 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 26 n.89 | 0840-1021 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 20 n.77, 21 n.78, 22 n.79 | 1022-1036 |
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216 (2007) | 12 n.43 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173 (2011) | 20 n.76 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 16 n.56 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 30 n.99 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 28 n.95 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 12 n.46 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and | 28 n.95 | 1157-1264 |

| | | |
|---|---|---|
| Regulations (2012) | | |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 31 n.103 | 1266 |
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 33 n.109 | 1268-1269 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 4 n.5 | 1270-1310 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 28 n.94 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 32 n.108 | 1322-1325- |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 32 n.107 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 33 n.109 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 31 n.104 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 33 n.110 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 9 n.32, 12 n.44, 17 n.62, 20 n.74 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 31 n.105 | 1438-1689 |
| The Violence Project's Mass Shooter Database | 34 n.111 | 1690 |

7

| | | |
|---|---|---|
| Guns.com, AR-15s | 28 n.94 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 28 n.94 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 36 n.113 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 19 n.69 | 1748 |

---

[i] The Declaration of Randolph Roth cites 36 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ 14 n.27-28, 15 n.29, 16 n.35-36, 18 n.43, 26 n.63, 29 n.75, 31 n.80, 35 n.87, 36 n.89, 37 n.90, 37 n.91-92, 39 n.93, 40 n.96-98 (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," Vanderbilt Law Review 54 (2001): 1805-1847; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Drew R.

McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, Alfred Nobel: *Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Professor Roth was unable to provide narrowed references to these 36 books he cited in his declaration on account of his prior commitment to attend, and deliver the keynote address at, a conference of the Council on Criminal Justice, in Washington D.C., in advance of the October 21 deadline to file this compendium. Should the Court wish to receive excepted copies of these works, Professor Roth is willing to provide them, but additional time to comply will be required.

them that the militia officers delayed their negotiations with the Mormons because they were still waiting for Boggs's orders.[3] Apparently the orders received by the officers the previous day did not contain specific instructions regarding what action to take against the Mormons. The governor's extermination proclamation was sent only to General Clark, who then forwarded it to the other generals.[4] The Mormon representatives returned to Far West with only a limited amount of information. And while they waited to begin negotiations, the Missouri forces continued to grow, swelling to over twenty-five hundred men.

The situation grew worse for the Mormons throughout the day. The news that General Lucas had taken charge of the militia distressed Mormon leaders, for Lucas had been one of their chief persecutors in Jackson County. The Missourians allowed some of their Mormon prisoners to return to Far West that day. The prisoners carried into town William Carey, who lay speechless and suffering, having been struck over the head by one of his captors. Carey died a day or two later. During the early afternoon Charles Rich and a small company of Mormons parading under a white flag escorted two non-Mormon prisoners out of Far West. During their return they were fired upon by Captain Bogart, who recognized Rich as one of his assailants at the Crooked River battle.[5] Although no one was injured, the Mormons believed this incident portended the kind of treatment they could expect from the Missouri troops. About this time a messenger brought news to Far West confirming the worst Mormon fears. A large company of Missourians had attacked and destroyed the Mormon village of Haun's Mill.

### The Haun's Mill Massacre

Haun's Mill was located on the eastern edge of Caldwell County, bordering Livingston County, about sixteen miles east

---

3. Corrill, *A Brief History*, pp. 40–41; and Peck, "Manuscript," p. 25.
4. See *Document*, pp. 61, 72, 76, the Governor to General Clark, 27 October 1838; General Lucas to the Governor, 2 November 1838; General Clark to the Governor, 30 October 1838; and Thorp, *Early Days in the West*, pp. 88–89.
5. Rich, Statement, p. 3; Josiah Butterfield to Mr. John Elden, 17 June 1839. Typescript, LDS Archives; and many other sources describe this incident.

---

of Far West. Ten to fifteen Mormon families lived at or near the village; another twenty emigrant families had stopped there during the disturbances and were living in their wagons. For two weeks a company of troops from Livingston County, led by Capt. Nehemiah Comstock, had harassed the Saints at Haun's Mill, driving off livestock and ordering the residents to leave their homes. After the 25 October battle at Crooked River, both the Mormons at Haun's Mill and the Livingston troops became fearful of an attack from the other. Consequently, their leaders signed a peace treaty halting the raids on the village. Joseph Smith repeatedly warned the Haun's Mill Saints to move into Far West for safety, but due to a misunderstanding of the Prophet's instructions, they chose to remain at the village, trusting in the Lord and their recently signed treaty to protect them. "None had ever been killed who abode by my counsel," Smith later said. "At Hauns' Mill the brethren went contrary to my counsel; if they had not, their lives would have been spared."[6]

No one knows who ordered the attack on Haun's Mill. The militia companies that participated in the assault belonged to General Parks's brigade, but he did not issue the order.[7] The troops organized under the command of Col. Thomas Jennings, who apparently acted on his own initiative in leading the attack.[8] It is possible that the Missourians received word of Governor Boggs's extermination order and took it upon themselves to carry out the decree, but they never offered this as a reason for the raid.[9] One of the attackers, Charles Ashby, a state legislator from Livingston, said the Missourians attacked because Mormon dissenters fleeing into Livingston warned them

---

6. *HC* 5:137.
7. Parks was with the troops that marched from Richmond to Far West. No evidence from Mormon or non-Mormon sources suggests that he ordered the attack.
8. *History of Caldwell and Livingston Counties*, p. 151; and Carrie P. Johnston and W. H. S. McGlumphy, *History of Clinton and Caldwell Counties, Missouri* (Topeka-Indianapolis: Historical Publishing Company, 1923), p. 240; both assert that Colonel Jennings, as commanding officer of the expedition, held responsibility for the attack on Haun's Mill. Jennings was a resident of Livingston County.
9. One problem with this theory is that there is no evidence indicating when Governor Boggs's order became known to the Missourians. Generals Atchison, Doniphan, and Lucas did not receive their orders from the governor until the afternoon of 30 October, and they did not receive an official

164                *The 1838 Mormon War in Missouri*

that the Saints at Haun's Mill were planning an invasion of their county. Local citizens decided they must act to prevent Mormon soldiers from overrunning Livingston as they had Daviess. "We thought it best to attack them first . . . ," Ashby told fellow legislators. "What we did was in our own defence, and we had the right to do."[10]

The Livingston troops were joined by companies from Daviess and Carroll counties. Many of the Daviess men wanted to even the score for Mormon depredations in their county. Capts. Nehemiah Comstock and William Mann, whose troops had been harassing Mormon emigrants and settlers, also brought their companies into the field. Prior to the attack, the Missourians blackened their faces and attached red cloths to their hats and shirts to distinguish themselves from their Mormon enemies. On the afternoon of Tuesday, 30 October, about 200 to 250 Missouri troops swept down upon Haun's Mill.[11]

The Mormons at Haun's Mill were not planning an attack

---

copy of the extermination order until 31 October. According to Burr Joyce, "The Haun's Mill Massacre," *St. Louis Globe-Democrat*, 6 October 1887, the decision to attack the Mormon village was made on 29 October.

10. *Missouri Republican*, 24 December 1838, speech by Charles Ashby.

11. Numerous descriptions were written by Mormon survivors of the attack. Petitions located in the U.S. Archives: Mosiah Benner, David C. Deming, Catherine Fuller, David Fullmer, Mahlon Johnson, Moses Kelley, Nathan K. Knight, Isaac Leany, Tarlton Lewis, Philandia Merrick, Reuben Naper, Ruth Naper, Alma Smith, Amanda Smith, Hannah York, and Joseph Young. Petitions in the LDS Archives: Jacob Fouts, Nathan K. Knight, Catherine McBride, Jacob Potts, Levi Stilts, and Joseph Young. Detailed accounts in later statements and reminiscences: Olive Ames, statement, *History of the Reorganized Church of Jesus Christ of Latter Day Saints*, 8 vols. (Independence, Mo.: Herald House, 1967), 2:234–37; Margaret Foutz, "Haun's Mill Massacre," LDS Archives; William Leany, "Autobiography of William Leany." Typescript, LDS Archives; David Lewis, "Excerpt From The Journal"; David Lewis, statement, *Times and Seasons* 1 (August 1840): 147–50; Ellis Eamut, statement, Journal History, 30 October 1838; and James McBride, "Autobiography." Photocopy, LDS Archives. The only known description by a non-Mormon participant is found in *Document*, pp. 82–83, D. Ashby's statement of the Battle at the Mill, 23 November 1838. Charles Ashby, also a participant, mentioned the incident in a speech in the state legislature, reported in the *Missouri Republican*, 24 December 1838. The *Missouri Republican*, 12 November 1838, published an account of the battle. The author of the Caldwell County history interviewed participants and local citizens for his account in the *History of Caldwell and Livingston Counties*, pp. 145–59. Joyce, "The Haun's Mill Massacre," also presents details of the incident.

---

*Surrender*                                                        165

upon Livingston settlers. They had set guards around the village, but because of their recent treaty they were not expecting an attack. The Missouri troops were first seen as they emerged from the woods about one hundred yards from the village. The Mormons, who were simply going about their daily tasks, did not react with alarm, but stared cautiously as the Missourians formed into three companies for their attack. Many of the Saints thought the troops were reinforcements from Far West. Captain Comstock fired his rifle into the air, after which ten seconds of silence followed. During the silence—described by Joseph Young as a "solemn pause"—the Mormons began slowly to grasp the meaning of the soldiers' appearance as they anxiously searched for wives, husbands, children, and the nearest shelter. The Missouri troops raised their guns, and with a thunderous roar broke the spell of silence by firing at the Mormon villagers.



From T. B. H. Stenhouse, *The Rocky Mountain Saints* (New York: D. Appleton and Company, 1881).

As soon as the shooting started, David Evans, the commander of the small militia force at Haun's Mill, ran to the center of the village, waved his hat, and yelled for quarter. So did a number of other Mormons, but the Missouri troops ignored

their appeals and continued firing. Mothers frantically gathered their children and fled into the woods. A rifle ball pierced Mary Stedwell's hand as she attempted to jump a log. Her dress caught the log, and she fell over it, protected, as another twenty balls peppered the fallen tree. Fifteen men and three boys ran into a blacksmith shop, where the Mormons had previously determined to fight if they were attacked. They thought the shop would provide a shelter from which to defend the village, and their brief stand doubtless saved the lives of their fleeing neighbors because they attracted most of the Missourians' fire. But the shop also became a deathtrap, for the Missourians' musket balls easily passed through the large, unchinked cracks between the logs of the shop's walls.

Inside the shop the three boys crawled under the bellows for safety while the men frantically loaded, fired, reloaded, and fired again. The Missourians poured round after round into the shop while the Mormons' fire proved entirely ineffective as one-by-one the Mormon men fell. The Missourians slowly advanced toward the shop until they simply shoved their muskets through the logs and fired into the crowd of bodies. David Lewis attempted to fire through an open window, but, as he raised his gun, saw a Missourian preparing to fire. Lewis ducked just as another Mormon, stepping to the window to fire his musket, was shot in the face. Eventually, the crush of the Missourians' guns through the shop walls was so great that the defenders could not return fire, but could only desperately parry and dodge as the Missourians continued firing into the shop.

About half the Mormon men had fallen when Captain Evans ordered the rest to flee, but most of them were cut down as they ran the gauntlet of soldiers. Thomas McBride, a sixty-two-year-old Mormon who was wounded as he ran from the shop, surrendered his gun when the Missourians came upon him. Jacob Rogers, who ran a ferry in Daviess County, took McBride's loaded gun and discharged it into the old man's breast. Rogers then hacked at McBride with a scythe until his body was mangled from head to foot. Isaac Leany, after having the breach of his rifle shot off, crawled through a window and ran for the woods. He received two shots in the chest, one in the hip, and one in each arm before reaching the safety of the brush. His clothes were torn to shreds by a dozen other balls that grazed his body. Inside

the blacksmith shop the Missourians found ten-year-old Sardius Smith hiding under the bellows. Young Smith, whose father lay mortally wounded on the floor, begged for his life, but William Reynolds of Livingston County put a gun to the boy's head and blew off the top. "Nits will make lice, and if he had lived he would have become a Mormon," Reynolds reportedly said in justification of his act.[12] After the firing ceased, some of the Missourians looted the homes and bodies of the Saints—several of the wounded were stripped as they feigned death—and then rode off. The Missourians suffered three wounded in the attack.

Few of the Saints returned to Haun's Mill until after dark. Some did not wander back until the next day. Amanda Smith returned to find her husband, Warren, and her son Sardius lying dead in the blacksmith shop. She discovered her seven-year-old son, Alma, wounded and feigning death under a pile of bodies (where he had lain since being shot), afraid to move or make any noise until he heard his mother calling several hours later. Bodies lay scattered throughout the village: eighteen had been killed or mortally wounded, twelve to fifteen others wounded.[13] All but one were men or boys. The floor of the blacksmith's shop was almost entirely covered by a pool of blood. The women who came back the night of the massacre tended to the wounded, but left most of the dead where they had fallen. "All through the night we heard the groans of the dying," Amanda Smith recalled. "Once in the dark we crawled over the heap of dead in the blacksmith's shop to try to help or soothe the sufferers' wants; once we followed the cries of a wounded brother who hid in some bushes from the murderers and relieved him all we could."[14] Late that night Isaac Leany crawled back to the village, where the Mormon women blessed him and then hid him under the floor of a cabin. A few of the men returned the next day, but, fearing the Missourians would

---

12. *History of Caldwell and Livingston Counties*, p. 149. Several different persons were named by the Mormons as having killed young Smith, but the author of the Caldwell County history, who investigated the incident, insisted that Reynolds was the assailant.

13. One of those killed was a non-Mormon named Walker. Walker was apparently a resident of Haun's Mill or a member of a Mormon emigrant company, because he did not belong to the militia. Blair, "The Haun's Mill Massacre," p. 64.

14. "Some Highlights in the Life of Amanda Barnes Smith," n.p. Typescript, BYU Special Collections.

Compendium_Roth
Page 0374

attack, did not take time to bury the dead. Instead, they helped the women gather the bodies, frozen stiff, and threw them into an old well, some feet first, others head first, after which they filled in the well with dirt and straw. Although some of the women stayed to care for the wounded, most of the men fled back into the woods for safety after they disposed of the dead.

The messenger who brought news of the attack to Far West did not know how many had been killed or wounded; he could only report that the Missourians had overrun Haun's Mill and massacred a great number of its inhabitants.

### Negotiations and Dictated Terms

News of the massacre seemed to change Joseph Smith's perception of the conflict. He not only saw that the Mormons could not win an all-out war with the Missourians, but he also realized that his people would be utterly destroyed if such a war occurred. He now pressed the five representatives to work out a compromise with the militia. Both Reed Peck and John Corrill wrote that Smith instructed them to "beg like a dog for peace."[15] Hinkle reported that Smith told them to obtain a treaty "on any terms short of a battle."[16] According to Corrill, Smith said he would go to prison for twenty years or even die rather than allow his people to be exterminated.[17] When the appointed time arrived, the Mormon representatives, with clear instructions from Smith to seek a compromise, rode out to meet the Missouri officers.

The negotiators met between Far West and the militia camp.[18] Colonel Hinkle spoke for the Mormons, General Lucas for the Missourians. The militia officers, having now received a copy of Governor Boggs's extermination order from General Clark, were ready to negotiate. After a brief discussion, during which Hinkle

---

15. Corrill, *A Brief History*, p. 41; and Peck, "Manuscript," p. 24.
16. Hinkle, "Letter to W. W. Phelps, August 14, 1844," p. 449.
17. *A Brief History*, p. 41.
18. Descriptions of the discussions between the Mormon representatives and the militia officers are found in *Document*, p. 73, General Lucas to the Governor, 2 November 1838; Corrill, *A Brief History*, pp. 41–42; Peck, "Manuscript," pp. 25–27; Hinkle, "Letter to W. W. Phelps, August 14, 1844," pp. 448–53; and Arthur Morrison, "Affidavit, January 9, 1840." Petitions, U.S. Archives. Morrison's statement is brief. W. W. Phelps left no known account of this incident.

---

expressed a desire to settle the conflict without a fight, Lucas read the order to the Mormon representatives. They were shocked by its severity. "I expected we should be exterminated without fail," John Corrill recalled of this moment. "There lay three thousand men, highly excited and full of vengeance, and it was as much as the officers could do to keep them off from us any how; and they now had authority from the executive to exterminate . . . ."[19]

Lucas assured the representatives that he would not be as harsh as the governor had stipulated. The matter could be settled without bloodshed, he said, if the Mormons would accede to four demands:

1st. To give up their leaders to be tried and punished.
2d. To make an appropriation of their property, all who had taken up arms, to the payment of their debts, and indemnify for damage done by them.
3d. That the balance should leave the State, and be protected out by the militia, but to be permitted to remain under protection until further orders were received from the Commander-in-Chief.
4th. To give up the arms of every description to be receipted for.[20]

Lucas made it clear that the Mormons who participated in the attack on Bogart's company at Crooked River as well as those who committed the depredations in Daviess County would be liable to trial and punishment.

Hinkle objected strenuously to the demands to surrender their weapons and leave the state. He contended that if the Mormons had committed any crimes, they should be tried and punished according to the law. "But to give up our arms and leave the State, would be virtually throwing away our most sacred rites as citizens of a republican state," he said.[21] Lucas became enraged by Hinkle's obstinacy and declared that no other terms would do. He allowed no discussion of the matter. Still hesitant to agree, Hinkle requested that the Mormons be given until the morning to decide. Lucas agreed, but demanded that Joseph Smith, Sidney Rigdon, Lyman Wight, Parley P. Pratt, and George W. Robinson be surrendered as hostages to insure the Mormons' faithful compliance with the terms. The general

---

19. *A Brief History*, p. 42.
20. *Document*, p. 73, General Lucas to the Governor, 2 November 1838.
21. Hinkle, "Letter to W. W. Phelps, August 14, 1844," p. 451.

Compendium_Roth
Page 0375



FIGURE 1

*Francis E. Brownell as a private in the 11th New York Regiment or Ellsworth's Zouaves in 1861. Note the bowie knife thrust through his belt. When the regiment marched into Alexandria, Va., Ellsworth was killed by a civilian who was in turn shot by Brownell. For this, Brownell received the Congressional Medal of Honor and the dagger illustrated in figure 86.* NATIONAL ARCHIVES

# AMERICAN KNIVES

*THE FIRST HISTORY AND COLLECTORS' GUIDE*

*by*
Harold L. Peterson

CHARLES SCRIBNER'S SONS · NEW YORK

Compendium_Roth
Page 0376

*TO MY CHILDREN*

Harold Jr., and Kristin Dorothy,
who believe every home
should have an armory

671,P442a
Peterson, Harold
    American knives

© 1958 BY HAROLD L. PETERSON

*All rights reserved. No part of this book may be reproduced in any form without the permission of Charles Scribner's Sons.*

11 13 15 17 19 MH/C 20 18 16 14 12 10
3 5 7 9 11 13 15 17 19  H/P  20 18 16 14 12 10 8 6 4 2

PRINTED IN THE UNITED STATES OF AMERICA
*Library of Congress Catalog Card Number 58-7523*
SBN 684-10462-8 *(cloth)*
SBN 684-14440-9 *(paper)*

S. F. PUBLIC LIBRARY

3 1223 00927 1058

As was noted above, the backwoodsman carried his scalping knife with him when he marched off to fight in the Revolution, while the private in the regular regiments carried a pocketknife. There was also one other knife that saw some use in the Revolution, particularly by officers: the dagger. Both the rifleman's "scalping" knife and the private's jackknife are mentioned in regulations. The dagger was strictly unofficial, carried only at the whim of the individual, and its existence is evidenced only by a few surviving specimens. Judging by these, they were not large weapons. The blades were about six inches long and double-edged. The guards were usually simple cross quillons. The known specimens run the gamut from simple hand forgings to fine silver mounts. None could have been a real fighting weapon, but they could have served as a last defense in an emergency.

These were the principal knives used during the first eight centuries of American history. The next 175 years brought a vastly greater variety and an infinitely larger production. The successors to the pioneer types must be considered separately and at greater length.

# THE BOWIE AND ITS ASSOCIATES



FIGURE 29

*James Bowie*



FIGURE 30

*Rezin P. Bowie*

BEN PALMER COLLECTION

IN THE history of American arms three weapons stand out above all the rest: the Kentucky rifle, the Colt revolver and the bowie knife. Each was a superb weapon, but more than that, each became so much a part of the American scene that it transcended its role in history and became a part of the great American legend.

Of none is this truer than the bowie knife. A century ago European visitors who ventured beyond the Appalachians found it such an integral part of the American way of life that they felt compelled to comment on it at length in accounts of their adventures. Schools were established in most of the larger cities of the old Southwest to teach its use. In many communities no man, whether hunter, gambler, tradesman or political leader felt himself fully clothed without one. It gave its name to the state

25

Compendium_Roth
Page 0378

where it was born, and Arkansas has been known unofficially ever since as the Bowie State. Even today the mere mention of its name immediately conjures up a picture of a wild and rough era characterized by violence and sudden death.

Among collectors and students of knives there is no more magic name than "bowie knife." All agree that a bowie is a most desirable knife to own, but ask them exactly what a bowie is, and agreement ends. Some maintain that it is a sheath knife with a clipped point. Any knife, no matter what its size, can qualify. Others insist that only large fighting knives with clipped points can qualify. A third group feels that the shape of the point is immaterial as long as it is a large knife; and a final group is willing to classify all of the various sheath knives of the period from 1830 to 1890 as bowies.

The problem is not simple. Each faction has some justification for its opinion. Certainly the original knife made for James Bowie was a large heavy knife suitable for both self-defense and general utility in the woods. It was single-edged with a false edge at the back of the point permitting a backstroke in fighting. The record is not absolutely clear, but it seems probable that the point was clipped. Thus it would seem that in its purest form the term should apply to large knives with clipped points. It should also be noted, however, that within a decade after the original knife was made, the name was being applied to all sheath knives large enough for use as weapons. This continued for the next thirty or forty years and covered the period of the knife's greatest popularity. The argument of contemporary usage plus the fact that one cannot be absolutely certain that Bowie's original knife had a clipped point provide good grounds for blanketing in all single-edged sheath knives of the period. The matter of size, too, is ephemeral. Everyone would agree that a blade of nine inches or more would qualify a knife as a weapon. But what about six inches? Modern American military knives are only a fraction longer, and a man can be killed with far less.

In view of this situation and of the conflicting definitions, it would seem best to establish how the term will be used here. The bowie in its purest form will be considered a large knife with a clipped point. Other knives of the period will also be classed as bowies but with qualifications describing either the point, the size or any other feature that causes them to vary from the pure form.

The story of this fabulous knife began in 1830. It was made in that



FIGURE 31

*The classical bowie in its purest form. It is a massive hand-forged weapon with a 13¾-inch blade, 2⅜ inches wide. The mountings are iron, and there is a brass strip on the back of the blade. The only marks are crudely engraved stars on the quillon terminals.*
WILLIAM O. SWEET COLLECTION

year, possibly by an Arkansas blacksmith named James Black, for the legendary James Bowie. So much legend surrounds Bowie, in fact, that it is often impossible at this date to distinguish fact from fancy. The romantic tales of Bowie's prowess had such an effect on the popularity of the knife, even in his own time, that it really makes little difference whether they are true or not. Bowie was probably born in Logan County, Kentucky, April 10, 1796. He grew to be a large man, six feet tall, weighing some 180 pounds. He was an open-hearted son of the frontier, generous to a fault and a true gentleman. But even his brother admitted he had a terrible temper. His career was varied and noteworthy, ranging from lumbering to the slave trade and land speculation. He prospered in all and built a considerable fortune. During the late 1820's he became interested in Texas, married there and was granted provisional citizenship by the Mexican government in 1830. When the movement for Texas independence began, Bowie took an active part and was appointed a colonel in the Texas Army. He commanded the forces at the Alamo and died there with the rest of the garrison, March 8, 1836.

The direct antecedent of the bowie knife was made for Rezin P. Bowie, James's brother. According to Rezin himself, he personally designed a knife 9¼ inches long and 1½ inches wide for use in hunting. It was single-edged and had a straight blade. In 1827 he gave this knife to James, who had recently been shot while unarmed by Major Norris Wright, in the thought that he might need it for self-protection. A short time later Bowie did indeed use the knife in the famous Vidalia Sandbar fight. After being shot in the